## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY and CIGNA
HEALTH AND LIFE INSURANCE
COMPANY,

        Plaintiffs,

    v.

BIOHEALTH LABORATORIES, INC., PB
LABORATORIES, LLC, EPIC REFERENCE
LABS, INC., EPINEX DIAGNOSTICS, INC.,
NJ REFERENCE LABORATORIES, INC., and
ALETHEA LABORATORIES, INC.,

        Defendants.

Case No.  19-1324

**CONNECTICUT GENERAL LIFE
INSURANCE COMPANY AND CIGNA
HEALTH AND LIFE INSURANCE
COMPANY'S COMPLAINT**

Plaintiffs Connecticut General Life Insurance Company and Cigna Health and Life
Insurance Company (collectively, "Cigna") hereby file the following Complaint against
Defendants BioHealth Laboratories, Inc., PB Laboratories, LLC, EPIC Reference Labs, Inc.,
Epinex Diagnostics, Inc., NJ Reference Laboratories, Inc., and Alethea Laboratories, Inc.
(collectively "Defendants" or "the Labs") and allege as follows:

### NATURE OF THE ACTION

1.    This lawsuit arises from the Labs' fraudulent billing scheme designed to enrich
themselves at the expense of Cigna and the health plans that Cigna administers (the "Cigna
Plans"). Over the course of several years, the Labs have employed a scheme through which
they have knowingly submitted fraudulent claims for reimbursement to Cigna.  In reliance on
the false and misleading representations in the Labs' claims, Cigna has reimbursed the Labs
millions of dollars in overpayments. Cigna brings this lawsuit to recover the overpayments
made to the Labs on behalf of itself and the Cigna Plans.

-1-

2.      As part of the Labs' fraudulent billing scheme, the Labs have engaged in a practice known as "fee forgiving." Through this practice, the Labs have been routinely and intentionally waiving their patients' cost-share obligations under the Cigna Plans for the services the Labs provided while at the same time charging Cigna and the Cigna Plans exorbitant rates. In other words, the Labs have been fraudulently submitting claims to Cigna containing grossly inflated charges that bear no relation to the amount the Labs bill their patients or the Cigna Plan members.

3.      This conduct is not only fraudulent, but it subverts Cigna's overall cost-containment arrangement designed to keep the cost of health-care down for its Plan members.

4.      In order to prevent this type of fraud and to minimize the costs to Plan members, Cigna Plans do not cover services for which the provider waives the patient's cost-share obligations as the Labs have repeatedly done.  Had Cigna known that the Labs' charges were fraudulent and did not represent that charges actually billed to their patients and Plan members, Cigna would not have reimbursed the Labs for these claims.

5.      In addition to fraudulently waiving their patients' cost-share obligations, the Labs have also been routinely submitting claims for reimbursement to Cigna for medically unnecessary and exceedingly expensive urine drug tests.

6.      The Cigna Plans only cover urine drug testing services that are medically necessary for the diagnosis and/or treatment of a patient based on that patient's medical history and current conditions. Absent extraordinary circumstances, "confirmatory" quantitative tests are not medically necessary following expected screening test results or negative screening test results.

7.      Nevertheless, in order to increase their revenue, the Labs routinely performed

expensive confirmatory quantitative drug tests following negative screening test results that were not medically necessary for the diagnosis or treatment of any patient. The Labs thereafter submitted claims for reimbursement to Cigna that fraudulently misrepresented that the drug testing services identified on the claims were medically necessary.

8.      Further, the Labs consistently, and fraudulently, billed Cigna separately for component parts of the urine drug testing that are required to be included or "bundled" into a single code.

9.      Cigna reasonably relied on the Labs to submit only claims that contain truthful and accurate representations regarding the drug testing allegedly performed and the medical necessity for those tests. Had Cigna known that the claims the Labs submitted were for medically unnecessary services and/or contained fraudulently unbundled services, Cigna would not have reimbursed the Labs for those charges.

10.      The Labs' fraudulent billing scheme has resulted in substantial revenue for the Labs at the expense of Cigna and Cigna Plans. Over the course of several years, the Labs have unjustly obtained and retained at least $17 million in overpayments from Cigna, which rightfully belong to Cigna and the Cigna Plans.

11.      Cigna brings this action on its own behalf and in its capacity as the claims administrator and fiduciary of the Cigna Plans to recover the millions of dollars it has paid to the Labs in violation of the Cigna Plan terms and to prevent the Labs from continuing their unlawful course of conduct.

## THE PARTIES

12.     Plaintiff Connecticut General Life Insurance Company ("CGLIC") is a corporation organized under the laws of the State of Connecticut, with its principal place of business in Bloomfield, Connecticut.  CGLIC is therefore a citizen of Connecticut.

13.     Plaintiff Cigna Health and Life Insurance Company ("CHLIC") is a corporation organized under the laws of the State of Connecticut, with its principal place of business in Bloomfield, Connecticut.  CHLIC is therefore a citizen of Connecticut.

14.     Defendant BioHealth Laboratories, Inc. ("BioHealth") is a corporation organized under the laws of the State of Florida, with its principal place of business in West Palm Beach, Florida.  BioHealth is therefore a citizen of Florida.

15.     Defendant PB Laboratories, LLC ("PBL") is a limited liability company organized under the laws of Florida with its principal place of business in West Palm Beach, Florida.

16.     Upon information and belief, the sole member of PBL is Medytox Diagnostics, Inc. Medytox Diagnostics ("Medytox") is a corporation organized under the laws of the State of Florida, with its principal place of business in West Palm Beach, Florida.  PBL is therefore a citizen of Florida.

17.     Defendant Epic Reference Labs, Inc. ("ERL") is a corporation organized under the laws of the State of Florida, with its principal place of business in Riviera Beach, Florida. ERL is therefore a citizen of Florida.

18.     Defendant Epinex Diagnostics Laboratories, Inc. ("EDL") is a corporation organized under the laws of the State of Nevada, with its principal place of business in Tustin, California.  EDL is therefore a citizen of Nevada and California.

19.     Defendant NJ Reference Laboratories, Inc. ("NJRL") is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Waldwick, New Jersey.  NJRL is therefore a citizen of New Jersey.

20.     Defendant Althea Laboratories, Inc. ("ALI") is a corporation organized under the laws of the State of Texas, with its principal place of business in La Cruces, New Mexico. ALI is therefore a citizen of Texas and New Mexico.

## JURISDICTION AND VENUE

21.     This Court has personal jurisdiction over the Labs pursuant to Conn. Gen. Stat. § 52-59b(a)(2) because the Labs committed tortious acts within the state.

22.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Cigna's claims arise under the Constitution, laws, or treaties of the United States.  Specifically, Cigna asserts claims in this case that arise under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

This Court has jurisdiction over Cigna's remaining claims pursuant to 28 U.S.C. § 1367 because the state and common law claims alleged herein are so related to the federal claims that they form part of the same case or controversy.

23.     In addition, this Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between Cigna and the Labs, and the amount in controversy substantially exceeds $75,000.  Cigna has suffered or will suffer substantially in excess of $75,000 in damages as a result of the Labs' actions described herein.

24.     Venue is proper in the District of Connecticut because a substantial part of the events giving rise to the claims in this action occurred in this District.  28 U.S.C. § 1391(b)(2).

25.     Venue is proper in the District of Connecticut because the Cigna Plans at issue are administered in this District.  29 U.S.C. § 1132(e)(2).

## FACTUAL BACKGROUND

### *Managed Care and the Cigna Plans*

26.     Cigna is a managed care company that administers employee health and welfare benefit plans. Typically, the Cigna Plans are funded by employers using employee contributions. Cigna provides administrative services for these Plans, including claims administration, in a fiduciary capacity.

27.     Certain Cigna entities also offer fully-insured plans, which are funded by the Cigna entity.

28.     Regardless of the type of plan funding, Cigna serves as a claims administrator for each plan and exercises discretionary authority and fiduciary responsibility over the administration of the plan.

29.     One of Cigna's fiduciary responsibilities is to control the cost of health care for its members. Cigna does so in part by entering into agreements with health-care providers and facilities that establish fixed rates for the health-care services provided. In exchange for accepting fixed rates, these "in-network" providers gain access to Cigna's plan members as a source of patients. As part of the agreement, in-network providers agree not to bill Cigna Plan members for the difference between the agreed-upon rates and the provider's ordinary billed charges.

30.     Moreover, Cigna Plans generally require members to pay less in "cost-share" obligations (for example, co-payments, co-insurance, and deductibles) when utilizing in-network providers than when utilizing out-of-network providers.  This allows Cigna Plan

members to obtain medical services from in-network providers with minimal financial risk or out-of-pocket expense, as compared with medical services from out-of-network providers.

31.    "Out-of-network" providers, like the Labs, on the other hand, have not entered into a provider agreement with Cigna.  Cigna has not agreed to pay providers, like the Labs, any predetermined amounts for the services provided to Cigna Plan members.  Out-of-network providers charge and bill Cigna and the Cigna Plan members at rates that the providers set independently.

32.    The majority of Cigna Plans do not foreclose its members from receiving care from out-of-network providers.  However, to sensitize Plan members to the increased cost of care associated with out-of-network providers, Cigna Plan members are required to pay a higher percentage of the charges that out-of-network providers bill for their services.

33.    To that end, Cigna's Plans generally require members to pay a higher cost-share obligation, such as co-payments, co-insurance, and deductibles, for services provided by out-of-network providers.  The Plans also provide that the maximum reimbursable charge that the Plans will pay for charges submitted for payment to Cigna for the services billed will be based on either a percentage of the usual and customary amount charged for such services by out-of-network providers in the relevant geographic area, or a multiple of the applicable Medicare rate for such services.

34.    The Plans further require that out-of-network providers bill the Plan members the balance between what the providers charge Cigna and the amount Cigna reimburses, a practice known as "balance billing."

35.    The amounts that out-of-network providers charge for their services are generally higher than the contractual rates agreed to between Cigna and in-network providers.

As a result, a Plan member's financial risk and out-of-pocket expense for obtaining medical services from out-of-network providers is generally greater than the expense associated with comparable in-network care.

36.     These cost-sharing mechanisms are not only critical to Cigna-administered or insured plans, they also underlie the managed health-care system.  If patients are required to pay for even a small portion of their care out of their own pocket, they will make more informed choices regarding medical care and choose care that is medically necessary, and not simply "free of charge."  Indeed, if patients did not share in these costs, they would have no incentive to use lower cost in-network providers.  And, without cost-sharing requirements, out-of-network providers (like the Labs) would have no incentive not to charge the Cigna Plans unnecessary, wasteful, and exorbitant rates.

37.     Cigna's network arrangement not only benefits its in-network providers, but it also benefits employers and plan members by keeping the overall cost of health-care down while increasing the quality of medical care.

### *The Practice of Fee-Forgiving*

38.     "Fee forgiving" occurs when an out-of-network provider does not attempt to collect (or "forgives" the member from having to pay) the required deductible or coinsurance from the member, and/or when the provider fails to balance bill the member for any portion of the billed charges that a health-benefit plan does not reimburse.

39.     The practice of fee forgiving destroys incentives to seek in-network providers and, ultimately, drives up medical costs for plans, which the plans must then pass on to members in the form of higher premiums and/or reduced benefits.

40.     For this reason, numerous courts have held fee forgiving to be an illegal practice.  Indeed, some jurisdictions, including Colorado and Florida have enacted statutes criminalizing the practice of fee forgiving.  *See* Colo. Rev. Stat. Ann. §18-13-119 (West 2011); Fla. Stat. § 817.234(7).

41.     Courts, legislatures, and other governmental bodies have recognized that this practice victimizes health-care benefit plans and the clients who sponsor them, members of the plans, and managed care companies like Cigna, by exponentially increasing health-care costs for employers and employees.

42.      To combat providers from engaging in fee forgiving, Cigna Plans include language that excludes coverage when a health-care provider does not obligate members to pay their required portion of the full amount of charges submitted to Cigna (*i.e.*, the patient's cost-share obligation).

43.     Accordingly, for Cigna Plans, if an out-of-network provider does not attempt to collect the required deductible or co-insurance from the member or fails to hold the member responsible for the difference between the insurance allowable and the provider's billed charge, the provider is not entitled to reimbursement by the Cigna Plan.

44.     For example, if one of the Labs submits "charges" of $10,000 to Cigna but does not obligate the patient to pay the cost-share amounts specified by the Plan, the Cigna Plan excludes coverage for that phantom $10,000 "charge."

### *Laboratory Urine Drug Testing Services*

45.     Modern health care utilizes various types of laboratory testing in connection with a medical provider's treatment of a patient.

46.     Under the Clinical Laboratory Improvement Amendments ("CLIA"), as set

forth in 42 C.F.R. § 493, the Centers for Medicare & Medicaid Services ("CMS") regulate all laboratory testing performed on human specimens when the results are to be used for diagnostic and/or treatment decisions.

47.     In order for a health-care provider to perform tests on a human specimen, a provider must satisfy different criteria under CLIA, depending on the type and complexity of the testing performed. For example, physicians may obtain CLIA waivers to perform simple testing in their offices rather than in a laboratory. Complex testing, however, is required to be performed by a CLIA-certified provider (generally, a laboratory).

48.     Urine drug testing is one of the most common types of ancillary testing. Medical providers often utilize these tests to aid in the detection of the patient's recent drug use.

49.     Urine drug testing is typically done in two stages: "screening" or "qualitative" testing and "confirmatory" or "quantitative" testing.

50.     The screening/qualitative tests are performed first. The simplest type of screening test is a point of care ("POC") test.  These tests are performed in a physician's office under a CLIA waiver and provide immediate results.

51.     POC testing is performed using "immunoassay" methodologies and provide qualitative results only.  The testing typically involves collecting a patient's urine in a cup that has a panel of embedded strips. The embedded strips change color to reflect whether a particular class of drugs is present in the patient's urine. Because of its simplicity, POC testing is comparatively inexpensive.

52.     Qualitative drug testing may also be performed in a CLIA-licensed laboratory using machines that analyze the chemistry of a specimen. This type of testing provides similar qualitative results but with a higher degree of reliability. Thus, machine-analyzed qualitative

testing is significantly more expensive than POC testing.

53.     Following the results of a qualitative drug test, a medical provider reviews the results along with other relevant clinical information, including the patient's medical history and current clinical indications, and determines whether he or she has sufficient information to render the necessary diagnosis or medical treatment for the patient.

54.     Sometimes, if the results of the qualitative testing are insufficient, "confirmatory" or "quantitative" testing is required. This typically occurs when the patient tests positive for an unexpected drug.

55.     Confirmatory testing is performed by CLIA-certified laboratories using specialized machines that analyze the urine using various methods, including mass spectrometry and either gas or liquid chromatography.

56.     This type of testing, unlike qualitative testing, provides detailed results, including the specific drugs detected from within a larger class of drugs, as well as the quantitative concentrations of those drugs or their metabolites.

57.     For example, whereas a qualitative test may reflect that the patient has tested positive for opioids, a confirmatory test will usually identify that particular opioid (*e.g.*, codeine) and its concentration (*e.g.*, 88.9 ng/mL).

58.     Because the equipment required to perform confirmatory testing is highly sophisticated, most hospital laboratories are not equipped to perform confirmatory testing. Instead, health-care providers and hospitals often refer confirmatory drug testing to commercial laboratories, such as the Labs.

59.     Because of its complexity and the use of sophisticated equipment, quantitative

confirmatory testing is more expensive than qualitative testing.

60.     Cigna considers confirmatory testing medically necessary when the following criteria are met: (1) the individual's clinical condition, history, examination, and/or prior testing results establish a need for the testing; and (2) the results of the test will directly impact clinical decision-making and the clinical outcome for the individual.

61.     Confirmatory testing is not medically necessary unless the screening or qualitative test indicates that confirmatory testing is required. Usually, this is because the screening results are positive for an unexpected drug.

62.     Confirmatory testing is rarely ever medically necessary when the screening or qualitative testing is entirely negative.

63.     Only under extremely unusual circumstances would it be appropriate to order quantitative confirmatory testing following negative qualitative results. This might occur if, for example, a physician prescribes one of the drugs covered by the qualitative screening test and the test does not detect it.

64.     Otherwise, it is generally not medically necessary to prove a negative result.

### The Labs

65.     The Labs purport to provide laboratory drug testing services to patients referred to it by various health-care providers.

66.     At all times, each of the individual Labs has been out-of-network with Cigna.

67.     All five of the individual Labs are wholly owned and operated by Medytox.

68.     Medytox is wholly owned and operated by Rennova Health, Inc.

69.     Upon information and belief, during the time period relevant to this Complaint, all five of the individual Labs used the same third-party billing company to prepare and submit

claims for reimbursement to Cigna.

70.     Upon information and belief, during the time period relevant to this Complaint, all five of the individual Labs employed the same policies, procedures, and/or practices with respect to urine drug testing; medical billing and coding; and the collection of cost-share obligations from patients and Cigna Plan members.

71.     During the time period relevant to this Complaint, each of the five individual Labs has provided its drug testing services to members of the Cigna Plans.

### Cigna's SIU Investigation Into the Labs' Billing Practices

72.     During the time period relevant to this Complaint, Cigna's anti-fraud unit, the Special Investigation Unit ("SIU"), received information that some or all of the Labs were engaging in potentially fraudulent conduct.

73.     In order to obtain further information about these allegations, SIU obtained a set of medical records from patients and Cigna members that received services from PBL. A medical director at Cigna reviewed these records and determined that PBL was engaged in various forms of fraudulent billing, including billing for medically unnecessary services and fraudulently unbundling medical billing codes in connection with PBL's confirmatory quantitative testing services.

74.     As a result of these findings, and in order to prevent PBL from further defrauding the Cigna Plans and Cigna, SIU placed a "flag" on PBL claims for reimbursement and denied all claims received from PBL for confirmatory quantitative testing.

75.     Thereafter, Cigna's SIU continued its investigation into PBL's fraudulent conduct in connection with its policies and practices with regard to billing its patients and also opened an investigation into BioHealth for similar conduct.

76.     In order to obtain further information, SIU sent approximately 125 verification of service letters to patients and Cigna Plan members asking them questions about the services they purportedly received from BioHealth and PBL.  Included were the following questions:

- Did you ever receive a bill from this out of network health care professional and/or facility?  If YES, how much was the bill you received?

- Did you ever pay this out of network health care professional and/or facility any money?  If YES, how much did you pay?

77.     Almost all of the patients and Cigna Plan members who responded to the verification of service letters responded that they never received a bill from BioHealth and PBL and never paid those laboratories any money.

78.     In addition, SIU conducted phone interviews of several patients about the services that were purportedly rendered at BioHealth and PBL.  Each of the patients interviewed by SIU stated that they never made any payment to those laboratories.

79.     As part of its investigation, SIU also obtained a sample of patient ledgers from PBL.  Those patient ledgers demonstrated that during the time period relevant to this Complaint, PBL routinely wrote off patient cost-share obligations, or simply did not bill patients or Cigna Plan members for their applicable cost-share obligations.

80.     As a result of these findings, and in order to prevent BioHealth and PBL from further defrauding Cigna and the Cigna Plans, SIU placed a "flag" on all claims from BioHealth and PBL and denied all claims for reimbursement from them based on fee forgiveness.

81.     Based upon information and belief and given that each of the Labs were affiliated with one another and owned and operated by the same entities, Medytox and Rennova

Health, each of the Labs followed the same testing, billing, and collection practices employed by BioHealth and PBL.

### The Labs' Fraudulent Fee-Forgiving Scheme

82.     To combat providers from engaging in fee forgiving, described above, Cigna Plans include language that excludes coverage when a health-care provider does not obligate members to pay their required portion of the full amount of charges submitted to Cigna (*i.e.*, the patient's "cost-share" obligation).

83.     Accordingly, for Cigna Plans, if an out-of-network provider does not attempt to collect the required deductible or co-insurance from the Plan member or fails to hold the Plan member responsible for the difference between the insurance allowable and the provider's billed charge, the provider is not entitled to reimbursement by the Cigna Plan.

84.     As part of the Labs' fraudulent billing scheme, the Labs systematically engaged in fee forgiving by waiving patients' cost-share obligations and by failing to bill the Cigna Plan members for any portion of billed charges that Cigna Plans did not reimburse.

85.     By not attempting to collect their patients' cost-share obligations and by not attempting to balance bill Cigna Plan members for any portion of billed charges that Cigna Plans did not reimburse, the Labs were not entitled to any reimbursement from Cigna under the applicable Plans.

86.     Nevertheless, the Labs submitted claims to Cigna for reimbursement that fraudulent misrepresented the amount the Labs intended or expected to collect from their patients.

87.     Further, the Labs repeatedly and intentionally submitted excessively high "charges" to Cigna on their claims for reimbursement, even though the Labs had no intention

of ever charging their patients or the Cigna Plan members for their cost-share obligations or balance billing their patients or the Cigna Plan members the amounts that were not reimbursed by the Cigna Plans.

88.     In this regard, the Labs engaged in a "dual-pricing" scheme, by fraudulent billing Cigna excessive "charges" for services that did not reflect the amount that the Labs actually charged their patients or the Cigna Plan members or that the Labs actually incurred for services rendered.

89.     Cigna and the Cigna Plans relied on these false representations and paid the Labs for services that Cigna was not obligated to pay under the applicable Plans.

***The Labs' Scheme to Fraudulently Bill Cigna For Medically Unnecessary Drug Testing***

90.     Cigna's SIU investigation and medical records review also revealed that the Labs were routinely submitting claims for reimbursement to Cigna for confirmatory drug tests that were not medically necessary and therefore not covered under the Cigna Plans.

91.     Federal regulations designate the American Medical Association's Current Procedural Terminology ("CPT") and the Centers for Medicare & Medicaid Services Common Procedure Coding System ("HCPCS") as the standard codes to be used for health-care services. 45 C.F.R. § 162.1002(a)(5), (b)(1).

92.     As part of its claims-adjudication process, Cigna relies on the CPT codes set forth in claims to Cigna for reimbursement to accurately identify the nature and scope of the health-care services provided. Based on the representations in the claims for reimbursement, Cigna determines whether the particular CPT code is covered under the applicable health benefit plan.

93.     Cigna's review of claims for reimbursement and patient medical records

revealed that the Labs were consistently and fraudulently billing Cigna using CPT codes for services that were not rendered and which were medically unnecessary.

94.     Specifically, the Labs routinely submitted claims for reimbursement for repeated comprehensive panels of confirmatory drug testing that resulted in entirely negative results and which followed qualitative drug tests with entirely negative results.

95.     As explained above, the comprehensive panels of confirmatory drug testing that the Labs purported to conduct are medically necessary only when the tests follow a positive qualitative drug testing, absent extraordinary or unusual circumstances, which, based upon information and belief, were not present with respect to the drug tests relevant to this Complaint.

96.     The patient medical records reflected, however, that the Labs routinely billed Cigna for comprehensive panels of confirmatory drug testing following qualitative drug tests with entirely negative results.

97.     Under these circumstances, the Labs' claims for reimbursement to Cigna contained charges for services that were not medically necessary.

98.     The Labs knew that these claims for reimbursement were not medically necessary and billed those charges to Cigna anyway, for the purpose of fraudulently increasing their revenue.

99.     Moreover, at the time the services were rendered, CPT code 80102 represented that confirmatory drug testing was being conducted following a positive qualitative result.

100.     Yet, the Labs routinely billed Cigna using CPT code 80102 where there had been no positive qualitative result.

101.     By way of example, patient J.T. received drug testing services from BioHealth

between February 10, 2014, and September 8, 2014.

102.    During this five-month period, BioHealth drug tested patient J.T.'s urine samples on 54 dates and submitted claims for 1,021 individual drug testing services for reimbursement to Cigna.  That is an average of almost 19 individual drug testing services submitted by BioHealth for reimbursement for each date of service.

103.    In total, for this one patient, BioHealth charged Cigna $319,212.60 in drug testing services over this five-month period, of which Cigna reimbursed BioHealth $163,602.30.

104.    During this time period, BioHealth charged Cigna 52 times for services associated with the CPT code 80102.

105.    As patient J.T.'s medical records reveal, however, his qualitative or screening test results were consistently negative in all categories.

106.    Not surprisingly then, all of patient J.T.'s comprehensive panels of confirmatory drug testing were also consistently negative.

107.    Accordingly, each time that BioHealth billed Cigna for services associated with CPT code 80102 for drug testing performed on patient J.T.'s urine, its claim to Cigna misrepresented the service that was actually performed and fraudulently billed Cigna for a service that was not medically necessary.

### The Labs' Fraudulent Unbundling Scheme

108.    The Labs also engaged in a fraudulent scheme to bill Cigna for "unbundled" claims.

109.    Many CPT codes describe services which are part of or included in services described by other, more inclusive CPT codes.  "Unbundling" occurs when a health-care

provider separately bills for each of the individual services that are included in a comprehensive code to increase reimbursement from third-party payors. CMS considers unbundling to be a form of health-care fraud and abuse.

110. Cigna's review of the patient medical records from the Labs revealed that the Labs were billing Cigna for unbundled services associated with their confirmatory drug testing.

111. For example, at the time of testing, the CPT code used for urinalysis by dip stick or tablet reagent was 81003. The urinalysis conducted pursuant to this CPT code includes testing for bilirubin, glucose, hemoglobin, ketone, leukocytes, nitrite, pH, protein, specific gravity, and urobilinogen.

112. Validity testing for specific gravity and pH to confirm that a urine specimen is not adulterated has its own separate CPT code of 83986.

113. But because the 81003 urinalysis includes validity testing, CPT code 83986 is a component of 81003 and cannot be billed separately. In other words, the charges associated with CPT 83986 are already built into the charge associate with CPT code 81003.

114. The Labs, despite knowing that they were not entitled to submit unbundled claims for reimbursement, routinely billed Cigna for urinalysis and also its component parts, including validity testing for specific gravity and pH.

115. The Labs did so for the purpose of fraudulently increasing their revenue.

116. In reliance on the CPT codes that the Labs' submitted, Cigna paid the Labs not only for the urinalysis but also for the separately billed validity testing.

### The Labs' Lawsuits Against Cigna in Florida

117. On August 17, 2015, after SIU had investigated and uncovered BioHealth's and PBL's fraudulent conduct and placed a "flag" and denied all claims for reimbursement from

them, BioHealth and PBL filed a complaint against Cigna in the United States District Court for the Southern District of Florida, Case No. 1:15-cv-23075-KMM (the "First Florida Action"). In the First Florida Action, BioHealth and PBL alleged that Cigna had improperly denied, delayed to process, or failed to process claims. BioHealth and PBL sought to recover these claims on behalf of Cigna Plan members via "assignments" that were allegedly obtained from the members. BioHealth and PBL asserted causes of action under ERISA and Florida law.

118. On February 1, 2016, the District Court dismissed the First Florida Action without prejudice for failure to state a claim under Fed. R. Civ. P. 12(b)(6). As to the ERISA counts, the Court held that BioHealth and PBL had failed to adequately plead standing and failed to demonstrate that they had exhausted their administrative remedies. As to the state law counts, the Court held that BioHealth and PBL had failed to adequately allege the existence of any non-ERISA plans that would be governed by state law rather than by ERISA.

119. On March 2, 2016, BioHealth and PBL filed a notice of appeal of the District Court's dismissal order.

120. On March 4, 2016, while BioHealth and PBL's appeal of the First Florida Action was pending, BioHealth and PBL filed another complaint in the United States District Court for the Southern District of Florida, Case No. 1:16-cv-20807-JLK (the "Second Florida Action"). The Second Florida Action was nearly identical to the First Florida Action, with the primary difference being that the Second Florida Action asserted causes of action only under ERISA.

121. In a transparent attempt to avoid having the Second Florida Action assigned to the same District Court judge who had dismissed the First Florida Action, BioHealth and PBL

did not file—as they should have—a Notice of Related or Similar Action pursuant to local rules in the Southern District of Florida when it filed the Second Florida Action. Instead, Cigna filed that notice, and the Second Florida Action was ultimately transferred to the judge who had presided over the First Florida Action, Chief Judge K. Michael Moore.

122. On June 23, 2016, the District Court dismissed the Second Florida Action for lack of subject-matter jurisdiction. The Court held that the issues raised in the Second Florida Action were virtually the "mirror image" to those raised in the First Florida Action, which was pending appeal. Because the United States Court of Appeals for the Eleventh Circuit had jurisdiction over the issues on appeal, the District Court concluded that it lacked subject-matter jurisdiction over the Second Florida Action.

123. On September 21, 2017, the Eleventh Circuit entered its mandate, vacating the part of the District Court's decision which dismissed BioHealth and PBL's claims for lack of standing, but affirming the remainder of the decision, including that part of the decision which dismissed the claims for failure to exhaust administrative remedies.

124. From on or about August 17, 2015, to on or about September 21, 2017, BioHealth and PBL's lawsuits against Cigna were pending.

## COUNT I: FRAUD

125. The preceding paragraphs are incorporated by reference as if set forth fully herein.

126. The Labs have made numerous false and misleading representations, directly and indirectly, to Cigna, including misrepresenting the services and treatment rendered to patients; misrepresenting that claims being submitted were for medically necessary covered services when, in fact, they were not; knowingly submitting fraudulent and excessively high

"charges" to Cigna that did not reflect the amount the Labs actually charged their patients or actually incurred for services rendered; and fraudulently unbundling component services that are required to be included in the comprehensive code simultaneously being billed.

127.   The Labs knew that their representations with regards to their services were untrue.  The Labs knew the services it represented on their claim forms were not medically necessary and/or were not the services rendered and knew the charges they submitted were false because the Labs knew they were going to waive, discount, or otherwise fail to collect the member's responsibility for the allowed charge.

128.   Such false and misleading representations were material with respect to Cigna's claims handling, and the decisions to pay the Labs' claims (including the amounts paid) and refrain from engaging in additional investigation and/or legal action sooner.

129.   Such false and misleading representations were made by the Labs knowingly and intentionally with the intent to mislead and defraud Cigna and the Cigna Plans.

130.   Cigna and the Cigna Plans detrimentally relied upon such false and misleading representations by, among other things, overpaying the Labs at least $17 million and refraining from engaging in additional investigation and/or legal action sooner.

131.   Cigna and the Cigna Plans have been damaged by the Labs' false representation in that they have paid money that was not owed and have incurred significant expenses and lost productivity as a result of the various investigations and claim processing mandated by such false representations.

## COUNT II: NEGLIGENT MISREPRESENTATION

132.   The preceding paragraphs are incorporated by reference as if set forth fully herein.

133.    In the alternative, the false and misleading representations made by the Labs, directly and indirectly, to Cigna, including but not limited to the misrepresentations described in Paragraph 126 above, were made negligently.

134.    The Labs knew or should have known that their representations were untrue.

135.    Cigna and the Cigna Plans reasonably relied upon the Labs' misrepresentations.

136.    Cigna and the Cigna Plans detrimentally relied upon such false and misleading representations by, among other things, overpaying the Labs at least $17 million and refraining from engaging in additional investigation and/or legal action sooner.

137.    Cigna and the Cigna Plans have been damaged by the Labs' false and misleading representations in that they have paid money that was not owed and have incurred significant expenses and lost productivity as a result of the various investigations and claim processing mandated by such false representations.

## COUNT III: UNJUST ENRICHMENT

138.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

139.    The Labs submitted, and caused to be submitted, claims for reimbursement to Cigna for services provided to Cigna Plan members that contained false and misleading representations, that included but are not limited to the misrepresentations described in Paragraph 126 above.

140.    The Cigna Plans include a provision that excludes coverage when a healthcare provider does not obligate members to pay their required portion of the full amount of charges submitted to Cigna.  The claims that the Labs submitted and caused to be submitted are not covered under the plans because the claims are based on false, misleading, and fraudulent

charges submitted to Cigna.  Among other things, the Labs' claims are charges are improper because the Cigna Plan member was excused from paying her/her required portion of the full amount of charges submitted to Cigna.

141.    Cigna and the Cigna Plans detrimentally relied upon the Labs' false and misleading claims for reimbursement.  The Labs' false and misleading representations caused Cigna and the Cigna Plans to pay, and allowed the Labs to receive, at least $17 million that the Labs were not entitled to receive under the Cigna Plans.

142.    The Labs have not returned any portion of the money that Cigna and the Cigna Plans paid on claims submitted for these Cigna Plan members.  The Labs would be unjustly enriched if they were allowed to retain these payments to which they are not entitled.

## COUNT IV: CONVERSION

143.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

144.    The Labs submitted, and caused to be submitted, claims for reimbursement to Cigna for services provided to Cigna Plan members that contained false and misleading representations, that included but are not limited to the misrepresentations described in Paragraph 126 above.

145.    The Labs intended to and did obtain funds from Cigna and the Cigna Plans based on these false and misleading representations.

146.    The Labs' conduct in making false and misleading representations on their claims for reimbursement to Cigna in order to obtain funds from Cigna and the Cigna Plans was unauthorized.

147.     The Labs exercised and continue to exercise ownership over those funds which rightfully belong to Cigna and the Cigna Plans.

148.     The Labs exercised and continue to exercise ownership over those funds to the exclusion of Cigna and the Cigna Plans, depriving Cigna and the Cigna Plans of their property.

149.     Cigna and the Cigna Plans have been harmed by the Labs' conversion of their funds.

## COUNT V: CIVIL STAUTORY THEFT (CONN. GEN. STAT. § 52-564)

150.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

151.     The Labs submitted, and caused to be submitted, claims for reimbursement to Cigna for services provided to Cigna Plan members that contained false and misleading representations, that included but are not limited to the misrepresentations described in Paragraph 126 above.

152.     The Labs intended to and did obtain funds from Cigna and the Cigna Plans based on these false and misleading representations.

153.     The funds Cigna paid to the Labs as a result of the Labs' fraudulent misrepresentations are funds that rightfully belong to Cigna and the Plans.

154.     The Labs obtained those funds with the intent to deprive Cigna and the Cigna Plans of them.

155.     As a result of the Labs' conduct, Cigna is entitled to treble damages pursuant to Conn. Gen. Stat. § 52-564.

## COUNT VI: ERISA (29 U.S.C. § 1132(a)(3))

156.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

157.    Under ERISA, a civil action may be brought by a fiduciary to obtain appropriate equitable relief to redress violations of Title I of ERISA or enforce Title I or ERISA.

158.    Title I of ERISA provides that plan assets must be held in trust, and held for the exclusive purpose of providing benefits to participants.

159.    Cigna is a fiduciary of each of the plans at issue in this case in its capacity as a claims administrator, as it exercises discretionary authority over plan assets and plan administration.

160.    The Cigna Plans at issue here authorize Cigna to recover any overpayments made by the plans on their behalf.

161.    The Labs submitted, and caused to be submitted, claims for reimbursement to Cigna for services provided to Cigna Plan members that contained false and misleading representations, that included but are not limited to the misrepresentations described in Paragraph 126 above.

162.    As a result of those misrepresentations, which Cigna and the Cigna Plans detrimentally relied upon, Cigna and the Cigna Plans overpaid the Labs at least $17 million in reimbursements.

163.    Upon information and belief, these overpayments were deposited into specified bank accounts that were and are under the control of the Labs.

164.    Upon information and belief, some or all of these overpayments remain in these accounts.  To the extent that some portion of the overpayments have been removed from these

accounts, those sums were transferred to, and remain in, other bank accounts within the possession, custody, and control of the Labs, or they were exchanged for other property that is also in the possession, custody, or control of the Labs.

165.    The Labs are not entitled to the plan assets they have received, and their use of such plan assets for their own benefit is a violation of Title I of ERISA and is remediable under 29 U.S.C. § 1132(a)(3).

166.    Further, the Labs are not entitled to the plan assets they have received under the plan terms, which may require retroactive termination of coverage, as a result of their fraud and intentional misrepresentations, and the plan terms are enforceable under 29 U.S.C. § 1132(a)(3).

167.    Cigna is entitled to an injunction enforcing the plan terms, ERISA's trust and exclusive purpose provisions, restitution, the imposition of a constructive trust and recovery for unjust enrichment.

## <u>COUNT VII: DECLARATORY RELIEF</u>

168.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

169.    Under the Declaratory Judgment Act, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

170.    The Labs submitted, and caused to be submitted, claims for reimbursement to Cigna for services allegedly provided to Cigna Plan members that are false and misleading, as described in Paragraph 126 above.

171.    The Cigna Plans include a provision that excludes coverage when a healthcare provider does not obligate members to pay their required portion of the full amount of charges submitted to Cigna.  The claims that the Labs submitted and caused to be submitted are not covered under the plans because the claims are based on false, misleading, and fraudulent charges submitted to Cigna and the Cigna Plans.  Among other things, the Labs' claims are charges are improper because the Cigna Plan member was excused from paying her/her required portion of the full amount of charges submitted to Cigna.

172.    An actual controversy exists between the Labs and Cigna as to whether the Labs are entitled to reimbursement for certain claims submitted to Cigna.

173.    Cigna seeks a declaration that the claims for reimbursement to Cigna are not covered and not payable under the applicable plans.

174.    Cigna also seeks a declaration that the Labs must return all sums received from Cigna and the Cigna Plans related to claims for reimbursement to Cigna for services not rendered.

## JURY DEMAND

### (As to Non-ERISA Claims Only)

175.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

176.    With respect to the Cigna's non-ERISA claims, Cigna hereby demands a trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Cigna prays for relief as follows:

(a)     That Cigna be granted judgment against the Labs in the total amount of all damages suffered as a result of the Labs' wrongful acts, including pre-judgment and post-judgment interest and treble damages pursuant to § 52-564;

(b)     That the Labs be ordered to make restitution for the amount of money it has improperly received, including pre-judgment and post-judgment interest at the statutory rate;

(c)     That the Labs be enjoined from instituting any legal or administrative action or complaints for the purpose of recovering any money as a result of services provided by the Labs;

(d)     That Cigna be granted a declaration that the Labs is not entitled to receive any payment on claims for reimbursement to Cigna;

(e)     That Cigna be granted judgment against the Labs for all costs of this action, including its reasonable attorneys' fees and costs; and

(f)     That this Court grant Cigna such other and further relief as it considers just and equitable under the circumstances.

Dated: August 27, 2019                    **ALSTON & BIRD LLP**


                                          _/s/ Edward T. Kang_
                                          EDWARD T. KANG
                                          EMILY COSTIN (_pro hac vice_ motion
                                          forthcoming)
                                          950 F Street, NW
                                          Washington, DC  20004
                                          Telephone:  202-239-3300
                                          Facsimile:  202-239-3333
                                          E-mail:  edward.kang@alston.com
                                          E-mail:  emily.costin@alston.com

                                          KELSEY L. KINGSBERY (_pro hac vice_ motion
                                          forthcoming)
                                          555 Fayetteville Street, Suite 600
                                          Raleigh, North Carolina 27615
                                          Telephone: 919-862-2200
                                          Facsimile: 919-862-2260
                                          E-mail: kelsey.kingsbery@alston.com

                                          _Attorneys for Plaintiffs Connecticut General Life_
                                          _Insurance Company and Cigna Health and Life_
                                          _Insurance Company_