UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY and CIGNA HEALTH AND LIFE INSURANCE COMPANY,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>BIOHEALTH LABORATORIES, INC., PB LABORATORIES, LLC, EPIC REFERENCE LABS, INC., and EPINEX DIAGNOSTICS, INC.,<br><br>　　　　Defendants. | Case No. 3:19-cv-01324<br><br>Hon. Janet C. Hall |

**LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED MATERIAL FACTS
<u>IN SUPPORT OF LABS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

I. THE LABS' ROLE IN THE HEALTHCARE INDUSTRY: PERFORMING DRUG TESTS ORDERED BY A MEDICAL DOCTOR .................................. 1

    A. Healthcare Treatment Begins with a Doctor-Patient Encounter ...................... 1

    B. Doctors Determine Whether to Order Drug Tests for Patients ........................ 2

    C. Doctors Determine the Nature, Type and Frequency of Tests ........................ 2

    D. Laboratories Do Not Meet with Patients or Render Treatment........................ 3

II. AFTER THE LABS PERFORMED A DOCTOR-ORDERED DRUG TEST, THEY SOUGHT REIMBURSEMENT FROM CIGNA .......................................................... 3

    A. The Standard Claims-Review and Payment Processes................................. 3

    B. Cigna's Special Investigation Unit ...................................................... 5

III. MEDICAL NECESSITY DETERMINATIONS ..................................................... 5

    A. The Labs Relied on Doctors' "Medical Necessity" Determinations.................. 6

    B. Cigna Paid Each Healthcare Claim that It Now Seeks to Recover from the Labs, without Requesting Supporting Clinical Information from the Labs at the Time ........................................................ 6

    C. Cigna Waited until August 27, 2019 to Notify the Labs that It Questioned the Medical Necessity of Claims Paid Years Ago ........................ 8

IV. IN 2015, CIGNA'S "CORE ACTION TEAM" DEVISED A NEW MEDICAL NECESSITY POLICY TO DENY LABORATORY CLAIMS FOR SUBSTANCE-ABUSE TREATMENT ............ 8

V. FEE FORGIVENESS................................................................................. 10

VI. UNBUNDLING ....................................................................................... 11

BioHealth Laboratories, Inc. ("**BioHealth**"), PB Laboratories, LLC ("**PB Labs**"), Epic Reference Labs, Inc. ("**Epic**") and Epinex Diagnostics, Inc. ("**Epinex**" and, collectively with BioHealth, PB Labs, and Epic, the "**Labs**"), pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "**Federal Rules**") and Rule 56 of the Local Civil Rules (the "**Local Rules**"), submit this *Local Rule 56(a)1 Statement of Undisputed Material Facts*, in support of the *Labs' Motion for Summary Judgment* against Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively "**Cigna**"), and respectfully state as follows:

## UNDISPUTED MATERIAL FACTS

**I.   THE LABS' ROLE IN THE HEALTHCARE INDUSTRY: PERFORMING DRUG TESTS ORDERED BY A MEDICAL DOCTOR**

1. Laboratory testing is integral to the modern practice of medicine, and drug testing specifically is part of the practice of treating people who are prescribed controlled substances and the treatment of those with substance use disorder or the disease of addiction. *See* **Ex. 17**, Clark Depo. at 94:24–95:4, 95:18–95:21.

   **A.   Healthcare Treatment Begins with a Doctor-Patient Encounter**

2. The medical treatment of a patient begins when a doctor sees a patient. *See* **Ex. 18**, 03/01/23 Clark Report at ¶ 20.

3. The doctor gathers information about the patient's complaint and experience which is specifically relevant to their problem, such as the patient's symptoms, when they occurred, and their family history. *See id.*

4. The doctor also may obtain information from family members or from other treatment providers. *See id.*

1

5. Also during the doctor-patient encounter, any relevant physical and mental status examinations are completed. *See id.*

### B. Doctors Determine Whether to Order Drug Tests for Patients

6. Individuals with addiction have multiple reasons not to be truthful about their drug use. *See* **Ex. 18**, 03/01/23 Clark Report at ¶ 39.

7. Laboratory testing is used in clinical medicine to assist with the care of patients and provides objective information about a patient, as opposed to relying upon a patient's self-report. *See id.* at ¶¶ 28, 38, 39.

8. Drug tests provide information about the condition of a patient at a particular point in time, which may serve several possible functions to assist the clinician, including to: (i) make an initial working diagnosis, (iii) assess the patient's current health status in order to determine the safety and suitability of a proposed or active treatment plan, and (iii) monitor the effectiveness of a treatment plan. *See id.* at ¶ 28.

9. When a medication is prescribed, follow up testing may be done to monitor the effectiveness of treatment. *See id.* at ¶ 22.

### C. Doctors Determine the Nature, Type and Frequency of Tests

10. If a doctor determines that drug tests are necessary for the treatment or care of a patient, the doctor also will determine: (i) the necessary *frequency* of those tests, *see* **Ex. 18**, 03/01/23 Clark Report at ¶ 46 ("There is no standard frequency at which every patient should undergo urine drug testing."); (ii) the necessary *types* of tests, *see id.* at ¶¶ 52, 55 ("There [are] … different types of urine drug tests" that "the doctor can … select."); and (iii) the necessary *intensity* or "number of individual

substances." See id. at ¶ 65 ("There is no single appropriate panel of drug tests."); id. at ¶ 160 (defining intensity).

### D.  Laboratories Do Not Meet with Patients or Render Treatment

11. In contrast to the doctor-patient relationship, the Labs did *not*: meet with patients; gather information about their complaints and experiences; perform physical or mental examinations on patients; diagnose them; or determine the safety or suitability of patients' treatment plans. See **Ex. 17**, Clark Depo. at 62:8–62:11, 63:20–64:7, 77:6–77:15.

## II.  AFTER THE LABS PERFORMED A DOCTOR-ORDERED DRUG TEST, THEY SOUGHT REIMBURSEMENT FROM CIGNA

### A.  The Standard Claims-Review and Payment Processes

12. Cigna is a managed care company that administers employee health and welfare benefit plans (the "**Cigna Plans**"), including fully-insured plans that are funded by Cigna. See Dkt. 87, Am. Compl. at ¶¶ 25, 26.

13. Cigna serves as a claims administrator for each Cigna Plan, and all of the patients whose urine or blood samples the Labs tested, that are at issue in this case, were insureds under a Cigna Plan. See id. at ¶ 27.

14. The Labs were "out-of-network" service providers, meaning that they did not enter into a provider agreement with Cigna. See id. at ¶ 30.

15. After a laboratory performs a drug test, it will file a claim with the patient's insurance company for reimbursement—in this case, Cigna. See **Ex. 4**, Cigna 30(b)(6) Depo. at 25:8–25:22.

3

16. Most claims are "auto-adjudicated," meaning that Cigna has developed a system of computer programs, with rules built into them, to recognize the coding and other information contained in the claims submission. *See id.* at 25:8–26:2.

17. Those auto-adjudication rules compare the information on the claim to the patient's plan benefits to determine coverage. *See id.* at 25:8–26:5.

18. In order for the claim to be payable, it must be a "covered" claim, *see id.*, or, in other words, covered by a Cigna Plan. *See* **Ex. 19**, 05/19/23 Clark Rebuttal Report at ¶ 19; *see also* **Ex. 4**, Cigna 30(b)(6) Depo. at 28:6–28:16.

19. Cigna Plans did not exclude coverage for drug testing, drug and alcohol treatment, and pain management care. *See* **Ex. 4**, Cigna 30(b)(6) Depo. at 46:7–46:17, 50:16–50:18.

20. After Cigna receives a reimbursement request from an out-of-network service provider, it will either:

    a. "allow" the healthcare claim if it is covered and pay the party seeking reimbursement, *see, e.g.,* **Ex. 4**, Cigna 30(b)(6) Depo. at 25:8–26:18, 51:1–51:8, although the allowable amount of the claim is oftentimes substantially less than the "billed" amount of the claim, *see id.* at 66:6–67:19;

    b. "deny" the healthcare claim and withhold payment (*e.g.*, because Cigna contends the claim is not "covered"), *see id.* at 123:23–124:5; or

    c. "pend" the healthcare claim and seek additional information for review and consideration prior to determining whether to allow or deny the healthcare claim. *See* **Ex. 5**, Borden Depo. at 25:25–26:5, 39:17–39:20.

21. In this action, Cigna exclusively seeks to recover payments it made to the Labs for healthcare claims that it "allowed" and paid. *See, e.g.*, Dkt. 87, Am. Compl. at ¶ 11 ("Cigna brings this action" "to recover" amounts "paid to the Labs").

### B. Cigna's Special Investigations Unit

22. Cigna's Special Investigations Unit ("**SIU**") may investigate claims submitted by a medical provider. *See, e.g.*, Dkt. 87, Am. Compl. at ¶¶ 71–79.

23. The SIU may "flag" the party under investigation and apply a "rule" in the claims system, such that if the party submits a claim, Cigna will request medical records before it determines whether to allow or deny the claim. *See* **Ex. 4**, Cigna 30(b)(6) Depo. at 93:16–94:1, 175:8–176:4; **Ex. 16**, Welch Depo. at 40:2–40:7.

24. The following individuals participated in the SIU's investigation of the Labs: (i) Stephanie Canto; (ii) Dr. Douglas Nemecek; (iii) Dr. Daniel Nicoll; (iv) Patrick Hurley; (v) William Welch, II; (vi) Thomas Hixson. *See Declaration of Anthony T. Gestrich in Support of Labs' Motion for Summary Judgment* (the "**Gestrich Decl.**") at ¶¶ 6.a–b, 7.a–e, 8.a, 9.c–e, 10.a–b, 11.a.

25. At the Labs' depositions of each of these Cigna witnesses, they were unable to recall material facts about the SIU's investigation of the Labs. *See generally id.* at ¶¶ 6.b–c, 7.c–e, 8.b–c, 9.c–e, 10.b, 11.b–d.

### III. MEDICAL NECESSITY DETERMINATIONS

26. "Medical necessity" is a term used by insurers for "coverage" determinations. *See* **Ex. 17**, Clark Depo. at 36:23–36:25, 63:2–63:8.

27. If a service is medically necessary, it is covered by a patient's health plan. *See* **Ex. 18**, 03/01/23 Clark Report at ¶¶ 23, 110.

28.  Accordingly, a doctor, in the first instance, determines whether a medical service is necessary and, therefore, will be ordered—based on the information that the doctor obtains directly from patients. *See* **Ex. 13**, Nicoll Depo. at 101:3–101:9; **Ex. 18**, 03/01/23 Clark Report at ¶ 108.

29.  After a laboratory submits a doctor-ordered drug test, Cigna has the opportunity to question the doctor's medical-necessity determination. *See* **Ex. 17**, Clark Depo. at 63:2–63:8*;* **Ex. 20** at 0327732 (Cigna employee acknowledging that commercial laboratories "are 'just following [doctors'] orders,'" and suggesting adoption of a new policy "that everything one provider orders is medically not necessary so we can exclude payments").

### A. The Labs Relied on Doctors' "Medical Necessity" Determinations

30.  Commercial laboratories—like and including the Labs—do not determine whether a given drug test is medically necessary. *See* **Ex. 17**, Clark Depo. at 63:2–63:8; **Ex. 20** at 0327732 (Cigna employee recognizing that commercial laboratories "do not decide how many tests to run or how often to run tests" but, instead, "[a medical] provider … orders the tests, and the lab runs them.").

31.  Doctors certified to the Labs that the drug tests they ordered were "medically necessary." See **Ex. 21** (compilation of orders sent to PB Labs, BioHealth and Epic).

### B. Cigna Paid Each Healthcare Claim that It Now Seeks to Recover from the Labs, without Requesting Supporting Clinical Information from the Labs at the Time

32.  When a commercial laboratory submits a reimbursement request to Cigna, it does not provide clinical information from the ordering doctor to demonstrate that the

6

doctor ordered a medically necessary drug test. *See* **Ex. 20** at 0327735 (Cigna employee acknowledging that reimbursement requests submitted to Cigna contain "either no clinical information or insufficient clinical information (e.g. provider office notes) to explain … how testing will affect treatment course or clinical outcome"); **Ex. 4**, Cigna 30(b)(6) Depo. at 136:8–136:10 ("[T]here's no documentation … between the patient and the lab prior to rendering the service.").

33. Accordingly, if Cigna decides to question a doctor's determination that a drug test was medically necessary, Cigna must *request* additional information from the laboratory that is seeking reimbursement. *See* **Ex. 3**, 10/27/22 Canto Depo. at 43:10–43:19; **Ex. 17**, Clark Depo. at 20:19–22:4 (confirming that Cigna "[does not] typically get documents … with every claim" that a laboratory submits for payment, "but … the medical records [may be] requested … to determine whether [a service] really [was a] covered service").

34. In order for Cigna to confirm its disagreement with a doctor's medical-necessity determination, Cigna must obtain a patient's medical record. *See* **Ex. 17**, Clark Depo. at 16:18–20:18.

35. A patient's medical record will identify (i) the patient's history, physical examination and previous laboratory findings, current treatment plan, prescribed medication(s), and risk assessment plan, (ii) the medical necessity for, and testing ordered on the patient, (iii) an appropriate testing frequency, and (iv) the rationale for the drug classes ordered. *See id.* at 16:18–20:18 (confirming that the Labs' expert witnesses, Jacqueline Thelian, "quite nicely" identified the "necessary" "documentation" in her "rebuttal report"); **Ex. 22**, Thelian Rebuttal Report at 6.

7

36. For the healthcare claims at issue in this case, Cigna did not request any supporting documentation from the Labs but, instead, paid the Labs' reimbursement requests. *See, e.g.,* Dkt. 87, Am. Compl. at ¶ 10.

37. Cigna has not obtained or identified any patient medical records for any of the healthcare claims it paid and now seeks to recover from the Labs. *See* **Ex. 17**, Clark Depo. at 16:18–17:4, 156:19–156:23.

### C. Cigna Waited until August 27, 2019 to Notify the Labs that It Questioned the Medical Necessity of Claims Paid Years Ago

38. Cigna did not notify the Labs that it questioned the medical necessity of the drug-test services for which it paid the Labs until August 27, 2019, when Cigna commenced this action. *See generally* Dkt. 1, Compl.

39. Cigna did not identify its grounds for challenging "medical necessity" until March 1, 2023, when Cigna served on the Labs two expert reports, including an *Expert Report of Dr. Kelly Clark* (the "**Clark Report**"). *See generally* **Ex. 18** (excerpted).

### IV. IN 2015, CIGNA'S "CORE ACTION" TEAM DEVISED A NEW MEDICAL NECESSITY POLICY TO DENY LABORATORY CLAIMS FOR SUBSTANCE-ABUSE TREATMENT

40. In 2015, Cigna "assembled a core action [team] from across the enterprise" to address "substance abuse claims" (the "**Core Action Team**"). *See* **Ex. 6** at 0289530, 31; *see also, e.g.*, **Ex. 9**, Nemecek Depo. at 107:10–108:9.

41. At that time, "Cigna underst[ood]" that the costs associated with commercial laboratories' reimbursement requests were "a result of [Cigna's established] payment methodology," in which it "reimbursed … on … Medicare plus payment" or "reasonable and customary" terms—often "at 100% of charges." *See* **Ex. 7** at 0324598.

8

42. Also at that time, Cigna was "one of [only] two [insurance companies] to offer out-of-network … benefits for substance in abuse … and the only [insurance company] to offer such [out-of-network] benefits in 2016." *Id.*

43. The Core Action Team created a memorandum identifying its "goals" for reducing payment to out-of-network laboratories (the "**Mission Statement**"). *See* **Ex. 6**.

44. One of the Core Action Team's goals was to "[r]**educe the substance abuse paid amount from [more than] $1 [million] a day to a target of approximately $50 [thousand] per … day** …." *See* **Ex. 6**, Mission Statement at 0289530 (emphasis added); *see also* **Ex. 23** at 0326151 (Cigna employee stating that "[w]e shouldn't feel obligated to continue paying" and "should … suspend/hold more claims payments").

45. Among other things, the Core Action Team planned "to develop a [new] pricing methodology [for] substance abuse codes" and abandon its current "payment methodology." *See* **Ex. 7** at 0324596, 98.

46. The Core Action Team included individuals from different departments within Cigna, including (i) **Eva Borden**, Cigna's Chief Risk Officer; and (ii) **Dr. Nemecek**, Cigna's Chief Medical Officer for Behavioral Health. *See* **Ex. 8** (Ms. Borden identifying herself and Dr. Nemecek each as an "owner or key supporter" of the Core Action Team).

47. The Core Action Team also interacted directly with **David Cordani**, **Cigna's Chief Executive Officer**. *See, e.g.*, **Ex. 24** at 0327090; **Ex. 25** at 0330848.

48. The Core Action Team specifically addressed "medical necessity." *See, e.g.*, **Ex. 26** at 0327420–21; **Ex. 20** at 0327732 (Cigna suggesting adoption of a

9

new policy "that everything one provider orders is medically not necessary so we can exclude payments").

49. The Core Action Team understood that second-guessing a doctor's determination of medical necessity would present a challenge for any laboratory to overcome because, "often, the lab would not have the necessary documentation" and "[o]nly the ordering clinician could document unique circumstances" to demonstrate medical necessity. *See* **Ex. 2** at 0330876.

50. By the end of 2015, the Core Action Team created a new set of policies to allow Cigna to justify widespread denials of healthcare claims submitted for payment. *See* **Ex. 9**, Nemecek Depo. at 109:19–110:5; **Ex. 27** at 0324608; **Ex. 28**.

51. Cigna tasked its SIU with using the Core Action Team's new policies to deny healthcare claims in bulk, *see* **Ex. 29** at 0330124; **Ex. 30** at 0327227 ("SIU is helping to drive … the [out-of-network] Substance abuse work that is ongoing"), even though "each case that [SIU] would investigate" was supposed to be "an independent investigation" "on its own merit." *See* **Ex. 12**, Hixson Depo. Tr. at 64:10–64:19.

52. At the Labs' depositions of Ms. Borden and Dr. Nemecek, they were unable to recall material facts about the Core Action Team's undertakings and its goals to deny laboratory drug-test claims. *See* Gestrich Decl. at ¶¶ 5.c, 9.a–b.

V. **FEE FORGIVENESS**

53. Cigna alleges that the Labs did not attempt to collect insurance cost-share obligations owed by Cigna's insureds (*i.e.*, doctors' patients), including co-payments,

10

co-insurance and deductibles—in "a practice known as 'fee forgiving.'" *See* Dkt. 87, Am. Compl. at ¶¶ 2, 29, 134, 154.

54. On December 11, 2014, Cigna "flagged" PB Labs for allegedly engaging in fee forgiving. *See* **Ex. 31** (excerpted version of CIGNA19-1326 0302256).

55. On May 22, 2015, Cigna "flagged" BioHealth for allegedly engaging in fee forgiving. *See* **Ex. 32** at 0291380 (identifying "Flag Date 05/22/2015").

## VI. UNBUNDLING

56. Cigna alleges that the Labs "billed Cigna separately for component parts of [] urine drug testing that are required to be included or 'bundled' into a single code." *See* Dkt. 87, Amended Complaint at ¶¶ 2, 29, 134, 154.

57. Specifically, Cigna asserts that "the Labs improperly unbundled the following codes in claims for reimbursement to Cigna during the time period at issue":

| Unbundled Codes | Proper Code |
|---|---|
| 83986, 81003 | 81003 |
| G0480; G0481: G0482; G0483 | Only one code can billed |
| 82570 in addition to any code for presumptive testing | Code for drug screen only |

*See* **Ex. 33** at 5–6.

Dated: July 18, 2023

Respectfully submitted,

/s/ Anthony T. Gestrich
Scott M. Hare (phv10339)
Anthony T. Gestrich (phv11119)
WHITEFORD, TAYLOR & PRESTON, LLP
11 Stanwix Street, Suite 1400
Pittsburgh, PA 15222
Telephone: 412-618-5600
Facsimile: 412-618-5596
E-mail:    SHare@whitefordlaw.com
           AGestrich@whitefordlaw.com

Fred Alan Cunningham (phv20210)
Matthew Christ (phv20209)
DOMNICK CUNNINGHAM & YAFFA
2401 PGA Boulevard, Suite 140
Palm Beach Gardens, FL 33410
Telephone: 561-625-6260
Facsimile: 561-625-6269
E-mail:    Fred@pbglaw.com
           Matt@pbglaw.com

John J. Radshaw III
(ct19882)
65 Trumbull Street, 2nd Fl.
New Haven, CT 06510
Telephone: 203-654-9695
Facsimile: 203-721-6182
E-mail:    jjr@jjr-esq.com

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on July 18, 2023, a copy of the foregoing was served on the following counsel for the parties by electronic mail:

EDWARD T. KANG
EMILY COSTIN
**ALSTON & BIRD LLP**
950 F Street, NW
Washington, DC 20004
edward.kang@alston.com
emily.costin@alston.com

KELSEY L. KINGSBERY
555 Fayetteville Street, Suite 600
Raleigh, North Carolina 27615
kelsey.kingsbery@alston.com

*Counsel for Connecticut General Life Insurance Company and
Cigna Health and Life Insurance Company*

                                            /s/ Anthony T. Gestrich
                                            Anthony T. Gestrich