# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY and CIGNA HEALTH AND LIFE INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>BIOHEALTH LABORATORIES, INC., PB LABORATORIES, LLC, EPIC REFERENCE LABS, INC., and EPINEX DIAGNOSTICS, INC.,<br><br>Defendants. | Case No. 3:19-cv-01324<br><br>Hon. Janet C. Hall |

## MEMORANDUM IN SUPPORT OF
## LABS' MOTION FOR SUMMARY JUDGMENT [1]

---

[1]      BioHealth Laboratories, Inc. ("**BioHealth**"), PB Laboratories, LLC ("**PB Labs**") and Epic Reference Labs, Inc. ("**Epic**" and, collectively with BioHealth and PB Labs, the "**Labs**") submit this memorandum in support of the *Labs' Motion for Summary Judgment* against Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively, "**Cigna**").

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

I. PROCEDURAL BACKGROUND ................................................................... 2

II. SUMMARY JUDGMENT STANDARDS.......................................................... 4

III. ARGUMENT .............................................................................................. 5

    A. CIGNA IS GUILTY OF LACHES ................................................................. 5

        1. Cigna Inexcusably and Unreasonably Delayed Filing Its Claims.................... 6

        2. Cigna Has Significantly Prejudiced the Labs.................................... 7

            i. Cigna's Witnesses Cannot Recall Material Facts ....................................... 8

            ii. Essential Documents Are Missing ........................................... 20

            iii. The Labs Now Have No Recourse Against Third Parties ........................ 21

    C. CIGNA HAS NOT COME FORWARD WITH REQUIRED EVIDENCE TO SUPPORT ITS EQUITABLE CLAIMS FOR RELIEF UNDER COUNT II .................................... 21

    D. CIGNA'S "COVERAGE" THEORIES ........................................................... 22

        1. Medical Necessity ..................................................................... 23

            i. Laboratories Are Permitted to Rely on Doctors' Determinations that Drug Tests They Ordered Are "Medically Necessary" ...................... 23

            ii. Cigna Has the Burden to Prove Its "Medically Unnecessary" Theory ...... 25

        2. Fee Forgiveness ...................................................................... 26

         3. Unbundling.............................................................................. 27

IV. CONCLUSION.......................................................................................... 28

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Batiste v. City of New Haven*,
    239 F. Supp. 2d 213 (D. Conn. 2002) ........................................................ 6

*Beecher v. Buckingham*,
    18 Conn. 110, 119 (1846) ................................................................ 27

*Bekker v. Neuberger Berman Grp. LLC*,
    No. 16-6123, 2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018) ................................... 22

*Berin v. Olson*,
    439 A.2d 357 (Conn. 1981) ................................................................ 8

*Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*,
    988 F.3d 127 (2d Cir. 2021) ............................................................... 3

*CSL Silicones, Inc. v. Midsun Grp. Inc.*,
    301 F. Supp. 3d 328 (D. Conn. 2018) .................................................... 5, 20

*Homesite Ins. Co. v. Brezniak*,
    581 F. Supp. 3d 424 (D. Conn. 2022) ...................................................... 4

*In re Lehman Bros. Inc.*,
    617 B.R. 231 (Bankr. S.D.N.Y. 2020) ...................................................... 6

*K.P. v. Juzwic*,
    891 F. Supp. 703 (D. Conn. 1995) ......................................................... 8

*Lamborn v. Dickinson Cty. Comm'rs*,
    97 U.S. 181 (1877) ...................................................................... 26

*Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*,
    896 F.3d 174 (2d Cir. 2018) ............................................................ 5, 8

*Morris v. City of New Haven*,
    63 A. 123 (Conn. 1906) ............................................................... 26–27

*Price v. Indep. Party of CT-State Cent.*,
    147 A.3d 1032 (Conn. 2016) ............................................................... 5

*Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*,
    959 F.2d 409 (2d Cir. 1992) ............................................................... 7

*Satan Wears Suspenders, Inc. v. Jaar*,
   No. 21-812, 2022 WL 2181449 (S.D.N.Y. June 16, 2022) .......................................... 6

*SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*,
   580 U.S. 328 (2017) ......................................................................................................... 5

*Spagnola v. Chubb Corp.*,
   574 F.3d 64 (2d Cir. 2009) ............................................................................................ 26

*Stuart & Sons, L.P. v. Curtis Pub. Co.*,
   456 F. Supp. 2d 336, 347 (D. Conn. 2006) .................................................................... 7

*Synthetic Pats. Co. v. Sutherland*,
   22 F.2d 494 (2d Cir. 1927) ............................................................................................ 26

*Trustees of Plumbers & Steamfitters Loc. Union No. 22
   Joint Apprenticeship Training Tr. Fund v. Rossman*,
   No. 19-414, 2020 WL 5230908 (W.D.N.Y. Sept. 1, 2020) ......................................... 22

*United States v. Lab. Corp. of Am. Holdings*,
   No. 14-3699, 2019 WL 236799 (D.S.C. Jan. 16, 2019) ............................................... 24

*United States ex rel. Groat v. Bos. Heart Diagnostics Corp.*,
   296 F. Supp. 3d 155 (D.D.C. 2017) .............................................................................. 24

*United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*,
   332 F. Supp. 3d 48 (D.D.C. 2018) ................................................................................ 24

*Wiblyi v. McDonald's Corp.*,
   144 A.3d 530 (Conn. App. Ct. 2016) .............................................................................. 5

*Zuckerman v. Metro. Museum of Art*,
   928 F.3d 186 (2d Cir. 2019) ............................................................................................ 8

## Statutes

Fla. Stat. § 95.11(4)(a) (2023) ........................................................................................... 21

## Rules

Fed. R. Civ. P. 56(a) ............................................................................................................. 4

*"[L]aboratories have never been required to make a determination of medical necessity before submitting a claim . . . The very nature of laboratory testing makes it impossible for laboratories to determine the medical necessity of testing ordered by physicians"* because *"the laboratory does not have the patient's medical record, have knowledge of the patient's condition or medical history, or have any other information related to the patient."*

*Alston and Bird, LLP, DC Office, July 26, 2017.*

Cigna's own counsel, the law firm Alston and Bird, LLP, is no stranger to persuading courts that commercial laboratories have no obligation to determine medical necessity and, to the contrary, are permitted to bill for services based on doctors' orders. In a federal court lawsuit filed not long before this case, Alston and Bird advocated the very position that the Labs take in this suit: commercial laboratories "are not expected to make a determination concerning medical necessity prior to performing tests and billing for them, and . . . laboratories are permitted to bill for the services[] based on the diagnostic information received from physicians who ordered the tests." *United States ex rel. Tina D. Groat v. Boston Heart Diagnostics Corp.*, Amicus Brief of Am. Clinical Laboratory Ass'n, 1:15-cv-00487-RBW (D.D.C. 2017), Doc. No. 64 (attached as **Ex. 1**). In fact, Alston and Bird's client took the initiative to appear as an amicus, not a party in the *Groat* case, and Alston and Bird wrote its brief to request that the court reconsider an earlier decision and hold that laboratories do not determine medical necessity—and that such determinations are made strictly by treating providers. *See generally id.* But now, Cigna asks this Court to reject the very position that Alston and Bird advocated in *Groat*. This wholesale change in position is intended to pave the way for Cigna to bring this untimely action and thereby create new law consistent with a scheme it hatched in 2015: if Cigna is permitted to second-guess doctors' medical necessity determinations years after its insureds receive medical treatment, Cigna can

seek to disgorge payments on claims that it already determined were covered. Cigna filed this lawsuit knowing the intervening years would ensure that "the lab would not have the necessary documentation" to defend against Cigna's untimely equitable claims because "[o]nly the ordering clinician could document" the medical necessity of a drug test. *See* **Ex. 2** at 0330876.

## I.    PROCEDURAL BACKGROUND

The above-captioned action is one of two cases pending before the Court.  In this case, Cigna seeks to recover more than $20 million it paid to the Labs over the period from 2012 to 2017 ("**Cigna's Case**").  In the other (and earlier-filed) case, the Labs seek payment for services they performed but Cigna failed and refused to pay. *See generally* Case No. 19-1326 (the "**Labs' Case**"). The Labs seeks damages of more than $40 million against Cigna.

Although these two actions share a context—*i.e.*, medical doctors directed the Labs to perform drug tests, after which the Labs sought payment from Cigna—there are two critical differences between them: *notice* and *timing*.  The Labs' Case has a history extending back to 2013, shortly after which the Labs timely demanded payment from Cigna; since then, the Labs have continuously sought a remedy for Cigna's failure to pay for drug-test services performed.  Cigna's Case is very different; Cigna waited until August 2019 to place the Labs on notice, through a complaint, that it sought to *disgorge* more than $20 million of payments it made to the Labs beginning in 2012.

Cigna brought this untimely action in August 2019 for one reason: to retaliate against the Labs for suing Cigna one month earlier, in July 2019 (*i.e.*, the Labs' Case). Importantly, Cigna admits in its complaint—both original and amended—that it *could*

_have_ acted without delay and filed suit against the Labs by "August 17, 2015." _See_ Dkt. 1, Compl. at ¶ 117; Dkt. 87, Am. Compl. at ¶ 124. Cigna did not file suit in 2015 but, instead, unreasonably and unjustifiably waited _four years_ to place the Labs on notice of this dispute and assert grounds for seeking disgorgement of payments made a decade ago.

By waiting four years to bring this action, Cigna significantly prejudiced the Labs' ability to defend themselves. In discovery, the Labs deposed several current and former employees of Cigna who investigated the Labs and/or were members of a group that Cigna formed in 2015—_i.e._, the "core action" team—to develop a set of policies to deny healthcare claims submitted by commercial laboratories. Cigna's witnesses were unable to recall material information about these foundational issues, which underlie Cigna's claims for relief. In 2020, the Court dismissed this case as untimely. _See generally_ Dkt. 48. In 2021, the Second Circuit determined that Cigna's equitable claims in this case should be reinstated—but ultimately dismissed if this Court "concludes that a meritorious laches defense is available." _See Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc._, 988 F.3d 127, 135 (2d Cir. 2021). Now, with the benefit of a developed record, and as Parajudicial Officer Hawkins recently observed, "the Labs have a very viable laches defense" to Cigna's untimely claims to recover monies paid as early as in 2012. _See_ Dkt. 183 at 9. The Court should dismiss Cigna's case in its entirety because Cigna is guilty of laches, as demonstrated below.

Cigna's sole theory of recovery in this case is based on its position that the Labs received payments for services that were **<u>not</u>** "**covered**" by the individual healthcare plans Cigna administers (each, a "**<u>Cigna Plan</u>**"). _See_ Dkt. 87, Am. Compl. at ¶¶ 4, 6, 41,

89, 97, 133, 134, 143, 153, 154, 156.  From there, Cigna asserts that Cigna Plans "exclude" from coverage healthcare claims for drug-test services (i) that were not "**medically necessary**," *see, e.g., id.* at ¶ 6, or (ii) for which the Labs did not attempt to collect a patient's cost-share obligations (*i.e.*, engaged in "**fee forgiveness**"), *see, e.g., id.* at ¶ 4, or (iii) that were "**unbundled**." *See, e.g., id.* at ¶ 9.  Even if Cigna somehow paid the Labs more than $20 million for healthcare claims that were not "covered" by Cigna Plans, Cigna's claims for, and theories of, recovery fail for a variety of reasons, as explained more fully below.[2]

## II.    SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "'A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Homesite Ins. Co. v. Brezniak*, 581 F. Supp. 3d 424, 431 (D. Conn. 2022) (quoting *Williams v. Utica Coll. of Syracuse Univ.,* 453 F.3d 112, 116 (2d Cir. 2006)). "The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact," *id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986)), "and the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party," *id.* (citing *Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir. 2008)). "If the moving party carries its burden, 'the opposing party must come forward with

---

[2]    In the Labs' Case, Cigna asserts the same "coverage" theories—*e.g.*, medical necessity and fee forgiveness—as affirmative defenses.  These defenses suffer from the same flaws addressed herein, among others, and should be preemptively rejected for the same reasons.

specific evidence demonstrating the existence of a genuine dispute of material fact.'" *Id.* (quoting *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011)).

## III.    ARGUMENT

### A.    CIGNA IS GUILTY OF LACHES

"'Laches is an equitable defense based on the maxim [that] … equity aids the vigilant, not those who sleep on their rights[].'" *CSL Silicones, Inc. v. Midsun Grp. Inc.*, 301 F. Supp. 3d 328, 364 (D. Conn. 2018) (quoting *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997)); *see also, e.g., Wiblyi v. McDonald's Corp.*, 144 A.3d 530, 538 (Conn. App. Ct. 2016) (explaining that "laches" applies to equitable claims "in which there has been an inexcusable delay").  Unlike "legal" claims, "equitable" claims are not subject to statutory limitations periods and, therefore, the "doctrine of laches functions in part as kind of flexible statute of limitations." *See Wiblyi*, 144 A.3d at 538 (citing *Fromm v. Fromm*, 948 A.2d 328, 334 (Conn. App. Ct. 2008)); *see also, e.g., SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 335 (2017) (explaining that "[l]aches is a gap-filling doctrine … where there is [no] statute of limitations").  As a long-recognized common law defense, the laches doctrine is consistent "between Connecticut and federal law." *See* Dkt. 80, *Post-Remand Ruling on Defendants' Motion to Dismiss* ("**Remand Opinion**") at 16.

"A meritorious laches defense requires a showing that the plaintiff: (1) 'is guilty of unreasonable and inexcusable delay,' and; (2) that the delay 'has resulted in prejudice to the defendant.'" *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 193 (2d Cir. 2018); *see also, e.g., Price v. Indep. Party of CT-State Cent.*, 147 A.3d 1032, 1042 (Conn. 2016) (explaining that "[l]aches consists of an inexcusable delay [that

unduly] prejudices the defendant") (quoting *Cummings v. Tripp*, 527 A.2d 230, 240

(Conn. 1987)).  Although both elements of laches must be established, the "prejudice"

element "is integrally related to the inquiry regarding delay" and, "[w]here there is no

excuse for delay, defendants need show little prejudice." *Batiste v. City of New Haven*,

239 F. Supp. 2d 213, 225 (D. Conn. 2002) (citing *Stone v. Williams*, 873 F.2d 620, 625

(2d Cir. 1989)); *see also, e.g., In re Lehman Bros. Inc.*, 617 B.R. 231, 246 (Bankr.

S.D.N.Y. 2020) (stating same).  "Thus, the bar for Defendants to show prejudice is low,

and the bar for Plaintiff[s to] disprove prejudice is high." *Satan Wears Suspenders, Inc.

v. Jaar*, No. 21-812, 2022 WL 2181449, at *7 (S.D.N.Y. June 16, 2022).[3]

### 1.    Cigna Inexcusably and Unreasonably Delayed Filing Its Claims

In its Amended Complaint, Cigna concedes that **prior to** "**August 17**, **2015**," it

already had "investigated and **uncovered the Labs**' … **conduct**" for which Cigna

believes that it is entitled to recover "at least $20 million" of payments it made to the

Labs. *See* Dkt. 87, Amended Complaint at ¶¶ 1, 10, 124 (emphasis added).  Indeed,

Cigna concluded in **September 2013** that it had adequate information to begin denying

claims submitted by PB Labs. *See* <u>**Ex. 3**</u>, 10/27/22 Canto Depo. at 148:15–148:18.

Nevertheless, Cigna did not file suit until <u>four</u> years after it purportedly "uncovered" the

---

[3]      The bar is especially high for Cigna in this matter because this Court already has
"conclude[d] that the "presumption [of laches] applies to [Cigna's] federal claims in this
case …." *See* Dkt. 80, Remand Opinion at 15.  The Court explained that it reached this
conclusion because the legal claims Cigna asserted (in conjunction with its equitable
claims) were subject to "three-year statute[s] of limitation," *see* Dkt. 47 at 4, and "where
the plaintiff's delay in bringing the action exceeds the time fixed for suit by statutes of
limitations in an analogous action at law, the burden is on the party asserting [a] right [to
sue] to explain the delay and to show that it would be inequitable and unjust to refuse
the aid of the court in the enforcement of the right." *See* Dkt. 80, Remand Opinion at 14
(internal quotation marks and citation omitted).

conduct it alleges in this case—despite the pendency of prior litigation between the parties in Florida federal court, which concluded on September 20, 2017. *See generally BioHealth Med. Lab., Inc. v. Conn. Gen. Life Ins. Co.*, No. 15-23075 (S.D. Fla. Aug. 17, 2015); *BioHealth Med. Lab., Inc. v. Conn. Gen. Life Ins. Co.*, No. 16-20807 (S.D. Fla. Mar. 4, 2016).

Nearly <u>two</u> years after the Florida litigation ended, Cigna filed this action—but even then, only as a retaliatory strike against the Labs, which commenced an action against Cigna one month earlier in the Connecticut state court. *See* Case No. 19-1326, Dkt. 1, Notice of Removal, ¶ 1 ("On or about July 25, 2019, [the Labs filed a complaint] in the Superior Court of the State of Connecticut for the Judicial District of Hartford, Case No. HHD-CV19-6115233-S.").  Cigna has no legitimate or reasonable excuse for waiting until August 2019 to commence this action, such that a trial in this matter (concerning healthcare claims that Cigna paid, including many claims paid more than ten years ago) will be heard at a trial in February 2024.  "A party's delay is unreasonable if the party 'discovers … the wrong of which he complains'" but does not act. *Stuart & Sons, L.P. v. Curtis Pub. Co.*, 456 F. Supp. 2d 336, 347 (D. Conn. 2006) (quoting *I 291 Why? Ass'n v. Burns,* 372 F.Supp. 223, 239 (D. Conn. 1974)).  Here, Cigna failed to act until August 2019, despite freely admitting that, at least four years earlier, it "uncovered" the conduct at issue in this action.

### 2.     <u>Cigna Has Significantly Prejudiced the Labs</u>

Courts have long recognized that prejudice will be found when "the delay makes it difficult [for the defendant] to garner evidence to vindicate [its] rights." *Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 424 (2d Cir. 1992) (quoted by

*Durkin v. Nassau Cty. Police Dep't*, 175 F. App'x 405, 408 (2d Cir. 2006); *see also, e.g., Berin v. Olson*, 439 A.2d 357, 361 (Conn. 1981) (explaining that "[l]aches" occurs in the event of "delay that works a disadvantage to another") (internal quotation marks and citation omitted). When evidence is lost or becomes unavailable during an unreasonable delay, prejudice is established. *See, e.g., Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 194 (2d Cir. 2019) (stating that the delay "has resulted in … **faded memories**") (internal quotation marks and citation omitted); *K.P. v. Juzwic*, 891 F. Supp. 703, 716 (D. Conn. 1995) (identifying "**faded**" "**memories of witnesses**" and "**missing**" "**essential documents**" as forms of prejudice) (emphasis added). Likewise, "[a] laches defense may be justifiable where delay diminishes a [defendant's] ability to absorb a loss," including when "the defendant has ... lost the right to contribution or indemnity" "because **lawsuits against third parties no longer lie**." *Leopard Marine*, 896 F.3d at 196 (emphasis added) (internal quotation marks and citations omitted). Each of these forms of prejudice is plain in the record of this case, as discussed below.

### i.    Cigna's Witnesses Cannot Recall Material Facts

Cigna alleges that that it "uncovered" the purported conduct about which it complains based on the SIU's investigation of the Labs. *See, e.g.*, Dkt. 87, Am. Compl. at ¶¶ 71–79, 81–88. Accordingly, during fact discovery, the Labs deposed numerous Cigna employees who investigated the Labs in consultation with the SIU *and/or* participated in the Core Action Team's initiative to develop policies for denying out-of-network laboratory healthcare claims. These front-line Cigna witnesses repeatedly failed to "recall" or "remember" material information—indeed, almost anything—about material and underlying aspects of Cigna's claims against the Labs in this case. Their

common refrain was that the Labs were asking questions about events that took place "ten years ago," as discussed immediately below.

The Labs deposed Cigna's Rule 30(b)(6) designee, Michael Goldfarb. *See generally* **Ex. 4**, Cigna 30(b)(6) Depo.  Mr. Goldfarb readily admitted that the "events" giving rise to Cigna's lawsuit against the Labs were "many years ago" and that he was not employed by Cigna when "much of the events here" took place. *See* Gestrich Decl. at ¶ 4(a) (citing **Ex. 4**, Cigna 30(b)(6) Depo. at 106:1–106:19).  Mr. Goldfarb also conceded that he did not speak with any Cigna employees who had first-hand knowledge of the alleged facts giving rise to this case. *See id.* at ¶ 4(b) (citing **Ex. 4**, Cigna 30(b)(6) Depo. at 77:23–77:25) (testifying that he "did not" "talk with [Ms.] Canto in preparation for [his] deposition"); *see id.* (citing **Ex. 4**, Cigna 30(b)(6) Depo. at 20:1–20:12 (confirming that he did not consult "anyone" with first-hand knowledge of the facts Cigna alleged in this case).

The Labs additionally deposed Cigna employees with first-hand knowledge to obtain information that Cigna's corporate designee was unprepared to offer. Ms. Borden—the leader of the Core Action team, *see Local Rule 56(a)1 Statement of Undisputed Material Facts in Support of Labs' Motion for Summary Judgment* (the "**LRS**") at ¶ 46—testified that "[i]t was her responsibility … to identify where [Cigna] would see potential risk to [its] business" and "the root cause" or "key drivers" of those risks. *See* Gestrich Decl. at ¶ 5(a) (citing **Ex. 5**, Borden Depo. at 33:10–34:15).  Ms. Borden authored the Mission Statement for the Core Action Team, *see id.* at ¶ 5(b) (citing **Ex. 5**, Borden Depo. at 60:7–60:11), which identified the Core Action Team's five

"goals" and planned "action[s]" for drastically reducing payments to laboratories for bona fide "Substance Abuse" expenses. *See* **Ex. 6** at 0289530.

However, Ms. Borden could not "recall": (i) the Core Action Team itself, *see* Gestrich Decl. at ¶ 5(c)(i) (citing **Ex. 5**, Borden Depo. at 64:25–65:6) ("I don't recall the core action team"), (ii) the Core Action Team's Mission Statement and why she drafted it, *see id.* at ¶ 5(c)(ii) (citing **Ex. 5**, Borden Depo. at 30:1–30:10, 60:3–60:11, 61:13–61:15); (iii) what she meant by the term, "core action," *see id.* at ¶ 5(c)(iii) (citing **Ex. 5**, Borden Depo. at 37:1–37:5); (iv) the "risks" she identified in the Mission Statement, *see id.* at ¶ 5(c)(iv) (citing **Ex. 5**, Borden Depo. at 41:3–41:6); (v) whether she maintained files for the Core Action Team, *see id.* at ¶ 5(c)(v) (citing **Ex. 5**, Borden Depo. at 60:21–61:11); (vi) discussing, with other Cigna employees, the reasons she formed the Core Action Team, *see id.* at ¶ 5(c)(vi) (citing **Ex. 5**, Borden Depo. at 31:2–31:17); (vii) "who" at Cigna conducted an "analysis" on substance abuse claims that led to the Core Action Team's formation, *see id.* at ¶ 5(c)(vii) (citing **Ex. 5**, Borden Depo. at 34:24–35:15); (viii) meetings with and among other members of the Core Action Team, *see id.* at ¶ 5(c)(viii) (citing **Ex. 5**, Borden Depo. at 37:6–37:10, 44:23–45:2, 61:22–62:2); (ix) the Core Action Team's performance of its "goals," *see id.* at ¶ 5(c)(ix) (citing **Ex. 5**, Borden Depo. at 37:11–38:5, 56:18–56:24, 57:17–57:23, 59:10–59:14); (x) partnering with Navigant to develop procedures for denying substance abuse claims submitted by laboratories, *see id.* at ¶ 5(c)(x) (citing **Ex. 5**, Borden Depo. at 55:15–55:24);[4] (xi) "why" she sent

---

[4]    *See* **Ex. 7** at 0324594, 96 (Cigna's *Statement of Work* agreement with Navigant, providing that "Navigant will work with Cigna to … evaluate drivers of … substance abuse spend in [Southern Florida] … [and] develop a pricing methodology for substance abuse" claims).

"Substance Abuse" agendas to the members of the Core Action Team, despite the Labs providing her examples as deposition Exhibit 1, Exhibit 4 and Exhibit 6, *see id.* at ¶ 5(c)(xi) (citing **Ex. 5**, Borden Depo. at 18:1–18:7, 27:12–28:13, 65:7–65:15); (xii) the "role the SIU … played" in the Core Action Team's initiatives, *see id.* at ¶ 5(c)(xii) (citing **Ex. 5**, Borden Depo. at 18:12–18:15); (xiii) information the SIU "need[ed]" from the Core Action Team, *see id.* at ¶ 5(c)(xiii) (citing **Ex. 5**, Borden Depo. at 18:8–18:11); (xiv) why the SIU was "pending" substance abuse claims, *see id.* at ¶ 5(c)(xiv) (citing **Ex. 5**, Borden Depo. at 40:16–40:21); (xv) the content of her internal e-mails concerning the Core Action Team's work, *see id.* at ¶ 5(c)(xv) (citing **Ex. 5**, Borden Depo. at 18:25– 19:3, 44:4–44:5, 58:18–58:19); (xvi) the algorithm or "edit" the Core Action Team created to deny laboratory claims on an automated basis, *see id.* at ¶ 5(c)(xvi) (citing **Ex. 5**, Borden Depo. at 24:23–25:5); (xvii) which department within Cigna implemented the "edit" to deny laboratory claims on an automated basis; *see id.* at ¶ 5(c)(xvii) (citing **Ex. 5**, Borden Depo. at 25:15–25:16); and (xviii) initiatives, other than "edits," that the Core Action Team developed to deny substance abuse claims. *See id.* at ¶ 5(c)(xviii) (citing **Ex. 5**, Borden Depo. at 52:16–53:23).

Likewise, despite Dr. Nemecek's role as an "owner or key supporter" of the Core Action Team, *see* **Ex. 8**, Dr. Nemecek had "no recollection" of the Mission Statement that Ms. Borden created. *See* Gestrich Decl. at ¶ 9(a) (citing **Ex. 9**, Nemecek Depo. at 105:22–106:13; 113:8–113:15).  He also could not "recall": (i) "any specific … findings" of the Core Action Team, *see id.* at ¶ 9(b)(i) (citing **Ex. 9**, Nemecek Depo. at 109:13– 109:18); (ii) whether the Core Action Team performed or achieved certain of its stated "goals," *see id.* at ¶ 9(b)(ii) (citing **Ex. 9**, Nemecek Depo. at 119:20–121:7); (iii) whether

the "SIU was … able to work through it[s] … backlog of pended claims" submitted by substance-abuse providers, *see id.* at ¶ 9(b)(iii) (citing **Ex. 9**, Nemecek Depo. at 124:1–124:6); (iv) whether he "suppl[ied] any documents for the group to review" or had been "provided … any documents" from the Core Action Team. *See id.* at ¶ 9(b)(iv) (citing **Ex. 9**, Nemecek Depo. at 114:11–114:17); *see also id.* (citing **Ex. 9**, Nemecek Depo. at 131:22–132:7 ("I don't recall … what … documents … were there back then.").

Apart from his involvement in the Core Action Team, Dr. Nemecek testified that the SIU "occasion[ally]" asked him to review healthcare clams under evaluation, *see id.* ¶ 9(c) (citing **Ex. 9**, Nemecek Depo. at 28:18–29:3), and "always asked" him "about medical necessity," but he was unable to "recall specific questions related to that from the SIU." *See id.* (citing **Ex. 9**, Nemecek Depo. at 32:12–32:19).  And although Dr. Nemecek, in fact, reviewed healthcare claims submitted by the Labs "to ascertain if the … services were medically necessary,"[5] he was unable to "recall" reviewing any of them. *See id.* at ¶ 9(d) (citing **Ex. 9**, Nemecek Depo. at 36:24–37:12, 57:17–58:14). Even after the Labs introduced, as deposition exhibits, e-mail requests from the SIU to Dr. Nemecek, he had no "recollection" of the meaning of their contents. *See id.* at ¶ 9(e) (citing **Ex. 9**, Nemecek Depo. at 59:11–62:25) ("The email appears to say that, but I don't have any recollection from that time," in late 2014 and early 2015.); *id.* (citing **Ex. 9**, Nemecek Depo. at 66:7–67:9) (Dr. Nemecek testifying that he could not recall a records-review he performed in January 2015); *id.* (citing **Ex. 9**, Nemecek Depo. at 67:10–68:8) (Dr. Nemecek testifying that the Labs' deposition exhibits did not "refresh his recollection" about the records-review he performed); *id.* (citing **Ex. 9**, Nemecek

---

[5]    *See, e.g.*, **Ex. 10** at 0291077–78.

Depo. at 68:24–70:21) (same); *id.* (citing **Ex. 9**, Nemecek Depo. at 102:19–104:18) (Dr. Nemecek testifying that he had no "recollection" about a records-review concerning the Labs, despite documentation expressly identifying his involvement); *id.* (citing **Ex. 9**, Nemecek Depo. at 104:22–105:2) (same); *id.* (citing **Ex. 9**, Nemecek Depo. at 105:3– 105:13) (Dr. Nemecek testifying that the Labs' deposition exhibit did "not" "refresh [his] memory" "at all").

Ms. Canto was the fraud investigator for the SIU that spearheaded Cigna's investigation of PB Labs and BioHealth. *See* Gestrich Decl. at ¶ 8(a) (citing **Ex. 3**, 10/27/22 Canto Depo. at 14:13–14:19).  And despite Cigna's counsel providing Ms. Canto a "binder" of materials to review in advance of her deposition, she testified that those materials only "somewhat" "refresh[ed her] memory" about her "involvement in the handling of these cases" because "it has been some time" since the investigation. *See id.* at ¶ 8(b) (citing **Ex. 3**, 10/27/22 Canto Depo. at 44:3–44:22, 46:5–46:9).[6]  Indeed, Ms. Canto could not recall: (i) the critical conversation she had with her superior to "proceed with flagging" PB Labs and stopping payment on the Labs' reimbursements requests, *see id.* at ¶ 8(c)(i) (citing **Ex. 3**, 10/27/22 Canto Depo. at 109:13–110:10); (ii)

---

[6]    To prevent the Labs from determining the extent to which a witness may have attempted to refresh his or her memory in advance of a deposition, Cigna consistently refused to allow its witnesses to identify whether they reviewed specific material in advance of the deposition. *See, e.g.*, **Ex. 3**, 10/27/22 Canto Depo. at 66:17–66:23 (Cigna "object[ing]" to the Labs' question about whether Ms. Canto reviewed deposition Exhibit 2 in advance of her deposition "because it gets into potentially attorney-client privilege"); **Ex. 11**, Hurley Depo. at 17:13–18:14 ("instruct[ing]" the witness "to [not] identify … any documents … we looked at" prior to the deposition); **Ex. 5**, Borden Depo. at 6:19–6:23 (Cigna "instruct[ing Ms. Borden] not to answer any specific documents that we looked at"); **Ex. 12**, Hixson Depo. at 111:21–112:5 ("instruct[ing]" the witness "not to answer" "what documents [he] reviewed" in advance of his deposition, including the Labs' "case files").

how she "decide[d]" which of the Labs' healthcare claims to examine, *see id.* at ¶ 8(c)(ii) (citing **Ex. 3**, 10/27/22 Canto Depo. at 121:16–121:19; *see id.* (citing **Ex. 3**, 10/27/22 Canto Depo. at 122:10–122:14); *id.* (citing **Ex. 3**, 10/27/22 Canto Depo. at 134:11–135:12 ("I cannot recall the type of criteria that I had utilized at the time for this particular audit."); *id.* (citing **Ex. 3**, 10/27/22 Canto Depo. at 136:13–136:17 ("At this point in time, I do not recall"); 137:24–138:3 ("I just don't recall the criteria that was utilized"); (iii) conversations with her SIU colleagues about their investigation of the Labs, *see id.* at ¶ 8(c)(iii) (citing **Ex. 3**, 10/27/22 Canto Depo. at 127:18–127:23, 186:5–186:9); (iv) when Cigna may have notified PB Labs that it was denying claims in bulk, *see id.* at ¶ 8(c)(iv) (citing **Ex. 3**, 10/27/22 Canto Depo. at 151:12–151:22, 152:9–152:16); and (v) the grounds on which Cigna chose not to pay the Labs over time. *See id.* at ¶ 8(c)(v) (citing **Ex. 3**, 10/27/22 Canto Depo. at 228:21–229:13) ("I don't remember the exact chronology during the course of the case").

Mr. Hurley was Ms. Canto's manager within the SIU, *see* **Ex. 3**, 10/27/22 Canto Depo. at 40:23–41:2, and he also led the SIU's investigation of Epic. *See* Gestrich Decl. at ¶ 11(a) (citing **Ex. 11**, Hurley Depo. at 22:23–22:25.  Mr. Hurley testified that he did "not [have] much" of "any independent recollection of [his] work investigating Epic," *see id.* at ¶ 11(b) (citing **Ex. 11**, Hurley Depo. at 22:23–22:25), and that his review of documents in advance of the deposition "really didn't open up … a floodgate of memory in terms of … what [he] did with the … investigation." *Id.* (citing **Ex. 11**, Hurley Depo. at 23:4–23:14); *see also id.* (citing **Ex. 11**, Hurley Depo. at 59:23–60:3) (testifying that deposition Exhibit 1 "d[i]d not" "refresh [his] recollection" about the content of the

document); 66:4–66:6 (same, regarding deposition Exhibit 2); 74:18–74:21 (same);

117:22–117:25 (same, regarding deposition Exhibit 5).

Mr. Hurley testified that "[i]t's been over ten years since I've … had any

involvement with … [this] case" and "[m]y ability to recollect is extremely limited." *See id.*

at ¶ 11(c) (citing **Ex. 11**, Hurley Depo. at 133:1–133:12).  Among other things, Mr.

Hurley could not recall: (i) "the circumstances that led [him] to assign [the] investigation

to [Ms.] Canto," *see id.* at ¶ 11(d)(i) (citing **Ex. 11**, Hurley Depo. at 72:15–72:18); (ii) why

he documented a lack of "evidence of a kickback" scheme, *see id.* at ¶ 11(d)(ii) (citing

**Ex. 11**, Hurley Depo. at 74:22–75:5); (iii) when the SIU commenced its investigation into

Epic, *see id.* at ¶ 11(d)(iii) (citing **Ex. 11**, Hurley Depo. at 118:12–118:19); (iv) the

number of "verification of service letters" he sent or "how [he] determined to whom to

send them," *see id.* at ¶ 11(d)(iv) (citing **Ex. 11**, Hurley Depo. at 121:17–122:12); (v)

who, within the SIU, drafted case notes for the investigation of the Labs, *see id.* at ¶

11(d)(v) (citing **Ex. 11**, Hurley Depo. at 134:23–135:20, 146:24–147:22); (vi) whether

Epic "cooperated, or did not cooperate, with the information … sought during the [SIU]

investigation," *see id.* at ¶ 11(d)(vi) (citing **Ex. 11**, Hurley Depo. at 152:18–152:23,

205:19–205:25); (vii) "any discussion about revising the [SIU's] strategy" for

investigating Epic, *see id.* at ¶ 11(d)(vii) (citing **Ex. 11**, Hurley Depo. at 157:10–157:15,

203:25–204:7; and (viii) why he wrote in Cigna's files that "I just do not know if we have

enough to establish fee forgiving …." *See id.* at ¶ 11(d)(viii) (citing **Ex. 11**, Hurley Depo.

at 173:9–173:16).

In Dr. Nicoll's role as Medical Director for Fraud and Abuse, he "worked with the

[SIU] and nurse reviewers," who would "send [him] … groups of cases." *See* Gestrich

Decl. at ¶ 7(a) (citing **Ex. 13**, Nicoll Depo. at 24:24–25:13, 25:21–26:15).  Dr. Nicoll

"work[ed] directly with Ms. Canto" "[m]any times," and her supervisor, Mr. Hixson. *See*

*id.* at ¶ 7(b) (citing **Ex. 13**, Nicoll Depo. at 39:8–39:10, 69:25–70:8).  In fact, Dr. Nicholl

reviewed the Labs' records. *See, e.g.*, **Ex. 14**; **Ex. 15**.  However, at his deposition, Dr.

Nicoll had "no memory of" "being requested … in or around August of 2013 to review

[records] related to PB Lab[s]." *See* Gestrich Decl. at ¶ 7(c) (citing **Ex. 13**, Nicoll Depo.

at 43:14–43:19, 44:4–44:19).  Nor did Dr. Nicoll "remember" "being requested … to

review [records] relating to Bio[H]ealth," or have any "memory of" "being asked … to

review [records] relating to Epic …." *See id.* at ¶ 7(d) (citing **Ex. 13**, Nicoll Depo. at

43:20–44:3, 44:14–44:19).

The Labs presented exhibits to Dr. Nicoll confirming that the SIU sent him the

Labs' records, which he reviewed and evaluated; nevertheless, Dr. Nicholl did not recall

reviewing the Labs' records. *See id.* at ¶ 7(e) (citing **Ex. 13**, Nicoll Depo. at 62:19–63:5)

("It was … ten years ago [and] … I'm [not] remembering everything."); *see id.* (citing **Ex.**

**13**, Nicoll Depo. at 78:24–79:4) (testifying that he had "[n]o memory at all" about "18

patient records" he reviewed from the Labs); *see id.* (citing **Ex. 13**, Nicoll Depo. at

86:25–87:24) (same); *see id.* (citing **Ex. 13**, Nicoll Depo. at 88:20–89:3) (regarding the

records he reviewed, commenting that "I'm trying to read my mind from ten years ago");

*see id.* (citing **Ex. 13**, Nicoll Depo. at 89:14–89:19) ("I have no memory of the review at

all."); *see id.* (citing **Ex. 13**, Nicoll Depo. at 100:15–100:21) (testifying that he had "no

memory" of reviewing doctors' drug-test orders sent to the Labs); *see id.* (citing **Ex. 13**,

Nicoll Depo. at 100:22–101:2) ("I have no memory of" "whether the testing that was

performed by the [L]ab was consistent with the medical order."); *see id.* (citing **Ex. 13**,

16

Nicoll Depo. at 104:22–105:4) (stating, "I have no memory of what I reviewed in 2013");
*see id.* (citing **Ex. 13**, Nicoll Depo. at 111:18–112:6) (testifying about the identity of a
"referring [doctor]" and, "[s]ince I have no memory of it," "I have no way of knowing");
*see id.* (citing **Ex. 13**, Nicoll Depo. at 118:5–118:16) (reviewing the language of an e-
mail he sent, and responding that "you're asking me what I meant ten years ago"); *see
id.* (citing **Ex. 13**, Nicoll Depo. at 144:18–145:19) (Dr. Nicoll unable to testify about his
review of the Labs' records because "I have no memory of what I reviewed"); *see id.*
(citing **Ex. 13**, Nicoll Depo. at 149:20–150:5 (testifying that he had "[n]o memory at all"
of performing a records-review identified in an e-mail from Ms. Canto to Dr. Nicoll); *see
id.* (citing **Ex. 13**, Nicoll Depo. at 160:18–161:16 (testifying that he "ha[d] no memory of
[a] meeting" concerning "PB Labs," as reflected in an e-mail to Dr. Nicoll); *see id.* (citing
**Ex. 13**, Nicoll Depo. at 161:25–163:12 (Dr. Nicoll had "[n]o memory" of reviewing certain
of the Labs' records sent to him).

William Welch joined Cigna in 2012 as a "legal advisor to the SIU …." *See*
Gestrich Decl. at ¶ 6(a) (citing **Ex. 16**, Welch Depo. at 10:4–10:17, 25:9–25:14).
Although Mr. Welch addressed the SIU's investigation of PB Labs and BioHealth, he
testified that he "ha[d] little or no memory" of the Labs and "did not," in advance of his
deposition, "ask … for" or receive "any documents … that might refresh [his]
recollection." *See id.* at ¶ 6(b) (citing **Ex. 16**, Welch Depo. at 35:5–35:21).  During his
deposition, Mr. Welch could not recall: (i) "how he got involved" in the investigation of
the Labs, *see id.* at ¶ 6(c)(i) (citing **Ex. 16**, Welch Depo. at 33:12–33:16); (ii) the Labs'
cooperation with Cigna in the investigation, *see id.* at ¶ 6(c)(ii) (citing **Ex. 16**, Welch
Depo. at 113:9–113:16); (iii) "when Cigna placed [its] first flag" on the Labs, *see id.* at ¶

6(c)(iii) (citing **Ex. 16**, Welch Depo. at 50:13–50:16, 79:5–79:8); (iv) whether Cigna began denying claims immediately after it first flagged the Labs, *see id.* at ¶ 6(c)(iv) (citing **Ex. 16**, Welch Depo. at 82:13–82:18); (v) how Cigna notified the Labs "of a flag that had been placed on their claims," *see id.* at ¶ 6(c)(v) (citing **Ex. 16**, Welch Depo. at 84:17–84:22); (vi) the methodology Cigna employed to investigate the Labs' claims, *see id.* at ¶ 6(c)(vi) (citing **Ex. 16**, Welch Depo. at 112:8–112:16); (vii) "who [he] would have spoken with to get the information that [he] put into" letters he sent to the Labs, *see id.* at ¶ 6(c)(vii) (citing **Ex. 16**, Welch Depo. at 54:13–55:4, 57:1–57:6, 103:14–103:17); (viii) the basis for purported facts he asserted about the Labs, *see id.* at ¶ 6(c)(viii) (citing **Ex. 16**, Welch Depo. at 69:4–70:3, 77:19–78:3, 94:11–94:20, 102:8–102:15, 103:10–103:13, 178:2–178:19); (ix) meetings he had with other employees about Cigna's investigation of the Labs, *see id.* at ¶ 6(c)(ix) (citing **Ex. 16**, Welch Depo. at 97:6–97:13); (x) the "conclusions reached by Dr. Nicoll or anybody else" concerning the Labs, *see id.* at ¶ 6(c)(x) (citing **Ex. 16**, Welch Depo. at 59:9–59:16); and (xi) the information Dr. Nicoll reviewed to reach his conclusions about the Labs. *See id.* at ¶ 6(c)(xi) (citing **Ex. 16**, Welch Depo. at 59:17–59:23).

Mr. Hixson was an Audit Director within the SIU and "overs[aw] investigative teams" in that department. *See* Gestrich Decl. at ¶ 10(a) (citing **Ex. 12**, Hixson Depo. at 52:20–52:25, 54:3–54:7).[7]  Nevertheless, Mr. Hixson could not recall: (i) "the tasks that [Ms. Canto] was taking under investigation, or what she knew at th[e] time," *see id.* ¶

---

[7]     In three prior cases, Cigna designated Mr. Hixson as its Rule 30(b)(6) witness, *see* **Ex. 12**, Hixson Depo. at 11:6–11:17, but designated Mr. Goldfarb in this case despite his lack of first-hand knowledge of the facts and circumstances underlying Cigna's claims against the Labs. *See supra* at 9.

10(b)(i) (citing **Ex. 12**, Hixson Depo. at 197:7–198:1); *see also id.* (citing **Ex. 12**, Hixson Depo. at 229:11–229:17) ("I don't recall specifics in [Ms. Canto's] investigation"), (ii) creating a "folder for the claims" under investigation because "[t]his was a long time ago," *see id.* ¶ 10(b)(ii) (citing **Ex. 12**, Hixson Depo. at 247:3–248:9); (iii) the meaning of internal e-mails he authored concerning the Labs, *see id.* ¶ 10(b)(iii) (citing **Ex. 12**, Hixson Depo. at 194:15–196:4 ("It's so long ago, I would be speculating what that meant."); *id.* (citing **Ex. 12**, Hixson Depo. at 197:1–197:4) ("I don't recall this e-mail"); *id.* (citing **Ex. 12**, Hixson Depo. at 200:13–200:18) ("I don't [recall].  This is very old."); *id.* (citing **Ex. 12**, Hixson Depo. at 215:2–215:13) (testifying that he could only "speculate" about "the intent of [his] e-mail or th[e] analysis [he] did" because he could not "recall"); *id.* (citing **Ex. 12**, Hixson Depo. at 219:8–219:14) ("I don't recall this e-mail, so it's hard for me to determine what this means."); *id.* (citing **Ex. 12**, Hixson Depo. at 219:16–222:3) (series of failures to recollect the meaning of e-mail content); (iv) which "flags" the SIU placed on the Labs during its investigation, *see id.* ¶ 10(b)(iv) (citing **Ex. 12**, Hixson Depo. at 113:8–113:14), and (v) whether the SIU used "any software" to create "a statistically valid random sample" of claims to be reviewed during an investigation. *See id.* ¶ 10(b)(v) (citing **Ex. 12**, Hixson Depo. at 104:11–104:18, 105:10–105:14).

Cigna should not be permitted to pursue untimely equitable claims against the Labs and *simultaneously* avoid meaningful fact discovery about the very conduct and issues underlying those claims.  This is precisely what laches is designed to address.  On the basis of Cigna's witnesses' faded recollections alone, Cigna is guilty of laches and the Court should enter an Order dismissing this case in its entirety.

### ii.  __Essential Documents Are Missing__

Cigna's theory of recovery is that it paid the Labs for "uncovered" services, because, *inter alia*, those services may not have been "medically necessary." *See supra* at 3–4.  In this case, however:

- Cigna concedes that if it chose to challenge the medical necessity of a particular healthcare claim (at the time a Lab sought reimbursement), Cigna would have requested the doctor's "patient" records to confirm whether the claim was medically necessary, *see* LRS at ¶ 33;

- Cigna paid each underlying healthcare claim submitted by the Labs without requesting any patient records, *see* LRS at ¶ 36; and

- Cigna did not request any patient records for *four* years after August 2015—*i.e.*, when Cigna apparently first determined that it needed those records, *see* LRS at ¶ 37; and

- as of this filing, Cigna has no patient records to support its theory of recovery. *See* LRS at ¶ 37.

Cigna has no patient records, dating back to 2012, because it waited until August 2019 to commence this case—and then waited until March 2023 to serve the Clark Report and identify "examples" of healthcare claims that it suspects were not medically necessary.  The laches doctrine is designed to address the absence of records caused by a plaintiff's delay. *See supra* at 8.  This case presents a classic example of the principle that "equity" does not "aid[] … those who sleep on their rights[].'" *CSL Silicones, Inc.*, 301 F. Supp. 3d at 364 (internal quotation marks and citation omitted); *see also supra* at 4 n.2.

### iii.    The Labs Now Have No Recourse Against Third Parties

It is undisputed that the Labs did not make medical-necessity determinations but, instead, relied on doctors who met with patients. *See* LRS at ¶ 30.  The doctors who ordered the Labs to run drug tests *certified* that those tests were medically necessary. *See* LRS at ¶ 31.  Years after the fact, Cigna—through Dr. Clark—now questions whether those doctors' certifications were valid. *See* LRS at ¶ 39.  If Cigna prevailed against the Labs on its theory that doctors' incorrectly certified that the drug tests they ordered were medically necessary, the Labs now would have no legal recourse against those doctors. *See, e.g.*, FLA. STAT. § 95.11(4)(a) (2023) (providing that "[a]n action founded on negligence," including "professional malpractice," "shall be commenced" "[w]ithin two years").

### B.    CIGNA HAS NOT COME FORWARD WITH REQUIRED EVIDENCE TO SUPPORT ITS EQUITABLE CLAIMS FOR RELIEF UNDER COUNT II

Cigna's cause of action for ERISA relief (Count II) requires Cigna to demonstrate that the Labs remain in possession of the funds that—in Cigna's view—they wrongfully received. *See, e.g.*, Dkt. 87, Am. Compl., ¶¶ 145, 146 (alleging as an element of its ERISA claim that, "[u]pon information and belief," the payments the Labs received from Cigna "were deposited into specified bank accounts that were and are under the control of the Labs" and, further, that, "those []payments remain in these accounts" or "were exchanged for other property that is also in the possession, custody, or control of the Labs").  Cigna made this allegation on "information and belief" because it knew the Labs no longer are in possession of the funds they received from Cigna (beginning in 2012) and are not in possession of identifiable "property" acquired with those funds.  In any event, Cigna has not come forward with any evidence to support these allegations.

Equitable relief under section 1132(a)(3) requires proof of an "identifiable *res*" that can be recovered. *See Trustees of Plumbers & Steamfitters Loc. Union No. 22 Joint Apprenticeship Training Tr. Fund v. Rossman*, No. 19-414, 2020 WL 5230908, at *4 (W.D.N.Y. Sept. 1, 2020). Thus, such equitable relief is only "available where the specific *res* or funds can be identified and attached by equitable lien or constructive trust, but not where the plaintiff seeks to impose general personal liability as a remedy …." *Id.* (citation omitted); *see also, e.g., Bekker v. Neuberger Berman Grp. LLC*, No. 16-6123, 2018 WL 4636841, at *11 (S.D.N.Y. Sept. 27, 2018) (explaining that an equitable remedy under section 1132(a)(3) "requires that 'the money or property identified as belonging in good conscience to the plaintiff [can] be clearly traced to particular funds or property in the defendant's possession,'" and "[b]ecause Plaintiff fails to trace the [funds] paid … to any particular property or funds held by Defendants, … Plaintiff's … claim is not sustainable") (quoting *Great-W Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)).

As of this filing, Cigna has not come forward with evidence to support the recovery of an identifiable *res* that can be traced back to a payment that Cigna retrospectively contends the Labs should not have received. As a result, Cigna's equitable claim for ERISA relief cannot proceed. The Court should dismiss Count II of the Amended Complaint on this alternative basis.

## C. CIGNA'S "COVERAGE" THEORIES

Cigna contends that the plans it administered "exclude[] coverage" for a healthcare claim: (i) that is not **medically necessary**, *see, e.g.*, Dkt. 87, Am. Comp. at ¶ 6, 97, (ii) in which the Labs engaged in "**fee forgiving**"—*i.e.*, did not attempt to obtain a

patient's "cost-share obligations," such as "co-payments, co-insurance, and deductibles"), *see id.* at ¶¶ 4, 29, 41, 43, 89; or (iii) with "**unbundled services**." *See id.* at ¶¶ 8, 9, 116. Each of Cigna's three "coverage" theories, however, suffers from a fatal defect.

### 1.    <u>Medical Necessity</u>

Cigna seeks to recover more than $20 million that it voluntarily paid the Labs on a theory that it paid for "medically unnecessary" drug-testing services. *See, e.g.,* Dkt. 87, Am. Compl. at ¶¶ 133, 143, 153. Cigna fancies this theory of recovery because Cigna believes that it is the <u>*sole arbiter*</u> of whether drug-testing services are "medically necessary"; accordingly, Cigna also believes that it may recover monies paid—at any time—if it simply asserts that already-paid services were not "medically necessary."

The Court should dismiss Cigna's "medically unnecessary" theory of recovery. <u>***First***</u>, as a matter of fact and law, *doctors* (as opposed to the Labs) determined whether it was medically necessary to order a test and the Labs relied on the doctors' medical-necessity determinations. <u>***Second***</u>, if Cigna wishes to obtain a judgment from the Court that it is entitled to recover payments from the Labs for "medically unnecessary" drug-testing services that it paid beginning in 2012, Cigna has the burden to support and prove its theory of recovery.

### i.    <u>Laboratories Are Permitted to Rely on Doctors' Determinations that Drug Tests They Ordered Are "Medically Necessary"</u>

It is undisputed that the Labs did <u>*not*</u>: meet with patients; gather information about their complaints and experiences; perform physical or mental examinations on patients' diagnose them; or determine the safety or suitability of patients' treatment plans. *See* LRS at ¶ 11. Thus, Cigna concedes—as it must—that the Labs ***did not***

determine whether a drug test was medically necessary. *See* LRS at ¶ 30; **Ex. 17**, Clark

Depo. at 63:2–63:6.

It is well-established that "a laboratory cannot and is not required to determine

medical necessity, but rather is permitted to rely on the ordering physician's

determination that the laboratory tests billed … are medically necessary." *United States*

*ex rel. Groat v. Bos. Heart Diagnostics Corp.*, 296 F. Supp. 3d 155, 158 (D.D.C. 2017);

*see also, e.g., United States v. Lab. Corp. of Am. Holdings*, No. 14-3699, 2019 WL

236799, at *3 (D.S.C. Jan. 16, 2019) (dismissing plaintiffs' "medically unnecessary

tests" theory of the case, and explaining that a commercial laboratory, "may rely on [a]

doctor's order in submitting a claim for reimbursement as medically necessary")

(quoting *United States v. Bertram*, 900 F.3d 743, 750 (6th Cir. 2018)); *United States ex*

*rel. Riedel v. Bos. Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 57, 76 (D.D.C. 2018)

(dismissing the "medically unnecessary testing theories of liability" and explaining that

"the laboratory is not required to make an independent determination of medical

necessity, but rather may rely on the ordering physician's determination") (quoting

*Groat*, 296 F. Supp. 3d. at 163).

Cigna is well-aware that laboratories are legally permitted to rely on doctors'

medical-necessity determinations.  Indeed, Cigna's counsel in this action submitted

briefs to the *Groat* Court on behalf of the American Clinical Laboratory Association—

successfully arguing that laboratories cannot and do not make medical-necessity

determinations but, instead, rely on doctors to make them. *See supra* at 1.  The Court

agreed with Cigna's counsel on this critical point and now the *Groat* decision is an oft-

cited, well-followed authority on the subject. In this case, however, Cigna takes the

opposite view and asserts claims for relief on the notion that the Labs submitted claims that were not medically necessary, even though it is undisputed that the drug tests were in fact ordered by doctors.  Therefore, the Court should dismiss Cigna's "medical necessity" theory of recovery, consistent with case law above.

### ii.    Cigna Has the Burden to Prove Its "Medically Unnecessary" Theory

Cigna concedes that it "[does not] typically get documents … with every claim" that a commercial laboratory submits for payment, "but … the medical records [may be] ***requested*** … to determine whether [a service] really [was a] covered service[.]" *See* LRS at ¶ 33 (emphasis added); *see also* **Ex. 17**, Clark Depo. at 16:18–17:4; *see also id.* at 25:2–25:15 (testifying that if an insurer denied one of Dr. Clark's reimbursement requests "for lack [of] medical necessity," "[t]hen [she] would have to send … documentation" to the insurer to get the request "approved"); 31:9–31:17 (confirming that "the payor" may "request … additional information" from the party seeking reimbursement); 75:7–75:13 (acknowledging that "documents don't go with every claim" submitted to insurance because "[t]hat would be a huge amount of information" but, "when [the insurer] says I want to see documents for this claim to support this claim," the documentation must be "provided").

In this case, however, Cigna paid the Labs without ***requesting*** additional information to establish that a drug test was medically necessary. *See* LRS at ¶ 36.  As a result, Cigna is unable to identify any "medical records which support the [purported lack of] medical necessity of any of the claims …." *See* **Ex. 17**, Clark Depo. at 156:19–156:23 (cited in LRS at ¶ 37).

25

## 2.    Fee Forgiveness

"'Fee forgiving' occurs when an out-of-network provider does not attempt to collect (or "forgives" [a patient] from having to pay) the required deductible or coinsurance from the [patient], and/or when [a laboratory] fails to balance bill the [patient] for any portion of the billed charges that a health-benefit plan does not reimburse." *See* Dkt. 87, Amended Complaint at ¶ 37.  This is one of Cigna's three "coverage" theories—*i.e.*, that the Labs did not attempt to collect cost-share obligations from doctors' patients, including "co-payments, co-insurance and deductibles." *See* Dkt. 87, Amended Complaint at ¶¶ 2, 29, 37, 42, 90, 134, 143, 154.

Cigna, however, cannot recover any payments on a theory of "fee forgiveness" if it paid the Labs notwithstanding its determination that the Labs purportedly engaged in such conduct.  The voluntary payment doctrine bars recovery of payments made voluntarily with full knowledge of the facts. *Lamborn v. Dickinson Cty. Comm'rs*, 97 U.S. 181, 185 (1877) ("A voluntary payment, made with a full knowledge of all the facts and circumstances of the case . . . cannot be revoked, and the money so paid cannot be recovered."). Courts in this jurisdiction have long-recognized and applied the voluntary payment doctrine. *See Spagnola v. Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2009) ("The voluntary payment doctrine precludes a plaintiff from recovering payments 'made with full knowledge of the facts' and with a 'lack of diligence' in determining his contractual rights and obligations."); *Synthetic Pats. Co. v. Sutherland*, 22 F.2d 494, 495 (2d Cir. 1927) ("A party may not, by direct action or by way of set-off or counterclaim, recover money voluntarily paid with the full knowledge of all the facts, without proof of fraud, duress, or mistake, although no obligation to make such payment exists."); *Morris v.*

*City of New Haven*, 63 A. 123, 123 (Conn. 1906) ("A party cannot recover money voluntarily paid with a full knowledge of all the facts, although no obligation to make such payment existed."); *Beecher v. Buckingham*, 18 Conn. 110, 119 (1846) ("There is no evidence that the payment was not made by the defendants, voluntarily, and with a full knowledge of all the facts. The rule is well settled, that moneys paid under such circumstances, cannot be recovered back.").

The undisputed facts demonstrate that:

- Cigna "flagged" PB Labs for "fee forgiveness" on December 11, 2014, *see* LRS at ¶ 54;

- Cigna first "flagged" BioHealth for "fee forgiveness" on May 22, 2015, *see* LRS at ¶ 55; and

- no later than "August 17, 2015," Cigna "uncovered the Labs' [purported] fraudulent conduct." *See, e.g.,* Dkt. 87, Am. Compl. at ¶ 124.

On these facts, and pursuant to the voluntary payment doctrine, Cigna cannot prevail on its "fee forgiveness" theory to recover (i) any payments it made to **any of the Labs** on or after August 17, 2015, (ii) any payments it made to **BioHealth** on or after May 22, 2015; or (iii) any payments it made to **PB Labs** on or after December 11, 2014. The Court should enter an Order consistent with this result.

### 3. Unbundling

"'Unbundling' occurs when a health-care provider separately bills for each of the individual services that are included in a comprehensive [CPT] code to increase reimbursement from third-party payors," like Cigna and Cigna Plans. *See* Dkt. 87, Amended Complaint at ¶ 116. Cigna alleges that the Labs "billed Cigna separately for

component parts of [] urine drug testing that are required to be included or 'bundled' into a single code." *See* Dkt. 87, Amended Complaint at ¶¶ 2, 29, 134, 154.  This is another of Cigna's three "coverage" theories of recovery.

Cigna cannot prevail at all under its "unbundling" theory pursuant to the voluntary payment doctrine.  In contrast to "fee forgiving," Cigna at all times had all of the facts necessary to conclude that the Labs were presenting separate claims for services that should have been bundled into a single claim. *See* LRS at ¶¶ 56–57.  The voluntary payment doctrine requires the Court to enter an Order dismissing Cigna's theory in its entirety.

## V.    <u>CONCLUSION</u>

The Court should dismiss Cigna's equitable claims against the Labs in full because Cigna is guilty of laches. Alternatively, the Court should (1) dismiss Count II in its entirety because Cigna has failed to come forward with any proof of an "identifiable *res*" that can be recovered, (2) dismiss Cigna's "medical necessity" theory in its entirety because the Labs relied, and had a right to rely, on doctors' medical-necessity determinations, (3) dismiss Cigna's "unbundling" theory in its entirety pursuant to the voluntary payment doctrine and (4) dismiss Cigna's "fee forgiving" theory in part, based on the dates on which Cigna determined that PB Labs, BioHealth and all other Labs purportedly forgave patients' cost-share obligations.

Dated: July 18, 2023                          Respectfully submitted,

/s/ Anthony T. Gestrich
Scott M. Hare (phv10339)
Anthony T. Gestrich (phv11119)
WHITEFORD, TAYLOR & PRESTON, LLP
11 Stanwix Street, Suite 1400
Pittsburgh, PA 15222
Telephone: 412-618-5600
Facsimile: 412-618-5596
E-mail:      SHare@whitefordlaw.com
              AGestrich@whitefordlaw.com

Fred Alan Cunningham (phv20210)
Matthew Christ (phv20209)
DOMNICK CUNNINGHAM & YAFFA
2401 PGA Boulevard, Suite 140
Palm Beach Gardens, FL 33410
Telephone: 561-625-6260
Facsimile: 561-625-6269
E-mail:      Fred@pbglaw.com
              Matt@pbglaw.com

John J. Radshaw III
(ct19882)
65 Trumbull Street, 2nd Fl.
New Haven, CT 06510
Telephone: 203-654-9695
Facsimile: 203-721-6182
E-mail:      jjr@jjr-esq.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 18, 2023, a copy of the foregoing was served on the following counsel for the parties by electronic mail:

EDWARD T. KANG
EMILY COSTIN
**ALSTON & BIRD LLP**
950 F Street, NW
Washington, DC 20004
edward.kang@alston.com
emily.costin@alston.com

KELSEY L. KINGSBERY
555 Fayetteville Street, Suite 600
Raleigh, North Carolina 27615
kelsey.kingsbery@alston.com

*Counsel for Connecticut General Life Insurance Company and
Cigna Health and Life Insurance Company*

/s/ Anthony T. Gestrich
Anthony T. Gestrich