# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., )<br>Ex rel. TINA D. GROAT, )<br>)<br>Plaintiffs, )<br>)<br>)<br>v. )<br>)<br>)<br>BOSTON HEART DIAGNOSTICS )<br>CORPORATION, )<br>)<br>Defendant. )<br>)<br>) | Civil Action No. 15-487 (RBW) |

## BRIEF OF AMICUS CURIAE
## <u>AMERICAN CLINICAL LABORATORY ASSOCIATION</u>

## **TABLE OF CONTENTS**

I. INTEREST OF ACLA ................................................................................................................ 1

II. ARGUMENT ............................................................................................................................. 2

    A. Introduction ................................................................................................................... 2

    B. Laboratories Cannot Determine Medical Necessity. ..................................................... 3

    C. Laboratories Have Never Been Required To Make Medical Necessity
        Determinations. .............................................................................................................. 6

    D. Requiring Laboratories to Assess Medical Necessity would Adversely
        Affect Patients' Ability to Obtain Necessary Testing. .................................................. 8

III. CONCLUSION ....................................................................................................................... 10

The American Clinical Laboratory Association ("ACLA") submits this brief in support of the Motion of Defendant, Boston Heart Diagnostics Corporation, for Reconsideration of the Court's Memorandum Opinion of June 9, 2017 ("<u>Memorandum Opinion</u>"). As discussed more fully below, ACLA, which represents the interests of laboratories and their patients, takes the position that laboratories are not required by applicable law to determine the medical necessity of a test before submitting a claim to Medicare for the test; it would be impossible for laboratories to do so, given the sheer volume of laboratory testing that is performed daily; and enforcing such a policy would have significant deleterious effects on laboratories and on the physicians and patients who rely on the testing. As a result, we respectfully request the Court reconsider its finding concerning the obligation of laboratories to make an independent assessment of the medical necessity of testing performed and billed for.[1]

**I.      INTEREST OF ACLA.**

The American Clinical Laboratory Association is a not-for-profit organization that represents the interests of clinical laboratories and advocates for laws and regulations that support the essential role of laboratories in delivering quality health care. ACLA also works to promote public awareness about the value of laboratory services in preventing illness, diagnosing disease, and monitoring health treatment. ACLA actively works with Congress, the Centers for Medicare and Medicaid Services ("CMS") and Medicare contractors to promote the development of appropriate policies that protect the Medicare program and minimize the burdens on laboratories and test-ordering physicians.

---

[1] ACLA's specific concern is with Section III.A.1.b.iii. of the Memorandum Opinion, entitled "Whether Boston Heart Must Determine Medical Necessity" at pp. 15-19.

ACLA has 33 members, including local, regional, and national laboratories, and its membership includes laboratories performing both routine and esoteric testing. Defendant Boston Heart is not a member of ACLA. Every laboratory that is a member of ACLA provides services to Medicare beneficiaries and bills the Medicare program for those services. ACLA members are concerned that strict enforcement of the language in the Court's Memorandum Opinion would adversely affect laboratories and the quality of care received by Medicare beneficiaries.

## II. ARGUMENT.

### A. Introduction

ACLA submits this brief because it is concerned about the impact of certain conclusions reached by the Court on the ability of laboratories to provide testing services. According to the Memorandum Opinion, Boston Heart "has an obligation to establish that the tests for which it seeks government reimbursement are medically necessary" before it bills for the tests.[2] The Court also notes that the laboratory "had an independent obligation to certify that the tests for which it requested government reimbursement were medically necessary."[3]

Based on these statements, it appears the Court has concluded that laboratories must review the diagnosis codes and other information submitted by the test-ordering physician and, based on that information, assess the patient's medical condition to determine medical necessity before billing for the testing. If the laboratory determines that the tests ordered were not medically necessary, then presumably the laboratory would not perform the tests, since it is unlikely to perform tests for which it would not be paid.

---

[2] Memorandum Opinion at 16.

[3] *Id.* at 12. According to the Relator, "Labs have an affirmative obligation to examine the doctor's test ordering information and only perform and bill for the test if it is properly justified by the diagnosis." Relator's Opposition to Defendant's Motion to Dismiss Relator's Second Amended Complaint at 12-13.

2

ACLA has several concerns with this view. First, laboratories are not in a position to determine whether or not a test is medically necessary. Second, laboratories have never been required to make a determination of medical necessity before submitting a claim to Medicare. And finally, given the volume of tests that are performed for Medicare beneficiaries, such a requirement would likely slow down the testing process significantly and would have a significant adverse impact on physicians and their patients, as well as on laboratories. We discuss each of these issues in detail below.

B.  **Laboratories Cannot Determine Medical Necessity.**

The very nature of laboratory testing makes it impossible for laboratories to determine the medical necessity of testing ordered by physicians. In the vast majority of cases, laboratories do not see the patient for whom the testing is being ordered. Even in cases in which the patient comes to a laboratory facility to have a specimen drawn, the laboratory does not examine the patient to assess his or her medical condition. Laboratories receive and analyze the blood, urine, or other bodily fluid of patients. In the overwhelming majority of cases, the laboratory does not have the patient's medical record, have knowledge of the patient's condition or medical history, or have any other information related to the patient. Thus, the laboratory has no ability to determine whether a test is appropriate for the specific patient for whom it is being ordered. The physician is the health professional with access to the patient's medical record, which is why he or she is the one who must determine medical necessity.

For example, when a laboratory receives a physician order for a glucose test, a very common test, it has no way to determine independently whether or not the test is medically necessary for the patient, because it is not aware of the patient's underlying condition or medical history. Even if the diagnosis code submitted is one of the hundreds that are recognized by the

3

National Coverage Determination for this test,[4] the laboratory cannot determine if that code is the correct one for the particular patient. And, if the code submitted is not one of the codes included on a list in the National Coverage Determination, the laboratory still cannot say conclusively that the test is not medically necessary because there may be other factors that affected the physician's decision-making about ordering the test.[5] Doctors order tests for a variety of reasons, including diagnosis, screening for disease, monitoring disease progression, determining response to treatment, monitoring medication blood levels, and assessing genetic predisposition to disease. Since the laboratory cannot know what the physician's specific reason was for ordering a test, it must rely on his or her determination.

Further, expecting laboratories to judge the medical necessity of a test blurs the line between the practice of medicine and the function of a clinical laboratory. Laboratories do not order clinical diagnostic tests for Medicare patients. Under Medicare rules, the program pays for a laboratory test only when it is ordered by a physician or other health care practitioner who is treating the patient.[6] The Office of Inspector General of HHS ("OIG") has acknowledged that laboratories do not "treat patients."[7] The role of the laboratory is to analyze the specimen submitted for the presence or absence of various substances, or to quantify how much of a

---

[4] *See* Medicare Program: Negotiated Rulemaking: Coverage and Administrative Procedures for Clinical Diagnostic Laboratory Services; Final Rule, 66 Fed. Reg. 58788, 58846 (Nov. 23, 2001) ("Negotiated Rulemaking"). *See also* National Coverage Determination for Blood Glucose Testing (190.20) *available at:* www.cms.hhs.gov.

[5] As discussed below, Medicare contractors may find a service medically necessary even if the codes are otherwise not considered covered. *See, infra,* at pp. 7-8. *See also,* CMS, Medicare Claims Processing Manual, Chap. 17, § 120.1. (Even where there is an LMRP or NCD for the test, the contractor "reviews all of the diagnosis codes in making a determination regarding medical necessity of the service.")

[6] 42 C.F.R. § 410.32(a).

[7] Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45076, 45079 (Aug. 24, 1998) ("Compliance Program Guidance").

4

particular substance is present, and to report those results back to the physician.[8] Laboratories do not determine what use is to be made of that information; that is the decision of the physician and constitutes the practice of medicine.

For example, under Massachusetts law, where the Defendant is located, a laboratory is licensed under a state law establishing laboratory licensing requirements. A laboratory is defined as "a facility or place, however named, the purpose of which is to make biological, serological, chemical, immunohematological, cytological, pathological or other *examinations of materials derived from a human body*."[9] In that case, the entity is regulated and licensed by the Massachusetts Department of Health. On the other hand, if an individual is "practicing medicine" then he or she must be licensed by the Board of Medicine. The practice of medicine includes conduct "involving or reasonably thought to involve an assumption of responsibility for the other person's physical or mental well being: diagnosis, treatment…"[10] Thus, if a laboratory were to make determinations concerning medical necessity, including deciding not to perform a test that had been ordered by a physician—a decision that would be inappropriate, as the laboratory has not examined the patient and has no information about the patient—then the laboratory would be assuming "responsibility for the other person's physical … well being" and treating the patient, *i.e.,* practicing medicine.

Finally, if the laboratory disregarded the judgment of the medical professional who ordered the test, did not perform it, and the patient suffered an illness or injury as a result, the

---

[8] All laboratories must have a certificate under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"). Under the applicable regulations, a laboratory is one that conducts an "examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings." 42 C.F.R. § 493.2 (definition of "laboratory.")

[9] 105 Code Mass. Regs. § 180.010 (emphasis added).

[10] 243 Code Mass. Regs. § 2.07.

laboratory likely would be held liable for its failure to perform the test as ordered. It would be unreasonable for the Medicare program to require the laboratory to act in a way that could result in the laboratory subsequently being found liable as a result of complying with that requirement. Presumably, the laboratory could perform the test and then not bill for it, but it also is unreasonable to expect a laboratory to perform a test for which it will not be paid.

In sum, laboratories cannot determine medical necessity because they do not have the patient's medical record and have not examined the patient; doing so would require them to "practice medicine," which they are not permitted to do; and it could result in their being liable for any subsequent injury to the patient.

### C. Laboratories Have Never Been Required To Make Medical Necessity Determinations.

The OIG, which enforces the federal health care fraud and abuse laws, has recognized that laboratories are not in a position to determine medical necessity. In its Model Compliance Plan for Laboratories, the OIG stated: "We recognize that *laboratories do not and cannot treat patients or make medical necessity determinations.*"[11] The OIG found that laboratories do have obligations to inform physicians about applicable Medicare requirements and explain the risk that Medicare may not pay for the services, but it recognized that laboratories are not in a position to make determinations regarding medical necessity.[12] Moreover, it noted that physicians must be able to order any tests that they believe are appropriate for the treatment of their patients.[13]

---

[11]   Compliance Program Guidance, 63 Fed. Reg. 45076, 45079 (Aug. 24, 1998) (emphasis added).
[12]   *Id.*
[13]   *Id.*

6

The purpose of the OIG's Compliance Program Guidance was to provide clear guidance to laboratories concerning their obligations under the fraud and abuse laws.[14] At no point does the OIG suggest that the laboratory is to make a determination concerning medical necessity of the tests ordered. To the contrary, it notes that laboratories cannot make that determination. Further, it notes that physicians must be able to order any tests that they believe are appropriate. It would be odd for the OIG to make this statement if it then expected the laboratory not to perform (or bill for) that test, a test that the OIG acknowledges the physician has the right to order. In sum, there is no suggestion that the OIG expects laboratories to take on any kind of independent assessment of medical necessity.

Finally, it is not up to the laboratory or the physician to determine whether Medicare should pay for a service or not. That determination is made by the Medicare Administrative Contractors ("MAC"), to whom CMS has given claims-processing responsibility. In 2001, CMS published a regulation that resulted from a Congressionally-mandated negotiated rulemaking dealing with laboratory billing issues.[15] That rulemaking resulted in a group of National Coverage Determinations for common laboratory tests, which included specified diagnosis codes that would be considered covered. One commenter specifically noted concern that establishing a list of covered diagnoses would foreclose patients from obtaining coverage for diagnoses not listed. In responding, however, CMS noted that simply because a particular code was not listed as a covered code did not eliminate potential coverage. According to CMS, the policies were "constructed in a fashion to permit a Medicare contractor to consider coverage of additional indications on a case-by-case basis." Further, because contractors are required to consider all

---

[14] *Id.* at 45077 ("The following compliance program guidance is intended to assist clinical laboratories in developing effective internal controls that promote adherence to applicable" laws.)

[15] Negotiated Rulemaking at 58788.

information accompanying the claim, CMS went on to note that even codes that were listed as not covered still could be covered when accompanied by appropriate medical justification for a particular patient's condition.[16] Moreover, even if a code is denied by the contractor, the laboratory can always appeal that determination.[17]

In sum, CMS and the OIG have recognized that the laboratory cannot determine medical necessity and have never suggested that the laboratory must, nonetheless, make a medical necessity determination prior to billing for a test.[18] Moreover, it is the Medicare contractor, not the laboratory, that has the final decision as to what is medically necessary.

D.  **Requiring Laboratories to Assess Medical Necessity Would Adversely Affect Patients' Ability to Obtain Necessary Testing.**

Requiring that laboratories review each test order to determine whether or not the information presented justifies the performance of the test would be especially difficult because of the sheer number of tests that are being performed. According to a recent report from the OIG, in 2015, there were 474 million laboratory tests billed to Medicare by over 60,000 different laboratories.[19] That would mean that, on average, laboratories are performing almost 1.3 million tests a day. These tests were provided to 27 million Medicare beneficiaries annually who

---

[16] *Id.* at 58792. CMS also responds to a comment seeking a process that would allow contractors to consider other justification for a test, in addition to those codes in the NCD. CMS noted that contractors were required to consider any documentation that is submitted with the claim. "Thus a process already exists for physicians to justify tests that are not presumed medically necessary."

[17] *See* 42 C.F.R. Part 405, Subpart I.

[18] Section 410.32(d) does not require laboratories to make an assessment of medical necessity. It simply states that the laboratory is to maintain the documentation that it receives from the ordering physician. 42 C.F.R. § 410.32(d)(2)(ii). While it *permits* the laboratory to seek additional information from the physician, it does not *mandate* that it do so. *Id.* at § 410.32(d)(2)(ii). Finally, section 410.32 states that if CMS is unable to determine medical necessity, it may request "from the ordering physician …those parts of the [patient's] medical record that are relevant" to such a determination. *Id.* at § 410.32(d)(3)(ii). That the medical necessity documentation is sought from the physician, rather than the laboratory, further underscores that it is the physician—not the laboratory—who is responsible for determining medical necessity.

[19] Office of Inspector General, Medicare Payments for Lab Tests in 2015: Year 2 of Baseline Data (OEI-09-16-00040) at 3, (June 28, 2017), *available at* https://oig.hhs.gov/oei/reports/oei-09-16-00040.asp.

8

received at least one test during the year and were ordered by over 600,000 different medical professionals.[20]

Today, laboratory testing is designed to be done rapidly and cost-effectively, ensuring that physicians receive their patients' results as quickly as possible. Physicians routinely order tests electronically, through web-based portals established by the laboratories or third-parties. Lab couriers pick up test specimens each evening at doctors' offices and the specimens are then delivered to a laboratory where they are tested, usually overnight. Laboratories themselves also are highly automated, so that specimens can be efficiently directed to the section of the laboratory where the appropriate type of testing is performed. The results are reported back to the physician as soon as possible, and often within 24 hours. Such rapid turnaround is of great benefit to physicians, who can then quickly determine an appropriate course of treatment, and to patients, who do not have to endure the uncertainty that can accompany waiting for a test result.

Complying with the Court's requirement would necessitate that an individual within the laboratory review each of the tests ordered and the diagnosis codes submitted, assess the appropriateness of the tests ordered based on the information submitted, and then make a decision about whether or not the test should be performed. Where additional information is necessary, the laboratory would have to try to contact the physician's office. Even if such a process were somehow possible, it is difficult to see how it could be performed daily almost 1.3 million times. Any attempt to do so would slow down the processes that laboratories currently use and certainly would result in physicians and patients having to wait longer periods for their results. In instances where a physician is waiting to determine a course of treatment based on the

---

[20] *Id.* In addition, according to the OIG, on average 3.7 laboratory tests were performed each time a Medicare beneficiary received testing. *Id.* Thus, the laboratory would have to determine the medical necessity not of a single test, but of at least three different tests for each Medicare beneficiary.

9

test results, such a delay could have a negative impact on the patient's health outcome. Furthermore, laboratory specimens cannot sit on a shelf waiting to be tested while the laboratory engages in the process detailed above. They must be tested before the quality of the specimen begins to degrade. Finally, because of the additional time and manpower that would be required to accomplish these tasks, the cost of doing the testing itself would increase, which also would lead to an increase in Medicare program costs.

In sum, ACLA respectfully submits that it is impossible for the laboratory to make an independent assessment of medical necessity before performing and billing for testing services— nor is such an assessment legally required—without also slowing down the entire testing process, risking the health of patients, and increasing testing costs.

## III. CONCLUSION.

In sum, ACLA asks the Court to revise its Memorandum Opinion to recognize that laboratories are not expected to make a determination concerning medical necessity prior to performing tests and billing for them, and that laboratories are permitted to bill for the services, based on the diagnostic information received from the physicians who ordered the tests.

Respectfully submitted,

*/s/ Peter M. Kazon*
Peter M. Kazon, Esq. (D.C. Bar No. 271817)
peter.kazon@alston.com
Kelley C. Barnaby, Esq. (D.C. Bar No. 998757)
kelley.barnaby@alston.com
Alston and Bird, LLP
950 F Street, NW
Washington, DC 20004
(202) 756-3300
(202) 654-4834(f)

*Counsel for non-party American Clinical Laboratory Association*