# EXHIBIT 3

Case 3:19-cv-01324-JCH   Document 214-3   Filed 07/20/23   Page 2 of 25
Connecticut General Life Insurance Co. v. Biohealth Laboratories, Inc., et al
Stephanie Canto                                                    Job Date:10/27/2022



```
 1        UNITED STATES DISTRICT COURT

 2         DISTRICT OF CONNECTICUT

 3        CASE NO:  3:19-CV-01324-JCH

 4   _____x

 5   CONNECTICUT GENERAL LIFE

 6   INSURANCE COMPANY and

 7   CIGNA HEALTH AND LIFE

 8   INSURANCE COMPANY,

 9         Plaintiffs,

10   Vs.

11   BIOHEALTH LABORATORIES, INC.,

12   PB LABORATORIES, LLC;

13   EPIC REFERENCE LABS, INC.,

14         Defendants.

15   _____x

16

17   VIDEOTAPE DEPOSITION OF:  STEPHANIE CANTO

18   DATE:  THURSDAY, OCTOBER 27th, 2022

19   TIME:  9:35 A.M. TO 4:33 PM

20   HELD AT:  WEB-BASED VIDEO CONNECTION

21   Reporter:    CHRISTINE FOX, CSR

22                BRANDON LEGAL TECH LLC

23                37 Pinnacle Mountain Road

24                Simsbury, Connecticut  06070

25                (860) 528.2244 (tel)
```

Stephanie Canto                                              Job Date:10/27/2022

```
 1   both of us are saying.  So it's very important
 2   that we not talk over each other.
 3        Is that okay?
 4        A.  Yes, sir.
 5        Q.  Okay.  All right.
 6        So what do you do for a living, ma'am?
 7        A.  I am currently a senior fraud manager
 8   with Cigna special investigations unit.
 9        Q.  Okay.  And during the course of -- well,
10   strike that.
11        When did you start with Cigna?
12        A.  August of 2000.
13        Q.  And were you the fraud investigator for
14   Cigna, for the SIU investigator for Cigna who was
15   responsible for handling the case against PB Labs
16   and also Biohealth, and also Epic?
17        A.  No, I was not.
18        I was responsible for PB Labs and
19   Biohealth only.
20        Q.  Okay.  Ma'am, do you have any
21   documentation or are you aware of any
22   documentation that indicates that your decision
23   in this case, stopping payment to PB Labs for
24   services not rendered, was supported by the same
25   or similar finding of the Florida Department of
```

Conduent Health Life Insurance Co. Bioheal Incorporated, Inc., et al

1  senior fraud investigator?

2      A.  No, I was not supervising.  I was

3  offering coaching and support assistance.

4      Q.  Okay.  But were you still handling any

5  number of cases as a senior fraud investigator?

6      A.  Yes, I still had an active caseload.

7      Q.  And would that caseload have increased

8  or decreased from when you were a fraud

9  investigator?

10      A.  I believe it may have decreased.

11      Q.  Was that because you would have been

12  spending more time helping others as opposed to

13  when you were a fraud investigator?

14      A.  I believe that's correct.

15      Q.  And was there a certain number of cases

16  that you would -- would be handling at any given

17  time as a senior fraud investigator?

18      A.  Are you asking if I had an exact number

19  assigned to me at any given time?

20      Q.  Yes, ma'am.

21      A.  That varied.  I -- I wouldn't be able to

22  give you a steadfast number.

23      Q.  Who would decide how many cases you

24  would be handling at any given time as a senior

25  fraud investigator?

1          A.   My manager.

2          Q.   Would that be Mr. Hurley?

3          A.   When I became a senior investigator, my

4     manager was Deanna Anderson for a short period of

5     time.

6          Q.   And then who was it after that?

7          A.   Gentleman by the name of that Matt

8     Priog, also for a short period of time.

9          Q.   Okay.  And who was it after that?

10         A.   I transitioned back to Deanna Anderson.

11         Q.   Do you know why that occurred?

12         A.   Mr. Priog left the organization.

13         Q.   And then you became a senior fraud

14    investigator manager, you told me, in 2018,

15    correct?

16         A.   Yes, sir.

17         Q.   Who was your supervisor when you became

18    a senior fraud investigator?

19         A.   Tom Hixson.

20         Q.   Did your job duties and responsibilities

21    change when you became a senior fraud manager as

22    opposed to the duties and responsibilities you

23    had as a senior fraud investigator?

24         A.   Yes.

25         Q.   How did they change?

Connecticut General Life Insurance Company & Cigna Health and Life Ins., et al

 1     A.   No.

 2     Q.   Ms. Canto, a moment ago you mentioned

 3  audits.

 4          What -- what is an audit?

 5     A.   It can vary, depending upon your job

 6  title.

 7          Would you want to understand more about

 8  an -- special investigations audit or a claim

 9  audit since I've done both?

10     Q.   Yes, ma'am.  Let's -- let's talk about a

11  special investigations audit.

12          What is that?

13     A.   A special investigations audit is

14  typically a retrospective audit that occurs, and

15  we perform data analysis that will involve a

16  thorough review of claims billing.

17          We will request information from a

18  provider that would include medical records,

19  patient and billing information.

20          We will also have opportunities to speak

21  with customers or send customers questionnaires

22  to understand more about their experience with a

23  particular provider.

24          We may be doing online research,

25  background research.

1          There's numerous elements to a special

2    investigations audit.

3          Q.  Okay.  Now, Ms. Canto, did you have an

4    opportunity to review any documents before your

5    deposition today to prepare for the deposition?

6          A.  No, sir.  Just what Teddy and Kelsey

7    have provided.

8          Q.  Okay.  But -- and I'm not -- certainly,

9    Mr. Kang will object if he deems it necessary.

10         All I'm trying to figure out is:  Did

11   you look at some documents to refresh your memory

12   as to your involvement in the handling of these

13   cases?

14         A.  I received a deposition binder.

15         (OVERTALK)

16         COURT REPORTER:  I'm sorry.  Overtalk.

17         MR. CUNNINGHAM:  Sorry.  That's my

18     fault.

19   BY MR. CUNNINGHAM:

20         Q.  Okay.  What do you mean by "a deposition

21   binder"?

22         A.  I received a binder of exhibits.

23         Q.  Okay.  Did you review Deanna Anderson's

24   deposition that was taken in this case?

25         A.  No, sir.

Conn. Gen. Life Ins. Co. v. BioHealth Lab., Inc., et al.

1 your activity on the cases that we're here to

2 talk about today?

3     A.  If that information was in the binder,

4 it's possible that I had seen that, yes.

5     Q.  Did reviewing the documents you reviewed

6 refresh your memory or refresh your recollection

7 as to the activity that you performed in handling

8 these cases?

9     A.  Somewhat.  It -- it has been some time.

10     Q.  Okay.  Did you have any independent

11 memory, independent recollection of your handling

12 of these cases?

13     A.  I would say, yes, specific to PB Labs

14 and Biohealth, I -- I do have some individuals

15 recollection.

16     Q.  Okay.  Can you tell me what you

17 remember?

18     A.  I remember being responsible for

19 auditing both of these labs.  I requested various

20 information, whether it was through customer

21 outreach or with the provider directly.

22       I also did perform data analysis on

23 claims that were submitted by each lab.  I've

24 consulted with internal clinicians, our

25 attorneys, my manager, and ultimately, made

Connecticut General Life Insurance Company vs. Biohealth Laboratories, Inc., et al.

1    A.  It would be a very speculated answer,
2  but maybe a couple hundred.
3    Q.  Okay.  So you were familiar with the
4  audit process when this claim came in at Cigna,
5  correct?
6    A.  Yes.
7    Q.  Okay.
8    MR. CUNNINGHAM:  All right.  Matt, let's
9    put up -- we'll mark as Exhibit 2 Bates
10    number 0291657.
11    (Exhibit Number 2
12    Bates 0291657
13    Marked for Identification)
14    MR. CUNNINGHAM:  Could you enlarge that,
15    please, Matt.
16  BY MR. CUNNINGHAM:
17    Q.  Did you review this document in
18  preparation for your deposition, Ms. Canto?
19    MR. KANG:  Fred, I'm going to object to
20    that question just because it gets into
21    potentially attorney-client privilege, but
22    you can ask questions about the document.  I
23    have no problem with that.
24  BY MR. CUNNINGHAM:
25    Q.  Now, what I want to ask you about,

1        A.  It's possible, yes.

2        Q.  And you would expect that, wouldn't you?

3        A.  I would think so, yes.

4        Q.  Okay.  Let me --

5            MR. CUNNINGHAM:  Scroll up, please.  The

6        next one, Matt.

7    BY MR. CUNNINGHAM:

8        Q.  July 18, 2013, and let me read this in

9    the record.

10           Is this note from you?  July 18, 2013,

11   at 11:26, a.m.?

12       A.  Yes, I do see that note.

13       Q.  Okay.  Does it say, "I spoke to Patrick

14   about my conversation with Dolores and the use of

15   the unlisted lab code as the highest paid

16   procedure on for this H -- HCP.  He agreed that I

17   could proceed with flagging for the unlisted CPT

18   code.  I double-checked with Charlene on sending

19   a case notification to SAMBA, and even though

20   SAMBA provided referral, we were still required

21   to provide a case status form back to them."

22           Did I read that accurately, ma'am?

23       A.  Yes.

24       Q.  Okay.  Do you remember anything about

25   this conversation with Patrick?  I know we're

1    talk about nine years ago.  Do you have any

2    independent recollection aside from what you

3    wrote in this note?

4          A.  I do not, no.

5          Q.  Did Mr. Hurley ever suggest to you that,

6    you know, there willing to give you the names of

7    the referring doctors; why can't you just call

8    them or write them?

9          A.  I don't recall that suggestion, no.  I'm

10   sorry.

11         Q.  Then on July 23rd, 2013 --

12               MR. CUNNINGHAM:  At the top of the page,

13         Matt.

14   BY MR. CUNNINGHAM:

15         Q.  Did you say, at 11:13, a.m., "I

16   completed pulling the claim data for Dolores and

17   mailed out the spreadsheets via UPS," and then

18   you give a tracking number.  What are you talking

19   about there, ma'am?

20         A.  Based on the conversation I had with her

21   on the 17th, I did indicate at that time I would

22   supply her with claim detail for each of the

23   patients' medical records that we were

24   requesting, and that is the claim data that I

25   ultimately sent to her on the 23rd.

1    Q.  Okay.  For -- for how many claims -- or

2  how many claims did these spreadsheets encompass?

3         COURT REPORTER:  I'm sorry.

4         MR. CUNNINGHAM:  How many claims did

5     these spreadsheets encompass?

6         COURT REPORTER:  Thank you.

7         THE WITNESS:  I do not recall the total

8     number.

9  BY MR. CUNNINGHAM:

10    Q.  Do you think you would have sent her the

11  spreadsheets with the patient data just for the

12  claims that you were concerned about?

13    A.  The claim spreadsheet would have been

14  for the claims that were a part of that medical

15  record request that I initiated.

16    Q.  Okay.  And how did you decide for which

17  patients you wanted medical records?

18    A.  I don't recall the exact sampling

19  methodology used.

20    Q.  Would they all have been patients that

21  had CPT codes of 80299 for the lab work that was

22  done?

23    A.  I believe that that would have been one

24  of codes, yes.

25    Q.  Okay.  So typically, what type of

1  methodology would you use to determine which

2  particular patients you would need information

3  on?

4       A.  That can vary on a case-by-case basis.

5  Sometimes, that may be a probe sample, meaning a

6  small number of patient records were requested.

7  It could be a full sample meaning all patients

8  that were billed by a provider.  It -- it's going

9  to be vary on the case.

10      Q.  Okay.  And in this particular case, you

11 don't know how you selected the patients for whom

12 you requested further information?

13      A.  I don't recall specifically at this

14 time, no.

15          MR. CUNNINGHAM:  Okay.  Matt, please put

16     up 289439 and 289440.

17 BY MR. CUNNINGHAM:

18      Q.  These two pages were marked as Exhibit 3

19 at the Anderson deposition.  They will be

20 Exhibit 8 to this deposition.

21          (Exhibit Number 8

22          Bates 289439-440

23          Marked for Identification)

24 BY MR. CUNNINGHAM:

25      Q.  Thank you.  Okay.

1  just a minute, and maybe we'll come back to this

2  note.

3          He says, "I -- I ran a Fraud Shield

4  report, and it has a high score firing on five

5  alerts."

6          Did I read that accurately?

7      A.  Yes.

8      Q.  What is a Fraud Shield report?

9      A.  Healthcare Fraud Shield has an element

10  to it where you can perform data analysis on

11  claim detail, and that analysis is what can be

12  termed a Fraud Shield report.

13      Q.  Okay.  What was your understanding of

14  what he meant by, "I question the approach of

15  Dr. Nicoll with the pending volume"?

16      A.  I'm not on the e-mail.  So I don't

17  really know what he meant by that.

18      Q.  Do you know if Deanna Anderson would

19  have discussed the contents of this e-mail with

20  you at or around the time that she received it?

21      A.  It's possible.

22      Q.  Do you have any recollection of that?

23      A.  I don't.  I'm sorry.

24      Q.  Okay.  Do you remember consulting with

25  Dr. Nicoll on this case?

1   provider?

2        MR. KANG:  Objection.  Vague and

3     ambiguous.

4        But you can answer if you understand.

5        THE WITNESS:  No, I would not agree with

6     that statement.  If a client refers a

7     concern to our department, regardless of the

8     provider's participation status, we do our

9     due diligence in reviewing that concern.

10  BY MR. CUNNINGHAM:

11     Q.  All right.  You say, "I had requested

12  records for 20 patients, and they have supplied

13  what appears to be claim copies in the members'

14  lab results."

15        And I think this may be along the lines

16  of what I asked you earlier:  Do know how you

17  selected the 20 patients for whom you wanted to

18  see records?

19     A.  I do not recall.  I'm sorry.

20     Q.  Can you tell me what the alternatives or

21  what the options were?  I mean, you could have, I

22  guess, taken the first 20 that appeared on the

23  list, you could have taken by age, you could have

24  them taken by gender.  How do you typically, when

25  you're doing an audit, decide on which patients'

 1   records you want reviewed?

 2          MR. KANG:  Objection.  Asked and

 3      answered.

 4          But answer again.

 5          THE WITNESS:  I cannot recall the type

 6      of criteria that I had utilized at the time

 7      for this particular audit.  There really is

 8      no standard or typical methodology.  It

 9      really is going to depend on the concerns

10      that have been raised and the information

11      that we're looking to receive from the

12      provider.

13   BY MR. CUNNINGHAM:

14      Q.  Well, reason I'm asking, ma'am, is there

15   were over 750 claims from PB Labs that were in

16   the SIU for review, correct?

17      A.  I can't confirm that.  It was just an

18   e-mail with regards to potential pended claims.

19   I can't confirm if they actually were all

20   reviewed by SIU.

21      Q.  Okay.  But that's what Mr. Hixson put in

22   his e-mail that we just saw a moment ago, the

23   e-mail with Deanna Anderson, right?

24      A.  There was reference to that claim count,

25   yes, but unfortunately, I -- I don't know if that

1  meant all claims were to be reviewed by our

2  department.  I'm sorry.

3      Q.  Well, what I'm wondering, ma'am, is:  If

4  there were, in fact, 750 claims from Palm Beach

5  Labs, and you were only selecting 20, how would

6  you go about selecting 20 out of 750?

7      A.  The 20 patients were a retrospective

8  review.  I believe that that prior e-mail you

9  showed me was with regards to our prospective

10 protocol meaning that the claims have not been

11 paid, nor were they a part of my retrospective

12 review.

13     Q.  Okay.  So the bottom line on this is you

14 don't know how you selected the 20 patients that

15 you wanted to review records on?

16     A.  At this point in time, I do not know

17 recall, no.

18     Q.  Are there any guidelines or protocols at

19 Cigna that you're aware as to how you go about

20 selecting the people whose medical records you

21 want reviewed?

22     A.  At that point in time?  I don't believe

23 there was a guideline.

24     Q.  Is there a guideline now?

25     A.  There is a resources to utilize if you

1   are performing what's called a statistically

2   valid random sample.

3        Q.   Okay.  And what is that resource?

4        A.   RadStat, it's a CMS approved software

5   system for statistically valid random sampling.

6        Q.   I'm sorry.  Go ahead.  I'm sorry.  I

7   interrupted you.

8        A.   I -- I was just going to say, at that

9   point in time, we were not utilizing that

10  methodology.

11       Q.   So what was the methodology?  That's

12  what I'm trying to figure out.

13       A.   I don't recall.  All I can speak to

14  is -- what you're showing here, is that I

15  requested 20 patient records.

16       Q.   Well -- and, ma'am, you -- you really

17  hit the nail on the head a moment ago.  That's

18  what I'm trying to figure out is:  How do you

19  randomly select 20 people and make sure that that

20  random sampling is statistically valid?

21            MR. KANG:  Objection.  Asked and

22       answered.

23  BY MR. CUNNINGHAM:

24       Q.   You just don't know how you did it in

25  this case?

Stephanie Canto — Continued General Life Insurance, et al v. Bioheath Laboratories, Inc., et al.

Job Date:10/27/2022

1    A.  I'm sorry.  I just don't recall the
2   criteria that was utilized to select the sample
3   of records.
4    Q.  Do you know if it would have been a
5   decision that you made or a decision that one of
6   your colleagues or superiors would have made?
7    A.  I believe it would have been my
8   decision.
9    Q.  Okay.  So if you had to make a similar
10  decision today, if you had a healthcare provider
11  or a lab like PB Labs that had 750 claims pending
12  and you had to try to randomly select 20 of those
13  patients for a medical record review, how would
14  you go about doing that today?
15   A.  Well, first, I'd like to clarify.
16  There's two distinct claim parts that you're
17  referring to.  That 750 number, those were not a
18  part of a retrospective review; it's a
19  prospective.  So those were not a part of the
20  criteria of claims that I determined the 20
21  patients to request records on.  So it's two
22  distinct data criteria and elements.
23   Q.  May I ask how -- how you know that?
24   A.  In the prior e-mail, it does state 750
25  L-PENDS.  A pend is a term used for a claim that

1   requesting medical records; Cigna was just going

2   to deny payment of all claims using CPT code

3   80299?

4           A.  No, that is not correct.

5           Q.  So then why change it?

6           A.  This protocol request was to deny all

7   services as services not rendered as billed.  I

8   do not see any particular CPT code or procedure

9   code in the protocol.

10          Q.  Oh.  So are you telling that me, even if

11  a bill was submitted from PB Labs that did not

12  involve CPT code 80299, that bill was going to be

13  denied?

14          A.  As of September 26, 2013, yes.

15          Q.  Okay.  So all claims as of September 26,

16  2013, from PB Labs would be denied, regardless of

17  whether they used CPT code 80299?

18          A.  That is correct.

19          Q.  Okay.  And what was reason for that

20  change?

21          A.  I believe, by this point in time, we had

22  completed a review of the medical record

23  information supplied by the lab, and we

24  determined that the information did not support

25  the services billed.

1      A.   The terminology is going to be

2    explanation of payment.   It's the notification

3    that gets issued regardless if actual monies have

4    been paid.

5      Q.   But if PB Labs received an EOP on one

6    particular claim, they would not have been

7    advised that Cigna had made the decision to not

8    pay on any claims from PB Labs, regardless of

9    whether 80299 was used, correct?

10     A.   Correct, the EOPs are on a

11   claim-by-claim basis.

12     Q.   So how would PB Labs know that Cigna had

13   made a decision to disallow payment of any claims

14   from PB Labs, regardless of whether 80299 was

15   used?

16     A.   We would prepare what's called an audit

17   findings notification if the reason for

18   non-payment is due to our investigation findings.

19     Q.   And when did that happen in this case?

20     A.   I do not recall the specific timing of

21   our notification to the provider by way of that

22   letter.

23     Q.   Why wouldn't PB Labs have been notified

24   immediately of this change in status with respect

25   to payment of the claims?

1    A.  Honestly, it could be for a variety of

2  reasons.  I know, usually, there's some time

3  involved as far as the preparation of the letter.

4  There may be times where we are deferring

5  information and speaking with counsel about the

6  outcome of an investigation to prepare for an

7  audit findings notification.  There could be a

8  couple of different reasons.

9    Q.  Do you know what reason there was in

10  this case that Palm Beach Labs was not notified

11  of the change or the flag change at Cigna such

12  that none of their claims are going to be paid,

13  even if they weren't using CPT code 80299?

14    A.  I don't exactly recall.  I don't recall

15  when I did eventually issue that letter.  I can't

16  give an exact reason.

17    Q.  We'll -- we'll get to that, ma'am.

18    Let me ask you this:  At the time that

19  this change was made September 26, 2013, are you

20  aware of any guidelines or protocols at Cigna as

21  to whether a lab should be told of a flag change

22  like this, and if so when that notification

23  should occur?

24    A.  I do not believe there was a -- a

25  guideline that spoke to that.

1        Is -- did I read that accurately?

2    A.   Yes.

3    Q.   Okay.  So does it appear that -- strike

4  that.

5        So did you ever speak with Mr. Hixson

6  about whether he was pleased in the change in

7  protocol, in the change in flagging with respect

8  to PB Labs?

9    A.   Not that I can recall.

10    Q.   Did Mr. Hixson ever tell you that he

11  didn't really like the procedure before the flag

12  change where the letter 56 was being sent out?

13    A.   Not that I recall.

14    Q.   Did Mr. Hixson ever tell you that he was

15  happy with the change because sending letter 56

16  was a process that took too much time and there

17  were a bunch of claims with respect to PB Labs?

18    A.   No, I don't believe he did.

19    Q.   Okay.  Did you ever get that indication

20  from anybody, any of your superiors at Cigna?

21    A.   No, I don't believe I did.

22    Q.   Let's go back to something I asked you

23  about earlier.

24        MR. CUNNINGHAM:  Matt, can you put up --

25        this was Anderson 3, 0289439.

1   billed, correct?

2       A.   That was the first change to the

3   protocol, yes.

4       Q.   Right.   Why did Cigna give up that

5   rationale or that protocol for not paying claims

6   for Palm Beach Labs?

7       A.   I believe it's because we received

8   additional information that supported an

9   allegation around fee forgiveness.

10      Q.   So are you saying it didn't matter to

11  you why Cigna was going to deny all the claims as

12  long as Cigna felt there was a valid reason for

13  denying them?

14      A.   No, that's not what I'm saying.

15           I'm saying that the information that we

16  received or the evidence that we obtained, that

17  can change during the course of an investigation,

18  and because of those additional insights, we may

19  modify a particular flag protocol based on these

20  additional findings.

21      Q.   Is there any reason that Cigna could not

22  have left both flags in place?

23      A.   Do you mean both flag protocols, sir?

24      Q.   Yes, ma'am.   In other words, is there

25  any reason Cigna couldn't have said, "Okay.

1   Well, we come up with an additional route, PB

2   Labs.  We're not only going to deny all claims

3   that you submit of services not rendered as

4   billed, but now we're also going to deny them

5   because of fee forgiveness.  So we have not one

6   rationale, but now we have two."

7        Is there any reason that Cigna couldn't

8   have done that?

9      A.  It's possible we could have done that.

10   Truth be told, I -- I don't remember the exact

11   chronology during the course of the case, and it

12   is possible that we could have had what you refer

13   to as a -- perhaps a dual-denial.

14      Q.  Well, I believe, at this point, there

15   was already litigation or threatened litigation

16   over nonpayment of bills.

17        Why wouldn't Cigna want to have what it

18   deemed to be two valid reasons for denying claims

19   instead of just one?

20      A.  I'm not sure that I can answer that

21   question for you.  I'm sorry.

22      Q.  Okay.  Here -- here's what I'm trying to

23   find out, ma'am.  I think what you're telling me

24   is Cigna developed information through its

25   investigation that let it to believe that PB Labs