# EXHIBIT 4

```
 1                   UNITED STATES DISTRICT COURT

 2                     DISTRICT OF CONNECTICUT

 3

 4   CONNECTICUT GENERAL LIFE      )

 5   INSURANCE COMPANY and         ) Case No.

 6   CIGNA HEALTH AND LIFE         ) 3:19-CV-01324-JCH

 7   INSURANCE COMPANY,            )

 8   VS.                           )

 9   BIOHEALTH LABORATORIES, INC.,)

10   PB LABORATORIES, LLC, and     )

11   EPIC REFERENCE LABS, INC.,    )

12

13

14

15

16        REMOTE VIDEOTAPED DEPOSITION OF MICHAEL GOLDFARB

17                    February 16, 2023

18                       9:04 a.m.

19

20

21

22

23

24

25
```

```
 1          Mr. Goldfarb, setting aside any conversations with

 2    your lawyers, with Cigna's lawyers, with whom, if anyone,

 3    did you meet or discuss this case in preparation for your

 4    testimony as a corporate designee?

 5       A.  I had a meeting with a gentleman who works in the

 6    National Appeals Organization just to ensure that I -- I

 7    was prepared to speak to those topics.  I do have a fair

 8    amount of familiarity with appeals on my own, but I wanted

 9    to make sure that I was more prepared, and so I did meet

10    with someone from NAO.

11       Q.  Okay.  Anyone else, excluding counsel?

12       A.  No.

13       Q.  And what is that gentleman's name from NAO?

14       A.  His name is Mike.  I -- I don't know -- I can't

15    remember his last name.

16       Q.  We'll come to --

17       A.  He was a -- I believe he was a senior manager of

18    operations, was his title.

19       Q.  Okay.  We'll come to this in further detail in due

20    course today.

21          But is NAO a unit or -- or group within Cigna or

22    is that an outside organization of some sort?

23       A.  It is -- it is a unit within Cigna.

24       Q.  And is it separate or distinct or independent,

25    whatever you like, from the SIU?
```

```
 1      Q.  You described to me direct contact that you had
 2   with the labs in 2015, including correspondence and
 3   conversations with Viskovich.
 4           Were you acting at that time in a legal capacity
 5   or as a business person?
 6      A.  The entire time that I served as counsel, I was
 7   acting as a lawyer for the company.
 8      Q.  Okay.  All right.  Let's go back to Schedule A now
 9   and start working through these topics.
10           And I want to understand first the -- the
11   processing of claims within Cigna submitted by
12   out-of-network providers.  And can we begin just with a
13   top-level description of how the work flow proceeds for
14   the submission and subsequent processing within Cigna of
15   claims submitted by out-of-network providers?
16      A.  Okay.  That's a very broad question, so I will do
17   my best to answer that.
18           Initially, an out-of-network provider may submit a
19   claim to Cigna.  The claim could be submitted on paper or
20   it could be submitted electronically.  Whichever version
21   is done, it would be received by Cigna's claims
22   department.
23           And we have claims systems at Cigna.  And most
24   claims get what we call auto-adjudicated by the claims
25   systems.  And there are rules built into the claims
```

```
 1   systems to recognize the coding and other information that
 2   is contained in the claims submission.
 3        Those rules would basically compare the
 4   information what's on the claim form to the patient's plan
 5   benefits to determine coverage.  And then the claim would
 6   be priced according to the plan benefit.  And then at
 7   which point if the claim -- well, it gets adjudicated one
 8   way or the other.  And when I say "one way or the other,"
 9   it could be determined to be a covered service based on
10   the information in the claim submission form.
11        And I want to back up about that, because when we
12   receive a claim from a provider, in the ordinary course,
13   we are relying upon the information that's in there, that
14   it is truthful and accurate, in making our decision as to
15   whether to determine whether the claim is covered or not.
16        If a claim is covered, the claim would then get
17   priced, and then an EOP would issue to the provider.  An
18   Explanation of Payment.  The Explanation of Payment would
19   explain to the provider how the claim was adjudicated,
20   what the allowed amount is for the claim, whether there is
21   any coinsurance or deductible associated with the claim,
22   and, yeah, and how much payment there would be.  There's
23   also a remark code on the Explanation of Payment that
24   explains how the claim was adjudicated, what methodology.
25        In addition to that, an EOB, an Explanation of
```

 1  within the claims adjudication system set forth anywhere

 2  outside the system itself?  Is there any documentation as

 3  to what those rules or those algorithms are that the

 4  auto-adjudication system applies and follows?

 5      A.  Yeah.

 6      Q.  Okay.  And where do those rules appear, apart from

 7  within the -- the black box of the system itself?

 8      A.  So I can't, you know, tell you where every rule

 9  exists, but I can tell you what some of the rules would

10  be.

11      Q.  Okay.

12      A.  So Cigna has coverage policies with respect to

13  many different types of services that a provider could do.

14  And to the extent that Cigna has coverage policies, rules

15  would try to be written that, you know, capture those

16  policies, and that would be put into the system.

17          I will tell you that the system is not foolproof,

18  and I know of instances where Cigna has coverage policies

19  and some of -- some of the coverage limitation has not

20  made it into auto-adjudication.  But in general, you know,

21  that would be an example of things that -- that go in as

22  coverage policies.

23      Q.  When there are coverage policies that are not

24  embodied within the rules in the auto-adjudication system,

25  how do those or when do those policies get layered on to

Cummings General Life Insurance v. BioHealth Laboratories, Inc., et al

```
 1   know, the claims that are relevant to this case.  And

 2   you've given me some examples of -- of types of claims

 3   that would not be.  So for example, you may recall you

 4   said that some, what you call, rich plans might provide

 5   coverage for bariatric surgery; other less rich plans

 6   might not.

 7        To your knowledge, did any of the plans at issue

 8   in this lawsuit exclude coverage for drug and alcohol

 9   treatment?

10   A.  No.

11   Q.  Okay.  And within that umbrella, subject to

12   adjudication of particular claims, of course, did any of

13   the plans exclude coverage for drug and alcohol screening

14   and testing?

15   A.  As a general matter, assuming all other plan terms

16   are -- are met, those plans would cover drug testing,

17   subject to limits in coverage policies, etc.

18   Q.  Okay.  And are there -- are there different

19   versions of the -- of the edits that you've referred to,

20   the NCCI edits?

21   A.  I don't understand the question.

22   Q.  Yeah, who -- who is the -- what body or what

23   entity publishes those edits rules?

24   A.  I believe it's called the National Correct Coding

25   Institute.  It is not Cigna.  I don't know anything
```

1    A.  I have not.

2    Q.  So setting that aside, the revenue codes that you

3    just gave as examples, are these codes that Cigna has

4    created for its own use?

5    A.  No, these codes, I don't know who publishes these

6    codes, but -- but they exist outside of Cigna.  Whether

7    you are submitting a claim to Cigna or another insurance

8    company or perhaps to the government, there are

9    appropriate revenue codes to use for different types of

10   services.

11   Q.  Okay.  I asked you earlier whether any of the

12   plans at issue in this litigation would exclude coverage

13   for drug and alcohol treatment.  You said no, that would

14   be a covered item of care, of course subject to all of the

15   other review and requirements.

16       Same question.  Do any of the plans at issue in

17   this case exclude coverage for pain management care?

18   A.  No.

19   Q.  Okay.

20   A.  I should say, not that I'm aware of.  I mean, if

21   there was a particular EOP that told you that that plan

22   didn't -- didn't cover pain management care, then okay,

23   then that would -- that would be true.  But not that I am

24   aware of.  I -- I, as I sit here today, believe that it

25   would be covered.

1    Q.  Okay.  Well, let's turn to that.  You mentioned

2  EOPs.  So we've now gone through the work flow.  Claim

3  submission.  Auto-adjudication.  A coverage determination

4  has been made.  If it's an allowed claim, it would be

5  priced.  And you said the next step would be the issuance

6  of an EOP to the provider.  An Explanation of Payment.

7      Is that correct?

8    A.  Yeah.

9    Q.  And let me just start with that.

10     Would Cigna issue an EOP to the provider in every

11  instance when the provider submitted a claim for payment

12  to Cigna?

13    A.  Yes.  Upon the claim being adjudicated, yeah, an

14  EOP is auto-generated and is sent to the provider.

15    Q.  Okay.  And -- and how is the EOP sent to the

16  provider?

17    A.  As it relates to this case, the providers were

18  submitting claims electronically through a portal, and the

19  EOP was remitted back to the provider electronically.

20    Q.  So let's just break down the claim submission

21  method and the EOP notice.

22     When a claim is submitted in paper form, would the

23  EOP then be returned to the provider on paper?

24    A.  It's based on the election of the provider.  So I

25  think it would be strange if a provider was submitting

 1   I suppose there's an out-of-pocket max on in-network
 2   claims, so maybe you'd stop paying co-pays on those as
 3   well.  But there are no co-pays with respect to
 4   out-of-network claims.  There is only coinsurance and
 5   deductible.
 6      Q.  Okay.  And are those obligations capped in any
 7   fashion?
 8      A.  So I want to help you here.  Let's talk about
 9   in-network benefits for a minute, 'cause I'll get there
10   and I'll explain this for you.
11         So in-network benefits can have co-payments,
12   deductibles, and coinsurance.  And then they also have an
13   out-of-pocket max.  So the out-of-pocket max is, in an
14   in-network plan, the most that patient is going to pay.
15   And once that is exhausted, the patient has paid all that
16   money, then the plan will pay one hundred percent of the
17   allowable amount under the plan.  Okay.
18         Now, since the allowable amount under the plan in
19   an in-network situation equals the contracted rate with
20   the provider, there is nothing over and above the
21   allowable amount.  So in the in-network side, once you
22   have met your out-of-pocket max, you don't have to pay
23   in-network providers any more money.
24         Now let's switch gears.  In the out-of-network
25   context, as we have discussed, there is no agreed upon

Michael Goldfarb

Job Date:2/16/2023

```
 1   rate ahead of time between Cigna and the provider.  So the

 2   provider can submit whatever billed charge it wants to

 3   Cigna.  Then Cigna adjudicates the claim.  It determines

 4   the allowable amount.  We talked briefly about how that's

 5   determined.

 6           After Cigna determines the allowable, it

 7   determines what portion of the allowable is attributable

 8   to deductible and coinsurance.  Okay.  And so Cigna would

 9   then pay the provider the allowable amount less any

10   deductible and coinsurance.

11           The out-of-pocket max as it relates to

12   out-of-network claims is, you know, a certain dollar

13   figure that's set in the plan.  And when you reach that,

14   you have no -- no longer have any deductible or

15   coinsurance to pay.  And therefore, when you reach that,

16   Cigna will pay one hundred percent of the allowable.

17           But the allowable in out-of-network claims is

18   oftentimes not the billed charge.  It would be

19   substantially less than the billed charge.  And therefore,

20   anything above the allowable, the difference between the

21   billed charge and the allowable, the patient still owes

22   that money.

23           And that's why I say in the out-of-network

24   context, all you have to look at is what Cigna pays and

25   the billed charge.  And the difference between the two is
```

1   Q.   Okay.   And his review came at the particular

2   request of Stephanie Canto within the SIU.   Is that

3   correct?

4   A.   That's correct.

5       I want to add that that was his initial review.

6   He was then -- there was plenty of correspondence, I'm

7   sure you've seen it, between the parties going back and

8   forth.   Bill Welch at one time offered the labs to review

9   additional documents.   The labs then took Bill up on that

10  offer.   And so then there was a second review performed by

11  Dr. Nicoll.

12      Off the top of my head, I don't know how many

13  records and how many claims he reviewed in the second

14  review.   I don't think that was touched upon in his

15  deposition, though I did see reference to it in the case

16  notes, as well as correspondence between Attorney Bill

17  Welch and the Ackerman law firm, and other correspondence

18  between Stephanie Canto and the lab in terms of getting

19  the additional records, etc.

20  Q.   You told me that in the course of your 50 hours of

21  preparation for your deposition, you met with senior

22  manager Mike thus and such from the NAO business unit.

23      Did you ever talk with Stephanie Canto in

24  preparation for your deposition?

25  A.   I did not.

1   provide for external review.  That is limited to cases

2   involving medical necessity issues.

3       Q.  And external review, does that mean external to

4   Cigna or external to the NAO?

5       A.  That's external to Cigna.  We call it IRO,

6   Independent Review Organization.  I don't actually know

7   who the panel is that that goes to or what that goes to.

8       Q.  Okay.  I want to transition now to pick up on the

9   conversation about the SIU investigation and review

10  process, but first, folding all the way back into the

11  claims submission and adjudication process.

12          Where a provider has been flagged by the SIU for

13  any given reason, is that flag -- is the flag then

14  accounted for in the claims -- in the auto-adjudication

15  claims system?

16          So in other words, once an SIU -- once SIU flags a

17  particular provider, does that flag status attach to all

18  subsequent incoming claims submitted by that provider?

19              MR. KANG:  Objection to form.

20              THE WITNESS:  So yeah, the way it works is,

21  you know, we have flags and edits.  Sometimes we use those

22  words interchangeably.  They -- it's basically telling the

23  claims system it's a rule to apply to the claims system,

24  and it's whatever rule we choose to apply.

25              It could be a rule that says, if they submit

```
1   a claim, request medical records.  It could be a code

2   specific rule that says, if they submit a claim with this

3   particular code, ask for medical records.  Right?

4           So it's direction to the claims system to

5   apply a particular rule for a claim, and depending on

6   which claims system, Cigna has multiple claims systems

7   that a rule is put into that will determine, you know,

8   what happens.

9           So, you know, it's possible.  I've been here

10  where somebody has put a flag and did not put it all on

11  claims systems, and so therefore, a provider who, quote,

12  was flagged by SIU, only some of their claims got hit by

13  the flag, but others didn't, depending on which claims

14  system it flowed through.

15          And which clams system it flows through

16  depends on who the patient is and what plan they're in and

17  -- and how that plan is set up with Cigna, and what claims

18  system it's associated with.  Does that answer your

19  question?

20  BY MR. HARE:

21    Q.  That's helpful.  We may develop it further.

22        How did these labs come to the attention of

23  Cigna's SIU?

24        Let me ask a better question.  How did these labs

25  or any one of them come to the attention of Cigna's SIU?
```

```
 1      Q.   Okay.  And I appreciate that.  And I think you
 2   also understand that because we have you here as a
 3   corporate designee, even if information appears elsewhere
 4   in the record, these are some of the questions that I have
 5   for you as a -- as a deponent.  But let me try to shortcut
 6   this.
 7      A.   Well, can I -- can I respond to that for a second,
 8   Scott?  Yes, it is all -- you know, it's fair for
 9   questioning.  I worked really, really hard to prepare for
10   today.  And there is only so much that one can retain
11   and -- and learn.  So I'm doing my best.  And the reason
12   why I refer you to those documents is, you know, that's
13   obviously where I obtained the information.
14          You know, I started at Cigna after much of the
15   events here, so my personal knowledge of the events is
16   limited to a short period of time.  Also, whatever
17   personal knowledge that I had, these events are, you know,
18   many years ago.  And so the bulk of my knowledge is based
19   on my preparation for today.
20          And -- and so that's why I do refer you to these
21   things, that I recall I read this in a particular place.
22   I don't -- because honestly, you're not gonna get more out
23   of me on certain topics other than what I could do to
24   prepare.
25      Q.   I appreciate that.  And just to be clear, I'm
```

 1  ProClaim.  Those are the big ones.  And I'm -- I'm not

 2  aware of anytime that SIU has placed a flag where they

 3  didn't place it on -- on those two.

 4  BY MR. HARE:

 5     Q.  Okay.  Do you know by chance which of the claims

 6  systems auto-adjudicated claims submitted by the three

 7  labs in this lawsuit?

 8     A.  I know for certain PMHS and ProClaim did.

 9     Q.  Okay.

10     A.  Yeah.

11     Q.  Now, when -- let's just follow that through.

12         When SIU flags a provider and the flag is noted in

13  ProClaim and PMHS, are subsequent claims by that same

14  provider then denied on account of the flag?

15     A.  It depends on what is in the claim and what the

16  flag says.

17     Q.  Okay.  And you've explained that sometimes a flag

18  could be specific to a particular type of claim or a claim

19  with particular characteristics, and that flag wouldn't

20  necessarily result in a denial of other sorts of claims.

21         Is that fair to say?

22     A.  That's correct.

23     Q.  Okay.  But if a new claim comes in fitting the

24  claim type or the characteristics that are the subject of

25  that flag, the system would know to deny that new claim

1  that fits those characteristics?

2     A.  Correct.  If -- if the rule says, if you bill this

3  particular code, it's going to trigger the flag, and then

4  that -- a claim comes in with that code, then that claim

5  would get an initial -- initial denial based on the flag.

6     Q.  Okay.  And that actually anticipates my next

7  question.

8        When there is a denial based on a flag in the

9  auto-adjudication initial review, is that denial

10  identified as a first denial or a final denial or

11  something else?

12     A.  Well, it -- I don't know that we call them first

13  denial, final denials.  Right.  That is the -- that is the

14  initial adjudication of the claim.  An EOP will -- will

15  generate that tells you that this claim was denied and

16  then here's the appeal rights and you can go follow your

17  appeal rights and take it from there.

18     Q.  Okay.  In that instance where a claim has been

19  denied through the initial auto-adjudication and an EOP is

20  issued to the provider, notifying the provider that the

21  claim was denied, will that EOP indicate that the denial

22  came as a result of some flag or does it look generically

23  like a denial like any other denial?

24     A.  Any way that a claim is adjudicated, there will be

25  a remark code that tells you exactly how it was

1  documents, that was an example with respect to some other

2  provider; that's not something that you're saying these

3  labs in this lawsuit were engaged in?

4  A.  That's correct.  'Cause it's my understanding that

5  in this particular case, the labs don't even have a

6  consent to treat any of the patients at issue, at least

7  with respect to the claims that you are doing in this

8  litigation.  And so therefore, there's no documentation

9  actually between the patient and the lab prior to

10  rendering the service.

11  Q.  To your knowledge, did the labs in this case ever

12  in fact have a patient encounter with the patient whose

13  sample was being tested?

14  A.  Can you repeat that?  I didn't understand.

15  Q.  Yeah.  The question is, to your knowledge, did the

16  labs in this lawsuit ever actually have a patient

17  encounter with the patient whose samples, urine samples or

18  blood samples, were being tested?

19          MR. KANG:  Objection to form.

20          THE WITNESS:  Is your question whether a

21  patient showed up at the lab in order to give their

22  specimen?

23  BY MR. HARE:

24  Q.  That is my question.

25  A.  If -- if that's the question, I'm not aware of any

Michael Goldfarb

```
 1        What is an L pend?
 2     A.  I'm not sure why it's called L pend or L.  I don't
 3  know what specifically that means.  But an L pend I
 4  believe was -- it's a pending a claim, and a claim comes
 5  in, and you're asking for medical records.  And so the
 6  claim is pending, waiting medical records before further
 7  action will be taken on the claim.
 8     Q.  And what are the -- what are the circumstances
 9  that would result in a -- in an L pend status for a given
10  claim?
11     A.  Well, the circumstances would be, from an SIU
12  standpoint, a decision was made to put a provider in the
13  status to request medical records.  And someone would do
14  this because they're interested in getting more
15  information about what exactly the provider is doing
16  and -- and do the medical records support what is being
17  billed.
18     Q.  Okay.  And if I'm understanding correctly, a given
19  claim, if it's marked as L pend, that is, so to say, held
20  in abeyance pending receipt of the additional requested
21  information?
22     A.  Correct.
23     Q.  Okay.  So that's different than a claim denial.  A
24  claim that is L pend has not yet been allowed or denied.
25  Is that fair to say?
```

1    A.  Correct.  It has not been adjudicated.  It is --

2  we have asked for records, and we are waiting for records

3  to be supplied.  And then the plan is, you know, it'll be

4  adjudicated afterward.

5    Q.  Okay.  And is there any -- any fixed timetable

6  during which a claim will remain in L pend status?

7    A.  I believe how it works is that -- I don't know the

8  number of days, but the provider has a certain number of

9  days to provide the records.  And then if the days passed

10  and no records are received, then the claim may be denied

11  for records requested not received.

12    Q.  Okay.

13    A.  Which we would call a soft denial, because if they

14  submit the records, then we would open up the claim and we

15  would adjudicate it, and you wouldn't have to use your

16  appeal.

17    Q.  Okay.  Is a provider notified or alerted that a

18  given claim has been put in L pend status?

19    A.  Yes.

20    Q.  And how does that happen?

21    A.  They would submit the claim.  And in response, a

22  letter would generate asking them for records.  You know,

23  the word L pend, right, like, it's meaningless, right, so

24  we don't say, "Hey, provider, this claim is in L pend

25  status," 'cause they wouldn't know what that means.  What