# EXHIBIT 5

Case 3:19-cv-01324-JCH    Document 214-5    Filed 07/30/23    Page 2 of 34

Eva Borden                    Connecticut General Life Insurance Company, et al vs. Biohealth Laboratories, Inc., et al                    Job Date:2/17/2023

```
 1                 UNITED STATES DISTRICT COURT

 2                   DISTRICT OF CONNECTICUT

 3

 4   CONNECTICUT GENERAL LIFE      )

 5   INSURANCE COMPANY and         ) Case No.

 6   CIGNA HEALTH AND LIFE         ) 3:19-CV-01324-JCH

 7   INSURANCE COMPANY,            )

 8   VS.                           )

 9   BIOHEALTH LABORATORIES, INC.,)

10   PB LABORATORIES, LLC, and     )

11   EPIC REFERENCE LABS, INC.,    )

12

13

14

15

16         REMOTE VIDEOTAPED DEPOSITION OF EVA BORDEN

17                    February 17, 2023

18                      10:03 a.m.

19

20

21

22

23

24

25
```

 1    Q.   Second, it's also natural to sometimes, you know,

 2   nod your head or shake your head while answering a

 3   question, but the court reporter can't take that down very

 4   easily.  So if you could just audibly answer all

 5   questions, that would be appreciated too.  Okay?

 6    A.   Okay.

 7    Q.   Okay.  And then I understand you have a hard stop

 8   at 2:00 p.m. today.  I don't expect that we will take that

 9   long.  If you need to take a break, please ask us.  We're

10   happy to accommodate you.  My only request is that you

11   answer whatever question is pending at the time.  Okay?

12    A.   Okay.

13    Q.   All right.  Did you do anything to prepare for

14   today's deposition?

15    A.   I met with our counsel.

16    Q.   I'm sorry, I -- I -- I didn't hear the last part.

17   You met with somebody?

18    A.   I met with our counsel.

19    Q.   Okay.  Did you review any documents?

20        MR. KANG:  I'm gonna instruct her not to

21   answer that.  Well, you can -- you can answer yes or no,

22   Ms. Borden, but I'm gonna instruct you not to answer any

23   specific documents that we looked at.

24        THE WITNESS:  Yes.

25   BY MR. CHRIST:

Eva Borden

Case 3:19-cv-01324-JCH Document 214-5 Filed 07/20/23 Page 4 of 34

Cigna Corp./Cigna Health Life Insurance Co. v. Biohealth Laboratories, Inc., et al.

Job Date:2/17/2023

```
 1      Q.  I have a few questions just about the individuals

 2   listed in the address bar here.  I'd like you to take a

 3   moment just to review them on your own.  And I can blow

 4   this up for you so you can read it a little bit easier.

 5          And do you recall why you would have been sending

 6   that particular -- this e-mail to these individuals?

 7      A.  No.

 8      Q.  Another bullet point below is, "SIU needs,

 9   question mark.  Tom, Aneta, Matt."

10          What did you mean by "SIU needs"?

11      A.  I don't recall.

12      Q.  Do you recall what role SIU would have played at

13   all in these daily stand up agenda meetings that is

14   referenced in this e-mail?

15      A.  I don't recall the meeting.

16      Q.  Okay.  The next -- next bullet point is, "Claim

17   policy, update on implementation for denying and mapping

18   to MRC codes, question mark.  Denise."

19          First question, do you recall who Denise was?

20      A.  I -- I don't recall specifically.

21      Q.  Would it have been an individual listed in this

22   address box, such as Denise Burns?  Does that ring a bell,

23   refresh your memory?

24      A.  It could be.

25      Q.  Do you recall what Ms. Burns did for Cigna --
```

1      A.  I don't recall.

2      Q.  What does "MRC codes" refer to?

3      A.  I don't actually recall.

4      Q.  You don't recall what the acronym "MRC" means?

5      A.  I don't.

6      Q.  Move on to our next exhibit.  This is Exhibit 2,

7  which we'll mark as Exhibit 2.  It is, for our court

8  reporter, bates stamped Cigna 19-1326 0289518.

9              (Exhibit 2, August 3, 2015 E-mail, marked

10  for identification.)

11  BY MR. CHRIST:

12      Q.  Ms. Borden, I referenced earlier a dot M-S-G or

13  message attachment to the previous August 3rd, 2015

14  e-mail, which we just marked as Exhibit 1 to your

15  deposition with the subject "IFP ACA early reads."

16          Do you recall that line of questioning a few

17  minutes ago?

18      A.  I remember that question.

19      Q.  Okay.  I'm going to show you on my -- on your

20  screen what we just marked as Exhibit 2.  This appears to

21  be subject -- an e-mail with the same subject line, "IFP

22  ACA Early Reads."

23          Would you agree?

24      A.  I agree it says "IFP ACA Early Reads."

25      Q.  And this e-mail is from Corey Wright to you at

```
 1   allowed amounts, the weekly -- the weekly allowed amounts

 2   for substance abuse spend.

 3   BY MR. CHRIST:

 4      Q.  I'd like to break that down a little bit.  What

 5   does "weekly allowed amount" mean?

 6      A.  I don't recall specifically what "weekly allowed

 7   amount" on here would have meant.

 8      Q.  And what does "SA spend" mean?

 9      A.  It means the amount of money that was spent on

10   substance abuse care.

11      Q.  And "non par," does that mean -- refer to

12   non-participating providers?

13      A.  "Non par" refers to non-participating.

14      Q.  Is that another way of describing out-of-network

15   providers?

16      A.  No.

17      Q.  Okay.  Could you describe the difference for me,

18   or the distinction?

19      A.  There are two ways to think about care.  One is if

20   a provider is participating versus non-participating, and

21   then how care is handled under an out-of-network or an

22   in-network benefit.

23      Q.  And I see here with an arrow that's being drawn to

24   sometime between April 12th and May 10th -- it looks

25   probably closer to the beginning of May -- a descriptor
```

```
 1   here that says "prepay IFP_lab edit, more than four units,

 2   active."

 3        Do you know what that is in reference to?

 4   A.  I do not recall specifically the "prepay IFP lab

 5   edit."

 6   Q.  Would this have been just a -- and this is just --

 7   would this have been -- strike that.

 8        Would this have been a edit that the SIU

 9   department would have implemented for reviewing certain

10   claims?

11             MR. KANG:  Objection to form.

12             THE WITNESS:  No, SIU does not implement lab

13   edit or claim edits.

14   BY MR. CHRIST:

15   Q.  Okay.  Who implements claim edits?

16   A.  I don't recall the exact area that does it.

17   Q.  There's another entry or descriptor here at the

18   top that says, "SMA lab shut down by SIU."

19        Do you recall what this is in reference to?

20   A.  During this time, we were actively looking for

21   labs or other facilities that were participating in fraud

22   and abuse.  Particularly in the substance abuse space.  So

23   this tells me that there was a particular lab, SMA, that

24   SIU had found was participating in fraud and abuse.

25   Q.  And the next bullet point says, "Claims pended for
```

1   HCPs under investigation."

2          Again, do you know what that is in reference to?

3      A.  When we suspect there is fraud or abuse in play,

4   we will pend the claim, which means neither pay nor deny

5   until we understand the investigative outcome.

6      Q.  And then the final line says, "Additional TINs

7   added to IFP lab prepay edit."

8          Do you know what this line is in reference to?

9      A.  I would have to speculate, so I don't know

10  exactly.

11     Q.  Okay.  So if you were to speculate, what would you

12  -- how would you speculate?

13             MR. KANG:   Objection to form.

14  BY MR. CHRIST:

15     Q.  And we'll -- we'll accept that it's speculation.

16     A.  I don't recall.

17     Q.  Okay.  Our next exhibit, which we'll mark as

18  Exhibit 4.  For our court reporter, that is bates stamped

19  Cigna 19-1326 0289525 to 526.

20             (Exhibit 4, August 6, 2015 E-mail, marked

21  for identification.)

22  BY MR. CHRIST:

23     Q.  And Ms. Borden, can you see this e-mail on your

24  screen?

25     A.  Yes, I can see it.

```
 1       Q.  This appears to be an e-mail from Jessica DeShaw
 2   to you and a few other individuals.  Do you recall who
 3   Jessica DeShaw is?
 4       A.  I do know who Jessica DeShaw is.
 5       Q.  And who is Ms. DeShaw?
 6       A.  She was a colleague of mine.
 7       Q.  And what is her role at Cigna?
 8       A.  I don't recall her specific role.
 9       Q.  Do you recall what her role was at Cigna back in
10   August 2015?
11       A.  I do not recall her role in August of 2015.
12       Q.  And again, would this appear -- strike that.
13           The next page of this attachment or exhibit lists
14   another e-mail from you.  It's at the bottom here.  To a
15   few other individuals, again, including Mr. Tom Hixson,
16   Mr. Matthew Norton, Mr. William Welch, Brian Evanko, and
17   Lisa Lough.
18           And again, it has the subject line "daily status
19   of actions and blockers, agenda will be sent in advance."
20   I'm sorry, subject line is actually "substance abuse daily
21   stand up."
22           Seeing this other e-mail, does this refresh your
23   memory of e-mails you were sending at this time with this
24   subject line?
25                   MR. KANG:  Objection to form.
```

Eva Borden

Case 3:19-cv-01324-JCH  Document 214-5  Filed 07/20/23  Page 10 of 34
Unredacted - General Liability Document 214-5, prehearing exhibit draw-down, etc., e

Job Date:2/17/2023

```
 1              THE WITNESS:  No.
 2   BY MR. CHRIST:
 3      Q.  You don't recall what "daily stand up" meant?
 4              MR. KANG:  Objection to form.  Asked and
 5   answered.
 6   BY MR. CHRIST:
 7      Q.  You can answer.
 8      A.  I don't recall.
 9      Q.  So because you don't recall, I'm assuming that you
10   also don't recall what the "daily status of actions and
11   blockers," what you meant by that in the subject -- in the
12   message of this e-mail?
13      A.  I don't recall.
14      Q.  And there's an agenda here that is attached.  I'm
15   sorry, strike that.
16          I'll read this into the record, and you can please
17   confirm that I've read it accurately.  "Good afternoon.
18   Below is the agenda for our touch point call.  Agenda,"
19   under the bullet point, "daily report, awareness only,"
20   there's a message attachment, "IFP ACA Early Reads
21   message."
22          Then there is another bullet point, "Memo to
23   Brian," with parens, "awareness only," with a Word doc,
24   "Substance Abuse Actions 20150805."  And then another
25   bullet point, "SIU needs, question mark.  Matt, Aneta," or
```

Case 3:19-cv-01324-JCH   Document 214-5   Filed 07/20/23   Page 11 of 34

Eva Borden

Connecticut General Life Insurance Co., et al. v. BioHealth Laboratories, Inc., et al.

Job Date: 2/17/2023

```
 1    Q.  Okay.  Fair to say based on the -- first, for our

 2    court reporter and for the record, Exhibit 5 is marked

 3    Cigna 19-1326 0289530 through 532.

 4         Ms. Borden, is it fair to say based on the -- the

 5    top left corner of this document that lists it's from you

 6    to Brian Evanko, to Lisa Lough, that you were the author

 7    of this document?

 8    A.  This document says that it came from me.

 9    Q.  Do you recall this document?

10    A.  No, I don't recall it specifically.

11    Q.  Did you in your role as chief risk officer back in

12    August 2015 prepare other similar documents like this?

13              MR. KANG:  Objection.  Vague and ambiguous.

14    BY MR. CHRIST:

15    Q.  You can still answer.

16    A.  I would have written summaries of things that we

17    were doing at the time.

18    Q.  And this document's titled "Substance Abuse

19    Actions August 6, 2015."

20         After reviewing this document, how would you

21    describe it?  Is it a memorandum, a report, an agenda,

22    something else?

23              MR. KANG:  Objection to form.

24    BY MR. CHRIST:

25    Q.  You can answer.
```

Case 3:19-cv-03324-JCH Document 214-5 Filed 07/20/23 Page 12 of 34
Eva Borden
Cmmdd34 General Litigation, et al Behavioral Laboratory, Inc., et al
Job Date:2/17/2023

1    A.   I would describe this as a summary document.

2    Q.   Okay.   I'm going to read just parts of this into

3   the record, and I'll ask you to confirm that I've read it

4   accurately.

5        First, the beginning, "Cigna's costs attributable

6   to fraud and substance abuse claims have exploded during

7   2015, especially related to out-of-network utilization.   A

8   primary source of this cost increase is substance abuse

9   spending for plans sold through the FFM."

10        Did I read that accurately?

11    A.   Yes.

12    Q.   Okay.   Did anyone at Cigna around this time frame,

13   in August 2015, discuss with you costs attributable to

14   fraud and substance abuse had exploded in 2015?

15            MR. KANG:   Objection to form.

16            THE WITNESS:   I don't -- I don't recall

17   specific conversations related to this.

18   BY MR. CHRIST:

19    Q.   So putting aside specific conversations, do you

20   recall whether there was just a general discussion that

21   was going on in your department or in Cigna at that time

22   regarding costs pertaining to substance abuse claims?

23            MR. KANG:   Objection to form.   Vague and

24   ambiguous.

25            THE WITNESS:   It was my department's

Eva Borden

Case 3:19-cv-01324-JCH Document 214-5 Filed 07/20/23 Page 13 of 34
Combined General Life Insurance, et al v. Shoreham Towers Inc., e...

Job Date:2/17/2023

 1      A.  It's Lisa Lough.

 2      Q.  Lisa Lough.  I'm glad we cleared that up.  All

 3  right.  So Lisa Lough.

 4          And how was -- and what was Ms. Lough's role?

 5      A.  She was in charge of strategy for the individual

 6  and family plan business.

 7      Q.  Would she have been someone that you also reported

 8  to back in August 2015?

 9      A.  No.

10      Q.  This next section of the document is titled "Key

11  Drivers."  And there's two subheadings.  "One -- Number

12  one, Patient Brokering."  And "Number two, Out-of-Network

13  Outpatient Rehab and Drug Testing."

14          I'll read these into the record and ask that you

15  confirm that I've read them accurately.  "Number one,

16  Patient Brokering.  Ineligible individuals are being

17  fraudulently enrolled into plans, particularly Silver 100

18  CSR plans, sold through the FFM to exploit out-of-network

19  benefits and federal government subsidies."

20          Did I read that correctly?

21      A.  You read it correctly.

22      Q.  "Number two, Out-of-Network Outpatient Rehab and

23  Drug Testing.  Outpatient substance abuse facilities, many

24  located in south Florida, intentionally remain

25  out-of-network and engage in a variety of fraudulent and

1  abusive practices, including fee forgiveness, physician

2  kickbacks, and unnecessary drug testing on customers."

3     Did I read that correctly?

4  A.  You read it correctly.

5  Q.  And, ma'am, my question is, where did you, I

6  guess, get the information that you placed in these two

7  paragraphs?

8          MR. KANG:  Objection to form.

9          THE WITNESS:  It was my responsibility at

10 the time to identify where we would see potential risk to

11 the business.  One of the ways that we identified risk to

12 the business was to understand where it was discrepant to

13 a norm.  And from that, we would begin to look at what

14 would be the root cause of those discrepancies, which led

15 to these key drivers.

16 BY MR. CHRIST:

17 Q.  How would you determine a discrepancy existed?

18 A.  We have a very large book of business, which I'll

19 refer to as our commercial book of business, that had ten

20 plus million lives, so very statistically significant.

21 And we would compare our IFP utilization to the commercial

22 utilization to determine where there might be outliers

23 across many different types of care.

24 Q.  So what I'm taking from what you just said was

25 that you might use statistical models and analyses to

```
 1   locate a discrepancy?

 2              MR. KANG:  Objection to form.

 3              THE WITNESS:  We would use analysis to

 4   determine in a comparison between the IFP plan and the

 5   commercial plan.

 6   BY MR. CHRIST:

 7      Q.  How would you have -- strike that.

 8          Who would have conducted that analysis?

 9      A.  I don't recall specifically.

10      Q.  Would it have been individuals in your department?

11      A.  Some individuals in my department would have been

12   a part of it.

13      Q.  Okay.  What other departments would have been a

14   part of this analysis?

15      A.  I don't recall specifically.

16      Q.  Would SIU -- strike that.

17          Would the Special Investigations Unit, which I've

18   been referring to as SIU, have been involved in conducting

19   that analysis?

20      A.  No.

21      Q.  Okay.  How would you determine here that some

22   outpatient substance abuse facilities, many located in

23   south Florida, intentionally remain out-of-network?

24      A.  So it -- we would have determined this by if we

25   had offered a -- a contract to a facility and they did not
```

1    Q.  And Ms. Borden, do you recall meeting with these

2    individuals as part of the "core action that we assembled

3    from across the enterprise" that you wrote in this

4    paragraph?

5    A.  I do not recall that.

6    Q.  So you don't recall ever meeting with Mr. Nemecek,

7    Mr. Norton, Bill Welch, and these other individuals

8    during around (cross-talk) sorry -- during the time in the

9    middle of 2015?

10   A.  I do not recall meeting with them.

11   Q.  Let's start with goal one.  I'll read this into

12   the record.  I'll ask that you confirm I've read it

13   accurately.

14        "Goal number one:  Reduce the substance abuse paid

15   amount from more than a million dollars a day to a target

16   of approximately $50,000 per claims paid day or $300,000

17   per week."  And in paren, "Progress:  Week of August 3rd

18   we are trending toward $800,000 in claims, down from

19   $8 million two weeks ago.  See attached PDF."

20        Did I read that accurately?

21   A.  You read it correctly.

22   Q.  And then underneath that, there's a few other

23   entries here.  The first line which I'll read is, "This

24   was driven by SIU actions on 154 facilities and lab TINs."

25   In paren, "Percentage of substance abuse allowed spend."

 1      Did I read that accurately?

 2    A.  Yes.

 3    Q.  Do you recall what SIU actions were taken that

 4  this is referencing?

 5    A.  I don't recall the specific actions.

 6    Q.  Do you recall in general what steps SIU was

 7  taking?

 8          MR. KANG:  Objection.  Objection to form.

 9  Vague and ambiguous.  Are you talking about all actions

10  that SIU was taking, Matt?

11          MR. CHRIST:  No, just in general, any --

12  anything that Ms. Borden recalls that SIU did that formed

13  the basis of her writing this sentence.

14          MR. KANG:  Objection to form.

15          THE WITNESS:  It's SIU's responsibility to

16  investigate fraud and abuse, so it would relate to those

17  actions.

18  BY MR. CHRIST:

19    Q.  And there's a few percentages broken down.  We'll

20  start with the first one.  "12%, deny claims with evidence

21  of fraud or abuse, facilities added on February 24th,

22  April 15th, July 22nd."

23      Did I read that correctly?

24    A.  You read it correctly.

25    Q.  What was this in reference to?

Eva Borden

Case 3:19-cv-01324-JCH  Document 214-5  Filed 07/20/23  Page 18 of 34
Consolidated General Life Insurance v. Choheath Law Group, Inc., et al.

Job Date:2/17/2023

 1    A.   I don't know the specifics that it referred to.

 2    Q.   So fair to say, though, that you were denying some

 3  claims if you thought -- if Cigna thought there was

 4  evidence of fraud or abuse?

 5           MR. KANG:  Objection to form.

 6           THE WITNESS:  If they are fraudulent or

 7  abusive claims, we wouldn't pay them, per the contracts

 8  with our client.

 9  BY MR. CHRIST:

10    Q.   And then the next category says -- I'll read.

11  I'll ask that you read this -- confirm that I've read it

12  accurately.  "48%, pend claims with suspected evidence of

13  fraud or abuse, facilities added July 24th, July 31st, end

14  paren."

15        Did I read that correctly?

16    A.   You read it correctly.

17    Q.   What does "pend" refer to here?

18    A.   "Pend" refers to that when a claim is submitted,

19  it is held from auto-adjudication until we can confirm

20  whether or not it's appropriate to pay or deny the claim.

21    Q.   And underneath that is another bullet point in

22  italics.  It says, "Risk, SIU is building up a pended

23  claim backlog of approximately 1,200 claims per day."

24        Did I read that accurately?

25    A.   You read it correctly.

1    Q.   What do you recall back in August 2015 the backlog

2    of pended claims that SIU had at that time that you're

3    referencing?

4    A.   I recall that there was a significant amount of

5    fraud and abuse that was coming into IFPs that we were

6    trying to address.

7    Q.   And do you recall hearing any concerns that there

8    were a lot of claims that were being pended by SIU?

9              MR. KANG:   Objection to form.

10             THE WITNESS:   I don't recall -- well, strike

11   that.

12             SIU does not pend claims.

13   BY MR. CHRIST:

14   Q.   I'm sorry, could you repeat that?   SIU?

15   A.   Does not pend claims.

16   Q.   So claims were being pended -- okay, strike that.

17        Why would this be a -- why would -- why would it

18   be listed as a risk, that SIU was building up a pended

19   claim backlog of 1,200 claims per day, as you wrote here?

20   A.   I don't recall why I would have listed it as a

21   risk.

22   Q.   Well, could it possibly be because more claims

23   were being pended that was creating a backlog of work for

24   SIU employees to get through?

25             MR. KANG:   Objection to form.

```
 1              THE WITNESS:  No.
 2   BY MR. CHRIST:
 3      Q.  So you don't recall at all what you meant by
 4   "risk" in this context?
 5              MR. KANG:  Objection to form.
 6              THE WITNESS:  No.
 7   BY MR. CHRIST:
 8      Q.  Next bullet point says, "20%, add labs to manual
 9   prepay edit requiring medical necessity review for any
10   test with more than four drugs requested, May 8th and
11   July 22nd."
12          Did I read that correctly?
13      A.  Yes, you read it correctly.
14      Q.  Okay.  Could you explain what you meant by this
15   bullet point?
16      A.  I don't recall the specifics of what I meant by
17   this bullet point.
18      Q.  Well, reading it now, what do you think you meant
19   generally regarding this bullet point?
20              MR. KANG:  Objection to form.  Calls for
21   speculation.
22              THE WITNESS:  Overall, I would say that this
23   relates to -- we require medical -- when certain
24   procedures are performed, we look for medical -- medical
25   necessity to ensure that we don't have someone -- we don't
```

Eva Borden

Case 3:19-cv-01324-JCH Document 214-5 Filed 07/20/23 Page 21 of 34
Cmmns 2244 General Life Document 214-5 Lohealthcaraw/2023, Inc., e...

Job Date:2/17/2023

```
 1       Q.  What does USI Analytics refer to?

 2       A.  An area within the individual and family plan, or

 3  US individual business.

 4       Q.  Do you recall what the acronym USI refers to?

 5       A.  I don't recall specifically.

 6       Q.  Do you recall or do you know Aaron Bigman?

 7       A.  Yes.

 8       Q.  Is Aaron Bigman still an employee of Cigna?

 9       A.  No.

10       Q.  What was his role in 2015 at Cigna?

11       A.  He was the leader of the USI Analytics team.

12       Q.  And what did the USI Analytics team do?

13       A.  I don't recall their specific roles.

14       Q.  Well, what did you mean when you wrote, "SIU and

15  USI Analytics have been working together to find suspect

16  brokers"?

17       A.  I mean that the SIU and the US Analytics team have

18  been working together to find brokers where we had

19  suspected fraud and abuse that was occurring by them.

20       Q.  Do you recall how large the USI Analytics team was

21  that Mr. Bigman headed up?

22       A.  I do not.

23       Q.  Were the -- was the USI Analytics team part of

24  these meetings that you had where this document was sent

25  to?
```

Eva Borden
Case 3:19-cv-01324-JCH Document 214-5 Filed 07/20/23 Page 22 of 34
Consolidated General Life Insurance... v. Brandon Bewick, Inc., et al.
Job Date:2/17/2023

```
 1                    MR. KANG:  Objection to form.

 2                    THE WITNESS:  I don't recall the meeting.

 3       BY MR. CHRIST:

 4            Q.   Do you recall -- well, what did you mean by,

 5       "Model for finding broker fraud has been developed and is

 6       being used by SIU"?

 7            A.   It would refer to an analytic model.

 8            Q.   And would USI Analytics, I'm guessing, have

 9       developed that model?

10            A.   I don't recall who specifically developed it.

11            Q.   Scroll down --

12            A.   Can we take a break when your -- can we just take

13       a quick break?

14            Q.   Yeah, absolutely.

15                    THE VIDEOGRAPHER:  We are going off the

16       record.  The time is 11:17.

17                    (Off the record.)

18                    THE VIDEOGRAPHER:  We are now back on.  The

19       time is 11:21.

20       BY MR. CHRIST:

21            Q.   All right.  Ms. Borden, I'm going to show you the

22       same document we were looking at before, but goal number

23       three.  And I will read this into the record again and ask

24       that you confirm that it's correct.

25                    "Goal number three:  Use our behavioral UM/CM
```

 1  preparing for further fraud and abuse perhaps across the

 2  country?

 3            MR. KANG:  Objection to --

 4            THE WITNESS:  -- our responsibili- -- it's

 5  our responsibility to look for fraud and abuse in wherever

 6  we think it could possibly happen, and to be prepared for

 7  that.

 8  BY MR. CHRIST:

 9     Q.  All right.  Goal number four, could you read this

10  into the record?

11     A.  "Goal number four, colon, enhance our clinical

12  policies to minimize ongoing exposure to substance abuse

13  fraud, period.  Open paren, progress, colon, actions will

14  be implemented in August and October 2015, period, closed

15  paren."

16     Q.  Okay.  Thank you.  And there's a few other bullet

17  points listed here, but I'm just gonna focus on the

18  second, I guess, main bullet point under, "Stop paying

19  billed charges on OON claims, paren, where legally

20  allowed."

21         Can you read that bullet point and the first

22  bullet point under it called "crosswalk" into the record,

23  please?

24     A.  "The clinical policy team is addressing this in

25  two ways, colon, dot" -- let's see -- "open quote,

Eva Borden

Conn. Gen'l Life Ins. et al v. Biohealth Laboratories Inc., et al

Job Date:2/17/2023

```
 1    crosswalk, closed quote, about half of the codes used
 2    today to Medicare equivalent codes, period.  This has been
 3    a more aggressive approach than Cigna had been willing to
 4    take in the past, period.  Targeting implementation of
 5    this manual process by end of 2015, period."
 6         Q.  Okay.  Thank you.  What are the Medicare
 7    equivalent codes that you're referring to here?
 8         A.  I don't recall specifically.
 9         Q.  And what did you mean by "crosswalk"?
10         A.  I don't recall specifically.
11         Q.  Okay.  Well, what did you mean when you wrote --
12    what did you mean when you wrote this bullet point here?
13         A.  I don't recall specifically.
14         Q.  Well, I'm not asking you specifically.  I don't
15    want you to think of this as a memory test.  But just you
16    looking at this now and with your experience and
17    background, are you saying that you -- do you not believe
18    you can interpret this paragraph to convey to us what you
19    meant when you wrote it?
20              MR. KANG:  Objection to form.  Calls for
21    speculation.
22              THE WITNESS:  I don't recall specifically
23    what I meant by this paragraph.
24    BY MR. CHRIST:
25         Q.  I'd like you to read the next bullet point that
```

Eva Borden

Case 3:19-cv-01324-JCH Document 214-5 Filed 07/20/23 Page 25 of 34
Cunha, et al v. General Life Insurance in Life of Southeast, et al., etc., et al.

Job Date:2/17/2023

 1      A.  Yes.

 2      Q.  And what is Medical Economics in charge of?

 3      A.  Analytics of our utilization.

 4      Q.  Forgive me, but what does that mean?

 5      A.  Utilization is how many people and where are using

 6  certain services.

 7      Q.  So does that help Cigna -- strike that.

 8          Does the Medical Economics department help Cigna

 9  plan for future costs and expenses?

10              MR. KANG:  Objection to form.  Vague and

11  ambiguous.

12              THE WITNESS:  I don't know the specific

13  responsibilities of the Medical Economics team.

14  BY MR. CHRIST:

15      Q.  And what does "Navigant" refer to?

16      A.  I don't know.

17      Q.  Would you have known back in 2015 or -- I know

18  it's been a few years, but do you not know now?  Do you

19  not know -- you didn't know when you wrote this?

20      A.  I don't recall what "Navigant" refers to.

21      Q.  And it says here, "Proposal from Navigant has been

22  received."

23          Do you recall what the proposal was?

24      A.  No.

25      Q.  I'd like you to read into the record goal number

Eva Borden

Case 3:19-cv-01324-JCH Document 214-5 Filed 07/20/23 Page 26 of 34
UnitedHealth Life Insurance v. Omnihealthcare, Inc., et al.

Job Date:2/17/2023

 1  five.

 2      A.  "Reduce our 2016 exposure by adjusting Florida and

 3  Texas plan designs to remove out-of-network benefits,

 4  period.  Open paren, progress, colon, we will know our

 5  options by the end of August 2015, period, closed paren."

 6      Q.  Thank you.  How would you go about actually

 7  reducing the 2016 exposure by adjusting the Florida and

 8  Texas plan designs?

 9              MR. KANG:  Objection to form.

10              THE WITNESS:  -- the plan -- we were looking

11  to remove the out-of-network benefits in the Florida and

12  Texas plan design.

13  BY MR. CHRIST:

14      Q.  And why was that?

15      A.  Due to the rampant fraud and abuse.

16      Q.  In just those two states?

17      A.  The memo states that it's for Florida and Texas.

18      Q.  To remove out-of-network benefits from those plan

19  designs, would you have had to have sought approval from

20  the appropriate regulatory agencies of those two states?

21              MR. KANG:  Objection to form.

22              THE WITNESS:  I don't recall -- I don't

23  recall the specific actions to gain approval on removing

24  benefits.

25  BY MR. CHRIST:

Eva Borden

Case 3:19-cv-01324-JCH Document 214-5 Filed 07/20/23 Page 27 of 34
Conol.324-JCH Li Document 214-5 hearin 07/20/23 ec., e Page

Job Date:2/17/2023

1    Q.  This first bullet point under goal number five,

2  can you read that into the record, please, starting with

3  "FL"?

4    A.  "Florida OIR and TDI receptive to the remove of

5  out-of-network benefits, dash, completed early August

6  2015, period.  Conversations will be ongoing dependent

7  upon CMS outcome, period."

8    Q.  So my powers of deduction, while admittedly

9  limited, I'm going to deduce that OIR stands for Office of

10  Insurance Regulation in Florida and TDI stands for the

11  Texas Department of Insurance.  Would you agree?

12    A.  I don't know specifically what that stands for.

13    Q.  Okay.  Do you recall what you meant when you wrote

14  this bullet point?

15    A.  That at the time, the Florida OIR and TDI were

16  open to removing out-of-network benefits.

17    Q.  How would you have, I guess, gathered the

18  information you needed to gather to make that

19  determination when you wrote it in this summary?

20    A.  I don't recall --

21          MR. KANG:  Objection --

22          THE WITNESS:  -- a specific action I would

23  have taken.

24  BY MR. CHRIST:

25    Q.  And then finally, I would like you to read into

Eva Borden

Case 3:19-cv-01324-JCH Document 214-5 Filed 07/20/23 Page 28 of 34

Cigna-General Life Insurance et al. v. Biohealth Laboratories, Inc., et al.

Job Date:2/17/2023

 1   the record "Longer Term" and all the bullet points that

 2   are underneath that.

 3       A.  "Longer Term, colon, as the goals above are being

 4   achieved, comma, we are looking at how to apply the same

 5   lessors to, colon, expansion of substance abuse across

 6   geographies, early identification of new forms of fraud

 7   and abuse, 2017 plan and product offerings, dash,

 8   including benefit language changes, remediate MRC2 where

 9   there is no Medicare equivalent rate, open paren, beyond

10   substance abuse, closed paren."

11       Q.  Okay.  Thank you.  Can you explain what you meant

12   by this entry?

13               MR. KANG:  Objection to form.

14               THE WITNESS:  That based on the lessons we

15   were learning, we wanted to make sure we were looking

16   across multiple geographies in our 2017 plan offering.

17   BY MR. CHRIST:

18       Q.  What does "MRC2" refer to?

19       A.  I don't recall.

20       Q.  Earlier, you described this document as a summary.

21   Is that correct?

22       A.  Yes.

23       Q.  Was this a summary of steps then that were being

24   taken back in August 2015 to reduce Cigna's spend on

25   substance abuse claims?

```
  1                    MR. KANG:  Objection to form.

  2    BY MR. CHRIST:

  3       Q.  -- fair and accurate description?

  4                    MR. KANG:  Objection to form.

  5                    THE WITNESS:  No.  This is a summary

  6    document that outlines the actions or the concerns that we

  7    had relative to what we perceived to be fraud and abuse

  8    happening in the substance abuse space.

  9    BY MR. CHRIST:

 10       Q.  Okay.  Now, did Cigna take -- ultimately end up

 11    taking some of the steps that you've outlined in this

 12    summary?

 13                    MR. KANG:  Objection --

 14                    THE WITNESS:  I don't recall specifically.

 15    BY MR. CHRIST:

 16       Q.  Are you -- do you recall -- and again, I don't

 17    need a specific, but a general ball park number is fine,

 18    of how much money Cigna saved by implementing any of these

 19    steps?

 20                    MR. KANG:  Objection to form.  Also, lacks

 21    foundation and mischaracterizes the witness testimony.

 22    BY MR. CHRIST:

 23       Q.  You can answer.

 24       A.  Cigna is responsible for addressing potential

 25    areas of fraud and abuse.  So I do not know the specific
```

Eva Borden

Case 3:19-cv-01324-JCH Document 214-5 Filed 07/20/23 Page 30 of 34

Conn. Gen'l Life Insurance Co., et al. v. BioHealth Labs., Inc., et al.

Job Date:2/17/2023

```
 1   numbers on what are the level of fraud and abuse that we

 2   were identifying at this time.

 3      Q.  How did you come to prepare this summary?

 4              MR. KANG:  Objection to form.

 5              THE WITNESS:  I don't recall.

 6   BY MR. CHRIST:

 7      Q.  Well, would this summary have been something you

 8   would have prepared as -- in your role as chief risk

 9   officer?

10      A.  It appears from the memo that I would have written

11   it.

12      Q.  Would you have prepared this summary outside of

13   your role as chief risk officer?

14      A.  No.

15              MR. KANG:  Objection to form.

16   BY MR. CHRIST:

17      Q.  Would you have -- strike that.

18          Are you familiar at all with my clients, BioHealth

19   Laboratories, PB Laboratories, and Epic Reference Labs?

20      A.  No.

21      Q.  In preparing this summary, where would you have, I

22   guess, maintained any work product that you would have

23   generated to prepare this?

24              MR. KANG:  Objection to form.

25              THE WITNESS:  I don't recall.
```

Case 3:19-cv-01324-JCH Document 214-5 Filed 07/20/23 Page 31 of 34
Eva Borden
Cornelius General Liability document re: prehearing draw Inc., et al.
Job Date:2/17/2023

1  BY MR. CHRIST:

2     Q.  You don't recall?  You didn't have -- what would

3  you -- strike that.

4        What would have been your norm back in August 2015

5  when you were working as the chief risk officer to

6  maintain your data when completing your job

7  responsibilities?

8                MR. KANG:  Object to form.

9                THE WITNESS:  I don't recall my specific

10  actions in 2015 on how I would have conserved my work

11  product.

12  BY MR. CHRIST:

13     Q.  Did Brian Evanko and Lisa Lough ask you to write

14  this summary?

15     A.  I don't recall.

16     Q.  I don't want you to tell me anything that would --

17  that would involve communications with Mr. Kang or his

18  colleagues or Cigna counsel.  But have you seen this

19  document before today, outside of August 6, 2015?

20     A.  I'm only aware of this document through my

21  communications with counsel.

22     Q.  Do you recall any meetings back in -- well, in

23  2015, with other individuals in your department and

24  outside your department, discussing -- discussing the,

25  quote, unquote, exploding costs relating to substance

Case 3:19-cv-01324-JCH   Document 214-5   Filed 07/20/23   Page 32 of 34
Connecticut General Life Insurance Company, et al. v. BioHealth Laboratories, Inc., e...
Eva Borden                                                                                   Job Date:2/17/2023

 1  abuse claims?

 2    A.  I don't recall any specific discussions from 2015.

 3    Q.  Do you recall any discussions before 2015 or after

 4  2015 on the same topic?

 5                MR. KANG:  Objection to form.

 6                THE WITNESS:  I recall general conversations

 7  around the level of fraud and abuse that we were seeing in

 8  the substance abuse space.

 9  BY MR. CHRIST:

10    Q.  And do you recall any -- well, where -- where were

11  those conversations generally taking place?  Were they in

12  meetings?  Were they just through e-mails?

13    A.  I don't recall the specifics of how those

14  conversations took place.

15                MR. CHRIST:  Okay.  I'm going to take, let's

16  say, a five-minute break just to review my notes.  I don't

17  think I have much more for you, Ms. Borden, but I just

18  want to take one last look, and hopefully we will be able

19  to get you out of here by noon.

20                THE WITNESS:  Okay.

21                THE VIDEOGRAPHER:  Going off the record.

22  The time is 11:50.

23                (Off the record.)

24                THE VIDEOGRAPHER:  We are now back on the

25  record.  The time is 11:54.

Eva Borden

Connecticut General Life Insurance Company and Cigna Healthcare of Connecticut, Inc., e...

Job Date:2/17/2023

 1  don't recall?

 2      A.  Dan Nicoll.  Marco Vitiello.  Amy Szable.  Kelly

 3  Banaszek.  Carmen Seller.

 4      Q.  In reviewing this collection of individuals, are

 5  there any -- is there anything these individuals have in

 6  comma -- common at Cigna; meaning, do they work in the

 7  same department, work on the same project, committee,

 8  team?

 9              MR. KANG:  Objection to form.

10              THE WITNESS:  I'm not aware of a combining

11  thread.

12  BY MR. CHRIST:

13      Q.  So fair to say then that these individuals are

14  spread out across various departments at Cigna?

15              MR. KANG:  Objection to form.  When you're

16  referring to these individuals also, Matt, are you

17  referring to everybody or the ones that she listed as the

18  ones that she doesn't recall?

19              MR. CHRIST:  Yes, thank you, Ted.

20  BY MR. CHRIST:

21      Q.  I'm referring to all of the individuals who the

22  e-mail is addressed to.

23      A.  The individuals on this e-mail represent multiple

24  areas across Cigna.

25      Q.  And earlier, we were referring to a, quote,

Eva Borden

Case 3:19-cv-01324-JCH Document 214-5 Filed 07/20/23 Page 34 of 34
Voya Inst. General Life Insurance, et al. v. Brehearty, et al., Inc., et al.

Job Date:2/17/2023

 1  unquote, core action team that was referenced in that

 2  summary that we discussed, which was Plaintiff's

 3  Exhibit 5.

 4        Would these individuals have been a part of that

 5  core action team?

 6   A.  I don't recall the core action team.

 7   Q.  Looking at this e-mail now today, do you have any

 8  recollection of a time in 2015 where you would send

 9  regular agendas labeled "daily -- substance abuse daily

10  stand up"?

11            MR. KANG:  Objection to form.

12  BY MR. CHRIST:

13   Q.  As listed in the subject of this e-mail?

14            MR. KANG:  Same objection.

15            THE WITNESS:  I do not recall.

16  BY MR. CHRIST:

17   Q.  Ma'am, are you on any medication today that would

18  affect your ability to answer truthfully today or affect

19  your memory?

20   A.  No.

21            MR. CHRIST:  All right.  Those are all the

22  questions I have.  Thank you very much for your time and

23  your patience.

24            MR. KANG:  I will say on the record that we

25  consider this deposition closed.  So thank you very much,