# EXHIBIT 9

1            UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
2    ---------------------------------------------
     Connecticut General Life
3    Insurance Company and Cigna
     Health and Life Insurance Company,
4              Plaintiffs,

5    v.                    Case No. 3:19-cv-01324 JCH

6    BioHealth Laboratories, Inc.,
     PB Laboratories, LLC; and
7    Epic Reference Labs, Inc.
                Defendants.
8    ---------------------------------------------

9            The Videotape Deposition of

10   Dr. Douglas Nemecek, taken pursuant to Notice

11   of Taking Deposition, taken before Deb

12   Beauvais, RPR, CRR, and a Notary Public in

13   and for the County of Ramsey, State of

14   Minnesota, taken on December 9, 2022 remotely

15   at St. Paul, Minnesota, commencing at

16   approximately 9:00 a.m.

17

18            AFFILIATED COURT REPORTERS
                 6880 River Road
           Inver Grove Heights, MN 55076
19              (612) 338-4348
            Info@AffiliatedReportersMN.com
20

21

22

23

24

25

1          MS. COSTIN:  Object to the form.

2          THE WITNESS:  The SIU is focused on

3     looking at potential issues of fraud, waste

4     or abuse in the system.

5     BY MR. HARE

6   Q.  How long has the SIU existed within Cigna?

7   A.  I don't know exactly.

8   Q.  Has it existed as far back as your joining

9     Cigna in 2002?

10  A.  It's existed as long as I've been aware that

11    there was one.  I don't know exactly when it

12    started, though.

13  Q.  Okay.

14          Do you have any affiliation with

15    the SIU in an organizational sense within

16    Cigna?

17  A.  No, I don't.

18  Q.  Are you sometimes called upon by the SIU unit

19    to assist in investigations that those folks

20    are undertaking?

21  A.  Yes.

22  Q.  How often does that happen?

23  A.  When they need behavioral health expertise, a

24    psychiatrist to review something, they'd

25    reach out.  Currently, I don't personally get

```
 1           outreached at all.  Earlier in my career
 2           here, I was outreached on occasion to review
 3           a case or two.
 4    Q.     And I gather that given that you're now the
 5           chief medical officer for behavioral health,
 6           any outreach from the SIU these days would be
 7           directed to some of your underlings; is that
 8           correct?
 9    A.     That's correct.  Yes.
10    Q.     Do you have any understanding as to the size
11           of the SIU in terms of personnel and
12           staffing?
13                   MS. COSTIN:  Did you just freeze up
14           a little bit?  Yep.
15                   THE WITNESS:  Okay.
16                   THE VIDEOGRAPHER:  He's frozen up.
17                   THE WITNESS:  I'm back.  Can you
18           hear me again?
19                   MR. HARE:  Yeah.  We seem to be
20           live with you now.  Can you hear us okay?
21                   THE WITNESS:  Yes, I can.  I
22           apologize, my VPN went off so it dropped
23           everything, but I reconnected.
24                   MR. HARE:  No worries.
25                   MS. COSTIN:  Why don't we -- Scott,
```

1    Q.    Okay.  So would that be confirming whether,

2          for instance, services that had been billed

3          were in fact provided as reflected in the

4          medical record?

5    A.    The questions would have potentially have

6          been similar to this is what was billed, is

7          this what was provided, yes.

8    Q.    Okay.

9                Any other categories or topics of

10         inquiry that you can recall?

11   A.    Not currently, no.

12   Q.    Do you recall ever being asked by SIU to

13         provide your thoughts with respect to medical

14         necessity in connection with a billing

15         review?

16   A.    We're always asked about medical necessity.

17         As we review things from a payor perspective,

18         I don't recall specific questions related to

19         that from the SIU.

20   Q.    In performing that review as a payor how

21         would you go about assessing medical

22         necessity in reviewing billing requests?

23                MS. COSTIN:  Object to the form.

24         Calls for speculation.

25                THE WITNESS:  When I reviewed a

1              MS. COSTIN:  Object to the form.

2              THE WITNESS:  Yes.

3     BY MR. HARE

4  Q.  And what is claims flagging?

5              MS. COSTIN:  Object to the form.

6              THE WITNESS:  A process that the --

7     that the SIU uses as they investigate

8     programs is to identify facilities and then

9     have those -- have every claim from those --

10    from that facility provider, program,

11    whatever it might be identified so that they

12    can review in total all of the -- all of the

13    claims from that provider.

14    BY MR. HARE

15 Q.  And are there different -- are there

16    different particular types of flags or

17    instances of flags?  Is there any

18    nomenclature that SIU would use?

19              MS. COSTIN:  Object to the form.

20    Lacks foundation.

21              THE WITNESS:  I don't know.

22    BY MR. HARE

23 Q.  Okay.

24              Dr. Nemecek, do you recall ever

25    being asked to provide a review of claims or

```
 1          billing records relating to PB Labs?
 2   A.     No.
 3   Q.     Do you recall ever being asked to provide
 4          your -- a review with regard to claims
 5          submitted by BioHealth?
 6   A.     No.
 7   Q.     Do you recall ever being asked to provide
 8          your view with regard to claims submitted by
 9          Epic Reference Labs?
10   A.     No.
11   Q.     Same question:  Epinex Diagnostics?
12   A.     No.
13   Q.     Same question:  NJ Reference Laboratories?
14   A.     No.
15   Q.     And same question:  Alethea Laboratories?
16   A.     No.
17   Q.     Whether or not you were ever asked to review
18          billing relating to or submitted by any of
19          those entities, do you recognize the names of
20          any of those entities?
21   A.     Only a couple that I, you know, saw were on
22          the information from the deposition request
23          that I got.
24   Q.     And that would be in the caption at the top
25          of the page?
```

```
 1          paper will be Nemecek Exhibit 2.

 2                     So you can close that, Dr. Nemecek.

 3                     And I'm going to upload another

 4          exhibit.

 5   A.     Okay.  I think I have it up.

 6   Q.     Okay.  Would you just scroll to the page

 7          break after the first page.

 8                     Okay.  Perfect.

 9                     This is a document with a Bates

10          number ending in 119.

11                     MR. HARE:  We will mark this as

12          Nemecek Exhibit 3.

13     (Deposition Exhibit 3 was marked for identification.)

14          BY MR. HARE

15   Q.     And you've got it on the screen.  I

16          appreciate that.

17                     Would you start at the second page

18          of this two-page document -- actually, that

19          rolls over from the bottom of the page

20          before, so let's -- let's start with this

21          email -- and you've landed on it correctly --

22          from Stephanie Canto to you on December 17th,

23          2014.  Do you see that?

24   A.     Yes.

25   Q.     And forgive me if I asked already, but who is
```

58

```
 1          Stephanie Canto?
 2   A.    I don't know her personally.  Her email
 3          signature says she works in the SIU unit.
 4   Q.    And other than looking at this document now,
 5          did you recognize her name?
 6   A.    No.
 7   Q.    Okay.  Let's go through her email to you on
 8          December 17th, 2014.
 9                  Again, apart from the contents of
10          the email itself, do you have any
11          recollection of interacting with Ms. Canto in
12          December of 2014 with respect to an SIU
13          medical records review?
14   A.    No.
15   Q.    Okay.
16                  I'm guessing that your answer may
17          be I don't know to some of these questions,
18          but let's just go through them.
19                  Ms. Canto's email to you begins:
20          "I know that it has been a long time coming
21          but I have finally had all the medical
22          records copied out on the T drive for your
23          review."  Do you know what she means by "a
24          long time coming"?
25   A.    No.
```

1    Q.    And do you know what medical records she's

2          referencing?

3    A.    Not specifically, no.

4    Q.    Is the T drive an internal hard drive

5          designation or server designation within

6          Cigna?

7    A.    Yes.  It was a -- you know, a version of what

8          we call share drives today where people could

9          have access to information.

10   Q.    Okay.

11              And Ms. Canto in this 12-17-2014

12         email explains that she has separated the

13         medical records into two folders:  "one for

14         the lab medical records and the other for the

15         rehab and chiro medical records."  Would you

16         understand that to reference chiropractic

17         care?

18   A.    Yes.

19   Q.    Okay.

20              Do you have any recollection of

21         what labs she is referring to in this email?

22   A.    No.

23   Q.    Okay.

24              If you would look at the top of the

25         second page then.  "This review was with

```
 1              respect to" -- you were there.
 2    A.        I'm sorry.
 3    Q.        Yep.  There it is.  So just after the page
 4              break.
 5                        Yeah.  Perfect.
 6                        "This review was with respect to
 7              Angels Rehab Recovery Center, Angels Chiro
 8              and PB Labs (aka Collectaway Labs)."  Do you
 9              recognize any of those providers by name?
10    A.        No, I don't.
11    Q.        She goes on to say, "I was trying to
12              determine if the rehab services being billed
13              were appropriately documented in the records
14              in addition to trying to ascertain if the
15              chiro services were rendered as billed and
16              medically necessary."
17                        Do you know whether PB Labs
18              provided any rehab services or chiropractic
19              services?
20    A.        I don't, no.
21    Q.        Okay.
22                        Then the next sentence says, "The
23              lab medical records were primarily being
24              reviewed with respect to the urine drug
25              screenings that were being collected at the
```

```
 1            rehab facility."  Do you see that sentence?
 2   A.       Yes.
 3   Q.       And do you have any recollection of what you
 4            understood her request to be in this email as
 5            it relates to the lab medical records?
 6                      MS. COSTIN:  Object to the form of
 7            the question.  There is no request of him.
 8                      MR. HARE:  Well, let's go through
 9            the email.
10   BY MR. HARE
11   Q.       This is an email from Stephanie Canto to you,
12            Dr. Nemecek; is that correct?
13   A.       Yes.
14   Q.       And you understand that she is asking you to
15            review the medical records that she has
16            copied onto the T drive?
17   A.       Yes.
18   Q.       And you see there in the body of her email
19            that she copied these records onto the T
20            drive "for your review"?
21   A.       Yes.
22   Q.       And you understand that one of the two
23            folders into which she organized the records
24            was a folder for lab medical records?
25   A.       Yes.  That's what the email says.
```

1    Q.    And you see that she explains that the lab

2          medical records were primarily being reviewed

3          with respect to urine drug screenings that

4          were being collected at the rehab facility?

5          Do you see that?

6    A.    Yes, that's what the email says.

7    Q.    And do you understand that she was asking you

8          to review those lab medical records with

9          respect to urine drug screenings?

10              MS. COSTIN:   Objection to form.

11              THE WITNESS:   The email appears to

12         say that, but I don't have any recollection

13         from that time.

14   BY MR. HARE

15   Q.    Okay.

16              So do you have any recollection as

17         to what those records consisted of?

18   A.    No.

19   Q.    Do you have any recollection as to what

20         laboratory was identified in any of those

21         records?

22   A.    No.

23   Q.    Do you have any recollection as to what urine

24         drug screenings were being performed?

25   A.    No.

1          And would you go to the last page

2     of this document.  And is this -- does this

3     appear to be that same initiating email from

4     Stephanie Canto to you on December 17th,

5     2014?

6   A.   Yes, it looks like the same email.

7   Q.   Okay.  And let's follow this thread.  So

8     let's go to the next email, which appears --

9     yep, you're right there -- at the bottom of

10     the page Bates numbered 078, Stephanie Canto

11     to you on January 16th, 2015.  And the email

12     says, "Good morning Dr. Nemecek - when you

13     have a moment, could you let me know if

14     you've had an opportunity to review the

15     records below?  Thank you again for your

16     assistance."

17          Do you have any recollection

18     whether you had commenced the review as of

19     January 16th?

20   A.   No.

21   Q.   Do you have any recollection as to what the

22     records were that she was asking you to

23     review?

24   A.   I don't have any personal recollection, no.

25   Q.   It appears that you replied to her email

```
 1              later that morning on January 16th, and you

 2              explained that you're finishing up one other

 3              review and her request is next on the list,

 4              you hope to get it done next week.

 5                   Do you recall whether you were able

 6              to initiate the review of her record request

 7              at or around that time?

 8    A.   I don't have any personal recollection of

 9              trying to get it done at the time.

10    Q.   Okay.

11                   Would you scroll to the first page

12              of the document, and we'll start by looking

13              at the bottom portion.  And you were right

14              there.

15                   Do you see there is an email that

16              you sent to Stephanie Canto on January 21st?

17    A.   Yes.

18    Q.   And it looks like you're updating her.

19              "...as promised, I finally got a chance to

20              look at some of these records tonight to see

21              what was going on.  I didn't realize the

22              volume of records and materials that you have

23              gathered for review."

24                   Does that refresh your recollection

25              at all as to either the particular records or
```

```
 1           the quantity or volume of records that
 2           Ms. Canto was asking you to review?
 3   A.      No.  It doesn't.
 4   Q.      And I won't take the time to read the next
 5           sentence into the record, but I'll invite you
 6           to do that and same question:  Does that
 7           refresh your recollection at all?
 8   A.      No.
 9   Q.      You say in that sentence that most of the
10           reviews you've done so far have taken several
11           hours.  Would you say that, in your
12           experience, that was typically the case, that
13           the records you were given for review could
14           be reviewed carefully within the space of
15           several hours?
16                   MS. COSTIN:  Object to the form.
17                   THE WITNESS:  Yeah, I -- I don't
18           have many -- I don't have much recollection
19           of any of the specifics.  But I generally
20           would agree that, yes, it was a several-hour,
21           several-day review.
22   BY MR. HARE
23   Q.      Okay.
24                   Let's look at the next email in the
25           thread.  I think there's -- if you scroll up
```

1       a bit, you'll find an email that you sent to

2       Ms. Canto and Dr. Lopez on January 22nd.

3                   There you are.  January 22nd, 2015

4       at 12:30 a.m.  So you're burning the midnight

5       oil I see.  And you say in your email:  "Will

6       - As we have discussed about the SIU reviews,

7       please connect with Stephanie Canto about

8       this claim review."  You go on to say, "This

9       is a very large volume review - I do not

10      believe that one MD will have the time to

11      review this record along with the other

12      requests that came in today from others in

13      the SIU."  And you say, "We will need to

14      determine a plan to address all of these

15      needs."

16                  Again, forgive me, I don't mean to

17      be pedantic, but does this email refresh your

18      recollection as to what Ms. Canto had asked

19      you to review?

20   A.   No.

21   Q.   You reference other requests that came in

22      that day from others in the SIU.  Do you have

23      any recollection of what that references?

24   A.   I have no recollection of any specifics, no.

25   Q.   Okay.

```
 1                        And, finally, working through this
 2            thread, at the top of the first page of the
 3            exhibit there's an email from Ms. Canto to
 4            you and to Dr. Lopez on January 22nd, the
 5            afternoon of that same day.  She says, "I
 6            understand that this case is quite large and
 7            there are a significant amount of records for
 8            review but I'm not sure if you'd like to
 9            consider a sample to review rather than
10            review the full lot?"
11                        Do you recall any -- any extract or
12            sampling of the records for you to review
13            subsequently at this point?
14    A.      No.
15    Q.      Okay.
16                        Do you recall whether you ever
17            proceeded to complete the review of whatever
18            records or subset thereof Ms. Canto was
19            asking you to review?
20    A.      I don't have any recollection of any
21            participation in this review.
22    Q.      Okay.
23                        In this email reply of hers on
24            January 22nd she explains that she had
25            "requested records for roughly 20 patients,
```

```
 1   Q.   And then once it's downloaded and you've

 2        opened it natively within Excel, yeah, you

 3        should be able to -- perfect, perfect,

 4        perfect.

 5             So now that we've got it here, I

 6        actually can, hopefully, just drill down

 7        exactly where we want to go.

 8             If you see in the left-hand border

 9        all of the rows are numbered -- do you see

10        that?

11   A.   Yep.

12   Q.   Can you just scroll down to line 76 or I

13        should say row 76.

14             (Witness complies.)

15             Okay.  And do you see on that row,

16        reading left to right in these cells, "Audit

17        preparation," December 2nd, 2014?

18   A.   Yes.

19   Q.   And if you look in column E, the entry says,

20        "11/21:  I called Dr. Nemecek and left a

21        voicemail regarding this case."  I'm going to

22        pause right there just to ask do you recall

23        ever seeing this spreadsheet or spreadsheets

24        like this in the course of your employment at

25        Cigna?
```

```
 1   A.    No.

 2   Q.    Okay.

 3               And is it fair to say you don't

 4         recognize this particular spreadsheet?

 5   A.    Correct, I don't.

 6   Q.    Okay.

 7               Do you have any recollection --

 8         and, as always, I'll invite you to take as

 9         much time as you need to read this entire

10         entry at E 76 and to read anything else in

11         the spreadsheet, but take a look at that

12         entry and tell me if you have any

13         recollection regarding the matters described

14         therein.

15   A.    I've got -- I've got no recollection.

16   Q.    Okay.

17               Would you scroll up to row 63.

18               (Witness complies.)

19               And, again, in cell E 63 I see your

20         name appearing.  Same thing, Doctor:  Could I

21         just ask you to read that to yourself and

22         tell us whether you have any recollection

23         regarding the events or topics described.

24   A.    I don't really have any recollection.

25   Q.    If you look up -- it's actually within the
```

```
 1              same field of view, two rows up, row 61,
 2              "Medical director case sent for review."  Now
 3              we're at December 30th, 2014.  And cell E 61
 4              references an email sent to you.  Can you
 5              read that and let me know if you have any
 6              recollection.
 7    A.   No, I don't have any recollection.
 8    Q.   If you can go up to row 51.
 9              (Witness complies.)
10              This is a row -- A 51 says, "Case
11         approved for closure."  This is on 12-31-14.
12              And cell E 51, again, contains your
13         name.  "Case has been approved for closure"
14         and it goes on from there.
15              Could you read that for yourself
16         and tell us whether you have any independent
17         recollection.
18    A.   No, I don't have any recollection.
19    Q.   Do you know what it means in the world of SIU
20         when they say a case is approved for closure?
21    A.   No.
22    Q.   Row 46.  I'll spare reading the details into
23         the record, but if you could look at that row
24         and tell me if you have any recollection.
25    A.   No, no recollection.
```

1  Q.   Row 45, an entry of January 29th, 2015.

2  A.   No, no recollection.

3  Q.   So this entry appears to have a little more

4       detail beyond what we saw in the

5       corresponding email earlier.  The last

6       sentence of the cell E 45 states, "I asked if

7       they could complete at least 1/2 of the

8       medical records received (17 patient records

9       total)."

10           Do those numbers help refresh your

11      memory at all as to what you might've

12      reviewed?

13  A.   No, not at all.

14  Q.   Okay.  You can close that exhibit.

15           (Witness complies.)

16           MR. HARE:  And if I didn't say

17      already, we'll mark that Excel spreadsheet as

18      Nemecek Exhibit 6.  I think we'll probably

19      need to save it as a print-out for purposes

20      of the transcript.

21      BY MR. HARE

22  Q.   And now I've uploaded to you, Doctor, a pdf

23      that we'll mark as Exhibit 7.

24   (Deposition Exhibit 7 was marked for identification.)

25      BY MR. HARE

1    Q.    Okay.

2                This is -- yeah, you've got it.

3          This is a document entitled at the top of the

4          first page, "Substance Abuse Actions, August

5          6, 2015."  This is a three-page pdf that

6          begins at Bates number ending 530.

7                As always, Dr. Nemecek, please take

8          as much time as you would like to review

9          this.  My first question to you will be

10         whether you recall ever seeing this document

11         before?

12   A.    No recollection prior to conversations with

13         my attorneys, no.

14   Q.    Okay.

15               Would you turn, please, to the top

16         of the second page.  And do you see in that

17         first paragraph -- I'll just read it into the

18         record.  "We assembled a core action from

19         across the enterprise.  Key enterprise areas

20         included are:  TH&N medical director (Dr.

21         Doug Nemecek)," and then some other folks.

22         Do you see that?

23   A.    Yes.

24   Q.    Okay.

25               What does the shorthand "TH&N"

1          stand for?

2     A.   Stands for Total Health & Network.

3     Q.   And what does that mean in the world of

4          Cigna?

5     A.   It was the name of the organization that I

6          belonged to all reporting up to the chief

7          medical officer at the time, so everybody who

8          reported to that chief medical officer.

9     Q.   Okay.

10              Do you know -- on or around August

11         6, 2015, which appears to be the date of this

12         document, do you know what this first

13         sentence is referencing, "We assembled a core

14         action from across the enterprise"?

15    A.   Yes.

16    Q.   Tell me what you recall about that.

17    A.   On or about this time when it was identified

18         that there had been significant increase in

19         claim costs for substance use disorder

20         treatment and laboratory testing, a group was

21         pulled together to investigate what was

22         behind the cause of that claim increase.

23    Q.   And is this memo correct that you were a

24         member of that group?

25    A.   Yes.

```
1   Q.   Tell us what the group did in order to
2        fulfill this task.
3              MS. COSTIN:  Object to the form.
4        Extremely vague.  Calls for speculation.
5              THE WITNESS:  Ultimately we were
6        pulled together to drill down and evaluate
7        the trend we were seeing in substance use
8        disorder claim costs and what was driving
9        those.
10       BY MR. HARE
11  Q.   So did this group have a name, whether
12       formally or informally, that folks used to
13       refer to the group as such?
14  A.   Not that I recall.
15  Q.   Did the group ever meet as a group in this
16       undertaking?
17  A.   We had -- we had regular phone calls on which
18       members of the group who were available
19       attended for updates and discussion.
20  Q.   And how regular were those phone calls?
21  A.   They were on the order of a couple times a
22       week at first, and then they became less
23       frequent, you know, as we went out.  And the
24       whole process lasted I -- you know, a few
25       months.  I don't recall exactly.
```

```
1    Q.   Were there any minutes or records of the
2         regular phone calls that the group
3         participated in?
4    A.   I don't recall that there were.
5    Q.   Was there any -- did the group issue any
6         findings or memos or any other records
7         addressing or describing its findings?
8    A.   I have no recollection of formal documents
9         that were created outside it was likely
10        discussed in various places by people.  So I
11        -- but no documents that I'm aware of.
12   Q.   Okay.
13             To your recollection, did the
14        group, in fact, reach any findings?
15   A.   I don't recall any specific list of findings
16        outside of some of the things we looked at to
17        try to identify what was driving it.  So I
18        don't remember specifics.
19   Q.   Do you know whether Cigna changed any of its
20        practices or policies with respect to
21        reimbursement as a result of the review by
22        this group?
23   A.   One of the policies around reimbursement for
24        drug testing was changed as part of one of
25        the actions that was taken at this same time.
```

1            MS. COSTIN:  Object to the form.

2       Lack of foundation.

3            THE WITNESS:  I didn't write this,

4       so I don't know exactly what the writer meant

5       there.

6       BY MR. HARE

7    Q.  Okay.

8            And, to your recollection, you've

9       never seen this document prior to the time of

10      your deposition?

11   A.  Correct.

12   Q.  Was this document ever submitted to the

13      working group for review or comment?

14   A.  I don't have any recollection of seeing it.

15      I don't know.

16   Q.  Okay.

17           Do you know how you came to be a

18      member of this group?

19   A.  As the chief medical officer for behavioral

20      health, which oversees management of the

21      substance use disorder benefits, I was asked

22      to participate.

23   Q.  You've described the regular phone calls,

24      which you said were initially one or two

25      times per week, tapering off from there.

```
 1                    Were you or other members of the
 2          group ever provided any materials to review
 3          in connection with your meetings or
 4          otherwise?
 5     A.   There were materials that were reviewed
 6          people had -- if people had documents.  So,
 7          for example, what I recall was claim data
 8          analyses of the claims that had come in.  But
 9          I -- but there weren't regular -- there
10          wasn't regular data or documents.
11     Q.   Did you provide or supply any documents for
12          the group to review?
13     A.   Not that I recall.
14     Q.   And were you directly provided with any
15          documents beyond those that you just
16          described?
17     A.   Not that I recall.
18     Q.   Do you know whether any of the documents that
19          were made available for review by this group
20          were retained in a permanent file?
21                    MS. COSTIN:  Object to the form.
22                    THE WITNESS:  I have no
23          recollection.
24          BY MR. HARE
25     Q.   And would you have any way of knowing, to the
```

1    under a section captioned, "ACTION SUMMARY."

2    Do you see that there are five goals that are

3    enumerated?

4  A.   Yes.

5  Q.   And do you recall in your meetings with this

6    group coming up with goals that the group was

7    to identify for Cigna?

8  A.   Yes.

9  Q.   And are these five goals identified on

10    Exhibit 7 consistent with what you recall the

11    group advising?

12  A.   Yes.

13        MS. COSTIN:   Objection, form.

14    Object to the form.

15    BY MR. HARE

16  Q.   Go ahead, Dr. Nemecek.

17  A.   They are generally consistent with what I

18    recall.

19  Q.   Okay.

20        Would you look at Goal #3, which

21    advises:  "Use our behavioral UM/CM resources

22    to stop future 2015 claims before they

23    incurred or paid."  What are "behavioral

24    UM/CM resources"?

25  A.   What we have is case managers and advocates

```
 1          who are on the phone who help direct people

 2          to treatment when they have questions about

 3          what's in network or where they should go and

 4          then do the utilization management of those

 5          services when somebody is in care.

 6    Q.    Do you know -- you told me that as a result

 7          of the work of this group, Cigna did change

 8          its policy with respect to the number of

 9          tests that it would reimburse per year in the

10          absence of additional support.

11                  Do you know whether the steps

12          described in Goal #3 were adopted by Cigna?

13    A.    I don't know if those staff that are

14          mentioned there were ever hired or not.  I

15          don't have any recollection.

16    Q.    And, in fact, let me -- let me just go

17          through these.

18                  Do you know whether Cigna managed

19          to achieve Goal #1 in this document?

20                  MS. COSTIN:  Object to the form.

21          Lacks foundation.

22                  THE WITNESS:  I don't recall.

23    BY MR. HARE

24    Q.    Do you know whether Cigna accomplished

25          Goal #2?
```

```
 1                      MS. COSTIN:  Same objection.

 2                      THE WITNESS:  I don't have a

 3           recollection.

 4      BY MR. HARE

 5      Q.   I think I asked this already, but do you know

 6           whether Cigna accomplished Goal #3?

 7      A.   I don't recall.

 8      Q.   Do you know whether Cigna accomplished

 9           Goal #4?

10      A.   Yes.  As we've already discussed, I do know

11           that that clinical policy was developed.

12      Q.   Okay.

13                      The parenthetical at the end of

14           Goal #4 on page 1 of Exhibit 7 states:

15           "Progress:  Actions will be implemented in

16           August and October 2015)."  Is that

17           consistent with your recollection of the time

18           frame in which this policy change was

19           adopted?

20      A.   I don't remember the specifics, but it's

21           consistently in this time range, yes.

22      Q.   Do you know whether Cigna accomplished

23           Goal #5?

24      A.   I know we ultimately pulled out and dropped

25           our plan in the Florida market and stopped
```

```
 1    Q.    Do you have any knowledge whether SIU was

 2          eventually able to work through it's

 3          accumulated backlog of pended claims and

 4          finalize their review on whatever timetable?

 5    A.    I -- I -- I don't recall when that all was

 6          closed and finalized, no.

 7    Q.    If you look down under Goal #2, I just want

 8          to address some terms that appear.  The third

 9          bullet you'll see it says in all caps:  "PUSH

10          CMS TERM CUSTOMERS WITH EVIDENCE OF FRAUD AND

11          ABUSE."  What are CMS term customers?

12    A.    What this is saying is CMS, Center For

13          Medicare and Medicaid Services, the

14          recommendation from us, as Cigna, and as well

15          as other health plans at the time, was to

16          have CMS put in some regulations around

17          plans' ability to terminate customers when

18          there was found evidence of fraud and

19          abuse --

20    Q.    Okay.

21    A.    -- on the exchange.

22    Q.    Do you know whether -- so just continuing in

23          this bullet point there's a notation that:

24          "Currently CMS does not have the technical

25          capability to terminate customers based on
```

1                    THE WITNESS:  I don't recall.

2        BY MR. HARE

3    Q.    When you participated in this group while it

4          was ongoing, did you view this process to be

5          important for Cigna?

6                    MS. COSTIN:  Object to the form.

7          Vague.

8                    THE WITNESS:  I think everything I

9          work on is important.  Yes.

10       BY MR. HARE

11   Q.    And you took your participation in this group

12         project seriously; is that fair to say?

13   A.    Yes, as I do with all projects.

14   Q.    Are you bothered by the fact that you never

15         saw this document before the time of your

16         deposition?

17                   MS. COSTIN:  Object to the form.

18         Mischaracterizes his testimony.

19                   THE WITNESS:  No, I'm not.  Don't

20         have a concern.

21       BY MR. HARE

22   Q.    Are you bothered by the fact that you've

23         never seen any other documentation that was

24         prepared or created as a result of the review

25         of this committee?

```
 1                  MS. COSTIN:  Same objection.
 2         Mischaracterizes his testimony.
 3                  THE WITNESS:  I think I said I
 4         wasn't aware of it or don't recall it, which
 5         is true.  I don't recall.  I don't know what
 6         other documents and things were there back
 7         then.
 8         BY MR. HARE
 9    Q.   Did you view the participation of
10         representatives of the SIU as an important
11         part of the exercise of this committee?
12                  MS. COSTIN:  Object to the form.
13                  THE WITNESS:  The SIU plays an
14         important role at the health plan, so their
15         work is important as well.
16         BY MR. HARE
17    Q.   You told me about one outcome of the
18         committee's work that you can recall, which
19         was this change in reimbursement policy with
20         respect to the number of testing procedures
21         that Cigna would reimburse on an annual
22         basis.  Do you recall that?
23    A.   Yes.
24    Q.   Prior to the work of this committee described
25         in Exhibit 7, did Cigna have, to your
```