# EXHIBIT 11

1      UNITED STATES DISTRICT COURT

2        DISTRICT OF CONNECTICUT

3      CASE NO:  3:19-cv-01324-JCH

4  _____x

5  CONNECTICUT GENERAL LIFE

6  INSURANCE COMPANY and

7  CIGNA HEALTH AND LIFE

8  INSURANCE COMPANY,

9         Plaintiffs,

10 Vs.

11 BIOHEALTH LABORATORIES, INC.,

12 PB LABORATORIES, LLC;

13 EPIC REFERENCE LABS, INC.,

14         Defendants.

15

16 _____x

17 VIDEOTAPE DEPOSITION OF:  PATRICK DAVID HURLEY

18 DATE:  FRIDAY, DECEMBER 16TH, 2022

19 TIME:  10:06 A.M. TO 3:37 P.M.

20 HELD AT:  WEB-BASED VIDEO CONNECTION

21 Reporter:     CHRISTINE FOX, CSR

22               BRANDON LEGAL TECH LLC

23               37 Pinnacle Mountain Road

24               Simsbury, Connecticut  06070

25               (860) 528.2244 (tel)

1    A.  Yes.

2    Q.  Okay.  Have you spent any time with Ms.

3  Kingsbery or anybody in her firm preparing for

4  this deposition?

5    A.  Yes.  I've spent a little bit of time

6  with them, just start reviewing in terms of the

7  subpoena, what it related to.

8    Q.  Okay.  How long do you think you spent

9  total preparing for this deposition with Ms.

10  Kingsbery or anybody from Alston Bird?

11    A.  I'd say approximately one-and-a-half to

12  two hours.

13    Q.  Okay.  I don't want to know anything you

14  talked about.  I don't want to know any specific

15  documents.  But did you review certain documents

16  that related to your handling of any of these

17  claims that we're here to talk about?

18    A.  I have reviewed some notes.

19    MS. KINGSBERY:  I want to instruct you,

20    Mr. Hurley, and I know Mr. Cunningham said

21    this, but you don't need to identify any --

22    any documents that we discussed and what we

23    looked at.  That is privileged.

24    MR. CUNNINGHAM:  Well, let me ask

25  this -- and, Kelsey, you can decide whether you

1  want to object or not.

2  BY MR. CUNNINGHAM:

3      Q.  I want to know what types of documents

4  you reviewed because we've seen ledgers, we've

5  seen case notes.  So, can you tell me generally

6  what type of documents, without telling me what

7  documents they were?

8          MS. KINGSBERY:  I'll object to that,

9      too.

10         MR. CUNNINGHAM:  Telling him not to

11     answer that?

12         MS. KINGSBERY:  You don't need to

13     disclose any information about the types of

14     documents we discussed.

15 BY MR. CUNNINGHAM:

16     Q.  Sir, when did you leave the employment

17 of CIGNA?

18     A.  I left October of 2016.

19     Q.  Why did you leave CIGNA?

20     A.  It was a decision that I should leave.

21 I was encouraged to leave.

22     Q.  Okay.  So it was not completely your

23 decision?

24     A.  Not completely my decision, even though

25 I had -- I had some -- some issues in terms of

1    A.  I can't even recall in terms of when --

2    when the discussions started to happen.

3    Q.  Okay.  So, you said that you left in

4    October of 2016, right?

5    A.  Yes.

6    Q.  Did the displeasure of CIGNA have

7    anything to do with your work in investigating

8    Epic Reference Labs?

9    A.  No.  I think it's really in terms of how

10   these cases are assigned; so it's really in terms

11   of nobody is in a position to be able to pick and

12   choose what they want.  And to this day, that's

13   the case.

14        So it's -- it's always been a matter of

15   assignment.  And I think in terms of setting up

16   how I structure my investigations even today,

17   really, doesn't really influence my decision in

18   terms of working one case differently -- or the

19   cases are unique but it's really in terms of --

20   in terms of preferences.

21        You just don't -- you don't have that --

22   you don't work under those conditions.

23    Q.  Do you have any independent recollection

24   of your work investigating Epic?

25    A.  Not much.

Cvm d1324-GJ H Lif Doc cme a2 5i 6i heal Filea 0 07/20 2a ., et Rage

```
 1          I remember the name, I think when I
 2   first had received -- received the subpoena but
 3   it's -- it's extremely, extremely limited.
 4       Q.  Okay.  And without telling me what
 5   documents you reviewed, did the documents you
 6   reviewed refresh your memory in any way as to the
 7   investigation that you performed of Epic?
 8       A.  I'm going to have to say no, just
 9   because in terms of the documentation is pretty
10   consistent with how I document.  So, what I
11   looked at really didn't open up -- open up a
12   floodgate of memory in terms of, for me, in terms
13   of what -- what I did with the case through my
14   course of investigation.
15       Q.  And I'm not sure if you misunderstood my
16   question.  I'm going to ask a little more
17   specifically.
18          Were you ever told that your work
19   investigating Epic had anything to do with CIGNA
20   wanting you to leave?
21       A.  No.  Not that I'm aware of, no.
22       Q.  And we'll talk about I think one of the
23   performance reviews that was produced to us by
24   CIGNA, but that will be a little bit later.
25          Sir, would you -- strike that.
```

1      is 11:06.

2            (Recess taken

3            From 11:06 A.M. to 11:10 A.M.)

4                  * *

5            VIDEOGRAPHER:  Okay.  We are back on the

6      record at 11:10.

7   BY MR. CUNNINGHAM:

8      Q.  All right.  Mr. Hurley, I want to start

9   talking about some of the documents that bear

10  your name relative to this case.

11            MR. CUNNINGHAM:  Matt, would you please

12  put up Bates number 0291657.

13            Please enlarge that.

14            Mr. Hurley, can you see that document on

15  the screen?

16            (Exhibit Number 1

17            Bates 0291657

18            Marked for Identification)

19      A.  Yes, I can.

20            If there's anything below the -- the --

21  just the summary spreadsheet.

22            Okay.  Thank you.

23      Q.  So, does looking at this document

24  refresh your recollection at to anything that is

25  contained in the document?  And please, take your

```
 1    time to review it.
 2            Let me know when you're done.
 3        A.   It does not.
 4        Q.   Okay.  This is a document that was sent
 5    to you.  Do you know who it was that sent this
 6    document to you?
 7        A.   No, I do not because it comes from a
 8    general mailbox.
 9        Q.   Okay.  And this is dated June 20th of
10    2013 at 4:05 p.m., correct?
11        A.   Yes.
12        Q.   Do you remember what your job title was
13    at that time?
14        A.   I thought I was still in -- in
15    management capacity, but based on the -- based on
16    the assignment, I was an investigator capacity.
17        Q.   And it says:  Subject Samba referral in
18    AMD Status.  REFP-2013-188; correct?
19        A.   Yes.  Repeat what subject is, yeah.
20        Q.   Do you know what Samba is there?
21        A.   I don't recall what Samba is.
22        Q.   And we'll come to that in just a minute.
23        A.   Sure.
24        Q.   I'm pretty sure it was the client.
25            It says:  The Samba rereferral in AMD
```

1   Balta out of Lake Worth, Florida.

2           Did I read that accurately, sir?

3       A.  Yes.

4       Q.  Okay.  So, does reviewing that with me

5   refresh your recollection as to who Samba was?

6       A.  No, it does not.

7       Q.  And does it say, per the man in that

8   paragraph:  There is not clear allegation

9   advising management of new referral for Samba.

10  The bills have all been for the current member

11  we're concerned about and one of the member Total

12  Recovery, all for current member in 2012.

13          Did I read that accurately?

14      A.  I think there was a break in terms of

15  advising management of a new referral for Samba.

16      Q.  Right.

17      A.  2010 to the present.  They identify the

18  exposure.

19      Q.  All right.  And at the end, does it say:

20  Thanks, Judy Andrew, Samba?

21      A.  Yes.  That's what it documented as, yes.

22          MR. CUNNINGHAM:  Okay.  All right.

23  Let's go to page 535, first page of the document.

24  And scroll up, please.

25  BY MR. CUNNINGHAM:

1   that I was in a manager capacity.  I don't

2   recall; or if I was in a specialist capacity, I

3   don't recall.

4       Q.  But if you were a fraud specialist, like

5   Stephanie Canto was on June 20th, 2013, you would

6   not have been in a position to assign this

7   investigation to her, correct?

8         MS. KINGSBERY:  Objection.  Asked and

9     answered.

10  BY MR. CUNNINGHAM:

11      Q.  Is that true, sir?

12      A.  I don't know of any formal circumstances

13   where I would be asked to do it, so, I don't

14   know.

15      Q.  Do you have any independent recollection

16   as to the circumstances that led you to assign

17   this investigation to Stephanie Canto?

18      A.  I have no recollection.

19      Q.  Okay.  Do you want to go ahead and read

20   this entry, sir.  Why don't you go ahead and read

21   it out loud, because I think that will serve two

22   purposes; one, that will tell us what's on this

23   note that you authored, and secondly, might jive

24   your recollection.

25         So will you go ahead and read that into

1   Samba has noted unusual and repeated

2   billing for one employee by the lab.  Typical

3   charges exceed the $1000.  As there is a concern

4   about kickback, it should be noted that the

5   employee was in drug and rehab facility at the

6   time, the lab services were billed.  Top billed

7   for the laboratory was $119,702.

8   Recommend analysis around patient

9   population and treatment programs where lab

10  services were incurred.  Samba referral notes

11  employee information for treatment at Total

12  Recovery Center.  The referral was being assigned

13  to Stephanie Canto for investigation.  Findings

14  will need to be reported to Samba via the

15  Referral reporting form.

16  Should I continue?

17  Q.  No.  That's fine.

18  Does reading that entry refresh your

19  recollection about anything that's depicted in

20  that e-mail from you?

21  A.  No, it does not.

22  Q.  You say there's no defined evidence of

23  kickback, though it is surmised in the

24  allegation, not indicated in the SIRIS entry.

25  What does that mean, sir?

1          MS. KINGSBERY:  Objection.  He's already

2     said he doesn't remember.

3  BY MR. CUNNINGHAM:

4     Q.  You can answer, sir.

5     A.  I don't recall.

6     Q.  What is SIRIS?

7     A.  SIRIS is a data base that is supported

8  in the NHCAA organization, that allows for

9  various carriers to submit findings,

10  investigative findings, pertaining to particular

11  entities.  And it provides us with a means of

12  going into that data base to say, to do a look-up

13  on a particular provider, to see if other

14  carriers actually have an investigation, or had

15  an investigation at that time.

16          Also provides a means of contact to be

17  able to network with these individuals, to find

18  out additional information.

19     Q.  And so when you say there's no defined

20  evidence of kickback, though it is surmised in

21  the allegation, not indicated in the SIRIS entry,

22  are you saying there that when you looked at the

23  SIRIS entries, with this particular situation,

24  there was no indication that there was any

25  evidence of kickbacks between the labs?

1  the term edit and flag interchangeably?

2    A.  Yes.  Yes.

3        I don't use flag any more.

4    Q.  Okay.  I just want to make sure we're

5  talking about the same thing?

6    A.  Yeah, you are.  I apologize.

7    Q.  That's okay.

8        All right, sir.  The -- the next e-mail

9  above that is from Deanna Anderson to you, dated

10 May 26, 2015, at 3:54 p.m., correct?

11   A.  Yes.

12   Q.  It's referring to Epic Reference Labs,

13 correct?

14   A.  Yes.

15   Q.  And it says:  Tom stated that we are

16 only eight days into the new edit.  We will hold

17 off on the IFP edit for at least one week.  For

18 now, continue with your standard investigative

19 steps.  Thanks.

20       Did I read that accurately, sir?

21   A.  Yes.

22   Q.  Do you have any independent recollection

23 of reviewing this e-mail when you got it on May

24 26 of 2015?

25   A.  I have no recollection.

1      Q.  Okay.  Do you know what Deanna Anderson

2  meant when she said:  We will hold off on the IFP

3  edit for at least one more week?

4      A.  I think, as stated, they're not --

5  they're eight days from the way -- from the time

6  that it was written, that they're going to

7  consider placing the provider under a specific

8  edit.  And that we're to continue the

9  investigative steps that we have in place at that

10 time.  But that's open to interpretation, what's

11 written.

12     Q.  And she says:  For now, continue with

13 your standard investigative steps.

14         Would that be an indication to you that

15 you were, in fact -- you had already commenced an

16 investigation into Epic Reference Labs as of May

17 26, 2015?

18     A.  It may, but I can't speak to the

19 specific steps because I don't recall.

20     Q.  All right.  So this will probably be the

21 last thing I ask you about before we take a

22 little break.

23     A.  Sure.

24         MR. CUNNINGHAM:  Matt, would you go to

25 289478.  Go to the very top entry.

1    VOS are verification of service letters

2  are.  And I summarized them.  All together we

3  have 17 letters.  All together 17; fourteen

4  indicate no payment.

5    Fourteen of those are responses,

6  indicate no bill.

7    And then what I'm summarizing here are

8  the verification of service responses.  So, three

9  indicate that they received a bill.  One received

10  a bill and paid.

11    And then from there, I said:  I will

12  continue tracking verification of service

13  letters.  And I am following the original billing

14  ledger request.  As that had been -- I'm assuming

15  it had been -- not been responded to at the time

16  I wrote this.

17    Q.  So here you're indicating that you have

18  sent out 17 verification of service letters?

19    A.  I don't have an accurate account in

20  terms of how many were sent, because I don't

21  recall.  But in terms of the ones that we had

22  received at that time, I believe the responses

23  were 17.

24    That's what I'm indicating there.

25    Q.  But you don't know, as we sit here

 1  today, how many you sent out?

 2        A.  No, I do not.

 3        Q.  Do you have any idea of what methodology

 4  you used to determine to whom to send

 5  verification of service letters?

 6        A.  Are you referring to sampling or are you

 7  referring to how many did I actually think needed

 8  to be sent letters?

 9        Q.  I'm trying to figure out how you

10  determined to whom to send them, and how many you

11  needed to send the VOS letters?

12        A.  I have no recollection.  I don't recall.

13        Q.  Do you remember whether there was any

14  protocol or methodology at CIGNA, to insure that

15  the letters you sent out and the people you sent

16  them to would be statistically valid?

17        A.  Again, it would really -- not again.

18  But in terms of when -- when this was

19  communicated, and when this was written, in terms

20  of how we represented statistical sampling as

21  being an objective measure, versus utilizing a

22  fairly random process, I don't even have the

23  specific date.  But I know that the SIU deferred

24  to RAT (sp) stats, which was CMS's tool for

25  sample selection.  And that would have been

1   Q.  And over the lunch break, did you think

2  about anything that you told me you didn't

3  remember, that you might have remembered during

4  the lunch break?

5   A.  No, it's -- I have to be honest with

6  you:  It's been over ten years since I've, you

7  know, had any involvement with -- with any case,

8  or a case that's identified as a -- as a lab,

9  so...

10   Q.  Go ahead, I'm sorry.

11   A.  My ability to recollect is extremely

12  limited.

13   Q.  Okay.  Not to quibble with you, but the

14  entries here are dated May 13, 2015, correct?

15   A.  Um-hmm.  Yes.

16   Q.  That's seven and-a-half years go?

17   A.  Seven and-a-half years.

18   Q.  Sir, during the course of the remainder

19  of the deposition, if you remember something that

20  just pops into your head, that you did not

21  remember earlier, just feel free to let know

22  that.  Okay?

23   A.  I will absolutely do that.

24   Q.  You've been cross examined at trial,

25  have you not?

1    A.  Yes, I have.

2    Q.  Do you understand that you will not be

3 allowed to change your testimony on particular

4 topics or particular question if we go to trial?

5    A.  I -- I would say yes, I have that

6 understanding.

7    Q.  Okay.  Technically, you can change your

8 testimony, but then I can do something called

9 impeachment.  You wouldn't say:  Well, that's not

10 what you testified at deposition.  Do you

11 understand that?

12    A.  Um-hmm.  I understand that.

13    Q.  Okay, all right.  So let's talk about

14 this.

15        Just, please confirm we're on line 157,

16 again.  And if you need that larger, please let

17 us know.

18        Okay.  It says:  Manger (sic) -- kind of

19 interesting for a Christmas spirit, but it should

20 be:  Manager discussed with investigator,

21 correct?

22    A.  Yes.

23    Q.  It says:  Investigator to set up ten day

24 case meeting, scheduled.  Issue of fee forgiving,

25 case development has requested patient ledger for

1  seven patients, and awaiting receipt.  Patient

2  liability analysis identified 56 percent of

3  patient population with liability.  Manager

4  concern with percentage amount may not constitute

5  enough to address investigating for fee

6  forgiving.  To consider moving the tax ID to the

7  IFP claim edit given the lab billing.  The

8  customer claim history is pending report.  The

9  investigator should look to complete for the

10  complete customer history, to assess any changes

11  in patient liability percentages on a year to

12  year basis, to rule out any increases.  Identify

13  rehab facilities that the lab is performing UDT

14  services.

15        Did I read that accurately, sir?

16     A.  Yes, you did.

17     Q.  Do you know who typed this entry into

18  this ledger?

19     A.  I do not know who typed that into the

20  ledger.

21     Q.  Okay.  So with this Column I, where your

22  name is in it, does that indicate who actually

23  made the entry?

24     A.  Well, again there's two -- there's

25  fields.  There's the updated by, which I think is

1    A.  I do.

2    Q.  Do you see your name, your first name in

3  here twice, in Column I and Column L?

4    A.  Yes, I do.

5    MR. CUNNINGHAM:  Matt, go back up for a

6  second so we can note for the record what "I" and

7  L are.  Just go to the top, please.  And then

8  we'll come back.

9  BY MR. CUNNINGHAM:

10    Q.  So the "I" column, created by.

11    And the L column is updated by, correct?

12    A.  Correct.

13    Q.  Okay.  Let's go back to 154, please.

14    I'm going to read this entry into the

15  record, at block 154.  And it appears that this

16  was updated by you, correct?

17    A.  Based on what's on -- based on what's on

18  this -- this spreadsheet, it may.

19    I, again, I don't recall making the

20  entries, so, it's...

21    Q.  I understand.  It's dated May 13, 2015,

22  correct?

23    A.  That's what the field says, yes.

24    Q.  It says:  Case development has

25  identified licensing and initial data analysis.

1  Case issues are Epic's potential for fee

2  forgiving.  Discussion with manager to determine

3  with SIU director, that current percentage of

4  patient population of liability (56%), is

5  substantial to initiate a fee forgiving

6  investigation.  And then there's a redaction for

7  privilege.

8          Complete customer history has been

9  received.  Investigator conducted double billing

10  analysis with results showing double -- evidence

11  of double billing; however, claims system has

12  adjudicated claims for small amount in paid

13  claims.  Next action is to take into

14  consideration moving the tax ID to the IFP edit.

15  Investigator will be notified of team manager

16  director discussion.  Ten day case meeting has

17  been scheduled.

18          Did I read that accurately?

19      A.  Yes.

20      Q.  Do you know whether you were the one

21  that typed this entry in?

22      A.  I don't recall making the entry.

23      Q.  And there's another reference here to a

24  current percentage of patient population with

25  liability being 56%; correct?

1  that you have a conversation where you returned a

2  phone call for the compliance director for Epic

3  Reference Labs?

4        A.   Yes.

5        Q.   Did he indicate that he was going to be

6  sending you the information you requested,

7  namely, the current ledgers?

8        A.   Yes.

9        Q.   And does it also indicate that he wanted

10 clarification on which patients you wanted these

11 ledgers for?

12       A.   That were requested, yes.

13       Q.   Okay.  And does it indicate that Mr.

14 Viskovich did in fact e-mail the account

15 statements for the five patients you have

16 requested?

17       A.   That's what's documented here, yes.

18       Q.   Sir, do you have any independent

19 recollection as to whether you believe that Epic

20 Reference Labs cooperated, or did not cooperate,

21 with the information you sought during the

22 investigation?

23       A.   I do not.

24       Q.   You don't plan to offer any testimony

25 that Epic Reference Labs did not fully cooperate

1    all responses.  Next step will involve request

2    for billing practices letter.  Currently all

3    responses indicate no bill or payment has been

4    made.  There is an issue with Epic and other labs

5    under investigator, as to their corporate

6    stricture, and is there a relationship with other

7    labs.

8            Did I read that accurately, sir?

9        A.  Yes.

10       Q.  Do you remember any discussion about

11   revising the strategy from maybe including Epic

12   on the IFP edit, to now approaching a different

13   strategy involving fee forgiving?

14       A.  I don't -- I don't recall having any

15   discussion when I was at CIGNA, over this issue.

16       Q.  I'm going to go to another section of

17   this.

18           Let's go to 108, please.

19           Okay.  Have you had a collapse to look

20   at that, sir?

21       A.  Okay.  There's no other entries on this

22   cell?

23       Q.  I don't think so.

24       A.  Okay.

25       Q.  Let me check my copy, but I think that's

1  be able to communicate that.

2          MR. CUNNINGHAM:  Scroll up a little bit,

3      please.

4          Too far.  I want to go into more detail

5      about the one that Mr. Hurley just testified

6      to.  The one at 3:07 p.m.

7          Thank you.

8  BY MR. CUNNINGHAM:

9      Q.  You say:  I just do not know if we have

10  enough to establish fee forgiving for this lab.

11          Sounds pretty self-explanatory, but do

12  you know what you meant by that?

13      A.  No, I don't.  I don't recall what I

14  would have used as a -- as a barometer of being

15  able to have enough information for the lab in

16  order to be able to flag for fee forgiving.

17      Q.  Well, you anticipated my next question,

18  sir.  That's what I was going to ask you about.

19          Were there criteria, were there

20  guidelines at CIGNA that would inform you or

21  guide you, as to what you would need, in terms of

22  quantity of evidence to establish fee forgiveness

23  for a particular lab?

24      A.  I don't know if there was any general

25  rule of thumb, or any measuring stick that would

 1  things, like adjudicated amount, allowed amount,

 2  patient liability amount, that would give you am

 3  indication of what potentially the patient cost

 4  share would be.

 5      Q.  Wouldn't the claim data also tell you of

 6  the patient had a co-pay?

 7      A.  I believe there may have been a filed

 8  for that, but I don't recall.

 9      Q.  Well, if the claim data did, in fact,

10  indicate to your whether the patient had a co-pay

11  or not, wouldn't the source of that co-pay only

12  exist if the particular policy had a cost share

13  obligation?

14      A.  Again, it's a --

15          MS. KINGSBERY:  Object to form.  Calls

16  for speculation.

17  BY MR. CUNNINGHAM:

18      Q.  You can answer.

19      A.  I'm just saying in terms of, I don't

20  recall any specific field in the claims data.

21  There's a lot of other fields outside of this

22  that I don't have recollection of, in terms of

23  claims data.  But I don't recall if there was a

24  specific field that was identified as co-pay.

25      Q.  Do you have any idea what you meant when

1  you said:  Our strategy changed when the IFP was

2  taken off the table.  Glad it is being

3  reconsidered.

4      A.  I have no recollection in terms of how I

5  used that, or why I used that term strategy.  I

6  just don't have a recollection of what that --

7  what that involved.

8          MR. CUNNINGHAM:  Okay.  Let's go to

9  Bates number 291733 and 734.

10          This will be Exhibit 13.

11          (Exhibit Number 13

12          Bates 291733 - 734

13          Marked for Identification)

14          MR. CHRIST:  No, I believe it's 14.

15          MR. CUNNINGHAM:  Can we figure it out at

16  the end of the deposition.

17          You had one job to keep track of our

18  exhibit numbers.  No drinks for you tonight.

19          (Exhibit Number 13-A

20          Bates 291733 - 734

21          Re-Marked for Identification)

22      Q.  So, we're going to refer to this as

23  Exhibit 13-A.  Again this is Bates 291733.

24          Sir, a little bit ago, we were talking

25  about, whether Epic Reference Labs had cooperated

1    with your investigation, in terms of providing

2    information.

3            I want to you ask about this.  You see

4    at the bottom of page -- Matt, you want to

5    enlarge that a little bit, please.

6            Is this the e-mail message from you to

7    Stephanie Canto, on July 7th, 2015, at 4:31 p.m.?

8        A.  Yes.

9        Q.  And does it say:  Stephanie, I just

10   received an entire box of patient ledgers from

11   the billing company for Epic Reference Labs,

12   Medical Billing Choices.  When you were

13   contending your fee forgiving case for PB, did

14   you -- did they ever send you ledgers.  I will be

15   bring to review this week.  I just wanted to see

16   if you have had experience reading the ledgers.

17           Did I read that accurately?

18       A.  Yes.

19       Q.  Okay.  Would this e-mail be a further

20   indication that Epic Reference Labs was

21   cooperating with your investigation by providing

22   you information you requested?

23       A.  I don't -- I don't recall.  I wouldn't

24   know, because it would depend in terms of what

25   the contents of the ledgers were.