# EXHIBIT 12

1       UNITED STATES DISTRICT COURT

2         DISTRICT OF CONNECTICUT

3        CASE NO:  3:19-cv-01324-JCH

4    _____x

5   CONNECTICUT GENERAL LIFE

6   INSURANCE COMPANY and

7   CIGNA HEALTH AND LIFE

8   INSURANCE COMPANY,

9          Plaintiffs,

10   Vs.

11   BIOHEALTH LABORATORIES, INC.,

12   PB LABORATORIES, LLC;

13   EPIC REFERENCE LABS, INC., and

14   EPINEX

15   _____x

16

17   VIDEOTAPE DEPOSITION OF:  THOMAS HIXON

18   DATE:  MONDAY, DECEMBER 5TH, 2022

19   TIME:  10:03 A.M. TO 4:52 P.M.

20   HELD AT:  WEB-BASED VIDEO CONNECTION

21   Reporter:       CHRISTINE FOX, CSR

22                   BRANDON LEGAL TECH LLC

23                   37 Pinnacle Mountain Road

24                   Simsbury, Connecticut  06070

25                   (860) 528.2244 (tel)

1     that more clearly once ne that Discovery

2     deadline evaporated.

3          So may I proceed?

4          MR. KANG:  Sure.

5  BY MR. CUNNINGHAM:

6     Q.  Okay.  Mr. Hixon, you said that you have

7  been deposed three time previously.  Can you tell

8  me about that?

9     A.  Sure.

10         I was a 30(b)(6) witness, representing

11 CIGNA, I believe three cases, providers brought

12 against us.

13    Q.  Okay.  So are you telling me that in

14 every prior instance in which you have given a

15 deposition, it was as a 30(b)(6) witness for

16 CIGNA?

17    A.  Yes.

18    Q.  Okay.  And can you tell me what the

19 topics were for your 30 (b)(6) expertise in each

20 of those cases?

21    A.  If I recall, it was about the providers

22 that had been investigated the by SIU who had

23 brought claims against CIGNA and claim payment.

24    Q.  Okay.  Would that be the case for all

25 three of the depositions you have give in?

1  ideas, sir, of the effective date of this

2  organizational chart for the SIU department?

3      A.  No, not specifically.

4      Q.  Okay.  This organizational chart says

5  that you were an audit director.  Do you see that

6  on the left side?

7      A.  Yes.

8          MR. CUNNINGHAM:  Okay.  Ted, do we have

9  agreement that this is from 2015?  I don't really

10 want to fight about that.

11         MR. KANG:  If that's what we

12     represented, yeah.

13         MR. CUNNINGHAM:  Okay.  Matt, is that

14     your understanding?

15         MR. CHRIST:  No.  I'm looking actually

16     at the -- some of the metadata that was

17     produced.  It's from 2014.

18         MR. CUNNINGHAM:  Okay.  Thank you.

19 BY MR. CUNNINGHAM:

20     Q.  All right.  So, Mr. Hixon, assuming that

21 we've been told is accurate, that this

22 organizational chart is from 2014, it appears at

23 that time that you were in the job title of audit

24 director, correct?

25     A.  Yes.

1   no longer with the SIU.

2           Mark Lasner. (Sp).

3       Q.   Okay.  And when you began working as an

4   audit director, what were your job

5   responsibilities and duties?

6       A.   To oversee the investigative teams,

7   focus in on external fraud, waste and abuse.

8           Worked with clients who might have

9   questions about our antifraud program.

10          Those are my two primary

11  responsibilities.

12      Q.   Now if I understand this organizational

13  chart, it appears that you only reported to one

14  person, and that would have been Matthew Norton

15  who would have been the audit senior director.

16  Is that accurate?

17      A.   Yes.

18      Q.   To your knowledge, what was the

19  difference between your job responsibilities and

20  Matthew Norton's job responsibilities?  If you

21  know?

22      A.   Well, I had oversight of the

23  investigations.  He would have had oversight of

24  case development and the technology, and intake,

25  as well.

```
 1   BY MR. CUNNINGHAM:
 2       Q.  Would you agree with me that each claim
 3   is independent?
 4           MR. KANG:  Fred, are you talking about
 5       each individual claim submitted by a
 6       provider or each individual case?  We've had
 7       this discrepancy in the past.
 8           MR. CUNNINGHAM:  Sure.  Sure.
 9   BY MR. CUNNINGHAM:
10       Q.  Let's talk about cases referred to SIU.
11           Sir, would you agree with me that each
12   case is independent?
13       A.  Yes.  Each case that we would
14   investigate would be an independent investigation
15   that can take its own course.  Yes.
16       Q.  So, wouldn't each case have to be
17   investigated on its own merits?
18       A.  Yes.  Each investigation would be looked
19   at on its own merit.  On its own -- yeah.
20       Q.  Okay.  And let's talk about the
21   difference between claims and cases.
22           My understanding of the way CIGNA
23   distinguishes those two is a claim can become a
24   case if it's referred to the SIU.
25           Is that your understanding?
```

1  sent to CIGNA doctor represent a statistically

2  valid sample of the records?

3      A.  I didn't specifically train Stephanie

4  Canto.  She would have been trained by her

5  manager.  And as mentioned earlier, there would

6  be reference documents in terms of how to

7  investigate a particular scheme, where it might

8  introduce ways, variables that could be used to

9  select a sample, whether it be statistically

10 valid or probes sample, or a full sample.

11     Q.  During the relevant time frame we're

12 discussing, did CIGNA have any software that

13 could be used by the fraud investigators to

14 guarantee that a statistically valid sample would

15 be generated?

16     A.  I can't recall during the time period,

17 if they were using software to do a specific

18 statistically valid random sample.

19     Q.  Do you know if any software is used by

20 CIGNA's SIU investigators now?

21     A.  Yes.

22     Q.  Okay.  And what is your understanding of

23 how that software works?

24     A.  It's software where you would enter in

25 variables, and it would scientifically select

Cornelia v. General Life Insurance, Brighealthc Confidence, Inc., et al

1  what a sample size should be.  And then you would

2  use a randomizer to make that random selection.

3      Q.  A random selection of the particular

4  patient's records that were going to be given to

5  the inhouse medical doctor?

6      A.  Right.  So the software would say --

7  would calculate for you what that number is.  And

8  then the randomizer would select randomly that

9  number.

10      Q.  Okay.  But did you tell me a moment ago

11  that you do not believe that software was in

12  effect from 2013 to 2017?

13      A.  I can't recall if that was being used or

14  not.

15      Q.  Were you aware that Stephanie Canto did

16  not document anywhere in the case file how she

17  selected the ten patient medical records that

18  were sent for review to Dr. Nicholl?

19      A.  Yeah, I'm not aware.  I'm not familiar

20  with the -- the investigator steps that she had

21  taken or the -- the notes that she had

22  documented.

23      Q.  Would you have preferred that she

24  indicated indicate in the case notes how she

25  selected the patient records that she sent to Dr.

1   BY MR. CUNNINGHAM:

2       Q.  But she should have taken those steps,

3   right?  She should have documented, in the case

4   file, how she selected the records that she sent

5   and she should have documented the actual records

6   that she did sent?

7           MR. KANG:  Objection, hypothetical.

8       Argumentative.  Asked and answered.

9           THE WITNESS:  You can't make that

10      determination.

11  BY MR. CUNNINGHAM:

12      Q.  Sir, did you review any deposition

13  testimony that has been taken in this case?

14      A.  No.

15      Q.  You did not review Deanna Anderson's

16  deposition or Stephanie Canto's deposition?

17      A.  No.

18      Q.  Did you review any documents in

19  preparation for this deposition?

20      A.  I did.

21      Q.  Can you describe for me generally what

22  documents you reviewed?

23          MR. KANG:  Objection.  Attorney-client

24      privilege.

25          Instruct you not to answer.

```
 1    BY MR. CUNNINGHAM:
 2        Q.  Did you review the -- the case files for
 3    either PB Labs or Biohealth?
 4            MR. KANG:  Objection.  Instruct you not
 5        to answer.
 6        Q.  Did you review any documents to refresh
 7    your memory of the events that occurred here
 8    since they occurred several years ago?
 9        A.  No.
10        Q.  Did you review any of the notes that
11    contain your name on them?
12        A.  No.
13        Q.  All right, sir.  Let me talk to you
14    about what can happen at CIGNA after, if what
15    CIGNA called an audit is conducted.
16            Would you agree with me that after CIGNA
17    performs that, the healthcare provider can
18    experience or can suffer penalties?
19            MR. KANG:  Objection as to form.
20            THE WITNESS:  I'm not understanding what
21        you mean by penalty.
22    BY MR. CUNNINGHAM:
23        Q.  Well, what is a flag?
24        A.  Do you mean from an SIU standpoint?
25        Q.  Yes, sir.
```

1    A.  A flag is something that can be placed

2  in the claim system to impact a provider's claims

3  that are submitted.

4    Q.  Okay.  And is the effect of a flag

5  potentially that no further claims will be paid

6  from that healthcare provider?

7    A.  It could.

8    Q.  Can you tell me how many different flags

9  there are or there were during the relevant

10  timeframe we're talking about here?

11    A.  No.

12    Q.  In other words, were there five, were

13  there ten, were there fifteen?

14    A.  I don't recall.

15    Q.  Okay.  We've seen several in this case.

16  We've seen fee forgiveness is one type of flag

17  that used, correct?

18    A.  Yes.

19    Q.  Is that still in use today as a flag at

20  CIGNA?

21    A.  Yes, it is.

22    Q.  Okay.  Services not rendered as billed,

23  was another flag that was used in this case,

24  correct?

25    A.  Yes.

1    Q.  And next the e-mail in this series is

2  same day.  This is at 8:49 p.m. from you to

3  Matthew Norton.  And we established earlier that

4  Matthew Norton was really the only person you

5  reported to, correct?

6    A.  Yes.

7    Q.  Okay.  Why don't you go ahead and read

8  into the record what you said to Mr. Norton

9  there.

10    A.  This TIN for a non-FL case is ranged

11  number 2 on the L-pend inventory.  A good

12  reaction from Deanna to get Stephanie engaged,

13  and change the current direction of the case from

14  sent letters to deny as services not rendered.

15    Q.  Okay.  So, what did you mean non-Florida

16  case?

17    A.  I don't know.

18    Q.  Do you know what you would have reviewed

19  before you prepared this e-mail?

20    A.  No.

21    Q.  I know we're only going back nine years,

22  but do you have any independent recollection of

23  this e-mail?

24    A.  I do not.

25    Q.  Do you know if you would have spoken

1   with anyone about this particular claim or this

2   particular healthcare care provider before you

3   sent that e-mail?

4        A.  I don't recall.

5        Q.  What did you mean when you said this tax

6   identification number is ranked number two on

7   L-pend inventory?

8        A.  I don't recall.

9        Q.  Well, do you have an idea, as you sit

10  here today, what that would mean, it was ranked

11  number two on the L-pend inventory?

12       MR. KANG:  Objection.  Asked and

13      answered.

14       THE WITNESS:  I don't recall.

15  BY MR. CUNNINGHAM:

16       Q.  Do you think that would mean that that

17  was the second largest number of L-pend claims?

18       MR. KANG:  Same objection.

19       THE WITNESS:  I don't recall.

20  BY MR. CUNNINGHAM:

21       Q.  And I'm not trying to give you a hard

22  time, but you're basically the audit director,

23  and you're telling me you don't know what you

24  meant when you say this tax identification number

25  ranks number two on the L-pend inventory?

1    MR. KANG:  Objection.  Asked and

2    answered.

3        THE WITNESS:  It's so long ago, I would

4    be speculating what that meant.

5  BY MR. CUNNINGHAM:

6    Q.  Well, those are your words, correct?

7    A.  Yes.

8    Q.  I think you're allowed to speculate on

9  what your own words mean?

10        MR. KANG:  You want him to guess, Fred?

11        MR. CUNNINGHAM:  If that's what it

12  requires.  These are his words.

13        MR. KANG:  Well, then this is his guess.

14        MR. CUNNINGHAM:  That's fine.

15    A.  I would speculate that rank number two

16  on the L-pend inventory report, inventory would

17  be they had the second highest number of claims

18  pending.

19    Q.  Okay.  Thank you.

20        And then it says:  A good reaction from

21  Deanna to get Stephanie engaged and change the

22  current direction of the case from sent letters

23  to deny as services not rendered.

24        Did I read that correctly?

25    A.  Yes.



1    Q.  Okay.  Why did you consider that to be a

2  good reaction?

3    A.  Again, I don't recall this e-mail at the

4  time.

5    Q.  Okay.  Put it back up, please, Matt.

6       Thank you.

7       Okay.  So you say:  Good reaction from

8  Deanna to get Stephanie engaged and change the

9  current direction of the case from send letters

10  to deny as services not rendered.

11       Would it be fair to say, sir, that what

12  you were saying here is:  It was a good reaction

13  from Deanna to get Stephanie engaged to change

14  the direction -- well, strike that.

15       Would it be to say that what you were

16  recognizing with this sentence is that what

17  Stephanie decided to do, by denying a services

18  not rendered, instead of asking -- instead of

19  sending letter 56, was a more efficient way to

20  basically get rid of those L-pends?

21       MR. KANG:  Objection as to form.

22       THE WITNESS:  I don't recall.  And I

23    don't recall that the specific steps or the

24    tasks that Stephanie was taking under

25    investigation, or what she knew at that

1    Q.  Okay.  Why did you consider that to be a

2  good reaction?

3    A.  Again, I don't recall this e-mail at the

4  time.

5    Q.  Okay.  Put it back up, please, Matt.

6    Thank you.

7    Okay.  So you say:  Good reaction from

8  Deanna to get Stephanie engaged and change the

9  current direction of the case from send letters

10  to deny as services not rendered.

11    Would it be fair to say, sir, that what

12  you were saying here is:  It was a good reaction

13  from Deanna to get Stephanie engaged to change

14  the direction -- well, strike that.

15    Would it be to say that what you were

16  recognizing with this sentence is that what

17  Stephanie decided to do, by denying a services

18  not rendered, instead of asking -- instead of

19  sending letter 56, was a more efficient way to

20  basically get rid of those L-pends?

21    MR. KANG:  Objection as to form.

22    THE WITNESS:  I don't recall.  And I

23    don't recall that the specific steps or the

24    tasks that Stephanie was taking under

25    investigation, or what she knew at that

Connecticut General Life Insurance, et al. v. BioHealth Laboratories, Inc., et al.

```
 1        time, when this e-mail was sent out.
 2   BY MR. CUNNINGHAM:
 3        Q.   Okay.   What would be the difference in
 4   the two approaches; in other words, what would be
 5   the difference between sending letter 56, on the
 6   one hand, and denying a services not rendered on
 7   the other hand?
 8             MR. KANG:   Objection as to form.   Vague.
 9             What are you trying to ask, Fred?
10             MR. CUNNINGHAM:   I'm asking what is the
11        difference between those two approaches?   He
12        said this was a good reaction, could change
13        the current direction.
14             So I'm asking him what the difference,
15        in his mind, from one approach which is
16        sending letter 56, and the other approach is
17        denying a service not rendered?
18             MR. KANG:   Same objection.   That could
19        mean so many different things.
20             THE WITNESS:   I don't recall the steps
21        that she was taking.   Stephanie was taking
22        on the investigation.
23             I'm not -- I can't recall, or I'm not
24        familiar with what letters were being sent
25        out.
```

1   Q.  Would you agree with me, sir, that

2   typically cases would be resolved more

3   efficiently by simply denying them as services

4   not rendered, as opposed to sending letter 56,

5   and requesting additional medical information?

6         MR. KANG:  Objection as to form.

7         THE WITNESS:  No.  Again, I'm not

8      familiar with the steps that she took or

9      evidence that she knew at the time, when she

10      was changeling the flag to deny as services

11      not rendered.

12   BY MR. CUNNINGHAM:

13   Q.  And as we sit here today, you still have

14   no idea what you meant by:  It was a good

15   reaction for Stephanie to change current

16   direction of the case from send letters to deny

17   as services not rendered?

18   A.  I don't.  This is very old.

19   Q.  What happens to claims submitted by a

20   provider like PB Labs, when there's a flag that

21   includes services not rendered as billed, but

22   also a request to send letter 56, requesting

23   additional medical information?  What happens to

24   those claims while that is being done?

25         MR. KANG:  Objection.  Vague.

Cundall Joseph Lincoln, et al. v. United Healthcare Ins. Co., e...

Thomas Hixon                                           Job Date:12/5/2022

```
1          A.  Yes.

2          Q.  So what were you doing here, sir?  What

3     was the intent of this e-mail or this analysis

4     you did?

5          A.  I don't recall.

6          Q.  Okay.  Does it appear that you were

7     looking at claims from healthcare providers that

8     had a large number of L-pends?

9              MR. KANG:  Objection as to form.

10             THE WITNESS:  I don't recall.  I would

11        speculate based upon what's written in

12        reviewing the L-pend report.  And these

13        cases were of interest.

14    BY MR. CUNNINGHAM:

15         Q.  Is this the type of report that you

16    prepare on a regular basis?

17         A.  I'm sorry, can you clarify?  Report as

18    in the L-pend report or report as in this e-mail?

19         Q.  This e-mail?  Do you, on a regular

20    basis, send e-mails to your fraud mangers to let

21    them know there are certain cases that have a

22    high number of pending claims?

23             MR. KANG:  Objection, vague as to review

24        reports.

25             THE WITNESS:  I can't recall how often I
```

1     A.  I don't know.  I -- this is -- I don't

2  recall the -- the previous document we looked at,

3  referencing that code.

4     Q.  Well, your words literally say:

5  Protocol requires letter to HCP, if 80299 is

6  billed, correct?

7     A.  That's what it says, yeah.

8     Q.  You don't understand the words you

9  wrote?

10        MR. KANG:  Objection.  Asked and

11     answered.

12        THE WITNESS:  I don't recall this

13     e-mail, so it's hard for me to determine

14     what this means.

15  BY MR. CUNNINGHAM:

16     Q.  I'm not sure why, but despite July

17  imports to Staging, the analyst team has touched

18  only two SRs.

19        What does that mean, sir?

20     A.  I don't know.

21     Q.  What are SRs?

22     A.  SRs would be an acronym for service

23  requests.

24     Q.  What are service requests?

25     A.  Services requests would be something

1   initiated by a claim operations to route the

2   claim to a business area like SIU.

3       Q.   Okay.  So do you know what it means when

4   it says:  Despite July imports to Staging, the

5   analyst team has touched only two service

6   requests?

7       A.   I don't.

8       Q.   Would that appear to be a comment by you

9   in a lack of efficiency by the analyst team?

10      A.   I don't know.

11      Q.   When you say the analyst team has

12  touched only two service requests.

13           Doesn't that appear to be a criticism of

14  the number of service requests touched by the

15  analyst team?

16           MR. KANG:  Objection as to form.

17           THE WITNESS:  I don't know.  It's just

18      raising a question.

19  BY MR. CUNNINGHAM:

20      Q.   But you don't know what that means?

21      A.   I do not.

22      Q.   Case notes have direction by Dr.

23  Nicholl, but I question the approach with the

24  pending volume.

25           What does that sentence mean?

1    A.  I don't know.

2    Q.  Case notes have direction by Dr.

3 Nicholl, what does that mean?

4         MR. KANG:  Objection.  Asked and

5    answered.

6         THE WITNESS:  I don't know.

7 BY MR. CUNNINGHAM:

8    Q.  Wouldn't that seem to mean that you have

9 looked at case notes, and Dr. Nicholl had given

10 some direction in those case notes?

11        MR. KANG:  Objection as to form.

12        THE WITNESS:  I don't know.

13 BY MR. CUNNINGHAM:

14   Q.  This says:  But I question the approach

15 with the pending volume.

16        Do you know what that means?

17   A.  I don't.

18   Q.  Doesn't that appear to mean that you're

19 questioning Dr. Nicholl's approach of reviewing

20 medical records when you have 750 claims pending?

21        MR. KANG:  Objection as to form.

22        THE WITNESS:  I don't recall.

23 BY MR. CUNNINGHAM:

24   Q.  Doesn't that mean that what you were

25 looking for was a more efficient way to process

Cunningham v. General Life Insurance of America, Inc., et al

```
 1   the 750+ pending claims by PB Labs?

 2          MR. KANG:  Objection to form.

 3          THE WITNESS:  I don't recall.

 4   BY MR. CUNNINGHAM:

 5      Q.  I don't mean to sound flippant.  Do you

 6   have any type of head injury or anything that

 7   causes memory loss?

 8          MR. KANG:  Objection to form.

 9          THE WITNESS:  No.

10   BY MR. CUNNINGHAM:

11      Q.  And you said earlier you're not on any

12   medication that affects your memory, correct?

13          MR. KANG:  Objection.  Asked and

14   answered.

15          THE WITNESS:  Correct.

16   BY MR. CUNNINGHAM:

17      Q.  Have you taken any medication this

18   afternoon that you did not take this morning?

19          MR. KANG:  Objection, form.

20          THE WITNESS:  No.

21   BY MR. CUNNINGHAM:

22      Q.  All right.  Case notes have direction by

23   Dr. Nicholl but I question the approach with the

24   pending volume.

25          Are you telling me you have no idea what
```

1   audit letter should go out to the healthcare

2   providers promptly, if I remember your word

3   correctly.

4         Do you remember that, sir?

5      A.   Promptly after the provider has been

6   flagged, yes.

7      Q.   Okay.

8         MR. CUNNINGHAM:  Matt, could you put up

9      Stephanie Canto's case notes.

10  BY MR. CUNNINGHAM:

11     Q.   Now, sir, we established earlier that

12  the flag was placed on PB Labs on September 26,

13  of 2013.

14         Correct?

15     A.   I don't recall specifics in Stephanie's

16  investigation but if that's the date, then --

17  then yes.

18     Q.   Okay.  So, if the flag was placed on

19  September 26th, 2013, would you expect that she

20  would have sent an audit letter to PB Labs, the

21  healthcare provider, sometime within 30 days from

22  September 26th, 2013.

23     A.   As I previously stated, you know, our

24  goal is to send it out promptly after we flag the

25  provider.  There's no set number of days or

1  about just a couple last things, which we talked

2  about.

3          In the last sentence of this first

4  paragraph, talking about PB Labs, you say:  I

5  have attached the Fraud Shield report and will

6  set up a folder for the claims at risk files.

7          Did I read that accurately?

8      A.  Yes.

9      Q.  Sir, we have never seen this Fraud

10 Shield report.

11         Do you know where that would be located?

12     A.  I don't recall.

13         MR. CUNNINGHAM:  Okay.  Ted, we can talk

14 about this more off the record, but I think you

15 thought that would have been produced.  And we

16 have not seen it.  So if we could get that at

17 some point, we'd appreciate it.

18         MR. KANG:  Got it.

19 BY MR. CUNNINGHAM:

20     Q.  Okay.  And it says:  And will set up a

21 folder for the claims at risk files.

22         Do you know what that is referring to?

23     A.  Yes.  It's part of the healthcare Fraud

24 Shield tool that we use.  You could generate a

25 report, and you could also export the claim that

1  that report was driven off of; so, it's referred

2  to as claims at risk files.

3      Q.  Okay.  And where would that be located?

4      A.  I don't recall where I would have put

5  it.

6      Q.  Do you know if you did, in fact, set up

7  a folder for the claims at risk files?

8      A.  I don't recall.  I may have.  This was a

9  long time ago.

10     Q.  Did you keep your own case notes on

11 particular cases?

12     A.  No.

13     Q.  So, where would you document your

14 activity?

15     A.  Well, I may provide information to

16 investigators, so, you know, conversations with

17 managers.  I may jot down notes there, but it's

18 not something that would be specific to -- more

19 along the lines of what the manager is providing

20 to me.

21     Q.  Okay.  But you didn't have any central

22 place where you would keep whatever work you

23 performed on various cases?

24     A.  No, no.

25     Q.  All right.  I want to ask you about one