# EXHIBIT 16

**William M. Welch II**
**February 10, 2023**

```
              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT

                           C.A. No. 3:19-CV-01324-JCH


CONNECTICUT GENERAL LIFE        )
INSURANCE COMPANY and           )
CIGNA HEALTH AND LIFE           )
INSURANCE COMPANY,              )
                                )
               Plaintiffs       )
                                )
v.                              )
                                )
BIOHEALTH LABORATORIES, INC.,   )
PB LABORATORIES, LLC, and       )
EPIC REFERENCE LABS, INC.,      )
                                )
               Defendants       )




              ----- VOLUME 1 -----



     Videotaped deposition of William M. Welch, II

          Friday, February 10, 2023

             via Zoom Meeting

          10:59 a.m. - 3:01 p.m.






          --- Sharon Roy, RPR ---
          Accurate Court Reporting
         1500 Main Street, Suite 222
           Springfield, MA 01115
              413-747-1806
```

1      Q.    When did you graduate from law school,

2   sir?

3      A.    Nineteen eighty -- sorry, 1989.

4      Q.    Can you tell us about your work experience

5   from the time that you graduated from law school?

6      A.    Went to the U.S. Department of Justice

7   Honors Program that lasted 18 months.  Became an

8   Assistant U.S. Attorney in Reno, Nevada beginning in

9   1991; stayed there until 1995.  Transferred to the

10  District of Massachusetts; stayed there until

11  approximately 2007.  Went down to Washington, D.C.,

12  became head of the Public Integrity Section; did

13  that for approximately two years.  Became senior

14  litigation counsel to the Assistant Attorney General

15  of the Criminal Division; did that for approximately

16  three years.  And then began at Cigna in

17  approximately April 2012.

18     Q.    Sir, before you started working with Cigna

19  in April of 2012, did you have any experience at all

20  in terms of healthcare compliance issues?

21     A.    No.

22     Q.    Can you tell me what training you would

23  have received, if any, at Cigna with regard to

24  healthcare compliance issues?

**William M. Welch II**
**February 10, 2023**                                                                     **25**

1   role in the Ted Stevens prosecution and the special

2   counsel's investigation?

3       A.    Yes, I did.  They were fully aware of it.

4       Q.    So, when you went to work with Cigna, what

5   was your title?

6       A.    I believe it was either associate chief

7   counsel or assistant chief counsel.  I believe it

8   was the former.

9       Q.    Can you tell us what your job duties and

10  responsibilities were when you first started working

11  with Cigna?

12      A.    I was hired to serve as legal advisor to

13  the SIU and I was also hired to assist with

14  litigation matters within Cigna.

15      Q.    You said that you were hired to be legal

16  advisor to the SIU, or the special investigations

17  unit, correct?

18      A.    Correct.

19      Q.    Besides your prosecutorial experience,

20  have you ever had any experience in the private

21  sector being the legal director of a special

22  investigations unit?

23      A.    No, not in the private sector.

24      Q.    Okay.  And I would assume it would be your

**William M. Welch II**
**February 10, 2023**                                                                33

```
 1   is an individual claim to be reimbursed for services

 2   rendered, and a case is when the SIU division or SIU

 3   department at Cigna would want to do an

 4   investigation or a post-payment audit.

 5            MR. KANG:  Objection.

 6   BY MR. CUNNINGHAM:

 7      Q.   With regard to claims.

 8            MR. KANG:  Objection to form.

 9      A.   Okay.  I'll repeat my answer.  I cannot

10   recall a claims person ever coming to me about an

11   SIU investigation.  That was your question.

12      Q.   Yes, sir.  Okay.  So, in this particular

13   case, do you know how you got involved in this

14   particular case, mainly the investigation of PB Labs

15   and Biohealth?

16      A.   I do not.

17            MR. KANG:  Objection.

18      A.   Sorry.

19            MR. KANG:  Object to form.  Go ahead.

20   BY MR. CUNNINGHAM:

21      Q.   Sir, did you review any materials in

22   preparation for your deposition testimony today?

23      A.   I did not.

24      Q.   You did not review any deposition
```

1   company lost at the district court level, the

2   company lost again at the appeals level, and then

3   there was some litigation reinstituted, and that was

4   primarily it.

5        Q.    Did Mr. Kang ask you if you had any

6   independent recollection of your involvement in

7   these investigations?

8        A.    He didn't ask me that.  I volunteered

9   that.  I told him I have little or no memory of

10  PB Labs, Biohealth; I didn't quite understand how I

11  could serve a useful purpose.  I'm certainly happy

12  to sit here and, you know, answer questions about

13  the Stevens prosecution and things like that.

14       Q.    Okay.  Well, given the fact that you said

15  you had no recollection of any of the events, did

16  you ask Mr. Kang for any documents relating to your

17  involvement that might refresh your recollection?

18       A.    I did not.

19       Q.    Did Mr. Kang volunteer to provide you with

20  documents that would refresh your recollection?

21       A.    He did not.

22       Q.    Do you believe that reviewing case notes

23  and ledgers would have refreshed your recollection

24  as to the activity you conducted in this case?

1      A.      Generally.

2      Q.      What was a flag, to your knowledge, during

3   the time that you were at Cigna?

4      A.      A flag would mean that there would be, for

5   lack of a better phrase, a prompt placed into the

6   claims system that would then reroute claims to SIU

7   for review.

8      Q.      Okay.  And then SIU would determine

9   whether to pay those claims or deny payment for

10   those claims, correct?

11      A.      Incorrect.

12      Q.      Okay.  Please answer -- or please tell me

13   what's correct.

14      A.      Well, they would begin the process of

15   reviewing the claims, and if they had an

16   investigation, the claims would be pended as they

17   made the determination about the facts that they

18   were gathering, and then based upon whatever the

19   results of that investigation were, the flag could

20   be lifted and claims would go back into the normal

21   queue, if you will, and get paid.  Or, a

22   determination could be made to recommend that claims

23   either be denied or paid in part or some other

24   variation thereof.

1            MR. KANG:  Objection.  Same

2       instruction about matters related to privilege,

3       Mr. Welch.

4       A.    So, for example, if I was being asked

5    about an investigation that, you know, was several

6    months into the investigation, I may ask for case

7    notes so that I could see how it began and the

8    progression up until the point in time that I was

9    talking to the investigator.

10            If I wanted to see or get more clarity on

11   a particular issue or fact, I may ask for case

12   notes.  Those are two examples that come to mind.

13       Q.    All right, sir.  And do you have any

14   independent recollection as to when Cigna placed the

15   first flag on PB Labs?

16       A.    I do not.

17       Q.    I'm going to ask you to assume -- you

18   really don't have to assume.  I'm going to ask you

19   to accept my representation that that was done on

20   September 26th of '13.  Okay?

21            MR. KANG:  Objection to form.

22   BY MR. CUNNINGHAM:

23       Q.    Sir, is that okay?

24       A.    Sure.

1  stamp number 0289948; do you recognize this

2  document, sir?  And I'll let you take a look at it

3  and I'll let you read it.

4      A.    I mean, I recognize it as a letter that I

5  authored.

6      Q.    Okay.  Do you want to read it, sir?

7      A.    No.

8      Q.    Okay.  Well, what I want to ask you about,

9  sir, is, do you know whether you spoke to Ms. Canto

10  before you sent this letter to Michael Gennett at

11  the Akerman firm, who was counsel for the labs?

12      A.    I have no memory of that.

13      Q.    Do you recall who you would have spoken to

14  to get the information that you put into this letter

15  dated March 7, 2014?

16      A.    I do not.

17      Q.    Okay.  And this is a letter that concerns

18  CPT codes, correct?

19      A.    That's what it says, correct.

20      Q.    Sir, did you consider yourself an expert

21  in CPT coding as of March 7, 2014?

22      A.    No.

23      Q.    So do you believe that this letter that

24  you wrote would have been based on information

**William M. Welch II**
**February 10, 2023**                                                                 **55**

1   within your knowledge or it would have been based on

2   information that was provided to you by somebody

3   else?

4        A.    From somebody else.

5        Q.    You just don't know who?

6        A.    Correct.

7             MR. CUNNINGHAM:  Matt, can we go to

8        003, which would be the letter from Mr. Welch to

9        Mr. Gennett.

10            Hang on one second, Matt.  Was that the

11       one we were just looking at?  I'm sorry.  Okay.

12            All right.  So this is a different

13       letter than -- the last one we'll mark as Exhibit

14       4.  Sorry, Sharon.  This one we'll mark as Exhibit

15       5.  The Bates stamp here is 292340.

16            (Exhibits 4 and 5, to be marked)

17   BY MR. CUNNINGHAM:

18       Q.    Sir, does this appear to be a letter

19   authored by you on March 25, 2014 to Mr. Gennett who

20   was counsel for the labs at that time?

21       A.    I'd need to see the signature.

22       Q.    Okay.

23       A.    Yes, it does appear to be a letter that I

24   authored.

**William M. Welch II**
**February 10, 2023**                                                          57

1      Q.    How did you get the information that you

2   put in those sentences?

3      A.    I don't recall.

4      Q.    Do you remember who you would have spoken

5   with?

6      A.    I do not.

7      Q.    Do you believe that this discussion that

8   you wrote about CPT codes would have been something

9   within your knowledge as of March 25th of 2014?

10     A.    So, when you say within my knowledge, it

11  would have been within my knowledge to the extent

12  that I was provided that information.

13     Q.    Okay.  So, you were basically repeating

14  something that someone in the claims department at

15  Cigna had told you about that particular CPT code,

16  80102, correct?

17              MR. KANG:  Objection to form.

18     A.    Incorrect.

19     Q.    Okay.  Please explain to me, then.

20     A.    I don't think I ever got information from

21  someone in the claims department about information

22  that would have gone into one of my letters relating

23  to an SIU matter.

24     Q.    Okay.  Do you believe that you would have

1       Q.    Do you know anything about the means or

2   methods Dr. Nicoll used to arrive at a conclusion?

3       A.    I don't understand your question.

4       Q.    Okay.  Do you know how Dr. Nicoll arrived

5   at the conclusions that he reached?

6                MR. KANG:  Objection to form.

7       A.    I don't know what conclusions you're

8   talking about.

9       Q.    Okay.  So you are completely without

10  knowledge, as we sit here today, about the

11  conclusions reached by Dr. Nicoll with regard to

12  PB Labs?

13                MR. KANG:  Objection as to form.

14      A.    As I sit here today, I have no memory of

15  conclusions reached by Dr. Nicoll or anybody else as

16  it relates to this letter and PB Labs.

17      Q.    Okay.  Sir, I will represent to you that

18  Dr. Nicoll based his conclusions about the propriety

19  or impropriety of the bills submitted by PB Labs

20  based on a review of ten medical records.  Were you

21  aware of that, sir?

22                MR. KANG:  Objection to form.

23      A.    I have no memory of that.

24      Q.    Do you know anything about the statistical

1    Cigna's record retention policy?

2              MR. KANG:  Objection to form.

3        A.    It depends why they didn't maintain it.

4        Q.    Okay.  Let me ask you about something in

5    the third paragraph of this letter, sir.  You wrote,

6    "Moreover, the treating physician does not solely

7    determine medical necessity.  Your interpretation

8    would negate any coverage limitation based on

9    medical necessity, leading to unnecessary drug

10   testing and skyrocketing health care costs.  To

11   date, based upon what your client has provided, we

12   do not have any evidence establishing a medical

13   necessity of confirmatory, quantitative drug tests

14   submitted by your client."

15             First of all, sir, did I read that

16   accurately?

17       A.    Correct.

18       Q.    Okay.  Can you tell me each and every

19   standard you relied upon in writing that sentence?

20             MR. KANG:  Objection to form.

21       A.    I cannot.

22       Q.    Excuse me, there were three sentences

23   there.  Can you tell me any standards that you would

24   have relied upon when you wrote those three

**William M. Welch II**
**February 10, 2023**                                                                                      **70**

1   sentences?

2              MR. KANG:  Objection to form.

3      A.    Based upon my memory today, no, I cannot.

4      Q.    Do you believe that what you wrote here

5   would have been within your knowledge solely or it

6   would have been information that was provided to you

7   by somebody else?

8      A.    A combination.

9      Q.    Okay.  But you don't have any specific

10  recollection as to who provided you the information

11  you used in writing these three sentences?

12     A.    Well, so the first sentence would be plan

13  language.  The second sentence sounds like it came

14  from a letter that was sent to me.  And, beyond

15  that, I mean, I couldn't tell you what the other

16  sources of information may or may not be.

17     Q.    When you wrote, "Moreover, the treating

18  physician does not solely determine medical

19  necessity," how did you come to that conclusion?

20     A.    It would be based on Cigna plan language.

21     Q.    So you believe that Cigna plan language

22  would be dispositive in a legal sense as to whether

23  the treating physician solely determined medical

24  necessity?

1      Q.   Okay.  Now, in this letter, in the first

2    paragraph, you say -- and just confirm that I read

3    this accurately.  I'm going to try to speed this

4    along.  "Having had a chance to review your letter

5    fully as well as engage in other discussions, I have

6    requested that any denial edit that may currently be

7    in place for CPT codes submitted for initial

8    qualitative drug analysis be lifted."

9           Did I read that accurately?

10     A.   Correct.

11     Q.   Okay.  You say, "Having had a chance to

12   review your letter fully as well as engage in other

13   discussions."  So, that's what we were just talking

14   about a moment ago, right; you would have spoken to

15   other people but you just don't remember who for

16   certain?

17     A.   I could have talked to Mr. Gennett, too.

18   I don't know who that refers to.

19     Q.   You say, "I've requested that any denial

20   edit that may currently be in place for CPT codes

21   submitted for initial qualitative drug analysis be

22   lifted," correct?

23     A.   Correct.

24     Q.   Now, what did you mean by that, sir?

**William M. Welch II**
**February 10, 2023**                                                                78

```
 1                MR. KANG:  Objection to form.
 2        A.    I have no memory of that.  I don't know
 3    what I had meant by that.
 4        Q.    Do you recall that Cigna's position was
 5    that the labs were doing quantitative testing in the
 6    absence of any findings, positive findings on the
 7    qualitative testing; do you remember that at all?
 8        A.    No.
 9        Q.    Okay.  So, sir, is it your belief that
10    once you lifted this flag for initial qualitative
11    drug analysis that claims submitted by PB Labs were
12    then being paid?
13                MR. KANG:  Objection to form.
14        A.    Yeah, I don't have any knowledge one way
15    or the other.
16        Q.    Would you have expected that claims
17    submitted by PB Labs for initial qualitative drug
18    analysis would be paid since you had told the labs
19    that the flag was being lifted?
20                MR. KANG:  Objection to form.
21        A.    Not necessarily.
22        Q.    Okay, but you're not aware one way or the
23    other whether claims were being paid for initial
24    qualitative drug analysis after you said that the
```

**William M. Welch II**
**February 10, 2023**                                                        79

1  denial edit was going to be lifted?

2              MR. KANG:  Objection to form.

3     A.    I don't have a memory one way or the

4  other.

5     Q.    All right, sir.  Do you know when

6  Stephanie Canto placed a flag on PB Labs for

7  services not rendered as billed?

8     A.    No, I don't.

9     Q.    I'm going to represent to you, sir, that

10  the record reflects that that was on March 27 of

11  2014.  And my question for you, sir, is, you're

12  writing this letter on March 25 of 2014, two days

13  before Ms. Canto placed the flag on PB Labs.  Were

14  you aware that that flag was going to be placed two

15  days later?

16     A.    Yeah, I -- I don't have a memory one way

17  or the other, no.

18     Q.    Would you typically be advised on a case

19  that you had consulted with SIU on, would you

20  typically be advised when a flag is going to be

21  placed?

22              MR. KANG:  Objection to form.

23     A.    Sometimes yes, sometimes no.

24     Q.    And would you have been able to look in

1  would have been something that you would have told

2  Mr. Gennett if you knew a flag was going to be

3  placed on that provider within two days?

4      A.    Not necessarily.

5              MR. KANG:  Objection.

6  BY MR. CUNNINGHAM:

7      Q.    Why not?

8      A.    Well, I'm responding to his email,

9  apparently, and perhaps a letter, perhaps a

10  discussion, and I don't know whether or not what I'm

11  responding to is at all related to the reason for

12  the flag, if in fact it was placed two days later.

13      Q.    And were you aware, sir, that once the

14  flag was placed, claims submitted by PB Labs were

15  not being paid at all?

16              MR. KANG:  Objection to form.

17      A.    I don't have a memory one way or the

18  other.

19      Q.    If you knew that claims were not going to

20  be paid for PB Labs after the flag was placed, do

21  you think you would have let Mr. Gennett know that

22  fact?

23      A.    Again --

24              MR. KANG:  Objection to form.

1  immediately have been notified of that?

2              MR. KANG:  Objection to form.

3      A.    When you say immediately notified of that,

4  I don't know what you're referring to.

5      Q.    Okay.  Are you aware of whether there was

6  a policy or procedure at Cigna as to how long after

7  a flag was placed the medical provider would be

8  notified of that flag?

9      A.    Um, I'm not aware of a policy or

10  procedure, but I do know the provider would be

11  notified by the EOPs.

12      Q.    Okay, and was the only way the provider

13  would be notified, would be the explanation of

14  payments?

15      A.    There may be other ways, but that's the

16  one that comes to mind.

17      Q.    Okay, you're not aware or you do not have

18  any recollection of any other ways a provider would

19  be notified of a flag that had been placed on their

20  claims?

21              MR. KANG:  Objection as to form.

22      A.    Yeah, sitting here today, no.

23      Q.    Were you aware, sir, that PB Labs was

24  continuing to perform work for Cigna insureds and

1   you about is the next one in Ms. Canto's case notes.

2   This is you to Stephanie Canto one day later, on

3   April 8, 2014, correct?

4        A.    Correct.

5        Q.    And it says, "Subject:  PB Lab, LLC,"

6   correct?

7        A.    Correct.

8        Q.    And it says, "Stephanie" and then it's

9   redacted for privilege, correct?

10       A.    Correct.

11       Q.    Okay.  I don't want to know, and I doubt

12  if you remember, but do you have any recollection

13  not of any specific advice but the subject of what

14  you would have written here?

15       A.    No.

16       Q.    Do you think it would have been an email

17  about the possible legal implications of the

18  decision to place a flag for services not rendered

19  as billed?

20       A.    I don't have a memory.

21       Q.    Can you think of anything else you would

22  have been conversing with Ms. Canto on or about?

23       A.    No.

24       Q.    Let's look up just above that.  And this

**William M. Welch II**
**February 10, 2023**                                                                 97

1   sure it's an email, just a note by Stephanie Canto

2   on April 7, 2014 at 2:27 p.m.  Do you see that, sir?

3       A.    No.  What p.m?  2:07:03?

4       Q.    2:27 p.m.

5       A.    Yes, I see that.

6       Q.    Okay.  And does it say, "I had my meeting

7   this afternoon with Dr. Nicoll and Bill Welch"?

8       A.    Yes.

9       Q.    And the next entry is redacted for

10  privilege.  Again, sir, do you have any idea what

11  the topic of the discussion with Dr. Nicoll,

12  Stephanie Canto, and you was on April 7, 2014?

13      A.    No.

14      Q.    Let's ask about the next entry in sequence

15  which is the next one up, a note by Stephanie Canto,

16  April 9, 2014 at 10:24 a.m.

17            Does it say, "I was able to complete a

18  random audit sample of 25 patients with date of

19  service in 2014 and" -- and the rest is redacted for

20  privilege, correct?

21      A.    Correct.

22      Q.    Do you have any idea what the topic of

23  discussion was that's redacted here?

24      A.    I do not.

1   BY MR. CUNNINGHAM:

2       Q.    Okay.  So this is a letter where you

3   start, the first sentence says, "I have been able to

4   assemble information regarding how your client can

5   submit claims for the initial, qualitative tests,"

6   correct?

7       A.    Yes, correct.

8       Q.    Okay.  And this is a consequence of your

9   decision to lift the denial edit to allow payment of

10  valid qualitative testing claims.  Correct?

11              MR. KANG:  Objection to form.

12      A.    Yeah, I, I cannot tie this letter with,

13  with my previous letter.  Maybe they're connected,

14  maybe they're not.  I don't have a memory one way or

15  the other.

16      Q.    So, let me direct you to the third

17  paragraph.  It says, "You stated that your client

18  has instances of confirmatory, quantitative drug

19  tests preceded by an initial, positive qualitative

20  test for the same substance of specimen.  As I told

21  you, we have no evidence of that.  Given the volume

22  of claims, we have selected a random sample of 25

23  Cigna customers for whom we have received claims

24  during the year 2014.  Presumably there must be some

1  examples of confirmatory, quantitative drug tests,

2  preceded by an initial, positive qualitative test

3  within the following sample."

4          Did I read that accurately, sir?

5  A.    Correct.

6  Q.    Okay.  So, you say in this paragraph that

7  Cigna selected a random sample of 25 Cigna

8  customers, correct?

9  A.    Correct.

10  Q.    Do you remember what role, if any, you

11  played in selecting the random sample of 25 Cigna

12  customers?

13  A.    No.

14  Q.    Do you know who else would have a role in

15  determining that random sample of 25 Cigna

16  customers?

17  A.    No.

18  Q.    Would it typically be something that you

19  would do, that you would engage in the process of

20  selecting a random sample of customers for the

21  claims to be examined?

22          MR. KANG:  Objection to form.

23  A.    No.

24  Q.    Do you know who else might have had a role

1   question, you inserted an adverb, and we had gone

2   through that, when I write letters, I try to make

3   them accurate.  I'm pretty sure that I did not put

4   in my letter "an allegedly random sample."

5       Q.    So when you put "random sample," you

6   believed that it was a random sample?

7       A.    That is correct.

8       Q.    Do you think at that time you would have

9   known the methodology for selecting the allegedly

10  random sample?

11      A.    I might have.

12              MR. KANG:  Objection to form.

13  BY MR. CUNNINGHAM:

14      Q.    You just don't have a recollection?

15      A.    I don't have a specific recollection as to

16  this case.

17              MR. CUNNINGHAM:  All right.  Matt, can

18      you go to Ms. Canto's case notes on April 14?

19  BY MR. CUNNINGHAM:

20      Q.    So, sir, while that's being pulled up,

21  would you agree that you and Mr. Gennett seemed to

22  be attempting to cooperate with each other?

23      A.    Am I looking at this to then answer the

24  question, or are you just asking me --

1      Q.    No, sir.  I was asking --

2      A.    -- as to what I've seen previously?

3      Q.    I'm sorry, I didn't mean to interrupt you.

4   I'm asking you, without looking at this exhibit,

5   based on what you've seen so far, does it appear to

6   you that you and Mr. Gennett were attempting to

7   cooperate with one another?

8      A.    That's correct.

9      Q.    Okay.  And you asked him for information

10  and you were waiting to see what he would provide,

11  correct?

12     A.    Correct.

13     Q.    When you asked him for the information, he

14  didn't say "I'm not going to provide any

15  information," did he?

16     A.    I don't know one way or the other.

17     Q.    Okay.  We'll come to that, too.

18              MR. CUNNINGHAM:  Matt, could you put

19      the April 14 note up, please?

20              (Exhibit 9, to be marked)

21  BY MR. CUNNINGHAM:

22     Q.    Okay, so, do you see the notes here at the

23  bottom of that first page, sir; I believe that would

24  be considered page 16.  It's Bates stamp number

**William M. Welch II**
**February 10, 2023**                                                                178

1  that developed.

2      Q.    All right.  So let's talk a little bit

3  about this letter.  December 12, 2014 from you to

4  Mr. Gennett, the attorney for the labs.

5          "Dear Mr. Gennett:  As you know, Cigna has

6  been conducting an audit of medical records and a

7  review of the billing practices of PB Labs.  I wrote

8  to you on July 31, 2014 to request clarification

9  regarding the billing policies of PB Labs and to

10  point out discrepancies in the billing and

11  collection information that your client provided.

12  You never responded."

13          Next paragraph, "Cigna has received

14  additional information that PB Labs waives in whole

15  or in part the full out-of-network cost share

16  liability of Cigna customers."

17          Sir, do you know what information you were

18  referring to there?

19      A.    No.

20      Q.    Do you think it would be the information

21  contained in the documentation of Ms. Canto's phone

22  calls to the randomly selected patients?

23      A.    I believe that would be part of the

24  information, correct.