**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| |
|---|
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY and CIGNA HEALTH AND LIFE INSURANCE COMPANY,<br><br>                    Plaintiffs,<br><br>          v.<br><br>BIOHEALTH LABORATORIES, INC., PB LABORATORIES, LLC, EPIC REFERENCE LABS, INC., and EPINEX DIAGNOSTICS, INC.,<br><br>                    Defendants. |

Case No. 3:19-cv-01324

Hon. Janet C. Hall

**MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE THE EXPERT
OPINION REPORT AND TESTIMONY OF DR. KELLY CLARK**

 Defendants BioHealth Laboratories, Inc., PB Laboratories, LLC, EPIC Reference

Labs, Inc., and Epinex Diagnostics, Inc. ("Defendants" or the "Labs"), through their

undersigned counsel, file this Memorandum in Support of their Motion *in Limine* to

Exclude the Expert Opinion Report and Testimony of Dr. Kelly Clark, and in support

thereof, state as follows:

**PRELIMINARY STATEMENT REGARDING THE REPORT AND TESTIMONY
OF DR. KELLY CLARK**

 Plaintiffs Connecticut General Life Insurance Company and Cigna Health and

Life Insurance Company ("Cigna" or "Plaintiffs") designate Dr. Kelly Clark to offer expert

opinion testimony "on the nature of the lab drug testing services" performed by

Defendants.  (*See* Expert Report of Dr. Kelly Clark dated March 1, 2023, attached

hereto as Exhibit A, ¶ 1.)  Specifically, Clark concludes that, in her opinion:

**ORAL ARGUMENT REQUESTED**

- Defendants' "business model was to bill insurance for drug tests, consisting of urine and blood specimens that were not medically necessary," (*Id.* ¶ 11);

- Defendants "engaged in pervasive and systematic inappropriate and unallowable billing practices that led to grossly excessive billing of lab testing to Cigna," (*Id.* ¶ 12); and

- Defendants' "excessive intensity, frequency, inappropriate code use, exhorbitant charges in excess of reasonable and customary rates, as well as patterns of long duration of test protocols per patient, resulted in a stunning and exorbitant amount billed to Cigna for many patients." (*Id.* ¶ 13.)

Clark's conclusions lack sufficient required data to provide a reliable foundation and fail to conform to any generally accepted and reliable methodology, and should therefore be stricken and excluded.  Federal Rule of Evidence 702 and the legal standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), and its progeny require that expert testimony be based upon sufficient facts or data using reliable principles and methods applied to the facts of the case to be admissible.  Clark's reliance on insufficient, unscientific, and statistically invalid data to reach unfounded conclusions lacks the necessary factual support and methodology to qualify for admission.  Accordingly, those portions of Clark's Report concerning Defendants' business model and billing practices should be excluded.

## **LEGAL STANDARDS**

A motion *in limine* allows a court to address evidentiary issues, such as admissibility, before a trial begins. *See, e.g.*, *Palmieri v. Defaria,* 88 F.3d 136, 139 (2d Cir. 1996). A trial judge serves as a "gatekeeper" to evidence, and the trial judge has broad discretion to determine whether to admit or exclude certain evidence, such as expert opinion testimony. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

The burden of proof to establish the admissibility of any testimony is upon the party eliciting such testimony, including expert witness testimony. *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 487 (S.D.N.Y. 2002); Fed. R. Evid. 702, Advisory Committee's Note (2000 Amendments) ("[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."). To admit expert witness testimony under Federal Rule of Evidence 702, courts must also find that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Lynch v. Trek Bicycle Corp.*, 374 Fed. App'x 204, 206 (2d Cir. 2010) (internal quotations omitted) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)); *see also* Fed. R. Evid. 402; Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589; *Feinberg v. Katz*, 2007 WL 4562930, at *6 (S.D.N.Y. Dec. 21, 2007) ("To be admissible, expert testimony must be both relevant and reliable."). Accordingly, a party eliciting expert testimony must show that the expert testimony is (1) relevant and (2) reliable.

An expert's testimony is relevant if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also* Fed. R. Evid. 401;

*Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003), *aff'd*, 99 Fed. App'x 274 (2d Cir. 2004). A court should first look to the standards of Rule 401 to analyze and determine whether proffered expert testimony is relevant. *Amorgianos*, 303 F.3d at 265. Under the Rule 401 standard, a court must decide whether the proffered expert testimony has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* (quoting *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001)). Where expert testimony "does not relate to any issue in the case[, it] is not relevant and, ergo, non-helpful.'" *Daubert*, 509 U.S. at 591 (quoting 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 702[02], at 702-18 (1988)).

Rule 702 sets forth the standards for reliability, which a proponent must prove by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10. In particular, Rule 702 permits a witness to provide expert opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. To determine whether expert testimony is admissible under Rule 702, Courts inquire into: "(1) the qualifications of the proposed expert; (2) whether each proposed opinion is based on reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013); *see Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005); *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y.

2014). The expert's proponent must satisfy each of these requirements. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

As for qualifications, a court compares "the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). Expertise in a field is not a sufficient qualification—the expertise must be specifically relevant to the testimony offered. *Id.* In fact, an expert may be permitted to opine on some topics, but excluded from testifying as to others. *See Davis v. Caroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013) (a court's "admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case"); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) ("[A]n expert qualified in one subject matter does not thereby become an expert for all purposes.").

As for "whether each proposed opinion is based on reliable data and reliable methodology," *see Tourre*, 950 F. Supp. 2d at 674, a court will undertake a rigorous examination of the "factual basis, data, principles, [and] methods" underlying an expert's opinion, as well as "their application" by the expert. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *see* Fed. R. Evid. 702. "[The trial court's task] is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). For example, selective consideration of the facts of the case renders the application of any methodology unreliable. *See, e.g.*,

*Amorgianos*, 303 F.3d at 268-69 (excluding testimony of expert who endorsed multi-factor methodology for assessing the concentration of solvent vapor in an enclosed space but did not include all variables in his assessment).

Under the *Daubert* inquiry, courts readily critique the "principles and methodology" of an expert, not just conclusions generated by the expert. *Daubert*, 509 U.S. at 595. Courts focus on four factors:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593-95) (internal quotes and citations omitted). In applying these factors, if a court finds that the "expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (quotations omitted). Courts should refuse to allow expert opinion where the conclusion drawn from a methodology "is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146; *see also Louis Vuitton*, 525 F. Supp. 2d at 643 ("The court does not fulfill its gatekeeper function if it simply accepts the *ipse dixit* of an expert."). Accordingly, a district court may exclude expert testimony if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec.*, 522 U.S. at 146. And in that respect, courts readily exclude expert opinion that is not the result of a reliable method and procedure. *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, No. M21-88, 2008 WL 2324112 at *3 (S.D.N.Y.

June 5, 2008) (excluding expert's testimony because the court was unable to "discern

any method – much less a reliable method – that [the expert] used to reach his

conclusion."); *Pasternak v. Dow Kim*, 916 F.Supp.2d 593, 595 (S.D.N.Y. 2013)

(excluding plaintiff's damages expert for failing to provide any support for the expert's

methodology).

## **LEGAL ARGUMENT**

**I.     The Court Should Exclude Clark's Opinions Regarding the Labs' "Business Model" and "Billing Practices."**

The Court should exclude paragraphs 11-13 and 113-230 of the March 1, 2023

Clark Report. As summarized above, these portions of the report and testimony provide

nothing other than Clark's unsupported, unscientific generalizations based upon

inadequate, unscientific and statistically-invalid data, and reached without any accepted

methodology. *See Ruggiero*, 424 F.3d 255 (requiring expert testimony to be excluded

pursuant to *Daubert* if the opinion is based on data, methodologies, or studies that are

"simply inadequate to support the conclusions reached"). Such interpretation and

argument are not the proper subject matter of expert reports or testimony. *See id.;*

*LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (excluding

report which, *inter alia*, "does no more than counsel for [plaintiff] will do in argument, i.e.,

propound a particular interpretation of [defendant]'s conduct. This is not justification for

the admission of expert testimony."), quoting *Primavera Familienstifung v. Askin*, 130 F.

Supp. 2d 450, 530 (S.D.N.Y.2001).

**A.     Clark's Conclusions regarding Defendants' Purported "Business Model" Lack Sufficient Data and Fail to Conform to any Accepted Methodology.**

Section I of Clark's Report details the bases for Clark's opinion that Defendants' "business model was built upon selling the highest possible number of urine and blood tests," and thus "the actual requirements for legitimate medical orders for tests, the medical necessity of the tests, and appropriate billing for tests, were grossly ignored." (Ex. A, ¶¶ 113, 157.)  Section I of Clark's Report should be excluded for at least four reasons.

### 1.  Clark is not a qualified "business" expert.

First, an analysis of Defendants' "business model" is beyond the scope of Clark's expertise as a medical doctor.  Clark's lack of business experience is evident in, for example, deriding Defendants for owning and cross-marketing a medical billing company, illogically contending that providing medical billing services is somehow antithetical to conducting proper lab testing.  (*Id.* ¶ 152-54.)  As Defendants' rebuttal expert, Dr. Robert J. Boorstein, notes in his Report, "there is no legitimate reason to view [Defendants'] business model as uniquely designed to compete in this industry using tactics that are dissimilar to all other companies in the sector."  (May 19, 2023 Expert Report of Dr. Robert J. Boorstein, attached hereto as Exhibit B, at 12.)  On the contrary, "cross selling serves as an opportunity to advertise available medical services that a medical provider may deem to be medically necessary to a patient's treatment." (*Id.*, at 13.)

Even if Clark was somehow qualified to offer testimony concerning Defendants' business model, however, an expert may not offer testimony as to a party's motivation or intent behind its management choices.  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 46-47 (S.D.N.Y. 2016) (excluding portion of expert opinion because expert

"may not assign [Defendant] motivation or intent behind its business model").   Thus,
Clark's unsupported opinions that Defendants were motivated by "selling the highest
possible number of urine and blood tests – regardless of whether those tests were
medically necessary or not" is plainly impermissible under Federal Rule of Evidence
702.  *See id.*

> **2. Clark's use of the Medytox Sales Manual does not assist the trier of fact.**

Second, Clark's analysis of Defendants' Sales Manual is not based on any sort of
scientifically recognized methodology appropriate for use by a medically trained expert
witness.  Clark does not use the contents of the manual to draw any conclusions about
Defendants' actual actions or inactions.  (*See* Ex. B, at 12 (observing that Clark "goes
into extensive detail interpreting each sales instruction as an alleged attempt to induce
physicians to order unnecessary tests," but that she "fails to identify any instances
where such an inducement actually occurred").)  Instead, Clark quotes portions of the
manual as evidence of Defendants' motivations for its business decisions – which, as
detailed above, constitutes inadmissible expert testimony.[1]  *See Scott*, 315 F.R.D. at
46-47.

---

[1] Further, Clark attempts to refute various passages of the manual through nonspecific,
unsupported argumentation rather than demonstrable data or expertise.  For example,
Clark disputes the statement in the manual that Defendants' clients "routinely collect
urine samples from their patients and require[] that the samples be tested in a clinical
laboratory," contending that treatment providers "may simply use a point-of-care (POC)
cup" instead of a clinical laboratory.  (Ex. A ¶¶ 115-16.)  This distinction is nonsensical,
however, since by definition if a treatment provider is a client of Defendants, the
provider must have chosen to engage a clinical laboratory.

Other examples of Clark's nonspecific, unsupportable argumentation include her
assertion that it is "medically absurd" for a physician to need to know the quantitative
level of drugs in a patient's urine (*id.* ¶ 118); and that it was "clinically absurd" to
contract with intensive outpatient and sober living programs, without any reference to

As noted by Defendants' rebuttal expert Jacqueline Thielen:

> [T]he Sales Manual is incomplete and does not appear to have even been distributed.  There are many passages in the manual indicating more work needs to be completed before it is finalized.  For example, page 15 "Dry Urine Testing: "NEED MORE INPUT FROM YOU GUYS ON THIS" AND Dry Blood Spot Testing: "NEED MORE INPUT FROM YOU GUYS ON THIS", page 40 "FRANK IS MAKING A CHART.  TO BE INSERTED HERE AS PAGE 38, SCHEMATICALLY SHOWING THE DIFFERENCE AN DISTANCING BETWEEN US AND OUT COMPETORS", page 46, "ROLE PLAYING EXERCISES SHOULD NOW TAKE PLACE/INSERT PAGE 43 OF FRANK AND STEVE'S ORIGINAL DRAFT HERE."  Finally, page 91 is the best indication the Sales Manual is incomplete as it includes a list of additional information yet to be added.

(May 19, 2023 Rebuttal Report of Jacqueline Theilen, attached hereto as Exhibit C, at 7 (quoting LABS00550343) (emphasis, punctuation, and typographical errors in original).)  In fact, Clark admitted in her deposition that she did not know whether Defendants used the manual for any purpose, whether Defendants even gave the manual to any of their employees, who wrote the manual, or even whether the manual was a draft or a final version.  (Deposition of Kelly Clark, attached hereto as Exhibit D, at 113:3 – 121:5.)  Regardless, as Ms. Thielen observed, "Dr. Clark fails to understand that the references in the Sales Manual serve as macro-level descriptions of the drug testing industry and describe common practices in the industry."  (Ex. C, at 7.)  As Dr. Clark's use of the manual does nothing more than establish that one or more of

---

actual supposedly improper testing orders originating from those programs.  (*Id.* ¶ 133-36).

As another example, Clark takes Defendants to task for a passage of the manual stating colloquially that one reason a doctor might do drug testing is "to eliminate the possibility of being labeled a 'pill mill' provider," complaining that that is not the proper standard to measure medically necessary drug testing.  (*Id.* ¶ 129).  But Clark once again ignores the fact that it is the *doctors* who are held to the standard of whether particular drug testing is medically necessary, not the labs who simply carry out the doctors' orders. *See* n.2, *infra.*

Defendants, at some point, had begun to draft a document detailing common practices in the drug testing industry in accordance with the U.S. free enterprise system of healthcare payment, her opinions as pertain to the Sales Manual are irrelevant, would not help the trier of fact to determine any issue in the case, and are therefore inadmissible pursuant to Rule 702(a).

### 3. Clark fails to include any reliable, testable methodology to support her conclusions.

Third, in lieu of actual methodology or analysis, Clark simply makes unsupported, conclusory statements. Clark declares, without citation, that an "enormous number of tests…are definitely not medically necessary," (Ex. A. ¶ 116);[2] that she "observed multiple examples" of Defendants inappropriately billing for validity testing (*id.* ¶ 117); she cites to "multiple patterns of grossly inappropriate" billing (*id.* ¶¶ 122, 138); and that "data shows that [Defendants were] billing for definitive testing done routinely and repeatedly at very high frequencies," (*id.* ¶ 131). These plainly unsupported statements should be excluded.

Clark makes further sweeping generalizations and unsupportable extrapolations based on a small quantity of data. For instance, Clark declares that Defendants engaged in "a repeated pattern of conduct" of not individualizing large panels, but cites to only five lab orders out of thousands. (*Id.* ¶ 144.) Similarly, Clark declares that these large panels "were stacked with tests which were clearly not medically necessary," but

---

[2] This claim is particularly egregious in light of the holding of *United States ex rel. Groat v. Bos. Heart Diagnostics Corp.*, 296 F. Supp. 3d 155 (D.D.C. 2017), which definitively established that "a laboratory cannot and is not required to determine medical necessity, but rather is permitted to rely on the ordering physician's determination that the laboratory tests billed to Medicare are medically necessary." *Id.* at 158.

cites to only a single test in support of that sweeping generalization.  (*Id.* ¶ 145.)

Likewise, Clark assets that she "found numerous instances where [Defendants] billed

for tests that were never even ordered by a physician," yet cites to only a single

example, and that Defendants "in some instances…billed for blood tests above and

beyond what was actually ordered by the physician," again citing to only a single

example.  (*Id.* ¶¶ 147-48.)

      In fact, Clark admitted in her deposition that she did not have the documentation

to conclude whether any given claim was medically necessary or not – and that

Defendants played no role in determining medical necessity in the first place.  (Ex. D, at

16:18 – 17:16, 63:2-63:8.)  Defendants' rebuttal experts reinforce Clark's grudging

admission that physicians, not testing labs, have responsibility for determining medical

necessity. (Ex. B, at 7 ("[M]edical providers – as opposed to commercial laboratories,

like the Labs at issue in this matter – determine what is 'medically necessary' to test a

patient, including the frequency of any such tests and the type of tests. . . .  Simply put,

a commercial laboratory is permitted to rely, and must be permitted to rely, on a medical

provider's determination of 'medical necessity.'"); Ex. C, at 3 ("[M]edical necessity is

determined exclusively by the ordering physician based upon the documentation in the

patient's medical record.").) Moreover, Clark admitted that she was not aware "of any

instance in which Cigna denied a claim on the basis that the lab performed a test that

was not ordered by a physician."  (*Id.* at 33:20 – 34:1; *see also id.* at 37:22-38:7.)

      Expert testimony must be based on sufficient facts or data. Fed. R. Evid. 702(b).

"[W]hen an expert opinion is based on data . . . or studies that are simply inadequate to

support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that

unreliable opinion testimony." *Amorgianos*, 303 F.3d at 265-66.  Defendants' rebuttal expert Christopher Haney notes that only 55 patients were mentioned in the Clark Report – fewer than three percent of the patients at issue in this case.  (*See* May 19, 2023 Rebuttal Expert Report of Christopher Haney, attached hereto as Exhibit E, ¶ 17.) As these assertions are supported by either no support or next to no support, they cannot be admissible under *Daubert* or Rule 702.

  Courts have consistently excluded expert testimony that "cherry-picks" data. *See, e.g., Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) L.L.C.*, 752 F.3d 82, 92 (1st Cir. 2014); *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1086 (D.C. Cir. 2011); *Barber v. United Airlines, Inc.*, 17 Fed. App'x. 433, 437 (7th Cir.2001); *Fail–Safe, LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 891 (E.D. Wis. 2010); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176-77 (N.D. Cal. 2007). "[A]n expert may not 'pick and choose from the scientific landscape and present the Court with what he believes the final picture looks like.'" *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004) (quoting *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594 (9th Cir.1996)); *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").  "Samples" of broader data that purports to agree with an expert opinion, without more, do not show an expert's methodology, do not demonstrate a testable hypothesis, cannot be subjected to peer review, and does not have a known or potential date of error.  *See Pugh v. Cmty. Health Sys., Inc.*, No. 5:20-CV-00630-

JMG, 2023 WL 3361166, at *13 (E.D. Pa. May 10, 2023) (quoting *Daddio v. A.I. DuPont Hosp.*, 650 F.Supp.2d 387, 403 (E.D. Pa. 2009).

Here, by citing only a small handful of cherry-picked examples, Clark impermissibly and improperly extrapolates to conclude that Defendants are engaged in some sort of widespread fraudulent billing practices.  Clark fails to connect these so-called "examples" to the data set, nor does she explain why the examples she chose are representative of the whole.  (*See* Ex. D, at 128:1-11 (Clark admitting that she "took the data and found the story in it" and "chose some examples" to support her story).)  With such a small number of "problematic" examples, Clark could undoubtedly have considered an equal number of claims that were perfectly appropriate, thus undermining the entirety of her conclusions.  Instead, by failing to utilize any "passably scientific analysis" to undergird her selection of example claims to support her conclusions, Clark's opinions lack reliability, a testable methodology, or sufficient facts or data to be admissible under Rule 702.  *See Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014), aff'd, 638 F. App'x 43 (2d Cir. 2016) (holding that a statistical expert cannot cherry pick underlying data and instead must utilize some "passably scientific analysis" to choose the frame of reference of what data is to be considered).

This conclusion is supported by Defendants' rebuttal expert Christopher Haney, who notes in his report (with robust and authoritative citations in support) that "Dr. Clark's statistical conclusions cannot be reproduced or even scrutinized given the lack of evidence underlying her claims."  (Ex. E ¶ 14.)  Mr. Haney observes that, while Clark presents twelve total "examples" of patients she considers "representative" of

Defendants' practice, "Dr. Clark makes no mention of undertaking or even considering valid statistical analysis to verify the representativeness of these samples; instead, Dr. Clark merely asserts, without basis, that her samples are *representative*, implying her opinions are also applicable to the entirety of the population at issue." (*Id.* ¶ 10.)  Mr. Haney points out that Dr. Clark included no citations or references to any statistical method, textbook, or principle, and failed to provide any of the scientific basis for any of the "examples" used by Clark in her Report, including:

- Policies, procedures, or standards adhered to when designing and executing Clark's analysis;

- Specifications and rationale for defining the universe and sampling frame considered by Clark (i.e., the "data") in reaching her conclusions;

- Details of the sample design, including details of sample size calculation, anticipated error rates, standard deviation, or rationale for which attributes or variable were collected or analyzed;

- Details of the randomization process (or the lack thereof – *see* Ex. D, at 127:20-25);

- Evaluation of the sample size and representativeness, once selected, to ensure the sample was sufficient to meet the objectives of Clark's analysis; and

- Details of the estimation methodology and extrapolation calculations, including calculations of precision confidence.

(*Id.* ¶¶ 12, 27.)  In fact, it appears that Clark did not employ any meaningful methodology whatsoever in selecting the examples to analyze.  As Clark fails to offer

any explanation as to how the examples cited in her report relate to the universe of disputed claims as a whole, Clark's conclusions based on those examples are meaningless beyond the examples themselves, and therefore must be excluded pursuant to Rule 702.  (*See* Ex. E ¶ 30 ("Dr. Clark's broad generalizations based on her samples are fatally flawed.  Dr. Clark's sampling design and execution are not memorialized in a manner to permit even a basic understanding how they were performed.  No evidence exists that the samples were randomly selected, and even if they were, most were of insufficient size to reach valid conclusions.  These flaws lead to invalid and unreliable generalizations, and the sample size conclusions are only useful for the sampled claims themselves.").

### 4. Clark's opinions based on pure speculation should be excluded under Rule 702.

Fourth, Clark engages in unsupportable pure speculation that is entirely improper as a basis for expert opinion and must accordingly be excluded.  For instance, Clark characterizes the existence of a confidential internal form that summarizes the tests to be performed for a particular client as "suspicious" and speculates, without a shred of data or even logical rationale, that the form "may have contained information about inappropriate financial relationships between the clients and [Defendants.]"  (*Id.* ¶ 128).  As another example, Clark speculates that because a standing order form for Defendants allegedly had check marks for two terms ("POC" and "panel") that "in practice…appear[ed] to have been the same," Defendants must have therefore improperly billed Cigna for lab testing, despite the fact that Clark herself acknowledged that there were situations where the use of master order sheets for drug testing were

appropriate.  (*Id.* ¶ 141; Ex. D, at 60:11 – 61:10.)[3]   Again, as these baseless

accusations cannot be supported by any actual facts or data, they are inadmissible

under Rule 702.

> **B.    Clark's Conclusions regarding Defendants' Purported "Systematic Inappropriate Billing" Lack Sufficient Data and Fail to Conform to any Accepted Methodology.**

Section II of Clark's Report details the bases for Clark's opinion that Defendants

"engaged in systematically inappropriate and unallowable patterns of drug testing and

billing, which resulted in grossly excessive charges of lab testing services to Cigna."

(Ex. A, ¶ 158.)  Clark focuses on what she calls "inappropriately high" utilization of urine

testing, "inappropriate…billing" for blood testing, and "use of improper billing codes."

(*Id.* ¶ 159.)  However, Clark does not perform anything resembling a statistical analysis

of Defendants' full claims data.  Instead, she admittedly uses only cherry-picked

"examples" that are "illustrative" of the "themes" that she claims were "broadly present"

in the claims reviewed.  (*Id.*)

In each instance, Clark cites to only a single example of an allegedly improper

claim, then concludes, without citing to any evidence or support, that the alleged

impropriety is a "pattern" that permeates all of Defendants' submitted claims.  (*See, e.g.*,

*id.* ¶¶ 161-62 (single example of allegedly excessive testing referred to as a "pattern");

163-66 (two examples of allegedly excessive frequency of testing called a "pattern" and

accompanied by speculation that "it is doubtful that the ordering clinician could have

even seen the results of most, if any, of these tests"); 173-75 (referring to two specific

---

[3] Defendants' rebuttal expert Dr. Boorstein explains that the existence of a standing form is standard practice in the drug testing industry.  (*See* Ex. B, at 10.)

billing charges as a "coding and billing practice[]"); 177-81 (referring to claims from four patients from 2013-14 as a "pattern of billing for medically unnecessary blood testing"); 182-86 (accusing Defendants of a pattern of false billing for diagnosing six patients over two years with an unspecified endocrine disorder); 190-201 (claiming that Defendants "routinely billed" improperly based on four patient examples); 202-10 (accusing Defendants of a "pervasive system of overbilling" based on four patient examples); 211-28 (citing twelve examples of patients who were tested at a "high frequency and intensity" and accusing Defendants, without evidence, of conducting tests that were "likely un-ordered"). Clark acknowledged that she did not have any information to indicate that any of the testing referenced above was contrary to the orders of a treating physician. (Ex. D, at 130:24 – 133:11.)

These opinions should be excluded for the same reasons articulated in Section I.A.3, *supra*, which are incorporated herein by reference. With respect to Clark's inflammatory and unsupported language, Mr. Haney observes that, while Clark repeatedly claims that "patterns in the data" exist, she fails to explain what criteria a claim must meet to fit the "pattern," or how many and which claims meet that unexplained criteria. (Ex. E, ¶ 14.) In fact, he notes that the word "pattern" appears 60 times in the Clark Report, alongside 22 appearances of the word "excessive," 9 uses of "systematic," 8 uses of "grossly," 6 uses of "outrageous," and 3 uses of "pervasive," yet there are precisely zero references to any statistical or quantitative analysis regarding any of Dr. Clark's claims. (*Id.* ¶¶ 14-18.) Accordingly, all of Clark's conclusions regarding these alleged "patterns" are merely speculative and cannot be reproduced or scrutinized further, and therefore should be excluded pursuant to Rule 702.

**C.      Clark Fails to Differentiate Among Defendants.**

Mr. Haney identifies another fatal flaw in Dr. Clark's Report that renders it fundamentally speculative and unreliable: Clark fails to quantify which of her "example" patients correspond to which Defendant.  Throughout her Report, Clark continually refers to the Defendants collectively as "Medytox," and presumes each patient belongs to all of the Defendants collectively, which is obviously not the case.  There are three distinct Defendants in this action, each of whom have their own separate patients and clients and submitted their own separate billing.  Clark's only explanation for generalizing across all Defendants is that she did so "for simplicity."  (Ex. A ¶ 1.) "Without a reasonable basis for aggregating the Labs and without weighing each Lab's unique characteristics," concludes Mr. Haney, aggregating BioHealth, PBL, and Epic without weighing the differences between them "is neither reliable nor appropriate."  (Ex. E, ¶¶ 20, 23.)  Because Dr. Clark failed to differentiate between Defendants, the data she cites fails to support a reliable conclusion that the Defendants are equivalent or interchangeable.  (*See id.* ¶ 25.)  Accordingly, Clark's conclusions are overgeneralized without basis, and are therefore neither scientifically valid nor reliable.  (*See id.*)

**II.     Dr. Clark's Rebuttal Opinions Should Be Excluded on the Same Basis as her Expert Opinions.**

Dr. Clark also submitted a report in rebuttal to the Expert Report of Jacqueline Thielen, in which she incorporates the opinions contained in her principal report. (Rebuttal Report of Dr. Kelly Clark, attached hereto as Exhibit F.)  While her opinions are fundamentally flawed in numerous respects, many of those challenges go to the weight, not the admissibility, of her testimony.  To the extent, however, that Dr. Clark

restates or incorporates, either explicitly or implicitly, any of the opinions contained in her principal report, those opinions should be excluded from her rebuttal report as well.

Clark specifically references the same opinions on "medical necessity," "covered services," and "inappropriate billing" addressed above in paragraphs 16-17, 19-20, 22-28, 33, 39, 46-47, 58, 63, 91-92 94, and 100-02 of her Rebuttal Report.  (*See* Ex. F.) Those paragraphs should be excluded for the same reasons as those cited above.

### CONCLUSION

For the reasons set forth above, the Labs respectfully request that this Court exclude the Expert Opinion Report and testimony of Dr. Kelly Clark, along with those portions of the Rebuttal Opinion of Dr. Kelly Clark that concern the same subject matter as her Expert Opinion Report, and such additional relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Anthony T. Gestrich*
Scott M. Hare (phv10339)
Anthony T. Gestrich (phv11119)
WHITEFORD, TAYLOR & PRESTON, LLP
11 Stanwix Street, Suite 1400
Pittsburgh, PA 15222
Telephone: 412-618-5600
Facsimile: 412-618-5596
E-mail:        SHare@whitefordlaw.com
               AGestrich@whitefordlaw.com

Fred Alan Cunningham (phv20210)
Matthew Christ (phv20209)
DOMNICK CUNNINGHAM & YAFFA
2401 PGA Boulevard, Suite 140
Palm Beach Gardens, FL 33410
Telephone: 561-625-6260
Facsimile: 561-625-6269
E-mail:        Fred@pbglaw.com
               Matt@pbglaw.com

John J. Radshaw III
(ct19882)
65 Trumbull Street, 2nd Fl.
New Haven, CT 06510
Telephone: 203-654-9695
Facsimile: 203-721-6182
E-mail: jjr@jjr-esq.com

*Counsel for Defendants*

Date:  July 18, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date a copy of the foregoing was served by e-mail to

counsel for Plaintiffs, including:

EDWARD T. KANG
EMILY COSTIN
**ALSTON & BIRD LLP**
950 F Street, NW
Washington, DC 20004
edward.kang@alston.com
emily.costin@alston.com

KELSEY L. KINGSBERY
555 Fayetteville Street, Suite 600
Raleigh, North Carolina 27615
kelsey.kingsbery@alston.com

*Counsel for Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company*

*/s/ Anthony T. Gestrich*
Anthony T. Gestrich

Date: July 18, 2023