# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY and CIGNA HEALTH AND LIFE INSURANCE COMPANY, | |
| Plaintiffs, | Case No. 3:19-cv-01324 |
| v. | Hon. Janet C. Hall |
| BIOHEALTH LABORATORIES, INC., PB LABORATORIES, LLC, and EPIC REFERENCE LABS, INC., | March 1, 2023 |
| Defendants. | |

<u>**EXPERT REPORT OF DR. KELLY CLARK**</u>

<u>**CONFIDENTIAL**</u>

## SCOPE OF ENGAGEMENT

1.      I have been retained by counsel for Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company ("Cigna") in this matter, Alston & Bird LLP. The scope of my engagement is to analyze documents provided and render an opinion on the nature of the lab drug testing services performed and billed by BioHealth Medical Laboratories, Inc. ("BioHealth"), PB Laboratories, LLC ("PBL"), and Epic Reference Labs, Inc. ("Epic"). For simplicity in this report, I will use the term "Medytox" to refer to these three labs in the collective, unless otherwise specified.

## QUALIFICATIONS

2.      I received my Doctor of Medicine degree from the University of Wisconsin School of Medicine and my Master of Business Administration with an Additional Certificate in Health Sector Management from the Fuqua School of Business at Duke University. I am a physician board certified in both Psychiatry and Addiction Medicine. I have provided direct patient care to thousands of patients as well as oversight of care providers in multiple settings. A copy of my most recent CV is attached as **Appendix A**.

3.      In my career I have performed thousands of reviews of care provision around the country for medical necessity on behalf of health plans, worker's compensation and disability insurance providers, as well as performed reviews as a treating provider. As the Medical Director for Behavioral Health at a non-profit community health plan, Capital District Physicians Health Plan ("CDPHP") in Albany, New York, I worked with the Special Investigation Unit ("SIU") on issues of Fraud, Waste, and Abuse by analyzing claims data abnormalities. As a Medical Director with CVS Caremark, I also assisted their SIU on issues of Fraud, Waste and Abuse as identified via aberrant claims data.

4.      I was elected by my peers as the president of my medical specialty society, the American Society of Addiction Medicine ("ASAM"), consisting of about 6,500 physicians involved in this specialty. I have worked with groups of experts throughout the fields of addiction medicine and psychiatry to publish a number of practice and policy guidelines, including such documents as the ASAM "National Practice Guideline for the Treatment of Opioid Use Disorder," the ASAM "Appropriate Use of Drug Testing in Clinical Addiction Medicine" (2017), and the United States Health and Human Services' Substance Use and Mental Health Services Administration (SAMHSA) as a paid consultant on "TIP 63: Medications for Opioid Use Disorder" (2018).

5.      I have worked as a litigation consultant and expert witness in federal criminal fraud cases related to medically unnecessary laboratory testing, including the urine and blood work billed in *United States v. Perez et al.*, 3:20-cr-00086-TJC-JBT (M.D. Fla.), and I have been qualified in federal court as an expert on issues of medical billing and drug testing. A list my experience as a testifying expert in the last 4 years is attached as **Appendix B**.

6.      I have published numerous articles on topics related to addiction medicine, including the use of drug testing, treatment of opioid addiction, management of alcohol

1

withdrawal, systems of care including and policy and payment for behavioral health including addiction services. A list of my publications for the last ten years is attached as **Appendix C**.

7.      I am being compensated for my time on this matter at a rate of $1,150 per hour.

## MATERIALS CONSIDERED

8.      In forming my opinions, I have reviewed many documents, including: spreadsheets of health plan insurance claims made by Medytox to Cigna for lab services performed; client files which consist of documentation between Medytox and the specific customers (doctors' offices, clinics, and other organizations/locations) where they provide lab services  (these files also can include actual lab orders); patient files which mainly consist of itemized bills, order sheets, and lab results sent to individual patients in attempts to collect co-pays/co-insurance or other direct payments; a Medytox Sales Training Manual; as well as other documents such as some internal emails at Medytox.

9.      Regarding data of claims made by Medytox to Cigna, the following spreadsheets of claims for a range of dates of service were available for review:

- BioHealth (TIN 450536376): approximate date range 1/11/2012 - 6/03/2016, CIGNA19-1326 0007531, CIGNA19-1326 0007981
- PB Labs (TIN 203650491): approximate date range 1/01/2012 - 6/22/2016, CIGNA19-1326 0007530, CIGNA19-1326 0007983
- Epic (TIN 462266700): approximate date ranges 1/07/2014 - 12/31/2014; 1/04/2016 - 12/29/2017, 1/1/2015 - 12/31/2015, CIGNA19-1326 0007533, CIGNA19-1326 0007979, CIGNA19-1326 0007980

10.      A complete list of the materials I reviewed and considered in connection with forming my opinions is attached as **Appendix D**. I have also relied on certain publicly available publications which are cited in this report.

## INITIAL SUMMARY OF OPINIONS

11.      Through my review of the documents, it is my opinion that Medytox's business model was to bill insurance for drug tests, consisting of urine and blood specimens that were not medically necessary. Medytox created a master order sheet of panels of drug tests for Medytox's clients to complete. That master order sheet was then used as the default standing order for all drug testing ordered for all of the client's patients, regardless of the clinical diagnosis or treatment of any individual patient. Medytox would then bill Cigna for performing those drug tests. The practice of using these standing orders resulted in drug testing that was excessive (both in the number and frequency of tests), not individualized, and not expected to provide information to be used in the treatment of the patient. Therefore, the drug testing was not medically necessary.

12.      In addition, based on my review of the documents, it is my opinion that Medytox engaged in pervasive and systematic inappropriate and unallowable billing practices that led to grossly excessive billing of lab testing to Cigna. Each billing code is associated with definitions

2

for its allowable use in legitimate and appropriate medical billing. Data from Medytox's claims reflect systematic violations of appropriate, legitimate, and allowable billing practices. Among other things, I was able to identify the following improper practices:

    a)    Medytox engaged in systematic patterns of inappropriate and medically unnecessary billing for urine tests due to high utilization, including excessive frequency, excessive intensity, excessive dollar charges per test, and testing for inappropriate substances and tests.

    b)    Medytox engaged in inappropriate and medically unnecessary billing of blood tests, including excessive intensity, testing not supported by appropriate diagnoses, and provided diagnoses used to justify testing which are suspicious for false billing.

    c)    Medytox used protocols of billing in ways not consistent with the legitimate and appropriate use of billing codes, including billing multiple codes which are not allowable in the same day.

13.    Medytox's excessive intensity, frequency, inappropriate code use, exorbitant charges in excess of reasonable and customary rates, as well as patterns of long duration of test protocols per patient, resulted in a stunning and exorbitant amount billed to Cigna for many patients.

14.    I understand that Medytox did not produce in this litigation all of the drug testing orders and results for all drug tests for which they billed Cigna, but the drug testing orders, results, and claim data that I reviewed to date is more than sufficient to demonstrate the grossly inappropriate systematic billing for lab testing services.

15.    Much of this report contains technical information which, for the sake of brevity, involves some generalization.

16.    The examples in this report should be considered illustrative and representative of the problems identified, but does not reflect an exhaustive list.

17.    I reserve the right to alter my opinions based upon the review of any additional information.

## **BACKGROUND**

## I.    **Overview of the Practice of Medicine and Use of Laboratory Testing**

18.    Laboratory testing is integral to the modern practice of medicine. General health testing is part of the expertise of any physician, but drug testing specifically is part of treating people who are prescribed controlled substances and the treatment of those with substance use disorder or the disease of addiction.

19.     In order to explain the patterns of deviation from legitimate and acceptable billing for laboratory work, it is necessary to first discuss the appropriate use of these technologies and the related appropriate billing. As the majority of tests I reviewed were done for a primary diagnosis having to do with substance use disorders and most of Medytox's clients appear to be involved with patients with addiction, I focus mainly on the appropriate use of drug testing specifically related to substance use disorders, but also briefly discuss other patterns of inappropriate laboratory testing and billing reflected in Medytox's documents.

### A.     Overview of the practice of medicine

20.     Typically, the medical treatment of a patient begins when a doctor or other medical clinician sees a patient. The medical professional gathers information about the patient's complaint and experience which is specifically relevant to their problem, such as the patient's symptoms, when they occurred, or their family history. Additional information might be obtained from family members or from other treatment providers. The relevant physical and mental status examinations are completed. Additional information may be sought, such as laboratory tests on specimens from the patient's body or radiological imaging tests. The doctor reviews this information to determine likely diagnoses and works with the patient to determine how they will manage the problem. There may be medications, surgical interventions, or different types of therapy performed. At some point the patient returns to the doctor in order to evaluate how well that plan has worked, and make any changes needed.

21.     In short, the clinician gathers data to make an initial working diagnosis, determines the safety and suitability of different potential treatment plans, discusses and agrees on recommended treatment plans, and monitors the effectiveness of the treatment plans once implemented. The process continues whereby additional information may either confirm or alter the working diagnosis, the preferred treatment plan, and the type of information needed to continue to care for the patient. This is true of the general practice of medicine, whether the service is inpatient or outpatient, and regardless of the specific medical condition.

22.     By way of example, a patient may present to their primary care provider with low energy, depressed mood, oversleeping, problems concentrating, and general decrease of engagement in their activities. The patient may believe they are depressed due to increased stress at work and home. If there are no other symptoms and the patient has normal results on routine annual blood work 4 months previously, a working diagnosis may be made of an episode of Major Depression and the patient may start on a therapeutic dose of a medication. If the patient does not improve, the clinician may request additional data in the form of lab testing. In this example, the lab testing typically ordered would be expected to be paid by their health plan at well under $300. The results may show that the patient has anemia or low thyroid function as the cause of their symptoms, not a mood disorder. The data obtained by lab testing is then used to change the diagnosis and treatment plan. If the patient has anemia, additional testing specific to the different types and causes of anemia may be then ordered and performed. If a medication is prescribed or procedure done, follow up testing may be done to monitor the effectiveness of that treatment. Each of the lab tests performed is directly related to the diagnosis and treatment of the patient.

23.     Modern medicine makes available to clinicians an enormous range of technologies such as testing of bodily fluids which could potentially be used to treat a patient. Insurance

4

companies and managed care systems typically provide coverage for lab testing that is medically necessary for the care of patients. In order to be medically necessary, a provider's services must be directly related to the medical needs and treatment of a particular patient.

24.    The baseline principle is this: if information to be gained from a test is not needed to care for a specific patient, then the test is not medically necessary.

## B.    Overview of the practice of addiction medicine

25.    Addiction medicine, a sub-specialized area of medical practice recognized by the American Board of Medical Specialties, is like any other field of medicine. With advances in science, we now understand that while people may have issues with use or misuse of many substances, those people who develop addiction have developed a chronic brain disease. Doctors and other clinicians can provide treatment for people misusing substances before they develop addiction, or after the addiction has occurred.

26.    In treating addiction, the same concepts and practices described above are employed as with any other field of medicine. Namely, the clinician obtains information in order to make a diagnosis, works with the patient on a treatment plan, and then gathers additional information to monitor how well the treatment plan is working.

27.    There are many sources of information used to diagnose and treat patients with substance use disorders. These sources of information include the patient's verbal description to the clinician about the patient's history, information provided by the patient's families and loved ones, information provided by past and current treatment providers, physical and mental status examinations, information regarding the patient's adherence to follow up and other appointments, information from the prescription drug monitoring program, and information from the results of lab testing, including drug testing.

## C.    The use of blood and urine testing in the overall medical care of a patient.

28.    Lab testing is used in clinical medicine to assist with the care of a specific patient. It provides additional information about the condition of a patient at a particular point in time. It provides data which may serve several possible functions to assist the clinician, including:

- for screening during wellness visits, or to make an initial working diagnosis when the patient has new complaints;

- to assess the patient's current health status in order to determine the safety and suitability of a proposed or active treatment plan; and

- to monitor the effectiveness of the treatment plan.

Each of these issues is described further here.

5

### 1.   Routine Screening: The General Medical Examination Without Abnormality

29.     Many people have experienced going to the doctor and having blood drawn for an annual examination, or having lab testing done when they have specific complaints.

30.     There are guidelines for the types of testing recommended for annual examinations, and these generally involve screening tests for normal function of liver, kidneys, blood cells, thyroid, etc. This is part of a general health monitoring, which is essentially a diagnostic screen for common and silent medical issues which might not present with complaints that a patient mentions.

31.     When a test comes back with an abnormality, the clinician then may follow up with more focused, specific, and expensive testing to evaluate that abnormality. This is the appropriate use of testing.

32.     It is not appropriate to "test for everything" on a general well-patient examination, or to "test for anything" if not specifically related to a patient's clinical needs.

### 2.   Assessing the Safety of a Proposed or Active Treatment Plan

33.     As one example, some medications have significant safety issues which must be considered before or while they are prescribed to each patient as part of a treatment plan. So in some situations, lab testing may be required to monitor for potential damage for the kidneys or liver.

34.     As another example, it is possible to test for the blood levels of medications to monitor for appropriate dosing. Relatively few medications have clear ranges of therapeutic blood levels, meaning that blood levels below that range are not as likely to be effective and/or levels above the range have high risk to be toxic to the patient.

### 3.   Assessing the Efficacy of an Active Treatment Plan

35.     Lab testing can be used to monitor how well a patient is responding to a treatment plan. For example, lab tests can show if the plan implemented for improving blood sugar control for someone with diabetes is working well. Although the treatment plan may call for strict blood sugar monitoring and diet and exercise, the patient may not adhere well to that regimen. If the lab work shows poor control of their blood sugar, a change in treatment plan would be considered.

36.     Deciding what tests are required for a specific patient's care at a specific point in time should be made, bringing clinical acumen to bear on the recommended practices and standards of care as related to that patient's current condition. It is not medically appropriate, nor is it medically necessary to 'over-test' a patient – performing, causing to perform, or billing for testing which is not indicated for the treatment of a patient's condition.

### D.   Use of drug testing in addiction treatment

37.    Drug testing serves an important function in the treatment of people with addiction. Drug testing is one piece of information that assists the clinician in diagnosing and treating the patient. As with any test, providers should take the cost and benefit of a specific drug test into account when ordering it and choose only the specific tests and testing frequency that is appropriate for support and ongoing assessment.

38.    The primary utility of drug testing in the treatment of addiction is as a therapeutic tool to provide objective checkpoints for patients' self-reports and allow ongoing treatment planning updates between provider and patient. Because addiction is a chronic brain disease, the symptoms of addiction increase and decrease over time. Patients may require treatment in a variety of environments with different levels of structure and support, called levels of care. Drug testing provides one type of objective information about how a person is doing at a point in time, which should be used to determine if the treatment plan is working well or if changes are needed.

39.    Drug testing is also valuable in the treatment of these patients because people with addiction have multiple reasons to not be truthful about their drug use, including guilt and shame as well as fear of legal, familial, or occupational repercussions. Rather than simply relying upon the patient's self-report, treating providers use this objective information to work with the patient and ensure the best approach to treatment.

40.    Importantly, the purpose of drug testing is not to try to "catch the patient" when they use a substance. People with any chronic disease are not expected to perfectly adhere to the treatment plan. Rather, the medical purpose of drug testing submitted for medical billing is primarily therapeutic and is not to be used as a punitive surveillance technique.

41.    For all of these reasons, it is rarely, if ever, clinically necessary to monitor the actual quantitative level of a substance in a patient's urine. Definitive tests are generally considered "Present/Absent" in clinical usage.

42.     Furthermore, it is simply not possible to test for every drug which could possibly be misused, and it is not appropriate to waste resources testing for substances when there is no reasonable expectation that the test results will alter a patient's treatment plan.

43.    Providers should discuss the outcomes of each drug test with patients as they become available, as is the typical approach to every medical test ordered by a provider.

44.    The medical necessity of any test is in its utilization for treatment planning – failure to use the information from a test means that the test had no medical purpose.

45.    To reiterate, if information to be gained from a test is not needed to care for a specific patient, then the test is not medically necessary.

E.    **Frequency of Drug Testing**

46.     There is no standard frequency at which every patient should undergo urine drug testing.  Rather, the necessary frequency of testing depends upon the needs of the clinician for information to treat the patient. When a patient is doing well, testing should be less frequent  than when a patient is early in treatment or not doing well. They should be tested if they appear impaired and do not admit to having misused a substance or if diversion of their prescribed medication is suspected.

47.     National guidelines discuss the recommended frequency of drug testing for patients with opiate use disorder or being treated with methadone for buprenorphine   Methadone delivered in an Opioid Treatment Program (an OTP or "methadone clinic") requires a minimum of random drug testing eight times per year under federal regulations. And ASAM recommends that patients being treated with buprenorphine be drug tested at least monthly until stable in their recovery.[1]  In 2013, a consensus panel which drew up SAMHSA's Treatment Improvement Protocol ("TIP") 47 for Intensive Outpatient Care recommended that in early treatment urine drug testing should occur between every 4-7 days, with decreased frequency as the person stabilizes such that during Intensive Outpatient Care "monthly testing is standard in most programs."[2]

48.     The primary purpose of drug testing after initial assessment is to monitor how well the treatment plan is working, namely, determining whether the patient is taking the substances they should take and refraining from taking substances they should not take. The data from the tests must be received by the clinician, analyzed, the results made available to the patient and discussed, and changes to the treatment plan considered. Additional testing may be required in cases where the actual results are not the same as the expected results.

49.     While there may be instances in which a patient requires drug testing more frequently than once a month or eight times per year, there is no medical reason to regularly submit urine specimens to a laboratory and bill insurance for every individual patient at a treatment facility for drug testing several times per week.

50.     Moreover, there is no medical reason for routinely ordering and billing expansive and expensive definitive testing for dozens of substances on every individual patient's urine several times per week.

51.     If a urine specimen must be shipped from the treatment location to the lab performing the testing, there is typically a several day lag between day of test and when the results are available to the clinician. In many instances the care of the patient may require this. However, it is neither medically necessary nor reasonable to be routinely testing patients multiple times a

---

[1] American Society of Addiction Medicine, *Appropriate Use of Drug Testing in Clinical Addiction Medicine* (2017), available at https://www.asam.org/docs/default-source/quality-science/appropriate_use_of_drug_testing_in_clinical-1-(7).pdf?sfvrsn=2.

[2] Substance Abuse and Mental Health Services Administration Center for Substance Abuse Treatment ("SAMHSA"), Substance Abuse: Clinical Issues in Intensive Outpatient Treatment, A Treatment Improvement Protocol 47, at 262, https://store.samhsa.gov/sites/default/files/SAMHSA_Digital_Download/sma13-4182.pdf ["TIP 47"].

week when the results of each test have not been reviewed or are not even available before the next test is ordered and sent.

### F.  **Types of Drug Testing and Choice of Tests**

52.  There is a range of technological complexity in the different types of urine drug tests. The most rapid and least expensive are on-site screening tests, also known as Point of Care ("POC") tests. These are similar to home pregnancy tests or home Covid tests where the change in color on a chemical strip gives a positive or negative result. More expensive, but less prone to error, are tests by a mechanized approach using optical scanning technology, and similar immunoassay technologies. These are considered "presumptive" tests because of the rates of errors and inability to test for certain substances.

53.  "Definitive" testing is performed by larger laboratory machines not found in physician offices. These provide much lower error rates and are hence "definitive," and also allow for more complex analysis on a wider range of substances. However, these tests take longer for the information to become available to the clinician and are more expensive. Therefore, these tests have been used in specific situations.

54.  The correct use of these technologies can be illustrated by the prior example of a patient who had a typical, inexpensive blood panel done to screen for problems with kidneys, liver, thyroid, and so on, and was found to be anemic. The doctor can then evaluate the information in the lab reports, which may lead to a likely cause. If the likely cause cannot be determined from the information in the blood work, additional lab work may be needed to determine the exact cause and enable the doctor to determine the correct treatment plan. There are a wide range of tests which can identify different causes of anemia, but the information from the screening blood work would probably be enough to differentiate an anemia due to low Vitamin B12 from anemia due to iron deficiency.

55.  Once the doctor determines by a screening test that a patient likely has  anemia due to iron deficiently, the doctor can then select and order further specialized tests to further evaluate the patient's condition. That is correct medical practice, and the lab tests ordered as described are medically necessary for that patient. It is clearly improper and medically unnecessary practice to routinely run a wide range of tests for possible causes of anemia as part of the routine medical exam when there is no indication the patient has anemia. There is additional cost involved with over-testing which is not offset by any anticipated value of information obtained.

56.  In the same way, the appropriate approach to drug testing during the time period at issue was that patients with addictive disease may have presumptive urine drug testing done, and when a result is unexpected, definitive testing might then be necessary.

57.  As is required in Opioid Treatment Programs under federal rules, which will be discussed later, a treatment program may routinely screen for a relatively few number of drugs of abuse. The approach described in TIP 47, which was published in 2013, is that a program's standardized battery of screening tests may be small, and the potential to add specific tests could be increased in specific communities where there is demonstrated need (e.g., the example used in

this document was oxycodone). Some of these substances might not be detected with presumptive technology and require definitive tests.

58.     The 2023 state-of-the-art for laboratories running large numbers of urine definitive drug tests and urine is that an expansive panel of tests are run by the machine – regardless of the tests actually ordered – because the operations of machine and cost of changing test run specimen by specimen are prohibitive. However, the tests not ordered cannot be legitimately billed, and the clinician must order the appropriate test for that patient for the specimen.[3]

59.     During the relevant time period, the appropriate approach to drug testing patients with addictive disease was to perform presumptive urine tests, and when a result is unexpected, definitive testing could be deemed to be necessary.

60.     A result may be unexpected for a few reasons:  (1) there was something in the urine that should not be there (like a drug they have misused), (2) there was something that should be but which was not in the urine (like their prescribed medication), or (3) when there is evidence that the patient had tampered with the urine specimen ('faking' or 'cheating on' their test).  If a person is prescribed medication and their drug test comes back positive, that positive test is expected and there would be no reason to perform a definitive test. But a negative test for a patient's prescribed medication is a problem – they are not taking it appropriately or may even be diverting it. If a person comes into the doctor's office and admits to using a drug and the presumptive test comes back positive for that drug, there is no reason to order or bill a definitive test on that substance - that positive result was expected by the history they gave.

61.     While there are many substances for which testing can be done, there are relatively few classes of drugs of misuse, and relatively few specific drugs within those classes, for which there are clinical indications in the treatment of a patient with addiction. There is simply no medical rationale that would support the routine testing for the presence of TCAs or other antidepressants as part of a urine drug test panel for a patient being treated for substance use disorder.

62.     Similarly, there is very rarely a clinical need to test for the presence of nicotine – a very prevalent substance which is highly addictive and causes significant death and disease.

63.     Just because drug testing is technologically possible does not mean that ordering, performing, or billing for these drug tests are medically necessary. The routine testing of urine for substances like these is not medically necessary but can serve to "up code" a claim by adding tests

---

[3] The current state-of-the-art may also allow for definitive testing to occur without presumptive testing being billed in some situations, due to the nature of the information required in the deep drop in the costs of definitive testing technology. For example, currently a panel of 15-21 definitive tests coded as G0482 (which includes validity testing), may be reimbursed by a Medicaid plan around $250. This is substantially different than the $5 - $100 per individual test noted in Tip 47 in 2013 and, as discussed in more detail below, very far from the total amount billed for drug testing by Medytox of over $4300 seen in many of these claims in 2013. *See* Appendix E, Examples, Tab G.

and an additional drug class to the billing, which can inappropriately increase the revenue to that testing provider.

64.     There are scientific, clinical, and economic issues which should be considered in performing drug testing. These have been considered in the production of national treatment guidelines and provide the bedrock foundation of the recommendations for frequency and intensity of drug testing. The same scientific, clinical, and economic concerns factor into the clinician's selection of tests necessary for the care of a specific patient.

65.     There is no single appropriate panel of drug tests for every patient on every specimen. The ordering clinician must determine which tests are appropriate for each specimen of each patient. While there may be substances for which it is appropriate to screen all patients, such as alcohol or benzodiazepines, it is expected that a clinician may order a range of different drug tests within their practice, depending upon the clinical need of specific patients at specific points in time. It is also expected that different clinicians will order different tests as their routine initial screening panel, depending upon the needs of patients in their practice population and drugs of misuse in their community.

66.     There are a few specific guidelines for substances to be screened on a routine basis – those for patients with opioid addiction receiving methadone and those receiving buprenorphine treatment.

### G.     National Testing Recommendations

67.     There are national guidelines regarding drug testing for those patients with the type of addiction most likely to cause overdoses, Opioid Use Disorder, and the 2013 SAMHSA Publication TIP 47 also provides some baseline guidance.

68.     The use of methadone to treat addiction is the most highly regulated form of addiction treatment in the country. This is the only type of medication to treat any disorder which is required to be done through a specialty clinic licensed and certified by both state and federal agencies and the medication cannot be prescribed by a doctor's office legally to treat addiction in the United States. Patients come into these locations daily to receive their medication, until they are doing well enough to earn up to 27 days of take-home medication. There are multiple legal and regulatory requirements of these programs, including minimum drug testing requirements.

69.     As mentioned earlier, there are a minimum of eight random drug tests required to be done annually on each patient with opioid addiction being treated with methadone.

70.     The 2015 Federal Guidelines for Opioid Treatment Programs (OTPs, or methadone clinic) provide specific guidance on required and recommended drug testing.[4] According to the guidelines, a few, targeted, inexpensive presumptive technologies is the accepted protocol. Expensive definitive testing should be limited to specific issues which may at times need to be

---

[4]     SAMHSA, 2015 Federal Guidelines for Opioid Treatment Programs (2015), https://store.samhsa.gov/sites/default/files/d7/priv/pep15-fedguideotp.pdf.

addressed for a patient's care. Expansive drug testing, either presumptive or definitive, is neither required nor appropriate to add to the basic drug test screening. Rather, what is important to add to basic screenings should be determined by the clinician based on "analyzing community drug-use patterns and individual medical indications."

71.     The 2015 ASAM "National Practice Guidelines for the Use of Medication in the Treatment of Addiction Involving Opioids" provides recommendations for testing which should occur at least monthly until that patient is in stable recovery.[5]

72.     The classes of drugs and specific substances mentioned as recommended for testing, in total, between both of these documents are opioids (including prescription opioids, heroin, methadone, buprenorphine and their metabolites), benzodiazepines, amphetamines, barbiturates, alcohol, and marijuana.

73.     The routine use of expansive and expensive panels of tests – the "test for everything" approach – is not consistent with the standard of care or legitimate practice of medicine, and such testing is not medically necessary. The routine testing of substances not often misused in the community or historically misused by the patient is simply not medically necessary or appropriate, and to bill for these tests is therefore not appropriate.

74.     It cannot be stated often enough: *if the results of a test are not needed to care for the patient then the test is not medically necessary*.

75.     As previously mentioned, SAMHSA's 2013 TIP 47 for Intensive Outpatient Care contained recommendations from a consensus panel. For early treatment urine drug testing, they recommended that drug testing should occur between every 4-7 days, with decreased frequency as the person stabilizes. And again, they noted that during Intensive Outpatient Care "monthly testing is standard in most programs."  (Appendix B— Urine Collection and Testing Procedures and Alternative Methods for Monitoring Drug Use)

76.     TIP 47 stated:

"Programs need to test for a standard battery of drugs, which may include such drug groups as amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine, methadone, methaqualone, opioids, phencyclidine (PCP), propoxyphene, or euphorics (Ecstasy). In programs where the majority of clients use only a few types of substances, the standard battery can be small, and only selected individual clients need be tested for other specified substances. Programs should add substances to the routine battery, temporarily or permanently, if patterns of substance use change in the target population or in the community. It is helpful to stay up to date about local drug use patterns identified by the nearest     Community     Epidemiology     Work     Group     (www.nida.nih.

---

[5] Kampman, Kyle MD; Jarvis, Margaret MD, FASAM American Society of Addiction Medicine (ASAM), *National Practice Guideline for the Use of Medications in the Treatment of Addiction Involving Opioid Use*, JOURNAL OF ADDICTION MEDICINE, September/October 2015, at 358-367.

gov/CEWG/CEWGHome.html) or the Single State Authority. For example, oxycodone (OxyContin®) has become a serious drug of abuse in particular locales. Fads come and go for abuse of a wide variety of substances (e.g., Ecstasy, PCP, pentazocine [Talwin®], propoxyphene [Darvon®])

.....

"A program should consider a variety of factors in selecting a method and source for drug testing. None of the methods are inexpensive, with costs ranging from less than $5 to more than $100 per assay for a particular drug. Turnaround time in receiving results is another important determinant. Whereas onsite methods can provide results in a matter of minutes, more accurate and expensive commercial laboratory analyses may take several days or longer. Reliability is a major consideration. However, substance abuse treatment programs that are using results for clinical purposes do not require the same accuracy (i.e., workplace standards) as agencies that make important, one-time decisions about such issues as employment, safety, eligibility for sports competitions, or probation or parole violations.

...

"Two categories of urine tests are available:

> • Screening tests. These detect only the presumptive presence or absence of a class of drugs in the urine specimen, return results rapidly, are relatively inexpensive ($1 to $5 per assay), can be set to detect low concentrations of drugs (have high sensitivity), and are relatively simple to perform.

...

> • Confirmatory tests. These provide more definitive information about the quantitative concentrations (nanograms/milliliter) of specific drugs or their metabolites in urine specimens and are more accurate than drug screens (have higher specificity and sensitivity). They are much more expensive (up to $100 per assay), technically complex, labor intensive, and time consuming—often taking days to complete. If the results of a drug test will be used as a basis for actions taken against an individual (e.g., in a justice system context), positive findings should be followed by a confirmatory test of equal or greater sensitivity and better specificity (Bureau of Justice Assistance 1999). Although results from these quantitative tests can be more useful than a simple positive or negative for monitoring intermediate changes in drug consumption patterns, the concentration in urine might be the same for a small amount of a drug administered recently as for a large amount of the drug consumed several days ago. In addition, concentrations can be affected by fluid consumption levels and may be misleading (Preston et al. 1999)[6]

77.     The 2013 TIP summarizes some of the issues clinicians must consider when using drug testing. The actual "quantitative level," or concentration in urine, of a substance is routinely of no clinical utility. The "quantitative level" is simply how the testing machine technically evaluates the specimen, but clinically it is reported just to determine if it reached a cut-off where the substance was considered to be present or not. Too many variables are at work to monitor drug levels from urine – which is why when it is clinically necessary to actually monitor amounts of medication a patient has in their body, the specimens used for Therapeutic Drug Assays may be

---

[6] TIP 47, *supra* note 2, at 239-241.

done on blood but this test cannot be legitimately billed if performed on urine. The use of definitive testing here is considered to have few clinical uses. The TIP 47 does point out that in general, a standard battery can be small, and that only some specific patients may require additional testing, and that community drug use patterns should be considered in choosing tests. It is important to note that TIP 47 is a consensus document and was not using an evidence-based methodology, and its definition of the population of patients in treatment was extremely broad. I include it here as an example of the national guidance available in 2013 regarding the appropriate use of drug testing.

### H.   Inappropriate Over-Use of Drug Testing

78.      The field of addiction medicine is aware of problems with over-testing and overbilling for drug tests and the harms caused by fraudulent billing. In 2017, ASAM published the "Appropriate Use of Drug Testing in Clinical Addiction Medicine," which was endorsed by the American College of Medical Toxicology.[7]

79.      The document is clear on these issues, and identifies them as one reason these clinical guidelines were developed:

> The inappropriate use of drug testing can have extraordinary costs to third-party payers, taxpayers, and at times the patients who are receiving care. Though non-monetary, this has also cost the addiction treatment field because of loss of credibility. Examples of inappropriate and often-costly drug-testing practices are (1) the routine use of large, arbitrary test panels, (2) unnecessarily frequent drug testing without consideration for the drug's window of detection, and (3) the confirmation and quantification of all presumptive positive and negative test results.

> It is ASAM's position that these and other inappropriate drug-testing practices are harmful not only because they waste valuable resources but because they do not fit the standards of appropriate clinical care. Providers have an obligation to ensure the highest possible quality of treatment for all patients, which includes the appropriate use of clinical drug testing. One of the purposes of this document is to clarify appropriate clinical use of drug testing and, in so doing, shine a light on drug-testing practices that are clearly outside of these boundaries. The delineation of appropriate treatment practices will confer multiple benefits; most importantly, it will improve patient care. At the same time, it will reduce waste and fraud.[8]

---

[7] American Society of Addiction Medicine, *Appropriate Use of Drug Testing in Clinical Addiction Medicine* (2017).
[8] *Id.* at 3-4.

80.     By 2016 it was clear to the national organization of physicians specializing in addiction medicine that the use of drug testing was a focus of waste, fraud, and abuse in the country and was harming not only those who pay for these inappropriate and medically unnecessary tests, but was also harming the patients and the field itself. The issue was of such importance that it was a significant reason for the building of the clinical guideline.

## II.     Billing and Payment for Medical Services

81.     Health insurance plans in this country are designed to pay for needed medical care of the members enrolled in that plan. When a healthcare provider delivers services, if the patient has insurance, providers often file a claim with the patient's insurance company for reimbursement. In order for the claim to be covered and payable, the claim must contain certain information, and the system depends upon the appropriateness of the information and care delivered.

82.     Health care providers submit claims to their patient's insurance company or health plan which may contain information on several different services. Each service on the claim is associated with a billing code. A claim submission may have only one service or dozens of different services.

83.     A claim must contain certain information in order for the services coded on the bill to be considered covered and payable. In addition to the date and place of the coded service, the claim must contain the name of the patient, the provider of the care, the clinician who referred or ordered that care if applicable, the code that describes the service rendered, and the code for the patient's diagnosis.

84.     The information in each of these sections should make medical sense. For example, it would be medically nonsensical for a patient with a back pain diagnosis to receive complex sex hormone testing. A legitimate claim must contain the actual, correct information about the patient, including a diagnosis that justifies the need for the service.

85.     The American Medical Association ("AMA") publishes a manual with the national Current Procedural Terminology ("CPT") codes and, in a complementary document, CMS publishes the Healthcare Common Procedure Coding System ("HCPCS codes") manual. Over time, the nature of the care delivered changes, and the codes for that care also change. Every year, the CPT and HCPCS codes are updated, with some codes added, some deleted, and some changed. The general laboratory section is updated such that the changes become effective each January 1st (i.e., the 2015 CPT codes are effective for dates of service beginning January 1, 2015 and the 2014 CPT codes then are obsolete for any DOS after December 31, 2014).

86.     It is the responsibility of those performing a lab service and billing a code for that service to understand how that code is defined at the time of service and to ensure the service delivered meets the criteria to legitimately and accurately bill that code.

87.     During the relevant time period for this case, several of the codes for drug testing changed. For example, two of the codes generally used for presumptive testing bundles in claims

using machine analysis are seen in these claims and are differentiated by the Date of Service (DOS), as the codes changed on 1/1/2017.

G0479: Presumptive Drug test(s), presumptive, any number of drug classes including validity testing. This is a national code which was in effect through 12/31/2016, at which time it was retired.

80307: Drug test(s), presumptive, any number of drug classes, including sample validation. This is a national code which began to be used 1/1/2017 and replaces G0479. This code typically is paid out by insurance now at around $80.00.

There are multiple codes for presumptive drug testing, and those billing insurance must ensure the use of the correct code:

80305: Drug tests(s), presumptive, any number of drug classes; any number of devices or procedures, (e.g., immunoassay) capable of being read by direct optical observation only (e.g., dipsticks, cups, cards, cartridges), includes sample validation when performed, per date of service

80306: Drug tests(s), presumptive, any number of drug classes; any number of devices or procedures, (e.g., immunoassay) read by instrument-assisted direct optical observation (e.g., dipsticks, cups, cards, cartridges), includes sample validation when performed, per date of service.

80307: Drug tests(s), presumptive, any number of drug classes, qualitative, any number of devices or procedures; by instrument chemistry analyzers (e.g., utilizing immunoassay [e.g., EIA, ELISA, EMIT, FPIA, IA, KIMS, RIA]), chromatography (e.g., GC, HPLC), and mass spectrometry either with or without chromatography, (e.g., DART, DESI, GC-MS, GC-MS/MS, LC-MS, LC-MS/MS, LDTD, MALDI, TOF) includes sample validation when performed, per date of service.

88.     As another example from a year earlier, as of January 1, 2016, definitive testing codes can be billed using the panel codes G0480-G0483, but only one code may be used per day per patient:

G0480: Drug test(s), definitive, utilizing (1) drug identification methods able to identify individual drugs and distinguish between structural isomers (but not necessarily stereoisomers), including, but not limited to GC/MS (any type, single or tandem) and LC/MS (any type, single or tandem and excluding immunoassays (e.g., IA, EIA, ELISA, EMIT, FPIA) and enzymatic methods (e.g., alcohol dehydrogenase)), (2) stable isotope or other universally recognized internal standards in all samples (e.g., to control for matrix effects, interferences and variations in signal strength), and (3) method or drug-specific calibration and matrix-matched quality control material (e.g., to control for instrument variations and mass spectral drift); qualitative or quantitative, all sources, includes specimen validity testing, per day; 1-7 drug class(es), including metabolite(s) if performed

16

G0481: Same as above but for 8-14 drug classes

G0482: Same as above but for 15-21 drug classes

G0483: Same as above but for 22+ drug classes

89.     It would be inappropriate double billing to submit more than one code per day per patient above. It would also be inappropriate double billing to bill for validity tests, such as pH or creatinine, on urine the same date as billing one of these codes, as the validity tests are subsumed in the bundled code.

90.     The changes in the codes may also relate to what exactly is allowable and what is not allowable in appropriate billing. These are contained not only in the AMA's CPT manual, but also can be specific to a health plan or insurer. For example, Medicare may decide to pay for a bundle of services for pain management patients, to include case management and psychologist and so forth, and provide a billing code for that service.

91.     Commercial health plans also may provide guidance on what they will and will not consider appropriate billing.[9]

92.     It is incumbent upon those submitting codes for their provided services to be aware of how the payer is determining the requirements for legitimately billing those codes, which include keeping up with the changes in coding requirements and definitions.

93.     Each health plan[10] contract sold to a purchaser on behalf of those individuals covered has a defined list of benefits to be covered and how much coverage will be. Each of these plans will have that information loaded into the plan's computer systems. For example, one small employer may decide not to offer addiction treatment coverage to employees, and the codes for those services will be loaded into Cigna's computer system so that if billed they will be denied as uncovered benefits. Another employer have chosen a plan with no OON benefit, and that information will be entered for into the claims payment computer systems. Other employers may offer employees options for plans with 10% co-pays for OON services, or 25% co-pays, or other specifics – and for each individual person covered, their specific plan details must be entered into the plan's computer systems.

94.     The health care plan billing and payment system in the U.S. is based upon a presumption of good faith in billing and payment. It is not structured to prevent egregious abuses of the system by those submitting claims. Health plan computers process gargantuan numbers of health care claims each day and the computers are programmed to allow this to occur as smoothly as possible and rely upon providers to behave in an appropriate manner regarding legitimate billings.

---

[9] *See, e.g.*, LABS00535783.

[10] I will generally refer to "health plans" in this report as commercial plans unless otherwise specified.

95.     One example of the trust-based system of billing, and the fact that it is incumbent upon those billing for their services rendered to use the appropriate and allowable codes for billing those services, is seen with issues of unbundling codes.

96.     For example, the CPT codes for routine urinalysis are 81000-81003, depending on if the process is automated or not and if microscopy was done or not. These code for routine urinalysis such as are typically done on annual check-ups and are not related to drug testing. These bundled codes have been defined in the CPT manuals, at least since 2011, as consisting of:

> "Urinalysis, by dip stick or tablet reagent for bilirubin, glucose, hemoglobin, ketones, leukocytes, nitrite, pH, protein, specific gravity, urobilinogen, any number of these constituents"

97.     To bill for a specific person on a specific day the code 81003 includes any/all of these tests being done on their urine. If on the same day the patient had a blood glucose or blood hemoglobin test done, those could be additionally legitimately billed. But if the lab billed the 81003 and also a pH done on a urine specimen the same day, this would be not allowed as it represents double billing by adding an unbundled code to the claims for that day of service.

98.     Another example of improper billing is unbundling each element of a code and billing it individually, as separate services. For example, beginning with the 2015 CPT manual, part of the section on Definitive Drug Testing reads:

> The **Definitive Drug Classes Listing** provides the drug classes, their associated CPT codes and the drugs included in each class. Each category of the drug class, including metabolite(s) if performed (except stereoisomers), is reported once per day of service. Metabolites not listed in the table may he reported using the code for the parent drug. Drug class metabolite(s) is not reported separately unless the metabolite(s) is listed in a separate category in the **Definitive Drug Classes Listing** (e.g., heroin metabolite).[11]

99.     Using the drug class "Antidepressant, tricyclic and other cyclicals" as an example, the appropriate bundled definitive codes are:

- 80335; 1-2 specific substances in the class
- 80336; 2-5 specific substances in the class.
- 80337; 6 or more specific substances in the class

100.    The **Definitive Drug Classes Listing provides** "the more common analytes within" the drug class of "Antidepressant, tricyclic and other cyclicals" as "Amitriptyline, amoxapine, clomipramine, demexiptiline, desipramine, doxepin, imipramine, propylene, mirtazapine, nortriptyline, protriptyline".

---

[11]  Current Procedural Terminology (CPT) Manual, Standard Edition, American Medical Association (2015), at 307-320 ["CPT Manual"].

101.    It would be improper unbundling to submit a separate code for each substance tested, as the appropriate codes are the bundled codes above and only one code per class per day is allowed. Furthermore, it would also be inappropriate to bill individually for imipramine and its metabolite desipramine, or amitriptyline and its metabolite nortriptyline, which are all listed in the same drug class listing.

102.    There is a plethora of information regarding the allowable, appropriate, legitimate codes to be used for billing health plans and insurance for healthcare services. In addition to the actual coding manuals referenced previously, there are local coverage determination documents from Medicare,[12] information from professional medical coding associations,[13] information directly from payers.[14] Medical coding updates are also available and easily obtained through these sources.[15]

103.    However, despite the widely published codes to be used in medical billing, the complex nature and trust-based approach to claims processing can lead to huge and systematic overpayments by payers.

104.    For example, patterns of inappropriate billing for validity testing such as pH and creatinine while billing for drug testing was identified by the Office of the Inspector General (OIG), despite multiple coding documents released stating this should not occur. They also identify that although computer claims editing programming was changed to try to stop these inappropriate payments, millions of dollars of inappropriate payments were still occurring.

105.    The OIG estimated Medicare improperly paid a total of over $66 million for specimen validity tests billed in combination with urine drug test in calendar years 2014-2016 alone. The OIG recommended that CMS contractors recover the improper payments, strengthen its system edits to prevent future payments, and instruct that Medicare again publicize the appropriate coding requirements.[16] In response, CMS again provided information on correct coding to the public.[17]

---

[12] Centers for Medicare & Medicaid Services, *Controlled Substance Monitoring and Drugs of Abuse Testing* (2015), publicly available at cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=35006.

[13] John Verhovshek, *CMS Drug Testing Codes for 2016*, AAPC, Jan. 11, 2016, https://www.aapc.com/blog/33209-cms-drug-testing-codes-for-2016/.

[14] *See, e.g.,* LABS00535783.

[15] Brad Ericson, *CMS Releases 2016 HCPCS Corrections*, AAPC, Dec. 3, 2015, https://www.aapc.com/blog/32826-cms-releases-2016-hcpcs-corrections/.

[16] Daniel R. Levinson, *MEDICARE IMPROPERLY PAID PROVIDERS FOR SPECIMEN VALIDITY TESTS BILLED IN COMBINATION WITH URINE DRUG TESTS*, Dep't of Health and Human Services, Office of Inspector General, Feb. 2018, https://oig.hhs.gov/oas/reports/region9/91602034.pdf.

[17] *Proper Coding for Specimen Validity Testing Billed in Combination with Drug Testing*, (MLN Matters Number: SE18001), Centers for Medicare & Medicaid Services, March 29, 2018, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/SE18001.pdf.

106.    Legitimate and allowable appropriate medical coding for billing insurances companies utilize only the allowable codes as defined by national guidelines and specific payers. The process of adjudicating those codes on submitted claims involves complex computer claims editing processes, which are designed and based upon the assumption that claims will be submitted with valid information for appropriately coded services which were actually rendered and medically necessary. As patterns of inappropriate billing are identified by payers, they can try to collect the payments made for improperly billed charges and codes, and can change the processes in an effort to halt those inappropriate payments, but this is a difficult process to ensure.

107.    Key to the legitimacy of billing a code to a payer for medical services rendered, including laboratory testing, is the requirement that the test was medically necessary for that specific patient's medical care.

## III.   <u>Medical Necessity</u>

108.    A core principle regarding the medical necessity of any test is the need for the ordering clinician to use the information obtained in the test results for that patient's treatment planning. Therefore, if information to be gained from a test is not needed for the medical care for a specific patient, then the test is not medically necessary. In addition, medical necessity determinations typically require consideration of the cost-effectiveness of the care.

109.    The medical necessity for any specific medical product or service for a specific patient is actually defined within the contract for coverage between the health plan and whomever had purchased the coverage for that specific payment. But in general commercial, Medicaid and managed Medicare health plans[18] have medical necessity criteria defined as and containing certain concepts, in whatever specific language used. The terms "Medically Necessary" or "Medical Necessity" are applied to health care goods and services provided to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:

- necessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease or its symptoms

---

[18] One unusual definition of medical necessity is that of straight, Fee-For-Service Medicare is not a health plan, but rather runs like an unmanaged insurance company and has its own definition unchanged since at least 2006: "Services or supplies that: are proper and needed for the diagnosis or treatment of your medical condition, are provided for the diagnosis, direct care, and treatment of your medical condition, meet the standards of good medical practice in the local area, and aren't mainly for the convenience of you or your doctor". Fee-for-Service Medicare is also unique in that it is structure to provide a fully transparent fixed fee schedule, to not negotiate with providers, and to not offer out of network benefits. *See, e.g., Medically Necessary*, CMS Glossary, https://www.cms.gov/apps/glossary/search.asp?Term=medically+necessary; *What Does 'Medically Necessary' Mean?*, Medicare.org, https://www.medicare.org/articles/what-does-medically-necessary-mean/.

- within the generally accepted standards of medical care in the community

- not solely for the convenience of the insured, the insured's family or the provider.

- not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

110.    Again, the overall concept is that health plans pay for what is needed for the medical care of its members. They do not pay for whatever a doctor orders, or for whatever a member requests, or for a product or service which may be helpful. Rather, health plans pay for what is medically needed to treat the condition. With one exception (fee-for-service Medicare as noted below), they do not pay for products or services more expensive than those likely to produce the same medical result. They do not pay for medical services requested by a member's employer as a condition of continued employment, by a court as a condition of probation or parole, or for a landlord as a maintaining housing.

111.    Lab tests are medical procedures which are performed by the provider of lab services upon the order of a referring clinician who requires specific information to treat a patient. When medically unnecessary lab tests are ordered and performed, such lab tests cannot be properly billed to a health plan. These can include simple or complex tests, from drug testing as a workplace requirement to genetic testing for the hobby of genealogy. A health plan should not be billed for medical services which are not medically necessary for the care of the patient.

112.    In my analysis and in this report, I will use my experience and understanding of billing protocols and requirements as well as of rate structures in providing estimates of the typical fees a provider might reasonably expect to be paid for these lab services.

## OPINIONS

### I.    Medytox designed its business model to obtain the highest amount of revenue by billing for medically unnecessary tests.

113.    In my opinion, Medytox's business model was built upon selling the highest possible number of urine and blood tests – regardless of whether those tests were medically necessary or not. My review of the "lab order" sheets, billing statements, client registration forms, and a training manual for sales account executives supports this conclusion.

114.    Based on my review of the documents, when the Medytox sales representatives contracted with new clients, clients would complete a standing lab testing order. This standing order set the master panel of tests to be used as the default order. Medytox would then bill Cigna, presumably among other payers, for having performed these tests.

### A.    Medytox's Sales Manual

115.    A training manual for Medytox sales account executives describes their business model:

> Our clients, who typically comprise drug rehabilitation facilities of various kinds (distinctions between the various types of drug rehab and detox facilities will be discussed later in this manual), pain management facilities and physician practices and clinics, routinely collect urine sample from their patients and requires that the samples be tested in a clinical laboratory setting in order to determine the presence (or lack) of alcohol, prescription drugs, or drugs of abuse in their patient's system at the time a specimen collection.[19]

116.    I disagree with this statement in the Sales Manual. Treatment providers may wish to know the presence or absence of certain drugs of misuse on specific patients at times. But the provider may simply use a point-of-care (POC) cup. A clinical laboratory is not required to perform the testing, and the quantitative urine drug values or enormous number of tests typically sold to Medytox clients are definitely not medically necessary.

117.    The Sales Manual also instructs that "all specimens must undergo so-called validity testing at the laboratory in order to ensure that the specimen has not been diluted or adulterated in any manner, which will also cause incorrect or invalid results."[20] But while Medytox appears to know that validity testing is part of doing a panel of drug tests, I observed multiple examples where Medytox routinely inappropriately billed for validity testing as an unbundled code in addition to bundled drug tests.

118.    The Sales Manual also instructed that physicians needed to know the quantitative levels of drugs in the urine to manage their patients,[21] which, as previously mentioned, is simply untrue. The Sales Manual also stated that psychiatric practitioners have an "important need to measure the presence of prescribed medications in their patient's system in order to adjust treatment plans where necessary, as do urologists, endocrinologists, general practitioners, osteopaths and even OB/GYN's" – which is a medically absurd statement.

119.    From my review of the Sales Manual, Medytox incentivized its sales representatives to maximize revenues. Specifically, the Sales Manual stated:

> [Y]ou have joined Medytox with the understanding that you shall be remunerated with the percentage of monies collected by ARC medical billing for each client that is attributed to you. While this is our commitment to you, the power to increase your monthly commission checks lies squarely in your own hands is a direct result of your own sales efforts, coupled with your ability to ensure that when signing a new client, you have done your utmost to reach

---

[19] LABS00550343.

[20] *Id.* at 7.

[21] *Id.* at 7, 16.

agreement with that client for the provision of as many Medytox products and services as possible.

120.     The Sales Manual includes some statements about practices prohibited by law. For example, it states, "while we do not advocate for clients engage in frivolous or unnecessary testing, and indeed are **expressly prohibited by law from encouraging clients to perform unnecessary tests**, it is logical that revenues are higher from client to specify that there submitted samples undergo confirmation testing not only of positive results but also of negative results".[22]

121.     The Sales Manual instructed that, "when meeting or communicating with the clients, you should always be probing, in a polite and professional manner, to determine whether the client is open to expanding their relationship with us by allowing us to provide them with additional services, such as billing, or additional testing opportunities, whether the confirmation of negatives, the addition of further tested substances to the current panels, or similar." In my opinion, the commission-based payment structure incentivized the Medytox sales representatives to engage in "Up-Selling Additional Products and Services." In a general business environment, there is nothing wrong with up selling the company's product and services to its clients. But in the case of billing for medical services, products and services should only be billed to a health plan if they are medically necessary for the care of an individual patient.

122.     In my opinion, simply stating in conclusory fashion that Medytox does not encourage engaging in inappropriate and unnecessary testing in no way negates the fact that their entire business model – and multiple patterns of grossly inappropriate billing protocols which I will describe later – demonstrates clearly that this is indeed their underlying business practice.

123.     The Sales Manual acknowledges that Medytox is subject to the Federal Anti-Kickback Statute and the False Claims Act for any services paid for by a federal health care program such as Medicare and Medicaid. The Sales Manual further states that Medytox does not accept or test samples from Medicaid members.[23] Rather, Medytox's target clients are those with primarily commercially insured patients and they do not accept or test samples from Medicaid members.[24]

124.     The Sales Manual also makes clear to sales representatives that their "**primary function as a Medytox Account Executive is to sell our UDT testing services.**"[25] However, the Medytox sales representatives were also told to "pursue the opportunity to engage the client for the provision of Medytox's blood sample collection and testing services", where they would provide a licensed phlebotomist to collect blood samples and transport them back to their lab.

125.     The Sales Manual makes various statements about "chain of custody," and claims that definitive tests are "forensic tests", which I note are examples of some of the clinically

---

[22] *Id.* at 23.
[23] *Id.* at 72-80.
[24] *Id.* at 41.
[25] *Id.* at 8.

nonsensical and incorrect concepts that are contained in the Sales Manual but are otherwise beyond the scope of this review.[26]

126.    The Sales Manual instructs the sales representatives to have each new client complete a "Client Registration Form," which, among other things, would enable Medytox to "legally take custody of, perform testing on and generate bills for their submitted patient samples the client registration form encompasses several pages including software access registration form and recurring provider acknowledgment and consent form as well as a laboratory test panel and POC test selection sheet",  which could only be signed by "the physician in charge, owner, Medical Director or Executive Director of the client".

127.    After the client registration form was completed, the Sales Manual instructs that their "colleagues at corporate headquarters will use this information to arrange for the setting up of a new account in all respects. One way in which the information contained in the client registration form will be used will be as a basis for the creation of the Chargemaster, a confidential internal form that summarizes the tests that will be performed for the client and serves as the basis for the billing that will be performed by ARC once testing begins".

128.    The Medytox Sales Training Manual states that "testing cannot begin until the Chargemaster has been created by corporate based on the information supplied by you in the completed Client Registration Form" – but that "you most likely will never see the Chargemaster for any of your clients." This is suspicious in my opinion, as the sales representatives were promised a percentage of the revenues from these relationships and billings, which was shielded from the actual contract. I can not imagine any reason for this other than that the Chargemasters themselves may have contained information about inappropriate financial relationships between the clients and Medytox.

129.    The Sales Manual also informed the sales representatives that one of the reasons that doctors, such as pain management specialists, may do drug testing is "to eliminate the possibility of being labeled a "pill mill" provider, by properly and legitimately testing patient urine on an ongoing basis, and by considering the results of UDT testing when devising or amending the patient's plan of care."[27] But avoiding being labeled as a "pill mill" provider is not the standard by which to measure proper urine and drug testing. Rather, the guiding principle should be medically necessary drug testing, in which the provider must consider the results of drug testing when devising or amending the patient's plan of care – which includes doing further testing.

130.    The Sales Manual also indicates that, while a POC test "can provide the treating physician with an immediate indication of the presence of certain drugs and substances in patient's urine", if instead urine for presumptive testing was sent to their labs, the report was "usually made available to the client within 24 hours from the time that the urine sample was collected", and that a report on confirmation testing results "is usually made available to the client within 72 hours from the time that the urine specimen arrived at our laboratory".[28]

---

[26] *Id.* at 7, 13.
[27] *Id.* at 30.
[28] *Id.* at 11.

131.    But claims data shows that Medytox was billing for definitive testing done routinely and repeatedly at very high frequencies, such as every 1-3 days, which means Medytox knew that the treating physician would likely not have the results of one test back before one or more other urine specimens were tested. This contradicts the statements in the Sales Manual about the appropriate use of drug testing in treatment planning. Regarding the need to "consider the results of UDT testing", the actual Turn Around Time for the lab results provided by Medytox was often in excess of the frequency of testing, rendering it impossible that the results of the tests would be available for review and analysis the physician for the "devising or amending the patient's plan of care" regarding the next urine drug tests.

132.    The Sales Manual also indicated that selling a POC cup to be billed by the facility to the health plan would provide them less income than selling a POC cup for the urine to be sent to the Medytox labs.

133.    The Sales Manual states that Medytox's "target market includes all types of treatment centers", and then provided "a comprehensive listing of the various such types of centers." This list is clinically absurd, in my opinion, as it includes "Intensive Outpatient Programs (IOPs)," "Counseling (Individual, Group or Family)" and "Sober Living."[29]

134.    Typically, Intensive Outpatient Programs (IOPs) did not and currently do not have physicians with ability to order and monitor drug tests as core elements of their program; "counseling" is not a type of treatment program, and counselors are not qualified to engage in ordering and interpreting drug tests; and sober living facilities are not treatment at all.

135.    In my review, a large number of contracts were inappropriately made with sober or transitional living programs.[30]

136.    These are housing programs – not treatment centers. If a landlord or sober living center has a policy that residents must pass drug tests to remain in that housing, this is a housing requirement – not an indication of medical necessity for drug testing. Submitting medical procedure claims to a health plan can only be legitimately done for medically necessary procedures.

**B.    Medytox's Standing Order Sheets**

137.    The lab orders could only be legitimately signed by a physician or Advanced Practice Clinicians ("APC")[31] as part of the treatment plan of that clinician. It would be the clinician who states they require the testing and was going to review and use the results in treatment. While physicians may rarely do house calls, they typically treat addiction in outpatient treatment offices or facilities, or inpatient treatment settings, not in non-clinical housing centers.

---

[29] *Id.* at 26.
[30]    *See, e.g.,* LABS01151806;    LABS00495934;    LABS01207420; LABS01213759; LABS01212297.
[31] When I refer to physicians in this report, I intend to include all APCs as well.

For testing to be medically necessary, a test must specifically be done at the request of the physician with the information provided back to the physician to make treatment decisions.

138.    These standing lab order sheets, when coupled with the test results, claims data, and the information provided to the health plan to justify the billings, show clearly the standard operating procedures of Medytox with grossly inappropriate systematic billing for lab testing services. Medytox updated their order forms over time, but the forms are, in my opinion, to a large degree, internally non-sensical in their approach.

139.    The standing orders were not medically necessary on their face, because they were not individualized or customized for each patient's specific treatment.

140.    For example, some indicate Medytox should "confirm positive and negatives," even when there were no presumptive tests done or presumptive test results noted.[32]

141.    Many standing orders – if not most of them – contained check marks for both "POC" and "panel," although in practice these appear to have been the same. However, the lack of internally logical standing orders does not appear to have deterred Medytox for billing Cigna for lab testing.

142.    Medytox often submitted for billing large panels of definitive testing no matter the outcome of the presumptive testing, or indeed the actual order sheet, which represent clearly inappropriate and medically unnecessary billing.

143.    The very existence of standing orders which were billed for very large panels of definitive testing without presumptive testing is, on the face of it, contrary to the concept of medically necessary testing. In addition, large panels were generally not individualized, as is seen in multiple claims specimens obtained from the same Medytox client on different patients. However, this appears to have been a repeated pattern of conduct by Medytox.[33]

144.    The documents reviewed provide little, if any, evidence that that these test results were used in the care of patients. The protocol of standing order testing for huge panels appears to have led to repeated, and large, batteries of medically unnecessary testing being done even when the patient's submitted urine was repeatedly not consistent with human urine.[34] This document shows that a standing order from 2012 was used in 2014 to justify these billed tests - contrary to the essence of medically necessary testing.[35]

145.    The large panels were stacked with tests which were clearly not medically necessary. In addition to routinely running antidepressants, and then of nicotine metabolites, at

---

[32] *See* LABS00490873.
[33] *See, e.g.,* LABS00492505; LABS00495934; LABS00495787; LABS0049572; LABS00495729.
[34] *See, e.g.,* LABS00490922.
[35] *Id.*

times the standing orders included running tests for caffeine, which is clinically unnecessary and, in my opinion, ridiculous.[36]

146.   This protocol of testing everyone with the same panel leads to testing for substances not likely to be present because of a given individual patient's history or the community pattern of drug use.[37]

147.   Furthermore, I found numerous instances where Medytox billed for tests that were never even ordered by a physician. For example, one standing order states clearly that only positives should have definitive testing, but a huge series of definitive tests were done and billed.[38]

148.   It appears in some instances that Medytox also billed for blood tests above and beyond what was actually ordered by the physician.[39]

149.   One particularly odd set of orders is seen in a standing order signed March 23, 2013 by Martin Holms, MD.[40] In this signed order sheet, Dr. Holms signs for a 12 panel POC cup, but not for Medytox to run analysis on the urine specimens. This seems to be an original form in color. However, in a document with the same signature date the same day, a copy in black and white shows qualitative and quantitative testing be done on the specimens via new check marks.[41]

150.   Throughout the various client standing orders I reviewed for urine drug testing, I rarely if ever saw any order for routine urinalysis, which was routinely billed for years.

151.   Lab testing can only be legitimately billed to insurance companies or health plans if the service rendered is appropriately ordered by the clinician who needs the information that will be gained in order to treat that patient. The claims submitted must be appropriately coded with allowable codes that described validly the services rendered. But the primary business model of Medytox was based upon selling their lab services by standing orders for frequencies and intensities they would have known were not appropriate. Although their Sales Manual states, "while we do not advocate for clients engage in frivolous or unnecessary testing, and indeed are **expressly prohibited by law from encouraging clients to perform unnecessary tests**", I found that the standing orders that Medytox used to justify its billings in fact encouraged just this frivolous and unnecessary testing. Further, their clients did not perform the testing; rather, Medytox did. And in the documents reviewed for this report, their clients were not coding and billing for lab services performed; rather, Medytox was.

---

[36] *See, e.g.,* LABS00491367.
[37] *See, e.g.,* CIGNA19-1326 0007980 (Invoices # 1007221600159 and # 1008231601369) (patient with a single diagnosis of uncomplicated alcohol use disorder had multiple tests for large batteries of substances billed Epic inappropriately billed for panels of definitive drug tests done 7/18/16 (22+ drug classes) and 8/18/16 (8-14 drug classes), totaling of over $1,170).
[38] *See, e.g.,* LABS00492638.
[39] *See, e.g.,* LABS00491170.
[40] LABS01209886.
[41] LABS01216100.

152.     Medytox had a subsidiary company, Medical Billing Choices (a/k/a/ ARC Medical Billing) ("MBC"), which Medytox used for its own billing but also sold these billing services to their clients, which according to the Sales Manual "indicates that they either want to improve their collections, streamline their accounts receivable process or outsource the billing and accounts receivable process in its entirety to a third party".[42]

153.     Medytox touted these billing company services as a distinguishing feature of its toxicology testing services business: "While many companies offer clinical toxicology testing services, Medytox is unique in its ability to offer its clients the flexibility and convenience of outsourcing their complete billing and collection function to a fully automated, highly experienced and streamlined team of competent accounts receivable professionals who know the codes, processes and procedures necessary to maximize cash flow and revenue..."[43]

154.     Interestingly, Medytox is claiming a competitive advantage over other drug testing companies due to its ability to use codes to "maximize cash flow and revenue". Medytox does not claim that its "billing and collection function" staff know the proper, allowable, legitimate codes for billing – only that MBC knows the codes to maximize income. Medytox tells its sales representatives that "your colleagues at ARC Medical Billing are American Collection Association certified." Medytox does not state that the staff at MBC hold any certifications as Medical Coders through any of the major coding credentialling organizations such as the Practice Management Institute, American Health Information Management Association, or the American Academy of Professional Coders - or indeed have any professional experience in healthcare coding and billing.

155.     The emphasis is entirely on collecting money billed with the highest codes to provide the most revenue and cash flow, rather than the ability to correctly and legitimately bill health plans for lab testing services.

156.     The Sales Manual instructed the sales representatives to "include a discussion" of the services provided by [MBC], and benefits inherent in using their range of services, in every meeting with prospective clients."

157.     My analysis of the documents available is that with Medytox's emphasis on "selling" as many high-income producing products and services to clients as possible, the actual requirements for legitimate medical orders for tests, the medical necessity of the tests, and appropriate billing for tests, were grossly ignored.

## II.     Claims for Urine and Blood Tests Submitted to Cigna by Medytox Demonstrate Systematic Inappropriate Billing

158.     Based on my review of the documents and claims data from Cigna, it is my opinion that Medytox engaged in systematically inappropriate and unallowable patterns of drug testing and billing, which resulted in grossly excessive charges of lab testing services to Cigna. My analysis

---

[42] LABS00550354 at 13.

[43] *Id.*

of Medytox's claims shows that they engaged in multiple patterns and protocols of drug testing and billing in violation of appropriate and standard practices.

159.    Below, I describe 3 main themes of inappropriate drug testing and billing practices on the part of Medytox that I identified: (A) inappropriately high utilization of urine testing that is not medically necessary, (B) inappropriate drug testing and billing for blood testing, and (C) use of improper billing codes. I will take each theme and discuss some examples of each briefly in turn, then provide examples showing how these patterns were broadly present in the claims reviewed. The examples provided are simply illustrative of the themes I will describe in these claims and should not be considered in any way exhaustive examples.

### A.   Medytox engaged in patterns of inappropriate and medically unnecessary drug testing and billing due to high utilization of urine testing and extremely high charges.

Within this general theme, I will describe examples of inappropriately excessive intensity, frequency, unnecessary specific tests done, as well as exorbitant charges per test.

**Intensity**

160.    Medytox was regularly performing urine drug testing for an outrageously high number of individual substances (high intensity) which could not possibly be considered medically necessary.

161.    As one example, Tab A shows that Medytox billed Cigna for 33 different lab testing codes for a single patient's urine specimen on 11/17/15 and for the same 33 codes two days later, on 11/19/15.[44] This includes some codes for testing only individual substances, such as the rarely used opioid propoxyphene, as well as codes which include multiple tests, such as 80370 which reflects testing for three or more skeletal muscle relaxants and 80334 which reflects testing for six or more serotonergic antidepressants (e.g., Zoloft, Paxil, Prozac, Celexa, Lexapro). On these two days, the data reflects testing on substantially greater than 33 individual tests, which, in my opinion, is far more than could possibly be medically necessary.

162.    This pattern of testing an excessive number of different substances per specimen appears throughout the claims data across the relevant time period, including the other examples of specific patient claims discussed in this report.

**Frequency**

163.    Medytox also had a pattern of testing individual substances at an outrageously high frequency which could not possibly be medically necessary – often running tests on three different urine samples over a four-day period.

164.    For example, Medytox billed Cigna a total of $48,626 for testing on a single patient over approximately a two-month period, for which Medytox received more than $29,800 in

---

[44] Appendix E, Examples, Tab A.

reimbursement.[45] Medytox billed for 23 different tests usually performed two or three days in a row, approximately weekly. Medytox performed 23 tests and billed $2,860 on each of May 14, 15, 20, 21, June 4, 5, 6, 9, 11, 13, 16, July 8, 9, 10, 15, 16, and 17. This pattern of excessively frequent testing cannot be medically necessary.

165.    As another example of this inappropriately high testing, Medytox billed for drug testing on a patient between January and April 2014 at an excessively high frequency. Tests were performed on January 8, 9, 14, 15, 21, 22, 23; February 4, 5, 6, 11, 12, 13, 18, 19, 20, and so on.[46] This frequency is, again, clinically absurd. This testing could not be used to treat the patient, and the tests chosen could not possibly be individualized to the patient based upon recent drug use information. This type of testing continued through April 8, 10 and 11, with 22 different codes repeatedly billed per specimen. The billings contained codes for UA which was not medically necessary, as well as pH. In less than 4 months, Medytox billed Cigna $169,086 in drug testing for a single patient.

166.    In my opinion, the frequency of this testing cannot be medically necessary for multiple reasons. First, the length of time many of these substances remain in the urine can last up to several weeks, and therefore this kind of testing for enormous numbers of these substances cannot be anticipated to provide information needed to treat the patient. Second, given the high frequency, is it doubtful that the ordering clinician could have even seen the results of most, if any, of these tests before the next extremely large battery of tests was run on the patient's next collected urine specimen. As discussed above, if the information is not being used to treat the patient, the testing is not medically necessary.

167.    These two examples are not outliers. They are illustrative of regular patterns reflected in the claims data. While there are some patients for whom testing was performed on a single day or once monthly, the pattern was for Medytox to test many, if not most, patients at an excessively high frequency similar to the two examples above. Some additional illustrations of other high frequency billings are found in examples HF1-HF12, which will be discussed later.[47]

### Unnecessary specific tests

168.    There were tests routinely done and billed for specific substances which could not be considered medically necessary because they could not be anticipated to make any difference in the care of patients. While in my opinion, the Medytox claims show patterns of excessive tests for a range of different opioids, muscle relaxants, "spice" (which are synthetic cannabinoids), and other drugs of misuse, there was also routine testing for drugs which simply cannot be expected to provide any information to assist in the treatment of patients with pain or addiction and therefore could not be possibly considered to be medically necessary.

169.    For example, testing for medications that are not misused, such as antidepressants, are not medically necessary, and yet Medytox routinely running these tests. For example, Medytox

---

[45] Appendix E, Tab B.
[46] Appendix E, Tab C.
[47] *See* Appendix F, High Frequency Billing Examples.

was routinely conducting Tricyclic Antidepressant ("TCA") screens.[48] Medytox regularly billed for a variety of different antidepressant classes, such as a panel covering 6 or more of the TCA or other cyclic antidepressant class, and also the Serotonergic antidepressant class (Prozac, Zoloft, Lexapro). The drug testing standing orders that I reviewed did not even list the serotonergic agents as options to be ordered for testing. This type of medically unnecessary testing for antidepressants is prevalent throughout the claim data.

170.    Another example of a test that Medytox was performing that is clearly not medically necessary is of the nicotine metabolite, cotinine. This substance was part of the list of offerings sold to Medytox clients, and when the standing order selected this substance, it appears that the nicotine metabolites quantitative urine levels were intended to be tested on all urine specimens.[49]

171.    Interestingly, the fact that a check mark was made on the order sheet does not mean that Medytox actually performed the test on those patients. The example seen a previous attachment of an order, billings and test results, shows that while the test for cotinine was checked off for definitive testing on the master list, it does not seem to have been done on this particular patient, perhaps related to the billing codes utilized.[50]

**<u>Exorbitant charges</u>**

172.    Medytox was also inappropriately charging enormous amounts for specific tests far beyond reasonable and customary amounts, as demonstrated in Tab E.[51]

173.    For example, with respect to the code G0431, or multiple class drug screen, in June 2014, from date of service 5/5/2014 through 6/4/14, Medytox billed $400 for each test done on 8 different days.[52] Beginning 6/11/2014, they billed the same services at $1500 on 9 different days through 7/12/2014.[53]

174.    This Cigna member's medical claims for this OON provider were paid at 80% of billed charges.[54] By arbitrarily increasing the charge for the identical drug screen from $400 to $1500, Medytox increased its revenue for this screen from $320 to $1200 for each specimen tested.[55]

175.    In another example, it is noted that while Biohealth had been billing in 2012 for small amounts per claim for routine blood work, that changed in 2013 when BioHealth began

---

[48] Appendix E, Tab D.
[49] *See* LABS01205782.
[50] *See* LABS00495787.
[51] Appendix E, Tab E illustrates this pattern of over-charging and its effects in revenue for Medytox.
[52] Appendix E, Tab E
[53] Appendix E, Tab E
[54] Appendix E, Tab E
[55] Appendix E, Tab E

billing primarily very high dollar amounts for urine drug testing.[56] This makes financial sense, seeing that in 2012, PB Labs was billing multiple urine samples over $2000 each day[57] In fact, in 2012, PB was billing over $213,000 for urine tests on one person over a 6 month period .[58]

176.     By grossly overcharging in this manner, it is my opinion that Medytox's coding and billing practices was able to take advantage of Cigna's claims payment systems, which rely on the providers to submit only those claims for services that are medically necessary and at reasonable rates.

**B.     Medytox engaged in a pattern of billing for medically unnecessary blood testing.**

177.     The data reflects that, in 2012, BioHealth was seemingly billing Cigna for normal patient blood work.[59] The occasional normal blood test it was doing in 2012 billed out at about $170-$330. At some point, this pattern changed and Medytox began billing for medically unnecessary blood work.

178.     A few illustrative examples of the medically unnecessary blood work for which Medytox was billing Cigna are reflected on Tab J showing claims from PB Labs for four patients in 2013 and 2014 and Tab K which shows claims from Epic in which a single day's blood work for medically unnecessary testing was typically billed over $2,000.

179.     The data reflects two major improper practices. *First*, an excessive number of individual tests were purportedly performed to evaluate the reasons for abnormal screening tests – but these tests were done on the same day as the screening tests without a diagnosis to support the tests.[60]  These types of tests included full sex hormone panels, as well as thyroid tests and other hormone tests. As I stated earlier in this report, it is not medically necessary to test for causes of abnormalities unless and until those abnormalities are identified. The diagnoses provided as the justification/reason for the testing simply did not support the medical necessity of these tests.

180.     Abnormalities in the reported diagnoses are suspicious for false billing. Multiple patients had suspiciously the exact same diagnoses, in order, listed to describe their medical conditions and to justify the lab work.

181.     For example, in the PB 2013 and 2014 examples in Tab J, 3 of the 4 patients had the same diagnoses in the same order: "UNSPECIFIED HYPOTHYROIDISM; DIABETES MELLITUS WITHOUT MENTION OF COMPLICATION, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED; PURE HYPERCHOLESTEROLEMIA. [61]

---

[56] *See* Appendix E, Tab G.

[57] *See* Appendix E, Tab H.

[58] Appendix E, Tab I.

[59] Appendix E, Tab F.

[60] Appendix E, Tab K.

[61] Appendix E, Tab J.

182.     In the Epic 2016 and 2017 data sheet,  the 6 patients' claims show that each of those patients' diagnoses, in order, were "OTHER LONG TERM (CURRENT) DRUG THERAPY; OTHER MALAISE; ENDOCRINE DISORDER, UNSPECIFIED."[62]

183.     It is highly unusual to have so many patients with the exact same diagnoses, and it is suspicious that these are not valid diagnoses. It is also highly unusual to see so many tests re-run within a few months, with 2 of these 6 Epic examples showing that pattern. Importantly, the 3 listed diagnoses would not justify the full batteries of tests done on these patients as being medically necessary.

184.     *Second*, not only are the diagnoses provided suspicious for false billing due to the repeated use of the same diagnoses for different patients getting the same huge number of unnecessary tests, there is another suspicious pattern indicative of providing false diagnoses as the rationale for excessive blood testing. Tab L shows multiple different and internally incoherent diagnoses reported on the same patient for labs on the same date.[63]

185.     For example, for one patient who had blood testing done on 6/11/2013, Medytox submitted multiple different claims with different codes and diagnoses to Cigna:

- A claim for a normal comprehensive metabolic panel, blood count, glycosylated hemoglobin, and a routine urinalysis were billed with a diagnosis of diabetes mellitus. This group of tests alone is internally consistent with the diagnosis provided.
- A different claim for a lipid panel with a diagnosis of pure hypercholesterolemia
- A different claim for a Vitamin D level for with a diagnosis of hyperparathyroidism
- A different claim for an estrogen (estradiol) level with a diagnosis of other ovarian hyperfunction
- A different claim for 2 sex hormones and a thyroid test with a diagnosis of unspecified hypothyroidism
- A different claim for a progesterone hormone level with a diagnosis of adrenogenital disorders
- A different claim for a prolactin hormone level with a diagnosis of psychosexual dysfunction with inhibited sexual excitement
- And yet another different claim for a testosterone level with a diagnosis of screening for unspecified condition.

186.     This jumble of different diagnoses are, in my opinion, non-sensical in combination, with a different diagnosis for each different claim submitted. To me, it suggests that someone filled in different diagnoses that they thought might justify the testing and sent them in multiple different claims.

---

[62] Appendix E, Tab K.
[63] Appendix E, Tab L.

187.    It is not reasonable to believe that an ordering clinician put each of these diagnoses on an order slip to justify this range because they do not clinically align as any unified medical whole. In my opinion, these claims with conflicting diagnoses are most likely to  have been added by someone who was not a clinician ordering these tests, and the diagnoses were added to justify billing these medically unnecessary tests.

188.    Again, this is a pattern of an inappropriately large number of diagnoses which are medically unintelligible when taken together, provided in multiple different claims submitted on the same date for the same date of service. It is another aberrant pattern seen in multiple claims, as seen even in the PB 2013 2014 data sheet.[64]  The pattern described here is not of a lone, single billing error, but a repeated billing protocol.

### C.    Medytox engaged in patterns of billing not consistent with legitimate, allowable billing practices.

189.    As previously explained, certain coding and billing practices are not allowable and considered not legitimate billing. I will focus on just a few of the improper billing and coding patterns reflected in the claims Medytox submitted to Cigna.

190.    Medytox routinely billed more than one definitive G0480-G0483 code panel per day. Again, it is not allowable to bill codes for any combinations of these which represent 1-7 definitive drug classes per day, 8-14, 15-12, and 22+ drug classes per day. Tab M shows the ongoing patterns of billings for 4 example patients in 2016 and 2017, but simply looking through the claims sheets shows the repetitive nature of this kind of aberrant billing process at Medytox.

191.    Epic billed these codes together in a large number of claims from 2016 through December 2017 (the last month of claims available for review). The pattern here is not of incorrect billing followed by correct re-billing once the claims were denied and Medytox changed to appropriate procedures. This is known by checking the invoice numbers and affiliated dates of the claims, which show the pattern of double billing on the very same claim submission.

192.    As an example, Medytox began billing inappropriately for drug tests for a patient in 2016.[65] Medytox billed both the G code for total number of definitive tests done **plus** individual additional tests. This represents unallowable double billing, by billing for tests through both a bundled and unbundled code.

193.    In addition to this type of double billing, these claims show 4 patterns of improper billing seen broadly through the claims data reviewed:

        a.    Medytox had a pattern of billing for routine urine analysis (UA) which is not medically necessary to accompany urine drug testing and which did not appear to have been ordered on the urine testing documents, and rarely in general lab (including blood) testing orders.

---

[64] *See* Appendix E, Tab J.
[65] Appendix E, Tab N; Appendix E, Tab O.

    b.   Medytox had a pattern of billing inappropriately for pH in addition to routine UA testing, which is not allowable as previously discussed.

    c.   Medytox had a pattern of billing for pH and creatinine – although both of these tests are clearly included in the drug test G code that they billed.

    d.   Medytox had a pattern of double or unallowable billing by unbundling s represent 2 additional forms of inappropriate double billing by unbundling specific drug tests from the testing bundled panels (such as G0480-G0483 codes).

194.    For this illustrative Cigna member, Medytox then settled into a pattern of billing for a presumptive panel and the highest level definitive panel code (22+ drug classes) at a total of about $1,175 approximately twice per week.[66]

195.    Then in June 2016 Medytox began a different way of inappropriately double billing, by intermittently inappropriately adding the definitive code for 8-14 classes to the 22+ drug class code and presumptive panel code, through the last claim available for review on 9/8/16.[67]

196.    In total, in 2016, Epic billed Cigna $86,304 for urine tests on this patient, testing his urine on approximately 50 separate days through September 9, generally with definitive testing on every specimen for which presumptive testing was done, and testing over 22 specific drug classes.[68]

197.    These patterns of billing are not consistent, in my opinion, with allowable and proper billing practices. They appear in other instances throughout the claim data, as is noted by additional examples in Tab M.

198.    Another patient's claims made to Cigna illustrate the lack of focus by Medytox on appropriate billing protocols.[69] These are claims for 3 different dates of testing on this one patient in November 2017, show several of the aberrant patterns of coding and billing discussed:

- On 11/10/2017, Medytox billed for DOS 11/02/2017, the presumptive panel (80307) and the 22+ definitive panel (G0483) was joined by an inappropriate additional unbundled doubled bill with a code for opiate tests.

- On March 7, 2018, Medytox billed for a DOS 4 months earlier, 11/06/2017, with inappropriate unbundling of tests, consisting of 28 different tests billed, including 3 types of antidepressants, opiates, opioids, oxycodone, and others, rather than using the correct G-codes. They also billed for routine urinalysis, creatinine, and pH.

---

[66] *See* Appendix E, Tab N; Appendix E, Tab O.
[67] *See* Appendix E, Tab N; Appendix E, Tab O.
[68] *See* Appendix E, Tab N.
[69] Appendix E, Tab P.

- On 11/24/17, Medytox billed for DOS11/13/17, Medytox billed an internally consistent claim with the codes for a presumptive and 22+ definitive panels

199. It is unusual to see a bill 4 months after the date of service, but the bills sent for the first 2 dates of service show different inappropriate billing protocols – but these protocols were seen for many patients.

200. Regarding the pattern of Medytox billing of creatinine and pH and routine UAs, it should be noted that starting on January 1, 2012 (the first date of the spreadsheet claims data available for review), PB Labs was billing for urine drug tests and inappropriate routine urine analysis (UA) as well as the creatinine and pH that were subsumed under the other codes.[70] This is a standard pattern seen broadly in the claims.

201. In addition, Medytox would routinely submit one claim for 20 substances with definitive tests performed on the same date they submitted another claim for 5 screening and UA tests done (drug screen G0431, UA, spectrophotometry with analyte not specified, creatinine and pH). In total, over a period of about 2 months, for urine drug tests (and inappropriate standard UA, creatinine and pH testing), Medytox billed Cigna over $74,395 and received $48,011.[71]

## D.  Representative Examples of Medytox's Improper Practices

202. Taken as a whole, the combination of excessive intensity, frequency, and amounts billed per test, as well as the excessive duration of testing in some patients resulted in exorbitant amounts billed to Cigna. These patterns clearly indicate a pervasive system of overbilling for testing services where no medical necessity can possibly be inferred.

203. Below are several representative examples to illustrate the patterns described above.

204. For one BioHealth patient, from 1/3/2014 through 4/10/2014, Cigna was billed more than $341,947 with dates of billing for these services continuing to 6/5/2015, over a year after the purported date of service.[72]

205. These billings contained codes for UA which was not medically necessary, as well as pH and creatinine which are not allowed with the drug screening codes and UA codes billed. An excessive number of tests, about 22 codes, were routinely billed per urine specimen. These enormous amounts were not simply billed by BioHealth, or just in 2014. Analysis of billings from 2015 by Epic shows the same patterns of medically unnecessary and grossly inappropriate billing discussed above.

206. As another example, in February 2017 Medytox re-billed for many tests for which they had been paid by Cigna 1-2 years earlier.

---

[70] *See* CIGNA19-1326 0007530, CIGNA19-1326 0007983.
[71] Appendix E, Tab E.
[72] Appendix E, Tab Q.

207.   For one individual Cigna member, example patient HF1, claims were made to Cigna for one member from 1/05/2015 – 12/17/15 totaling $668,762 for which they received $225,434.[73]   Note that Medytox delayed billing for these alleged tests and did not actually provide a first bill to Cigna until 3/16/2015, which is suspicious in timing. It cannot be determined with the data available whether these tests were actually performed. The extraordinarily high and medically unnecessary billings for urine tests for this one patient were purportedly performed on approximately these dates:

- January 5,6,8,12,13,16,19,23
- February 6,9,13,16,17,18,20,23,24,27
- March 2,3,6,9,10,12,13,16,17,19,23,24,31
- April 2,3,6,7,9,10,17,20,21,23,30
- May 4,5,11,12,31
- June 1,15,18,22,25,29
- July 2,6,9,13,16,21,23,27,30
- August 3,6,10,17,20,24,27,31
- September 3,8,10,14,17,21,24,28
- October 1,5,8,12,15,19,26,29
- November 2,5,9,12
- December 10,17

208.   In other words, Medytox billed Cigna for drug testing that was performed approximately every 4 days for an entire year. The frequency of this testing is clinically absurd and, in my opinion, cannot possibly be considered medically necessary. In addition to the excessive frequency, Medytox charged unreasonable amounts for the tests performed. Medytox also performed tests that could not possibly be medically necessary, such as for antidepressants, and was improperly unbundling codes such as routine urine analysis, pH and creatinine billed on the same day/sample as UA and drug tests. All of these deviations from the acceptable practice of medical billing led to this outrageous amount billed to Cigna for drug testing for a single patient.

209.   As a further example of the inappropriately large amount and inappropriate processes used in billing by Medytox, multiple claims for testing on a single day of service for a different patient are illustrative.[74] For tests reportedly done on 1/16/15, many different claims were submitted with multiple tests billed per claim, totaling $8,223.  These claims were submitted over 3 different months. A large list of tests (including TCA and serotonergic antidepressants, pH, UA, many definitive tests) were billed in April of 2015 and were paid in May. Medytox also billed for a number of presumptive tests in April with 80301 and several 80302 codes totaling over $1,500, which were denied. Then in June Medytox billed $1,500 for G0431 drug screen panel (and was paid the "reasonable and customary" amount of $108.86). And although Medytox had been paid for the claims made, in September it re-billed what appear to be all the amounts that had previously been billed and paid (38 test codes in total).

---

[73] Appendix F, High Frequency Billing Examples, Tab HF1.
[74] Appendix E, Tab R.

210.    In other words, the pattern of billing is suspicious for tests not having been done, for tests which could not be legitimately billed in combination, billing both unbundled and bundled tests for the same substances in different months for the same date of service, billing in extreme excess of reasonable and customary charges, and billing for claims already paid. These types of patterns are seen in multiple claims on this one patient and represent, in my opinion, improper billing practices which are not allowed under legitimate billing to health plans for laboratory tests.

211.    The billing practices Medytox employed this one patient are the same improper practices employed for several other patients. The same types of practices are seen in the 12 provided examples in Appendix F (Patients HF1-HF12), which I will discuss briefly.

212.    For Patient HF 2, testing was done so close together that it is not likely that the results of one test could have been provided to the ordering physician before the next ordered testing was done.[75] While an occasion may arise where testing may need to be done on consecutive days, it is not appropriate to see this as the repeated pattern of testing on March 2,3,4,6, 9,10,12, 16,17,19, 20, 23,26,27,30,31 with the pattern continuing in April. It is simply unnecessary for drug testing to occur more than half the days in a month. For 2 months of urine testing, Medytox billed over $184,000 and received over $83,000 from Cigna for this member.

213.    For Patient HF3, similar patterns of high frequency and high dollar amounts, unnecessary numbers of testing, and so on occur.[76] There is also a repeated example of both bundling and unbundling tests in billing $262 for "Antidepressants, tricyclic and other cyclicals; 6 or more" (80337) which began to be denied around January 2016 for dates of service around October 2015. These claims were not denied due to improper codes, but these bundled tests were denied due to lack of medical necessity, Medytox then inappropriately unbundled the tests and re-billed them in May 2016 for the individual tests of the cyclic antidepressants amitriptyline ($97), desipramine ($93), nortriptyline ($73), imipramine ($93), and doxepin ($84). In fact, Medytox re-billed multiple denied tricyclic tests from October, November, and December 2015 by unbundling them in Mary 2016. In my opinion, this is a concerted effort on the part of Medytox to get around the determination that these tests were not medically necessary by billing inappropriately, unbundling and re-billing for each of the appropriately denied tests. In total Medytox billed Cigna over $149,000 and received over $48,000 for testing done over a 6 month period.

214.    Patient HF3 had blood work done consistent with the medically unnecessary hormone testing (including 9 sex hormones, insulin, cortisol), ferritin (part of a work up for anemia or as a monitoring test with diabetes), while at the same time having normal screening tests done and having no diagnosis of anemia, diabetes, or suspected endocrine disease.[77] Her only diagnosis was "unspecified drug dependence". In my opinion, this type of over-testing of blood is medically unnecessary.

---

[75] Appendix F, Tab HF2.
[76] Appendix F, Tab HF3.
[77] *Id.*

215.    For Patient HF4, Medytox billed Cigna over $93,000 and received over $71,000 for testing done from 1/2/15- 4/1/15.[78] The same issues of inappropriate billing including for unnecessary tests like antidepressants and urinalysis, medical unnecessary high frequency testing, and unallowable unbundled/redundant pH and creatinine billings are seen.

216.    For Patient HF5, Medytox billed Cigna over $207,000 and received over $56,000 for tests done 7/15-11/16/2015.[79] There were up to 33 of individual tests codes billed for a single specimen on a single day. The persistent inappropriate billing if urinalysis, creatinine and pH, as well as high frequency and intensity also occurred.

217.    For patient HF6, Medytox billed over $221,000 and was paid over $61,000 for testing done through from 4/9/2015- 12/28/2015.[80] Up to 34 test codes were billed per specimen, and the previously described issues with medically unnecessary and non-allowable billings occurred.

218.    For patient HF7, Medytox billed over $141,000 and received over $50,000.[81] In addition to the typical patterns noted, again we see the un-bundling of tricyclic antidepressant billings after the bundled code for service in September 2015 was denied in January 2016, again in May 2016 Medytox re-billed 5 individual tests after inappropriately unbundling them (although again the bundle that Medytox had originally billed was for 6 or more cyclic antidepressants). Medytox was still being paid for a bundle of serotonergic antidepressants, which are not medically necessary and were not seen on as options on any of the standing orders available for review.

219.    For patient HF8, Medytox billed for one patient from 3/3/15 through 6/25/15 dates of service the outrageous amount of $349,000 and received over $148,000.[82] Medytox was billing up to 38 individual test codes per claim. Again, the frequency of testing (often 3 of 4 consecutive days), the intensity of testing with medically unnecessary tests, and billing for unallowable unbundled tests is evident.

220.    For lab work on patient HF9, Medytox billed Cigna over $539,000 and was paid over $274,000 to Medytox in 2015.[83] Up to 38 different test codes were submitted for one day's testing sample. This Cigna member had multiple tests done nearly if not every week from January 5, through December 28, 2015. This is beyond credulity and cannot be imagined to be medically necessary. Again, we see that after the bundled code for 6+ Tricyclics and other cyclic antidepressants was denied in January 2016 with the same language as previously discussed patients ("Utilization Review": "Based on documentation currently on file, these services do not appear to be medically necessary. Your plan provides coverage only for medically necessary. our plan provides coverage only for medically necessary services and supplies."), Medytox in May

---

[78] Appendix F, Tab HF4.
[79] Appendix F, Tab HF5.
[80] Appendix F, Tab HF6.
[81] Appendix F, Tab HF7.
[82] Appendix F, Tab HF8.
[83] Appendix F, Tab HF9.

2016 inappropriately unbundled and re-billed for the same 5 individual antidepressants referenced above.

221.    For patient HF10, Medytox billed Cigna over $522,000 and was paid over $245,000 for tests from January through November 2015.[84] The same issues of clinically absurd high frequency and intensity of tests, billing for unallowable unbundled pH and creatinine, likely un-ordered and medically unnecessary urinalysis and serotonergic antidepressants, re-billing in April 2016 by unbundling 5 cyclic antidepressants denied as medically unnecessary for date of services beginning 8/3/15, billing outrageous amounts above reasonable and customary (as in $1,500 for a drug screen panel paid out at $108) -these patterns are seen with this patient.

222.    For patient HF11, Medytox billed Cigna over $195,000 and was paid over $115,000 for the dates of service January through July 2015.[85] The same issues of issues of clinically absurd high frequency and intensity of tests, billing for unallowable unbundled pH and creatinine, outrageous charges such as $1,500 for a drug screening panel, likely un-ordered and medically unnecessary urinalysis and serotonergic antidepressants are seen.

223.    It is also noted that Medytox rebilled multiple tests on February 10, 2017 which had already been paid in in July 2015 such as PCP, heroin, methadone, oxycodone, and an opioid panel for DOS 6/30/15.[86]

224.    On February 10, 2017, Medytox also re-billed for tests on 6/21/15 which had been paid over a year and a half before, such as tricyclic antidepressants, serotonergic antidepressants, barbiturates, benzodiazepines, and other tests.[87]

225.    On February 10, 2017, Medytox also rebilled for tests paid in July 2015 for DOS 6/18/2015 such as routine UA, creatinine and pH.[88]

226.    While the claims for some patients showed a re-billing in February 2017 for tests billed and paid 1-1.5 years earlier, this pattern was not as strong as the others mentioned in this section.[89]

227.    For patient HF12, Medytox billed a total of over $108,000 and received over $31,000.[90] Also on this patient, Medytox rebilled on February 21, 2017 for lab testing which was already paid a year earlier, in February 2016 for multiple tests done multiple dates. This occurred on a different day than the re-billings for Patient HF11, with Cigna being billed for services on HF12 with examples such as:

---

[84] Appendix F, Tab HF10.
[85] Appendix F, Tab HF11.
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] Appendix F, Tab HF12.

- For DOS of 11/18/15 Medytox rebilled a year after being paid for multiple labs, such as alcohol, and a drug screen panel.

- For DOS 11/11/15 Medytox rebilled a year after being paid for both natural and synthetic cannabinoid tests.

- For DOS 12/2/15, Medytox rebilled a year after being paid they rebilled a year after being paid for both natural and synthetic cannabinoid tests, for alcohol tests, for buprenorphine and fentanyl  and heroin  and other tests.

228.    In the case of patient HF12, we see the same very strong patterns listed above, with rebilling and unbundling of antidepressants after the bundled claim was denied for lack of medical necessity, excessive amounts billed per test, medically unnecessary high intensity of testing, unnecessary and likely unordered urinalysis, medically individual unnecessary tests such as serotonergic antidepressants, and unallowable pH and creatinine billings which are subsumed under the other tests billed.[91]

229.    The examples above are for the purposes of illuminating some of the repeated, pervasive patterns of coding and billing for medical services which were inappropriate, not medically necessary, and did not meet criteria for legitimate billing to health plans.

## FINAL SUMMARY

230.    My review of the documents provided provides an overview of the approach of Medytox to its business. The Sales Manual indicates the intention to find clients who would obtain their patient's urine for testing. Medytox might provide a POC cup specialized for 12 analytes to presumptively screen for drug classes, which could be billed to Cigna by the medical provider or by Medytox. The client may send the urine (or blood) specimens to Medytox, and Medytox would then run a number of presumptive tests and / or definitive tests on the specimen and bill Cigna for tests performed. The tests billed were generally pre-determined and not individualized, which is inconsistent with medical necessity criteria but built into the Medytox model. An enormous amount of billing was sent by Medytox to Cigna for tests which were without a legitimate physician order; were clearly not medically necessary and done at excessive frequency, intensity, billed at amounts far in excess of reasonable and customary charges; and routinely and systematically were outside of legitimate and allowable billing practices.

DATED: March 1, 2023

_____

Dr. Kelly Clark

---

[91] *Id.*

41