# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

---

Civil Action No. 19-cv-01324-JCH

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY and
CIGNA HEALTH AND LIFE
INSURANCE COMPANY,

  *Plaintiff*,

v.

BIOHEALTH LABORATORIES, INC.,
PB LABORATORIES, LLC,
EPIC REFERENCE LABS, INC., and
EPINEX DIAGNOSTICS, INC.,

  *Defendants*.

---

## REBUTTAL  REPORT OF
### Jacqueline Thelian, CPC, CPC-I, CPMA, CHCA

*Jacqueline Thelian*

**Jacqueline Thelian, CPC, CPC-I, CPMA, CHCA**
**Healthcare Consultant**
**Medco Consultants, Inc.**
**May 19, 2023**

1

**Prepared By:** Jacqueline Thelian, CPC, CPC-I, CHCA, CPMA

## Introduction

Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively, "Cigna") filed a complaint on August 27, 2019, which it amended on December 13, 2021 ("Cigna's Complaint"), bringing an unjust enrichment claim, among other claims, against BioHealth Laboratories, Inc. ("BioHealth"), PB Laboratories, LLC ("PB Labs"), Epic Reference Labs, Inc. ("Epic"), and others.[1]  On January 11, 2021, Epic, BioHealth, and PB Labs (individually, a "Lab" and collectively the "Labs") filed a separate amended complaint ("Lab's Complaint"), bringing a breach of contract claim, among other claims, against Cigna.[2] These matters were consolidated on February 2, 2022.  As part of this litigation, the Labs allege that Cigna, during the relevant period of 2012 through 2017, failed to properly reimburse the Labs' covered claims for blood and urine testing services.

## Objective

Counsel for the Labs, Whiteford, Taylor & Preston L.L.P. ("Counsel"), retained me as a testifying expert witness to evaluate documentation related to the Labs' healthcare claims seeking reimbursement from Cigna, along with Cigna's justification(s) for denying such claims. Specifically, Counsel asked me to evaluate and opine on (i) the coding, billing, and supporting documentation for the Labs' covered drug testing claims, and (ii) Cigna's decision to flag and deny reimbursement for the Labs' covered drug testing claims.

This report ("Rebuttal Report") summarizes my findings, comments, and opinions regarding the report of Dr. Kelly Clark to date. My opinions are based upon the information available to me at the time this report was written and are listed in Appendix A. I reserve the right to supplement, amend or revise my opinions if additional information or data becomes available

---

[1] *Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company v. BioHealth Laboratories, Inc., PB Laboratories, LLC, Epic Reference Labs, Inc., and Epinex Diagnostics, Inc., et al.*, No. 19cv01324, in the U.S. District Court for the District of Connecticut.

[2] *Epic Reference Labs, Inc., BioHealth Laboratories, Inc., and PB Laboratories, LLC v. Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company*, No. 19cv01326, in the U.S. District Court for the District of Connecticut.

2

for my review and to respond to any additional expert opinions proffered by or on behalf of the parties to this matter.

I submitted my own expert report on behalf of the Labs in this matter, dated March 1, 2023. My qualifications as an expert were provided in my expert report and my curriculum vitae is attached in Appendix B.

This report addresses the coding and billing opinions of Dr. Kelly Clark's expert report. I am aware that other experts on behalf of the Labs will address the clinical and statistical aspects of Dr. Clark's report.

**Summary of Opinions**

This section provides a brief summary of my rebuttal opinions. The bases for my opinions are discussed and supported herein. Based upon my experience, education, and training, along with the results of my analysis, I have concluded the following:

1. Rebuttal Opinion 1 – Dr. Clark's opinion is inaccurate where she alleges that Medytox created a master order sheet of panels of drug tests for clients to complete and utilize as a default standing order for all drug testing ordered for all of the client's patients, regardless of the clinical diagnosis or treatment of the patient. I find this comment to be inaccurate based upon the scope of services provided by the Labs as well as the onboarding process employed by each respective Lab. Each Lab created a requisition form (order form) based upon the particular tests selected by the ordering physician and/or QHP (qualified healthcare professional).

2. Rebuttal Opinion 2 – Dr. Clark's opinion is inaccurate where she alleges that Medytox designed its business model to obtain the highest amount of revenue by billing for medically unnecessary tests. Medical necessity is determined exclusively by the ordering physician and/or QHP based upon the patient's medical records and those records were not provided to or shared with the Labs. Notably, Dr. Clark's report does not reference

3

the review of any patient medical records. Further, the sales manual referenced by Dr. Clark is incomplete and does not even appear to have been distributed.

3. <u>Rebuttal Opinion 3 – Dr. Clark's opinion is inaccurate where she alleges that Medytox engaged in systematic patterns of inappropriate and medically unnecessary billing for urine tests due to high utilization, excessive dollar charges per test, and testing for inappropriate substances and tests.</u> The tests ordered, the number of tests, the frequency of testing, as well as the substances tested are exclusively determined and ordered by the patient's physician or QHP. Further, out of network laboratories set their own fee schedule, as insurance companies will reimburse at their UCR (Usual Customary & Reasonable) fee.

4. <u>Rebuttal Opinion 4 – Dr. Clark's opinion is inaccurate where she alleges that Medytox used protocols of billing in ways not consistent with legitimate and appropriate use of billing codes, including multiple codes which are not allowable in the same day.</u> CPT (Current Procedural Terminology) codes change frequently, sometimes on a yearly basis. A reasonable period of time is required to allow facilities, insurance carriers and providers adequate time to update their electronic billing systems with the new codes. Additionally, the NCCI (National Correct Coding Initiative) edits are updated quarterly. There were very few instances where Cigna paid unallowable codes.

5. <u>Rebuttal Opinion 5 – Dr. Clark references numerous claim examples which were determined to be irrelevant in this case.</u> Dr. Clark's examples of upcoding and unbundling include line items that were either not reimbursed by Cigna, or Cigna split the payment between two line items, which is their methodology in reimbursing claims.

**Source Documents / Reference Materials**

- ✓ Current Procedural Terminology (CPT) manuals 2012-2017
- ✓ Healthcare Common Procedure Coding System (HCPCS) manuals 2012-2017
- ✓ National Uniform Claim Committee, (NUCC) 1500 Health Insurance Claim Form Reference Instruction Manual June 2013, July, 2014, July 2015, July 2016, and July 2017
- ✓ CPT Assistant, April 2015, Volume 25 Issue 4, Definitive vs Presumptive: The "New" Qualitative/Quantitative Designation for Drug Identification and Testing"
- ✓ Cigna's Definition of Medical Necessity for Physicians

4

✓ CMS Local Coverage Determination (LCD) L36393, Controlled Substance Monitoring and Drugs of Abuse Testing

**Rebuttal Findings**

**Rebuttal Opinion 1** – Dr. Clark's opinion is inaccurate where she alleges that Medytox created a master order sheet of panels of drug tests for clients to complete and utilize as a default standing order for all drug testing ordered for all of the client's patients, regardless of the clinical diagnosis or treatment of the patient.

I find this comment to be inaccurate based upon the scope of services provided by each Lab as well as the onboarding process employed by each respective Lab. Each Lab created a requisition form (order form) based upon the particular tests selected by the ordering physician and/or QHP.

Laboratory requisition forms (order sheets) were developed at the time a client is onboarded to the Lab. During the onboarding process, *the client selected* the delivery method and the users. The *type of panel (preset (a predetermined drug), custom (client selects the drugs))* and how the drug testing is to be confirmed (positive and/or negatives) was selected by the *physician.*[3]

The requisition forms (order forms) are developed to reflect the orders of the physician at each facility and vary for each client. Any similarity between the clients is due to the nature of business, which is mainly drug testing.

**Rebuttal Opinion 2** – Dr. Clark's opinion is inaccurate where she alleges that Medytox designed its business model to obtain the highest amount of revenue by billing for medically unnecessary tests.

Based upon my thirty plus years as a Certified Healthcare Auditor by two separate accrediting organizations, (American Academy of Professional Coders (AAPC) and Association

---

[3] Cigna19-1326 0307522, Cigna19-1326 0306397, Cigna19-1326 0306094, Cigna19-1326 0304516, Cigna19-1326 0303779

of Health Care Auditors and Educators (AHCAE) and as a Certified Coder and Certified Coding Instructor (both from the AAPC), medical necessity is determined exclusively by the ordering physician based upon the documentation in the patient's medical record.

When determining the definition of medical necessity, the ordering physician looks to the insurer's definition as well as the industry standard, which is Medicare as referenced by Dr. Clark.[4]

However, Dr. Clark's reference to Medicare's definition of medical necessity is not specific to the CPT/HCPCS codes related to drug testing. For the CPT codes related to drug testing, Medicare provides specific references to medical necessity. In this case, the Centers for Medicare and Medicaid Service's (CMS) Local Coverage Determination (LCD), and Controlled Substance Monitoring and Drugs of Abuse Testing, provides the following guidance and defines medical necessity as follows:[5]

- ✓ Designates *documentation, by the clinician in the patient's medical record*, of medical necessity for, and testing ordered on an individual patient basis;
- ✓ The *patient's medical record must* include an appropriate testing frequency based on the stage of treatment or recovery, the rationale for the drug/drug classes ordered and the results documented *in the medical record and used to direct care*.
- ✓ The testing frequency must *meet the medical necessity and be documented in the clinician's medical record.*
- ✓ Criteria to establish medical necessity for drug testing must be based on patient-specific elements identified during the clinical assessment and *documented by the clinician in the patient's medical record,* and must include at least the following elements: Patient history, Physical examination and previous laboratory findings, Current treatment plan, Prescribed medication(s), and Risk assessment plan.
- ✓ Testing must be based on *clinician's documented medical necessity and reviewed by the clinician in the management of prescribing/renewing a controlled substance.*

---

[4] Dr. Kelly Clark's expert report, page 20 footnote 18

[5] CMS Local Coverage Determination (LCD) L36393 Controlled Substance Monitoring and Drugs of Abuse Testing

Cigna also defines medical necessity as: "Clinically appropriate, in terms of type, frequency, extent, site, and duration, and considered effective for the patient's illness, injury, or disease," which by definition requires a review of the patient's medical record.[6]

Therefore, there is no question that medical necessity can only be established by the ordering physician based upon her review of the documentation in the patient's medical record. Dr. Clark's report makes no mention of this fundamental requirement necessary to determine medical necessity.

Dr. Clark's references Medytox's Sales Manual as a means of substantiating "a business model designed to obtain the highest amount of revenue," is concerning because the Sales Manual is incomplete and does not appear to have even been distributed. There are many passages in the manual indicating more work needs to be completed before it is finalized. For example: page 15 "Dry Urine Testing: "NEED MORE INPUT FROM YOU GUYS ON THIS" and Dry Blood Spot Testing: "NEED MORE INPUT FROM YOU GUYS ON THIS", page 40, "FRANK IS MAKING A CHART. TO BE INSERTED HERE AS PAGE 38, SCHEMATICALLY SHOWING THE DIFFERENCE AN DISTINCTING BETWEEN US AND OUT COMPETORS", page 46, "ROLE PLAYING EXERCISES SHOULD NOW TAKE PLACE/INSERT PAGE 43 OF FRANK AND STEVE'S ORIGINAL DRAFT HERE." Finally,  page 91 is the best indication the Sales Manual is incomplete as it includes a list of additional information yet to be added.[7]

Nevertheless, I will address Dr. Clark's concerns to the Sales Manual as "being intended to obtain the highest amount of reimbursement." The Sales Manual provides basic information to the sales team regarding the types of services provided, the different types of testing, current state of affairs regarding drug abuse, and the types of facilities that utilize drug testing. Dr. Clark fails to understand that the references in the Sales Manual serve as macro-level descriptions of the drug testing industry and describe common practices in the industry.

---

[6]  https://www.cigna.com/health-care-providers/coverage-and-claims/policies/medical-necessity-definitions#:~:text=%22Medically%20Necessary%22%20or%20%22Medical,injury%2C%20disease%2C%20or%20its%20symptoms

[7] LABS00550343

For example: Dr. Clark's reference to "*The Sales Manual states that Medytox does not accept or test samples from Medicaid members. Rather, Medytox's target clients are those with primarily commercially insured patients and they do not accept or test samples from Medicaid members.*"[8]

Dr. Clark's stated concern is completely misplaced. The U.S. has a free enterprise system of healthcare payment. Each private practice, hospital, lab, or facility has a right to charge what it wants to charge, and which payers it wishes to work with.
Physicians, QHPs, laboratories and diagnostic testing facilities may elect to accept or refuse to accept any type of insurance.

It is common and necessary practice to educate the sales team regarding the types of insurance companies accept. Frequently the physicians/QHPs will ask a given testing laboratory what type of insurances it accepts to determine if that particular laboratory is a good fit for their patient population.

Additionally, because the laboratory does not have direct interaction with the patients during the ordering process, the responsibility falls upon the treating facility, physician, and QHPs to inform their patient population of those insurance companies that provide coverage for the ancillary services provided by any outside testing facilities.

Since the Labs main business is drug testing, it stands to reason that the primary focus for the Medytox Account Executive would be to sell the Urine Drug Testing (UDT) services and ancillary services that would best accommodate the client, including the provision of a licensed phlebotomist to collect blood samples and transport them back to their lab.

Dr. Clark's refence to having the client complete a "Client Registration Form," including a laboratory test panel and POC (Point of Care) test selection sheet,[9] is common practice for all drug testing laboratories.

---

[8] Expert report of Dr. Kelly Clark, page 23, 123
[9] Expert report of Dr. Kelly Clark, page 24, 126

These forms include basic and necessary information. They inform the laboratory how the client would prefer to have the test results delivered (fax, secure email, online, etc.), identify the type of facility, hours of operation, contact person, user access information, notice of privacy practices, POC and billing preferences, and allows the client to set their testing preferences.

The Sales Manual's reference to instructing physicians needing to know the quantitative level of drug in the urine to manage their patients serves to alert the physician of the percentage of inaccuracy of the Point of Care (POC) cups. This information is similar to the information in the CPT Assistant.[10] The CPT assistant provides the following similar information: "In reality, the qualitative tests could test negative when the drug was actually present but below the limits of detection (false negative), as well as test positive when there was a cross reaction with another compound with similar properties (false positives). The quantitative tests not only identified the concentration of drug in the sample but also used lab techniques that uniquely identified the drug reported. For these reasons, it was determined that the terms "presumptive" and "definitive" (rather than "qualitative" and "quantitative") more accurately reflected the codes to be reported."

**Rebuttal Opinion 3** – Dr. Clark's opinion is inaccurate where she alleges that Medytox engaged in systematic patterns of inappropriate and medically unnecessary billing for urine tests due to high utilization, including excessive dollar charges per test, and testing for inappropriate substances and tests.

Each individual insurance company determines what rate services are reimbursed to Out Of Network (OON) providers. For example, insurers may use industry resources such as Fair Health,[11] a percentage above the CMS Medicare database fee schedule, the amount decided by the insurer to be "the usual, customary, and reasonable amount," and in some cases based off the OON providers actual charge billed.

---

[10] The CPT Assistant is a monthly publication from the American Medical Association (AMA) that provides information and clarification regarding proper CPT code usage.

[11] FAIR Health is a national, independent not-for-profit organization dedicated to bringing transparency to healthcare costs and health insurance information through data products, consumer resources and health systems research support.

Cigna reimburses OON providers based upon a Maximum Reimbursable Amount (MCR). Cigna determines the MCR in one of two ways:[12]

1. Using a percentage (selected by your employer) of a fee schedule developed by Cigna using a methodology similar to the one used by Medicare.

2. For some covered services, a fee schedule is not available. In these cases, "the Maximum Reimbursable Charge (MCR) is based on the lesser of the normal charge for the service or a percentile of what other doctors or facilities in your area typically charge for the same service. These charges are based upon information from independent third-party databases."

Since reimbursement rates for OON providers vary from insurer to insurer, most OON providers will utilize a fee schedule based off of the 90th percentile amount to consider the difference in reimbursement from insurer to insurer.[13] Therefore, the rate billed by OON providers is often higher than the in-network contracted rates.

Dr. Clark's report and the examples listed on Appendix E are all focused on the amount of charges billed as opposed to what was actually reimbursed.

**Rebuttal Opinion 4** – Dr. Clark's opinion is inaccurate where she alleges that Medytox used protocols of billing in ways not consistent with legitimate and appropriate use of billing codes, including multiple codes which are not allowable in the same day.

CPT (Current Procedural Terminology) codes change frequently, sometimes on a yearly basis. A reasonable period of time is generally provided to allow facilities, insurance carriers and providers time to update their electronic billing systems with the new codes. Additionally, the

---

[12] How your Out-Of-Network Claims Are Paid

[13] Optum 360 National Fee Analyzer, "If the fee is at the 90th percentile, then based on FH (Fair Health) Medical methodology and data, 10 percent of the charges are equal to or higher than that fee."

NCCI (National Correct Coding Initiative) edits are updated quarterly. There were very few instances where Cigna paid unallowable codes.

Dr. Clark states "Medytox routinely billed more than one definitive G0480-G0483 code panel per day". HCPCS code G0480-G0483 became effective in 2016. When new codes are released, it takes both the insurers and the hospitals, laboratories, diagnostic testing facilities, physicians and QHPs time to update their billing and reimbursement systems with the new codes. Typically, this process can take a year and for some insurers even longer. In addition to updating their systems, there is also a learning curve on how and when to report the new codes.

A review of the charges submitted for HCPCS Codes G0480-G0483 across the entire dataset shows there were one thousand one hundred twenty-seven (1,127) encounters that contain at least one (1) G048x code.  Four hundred and seven (407) of these encounters contain multiple G048x codes billed to Cigna. However, only sixteen (16) of these encounters were reimbursed for multiple G048x codes. These 16 encounters result in a paid amount of $2,754 related to additionally billed G048x codes.

The dates of service for these encounters are in 2016 and the first three months of 2017, which is not an unusual occurrence considering the dates of service are during the code transition period, and the small number of claims reported.

Just three (3) of the thirty (30) encounters included in Clark's Appendix E, tab M, contain multiple G048x codes paid by Cigna.

Dr. Clark also purports to describe inappropriate billing for a G code, by way of billing for a group of definitive tests in addition to billing individual additional definitive tests.

As mentioned above, the new "G codes" became effective in 2016. As is typical with new codes, there is always some confusion regarding how and when these codes would be reported.

A review of this code set (reporting G codes plus individual definitive drug testing codes) for the 2016 – 2017 time period for Epic Labs shows there were twenty- four (24) encounters billed

to Cigna. Only thirteen (13) of these encounters, however, were reimbursed for both a G code and individual definitive drug testing code(s) by Cigna. These thirteen (13) encounters result in a paid amount of $6,329 related to individual definitive drug testing codes.

The dates of service for these encounters were 2016, which is not an unusual occurrence considering the dates of service are during the code transition period and the small number of claims reported.

Just six (6) of the fifty (50) encounters included in Clark's Appendix E, tab N, contain both a G code and individual definitive drug testing code(s) paid by Cigna. The references made by Dr. Clark regarding these billing errors did not consider Cigna's failure to timely update their system to capture the edits for the code set.

When referencing Medytox's improper billing practices, Dr. Clark elects to focus on the billed amounts and not the reimbursed amounts. For example, Dr. Clark references one BioHealth patient with dates of service from 1/3/2014 through 4/10/2014 was billed $341,947.[14] In this case, Cigna reimbursed $30,082.60

As mentioned earlier in this report OON providers will bill at the higher percentile of the fee schedule to take into consideration the various methods of reimbursement from the multiple insurers.

Interestingly, Dr. Clark's report makes no mention of Cigna's denial reason for laboratory claims regarding denial reason 0322 fee forgiveness.

Approximately in December of 2014 Cigna began denying claims for PB Labs for fee forgiveness and approximately in May of 2015 Cigna began denying claims for BioHealth Labs for the same reason.

My opinion on Fee Forgiveness is addressed in my Expert report dated March 1, 2023.

---

[14] Dr. Clark's report Appendix E, Tab Q

12

**Rebuttal Opinion 5** - Dr. Clark references numerous claim examples which were determined to be irrelevant in this case. Dr. Clark's examples of upcoding and unbundling include line items that were not reimbursed by Cigna.

Appendix E representing Dr. Clark's examples of upcoding and unbundling claims is repetitive as it references the same examples. When considering all the data for the claims billed and reimbursed by Cigna with respect to upcoding and unbundling, the claims data supports the following:

| Billing Issue[15] | Billed Occurrences Encounter Count | Paid Occurrences Encounter Count | Associated Payment Amount |
|---|---|---|---|
| Labs billed/paid G0480 – G0483 more than once for the same encounter | 407 | 16 | $2,754 |
| Epic Labs billed/paid G0480 – G0483 in addition to the individual definitive drug testing codes. (CPT 80320-80377, 83993) any time after 10/15/2015 (DOS) | 24 | 13 | $6,392 |
| Labs billed/paid for the following CPT codes 80307, 81002, 81003, 82570 and 83986 along with any individual definitive drug testing code (CPT 80320-80377, 83992) any time after 10/15/2015 (DOS) | 434 | 309 | $7,649 |
| **Totals** | **865** | **338** | **$16,795** |

In Summary

---

[15] Spreadsheets produced by Cigna listing individual claims and claim line components representing all drug testing services performed by the Labs and submitted to Cigna for reimbursement. See CIGNA19-1326 0007983, CIGNA19-1326 0007530, CIGNA19-1326 0007980, CIGNA19-1326 0007979, CIGNA19-1326 0007533, CIGNA19-1326 0007981, CIGNA19-1326 0007531."

13

Dr. Clark's report failed to consider how the Labs operate relating to the onboarding process, training of sales representatives, and the establishment of OON fee schedules.

From a coding and documentation perspective, lack of medical necessity is determined upon reviewing and analyzing the patient's medical records and the referring physician's clinical determination for ordering the test(s) is successfully challenged.  Dr. Clark did not perform a review of any patient's medical record.

Regarding incorrect billing practices, Dr. Clark referenced the same few examples which did not consider the claim lines which were not reimbursed, and which represented claim lines which were billed during the transition period of new CPT codes being implemented.

Appendix A – Documents Considered
Expert Report of Jacqueline Thelian, CPC, CPC-I, CHCA, CPMA

## Case Pleadings & Filings

1. Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company v. BioHealth Laboratories, Inc., PB Laboratories, LLC, Epic Reference Labs, Inc., and Epinex Diagnostics, Inc., et al., No. 19cv1324, in the U.S. District Court for the District of Connecticut.
2. Epic Reference Labs, Inc., BioHealth Laboratories, Inc., and PB Laboratories, LLC v. Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company, No. 19cv01326, in the U.S. District Court for the District of Connecticut.

## Expert Reports

1. Expert Report of Dr. Kelly Clark

## Public Documents

1. Current Procedural Terminology (CPT) manuals 2012-2017
2. Healthcare Common Procedure Coding System (HCPCS) manuals 2012-2017
3. National Uniform Claim Committee, (NUCC) 1500 Health Insurance Claim Form Reference Instruction Manual June 2013, July, 2014, July 2015, July 2016, and July 2017
4. CPT Assistant, April 2015, Volume 25 Issue 4, Definitive vs Presumptive: The "New" Qualitative/Quantitative Designation for Drug Identification and Testing"
5. Cigna's Definition of Medical Necessity for Physicians
6. CMS Local Coverage Determination (LCD) L36393, Controlled Substance Monitoring and Drugs of Abuse Testing
7. https://www.cigna.com/health-care-providers/coverage-and-claims/policies/medical-necessity-definitions#:~:text=%22Medically%20Necessary%22%20or%20%22Medical,injury%2C%20disease%2C%20or%20its%20symptoms
8. Fair Health - https://www.fairhealthconsumer.org/
9. How Out of Network Claims Are Paid - https://littletonpublicschools.net/sites/default/files/Understanding%20Out%20of%20Network%20Claims.pdf
10. Optum 360 National Fee Analyzer
11. Florida's Prompt Pay Statute § 627.6131(6), Fla.Stat.
12. Proper Coding for Specimen Validity Testing Billed in Combination with Drug Testing, MLN Matters Number: SE1800, Article Release Date: March 29, 2018, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/SE18001.pdf

## Bates Numbers Records

- ✓ Cigna19-1326 0307522
- ✓ Cigna19-1326 0306397
- ✓ Cigna19-1326 0306094
- ✓ Cigna19-1326 0304516
- ✓ Cigna19-1326 0303779
- ✓ LABS00550343

- ✓ LABS00535783
- ✓ CIGNA19-1326 0007983
- ✓ CIGNA19-1326 0007530
- ✓ CIGNA19-1326 0007980
- ✓ CIGNA19-1326 0007979
- ✓ CIGNA19-1326 0007533
- ✓ CIGNA19-1326 0007981
- ✓ CIGNA19-1326 0007531

# MEDCO
### CONSULTANTS, INC.

## JACQUELINE THELIAN CPC, CPC-I, CHCA, CPMA



Mrs. Jacqueline Thelian is a Healthcare Consultant, Certified Professional Coder & Auditor, Subject Matter Expert and sought after educator and Author with over thirty years' experience in medical coding and business management. Her extensive experience includes physician practice management, coding/billing compliance and reimbursement issues and she has taught extensively in Academic Medical Centers, The Chubb Institute, Hospitals, private physician practices and has conducted a variety of seminars for numerous Medical Societies.

She is also a AAPC Certified PMCC instructor for the PMCC (Professional Medical Coding Curriculum) Coding Certification Prep Course, and a Certified ICD-10 Expert Trainer. Her articles on clinical coding issues have been published in many popular healthcare publications.

## APPLICABLE EXPERIENCE

Mrs. Thelian is frequently contracted by many of the major Healthcare Law Firms for clients under Corporate Integrity Agreements (CIA's). In this capacity Mrs. Thelian is the Independent Review Organization (IRO) performing chart reviews following the Office of Inspector General's (OIG) guidelines and working with the law firm, client and government officials on the case. She provides healthcare program monitoring for physicians who require monitoring by the Department of Health (DOH) and/or IPRO (a national organization providing a full spectrum of healthcare assessment and improvement services).

Mrs. Thelian also provides education to facilities and providers who are under CIA's (Corporate Integrity Agreements). Working in concert with major Healthcare Law Firms on various cases, Mrs. Thelian has provided expert testimony on behalf of many physicians/providers both at Medicare Hearings and for the Office of Professional Medical Conduct (OPMC). In several cases Administrative Law Judges (ALJ's) have based their decisions/rulings on Mrs. Thelian's detailed unbiased reports and testimony, which ultimately resulted in favorable outcomes for the physician/provider.

Mrs. Thelian has developed curriculum for numerous specialty and facility topics. She has been a key presenter and a didactic author for the past several years for major Healthcare Facilities of New York City and the Tri-State area. In this capacity, Mrs. Thelian has developed training materials related to subjects such as ICD-10 , Appropriate Designation of Evaluation and Management Level of Service, the accurate usage of modifiers, specialty seminars for Pediatrics, Internal Medicine, Family Practice, OB-GYN, Psychiatry, Emergency Medicine, Physical Therapy, and General Surgery. Mrs. Thelian is a requested speaker for third party billing companies, physician organizations and National & Local Healthcare Associations.

In addition, Mrs. Thelian has extensive experience in operational issues related to Medicare and Medicaid billing and reimbursement. She has performed an extensive amount of documentation audits and CMS 1500 claim reviews for New York Law firms, Accounting firms, Leading Healthcare Facilities, Clinics and private physician practices. She has also authored the book "Coding Exam Success" by publisher FA Davis.

## CERTIFICATIONS / ENDORSEMENTS

**CPC-** Certified Professional Coder – Credentialed by the AAPC
**CPC-I -** Certified PMCC Course Instructor- AAPC credentialed. Medco's enhanced PMCC course curriculum helps prepare individuals for the National CPC (AAPC) and CCS-P (AHIMA) exams. We also proctor the CPC exams
**CHCA -** (Certified Healthcare Chart Auditor) - Credentialed by the AHCAE (Association of Health Care Auditors & Educators.

**CPMA -** Certified Professional Medical Auditor – Credentialed by the AAPC
**M/WBE –** Certified by NYC as a WBE (Women's Business Enterprise) to offer professional healthcare consulting services and products to City, agencies.
**MSSNY –** Endorsement by the Medical Society of the State of New York as a preferred provider for coding consulting services offering significant benefits to their members.

PO BOX 650474
FRESH MEADOWS, NY
11365 0474

MEDCOCONSULTANTS.COM

TEL.:718 217 3802
FAX:718 217 4236
EMAIL: INFO@MEDCOCONSULTANTS.COM

| Client's Name | Index# | County | Facts of the Case |
|---|---|---|---|
| Dr. Ilya Burshteyn, M.D. | ALJ-1-56366698 | Nassau | Overpayment demand for Physical Therapy Services |
| Testimony: Decision Partially Favorable | | | |
| I & R Medical PC | ALJ-2008282463 | The hearing was in Nassau County | Overpayment demand for inappropriately coding for Physical therapy and chiropractic services. |
| Testimony: The ALJ agreed with my findings with the exception of very few cases, CMS is appealing the ALJs decision. | | | |
| DAC Physical Medicine, P.C. | ALJ-1-1144403663 | The hearing was in Queens | Overpayment demand for Physical therapy and E/M visits. |
| Testimony: Documentation did support all the services provided. The ALJ agreed. Favorable decision. | | | |
| Venkateswararao Violet MD | ALJ-1-863340051 | The hearing was in Nassau County | Overpayment demand for Split shared visits. Failure to provide documentation. |
| Testimony: The missing documentation was due to an ACT of God (flooding in the facility destroyed the records) In other cases the documentation supported the services. Decision Partially Favorable | | | |
| Maria-Lucia Anguel MD | OPMC Case BPMC 09-132 | The hearing was in Manhattan | Charges: 25 counts of misconduct. |
| Testimony: I testified where applicable to the doctor's documentation and coding in cases where it was supported. | | | |
| Martin Grajower | Not sure this was a while ago | Not sure | Overpayment for inappropriate coding for E/M and glucose testing. |
| Testimony: Documentation supported the service billed. Decision: Favorable | | | |
| Diamond Medical / Delys St. Hill MD | OPMC Case | The hearing was in Manhattan | Inappropriately reporting medical services |
| Testimony: Documentation supported the services billed in some cases lower levels of E/M than reported however the E/M was documented was not unbundled from any other services provided. | | | |
| Dr. Gene Meisenberg | ALJ 1-1281986383 | Not Sure, the hearing was in Nassau County | Overpayment demand for inappropriately coding for urology services |
| Testimony: In some cases, the documentation did support the services Billed. Outcome of case: Still pending | | | |
| Dr. Barry Solomon | ALJ 1-258451311 | Nassau County | Overpayment demand for inappropriately coding for dermatology services |
| Testimony: For cases which were supported by the documentation Decision: Partially favorable. | | | |
| Dr. Joseph Pober | OPMC Case | Manhattan 9/25/18 | Utilization of incorrect CPT code 5570 Dermatology should have used complex closures |
| Testimony: Documentation supported a flap reconstruction. However, the documentation was not sufficient to clearly determine if it supported the 14000 series or 15570 series. Decision: Pending | | | |

| Provider | ALJ / Appeal # | County | Service |
|---|---|---|---|
| Dr. Rammy Hanna | ALJ | Nassau County | Physical Therapy Services |
| **Testimony:** Claims were denied for no Plan of Care and lack of medical necessity. Testimony included plans of care were valid as the patient was seen for PT and by the doctor on the same day in the same office and documentation of PT services was in the patient chart when the doctor saw the patient. Medical necessity was not specifically stated on the line by line determination. STAUS: Pending | | | |
| Dr. Eduard Zinger | ALJ 3-2901300408 | Nassau County | Home Visits and Care Plan Oversight |
| **Testimony:** Claims were denied for inappropriate use of modifier 25 for E/M & CPO, Insufficient documentation to support the level of E/M service and insufficient documentation to support CPO. Decision: Partially Favorable & Extrapolation deemed invalid. | | | |
| Soundside Physical Therapy | ALJ – 3-3729024090 | Nassau County | Physical Therapy & Occupational Therapy |
| **Testimony:** Claims were denied for lack of skilled therapy and unsigned plans of care. | | | |
| Pain Physicians | ALJ | Nassau County | Pain Medicine, Chiropractic & Physical Therapy Services |
| **Testimony:** Claims were denied for lack of medical necessity and cloned documentation. Decision: Extrapolation deemed invalid. Overturned | | | |
| Mowafak Hussain / Logy Healthcare PT PC | ALJ – 3-4720836422 | Nassau County | Physical Therapy Services |
| **Testimony:** Claims were denied for lack of skilled therapy and the Ordering MD differed from the MD who signed the POC. | | | |
| Extensive Care  PT PC | ALJ –1-3008447986 | Nassau County | Physical Therapy Services |
| **Testimony: Decision: Mostly Favorable.** | | | |
| Health Pro OT, PC Lyubov Servakh | Appeal# 3-5174262760 | Nassau County | Occupational Therapy Services |
| **Testimony:** Claims were denied for No signed POC, Insufficient documentation, no skilled therapy. Decision: Unfavorable | | | |
| Wellness in Motion | Appeal# 1-9433338222 | Nassau County | Occupational Therapy Services |
| **Testimony:** Claims were denied for no prior therapy, No specific HEP, No individualized co-morbidities, medication. Decision: pending | | | |
| Heart & Vein NYC | Appeal# 1-5542192734 | Manhattan | Vascular Procedures & Diagnostic testing |
| **Testimony:** Claims were denied for lack of medical necessity . Partially Favorable | | | |
| Melvin Murphy MD | Appeal# 3-3305710285 | Detroit, MI | Internal Medicine |
| **Testimony:** Claims were denied for lack of medical necessity, signature issues and missing notes – Pending | | | |
| Sergio Sokol MD | Appeal# 1-8481283184 | Nassau County | Cardiovascular Diagnostic Testing |
| **Testimony:** Claims were denied for lack of medical necessity, missing credentials and missing notes - Pending | | | |
| Ortho-Step | Appeal# 3-5953187824 | Nassau County | DME – Diabetic Shoes |
| **Testimony:** Insufficient documentation DME- Unfavorable decision | | | |
| Century Medical & Dental | Appeal# 3-8593332308 | Nassau County | OMT, E/M Psychotherapy and Podiatry Issues |

| Testimony: Supporting a percentage of E/M and OMT regarding areas treated – Pending Status | |
|---|---|
| Deposition | 9/12/22 |

| Testimony: Deposition testimony: New England Motor Freight | |
|---|---|
| Deposition | 5/15/23 |

| Testimony: Deposition testimony: Ryan Whitney V. Montefiore Medical Center |
|---|

There were two other cases for whom I cannot remember

1. Additional case for DAC Physical Medicine it was also for physical therapy services. The was also a favorable decision
2. There was a pain management physician I do not remember the providers name as this goes back quite a few years
3. Administrative Law Judge hearing a few years ago for Dr Barry Solomon
4. A deposition many years ago for an internam medicine provider

Jacqueline Thelian, CPC, CPC-I, CHCA, CPMA
Articles & Published Books

| Article | Publication | Date |
|---|---|---|
| 1999 CPT Has More Than 500 Changes | NY Hospital & Health News | January 1999 |
| Requirements and Completion of Certificates of Medical Necessity | NY Hospital & Health News | May 1999, Volume 11, No. 5 |
| Understanding Basics of APC's | NY Hospital & Health News | July 2000 |
| Understanding Basics of APC's | HFMA Newscast | September 2000- November 2000, Volume 34, Number 2 |
| Two Years of Changes to ICD-9-CM 2001 Codes | NY Hospital & Health News | November 2000 |
| Two Years of Changes to ICD-9-CM 2001 Codes | Medical Office Management | January/ February 2001, Volume 14, Number 1 |
| Medicare's New Smoking Cessation Codes | AAPC Coding Edge | August 2005, Volume VII, Issue VIII |
| Audits are Here, Are You Ready? | Hospital Newspaper | March 2007 |
| Mandatory Use of the New CMS-1500 Form Is Around the Corner — Will You Be Ready? | AAPC Edge Blast: The Bi-weekly "Edge" in Coding (Electronic News) | May 2007 |
| New CMS- 1500: Are you Ready? | Advance for Health Information Professionals | June 1, 2007 http://health-information.advanceweb.com/Article/New-CMS-1500-Are-You-Ready.aspx |
| 5 Minutes with... Jackie Thelian | BC Advantage | January 2009 |
| CMS Changes Medicare Enrollment Rules- How will This Impact Your Practice | BC Advantage | May 2009 |
| Does Multiple Surgery Rule Apply to Non-Pars? | Jennifer Kirschenbaum, Esq.- Healthcare Newsletter (electronic) | February 11, 2010 |
| ICD-10 The Time to Prepare is Now | Healthcare Wealthcare: Radio Blog About Wealth & Practice Management for Doctors | 4/16/2010 |
| ICD-10 The Time to Prepare is Now | BC Advantage | July 2010 |
| ICD-10 The Time to | Managing Health Today | September 2010, Volume 15, Issue 2 |

| Prepare is Now | | |
|---|---|---|
| ICD-10 The Time to Prepare is Now | Practice Support Resources, Inc. | http://www.practicesupport.com/ICD%2010%20Time%20to%20Prepare.pdf |
| Conforming Your Documentation to ICD-10-CM | For The Records (E-News Exclusive) | http://www.fortherecordmag.com/news/ enews_0311_01.shtml |
| Coding Exam Success: Coder's Guide to Passing the CPC and CCS Exams | F.AS. Davis Company | Copyright © 2012 |
| Potential CMS Extension for E-Rx Exemptions | ADVANCE for Health Information Professionals- HIM Insider: Blogs | http://community.advanceweb.com/blogs/xi_1/default.aspx 7/12/11 |
| Potential CMS Extension for E-Rx Exemptions | BC Advantage | August/ September 2011, Issue 6.5 |
| Transitional Care Management Services: What you Need to Know | BC Advantage | April/May 2013 Issue 8.3 |
| Transitional Care Management Services: Everything  You Need to Know | The Journal of Practice Management | May/June 2013 Issue |
| The Changing Face of Healthcare | The Journal of Practice Management | March/April 2016 |
| Indefatigable RACs Plow Ahead | For the Record | September 2017 |
| Medco Tip (Hearing Exams) | BC Advantage Magazine | January/February 2018 |
| Denial Reasons You Never saw Coming | For the Record | September 2019 |
| CPT Test Taking Strategies | For the Record | November 2020 |