# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

Civil Action No. 19-cv-01324-JCH

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY and
CIGNA HEALTH AND LIFE
INSURANCE COMPANY,

    *Plaintiffs*,

v.

BIOHEALTH LABORATORIES, INC.,
PB LABORATORIES, LLC, and
EPIC REFERENCE LABS, INC.

    *Defendants*.

# REBUTTAL REPORT OF

# CHRISTOPHER L. HANEY, CPA, CFE, CHC

_____
**Christopher L. Haney, CPA, CFE, CHC**
**Managing Director**
**Forensus Group, LLC**
**May 19, 2023**

## Table of Contents

I.     INTRODUCTION ........................................................................................................................3

II.    SUMMARY OF OPINIONS ......................................................................................................3

    A.    Information Considered ..................................................................................................4

III.   OVERVIEW OF THE CLARK REPORT ...............................................................................4

    A.    Purported Data Analysis in the Clark Report ..............................................................4

    B.    Medytox Collectively versus Epic, BioHealth, and PBL Individually .........................5

    C.    "Representative" Examples (i.e., Samples) ...................................................................5

    D.    Implications of Clark Report on Financial Damages ...................................................5

IV.    REBUTTAL OPINION #1 .........................................................................................................6

    A.    Dr. Clark's opinions regarding (i) Medytox, collectively, as opposed to each of the individual Labs, and (ii) "patterns in the data" and "representativeness," are not the product of scientifically valid methods or principles. Those opinions are speculative, cannot be reproduced, and are objectively *unreliable*. Dr. Clark's methods improperly generalize conclusions without adequate basis and contrary to accepted statistical principles. ......................................................................................................6

    B.    Lack of Valid Scientific Principles or Methods .............................................................6

    C.    Methods Applied Without Reliability ............................................................................7

    D.    Medytox Collectively versus Epic, BioHealth, and PBL Individually .........................8

V.     REBUTTAL OPINION #2 .......................................................................................................12

    A.    Even if Dr. Clark had opined about the Labs individually, her opinions are based on flawed samples of patients and are not the product of scientifically valid methods or principles. Those opinions are speculative, cannot be reproduced, and are objectively *unreliable*. The samples on which Dr. Clark based her opinions were neither designed nor executed in a scientific manner and her wrongly generalized conclusions based on those samples are meaningless beyond the sampled items themselves. ..12

    B.    Limited Support for Dr. Clark's Analysis ...................................................................12

    C.    Improper Design of Dr. Clark's Samples ....................................................................13

    D.    Improper Execution of Dr. Clark's Samples ..............................................................13

REBUTTAL APPENDIX A – DOCUMENTS CONSIDERED ............................................................14

REBUTTAL APPENDIX B – CURRICULUM VITAE OF CHRISTOPHER HANEY, CPA, CFE, CHC .....14

## I. INTRODUCTION

1. Whiteford, Taylor & Preston L.L.P., Counsel for Epic, BioHealth, and PBL (collectively the "Labs"), retained me to evaluate the expert report of Dr. Kelly Clark, submitted on behalf of Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively, "Cigna"). Specifically, Counsel asked me to review Dr. Clark's report, dated March 1, 2023, to evaluate her opinions, methodologies, and analysis regarding (i) the statistical bases of any conclusions, and (ii) any conclusions, express or implied, regarding financial damages. I understand the Labs, through separate experts, will also rebut Cigna's opinions and analysis on additional topics (e.g., healthcare claims processing and denials, medical necessity, etc.), and my findings are limited to the topics of financial damages and statistical analysis.

2. This report ("Rebuttal Report") summarizes my findings, observations, and opinions regarding the report of Dr. Clark, to date. I submitted my own expert report on behalf of the Labs in this matter, dated March 1, 2023 ("Haney Report"). My opinions are based on the data and information available to me at this time and a detailed listing of all documents relied upon are listed in Appendix A. I reserve the right to update, supplement, amend, or revise my opinions if and when additional information or data becomes available for my review and to respond to any additional expert opinions proffered by or on behalf of the parties to this matter. My qualifications as an expert and additional Federal Rules of Civil Procedure Rule 26 disclosures were provided in the Haney Report and are incorporated herein by reference.

## II. SUMMARY OF OPINIONS

3. This section is intended to provide only a brief summary of my rebuttal opinions in this matter. The bases for my opinions are fully discussed and supported herein. Based on my experience, education, training, and the results of my analysis (described in detail throughout this report), I have concluded, to a reasonable degree of certainty, the following:

   **Opinion #1:** *Dr. Clark's opinions regarding (i) Medytox, collectively, as opposed to each of the individual Labs, and (ii) "patterns in the data" and "representativeness," are not the product of scientifically valid methods or principles. Those opinions are speculative, cannot be reproduced, and are objectively unreliable. Dr. Clark's methods improperly generalize conclusions without adequate basis and contrary to accepted statistical principles.*

   **Opinion #2:** *Even if Dr. Clark had opined about the Labs individually, her opinions are based on flawed samples of patients and are not the product of scientifically valid methods or principles. Those opinions are speculative, cannot be reproduced, and are objectively unreliable. The samples on which Dr. Clark based her opinions were neither designed nor executed in a scientific manner and her wrongly generalized conclusions based on those samples are meaningless beyond the sampled items themselves.*

A.     **Information Considered**

4. Counsel provided access to data, in addition to information described in the Haney Report, including, but not limited to:[1]

    a. Cigna's expert report of Dr. Kelly Clark, dated March 1, 2023 ("Clark Report"); and

    b. The Labs' expert rebuttal report of Ms. Jacqueline Thelian, dated May 19, 2023.

5. In addition to the information provided to me, I obtained additional information, where necessary, from publicly available sources. A complete listing is included in Rebuttal Appendix A of this report along with all other information considered.

6. In the Haney Report, I described the relevant principles and methodologies for statistical sampling and financial damages analysis.[2] In the following pages, I evaluate the Clark Report and note where Dr. Clark diverges from these accepted methodologies.

III.    **OVERVIEW OF THE CLARK REPORT**

7. The Clark Report presents a wide range of opinions regarding the Labs' services, including that (i) certain tests performed by the Labs were medically unnecessary, (ii) the Labs' practices for selling its services and onboarding physicians were improper, (iii) medical coding and billing practices of the Labs' were "unallowable" and "grossly excessive," and (iv) the Labs' charged "enormous amounts" in excess of reasonable and customary reimbursement amounts for laboratory testing services, among other things.[3] In addition to these opinions, the Clark Report also addresses numerous statistical conclusions, directly or otherwise, that impact many, if not all, of its opinions. Those statistical conclusions are the subject of this report, and they are summarized below and addressed fully in the following sections.

A.     **Purported Data Analysis in the Clark Report**

8. Dr. Clark invokes a variety of undefined analysis to identify "patterns in the data" which purportedly support her opinions. These purported patterns were routinely referenced throughout the Clark Report and their existence was cited as the basis for most or all of Dr. Clark's opinions.

---

[1] To the best of my knowledge, the data and information provided to me by Counsel was not limited in any manner, and I was allowed the opportunity to request additional information and documents that supported the opinions contained herein as well as conflicting evidence, if any. A complete listing of the documents considered is included in Appendix A.
[2] The Labs' expert report of Christopher L. Haney, dated March 1, 2023, § IV.C., and V.B.
[3] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023.

Page **4** of **14**

B.     **Medytox Collectively versus Epic, BioHealth, and PBL Individually**

9. Each of Dr. Clark's opinions are generally applied to Medytox collectively, as opposed to the individual Labs with particularity, (i.e., Epic, BioHealth, and PBL), even when data from only a single Lab was presented as evidence. This implied assumption is statistical in nature, in that Dr. Clark effectively assumes each Lab is equivalent and interchangeable, permitting the generalization that Medytox, as a whole, is *representative* of Epic, BioHealth, and PBL individually. In other words, Dr. Clark assumes the relevant operations of each individual Lab (i.e., patient demographics, types of tests performed, sales practices, etc.), are equivalent across all three of the Labs such that findings from one Lab can be reliably generalized across others.

C.     **"Representative" Examples (i.e., Samples)**

10. The Clark Report presents twelve *examples* of patients it asserts are "representative" of Medytox's practices as a whole.[4] As I described at length in the Haney Report, such examples of claims chosen from a larger population comprise, by definition, a *sample*. I also explained how the term *representative* is a statistical term referring to a sample that "contains all of the attributes of the population in the same proportion that they exist in the population."[5] Dr. Clark makes no mention of undertaking or even considering valid statistical analysis to verify the representativeness of these samples; instead, Dr. Clark merely asserts, without basis, that her samples are *representative,* implying her opinions are also applicable to the entirety of the population at-issue. In fact, Dr. Clark claims exactly that, stating "the examples in [the Clark Report] should be considered illustrative and representative…"[6]

D.     **Implications of Clark Report on Financial Damages**

11. Cigna alleges that the Labs "unjustly obtained and retained at least $17 million in overpayments from Cigna."[7] However, the Clark Report fails to present any methodologies, analysis, or opinion regarding financial damages, nor has Cigna proffered any other expert opinions in this regard. Without such evidence or analysis, opinions regarding Cigna's financial damages are merely speculative and I cannot weigh them further. I reserve the right to respond to any additional expert opinions proffered by or on behalf of the parties to this matter.

---

[4] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, § D.
[5] The Labs' expert report of Christopher L. Haney, dated March 1, 2023, ¶¶ 31, 35 to 36.
[6] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, ¶ 8.
[7] *Connecticut General Life Insurance Company, et al. v. BioHealth Laboratories, Inc., et al.,* No. 19cv01324, in the U.S. District Court for the District of Connecticut, ¶¶ 10, 130, 136, 141, and 162.

IV.    **REBUTTAL OPINION #1**

A. **Dr. Clark's opinions regarding (i) Medytox, collectively, as opposed to each of the individual Labs, and (ii) "patterns in the data" and "representativeness," are not the product of scientifically valid methods or principles. Those opinions are speculative, cannot be reproduced, and are objectively *unreliable*. Dr. Clark's methods improperly generalize conclusions without adequate basis and contrary to accepted statistical principles.**

B. **Lack of Valid Scientific Principles or Methods**

12. Most of Dr. Clark's opinions are based on purported statistical analysis (e.g., "patterns in the data," generalizations based on sampling, conclusions about "representativeness," etc.). However, I have seen no evidence these analyses or conclusions were based on valid statistical methods or principles. A review of the Clark Report found no citations or references to *any* statistical method, textbook, or principle, nor did Dr. Clark's "Materials Considered" appendix reveal any such materials or considerations. In fact, as will be explained in the following paragraphs, Dr. Clark's unsupported analysis objectively contradicts numerous valid and accepted statistical principles.

13. In the Haney Report, I explained at length many of the fundamental statistical concepts and principles underlying valid statistical analysis.[8] While I do not restate that summary of statistical concepts here, those topics are incorporated herein by reference, and many of the following paragraphs explain how Dr. Clark's analysis and opinions objectively violate these well-established methods and principles.

---

[8] The Labs' expert report of Christopher L. Haney, dated March 1, 2023, § IV.C.

Page **6** of **14**

C. **Methods Applied Without Reliability**

14. Beyond the *validity* of the purported methods and principles employed by Dr. Clark, those methods were not *reliably* applied to the data in this matter. In statistics, *reliability* refers to reproducibility of results.[9] A reliable analysis returns consistent results when using the same data, regardless of who performs the calculations. Dr. Clark's statistical conclusions cannot be reproduced or even scrutinized given the lack of evidence underlying her claims. For example, Dr. Clark frequently claims that "patterns in the data" exist, despite failing to explain precisely what criteria a claim must meet to fit the pattern, or precisely how many and which claims meet those criteria.

15. For example, Dr. Clark states "this *pattern* of testing an excessive number of different substances per specimen appears *throughout the claims data across the relevant time period*."[10] Note that only a single patient was cited in the corresponding section of the Clark Report, seemingly the lone evidence of the purported "pattern."[11] In fact, the term "pattern" (which is defined to involve *repeated* or *recurring* data points) appears in Dr. Clark's report sixty times without reference to any valid statistical or quantitative analysis regarding the existence or prevalence of such "patterns." In other words, Dr. Clark has presented no reliable evidence to support her opinions on this topic. Without such evidence or analysis, Dr. Clark's opinions on the existence of "patterns" are merely speculative and cannot be reproduced or scrutinized further.

16. Similarly, Dr. Clark asserts that certain samples of claims are *representative* of Medytox's improper practices, as a whole, despite presenting no evidence that the samples were reliably determined to be *representative*. Recall that the accepted method of sample selection anticipated to lead to a *representative* sample is *random* selection. Without evidence demonstrating Dr. Clark's samples were, in fact, selected randomly or otherwise, any purported claims about a sample's *representativeness* are merely speculative, cannot be reproduced, and are, by definition, *unreliable*.

17. I also noted numerous terminologies used throughout the Clark Report that imply some degree of quantitative or empirical analysis; however, no supporting analysis was presented. For example, the term "excessive" was cited 22 times in the Clark Report, yet a standard measure of what

---

[9] Federal Judicial Center, *Reference Manual on Scientific Evidence*, 3rd Edition (Washington, DC: National Academy of Sciences, 2011), page 227.
[10] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, ¶ 161. Emphasis added.
[11] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, footnote 44. *See also* Clark Report Appendix E, Tab A.

Page **7** of **14**

makes a particular charge or therapy "excessive" was not presented. The terms "grossly" (cited eight times) and "outrageous" (cited six times) imply a measure that *significantly exceeds* a particular standard, however no such standards were presented in the Clark Report. In other examples, the terms "systematic" and "pervasive" were cited nine times and three times respectively. Much like the "patterns" described throughout the Clark Report, I found no reliable evidence to support such trends. In fact, fewer than three percent of the patients at-issue in this matter (i.e., only 55 patients in total) were cited in the Clark Report.

18. Despite Dr. Clark's representation to the contrary, her claims about (i) patterns, (ii) representativeness, and (iii) generalizations based on limited samples are mere speculation. Those allegations cannot be reproduced or scrutinized adequately and are, by definition, *unreliable*.

### D. Medytox Collectively versus Epic, BioHealth, and PBL Individually

19. Dr. Clark's opinions are generally applied to Medytox collectively, as opposed to the individual Labs with particularity (i.e., Epic, BioHealth, and PBL), despite the fact certain of the Labs were excluded from aspects of her analysis. These overly broad generalizations were necessary, according to Dr. Clark, "for simplicity."[12] In fact, Dr. Clark's method wrongly sacrifices *reliability* for *simplicity*. Dr. Clark also asserts that "patterns" identified in her analysis "clearly indicate a pervasive system of overbilling [by Medytox] for testing services where no medical necessity can possibly be inferred."[13]

20. Without a reasonable basis for aggregating the Labs and without weighing each Lab's unique characteristics, conclusions about a particular Lab could incorrectly be generalized across others using Dr. Clark's approach, materially misstating a given conclusion. This issue can be magnified when only certain Labs are evaluated, because those conclusions are broadly painted across the remaining unexamined Labs. In fact, that is the precise flaw committed by Dr. Clark here, which I will describe in the following paragraphs.

21. Among the compelling reasons to evaluate the Labs separately is Cigna's own knowledge that the Labs were distinct and required individualized treatment. From 2012 to 2017, Cigna's SIU audited the Labs separately and reached *materially different* conclusions about each of the Labs' practices. Cigna audited the Labs using different techniques for different reasons, and ultimately

---

[12] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, ¶ 1.
[13] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, ¶¶ 202, 230.

Page **8** of **14**

reached varying conclusions about each Lab's practices, over different timeframes.[14] In fact, Cigna's own records demonstrate separate Labs operated at distinct periods of time, resulting in differing referring physicians and a differing mix of testing procedures being ordered at certain Labs.[15] Dr. Clark presented no evidence that she evaluated or even considered Cigna's own rationale for treating the Lab's individually. Instead, Dr. Clark's overly broad opinions are applied to each of the Labs without particularity or consideration of the distinct characteristics and differences of each Lab.

22. Statistical texts make it clear that, no matter how a particular population is defined, the results obtained from sampling can only be generalized (i.e., extrapolated) to the collection of units from which the sample was drawn.[16] On its face, Dr. Clark's analysis disproportionately favors certain of the Labs in reaching her opinions, while objectively ignoring others. For example, I identified numerous instances where Dr. Clark's analysis fails to reasonably consider each Lab, despite rendering generalized opinions about all three Labs collectively. Specifically, Dr. Clark identified numerous samples of patient(s) as the basis for her conclusions, described further here:

   a. **("Intensity - Sample of 1")** In her analysis of "excessive intensity," Dr. Clark cited *only* a single patient from Epic in 2015 (ignoring both BioHealth and PBL entirely), for which she opined *too many* tests were performed. Notably, Dr. Clark did not examine the medical records for this patient, nor did she opine as to how many tests would have been acceptable. Based on this single patient, Dr. Clark claims this subjective "pattern" exists throughout the claims data, for the entirety of the relevant timeframe, and for all three of the Labs collectively.[17]

   b. **("Frequency - Sample of 2")** In her analysis of "outrageously high frequency," Dr. Clark cited a single patient from Epic in 2014 and a single patient from BioHealth in 2014 (again ignoring PBL), for which she opined tests were performed *too frequently*. Notably, Dr. Clark did not examine the medical records for these patients, nor did she opine as to what frequency would have been acceptable. Based on these two patients, Dr.

---

[14] The Labs' expert report of Christopher L. Haney, dated March 1, 2023, § B.
[15] CIGNA19-1326 0007531, CIGNA19-1326 0007533, CIGNA19-1326 0007530, CIGNA19-1326 0007979, CIGNA19-1326 0007980, CIGNA19-1326 0007983, CIGNA19-1326 0007981.
[16] Arkin Herbert, *Handbook of Sampling for Auditing and Accounting*, 3rd Ed., McGraw-Hill, 1984, page 20.
[17] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, ¶¶ 160 to 162.

Clark claims this subjective "pattern" exists throughout the claims data, for the entirety of the relevant timeframe, and for all three of the Labs.[18]

c. (**"Unnecessary - Sample of 1"**) In her analysis of "unnecessary specific tests," Dr. Clark cited *only* a single patient from BioHealth in 2015 (ignoring both Epic and PBL), for which she opined *unnecessary* tests were performed. Notably, Dr. Clark did not examine the medical records for this patient, nor did she discuss possible instances in which such testing would be permissible. Based on this single patient, Dr. Clark claims this subjective "pattern" exists throughout the claims data, for the entirety of the relevant timeframe, and for all three of the Labs collectively.[19]

d. (**"Overcharging - Sample of 17"**) In her analysis of "exorbitant charges," Dr. Clark cited five patients from BioHealth in 2012 and 2013, and 12 patients from PBL in 2012 (ignoring Epic entirely), for which she opined Cigna was *grossly overcharged* for tests. Notably, Dr. Clark did not provide evidence of her "reasonable rates" or the maximum charge amount that would be allowable, nor did her analysis demonstrate what threshold BioHealth and PBL's charges exceeded to be deemed *grossly* excessive (as opposed to merely being higher than what Cigna had hoped to pay). Based on these 17 patients, Dr. Clark again claims this subjective "pattern" exists throughout the claims data, for the entirety of the relevant timeframe, and for all three of the Labs collectively.[20]

e. (**"Representative - Sample of 12"**) Dr. Clark cited 12 patients from Epic in 2015, for which she claimed the sample to be "representative examples to illustrate the patterns described" throughout her report.[21] Once again, Dr. Clark neither (i) examined the medical records for these patients, (ii) opined as to how many tests would have been acceptable, (iii) opined as to what frequency of testing would have been acceptable, nor (iv) provided evidence of her "reasonable rates" or the maximum charge amount that would be allowable. Nonetheless, Dr. Clark found these 12 patients, sampled from only one Lab and from only one year, to be "representative" for the entirety of the relevant timeframe, and for all three of the Labs collectively.[22]

---

[18] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, ¶¶ 163 to 167.
[19] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, ¶¶ 168 to 171.
[20] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, ¶¶ 168 to 171.
[21] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, ¶ 202.
[22] Cigna's expert report of Dr. Kelly Clark dated March 1, 2023, ¶¶ 168 to 171.

   f. Dr. Clark identified several additional samples in her report. In total, all of those samples represent only 55 patients in total (i.e., less than 3 percent of the total patients at-issue). Virtually all of those samples fail to examine patients from all three of the Labs, or from all relevant years. Nonetheless, Dr. Clark consistently cites these samples as the basis for her speculative conclusions that the samples represent the Labs' unjust conduct for the entirety of the relevant timeframe, and for all three of the Labs.

23. Notwithstanding Dr. Clark's intention to "simplify" her analysis, aggregating BioHealth, PBL, and Epic without weighing the fundamental differences between those Labs is neither reliable nor appropriate. As shown in the previous paragraphs, virtually all of Dr. Clark's opinions about Medytox, generally, were based on limited samples that expressly ignored one of more of the individual Labs. This flawed method effectively assumes each of the Labs is interchangeable. On the contrary, each of the Labs possesses unique characteristics and differing testing profiles that preclude Dr. Clark's generalizations.

24. For example, a single Lab, Epic, performed the vast majority of the Labs' routine testing procedures. Specifically, Epic performed **92 percent of all Vitamin D assays** (CPT code 82306), **94 percent of all Estradial assays** (CPT code 82670), **93 percent of all DHEA Sulfate immunoassays** (CPT code 82627), and **93 percent of all Serum IGF-1** (CPT code 84305). Consistent with these findings, I understand the Labs' medical coding expert, Ms. Jacqueline Thelian, concluded Epic performed the majority (i.e., more than 75 percent) of over 20 different routine testing procedures.[23] This disproportionate mix of testing indicates the Labs *are not* equivalent or interchangeable as Dr. Clark suggests. Ignoring these disproportionate testing profiles can lead to invalid and unreliable generalizations painted across all three of the Labs indiscriminately and without adequate basis.

25. Consequently, Dr. Clark's decision to render opinions about Medytox generally, as opposed to addressing the Labs separately, is fatally flawed. The data cited by Dr. Clark as the basis for this decision does not support a reliable conclusion that the Labs are equivalent or interchangeable, nor does her analysis demonstrate that Medytox fairly represents the Labs individually or as a whole. This flaw leads to overgeneralized conclusions that, at a minimum, paint the Labs with broad conclusions despite the fact each of the Labs were not separately analyzed. This method of overgeneralization, without basis, is not scientifically valid or reliable.

---

[23] Including CPT codes 80053, 87491, 97591, 82306, 86803, 84403, 82670, 84402, 82627, 83002, 84305, 83001, 87522, 84146, 84481, 83090, 82533, 82728, and 84270, among others.

## V. REBUTTAL OPINION #2

**A. Even if Dr. Clark had opined about the Labs individually, her opinions are based on flawed samples of patients and are not the product of scientifically valid methods or principles. Those opinions are speculative, cannot be reproduced, and are objectively *unreliable*. The samples on which Dr. Clark based her opinions were neither designed nor executed in a scientific manner and her wrongly generalized conclusions based on those samples are meaningless beyond the sampled items themselves.**

26. Much like the analysis performed by Cigna's SIU in this matter and discussed at length in the Haney Report, the statistical bases for Dr. Clark's samples and any implied inferences are invalid and unreliable.

**B. Limited Support for Dr. Clark's Analysis**

27. I sought to review necessary data and documentation routinely memorialized by analysts who perform statistical sampling analysis. However, virtually none of that information was presented in the Clark Report. Specifically, the Clark Report fails to present *any* of the scientific basis for *any* of its samples, including any of the following:

    a. Policies, procedures, or standards adhered to when designing and executing analysis;
    b. Specifications and rationale for defining the universe and sampling frame (i.e., "the data" as it is routinely and vaguely described in the Clark Report);
    c. Details of the sample design, including details of sample size calculation, anticipated error rate(s), standard deviation, or rationale for attribute/variable analysis;
    d. Details of the randomization process and steps required to replicate the randomization;
    e. Evaluation of the sample's representativeness (despite Dr. Clark's assertion that her samples are "representative"); and,
    f. Details of the estimation methodology and extrapolation calculations, including corresponding statistical software reports or calculations of precision or confidence.

28. Notwithstanding the Clark Report's insufficient scientific basis and my opinions thus far, I reviewed the limited analysis in the Clark Report and evaluated it to the extent possible in the following sections.

C. **Improper Design of Dr. Clark's Samples**

29. I have seen no evidence to suggest any of Dr. Clark's samples were designed – thoughtfully or otherwise – to reach valid or reliable conclusions about what Dr. Clark describes as "the data." Without a thoughtful and valid statistical design, conclusions are useful for nothing more than the sampled items themselves (i.e., not for extrapolation or generalization for any unsampled claim submitted by the Labs to Cigna).

30. As described in the Haney Report, a key aspect of designing a sample is determining a sufficient sample size necessary to achieve reliable results for the study. In particular, small samples risk failing to adequately capture subsets or characteristics of the universe, thereby skewing the analysis' conclusions with a non-representative sample. Recall that *minimum* sample sizes of 30 to 50 units are generally required to extrapolate valid conclusions.[24] However, virtually all of Dr. Clark's samples fall well below that threshold, and many are as small as a *single patient* out of more than one thousand patients at-issue in this matter. Similarly, Dr. Clark's limited samples only address particular timeframes (i.e., certain months or certain years), yet her opinions broadly assert these limited samples represent the entire timeframe at-issue.

D. **Improper Execution of Dr. Clark's Samples**

31. I have seen no evidence to suggest any of Dr. Clark's samples were randomly selected, a fundamental linchpin of valid statistical sampling. Recall that, without randomness, samples are commonly referred to as *judgement* samples, whereby the selection may be haphazard or arbitrary based on an analyst's own judgement (or worse, cherry-picked to support the analyst's pre-determined conclusion). Such samples, like Dr. Clark's here, are meaningless for the purposes of extrapolation and cannot be reliably estimated across the population from which they were selected.

32. Similarly, recall that a sample should be reasonably *representative* of the population from which it is chosen. Despite Dr. Clark's evidence-free assertion that her samples are *representative* of the claims at-issue, a truly representative sample "contains all of the attributes of the population in the same proportion that they exist in the population. This allows one to generalize from the sample to the population, to make inferences from the sample to the population."[25] Conversely,

---

[24] The Labs' expert report of Christopher L. Haney, dated March 1, 2023, § VI.
[25] Corty, Eric W., *Using and Interpreting Statistics*. St. Louis: Mosby, 2007, page 145.

if the sample chosen is *not* representative of the population, inferences about the population may be irreparably biased and invalid.

33. Said another way, results obtained from sampling can only be extrapolated to the collection of units from which the sample was drawn. For instance, healthcare claims sampled from a particular date range should not be used to yield statistical conclusions about other periods, even at the same facility.

34. Consequently, Dr. Clark's broad generalizations based on her samples are fatally flawed. Dr. Clark's sampling design and execution are not memorialized in a manner to permit even a basic understanding how they were performed. No evidence exists that the samples were randomly selected, and even if they were, most were of insufficient size to reach valid conclusions. These flaws lead to invalid and unreliable generalizations, and the sample conclusions are only useful for the sampled claims themselves.

**Rebuttal Appendix A – Documents Considered**

**Rebuttal Appendix B – Curriculum Vitae of Christopher Haney, CPA, CFE, CHC**

Rebuttal Appendix A - Documents Considered
Expert Report of Christopher Haney, CPA, CFE, CHC

| | Case Pleadings and Filings |
|---|---|
| 1 | Complaint and Amended Complaint, Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company v. BioHealth Laboratories, Inc., PB Laboratories, LLC, Epic Reference Labs, Inc., and Epinex Diagnostics, Inc., et al., No. 19cv01324, in the U.S. District Court for the District of Connecticut. |
| 2 | Amended Complaint, Epic Reference Labs, Inc., BioHealth Laboratories, Inc., and PB Laboratories, LLC v. Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company, No. 19cv01326, in the U.S. District Court for the District of Connecticut. |
| | **Expert Reports and Deposition Testimony** |
| 3 | Labs' rebuttal expert report of Ms. Jacqueline Thelian, CPC, CPC-I, CHCA, CPMA, including appendices, dated May 19, 2023. |
| 4 | Labs' expert report of Mr. Christopher Haney, CPA, CFE, CHC, including appendices, dated March 1, 2023. |
| 5 | Cigna's expert report of Dr. Kelly Clark, including appendices, dated March 1, 2023. |
| | **Public Documents** |
| 6 | Arkin, Herbert, *Handbook of Sampling for Auditing and Accounting*, 3rd Ed., McGraw-Hill, 1984. |
| 7 | Centers for Medicare and Medicaid Services, *Medicare Program Integrity Manual*, Chapter 8. |
| 8 | Cochran, William G. Sampling Techniques. New York: Wiley, 1977. |
| 9 | Corty, Eric W., *Using and Interpreting Statistics*. St. Louis: Mosby, 2007. |
| 10 | Federal Judicial Center, Reference Manual on Scientific Evidence, 3rd Edition (Washington, DC: National Academy of Sciences, 2011). |
| 11 | Healthcare Compliance Association, The Health Care Compliance Professional's Manual, 2015. |
| 12 | Richard A. Pollack et al., American Institute of Certified Public Accountants, Practice Aid 06-4, Calculating Lost Profits (2006). |
| 13 | Thompson, Steven K. *Sampling*. New York: Wiley, 2012. |
| 14 | Weil, Roman L. et al (eds.), Litigation Services Handbook: The Role of the Financial Expert (5th ed. 2015). |
| 15 | Youngstrom, Nina. "Report on Medicare Compliance Volume 30, Number 25. July 12, 2021 Rulings: Sampling, Extrapolations Should Include Underpayments, Unpaid Claims." (Society of Corporate Compliance and Ethics [SCCE] & |
| | **Bates Numbered Records** |
| 16 | CIGNA19-1326 0007530 to CIGNA19-1326 0007531 |
| 17 | CIGNA19-1326 0007533 |
| 18 | CIGNA19-1326 0007979 to CIGNA19-1326 0007981 |
| 19 | CIGNA19-1326 0007983 |

**Rebuttal Appendix B** – Curriculum Vitae of Christopher Haney, CPA, CFE, CHC

*Expert Report of Christopher Haney*



## Christopher Haney

CPA, CFE, CHC

christopher.haney@forensus.com

Chris Haney is a Managing Director of the Forensus Group, LLC, specializing in financial investigations, statistical analysis, forensic accounting, and healthcare regulatory disputes. Previously, Chris was a Forensic Accountant at the Federal Bureau of Investigation, specializing in complex white collar and healthcare violations.

Chris has led extensive financial investigations with experience spanning criminal, civil, and internal corporate matters. Prior to joining the FBI, Chris spent five years at General Electric. While at GE, Chris was part of the Corporate Audit Staff focused on internal investigations and audits of financial and compliance controls across a breadth of industries.

Throughout his career, Chris has been engaged in disputes involving large volumes of data which required the development and use of robust statistical analysis. He has been published and regularly speaks about the role of data analysis in healthcare disputes, and he has conducted in-depth training programs for a variety of audiences, including government and healthcare auditors, on the proper execution of statistical sampling analysis.

He is a certified public accountant ("CPA"), a certified fraud examiner ("CFE"), and certified in healthcare compliance ("CHC"). He also continues to serve in the U.S. Army Reserve as a Medical Service Corps officer.

### *Representative Engagements*

- Federal Damages Expert - Defense: Retained as a testifying expert on behalf of an orthopedic physician practice in its defense of civil False Claims Act allegations. Drafted expert rebuttal reports evaluating analyses related to overpayment claims from a large private insurance provider.

- Federal Damages Expert - Relator: Testified as an expert on behalf of relators estimating damages related to fraudulent reimbursement allegations. Led a team of forensic accountants and analyzed financial records of a large national allergenic extract manufacturer to develop damage methodologies and estimates.

- Statistical Sampling Expert: Retained as a testifying expert on behalf of a large regional health system and orthopedic practice to evaluate and scrutinize statistical sampling analysis performed by plaintiffs related to False Claims Act and Texas Medicaid Fraud Prevention Act litigation.

- Neutral Statistician: Retained as a neutral statistician to evaluate statistical analysis produced by both parties in a healthcare payment dispute arbitration. Evaluated the design of various statistical methodologies and scrutinized analysis produced by both parties. Conducted independent analysis for the benefit of the Arbitrator.

- Healthcare Compliance Expert for DOJ: Retained as a testifying compliance expert on behalf of the Department of Justice's Civil Division in support of FCA litigation. Evaluated the defendant's compliance program and authored an expert report rendering opinions related to the company's compliance activities.

- Forensic Accounting Expert in Healthcare Fraud: Testified as an expert in U.S. District Court rendering opinions on forensic accounting, statistical analysis and fraud related to allegations of criminal healthcare fraud and conspiracy. Analyzed billing records to identify indicia of fraud and to calculate damages.

- Physician/Payer Overpayment Disputes: Testified as an expert in multiple arbitration matters on behalf of a large regional physician practice, evaluating the statistical sampling and data analyses related to post-payment audits from a large private insurance provider.

**Rebuttal Appendix B** – Curriculum Vitae of Christopher Haney, CPA, CFE, CHC

*Expert Report of Christopher Haney*

---

### Education

- Graduate Certificate in Applied Statistics, Pennsylvania State University, 2014
- M.B.A., University of Virginia, Darden School of Business, 2004
- B.S., Virginia Military Institute, Mechanical Engineering, 2000

### Current Certifications

- Certified Public Accountant, CPA, Virginia Board of Accountancy; 2014 (previously licensed in Illinois, 2009)
- Certified Fraud Examiner, CFE, Association of Certified Fraud Examiners, 2011
- Certified in Healthcare Compliance, CHC, Healthcare Compliance Association, 2015

### Recent Publications

- Probe Samples for Healthcare Audits, Self-Disclosure and CIAs; *HCCA Compliance Today,* Oct 2018
    *A discussion of the role and techniques for utilizing probe samples in healthcare compliance*

- Extrapolating Liability; An Analysis of the Potential Use of Sampling; *ABA Health Lawyer,* vol. 30.4, 2018
    *A discussion of recent FCA cases involving extrapolation of clinical decision-making to prove liability*

- Key Statistical Issues in Eye Doc Fraud Sentencing; Law360 Expert Analysis, 2018
    *The reasonableness of an extrapolated loss calculation was a significant issue in U.S. v. Melgen*

- <u>2018 Health Law and Compliance Update</u>; Chapter 5; Statistical Sampling and RAT-STATS; 2017
    *Framework and strategies for developing and scrutinizing statistical sampling analysis*

- Mitigating FCA Whistleblower Risk When Employees Leave; Law360 Expert Analysis, 2015
    *Discussion of considerations for those dealing with departing employees*

- Extrapolating False Claims: The Debate in *Life Care*; Law360 Expert Analysis, 2014
    *Discussion of the Court ruling in Life Care regarding extrapolation of liability in FCA cases*

- Responding to CMS Overpayment Demands: Practical Steps to Appeal; *ABA Health Lawyer,* vol. 26.6, 2014
    *A statistical framework for appealing Medicare contractor demands for repayment*

- Unique Areas of Risk in Illinois' Insurance Claims Fraud Prevention Act; Law360 Expert Analysis, 2013
    *Addressing the key risks and implications of the Illinois statute and recent enforcement trends*

- Demystifying the Government's Fraud and Abuse Tool for Healthcare; *Government Health IT*, 2013
    *Support compliance or legal defense with an understandable framework for using RAT-STATS*

- Healthcare M&A; Mitigating Enforcement Risk and Closing the Deal; 2013
    *Healthcare enforcement trends and best practices to mitigate risk for M&A*

- Investigative Interviewing Techniques; Practicing Law Institute, 2012
    *White collar interviewing techniques and investigative best practices*

Case 3:19-cv-01324-JCH    Document 223    Filed 07/20/23    Page 19 of 20
**Rebuttal Appendix B** – Curriculum Vitae of Christopher Haney, CPA, CFE, CHC

*Expert Report of Christopher Haney*

*Sworn Testimony* (underline denotes party represented)

- <u>United States ex rel. Forney</u> v. Medtronic, Inc., U.S. District Court, Eastern District of Pennsylvania, Case 15-cv-6264.  Provided expert testimony evaluating the effectiveness of defendant's compliance program and evaluating compliance risks, controls, and auditing performance related to alleged violations of the Anti-Kickback Statute.

- *Brietstein and Strauss D.P.M., P.A. v. <u>Podiatry Billing Services, et al.</u>, Circuit Court, Fourth Judicial Circuit of Florida, Case 16-2019-CA-001711.*  Provided expert testimony regarding validity of statistical sampling and damages calculations performed by plaintiff's expert.

- <u>Buffalo Emergency Associates, LLP</u> *v. HealthNow New York, Inc., dba BlueCross BlueShield of Western New York; AHLA ADR Case 3393.*  Provided expert testimony regarding validity of statistical sampling analysis.

- *Norfolk Southern Railway Co. v. <u>Boatright Railroad Products, Inc., et al.</u>, U.S. District Court, Northern District of Alabama, Case 2:17-cv-1787.*  Provided expert testimony evaluating statistical sampling analysis related to chemical treatment of railroad bridge and cross ties.

- <u>Thomas E. Reynolds, in his capacity as Chapter 7 Trustee of the estate of Atherotech, Inc.</u> *v. Behrman Capital IV, L.P., et al., U.S. District Court, Northern District of Alabama. No. 2:18-cv-0514*.  Expert testimony evaluating the risk of Anti-Kickback Statute violations and estimating False Claims Act enforcement settlements.

- <u>United States ex rel. Skibo</u> *v. Greer Laboratories, Inc., U.S. District Court, Western District of North Carolina, Case 5:13-cv-110.*  Provided expert testimony estimating financial damages related to alleged violations of the False Claims Act resulting from the sale and manufacture of unlicensed and misbranded drugs.

- *United States v. <u>Beth Stein</u>, U.S. District Court, Southern District of Ohio, Western Division, Case 1:14-cr-019.*  Provided expert witness testimony regarding statistical analysis and forensic accounting related to allegations of criminal conspiracy and healthcare fraud for a durable medical equipment provider.

- <u>Kevin P. Clancy, in his capacity as Liquidating Trustee for the New England Motor Freight Liquidating Trust</u> *v. United HealthCare Insurance Company and HPHC Insurance Company, Inc., U.S. District Court, Eastern District of Virginia, Case 3:21cv535.*  Provided expert testimony and estimated financial damages.

- Numerous proceedings before Medicare Office of Appeals and Hearings providing expert testimony evaluating the validity of statistical sampling analysis and overpayment audits performed by CMS Contractors:

    - *AdvanceMed Corporation (Contractor), <u>Crossroads Hospice of Philadelphia (Appellant)</u>; Multiple Appeals 1-2920443795 and 1-1992297737;*
    - *Cahaba Safeguard Administrators, <u>Melvin Murphy, MD, P.C. (Appellant)</u>: Appeal 3-3305710285;*
    - *Health Integrity, <u>Han Ma Eum, Inc. (Appellant)</u>; Appeal 3-5175732407;*
    - *Qlarant, <u>A American Home Health (Appellant)</u>; Multiple Appeals 3-5673542471 and 1-5620409401;*
    - *Qlarant, <u>American Medical Hospice Care, LLC (Appellant)</u>; Appeal 1-10245971437;*
    - *Qlarant, <u>Citywide Housecalls, LLC (Appellant)</u>; Appeal 3-10886949697;*
    - *Qlarant, <u>Promed Medical Supplies (Appellant)</u>; Appeals 2-1112000307 and 1-10398476671;*
    - *SafeGuard Services, <u>Kio Medical Center (Appellant)</u>; Appeal 1-2811005796;*
    - *SafeGuard Services, <u>Ilya Burshteyn, M.D. (Appellant)</u>; Appeal 1-56366698; and*
    - *SafeGuard Services, <u>Ahava Medical and Rehabilitation (Appellant)</u>; Appeal 3-3326869882.*

### *Recent Presentations*

- FCA Litigation: Leveraging Statistical Sampling to Prove or Disprove Liability; Panelist
    *Hands-on discussion of statistical software for conducting healthcare audits, Strafford, 2021*

- Guide to RAT-STATS Statistical Software; Panelist
    *Hands-on discussion of statistical software for conducting healthcare audits, Lorman, 2020*

- Compliance in Value-Based Reimbursement; Panelist
    *Compliance issues facing value-based reimbursement, AHLA Fraud and Compliance Forum, 2018*

- Detecting Outpatient Facility Fraud with Statistical Sampling; Panelist
    *Tools and techniques for identifying fraud red flags for SIUs, NHCAA Rising Trends Conference, 2018*

- Trends in Behavioral Health and Substance Abuse Compliance; Panelist
    *Discussion of enforcement trends and compliance best practices, HCCA Compliance Institute, 2018*

- Statistical Analysis in Healthcare Compliance Audits; Instructor
    *Discussion of trends and tactics for defending healthcare compliance audits, CareFirst BCBS, 2018*

- Using Data and Statistics in Healthcare Enforcement; Panelist
    *Discussion of trends and tactics for defending FCA claims, HCCA Fraud and Compliance Forum, 2017*

- Fraud Against the Government & SEC Whistleblower Training; Panelist
    *Discussion of presenting an FCA case to the Government, Emory University School of Law, 2016*

- The Government's Process for Evaluating Whistleblower Claims; Panelist
    *Business and Legal Issues in Dialysis and Nephrology Symposium, McGuireWoods, 2015*

- Responding to CMS Overpayment Demands: Practical Steps to Appeal; Panelist
    *A framework for appealing Medicare contractor demands for repayment, AHLA Fraud Forum, 2014*

- Statistical Analysis, RAT-STATS and Other Investigative Techniques; Instructor
    *Michigan Department of Community Health, Office of Inspector General, 2013*

### *Post-Graduate Teaching Experience*

- Forensic Accounting and Fraud; Forensic accounting and anti-money laundering lecturer
    *University of Virginia, McIntire School of Commerce, 2014-2019*

- Forensic & Investigative Accounting; Forensic accounting and investigative interviewing lecturer
    *Virginia Tech, Pamplin College of Business, 2016-2019*

- Adjunct Faculty; Forensic Accounting and Litigation Support
    *Virginia Commonwealth University, School of Business, 2017*

- Health Law; Healthcare fraud and abuse lecturer
    *IIT Chicago - Kent, College of Law, 2013*