# EXHIBIT 3

CT GENERAL LIFE INSURANCE., ET AL. vs BIOHEALTH LABORATORIES INC., ET AL.
Confidential                    Jacqueline Thelian on 06/22/2023

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT

 3

 4    CONNECTICUT GENERAL LIFE        ) Case No.
      INSURANCE COMPANY, CIGNA        ) 3:19-cv-1324
 5    HEALTH AND LIFE INSURANCE       ) (JHCH)
      COMPANY,                        )
 6                                    )
                    Plaintiffs,       )
 7                                    )
                vs.                   )
 8                                    )
      BIOHEALTH LABORATORIES,         )
 9    INC., PB LABORATORIES, LLC,     )
      and EPIC REFERENCE LABS,        )
10    INC.,                           )
                                      )
11                  Defendants.       )
                                      )
12    --------------------------------)

13

14

15                    CONFIDENTIAL

16       VIDEOCONFERENCE DEPOSITION OF

17            JACQUELINE THELIAN

18            New York, New York

19         Thursday, June 22, 2023

20

21

22

23

24    Reported by:
      TAMI H. TAKAHASHI, RPR, CSR
25    JOB NO. 1322
```

CT GENERAL LIFE INSURANCE., ET AL. vs BIOHEALTH LABORATORIES INC., ET AL.
Confidential                   Jacqueline Thelian on 06/22/2023                   Page 2

1                              June 22, 2023

2                              9:30 a.m.

3

4              Confidential Videoconference

5    Deposition of JACQUELINE THELIAN, held via

6    Zoom remote video conferencing software in

7    New York, pursuant to Notice, before TAMI H.

8    TAKAHASHI, a Registered Professional Reporter

9    and Notary Public of the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2    (All parties appearing remotely)

 3

 4    Representing the Plaintiffs:

 5        ALSTON & BIRD

 6                The Atlantic Building

 7                950 F Street, NW

 8                Washington, D.C.  20004-1404

 9                202.239.3728

10        BY:   EDWARD T. KANG, ESQ.

11                edward.kang@alston.com

12    - and -

13        ALSTON & BIRD

14                555 Fayetteville Street

15                Suite 600

16                Raleigh, North Carolina  27601-3034

17                919.862.2227

18        BY:   KELSEY KINGSBERY, ESQ.

19                kelsey.kingsbery@alston.com

20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2   (All parties appearing remotely)

 3

 4   Representing the Defendants BioHealth

 5   Laboratories, Inc., PB Laboratories, LLC,

 6   Epic Reference Labs, Inc.:

 7        WHITEFORD TAYLOR & PRESTON, LLP

 8              7 Saint Paul Street

 9              Baltimore, Maryland 21202-1636

10              410.347.9421

11        BY:   TODD M. BROOKS, ESQ.

12              tbrooks@whitefordlaw.com

13              KENNETH J. LUND, ESQ.

14              klund@whitefordlaw.com

15        - and -

16        WHITEFORD TAYLOR & PRESTON, LLP

17              11 Stanwix Street, Suite 1400

18              Pittsburgh, Pennsylvania 15222

19              412.275.2400

20        BY:   ANTHONY T. GESTRICH, ESQ.

21              a.gestrich@whitefordlaw.com

22

23   ALSO PRESENT:

24        JACK McKENZIE, Videographer

25        CHRIS HANEY, Forensus Group
```

```
 1                  CONFIDENTIAL - J. Thelian
 2          Q.    Okay.  And you reference here, I
 3    believe, some of your background.  But can
 4    you walk me through perhaps your educational
 5    history starting with college and going
 6    forward.
 7          A.    I didn't go to college.  And my
 8    experience in documentation and coding are
 9    from my certifying organizations.
10          Q.    And what certifying organizations
11    are those?
12          A.    The American Academy of
13    Professional Coders.  And also the Certified
14    Healthcare Chart Auditing Association For
15    Auditors and Educators.
16          Q.    Okay.  And those certifications,
17    you received certifications from those
18    organizations?
19          A.    Yes.
20          Q.    How long ago did you receive
21    certifications from those organizations?
22          A.    Well, the CP-C would go back to, if
23    I recall correctly, 1997.  And the CP-C-I,
24    which is the instructor certification, that
25    would go back to probably, I would say, 2000.
```

```
 1              CONFIDENTIAL - J. Thelian
 2   And then the CHCA or the Certification For
 3   Healthcare and Chart Auditors and Education,
 4   I'd say that probably goes back about 10
 5   years.
 6        Q.   So other than the CP-C, the CP-C-I
 7   and the CHCA certifications, are there any
 8   other certifications or licenses that you've
 9   received?
10        A.   Yes, there's the Certified
11   Professional Medical Auditor.  That's also
12   from the American Academy of Professional
13   Coders.  That's probably -- I'm just -- I
14   couldn't put a time frame on that, but it has
15   to be more than 10 years.
16        Q.   Okay.  Anything else?
17        A.   Not that I could recall.
18        Q.   So, I take it, you are not a
19   medical doctor, correct?
20        A.   That is correct.
21        Q.   You do not have an M.D.?
22        A.   I do not.
23        Q.   Are you a registered nurse?
24        A.   I am not.
25        Q.   Have you had -- ever had any
```

```
 1              CONFIDENTIAL - J. Thelian
 2    clinical training as an addictionologist?
 3         A.   No.
 4         Q.   Any clinical training as a
 5    psychiatrist?
 6         A.   No.
 7         Q.   And any clinical training in the --
 8    related to the treatment or diagnosis of
 9    substance use disorder or addiction care?
10         A.   No.
11         Q.   So I understand that you are
12    currently the president of Medco Consultants,
13    Inc.; is that right?
14         A.   Correct.
15         Q.   What does Medco do?
16         A.   Well, we do chart audits, we do
17    education, we do compliance programs, we
18    assist in chart appeals.  We do expert
19    testimony.  We are distributors for the
20    coding products from the American Medical
21    Association through Optum.
22         Q.   How long have you been in your role
23    as president of the company?
24         A.   Oh, since the company started.
25    It's a woman-owned business.
```

```
 1              CONFIDENTIAL - J. Thelian
 2        Q.   And when was that?
 3        A.   That's got to be about 20-some-odd
 4   years.
 5        Q.   So you started the company?
 6        A.   I did.
 7        Q.   Have you ever had any title with
 8   the company other than president?
 9        A.   Healthcare consultant, which is
10   basically what I do in the company.
11        Q.   How many employees are at Medco
12   currently?
13        A.   Four employees, not counting
14   subcontractors.
15        Q.   You said four?
16        A.   Yes, sir.
17        Q.   And how many subcontractors,
18   approximately, do you -- do you all use?
19        A.   It could be anywhere from three to
20   six, depending on the time of year.
21        Q.   And what are your current
22   responsibilities at Medco?
23        A.   I oversee the coding staff.  And I
24   actually work on cases as they come in.
25        Q.   When you say "the coding staff," is
```

```
 1                  CONFIDENTIAL - J. Thelian
 2          Q.    Okay.  Anything else?
 3          A.    No.
 4          Q.    And you say "medical necessity as
 5     it relates to documentation and coding."  I
 6     assume you state it that way because you
 7     don't make a clinical determination of
 8     medical necessity, correct?
 9          A.    That's correct.
10          Q.    All right.  Any other areas, other
11     than what we've talked about already, that
12     you consider yourself to be an expert in?
13          A.    No.
14          Q.    Got it.  Can you remind me of your
15     hourly rate that you're billing in this case,
16     ma'am?
17          A.    I do not know the per hour rate for
18     this case.  I don't do the billing.
19          Q.    Do you know whether there are any
20     other timekeepers at Medco that are
21     helping -- that are being billed on this
22     case?
23          A.    I don't understand the question.
24          Q.    Other than yourself, is there
25     anybody else from Medco that is working on
```

```
 1              CONFIDENTIAL - J. Thelian
 2   and opine on the labs' covered drug testings
 3   claims, correct?
 4        A.   Correct.
 5        Q.   Did you look at plan documents for
 6   each of the claims at issue in this case?
 7        A.   No.
 8        Q.   Did you look at plan documents for
 9   any of the claims at issue in this case?
10        A.   No.
11        Q.   Now, you -- do you understand and
12   know that the labs in this case were
13   out-of-network providers with Cigna?
14        A.   I do.
15        Q.   And did you look into whether the
16   patients whose claims are at issue had
17   reached their deductible and coinsurance
18   maximums for the year?
19        A.   I don't understand the question.
20   I'm sorry.
21        Q.   Did you look to see about patients'
22   cost share and whether they were eligible to
23   receive insurance?
24        A.   No.
25        Q.   How did you make the determination
```

```
 1              CONFIDENTIAL - J. Thelian
 2    that the labs' drug testing claims were
 3    covered drug testing claims?
 4         A.   Well, I've looked at a lot of data
 5    from Cigna on the Excel spreadsheets which
 6    they provided which would determine what
 7    claims were paid and what claims were denied.
 8         Q.   Okay.  And, in your view, how did
 9    that data reflect whether or not the claims
10    were covered or not?
11         A.   What do you mean if the claims were
12    recovered?
13         Q.   No.  Whether they were covered or
14    not.  You said --
15         A.   Oh, whether they were covered or
16    not?
17         Q.   Yeah.
18         A.   I'm sorry, I didn't hear that.
19              Well, I could tell the way -- I
20    mean, we had data for a number of years.  And
21    if Cigna would routinely pay claims or Cigna
22    would routinely deny claims over said period
23    of time, one can determine what it is they
24    pay and what they don't pay.
25         Q.   I see.  So you saw a pattern of
```

```
 1              CONFIDENTIAL - J. Thelian

 2    paid claims and then you subsequently saw a

 3    pattern of denied claims and you concluded

 4    that the denied claims must have been for

 5    covered services because of the prior history

 6    of Cigna paying claims?

 7         A.   Correct.

 8         Q.   Okay.  Any other basis that you

 9    came -- that allowed you to determine that

10    these were covered claims?

11         A.   Well, yeah.  You know, based upon

12    the pattern and information that I was

13    reading, that seems to be Cigna's opinion as

14    well.

15         Q.   Okay.  Anything other than the

16    pattern of prior payments that you relied

17    upon in determining that Cigna was denying

18    claims that were covered?

19         A.   The denial reasons -- Cigna's

20    denial reasons.

21         Q.   Right.  Okay.  That -- the denial

22    reasons show that they were -- they were

23    denied, correct?

24         A.   Correct.

25         Q.   Do the denial reasons necessarily
```

```
 1                 CONFIDENTIAL - J. Thelian

 2        A.   It's more clinical, the association

 3   for the drug addiction.

 4        Q.   And would you agree that ASAM is

 5   considered to be one of the leading

 6   authorities on clinical standards related to

 7   treatment and diagnosis in addiction

 8   medicine?

 9        A.   That's a clinical question.  I

10   can't answer that.

11        Q.   Okay.  And is that why, I assume,

12   you did not review or include anything

13   related -- any publication by ASAM, is

14   because that's a -- those are clinical

15   issues, not the type of issues that you have

16   expertise on?

17        A.   It's not the type of issues that I

18   was asked to opine upon so, no, I did not

19   include it.

20        Q.   Okay.  And you would also not

21   consider yourself to be an expert on clinical

22   issues, correct?

23        A.   That is correct.

24        Q.   On page 3 of your report,

25   Ms. Thelian, going back to Medco, you write
```

```
 1                CONFIDENTIAL - J. Thelian
 2     staff on how to become certified.  So we're
 3     instructors, we're certified professional
 4     coding instructors.
 5                So from time to time, insurance
 6     companies will send us their staff so they
 7     can become certified professional coders.
 8         Q.    Got it.  What are qualified
 9     healthcare professionals, QHPs?
10         A.    Sure.  Those are physical
11     therapists, occupational therapists, social
12     workers, qualified professionals that don't
13     have an M.D., a DO.
14         Q.    I see.  And how about revenue cycle
15     management, RCM?
16         A.    Right.  That's basically billing to
17     make sure we would go in and we would check
18     to see why their cash flow was maybe crimped
19     at that particular time.  We would look at
20     the documentation and coding, the billing
21     cycle and assist the clients, the facilities,
22     with that information as well.
23         Q.    Okay.  So does Medco provide
24     billing services, then, to its clients?
25         A.    No.
```

```
 1                    CONFIDENTIAL - J. Thelian
 2         Q.    Okay.  And I assume, then, you also
 3   personally do not provide billing services to
 4   clients?
 5         A.    That's correct, I do not.
 6         Q.    And does Medco perform coding
 7   services for any of its clients?
 8         A.    Yes.
 9         Q.    When I say "coding services," I
10   mean actually coding the UP-04 forms, 1500
11   forms to submission to insurance or payors.
12         A.    No, we do not complete the forms
13   for them.  We would do coding, but we don't
14   complete the forms.
15         Q.    Okay.  And you personally do not
16   provide that service either, correct?
17         A.    Correct, I do not.
18         Q.    You did previously when you were
19   working for the GI doctor and the
20   pediatrician; that was a number of years ago?
21         A.    Just for the pediatrician.
22         Q.    On page 3 of your report, you also
23   state that your "day-to-day
24   responsibilities" -- over here --
25         A.    Um-hum.
```

CT GENERAL LIFE INSURANCE., ET AL. vs BIOHEALTH LABORATORIES INC., ET AL.
Confidential                    Jacqueline Thelian on 06/22/2023                    Page 86

```
 1                  CONFIDENTIAL - J. Thelian
 2        Q.    -- "include developing course
 3     curriculum, providing education and/or chart
 4     reviews to facilities, physicians and QHPs
 5     who are under Corporate Integrity
 6     Agreements."
 7              Is that a fair statement of your
 8     responsibilities on a regular basis?
 9        A.    Yes.
10        Q.    And you don't -- but don't see or
11     encounter any patients in your job, correct?
12        A.    That is correct.
13        Q.    And you don't provide any clinical
14     treatment to patients, correct?
15        A.    I do not.
16        Q.    Down here, you write, "My
17     experience in medical practice operational
18     issues is used to assist clinics, group
19     practices, physicians and QHPs in managing
20     the administrative and clinical functions
21     associated with claims processing, payment,
22     and revenue generation."
23              Do you see that?
24        A.    I do.
25        Q.    What do you -- what are you
```

1              CONFIDENTIAL - J. Thelian

2    referring to when you say "revenue

3    generation" here?

4        A.    Revenue generation would be sending

5    out clean claims.  I would train the staff on

6    how to use the NCCI edits, how to use the

7    system to generate claims and get them out

8    the door, how to check on the reports that

9    come back when claims are sent

10   electronically, things of that nature.

11       Q.    Do you work with clearinghouses as

12   well?

13       A.    I don't directly myself work with

14   the clearinghouses.  But I do sometimes make

15   recommendations on the various clearinghouses

16   for my clients.

17       Q.    Going down on page 6 of your report

18   starts a section called, "Data Review

19   Protocol."

20            Do you see that?

21       A.    I do.

22       Q.    And that continues on for a couple

23   of pages until page 8, right?

24       A.    That is correct.

25       Q.    And this section lists the data,

CT GENERAL LIFE INSURANCE., ET AL. vs BIOHEALTH LABORATORIES INC., ET AL.
Confidential                    Jacqueline Thelian on 06/22/2023                    Page 98

1                    CONFIDENTIAL - J. Thelian

2        Q.    Okay.  How about for the 1648?

3        A.    The 1648 is an invalid service

4    code.  And Cigna's description of that denial

5    reason:  "Your claim was received with a

6    missing or invalid service code based on our

7    reimbursement policy."

8              And actually Cigna's data

9    dictionary does go on to basically say, "You

10   do need to resubmit the claim."  So this type

11   of a denial is also a reimbursement denial

12   based upon the CMS1500 claim form where Cigna

13   is basically saying that the CPT code that

14   was billed for that point in time was no

15   longer.

16             So the CPT codes changed -- not --

17   they don't all change every year, but some of

18   them change every year.

19             So that would make the code invalid

20   which means that you would have to resubmit

21   that claim with the correct code for that

22   time period.

23       Q.    Okay.  How about 369?

24       A.    "369 - Services Not Performed -

25   Based upon the information reported or

 1                    CONFIDENTIAL - J. Thelian

 2    contained in the file, services were not

 3    rendered as billed."

 4              This can go either way.  This could

 5    potentially be a reimbursement denial or it

 6    could be where records were provided and a

 7    manual or a complex review was performed.

 8         Q.    And why was -- why did you believe

 9    that Cigna's denial was unsubstantiated for

10    369?

11         A.    Well, the records that I had to

12    review for these denial reasons, I felt were

13    not supported.  I felt the information was

14    there in the file.

15         Q.    Okay.  And how about fee

16    forgiveness, 322?

17         A.    Fee forgiveness, basically this is

18    where Cigna was determining that -- well,

19    "Cigna-administered plan document:  Charges

20    which you are not obligated to pay or for

21    which you are not billed or for which you

22    would not have been billed except that they

23    were covered under the plan are not covered."

24    It's kind of a convoluted explanation.

25              But basically Cigna would be

```
 1                   CONFIDENTIAL - J. Thelian
 2          A.    Correct.
 3          Q.    Then lastly for BioHealth, the time
 4   period is May 22, 2015 to February 25, 2017,
 5   correct?
 6          A.    Correct.
 7          Q.    So you would not have reviewed any
 8   claims data where there was a denial for 322
 9   code on BioHealth prior to May 22nd of 2015
10   or after February 25th of 2017, correct?
11          A.    Correct.
12          Q.    Okay.  On page 8 of your report,
13   you write that you reviewed "depositions,
14   correspondence from Cigna to the Labs, along
15   with numerous examples of supporting
16   documents for each claim, including medical
17   reports to further evaluate Cigna's decision
18   to flag or deny claims for the above
19   reasons."
20               Did I say that correctly?
21          A.    You did.
22          Q.    What were the -- other than medical
23   records, what supporting documents did you
24   review?
25          A.    The CMS1500 claim form, the orders,
```

```
 1              CONFIDENTIAL - J. Thelian
 2    the laboratory reports.
 3         Q.   Anything else?
 4         A.   Sometimes there was onboarding
 5    information.  Well, that would be the orders.
 6         Q.   When you say "the orders," did you
 7    see individualized orders for each of the --
 8    of the patients that you reviewed?
 9         A.   There were onboarding documents
10    that included orders.
11         Q.   Are these the master sheet orders
12    or the standing orders?
13         A.   That would be correct.
14         Q.   When you say "orders," the drug
15    orders, did you see anything else other than
16    those -- the master sheet orders?
17         A.   No.
18         Q.   When you say "medical records,"
19    Ms. Thelian, what are you referring to there?
20         A.   The laboratory reports.
21         Q.   Okay.  So did you review any of the
22    underlying treatment records provided by the
23    treating physician?
24         A.   No.
25         Q.   All right.  You go on to state, "I
```

```
 1                CONFIDENTIAL - J. Thelian

 2    things, did you seek to determine anything

 3    else in your review?

 4         A.   No.

 5         Q.   Okay.  You -- did you assess or

 6    seek to assess whether the labs, drug testing

 7    services were medical -- medically necessary

 8    from a clinical perspective?

 9         A.   Not from a clinical perspective,

10    no.

11         Q.   Did you seek to independently

12    verify whether the labs' drug testing

13    services had actually been performed or not?

14         A.   That's why I asked for the

15    laboratory reports.

16         Q.   Other than that, did you do

17    anything else to confirm whether the labs'

18    services had been actually rendered other

19    than getting the lab reports?

20         A.   No.

21         Q.   Okay.  Did you review plan

22    documents to assess whether the labs' drug

23    testing services were covered under the

24    plans?

25         A.   No.
```

```
 1                    CONFIDENTIAL - J. Thelian
 2      that's payable and parts of the claim that is
 3      not payable.
 4           Q.   Understood.  Okay.  So even -- so I
 5      guess even if the code identified in this
 6      particular remark code as the basis for
 7      denial was erroneous or unsubstantiated, is
 8      it possible that the claim would still be not
 9      covered or not payable under the terms of the
10      patient's benefit plans for some other
11      reason?
12           A.   If the patient wasn't covered.
13           Q.   I'm sorry.  Is there an answer --
14      your answer there?
15           A.   Yeah.  Well, you're asking me:
16      Could an entire claim be denied.  And I'm
17      responding an entire claim can be denied.
18      The patient may not have had coverage at that
19      time.  That would deny the entire claim.
20           Q.   How about -- and I apologize, I
21      should have been more clear.  My question was
22      going back to the service line.  I should
23      have articulated that.
24                My question is:  Even if for a
25      particular service line, just the particular
```

```
 1              CONFIDENTIAL - J. Thelian
 2    code that was identified in the line as being
 3    the basis for denial was erroneous or
 4    unsubstantiated, could it be possible that
 5    the claim is still not payable under the
 6    terms of the patient's benefit plan for
 7    another reason?
 8         A.   Typically entire claims are denied
 9    when patients are not covered or the whole
10    thing is applied to their deductible, things
11    of that nature.
12         Q.   But a -- but you would agree that a
13    particular line item may not be payable for
14    more than just one reason, correct?
15         A.   If that's indicated as such.
16         Q.   What do you mean by that?
17         A.   Well, then you would have multiple
18    denials on that one claim line.
19         Q.   And here in this data, there's only
20    room for one remark code, correct?
21         A.   From what I see, yes.
22         Q.   Okay.  All right.
23              MR. KANG:  We are at noon right
24         now.  Is this a good time to break for
25         lunch?  I'm actually at a good stopping
```

```
 1                CONFIDENTIAL - J. Thelian
 2    code in the chemistry section or the
 3    therapeutic drug assay section.
 4         Q.   Okay.  This wasn't -- I appreciate
 5    it if you could just answer my question.  My
 6    question was simply:  Do you know what a
 7    "therapeutic drug assay" is?
 8         A.   I do.
 9         Q.   Okay.  What is it?
10         A.   These types of tests are used to
11    see if there's a therapeutic level of the
12    drug in the patient who is taking a
13    particular drug for therapeutic reasons.
14         Q.   Okay.  And so a therapeutic drug
15    assay measures the level or quantity of a
16    particular therapeutic drug in an
17    individual's system?
18         A.   To my knowledge, yes.
19         Q.   What's a "therapeutic drug"?
20         A.   I believe I just explained that.  A
21    therapeutic drug is medication that's given
22    to a patient for therapeutic purposes.
23         Q.   Okay.  In your opinion, do all
24    drugs need to be treated -- or I'm sorry.
25              Do all drugs need to be tested with
```

```
 1              CONFIDENTIAL - J. Thelian
 2    a therapeutic drug assay?
 3         A.   I'm not a clinician.  I don't think
 4    I can answer that question.
 5         Q.   Okay.  You're not qualified to
 6    answer that question?
 7         A.   I don't believe so, no.
 8         Q.   Do you believe that it's
 9    appropriate for drugs that serve no
10    therapeutic purpose to be tested with a
11    therapeutic drug assay?
12         A.   According to CPT, yes, that's the
13    only option we have for unlisted drugs.
14         Q.   My question was whether it's
15    appropriate for drugs that have no
16    therapeutic purpose to be tested with a
17    therapeutic drug assay?  Do you have an
18    opinion on that?
19         A.   I do not.
20         Q.   Okay.  And you do not because
21    you're not a clinician?
22         A.   That would be correct.
23         Q.   That's not within your range of
24    expertise?
25         A.   That would be correct.
```

CT GENERAL LIFE INSURANCE., ET AL. vs BIOHEALTH LABORATORIES INC., ET AL.
Confidential                Jacqueline Thelian on 06/22/2023                Page 147

```
 1                  CONFIDENTIAL - J. Thelian
 2          Q.   Okay.  Do you know of any
 3     therapeutic purpose of propoxyphene?
 4          A.   Again, I cannot speak to the drugs
 5     themselves.  I'm not a clinician.
 6          Q.   Okay.  You have no expertise in
 7     that field?
 8          A.   I'm not a clinician, no.
 9          Q.   So do you also know of any
10     therapeutic purpose for cocaine?
11          A.   I do not.
12          Q.   Okay.  Do you know of any
13     therapeutic purpose of K2/Spice?
14          A.   I do not.
15          Q.   Do you know what "K2/Spice" is?
16          A.   It's a drug, recreation drug, I
17     guess you would call it.
18          Q.   If I were to tell you it's a
19     synthetic marijuana, would that sound right?
20          A.   That does.
21          Q.   Okay.  Can you think of any
22     therapeutic reason for an individual taking a
23     synthetic marijuana?
24          A.   Maybe for chemotherapy.
25          Q.   And what's the basis for your
```

```
 1              CONFIDENTIAL - J. Thelian
 2   belief of that?
 3        A.   Well, I've done work for a
 4   hematologist/oncologist, and some of the
 5   patients do take marijuana.
 6        Q.   How about synthetic marijuana?
 7        A.   I don't know.
 8        Q.   Okay.  That's something a clinician
 9   would know, not you, correct?
10        A.   That would be correct.
11        Q.   How about PCP, can you think of any
12   therapeutic purpose for someone to take PCP?
13        A.   I cannot.
14        Q.   How about ecstasy, any therapeutic
15   purpose of taking ecstasy?
16        A.   Not to my knowledge.
17        Q.   Do you have an opinion as to those
18   drugs that we've just discussed, if there's
19   no therapeutic purpose of using those drugs,
20   do you have an opinion as to whether it's
21   appropriate to run a therapeutic drug assay
22   on them?
23        A.   It's not a therapeutic drug assay.
24   That's the only code that we have for
25   unlisted code that's being quantified.
```

```
 1                CONFIDENTIAL - J. Thelian
 2    propoxyphene --
 3         Q.    Um-hum.
 4         A.    -- it tells you for quantitative,
 5    you can use the 80299 or the 82491 --
 6         Q.    Okay.
 7         A.    -- right?  So, hence, we would use
 8    the 80299 because it is an unlisted code.
 9         Q.    Okay.
10         A.    All right.  So clearly we are
11    allowed -- if you read the rules and the regs
12    in the CPT manual -- to use the 80299 when
13    we're quantifying a particular drug.
14         Q.    Got it.  So for phencyclidine, it's
15    not appropriate to use 80299?
16         A.    No, it is.  Look at the --
17         Q.    Well, it's -- I'm just looking up
18    at the phencyclidine here.
19         A.    Oh, I'm sorry.  I thought you
20    said --
21         Q.    Yeah.
22         A.    I'm so sorry.
23         Q.    So according to this table that you
24    helpfully pointed out, phencyclidine is not
25    appropriate to use 80299 for the
```

```
 1              CONFIDENTIAL - J. Thelian
 2    quantitative, correct?
 3         A.    For that particular year.  Can you
 4    scroll to the top.
 5         Q.    Sure.
 6         A.    Yeah, that's 2013.
 7         Q.    Okay.
 8         A.    So where there was -- like if you
 9    look at the barbiturates --
10         Q.    Um-hum.
11         A.    -- or the cocaine or the methadone,
12    in a number of case, those codes were
13    utilized for quantitative.
14              But when there was nothing, like
15    you mentioned before for the ectasy, for the
16    K2/Spice, you would use the 80299 as the
17    unlisted code.
18         Q.    So my question was simply about
19    phencyclidine.  Would you agree with me that
20    it's not appropriate, according to the 2013
21    CPT manual, to bill quantitative tests for
22    phencyclidine under 80299?
23         A.    I would agree with you on.
24         Q.    And it's not appropriate to bill
25    opiates -- quantitative tests for opiates
```

CT GENERAL LIFE INSURANCE., ET AL. vs BIOHEALTH LABORATORIES INC., ET AL.
Confidential                Jacqueline Thelian on 06/22/2023                Page 152

```
 1                CONFIDENTIAL - J. Thelian
 2    with 80299, correct?
 3         A.   I would agree with you on this.
 4         Q.   Or cocaine and metabolites, it's
 5    inappropriate to bill 80299 according to the
 6    2013 CPT manual for quantitative?
 7         A.   I would agree on this.
 8         Q.   As well as alcohol, correct?
 9         A.   Yes.
10         Q.   As well as amphetamines, correct?
11         A.   Right, one would reference the
12    table that's here.
13         Q.   Okay.  So for everything that's on
14    here under "quantitative" where something
15    other than 80299, then that code is the
16    appropriate one to use, not 80299, correct?
17         A.   Correct.
18         Q.   All right.  We can put that down.
19    Actually, and just to -- just so the record
20    is clear, that is page 414 of the 2013 CPT
21    manual, correct?
22         A.   Correct.
23         Q.   Okay.
24              MR. KANG:  Jack, we can take that
25         down and go back to Exhibit 2.
```

CT GENERAL LIFE INSURANCE., ET AL. vs BIOHEALTH LABORATORIES INC., ET AL.
Confidential                   Jacqueline Thelian on 06/22/2023                   Page 158

```
 1                CONFIDENTIAL - J. Thelian
 2    we're going back to the report.  So, again,
 3    for the Opinion 2 applies to a subset of the
 4    claims for BioHealth and Epic, then, correct?
 5          A.   That would be correct.
 6          Q.   But what you did here, again, was
 7    to look to see whether the codes that were
 8    identified in the claims were actually valid
 9    codes in the CPT -- the corresponding CPT
10    manuals for the given year, correct?
11          A.   Correct, the CPT codes.
12          Q.   You're not providing an opinion
13    here on whether or not these codes were
14    medically necessary, correct?
15          A.   That is correct.
16          Q.   You're not rendering an opinion as
17    to whether these services were covered under
18    the applicable plans, correct?
19          A.   That is correct.
20          Q.   So essentially what you were doing
21    is -- I'm saying this for the third time, I
22    think.  But so I understand, you were -- you
23    gathered the CPT codes and then
24    cross-referenced to see if this -- that CPT
25    code was valid in the corresponding CPT
```

```
 1              CONFIDENTIAL - J. Thelian

 2    manual?

 3        A.   I was responding to the denial

 4    reason from Cigna.  So Cigna was denying the

 5    claims saying the service code was invalid

 6    and that it should have been submitted --

 7    they're telling you -- Cigna's denial reason

 8    tells you to resubmit the claim.

 9              So, obviously, if it's an invalid

10    CPT code, it means that, during that time

11    period in question when that code was

12    reported, that CPT code was not valid at that

13    time.

14        Q.   So if you look at pages 14 through

15    17 of your report, these are the CPT codes

16    that you were -- that you were looking at,

17    correct?

18        A.   Correct.

19        Q.   So --

20        A.   Those --

21        Q.   I'm sorry.  Go ahead.

22        A.   No, no, no.  I'm so sorry.  Go

23    ahead.

24        Q.   So these are the ones that you

25    found in the BioHealth and Epic claims from
```

```
 1               CONFIDENTIAL - J. Thelian
 2     the CMS forms and then you were checking to
 3     see whether these codes were valid listed
 4     codes in the CPT manual?
 5          A.   At the time they were reported,
 6     yes.
 7          Q.   Okay.  And if they were in the
 8     corresponding CPT manual, then your
 9     conclusion was that Cigna's denial on the
10     1648 reason code was improper?
11          A.   That's correct.
12          Q.   Would you agree with me that the
13     cross-referencing and checking that you did
14     here is something that someone without your
15     background and qualifications and expertise
16     could have done?
17          A.   Potentially.
18          Q.   I could have gone in and checked
19     and cross-referenced and did the work that
20     you did?  Not -- not belittling the work that
21     you did, but that's something I could do as
22     well, correct, even someone like me?
23          A.   If you were tasked to do something
24     and knew what you had to do, I would say yes,
25     I would agree with you on that.
```

CT GENERAL LIFE INSURANCE., ET AL. vs BIOHEALTH LABORATORIES INC., ET AL.
Confidential                    Jacqueline Thelian on 06/22/2023                    Page 165

```
 1              CONFIDENTIAL - J. Thelian

 2    improperly denied by Cigna was 80101?

 3         A.   Right.  So I believe that the Cigna

 4    document started in August.  Was that

 5    correct, of 2013?

 6         Q.   Correct.

 7         A.   So anything prior to August of 2013

 8    for the 80101 would still have been valid.

 9         Q.   Okay.  How about after August 19,

10    2013?

11         A.   Then it would not.

12         Q.   Okay.  So then did your report make

13    that distinction, because it sees -- it

14    suggests here that the code under "Code

15    History" your report notes, "It was a valid

16    CPT code in 2013.  As per CPT, this code was

17    deleted in 2015."

18         A.   Correct, and I believe -- to

19    respond to your earlier question, I believe

20    that the data was filtered out for anything

21    just -- well, the data -- I should say the

22    data was filtered to include anything prior

23    to that August date, to my knowledge.

24         Q.   Okay.  But you would agree, then,

25    that, as of August 19, 2013 and onwards, any
```

```
 1              CONFIDENTIAL - J. Thelian
 2    denials that Cigna rendered on the 80101 code
 3    would be appropriate, given the policy
 4    change?
 5         A.   It wouldn't -- well, okay.  If they
 6    were billing the 80101 after the policy
 7    changed, that would not be correct.
 8         Q.   That would be -- that would not be
 9    correct for -- for -- for the labs to submit
10    with an 80101 code after August 19, 2013,
11    correct?
12         A.   Well, let me say this.  You're
13    correct, right.
14         Q.   All right.  And so if Cigna denied
15    any claims under 80101 after August 19, 2013,
16    you would agree with me that those denials
17    would be appropriate based on the policy that
18    we looked at?
19         A.   That would be correct.
20         Q.   Okay.  I want to also show you
21    80 --
22              MR. KANG:  Can we show -- go to Tab
23         8, Jack.
24              (Plaintiffs' Exhibit 9, Cigna
25         Reimbursement Policy, marked for
```

```
 1              CONFIDENTIAL - J. Thelian
 2   There's only a couple of pages left.  Is this
 3   something that looks familiar to you as
 4   something you reviewed?
 5        A.   I might have reviewed it.  I
 6   reviewed many documents.
 7        Q.   Okay.
 8        A.   I just can't recall at this
 9   particular point in time.
10        Q.   Okay.  I wanted to direct your
11   attention to this section "Qualitative Drug
12   Screens" --
13        A.   Um-hum.
14        Q.   -- in particular here.  It
15   states -- and you can read, obviously, the
16   whole section.  But I'm directing your
17   attention to that last sentence.  This talks
18   about reimbursement policies.  And according
19   to this document, Cigna states that, "The new
20   replacement codes 80300-80304 will also be
21   considered non-eligible for reimbursement."
22            And it notes that its effective
23   date is January 1, 2015.
24        A.   Right.
25        Q.   Okay.  So is it fair to say, then,
```

```
 1              CONFIDENTIAL - J. Thelian
 2   that after -- as of January 1, 2015 and
 3   onwards, according to this policy, providers
 4   cannot bill -- well, they could bill but it
 5   would -- it would be -- it would be excluded
 6   if they billed for 80300 to 80304?
 7        A.   That would be correct.
 8             MR. KANG:  Okay.  So then if we go
 9        back to Exhibit 2, Jack.
10             THE WITNESS:  I'm sorry.
11             MR. KANG:  Sure.
12             THE WITNESS:  I'm so sorry.  If you
13        could just go back to that --
14             MR. KANG:  Yeah.
15             THE WITNESS:  -- for a moment.
16             MR. KANG:  Yeah.
17             THE WITNESS:  Thank you.  If you
18        could scroll to the top --
19             MR. KANG:  Okay.
20             THE WITNESS:  -- please.
21             MR. KANG:  Sure.  Of this page or
22        the whole document?
23             THE WITNESS:  The whole document.
24        The beginning of the document.
25             MR. KANG:  Sure.
```

```
 1                    CONFIDENTIAL - J. Thelian

 2                    THE WITNESS:  Okay.  Just one

 3          moment.

 4                    MR. KANG:  Um-hum.

 5                    THE WITNESS:  And if you could

 6          scroll down just a little bit, please.

 7                    MR. KANG:  Sure.

 8                    THE WITNESS:  Down a little more.

 9          Just to the bottom of the page.  Okay.

10          Okay.  And just -- that's fine.  That's

11          okay.

12                    MR. KANG:  Okay?

13                    THE WITNESS:  Yeah, thank you.

14                    MR. KANG:  Sure.  So if we could go

15          back to Exhibit 2, Jack.  Oh, actually I

16          can control it.  Here we go.

17     BY MR. KANG:

18          Q.   So now going back to your report.

19     So, again, Cigna says, as of January 1, 2015,

20     80300 to 80304 no longer -- is now going to

21     be excluded.

22                    I'm just wondering:  Does that

23     change your Opinion Number 2 as to the

24     references to 80301 and 80302 in your report?

25          A.   It does.
```

```
 1              CONFIDENTIAL - J. Thelian
 2        Q.   Okay.  And how does it change it?
 3        A.   Well, anything for the 80302 or the
 4   80301 that was billed prior to January 1 of
 5   2015 would not be considered for payment by
 6   Cigna.
 7        Q.   Okay.  Is that something that you
 8   might want to go back to amend your report in
 9   any way?
10        A.   I will have to go back and look at
11   the Excel spreadsheet that corresponds to
12   this particular denial reason, so yes.
13        Q.   Okay.  Just to be clear, I believe
14   you said prior to January 1, 2015.  Did you
15   mean to say any claims submitted under 80301
16   and 80302 after January 1, 2015 would be
17   excluded and not payable?
18        A.   My error, correct.
19        Q.   All right.
20        A.   If that policy, I believe that you
21   showed, was in effect as of January 1 of
22   2015 --
23        Q.   Okay.
24        A.   -- was -- I believe that, yeah, to
25   be true.
```

```
 1
 2                    C E R T I F I C A T E
 3     STATE OF NEW YORK      )
 4                            : ss.
 5     COUNTY OF NEW YORK     )
 6
 7              I, TAMI H. TAKAHASHI, a Notary
 8         Public within and for the State of New
 9         York, do hereby certify:
10              That JACQUELINE THELIAN, the
11         witness whose deposition is hereinbefore
12         set forth, was duly sworn by me and that
13         such deposition is a true record of the
14         testimony given by the witness.
15              I further certify that I am not
16         related to any of the parties to this
17         action by blood or marriage, and that I
18         am in no way interested in the outcome
19         of this matter.
20              IN WITNESS WHEREOF, I have hereunto
21         set my hand this 28th day of June 2023.
22
23
24         _____
25                    TAMI H. TAKAHASHI
```