# EXHIBIT 18

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY and CIGNA HEALTH AND LIFE INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>BIOHEALTH LABORATORIES, INC., PB LABORATORIES, LLC, and EPIC REFERENCE LABS, INC.,<br><br>Defendants. | Case No. 3:19-cv-01324<br><br>Hon. Janet C. Hall<br><br>March 1, 2023 |

## EXPERT REPORT OF DR. KELLY CLARK

## CONFIDENTIAL

19. In order to explain the patterns of deviation from legitimate and acceptable billing for laboratory work, it is necessary to first discuss the appropriate use of these technologies and the related appropriate billing. As the majority of tests I reviewed were done for a primary diagnosis having to do with substance use disorders and most of Medytox's clients appear to be involved with patients with addiction, I focus mainly on the appropriate use of drug testing specifically related to substance use disorders, but also briefly discuss other patterns of inappropriate laboratory testing and billing reflected in Medytox's documents.

### A.   Overview of the practice of medicine

20. Typically, the medical treatment of a patient begins when a doctor or other medical clinician sees a patient. The medical professional gathers information about the patient's complaint and experience which is specifically relevant to their problem, such as the patient's symptoms, when they occurred, or their family history. Additional information might be obtained from family members or from other treatment providers. The relevant physical and mental status examinations are completed. Additional information may be sought, such as laboratory tests on specimens from the patient's body or radiological imaging tests. The doctor reviews this information to determine likely diagnoses and works with the patient to determine how they will manage the problem. There may be medications, surgical interventions, or different types of therapy performed. At some point the patient returns to the doctor in order to evaluate how well that plan has worked, and make any changes needed.

21. In short, the clinician gathers data to make an initial working diagnosis, determines the safety and suitability of different potential treatment plans, discusses and agrees on recommended treatment plans, and monitors the effectiveness of the treatment plans once implemented. The process continues whereby additional information may either confirm or alter the working diagnosis, the preferred treatment plan, and the type of information needed to continue to care for the patient. This is true of the general practice of medicine, whether the service is inpatient or outpatient, and regardless of the specific medical condition.

22. By way of example, a patient may present to their primary care provider with low energy, depressed mood, oversleeping, problems concentrating, and general decrease of engagement in their activities. The patient may believe they are depressed due to increased stress at work and home. If there are no other symptoms and the patient has normal results on routine annual blood work 4 months previously, a working diagnosis may be made of an episode of Major Depression and the patient may start on a therapeutic dose of a medication. If the patient does not improve, the clinician may request additional data in the form of lab testing. In this example, the lab testing typically ordered would be expected to be paid by their health plan at well under $300. The results may show that the patient has anemia or low thyroid function as the cause of their symptoms, not a mood disorder. The data obtained by lab testing is then used to change the diagnosis and treatment plan. If the patient has anemia, additional testing specific to the different types and causes of anemia may be then ordered and performed. If a medication is prescribed or procedure done, follow up testing may be done to monitor the effectiveness of that treatment. Each of the lab tests performed is directly related to the diagnosis and treatment of the patient.

23. Modern medicine makes available to clinicians an enormous range of technologies such as testing of bodily fluids which could potentially be used to treat a patient. Insurance

4

companies and managed care systems typically provide coverage for lab testing that is medically necessary for the care of patients. In order to be medically necessary, a provider's services must be directly related to the medical needs and treatment of a particular patient.

24. The baseline principle is this: if information to be gained from a test is not needed to care for a specific patient, then the test is not medically necessary.

### B. Overview of the practice of addiction medicine

25. Addiction medicine, a sub-specialized area of medical practice recognized by the American Board of Medical Specialties, is like any other field of medicine. With advances in science, we now understand that while people may have issues with use or misuse of many substances, those people who develop addiction have developed a chronic brain disease. Doctors and other clinicians can provide treatment for people misusing substances before they develop addiction, or after the addiction has occurred.

26. In treating addiction, the same concepts and practices described above are employed as with any other field of medicine. Namely, the clinician obtains information in order to make a diagnosis, works with the patient on a treatment plan, and then gathers additional information to monitor how well the treatment plan is working.

27. There are many sources of information used to diagnose and treat patients with substance use disorders. These sources of information include the patient's verbal description to the clinician about the patient's history, information provided by the patient's families and loved ones, information provided by past and current treatment providers, physical and mental status examinations, information regarding the patient's adherence to follow up and other appointments, information from the prescription drug monitoring program, and information from the results of lab testing, including drug testing.

### C. The use of blood and urine testing in the overall medical care of a patient.

28. Lab testing is used in clinical medicine to assist with the care of a specific patient. It provides additional information about the condition of a patient at a particular point in time. It provides data which may serve several possible functions to assist the clinician, including:

- for screening during wellness visits, or to make an initial working diagnosis when the patient has new complaints;

- to assess the patient's current health status in order to determine the safety and suitability of a proposed or active treatment plan; and

- to monitor the effectiveness of the treatment plan.

Each of these issues is described further here.

5

37. Drug testing serves an important function in the treatment of people with addiction. Drug testing is one piece of information that assists the clinician in diagnosing and treating the patient. As with any test, providers should take the cost and benefit of a specific drug test into account when ordering it and choose only the specific tests and testing frequency that is appropriate for support and ongoing assessment.

38. The primary utility of drug testing in the treatment of addiction is as a therapeutic tool to provide objective checkpoints for patients' self-reports and allow ongoing treatment planning updates between provider and patient. Because addiction is a chronic brain disease, the symptoms of addiction increase and decrease over time. Patients may require treatment in a variety of environments with different levels of structure and support, called levels of care. Drug testing provides one type of objective information about how a person is doing at a point in time, which should be used to determine if the treatment plan is working well or if changes are needed.

39. Drug testing is also valuable in the treatment of these patients because people with addiction have multiple reasons to not be truthful about their drug use, including guilt and shame as well as fear of legal, familial, or occupational repercussions. Rather than simply relying upon the patient's self-report, treating providers use this objective information to work with the patient and ensure the best approach to treatment.

40. Importantly, the purpose of drug testing is not to try to "catch the patient" when they use a substance. People with any chronic disease are not expected to perfectly adhere to the treatment plan. Rather, the medical purpose of drug testing submitted for medical billing is primarily therapeutic and is not to be used as a punitive surveillance technique.

41. For all of these reasons, it is rarely, if ever, clinically necessary to monitor the actual quantitative level of a substance in a patient's urine. Definitive tests are generally considered "Present/Absent" in clinical usage.

42. Furthermore, it is simply not possible to test for every drug which could possibly be misused, and it is not appropriate to waste resources testing for substances when there is no reasonable expectation that the test results will alter a patient's treatment plan.

43. Providers should discuss the outcomes of each drug test with patients as they become available, as is the typical approach to every medical test ordered by a provider.

44. The medical necessity of any test is in its utilization for treatment planning – failure to use the information from a test means that the test had no medical purpose.

45. To reiterate, if information to be gained from a test is not needed to care for a specific patient, then the test is not medically necessary.

**E.     Frequency of Drug Testing**

46.  There is no standard frequency at which every patient should undergo urine drug testing.  Rather, the necessary frequency of testing depends upon the needs of the clinician for information to treat the patient. When a patient is doing well, testing should be less frequent than when a patient is early in treatment or not doing well. They should be tested if they appear impaired and do not admit to having misused a substance or if diversion of their prescribed medication is suspected.

47.  National guidelines discuss the recommended frequency of drug testing for patients with opiate use disorder or being treated with methadone for buprenorphine   Methadone delivered in an Opioid Treatment Program (an OTP or "methadone clinic") requires a minimum of random drug testing eight times per year under federal regulations. And ASAM recommends that patients being treated with buprenorphine be drug tested at least monthly until stable in their recovery.[1]  In 2013, a consensus panel which drew up SAMHSA's Treatment Improvement Protocol ("TIP") 47 for Intensive Outpatient Care recommended that in early treatment urine drug testing should occur between every 4-7 days, with decreased frequency as the person stabilizes such that during Intensive Outpatient Care "monthly testing is standard in most programs."[2]

48.  The primary purpose of drug testing after initial assessment is to monitor how well the treatment plan is working, namely, determining whether the patient is taking the substances they should take and refraining from taking substances they should not take. The data from the tests must be received by the clinician, analyzed, the results made available to the patient and discussed, and changes to the treatment plan considered. Additional testing may be required in cases where the actual results are not the same as the expected results.

49.  While there may be instances in which a patient requires drug testing more frequently than once a month or eight times per year, there is no medical reason to regularly submit urine specimens to a laboratory and bill insurance for every individual patient at a treatment facility for drug testing several times per week.

50.  Moreover, there is no medical reason for routinely ordering and billing expansive and expensive definitive testing for dozens of substances on every individual patient's urine several times per week.

51.  If a urine specimen must be shipped from the treatment location to the lab performing the testing, there is typically a several day lag between day of test and when the results are available to the clinician. In many instances the care of the patient may require this. However, it is neither medically necessary nor reasonable to be routinely testing patients multiple times a

---

[1] American Society of Addiction Medicine, *Appropriate Use of Drug Testing in Clinical Addiction Medicine* (2017), available at https://www.asam.org/docs/default-source/quality-science/appropriate_use_of_drug_testing_in_clinical-1-(7).pdf?sfvrsn=2.

[2] Substance Abuse and Mental Health Services Administration Center for Substance Abuse Treatment ("SAMHSA"), Substance Abuse: Clinical Issues in Intensive Outpatient Treatment, A Treatment Improvement Protocol 47, at 262, https://store.samhsa.gov/sites/default/files/SAMHSA_Digital_Download/sma13-4182.pdf  ["TIP 47"].

8

week when the results of each test have not been reviewed or are not even available before the next test is ordered and sent.

### F.  Types of Drug Testing and Choice of Tests

52. There is a range of technological complexity in the different types of urine drug tests. The most rapid and least expensive are on-site screening tests, also known as Point of Care ("POC") tests. These are similar to home pregnancy tests or home Covid tests where the change in color on a chemical strip gives a positive or negative result. More expensive, but less prone to error, are tests by a mechanized approach using optical scanning technology, and similar immunoassay technologies. These are considered "presumptive" tests because of the rates of errors and inability to test for certain substances.

53. "Definitive" testing is performed by larger laboratory machines not found in physician offices. These provide much lower error rates and are hence "definitive," and also allow for more complex analysis on a wider range of substances. However, these tests take longer for the information to become available to the clinician and are more expensive. Therefore, these tests have been used in specific situations.

54. The correct use of these technologies can be illustrated by the prior example of a patient who had a typical, inexpensive blood panel done to screen for problems with kidneys, liver, thyroid, and so on, and was found to be anemic. The doctor can then evaluate the information in the lab reports, which may lead to a likely cause. If the likely cause cannot be determined from the information in the blood work, additional lab work may be needed to determine the exact cause and enable the doctor to determine the correct treatment plan. There are a wide range of tests which can identify different causes of anemia, but the information from the screening blood work would probably be enough to differentiate an anemia due to low Vitamin B12 from anemia due to iron deficiency.

55. Once the doctor determines by a screening test that a patient likely has anemia due to iron deficiently, the doctor can then select and order further specialized tests to further evaluate the patient's condition. That is correct medical practice, and the lab tests ordered as described are medically necessary for that patient. It is clearly improper and medically unnecessary practice to routinely run a wide range of tests for possible causes of anemia as part of the routine medical exam when there is no indication the patient has anemia. There is additional cost involved with over-testing which is not offset by any anticipated value of information obtained.

56. In the same way, the appropriate approach to drug testing during the time period at issue was that patients with addictive disease may have presumptive urine drug testing done, and when a result is unexpected, definitive testing might then be necessary.

57. As is required in Opioid Treatment Programs under federal rules, which will be discussed later, a treatment program may routinely screen for a relatively few number of drugs of abuse. The approach described in TIP 47, which was published in 2013, is that a program's standardized battery of screening tests may be small, and the potential to add specific tests could be increased in specific communities where there is demonstrated need (e.g., the example used in

9

and an additional drug class to the billing, which can inappropriately increase the revenue to that testing provider.

64. There are scientific, clinical, and economic issues which should be considered in performing drug testing. These have been considered in the production of national treatment guidelines and provide the bedrock foundation of the recommendations for frequency and intensity of drug testing. The same scientific, clinical, and economic concerns factor into the clinician's selection of tests necessary for the care of a specific patient.

65. There is no single appropriate panel of drug tests for every patient on every specimen. The ordering clinician must determine which tests are appropriate for each specimen of each patient. While there may be substances for which it is appropriate to screen all patients, such as alcohol or benzodiazepines, it is expected that a clinician may order a range of different drug tests within their practice, depending upon the clinical need of specific patients at specific points in time. It is also expected that different clinicians will order different tests as their routine initial screening panel, depending upon the needs of patients in their practice population and drugs of misuse in their community.

66. There are a few specific guidelines for substances to be screened on a routine basis – those for patients with opioid addiction receiving methadone and those receiving buprenorphine treatment.

### G.     **National Testing Recommendations**

67. There are national guidelines regarding drug testing for those patients with the type of addiction most likely to cause overdoses, Opioid Use Disorder, and the 2013 SAMHSA Publication TIP 47 also provides some baseline guidance.

68. The use of methadone to treat addiction is the most highly regulated form of addiction treatment in the country. This is the only type of medication to treat any disorder which is required to be done through a specialty clinic licensed and certified by both state and federal agencies and the medication cannot be prescribed by a doctor's office legally to treat addiction in the United States. Patients come into these locations daily to receive their medication, until they are doing well enough to earn up to 27 days of take-home medication. There are multiple legal and regulatory requirements of these programs, including minimum drug testing requirements.

69. As mentioned earlier, there are a minimum of eight random drug tests required to be done annually on each patient with opioid addiction being treated with methadone.

70. The 2015 Federal Guidelines for Opioid Treatment Programs (OTPs, or methadone clinic) provide specific guidance on required and recommended drug testing.[4] According to the guidelines, a few, targeted, inexpensive presumptive technologies is the accepted protocol. Expensive definitive testing should be limited to specific issues which may at times need to be

---

[4] SAMHSA, 2015 Federal Guidelines for Opioid Treatment Programs (2015), https://store.samhsa.gov/sites/default/files/d7/priv/pep15-fedguideotp.pdf.

106. Legitimate and allowable appropriate medical coding for billing insurances companies utilize only the allowable codes as defined by national guidelines and specific payers. The process of adjudicating those codes on submitted claims involves complex computer claims editing processes, which are designed and based upon the assumption that claims will be submitted with valid information for appropriately coded services which were actually rendered and medically necessary. As patterns of inappropriate billing are identified by payers, they can try to collect the payments made for improperly billed charges and codes, and can change the processes in an effort to halt those inappropriate payments, but this is a difficult process to ensure.

107. Key to the legitimacy of billing a code to a payer for medical services rendered, including laboratory testing, is the requirement that the test was medically necessary for that specific patient's medical care.

### III. Medical Necessity

108. A core principle regarding the medical necessity of any test is the need for the ordering clinician to use the information obtained in the test results for that patient's treatment planning. Therefore, if information to be gained from a test is not needed for the medical care for a specific patient, then the test is not medically necessary. In addition, medical necessity determinations typically require consideration of the cost-effectiveness of the care.

109. The medical necessity for any specific medical product or service for a specific patient is actually defined within the contract for coverage between the health plan and whomever had purchased the coverage for that specific payment. But in general commercial, Medicaid and managed Medicare health plans[18] have medical necessity criteria defined as and containing certain concepts, in whatever specific language used. The terms "Medically Necessary" or "Medical Necessity" are applied to health care goods and services provided to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:

- necessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease or its symptoms

---

[18] One unusual definition of medical necessity is that of straight, Fee-For-Service Medicare is not a health plan, but rather runs like an unmanaged insurance company and has its own definition unchanged since at least 2006: "Services or supplies that: are proper and needed for the diagnosis or treatment of your medical condition, are provided for the diagnosis, direct care, and treatment of your medical condition, meet the standards of good medical practice in the local area, and aren't mainly for the convenience of you or your doctor". Fee-for-Service Medicare is also unique in that it is structure to provide a fully transparent fixed fee schedule, to not negotiate with providers, and to not offer out of network benefits. *See, e.g., Medically Necessary*, CMS Glossary, https://www.cms.gov/apps/glossary/search.asp?Term=medically+necessary; *What Does 'Medically Necessary' Mean?*, Medicare.org, https://www.medicare.org/articles/what-does-medically-necessary-mean/.

- within the generally accepted standards of medical care in the community

- not solely for the convenience of the insured, the insured's family or the provider.

- not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

110. Again, the overall concept is that health plans pay for what is needed for the medical care of its members. They do not pay for whatever a doctor orders, or for whatever a member requests, or for a product or service which may be helpful. Rather, health plans pay for what is medically needed to treat the condition. With one exception (fee-for-service Medicare as noted below), they do not pay for products or services more expensive than those likely to produce the same medical result. They do not pay for medical services requested by a member's employer as a condition of continued employment, by a court as a condition of probation or parole, or for a landlord as a maintaining housing.

111. Lab tests are medical procedures which are performed by the provider of lab services upon the order of a referring clinician who requires specific information to treat a patient. When medically unnecessary lab tests are ordered and performed, such lab tests cannot be properly billed to a health plan. These can include simple or complex tests, from drug testing as a workplace requirement to genetic testing for the hobby of genealogy. A health plan should not be billed for medical services which are not medically necessary for the care of the patient.

112. In my analysis and in this report, I will use my experience and understanding of billing protocols and requirements as well as of rate structures in providing estimates of the typical fees a provider might reasonably expect to be paid for these lab services.

## **OPINIONS**

### I. **Medytox designed its business model to obtain the highest amount of revenue by billing for medically unnecessary tests**.

113. In my opinion, Medytox's business model was built upon selling the highest possible number of urine and blood tests – regardless of whether those tests were medically necessary or not. My review of the "lab order" sheets, billing statements, client registration forms, and a training manual for sales account executives supports this conclusion.

114. Based on my review of the documents, when the Medytox sales representatives contracted with new clients, clients would complete a standing lab testing order. This standing order set the master panel of tests to be used as the default order. Medytox would then bill Cigna, presumably among other payers, for having performed these tests.

### A. **Medytox's Sales Manual**

21

of Medytox's claims shows that they engaged in multiple patterns and protocols of drug testing and billing in violation of appropriate and standard practices.

159.   Below, I describe 3 main themes of inappropriate drug testing and billing practices on the part of Medytox that I identified: (A) inappropriately high utilization of urine testing that is not medically necessary, (B) inappropriate drug testing and billing for blood testing, and (C) use of improper billing codes. I will take each theme and discuss some examples of each briefly in turn, then provide examples showing how these patterns were broadly present in the claims reviewed. The examples provided are simply illustrative of the themes I will describe in these claims and should not be considered in any way exhaustive examples.

      **A.**      **Medytox engaged in patterns of inappropriate and medically unnecessary drug testing and billing due to high utilization of urine testing and extremely high charges.**

Within this general theme, I will describe examples of inappropriately excessive intensity, frequency, unnecessary specific tests done, as well as exorbitant charges per test.

**Intensity**

160.   Medytox was regularly performing urine drug testing for an outrageously high number of individual substances (high intensity) which could not possibly be considered medically necessary.

161.   As one example, Tab A shows that Medytox billed Cigna for 33 different lab testing codes for a single patient's urine specimen on 11/17/15 and for the same 33 codes two days later, on 11/19/15.[44] This includes some codes for testing only individual substances, such as the rarely used opioid propoxyphene, as well as codes which include multiple tests, such as 80370 which reflects testing for three or more skeletal muscle relaxants and 80334 which reflects testing for six or more serotonergic antidepressants (e.g., Zoloft, Paxil, Prozac, Celexa, Lexapro). On these two days, the data reflects testing on substantially greater than 33 individual tests, which, in my opinion, is far more than could possibly be medically necessary.

162.   This pattern of testing an excessive number of different substances per specimen appears throughout the claims data across the relevant time period, including the other examples of specific patient claims discussed in this report.

**Frequency**

163.   Medytox also had a pattern of testing individual substances at an outrageously high frequency which could not possibly be medically necessary – often running tests on three different urine samples over a four-day period.

164.   For example, Medytox billed Cigna a total of $48,626 for testing on a single patient over approximately a two-month period, for which Medytox received more than $29,800 in

---

[44] Appendix E, Examples, Tab A.

29