# EXHIBIT 19

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY and CIGNA HEALTH AND LIFE INSURANCE COMPANY,<br><br>      Plaintiffs,<br><br>   v.<br><br>BIOHEALTH LABORATORIES, INC., PB LABORATORIES, LLC, and EPIC REFERENCE LABS, INC.,<br><br>      Defendants. | Case No. 3:19-cv-01324<br><br>Hon. Janet C. Hall<br><br><br>May 19, 2023 |

## REBUTTAL EXPERT REPORT OF DR. KELLY CLARK

## CONFIDENTIAL

Billing confirmatory/definitive tests as though the information sought was "quantitative" in nature is inappropriate, and indicative of waste and abuse.

12.     On February 12, 2014, Dr. Michael Cohen, a medical director with Cigna, opined on what constitutes legitimate and appropriate use of drug testing for purposes of drug treatment, in response to questions from Cigna's SIU.[6]

13.     Based on my experience in the industry, I agree with the analysis set forth in Dr. Cohen's February 12, 2014 e-mail. Dr. Cohen accurately described how urine drug testing should work, using presumptive and well-chosen definitive tests. In addition to his own clinical expertise, he relied upon information provided by the national specialty society for addiction medicine published in the prior year, the ASAM White Paper, which I co-authored. In my opinion, Dr. Cohen's explanation of what constitutes appropriate and medically necessary urine drug testing was sound.

## SUMMARY OF REBUTTAL OPINIONS

14.     Ms. Thelian's opinions are inaccurate, unsubstantiated, and misleading for several reasons.

15.     **First,** the stated objective of Ms. Thelian's report is built upon fundamentally flawed premises and focuses on irrelevant issues. Ms. Thelian states that she is opining on: "(i) the coding, billing, and supporting documentation for the Labs' covered drug testing claims, and (ii) Cigna's decision to flag and deny reimbursement for the Labs' covered drug testing claims."[7]

16.     Ms. Thelian's stated objective presupposes that the claims submitted by the Labs to Cigna were for *covered* services. As explained throughout my reports, however, many (if not most) of the claims submitted by the Labs to Cigna were not actually ordered by a physician and/or not medically necessary and, therefore, are *not* covered by the applicable Cigna plan.

17.     Moreover, the denial codes Cigna used in evaluating the Labs' claims are not relevant to any questions in this case. Ms. Thelian improperly focuses on the denial codes used by Cigna, rather than whether the claims submitted by the Labs to Cigna were legitimate, appropriate, and covered services in the first place.

18.     By focusing on only a few internal Cigna denial codes and not looking at the overall nature of the billing, Ms. Thelian ignores a number of plainly inappropriate coding patterns, such as: (1) billing for validity tests like pH on the same day as urinalysis (which is not allowed), (2) billing for drug tests at an inappropriately high frequency, and (3) unbundling. This represents a fundamentally flawed approach to her stated task of evaluating and opining on "the coding, billing, and supporting documentation for the Labs' covered drug testing claims."[8]

19.     **Second,** Ms. Thelian uses a fundamentally invalid methodological approach to address the underlying issue of whether a coded service claim was a "covered service" or not.  Ms.

---

[6] CIGNA19-1326 0291208-211.
[7] Thelian Report, at 2.
[8] *See* Thelian Report, at 2.

Thelian incorrectly assumes that any claim made for a service performed using an active CPT code was properly billed and constitutes a "covered drug testing claim." "Covered services" are not simply based upon a CPT code being listed in the AMA's manual for that date of service. Rather, "covered services" are based upon other underlying issues, including, among other things: (1) whether the service was legitimately ordered by a physician, (2) whether the test was medically necessary, and (3) whether the service and the CPT Code used are covered by the member's health plan.

20.     Ms. Thelian focuses almost exclusively on whether there was an active CPT code that could possibly be used to bill for a particular service at the time. But in doing so she wholly ignores whether the services were legitimate, appropriate, and covered services in the first place.

21.     **Third,** Ms. Thelian fails to look at the totality of the applicable CPT Manual sections to see which codes were appropriate for the specific services reportedly delivered on a specific Date of Service ("DOS"). She ignores relevant portions of the CPT Manuals and, by doing so, she provides opinions that do not validly address the questions at hand.

22.     **Fourth,** to submit a claim with a CPT or HCPCS code to a health plan is to affirmatively assert that the conditions for the use of that code for a covered service have been met. Ms. Thelian ignores the important component of medical necessity.

23.     In the Clark Report, I defined "medical necessity" and explained the overall concept that health plans pay for what is needed for the medical care of their members. They do not pay for whatever is ordered or requested or reportedly done.[9] When medically unnecessary lab tests are ordered and performed, such lab tests cannot legitimately be billed to a health plan.

24.     Throughout the Clark Report, I described how the Labs billed for medically unnecessary urine and blood tests. I delineated several patterns of billing for medically unnecessary tests, including:

> ➢ "regularly performing urine drug testing for an outrageously high number of individual substances (high intensity) which could not possibly be considered medically necessary".[10]
>
> ➢ "testing individual substances at an outrageously high frequency which could not possibly be medically necessary – often running tests on three different urine samples over a four-day period."[11]
>
> ➢ "tests routinely done and billed for specific substances which could not be considered medically necessary because they could not be anticipated to make any difference in the care of patients"[12]

---

[9] Clark Report, at 20-21.
[10] Clark Report, at 29.
[11] Clark Report, at 29.
[12] Clark Report, at 30.

4