# EXHIBIT 30

1                UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
2

3    CONNECTICUT GENERAL LIFE
     INSURANCE COMPANY and CIGNA
4    HEALTH AND LIFE INSURANCE
     COMPANY,
5
         Plaintiffs,
6
     vs.                          CASE NO:  3:10-CV-01324
7                                 HON. JANET C. HALL
     BIOHEALTH LABORATORIES,
8    INC., and PB LABORATORIES,
     LLC, and EPIC REFERENCE
9    LABS, INC.,                  JANUARY 26, 2033

10       Defendants.

11

12

13            ZOOM/VIDEOTAPED DEPOSITION OF:
                      SEAMUS LAGAN
14         30(b)(6) of BIOHEALTH LABORATORIES, INC.

15

              Taken on Behalf of the Plaintiffs
16

17

18       DATE TAKEN:    Friday January 27, 2023

19       TIME:          10:00 a.m. - 6:56 p.m.

20       PLACE:         via Zoom videoconference

21       REPORTER:      Lisa Adkins
                        Notary Public
22                      State of Florida

23       VIDEOGRAPHER:  Jack McKenzie

24

25

Case 3:19-cv-01324-JCH    Document 240-2    Filed 07/20/23    Page 3 of 27

Connecticut General Life Ins. Co. et al. vs Biohealth Laboratories, Inc., et al.
30(b)(6)                          Seamus Lagan on 01/27/2023                          Page 2

```
 1   APPEARANCES:

 2   Counsel for Plaintiffs:

 3       EDWARD T. KANG, ESQUIRE
         EMILY COSTIN, ESQUIRE
 4       KELSEY KINGSBERY, ESQUIRE
         MICHELLE JACKSON, ESQUIRE
 5       950 F. Street, NW
         Washington, D.C. 20004
 6       202.239.3300
         edward.kang@alston.com
 7
             Appeared via Zoom videoconference
 8

 9
     Counsel for Defendants:
10
         ANTHONY GESTRICH, ESQUIRE
11       Whiteford, Taylor & Preston, LLP
         11 Stanwix Street
12       Suite 1400
         Pittsburgh, Pennsylvania 15222
13       agestrich@wtplaw.com
                   and
14       MATTHEW CHRIST, ESQUIRE
         Domnick, Cummingham & Yaffa
15       2401 PGA Boulevard
         Suite 140
16       Palm Beach Gardens, Florida 33410
         mtc@pbglaw.com
17
             Both appeared via Zoom Videoconference
18

19
         JOHN T. RADSHAW, III, ESQUIRE
20       65 Trumbull Street
         Second Floor
21       New Haven, Connecticut 06510
         jjr@jjr-esq.com
22
             Appeared via Zoom videoconference
23

24

25
```

1    A.    Medytox was seeking to acquire clinical labs.

2 So it had a -- it had -- back to the -- the gentleman I

3 mentioned earlier, they were putting together a

4 sales-and-marketing division.  And they didn't own any

5 clinical labs.  So as part of the discussions in how to

6 create a business opportunity going forward, we decided

7 to acquire clinical labs to operate a

8 sales-and-marketing division separate, if you like, from

9 each lab.  Like, a number over the top of each lab and

10 -- and drawn the labs as just a production of -- to

11 complete clinical diagnostic -- provide clinical

12 diagnostic services to customers.

13    Q.    Prior to your experience with Medytox, did you

14 have any experience or training in the healthcare

15 industry?

16    A.    Absolutely none.

17    Q.    Okay.  Prior to -- prior to Medytox, did you

18 have any training or experience with medical billing?

19    A.    None.  I had none.

20    Q.    Okay.  How about with medical coding?

21    A.    I had none.

22    Q.    Did you have any experience or training with

23 clinical labs prior to your experience with Medytox?

24    A.    I had none.

25    Q.    Okay.  Did you have any experience with

Connecticut General Life Ins. Co. et al. vs Biohealth Laboratories, Inc., et al.

30(b)(6)                    Seamus Lagan on 01/27/2023                    Page 33

```
 1   substance abuse treatment centers prior to your time

 2   with Medytox?

 3        A.   I had none.

 4        Q.   Did you have any experience or training with

 5   invoicing or billing insurance companies prior to

 6   Medytox?

 7        A.   I had none.

 8        Q.   To your knowledge, did Mr. Forhan have any

 9   experience in any of these fields before his -- his time

10   with Medytox?

11        A.   No.

12        Q.   How about Mr. Mendolia, what was his

13   background?

14        A.   Mr. Mendolia -- or Dr. Mendolia --

15             MR. GESTRICH:  Objection to form.

16        A.   -- had owned his own business.  He was

17   obviously a doctor.  I hope I use the right term.

18   Proctologist, I believe he was.

19             And he -- to the best of my knowledge, he had

20   sold that business prior to initiating or creating what

21   became the business of Medytox.

22   BY MR. KANG:

23        Q.   Got it.

24             So he was a practicing physician before -- to

25   your knowledge, he was a practicing physician
```

Connecticut General Life Ins. Co. et al. vs Biohealth Laboratories, Inc., et al.

Seamus Lagan on 01/27/2023

1  did you say -- drug testing.

2  BY MR. KANG:

3       Q.   It was a clinical lab, correct?

4       A.   It was a clinical lab.

5       Q.   Okay.  It wasn't an Urgent Care Center,

6  correct?

7       A.   No, I don't believe so.

8       Q.   Was it -- what's that?

9       A.   No.  It was a clinical diagnostics lab.

10      Q.   Okay.  It wasn't a hospital or licensed as a

11  hospital?

12      A.   It was a clinical diagnostics lab.

13      Q.   So it was not a hospital, correct?

14      A.   No.

15      Q.   And it wasn't licensed as an ambulatory

16  surgical center either?

17      A.   I don't believe so.

18      Q.   Okay.  Was there any -- were there any

19  administrative staff at PB Labs, you know, folks that,

20  for example, greeted patients?

21      A.   Greeted patients?

22      Q.   Uh-huh.

23      A.   I can't answer you as to the process if -- if

24  the patients -- patients were greeted.

25           My recollection is that the number of patients

1   that would have come to the lab would have been very,

2   very minimal.  You know, or a very minimal percentage of

3   the business of lab.  They might have been -- I do

4   remember there was a chair where someone could have come

5   and got their blood drawn, or come if an employer sent

6   them to collect a urine sample.  So there -- there would

7   have to be someone to receive that patient if that

8   patient was -- was sent to the lab.

9        But if I recall, that was a minimal percentage

10  of the overall business of the lab.  The majority of the

11  diagnostics that the -- that the lab and any of our labs

12  performed was -- had -- had zero communication -- direct

13  communication with a patient.

14       **Q.   Because the majority of the specimens came in**

15  **from referring providers, correct?**

16       A.   That is correct.  I believe that's -- well, I

17  believe that's the common model.  I believe that's the

18  same for even the Quest and diagnos- -- and big

19  companies.  I think a lot of them receive their samples

20  from providers.  So that was the model -- that was the

21  business model, yes.

22       **Q.   So the majority of PB Labs' business model**

23  **was -- whether it's blood samples or urine samples,**

24  **those would be collected by referring providers and then**

25  **delivered to PB Labs to have tests run?**

Case 3:19-cv-01324-JCH    Document 240-2    Filed 07/20/23    Page 8 of 27

**Connecticut General Life Ins. Co. et al. vs Biohealth Laboratories, Inc., et al.**
30(b)(6)                    **Seamus Lagan on 01/27/2023**                    Page 66

1  Urgent Care, or anything other than a clinical

2  diagnostics lab.

3     **Q.    Was anyone at Medytox or PB Labs verifying**

4  **insurance coverage prior to PB Labs performing drug**

5  **testing services?**

6     A.    Verifying insurance -- sorry, can you ask the

7  question again, please?

8     **Q.    Sure.**

9        **Was anyone at Medytox or PB Labs verifying**

10 **insurance coverage prior to PB Labs providing testing**

11 **services to a patient?**

12    A.    I would suggest verifying -- no, we had --

13 we -- I don't believe there was anybody verifying

14 insurance details.  We would have been reliant on the

15 doctor having already done that before they would send

16 us a sample.

17    **Q.    Okay.  And is that the same with respect to**

18 **BioHealth and Epic as well?**

19    A.    Yes.  As -- as part of the software development

20 and as part of the software -- the Advantage Software

21 that Sharon Hollis created and was acquired into the

22 company, I do remember that there was a part and share

23 that we had collected insurance information.  Insurance

24 information was collected, was adequate to -- to allow

25 the company to generate -- develop a claim -- but I

1   within the lab.  And that was how they identified or

2   matched a lab -- or a sample with the order that was

3   being given to request, you know, diagnostic tests,

4   whatever they're called.

5        **Q.   Okay.  None of the three labs at issue in this**

6   **case, sir, had an in-network contract with CIGNA,**

7   **correct?**

8        A.   Yeah, I -- I believe that is accurate.  That

9   was always a -- I don't remember where it ended up but

10  it's -- it's -- it's always been something that I -- I

11  recall for in-house legal and compliance requesting an

12  in-house -- or an in-network agreement or contract with

13  CIGNA.

14          And, look, as I said at the earlier stage, I'm

15  not -- I don't have a clinical background; so I could

16  never understand from a business perspective, from a

17  logic perspective, from any perspective why CIGNA

18  refused to allow labs to have an in-net- -- an

19  in-network contract where they could agree with a lab

20  and communicate with a lab an agreed price or what they

21  wanted to receive from the lab with regards to a claim.

22  But that's just, to me as a business person, completely

23  illogical but that's...

24       **Q.   Sir, can you just --**

25          MR. KANG:  First of all, I will note for the

1  because the lab didn't attempt or want to have an in --

2  in-network contract.

3          The lab made every attempt to have an

4  in-network contract, to collaborate with CIGNA to

5  perform -- to figure out how CIGNA wanted the lab to

6  deal with CIGNA covered insurance, covered parties,

7  people that CIGNA, obviously, took money from to cover

8  their medical services.

9          MR. KANG:  I'll move to strike everything after

10     Mr. Lagan's statement of yes.

11 BY MR. KANG:

12     **Q.   Sir, as a toxicology -- or a clinical lab**

13 **company, what types of facilities were Medytox's**

14 **clients?**

15     A.   The majority of facilities, I believe, were

16 providing substance abuse care or treatment.

17     **Q.   Okay.  So those are facilities like drug rehab**

18 **facilities?**

19     A.   I don't know the exact definition of what

20 services those doctors provided.  I -- I use the

21 substance abuse facility as a general term from -- as an

22 executive of the company, I was aware that the majority

23 of our business was in the substance abuse sector.  It

24 was a sector that required a quick turnaround.  It was a

25 business model that we both -- was to service that

1  I -- you know, so -- so that -- I mean, that cost, plus

2  the cost to processing the like, I don't -- I can't tell

3  you the profit margin and the different diagnostics,

4  sir.

5  BY MR. KANG:

6      Q.   I'm sorry.  You --

7      A.   I cannot tell you what the profit margin or the

8  profitability of a different -- of the various

9  diagnostics would have been in a -- in a lab.

10      Q.   Would the labs have been able to bill out more

11  charges if providers ordered more quantitative tests?

12          MR. GESTRICH:  Objection to form.

13      A.   They would have billed the tests related to the

14  volume, so the answer is yes.  If they were processing

15  more tests, they would have generated more bills.

16  BY MR. KANG:

17      Q.   Medytox had sales representatives, correct?

18      A.   Yes.

19          MR. GESTRICH:  Objection to form.

20  BY MR. KANG:

21      Q.   And those -- and those sales representatives

22  were called account executives?

23      A.   Technically, I don't know what the formal --

24  sales -- sales employees and executives.  Yes.

25      Q.   And the job of these sales representatives or

 1   account executives was to sell Medytox's services,

 2   correct?

 3       A.   Yes.

 4            MR. GESTRICH:  Objection to form.

 5       A.   Yes.

 6   BY MR. KANG:

 7       Q.   And it was to sell primarily Medytox's urine

 8   drug testing services, correct?

 9            MR. GESTRICH:  Objection to form.

10       A.   I would suggest that's not correct.  They

11   were -- they were to sell any services that Medytox

12   offered as a -- as a group.  So it wasn't specific and

13   only those tests.

14   BY MR. KANG:

15       Q.   Have you ever heard that urine toxicology

16   testing is the foundation of Medytox's business?

17            Does that sounds familiar to you?

18       A.   It -- it was certainly the biggest part of

19   Medytox's business, so that's a fair statement.

20       Q.   Okay.

21       A.   I've already confirmed that, you know, the

22   biggest factor was substance abuse and -- and I'm not

23   sure what other diagnostics.  I don't believe urine

24   toxicology was 100 percent of the services to that

25   sector either, but it was certainly a very big

1      Q.    Yep.

2            And do you see here, sir, this line from

3    Ms. Canto provides information to Mr. Hicks.

4            "CIGNA medical director reviewed information

5    suppled by Collectaway, PB Labs, and determined that the

6    information provided within the record documentation did

7    not substantiate the claim information billed to CIGNA";

8    do you see that?

9      A.    I do.

10     Q.    Okay.  And do you also see here that Ms. Canto

11   advised Mr. Hicks that:  "Claims submitted during and

12   after the audit have not been paid."

13           And Mr. Hicks -- Evelin Gills has agreed to

14   supply a sample of outstanding claims to CIGNA for

15   additional medical review"; do you see that as well?

16     A.    I do.

17     Q.    Okay.  Would you agree here that Ms. Canto was

18   telling Mr. Hicks that a medical director had reviewed

19   information and determined that the record documentation

20   did not substantiate the claim information billed to

21   CIGNA by PB Labs?

22           MR. GESTRICH:  Objection to form.

23     A.    I see the wording, sir.  I would have had

24   regular communication with Mike Nicholson about any

25   information, but I don't recall specifically seeing that

1  email or that language and I'm -- you know, I'm not -- I

2  can't comment on some of them -- on the position or

3  whatever.

4          Obviously there was a communication and

5  collaboration between the staff at the billing company

6  and the lab and CIGNA.

7      Q.   **No doubt, though, that Ms. Canto communicated**

8  **this information to Mr. Hicks, though, correct?**

9      A.   Yeah.  I mean, I'm not denying that.  That's --

10 I'm not sure what that information you're showing me --

11 exactly what that means.

12     Q.   **That's fine.**

13         MR. KANG:  Mr. McKenzie, can we -- or, I'm

14     sorry, Ms. Adkins, for the good of the order, is

15     that Exhibit 10?

16         THE REPORTER:  Yes, it is.

17         MR. KANG:  Okay.

18     (Plaintiffs' Exhibit No. 10 is marked for

19                     identification.)

20         MR. KANG:  Mr. McKenzie, can we go to Exhibit C

21     to the Excels.

22 BY MR. KANG:

23     Q.   **Mr. Lagan, do you see this?**

24     A.   Yes.

25     Q.   **These are the claims that the labs purport to**

1      Q.    Do you see this document that's on your screen,

2  sir?

3      A.    Yes.

4      Q.    Okay.  Do you recognize this document?

5      A.    Yes.

6      Q.    Okay.  What is this document?

7      A.    That was a client registration.  The client

8  being a physician's office.

9      Q.    Did the labs draft this document?

10      A.    Not -- not on their own, no.

11      Q.    Okay.  But what I mean is:  Did somebody from

12  the labs, as opposed to the physician's office, prepare

13  this document?

14      A.    Yes.

15      Q.    Okay.  And what is the purpose of this

16  document, generally?

17      A.    That would have been to accumulate information

18  on a client, and that would have come into -- the

19  salesperson would have accumulated that information,

20  brought in to customer services, and the client would

21  have been setup in, I believe Advantage, and the lab

22  separately.

23      Q.    So if I understand correctly.  The sales

24  representative, if they were able to land a new client,

25  this would be the -- one of the forms used to register

1    Q.    Uh-huh, okay.

2          And what's the purpose of this form?

3    A.    You know, I'm not affiliated with the clinical

4    or legal requirements of that form, or if was required

5    of every patient.  I do remember at some stage, you

6    know, compliance and in-house legal determining that we

7    should, you know, try to get our own record of a patient

8    consent form as opposed to relying solely on the

9    doctor's order.  And I know it was something that was

10   completely out of our control because we were relying on

11   a -- you know, on a -- you know, I was privy to

12   conversations about patient consent forms.  Trying to

13   obtain one from someone who was either intoxicated or

14   under the influence of drugs coming into a doctor's

15   facility and it just, you know, wouldn't have been

16   possible to get them from a patient.  But, you know, you

17   still got -- you still had to run a sample.  So I don't

18   know all the importance of it.

19         But to answer your question.  Simply, would

20   have been provided to the doctors, and I believe we

21   would have asked them if at all possible to try and

22   collect them.

23   Q.    Other than through this patient consent form,

24   do you know whether the labs had any other method of

25   obtaining patient consent?

Connecticut General Life Ins. Co. et al. vs Biohealth Laboratories, Inc., et al.

30(b)(6)                    Seamus Lagan on 01/27/2023                    Page 241

1    A.    They would not.  They would probably never have

2  known.  Unless, as I said, some of the blood draws where

3  a patient would have turned up with an acquisition from

4  a doctor, we would never have known the patient, or met

5  patients, or seen patients.

6    Q.    Got it.

7          So, again, other than this consent form, there

8  wouldn't have been a way for you to obtain the patient

9  consent, is that what you're saying?

10   A.    That's accurate.

11   Q.    Okay.  Previously we saw -- and if you want me

12  to pull it up, I'm happy too.  But one of the earlier

13  exhibits was Exhibit A, Part 3.  I showed you one of the

14  columns Q that said consent on file and it was either a

15  yes or no --

16   A.    Yeah.

17   Q.    -- do you recall that?

18   A.    I do.

19   Q.    Is it fair to say that that column "consent on

20  file" referred to this patient consent form?

21   A.    Yes, and I can't guarantee that that's the only

22  form of -- patient consent form that we -- we had.  But

23  it was -- but I would say yes.

24   Q.    Okay.  So if the column said yes, that means

25  for that patient it would have been this form or

Connecticut General Life Ins. Co. et al. vs Biohealth Laboratories, Inc., et al.

1     Q.   In 2014?

2     A.   Yes.

3     Q.   In 2015?

4     A.   Yes.

5     Q.   And 2016, and 2017 as well?

6     A.   I can't attest to the exact dates of claims

7  that weren't paid at this -- as I sit here now, but I

8  believe that is accurate, yes.

9     Q.   Would it be fair to say during those years,

10  2013 to 2017, CIGNA was certainly not consistently

11  paying labs for services billed?

12     A.   Are you taking about only our labs, or are you

13  talking about --

14     Q.   Your labs.  I'm sorry, the three labs, Epic,

15  BioHealth, and PB.

16     A.   I'm sorry, can you repeat the question just so

17  I understand --

18     Q.   Sure.

19     A.   -- it was only our labs.

20     Q.   Would it be fair to say that during those

21  years, 2013 to 2017, it is the labs' view that CIGNA was

22  not consistently paying the three labs for the services

23  that they were billing?

24     A.   That is accurate, yes.

25     Q.   Okay.

1  BY MR. KANG:

2      Q.   We talked about Angel's Recovery.  You said you

3  were aware of that provider, correct?

4      A.   Yes.

5      Q.   Okay.  Were they a substance abuse treatment

6  center?

7      A.   They were in the substance abuse sector, so

8  yes.  I don't remember all services they provided, but

9  they were.

10      Q.   Okay.  And you would agree with me that Angel's

11  Recovery was a significant customer of the labs?

12      A.   I don't remember the specific volume but, yes,

13  they were a significant size of a facility.

14      Q.   And were they a significant customer of the

15  labs from 2013 through 2017?

16      A.   I don't remember when they started and when

17  they finished.  I know that they -- we parted company

18  with Angel's Recovery at one time so I -- they were not

19  always a customer of our labs.

20      Q.   Okay.

21          MR. KANG:  Mr. McKenzie, could you pull up

22      LABS00415302; it's a spreadsheet.

23          THE VIDEOGRAPHER:  Yes.

24  BY MR. KANG:

25      Q.   Do you recognize this document, Mr. Lagan?

```
 1      A.   Yes.

 2      Q.   Okay.  Is this a Medytox internal document,

 3 sir?

 4      A.   Yes, I believe it is.

 5      Q.   Okay.  And it's titled Financial Analysis by

 6 Facility.

 7           Did I read that correctly down here at the

 8 bottom?

 9      A.   Yes, you did.

10      Q.   Okay.  And this appears to be a financial

11 analysis by facility with respect to BioHealth, correct?

12      A.   Yes.

13      Q.   And the time period that's described here is

14 February 2014, correct?

15      A.   Correct.

16      Q.   All right.  And is this a document that

17 reflects the financial analysis of drug specimens -- or,

18 I'm sorry, specimens that are being submitted to

19 BioHealth in the month of February 2014 broken down by

20 the referring providers?

21      A.   Yes, it does.

22      Q.   Okay.  And do you see Angel's Recovery on this

23 list?

24      A.   Yes.

25      Q.   Okay.  And according to this document, sir,
```

1   Angel's Recovery -- there's a column that says "total

2   sample count"; do you see that?

3       A.   Yep.

4       Q.   Does total sample count reflect the total

5   number of specimens that would have been sent by these

6   providers to BioHealth in the 2014?

7       A.   I believe it does, yes.

8       Q.   Okay.  And you'll see that for Angel's

9   Recovery, according to this document, there were 16,044

10  specimens sent to testing to BioHealth, correct?

11      A.   Correct.

12      Q.   All right.  And do you see on this list any

13  other provider that submitted more samples to BioHealth

14  than Angel's Recovery?

15      A.   No.  I do not, no.  A couple of other big

16  numbers there, but there's --

17      Q.   Yeah.

18      A.   -- a 4,000, and an 8,000, and 3,700, but none

19  bigger than Angel's Recovery.

20      Q.   Sure.

21           And in the total gross charges column does that

22  reflect the total amount that was charged by BioHealth

23  for the specimens that were sent by these listed

24  referring providers?

25      A.   I'm assuming that as the gross charges, yes.

1      Q.    Got it.

2            And so the total amount, then, that BioHealth

3      charged for Angel's Recovery specimens in the month of

4      2014, according to this, was $4,057,553.90; is that

5      right?

6      A.    That's correct.

7      Q.    And that's just in one month.  In the month of

8      February, 2014, correct?

9      A.    Yes.

10     Q.    All right.  And among the providers on this

11     list, the $4 million plus in gross charges for Angel's

12     Recovery is the highest, correct?

13     A.    That is correct.  But that month and that point

14     in time they appear to definitely be our biggest

15     customer that month.  They appear to run the biggest

16     volume of samples, and their gross billing to probably a

17     number of pairs is $4 million.  So that is what that

18     document is saying.

19     Q.    And, in fact, down at the bottom here you see

20     the total gross charges that BioHealth billed across all

21     facilities for the month of February 8th, 2014, correct?

22     A.    Correct.

23     Q.    And that was about $11.3 million, correct?

24     A.    Correct.

25     Q.    So the amount of business -- or the amount of

1  billed charges that was attributable to Angel's Recovery

2  was roughly about 35 percent of BioHealth' business in

3  the month of February of 2014, correct?

4          MR. GESTRICH:  Objection to form.

5      A.   Yes.

6  BY MR. KANG:

7      Q.   Okay.  Does the name Tovah Jasperson ring a

8  bell to you?

9      A.   No.

10      Q.   Tara Jasperson, does that ring a bell to you?

11      A.   Yes.

12      Q.   Okay.  Who is Tara Jasperson?

13      A.   I don't know if she was the CEO or an

14  individual, but she was part of management with Angel's

15  Recovery.

16      Q.   Okay.  And how did you know that?

17      A.   I think, sir, it was well publicized that

18  Angel's Recovery got themselves in a lot of trouble in

19  their business model and what they were doing.  So, you

20  know, Tara's -- I don't recall what the allegations

21  were, or what the charges were.  But you've picked a

22  facility -- as I said earlier, we terminated our

23  business relationship with them.  I terminated the

24  business relationship with that company, and I -- and a

25  lot of those people got themselves in trouble for

1           THE VIDEOGRAPHER:  This is the beginning of

2      Media 7.  The time is 6:31 p.m., and we're back on

3      the record.

4           MR. KANG:  Okay, thank you very much,

5      Mr. Lagan, I just have really a couple more

6      questions to ask.

7  BY MR. KANG:

8      **Q.   Have you reviewed, sir, all of the labs'**

9  **responses to CIGNA's interrogatories in this case?**

10     A.   Yes.

11     **Q.   Okay.  Are all of those interrogatory responses**

12  **accurate and complete?**

13     A.   To the best of my knowledge, yes.

14     **Q.   Okay.  You're not aware of any other**

15  **information that's responsive to those interrogatories**

16  **that haven't already been provided in the responses?**

17          MR. GESTRICH:  Objection to form.

18     A.   No.

19          MR. KANG:  All right, I -- I don't think I have

20      any further questions.

21          MR. GESTRICH:  Okay.

22          MR. KANG:  Tony, did you say -- did you say you

23      had a couple of follow-ups?

24          MR. GESTRICH:  I do.  I have a couple of

25      follow- ups for you.

1                           STIPULATIONS

2

3          IT WAS STIPULATED BETWEEN Counsel for the

4   respective parties, with the consent of the witness,

5   that reading and signing of the foregoing deposition by

6   the witness be reserved.

7

8          THEREUPON, the deposition of SEAMUS LAGAN,

9   taken at the instance of the Plaintiffs, was concluded

10  at 11:58 a.m.

11

12         NOTE:  The original and one copy of the

13  foregoing deposition will be held by E. Ted Kang,

14  Counsel for the Plaintiffs.

15              A copy of the foregoing deposition will

16  be held by Anthony Gestrich, Counsel for the Defendants.

17

18

19

20

21

22

23

24

25

```
 1                 CERTIFICATE OF REPORTER OATH

 2

 3  STATE OF FLORIDA

 4  COUNTY OF HILLSBOROUGH

 5

 6           I, the undersigned authority, hereby certify

 7  that the witness named herein personally appeared before

 8  me via Zoom videoconference and was duly sworn on

 9  Friday, January 27th, 2023.

10

11           WITNESS my hand and official seal this 2nd day

12  of February, 2023.

13

14

15

16

17           _____

18           LISA T. ADKINS

19           NOTARY PUBLIC - STATE OF FLORIDA

20           MY COMMISSION NO.:  HH 047535

21           EXPIRES:  November 8th, 2024

22

23

24

25
```

Case 3:19-cv-01324-JCH    Document 240-2    Filed 07/20/23    Page 27 of 27

Connecticut General Life Ins. Co. et al. vs Biohealth Laboratories, Inc., et al.

30(b)(6)                          Seamus Lagan on 01/27/2023                          Page 314

```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2

 3  STATE OF FLORIDA

 4  COUNTY OF HILLSBOROUGH

 5

 6        I, Lisa T. Adkins Notary Public in and for the

 7  State of Florida at large, hereby certify that the

 8  witness appeared before me via Zoom videoconference for

 9  the taking of the foregoing deposition, and that I was

10  authorized to and did stenographically and

11  electronically report the deposition, and that the

12  transcript is a true and complete record of my

13  stenographic notes and recordings thereof.

14        I FURTHER CERTIFY that I am neither an attorney,

15  nor Counsel for the parties to this cause, nor a

16  relative or employee of any attorney or party connected

17  with this litigation, nor am I financially interested in

18  the outcome of this action.

19        DATED THIS 2nd day of February, 2023, at Tampa,

20  Hillsborough County, Florida.

21

22

23  _____
                 LISA T. ADKINS

24

25
```