# EXHIBIT 34

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF CONNECTICUT

 3

 4    CONNECTICUT GENERAL LIFE        ) Case No.
      INSURANCE COMPANY, CIGNA        ) 3:19-cv-1324
 5    HEALTH AND LIFE INSURANCE       ) (JHCH)
      COMPANY,                        )
 6                                    )
                    Plaintiffs,       )
 7                                    )
               vs.                    )
 8                                    )
      BIOHEALTH LABORATORIES,         )
 9    INC., PB LABORATORIES, LLC,     )
      and EPIC REFERENCE LABS,        )
10    INC.,                           )
                                      )
11              Defendants.           )
                                      )
12    -------------------------------)

13

14

15                  CONFIDENTIAL

16       VIDEOCONFERENCE DEPOSITION OF

17            JACQUELINE THELIAN

18            New York, New York

19           Thursday, June 22, 2023

20

21

22

23

24    Reported by:
      TAMI H. TAKAHASHI, RPR, CSR
25    JOB NO. 1322
```

```
 1                        June 22, 2023

 2                        9:30 a.m.

 3

 4            Confidential Videoconference

 5   Deposition of JACQUELINE THELIAN, held via

 6   Zoom remote video conferencing software in

 7   New York, pursuant to Notice, before TAMI H.

 8   TAKAHASHI, a Registered Professional Reporter

 9   and Notary Public of the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    A P P E A R A N C E S:

 2    (All parties appearing remotely)

 3

 4    Representing the Plaintiffs:

 5        ALSTON & BIRD

 6              The Atlantic Building

 7              950 F Street, NW

 8              Washington, D.C.  20004-1404

 9              202.239.3728

10      BY:   EDWARD T. KANG, ESQ.

11              edward.kang@alston.com

12    - and -

13        ALSTON & BIRD

14              555 Fayetteville Street

15              Suite 600

16              Raleigh, North Carolina  27601-3034

17              919.862.2227

18      BY:   KELSEY KINGSBERY, ESQ.

19              kelsey.kingsbery@alston.com

20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2   (All parties appearing remotely)

 3

 4   Representing the Defendants BioHealth

 5   Laboratories, Inc., PB Laboratories, LLC,

 6   Epic Reference Labs, Inc.:

 7        WHITEFORD TAYLOR & PRESTON, LLP

 8             7 Saint Paul Street

 9             Baltimore, Maryland 21202-1636

10             410.347.9421

11        BY:   TODD M. BROOKS, ESQ.

12             tbrooks@whitefordlaw.com

13             KENNETH J. LUND, ESQ.

14             klund@whitefordlaw.com

15        - and -

16        WHITEFORD TAYLOR & PRESTON, LLP

17             11 Stanwix Street, Suite 1400

18             Pittsburgh, Pennsylvania 15222

19             412.275.2400

20        BY:   ANTHONY T. GESTRICH, ESQ.

21             a.gestrich@whitefordlaw.com

22

23   ALSO PRESENT:

24        JACK McKENZIE, Videographer

25        CHRIS HANEY, Forensus Group
```

```
 1              CONFIDENTIAL - J. Thelian
 2        Q.   Okay.  So when we were talking
 3   about the policy -- coverage policies that
 4   you looked at, you had referenced something
 5   from April 15, 2015.  And then you saw
 6   correspondence related to that April 15, 2015
 7   policy, and then you said some other memo
 8   that related to a different policy.
 9              And now having reviewed this, you
10   think this might be the memo that you were
11   referring to?
12        A.   It is, sir, yes.
13        Q.   And this is -- this is a letter
14   but -- but -- okay.
15              And so this is a policy that was
16   going to be effective August 19th of 2013,
17   correct?
18        A.   That is correct.
19        Q.   And as you can see, Cigna writes to
20   PB Labs the "Qualitative drug screen testing
21   claims under CPT codes 80100, 80101, and
22   80104 will no longer be reimbursed"; is that
23   correct?
24        A.   That's correct.
25        Q.   And you can see that Cigna writes
```

```
 1              CONFIDENTIAL - J. Thelian
 2    that this policy is in accordance with
 3    recommended updates from CMS, correct?
 4        A.    Correct.
 5        Q.    Does this policy change -- does
 6    this policy change any of the conclusions
 7    that you articulated in Opinion 2?
 8        A.    Opinion 2 was the 1638?
 9        Q.    Yes.  And we can go back to that.
10            MR. KANG:  Jack --
11            THE WITNESS:  Yeah, would you.
12            MR. KANG:  Jack, if you could go
13        back to Exhibit 2, please.
14    BY MR. KANG:
15        Q.    So here are the codes, right?
16        A.    Um-hum.
17        Q.    So the policy letter or the letter
18    that apprised PB Labs of the policy change
19    indicated that, as of August 19, 2013, Cigna
20    was going to be excluding coverage for tests
21    submitted under 80100, 80101 and 80104.  And
22    I see 80101 among the codes that you looked
23    for.
24        A.    Correct.  Can I -- I'm having a
25    little difficulty looking at it on the
```

CT GENERAL LIFE INSURANCE., ET AL. vs BIOHEALTH LABORATORIES INC., ET AL.

```
 1                    CONFIDENTIAL - J. Thelian

 2     screen.

 3          Q.   Sure.

 4          A.   I do have my report next to me.

 5          Q.   Okay.

 6          A.   If you could bear with me --

 7          Q.   Sure.

 8          A.   -- I can look through on page --

 9          Q.   14.  It's 14 of your report.

10          A.   Thank you.  Okay.  I'm sorry.  If

11     you can -- I have it now.  If you can just

12     repeat the question.

13          Q.   Sure.  So we saw the letter from

14     Cigna to PB Labs indicating that there was

15     going to be a coverage change effective

16     August 19, 2013.  That was Exhibit 8.

17               And in that letter, Cigna was

18     informing that, effective August 19, 2013,

19     80101 was no longer going to be reimbursed,

20     that it was going to be excluded.

21               And so my question to you is:  Does

22     that change -- does your knowledge of that

23     exclusion effective August 19, 2013 change

24     your Opinion Number 2 at all given that one

25     of the CPT codes that you believe was
```

```
 1              CONFIDENTIAL - J. Thelian
 2    improperly denied by Cigna was 80101?
 3         A.   Right.  So I believe that the Cigna
 4    document started in August.  Was that
 5    correct, of 2013?
 6         Q.   Correct.
 7         A.   So anything prior to August of 2013
 8    for the 80101 would still have been valid.
 9         Q.   Okay.  How about after August 19,
10    2013?
11         A.   Then it would not.
12         Q.   Okay.  So then did your report make
13    that distinction, because it sees -- it
14    suggests here that the code under "Code
15    History" your report notes, "It was a valid
16    CPT code in 2013.  As per CPT, this code was
17    deleted in 2015."
18         A.   Correct, and I believe -- to
19    respond to your earlier question, I believe
20    that the data was filtered out for anything
21    just -- well, the data -- I should say the
22    data was filtered to include anything prior
23    to that August date, to my knowledge.
24         Q.   Okay.  But you would agree, then,
25    that, as of August 19, 2013 and onwards, any
```

```
 1                CONFIDENTIAL - J. Thelian
 2     denials that Cigna rendered on the 80101 code
 3     would be appropriate, given the policy
 4     change?
 5          A.   It wouldn't -- well, okay.  If they
 6     were billing the 80101 after the policy
 7     changed, that would not be correct.
 8          Q.   That would be -- that would not be
 9     correct for -- for -- for the labs to submit
10     with an 80101 code after August 19, 2013,
11     correct?
12          A.   Well, let me say this.  You're
13     correct, right.
14          Q.   All right.  And so if Cigna denied
15     any claims under 80101 after August 19, 2013,
16     you would agree with me that those denials
17     would be appropriate based on the policy that
18     we looked at?
19          A.   That would be correct.
20          Q.   Okay.  I want to also show you
21     80 --
22               MR. KANG:  Can we show -- go to Tab
23          8, Jack.
24               (Plaintiffs' Exhibit 9, Cigna
25          Reimbursement Policy, marked for
```

```
 1              CONFIDENTIAL - J. Thelian
 2    There's only a couple of pages left.  Is this
 3    something that looks familiar to you as
 4    something you reviewed?
 5         A.   I might have reviewed it.  I
 6    reviewed many documents.
 7         Q.   Okay.
 8         A.   I just can't recall at this
 9    particular point in time.
10         Q.   Okay.  I wanted to direct your
11    attention to this section "Qualitative Drug
12    Screens" --
13         A.   Um-hum.
14         Q.   -- in particular here.  It
15    states -- and you can read, obviously, the
16    whole section.  But I'm directing your
17    attention to that last sentence.  This talks
18    about reimbursement policies.  And according
19    to this document, Cigna states that, "The new
20    replacement codes 80300-80304 will also be
21    considered non-eligible for reimbursement."
22              And it notes that its effective
23    date is January 1, 2015.
24         A.   Right.
25         Q.   Okay.  So is it fair to say, then,
```

```
 1              CONFIDENTIAL - J. Thelian

 2    that after -- as of January 1, 2015 and

 3    onwards, according to this policy, providers

 4    cannot bill -- well, they could bill but it

 5    would -- it would be -- it would be excluded

 6    if they billed for 80300 to 80304?

 7         A.   That would be correct.

 8              MR. KANG:  Okay.  So then if we go

 9         back to Exhibit 2, Jack.

10              THE WITNESS:  I'm sorry.

11              MR. KANG:  Sure.

12              THE WITNESS:  I'm so sorry.  If you

13         could just go back to that --

14              MR. KANG:  Yeah.

15              THE WITNESS:  -- for a moment.

16              MR. KANG:  Yeah.

17              THE WITNESS:  Thank you.  If you

18         could scroll to the top --

19              MR. KANG:  Okay.

20              THE WITNESS:  -- please.

21              MR. KANG:  Sure.  Of this page or

22         the whole document?

23              THE WITNESS:  The whole document.

24         The beginning of the document.

25              MR. KANG:  Sure.
```

```
 1              CONFIDENTIAL - J. Thelian
 2         A.    Again, it's based upon the
 3    consistency of what I found with the
 4    documents of which I were reviewing.
 5         Q.    Okay.  Okay.  So this 3 --
 6              MR. KANG:  You can take this down,
 7         Jack, and go back to Exhibit 2.
 8    BY MR. KANG:
 9         Q.    So the 322 code is -- is the fee
10    forgiving -- known as the "fee forgiving"
11    code, correct?
12         A.    Correct.
13         Q.    And I just want to talk generally
14    about in-network and out-of-network providers
15    for a sec.
16              Obviously, you're well aware of the
17    distinction between in-network and
18    out-of-network providers, correct?
19         A.    Correct.
20         Q.    In-network providers are also known
21    as "participating providers"?
22         A.    That's correct.
23         Q.    And out-of-network providers
24    sometimes are referred to as
25    "nonparticipating" or "nonpar providers,"
```

```
 1                  CONFIDENTIAL - J. Thelian
 2    right?
 3         A.   Correct.
 4         Q.   And in-network providers, as I
 5    understand, are those that have agreements
 6    with payors like Cigna, correct?
 7         A.   Contracts, yes.
 8         Q.   Okay.  And those contracts, they --
 9    among other things, they establish
10    agreed-upon rates for the services and how
11    much they're going to be compensated for
12    those services, right?
13         A.   Correct.
14         Q.   And in return for those rates, one
15    of the things that the in-network providers
16    gain is access to Cigna plan members as a
17    source of patients, right?
18         A.   Correct.
19         Q.   And as part of the agreement,
20    in-network providers agree not to bill plan
21    members for what's known as the "balance
22    bill," correct?
23         A.   No, I don't agree with that.
24         Q.   No?  What about that do you not
25    agree with?
```

```
 1              CONFIDENTIAL - J. Thelian

 2        A.   Well, just because you're

 3   in-network, a lot of folks still have

 4   coinsurance, copayments.

 5        Q.   Okay.  How about the difference

 6   between the agreed-upon rates and the

 7   providers -- in-network providers ordinary

 8   bill charges, they agree not to bill the

 9   patient for that -- that delta, correct?

10        A.   Correct.

11        Q.   Okay.  All right, that's

12   in-network.

13             Now, out-of-network providers --

14   correct me if I'm wrong -- they're ones that

15   do not have contracts or agreements with

16   payors like Cigna, right?

17        A.   Correct.

18        Q.   And as a result, they do not have

19   agreed-upon rates for the services that they

20   provide, right?

21        A.   Correct.

22        Q.   They bill -- the out-of-network

23   providers bill at the rates that they -- the

24   out-of-network providers set, correct?

25        A.   Correct.
```

```
 1                    CONFIDENTIAL - J. Thelian
 2          Q.    And that's known as the "bill
 3    charges," right?
 4          A.    Correct.
 5          Q.    And then the out-of-network
 6    providers submit their bill and they're paid
 7    out in accordance with the terms of the
 8    individual plans, right?
 9          A.    Yes, typically.
10          Q.    Okay.  And so in order to know how
11    much an out-of-network provider is going to
12    be paid on a particular plan, you would need
13    to look at the plan documents, correct?
14          A.    You can also look at the
15    reimbursement rates that come in for those
16    particular patients to determine what Cigna
17    generally pays for that group.
18          Q.    That's an estimate.  But even for
19    an individual patient, plans can change from
20    year to year, can't they?
21          A.    They sure do.
22          Q.    So even if, you know, Ted Kang is
23    getting service in 2013 and 2014, whatever
24    reimbursement rates that Cigna pays out to
25    Ted Kang in 2013, 2014 might not apply in
```

1          CONFIDENTIAL - J. Thelian

2    2015 if there's a change in the plan,

3    correct?

4          A.    That's correct.

5          Q.    Right.  So in order to know how

6    much Ted Kang would get paid or reimbursed in

7    2015, you'd need to take a look at the 2015

8    plan document, no?

9          A.    If I wanted to know specifically

10   how much I was getting paid for that

11   particular service --

12         Q.    Um-hum.

13         A.    -- you would.  Unfortunately, labs

14   don't have that opportunity.

15         Q.    Right.  But you agree that, in

16   order to know what would be paid out in 2015,

17   you would need to take a look at the plan

18   document for 2015?

19         A.    Most out-of-network providers

20   don't.  They just submit their claim.

21         Q.    That's not what my question was.

22               My question was:  If you wanted to

23   know -- my question was not about what

24   out-of-network providers do.

25               But if you wanted to know how much

CT GENERAL LIFE INSURANCE., ET AL. vs BIOHEALTH LABORATORIES INC., ET AL.
Confidential                    Jacqueline Thelian on 06/22/2023                    Page 187

```
 1                CONFIDENTIAL - J. Thelian
 2    would get paid out, you would agree that you
 3    would need to take a look at the plan
 4    document right?
 5         A.   Specifically, yes.
 6         Q.   Okay.  Out-of-network providers,
 7    unlike in-network providers where we're
 8    talking about in-network providers not
 9    needing to bill the patient the difference
10    between the contracted rate and their
11    ordinary billed charges, out-of-network
12    providers are required to bill the patient
13    for the difference between their billed
14    charges and the amount that they get paid
15    according to the plan, correct?
16         A.   Could you say that again, please.
17         Q.   Sure.  Are out-of-network -- let me
18    ask it this way.  Have you heard of something
19    called "balance billing"?
20         A.   Sure.
21         Q.   What's "balance billing," to your
22    understanding?
23         A.   Balance billing is billing the
24    patients whatever their responsibility is
25    based upon the explanation of benefits.
```

```
 1                  CONFIDENTIAL - J. Thelian
 2     particular charge, and then the patient's
 3     responsible for their coinsurance or their
 4     portion of the cost share for that services.
 5          Q.   And then there's something also
 6     called a "deductible," correct?
 7          A.   Correct.
 8          Q.   And what's a "deductible"?
 9          A.   The deductible is the portion that
10     the patient is responsible to pay prior to
11     having the insurance company start to
12     reimburse for services.
13          Q.   Okay.  And then for out-of-network
14     providers, the patients also, depending on
15     the plan language, may be responsible for the
16     balance bill, correct?
17          A.   Correct.
18          Q.   Okay.  Now, fee forgiving, which is
19     the subject of your Opinion 3, what in your
20     mind is -- what is your understanding of what
21     "fee forgiving" is?
22          A.   Fee forgiving would be not
23     collecting any of the patient's
24     responsibility unless -- well, there's
25     certain circumstances where there, A, would
```

```
 1                    CONFIDENTIAL - J. Thelian
 2     not be a patient responsibility based upon
 3     the explanation of benefits.
 4              B, in some cases, there's financial
 5     hardship.  There would be documentation for
 6     that as well.
 7          Q.   Okay.  Is fee forgiving generally
 8     considered to be an improper or illegal
 9     practice?
10          A.   Well, I would say I don't know that
11     it's illegal.  I would say it's improper.
12          Q.   Why?
13          A.   Why?  Because the patient has an
14     obligation to their financial responsibility
15     unless there are other circumstances that
16     would allow them not to pay.
17              As I mentioned, it would be things
18     like financial hardship or sometimes the EOB
19     comes back and there is no patient
20     responsibility for it.  Sometimes their
21     deductibles -- they met their max and they
22     just don't have a responsibility.
23          Q.   And outside of the context of those
24     couple examples, in sort of the
25     run-of-the-mill fee forgiving context absent
```

```
 1                CONFIDENTIAL - J. Thelian

 2     sort of the -- some of the exceptions, what

 3     impact does the practice of fee forgiving

 4     have on the cost of healthcare?

 5         A.   Well, I'm trying to think of a good

 6     way to explain it.  Can I give an example?

 7         Q.   Yeah, sure.

 8         A.   So if I were to charge the

 9     insurance company $100, and $20 is the

10     patient's responsibility and I don't collect

11     or I fee forgive, as you call it, the $20,

12     then it would appear that I'm willing to

13     accept $80 instead of $100 that I billed the

14     insurance company.

15         Q.   In other words, the true -- in your

16     example, the provider's true cost was only

17     80, but instead the provider billed 100 to

18     insurance?

19         A.   If fee forgiveness was applied.

20         Q.   Um-hum.  And that overcharging,

21     if it's a practice and if it's something

22     that's -- occurs on a widespread level, it is

23     something that ultimately could have the

24     impact of driving up healthcare costs,

25     correct?
```

```
 1              CONFIDENTIAL - J. Thelian
 2      A.   I would agree to that.
 3      Q.   Okay.  On page 19 --
 4           MR. KANG:  How are you doing?
 5      We've been going an hour and 20.  You
 6      need a break?
 7           THE WITNESS:  I think I'm okay.
 8           MR. KANG:  Okay.  Why don't we go
 9      another five or so then I'll probably be
10      at a good breaking point.
11           THE WITNESS:  Okay.
12 BY MR. KANG:
13      Q.   On page 19 of your report, you
14 reference the Office of Inspector General,
15 right?
16      A.   Correct.
17      Q.   Okay.  And this is the Office of
18 Inspector General of the Department of Health
19 and Human Services, correct?
20      A.   That is correct.
21      Q.   And you -- you quote here that the
22 OIG requires, quote, a good faith effort to
23 collect deductibles and copayments must be
24 made, correct?
25      A.   Correct.
```

```
 1              CONFIDENTIAL - J. Thelian
 2         Q.   Got it.  How about -- and sort of
 3    with the caveats you expressed about locating
 4    the patient, how about sending collection
 5    notices to patients, would that also be
 6    considered, in your opinion, a good faith
 7    collection effort?
 8         A.   Again, you know, that depends on
 9    what that provider's policy is, if they
10    choose to send patients to collection
11    agencies or not.  Some do, some don't.
12         Q.   Okay.  But if -- if a provider was
13    routinely sending patients out to
14    collections, you would -- you would agree
15    that that would represent and demonstrate
16    certainly good faith collection efforts,
17    right?
18         A.   I would agree to that.
19         Q.   Okay.  Now, according to your
20    report on page 20, you list patient
21    statements that were sent and you give some
22    examples with respect to three patients,
23    correct?
24         A.   Correct.
25         Q.   And according to this chart, the
```

```
 1              CONFIDENTIAL - J. Thelian

 2   date of statement sent for these three

 3   patients was February 27, 2015; December 15,

 4   2014; and February 13, 2015, correct?

 5        A.   Correct.

 6        Q.   So the earliest patient statement

 7   that you indicate in your report that you saw

 8   was December 15, 2014, correct?

 9        A.   Correct.

10        Q.   Do you know whether you saw any

11   patient statements sent prior to that date?

12        A.   I don't recall.

13        Q.   Okay.  Do you remember how it was

14   that -- who provided you with these patient

15   statements?

16        A.   Again, this is information that I

17   received from the law firm.

18        Q.   Okay.  Did you see any

19   documentation reflecting follow-up

20   correspondence or phone calls being placed to

21   patients prior to December 15, 2014?

22        A.   I don't recall.

23        Q.   Do you see -- do you recall seeing

24   any documentation of any collection notices

25   being sent out prior to December 15, 2014?
```

```
 1                CONFIDENTIAL - J. Thelian

 2        A.    I do not recall.

 3              MR. KANG:  Why don't we break here.

 4              THE WITNESS:  That would be good.

 5              MR. KANG:  I think we can use a

 6        break.

 7              THE WITNESS:  Thank you.

 8              MR. KANG:  Thank you very much.

 9              THE VIDEOGRAPHER:  The time is 2:00

10        p.m.  We're now off the record.

11              (Recess taken.)

12              THE VIDEOGRAPHER:  This is the

13        beginning of media 4.  Time is 2:12 p.m.

14        We're back on the record.

15   BY MR. KANG:

16        Q.    So, Ms. Thelian, before we broke we

17   were looking at your report regarding fee

18   forgiveness and patient statements with --

19   that you reviewed, correct?

20        A.    Correct.

21        Q.    And are -- did you come across -- I

22   believe your testimony was that you did

23   not -- you did not see any patient statements

24   sent out prior to December 15, 2014, correct?

25        A.    Yes, not that I could recall.
```

```
 1                  CONFIDENTIAL - J. Thelian
 2          Q.    Okay.  Based on what you saw, do
 3      you believe that the labs had a practice of
 4      routinely sending out patient statements
 5      prior to December 15, 2014?
 6          A.    I don't recall.
 7          Q.    What do you mean you don't recall,
 8      ma'am?
 9          A.    Say the question again, please.
10      I'm sorry.
11          Q.    Sure.  Based on -- based on the
12      documents that you were provided, do you have
13      an opinion as to whether the labs, prior to
14      December 15, 2014, had a practice of
15      routinely sending patient statements out to
16      patients?
17          A.    I don't recall seeing anything
18      prior to the 20 -- the 12/15/2014 date.
19          Q.    Okay.  Now, based on that -- so
20      strike that.
21                Okay.  And we've been focusing on
22      the stuff before December 15, 2014.  Let me
23      ask you:  On records after December 15, 2014,
24      did you come across any records indicating
25      that, after December 2014, the labs made
```

```
 1
 2                C E R T I F I C A T E
 3    STATE OF NEW YORK      )
 4                           : ss.
 5    COUNTY OF NEW YORK     )
 6
 7            I, TAMI H. TAKAHASHI, a Notary
 8       Public within and for the State of New
 9       York, do hereby certify:
10            That JACQUELINE THELIAN, the
11       witness whose deposition is hereinbefore
12       set forth, was duly sworn by me and that
13       such deposition is a true record of the
14       testimony given by the witness.
15            I further certify that I am not
16       related to any of the parties to this
17       action by blood or marriage, and that I
18       am in no way interested in the outcome
19       of this matter.
20            IN WITNESS WHEREOF, I have hereunto
21       set my hand this 28th day of June 2023.
22
23
24       _____
25                TAMI H. TAKAHASHI
```