# EXHIBIT 35

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

Civil Action No. 19-cv-01324-JCH

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY and
CIGNA HEALTH AND LIFE
INSURANCE COMPANY,

     *Plaintiff*,

v.

BIOHEALTH LABORATORIES, INC.,
PB LABORATORIES, LLC,
EPIC REFERENCE LABS, INC., and
EPINEX DIAGNOSTICS, INC.,

     *Defendants*.

## EXPERT REPORT OF

## CHRISTOPHER L. HANEY, CPA, CFE, CHC

_____

**Christopher L. Haney, CPA, CFE, CHC**
**Managing Director**
**Forensus Group, LLC**
**March 1, 2023**

## Table of Contents

I.    INTRODUCTION .................................................................................................................. 3

II.   EXPERT BACKGROUND AND QUALIFICATIONS ..................................................... 4

III.  SUMMARY OF OPINIONS .............................................................................................. 5

    A.   Information Considered ..................................................................................................... 6

IV.   RELEVANT BACKGROUND ........................................................................................... 7

    A.   Population of Claims At-Issue ........................................................................................... 7

    B.   The Sample Bases for Cigna Flagging and Denying the Labs' Claims ............................. 8

    C.   Overview of Statistical Principles ................................................................................... 15

V.    ASSIGNMENT AND METHODOLOGY OF ANALYSIS ............................................ 18

    A.   Evaluating Cigna's Sampling Analyses .......................................................................... 18

    B.   Damages Estimation ........................................................................................................ 19

VI.   OPINION #1 ...................................................................................................................... 21

    A.   Cigna's statistical bases for unilaterally flagging and denying the Labs' claims for reimbursement are invalid and unreliable.  The samples on which Cigna based its denial decisions were neither designed nor executed in a scientific manner and Cigna's generalized conclusions based on those samples are meaningless beyond the sampled items themselves. ................................................................... 21

    B.   Limited Support for Cigna's Analyses ............................................................................ 21

    C.   Improper Design of Cigna's Samples .............................................................................. 23

    D.   Flawed Execution of Cigna's Samples ............................................................................ 25

VII.  OPINION #2 ...................................................................................................................... 27

    A.   Cigna's improper denial of the Labs' 15,842 eligible and covered healthcare claims, with dates of service from January 1, 2012, to December 29, 2017, caused estimated damages in the amount of $20,427,577.  Penalty interest for these claims, in accordance with various state laws, is estimated to be at least an additional $19,819,549 as of the date of this report. ................................................................... 27

    B.   Penalty Interest in Accordance with State Law(s) .......................................................... 28

VIII. OPINION #3 ...................................................................................................................... 30

    A.   Counsel identified 6,458 claims where (i) the Labs allegedly were not properly notified of Cigna's denial, in violation of state law, and (ii) Cigna failed to properly pay the Labs' invoices for those claims. The unpaid principal balance for these claims caused actual damages in the amount of $9,812,173. Penalty interest for these claims, in accordance with state law, is estimated to be at least an additional $10,261,928 as of the date of this report. .............................................................................................. 30

    B.   Claims Without Proper Notification of Denial, in Violation of State Law ...................... 30

    C.   Penalty Interest in Accordance with State Law(s) .......................................................... 31

        APPENDIX A – DOCUMENTS CONSIDERED ................................................................ 32

        APPENDIX B – CURRICULUM VITAE OF CHRISTOPHER HANEY, CPA, CFE, CHC ............... 32

        APPENDIX C – ESTIMATE OF ACTUAL DAMAGES – CIGNA'S IMPROPER DENIALS ............. 32

        APPENDIX D – STATE PROMPT PAY STATUTES ....................................................... 32

        APPENDIX E – PENALTY INTEREST FOR IMPROPER DENIALS – FLORIDA LAW ................ 32

        APPENDIX F – PENALTY INTEREST FOR IMPROPER DENIALS – RESPECTIVE STATE LAW ........... 32

        APPENDIX G – ESTIMATE OF ACTUAL DAMAGES – CLAIMS IN VIOLATION OF STATE LAWS ........ 32

        APPENDIX H – PENALTY INTEREST FOR CLEAN CLAIMS – FLORIDA LAW ..................... 32

        APPENDIX I – PENALTY INTEREST FOR CLEAN CLAIMS – RESPECTIVE STATE LAW ............ 32

## I.    INTRODUCTION

1.  Among other filings in this matter, Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively, "Cigna") filed a complaint on August 27, 2019, which it amended on December 13, 2021 ("Cigna's Complaint"), bringing an unjust enrichment claim, among other claims, against BioHealth Laboratories, Inc. ("BioHealth"), PB Laboratories, LLC ("PBL"), Epic Reference Labs, Inc. ("Epic"), and others.[1]  On January 11, 2021, Epic, BioHealth, and PBL (collectively the "Labs") filed a separate amended complaint ("Labs' Complaint") bringing a breach of contract claim, among other claims, against Cigna.[2] These matters were consolidated on February 2, 2022.  As part of this litigation, the Labs allege that Cigna, during the relevant period of 2012 through 2017, failed to properly reimburse the Labs' covered claims for blood and urine testing services.

2.  Counsel for the Labs, Whiteford, Taylor & Preston L.L.P. ("Counsel"), retained me as a testifying expert witness to evaluate documentation related to the Labs' healthcare claims seeking reimbursement from Cigna, along with Cigna's justification(s) for denying such claims. Specifically, Counsel asked me to (i) evaluate Cigna's purported statistical basis for unilaterally flagging and denying reimbursement for the Labs' covered testing service claims, (ii) estimate financial damages resulting from Cigna's alleged improper denial of such claims, including penalty interest, and (iii) estimate financial damages resulting from Cigna's alleged violations of state law(s), including prompt pay statutes (the "Assignment").

3.  This report summarizes my findings, observations, and opinions to date.  My opinions are based on the data and information available to me at this time, which are listed in Appendix A.  I reserve the right to update, supplement, amend, or revise my opinions when additional information or data becomes available for my review and to respond to any additional expert opinions proffered by or on behalf of the parties to this matter.

---

[1] *Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company v. BioHealth Laboratories, Inc., PB Laboratories, LLC, Epic Reference Labs, Inc., and Epinex Diagnostics, Inc., et al.,* No. 19cv01324, in the U.S. District Court for the District of Connecticut.
[2] *Epic Reference Labs, Inc., BioHealth Laboratories, Inc., and PB Laboratories, LLC v. Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company,* No. 19cv01326, in the U.S. District Court for the District of Connecticut.

## II.    EXPERT BACKGROUND AND QUALIFICATIONS

4. I am a Managing Director at the Forensus Group, LLC ("Forensus").  Forensus is a forensic accounting and investigative consulting firm supporting client needs principally in the areas of fraud investigation, healthcare compliance, statistical analysis, and litigation support.

5. Previously, I was a Director in the Disputes and Investigations practice at a global consulting firm Duff & Phelps (now Kroll) and, before that, a Forensic Accountant at the Federal Bureau of Investigation ("FBI"), specializing in healthcare and white-collar violations.  Prior to joining the FBI, I was a member of General Electric Co.'s Corporate Audit Staff, focusing on financial and compliance audits across the company.  I also previously served as the Chief Compliance Officer for a large toxicology laboratory (i.e., blood and urine testing), much like the Labs in this matter.

6. My primary responsibility at Forensus is to provide litigation-related consulting services.  I have over 18 years of experience providing statistical advice, investigative analysis, and forensic accounting in a variety of civil and criminal healthcare disputes.  I have also been qualified as, and testified as, an expert in the U.S. District Court, as well as other venues.

7. I am regularly retained as an expert to evaluate large volumes of healthcare claims data and to estimate financial damages in healthcare reimbursement disputes.  I routinely provide statistical advice related to sample selection and extrapolation for potentially improper and/or fraudulent healthcare claims.  I have also conducted in-depth statistical training programs for healthcare insurance companies and their Special Investigative Units ("SIU") on the topic of proper uses of statistical sampling and auditing techniques.

8. I have been retained by both plaintiff and defense counsel, including the Department of Justice, on multiple occasions.  I have also served as a neutral statistical expert and a damages expert in healthcare reimbursement arbitration matters.  I routinely speak at national healthcare industry conferences and am published in industry journals on topics related to healthcare reimbursement disputes, statistical sampling, and financial damages.  I also continue to serve as a Lieutenant Colonel and Medical Service Corps Officer in the U.S. Army Reserve, with specializations in healthcare administration and medical operations.

9. I earned my M.B.A. from the University of Virginia and my B.S. in Mechanical Engineering from the Virginia Military Institute.  I earned my Graduate Certificate in Applied Statistics from Pennsylvania State University.  I am a Certified Public Accountant ("CPA"), a Certified Fraud Examiner ("CFE") and Certified in Healthcare Compliance ("CHC"), all in good standing.

10. My education, professional history, qualifications, and a list of my publications are set forth in my curriculum vitae, which is attached as Appendix B along with additional Federal Rules of

Civil Procedure Rule 26 disclosures. I am being compensated for my work in this matter at the rate of $595 per hour, and I am being reimbursed for out-of-pocket expenses. The payment of fees is not contingent on any finding, result, or testimony in this matter.

## III.    SUMMARY OF OPINIONS

11. This section is intended to provide only a brief summary of my expert opinions in this matter. The bases for my opinions are fully discussed and supported herein. Based on my experience, education, training, and the results of my analysis (described in detail throughout this report), I have concluded, to a reasonable degree of certainty, the following:

**Opinion #1:** *Cigna's statistical bases for unilaterally flagging and denying the Labs' claims for reimbursement are invalid and unreliable. The samples on which Cigna based its denial decisions were neither designed nor executed in a scientific manner and Cigna's generalized conclusions based on those samples are meaningless beyond the sampled items themselves. This includes conclusions based on (i) BioHealth's Sample of 15 Patients, (ii) BioHealth's Sample of 108 Patients, (iii) PBL's Sample of 10 Claims, (iv) PBL's Sample of 8 Patients, and/or (v) PBL's Sample of 17 Patients.*

**Opinion #2:** *Cigna's improper denial of the Labs' 15,842 eligible and covered healthcare claims, with dates of service from January 1, 2012, to December 29, 2017, caused estimated damages in the amount of $20,427,577. Penalty interest for these claims, in accordance with various state laws, is estimated to be at least an additional $19,819,549 as of the date of this report.[3]*

**Opinion #3:** *Counsel identified 6,458 claims where (i) the Labs allegedly were not properly notified of Cigna's denial, in violation of state law, and (ii) Cigna failed to properly pay the Labs' invoices for those claims. The unpaid principal balance for these claims caused actual damages in the amount of $9,812,173. Penalty interest for these claims, in accordance with state law, is estimated to be at least an additional $10,261,928 as of the date of this report.*

---

[3] I use the term "penalty interest" throughout my report to describe the amounts due to the Labs resulting from Cigna's alleged violation of various state laws, including prompt pay statutes. I understand some state statutes refer to these amounts as "penalties" while others refer to these amounts as "interest".

**A.    Information Considered**

12. Counsel provided access to information, including, but not limited to:[4]

   a. Complaint and Amended Complaint in *Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company v. BioHealth Laboratories, Inc., PB Laboratories, LLC, EPIC Reference Labs, Inc., and Epinex Diagnostics, Inc., et al.,* No. 19cv01324, in the U.S. District Court for the District of Connecticut;

   b. Amended Complaint in *Epic Reference Labs, Inc., BioHealth Laboratories, Inc., and PB Laboratories, LLC v. Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company,* No. 19cv01326, in the U.S. District Court for the District of Connecticut;

   c. Spreadsheets produced by Cigna describing the individual claims and individual claim-line components representing all drug testing services performed by the Labs where reimbursement was sought from Cigna.[5]

   d. Cigna's SIU Case Notes;[6]

   e. The Labs' expert report of Ms. Jacqueline Thelian, dated March 1, 2023;

   f. Deposition transcript of Ms. Deanna Anderson, dated September 26, 2022; and

   g. Deposition transcripts of Ms. Stephanie Canto, dated October 27, 2022, February 2, 2023.

13. In addition to the information provided to me, I obtained additional information, where necessary, from publicly available sources.  A complete listing is included in Appendix A of this report along with all other information considered.

14. My work in connection with the Assignment was planned in accordance with applicable professional standards.  Litigation service engagements performed by CPAs are deemed to be forensic services as defined by the American Institute of Certified Public Accountants ("AICPA").  My work on this Assignment was performed in accordance with the applicable standards as set forth in the Standards for Forensic Services established by the AICPA.  Further, with respect to the other professional certifications that I possess, I adhered to the applicable standards of those governing organizations in the performance of my work in this matter.

---

[4] To the best of my knowledge, the data and information provided to me by Counsel was not limited in any manner, and I was allowed the opportunity to request additional information and documents that supported the opinions contained herein as well as conflicting evidence, if any. A complete listing of the documents considered is included in Appendix A.
[5] CIGNA19-1326 0007531, CIGNA19-1326 0007533, CIGNA19-1326 0007530, CIGNA19-1326 0007979, CIGNA19-1326 0007980, CIGNA19-1326 0007983, CIGNA19-1326 0007981.
[6] CIGNA19-1326 0302256, CIGNA19-1326 0302257, CIGNA19-1326 0302258.

## IV.    RELEVANT BACKGROUND

### A.    Population of Claims At-Issue

15. Both Cigna's Complaint and the Labs' Complaint address a common population of healthcare claims.  For example, the Labs' Complaint alleges that Cigna failed to properly pay the Labs' invoices for laboratory testing services, from 2013 through the present, for amounts in excess of $32 million.  Similarly, Cigna's Complaint alleges that, the Labs, "over the course of several years," fraudulently obtained and retained "at least $20 million in overpayments from Cigna."[7]

16. In this litigation, Cigna produced numerous spreadsheets of data describing the individual claims representing all drug testing services performed by the Labs where reimbursement was sought from Cigna.  In other words, these spreadsheets portray all claims at issue in this matter, whether they were unjustly paid as alleged by Cigna, or improperly denied as alleged by the Labs.  This population of healthcare claims (the "Population") formed the basis for much of the analyses described herein and is summarized in Table 1 below:[8] [9]

**Table 1. Population of Claims At-Issue**
*Summary of Claims for Reimbursement Submitted to Cigna by the Labs*

| | |
|---|---|
| Labs Included in Population | BioHealth, PBL, and Epic |
| Dates of Service for Claims | Jan 1, 2012 to Dec 29, 2017 |
| No. of Unique Claims Submitted | 36,290 |
| Charged Amount | $56,663,179 |
| Net Paid Amount | $16,169,936 |

[7] Labs' Complaint ¶ 19.  *See also* Cigna's Complaint ¶ 10.

[8] CIGNA19-1326 0007531, CIGNA19-1326 0007533, CIGNA19-1326 0007530, CIGNA19-1326 0007979, CIGNA19-1326 0007980, CIGNA19-1326 0007983, CIGNA19-1326 0007981.  Numerous claims were identified in Cigna's spreadsheets where Cigna ultimately reversed the adjudication and/or payment, then re-adjudicated the claim ("Reversed Claims").  Reversed Claims were identified as any claim line with negative [Unit Qty] and negative [Charge Amount] and a reciprocal claim line with positive [Unit Qty] and positive [Charge Amount] combined with the same [INV DCN], [Line Number] and [First Service Date] on the previous [Claim Paid Date].  For example, claim 4431432593908, line 17, was first adjudicated on 12/13/2014 and denied by Cigna for remark code 1698.  That claim was reversed on 11/10/2015 and re-adjudicated and denied again for remark code 0322.  For the purposes of defining the Population, the Reversed Claim Lines were excluded to prevent double-counting.

[9] Numerous claims were identified in Cigna's spreadsheets where the Labs resubmitted a claim for services that were submitted and denied as part of another claim ("Resubmitted Claims").  Resubmitted Claims were identified as any claim line with a [AMI], [First Service date], [Service Code] combination with a [Claim Received Date] earlier than the latest [Claim Received Date] for that combination. For example, see claims 8431409790353 and 8431516295538. For the purposes of defining the Population, only the most recent version of Resubmitted Claim Lines were considered to prevent double-counting.

**B.      The Sample Bases for Cigna Flagging and Denying the Labs' Claims**

17. As part of its allegations, Cigna purportedly performed several forms of analyses on subsets (i.e., samples) of the Population, allegedly establishing a basis for flagging and denying certain of the Labs' claims for reimbursement.   The following sections address many of Cigna's purported analyses.   To the extent Cigna based its decisions to flag and deny the Labs' claims on samples (random or otherwise), my analysis in the following pages evaluates those samples and the validity of any generalized conclusions based on those samples.

*BioHealth Samples*

Samples of Patients from BioHealth – Denial Code 0322 (Fee Forgiveness)

18. In approximately the fall of 2014, Cigna's SIU opened an investigation into BioHealth regarding alleged fee forgiveness whereby it selected a sample of 24 BioHealth patients to conduct "outreach" phone call surveys inquiring about BioHealth's billing practices.[10]   Cigna's SIU Case Notes indicate only 15 of the 24 sampled patients were contacted via telephone ("**Sample of 15 Patients**").   Note that, regardless of the number of patients selected for outreach, the *size* of a sample is merely the number of units addressed in the analysis-in this case only those 15 patients contacted by Cigna's SIU.

19. Cigna's SIU was ultimately able to speak with only three of the patients (i.e., a response rate of only 20 percent).   Cigna also spoke with a family member for one patient.   Of those interviewed, three of the four responses indicated patients received bills from BioHealth.   Although I understand it is Cigna's policy to record all such phone calls, I have not seen any transcripts of these calls produced by Cigna in this matter.   A summary of the Sample of 15 Patients is described in Table 2 below.

---

[10] Cigna's Complaint ¶ 77.  *See also* Deposition transcript of Ms. Stephanie Canto, dated February 2, 2023, at 321:15. *See also* CIGNA19-1326 0302258.

**Table 2. Summary of BioHealth's *Sample of 15 Patients*[11]**
*Cigna SIU Activity for BioHealth Patients*

| Patient # - initials | Date | Cigna SIU Activity | Result |
|---|---|---|---|
| 1 – W.W. | Feb 16 – Mar 2, 2015 | Left voice message | No response. |
| 2 – B.C. | Feb 16 – Mar 2, 2015 | Left voice message | No response. |
| 3 – M.N. | Feb 16 – Mar 2, 2015 | Left voice message | Patient responded and received no bills. |
| 4 – S.M. | Feb 16 – Mar 2, 2015 | Disconnected | No response. |
| 5 – A.L. | Feb 16 – Mar 2, 2015 | Left voice message | No response. |
| 6 – A.G. | Feb 16 – Mar 2, 2015 | Wrong number | No response. |
| 7 – T.C. | Feb 16 – Mar 2, 2015 | Left voice message | No response. |
| 8 – M.A. | Feb 16 – Mar 2, 2015 | Left voice message | Patient responded and received bills. |
| 9 – N.A. | Feb 16 – Mar 2, 2015 | Left voice message | Family member responded and received bills. |
| 10 – E.F. | Feb 16 – Mar 2, 2015 | Left voice message | No response. |
| 11 – K.G. | Feb 16 – Mar 2, 2015 | Disconnected | No response. |
| 12 – N.H. | Feb 16 – Mar 2, 2015 | Left voice message | No response. |
| 13 – J.M. | Feb 16 – Mar 2, 2015 | Left voice message | No response. |
| 14 – M.R. | Feb 16 – Mar 2, 2015 | Left voice message | Patient responded and received bills. |
| 15 – T.S. | Feb 16 – Mar 2, 2015 | Left voice message | No response. |

20. On March 4, 2015, Cigna's SIU suspended its analysis of the Sample of 15 Patients.[12]  In its place, Cigna's SIU purportedly sent Verification of Service ("VOS") letters seeking responses from 108 patients that Cigna alleged were the entirety of patients for which it received claims from BioHealth in 2014 ("**Sample of 108 Patients**").[13]  In other words, Cigna contends these 108 patients are not a *sample* of BioHealth's claims but rather represent the *entirety* of the BioHealth population for 2014.  However, upon review of the Population of BioHealth's claims in 2014 (i.e., Cigna's own spreadsheets), claims for **more than 150** patients were submitted to Cigna for reimbursement in 2014.

---

[11] CIGNA19-1326 0302258.

[12] Deposition transcript of Ms. Stephanie Canto, dated February 2, 2023, at 319:18.  *See also* CIGNA19-1326 0302258.

[13] CIGNA19-1326 0302258.

21. According to its SIU Case Notes, Cigna received approximately 20 responses to its Sample of 108 Patients by May 22, 2015 (i.e., a response rate of less than 20 percent).[14]  Of these responses, 3 indicated the patient either received a bill or paid BioHealth as part of its services.  Another 8 responses indicated the patient had not received a bill.  The remaining responses were either unclear or indicated the patient had not remitted payment to BioHealth without clarifying whether the patient received a bill.  Despite Cigna's SIU case notes claiming it maintained a spreadsheet of these VOS letters and their responses, I have seen no evidence produced by Cigna in discovery that substantively memorializes this analysis.[15]

22. Based on the findings of the *Sample of 15 Patients* and the *Sample of 108 Patients*, Cigna's SIU placed a "flag" on all future claims for reimbursement on May 22, 2015, and began denying all claims from BioHealth (i.e., indicated through denial code 0322 – Fee Forgiveness).[16]  From the time Cigna placed its flag on BioHealth until February 2017, over 4,051 claims for reimbursement from BioHealth were denied using denial code 0322.  These denied claims represented over $5.6 million in charges.  Charts 1 illustrates how BioHealth's claims for reimbursement were denied by Cigna during this timeframe, based on the findings of its samples.

**Chart 1. Cigna's Denials of BioHealth Claims**[17]
*May 22, 2015, to February 25, 2017*



$667,240

$5,605,301

■ 0322 - Fee Forgiveness    ■ All Others

---

[14] It is my understanding Cigna has not produced the full set of VOS letters purportedly sent as part of its survey, nor has it fully produced the subsequent patient responses, despite the Labs having requested these documents.  For instance, only 2 of the purported 20 responses Cigna received to its BioHealth VOS letters were produced by Cigna in discovery. CIGNA 19-1326 0004752 and CIGNA 19-1326 0291184.

[15] CIGNA19-1326 0290560 at 561.

[16] Cigna's Complaint ¶ 79.  *See also* Deposition transcript of Ms. Stephanie Canto, dated October 27, 2022, at 221:21.

[17] CIGNA19-1326 0007531, CIGNA19-1326 0007533, CIGNA19-1326 0007530, CIGNA19-1326 0007979, CIGNA19-1326 0007980, CIGNA19-1326 0007983, CIGNA19-1326 0007981.

*PBL Samples*

"Sample of 10 Claims" from PBL – Denial Code 0369 (Services Not Performed)

23. In approximately the summer of 2013, Cigna's SIU selected a sample of 20 patients' claims for drug testing services submitted by PBL.  Cigna also obtained additional supporting information, including medical records, for those claims.  A Cigna Medical Director reviewed only 10 of the 20 patients' claims (the "**Sample of 10 Claims**").[18]  Based on the findings of the Sample of 10 Claims, Cigna's SIU placed a "flag" on all future claims for reimbursement on September 26, 2013, and began denying all claims for confirmatory testing from PBL (i.e., indicated through denial code 0369 – Services Not Performed).[19]  As part of this denial, Cigna purportedly sought additional claim-level records from PBL in support of each denied claim.

24. From the time Cigna placed a flag on PBL on September 26, 2013, until it subsequently modified the flag on March 26, 2014, over 3,400 claims for reimbursement from PBL were denied using denial code 0369.  These denied claims represented over $5.9 million in charges.  Chart 2 below illustrates how PBL's claims for reimbursement were denied by Cigna during this timeframe, based on the findings of the Sample of 10 Claims.

**Chart 2. Cigna's Denials of PBL Claims[20]**
*September 27, 2013, to March 26, 2014*



$322,631

$5,906,970

■ 0369 - Services Not Performed  ■ All Others

---

[18] Cigna's Complaint ¶ 71-72.  *See also* Deposition transcript of Ms. Stephanie Canto, dated October 27, 2022, at 158:21.
[19] Cigna's Complaint ¶ 73. *See also* Deposition transcript of Ms. Stephanie Canto, dated October 27, 2022, at 129:24, 148:14.  *See also* Deposition transcript of Ms. Deanna Anderson, dated September 26, 2022, at 167:19.
[20] CIGNA19-1326 0007531, CIGNA19-1326 0007533, CIGNA19-1326 0007530, CIGNA19-1326 0007979, CIGNA19-1326 0007980, CIGNA19-1326 0007983, CIGNA19-1326 0007981.

25. Cigna's SIU later modified PBL's flag on March 27, 2014, changing the *full* denial to a *code-specific* denial, based on further consideration of the Sample of 10 Claims and discussion with PBL counsel.[21]   From the time Cigna modified the flag on PBL on March 27, 2014, until it unilaterally flagged PBL for fee forgiveness on December 11, 2014, over 2,000 claims for reimbursement from PBL were denied using denial code 0369.   These denied claims represented over $2.9 million in charges.   Chart 3 below illustrates how PBL's claims for reimbursement were denied by Cigna during this timeframe, based on the findings of the Sample of 10 Claims.

**Chart 3. Cigna's Denials of PBL Claims**[22]
*March 27, 2014, to December 11, 2014*



Samples of Patients from PBL – Denial Code 0322 (Fee Forgiveness)

26. In approximately November 2014, Cigna's SIU opened an investigation into PBL regarding alleged fee forgiveness whereby it selected a sample of 10 PBL patients to conduct "outreach" phone call surveys inquiring about PBL's billing practices.[23]   Cigna's SIU Case Notes indicate only 8 of the 10 sampled patients were contacted via telephone, and Cigna's SIU was ultimately unable to speak with any of the patients (i.e., a response rate of zero percent).   Instead, Cigna purportedly spoke with family members for 2 of the 8 patients, and both indicated they "didn't

---

[21] CIGNA 19-1326 0292118, CIGNA19-1326 0289467.
[22] CIGNA19-1326 0007531, CIGNA19-1326 0007533, CIGNA19-1326 0007530, CIGNA19-1326 0007979, CIGNA19-1326 0007980, CIGNA19-1326 0007983, CIGNA19-1326 0007981.
[23] Cigna's Complaint ¶ 77.  *See also* Deposition transcript of Ms. Stephanie Canto, dated February 2, 2023, at 356:7.

recall" if they or the patients had received bills from PB Labs. Although I understand it is Cigna's policy to record all such phone calls, I have not seen any transcripts of these calls produced by Cigna in this matter. A summary of this sample (the "**Sample of 8 Patients**") is described in Table 3 below.

**Table 3. Summary of PBL's *Sample of 8 Patients*[24]**
*Cigna SIU Activity for PBL Patients*

| Patient # - initials | Date | Cigna SIU Activity | Result |
|---|---|---|---|
| 1 – L.N. | Nov 21, 2014 | Left voice message | Family member responded and "didn't recall" bill. |
| 2 – D.R. | Nov 21, 2014 | No answer | No response. |
| 3 – N.B. | Nov 21, 2014 | Out of service | No response. |
| 4 – B.M. | Nov 21, 2014 | Left voice message | No response. |
| 5 – R.J. | Nov 21, 2014 | No answer | No response. |
| 6 – T.K. | Nov 21, 2014 | Left voice message | No response. |
| 7 – M.L. | Nov 21, 2014 | Left voice message | Left second voice message with family member–no response. |
| 8 – C.S. | Nov 21, 2014 | Left voice message | Family member responded and "didn't recall" bill. |

27. Cigna's SIU also purportedly selected a sample of PBL's patients and sent VOS letters seeking responses regarding services provided by PB Labs.[25] However, I have seen almost no evidence demonstrating Cigna's analysis on this topic. For example, the Cigna Complaint describes 125 VOS letters sent to patients of **both** BioHealth and PBL. However, as described previously, the *Sample of 108 Patients* accounted for 108 VOS letters sent to BioHealth patients, leaving only 17 letters for PBL patients ("**Sample of 17 Patients**"). Moreover, Cigna's SIU Case Notes for PBL make no mention of *any* VOS letters sent to PBL patients, and Cigna only produced six responses to its VOS letters for PBL to the Labs during discovery. Nonetheless, Cigna purportedly found that "almost all of the patients" that responded to VOS letters never received a bill and never paid PBL.[26]

---

[24] CIGNA19-1326 0302256.
[25] Cigna's Complaint ¶ 75.
[26] *Id.* at 76.

28. Based on the findings of the *Sample of 8 Patients* and the *Sample of 17 Patients*, Cigna's SIU placed a "flag" on all future claims for reimbursement on December, 11 2014, and began denying all claims from PBL (i.e., indicated through denial code 0322 – Fee Forgiveness).[27] From the time Cigna placed flags on PBL until November 2017, over 700 claims for reimbursement from PBL were denied using denial code 0322. These denied claims represented over $1.3 million in charges. Charts 4 illustrates how PBL's claims for reimbursement were denied by Cigna during this timeframe, based on the findings of its samples.

**Chart 4. Cigna's Denials of PBL Claims**[28]
*December 12, 2014, to November 13, 2017*



*Epic Reference Labs Sample*

Sample of 20 VOS Letters from Epic Reference Labs

29. In approximately the winter of 2015, Cigna's SIU opened an investigation into Epic whereby it selected a sample of approximately 200 patients and purportedly sent VOS letters seeking responses from patients regarding services provided by Epic.[29] Cigna received responses to approximately 10 percent of those letters, Cigna, however, did not flag Epic or unilaterally deny

---

[27] Cigna's Complaint ¶ 79. *See also* Deposition transcript of Ms. Stephanie Canto, dated October 27, 2022, at 221:21.
[28] CIGNA19-1326 0007531, CIGNA19-1326 0007533, CIGNA19-1326 0007530, CIGNA19-1326 0007979, CIGNA19-1326 0007980, CIGNA19-1326 0007983, CIGNA19-1326 0007981.
[29] Cigna's Complaint ¶ 82-83. *See also* Deposition transcript of Ms. Deanna Anderson, dated September 26, 2022, at 214:5.

its claims based on that sample of VOS letters.[30]  Consequently, my analysis does not delve into Cigna's sample of VOS letters for Epic since it seemingly did not rely on that sample as the basis for negative actions against Epic.

30. Figure 1 below provides a summary of Cigna's samples and denial flags for the Labs from 2012 through 2017.

**Figure 1. Timeline of Cigna's Samples and Denial Flags**



## C.     Overview of Statistical Principles

31. Statistical *inference* is analysis where one seeks to infer useful information about a relatively large *population* by examining only a subset of that population (i.e., a *sample*).  Estimation or *extrapolation* is a procedure where measured characteristics of a sample yield estimates about the population from which the sample was drawn.[31]

32. In practice, sampling studies involve two equally important phases: *Design* and *Execution*.  The major steps in the process comprise a framework shown in Figure 2 below.  This 8-step framework is comprised of: (1) defining the question to be answered; (2) defining the population, the sampling unit and the sampling frame; (3) designing the sampling plan; (4) determining the sample size; (5) selecting the sample; (6) reviewing each of the sampling units and analyzing their relevant characteristics; (7) estimating conclusions by extrapolating sample results; and (8) interpreting sampling conclusions to ensure they are useful and meaningful.

---

[30] Deposition transcript of Ms. Deanna Anderson, dated September 26, 2022, at 214:5.
[31] Arkin, Herbert, *Handbook of Sampling for Auditing and Accounting*, 3rd Ed., McGraw-Hill, 1984, page 20.

**Figure 2. Major Steps of Sampling and Extrapolation**



33. Even if a sampling study is designed appropriately, care must be taken to ensure the study is also executed in accordance with the design and without error. Both tasks are equally important, and both are subject to fatal flaws that can invalidate an analysis entirely.

34. An analysis' *validity* is the extent to which the study measures what it is supposed to and, thus, the extent to which the results from the study are useful.[32] Put another way, a sampling study that does not measure what it is supposed to is invalid. In statistics, *reliability* refers to reproducibility of results.[33] A reliable analysis returns consistent results when using the same data, regardless of who performs the calculations. A bathroom scale, for example, is perfectly reliable if it reports the same weight for the same object, time and time again.

35. Because characteristics of a sample will be used to infer characteristics of the broader population, a sample should be reasonably *representative* of the population. Specifically, "a representative sample contains all of the attributes of the population in the same proportion that they exist in the population. This allows one to generalize from the sample to the population, to make inferences from the sample to the population."[34] Conversely, if the sample chosen is not representative of the population, inferences about the population may be irreparably biased and invalid.

36. The method of sample selection anticipated to lead to a representative sample is called *random sampling.* Simple random sampling occurs when "every object in the population has an equal chance of being selected, or drawn, for inclusion."[35] Without using proper randomization to

---

[32] Federal Judicial Center, *Reference Manual on Scientific Evidence*, 3rd Edition (Washington, DC: National Academy of Sciences, 2011), page 228.

[33] *Id.* at 227.

[34] Corty, Eric W., *Using and Interpreting Statistics*. St. Louis: Mosby, 2007, page 145.

[35] *Id.* at 146.

select a sample, the presence of selection bias may prevent a sample from being reasonably representative.

37. *Bias* has a specific meaning here. "A sample is biased if it is gathered in such a way that some systematic error has entered into the process."[36] The random selection of a sample removes recognized and unrecognized sources of human bias, such as conscious or unconscious tendencies to select units with particular characteristics that could affect variables of interest (i.e., selection bias). For example, disproportionately selecting laboratory claims based on a particular ordering physician would be a form of *selection bias*.

38. A common type of bias in survey studies (i.e., phone calls or letter surveys) is *nonresponse bias*. Nonresponse bias occurs when a study's subjects determine themselves whether to participate in the study, which can lead to subjects with particular characteristics choosing to respond, or not, and therefore disproportionately influence the available data available. In other words, subjects who choose to respond may express views that unfairly and disproportionately represent the potential views of nonrespondents. This risk is particularly high in studies with a high percentage of nonresponse; therefore, numerous techniques exist to minimize nonresponse bias.[37]

39. Having selected an appropriate random sample, and after using the sample data to estimate characteristics of the population, statisticians generally make assessments regarding the accuracy of those estimates. Using widely accepted statistical procedures and equations, one can state with any desired degree of *confidence* (i.e., confidence level), that the conclusion of the probability sample is within some calculable amount (i.e., precision amount) of the true, but unknown, value of the population.[38] These procedures and equations are predicated on the sample's randomness and *may not* be validly applied to non-random samples.[39]

40. Careful sampling demands attention to all phases of analysis since poor work in one phase may render a study unreliable, even when everything else is done well.[40] For example, a well-designed study in all other respects will likely be worthless if the sample is not chosen randomly, or if the sample is selected with material bias.

---

[36] Corty, Eric W., *Using and Interpreting Statistics*. St. Louis: Mosby, 2007, page 148.
[37] Thompson, Steven K. *Sampling*. New York: Wiley, 2012, page 191.
[38] Arkin, Herbert, *Handbook of Sampling for Auditing and Accounting*, 3rd Ed., McGraw-Hill, 1984, page 8.
[39] Federal Judicial Center, *Reference Manual on Scientific Evidence*, 3rd Edition (Washington, DC: National Academy of Sciences, 2011), page 230. *See also* Cochran, William G. *Sampling Techniques*. New York: Wiley, 1977, page 9.
[40] Cochran, William G. *Sampling Techniques*. New York: Wiley, 1977, page 8.

Illustrative Example:

41. Perhaps the best-known illustration of what can go wrong when a sample contains bias is the "Dewey Defeats Truman" headline of the Chicago Tribune, which wrongly proclaimed the winner of the presidential election in 1948. This example is often cited as a cautionary tale in courses that teach statistical sample selection techniques. In advance of that election, polling was done by telephone. As it turned out, in 1948, Dewey Republicans were more likely to have a telephone than comparatively less affluent Truman Democrats. The selected sample therefore was biased (i.e., not representative of the population), despite being chosen randomly, which led to a famously incorrect inference. That is why political polling—like other forms of statistical inference—relies on selecting a sample that is random *and* without bias.

## V.    ASSIGNMENT AND METHODOLOGY OF ANALYSIS

### A.    Evaluating Cigna's Sampling Analyses

42. I was asked to evaluate Cigna's statistical bases for unilaterally flagging and denying certain of the Labs' claims for reimbursement. Specifically, I was asked to evaluate instances in which Cigna based its denial decisions on samples of information, rather than basing those decisions on a claim-by-claim analysis. This included evaluating the statistical basis of samples which were designed, selected, and analyzed by Cigna's SIU, from which it based its decision to flag and deny the Labs' claims. Cigna's samples relevant to my Assignment include the following:

   a.  BioHealth; Sample of 15 Patients;

   b.  BioHealth; Sample of 108 Patients;

   c.  PB Labs; Sample of 10 Claims;

   d.  PB Labs; Sample of 8 Patients; and

   e.  PB Labs; Sample of 17 Patients.

43. My analysis evaluates the design and execution of Cigna's sampling analyses and evaluates whether (i) the samples were properly designed and randomly selected, and (ii) the resulting conclusions are reliable and/or statistically valid. In other words, my analysis evaluates whether the chosen samples offer a meaningful basis from which Cigna's SIU can reach conclusions about the larger Population. I evaluated Cigna's various samples by applying the statistical principles described in the preceding paragraphs, along with my own significant experience, qualifications, and training regarding the design and execution of sampling in healthcare disputes and investigations.

**B.    Damages Estimation**

44. I was also asked to estimate financial damages resulting from (i) Cigna's alleged lack of proper reimbursement for the Labs' claims, including penalty interest, and (ii) Cigna's alleged violation of state law(s), including prompt pay statutes.  In addition to my own analysis, I relied on the Labs' medical coding and healthcare reimbursement expert, Ms. Jacqueline Thelian, and her opinions on the topic of healthcare reimbursement, medical coding, and claims adjudication. Specifically, I relied on Ms. Thelian's opinions regarding whether certain of the Labs' claims had been improperly denied by Cigna.  I also relied on certain analysis performed by Counsel identifying specific claims where the Labs were not properly notified of Cigna's denial, allegedly in violation of state law.

45. The aim of damages analyses is generally to estimate a party's loss of economic value, if any, resulting from another party's harmful act.[41]  Various theories of damages exist in litigation, such as compensatory damages, consequential damages, punitive damages, and others.  Compensatory damages, as the term connotes, compensate an aggrieved party for the loss of the bargain for which it negotiated (also sometimes referred to as expectation damages).[42]  In other words, compensatory damages are an amount sufficient to give the aggrieved party the same economic value it would have received if the other party had fulfilled the promise or bargain, commonly referred to as the *but-for* scenario (i.e., what economic value would have been achieved *but-for* the alleged misconduct).

46. For this Assignment, Counsel asked me to estimate compensatory (i.e., actual) damages.  Courts sometimes refer to these damages as "Benefit of the Bargain" ("BOB") damages, which seek to make an aggrieved party whole as if the other party had performed the contract in full.  In other words, BOB damages in this matter would be calculated by determining the difference between (i) the amounts Cigna *actually paid* for the Labs' claims, if any, and (ii) the amounts Cigna *should have paid* had those claims been properly adjudicated.

47. BOB damages are consistent with comparable health care matters involving reimbursement disputes, and I found this method appropriate given the conduct and harm described herein. For the purposes of my Assignment, I limited my analysis of damages to the direct financial harm resulting from Cigna's failure to properly reimburse the Labs' claims.  This limitation expressly

---

[41] Federal Judicial Center, *Reference Manual on Scientific Evidence*, 3rd Edition (Washington, DC: National Academy of Sciences, 2011) page 429.  *See also* Richard A. Pollack et al., AICPA Practice Aid 06-4, Calculating Lost Profits (2006), page 3.
[42] Weil, Roman L. et al (eds.), *Litigation Services Handbook: The Role of the Financial Expert* (5th ed. 2015), page 4.6.

ignores other types of legitimate financial harm, in favor of Cigna, such as the Labs' collection costs, bankruptcy costs related to Cigna's nonpayment, etc.

48. Damages experts who fail to adequately consider causation (i.e., whether the harm in question reasonably resulted from the conduct at issue) take a risk that their testimony and opinions lack an essential tie to facts of the case.[43]  Consequently, I evaluated the causal link between the two. Specifically, I evaluated whether Cigna's alleged conduct (e.g., unilaterally flagging and denying the Labs' claims, failing to properly consider the Labs' appeals, etc.) reasonably led to the Labs sustaining harm (i.e., the Labs receiving insufficient reimbursement for its claims).  I concluded that Cigna's alleged conduct would reasonably lead to the Labs sustaining direct financial harm.[44]

49. I also estimated damages in a manner that avoided redundancy of my estimates.  As my report describes further below, numerous individual claims were identified to possess numerous different errors (e.g., a claim that is both (i) erroneously flagged and denied for fee forgiveness *and* (ii) for which the Labs were not properly notified of Cigna's denial, in violation of state law).  Because I will calculate damages for each issue separately, redundancy in damages (i.e., double-counted claims included in distinct calculations of damages) may occur for those claims that possess multiple errors.  My report will describe additional analysis to identify and remove any duplicated damages to avoid redundancy.

50. Based on these considerations, I estimated compensatory damages in this matter to be the difference between (i) the amount that *should have been paid* by Cigna, and (ii) the amount that was *actually paid* to the Labs by Cigna.

51. In addition to my estimates of penalty interest due under various state(s) prompt pay statutes, I have been informed by Counsel the Labs may be entitled to pre-judgment interest under other various legal theories.  Consequently, I understand I may be asked to estimate the pre-judgment interest owed by Cigna to the Labs.  I specifically reserve the right to supplement and/or amend my opinions regarding any such estimates of pre-judgement interest if and when Counsel requests such analysis.

---

[43] Weil, Roman L. et al (eds.), *Litigation Services Handbook: The Role of the Financial Expert* (5th ed. 2015), page 3.12.
[44] As part of this analysis, I assume the allegations in the Labs' Complaint are factually accurate.  I assume these allegations will be proven, or not, at trial and I render no opinions about the allegations themselves or either Cigna's liability in this matter.

## VI.    OPINION #1

**A. Cigna's statistical bases for unilaterally flagging and denying the Labs' claims for reimbursement are invalid and unreliable. The samples on which Cigna based its denial decisions were neither designed nor executed in a scientific manner and Cigna's generalized conclusions based on those samples are meaningless beyond the sampled items themselves.**

**This includes conclusions based on (i) BioHealth's Sample of 15 Patients, (ii) BioHealth's Sample of 108 Patients, (iii) PBL's Sample of 10 Claims, (iv) PBL's Sample of 8 Patients, and/or (v) PBL's Sample of 17 Patients.**

### B.    Limited Support for Cigna's Analyses

52. To adequately evaluate Cigna's analyses and conclusions, I sought to review necessary data and documentation routinely memorialized by analysts who perform such analysis. However, much of that information did not exist in Cigna's SIU records or in subsequent data produced by Cigna through discovery. I understand Cigna asserts that all relevant data has been produced to the Labs in this matter, including all of Cigna's SIU documentation related to its analyses of samples discussed herein. Nevertheless, Cigna's apparent failure to maintain and/or produce this necessary documentation prohibits me from adequately replicating Cigna's analyses, a linchpin of the scientific method and fundamental due process.

53. Adequate documentation to support statistical conclusions is essential to support the reliability and validity of analysis and its conclusions. There is abundant authority expressly requiring the maintenance and production of these documents in healthcare sampling matters, including from the Centers for Medicare and Medicaid Services ("CMS") and from the Department of Health and Human Services, Office of the Inspector General ("OIG"), both of which are regularly cited by Cigna's SIU.[45] The Healthcare Compliance Association ("HCCA") also stipulates the need for maintaining such data when performing sampling.[46]

---

[45] Centers for Medicare and Medicaid Services, *Medicare Program Integrity Manual*, 8.4.4.4.1 - Documentation of Universe and Frame, Rev. 377, Issued: 05-27-11, Effective: 06-28-11, Implementation: 06-28-11. *See also* Medicare Program Integrity Manual, 8.4.4.4 - Documentation of Sampling Methodology, Rev. 377, Issued: 05-27-11, Effective: 06-28-11, Implementation: 06-28-11. *See also* Medicare Program Integrity Manual, 8.4.1.5 - Consultation with a Statistical Expert, Rev. 377, Issued: 05-27-11, Effective: 06-28-11, Implementation: 06-28-11.
[46] Healthcare Compliance Association, The Health Care Compliance Professional's Manual, 51,045, 2015.

54. In this matter specifically, Cigna has not maintained or produced *any* of the following documentation in support of *any* of its samples:

   a. Policies, procedures, or standards adhered to when designing and executing analysis;

   b. Specifications and rationale for defining the universe and sampling frame;

   c. Details of the sample design, including details of sample size calculation, anticipated error rate(s), standard deviation, or rationale for attribute/variable analysis;

   d. Details of the randomization process and steps required to replicate the random sample selection (including any randomization software reports generated);

   e. Evaluation of the sample size and representativeness, once selected, to ensure the sample is sufficient to meet the objectives of the study; and

   f. Details of the estimation methodology and extrapolation calculations, including corresponding statistical software reports or calculations of precision or confidence.

55. In fact, Cigna's SIU investigator, Ms. Stephanie Canto, could not explain the basic concepts of its sampling method, or even whether *any* methodology was followed, despite numerous attempts to explain Cigna's sampling.[47]   For example, when asked "Isn't it true that you have no idea how it was that you determined which patient files were going to be audited?" Ms. Canto testified "I cannot say that I recall, no."[48]   Moreover, Ms. Canto admitted, "There does not appear to have been any effort to be concerned with statistical accuracy in picking the 24 patient files to review."[49]

56. I routinely find that sampling and extrapolation analysis is deemed to be unreliable and invalid in instances where it cannot be replicated or when material documentation has not been adequately maintained and/or produced for review.   In fact, CMS's own chief statistician recently acknowledged this in a similar case, stating, "I found the information provided [by the analyst] to be insufficient to replicate the sample pull.  This issue alone invalidates the sampling . . ."[50]

57. Because Ms. Canto's testimony suggests that Cigna's SIU failed to employ any meaningful methodology whatsoever, and the record does not demonstrate any such methodology, I cannot fully weigh what Cigna, in fact, did or didn't do.  For that reason alone, it is my opinion that

---

[47] Deposition transcript of Ms. Stephanie Canto, dated October 27, 2022, at 121:18, 164:10, 163:2.  *See also* Deposition transcript of Ms. Stephanie Canto, dated February 2, 2023, at 357:5.

[48] Deposition transcript of Ms. Stephanie Canto, dated February 2, 2023, at 295:19 and 357:5.

[49] *Id.* at 297:16.

[50] Youngstrom, Nina. "Report on Medicare Compliance Volume 30, Number 25. July 12, 2021 Rulings: Sampling, Extrapolations Should Include Underpayments, Unpaid Claims." (Society of Corporate Compliance and Ethics [SCCE] & Health Care Compliance Association [HCCA], 2021).

Cigna's sampling analyses are invalid and unreliable for the purposes of generalizing across the Population or *any* set of claims (i.e., extrapolation). Consequently, Cigna's conclusions based on its samples are meaningless beyond the samples themselves.

58. Notwithstanding Cigna's insufficient production of documents and my opinions thus far, I reviewed the limited evidence in the record and evaluated those materials to the extent possible in the following sections.

## C.    Improper Design of Cigna's Samples

Cigna's Lack of Sample Design

59. I have seen no evidence to suggest any of Cigna's samples were thoughtfully designed to reach valid or reliable conclusions about the Population. Generally, analysts seek to understand numerous considerations about the Population and the goals of an analysis before simply embarking on sample selection, as Cigna's SIU seemingly did here. In fact, Ms. Canto testified that the SIU had "no standard or typical methodology" for determining sample selections.[51]

60. For example, several types of samples can be employed to achieve different objectives, such as simple random samples, probe samples, cluster samples, etc. The utility of a chosen sample is directly related to the type of sample selected, therefore properly designing and planning a sampling study to achieve particular objectives is imperative. In fact, Ms. Canto, testified Cigna generally does "make efforts to have random samples, or probe samples, or full samples."[52] However, Cigna has presented no evidence that it engaged in such design and planning analysis in this matter, nor could Ms. Canto specifically articulate such analyses for *any* of its samples.

61. Another key consideration for sample design involves thoughtful construction of interview questions or surveys used to solicit responses, such as Cigna's phone interviews or VOS letters. The delivery and wording of such questionnaires is critical to the reliability of the study, and a clear record or transcript of responses is necessary to reach meaningful conclusions. At best, Cigna's SIU demonstrated haphazard recordkeeping for its samples, and failed to clearly memorialize interview questions and responses. For example, only two responses from Cigna's Sample of 108 Patients have been produced in discovery.[53] Similarly, Cigna SIU's Case Notes often memorialize unclear and contradictory interview responses from patients, with no

---

[51] Deposition transcript of Ms. Stephanie Canto, dated October 27, 2022, at 135:7.
[52] Deposition transcript of Ms. Stephanie Canto, dated February 2, 2023, at 296:9.
[53] CIGNA 19-1326 0004752, CIGNA 19-1326 0291184.

transcript of the specific questions that were asked. Without a comprehensive and thoughtful sample design forming the foundation of its interviews and surveys, Cigna's conclusions from its analyses are, at best, unreliable.

<u>Arbitrary and Insufficient Sample Size</u>

62. Another key aspect of designing a sample is determining a sufficient sample size necessary to achieve reliable results for the study. In accordance with CMS regulations, one of the "major" steps of statistical sampling involves "performing the appropriate assessment(s) to determine whether the sample size is appropriate for the statistical analyses used."[54] Small samples risk failing to adequately capture subsets or characteristics of the universe, thereby skewing the analysis' conclusions with a non-representative sample.

63. Nevertheless, Cigna's documentation showed *no* evidence of *any* statistical considerations used to determine an adequate sample size, nor did it demonstrate *any* statistical calculations to compute its sample sizes. Such equations vary depending on the design of the sample (which Cigna also failed to consider) and typically involve a variety of considerations such as (i) desired *precision* level in the conclusions, (ii) estimated *error rate* in the population, (iii) desired *confidence* level in the conclusions, among other things. Despite the need for these basic considerations, Cigna's SIU has not demonstrated that it undertook *any* analysis whatsoever in determining an appropriate size for its samples.

64. This issue is particularly troubling given the extremely small samples Cigna employed. *Minimum* sample sizes of 30 to 50 units are generally required to extrapolate valid conclusions, however Cigna initially selected numerous sample sizes with fewer than 25 items.[55] Even if such small samples had been properly designed and selected, which they were not, they would still be insufficient for the purposes of extrapolation. In fact, Cigna's SIU further undermined its sample sizes by arbitrarily reviewing only certain items from each sample. For instance, even though Cigna selected 20 of PBL's patients' claims for review, only 10 were reviewed by Cigna's Medical Director. Similarly, even though Cigna's SIU selected 24 of BioHealth's patients for

---

[54] Centers for Medicare and Medicaid Services, *Medicare Program Integrity Manual*, 8.4.1.3(5).
[55] Sample sizes of at least 30 to 50 units generally permit an analyst to rely on the statistical "assumption of normality" when constructing confidence intervals (i.e., extrapolating). This assumption of normality is fundamental to many of the equations used to extrapolate conclusions, and it permits the analyst to reliably calculate confidence intervals, among other things. A sample size of less than 30 units may be permissible in certain circumstances; however, the assumption of normality would no longer be reliable, forcing the analyst to perform additional nonparametric statistical methods to reach valid conclusions. Cigna provided no evidence that it performed any such analysis in this matter.

phone interviews, it only called 15. Such arbitrary decision-making defeats the purpose of objective and valid statistical analysis.

65. Regardless of any other sampling errors described herein, Cigna's failure to select adequately sized samples and adhere to those sample sizes is a fatal flaw which injects incurable selection bias and renders its selected samples meaningless for the purposes of extrapolation.

### D. Flawed Execution of Cigna's Samples

<u>Random Selection</u>

66. I have seen no evidence to suggest any of Cigna's samples were randomly selected. Recall that randomness justifies the use of statistical equations to estimate the *margin of error* and *confidence intervals* needed to weigh the quality of a purported extrapolation. Without randomness, samples are commonly referred to as *judgement* samples, whereby the selection may be haphazard or arbitrary based on an analyst's own judgement. Such samples, like Cigna's here, are meaningless for the purposes of extrapolation and cannot be reliably estimated across the population from which they were selected.

67. Even if Cigna had randomly selected its samples, that randomness was invalidated by Cigna's arbitrary decision to only analyze certain of the sampled items. Recall that Cigna's SIU selected 24 of BioHealth's patients to interview, but only actually called 15, with no rationale for which 15 of the 24 selected patients were chosen, or why others were ignored. Even if Cigna had initially selected these samples randomly, its arbitrary selection of which items would actually be analyzed voids any potential claim of randomness and again presents incurable selection bias.

68. Regardless of any other sampling errors described herein, Cigna's failure to select samples randomly is a fatal flaw, rendering *all* of its selected samples meaningless for the purposes of extrapolation.

<u>Cigna's Illogical and Unsupported Conclusions</u>

69. Cigna based many, if not all, of its decisions to unilaterally flag and deny the Labs' claims on the samples described herein. For example, Ms. Anderson described Cigna's decision to unilaterally flag BioHealth for fee forgiveness based on the *Sample of 15 Patients* and the *Sample of 108 Patients.* She testified that "at that point [following analysis of the samples], we've established a

billing pattern, that this is the–the provider's business practice across the board."[56]   In other words, Ms. Anderson concluded the *entirety* of BioHealth's claims were the result of improper fee forgiveness based on Cigna's limited and flawed samples.

70. Moreover, the results of Cigna's samples flatly contradict its conclusions about BioHealth.  For instance, the Sample of 15 Patients found **75 percent of respondents**, in fact, received bills from BioHealth.  Similarly, the Sample of 108 Patients found **over 33 percent of respondents** indicated BioHealth did not indicate evidence of fee forgiving, and had either sent bills or collected fees from those patients.[57]   Even if these samples had been designed properly, which they were not, the limited results of Cigna's samples clearly demonstrate that BioHealth's alleged practices of "across the board" fee forgiveness are illogical and unsupported by Cigna's own analyses.  Cigna's striking flaws in interpreting its own data raise significant concerns about its ability to conduct objective and unbiased analysis.

71. Notwithstanding Cigna's own contradictory analyses, the Labs' medical coding and reimbursement expert, Ms. Jacqueline Thelian, also addresses significant unsupported and illogical conclusions reached by Cigna's SIU.  Cigna's decisions to unilaterally flag and deny the Labs' claims for reimbursement "across the board" are not supported by the samples in this matter.  Such generalizations are a defective form of extrapolation which, as I have explained, is fatally flawed, invalid, and unreliable.

**Summary of Opinion**

72. Cigna's statistical bases for unilaterally flagging and denying the Labs' claims for reimbursement are invalid and unreliable.  The samples on which Cigna based its denial decisions were neither designed nor executed in a scientific manner.  The samples were not designed using any meaningful methodology and were determined to have arbitrary and/or insufficient sample sizes.   Similarly, none of the samples were randomly selected and Cigna's conclusions are flatly contradicted by the sample results themselves.

73. Overall, Cigna's generalized conclusions based on those samples are meaningless beyond the sampled items themselves.  This includes conclusions based on (i) BioHealth's Sample of 15 Patients, (ii) BioHealth's Sample of 108 Patients, (iii) PBL's Sample of 10 Claims, (iv) PBL's Sample of 8 Patients, and/or (v) PBL's Sample of 17 Patients.

---

[56] Deposition transcript of Ms. Deanna Anderson, dated September 26, 2022, at 238:17.
[57] Deposition transcript of Ms. Stephanie Canto, dated February 2, 2023, at 344:10.

## VII.    Opinion #2

**A.  Cigna's improper denial of the Labs' 15,842 eligible and covered healthcare claims, with dates of service from January 1, 2012, to December 29, 2017, caused estimated damages in the amount of $20,427,577.[58]  Penalty interest for these claims, in accordance with various state laws, is estimated to be at least an additional $19,819,549 as of the date of this report.[59]**

74. The Labs' medical coding and reimbursement expert, Ms. Jacqueline Thelian, identified numerous eligible and covered claims in the Population where the Labs submitted claims for reimbursement and Cigna incorrectly denied those claims in their entirety, in some cases more than once.  Table 4 below summarizes the findings of Ms. Thelian on this issue.

**Table 4. Summary of Ms. Thelian's Expert Opinions[60]**

| Lab | Denial Reason | No. of Unique Claims | Charged Amount |
|-----------|----------------------------|--------------------|----------------|
| BioHealth | 0322 – Fee Forgiveness | 3,896 | $5,380,209 |
| BioHealth | 1698 – Unlisted Code | 861 | $948,661 |
| BioHealth | 1648 – Invalid Service Code | 168 | $255,279 |
| PBL | 0369 – Services Not Performed | 5,490 | $8,776,459 |
| PBL | 0322 – Fee Forgiveness | 718 | $1,244,124 |
| PBL | 1698 – Unlisted Code | 923 | $666,672 |
| Epic | 1648 – Invalid Service Code | 2,164 | $2,036,385 |
| Epic | 1698 – Unlisted Code | 2,415 | $1,119,787 |
| **Total** | | **15,842[61]** | **$20,427,577** |

---

[58] I have assumed or otherwise relied on the expert opinions of Ms. Jacqueline Thelian, the Labs' medical coding and reimbursement expert, that certain healthcare claims should or should not have been denied.

[59] I have assumed or otherwise relied on Counsel's legal analysis, that certain state laws were violated by Cigna and those laws permit certain penalty interest.  I render no legal analysis or legal opinions.  I assume the Labs' allegations will be proven, or not, at trial, and I render no opinions about Cigna's liability in this matter generally or on this topic specifically.

[60] Expert report of Ms. Jacqueline Thelian, dated March 1, 2023.

[61] The sum of No. of Unique Claims is 16,635, however a single claim can have separate claim lines relating to different improper denial reasons.  After adjusting for this double-counting, 15,842 unique claims correspond to the total Charged Amount.

75. When considering the damages calculation for claims identified by Ms. Thelian, I evaluated the difference between the amount *actually paid* by Cigna, and the amount Cigna *should have paid*, but-for the improper denial.  Considering that all the claims identified by Ms. Thelian were denied by Cigna in their entirety (i.e., $0 was paid for each claim), damages are simply the amount Cigna *should have paid* for each claim.

76. Based on a review of the Population where Cigna paid for claims submitted by the Labs, Cigna almost always (i.e., over 99.9 percent of the time) reimbursed an amount equal to the following calculation:

**[Paid Amount]** = [Allowed Amount] minus [Discount Amount] minus [Coinsurance Amount] minus [Copay Amount] minus [Deductible Amount] minus [COB Savings] minus [Not Covered Amount][62]

77. Based on my experience estimating damages in healthcare reimbursement matters, I found this equation to be reasonable and reliable method for calculating the amount Cigna *should have paid* for each individual claim, but-for their improper denial.  Additionally, each of the data fields needed to perform this calculation were included in Cigna's spreadsheets of the Population, including data for each of the claims identified by Ms. Thelian.  Applying this calculation to each of the claims identified by Ms. Thelian resulted in a payment amount (i.e., actual damages) of $20,427,577, the components of which are presented in my Appendix C.

## B. Penalty Interest in Accordance with State Law(s)

78. Counsel also asked me to estimate penalty interest associated with Cigna's nonpayment for these 15,842 improperly denied claims, assuming such interest is permitted by state law(s).  Specifically, Counsel asked me to estimate penalty interest for two scenarios, assuming (i) all improperly denied claims are subject to Florida state law because the Labs' services were performed entirely in the state of Florida, and (ii) improperly denied claims were subject to the respective state law where the patient's policy was issued (i.e., the [Situs Ste Code] portrayed in the Population) for each respective claim.[63]  Counsel identified, through its own analysis, state laws addressing penalty interest for unpaid healthcare claims ("Prompt Pay Statutes").  Those statutes are presented in my Appendix D.

---

[62] In estimating what Cigna should have paid for claims that were determined to be improperly denied by the Labs' expert, Ms. Thelian, the [Not Covered Amount] was assumed to be $0 (i.e., the claim *should have been* covered).
[63] Correspondence from Kelsey Kingsbury to Anthony Gestrich defining [Situs Ste Code], dated May 17, 2022.

79. As part of its analysis of the Prompt Pay Statutes, Counsel identified relevant penalty interest percentages and criteria for each of the relevant states represented by the [Situs Ste Code], with 38 states represented.[64]  I calculated penalty interest for each respective claim beginning on the date payment was due in accordance with the respective state law (typically 30 to 120 days after claim submission) until the date of this report.  To the extent state laws were vague or silent on criteria for calculating penalty interest, I elected the more conservative approach, in favor of Cigna (i.e., an approach that results in lower amounts of penalty interest).  For example, I elected to estimate *simple* interest for all states, rather than the faster-growing *compound* interest method, despite some states that may allow compound interest.  It is my understanding penalty interest will continue to accrue after the date of my report, therefore my calculation will likely need to be updated and I reserve the right to amend my opinion subject to the resolution of this issue.

80. Penalty interest for the Labs' improperly denied claims, assuming those claims are *all* subject to Florida state law, is $19,819,549, the components of which are presented in my Appendix E.  Assuming the Labs' improperly denied claims are subject to the respective state laws where the patient's insurance policy was issued, the estimated penalty interest is $20,978,153, the components of which are presented in my Appendix F.  Considering these two values, I concluded the penalty interest for the Labs' improperly denied claims is *at least* $19,819,549.

---

[64] A portion of the claims (less than 2 percent) did not include relevant [Situs Ste Code] data in Population (i.e., Cigna's spreadsheets) preventing an accurate understanding of where the patient policies for those respective claims were issued. At the request of Counsel, I assumed these improperly denied claims were subject to Florida law for the purposes of estimating penalty interest.

## VIII.  Opinion #3

**A.  Counsel identified 6,458 claims where (i) the Labs allegedly were not properly notified of Cigna's denial, in violation of state law, and (ii) Cigna failed to properly pay the Labs' invoices for those claims.  The unpaid principal balance for these claims caused actual damages in the amount of $9,812,173.  Penalty interest for these claims, in accordance with state law, is estimated to be at least an additional $10,261,928 as of the date of this report.[65]**

**B.  Claims Without Proper Notification of Denial, in Violation of State Law**

81. I understand the Labs allege state law requires claims for healthcare reimbursement, including the entirety of the Population in this matter, to be paid in full barring written explanation of any denial or nonpayment (either total or partial) within a specified timeframe, depending on the respective state law.  This written explanation of denial is typically provided through one or more documents, such as the Explanation of Payment ("EOP"), Explanation of Medical Benefits ("EOB"), or the claim's remittance advice.[66]  I understand the mechanism for receiving this explanation of denial would typically include written correspondence from Cigna to the Labs, delivered either physically via mail or electronically via email.[67]

82. Counsel identified, through its own analysis, 6,458 of the Labs' claims for reimbursement in which Cigna provided no EOP, EOB, remittance advice, or any other meaningful communication explaining if or why the respective claims were denied payment, in whole or in part, ("Clean Claims").  In fact, most of the Clean Claims identified by Counsel (i.e., over two-thirds), were denied in their entirety and no payment was remitted to the Labs.  These findings are consistent with the Labs' claims that, despite regularly seeking explanation from Cigna for claim denials and nonpayment, the Labs were generally not provided with meaningful responses.[68]  Similarly, Cigna and its SIU testified that it either failed to notify or could not recall properly notifying the

---

[65] I have assumed or otherwise relied on Counsel's legal analysis, that certain state laws were violated by Cigna and those laws permit certain penalty interest.  I render no legal analysis or legal opinions.  I assume the Labs' allegations will be proven, or not, at trial, and I render no opinions about Cigna's liability in this matter generally or on this topic specifically.

[66] Deposition transcript of Ms. Stephanie Canto, dated October 27, 2022, at 150:16.

[67] In other matters, this information can also be conveyed through electronic correspondence delivered via an insurer's online customer interface (i.e., the insurer's portal).  I understand access to an insurer's portal is generally limited to in-network healthcare providers, and the out-of-network Labs in this matter expressly did not have access to Cigna's portal.

[68] CIGNA19-1326 0289779.

Labs with explanation of denials for some claims.[69]   Counsel also identified requirements pertaining to payment of Clean Claims included in the Prompt Pay Statutes.

83. Counsel asked me to estimate damages for these 6,458 Clean Claims assuming Cigna's failure to properly provide an explanation of its denial and nonpayment violated state law, thereby rendering the entirety of the principal balance for those claims an incontestable obligation. Considering the entirety of Cigna's principal balance, damages would be estimated as the [Charge Amount] (i.e., the amount charged to Cigna by the Labs) minus the [Payment Amount] (i.e., any amount paid by Cigna), for each of the claims identified by Counsel. The unpaid principal balance for these claims caused actual damages in the amount of $9,812,173, the components of which are presented in my Appendix G.

## C. Penalty Interest in Accordance with State Law(s)

84. Counsel also asked me to estimate penalty interest associated with actual damages for these 6,458 Clean Claims, assuming Cigna's alleged violation of state law specified such interest. Again, Counsel asked me to estimate penalty interest for two scenarios, assuming (i) *all* Clean Claims are subject to Florida state law, and (ii) Clean Claims were subject to the respective state law where the patient's policy was issued.[70]

85. I calculated penalty interest for each respective claim beginning on the date payment was due in accordance with the respective state law (typically 30 to 120 days after claim submission) until the date of this report.[71]   To the extent state laws were vague or silent on criteria for calculating penalty interest, I elected the more conservative approach, in favor of Cigna (i.e., an approach that results in lower amounts of penalty interest).  It is my understanding penalty interest will continue to accrue after the date of my report, therefore my calculation will likely need to be updated and I reserve the right to amend my opinion subject to the resolution of this issue.

86. Estimated penalty interest for the Labs' Clean Claims, assuming those claims are *all* subject to Florida state law is $10,261,928, the components of which are presented in my Appendix H. Assuming the Labs' Clean Claims are subject to the respective state laws where the patient's insurance policy was issued, the estimated penalty interest is $11,037,960, the components of

---

[69] CIGNA19-1326 0000039.

[70] Correspondence from Kelsey Kingsbury to Anthony Gestrich defining [Situs Ste Code], dated May 17, 2022.

[71] A portion of the Clean Claims (approximately 2 percent) did not include relevant [Situs Ste Code] data in Cigna's spreadsheets preventing an accurate understanding of where the patient policies for those respective claims were issued. At the request of Counsel, I assumed these Clean Claims were subject to Florida law for the purposes of estimating interest penalties.

which are presented in my Appendix I.  Considering these two values, I concluded the penalty interest for the Labs' Clean Claims is *at least* $10,261,928.

87. Many of the 6,458 claims identified by Counsel were also identified by Ms. Thelian and addressed my Opinion #2.   In other words, many claims were found to have multiple errors, including (i) being improperly denied by Cigna, and (ii) Cigna's failure to properly inform the Labs of its denial, in violation of state law.  These numerous errors result in double-counting of claims and damages *if* the Labs are awarded damages on both issues (i.e., both my Opinion #1 and Opinion #2).   Consequently, I performed additional analysis to de-duplicate these 6,458 claims and quantify estimated compensatory damages assuming the Labs are awarded damages for both issues.[72]   Based on that analysis, 1,612 of the 6,458 claims remain, representing estimated damages of $3,133,454 ($1,565,359 in unpaid principal and *at least* $1,568,094 in penalty interest).

   **Appendix A – Documents Considered**

   **Appendix B – Curriculum Vitae of Christopher Haney, CPA, CFE, CHC**

   **Appendix C – Estimate of Actual Damages – Cigna's Improper Denials**

   **Appendix D – State Prompt Pay Statutes**

   **Appendix E – Penalty Interest for Improper Denials – Florida Law**

   **Appendix F – Penalty Interest for Improper Denials – Respective State Law**

   **Appendix G – Estimate of Actual Damages – Claims in Violation of State Laws**

   **Appendix H – Penalty Interest for Clean Claims – Florida Law**

   **Appendix I – Penalty Interest for Clean Claims – Respective State Law**

---

[72] I reserve the right to re-calculate these de-duplication calculations if and when any of the claims described thus far are limited, disallowed, or otherwise de-scoped from this litigation.  On the topic of disaggregation of damages for multiple claims, see generally the Federal Judicial Center, *Reference Manual on Scientific Evidence*, 3rd Edition (Washington, DC: National Academy of Sciences, 2011), Reference Guide on Estimation of Scientific Damages, pages 475-477.