# EXHIBIT 37

**PALM BEACH COUNTY SOBER HOMES TASK FORCE REPORT**

**IDENTIFICATION OF PROBLEMS IN THE SUBSTANCE ABUSE TREATMENT AND RECOVERY RESIDENCE INDUSTRIES WITH RECOMMENDED CHANGES TO EXISTING LAWS AND REGULATIONS**

**JANUARY 1, 2017**

**BACKGROUND AND SCOPE**

Florida is in the midst of an opioid crisis.  Although South Florida has experienced the worst of this crisis, it is present and growing in other areas of the State.   The crackdown on pill mills dispensing opioid drugs, such as oxycodone and hydrocodone, has contributed to the rise in heroin addiction.  The introduction of synthetic opiates such as fentanyl (100 times more potent than morphine), and carfentanil (1000 times more potent than Morphine), puts Florida on a pace to double the number of overdose deaths over last year's horrific numbers.  Federal laws, including the Mental Health Parity and Addiction Equity Act of 2008 and the Affordable Care Act of 2012, have dramatically increased required insurance coverage for behavioral health issues, including substance abuse treatment.   Children remain on their parents' insurance policies until age 26 and pre-existing conditions may no longer be excluded from coverage. Young adults with a Substance Use Disorder (SUD) are being marketed to Florida's recovery residences, also known as sober homes, and substance abuse treatment providers by the thousands, and many in this vulnerable class are being exploited and abused.  The lack of effective oversight of this industry, especially in the private sector, has allowed bad actors to flourish, significantly contributing to the rising death toll.

The Americans with Disabilities Act (ADA) and the Fair Housing Act (FHA) have combined to limit government oversight of recovery residences that house persons recovering from SUDs. Florida has become a medical vacation destination as desperate parents continue to send their adult children to Florida for treatment.  The flood of out-of-state patients, with insurance covering more lucrative out-of-network programs, has created a billion-dollar industry in Florida, with little oversight.

Recognizing the problem, the Florida Legislature asked Dave Aronberg, State Attorney for the 15th Judicial Circuit, to form a Task Force to study the issue and recommend changes to Florida law and administrative rules to combat this crisis. Mr. Aronberg established three groups. First, a Law Enforcement Task Force to investigate and arrest the rogue players in the treatment and recovery residence industries, using current laws. These coordinated law enforcement efforts have also helped to identify the strengths and weaknesses of existing criminal laws. Second, a Proviso Task Force, including members of organizations named in the legislative proviso, was created to study the issues and make specific recommendations for positive change through legislation and regulatory enhancements. Lastly, a third, larger and more inclusive group, was created from a broad-based combination of industry representatives, public officials, private organizations and individuals to further study the problem and recommend solutions. The following report reflects the findings of the study and contains a number of recommendations endorsed by the two Task Force groups. The recommendations in this report reflect the overwhelming consensus of the groups although there was not unanimous agreement on all recommendations outlined in the report.

The economic environment of substance abuse treatment in Florida, primarily in the private sector, creates the opportunity for abuse: overbilling for services, most notably confirmatory and quantitative urinalysis testing (UA); marketing abuses; patient brokering; unregulated "flophouses" masquerading as sober homes and a system that encourages relapse. There is an incentive for marketers to refer patients to an out-of-network program, resulting in more referrals of out-of-state patients to providers in Florida. Out-of-network providers are generally not bound by contract to a set fee schedule for services. Thus, there is an economic incentive for providers who are not bound by pre-set charges to treat out-of-network patients. In a recent Optum report, it was estimated that insurance company reimbursement for out-of-network drug treatment was, on average, three times the amount paid for the same in-network

services.[1]  That same study showed that 75% of private sector patients actively being treated in Florida are from out-of-state.

There are a number of causes contributing to the explosive expansion of this tragic opioid epidemic.  A Florida Department of Law Enforcement study in conjunction with the Medical Examiners Commission, released in September 2016, aptly shows that this is not solely a Palm Beach County, or South Florida crisis.  Statewide, in 2015, heroin caused 733 deaths,[2] fentanyl, 705, oxycodone, 565, and hydrocodone, 236.  Deaths caused by heroin increased by 79.7 percent, and fentanyl by 77.6 percent statewide when compared with 2014.  Total deaths in 2015 with morphine detected, 1,483; fentanyl detected, 911; heroin, 779.[3] All indications are that the statewide death toll for 2016 will be significantly higher.  According to the Palm Beach County Medical Examiner's Office, there have been 377 opiate overdose deaths in Palm Beach County alone through September 2016.

In addition to the terrible cost in human life, there are public costs, including the psychological toll on our community of first responders. Through October 24, 2016, Palm Beach County Fire Rescue (PBCFR) reported over 3,000 overdose responses, with more than 1 in 10 resulting in death.   Police and Fire departments have routinely engaged mental health professionals to assist first responders in dealing with the crisis.  The cost of an average PBCFR "run" is between $1,000 and $1,500.  Ten years ago, the average dose of Narcan required to reverse an overdose was .5 mg.  Today, it is not uncommon for first responders to administer 10 mg. due to the higher potency of fentanyl and carfentanil.

---

[1] Optum; *Young Adults and the Behavioral Health System*.

[2] *Drugs Identified in Deceased Persons by Florida Medical Examiners*, 2015 Annual Report, FDLE (September 2016) (for counties with over twenty cases detected with heroin alone, Palm Beach County (165), Orlando (108), Ft. Lauderdale (80), Ft. Myers (43), Sarasota (68), Jacksonville (45), Pensacola (28), Miami (92), Tampa (35), Daytona Beach (20)).

[3] *Drugs Identified in Deceased Persons by Florida Medical Examiners*, 2015 Annual Report, FDLE (September 2016).

## SUMMARY

The Legislature needs to recognize that the substance abuse treatment industry is a part of the healthcare system.  Currently, there is little oversight of the industry,[4] other than licensing as a right, unlike other areas of healthcare licensed and regulated by the Department of Health (DOH) and Agency for Health Care Administration (AHCA).[5] Recovery residences, connected to treatment providers by commerce, housing vulnerable patients engaged in intensive outpatient treatment, currently are not regulated at all.  All too often, the result is the warehousing of patients in unlicensed, unregulated, substandard housing that encourages anything but sobriety.  It is imperative that the Department of Children and Families (DCF) be given the mandate and resources to effectively oversee both treatment providers and recovery residences connected through commerce to the providers.  Sober housing for patients involved in intensive outpatient treatment is akin to Adult Family Care Facilities (AFC) in that these homes also house disabled individuals that require care and assistance. Increased oversight of this billion-dollar industry can be financed primarily through reasonable licensing fees and other fees for service.  By allowing the industry to fund regulation through reasonable fees, to provide for DCF services and FARR certification for commerce-related recovery residences, it will become much more difficult for bad actors to thrive.

Marketing is another unregulated area that contributes to this crisis. No marketing norms or standards exist within the industry. Marketers and admissions personnel are not required to obtain licensing or certification.  There is no minimum education, training or experience required.  Some marketers create an online presence whereby potential patients and their families are willfully mislead and misdirected by unqualified individuals who offer

---

[4] It is important to note that a different level of oversight exists between the private treatment system and the publically funded system. Providers publically funded by DCF through a contract with a Managing Entity have annual program reviews, are required to have a consumer complaint system, have contract obligations related to quality of care, and are actively investigated if misrepresentation or fraud is indicated.

[5] § 429.01(3), Fla. Stat. (2016) ("the principle that a license issued under this part is a public trust and a privilege and is not an entitlement . . . .").

diagnoses and placement recommendations. Often the result of these "lead generators" is a referral to a provider in Florida. In many cases, the referral is to a treatment center or recovery residence in Florida that is not the original destination requested or sought by the caller. To protect the vulnerable consumer, minimum marketing standards need to be developed by DCF, including education, training, licensing and certification by the Florida Certification Board (FCB). In addition, an ethics in marketing statute would be helpful to provide guidance in this area of the industry. Lastly, knowing, intentional and material misrepresentations should be criminalized.

While this crisis cannot be eliminated through criminal investigation and prosecution alone, law enforcement requires more effective tools than are currently available. The Task Force has attached several specific recommendations: greater penalties and other enhancements to the patient brokering statute; enactment of a fraud statute specific to intentional and knowing material misrepresentations by marketers; requirement that any recovery residence referral, either to or from a provider, be by or to a recovery residence that is certified by a credentialing entity (currently FARR) and managed by a certified recovery residence administrator (currently FCB).

To allow for a more efficient and effective response to criminal wrongdoing within the treatment and recovery residence industries, funding should be made available for training local law enforcement agencies and prosecutors to more effectively navigate privacy concerns, while investigating and prosecuting persons or entities who engage in patient brokering and other fraudulent activities. Additionally, the jurisdiction of the Attorney General's Office of Statewide Prosecution should be expanded to add patient brokering to the list of prosecutable crimes as well as inclusion on the predicate list for the purpose of Racketeering (RICO) prosecution. Lastly, investigating cases involving behavioral health[6] is extremely difficult. Florida privacy laws requiring prior notice of disclosure of records should adopt the same

---

[6] § 397.501(7)(a)5, Fla. Stat. (2016); 42 U.S.C. § 290dd-2(b)(C)(disclosure of records), 42 C.F.R. § 2.17(a) and 42 C.F.R. § 2.67 (undercover operations).

federal exception for ongoing investigations, allowing patient notice to be given after an investigation, but before records are released to the public.

For purposes of this report, the Task Force has determined that there is a vast difference between a classic recovery residence and a commercial recovery residence. A classic recovery residence or sober home is a grouping of like-minded individuals who choose to live together in a sober environment. In most cases, the residents are all signatories of any lease agreement. In this regard, a recovery residence generally does not house persons who require intensive outpatient treatment or higher level of care. More importantly, a recovery residence, in this context, does not have an ongoing economic relationship with a treatment provider.

When referring to a commercial recovery residence, the Task Force is limiting the discussion and its legislative and regulatory recommendations to those commercial residences that are owned or operated either by a treatment provider or another third party, are engaged in commerce with a treatment provider, and house a vulnerable class of recovering addicts attending intensive outpatient programs. This is an important distinction. All recovery residences, as a grouping of disabled persons choosing to live a sober lifestyle together as a group, are protected by federal law from discrimination. However, the commerce between commercial recovery residences and treatment providers can and should be regulated. Commercial recovery residences, engaged in commerce with treatment providers, require regulation, not for the purpose of limiting or restricting them, but rather to protect this vulnerable class of disabled persons from exploitation and abuse. For the remainder of this report, the Task Force will be identifying statutory clarifications and enhancements to existing law as they pertain to treatment providers and commercial recovery residences only.

A number of specific written statutory recommendations are attached to this report. There are other important issues, including fundamental changes to DCF's role in cleaning up the industry, that have not been reduced to specific written statutory language. We urge the Legislature to develop and enact legislation in keeping with the recommendations of the Task Force. Most significantly, the Legislature must create a statutory structure that adequately

funds DCF, funds a credentialing entity for commercial recovery residences (currently FARR), and gives DCF the authority to effectively regulate and license these businesses.

We acknowledge and applaud the recent Palm Beach County Grand Jury Presentment on these issues. Many of the recommendations published in the Presentment are adopted by this Task Force. The Presentment is attached to this report. (Attachment #1).

## IDENTIFICATION OF ABUSES IN THE INDUSTRY AND RECOMMENDED SOLUTIONS

## THE ROLE OF DCF

As of August 31, 2016, there were a total of 931 substance abuse treatment providers licensed in Florida, holding 3,417 separate component (program) licenses.[7] The Southeast Region (Palm Beach, Broward and the Treasure Coast had 321 licensed providers, (34% of providers) holding 1307 component licenses (38% of all licenses). From April-July, 2016, the Southeast Region alone received 241 Provider Application Packets for the licensure of 606 program components (63 from new providers). The DCF Southeast Region Office of Substance Abuse and Mental Health currently has 9 licensing specialists. The total number of licensing specialists in the 6 DCF state regions combined is 25. Licensing specialists also have the duty and obligation to perform any monitoring of programs in addition to processing licenses and license renewals. Experience shows that DCF rarely moves to revoke the license of a treatment provider. The lack of resources and statutory limitations have undermined DCF's ability to monitor treatment providers. For example, unlike AHCA or the Managing Entity, which oversees state funded providers under contract, DCF personnel do not have the ability or resources to make unannounced auditing visits. Additional staff and authority would allow the Department to be more effective when investigating complaints and enforcing laws against a problem provider.

---

[7] Information provided by DCF to the Palm Beach County Recovery Residences Task Force.

- The Task Force recommends adoption of language as applied to AHCA in the Assisted Living Facilities Act[8], making licenses for substance abuse treatment providers and recovery residences engaged in commerce with those providers a privilege, rather than a right, for purposes of licensure and enforcement of standards.  As with AHCA, DCF should be given greater ability to monitor and effectively investigate complaints, as well as license.  Chapter 397 should include provisions allowing DCF greater flexibility to deny or delay the issuance of licenses where there are concerns with compliance.  For example, when a license is revoked or surrendered, a significant time period should be required before a provider may re-apply.  Re-application should require greater scrutiny.

- Additionally, DCF should be given the ability to license commercial recovery residences engaged in commerce with treatment providers.  Licensing should encompass more than just safety issues such as fire code compliance.  DCF should have the ability to require significant protocols be followed, akin to those utilized by AHCA for the oversight of ALF and AFC licenses.

- Require DCF to develop standards, similar to the National Alliance of Recovery Residences (NARR) standards, which must be met by applicants prior to issuing a license to the commercial recovery residence.

- Marketing practices standards should be included in the requirements for all components of licenses.  Standards should address advertising, internal and external admissions and call centers, staff training, minimum qualifications and compensation, referrals of patients the center cannot accept, and compliance with the Florida Patient Brokering Act.

---

[8] § 429.01(3), Fla. Stat. (2016).

- Create and nationally advertise a hotline for DCF to investigate complaints against treatment providers and commercial recovery residences in Florida. A separate investigative division should be established to monitor compliance as well as marketing abuses.

At the present time, DCF funding is barely sufficient to process provider and component licenses. Increased funding is imperative. That funding can be made revenue neutral. Adequate funding for DCF can be achieved through an increase in fees for non-public licensed providers and commercial recovery residences. This includes reasonable fees for licensing, ongoing oversight of licensed components, including monitoring of compliance with housing standards and protocols, adequate investigative resources, and robust enforcement of standards, including license revocation. The industry can well afford increased fees sufficient to provide for adequate staffing. Staffing is needed not only for licensing and renewals, but regular auditing, investigation and legal staff to pursue license revocation, if appropriate. As a billion-dollar industry, substance abuse treatment providers should be willing and easily able to absorb the level of scrutiny that will curb the abuses that are currently all too prevalent, and preventable. It is in their best interest to rid the State of those rogue operators who "body snatch" patients from legitimate providers and recovery residences.

- Expand the role of DCF to more effectively monitor and investigate abuses, including consumer complaints, in the substance abuse treatment and commercial recovery residence industries.

- Provide adequate revenue-neutral funding through reasonable increases in licensing fees and fees for service.

## PATIENT BROKERING

Due to the fact that most private patients are from out-of-state, treatment providers in Florida often refer them to recovery residences or accept referral from recovery residences to their treatment facilities. A common practice within the industry in Florida is for the treatment

provider to pay a weekly fee or kickback to the recovery residence, with the understanding that the recovery residence will allow the patient to live at the residence for free or at a greatly reduced rent while attending the provider's outpatient treatment program.  This practice was developed, in part, to ensure that out-of-state patients have a local place to live after they step down from inpatient to outpatient treatment.  Most out-of-state patients who are attending intensive outpatient treatment are not locally employed, and while some are able to pay rent, many do not have the means.  Without a local, stable address, it would be difficult, if not impossible, for a provider to treat the patient.  This creates economic pressure for the provider to find a way to house the patient locally.  Brokering, by providing kickbacks to the recovery residence in exchange for the delivery of a patient, is commonplace.  Some treatment providers and recovery residences offer incentives such as gym memberships, scooters, weekly massages, chiropractic services, cigarettes, clothes, gift cards and more.  Brokers known as "body snatchers" will approach an individual with an SUD and convince them to move to another recovery residence or treatment provider that offers "better stuff."

As a result of patient brokering, there exists an economic incentive for both the patient and the provider to recycle through treatment.  Often insurers are required to cover each relapse as a separate event (analogous to breaking a leg one week, and an arm the next).  Therefore, a relapse is an event that triggers the cycle of coverage anew.  For example, if a patient's benefits expire after inpatient treatment, followed by 8 weeks of outpatient treatment, a new series of benefits are triggered upon relapse, resulting in the patient being eligible for additional treatment, its level and length dependent upon the policy terms.  As a result, there is an economic incentive for bad actors in the industry to encourage relapse.  It is not uncommon for a person to be in this cycle of treatment/relapse for years.  All too often, this cycle ends in overdose and death.

Regulating the type of residence that houses vulnerable persons undergoing intensive outpatient treatment, where there is an economic nexus between provider and residence, does not violate the rights of the patients under the ADA or FHA, any more than does AHCA licensing and regulating housing of disabled and elderly residents at an AFC.  The purpose is to protect

disabled persons from being exploited or abused.  The purpose is to ensure that patients are living in a safe environment that encourages recovery.  Any residence that does not have an economic connection to a treatment provider would not be subject to DCF licensing requirements or be required to be FARR certified.  It is the economic connection and protection of patients that enables oversight.[9]

Right now, it is a violation of the patient brokering statute to offer or pay any commission, bonus, rebate, kickback, or bribe, "directly or indirectly," in cash or in kind, or engage in any split-fee arrangement, "in any form whatsoever," to induce the referral of patients or patronage to or from a health care provider.  § 817.505(1)(a), Fla. Stat. (2016).  It is also a violation to solicit or receive the benefits described above (1) "in return for referring patients or patronage to or from a health care provider" or (2) "in return for the acceptance or acknowledgment of treatment from a health care provider."  § 817.505(1)(b)-(c), Fla. Stat.  The model upon which the industry currently rests is illegal.  Artifices such as "case management agreements," "bona fide employee" and marketing agreements are generally transparent attempts to evade prosecution.  A kickback is a kickback.

If the Legislature chooses to recognize the reality that out-of-state private pay and insured patients require housing while attending intensive outpatient levels of care, and that it is in the public interest that treatment providers be allowed to subsidize that housing without being in violation of the patient brokering statute, then there must be mandatory, effective, meaningful oversight and control over the housing component.

- The problem is so pressing and the ramifications of failure so severe, that the Task Force recommends meaningful DCF oversight and enforcement as well as mandatory credentialing (currently FARR certification) for any commercial recovery residence that is allowed to receive a subsidy, directly or indirectly, from the

---

[9] *See* Attachment #3, legal memo by Terrell Pyburn, City Attorney, Coconut Creek.

treatment provider in exchange for referrals to, or from, that provider, or otherwise contracts in any way with a provider.

- The Task Force also recommends that the Legislature adopt changes to § 397.407(11). (Attachment #2).  Specifically, a licensed service provider should not be allowed to refer a "prospective, current or discharged patient to, or accept a referral from" a recovery residence unless the recovery residence is certified and actively managed by a certified recovery residence administrator.

- Commercial recovery residences that contract with a service provider, directly or indirectly, need to be licensed and monitored by DCF and be required to maintain identifiable standards, such as those required by AHCA licensed residences, or to maintain standards similar to those required under the National Alliance of Recovery Residences (NARR) platform.

- To avoid the "institutionalization" of patients in recovery, restrict the licensure category for IOP or Day/Night treatment from providing free or subsidized housing to a patient beyond 90 days within one calendar year.

- With regard to the Patient Brokering Statute[10] (Attachment #4), add the word "benefit" to the prohibited items solicited or received in return for patient referrals. In addition, enhanced penalties for multiple brokering offenses are needed, along with significant fines to deter this course of conduct.

- The commercial recovery residence credentialing entity must be adequately funded through increased certification fees and fees for service.

---

[10] § 817.505, Fla. Stat. (2016).

## MARKETING

Currently, there are no provisions in Chapter 397 to control unethical marketing practices that prey on distressed families or individuals in crisis seeking treatment. There are no educational, vocational, licensing or certification requirements for admissions personnel, marketers or advocates in the industry. Patients and their families are routinely misled, misdirected and misdiagnosed by unqualified individuals motivated by profit. The State of Florida licenses haircutters. We must do better in protecting disabled people with substance use disorders.

- A marketer or admissions employee directing patients to specific treatment programs should be required to have certain minimum education and/or certification qualifications and should be prohibited from diagnosing and/or recommending specific levels of care without the appropriate license or certification.

- A marketing entity referring patients to Florida should be required to have a registered agent in the State for service of process.

- The Legislature should enact § 397.55 "Prohibition of Unethical Marketing Practices" (Attachment #5), an ethical marketing statute that would be useful to clarify standards in the industry. This would include appropriate disclaimers.

Certain predatory marketing practices involve fraudulent misrepresentation at a time when potential patients and their loved ones are in crisis and most vulnerable. Marketers who knowingly and willfully make materially false statements, whether in advertising or by direct communication, with current or potential patients, should be held criminally accountable. False statements of material fact may include misleading representation about the "identity, products, goods, services, or geographical location" of a service provider or recovery residence by the marketer or marketing entity.

- The Legislature should enact § 817.0345; "Prohibition of Fraudulent Marketing Practices" (Attachment #6) to criminalize and deter the most serious marketing abuses involving fraudulent representations.

## ATTORNEY GENERAL OFFICE OF STATEWIDE PROSECUTION: JURISDICTION

The Office of Statewide Prosecution has jurisdiction over certain crimes when they are committed in multiple circuits. The crimes are set out in statute. Currently, patient brokering is not specifically enumerated. It would enhance law enforcement efforts to combat unlawful patient brokering by providing jurisdiction to the Attorney General in those cases that cross circuit lines.

- The Legislature should amend § 16.56 (Attachment #7) to include patient brokering as a specific offense, enabling the Attorney General to investigate and prosecute this crime.

- The Legislature should amend § 895.02 (Attachment #8) to add patient brokering to the predicate offenses constituting "racketeering activity" enabling the Attorney General to investigate and prosecute criminal enterprises that commit these crimes in one or more circuits.

## IMPEDIMENTS TO EFFECTIVE PROSECUTION: RECOMMENDATIONS

Criminal cases in Florida are investigated by law enforcement and submitted to the state attorney for the filing of criminal charges. The privacy protections afforded by both federal and state law for the protection of persons being treated for behavioral health conditions significantly impacts the ability of law enforcement to effectively investigate in these areas. For example, an officer is at risk of violating privacy laws by walking up to a known recovery residence and asking routine questions of the residents such as whether and where they receive treatment.

Commencing an undercover operation of a treatment provider or recovery residence requires prior court approval. This is known as a "Title 42" order. It is time consuming and

costly. The patient notification requirements under State law are unclear as to when such notification is required. As a result, one Palm Beach County Circuit Judge refused to sign a requested "Title 42" preliminary order without prior notification to all patients, who were unknown at the time. The average law enforcement agency simply does not have the resources to develop these kinds of extensive investigations within their jurisdictions.

Most criminal investigations are initiated by a complaint; a car is stolen, a person is battered, etc. But the abuses in the drug treatment industry, particularly patient brokering, are not likely to come to light through a person with direct knowledge of these illegal practices. Patients, providers and recovery residence operators are all complicit in patient brokering. For example, there is no incentive for a patient who is benefiting from the arrangement to come forward and initiate a complaint. Therefore, the privacy issue is compounded by the lack of direct complaints and cooperation by this vulnerable class.

- The Task Force recognizes that there are impediments to prosecution that are based on federal law. The difficulties and expense of effective investigation into the abuses of the treatment industry underscore the need for better oversight of providers and recovery residences. There is a legislative cure for the inconsistency between federal and state law regarding adequate notice to the patient. § 397.501 Rights of Individuals (Attachment #9) should be amended to follow the criteria for the issuance of a preliminary court order by specifically adopting by reference the language found in 42 C.F.R. § 2.66(b).

- In order to enhance law enforcement's ability to investigate abuses within the industry, the Legislature should consider additional state funding for law enforcement training in the areas of patient brokering, marketing and healthcare fraud in the substance abuse treatment industry. Training is necessary to enable smaller agencies and counties/circuits throughout Florida to be able to take on these complex investigations.

## STANDARD OF CARE/MEDICAL NECESSITY

Potential abuse has expanded to include confirmatory and quantitative drug testing, DNA, genetic testing, pathology, and any diagnostic test that a physician is privileged to order, including up-coded office visits. A point of care (POC) urinalysis test kit is readily available over the counter and costs a few dollars. Confirmatory testing at a laboratory involves sophisticated instruments, often tests for specific and collateral drugs (panels) and routinely results in billings of thousands of dollars per sample. In many cases confirmatory testing is ordered by treatment providers multiple times per week. Medical doctors sign off on such testing as medically necessary and, in many cases, major insurance carriers are compelled to pay claims for laboratory testing without prior authorization based on "access to care" requirements found in federal law. In other words, laboratory testing as a complement to clinical care may be routinely billed for without legitimate proof of medical necessity. This is one of the engines that currently run the industry.

While insurance companies generally pay a percentage of the billed amount, it is not unusual for unscrupulous treatment providers to bill tens or hundreds of thousands of dollars in insurance claims for confirmatory and quantitative UA and other laboratory testing for an individual patient over the course of treatment. In many instances, confirmatory test results are never reviewed by the ordering physician. In addition, unscrupulous providers will submit falsely labeled samples purportedly given by active patients. Frequently, a business nexus exists between the owners of treatment programs, recovery residences and drug testing laboratories.

Currently, there is little communication between stakeholders in the areas of medical necessity, insurance fraud and appropriate standards of care. While the market may correct itself to some degree, it is counterproductive if the market over-corrects and persons with substance use disorders are not properly covered and treated. Inadequate treatment will invariably lead to more overdoses, and more deaths.

- The issue of billing for unnecessary treatment that is fraudulent on its face, including urinalysis or other laboratory testing, is covered under current fraud statutes. As a

further deterrent for those bad actors who knowingly and intentionally defraud private payers or insurance companies, the Legislature should consider enhanced penalties based on significant dollar amount thresholds; over $100,000, $500,000, $1,000,000.

- The standard of care involved in substance abuse treatment is not easily defined or universally accepted. The Task Force will continue to study the issue and report any findings or recommendations to the Legislature.

To facilitate communication between industry and government stakeholders, the Task Force recommends that the Legislature create an ongoing statewide government/private sector panel to examine standard-of-care abuses in the industry, pool resources and share information. The panel should include the Attorney General, Florida Department of Financial Services-Fraud Division (DFS), Department of Business and Professional Regulation, DOH, AHCA, representatives from the insurance industry doing business in Florida, Florida Alcohol and Drug Abuse Association (FADAA), DCF, FARR, medical doctors and inpatient and outpatient treatment providers, among other potential stake-holders. This panel would be tasked with identifying areas of abuse and coordinating efforts within the private industry and government agencies to curb those abuses as well as recommending appropriate action by the Legislature and executive branches.

## RECOGNIZING THE NEED FOR ANCILLARY SERVICES AT RECOVERY RESIDENCES

A great deal of discussion among Task Force members has revolved around whether or not persons recovering from addiction who are actively being treated either in day/night or intensive outpatient programs require ancillary services at their residence as part of the continuum of care. The debate does not include substance abuse treatment, which is not recognized as a function of the residence. Ancillary services could include assistance with transportation, obtaining government benefits, obtaining a job, a driver's license, life skills training, and overall support of a sober environment. The Task Force will continue to study this issue and will report its findings to the Legislature.

## ALTERNATIVES TO DCF LICENSING OF RECOVERY RESIDENCES: AHCA

As an alternative agency to DCF, and in addition to mandatory FARR certification for patient housing connected by commerce to treatment providers, there is an argument to be made that AHCA should license commercial recovery residences with patients engaged in active intensive treatment.  This type of license would be similar to a license for an Adult Family Care Home (AFC).

At the very least, AHCA licensure may be considered if a recovery residence supervises one or more residents who receive medication assisted treatment (MAT).   Under such circumstances, the Recovery Residence appears to meet the definition of an ALF, which already requires licensure by AHCA.[11]

The reasoning behind mandatory licensure for ALFs equally applies to Recovery Residences.  The purpose of the Assisted Living Facilities Act "is to promote the availability of appropriate service for . . . adults with disabilities in the least restrictive and most homelike environment, to encourage the development of facilities that promote dignity, individuality, privacy, and decision making ability of such persons, to provide for the health, safety, and welfare of residents . . ., to promote continued improvement of such facilities, to encourage the development of innovative and affordable facilities particularly for persons with low to moderate incomes, to ensure that all agencies of the state cooperate in the protection of such

---

[11] "Assisted living facility" means any building . . . which undertakes through its ownership or management to provide housing, meals, and one or more personal services for a period exceeding 24 hours to one or more adults who are not relatives of the owner or administrator." § 429.02(5), Fla. Stat. (2016). "Personal services" means . . . supervision of the activities of daily living and the self-administration of medication and other similar services . . ."  § 429.02(17), Fla. Stat. (2016). "Supervision" means reminding residents to engage in activities of daily living and the self-administration of medication, and, when necessary, observing or providing verbal cuing to residents while they perform these activities."   § 429.02(24), Fla. Stat. (2015). "Activities of daily living" means functions and tasks for self care . . ."  § 429.02(1), Fla. Stat. (2015).

residents, and to ensure that needed economic , social, mental health, health, and leisure services are made available to residents . . . through the efforts of [AHCA] [DCF], [DOH], assisted living facilities, and other community agencies." § 429.01(2), Fla. Stat. (2014).

## CONCLUSION

The addiction treatment industry in Florida has a long history of providing quality care and effective treatment.  There is a recent trend by unethical providers, however, to exploit the patients they serve and to use the lack of effective oversight to promote patient brokering, excessive billing of services, and inappropriate patient care. This report is written to address systemic problems in the system, created by some, and it should not be assumed these abuses are practiced by all providers.

Many individuals, both Floridians and patients from out of state, find long-term recovery as a result of their engagement in substance abuse treatment. While there are many reputable treatment providers who have a long history of delivering quality care, the reputation of the industry has been negatively affected, and the well-being of patients jeopardized, by a number of providers who have used their license to provide treatment as a means to deliver inadequate care, put patients at risk, use unethical marketing  and brokering practices, and practice fraud. This proliferation of fraud and abuse within the substance abuse treatment and recovery residence industries requires immediate attention by the Legislature.  Currently, there is very little oversight of providers and no oversight of most recovery residences.  Creating a vibrant, adequately funded system of oversight through either DCF or AHCA is crucial.  The funding can and should be acquired through increased licensing fees and fees for service, which would make the enhancement revenue neutral.   In addition, recovery residences engaged in commerce with treatment providers need to be certified and managed by a certified recovery residence administrator.

Certain law enforcement measures will be helpful to both deter criminality and assist law enforcement in its investigation of patient brokering.  The Legislature needs to address abuses in marketing by criminalizing material misrepresentations.   Referrals to and from

treatment providers and commercial recovery residences should be allowed only when the recovery residence is certified by a credentialing entity. Jurisdiction should be given to the Attorney General to criminally prosecute patient brokering that occurs across multiple circuits.

Aggressive law enforcement efforts alone will not eliminate all the industry bad actors, any more than criminalizing grand theft auto has eliminated all car thefts. Without bold action the problem will certainly worsen. Currently, paying rent and amenities for patients in order to induce the patient to use a particular provider constitutes patient brokering. If the Legislature recognizes the need to permit treatment providers to subsidize recovery residences housing patients in IOP and day/night treatment programs, those commercial recovery residences need to be both licensed by DCF or AHCA and certified by a credentialing entity. One way this can be achieved is through the creation by DCF of a community residential overlay license connected to intensive outpatient treatment components. A provider may only provide rent subsidy to a recovery residence under this dual system of licensure, along with certification of the residence, and for a limited time.

Marketers and admission personnel should be licensed and subject to marketing standards developed by the Legislature. The most egregious material misrepresentations should be criminalized. The Task Force will continue to study the industry standards and will be making further recommendations regarding marketing and treatment personnel qualifications and appropriate standard of care issues.

The Legislature should create a statewide panel of public and private stakeholders to share information and recommend ongoing improvements in substance abuse treatment industry standards.

While the problems identified in this report have a significant impact on the Southeast part of the state, the Task Force has found that these practices also occur in other communities across Florida. The goal of this report is to ensure that all patients receive quality treatment without being subject to fraud or abuse. The Task Force encourages swift and decisive action by the Legislature.