# EXHIBIT 47

# UNITED STATES DISTRICT COURT
## Southern District of Florida
### West Palm Beach Division

**UNITED STATES OF AMERICA**
v.
**TOVAH LYNN JASPERSON**

**JUDGMENT IN A CRIMINAL CASE**

Case Number: **17-80194-CR-MIDDLEBROOKS**
USM Number: **17002-104**

Counsel For Defendant: **Alvin E. Entin**
Counsel For The United States: **Ann Marie C. Villafana**
Court Reporter: **Jill Felicetti**

**The defendant pleaded guilty to count(s) One.**

The defendant is adjudicated guilty of these offenses:

| TITLE & SECTION | NATURE OF OFFENSE | OFFENSE ENDED | COUNT |
|---|---|---|---|
| 18 U.S.C. §1349 and 1347 | Conspiracy to commit health care fraud | 09/02/2015 | 1 |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**All remaining counts are dismissed on the motion of the government.**

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Date of Imposition of Sentence: **5/11/2018**

**Donald M. Middlebrooks**
**United States District Judge**

Date: 5/11/18

DEFENDANT: **TOVAH LYNN JASPERSON**
CASE NUMBER: **17-80194-CR-MIDDLEBROOKS**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of **SEVENTY-EIGHT (78) MONTHS as to Count One**.

**The court makes the following recommendations to the Bureau of Prisons:**

1. **The Defendant be designated to a facility in West Virginia or South Florida.**
2. **The Defendant participate in the drug treatment program while in custody.**

**The defendant shall surrender to the designated facility and/or the US Marshal for this District on or before SEPTEMBER 10, 2018 BY 3:00 PM.**

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

_____
DEPUTY UNITED STATES MARSHAL

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                                          Page 3 of 6

DEFENDANT: **TOVAH LYNN JASPERSON**
CASE NUMBER: **17-80194-CR-MIDDLEBROOKS**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **THREE (3) YEARS as to Count One**.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

**The defendant shall cooperate in the collection of DNA as directed by the probation officer.**

**The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.**

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1. The defendant shall not leave the judicial district without the permission of the court or probation officer;
2. The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first fifteen days of each month;
3. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4. The defendant shall support his or her dependents and meet other family responsibilities;
5. The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6. The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7. The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9. The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11. The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT: **TOVAH LYNN JASPERSON**
CASE NUMBER: **17-80194-CR-MIDDLEBROOKS**

## SPECIAL CONDITIONS OF SUPERVISION

Association Restriction - The defendant is prohibited from associating with any of the coconspirators, except her father Alan Martin Bostom, while on probation/supervised release.

Financial Disclosure Requirement - The defendant shall provide complete access to financial information, including disclosure of all business and personal finances, to the U.S. Probation Officer.

Health Care Business Restriction - The defendant shall not own, directly or indirectly, or be employed, directly or indirectly, in any health care business or service, which submits claims to any private or government insurance company, without the Court's approval.

Mental Health Treatment - The defendant shall participate in an approved inpatient/outpatient mental health treatment program. The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

Permissible Search - The defendant shall submit to a search of his/her person or property conducted in a reasonable manner and at a reasonable time by the U.S. Probation Officer.

Related Concern Restriction - The defendant shall not own, operate, act as a consultant, be employed in, or participate in any manner, in any sober home or substance abuse treatment facility related concern during the period of supervision.

Substance Abuse Treatment - The defendant shall participate in an approved treatment program for drug and/or alcohol abuse and abide by all supplemental conditions of treatment. Participation may include inpatient/outpatient treatment. The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

DEFENDANT: **TOVAH LYNN JASPERSON**
CASE NUMBER: **17-80194-CR-MIDDLEBROOKS**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|        | Assessment | Fine   | Restitution    |
|--------|------------|--------|----------------|
| TOTALS | $100.00    | $0.00  | $4,045,364.98  |

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| NAME OF PAYEE | TOTAL LOSS* | RESTITUTION ORDERED | PRIORITY OR PERCENTAGE |
|---|---|---|---|
| See attached list of victims | $ | $4,045,364.98 | |

**Restitution with Imprisonment** - It is further ordered that the defendant shall pay joint and several restitution in the amount of $4,045,364.98. The following amount is due immediately $1,976.668.10.

Upon release of incarceration, the defendant shall pay restitution at the rate of 10% of monthly gross earnings, until such time as the court may alter that payment schedule in the interests of justice. The U.S. Bureau of Prisons, U.S. Probation Office and U.S. Attorney's Office shall monitor the payment of restitution and report to the court any material change in the defendant's ability to pay. These payments do not preclude the government from using other assets or income of the defendant to satisfy the restitution obligations.

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**Assessment due immediately unless otherwise ordered by the Court.

DEFENDANT: **TOVAH LYNN JASPERSON**
CASE NUMBER: **17-80194-CR-MIDDLEBROOKS**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A. Lump sum payment of $1,976,768.10 due immediately.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

This assessment/fine/restitution is payable to the CLERK, UNITED STATES COURTS and is to be addressed to:

**U.S. CLERK'S OFFICE**
**ATTN: FINANCIAL SECTION**
**400 NORTH MIAMI AVENUE, ROOM 08N09**
**MIAMI, FLORIDA 33128-7716**

The assessment/fine/restitution is payable immediately. The U.S. Bureau of Prisons, U.S. Probation Office and the U.S. Attorney's Office are responsible for the enforcement of this order.

**Joint and Several**

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

| CASE NUMBER DEFENDANT AND CO-DEFENDANT NAMES (INCLUDING DEFENDANT NUMBER) | TOTAL AMOUNT | JOINT AND SEVERAL AMOUNT |
|---|---|---|
| 17-80194-CR-DMM Tovah Lynn Jasperson (1) and Alan Martin Bostom (2) | $0.00 | $4,045,364.98 |

**Restitution is owed jointly and severally by the defendant and co-defendants in the above case.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. __17-80194-CR-MIDDLEBROOKS/BRANNON__

UNITED STATES OF AMERICA

vs.

TOVAH LYNN JASPERSON,
a/k/a "Tara,"

        **Defendant.**
_____/

## FACTUAL PROFFER

Defendant Tovah Lynn Jasperson, a/k/a "Tara" (hereinafter "the defendant"), her counsel, and the United States agree that, had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and that the following facts are true and correct and are sufficient to support a plea of guilty:

1.    The defendant and her co-defendant, Alan Martin Bostom ("Bostom"), were residents of Wellington, Florida, in Palm Beach County, in the Southern District of Florida. The co-defendants share a familial relationship, that is, the defendant is Bostom's daughter.

2.    In July 2010, Bostom filed and caused the filing of documents with the Florida Secretary of State to create "Angels and Angelmen, LLC." In August 2010, the name of the limited liability company was changed from "Angels and Angelmen, LLC" to "Angel's House LLC," d/b/a "Angel's Recovery" (hereinafter referred to as "Angel's Recovery").

3.    The defendant later filed and caused the filing of documents with the Florida Secretary of State listing herself as the 100% owner of Angel's Recovery. Despite the representation to the Secretary of State regarding the change in ownership, Bostom continued to be involved in the management of Angel's Recovery and continued to participate in its profits.

4.    The defendant and Bostom also filed and caused the filing of documents with the Florida Secretary of State to create a separate LLC named "Angel's Recovery, LLC." On June 3, 2014, the defendant, on behalf of Angel's Recovery, LLC, filed and caused the filing of a fictitious name registration with the Florida Secretary of State, providing notice that Angel's Recovery, LLC, owned the fictitious name "Gold River Labs." The filing gave Angel's Recovery, LLC ownership of the name "Gold River Labs" through December 31, 2019.

5.    Angel's Recovery had multiple locations in Palm Beach County, in the Southern District of Florida, including 11576 Pierson Road, Wellington, Florida, and 222 Professional Way, Wellington, Florida. Angel's Recovery purported to operate as a licensed "substance abuse service

CIGNA19-1326 0317939

provider" or "treatment center," that is, it offered clinical treatment services for persons suffering from alcohol and drug addiction. Angel's Recovery offered medication-based treatment for opioid addiction, that is, treatment on a "nonresidential basis which utilize[d] methadone or other approved medication in combination with clinical services to treat persons who are dependent upon opioid drugs." Fla. Admin. Code § 65D-30.002(16)(m).

6.  At different times, the defendant and Bostom managed all aspects of Angel's Recovery, including hiring and firing personnel, admitting and discharging patients, and making financial decisions. The defendant and Bostom were listed as owners and Chief Executive Officers of Angel's Recovery on the licensing documents filed with the Department of Children and Families ("DCF").

7.  To be properly licensed by the State of Florida, Angel's Recovery was required to have a "medical director," that is, "a physician licensed under Chapter 458 or 459, [Florida Statutes], who has been designated to oversee all medical services of a [substance abuse treatment] provider and has been given the authority and responsibility for medical care delivered by a provider. Fla. Admin. Code § 65D-30.002(37).

8.  The defendant and Bostom hired a person with initials KRK (hereinafter referred to as "Doctor #1") to serve as the medical director of Angel's Recovery. Doctor #1 had two reported reprimands from the Florida Board of Medicine, was the subject of a third disciplinary proceeding, and was actively abusing prescription opioids and cocaine.

9.  During the period of his employment, Doctor #1 frequently pre-signed prescriptions that were used to dispense controlled substances to patients of Angel's Recovery by other employees.

10. After several years of contested proceedings, on February 17, 2015, the Florida Board of Medicine issued a Final Order suspending Doctor #1's medical license for four years. Following the suspension, the defendant and Bostom continued to employ Doctor #1 as the medical director of Angel's Recovery, knowing that Doctor #1's license had been suspended. After his license was suspended, and until at least September 2, 2015, Doctor #1 continued to examine and treat some patients at Angel's Recovery, continued to prescribe controlled substances and bodily fluid testing to Angel's Recovery patients, and continued to provide pre-signed prescriptions that allowed other employees of Angel's Recovery to unlawfully provide prescriptions for controlled substances and bodily fluid testing to Angel's Recovery patients. The bodily fluid testing that was prescribed by Doctor #1 (or others using prescriptions pre-signed by Doctor #1) was not properly prescribed or medically necessary because: (i) Doctor #1 signed the prescriptions and statements of medical necessity for bodily fluid testing when he had not examined the patients prior to prescribing the testing; (ii) Doctor #1 was not a licensed medical doctor at the time he signed the prescriptions and statements of medical necessity; and (iii) the test results were not timely reviewed or used by a doctor or treatment professional in developing or modifying the patients' treatment plans.

11. Substance abuse treatment facilities in Florida that offer inpatient treatment or offer outpatient treatment with a residential housing component are subject to specialized licensing requirements. Many insurance companies do not provide coverage for inpatient treatment (other

2

CIGNA19-1326 0317940

than inpatient detoxification) or for residential housing components, so patients are required to pay for their own housing while attending outpatient treatment.

12. To secure a steady stream of patients, the defendant and Bostom established illegal kickback/bribe relationships with owners of recovery residences, commonly referred to as "sober homes," in exchange for referring the sober homes' insured residents to Angel's Recovery for treatment. The defendant and Bostom provided the money used to purchase or rent several properties used as "sober homes," although the purchase agreements or leases would bear the names of third parties.

13. Redemption Sober House, Inc. ("Redemption") was a multi-bed residence in Palm Beach County, Florida, located at 243 N.E. 13th Street, Delray Beach, Florida, that purported to operate as a sober home. According to corporate records filed with the State of Florida, Michael Bonds was the president of Redemption. Michael Bonds referred Redemption residents to Angel's Recovery and, in exchange, directly or indirectly received more than $700,000 in payments from Angel's Recovery.

14. A person with initials A.J. owned two multi-bed residences in Palm Beach County, Florida, that purported to operate as sober homes. A.T. Way LLC ("A.T. Way") was located at 120 SW 13th Ave, Boynton Beach, Florida, and Carter Care Recovery ("Carter Care") was located at 315 SW 7th Avenue, Boynton Beach, Florida. A.J. received money from the defendants to purchase the properties used as A.T. Way and Carter Care. A.J. referred residents of A.T. Way and Carter Care to Angel's Recovery and, in exchange, directly or indirectly received more than $150,000 in payments from Angel's Recovery.

15. The defendants and their co-conspirators required the sober home residents to travel to Angel's Recovery multiple times per week to attend treatment sessions and to submit to drug testing, which the defendants and co-conspirators could bill to the Insurance Plans. To this end, the defendants sent vans to the sober homes to transport the residents to Angel's Recovery.

16. The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") was tasked with establishing and implementing a comprehensive program to improve the provision of treatment and related services to individuals with respect to substance abuse and with protecting the legal rights of individuals who are substance abusers. 42 U.S.C. § 290aa.

17. "Substance abuse" was defined as "the abuse of alcohol or other drugs." 42 U.S.C. § 290cc-34(4). "Treatment" meant "the management and care of a patient suffering from alcohol or drug abuse, a condition which is identified as having been caused by that abuse, or both, in order to reduce or eliminate the adverse effects upon the patient." 42 C.F.R. § 2.11.

18. In addition to substance abuse treatment programs, SAMHSA promulgated guidelines for sober homes. Sober homes generally did not provide medical care or clinical services to their residents. When properly managed, sober homes operated as alcohol and drug free living environments for individuals attempting to abstain from alcohol and drugs, including providing a peer support network of individuals in recovery.

19. Substance abuse services in Florida were governed by the "Hal S. Marchman

CIGNA19-1326 0317941

Alcohol and Other Drug Services Act" ("the Marchman Act"), Fl. Stat. § 397.301. Amongst other things, the Marchman Act made it unlawful for any person or agency to act as a substance abuse service provider unless it was properly licensed. Fl. Stat. § 397.401(1); Fl. Admin. Code § 65D-300.003(1)(a). Under the Marchman Act, private substance abuse service providers' policies regarding payment for services had to comply with federal and state law. Fl. Stat. § 397.431

20. DCF was tasked with regulating and licensing substance abuse service providers. Fl. Stat. § 397.321.

21. The Marchman Act also provided guidelines for sober homes/recovery residences, which were defined as "a residential dwelling unit, or other form of group housing that is offered or advertised . . . as a residence that provides a peer-supported, alcohol-free, and drug-free living environment." Fl. Stat. § 397.311(36).

22. Insurance coverage for substance abuse treatment and testing was available through a number of avenues, including federal health care benefits programs like the Federal Employees Health Benefits Program ("FEHBP"), health plans sponsored by private employers (including the National Railroad Passenger Corporation ("Amtrak") employee health care benefit plans), and health plans offered directly by private insurance companies. Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq., while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

23. Both ERISA and non-ERISA health benefit plans, including Affordable Care Act plans, were offered or administered by private insurance companies, including Blue Cross/Blue Shield ("BCBS"), Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

24. Angel's Recovery submitted claims for reimbursement to multiple health benefit plans, including the FEHBP plans, Amtrak's established plans, and private ERISA and non-ERISA health benefit plans (jointly referred to as "the Insurance Plans").

25. The Insurance Plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

26. Regardless of the type of Insurance Plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the patient's insurance documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims.

27. The "Florida Patient Brokering Act," made it a felony offense for any person, health care provider, or health care facility, including any state licensed substance abuse service provider, to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in

4

CIGNA19-1326 0317942

kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)." Fla. Stat. § 817.505.

28. The defendants and co-conspirators provided kickbacks and bribes, in the form of free or reduced rent, insurance premium payments, and other benefits to individuals with insurance who agreed to reside at the sober homes and attend drug treatment, which included regular and random drug testing (typically three or more times per week), so that members of the conspiracy could bill the testing and treatment to the residents' Insurance Plans. To disguise kickbacks and bribes to patients, the defendants used a separate entity named Angel Watch Foundation, Inc., to pay insurance premiums for patients of Angel's Recovery so that Angel's Recovery could continue to bill the patients' insurance companies for treatment expenses.

29. Under the terms of the insurance policies and consistent with state and federal law, the Insurance Plans were only responsible for claims for services that: (a) were "medically necessary" and actually rendered, (b) were provided by a properly licensed service provider, and (c) complied with the terms of the health care plans, including the obligation to pay co-insurance and deductibles.

30. Unlike treatment facilities, sober homes generally did not provide medical care or clinical services that could be reimbursed by health insurance. While there were federal and state guidelines, sober homes were not licensed or funded by state or local governments. However, if a treatment facility offered residential services, those services had to be licensed by DCF. Since sober homes were merely places to live, legitimate sober homes generated income to cover expenses through the collection of weekly or monthly rent paid by their residents, just as with any other landlord-tenant relationship.

31. Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva. Urine Analysis or urinalysis ("UA") testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis. Laboratories could also conduct complex analysis on blood and saliva samples.

32. Like other medical tests, bodily fluid testing could be billed and reimbursed pursuant to the terms of the insurance policy. The Insurance Plans were only responsible for claims for testing that was "medically necessary," actually performed, properly prescribed, and conducted by a properly licensed service provider, and conducted and billed in compliance with the terms of the health care plan, including the obligation to pay co-insurance.

33. The defendants and co-conspirators prepared and caused the preparation and submission of fraudulent insurance claim forms attesting that the billed amounts qualified for reimbursement, that is, (i) the claims falsely stated that the testing and treatment had been

5

CIGNA19-1326 0317943

medically necessary when, in truth and in fact, some of the claimed testing and treatment had not been necessary; (ii) the claims failed to disclose that the patients were referred to Angel's Recovery in exchange for kickbacks and bribes; (iii) the claims failed to disclose that some patients had not paid their co-payments and deductibles; (iv) the claims failed to disclose that some of the patients' insurance premiums were paid by the defendants themselves; and (v) the claims failed to disclose that Doctor #1's medical license was suspended and, accordingly, the license of Angel's Recovery was invalid because it did not have a properly licensed medical director.

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

Date: _____ By: _____
A. MARIE VILLAFAÑA
ASSISTANT UNITED STATES ATTORNEY

Date: 1/12/18 By: _____
ALVIN ENTIN, ESQ.
ATTORNEY FOR DEFENDANT

Date: 1/12/18 By: _____
TOVAH LYNN JASPERSON, DEFENDANT

6

CIGNA19-1326 0317944