1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3    _____
     CONNECTICUT GENERAL )
4    LIFE INSURANCE CO.  )
     AND CIGNA HEALTH    )
5    AND LIFE INSURANCE  )
     CO.                 )
6          Plaintiffs )     NO: 3:19cv1324(JCH)
                        )     NO: 3:19CV1326(JCH)
7     vs.               )     October 18, 2024
                        )     9:12 a.m.
8                       )
     BIOHEALTH MEDICAL  )
9    LABORATORIES INC,  )
     PB LABORATORIES, LLC)
10   and EPIC REFERENCE  )
     LABS, INC.         )
11         Defendants. )
     _____)      141 Church Street
12                             New Haven, Connecticut

13

14              DAY ONE OF TRIAL

15

16   B E F O R E:

17            THE HONORABLE JANET C. HALL, U.S.D.J.

18   A P P E A R A N C E S:

19   For CIGNA:        Edward T. Kang
                       Emily Costin
20                     Alston & Bird LLP
                       950 F Street, NW,
21                     Washington, DC 2004-1404

22                     Michelle Nicole Jackson
                       Alston & Bird LLP
23                     1201 West Peachtree Street
                       Atlanta, GA 30309

24

25                 -- continued --

```
 1                         Alexander Akerman
                           Alston & Bird LLP
 2                         350 South Grand Avenue
                           51st Floor
 3                         Los Angeles, CA 90071

 4                         Kelsey Kingsbery
                           Alston & Bird LLP
 5                         555 Fayetteville Street
                           Ste 600
 6                         Raleigh, NC 27601

 7

 8   For BioHealth Labs:  Scott M. Hare
                           Anthony Thomas Gestrich
 9                         Raines Feldman Littrell
                           11 Stanwix Street
10                         Suite 1400
                           Pittsburgh, PA 15222
11
                           Fred Alan Cunningham
12                         Matthew Thomas Krist
                           Rafferty Domnick Cunningham & Yaffa
13                         2401 PGA Boulevard
                           Suite #140
14                         Palm Beach Gardens, FL 33410

15                         John J. Radshaw, III
                           John J. Radshaw, III, Esquire
16                         65 Trumbull Street, 2d Fl.
                           New Haven, CT  06510
17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Good morning.  Please be seated.

2          We're here this morning for day one of the

3    evidence in the trial in the two cases known as

4    Connecticut General Life Insurance Company, et al versus

5    BioHealth Laboratories Inc., et al, 19-CV-1324; and the

6    second, Epic Reference Labs, Inc., et al versus Cigna

7    Health and Life Insurance, et al, number 19-CV-1326.

8          I was told there were no issues between the

9    parties before we begin this morning.  Is that a correct

10   report?

11         MS. KINGSBERY:  Yes, Your Honor.

12         MR. HARE:  Yes, Your Honor.

13         THE COURT:  I should allow counsel to note their

14   appearances, please, for the record.

15         MR. CUNNINGHAM:  Good morning, Your Honor.  Fred

16   Cunningham for the Labs.

17         MR. CHRIST:  Good morning, Your Honor.  Matthew

18   Christ for the Labs.

19         MR. HARE:  Your Honor, good morning.  Scott

20   Hare, Raines Feldman Littrell, for the Labs.

21         MR. CUNNINGHAM:  Good morning.  Anthony Gestrich

22   also for the Labs.

23         MR. RADSHAW:  Good morning, Your Honor.  John

24   Radshaw for the Labs.

25         THE COURT:  Good morning to all of you.

1        And for Cigna.

2        MR. KANG:  Good morning, Your Honor.  Edward

3    Kang from Alston & Bird on behalf of Cigna.

4        MR. AKERMAN:  Good morning, Your Honor.

5    Alexander Akerman, Alston & Bird, also for Cigna.

6        MS. COSTIN:  Good morning, Your Honor.  Emily

7    Costin, Alston & Bird, for Cigna.

8        MS. KINGSBERY:  Good morning, Your Honor.

9    Kelsey Kingsbery with Alston & Bird, also for Cigna.

10        MS. JACKSON:  Good morning, Your Honor.

11    Michelle Jackson with Alston & Bird, also for Cigna.

12        THE COURT:  Good morning to everyone.  I have to

13    remember to come out five minutes early for no other

14    reason to open court, announce the case, and get

15    appearances.

16        I'm here because there are some open issues of

17    some areas of uncertainty between my Clerk and I as to

18    certain things.

19        First of all, I raised the issue of offset back

20    when I talked about the *Hall* case and the fact we were

21    going to try two separate cases, two different verdicts.

22    I will not charge offset to the jury because I don't

23    think you can offset when it is two separate cases.

24    Maybe at collection time you can.  But I don't think in

25    the course of the trial process.

1        Somebody thinks I'm wrong, you should be ready

2   for the charge conference and tell me that I'm wrong on

3   that.

4        I think the parties could agree.  I would think

5   you'd want to agree upon final judgment in both cases

6   because, of course, you can have one trail the other on

7   appeal, as *Hall* explains.  But you could agree to do

8   that, but I can't charge it and tell the jury to do it.

9   So that's just my view.  If you think I'm wrong, I would

10  love to see some case law or some argument for that.

11       The second thing is I raised the issue of do we

12  really need I said both Cignas.  I really had thought

13  General Life Insurance but.  I know there was a response,

14  Attorney Kang, but I don't know where we are on that.

15  And when you are talking about charging, I have to know.

16  Am I doing a verdict form that has the two Cignas and

17  did you prove your claim or did each one prove a special

18  defense in the Labs cases?  It's very uncertain to me.  I

19  think I dodged it in the pretrial instructions, but I

20  would really like to settle that before I give you the

21  first draft of the charge and I don't think I have it

22  settled.

23       With respect to one of the bases, one of the

24  statutes in Count One of the Labs' claims, which is the

25  Prompt Payment Act.  I know we had a discussion in

1    connection with the precharge.  I have a recollection

2    that everyone agreed that they were electronic bills that

3    are at issue in the case and, therefore, the 120 days

4    applies.  Is that correct?

5            MR. CUNNINGHAM:  Yes, Your Honor.

6            THE COURT:  Thank you.

7            And then as to -- that's that.  As to the

8    Goldfarb deposition transcript that I've received.  My

9    understanding was that I don't have -- excuse me.

10           My understanding was that he's going to be here

11   live; is that correct?

12           MR. KANG:  Yes, Your Honor.

13           THE COURT:  You will be examining him on direct

14   exam, right?

15           MR. KANG:  Correct.

16           THE COURT:  Okay.  And then the Labs intend to

17   cross-examine him, correct, in the ordinary course as you

18   would ask questions on cross-examination; is that

19   correct?

20           MR. HARE:  We do, Your Honor.

21           THE COURT:  But you also wish to offer portions

22   of his deposition which you characterized as whether it's

23   a statement of a party opponent or whether it's a

24   statement against interest, whichever one, it would come

25   in that way; is that correct?

1          MR. HARE:  That's correct, Your Honor, as a

2     party admission.  And that deposition, in particular, was

3     a 30(b)(6) corporate designee.

4          THE COURT:  I remember.  I have read them.  So I

5     don't understand, Attorney Kang, you've got -- it's like

6     you've designated almost the whole deposition.  I don't

7     understand the purpose of that.  You can do all of this

8     with him live.  And I think they could wait -- well, I

9     don't understand what's going on.

10          MR. KANG:  We don't intend to offer his

11     deposition designations.  He's going to testify live.

12          THE COURT:  I'm not sure you can.  I mean, not

13     when it's your witness if it qualifies, right?

14          MR. KANG:  Sure.

15          THE COURT:  Okay.  So I'm going to say Cigna's

16     designations are withdrawn as to Mr. Goldfarb's

17     deposition.  Is that a fair statement, Attorney Kang?

18          MR. KANG:  That's fine, yes, Your Honor.

19          THE COURT:  I have already done rulings.  There

20     was one objection to one of your nine designations of

21     short portions of the deposition, and I believe I have

22     ruled on that; is that correct?

23          MR. HARE:  That's our understanding, Your Honor.

24          MR. KANG:  Your Honor, if I may, on the Goldfarb

25     deposition one more time.  Obviously, with respect to us,

1    no problem with withdrawing it.  I'm still having a hard

2    time understanding the Labs' basis for it.  Mr. Goldfarb

3    will be testifying on the stand and they can

4    cross-examine him.

5            THE COURT:  Right.

6            MR. KANG:  And so I don't know if in terms of if

7    they plan on reading after Mr. Goldfarb gets off the

8    stand additional portions of his transcript to the jury.

9    I would disagree with that.  Obviously, I think they

10    should examine Mr. Goldfarb if there's any portions of

11    his deposition transcript they want to impeach him on.

12    They are entitled to do that.  But I just don't know the

13    basis for them, after Mr. Goldfarb gets off the stand,

14    reading in additional portions to the jury.

15            THE COURT:  I guess I don't think it's offered

16    by way of impeachment.  They could have said take one of

17    those sentences, questions and answers.  Take the answer

18    where he said, yes, I shot my wife.  They could say isn't

19    it true, Mr. Goldfarb, you shot your wife?  He can say

20    yes.  So he's admitted it.  Or no, and then you impeach

21    him.  They are, I believe, entitled it's a statement of a

22    party opponent, right?  Mr. Goldfarb is someone in some

23    standing in the company.  He's not low down.  He's not an

24    office, you know, a delivery man or something.  He was

25    involved in the issues here.  I don't know what -- you

1    tell me.  What his role?  Maybe I'm assuming something

2    I shouldn't assume.

3         MR. KANG:  At the time he was a lawyer with the

4    company.  He's now a director with SIU.  He testified as

5    our 30(b)(6) witness in this case.

6         My understanding of the law, Your Honor, is that

7    if, in this instance, if the Labs were to offer, as they

8    apparently plan to do, his testimony as speaking on

9    behalf of the company as a 30(b)(6), we are entitled then

10   also to examine him as to be able to speak on the

11   company's behalf as a 30(b)(6) witness as well.

12        THE COURT:  You can do that.  I don't know that

13   you are prohibited from that.  Do you think he is?  I

14   mean, he can examine him directly on whatever he wants to

15   examine him on.

16        MR. HARE:  Agreed, Your Honor.  And the Federal

17   Rules speak directly to this.  Rule 32(a)(3), Using

18   Depositions in Court Proceedings.  At a hearing or trial,

19   all or part of a deposition may be used against a party

20   on these conditions.  (3) says an adverse party may use

21   for any purpose the deposition of a party or anyone who

22   when deposed... was the designee under Rule 30(b)(6).

23        So reading in as admissions is a purpose and

24   it's a proper and contemplated purpose under Rule 32.

25        THE COURT:  I'm not doubting you, sir.  I just

1   want to read the words, put my own eyes on it.  But

2   continue with what you're citing to me.

3           MR. HARE:  And there were some unspoken ellipses

4   in what I just read into the record.

5           THE COURT:  That's fine.

6           Deposition of a party agent or designee.  And he

7   could be both an agent and a designee.  But he clearly

8   was a 30(b)(6) witness.  And the party may use -- adverse

9   party may use.  Doesn't say you may use, Attorney Kang.

10  The adverse party may use for any purpose the deposition

11  of a party or anyone who, when deposed, was the party's

12  officer, director, managing agent, or designee under

13  30(b)(6).

14          I don't think you can -- I don't think there's a

15  basis to prevent them from using what I think are a few

16  lines of testimony from this deposition.

17          MR. KANG:  So I don't have a problem with that,

18  Your Honor.  But if they are going to be offering in Mr.

19  Goldfarb, his portions as a 30(b)(6) representative, not

20  just talking about his personal knowledge, but as a

21  corporate representative, then my point is I should be

22  entitled during my examination of Mr. Goldfarb also to

23  ask him questions on behalf of him as a corporate

24  representative.

25          THE COURT:  I don't hear any objection from

1    Attorney Hare to that.

2         MR. HARE:  Rule 32(a)(3), as the Court just

3    pointed out, empowers an adverse party, not --

4         THE COURT:  He's not talking about using the

5    deposition.  He knows the nine things you've designated.

6    Those are topics he's forewarned he better cover on

7    direct, because you are going to cover them on cross.

8    You will cover by reading them.  So he's saying I have a

9    right to question on those subjects.

10        Now, I don't know -- are you saying you have a

11   right to ask him anything at all about your two clients

12   as a 30(b)(6) on any subject?  I don't think so.  He was

13   designated for one or more subjects in the deposition.

14   On those maybe we can talk, but not on everything.

15        MR. KANG:  That's right.

16        THE COURT:  What's your view on that, Attorney

17   Hare?

18        MR. HARE:  By way of live testimony question and

19   answer, I agree.

20        THE COURT:  I agree.  You can object if you

21   think it's not relevant, you think it's inappropriate or

22   whatever, but he wasn't what he's designated.  I don't

23   have the deposition notice in front of me so I don't know

24   the designation area, but you're going to have to get on

25   your feet.

1          MR. HARE:  We had understood all along, by

2     virtue of its counter-designation, that Cigna was seeking

3     to offer great swabs of that deposition testimony which

4     would not be appropriate.  Live question and answer, of

5     course, is governed by the rules at trial.

6          THE COURT:  That's fine.  As I say, I think as

7     to at least the subject in those lines designated, you're

8     forewarned.  Don't expect to tell me you are going to get

9     up on redirect and do a lengthy examination of this

10    gentleman based on anything in those topics.  If you want

11    him to talk about those things, maybe pull the teeth

12    before they get to put it on the record, you got him on

13    direct.  You can do that.  Okay.

14         MR. HARE:  Thank you, Your Honor.

15         THE COURT:  All right.  One more question.  I

16    apologize.

17         I know you want me to read something known as

18    Updated Statement of Stipulated Facts at the beginning,

19    in other words, before any questioning is done, before I

20    turn to having a witness called.  I will have it marked

21    as a Court Exhibit and at the end of the case it goes to

22    the jury as an exhibit.  However, again, this is an area

23    where my recollection and Alex's seems to differ.  I

24    think I raised the issue of the fact there are a few not

25    significant, but there are stipulations in the pretrial

1    memo going back to what you filed in August.  And I

2    thought neither of you had interest in having me read

3    those to the jury.  And they certainly haven't been

4    prepared as an exhibit or something to be docketed that

5    way.

6           So my intention is just to read Document 427,

7    the Updated Statement of Stipulated Facts.  Period.

8           Does anyone have a different expectation of what

9    I would be doing in about an hour?

10          MR. KANG:  No, Your Honor.

11          THE COURT:  How about the Labs' side, please?

12          MR. HARE:  Mr. Gestrich is pulling up the

13   pretrial.

14          THE COURT:  Well, let me put it this way.  Have

15   you gone in to check, Liana?

16          THE CLERK:  Right before you took the bench.

17          THE COURT:  Go now.  I thought I said that, but

18   maybe I interrupted myself.

19          MR. HARE:  Forgive me, Your Honor.  We were

20   being prudent in double-checking.  We agree as well.

21          THE COURT:  All right.  That's fine.

22          I think we're going to check.  We had six about

23   15 minutes ago which is excellent.  So we'll see if

24   everybody's shown up.

25          MR. HARE:  Will the Court Exhibit be entered?

1          THE COURT:  I'll just say the parties have asked

2     me to read it and have also asked that it be marked.

3     Since they both submitted it, I think it's appropriate to

4     mark it as a Court Exhibit.  I will turn to Liana and say

5     mark it Court Exhibit 1.  I don't need a motion to mark

6     something as a Court Exhibit.

7          MR. HARE:  And then, so to say, totem pole

8     admissions.  Some of the admissions address court

9     exhibits.  Will those Joint Exhibits thereupon be

10    admitted into the record as well?

11         THE COURT:  I don't know what means and you are

12    out of time.  So if you want to raise this with me, you

13    raise it later.  I mean, that could have been discussed

14    yesterday.  I don't even know what you're saying.  We'll

15    take it up another time.  I won't take it up but -- well,

16    you have a lot more Joint Exhibits than are listed in the

17    stipulation.  I think we've agreed those are to be full

18    exhibits out of the box.  I probably at some point, as a

19    matter of housekeeping, should read those numbers into

20    the record.  Poor Terri is going to shoot me.  But I'm

21    not doing it at the beginning of the trial.

22         MR. HARE:  Understood, Your Honor.

23         THE COURT:  If you want to use one before I do

24    it, you tell me it's Joint and I will say it's a full

25    exhibit and you go ahead.

1          THE CLERK:  We're ready.

2          THE COURT:  Fantastic.  Bring the jury in,

3   please.

4          Anyone ask for a two minute warning on the

5   closing time limit?

6          MR. CUNNINGHAM:  I would like that, Your Honor.

7          THE COURT:  Okay.  I couldn't remember.

8          How about you, Attorney Kang?

9          MR. KANG:  Yes, please.  Thank you.

10          (In the presence of the jury at 9:29 a.m.)

11          THE COURT:  Everyone be seated, please.

12          Welcome back, ladies and gentlemen.  You all

13   look familiar to me.  So I think you are the folks I

14   picked yesterday.

15          Thank you for being on time.  You will note, I

16   had you out here at 9:30.  It's all because you were here

17   on time.

18          The first order of business today is to take

19   the roll call because it's your first day and it's the

20   first time you've been assigned a number for the trial.

21          So, Liana, if you would please do the roll

22   call.  She's going to do it by number and all you have to

23   answer is present, here, whatever you want to say.

24          THE CLERK:  Juror 1.

25          THE JUROR:  Here.

```
1              THE CLERK:  Juror 2.

2              THE JUROR:  Here.

3              THE CLERK:  Juror 3.

4              THE JUROR:  Here.

5              THE CLERK:  Juror 4.

6              THE JUROR:  Here.

7              THE CLERK:  Juror 5.

8              THE JUROR:  Here.

9              THE CLERK:  Juror 6.

10             THE JUROR:  Here.

11             THE CLERK:  Juror 7.

12             THE JUROR:  Here.

13             THE CLERK:  Juror 8.

14             THE JUROR:  Here.

15             THE CLERK:  Juror 9.

16             THE JUROR:  Here.

17             THE COURT:  Great.  And we'll administrator the

18   oath at this point.  I don't know of any reason not to.

19             You all need to raise your right hand, be

20   attentive to the Clerk's statement of the oath.  And when

21   she's done, I have to see all of your mouths moving and

22   saying I do or I will or something like that.

23             Go ahead, Liana.

24             THE JURORS:  I do.

25             (Whereupon, the jury is sworn.)
```

1        THE COURT:  Thank you very much, ladies and

2   gentlemen.  You are now officially our jury.  You may be

3   seated, sir.  Thank you.

4            At this time, I'm going to go to give you what

5   are called pretrial instructions.  And it's intended

6   really to give you an introduction to the two trials that

7   we have before us.  I will not give you copies.  It's not

8   that long.  Not as long as what the final one will be.

9   And it's not a substitute for the final instructions that

10  are much more detailed that I will give you at the end of

11  the trial.  I will instruct you on the law as it relates

12  to the evidence in this case before you go to retire your

13  two verdicts.  Instead my remarks this morning are simply

14  designed to orient you to the particular cases we have

15  under consideration.

16           Because I have this limited purpose, I'm not

17  going to give you complete instructions and it is

18  important therefore that you don't attempt to form a

19  final or firm opinion about the cases until you have

20  heard all of evidence and until I have given you complete

21  instructions at the end of a trial.

22           On the contrary, you are sworn to keep an open

23  mind until you've heard all of the evidence, until you

24  have been fully instructed in the law and until you have

25  had a chance to deliberate and discuss the cases at the

1    end of a trial with your fellow jurors.

2         As I mentioned at jury selection this is a trial

3    of two separate cases so it's really two trials although

4    it is going to go on seamlessly.  They have been

5    consolidated for trial that is we're going to hear them

6    at the same time.  The decision to try these together was

7    made because they both involve the same parties and much

8    of the same evidence and some similar questions of fact

9    and law.

10         In an ordinary single case between two parties,

11   one of the parties is called the plaintiff and the other

12   party is called the defendant.  It plaintiff is the party

13   who is bringing the claims and the defendant is the party

14   who denying them, resisting or defending against those

15   claims.  A case can also have multiple plaintiffs,

16   multiple defendants or both so there's two or more people

17   asserting a claim against two or more defendants.

18         As to each claim brought by each plaintiff, you

19   have to consider each plaintiff and each defendant

20   separately but you would return a verdict that finds

21   either for a plaintiff, for a defendant or for both in

22   part and against both in party.

23         For the reasons I will shortly explain, in these

24   cases the words plaintiff and defendant would be

25   confusing but all of the parties have both a plaintiff

1    hat and a defendant hat so if I start or the lawyers talk

2    about a plaintiff or a defendant, you will be wondering

3    who is that, which one is that.  So in other words, there

4    are the three lab companies.  Remember I mentioned that.

5    Biohealth Labs, PB Labs and Epic Reference Labs, et al.

6    That's a shorthand of their names.  These labs are

7    represented by the same attorneys and going to be putting

8    their case on together for you.  In other words, they

9    will present evidence that could apply to one or more of

10   the labs.

11           However, as jurors, you will have to return a

12   verdict separate for each of the three labs for

13   convenience and understanding of everyone at the trial, I

14   am going to refer to the three labs just as the Labs.  In

15   other words, I will not try to say, the plaintiff or the

16   defendant.  I will say the Labs.  However at various

17   points in the trial, you will hear evidence that pertains

18   to just one or two of these lab companies or you may hear

19   evidence that pertains to all three of them.  Just keep

20   in mind when I or the attorneys mention the Labs, it

21   means the three Lab companies.  If they are discussing a

22   particular lab, I expect they will use that lab company's

23   name.  But if they are speaking generally about the three

24   we'll, call them the Labs, we're not talk about them as a

25   plaintiff or a defendant.

1       In the case in which the plaintiffs -- the Labs

2   are the plaintiffs, the Labs are suing two different

3   insurance companies.  In other words, in that case, the

4   insurance companies are the defendants.  These two

5   insurance companies are called Connecticut General Life

6   Insurance Company and Cigna Health and Life Insurance

7   Company.  These companies are both subsidiaries of the

8   larger Cigna corporation.  For ease of reference, I'm

9   going to refer to them as Cigna.  However you may hear

10  evidence that pertains to just one of these parties or to

11  both of them.  And again, you will have to return a

12  separate verdict with respect to each of these two

13  companies so in that case, where the Labs are the

14  plaintiffs and they are bringing their claims against the

15  two Cigna companies who are the defendants.

16      However, as I mentioned before this is a trial

17  of two cases that have been consolidated.  That means

18  there's a second case.  In that second case, it's Cigna

19  who takes off their defendant hat and puts on their

20  plaintiff hat.  They have brought claims against the same

21  three labs so the labs are now the defendants in that

22  second case.  And Cigna is the plaintiff.

23      Again I'm not going to use the term plaintiff

24  and defendant which we usually do in a trial because it

25  is clear who the plaintiff and defendant is.  Here those

1    terms could apply to either party depending on which case

2    we're talking about.  As I said I'll refer to the parties

3    as the Labs or Cigna.

4         But as I say, at the end of a case you will have

5    to analyze the evidence in order to return two verdicts

6    one in each case.  Each verdict will have to be separate

7    with respect to each of the three labs and both of the

8    two different insurance companies.  I know that's

9    probably a little confusing and maybe overwhelming to you

10   now.  But please understand, the instructions I give you

11   at the end will be very lengthy and there will be a

12   significant portion giving you instructions on how to do

13   that and about who has the burden on what issues have to

14   be proven as to which parties.

15        Further, you will receive what's called the

16   verdict but I usually call it special interrogatories.

17   It's a series of questions that you answer based on the

18   facts you agree upon and those answers is what leads to

19   the verdicts and there those will be people -- companies

20   will be separated, counts will be separate, you will have

21   to answer each of them so in a way those are almost like

22   road maps for you.  Relax.  Take a deep breath.  I hope

23   I'm not confusing people too much.  Trust me.  By the end

24   of the case, you will understand how it is structured and

25   what you have to do.

1          The instructions I will give you now fall into

2    two broad categories.  First, I will give you some

3    instructions specific to the two cases and I will go over

4    each of the parties' claims and defenses.

5          Second, I will give you some general

6    instructions on how to approach your duties as a juror.

7    I will start by giving background necessary to understand

8    the two cases.  As I said previously, the Labs are three

9    commercial toxicology testing labs.  The labs provide

10   drug testing services of patient blood and urine samples.

11   They perform tests for patients involved in substance

12   abuse treatment.  The Labs perform these tests for

13   patients who have their health insurance with Cigna.

14         Starting in 2020, the parties agree that Cigna

15   paid the Labs millions of dollars for services that the

16   labs billed to them.  Eventually for reasons you will

17   hear about in the trial.  Cigna stopped making payment

18   for certain claims filed by the Labs.

19         In the Labs' case against Cigna, the Labs are

20   seeking reimbursement, payment, in effect, for those

21   claims that they filed with Cigna but Cigna has not paid.

22         In Cigna's case against the Labs, Cigna is

23   seeking to recoup, that is to get back, all of the money

24   it has already paid the Labs.  Cigna argues that it is

25   unlawful for the Labs to keep any payments that they have

1    made to them because Cigna alleges the tests were not

2    medically necessary and were billed through improper

3    billing practices.

4         That's very high level.  That's like 50 miles

5    high up in the sky level of what the trial is about.

6    That's the type of evidence you will hear about.

7         I will now give you some specific instructions

8    as it relates to the two cases.  Let me turn first

9    because you will here first about the Labs' case against

10   Cigna.

11        The Labs allege that Cigna stopped paying

12   certain of their invoices.  The Labs sued Cigna based on

13   the non-payment and the Labs claim in their case that

14   they performed those tests and these tests were covered

15   under Cigna's insurance policies.

16        Therefore, the Labs claim that Cigna is

17   obligated to pay them.  The Labs have asserted two counts

18   in their lawsuit related to Cigna's nonpayment.

19        In Count One, the Labs argue that nonpayment

20   violates Florida insurance law as set forth in two

21   different sections of the Florida statutes on insurance.

22        In Count Two, the Labs allege the nonpayment

23   violates the Labs' right to receive the money as a third

24   party beneficiary to Cigna's insurance contracts with the

25   Labs' patients.

1    In defense, Cigna contends as to both counts

2 that the Labs' claims for payment were properly denied by

3 them because the drug testing services were not medically

4 necessary for the diagnosis or treatment of any patient

5 and because the Labs engaged in prohibited billing

6 practices.

7    Cigna has asserted various what we call

8 affirmative defenses which I will explain in a moment.

9    In the Labs' case, as I have said, the Labs are

10 what we would normally call the plaintiffs and as in most

11 civil actions, a plaintiff like the Labs have the burden

12 of proving their claim by a fair preponderance of the

13 evidence.  That's a legal phrase that I will explain in a

14 moment.  What that means is the Labs must prove each

15 element of their claim by a preponderance of the

16 evidence.

17    However, the defendants also have the burden of

18 the preponderance of the evidence only as to their

19 affirmative defenses.  In other words, if they assert a

20 particular affirmative defenses, then the burden becomes

21 Cigna as the defendant.  But as to the claim to begin

22 with, the Labs have that burden.

23    Let me briefly explain to you what it means to

24 prove something by a preponderance of the evidence.  In a

25 civil case such as this, a party can prevail, that is

1    win, get a verdict, on a claim if they prove that all

2    essential elements of the claim are more likely true than

3    not true.  That's what preponderance means.

4          This standard is what we call preponderance of

5    the evidence and it's different.  The only time I will

6    mention the next phrase beyond a reasonable doubt

7    standard that applies in criminal cases.  You have heard

8    that I'm sure in television shows.  If you served on a

9    criminal jury, the Government must prove their claim

10   beyond a reasonable doubt that the claim was committed.

11   That has no relevance, no application.  It is never going

12   to be mentioned again.  Please take that phrase beyond a

13   reasonable doubt and just take it right out of your mind

14   and put it in the barrel as long as you are serving on

15   this jury.  It has no role in a civil case.

16         The standard we use preponderance of the

17   evidence is what applies to both of our cases. To

18   understand that standard of preponderance of the

19   evidence, it might be helpful to visualize and some of

20   you aren't old enough to have ever seen one.  A few folks

21   are.  In chemistry, when I was a chemistry student, there

22   used to be this balance beam with a base and out comes

23   the arms and there's baskets on either side.

24         If you go to the butcher when I was a child, the

25   butcher had to measure the hamburger.  He would put

1    a pound weight here and then put hamburger there until

2    they got equal.  I think Lady Justice appears in some

3    form with the blind fold.  She's holding exactly what I

4    just described.

5        So visualize that type of scale so you have the

6    two buckets.  If you put on one side of the scale, the

7    evidence that you be find credible, you believe it,

8    relevant, that means it relates to the issues that you

9    have to decide and supportive of an element on one of the

10   plaintiff's claims.  Place on the other side of the

11   scale, similarly credible and relevant, supportive

12   evidence to the contrary.

13       I'm not suggesting -- that's what's wrong with

14   this example of the scale.  You don't weigh the evidence

15   in terms of the number of exhibits or he called more

16   witnesses than the other side, so he must have more

17   weight in his scale.  It tips.  Really what it is based

18   on each is your view of the evidence on each element of

19   the claim.  How persuasive is the element.  Excuse me.

20   How persuasive is the evidence on the issue you are

21   trying to decide.  If the scales tip in favor of a

22   defendant, so you have got your scales started out even

23   and now you are considering an issue, an element in one

24   of the claims of the plaintiff and you think no, I think

25   it's more likely true than not that the defendant's

1    position is correct.  The plaintiff hasn't carried their

2    burden.  Then obviously, the plaintiff hasn't sustained

3    their burden and you must return a verdict for the

4    defendant or you must find that on that element that the

5    plaintiff has failed to prove his claim.  When you find

6    that, it means the plaintiff can't win on that claim and

7    the verdict is for the defendant.

8            However, these same scales if they tip ever so

9    much in favor of the plaintiff's position as far as the

10   weight of the credible, relevant, supportive evidence,

11   then the plaintiff has carried that preponderance of the

12   evidence burden and you would find for him on that

13   element and if he proved all elements, you would find for

14   him on that claim.

15           People always want to know a percentage number.

16   There isn't any number.  All it is is more than 50

17   percent.  More likely true than not true.  All right.

18           The same applies as I told you when the

19   defendant's assert an affirmative defense as has happened

20   in this case, then the burden is on the defendant in that

21   instance to prove that affirmative defense and again if

22   the scales tip in favor of the defendant's favor on all

23   of the elements that make up an affirmative defense, then

24   it will have sustained or carried its burden of proof on

25   the affirmative defense.  That would mean the plaintiff

1    can't win.  Affirmative defenses are defenses that even

2    if you find a plaintiff has proved his case, an

3    affirmative defense blocks the plaintiff's recovery.

4           As I mentioned, Labs have asserted two counts

5    against Cigna.  The first count brought pursuant to State

6    of Florida insurance laws.  It is not based on an

7    agreement or an understanding between the Labs or Cigna.

8    It is based on what Florida state law requires of health

9    insurance companies when billed by a medical provider.

10          The Labs first basis for the cause of action

11   asserted in Count One is that Cigna violated this

12   obligation under Florida insurance laws Direct Payment

13   Provision.  That's the name of the statute of the

14   provision.  It will be referred to possibly by the

15   parties as Section 627.636.  Hopefully we'll call it the

16   Direct Payment Provision.

17          To prevail on that basis, for the claim asserted

18   by the Labs in Count One, the Labs must prove the

19   following elements by a preponderance of the evidence.

20          One, that the Labs provided medical services to

21   Cigna's insured.  People insured under a Cigna policy.

22           Two, those services were in accordance with the

23   provisions of Cigna's policy.

24          Three, that the Labs submitted claims for such

25   services to Cigna for reimbursement.  Payment for those

1    services and.

2         Four, Cigna's insureds authorized or consented

3    to direct payment for those services to the Labs.  In

4    other words, direct to the Labs the money would be sent.

5         If the Labs can prove these four elements by a

6    preponderance of the evidence, then Florida law requires

7    that Cigna, quote, shall make such payment, end quote, to

8    the Labs.

9         The second basis for the Labs' Count One is the

10   Florida law Prompt Payment Act, Section 627.6131, the

11   Prompt Payment Act created certain timing requirements

12   for the payment or denial of claims under Florida law.

13   Specifically, if the claim was submitted electronically,

14   known as an electronic claim, it requires the insurer to

15   pay or deny that claim within 120 days of receipt of the

16   claim.

17        If the insurer fails to pay or deny a claim

18   within 120 days of receipt, the law creates a, quote,

19   uncontestable obligation to pay the claim after 120 days,

20   end quote.  In order to prove their claim on the second

21   basis in Count One, this Prompt Payment Act, the Labs

22   must prove by a preponderance of the evidence that the

23   Labs,

24        One, submitted electronic claims.

25        Two, that those claims were not paid or denied

1  by Cigna within 120 days of receipt of the claim as

2  required by the Florida Prompt Payment Act.  Again I will

3  give you more specific instruction on this at the close

4  of trial.

5        But I want you to understand those are the two

6  bases for Count One that the Labs seek money and that's

7  very simple terms they need to prove those elements.

8        Let me turn to Count Two of the Labs' case

9  against Cigna.  In Count Two, the Labs' claim Cigna

10  violated their own contracts of insurance by not paying

11  the claims.  None of the Labs are party to the contracts.

12  Those are between an insured, that is the patient of the

13  Labs and Cigna.

14        However, the Labs may be entitled to damages

15  for breach of the contract by nonpayment if they can

16  prove that Cigna and its insured intended the Labs as

17  medical service providers to benefit from these insurance

18  policies.  It's not necessary for the Labs to have been

19  named in the insurance policy for this cause of action to

20  exist.

21        In deciding what Cigna and its subscribers and

22  beneficiaries intended, you should consider the insurance

23  policies as a whole, the circumstances under which they

24  are made and the apparent purpose the parties were trying

25  to accomplish.  For the purpose of these claims, you may

1    also consider requirements of federal law as mandatory

2    conditions of Cigna's insurance policies.

3          Thus, the Labs must prove by a preponderance of

4    the evidence that:

5          One, Cigna and its insureds intended that the

6    Labs as providers benefit from their insurance policies.

7          Two, that Cigna was obligated to make payments

8    under the terms of those policies.

9          Three, that Cigna breached that obligation and.

10         Four, that the Labs were damaged by Cigna's

11   nonpayment.

12         In response to both of the Labs' claims, Cigna

13   denies that the services the Labs billed for were covered

14   under its insurance policies.  Cigna claims the services

15   were not covered because Cigna claims they were medically

16   necessary and were billed through improper billing

17   practices.

18         Later on when I give you my instructions of

19   Cigna's case against the Labs, you will hear about a

20   third reason for the denial of payment which is called

21   fee forgiveness.

22         In the case of the Labs, that may have some

23   application as to one lab's claims but not as to two of

24   them.  In other words, there's a time period when things

25   changed in policies.  But I will give you those detailed

instructions at the time of the closing.  In addition to

denying that the Labs can prove coverage, Cigna has

raised an affirmative defense that in Latin is *in pari*

*delicto*.

The *in pari delicto* defense refers to the

principle that a plaintiff who has participated in

wrongdoing may not recover damage resulting from the

wrongdoing.

In order to prevail on this special defense,

Cigna must prove by a preponderance of the evidence that,

one, the Labs were participants in the same wrongdoing

which they seek to prove and, two, that the Labs are at

least equally at fault.

If Cigna proved this by a preponderance of the

evidence, the Labs may not be able to recover damages.

If you find Cigna liable for any one or more of the Labs'

claims, you would then in your deliberations turn to the

issue of damages.  In other words, how much does Cigna

owe based upon your findings that the Labs had prevailed

on one or more claims.

The Labs seek compensatory damages. That's money

damages for each of their claims.  Compensatory damages

in the law seek to make the Labs whole, that is to

compensate them for the damage they suffered.  It will be

up to you to determine whether the Labs are entitled to

1   receive damages.  If so, the amount of damages to which

2   they are entitled.  I will explain that in much greater

3   detail at the end of the trial.  That concludes my

4   summary of the Labs' claims against Cigna and Cigna's

5   defenses to those claims.  All of that is in the first

6   trial.  The Labs' case against Cigna.

7           I will now give you an overview of Cigna's case

8   against the Labs.  That case includes a claim that Cigna

9   is making against the three labs and defenses the labs

10  are raising against Cigna's claims.  Cigna brings one

11  count, one claim, asserting unjust enrichment against the

12  Labs.

13          Under Count One of Cigna's case, Cigna contends

14  or argues that it is unfair for the Labs to maintain any

15  payments that Cigna made to them.

16          In order to prove its claim for unjust

17  enrichment, Cigna must prove by a preponderance of the

18  evidence the following:

19          One, that Cigna paid the Labs for testing.

20          Two, the Labs voluntarily accepted and retained

21  the payments and

22          Three, that circumstances are such that it would

23  be unfair for the Labs to retain those payments.  Cigna

24  argues that it is unfair for the Labs to retain these

25  payments for three different reasons:

1      First, you heard about in connection with

2  Cigna's defenses to the Labs' claim.  That Cigna argues

3  the services the Labs provided were not medically

4  necessary.  Because Cigna reimbursed the Labs for some of

5  the services rendered, the ones which Cigna claims are

6  medically unnecessary, Cigna claims it's unfair for the

7  Labs to retain those payments.

8      Second, Cigna argues that it is unfair for the

9  Labs to retain payment because the Labs improperly billed

10  for certain bundle services, quote, unquote, bundled

11  services separately.  When those services should have

12  been billed together, bundled, as a discounted bundle.

13      Third, Cigna argues that it's unfair for the

14  Labs to retain payments because they engaged in a

15  practice that Cigna calls fee forgiveness.

16      Fee Forgiveness is a term that Cigna uses to

17  refer to when an out-of-network medical provider does not

18  attempt to collect or indeed forgives the patient from

19  having to pay their required co-pay, deductible or

20  coinsurance for any portion of the charge that Cigna

21  billed.  Cigna argues it is unfair for the Labs to retain

22  the money that Cigna paid when the Labs engaged in such

23  fee forgiveness if it did.  If you found it did.

24      For all three of these reasons, Cigna claims it

25  is unfair for the Labs to retain the money that Cigna

already paid to them.  I will turn now to a defense that the Labs raise against this count.

The Labs raise a defense to this count under what's known under Florida law which applies here the, quote, Voluntary Payment Doctrine, end quote.  The Voluntary Payment Doctrine is the idea that when one makes a payment with full knowledge of the facts, the payment is voluntary and cannot be recovered.

To prevail on this special defense, the burden is on the Labs.  The Labs must prove by a preponderance of the evidence that at the time Cigna made any payments, they were voluntary and were made with full knowledge of the facts that Cigna now alleges serve as the basis for their claim.

If you find the Labs have carried this burden for any of the payments Cigna made to the Labs, then Cigna may not prevail on its claim.  May not recover that payment.  If you find the Labs liable for Cigna's count of unjust enrichment, you would then have to turn -- yeah.  You would then have to turn to the issue of damages.

Cigna seeks compensatory damages, money damages, for their claim against the Labs.  Compensatory damages again seek to make Cigna whole.  That is to compensate them for the damage that they have suffered.  It will be

1  up to you to determine whether Cigna is entitled to

2  receive damages.  If so, what the amount of those damages

3  it is that they are entitled to.  I will explain how to

4  determine damages in greater detail at the end of the

5  trial.

6        That concludes my preliminary instructions about

7  Cigna's case against the Labs.  Now I will turn to the

8  second broad category of instructions.  That is the

9  general instructions on how to approach your duties as

10  jurors.  Your purpose as jurors is to find and determine

11  the facts.

12        Under our system of civil justice, you are the

13  sole judges of the facts.  If at any time, I make any

14  comment regarding at facts, you are at liberty and indeed

15  you should, disregard it because I don't intend to do

16  that.  If you think, oh, is she making a comment on the

17  evidence, I'm not, so you certainly should disregard what

18  I say as to making a comment that I'm not doing.

19        It is up to you decide what inferences are to be

20  drawn from the evidence and what facts are proven by the

21  evidence.  It is especially important that you perform

22  your duty of determining the facts diligently and

23  conscientiously.  For ordinarily, there's no means of

24  correcting an erroneous determination of the facts by a

25  jury.

1    On the other hand and with equal emphasize, I

2    instruct you that the law as given by the Court

3    constitutes the only law for your guidance and it is your

4    duty to accept and follow it.  It is your duty to follow

5    the law as I give it to you even if you don't agree with

6    that law.

7    Now, you are to determine the facts in these

8    cases solely from the evidence in these trials, the two

9    trials which consist of exhibits received in evidence,

10   the testimony of witnesses and any stipulations.  Those

11   are agreements between the parties about a fact.

12   Questions asked by lawyers are not evidence.

13   This really is important for a juror to remember that.

14   Rather, the evidence is consists of the witness's answer

15   to the question.  Oftentimes a lawyer will ask a

16   question.  Did you go through the red light, Mrs. Jones?

17   That question didn't prove anything.  If the witness says

18   no, there's been nothing proved other than this witness

19   said she didn't go through a red light.  If she says yes,

20   then it's been proved by her testimony anyways that she

21   did.  But the fact it is in the question buried in that

22   question and asked of the witness is not evidence.  It is

23   the answer of the witness to the question that gives you

24   the evidence.  Statements and arguments of counsel are

25   not evidence.  Objections to questions are not evidence.

1    You are going to hear during this trial one or more

2    lawyers stand up and say "Objection, Your Honor" when

3    some question is asked or document is offered.  Lawyers

4    have an obligation to their clients to make objections

5    when they believe evidence being offered is improper

6    under our Rules of Evidence.  You should not be

7    influenced by the objection, the fact an objection is

8    made or by my ruling.  If I say the objection is

9    sustained.  Ignore the question.  Ignore the reference to

10   the document.  None of it is coming into evidence if I

11   say sustained.  If I say overruled, that means I don't

12   agree with the objection made and there will be an answer

13   for example from the witness.  Please don't give that

14   answer any more weight than any other answer because

15   there was an objection about it.  Treat the answer like

16   any other answer.

17          If you are instructed by me that some item of

18   evidence is received for a limited purpose only.  That's

19   a phrase I will use.  I will explain to you what the

20   purpose, is the limited purpose, but you have to follow

21   that instruction even though it relates to the evidence.

22   That's the one where you do have to listen to what I say

23   and use the evidence solely for the purpose that it is

24   offered for.

25          As I say, especially the first time this comes

1    up, I will explain in detail how that works.  Testimony

2    the Court has excluded or stricken or told you to

3    disregard is not evidence and is not to be considered.

4    Anything you may have heard or seen outside the courtroom

5    is not evidence and must be disregarded.  You are to

6    decide the case as you took an oath a few moments ago,

7    solely on the evidence presented here in this courtroom.

8            Now there are two types on evidence in the law.

9            One is known as direct evidence and the other is

10   circumstantial evidence.

11           Direct evidence is I hate to use the same word

12   direct proof of a fact.  For example, the testimony of an

13   eyewitness.  I saw Mrs. Jones go through the red light.

14   That's direct proof.  Now you might not believe the

15   witness but it is direct proof.

16           Circumstantial evidence is proof of facts from

17   which you may infer or conclude that other facts exist.

18   For example, assume when you came here to the courtroom

19   this morning, it was sunny outside.  But the forecast did

20   call for rain.

21           As you sit here, someone walks in through the

22   door back there with an umbrella, they folded it up and

23   everything, going like this and looks like there's drops

24   coming off of it.

25           A few minutes later a came enters with long hair

1    and it is like plastered to her head.  Now you can't look

2    outside the courtroom.  Unfortunately, we don't have any

3    windows in this courtroom.  You don't know if it is

4    raining or has been raining.

5            On the combination of facts I just gave you,

6    though, it would be reasonable and logical for you to

7    conclude it was or had been raining recently.  It is not

8    the only conclusion you can reach, though.  Nor must you

9    reach that conclusion but I would suggest to you you

10   could do so using your reason, logic and common sense.

11           I will give you further instructions on these as

12   well as other matters at the end of the case.  But bear

13   in mind that you may consider both kinds of evidence in

14   deciding the case.  It will be up to you to decide which

15   witnesses to believe, which witnesses not to believe and

16   how much of any one witness's testimony to accept or

17   reject.  I will give you guidance on that for determining

18   credibility of the witness at the end of the trial, but

19   for now, let me merely instruct you and encourage you you

20   should carefully listen to and observe each witness as he

21   or she testifies.

22           The exhibits that are received as full exhibits

23   during the trial will be available to you in the jury

24   room during your deliberations.  It is important you obey

25   the following instructions during the entire course of

1    the trial and when the time comes, during the course of

2    your deliberations.

3          First, until the cases are submitted to you at

4    the end of all of evidence, closing arguments and my

5    charge on the law, you must not discuss these cases with

6    anyone.  Not even your fellow jurors.  You may not

7    discuss this case with anyone until you have returned the

8    verdicts and the cases are at an end.

9          I know that many of you I'm sure all of you have

10   cell phones, IPhones, whatever, you use the Internet and

11   other tools of technology.  You must not use these tools

12   to communicate electronically or otherwise with anyone

13   about cases this includes family and friends, includes

14   people in chat rooms and otherwise.

15         You may not communicate with or receive

16   communications from anyone about the case whether it's

17   your cell phone, email, Iphone, text messaging, X,

18   through any blog or website by anyway of any social media

19   networking websites including Facebook, Instagram,

20   TikTok, Linked In, Snapchat, X, YouTube and whatever else

21   has been published and pushed to the Web this morning

22   while we're sitting that we don't even know.

23         After the cases are submitted to you, then you

24   must discuss the cases only with your fellow jurors only

25   in the jury room and only with all jurors are present.

1    So if somebody needs a bathroom break, you have

2    to wait.  You can't talk about when not everybody is

3    hearing what's being said.  It's important you keep an

4    open mind and not decide any issues in the cases until

5    the entire trial is concluded and the cases have been

6    submitted to you on instructions from me.

7    Second, during the trial, you may take notes if

8    you wish to do so.  I think you found a notebook and

9    pencil on your seat.  Whether you take notes on not,

10   leave a notebook on your seat during breaks, lunch break,

11   et cetera.  Ms. Barry, the Deputy Clerk, whom you have

12   met, she'll collect them.  Trust me.  She hasn't got time

13   to look at them.  Nobody is going to look at them.  They

14   are in her safekeeping.  I'm telling her, I will not ask

15   for them but I'm telling her if anybody asks for them,

16   I'm ordering her not to permit anyone including myself.

17   They are not going to be looked at.  They are just for

18   the person's use who made the notes.  They are not to be

19   taken from the courtroom or given or read to anybody

20   else.

21   If you decide to take notes, let me suggest or

22   warn you to be careful.  You will see I take notes from

23   time to time.  Please don't read into that that I think

24   something is important so I'm making a note.  Sometimes I

25   could be writing down the time.  I could be writing down

1    something I want to remember to cover at break with the

2    lawyers.  It could be anything.  What I do know though

3    from one taking notes they can distract you from

4    listening to what's still being answered.

5           So let's say the witness said something in the

6    beginning of the answer and you want to make a note of

7    that, while you write, I chAlange you to tell me that you

8    can listen carefully to the rest of the answer.

9           What I find it's good to maybe jot down one

10   quick word and then continue listening and then when

11   there's a break meaning the lawyers look through their

12   papers or the witness thinks of an answer is looking at a

13   document and then while it is still fresh, you can

14   elaborate in your notes.  That's a safer way.  Okay.

15          Third, don't read or listen to anything about

16   the cases or permit any to case discuss the cases in your

17   presence.  If anyone does so, despite your telling the

18   person not to do so, please report that as soon as

19   possible to the Court and that would be to Ms. Barry,

20   Liana, then she'll tell me immediately.

21          You shouldn't, however, discuss that this

22   happened with any fellow jurors.  Don't discuss that fact

23   or any other fact you feel necessary to bring to the

24   attention of the court.  That will be between you and

25   first Ms. Barry.  And if there's a question or a concern,

1    we'll get back to you as soon as we can.

2         Fourth, don't try to do any research, make any

3    investigation about the case on your own.  You as jurors

4    as I know this is repetitive but it's really important.

5    You have to decide the case based on what you hear in

6    this courtroom.  So you shouldn't conduct any independent

7    research or the matters in the cases or the individuals

8    involved in the cases.  In other words, don't consult a

9    dictionary or reference materials, search the Internet,

10   use any electronic tools to obtain information or help

11   you decide the case.  Please don't try to find out

12   information from any source outside of what you hear and

13   see within the confines of the courtroom.  I explained

14   this briefly yesterday.

15        First of all, it would break your oath if you

16   did that.  Practically speaking for everybody else in

17   this courtroom any who does what I just told you not to

18   do is going to result in us having to start over again.

19   Okay.  So if for no other reason, please think of the

20   rest of us.  I mean it is not going to be good for you if

21   you did it because I have told you not to.  It also

22   has consequences beyond yourself.

23        Fifth, although there's a normal human tendency

24   to converse with people with whom one is thrown into

25   contact, please don't during the time you serve on the

1   jury speak whether it is in or out of the courtroom,

2   speak with any of the parties, any lawyers or any

3   witnesses, with me or with my law clerk.

4         By this I mean not only don't converse about the

5   trial, please don't converse about anything even if it's

6   just to pass the time of day or say good morning.  Say

7   there's a lawyer behind you getting through the security.

8   It is really awkward.  It's awkward for me if I pass a

9   juror in the corridor, it's awkward.  I want to say good

10  morning, how are you doing.  That's what you want to do.

11  You feel you have to do it to be polite.  Lawyers feel

12  the same way.  Trust me.  It's very awkward for them.

13  They are instructed by me.  I don't want one word to pass

14  your lips to a jury.

15        The reason for this there's no other way

16  everybody, all the parties, can be assured of the

17  absolutely impartially of the jury that they are entitled

18  to expect.

19        As I have just said, the lawyers are instructed

20  not to talk with you.  If they pretend to ignore you when

21  they see you, please know they are not being rude.  They

22  are simply following the court's order.

23        And again a brief explanation.  This is a small

24  building, it's a square.  Let's say you and a lawyer from

25  one side is at one end of the corridor.  You just went

through security.  You are walking there and something is
said by one or the other of you.  You can see lips moving
when the person is right there.  A lawyer for the other
side is at the end of the corridor.  He doesn't know you
are saying that the line is long.  He doesn't know you
are saying I think it is going to be cold today or
whatever, have a good morning.  They don't know that.
What's their reaction going to be.  Oh, my God, my
opponent is speaking to a juror.  You have no idea how
disturbing that is because they don't know what you are
talking about.  You could be talking about the witness.
You could be telling the lawyer that witness is great.
Keep them on longer or something like that.  I don't
know.  I can't think of an example of what you would say
to the lawyer, but the other lawyer just doesn't know.

So you know what's going to happen, the second
lawyer is going to be report to the court, to Liana then
to me, I saw a juror and lawyer attorney so and so
talking to each other.  I would be surprised if lawyer so
and so who was the one talking doesn't self-report.

So now I'm going to get told.  We'll have to
bring out the juror in question.  Ask you is it true that
you had some interaction yeah, yeah.  And what did you
say?  I said good morning.  And what did the lawyer saw?
He said good morning, you know.  If that's what the

1    lawyer told me was said, that's probably the end of it.

2    But I don't need to do that.  You don't need to do that.

3    Just don't say anything.  Okay.  Thanks.

4          Now, I have been a judge a long time, but the

5    very first trial I had.  Liana wasn't probably born when

6    I had the first trial.  That's probably true.  My

7    courtroom deputy was a woman who had been on the court

8    staff a long time and she knew a lot of things.  She had

9    A lot of experience, a lot of trials and I gave this

10   instruction to the jury and they knew I moved on to the

11   next part.  At the first break she comes into chambers

12   and says, Judge, we have a problem.  Those are words a

13   judge does not want to hear in connection with the person

14   who takes care of the jury.  I said what's wrong.  She

15   said they are not talking to each other.  There is no

16   question you are all different.  You come from different

17   backgrounds.  You live in different places.  You have

18   different jobs, families or situations.  Whatever it is

19   you have.  Get to know each other.  Trust me.  It will

20   help your deliberations.  If get to know each other on a

21   personal level.  If some of you are UConn basketball

22   fans.  I can't believe there aren't some in this group.

23   Talk to the other person about UConn basketball.  Are we

24   going to win a third championship or not.  I'm sure

25   there's Yankee fans.  I won't comment on that, but if

1    there are you will probably want to talk about the games

2    and the playoffs, that's fine.  If you like to garden,

3    you like to knit, if you like to read, talk about the

4    book you are reading.  I love it when people tell me they

5    have a good book.  What is it, who is the author, maybe I

6    will pick it up.  Whatever it is.  Talk about the

7    weather.  All of my things about don't talk do not apply

8    to things that aren't related to the case while you are

9    on your breaks, walking in, leaving or whatever.  Okay.

10         Next it is important, this is repetitive, it is

11   important that you keep an open mind.  When people hear a

12   few things your tendency is start to move to a

13   conclusion.  Resist it.  Keep an open mind.  Be open to

14   the next three pieces of evidence which may paint an

15   entirely different picture and keep that open mind until

16   the evidence is over and I charge you on the law and you

17   hear their closing arguments.

18         If you have a question to pose to me or as I say

19   any message you speak to Liana.  She'll help you.

20   Probably she can deal with th issue.  If not, she'll

21   bring it to my attention and we'll respond as promptly as

22   possible.

23         This is always a rub for me.  During the trial,

24   it may be necessary for me to confer with the lawyers

25   from time to time outside your hearing concerning

1    questions of law or procedure that require consideration

2    by me.  It is not a jury a matter.  It is not evidence.

3    On some of those occasions, I might tell you to leave

4    early for a break or excuse you so we can have I will

5    call it a free ranging discussion.  We're not all huddled

6    over here on the aside.  Trust me.  We try to limit those

7    interruptions as much as possible.  I've told the lawyers

8    I'm here at 8:30 in the morning.  I will stay until 6 or

9    7 at night.  I will miss my lunch hour.  We can discuss

10   these issues when you are not meant to be in box.  With

11   my best efforts and I'm sure the cooperation of counsel,

12   we're going to limit these interruptions hopefully to

13   zero where you are here in the court, it's not a break

14   time and you are not sitting listening to evidence.

15   Those we hope to limit, but I have to tell you I can't I

16   won't have to do that.

17          Please understand that it is important that I

18   address it at that moment and the issue that needs to be

19   addressed is very important.  So I thank you for your

20   patience.

21          That concludes my preliminary instructions.  As

22   I said earlier, they are intended simply to provide a

23   framework to help you understand the issues in these

24   cases.  Later before you begin deliberations, I will

25   instruct you again in greater detail.  I'm sure you will

1    bear these principles in mind and keep an open mind until

2    you've heard all of the evidence, closing argument and my

3    instructions.

4         With these things in mind, the parties have

5    requested and I have agreed they may present what's

6    called an opening statement to you.  It's really an

7    effort for them to outline the evidence that they expect

8    you will hear about the two cases.  We're going to begin

9    with the Labs who will present their case first.  When

10   the Labs are finished, Cigna will do their opening

11   statement.

12        MR. CUNNINGHAM:  May it please the Court,

13   Counsel, Ladies and Gentlemen of the jury, good morning.

14   As you heard yesterday my name is Fred Cunningham from

15   Palm Beach Gardens, Florida.  Along with my co-counsel,

16   we represent three labs who are suing Cigna for stopping

17   to pay them.  Now, as Judge Hall said, what I'm going to

18   tell you is not evidence in the case.  What I'm going to

19   tell you in the next 20 minutes is what we expect the

20   evidence will prove, and you may wonder how do we know or

21   how can we forecast what the evidence will prove?  We can

22   forecast that because we have taken thousands of pages of

23   depositions in this case going back over several years so

24   we have a really good idea of what the evidence in this

25   case is going to show.  So on behalf of the Labs, I'm

1   going to tell you what we expect we'll prove to you in

2   this case through the evidence which will be exhibits,

3   live testimony and deposition testimony.

4        Members of the jury, we're here because in 2014,

5   Cigna recognized that it had a big, big financial problem

6   on the horizon.  Cigna recognized that it had about a 150

7   to 200 million dollar problem on the horizon and that was

8   a problem the evidence will show of its own creation

9   because of the language it had in its health insurance

10  policies, but this was a major problem nonetheless.  This

11  was going to be a financial avalanche created by

12  substance abuse treatment in South Florida.  And so what

13  Cigna did, the evidence will show, is they decided that

14  they had to find a way to avoid this problem as quickly

15  as possible.  As the evidence will show, what Cigna did

16  is Cigna found a way to just stop paying these claims

17  including the claims presented by our labs as quickly and

18  efficiently as possible.  So they stopped paying payment

19  of claims for people who were receiving treatment by

20  doctors for substance abuse, and they stopped paying the

21  payments to our labs who were simply performing blood

22  testing, urine testing that was specifically ordered by

23  the doctors who were treating these people who were

24  suffering from the disease of addiction.

25        Their decision, Cigna's decision to stop paying

1    the Labs caused tremendous damage to these labs in the

2    millions of dollars.  And at the end of this case, after

3    you have heard the evidence about what those monetary

4    damages are, we're going to ask you to find that Cigna

5    wrongfully stopped paying the Labs and we're going to ask

6    you to compensate the Labs for what they lost.  Because

7    there will be no doubt in this case that the Labs

8    performed the work.  Now Cigna will now say that some of

9    the work was not medically necessary.  But there's no

10   doubt that these tests were ordered by the doctors who

11   were treating these people who were suffering from the

12   disease of addiction.  There's no doubt that we preformed

13   the work.

14          At the end of the case, we'll ask you compensate

15   the Labs for what Cigna did to them by not paying them.

16   That's what this case is about.  That's why we're here.

17          Members of the jury, to understand this we have

18   to go back to the year 2011.  At that time, this country

19   was grappling what the Centers for Disease Control called

20   an Epidemic of Substance Abuse Problems.  That's around

21   the time that the opoid problem began in a lot of places

22   in the country.  South Florida became one of the focal

23   points in the country for the substance abuse crisis and

24   opioid crisis.

25          During this time, Cigna made money off of

1    policies that it had issued to people who lived in South

2    Florida.  These were called individual family plans.

3    With these plans, it didn't matter if you had cancer, if

4    you had multiple sclerosis or if you had an addiction

5    problem, these plans were very broadly written to provide

6    coverage for whatever type of disease it was that you

7    had.  And you will see those policies in evidence so I

8    will not really read a lot of that right now.  The

9    important point for now is that laboratory testing was

10   specifically a covered service under these policies.

11   There will be no dispute about that in this case.  That's

12   what the evidence will clearly show.

13         So what Cigna did is Cigna got premiums from

14   their customers and they promised in these contracts if

15   you had these diseases, if you had cancer, if you had

16   multiple sclerosis, if you had addiction, we're going to

17   cover a lot of services, a wide range of services

18   including lab testing in conjunction with your treatment

19   by your doctors.

20         Cigna also in the policies promised that if

21   there was a disagreement about whether a particular

22   service was covered under the policy, they would let

23   their customer know that in writing and they promised

24   they would point to the specific reason why they were

25   denying coverage or why they weren't paying a certain

1    service because they promised that they wanted their

2    customers to understand why they weren't getting payment

3    for the treatment that they had already received.

4        So if Cigna had an issue with a submitted claim,

5    then Cigna promised in these policies, they were going to

6    tell the patient or the health care provider what the

7    issue was and they were going to allow the health care

8    provider, the doctor, the lab to provide evidence to

9    support the claim.  You will see that in the policies.

10   We'll show those to you.

11       So let's talk about the Labs.  The Labs first

12   came into existence in 2011.  The Labs came into

13   existence to service this need.  There was a tremendous

14   need for medical testing labs in South Florida because of

15   the crisis that was going on down there with substance

16   abuse.  So these Labs were like a smaller version of

17   Labcorp or Quest.  These were specialized, state of the

18   art labs that were created to service the need that the

19   medical community in South Florida had.  And the evidence

20   in this case will be that these were highly sophisticated

21   labs that did good work.

22       And one of the things they were known for was

23   providing maybe a little bit quicker turnaround than the

24   Labcorps and the Quests of this world. Because that was

25   very important, especially when you are treating people

1    with addiction and substance abuse issues.  Doctors need

2    to know literally on a daily basis what's in a person's

3    blood to see if they're using again or not using.  So

4    that was why the Labs came into existence.

5         Now the Labs were not in Cigna's network.  You

6    have all probably heard the term "out of network."  They

7    are independent labs and what you will see in some of the

8    documents are the initials OON that means "out of

9    network."  These were independent labs.  We had 300

10   employees total.  Three hundred people who were providing

11   service to people in South Florida at these labs.  And

12   these labs were working diligently to try to provide the

13   doctors who were treating people with the disease of

14   addiction the information they needed to appropriately

15   treat those people.

16        Now the evidence will be, and this is very

17   important, the labs could not do anything without a

18   prescription from the doctor.  The lab didn't decide what

19   test to run on a particular patient.  They would get a

20   prescription from the doctor, the treating doctor, who

21   would say this is exactly what I want.  You will see some

22   of those tests are called "panels" like, they are

23   different types of panels.  You probably have seen this

24   with lipid panels, cholesterol panels, things of that

25   natures.  You would have the same thing when people were

1    being treated for substance abuse.  The Labs would not

2    know what to do, would not be allowed to do anything

3    until they got that prescription from the doctor.  And

4    what the Labs would do is they would fill that

5    prescription.  If the doctor said we want a full chemical

6    panel on this particular patient, that's exactly what our

7    labs would do.  The goal was to get the lab's result back

8    to the treating doctors as quickly as possible because

9    time is of the essence when you are treating people with

10   substance abuse problems.

11          In this case, the evidence will show that Cigna

12   does not contest that the Labs did the work.  That's not

13   going to be an issue in the case.  Now Cigna may quibble

14   with maybe some services were performed too often

15   something called a unbundling which they can explain to

16   you, but they will not contest that the work was actually

17   done.  And every one of 200 doctors in South Florida who

18   ordered tests from our labs swore they signed agreements

19   with our labs swearing that they would only order tests

20   that were medically necessary.  That's part of the safety

21   that was built into the Labs' agreement with those

22   doctors.

23          So from 2012 to 2013, the Labs even though they

24   are out of network, they were submitting their bills to

25   Cigna for treatment of people with substance abuse.

1    There was really no problem.  As I said, the language in

2    those policies, they are individual family plans, you

3    will see them called IFPs, the language was very broad

4    and they were paying those claims.  As it turns out in

5    2012 in the first part of 2013, the Labs submitted and

6    Cigna paid over 8,000 claims, 8,000 claims.  And they

7    paid about 7,000 -- excuse me, seven million dollars

8    during that time for those services and those were

9    considered reasonable and customary charges in the South

10   Florida community.  They had about 1200 claims that they

11   initially questioned and that was fine.  They let us know

12   what the problem was, we corrected the problem and they

13   paid about a million dollars more on those 1200 claims.

14        So in 2012 and early 2013, there were literally

15   about 9,500 claims from these Labs.  I know that sounds

16   like a lot.  That gives you an idea of the scope of the

17   problem in South Florida with substance abuse.

18        Those bills were being paid.  We didn't have a

19   problem.  Cigna was following the procedure the promises

20   they put in their contract that if there's a problem,

21   we're going to tell you what it is, you give us

22   documentation, we'll work it out.  That's exactly what

23   happened.

24        So why did things change?  Things changed

25   because in 2014, a person at Cigna, a gentleman at Cigna,

1    his name is Brian Evanko, E-V-A-N-K-O, who will be

2    testifying in this case, we'll be calling him in our case

3    on Tuesday.  He'll be here live.  Mr. Evanko is a very

4    important man at Cigna, he still is.  This is ten years

5    ago.  He continues to rise through the ranks, he's been a

6    vice president.  He's been chief financial officer.  He

7    was basically in charge of Cigna's health care division.

8            So what happened is in 2014, Mr. Evanko was

9    informed by some of the people, when I say bean counters,

10   I don't mean that in a derogatory way, he was informed,

11   he was advised by people at Cigna who were supposed to be

12   watching these things we have a major, major problem on

13   the horizon.  And the problem as I alluded to a moment

14   ago was we're going to have about 150 to 200 million

15   dollars in claims coming in for substance abuse treatment

16   in South Florida.  And that was considered a major

17   problem.

18           And Mr. Evanko, the evidence will show, did not

19   want that to happen on his watch.  Nobody wanted that to

20   happen on their watch at Cigna.  That's a big problem.

21   So what did they do?  In fact Mr. Evanko estimated those

22   costs were going to be as much as $1 million per day.  So

23   something had to be done about that.  Mr. Evanko called

24   those costs, quote, a serious problem closed quote, and

25   the "single biggest issue to our business" to give you an

1    idea of how serious Cigna considered that problem to be.

2    And these were simply costs for medical testing and

3    treatment for people suffering from substance abuse.

4         And as I said at the beginning, this problem was

5    created by -- it was Cigna's own creation because what

6    their policy said was that with charges like that, with

7    covered services, if somebody did not have Medicare plus,

8    then Cigna would agree to pay under that contract.  They

9    would promise to pay the reasonable and customary charges

10   which Cigna interpreted to be 100 percent of the charges.

11   That was in their contract.  That's what caused the

12   problem here.

13        The further problem for Cigna, the evidence will

14   show, is that they couldn't fix this quickly.  They

15   couldn't change the language in thousands upon thousands

16   of policies and just change it without giving people some

17   time to deal with that.  So that was not an option.  So

18   what option did they decide upon?  Well, Mr. Evanko put

19   together a team of some of the really important people at

20   Cigna and called it the Core Action Team.  And the Core

21   Action Team job was to figure out how do we deal with the

22   avalanche that's coming?  How do we deal with that

23   quickly?  And there's a woman on the team, you will see

24   her testimony.  Her name was Eva Borden.  She won't be

25   live.  You will see her deposition testimony.  I will

1    tell you right now the evidence will show she didn't

2    remember a lot.  You will be able to determine when you

3    are judging her credibility if there's reasons why she

4    didn't seem to remember things that she otherwise might

5    have remembered.  Ms. Borden was a risk manager.  It was

6    her job to see these things coming and try to do

7    something to avoid these financial problems.  And

8    obviously the evidence will show that that did not happen

9    in this case.  So they put together this Core Action

10   Team.  And they are trying to figure out how are we going

11   to deal with this?  They ended up hiring an expensive

12   consultant to try tell them what they might be able to do

13   with this.

14           So what happened is, the evidence will show,

15   there was not a lot of great options.  And what you will

16   see from the evidence in this case is that Mr. Evanko

17   said to the Core Action Team, we have to act swiftly.

18   Those are his words.  We have to act swiftly to solve

19   this problem.  So the evidence will show that Cigna

20   decided to cut costs at any cost.  They were desperate to

21   do something to cut these costs that they knew were

22   coming.  The evidence will show in this case that they

23   simply stopped paying out-of-network labs like our

24   clients.  They just stopped.

25           THE COURT:  Sir, you have about two minutes

1    left.  Sorry to interrupt you.

2         MR. CUNNINGHAM:  Oh, boy.  So I apologize, Your

3    Honor.  So I'm going to move through some things.

4         So what they did is they came up and went to

5    what they called the SIU.  That's a Special Investigation

6    Unit.  And there's a lead there.  You will see later

7    today, as a matter of fact in this courtroom.  Her name

8    is Stephanie Canto.  What they did is they tried to come

9    up with a way to stop paying as soon as possible.  That

10   is what they did with Palm Beach Labs.  Palm Beach Labs

11   had 750 claims that had been submitted to Cigna.

12   Ms. Canto found a way to just stop paying those claims.

13   There was no appeal at the beginning.  Once you got into

14   SIU, and your claims were -- they weren't going to pay

15   your claims anymore, and what happened then was you were

16   done.  And you had to try to get out of that.  But they

17   were not going to pay any claims until they resolved what

18   they thought the problem was.

19        So they settled on something called Services Not

20   Rendered As Billed, another word for medical necessity.

21   What happened is the problem with that was they

22   determined that if we're going to do that, then we have

23   to review medical records for all of these people to see

24   if the services really were medically necessary.

25        Once they did that they submitted the records to

1    a Dr. Nichol.  Dr. Nichol, before he even looked at any

2    record, said, there's a problem, stop paying these

3    claims.  Important thing, evidence will show, Cigna

4    abandoned that rationale later because they realized once

5    they got these medical records, they realized the

6    services were, in fact, medically necessary. So what did

7    they do then?

8            I'm almost done, Your Honor.

9            What did they do then?  They come up with

10   another excuse for not paying.  These claims haven't been

11   paid.  Seven hundred and fifty claims they haven't paid

12   because Cigna decided they weren't going to pay them,

13   that's what the evidence will show.  So they came up with

14   something they call fee forgiveness which the Judge

15   alluded to in her preliminary instructions.  They said

16   well, these Labs weren't collecting co-pays and

17   deductibles from their patients.  They found out that

18   wasn't true either.  They eventually abandoned that flag

19   as well.

20           So Members of the Jury, in this case, in this

21   litigation, despite the fact that Cigna eventually

22   abandoned the medical necessity defense before they

23   settled on a fee forgiveness, now Cigna is arguing

24   medical necessity again.  And you will see the evidence

25   in this case.  They are not going to present thousands

1    upon thousands of medical records that show there was not

2    medical necessity for these services.

3            So Members of the Jury, at the end of the case,

4    we're going to ask you to find that Cigna wrongfully

5    refused to pay these bills and we're going to ask you to

6    award damages in the millions of dollars which will be

7    proven to you by the experts.  I want to thank you for

8    your time.  Thank you.

9            THE COURT:  Is Cigna ready to present their

10   opening statement?

11           MR. KANG:  Yes.  Thank you, Your Honor, counsel,

12   Ladies and Gentlemen of the jury, the Labs should not be

13   rewarded for cheating.  That's what this case is about.

14   That's what the evidence will show during this trial.

15           Good morning, everyone.  My name is Edward Kang.

16   I know we had a chance to very briefly meet yesterday.

17   There was a lot going on.  So I wanted to briefly

18   reintroduce myself to you today.

19           On behalf of our client Cigna and on behalf of

20   the members of my team, I want to thank you for your

21   service and your sacrifice for being here.

22           Folks, our country's health care system is no

23   doubt a complex one, right?  With lots of different

24   moving parts.  But as you will find out during this trial

25   the core, the way the system is supposed to work is

1    actually quite simple.

2         First, the patient has health care needs;

3    second, health care providers perform services that

4    actually address and treat those needs.  Third, payers

5    like Cigna come up, come forward to help pay a portion of

6    those costs, and Fourth, the patients, too, are

7    responsible for paying a portion of the health care bill.

8    That's how it's supposed to work.  When all of this is

9    done and people are acting in the right way, what happens

10   is patients are able to get needed services at an

11   affordable cost.

12        But in this case, you are going to learn that

13   didn't happen.  Because for many patients these Labs

14   billed hundreds of thousands of dollars in some instances

15   over $700,000 for a single patient on wasteful urine drug

16   testing services, three or four times a week that were

17   not even used to treat the patient.

18        The evidence is going to show, ladies and

19   gentlemen, that the Labs took advantage of the system.

20   They took advantage of it for their own financial gain.

21   They profiteered off of the patients that Mr. Cunningham

22   mentioned, those patients were suffering from drug

23   addiction, by billing for a whole bunch of unnecessary

24   services to line their pockets.  And then, the evidence

25   will show you, that they concealed what they did, by not

1    billing patients for their portion of the health care

2    costs.  By billing for these wasteful services, you will

3    learn that the Labs made a whole bunch of money, over 16

4    million dollars.  But you know who bore that cost?  You

5    will hear it was the employers who offered health plans

6    to their employees and their employees' families.

7         So at the bottom you will hear this case is

8    about the Labs' greed not about any desire to help

9    patients.  You just heard the Labs' counsel say the labs

10   were highly sophisticated, I suspect you will learn that

11   the company that bought the labs in 2011, they were

12   called a casino players.  I invite you to make up your

13   own mind after this trial on how sophisticated they

14   really were.  You will learn for a while, Ladies and

15   Gentlemen, that the Labs were able to get away with it.

16   Cigna couldn't detect what the Labs were doing.  They

17   trusted that the Labs were being honest in representing

18   that the services they were performing were medically

19   necessary.

20        But in 2013 and 2014, two of Cigna's concerned

21   clients made Cigna aware of the problem.  They told Cigna

22   they were getting hit with a dramatic explosion of costs

23   that the labs were billing to certain of their members,

24   hundreds of thousands of dollars for single patients.

25   You will learn these clients were employer-sponsored

1    plans, health plans that are funded by employers like the

2    Miami Dade County Public School System.  You will learn

3    that what Cigna does for these administrative plans,

4    these employer-sponsored plans is things like processing

5    a claim, providing customer service.  The important

6    thing, though, is to understand that the money that is

7    used to pay for the claims funded by those plans it's not

8    Cigna's money.  It's the money that belongs to the

9    employers and the employees.  You will learn that this is

10   why these two clients were complaining.  It was their

11   money.  It was their employees' money that was being used

12   to pay these labs.  So the complaints were looked into by

13   Cigna's Special Investigation Unit, the SIU.  And while

14   the SIU is a three letter acronym they were not the FBI,

15   they're not the police.  The SIU is a department at Cigna

16   that many state laws require insurance companies to have.

17   They conducted an investigation, and guess what, they

18   confirmed that the clients' complaints were right.  But

19   to be sure, SIU reached out.  They engaged with the labs,

20   called them, told the labs, hey, if you want to get paid

21   for your claims, send us records, send us proof to

22   support your billing for what you are actually

23   performing.  But you know what the Labs did instead?

24   They turned around and sued Cigna.  That's what this case

25   is really about.

1    The case is about the Labs cheating the system,

2    making a bunch of money they weren't entitled to.  This

3    money should be sent back to the rightful owners, the

4    employee-sponsored health plans.

5    THE COURT:  Excuse me, I'd appreciate it if

6    you'd step back a bit on argumentative.

7    MR. KANG:  Yes, Your Honor.  I apologize.

8    You may be asking yourself, how did this happen

9    in the first place?  How could Cigna not have known what

10   the labs were doing?  Well, what the evidence will show

11   is that of the millions of claims that Cigna receives

12   every single day, claims have to be processed

13   automatically, a process called auto-adjudication.  While

14   auto-adjudication can detect certain forms of improper

15   billing, you will learn it cannot detect all of them

16   especially in 2012 through 2017, which is the time period

17   at issue in the case.

18   You will learn that Cigna's system is a

19   trust-based one.  It trusts that health care providers

20   are being honest in submitting claims truthfully and

21   accurately.  Fortunately, most providers are honest

22   brokers.  But not in this case.  So what exactly did the

23   Labs do?  Well, the first as you have heard is that the

24   Labs repeatedly billed for services that were medically

25   unnecessary.  That were wasteful.  Most of you are

1   probably familiar with the concept of medical necessity.
2   And you are going to hear from some medical doctors in
3   this case.  And you will hear them give you an example
4   that explains what medical necessity is in fairly simple
5   terms.  They will testify that let's say you sprain your
6   ankle playing football.  It will be medically necessary
7   for your doctor to take an x-ray of you left ankle, but
8   it wont be medically necessary for your doctor to also
9   take an x-ray of your right ankle, your knee, your elbow,
10  and your shoulder then run those X-rays three or four
11  times a week for months on end.  In that scenario, you
12  will hear testimony that the initial x-ray of your left
13  ankle will be payable but not all the other X-rays.  That
14  makes sense, right?  You are going to hear in this case
15  that the x-ray example is very similar to what the Labs
16  were doing.
17          You will hear the testimony of Dr. Kelly Clark,
18  a board certified physician and one of the most renowned
19  specialists in the field of addiction medicine.
20          THE COURT:  You are at about the two minute
21  warning.
22          MR. KANG:  Two minutes, Your Honor?
23          THE COURT:  I'm that's my mistake.  You have 12
24  minutes left.  My apologies.
25          That's my bad, Ladies and Gentlemen.

1          MR. KANG:  She'll tell you that the Labs billed

2     Cigna for urine drug tests over and other again,

3     sometimes three or four times a week for a single patient

4     for months on end.  On each of these days, she'll testify

5     that the Labs were billing Cigna for tests for 20 even 30

6     different substances, and this includes testing for an

7     absurdly wide range of substances, ranging from nicotine

8     to alcohol to antidepressants even to bath salts, Ladies

9     and Gentlemen.  That's what she's going to testify to.

10    She'll tell you there's no medical necessary reason to

11    repeatedly test one person three times a week for all of

12    those substance for months on end.  Just like the x-ray

13    example.  Because of this wasteful billing pattern, you

14    will hear evidence, can see data for yourself that shows

15    for many patients the Labs billed Cigna hundreds of

16    thousands of dollars just for urine drug test.  Not even

17    for the patient's drug addiction treatment, just for the

18    urine drug tests.  You will learn that as a result, urine

19    drug testing was even referred to as liquid gold.

20         One patient you will learn about is Richard

21    Sanborn.  We've anonymised his name for privacy reasons

22    in this trial.  You are going to learn that Mr. Sanborn

23    was being treated at a center called Angel's Recovery.

24    He was a beneficiary on his parent's health plan through

25    a company called American Nutrition.  You will learn that

1    for Mr. Sanborn alone the Labs billed over $450,000 worth

2    of urine drug tests.  In fact it was American Nutrition

3    that was one of the two clients who referred the Labs

4    billing practices and asked Cigna's SIU to take on the

5    case.

6           Now you have heard the Labs suggest because

7    doctors ordered the tests, the tests could not have been

8    wasteful.  But Dr. Clark will testify that if drug tests

9    are ordered but never used for the treatment of any

10   patient or ordered so frequently that they can't be used

11   to treat any patient, then that test isn't medically

12   necessary even if a doctor ordered it.

13          You will also learn that the doctors' ordered

14   that the Labs say they relied upon, were nothing more

15   than blank forms that the Labs wrote.  They were referred

16   to, and you will hear testimony on this, as standing

17   orders used to order the same sets of tests for every

18   patient in a given treatment center for indefinite period

19   of time.  You will get to see the standing order for

20   yourself, ladies and gentlemen of the jury.

21          The evidence will show these weren't standing

22   orders for a single individual patient, no.  They were

23   facility standing orders to apply to all patients at a

24   given treatment center.  In other words, you will hear

25   testimony that the order will be the same whether it was

1    for John Smith who had a heroin addiction, Jane Doe who

2    was hooked on meth, or Joe Schmo who was on cocaine.  The

3    same battery of tests run for every patient at that

4    facility using the same test regardless of their

5    individual needs.  Dr. Clark will testify this is totally

6    improper.  No reputable lab in the industry does this.

7    You will learn that the Labs just can't turn a blind eye

8    to billing patterns that are totally egregious.

9    Testimony will show that the Labs, they are not a copy

10   vendor that runs whatever order comes through.  You will

11   hear that the Labs have an independent duty to make sure

12   that wasteful services are not being performed.

13          As a result, the Labs cannot hide behind a

14   standing order to say they didn't know this was wrong.

15          You will also hear from one of the doctors who

16   ordered some of the tests at issue in this case, Dr.

17   Michael Ligotti.  I expect that Dr. Ligotti will testify

18   that he signed many standing orders for many patients he

19   had never seen, never even treated.   I expect that Dr.

20   Ligotti will tell you these standing orders allowed for

21   large panels of the most expensive drug tests to be run

22   for many different patients.  He will testify he didn't

23   look at those results.  Let alone use them for the

24   treatment of any patients.  In fact, during this trial, I

25   would invite you to listen carefully whether the Labs

1    even got consent from the patients to run the test.

2            So that is the first thing.  They billed for

3    millions of dollars of wasteful medically unnecessary

4    services.  What else did the Labs do?  As Her Honor said

5    they engaged in improper billing practices including

6    something called fee forgiving.  You will hear from Cigna

7    SIU witnesses that fee forgiving is the practice where a

8    provider waives or fails to bill or collect from patients

9    their portion of a health care bill.  That includes

10   waiving things like deductible, co-insurance or balance

11   bill.  You might be asking, Mr. Kang, why is waiving a

12   patient's portion of a health care bill such a bad thing?

13   Forgiving a fee actually sounds like something that is

14   good, right?  But as the saying goes nothing in life is

15   free.  You are going to learn that fee forgiving is bad

16   because among other things, it allows providers to

17   conceal from patients as well as from payers like Cigna

18   the fact they are billing for wasteful services and

19   charging excessive amounts.  How does fee forgiving do

20   that?  Well, you are going to hear from Mike Goldfarb,

21   the director at Cigna's SIU.  He'll explain it to you.

22   He'll tell you if a plan, for example, requires a patient

23   to pay 20 percent co-insurance for a patient like Richard

24   Sanborn where the Labs billed $450,000 that co-insurance

25   would amount to tens of thousands of dollars.

1    The evidence will show if the Labs actually

2    billed Mr. Sanborn for that full amount their excessive

3    billing would have been exposed. Mr. Sanborn probably

4    would have made sure his urine samples went some where

5    else.  But by waiving Mr. Sanborn's cost-share or by

6    billing not him or by not making efforts to collect, Mr.

7    Goldfarb will testify that the Labs' excessive billing

8    practice was more likely to fly under the radar evading

9    detection from the patients and Cigna.

10    So you will hear that not holding patients

11    responsible for their portion of a health care bill

12    ultimately leads to higher health care costs for

13    everybody.  It leads to services being ordered that are

14    spent excessively and wastefully.  Folks, that's why fee

15    forgiving is bad.  Evidence will show in this case the

16    Labs did do that.  You will hear testimony, you will see

17    documents that will show that the Labs did not even have

18    the ability to send patients bills until January 2015,

19    almost 3 years after some of the testing services were

20    supposedly performed.  And even after sending those bills

21    out, you will hear the Labs did nothing to collect.  Now

22    as you have heard the Labs have some claims against Cigna

23    as well.

24    First, the Labs said that Cigna didn't respond

25    to their claims for payment.  The evidence in this case

1    will show that's not true.  You will hear Cigna's SIU was

2    in contact with the Labs.  SIU informed them of the

3    investigation findings and many letters were exchanged.

4    You will get to see those communications for yourself.

5    The Labs also argue they get to stand in the shoes of

6    some of the Labs' patients to pursue a breach of contract

7    against Cigna based on policies that Cigna had with those

8    individual patients.  You will learn these policies were

9    meant to benefit the individuals and their family

10   members, not the Labs.

11          Ladies and Gentlemen, at a conclusion of this

12   trial, I will come back up to you ask that you find in

13   Cigna's favor for one count.  It's called unjust

14   enrichment.  Judge Hall told you about it.  And the

15   elements of that count are quite simple.  First, the Labs

16   -- that Cigna paid the Labs money.  Second, the Labs did

17   not return that money even though Cigna asked.

18          MR. CUNNINGHAM:  Objection, Your Honor.

19          THE COURT:  Basis?

20          MR. CUNNINGHAM:  Province of the Court to

21   instruct the jury.

22          THE COURT:  Yeah.  I already have briefly.  I

23   think it's alright.  As long as he's going to talk about

24   the evidence he has to prove any of those elements.  He

25   can refresh the jury on what those elements were.  Go

1    ahead, sir.

2          I also warn you, I think I'm right now, you are

3    at your 2 minutes and maybe into it.

4          MR. KANG:  I'm wrapping up, Your Honor.

5          Lastly, as the Court's instructions provided, it

6    would be unfair for the Labs to keep that money.  Folks,

7    the evidence in this case will show that Cigna paid the

8    Labs because they relied on the Labs' representations.

9    But in fact, the Labs were not being truthful.  They

10   cheated the system by billing for wasteful and

11   unnecessary services.  The evidence will show that they

12   hid it by waiving patient's cost-share obligations.  And

13   because of that, the Labs got paid millions of dollars

14   they were not entitled to.  16 million dollars.  Cigna

15   asked them to return the money, they refused.  It will be

16   unfair for the Labs to keep that money because the money

17   belongs in the hands of the health plans and their

18   members.

19          That is why, Ladies and Gentlemen, at the end of

20   this trial, I will come back and ask that return a

21   verdict for the full amount of money that Cigna paid to

22   the Labs so that the money can be returned to its

23   rightful owners.  Thank you for your time.  We know how

24   valuable your time is and we'll certainly do our best to

25   be as efficient as possible during this trial.  Thank

1    you.

2         THE COURT:  Thank you.  That completes the

3    opening statements of the two sides in each of the two

4    cases.  At this point, parties have asked me to read to

5    you something that's called a Statement of Stipulated

6    Facts.  A Stipulation Of fact which is what I will read

7    you -- a number of them.  What it is is an agreement

8    between opposing parties, that's Cigna and the Labs.

9    That a certain fact is true.  Okay.  For example, they

10   might stipulate that the sun rose in the east this

11   morning.  Okay.  That's a stipulation.  So nobody has to

12   come in with any evidence to prove that.  It's already

13   proven by their agreement so that's all these are.  I

14   will read them to you, then I'm going to ask the deputy

15   clerk to mark it as Court Exhibit 1.  And then it will be

16   available among other exhibits at the end of the case.

17   Alright, Ladies and Gentlemen.

18         So the parties, that is Cigna and the Labs have

19   agreed and stipulated to the following facts.  One,

20   Cigna's plans and policies govern all insurance plans in

21   this litigation including all claims by the Labs and all

22   claims by Cigna.

23         Two, Joint Exhibits numbered 47 to 73 those are

24   when they are called Joint, they are agreed between the

25   two parties so they both are offering them, those

1    exhibits 47 to 73 are representative samples of all Cigna

2    policies, plans and policies during the relevant time

3    period for the claims at issue in this litigation for

4    purposes of the trials.

5            Three, claims data, Joint Exhibits 40 through 46

6    are excerpts from Cigna's claim level and line level data

7    which remove certain fields that contain HIPAA protected,

8    that's a statute that says you can't disclose health

9    information, so they contain HIPAA protected personal

10   health information and data not relevant to the case so

11   they agree that they are excerpts but that some of them

12   have been redacted so you won't see a name.

13           Explanation of payments, Number Four, Joint

14   Exhibits 74 to 78 are Explanations of Payments known as

15   EOPs from Cigna that are representative samples of EOPs

16   during the relevant time period for the claims at issue

17   in this litigation for purposes of trial.

18           Electronic remittance forms, Number Five, Joint

19   Exhibits 79 to 83 are electronic remittance forms that

20   are representative samples of the electronic remittances

21   during the relevant time period for the claims at issue

22   in this litigation for purposes of trial.

23           Test results, Number Six, Joint Exhibits 84 to

24   117 are test results in that are representative samples

25   of the form in which test results were reported during

1    the relevant time period for the claims at issue in this

2    litigation for purposes of trial.

3              Recurring provider agreements, Number 7, Joint

4    Exhibits 118 through 128 are recurring provider

5    agreements that are representative samples of the various

6    versions of the recurring provider agreements during the

7    relevant time period for the claims at issue in this

8    litigation for purposes of trial.

9              Should I read footnote One?  Doesn't appear to

10   be a part of the stipulation just a sort of note to the

11   Court to preserve something.

12             MR. HARE:  That's right, Your Honor.

13             THE COURT:  Thank you.  Sorry for the

14   interruption.

15             Patient initials and pseudonyms, Eight.  The

16   parties may use a patient's initials or a pseudonym at

17   trial in lieu of the patient's actual name.

18             That completes the Stipulation of Facts by the

19   Labs and Cigna for purposes of the trial.  And as I said,

20   Liana, if you would -- you will need to print a clean

21   copy -- print that document.  Mark it as an exhibit,

22   Court Exhibit 1 for purposes of this trial.  All right.

23             I believe at this time I would call on the Labs

24   to call their first witness.

25             MR. CUNNINGHAM:  The plaintiff calls Dr. Thomas

1    Mendolia.

2         THE COURT:  Mr. Mendolia, you are coming to the

3    right place. I don't have to tell you that.  Please

4    remain standing as the clerk will administer an oath.

5         T H O M A S   M E N D O L I A

6    Having been called as a witness, was first duly sworn and

7              testified on his/her oath as follows:

8         THE WITNESS:  Yes.

9         THE CLERK:  Please be seated.  State your name

10   for the record, spelling your last name.

11        THE WITNESS:  Dr. Thomas Mendolia,

12        M-E-N-D-O-L-i-A

13        THE COURT:  You may proceed.

14   DIRECT EXAMINATION BY MR. CUNNINGHAM:

15     Q.   Dr. Mendolia, obviously you have a medical

16   degree?

17     A.   I do.

18        THE COURT:  Hold on.  We have to stop.  You have

19   to pull the mic closer.  The mic moves and the chair

20   moves.

21        THE WITNESS:  Is that better?

22        THE COURT:  Everybody now can hear you.  That's

23   excellent.  If you keep that up, I won't have to

24   interrupt you.  Trust me I will.

25        THE WITNESS:  No worries.  I'm good.

BY MR. CUNNINGHAM:

Q.   Dr. Mendolia, what type of doctor are you?

A.   Gastroenterologist.

Q.   What is a gastroenterologist?

A.   We specialize in disorders of the gastrointestinal tract which includes the esophagus, the stomach, the small intestine, the colon, the rectum, pancreas, gallbladder and liver.

Q.   And I would say ask you to speak slowly and in plain English for all of us if you would.

A.   Sure.

Q.   Where do you practice?

A.   I retired.  I had my practice in Elkin, North Carolina.

Q.   Where were you educated, sir?

A.   I was educated at New York College of Osteopathic Medicine is where I went to medical school. I did a year of cancer research prior to that at Roswell Park Memorial Institute.  Prior to going to medical school and prior to cancer research was at the State University of New York and Buffalo where I received a bachelor of science in medical technology degree.

Q.   Sir, how many years did you practice as a doctor?

A.   17 years.

1    Q.    How long have you been retired?

2    A.    I retired in October of '09.

3    Q.    And sir, what type of residency did you do as a

4    medical doctor?

5    A.    After medical school, I did three years of

6    internal medicine.  The first year is characterized as

7    an internship, then the subsequent two years are part of

8    a residency.  So I did three years of internal medicine

9    residency, then I went onto do two years of

10   gastroenterology fellowship before I started my practice.

11   Q.    And can you tell us what the term "residency"

12   means?

13   A.    Clinical practice.  So after you complete

14   medical school, you are now a physician, so now it is

15   time to get out into clinical, clinical field and take

16   care of patients.  The first year -- there's three

17   different years -- the first year is internship as I

18   mentioned.  And the other two years are residency and you

19   are taking care of inpatients, primarily inpatient and

20   outpatient.

21   Q.    Sir, during the course of that three-year

22   residency, did you have occasion to treat anyone with

23   substance abuse issues?

24   A.    Yes, I did.

25   Q.    Can you tell us about that.

1    A.    Sure it was a vast experience of taking care of

2   lots of different patients that came in through the

3   emergency room or in the outpatient department.  So it

4   ranged anywhere from heart attacks to substance abuse to

5   GI bleeds to pediatric issues, many different issues

6   during that three-year period.

7    Q.    Sir, do you have any relationship or have you

8   ever had any relationship with the three labs that are

9   the Plaintiffs in this lawsuit against Cigna?

10    A.    I was one of the founders of Medytox first and I

11   was CEO of the laboratories for a period of time as well.

12    Q.    So you mentioned Medytox.  What's Medytox?

13    A.    Medytox was the name of the company the sort of

14   umbrella company that oversaw, that established all of

15   the laboratories.  We had five laboratories in the United

16   States.  Three in South Florida, one in New Mexico,

17   actually four in South Florida and one in New Mexico.

18    Q.    Was Medytox basically formed for the purpose of

19   owning those labs?

20    A.    Yes.

21    Q.    What year was Medytox incorporated?

22    A.    I want to say somewhere around 2010, 2011, or

23   12. I'm not exactly sure what year.

24    Q.    What was the purpose of forming Medytox?  To

25   open those labs?

1      A.    To be a service to analyze urine tox specimens.

2  That was our main thrust.

3      Q.    Okay, I'm not sure I understand what you said.

4      A.    To analyze urine specimens for urine toxicology.

5  The laboratories were focused on urine toxicology.

6      Q.    I am going to ask you not to use abbreviations

7  that I know doctors throw around all the time.  So you

8  are talking about toxicology?

9      A.    Urine toxicology.

10     Q.    Determining what substances might be in a

11  person's urine?

12     A.    Correct.

13     Q.    Toxicology would also apply to blood samples

14  well?

15          MR. KANG:  Objection to leading.

16          THE COURT:  It is.  Rephrase please.

17  BY MR. CUNNINGHAM:

18     Q.    Does toxicology also sometimes apply in with

19  respect to blood samples?

20     A.    Yes, it does.

21     Q.    Thank you.  All right.  Sir, what was the first

22  of the labs to be formed in Florida?

23     A.    PB Labs.

24     Q.    Where was that located?

25     A.    I think it was in the Boynton Beach area.

1     Q.   I may be testing your memory here, but do you

2   remember approximately what year PB Labs was founded?

3     A.   I will say somewhere around 2010, 2011.

4     Q.   What was the next lab that was opened?

5     A.   BioHealth Labs.

6     Q.   Approximately what year was that opened?

7     A.   Say within a year or year and a half after PB

8   Labs.

9     Q.   What was the third Lab in Florida?

10     A.   Epic Labs.

11     Q.   Alright.  And what was the purpose of opening

12   those Labs?

13     A.   To expand the service area and also to establish

14   confirmation testing.

15     Q.   What do you mean by that?

16     A.   Confirmation testing is considered or is

17   established when they are expensive machines that we had

18   to purchase for confirmations to confirm the name of the

19   drug and the quantity of a drug.  And typically these

20   machines are extremely expensive.  These are

21   machines that are used in all confirmation laboratories,

22   various brands.  Machines that are used by Labcorp and

23   Quest, for example.

24     Q.   Can you give us an idea of what those type of

25   machines would cost?

1    A.    Upwards of 200 to 250,000 per machine.

2    Q.    How many of each of those machines would be in

3    each of those particular labs?

4    A.    As I recall at Epic, we had at least four.

5    Q.    So would it be fair to say that opening these

6    labs involved a significant financial obligation?

7            MR. KANG:  Objection to leading.

8            THE COURT:  It is.

9    BY MR. CUNNINGHAM:

10    Q.    Did opening these labs involve a significant

11    financial expenditure?

12            MR. KANG:  Objection.

13            THE COURT:  Overruled.  You may answer, sir.

14    A.    I mean four times, $250,000 is a $1,000,000 and

15    I think that's substantial amount of income to invest in

16    opening up a laboratory.

17    BY MR. CUNNINGHAM:

18    Q.    Now, sir, with labs like Labcorp and Quest

19    already in South Florida, why did you feel the need to

20    open your own labs in South Florida?

21    A.    Provide better service.

22    Q.    Do you believe that your labs provided better

23    service than Labcorp and Quest?

24    A.    Absolutely.

25    Q.    Specifically how?

1        A.    We were very proud of our laboratories.  We were

2    proud with regards to the serviceability to our clients,

3    meaning turnaround time.  As a physician, as a practicing

4    physician and also knowing laboratory medicine in my

5    undergraduate work, it's all about turnaround time, how

6    quickly a result can be turned around to the prescribing

7    physician.

8        Q.    Why is that important in your mind?

9        A.    Especially important in managing substance abuse

10   patients because those patients tend to be very

11   manipulative with regards to the types of substances they

12   are abusing.  So it's very important for the physician at

13   the time of treatment that's typically on a daily basis

14   they are seeing these patients that they know if they are

15   being truthful or not.  That's really what's most

16   important is to try to get these patients off the

17   substances and the urine testing or urine and blood

18   toxicology testing was the ultimate truth teller.

19          THE COURT:  It's time to take a break, sir.  It

20   is past 11:15, Ladies and Gentlemen.  I believe it's

21   11:18 so we'll about back at 11:33.  So you're excused.

22   You should leave first.  We wait for you all to leave and

23   Liana will take you out.   When it is time to come back,

24   hopefully you will all be there.  Thank you very much.

25          And, Doctor, you may step down.  You are free to

1    leave the courtroom, but you have to be back in the seat

2    at 11:31 so that I'm sure you are here and ready to go.

3    Thank you very much.

4              (In the absence of the jury at 11:19 a.m.)

5              THE COURT:  Is there anything the Court has to

6    take up at this time?

7              MR. CUNNINGHAM:  Nothing from the Labs.

8              MR. KANG:  Nothing from Cigna.

9              THE COURT:  I will be back on the bench at 11:32

10   to make sure we're out here on time.

11             (Whereupon, a recess was taken from 11:19 a.m.

12   to 11:31 a.m.)

13             THE COURT:  Please be seated, everyone.

14             I think how I will handle that issue of the

15   Joint Exhibits, you know, that they are in evidence, is

16   the first time anybody uses one, I will explain whenever

17   you hear Joint Exhibit means it's already been admitted

18   as a full exhibit and it will be available to you during

19   deliberations.

20             MR. CUNNINGHAM:  And then you said there's going

21   to be the three second thing where the jurors will see

22   it?

23             THE COURT:  That's in the three second category.

24             MR. CUNNINGHAM:  That's basically publishing it

25   to the jury, right, Your Honor?

1          THE COURT:  No.  That's making sure somebody

2    didn't realize, oh, my God, this shouldn't come into

3    evidence.

4          MR. CUNNINGHAM:  But are they in evidence?

5          THE COURT:  As long as there's no objection

6    after three seconds.

7          MR. CUNNINGHAM:  Okay.  It's going to come up

8    with Ms. Canto who is our next witness.

9          THE COURT:  Okay.  But that's when she throws

10   the switch in Juris is when you say showing you exhibit

11   whatever, 27, Joint Exhibit 27, or your exhibit which I

12   have said is in.  Then you count three seconds and then

13   you say -- you start reading from it, talking about it,

14   questioning about it.

15         MR. CUNNINGHAM:  Because they will see it on

16   their screens?

17         THE COURT:  Then it will be published, right.

18         MR. CUNNINGHAM:  Thank you, Your Honor.

19         THE COURT:  But I will explain what it means to

20   be a Joint Exhibit.  Somebody was concerned about that.

21         MR. CUNNINGHAM:  Your Honor, I don't want to

22   waste any time.  I'm trying to prevent the waste of time.

23         THE COURT:  Liana, would you see if they are

24   ready.

25         MR. CUNNINGHAM:  I want to bring up something

1    with regard to the next witness' testimony, Ms. Canto.

2        THE COURT:  Well, I hope you don't need to have

3    an answer before lunch time.

4        MR. CUNNINGHAM:  I can wait until after lunch

5    time, Your Honor.

6        THE COURT:  Yes, I would think so.  I could be

7    wrong.  But you will have to because it's time to bring

8    them.  It's 11:33 and our time is up.

9        MR. CUNNINGHAM:  Thank you.

10        THE COURT:  I have a feeling they won't be ready

11    right now.  But that's all right.  They have to get in

12    the swing of my swing.

13        (In the presence of the jury at 11:34 a.m.)

14        THE COURT:  Everybody be seated.

15        I will note the presence of the nine jurors.  I

16    will note the presence of counsel.

17        And, Attorney Cunningham is at the podium ready

18    to begin and the witness is in the box.

19        You may proceed, sir.

20        MR. CUNNINGHAM:  Thank you, Your Honor.

21    BY MR. CUNNINGHAM:

22        Q.   Dr. Mendolia, I want to just return for a

23    moment because of the break to your residence.  And you

24    told us before the break that you treated people with

25    substance abuse problem during your residency, correct?

1        A.    That's correct.

2        Q.    Sir, when you treated those patients with

3    substance abuse issues during your residency, would you

4    have to order lab tests to see what was going on with

5    them?

6             MR. KANG:  Objection to the leading, Your Honor.

7             THE WITNESS:  Certainly.

8             THE COURT:  You have to wait until I rule, sir.

9    That's okay.  No, it's a common error.

10            I wouldn't view that as leading.  My view is

11   generally if the question suggests an answer, that's

12   clearly leading.  If it can be answered yes or no,

13   generally I don't view it as leading.  I might have a

14   different view, depending on the tone, et cetera.  So for

15   that reason, I would overrule that objection.  But thank

16   you.

17            MR. CUNNINGHAM:  Your Honor, I want to ask it

18   again.

19            THE COURT:  Yes, ask it again.  Absolutely.

20   BY MR. CUNNINGHAM:

21       Q.    What I asked you, sir, is during your residency

22   when you treated patients with substance abuse problems,

23   would you order lab tests for them?

24       A.    Yes.

25       Q.    What would the reason be for ordering lab tests?

1      A.    To determine what substances they were abusing.

2      Q.    So when you started Medytox and you guys started

3  the labs that we're talking about here, did you have that

4  same protocol in mind in terms of ordering lab testing?

5      A.    Of course, yes.  As a practicing physician,

6  during internship and residency, and also during the

7  times that I moonlighted, prior to starting Medytox and

8  in practice for 17 years, of course, it was our decision

9  as a physician to order certain tests and how it applied

10  to that particular patient.

11      Q.    In your experience, sir, are medical labs

12  legally allowed to perform tests without a prescription

13  from the treating doctor?

14      A.    No.

15          MR. KANG:  Your Honor, objection.  This is

16  improper expert testimony.  He was not notified as an

17  expert witness.

18          MR. CUNNINGHAM:  I'm not asking him for an

19  expert opinion, Your Honor.  I'm asking him based on his

20  experience.  I'm asking what his --

21          THE COURT:  I heard you say it.  I don't need

22  more.  I was thinking something before you stood up,

23  Attorney Kang.

24          This question, Terri, begins with your

25  experience.  Is a lab allowed to perform a test without a

1    prescription from a treating physician essentially.  This

2    is asking him his experience in the residency or --

3              MR. CUNNINGHAM:  His experience also in the

4    field.  He ran Medytox and ran the three labs.

5              THE COURT:  The problem is 702, sir.  It's with

6    a witness who is qualified as an expert by dot dot dot

7    experience.

8              MR. CUNNINGHAM:  Right.  I'm not trying to

9    establish him as an expert, Your Honor.

10             THE COURT:  No, I know you don't.  But you want

11   to ask him questions.

12             MR. CUNNINGHAM:  Well, if you want me to say the

13   predicate for expert testimony, I'm happy to do that.

14             THE COURT:  But he wasn't disclosed.

15             MR. CUNNINGHAM:  I wasn't intending to do it,

16   Your Honor.

17             THE COURT:  Well, I think you better move on.

18   I'm sorry, sir, I shouldn't have gone on so long.

19             MR. CUNNINGHAM:  That's okay.  I apologize.

20             THE COURT:  No, go ahead.

21   BY MR. CUNNINGHAM:

22      Q.   Dr. Mendolia, what was the protocol that you

23   established for the labs in terms of whether labs were

24   allowed to do testing without a doctor's prescription?

25      A.   There's no particular protocol.  This is purely

1    up to the physician.  Whether it's in toxicology or any

2    other discipline, it's always up to the physician to

3    create the order.  The laboratory does not make the

4    decision on how to treat the patient and what tests to

5    order.  We provide a service as a laboratory.

6         Q.   Is that service based on the prescription that

7    is written by the doctor?

8         A.   It is based on either a prescription or it's

9    based on a particular order that is checked off within

10   their facility, whether it's their office or hospital, a

11   treatment center, an emergency room, an urgent care.

12        Q.   Sir, do you know who Mike Nicholson is?

13        A.   Yes, I do.

14        Q.   The jury is going to be hearing his testimony.

15   Can you tell us who Mike Nicholson is, to your knowledge?

16        A.   Yes.  Mike Nicholson -- actually, I met Mike

17   Nicholson in my practice as a gastroenterologist in North

18   Carolina.  As I mentioned, I was in practice for a period

19   of 17 years.  I had my own in-house biller in my

20   practice.  And for the last few years, towards the end of

21   my practice, I was introduced to Mike Nicholson.  It was

22   actually through my software company.  And I had heard

23   about his abilities.  He lived in Charlotte.  It was

24   about 45 minutes away from where I practiced.  I had him

25   come up.  I talked to him about outsourcing my billing.

1    And he was able to download several years of my billing.

2    And a few weeks later he told me some good news and bad

3    news.  So for a long period of time, throughout the

4    majority of my practice, my in-house biller wasn't really

5    billing the way she was supposed to bill.  And I didn't

6    realize that until Mike Nicholson pointed that out.

7        Q.   What was the name of Mr. Nicholson's company?

8        A.   ARC Medical Billing.

9        Q.   And did you eventually retain Mr. Nicholson to

10   do billing for you when you were in private practice in

11   North Carolina?

12       A.   Yes, I did.  For the last two or three years.

13       Q.   What was your perception of Mr. Nicholson?

14       A.   My regret was that I did not meet Mike 15 years

15   prior.  Mike was an excellent biller.  He was very

16   knowledgeable.  He had been in the billing practice for

17   many years prior to meeting me.  So intelligent,

18   efficient, credible.

19       Q.   Trustworthy?

20       A.   Extremely.

21       Q.   Did you find ARC's billing to be detailed

22   oriented?

23       A.   Extremely.  You have to be.

24       Q.   Now, sir, did you eventually work with

25   Mr. Nicholson in your capacity as a CEO of The Labs?

1    A.    Yes.  I think it was very disappointing to Mike

2  when I retired in '09, as I had a very large

3  gastroenterology practice.  As a matter of fact, when my

4  practice was purchased by the local hospital, they hired

5  a busy evaluator, and my practice turned out to be in the

6  top half percent of the country with regards to the size

7  of the practice.

8         So Mike was disappointed because I was one of

9  his largest clients.  However, shortly after, within a

10  few years, after I retired and started Medytox, one of a

11  founders of Medytox, Medytox needed a biller.  So I

12  suggested, strongly suggested, using the services of Mike

13  Nicholson.

14    Q.    Do you know for how many years he served in that

15  capacity as the billing person?

16    A.    I want to say maybe, I don't know, three, four,

17  five years maybe.

18    Q.    Now, sir, I want to turn to your role as CEO of

19  The Labs.  What did you do in that role?

20    A.    Well, we had a lot of different functions.  I

21  would be responsible for locating a spot for a facility.

22  I would be responsible for talking to potential

23  employees, including from laboratory director on down to

24  technicians and lab assistants.  Also, make decisions

25  about the types of equipment that we would need to

1    purchase, talk to various vendors.  And, most

2    importantly, establish quality control within the

3    laboratory.  And quality control is to make sure the

4    machines are reporting accurate test results.  Multiple

5    tests are sent in on a daily basis to laboratories and

6    machines have to be accurate.  They have to be

7    standardized and accurate.  And there are specific

8    quality control programs that must be abided by.

9        Q.   Were you responsible for running the day-to-day

10   operations of corporation?

11       A.   Not the day-to-day operations.  That was really

12   up to the Laboratory Director and the managers.  But I

13   oversaw all of the laboratories.

14       Q.   Were you responsible for business development

15   for the Labs?

16       A.   When you say business development, are you

17   talking about creating business to come towards the

18   laboratories?

19       Q.   Right.  Marketing, things of that nature.

20       A.   No, that wasn't my function.

21       Q.   Who did that for you?

22       A.   The sales people would be involved with that.

23       Q.   Sir, what was the main business of the Labs?

24       A.   It was mainly urine toxicology.  Urine and blood

25   toxicology.  Mainly urine.

1    Q.    And for whom were those -- strike that.

2         Who was the intended recipient or beneficiary of

3    the services that the Labs performed?

4    A.    The ordering physicians.

5    Q.    Sir, can you walk us through practically how it

6    works when a doctor wants a particular lab panel or some

7    blood test or urine test result to be done.

8    Logistically, how does that work?

9    A.    The way it would work is the sales people would

10   contact a potential client, the physician, whether it was

11   at sober homes or addiction centers or any other

12   treatment facilities.  They would, if they agreed to

13   utilize our services, that client was on boarded.  They

14   would be provided iPads.  They would be provided various

15   supplies.  And most importantly, they would make the

16   decision about the panels that they would choose.

17        You know, when it comes to the types on patients

18   they are treating, they were treating patients, of

19   course, that had various types of -- they were using

20   various substances, which ran the gamut from opioids to

21   bath salts to antidepressants to antianxiety medications.

22   You name it, they were taking it.  So it was their

23   decision to choose which panel that they would like to

24   run, depending on their patients --

25   Q.    You used the word panel, sir.  I'm sorry to

1    interrupt you.  What you do mean by the word panel?

2        A.    There were several different, how should I say,

3    there were several different substances that belonged to

4    each panel.  And depending on their patients, they would

5    choose a certain panel for us, as a laboratory, to run

6    when their specimens came to our laboratory.

7        Q.    Could the Labs decide which tests the doctors

8    would select to run on their patients?

9        A.    No, that was purely up to the physician.

10       Q.    And why is that important, sir?

11       A.    That's their patients.  They are the ones that

12   are seeing the patients.  They are the ones that are

13   treating the patients.  They're the ones that know the

14   patients.  So they are the ones that make the final

15   decision about what's being ordered.

16       Q.    Did you market the Labs as an alternative to

17   bigger labs like Quest and Labcorp?

18       A.    Well, yeah, we did.  And one of the biggest

19   reasons that we felt it was important to utilize our

20   services was the turnaround time.  As I alluded to

21   earlier, it's all about for that physician in seeing that

22   patient, especially in the environment of substance

23   abuse, these are very manipulate types of people and the

24   true result lies in the urine and/or blood test.

25            So getting the specimen from the time that the

1    specimen was collected, getting the results back to the

2    physician in the most efficient time frame, that's what

3    we -- that's how we sold ourselves.

4        Q.   Sir, when you say that substance abuse patients

5    are sometimes manipulate, what do you mean by that?

6        A.   They don't tell the truth a lot.  They are not

7    telling the truth ability about what they are taking,

8    what they are not taking.

9        Q.   Is that sometimes because they are addicted to

10   something and they don't want to stop taking it?

11       A.   Exactly right.

12            MR. KANG:  Objection, Your Honor, leading.

13            THE COURT:  That is leading.  You can rephrase.

14       Q.   Sir, what reason would a substance abuse patient

15   have to be manipulative?

16       A.   To not come off of their medication.  To add

17   other medications.  These are very tricky patients.  You

18   know, sometimes they would add water to the urine

19   specimen.  Sometimes they would add other substances to

20   the urine specimen which can disguise certain substances

21   that were being abused.

22       Q.   Sir, were your Labs CLIA certified?

23       A.   Yeah.  We were CLIA certified, yes.

24       Q.   What does that mean?

25       A.   It's an accrediting body.  There's several

1    accrediting bodies.  There's CLIA certification under

2    which there's the College of American Pathology, and also

3    SAMHSA.  The same types of accreditations that are given

4    to other laboratories such as Labcorp and Quest.

5        Q.   What is the process of accreditation?

6        A.   It's a matter of an on-site visit.  Application,

7    on-site visit, and defining the types of testing that we

8    are performing within the laboratory.  And then

9    eventually gets approved by those agencies.

10       Q.   Sir, the last thing I want to ask you about is

11   could the labs override a physician's orders or

12   prescription as to what tests should be performed on a

13   particular substance abuse patient?

14            MR. KANG:  Objection, leading, Your Honor.

15            THE COURT:  Overruled.

16       A.   No, they cannot.

17            MR. CUNNINGHAM:  That's all the questions I have

18   for you, sir.  Thank you.

19            THE COURT:  All right.  You may cross-examine.

20                CROSS-EXAMINATION

21   BY MR. KANG:

22       Q.   Good morning, Mr. Mendolia.  My name is Edward

23   Kang.  I represent Cigna.  Good to meet you.

24       A.   Good morning.

25       Q.   If I understand this correctly, Mr. Mendolia,

1    you are a gastroenterologist by training?

2            MR. CUNNINGHAM:  Excuse me.  I think it Dr.

3    Mendolia.

4    BY MR. KANG:

5        Q.    Sorry.  Dr. Mendolia, I understand that you are

6    a gastroenterologist by training, sir?

7        A.    By training.

8        Q.    You don't have any formal training in

9    addictionology, sir?

10       A.    No, I don't.

11       Q.    And prior to joining Medytox you had no

12   experience running a clinical laboratory, sir?

13       A.    No.  Actually, during -- when I was doing my

14   bachelor's at the state university in Buffalo, New York,

15   I focused on medical technology.  That was my degree.

16   And in medical technology it's all about laboratory

17   medicine.  Meaning, I worked in laboratories.  I trained

18   in laboratories.  You have to have an understanding about

19   all the specimens that are being provided to the

20   laboratories, all the disorders that are associated with

21   various parameters that are being pleasured within the

22   laboratories.  And so I did have laboratory experience.

23       Q.    Okay.  And how long ago was that experience,

24   sir?

25       A.    Too many years.  I was in college from 1976 to

1    1981.

2        Q.    So your entire experience related to clinical

3    laboratories was in 1976 to 1981, before Medytox?

4        A.    No.  But in addition to that, of course, in my

5    clinical years of medical school, I also had experience

6    with laboratories because I was the ordering physician in

7    my clinical years.  And then certainly, within those two

8    years of medical school after that, in internship, two

9    years of residency and two years of gastroenterology

10   fellowship and moonlighting in various emergency rooms, I

11   had significant experience with labs.

12       Q.    How long ago was that, sir?

13       A.    Well, so I graduated high school in 1976.  I

14   went to -- I had five years of undergrad, from '76 to

15   '81.  From '81 to '82, I did cancer research at Roswell

16   Park Memorial Institute which also worked with

17   laboratories.  Then I went to medical school from 1982 to

18   1986.  And then from 1986 to 1989, I did three years of

19   internship and residency.  And then 1989 to 1991 is two

20   years of gastroenterology fellowship.  And then From 1991

21   to 2009, I was a gastroenterologist.

22       Q.    I appreciate all the detail.  My question,

23   though, was your experience that you testified to with

24   respect to laboratories that you described during your

25   residency, that would have been in what years?

1      A.   In residency, that was '86 to -- sorry.  '86 to

2  '89.

3      Q.   Okay.  So since your -- and when you were in

4  your residency, did you actually see patients to treat

5  them for substance use disorders?

6      A.   Yes, I did.

7      Q.   You did.  Okay.  And you didn't do that after

8  you finished your residency, is that correct?

9      A.   No, that's incorrect.  I did that when I

10  moonlighted in emergency rooms.

11      Q.   Are you member of ASAM, sir?

12      A.   I'm sorry.

13      Q.   Are you a member of ASAM?

14      A.   No.

15      Q.   Do you know what ASAM is?

16      A.   No, I don't.

17      Q.   Did you review any of the medical records that

18  are at issue in this case?

19      A.   I'm sorry.

20      Q.   Did you review any of the medicals that are at

21  issue in this case?

22      A.   No.

23      Q.   You didn't see -- did you take a look at any of

24  the lab results that are issue in this case?

25      A.   No.

1    Q.    You mentioned that you were one of the

2    cofounders of Medytox, is that correct, sir?

3    A.    Yes, I was.

4    Q.    There were other cofounders as well as, correct?

5    A.    Yes, there was.

6    Q.    Another gentleman was the name of Seamus Lagan?

7    A.    Yes.

8    Q.    When he co-founded Medytox with you, did Mr.

9    Lagan, to your knowledge, have any experience in the

10   healthcare industry?

11   A.    Not that I know of.

12   Q.    Did he have any educational degree in healthcare

13   whatsoever?

14   A.    Not that I know of.

15   Q.    Did he have any experience in toxicology

16   whatsoever?

17   A.    Not that I know of.

18   Q.    Did he have any professional experience in

19   addiction treatment?

20   A.    No.

21   Q.    Did he have any experience with medical billing?

22   A.    No.

23   Q.    Did he have any professional experience with

24   clinical labs at the time that Medytox was formed?

25   A.    No.

1    Q.   Another one of your partners was a woman named

2    Sharon Hollis; is that correct?

3    A.   Yes.

4    Q.   And when she co-founded Medytox with you, to

5    your Knowledge, did Ms. Hollis have any prior experience

6    in the healthcare industry?

7    A.   Not that I know of.

8    Q.   Any educational background in healthcare?

9    A.   No.

10   Q.   Did she have any professional experience, to

11   your knowledge, in toxicology?

12   A.   No.

13   Q.   Running clinical labs?

14   A.   No.

15   Q.   Another one of your cofounders was a gentleman

16   named Bill Forhan; is that correct?

17   A.   No, he was not a co-founder.

18   Q.   Was he the CEO of Medytox at some point?

19   A.   He was the CEO, but he was not a co-founder.

20   Q.   Okay.  To your knowledge, was he CEO at the same

21   that you were with Medytox?

22   A.   Yes.

23   Q.   To your knowledge, did Mr. Forhan have any prior

24   experience in the healthcare industry?

25   A.   No.

1      Q.   Did he have any educational degree in

2  healthcare?

3      A.   Not that I knew.  Not that I can recall.

4      Q.   Did Mr. Forhan have any professional experience

5  in toxicology or with clinical labs?

6      A.   No.

7          MR. KANG:  Mr. Salazar (ph), if we can put up

8  Cigna Exhibit 26.  And, Your Honor, this is one of the

9  exhibits that on stipulation by the party, I don't

10  believe there's an objection by the Labs.

11          THE COURT:  All right.  Would you publish it

12  just to us.  Not to the jury.  It's up for counsel and

13  myself.  I think you say it's a full exhibit, there's no

14  objection.

15          MR. KANG:  Yes, Your Honor.

16          THE COURT:  All right.  So it may be published

17  to the jury and be marked as a full exhibit, please.

18          MR. KANG:  Thank you.

19  BY MR. KANG:

20      Q.   Dr. Mendolia, do you see this document that's in

21  front of you, sir?

22      A.   Yes, I do.

23      Q.   This is what's called a form 10-K; is that

24  right?

25      A.   Yes.

1    Q.   And this is a document that gets filed with the

2    United States Securities and Exchange Commission; is that

3    right?

4    A.   Correct.

5    Q.   And so would you agree with me that it's

6    important for the representations in a document like this

7    to be accurate?

8    A.   Correct.

9    Q.   And complete, correct?

10    A.   Yes.

11    MR. KANG:  And Mr. Salazar, if you could go to

12    page 71 of this document, sir.  And if you can zoom into

13    that section that describes Dr. Mendolia's role.

14    Q.   And the 10-K states, does it not, sir, that Dr.

15    Thomas F. Mendolia has served as a Chief Executive

16    Officer of the company's laboratory since April of 2012.

17    Dr. Mendolia is board certificate in gastroenterology and

18    practiced medicine for 23 years before selling his

19    practice in 2009.

20    Did I read that correctly, sir?

21    A.   Yes, you did.

22    Q.   Is that an accurate statement, sir?

23    A.   I practiced gastroenterology for 17 years.

24    MR. KANG:  Mr. Salazar, can we go to page 43 of

25    this document, sir.  And actually the next page.

1          And, Mr. Salazar, if you can highlight the first

2    paragraph under organization, please.

3          Q.   Do you see that paragraph, Dr. Mendolia?

4          A.   I do.

5          Q.   If I could read it.  Organization Medytox

6    Solutions, Inc.  Is that the Medytox that you have been

7    testifying about here today?

8          A.   Correct.

9          Q.   The same company that acquired the Labs starting

10   in 2011?

11         A.   Same company.

12         Q.   Okay.  And it states: Medytox Solutions, Inc.,

13   the company, was incorporated in Nevada on July 20, 2005

14   as Casino Players, Inc.  In the first half of 2011,

15   company management decided to reorganize the operations

16   of the company as a holding company to acquire and manage

17   a number of companies in the medical services sector.

18   Did I read that correctly, sir?

19         A.   You read that correctly.

20         Q.   And would you agree with me that prior to the

21   reorganization, Casino Players, Inc. was not a company

22   that was involved in the healthcare industry?

23         A.   That's correct.

24         Q.   It was a company that was involved in the

25   gambling industry, correct?

1      A.    Yes.  And owned by Bill Forhan.

2      Q.    Who was also the CEO of Medytox?

3      A.    Correct.

4      Q.    You would agree with me that the gambling

5      industry has nothing to do with clinical laboratories?

6      A.    Correct.

7      Q.    You testified, if I heard you correctly, that

8      one of the things that Medytox emphasized with the quick

9      turnaround time; is that correct?

10     A.    Correct.

11     Q.    And one of the benefits I believe that you said

12     that the Labs would provide is because of that quick

13     turnaround time, it would help facilities to be able to

14     catch patients, correct?

15     A.    To accurately treat their patients.

16     Q.    To catch the patients.  And When you said catch

17     patients, what did you mean by that?

18     A.    To see if they are telling the truth.

19     Q.    See if they are telling the truth?

20     A.    Yes.

21     Q.    So you would agree with me that using a test to

22     see if they're telling the truth, that's not using the

23     test to treat the patient, correct?

24     A.    No, that's inaccurate.

25     Q.    You would disagree with that?

1     A.    Yes, I would.

2     Q.    How would using a test to see if someone is

3   telling the truth, how would that aid in the treatment of

4   that patient, sir?

5     A.    Well, I mean, I think if the patient is not

6   being truthful with regards to what they are taking or

7   not taking, I think that's going to add further treatment

8   decisions for that particular patient.

9     Q.    And you're basing that on what?

10    A.    Common sense.

11    Q.    Common sense?

12    A.    Mm-hmm.

13    Q.    Okay.  Anything else that you are basing that

14  on?

15    A.    No.

16    Q.    Okay.  Not based on your clinical training?

17    A.    No.

18    Q.    Not based on reading any literature from ASAM?

19    A.    It's not necessarily required, no.

20    Q.    Not based on any reading of literature published

21  by the Department of Health and Human Services, Office of

22  Inspector General?

23    A.    I don't believe that that's necessary, no.

24    Q.    You don't believe it's necessary?

25    A.    Correct.

1    Q.   Because you think it's appropriate to use your

2    common sense?

3    A.    No.   Because if I had my own experience, taking

4    care of patients with substance abuse, whether it's

5    during my emergency room rotations or during internal

6    medicine experience or moonlighting in emergency rooms.

7    Q.   Are there any medical literature that you are

8    aware of that supports Your common sense on that, that

9    catching patients is a clinical reason to run drug tests?

10    A.   When you say catching patients, it's important

11    that as a treating physician that you rely on certain

12    tests to help treat the patient, because these patients

13    are very manipulative, as I mentioned before.   And you

14    need to have accurate objective data to treat these

15    patients.

16    Q.   Do you know someone named Jace Simmons?

17    A.   Yes.

18    Q.   Jace Simmons was the CFO of Medytox?

19    A.   He was the CEFO at the time, yes.

20    Q.   Chief Financial Officer?

21    A.   Correct.

22    Q.   He was the Chief Financial Officer during the

23    time that you were with Medytox, sir?

24    A.   Yes.

25    Q.   Just so I'm aware, when did you leave Medytox?

1    A.   I want to say somewhere around 2014, 2015.

2    Q.   And you joined Medytox when?

3    A.   Say 2010 or so.

4    Q.   And was Mr. Simmons the Chief Financial Officer

5  of Medytox, roughly, during the time that you were at

6  Medytox?

7    A.   For the majority of the time, yes.

8    Q.   And as CFO of the company, would you agree that

9  he would have general awareness of the company's

10  financial situation?

11    A.   Of course, as a CFO.

12    Q.   Aware of the company's billing practices?

13    A.   Yeah, of course.

14    Q.   Amount of money that's being collected?

15    A.   Sure.

16    Q.   Revenues?

17    A.   Sure.

18    Q.   Including where those revenues are coming from?

19    A.   Sure.

20    Q.   The amount that they billed?

21    A.   I would gather, yes.

22    Q.   Those are all fairly fundamental things that a

23  Chief Financial Officer of a company would generally need

24  to know, correct?

25    A.   Yes.

1          MR. KANG:  Mr. Salazar, can we put up Joint

2     Exhibit 132A.  And, Your Honor, this is a Joint Exhibit.

3          THE COURT:  Ladies and gentlemen -- 132A you're

4     saying.  Remember this morning I read those stipulations.

5     And I read a whole lot of ranges of exhibits that were

6     called Joint Exhibits.  And I think I might have

7     explained those were exhibits that both sides agreed

8     should be before you when you are deciding the case.  In

9     other words, they are in evidence full.

10          This is the first one that's actually going to

11     be shown to you, but you should understand that when a

12     lawyer says Joint Exhibit we're not going to stop and

13     maybe have discussion of should it come into evidence or

14     not.  It is in evidence.  I've already decided that.  And

15     that means it will be seen by you during -- it can be

16     seen by you during your deliberations.

17          So go ahead, sir.

18          MR. KANG:  Thank you, Your Honor.

19     BY MR. KANG:

20     Q.    Dr. Mendolia, do you see this page on Joint

21     Exhibit 132-A, sir?

22     A.    I do.

23          MR. KANG:  And, Mr. Salazar, if you can blow it

24     up to what you had earlier.

25     Q.    This is an email from Jace Simmons dated

1    December 10th, 2014, would you agree with me?

2        A.    Yes.

3        Q.    That's his email address, the

4    medytoxsolutionsinc.com?

5        A.    Yes.

6        Q.    And would you agree with me that the subject of

7    this email reads Medytox Accounting Position Memoranda?

8        A.    I can see that.

9        Q.    And it is addressed to a person name Richard

10   Sacher.  Do you see that, sir?

11       A.    I do.

12       Q.    And Mr. Sacher was a financial auditor of

13   Medytox during this time period, wasn't he?

14       A.    I do not recall.

15       Q.    Do you see the us.gt.com?

16       A.    I so see.

17       Q.    If I were to tell you that Richard Sacher was an

18   auditor with the firm of Grant Thornton, would you have

19   any reason to dispute that?

20       A.    I have no idea.

21       Q.    Would you agree with me that it would be

22   important for Medytox and Mr. Simmons to be truthful with

23   the company's financial auditor?

24       A.    Of course.

25       Q.    And do you see there's a number of attachments

1   to this email, sir?

2        A.    I can see that there are a number of

3   attachments.

4        Q.    The last one, attachment that's on this email,

5   would you agree with me it's called Memorandum to Bet

6   File Bad Debts?  Do you see that?

7        A.    I can see that.

8        Q.    And it says -- the body of the email reads:

9   Richard, as promised, attached are the Medytox accounting

10  position memoranda for the issues at-hand along with

11  supporting documentation.  We sincerely hope that Grant

12  Thornton will concur with our positions and we look

13  forward to your response within 24 to 48 hours.  Did I

14  read that correctly?

15       A.    Yes, you did.

16       Q.    The importance on this email is high, correct?

17       A.    I'm not sure.  I was not involved with this.

18       Q.    Would you agree it states importance high?

19       A.    That's what it states.

20            MR. KANG:  All right.  And if you can zoom up at

21  the top, the re and from.  Thank you, Mr. Salazar.

22       Q.    Do you see this document which is the next page

23  on Joint Exhibit 132-A?  This is a document titled

24  Memoranda to File Re Accounting For and Presentation of

25  Bad Debts, correct?

1    A.    Yes.

2    Q.    This appears it's consistent with the file that

3    was the attached to Mr. Simmons' email that we just saw

4    earlier, correct?

5    A.    I gather, yes.

6    Q.    Do you have -- and it states that it's from Jace

7    Simmons, CFO, correct?

8    A.    Yes.

9    Q.    Do you have any reason to doubt that this is a

10   memorandum written by Mr. Simmons?

11   A.    Based on its appearance, no.

12   Q.    Any reason, sitting here today, to doubt the

13   accuracy of anything that Mr. Simmons wrote in this memo?

14   A.    Again, based on its appearance, I don't have any

15   doubt.

16        MR. KANG:  Mr. Salazar, if you can scroll down

17   to the second page of this memorandum, sir.  And if we

18   can highlight the paragraph that starts as the company

19   has yet.

20   Q.    Dr. Mendolia, the memo here that's zoomed out

21   states:  As the company has yet to be able to bill

22   patients for their portion of the services rendered, the

23   total amount of such billings is included as a reduction

24   of revenue and any related bad debt provisions should

25   also be deducted from revenue.

1          Did I read that correctly, sir?

2     A.    You did.

3     Q.    And when he's saying the company, what company

4  is he referring to?

5     A.    Medytox.

6     Q.    And Medytox owns the three Labs in this case,

7  correct?

8     A.    Correct.

9     Q.    All right.  And the date of the email that this

10  memo was attached to we saw earlier was December 10,

11  2014, correct?

12     A.    Yes.

13     Q.    So would you agree with me that at least

14  according to this memo, as of December 10, 2014, the

15  company was not able to bill patients for their portion

16  of cost share?

17     A.    Based on what this memo states, yes.

18     Q.    And any reason to doubt that?

19     A.    No.

20     Q.    Okay.  And you would agree with me that

21  Mr. Simmons, the CFO, says that as a result, the total

22  amount of such billings is included as a reduction of

23  revenue, correct?

24     A.    That's the statement.

25     Q.    And written off as bad debt?

1    A.   That's the statement that's being read here.

2    Q.   Okay.  And, in fact, that's the title of his

3  memo, right?  It's writing accounting provisions to write

4  off as bad debt?

5    A.   That's what it states.

6         MR. KANG:  You can take that down, Mr. Salazar.

7  By MR. KANG:

8    Q.   Did you have any involvement in submitting bills

9  to insurance on behalf of the Labs?

10   A.   No, I did not.

11   Q.   Were you involved in any collection of

12  collection of patient cost-share?

13   A.   No, I did not.

14   Q.   You don't know whether the Labs collected any

15  money from patients whose tests are at issue in the case

16  from 2012?

17   A.   That was not my purview.

18   Q.   Or 2013?

19   A.   That was not my purview.

20   Q.   Same with 2014 and 2015 I assume is correct?

21   A.   Correct.

22   Q.   You are not employed with the Labs after when?

23   A.   I believe it was 2015.

24   Q.   You wouldn't know about the Labs' collection

25  after 2015?

1      A.   I did not get involved with that.

2           MR. KANG:  Mr. Salazar, can we put up Exhibit

3      2018?

4           Your Honor, this is a Cigna exhibit that has no

5      objection from the Labs.

6           THE COURT:  All right if that's so it may be

7      published to the jury and we'll mark it as a full

8      exhibit.  Cigna 2018.

9      By MR. KANG:

10          Q.   Do you see that document, sir?

11          A.   I do.

12          MR. KANG:  Mr. Salazar, can we scroll to the

13     bottom, please, of the second page.

14          BY MR. KANG:

15          Q.   With these email strings the last page is

16     actually the first email, right?

17          A.   I see that.

18          MR. KANG:  Mr. Salazar, could we zoom in on that

19     last email from Ms. Hollis.

20     BY MR. KANG:

21          Q.   Dr. Mendolia, I know this is after you left the

22     company dated October 31, 2016, correct?

23          A.   Correct.

24          Q.   But it's from Sharon Hollis, yes?

25          A.   It is.

1      Q.   It is to two ladies, one is Dolores Brennan and

2  the one is to Susann Garvey.  Do you see that?

3      A.   I do.

4      Q.   Do you know who Dolores Brennan and Susann

5  Garvey were?

6      A.   I'm only presuming they worked for Medical

7  Billing Choices --

8           THE COURT:  You shouldn't presume, sir.  You

9  need to testify on your own knowledge.

10     A.   I don't recall their names.

11     Q.   Do you recognize their email addresses however?

12     A.   I do.

13     Q.   And Medical Billing Choices I think you were

14 saying was the billing company that Medytox used?

15     A.   Correct.

16     Q.    And that was the company that Mr. Nicholson was

17 the successor company to his ARC Billing Company,

18 correct?

19     A.   Yes.

20     Q.   And in the email Ms. Hollis says, "We

21 immediately need a full report on patient statements

22 specifically for Cigna patients," correct?

23     A.   That's what it says.

24           MR. KANG:  And Mr. Salazar, if you can zoom out

25 of that and go to the first email in the first page.  And

1    zoom in there.

2    BY MR. KANG:

3        Q.   So now this is still on October 31, 2016.

4    Ms. Brennan's response to the email we saw, correct?

5        A.   Yes.

6        Q.   And it attaches a document that's titled "2014

7    Cigna PTPM PYMNTS.XLSX," correct?

8        A.   I see that.

9        Q.   And Ms. Brennan writes, "Sharon, here is the

10   first report for 2014," yes?

11       A.   Correct.

12       Q.   So it appears to attach this Excel file,

13   correct?

14       A.   Correct.

15           MR. KANG:  Can we put this down, Mr. Salazar and

16   put up Exhibit 2019.

17           THE COURT:  That's your exhibit?

18           MR. KANG:  Cigna 2019 with no objection.

19           THE COURT:  No objection, then it may be

20   published to the jury.

21           MR. KANG:  Thank you.

22           This is very small.  I apologize, but the chart

23   here at the top if you can zoom in at the top left corner

24   Mr. Salazar.

25   BY MR. KANG:

1       Q.   It's titled "2014 Cigna, PT PYMNTS"?

2       A.   I see that.

3       Q.   That was the same name of a Excel attachment

4    that we saw in the email, correct?

5       A.   I see that.

6       Q.   If you can zoom out of there.  And there are a

7    number of columns at the top, correct?  In this Excel

8    spreadsheet?

9       A.   I can see that.

10          MR. KANG:  Mr. Salazar is there away you can

11   zoom in for Dr. Mendolia convenience?

12   BY MR. KANG:

13      Q.   There's a number of columns.  Patient account

14   number, Patient name, provider of service, referrer

15   practice name, primary insurance carrier, Box 24 DCPT

16   code, modifier codes and data service.  Those are some of

17   them, right?

18      A.   Correct.

19          MR. KANG:  And if you could then Mr. Salazar,

20   zoom in on the others.

21   BY MR. KANG:

22      Q.   Continuing on there's date entered --

23          MR. CUNNINGHAM:  Objection, Your Honor, there's

24   no testimony that he's familiar with this document or

25   seen this document before today.

1          THE COURT:  Do you claim it, sir?  He said he's

2    not involved in billing.  He has to have personal

3    knowledge to testify to something.  I think he said he

4    hasn't seen the document.  I don't think you can

5    cross-examine him about the document and his answer looks

6    like that.  I don't know.

7          MR. KANG:  All right.

8      A.   I'm corroborating what you are stating here on

9    this document.  I have never seen this document before.

10          THE COURT:  That is all right, sir.  There's no

11    question pending.

12          MR. KANG:  That's fine, Your Honor. I will move

13    on.

14          THE COURT:  Can I just ask what number that was,

15    the beginning of it?

16          MR. KANG:  2019.

17          THE COURT:  You will understand why I ask when

18    we have a break.  Go ahead.

19    BY MR. KANG:

20      Q.   Dr. Mendolia, the Labs had no contact with the

21    patients when testing services were performed, correct?

22      A.   Correct.

23      Q.   Patients did not physically come in to the labs

24    to provide urine specimens, correct?

25      A.   No.

1    Q.   The urine samples were shipped to the Labs to be

2    tested, correct?

3    A.   Actually, we had our own fleet of cars that were

4    wrapped and he were proud of that went to the facilities

5    to collect the specimens and bring back to the

6    laboratory.

7    Q.   Did your Labs see patients and have patient

8    encounters when they went to pick those up?

9    A.   Not at all.

10    Q.   The Labs relied on something called a patient

11    consent form?

12    A.   Yes.

13        MR. KANG:  Could we put up Joint Exhibit 163?

14        THE COURT:  Is there objection to 163?

15        Don't publish to it the jury, Liana.

16        MR. KANG:  Joint 163.

17        THE COURT:  I didn't heard that.

18        If it is Joint you may publish, Liana, please.

19        MR. KANG:  Mr. Salazar, could you go to the

20    second page?

21    BY MR. KANG:

22    Q.   This is an example of a patient consent form,

23    correct?

24    A.   Appears to be, yes.

25    Q.   This is a form that the Labs relied on?

1    A.    I'm sorry, say that again.

2    Q.    This is a form that the Labs relied on?

3    A.    For patient consent, yes.

4    Q.    This is a form that the Labs created, sir?

5    A.    Yes.

6         MR. KANG:  And if we can zoom in, Mr. Salazar,

7    on the consent section.

8    BY MR. KANG:

9    Q.    The form reads, "I voluntarily consent to the

10   collection and testing of my specimen.  I voluntarily

11   consent to the testing as of today's date and all further

12   testing done by this laboratory unless I give the

13   laboratory written notice that I have revoked consent."

14        Did I read that correctly?

15   A.    Yes, you did.

16   Q.    So this was the form used by the Labs to obtain

17   patient consent, yes?

18   A.    It was used by the treating physician's office

19   or center for the, for this specimens to be sent to our

20   laboratory.

21   Q.    It's a form that Medytox created?

22   A.    Medytox created, yes.

23   Q.    And sent to the treating physician?

24   A.    Correct.

25   Q.    This form and obtaining consent in this way was

1  the only manner that the Labs obtained a consent from the

2  patient, correct?

3      A.   Correct.

4      Q.   Again the parties would not have come into the

5  lab's facility to physically sign this form, correct?

6      A.   Correct.

7      Q.   They would have been signed when they were at

8  the treatment center?

9      A.   Correct.

10     Q.   Was anyone, to your knowledge, from the Labs

11 physically present while the patients were signing these

12 consent forms?

13     A.   No.

14     Q.   Do you have any personal knowledge as to who

15 signed patient consent forms?

16     A.   No, I don't.

17     Q.   Would you agree as a practicing physician for

18 over two decades it is important to obtain consent from

19 the patient before a provider performs services?

20     A.   Before a provider performs service, yes.

21     Q.   It would be improper, I'm sure you would agree,

22 for a laboratory to run drug tests on a patient who had

23 not consented?

24     A.   It would be improper for a provider to not be

25 able -- if they did not get consent from a patient to not

1    proceed with their appropriate testing.

2            MR. KANG:  Can we put this down and,

3    Mr. Salazar, can we go to Cigna exhibit 372.

4            This is a document, Your Honor, that there's no

5    objection.

6            THE COURT:  All right.  No objection, Cigna 372

7    may be published to the jury.

8    BY MR. KANG:

9        Q.   Do you recognize this document?

10       A.   I do not.

11       Q.   Would you agree it states at the top, "Exhibit D

12   part three, Cigna unpa, unpay"?

13       A.   I can see that.

14           MR. CUNNINGHAM:  Objection.  He testified he

15   doesn't recognize the document.

16           THE COURT:  Yeah.

17           If you'd like him to stop we can read it, but I

18   don't know asking him questions has any relevance as he

19   hasn't seen it.  If you asked him, Did he received it

20   when he was -- anything like that to give him some

21   connection to the document that would be helpful before

22   you start asking him the contents.

23           MR. KANG:  How about I ask it this way, Your

24   Honor.

25   BY MR. KANG:

1    Q.   Do you see the one column that says "consent on

2    file," Dr. Mendolia?

3    A.   I can see that.

4    Q.   Do you have any knowledge as to what that refers

5    to?

6    A.   Likely eludes to the consent we just spoke

7    about.

8    Q.   That would mean the patient consent forms?

9         MR. CUNNINGHAM:  Objection calls for specific.

10        MR. KANG:  He just testified --

11        MR. CUNNINGHAM:  He said "likely."

12        THE COURT:  Gentleman, you are not having a

13   conversation.  You are talking to me.  When I want to

14   hear from the other fellow I will indicate that.  Thank

15   you.

16        Objection sustained.

17        MR. KANG:  Can we put that down, Mr. Salazar and

18   put up Exhibit 16, Cigna Exhibit 16.

19        THE COURT:  Any objection?

20        MR. KANG:  This is no objection.

21        THE COURT:  All right then it may be published

22   Cigna Exhibit 16 is a full exhibit.

23   BY MR. KANG:

24   Q.   You testified earlier, Dr. Mendolia, about

25   orders that the doctors would send to the Labs to run the

 1    tests, correct?

 2        A.    Correct.

 3            MR. KANG:   And if you could go, Mr. Salazar, to

 4    page 3 and 4 of this document.

 5    BY MR. KANG:

 6        Q.    Do you recognize this document, sir?

 7        A.    I have seen it in the past.

 8        Q.    And this document is called recurring provider

 9    acknowledgment and consent form, correct?

10        A.    Yes.

11        Q.    And you can see the logo on the side says "PB

12    Laboratories a Medytox owned laboratory" do you see that?

13        A.    Yes.

14        Q.    Would you agree with me this is a form that the

15    Labs created?

16        A.    Yes.

17        Q.    Medytox created it?

18        A.    Correct.

19        Q.    This was a form that the Labs created to send to

20    the doctors to order tests, correct?

21        A.    Correct.

22        Q.    So the order form that the doctors used to place

23    order at the labs those were order formed created by

24    Medytox, correct?

25        A.    Yes.

1    Q.    And if you see on here it states "salesperson";

2  is that right?

3    A.    Where is that?

4    Q.    Up at the top there.

5    A.    Yes.

6    Q.    What's a salesperson?

7    A.    The person that was responsible for connecting

8  the provider to the laboratory.

9    Q.    That's Medytox employee?

10   A.    Yes.

11   Q.    Also referred to as account executives?

12   A.    I don't recall.

13   Q.    And then it says "facility name" what does that

14  mean?

15   A.    It would be the name of the facility from which

16  the specimens came from.

17   Q.    Like the treatment center?

18   A.    That would be an example, yes.

19   Q.    And then the address city state and zip was that

20  the address city, state and zip for the facility?

21   A.    For the facility.

22   Q.    Not for the patient?

23   A.    Not for the patient.

24        MR. KANG:  Can you zoom back out, Mr. Salazar,

25  and go to the bottom there.

1   BY MR. KANG:

2       Q.   And you see here there's a signature line at the

3   bottom, right?

4       A.   Yes.

5       Q.   For the provider to sign?

6       A.   Yes.

7       Q.   Is that the doctor?

8       A.   Correct.

9       Q.   And the doctor is the doctor, presumably, at the

10  facility?

11      A.   Yes.

12      Q.   And if you can zoom pack out.  This is an order

13  form for blood testing, correct?

14      A.   There are some blood tests, there's urine

15  analysis testing, there's stool testing, there's cultures

16  from urine, from throat, from wounds cultures, etc.,.

17      Q.   Do you see anywhere on this sheet that indicates

18  a patient's name?

19      A.   Can you scroll up?

20      Q.   Sure.

21      A.   No, I do not.

22      Q.   No field for a patient name?

23      A.   No.

24      Q.   No?

25      A.   No, I don't see that.

1    Q.    Mr. Salazar?

2    A.    However I do see.  Can you go back and highlight

3    that again please?

4    Q.    Sure.

5    A.    Scroll down.  Keep going, bottom right

6    creatinine clearance, height, weight, pounds that would

7    pertain to the patient.

8    Q.    Anywhere that says patient name?

9    A.    No.  There's no entry for a name.

10    MR. KANG:  Could you go to the next page, sir.

11    Mr. Salazar.

12    BY MR. KANG:

13    Q.    This is another recurring provider acknowledge

14    and consent form, correct?

15    A.    Correct.

16    Q.    And would you agree with me this is for urine?

17    A.    Yes, it is.

18    Q.    All right.  And again at the top, you can see

19    this is a form that Medytox created, correct?

20    A.    Yes.  On behalf of PB Labs.

21    Q.    And if you see there's about 24 substances along

22    what's called a drug class menu, do you see that?

23    A.    Correct.

24    Q.    There's 24 substances; is that right?

25    A.    Correct.

1    Q.   Are those all the substances that is the PB

2   Labs' machines were capable of running tests on?

3    A.   As I recall, yes.

4    Q.   You see things like barbiturates, correct?

5    A.   Yes.

6    Q.   Bath salts, right?

7    A.   Correct.

8    Q.   K2 Spice.  Do you know what K2 Spice is?

9    A.   A substance that was being abused at the time.

10    Q.   PCP?

11    A.   Yes.

12        MR. KANG:  And, Mr. Salazar, if you can zoom

13   back out and go to the bottom.

14   BY MR. KANG:

15    Q.   Do you see on there, sir, like the form we saw

16   before there's a line for provider signature, right?

17    A.   Yes.

18    Q.   And the same question, do you see anywhere on

19   this document any fields for the name of a patient?

20    A.   Not to this document.

21    Q.   Again this is a document that Medytox created

22   for the doctors to fill out, yes?

23    A.   That's one of the documents, yes.

24    Q.   You were asked some questions on direct about

25   sales.  Do you remember that sales and marketing division

1    of Medytox?

2         A.    Yes.

3         Q.    And you weren't involved in that, correct?

4         A.    I was not.

5         Q.    Do you know someone named Steve Ziemian?

6         A.    Yes.

7         Q.    Who is Steve Ziemian?

8         A.    He was a salesperson.

9         Q.    He was the one that oversaw the sales and

10   marketing department of Medytox, correct?

11        A.    At one point, yes.

12        Q.    And we saw earlier that there was a name a field

13   in there for salesperson on these order forms, correct?

14        A.    Correct.

15        Q.    Those were for salespeople from Medytox,

16   correct?

17        A.    Yes.

18        Q.    And do you know how these sales

19   people -- -- strike that.

20             Do you know what the qualification requirements

21   were to the salespeople?

22        A.    I don't recall.

23        Q.    Do you know how those salespeople would get

24   paid?

25        A.    I don't recall that either.

1    Q.   If I were to tell you that they got paid partly

2    on salary, but mostly on commission would that be

3    something that you would have reason to dispute?

4    A.   I don't recall.

5    Q.   Do you know, sir, if there were any conflict of

6    interest safeguards in place about who could not be a

7    salesperson at Medytox?

8    A.   I don't recall that.

9    Q.   Do you think it would be proper, for example,

10   for a doctor to be sending urine sample referrals to the

11   Labs while at the same time getting paid by a lab as a

12   salesperson.  Do you think that would be proper?

13   A.   A physician?  Can you restate that please?

14   Q.   Sure.  Would it be appropriate in your mind for

15   a doctor to be sending urine sample to the lab to be

16   processed while at the same time that doctor being

17   employed as a salesperson at the Labs?

18        MR. CUNNINGHAM:  Objection, Your Honor.  Calls

19   for expert testimony from non-expert witness.

20        THE COURT:  I can't rule on an objection if I

21   don't know what you mean by "appropriate" in that

22   context.  It's not appropriate for me to burn my bacon in

23   the morning, but it's also not appropriate as a lawyer to

24   lie to the court.  There's different context of what's

25   appropriate.  So I'm afraid, if you can maybe clarify

1    that then I could, if there's further objection, I can

2    address it.

3         MR. KANG:  Sure.

4    BY MR. KANG:

5    Q.   Dr. Mendolia, as a doctor, would you think it

6    would be appropriate for you to send urine samples to a

7    lab while at the same time being employed as salesperson

8    of that lab?

9    A.   I think that would not be appropriate.

10   Q.   Why?

11   A.   As a treating physician, to send a specimen to a

12   laboratory and then be compensated by that laboratory,

13   that's not the right thing to do.

14   Q.   How about if a person co-owned a treatment

15   center, to send a bunch of referrals to the labs while at

16   the same time having one of the co-owners employed as a

17   salesperson.  Would that about appropriate?

18        MR. CUNNINGHAM:  Objection, Your Honor, calling

19   for expert testimony.

20        THE COURT:  I'm not sure that he's indicated

21   knowledge of the sales area, for example, even of his own

22   company.

23        MR. CUNNINGHAM:  It was also improper --

24        THE COURT:  Sir, remember?  Remember?

25        MR. CUNNINGHAM:  I'm sorry.

1           THE COURT:  The other half of the equation there

2    was not as a doctor I think it was somebody involved with

3    a treatment center.  I didn't think it was a doctor.  If

4    I misunderstand, you have to tell me.

5           The objection is sustained.

6    BY MR. KANG:

7        Q.   Have you ever heard of Alan Bostom?

8        A.   Can you repeat that?

9        Q.   Alan Bostom, B-O-S-T-O-M?

10       A.   No, I don't recall.

11       Q.   Have you heard of a facility called Angels

12   Recovery?

13       A.   I recall that name.

14       Q.   Why do you recall that name?

15       A.   Just as a client.

16       Q.   It was a large client of Medytox?

17       A.   I don't recall that.

18       Q.   If I were to tell you it was would you have any

19   reason to dispute that?

20       A.   I guess.

21       Q.   If I were to tell you Alan Bostom was a co-owner

22   of Angel Recovery would you have any reason to dispute

23   that?

24       A.   I have no idea.

25       Q.   If I were to tell you Alan Bostom was a

1    salesperson with the Labs, do you have any reason to

2    dispute that?

3         A.   I don't recall.

4              MR. CUNNINGHAM:  Objection, lack of foundation.

5              THE COURT:  A little bit late but I would

6    sustain and strike the answer.

7              MR. KANG:  Could we put up Joint Exhibit 37

8    please.  I'm sorry, Your Honor, this is Joint 37.

9              May we publish?

10             THE COURT:  Yes, you may.

11             Any time it's Joint, Liana.  If he says Joint,

12   publish it right away to the jury.  It's already in

13   evidence.  That's 37 Joint.  You should mark it as such

14   in the system as well, any Joint that's used.  Sorry.

15   BY MR. KANG:

16        Q.   Dr. Mendolia, this is a one-page email string

17   that has your name on it, correct?

18        A.   Yes, it does.

19             MR. KANG:  Let's starts at the bottom if we

20   could, Mr. Salazar.

21   BY MR. KANG:

22        Q.   It starts with an email from Mike Nicholson to

23   Seamus Lagan to you to Jase Simmons and Bill Forhan,

24   correct?

25        A.   Yes.

1    Q.   And the date a Tuesday, May 28t of 2013, yes?

2    A.   Yes.

3    Q.   And it subject is "bad news from Cigna."  Did I

4    read that correctly?

5    A.   Yes.

6    Q.   And it states "per the attached letter we

7    received from Cigna today effective August 19, 2013, they

8    are going to go to the Medicare code G0431 and no longer

9    will pay code 80101.  This code can only be bill once per

10   patient encounter, unlike the 80101 which we could bill

11   out for each drug class."  Did I read that correctly?

12   A.   Yes, you did.

13   Q.   These codes -- these are different codes that

14   would be billed to do an insurance company like Cigna to

15   be paid, correct?

16   A.   Correct.

17   Q.   And 80101 is a code that is used for qualitative

18   drug screens, correct?

19   A.   I don't recall.

20   Q.   Based on this email would you agree with me,

21   that 80101 previously could be billed out for each drug

22   class, yes?

23   A.   Based on this statement, yes.

24   Q.   And is that means that 80101 before this change

25   could be billed multiple times per patient encounter,

1    right?

2         A.    Based on this statement, yes.

3         Q.    But you learned in this email from

4    Mr. Nicholson, did you not, that Cigna was now changing

5    at code to something called G0431?

6         A.    That's what it states.

7         Q.    With this new G0431 is that could only about

8    billed one time per patient encounter, correct?

9         A.    Again that's what it states.

10        Q.    Again not multiple times like the 80101?

11        A.    That's what it states.

12        Could you scroll up a little bit.  And Mr. Lagan

13   responds quote "That finishes the POLs for all these

14   facilities too."  Do you know what POLs refers to?

15        A.    Physician Office Laboratories.

16        Q.    He states "Means that the only real business

17   will be the confirmation business," correct?

18        A.    Correct.

19        Q.    And I believe you testified earlier about

20   confirmatory tests, correct?

21        A.    Yes.

22        Q.    Did you understand Mr. Lagan when he's referring

23   to confirmation business meaning the business of the

24   bills for confirmatory tests?

25        A.    Yes.

1    Q.   So based on this, Mr. Lagan's was saying that

2    the real business, the real revenue would be from the

3    confirmation sides of house, correct?

4    A.   Yes.  I think it was also saying this finishes

5    the POLs for these facilities as well, meaning the

6    facilities at times depending on a facility they would

7    purchase equipment to perform their own testing.

8    Q.   And the code for -- the code for qualitative

9    tests had previously been 80101.  We saw that, right?

10    A.   You said that I'm not billing expert.  I don't

11    recall that.

12    Q.   80102 do you recall being a code for

13    confirmatory tests?

14    A.   I don't.

15    Q.   Let's take a look at the next email.

16    MR. KANG:  If we can see the top email, Mr.

17    Salazar.

18    BY MR. KANG:

19    Q.   So the last email on this string, Mr. Lagan --

20    I'm sorry, Mr. Nicholson says, "Yes, sir, the 80102 is

21    not effected," did I read that correctly?

22    A.   Yes, you did.

23    Q.   Is it fair to say that unlike the qualitative

24    screens where there was a limit, the confirmatory tests

25    there was still no limit on the number of tests that can

1   be billed?

2        MR. CUNNINGHAM:  Objection, lack of foundation.

3   He said he didn't know what either of those codes mean.

4        THE COURT:  I don't see the foundation to ask

5   them a question.

6   BY MR. KANG:

7        Q.   Do you know?

8        A.   Can you repeat the question?

9        THE COURT:  You can ask him does he know that.

10  BY MR. KANG:

11       Q.   Do you know whether the confirmatory tests had a

12  limit based on this email string?

13       A.   I can't conclude that, no.

14       Q.   The email does say though that the 80102 code is

15  not effected, correct?

16       A.   That's what it states.

17       MR. KANG:  Could we see Joint Exhibit 159 A, Mr.

18  Salazar.

19       THE COURT:  You may publish it.

20       MR. KANG:  Thank you.

21       If we can zoom up to the top portion of that

22  letter, sir.

23  BY MR. KANG:

24       Q.   Dr. Mendolia, this is a letter from Cigna

25  addressed to do PB Labs, correct?

1    A.    Appears to be.

2    Q.    It's dated May 22nd of 2013?

3    A.    Correct.  I can see that.

4    Q.    Would you agree with me that this letter is

5    dated six days before the emails that we just saw?

6    A.    Yes.

7    Q.    And the email that Mr. Nicholson had written was

8    called a "bad news from Cigna" referencing an attached

9    letter that we received today from Cigna, correct?

10    A.    Yes.

11    Q.    Any reason to doubt that this is the letter that

12    Mr. Nicholson was referring to?

13    A.    I don't.  I don't have any doubts.

14    Q.    And the subject line of this is "re: qualitative

15    drug screen reimbursement policy," do you see that?

16    A.    Yes.

17    Q.    That refers to the drug screens, yes?

18    A.    Yes.

19    Q.    Not the confirmatory tests, correct?

20    A.    Yes.

21    Q.    The first paragraph states, "We routinely review

22    our administrative policies and coverage positions.  As a

23    result of recent review we're updating our code edit

24    policy with guidelines for qualitative drug screen

25    testing effective August 19, 2013.  The policy is in

1    accordance with recommended updates from the centers for

2    Medicare and Medicaid, C M S."  Did I read this

3    correctly?

4         A.   Yes.

5         Q.   But would you agree this is notice Cigna is

6    providing to PB Labs updates regarding its code edit

7    policy that would be effective August 19th of 2013?

8         A.   That's what it states.

9              MR. KANG:  Mr. Salazar, can you highlight the

10   next paragraph please.

11   BY MR. KANG:

12        Q.   And the letter goes on to explain what this

13   means to you. Did I read that correctly?

14        A.   Yes.

15        Q.   It states "Qualitative drug screen testing

16   submitted under our own C P T 80100, 80101 and 80104 will

17   no longer be reimbursed."  Did I read that correctly,

18   sir?

19        A.   Yes, you did.

20        Q.   Would you agree with me that this is consistent

21   with an email that Mr. Nicholson sent to you and to Mr.

22   Lagan and Mr. Simmons and Mr. Forhan confirming that

23   Cigna would no longer reimburse for 80101?

24        A.   Yes.

25        Q.   The Labs were aware of this reimbursement policy

 1    back in May of 2013, correct?

 2        A.    Correct.

 3            MR. KANG:  One minute, Your Honor.  No further

 4    questions, Your Honor.

 5            THE COURT:  All right, sir.  We have discussed

 6    redirect.  Not seeing you up to push it, so.

 7            You're excused, Dr. Mendolia.  You may step

 8    down.

 9            And you can call your next witness, Labs I mean.

10            MR. CUNNINGHAM:  The Labs call Stephanie Canto

11    who is a Cigna employee.

12            THE COURT:  Ms. Canto, if you would come up to

13    the witness stand when you arrive I ask that you remain

14    standing so the clerk may administer an oath to you.

15                        STEPHANIE CANTO

16    Having been called as a witness, was first duly sworn and

17    testified on his/her oath as follows:

18            THE WITNESS: Yes.

19            THE CLERK:  Please be seated.

20            Please state your name for the record.  Spell

21    your last name.

22            THE WITNESS:  Stephanie Lynn Canto, C A N T O.

23            THE COURT:  You may proceed, sir.

24            MR. CUNNINGHAM:  Thank you, Your Honor.

25    DIRECT EXAMINATION BY MR. CUNNINGHAM:

1      Q.   Ms. Canto, how are you this afternoon?

2      A.   I'm well, thank you.  How about yourself?

3      Q.   I'm doing well, thank you.

4           We met previously, have we not?

5      A.   I wouldn't say recently, but we have met before,

6      yes.

7      Q.   I took your deposition, right?

8      A.   Yes, you did.

9      Q.   Twice?

10     A.   Yes, you did.

11     Q.   I think it was almost exactly two years ago.

12     Does that sound about right to you?

13     A.   Approximately, yes.

14     Q.   Okay.  Thank you.

15          Now, I'm going to cut right to it, Ms. Canto.

16     You were an investigator for the Cigna Special

17     Investigation Unit in the time period from 2014 to 2018,

18     correct?

19     A.   No.  At that time I was a Senior Investigator.

20     But prior to 2014, I was considered an investigator only.

21     Q.   My recollection is that you started with Cigna

22     in the year 2000?

23     A.   Yes.  With Cigna, 2000.

24     Q.   Can you tell us what you did after high school

25     before you went to work for Cigna?

1      A.    I held other full-time jobs.  I was an operator

2  for a phone answering service for a period of time.  I

3  was a deli manager at a local gas station.  And I also

4  was working with Xerox as a mail courier and copy machine

5  worker.

6      Q.    And when you went to work with Cigna in

7  approximately the year 2000, what was your first job with

8  Cigna?

9      A.    I was a claim processor for the Health

10  Maintenance Organization claims.  HMO claims back then.

11      Q.    During the time you were with Cigna, did you

12  ever receive any training with regard to investigation of

13  claims that were submitted to Cigna?

14      A.    Not necessarily the investigation but, rather,

15  the detection of potential fraud, waste, and abuse.  We

16  were required to receive annual training with regards to

17  that topic.

18      Q.    You had never received any investigative

19  training before you went to work with Cigna, had you not?

20      A.    No, I had not.

21      Q.    I want to talk to you about your involvement in

22  the matters related to this case that we're here to talk

23  about or that we're here in trial on.

24         Let's talk about, first, your review of Palm

25  Beach Labs.  Do you have a recollection of that, ma'am?

1    A.    Yes, I do, sir.

2    Q.    Did you have a chance to review your deposition

3    before you came to testify?

4    A.    I wasn't focused on my deposition.  I was

5    focused on preparing for trial, which included a thorough

6    review of my cases.

7    Q.    And did you review your case ledger?

8    A.    Are you referring to my case notes?

9    Q.    Wherever you documented the activity you

10   performed.

11   A.    Yes, I did perform a review of our Case

12   Management System which houses my Investigative Log.

13   Q.    And did you review your entire Case Note System?

14   A.    To the best of my abilities, I did.

15   Q.    Over how many years did you investigate any and

16   all of these labs?

17   A.    Are you referring to the three here?

18   Q.    Yes, ma'am.

19   A.    I believe that my investigations were between a

20   year and a half to two years or so.

21        MR. CUNNINGHAM:  Okay.  Mr. Smeig, can we put up

22   Joint Exhibit 4?

23        THE COURT:  That's a full exhibit.  It may be

24   published.

25   Q.    I would like to go to the bottom of page 2.

1          What I want to ask you about first, ma'am, is do

2     you recall when you began your investigation?

3          A.    Which investigation, sir?

4          Q.    Of Palm Beach Labs?

5          A.    I believe it was approximately the spring of

6     2013.

7          Q.    Okay.  Do you see at the very bottom of the page

8     there it says Patrick Hurley, June 20, 2013, referral

9     assigned for investigation to Stephanie Canto?

10         A.    Yes, I do see that highlighted.

11         Q.    Does that refresh your memory as to when

12    actually were assigned the investigation?

13         A.    I believe that would have been the true

14    assignment date, yes.

15         Q.    And that was the investigation solely of Palm

16    Beach Labs at that time, correct?

17         A.    I believe so, yes.

18         Q.    Was Patrick Hurley the head of the SIU Division

19    at that time?

20         A.    No.  At that time he was my direct manager.

21         Q.    So he's the one that assigned the investigation

22    to you to begin on June 20, 2013, correct?

23         A.    Yes, based on this highlighted statement.

24         Q.    Did you simply misremember when you said you

25    thought you started the investigation in the spring of

1    2013?

2        A.    No.  We often have a workup prior to a case

3    being assigned to an actual investigator.  We have a team

4    that is called our intake or support team.  And they are

5    responsible for reviewing each and every referral that

6    our department gets.  And so a referral can come in

7    months before it's actually assigned to an investigator

8    to pursue further.

9        Q.    Now, was it a requirement in the SIU at Cigna

10   that you keep a detailed ledger of any healthcare

11   provider that you were reviewing?

12       A.    We would be responsible to have a case log that

13   would contain all of our investigative notes.

14       Q.    Would you agree with me that if you did not put

15   something in your case log, for all intents and purposes,

16   it didn't happen?

17       A.    Yes, I would say that.  We oven hear that

18   phrase, if it's not documented, it didn't happen.

19       Q.    So you understood that your responsibility was

20   to document any significant activity in that Claim Log,

21   correct?

22       A.    I'm sorry, can you repeat the full question?

23       Q.    Sure.  You agree with me that it was your

24   understanding that you were to document any significant

25   activity with respect to investigation in that Case Log?

1      A.   Yes, that's correct.

2          MR. CUNNINGHAM:  Can we go to Joint Exit 146-A,

3    please, Mr. Smeig.

4      Q.   Do you see that in front of you, ma'am?

5      A.   Yes.  Am I looking for a particular area, sir?

6      Q.   Not yet.  I will direct you in just a moment.

7    But I just wanted to make sure you recognize that as an

8    the entry in your Case Log or in your case notes?

9      A.   Yes.

10     Q.   Okay.  So, ma'am, let me ask you first.  Would

11   you agree with me that when you look at those case notes,

12   the case notes do not begin until August 6 of 2013,

13   correct?

14         MR. CUNNINGHAM:  Can you zoom in on that,

15   please.  Thank you, sir.

16     A.   Can this scroll all the way down so I could

17   confirm the dates?

18     Q.   How far down do you want to go?

19     A.   However far this document is.

20         THE COURT:  All the way she said.  To the

21   bottom.

22         MR. CUNNINGHAM:  Okay.

23   BY MR. CUNNINGHAM:

24     Q.   Would you like us to scroll back up?

25     A.   Yes.  I'm trying to confirm the date you

1    mentioned.

2          MR. CUNNINGHAM:  Okay.  Can you please scroll

3    back up, Mr. Smeig.

4        A.    I'm sorry.  Can you repeat your question again

5    now, please?

6        Q.    Sure.  My question was simply what is the date

7    on which your case notes reflect that you began your

8    investigation?

9        A.    Well, these case notes appear to be quite

10   sometime after I originated by investigation.  My

11   investigation into PB Labs started in 2013 and the time

12   stamp of these particular notes are the following year.

13         MR. CUNNINGHAM:  Okay.  Can we go to Joint

14   Exhibit 7.

15         THE COURT:  I may be published.  Joint Exhibit 7

16   is a full exhibit.

17         MR. CUNNINGHAM:  Page 2 of that, please, sir.

18   Thank you.  Please go back up one page, sir.

19       Q.    Now, ma'am, when I refer to the word flag, do

20   you know what that word means at Cigna?

21       A.    Yes, I do.

22       Q.    What is a flag?

23       A.    A flag is a term that we use in our department

24   when we are taking action in some form of either stopping

25   a claim, denying a claim, or requesting a claim for

1   various levels of information.

2       Q.   And once a claim is flagged, what happens to

3   payment of that claim?

4       A.   The payment can be held for a variety of

5   reasons, depending upon the flag protocol or the flag

6   language.

7       Q.   And once a particular healthcare provider is

8   flagged, would you agree with me that no further claims

9   from that healthcare provider are going to be paid until

10  that flag is resolved?

11      A.   No, not necessarily.  As I mentioned, we may

12  have various types of flag protocols.  And sometimes we

13  may be requesting information, sometimes we may be

14  denying, and other times we may be paying.

15      Q.   Okay.  Ms. Canto, I will try to move this along

16  as quickly as possible.

17          Would you agree with me that you first flagged

18  Palm Beach Labs of July 18 of 2013?

19      A.   I believe that that would be an approximate date

20  of the first flag placed on this provider, yes.

21      Q.   And that was just a little bit past A month

22  after you had started your investigation of PB Labs,

23  correct?

24      A.   Yes.  And that had been a decision that I had

25  made due to some concerns that I had with regards to how

1    this Lab had been billing.  And the fact that I hadn't

2    had an opportunity to receive medical records as

3    requested at that time.

4         Q.   And the flag that you placed at that time was

5    what specifically?

6         A.   The flag stipulated that if this particular lab

7    billed for an unlisted procedure code, 80299, that

8    we would pend the claim and ask for medical records of

9    that particular service.  And then subsequently, in the

10   event that anything else was billed, those claims would

11   be paid.

12        Q.   And was the particular flag services not

13   rendered as billed?

14        A.   No. In the beginning of my investigation, the

15   first flag that was placed was to pend the claim and

16   request medical records only if that particular code had

17   been billed.  All other services were, in fact, being

18   paid.

19        Q.   And now when you flagged PB Labs, specifically

20   on July 18, 2013, you had not reviewed any medical

21   records for Palm Beach Labs at that point in time, had

22   you?

23        A.   No.  I attempted to request them and was unable

24   to receive complete medical records by the Lab.

25        Q.   But you placed a flag to stop payments from Palm

1    Beach Labs before you had reviewed a single medical

2    record, correct?

3        A.    Yes.  I had an obligation to our clients to

4    ensure that the services that their money was paying

5    were, in fact, supported.  And as a part of that support

6    process, I'm obligated to obtain information from the

7    providers to ensure that those services are rendered as

8    billed, medically necessary, and are accurately

9    represented.

10       Q.    But you certainly could have waited to place a

11   flag until you had actually reviewed some medical records

12   and determined that maybe the medical records didn't

13   satisfy your criteria, correct?

14       A.    At that particular point in time I felt it

15   prudent to pause and attempt to receive information.  A

16   client had come to our department requesting assistance,

17   expressing concerns about the Lab's billing of a

18   particular patient.

19       Q.    Ma'am, I asked you a yes or no question.  I'm

20   sorry.  I appreciate your explanation.  I asked you a yes

21   or no question.

22            THE COURT:  You have to ask me to instruct her.

23            MR. CUNNINGHAM:  I'm sorry, Your Honor.

24            THE COURT:  What he's trying to help you with is

25   that you have to listen to his question.  There may be a

1    lot you want to tell us, but right now he gets to ask the

2    question and that's all you answer.  So for the last

3    several answers you have been explaining things.  He's

4    asking you questions, I think for the most part,

5    certainly this one, could be answered yes/no.  And that's

6    what you have to do.  Yes/no.

7          Now, if you cannot answer a question yes/no,

8    then you say to the lawyer, I cannot answer it.  At that

9    point he has to decide is he going to rephrases it, is he

10   going to ask it a different way, or he's just going to

11   move on.  That's for him to decide.  But you can't -- the

12   only word I can use is give your explanation which, you

13   know, you probably want to do.  But that's not what he's

14   asked you to do.  Unfortunately, every witness has

15   trouble with this.  This is the way you work in the

16   world, you know, you talk to people, you explain things.

17   That's not the way of the courtroom.  I'ts question,

18   answer.

19          THE WITNESS:  Understood, Your Honor.  Thank

20   you.

21          THE COURT:  Okay, ma'am.  Go ahead, sir.  Sorry

22   to take so long, but it's the first time we've had this.

23   Go ahead.

24   BY MR. CUNNINGHAM:

25     Q.   Ms. Canto, what I'm simply asking you is this.

1    Isn't it true that instead of placing a flag before you

2    had reviewed even a single medical record, what you could

3    have you could have done is waited until you received

4    medical records and then, if there's a problem, you could

5    have placed a flag then?  Yes or no.

6        A.    I wouldn't be able to answer yes or no for that

7    question, sir.

8        Q.    Ma'am, have you ever heard the term shoot first

9    and ask questions later?

10       A.    I have heard that phrase, yes.

11       Q.    Isn't that what you did here?

12       A.    No, sir.  That was not what I had done here.

13       Q.    Didn't you judge Palm Beach Labs as somehow

14   violating Cigna's policies before you even reviewed a

15   single medical record?

16       A.    No, sir.  That was not my intent.  I was

17   attempting to receive information right out the gate,

18   sir.

19       Q.    But, ma'am, you decided to stop payment to PB

20   Labs for all claims when you had not even reviewed a

21   single medical record?

22       A.    That's incorrect, sir.  As I stated --

23            THE COURT:  You answered the question.  He gets

24   to ask the next one.

25       Q.    When you first placed a flag on PB Labs, you had

1   no evidence that PB Labs had done anything wrong, did

2   you?

3       A.   I did, sir.

4       Q.   You had an accusation that PB Labs had done

5   something wrong.

6       A.   I had received a referral from a client

7   expressing concerns.  I performed data analysis and

8   research.  And then I subsequently tried to request

9   information from the Lab.  When all of those led to no

10  further substantiation or support of the claims, I moved

11  forward with stopping those claims from paying and

12  requesting that information.

13      Q.   That's exactly right, ma'am.  You said you had

14  no further substantiation.  And that's my point.  You had

15  no evidence.  You had an allegation from one of your

16  subscribers that maybe PB Labs had something going on

17  that was violating Cigna's policy, but you had no

18  evidence, did you?

19          MR. KANG:  Objection, Your Honor.  Compound.

20  Argumentative.

21          MR. CUNNINGHAM:  It's cross-examination.

22          THE COURT:   It is, but --

23          MR. CUNNINGHAM:  I'll rephrase it, Your Honor.

24          THE COURT:  Just ask the question at the end of

25  what you said would be probably what you're trying to do.

1      Q.   Ma'am, you had no substantiation that PB Labs

2  had done anything wrong when you placed the flag on PB

3  Labs?

4      A.   I had concerns with respect to a particular code

5  that was being billed excessively at the time when

6  compared with fares.  And I was trying to understand from

7  the provider's perspective what they were performing.

8      Q.   You had no evidence when you placed the flag,

9  yes or no?

10         MR. KANG:  Your Honor, objection.  Asked and

11  answered.

12         THE COURT:  She didn't answer it.  You can

13  answer the question, ma'am.

14      A.   I feel I did have some evidence to suggest

15  questionable billing patterns.

16      Q.   You had not reviewed a single medical record

17  when you placed a flag on PB Labs, had you?

18      A.   No, I didn't review records at that time but --

19      Q.   Thank you, ma'am.

20      A.   -- as I said, I didn't get them yet.

21         THE COURT:  Ma'am, remember what I said?

22         THE WITNESS:  Yes.

23         THE COURT:  The question was:  You had not

24  reviewed a single medical record when you placed a flag

25  on PB Labs, had you?  That's yes, no, or I can't answer.

1    So I'm going to strike everything after your no.  If you

2    think that's not -- that it should be can't answer or

3    can't answer it yes or no, you need to tell me that.  But

4    basically I'm striking everything because you started out

5    by saying no and that's an answer to his question.  Okay.

6            THE WITNESS:  Thank you.

7            THE COURT:  Thank you.  Go ahead.

8    BY MR. CUNNINGHAM:

9        Q.   Ma'am, let's assume for a moment that you did

10   have medical records.  Even if you had medical records,

11   with all due respect, you were not qualified or you were

12   not the person at Cigna that was going to make a

13   determination based on the medical records, were you?

14       A.   I can't answer just yes or no.

15       Q.   Those medical records would have been sent to a

16   Medical Director at Cigna, correct?

17       A.   Yes, for clinical review.

18       Q.   Yes, ma'am.  Because you are not qualified, with

19   all due respect, to make opinions or determinations of

20   medical necessity, are you?

21       A.   Clinically, no.

22       Q.   So when you placed the flag, you did not have

23   one single medical record, correct?

24       A.   Correct.

25       Q.   And even if you had a medical record, you still

1    would have had to send that medical record to the Medical

2    Director for what you call clinical review, yes?

3        A.   Yes, that's correct.

4        Q.   So you placed this flag on the basis of not

5    reviewing anything except for an allegation from one of

6    Cigna's subscribers?

7            MR. KANG:  Objection, argumentative.

8            THE COURT:  I thought it was going to be another

9    basis.

10           MR. CUNNINGHAM:  I will move on, Your Honor.

11           THE COURT:  I think it's been covered I guess.

12           Sustained.  Go ahead.  Move on.

13   BY MR. CUNNINGHAM:

14       Q.   Ma'am, would you agree with me that you placed

15   that flag before your case notes or your ledger even

16   began on August 9?

17       A.   I'm sorry.  Can you repeat the question?

18       Q.   Sure.  Would you agree with me that you

19   placed that flag on PB Labs before you had even started

20   your case notes which occurred on August 9?

21       A.   That's not correct, sir.

22       Q.   I thought you told me a moment ago that you

23   placed the flag on PB Labs on July 18 of 2013?

24       A.   That is correct.  However, the investigation

25   started when it was assigned to me in June of 2013.

1    Q.   I asked you if you placed the flag before you

2    started making entries in your case log which you just

3    told me a moment ago was on August 9.

4    A.   Sir, I started my case log in June of 2013.  And

5    the information that you showed me didn't reflect the

6    initial notes.

7    Q.   Now, ma'am, when you placed the flag on PB Labs,

8    you did not tell them before placing the flag that you

9    were going to do so, did you?

10   A.   I don't believe so, no.

11   Q.   Do you think that's something that you would owe

12   a healthcare provider, to tell them that you were going

13   to place a flag and stop all their payments for services

14   they had rendered?

15        MR. KANG:  Objection, Your Honor, argumentative.

16        THE COURT:  You're beginning to get a little

17   bit, sir, of both tone and the language.  I mean, it is

18   cross-examination.  She's an opposing party.  I believe

19   you are entitled to cross, but I think ask it so it calls

20   for a yes or no is fine.  If you can rephrase I think,

21   sir.  Thank you.

22   BY MR. CUNNINGHAM:

23   Q.   Ms. Canto, were aware of the policy language in

24   the Cigna policies that stated that Cigna would let a

25   healthcare provider or a customer know in writing before

1    they would stop making payments?

2        A.    Are you referring -- I'm not sure I understand

3    the question.

4        Q.    You were familiar with the individual family

5    plans that Cigna was selling in Florida?

6        A.    I have an awareness to the plan, yes.

7        Q.    And isn't that what we're talking about here?

8    These were claims arising out of the individual family

9    plans, correct?

10       A.    I thought we were talking about medical

11   necessity.  I'm sorry.  I didn't realize it was specific

12   to that plan.

13       Q.    Well, we're talking about medical necessity as

14   it relates to the individual family plans that Cigna had

15   sold to people in South Florida.  Isn't that true?

16       A.    I believe so, yes.

17       Q.    Okay.  Thank you.

18            So were you aware of the policy or of the

19   language in the individual family plans that where Cigna

20   promised that if they weren't going to pay claims they

21   would tell the customer or the provider in writing why

22   they were not doing so?

23            MR. KANG:  Objection, Your Honor, vague and

24   confusing.

25            THE COURT:  Overruled.

1          If you can answer it, ma'am.

2     A.   If it could be clarified.  I want to make sure

3  I'm understanding what type of communication you are

4  referring to.

5     Q.   Ma'am, is it your understanding that in the

6  individual family plans -- first of all, you're familiar

7  with the terms of the individual family plans that Cigna

8  sold in south Florida during this time frame, aren't you?

9     A.   Are you asking about direct knowledge of plan

10  language specifically?

11    Q.   I'm asking about plan language that would be

12  implicated by your job.  Such as, if you were going to

13  stop paying or not pay a claim that was submitted by a

14  customer or a healthcare provider, that you would let

15  them know in writing before you would not pay them.  Are

16  you familiar with that language in the policies?

17         MR. KANG:  Objection to form, Your Honor.

18         THE COURT:  Overruled.

19         THE WITNESS:  Your Honor, may I answer?

20         THE COURT:  Yes, you may, ma'am.  I'm sorry.

21  When I overrule it that's what it means, you do answer

22  it.  Thank you.

23         THE WITNESS:  Thank you.

24    A.   Are you referring to explanation of payment and

25  explanation of benefit communications about how a claim

1    was processed?

2        Q.    Ma'am, let me ask you this.  We'll come back to

3    this in just a little bit.  Let me ask you this.

4            Would you agree with me that as a matter of

5    common courtesy, even if it's not required by an

6    insurance contract, before you stop or before you don't

7    pay a healthcare provider for services that have

8    admittedly been rendered, that you should let them know

9    that you are not going to pay them?

10       A.    In this instance, that would have occurred when

11   we pended the claim to request records.

12           THE COURT:  So is your answer yes or no, ma'am?

13       A.    Yes.  The provider would have been notified with

14   the request for medical records when the claim was

15   submitted.

16       Q.    Was the provider notified that you were not

17   going to pay those claims at all?

18       A.    I don't know the exact verbiage that the

19   explanation of payment lists, but I believe to the effect

20   of we require medical records for this date of service

21   before payment can be rendered.

22       Q.    Isn't it true once you place that flag on PB

23   Labs, it wasn't just the one particular claim that

24   prompted to you place the flag.  You were going to make

25   sure that no further claims from PB Labs were paid until

1    that flag was resolved to your satisfaction?

2        A.   No, that's not correct.

3        Q.   Now, can we go to Joint Exhibit 41.

4            THE COURT:  Joint Exhibit 41 is a full exhibit

5    and may be published.

6        Q.   Can you see that, Ms. Canto?  I know the type is

7    rather small.

8        A.   I do see it.  It looks like an excel

9    spreadsheet.

10       Q.   Yes, ma'am.  And is this a document that was

11   generated by Cigna?

12       A.   Yes.

13       Q.   I would like to go to page 5 of that exhibit

14   please, Mr. Smeig.

15           Here's what I want to ask you about, ma'am.  Do

16   you remember that you eventually sent medical records to

17   Dr. Nicoll, the Cigna in-house doctor?

18       A.   Yes, I have sent medical records to him.

19       Q.   And you were able to obtain those medical

20   records from PB Labs, correct?

21       A.   No.  I believe what I received from the Lab

22   was -- pardon.  No.

23       Q.   But you received the medical records from some

24   source?

25       A.   Not medical records, no.

1    Q.    Didn't you just say that you sent medical

2    records to Dr. Nicoll?

3    A.    What I received was test results, not records.

4    Q.    So you're distinguishing between test

5    results and records?

6    A.    Yes.

7    Q.    Aren't test results usually part of a patient's

8    medical file?

9    A.    Yes, a portion of it.

10    Q.    Okay.  So, ma'am, you did receive test results

11    that you sent to Dr. Nicoll, correct?

12    A.    Yes, that's correct.

13    Q.    Okay.  And Dr. Nicoll was an in-house doctor who

14    worked specifically with the SIU at Cigna, right?

15    A.    For a period of time, yes.

16    Q.    He was not treating patients at that time, was

17    he?

18    A.    I don't have any knowledge of that.

19    Q.    You don't know whether Dr. Nicoll had a

20    full-time clinical medical practice in addition to being

21    the SIU medical doctor?

22    A.    No, I wouldn't have knowledge of that.

23    Q.    So you sent Dr. Nicoll 20 records or lab tests,

24    correct?

25    A.    I can't answer just yes or no.

1    Q.   Ma'am, would you agree with me that Dr. Nicoll

2    took less than a day to review the medical records or lab

3    results that you sent him?

4         MR. KANG:  Objection, lacks foundation.

5         THE COURT:  We'll talk about that at the break.

6    I believe it does.

7    Q.   Ma'am, were you aware that Dr. Nicoll took less

8    than a day to perform his review of the lab reports?

9    A.   I don't know the exact time it took him to

10   complete the record review.

11   Q.   Were you aware that Dr. Nicoll only looked at

12   ten records or ten lab reports, not 20?

13   A.   I can't answer just yes or no.

14   Q.   Ma'am, isn't it true that when you placed the

15   flag you had actually, as Cigna calls it, pended 750

16   claims?

17   A.   I don't recall the exact number of claims

18   pended.

19   Q.   Okay.  You don't remember that from your

20   deposition testimony?

21   A.   The exact number, I don't recall.

22   Q.   You don't remember that from your review of your

23   case notes as you prepared for your trial testimony?

24   A.   No.  I can't give a yes or no, because claims

25   come in daily and I would need an opportunity to quantify

1    the total amount of claims.

2        Q.   Ma'am, if you had pended 750 claims, do you

3    think it would be appropriate that you had only sent 20

4    medical records or lab reports to Dr. Nicoll for review?

5        A.   I actually sent over 700 claims.  It was for 20

6    patients.  That was the request.

7        Q.   So you sent Dr. Nicoll lab reports on 20

8    patients?

9        A.   He reviewed half of the patients, which would

10   have been ten full patients, and their claims totaled

11   over 700 claims for those ten patients that were reviewed

12   by Dr. Nicoll.

13       Q.   Are you saying that those 700 claims are part of

14   the 750 claims that you pending or had pended?

15       A.   That's not what I'm saying.

16       Q.   So what are you saying?

17       A.   I'm saying that the claims that I sent to Dr.

18   Nicoll with the correlating test results were previously

19   paid.

20       Q.   Ma'am, would you agree with me that if you had

21   pended 750 claims, sending Dr. Nicoll lab reports on 20

22   patients would not be a statistically relevant sample?

23           MR. KANG:  Objection, Your Honor.

24   Mischaracterizes the prior testimony.

25           THE COURT:  Sustained.

1    Q.    Ma'am, would you agree with me that when you are

2  pending a large number of claims and if you're having

3  medical records reviewed with respect to that number of

4  claims, that you should attempt to achieve a

5  statistically relevant number of files that would be

6  reviewed by the Medical Director?

7    A.    I can't answer yes or no, sir.

8         MR. CUNNINGHAM:  Let's go to Joint Exhibit 141,

9  please.

10         THE COURT:  Joint Exhibit 141 may be published.

11  It is a full exhibit.

12         MR. CUNNINGHAM:  I think it's page 5 here on

13  Exhibit 141.  Is there any way to zoom on that,

14  Mr. Smeig, I'm a little bit old to see that type that

15  small.

16         THE COURT:  I think page 5 that you called for

17  is the table that just disappeared.  Am I wrong?  Correct

18  me if I'm wrong.  It says page 5 up there.  So you're

19  going to have to clarify with him if you wanted the table

20  or you wanted page 5 of an email string.

21    Q.    Let me ask you this.  On September 19, 2013.

22  That's right in front of you, ma'am.

23         Does this appear to be -- first of all, let me

24  ask you.  Is this an email from you?

25    A.    Yes, it is.

1    Q.   This is on September 19, 2013 at 2:01 p.m.?

2    A.   Yes, that's correct.

3    Q.   And this email is to Dan Nichol?

4    A.   Yes, it is.

5    Q.   And Dan Nichol is the Cigna doctor that we've

6    been talking about who did medical reviews or medical

7    record reviews at that time, right?

8    A.   Yes.

9         THE COURT:  Could I suggest you blow the email

10   up the way it was 15 seconds ago before it disappeared.

11   If that's the one you want to talk about.

12        All right.  Now we can read it.

13   Q.   So what I want to ask you about is -- let me go

14   ahead and read this into the record to try to make this

15   go more quickly, ma'am.  Just confirm that I read it

16   accurately, please.

17        Good afternoon, Dan.  Last month during our

18   one-on-one I had briefly discussed a lab that I had in

19   Florida regarding a non-participating lab billing

20   excessively for CPT code 80299.  I had requested records

21   from the lab and after some back and forth with them, I

22   received records.

23        Didn't you tell me just a moment ago that you

24   did not receive records from the labs?

25   A.   Correct.  And I added that statement in this

1 highlighted section as well.

2    Q.    Okay.  But doesn't that sentence I just read

3 where I said -- where you said I had requested records

4 from the lab and after some back and forth with them I

5 received records.  Doesn't that mean that you got the

6 records from PB Labs?

7    A.    No.  The next statement clarifies what exactly

8 was received by the lab.

9    Q.    I had requested records for 20 patients and they

10 have supplied what appears to be claim copies and the

11 member's lab results.  You definitely received that from

12 from the Labs, correct?

13    A.    Yes.

14    Q.    So the Labs were cooperating with your

15 investigation, correct?

16    A.    No.  That's not correct.

17    Q.    They gave you lab results, didn't they?

18    A.    They did.  But I requested complete records,

19 sir.

20    Q.    But they gave you something.  They gave you lab

21 results?

22    A.    Yes, they gave me lab results.

23    Q.    Do you recall that maybe they didn't even have

24 those medical records on those patients?

25    A.    If they did not, we would have other concerns.

1    Q.   It wouldn't be -- I'm sorry.  I don't mean to

2    cut you off, ma'am.

3         It wouldn't be unusual for a lab to just have

4    lab results in their chart and not have the actual

5    medical records, would it?

6    A.   It would be questionable in my opinion.

7    Q.   Wouldn't you expect the doctor's office to

8    actually have the medical records and the lab results and

9    lab would only have the lab results?

10   A.   No.  And I did not explain that to personnel

11   with PB Labs as well.

12        THE COURT:  Perhaps we can take our break at

13   this time.  We're a few minutes past, but not too much.

14        Ladies and gentlemen, we'll be back at one

15   minute past 2.  I'm not going to short change you.  So

16   that's a 45 lunch break.  You are free to leave the

17   building, as you are on any break, but you obviously have

18   some time to leave it if you wanted to get some fresh air

19   or stay in the room and just relax there.  But we'll see

20   you at a minute past 2.

21        Thanks very much, ladies and gentlemen.

22        (In the absence of the jury at 1:16 p.m.)

23        THE COURT:  Since it's our first witness that is

24   at a break and because it's in the middle of a topic I'll

25   say, I just want to -- have you told the witness about

1    what happens when she gets of the stand as far as your

2    communicating with her or should I do that, Attorney

3    Kang?

4         MR. KANG:  I have but, Your Honor, if you would

5    like.

6         THE COURT:  We have a rule that it's not

7    appropriate for a lawyer to talk to a witness, thus, for

8    the witness to talk to a lawyer, when you're in the

9    middle of testimony.  Okay.  Because it creates a

10   possible not good appearance.  I'm not suggesting you are

11   going to do anything wrong or the lawyer is.  I'm just

12   saying it's a rule.  And that's the rule I've adopted in

13   this case.

14        Since you're the first one, I will tell you

15   we're at a break, and especially you are in the middle of

16   an examination from the opposing counsel, you are not

17   allowed to talk to the attorney about what's happened so

18   far or what your answers are or maybe what's coming and

19   what your answers could be.  Nothing at all about your

20   testimony.  You can discuss whether the sandwiches are

21   any good.

22        Thank you very much.  You're now excused.

23        THE WITNESS:  Thank you.

24        THE COURT:  Everybody be seated.  I do have a

25   few questions.

1          First.  Going back to the opening statements.

2    Attorney Kang, you referred to somebody whose initials

3    were RS.  I'm not going to say the name.  It's not clear

4    to me if that's the gentleman's real name or a pseudonym

5    you ascribe to him when you use the full name.

6          MR. KANG:  Pseudonym.

7          THE COURT:  Just wanted to confirm it.  Terri

8    has to know.  So there's no HIPAA requirement to block

9    out the name, correct, as an example?

10         MR. KANG:  Correct.

11         THE COURT:  Okay.  Or a pseudonym.

12         I'm hearing Joint Exhibits which makes my heart

13   sing that they are agreed to.  However, I don't

14   understand the A's.  There's no A's on the Joint Exhibit

15   List.  I got 132-A.  Does that mean I will get B, C, D,

16   E, F, and that will not fit of the form, or is A a

17   section taken -- I don't know what it means.

18         MR. KANG:  Ms. Jackson may know the answer.  My

19   understanding is they're duplicates, Your Honor.

20         THE COURT:  They're duplicates?

21         MS. JACKSON:  Your Honor, to comply with the

22   Juris requirements that each file is under ten megabytes,

23   there may be A, B, C, D.

24         THE COURT:  So I could end up A, B, C, D.

25         MS. JACKSON:  Correct.

1          THE COURT:  I have no capacity on your forms --

2     and this could be true for Cigna and Labs.  When I say

3     form, I mean the list you gave me.  I keep track, in

4     order to make sure Liana is keeping the proper track of

5     what's come into evidence and what's been used with a

6     witness.  I need to -- I put initials for a witness.  I

7     check a box if it has been used and it's full, like on

8     the Joint list that's what the checks means it's been

9     used.  As I told you all, I'm not sending everything on

10    these lists to the jury.  They have to know what it's

11    about and so generally that's by using it.  That tells me

12    that.  And I don't mean to single out you folks.  I don't

13    know, maybe it's going to happen with the other side.

14    But if we start having A, B, C, D, E, F and G, I don't

15    know where you think I'm going to fit it.  The line is

16    about one-eighth of an inch wide for 134.  Where am I

17    supposed to insert 134-B?

18         MR. JACKSON:  We can update.  We can provide a

19    list that shows A, B, C, D and how it's going to show up

20    in Juris.

21         THE COURT:  I thought you were going to say

22    that.  I appreciate your offer.  But think about it.  I'm

23    sitting up here handwriting.  So you give me a clean

24    list.  I got to transfer all my handwritten notes from

25    today's list to tomorrow and then through day eight.  I

1    don't think that's what I'm going to do.  So I guess you

2    have to figure out another way.  If you want to give me a

3    list tomorrow that has space for how many you -- I assume

4    you might know.  Maybe you don't.  But space for other

5    134's by letter, then I will transfer today's because

6    it's not a huge amount.  But that's going to be the end

7    of it.  I have to have room.  So I don't know if that's

8    clear to everybody.  I'm sure you think this is more

9    evidence of how obnoxious I am.  You have to understand,

10   logistically, I'm trying to take notes and keep a record

11   of what the record is.  I can't do it.  I guess, Liana,

12   you are capable because it's on a program.  She can do

13   it.  But I'm the person who backstops her.  So I have to

14   have something.  So if you can maybe talk to each other

15   and come to an agreement.  If you want to give it to me,

16   email it tonight or tomorrow on the ones you know you

17   will have A's and you're going to have more.  I don't

18   care.  Leave eight lines.  Even if you only end up having

19   C, up to C.  I don't mind having gaps.  I just have to

20   have a place to acknowledge that it's another exhibit.

21   Is that clear enough?  Thank you very much.

22           MS. JACKSON:  We can provide that.

23           THE COURT:  You used a document, Attorney Kang.

24   A Cigna Exhibit 2009.

25           MR. KANG:  2019.

1          THE COURT:  2019.  My list goes from -- oh, I'm

2     sorry.  That's my mistake.  Thank you very much.  That

3     was my error.  I appreciate it.

4          It's interesting, Attorney Kang, because you

5     have a habit -- I've seen it in the depositions so I'm

6     sorry that I'm catching this up early in the game.  You

7     often will ask someone a question about a document that

8     they haven't seen, like Dr. Mendolia, the first witness,

9     that he doesn't recognize the document.  And he's not a

10    person whose responsibilities cover the subject of the

11    document.  It's in evidence.  So you can read it to the

12    jury, but I don't know that you can do things like do you

13    agree with this, and do you have any reason to disagree

14    with me when I say this shows x.  And I might have to

15    explain why I think that's not appropriate except just

16    five minutes ago you objected to one of his questions

17    because he did the same -- not exactly the same thing.

18    He asked it a little bit different and you objected and I

19    sustained it.  Because I don't think it's proper when

20    there's no foundation for the witness' knowledge.

21    Witnesses are called because they know things.  And he

22    says I don't do billing.  I don't know that you can ask

23    about billing.  And the same thing, whatever it was with

24    you.  I know it happened.  I could search, but I'm not

25    going to.  It happened five minutes ago.  I can't

1    remember how you phrased it.  You did it a little bit

2    different, but it's the same problem.  I mean you can

3    keep doing it.  Just so he know, unless you persuade me

4    at some break, judge, you are really bad evidence.  Let

5    me explain to you why that's wrong.  And I'm happy to

6    hear.  I can always improve.  But I don't think they are

7    proper questions.

8              MR. CUNNINGHAM:  Your Honor, if I may.  I think

9    the distinction in my case was I was asking her if she

10   knew about the language in the Cigna policies.

11             THE COURT:  I don't know that that was it.

12             MR. CUNNINGHAM:  That's what I thought it was.

13             THE COURT:  Well, if you think you asked a

14   proper question and I made a bad ruling, you can ask her

15   again.  This applies to both sides.  I don't think it's

16   proper to question when you haven't established a

17   foundation or knowledge in the person about it.  For

18   example, if she had said I didn't read the policy.

19   That's a hypothetical.  She's trying to say she knows.

20   But if she didn't, you could haven then said, well, do

21   you have any reason not to agree with me that the policy

22   says you should send a gift package to the labs when you

23   say we're not paying you anymore.

24             MR. CUNNINGHAM:  I was going to put the language

25   of the policy up, Your Honor.  I was just trying to save

1    time.  It wasn't important enough to do that.

2          THE COURT:  That's fine.  Anyway.

3          Again, if you think I'm wrong, maybe at 3:45 we

4    can spend some time talking about it.  But I think the

5    witness, is it 401, 402, somebody has to have relevant

6    knowledge or evidence.  When he said, anyways, with him,

7    he clearly said I wasn't involved in billing and I have

8    no knowledge of the document.  I don't know how you can

9    ask him about it.  And I thought it applies to yours.

10   And if it does, good.  That allowed me to make this

11   speech.  If it doesn't, you can ask him again.  If it

12   didn't, I won't stain the objection.

13         Somebody mentioned something with Ms. Canto.

14   Now, Ms. Canto, you have to actually leave.  And any

15   other folks back there who happen to be associated with a

16   party, it's not just the lawyer.  You can't go, oh,

17   Ms. Canto, this is what they just talked about.  So that

18   applies to everybody.

19         MR. CUNNINGHAM:  Your Honor, I should have done

20   this earlier.  I would like to invoke the rule of

21   sequestration.

22         THE COURT:  But you didn't.  So I couldn't do

23   anything.  I think they came in slightly after we

24   started.  It's not me to do it unless you've asked.  And

25   I heard the other side and I granted a motion.  You have

1    to tell me if you want to make a motion.

2         MR. CUNNINGHAM:  Yes.  I would say like to

3    invoke the rule, Your Honor.  And to alleviate the

4    Court's concern, we have our paralegal here from Florida

5    who is helping shuttle witnesses in here.  Now,

6    obviously, with witnesses like Ms. Canto who are Cigna

7    witnesses, they're not in my custody and control.  But I

8    don't think it's appropriate that any future witness sits

9    in the courtroom and listens to the testimony of other

10   witnesses.

11        THE COURT:  So you want an order of

12   sequestration.  Do you want an exception to anybody on

13   your team who will be a witness but will assist you in

14   the trial?  Like in a criminal case you have the agent,

15   you know, the law enforcement guy maybe who did the

16   investigation.

17        MR. CUNNINGHAM:  We won't have any of our

18   witnesses in the courtroom.  All I'm saying is my

19   paralegal is here from Florida.

20        THE COURT:  Well, that's all right.  She's not

21   going to testify.

22        MR. CUNNINGHAM:  No, that's my point.

23        THE COURT:  Attorney Kang, do you join or

24   oppose?

25        MR. KANG:  Your Honor, we do request having our

1    corporate representative who is Michael Goldfarb.  He is

2    our corporate rep and I believe we are entitled to have a

3    representative from the company.

4         THE COURT:  Yes.  Yes, I think that's

5    appropriate.

6         MR. CUNNINGHAM:  I think so too, Your Honor.

7         THE COURT:  So you can have that one

8    representative, but I know he will testify.  But that's

9    the price you pay to allow it.

10         But other than Mr. Goldfarb -- I guess he's an

11   attorney.  I'm not sure what I should call him.  But Mr.

12   Goldfarb.  I believe anybody else from Cigna who is going

13   to testify is on a list that we have got, for example, or

14   even a may call, should not be in the courtroom until

15   it's time for them to testify.

16         MR. KANG:  What about experts, Your Honor?

17         THE COURT:  I don't know.  It's your motion.

18         MR. CUNNINGHAM:  I don't think experts should be

19   allowed to sit in the courtroom while fact witnesses

20   testify.

21         THE COURT:  The argument sometimes is made that

22   the questioning of them can be premised upon if you

23   assume Ms. Canto testified to x, what would your opinion

24   be about this?  And the argument's made, well, if they

25   are in the courtroom they will have heard it.  But the

1    problem is not every expert sits through all the

2    testimony.

3            Do you have an expert here now who sat through

4    the beginning on the trial?

5            MR. KANG:  No.  Not yet.

6            THE COURT:  I think for now my view would be if

7    we're going to sequester witnesses, they're witnesses.

8    And without a showing that they need to be in the

9    courtroom for a particular person's testimony or

10   something like that, I would include them in the

11   sequestration order.  If something develops, Attorney

12   Kang, I will listen to you.  But my instinct is to

13   exclude them.  So that means there should be nobody from

14   Cigna who is going to testify in the courtroom during the

15   testimony, including experts I include as from Cigna or

16   from the Labs.  All right.

17           So that should be reflected, Liana, as an Order

18   of the Court.

19           If you want help with the wording, it's what I

20   just said, but I'm happy to look at what you draft.

21           Somebody raised an issue, though, about Ms.

22   Canto's testimony.

23           MR. CUNNINGHAM:  Do you mind if I come up here?

24           THE COURT:  No, not at all.

25           MR. CUNNINGHAM:  Your Honor, it's the issue that

1    we raised a couple of days ago.  I'm not even sure what

2    day it is right now.  But A couple of days ago we raised

3    this issue about the fee forgiveness issue.

4         THE COURT:  When I was reading the opening

5    charge, the pretrial charge, I was concerned.  But my

6    recollection is I suppose it's based on a representation

7    that Mr. Kang can prove the post 2014 policies that

8    govern the last remaining billing by Epic Labs contained

9    the language that I used as an example in my summary

10    judgment was clearer than the language I said they don't

11    get to argue fee forgiveness.

12         Now, I suppose if he can't prove that, I'm going

13    to charge it away from the jury, as to all Labs' claims

14    in your case.  If he proves it, then I'll say do not

15    consider fee forgiveness and we shouldn't have testimony

16    on fee forgiveness about I think it's pre-January 2014 or

17    is it 2015?

18         MR. CUNNINGHAM:  2015, Your Honor.

19         THE COURT:  Is the new language January 2015?

20    You agree?  Attorney Kang is shaking his head.  Okay.

21         So we shouldn't hear fee forgiveness with regard

22    to any claim prior to January of 2015.  Then I should

23    only hear language about fee forgiveness for a claim

24    after that date that had a policy language that was

25    clear.  And I'm taking the representation, but I think

1  that Cigna has to prove that.  That at that time all

2  these claims were covered by this policy and that

3  language, I hope, is in some representative sample that

4  was part of the stipulation and Joint Exhibits.  If

5  somebody could show it to me.  Did I ever get a policy?

6  Didn't I ask for a policy?

7           THE CLERK:  You got it.

8           THE COURT:  No, I did get a policy.  But it's

9  like 50 pages long.  Anybody who thinks I have time to

10  read 50 pages to find a clause on fee forgiveness, let me

11  introduce you to my life.  I have a whole bunch of other

12  matters I'm trying to deal with.  Plus, as you know, we

13  have a lot of matters in this case.

14           So if somebody, maybe from Cigna, could

15  identify, show me language that's from 2015 in later

16  policy, which is different language than what's in the

17  basis of the summary judgment throwing out fee

18  forgiveness for pre January 2015 policies.  If you show

19  me that language and I confirm, yeah, that looks like the

20  language I said would be clearer.  And, therefore, a

21  policy holder would have known this was a basis for him

22  to lose his coverage, which was the problem I had.  Then

23  you can introduce that evidence, Attorney Kang, and argue

24  it to the jury that the fee forgiveness aspect there, as

25  well as in your own case, as an argument of unfairness.

1    But his opening and the charge I think reflected, you

2    know, I mean, you told me things you are going to prove.

3    He tells me things he's going to prove.  I'm trying to

4    cover that.  Not that I'm talking about your proof, but

5    it's what would I charge them on.

6              MR. CUNNINGHAM:  If I may just very briefly

7    express my practical concern, Your Honor.

8              THE COURT:  Yes.

9              MR. CUNNINGHAM:  My understanding of the Court's

10   ruling on summary judgment and earlier during the

11   pretrial conferences was that fee forgiveness was not a

12   defense that Cigna had available to it, to the Labs

13   claims for any policies that were before January 1 of

14   2015.

15             THE COURT:  Correct.  Because they all had -- in

16   fact, my clerk spent time going through the chart that

17   was tens of pages of snippets from policies that even if

18   it wasn't exactly the language I ruled on, it wasn't any

19   better.  Okay.  Then the issue came up.  No, we did

20   change it and he reminded me and I pointed that out.  He

21   represented it was January of 2015.  And you were still

22   billing in 2015 through Epic only.  I understand that.

23   So I would limit it to Epic.  And if somebody would show

24   me that language and I can be comfortable that I'm right

25   in what I concluded, that it's different for 2015 and

1    beyond Epic claims.  If you want, I guess I would say

2    consider.  I'm not sure I would did it.  But I would

3    consider, you know, when the issue comes up again, you

4    know, saying something to the jury about this is -- in

5    effect, it's a limiting instruction.  It's relevant to

6    the Epic claims after January 2015.  But it has no

7    relevance to the claims prior.

8              MR. CUNNINGHAM:  That's my understanding of the

9    ruling, Your Honor.  Originally, the context for my

10   concern was I know from taking Ms. Canto's depo that

11   obviously there was a fee forgiveness flag placed on

12   PB --

13             THE COURT:  But they moved --

14             MR. CUNNINGHAM:  Right.  They moved away from

15   services rendered not billed.  They moved to fee

16   forgiveness.

17             THE COURT:  Well, I don't know how you are going

18   to handle that or Attorney Kang is going to handle it.

19   It's not relevant testimony.  If she's talking about PB

20   prior to January of 2015 and she says fee forgiveness,

21   it's not relevant.  I believe I ruled that.  No?  I'm

22   sorry.

23             We're going to see whose right up here, Attorney

24   Kang.

25             Did the Florida individual policies ever have

1    what I'll call the better language on fee forgiveness

2    through the end of the last claim submitted by the Labs?

3         MR. KANG:  No.

4         THE COURT:  That's not what I under understood

5    from our colloquy two or three days ago.

6         MR. KANG:  No.  The Florida individual policies

7    are those that the Labs claims against us.

8         THE COURT:  Correct.  Everything I've said for

9    the last ten minutes has nothing to do with your case.

10   It relates to their case.  Which is what I thought we

11   were talking about.

12        MR. KANG:  We agree.

13        THE COURT:  So my summary judgment, the effect

14   of that ruling on that clause and the application of

15   Florida law, would you agree, Attorney Kang, means that

16   fee forgiveness has nothing to do with the claims they're

17   trying to get, they, the Labs, are trying to get paid on,

18   their case.

19        MR. KANG:  I don't agree with it, but I

20   understand that's what Your Honor held.

21        THE COURT:  All right.  I think now we're clear.

22        MR. CUNNINGHAM:  I think we are, but there's a

23   consequence.  So there's another question which is I want

24   to make sure since fee forgiveness is no longer a defense

25   to our claims against Cigna, that Ms. Canto is not going

1    to be talking about fee forgiveness.  I want to make sure

2    that she's been instructed.

3            THE COURT:  Do you agree, Attorney Kang?

4            MR. KANG:  No.  Because she can talk about fee

5    forgiveness with our affirmative case.

6            THE COURT:  But he hasn't put her on for that.

7    When you get up and cross her, you're going to cross her

8    on what she's answered to his questions.  And as we

9    discussed, you then may move into Ms. Canto as a witness

10   for your case.  At that point, the words fee forgiveness

11   can be used.  How else am I going to do it?

12           MR. KANG:  A limiting instruction.

13           THE COURT:  Oh, I could do that, too, I guess.

14           MR. CUNNINGHAM:  I still haven't seen the

15   language that would justify them getting it.

16           THE COURT:  I haven't either.  Have we got it?

17   You said I have language.  I don't know what language I

18   have.

19           MR. CUNNINGHAM:  I don't understand the basis

20   for them even being able to argue fee forgiveness on

21   their affirmative claims back against us.

22           THE COURT:  Policy language is irrelevant to

23   Cigna's claims.  It's not based on policy.  It's based on

24   an equitable argument the it's unfair for a provider to

25   bill an insurance company without collecting co-pays, et

1    cetera.  Right?

2         MR. CUNNINGHAM:  Yes, Your Honor.  But here's

3    the problem that presents for me.  If she's going to talk

4    about fee forgiveness --

5         THE COURT:  Not while you're questioning her.

6         MR. CUNNINGHAM:  I know.  But she's going to

7    talk about it on their questioning.

8         THE COURT:  And that's when I'll give a limiting

9    instruction.

10        MR. CUNNINGHAM:  Okay.  So the jury will be

11   instructed essentially that it has nothing to do with our

12   claim against Cigna --

13        THE COURT:  Might be nice when you move from the

14   cross of her -- it's not going to be much of a cross.

15   It's going to be direct.  She's your witness.  Having to

16   do with his case.  I mean, have you done it that way?

17   Are you going to address first what she's already said

18   and then move to try to begin to prove your case or is it

19   mixed up?

20        MR. KANG:  Probably mixed up, to be honest with

21   you.

22        THE COURT:  Then I will have to do a limiting

23   instruction.

24        MR. CUNNINGHAM:  Okay.  So just so the record is

25   clear, Your Honor, what I plan to do because I believe

1    Your Honor has taken that defense out of our case against

2    Cigna, I'm not going to spend time with her on my

3    examination asking her about it.

4             THE COURT:  I would think not.

5             MR. CUNNINGHAM:  I would incur your wrath if I

6    did.

7             THE COURT:  You're going to get my wrath in a

8    minute.  These poor people here get a break.  You don't

9    get to occupy the whole lunch break arguing evidence

10   rulings.

11            We'll going to stand in recess.

12            (Whereupon, a luncheon recess was taken from

13   1:40 p.m. to 2:02 p.m.)

14            THE COURT:  I have one issue to address.  Ms.

15   Canto, you have to leave the courtroom.

16            I have a very strong recollection that I believe

17   on Tuesday someone asked me a question about questioning

18   and I gave the following instructions.

19            Lawyer A calls a witness.  He does direct

20   examination.  He sits down.  Lawyer B then I invite him

21   to cross-examine the witness on the subject of the direct

22   exam of Lawyer A.  Then Lawyer B announces I have

23   completed my cross and I'm proceeding to examine the

24   witness, in support of your case it would be my

25   case-in-chief.  It could later become the special defense

1    of the Labs.  Then you are on direct and then he gets to

2    cross on just that.

3         The difficulty, Attorney Kang, with the idea

4    that it is a bit mixed up is he never has an opportunity

5    to argue outside the scope.  You will always claim I'm

6    over in Cigna's case.  They will not be able to retain

7    that distinction.

8         I also would like to speak with counsel at

9    sidebar when the jury is gone for the afternoon on a

10   subject relating to what we were talking before we

11   stepped out.  I don't have the time to do it right now.

12   I would expect, Attorney Kang, that you will question

13   Ms. Canto on her cross-examination of what she testified

14   to in response to questioning by Attorney Cunningham.

15        Then you will tell me you are done with that and

16   you will move to your questioning which of course relates

17   to your claim or I suppose any special defenses.  At this

18   point, it is my view you have no special defense on fee

19   forgiveness claims of the Labs.  As to whether you can

20   use fee forgiveness in a policy on a claim that is not

21   based on the contract and to which contract these folks

22   haven't signed, I have to say I have to think about that

23   a little bit.  I guess you can ask about fee forgiveness

24   in your direct examination of her in support of your

25   claim of unfairness, unjust enrichment and obviously

1    subject to my making it clear to the jury in the final

2    charge that it doesn't have anything to do with that

3    claim.

4              I think are we ready to bring the jury in.

5    Let's bring the jury in.

6              (In the presence of the jury.)

7              THE COURT:  Welcome back, ladies and gentlemen.

8    I will note for the record, the nine jurors are in the

9    box.  Counsel, may be seated.  I hope you are able to get

10   some fresh air.  You are still examining, Attorney

11   Cunningham, and somebody has to get Ms. Canto.  She came

12   on time.  She's not here right now.  We'll get her in a

13   second.

14             Ms. Canto, now if you can come back to the

15   stand, I would appreciate it.

16             You may continue, Attorney Cunningham, as soon

17   as Ms. Canto gets to sit down.

18             MR. CUNNINGHAM:  Thank you, Your Honor.

19              May it please the court.

20             THE COURT:  Yes, it does.

21   BY MR. CUNNINGHAM:

22     Q.   Ms. Canto, before you took the lunch break, I

23   think where we left off was I think you admitted that you

24   did not contact PB Labs before you placed the flag to

25   advise them before you placed the flag that you were in

1    fact going to do so; isn't that true?

2        A.    Yes.

3        Q.    Thank you.  Ma'am, do you remember the name Mark

4    Hicks?

5        A.    Yes, I do.

6        Q.    And is it your recollection that Mr. Hicks was

7    the Chief Operating Officer of PB Labs?

8        A.    I don't recall his full title.

9        Q.    We'll pull that up.  Joint Exhibit 7 please, Mr.

10   Smeig.

11            THE COURT:  Joint Exhibit 7 is a full exhibit.

12   BY MR. CUNNINGHAM

13       Q.    Do you have that on the screen in front of you,

14   ma'am?

15       A.     Yes, there something on the screen.

16       Q.    Okay.  So do you see at the bottom of the page

17   there there's an email from you on October 29, 2013 to a

18   Belinda Hazelton and a Deanna Anderson regarding

19   CollectAwayPB Labs that, ma'am?

20       A.    Yes, I do.

21       Q.    I will read this into the record to save time.

22   Please confirm that I read this accurately.

23            Belinda, the only communications I have received

24   related to this case are for questions regarding

25   licensing and this is the first that I have heard of a

1    Mark Hicks contacting SIU on this case.  I will contact

2    him to assist with questions that he may have related to

3    this case.  Did I read that accurately?

4        A.    Yes.

5        Q.    Can we go to the entry above that please?

6              And is that an email from Belinda Hazleton to

7    you that is in this chain of emails on this topic of

8    Collectaway/PB Labs?

9        A.    Yes.

10       Q.    Does it say on October 30, 2013 at 11:36 in the

11   morning honestly I don't believe he has contacted SIU,

12   just the customer service center.  He stated he was being

13   transferred all over even overseas.  Did I read that

14   accurately?

15       A.    Yes.

16       Q.    So, ma'am, would it be fair to say that if these

17   emails are accurate that not only was PB Labs not advised

18   that the flag was being placed before it was placed but

19   Mr. Hicks was trying to contact Cigna to find out what

20   was going on, but he was being transferred all over the

21   place even overseas.

22       A.    I am not able to comment on what happened prior

23   to this communication as I don't have direct knowledge.

24       Q.    This email sent to you from Belinda Hazleton he

25   stated he was being transferred all over even overseas.

1      A.   That's what her statement says, yes.

2      Q.   Do you have any reason to disbelieve her

3  statement?

4      A.   No, I don't.

5      Q.   Her statement was apparently based upon a

6  conversation she had with Mr. Hicks himself?

7           MR. KANG:  Objection.  Calls for hearsay.

8           THE COURT:  It does.

9           MR. CUNNINGHAM:  That's fine.  I will move on.

10  By.

11     Q.   At this point in time once the flag was placed,

12  the test performed by labs were not being paid for, were

13  they?

14     A.   Not all, no.

15     Q.   And you never told Mr. Hicks that you had

16  flagged them and they were not going to be paid before

17  you placed a flag, correct?

18     A.   Before the flag was placed, no.

19     Q.   Would you agree with me that at the time we're

20  talking about here on October 30, the flag had been

21  placed over a month before that?

22     A.   I feel that's approximate, yes.

23     Q.   And apparently PB Labs was completely in the

24  dark as to what was going on and why they were not being

25  paid, correct?

1          MR. KANG:  Objection.

2          THE COURT:  Sustained.

3    BY MR. CUNNINGHAM:

4      Q.   Do you know whether anyone at Cigna had advised

5    Mr. Hicks as of October 30 as to why PB Labs was not

6    getting paid?

7      A.   I believe that he had received EOPs based on the

8    discussion I had with him and he was questioning why the

9    claims were being denied.

10     Q.   Was it customary at that time in the SIU at

11   Cigna to not let a health care provider or a customer

12   know for over 30 days, why they were not being paid?

13     A.   I don't believe that that is a significant

14   period of time as we were still preparing communications

15   to be issued to the provider and that was explained to

16   Mr. Hicks as well.  Same day as that that email, sir.

17     Q.   So even though they have performed services for

18   which they expected to be paid and a flag had been placed

19   30 days prior, you don't think that's a long period of

20   time to not let them even know what was going?

21         MR. KANG:  Objection.  Assumes facts not in

22   evidence.

23         THE COURT:  Overruled.  You may answer.

24   Overruled means that.  I apologize.

25     A.   During the course of the investigation I had

1    been in contact with the Labs, they were aware that they

2    were being audited and then subsequently the conversation

3    I had with Mr. Hicks did confirm that information both

4    verbally and in writing the same day as that email, sir.

5    BY MR. CUNNINGHAM:

6        Q.    But they were not advised they were being

7    audited or being flagged for at least 30 days after the

8    flag was placed, correct?

9        A.    They were first notified in July of 2013 of the

10   audit and during those conversations, I did make mention

11   that we needed an opportunity to support the services

12   that were being billed and the medical records were

13   needed in order to do that.

14       Q.    You have a recollection of that from July of

15   2013?

16       A.    Upon preparing for trial, I did read my case

17   notes and did confirm a conversation with Dolores in July

18   after I sent my request for information.

19       Q.    Could we see Joint Exhibit 146A please, page 21.

20            THE COURT:    Joint Exhibit 146 A is a full

21   exhibit.

22   BY MR. CUNNINGHAM:

23       Q.    Page 21 in the middle.  Could you make that

24   bigger please.

25            I'm looking for an entry on November 13.  There

1    we go.  Thank you.  Do you see that entry there, ma'am,

2    that's been highlighted?

3        A.   Yes, I do.

4        Q.   This is an entry by you in your case notes,

5    correct?

6        A.   Yes, that's correct.

7        Q.   So this would have been typed by you into your

8    case management testimony on your case notes, correct?

9        A.   Yes, that's Correct.

10        Q.   Could you go ahead and read that into the record

11    please?

12        A.   Starting where it is highlighted, sir?

13        Q.   Yes, ma'am.  Just that paragraph.

14        A.   I have received three boxes of records from Mike

15    Nicholson, CEO, PB Labs containing records for review.

16    Dr. Nicoll is presently out of office until Monday and I

17    will need to follow-up with Dr. Nicoll to see if he can

18    review the additional records and perform a compare of

19    the records previously received from PB Labs.

20        Q.   Could you read the next sentence please?

21        A.   I sent Mike Nicholson an email indicating that I

22    received the three boxes and that our medical director

23    was out of the office presently but I will have him start

24    the review once he returns.

25        Q.   So, ma'am, would you agree with me that this

1    entry indicates that PB Labs was, in fact, cooperating

2    with you in trying to provide information to you to

3    address the flag that you had placed on PB Labs?

4         A.   Yes, after that conversation with Mr. Hicks.

5         Q.   Joint Exhibit 130.

6              THE COURT:   Joint Exhibit 130 is a full exhibit.

7    BY MR. CUNNINGHAM:

8         Q.   Can we please enlarge that?  Ms. Canto, does

9    this appear to be an email authored by you on October 30,

10   2013?

11        A.   Yes, sir.

12        Q.   And this an email that's being sent to Mark

13   Hicks203 at Gmail dot-com?

14        A.   That's correct.

15        Q.   Subject Cigna audit, correct?

16        A.   Yes.

17        Q.   So I will give you a moment to take a look at

18   that if you like.  I want to ask you about something

19   specific there.  Specifically what I want to ask you, if

20   you want to read the whole thing for context, please feel

21   free.  Doesn't this state that a medical record would

22   need to review all of the records?

23             THE COURT:  I think you might have misspoke.

24   You said doesn't this state a medical record would need

25   to review all of the records.

1          MR. CUNNINGHAM:  I think I said medical

2   director, but it might have come out medical record.

3          THE COURT:  I misheard and so did the reporter.

4          MR. CUNNINGHAM:  Okay.

5          THE COURT:  Restate it please.

6   BY MR. CUNNINGHAM:

7      Q.  Doesn't the last bullet point state that a

8   medical director would need to review the medical

9   records?

10     A.  Yes, that last bullet states that.

11     Q.  Does your ledger indicate when you asked Dr.

12  Nicoll to review those medical records?

13     A.  I'm sorry.  Can you repeat that?

14     Q.  Yes, ma'am.  Does your ledger indicate when you

15  asked Dr. Nicoll to review those medical records?

16     A.  I believe so but I would need to review and

17  confirm.

18     Q.  Can we please have Joint Exhibit 146A, page 21,

19  at the top of the page.  Thank you.

20          Now, ma'am, do you see entries -- let's go to

21  the December 4, 2013 entry please, Mr. Smeig.  Thank you.

22  Okay.  So let's look at both of these.  Let's look at

23  November 13 first.  The one below that please, Mr. Smeig.

24  Okay.  So this entry is on November 13, 2013, correct?

25     A.  Yes.

1    Q.   And that's 14 days, two weeks, after when you

2    spoke with Mr. Nicholson about the medical records, the

3    three boxes of medical records that PB Labs had provided

4    to you, correct?

5    A.   Yes, that looks correct.

6    Q.   Does your entry say on November 13, 2013, I have

7    received three boxes of records from Mike Nicholson, CEO

8    of PB Labs, containing records for review.  Dr. Nicoll is

9    presently out of the office until Monday.  I will need to

10   follow up with Dr. Nicoll to see if he can view with

11   additional records and perform a compare of the records

12   previously received from PB Labs.  Did I read that

13   accurately?

14   A.   Yes, it is.

15   Q.   So in this entry, you are letting Mr. Nicholson

16   know -- -- strike that.

17       So you have now received three boxes of medical

18   records in addition to the Lab reports that you have

19   already received previously from PB Labs, correct?

20   A.   Yes, that's correct.

21   Q.   Can you go up to the next entry, Mr. Smeig,

22   December 4.  Okay.  December 4, 2013, do you say I spoke

23   with Dr. Nicoll yesterday regarding the new batch of

24   records submitted from this Lab?  That's on December 4,

25   2013, correct?

1       A.   Yes.

2       Q.   So would you agree with me, ma'am, that from the

3    time you reviewed those medical records from PB Labs and

4    spoke with Mr. Nicholson about sending them to Dr.

5    Nicoll, this entry indicates it was three weeks later

6    before you actually got around to sending those medical

7    records to Dr. Nicoll to review?

8       A.   That time frame appears correct, yes.

9       Q.   Do you believe it is important when you placed a

10   flag on a health care provider and not paying their bills

11   to act as promptly as possible to try to resolve the

12   issue so they can get paid if it's appropriate?

13      A.   Yes, I would say I agree with that.

14      Q.   Would it be unusual, during this time frame, for

15   you to wait three weeks to send medical records to the

16   medical director for review?

17      A.   There may be other circumstances warranting my

18   time so depending upon what I may have been working on,

19   there could have been a slight delay.

20      Q.   Are there any entries in your claim activity

21   log, your claim notes that indicate that there's

22   something that delayed you sending those records for

23   three weeks?

24      A.   There may be information in other cases as I

25   work multiple cases.

1    Q.   Would you agree with me that it's incumbent upon

2  you to act promptly when you having flagged a health care

3  provider and you are not paying their bills?

4    A.   Yes.  I attempt to do things as swiftly as I can

5  with all of the information readily available to me.

6    Q.   Okay.  And then isn't it true that the very next

7  sentence on December 4, 2013 says Dr. Nicoll stated that

8  he wouldn't review the records at this time but wanted

9  additional information from the Lab.  Did I read that

10  accurately?

11    A.   You did.

12    Q.   So now Dr. Nicoll has these records and he's

13  telling you he's not even going to look at them at this

14  time, right?

15        MR. KANG:  Objection.  Calls for hearsay.

16    A.   Based on --

17        THE COURT:  Holds on minute.  I have to rule.  I

18  have to do my job, ma'am.

19        Overruled.

20    A.   Based on what I documented here, he wanted to

21  receive even more information from the Labs before

22  initiating another review.

23    Q.   Did you ever ask him why can't you go ahead and

24  review the medical records, these people have been

25  waiting for months?

1    A.    I don't recall.

2    Q.    It's not in your notes is it?

3    A.    Not in this particular case  that we're looking

4  at, no.

5    Q.    You told us earlier if it is not in your notes,

6  it didn't happen, right?

7    A.    Correct.  On this day, I don't believe that's

8  documented.

9    Q.    Did you think it was fair to PB Labs that Dr.

10  Nicoll as of December 4, 2013 tells us you that he's not

11  even going to review the medical records at that time?

12        MR. KANG:  Objection.  Relevance on what's fair.

13        THE COURT:  Sustained.

14        MR. CUNNINGHAM:  I will move on.

15  BY MR. CUNNINGHAM:

16    Q.    Now, ma'am, you went on maternity leave around

17  January of 2014, correct?

18    A.    No.  December, 2013.

19    Q.    So your children is over ten years old now I

20  would guess?

21    A.    She's almost ten.

22    Q.    So you were on maternity leave, what I was going

23  to ask you during that time you were on maternity leave,

24  do you remember how long that time was?

25    A.    I believe it was close to three months.

1    Q.   So when you went on maternity leave, Palm Beach

2    Labs still dot have any way of knowing or had no

3    resolution to that flag that you had placed on Palm Beach

4    labs, right?

5    A.   I'm not aware of what communications could have

6    transpired while I was on leave.

7    Q.   Are you aware of any.

8    THE COURT:  The question was when you went on

9    leave.

10   A.   Can you repeat it.

11   Q.   When you left on maternity, would you agree with

12   me that Palm Beach still did not have resolution of the

13   flag that you placed on all of the claims they were

14   submitting to Cigna?

15   A.   If I'm understanding the question correctly, a

16   resolution was not made at that time before I left

17   maternity leave.

18   Q.   And in your claim notes, in your claim log,

19   while you were on maternity leave if anybody else had

20   performed activity on this particular file, they would

21   simply put it in your claim activity log, would they not?

22   A.   They would document it in our case file.

23   Q.   Right.  And you said you reviewed your case file

24   to prepare for your testimony today, did you not?

25   A.   Yes, I did.

1      Q.   Do you remember seeing any entries by anybody

2   else that did anything to move the ball forward with

3   respect to this flag that was placed on PB Labs while you

4   were on maternity leave?

5      A.   I believe that just medical record appeal

6   reviews were being performed while I was out on leave.  I

7   don't recall that individuals reached out to the labs

8   directly on my behalf.

9      Q.   You were on maternity leave so I'm not being

10   critical of this, but you would not have reached out to

11   PB Labs while you were on maternity leave?

12      A.   No, I would not.

13      Q.   So while you are on maternity leave for three

14   months longer, PB Labs still has no resolution of that

15   flag that's been placed and is preventing payment of all

16   of the claims it has submitted, corrected?

17      A.   No, that's not correct.

18      Q.   The issue was resolved while you were on

19   maternity leave?

20      A.   During the course of my investigation, there

21   were multiple flag protocols as we progressed and

22   identified a different level of information and I believe

23   that the flag protocol had changed yet again as legal

24   representation for both sides came into the conversation.

25      Q.   Let's go to Joint Exhibit 146, page 17 please.

1    That's the bottom of page 17.  Do you so he that, ma'am?

2        A.    Yes, I do.

3        Q.    Scroll down just a little bit more, Mr. Smeig.

4    That's far enough.  Thank you.  Please go back up to

5    where we were page 17 I believe.

6            So ma'am, would it be fair to say it appears

7    that your next entry -- please scroll down to the bottom

8    of that page, thank you.  Your next entry in the claim

9    notes is on March 20, 2014, correct?

10       A.    I do see the time stamp, yes.

11       Q.    Which would be reflective of the fact that you

12   took three months maternity leave, correct?

13       A.    Yes.

14       Q.    Now, scroll up, just scroll up a little bit

15   please.  Thank you.  Ma'am, do you know why all of these

16   documents were redacted for privilege?

17       A.    I believe it was because we were working with

18   legal counsel at this time.

19       Q.    And would that have been Mr. Welch?

20       A.    Yes, Bill Welch.

21       Q.    What was Bill Welch's title at that time?

22       A.    Legal counsel.

23       Q.    For Cigna?

24       A.    Yes.

25            MR. CUNNINGHAM:  All right.  Joint Exhibit 157

1    please.

2            THE COURT:  Joint Exhibit 157 is a full exhibit.

3    BY MR. CUNNINGHAM:

4        Q.    Yes, ma'am.  Thank you.  Could you make that

5    smaller so we can see the whole thing.

6            Ms. Canto, can you read that letter?  Not out

7    loud.  Can you see that well enough to read it?

8        A.    Yes, I can.

9        Q.    Is this letter dated March 27, 2014?

10       A.    Yes, it is.

11       Q.    Would it be fair to say this is what would be

12   called an overpayment letter or a demand letter?

13       A.    Yes, that's correct.

14       Q.    And was this letter addressed to a lawyer at the

15   Akerman Law Firm in Miami, Florida?

16       A.    Yes.

17       Q.    Does it say regarding refund request?

18       A.    Yes.

19       Q.    So can you describe the purpose of this letter?

20       A.    This letter is supplying additional information

21   regarding the outcome of the audit and the fact that we

22   had identified damages and were requesting those monies

23   back from the lab.

24       Q.    Do you know whether this letter was ever sent?

25       A.    I believe that it was.

1       Q.   It was my understanding this was a draft letter.

2            MR. KANG:  Objection, Your Honor.

3            THE COURT:  He can ask that question.

4       Overruled.  You can answer, ma'am, if you can.

5       BY MR. CUNNINGHAM:

6       Q.   Let me ask you.  Let me move on past that.  So

7       would you agree with me that what this letter is alleging

8       is that the Labs owed Cigna money for basically billing

9       for services not rendered as billed.  Would you agree

10      with that?  We can make parts of it larger if you need us

11      to.

12      A.   Yes.  There is a statement that indicates the

13      services were not rendered as billed.

14      Q.   In this letter, Cigna was asking for the Labs to

15      pay Cigna $2,418,700.20 correct?

16      A.   Not exactly.  That money wasn't going to Cigna.

17      It was going to our clients.

18      Q.   The letter is on the Cigna letterhead, isn't it?

19      A.   Yes.

20      Q.   Now would it be fair to say that as of this

21      point in time March 27, 2014 shortly after you came back

22      from maternity leave, your allegation and Dr. Nicoll's

23      allegation was that the testing that was done by PB Labs

24      was not medically necessary?

25      A.   Yes.  That was the primary area of concern was

1    the medical necessity.

2        Q.   Isn't it true that PB Labs had provided you a

3    lot of medical records and Lab reports that disproved the

4    allegation that the testing was not medically necessary?

5            MR. KANG:  Objection.  Mischaracterizes prior

6    testimony.

7            THE COURT:  Her prior testimony?

8            MR. KANG:  Yes, Your Honor.

9            THE COURT:  She can say that.  You can answer

10   that question.  He's asking is the statement he's making

11   true.  You can say yes or no..  Or I don't understand or

12   I can't answer it.

13       A.   Would you please repeat the question?

14   BY MR. CUNNINGHAM:

15       Q.   I will try.  I will probably start a new

16   question.

17           Isn't it true, ma'am, that as of the date of

18   this March letter March 27, 2014.  As this letter

19   establishes, you and Dr. Nicoll believed at this time

20   that the testing by PB Labs was not medically necessary?

21           MR. KANG:  Objection to calling for Dr. Nicoll's

22   belief.

23           THE COURT:  Sustained.

24   BY MR. CUNNINGHAM:

25       Q.   Isn't it true -- well, strike that.  Let me

1    approach it this way, ma'am.

2          Isn't it true that you were relying upon the

3    opinion or the assessment of Dr. Nicoll before deciding

4    what to do with that flag against PB Labs?

5    A.    That was the just one element of the

6    information, sir.

7    Q.    But you were not competent and I mean no

8    disrespect, you were not competent from a medical

9    standpoint to give an opinion about whether something was

10   medically necessary, were you?

11   A.    No, I'm not a clinician.

12   Q.    So in determining whether this testing was

13   medically necessary, you would have had to rely upon Dr.

14   Nicoll to provide his assessment of that, right?

15   A.    Yes, the clinical aspects.

16   Q.    This letter doesn't say I, Stephanie Canto, who

17   is not a doctor, have determined that the testing of PB

18   Labs is not medically necessary, does it?

19         MR. KANG:  Objection.  Argumentative.

20         THE COURT:  Overruled.

21   A.    The letter supplies an overview of what the

22   findings of the audit were.

23   BY MR. CUNNINGHAM:

24   Q.    The finding of you and Dr. Nicoll?

25   A.    Yes, based on the information supplied by the

1    Labs.

2        Q.    So this letter summarizes your belief and Dr.

3    Nicoll's belief that as of that point in time, the

4    testing by PB Labs was not medically necessary, true?

5        A.    True.

6        Q.    And the Labs provided a lot of information to

7    you to establish that some of the testing, at least some

8    of the testing was medically necessary?

9        A.    Not directly to me.  I had received that

10   information through legal counsel.

11       Q.    I don't want to know what you talked about with

12   legal counsel but let me ask you this.  Were you saying

13   with this letter that you gave us boxes of documents PB

14   Labs.  You gave us lab reports and there was not one

15   single piece of evidence in those records that you

16   provided to us that established medical necessity for any

17   of the lab services performed by PB Labs.  Is that what

18   this letter was saying?

19       A.    No.  What the letter is stating is that there

20   were initial qualitative tests and based on those test

21   results the quantitative testing being performed by the

22   lab was not supported as being medically necessary.

23       Q.    But you were not saying there's not any evidence

24   at all that not one single test that you performed is

25   medically necessary.  That's not what you are saying

1    here, was it?

2        A.    No.  That's not what this letter states.

3        Q.    Still this letter asks for repayment of 2.4

4    million dollars, right?

5        A.    Yes, it does.

6        Q.    Was there any attempt in this letter to parse

7    out what you thought might not be medically necessary

8    versus what might be medically necessary?

9        A.    That information was documented in the email

10   that you showed me before.

11       Q.    But if there were parts of those lab tests or if

12   there were certain lab tests that were, in fact,

13   determined to be medically necessary by Cigna, you should

14   have sent them a check at that time for services

15   rendered, shouldn't you?

16       A.    If I can elaborate with a longer answer.

17           THE COURT:  You have to say I can't answer or

18   yes or no.

19       A.    I can't answer.

20   BY MR. CUNNINGHAM:

21       Q.    Let's look at Joint Exhibit 146 at page 17.  On

22   March 27, okay.  This is what I want to ask you about,

23   ma'am.  See your entry there on March 27, 2014.

24       A.    Yes, I do.

25       Q.    I will go ahead and read it to make things go a

1    little more quickly.  I completed merging the GW and

2    Cigna East info.  I placed both the claim data and the

3    overpayment letter in a password protected zip file on

4    the T drive in my case notes.  The password is

5    CollectAway.  Did I read that accurately?

6        A.   Yes.

7        Q.   You refer to an overpayment letter, do you not?

8        A.   Yes, I do.

9        Q.   Would you agree with me that the overpayment

10   letter that you are referring to is the one we just

11   looked at?

12       A.   Yes.

13           THE COURT:  Can you give me that exhibit number

14   so the record will be complete. Joint 157 is that what

15   you are referring to?

16           MR. CUNNINGHAM:  Yes, Your Honor.  The

17   overpayment letter.

18   BY MR. CUNNINGHAM:

19       Q.   So let's go to Joint Exhibit 146A at page 17,

20   Mr. Smeig.

21           Do you see there, ma'am, on April 7, 2014.  It's

22   the second entry from the top, Mr. Smeig.  Do you see

23   that entry with your name next to it on April 7, 2014 at

24   2:27 p.m?

25       A.   I do.

1    Q.    Does it say I had my meeting this afternoon with

2   Dr. Nicoll and Bill Welch?  Did I read that accurately?

3    A.    Yes.

4    Q.    There are some redactions presumably for

5   attorney/client privilege, right?

6    A.    Are you wanting me to answer that?

7    Q.    I don't know if you remember what was in here.

8         THE COURT:  He's asking you to agree after what

9   he just read, it says redacted privilege.

10        THE WITNESS:  Yes, I agree.

11   BY MR. CUNNINGHAM:

12    Q.    It said I had my meeting with Bill Welch and Dr.

13   Nicoll?

14    A.    Yes, that's correct.

15    Q.    Now, ma'am, would you agree with me as a result

16   of the meeting with Mr. Welch, Mr. Welch prohibited you

17   from sending that overpayment letter that we spent the

18   last few minutes talking about?

19    A.    Without seeing the remainder of the information,

20   I can't confirm.

21    Q.    It's still your belief and your memory after

22   reviewing your file that you actually sent that

23   overpayment letter that basically said that the Labs were

24   not being paid because the services rendered were not

25   medically necessary.  Is that your testimony?

1      A.    I believe that they did receive my letter.

2      Q.    Ma'am, in fact, isn't it true that you around

3   the same time lifted the flag for services not rendered

4   as billed?

5      A.    If I recall, I modified the protocol of the

6   flag.

7      Q.    So that's a yes.

8      A.    Portions of the flag were to still deny services

9   as not rendered as billed.

10      Q.    You say you modified the protocol.  You lifted

11   the flag at least with respect to some of the claims that

12   had been submitted a PB Labs?

13      A.    That's not what I said.

14      Q.    I'm asking if that's what you meant?

15      A.    No.  What I meant was the flag protocol language

16   was modified so that only certain services on the go

17   forward were to be denied as services not rendered as

18   billed.  The remainder of any services billed would be

19   paid.

20      Q.    So that was a change in position by Cigna, was

21   it not?

22      A.    No, it was not.  It was a discussion between two

23   attorneys and I didn't have a real inclination of what

24   those conversations may have led to.

25      Q.    Well, ma'am, you placed a flag against PBL that

1    resulted in no claims being paid based on services not

2    rendered as billed, correct?

3        A.   At one period of time, yes.

4        Q.   Now you are telling me after you met with

5    Mr. Welch, after the medical records had been reviewed,

6    you modified the protocol I believe is the term you used?

7        A.   Yes, that's correct.

8        Q.   You just said that some of the claims were

9    allowed to be paid?

10       A.   Some of the services.

11       Q.   Okay.  Some of the services were allowed to be

12   paid because Cigna determined that they were, in fact,

13   medically necessary; isn't that true?

14       A.    I honestly can't determine what attorneys

15   discussed other than providing me the outcome of

16   modifying the protocol.

17       Q.   Ma'am, the whole rationale for not paying was

18   because you had determined before you saw the medical

19   records and Dr. Nicoll saw the medical records that the

20   services were not medically necessary, right?

21       A.    If I were given an opportunity to explain the

22   investigative actions taken, I would be able to

23   demonstrate that over the course of a year, the flag

24   protocol was changed several times based on the

25   information supplied by the Labs.

1          Q.   I'm trying to finish with you.  Okay.  And I

2    appreciate you are trying to answer my questions.

3          You placed a Lab -- you placed a flag on PB Labs

4    for services not rendered a billed, right?

5          A.   Yes, that's not the first flag, though.

6          Q.   I understand.  That wasn't my question.  Please

7    listen to my question.  PB Labs then sent you boxes of

8    medical records and a bunch of lab reports, right?

9          A.   Yes.

10         Q.   Dr. Nicoll eventually reviewed those materials

11   that were submitted by PB Labs, right?

12         A.   Correct, yes.

13         Q.   You told us after that, PB Labs modified the

14   protocol and allowed some of those claims that had been

15   previously flagged to be paid, right?

16         A.   The decision came from legal counsel, not Dr.

17   Nicoll.

18         Q.   That wasn't my question.  Whoever made the

19   decision, Cigna instructed you to remove the flag at

20   least for some of those claims that you previously

21   claimed were not medically necessary and you allowed some

22   of those claims to be paid?

23         A.   Yes.

24         Q.   And the reason that you had not allowed them was

25   you thought they weren't medically necessary but now

1    after reviewing all of the records, Cigna changed its

2    mind and agreed that the claims that now could be paid,

3    were going to paid because the services were, in fact,

4    medically necessary, true?

5        A.   I don't believe that's an accurate statement of

6    our conclusions.

7        Q.   At this point in time when this flag protocol

8    changed, to use your terminology, PB Labs had been

9    dealing with this flag for almost a year, hadn't it?

10       A.   Yes.

11       Q.   Did you ever contact PB Labs and say I'm really

12   sorry this took a year.  I'm really sorry we did this to

13   you?

14            MR. KANG:  Objection, Your Honor, relevance.

15            THE COURT:  I will allow it.

16       A.   No conversation to that effect was had.

17   BY MR. CUNNINGHAM:

18       Q.   Did anybody at the Cigna SIU express their

19   regret to Palm Beach Labs for delaying payment for a year

20   then changing their minds?

21            MR. KANG:  Same objection, Your Honor.

22            THE COURT:  Overruled.

23       A.   I don't regret doing my job, sir.

24   BY MR. CUNNINGHAM:

25       Q.   Isn't it true, ma'am, that once -- give me one

1    moment here, Your Honor.  I'm almost finished.

2          Ms. Canto, isn't it true that once Cigna

3    determined that certain of the claims should be paid

4    because the medical necessity flag was not valid with

5    respect to those claims, you then began searching for

6    another way to deny payment of claims to PB Labs?

7    A.    No.  That's not correct.

8    Q.    Didn't you come up with another rationale?

9    Didn't you place another flag on PB Labs?

10   A.    I can't answer with just yes or no, sir.

11   Q.    Did you know at this time that

12   Mr. Evanko -- -- strike that.

13         Let me ask you this first.  Do you know who

14   Brian Evanko is.

15   A.    I do.

16   Q.    Do you remember that he was the head of what was

17   called the Core Action Team?

18   A.    I didn't hear that term until today, sir.

19   Q.    But you knew who Mr. Evanko was, right?

20   A.    Yes.

21   Q.    What was your understanding of who he was?

22   A.    He was a part of Cigna's senior leadership team.

23   Q.    Was he like Vice President of Cigna Health Care

24   at that time?

25   A.    I don't know.

1    Q.    But he was a bigwig in the health insurance

2    department at Cigna, right?

3    A.    I suppose so.

4    Q.    Do you remember having any discussions with him

5    around this time frame in March or April of 2014 about

6    maybe trying to find another way to deny payment to PB

7    Labs?

8    A.    I have never had a conversation with Mr. Evanko.

9    Q.    Now, ma'am, would you agree with me that with

10   all due respect, you were wrong about the claims that you

11   later capitulated on and agreed to pay?

12   A.    I don't believe I was wrong, sir.

13   Q.    Did anyone at Cigna ever investigate you?

14   A.    Not to my knowledge.

15   Q.    Now, ma'am, weren't you also assigned to

16   investigate another one of the labs called BioHealth?

17   A.    Yes.

18   Q.    Do you know why the investigation was BioHealth

19   Labs or BioHealth was assigned to you?

20   A.    I believe it was because I was already working

21   on the other labs associated with BioHealth.

22   Q.    Did you ever say to anyone at Cigna, you know,

23   I'm just wrapping up this investigation on PB Labs.

24   Maybe somebody else should do BioHealth?

25   A.    No.

1    Q.    Were you reprimanded in any way for the fact

2    that it took a year to finally lift the flag with respect

3    to come some of the claims that PB Labs had submitted?

4    A.    Not that I recall.

5    Q.    Let's look at your ledger for BioHealth, ma'am.

6    We need to see Labs Exhibit 6562.  This is not in

7    evidence, Your Honor.

8         THE COURT:  Don't publish to the jury.  Lab

9    Exhibit 6562.

10   BY MR. CUNNINGHAM:

11   Q.    Top of page 21, entry on May 9, 2014.

12        Now, ma'am, do you recognize this entry?

13   A.    Yes.

14   Q.    Do you recognize this document?

15   A.    This appears to be a snapshot of our current

16   case management system.

17   Q.    And, in fact, if we zoom out for a minute and

18   you can see the entire document, is it clear that this is

19   a page from your case notes on your case log?

20   A.    Yes.

21        THE COURT:  Can you make it clear what page in

22   the exhibit that is?

23        MR. CUNNINGHAM:  Yes, ma'am.  Be happy to.  I

24   believe page 21.  Can we please zoom back in.

25   BY MR. CUNNINGHAM:

1      Q.   All I want to ask about is this, ma'am.  You

2   recognize this to be an entry from your case notes,

3   right?

4      A.   Yes.

5      Q.   And this entry is entered by you on May 9, 2014,

6   is it not?

7      A.   Yes.

8      Q.   Mr. Smeig, let's make sure we don't scroll down

9   any lower than this please.  Thank you.  So does this

10   entry indicate that you had developed an investigative

11   plan with regard to BioHealth?

12      A.   Yes.

13          MR. CUNNINGHAM:  Your Honor, we can redact this

14   document.  We can redact this exhibit because of some

15   concerns, but I would like to move this into evidence.  I

16   think it's been authenticated.

17          THE COURT:  I need to know what the this is.

18   What you will redact.  What will be the exhibit.

19          MR. CUNNINGHAM:  We want to enter this one

20   entry, this highlighted portion.

21          THE COURT:  Is there objection to marking as

22   6562A, the blown-up version which relates to an entry on

23   the left column investigative plan dash developed

24   5-9-2014.  Long digit numbers in the fourth column and

25   words are about BioHealth and PB Labs are both owned by

1    Medytox and describing what the investigative plan is?

2            MR. KANG:  No objection, Your Honor.

3            THE COURT:  So if you would prepare a document

4    that's just what you have highlighted that will be marked

5    as Lab Exhibit 162A as a full exhibit.  What is up there

6    would you like published to the jury at this time?

7            MR. CUNNINGHAM:  I don't think it's necessary.

8            THE COURT:  That is a full exhibit, Liana.

9            MR. CUNNINGHAM:  Thank you.  I need a moment.  I

10   was not aware of the concern that was raised.  I need to

11   adjust this on the fly.

12   BY MR. CUNNINGHAM:

13     Q.   Can we pull up Joint Exhibit 162A which is a

14   full exhibit.

15           I will move on from this.

16           I would like to pull up the entire exhibit, not

17   the redacted part.  There's something I want to ask her

18   about with publishing it to the jury?

19           THE COURT:  If you want to pull up that exhibit,

20   you say exhibit number or Lab exhibit number then we

21   know.

22           MR. CUNNINGHAM:  Lab 6562.

23           THE COURT:  That's not published to the jury.

24   The entire document is still ID.

25   BY MR. CUNNINGHAM:

1    Q.   If we can go past the one that you zoomed in

2    already.  Let's go below that.  I will ask you a few

3    questions about this, Ms. Canto.  I don't want to get

4    into the minute details of it.  Let's go to May 1,

5    please.  Let's look at the entry on May 1.  The top one,

6    Ms. Canto.  Does it say allegation changed to

7    misrepresentation?

8    A.   Yes.

9    Q.   So you are alleging that BioHealth had engaged

10   in misrepresentation with respect to claims it had

11   submitted to Cigna, correct?

12   A.   No.  That statement isn't made by myself.

13   Q.   Okay.  That's made by your supervisor at the

14   time Ms. Anderson, correct?

15   A.   Yes.

16   Q.   But this is an entry in the notes that the

17   common file that you and Ms. Anderson were both working

18   on, right?

19   A.   Yes.  This is in my case file.

20   Q.   Does it say allegation changed to misrep?

21   A.   Yes.

22   Q.   That entry is by Ms. Anderson?

23   A.   Yes.

24   Q.   That's D-e-a-n-n-a Anderson.  And it says

25   allegation changed to misrepresentation, correct?

1    A.    Yes, that's what she's noted.

2    Q.    Do you know what she meant by that?

3        I believe she's going to testify so if you don't

4  that's okay.

5    A.    I don't.  I'm sorry.

6    Q.    Misrepresentation is a pretty serious

7  allegation, is it not?

8    A.    I believe any allegation is serious, sir.

9    Q.    Well, misrepresentation basically means the same

10  thing as lying, right?

11    A.    Essentially, yes.

12    Q.    All right.  Then let's go to May 9 please.  This

13  entry is entered by you on May 9, 2014, is it not?

14    A.    Yes.

15    Q.    Okay.  Do you say I need to review data between

16  the two labs for possible double billing in addition to

17  qualitative/quantitative drug screens.  Did I read that

18  accurately?

19    A.    Yes.

20    Q.    So you changed the allegation from the previous

21  allegation that was made against BioHealth, correct?

22    A.    No.  I was dominating what I was pursuing based

23  on the client's concerns, what prompted this referral.

24    Q.    So Ms. Anderson says we might have

25  misrepresentation.  You say we might have double billing?

1    A.    Technically I client expressed concerns of

2    double billing.  That's what I was looking for.

3    Q.    Right.  That's what you are going to

4    investigate?

5    A.    Yes.

6    Q.    You add another allegation on that same date

7    that I don't want you to talk about.  Just below that

8    that's another allegation that you want to look into,

9    right?  Don't tell me what that is.

10   A.    Yes.

11   Q.    So that's a series of three different

12   allegations that have been leveled against BioHealth

13   basically in the first day of the investigation of

14   BioHealth, correct?

15   A.    Those were allegations that we were dominating

16   based on the referral source.

17        THE COURT:  That wasn't the question.

18   A.    Yes.

19 BY MR. CUNNINGHAM:

20   Q.    Ma'am, would you agree with me that you were

21   just throwing allegations against the wall and hoping

22   that something would stick?

23   A.    Absolutely not.

24   Q.    Can we go Labs Exhibit 6562, pages 18 and 19.

25        THE COURT:  That's not fully in evidence so it

1  should not be published I believe.

2      MR. CUNNINGHAM:  Thank you, Your Honor.  I'm

3  talking about November 18, 2024 entry.  If you can please

4  pull that up, Mr. Smeig.  Give me one moment, Your Honor.

5  BY MR. CUNNINGHAM:

6      Q.   Ma'am, I want to ask you about the entry on

7  November 18, 2014.  Do you see that in the middle of the

8  page?

9      A.   Yes.

10     Q.   And that entry is made by you, correct?

11     A.   Can you clarify which one please?

12     Q.   The second one says investigative plan updated?

13     A.   Yes.  That's mine.

14     Q.   November 18.  Do you write here given the volume

15  of claims being supplied with medical records, I have

16  requested to remove the flag on this case.  Is that what

17  you wrote there?

18     A.   Yes.

19     Q.   So would you agree with me that that was

20  basically you admitting defeat on the flag of medical

21  necessity because the volumes of claims being submitted

22  with medical records you decided to remove the flag?

23     A.   That's an incorrect statement, sir.

24     Q.   You were giving up that the flag of medical

25  necessity, were you not?

1       A.   I wasn't pursuing medical necessity on this

2   case, sir.

3       Q.   What were you pursuing on this case at this

4   time?

5       A.   Concerns related to double billing.

6       Q.   Whatever the flag was, whatever the reason was,

7   you requested to remove the flag on BioHealth, did you

8   not?

9       A.   Yes, the flag for medical records.

10      Q.   You decided to take the investigation in a

11  different direction that we're not going to talk about

12  right now, correct?

13      A.   Yes, that's correct.

14      Q.   Ma'am, do you believe that you gave Palm Beach

15  Labs and BioHealth the treatment they deserved as medical

16  care providers or health care providers who submitted

17  claims to Cigna?

18      A.   Yes, I treated them no differently than any

19  other providers I audit.

20          MR. CUNNINGHAM:  Thank you, ma'am, for your

21  time.

22          THE COURT:  Cross-examination, Attorney Kang by

23  Cigna of Ms. Canto.  Bearing in mind what I'm trying to

24  say.  I hope you know what I'm trying to say.  She's an

25  employee of the parties you are cross-examining on.

1    MR. KANG:  Yes.  I'm going to go to abide by the

2  scope that was covered on direct.

3    THE COURT:  Just so the ladies and gentlemen,

4  remember I told you we're going to try to avoid -- maybe

5  I didn't.  We're going to try to avoiding -- this witness

6  has been presented initially by the Labs in their case.

7  Attorney Kang, has the right to cross-examine her on what

8  she testified to in response to the Labs' questions on

9  their case.

10    However, Cigna has alerted everyone they would

11  call Ms. Canto in their case.  But for various I won't

12  call them technical but legal reasons I will say, I have

13  instructed counsel when this happens, it will happen on

14  the other side.  It flip when Attorney Kang starts

15  calling witnesses for his case.

16    When this happens the lawyer currently Attorney

17  Kang gets up to cross-examine.  He'll limit his questions

18  in the beginning to examining the witness stand on the

19  subjects that she testified to in response to the Labs'

20  counsel's questions.

21    Then he'll alert me, Judge, I completed my cross

22  -- the cross of the Lab's questions and I'm going to

23  begin to treat, in effect, Ms. Canto as my witness in

24  proving Cigna's case.  And then he'll start what's called

25  a direct examination which the Labs have a right to do a

1    cross to. I'm sorry it's very technical. That's what

2    counsel is referring to. There's a two step here in

3    order to, as I told you at the beginning, a lot of

4    witnesses are the same in both cases.

5          In order to prevent bringing someone down and

6    preparing them, then excusing them and send her back to

7    her desk and she just picks up her pen to start working

8    and call her back again is to avoid that.

9          I hope you can follow. We'll try to give you a

10   cues as Attorney Kang suggested when he stood up. I

11   appreciate that, sir. Whenever you are ready.

12   CROSS-EXAMINATION BY MR. KANG:

13      Q.   Good afternoon, Ms. Canto. How are you?

14      A.   I'm doing well. How are you?

15      Q.   I'm doing well. So again we'll try to stay on

16   this part in the areas that Mr. Cunningham asked you

17   questions on first, okay, ma'am?

18      A.   Yes.

19      Q.   I want to start off with a topic that Attorney

20   Cunningham asked about regarding the communications that

21   Cigna and Cigna SIU had with PB Labs about the audit. I

22   believe he asked you some question whether that you had

23   the common courtesy of getting back to them. I want to

24   follow up on that, okay?

25      A.   Yes.

1     Q.   Can you tell the jury when did you first learn

2    about information that caused an investigation to open

3    into PB Labs?

4     A.   The initial referral was received in the spring

5    of 2013.  One of our clients expressed concerns with

6    regards to the amount of charges and payments for one

7    particular customer covered under the plan.

8     Q.   When you say one of your customers or clients,

9    referred this, which client was that?

10    A.   With respect to PB Labs, the client called Samba

11    had made a referral to our SIU.

12    Q.   That's Samba?

13    A.   Samba is a federally funded employer group that

14    utilizes Cigna to price their claims.

15    Q.   Is Samba -- and Mr. Cunningham asked you some

16    questions about the individual and family plans, the IFP

17    plans.  Do you remember that?

18    A.   Yes.

19    Q.   Is Samba an IFP plan?

20    A.   No, it is not.

21    Q.   Samba is an employer-sponsored plan?

22    A.   Yes, that's correct.

23    Q.   And so what was the nature of the referral from

24    Samba that caused this to begin?

25    A.   They had identified and expressed concerns with

1    high frequency billing for drug testing services with

2    regards to one of the customers that was covered under

3    the plan.  They were concerned due to the frequency and

4    the amount of charges involved, they submitted a referral

5    to our department requesting an investigation into that.

6        Q.   That was into PB Labs?

7        A.   That's correct.

8        Q.   I'm not going to go into all of the details of

9    what you did right away.  I think that will be the

10   subject of your direct.  Let me ask you this.  Eventually

11   after receiving that referral from Samba, did you get in

12   contact with somebody from PB Labs?

13       A.   Yes, I did to initiate my review and request for

14   records.

15       Q.   When you say request for records and we have

16   heard that a little bit.  What do you mean by that and

17   why were you requesting records?

18       A.   When we receive a referral with regards to

19   especially client concerns of excessive billing or high

20   charges, we need an opportunity to review information

21   from the provider to understand whether or not that's

22   been supplied as claims is actually supported and as part

23   of my investigation, I would request that information

24   from the provider to compare it to their claims.

25       Q.   And we have heard the distinction between you

1    have made between medical records and lab results.  Can

2    you explain the difference between those two documents?

3         A.   In high detail, a lab test result is only

4    telling you whether or not a patient has a specific drug

5    in their system.  Whereas a medical record is going to be

6    a complete medical history of that patient.  It is going

7    to identify their diagnoses, their treating provider,

8    that providers justification or medical necessity, the

9    type of test, the frequency of the test.  There's a lot

10   that goes into a medical record.

11        Q.   So medical record contains clinical information

12   from the underlying provider who is treating the patient?

13        A.   Yes.  That would be expected as a part of the

14   compete record.

15        Q.   What about the lab results does that include the

16   clinical information?

17        A.   Just the outcome of the actual test.

18        Q.   Why can't you glean medical necessity just from

19   those lab test results?

20        A.   Essentially, all they are saying is whether or

21   not the patient tested positive or negative for a

22   substance.  It is not telling us the medical necessity

23   for that test.

24        Q.   Did you request medical records from PB Labs?

25        A.   I did.

1          Q.    Can we pull up, Mr. Salazar, Cigna Exhibit 395

2     which I believe does not have an objection, Your Honor.

3                THE COURT:  Absent Cigna Exhibit 395 will be

4     marked as a full exhibit and may be published.

5                MR. KANG:  If you could zoom in, Mr. Salazar, to

6     the first third of this document that would be great.

7     BY MR. KANG:

8          Q.    Ms. Canto, do you recognize this document?

9          A.    Yes.

10         Q.    What is this?

11         A.    This is the letter that I sent to the lab

12    requesting those medical records.

13         Q.    What's the date of this?

14         A.    July 15, 2013.

15         Q.    About how long after you heard from Samba, did

16    you send this letter out?

17         A.    Less than a month.

18         Q.    And I see there says CollectAway.  What's

19    CollectAway?

20         A.    It was the D/B/A for PB Labs at the time.

21         Q.    D/B/A is what?

22         A.    Doing business as.

23         Q.    CollectAway is the same as PB Labs?

24         A.    Yes, that's correct.

25         Q.    If you can scroll down.  You state here to whom

1    it may concern, I am performing an audit of medical

2    claims submitted to Cigna for members on the enclosed

3    spreadsheet.  Did I read that correctly?

4         A.   Yes.

5         Q.   So were you apprising PB Labs at this point an

6    audit of SIU was pending?

7         A.   Yes.

8         Q.   And if you scroll down, there's a lot of bullet

9    points here.  What's all of this stuff?

10        A.   These are some examples of what we would expect

11   to see with a complete medical record.

12        Q.   One of the items as you see is lab results,

13   correct?  Mr. Salazar, if you can highlight that.  One of

14   the requests you made was for lab results, correct?

15        A.   Yes.

16        Q.   But is it the only thing that you asked for?

17        A.   No, it's not.

18        Q.   All those other things you asked for as well?

19        A.   Yes, as applicable.

20        Q.   Did you feel that some or all of those other

21   things could help you determine the medical necessity of

22   these services?

23        A.   Yes.

24        Q.   If you could scroll down to the second page, Mr.

25   Salazar.  This is the second page of your letter,

1    Ms. Canto.  What is this?

2        A.    That's the actual patient information for the

3    sample of records that I was asking for.

4        Q.    You were asking for all of those things in the

5    bullet point for these patients?

6        A.    Yes, that's correct.

7        Q.    And have you heard of the term probe sample?

8        A.    Yes, I have.

9        Q.    What's that?

10       A.    A probe sample quite frankly just a

11   representative sample of services.

12       Q.    And so here you are asking for records related

13   to 20 patients?

14       A.    Yes, that's correct.

15       Q.    Why didn't you ask for more?

16       A.    As a matter of my judgment, I was hoping that

17   request for 20 patient records would not be too

18   burdensome for the lab.

19       Q.    So this is dated July 15, 2013; is that right,

20   ma'am?

21       A.    Yes, I believe that was the date.

22       Q.    So did you have a follow-up call with anybody

23   from the Labs?

24       A.    Yes.

25       Q.    And approximately when did that occur?

1      A.    I believe it was the towards the latter part of

2  July.

3      Q.    And do you remember who you spoke with?

4      A.    It was a woman named Dolores.

5      Q.    Did you know what position Dolores had at PB

6  Labs?

7      A.    I believe she might have been with their billing

8  area.

9      Q.    What did you ask her?

10     A.    I was asking her to comply with the request for

11  information and that we needed this in order to

12  substantiate the claims that were being submitted.

13     Q.    Did she comply?

14     A.    No.  She did not.

15     Q.    What did she say?

16          MR. CUNNINGHAM:  Objection.  Hearsay.

17          MR. KANG:  Statement of party opponent, Your

18  Honor.

19          THE COURT:  I'm not sure she established a

20  person is a person authorized to speak.

21          MR. KANG:  I can lay the foundation.

22  BY MR. KANG:

23     Q.    You said Dolores was from where?

24     A.    I believe she was the billing person on behalf

25  of CollectAway or PB Labs.

1    Q.   Did you understand her to be authorized to speak

2    to behalf of the Labs on this issue?

3    A.   Yes.

4    Q.   So what did you discuss with Dolores?

5    A.   I explained to Dolores that I needed the medical

6    records.

7         MR. CUNNINGHAM:  Objection.  May I be heard very

8    briefly?

9         THE COURT:  If you get yourself on a microphone.

10        MR. CUNNINGHAM:  The objection is still hearsay.

11   This is not a party opponent.  She worked for Medical

12   Billing Corporation.

13        THE COURT:  At that time, that would be my

14   understanding so she was not.

15        MR. KANG:  I think she just testified she was

16   authorized on this issue of billing.

17        THE COURT:  Probably should have been an

18   objection as to the basis for this witness's testimony

19   after saying she wasn't sure she was in billing but she

20   thought she was to then say she's authorized to speak for

21   an entity that's not a party to this case, I would

22   sustain the objection.

23   BY MR. KANG:

24   Q.   Did Ms. Dolores represent to you that she was

25   authorized to speak on behalf of PB Labs on this issue?

1          A.   Yes.  When I contacted the lab to follow up on

2     my request, I was transferred to Dolores with regards to

3     my letter.

4               MR. KANG:  Your Honor, I would say offer it.

5               THE COURT:  Objection.

6               MR. CUNNINGHAM:  Same objection, Your Honor.  It

7     is boot strapping at this point.  Not a party opponent.

8               THE COURT:  Remind me the number of statement of

9     a party opponent.  What section it is.

10              MR. CUNNINGHAM:  It's under 801, Your Honor.

11              THE COURT:  That makes it not hearsay and it is

12    your position you are stating to the Court, the company

13    she worked for whom I think we heard testimony was

14    engaged by Mr. Nicholson's company, in effect.  The first

15    witness testified to that is not acting, in effect, on

16    billing issues representing PB.

17              MR. CUNNINGHAM:  They are a contractor for the

18    Labs, but they are not the party.

19              THE COURT:  So you are chAlanging C.  She isn't

20    a party authorized to make the statement on the subject.

21    I don't think you laid the foundation if they are going

22    to assert the objection.

23              Sustained.

24              MR. KANG:  I would offer it then for nonhearsay

25    purposes to show what it is that Ms. Canto did as a

1  follow up.

2          THE COURT:  For state of mind?

3          MR. KANG:  Yes.

4          THE COURT:  Is there objection to that?

5          MR. CUNNINGHAM:  It still requires the truth of

6  the matter asserted by the out of court declarant.

7          THE COURT:  What was the question that we

8  started.  You wanted to read this exhibit?

9          What are trying to get in?

10          MR. KANG:  I want to get in through her

11  conversation about what she did in the contacts that she

12  had with PB Labs.  That's it.

13          THE COURT:  If I limit this not to prove the

14  truth of what she said she heard but to prove she heard

15  it in connection with her next being asked what's your

16  next step and why, I don't think that's hearsay if a

17  limit instruction is given.

18          MR. CUNNINGHAM:  Your Honor, just to follow up

19  on this last point, my understanding of the state of mind

20  exception is that it only applies if state of mind is an

21  issue in this case.

22          THE COURT:  Put a question to the witness.  It

23  will demonstrate to me why it's relevant.  Why her state

24  of mind is relevant.  You sort of got a cart before the

25  horse here.

1          MR. KANG:  I'm trying to establish that

2    Mr. Cunningham was indicating that Ms. Canto did not have

3    any contact with PB Labs about her investigation.

4          THE COURT:  That's not state of mind.  That's an

5    out of court statement.  I'm sorry, sir.  Please move on.

6          MR. KANG:  May I inquire of her about the

7    contact that she had with Dolores?

8          THE COURT:  As long as you don't have her say

9    hearsay statements.

10          MR. KANG:  Understood.

11    BY MR. KANG:

12          Ms. Canto, did you place a call to a

13    representative of PB Labs after your letter was sent out

14    on July 15, 2013?

15    A.    Yes.

16    Q.    Do you recall approximately when that was?

17    A.    Towards the latter part of July.

18    Q.    And did that individual -- what was the name of

19    that individual?

20    A.    Her name was Dolores.

21    Q.    Did that individual indicate anything to you

22    that she had not received the medical records request

23    that you had sent?

24          MR. CUNNINGHAM:  Same objection, Your Honor.

25          THE COURT:  Sustained.

1    BY MR. KANG:

2        Q.    Did you speak with Dolores about your medical

3    records request?

4        A.    Yes.

5        Q.    Did you -- based on a conversation that you had

6    with Dolores from PB Labs, did Dolores provide you after

7    that call with the medical records that you were

8    requesting?

9        A.    No, just test results.

10       Q.    And why was that insufficient in your mind?

11       A.    As I previously had stated, the test results are

12   not going to give clarity or any details to speak to the

13   medical necessity of the testing, just the actual result.

14       Q.    So at this point, you spoke with her in July of

15   2013, yes?

16       A.    Yes.

17       Q.    And based on that conversation, what did you do?

18       A.    I followed up with my manager to discuss a

19   potential inability to receive the requested information.

20       Q.    And was there a decision made to place what is

21   known as an edit on PB Labs?

22       A.    Yes.  As a part of that conversation with my

23   manager, I was moving forward with a decision to actually

24   pend claims for one particular code of concern to request

25   records prospectively.

1       Q.   So there's been terms pend and edit and flag.

2   Can you please tell the jurors the difference between a

3   full denial flag and an edit or a pend request?

4       A.   I will try to do this as high level as I can.

5   When we pend a claim that means that we are holding the

6   claim and we can hold the claim for a variety of reasons

7   and with respect to PB Labs, the protocol that I was

8   placing was to request medical records if the claim was

9   billed with what we called an unlisted procedure code.

10      Q.   How is that different from a full denial flag?

11      A.   A full denial is basically that.  It is going to

12  deny something out right in full.

13      Q.   So on a medical records edit, if the provider,

14  the claim is held pending medical records provided by the

15  provider?

16      A.   Yes.  The claim is suspended and not processed

17  and a letter is generated requesting medical records for

18  that claim.

19      Q.   What happens then if the provider follows up and

20  sends you medical records to justify that the services

21  have been supported?

22      A.   If we do, in fact, receive the medical records,

23  they are reviewed and if they support what was billed,

24  the claim is released to pay.

25      Q.   Did that happen with respect to PB Labs?

1      A.    No.

2      Q.    As a result, we have been talking although you

3   did not receive medical records in response to your

4   request, you are did receive some Lab results; is that

5   correct?

6      A.    Yes.

7      Q.    And for how many patients did you receive lab

8   results?

9      A.    For the probe sample of 20.

10      Q.    When Mr. Cunningham was asking you that these

11   were for 20 patients, how many lab results did you

12   receive for these 20 patients?

13      A.    Hundreds.

14      Q.    And were these hundreds of lab test results sent

15   out to a clinician for review?

16      A.    Half of those were.

17      Q.    Is that Dr. Dan Nicoll that we have heard about?

18      A.    Yes.

19      Q.    Do you know who is Dr. Dan Nicoll?

20      A.    At the time of this investigation, he was an

21   internal Cigna medical director that worked with special

22   investigations.

23      Q.    Was he a special investigations unit employee?

24      A.    No, he was not.

25      Q.    He was a resource that SIU could go and receive

1    assistance from?

2        A.   Yes.

3        Q.   And based on among other things, Dr. Nicoll's

4    review, was a denial flag eventually placed on PB Labs?

5        A.   Yes, it was.

6        Q.   When did that occur?

7        A.   That occurred in the Fall of 2013 I believe

8    September.

9        Q.   If I told you September 26 of 2013 would that

10   sound right?

11       A.   Yes.

12       Q.   And subsequent to that flag being placed on PB

13   Labs, what would happen if PB Labs submitted a claim to

14   Cigna?

15       A.   Once the protocol was updated in September, the

16   claims would deny.

17       Q.   And how was PB Labs informed about the fact that

18   their claim was being denied?

19       A.   Initially they would receive explanation of

20   payments explaining the denial and then subsequently, I

21   had conversation with Mr. Hicks.

22       Q.   Is an explanation of payment also referred to as

23   an EOP?

24       A.   Yes.

25       Q.   What's an EOP?

1    A.    An EOP is what a provider receives when a claim

2    is processed.

3    Q.    When you say "processed", does that also mean if

4    a claim is denied?

5    A.    Correct.  It's going to give the provider a high

6    level overview of how their claims were managed from a

7    processing perspective.

8    Q.    Who generates these EOP's?  Is it SIU?

9    A.    No, I believe they are automated.

10   Q.    How are these EOPs sent to a provider like PB

11   Labs?

12   A.    I believe it would depend on their payment

13   method so I believe it is paper mailed out or perhaps

14   electronic.

15   Q.    And what information is included in the EOP if

16   for example the claims were being denied due an SIU

17   denial flag?

18   A.    Claim processors will utilize a term called

19   remark codes.  These remark codes will be generated on an

20   EOP and their definitions is also listed and so depending

21   upon the processing protocol, a remark code will supply a

22   high level overview of how that claim was processed.

23   Q.    Do you have any doubt in your mind that after

24   you placed the denial flag on PB Labs in September of

25   2013 that EOPs were not being sent out?

1    A.    No.

2    Q.    How do you know that?

3    A.    Mr. Hicks had expressed concern about claim

4  denials.

5    Q.    And Mr. Hicks was the gentleman representative

6  from PB Labs?

7    A.    Yes.

8    Q.    And Mr. Cunningham had shown you a couple of

9  emails with Mr. Hicks trying to reach out to somebody at

10  Cigna to talk about those denials, correct?

11    A.    Yes.

12    Q.    Did you have a conversation with Mr. Hicks after

13  you had found out that he was looking for someone to

14  speak with?

15    A.    Yes, I did.

16    Q.    Did you ignore his request?

17    A.    I did not.  I believe I spoke to him the same

18  day I may have received that inquiry.

19    Q.    How long did you speak with him, if you can

20  recall?

21    A.    Given we were discussing the audit, at minimum

22  maybe 30 minutes.

23    Q.    Was there anybody else on the phone from Mr.

24  Hicks' end to your recollection?

25    A.    He did place me on the speaker phone.  There was

1    a women I believe her that I am was Evelyn.

2        Q.   What did you tell Mr. Hicks during the phone

3    call that you had with him?

4        A.   I explained the edit process.  In particular,

5    the outcome of this particular audit and the fact that

6    their services and their claims were not supported with

7    the documentation supplied.

8        Q.   Did you tell him about the fact the results that

9    have been sent had gone to clinical review by Dr. Nicoll?

10       A.   Yes, I did.

11       Q.   During the call, did you hear anything from Mr.

12   Hicks indicating that he didn't understand what you were

13   saying?

14       A.   Not to my recollection.

15       Q.   Can I show you Joint Exhibit 130?  Did you

16   follow up with Mr. Hicks after your phone came with an

17   email?

18       A.   Yes.

19       Q.   Why did you do that?

20       A.   Something I like to ensure as far as clarity

21   what was discussed I memorialized that by my email.

22   During that initial conversation he was also wanting to

23   know what could be done for resolution.  So I wanted to

24   ensure he understood how we could move forward towards

25   that.

1      Q.    If you can take a look at this email.  It is

2   dated October 30, 2013, correct?

3      A.    Yes.

4      Q.    And did you send this follow-up email to him the

5   same day that you had the call with him?

6      A.    Yes.

7      Q.    The seven bullet points on here, Ms. Canto, take

8   a look at it and does that to your recollection reflect

9   the substance of what you talked about him during your 30

10  minute or so call that you had with him?

11     A.    Yes.

12     Q.    The first bullet says Cigna conducted

13  retrospective audit of medical claims submitted  by

14  Collectaway PB Labs.

15     A.    I was referring to my July, 2013 request for

16  information from the labs.

17     Q.    Second bullet says audit consisted of random

18  patient sample to review claim data --

19          THE COURT:  This is not in evidence.

20          MR. KANG:  This is Joint 130.

21          THE COURT:  I though I heard you say Cigna.  I

22  apologize.  Go ahead.

23  BY MR. KANG:

24     Q.    The second bullet point, Ms. Canto, says audit

25  consisted of random patient sample to review claim data

1  in comparison to requested medical record documentation.

2  What were you referring to there?

3      A.   Just providing an overview of what other audit

4  consisted of.

5      Q.   Was this the 20 patient probe sample that you

6  had referred to?

7      A.   Yes.

8      Q.   Do you recall Mr. Hicks saying anything to

9  question the 20 patients that you had selected?

10     A.   Not that I recall.

11     Q.   The third bullet says Cigna medical director

12 reviewed information supplied by CollectAway PB Labs and

13 determined that the information provided within the

14 record documentation did not substantiate the claim

15 information billed to Cigna, correct?

16     A.   Yes.

17     Q.   What were you referring to there?

18     A.   That would be Dr. Nicoll's clinical review of

19 the information supplied by the labs.

20     Q.   The fourth bullet says a formal letter for

21 refund based on the audit has not been provided to

22 CollectAway PB Labs yet, but is in progress.  What were

23 you referring to go there?

24     A.   This would be with regard to our outcome of

25 findings.

1      Q.    And the overpayment letter?

2      A.    Yes.

3      Q.    Did that letter eventually get sent out?

4      A.    I believe so.

5      Q.    The fifth bullet says claims submitted during

6  and after the audit have not been paid and Mark Hicks,

7  Evelyn have agreed to provide a sample of outstanding

8  claims to Cigna for additional medical review.  Did I

9  read that correctly?

10     A.    Yes.

11     Q.    What were you referring to there?

12     A.    This is actually something we see quite

13  frequently.  A provider may ask for an opportunity to

14  show us additional information to support their

15  stance and we honor that and I accepted additional

16  records from him.

17     Q.    The sixth bullet says Cigna will conduct a

18  medical review of the sample provided for an additional

19  assessment and determination.  Did I read that correctly?

20     A.    Yes.

21     Q.    What were you referring to there?

22     A.    I was explaining we would need an opportunity to

23  review the records that Mr. Hicks was subsequently

24  supplying.

25     Q.    Were you indicating that you were still open to

1    receiving more information that might change your

2    analysis?

3        A.   Yes.

4        Q.   Is that in any way indicative in your mind of

5    rushing to judgment?

6        A.   No.  Quite the contrary, sir.

7        Q.   The last bullet says once additional records

8    have been reviewed by medical directors, Cigna will

9    indicate how current claims billed by CollectAway PB Labs

10   will be handled.  What were you referring to there?

11       A.   This will be the resolution or the conclusion

12   and how we would handle the claims based on these

13   additional records.

14       Q.   So you had the medical records request in July

15   15, the conversation with Ms. Dolores in July, then this

16   call and email in October?

17       A.   Yes, sir.

18       Q.   You indicated that at some point you went out on

19   maternity leave?

20       A.   Yes.

21       Q.   And at that point, when you came back, did you

22   come to understand, I think you testified to this, that

23   Cigna's legal counsel got involved in this dispute?

24       A.   Yes.

25       Q.   And that legal counsel his name was what again?

1    A.    Mr. Bill Welch.

2    Q.    Was Mr. Welch was an internal Cigna lawyer?

3    A.    Yes.

4    Q.    Was there a lawyer that to your knowledge that

5    the Labs brought on?

6    A.    Yes.

7    Q.    Does the name Michael Gennett sound familiar?

8    A.    Yes.

9    Q.    And do you know are you aware of communications

10   that Mr. Gennett and Mr. Welch were having with respect

11   to various issues related to the PB Labs Cigna dispute?

12   A.    Yes, I understand that they were communicating

13   with one another.

14   Q.    Are you aware that there were multiple letters

15   that were sent back and forth between Mr. Welch and

16   Mr. Gennett about this issue?

17   A.    Yes.

18   Q.    Did you have a chance to see or review some of

19   those letters?

20   A.    Only what Bill provided on occasion.

21   Q.    Let me show you a couple of them.  Can we put up

22   Joint Exhibit 152A, Mr. Salazar.

23         THE COURT:  That's a Joint and may be published.

24         MR. KANG:  Yeah.  We'll do Joint 2, Your Honor.

25   BY MR. KANG:

1    Q.    Ma'am, do you recognize this document?

2    A.    Yes, I believe so.

3    Q.    If you could scroll up, so we can see who it is

4    from.

5          You see up on the top right corner Michael

6    Gennett?

7    A.    Yes.

8    Q.    Was he a lawyer that the Labs engaged?

9    A.    I believe so, yes.

10   Q.    It's addressed to Mr. Welch?

11   A.    Yes.

12   Q.    What is the date of that?

13   A.    March 19, 2014.

14   Q.    And in the first sentence of Mr. Gennett's

15   letter is it correct he says Dear Mr. Welch, I'm in

16   receipt of your letter dated March 7, 2014 responding to

17   our demand for payment; is that right?

18   A.    Yes.

19   Q.    I will not go through all of this because you

20   weren't drafting these letters back and forth, correct?

21   A.    Correct.

22   Q.    Did does it appear there was a letter that

23   Mr. Welch sent on March 7, 2014?

24   A.    Yes.

25   Q.    Then a response from Mr. Gennett on March 19?

1    A.   Yes.

2    Q.   So this is now the seventh contact I think

3    between Cigna and PB Labs about this issue?

4    A.   I believe so.

5    Q.   Can we take a look at Joint 10 please.  Here's

6    another letter dated March 25, 2014, correct?

7    A.   Yes.

8    Q.   And is this dated March 25, 2014?

9    A.   Yes.

10   Q.   I'm not going to go through all of it, as you

11   can see Mr. Welch in his first line says Dear

12   Mr. Gennett, as I stated in my email sent to you on March

13   21, 2014, I have been out of office on travel and could

14   not read the entire contents of your letter.  You see

15   that?

16   A.   Yes.

17   Q.   Would you agree there was more communication

18   between Mr. Welch and Mr. Gennett?

19   A.   Yes.

20   Q.   I know that -- so let's put that down for a

21   minute.  If we could go to Joint 157.  I believe you

22   testified to this, but do you recognize this document?

23   A.   Yes.

24   Q.   And what was this?

25   A.   This is the overpayment letter.

1      Q.    What's the date of that?

2      A.    March 27, 2014.

3      Q.    So, ma'am, based on all of these documents and

4  communications that we have seen, was SIU in contact with

5  the labs about this issue with the audit and the concerns

6  that the audit had revealed?

7      A.    Yes.

8          MR. KANG:  Your Honor, it's about 3:45.

9          THE COURT:  I was going to pull the plug myself.

10  We're two minutes early, ladies and gentlemen.  You are

11  telling me you about to switch at this point?

12          MR. KANG:  No.  I have a couple of cross topics

13  remaining.

14          THE COURT:  It's a good time to break.

15  Things have been interrupted.  We'll recess at this time.

16  We'll see you back in the box at 9:30 tomorrow morning.

17  Remember what I said about not talking to anybody or

18  researching.  I'm not going to repeat it because you

19  could say it to me.  Monday morning.  You have the

20  weekend off.  Rest up.  Have a wonderful weekend and

21  don't think about the case.  You will be here Monday

22  morning the 9:30.  Thanks very much.  Ladies and

23  gentlemen.

24          (In the absence of the jury at 3:43 p.m.)

25          THE COURT:  Five minute recess.  I will need at

1    least Attorney Kang and I suppose Attorney Cunningham.

2    If Attorney Hare wishes to stay that will be good.

3    Anyone is welcome to stay.  I don't need them for when we

4    return.  We'll stand in recess.  How is that.  I can do

5    that.

6            (Whereupon, a recess was taken from 3:44 p.m. to

7    3:52 p.m.)

8            THE COURT:  I see counsel present.  I would like

9    to ask a few predicate questions.  First, is it correct

10   that the Labs against Cigna.  I'm standing because I'm

11   tired of sitting.  Labs case against Cigna relates to FIP

12   Florida Individual Policies and not other kinds of

13   policies.

14           MR. KANG:  IFP.

15           THE COURT:  Individual family policies.

16           MR. CUNNINGHAM:  You threw me on that one, Your

17   Honor.

18           THE COURT:  Individual family policies.

19           MR. KANG:  Individual family plans.

20           THE COURT:  IFP's.  Would the Labs confirm for

21   me that all the claims and money they seek to be paid in

22   their lawsuit involved Individual Family Plans.

23           MR. HARE:  That's correct, Your Honor.

24           THE COURT:  Thank you.

25           And Attorney Kang, are the post-2015 Epic Plans

1    which allegedly you represented contained different

2    language than what was at issue in the summary judgment

3    motion.  Are those individual family plans?

4            MR. KANG:  The plans for the Epic post 2015 for

5    our overpayment.

6            THE COURT:  No, sir.  Their case.  I'm not

7    speaking of your case.

8            MR. KANG:  The Individual Family Plan documents

9    whether they are pre2015 or post, do not have -- they all

10   have the same language that you address in your summary

11   judgment.

12           THE COURT:  In your summary judgment I ruled was

13   ambiguous, construed it against you and as a matter of

14   law said fee forgiveness will not apply to the Labs case;

15   is that correct?

16           MR. KANG:  Yes, Your Honor.

17           THE COURT:  I would like to see you, sir, and

18   one representative from the other side at the sidebar.

19   You can put on the white noise.

20           (Sidebar.)

21           THE COURT:  All right.  Thank you.  I think

22   that's all that I had.  Is there any issue the parties

23   needs to take up?

24           MR. CUNNINGHAM:  Nothing for the Labs, Your

25   Honor.

1          MR. KANG:  Dr. Ligotti is testifying on Monday

2     at 11 a.m. I don't know who from the Labs are going to be

3     present at that one.

4          MR. HARE:  That will be me.

5          MR. KANG:  That will be done remotely.

6          THE COURT:  I did get an email.  I assume copied

7     to the other side.  You got a reporter.  You got some

8     Webex that will allow you to do it from here.  Each side

9     knows who is going to show up at the time and place.

10          We'll stand adjourned.

11          (Adjourned:  4:10 p.m.)

12

13     COURT REPORTER'S TRANSCRIPT CERTIFICATE

14     I hereby certify that the within and foregoing is a true

15     and correct transcript taken from the proceedings in the

16     above-entitled matter.

17

18     /s/  Terri Fidanza

19     Terri Fidanza, RPR

20     Official Court Reporter

21

22

23

24

25

```
1                           INDEX

2                        EXAMINATION

3    Witness Name                                    Page

4    THOMAS MENDOLIA

5        BY MR. CUNNINGHAM.................................... 79

6        BY MR. KANG......................................... 100

7    STEPHANIE CANTO

8        BY MR. CUNNINGHAM.................................... 145

9        BY MR. KANG......................................... 232

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```