```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF CONNECTICUT

 3     _____
       CONNECTICUT GENERAL )
 4     LIFE INSURANCE CO.   )
       AND CIGNA HEALTH     )
 5     AND LIFE INSURANCE   )
       CO.                  )
 6          Plaintiffs )        NO: 3:19cv1324(JCH)
                            )    NO: 3:19CV1326(JCH)
 7      vs.                 )    October 21, 2024
                            )    9:04 a.m.
 8                          )
       BIOHEALTH MEDICAL    )
 9     LABORATORIES INC,    )
       PB LABORATORIES, LLC )
10     and EPIC REFERENCE   )
       LABS, INC.           )
11          Defendants. )
       _____)       141 Church Street
12                                 New Haven, Connecticut

13

14            DAY TWO OF TRIAL

15

16     B E F O R E:

17            THE HONORABLE JANET C. HALL, U.S.D.J.

18     A P P E A R A N C E S:

19     For CIGNA:           Edward T. Kang
                            Emily Costin
20                          Alston & Bird LLP
                            950 F Street, NW,
21                          Washington, DC 2004-1404

22                          Michelle Nicole Jackson
                            Alston & Bird LLP
23                          1201 West Peachtree Street
                            Atlanta, GA 30309

24

25                   -- continued --
```

```
 1                        Alexander Akerman
                          Alston & Bird LLP
 2                        350 South Grand Avenue
                          51st Floor
 3                        Los Angeles, CA 90071

 4                        Kelsey Kingsbery
                          Alston & Bird LLP
 5                        555 Fayetteville Street
                          Ste 600
 6                        Raleigh, NC 27601

 7

 8    For BioHealth Labs:  Scott M. Hare
                          Anthony Thomas Gestrich
 9                        Raines Feldman Littrell
                          11 Stanwix Street
10                        Suite 1400
                          Pittsburgh, PA 15222
11
                          Fred Alan Cunningham
12                        Matthew Thomas Christ
                          Rafferty Domnick Cunningham & Yaffa
13                        2401 PGA Boulevard
                          Suite #140
14                        Palm Beach Gardens, FL 33410

15                        John J. Radshaw, III
                          John J. Radshaw, III, Esquire
16                        65 Trumbull Street, 2d Fl.
                          New Haven, CT  06510
17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 08:37:20 | 1 | THE COURT:  Good morning to you.  My apologies |
| 09:04:41 | 2 | because I gather I had you called in for, I don't know, |
| 09:04:45 | 3 | 15 or 20 minutes ago.  I was working on putting on the |
| 09:04:50 | 4 | record something that relates to the charge, but I |
| 09:04:54 | 5 | thought the parties should know. |
| 09:04:57 | 6 | But as we have been doing the charge, it became |
| 09:05:00 | 7 | clear to me what I was going to do with the subject. |
| 09:05:04 | 8 | Unfortunately, I haven't quite polished those thoughts in |
| 09:05:09 | 9 | a way to put it on the record.  So I will either do it at |
| 09:05:13 | 10 | 4:00 this afternoon or we'll do it tomorrow. |
| 09:05:15 | 11 | I do expect to get -- I hope to get a charge out |
| 09:05:20 | 12 | to you this afternoon after court.  It's not going to be |
| 09:05:30 | 13 | fully polished.  It's certainly going to probably need |
| 09:05:32 | 14 | some editing.  Not necessarily substantive.  I mean, my |
| 09:05:38 | 15 | substantive positions will be laid out.  But whether it's |
| 09:05:40 | 16 | clear to the jury whether I have done parallel |
| 09:05:44 | 17 | instructions throughout, those kind of things, I can't |
| 09:05:48 | 18 | guarantee you.  But I think it's better that I get it to |
| 09:05:51 | 19 | you than sit on it another night and not get it to you |
| 09:05:56 | 20 | tonight. |
| 09:05:57 | 21 | Although that's very little time for anybody to |
| 09:06:02 | 22 | review it, my thought was maybe we could do a short |
| 09:06:06 | 23 | charge session tomorrow and just put to bed what I will |
| 09:06:09 | 24 | call general instructions.  It's about the first 20, 25 |
| 09:06:12 | 25 | pages, and the last maybe 5 pages.  I have had to edit |

| | | |
|---|---|---|
| 09:06:17 | 1 | them because we're doing two trials.  So there could very |
| 09:06:22 | 2 | well be some contributions from counsel. |
| 09:06:24 | 3 | But they are not the causes of action.  They are |
| 09:06:27 | 4 | not the special defenses.  It's not that.  I wouldn't |
| 09:06:32 | 5 | expect you to be prepared to have a discussion on those |
| 09:06:35 | 6 | tomorrow afternoon. |
| 09:06:35 | 7 | But what do counsel think about the idea of |
| 09:06:41 | 8 | perhaps having a, hopefully, not too long charge |
| 09:06:45 | 9 | conference tomorrow afternoon that will just try to put |
| 09:06:48 | 10 | to bed, at least as much as we can, the general |
| 09:06:52 | 11 | instructions? |
| 09:06:52 | 12 | MR. CUNNINGHAM:  That's fine with the Labs, Your |
| 09:06:54 | 13 | Honor. |
| 09:06:56 | 14 | THE COURT:  Okay.  Does Cigna think they'll be |
| 09:06:56 | 15 | in a position to do that? |
| 09:06:56 | 16 | MR. KANG:  Yes, Your Honor. |
| 09:06:57 | 17 | THE COURT:  Okay.  Great.  So let's count on |
| 09:07:00 | 18 | that tomorrow at 4.  We'll try to do a charge session |
| 09:07:06 | 19 | that will accomplish that.  And then that will leave us |
| 09:07:09 | 20 | Wednesday and Thursday to discuss what's about 45 or 50 |
| 09:07:16 | 21 | pages of the charge on the two cases. |
| 09:07:28 | 22 | Let's see.  Just so you know, I believe that |
| 09:07:30 | 23 | where we are on the clock is the Labs have used 1 hour |
| 09:07:34 | 24 | and 58 minutes, that's 118.  And Cigna has used 1 hour |
| 09:07:40 | 25 | and 26 minutes.  That is 86 minutes. |

09:07:44   1        I believe Cigna is up currently on cross of Ms.

09:07:49   2   Canto, I believe.  And I would ask -- actually, this is

09:07:51   3   something I would ask generally.  But I would ask that

09:07:55   4   you identify when you are shifting to direct exam of

09:07:58   5   Ms. Canto, if you do, in connection with your claim,

09:08:03   6   Cigna's.

09:08:03   7        In that regard, I made some remarks at sidebar

09:08:07   8   on Friday that may have reflected it was Friday afternoon

09:08:10   9   and I might have been too harsh.  And if I was, I

09:08:15   10  apologize.  However, as I thought about it over the

09:08:17   11  weekend, I realized that there is confusion in the case.

09:08:21   12  Notice the passive use of the verb as to not ascribing it

09:08:26   13  to anybody.  Could be my fault.  My lacking.

09:08:31   14        But, counsel, when you get up and make an

09:08:33   15  argument, you know, we were here for pretrial for a long

09:08:36   16  time, all those arguments you made, but now will have

09:08:39   17  argument over the charge which will be pretty clear what

09:08:43   18  you are talking about.  But I think that I had failed to

09:08:48   19  keep all sides focused that when they are addressing an

09:08:52   20  issue, what is that issue relevant to.  In other words,

09:08:57   21  is it relevant to the Labs' claims or is it relevant to

09:09:00   22  Cigna's claims.

09:09:01   23        A good example on that is the issue which upset

09:09:04   24  me on Friday which is, you know, what policies are in

09:09:10   25  focus on which case.  And it being very confusing what

09:09:16  1   policy has what features in it which is then focused in

09:09:19  2   that case.  I'm not sure that it will be that important

09:09:23  3   from now on, mainly because I'm more sensitive to it and

09:09:27  4   I will just ask.

09:09:27  5        But to the extent that anybody gets up to make

09:09:30  6   an evidence objection, if you would -- or respond to an

09:09:34  7   evidence objection, if it's relevant, and it probably

09:09:38  8   will be, to say a word or two so I know that you are

09:09:42  9   resting your argument.  You focused your argument on

09:09:45  10  either the Labs case or Cigna's case.  That would, I

09:09:50  11  think, be helpful to the Court, and I assume maybe even

09:09:52  12  to the Court of Appeals.

09:09:55  13       There is one issue I think I need to cover with

09:10:00  14  Cigna.  Attorney Kang, I can't remember what day.  I

09:10:02  15  think it might have been Friday, maybe Thursday I raised

09:10:06  16  the issue of the two Cigna plaintiffs/defendants and I'm

09:10:12  17  not sure I got an answer.  I think the answer was we need

09:10:15  18  to have both of them, but I certainly didn't get a

09:10:20  19  definitive argument.  So we have spent the weekend

09:10:24  20  writing the charge on Cigna's claims as if there's two

09:10:28  21  parties, in other words, two parts to the claim.

09:10:30  22       So I have a question for both you and the Labs.

09:10:33  23  Are you in a position, which I hope you are if it's the

09:10:37  24  case, to proffer to me the evidence you will have that

09:10:40  25  each of the Cigna entities paid monies to one or more of

09:10:43    1    the Labs in the course of the time period at issue in

09:10:48    2    your unjust enrichment claim, and are seeking to each of

09:10:50    3    those plaintiffs to recover the monies it paid.

09:10:54    4         MR. KANG:  Your Honor, we have conferred with

09:10:57    5    Labs' counsel over the weekend about this.  And I think

09:11:01    6    to simplify matters, as we've talked about previously, we

09:11:05    7    are willing to drop one of the Cigna entities from the

09:11:10    8    case.

09:11:10    9         As Your Honor -- we took Your Honor's

09:11:13   10    suggestion, the Connecticut General Life Insurance

09:11:16   11    Company, we're willing to drop them from the case and

09:11:19   12    proceed with Connecticut --

09:11:22   13         THE COURT:  Okay.  Is that your case against the

09:11:24   14    Labs or both?

09:11:25   15         MR. KANG:  We would propose both.  We've

09:11:28   16    conferred with Attorney Hare.  We've proposed general

09:11:31   17    language for a stipulation.  I think if the ball was in

09:11:37   18    Attorney Hare's court on coming back with that.  We are

09:11:41   19    amenable to that to simplify things for the jury.

09:11:45   20         THE COURT:  Okay.  We'll have to unedit the

09:11:47   21    charge, but that's fine.  We'll just do a universal

09:11:50   22    search to start and we'll catch most of them.

09:11:53   23         Is that correct from the Labs' side?  Let's

09:11:55   24    start with that question.

09:11:55   25         MR. HARE:  That's correct, Your Honor.  We

09:11:57  1  conferred over the weekend.  During which time I

09:12:02  2  reiterated what I have said in open court, which is,

09:12:05  3  we're more than happy to have a stipulation dismissing

09:12:09  4  Connecticut General, retaining Cigna as the sole party

09:12:13  5  provided, as I described it to Mr. Kang yesterday, we

09:12:18  6  want a stipulation that Cigna will be fully liable

09:12:20  7  directly --

09:12:20  8        THE COURT:  The remaining Cigna entity.

09:12:23  9        MR. HARE:  The remaining Cigna entity for the

09:12:25  10  entirety of any judgment that's entered in favor of any

09:12:29  11  of the Labs, notwithstanding any other circumstances

09:12:33  12  giving rise to those claims, the province of those

09:12:36  13  claims.  I just need to know that I have a judgment

09:12:41  14  debtor defendant in the case who, by agreement, will be

09:12:44  15  fully responsible for any such judgment.  With that,

09:12:48  16  we're happy to agree.

09:12:49  17        THE COURT:  Well, I guess that's fine.  This is

09:12:53  18  something that we do pretty regularly in litigations.

09:12:57  19  People sue the wrong party, they sue too many parties.

09:13:02  20  There's just a couple of things in what you said, though,

09:13:04  21  that are not clear.

09:13:05  22        If we drop a party, they're not in the judgment.

09:13:08  23  And the jury will not be instructed on them or asked to

09:13:11  24  answer questions.  What you are saying is you would want

09:13:14  25  an agreement with the other side that to the extent -- to

| 09:13:20 | 1 | the extent any Lab wins on any of its counts or claims or |
|---|---|---|
| 09:13:26 | 2 | causes of action, that the judgment would enter against |
| 09:13:31 | 3 | Cigna Health and they would be responsible, to the extent |
| 09:13:35 | 4 | they have assets you can find, they would be responsible |
| 09:13:38 | 5 | for that judgment.  And, likewise, coming back the other |
| 09:13:41 | 6 | way.  They will be the party seeking to recapture |
| 09:13:47 | 7 | payments under their theory of any payments that they can |
| 09:13:51 | 8 | produce evidence of billings to the Labs, one or more of |
| 09:13:53 | 9 | the Labs.  That's a wordy explanation, but is that |
| 09:13:57 | 10 | accurate? |
| 09:13:58 | 11 | MR. HARE:  Precisely accurate and for exactly |
| 09:14:00 | 12 | the reason that the Court says.  Once a party is out of |
| 09:14:04 | 13 | the case, it will not be -- |
| 09:14:05 | 14 | THE COURT:  No, you can't collect.  Right. |
| 09:14:07 | 15 | Exactly. |
| 09:14:07 | 16 | MR. HARE:  Thank you, Your Honor. |
| 09:14:09 | 17 | THE COURT:  So, in effect, Cigna Health is |
| 09:14:13 | 18 | agreeing, by being the sole defendant and the sole |
| 09:14:18 | 19 | plaintiff, to be the sole person as to whom a judgment |
| 09:14:22 | 20 | would enter against them for Lab claims and for which a |
| 09:14:25 | 21 | judgment for them would enter against the Labs. |
| 09:14:28 | 22 | MR. HARE:  Correct.  And we shouldn't hear any |
| 09:14:30 | 23 | defense throughout the case that that particular payment |
| 09:14:33 | 24 | came from this -- |
| 09:14:34 | 25 | THE COURT:  Or that bill.  That's exactly right. |

| | | |
|---|---|---|
| 09:14:35 | 1 | And in the charge then I probably have to |
| 09:14:38 | 2 | mention this briefly, because the two Cigna companies |
| 09:14:42 | 3 | were mentioned.  But I would just charge them either like |
| 09:14:46 | 4 | on your claim, their special defense to that, their |
| 09:14:50 | 5 | claim, et cetera.  I would speak in terms of Cigna which |
| 09:14:54 | 6 | I will define as Cigna Health. |
| 09:14:56 | 7 | MR. HARE:  Thank you, Your Honor. |
| 09:15:01 | 8 | THE COURT:  Okay.  Is what I said what you had |
| 09:15:04 | 9 | in mind and discussed with your client, Attorney Kang? |
| 09:15:07 | 10 | MR. KANG:  Yes, Your Honor. |
| 09:15:07 | 11 | THE COURT:  So do we have agreement on that? |
| 09:15:10 | 12 | And should we reduce it to writing or is what I've just |
| 09:15:15 | 13 | said counsel's agreement to it sufficient given we're in |
| 09:15:19 | 14 | the middle of trial?  I mean, obviously, most things are |
| 09:15:23 | 15 | better put down in writing, because as you will see |
| 09:15:26 | 16 | during the charge I am drafting, you could see things and |
| 09:15:28 | 17 | issues come up that you didn't really think were there. |
| 09:15:32 | 18 | But on the other hand, you are all busy with the trial. |
| 09:15:36 | 19 | If this is sufficient for parties, it's |
| 09:15:39 | 20 | sufficient for me.  If it's not sufficient, then I guess |
| 09:15:42 | 21 | I'd ask counsel to submit something within 24 hours.  But |
| 09:15:47 | 22 | we'll proceed with revising the draft charge to reflect |
| 09:15:50 | 23 | that agreement that's been verbally agreed to. |
| 09:15:54 | 24 | MR. KANG:  Your Honor, I think just for the |
| 09:15:55 | 25 | record, we'll probably want to put it in writing. |

09:15:59  1        THE COURT:  That's fine.  That's fine.  But I

09:15:59  2   think I probably need it by tomorrow if we're going to

09:16:03  3   start putting the charge to bed.

09:16:05  4        MR. KANG:  Yes, Your Honor.

09:16:17  5        THE COURT:  Let's see if there's anything else.

09:16:17  6   I'm sorry, but I thought I was going to have something

09:16:20  7   that would take me 10 or 15 minutes to put on the record.

09:16:24  8   I haven't quite finished my thoughts in explaining and I

09:16:28  9   need a couple of case cites in there that I don't see.  I

09:16:33  10  would be more comfortable waiting until tomorrow.

09:16:38  11        What do we have today for witnesses?  Are we

09:16:43  12  still looking -- how long do you think Ms. Canto will

09:16:43  13  still be on the stand?

09:16:52  14        MR. KANG:  I anticipate 10 or 15 minutes on,

09:16:55  15  quote, unquote, cross.  And then maybe a half hour on

09:16:59  16  direct.

09:16:59  17        THE COURT:  I expect that the Labs will have

09:17:02  18  some cross of her.

09:17:04  19        MR. CUNNINGHAM:  Yes, Your Honor.  I will

09:17:06  20  anticipate maybe 45 minutes of cross.

09:17:08  21        THE COURT:  Okay.  Are you keeping an eye on

09:17:15  22  that clock, Attorney Cunningham?

09:17:16  23        MR. CUNNINGHAM:  Yes, Your Honor.

09:17:17  24        THE COURT:  That smile isn't going to win you

09:17:17  25  any more time.

| | | |
|---|---|---|
| 09:17:17 | 1 | Then we're looking at from the original list, if |
| 09:17:20 | 2 | you could confirm that it is still a list, Matt Norton, |
| 09:17:26 | 3 | Seamus Lagan, and then Borden and Nemecek by transcript. |
| 09:17:32 | 4 | MR. CUNNINGHAM:  You're Honor, there's been a |
| 09:17:32 | 5 | slight change of plans.  What we plan to do is present |
| 09:17:35 | 6 | the video deposition of Mr. Nicholson after Ms. Canto is |
| 09:17:44 | 7 | finished.  And I think that's about three hours total. |
| 09:17:45 | 8 | And then we plan to put on Mr. Norton with whatever |
| 09:17:51 | 9 | remaining time we have this afternoon. |
| 09:18:07 | 10 | THE COURT:  Okay.  Great.  And who is your last |
| 09:18:07 | 11 | witness?  I mean, I realize the witnesses are being |
| 09:18:07 | 12 | offered in both cases so it may be hard for you say that. |
| 09:18:08 | 13 | Which witness will be the point at which when you finish |
| 09:18:13 | 14 | you will, in effect, hand over the floor, at least the |
| 09:18:16 | 15 | initiation of a witness, to Attorney Kang?  I am right |
| 09:18:22 | 16 | that's kind of what we're doing, right? |
| 09:18:24 | 17 | I mean, you could put defense on today, defense |
| 09:18:26 | 18 | of his claim through some witness.  I suppose Nicholson |
| 09:18:35 | 19 | is a perfect example.  He talks a lot about, you know, |
| 09:18:37 | 20 | kind of on the issue of fee forgiveness.  I won't |
| 09:18:41 | 21 | characterize it.  But is there a witness here that's |
| 09:18:43 | 22 | really on the list because Attorney Kang put it on the |
| 09:18:47 | 23 | list, not because you put it on the list? |
| 09:18:49 | 24 | MR. HARE:  Your Honor, the outline and sequence |
| 09:18:53 | 25 | of witnesses that we set forth in a prior email otherwise |

09:19:01  1    remains largely unchanged.  And by that schedule, the

09:19:06  2    final two witnesses that the Labs intend to call in their

09:19:10  3    own case-in-chief in their plaintiff action would be our

09:19:13  4    two experts, Jacqueline Theilen and Christopher Haney.

09:19:20  5    We're currently anticipating that those folks would be

09:19:24  6    called during the day on Wednesday.

09:19:26  7              THE COURT:  Okay.  All right.  Great.

09:19:30  8              MS. COSTIN:  On that point, Your Honor, if I

09:19:31  9    may?

09:19:31  10             THE COURT:  Yes, ma'am.

09:19:31  11             MS. COSTIN:  We spoke on Friday about the

09:19:32  12   sequestration of witnesses and I believe there was a

09:19:35  13   little confusion between counsel as to how that came

09:19:38  14   about.  But Attorney Hare and I spoke this morning and I

09:19:41  15   believe we have agreement that experts on both sides do

09:19:45  16   not need to be sequestered.

09:19:48  17             THE COURT:  If that's your agreement, that's

09:19:50  18   fine with me.

09:19:50  19             MS. COSTIN:  That's our agreement we submit to

09:19:50  20   the Court and would like to put that on the record.

09:19:50  21             THE COURT:  All right.  Agreed?

09:19:50  22             MR. HARE:  I will confirm that, Your Honor.

09:19:52  23             THE COURT:  Thanks.  But otherwise, I think you

09:19:55  24   each have the right to have someone from your side here.

09:19:58  25   I think it was Mr. Goldfarb, yes.  And then I guess on

09:20:05   1   your side, I'm not sure who it was if you are going to

09:20:09   2   have anybody.

09:20:10   3          MR. HARE:  We have not yet, Your Honor.

09:20:12   4          THE COURT:  That's fine.  I'm out here a little

09:20:15   5   bit early.  Is there anything else that we could take up

09:20:19   6   before the jury comes out?

09:20:20   7          MR. HARE:  As the Court knows, today is the day

09:20:23   8   set for the remote de bene esse deposition of Dr.

09:20:29   9   Ligotti.

09:20:30   10          THE COURT:  Is it still at 11?

09:20:30   11          MR. KANG:  Yes, Your Honor.

09:20:30   12          MR. HARE:  I will be attending that on behalf of

09:20:34   13   the Labs.  My plan, Your Honor, to minimize disruption is

09:20:38   14   to excuse myself, with the Court's permission, before the

09:20:41   15   jury comes out and I will retire to our conference room.

09:20:47   16          THE COURT:  That's fine.  And who will be from

09:20:50   17   your side, Attorney Kang?  Is it you?

09:20:53   18          MR. KANG:  It will be Mr. Akerman and

09:20:55   19   Ms. Jackson.

09:20:55   20          THE COURT:  Okay.  Great.  I mean, I don't mind

09:20:56   21   if you get up in the middle.  It will distract the jury a

09:21:01   22   bit, I suppose, but it's not a big deal.  So whatever way

09:21:04   23   works for your team.

09:21:05   24          And you're going to start that at 11?

09:21:07   25          MR. KANG:  Yes, Your Honor.

| | | |
|---|---|---|
| 09:21:08 | 1 | THE COURT:  And How long do you expect it to go, |
| 09:21:10 | 2 | to 2? |
| 09:21:10 | 3 | MR. KANG:  We have until 3:00. |
| 09:21:12 | 4 | THE COURT:  All right.  Anything else? |
| 09:21:18 | 5 | MR. HARE:  Your Honor, I know our time is |
| 09:21:21 | 6 | limited and the Court may prefer that we circle back to |
| 09:21:25 | 7 | this. |
| 09:21:25 | 8 | This morning we received from Cigna what we |
| 09:21:29 | 9 | understand to be a subset of one of the parties joint |
| 09:21:32 | 10 | exhibits that Cigna would like to mark as a letter A |
| 09:21:38 | 11 | Joint Exhibit. |
| 09:21:38 | 12 | We haven't yet had the opportunity to review |
| 09:21:41 | 13 | that.  I can't confirm that we're on board with |
| 09:21:45 | 14 | designating that as a joint exhibit until we see what the |
| 09:21:48 | 15 | subset represents.  If it's a fair subset, that shouldn't |
| 09:21:52 | 16 | be an issue.  If it's a subset that is cherry picked in a |
| 09:21:57 | 17 | way, meaning no deliberate intent, but we would like to |
| 09:22:00 | 18 | review that before we can agree that the subset excerpt |
| 09:22:04 | 19 | is a joint exhibit. |
| 09:22:07 | 20 | THE COURT:  I guess my understanding of this, |
| 09:22:10 | 21 | and I was unaware of it, but some of your exhibits are |
| 09:22:13 | 22 | humongous.  And I didn't realize -- Liana explained it. |
| 09:22:16 | 23 | But this JERS Program will only accommodate I think 10 |
| 09:22:21 | 24 | pages at a time in an exhibit.  And so that's -- is that |
| 09:22:28 | 25 | right? |

09:22:28  1          THE CLERK:  Ten megabytes is my understanding.

09:22:31  2          THE COURT:  How many pages is that usually, do

09:22:34  3   you know?

09:22:34  4          THE CLERK:  I don't know how many.

09:22:35  5          THE COURT:  Well, whatever.  But it's less than

09:22:38  6   these humongous exhibits.  And it arose because I saw an

09:22:46  7   A exhibit come in which there wasn't an A exhibit on the

09:22:48  8   list.  That's how it was explained to me.

09:22:52  9          I assume you are going to upload the A exhibits

09:22:57  10  that are in your email -- not yours.  I'm sorry.

09:23:00  11  Attorney Jackson's email of October 21 at 6:17 a.m.  The

09:23:06  12  A exhibits that are referenced there, they're Joint

09:23:07  13  Exhibits 14, 15, 16, 20, 24, 27, 28, and 31.  All with an

09:23:15  14  A.  That you are going to submit those to JERS as an

09:23:23  15  exhibit.  For now it will have to be ID.  I think

09:23:26  16  counsel's not being unreasonable.  I'm assuming you are

09:23:28  17  just picking whatever fits up to the point where you want

09:23:32  18  to use that segment.  But I would think counsel have a

09:23:35  19  right to take a look at it and make sure you didn't start

09:23:38  20  in the middle of a paragraph and they think the paragraph

09:23:43  21  is essential to understanding the document.  And it would

09:23:45  22  have been there had you been able to upload this giant

09:23:49  23  thing.  So hopefully somebody on your team can take a

09:23:53  24  look at that sooner than later, because I have a feeling

09:23:56  25  I assume we're going to start having offers of those.

| | | |
|---|---|---|
| 09:23:58 | 1 | MR. HARE:  We'll do our best, Your Honor.  We |
| 09:24:00 | 2 | got these this morning, but we'll jump on it. |
| 09:24:03 | 3 | MS. COSTIN:  And we'll represent that the |
| 09:24:05 | 4 | excerpts were done in such a way these are patient files |
| 09:24:08 | 5 | that had been redacted fully with the names and we've |
| 09:24:12 | 6 | simply changed the PHR redactions to show initials for |
| 09:24:17 | 7 | the flow of the presentation of evidence. |
| 09:24:20 | 8 | THE COURT:  If they're patient excerpts from |
| 09:24:23 | 9 | patient files, I presume that the first page of the |
| 09:24:28 | 10 | excerpt starts with the first page of a patient's file |
| 09:24:31 | 11 | and that you end with the last page of either that or |
| 09:24:34 | 12 | another patient's file.  Do you see what I mean? |
| 09:24:39 | 13 | MS. JACKSON:  Yes, Your Honor.  So these were |
| 09:24:42 | 14 | very large packets.  Some of them were 2500 pages.  Most |
| 09:24:44 | 15 | of the packets I believe were only one patient.  The |
| 09:24:48 | 16 | excerpts got it down to like 20 to 40 pages.  And those |
| 09:24:53 | 17 | are all consistent with the same patient. |
| 09:24:59 | 18 | THE COURT:  So they are all about the same |
| 09:25:02 | 19 | patient, but it's possible the Labs may think it's again, |
| 09:25:05 | 20 | he specifically said ascribing no motive to you, but he |
| 09:25:09 | 21 | might think it's misleading to have started on page 7 and |
| 09:25:13 | 22 | ended on page 27.  That you should have started with 5 |
| 09:25:17 | 23 | and ended on 25.  And if you needed the last two, do that |
| 09:25:23 | 24 | as B.  So I think they just need a few minutes to look at |
| 09:25:26 | 25 | it.  But I think if they're patient files probably |

| | | |
|---|---|---|
| 09:25:31 | 1 | shouldn't take too long. |
| 09:25:32 | 2 | And, obviously, I'm getting -- I think Alex |
| 09:25:35 | 3 | confirmed I got an updated exhibit list to reflect what |
| 09:25:39 | 4 | you are going to offer.  So I'm not trying to squeeze in |
| 09:25:42 | 5 | A's, B's, and C's on my list.  That would be great.  Is |
| 09:25:47 | 6 | this going to keep happening or are you done? |
| 09:25:56 | 7 | MR. KANG:  I think we're hopeful this is the |
| 09:25:59 | 8 | end. |
| 09:26:00 | 9 | THE COURT:  That's fine.  How about you folks? |
| 09:26:04 | 10 | Have you seen that this is going to be a problem in your |
| 09:26:07 | 11 | offer?  By you folks, I mean the Labs. |
| 09:26:10 | 12 | MR. HARE:  Mr. Gestrich tells me there's one |
| 09:26:13 | 13 | legacy change from Friday.  But we anticipate that would |
| 09:26:15 | 14 | be the last item. |
| 09:26:18 | 15 | THE COURT:  So you are going to submit a new |
| 09:26:20 | 16 | exhibit list as well as send that to the JERS system? |
| 09:26:23 | 17 | MR. HARE:  Yes, Your Honor. |
| 09:26:24 | 18 | THE COURT:  Okay.  Great. |
| 09:26:27 | 19 | MR. CUNNINGHAM:  Your Honor, if I may, I just |
| 09:26:27 | 20 | have one last issue that I need to address, because it's |
| 09:26:29 | 21 | regarding the testimony of Ms. Canto, the continued |
| 09:26:34 | 22 | testimony. |
| 09:26:35 | 23 | And I apologize if I'm being obtuse on this |
| 09:26:38 | 24 | point, Your Honor.  I'm still trying to figure out what |
| 09:26:41 | 25 | we're doing about the fee forgiveness issue. |

09:26:43  1          THE COURT:  I will tell you what I think we're

09:26:45  2     doing.  As of now, unless someone clearly explains I'm in

09:26:50  3     error, I am going to tell them they've heard about fee

09:26:57  4     forgiveness, but it nothing to do with the Lab's case

09:27:01  5     against Cigna.  When I get to Cigna's case against the

09:27:05  6     Labs, I will tell them it is one of three bases that

09:27:09  7     Cigna is relying on, along with all the other

09:27:13  8     circumstances, to decide if it would be unfair for you to

09:27:18  9     retain the money.

09:27:19  10          Do you agree or are you just saying okay because

09:27:22  11    you are tired of fighting with this person who can't

09:27:25  12    quite get the case straight in your head?

09:27:29  13          MR. CUNNINGHAM:  I never get tired of fighting,

09:27:32  14    Your Honor.

09:27:33  15          I think the question that I have to ask about

09:27:34  16    that is we believe that Ms. Canto's investigation with

09:27:39  17    regard to fee forgiveness was seriously flawed.  Your

09:27:42  18    Honor has read her deposition.  She did almost no

09:27:44  19    investigation.  She never read any of the policies to see

09:27:45  20    if they even contained the language.  I think she made

09:27:49  21    less than ten phone calls.  Some of those phone calls

09:27:51  22    were to people who said, yes, we did receive bills.

09:27:55  23          So I believe if they are going to use that in

09:27:59  24    their case against us, I believe I need to be able to

09:28:02  25    point that out.

| | | |
|---|---|---|
| 09:28:03 | 1 | THE COURT:  I don't disagree. |
| 09:28:05 | 2 | MR. CUNNINGHAM:  Okay.  I just wanted to make |
| 09:28:06 | 3 | sure.  I didn't want to interrupt. |
| 09:28:08 | 4 | THE COURT:  No.  I think actually we talked |
| 09:28:12 | 5 | about whether I should say something to the jury so they |
| 09:28:18 | 6 | are not confused during the testimony, because it is |
| 09:28:22 | 7 | different between the two cases.  And I'm happy to |
| 09:28:25 | 8 | consider saying something short about fee forgiveness and |
| 09:28:28 | 9 | its relevance or lack of relevance. |
| 09:28:30 | 10 | I think -- I don't know, it sounds to me that |
| 09:28:36 | 11 | your questioning of a witness about fee forgiveness would |
| 09:28:40 | 12 | come in your cross of one of Cigna's witnesses. |
| 09:28:44 | 13 | MR. CUNNINGHAM:  I think it's going to come up |
| 09:28:46 | 14 | this morning in the cross of Stephanie Canto. |
| 09:28:51 | 15 | THE COURT:  You can cross her assuming she |
| 09:28:54 | 16 | testifies about fee forgiveness.  I don't whether |
| 09:28:56 | 17 | Attorney Kang may decide let's see if we can get through |
| 09:28:59 | 18 | the direct without the words fee forgiveness coming out |
| 09:29:02 | 19 | of her mouth.  Then it's outside your scope.  But I do |
| 09:29:06 | 20 | think to the extent, in any view, and I'm waiting to be |
| 09:29:10 | 21 | corrected, fee forgiveness is relevant to their proof of |
| 09:29:18 | 22 | how the jury could find unfairness.  It's one of several |
| 09:29:23 | 23 | things to consider.  Could consider. |
| 09:29:27 | 24 | Then I assume Attorney Kang is either going to |
| 09:29:32 | 25 | introduce it through her or he's going to introduce it |

09:29:34  1    through another Cigna witness, or he would introduce it

09:29:39  2    through one on your witnesses by saying, well, Nicholson

09:29:42  3    he can't cross anymore, but if Nicholson had been here

09:29:46  4    questioning him about you didn't really bill, that kind

09:29:49  5    of line, you would clearly be able to cross his

09:29:53  6    witnesses.

09:29:54  7         MR. CUNNINGHAM:  I think it's going to come up

09:29:56  8    this morning, Your Honor.

09:29:56  9         THE COURT:  With Canto?

09:29:59  10         MR. CUNNINGHAM:  Yes, ma'am.  She was the

09:30:00  11    person --

09:30:01  12         THE COURT:  I understand that.  I just don't

09:30:02  13    know whether he's going to, you know, he could decide

09:30:06  14    he's going to abandon that ground.  I don't mean he is

09:30:11  15    going to.  I'm just saying that he could.  In which case

09:30:13  16    he wouldn't bother to ask her.  Then you couldn't.  Other

09:30:16  17    than me telling them about its relevance or lack of

09:30:21  18    relevance, you wouldn't be able to cross.

09:30:24  19         MR. CUNNINGHAM:  Your Honor, I would request an

09:30:25  20    introduction along the lines of what you said just a

09:30:26  21    moments ago, that fee forgiveness is not an issue they

09:30:28  22    are to consider in the Labs' claims against Cigna.

09:30:32  23    However, in Cigna's claims back against the Labs, it is

09:30:36  24    an issue they can consider because it is I guess one of

09:30:42  25    the issues, one of the rationales that Cigna is raising.

| | | |
|---|---|---|
| 09:30:45 | 1 | THE COURT:  Could argue about if it's unfair. |
| 09:30:49 | 2 | MR. CUNNINGHAM:  Yes. |
| 09:30:50 | 3 | THE COURT:  I will see whether Attorney Kang |
| 09:30:51 | 4 | agrees or whether I continue to fail to understand where |
| 09:30:55 | 5 | the line is drawn between fee forgiveness as an issue and |
| 09:30:58 | 6 | not an issue. |
| 09:31:00 | 7 | MR. KANG:  As to Ms. Canto, I don't |
| 09:31:03 | 8 | anticipate -- in order to sort of streamline her |
| 09:31:06 | 9 | testimony and given the clock limitations. |
| 09:31:10 | 10 | THE COURT:  I understand.  You don't have to |
| 09:31:11 | 11 | explain it.  I'm smiling because I anticipated that.  So |
| 09:31:15 | 12 | pat the on back there.  I got it. |
| 09:31:18 | 13 | Do you agree that -- I'm assuming you are going |
| 09:31:23 | 14 | to argue the fee forgiveness was one of three things |
| 09:31:27 | 15 | specifically you point to for unfairness, and then you'll |
| 09:31:30 | 16 | make a general argument about all of the circumstances, I |
| 09:31:34 | 17 | guess, which is what the charge is. |
| 09:31:36 | 18 | So that it is an issue in the case, the case of |
| 09:31:40 | 19 | Cigna versus the Labs.  However, contrary to anything I |
| 09:31:46 | 20 | might have suggested in the original pretrial |
| 09:31:49 | 21 | instructions, it is not an issue and you won't consider |
| 09:31:54 | 22 | fee forgiveness at all in the Labs' case against Cigna. |
| 09:31:58 | 23 | Is that a fair statement? |
| 09:31:59 | 24 | MR. KANG:  That is.  I think we're in agreement |
| 09:32:01 | 25 | now, Your Honor. |

| | | |
|---|---|---|
| 09:32:01 | 1 | THE COURT:  I finally got it straight in this |
| 09:32:04 | 2 | thick head. |
| 09:32:05 | 3 | All right.  Anything else? |
| 09:32:16 | 4 | MR. CUNNINGHAM:  Nothing from the Labs, Your |
| 09:32:17 | 5 | Honor. |
| 09:32:18 | 6 | MR. KANG:  Your Honor, may I just have a |
| 09:32:20 | 7 | two-minute comfort break. |
| 09:32:21 | 8 | THE COURT:  Quick one, because I was just going |
| 09:32:22 | 9 | to say maybe line them up.  We haven't got them in order |
| 09:32:26 | 10 | yet, Liana.  The jury, they are still climbing over each |
| 09:32:31 | 11 | other.  Are they just not inclined to get in order? |
| 09:32:36 | 12 | THE CLERK:  I can try to line them up. |
| 09:32:38 | 13 | THE COURT:  Well, if they don't mind climbing |
| 09:32:40 | 14 | over each other, I don't care.  If you can get them in |
| 09:32:45 | 15 | somewhat of an order, certainly first and second row |
| 09:32:47 | 16 | order, that will be helpful.  If you can go get them and |
| 09:32:51 | 17 | get them ready.  We won't be long. |
| 09:33:33 | 18 | (Discussion Off the Record.) |
| 09:33:33 | 19 | (In the presence of the jury at 9:31 a.m.) |
| 09:33:33 | 20 | THE COURT:  Good morning.  Please be seated. |
| 09:33:33 | 21 | Counsel. |
| 09:33:33 | 22 | MR. KANG:  Your Honor, we call Ms. Canto to the |
| 09:33:33 | 23 | stand. |
| 09:33:33 | 24 | THE COURT:  If Ms. Canto can come back to the |
| 09:33:33 | 25 | witness stand. |

09:33:33  1          Welcome back, ladies and gentlemen.  Another

09:33:33  2  beautiful day out unfortunately for us sitting in here,

09:33:33  3  but we're here.  We're making progress.

09:33:33  4          Ms. Canto, if you would come back to the witness

09:33:33  5  stand.  You may be seated when you arrive.  Make sure you

09:33:33  6  have cup and some water, if you'd like it.

09:33:33  7          Cigna et al. versus BioHealth Laboratories et

09:33:33  8  al.  319-CV-1324 and 1326.

09:33:33  9          I failed to take appearances of counsel.  Can I

09:33:33  10  merely note for the record there's counsel here for both

09:33:33  11  sides present including those examining the witness.

09:33:33  12          I will remind the ladies and gentlemen of the

09:33:33  13  jury, when we recessed on Friday, Ms. Canto was on the

09:33:33  14  stand.  You already heard what was the direct examination

09:33:33  15  of the plaintiff, the Labs.  In other words, in their

09:33:33  16  case and now you are hearing for a little bit longer the

09:33:33  17  cross-examination by Cigna, in a sense essentially, in

09:33:33  18  their capacity as a defendant in that case brought by the

09:33:33  19  Labs.

09:33:33  20          Counsel will then tell us when he's going to

09:33:33  21  shift and ask Ms. Canto questions about Cigna's case

09:33:33  22  against the Labs.  That's what we'll proceed with first

09:33:33  23  this morning.

09:33:33  24          Before we do, I realize I'm not sure I was clear

09:33:33  25  about something, probably wasn't, and it's been an issue

09:33:33  1    that the lawyers and I have been discussing and I think I

09:33:33  2    should make it clear for you now rather than wait until

09:33:33  3    the final instructions.

09:33:33  4        If you remember I used the phrase "fee

09:33:33  5    forgiveness" in the pretrial instructions, if that rings

09:33:33  6    a bell.  It has to do with the idea that a provider of

09:33:33  7    services doesn't collect what's due from the insured

09:33:33  8    patient after any insurance is paid.  That issue, if

09:33:33  9    there was or wasn't fee forgiveness in these cases, is

09:33:33  10   relevant in connection with Cigna's claims against the

09:33:33  11   Labs.  And I will explain to you how it becomes relevant

09:33:33  12   in that case.  However, it is not relevant in any way to

09:33:33  13   the Labs' cases that they brought against Cigna for

09:33:33  14   payment that they claim they were entitled to be paid and

09:33:33  15   weren't as opposed to Cigna's case where they are

09:33:33  16   entitled to get money back.

09:33:33  17       In Cigna's case, fee forgiveness will be before

09:33:33  18   you to consider but in the Labs' case, it won't enter

09:33:33  19   into anything in that case.  I will make that clear in

09:33:33  20   the final charge.  I think I may have been less than

09:33:33  21   clear in the precharge and I wanted to be sure if anybody

09:33:33  22   is wondering, that's the case.  Thank you.

09:33:33  23       You may proceed, Attorney Kang.

09:33:33  24                  STEPHANIE CANTO

09:33:33  25    returned to the stand to testify further on her oath as

| | |
|---|---|
| 09:33:33 | 1 |

```
09:33:33   1                    follows:

09:33:33   2   CONTINUED CROSS-EXAMINATION BY MR. KANG:

09:33:33   3       Q.   Good morning, Ms. Canto.

09:33:33   4       A.   Good morning.

09:33:33   5       Q.   Ms. Canto, on Friday when Mr. Cunningham was

09:33:33   6   asking you some questions, do you remember him asking you

09:33:33   7   some questions about your case notes?

09:33:33   8       A.   Yes, I do.

09:33:33   9       Q.   Do you recall him showing you a document which

09:33:33  10   was Joint Exhibit 146 and he showed you some of the

09:33:33  11   entries and the dates of those entries?

09:33:33  12       A.   I don't recall the exact number, but I will take

09:33:33  13   your word for it.

09:33:33  14       Q.   Do you remember that he showed you a case note

09:33:33  15   where he said the earliest date was August 6, 2013?

09:33:33  16       A.   Yes, I recall.

09:33:33  17       Q.   And by showing you that, did you understand him

09:33:33  18   to be suggesting that you didn't document any of your

09:33:33  19   casework prior to August of 2013?

09:33:33  20       A.   Yes, that's what I had thought.

09:33:33  21       Q.   And did you also understand Mr. Cunningham to be

09:33:33  22   suggesting you had not made any entries prior to July 18,

09:33:33  23   2013, when PB Labs was put in a medical records edit?

09:33:33  24       A.   Yes, that's my assumption.

09:33:33  25            MR. KANG:  Mr. Salazar, can we put up Lab
```

09:33:33  1   Exhibit 7230.

09:33:33  2         And Your Honor, this is no objection.

09:33:33  3   BY MR. KANG:

09:33:33  4       Q.   Ms. Canto, do you recognize this document?

09:33:33  5       A.   Can you scroll to the bottom so I can look at

09:33:33  6   the whole thing, please?

09:33:33  7       Q.   (Complying).

09:33:33  8       A.   Yes.

09:33:33  9       Q.   What is it?

09:33:33  10      A.   This is a referral document in our case

09:33:33  11  management system.

09:33:33  12      Q.   Does this include entries regarding PB Labs

09:33:33  13  prior to August 6, 2013?

09:33:33  14      A.   I believe so.  At the top there's a date open

09:33:33  15  time stamp.

09:33:33  16      Q.   And Mr. Salazar, could you please turn to page 6

09:33:33  17  of this document, sir.  If you can zoom in.

09:33:33  18         Ms. Canto, do you see this entry here dated June

09:33:33  19  20, 2013?

09:33:33  20      A.   Yes, I do.

09:33:33  21      Q.   Is this a case note entry with respect to PB

09:33:33  22  Labs dated June 20, 2013?

09:33:33  23      A.   Yes.

09:33:33  24      Q.   And so, in fact, were there case note entries

09:33:33  25  regarding PB Labs prior to August 6, 2013?

09:33:33  1    A.   Yes.

09:33:33  2    Q.   And there were case notes on PB Labs prior to

09:33:33  3    July 18, 2013, when you put them in a medical records

09:33:33  4    edit?

09:33:33  5    A.   Yes.

09:33:33  6    Q.   Did Mr. Cunningham show you this document on

09:33:33  7    Friday?

09:33:33  8    A.   I don't believe so, no.

09:33:33  9    Q.   And if I can read the second paragraph there it

09:33:33  10   states, "SAMBA has noted unusual and repeated billing for

09:33:33  11   one employee by the lab.  Typical charges exceed $1,000.

09:33:33  12   As there's a concern about kickbacks, it should be noted

09:33:33  13   that the employee was in a drug and rehab facility at the

09:33:33  14   time the lab's services were billed.  Total bill for the

09:33:33  15   lab was $119,702."  Did I read that correctly?

09:33:33  16   A.   Yes.

09:33:33  17   Q.   Does this relate to the referral from Samba that

09:33:33  18   led to the investigation into PB Labs?

09:33:33  19   A.   Yes, it does.

09:33:33  20   Q.   What was the amount of money that was being

09:33:33  21   billed by PB Labs that caused SAMBA to be concerned and

09:33:33  22   make the referral?

09:33:33  23   A.   Per this note $119,000 and change.

09:33:33  24   Q.   And can you tell the jury what SAMBA is again?

09:33:33  25   A.   SAMBA is one of Cigna's employer groups.  We

09:33:33  1    partner with them as a part of their administration of

09:33:33  2    benefits.

09:33:33  3        Q.    What is -- does Cigna's money -- is Cigna's

09:33:33  4    money used to pay claims for any claim submitted by

09:33:33  5    SAMBA?

09:33:33  6        A.    No, it is not.  It is strictly the clients'

09:33:33  7    money.

09:33:33  8        Q.    Whose money is paying the SAMBA claim?

09:33:33  9        A.    That would be the client, SAMBA.

09:33:33  10       Q.    This $119,702 that was being referred, whose

09:33:33  11   money was being used to pay that?

09:33:33  12       A.    That would be SAMBA's.

09:33:33  13       Q.    Do you recall Mr. Cunningham asking you some

09:33:33  14   questions on Friday about IFP policies, Ms. Canto?

09:33:33  15       A.    Yes.

09:33:33  16       Q.    What is your understanding as to what IFP

09:33:33  17   policies are?

09:33:33  18       A.    It's my understanding that those policies

09:33:33  19   pertain to individuals who do not have coverage through

09:33:33  20   an employer group but rather through the marketplace.

09:33:33  21       Q.    Does IFP stand for Individual and Family Plans?

09:33:33  22       A.    Yes, it does.

09:33:33  23       Q.    Those are contracts that individuals enter into

09:33:33  24   with Cigna?

09:33:33  25       A.    Yes.

09:33:33  1    Q.   How is that different than an employer-sponsored

09:33:33  2    plan like SAMBA, the one we saw?

09:33:33  3    A.   The SAMBA plan has claim activity that's paid

09:33:33  4    directly by them, whereas the IFP or Individual Family

09:33:33  5    Plans those are funded through Cigna I believe.

09:33:33  6    Q.   Was the investigation that you were conducting

09:33:33  7    into PB Labs limited to looking at only certain types of

09:33:33  8    plans?

09:33:33  9    A.   No, it was not.

09:33:33  10   Q.   Your investigation into PB Labs was not limited

09:33:33  11   to looking just at IFP plans?

09:33:33  12   A.   No, it was not.

09:33:33  13   Q.   Ms. Canto, do you recall Mr. Cunningham asking

09:33:33  14   you some questions on Friday about BioHealth?

09:33:33  15   A.   Very little, but, yes.

09:33:33  16   Q.   And you testified that the investigation into PB

09:33:33  17   Labs was started by a referral from SAMBA, correct?

09:33:33  18   A.   Yes, that's correct.

09:33:33  19   Q.   Was the BioHealth investigation also initiated

09:33:33  20   by a customer referral?

09:33:33  21   A.   It was initiated from a client.

09:33:33  22   Q.   Which client was that?

09:33:33  23   A.   That would have been American Nutrition.

09:33:33  24   Q.   And what is American Nutrition?

09:33:33  25   A.   That is another employer group that utilizes

09:33:33  1    Cigna to administer their plan benefits.

09:33:33  2        Q.   What, if any, concerns did American Nutrition

09:33:33  3    express?

09:33:33  4        A.   American Nutrition expressed concerns with

09:33:33  5    regards to a covered dependant on their plan who had

09:33:33  6    excessive charges associated with not just BioHealth but

09:33:33  7    a few other providers during the same time frame.

09:33:33  8        Q.   Do you recall approximately when it was that

09:33:33  9    this referral was made?

09:33:33  10       A.   The spring of 2014.

09:33:33  11       Q.   And did American Nutrition's referral relate to

09:33:33  12   a particular individual member?

09:33:33  13       A.   Yes, it did.

09:33:33  14       Q.   I know we're using a anonymized names here to

09:33:33  15   protect patient privacy, but did that relate to an

09:33:33  16   individual member named Richard Sanborn?

09:33:33  17       A.   Yes.

09:33:33  18       Q.   Who did you understand, based on your

09:33:33  19   investigation, Mr. Sanborn to be?

09:33:33  20       A.   He was a covered dependant under the plan.

09:33:33  21       Q.   Meaning he was on his parents' health plan?

09:33:33  22       A.   Yes, that's correct.

09:33:33  23       Q.   Through American Nutrition?

09:33:33  24       A.   Yes, that's right.

09:33:33  25       Q.   So as an employer-sponsored plan, whose money

09:33:33  1    was paying for claims submitted to American Nutrition?

09:33:33  2        A.   That would be the client's, American

09:33:33  3    Nutrition's, money.

09:33:33  4        Q.   In connection with this referral that came in

09:33:33  5    from American Nutrition related to BioHealth, did you

09:33:33  6    also receive information regarding an entity called

09:33:33  7    Angel's Recovery?

09:33:33  8        A.   Yes, the referral from American Nutrition had

09:33:33  9    multiple providers listed of concern.

09:33:33  10       Q.   Did you investigate Angel's Recovery as a

09:33:33  11   result?

09:33:33  12       A.   Yes, I did.

09:33:33  13       Q.   What is Angel's Recovery?

09:33:33  14       A.   Angel's Recovery is a mental health and

09:33:33  15   substance abuse treatment facility located in Florida.

09:33:33  16       Q.   During the time you were investigating

09:33:33  17   BioHealth, who did you come to understand owned Angel's

09:33:33  18   Recovery?

09:33:33  19       A.    I believe there were two individuals.  Tova

09:33:33  20   Jasperson and Alan Bostom.

09:33:33  21       Q.   What, if anything, did you come to learn about

09:33:33  22   Mr. Bostom's relation with Medytox?

09:33:33  23       A.   As a matter for the preparation for trial, I had

09:33:33  24   found out that this individual was also employed by the

09:33:33  25   lab in addition to owning the rehab.

09:33:33   1        Q.   When you say "the lab," what lab are you

09:33:33   2   referring to?

09:33:33   3        A.   I believe he was employed by Medytox.

09:33:33   4        Q.   Did he hold that employment at the same time he

09:33:33   5   owned Angel's Recovery?

09:33:33   6        A.   I believe so.

09:33:33   7        Q.   What was your understanding as to how much

09:33:33   8   Mr. Bostom was being paid by the Labs?

09:33:33   9        A.   I learned that he received upwards of $200,000.

09:33:33   10        Q.   Was this at the same time the Labs were

09:33:33   11   referring urine drug samples to BioHealth for processing?

09:33:33   12        A.   I believe so, yes.

09:33:33   13        Q.   What, if any, relationship did you understand

09:33:33   14   there to be between Tova Jasperson and Alan Bostom?

09:33:33   15        A.   I believe that they were co-owners of Angel's

09:33:33   16   Recovery.

09:33:33   17        MR. KANG:   Your Honor, I think that concludes my

09:33:33   18   cross-examination.

09:33:33   19        THE COURT:   Okay.   You are shifting now to

09:33:33   20   questioning Ms. Canto about Cigna's case against the

09:33:33   21   Labs.

09:33:33   22   DIRECT EXAMINATION BY MR. KANG:

09:33:33   23        Q.   Ms. Canto, I will be fairly brief.   You had

09:33:33   24   indicated with respect to PB Labs that there was a flag

09:33:33   25   that was placed on them for lack of medical necessity,

| | | |
|---|---|---|
| 09:33:33 | 1 | correct? |
| 09:33:33 | 2 | A.   Not exactly correct. |
| 09:33:33 | 3 | Q.   I'm sorry. |
| 09:33:33 | 4 | A.   Not exactly correct. |
| 09:33:33 | 5 | Q.   Can you correct me on that? |
| 09:33:33 | 6 | A.   So the Special Investigation Unit placed a flag |
| 09:33:33 | 7 | to deny services as services not rendered as billed which |
| 09:33:33 | 8 | would encompass lack of medical necessity. |
| 09:33:33 | 9 | Q.   Thank you for clarifying that.  Why is it in |
| 09:33:33 | 10 | your mind that the phrase "services not rendered as |
| 09:33:33 | 11 | billed" also includes conduct that's not medical |
| 09:33:33 | 12 | necessity? |
| 09:33:33 | 13 | A.   When we identify an inability to validate that |
| 09:33:33 | 14 | the services were medically necessary, we in turn equate |
| 09:33:33 | 15 | that service as not being rendered as billed because we |
| 09:33:33 | 16 | deem it as not medically necessary. |
| 09:33:33 | 17 | Q.   So "services not rendered as billed" that phrase |
| 09:33:33 | 18 | encompasses more than services not being performed? |
| 09:33:33 | 19 | A.   Yes.  That's correct. |
| 09:33:33 | 20 |       MR. CUNNINGHAM:  Objection, leading. |
| 09:33:33 | 21 |       THE COURT:  Sustained.  The answer will be |
| 09:33:33 | 22 | disregarded. |
| 09:33:33 | 23 | BY MR. KANG: |
| 09:33:33 | 24 | Q.   Let me ask it again.  What, if anything, is your |
| 09:33:33 | 25 | understanding as to whether services not rendered as |

09:33:33  1    billed -- strike that.  We'll move on.

09:33:33  2            Is there a particular code that's assigned to a

09:33:33  3    flag for services not rendered as billed?

09:33:33  4        A.    Yes.  Each claim system that we process claims

09:33:33  5    on has their own respective code.

09:33:33  6        Q.    Is there a number that's associated with that

09:33:33  7    for services not rendered as billed?

09:33:33  8        A.    It would depend on the claim system, but yes.

09:33:33  9        Q.    Is there some claim systems that use the number

09:33:33  10   369?

09:33:33  11       A.     Yes, that would be our pro-claim claim system.

09:33:33  12       Q.    Are there certain codes in the Cigna system that

09:33:33  13   have nothing to do with SIU?

09:33:33  14       A.    Yes.

09:33:33  15       Q.    Are you familiar with a remark code 1698?

09:33:33  16       A.    Not off the top of my head, no.

09:33:33  17       Q.    To your knowledge is 1698 an SIU-related denial

09:33:33  18   code?

09:33:33  19       A.    No, I don't believe.

09:33:33  20       Q.    Is that the case back in the time period at

09:33:33  21   issue in this case?

09:33:33  22       A.    No.  I don't believe that that was one of our

09:33:33  23   remark codes.

09:33:33  24       Q.    Ms. Canto, you testified on Friday that PB Labs

09:33:33  25   did eventually send some lab test results to you,

09:33:33  1    correct?

09:33:33  2         A.    Yes.

09:33:33  3         Q.    And these were associated with the 20 patients

09:33:33  4    that you identified in your probe sample?

09:33:33  5         A.    Yes.

09:33:33  6         Q.    Remind the jury what did you do with some

09:33:33  7    portion of those records?

09:33:33  8         A.    I had sent a sample of those records to be

09:33:33  9    reviewed by Dr. Nicoll.

09:33:33  10        Q.    What type of records did PB Labs actually

09:33:33  11   provide to you?

09:33:33  12        A.    They provided the lab test results for those

09:33:33  13   patients.

09:33:33  14        Q.    What did they not provide to you?

09:33:33  15        A.    The complete medical record which would have

09:33:33  16   contained a letter of medical necessity.

09:33:33  17        Q.    Mr. Salazar, could you put up on the screen

09:33:33  18   Joint Exhibit 31.  This is a joint exhibit, Your Honor.

09:33:33  19             Ms. Canto, do you recognize this exhibit?

09:33:33  20        A.    Yes.

09:33:33  21        Q.    Does this appear to be one of the files that the

09:33:33  22   Labs sent over for one of the 20 patients?

09:33:33  23        A.    I believe so, yes.

09:33:33  24        Q.    And when would the Labs have sent this over to

09:33:33  25   you?

09:33:33  1      A.   I believe that might have been towards the

09:33:33  2  middle of August, 2013.

09:33:33  3      Q.   And if you look at the first page of this

09:33:33  4  document, do you see which facilities -- which facility

09:33:33  5  these documents relate to?

09:33:33  6      A.   I believe Angel's Recovery.

09:33:33  7      Q.   The same Angel's Recovery you testified about a

09:33:33  8  few minutes ago?

09:33:33  9      A.   Yes, sir.

09:33:33  10     Q.   Is that the address of -- your understanding of

09:33:33  11 the address of Angel's Recovery's location?

09:33:33  12     A.   I believe so, yes.

09:33:33  13     Q.   In Wellington, Florida?

09:33:33  14     A.   Yes.

09:33:33  15     Q.   And Mr. Salazar, if we can scroll down to the

09:33:33  16 bottom of this document, sir.

09:33:33  17          Do you see a section here at the bottom, Ms.

09:33:33  18 Canto, that starts "practitioner authorization"?

09:33:33  19     A.   Yes, I do.

09:33:33  20     Q.   That states, "I authorize Medytox, through its

09:33:33  21 affiliate labs, to perform drug testing on patients from

09:33:33  22 my practice as directed by the individual patient test

09:33:33  23 requisition form as well as the provided custom profile

09:33:33  24 on file.  I understand that it is the practitioners'

09:33:33  25 responsibility to determine the medical necessity of each

09:33:33  1    test requested through the individual patient test

09:33:33  2    requisition form and custom profile."  Did I read that

09:33:33  3    correctly?

09:33:33  4        A.   Yes, you did.

09:33:33  5        Q.   Is it your understanding that a doctor is

09:33:33  6    supposed to sign this?

09:33:33  7        A.   Yes.

09:33:33  8        Q.   At the bottom of the document it says

09:33:33  9    "practitioner signature"?

09:33:33  10       A.   Yes.

09:33:33  11       Q.   Do you see a signature next to that?

09:33:33  12       A.   Yes.

09:33:33  13       Q.   Does it appear whose signature that?

09:33:33  14       A.   I believe it says "Tova Jasperson."

09:33:33  15       Q.   The co-owner of Angel's Recovery?

09:33:33  16       A.   Yes.

09:33:33  17       Q.   To your knowledge, was Ms. Jasperson ever a

09:33:33  18    doctor?

09:33:33  19       A.   I don't believe she was.

09:33:33  20       Q.   If you can zoom out, Mr. Salazar.

09:33:33  21            Ms. Canto, what's your understanding of what

09:33:33  22    this document is, this first page?

09:33:33  23       A.   It would be my understanding that this is filled

09:33:33  24    out by the rendering or referring practitioner for the

09:33:33  25    type of testing to be performed.

09:33:33  1      Q.    Can we turn to the next page please, 339.

09:33:33  2            Is this the next page in the document, ma'am?

09:33:33  3      A.    Yes.

09:33:33  4      Q.    And if you can see there are a couple of names

09:33:33  5   that are listed on the top half of that document,

09:33:33  6   correct?

09:33:33  7      A.    Yes, sir.

09:33:33  8      Q.    Do you see Alan Bostom's name on there?

09:33:33  9      A.    Yes, I do.

09:33:33  10     Q.    According to this document, what is Alan

09:33:33  11  Bostom's title?

09:33:33  12     A.    Owner.

09:33:33  13     Q.    Owner of what?

09:33:33  14     A.    I believe Angel's Recovery.

09:33:33  15     Q.    If you can zoom out, Mr. Salazar.

09:33:33  16           Do you see Ms. Jasperson's name on here?

09:33:33  17     A.    I do, yes.

09:33:33  18     Q.    By the way, based on your investigation did,

09:33:33  19  Tova Jasperson, Ms. Jasperson, go by another name?

09:33:33  20     A.    I believe Tara was an alias.

09:33:33  21     Q.    According to this document, what is

09:33:33  22  Ms. Jasperson's title?

09:33:33  23     A.    Owner as well.

09:33:33  24     Q.    Owner of what?

09:33:33  25     A.    Angel's Recovery.

09:33:33  1      Q.    Can we go to page 41, Mr. Salazar.

09:33:33  2            THE COURT:  Are we still discussing Joint

09:33:33  3  Exhibit 31?

09:33:33  4            MR. KANG:  Yes, Your Honor.

09:33:33  5  BY MR. KANG:

09:33:33  6      Q.    Ms. Canto, is this another page from Joint

09:33:33  7  Exhibit 31, the materials the lab provided to Cigna?

09:33:33  8      A.    Yes.

09:33:33  9      Q.    What is this page?  What is this document?

09:33:33  10     A.    I believe these would be the items to test for

09:33:33  11  or the drugs to test for.

09:33:33  12     Q.    Is this an order form?

09:33:33  13     A.    Yes, sir.

09:33:33  14     Q.    So these are the order forms that would be used

09:33:33  15  by Angel's Recovery to submit to PB Labs for testing?

09:33:33  16     A.    I believe so, yes.

09:33:33  17     Q.    Do you see a provider's name at the bottom of

09:33:33  18  this form?

09:33:33  19     A.    Yes, I do.

09:33:33  20     Q.    Whose name appears?

09:33:33  21     A.    Kenneth Rivera-Kolb, MD.

09:33:33  22     Q.    If you can zoom back out, Mr. Salazar, and see

09:33:33  23  the top.

09:33:33  24            What laboratory is this for?

09:33:33  25     A.    It indicates PB Laboratories.

09:33:33  1      Q.   Ms. Canto, on this order form, do you see any

09:33:33  2  line showing where the doctor could put the name of a

09:33:33  3  patient?

09:33:33  4      A.   No, sir, I do not.

09:33:33  5      Q.   Do you see any line of this order form where the

09:33:33  6  doctor could put the date of the order?

09:33:33  7      A.   No, I do not see one.

09:33:33  8      Q.   Based on your investigation into Angel's

09:33:33  9  Recovery, what, if anything, did you determine as to

09:33:33  10  whether Angel's Recovery was a significant client of

09:33:33  11  Medytox?

09:33:33  12      A.   I had learned through analysis that Angel's

09:33:33  13  Recovery did appear to have a lot of similar patterns of

09:33:33  14  patient claims in addition to what the lab was billing.

09:33:33  15      Q.   Were they a significant customer of Medytox from

09:33:33  16  your investigation?

09:33:33  17      A.   Based on my findings, yes.

09:33:33  18      Q.   If you could go to page 348, Mr. Salazar.

09:33:33  19           Is this also in Joint Exhibit 31, Ms. Canto,

09:33:33  20  among the materials the Labs provided?

09:33:33  21      A.   Yes.

09:33:33  22      Q.   What is this document?

09:33:33  23      A.   This is what we could HICFA 1500 or a claim

09:33:33  24  form.

09:33:33  25      Q.   And who prepares the information on this form?

09:33:33  1    A.   That would be the provider.

09:33:33  2    Q.   In this case who would that about?

09:33:33  3    A.   PB Labs, LLC.

09:33:33  4    Q.   What is the purpose of this document?

09:33:33  5    A.   This is a claim submission meant for payment or

09:33:33  6  reimbursement of the claim.

09:33:33  7    Q.   Is this is a claim form that PB Labs submits to

09:33:33  8  Cigna to get paid?

09:33:33  9    A.   Yes, that's correct.

09:33:33  10    Q.   Is it important that everything on this document

09:33:33  11  be accurate?

09:33:33  12    A.   Yes, it is.

09:33:33  13    Q.   Does Cigna rely upon the information on here?

09:33:33  14    A.   Yes, we do.

09:33:33  15    Q.   If you can zoom in, Mr. Salazar, to the bottom

09:33:33  16  of the page, there's a box 32.

09:33:33  17        Do you see that, Ms. Canto?

09:33:33  18    A.   Yes, I do.

09:33:33  19    Q.   It says "Box 32 service facility location

09:33:33  20  information," did I read that correctly?

09:33:33  21    A.   Yes, you did.

09:33:33  22    Q.   Does this box indicate the location where this

09:33:33  23  service was purportedly performed?

09:33:33  24    A.   Yes, it does.

09:33:33  25    Q.   According to this claim form that PB Labs

09:33:33  1    submitted, where was this particular service performed?

09:33:33  2        A.    Sterling Reference Laboratory.

09:33:33  3        Q.    But where does it say Sterling Reference

09:33:33  4    Laboratory is located?

09:33:33  5        A.    2617 East L Street, Suite A, Tacoma, Washington.

09:33:33  6        Q.    Not in Florida?

09:33:33  7        A.    No, sir.

09:33:33  8        Q.    Does it say here that the service was

09:33:33  9    performed at PB Labs?

09:33:33  10       A.    No, it does not.

09:33:33  11       Q.    Does it say here it was performed at BioHealth

09:33:33  12   Laboratories?

09:33:33  13       A.    No, sir.

09:33:33  14       Q.    Does it say here that the service was performed

09:33:33  15   at Epic Laboratories?

09:33:33  16       A.    No, sir.

09:33:33  17       Q.    Ms. Canto, during the course of your

09:33:33  18   investigation, did you ever get a phone call from any

09:33:33  19   patient demanding that Cigna pay their claim for services

09:33:33  20   that they had received from the Labs?

09:33:33  21       A.    No, not that I recall.

09:33:33  22       Q.    At any point during your investigation, did any

09:33:33  23   patient send any form of communication to you demanding

09:33:33  24   that Cigna pay their claim for services that they had

09:33:33  25   gotten from the Labs?

| | | |
|---|---|---|
| 09:33:33 | 1 | A.    No.  Not that I recall. |
| 09:33:33 | 2 | MR. KANG:  One minute, Your Honor.  That's all |
| 09:33:33 | 3 | the questions I have.  I tender the witness. |
| 09:33:33 | 4 | THE COURT:  If you can wait one moment.  I had |
| 09:33:33 | 5 | one question, but I can't find it. |
| 09:33:33 | 6 | MR. CUNNINGHAM:  Your Honor, may I have one |
| 09:33:33 | 7 | moment before I begin? |
| 09:33:33 | 8 | THE COURT:  Yes.  I guess maybe I can find that |
| 09:33:33 | 9 | in a moment. |
| 09:33:33 | 10 | MR. CUNNINGHAM:  Your Honor, if it please the |
| 09:33:33 | 11 | Court. |
| 09:33:33 | 12 | THE COURT:  I think I will ask one question for |
| 09:33:33 | 13 | clarification.  Ms. Canto, you were asked by counsel |
| 09:33:33 | 14 | based on your investigation into Angel's Recovery what, |
| 09:33:33 | 15 | if anything, did you determine as to whether Angel's |
| 09:33:33 | 16 | Recovery was a significant client of Medytox and I |
| 09:33:33 | 17 | believe your answer was something to the effect, "I had |
| 09:33:33 | 18 | learned through analysis Angel's Recovery did appear to |
| 09:33:33 | 19 | have a lot of similar patterns of patient claims in |
| 09:33:33 | 20 | addition to what the lab was billing."  I don't |
| 09:33:33 | 21 | understand what patient claims are separate from the labs |
| 09:33:33 | 22 | attempting to bill on what would be a patient claim. |
| 09:33:33 | 23 | THE WITNESS:  Would you like me to elaborate a |
| 09:33:33 | 24 | little bit more, Your Honor? |
| 09:33:33 | 25 | THE COURT:  Is that what your answer was? |

| 09:33:33 | 1 | THE WITNESS:  Yes, it was. |

09:33:33  1    THE WITNESS:  Yes, it was.

09:33:33  2    THE COURT:  I will leave it as is.  Go ahead,

09:33:33  3  sir.

09:33:33  4  CROSS-EXAMINATION BY MR. CUNNINGHAM:

09:33:33  5    Q.   If we can go to Joint Exhibit 14, please.  Let's

09:33:33  6  see PDF 7, please.

09:33:33  7    Ma'am, do you recognize this document?  We'll

09:33:33  8  zoom on this for you.  Do you recognize what this

09:33:33  9  document is?

09:33:33  10    A.   Yes, I do.

09:33:33  11    Q.   Okay.  Can you please scroll down, Mr. Smeig.

09:33:33  12  Let me ask you a couple of things about this document in

09:33:33  13  particular.  Do you see, starting with the words "to

09:33:33  14  enable me"?

09:33:33  15    A.   Yes, sir.

09:33:33  16    Q.   Is this document signed by a provider named Dr.

09:33:33  17  David Simon?

09:33:33  18    A.   Yes, I do see that name.

09:33:33  19    Q.   So let me read this into the record and see if

09:33:33  20  you can confirm that I read this accurately.  "To enable

09:33:33  21  me to assess the cause of testing my patients with this

09:33:33  22  toxicology custom panel and confirmatory testing hereby

09:33:33  23  directed, I have carefully reviewed the tests that I have

09:33:33  24  selected here to include in the panel.  I understand and

09:33:33  25  hereby acknowledge, number one, I only believe -- excuse

09:33:33  1   me -- I only order tests that I believe to be medically

09:33:33  2   necessary for each individual patient to ensure patient

09:33:33  3   compliance with the therapy I have prescribed for that

09:33:33  4   patient and I will order this panel accordingly.  If not,

09:33:33  5   all of the components on this custom profile are

09:33:33  6   medically necessary, I will order only those individual

09:33:33  7   tests where a less inclusive profile I believe to be

09:33:33  8   medically appropriate."  Did I read that accurately,

09:33:33  9   ma'am?

09:33:33  10      A.   Yes, sir.

09:33:33  11      Q.   Okay.  And are you familiar with the term

09:33:33  12  "attestation"?

09:33:33  13      A.   Yes.

09:33:33  14      Q.   Would this be considered an attestation by Dr.

09:33:33  15  David Simon?

09:33:33  16      A.   I would believe so, yes.

09:33:33  17      Q.   What he's saying is he swears that he only

09:33:33  18  orders tests that he believes to be medical necessity,

09:33:33  19  correct?

09:33:33  20          MR. KANG:  Your Honor, I object.  This is the

09:33:33  21  subject of the evidentiary memo regarding the limited

09:33:33  22  purpose.

09:33:33  23          THE COURT:  Give me just one moment.  Remember I

09:33:33  24  hinted at the beginning that there might be some evidence

09:33:33  25  that would come in that I would tell you you can only use

09:33:33  1    for a certain purpose.  This is the first time that's

09:33:33  2    happened.

09:33:33  3         Let's assume a friend of my son's told him that

09:33:33  4    he saw me drive through a red light at a high rate of

09:33:33  5    speed in New Haven.  So friend tells my son that.  Let's

09:33:33  6    say there's an accident that followed.  My son could not

09:33:33  7    come in and offer testimony to a jury that his mother

09:33:33  8    went through a red light at a high speed.  That wouldn't

09:33:33  9    prove the fact of what I did when my son wasn't there.

09:33:33  10   He didn't see it.  He's repeating what someone else said

09:33:33  11   who may or may not have been there, but my son wasn't

09:33:33  12   there.

09:33:33  13        However, if he is asked something, let's see to

09:33:33  14   the effect of did you speak with your mother after you

09:33:33  15   spoke to your friend?  He would answer, yes, let's say.

09:33:33  16   And what did you say to her?  His statement is direct

09:33:33  17   evidence, but as to what it is based on, it's the what

09:33:33  18   the friends told him.  If asked that he would say,

09:33:33  19   because my friend told me she went through the red light

09:33:33  20   and she was speeding.  The judge would tell the jury, do

09:33:33  21   not -- this doesn't prove she was speeding or went

09:33:33  22   through a red light.  It just proves the state of mind of

09:33:33  23   my son.  For example, if it was relevant, why did you

09:33:33  24   talk to your mother about her driving?  That's what's

09:33:33  25   going to happen whenever I tell you this evidence is

09:33:33  1    limited.  It can only be used for this purpose to prove

09:33:33  2    this fact or it can't be used for another fact.  And

09:33:33  3    that's the only way you can use it.  That's the only

09:33:33  4    thing I have to say about evidence in the case.  Just to

09:33:33  5    be sure you use the evidence in a proper way.

09:33:33  6            Apparently this is one of those.  Is this

09:33:33  7    considered a Recurring Provider Agreement or the --

09:33:33  8    not --  it's not a consent form, so it has to be the

09:33:33  9    provider agreement.  Is that right?  Is that what you

09:33:33  10   call it?

09:33:33  11           MR. CUNNINGHAM:  Yes, Your Honor.

09:33:33  12           THE COURT:  The document you are looking at

09:33:33  13   which is Joint Exhibit 14, is one of probably others, is

09:33:33  14   known as the Recurring Provider Agreement, and it's in

09:33:33  15   evidence by agreement of the parties.  The Recurring

09:33:33  16   Provider Agreement contains handwritten signatures within

09:33:33  17   the documents.  The handwritten signatures themselves are

09:33:33  18   admitted only for the purposes of evidencing that the

09:33:33  19   Labs received the Recurring Provider Agreement with the

09:33:33  20   handwritten signatures within the ordinary course of

09:33:33  21   business, and the Labs' practice was after review to

09:33:33  22   accept and act upon the handwritten signature so the

09:33:33  23   evidence can be received to prove that the Labs received

09:33:33  24   this document as you see it there on the screen with the

09:33:33  25   signature of an MD, a doctor.  And that's what its

09:33:33    1    purpose can be as well as the contents of the document;

09:33:33    2    is that correct?

09:33:33    3            MR. CUNNINGHAM:  That's what I'm trying to ask

09:33:33    4    about, the contents.

09:33:33    5            THE COURT:  All right.  I won't go there then.

09:33:33    6    What it doesn't prove is Dr. Simon put his signature

09:33:33    7    there.  You would need Dr. Simon to come here and say

09:33:33    8    yes, I signed the document.  Dr. Simon is not here

09:33:33    9    obviously so it's limited in what you can use it for.

09:33:33   10    But you can use it to conclude in your deliberations that

09:33:33   11    the Labs received this document as you see it which

09:33:33   12    contained a signature quote Dr. David Simon.

09:33:33   13            Is that a fair characterization of its use?

09:33:33   14    Yes.  Go ahead then, sir.

09:33:33   15    BY MR. CUNNINGHAM

09:33:33   16        Q.    Ma'am, all I'm asking you is, isn't it true that

09:33:33   17    this is a form that purports to be signed by Dr. David

09:33:33   18    Simon where he is attesting or swearing that he only

09:33:33   19    orders test that he believes to be medically necessary?

09:33:33   20            MR. KANG:  Objection, Your Honor.

09:33:33   21            THE COURT:  Basis?

09:33:33   22            MR. KANG:  I think that goes beyond what Your

09:33:33   23    Honor instructed.

09:33:33   24            THE COURT:  He said purports to be signed.  And

09:33:33   25    the words, the document speaks for itself, but I wouldn't

09:33:33  1    call it an unfair characterization.

09:33:33  2          But as to what the document -- what is being

09:33:33  3    attested to, Ladies and Gentlemen, it would be the

09:33:33  4    document you would look to, but for the purposes of

09:33:33  5    asking the question, I think counsel is, in effect,

09:33:33  6    trying to summarize what he thinks it says and asking the

09:33:33  7    witness if she agrees.

09:33:33  8          Go ahead, ma'am.

09:33:33  9    BY MR. CUNNINGHAM:

09:33:33  10   A.    Can you repeat the question?

09:33:33  11   Q.    I will try.  Would you agree with me, ma'am,

09:33:33  12   that what this document is is a document where Dr. David

09:33:33  13   Simon purports to sign this document that says that he

09:33:33  14   swears he only orders tests that he believes to be

09:33:33  15   medically necessary?

09:33:33  16   A.    Yes, I believe so.

09:33:33  17   Q.    Now, Ms. Canto, I believe on your direct

09:33:33  18   examination, Mr. Kang showed you three or four documents,

09:33:33  19   correct?

09:33:33  20   A.    Yes.

09:33:33  21   Q.    And when we spoke on Friday, you told us that

09:33:33  22   you sent three boxes of documents to Dr. Nicoll, the

09:33:33  23   medical director at Cigna?

09:33:33  24   A.    I believe so at one point in time.

09:33:33  25   Q.    Those were literally thousands of documents that

09:33:33  1    were provided to you by the Labs, correct?

09:33:33  2        A.   I believe so, yes.

09:33:33  3        Q.   Now, Ms. Canto, you didn't review all of those

09:33:33  4    documents before you sent them to Dr. Nicoll, did you?

09:33:33  5        A.   I don't recall.

09:33:33  6        Q.   Now, ma'am, is it your testimony that you

09:33:33  7    believe that the Labs should have provided medical

09:33:33  8    records, operative reports, and things of that nature?

09:33:33  9        A.   Yes.  In order to substantiate their claims.

09:33:33  10       Q.   Even if they didn't have such documents?

09:33:33  11       A.   I would have expected a provider to have

09:33:33  12   complete medical records.

09:33:33  13            MR. CUNNINGHAM:  Can we go to Cigna 395, please.

09:33:33  14            THE COURT:  Is this a full exhibit?

09:33:33  15            MR. CUNNINGHAM:  Yes, Your Honor.

09:33:33  16            THE COURT:  Thank you.  395.

09:33:33  17            MR. CUNNINGHAM:  Could you please zoom in a

09:33:33  18   little bit, Mr. Smeig.  Thank you.

09:33:33  19   BY MR. CUNNINGHAM:

09:33:33  20       Q.   Now, Ms. Canto, on Friday afternoon Mr. Kang had

09:33:33  21   part of this first paragraph enlarged.  My recollection

09:33:33  22   is he did not have the words in parentheses enlarged.  Do

09:33:33  23   you see those words if applicable?

09:33:33  24       A.   Yes, sir.

09:33:33  25       Q.   So was this a standard letter that you sent to

09:33:33  1    CollectAway or PB Labs on July 15, 2013?

09:33:33  2        A.   Yes.  This is a standard medical record request

09:33:33  3    letter.

09:33:33  4        Q.   Was this letter 56 as Cigna referred to it?

09:33:33  5        A.   I don't believe so.  But a very similar letter.

09:33:33  6        Q.   But this was a standard letter that you would

09:33:33  7    send to a provider when you wanted more medical

09:33:33  8    information from that provider, correct?

09:33:33  9        A.   Yes, sir.

09:33:33  10       Q.   So let's talk about the documents that are

09:33:33  11   reflected in these bullet points.

09:33:33  12            Operative reports.  Would you expect there to be

09:33:33  13   any Operative Reports in any medical records sent to you

09:33:33  14   by the Labs?

09:33:33  15       A.   If the Lab testing was done in conjunction with

09:33:33  16   an operation, then yes.

09:33:33  17       Q.   But if not, then certainly there wouldn't be an

09:33:33  18   Operative Report there, would there?

09:33:33  19       A.   No, there would not.

09:33:33  20       Q.   What about Physician Progress Notes.  You

09:33:33  21   wouldn't expect those to be in medical records that were

09:33:33  22   sent to you by Labs that were doing blood and urine

09:33:33  23   testing, would you?

09:33:33  24       A.   It's possible if they are reviewing and

09:33:33  25   documenting the results of those tests.

09:33:33  1       Q.   What about the complete medical record?  You

09:33:33  2  wouldn't expect those to be contained in medical records

09:33:33  3  being sent to you by labs that are doing blood and urine

09:33:33  4  testing, would you?

09:33:33  5       A.   Yes, if they are repeatedly testing the patient.

09:33:33  6       Q.   Ma'am, let me just ask you this without going

09:33:33  7  through all of these.  Wouldn't you agree with we that

09:33:33  8  these labs that were doing blood and urine testing were

09:33:33  9  simply not going to have a lot of these items that you

09:33:33  10  itemized in this standard letter you sent to the labs?

09:33:33  11      A.   No, that's not correct.  I believe that there

09:33:33  12  would be a good portion of these documented in a record

09:33:33  13  by a lab.

09:33:33  14      Q.   Now, ma'am, there was some testimony about or

09:33:33  15  some discussion about standing orders.  What is a

09:33:33  16  standing order?

09:33:33  17      A.   It would be my impression that a standing order

09:33:33  18  is a lab requisition that does not dictate the medical

09:33:33  19  necessity, more or less, of why something is being

09:33:33  20  repeatedly testing.

09:33:33  21      Q.   Okay.  But you understand that physicians do, in

09:33:33  22  fact, issue standing orders, correct?

09:33:33  23      A.   I believe so, on occasion.

09:33:33  24      Q.   In fact, in this one bullet point -- Mr. Smeig,

09:33:33  25  if you can highlight this bullet point that's about

09:33:33  1    two-thirds of the way down that list.

09:33:33  2           See that one of the thing that you request is

09:33:33  3    physician standing orders, right?

09:33:33  4        A.   Yes, it is one of those items.

09:33:33  5        Q.   So you're not critical of physicians for using

09:33:33  6    standing orders, are you?

09:33:33  7        A.   Not as long as they support the medical

09:33:33  8    necessity of those tests.

09:33:33  9        Q.   Could you go to Joint 14, please, Mr. Smeig.

09:33:33  10          Okay.  Ma'am, what I want to ask you about first

09:33:33  11   is PDF 7.  That's the one we just saw.  I apologize.

09:33:33  12          Would you agree with me, ma'am, that you had

09:33:33  13   statements of medical necessity for each of the 20

09:33:33  14   patients that were signed by the ordering physician?

09:33:33  15       A.   I don't recall receiving all 20 of those, sir.

09:33:33  16       Q.   Okay.  Then we'll go on through those, ma'am.

09:33:33  17          Would you agree with me that you have an

09:33:33  18   individual attestation signed by the treating physician

09:33:33  19   as part of the normal course of what the Labs, PB Labs,

09:33:33  20   would send you?

09:33:33  21       A.   I'm sorry.  Can you repeat the question

09:33:33  22   specifically?

09:33:33  23       Q.   Sure.  Would you agree with me that you would

09:33:33  24   have had the statements of medical necessity contained in

09:33:33  25   these forms that were sent to you by PB Labs?

09:33:33  1    A.   I would like an opportunity to confirm that, but

09:33:33  2  it would have been a part of a medical record upon

09:33:33  3  request.

09:33:33  4    Q.   We'll go through those.

09:33:33  5         Did you see any of these statements of medical

09:33:33  6  necessity from the Labs before or after you sent the

09:33:33  7  documents to Dr. Nicoll?

09:33:33  8    A.   Yes.  There were a couple of batches of

09:33:33  9  information sent to Dr. Nicoll.

09:33:33  10   Q.   And that included statements of medical

09:33:33  11 necessity by the doctors that ordered the specific tests

09:33:33  12 that PB Labs performed, correct?

09:33:33  13   A.   If the Lab provided them then, yes, those would

09:33:33  14 have been in the records.

09:33:33  15   Q.   Let's look at PDF 8, please.  Can you zoom in on

09:33:33  16 this please, Mr. Smeig.

09:33:33  17        Ma'am, do you recognize this document?

09:33:33  18   A.   I believe so, yes.

09:33:33  19   Q.   It's from PB Labs, correct?

09:33:33  20   A.   Yes.

09:33:33  21   Q.   And it says Laboratory Tests Panel and POC,

09:33:33  22 which would mean point of care, correct?

09:33:33  23   A.   I believe so, yes.

09:33:33  24   Q.   Testing Selection Sheet.  What I want to ask you

09:33:33  25 about on this, ma'am, is there's a column second from the

09:33:33  1    right that is captioned "custom", correct?

09:33:33  2         A.    Yes.

09:33:33  3         Q.    And under that column which is checked, correct?

09:33:33  4         A.    Yes, it's checked.

09:33:33  5         Q.    And what this shows is that the doctor here

09:33:33  6    specifically requested a number of custom tests to be

09:33:33  7    performed on this particular blood or urine sample,

09:33:33  8    correct?

09:33:33  9              MR. KANG:  Objection, lack of personal

09:33:33  10   knowledge.

09:33:33  11              THE COURT:  I don't have the transcript up, but

09:33:33  12   I believe he asked does the document show something.  If

09:33:33  13   she's looking at it, she would have knowledge.

09:33:33  14              Overruled.

09:33:33  15              THE WITNESS:  Can you repeat the question,

09:33:33  16   please?

09:33:33  17   BY MR. CUNNINGHAM:

09:33:33  18        Q.    Sure.  Let me ask you this, ma'am.  This is the

09:33:33  19   type of document that you review routinely as an

09:33:33  20   investigator for Cigna, correct?

09:33:33  21        A.    Not always, but it's very similar documents,

09:33:33  22   yes.

09:33:33  23        Q.    And you are familiar with the fact that there

09:33:33  24   are standard panels and then there are also custom

09:33:33  25   testing panels, right?

09:33:33  1    A.   Yes.

09:33:33  2    Q.   And this document reflects that the particular

09:33:33  3  treating doctor here ordered what's called a custom panel

09:33:33  4  to check to see for the presence or absence of certain

09:33:33  5  substances in this patient's blood or urine, correct?

09:33:33  6         MR. KANG:  Objection, Your Honor.  This is going

09:33:33  7  into beyond the limiting instruction that Your Honor

09:33:33  8  provided.

09:33:33  9         THE COURT:  The limiting instruction.  About the

09:33:33 10  signature?

09:33:33 11         MR. KANG:  I'm sorry?

09:33:33 12         THE COURT:  About the signature?

09:33:33 13         MR. KANG:  Yes.

09:33:33 14         MR. CUNNINGHAM:  Could you scroll down to the

09:33:33 15  bottom, please, Mr. Smeig.

09:33:33 16         THE COURT:  I guess it would depend on what you

09:33:33 17  read into the word reflects.  How about we substitute the

09:33:33 18  word shows or appears to show.  This is, again, remember,

09:33:33 19  we don't have a witness who could say they saw the doctor

09:33:33 20  put the signature on the paper.  But he wants to ask

09:33:33 21  about when you look at the document, what do you see.

09:33:33 22  That's what the question is.  So to the extent, the

09:33:33 23  objection's overruled as long as the witness understands

09:33:33 24  the question.  Otherwise, I will ask you to restate it as

09:33:33 25  I suggest.

| 09:33:33 | 1 | BY MR. CUNNINGHAM: |
| 09:33:33 | 2 | Q. Ms. Canto, do you see a provider name at the |
| 09:33:33 | 3 | bottom of this document? |
| 09:33:33 | 4 | A. I do see a provider name, yes. |
| 09:33:33 | 5 | Q. Do you see a signature next to the x beside |
| 09:33:33 | 6 | provider signature which purports to be the signature of |
| 09:33:33 | 7 | Dr. David Simon? |
| 09:33:33 | 8 | A. Yes, I do see a signature. |
| 09:33:33 | 9 | Q. And this form reflects a custom panel that was |
| 09:33:33 | 10 | ordered by Dr. Simon to be performed by PB Labs on this |
| 09:33:33 | 11 | particular patient? |
| 09:33:33 | 12 | A. Could you scroll up to the top, please? |
| 09:33:33 | 13 | I don't see any information about a patient, |
| 09:33:33 | 14 | sir. |
| 09:33:33 | 15 | Q. Ma'am, do you believe that this was -- that this |
| 09:33:33 | 16 | form was not relating to a specific patient? |
| 09:33:33 | 17 | A. No, I don't see a selection for a specific |
| 09:33:33 | 18 | patient's details. |
| 09:33:33 | 19 | Q. But you do see that this was a custom panel that |
| 09:33:33 | 20 | was ordered by Dr. David Simon? |
| 09:33:33 | 21 | A. Yes. |
| 09:33:33 | 22 | Q. Go to PDF 12, please, Mr. Smeig. |
| 09:33:33 | 23 | THE COURT: Could you tell me, when you say PDF, |
| 09:33:33 | 24 | what's PDF, what are you referring to? Are we still in |
| 09:33:33 | 25 | Joint Exhibit 14? |

09:33:33  1          MR. CUNNINGHAM:  Yes, Your Honor.  There are a

09:33:33  2     number of PDF's within the Joint Exhibit.  I apologize

09:33:33  3     for not making that clear.

09:33:33  4          THE COURT:  If Liana were to look for this,

09:33:33  5     Joint Exhibit 14, PDF 8, that's all under Joint Exhibit

09:33:33  6     14?

09:33:33  7          MR. CUNNINGHAM:  Yes, Your Honor.

09:33:33  8          THE COURT:  Thank you.  That's all I needed.

09:33:33  9          MR. CUNNINGHAM:  I'm sorry that I didn't make

09:33:33  10    that more clear.

09:33:33  11         PDF is just the page number, Your Honor.

09:33:33  12         THE COURT:  That's easier.  Thank you.

09:33:33  13         MR. CUNNINGHAM:  The younger attorneys pointed

09:33:33  14    that out to me, Your Honor.

09:33:33  15         THE COURT:  So you are turning to page 14 of

09:33:33  16    Joint Exhibit 14, I believe?

09:33:33  17         MR. CUNNINGHAM:  Yes.

09:33:33  18         THE COURT:  You said PDF 12.  So it's page 12?

09:33:33  19         MR. CUNNINGHAM:  Yes, Your Honor.

09:33:33  20         THE COURT:  Thank you.

09:33:33  21    BY MR. CUNNINGHAM.

09:33:33  22      Q.   Ma'am, would you agree with me, if we can zoom

09:33:33  23    in on that a little bit, Mr. Smeig.  And scroll down a

09:33:33  24    little bit please.

09:33:33  25         First of all, does this appear to be a health

09:33:33  1    insurance claim form?

09:33:33  2        A.    Yes, sir.

09:33:33  3        Q.    And under Section 21 there, Mr. Smeig, if you

09:33:33  4    can highlight that.  Did there appear to be diagnosis

09:33:33  5    codes there?

09:33:33  6        A.    Yes, sir.

09:33:33  7        Q.    So on this particular claim form, the ordering

09:33:33  8    physician placed specific diagnosis codes for the tests

09:33:33  9    that that physician was ordering, correct?

09:33:33  10        MR. KANG:  Objection, to the extent that he's

09:33:33  11    representing or asking about what a physician did, Your

09:33:33  12    Honor.  Again, physician is not here.

09:33:33  13        THE COURT:  Sustained.

09:33:33  14    BY MR. CUNNINGHAM:

09:33:33  15        Q.    Ma'am, does this document purport to show

09:33:33  16    diagnosis codes that would have been placed there by the

09:33:33  17    ordering physician?

09:33:33  18        A.    No.  This is representative of what the lab is

09:33:33  19    telling us is the diagnosis.

09:33:33  20        Q.    But there is a diagnosis code there?

09:33:33  21        A.    Yes, sir.

09:33:33  22        Q.    Can we please go to PDF 24.

09:33:33  23        Ma'am, is it your testimony that of the medical

09:33:33  24    records that you sent to Dr. Nicoll, none of those

09:33:33  25    records showed positive quantitative findings?

09:33:33  1      A.   I don't recall the exact numbers for each of

09:33:33  2  those reviews.

09:33:33  3      Q.   Okay.  Well, isn't it your understanding that

09:33:33  4  Dr. Nicoll had indicated that, of the record or records

09:33:33  5  he looked at, there were no positive quantitative

09:33:33  6  findings?

09:33:33  7          MR. KANG:  Objection, calls for hearsay.

09:33:33  8          THE COURT:  I don't know what your basis is for

09:33:33  9  how you can ask her about what Dr. Nicoll's indicated.

09:33:33  10  Is it in a document that would be admissible or not?  If

09:33:33  11  not, then I'm sustaining it because I don't know.

09:33:33  12  BY MR. CUNNINGHAM.

09:33:33  13     Q.   Ma'am, was it your understanding that Dr. Nicoll

09:33:33  14  purported to have reviewed some of the medical records

09:33:33  15  you sent to him?

09:33:33  16          MR. KANG:  Same objection, Your Honor.

09:33:33  17          THE COURT:  Well, if it's not offered for the

09:33:33  18  truth.  Her understanding, I don't know.  What is your

09:33:33  19  offer, sir?

09:33:33  20          MR. CUNNINGHAM:  Do I need -- you want me to

09:33:33  21  reply, Your Honor?  I think it goes to --

09:33:33  22          THE COURT:  I want you to answer my question of

09:33:33  23  what are you offering the answer to this question for.

09:33:33  24          MR. CUNNINGHAM:  This really goes to her state

09:33:33  25  of mind as the investigator.

324

09:33:33  1          THE COURT:  That will be allowed.  Go ahead.

09:33:33  2          THE WITNESS:  Can you repeat that question?

09:33:33  3          MR. CUNNINGHAM:  I'll try.

09:33:33  4   BY MR. CUNNINGHAM:

09:33:33  5      Q.   Isn't it's true that Dr. Nicoll had told you

09:33:33  6   that he had reviewed certain medical records and had

09:33:33  7   not found any positive quantitative results in the

09:33:33  8   records that he reviewed?

09:33:33  9          MR. KANG:  Your Honor, same objection.

09:33:33  10         THE COURT:  You should only accept the answer

09:33:33  11  for what it is being offered and, that is, not that

09:33:33  12  that's what Dr. Nicoll's did.  It's what she understood

09:33:33  13  within her own mind about what happened.  For example, my

09:33:33  14  son being told something about my driving doesn't prove

09:33:33  15  my driving, but it proves what's in his head.  Somebody

09:33:33  16  said things to him.  That's what this question is.  Did

09:33:33  17  she understand Dr. Nicoll said or did something.  It's

09:33:33  18  being offered to prove what was in her mind.

09:33:33  19     A.   I understand Dr. Nicoll did perform a review of

09:33:33  20  records.  However, I don't recall the exact number that

09:33:33  21  he provided in that email correspondence.

09:33:33  22     Q.   Let's go to Joint Exhibit 141, please.  And page

09:33:33  23  4 of that exhibit.

09:33:33  24         Ma'am, do you recognize this document?

09:33:33  25     A.   Was this the complete document, sir, before I

09:33:33  1    answer?

09:33:33  2        Q.   We can scroll up if you need to.

09:33:33  3        A.   Yes, please.

09:33:33  4        Q.   Can we go up.  Let me ask you this, ma'am.

09:33:33  5    Let's look at the paragraph beginning it is noteworthy.

09:33:33  6    About halfway down the page, Mr. Smeig.

09:33:33  7            Now, ma'am, this is an email from Dr. Nicoll to

09:33:33  8    you after you had sent him the three boxes of medical

09:33:33  9    records provided to you by Palm Beach Labs, correct?

09:33:33  10       A.   I can't confirm it was those three boxes in

09:33:33  11   particular.  As I said, I did send him a couple of

09:33:33  12   different samples of records for review.

09:33:33  13       Q.   Let me ask you this, ma'am.  Does it say in the

09:33:33  14   highlighted portion here, it is noteworthy that of the

09:33:33  15   ten charts I examined, none had a positive quantitative

09:33:33  16   test and all had multiple substances tested?  Is that

09:33:33  17   what that says?

09:33:33  18       A.   Yes, sir.

09:33:33  19       Q.   So, clearly, Dr. Nicoll is telling you that of

09:33:33  20   the records he reviewed that you sent to him, none of

09:33:33  21   those records revealed a positive quantitative test,

09:33:33  22   correct?

09:33:33  23       A.   Yes, based on this statement.

09:33:33  24       Q.   Now, let's go back to Joint Exhibit 14, please.

09:33:33  25   And PDF 35, please.

09:33:33  1          And does this appear to be a laboratory form

09:33:33  2  that's on the letterhead of a Bruce Burks, B U R K S,

09:33:33  3  M.D., Medical Director?

09:33:33  4      A.   Yes, sir.

09:33:33  5      Q.   And does it say requesting physician Mary

09:33:33  6  Scanlon?

09:33:33  7      A.   Yes, it does.

09:33:33  8      Q.   And when you look at the next column to the

09:33:33  9  right where it says specimen outcome, does it say

09:33:33  10  positive?

09:33:33  11      A.   Yes, it does.

09:33:33  12      Q.   Let's go to PDF 35, please.  I will try to go

09:33:33  13  through these more quickly, ma'am.

09:33:33  14          Does this appear to be another form from Dr.

09:33:33  15  Bruce Burks that contains laboratory order information?

09:33:33  16      A.   Yes, sir.

09:33:33  17      Q.   Does this one also say specimen outcome

09:33:33  18  positive?

09:33:33  19      A.   Yes, sir.

09:33:33  20      Q.   Let's go to page 46, please.

09:33:33  21          MR. KANG:  Your Honor, I'm sorry.  I object.  I

09:33:33  22  think that was actually the same page.  It was a

09:33:33  23  duplicate.

09:33:33  24          MR. CUNNINGHAM:  I apologize, Your Honor.

09:33:33  25      Q.   Let's go to 46, please.

09:33:33  1          Is this another form from Dr. Burks that says

09:33:33  2    specimen outcome positive?

09:33:33  3          A.   Yes, sir.

09:33:33  4          Q.   Let's go to page 57, please.

09:33:33  5          Is this another form from Dr. Burks that also

09:33:33  6    indicates specimen outcome positive?

09:33:33  7          A.   Yes, sir.

09:33:33  8          Q.   Page 71, please.

09:33:33  9          Is this another form from Dr. Burks that also

09:33:33 10    indicates specimen outcome positive?

09:33:33 11          A.   Yes, sir.

09:33:33 12          Q.   Let's go to page 88, please.

09:33:33 13          Is this another form, laboratory order from Dr.

09:33:33 14    Bruce Burks, that indicates specimen outcome positive?

09:33:33 15          A.   Yes, sir.

09:33:33 16          Q.   Page 99, please.

09:33:33 17          Is this another form, a laboratory order from

09:33:33 18    Dr. Bruce Burks, that also indicates specimen outcome

09:33:33 19    positive?

09:33:33 20          A.   Yes, sir.

09:33:33 21          Q.   Clearly, Dr. Nicoll was wrong, was he not?

09:33:33 22          A.   No.  I don't know if he reviewed these actual

09:33:33 23    records or not.

09:33:33 24          Q.   He said of the records he reviewed, none has a

09:33:33 25    positive quantitative finding, didn't he?

09:33:33  1    A.   Correct.  But I don't know if these were the

09:33:33  2   ones that were a part of his review, sir, so I can't

09:33:33  3   confirm that piece.

09:33:33  4    Q.   These records were provided to us by Cigna,

09:33:33  5   ma'am.  Were you aware of that?

09:33:33  6    A.   Yes.

09:33:33  7    Q.   Don't you believe these are the documents that

09:33:33  8   you sent to Dr. Nicoll?

09:33:33  9    A.   Without having an opportunity to confirm that, I

09:33:33  10   would have to say no.

09:33:33  11    Q.   Well, do you think that Cigna's lawyers sent us

09:33:33  12   the wrong documents?

09:33:33  13    A.   No, sir, I do not.

09:33:33  14    Q.   Ma'am, I want you to assume that these were the

09:33:33  15   documents provided to us by Cigna's lawyers in response

09:33:33  16   to a request for the documents that Dr. Nicoll was sent.

09:33:33  17   Okay.  Do you have that assumption?

09:33:33  18         MR. KANG:  Objection, Your Honor.

09:33:33  19         THE COURT:  Sustained.

09:33:33  20   BY MR. CUNNINGHAM:

09:33:33  21    Q.   Ma'am, if these are the documents that were sent

09:33:33  22   to Dr. Nicoll for review, clearly, Dr. Nicoll was

09:33:33  23   incorrect in his conclusion that none of the documents he

09:33:33  24   reviewed showed a positive quantitative finding.  True?

09:33:33  25    A.   Again, I can't confirm that level of detail

09:33:33  1    without confirming that these were the patient records he

09:33:33  2    did review.

09:33:33  3        Q.   So you believe that Cigna's lawyers sent us the

09:33:33  4    wrong documents?

09:33:33  5             MR. KANG:   Objection, Your Honor.

09:33:33  6             THE COURT:   Sustained.

09:33:33  7    BY MR. CUNNINGHAM:

09:33:33  8        Q.   Dr. Nicoll said to you of the ten charts I

09:33:33  9    received, none had a positive quantitative test, correct?

09:33:33  10       A.   Yes, that's correct.

09:33:33  11       Q.   I think I just showed you seven positive tests

09:33:33  12   for the first patient, correct?

09:33:33  13       A.   Again, I cannot confirm that these are the

09:33:33  14   records that Dr. Nicoll truly reviewed.

09:33:33  15            THE COURT:   That's not the question he asked,

09:33:33  16   ma'am.  He actually misspoke.  I don't think he showed

09:33:33  17   seven.  He showed at least five.  And he asked you, he

09:33:33  18   said I showed you seven positive tests for a particular

09:33:33  19   patient, correct?  That isn't a question of you

09:33:33  20   confirming what or was not sent to Dr. Nicoll.  It's a

09:33:33  21   question of the pages that you just saw.

09:33:33  22            THE WITNESS:   Your Honor, I do understand that.

09:33:33  23   But without any relevant patient information, I can't

09:33:33  24   confirm that these were, in fact, reviewed by Dr. Nicoll.

09:33:33  25            THE COURT:   But, ma'am, he didn't ask you that.

09:33:33   1   He's asked you that several times and I have not let him

09:33:33   2   ask you.  But he's asked you, have you just put your eyes

09:33:33   3   on these five, and maybe seven patient laboratory

09:33:33   4   records, that showed a positive.

09:33:33   5           THE WITNESS:  To answer the Judge's question.

09:33:33   6   Yes, you showed me multiple positive test results.

09:33:33   7           THE COURT:  That was his question, too.  His

09:33:33   8   question was, I think I showed you seven positive tests

09:33:33   9   for a particular patient.  Correct?  Dr. Nicoll's name is

09:33:33  10   not in that question.

09:33:33  11           THE WITNESS:  Okay, ma'am.  Yes.

09:33:33  12   BY MR. CUNNINGHAM:

09:33:33  13       Q.   And for the record, I believe I showed you page

09:33:33  14   24, page 35, page 46, page 57, page 71, page 88, and page

09:33:33  15   99.

09:33:33  16           Ma'am, every one of those pages I showed you for

09:33:33  17   this particular patient had a positive quantitative

09:33:33  18   finding.  True?

09:33:33  19       A.   I suppose so.

09:33:33  20       Q.   Now, Ms. Canto, you were relying upon Dr. Nicoll

09:33:33  21   for determinations of medical necessity because you are

09:33:33  22   not a medical doctor, correct?

09:33:33  23       A.   Yes, that's correct.

09:33:33  24       Q.   And if Dr. Nicoll was wrong, then your

09:33:33  25   investigation would be wrong, wouldn't it?

09:33:33  1       A.    No, it would not, sir.

09:33:33  2       Q.    Can we please go to Joint Exhibit 15, page 73,

09:33:33  3   please.

09:33:33  4            Now, ma'am, I'm going to go through some more of

09:33:33  5   these as quickly as possible and as efficiently as

09:33:33  6   possible.  So I would ask you to follow along with me,

09:33:33  7   please.

09:33:33  8            Does this appear to be another laboratory order

09:33:33  9   form from Dr. Bruce Burks which says specimen outcome

09:33:33  10  positive?

09:33:33  11      A.    Yes, sir.

09:33:33  12      Q.    Let's go to Joint 16, page 19, please.

09:33:33  13            Does this appear to be another laboratory order

09:33:33  14  form from Dr. Bruce Burks which indicates specimen

09:33:33  15  outcome positive?

09:33:33  16      A.    Yes, sir.

09:33:33  17      Q.    Let's go to Joint 17, page 105, please.

09:33:33  18            Ma'am, does this one indicate that the

09:33:33  19  requesting physician is Dr. Mark Hernandez?

09:33:33  20      A.    Yes, sir.

09:33:33  21      Q.    Okay.  And does this one also indicate specimen

09:33:33  22  outcome positive?

09:33:33  23      A.    Yes, sir.

09:33:33  24      Q.    Let's go to Joint 18, page 13, please.

09:33:33  25            Does this form indicate that the requesting

09:33:33  1    physician is a Dr. Steven Pacetti, P A C E T T I?

09:33:33  2        A.    Yes, sir.

09:33:33  3        Q.    Does this form also indicate that the specimen

09:33:33  4    outcome is positive?

09:33:33  5        A.    Yes.

09:33:33  6        Q.    Let's go to Joint 19, page 15, please.

09:33:33  7              Does this form indicate that the requesting

09:33:33  8    physician is a Dr. Peter Ventre, V E N T R E?

09:33:33  9        A.    Yes, sir.

09:33:33 10        Q.    Does this form also indicate that the specimen

09:33:33 11    outcome is positive?

09:33:33 12        A.    Yes, sir.

09:33:33 13        Q.    Let's go to Joint Exhibit 20, page 19, please.

09:33:33 14              Does this form indicate that the requesting

09:33:33 15    physician is Dr. Emilio Mantero Atienza?  A T I E N Z A.

09:33:33 16        A.    Yes, sir.

09:33:33 17        Q.    Does this form indicate that the specimen

09:33:33 18    outcome was positive?

09:33:33 19        A.    Yes.

09:33:33 20        Q.    Let's go to Joint Exhibit 21, page 18, please.

09:33:33 21              Does this document indicate that the requesting

09:33:33 22    physician was a Dr. Thomas Jordan?

09:33:33 23        A.    Yes, sir.

09:33:33 24        Q.    Does this document indicate that the specimen

09:33:33 25    outcome was positive?

333

09:33:33  1       A.   Yes, sir.

09:33:33  2       Q.   Let's go to Joint Exhibit 22, page 20, please.

09:33:33  3            Does this document appear to be from a

09:33:33  4   requesting physician, Dr. Steven Pacetti?

09:33:33  5       A.   Yes, sir.

09:33:33  6       Q.   Does this document indicate that the specimen

09:33:33  7   outcome was positive?

09:33:33  8       A.   Yes, sir.

09:33:33  9       Q.   Let's go to Joint Exhibit 23, page 17, please.

09:33:33  10           Does this indicate that the requesting physician

09:33:33  11  is Dr. Kenneth Rivera-Kolb, K O L B?

09:33:33  12      A.   Yes, sir.

09:33:33  13      Q.   Does this document also indicate that the

09:33:33  14  specimen outcome is positive?

09:33:33  15      A.   Yes, sir.

09:33:33  16      Q.   Let's go to Joint Exhibit 24, page 19.

09:33:33  17           Does this document appear to be from requesting

09:33:33  18  physician Emilio Montero Atienza?

09:33:33  19      A.   Yes, sir.

09:33:33  20      Q.   And does this document also indicate that the

09:33:33  21  specimen outcome was positive?

09:33:33  22      A.   Yes, it does.

09:33:33  23      Q.   Let's go to Joint Exhibit 26, page 15, please.

09:33:33  24           Does this document appear to be from requesting

09:33:33  25  physician Peter Ventre?

09:33:33  1      A.    Yes, sir.

09:33:33  2      Q.    And does this document indicate that the

09:33:33  3  specimen outcome was positive?

09:33:33  4      A.    Yes, it does.

09:33:33  5      Q.    Let's go to Joint Exhibit 27, please, page 47.

09:33:33  6            Does this document appear to be from requesting

09:33:33  7  physician Kenneth Rivera-Kolb?

09:33:33  8      A.    Yes, sir.

09:33:33  9      Q.    Does this document indicate that the specimen

09:33:33  10  outcome was positive?

09:33:33  11      A.    Yes, it does.

09:33:33  12      Q.    Let's go to Joint Exhibit 28, please, page 17.

09:33:33  13            Does this document appear to be from requesting

09:33:33  14  physician Kenneth Rivera-Kolb?

09:33:33  15      A.    Yes, it does.

09:33:33  16      Q.    Does this document indicate that the specimen

09:33:33  17  outcome was positive?

09:33:33  18      A.    Yes.

09:33:33  19      Q.    Let's go to Joint Exhibit 29, page 46.

09:33:33  20            Does this document appear to be from requesting

09:33:33  21  physician Kenneth Rivera-Kolb?

09:33:33  22      A.    Yes.

09:33:33  23      Q.    Does this document indicate that the specimen

09:33:33  24  outcome was positive?

09:33:33  25      A.    Yes.

335

09:33:33  1      Q.    Let's go to Joint Exhibit 30, page 21, please.

09:33:33  2           Does this document appear to be from requesting

09:33:33  3    physician Tay Gaines, G A I N E S?

09:33:33  4      A.    Yes, sir.

09:33:33  5      Q.    And does this document indicate that the

09:33:33  6    specimen outcome is positive?

09:33:33  7      A.    Yes.

09:33:33  8      Q.    I only have three more, ma'am.  I appreciate

09:33:33  9    your patience.

09:33:33 10           Let's go to Joint Exhibit 31, page 19.

09:33:33 11           Does this document appear to be from requesting

09:33:33 12    physician Kenneth Rivera-Kolb?

09:33:33 13      A.    Yes, sir.

09:33:33 14      Q.    Does this indicate that the specimen outcome was

09:33:33 15    positive?

09:33:33 16      A.    Yes, it does.

09:33:33 17      Q.    Let's go to Joint Exhibit 32, page 25.

09:33:33 18           Does this document appear to be from requesting

09:33:33 19    physician Kenneth Rivera-Kolb?

09:33:33 20      A.    Yes.

09:33:33 21      Q.    Does this document indicate the specimen outcome

09:33:33 22    was positive?

09:33:33 23      A.    Yes, it does.

09:33:33 24      Q.    And then, finally, ma'am, let's go to Joint

09:33:33 25    Exhibit 33, page 257.

09:33:33  1          Does this document appear to be from requesting

09:33:33  2  physician Kenneth Rivera-Kolb?

09:33:33  3      A.   Yes, sir.

09:33:33  4      Q.   And does it say specimen outcome abnormal?

09:33:33  5      A.   Yes, it does.

09:33:33  6      Q.   Now, ma'am, would you agree with me that based

09:33:33  7  on reviewing these laboratory orders that there were a

09:33:33  8  number of different requesting physicians involved in

09:33:33  9  these documents that you sent to Dr. Nicoll?

09:33:33 10      A.   Yes, I did see several names.

09:33:33 11      Q.   And you would agree that every document I showed

09:33:33 12  you revealed that there was a positive quantitative test

09:33:33 13  outcome, correct?

09:33:33 14      A.   Yes.

09:33:33 15      Q.   Now, ma'am, you were relying on the opinions and

09:33:33 16  the assessments of Dr. Nicoll in making your

09:33:33 17  determinations as an investigator for Cigna, weren't you?

09:33:33 18      A.   No.  That's not correct.

09:33:33 19      Q.   Ma'am, have you ever heard the term garbage in

09:33:33 20  garbage out?

09:33:33 21      A.   Yes, I have.

09:33:33 22      Q.   You know what that means?

09:33:33 23      A.   I believe so, yes.

09:33:33 24      Q.   Do you have any explanation for how Dr. Nicoll

09:33:33 25  could have missed all of those positive quantitative

| | | |
|---|---|---|
| 09:33:33 | 1 | tests I just showed you? |
| 09:33:33 | 2 | A.   Again, I do not know what Dr. Nicoll reviewed |
| 09:33:33 | 3 | patient-wise. |
| 09:33:33 | 4 | Q.   Would you agree with me that it appears that Dr. |
| 09:33:33 | 5 | Nicoll could not have done a thorough review of these |
| 09:33:33 | 6 | records? |
| 09:33:33 | 7 | MR. KANG:  Objection to the characterization. |
| 09:33:33 | 8 | THE WITNESS:  No, I don't believe that would be |
| 09:33:33 | 9 | correct. |
| 09:33:33 | 10 | THE COURT:  I'm sorry.  You usually have to wait |
| 09:33:33 | 11 | for me to rule, but I actually was going to say let the |
| 09:33:33 | 12 | witness answer if she can.  If not, she doesn't have to. |
| 09:33:33 | 13 | Your answer I guess would be, no, I don't |
| 09:33:33 | 14 | believe that would be correct.  That's your answer? |
| 09:33:33 | 15 | THE WITNESS:  Yes, Your Honor. |
| 09:33:33 | 16 | THE COURT:  You may continue, sir. |
| 09:33:33 | 17 | BY MR. CUNNINGHAM: |
| 09:33:33 | 18 | Q.   Dr. Nicoll missed a lot of positive tests, |
| 09:33:33 | 19 | didn't he? |
| 09:33:33 | 20 | A.   Again, I can't confirm that without -- |
| 09:33:33 | 21 | Q.   I just showed you, didn't I? |
| 09:33:33 | 22 | A.   I'm unable to answer without confirming the |
| 09:33:33 | 23 | patient information.  I can't confirm which patients Dr. |
| 09:33:33 | 24 | Nicoll reviewed looking at this information. |
| 09:33:33 | 25 | Q.   Are you sure that he reviewed any? |

09:33:33  1    A.    Yes.  I would be confident that Dr. Nicoll

09:33:33  2    reviewed records.

09:33:33  3    Q.    Well, he said of all the records he reviewed,

09:33:33  4    none showed a positive quantitative finding, correct?

09:33:33  5    A.    Yes.  That was what he stated.

09:33:33  6    Q.    I just showed you probably 20 positive

09:33:33  7    quantitative findings, didn't I?

09:33:33  8    A.    Yes, you did.

09:33:33  9         MR. CUNNINGHAM:  I would like to go to Joint

09:33:33  10   Exhibit 43, please.  And there's no way anybody is going

09:33:33  11   to be able to read that, but can we go ahead and zoom in

09:33:33  12   on that please, Mr. Smeig.

09:33:33  13   BY MR. CUNNINGHAM:

09:33:33  14   Q.    I just want to have you identify this, ma'am, if

09:33:33  15   you can.  Do you recognize this document or a document of

09:33:33  16   this type, ma'am?

09:33:33  17   A.    I believe so.

09:33:33  18   Q.    Is this what's called a Line Level Report?

09:33:33  19   A.    I believe so.

09:33:33  20   Q.    Is that what Cigna calls them?

09:33:33  21   A.    Based on the title, yes.

09:33:33  22   Q.    You use these type of reports in your work as an

09:33:33  23   investigator with Cigna, don't you?

09:33:33  24   A.    Yes, sir.

09:33:33  25   Q.    So you recognize this exhibit as the type of

09:33:33  1    document that you use in your investigative work at

09:33:33  2    Cigna, correct?

09:33:33  3         A.   Yes, sir.

09:33:33  4              MR. CUNNINGHAM:  Let's go to Joint Exhibit 44,

09:33:33  5    please.

09:33:33  6    BY MR. CUNNINGHAM:

09:33:33  7         Q.   I believe this is the same thing, ma'am.  Did

09:33:33  8    this appear to be the same type of report that you used?

09:33:33  9         A.   Yes, sir.

09:33:33  10        Q.   And what is the purpose of this type of report,

09:33:33  11   ma'am?

09:33:33  12        A.   There could be a variety of uses.  Would you

09:33:33  13   like a few examples?

09:33:33  14        Q.   I'm just wondering, is -- is this part of your

09:33:33  15   case notes or is this a way for you to take a glance at

09:33:33  16   this and know everything that's going on with regard to

09:33:33  17   the investigation of a particular health care provider?

09:33:33  18        A.   No.  This is just a snapshot in time of claims

09:33:33  19   that were processed in our claim systems.

09:33:33  20             MR. CUNNINGHAM:  Let's go to Exhibit 46, please.

09:33:33  21   And let's zoom on little bit on that, please.

09:33:33  22   BY MR. CUNNINGHAM:

09:33:33  23        Q.   And, again, this is the type of report that you

09:33:33  24   would use in your investigative work for Cigna, correct?

09:33:33  25        A.   Yes.

09:33:33  1          THE COURT:  That's another joint one, correct,

09:33:33  2  Counsel?

09:33:33  3          MR. CUNNINGHAM:  That's Joint 46, yes, ma'am.

09:33:33  4  All three of those were joint exhibits, Your Honor.

09:33:33  5          Could we go to Exhibit 45 as well, Joint

09:33:33  6  Exhibit.

09:33:33  7  BY MR. CUNNINGHAM:

09:33:33  8      Q.   Same questions, ma'am.  Is this another example

09:33:33  9  of Line Level Report?

09:33:33  10     A.   Yes, sir.

09:33:33  11     Q.   And, in fact, this one at the top says

09:33:33  12  "Excerpted Line Level Report for BioHealth," correct?

09:33:33  13     A.   Yes, sir.

09:33:33  14          MR. CUNNINGHAM:  Your Honor, let me look at my

09:33:33  15  notes for a moment.  Okay.  Thank you.

09:33:33  16          THE COURT:  Yes.

09:33:33  17  BY MR. CUNNINGHAM:

09:33:33  18     Q.   Ma'am, were you aware that the three labs that

09:33:33  19  we represent, PB Labs, BioHealth and Epic, employed

09:33:33  20  collectively around 300 people?

09:33:33  21     A.   I believe you mentioned that on Friday, yes.

09:33:33  22     Q.   Ma'am, would you agree with me, based on what we

09:33:33  23  have just reviewed for the last little bit, that Cigna's

09:33:33  24  investigation in this matter was seriously flawed?

09:33:33  25     A.   No, I would disagree, sir.

09:33:33  1              MR. CUNNINGHAM:  Thank you, ma'am.

09:33:33  2              THE COURT:  All right.  Thank you very much.

09:33:33  3      You may step down.  I assume you are excused.

09:33:33  4              Do the Labs have their next witness available,

09:33:33  5      please?  I can't hear you.  Your next witness, sir?

09:33:33  6              MR. CUNNINGHAM:  The deposition of

09:33:33  7      Mr. Nicholson.

09:33:33  8              THE COURT:  Ladies and gentlemen, I want to

09:33:33  9      explain to you what's going to happen next briefly.  When

09:33:33  10     someone brings a lawsuit -- as we know, we have two

09:33:33  11     lawsuits.  The parties have a right to do what we call

09:33:33  12     discovery in civil cases.  And what that means is each

09:33:33  13     side gets to ask the other questions, I want your

09:33:33  14     documents about this, I want, you know, to answer this

09:33:33  15     question.  But, in addition, they are able to do what are

09:33:33  16     called depositions.  And depositions are merely a

09:33:33  17     discovery method whereby the person who notices the

09:33:33  18     deposition, in other words, tells Mr. Jones to come, I am

09:33:33  19     going to ask you some questions.  That person thinks this

09:33:33  20     witness will be -- provide useful information in

09:33:33  21     understanding the cases.

09:33:33  22              And in this case, you are going to hear from, I

09:33:33  23     think, four or five people by way of video deposition.

09:33:33  24     They are not here live in the courtroom for a variety of

09:33:33  25     reasons you don't need to think about.  But their

09:33:33  1    testimony which they gave during this pretrial deposition

09:33:33  2    was under oath and the other side, the opposing counsel,

09:33:33  3    was present and able to ask some questions themselves if

09:33:33  4    they wanted to.

09:33:33  5         So when it gets to a trial and it becomes clear

09:33:33  6    that a person whose deposition was taken will not be at

09:33:33  7    the trial, a party can offer some of that deposition,

09:33:33  8    some of those questions and answers.  And before the

09:33:33  9    sections are picked, they make objections to each other's

09:33:33  10   questions or things, just like they are doing in the

09:33:33  11   courtroom, and I rule on them.  Obviously not in front of

09:33:33  12   you.  There may be -- in the transcripts, the testimony,

09:33:33  13   you might hear a lawyer, I object, but I have ruled on

09:33:33  14   that.

09:33:33  15        So we're about to have played, I believe, as

09:33:33  16   part of the Labs' case the deposition of a witness whose

09:33:33  17   last name is Nicholson.  I'm having a bit of mental

09:33:33  18   block.  Oh, is it Mike Nicholson?  And if it's ready to

09:33:33  19   be queued up, I would invite you to hit "Play."  It is

09:33:33  20   rather long, ladies and gentlemen.  Won't go to the end

09:33:33  21   of the day, but it's going to go awhile, but we'll have

09:33:33  22   our usual breaks.  So we're going to start now and we'll

09:33:33  23   just keep going.

09:33:33  24        I believe both sides designated as to this

09:33:33  25   deposition, in other words, picked out portions of

09:33:33 1  questions and answers to have played for you.

09:33:33 2  Fortunately, in this case -- in the old days, we didn't

09:33:33 3  have video depositions.  You had to sit there while

09:33:33 4  somebody read it to you.  At least you can watch the

09:33:33 5  witness just like you would watch a witness up here on

09:33:33 6  the witness stand.  So everything I told you about

09:33:33 7  everything they do is important.

09:33:33 8          It appears as if the parties have, I assume by

09:33:33 9  agreement, placed what the stenographer -- there's

09:33:33 10 somebody just like Terri at this deposition -- took down

09:33:33 11 as the record of what the witness said, which can be

09:33:33 12 helpful in following along.  But I would tell you the

09:33:33 13 evidence is what the witness is saying.  So it is

09:33:33 14 important to listen carefully, but if it helps you to

09:33:33 15 look at the transcript, please go ahead and do that.

09:33:33 16         Is all of that okay with the parties?  All

09:33:33 17 right.  Then go ahead then, sir.

09:33:33 18         (Playing the video deposition of Michael

09:33:33 19 Nicholson, 10:57 a.m.)

09:33:33 20         (Paused playing of deposition, 11:14 a.m.)

09:33:33 21         THE COURT:  Ladies and gentlemen, time for

09:33:33 22 morning break.  Get a good stretch, some coffee, maybe

09:33:33 23 fresh air, and we'll see you back at 11:30.  Thank you.

09:33:33 24         (In the absence of the jury at 11:15 a.m.)

09:33:33 25         THE COURT:  I have a vague recollection I

344

09:33:33  1    imposed on counsel to tell me the split of lines,

09:33:33  2    questions and answers and -- that are being shown in the

09:33:33  3    deposition so I can ascribe time.  Did you do that?

09:33:33  4         MS. KINGSBERY:  We do.  Cigna prepared this

09:33:33  5    video, and Cigna's time for its designations is 55

09:33:33  6    minutes 40 seconds.  The Labs' time is 2 hours and 16

09:33:33  7    minutes and 46 seconds.

09:33:33  8         THE COURT:  And -- what's going to be played,

09:33:33  9    ma'am, or the whole deposition?

09:33:33  10        MS. KINGSBERY:  This is designated.

09:33:33  11        THE COURT:  That's fine.

09:33:33  12        MS. KINGSBERY:  I've got one more number for

09:33:33  13   you.  There is some testimony that both the Labs and

09:33:33  14   Cigna designated, and our proposal would be to split that

09:33:33  15   number evenly.  One second and I'll get that number.

09:33:33  16        THE COURT:  That's fine.

09:33:33  17        Attorney Christ, while she's looking, do you --

09:33:33  18   have you agreed to these or not?

09:33:33  19        MR. CHRIST:  I'm checking emails that I was

09:33:33  20   copied on late last night, but I was involved in the

09:33:33  21   initiation of that -- of that split.

09:33:33  22        THE COURT:  That's fine.  Maybe you can confirm

09:33:33  23   when I come out at 11:29.  Well, perhaps you'll give me

09:33:33  24   the split -- the -- the both designate number when we

09:33:33  25   come back.  We'll stand in recess.  Thank you very much.

| | | |
|---|---|---|
| 09:33:33 | 1 | (Recess taken, 11:16 a.m. to 11:31 a.m.) |
| 09:33:33 | 2 | THE COURT:  I have no problem with one for each |
| 09:33:33 | 3 | side. |
| 09:33:33 | 4 | Go ahead and get them, Liana. |
| 09:33:33 | 5 | Can you tell me what the -- what Cigna's number |
| 09:33:33 | 6 | is, Attorney Kingsbery, I think was -- |
| 09:33:33 | 7 | MS. KINGSBERY:  Yes.  So I actually gave you the |
| 09:33:33 | 8 | total.  That included the split we had proposed.  These |
| 09:33:33 | 9 | are Cigna's numbers that we -- |
| 09:33:33 | 10 | THE COURT:  Understood. |
| 09:33:33 | 11 | Is there agreement? |
| 09:33:33 | 12 | MR. CHRIST:  Yes, Your Honor, there is.  I'm |
| 09:33:33 | 13 | relaying the argument that my colleague, Attorney |
| 09:33:33 | 14 | Gestrich, will be making since he was involved with this. |
| 09:33:33 | 15 | My understanding is we submitted -- my understanding was |
| 09:33:33 | 16 | that we submitted joint designations to the Court, |
| 09:33:33 | 17 | obviously a while ago. |
| 09:33:33 | 18 | THE COURT:  We'll do this at lunch.  We're |
| 09:33:33 | 19 | already at 11:34, which is not what we're going to keep |
| 09:33:33 | 20 | doing. |
| 09:33:33 | 21 | (In the presence of the jury at 11:32 a.m.) |
| 09:33:33 | 22 | THE COURT:  Thank you very much.  The jury is |
| 09:33:33 | 23 | back in the box.  Counsel for both sides are present. |
| 09:33:33 | 24 | Can somebody hit the "Play" button on the deposition, |
| 09:33:33 | 25 | please. |

| | | |
|---|---|---|
| 09:33:33 | 1 | (Playing the video deposition, 11:33 a.m.) |
| 09:33:33 | 2 | THE COURT:  Could I ask you to pause. |
| 09:33:33 | 3 | (Playing of video paused.) |
| 09:33:33 | 4 | THE COURT:  Could I have counsel at sidebar. |
| 09:33:33 | 5 | (Beginning of sidebar.) |
| 09:33:33 | 6 | Q.   I am very confused, Counsel.  I have, I believe, |
| 09:33:33 | 7 | Mr. Nicholson's designations and parties' designations |
| 09:33:33 | 8 | and counter designations start at 6:15 and go on for |
| 09:33:33 | 9 | quite a while without objection, until you get to |
| 09:33:33 | 10 | something to like 2:02.  The line [sic] that's up there |
| 09:33:33 | 11 | now is 91 -- page.  Excuse me.  I don't see that |
| 09:33:33 | 12 | designation.  Is that our fault or is that just playing |
| 09:33:33 | 13 | stuff you didn't want to play? |
| 09:33:33 | 14 | MS. KINGSBERY:  Cigna withdrew some of its |
| 09:33:33 | 15 | designations after the motions in limine and notification |
| 09:33:33 | 16 | of the -- |
| 09:33:33 | 17 | THE COURT:  No, you don't understand.  I'm |
| 09:33:33 | 18 | looking at and hearing Line [sic] 91.  I don't see it on |
| 09:33:33 | 19 | the designation for either party.  It's the opposite of |
| 09:33:33 | 20 | what you just said. |
| 09:33:33 | 21 | MS. KINGSBERY:  We would not have added |
| 09:33:33 | 22 | anything, Your Honor. |
| 09:33:33 | 23 | MR. CHRIST:  We did not add anything. |
| 09:33:33 | 24 | THE COURT:  So why are you playing it? |
| 09:33:33 | 25 | Obviously, you played a bunch of pages already that I |

| | | |
|---|---|---|
| 09:33:33 | 1 | didn't happen to be looking at line numbers.  But I just |
| 09:33:33 | 2 | happened to look up and it doesn't make sense, unless I'm |
| 09:33:33 | 3 | missing something.  It says 91:07.  And I believe -- I |
| 09:33:33 | 4 | mean, this is my document indicating Nicholson.  But I |
| 09:33:33 | 5 | don't think I confused the lists of designations. |
| 09:33:33 | 6 |         MR. CHRIST:  My understanding is that Cigna only |
| 09:33:33 | 7 | withdrew.  Nothing was added. |
| 09:33:33 | 8 |         MS. KINGSBERY:  Nothing was added, so I'm not |
| 09:33:33 | 9 | sure -- |
| 09:33:33 | 10 |         THE COURT:  Then why are you playing 91 -- Page |
| 09:33:33 | 11 | 91?  Excuse me. |
| 09:33:33 | 12 |         MR. CHRIST:  We may have a video -- a |
| 09:33:33 | 13 | transcription error if there was a -- |
| 09:33:33 | 14 |         MR. RADSHAW:  It's within the range. |
| 09:33:33 | 15 |         THE COURT:  It's within the range.  I apologize. |
| 09:33:33 | 16 |         MR. CHRIST:  97 all the way to 103. |
| 09:33:33 | 17 |         THE COURT:  I'm sorry.  I'm looking just at the |
| 09:33:33 | 18 | first number. |
| 09:33:33 | 19 |         MR. RADSHAW:  That's quite all right, Judge.  No |
| 09:33:33 | 20 | worries. |
| 09:33:33 | 21 |         THE COURT:  Thank you, Counsel.  I appreciate |
| 09:33:33 | 22 | it.  My apologies. |
| 09:33:33 | 23 |             (End of sidebar.) |
| 09:33:33 | 24 |         THE COURT:  I'm just trying to make sure you |
| 09:33:33 | 25 | were watching what they wanted you to.  Thank you. |

| | | |
|---|---|---|
| 09:33:33 | 1 | Whoever has the hit button to play can hit it. |
| 09:33:33 | 2 | (Playing the video deposition, 12:28 p.m.) |
| 09:33:33 | 3 | (Paused the video deposition, 1:14 p.m.) |
| 09:33:33 | 4 | THE COURT:  Can I ask -- you can start back at |
| 09:33:33 | 5 | the beginning of the question when we come back.  I think |
| 09:33:33 | 6 | that's a good place to break 1:15. |
| 09:33:33 | 7 | Ladies and gentlemen, when you return we will |
| 09:33:33 | 8 | continue with this deposition, which will go for a little |
| 09:33:33 | 9 | while longer, but not to the end of the day.  Thank you |
| 09:33:33 | 10 | for your attention and patience, and we will see you |
| 09:33:33 | 11 | after lunch.  Again, I suggest you get some of the fresh |
| 09:33:33 | 12 | air on this beautiful day.  Thanks. |
| 09:33:33 | 13 | (In the absence of the jury at 1:15 p.m.) |
| 09:33:33 | 14 | THE COURT:  Hold on just a second.  I've got one |
| 09:33:33 | 15 | question. |
| 09:33:33 | 16 | Counsel, during that portion of the deposition, |
| 09:33:33 | 17 | a document was read from which was identified as Exhibit |
| 09:33:33 | 18 | 2.  And so I need to know what exhibit it is in the |
| 09:33:33 | 19 | trial, and I assume it was agreed to be admitted as an |
| 09:33:33 | 20 | exhibit because I think my ruling was sustained unless |
| 09:33:33 | 21 | the document is in evidence.  So when I -- if you can let |
| 09:33:33 | 22 | Liana know that and she'll leave me a sticker so I can |
| 09:33:33 | 23 | update my list.  Thank you very much and we'll stand in |
| 09:33:33 | 24 | recess. |
| 09:33:33 | 25 | (Recess taken from 1:16 p.m. to 2:00 p.m.) |

```
09:33:33   1          THE COURT:  I think I will impose on you folks
09:33:33   2   again to come in at ten of 9:00.  I am pretty sure I will
09:33:33   3   be prepared to put on the record what I wanted to put on
09:33:33   4   this morning but didn't get to.  And I want to do that if
09:33:33   5   we're are going to be able to do some charge at 4:00.
09:33:33   6          So go ahead, Liana.  Whenever they're ready is
09:33:33   7   fine.
09:33:33   8          (In the presence of the jury at 2:01 p.m.)
09:33:33   9          THE COURT:  Continued deposition of
09:33:33  10   Mr. Nicholson, as indicated by both sides.
09:33:33  11          (Playing the video, 2:02 p.m.)
09:33:33  12          (End of playing video, 3:18 p.m.)
09:33:33  13          THE COURT:  I think that completes the reading
09:33:33  14   of the deposition.  I need to speak to counsel a little
09:33:33  15   bit about some of the readings, but I don't want to
09:33:33  16   bother the jury with that.  It's just technical stuff, I
09:33:33  17   guess I will say.  So we should call our next witness for
09:33:33  18   the Labs, I believe.
09:33:33  19          MR. CUNNINGHAM:  Your Honor, the Labs call
09:33:33  20   Matthew Norton.
09:33:33  21          THE COURT:  Mr. Norton, sir, hi.
09:33:33  22          THE WITNESS:  Hi.
09:33:33  23          THE COURT:  Would you come up to this area where
09:33:33  24   I'm pointing.  That is the witness stand.  When you
09:33:33  25   arrive there, I would ask if you'd remain standing.  The
```

09:33:33  1   clerk wants to administer an oath to you, sir.  Thank

09:33:33  2   you.

09:33:33  3                       MATTHEW NORTON,

09:33:33  4   having been called as a witness, was first duly sworn and

09:33:33  5            testified on his oath as follows:

09:33:33  6            THE WITNESS:  Yes.

09:33:33  7            THE CLERK:  Please be seated.  State your name

09:33:33  8   for the record, spelling your last name.

09:33:33  9            THE WITNESS:  Matthew Norton.  N-O-R-T-O-N.

09:33:33  10            THE COURT:  You are nice and soft, sir.  You're

09:33:33  11   going to have to pull the mic a little bit closer to you.

09:33:33  12            THE WITNESS:  Yeah, I'm a quiet talker.

09:33:33  13            THE COURT:  You are very quiet.  A tiny bit

09:33:33  14   closer.  Don't swallow it, just get a little bit closer.

09:33:33  15   I don't know if we can increase the volume on that?

09:33:33  16            THE WITNESS:  How is that?

09:33:33  17            THE COURT:  It's a little better, but let's see

09:33:33  18   if she can up it.  Go ahead.  That's fine.

09:33:33  19            MR. CUNNINGHAM:  Thank you, Your Honor.  May it

09:33:33  20   please the Court.

09:33:33  21            THE COURT:  Yes.

09:33:33  22   DIRECT EXAMINATION BY MR. CUNNINGHAM:

09:33:33  23       Q.   Mr. Norton, have we ever previously met?

09:33:33  24       A.   We have not.

09:33:33  25       Q.   I think we saw each other in the hallway.

09:33:33  1       A.   Exactly.  We said hi.

09:33:33  2       Q.   We've never formally met, right?

09:33:33  3       A.   Correct.

09:33:33  4       Q.   Sir, my name is Fred Cunningham.  I'm one of a

09:33:33  5   lawyers who represent the Labs in the case against Cigna.

09:33:33  6   I just wanted you to know that.

09:33:33  7            Sir, was your deposition taken in this case?

09:33:33  8       A.   No, it was not.

09:33:33  9       Q.   Sir, by whom are you employed?

09:33:33  10      A.   I was been with Cigna for 17 years.

09:33:33  11      Q.   And what is your job title with Cigna?

09:33:33  12      A.   It's businesses analytics managing director.

09:33:33  13      Q.   One more time.  I'm sorry.

09:33:33  14      A.   Business analytics managing director.

09:33:33  15      Q.   So if my math is correct, you would have started

09:33:33  16   with Cigna around 2007?

09:33:33  17      A.   Correct.

09:33:33  18      Q.   And the job title, the business analytics title,

09:33:33  19   is that the title you were in back in 2013 and 2014?

09:33:33  20      A.   Yes.  The company actually changed the title

09:33:33  21   system a little bit, so it would have been the same thing

09:33:33  22   as a senior director as opposed to managing director, but

09:33:33  23   that was just an internal company changing the title.

09:33:33  24      Q.   Sir, my understanding is at one time you were

09:33:33  25   the director of the Special Investigation Unit, or SIU?

09:33:33  1      A.    The work that I do includes the SIU.  So that is

09:33:33  2  my job.  I am the lead for the SIU.

09:33:33  3      Q.    You are the leader of the SIU at Cigna?

09:33:33  4      A.    Correct.

09:33:33  5      Q.    How long have you been in that title, sir?

09:33:33  6      A.    Since 2013, so about 11 years.

09:33:33  7      Q.    Have you heard the term "the buck stops here"?

09:33:33  8      A.    Sure.

09:33:33  9      Q.    Does the buck stop with you at the SIU

09:33:33  10  department at Cigna?

09:33:33  11      A.    Yeah.  I run the SIU.  So within my scope is the

09:33:33  12  health care lead, which is the senior director over

09:33:33  13  health care.

09:33:33  14      Q.    How many people are under your supervision in

09:33:33  15  the SIU department?

09:33:33  16      A.    About 180.

09:33:33  17      Q.    180?

09:33:33  18      A.    Correct.

09:33:33  19      Q.    Has the SIU department grown since you have been

09:33:33  20  leading it since 2013?

09:33:33  21      A.    It has grown.  It's mostly grown due to

09:33:33  22  acquisition of Express Scripts PBM, but there's some

09:33:33  23  marginal growth as well in basic health care.  So

09:33:33  24  probably, I don't know, 20 percent over the last ten

09:33:33  25  years.

09:33:33  1       Q.    And how many levels of management were there
09:33:33  2   between you and Stephanie Canto as of 2013, 2014, 2015?
09:33:33  3       A.    I believe Stephanie would have reported to
09:33:33  4   someone who reported to the person that reported to me.
09:33:33  5   So what do we want to say, two levels down on that?
09:33:33  6       Q.    Can you give us the names of those people,
09:33:33  7   please?
09:33:33  8       A.    I'm not sure who she was reporting to in 2013 or
09:33:33  9   2015.
09:33:33  10      Q.    Was it Deanna Anderson or Deanna (pronouncing)
09:33:33  11  Anderson?
09:33:33  12      A.    It definitely could have been, yes.  That would
09:33:33  13  have been a logical one, and then that rolls up to Tom
09:33:33  14  Hixson.
09:33:33  15      Q.    So then Deanna Anderson reported to Tom Hixson?
09:33:33  16      A.    Yes.
09:33:33  17      Q.    And Tom Hixson reported to you?
09:33:33  18      A.    Correct.
09:33:33  19      Q.    Sir, what is the function of the SIU in the
09:33:33  20  health care division of Cigna?
09:33:33  21      A.    It's to identify the risk of fraud and deal with
09:33:33  22  the disk of fraud in general.  So we are responsible for
09:33:33  23  reviewing the billing that's coming in from providers and
09:33:33  24  seeing if that's valid.
09:33:33  25      Q.    Sir, is it just fraud or can it be other

354

09:33:33  1    improper billing practices that don't rise to the level
09:33:33  2    of fraud?
09:33:33  3        A.   Certainly that occurs.  We interact with many
09:33:33  4    providers and it just comes down to education as opposed
09:33:33  5    to intent.
09:33:33  6        Q.   The term "fraud" is a very serious allegation,
09:33:33  7    isn't it?
09:33:33  8        A.   Fraud is well-defined by the National Health
09:33:33  9    Care Anti-Fraud Association.
09:33:33 10        Q.   Sir, that's my point.  The term "fraud" implies
09:33:33 11    criminal intent, does it not?
09:33:33 12        A.   It implies intent, yes.
09:33:33 13        Q.   So would you agree with me that you are the head
09:33:33 14    of the SIU and you would be looking for improper billing
09:33:33 15    practices that may or may not rise to the level of fraud
09:33:33 16    in Cigna's eyes?
09:33:33 17        A.   We would be looking to encourage appropriate
09:33:33 18    billing, so what we're trying to do is drive correct
09:33:33 19    billing.
09:33:33 20        Q.   Sometimes it's just negligence, I would assume?
09:33:33 21        A.   A provider could just not understand or make a
09:33:33 22    mistake, so absolutely.  That's not fraud.
09:33:33 23        Q.   The point is -- I'm sorry.  Did you finish your
09:33:33 24    answer?
09:33:33 25        A.   Yes.  I was just saying it's not always fraud.

09:33:33  1    Q.    That's what I want to know, sir.  Thank you.

09:33:33  2         Sir, would you agree with me that the SIU and

09:33:33  3    the health care division is very powerful?

09:33:33  4    A.    We don't have any real power.  We do analysis

09:33:33  5    and we identify risks and people tell us about their

09:33:33  6    concerns, risks, and we pursue those.

09:33:33  7    Q.    You have the power to stop paying health care

09:33:33  8    providers, don't you?

09:33:33  9    A.    We can stop paying if that's an appropriate

09:33:33  10   thing to do, yes.

09:33:33  11   Q.    You don't consider that powerful?

09:33:33  12   A.    No.  I consider that a basic part of the health

09:33:33  13   care system.  If there's questionable billing to request

09:33:33  14   additional information to support those charges is

09:33:33  15   completely appropriate.

09:33:33  16   Q.    Well, sir, you understand when you stop paying a

09:33:33  17   health care provider that the health care providers have

09:33:33  18   employees just like any other business, right?

09:33:33  19   A.    Sure.

09:33:33  20   Q.    Health care providers have to meet payroll just

09:33:33  21   like any other business?

09:33:33  22   A.    Sure.  And they have every opportunity to

09:33:33  23   provide the information that we've requested to allow us

09:33:33  24   to review and ensure that the charges are appropriate.

09:33:33  25   Q.    Well, sire, that wasn't my question.

09:33:33 1    A.    I answered your question.

09:33:33 2    Q.    Do me a favor, please.  Please do me a favor and

09:33:33 3  try to answer my questions.  Mr. Kang will have an

09:33:33 4  opportunity to question you as well.  Okay?  Thank you,

09:33:33 5  sir.

09:33:33 6        All right.  Sir, so the SIU does not need the

09:33:33 7  permission of any other division within Cigna to stop

09:33:33 8  paying a health care provider if it deems it appropriate,

09:33:33 9  right?

09:33:33 10   A.    That's correct.

09:33:33 11   Q.    Sir, would you agree with me that to a health

09:33:33 12  insurer like Cigna, the vast amount of money being spent

09:33:33 13  by Cigna is paid to health care providers?

09:33:33 14   A.    Yes.

09:33:33 15   Q.    And you would agree that you as the person in

09:33:33 16  charge of the SIU have the power to stop paying health

09:33:33 17  care providers if you think that's appropriate?

09:33:33 18   A.    We have the power to intervene in the payment

09:33:33 19  process if we feel there's risk of fraud.

09:33:33 20   Q.    I'm asking about you in particular.  You are the

09:33:33 21  head of the unit, correct?

09:33:33 22   A.    I manage multiple parts of the SIU, so I have

09:33:33 23  prescriber investigations, pharmacy investigations, Part

09:33:33 24  C being the Medicare Advantage business, Part D being the

09:33:33 25  pharmacy government business, as well as health care.  So

09:33:33  1   my job is not day-to-day to make case level decisions of

09:33:33  2   what should be stopped and what should not.

09:33:33  3       Q.   Sir, you would agree with me that the buck

09:33:33  4   literally stops with you because you are the head of the

09:33:33  5   SIU and you are the person that can direct the SIU to

09:33:33  6   stop paying a health care provider?

09:33:33  7            MR. KANG:  Objection, Your Honor.  Getting

09:33:33  8   argumentative.

09:33:33  9            THE WITNESS:  Can I answer that?

09:33:33  10           THE COURT:  Just one moment, if you would, sir.

09:33:33  11  When the lawyers object, I have to have a minute.  And I

09:33:33  12  couldn't tell if it was a single or a double question.

09:33:33  13           MR. CUNNINGHAM:  Would you like me to rephrase,

09:33:33  14  Your Honor?

09:33:33  15           THE COURT:  I think you better, yeah.  It may

09:33:33  16  have been two questions, but it's hard to tell.  Go

09:33:33  17  ahead, sir.

09:33:33  18  BY MR. CUNNINGHAM:

09:33:33  19      Q.   Sir, you told us earlier that the buck stops

09:33:33  20  with you in the SIU department, correct?

09:33:33  21      A.   I agree that I run the SIU.

09:33:33  22      Q.   And I meant that figuratively at the time, but

09:33:33  23  literally, the buck stops with you because you are the

09:33:33  24  person that determines whether the SIU shuts down or

09:33:33  25  stops paying a health care provider?

09:33:33  1    A.    No, that's not accurate.  I don't make those

09:33:33  2  decisions at all.  I have a team of professionals who

09:33:33  3  have many years' experience in this, and they are making

09:33:33  4  the decisions.  I don't make case-level decisions.

09:33:33  5    Q.    If there's a disagreement within the team,

09:33:33  6  aren't you the ultimate authority on what gets done?

09:33:33  7    A.    I have never had a disagreement related to

09:33:33  8  whether something should be -- someone's payments should

09:33:33  9  be stopped.

09:33:33  10    Q.    So there's never been an investigation of a

09:33:33  11  health care provider where somebody at Cigna said, you

09:33:33  12  know, maybe this is all innocent, maybe we should not

09:33:33  13  stop paying them?  That's never happened during the --

09:33:33  14  since 2007?

09:33:33  15        MR. KANG:  Objection, Your Honor.

09:33:33  16        THE COURT:  Overruled.

09:33:33  17        THE WITNESS:  Meaning I can answer?

09:33:33  18        THE COURT:  Yes, sir.  I'm sorry.  Yes.

09:33:33  19    A.    Okay.  So can you rephrase that or -- or restate

09:33:33  20  the lat question, say it the same?  I just want to make

09:33:33  21  sure I am going the right direction here.

09:33:33  22        (Requested portion was read.)

09:33:33  23        THE WITNESS:  My statement was related to my

09:33:33  24  direct involvement.  But in terms of debating whether an

09:33:33  25  individual provider should have payments stopped, that

09:33:33  1    debate I'm sure is lively and fact-based, but I'm not a

09:33:33  2    part of that debate.

09:33:33  3    BY MR. CUNNINGHAM:

09:33:33  4         Q.   Sir, would you agree with me that in the

09:33:33  5    overwhelming majority of times that the SIU department

09:33:33  6    gets involved in the investigation of a health care

09:33:33  7    provider, the decision is made to place a flag or to stop

09:33:33  8    paying that health care provider at least temporarily?

09:33:33  9         A.   No, definitely not.

09:33:33  10        Q.   Sir, would you agree with me that there's no

09:33:33  11   other group within Cigna that can permanently shut down

09:33:33  12   payments to a health care provider?

09:33:33  13        A.   No, I am sure there are probably multiple

09:33:33  14   departments.

09:33:33  15             (Phone ringing.)

09:33:33  16             THE COURT:  Oh, my goodness.  My apologies,

09:33:33  17   ladies and gentlemen.  If a lawyer left their phone on,

09:33:33  18   they'd be in deep trouble.  I don't usually bring my

09:33:33  19   phone on the bench for just that reason.  But somehow, I

09:33:33  20   must have stuck it in there at lunch, and there it is.

09:33:33  21             MR. CUNNINGHAM:  Your Honor, I think you left

09:33:33  22   your flashlight on.

09:33:33  23             THE COURT:  Probably that, too.  Whatever you

09:33:33  24   do, don't get the new Apple phone because all the buttons

09:33:33  25   are in a different place than the last version.  So you

09:33:33  1   think you are going to -- I don't know.  You go to push a

09:33:33  2   button to increase the volume, that's now the silent

09:33:33  3   button.

09:33:33  4        So anyway, go ahead.  I apologize.  Counsel, you

09:33:33  5   go right ahead.

09:33:33  6        MR. CUNNINGHAM:  Thank you, Your Honor.

09:33:33  7   BY MR. CUNNINGHAM.

09:33:33  8   Q.   Sir, would you agree with me that the amount of

09:33:33  9   dollars that you can control as the head of the SIU

09:33:33  10  department at Cigna could literally be in the billions of

09:33:33  11  dollars in a given year?

09:33:33  12  A.   That's quite a hypothetical you're suggesting.

09:33:33  13  I would shut down the business.

09:33:33  14  Q.   Well, sir, we can get very specific, and we will

09:33:33  15  in a minute.  In Florida, you were concerned that

09:33:33  16  substance abuse programs in Florida, the expenditures

09:33:33  17  were going to be approaching 150 to 200 million dollars

09:33:33  18  per year in Florida alone, correct?

09:33:33  19  A.   That was the number that was out there.  I did

09:33:33  20  not produce that number.

09:33:33  21  Q.   Do you doubt the veracity or the accuracy of

09:33:33  22  that number?

09:33:33  23  A.   No.  Based on the run rate of spend in Florida

09:33:33  24  at the time, that much fraud could have flowed into the

09:33:33  25  process for sure.

361

09:33:33  1        Q.   Obviously, Florida is one of only 50 states in
09:33:33  2  this country, right?
09:33:33  3        A.   Absolutely, and it's an outlier relative to this
09:33:33  4  particular scheme.
09:33:33  5        Q.   And Cigna writes insurance policies -- health
09:33:33  6  insurance policies in every state in this
09:33:33  7  country, doesn't it?
09:33:33  8        A.   I believe so.
09:33:33  9        Q.   So if the substance abuse expenditures in
09:33:33  10  Florida in one year were expected to be 150 to 200
09:33:33  11  million dollars, wouldn't you agree with me that
09:33:33  12  nationwide the expenditures could have been over a
09:33:33  13  billion dollars a year?
09:33:33  14        A.   No, I don't agree.  So Florida was dramatically
09:33:33  15  higher than other states, and we don't have an equal
09:33:33  16  number of plans in each state.  So Florida actually, I
09:33:33  17  think, was potentially one of six -- I want to say there
09:33:33  18  were six states where we had the IFP product, but I can't
09:33:33  19  guarantee that number.
09:33:33  20        Q.   Sir, I would like to talk to you about the ways
09:33:33  21  the SIU can stop paying a health care provider.  What is
09:33:33  22  a tax identification number when you are talking about a
09:33:33  23  lab?
09:33:33  24        A.   I think of it almost like a Social Security
09:33:33  25  number for a person.  It's a number associated with the

09:33:33  1    facility.

09:33:33  2        Q.   Are you familiar with the abbreviation TIN at

09:33:33  3    Cigna?

09:33:33  4        A.   Yes, for tax identification number.

09:33:33  5        Q.   So specifically, what does that means as it

09:33:33  6    relates to the SIU department?

09:33:33  7        A.   If someone says I have ten TINs or whatever, it

09:33:33  8    relates to essentially ten facilities typically.  There

09:33:33  9    are occasions where multiple TINs are linked to a

09:33:33  10   facility.

09:33:33  11       Q.   So instead of naming the lab, you would just use

09:33:33  12   the tax identification number for the Lab?

09:33:33  13       A.   Someone could do that, yes.

09:33:33  14       Q.   If someone said to you, I have ten TINs that I'm

09:33:33  15   concerned about, that means there are ten different

09:33:33  16   health care providers that Cigna is watching in the SIU

09:33:33  17   department?

09:33:33  18       A.   That's accurate.

09:33:33  19       Q.   Now, sir, what is the term "pending" a claim

09:33:33  20   mean?

09:33:33  21       A.   So if you look at any claim adjudication

09:33:33  22   process, it flows.  If you kind of go left to right.  The

09:33:33  23   claim comes in, and it has a certain pend ID on it so we

09:33:33  24   can see what inventory looks like.  It then goes through

09:33:33  25   auto adjudication.  And if it auto adjudicates, or if it

09:33:33  1    doesn't, it gets one of two different identifiers.  So

09:33:33  2    the point of the pend tracking is to be able to see the

09:33:33  3    status of the claim all the way through.  So the pends

09:33:33  4    that you are concerned about are occasions when we see a

09:33:33  5    risk of fraud and we say, Please give us additional

09:33:33  6    information so we can pay this claim and it's validated

09:33:33  7    to be appropriate.

09:33:33  8         Q.   Okay.  Sir, when you talk about pending a claim,

09:33:33  9    doesn't that mean that no payments are going to be made

09:33:33  10   to that health care provider while that health care

09:33:33  11   provider is under review by the SIU department at Cigna?

09:33:33  12        A.   If that's the pend status that it's in.  It

09:33:33  13   could be in many different pend statuses.

09:33:33  14        Q.   The amount in question is pending until there's

09:33:33  15   further action by the SIU department?

09:33:33  16        A.   Right.  If you asked for information, you would

09:33:33  17   pend the claim while you await that information.  When

09:33:33  18   you receive the information, you pay or --

09:33:33  19        Q.   That's why it's -- I'm sorry.  I didn't mean to

09:33:33  20   cut you off.

09:33:33  21        A.   No, you are good.

09:33:33  22        Q.   Are you finished with your answer?

09:33:33  23        A.   Yes.

09:33:33  24        Q.   That's why it's called pending, right?  Payments

09:33:33  25   are pending until the SIU completes its investigation?

364

| | | |
|---|---|---|
| 09:33:33 | 1 | A. Well, there are many different pend codes. |
| 09:33:33 | 2 | There are probably 20 or 30 different pend codes, so |
| 09:33:33 | 3 | depending on where a claim is in the process, it would |
| 09:33:33 | 4 | have a particular pend code. So SIU does have a pend |
| 09:33:33 | 5 | code. |
| 09:33:33 | 6 | Q. Sir, within the SIU at Cigna, you have a |
| 09:33:33 | 7 | means or a method to monitor the number of claims pending |
| 09:33:33 | 8 | for a specific health care provider, don't you? |
| 09:33:33 | 9 | A. Yes. |
| 09:33:33 | 10 | Q. When claims are submitted by a health care |
| 09:33:33 | 11 | provider, when those are pended, that means no payments |
| 09:33:33 | 12 | are going to be made to that health care provider until |
| 09:33:33 | 13 | there's been some resolution of that investigation, |
| 09:33:33 | 14 | right? |
| 09:33:33 | 15 | MR. KANG: Objection. Asked and answered. |
| 09:33:33 | 16 | THE WITNESS: Well, can I go ahead -- |
| 09:33:33 | 17 | THE COURT: I'm going to allow it. |
| 09:33:33 | 18 | THE WITNESS: -- and answer a little more? |
| 09:33:33 | 19 | BY MR. CUNNINGHAM: |
| 09:33:33 | 20 | Q. That's yes or no. |
| 09:33:33 | 21 | THE COURT: That's a yes or no. I'm sorry, sir. |
| 09:33:33 | 22 | When you are on the stand, it's not -- if I asked you |
| 09:33:33 | 23 | that question in the hallway, you would explain it to me. |
| 09:33:33 | 24 | That's how we operate in day-to-day interactions. On the |
| 09:33:33 | 25 | witness stand, you are required to answer just the |

09:33:33  1    question asked.  And in this instance, I believe Counsel

09:33:33  2    is correct that this question can be answered with a yes

09:33:33  3    or no answer.  Now, if you don't feel you can give an

09:33:33  4    honest yes or no, then you just tell us I can't answer it

09:33:33  5    yes or no, and it's to counsel to decide what to do.

09:33:33  6            THE WITNESS:  Sounds good.

09:33:33  7            THE COURT:  Do you need it read back, sir?

09:33:33  8            THE WITNESS:  That would be great.

09:33:33  9            (Requested portion was read.)

09:33:33  10           THE COURT:  I'm sorry.  I didn't read that very

09:33:33  11   smoothly.

09:33:33  12           If a claim is submitted and it's in a category

09:33:33  13   called pending, that means that no payments are made

09:33:33  14   until there's some resolution to the investigation.

09:33:33  15           THE WITNESS:  Anytime a claim is pended means it

09:33:33  16   is in either a waiting status or -- well, it's waiting.

09:33:33  17   It's somewhere not able to be processed.

09:33:33  18           THE COURT:  The question was, though, that no

09:33:33  19   payment is made when it is in a pend status; is that

09:33:33  20   correct?

09:33:33  21           THE WITNESS:  That is not the way I would

09:33:33  22   describe it.

09:33:33  23           THE COURT:  You will have to proceed,

09:33:33  24   Mr. Cunningham.

09:33:33  25   BY MR. CUNNINGHAM:

09:33:33   1          Q.   Let me ask you about this particular case that

09:33:33   2   we're here about.

09:33:33   3          Did you review any of the materials in Cigna's

09:33:33   4   file before you came to testify today?

09:33:33   5          A.   Yes.

09:33:33   6          Q.   You did not have a deposition to review because

09:33:33   7   we didn't take your deposition, correct?

09:33:33   8          A.   Yes.

09:33:33   9          Q.   Tell us what you reviewed, please.

09:33:33   10          A.   So I was -- a number of emails were shared with

09:33:33   11   me as part of the preparation for this.  So I basically

09:33:33   12   read those emails, tried to kind of rebuild in my mind

09:33:33   13   what was the context that was going on at the time.

09:33:33   14          Q.   Did you look at any of Stephanie Canto's case

09:33:33   15   notes or case ledger of anything of that nature?

09:33:33   16          A.   No.  I really don't deal with case-level

09:33:33   17   details, and didn't plan on bringing that to this table.

09:33:33   18          Q.   Sir, in reviewing the emails, did you ascertain

09:33:33   19   or did you determine that Ms. Canto, once she placed a

09:33:33   20   flag on PB Labs, did not pay any more claims with

09:33:33   21   respect to PB Labs?

09:33:33   22          A.   My understanding is PB Labs was flagged for fee

09:33:33   23   forgiving, and so payments would not have been made

09:33:33   24   unless they were -- if a customer's deductible had been

09:33:33   25   met, I expect they would have been paid.

09:33:33  1          MR. CUNNINGHAM:  Your Honor, I need to approach

09:33:33  2    for a moment.

09:33:33  3          THE COURT:  Yes.  Well, can you say something --

09:33:33  4          MR. CUNNINGHAM:  Can I do it and say, Your

09:33:33  5    Honor?

09:33:33  6          THE COURT:  Yes.

09:33:33  7          MR. CUNNINGHAM:  Thank you.

09:33:33  8          THE COURT:  Short.

09:33:33  9          MR. CUNNINGHAM:  I would like to move to strike

09:33:33  10   that answer, Your Honor.

09:33:33  11         THE COURT:  Is there objection to striking it,

09:33:33  12   given my earlier instruction this morning about the

09:33:33  13   irrelevance of that phrase "fee forgiving" to the Labs'

09:33:33  14   claims, which I understand to be what he's examining him

09:33:33  15   about?

09:33:33  16         MR. KANG:  No, Your Honor.

09:33:33  17         THE COURT:  So the answer will be stricken and

09:33:33  18   the jury will disregard it.  This is kind of a legal

09:33:33  19   question that's the basis for my ruling, but it just

09:33:33  20   means that the question -- well, the answer to the

09:33:33  21   question won't be considered.

09:33:33  22         Go ahead.

09:33:33  23   BY MR. CUNNINGHAM:

09:33:33  24     Q.   Sir, were you in the courtroom on Friday or

09:33:33  25   today when Ms. Canto testified that once a fl was placed

368

09:33:33   1    on PBL, no further payments were made to PBL?

09:33:33   2        A.   I was in the courtroom until notification of

09:33:33   3    being sequestered, and then I left.  So that was about an

09:33:33   4    hour of Stephanie's --

09:33:33   5        Q.   Sir, if you could please answer my question,

09:33:33   6    this will go a lot faster.

09:33:33   7        A.   Sorry.

09:33:33   8             THE COURT:  I think you should have said "I

09:33:33   9    can't answer it yes or no."

09:33:33  10             THE WITNESS:  All right.  Let's do it again.

09:33:33  11    BY MR. CUNNINGHAM:

09:33:33  12        Q.   Were you in the courtroom when Ms. Canto

09:33:33  13    testified that once she placed a flag on PB Labs, no

09:33:33  14    further payments were made to PB Labs?

09:33:33  15        A.   I can't swear she said exactly that, but that

09:33:33  16    would not surprise me.

09:33:33  17        Q.   Sir, isn't it true that that is a common

09:33:33  18    occurrence once a flag is placed on a health care

09:33:33  19    provider by the SIU, that health care provider does not

09:33:33  20    receive any further payments?

09:33:33  21        A.   We work to resolve, so I would say, I guess, to

09:33:33  22    fit the criteria here, no.

09:33:33  23        Q.   Sir, would you agree with me that another way to

09:33:33  24    stop paying a health care provider is the use of a prepay

09:33:33  25    edit?

369

09:33:33  1        A.    Yes.  It's another tool.

09:33:33  2        Q.    What's a prepay edit?

09:33:33  3        A.    So this really just relates to how you are

09:33:33  4    getting something done.  So I mentioned earlier if you

09:33:33  5    can flow the claim through it has different status codes

09:33:33  6    along the way.  Releasing for payment has a different

09:33:33  7    status code than being held.  So I'm sorry, I'm losing

09:33:33  8    the question.

09:33:33  9            THE COURT:  What's a prepaid edit?

09:33:33  10           THE WITNESS:  A prepay edit, if you -- I'm

09:33:33  11   sorry.  Think about how to explain this.  A claim could

09:33:33  12   be auto adjudicated by the system, or in some cases a

09:33:33  13   human being needs to look at that claim.  And so a prepay

09:33:33  14   edit says if a claim fits a certain criteria, has certain

09:33:33  15   attributes, then send it over to a human being who is

09:33:33  16   specially trained on -- on that particular issue.  And

09:33:33  17   then they make a payment decision based on the protocols

09:33:33  18   that are set up.  So it's a way to route a claim to a

09:33:33  19   specialist, a more accurate or briefer answer.

09:33:33  20       Q.    Sir, isn't a prepay edit where Cigna sets up the

09:33:33  21   computer to automatically recognize either a particular

09:33:33  22   health care provider or a particular code the health care

09:33:33  23   provider is submitting?

09:33:33  24           MR. KANG:  Objection, Your Honor, compound

09:33:33  25   question.

09:33:33  1          THE COURT:  No, I don't think it is.  Just you

09:33:33  2  have to be careful about the question he's asked you.

09:33:33  3      A.   A prepay edit relies on information in the claim

09:33:33  4  and routes based on that information.  So yes, a

09:33:33  5  particular provider, a particular service type would be

09:33:33  6  among the things that prepay edit can look at.

09:33:33  7  BY MR. CUNNINGHAM:

09:33:33  8      Q.   Right.  So before Cigna would even consider

09:33:33  9  paying that particular claim that's submitted, if it

09:33:33  10  comes from a particular provider or it comes from -- or

09:33:33  11  it uses a particular code that's in a prepay edit, Cigna

09:33:33  12  is automatically going to prevent payment of that claim

09:33:33  13  from that health care provider?

09:33:33  14      A.   Cigna is going to route that to a processor.

09:33:33  15  The amount of delay is very, very small.  We're talking

09:33:33  16  well within the 30-day payment period.

09:33:33  17      Q.   Sir, would you agree that the third and final

09:33:33  18  way to stop paying a health care provider is to -- for

09:33:33  19  the SIU department to place a permanent flag on that

09:33:33  20  health care provider's bills?

09:33:33  21      A.   We don't think of it as permanent, but, yes, we

09:33:33  22  can flag a provider's claims and have them flow into the

09:33:33  23  SIU.

09:33:33  24      Q.   They certainly can be permanent, can't they?

09:33:33  25      A.   You could have it permanent.  You typically are

| | | |
|---|---|---|
| 09:33:33 | 1 | looking to resolve these issues. |
| 09:33:33 | 2 | Q.   And that's when the flag protocol is identified, |
| 09:33:33 | 3 | for whatever reason the SIU cites, like services not |
| 09:33:33 | 4 | rendered as billed, right? |
| 09:33:33 | 5 | A.   I don't understand the question. |
| 09:33:33 | 6 | Q.   Okay.  When you place a flag, Cigna gives a |
| 09:33:33 | 7 | reason to the health care provider for the placement of a |
| 09:33:33 | 8 | flag, right? |
| 09:33:33 | 9 | A.   Yes. |
| 09:33:33 | 10 | Q.   One of the ones we have heard here is services |
| 09:33:33 | 11 | not rendered as billed.  You are familiar with that, |
| 09:33:33 | 12 | aren't you? |
| 09:33:33 | 13 | A.   Yes. |
| 09:33:33 | 14 | Q.   A permanent edit goes to what is called |
| 09:33:33 | 15 | SharePoint, right? |
| 09:33:33 | 16 | A.   No, it -- |
| 09:33:33 | 17 | MR. KANG:  Objection to the characterization as |
| 09:33:33 | 18 | permanent edit, Your Honor. |
| 09:33:33 | 19 | THE COURT:  Do you claim it, sir, or do you want |
| 09:33:33 | 20 | to rephrase? |
| 09:33:33 | 21 | MR. CUNNINGHAM:  Your Honor, I will move on. |
| 09:33:33 | 22 | THE COURT:  Thank you. |
| 09:33:33 | 23 | BY MR. CUNNINGHAM: |
| 09:33:33 | 24 | Q.   Now, sir, if the SIU permanently flags a health |
| 09:33:33 | 25 | care provider, theoretically, the health care provider |

09:33:33  1    can appeal to Cigna, can it not?

09:33:33  2            MR. KANG:  Objection again to the

09:33:33  3    characterization of a permanent flag, Your Honor.

09:33:33  4            MR. CUNNINGHAM:  I will rephrase it, Your Honor.

09:33:33  5            THE COURT:  Thank you.

09:33:33  6    BY MR. CUNNINGHAM:

09:33:33  7        Q.   Sir, if the SIU flags a health care provider

09:33:33  8    like PB Labs, in theory, that health care provider can

09:33:33  9    appeal that decision to Cigna, right?

09:33:33  10       A.   Absolutely.  Asd a part of investigative

09:33:33  11   process, the contact would be provided for that provider

09:33:33  12   to be able to outreach and resolve the issue with us.

09:33:33  13       Q.   But isn't it true that's it's totally up to

09:33:33  14   Cigna to decide if that appeal is going to be granted or

09:33:33  15   denied?

09:33:33  16       A.   We work with providers in a productive way.

09:33:33  17       Q.   That's not my question, sir.

09:33:33  18       A.   Is it totally up to Cigna to deny claims?

09:33:33  19       Q.   No, sir.  Let me ask you this way.

09:33:33  20            Sir, when the SIU flags a health care provider

09:33:33  21   and the health care provider appeals that determination,

09:33:33  22   that appeal doesn't go to some outside company other than

09:33:33  23   Cigna, does it?

09:33:33  24       A.   It would be mediated in one way or another.  For

09:33:33  25   the most part, it's settlement agreements that we make.

| | | |
|---|---|---|
| 09:33:33 | 1 | So we resolve the issues. |
| 09:33:33 | 2 | Q.   But the first level of -- |
| 09:33:33 | 3 | THE COURT:  Can I suggest that it's time for me |
| 09:33:33 | 4 | to send the jury home for the day. |
| 09:33:33 | 5 | MR. CUNNINGHAM:  Sure. |
| 09:33:33 | 6 | THE COURT:  Thank you very much. |
| 09:33:33 | 7 | Sir, you are excused now, but we do need you in |
| 09:33:33 | 8 | the witness chair about, I don't know, 2:25, 2:28, |
| 09:33:33 | 9 | because I bring the jury out at -- I'm sorry, not -- 9:25 |
| 09:33:33 | 10 | or so.  I bring the jury out at 9:30, so I want to be |
| 09:33:33 | 11 | sure that you are already here.  Thank you. |
| 09:33:33 | 12 | THE WITNESS:  No problem. |
| 09:33:33 | 13 | THE COURT:  Thanks very much. |
| 09:33:33 | 14 | Ladies and gentlemen, have a nice evening. |
| 09:33:33 | 15 | (In the absence of the jury at 3:46 p.m.) |
| 09:33:33 | 16 | THE COURT:  Everybody be seated, please.  A |
| 09:33:33 | 17 | couple housekeeping things. |
| 09:33:33 | 18 | MR. CUNNINGHAM:  Your Honor, I have a motion.  I |
| 09:33:33 | 19 | don't know when you want to take that up. |
| 09:33:33 | 20 | THE COURT:  I don't know what it's about, so I |
| 09:33:33 | 21 | don't know when I want to take it up. |
| 09:33:33 | 22 | MR. CUNNINGHAM:  Can I make it briefly, Your |
| 09:33:33 | 23 | Honor? |
| 09:33:33 | 24 | THE COURT:  Yes, sir. |
| 09:33:33 | 25 | MR. CUNNINGHAM:  Your Honor, I reluctantly have |

09:33:33  1    to move for a mistrial because of the testimony by

09:33:33  2    Mr. Norton about the flag being placed for fee

09:33:33  3    forgiveness.  I specifically discussed this with the

09:33:33  4    Court and opposing counsel, I think on Friday.  I said

09:33:33  5    certainly I'm going to assume that opposing counsel is

09:33:33  6    going to instruct witnesses as to the Court's rulings to

09:33:33  7    prevent this very situation.

09:33:33  8         So Your Honor, I would ask that -- I would move

09:33:33  9    for mistrial, but I would ask the Court to reserve

09:33:33  10   ruling, because the last thing I want right now is a

09:33:33  11   mistrial.

09:33:33  12        THE COURT:  Those were the first words coming

09:33:33  13   out of my mouth.

09:33:33  14        MR. CUNNINGHAM:  We have that procedure in

09:33:33  15   Florida.  I don't know if they have it here, Your Honor.

09:33:33  16        THE COURT:  So I appreciate it.  You have made

09:33:33  17   your -- planted your flag, I will call it, is how I used

09:33:33  18   to view it.  I will respond without asking for counsel's

09:33:33  19   view.  I do not believe this is a mistrial.  I

09:33:33  20   specifically talked to them about fee forgiving this

09:33:33  21   morning.  So even though Mr. Norton apparently didn't get

09:33:33  22   the message, the jury understands it's not relevant to

09:33:33  23   your case.  I made it clear you are doing your case now,

09:33:33  24   so it's not relevant and to -- I think I said strike, but

09:33:33  25   disregard it, words to that effect.

09:33:33   1            MR. CUNNINGHAM:  Your Honor, just to close the

09:33:33   2   loop on this.  I would ask for a curative instruction

09:33:33   3   first thing in the morning about it again because I think

09:33:33   4   the jury could certainly be confused as to why this

09:33:33   5   witness is talking about fee forgiveness when we told

09:33:33   6   them.

09:33:33   7            THE COURT:  Yeah, I don't -- I'm not going to

09:33:33   8   inquire what was said between he and his counsel.  I

09:33:33   9   suspect he said it because it's in the paperwork.  It's

09:33:33  10   in the file for this case, I think.  I think I have seen

09:33:33  11   somewhere at some point, whether it's Ms. Canto or

09:33:33  12   somebody else, makes a note that they have moved on to

09:33:33  13   fee forgiveness as a reason, right?

09:33:33  14            MR. CUNNINGHAM:  But, Your Honor, that's --

09:33:33  15            THE COURT:  So it's kind of hard when you ask

09:33:33  16   him a question and the answer is, in effect, the record

09:33:33  17   said fee forgiveness for him not to say it.  So I'm a

09:33:33  18   little reluctant to be critical of him or even counsel.

09:33:33  19   I am not going to delve into it.

09:33:33  20            How we're going to deal with that, I guess I'll

09:33:33  21   ask Attorney Kang for his view, but it may be that I am

09:33:33  22   going to say it multiple times before you rest your case.

09:33:33  23            Attorney Kang, do you object to my again

09:33:33  24   reminding them in the morning that although they may hear

09:33:33  25   a witness use the phrase "fee forgiveness," if it is

09:33:33  1   raised?  And maybe I will have to say I will tell you if

09:33:33  2   it's relevant as I told you it's not relevant to the

09:33:33  3   Labs' causes of action, but it -- you may consider it in

09:33:33  4   connection with Cigna's.  Maybe I have to say that say

09:33:33  5   that, too.  But do you object to my doing that again in

09:33:33  6   the morning?

09:33:33  7       MR. KANG:  Your Honor, I'll certainly defer to

09:33:33  8   the Court on this one.  I think you have said it, as Your

09:33:33  9   Honor pointed out, multiple times, both this morning,

09:33:33  10  right after Mr. Norton testified to that issue.  I think

09:33:33  11  that is enough, but, again, I will defer to the Court on

09:33:33  12  this one.

09:33:33  13      THE COURT:  But in that regard, I mean, can we

09:33:33  14  do anything vis-a-vis what a witness answers?  I mean, I

09:33:33  15  have explained why I'm going to view his answering that

09:33:33  16  way is not trying to disregard my instructions, my

09:33:33  17  conversation with counsel, et cetera, but I think --

09:33:33  18  again, this is one of these problems.  It was a problem

09:33:33  19  for me as the judge trying to decide legal issues.  It's

09:33:33  20  going to be a problem for the Cigna witnesses.  You know,

09:33:33  21  when do I answer fee forgiveness and when don't I?  And

09:33:33  22  that's a function of whether the question relates to the

09:33:33  23  Labs' claim, either on cross or direct, and when it

09:33:33  24  doesn't, it relates to Cigna's, right?  I mean, that's

09:33:33  25  where I ended up anyway.  You don't have to give up any

09:33:33  1    objections, but that's where I ended up.

09:33:33  2         So I don't quite know how would you tell this

09:33:33  3    witness?  Assuming I'm right that somewhere in a printed

09:33:33  4    document at Cigna they talk about fee forgiveness as a

09:33:33  5    reason not to pay, whether to make the pends file flag

09:33:33  6    continue or some other reason they're not paying them,

09:33:33  7    fee forgiveness, that's our reason.  Okay?  How would you

09:33:33  8    -- and you asked about different ways to put that flag on

09:33:33  9    there for pending.  I don't remember your exact question.

09:33:33  10   But he's thinking, Oh, I looked at some record or memo

09:33:33  11   that talked about fee forgiving, so he's going to mention

09:33:33  12   that.

09:33:33  13        MR. CUNNINGHAM:  That wasn't even the original

09:33:33  14   flag, Your Honor.  The original flag --

09:33:33  15        THE COURT:  I know it wasn't.  I know it wasn't.

09:33:33  16   I thought I made that clear.

09:33:33  17        MR. CUNNINGHAM:  And my concern is even though

09:33:33  18   the Court instructed the jury this morning about fee

09:33:33  19   forgiveness, that should not give Cigna a carte blanche

09:33:33  20   to have all of its witnesses come in and talk about it.

09:33:33  21        THE COURT:  I know they shouldn't.  And that's

09:33:33  22   why I just asked the question I asked.  You need the

09:33:33  23   instruction we're giving to the witnesses.  Answer my

09:33:33  24   question.  What would you have me or Cigna do vis-a-vis

09:33:33  25   any Cigna witness, whether they put them on the stand or

09:33:33  1    you put them on the stand, about this topic of fee

09:33:33  2    forgiveness?  If your answer is in the Labs' case, don't

09:33:33  3    say fee forgiveness, say I can't answer the question.  If

09:33:33  4    your answer is the -- Cigna's case, for unfairness, then

09:33:33  5    you can answer fee forgiveness?

09:33:33  6              MR. CUNNINGHAM:  I think it's very simple, Your

09:33:33  7    Honor.  I think you hit the nail on the head.  If it's --

09:33:33  8              THE COURT:  I don't think that is simple, to be

09:33:33  9    honest with you.  If I am witness, I wouldn't call that

09:33:33 10    simple, but it may be what I have to do.

09:33:33 11              I think -- I guess, Attorney Kang, I would ask

09:33:33 12    you -- well, you're not supposed to be talking to

09:33:33 13    witnesses -- on this one, and any future Cigna witnesses,

09:33:33 14    whether called by you or them, that if -- and you may not

09:33:33 15    know every answer that's going to have a fee forgiveness

09:33:33 16    answer.  I understand that, Attorney Kang.  But spent a

09:33:33 17    lot of time on this case, so I hope you do for most --

09:33:33 18    most situations -- that you need to tell the lawyers,

09:33:33 19    look, we're trying two cases at once.  The issue of fee

09:33:33 20    forgiveness isn't in the Labs' case.  So if they ask you

09:33:33 21    a question and your answer would be something that has

09:33:33 22    fee forgiveness in it and it is being asked because you

09:33:33 23    are called by the Lab, and whether I'm examining you as

09:33:33 24    cross or he's examining you directly, you should say I

09:33:33 25    cannot answer that currently, or something like that.

09:33:33  1    Hopefully, we'll remember what that means it is code for.

09:33:33  2         But that if you are calling someone or you are

09:33:33  3    trying to address like on a direct once you are finished

09:33:33  4    with cross of a witness, you might do that.  With this

09:33:33  5    witness, you might ask him about fee forgiveness as it

09:33:33  6    relates to your claim.  I think then he can answer.  But

09:33:33  7    again, it's like me and directing you folks plant a flag

09:33:33  8    on what you are talking to me about.  You are talking

09:33:33  9    about your claim Cigna, or their claim.

09:33:33  10        I think somehow in questioning when we're

09:33:33  11   shifting from the Labs' case to your case, you have got

09:33:33  12   to plant a flag.  Like -- you did this morning.  You

09:33:33  13   said, Judge, I'm now shifting to my claim in direct exam.

09:33:33  14   So you'd do that again.  And it may be that when he -- if

09:33:33  15   he answers fee forgiveness when you are questioning on

09:33:33  16   that or when he's cross-examining, I may -- I'm going to

09:33:33  17   give another charge in the morning, short one, but I am

09:33:33  18   going to mention it.

09:33:33  19        But when we shift and somehow fee forgiveness

09:33:33  20   comes out in your case, I am probably going to stop and

09:33:33  21   say, okay, ladies and gentlemen, remember I told you not

09:33:33  22   to think about fee forgiveness in the Labs' case, but you

09:33:33  23   heard Attorney Kang say he was shifting to his case,

09:33:33  24   that's why you are hearing about it now, something like

09:33:33  25   that.  Unless there's any objection to that, I think that

09:33:33  1    will be my inclination.

09:33:33  2            MR. CUNNINGHAM:  That's fine from the Labs, Your

09:33:33  3    Honor.

09:33:33  4            THE COURT:  All right.  I believe that during

09:33:33  5    the reading of Mr. Nicholson's deposition I heard

09:33:33  6    reference -- well, certainly to multiple exhibits.  For

09:33:33  7    the deposition numbers, I heard 2, 3, 4, 5, 6, 7, 9, 10,

09:33:33  8    13, 14 and 15.  I believe with respect to one of the

09:33:33  9    deposition designations I was provided, I don't remember

09:33:33  10   by whom, what I call the translation sheet that told me

09:33:33  11   what the exhibit as marked at the deposition would become

09:33:33  12   at trial.  I did not, I don't believe, get one for

09:33:33  13   Mr. Nicholson's deposition.  So somebody has to be

09:33:33  14   prepared in the morning to tell me what Court exhibits

09:33:33  15   those depo exhibits numbers correspond to.  And I guess

09:33:33  16   then we're going to make sure they are being offered into

09:33:33  17   evidence by someone.  Because otherwise, my ruling that

09:33:33  18   this objection -- any 801 or '2 objection was sustained

09:33:33  19   unless the document is in evidence.  I'm not quite sure

09:33:33  20   how I ended up phrasing the negative of a positive.  But

09:33:33  21   otherwise, I guess we all just decided that Hall

09:33:33  22   shouldn't have spent that time reading the deposition

09:33:33  23   transcripts and ruling.

09:33:33  24           There are about 14 objections which I overruled

09:33:33  25   and sustained.  I don't think I am going to stay this

09:33:33  1   afternoon to put on the record certainly the ones as to

09:33:33  2   403, which I do have to do.  Hopefully in the morning

09:33:33  3   after I finish putting on the record what conclusion I've

09:33:33  4   come to about a particularly large issue in the case,

09:33:33  5   once I do that, if I have time I will move to dealing

09:33:33  6   with putting on a record some of those, or all if I can.

09:33:33  7          The only thing that puzzled me is the second to

09:33:33  8   last objection, 224-7 through 13, I said the objection

09:33:33  9   was sustained.  I think the hypothetical, and I don't

09:33:33  10  know, I guess I thought it should be sustained.  I think

09:33:33  11  it got read.  I could be wrong.  I meant to go back and

09:33:33  12  double-check it, but I didn't want to forget to raise it.

09:33:33  13         It's Page 224-7, it asks, "Had Ms. Canto

09:33:33  14  specified the inaccurate or identified specific

09:33:33  15  information that she needed in order to process and

09:33:33  16  approve and adjudicate those claims, would you have

09:33:33  17  endeavored to give that to her?

09:33:33  18         "Answer:  Absolutely."

09:33:33  19         I'm pretty sure I heard that read, and yet I

09:33:33  20  have a sustained in my form.  So I would just -- I don't

09:33:33  21  think there's -- I wouldn't add it to your list of

09:33:33  22  mistrial requests, but -- maybe it would work the other

09:33:33  23  way.  Maybe Attorney Kang will join you.  But I would ask

09:33:33  24  that people be more careful if I'm correct.  If I am not,

09:33:33  25  I'm sure you all can appreciate that that was a very long

382

09:33:33  1    deposition reading, and I may have lost track at some

09:33:33  2    point.  But if I am correct, I would ask that whoever is

09:33:33  3    preparing them, you know, just be careful to be sure that

09:33:33  4    doesn't happen again.

09:33:33  5          Okay.  I am going to recess now.  As I said, I'd

09:33:33  6    ask if you'd be here at 8:50.  And the first thing I hope

09:33:33  7    to do, if I get my thoughts collected tonight finally, is

09:33:33  8    to put on the record my view of one of the major legal

09:33:33  9    issues in the case.  I assume it's not surprise, it's the

09:33:33  10   medical necessity issue and the *Mario* decision.

09:33:33  11         Once I do that, if I have time, I will put on

09:33:33  12   the record certainly any 403 ruling.  I don't know that

09:33:33  13   -- there are lots of other objections, mode of

09:33:33  14   questioning.  I mean, if I allowed it, it meant that, you

09:33:33  15   know, I viewed them as having him on cross or I didn't

09:33:33  16   finds it particularly heavily leading.  He's no longer

09:33:33  17   employed by any party, whatever.  I mean, that's kind of

09:33:33  18   my reasoning.  It's really the 403 that I'm concerned

09:33:33  19   about.  So I will try to put those on the record after I

09:33:33  20   do the -- my explaining on the record why I'm going to

09:33:33  21   approach the charge in a certain way.

09:33:33  22         Anything further?

09:33:33  23         MR. KANG:  I'm sorry, Your Honor.  Just one

09:33:33  24   housekeeping item on our end.

09:33:33  25         THE COURT:  Absolutely, no problem.

09:33:33  1        MR. KANG:  The first exhibit that I used with

09:33:33  2  Stephanie Canto today was Labs' Exhibit 7230.  That was

09:33:33  3  not a joint exhibit, but it was an exhibit that had no

09:33:33  4  objections.

09:33:33  5        THE COURt:  Yes.

09:33:33  6        MR. KANG:  I don't think I actually moved for

09:33:33  7  the formal admission of that document in evidence.

09:33:33  8        THE COURT:  No, I don't believe you did.

09:33:33  9        MR. KANG:  I would like to do that now.

09:33:33 10        THE COURT:  I remember checking.  You said it

09:33:33 11  was Labs, and I looked and saw it was on the list -- give

09:33:33 12  me a minute.  There's so many pages.  It takes a while to

09:33:33 13  get to it.  7236 [sic], it actually wasn't.  So I guess I

09:33:33 14  didn't --

09:33:33 15        MR. KANG:  7230.

09:33:33 16        THE COURT:  Oh, yes.  I checked that as Canto

09:33:33 17  Day 2.  If you are moving, it shows no objection.  Was he

09:33:33 18  correct -- were you correcting your listing?  So it is a

09:33:33 19  full exhibit for the purposes of Liana marking her chart

09:33:33 20  that way, absent objection.

09:33:33 21        MR. KANG:  Thank you.

09:33:33 22        THE COURt:  Anything further?  How about from

09:33:33 23  you folks?

09:33:33 24        MR. CHRIST:  Yes, Your Honor, one other

09:33:33 25  housekeeping matter.  You brought up earlier that we need

09:33:33   1    to move in the USB stick --

09:33:33   2            THE COURT:  For the deposition, yes.

09:33:33   3            MR. CHRIST:  -- for deposition.  Can we do so

09:33:33   4    now as Court Exhibit --

09:33:33   5            THE COURT:  Certainly.

09:33:33   6            MR. CHRIST:  -- 2, I believe.

09:33:33   7            THE COURT:  Court Exhibit 2 is the Nicholson

09:33:33   8    deposition, which is, I presume, a data file of exactly

09:33:33   9    what was played in the courtroom today.  Is that correct,

09:33:33   10   Attorney Christ?

09:33:33   11           MR. CHRIST:  Yes, Your Honor.

09:33:33   12           THE COURT:  And is there any issue from Cigna's

09:33:33   13   side to that, or did you both see what was put on -- know

09:33:33   14   what would go onto a disk and that it was what was

09:33:33   15   played?

09:33:33   16           MR. KANG:  Yes, Your Honor, I think that's fine.

09:33:33   17           THE COURT:  All right.  Well, I think that's --

09:33:33   18   I'm done for the day.  And as I say, I hopefully will get

09:33:33   19   this ready by 8:50.

09:33:33   20           I think we expect to send you -- I think I am

09:33:33   21   only going to send you the general sections, the front

09:33:33   22   and the back.  And I'm about to go and just sort of skim

09:33:33   23   those to make sure there isn't something been dropped or

09:33:33   24   we didn't insert the Star Spangled Banner or something.

09:33:33   25   And so it will go out probably by 5:00 or 6:00.  And

09:33:33  1    we'll limit tomorrow's charge conference at 4:00 to just

09:33:33  2    those sections.

09:33:33  3         I would expect you are going to get the rest of

09:33:33  4    it sometime tonight.  That's the part that will not be --

09:33:33  5    there will be a lot of edits in there, I suspect.  If you

09:33:33  6    have some sharp-eyed person on your team checking those

09:33:33  7    sorts of things, you're going to maybe see a lot.  Many

09:33:33  8    of them arising out of this issue of having three labs

09:33:33  9    and the Labs' case versus what was two Cignas and the

09:33:33  10   Cigna case, but which is now one Cigna.  So all of those

09:33:33  11   are in the process of trying to be consistently

09:33:33  12   described.  And as to what the proof has to be, each Lab

09:33:33  13   has to prove this as to the claims those Labs, that sort

09:33:33  14   of language.  I doubt we're going to get that

09:33:33  15   100 percent.

09:33:33  16        So what I expect when we get to those parts you

09:33:33  17   might just say, Judge, you know, the second full

09:33:33  18   paragraph you don't have a parallel language that you

09:33:33  19   have had elsewhere or something, and we'll just -- we'll

09:33:33  20   know we have to fix it.  Just a housekeeping and we'll

09:33:33  21   get it done in the next day or so when we give you what

09:33:33  22   we -- my normal experience is I would think by Thursday

09:33:33  23   at the close of charge we will have what I call a fairly

09:33:33  24   stable final charge.  You will have objected, that's

09:33:33  25   fine.  But I will have looked again at the issue and

09:33:33  1    decided no, this is how I'm giving it, preserve your

09:33:33  2    objection.

09:33:33  3         It I think could very well about hopefully only

09:33:33  4    a handful of charges -- by handful I mean three pages

09:33:33  5    where there's a substantive disagreement, you're coming

09:33:33  6    forward with more information for me as I might have

09:33:33  7    asked for or you might have offered, and I'm still

09:33:33  8    looking at that and thinking about it.  Those might not

09:33:33  9    get put to bed until Monday or Tuesday when we're close

09:33:33  10   to closings.  But as I resolve those, I won't have

09:33:33  11   another conference, I'll just come out in the morning and

09:33:33  12   say, look, this is the language I'm doing on Charge 57.

09:33:33  13   And if you have an objection, I will listen.  And if I

09:33:33  14   don't change my mind, I will say preserve your objection.

09:33:33  15        I mean, this isn't a normal case, but that's

09:33:33  16   normally how a civil case proceeds for me.  So that's

09:33:33  17   what we're going to try to do and try to get some of it

09:33:33  18   hacked off tomorrow and then we'll move to the

09:33:33  19   substantive stuff on Wednesday and Thursday, and

09:33:33  20   hopefully get you before Friday a charge that's largely

09:33:33  21   in part either agreed upon or I have told you I don't

09:33:33  22   want to hear any more.  It's going to be what I'm giving

09:33:33  23   and you make your record.  That's all you have to do at

09:33:33  24   that point.

09:33:33  25        And we'll leave the last couple, you know.

09:33:33  1    Probably over the weekend we will dig into those and then

09:33:33  2    we'll put them to bed on Monday on Tuesday morning.

09:33:33  3           Yes, sir.

09:33:33  4           MR. CUNNINGHAM:  One last question, Your Honor.

09:33:33  5    Can you give us a time counts on where we are?

09:33:33  6           THE COURT:  Yes.  Well, I asked my clerk.  I

09:33:33  7    have a number, but I don't want to give it if I'm way

09:33:33  8    off.  I mean, like I added wrong and I'm an hour or a

09:33:33  9    hundred minutes off because right now I'm not doing too

09:33:33  10   well on those kinds of things.  Where did I put it?  Do

09:33:33  11   you have a -- can you come over and give me a number for

09:33:33  12   a total?  Where did I put it?  What is your Nicholson

09:33:33  13   allocation?  You already gave it to me.

09:33:33  14          Excuse me.  You will have to wait.  I can't find

09:33:33  15   the sticker I wrote the number on.  It's in here

09:33:33  16   somewhere.  I believe the Labs are over five hours, but

09:33:33  17   we have a disagreement on how much.  Maybe deriving from

09:33:33  18   the allocation of Nicholson.  So I will give that to you

09:33:33  19   first thing in the morning.

09:33:33  20          And I think for Cigna, it's about two hours and

09:33:33  21   40 -- what did you say?  Yeah, we're exactly agreed on

09:33:33  22   the Cigna's, 2 hours and 44 minutes.  That assumes a

09:33:33  23   Nicholson -- I have got to figure out why he and I are

09:33:33  24   not on the same number, and we're not that close which

09:33:33  25   we're going to have to -- bring your notes back to

388

09:33:33  1  chambers, Alex, but we'll get you that number.  And if it

09:33:33  2  matters, I will ask Alex to email it to you.

09:33:33  3       You have to understand the interim numbers that

09:33:33  4  were given, even if I check with Alex, is all subject to

09:33:33  5  auditing at the end.

09:33:33  6       MR. CUNNINGHAM:  Tomorrow morning will be fine,

09:33:33  7  Your Honor.

09:33:33  8       MR. KANG:  Your Honor, one last thing.  I am

09:33:33  9  permitted to talk with Mr. Norton just about the fee

09:33:33  10  forgiving issue?

09:33:33  11       THE COURT:  Yes, yes.  Absolutely.  And I don't

09:33:33  12  know whether you intend to examine him on that subject on

09:33:33  13  your case.  So you do -- for two reasons you have to talk

09:33:33  14  to him, but that was it because I think we agreed that it

09:33:33  15  would not be proper during testimony.

09:33:33  16       MR. KANG:  Thank you.

09:33:33  17       THE COURT:  Thank you very much.  We'll stand

09:33:33  18  adjourned.

09:33:33  19       (Court adjourned at 4:06 p.m.)

20

21

22

23

24

25

389

1

2  COURT REPORTER'S TRANSCRIPT CERTIFICATE

3  I hereby certify that the within and foregoing is a true

4  and correct transcript taken from the proceedings in the

5  above-entitled matter.

6

7  /s/  Terri Fidanza

8  Terri Fidanza, RPR

9  Official Court Reporter

10

11

12                          INDEX

13                       EXAMINATION

14  Witness Name                                    Page

15  STEPHANIE CANTO

16    CONTINUED CROSS-EXAMINATION BY MR. KANG ........... 288

17    DIRECT EXAMINATION BY MR. KANG ..................... 295

18    CROSS-EXAMINAITON BY MR. CUNNINGHAM ................ 307

19  MICHAEL NICHOLSON

20     Playing video deposition ....................... 343

21  MATTHEW NORTON

22    DIRECT EXAMINATION BY Mr. CUNNINGHAM .............. 350

23

24

25