1               UNITED STATES DISTRICT COURT

2                  DISTRICT OF CONNECTICUT

3       _____
        CONNECTICUT GENERAL )
4       LIFE INSURANCE CO.  )
        AND CIGNA HEALTH    )
5       AND LIFE INSURANCE  )
        CO.                 )
6             Plaintiffs )    NO: 3:19cv1324(JCH)
                          )    NO: 3:19CV1326(JCH)
7        vs.              )    October 22, 2024
                          )    8:51 a.m.
8                         )
        BIOHEALTH MEDICAL  )
9       LABORATORIES INC,  )
        PB LABORATORIES, LLC)
10      and EPIC REFERENCE )
        LABS, INC.         )
11            Defendants. )
        _____)    141 Church Street
12                               New Haven, Connecticut

13

14              DAY THREE OF TRIAL

15

16      B E F O R E:

17              THE HONORABLE JANET C. HALL, U.S.D.J.

18      A P P E A R A N C E S:

19      For CIGNA:          Edward T. Kang
                            Emily Costin
20                          Alston & Bird LLP
                            950 F Street, NW,
21                          Washington, DC 2004-1404

22                          Michelle Nicole Jackson
                            Alston & Bird LLP
23                          1201 West Peachtree Street
                            Atlanta, GA 30309

24

25                      -- continued --

```
 1                            Alexander Akerman
                              Alston & Bird LLP
 2                            350 South Grand Avenue
                              51st Floor
 3                            Los Angeles, CA 90071

 4                            Kelsey Kingsbery
                              Alston & Bird LLP
 5                            555 Fayetteville Street
                              Ste 600
 6                            Raleigh, NC 27601

 7

 8    For BioHealth Labs:   Scott M. Hare
                            Anthony Thomas Gestrich
 9                          Raines Feldman Littrell
                            11 Stanwix Street
10                          Suite 1400
                            Pittsburgh, PA 15222
11
                            Fred Alan Cunningham
12                          Matthew Thomas Christ
                            Rafferty Domnick Cunningham & Yaffa
13                          2401 PGA Boulevard
                            Suite #140
14                          Palm Beach Gardens, FL 33410

15                          John J. Radshaw, III
                            John J. Radshaw, III, Esquire
16                          65 Trumbull Street, 2d Fl.
                            New Haven, CT  06510
08:51:14 17

18

19

20

21

22

23

24

25
```

08:51:14  1          THE COURT:  Good morning to you.  We're here

08:51:18  2   again in the case known as Connecticut General -- I'm

08:51:22  3   sorry, I'm not sure.  Anybody want to suggest what we

08:51:25  4   call it now that Connecticut General Life Insurance is no

08:51:29  5   longer in the case?  I would think it should be Cigna

08:51:33  6   Health and Life Insurance Co. versus BioHealth Labs, et

08:51:37  7   al.

08:51:37  8          Any problem with that?

08:51:39  9          MR. KANG:  No, Your Honor.

08:51:41  10          THE COURT:  Attorney Cunningham, is that all

08:51:46  11   right?

08:51:47  12          MR. CUNNINGHAM:  That's fine, Your Honor.

08:51:49  13          THE COURT:  Well, we're here in that case,

08:51:49  14   docket 19-CV-1324, along with the case consolidated for

08:51:54  15   trial, 19-CV-1326, which is the reverse, BioHealth Labs,

08:52:00  16   et al versus Cigna Health and Life Insurance Co.

08:52:04  17          I asked you all to come early.  I hope I asked

08:52:09  18   you to come early enough.  I'm basically going to -- I

08:52:16  19   don't know if it will bore you.  You may be shocked with

08:52:21  20   the process that's taken me to work my way through the

08:52:25  21   issue and to explain where I'm ending up.

08:52:28  22          So, I want to put on the record my reasoning as

08:52:35  23   it relates really to burden of proof generally on the

08:52:38  24   causes of action in this case.  In particular, as that

08:52:43  25   thinking has been driven by the *Mario* case which was

08:52:46  1  brought to our attention by Cigna counsel sometime ago.

08:52:51  2  Maybe three or four weeks ago.

08:52:52  3          I think you all would agree that the Court and

08:52:55  4  the parties have struggled with that decision, the *Mario*

08:52:59  5  decision, which is I think the only case the Court has

08:53:03  6  found or has been cited to the Court by the parties that

08:53:07  7  involves a policy with language similar to the language

08:53:11  8  in our case.  That is, the coverage section includes

08:53:15  9  coverage for medical necessity.  And then later the

08:53:20  10  policy excludes services that are defined as not

08:53:24  11  medically necessary.

08:53:24  12          Although not controlling, the *Mario* decision,

08:53:28  13  which obviously decided the law under either New York or

08:53:32  14  Connecticut state law.  The three cases that we have

08:53:41  15  involving Florida law still feel like the *Mario* case

08:53:45  16  should somehow have helped us to inform the Court as to

08:53:50  17  how to charge the burden of proof.

08:53:52  18          However, let me first note that *Mario* is quite

08:53:58  19  distinguishable from our case for a number of reasons:

08:54:00  20          First, the case is applying the substantive

08:54:04  21  insurance law of New York and Connecticut.  Whereas here

08:54:06  22  we are applying the substantive law of Florida of all

08:54:10  23  claims.

08:54:11  24          Second, *Mario* was an ERISA and Title VII case.

08:54:14  25  Our case, of course, is a health insurance case not under

08:54:15  1   ERISA.  At least with small exception in a portion of

08:54:20  2   Cigna's claim in their cause of action.

08:54:22  3        Third, it was a case of an individual

08:54:25  4   challenging one denial, not tens of thousands of claims

08:54:30  5   as are at issue here.

08:54:31  6        It's very unclear and uncertain from *Mario* that

08:54:35  7   a determination that something is not medically necessary

08:54:37  8   in the ordinary case is sufficient to deny tens of

08:54:41  9   thousands of their claims on their face.

08:54:43  10        Most important, however, to the Court is that

08:54:46  11   it's clear to the Court that the resolution of the *Mario*

08:54:50  12   case depended on the context for the Court's decision.

08:54:55  13   It is a ruling on a Motion for Summary Judgment and it

08:54:59  14   depends on the standard for summary judgment.  See *Mario*,

08:55:02  15   313 F.3d at 765 ("Whereas, here the plan administrator

08:55:10  16   presents sufficient evidence to show that the treatment

08:55:13  17   is not medically necessary in the usual case.  It was up

08:55:15  18   to his or her position to show that this individual

08:55:18  19   patient is different from the usual in ways that make the

08:55:22  20   treatment medically necessary for him or her...")

08:55:25  21   (emphasis added.))

08:55:30  22        Finally, focusing on that, as well the nature of

08:55:34  23   the scope of coverage in our particular cases, in

08:55:40  24   relationship to the exclusion in particular, is what has

08:55:45  25   caused me to come -- to take a lot of time to work my way

08:55:50  1    through this and to come to a conclusion as to the proper

08:55:53  2    way to charge burden.

08:55:57  3            It is clear staying still for a moment with the

08:56:00  4    *Mario* case.  First, it is clear from the words "presents

08:56:05  5    sufficient evidence."  But this is a summary judgment

08:56:08  6    standard and a ruling in the *Mario* case.  The words

08:56:10  7    "presents sufficient evidence" can only be a reference to

08:56:15  8    what is necessary to show by the movant that there is no

08:56:18  9    genuine issue of material fact.

08:56:20  10           I struggle with the idea that the Second Circuit

08:56:22  11   meant this to be the approach for an instruction to a

08:56:26  12   jury trying to reach a verdict and, therefore, judgment.

08:56:30  13   In the burden of proof context what is "sufficient

08:56:33  14   evidence" I cannot, nor will I, instruct the jury that

08:56:40  15   Cigna carries the burden on the issue of what is "not

08:56:44  16   medically necessary" by presenting "sufficient evidence."

08:56:47  17   It is -- just to say that sounds disconsonant to me.  By

08:56:56  18   presenting sufficient evidence that a service or

08:56:58  19   procedure is not generally medically necessary.

08:57:03  20           As I will explain in a moment, instructing that

08:57:06  21   Cigna first has the burden of proof on the lack of

08:57:10  22   medical necessity, I would be instructing the jury on an

08:57:13  23   affirmative defense to the Labs' case, first, before the

08:57:16  24   jury had been instructed on, let alone decided, if the

08:57:20  25   Labs had proven there was coverage for their insureds.

08:57:26  1          Think of that.  We would ask the jury to decide

08:57:32  2   is there an exclusion to the coverage the jury hadn't yet

08:57:36  3   found.

08:57:36  4          In other context, particularly in employment and

08:57:40  5   labor law, the Second Circuit has repeatedly made clear

08:57:43  6   it is error to use a burden shifting scheme applicable at

08:57:47  7   summary judgment when one is in the context of a jury

08:57:51  8   charge.  See *Sharkey v Lasmo (AUL Ltd.)*, 214 F.3d 371,

08:57:59  9   374 (Second Circuit 2000).  ("Instructing the jury on

08:58:10  10  this complex process of the *McDonnell Douglas* test

08:58:14  11  produces no benefits and runs the unnecessary risk of

08:58:18  12  confusing the jury.  If the plaintiff has successfully

08:58:22  13  made a prima facie case and the defendant has met its

08:58:25  14  burden by offering a reason other than discrimination for

08:58:25  15  its actions, the Court should instruct the jury the

08:58:29  16  plaintiff bears the burden of proving that the defendant

08:58:33  17  was motivated by prohibitive discrimination.  That is the

08:58:37  18  ultimate fact in a plaintiff's case of this type,

08:58:40  19  continuing with the quote, without reference to the

08:58:43  20  success of burden shifting test the parties have been

08:58:47  21  required to pass.").

08:58:47  22         As *Sharkey* and other Second Circuit decisions

08:58:53  23  make clear, burden shifting isn't involved in charging

08:58:57  24  the jury for several reasons:

08:58:59  25         First.  It's confusing.

08:59:00  1         Second.  The lowered evidentiary thresholds like

08:59:03  2    prima facie case or, in the *Mario* decision, sufficient

08:59:07  3    evidence, do not have a place at trial.

08:59:10  4         At the end of the day, the correct jury charge

08:59:12  5    is simpler.  The plaintiff must prove coverage by a

08:59:18  6    preponderance of their evidence on their claims.  And

08:59:20  7    that is what I intend to do.

08:59:23  8         Let me now turn to the scope of coverage and

08:59:26  9    exclusions in these health policies which has finally

08:59:29  10   caused me to see why *Mario* is not involved here in

08:59:33  11   charging the jury as to the Labs or Cigna's burdens of

08:59:37  12   proof.

08:59:57  13        I wrote here as the parties know.  It may not be

08:59:57  14   that you know this.  You probably maybe don't even agree

08:59:59  15   with me.  But I will say as the Court knows, the presence

09:00:02  16   of "medical necessity" language in both the coverage and

09:00:05  17   the exclusion sections of Cigna's policies creates a

09:00:10  18   paradox with respect to the burden of proof.  The

09:00:13  19   language of the exclusion is negatively identical to the

09:00:19  20   language scope of coverage.

09:00:23  21        Traditionally, a plaintiff has a burden of

09:00:25  22   proving coverage in an insurance case.  Once a plaintiff

09:00:29  23   does that, the defendant has the burden of proving an

09:00:32  24   exclusion.  There are too many cases.  I won't even

09:00:34  25   bother to cite one.  I'm sure we could find 5,000.

09:00:40  1          In working my way through the charge, it has
09:00:46  2    become clear to this Court that the policies at issue in
09:00:50  3    these cases create an -- I'm sorry -- an insoluble
09:00:59  4    problem.  It also presents an irresoluble issue.
09:01:06  5          Counsel, in my view, counsel struggled in their
09:01:12  6    proposed pretrial jury instructions -- not pretrial, but
09:01:16  7    that were filed with me pretrial but their proposed jury
09:01:20  8    instructions.  And I looked at both of them several
09:01:23  9    times.  I don't believe they lay out a very clear path
09:01:26  10   for the jury to follow on the charge of medical necessity
09:01:30  11   for either coverage or any applicable exclusion.
09:01:37  12         I reach the decision I do today, in part,
09:01:40  13   because I conclude that the medical necessity exclusion
09:01:45  14   creates an ambiguity in the policy and, thus, is not a
09:01:49  15   true exclusion within the meaning of insurance law.  And
09:01:52  16   I will not apply it and will, instead, revert to the
09:01:56  17   default and the standard traditional foundational rule of
09:01:59  18   insurance law.  The plaintiff insured has the burden of
09:02:02  19   proving coverage.
09:02:02  20         I've never in my life cited a case from Alabama.
09:02:07  21   There were three of them from Alabama on this point.  I
09:02:11  22   thought it fits with what my thinking is.  *St. Paul Fire*
09:02:17  23   *and Marine vs Britt*, 2016 Westlaw 360654 (Alabama 2016).
09:02:25  24   When the limitation or exclusion completely contradicts
09:02:30  25   the insuring coverage provisions, insurance coverage

09:02:35  1    becomes illusory and the law does not countenance such a

09:02:39  2    Illusory coverage.

09:02:40  3         As I noted in the summary judgment about the

09:02:44  4    forgiveness language, when a policy is susceptible --

09:02:51  5    well, there it was to multiple reasonable interpretations

09:02:56  6    making it ambiguous, Florida applies the contra

09:03:02  7    proferentem canon to ambiguous terms, meaning such

09:03:05  8    ambiguous must be liberally construed in favor of

09:03:07  9    coverage and strictly against the insured.  That's at

09:03:10  10   page 74 of Docket Number 271.

09:03:14  11        I conclude that Cigna's policy exclusions for

09:03:17  12   services that are not medically necessary is not a true

09:03:21  13   exclusion.  It is just another way of restating the

09:03:26  14   condition that exists to qualify for coverage.  In some

09:03:31  15   ways it's a redundancy and an unnecessary contract term

09:03:38  16   and it certainly is confusing.

09:03:41  17        Further, it is not a true exclusion within the

09:03:44  18   meaning of that term in insurance law.  An exclusion is

09:03:48  19   referred to as a limitation or an exception to what is

09:03:53  20   otherwise covered under a policy.  Put another way, an

09:03:57  21   exclusion is a clause that narrows coverage.  It exempts

09:04:02  22   a subset of what otherwise would be covered.  However, it

09:04:07  23   leaves coverage, albeit to a lesser extent, but still

09:04:12  24   coverage.  For example, I'm sure many Cigna policies and

09:04:16  25   just about every policy in America, insurance policies

| | | |
|---|---|---|
| 09:04:21 | 1 | for health covers surgery.  However, I think almost every |
| 09:04:28 | 2 | policy has an exclusion for cosmetic surgery.  Clearly, |
| 09:04:33 | 3 | we would agree, I hope, that cosmetic surgery is a subset |
| 09:04:36 | 4 | or a limitation on the broad word "surgery".  So the |
| 09:04:40 | 5 | exclusion is carving out a piece of what would otherwise |
| 09:04:44 | 6 | be covered.  But it leaves coverage. |
| 09:04:49 | 7 | Here, the medical necessity exclusion does not |
| 09:04:54 | 8 | carve out just a subset of what otherwise would be |
| 09:04:57 | 9 | covered.  It just, in effect, restates the same condition |
| 09:05:06 | 10 | that is necessary for coverage in the first instance, |
| 09:05:10 | 11 | albeit stating it as a negative.  I mean, otherwise, how |
| 09:05:14 | 12 | would you get it to be an exclusion?  It is, in my view, |
| 09:05:19 | 13 | I think the right word is tautology.  It's restating the |
| 09:05:24 | 14 | same thing, the scope of the same thing, twice, in |
| 09:05:28 | 15 | different words.  The medical necessity language in the |
| 09:05:31 | 16 | exclusion is, thus, could be said to be redundant, |
| 09:05:35 | 17 | certainly creates an ambiguity what did the writer of the |
| 09:05:40 | 18 | policy expect to be covered if it covers medical |
| 09:05:44 | 19 | necessity, but then takes it away when there is no |
| 09:05:47 | 20 | medical necessity.  It does nothing in the contract, in |
| 09:05:51 | 21 | my view, other than to create ambiguity, most especially |
| 09:05:56 | 22 | for us here in this case trying to figure out how to |
| 09:06:06 | 23 | charge burden of proof. |
| 09:06:14 | 24 | As to the point I just iterated in that section |
| 09:06:18 | 25 | about carving out or being a subset, that's what an |

09:06:21  1    exclusion is in relation to the coverage.  Williston, at

09:06:27  2    17 Williston 49:111, 4th edition, clearly makes this

09:06:34  3    point with various cases cited to support it.

09:06:42  4    The best way -- it's difficult to articulate because, of

09:06:47  5    course, the exclusion has the not in front of medical

09:06:51  6    necessity.  It would be similar to saying surgery is

09:06:57  7    covered and, instead of doing a narrow set of not

09:07:00  8    cosmetic, you said but not surgeries covered.  It is

09:07:08  9    nonsensical to the Court.

09:07:17  10             I think of it as a Venn Diagram.  I hope you are

09:07:20  11   all familiar with it.  Usually might be two or three

09:07:25  12   bubbles, circles, and they can overlap slightly in the

09:07:29  13   fields that where they overlap define a smaller class of

09:07:33  14   people who might have certain characteristics.  So you

09:07:37  15   might have a circle of people under the age of 20.  And

09:07:43  16   then you might have a circle of people who have red hair.

09:07:47  17   And then you have a circle of people who are all the

09:07:50  18   males in the country.  Okay.  So those circles would

09:07:56  19   overlap and the red hair and the under 20 and all males

09:07:59  20   might all converge and have a very small section where

09:08:05  21   all three are on top of each other.  There will be some

09:08:09  22   sections where the red haired or the under 20 clearly

09:08:14  23   overlap with all males in the country.  But under no

09:08:17  24   circumstances in that silly example would you see all

09:08:21  25   three circles congruent, lying on top of each other, in

09:08:26    1    the sense that all males with red hair and under 20 are

09:08:31    2    all the same.  That's all there is in the United States.

09:08:34    3    There's no other universe.  And thinking that way in this

09:08:38    4    case, well, generally in insurance law, you have coverage

09:08:42    5    as a big circle.  And then you have series of exclusions,

09:08:46    6    but they are another circle.  And they clearly cover part

09:08:52    7    of the coverage circle.  In effect, that's what you are

09:08:55    8    taking away.  But I don't know of exclusions that

09:09:02    9    entirely cover the Venn Diagram of coverage.  It's an

09:09:07   10    illusion that there's coverage if you allow that.

09:09:09   11        Now, the clearest case would be, as I said,

09:09:13   12    coverage medical necessity exclusion -- well, it's not

09:09:20   13    medical necessity.  It's taking it away.  Leaving no

09:09:23   14    coverage at all in effect.  And that can't be what the

09:09:28   15    policy is, because then the insurance is illusory.

09:09:43   16        Another way to explain it is -- and this is why

09:09:45   17    I have been struggling with the charge and you're getting

09:09:48   18    it when you're getting it.  I cannot charge the jury that

09:09:52   19    the Labs both -- that the Labs must have the burden of

09:09:55   20    proving medical necessity by a preponderance of the

09:09:57   21    evidence, on the one hand, and that Cigna has the burden

09:10:01   22    of proving the lack of medical necessity by a

09:10:03   23    preponderance of the evidence.  If we were speaking not

09:10:06   24    about those terms in particular, but generally about

09:10:09   25    coverage and exclusions, that's what we would do.  I

09:10:14  1    wouldn't spend five minutes writing that section.  But

09:10:17  2    when I plug in for coverage medical necessity and for

09:10:21  3    exclusion not medical necessity it creates, in my

09:10:24  4    opinion, a paradox.  I'm not sure I have the right word

09:10:29  5    there, but that's what it feels like.  Both parties

09:10:32  6    cannot have the burden of proof on the same issue.

09:10:38  7         Again, I acknowledge that the phrase "medical

09:10:41  8    necessity' and that a service is not medical necessity

09:10:43  9    are not the same words.  But they are, in effect, a

09:10:48  10   negative of each other and are really the same proof.

09:10:55  11        Think also of another problem with the approach

09:10:58  12   that have been talked about up until now.  Let's say it

09:11:02  13   was found by the jury that the Labs proved medical

09:11:05  14   necessity for these services by a preponderance of the

09:11:07  15   evidence.  Therefore, they found coverage.  And how did

09:11:14  16   they find it?  By a preponderance of the evidence.  More

09:11:17  17   than 50 percent.  Right.  Then Cigna can't possibly prove

09:11:29  18   not medical necessity.  Because Cigna would need more

09:11:33  19   than 50 percent preponderance of the evidence to prove

09:11:37  20   it.  And if the jury has already found by a preponderance

09:11:43  21   medical necessity, I don't know how someone can prove the

09:11:48  22   negative of medical necessity by more than 50 percent.

09:11:51  23   We can't exceed 100 percent.  So it's just not possible

09:11:56  24   in my mind.

09:11:57  25        All of our attempts in drafting the charge to

|          |    |                                                         |
|----------|----|---------------------------------------------------------|
| 09:12:00 | 1  | resolve this question of how to charge the burden of    |
| 09:12:05 | 2  | proof have ended up being contradictory.  I think       |
| 09:12:10 | 3  | incredibly confusing to the jury.  And not the least of |
| 09:12:14 | 4  | which is if we followed *Mario*, as has we had been     |
| 09:12:19 | 5  | talking, you end up charging the jury first about the   |
| 09:12:22 | 6  | burden on Cigna to prove something, i.e., not medically |
| 09:12:26 | 7  | necessary to show an exclusion when the jury has yet to |
| 09:12:31 | 8  | decide there is coverage.  Right?  We haven't had the   |
| 09:12:36 | 9  | jury charged and told to consider first is there        |
| 09:12:41 | 10 | coverage.  Have you proven medical necessity.  So you are |
| 09:12:45 | 11 | proving an exclusion to something that hasn't yet been  |
| 09:12:50 | 12 | shown to exist.                                         |
| 09:12:51 | 13 |         So, instead, for the reasons as I have hopefully |
| 09:12:56 | 14 | explained, I'm going to revert to the usual rule and,   |
| 09:12:59 | 15 | that is, the plaintiff has the burden to show coverage on |
| 09:13:03 | 16 | its claim.  To the extent the contract is ambiguous about |
| 09:13:06 | 17 | who has the burden of proof and when, I must assign the |
| 09:13:11 | 18 | burden of proof to the plaintiff as I would say in any  |
| 09:13:14 | 19 | civil case.  Certainly, any insurance case.             |
| 09:13:26 | 20 |         To me, the language in the policies help make   |
| 09:13:32 | 21 | this clearer than it's been.  Let me put it that way.   |
| 09:13:34 | 22 | I'm not sure I'm crystal clear.  Let me cite to ECF     |
| 09:13:39 | 23 | 244-1.  That's one of the individual policies here.  On |
| 09:13:44 | 24 | page 5 it says, "The benefits of this policy provided   |
| 09:13:49 | 25 | only for those services that are medically necessary."  |

| 09:13:53 | 1 | On page 38, in the exclusion section, it exempts |
|---|---|---|
| 09:13:59 | 2 | "services that are not medically necessary." |
| 09:14:03 | 3 | Again, I don't know if I have the right word, |
| 09:14:06 | 4 | but I view that as a tautology.  The second phrase is a |
| 09:14:11 | 5 | double negative of the first.  X is a necessary condition |
| 09:14:14 | 6 | for coverage equals not x is not covered.  What do we do |
| 09:14:19 | 7 | with double negatives?  We drop them.  And so we're left |
| 09:14:23 | 8 | with x is covered.  So it's an equation in my term. |
| 09:14:28 | 9 | Florida law deals with exclusions through a |
| 09:14:32 | 10 | burden shifting scheme that only makes sense if |
| 09:14:34 | 11 | exclusions are carved out.  Burden shifting plaintiff |
| 09:14:39 | 12 | insured proves coverage.  Then the defendant gets to go |
| 09:14:42 | 13 | and present evidence on exclusions.  But Florida law |
| 09:14:46 | 14 | deals with it in a way that only makes sense if the |
| 09:14:50 | 15 | exclusion in the policy is a carve out of part of the |
| 09:14:53 | 16 | coverage.  A subset.  Not the entire scope of coverage |
| 09:14:58 | 17 | which I believe this is.  It's a case *Singer v Colony* |
| 09:15:03 | 18 | *Insurance Co.,* 147 F.Supp 3d 1369, 1375 (S.D. Fla. 2015). |
| 09:15:16 | 19 | "Under Florida law, if there is a dispute over coverage |
| 09:15:21 | 20 | and exclusions, the Court employs a burden shifting |
| 09:15:25 | 21 | framework.  If parties seeking to recover on an insurance |
| 09:15:28 | 22 | policy has the burden of proving a loss from causes |
| 09:15:31 | 23 | within the terms of the policy.  And if such proof of |
| 09:15:35 | 24 | loss is made, within the contract of insurance the burden |
| 09:15:37 | 25 | is then on the insurer to establish that the loss arose |

09:15:41  1    from a cause that is excepted from the policy.  If the

09:15:45  2    insurer is able to establish that an exception applies,

09:15:49  3    the burden shifts to the insured to prove an exception to

09:15:52  4    the exception." That's not our case, the third step.

09:15:57  5         Under that *Singer* opinion in Florida, the

09:16:00  6    burden -- the plaintiff has the initial burden of proving

09:16:05  7    coverage.  If they carry that burden, the defendant has

09:16:08  8    the burden of proving that loss "arose from a cause that

09:16:12  9    is excepted from the policy." That is when the plaintiff

09:16:15  10   has already proven a services covered the defendant must

09:16:19  11   prove it fits within the exclusion.  This only makes

09:16:22  12   sense if the exclusion is a subset or carve out that can

09:16:26  13   otherwise be proven to fit within the larger bucket of

09:16:33  14   coverage.  Again, think Venn Diagram.  A subset within a

09:16:37  15   subset where the burden -- I'm sorry.  If coverage equals

09:16:44  16   not coverage and as *Singer* assumes the Labs carried the

09:16:46  17   burden of proof on medical necessity, Cigna cannot prove

09:16:52  18   that there is not medical necessity.

09:16:55  19        Obviously, if the Labs fail to prove by a

09:16:58  20   preponderance that it's covered, there's no point in

09:17:01  21   Cigna proving carrying its burden of proof on the

09:17:05  22   exemption.

09:17:06  23        Because I determined that the not medical

09:17:10  24   necessity language is not a true exclusion to the

09:17:13  25   coverage in our policies, I will treat it as such.

09:17:31  1      In effect, if the jury finds the plaintiff has

09:17:34  2  carried their burden of proof on coverage, how could the

09:17:36  3  jury reach the latter question of exclusion?  It's an

09:17:39  4  empty exercise.  If the jury's already decided by a

09:17:42  5  preponderance that the plaintiffs proved medical

09:17:44  6  necessity, the jury could not find by a preponderance

09:17:46  7  that the defendant has proved not medically necessary.

09:17:50  8  And the same in reverse were I to charge the exclusion

09:17:55  9  first, which I won't.

09:17:56  10      Thus, the charge is going to be outlined and

09:18:00  11  written such that the plaintiff insured has the burden to

09:18:04  12  show coverage.  Here I recognize the plaintiffs are not

09:18:07  13  the insured, but I'm speaking summarily just to get

09:18:08  14  through this.  Nevertheless, as plaintiffs, they are

09:18:13  15  trying to show that their services were covered under

09:18:17  16  policies with insureds of Cigna or in policies

09:18:23  17  administered if the insured's under Cigna.

09:18:25  18      As a result, the burden of proof is on them to

09:18:28  19  show that services were medically necessary and, thus,

09:18:30  20  covered.

09:18:32  21      There's several other bases for this decision

09:18:36  22  under Florida law.  Florida law, in a classic statement

09:18:40  23  of burden of proof on insurers exclusion says the

09:18:44  24  following: "When an insurer relies on an exclusion to

09:18:48  25  deny coverage, it has the burden of demonstrating that

09:18:51  1   the allegations of the complaint are cast solely and

09:18:55  2   entirely within the policy exclusion and are subject to

09:18:58  3   no other interpretation.  *Cincinnati Insurance Co. v*

09:19:05  4   *Quorum Management Company,* 186 F.Supp.3d, 1307, 1316

09:19:13  5   (M.D. Fla 2016).  See also  *Acosta, Inc. v National Union*

09:19:21  6   *Fire Insurance Company, 39 So.3d 565,* 574 (Fla. Dist. Ct.

09:19:32  7   App. 2010).

09:19:33  8           The key word in the initial quote I just read is

09:19:44  9   rely.  Here, while medical necessity language is present

09:19:47  10  in the exclusion section, Cigna does not rely on the

09:19:52  11  exclusion.  Because, practically speaking, it is a

09:19:59  12  condition of coverage.  That that very same phrase must

09:20:03  13  be satisfied in order to be covered in the first

09:20:05  14  instance.  Thus, for Cigna, there's no need to rely on

09:20:11  15  the exclusion or reach the issue of the exclusion at all.

09:20:14  16          Secondly, in certain circumstances there's

09:20:18  17  precedent under Florida law for resolving ambiguities in

09:20:25  18  insurance contracts by ignoring exclusions.  While not

09:20:28  19  directly on point, the case of *Travelers Property*

09:20:31  20  *Casualty Co. of America v. H.E. Sutton Forwarding*

09:20:35  21  *Company, LLC*, 688 F.Supp.3d 1138, 1147, (M.D. Fla. 2023),

09:20:47  22  the Court wrote:  If the policy is found to be illusory

09:20:52  23  or ambiguous it is resolved by ignoring the exclusion

09:20:56  24  (internal quotation marks omitted.)

09:20:59  25          Granted, this is most often done when the

09:21:02 1    coverage is viewed as illusory.  I actually view this

09:21:08 2    exclusion as illusory.  The coverage is illusory because

09:21:13 3    the exclusion takes all the coverage away.  And by

09:21:17 4    exclusory these cases speak in terms of when a policy is

09:21:22 5    ambiguous because a policy covers something that has a

09:21:27 6    coverage exclusion for the same thing.

09:21:29 7         Here we have a slightly different situation.

09:21:32 8    Here the policy is ambiguous as to the burden of proof

09:21:37 9    because the exclusion just restates a necessary condition

09:21:39 10   of coverage, albeit in the negative.  Well, exclusions

09:21:44 11   are negatives.

09:21:47 12        I will resolve the ambiguity of the illusionary

09:21:53 13   aspect of these policies between coverage and exclusion

09:21:56 14   sections by, in effect, ignoring the exclusion.  It

09:22:05 15   doesn't mean I won't charge about if something isn't

09:22:05 16   medically necessary, or that Cigna argues that it isn't

09:22:11 17   medically necessary.  But in my view it comes down to the

09:22:14 18   default rule of insurance law.  The plaintiff proves its

09:22:17 19   case.  And a fundamental element of any plaintiff's case

09:22:21 20   in insurance is coverage.

09:22:26 21        That completes the painful reading of my

09:22:31 22   thoughts as to what I intend to do in the charge.

09:22:35 23   Obviously, we can discuss it during the charge.  I don't

09:22:40 24   know if either side -- we do have maybe two minutes for

09:22:44 25   each side to tell me so I might know whether I need to

| | | |
|---|---|---|
| 09:22:48 | 1 | wear body armor going into the charge on this section |
| 09:22:54 | 2 | which I think will be tomorrow afternoon.  I hope to get |
| 09:22:58 | 3 | this section to you by when we finish in court. |
| 09:23:02 | 4 | But I don't know if anybody wishes to be heard. |
| 09:23:06 | 5 | I guess I should start with Cigna.  Although I know the |
| 09:23:10 | 6 | Labs have been saying they thought *Mario* was the right |
| 09:23:14 | 7 | thing to argue.  So you both may think that I have -- am |
| 09:23:20 | 8 | suffering from lack of intellectual ability.  But I can |
| 09:23:24 | 9 | tell you, I lost a lot of brain cells trying to make this |
| 09:23:29 | 10 | case be chargeable under a *Mario*-type approach or under |
| 09:23:34 | 11 | recognizing it's an exception, the not medically |
| 09:23:36 | 12 | necessary.  And it just doesn't work. |
| 09:23:41 | 13 | Admittedly, there's very little case law out |
| 09:23:43 | 14 | there.  But I think, admittedly, insurance companies |
| 09:23:47 | 15 | don't usually write exclusions to be equal to coverage. |
| 09:23:51 | 16 | And that's why I don't find much.  That's why I'm taking |
| 09:23:53 | 17 | a step off the end of a dock into deep water and I will |
| 09:23:58 | 18 | do the best I can. |
| 09:23:59 | 19 | If anybody wants to respond or a few words, you |
| 09:24:03 | 20 | just want to say, no, we're going to think about it and |
| 09:24:05 | 21 | see what you actually write, that's perfectly fine. |
| 09:24:10 | 22 | MR. GESTRICH:  We would just like to have our |
| 09:24:14 | 23 | objection noted for the record. |
| 09:24:16 | 24 | THE COURT:  Okay.  You'll tell me what that is |
| 09:24:18 | 25 | when we have the charge conference.  So that's fine. |

| | | |
|---|---|---|
| 09:24:20 | 1 | MR. GESTRICH:  Yes, Your Honor. |
| 09:24:20 | 2 | THE COURT:  And I would ask if you do object, I |
| 09:24:25 | 3 | would ask that you come to the charge conference with a |
| 09:24:28 | 4 | charge that actually explains coverage versus exclusion. |
| 09:24:32 | 5 | No offense, but I don't think your request to charge |
| 09:24:35 | 6 | comes anywhere close.  It's like half a page long.  We |
| 09:24:39 | 7 | have three Labs, you have to explain about that.  I don't |
| 09:24:45 | 8 | understand how your charge would successfully address the |
| 09:24:51 | 9 | issues in the case under what I understand to be the law. |
| 09:24:54 | 10 | So if you want to come or give to me tomorrow |
| 09:24:57 | 11 | before the charge conference or come to the charge |
| 09:24:58 | 12 | conference with it, the Court would greatly appreciate |
| 09:25:02 | 13 | it. |
| 09:25:02 | 14 | Attorney Kang. |
| 09:25:02 | 15 | MR. KANG:  Your Honor, we have no objection to |
| 09:25:04 | 16 | Your Honor's proposal.  We greatly appreciate all of the |
| 09:25:08 | 17 | time that you put into this issue.  We know it was a |
| 09:25:11 | 18 | difficult one. |
| 09:25:11 | 19 | THE COURT:  Okay.  I think I was supposed to |
| 09:25:19 | 20 | tell time to somebody in particular that I was fussy on, |
| 09:25:21 | 21 | fidgety on. |
| 09:25:22 | 22 | I think what we've settled on is that the |
| 09:25:24 | 23 | Labs have used 5 hours and 3 minutes, and that Cigna has |
| 09:25:28 | 24 | used 2 hours and 44 minutes by the end of day two.  If |
| 09:25:35 | 25 | somebody thinks we're way off, now is not the time, but |

| | | |
|---|---|---|
| 09:25:38 | 1 | it should be brought to my attention so we can go back |
| 09:25:42 | 2 | and see where the difference is.  I was off by a half an |
| 09:25:46 | 3 | hour on one of you yesterday afternoon, but I figured out |
| 09:25:50 | 4 | where I made a mistake.  I counted something twice. |
| 09:25:53 | 5 | That's where you are.  I think we're on |
| 09:25:56 | 6 | examination of Mr. Norton. |
| 09:25:59 | 7 | MR. CUNNINGHAM:  That's correct, Your Honor. |
| 09:26:00 | 8 | Would you like a forecast for the day? |
| 09:26:04 | 9 | THE COURT:  Yes, please. |
| 09:26:04 | 10 | MR. CUNNINGHAM:  Your Honor, the plan is to |
| 09:26:06 | 11 | finish Mr. Norton.  Then to present the live testimony of |
| 09:26:10 | 12 | Mr. Seamus Lagan.  Then I think that will probably take |
| 09:26:13 | 13 | us through lunch, but if it doesn't we want to present |
| 09:26:16 | 14 | the testimony live of Mr. Nicoll, the Medical Director. |
| 09:26:20 | 15 | And then if we have any time at the end of the day, we'll |
| 09:26:24 | 16 | play the deposition of Dr. Nemecek. |
| 09:26:28 | 17 | THE COURT:  Okay.  That's fine. |
| 09:26:31 | 18 | Any estimate on the remaining direct on your |
| 09:26:34 | 19 | case as to Mr. Norton? |
| 09:26:36 | 20 | MR. CUNNINGHAM:  Your Honor, it depends on how |
| 09:26:38 | 21 | the questions are answered. |
| 09:26:40 | 22 | THE COURT:  That's fine. |
| 09:26:42 | 23 | MR. CUNNINGHAM:  I would say assuming questions |
| 09:26:44 | 24 | are answered, between 30 and 45 minutes. |
| 09:26:47 | 25 | THE COURT:  I'm having trouble with my contact |

| | | |
|---|---|---|
| 09:26:50 | 1 | lenses so I don't see faces at a distance.  Is Mr. Norton |
| 09:26:55 | 2 | here?  I didn't think it was Mr. Norton. |
| 09:26:59 | 3 | MR. KANG:  No, we'll go get him. |
| 09:27:00 | 4 | THE COURT:  We need him in the chair.  And what |
| 09:27:06 | 5 | was the other thing?  Oh, I am going to give a brief |
| 09:27:08 | 6 | charge on the fee forgiveness, reminding them it has |
| 09:27:12 | 7 | nothing to do with the Labs case, which we're in the |
| 09:27:14 | 8 | middle of presenting the Labs case.  Although from time |
| 09:27:17 | 9 | to time we may turn to evidence about the Cigna case, but |
| 09:27:21 | 10 | it has nothing to do with the Labs case and it should be |
| 09:27:26 | 11 | disregarded.  And not to be applied or involved in any |
| 09:27:29 | 12 | way of your consideration of the Labs case.  That's about |
| 09:27:33 | 13 | it. |
| 09:27:33 | 14 | MR. CUNNINGHAM:  Thank you, Your Honor. |
| 09:27:34 | 15 | Your Honor, I think we have three minutes to |
| 09:27:37 | 16 | 9:30.  May I take a comfort break? |
| 09:27:40 | 17 | THE COURT:  You may. |
| 09:27:43 | 18 | Now I lost Attorney Radshaw.  Do we have |
| 09:31:05 | 19 | counsel?  We need to start. |
| 09:31:07 | 20 | MR. CUNNINGHAM:  We do. |
| 09:31:09 | 21 | THE COURT:  Go ahead, Liana. |
| 09:31:11 | 22 | (In the presence of the jury at 9:31 a.m.) |
| 09:31:33 | 23 | THE COURT:  Everybody be seated. |
| 09:31:38 | 24 | Welcome back, ladies and gentlemen of the jury. |
| 09:31:41 | 25 | Thank you for being so prompt.  You are doing very well. |

09:31:45  1    I'm doing okay.  Not perfect.

09:31:46  2          Before we begin, I want to remind you of an

09:31:56  3    instruction that I gave you I think yesterday or could

09:32:00  4    have been Friday.  If you remember, I told you that the

09:32:04  5    concept of fee forgiveness is not relevant in any way to

09:32:11  6    the Labs' case against Cigna.  Has no bearing whatsoever.

09:32:17  7    When you go to deliberate, you won't say that phrase or

09:32:20  8    think about it.  Okay.  However, it is relevant in

09:32:25  9    Cigna's case against the Labs.  And so this is one of the

09:32:28  10   situations where you try two cases at once and I say,

09:32:32  11   well, the evidence applies to both cases.

09:32:34  12         This one, think of there being a wall between

09:32:38  13   the two cases on that fee forgiveness.  And anything you

09:32:41  14   heard about fee forgiveness, you don't bring over to the

09:32:44  15   Labs' case.

09:32:44  16         Now yesterday the witness, and I'm not being

09:32:48  17   critical of you, Mr. Norton, but in response to a

09:32:51  18   question about the investigation at Cigna, that SIU

09:32:58  19   Group, at some point the issue of fee forgiveness came

09:33:00  20   up.  And I said it was strickened.  I told you not to

09:33:05  21   consider it.  That's because of what I have just said

09:33:08  22   about how it has no involvement.

09:33:11  23         There may be other times a witness mentions it.

09:33:14  24   Because the witnesses are just answering.  They don't

09:33:17  25   know what the rules of law that I'm setting up for the

09:33:20    1    purposes of this case.

09:33:21    2         So just to reiterate.  Fee forgiveness has no

09:33:25    3    relevance to the Labs' case which is what we're on.  This

09:33:28    4    is the Labs' lawyer asking questions about his case.

09:33:32    5    However, during the course of Mr. Norton's examination,

09:33:36    6    we'll have cross-examination from Attorney Kang about the

09:33:41    7    things he's talked about, Mr. Norton, with regard to the

09:33:45    8    Labs case.  However, if you remember, with Ms. Canto, at

09:33:49    9    some point Attorney Kang will shift and say, Judge, I'm

09:33:54    10   turning to Cigna's case.  In that context you may hear

09:33:57    11   the phrase fee forgiveness.  Just remember, it's like

09:34:01    12   buckets.  Okay.  Generally speaking, all the evidence in

09:34:04    13   the case for both cases go in both buckets.  But on the

09:34:11    14   Labs' bucket, never put anything about fee forgiveness in

09:34:16    15   that bucket.  It only goes in Cigna's bucket.

09:34:19    16        Thank you very much.  Any concern about that?

09:34:21    17   No.  Thanks very much.

09:34:23    18        We're ready to condition with the direct exam of

09:34:27    19   Mr. Norton who has come back this morning.

09:34:29    20        If you remember, Mr. Norton, you took an oath

09:34:32    21   yesterday to tell the truth.  I say this to every witness

09:34:36    22   who is held overnight or the weekend.  That oath

09:34:39    23   continues to bind your testimony in this trial.

09:34:41    24        Do you understand that?

09:34:42    25        THE WITNESS:  Yes.

```
09:34:42   1          THE COURT: Thank you very much.
09:34:42   2               MATTHEW NORTON,.
09:34:42   3     returned to the stand to testify further upon his
09:34:42   4           oath as follows:
09:34:42   5          THE COURT:  Go ahead.
09:34:42   6          MR. CUNNINGHAM:  Thank you, Your Honor.  May it
09:34:42   7   please the Court.  Yes.
09:34:42   8   CONTINUED DIRECT EXAMINATION BY MR. CUNNINGHAM.
09:34:42   9     Q.   Good morning, Mr. Norton.  I want to pick up
09:34:42  10   where we left off.  We were talking about the appeal
09:34:42  11   process for a health care provider who has been flagged
09:34:42  12   by the SIU.  Sir, who is Chris Arnold?
09:34:42  13     A.   Chris Arnold is an operations manager.  He
09:34:42  14   manages the appeals area.
09:34:42  15     Q.   That's what I wanted to ask you.  He's an
09:34:42  16   executive for Cigna who runs the appeal process for the
09:34:42  17   SIU?
09:34:42  18     A.   He's a manager, yes.
09:34:42  19     Q.   If the SIU flags a health care provider and
09:34:42  20   stops paying their claims for good, theoretically the
09:34:42  21   health care provider can appeal within the SIU, correct?
09:34:42  22     A.   They don't appeal within the SIU, but they do
09:34:42  23   appeal.  They have the right to appeal.
09:34:42  24     Q.   It's totally up to Cigna to decide if that
09:34:42  25   appeal is going to be granted or denied, correct?
```

09:34:42  1    A.    It's based on a plan and what's appropriate,

09:34:42  2  but, yes.  Cigna has control as to whether the claim will

09:34:42  3  be approved or not approved.

09:34:42  4    Q.    The appeal is handled in-house by Cigna?

09:34:42  5    A.    Correct.

09:34:42  6    Q.    There's not an outside body, an outside

09:34:42  7  insurance company, an outside group that decides those

09:34:42  8  appeals?

09:34:42  9    A.    Well, I'm not sure I can give you a completely

09:34:42  10  informed answer because I know there are occasions when

09:34:42  11  outside counsel believe clinical expertise can be

09:34:42  12  applied, so I'm not positive I can answer that correctly.

09:34:42  13    Q.    Now, sir, in this case, the appeal by PB Labs,

09:34:42  14  went directly to Stephanie Canto, the person who denied

09:34:42  15  the payment to PB Labs in the first place, right?

09:34:42  16    A.    I take your word for it.

09:34:42  17    Q.    You reviewed a series of documents before you

09:34:42  18  testified, did you not?

09:34:42  19    A.    I don't remember reading about PB Labs' appeals.

09:34:42  20    Q.    Sir, wasn't that standard operating procedure

09:34:42  21  that if Ms. Canto was the one that denied payment, if the

09:34:42  22  health care provider appealed, that first level appeal

09:34:42  23  would go right back to Ms. Canto?

09:34:42  24    A.    The appeal would be reviewed by the investigator

09:34:42  25  who had the expertise and history on the case.

09:34:42  1      Q.   And in this case, it would have been Ms. Canto

09:34:42  2   who denied the payment in the first place?

09:34:42  3      A.   The person who set up to hold payments, yes.

09:34:42  4      Q.   So essentially, Palm Beach Labs had to appeal to

09:34:42  5   Ms. Canto who was the very person who decided to stop

09:34:42  6   paying Palm Beach Labs in the first place?

09:34:42  7      A.   She would have been part of that decision.

09:34:42  8      Q.   Would you agree, sir, that that makes the SIU

09:34:42  9   and Cigna in effect the judge, the jury and the

09:34:42  10  executioner?

09:34:42  11          MR. KANG:  Objection, Your Honor, relevance.

09:34:42  12          THE COURT:  Overruled.

09:34:42  13     A.   The question is if Cigna is the judge, the jury,

09:34:42  14  the executioner?

09:34:42  15     Q.   The question is simply, Cigna decides to deny a

09:34:42  16  payment to a health care provider and that health care

09:34:42  17  provider appeals that decision by the Cigna SIU.  That

09:34:42  18  appeal goes back to the very person that decided to deny

09:34:42  19  that payment, isn't that true?

09:34:42  20     A.   Cigna's decision is based on the information

09:34:42  21  provided from the provider.

09:34:42  22     Q.   Not my question, sir.  I asked about which

09:34:42  23  person it goes to, not the basis for the decision?

09:34:42  24     A.   Yes, it goes back to the person who has the

09:34:42  25  expertise.

09:34:42  1      Q.    And, sir, if the health care provider disagrees

09:34:42  2   with the appeal process, then the remedy for the health

09:34:42  3   care provider is to file a lawsuit, right?

09:34:42  4      A.    Typically we do settlement agreements.  So we

09:34:42  5   sign multiple settlement agreements each week.  That's

09:34:42  6   the typical solution.

09:34:42  7      Q.    Certainly there's no settlement agreement in

09:34:42  8   this case was there?

09:34:42  9      A.    No.

09:34:42  10     Q.    Sir, have you heard of the Core Action Team at

09:34:42  11  Cigna?

09:34:42  12     A.    Yes.  I know what you are referring to.

09:34:42  13     Q.    What is the Core Action Team?

09:34:42  14     A.    There was a steep ramp in substance use disorder

09:34:42  15  expenses in early 2015.  It was particularly intense on

09:34:42  16  the IFP product and particularly intense within that

09:34:42  17  product in the Florida market, so we saw steady spend

09:34:42  18  levels in 2014 and a quick ramp of expenses driven by lab

09:34:42  19  fees and substance use disorder facilities.  So based on

09:34:42  20  this quick ramp in spend that was outside any norms we

09:34:42  21  had historically, a group of people were brought together

09:34:42  22  to address that ramp and address what happened to be

09:34:42  23  fraud.

09:34:42  24     Q.    So if I understand your testimony correctly,

09:34:42  25  sir, Cigna recognized there was a problem with the IFP,

09:34:42  1   Individual Family Plan policies, specifically with regard

09:34:42  2   to substance abuse testing and treatment and particularly

09:34:42  3   in the state of Florida.  Is that true?

09:34:42  4       A.   Yes,  Quick ramp in costs.

09:34:42  5       Q.   Thank you.  And the decision was made by Cigna

09:34:42  6   to put together what was called a Core Action Team to try

09:34:42  7   to address the problem, correct?

09:34:42  8       A.   Yes.  I'm not sure that's the name, but that's

09:34:42  9   certainly the idea.

09:34:42  10      Q.   The Core Action Team, you are not sure if that's

09:34:42  11  the name?

09:34:42  12      A.   Yeah.

09:34:42  13      Q.   Was it Mr. Evanko, Brian Evanko, who put that

09:34:42  14  team together?

09:34:42  15      A.   No.

09:34:42  16      Q.   Who put the team together, sir?

09:34:42  17      A.   I believe Eva Borden was the head of pulling

09:34:42  18  that together.  Eva was the risk officer for the IFP

09:34:42  19  business.

09:34:42  20      Q.   Thank you and Ms. Borden will be testifying here

09:34:42  21  by deposition.  You said a risk officer.  Is that like a

09:34:42  22  risk manager?

09:34:42  23      A.   I'm not sure I can say give an excellent

09:34:42  24  description.  I think of it probably as a link to the

09:34:42  25  compliance organization.  So.

09:34:42   1      Q.   Was it her job to look at the data that was

09:34:42   2  coming in on claims and try to identify problems or

09:34:42   3  potential problems before they became big problems?

09:34:42   4      A.   Honestly, I can't give you an exact answer as to

09:34:42   5  the scope of her role.

09:34:42   6      Q.   Now, sir, yesterday you said that the cost

09:34:42   7  problem for substance abuse treatment in Florida was an

09:34:42   8  "outlier," was the word you used.  Do you remember that?

09:34:42   9      A.   Yes.

09:34:42  10      Q.   So was it your testimony that it was more or the

09:34:42  11  expenses were higher in Florida than in a number of other

09:34:42  12  states?

09:34:42  13      A.   Yes, that not the bigger issue though.  The

09:34:42  14  bigger issue is that it was higher in general within the

09:34:42  15  IFP product and Florida was more intense beyond that.

09:34:42  16      Q.   Sir, isn't it true that part of the reason for

09:34:42  17  that is because Florida is the fourth most populated

09:34:42  18  state in the country?

09:34:42  19      A.   I'm sorry, the fourth most "populated," did you

09:34:42  20  say?

09:34:42  21      Q.   Yes, sir.

09:34:42  22      A.   Yes, we have about a million customers in

09:34:42  23  Florida.  Some portion of those were IFP, but it would

09:34:42  24  have been a very small portion at the time.

09:34:42  25      Q.   Okay, sir, and another reason that Florida was

09:34:42  1    an outlier, to use your words, Cigna chose to sell those

09:34:42  2    Individual Family Plans in Florida, right?

09:34:42  3        A.   It couldn't have happened if we didn't sell

09:34:42  4    those plans.

09:34:42  5        Q.   So that would be a yes?

09:34:42  6        A.   Yes.

09:34:42  7        Q.   Sir, this is what I'm talking about when I ask

09:34:42  8    you a question that calls for a yes or no answer.  I

09:34:42  9    would appreciate it if you would try to do that.  It will

09:34:42  10   save all of us a lot of time, okay?

09:34:42  11       A.   Yes.

09:34:42  12       Q.   Thank you.  Nobody forced Cigna to sell those

09:34:42  13   Individual Family Plans in Florida, did they?

09:34:42  14       A.   I'm sure they did not.

09:34:42  15       Q.   That was a conscious choice by Cigna to sell

09:34:42  16   those plans in Florida, right?

09:34:42  17            MR. KANG:  Objection, Your Honor, to form.

09:34:42  18            THE COURT:  Overruled.

09:34:42  19       A.   Yes.  Conscious choice.

09:34:42  20   BY MR. CUNNINGHAM:

09:34:42  21       Q.   Thank you.  And that choice was made because

09:34:42  22   Cigna thought selling those Individual Family Plans in

09:34:42  23   Florida would be profitable, right?

09:34:42  24       A.   I can't speak to the motivations, but I would

09:34:42  25   assume that makes sense.

09:34:42  1      Q.    Cigna is a for profit company, is it not?

09:34:42  2      A.    Right.

09:34:42  3      Q.    You have heard of not for profit corporations,

09:34:42  4  right?

09:34:42  5      A.    Sure.

09:34:42  6      Q.    Cigna is certainly is a for profit corporation,

09:34:42  7  isn't it?

09:34:42  8      A.    Yes.

09:34:42  9      Q.    In fact, Cigna is a Fortune 500 corporation,

09:34:42  10  isn't it?

09:34:42  11      A.    Yes.

09:34:42  12      Q.    Now, sir, you would agree with me, would you

09:34:42  13  not, that lab reports and lab testing were covered

09:34:42  14  services under these Individual Family Plans in Florida?

09:34:42  15      A.    Yes.

09:34:42  16      Q.    And again that was a decision that Cigna made,

09:34:42  17  correct?

09:34:42  18      A.    Yes.

09:34:42  19      Q.    Now I think you just said a moment ago that the

09:34:42  20  problem of these costs that were related to substance

09:34:42  21  abuse treatment in Florida was first identified by Cigna

09:34:42  22  in 2014?

09:34:42  23      A.    2014 the expenses were quite flat through the

09:34:42  24  year and then the very beginning of 2015, the world

09:34:42  25  flipped on its head and went dramatically up.

09:34:42  1    Q.   That was a problem for Cigna, right?

09:34:42  2    A.   Sure.  It indicated fraud.

09:34:42  3         MR. CUNNINGHAM:  Your Honor.

09:34:42  4         THE COURT:  I'm waiting for you to ask me to

09:34:42  5    instruct him.  I don't think there's anything in the

09:34:42  6    question that asked you what was the cause, what did you

09:34:42  7    understand the number increase to mean.  He didn't ask

09:34:42  8    you that so the jury should disregard the answer.  And

09:34:42  9    the question was "That was a problem for Cigna, right?"

09:34:42  10   When a lawyer phrases a question that's one of those yes

09:34:42  11   or no or I can't answer.  And I would think -- I will

09:34:42  12   tell you not what I expected your answer to be -- but it

09:34:42  13   wasn't what the answer you gave because it wasn't a yes

09:34:42  14   or no.  The question is "That was a problem for Cigna,

09:34:42  15   right?"  The problem being expenses dramatically going up

09:34:42  16   which was the last answer you gave.  Counsel picking up

09:34:42  17   on that answer, "That was a problem for Cigna, right?"

09:34:42  18   So you have to answer that question, sir.

09:34:42  19   A.   Yes.

09:34:42  20   BY MR. CUNNINGHAM

09:34:42  21   Q.   Sir, are you aware that Mr. Kang gets to ask you

09:34:42  22   questions after I finish?

09:34:42  23   A.   Yes.

09:34:42  24   Q.   I would say I would appreciate if I ask you a

09:34:42  25   question that calls for a yes or no answer --

```
09:34:42   1              THE COURT:  Just move along.  I will take over
09:34:42   2    instructions at this point.  Okay, sir?
09:34:42   3              MR. CUNNINGHAM:  Thank you, Your Honor.
09:34:42   4    BY MR. CUNNINGHAM:
09:34:42   5        Q.   Sir, the reason that cost going up is a problem
09:34:42   6    is because increasing costs.  If all other things are
09:34:42   7    equal, decreases profit, right?
09:34:42   8        A.   Yes.
09:34:42   9        Q.   And Cigna is a for profit corporation?
09:34:42  10        A.   Yes.
09:34:42  11        Q.   I want to talk about what the SIU did with Labs
09:34:42  12    including PBL back in September of 2013.
09:34:42  13              Can we please go to Labs Exhibit 6552.
09:34:42  14              Sir, do you see that document in front of you?
09:34:42  15        A.   Yes, I do.
09:34:42  16        Q.   So let's start at a bottom, sir.  Would this
09:34:42  17    have been one of the documents you reviewed in
09:34:42  18    preparation for your trial testimony?
09:34:42  19        A.   I'm not sure it is actually.
09:34:42  20        Q.   Well, the top header, the very top of the page,
09:34:42  21    indicates that that particular email is an email from
09:34:42  22    Thomas Hixson to you, correct?
09:34:42  23        A.   Yes.
09:34:42  24        Q.   And you were Thomas Hixson's direct supervisor,
09:34:42  25    were you not?
```

09:34:42  1      A.   I'm not saying I haven't read it.  I don't

09:34:42  2  remember reviewing it specifically in preparation for

09:34:42  3  today.

09:34:42  4      Q.   Let's go ahead and work through it.

09:34:42  5           Can say we start at the bottom place, Mr. Smeig.

09:34:42  6           All right, sir, the bottom email dated September

09:34:42  7  26, 2013, is an email from Stephanie Canto to Deanna

09:34:42  8  Anderson, correct?

09:34:42  9      A.   Yes.

09:34:42  10      Q.   As you said yesterday, Deanna Anderson was

09:34:42  11  Stephanie Canto's direct supervisor?

09:34:42  12      A.   Yes.

09:34:42  13      Q.   What is this, in this email is Ms. Canto telling

09:34:42  14  Deanna Anderson she's now placed a prepay edit on Palm

09:34:42  15  Beach Labs?

09:34:42  16      A.   Yes, she would be directing Palm Beach Labs to

09:34:42  17  be part of an existing prepay edit.

09:34:42  18      Q.   And what is that prepay edit, 1533, if you know?

09:34:42  19      A.   Well, this is due to customer cost share.

09:34:42  20      Q.   Okay.  Let me ask you this, sir.  Collectaway

09:34:42  21  Labs is another name for PB Labs, right?

09:34:42  22      A.   That's my understanding.

09:34:42  23           THE COURT:  I think he's hesitating because he

09:34:42  24  doesn't wish to violate the instructions.

09:34:42  25           MR. CUNNINGHAM:  That's why I'm trying.

427

09:34:42  1          THE COURT:  Okay, you go ahead.  I just want to
09:34:42  2  make sure you understood it.
09:34:42  3          MR. CUNNINGHAM:  Yes, I did.  Thank you, Your
09:34:42  4  Honor.
09:34:42  5  BY MR. CUNNINGHAM:
09:34:42  6      Q.   What does this mean in parentheses "high L-pend
09:34:42  7  count"?
09:34:42  8      A.   Yesterday, we talked a little bit about claim
09:34:42  9  processing and the fact that each claim is pended in one
09:34:42  10  way or another.  An L-pend means it is with the SIU so
09:34:42  11  it's been routed to the SIU.
09:34:42  12      Q.   So when it says "high L-pend account" that means
09:34:42  13  a lot of claims have come in from this particular
09:34:42  14  provider, Palm Beach Labs and they were pending.  They
09:34:42  15  weren't being paid?
09:34:42  16      A.   Correct.
09:34:42  17      Q.   Let's go to the middle one please.  Mr. Smeig.
09:34:42  18          Do you see, sir, the middle email is an email
09:34:42  19  that is the same date from Deanna Anderson to Thomas
09:34:42  20  Hixson, Ms. Canto and Ms. Kennedy, correct?
09:34:42  21      A.   Yes.
09:34:42  22      Q.   And TIN as we discussed yesterday is Tax
09:34:42  23  Identification Number, correct?
09:34:42  24      A.   Yes.
09:34:42  25      Q.   You recognize that number there to be the Tax

09:34:42   1   Identification Number for PB Labs, correct?

09:34:42   2       A.   I -- it certainly, contextwise would be that,

09:34:42   3   yes.

09:34:42   4       Q.   This says they have over 900 L-pends, right?

09:34:42   5       A.   Yes.

09:34:42   6       Q.   That means over 900 claims have been submitted

09:34:42   7   by PB Labs that have not been paid because the SIU is

09:34:42   8   investigating them, right?

09:34:42   9       A.   Yes.

09:34:42   10      Q.   Does this say, "Stephanie, good job pulling this

09:34:42   11  together"?

09:34:42   12      A.   Yes.

09:34:42   13      Q.   Let's go on to the top, Mr. Smeig.

09:34:42   14           Now this top email.  On --

09:34:42   15           MR. CUNNINGHAM:  Your Honor, I don't believe

09:34:42   16  this exhibit has been --

09:34:42   17           THE COURT:  I was like wondering about that.  I

09:34:42   18  didn't get any objection.  I believe it's listed on the

09:34:42   19  chart as all objections that were withdrawn except

09:34:42   20  foundation as to authenticity and hearsay exception.  I

09:34:42   21  think I heard the foundational and authenticity ones may

09:34:42   22  have also been withdrawn.  Clearly there's a hearsay

09:34:42   23  objection left at a minimum.

09:34:42   24           Attorney Kang, tell me what we have.

09:34:42   25           MR. KANG:  I think if Mr. Cunningham can

09:34:42  1    establish that the witness is aware of this document then

09:34:42  2    we're fine with it being admitted.

09:34:42  3            THE COURT:  I think he probably has already.  He

09:34:42  4    was just struggling with had he read it last night or

09:34:42  5    knew it to be familiar to him.  Do you agree or think

09:34:42  6    more foundation is needed?

09:34:42  7            MR. KANG:  No, that's fine, Your Honor.

09:34:42  8            THE COURT:  6552 -- Lab's Exhibit 6552 is a full

09:34:42  9    exhibit.  You may proceed.

09:34:42  10           MR. CUNNINGHAM:  Thank you.  Will that now be

09:34:42  11   published to the jury?

09:34:42  12           THE COURT:  It should be.

09:34:42  13   BY MR. CUNNINGHAM

09:34:42  14       Q.   Sir, we're looking at the third and final email

09:34:42  15   on this document which has now been moved into evidence.

09:34:42  16   Does this appear to be an email from Thomas Hixson to you

09:34:42  17   on September 26, 2013?

09:34:42  18       A.   Yes.

09:34:42  19       Q.   And let me read it into the record and just

09:34:42  20   confirm that I read it correctly.  "This tax ID number

09:34:42  21   for a non-Florida case is ranked number two on the

09:34:42  22   L-pends inventory.  A good reaction from Deanna to get

09:34:42  23   Stephanie engaged and change the current direction of the

09:34:42  24   case from send letters to deny as services not rendered."

09:34:42  25   Did I read that accurately, sir?

09:34:42  1        A.    Yes.

09:34:42  2        Q.    Doesn't this mean that what Mr. Hixson is

09:34:42  3   saying, he's praising Deanna and Stephanie for changing

09:34:42  4   the direction of this treatment of Palm Beach Labs from

09:34:42  5   sending letters asking for medical records to just

09:34:42  6   denying payment as services not rendered?

09:34:42  7        A.    The change is based on the facts of the case at

09:34:42  8   the time.

09:34:42  9        Q.    Sir, that wasn't my question.

09:34:42  10        A.    Yes.

09:34:42  11        Q.    Let me ask it again.  Thank you, sir.

09:34:42  12             It says "a good reaction from Deanna to get

09:34:42  13   Stephanie engaged and change this current direction of a

09:34:42  14   case from sending letters to deny as services not

09:34:42  15   rendered," correct?

09:34:42  16        A.    Yes.

09:34:42  17        Q.    Okay.  So the original action by the SIU was

09:34:42  18   that Ms. Canto was sending letters to PB Labs to try to

09:34:42  19   get medical records to substantiate or document the

09:34:42  20   charges, right?

09:34:42  21             MR. KANG:  Objection, hearsay.

09:34:42  22             MR. CUNNINGHAM:  It's 803-3, Your Honor.  State

09:34:42  23   of mind, specifically motive, intent and plan.

09:34:42  24             THE COURT:  Limiting the use of the evidence by

09:34:42  25   the jury to state of mind of the people at Cigna who were

09:34:42  1    dealing with this, as to this original action versus the

09:34:42  2    change, it's admitted.  Objection Overruled.  You can

09:34:42  3    answer the question which was, So the original action by

09:34:42  4    the SIU was that Ms. Canto was sending letters to it,

09:34:42  5    that is PB Labs, to get medical records to discuss it and

09:34:42  6    to document the charges. Is that right?"

09:34:42  7        A.   Can we scroll down a little bit?  I want to make

09:34:42  8    sure they are asking medical records versus payment

09:34:42  9    documentation.  A little bit further.

09:34:42  10           THE COURT:  The prior page.

09:34:42  11           THE WITNESS:  Is there a prior page?

09:34:42  12           MR. CUNNINGHAM:  That's all we have on this

09:34:42  13   exhibit is one page.

09:34:42  14           Scroll back up.

09:34:42  15           Let me try to ask you another question.

09:34:42  16   BY MR. CUNNINGHAM:

09:34:42  17       Q.   Says, "change the current direction of the case

09:34:42  18   from send letters to deny as services not rendered."

09:34:42  19   Sir, there's a standard letter at Cigna called Letter 56

09:34:42  20   that would be sent when you wanted a health care provider

09:34:42  21   to provide medical records and documentation of services

09:34:42  22   that were billed, right?

09:34:42  23       A.   I don't know the number, but I agree we had a

09:34:42  24   letter like that.

09:34:42  25       Q.   Must be, that has to be what is being talked

| | | |
|---|---|---|
| 09:34:42 | 1 | about here, isn't it, sir? |
| 09:34:42 | 2 | A. Seems like a reasonable conclusion. |
| 09:34:42 | 3 | Q. So Mr. Hixson was saying this was a good |
| 09:34:42 | 4 | reaction from Deanna and Stephanie to stop sending those |
| 09:34:42 | 5 | letters and requesting medical records and just simply |
| 09:34:42 | 6 | deny all claims from PB Labs as services not rendered, |
| 09:34:42 | 7 | right? |
| 09:34:42 | 8 | A. Based on the facts of the case, yes. |
| 09:34:42 | 9 | Q. Sir, the fact of the matter is that sending the |
| 09:34:42 | 10 | letters and requesting the medical records and having a |
| 09:34:42 | 11 | medical director review those medical records takes a lot |
| 09:34:42 | 12 | of time, doesn't it? |
| 09:34:42 | 13 | A. You have to receive medical records to have that |
| 09:34:42 | 14 | problem. Typically in this case, we weren't receiving |
| 09:34:42 | 15 | the records. |
| 09:34:42 | 16 | THE COURT: That's another yes or no answer, sir |
| 09:34:42 | 17 | which your answer wasn't so I will strike it. If you can |
| 09:34:42 | 18 | answer it, yes, or no. |
| 09:34:42 | 19 | A. Yes. |
| 09:34:42 | 20 | BY MR. CUNNINGHAM: |
| 09:34:42 | 21 | Q. Takes a lot more time to send a letter to a |
| 09:34:42 | 22 | health care provider, wait for them to send records back |
| 09:34:42 | 23 | to you, have your medical director review all of those |
| 09:34:42 | 24 | records then make a determination. It takes a lot more |
| 09:34:42 | 25 | time to do that then simply say we'll place a flag on |

09:34:42  1   this health care provider and deny all payments as

09:34:42  2   services not rendered, true?

09:34:42  3        A.    True.

09:34:42  4        Q.    You were interested in doing whatever you could

09:34:42  5   to save time for Cigna and deny payment of these claims

09:34:42  6   as efficiently as possible, true?

09:34:42  7        A.    No, I disagree with that.

09:34:42  8        Q.    Now, sir, yesterday you testified to the jury

09:34:42  9   that you don't get involved at the claim level.  Do you

09:34:42  10  remember that testimony?

09:34:42  11       A.    At the case level, yes.

09:34:42  12       Q.    Certainly here you are getting an email from

09:34:42  13  Mr. Hixson which is still at the claim level, isn't it?

09:34:42  14       A.    I disagree with the characterization.  The

09:34:42  15  reason this came to me is because I monitor operations

09:34:42  16  overall.  And seeing 900 claims pended with the need to

09:34:42  17  adjudicate them.  My interest is in moving the claims

09:34:42  18  through this process so people actually get paid or get

09:34:42  19  resolved.

09:34:42  20       Q.    Sir, you were involved at the claim level by

09:34:42  21  virtue of receiving this email, were you not?

09:34:42  22       A.    No.

09:34:42  23       Q.    Instead of requesting medical records from PBL,

09:34:42  24  the decision of the SIU was to place a flag for services

09:34:42  25  rendered and stop paying claims from PBL, right?

434

09:34:42  1      A.    No.

09:34:42  2      Q.    That's not right?

09:34:42  3      A.    No.   The action would have been based on the

09:34:42  4  facts of the case at the time.   If the provider had sent

09:34:42  5  in the information requested in the first place, the

09:34:42  6  problem wouldn't be there.   We wouldn't need to deny.

09:34:42  7      Q.    All right, sir.   Let me ask you a little bit

09:34:42  8  more about the Core Action Team.   I want you to tell me

09:34:42  9  to the best of your recollection who were the people

09:34:42  10  involved in that Core Action Team?

09:34:42  11      A.    Eva Borden, of course, as I mentioned earlier,

09:34:42  12  was a key player in that.   Annetta Andros who works for

09:34:42  13  me is an analytics director, senior director, Glen

09:34:42  14  Gerhardt does analytics overall, a couple medical

09:34:42  15  doctors, maybe Doug Nemecek, Liz Jobe.

09:34:42  16      Q.    What about Brian Evanko?

09:34:42  17      A.    Brian attended.   I wouldn't consider him a

09:34:42  18  member of the team if you want to call it a team.   But he

09:34:42  19  did join several meetings.

09:34:42  20      Q.    Wasn't he the president of Cigna Health Care at

09:34:42  21  the time?

09:34:42  22      A.    Honestly, I'm not sure what his title would be.

09:34:42  23  It wouldn't be president of Cigna Health Care.   I believe

09:34:42  24  he was over government operations, so I know he had IFP

09:34:42  25  within his scope.

09:34:42  1    Q.   He was chief financial officer at Cigna Health

09:34:42  2    Care at some point, was he not?

09:34:42  3    A.   Yes.  He essentially still is.

09:34:42  4    Q.   Would you agree with me that the Core Action

09:34:42  5    Team was comprised of individuals from several different

09:34:42  6    departments at Cigna Health Care?

09:34:42  7    A.   Yes.

09:34:42  8    Q.   Would you agree with me that the goal of that

09:34:42  9    Core Action Team was to try to come up with a strategy to

09:34:42  10   deal with the avalanche of claims and expenses that was

09:34:42  11   coming from these Individual Family Plans in Florida

09:34:42  12   related to substance abuse treatment?

09:34:42  13   A.   No, I wouldn't position it that way.  The issue

09:34:42  14   is not about the number of claims or the dollars.  It's

09:34:42  15   about the appropriateness of the fees.  So when we're

09:34:42  16   asking for information, it's to substantiate the

09:34:42  17   appropriateness which is required of us based on

09:34:42  18   regulatory requirements.

09:34:42  19   Q.   So we discussed yesterday that the amount of

09:34:42  20   unexpected costs that Cigna was facing in Florida was

09:34:42  21   estimated to be 150 to 200 million dollars per year?

09:34:42  22   A.   I saw that number in the material, yes.

09:34:42  23   Q.   You don't disagree with that number, do you?

09:34:42  24   A.   No.  I don't know what the best number is.  But

09:34:42  25   I don't disagree it was material.

09:34:42    1          Q.    Sir, would you agree with me that it was in the

09:34:42    2    best interest of your career with Cigna to take action as

09:34:42    3    quickly as possible to try to figure out some solution to

09:34:42    4    this coming avalanche of expenditures?

09:34:42    5          A.    No, key to my career is to do the right thing.

09:34:42    6    That is maybe paying the claim, maybe pending the claim,

09:34:42    7    maybe denying the claim.  We're looking for the long term

09:34:42    8    value.  We get paid to pay claims, not to stop claims, so

09:34:42    9    I have no desire to stop claims.

09:34:42    10         Q.    This whole issue was about saving money for

09:34:42    11    Cigna, was it not?

09:34:42    12         A.    No, it is about exposure to fraud, not paying

09:34:42    13    fraud.

09:34:42    14               MR. CUNNINGHAM:  Your Honor, I'm going to need

09:34:42    15    another instruction.

09:34:42    16               THE WITNESS:  The answer was no.

09:34:42    17               THE COURT:  The rest of that answer will be

09:34:42    18    stricken, Ladies and Gentlemen.  Disregard it.

09:34:42    19               MR. CUNNINGHAM:  Let's go to Trial Exhibit 6856.

09:34:42    20               THE COURT:  Whose exhibit is it?

09:34:42    21               MR. CUNNINGHAM:  001.  It's Labs Trial Exhibit,

09:34:42    22    Your Honor. 6856-001.

09:34:42    23               THE COURT:  6856?  It's not on your list.

09:34:42    24               MR. CUNNINGHAM:  I'm sorry, Your Honor, I'm

09:34:42    25    dyslexic this morning.  6586.  I'm having a contact lens

| | | |
|---|---|---|
| 09:34:42 | 1 | problem, Your Honor. |
| 09:34:42 | 2 | BY MR. CUNNINGHAM: |
| 09:34:42 | 3 | Q.   Who is Jeffrey Rigg? |
| 09:34:42 | 4 | A.   He was my manager at the time. |
| 09:34:42 | 5 | Q.   Could we enlarge that a little bit? |
| 09:34:42 | 6 | Now, sir, is this an email from you to Jeffrey |
| 09:34:42 | 7 | Rigg dated July 17, 2015? |
| 09:34:42 | 8 | A.   Yes. |
| 09:34:42 | 9 | Q.   And you recognize this to be an email that you |
| 09:34:42 | 10 | wrote to him on that date, right? |
| 09:34:42 | 11 | A.   Yes. |
| 09:34:42 | 12 | MR. CUNNINGHAM:  Your Honor, we would like to |
| 09:34:42 | 13 | move this exhibit into evidence. |
| 09:34:42 | 14 | THE COURT:  Any objection, Attorney Kang? |
| 09:34:42 | 15 | MR. KANG:  No, Your Honor. |
| 09:34:42 | 16 | THE COURT:  Exhibit 6586 is a full exhibit and |
| 09:34:42 | 17 | may be published to the jury. |
| 09:34:42 | 18 | BY MR. CUNNINGHAM. |
| 09:34:42 | 19 | Q.   Can we scroll down, Mr. Smeig? |
| 09:34:42 | 20 | Now, sir, there's an email below that one that's |
| 09:34:42 | 21 | dated July 17, 2015, as well, correct? |
| 09:34:42 | 22 | A.   Yes. |
| 09:34:42 | 23 | Q.   And that is authored by you, right? |
| 09:34:42 | 24 | A.   Yes. |
| 09:34:42 | 25 | Q.   To Eva Borden, yes? |

09:34:42   1        A.    Yes.

09:34:42   2        Q.    And you copy a number of other people including

09:34:42   3    Christopher Arnold, right?

09:34:42   4        A.    Yes.

09:34:42   5        Q.    Would you go ahead and read this into the

09:34:42   6    record, sir, starting with the word "Eva"?

09:34:42   7        A.    "Eva, Chris Arnold and I met earlier this

09:34:42   8    morning.  We reviewed the attached including the worse

09:34:42   9    case scenario possibilities around volume.  Chris is

09:34:42  10    supportive of adding these TINs, the purple rows within

09:34:42  11    the attached are the ones I have asked Rose to have added

09:34:42  12    to the edit.  The additional TINs being the purple rows,

09:34:42  13    total to 4.4 million for the month of June.  As a

09:34:42  14    reminder the 4.4 million is the amount that would have

09:34:42  15    hit the edit not the amount paid to the lab.  I've not

09:34:42  16    calculated what percent this is of the total payments

09:34:42  17    since the two time periods are not easy to align.  This

09:34:42  18    is based on process extract date, not date of payment.  I

09:34:42  19    don't have the answer to your question.  But I imagine

09:34:42  20    the answer will be later next week or the week after.

09:34:42  21    Matt."

09:34:42  22        Q.    Thank you, sir.

09:34:42  23              Could we scroll down to the next page, Mr.

09:34:42  24    Smeig.

09:34:42  25              Your email referenced an attachment regarding a

439

09:34:42   1    number of labs, is this the attachments, sir?

09:34:42   2        A.   Yes.

09:34:42   3        Q.   Would this be one of the documents you reviewed

09:34:42   4    in preparation for the trial testimony?

09:34:42   5        A.   Yes.

09:34:42   6        Q.   What does this table show?

09:34:42   7        A.   I'm sorry.

09:34:42   8        Q.   What does this table show?  What was the

09:34:42   9    purpose?

09:34:42  10        A.   So the lab edit was set up to check claims that

09:34:42  11    had more than four lab tests on one claim.  The first

09:34:42  12    group of tax IDs put in that there were seven that were

09:34:42  13    put in in mid-May, May 11th, and this was a second round

09:34:42  14    of facilities that had very high numbers of lab tests for

09:34:42  15    individual patients or claims.

09:34:42  16             So this is a group, there's 14 on this list that

09:34:42  17    fall into the "add to edit" category.  These were

09:34:42  18    outliers relative to the number of lab tests that were

09:34:42  19    running through.  So the intent here was to ask for

09:34:42  20    medical records to determine if these charges were

09:34:42  21    appropriate so these TINs were added to the lab edit on

09:34:42  22    July 22, I believe.  And claims were still paid for all

09:34:42  23    these claims going through except those that had more

09:34:42  24    than four, more than four tests on a single claim.

09:34:42  25        Q.   All right, sir.  Do you see there on number five

09:34:42  1  that Epic Reference Labs is included?

09:34:42  2      A.   Yes.

09:34:42  3      Q.   It says that at that point they had 345 claims

09:34:42  4  pending if I understand that correctly?

09:34:42  5      A.   I think this is volume for the month of June, is

09:34:42  6  that right?

09:34:42  7      Q.   Yes.

09:34:42  8      A.   Yes.  I don't think it's -- it's not pended.

09:34:42  9  It's claims that ran through.  So 769,000 was billed in

09:34:42  10  the month of June.

09:34:42  11      Q.   Okay.  Under "action" you put "add to edit,"

09:34:42  12  correct?

09:34:42  13      A.   Yes.

09:34:42  14      Q.   Now if you look above that for two labs that are

09:34:42  15  unrelated to this case called SMA Med Lab and AIM

09:34:42  16  Toxicology, the action for both of those says "flagging,"

09:34:42  17  right?

09:34:42  18      A.   Yes.

09:34:42  19      Q.   Why were some of these labs flagged and some of

09:34:42  20  them added to the edit?

09:34:42  21      A.   They were flagged for different reasons.  Could

09:34:42  22  have been anything.  I don't know.

09:34:42  23      Q.   What was your intention, though, or what was the

09:34:42  24  distinction between adding some of the labs to the edit

09:34:42  25  and flagging some of the labs?

09:34:42  1      A.    Would have been case specific.  In this case,

09:34:42  2   what we saw was a very high number of lab tests per

09:34:42  3   claim.  And if you look at something like SMA or Aim

09:34:42  4   there was probably different evidences to what was going

09:34:42  5   on with those labs, so they were flagged separate from

09:34:42  6   the lab edit.  The lab edit is just a tool to monitor

09:34:42  7   folks who were billing an extreme number of labs.

09:34:42  8      Q.    Let me do this, sir.  I want to provide a little

09:34:42  9   more context to the chart.

09:34:42  10          Can say we scroll down, Mr. Smeig, to the next

09:34:42  11   email, yes.  Thank you.

09:34:42  12          Now, sir, you see here that this is an email

09:34:42  13   from you to Eva Borden on July 14, 2015, correct?

09:34:42  14      A.    Yes.

09:34:42  15      Q.    And it's copied to the same people that the

09:34:42  16   subsequent email was copied to, right?

09:34:42  17      A.    Correct.

09:34:42  18      Q.    Says "Subject:  forward individual family plans

09:34:42  19   labs prepay edit," correct?

09:34:42  20      A.    Yes.

09:34:42  21      Q.    And you say, "Eva, a number of us met yesterday

09:34:42  22   on the potential to expand the edit ASAP.  While this

09:34:42  23   desire to expand is offset by concerns around potential

09:34:42  24   appeal volume, I believe we have landed in a good place."

09:34:42  25   Did I read that accurately, sir?

09:34:42   1       A.    Yes.

09:34:42   2       Q.    So you wanted to expand the edit to include more

09:34:42   3   labs that had submitted claims to Cigna, right?

09:34:42   4       A.    Correct.

09:34:42   5       Q.    You said "the desire to expand is offset by

09:34:42   6   concerns about potential appeal volume," right?

09:34:42   7       A.    Correct.

09:34:42   8       Q.    By that you meant that some of these labs, if

09:34:42   9   you placed them in this edit, were going to appeal,

09:34:42  10   right?

09:34:42  11       A.    It was unknown as to whether they would provide

09:34:42  12   the information and appeal.

09:34:42  13       Q.    But you were concerned about the number of

09:34:42  14   potential appeals you might face, right?

09:34:42  15       A.    Yes.  We always need to forecast.

09:34:42  16       Q.    You said "this desire to expand is offset by

09:34:42  17   concerns about potential appeal volume," right?

09:34:42  18       A.    Yes.  Can I add to this, though?

09:34:42  19             THE COURT:  No.  No, you may not.

09:34:42  20   BY MR. CUNNINGHAM

09:34:42  21       Q.    Sir, the problem with potential appeals is that

09:34:42  22   they take time, right?

09:34:42  23       A.    The problem is you've stopped a claim

09:34:42  24   inappropriately is the ultimate issue.

09:34:42  25       Q.    They take time to resolve those appeals, don't

09:34:42  1    they?

09:34:42  2         A.    You have to have enough people to do the

09:34:42  3    appeals.

09:34:42  4         Q.    Just below that, did you say the June spend was

09:34:42  5    8.4 million dollars?

09:34:42  6         A.    Yes.

09:34:42  7         Q.    What does that refer to?

09:34:42  8         A.    I imagine it's for those additional TINs,

09:34:42  9    additional tax IDs.

09:34:42  10        Q.    So if you were spending $8 million a month, if I

09:34:42  11   do the math, that's almost $100 million a year, right?

09:34:42  12        A.    Yes.

09:34:42  13        Q.    And you were trying to reduce that?

09:34:42  14        A.    We don't care what the actual number is.  We

09:34:42  15   don't want fraud in there.  My job isn't to reduce Cigna

09:34:42  16   spend.

09:34:42  17             THE COURT:  The question was you were trying to

09:34:42  18   reduce that.  Not why.

09:34:42  19        A.    I can't answer it that way.  Because I don't

09:34:42  20   know what the right number is.  If the right number is

09:34:42  21   this number, then I'm not trying to reduce it.

09:34:42  22             THE COURT:  Then you would answer -- your answer

09:34:42  23   should have been I can't answer it.

09:34:42  24   BY MR. CUNNINGHAM:

09:34:42  25        Q.    All right, sir.  Let me do this.  Let me go

09:34:42  1    ahead and read this next portion into the record to try

09:34:42  2    to speed this along.

09:34:42  3         The next 15 TINs, tax ID numbers, excluding

09:34:42  4    millennium, ranked by spend total to 4.6 million or 55

09:34:42  5    percent of the 8.4 million for June.  In yesterday's

09:34:42  6    meeting, we agreed in concept to adding these 15

09:34:42  7    additional TINS to the edit.  I say concept because we're

09:34:42  8    pulling some additional data to identify the LPI state

09:34:42  9    (late payment interest risk factor), and

09:34:42  10   participating/non-participating status as well as claim

09:34:42  11   volumes.  I expect we will add all 15 TINs to the edit,

09:34:42  12   but need to share the numbers with the group and gain

09:34:42  13   final consensus relative to any processing risks.  To be

09:34:42  14   clear on the processing risks, I'm referring to the risk

09:34:42  15   we receive an excessive number of appeals after the

09:34:42  16   claims are denied.  In such a scenario, we might have

09:34:42  17   difficulty with timeliness of appeals processing  (a

09:34:42  18   regulatory factor.)

09:34:42  19        Let me stop there for a moment, sir.

09:34:42  20        What did you mean that timeliness of appeals

09:34:42  21   processing might be a regulatory factor?

09:34:42  22   A.   If we were to not pay appeals or adjudicate

09:34:42  23   appeals on a timely basis.  So the issue here was that we

09:34:42  24   didn't have information yet as to how many folks would

09:34:42  25   send in information and their reaction.  So when we

09:34:42  1   processed a claim through here, we would send a letter to

09:34:42  2   the lab indicating we need this medical record

09:34:42  3   information.  We'd send a follow-up letter at 30 days.

09:34:42  4   We'd send a follow-up letter at 60 days.  At 90 days, the

09:34:42  5   claim would be denied if the information had not been

09:34:42  6   received.

09:34:42  7        The concern was if the denial is ultimately

09:34:42  8   going to get them to respond, because once the claim is

09:34:42  9   not paid, you would certainly think you might get a

09:34:42  10  response.  So we had not reached that end of that 90 day

09:34:42  11  period to know for sure exactly what we were going to

09:34:42  12  have response wise.

09:34:42  13  Q.   I appreciate that, sir.  What I want to

09:34:42  14  specifically ask you about is you say:  We might have

09:34:42  15  difficulty with timeliness of appeals processing (a

09:34:42  16  regulatory factor.)

09:34:42  17       When you refer to a regulatory factor, what are

09:34:42  18  referring to there?

09:34:42  19  A.   Timeliness of appeal handling.  So if we were

09:34:42  20  hit with a lot of volume that could impact our inventory

09:34:42  21  and our ability to keep up.

09:34:42  22  Q.   When you say a regulatory factor, that implies

09:34:42  23  to me that there's somebody that's regulating your

09:34:42  24  timeliness of appeals that you're concerned about, is

09:34:42  25  that true?

09:34:42  1      A.   Yes.   For the most part, each state has a

09:34:42  2  timeliness turnaround requirements.

09:34:42  3      Q.   So what you are concerned about is if you

09:34:42  4  expanded this edit to increase the number of labs as you

09:34:42  5  laid out here, your appeals might not be handled as

09:34:42  6  timely as possible and then maybe the, whatever

09:34:42  7  particular state it is, would look at that and chastise

09:34:42  8  you or punish Cigna for that?

09:34:42  9      A.   It would be a risk if response rates were higher

09:34:42  10  than we expected.

09:34:42  11      Q.   And then you say if this were to occur, one

09:34:42  12  worst case scenario could be for us to simply pay the

09:34:42  13  claims.   Is that what you wrote, sir?

09:34:42  14      A.   Yes.

09:34:42  15      Q.   So you said that's a worse case scenario for

09:34:42  16  Cigna to simply pay the claims?

09:34:42  17      A.   Yes.

09:34:42  18      Q.   You told us just a moment ago that Cigna's first

09:34:42  19  obligation or first intent was to pay claims.

09:34:42  20      A.   It's not about the worse case of paying the

09:34:42  21  claims.   This is about inventory.   So if you are to

09:34:42  22  receive a large number of appeals, you would still need

09:34:42  23  to comply with the turnaround time.   So the worst case

09:34:42  24  references the fact that you would be parting with money

09:34:42  25  that could be potentially inappropriate until you're

09:34:42  1    paying claims you shouldn't be paying.

09:34:42  2        Q.   But these are your words, sir, right?

09:34:42  3        A.   Yes, I stand by these words.

09:34:42  4        Q.   One worst case scenario could be for us to

09:34:42  5    simply pay the claims.  True?  That's what you wrote.

09:34:42  6        A.   That's what I wrote, yes.  And it refers to the

09:34:42  7    turnaround time.

09:34:42  8        Q.   All right.  So now I want to go back up to the

09:34:42  9    very top of this one which was page 1.  The July 15 --

09:34:42  10   excuse me -- July 17, 2015 email from Matthew Norton to

09:34:42  11   Jeffrey Rigg at 6:07 p.m.  Go up a little bit farther.

09:34:42  12   Thank you.

09:34:42  13        Sir, did you say that Mr. Rigg was your

09:34:42  14   supervisor?

09:34:42  15        A.   Correct.

09:34:42  16        Q.   Do you remember what his title was at the time?

09:34:42  17        A.   Chief Auditor for Cigna.

09:34:42  18        Q.   Was he the person you directly reported to?

09:34:42  19        A.   Yes.

09:34:42  20        Q.   Let me read this into the record.

09:34:42  21        THE COURT:  This number is, sir?  Sorry to

09:34:42  22   interrupt you.

09:34:42  23        MR. CUNNINGHAM:  Your Honor, this again is still

09:34:42  24   Labs Trial Exhibit 6586001 which is now in evidence.

09:34:42  25        THE COURT:  Thank you.

09:34:42  1    BY MR. CUNNINGHAM.

09:34:42  2        Q.   All right.  Please confirm that I read this

09:34:42  3    accurately, sir.

09:34:42  4            "Jeff, I told you yesterday we were working kind

09:34:42  5    of a big deal for the IFP book.  My 8:30 a.m. meeting

09:34:42  6    today gave the go ahead.  The additional 4.4 million per

09:34:42  7    month referenced below is not a direct medical cost

09:34:42  8    savings.  It represents the allowed dollar value of the

09:34:42  9    claims we will start requesting records for prior to

09:34:42  10   releasing payment.  Since these labs are highly suspect,

09:34:42  11   a good portion of these funds will prove to be

09:34:42  12   inappropriate, i.e., will not be paid.  The IFP people

09:34:42  13   are very happy.  Have a good weekend.  Matt."

09:34:42  14           Did I read that accurately, sir?

09:34:42  15       A.   Yes.

09:34:42  16       Q.   Sir, you say the -- since these labs are highly

09:34:42  17   suspect.  Is that the word you used?

09:34:42  18       A.   Yes.

09:34:42  19       Q.   So of all the labs that you placed on that

09:34:42  20   chart, you painted them all with the same broad brush

09:34:42  21   which was, in your words, that they were highly suspect?

09:34:42  22       A.   Yes.

09:34:42  23       Q.   You said the IFP people are very happy, right?

09:34:42  24       A.   Yes.

09:34:42  25       Q.   Who were you referring to?

09:34:42    1        A.    The same group of people that we have talked

09:34:42    2    about.

09:34:42    3        Q.    The Core Action Team?

09:34:42    4        A.    Yes.  Those that were concerned about this

09:34:42    5    expense going out of control.

09:34:42    6        Q.    They were very happy with this proposed course

09:34:42    7    of action?

09:34:42    8        A.    Yes.  Happy that we were intervening.

09:34:42    9        Q.    Because by handling it the way that you

09:34:42   10    proposed, you are just going to stop paying those claims,

09:34:42   11    right?

09:34:42   12        A.    We were going to request information to

09:34:42   13    substantiate the appropriateness before paying.

09:34:42   14        Q.    Right.  You weren't going to pay them unless and

09:34:42   15    until you got appropriate documentation that satisfied

09:34:42   16    Cigna?

09:34:42   17        A.    Correct.

09:34:42   18        Q.    Instead of simply paying the claims?

09:34:42   19        A.    Correct.  We have a regulatory responsibility.

09:34:42   20            THE COURT:  Again, sir, you continually add to

09:34:42   21    your answer.  It's inappropriate.  And I will now

09:34:42   22    interrupt you before you get to add that answer, sir.

09:34:42   23            THE WITNESS:  All right.  Sorry.

09:34:42   24            THE COURT:  Thank you.

09:34:42   25    BY MR. CUNNINGHAM.

| | | |
|---|---|---|
| 09:34:42 | 1 | Q.   I would like to go next to Trial Exhibit |
| 09:34:42 | 2 | 6570001. |
| 09:34:42 | 3 | THE COURT:  Why do you keep adding 001's at the |
| 09:34:42 | 4 | end? |
| 09:34:42 | 5 | MR. CUNNINGHAM:  I don't know if it's a number. |
| 09:34:42 | 6 | THE COURT:  That's a Bates number.  But that's |
| 09:34:42 | 7 | not the exhibit number.  It's just the 6570. |
| 09:34:42 | 8 | MR. CUNNINGHAM:  I will stop doing that, Your |
| 09:34:42 | 9 | Honor. |
| 09:34:42 | 10 | THE COURT:  Thank you very much.  It just makes |
| 09:34:42 | 11 | it easier if you search the transcript or for the |
| 09:34:42 | 12 | reporter. |
| 09:34:42 | 13 | MR. CUNNINGHAM:  Just trying to make the record |
| 09:34:42 | 14 | clear, Your Honor.  I'm sorry. |
| 09:34:42 | 15 | THE COURT:  Thank you. |
| 09:34:42 | 16 | BY MR. CUNNINGHAM: |
| 09:34:42 | 17 | Q.   So, sir, let me ask you about this next |
| 09:34:42 | 18 | document.  And do you see you're the last person copied |
| 09:34:42 | 19 | on this cc, right? |
| 09:34:42 | 20 | A.   I see that, yes. |
| 09:34:42 | 21 | Q.   So this email was copied to you Brittany Fritz. |
| 09:34:42 | 22 | Excuse me.  This is from Davida Kennedy in the SIU |
| 09:34:42 | 23 | Department to Brittany Fritz on June 24, 2015, and it's |
| 09:34:42 | 24 | copied to you, right? |
| 09:34:42 | 25 | A.   Yes. |

```
09:34:42   1        Q.   And, sir, would this be one of the documents you
09:34:42   2   would have reviewed in preparation for your trial
09:34:42   3   testimony?
09:34:42   4        A.   Yes.  This was in the file.
09:34:42   5             MR. CUNNINGHAM:  Your Honor, we would like to go
09:34:42   6   ahead and move this exhibit into evidence.
09:34:42   7             THE COURT:  Any objection to 6570?
09:34:42   8             MR. KANG:  Your Honor, I don't object to the
09:34:42   9   foundation on this one.  However, I would say like to
09:34:42  10   note that neither this document nor Labs 6552 that
09:34:42  11   Mr. Cunningham showed earlier was previously disclosed to
09:34:42  12   us under the 24 hour rule we agreed to.
09:34:42  13             THE COURT:  Is that correct, sir?
09:34:42  14             MR. CUNNINGHAM:  I'm not sure of that, Your
09:34:42  15   Honor.  I didn't handle that.  But I will accept Attorney
09:34:42  16   Kang's representation.  If it wasn't, it was an
09:34:42  17   oversight.
09:34:42  18             THE COURT:  I'm not going to keep it out, but
09:34:42  19   that can't continue.  And whoever got the witness has to
09:34:42  20   be responsible.
09:34:42  21             MR. CUNNINGHAM:  I think the --
09:34:42  22             THE COURT:  That's fine.  I don't need an
09:34:42  23   explanation.  It will be admitted.  But we need to do
09:34:42  24   what we agreed to do.
09:34:42  25             MR. CUNNINGHAM:  Thank you, Your Honor.
```

BY MR. CUNNINGHAM:

09:34:42  2      Q.   Sir, who is Britney Fritz?

09:34:42  3      A.   Britney is a Senior Manager within the
09:34:42  4  Healthcare Investigator's Team.  So she would be a peer
09:34:42  5  of Deanna Anderson's.

09:34:42  6      Q.   She was part of Deanna Anderson's team?

09:34:42  7      A.   No.  She was a peer of Deanna's.  So Stephanie
09:34:42  8  Canto was an investigator in those days.  Deanna and
09:34:42  9  Britney were the next level up.  They managed teams of
09:34:42  10  about eight or nine investigators.

09:34:42  11     Q.   Let's scroll down for just a moment, please,
09:34:42  12  Mr. Smeig.

09:34:42  13          And, sir, you said that you did review this
09:34:42  14  document.  Can you describe for me generally what this
09:34:42  15  series of emails is discussing?

09:34:42  16     A.   Yeah.  RNC is reason not covered.  So when an
09:34:42  17  EOB or an EOP is published, individual lines have
09:34:42  18  indicators describing why a line was handled the way it
09:34:42  19  was.  So the discussion here seems to be about developing
09:34:42  20  an RNC, reason not covered, that was clearer to those
09:34:42  21  receiving the EOBs.

09:34:42  22     Q.   I'm trying to speed this along, sir.  Do you
09:34:42  23  recall that Ms. Fritz says in this email that there's an
09:34:42  24  internal Cigna problem requiring new codes and edits?

09:34:42  25     A.   Okay.

09:34:42   1        Q.    Do you agree with that, sir?

09:34:42   2        A.    Yes.

09:34:42   3        Q.    What is your understanding of the internal Cigna

09:34:42   4   problem?

09:34:42   5        A.    I honestly don't know what the internal Cigna

09:34:42   6   problem was.  So if you look at point number one, you can

09:34:42   7   see there are multiple claim systems that need this

09:34:42   8   change made.  So large main frame systems are slow to

09:34:42   9   adopt change.  So I suspect it had something to do with

09:34:42   10  that, but I really don't know.

09:34:42   11       Q.    Now, Mr. Smeig, can we scroll down.  Because

09:34:42   12  what I wanted to ask you about, isn't it true that both

09:34:42   13  PBL and BioHealth are targets listed by Ms. Fritz here?

09:34:42   14  If you scroll down, please, Mr. Smeig.

09:34:42   15       Do you see that, sir, PB Labs and BioHealth are

09:34:42   16  both labs listed by Ms. Fritz here?

09:34:42   17       A.    I see that.

09:34:42   18       Q.    So would you agree that -- strike that.

09:34:42   19       Let's talk a little bit more about the BioHealth

09:34:42   20  situation, sir.

09:34:42   21       Sir, isn't it true that Cigna never determined

09:34:42   22  that BioHealth was not performing tests that were -- let

09:34:42   23  me strike that and start over.

09:34:42   24       Isn't it true that Cigna never determined that

09:34:42   25  BioHealth was performing medically unnecessary tests?

454

09:34:42   1      A.   I'm not involved with the case level.  I really
09:34:42   2  don't know the answer to that.
09:34:42   3      Q.   Were you in the courtroom when Ms. Canto
09:34:42   4  testified to that?
09:34:42   5      A.   I don't remember it from her testifying.  I was
09:34:42   6  in the courtroom the first, what, 45 minutes or so that
09:34:42   7  she was testifying.
09:34:42   8      Q.   To your understanding, sir, to your knowledge,
09:34:42   9  isn't it true that Cigna never flagged BioHealth for
09:34:42  10  performing tests that were not medically necessary?
09:34:42  11      A.   That's my understanding.  But, again, I don't
09:34:42  12  have the detail.
09:34:42  13      Q.   Sir, were you here for Ms. Canto's testimony
09:34:42  14  where she said I wasn't pursuing medical necessity with
09:34:42  15  respect to BioHealth?
09:34:42  16           MR. KANG:  Objection, hearsay, Your Honor.
09:34:42  17           THE COURT:  It's not an out of court statement,
09:34:42  18  Attorney Kang.  That's an interesting question.
09:34:42  19           I think I will allow it.  Really, the question
09:34:42  20  is about were you here.  Did you hear that testimony of
09:34:42  21  Ms. Canto in the courtroom?
09:34:42  22      A.   Can you repeat it?
09:34:42  23  BY MR. CUNNINGHAM:
09:34:42  24      Q.   Sure.  Were you in the courtroom when Ms. Canto
09:34:42  25  testified, I said, you were giving up that flag of

09:34:42  1    medical necessity, were you not?  This at page 229 of the

09:34:42  2    transcript.  And the answer was:  I wasn't pursuing

09:34:42  3    medical necessity on this case, sir.

09:34:42  4        A.    That sounds like something that was probably

09:34:42  5    said.

09:34:42  6        Q.    Okay.  You are not aware -- you don't have any

09:34:42  7    knowledge that Cigna believed that BioHealth was charging

09:34:42  8    for services that were not medically necessary, right?

09:34:42  9        A.    I don't have case level detail.  So that is

09:34:42  10   correct.

09:34:42  11       Q.    But the Core Action Team had BioHealth on this

09:34:42  12   list that it created and that list was for inappropriate

09:34:42  13   testing, right?

09:34:42  14           MR. KANG:  Objection, Your Honor.

09:34:42  15   Mischaracterizes the document.

09:34:42  16           THE COURT:  Could you scroll it up for me,

09:34:42  17   please.

09:34:42  18           I'll allow it.

09:34:42  19       A.    I don't know what the criteria was to make this

09:34:42  20   list.  These were never brought through the Core Action

09:34:42  21   Team as far as I can see in any documentation.

09:34:42  22   BY MR. CUNNINGHAM:

09:34:42  23       Q.    Well, sir, why else would these labs be on this

09:34:42  24   list?

09:34:42  25       A.     Someone generated a report with ones they

09:34:42  1    thought belonged on there.  Someone else probably

09:34:42  2    reviewed it and said, no, it's not what we want.

09:34:42  3        Q.   Just so the record is clear.  You understand

09:34:42  4    that Ms. Canto testified in this courtroom that she was

09:34:42  5    not pursuing BioHealth for any medical necessity reasons,

09:34:42  6    right?

09:34:42  7        A.   Okay.

09:34:42  8        Q.   I'm asking you yes or no.

09:34:42  9        A.   Yes.

09:34:42  10        Q.   And to your knowledge, as Director of the CIU,

09:34:42  11    you are not aware of any allegation by Cigna that

09:34:42  12    BioHealth Labs was performing any tests that were not

09:34:42  13    medically necessary, right?

09:34:42  14        A.   Correct.

09:34:42  15        Q.   Let's talk about Palm Beach Labs, if we can.

09:34:42  16    Can we go to Exhibit 6552, please.

09:34:42  17            THE COURT:  That's Cigna Exhibit 6552.

09:34:42  18            MR. CUNNINGHAM:  We have already seen this one,

09:34:42  19    Your Honor.  We saw this one at the very beginning.

09:34:42  20    BY MR. CUNNINGHAM.

09:34:42  21        Q.   Now, sir, we talked about this a little bit ago.

09:34:42  22    All I want to ask you about now is, is it your

09:34:42  23    understanding based on these documents that a flag for

09:34:42  24    services not rendered as billed was placed on Palm Beach

09:34:42  25    Labs?

09:34:42  1        A.    I believe that's the case.

09:34:42  2        Q.    And, sir, services not rendered as billed is

09:34:42  3   basically the same thing as lack of medical necessity,

09:34:42  4   right?

09:34:42  5        A.    Medical necessity is a clinical conclusion.

09:34:42  6   Services not rendered as billed is a documentation issue

09:34:42  7   typically.

09:34:42  8              THE COURT:  So the answer to that question would

09:34:42  9   be no.

09:34:42  10             THE WITNESS:  Sorry.

09:34:42  11             THE COURT:  Thank you.

09:34:42  12             The answer should be disregarded.

09:34:42  13   BY MR. CUNNINGHAM:

09:34:42  14        Q.    Could we go to Joint 13, please.  Could we

09:34:42  15   please zoom in toward the bottom.

09:34:42  16             Sir, I'm going to represent to you that this is

09:34:42  17   a letter that was written by William Welch.  Do you know

09:34:42  18   who William Welch was at this time?

09:34:42  19        A.    Yes.

09:34:42  20        Q.    Who was he?

09:34:42  21        A.    He worked in Cigna Legal.

09:34:42  22        Q.    He was the Chief Legal Officer for Cigna at the

09:34:42  23   time?

09:34:42  24        A.    No.

09:34:42  25        Q.    What was his title, do you remember?

09:34:42  1        A.    Counsel.  Senior Counsel.  I don't know.  He

09:34:42  2   would have been a couple levels down from the Chief

09:34:42  3   Legal.

09:34:42  4        Q.    Let me ask you about this, sir.  First, I will

09:34:42  5   represent to you that this is a letter that was written

09:34:42  6   by Mr. Welch to a Mr. Michael Gennett who was an attorney

09:34:42  7   for the Labs.  And I'll focus on this second paragraph.

09:34:42  8           If we would kind of zoom in on that, please, Mr.

09:34:42  9   Smeig.

09:34:42  10          All right.  Does it say:  As I stated in my

09:34:42  11  previous letter, all of your clients's claims are subject

09:34:42  12  to a medical necessity review under the terms and

09:34:42  13  conditions of the applicable health benefit plans.  The

09:34:42  14  mere fact that Cigna has agreed to lift its flag on

09:34:42  15  charges for the initial qualitative testing based upon

09:34:42  16  information presently available to us does not -- at this

09:34:42  17  time does not constitute, nor should it be construed, as

09:34:42  18  a waiver of that right.

09:34:42  19          Did I read that accurately, sir?

09:34:42  20       A.    Yes.

09:34:42  21       Q.    Sir, isn't it true that in this letter and the

09:34:42  22  paragraph we just read, Cigna had lifted the flag on

09:34:42  23  BioHealth for charges for the initial qualitative

09:34:42  24  testing?

09:34:42  25       A.    Sounds like it.

459

09:34:42  1        Q.   And that lifting of the flag was based on the
09:34:42  2    Labs providing evidence to Cigna that the tests in
09:34:42  3    question were legitimate?
09:34:42  4        A.   Yes.
09:34:42  5        Q.   Could we go to 30121, please.  I will move on
09:34:42  6    from that, Your Honor.  Just try to save time here.
09:34:42  7             Sir, would you agree with me that the SIU
09:34:42  8    removed any allegation from the Labs of performing
09:34:42  9    services that were not medically necessary because it was
09:34:42  10   simply a wrong basis to not pay those claims?
09:34:42  11       A.   Could you state that again or differently?
09:34:42  12       Q.   I will try.  Sir, the SIU at Cigna withdrew any
09:34:42  13   allegations from the Labs with regard to medical
09:34:42  14   necessity because those defenses or those bases just were
09:34:42  15   not present with respect to the charges submitted by the
09:34:42  16   Labs, right?
09:34:42  17            MR. KANG:  Objection, Your Honor.
09:34:42  18            THE COURT:  Overruled.  You can answer yes or
09:34:42  19   no, or I can't answer it.  If you can.
09:34:42  20       A.   Yeah, I can't answer.
09:34:42  21   BY MR. CUNNINGHAM:
09:34:42  22       Q.   But at a minimum we know that the flag that had
09:34:42  23   been placed on BioHealth was or ON PB Labs was removed?
09:34:42  24       A.   Sounds like it.
09:34:42  25       Q.   Let's go to Labs Trial Exhibit 6586.  And

09:34:42   1   before --

09:34:42   2        THE COURT:  What you answered was you could not

09:34:42   3   answer the question of the withdrawal of any allegations,

09:34:42   4   I guess, or flags by SIU with regard to medical necessity

09:34:42   5   was done because there was no basis to assert no medical

09:34:42   6   necessity?

09:34:42   7        THE WITNESS:  I was trying to say I don't really

09:34:42   8   know the answer to that question.  Sorry.

09:34:42   9        THE COURT:  Go ahead.

09:34:42  10        MR. CUNNINGHAM: Thank you, Your Honor.

09:34:42  11   BY MR. CUNNINGHAM:

09:34:42  12     Q.   The flags for Palm Beach Labs and BioHealth were

09:34:42  13   removed, were they not?

09:34:42  14     A.   I don't know the status of those cases.

09:34:42  15     Q.   All right.  So let's go to Labs Trial Exhibit

09:34:42  16   6586 which we have already seen.  I'm not going to go

09:34:42  17   over that again.

09:34:42  18        Let's go to Labs Exhibit 6584.  Can we scroll

09:34:42  19   down to the bottom of that page, Mr. Smeig.  Yes, that's

09:34:42  20   right.

09:34:42  21        The July 16, 2015 at 3:57 p.m.  Let starts

09:34:42  22   there.  Down below that, sir.  Thank you.  And then I

09:34:42  23   think it continues on to the next page.  If you can get

09:34:42  24   all of that on one, I would appreciate it.

09:34:42  25        Now, sir, does this appear to be an email that

09:34:42  1    you wrote to Eva Borden on July 16, 2015?

09:34:42  2        A.    Yes.

09:34:42  3        Q.    And the subject is Substance Abuse Points?

09:34:42  4        A.    Yes.

09:34:42  5              MR. CUNNINGHAM:  Your Honor, at this time we'd

09:34:42  6    like to move this Exhibit 6584.

09:34:42  7              THE COURT:  Any objection from Cigna?

09:34:42  8              MR. KANG:  No, Your Honor.

09:34:42  9              THE COURT:  All right.  6584 is a full exhibit.

09:34:42  10   BY MR. CUNNINGHAM.

09:34:42  11       Q.    Sir, let me read this into the record to try to

09:34:42  12   speed this along.

09:34:42  13             THE COURT:  Can I make a suggestion?  I'm sorry

09:34:42  14   I'm cutting you off on this.

09:34:42  15             We have screens.  You can see the letters on the

09:34:42  16   documents, right, ladies and gentlemen?  Can you just nod

09:34:42  17   your head or shake it.  I think it's faster if you just

09:34:42  18   ask the jury to read what's on the screen.  Watch when

09:34:42  19   people's heads come up.  That's a sign they are done.  I

09:34:42  20   think it's faster than reading out loud.  So let's try

09:34:42  21   that, anyway, for a while.

09:34:42  22             Would you please read what's on your screen.

09:34:42  23             They're all set I think.

09:34:42  24             All right sir.  Go ahead.

09:34:42  25   BY MR. CUNNINGHAM:

09:34:42  1      Q.    Sir, I just want to ask you about one thing

09:34:42  2  here.  Well, two things.

09:34:42  3          So in this email you are saying to Ms. Borden

09:34:42  4  that you thought the meeting you had had that day was

09:34:42  5  effective, right?

09:34:42  6      A.    Yes.

09:34:42  7      Q.    And then you say in the last paragraph:  On a

09:34:42  8  separate topic, I'm meeting with the Director over

09:34:42  9  appeals tomorrow morning.  I'm trying to get an okay to

09:34:42 10  proceed with 14 tax identification numbers that total to

09:34:42 11  about what I swagged earlier.  And then you have ($'s).

09:34:42 12          What in the world does that mean, when you say

09:34:42 13  14 tax identification numbers that totaled to about what

09:34:42 14  I swagged earlier?

09:34:42 15      A.    So what I was referring to with the swag is I

09:34:42 16  gave a high level estimate without having the specific

09:34:42 17  information.  So it sounds like when I got the

09:34:42 18  specification information it looked similar to my general

09:34:42 19  estimate that I had made.

09:34:42 20      Q.    Is swag a term of art that I'm not familiar

09:34:42 21  with, sir?

09:34:42 22      A.    Swag is certainly a common term, yes.

09:34:42 23      Q.    What does it mean?

09:34:42 24      A.    General idea, rough estimate.

09:34:42 25      Q.    All right.  Thank you.

| | |
|---|---|
| 09:34:42 | 1 |
| 09:34:42 | 2 |
| 09:34:42 | 3 |
| 09:34:42 | 4 |

Can we now go to Labs Exhibit 6586.  Let me do that one a different way, Mr. Smeig.  I think we have a Bates number of 0327732.  Will you be able to pull that up?

Your Honor, I would like to mark for identification this exhibit.  It's Bates stamp number 0327732.

THE COURT:  It is part of Labs Exhibit 6586 which is in evidence by my notes?  Do you have it in evidence?

THE CLERK:  It's in evidence.

MR. CUNNINGHAM:  Mr. Gestrich is checking on that, Your Honor.

THE COURT:  You can mark it for ID, I guess.  I don't know what it is or what you're doing with it.  The jury isn't going to know that either.

MR. CUNNINGHAM:  To speed this up, may I approach the witness and just kind of read along with him?

THE COURT:  Yes.  Not out loud.

That's why I asked.  If it's part of a document in evidence, you can read out loud.  You haven't told me the answer to that question.

MR. CUNNINGHAM:  One moment, Your Honor.

THE COURT:  If it's part of 6586, you may read

09:34:42  1    out loud.  And if we're going to mark it ID as requested,

09:34:42  2    it would be 11293 for ID.  I'm sorry, 11294.

09:34:42  3         MR. CUNNINGHAM:  Exhibit 6606 for the labs.

09:34:42  4         THE COURT:  6606.  Let's see.  All right so that

09:34:42  5    is currently ID and it may be used as ID witness can be

09:34:42  6    used.  You can put it up to everybody but the jury and

09:34:42  7    public.  And you can show it to the witness.

09:34:42  8    BY MR. CUNNINGHAM.

09:34:42  9    Q.   I would like to you to look at that document,

09:34:42  10   sir.  Is that an email from Philip Rabinowitz to you

09:34:42  11   dated August 28, 2015?

09:34:42  12   A.   Yes.

09:34:42  13        MR. CUNNINGHAM:  Your Honor, I don't know if I

09:34:42  14   need to ask the jury to read it or you are going to ask

09:34:42  15   the jury to read it.

09:34:42  16        THE COURT:  It's not in evidence.  Nobody is

09:34:42  17   going to read.

09:34:42  18        MR. CUNNINGHAM:  I would like to move it into

09:34:42  19   evidence at this time.

09:34:42  20        THE COURT:  Is there objection?

09:34:42  21        6606 Labs' Exhibit and part of it is up on the

09:34:42  22   screen.

09:34:42  23        MR. KANG:  No objection, Your Honor.

09:34:42  24        THE COURT:  No objection.  The document is in

09:34:42  25   evidence.  Lab Exhibit 6606.  Now you can do what you

09:34:42  1    want with it.

09:34:42  2          MR. CUNNINGHAM:  Your Honor, I will ask the jury

09:34:42  3    to read it, please.

09:34:42  4          Your Honor, may I proceed.

09:34:42  5          THE COURT:  You may.

09:34:42  6    BY MR. CUNNINGHAM.

09:34:42  7    Q.    Who was Philip Rabinowitz?

09:34:42  8    A.    He's a medical doctor?

09:34:42  9    Q.    Correct.  Was he a medical doctor in the same

09:34:42  10   division as Dr. Nicoll?

09:34:42  11   A.    I'm not sure.  I don't think they reported to

09:34:42  12   the same person, no.  They are both medical doctors at

09:34:42  13   Cigna.

09:34:42  14   Q.    Both medical directors who were charged with

09:34:42  15   reviewing medical records that would have been submitted

09:34:42  16   by providers?

09:34:42  17   A.    I don't think Phil Rabinowitz reviewed medical

09:34:42  18   records.  He may have done some but that wasn't his

09:34:42  19   primary role.

09:34:42  20   Q.    Okay, sir, does he say, "Perhaps we can take the

09:34:42  21   a process one step back and say that everything one

09:34:42  22   provider orders is not medically necessary so we can

09:34:42  23   exclude payments tracked to them.  But I'm not sure we

09:34:42  24   can say the same for the lab as they are quote just

09:34:42  25   following orders."

466

09:34:42  1      A.   Yes.

09:34:42  2      Q.   So that's what he's telling you that labs just

09:34:42  3  follow orders from the doctors who prescribe the tests

09:34:42  4  that are supposed to be run, right?

09:34:42  5      A.   That's what he's saying.

09:34:42  6      Q.   That's the position of a doctor, one of the

09:34:42  7  medical directors at Cigna, as of August 28, 2015,

09:34:42  8  correct?

09:34:42  9      A.   I disagree with that characterization.

09:34:42 10      Q.   Let's go to Bates No. 327735.  Your Honor, sorry

09:34:42 11  for the confusion. I believe this next document is part

09:34:42 12  of 6606.

09:34:42 13          THE COURT:  Lab Exhibit 6606, yes?  And Bate

09:34:42 14  stamp 327735?

09:34:42 15          MR. CUNNINGHAM:  Yes, Your Honor.

09:34:42 16          THE COURT:  6606 is a full exhibit.  You can

09:34:42 17  publish or read whatever you want.

09:34:42 18          MR. CUNNINGHAM:  Thank you, Your Honor.

09:34:42 19  BY MR. CUNNINGHAM.

09:34:42 20      Q.   Sir, does this appear to be an email from

09:34:42 21  Michael Gross to you on August 28, 2015?

09:34:42 22      A.   Yes.

09:34:42 23      Q.   Who is Dr. Gross?

09:34:42 24      A.   I honestly don't know what his day-to-day

09:34:42 25  responsibilities are.  Just another medical doctor within

09:34:42  1    Cigna.

09:34:42  2         MR. CUNNINGHAM:  And, Your Honor, may I ask that

09:34:42  3    the jury to please read this exhibit?

09:34:42  4         THE COURT:  Yes.

09:34:42  5         Read up what's on the screen.  The part that's

09:34:42  6    there.

09:34:42  7    BY MR. CUNNINGHAM:

09:34:42  8    Q.    Isn't it true in this email that what Dr. Gross

09:34:42  9    is telling you is that when he reviews lab customer

09:34:42  10   services in the majority of cases the clinical

09:34:42  11   information that accompanies the claims are lab test

09:34:42  12   results only?

09:34:42  13   A.    Yes.

09:34:42  14   Q.    He said, "There's no clinical information or

09:34:42  15   insufficient clinical information to explain why testing

09:34:42  16   is being ordered on a frequent basis and/or how the

09:34:42  17   testing will effect treatment course or clinical

09:34:42  18   outcome," correct?

09:34:42  19   A.    Yes.

09:34:42  20   Q.    So he doesn't have any clinical information

09:34:42  21   typically to determine whether testing is necessary or

09:34:42  22   unnecessary?

09:34:42  23   A.    That's what this says.

09:34:42  24        MR. CUNNINGHAM:  I would like to go to Bates

09:34:42  25   Number 23125.  This is part of 6605, Your Honor.

```
09:34:42   1            THE COURT:  Say again the number.
09:34:42   2            MR. CUNNINGHAM:  6605.
09:34:42   3            THE COURT:  That is ID at the moment.
09:34:42   4   BY MR. CUNNINGHAM:
09:34:42   5       Q.   Sir, does this appear to be an email from you to
09:34:42   6   yourself and Eva Borden?
09:34:42   7       A.   This is the text of an IM exchange between Eva
09:34:42   8   and I using messaging software.  I don't know why it's in
09:34:42   9   the format of an email but this was a dialogue of a text
09:34:42  10   conversation.
09:34:42  11       Q.   You said "IM" would that have been Instant
09:34:42  12   Messenger?
09:34:42  13       A.   Yes.
09:34:42  14       Q.   Is that AOL?
09:34:42  15       A.   God, who knows.
09:34:42  16       Q.   All right, sir.  This the last thing I want to
09:34:42  17   ask you about.
09:34:42  18            What I want to do is, Your Honor, if I may, I
09:34:42  19   would say like us to read this one together.  Not have
09:34:42  20   the jury read that.
09:34:42  21            So what I will do in it one I will play the
09:34:42  22   role of Eva Borden and I would say like you to read what
09:34:42  23   you wrote and I will read what she wrote, okay?
09:34:42  24            THE COURT:  I think maybe everybody needs to
09:34:42  25   take a stretch break.
```

469

| | | |
|---|---|---|
| 09:34:42 | 1 | MR. CUNNINGHAM:  This is the last thing. |
| 09:34:42 | 2 | THE COURT:  I wished I had known that.  It's |
| 09:34:42 | 3 | been a long morning.  I'm sorry to have stopped you |
| 09:34:42 | 4 | counsel.  That's terrible. |
| 09:34:42 | 5 | MR. CUNNINGHAM:  Your Honor, we would like to |
| 09:34:42 | 6 | move this exhibit into evidence. |
| 09:34:42 | 7 | THE COURT:  Any objection to 6605 of the Labs' |
| 09:34:42 | 8 | coming into evidence? |
| 09:34:42 | 9 | MR. KANG:  No, Your Honor. |
| 09:34:42 | 10 | THE COURT:  Exhibit 6605 is now a full Exhibit. |
| 09:34:42 | 11 | You may publish it. |
| 09:34:42 | 12 | BY MR. CUNNINGHAM: |
| 09:34:42 | 13 | Q.  I'm going to go to read Eva Borden's part and I |
| 09:34:42 | 14 | want you to read your part. |
| 09:34:42 | 15 | "To my dear friend Matt,  Can you send me the |
| 09:34:42 | 16 | new pended claim volume including lab edit. |
| 09:34:42 | 17 | A.  "I don't really want to send that file to you. |
| 09:34:42 | 18 | It's just going to generate questions. |
| 09:34:42 | 19 | Q.  "That's not encouraging. |
| 09:34:42 | 20 | A.  "I can do it if you want but I don't think it's |
| 09:34:42 | 21 | a good use of our time, yours or mine.  I have more |
| 09:34:42 | 22 | interesting things though.  Looking at opening the lab |
| 09:34:42 | 23 | edit to all customers and moving more of the cases over |
| 09:34:42 | 24 | to close the FF gap. |
| 09:34:42 | 25 | Q.  "I need the pended claim info.  I know it's |

09:34:42  1    annoying but I do need it, but will limit questions.  I'm

09:34:42  2    thrilled on a opening the lab edit.  That's definitely a

09:34:42  3    better use of time.

09:34:42  4        A.    "The pended claim info isn't in Excel, it is in

09:34:42  5    the email.  Let me look.

09:34:42  6        Q.    "Oh, I was looking for XLS detail.  I have your

09:34:42  7    8-25 info.

09:34:42  8        A.    "That's it. "

09:34:42  9        Q.    Let me just ask you for one moment, sir.  Would

09:34:42  10   XLS be Excel spreadsheets?

09:34:42  11       A.    Yes.

09:34:42  12       Q.    "I was looking for XLS detail. I have your 8-25

09:34:42  13   info?

09:34:42  14       A.    "That's it.

09:34:42  15       Q.    "You have no XLS?

09:34:42  16       A.    "No, we just make the stuff up.

09:34:42  17       Q.    "You lie, you lie.

09:34:42  18       A.    "The pended info isn't in there.  What's in

09:34:42  19   there is receipts by day and processed status."

09:34:42  20       Q.    Would you agree with me this appears to be you

09:34:42  21   and Ms. Borden are joking around?

09:34:42  22       A.    Yes.

09:34:42  23       Q.    This isn't a joking matter, is it?

09:34:42  24       A.    Our jobs are not a joking matter.  Claim fraud

09:34:42  25   is not a joking matter.

09:34:42  1    Q.   Were you aware this these labs, these three labs

09:34:42  2    that we represent, had about 300 employees?

09:34:42  3    A.   I don't know how many employees you have.

09:34:42  4    Q.   Did you ever bother to ask?

09:34:42  5    A.   No.

09:34:42  6    Q.   You understood when you don't pay health care

09:34:42  7    providers like medical labs that can effect the ongoing

09:34:42  8    operation of those companies, right?

09:34:42  9    A.   Right.   That's bad for everyone.

09:34:42  10   Q.   Were you aware that all three of these labs went

09:34:42  11   out of business?

09:34:42  12   A.   I do not get into case level decisions.   I

09:34:42  13   don't know the history of these labs.

09:34:42  14         THE COURT:   The answer would be no.  I was not

09:34:42  15   aware.

09:34:42  16         THE WITNESS:   Sorry.  I'm getting better.

09:34:42  17         THE COURT:   Your answer is stricken.

09:34:42  18         MR. CUNNINGHAM:   I have no further questions,

09:34:42  19   thank you, Your Honor.

09:34:42  20         THE COURT:   Cross-examination by Cigna.

09:34:42  21         MR. KANG:   Thank you, Your Honor.

09:34:42  22   CROSS-EXAMINATION BY MR. KANG:

09:34:42  23   Q.   Good morning, Mr. Norton.  Let's start off with

09:34:42  24   a couple of questions that Mr. Cunningham asked you on

09:34:42  25   direct examination.  First off, I want to go back to a

472

09:34:42  1    document that he put up.

09:34:42  2           If we can put up Joint 13, Mr. Salazar.

09:34:42  3           Do you recall Mr. Cunningham showing you this

09:34:42  4    letter this morning?

09:34:42  5    A.    Yes.

09:34:42  6    Q.    I believe he described it as a letter that was

09:34:42  7    written by Mr. Bill Welch?

09:34:42  8    A.    Yes.

09:34:42  9    Q.    Do you see at the top who the letter was

09:34:42  10   addressed to?

09:34:42  11   A.    Michael P. Gennett, I guess.

09:34:42  12   Q.    Do you have any idea who Mr. Gennett is?

09:34:42  13   A.    I do not.

09:34:42  14   Q.    Do you recall being on this letter?

09:34:42  15   A.    No.

09:34:42  16   Q.    Do you recall ever having written this letter?

09:34:42  17   A.    No.

09:34:42  18   Q.    Were you privy to any conversations between

09:34:42  19   Mr. Welch and Mr. Gennett that led to this letter?

09:34:42  20   A.    No.

09:34:42  21   Q.    Do you recall having any conversations with

09:34:42  22   Mr. Welch about this letter?

09:34:42  23   A.    No.

09:34:42  24   Q.    Do you have any personal knowledge about any

09:34:42  25   contents of this letter whatsoever?

```
09:34:42   1        A.   No.

09:34:42   2        Q.   Put that document down.  Can we put up Labs'

09:34:42   3   Exhibit 6570, please.

09:34:42   4             THE COURT:  A full exhibit?

09:34:42   5             MR. KANG:  Yes, Your Honor.

09:34:42   6   BY MR. KANG:

09:34:42   7        Q.   Do you recall Mr. Cunningham showing you the

09:34:42   8   document on examination?

09:34:42   9        A.   Yes.

09:34:42   10       Q.   Mr. Salazar, if you can zoom in to the top to

09:34:42   11  show the recipients.

09:34:42   12            Do you see those people that are on this list?

09:34:42   13       A.   Yes.

09:34:42   14       Q.   Are those employees of SIU?

09:34:42   15       A.   Yes.

09:34:42   16       Q.   You are on there as well?

09:34:42   17       A.   Yes.

09:34:42   18       Q.   Mr. Cunningham characterizes this as a

09:34:42   19  communication among people on the Core Action Team.  Do

09:34:42   20  you recall that?

09:34:42   21       A.   Yes.

09:34:42   22       Q.   Other than yourself, do you know if any of these

09:34:42   23  folks on this email string were members of the Core

09:34:42   24  Action Team?

09:34:42   25       A.   They were not.
```

| | | |
|---|---|---|
| 09:34:42 | 1 | Q.   Put that one down? |
| 09:34:42 | 2 | A.   Ah,  Annetta -- |
| 09:34:42 | 3 | THE COURT:  You can't add to that, sir.  Unless |
| 09:34:42 | 4 | you want to correct. |
| 09:34:42 | 5 | THE WITNESS:  I want to correct something. |
| 09:34:42 | 6 | THE COURT:  Then go ahead.  You are allowed to. |
| 09:34:42 | 7 | A.   I believe Annetta Andros -- got her name at the |
| 09:34:42 | 8 | end there.  She works for me.  She did participate in the |
| 09:34:42 | 9 | Core Action Team meetings at least some of theme. |
| 09:34:42 | 10 | THE COURT:  Thank you. |
| 09:34:42 | 11 | BY MR. KANG: |
| 09:34:42 | 12 | Q.   Mr. Norton, there were some questions regarding |
| 09:34:42 | 13 | SIU flags during your testimony today.  Do you recall |
| 09:34:42 | 14 | that? |
| 09:34:42 | 15 | A.   Yes. |
| 09:34:42 | 16 | Q.   And Mr. Cunningham asked some questions |
| 09:34:42 | 17 | suggesting that SIU would impose or place denial |
| 09:34:42 | 18 | flags for lack of a better word for administrative |
| 09:34:42 | 19 | convenience.  Do you recall that? |
| 09:34:42 | 20 | A.   Yes. |
| 09:34:42 | 21 | Q.   Does SIU flag providers just for administrative |
| 09:34:42 | 22 | convenience? |
| 09:34:42 | 23 | A.   Definitely not. |
| 09:34:42 | 24 | Q.   Explain why SIU doesn't do that. |
| 09:34:42 | 25 | A.   Our job is to pay claims in a timely matter, |

09:34:42  1   reduce abrasion.  What we want to do is work out correct

09:34:42  2   billing with providers so we try to work with providers

09:34:42  3   to resolve issues and move claims along.  We have no

09:34:42  4   incentive or desire to deny claims.

09:34:42  5       Q.   When SIU does impose a flag, is that evidence

09:34:42  6   based?

09:34:42  7       A.   Yes.

09:34:42  8       Q.   To follow up on what Mr. Cunningham indicated,

09:34:42  9   does SIU take the imposition of a flag seriously?

09:34:42  10      A.   Absolutely.

09:34:42  11      Q.   Does SIU only impose flags when there is

09:34:42  12  sufficient evidence to do so?

09:34:42  13      A.    Yes.

09:34:42  14      Q.    He asked you some questions regarding appeals.

09:34:42  15  Do you recall that?

09:34:42  16      A.   Yes.

09:34:42  17      Q.   I believe Mr. Cunningham told you -- talked

09:34:42  18  about how SIU was involved in certain appeals.  Do you

09:34:42  19  recall that?

09:34:42  20      A.   Yes.

09:34:42  21      Q.   Tell the jury again, explain why SIU may have

09:34:42  22  involvement in certain appeals?

09:34:42  23      A.   SIU has the case level information to appreciate

09:34:42  24  whether the appeal makes sense.  When a claim is a

09:34:42  25  flagged or a provider is flagged it's not taken lightly.

09:34:42   1   So when an appeal comes through we want the expertise of
09:34:42   2   that case knowledge applied to the appeal.
09:34:42   3       Q.   Who ultimately makes the decision or what
09:34:42   4   department makes the decision in deciding whether to
09:34:42   5   uphold or reverse a claim based on appeal?
09:34:42   6       A.   We would provide input to the appeals
09:34:42   7   organization.
09:34:42   8       Q.   Have you heard of the acronym NAO?
09:34:42   9       A.   Yes.
09:34:42  10       Q.   Does do you know what that stand says for?
09:34:42  11       A.   National Appeals Organization.
09:34:42  12       Q.   What is the National Appeals Organization?
09:34:42  13       A.   They review and process administrative and
09:34:42  14   clinical appeals.
09:34:42  15       Q.   Is the NAO a department within SIU?
09:34:42  16       A.   No, it is in operations.
09:34:42  17       Q.   Is SIU a department within NAO?
09:34:42  18       A.   No.
09:34:42  19       Q.   So are they separate departments?
09:34:42  20       A.   Yes.
09:34:42  21       Q.   So SIU is involved in the appeal process but
09:34:42  22   does not actually make that decision?
09:34:42  23       A.   Correct.
09:34:42  24       Q.   I want to go -- Mr. Cunningham asked you a
09:34:42  25   number of questions regarding the Core Action Team and

09:34:42  1    the IFP book of business.  Do you recall that?

09:34:42  2        A.    Yes.

09:34:42  3        Q.    Let's just try to level set here.  Explain to

09:34:42  4    the jury what was the IFP book of business?

09:34:42  5        A.    Individual and family plan think of it as

09:34:42  6    Obamacare basically, so government plans, individual

09:34:42  7    plans.  So there were some unique differences in IFP

09:34:42  8    business, an individual is signing up versus typically

09:34:42  9    the larger book of business for Cigna is our group plan

09:34:42  10   so your employer is buying the plan.

09:34:42  11       Q.    Was the IFP book of business, the outgrowth of

09:34:42  12   that was due to Obamacare, about expanding coverage to

09:34:42  13   individuals?

09:34:42  14       A.    Yes.

09:34:42  15       Q.    Do you know when it was that the Obamacare

09:34:42  16   passed?  Was that in January, 2014?

09:34:42  17       A.    I thought it was 2010.

09:34:42  18       Q.    Implemented.

09:34:42  19       A.    2014, yes, that makes sense.

09:34:42  20            THE COURT:  If you know.  You have to testify to

09:34:42  21   your recollection, sir.

09:34:42  22       A.    Yeah.  I don't know exactly when it started.

09:34:42  23   BY MR. KANG:

09:34:42  24       Q.    Do you know when the IFP book of business, Cigna

09:34:42  25   began that?

```
09:34:42  1        A.   Do I know what?

09:34:42  2        Q.   Let me strike that.  So was the IFP book of

09:34:42  3   business after the passage of Obamacare?  Was that a new

09:34:42  4   product?

09:34:42  5        A.   Yes.

09:34:42  6        Q.   You had talked about earlier an issue about

09:34:42  7   costs ramping up.  Do you remember that in your

09:34:42  8   testimony?

09:34:42  9        A.   Yes.

09:34:42 10        Q.   And that was costs associated with the IFP book

09:34:42 11   of business?

09:34:42 12        A.   Yes.

09:34:42 13        Q.   Explain what you meant by that.  What you meant

09:34:42 14   by ramp up in costs?

09:34:42 15        A.   Well, we should get out an exhibit.  You would

09:34:42 16   see that exhibit costs were flat all of 2014, very little

09:34:42 17   movement on substance use disorder fees.  Then you get

09:34:42 18   into 2015.  Immediately the ramp literally looks like,

09:34:42 19   looks like that.  So expenses were going up --

09:34:42 20             THE COURT:  Ah -- I'm sorry. Finish your answer.

09:34:42 21        A.   Expenses were going up at a crazy rate

09:34:42 22   literally.  I think it was around six or ten million

09:34:42 23   dollars a month.

09:34:42 24             THE COURT:  The witnesses was showing the jury

09:34:42 25   during his answers to flat hands and fingers, and when he
```

09:34:42  1    said 2015 he basically lifted his right hand up at a

09:34:42  2    fairly severe angle to his left to show a climbing rate.

09:34:42  3    Any objection to my characterization for the records?

09:34:42  4         MR. KANG:  No, Your Honor.

09:34:42  5         THE COURT:  Go ahead, Attorney Kang.

09:34:42  6    BY MR. KANG:

09:34:42  7         Q.   So what was the concern then about that ramp up?

09:34:42  8         A.   The concern was that it was driven by fraud.

09:34:42  9    Even if you look at the Obama administration, they had

09:34:42  10   announcements out at the time that there was risk in this

09:34:42  11   space.

09:34:42  12        Q.   Why was there a concern it was due to fraud and

09:34:42  13   not do to something else?

09:34:42  14        A.   The numbers were insanely high.  If you look at

09:34:42  15   the commercial book of business, I think we can look at

09:34:42  16   some of the specific numbers, I think we were paying

09:34:42  17   around four to six dollars per member per month.  If you

09:34:42  18   look at the IFP business, it was ramping up to a couple

09:34:42  19   of hundred dollars per member per month.  That's how much

09:34:42  20   you are spending for each member that's covered in the

09:34:42  21   plan.  You are talking about single digits, four to six

09:34:42  22   dollars being an established norm for the business, then

09:34:42  23   a quick ramp up to several hundred dollars a month, with

09:34:42  24   this book of business.  So it was clearly an outlier and

09:34:42  25   something was wrong.

| | | |
|---|---|---|
| 09:34:42 | 1 | Q.   So was Cigna concerned about this ramp up |
| 09:34:42 | 2 | because of its bottom line and profits? |
| 09:34:42 | 3 | A.   We were concerned because we thought there was |
| 09:34:42 | 4 | fraud. |
| 09:34:42 | 5 | Q.   Why was the concern that there was fraud? |
| 09:34:42 | 6 | A.   Because the numbers don't make sense. |
| 09:34:42 | 7 | MR. CUNNINGHAM:  Objection, Your Honor.  I think |
| 09:34:42 | 8 | this was subject of a motion in limine. |
| 09:34:42 | 9 | MR. KANG:  I think he opened the door to this, |
| 09:34:42 | 10 | Your Honor. |
| 09:34:42 | 11 | MR. CUNNINGHAM:  Or a court order. |
| 09:34:42 | 12 | THE COURT:  I'm sorry. |
| 09:34:42 | 13 | MR. CUNNINGHAM:  The use of that term, Your |
| 09:34:42 | 14 | Honor. |
| 09:34:42 | 15 | THE COURT:  Yeah.  It was in a question.  I'm so |
| 09:34:42 | 16 | sorry.  Now I'm understanding the point of your |
| 09:34:42 | 17 | objection.  Sir, that should not have been placed that |
| 09:34:42 | 18 | question as you placed it. |
| 09:34:42 | 19 | MR. KANG:  Your Honor, may we have a sidebar. |
| 09:34:42 | 20 | THE COURT:  Just one time.  Excuse us, Ladies |
| 09:34:42 | 21 | and gentlemen.  This will be brief. |
| 09:34:42 | 22 | (Beginning of sidebar.) |
| 09:34:42 | 23 | MR. KANG:  Your Honor was very clear when we had |
| 09:34:42 | 24 | our arguments of the motion in limine, if they opened the |
| 09:34:42 | 25 | door to suggest that the Core Action Team was set up -- |

09:34:42  1          THE COURT:  I don't think he opened door.  I

09:34:42  2     think your client had a very large shovel in his hand

09:34:42  3     through his direct examination and on any opportunity he

09:34:42  4     would add to what was a proper answer to the question and

09:34:42  5     shovel in things like fraud.  I don't know that that

09:34:42  6     means the lawyer opened the door.

09:34:42  7          MR. KANG:  My recollection was, Your Honor, on

09:34:42  8     this topic I had expressly stated to Your Honor during

09:34:42  9     our pretrial that if they suggested the Core Action Team

09:34:42  10    was meant to save money, increase profits, that would

09:34:42  11    open the door to ushering in evidence as to the real

09:34:42  12    reason, to prevent rampant fraud.  Your Honor ruled on

09:34:42  13    that.

09:34:42  14         THE COURT:  You may have said that.  I don't

09:34:42  15    have quite that specific recollection.  I know you

09:34:42  16    objected to the Core Action Team coming in. But it struck

09:34:42  17    me there was too much of an overlap between it and the

09:34:42  18    SIU as to the matters in the case.  It would not be

09:34:42  19    appropriate to keep out.  That doesn't mean everything

09:34:42  20    the Core Action Team was doing comes in.  I could be

09:34:42  21    mistaken.  But my recollection is fraud came in this

09:34:42  22    morning not because of a question, but by the witness's

09:34:42  23    desire to give an answer beyond the scope of the question

09:34:42  24    and thus get to talk about fraud, fraud, fraud.  So I

09:34:42  25    don't think it's proper for you to ask a question that

09:34:42  1    starts with a fraud.

09:34:42  2         MR. KANG:  Can I ask him the questions about

09:34:42  3    what the purpose of a Core Action Team was?

09:34:42  4         THE COURT:  Well, you have opened the door to

09:34:42  5    Core Action Team.  I don't see a question asking that.

09:34:42  6    Other than it's not relating necessarily to his clients

09:34:42  7    but when it was founded, set up, what was the purpose of

09:34:42  8    it, I don't find a problem with that one question.  If he

09:34:42  9    answers fraud among other things.

09:34:42  10        MR. CUNNINGHAM:  Your Honor, the problem --

09:34:42  11        THE COURT:  You did go there.

09:34:42  12        MR. CUNNINGHAM:  I understand that.

09:34:42  13        THE COURT:  You do?  Hurry up, we don't have a

09:34:42  14    lot of time left.

09:34:42  15        MR. CUNNINGHAM:  I need a curative instruction

09:34:42  16    or something because there is no allegation of fraud

09:34:42  17    against our clients in the case.  It's not part of this

09:34:42  18    case.

09:34:42  19        THE COURT:  I was wondering when you might get

09:34:42  20    to that.  He dropped the word "fraud" once.  He dropped

09:34:42  21    it a 100 times.

09:34:42  22        MR. CUNNINGHAM:  I was trying to stay away.

09:34:42  23        THE COURT:  Do you agree there's no allegation

09:34:42  24    of fraud in this case?

09:34:42  25        MR. KANG:  There's no allegation of fraud in the

09:34:42  1    case, but there's an allegation to the Labs saying we

09:34:42  2    unfairly targeted Epic just because they were a South

09:34:42  3    Florida provider.

09:34:42  4         THE COURT:  No.  Their allegation is you slapped

09:34:42  5    the word "fraud" on them in the midst of all these

09:34:42  6    corresponding emails, etc., in the course of the

09:34:42  7    investigation as a grounds to stop paying them when at

09:34:42  8    least in the end of it, the end of the day came

09:34:42  9    you didn't prove it and you don't claim it.

09:34:42  10        MR. CUNNINGHAM:  Your Honor, I think a simple

09:34:42  11   instruction that fraud is not an issue in this case --

09:34:42  12        THE COURT:  As to your client.

09:34:42  13        MR. CUNNINGHAM:  Yes.  I think that will fix it.

09:34:42  14        THE COURT:  You can ask about why was the team

09:34:42  15   set up after I give them the instruction.

09:34:42  16        (End of sidebar.)

09:34:42  17        THE COURT:  Ladies and Gentlemen, we heard a

09:34:42  18   word quite frequently this morning, often in answers

09:34:42  19   given by a witness, some of them I struck so you wouldn't

09:34:42  20   be remembering them, but some of them I think were.

09:34:42  21   There is nothing in this case about fraud, okay, as to

09:34:42  22   these three labs.

09:34:42  23        There will be allowed some questioning of the

09:34:42  24   witness about teams like Core Action Team or SIU and why

09:34:42  25   they were set up and what were they doing and looking

09:34:42  1    for.  You may hear the word "fraud" in connection with

09:34:42  2    that description of what were they set up to do and what

09:34:42  3    were they looking at.  I believe the parties have just

09:34:42  4    agreed with me over here there was no finding of fraud by

09:34:42  5    these three labs.  That's a big word "fraud."  People say

09:34:42  6    it and you go, whoa, you know.  You have to be very

09:34:42  7    careful not to let it -- not for you to absorb it as a

09:34:42  8    word that's relevant to the three labs here or the cases

09:34:42  9    here, okay?  Let's call it background, obviously Cigna

09:34:42  10   spent a lot of work looking into things and that's what

09:34:42  11   it's background to.

09:34:42  12          Is that all right?  Objection by anyone?  There

09:34:42  13   might be but is there anything the Court should correct

09:34:42  14   or you wish to make note of?

09:34:42  15          MR. CUNNINGHAM:  No objection from the Labs.

09:34:42  16          MR. KANG:  Not at this time.

09:34:42  17          THE COURT:  You may continue, Attorney Kang, as

09:34:42  18   we agreed to, why was it formed the Core Action Team,

09:34:42  19   okay?

09:34:42  20   BY MR. KANG:

09:34:42  21      Q.   So Mr. Norton, can you tell the jury why the

09:34:42  22   Core Action Team to your understanding was formed?

09:34:42  23      A.   It was based on what we viewed as an

09:34:42  24   unreasonable ramp in the expenses for substance abuse

09:34:42  25   disorder treatment.  That was split into primarily driven

09:34:42  1   by call it 50/50, lab excessive testing.  So folks would

09:34:42  2   test, you know, every day, every two days and not just

09:34:42  3   test the drugs of concern but test 20, 30, 40, different

09:34:42  4   drugs for no good reason.  That was on the lab side on

09:34:42  5   the substance use disorder and what I mean by that is the

09:34:42  6   treatment centers.  There were also abuses in the

09:34:42  7   treatment centers where billing did not tie with the

09:34:42  8   status of the person as well as patient brokering.

09:34:42  9        So when you have an individual plan it's

09:34:42  10  different than a group plan.  Group plan I referenced

09:34:42  11  earlier is your employer buys your plan.  On an

09:34:42  12  individual plan, there's -- there were a lot of issues

09:34:42  13  around patient brokering.  Transferring patients,

09:34:42  14  basically treating the patients as revenue drivers.

09:34:42  15       So if you get a patient, you can bill out 40,

09:34:42  16  50,000 a month while you are paying a few hundred dollars

09:34:42  17  for the health care.  Someone essentially says, I want

09:34:42  18  to go into a treatment center.  The treatment center buys

09:34:42  19  the health care plan for them.  They go in and the

09:34:42  20  treatment center bills, you know, tens of thousands of

09:34:42  21  dollars each month.

09:34:42  22       So we saw collectively again that numeric ramp.

09:34:42  23  We have a responsibility from a regulatory perspective to

09:34:42  24  understand if there's a risk of fraud, so when we're

09:34:42  25  audited, the regulator can say you did not take

09:34:42  1    reasonable action to protect against the risk of fraud.

09:34:42  2    And the Labs have that same responsibility which we can

09:34:42  3    talk about separately.

09:34:42  4         THE COURT:  I think we're talking about why the

09:34:42  5    Core Action Team was formed.  I think we're a bit off

09:34:42  6    field and we should continue to another question that can

09:34:42  7    be answered or objected to.

09:34:42  8    BY MR. KANG:

09:34:42  9         Q.   The name Eva Borden has been mentioned a couple

09:34:42  10   of times.  Do you recall that?

09:34:42  11        A.   Yes.

09:34:42  12        Q.   Who was Eva Borden back in 2015?

09:34:42  13        A.   She was the chief risk officer for the IFP

09:34:42  14   business.

09:34:42  15        Q.   She was not a member of SIU?

09:34:42  16        A.   No.

09:34:42  17        Q.   What does a chief risk officer do?

09:34:42  18        A.   I can't give a comprehensive answer.  I can tell

09:34:42  19   you she would work with the compliance organization.

09:34:42  20   Compliance is a function that's held within the legal

09:34:42  21   department in general, so Eva would have partnered with

09:34:42  22   the compliance organization.

09:34:42  23        Q.   When was the work on the, what we refer to as

09:34:42  24   the Core Action Team, when did that get started?

09:34:42  25        A.   I believe mid-July.

09:34:42  1      Q.   Of what year?

09:34:42  2      A.   Sorry, 2015.

09:34:42  3      Q.   When you describe the ramp up, when was the ramp

09:34:42  4  up in cost associated with the IFP book of business

09:34:42  5  noticed?

09:34:42  6      A.   Probably February.  At that point, you have

09:34:42  7  January actuals so you can start seeing January and

09:34:42  8  February trending at an entirely different level.

09:34:42  9      Q.   You had mentioned that there was an outlier with

09:34:42  10  respect to the rest of Cigna's business.  Was the spend

09:34:42  11  in 2015 noticed as an outlier even within the IFP book of

09:34:42  12  business when compared with a previous year?

09:34:42  13      A.   Absolutely.

09:34:42  14      Q.   Describe that to the jury.

09:34:42  15      A.   Honestly that's the picture I drew earlier.  So

09:34:42  16  steady level of spend across the IFP and then a severe

09:34:42  17  ramp up.

09:34:42  18          MR. KANG:  Your Honor, should we keep going?

09:34:42  19          THE COURT:  Perfect. 11:15.  We'll take our

09:34:42  20  morning recess.  It's another beautiful day, warm.  I

09:34:42  21  encourage you to go out the back or front get some fresh

09:34:42  22  air.  See you back at 11:30.

09:34:42  23          Mr. Norton, we need you back a few minutes

09:34:42  24  before a 11:30 so we don't keep the jury waiting.  You

09:34:42  25  are excused now.  Absolutely.

```
09:34:42   1              (In the absence of the jury at 11:15 a.m.)
09:34:42   2         THE COURT:  Everybody be seated.  Is there
09:34:42   3    anything that the Court has to take up at this time?
09:34:42   4         MR. CUNNINGHAM:  Nothing from the Labs, Your
09:34:42   5    Honor.
09:34:42   6         MR. KANG:  No, Your Honor.
09:34:42   7         THE COURT:  Thanks. We'll take a brief recess.
09:34:42   8              (Whereupon, a recess was taken from 11:15 a.m.
09:34:42   9    to 11:29 a.m.)
09:34:42  10         THE COURT:  Are there any witnesses in the back
09:34:42  11    of the court?
09:34:42  12         MS. KINGSBERY: Other than Dr. Clark right here,
09:34:42  13    our expert.
09:34:42  14         THE COURT:  An expert.  Okay.  That's fine.
09:34:42  15         If I could just ask folks to let me know that
09:34:42  16    when we come back.
09:34:42  17         MS. KINGSBERY:  No one else.
09:34:42  18         THE COURT:  How long do you think you will be,
09:34:42  19    Attorney Kang?  And I'm assuming including direct by you.
09:34:42  20         MR. KANG:  I would say estimate around 20
09:34:42  21    minutes, Your Honor.
09:34:42  22         THE COURT:  Oh, okay.
09:34:42  23         MR. CUNNINGHAM:  Mr. Kang, will let us know when
09:34:42  24    he's converting from --
09:34:42  25         THE COURT:  Yes, definitely he's going to do
```

09:34:42  1    that.  Right, Attorney Kang?

09:34:42  2              MR. KANG:  Yes, Your Honor.

09:34:42  3              MR. CHRIST:  He's not on the witness list,

09:34:42  4    though.

09:34:42  5              THE COURT:  What's that?

09:34:42  6              MR. GESTRICH:  Mr. Norton is not on the witness

09:34:42  7    list for Cigna.

09:34:42  8              THE COURT:  Is that right?

09:34:42  9              Attorney Kang, that's a problem.

09:34:42  10             I don't know where the witness lists were, but

09:34:42  11   I'll take your word for it.

09:34:42  12             MR. KANG:  I think that most of my areas are

09:34:42  13   within the scope of cross anyway.

09:34:42  14             THE COURT:  All right.  Then that's great.

09:34:42  15   Thank you.

09:34:42  16             (In the presence of the jury at 11:31 a.m.)

09:34:42  17             THE COURT:  Welcome back, ladies and gentlemen.

09:34:42  18   That felt good.  A little short, but felt good.

09:34:42  19   Everybody be seated.

09:34:42  20             We're ready to continue with the

09:34:42  21   cross-examination by Attorney Kang of Mr. Norton.

09:34:42  22             Whenever you are ready, sir.

09:34:42  23   BY MR. KANG:

09:34:42  24     Q.   Good morning, Mr. Norton.

09:34:42  25             So when we broke, you were explaining to the

09:34:42    1    jury the reasons for the Core Action Team being formed.

09:34:42    2    Do you remember that?

09:34:42    3        A.    Yes.

09:34:42    4        Q.    And due to the concerns that you testified about

09:34:42    5    earlier, did there come a time when something called the

09:34:42    6    IFP lab edit or IFP edit was implemented?

09:34:42    7        A.    Yes.

09:34:42    8        Q.    And when, approximately, was the IFP lab edit

09:34:42    9    implemented?

09:34:42    10        A.    It took effect on May 11, 2015.

09:34:42    11        Q.    Tell the jury what the IFP lab edit was.

09:34:42    12        A.    Any claim that had more than four tests on a

09:34:42    13    claim was pulled to the side.  A letter would be sent to

09:34:42    14    the lab inclusive of language from the Federal Register

09:34:42    15    reminding the labs that it's their responsibility to

09:34:42    16    substantiate the appropriateness of the charges that are

09:34:42    17    run through the lab.

09:34:42    18            That letter went out.  Then 30 days after that a

09:34:42    19    reminder letter would be sent.  60 days from the original

09:34:42    20    date another reminder would be sent.  And at 90 days, if

09:34:42    21    nothing was received or reviewed, then it would be

09:34:42    22    denied.

09:34:42    23        Q.    So the IFP lab edit, if I understand, that was

09:34:42    24    an edit, not a denial flag?

09:34:42    25        A.    Correct.  It's just asking for information.

09:34:42  1    Q.   So did the IFP lab edit then automatically deny

09:34:42  2    all claims that were submitted by labs?

09:34:42  3    A.   No.

09:34:42  4    Q.   If the lab that was placed in the IFP edit

09:34:42  5    provided sufficient medical records to substantiate their

09:34:42  6    services, what could happen to those claims?

09:34:42  7    A.   Those claims would be paid.

09:34:42  8    Q.   Did the IFP lab edit apply to all labs in

09:34:42  9    Florida?

09:34:42  10   A.   No.  The worst of the worst were picked from a

09:34:42  11   numbers perspective.  So seven TINs went in on May 11th.

09:34:42  12   An additional 14 TINs on, I believe, July 22nd.

09:34:42  13   Q.   So when you say TINs, you are saying seven labs

09:34:42  14   initially went into that edit?

09:34:42  15   A.   Correct.

09:34:42  16   Q.   And then another how many did you say were

09:34:42  17   added?

09:34:42  18   A.   Another 14.

09:34:42  19   Q.   Were there any others that you're aware of?

09:34:42  20   A.   There were one or two flips off where a lab was

09:34:42  21   taken off and another lab was put on.

09:34:42  22   Q.   So how many labs then ultimately were impacted

09:34:42  23   by this IFP lab edit?

09:34:42  24   A.   I imagine 24 would be right.  So there would be

09:34:42  25   the 22 that were put in and then those couple where one

09:34:42  1    was taken off and replaced with another.

09:34:42  2        Q.    Were these labs identified, as you said, the

09:34:42  3    worst of the worst?

09:34:42  4        A.    Yes.

09:34:42  5        Q.    Outliers?

09:34:42  6        A.    Yes, exactly.

09:34:42  7        Q.    What criteria was used to put a lab into the IFP

09:34:42  8    edit?

09:34:42  9        A.    If would be the intensity of their billing.

09:34:42  10       Q.    And so was it intended to apply only to labs

09:34:42  11   that were outliers in terms of their patterns of billing?

09:34:42  12       A.    Yes.  They were selected based on being

09:34:42  13   outliers.

09:34:42  14       Q.    To your knowledge, Mr. Norton, was PB Labs ever

09:34:42  15   impacted by this IFP edit?

09:34:42  16       A.    No, it was not.

09:34:42  17       Q.    Why not?

09:34:42  18       A.    It was already flagged and it was not an issue

09:34:42  19   at that time.

09:34:42  20       Q.    The investigation had been done already?

09:34:42  21       A.    Concluded.  I mean, more simplistically, they

09:34:42  22   were not an outlier at that point because lab charges

09:34:42  23   weren't going through.

09:34:42  24       Q.    Was BioHealth every impacted by the IFP edit?

09:34:42  25       A.    No.  Same answer.  They weren't an outlier

09:34:42  1   because no claims were going through.

09:34:42  2       Q.   They had already been flagged by SIU at that

09:34:42  3   point?

09:34:42  4       A.   Yes.

09:34:42  5       Q.   So of these three labs, was Epic the only one

09:34:42  6   that was impacted by the IFP edit?

09:34:42  7       A.   Yes.

09:34:42  8       Q.   When did Epic go into the IFP edit?

09:34:42  9       A.   July 22nd.

09:34:42  10      Q.   You had indicated there were two rounds, an

09:34:42  11  initial round of seven and then another of 14, correct?

09:34:42  12      A.   Yes.

09:34:42  13      Q.   Which round of labs was Epic placed into the

09:34:42  14  edit?

09:34:42  15      A.   They were on the 14.

09:34:42  16      Q.   They were in the second round?

09:34:42  17      A.   Correct.

09:34:42  18      Q.   And why was Epic put into the edit?

09:34:42  19      A.   Why was it added to the edit?

09:34:42  20      Q.   Why was Epic put into the edit?

09:34:42  21      A.   Again, based purely on numbers in terms of being

09:34:42  22  an outlier.

09:34:42  23      Q.   They were one of the worst of the worst?

09:34:42  24      A.   Correct.

09:34:42  25      Q.   When Epic was placed into that edit, were their

09:34:42  1    claims automatically denied?

09:34:42  2         A.   No.

09:34:42  3         Q.   If Epic had provided medical records to

09:34:42  4    substantiate their services, could their claims have been

09:34:42  5    paid?

09:34:42  6         A.   Yes, if found to be appropriate.

09:34:42  7         Q.   Did there come a time when the IFP lab edit

09:34:42  8    eventually expired?

09:34:42  9         A.   Yes.

09:34:42  10        Q.   When was that?

09:34:42  11        A.   Its functional use was no longer necessary as of

09:34:42  12   mid October.  The coding had been changed.  Coverage

09:34:42  13   policy had been pushed through the main systems.  So the

09:34:42  14   prepay edit is a way to get something done.  There's

09:34:42  15   actually a more systemic way built into the mainframe as

09:34:42  16   well.  So at the point, we systemically moved it into the

09:34:42  17   mainframe --

09:34:42  18        Q.   Could you move the mic a little bit closer.

09:34:42  19   Thank you.

09:34:42  20             Could you repeat your answer, Mr. Norton?

09:34:42  21        A.   Sure.  It was -- sorry.  It was retired due to a

09:34:42  22   lack of need for the edit.  So it was pushed into the

09:34:42  23   mainframe.  So the same functionality was produced, just

09:34:42  24   at a different kind of tactical administrative way.

09:34:42  25        Q.   When you are referring to a different way, was

09:34:42  1    that a drug coverage policy that came into effect in

09:34:42  2    October of 2015?

09:34:42  3        A.   Yes, that's correct.

09:34:42  4        Q.   So passage of that coverage policy essentially

09:34:42  5    obviated or mooted the need for the IFP edit?

09:34:42  6        A.   Correct.

09:34:42  7        Q.   I want to go back to one of the documents that

09:34:42  8    Mr. Cunningham showed you.  It's Labs Exhibit 6586.  If

09:34:42  9    we could put that up, please.

09:34:42  10            Do you recall Mr. Cunningham showing you this

09:34:42  11   document?

09:34:42  12       A.   Yes.

09:34:42  13       Q.   Mr. Salazar, if we can go back up to the top.

09:34:42  14            This was the email that you had sent to Jeff

09:34:42  15   Rigg; is that right?

09:34:42  16       A.   Correct.

09:34:42  17       Q.   Who is Jeff Rigg at this time?

09:34:42  18       A.   He was my boss at the time.  Chief Auditor.

09:34:42  19       Q.   Mr. Cunningham went through it, but the last two

09:34:42  20   sentences here, you write to Mr. Riggs:  Since these Labs

09:34:42  21   are highly suspect, a good portion of these funds will

09:34:42  22   prove to be inappropriate, i.e., will not be paid.  What

09:34:42  23   did you mean by inappropriate?

09:34:42  24       A.   Not substantiated by medical necessity.  Not

09:34:42  25   required.  Billed excessively.  Billed to generally drive

09:34:42  1    reimbursement as opposed to care of the customer and the

09:34:42  2    patient.

09:34:42  3        Q.    Wasteful?

09:34:42  4        A.    Correct.

09:34:42  5        Q.    Abusive?

09:34:42  6        A.    Correct.

09:34:42  7        Q.    You then write:  The IFP people are very happy.

09:34:42  8    And Mr. Cunningham told you about that.  What did you

09:34:42  9    mean by the IFP people are very happy?

09:34:42  10       A.    They were concerned that fraud was slipping

09:34:42  11   through or wasteful payments were slipping through.  So

09:34:42  12   they were happy that there was intervention to make sure

09:34:42  13   that the payments were inappropriate.

09:34:42  14       Q.    Did you mean they were happy because the money

09:34:42  15   being saved was boosting up Cigna's profits?

09:34:42  16       A.    No.  We don't think that way.

09:34:42  17       Q.    Did you mean that they were happy because the

09:34:42  18   money not paid to these providers would increase Cigna's

09:34:42  19   stock price?

09:34:42  20       A.    No.

09:34:42  21       Q.    Put that down, Mr. Salazar.

09:34:42  22             I want to show you another document that

09:34:42  23   Mr. Cunningham went through with you.  6606.  Lab 6606.

09:34:42  24             And this was the exchange that you had with Phil

09:34:42  25   Rabinowitz.  Do you remember this?

09:34:42  1      A.    Yes.

09:34:42  2      Q.    And, Mr. Salazar, if we could go to the third

09:34:42  3  page of this document.  If you can zoom in maybe just the

09:34:42  4  top half of this.  Thank you.

09:34:42  5            And you remember Mr. Cunningham showing you this

09:34:42  6  exchange?

09:34:42  7      A.    Yes.

09:34:42  8      Q.    Mr. Salazar, if we can go down just a little

09:34:42  9  bit, sir.

09:34:42  10           He highlighted for you that last sentence in the

09:34:42  11  email from Dr. Rabinowitz to you, correct?

09:34:42  12     A.    Yes.

09:34:42  13     Q.    In particular, he highlighted the phrase, but

09:34:42  14  I'm not sure we can say the same for labs as they are

09:34:42  15  just following the orders.  Do you see that?

09:34:42  16     A.    I do.

09:34:42  17     Q.    What did you understand Dr. Rabinowitz to mean

09:34:42  18  about labs just following the orders there?

09:34:42  19     A.    What he's referring to is that the labs are

09:34:42  20  fulfilling based on the referring physician.  The issue

09:34:42  21  is Dr. Rabinowitz is not familiar with the actual

09:34:42  22  compliance guidelines and requirements.  As I referenced

09:34:42  23  within the letter itself, the lab letter itself, we

09:34:42  24  identified national register requirements relative to the

09:34:42  25  compliance department for a lab which does require very

09:34:42  1    substantiated appropriateness of the charges.

09:34:42  2        Q.   Did you agree with Dr. Rabinowitz's email here

09:34:42  3    that labs don't need to determine medical necessity, they

09:34:42  4    can just follow doctor orders?  Did you agree with?

09:34:42  5        A.   I provided the phrasing that's issued on the

09:34:42  6    letter that we make the request that identifies that call

09:34:42  7    out.

09:34:42  8        Q.   If you can scroll back up, Mr. Salazar, to the

09:34:42  9    top on this.

09:34:42  10            In fact, here, and we'll see the rest of this

09:34:42  11   email, but you see this is a response, the end of a

09:34:42  12   response that you have to Dr. Rabinowitz's statement,

09:34:42  13   correct?

09:34:42  14       A.   Yes.

09:34:42  15       Q.   It says:  This guideline indicates to me the lab

09:34:42  16   has a responsibility to provide services that would

09:34:42  17   reasonably be considered medically necessary, right?

09:34:42  18       A.   Correct.

09:34:42  19       Q.   What did you mean by that?

09:34:42  20       A.   There's published requirements from the Office

09:34:42  21   of the Inspector General, as part of the Department of

09:34:42  22   Health and Human Services, that requires labs

09:34:42  23   substantiate the appropriateness and have proper

09:34:42  24   controls on referring physician orders.  So just like

09:34:42  25   when we're audited by the Government or by a state, we

09:34:42   1    have a responsibility to substantiate the appropriateness

09:34:42   2    of the fees and address outliers.  So it's the same for

09:34:42   3    the lab.  They have to do the same thing.

09:34:42   4         Q.   In other words, the labs couldn't just put their

09:34:42   5    head in the sand and say they were relying on doctor's

09:34:42   6    orders?

09:34:42   7         A.   Correct.

09:34:42   8         Q.   And you were basing that on some guidelines,

09:34:42   9    correct?

09:34:42   10        A.   Correct.  Federal Register.

09:34:42   11        Q.   If we can scroll up, Mr. Salazar, a little bit,

09:34:42   12   we'll see what you were referring to.

09:34:42   13             Is this your email, the rest of the email that

09:34:42   14   we saw the end of?

09:34:42   15        A.   Yes.  This was the next one.

09:34:42   16        Q.   Here you reference a August 24, 1998 HHS OIG

09:34:42   17   Compliance Program Guidelines for Clinical Laboratories.

09:34:42   18   Do you see that?

09:34:42   19        A.   Yes.

09:34:42   20        Q.   We'll see that in a minute.  What do you

09:34:42   21   understand that document to be?

09:34:42   22        A.   It's guidelines relative to how to run a

09:34:42   23   Compliance Department.  So it fairly specifically

09:34:42   24   identifies the fact that appropriate analytics should be

09:34:42   25   in place to understand that the orders are correct and

09:34:42  1    reasonable.  And outreach should be made to the ordering

09:34:42  2    physician if concerns are present.

09:34:42  3        Q.   And you write in the bullet point there that

09:34:42  4    according to the guidelines, the OIG Guidelines, clinical

09:34:42  5    laboratories are required to communicate to physicians

09:34:42  6    that claims submitted for service will only be paid if

09:34:42  7    the service is covered, reasonable, and necessary for the

09:34:42  8    beneficiary given his or her clinical condition.

09:34:42  9    Laboratories should take all reasonable steps to ensure

09:34:42  10   that it is not submitting claims for services that are

09:34:42  11   not covered reasonable and necessary.

09:34:42  12            Did I read that correctly?

09:34:42  13       A.   Yes.

09:34:42  14       Q.   Where were you getting that language from?

09:34:42  15       A.   That's the Federal Register, Office of the

09:34:42  16   Inspector General.

09:34:42  17       Q.   Was this a publicly available document?

09:34:42  18       A.   Yes.

09:34:42  19       Q.   And then if you go up, you sent this to Dr.

09:34:42  20   Rabinowitz, right?

09:34:42  21       A.   Yes.

09:34:42  22       Q.   If you can scroll up to the next page.

09:34:42  23            Did Dr. Rabinowitz respond to you?

09:34:42  24       A.   Yes.

09:34:42  25       Q.   Keep going up, Mr. Salazar.  A little bit down.

09:34:42   1    The next email.  There you go.

09:34:42   2         His response to you, after you sent him the

09:34:42   3    language on the OIG guidance is:  "Thanks Matt.  Actually

09:34:42   4    I think referencing that OIG guideline on performance of

09:34:42   5    medically unnecessary testing is brilliant.  I was not

09:34:42   6    familiar with that one.  I can get behind that."

09:34:42   7         Did I read that correctly?

09:34:42   8    A.   Yes.

09:34:42   9    Q.   So what did you understand him to be meaning

09:34:42  10    there?

09:34:42  11    A.   He was not aware that those guidelines existed.

09:34:42  12    Q.   And so when we said in the prior email that labs

09:34:42  13    can just simply say that they were following orders, do

09:34:42  14    you understand that he was not aware of this guidance

09:34:42  15    that you had now pointed out to him?

09:34:42  16    A.   Correct.

09:34:42  17    Q.   And he said, his response was I can say get

09:34:42  18    behind that?

09:34:42  19    A.   Correct.

09:34:42  20    Q.   So I'd like to show you what's been marked as

09:34:42  21    Cigna Exhibit 2880.

09:34:42  22         THE COURT:  This is ID or is it full?

09:34:42  23         MR. KANG:  This is ID right now.  I believe

09:34:42  24    there's an objection on this one.  I would like to lay a

09:34:42  25    foundation, Your Honor.

09:34:42   1          THE COURT:  Go ahead.  Let Liana know.

09:34:42   2          MR. KANG:  Thank you.

09:34:42   3          Is there still objection on this one, counsel?

09:34:42   4          THE COURT:  2880, go ahead and lay your

09:34:42   5   foundation and then we'll see if there's an objection.

09:34:42   6          MR. KANG:  Thank you.

09:34:42   7   BY MR. KANG:

09:34:42   8      Q.   Mr. Norton, do you recognize this document?

09:34:42   9      A.   Yes.

09:34:42   10     Q.   What is this document?

09:34:42   11     A.   This is the reference, Federal Register, from

09:34:42   12  the Office of the Inspector General.

09:34:42   13     Q.   This is the OIG guidance from 1998 that you

09:34:42   14  were referring to in your email to Dr. Rabinowitz?

09:34:42   15     A.   Correct.

09:34:42   16     Q.   And do you see at the top there.  Does it

09:34:42   17  indicate the source and where this guideline was

09:34:42   18  published?

09:34:42   19     A.   Federal Register, Volume 63, number 163.

09:34:42   20     Q.   Do you understand that to be a publicly

09:34:42   21  available record?

09:34:42   22     A.   I do.

09:34:42   23          MR. KANG:  Your Honor, I would say offer this.

09:34:42   24          THE COURT:  Under what exception?

09:34:42   25          MR. KANG:  803-8, public records.

| | | |
|---|---|---|
| 09:34:42 | 1 | THE COURT:  Objection? |
| 09:34:42 | 2 | MR. CUNNINGHAM:  The objection was hearsay, Your |
| 09:34:42 | 3 | Honor. |
| 09:34:42 | 4 | THE COURT:  Right.  But 803 is exceptions to |
| 09:34:42 | 5 | hearsay.  Public records.  Any reason that I should not |
| 09:34:42 | 6 | admit it under that exception? |
| 09:34:42 | 7 | MR. CUNNINGHAM:  I don't know that a proper |
| 09:34:42 | 8 | predicate has been laid to establish that it's a public |
| 09:34:42 | 9 | record. |
| 09:34:42 | 10 | THE COURT:  Objection's overruled. |
| 09:34:42 | 11 | The Court will take judicial notice it purports |
| 09:34:42 | 12 | to be a publication in the Federal Register. |
| 09:34:42 | 13 | MR. KANG:  Thank you, Your Honor. |
| 09:34:42 | 14 | May we publish? |
| 09:34:42 | 15 | THE COURT:  Yes, you may. |
| 09:34:42 | 16 | MR. KANG:  Thank you. |
| 09:34:42 | 17 | BY MR. KANG: |
| 09:34:42 | 18 | Q.  Mr. Norton, do you recognize this document? |
| 09:34:42 | 19 | A.  Yes. |
| 09:34:42 | 20 | Q.  Is this document -- what is this document, sir? |
| 09:34:42 | 21 | A.  It's general guidelines relative to our |
| 09:34:42 | 22 | compliance department -- |
| 09:34:42 | 23 | THE COURT:  You're going to have to keep your |
| 09:34:42 | 24 | voice up, sir.  General guidelines, we heard that.  After |
| 09:34:42 | 25 | that, what did you say? |

```
09:34:42   1        A.   Sorry.  General guidelines on how to run and
09:34:42   2   organize a compliance department for labs.
09:34:42   3   BY MR. KANG:
09:34:42   4        Q.   Was this the guidance that you were referring to
09:34:42   5   in your email to Dr. Rabinowitz?
09:34:42   6        A.   Yes.
09:34:42   7        Q.   And this is a several page document, is it not?
09:34:42   8        A.   Yes.
09:34:42   9        Q.   Did you understand this to be the leading
09:34:42   10  authority on compliance requirements for clinical
09:34:42   11  laboratories as of 1998 and onwards?
09:34:42   12       A.   Yes.
09:34:42   13            MR. CUNNINGHAM:  Objection.  Calls for expert
09:34:42   14  testimony.
09:34:42   15            THE COURT:  Sustained.
09:34:42   16  BY MR. KANG:
09:34:42   17       Q.   Mr. Salazar, can we turn to 45079.
09:34:42   18            THE COURT:  Is that a page in this exhibit?
09:34:42   19            MR. KANG:  Yes, it is.
09:34:42   20            THE COURT:  Thank you.
09:34:42   21  BY MR. KANG:
09:34:42   22       Q.   If we can zoom into the middle column, Mr.
09:34:42   23  Salazar.  And actually, this middle column, if we can
09:34:42   24  scroll down, Mr. Salazar.  All the way down.
09:34:42   25            And this is under a section called Medical
```

09:34:42  1    Necessity, correct?

09:34:42  2         A.    I presume, yes.  Oh, got it.  Yes.

09:34:42  3         Q.    And it starts here at the bottom and then it

09:34:42  4    continues on the second column, correct?

09:34:42  5         A.    Yes.

09:34:42  6         Q.    All right.  And do you see that in that section

09:34:42  7    on Medical Necessity, it states -- and if you could

09:34:42  8    highlight this, Mr. Salazar, for the jury's benefit.

09:34:42  9         "Laboratories should take all reasonable steps

09:34:42  10   to ensure that it is not submitting claims for services

09:34:42  11   that are not covered, reasonable, and necessary."

09:34:42  12        Did I read that correctly?

09:34:42  13        A.    Yes.

09:34:42  14        Q.    What did you understand that to mean?

09:34:42  15        A.    Exactly what it says.  That they are responsible

09:34:42  16   to ensure that the billing is appropriate.

09:34:42  17        Q.    Mr. Salazar, if you can zoom out.  And If I

09:34:42  18   could highlight the next part, which states:  "Upon

09:34:42  19   request, the laboratory should be able to produce or

09:34:42  20   obtain from the treating physician, test ordering

09:34:42  21   authorized person on the physician's staff or other

09:34:42  22   individual authorized by law to order tests, that

09:34:42  23   documentation to support the medical necessity of the

09:34:42  24   service the laboratory has provided and billed to a

09:34:42  25   federal or private healthcare program."

09:34:42  1          Did I had read that correctly?

09:34:42  2     A.   Yes.

09:34:42  3     Q.   Based on this, whose responsibility did you

09:34:42  4  understand it is in a clinical laboratory setting to

09:34:42  5  provide medical records to justify the medical necessity

09:34:42  6  of services?

09:34:42  7     A.   It's the lab.

09:34:42  8     Q.   Is it Medicare or Cigna's responsibility to get

09:34:42  9  those documents?

09:34:42  10    A.   It is not.

09:34:42  11    ?

09:34:42  12    Q.   If we can put that down, Mr. Salazar.

09:34:42  13         Go to 45080.

09:34:42  14         THE COURT:  Could you tell me the date of that

09:34:42  15  document?

09:34:42  16         MR. KANG:  Yes, ma'am.  Yes, Judge.  August 24,

09:34:42  17  1998.

09:34:42  18         Oh, and actually -- Judge, it reminds me I have

09:34:42  19  a question.

09:34:42  20  BY MR. KANG:

09:34:42  21    Q.   Did you understand this guidance to be in effect

09:34:42  22  during the time period at issue in this case, 2012 to

09:34:42  23  2017?

09:34:42  24    A.   Yes.

09:34:42  25    Q.   So 45080.  I would say like to call out your

09:34:42  1  attention to another section that states:  "The OIG

09:34:42  2  believes that laboratories can and should take the steps

09:34:42  3  described in this compliance guidance to help ensure

09:34:42  4  appropriate billing of lab tests."

09:34:42  5       Did I read that correctly?

09:34:42  6  A.   Yes.

09:34:42  7  Q.   What do you understand that to mean?

09:34:42  8       MR. CUNNINGHAM:  Objection, Your Honor.  702,

09:34:42  9  calling for expert testimony.

09:34:42  10       THE COURT:  Well, that and -- yeah, sustained.

09:34:42  11  BY MR. KANG:

09:34:42  12  Q.   Is that what this document says in the section

09:34:42  13  entitled Test Utilization Monitoring?

09:34:42  14  A.   Sorry.  I fell behind you.  What are you asking?

09:34:42  15  Q.   Is the words that are highlighted, in fact, does

09:34:42  16  it appear under a section called Test Utilization

09:34:42  17  Monitoring?

09:34:42  18  A.   Yes.

09:34:42  19       ?

09:34:42  20  Q.   You can put that down.  And if we could turn to

09:34:42  21  28 -- 2228, Mr. Salazar.

09:34:42  22       THE COURT:  That's a Cigna exhibit?

09:34:42  23       MR. KANG:  Yes, Your Honor.  Cigna Exhibit 2228.

09:34:42  24  Thank you.

09:34:42  25  BY MR. KANG:

09:34:42  1    Q.   Mr. Norton, do you recognize this document

09:34:42  2    that's marked as 2228 for identification?

09:34:42  3    A.   Yes, I do.

09:34:42  4    Q.   What is it?

09:34:42  5    A.   This was an update that was probably used at one

09:34:42  6    of those working session meetings.

09:34:42  7    Q.   And were these one of the working session

09:34:42  8    meetings that you would have attended personally?

09:34:42  9    A.   Yes.

09:34:42  10   Q.   Was this document prepared by someone with

09:34:42  11   knowledge of the matters described in this presentation?

09:34:42  12   A.   Yes.

09:34:42  13   Q.   Would it have been prepared by Ms. Borden or

09:34:42  14   someone from her team?

09:34:42  15   A.   I'm confident Ms. Borden would have approved it

09:34:42  16   before it was presented.

09:34:42  17   Q.   Was this document kept in the regular course of

09:34:42  18   regularly conducted activity by Cigna?

09:34:42  19   A.   Yes.

09:34:42  20   Q.   This with an example of the periodic updates of

09:34:42  21   the Core Action Team?

09:34:42  22   A.   Yes.

09:34:42  23   Q.   Was making this document a regular practice of

09:34:42  24   Ms. Borden and her team at this time?

09:34:42  25   A.   Similar documents, yes.

09:34:42    1              MR. KANG:  Your Honor, I offer Cigna Exhibit

09:34:42    2    2228 as a business record.

09:34:42    3              THE COURT:  Objection?

09:34:42    4              MR. CUNNINGHAM:  Your Honor, I don't think it

09:34:42    5    satisfies the requirements of a business record in terms

09:34:42    6    of its creation.  I don't think that's been established.

09:34:42    7              THE COURT:  What aspect doesn't it satisfy?

09:34:42    8              MR. CUNNINGHAM:  Well, I think it has to be

09:34:42    9    created by a person with knowledge or -- let me pull up

09:34:42   10    the exception, Your Honor, if I may?

09:34:42   11              THE COURT:  Yes.  That's what I was just doing

09:34:42   12    myself.  Made at or near the time or from information

09:34:42   13    transmitted by someone with knowledge.  That would be

09:34:42   14    what you just mentioned.  It's kept in the course of

09:34:42   15    regularly conducted business.  Making the record was a

09:34:42   16    regular practice of that activity.  All these conditions

09:34:42   17    are shown by the testimony of a qualified witness.  And

09:34:42   18    there's no other showing it's unreliable.

09:34:42   19              MR. CUNNINGHAM:  I don't think they satisfied

09:34:42   20    subsection C, Your Honor.  I believe this is like a

09:34:42   21    one-off PowerPoint presentation.  There's no showing

09:34:42   22    that --

09:34:42   23              THE COURT:  Subsection C.  Make it as a regular

09:34:42   24    practice.

09:34:42   25              MR. CUNNINGHAM:  Right.

| 09:34:42 | 1 | THE COURT:  Attorney Kang. |

09:34:42  1        THE COURT:  Attorney Kang.

09:34:42  2        MR. KANG:  I think the last question I asked

09:34:42  3  Mr. Norton was whether he was aware whether making this

09:34:42  4  document was a regular practice of Ms. Borden and her

09:34:42  5  team at this time.  And he said yes.

09:34:42  6        THE COURT:  Do you want to voir dire on that?

09:34:42  7  He did answer a question was making this document a

09:34:42  8  regular practice of -- I can't read it -- regular

09:34:42  9  practice of the team at this time.

09:34:42  10       Similar documents, yes, was his answer.

09:34:42  11       And asked was it periodic updates of Core Action

09:34:42  12  Team.  And he answered I can't say.

09:34:42  13       I don't think you have laid a sufficient

09:34:42  14  foundation.  I know the rule has proved well beyond the

09:34:42  15  idea that it's the entry that I paid my gas bill on a

09:34:42  16  certain day.  That record would be a business record.

09:34:42  17  But I'm not sure you have met it.

09:34:42  18       At this point the objection is sustained.  But

09:34:42  19  you may proceed if you wish to press.

09:34:42  20       MR. KANG:  May I ask some more questions to see

09:34:42  21  if I can lay a further foundation?

09:34:42  22       THE COURT:  Yes.  That's exactly what I meant.

09:34:42  23  I obviously wasn't clear.  But you go ahead.

09:34:42  24  BY MR. KANG:

09:34:42  25    Q.  Mr. Norton, are you personally familiar with

09:34:42  1    this particular document?

09:34:42  2         A.   Yes.

09:34:42  3         Q.   Did you actually prepare some of the material in

09:34:42  4    the slides that appear in this presentation?

09:34:42  5         A.   My department may have.  I'm not sure if I

09:34:42  6    personally did.

09:34:42  7         Q.   And your department, you would have approved or

09:34:42  8    reviewed that before it was sent to be included in this

09:34:42  9    presentation?

09:34:42  10        A.   Correct.

09:34:42  11        Q.   And is it your understanding that making this

09:34:42  12   presentation and providing the information from your

09:34:42  13   department was a regular practice of the Core Action Team

09:34:42  14   and the functions of that team?

09:34:42  15        A.   Yes.

09:34:42  16             MR. KANG:  Your Honor, I offer it.

09:34:42  17             THE COURT:  Well, that line of questioning

09:34:42  18   started with prepared some of the information.  I don't

09:34:42  19   know that that mean the entire document comes in.

09:34:42  20   Second, I believe he also said I'm not sure if he did it

09:34:42  21   personally.  His department would have approved it.  That

09:34:42  22   he answered correct.  And then it's his understanding

09:34:42  23   that making this and presenting it was a regular practice

09:34:42  24   of the Core Action Team.  I don't know what it means when

09:34:42  25   you say his understanding as opposed to he know that's

| | | |
|---|---|---|
| 09:34:42 | 1 | the case. |
| 09:34:42 | 2 | BY MR. KANG: |
| 09:34:42 | 3 | Q.   Mr. Norton, how do you know, when you testify |
| 09:34:42 | 4 | that this was a regular practice of the Core Action Team, |
| 09:34:42 | 5 | how do you know that? |
| 09:34:42 | 6 | A.   Because there were weekly PowerPoints made.  And |
| 09:34:42 | 7 | this is very similar from the format and the messaging |
| 09:34:42 | 8 | perspective as to what we were working on and why we were |
| 09:34:42 | 9 | working on it.  So in my mind it's a part of the process. |
| 09:34:42 | 10 | Q.   And you would have received those weekly |
| 09:34:42 | 11 | updates? |
| 09:34:42 | 12 | A.   Yes. |
| 09:34:42 | 13 | Q.   You would have reviewed those weekly updates? |
| 09:34:42 | 14 | A.   Yes. |
| 09:34:42 | 15 | Q.   You would have helped prepare some of those |
| 09:34:42 | 16 | weekly updates? |
| 09:34:42 | 17 | A.   Yes. |
| 09:34:42 | 18 | Q.   Does this appear to be one of those weekly |
| 09:34:42 | 19 | updates? |
| 09:34:42 | 20 | A.   Yes. |
| 09:34:42 | 21 | MR. KANG:  Your Honor, I offer it. |
| 09:34:42 | 22 | THE COURT:  Attorney Cunningham. |
| 09:34:42 | 23 | MR. CUNNINGHAM:  My understanding is that this |
| 09:34:42 | 24 | is a PowerPoint presentation. |
| 09:34:42 | 25 | THE COURT:  Right. |

09:34:42  1        MR. CUNNINGHAM:  And I don't think anything has

09:34:42  2  been established to prove that this PowerPoint

09:34:42  3  presentation was updated on a regular basis or that

09:34:42  4  PowerPoint presentations like this were regularly created

09:34:42  5  in that department.

09:34:42  6        Mr. Norton also testified that -- I think he

09:34:42  7  said that he's not sure that the information was provided

09:34:42  8  by him, but it was probably provided by someone within

09:34:42  9  his department.  And I think part of this rule is that

09:34:42  10  the information has to be transmitted by someone with

09:34:42  11  knowledge.  And I just don't think he's that person.

09:34:42  12        MR. KANG:  I think Mr. Cunningham established

09:34:42  13  during direct that the buck stopped with Mr. Norton and

09:34:42  14  his department.  So, respectfully, if we're now talking

09:34:42  15  about subsection A, Mr. Norton is someone with knowledge

09:34:42  16  as to the functions of his department.

09:34:42  17        THE COURT:  But he didn't make it.  He maybe

09:34:42  18  reviewed it.  And people under him maybe made it.

09:34:42  19        MR. KANG:  I don't believe that the subsection A

09:34:42  20  requirement requires the witness to actually have been

09:34:42  21  the one who made it.  Just that he's able to --

09:34:42  22        THE COURT:  Oh, no, I agree with you on that for

09:34:42  23  sure.  But as to his answers to questions, he's sort of

09:34:42  24  not hedging, but not admitting what would be clearly

09:34:42  25  making it admissible.

09:34:42   1          Attorney Cunningham, I believe there's now

09:34:42   2   testimony they met weekly.  So it's made on a weekly

09:34:42   3   basis.  That would satisfy C, it's a regular practice.

09:34:42   4   And he said it's the same type of PowerPoint.  So the

09:34:42   5   record is the same on a regular basis.  Keeping it, I

09:34:42   6   don't know that anybody's had any argument about that.  I

09:34:42   7   assume it reports -- are you going to proffer to me it

09:34:42   8   reports activity that was timely, in other words, subpart

09:34:42   9   A, Attorney Kang.

09:34:42   10          MR. KANG:  Yes, Your Honor.

09:34:42   11          THE COURT:  In other words, the date is going to

09:34:42   12   be from a recent time period.

09:34:42   13          Attorney Cunningham, what's wrong with it?

09:34:42   14          MR. CUNNINGHAM:  Your Honor, I still believe

09:34:42   15   that it hasn't been established that they were regularly

09:34:42   16   creating PowerPoints presentations of this nature in the

09:34:42   17   SIU Department.  So I don't think it satisfies subsection

09:34:42   18   C of 8036.  If this was a one-off PowerPoint

09:34:42   19   presentation, I don't think it would fit the exception.

09:34:42   20          THE COURT:  I probably would agree with you,

09:34:42   21   Attorney Cunningham.  However, he was asked would you

09:34:42   22   have received these weekly updates.  In other words,

09:34:42   23   they're weekly.  He says yes.  So I believe there's

09:34:42   24   evidence in the record they are regular in the sense of

09:34:42   25   weekly.

09:34:42   1            So I'm going to overrule the objection.  I think

09:34:42   2    it's a close question, but I think on balance there's

09:34:42   3    sufficient evidence to meet all of the criteria of 8036.

09:34:42   4            So Exhibit 2228 is marked as a full exhibit and

09:34:42   5    may be published to the jury.

09:34:42   6            MR. KANG:  Thank you, Your Honor.

09:34:42   7    BY MR. KANG:

09:34:42   8        Q.  So, Mr. Norton, can you explain to the jury what

09:34:42   9    this document is?

09:34:42  10        A.   It's an overview of the exposure and ramp, kind

09:34:42  11    of illustrating exactly how severe this issue is.

09:34:42  12        Q.   As you have testified earlier, was this a

09:34:42  13    document that was generated on a regular basis by the

09:34:42  14    Core Action Team?

09:34:42  15        A.   Yes.

09:34:42  16        Q.   And what was the purpose of these presentations?

09:34:42  17        A.   Well, it varied by week.  It might be different

09:34:42  18    levels of focus.  So in general it was here's the

09:34:42  19    magnitude of the issue.  Here are the overall trends.

09:34:42  20    Here are actions.

09:34:42  21        Q.   If you could turn to not the first slide, Mr.

09:34:42  22    Salazar, slide three, please.  Titled IFP Substance Abuse

09:34:42  23    Results.

09:34:42  24            Do you recognize this slide, sir?

09:34:42  25        A.   Yes.

09:34:42  1      Q.   And you had mentioned some numbers earlier in

09:34:42  2  your testimony.  You said per member per month.  Can you

09:34:42  3  tell the jury what you meant by that?

09:34:42  4      A.   Yes.  You want to normalize to the point of if

09:34:42  5  you have a large market versus a small market, you want

09:34:42  6  to make sure that you adjust your numbers based on the

09:34:42  7  number of people in that market.  So this is saying what

09:34:42  8  were the total costs for each member for just that month.

09:34:42  9  So it normalizes per membership.

09:34:42  10     Q.   Mr. Salazar, if you could zoom in on that table

09:34:42  11 on the top left there.

09:34:42  12          You see this chart has three columns, correct?

09:34:42  13     A.   Yes.

09:34:42  14     Q.   One is called substance abuse.  What do you

09:34:42  15 understand that column and the rows beneath that to refer

09:34:42  16 to?

09:34:42  17     A.   So the commercial norm is our Commercial Group

09:34:42  18 business.  So it is the business separate from the IFP or

09:34:42  19 individual.  IFP is the individual business.  So that's

09:34:42  20 showing the totals.  And then the ramp below -- I'm sorry

09:34:42  21 -- the totals for 2014.  Then the ramp below starts to

09:34:42  22 flow into the 2015 month by month.

09:34:42  23     Q.   So commercial norm is every other commercial

09:34:42  24 line of business at Cigna other than the IFP line?

09:34:42  25     A.   Correct.

09:34:42  1      Q.   And IFP FY 2014, is that for full year or fiscal

09:34:42  2  year of 2014?

09:34:42  3      A.   Yes.

09:34:42  4      Q.   Then IFP --

09:34:42  5           THE COURT:  Excuse me for interrupting, sir.

09:34:42  6  What is the fiscal year you're using in this chart?

09:34:42  7           THE WITNESS:  It ties with the calendar year.

09:34:42  8           THE COURT:  So it's just the same as saying

09:34:42  9  January to December?

09:34:42  10          THE WITNESS:  Yes.  FY is full year.

09:34:42  11           MR. KANG:  Thank you, Your Honor.

09:34:42  12      Q.   An IFP --

09:34:42  13          THE COURT:  Sometimes it is a fiscal year, which

09:34:42  14  is not a calendar year.  That's why I asked.

09:34:42  15          Go ahead, sir.

09:34:42  16  BY MR. KANG:

09:34:42  17      Q.   IFP YTD, Mr. Norton, what does that refer to?

09:34:42  18      A.   Year to date.

09:34:42  19      Q.   And then the second column there, it says

09:34:42  20  National PMPM.  What does that mean?

09:34:42  21      A.   So it's the cost per each member for a month.

09:34:42  22      Q.   So for the commercial norm, meaning every other

09:34:42  23  line of business at Cigna, on a national spend cost

09:34:42  24  level, it's $4 per member per month?

09:34:42  25      A.   Correct.

09:34:42  1          Q.    What does Florida PMPM mean?

09:34:42  2          A.    That's just for the State of Florida.

09:34:42  3          Q.    And so the per member per month of every other

09:34:42  4    Cigna product in Florida is $6 per member per month, is

09:34:42  5    that right?

09:34:42  6          A.    Correct.

09:34:42  7          Q.    And then what was the national PMPM for the IFP

09:34:42  8    book of business in 2014?

09:34:42  9          A.    That's the $28, the second row.

09:34:42  10         Q.    And so that's larger than the commercial norm,

09:34:42  11   correct?

09:34:42  12         A.    Materially.

09:34:42  13         Q.    And then the Florida PMPM for IFP in 2014, how

09:34:42  14   much was that?

09:34:42  15         A.    So that's going to be the 43.

09:34:42  16         Q.    And then it starts showing the spend, the cost

09:34:42  17   per member per month, from the IFP line for the first,

09:34:42  18   what is that, five months of 2015, correct?

09:34:42  19         A.    Yes.

09:34:42  20         Q.    What do you notice in that?

09:34:42  21         A.    A severe ramp.

09:34:42  22         Q.    Is that what you were referring to the ramp up

09:34:42  23   in your testimony?

09:34:42  24         A.    Correct.  The 28 was pretty flat for 2014 and

09:34:42  25   then a sharp ramp into 2015.

09:34:42  1      Q.    So by May of 2015 -- so just in five months, the

09:34:42  2  IFP book of business per member per month spend had

09:34:42  3  increased from $28 to $112 nationally?

09:34:42  4      A.    Correct.

09:34:42  5      Q.    And then in Florida, it had increased from $43

09:34:42  6  to $245?

09:34:42  7      A.    Correct.

09:34:42  8      Q.    And that $245 figure was how much times larger

09:34:42  9  than the commercial norm for Florida member per month?

09:34:42  10      A.    I'm sorry.  I forgot which one you're talking

09:34:42  11  about.  The 112 to the 245.

09:34:42  12      Q.    245 to the 6?

09:34:42  13      A.    So we're looking at what --

09:34:42  14      Q.    40 x?

09:34:42  15      A.    Yeah.  I was thinking it was higher than that,

09:34:42  16  but yes.

09:34:42  17      Q.    What does this -- these figures tell you?  What

09:34:42  18  was the concern?

09:34:42  19      A.    Spend that was completely out of control,

09:34:42  20  irrational, and a clear outlier from anything else that

09:34:42  21  we had seen.

09:34:42  22      Q.    Mr. Salazar, could you go to slide 5, please.

09:34:42  23            Do you see this slide, sir?

09:34:42  24      A.    Yes.

09:34:42  25      Q.    What information is reflected on this slide?

09:34:42  1        A.    These are concerns from the Obama Administration

09:34:42  2   about fraud, waste, and abuse in this specific product.

09:34:42  3        Q.    And it says that the Obama Administration was

09:34:42  4   committed to reducing fraud, waste, and abuse.

09:34:42  5             CMS.   What's CMS?

09:34:42  6        A.    Center for Medicare Services I believe is the

09:34:42  7   right acronym, but it's the government overseeing

09:34:42  8   Medicare.

09:34:42  9        Q.    Medicare is the Government payer, correct?

09:34:42  10       A.    Correct.

09:34:42  11       Q.    Sort of similar to Cigna, but on the Government

09:34:42  12   side, right?

09:34:42  13       A.    Correct.

09:34:42  14       Q.    And so CMS believes the resources required for

09:34:42  15   drug testing are not accurately reflected in the current

09:34:42  16   coding and payment structure.   The potential for

09:34:42  17   overcharging and overutilization of drug tests can be

09:34:42  18   reduced by moving away from separate payments for each

09:34:42  19   drug class tested in favor of a bundled approach.

09:34:42  20             Did I read that correctly?

09:34:42  21       A.    Yes.

09:34:42  22       Q.    So was the Obama administration also concerned

09:34:42  23   about this just like the Core Action Team was?

09:34:42  24       A.    Yes.

09:34:42  25             MR. KANG:   One minute, Your Honor.

09:34:42   1                 THE COURT:  Yes.

09:34:42   2                 MR. KANG:  No further questions.

09:34:42   3                 MR. CUNNINGHAM:  No redirect, Your Honor.

09:34:42   4                 THE COURT:  You may step down, Mr. Norton.  And

09:34:42   5   you're excused.

09:34:42   6                 The next witness, please.

09:34:42   7                 MR. CHRIST:  Your Honor, the Labs call Mr.

09:34:42   8   Seamus Lagan.

09:34:42   9                 THE COURT:  Mr. Lagan, I'm so sorry.  I didn't

09:34:42  10   see you there.

09:34:42  11                 If you'd come up to the area that I'm pointing

09:34:42  12   to with my left hand -- very impolitely pointing.  If you

09:34:42  13   get there, when you get there, would you remain standing.

09:34:42  14   The Clerk is going to administer an oath to you.

09:34:42  15                 SEAMUS LAGAN, having been called as a witness,

09:34:42  16   was first duly sworn and testified on his oath as

09:34:42  17   follows:

09:34:42  18                 THE CLERK:  Please be seated.

09:34:42  19                 Please state your name for the record and spell

09:34:42  20   your last name.

09:34:42  21                 THE WITNESS:  My name is Seamus Lagan.  Last

09:34:42  22   name L A G A N.

09:34:42  23                     DIRECT EXAMINATION

09:34:42  24   BY MR. CHRIST:

09:34:42  25        Q.   Good afternoon, Mr. Lagan.  How are you?

09:34:42  1      A.   I'm good, thank you.

09:34:42  2      Q.   I detect a slight bit of accent.  Where do you

09:34:42  3  call home originally?

09:34:42  4      A.    Ireland.  Northern Ireland.

09:34:42  5      Q.   Sir, what you do for a living?

09:34:42  6      A.   I'm a consultant to companies.  I restructure

09:34:42  7  distressed companies and help start up companies.  And

09:34:42  8  I'm currently involved with a number of projects and

09:34:42  9  perform that role.  As part of that, I also become an

09:34:42  10  officer and director of companies.  Not an investor.

09:34:42  11      Q.   Sir, we have heard in this trial about a company

09:34:42  12  called Medytox Solutions, Inc.  Did you have any role in

09:34:42  13  that company from 2013 to 2017?

09:34:42  14      A.    Yes.  I was the CEO of that company from -- I

09:34:42  15  don't remember the exact dates, but I think for that

09:34:42  16  period of time I was the CEO.

09:34:42  17      Q.   And what was the business of Medytox Solutions

09:34:42  18  during that time?

09:34:42  19      A.   Medytox owned a number of clinical laboratories,

09:34:42  20  provided diagnostic services, and owned healthcare

09:34:42  21  software division and provided healthcare software

09:34:42  22  solutions.

09:34:42  23      Q.   Now, how did Medytox as a company come into

09:34:42  24  existence?

09:34:42  25      A.   I was a key component of putting that company

09:34:42  1    together back in 2011, '12.  I was asked by a company, by

09:34:42  2    a CEO of an existing company, Casino Players, Inc., to

09:34:42  3    help him find a new business.  His business had been

09:34:42  4    involved in the vacation model.  He was arranging

09:34:42  5    vacations for people to go offshore on cruise ships for

09:34:42  6    weekends.  I think the laws changed in Florida and online

09:34:42  7    gambling and online casinos became legal and started to

09:34:42  8    pop up on his business field.  And he asked me to help

09:34:42  9    him find a business.

09:34:42  10            Parallel to that, I had been asked and

09:34:42  11    introduced to Dr. Tom Mendolia and a couple of his

09:34:42  12    associates, Frank Roca, Steve Sramowicz.  And had a

09:34:42  13    meeting with them.  They had asked me to help them

09:34:42  14    structure and secure funding for a clinical lab, clinical

09:34:42  15    diagnostics business that they were starting off.

09:34:42  16            So as part of that project, I combined the two

09:34:42  17    entities.  I went to Mr. Bellforum, the CEO of the

09:34:42  18    company which had retained me to find a business, and I

09:34:42  19    said I found a business opportunity here that I think you

09:34:42  20    should look at.  I went to sat with Dr. Mendolia and his

09:34:42  21    team and said, listen, if you want me to help structure

09:34:42  22    this and secure the funding for it, I think we should

09:34:42  23    combine it, combine your business model into Casino

09:34:42  24    Players.  Casino Players business was completely

09:34:42  25    redundant and at that minute it completed a name change

09:34:42  1    and became Medytox.  So that's where Medytox evolved

09:34:42  2    from.

09:34:42  3        Q.   From the business perspective, was medical lab

09:34:42  4    testing a competitive field?

09:34:42  5        A.   My initial diligence showed that it was.  There

09:34:42  6    were some very big players.  Labcorp.  Quest.  Some of

09:34:42  7    the big labs in the marketplace.  So it was a competitive

09:34:42  8    field.  I believed the individuals that I was meeting

09:34:42  9    with and seeing that they had a very interesting

09:34:42  10   opportunity to create a better product, to create a

09:34:42  11   better lab service, that would allow them to capture some

09:34:42  12   market share and build a good business.

09:34:42  13       Q.   So you mentioned some of your business partners

09:34:42  14   had a way to create a better product.  Can you tell us

09:34:42  15   ways that you are able to differentiate your labs from

09:34:42  16   these other big box store laboratories that you just

09:34:42  17   discussed?

09:34:42  18       A.   At that time the majority of labs were receiving

09:34:42  19   a paper order for a sample, along with a sample of blood

09:34:42  20   or urine or whatever they were testing.  They would run a

09:34:42  21   diagnostic and they would return a paper report to the

09:34:42  22   ordering physician, to whoever ordered the test.  And if

09:34:42  23   I remember, one of the biggest selling points was that

09:34:42  24   was taking a long time.  That turnaround time it was

09:34:42  25   called.  The turnaround time from a doctor ordering a

525

09:34:42  1    diagnostic and sending a sample to an outside lab was,
09:34:42  2    you know, could have been days.  And the sector that we
09:34:42  3    were targeting, the substance abuse sector, the speed of
09:34:42  4    turnaround was a key component for competition.

09:34:42  5         And we believed that if we could match or pair
09:34:42  6    the diagnostic service with a really good software
09:34:42  7    product, where we could implement a lab ordering and
09:34:42  8    reporting system for a physician's office or for the
09:34:42  9    ordering physician, that they could order -- have a
09:34:42  10   relatively easy system to order a diagnostic.  That
09:34:42  11   information would make it to the lab in front of the
09:34:42  12   sample and a report would be returned electronically
09:34:42  13   immediately a task was complete.

09:34:42  14        So that meant that the doctors that ordered the
09:34:42  15   tests were getting a very quick reply or turnaround on
09:34:42  16   their order.  And that was quite a big part of the market
09:34:42  17   because particularly in substance abuse, and I don't have
09:34:42  18   any clinical knowledge so I may not use proper clinical
09:34:42  19   terms, but for someone in detox or who was in
09:34:42  20   detoxification process, that total process might only be
09:34:42  21   seven to ten days.  So getting a result back as quick as
09:34:42  22   possible for a doctor to come up with a treatment plan
09:34:42  23   was a very big component of what we were trying to do.
09:34:42  24   And if a doctor wasn't getting a result back for four or
09:34:42  25   five or six or seven days, it was almost no good to him.

09:34:42  1          So the sector at the time, the diagnostics, the

09:34:42  2   big complaint from all the customers and one of the

09:34:42  3   reasons we were able to gain traction or grab market

09:34:42  4   share or build or business, was because of the efficiency

09:34:42  5   that we created for a physician's office or a practice

09:34:42  6   that needed a result.

09:34:42  7      Q.   Mr. Smeig, can you put on Joint Exhibit 38,

09:34:42  8   please.

09:34:42  9          THE COURT:  Has that been marked?

09:34:42  10         MR. CHRIST:  38, please. Joint Exhibit 38,

09:34:42  11  please.

09:34:42  12         THE COURT:  Joint 38 is treated as a full

09:34:42  13  exhibit and may be published.

09:34:42  14  BY MR. CHRIST:

09:34:42  15     Q.   Mr. Lagan, there's something we forgot to go

09:34:42  16  over and I want to clarify this with you.  When we're

09:34:42  17  talking about Medytox Solutions -- well, first, do you

09:34:42  18  recognize this document?

09:34:42  19     A.   Yes.

09:34:42  20     Q.   And what is this document?

09:34:42  21     A.   It's a combination of the corporate structure to

09:34:42  22  the entities, the legal -- the companies with some

09:34:42  23  description as to what those entities actually did.

09:34:42  24     Q.   So do you see in the middle bottom of the

09:34:42  25  document.

09:34:42  1          That could be blown up, Mr. Smeig.

09:34:42  2          There are a number of laboratories listed there;

09:34:42  3   is that correct?

09:34:42  4      A.   Correct.

09:34:42  5      Q.   When we're talking about the Labs, do you

09:34:42  6   understand me to be discussing PB Labs, BioHealth

09:34:42  7   Labs and Epic Reference Labs, that are the subject of

09:34:42  8   this case?

09:34:42  9      A.   Yes, I do.

09:34:42  10      Q.   You can put Joint 38 down, please.

09:34:42  11          From your perspective as CEO of Medytox, was the

09:34:42  12   laboratory testing service business a regulated industry?

09:34:42  13      A.   Very highly regulated.  From my perspective as

09:34:42  14   CEO, I didn't have any clinical knowledge or history so

09:34:42  15   the first, my first port of call was to a legal team

09:34:42  16   which I was doing my due diligence on the business.  And

09:34:42  17   asked them, first of all, the viability of the model and

09:34:42  18   health care sector and got introduced to health care

09:34:42  19   attorneys and I used them as a verification of the sector

09:34:42  20   and what was being proposed a business model.  So very

09:34:42  21   highly regulated industry.

09:34:42  22      Q.   Did you have to hire people to ensure compliance

09:34:42  23   with various regulations?

09:34:42  24      A.   Absolutely.  The Labs that you showed me, the PB

09:34:42  25   Labs, BioHealth, the labs named in this, we actually

09:34:42  1    acquired those labs.  Those labs were existing.  We

09:34:42  2    didn't start them up and make up and decide who to put

09:34:42  3    into them.  We bought those labs with -- they were

09:34:42  4    already regulated, had their licenses and had qualified,

09:34:42  5    capable people already in place.  So we thought that that

09:34:42  6    ticked the boxes.  But that helped us acquire that

09:34:42  7    capability that perhaps you know, from a business

09:34:42  8    perspective I didn't have.

09:34:42  9        Q.   So the Labs that we are discussing, PB Labs,

09:34:42  10   BioHealth, and Epic was the only Lab that Medytox started

09:34:42  11   up on its own Epic?

09:34:42  12       A.   Yes.  Started up on its own but what -- that's

09:34:42  13   partly true.  It was a new lab and was started up, but

09:34:42  14   Epic replaced PB Labs.  PB Labs rolled into Epic.  It

09:34:42  15   was a few miles, the same geographic location in West

09:34:42  16   Palm Beach.  PB Labs was a very small clinical lab on a

09:34:42  17   little strip mall.  Epic was a much bigger property with

09:34:42  18   millions of dollars worth of equipment and a much bigger

09:34:42  19   premises.  But all of the staff, all of the capability in

09:34:42  20   the clinical knowledge that was in PB Labs came into Epic

09:34:42  21   so, yes, we started a new entity, but it wasn't a

09:34:42  22   complete new team of people.

09:34:42  23       Q.   Was starting up these Labs a capital-intensive

09:34:42  24   project, meaning took money?

09:34:42  25       A.   Yes.  From our perspective we spent a lot of

09:34:42    1    money on compliance, on processes.  Checking processes,

09:34:42    2    all of these Labs, as you previously mentioned, are

09:34:42    3    regularly inspected by the state, and they had to have

09:34:42    4    policies in place that met those regulations, met those

09:34:42    5    requirements.  And the equipment, Epic Labs had ten

09:34:42    6    pieces of equipment $350,000 each, just as one part of it

09:34:42    7    so, yes.  Very capital intensive.  A lot of effort went

09:34:42    8    into owning these Labs.

09:34:42    9        Q.   If we can show Joint Exhibit 161, please.

09:34:42    10            Sir, do you recognize that document?

09:34:42    11       A.   Yes.  I mean it's a Medytox marketing and sales.

09:34:42    12   We had a sales and marketing division that managed the

09:34:42    13   compliance of salespeople and the marketing so that was a

09:34:42    14   document that could have been produced by them.

09:34:42    15       Q.   I would like to zoom in on the first paragraph

09:34:42    16   at the top there.  And you see where it says, "Medytox

09:34:42    17   requires it's clients to sign a client registration

09:34:42    18   form"?

09:34:42    19       A.   Yes.

09:34:42    20       Q.   What's your understanding of a client

09:34:42    21   registration form?

09:34:42    22       A.   There was a certainly amount of information that

09:34:42    23   would be required from a client.  Probably included the

09:34:42    24   usual contact details an address, simple information.

09:34:42    25   Probably also included the doctor, doctors' information.

09:34:42  1    All of our clients were actually doctors so there would

09:34:42  2    have been from a compliance perspective a double-check on

09:34:42  3    the background to make sure that the doctor was licensed

09:34:42  4    o regulated.  I don't remember the specific process the

09:34:42  5    compliance team went through, but it was their

09:34:42  6    responsibilities to make sure that when we engage with a

09:34:42  7    new client we had whatever information is required.

09:34:42  8    That's what that refers to.

09:34:42  9        Q.    When a lab test -- when a referring physician

09:34:42  10   ordered a lab test, how would the Labs know who to bill

09:34:42  11   for that service?

09:34:42  12       A.    As part of the software solution that we

09:34:42  13   developed, we were capturing the order and the

09:34:42  14   information, the insurance information, for the patient.

09:34:42  15   So the Lab was effectively given the information from the

09:34:42  16   ordering physician.  That would be provided or the

09:34:42  17   practice that would be provided to the Lab along with the

09:34:42  18   sample.

09:34:42  19       Q.    So you would receive information from the

09:34:42  20   patient or the provider giving you this information,

09:34:42  21   information about the insurance company about who to

09:34:42  22   bill?

09:34:42  23       A.    Yes.

09:34:42  24       Q.    Could we pull up Cigna 395, please.

09:34:42  25             Now Mr. Lagan, this letter has already been

09:34:42   1    admitted into evidence.  And it is a letter from Cigna to

09:34:42   2    PB Labs requesting information from the Labs.  Have you

09:34:42   3    seen this letter before or something similar?

09:34:42   4        A.   I don't remember that specific letter.  But I

09:34:42   5    have seen similar letters throughout the years.  It's not

09:34:42   6    unusual.

09:34:42   7        Q.   So what do this letter appear to be to you?

09:34:42   8        A.   In this instance, it's a letter to CollectAway

09:34:42   9    that was the name before PB Labs so that's confusing.

09:34:42   10   CollectAway.  When we acquired PB Labs it was called

09:34:42   11   CollectAways and we changed a names to PB Labs.  It was a

09:34:42   12   request for certain information.  In those instances

09:34:42   13   sometimes information was just not applicable.  If any

09:34:42   14   information was applicable, we would have provided it.

09:34:42   15   That's just almost normal business in this medical

09:34:42   16   sector, you could be asked for information.  But as I

09:34:42   17   look at that, you know, the likes of the physician order

09:34:42   18   or the diagnostic test results that would be provided by

09:34:42   19   a lab, but there's quite a lot of information there.

09:34:42   20   That's probably just a template letter that gets created

09:34:42   21   and sent out.  Nobody would expect a clinical lab to

09:34:42   22   understand the treatment plan for a patient or, you know,

09:34:42   23   particularly statement of medical necessity that was

09:34:42   24   never something that the Labs participated in.  Pharmacy

09:34:42   25   distributor name, those are -- there are a lot of items

09:34:42  1    on that, anesthesia notes, I don't even know if that's

09:34:42  2    applicable for the patient back the physician's office.

09:34:42  3    A lot of that information would not have been relevant to

09:34:42  4    a clinical lab.

09:34:42  5        Q.   To make sure I understand, would the Labs have

09:34:42  6    even had on their premises treatment plans or patient

09:34:42  7    progress notes that's requested in this letter?

09:34:42  8        A.   No.  The only thing that the lab received was a

09:34:42  9    physician's order ordering tasks that that physician

09:34:42  10   wanted to do.  We wouldn't have been responsible for

09:34:42  11   trying to figure out what the treatment plan was.  The

09:34:42  12   physician determined the treatment plans for its

09:34:42  13   patients.  The lab certainly could not interact with them

09:34:42  14   or have any part in that.

09:34:42  15       Q.   To your knowledge did the Labs ever maintain any

09:34:42  16   sort of running tally of tests it performed for a given

09:34:42  17   patient who was referred to the Labs?

09:34:42  18       A.   No, we would have just received a sample.  Back

09:34:42  19   to what I said earlier on, our ethos, our business model

09:34:42  20   was to be as efficient as possible, receive an order, a

09:34:42  21   sample, and return the result to the doctor, return an

09:34:42  22   accurate result the doctor can rely on and get it back to

09:34:42  23   the doctor as quick as possible.  So the staff and the

09:34:42  24   Labs, they received that information, they ran the test,

09:34:42  25   they provided the result, you know, end of story almost.

09:34:42  1    The information went to the billing company.  The lab was

09:34:42  2    only responsible for the test.

09:34:42  3        Q.   Would it have been a business practice of the

09:34:42  4    Labs to have performed services that were not medically

09:34:42  5    necessary?

09:34:42  6            MR. KANG:  Objection, Your Honor.  I don't think

09:34:42  7    he's qualified as an expert here.

09:34:42  8            MR. CHRIST:  I'm just asking if it was a

09:34:42  9    business practice.

09:34:42  10           THE COURT:  I think he's not really asking for a

09:34:42  11   medical answer.  Objection overruled.

09:34:42  12       A.   Any sample that we would have been asked to do a

09:34:42  13   diagnostic on our own would have been received with a

09:34:42  14   doctor's order.  We wouldn't have made a determination on

09:34:42  15   that.  If it came with a doctor's order the lab could not

09:34:42  16   refuse to run the test is my understanding.

09:34:42  17           THE COURT:  I think the question, sir, if you

09:34:42  18   can answer it, you don't have to if you can't.

09:34:42  19       A.   I'm sorry, Your Honor, I should have asked you

09:34:42  20   to repeat the question.

09:34:42  21           THE COURT:  It's alright. The question was would

09:34:42  22   it have been a business practice for the Labs to perform

09:34:42  23   services that were not medically necessary?

09:34:42  24       A.   No.  Definitely not.

09:34:42  25   BY MR. CHRIST:

09:34:42  1       Q.    Were the Labs in network with Cigna or out of

09:34:42  2    network?

09:34:42  3       A.    Out of network.

09:34:42  4       Q.    Out of network?

09:34:42  5       A.    They didn't have contracts.

09:34:42  6       Q.    Do you recall the Labs tried to go in network

09:34:42  7    with Cigna at any time?

09:34:42  8       A.    That was always the plan from a business

09:34:42  9    perspective.  There was discussion about getting network

09:34:42  10   contracts with pairs and I believe there was a lot of

09:34:42  11   effort made to do that.  I don't remember if there were

09:34:42  12   any in network contracts at the Labs secured.  I do

09:34:42  13   remember the billing company would have been asked and

09:34:42  14   instructed to try to get network contract and most

09:34:42  15   insurance companies either had a set window of time that

09:34:42  16   they allowed people to apply or something had their, I

09:34:42  17   don't mean preferred in that they preferred a lab, they

09:34:42  18   had their labs that they had contracts with.  They didn't

09:34:42  19   allow others to join.

09:34:42  20      Q.    Was Cigna the only insurance company that the

09:34:42  21   Labs would have submitted payment to and sought

09:34:42  22   reimbursement from?

09:34:42  23      A.    No.

09:34:42  24      Q.    Can you think of any other insurance companies?

09:34:42  25      A.    We did -- all of the big names come to mind,

09:34:42  1    United, Blue Cross/Blue Shield, not just Cigna.  Cigna

09:34:42  2    was a big portion, probably the biggest portion of our

09:34:42  3    business for some reason, in that sector but that's you

09:34:42  4    know, they were not on their own.

09:34:42  5        Q.   As part of your duty as a CEO of Medytox, would

09:34:42  6    you find the opportunity to learn if any of the Labs were

09:34:42  7    not being paid for services they were billing these other

09:34:42  8    insurance companies that you just discussed?

09:34:42  9        A.   I would have been aware just as an executive.

09:34:42  10   Obviously it was highlighted when we became aware that

09:34:42  11   Cigna had stopped paying.  Other insurance companies had

09:34:42  12   not stopped paying.  We got paid from other payers.

09:34:42  13       Q.   Do you recall if any other insurance companies

09:34:42  14   ever alleged to the Labs that the Labs had submitted

09:34:42  15   claims that were not medically necessary?

09:34:42  16       A.   I don't remember that at all.

09:34:42  17       Q.   What impact did Cigna's decision to stop making

09:34:42  18   payments to the individual labs have on their business?

09:34:42  19       A.   It caused them to eventually shut down.  It was

09:34:42  20   a massive impact.  The volume of tests which had been

09:34:42  21   conducted, which we had incurred the cost to do, then to

09:34:42  22   not get paid for them eventually led to massive financial

09:34:42  23   distress.  Those labs, they all went out of business over

09:34:42  24   this.

09:34:42  25       Q.   Do you recall approximately how many people

09:34:42  1    worked for the Labs at their peak?

09:34:42  2        A.   Each lab had different numbers.  There was in

09:34:42  3    excess of 200, 300 at the peak.  There would have been a

09:34:42  4    combination of directly employed people, a lot of

09:34:42  5    Medytox, a lot of clinical people, scientists in the

09:34:42  6    labs.  Outside of that, you had a lot of sales

09:34:42  7    individuals so this affected a lot of people.

09:34:42  8        Q.   What percentage of the Labs business came from

09:34:42  9    Cigna reimbursements?

09:34:42  10       A.   I don't remember exact percentages.  Cigna had

09:34:42  11   obviously done a pretty good job of their sales to the

09:34:42  12   people in the local community because it was a big

09:34:42  13   percentage.  Probably 50 or more.  Maybe you know, I

09:34:42  14   don't remember an exact percentage, but it was a very big

09:34:42  15   percentage.  Cigna-covered patients made up a lot of

09:34:42  16   patients in that sector.

09:34:42  17       Q.   So once Cigna stopped paying the Labs, could the

09:34:42  18   Labs afford to pay their employees?

09:34:42  19       A.   No.  The business wasn't there.  There was not

09:34:42  20   that much profit to be able to continue business with

09:34:42  21   just your other pairs.

09:34:42  22       Q.   Did the Labs' employees eventually lose their

09:34:42  23   jobs as a result?

09:34:42  24       A.   Yes.

09:34:42  25            MR. CHRIST:  One moment, Your Honor, if I could.

| | | |
|---|---|---|
| 09:34:42 | 1 | THE COURT:  Yes, of course. |
| 09:34:42 | 2 | MR. CHRIST:  No further questions.  Thank you, |
| 09:34:42 | 3 | Your Honor. |
| 09:34:42 | 4 | THE COURT:  Cross Examination. |
| 09:34:42 | 5 | CROSS EXAMINATION |
| 09:34:42 | 6 | BY MR. KANG: |
| 09:34:42 | 7 | Q.   Good afternoon, Mr. Lagan.  I think it is |
| 09:34:42 | 8 | afternoon now.  How are you? |
| 09:34:42 | 9 | A.   I'm good, thank you. |
| 09:34:42 | 10 | Q.   We have had occasion to meet previously, |
| 09:34:42 | 11 | correct, sir? |
| 09:34:42 | 12 | A.   Yes. |
| 09:34:42 | 13 | Q.   I took your deposition in this case, correct? |
| 09:34:42 | 14 | A.   Correct. |
| 09:34:42 | 15 | Q.   And in that deposition you were testifying and |
| 09:34:42 | 16 | you were designated by the Labs as the Labs' corporate |
| 09:34:42 | 17 | representative, weren't you? |
| 09:34:42 | 18 | A.   Yes, I believe that's right. |
| 09:34:42 | 19 | Q.   Meaning you were designated by the Labs as the |
| 09:34:42 | 20 | person with the most knowledge about certain topics |
| 09:34:42 | 21 | relevant to this case, correct? |
| 09:34:42 | 22 | MR. CHRIST:  Objection, Your Honor.  Mr. Lagan's |
| 09:34:42 | 23 | testimony as a 30(b)(6) representative would be outside |
| 09:34:42 | 24 | the scope of my direct. |
| 09:34:42 | 25 | MR. KANG:  That's not my question.  I'm asking |

09:34:42   1   whether he was designated for deposition as the person

09:34:42   2   most knowledgeable.

09:34:42   3        THE COURT:  Is it within the scope of direct?  I

09:34:42   4   don't know where you are going so I guess I'm just not

09:34:42   5   certain where you are going so it's hard for me to rule.

09:34:42   6   Are you going to ask something from the deposition

09:34:42   7   transcript so this is necessary for the jury to

09:34:42   8   understand what he was doing?

09:34:42   9        MR. KANG:  It's okay, Your Honor.  I will move

09:34:42  10   on.

09:34:42  11   BY MR. KANG:

09:34:42  12        Q.   You were the CEO of Medytox Solutions; is that

09:34:42  13   right?

09:34:42  14        A.   Yes.

09:34:42  15        Q.   And as I heard it today, you were one of the

09:34:42  16   co-founders of Medytox, correct?

09:34:42  17        A.   It wasn't my business idea at the start, but I

09:34:42  18   was one of the co-founders who put it together, yes.

09:34:42  19        Q.   That's right because you testified that you knew

09:34:42  20   a gentleman named Bill Forhan?

09:34:42  21        A.   Bill Forhan was the public company, was the

09:34:42  22   entity that evolved into Medytox but that was not the

09:34:42  23   Medytox business.  The Medytox business was Dr. Mendolia,

09:34:42  24   Frank Roca, Steve Sramowicz that crew.

09:34:42  25        Q.   So you knew Bill Forhan who had a company called

09:34:42  1   Casino Players, correct?

09:34:42  2        A.    Correct.

09:34:42  3        Q.    So you knew -- on the other hand you knew Dr.

09:34:42  4   Mendolia who was a gastroenterologist who wanted to open

09:34:42  5   up a clinical Lab, correct?

09:34:42  6        A.    Yes.

09:34:42  7        Q.    You thought it would be a great idea to put

09:34:42  8   those two together?

09:34:42  9        A.    I thought it made business sense at the time.

09:34:42  10       Q.    So you thought it would be, it would make

09:34:42  11  business sense to put Casino Players that's in the

09:34:42  12  gambling industry with clinical laboratories?

09:34:42  13       A.    Not in that form.  I think -- perhaps I wasn't

09:34:42  14  clear.  I was asked by Medytox, the business side to help

09:34:42  15  them structure business and secure funding.  They needed

09:34:42  16  funding to open the Labs to build the infrastructure they

09:34:42  17  wanted to build.  My personal forte, my personal

09:34:42  18  expertise is securing funding for public companies, so

09:34:42  19  here we had a little public company that regardless that

09:34:42  20  the business had failed it was still a public company.

09:34:42  21  The public company side could be fixed.  It could secure

09:34:42  22  money.  Therefore it was just between timing on the

09:34:42  23  business opportunity.  I used that public company to

09:34:42  24  secure the funding for the Lab business to start up, to

09:34:42  25  get it started.

09:34:42    1        Q.    There's no relationship between clinical

09:34:42    2    laboratories and a gambling, correct?

09:34:42    3        A.    There's was no relationship between Bill Forhan

09:34:42    4    Casino Players and the clinical lab business.

09:34:42    5        Q.    Can you answer my question?  My question is

09:34:42    6    there's no relationship between clinical laboratories and

09:34:42    7    gambling?

09:34:42    8        A.    No.

09:34:42    9        Q.    Okay.  You said your expertise is in securing

09:34:42   10    funding, correct?  You had no prior expertise with

09:34:42   11    clinical laboratories prior to putting together Casino

09:34:42   12    Players with the clinical labs, correct?

09:34:42   13        A.    That's correct.

09:34:42   14        Q.    You had no prior experience in medical billing

09:34:42   15    before that either?

09:34:42   16        A.    That's correct.

09:34:42   17        Q.    Or in medical coding, correct?

09:34:42   18        A.    Correct.    I think those are specialized

09:34:42   19    industries, so, yes.

09:34:42   20        Q.    I'm sorry, what was that?

09:34:42   21        A.    Those are specialized industries, so impossible

09:34:42   22    to be specialist in each of those areas.

09:34:42   23        Q.    They are specialized right?

09:34:42   24        A.    Correct.  So it's impossible for anyone to be a

09:34:42   25    specialist in each of those areas.

09:34:42  1      Q.   You had no experience in that specialized

09:34:42  2  industry, did you?

09:34:42  3      A.    Not in any one of those specialized sectors,

09:34:42  4  no.

09:34:42  5      Q.   No, you didn't have any expertise with substance

09:34:42  6  abuse treatment centers either, correct?

09:34:42  7      A.   No, that's correct.

09:34:42  8      Q.   Or with invoicing or billing insurance

09:34:42  9  companies, correct?

09:34:42  10      A.    In the healthcare sector that's correct.  No.

09:34:42  11      Q.   You didn't have any experience whatsoever in the

09:34:42  12  health care industry before you combined Casino

09:34:42  13  Players with clinical labs, correct?

09:34:42  14      A.   That's correct.

09:34:42  15      Q.   You don't have any educational degrees or

09:34:42  16  certifications or any education that is related to the

09:34:42  17  healthcare industry, correct?

09:34:42  18      A.    That's correct, but thankfully that doesn't

09:34:42  19  prohibit me from being an investor and owner of

09:34:42  20  healthcare industries.

09:34:42  21      Q.   We put up an exhibit, Joint 38.

09:34:42  22           Can you put that up?

09:34:42  23           THE COURT:  Joint 38.

09:34:42  24  BY MR. KANG:

09:34:42  25      Q.   I believe Mr. Christ showed you this during your

09:34:42  1  direct, correct?

09:34:42  2      A.    Yes.

09:34:42  3      Q.    If we can zoom in.

09:34:42  4          You had mentioned that there are in this

09:34:42  5  organizational chart the clinical laboratories that

09:34:42  6  Medytox owned?

09:34:42  7      A.    Yes.

09:34:42  8      Q.    And is this the complete list of the

09:34:42  9  laboratories that Medytox owned?

09:34:42  10     A.    I'm not sure what that's at.  I think there was

09:34:42  11  another lab.  I think that was the one in Las Cruces.  I

09:34:42  12  think there was another one California.  I don't remember

09:34:42  13  the name of it as we speak.

09:34:42  14     Q.    Sterling Reference Laboratories that's not on

09:34:42  15  this list?

09:34:42  16     A.    I don't recall that name.

09:34:42  17     Q.    Never heard of the Sterling Reference

09:34:42  18  Laboratories?

09:34:42  19     A.     I don't recall the name.  I don't know.

09:34:42  20     Q.    To your knowledge did Medytox ever own Sterling

09:34:42  21  Reference Laboratories?

09:34:42  22     A.    Under the name of Sterling or did it change it's

09:34:42  23  name?

09:34:42  24     Q.    Sterling Reference Laboratories in Tacoma,

09:34:42  25  Washington.

543

09:34:42  1      A.    Yes, that's International Tech New Jersey.  That

09:34:42  2   was Sterling Reference Labs.  If I'm remembering the

09:34:42  3   names correctly it was Sterling Business Labs doing

09:34:42  4   business as -- or International Technology Labs New

09:34:42  5   Jersey doing business as Sterling Reference Labs I think.

09:34:42  6      Q.    New Jersey?

09:34:42  7      A.    Yeah.

09:34:42  8      Q.    That's not in Tacoma --

09:34:42  9      A.    Yeah, at the bottom left that NJ stands for New

09:34:42  10  Jersey.  So we did have a Lab.

09:34:42  11     Q.    But not in Tacoma, Washington?

09:34:42  12     A.    Sorry.  Tacoma, Washington?  No.

09:34:42  13     Q.    Alright.  Mr. Lagan, are you familiar with the

09:34:42  14  difference between qualitative drug testing and

09:34:42  15  confirmatory drug testing?

09:34:42  16     A.    I am.

09:34:42  17     Q.    Which test -- what's this difference?

09:34:42  18     A.    Qualitative was just a simple positive or

09:34:42  19  negative indication for the presence of a certain drug.

09:34:42  20  Quantitative was a, an analysis of the sample which gave

09:34:42  21  them a more detailed information on -- I'm using the word

09:34:42  22  "drug" but there's a different term for all the different

09:34:42  23  chemicals that could be detected in a sample.

09:34:42  24     Q.    Which test is more complex?

09:34:42  25     A.    The quantitative is a more complex test.

09:34:42  1       Q.   Also that's referred to as confirmation or

09:34:42  2  confirmatory testing?

09:34:42  3       A.   Confirmation testing, yes sir.

09:34:42  4       Q.   So confirmatory testing is more complex than the

09:34:42  5  qualitative drug screens, correct?

09:34:42  6       A.   Correct.  Hence the need for the $350,000 piece

09:34:42  7  of kit as opposed to a very small.

09:34:42  8       Q.   Sure.  And the quantitative -- sorry -- the

09:34:42  9  confirmatory drug testing is more expensive than

09:34:42  10 qualitative drug screens, correct?

09:34:42  11      A.   Yes.  A $350,000 piece of kit along with it's

09:34:42  12 agents, much more expensive.

09:34:42  13      Q.   I believe you testified on your direct that

09:34:42  14 there was a sales and marketing department at Medytox; is

09:34:42  15 that right?

09:34:42  16      A.   Correct.

09:34:42  17      Q.   And that -- what was that department responsible

09:34:42  18 for?

09:34:42  19      A.   They would have been responsible for all --

09:34:42  20 first of all hiring salespeople, training salespeople,

09:34:42  21 and compliance with the rules and regulations of the

09:34:42  22 sector, securing customers, so everything today with the

09:34:42  23 sales and marketing and preparation of marketing

09:34:42  24 materials and for customers.

09:34:42  25      Q.   Do you know a gentleman by the a name of Steve

09:34:42  1    Ziemian?

09:34:42  2        A.   Oh, yes.  Steve Ziemian was in sales.  I think

09:34:42  3    he headed it up for a short period of time.

09:34:42  4        Q.   Was he the head of the sales and marketing

09:34:42  5    division at Medytox?

09:34:42  6        A.   He was for a period of time, yes.

09:34:42  7        Q.   And the sales people that you are referring to,

09:34:42  8    they were called account executives, correct?

09:34:42  9        A.   That sounds familiar.

09:34:42  10       Q.   And their job was to go out and sell Medytox's

09:34:42  11   services, correct?

09:34:42  12       A.   Correct.

09:34:42  13       Q.   They would go out and meet with -- their clients

09:34:42  14   that they tried to bring in were in places like addiction

09:34:42  15   treatment centers?

09:34:42  16       A.   It was a broad base.  That's one sector, yes.

09:34:42  17       Q.   Sober homes, residentials?

09:34:42  18       A.   I don't remember the specific target market.

09:34:42  19       Q.   Sorry, sir?

09:34:42  20       A.   I don't remember their specifics and the

09:34:42  21   distinctions and names you are just using.  They were

09:34:42  22   sales and marketing to doctors to physicians, whoever

09:34:42  23   ordered diagnostic or who needed a test run in a lab so

09:34:42  24   that's their target market.

09:34:42  25       Q.   How were the account executives compensated?

| 09:34:42 | 1 | A. They had an employment contract, a base salary |

09:34:42   1    A. They had an employment contract, a base salary

09:34:42   2    and a commission structure.

09:34:42   3    Q. Commission also?

09:34:42   4    A. Yes.

09:34:42   5    Q. Base plus commission?

09:34:42   6    A. Yes.

09:34:42   7    Q. What was the commission based off of?

09:34:42   8    A. It was based on percentage of either payments

09:34:42   9    received, percentage of collections on a account, on the

09:34:42   10    dollar value of an account.

09:34:42   11    Q. So the more that they were able to bring in

09:34:42   12    money for Medytox they would get a percentage on

09:34:42   13    commission.

09:34:42   14    MR. CHRIST: Your Honor, objection. I think

09:34:42   15    this is outside the scope of direct.

09:34:42   16    THE COURT: Do you claim it?

09:34:42   17    MR. KANG: I claim it, Your Honor.

09:34:42   18    THE COURT: On what basis? What are you

09:34:42   19    addressing from the direct?

09:34:42   20    MR. KANG: He was talking about the sales and

09:34:42   21    marketing department.

09:34:42   22    THE COURT: I think it was up on your

09:34:42   23    organizational chart, Attorney Christ, correct?

09:34:42   24    MR. CHRIST: Correct, Your Honor.

09:34:42   25    THE COURT: Unfortunately, I think that opens the

09:34:42   1    door.  You may proceed and the question pending was, so

09:34:42   2    the more the bring in, or were able to bring in money for

09:34:42   3    Medytox they would get a percentage on the commission?

09:34:42   4         THE WITNESS:  Yeah, I think just the same as any

09:34:42   5    salesperson, in any industry --

09:34:42   6         THE COURT:  You just need to say yes, sir.

09:34:42   7         THE WITNESS:  Yes.

09:34:42   8         THE COURT:  If that's your answer.  I don't mean

09:34:42   9    to put words in your mouth.

09:34:42   10        A.   Yes.  I believe they did.  If there was a bigger

09:34:42   11   accounts, more successful account the salesperson earned

09:34:42   12   more money.

09:34:42   13        Q.   Isn't it want true that Medytox encouraged their

09:34:42   14   account executives to try and sell more of Medytox

09:34:42   15   services to clients?

09:34:42   16        A.   Yes.

09:34:42   17        Q.   And there's in fact a phrase that Medytox used

09:34:42   18   called up selling, correct?

09:34:42   19        A.   I do remember that term, yes.

09:34:42   20        Q.   And one form of up selling was that Medytox

09:34:42   21   encouraged account executives to run and encourage the

09:34:42   22   confirmation of negatives, correct?

09:34:42   23        A.   I don't remember the specifics of up selling or

09:34:42   24   the confirmation of a negative.  Up selling was we had a

09:34:42   25   number of services.  We had software products for the

09:34:42  1    sector.  Up selling was salespeople could get paid on not
09:34:42  2    just the diagnostics they would get paid if customer
09:34:42  3    acquired a software solution.  We had on offer -- I don't
09:34:42  4    remember the specifics of the different diagnostics you
09:34:42  5    know, whatever the ordering physician decided was what we
09:34:42  6    ran.
09:34:42  7        Q.   You don't recall Medytox encouraging executives
09:34:42  8    to engage in confirmation of negative testing as part of
09:34:42  9    up selling services?
09:34:42  10       A.   Confirmation of negatives.  I don't remember the
09:34:42  11   specifics of that, you know, as I said, whatever services
09:34:42  12   we provided they were salespeople would have been
09:34:42  13   encouraged to sell.
09:34:42  14       Q.   Can we put up Cigna Exhibit 8 for identification
09:34:42  15   only, Your Honor.
09:34:42  16            THE COURT:  Yes.
09:34:42  17   BY MR. KANG:
09:34:42  18       Q.   Mr. Lagan, do you recognize this document that's
09:34:42  19   been put in front of you?
09:34:42  20       A.   I don't remember the date or the time, but it's
09:34:42  21   Medytox sales training manual.  So again as I said the
09:34:42  22   sales and marketing team or the sales and marketing
09:34:42  23   department would have put together numerous manuals and
09:34:42  24   documents for training people.  So I assume it to be part
09:34:42  25   of that.

09:34:42  1          THE COURT:  You shouldn't assume anything.  He's

09:34:42  2  asking you if you recognize it.

09:34:42  3  BY MR. KANG:

09:34:42  4     Q.   This is a sales training manual that governed

09:34:42  5  training for the sales department at Medytox, correct?

09:34:42  6     A.   Okay.

09:34:42  7     Q.   That's correct?

09:34:42  8     A.   I'm sorry.  I don't remember the specific

09:34:42  9  document, sir.  It says Medytox Sales Training Manual.  I

09:34:42  10  don't know if that's was a draft document, one was

09:34:42  11  utilized, if it was one that -- I don't want to give a

09:34:42  12  definitive yes when I don't know.

09:34:42  13     Q.   Mr. Salazar, can we go to 55 -- Bates Number

09:34:42  14  55042 on that one?

09:34:42  15          THE COURT:  Whose exhibit is this?

09:34:42  16          MR. KANG:  This is Cigna Exhibit 8, Your Honor,

09:34:42  17  I.D. only.

09:34:42  18          THE COURT:  You are going to a different page.

09:34:42  19          MR. KANG:  Yes, Your Honor. I'm sorry.

09:34:42  20     Q.   Could we zoom in on paragraph B.

09:34:42  21          Do you see that portion, the paragraph that

09:34:42  22  states, "up selling additional products and services."

09:34:42  23     A.   Yes.

09:34:42  24           MR. CHRIST:  Objection, Your Honor.  Mr. Lagan,

09:34:42  25  already testified he doesn't recall the document.  I

09:34:42  1    believe it's also subject to the Court's prior order of

09:34:42  2    motion in limine.

09:34:42  3              THE COURT:  Right, it isn't in evidence so you

09:34:42  4    just read from it in evidence, sir.  So I think that

09:34:42  5    would be objectionable.  You can ask him to read it to

09:34:42  6    himself, the highlighted parts, clearly highlighted.  You

09:34:42  7    might ask a question that might go to admissibility or

09:34:42  8    not.

09:34:42  9              MR. KANG:  Understood, Your Honor.

09:34:42  10             Mr. Salazar, can you highlight the first

09:34:42  11   sentence starting "when meeting?"

09:34:42  12             THE WITNESS:  When meeting --

09:34:42  13             THE COURT:  No sir, do not read out loud.  He's

09:34:42  14   asking, well maybe he didn't.  He should have asked you

09:34:42  15   to read it to yourself.

09:34:42  16             THE WITNESS:  I apologize.

09:34:42  17             THE COURT:  Don't say it out loud.  It's not in

09:34:42  18   evidence.

09:34:42  19   BY MR. KANG:

09:34:42  20        Q.   Let me know when you are done reading that.

09:34:42  21        A.   I have read it.

09:34:42  22        Q.   Okay.  Having read that sentence in this

09:34:42  23   document does that refresh your recollection as to

09:34:42  24   whether Medytox encouraged account executives to run

09:34:42  25   confirmation of negatives as a form of up selling.

09:34:42    1    A.    Yes, it's in the middle of a sentence --

09:34:42    2         THE COURT:  Don't read it out loud.  Listen to

09:34:42    3    the question.  He's asking you a question,  having now

09:34:42    4    read it --

09:34:42    5         Take it down, Liana.

09:34:42    6         The idea of refreshing a person's recollection

09:34:42    7    is to have you read it.  That's alright, sir.  Nobody

09:34:42    8    knows this process except lawyers who try cases.  You

09:34:42    9    read it and then you put it aside.  You are looking at

09:34:42   10    it.  And the questions is does it refresh your

09:34:42   11    recollection about something.  That's what you are having

09:34:42   12    to answer now.  Not what you remember the words of the

09:34:42   13    document said.

09:34:42   14         In your mind, do you have a recollection of what

09:34:42   15    the question was about?  Medytox -- encouraged sales

09:34:42   16    executives encourage their customers to purchase certain

09:34:42   17    services.

09:34:42   18         THE WITNESS:  The answer to that is yes.  I

09:34:42   19    remember Medytox encouraging its salespeople to sell

09:34:42   20    additional services and the word you asked for is in one

09:34:42   21    or three or four additional services that the company

09:34:42   22    must have offered.

09:34:42   23    BY MR. KANG:

09:34:42   24    Q.    You recall now, having refreshed your memory,

09:34:42   25    one of those forms of up sells was to encourage the

09:34:42  1    confirmation of negatives?

09:34:42  2        A.   Sir, I don't remember the specifics of what that

09:34:42  3    the chemical or clinical underline of that means.  I see

09:34:42  4    it in the middle -- you pointed it out in the middle of a

09:34:42  5    sales manual.  I can't say.  I assume -- so it is in the

09:34:42  6    middle of a sales manual for selling additional services.

09:34:42  7            THE COURT:  To the extent the witness includes

09:34:42  8    in his answers reference to the document not in evidence

09:34:42  9    the jury should disregard it.  You need to answer just

09:34:42  10   the question.  Having read that document, putting it

09:34:42  11   aside, I believe you said, It refreshes your recollection

09:34:42  12   that they were encouraged it sell other services.

09:34:42  13           THE WITNESS:  That's correct.

09:34:42  14           MR. KANG:  May I ask the next question, Your

09:34:42  15   Honor?

09:34:42  16           THE COURT:  Yes, you may.

09:34:42  17   BY MR. KANG:

09:34:42  18       Q.   Does it also, having read that now, does it also

09:34:42  19   refresh your recollection that one of the ways that is

09:34:42  20   account executives were encouraged to sell more product

09:34:42  21   was to sell confirmation of negatives?

09:34:42  22           THE COURT:  Your recollection not the documents.

09:34:42  23   Your recollection.

09:34:42  24       A.   I don't recollect that specifically the

09:34:42  25   confirmation of negatives.

553

09:34:42  1      Q.   Would you agree with me though, Mr. Lagan, that

09:34:42  2  reasoning a lot of expensive confirmation tests even when

09:34:42  3  an initial drug screen is negative would increase

09:34:42  4  Medytox's billing?

09:34:42  5      A.   I apologize.  Would you ask that again, please?

09:34:42  6      Q.   Sure.  Would you agree with me that running lots

09:34:42  7  of expensive confirmation tests even when an initial drug

09:34:42  8  screen is negative would increase Medytox's billings?

09:34:42  9      A.   Any test that would be run would increase the

09:34:42 10  value of the billing.  So whether it's confirmation or a

09:34:42 11  quantitative test of a negative or a positive, I agree

09:34:42 12  with you that absolutely any test that would be run the

09:34:42 13  lab would be entitled to bill for.  That would increase

09:34:42 14  the value of a bill, the claim.

09:34:42 15      Q.   So the more tests the ran the more billings it

09:34:42 16  could generate, is that fair?

09:34:42 17      A.   That's fair.

09:34:42 18      Q.   And also you would agree with me that if a lab

09:34:42 19  ran confirmation tests of 30 different substances that

09:34:42 20  would result in more billings than running confirmation

09:34:42 21  on just one substance, correct?

09:34:42 22      A.   Sir, a higher volume of tests that are billable

09:34:42 23  or permitted increases the value of billing, yes.

09:34:42 24      Q.   Would you agree with me the more Medytox bills

09:34:42 25  the more money it generates, correct?

09:34:42  1        A.    Yes.

09:34:42  2        Q.    And in fact isn't that why you previously wrote

09:34:42  3    in an email to Mike Nicholson that the only real business

09:34:42  4    will be in the confirmation business.

09:34:42  5        A.    Actually, I believe that to be true because the

09:34:42  6    clinical labs were licensed and I believe there was at

09:34:42  7    the time the sector had a lot of substance abuse

09:34:42  8    facilities or people that internally we would have

09:34:42  9    questioned their -- I don't want to call someone a bad

09:34:42  10   actor.  I don't know, there were situations where people

09:34:42  11   were opening their own labs, running just a quantitative

09:34:42  12   test, where as the Lab was fully regulated, fully

09:34:42  13   licensed, had made a massive capital investment in

09:34:42  14   policies and procedures to perform a very professional

09:34:42  15   service and I believe that that business would survive

09:34:42  16   outside of all the other physician-owned labs that

09:34:42  17   existed.  So I apologize for trying to give a longer

09:34:42  18   explanation, but yes.  That's why we made the massive

09:34:42  19   investment.  We didn't anticipate running tests and not

09:34:42  20   getting paid for them, sir.

09:34:42  21       Q.    Medytox was informed in 2013 that Cigna was

09:34:42  22   changing it's billing policies and reducing the number of

09:34:42  23   drug screens that Medytox could bill, correct?

09:34:42  24       A.    I don't remember the specifics.  There was an

09:34:42  25   ongoing -- insurance company constantly changed their

09:34:42  1    policy on items like that so I think that the companies

09:34:42  2    just had to -- our labs just adapted with it.

09:34:42  3         Q.   By adapting, you adapted by running confirmation

09:34:42  4    as many confirmation tests as you could, correct?

09:34:42  5         A.   We run test that the doctors order.  We didn't

09:34:42  6    dictate the number or decide the number of tests or type

09:34:42  7    of the test.  We ran tests that a physician must have

09:34:42  8    determined they needed for a patient, ordered our lab to

09:34:42  9    conduct, we ran the test, provided a report, and we

09:34:42  10   believed we would and should be paid for running that

09:34:42  11   test.

09:34:42  12        Q.   That's right.  You did say that.

09:34:42  13             THE COURT:  I think this is a good point to take

09:34:42  14   our recess.  It is exactly 1:00.

09:34:42  15             THE COURT REPORTER:  Lunch is at 1:15.

09:34:42  16             THE COURT:  I'm so sorry.  You are right. I was

09:34:42  17   so excited I was looking to see and it was one.

09:34:42  18             THE WITNESS:  I apologize if I'm boring you,

09:34:42  19   Your Honor.

09:34:42  20             THE COURT:  No. No. sir.  No. No.  I apologize

09:34:42  21   for interrupting you and Attorney Kang.  I think I have

09:34:42  22   done it to the other side this morning.  So let's call it

09:34:42  23   even.  Sorry, Attorney Kang.

09:34:42  24             MR. KANG:  I'm very flexible, Your Honor.

09:34:42  25             THE COURT:  Keep going.

09:34:42  1          MR. KANG:  I'm happy to do either.

09:34:42  2          Thank you, Ms. Fidanza.

09:34:42  3   BY MR. KANG:

09:34:42  4     Q.   Let me follow up on that.  You said you were

09:34:42  5   following the doctor's order, sir?

09:34:42  6     A.   Yes.

09:34:42  7     Q.   You did not -- the Labs did not do any

09:34:42  8   independent medical necessity determination or review?

09:34:42  9     A.   The Labs?  No.

09:34:42 10     Q.   No?

09:34:42 11     A.   No, the lab had no responsibilities to do

09:34:42 12   medical necessity or review.

09:34:42 13     Q.   You didn't have a doctor on staff to whose

09:34:42 14   function was specifically to assist with a medical

09:34:42 15   necessity review?

09:34:42 16     A.   I don't believe the doctor -- back to earlier

09:34:42 17   conversation -- the Labs had very qualified, capable

09:34:42 18   people including a doctor on staff and they would have

09:34:42 19   been there to communicate or collaborate with physicians

09:34:42 20   if they had any questions on their test results or on any

09:34:42 21   part of the process that we were performing.  I don't

09:34:42 22   believe our -- forget don't believe -- our doctor didn't

09:34:42 23   have any authority to challenge the medical necessity of

09:34:42 24   a diagnostic that was received by a lab.

09:34:42 25     Q.   The labs never made an independent medical

09:34:42  1    necessity determination is what you are saying?

09:34:42  2        A.    Independent?

09:34:42  3        Q.    Ye?

09:34:42  4        A.    No, sir, I don't recall ever hiring any

09:34:42  5    independent party for that purpose.

09:34:42  6        Q.    Your testimony is you ran whatever tests the

09:34:42  7    doctors ordered?

09:34:42  8        A.    Yes.

09:34:42  9        Q.    Okay.  And so I take it then that the Labs

09:34:42  10   didn't do anything to determine whether testing services

09:34:42  11   were being used or ordered excessively?

09:34:42  12       A.    Again the lab would have received an order, run

09:34:42  13   the test.  I don't think was questioned.

09:34:42  14       Q.    So the answer is no, the labs did do anything to

09:34:42  15   determine whether testing services were used or ordered

09:34:42  16   excessively?

09:34:42  17       A.    No.

09:34:42  18       Q.    Did the Labs ever hire an outside consultant to

09:34:42  19   analyze the pattern of utilization of tests being

09:34:42  20   ordered?

09:34:42  21       A.    I don't believe so.  I don't remember that, no.

09:34:42  22       Q.    Did the Labs ever conduct any investigations or

09:34:42  23   self audits to determine if there was any usually

09:34:42  24   activities or a utilization?

09:34:42  25       A.    I don't believe so.

09:34:42    1        Q.    Did you Labs ever analyze utilization data for

09:34:42    2    the top 30 tests that were performed each year by code.

09:34:42    3        A.    I don't believe so.  But again --

09:34:42    4        Q.    Never heard of any requirement like that?

09:34:42    5        A.    No.

09:34:42    6        Q.    Did the Labs ever compute the percentage growth

09:34:42    7    in the number of tests submitted for each of the those

09:34:42    8    top 30 tests from one year to the next?

09:34:42    9        A.    No.

09:34:42    10       Q.    Never heard of that requirement?

09:34:42    11       A.    Requirements?

09:34:42    12       Q.    Never heard of that?

09:34:42    13       A.    You say "requirement."

09:34:42    14           THE COURT:  He withdrew that, sir.

09:34:42    15   BY MR. KANG:

09:34:42    16       A.    I don't believe -- you said requirement a number

09:34:42    17   of times, sir.  I don't ever -- like I said we complied

09:34:42    18   with all of the regulations.  I think I would say

09:34:42    19   remember if there was a requirement to conduct the

09:34:42    20   reviews that you are asking and I don't believe there was

09:34:42    21   any requirement on the Labs to conduct those reviews.  So

09:34:42    22   perhaps I could be correct on that just to be clear.

09:34:42    23       Q.    Are you familiar with the 1998 guidance from the

09:34:42    24   U.S. Department of Health and Human Services OIG?

09:34:42    25       A.    I'm not sure.  That would not be my role.

559

09:34:42  1        Q.   Ever read that?

09:34:42  2        A.   No.

09:34:42  3        Q.   Did I hear you correctly that PB Labs was

09:34:42  4   located in a strip mall?

09:34:42  5        A.   PB Labs' property was a little rented unit.  I

09:34:42  6   think that's -- apologies, but I believe the U.S. term

09:34:42  7   for a little U-shaped number of units is a strip mall.

09:34:42  8   Maybe I used the wrong term.

09:34:42  9        Q.   That's were it was located or that's -- I'm

09:34:42  10  sorry, I'm not understanding.

09:34:42  11       A.   No, when we acquired it it was a small

09:34:42  12  industrial unit, probably half the size of this courtroom

09:34:42  13  and a little area which a mixture of -- I don't remember

09:34:42  14  what was next door to it -- a mixture of industrial and

09:34:42  15  retail, about ten other things around it.  So strip mall

09:34:42  16  I believe is the proper term.

09:34:42  17       Q.   I believe you testified that one of the services

09:34:42  18  that you believed the Labs were providing was for quick

09:34:42  19  turnaround time.  Did I get that right in my notes?

09:34:42  20       A.   Yes.  A quick turn around time on results, yes.

09:34:42  21       Q.   I think you said, and correct me if I'm wrong,

09:34:42  22  that you heard from customers that other labs were

09:34:42  23  turning it around in seven to ten days and that's too

09:34:42  24  long?

09:34:42  25       A.   At the start of the process back to -- my input

09:34:42  1    at the start was business, so I was asking typical

09:34:42  2    business questions.  Why do you believe this business

09:34:42  3    will work?  How do you differentiate yourself from your

09:34:42  4    competition?  Those were the things that I was informed

09:34:42  5    at the start were important to doctors and we had, there

09:34:42  6    was a doctor on the a team and you know, he said the

09:34:42  7    speed at which doctors could get results after asking a

09:34:42  8    diagnostic was very important.

09:34:42  9        Q.   Your idea and business model was try to get the

09:34:42  10   turn around time earlier than seven to ten days?

09:34:42  11       A.   We invested a lot of money on a software product

09:34:42  12   that allowed us to do that and create a significant

09:34:42  13   efficiency for doctors.

09:34:42  14       Q.   What do you measure the turn around time by?

09:34:42  15   The date from the specimen is collected to the date the

09:34:42  16   test result is completed?

09:34:42  17       A.   I don't remember.

09:34:42  18       Q.   That seems like a logical turn around time

09:34:42  19   period.  From the date the test is provided to the when

09:34:42  20   the result when the test comes back?

09:34:42  21       A.   I can't answer that.  There's a confirmation, as

09:34:42  22   you said early on a complex text.  So when it hit the lab

09:34:42  23   there was an efficient process to run the test quickly.

09:34:42  24   When a sample made it's way to the lab whether it was

09:34:42  25   picked up and delivered to it lab, delivery or it was

09:34:42  1    mailed.  I don't remember what that lead time would be.

09:34:42  2    But when it hit the lab, the process and the focus would

09:34:42  3    have been complete the test as quickly as possible and

09:34:42  4    get the result made available to the physician.

09:34:42  5         Q.   So you measure turn around time from the date

09:34:42  6    that the sample is sent off to when the lab test result

09:34:42  7    is completed?

09:34:42  8         A.   I don't recall what we measured.  I had no part

09:34:42  9    in that.

09:34:42  10         Q.   Tell me what turn around time means to you?

09:34:42  11         A.   Well you have three types.  From the time it was

09:34:42  12    collected but if a sample is collected but doesn't make

09:34:42  13    its way to the lab for 24 hours compared to a sample

09:34:42  14    being collected in the morning and being in a lab in the

09:34:42  15    afternoon.  I can't answer those but when it made its way

09:34:42  16    to the lab the turn around time is running efficiently

09:34:42  17    through a machine.   We invested, as I already said, we

09:34:42  18    invested in Epic 10 LCMS machines $350,000 each.  So

09:34:42  19    there's never a backlog of tests.  They didn't sit

09:34:42  20    waiting to get on a machine 24 hours later or 48 hours.

09:34:42  21    The minute they came to the lab they were able to get on

09:34:42  22    a machine fairly quickly and the result would be back to

09:34:42  23    a physician the minute -- well I don't know the minute --

09:34:42  24    had to go through a process and a sign-out process.  As

09:34:42  25    soon as possible.

09:34:42  1        MR. KANG:  Can we put up, Mr. Salazar, Joint

09:34:42  2   Exhibit 20, please.

09:34:42  3        Your Honor, may we publish this joint exhibit?

09:34:42  4        THE COURT:  Say again the number.

09:34:42  5        MR. KANG:  20, Joint Exhibit 20.

09:34:42  6        THE COURT:  I thought you said a longer number.

09:34:42  7   Yes, you may.

09:34:42  8   BY MR. KANG:

09:34:42  9     Q.   Mr. Salazar, could we jump to Bates Number

09:34:42  10   ending in 6415, sir.

09:34:42  11        Mr. Lagan, do you recognize this document?

09:34:42  12     A.   It looks like an order.  Sorry, is it a result

09:34:42  13   or an order.  Sorry, that's what you are asking me.  Lab

09:34:42  14   order information.  Okay.  Looks like a lab order.

09:34:42  15     Q.   It's a test result, right, from PB Labs?

09:34:42  16     A.   Sorry.  Okay.

09:34:42  17     Q.   Yes?

09:34:42  18     A.   Yeah, as I said at the start, I'm not the

09:34:42  19   clinical person or a doctor.  I couldn't pronounce most

09:34:42  20   of the words in the middle of that but, yes, it's a test

09:34:42  21   result.

09:34:42  22     Q.   This is a test results purporting to show

09:34:42  23   results from tests that were run at PB Labs?

09:34:42  24     A.   Yes.

09:34:42  25     Q.   You see there, there's some dates up on the

09:34:42  1    right-hand side.  "Collected date" do you see that?

09:34:42  2        A.    Collected date, yes.

09:34:42  3        Q.    And does that read January 4, 2013 at 11:20?

09:34:42  4        A.    If you asked me I would have said it is the

09:34:42  5    first of April.

09:34:42  6        Q.    Is that the collection date of the specimen?

09:34:42  7        A.    Collect the date of specimen received, same

09:34:42  8    date.

09:34:42  9        Q.    And you see down at the bottom "completed"?

09:34:42  10       A.    Yeah.

09:34:42  11       Q.    That's March 4, 2013, do you see that?

09:34:42  12       A.    I can't comment.  To me you are asking me, I

09:34:42  13   would say tell you it was collected on the first of

09:34:42  14   April, received on the first of April and tested on the

09:34:42  15   first of April and completed and delivered on the third

09:34:42  16   of April.

09:34:42  17       Q.    Say that again?

09:34:42  18       A.    It looks like it was collected on the first of

09:34:42  19   April, received on the first of April so it must have

09:34:42  20   been a physician -- I don't know where their address is

09:34:42  21   -- fairly local.  But its been collected, gone on to a

09:34:42  22   machine on the same day and the result has been signed

09:34:42  23   off on, completed on the third of April, so from 2 days.

09:34:42  24       Q.    Your testimony is that those -- it is day,

09:34:42  25   month, and year?

09:34:42  1        A.    Couldn't be completed before it was received,

09:34:42  2   sir, so it must be.

09:34:42  3        Q.    All right.

09:34:42  4              MR. KANG:  Your Honor, this may be a good time.

09:34:42  5              THE COURT:  Well, we're a little earlier but

09:34:42  6   that's all right.  We'll take our lunch break, Ladies and

09:34:42  7   Gentlemen.  We'll expect you back a few minutes before 2.

09:34:42  8   Have a lovely lunch.  Definitely get some fresh air and

09:34:42  9   we'll see you in 45 minutes.

09:34:42 10              Mr. Lagan, you are also free to leave right now

09:34:42 11   if you like.  You need to be in this chair about five

09:34:42 12   minute to 2.  That way we know you are available when we

09:34:42 13   have to bring out the jury.  Thank you very much, sir.

09:34:42 14              THE WITNESS:  Thank you.

09:34:42 15              (In the absence of the jury at 1:13 p.m.)

09:34:42 16              THE COURT:  Everybody be seated.  I had one

09:34:42 17   matter briefly to take up.  My clerk reports to me since

09:34:42 18   the first, the day before day one of the trial, there's

09:34:42 19   been no emails exchanging list of documents to be used.

09:34:42 20   So the problem identified by Attorney Kang this morning

09:34:42 21   about the first witness apparently continues on and I

09:34:42 22   thought we had an agreement.  I thought you folks had an

09:34:42 23   agreement which I blessed that you would exchange

09:34:42 24   documents so the witnesses would be able to look at those

09:34:42 25   and is be prepared for their questioning.  Has that sort

```
09:34:42   1    off fallen apart?
09:34:42   2            MR. KANG:  We have been exchanging, them, Your
09:34:42   3    Honor.  Apologies for not copying the Court.
09:34:42   4            THE COURT:  Okay.  If you would as that's the
09:34:42   5    way we get a heads up that this going all right.  And
09:34:42   6    when it wasn't going that was just an oversight.
09:34:42   7            MR. CUNNINGHAM:  Your Honor, what happened late
09:34:42   8    last night a couple of exhibits were added in.  We have
09:34:42   9    been doing that every day.
09:34:42  10            THE COURT:  I didn't know.  I had limited
09:34:42  11    information.  All right then.  Thank you very much.
09:34:42  12    Anything that has to be addressed before we can get this
09:34:42  13    witness going again at 2?
09:34:42  14            MR. KANG:  Just to remind, obviously Mr. Lagan
09:34:42  15    is now tendered as a witness.
09:34:42  16            THE COURT:  Counsel knows that so if he tries to
09:34:42  17    speak to you or ask a question you are not going to
09:34:42  18    communicate, correct?
09:34:42  19            MR. CUNNINGHAM:  Correct.
09:34:42  20            THE COURT:  Thank you very much.  Court now
09:34:42  21    stand in recess and see you back here a few minutes
09:34:42  22    before 2.
09:34:42  23            (Whereupon, a luncheon recess was taken from
09:34:42  24    1:15 p.m. to 1:57 p.m.)
09:34:42  25            THE COURT:  Everybody ready to continue with the
```

09:34:42    1    cross-examination of Mr. Lagan?

09:34:42    2        MR. KANG:  Yes, Your Honor.

09:34:42    3        THE COURT:  Okay.  I guess let's see if the jury

09:34:42    4    is ready.  They should be here.

09:34:42    5        (In the presence of the jury at 1:59 p.m.)

09:34:42    6        THE COURT:  Everyone be seated.  Welcome back,

09:34:42    7    ladies and gentlemen of the jury.  We're ready to

09:34:42    8    continue with our third session for the day.  If you

09:34:42    9    recall, Mr. Lagan is on cross-examination by Attorney

09:34:42    10   Kang.

09:34:42    11       Whenever you ready.

09:34:42    12       MR. KANG:  Thank you, Your Honor.

09:34:42    13   BY MR. KANG:

09:34:42    14       Q.   Mr. Salazar, could we put up Joint Exhibit 20.

09:34:42    15       Mr. Lagan, you recall before lunch we were

09:34:42    16   looking at a lab test result, right?

09:34:42    17       A.   Yes.

09:34:42    18       Q.   And I want to make sure I understood your

09:34:42    19   testimony because we were talking about the turnaround

09:34:42    20   time between the collection date and the completed date,

09:34:42    21   correct?

09:34:42    22       A.   Yes.

09:34:42    23       Q.   Your testimony, if I understand it, was that on

09:34:42    24   this document the collection date was April 1, 2013 and

09:34:42    25   the test completion date was April 3rd, correct?

09:34:42  1      A.   That's how I would read that date, you know.

09:34:42  2  The completed date could not be before a collected date

09:34:42  3  or tested date.

09:34:42  4      Q.   You are saying on a laboratory testing results,

09:34:42  5  the dates are written with the day first, slash month

09:34:42  6  slash year?  Is that the way you read it?

09:34:42  7      A.   I'm looking at this one only.  I don't know what

09:34:42  8  from a date format.  I'm just saying that my reading of

09:34:42  9  the dates, and I know that you asked date is month first

09:34:42 10  day.  The soft -- the completed date cannot be before a

09:34:42 11  received date.  So you asked me what date I thought that

09:34:42 12  was, and I told you.

09:34:42 13      Q.   Just a yes or no answer on that one, sir.  My

09:34:42 14  question was simply:  Your testimony is that the dates

09:34:42 15  on these Lab test results are day slash month slash year,

09:34:42 16  correct?

09:34:42 17      A.   Sir, I'm trying to give you an answer, but I'm

09:34:42 18  telling you that the one I'm looking at --

09:34:42 19      Q.   Yeah.

09:34:42 20      A.   -- that's what I believe that date is.  You are

09:34:42 21  using plural and talking about lab results in a much more

09:34:42 22  general term.  I can't answer that question.

09:34:42 23          MR. KANG:  Your Honor, if we can get an

09:34:42 24  instruction similar to the ones that were given --

09:34:42 25          THE COURT:  Well, I guess --

09:34:42  1       A.   I don't know the date format.

09:34:42  2           THE COURT:  That's all right, sir.  Let me

09:34:42  3  explain.  In the courtroom here, when they are on

09:34:42  4  cross-examination especially, they get to ask a question

09:34:42  5  and the witness is stuck with, just can only answer yes,

09:34:42  6  no or I can't answer it.  I would take what -- I'm not

09:34:42  7  going to tell you what I think -- I took what you said

09:34:42  8  meant.  But if you could please answer the question

09:34:42  9  either yes, no or I can't answer it, either because of

09:34:42  10  how he's framed or the assumptions he's made, doesn't

09:34:42  11  matter.  For any reason, I can't answer it.

09:34:42  12          THE WITNESS:  Thank you very much.  Understood.

09:34:42  13  I can't answer for all of them.  I can only answer for

09:34:42  14  the one I'm looking at.

09:34:42  15  BY MR. KANG:

09:34:42  16      Q.   Would you agree with me, though, that,

09:34:42  17  Mr. Lagan, if, in fact, the dates were month, day, year,

09:34:42  18  the turnaround time here would be two months?

09:34:42  19      A.   The turnaround time would be two months?

09:34:42  20  Collect on -- okay.  So you are saying January and 03 is

09:34:42  21  March?

09:34:42  22      Q.   Yes.

09:34:42  23      A.   Yes, if that was their -- yes.  Got it.

09:34:42  24      Q.   Okay.  But your testimony is that it's actually

09:34:42  25  April 1st collected date, April 3rd completed date.  So

569

09:34:42  1    your testimony is that the turnaround time was two days?

09:34:42  2        A.   My reading of the date format on the form you

09:34:42  3    are showing me is two days.  I would have to get a lot

09:34:42  4    more information on that sample to understand the

09:34:42  5    date. --

09:34:42  6             MR. KANG:  Mr. Salazar, can we go to Cigna --

09:34:42  7    BY MR. KANG

09:34:42  8        Q.   I am going to show you another page from the

09:34:42  9    same document, Mr. Lagan.  Okay.

09:34:42  10            MR. KANG:  Bates ending in 6798.  Can we zoom in

09:34:42  11   on the right screen, sir?

09:34:42  12            THE COURT:  Remind us, with the break, what is

09:34:42  13   the exhibit number?

09:34:42  14            BY MR. KANG:  Joint Exhibit 20, Your Honor.

09:34:42  15            THE COURT:  Joint 20.  And so you're at document

09:34:42  16   page number 6798.

09:34:42  17            MR. KANG:  Right.  Mr. Salazar, could we zoom

09:34:42  18   in.

09:34:42  19   BY MR. KANG:

09:34:42  20       Q.   And so this is another lab test result from the

09:34:42  21   same exhibit, Mr. Lagan.

09:34:42  22       A.   Okay.

09:34:42  23       Q.   And on this one it says the collected date is

09:34:42  24   01-21-2013, correct?

09:34:42  25       A.   Yes.

09:34:42  1       Q.   Would you agree with me that there is no 21st

09:34:42  2    month of the year?

09:34:42  3       A.   I would.

09:34:42  4       Q.   So is there any other logical way of reading

09:34:42  5    this other than that this is January 21st of 2013?

09:34:42  6       A.   No, that's fine.

09:34:42  7       Q.   And you would agree with me also that the

09:34:42  8    completed date here is March 4, 2013?

09:34:42  9       A.   Yes.

09:34:42  10       Q.   So the turnaround time here would be about a

09:34:42  11    month and two weeks, correct?

09:34:42  12       A.   Yes.

09:34:42  13       Q.   That's not a short turnaround time, is it?

09:34:42  14       A.   No, there's something not right with that date.

09:34:42  15       Q.   That's a lot longer than seven or ten days,

09:34:42  16    correct?

09:34:42  17       A.   Sir, my turnaround was, as I said earlier, one

09:34:42  18    to two days, so...

09:34:42  19       Q.   So now if we go back to the other document, you

09:34:42  20    would agree we with me that if you are -- would you like

09:34:42  21    to change your testimony as to the date for the collected

09:34:42  22    date and completed date on this one?

09:34:42  23       A.   Sir, I can't.  I don't know the date format in

09:34:42  24    the software.  As you pointed out in the other document,

09:34:42  25    there's no 21st.  If it is month and day, then it's, as

09:34:42  1    you suggest, two months.  But again, I don't know if the

09:34:42  2    an outlier, out of the thousands of tests and there's a

09:34:42  3    reason for it.  But our typical turnaround time which we

09:34:42  4    -- I mean no doctor would accept that period of a wait on

09:34:42  5    a result.  That's just not -- that's not good business.

09:34:42  6        Q.   You would agree with me that a turnaround time

09:34:42  7    of two months between January 4 to March 4, that's not a

09:34:42  8    short turnaround time either?

09:34:42  9        A.   Not a short term and not acceptable to a

09:34:42  10   physician.

09:34:42  11       Q.   So this is another outlier?

09:34:42  12       A.   Sir, I can't -- I don't know how many.  We did

09:34:42  13   tens of thousands of tests.

09:34:42  14            MR. KANG:  Could we see 6595, Mr. Salazar.  If

09:34:42  15   you can zoom in.  This is Exhibit 20, Joint 20.  Thank

09:34:42  16   you.

09:34:42  17   BY MR. KANG:

09:34:42  18       Q.   And you see here the collected date is January

09:34:42  19   28 of 2013, with a completed date of March 4th, sir?

09:34:42  20       A.   Okay.

09:34:42  21       Q.   Do you see that?

09:34:42  22       A.   Yes.

09:34:42  23       Q.   And that's a turnaround time of over a month,

09:34:42  24   correct?

09:34:42  25       A.   Yes.

09:34:42  1      Q.    That's not a short turnaround time, is it?

09:34:42  2      A.    No.

09:34:42  3            MR. KANG:  Can we go to Joint 20, Mr. Salazar?

09:34:42  4      I'm sorry.  Joint 18.  Could we go to page 5841 on this

09:34:42  5      one, sir.  Zoom in there.

09:34:42  6      BY MR. KANG:

09:34:42  7      Q.    This is now a different exhibit.  You would see

09:34:42  8      the collection date is January 7, 2013, correct?

09:34:42  9      A.    Okay.

09:34:42  10     Q.    Yes?

09:34:42  11     A.    Yes.

09:34:42  12     Q.    Completed on February 3rd of 2013, correct?

09:34:42  13     A.    It was received the next day and tested two days

09:34:42  14     later, yeah.  I'd have to say that I don't know what the

09:34:42  15     completed means on that because, you know, the collected

09:34:42  16     date the specimen received is the next day.  The tested

09:34:42  17     date is three days later.  As I said to you before, the

09:34:42  18     tested date -- at the point it's tested, a result is

09:34:42  19     available to the doctor after that.  So I'm not sure what

09:34:42  20     completed means in this, just to be clear with you.  I

09:34:42  21     don't know that.  I don't believe that means tested

09:34:42  22     because it says in the line above tested.

09:34:42  23            I think the other examples you showed me, each

09:34:42  24     testing date was within 24 to 48 hours of receipt.  And

09:34:42  25     with the software, the result was available to the

09:34:42  1    doctors immediately a test was complete.  So the

09:34:42  2    completed piece here, I'm not sure what that means, sir.

09:34:42  3    I don't know if that means signed off by someone in

09:34:42  4    compliance at a later date, checked, billed.  I don't

09:34:42  5    know what that completed mean.

09:34:42  6        Q.   Would you ever send a test result back to a

09:34:42  7    doctor before compliance had been checked off on it and

09:34:42  8    it had been validated that the test was completed?

09:34:42  9        A.   I don't know what the process was in the lab.  I

09:34:42  10   didn't run the compliance piece, but I understand that

09:34:42  11   there was a -- there was a name for it.  There's -- you

09:34:42  12   know, these were qualified people, so they had to release

09:34:42  13   the tests back to an individual.  But they were released

09:34:42  14   back and available on completion when it was tested.  So

09:34:42  15   again, I'm not sure what your completed on these

09:34:42  16   tomorrows refers to.

09:34:42  17       Q.   You would agree with me that completed means the

09:34:42  18   date that it's completed?

09:34:42  19       A.   I don't know what the definition of completed

09:34:42  20   was.  The date it was tested is purely within one to two

09:34:42  21   days of the date it was collected in each of those forms,

09:34:42  22   So the purpose of the lab was to run a test, run a

09:34:42  23   diagnostic.

09:34:42  24       Q.   What would you be sending a test result back if

09:34:42  25   it wasn't completed?  Why would you sending an incomplete

09:34:42  1    test result back to a physician?

09:34:42  2        A.    Once it's tested -- once a sample is run on a

09:34:42  3    machine, you have a diagnostic result.  On each of the

09:34:42  4    examples you have shown me, it was tested within 24 to 48

09:34:42  5    hours.  So again I don't -- completed -- we can say

09:34:42  6    completed means completed, yes, it does.  I don't know

09:34:42  7    what parts form part of that process.  I don't -- but I

09:34:42  8    would suggest no physician would be happy about a result

09:34:42  9    being a month.  We certainly would not keep that

09:34:42  10   customer.

09:34:42  11       Q.    So that's your testimony now?

09:34:42  12       A.    What do you mean now?

09:34:42  13       Q.    Is that your testimony?

09:34:42  14       A.    That is my testimony, yes.

09:34:42  15       Q.    Just like it was earlier your testimony that the

09:34:42  16   test results should be read as day month year, correct?

09:34:42  17       A.    Sorry.  You asked me to read a date format.  I

09:34:42  18   have already explained that.

09:34:42  19       Q.    Now, once an account executive got a client for

09:34:42  20   Medytox, the account executive would have the person fill

09:34:42  21   out a register station packet, correct?

09:34:42  22       A.    Yes.

09:34:42  23       Q.    And to be clear, that's a registration packet

09:34:42  24   that Medytox created?

09:34:42  25       A.    I believed so.  Yes, that would have been

09:34:42  1    consistent with Medytox onboardings information, yes.

09:34:42  2        Q.    The clients would not create these registration

09:34:42  3    packets, correct?

09:34:42  4        A.    For the most part, no.  I mean, we would --

09:34:42  5    certainly have had clients that would have provided

09:34:42  6    information in their own format.  But for the most part,

09:34:42  7    we tried to create a consistent process where information

09:34:42  8    was provided from a customer and a format that was then

09:34:42  9    uploaded into our software and then end there.

09:34:42  10        Q.    Simple yes or no question would have been

09:34:42  11    sufficient there, Mr. Lagan.

09:34:42  12            MR. KANG:  Could we put up --

09:34:42  13            THE COURT:  You couldn't answer it, Mr. Lagan.

09:34:42  14    But he's right, it called for a yes or no, but you are

09:34:42  15    allowed to say I can't answer it yes or no.

09:34:42  16            Go ahead, sir.

09:34:42  17            MR. KANG:  Thank you, Your Honor.

09:34:42  18            Can we put up Cigna Exhibit 220.

09:34:42  19            And this is, Your Honor, without objection, so

09:34:42  20    if we may publish.

09:34:42  21            THE COURT:  Yes, I see that.  It's marked as a

09:34:42  22    full exhibit.  It may be published to the jury.

09:34:42  23            MR. KANG:  If we can go to 3306, Mr. Salazar.

09:34:42  24    BY MR. KANG:

09:34:42  25        Q.    Mr. Lagan, do you recognize a document like

09:34:42  1    this?

09:34:42  2        A.   It looks like it is a PB Labs -- I don't know if

09:34:42  3    it's an order or not.  Is it just -- sorry.

09:34:42  4        Q.   It's part of a client -- it's a form from a

09:34:42  5    client registration packet.

09:34:42  6        A.   Okay.

09:34:42  7        Q.   Yes?

09:34:42  8        A.   Yes.

09:34:42  9        Q.   Do you see on this document it says "agency

09:34:42  10   name"?  Do you see that?

09:34:42  11       A.   Yes.

09:34:42  12       Q.   That's where the client would write down the

09:34:42  13   name of the facility, correct?

09:34:42  14       A.   Correct.

09:34:42  15       Q.   And in this instance, the facility is Angel's

09:34:42  16   Recovery, correct?

09:34:42  17       A.   Correct.

09:34:42  18       Q.   If you look down further on this registration

09:34:42  19   form, the client would also check the type of facility

09:34:42  20   that they are, either rehab center or pain center.  You

09:34:42  21   see that?

09:34:42  22       A.   Yes.

09:34:42  23       Q.   And the client would then also indicate the

09:34:42  24   projected daily sample volume.  Do you see that?

09:34:42  25       A.   Yes.

09:34:42  1     Q.   Is that the daily sample volume of drug testing

09:34:42  2  services?

09:34:42  3     A.   I can't answer that, sir.  I don't know.

09:34:42  4     Q.   Here, it says 15 to 20 three times a week.  Do

09:34:42  5  you see that?

09:34:42  6     A.   Yes.

09:34:42  7     Q.   And at the bottom of this form, there's also an

09:34:42  8  authorization paragraph, correct?

09:34:42  9     A.   I'm looking.  Yeah.

09:34:42  10     Q.   Practitioner authorization.  Do you see that?

09:34:42  11     A.   Yes.

09:34:42  12     Q.   And here, the practitioner authorization states

09:34:42  13  that "I authorize Medytox, through its affiliated labs,

09:34:42  14  to perform drug testing on patients from my practice as

09:34:42  15  directed by the individual patient test requisition form

09:34:42  16  as well as the provided customer profile on file.  I

09:34:42  17  understand that it is the practitioner's responsibility

09:34:42  18  to determine the medical necessity of each test requested

09:34:42  19  through the individual patient test requisition form and

09:34:42  20  customer profile."

09:34:42  21          Did I read that correctly?

09:34:42  22     A.   Yes, sir.

09:34:42  23     Q.   Is this the type of document that you testified

09:34:42  24  earlier that you would rely upon to determine medical

09:34:42  25  necessity?

09:34:42  1          A.   Yes, we would always rely on, as I said, the

09:34:42  2     words "I understand that it is the practitioner's

09:34:42  3     responsibility to determine the medical necessity."  That

09:34:42  4     rings true, sir.

09:34:42  5          Q.   And when it says "practitioner," that's someone

09:34:42  6     who's a licensed medical professional, correct?

09:34:42  7          A.   Yes.

09:34:42  8          Q.   A doctor, right?

09:34:42  9          A.   Yes.

09:34:42  10         Q.   Because you said it's important to -- because

09:34:42  11    doctors determine medical necessity, correct?

09:34:42  12         A.   Correct.

09:34:42  13         Q.   Here, the practitioner named is Tova Jasperson.

09:34:42  14    You know Tova Jasperson, don't you?

09:34:42  15         A.   I do not, sir, no.

09:34:42  16         Q.   You don't know Tova Jasperson?

09:34:42  17         A.   No.

09:34:42  18         Q.   Never heard of that name?

09:34:42  19         A.   Tara or Tova?

09:34:42  20         Q.   Do you know Tara Jasperson?

09:34:42  21         A.   I remember a Tara.  I don't remember the second

09:34:42  22    name.

09:34:42  23         Q.   Tova.

09:34:42  24         A.   I don't remember the name Tova.

09:34:42  25         Q.   You don't know that Tova Jasperson also went by

09:34:42   1    Tara Jasperson?

09:34:42   2        A.    No, I'm sorry.  I know a Tara -- I know Tara.  I

09:34:42   3    remember the name of Tara.  Tara with Angel's.  I didn't

09:34:42   4    even know her second name.

09:34:42   5        Q.    You knew someone named Tara Jasperson affiliated

09:34:42   6    with Angel's Recovery?

09:34:42   7        A.    Yes.

09:34:42   8        Q.    What did you understand Tara Jasperson -- what

09:34:42   9    was her affiliate with Angel's Recovery?

09:34:42  10        A.    Tara, I thought, was an owner or the CEO.  I

09:34:42  11    don't remember her role, but she was an owner.

09:34:42  12        Q.    Ms. Jasperson, to your knowledge, she's not a

09:34:42  13    doctor, is she?

09:34:42  14        A.    I don't know, sir.

09:34:42  15        Q.    You don't know that?

09:34:42  16        A.    I have no clue.

09:34:42  17        Q.    If I were to tell you she was not a doctor, you

09:34:42  18    wouldn't know one way or the other on that?

09:34:42  19        A.    Absolutely not.

09:34:42  20        Q.    You wouldn't check whether she was a doctor, so

09:34:42  21    you don't know one way or the other?

09:34:42  22        A.    Sir, I wouldn't be the person to check, no, sir.

09:34:42  23    I wouldn't know who signs the forms.

09:34:42  24             MR. KANG:  Can we go to 3305, Mr. Salazar?

09:34:42  25             THE COURT:  What's the number, please?

09:34:42  1          MR. KANG:  Page 3305.  It's still in the same
09:34:42  2   document, Your Honor.
09:34:42  3          THE COURT:  Yeah, I understand.  She needs to
09:34:42  4   make that record.
09:34:42  5   BY MR. KANG:
09:34:42  6      Q.   Mr. Lagan, do you recognize this document?
09:34:42  7      A.   Looks like the one from the software for the lab
09:34:42  8   order.  It looks like part of the lab order.
09:34:42  9      Q.   Okay.  This is a laboratory test panel and POC
09:34:42  10  testing selection sheet, correct?
09:34:42  11     A.   Yes.
09:34:42  12     Q.   It's a standing order?
09:34:42  13     A.   What do you mean by "standing," sir?
09:34:42  14     Q.   Do you know what "standing order" means?
09:34:42  15     A.    It could have been an order in the system that
09:34:42  16  meant that customer wanted -- that's the panel or that's
09:34:42  17  the test that they ordered if the software came from
09:34:42  18  their facility.
09:34:42  19     Q.   This would be a test order form that the
09:34:42  20  provider would use to place an order to, in this case, PB
09:34:42  21  Labs?
09:34:42  22     A.   Okay.
09:34:42  23     Q.   No, it's not okay.  Is that yes or no?
09:34:42  24          THE COURT:  Do you know that, sir?
09:34:42  25          THE WITNESS:  Do I know that?  Yes.  Yes.

09:34:42  1    BY MR. KANG:

09:34:42  2        Q.   So this is the form that the provider would fill

09:34:42  3    out to order a test for a patient for their labs to be

09:34:42  4    done at PB Laboratories?

09:34:42  5        A.   Yes.

09:34:42  6             MR. KANG:   And if you could zoom out,

09:34:42  7    Mr. Salazar.

09:34:42  8    BY MR. KANG:

09:34:42  9        Q.   Do you see anywhere on here a field for a

09:34:42  10   patient name?

09:34:42  11       A.   Not on this, no.

09:34:42  12       Q.   Do you see anywhere on here a field for the date

09:34:42  13   of the doctor's order?

09:34:42  14       A.   No.  But you asked me if this was a standing

09:34:42  15   order.

09:34:42  16       Q.   That was just a yes or no question, Mr. Lagan.

09:34:42  17            Do you see a field on here for a date?

09:34:42  18       A.   I don't see any field for a date, sir, no.

09:34:42  19       Q.   And because there's no date field on this form,

09:34:42  20   we cannot know sitting here today when this order was

09:34:42  21   actually prescribed, correct?

09:34:42  22       A.   We would know when it was entered into the

09:34:42  23   software, yes.  As we stand here today, sorry, no.

09:34:42  24       Q.   And based on this order, because that's no date,

09:34:42  25   we cannot determine what the expiration date of this

09:34:42  1    order is, correct?

09:34:42  2         A.   Sir, I can't even determine if that is the order

09:34:42  3    that was used for any tests.  I mean, I see a form.  As

09:34:42  4    you have pointed out, there's no date on it.  I can't

09:34:42  5    determine what this form was used for without the

09:34:42  6    information.

09:34:42  7         Q.   And part of the reason is you can't determine is

09:34:42  8    because there's no patient name or date, right?

09:34:42  9         A.   But a standing order that would be provided by a

09:34:42  10   facility would be for future patients and future orders.

09:34:42  11   So a standing order, which was your term -- a standing

09:34:42  12   order would not contain a patient name or a date.  It

09:34:42  13   would be an indication or an order that would be

09:34:42  14   performed on the patients or on dates after the standing

09:34:42  15   order was put in place.

09:34:42  16        Q.   You referred to this as a facility order?

09:34:42  17        A.   As I have said, this was not my specific role or

09:34:42  18   expertise in the company, so I'm trying to be as helpful

09:34:42  19   as possible.  And without a date, without any

09:34:42  20   information, I don't know if this is a form that was

09:34:42  21   used, wasn't used.  I don't know.

09:34:42  22        Q.   But my question is:  Was it your testimony just

09:34:42  23   a minute ago that you view this as a facility order?

09:34:42  24        A.   Yes, I view that as a facility order.

09:34:42  25        Q.   Okay.  And do you see on there, at the bottom,

09:34:42   1    there's a provider name?

09:34:42   2        A.    Provider name.  Kenneth Riveria-Kolb, M.D.

09:34:42   3        Q.    Kenneth Rivera-Kolb, M.D., you see that?

09:34:42   4        A.    I see the space for provider name and I see the

09:34:42   5    name, yes.  I would have never known the provider.

09:34:42   6        Q.    And you see above that there's a handwritten --

09:34:42   7    crossout with handwritten notes saying "do not bill on

09:34:42   8    80101"?  Do you see that?

09:34:42   9        A.    Yes.

09:34:42  10        Q.    And do you recall Mr. Nicholson writing to you

09:34:42  11    and Mr. Simmons and others saying that Cigna would no

09:34:42  12    longer be reimbursing for the code 80101?

09:34:42  13        A.    I don't remember specific emails, but I do

09:34:42  14    remember Cigna changing their policy on some -- on

09:34:42  15    billing or what they billed.  As I have said previously,

09:34:42  16    that was not unusual in the business.

09:34:42  17        Q.    Isn't it true as we -- you testified earlier

09:34:42  18    when I was asking you questions that Cigna had changed

09:34:42  19    the policy to limit the number of drug screens that could

09:34:42  20    be billed and, therefore, you wrote that the only real

09:34:42  21    business going forward was going to be confirmations?

09:34:42  22        A.    Yes.  I previously explained --

09:34:42  23        Q.    Got it.

09:34:42  24        A.    -- that I believed that to be a good business.

09:34:42  25        Q.    So here, whoever is writing this says, "Do not

09:34:42  1    bill under 80101," which is consistent with what

09:34:42  2    Mr. Nicholson told you and others that Cigna was no

09:34:42  3    longer paying for, correct?

09:34:42  4        A.   Sir, the 80101, if I -- that's a code that I

09:34:42  5    don't remember what it exactly described, but I think

09:34:42  6    that was the point of care.  Back to my email -- or the

09:34:42  7    email you referred to, physician-owned labs were doing

09:34:42  8    the point of care tests.  On a confirmation being run in

09:34:42  9    a lab, it was not billed under 80101.  That was a -- that

09:34:42  10   as -- as yourself explained, that was a much more complex

09:34:42  11   test run on a much more complex machine.  So I don't know

09:34:42  12   why it's written on that, but I don't know that

09:34:42  13   confirmation test, if that's what we were being asked to

09:34:42  14   do.  There were different codes, and I would -- I can

09:34:42  15   only say to you that whatever code was meant to be billed

09:34:42  16   from the system is what we would have billed.  I don't

09:34:42  17   believe there was any -- at any time any suggestion that

09:34:42  18   any codes that we billed were not accurate, were not the

09:34:42  19   proper codes.  So I, you know -- --

09:34:42  20        MR. KANG:  Mr. Salazar, can we put up Joint

09:34:42  21   Exhibit 37, please.  And if we could do a split screen,

09:34:42  22   that would be great.

09:34:42  23   BY MR. KANG:

09:34:42  24        Q.   Can you see this document has been admitted in

09:34:42  25   evidence in the case, Mr. Lagan?

09:34:42  1    A.    Yes.

09:34:42  2          MR. KANG:  If we can zoom in just a little bit

09:34:42  3    on the email, Mr. Salazar.  On the lower email.  I'm

09:34:42  4    sorry.

09:34:42  5    BY MR. KANG:

09:34:42  6    Q.    Mr. Nicholson writes to you and to Dr. Mendolia,

09:34:42  7    Jay Simmons and Mr. Forhan, on May 28, 2013, "Bad news

09:34:42  8    from Cigna.  Per the attached letter we received today

09:34:42  9    from Cigna, effective August 19, 2013, they are going to

09:34:42 10    the Medicare Code G0431 and will no longer pay 80101."

09:34:42 11    Do you see that?

09:34:42 12    A.    Yes.

09:34:42 13    Q.    No reason to dispute that email, correct?

09:34:42 14    A.    No. --

09:34:42 15          MR. KANG:  And then if you can scroll up,

09:34:42 16    Mr. Salazar, to see Mr. Lagan's response.

09:34:42 17    BY MR. KANG:

09:34:42 18    Q.    Your response was, "That finishes the POLs for

09:34:42 19    all of these facilities, too.  Means that the only real

09:34:42 20    business will be the confirmation business."

09:34:42 21          Did I read that correctly?

09:34:42 22    A.    You did.

09:34:42 23    Q.    The confirmation business means the confirmatory

09:34:42 24    tests, correct?

09:34:42 25    A.    Yes, the POLs could not run -- my understanding,

09:34:42  1   POLs, physician owned or physician operated labs, as it

09:34:42  2   says for all these facilities, we had invest a lot of

09:34:42  3   money in business and the facilities, some of them were

09:34:42  4   opening their own physician-owned labs attached to the

09:34:42  5   facilities, and they were running a part of the test.

09:34:42  6   But that was a very cheap test.  I don't recollect what

09:34:42  7   the reimbursement was.  But for us, that was good

09:34:42  8   business for us.  So I stand by that statement.

09:34:42  9        MR. KANG:  Your Honor, could I get a --

09:34:42  10       A.   The competing businesses of the physician-owned

09:34:42  11  lab --

09:34:42  12       THE COURT:  I'm waiting for somebody to

09:34:42  13  interrupt.  I'm sorry, sir.  Every witness has this

09:34:42  14  reaction.  You're used to -- if you were talking to me

09:34:42  15  over a drink and I asked you about confirmation business,

09:34:42  16  what you just said would be what you would say to me

09:34:42  17  because it's very polite, understands I don't know

09:34:42  18  anything, and you are going to put a background to the

09:34:42  19  question and the answer.

09:34:42  20       Here in court, all you get to do is say --

09:34:42  21  answer the question.

09:34:42  22       THE WITNESS:  Okay.

09:34:42  23       THE COURT:  Attorney Kang is on cross, which

09:34:42  24  generally means a large percentage of the questions

09:34:42  25  somebody asks on cross is yes, no, or I can't answer.

09:34:42  1          The question was the confirmation business

09:34:42  2  means the confirmatory tests, comma, correct?

09:34:42  3          THE WITNESS:  That is correct.

09:34:42  4          THE COURT:  Thank you. --

09:34:42  5          MR. KANG:  Thank you.

09:34:42  6          And, Mr. Salazar, can we go back to the test

09:34:42  7  order form.

09:34:42  8  BY MR. KANG:

09:34:42  9      Q.   And so now here on this form that we've been

09:34:42  10  talking about, you can see it says "Do not bill on

09:34:42  11  80101," and then there are some checkmarks to confirm

09:34:42  12  positives, check, confirm negatives, check.  Do you see

09:34:42  13  that?

09:34:42  14      A.   Yes.

09:34:42  15      Q.   And you would agree with me that means that a

09:34:42  16  confirmatory test would be run regardless of whether the

09:34:42  17  drug screen came out positive or negative, correct?

09:34:42  18      A.   Yes, if that's what the doctor asked for.

09:34:42  19      Q.   And that's the same confirmatory test -- testing

09:34:42  20  that you said was going to be the only real business

09:34:42  21  going forward, correct?

09:34:42  22      A.   Yes.

09:34:42  23          MR. KANG:  And if you could zoom out,

09:34:42  24  Mr. Salazar.  And if we could go up to the top here.

09:34:42  25  BY MR. KANG:

09:34:42  1      Q.   You'll see that there are 20 different

09:34:42  2   substances that are listed on this selection sheet,

09:34:42  3   correct?

09:34:42  4      A.   Yes.

09:34:42  5      Q.   And are these -- these are the 20 different

09:34:42  6   substances at the time that PB Labs had the capability of

09:34:42  7   testing, correct?

09:34:42  8      A.   Yes, that would be true.

09:34:42  9      Q.   All right.  And you see that there's an X mark

09:34:42 10   next to one of those columns.  Do you see that?

09:34:42 11      A.   Yes.

09:34:42 12      Q.   And that column that's X'd has a box next to

09:34:42 13   every one of those 20 substances, correct?

09:34:42 14      A.   Yes.

09:34:42 15      Q.   What this means is that this is an order for

09:34:42 16   testing to be run on all 20 substances on this list,

09:34:42 17   correct?

09:34:42 18      A.   Correct.

09:34:42 19      Q.   And confirmation to be run regardless of whether

09:34:42 20   drug screens were positive or negative, correct?

09:34:42 21      A.   Correct.

09:34:42 22           MR. KANG:  You can put that down.

09:34:42 23   BY MR. KANG:

09:34:42 24      Q.   Mr. Lagan, Medytox never communicated with Cigna

09:34:42 25   about insurance coverage prior to providing testing

589

09:34:42  1    services, correct?

09:34:42  2        A.    Prior to providing a testing service?

09:34:42  3        Q.    Yes.

09:34:42  4        A.    I don't believe so.  I believe it would have

09:34:42  5    generated a test.  And if Cigna was the person that had

09:34:42  6    -- was insuring the patient, would have sent Cigna --

09:34:42  7        Q.    Sorry.  Just a yes or no.  It was a yes or no

09:34:42  8    question.

09:34:42  9        A.    I don't know.

09:34:42  10       Q.    Okay.  Did the labs communicate with any of the

09:34:42  11   patients before performing services?

09:34:42  12       A.    I don't know that either, sir.  The labs would

09:34:42  13   never have seen patients.

09:34:42  14       Q.    The labs did -- and so actually you answered my

09:34:42  15   questions.  The labs never saw the patient before

09:34:42  16   rendering services?

09:34:42  17       A.    No, the labs did not see patients.

09:34:42  18       Q.    That's wasn't the business of the labs, for

09:34:42  19   patients to actually come in and get a draw or a urine

09:34:42  20   sample at the labs?

09:34:42  21       A.    We did have a phlebotomist for doing blood draws

09:34:42  22   on staff, and there was an area for phlebotomy if someone

09:34:42  23   sent a patient, but that was a very small portion of our

09:34:42  24   business.  Most of the samples were sent to us from a

09:34:42  25   doctor.

09:34:42  1       Q.   Or from a treatment center or a provider?

09:34:42  2       A.   I think that's just the same lab model

09:34:42  3   throughout the country.

09:34:42  4            THE COURT:  Is that -- you mean -- are those

09:34:42  5   generally your own tests, is what you mean, that they

09:34:42  6   would be -- doctor's office would collect and send to

09:34:42  7   you?

09:34:42  8            THE WITNESS:  Yes.

09:34:42  9            THE COURT:  Fine.  Thanks.

09:34:42 10            MR. KANG:  Thank you, Your Honor.

09:34:42 11   BY MR. KANG:

09:34:42 12       Q.   But the labs did rely on something called a

09:34:42 13   patient consent form, correct?

09:34:42 14       A.   Yes.

09:34:42 15            MR. KANG:  And can we show Joint Exhibit 163,

09:34:42 16   Mr. Salazar?

09:34:42 17   BY MR. KANG:

09:34:42 18       Q.   Mr. Lagan, this is a patient consent form for PB

09:34:42 19   Laboratories, correct?

09:34:42 20       A.   Correct, yes.

09:34:42 21       Q.   And the bottom right, there is a provision that

09:34:42 22   says "Consent insurance release."  Do you see that?

09:34:42 23       A.   Yes.

09:34:42 24       Q.   And it states, "I voluntary consent to the

09:34:42 25   collection and testing of my specimen," correct?

09:34:42  1    A.   Yes.

09:34:42  2    Q.   This forms is the only manner in which the labs

09:34:42  3   obtain the patient's consent, to your knowledge, correct?

09:34:42  4    A.   No.

09:34:42  5    Q.   How else?  No?

09:34:42  6    A.   No.

09:34:42  7    Q.   How else did the patients obtain -- how else did

09:34:42  8   the labs obtain the patient's consent?

09:34:42  9    A.   I believe that most situations, the doctor's

09:34:42  10   consent -- whatever consent the doctor had also covered

09:34:42  11   any auxiliary services, any lab service or other service

09:34:42  12   that the doctor might need from a patient.

09:34:42  13    Q.   And that would be written consent?

09:34:42  14    A.   I don't know how the doctors got their consent

09:34:42  15   from a patient.  But if a patient went to a doctor,

09:34:42  16   whatever that process was, my understanding is that that

09:34:42  17   permitted the doctor to -- whether it was a lab test or

09:34:42  18   an X-ray or a scan, that was just part of the process.

09:34:42  19    Q.   So you would either use this form to get patient

09:34:42  20   consent or the doctor's form for patient consent?

09:34:42  21    A.   Yeah.  Sorry.  I don't know the details of this

09:34:42  22   subject.  This is, obviously, a consent of something

09:34:42  23   that's come up a lot.  We never ever had a patient

09:34:42  24   suggest we did not have their consent, so I assume that

09:34:42  25   we had all of the consents for all of the patients in the

09:34:42  1    case of Medytox.

09:34:42  2         THE COURT:  It is all right to say I don't know.

09:34:42  3    I mean --

09:34:42  4         THE WITNESS:  I'm sorry.  I apologize.

09:34:42  5         THE COURT:  No, no, sir.  That one is not your

09:34:42  6    fault.  But that's what it sounded like your answer was.

09:34:42  7    Was I correct?  Put it that way.

09:34:42  8         THE WITNESS:  Could I ask just to reask the

09:34:42  9    question?

09:34:42  10        THE COURT:  So you would use this form to get

09:34:42  11   patient consent a doctor's form for patient consent?

09:34:42  12        THE WITNESS:  Yeah, we had forms.  I just

09:34:42  13   remember from compliance team there was a big effort.

09:34:42  14   And the system always improved, so there was always -- at

09:34:42  15   the start, there was an electronic process for getting a

09:34:42  16   patient consent at the doctor's office.  We purchased

09:34:42  17   little scanners that they signed.  And then at other

09:34:42  18   times there were this type of form.  So, I -- it was just

09:34:42  19   a thing that was -- became important as part of the busy.

09:34:42  20   BY MR. KANG:

09:34:42  21        Q.   To be clear --

09:34:42  22        MR. KANG:  Oh, I'm sorry, Your Honor.  Please.

09:34:42  23        THE COURT:  Can you answer the question I read

09:34:42  24   back to you?  So you use this form, meaning the one on

09:34:42  25   the screen, which is Joint Exhibit 163, and -- or the

09:34:42  1    doctor's form for patient consent, question mark?  Can

09:34:42  2    you answer that yes or no or you can't answer it?

09:34:42  3              THE WITNESS:  This form would have been used for

09:34:42  4    patient consent.  I don't remember seeing the doctor's

09:34:42  5    form, ma'am -- Your Honor, so I can't give you a full

09:34:42  6    answer.

09:34:42  7              THE COURT:  That's fine.  Sorry to interrupt

09:34:42  8    you.

09:34:42  9              MR. KANG:  Thank you, Your Honor.

09:34:42  10             THE COURT:  Sorry to interrupt you.

09:34:42  11             MR. KANG:  No, no.  Thank you for those

09:34:42  12    clarifications.

09:34:42  13    BY MR. KANG:

09:34:42  14        Q.   Mr. Lagan, the patients never came into the

09:34:42  15    labs, though, to sign consent forms, correct?

09:34:42  16        A.   That's correct.

09:34:42  17        Q.   They would have been signed wherever they were,

09:34:42  18    at the doctor's office, treatment center, wherever?

09:34:42  19        A.   Yeah.  It was the responsibility of the

09:34:42  20    physician that collected a sample to --

09:34:42  21        Q.   Just a yes or no, sir.  It would have been

09:34:42  22    signed at the doctor's office or treatment center?

09:34:42  23        A.   Correct.  Yes.

09:34:42  24        Q.   So you personally would not have observed

09:34:42  25    anybody -- any patient at the treatment signing a consent

09:34:42    1    form, correct?

09:34:42    2        A.    Yes, that's correct.

09:34:42    3        Q.    To your knowledge, nobody from the labs would

09:34:42    4    have observed anybody signing patient consent forms,

09:34:42    5    correct?

09:34:42    6        A.    That is correct.

09:34:42    7        Q.    So you don't have any personal knowledge of who

09:34:42    8    actually signed off on the patient consent forms?

09:34:42    9        A.    That is correct.

09:34:42    10       Q.    Would you agree with me that acquiring a

09:34:42    11   patient's consent before performing services like lab

09:34:42    12   testing services is important?

09:34:42    13       A.    Yes.

09:34:42    14           MR. KANG:  Can we show Cigna Trial Exhibit 372.

09:34:42    15           Your Honor, there's no objection from the other

09:34:42    16   side on this one.

09:34:42    17           THE COURT:  372.  Cigna?  Cigna's?

09:34:42    18           MR. KANG:  Yes, Your Honor.

09:34:42    19           THE COURT:  Oh, I see.  I apologize.  I believe

09:34:42    20   it's already in evidence.  Well, it was used with some

09:34:42    21   other witness, but it will be a full exhibit, 372.

09:34:42    22   BY MR. KANG:

09:34:42    23       Q.    Mr. Lagan, I believe I showed you a document

09:34:42    24   like this during your deposition last year.  Do you

09:34:42    25   recall that?

09:34:42    1         THE COURT:  Could I see counsel at sidebar for

09:34:42    2    about five seconds.

09:34:42    3         (Sidebar commences.)

09:34:42    4         THE COURT:  Attorney Kang, did you move to a

09:34:42    5    direct exam of him in your case and just not mentioned it

09:34:42    6    or -- I mean, the definition of scope in my world doesn't

09:34:42    7    include about an hour and a half of what you have done.

09:34:42    8         MR. KANG:  I think that's probably right, Your

09:34:42    9    Honor.  I apologize.  I should have flagged it.

09:34:42   10         THE COURT:  About an hour ago.  I mean, his

09:34:42   11    testimony on direct is less than half an hour.  And it

09:34:42   12    isn't like he asked questions that opened up about

09:34:42   13    billing other than he learned that Cigna stopped paying

09:34:42   14    the bills.  That was about all.  It was very limited.  So

09:34:42   15    should I tell the jury that --

09:34:42   16         MR. KANG:  Yes.

09:34:42   17         THE COURT:  -- certainly since we came back from

09:34:42   18    lunch, if not prior, that Attorney Kang is doing a direct

09:34:42   19    exam of this witness?

09:34:42   20         MR. KANG:  Yes.

09:34:42   21         THE COURT:  All right, Counsel.  I mean, I don't

09:34:42   22    know why I'm worried and your time, but it is a time

09:34:42   23    issue here for everybody.

09:34:42   24         (Sidebar ends.)

09:34:42   25         THE COURT:  Ladies and gentlemen of the jury, we

09:34:42  1    should have told you -- remember I told you there's a

09:34:42  2    point the lawyers will say when I'm switching from cross

09:34:42  3    to direct.  Probably should have told you that a little

09:34:42  4    bit before the break.  So it's kind of a technical legal

09:34:42  5    reason legal reason I brought them up to ask them about

09:34:42  6    it, but I think I was correct.  And that is -- so you

09:34:42  7    should understand this is direct exam by Attorney Kang on

09:34:42  8    his case.  In other words, his -- Cigna's claim cause of

09:34:42  9    action against the Labs.

09:34:42  10         Go ahead.

09:34:42  11         MR. KANG:  Thank you, Your Honor.  And I

09:34:42  12   appreciate Your Honor clarifying that.

09:34:42  13   BY MR. HARE:

09:34:42  14        Q.   Mr. Lagan, this is a document we had a chance to

09:34:42  15   review during your deposition last year, correct?

09:34:42  16        A.   Okay.  Yes.

09:34:42  17        Q.   And this is a document back then we reviewed as

09:34:42  18   one that the labs produced during this litigation,

09:34:42  19   correct?

09:34:42  20        A.   Yes.

09:34:42  21        Q.   And it is a document that identifies by rows the

09:34:42  22   Labs' patients that are relevant to this case, correct?

09:34:42  23        A.   Yes.

09:34:42  24        Q.   And there's a column here that says "SRC patient

09:34:42  25   ID."  Do you see that?

09:34:42  1    A.    Yes.

09:34:42  2    Q.    And there are some unique numbers there.  Bio

09:34:42  3    refers to a claim with respect to BioHealth Laboratories,

09:34:42  4    correct?

09:34:42  5    A.    Yes.

09:34:42  6    Q.    PBL down at the bottom there refers to a claim

09:34:42  7    associated with a PB Laboratories, correct?

09:34:42  8    A.    Yes, I believe so.

09:34:42  9    Q.    And EPI refers to a claim associated with a

09:34:42 10    Epic, correct?

09:34:42 11    A.    Yes.

09:34:42 12    Q.    And these various columns on this document that

09:34:42 13    was produced by the Labs provides some information about

09:34:42 14    each of these claims, correct?

09:34:42 15    A.    Yes.

09:34:42 16          MR. KANG:  Mr. Salazar, if we could --

09:34:42 17    BY MR. KANG

09:34:42 18    Q.    And you see one of the claims is "Consent on

09:34:42 19    file."  Do you see that?

09:34:42 20    A.    Yes.

09:34:42 21    Q.    And I believe you testified in your deposition

09:34:42 22    that column refers to whether there is patient consent,

09:34:42 23    correct?

09:34:42 24    A.    I believe so, yes.

09:34:42 25    Q.    And you see all of these claims for individual

09:34:42    1    patients listed on a document that the Labs produced

09:34:42    2    consent on file there's a lot of "nos" on here, correct?

09:34:42    3        A.   I see that, yes.

09:34:42    4        Q.   That would indicate that there is no patient

09:34:42    5    consent on file, correct?

09:34:42    6        A.   It certainly means we didn't have a consent in

09:34:42    7    our file.  I assume that's what it means.

09:34:42    8        Q.   Do you see any "yeses" on this page?

09:34:42    9        A.   I don't.

09:34:42    10       Q.   Is it true that even though there was a "no" on

09:34:42    11   this column for a particular service, the labs went ahead

09:34:42    12   and performed that service anyway?

09:34:42    13       A.   The labs would have been entitled to perform it,

09:34:42    14   sir.

09:34:42    15       Q.   And billed Cigna for those services?

09:34:42    16       A.   I can't use the word assume, but it would be my

09:34:42    17   understanding that the doctors had whatever consent they

09:34:42    18   required before they would send us a sample.

09:34:42    19       Q.   My question was:  Even though for all of these

09:34:42    20   services where there's a "no," you still ran the services

09:34:42    21   and billed Cigna for it, correct?

09:34:42    22       A.   Sir, yes, but you say you still run, as if we

09:34:42    23   weren't entitled to run the sample.  And that's not the

09:34:42    24   case.  We were entitled to run the sample.  We had

09:34:42    25   received a doctor's order.  We were entitled to believe

09:34:42    1    that they had consent to pass the order to us and to bill

09:34:42    2    for it.  We certainly being asked to provide a free

09:34:42    3    service.

09:34:42    4         MR. KANG:  Mr. Salazar, if you could -- this is

09:34:42    5    a very lengthy document, but I would like Mr. Salazar

09:34:42    6    just to scroll.

09:34:42    7    BY MR. KANG

09:34:42    8    Q.   And if you see a "yes" on that column, just

09:34:42    9    shout it out, okay?

09:34:42   10         (Scrolling through document.)

09:34:42   11    BY MR. KANG:

09:34:42   12    Q.   We're happy to keep going, but I think we might

09:34:42   13    mind stop there to be mindful of the jury's time.

09:34:42   14         Did you see any "yeses" in those first ten

09:34:42   15    pages?

09:34:42   16    A.   I did not, no.

09:34:42   17         MR. KANG:  You can put that done, sir.  Could we

09:34:42   18    put up Joint Exhibit 31, Mr. Salazar.

09:34:42   19    BY MR. KANG:

09:34:42   20    Q.   We went through a client registration document

09:34:42   21    earlier.  I want to go through a different document.

09:34:42   22         MR. KANG:  Could we go to page Bates ending in

09:34:42   23    348 on Joint Exhibit 31, Mr. Salazar.

09:34:42   24    BY MR. KANG:

09:34:42   25    Q.   Mr. Lagan, do you recognize this document?

09:34:42  1      A.   It looks like a lab result.

09:34:42  2      Q.   No, it's actually called a health insurance

09:34:42  3  claim form.   Do you know what that is?

09:34:42  4      A.   Then I don't know.  Like I said, I'm not

09:34:42  5  clinical or not an expert in these different things.

09:34:42  6      Q.   You are not familiar with the very claim form

09:34:42  7  that you all use to get paid by insurance?

09:34:42  8      A.    No, I wouldn't be.  I already said to you, sir,

09:34:42  9  I was CEO of the corporate entity.  We had specialist

09:34:42  10  individuals in each division that understood these.   I

09:34:42  11  was not -- I couldn't possibly be an expert in all of

09:34:42  12  these things.

09:34:42  13      Q.   You don't know, for example, that this is a

09:34:42  14  document that PB Labs would have filled in and submitted

09:34:42  15  to get paid by insurance?

09:34:42  16      A.   I wouldn't have -- never have seen a form

09:34:42  17  getting filled in and submitted to an insurance company.

09:34:42  18          MR. KANG:  Could say we zoom in on box Number

09:34:42  19  32.

09:34:42  20  BY MR. KANG:

09:34:42  21      Q.   You see there it's -- 32 says "Service facility

09:34:42  22  location information"?

09:34:42  23      A.   That's the name you asked me earlier, yes.

09:34:42  24      Q.   Again, this, according to this document, it says

09:34:42  25  the facility location is listed as Sterling Reference

09:34:42  1   Laboratory, correct?

09:34:42  2        A.   Yes.

09:34:42  3        Q.   And sitting here today -- well, strike that.

09:34:42  4             It doesn't say in this box, does it, PB Labs?

09:34:42  5        A.   In that box, no.  It says Sterling Reference

09:34:42  6   Lab.

09:34:42  7        Q.   Doesn't say BioHealth, right?

09:34:42  8        A.   It says Sterling Reference Lab.

09:34:42  9        Q.   It doesn't say Epic, correct?

09:34:42 10        A.   No, sir, it doesn't.

09:34:42 11        Q.   You don't know what Sterling Reference Lab is?

09:34:42 12        A.   I do remember now when I see it here and I see

09:34:42 13   it in this context, and that was a lab which we did not

09:34:42 14   own which we subcontracted to pay and paid for certain

09:34:42 15   services either during the time that we were -- either

09:34:42 16   had more business than our equipment would facilitate or

09:34:42 17   at a time when -- if a machine was down, it was not

09:34:42 18   unusual to have a backup.  I just forgot the name, but

09:34:42 19   Sterling Reference Lab was one of a couple of outside

09:34:42 20   facilities that we would use for our machinery -- you

09:34:42 21   know, if our -- PB was the first one.  It wasn't the big

09:34:42 22   Epic labs that we invested, you know, in all the new

09:34:42 23   equipment.  So it had one or two machines.  And if you

09:34:42 24   had more volume than those machines could run or you had

09:34:42 25   a broken down machine, you used the service of another

09:34:42  1    lab and paid them for it.

09:34:42  2        Q.   So you are saying, then, that some of the

09:34:42  3    services -- if a machine was broken at PB Labs, it would

09:34:42  4    be sent to Sterling Reference for the testing to be done

09:34:42  5    there?

09:34:42  6        A.   I don't remember the reason.  If you want me to

09:34:42  7    confirm if it was a broken down machine.  I don't

09:34:42  8    remember the reason, but, yes, that would not be unusual

09:34:42  9    to have a relationship with another lab that could help

09:34:42  10   you if you needed them.

09:34:42  11       Q.   So in those instances the services would not

09:34:42  12   have been performed at PB Labs, it would have been

09:34:42  13   performed at Sterling, correct?

09:34:42  14       A.   That's correct, as is being disclosed on the

09:34:42  15   form that was submitted to the insurance company.

09:34:42  16           MR. KANG:  All right.  Put that down, sir.  Can

09:34:42  17   we put up Cigna Exhibit 221.

09:34:42  18           THE COURT:  This is in evidence.

09:34:42  19           MR. KANG:  No objection on this one, Your Honor.

09:34:42  20           THE COURT:  221.

09:34:42  21           MR. KANG:  Actually, I'm sorry.  No, Your Honor.

09:34:42  22   I need to go through that one.  Can we put up Cigna 243.

09:34:42  23   There's no objection on this one either.

09:34:42  24           THE COURT:  Full exhibit.

09:34:42  25   BY MR. KANG:

09:34:42 Q. Mr. Lagan, do you recognize this document, sir? This is a document we went through during your deposition as well, if you recall.

09:34:42 A. Yeah, I don't remember it specifically, sir, no. BioHealth. Financial analysis by facility grouping. It's from ARC Medical Billing. It's a report from the billing company.

09:34:42 Q. This is a Medytox document, correct?

09:34:42 A. It's an ARC Medical Billing document, sir. I can't say -- it says ARC Medical Billing.

09:34:42 Q. It was produced by the Labs in this case, correct?

09:34:42 A. I can't answer. I'm reading the document and I'm seeing up in right-hand corner it says financial analyses by facility grouping with drill down, ARC Medical Billing. It looks like it was for the lab. So that was the billing company for the lab, not the lab itself.

09:34:42 Q. Arc Medical Billing, is that -- was that -- eventually the name changed to MBC?

09:34:42 A. It's another of those names that had a trading as MBC and Arc were the -- Arc Medical Billing practices and MBC are the same entity.

09:34:42 Q. And isn't it true that Medytox purchased MBC in August of 2012?

09:34:42   1    A.   I think we're in agreement in 2012.  We didn't

09:34:42   2   purchase it until one year later.  August 2000 -- yeah,

09:34:42   3   we didn't actually take ownership of it until later on.

09:34:42   4   I think it was August '13.

09:34:42   5    Q.   In any event, that would have been prior to

09:34:42   6   February of 2014, which is the date of this document,

09:34:42   7   correct?

09:34:42   8    A.   Yes.

09:34:42   9    Q.   So Arc Medical Billing, MBC, was a 100 percent

09:34:42  10   subsidiary owned by Medytox, correct?

09:34:42  11    A.   Yes.

09:34:42  12    Q.   So whatever document Arc Medical Billing

09:34:42  13   produced, that ultimately is a Medytox document, correct?

09:34:42  14    A.   Okay.  Yes.

09:34:42  15    Q.   This is a -- if you see up on the top right-hand

09:34:42  16   corner, a financial analysis by facility grouping with

09:34:42  17   drill down.  Do you see that?

09:34:42  18    A.   Yes.

09:34:42  19    Q.   And this is a financial analysis for BioHealth

09:34:42  20   Medical Laboratory, correct?

09:34:42  21    A.   Yes.

09:34:42  22    Q.   And the period of time for this financial

09:34:42  23   analysis is February 1, 2014 to February 28, 2014,

09:34:42  24   correct?

09:34:42  25    A.   Yes.

09:34:42  1      Q.   So this document, would you agree with me,

09:34:42  2  reflects the financial analysis of specimens submitted to

09:34:42  3  BioHealth in February 2014 broken down by facility name,

09:34:42  4  correct?

09:34:42  5      A.   Yes.

09:34:42  6      Q.   Do you see the name Angel's Recovery on this

09:34:42  7  document?

09:34:42  8      A.   Yes.

09:34:42  9      Q.   And do you see there --

09:34:42  10          MR. KANG:  If you could highlight that,

09:34:42  11  Mr. Salazar.

09:34:42  12  BY MR. KANG:

09:34:42  13     Q.   Can you see there's a number of different

09:34:42  14  columns, correct?

09:34:42  15     A.   Yes.

09:34:42  16     Q.   One of them says "Total sample count."  Do you

09:34:42  17  see that?

09:34:42  18     A.   "Total sample count."  Yes.  Yes.

09:34:42  19     Q.   And total sample count reflects the total number

09:34:42  20  of specimens that would have been sent by Angel's

09:34:42  21  Recovery to BioHealth in February of 2014, correct?

09:34:42  22     A.   Yes.

09:34:42  23     Q.   According to this document, Angel's Recovery in

09:34:42  24  the month of February of 2014, sent 16,044 specimens to

09:34:42  25  BioHealth for testing, did it not?

09:34:42  1    A.   Yes.

09:34:42  2    Q.   Do you see any other provider on this list that

09:34:42  3  submitted more samples to BioHealth for the month of

09:34:42  4  February 2014 other than Angel's Recovery?

09:34:42  5    A.   No.

09:34:42  6    Q.   Do you see there's another column called "Total

09:34:42  7  gross charges?"

09:34:42  8    A.   Yes.

09:34:42  9    Q.   Does that reflect the total amount charged by

09:34:42  10  BioHealth for those 16,044 specimens?

09:34:42  11    A.   That's the gross charges, yes.

09:34:42  12    Q.   And the gross charges for the month of February

09:34:42  13  for Angel's Recovery was $4,057,553.90, correct?

09:34:42  14    A.   Yes.

09:34:42  15    Q.   And that's just for the month of February?

09:34:42  16    A.   Yes.

09:34:42  17    Q.   And among all of the other providers on this

09:34:42  18  list, would you agree with me that $4 million and some

09:34:42  19  change in gross charges is the highest?

09:34:42  20    A.   Yes.

09:34:42  21    Q.   Down at the bottom of the chart, you can see

09:34:42  22  that the total that BioHealth billed across all of these

09:34:42  23  facilities was about 11.3 million, correct?

09:34:42  24    A.   Yes.

09:34:42  25    Q.   So would you agree with me that the amount of

09:34:42  1    billed charges attributable to Angel's Recovery was about

09:34:42  2    a third or more than a third of BioHealth's business in

09:34:42  3    the month of February 2014?

09:34:42  4        A.    For that month of February, yes.

09:34:42  5        Q.    Now, you said you know Tara Jasperson, right?

09:34:42  6        A.    I said I recognize the name.  I do not know her.

09:34:42  7        Q.    Co-owner at Angel's Recovery?

09:34:42  8        A.    Yes.

09:34:42  9        Q.    Do you know her father, Alan Bostom, as well?

09:34:42  10       A.    I've never met the man, but I do know the name.

09:34:42  11            MR. CHRIST:  Objection, Your Honor.  I think

09:34:42  12    this line of questioning is wading into territory that's

09:34:42  13    been covered by a Court's order.

09:34:42  14            THE COURT:  I'm very aware of that territory,

09:34:42  15    and I am trying to make sure that we don't cross the

09:34:42  16    line.  I don't know I can guarantee it, but I hope not.

09:34:42  17    I'm sure counsel remembers my ruling.

09:34:42  18            Go ahead, sir.

09:34:42  19    BY MR. KANG:

09:34:42  20       Q.    Mr. Lagan, isn't it true that Mr. Bostom was

09:34:42  21    hired by Medytox as a sales representative?

09:34:42  22       A.    He was, yes.

09:34:42  23            MR. KANG:  And, Your Honor, if I may --

09:34:42  24    BY MR. KANG:

09:34:42  25       Q.    And if I were to tell you that he was hired in

09:34:42  1   January of 2014, would that sounds about right?

09:34:42  2       A.   I wouldn't remember the dates, but I do remember

09:34:42  3   his hiring process.  It was pretty unique compared to --

09:34:42  4   we had six to eight plus salespeople, but of all the

09:34:42  5   salespeople, his was the one name that was brought to me

09:34:42  6   before he was hired simply because he was a part owner in

09:34:42  7   a facility.  And that was quite unusual for us, so I do

09:34:42  8   remember taking some outside advice from counsel before

09:34:42  9   we hired Mr. Bostom.  And we were --

09:34:42  10           MR. KANG:  Your Honor, I would move to strike.

09:34:42  11           THE COURT:  Yeah.  I don't think -- yeah.  The

09:34:42  12   question was:  If I were to tell you he was hired by -- I

09:34:42  13   don't know if you said Medytox or who, but --

09:34:42  14           MR. KANG:  Yes.

09:34:42  15           THE COURT:  -- Medytox, would that sound about

09:34:42  16   right?  And it's either yes, no, or I don't know.  And

09:34:42  17   the jury should disregard the answer.  I'm striking it

09:34:42  18   from it testimony.

09:34:42  19           Can you answer the question as it was asked,

09:34:42  20   sir.

09:34:42  21           THE WITNESS:  Time sounds right.  The time --

09:34:42  22   BY MR. KANG:

09:34:42  23       Q.   Yes?

09:34:42  24       A.   Yes.

09:34:42  25       Q.   And he was hired as a sales representative,

09:34:42  1    correct?  Yes or no?

09:34:42  2        A.    Yes.

09:34:42  3        Q.    And if I were to tell you that he was receiving

09:34:42  4    a base compensation of a thousand dollars, would that

09:34:42  5    sounds about right?

09:34:42  6        A.    Yes.

09:34:42  7        Q.    And also 15 percent commission, would that sound

09:34:42  8    about right?

09:34:42  9        A.    Commission on sales that he generated and only

09:34:42  10   on his own -- on the sales he generated, yes.

09:34:42  11       Q.    Yes.  So his compensation is he would get a

09:34:42  12   thousand dollars each month, and then for whatever

09:34:42  13   revenues he brings in as a sales representative of

09:34:42  14   Medytox, he would get 15 percent of those collections?

09:34:42  15       A.    That is correct.  He was entitled to earn 15

09:34:42  16   percent of any sales, but he was not allowed to generate

09:34:42  17   -- or earn any income on any sales or any business that

09:34:42  18   came from any facility that he had the ability to

09:34:42  19   influence, test or had any part ownership in.  Completely

09:34:42  20   unrelated to Angel Recovery, which he was a part owner.

09:34:42  21            MR. KANG:  Could we put up Cigna Trial Exhibit

09:34:42  22   51.

09:34:42  23   BY MR. KANG:

09:34:42  24       Q.    And this is an earning statement, correct?

09:34:42  25       A.    Correct.

09:34:42  1      Q.   And is this an earning statement that's

09:34:42  2  automatically issued by Medytox, sir?

09:34:42  3      A.   Looks like from HR I see, yes.  I wouldn't have

09:34:42  4  been involved in payroll or HR, but I -- yes.

09:34:42  5      Q.   And --

09:34:42  6      A.   ADP was our outside payroll party.

09:34:42  7      Q.   It's an -- and the earning statement reflects

09:34:42  8  the period, the month ending February 2014, correct?

09:34:42  9      A.   Yes.

09:34:42  10     Q.   The same month that we saw the financial

09:34:42  11  analyses by facility just a moment ago, correct?

09:34:42  12     A.   That's correct.

09:34:42  13     Q.   This is for Alan Bostom, correct?

09:34:42  14          THE COURT:  You are awfully close to testifying

09:34:42  15  about its contents, sir.  He said he recognizes it and

09:34:42  16  what it is.

09:34:42  17          MR. KANG:  I would say offer it, Your Honor.

09:34:42  18          THE COURT:  Objection.

09:34:42  19          MR. CHRIST:  Yes, Your Honor.  Objection on

09:34:42  20  relevance grounds.  I think it also wades again into the

09:34:42  21  prior court's ruling on this issue.

09:34:42  22          THE COURT:  I think it does, but I'm afraid it's

09:34:42  23  not going to be a good day in my no sidebar rule.  I am

09:34:42  24  going to have to see counsel at sidebar, for a few

09:34:42  25  minutes at least.

09:34:42  1          (Sidebar commences.)

09:34:42  2          THE COURT:  What's your purpose, sir, on this

09:34:42  3  offer and why is it relevant?

09:34:42  4          MR. KANG:  Your Honor, we have the burden of

09:34:42  5  proving in our affirmative case unjust enrichment, unfair

09:34:42  6  conduct.  One of the ways we want to prove unfair conduct

09:34:42  7  is to show that there was a conflict of interest and they

09:34:42  8  were -- and ultimately tests were being ordered and

09:34:42  9  billed to Cigna, medically unnecessary testing.

09:34:42  10         THE COURT:  That's not in your request to

09:34:42  11 charge.  I haven't heard it.  I heard your three reasons.

09:34:42  12 I've heard the general concept, but this is the first

09:34:42  13 I've heard --

09:34:42  14         MR. KANG:  Goes to medical necessity, or lack

09:34:42  15 thereof.

09:34:42  16         THE COURT:  How much he makes doesn't -- I don't

09:34:42  17 know that that tends to show medical necessity.

09:34:42  18         MR. KANG:  It shows that the reasons that there

09:34:42  19 were tests being ordered and run was not based on medical

09:34:42  20 necessity, but because of financial motive.  Therefore,

09:34:42  21 it would be unfair.

09:34:42  22         THE COURT:  Have we laid a foundation that he

09:34:42  23 was the sales agent for his daughter's facility?  Do you

09:34:42  24 admit that?  Acknowledge it?

09:34:42  25         MR. CHRIST:  No.  I thought he actually

09:34:42   1    testified the opposite he did not have sort of

09:34:42   2    relationship.  He could not receive compensation --

09:34:42   3           THE COURT:  Who is he?

09:34:42   4           MR. CHRIST:  I'm sorry.  Mr. Bostom could not

09:34:42   5    receive compensation for --

09:34:42   6           THE COURT:  Or tests sent to them --

09:34:42   7           MR. CHRIST:  -- his own facility.  He just

09:34:42   8    testified to that.

09:34:42   9           THE COURT:  There might be a parent conflict of

09:34:42  10    interest.  If there's a Chinese wall, you would know

09:34:42  11    that.  There's no conflict for a lawyer even though his

09:34:42  12    client is on the other side of the wall being sued by his

09:34:42  13    partner.

09:34:42  14           MR. KANG:  That's something that Mr. Christ

09:34:42  15    should be able to handle.

09:34:42  16           THE COURT:  No, because your question assumes

09:34:42  17    that he was doing tests, that -- getting tests from his

09:34:42  18    daughter's facility, that he was being compensated.

09:34:42  19    That's -- you've got an earning sheet up.  What else are

09:34:42  20    you trying to show?  Of course, you're trying to show he

09:34:42  21    made money from this.

09:34:42  22           MS. KINGSBURY: Your Honor, we can show --

09:34:42  23           THE COURT:  Excuse me.  We have a one lawyer

09:34:42  24    rule.  Thank you.  Thanks very much.

09:34:42  25           MR. KANG:  So, Your Honor --

09:34:42  1          THE COURT:  You have to lay a foundation that

09:34:42  2   this earning statement reflects income based on tests

09:34:42  3   done for -- what is it -- is she Angel Recovery, the

09:34:42  4   woman, Tova Jasperson?  I don't think you can do that.

09:34:42  5   You wouldn't permit it if it was about your law firm and

09:34:42  6   you had a Chinese wall.  I don't see how you do that.  If

09:34:42  7   he had said to me as an officer of the court, no, this

09:34:42  8   earning statement includes whatever, commissions that are

09:34:42  9   based on tests done by Angel's Recovery, I would have

09:34:42  10  said go for it.   But you haven't laid that foundation.

09:34:42  11  At least he thinks you haven't.

09:34:42  12          MR. KANG:  So if we have to establish that, then

09:34:42  13  we would be able to offer is that one of the facilities

09:34:42  14  that he was getting commissions from, was another

09:34:42  15  facility owned by his daughter, Redemptions?

09:34:42  16          THE COURT:  How would you object to that, si?

09:34:42  17          MR. CHRIST:  If it's his daughter, does he have

09:34:42  18  any sort of ownership in that facility?  If there is no

09:34:42  19  ownership interest, then why would that be relevant?

09:34:42  20          THE COURT:  I supposed if his daughter doesn't

09:34:42  21  live in his house or isn't supported by him, I presume

09:34:42  22  she's a grown adult making her own income?  It doesn't

09:34:42  23  have a great appearance.  I'm not sure that's a conflict

09:34:42  24  of interest or makes it unfair.

09:34:42  25          MR. KANG:  We also -- we didn't notice this as

09:34:42  1   one on the exhibits for today, although it's on the

09:34:42  2   exhibit list, the daughter, Ms. Jasperson, is emailing

09:34:42  3   Mr. Lagan and others, Mr. Ziemian saying "Where is my

09:34:42  4   dad's employment agreement?"  She knows what's going on.

09:34:42  5   She knows all of that.

09:34:42  6          THE COURT:  That doesn't matter.  She -- I mean,

09:34:42  7   I don't know why she's doing that, but I'm sure somebody

09:34:42  8   has an answer.  But if he is not getting money based on

09:34:42  9   tests that she's sending, I don't see that.

09:34:42 10          MR. KANG:  The facility is sending.

09:34:42 11          THE COURT:  The facility is sending.  That's

09:34:42 12   what I mean.

09:34:42 13          MR. KANG:  Her facility is sending Redemption.

09:34:42 14          THE COURT:  But he's not getting commissions on

09:34:42 15   it.

09:34:42 16          MR. KANG:  Yes, he was.

09:34:42 17          THE COURT:  You haven't established that.

09:34:42 18          MR. KANG:  That's what the earning statement is

09:34:42 19   going to show, which is that Redemption is one of the

09:34:42 20   facilities.

09:34:42 21          THE COURT:  Show it to me.  Don't publish the

09:34:42 22   document.  Do you have a copy?  This is why we have paper

09:34:42 23   copies.  I don't have it here.  In there?  Cigna?  Is it

09:34:42 24   31?

09:34:42 25          Have you go it?  57 or 51?  I can't keep up.

| | | |
|---|---|---|
| 09:34:42 | 1 | MR. KANG:  I haven't shown this one yet.  This |
| 09:34:42 | 2 | is established sales Mr. Bostom made. |
| 09:34:42 | 3 | THE COURT:  I can see it.  What is Redemption? |
| 09:34:42 | 4 | MR. KANG:  Redemption is a facility.  It's a |
| 09:34:42 | 5 | facility that's owned by Ms. Jasperson. |
| 09:34:42 | 6 | MR. CHRIST:  Again, what is the ownership? |
| 09:34:42 | 7 | Sorry? |
| 09:34:42 | 8 | THE COURT:  What's that, sir? |
| 09:34:42 | 9 | MR. CHRIST:  I'm done.  I didn't want to cut you |
| 09:34:42 | 10 | off. |
| 09:34:42 | 11 | THE COURT:  Yeah.  We have to establish that, |
| 09:34:42 | 12 | first of all.  But second, you just told me he didn't get |
| 09:34:42 | 13 | commissions on lab tests referred from his daughter's |
| 09:34:42 | 14 | facility, which I thought was Angel Recovery.  He's going |
| 09:34:42 | 15 | to have to establish Redemption encompasses that to the |
| 09:34:42 | 16 | labs.  And that's not saying that -- that's a bit of |
| 09:34:42 | 17 | money there. |
| 09:34:42 | 18 | MR. CHRIST:  Yeah, that's my -- |
| 09:34:42 | 19 | THE COURT:  That's your understanding.  If you |
| 09:34:42 | 20 | want to represent to this Court something, you better be |
| 09:34:42 | 21 | damn sure.  You are the one who put him on, you prepped |
| 09:34:42 | 22 | for him.  That's money.  So don't just stand there and |
| 09:34:42 | 23 | think you can get away with.  From now on in the case, I |
| 09:34:42 | 24 | do not accept one thing from either side with good reason |
| 09:34:42 | 25 | from both sides that I don't get proof.  Okay? |

616

09:34:42  1          So what's the answer to that, sir?

09:34:42  2          MR. CHRIST:  I don't have an answer for that.  I

09:34:42  3     do not think that there was an ownership interest that he

09:34:42  4     would receive any money from Redemption.

09:34:42  5          THE COURT:  Attorney Kang, if you establish that

09:34:42  6     Redemption is either his daughter's company or includes

09:34:42  7     the facility his daughter is in charge of or owned, and

09:34:42  8     you are telling me the document that nobody can get me a

09:34:42  9     copy that's up on the screen, why didn't you put it up on

09:34:42 10     the screen because you didn't ask him.  That's not good

09:34:42 11     enough.  No, the one you are asking him about, you are

09:34:42 12     asking to admit.  You have offered an exhibit.  What

09:34:42 13     number is it?

09:34:42 14          THE KANG:  That one is Exhibit --

09:34:42 15          THE COURT:  Terri, what exhibit -- Terri --

09:34:42 16     Terri, what is this exhibit number?  What's up -- oh,

09:34:42 17     you've got it up.

09:34:42 18          MR. KANG:  Your Honor, it's 51.  Cigna 51.

09:34:42 19          THE COURT:  Cigna 51.

09:34:42 20          MR. KANG:  Yes, Your Honor.

09:34:42 21          THE COURT:  Would you scroll up?  Whoever is

09:34:42 22     scrolling my screen, whoever has the document inputting

09:34:42 23     into our system -- thank you.

09:34:42 24          That doesn't mention.  It's just gross number.

09:34:42 25     It doesn't mention any --

09:34:42  1          MR. KANG:  51, that's on the bank statement.  I

09:34:42  2   want to show -- I want to be able to show how much he

09:34:42  3   made in February of 2014.

09:34:42  4          THE COURT:  Okay.  So you show that.  So we're

09:34:42  5   not going to go into the question of the daughter being

09:34:42  6   involved, if her facility is part of the numbers?

09:34:42  7          MR. KANG:  What I want to ask is how Mr. Bostom

09:34:42  8   is getting paid.  Is that the same Angel's Recovery that

09:34:42  9   he was referring to also includes $17,000.

09:34:42  10          THE COURT:  I don't understand.  You will have

09:34:42  11   to say it again.  That made no sense.  Either because I

09:34:42  12   couldn't hear it or it didn't make sense.

09:34:42  13          MR. KANG:  Sure.  You are asking me why I want

09:34:42  14   to offer this --

09:34:42  15          THE COURT:  You want to offer this to show Mr.

09:34:42  16   Bostom made this much money in this month.  Okay.  So

09:34:42  17   what?

09:34:42  18          MR. KANG:  Because that shows a conflict of

09:34:42  19   interest.

09:34:42  20          THE COURT:  On the face of this document, no, it

09:34:42  21   does not.

09:34:42  22          MR. KANG:  They are entitled to --

09:34:42  23          THE COURT:  What are you going to argue from

09:34:42  24   this document a conflict of interest?  Where do you have

09:34:42  25   the piece that connects it?  You're making an illative

09:34:42  1    leap.  And that number doesn't tell me what's included.
09:34:42  2    Where does it come from?  What is it comprised of?
09:34:42  3            MR. KANG:  It is this.  It's the document I
09:34:42  4    showed you.
09:34:42  5            THE COURT:  Well, fine.  But then you offer
09:34:42  6    that.  But you aren't going to ask him based on that
09:34:42  7    exhibit that includes Angel Recovery.
09:34:42  8            MR. KANG:  I can include that.
09:34:42  9            THE COURT:  Probably going to offer 49 next,
09:34:42  10   Attorney Christ, so I don't see a basis to object.
09:34:42  11   Assume he lays before he offers it he gets this witness
09:34:42  12   to acknowledge that this entity Redemption includes
09:34:42  13   Angel's Recovery.  Is that what you were thinking with
09:34:42  14   that, sir?
09:34:42  15           MR. KANG:  My proffer to the Court is that
09:34:42  16   Redemption is owned by Mr. Bostom's daughter, Tova
09:34:42  17   Jasperson.  And the way we know it, I don't want to get
09:34:42  18   into that.
09:34:42  19           THE COURT:  I know that, but you are not getting
09:34:42  20   into it.  However, I don't know that you are going to get
09:34:42  21   that from this witness.  You might, but you should be
09:34:42  22   prepared to not get it.  And if you don't, I'm not
09:34:42  23   letting -- you can offer it, but I won't let it in.  But
09:34:42  24   you can offer 31.  You've offered it.  I'm going to
09:34:42  25   overrule your objection, sir.

09:34:42  1          MR. KANG:  51.

09:34:42  2          THE COURT:  51.  Excuse me.

09:34:42  3          (Sidebar ends.)

09:34:42  4          THE COURT:  Sorry, ladies and gentlemen.

09:34:42  5          Exhibit 51 will be a full exhibit.

09:34:42  6          You may proceed, Attorney Kang.

09:34:42  7          MR. KANG:  Thank you, Your Honor.

09:34:42  8          Cigna would offer Exhibit 51.

09:34:42  9          THE COURT:  It's been offered and the Court has

09:34:42  10   admitted it.

09:34:42  11          MR. KANG:  Oh, I'm sorry.  It's published.

09:34:42  12          THE COURT:  Yes.

09:34:42  13   BY MR. KANG:

09:34:42  14      Q.   Mr. Lagan, do you see this document that's on

09:34:42  15   your screen, sir?

09:34:42  16      A.   Yes.

09:34:42  17      Q.   This is an earning statement associated with

09:34:42  18   Mr. Bostom for the period ending February 28 of 2014,

09:34:42  19   correct?

09:34:42  20      A.   Yes.

09:34:42  21      Q.   And according to this earning statement, the

09:34:42  22   amount that Medytox was paying to Alan Bostom in this pay

09:34:42  23   period, the gross amount was $17,549.15?

09:34:42  24      A.   Yes.

09:34:42  25      Q.   And this check -- this earning statement was in

09:34:42  1    the same month that Angel's Recovery referred over $4

09:34:42  2    million in billings to BioHealth?

09:34:42  3              MR. CHRIST:  Objection.  Leading.

09:34:42  4              MR. KANG:  Sorry.

09:34:42  5              THE COURT:  Yeah, you are on direct.

09:34:42  6              THE WITNESS:  That's not --

09:34:42  7              THE COURT:  Just a moment, sir.

09:34:42  8          When he says something and there's an objection

09:34:42  9    from the lawyer, the Labs, you have to give me a chance

09:34:42  10   to absorb and rule.

09:34:42  11         That sounds awfully leading, sir.  You can

09:34:42  12   rephrase it or you can refer back to the earlier document

09:34:42  13   that has that number on it and ask it that way.

09:34:42  14             MR. KANG:  Sure.  Why don't we do that?

09:34:42  15             Mr. Salazar, split, yes.

09:34:42  16   BY MR. KANG:

09:34:42  17      Q.   We took a look earlier at Exhibit 243, correct?

09:34:42  18   That's on the right?

09:34:42  19             THE COURT:  That's Cigna Exhibit --

09:34:42  20   BY MR. KANG:

09:34:42  21      Q.   Cigna Exhibit 243, yes, sir.

09:34:42  22      A.   Sorry.  I wasn't sure you were speaking to me.

09:34:42  23      Q.   Do you see a document that's on your right?

09:34:42  24      A.   I do, yes.

09:34:42  25      Q.   And we saw that document earlier, correct?

09:34:42    1      A.    Correct.

09:34:42    2      Q.    And we agreed that in the month of February of

09:34:42    3  2014, Angel's Recovery referred over $4 million in

09:34:42    4  billings to BioHealth, correct?

09:34:42    5      A.    Correct.

09:34:42    6      Q.    Is it true also that in that same month,

09:34:42    7  February of 2014, Medytox paid $17,549.15 to Alan Boston?

09:34:42    8      A.    That is correct, but they were completely

09:34:42    9  unrelated, sir.

09:34:42   10          MR. KANG:  Can we put these exhibits down.

09:34:42   11          THE COURT:  Yes.

09:34:42   12          MR. KANG:  Can we put up Cigna Exhibit 49 for

09:34:42   13  identification.

09:34:42   14          THE COURT:  For ID only?

09:34:42   15          MR. KANG:  Yes, Your Honor.

09:34:42   16  BY MR. KANG:

09:34:42   17      Q.    Mr. Lagan, do you recognize this document?

09:34:42   18      A.    It's a summary of -- I don't know -- here it is.

09:34:42   19  Year-end review 2014.

09:34:42   20      Q.    I'm sorry?

09:34:42   21      A.    A sales employee year-end review 2014.

09:34:42   22      Q.    Who is this for?

09:34:42   23      A.    Alan Boston.

09:34:42   24      Q.    And do you see it breaks down Mr. Boston's

09:34:42   25  annual compensation for the year 2014 by salary as well

09:34:42    1    as commission?

09:34:42    2        A.    Yes.

09:34:42    3        Q.    And if you see at the bottom of that page, there

09:34:42    4    are -- that's a breakdown of how he earned his

09:34:42    5    commission, correct?

09:34:42    6        A.    Correct.

09:34:42    7        Q.    And there are a number of accounts that are down

09:34:42    8    there, do you see that?

09:34:42    9        MR. KANG:    Can we scroll down, Mr. Salazar?

09:34:42    10    Thank you.

09:34:42    11        THE COURT:    I'm sorry.    Getting awfully close to

09:34:42    12    you testifying --

09:34:42    13        MR. KANG:    I'm trying to lay the foundation,

09:34:42    14    Your Honor.

09:34:42    15        THE COURT:    -- to text --

09:34:42    16        MR. KANG:    Yes, Your Honor.

09:34:42    17        THE COURT:    You can direct him to look at

09:34:42    18    something, but you can't load up a question with what it

09:34:42    19    is.    So I am going to strike the question and you can do

09:34:42    20    what I just said.

09:34:42    21    BY MR. KANG:

09:34:42    22        Q.    Do you see the name Redemption, LLC?

09:34:42    23        A.    I do.

09:34:42    24        Q.    Do you --

09:34:42    25        MR. CHRIST:    Same objection.

09:34:42   1           THE COURT:  You are testifying to exactly what I

09:34:42   2   just said.  If I hear one word that has text from that

09:34:42   3   document before you hear "admitted" --

09:34:42   4           MR. KANG:  Yes, Your Honor.

09:34:42   5           THE COURT:  You can direct him to look at a part

09:34:42   6   of the document and ask him to read it to himself, not

09:34:42   7   out loud.  But you are not going to get this document in

09:34:42   8   through your mouth, sir.

09:34:42   9           Go ahead.

09:34:42  10           MR. KANG:  Mr. Lagan [sic], could we highlight?

09:34:42  11           One minute, Your Honor.

09:34:42  12   BY MR. KANG

09:34:42  13      Q.   Do you see those two things that have been

09:34:42  14   highlighted by Mr. Salazar?

09:34:42  15      A.   Yes.

09:34:42  16      Q.   Do you recognize either of those names?

09:34:42  17      A.   No.

09:34:42  18      Q.   You don't?

09:34:42  19      A.   No, I would --

09:34:42  20           THE COURT:  He said no, sir.  Asked and

09:34:42  21   answered.

09:34:42  22           MR. KANG:  Can we keep this on the screen for

09:34:42  23   one minute, Your Honor?  I do want to try to lay further

09:34:42  24   foundation.

09:34:42  25           THE COURT:  Go ahead.

09:34:42   1          MR. KANG:  Can we --

09:34:42   2          THE COURT:  Is this being published?

09:34:42   3          MR. KANG:  No, Your Honor.   This is, Your

09:34:42   4   Honor, Cigna Exhibit 220 that was admitted.

09:34:42   5          THE COURT:  I think it is admitted.  I just

09:34:42   6   wondered what is being shown and what isn't.

09:34:42   7          MR. KANG:  Yes, Your Honor.

09:34:42   8          THE COURT:  I'd like to know that.  What's the

09:34:42   9   number, 220?

09:34:42  10          MR. KANG:  Yes.

09:34:42  11          THE COURT:   It is a full exhibit.  But if you

09:34:42  12   are just showing it to the witness, that's also fine.

09:34:42  13          MR. KANG:  Just showing it to the witness.

09:34:42  14          THE COURT:  Fine.

09:34:42  15   BY MR. KANG:

09:34:42  16       Q.   We saw this document earlier, correct,

09:34:42  17   Mr. Lagan?

09:34:42  18       A.   Yes.

09:34:42  19       Q.   And seeing the provider's name on the document

09:34:42  20   on the right that we went through earlier today, with the

09:34:42  21   list of accounts with the document on the left, does that

09:34:42  22   refresh your memory on the names -- of any of the names

09:34:42  23   of the accounts?

09:34:42  24       A.   I mean, I don't know the accounts, sir, no.  I

09:34:42  25   never -- I don't remember the name on the account.  I see

09:34:42  1    the name on the form that you have shown me.  I don't

09:34:42  2    recognize the name, remember it or know -- looks like an

09:34:42  3    M.D., so I'm assuming that's a doctor.  And the doctor

09:34:42  4    may not necessarily have been tied to one facility or one

09:34:42  5    account.  A doctor could have been a doctor in -- I think

09:34:42  6    Florida allowed them to be up to five -- a doctor could

09:34:42  7    be a doctor for up to five facilities.

09:34:42  8            MR. KANG:  Your Honor, I will offer it.

09:34:42  9            THE COURT:  Offering what, sir?

09:34:42  10            MR. KANG:  49.

09:34:42  11            MR. CHRIST:  Objection for the reasons stated at

09:34:42  12    the sidebar.

09:34:42  13            THE COURT:  Sustained for the reasons that we

09:34:42  14    explored at sidebar.  If anybody needs a fuller basis

09:34:42  15    said on the record, I will do it when the jury is on

09:34:42  16    their way home.

09:34:42  17            MR. KANG:  One minute, Your Honor.

09:34:42  18    BY MR. KANG

09:34:42  19        Q.    Mr. Lagan, have you heard of Renova?

09:34:42  20        A.    Renova?

09:34:42  21        Q.    Renova Health?

09:34:42  22        A.    Yes.

09:34:42  23        Q.    What he Renova Health?

09:34:42  24        A.    Renova Health is a predecessor from Medytox, of

09:34:42  25    which I'm the CEO.

09:34:42  1      Q.    And --

09:34:42  2      A.    I'm sorry, not predecessor.  Successor.

09:34:42  3  Apologies.  Wrong word.

09:34:42  4      Q.    I'm sorry.  Say that one more time.

09:34:42  5      A.    Medytox completed a merger in 2015 with a

09:34:42  6  company called CollabRx.  When those two companies

09:34:42  7  merged, they became Renova Health.

09:34:42  8          MR. KANG:  Your Honor, I'm on my portion of

09:34:42  9  direct, correct?

09:34:42 10          THE COURT:  Yes, sir.  I hope so.

09:34:42 11  BY MR. KANG:

09:34:42 12      Q.    Mr. Lagan, were you personally involved in

09:34:42 13  submitting bills to insurance on behalf of the labs?

09:34:42 14      A.    No.

09:34:42 15      Q.    You weren't personally involved in submitting

09:34:42 16  any bills to patients on behalf of the labs?

09:34:42 17      A.    No.

09:34:42 18      Q.    Do you know how much, if any amount, the labs

09:34:42 19  collected from patient statements in 2012?

09:34:42 20      A.    I don't know the number.  My involvement would

09:34:42 21  have been in assisting on the infrastructure.  Initially,

09:34:42 22  we used MBC.

09:34:42 23      Q.    That's a yes or no.  Answer the question, sir.

09:34:42 24  I'm sorry.

09:34:42 25      A.    I don't know the numbers, sir, no.

09:34:42  1      Q.   Do you know how much the labs collected from

09:34:42  2  patients in 2013?

09:34:42  3      A.   I do not.

09:34:42  4      Q.   In 2014?

09:34:42  5      A.   I do not.

09:34:42  6      Q.   2015?

09:34:42  7      A.   I do not.

09:34:42  8      Q.   2016?

09:34:42  9      A.   I do not.

09:34:42  10      Q.   2017?

09:34:42  11      A.   I do not.

09:34:42  12           MR. KANG:  Could we put up Cigna Exhibit 2019,

09:34:42  13  please.

09:34:42  14           THE COURT:  2019, not 219.

09:34:42  15           MR. KANG:  I believe this has admitted already.

09:34:42  16           THE COURT:  Is that right, Liana?

09:34:42  17           THE CLERK:  That's correct.

09:34:42  18           MR. KANG:  May we publish?

09:34:42  19           THE COURT:  Yes, sir.

09:34:42  20           MR. KANG:  Thank you.

09:34:42  21           THE COURT:  2019 has been admitted?  It's

09:34:42  22  already been used.  You have it admitted.  Go right ahead

09:34:42  23  then.  I didn't have it marked.  Sorry.

09:34:42  24  BY MR. KANG:

09:34:42  25      Q.   Mr. Lagan, this is a document that was produced

09:34:42   1    by the Labs in connection with this litigation, correct?

09:34:42   2            MR. KANG:  Can we zoom out a little bit.

09:34:42   3        A.   I assume it to be correct.  Can you blow it up?

09:34:42   4    I can't even see it.  I can barely see that.

09:34:42   5            MR. KANG:  Can we zoom in on the top, sir.

09:34:42   6    BY MR. KANG:

09:34:42   7        Q.   It's called "Cigna PT PYMNTS."  Do you see that?

09:34:42   8        A.   Yes.

09:34:42   9        Q.   And we went through this document during your

09:34:42  10    deposition, correct?

09:34:42  11        A.   I don't remember.

09:34:42  12            MR. CHRIST:  Objection.  Leading.

09:34:42  13            THE COURT:  Yes.

09:34:42  14            MR. KANG:  Adverse witness, Your Honor.  They

09:34:42  15    were leading all of our witnesses on direct.

09:34:42  16            THE COURT:  Then you should object.

09:34:42  17            MR. KANG:  Okay.

09:34:42  18            THE COURT:  Please ask another question.

09:34:42  19            MR. KANG:  Thank you.

09:34:42  20    BY MR. KANG:

09:34:42  21        Q.   And there are a number of columns, correct?

09:34:42  22        A.   Correct.

09:34:42  23        Q.   And the -- there are -- for example, Column A,

09:34:42  24    which has been blacked out, is -- relates to patient

09:34:42  25    account number, correct?

| | | |
|---|---|---|
| 09:34:42 | 1 | A.    Okay. |
| 09:34:42 | 2 | Q.    Yes? |
| 09:34:42 | 3 | A.    Yes. |
| 09:34:42 | 4 | Q.    And Column H, do you see it's a column for date |
| 09:34:42 | 5 | of service? |
| 09:34:42 | 6 | A.    Yes. |
| 09:34:42 | 7 | Q.    Column L relates to primary insurance paid |
| 09:34:42 | 8 | amount, correct? |
| 09:34:42 | 9 | A.    Yes. |
| 09:34:42 | 10 | Q.    And Column M is patient noninsurance payments, |
| 09:34:42 | 11 | correct? |
| 09:34:42 | 12 | A.    Yes. |
| 09:34:42 | 13 | Q.    Column N reflects the amount that the Labs |
| 09:34:42 | 14 | collected from patient directly, patient payments, |
| 09:34:42 | 15 | correct? |
| 09:34:42 | 16 | A.    Yes. |
| 09:34:42 | 17 | MR. KANG:  So, Mr. Salazar, if we could zoom out |
| 09:34:42 | 18 | and just highlight Column M. |
| 09:34:42 | 19 | BY MR. KANG: |
| 09:34:42 | 20 | Q.    That's the amount that the Labs collected for |
| 09:34:42 | 21 | each of these individual claims from patients, correct? |
| 09:34:42 | 22 | A.    Okay.  Yes. |
| 09:34:42 | 23 | Q.    And those are all zero on this page, correct? |
| 09:34:42 | 24 | A.    Yes. |
| 09:34:42 | 25 | THE COURT:  What page are you on, sir? |

09:34:42   1           MR. KANG:   Page 1.

09:34:42   2           Again, this is a very lengthy document, but

09:34:42   3    could we scroll up, Mr. Salazar.

09:34:42   4    BY MR. KANG:

09:34:42   5       Q.   And again, just shout out if you seeing anything

09:34:42   6    other than zero for patient payments in Column M.

09:34:42   7       A.   I'm not understanding.   The column says it's all

09:34:42   8    zeros.   And if one column -- if that's zero, if you

09:34:42   9    didn't receive any payment, how could there be -- I mean,

09:34:42   10   I'm not understanding your question.

09:34:42   11      Q.   My question is, if you could -- Mr. Salazar will

09:34:42   12   scroll up.   If you see anything other than a zero in

09:34:42   13   Column M, just let us know.

09:34:42   14           (Scrolling through document.)

09:34:42   15   BY MR. KANG:

09:34:42   16      Q.   We will stop there.   We can keep going, but it's

09:34:42   17   a very lengthy document.

09:34:42   18           Did you see anything other than zero in those

09:34:42   19   first ten pages in Column M?

09:34:42   20      A.   I did not, sir.   It couldn't be anything other

09:34:42   21   than zero.   There's no other number it could be.

09:34:42   22      Q.   Just a yes or no, sir.

09:34:42   23           THE COURT:   You have to answer the question yes

09:34:42   24   or no?

09:34:42   25      A.   No other -- there's no.

09:34:42  1         MR. KANG:  Move to strike, Your Honor, the rest

09:34:42  2    of his statement.

09:34:42  3         THE COURT:  He just wants to know if you saw a

09:34:42  4    number in that column, sir.  As to why or why not, that

09:34:42  5    doesn't matter.

09:34:42  6         THE WITNESS:  They are all zeros.

09:34:42  7         THE COURT:  All right.

09:34:42  8         MR. KANG:  Mr. Salazar, if you could go all the

09:34:42  9    way to the bottom to show how many rows there are in this

09:34:42 10    document, please.

09:34:42 11    BY MR. KANG:

09:34:42 12         Q.   Would you agree with me that the last row

09:34:42 13    reflected here is 31,696?

09:34:42 14         A.   Yes.

09:34:42 15         Q.   And would that refer to 31,696 claims being

09:34:42 16    reflected on this document?

09:34:42 17         A.   Yes.

09:34:42 18         Q.   And if I were to tell you that if you added up

09:34:42 19    everything in Column M, the amount would come to $3,900,

09:34:42 20    would there about any reason for you to dispute that?

09:34:42 21         A.   No.

09:34:42 22         Q.   Isn't it true --

09:34:42 23         MR. KANG:  We can put that down.

09:34:42 24    BY MR. KANG:

09:34:42 25         Q.   We talked earlier about how Medytox acquired

09:34:42   1   Medical Billing Choices, correct?

09:34:42   2       A.   Correct.

09:34:42   3           MR. KANG:   In fact, if we could put up Cigna

09:34:42   4   Exhibit 26 because I do want to get the date on this

09:34:42   5   correct.   I believe it's already in evidence, Your Honor.

09:34:42   6   If we could go to page 4 of this document, Mr. Salazar.

09:34:42   7   And could we zoom in on the part --

09:34:42   8           THE COURT:   Yes, it is.   My apologies for the

09:34:42   9   interruption.

09:34:42  10           MR. KANG:   Could we zoom in to the second to the

09:34:42  11   bottom paragraph, Mr. Salazar.

09:34:42  12   BY MR. KANG:

09:34:42  13       Q.   And do you see down there, Mr. Lagan, it states

09:34:42  14   -- by the way, this is a Form 10-K.   Do you know what a

09:34:42  15   Form 10-K is?

09:34:42  16       A.   Yes.

09:34:42  17       Q.   What is it?

09:34:42  18       A.   It's a filing filed with the SEC.

09:34:42  19       Q.   And it's important to be truthful and accurate

09:34:42  20   on these -- on any filing with SEC, correct?

09:34:42  21       A.   Yes.

09:34:42  22       Q.   On this SEC filing, it states that of August 22,

09:34:42  23   2011, the company acquired 100 percent of Medical Billing

09:34:42  24   Choices, Inc., MBC, correct?

09:34:42  25       A.   Okay.   Yes.

09:34:42  1    Q.   So Medytox -- MBC was a 100 percent subsidiary

09:34:42  2    of Medytox as of August 22, 2011, correct?

09:34:42  3    A.   That's correct, but that contract -- there's

09:34:42  4    something in my memory, it took a year to make the

09:34:42  5    payment.  And regardless that it owned 100 percent, it

09:34:42  6    didn't control it.  It did not have control of it until

09:34:42  7    the previous owners were paid out.  So yes, we owned it.

09:34:42  8    Q.   You owned it.  MBC was not a contractor to

09:34:42  9    Medytox, correct?

09:34:42 10    A.   That's where I would have to go back and look at

09:34:42 11    the contract.  You are talking 12 or 13 years ago, but it

09:34:42 12    did remain a contractor until they were paid in full.  We

09:34:42 13    didn't -- I see what it says, but earlier you said August

09:34:42 14    2012.  That may have been the right date.  I told you it

09:34:42 15    was one year later.  And perhaps it was the 2012 date

09:34:42 16    that you used that we took active ownership and control.

09:34:42 17    Q.   You would agree with me that in this publicly

09:34:42 18    filed document with the SEC it indicates nothing about

09:34:42 19    MBC being a contractor to Medytox, correct?

09:34:42 20    A.   That contract would have been attached to that,

09:34:42 21    sir.  The contract that would have been entered into is

09:34:42 22    part of the 10-K.  You didn't just make a statement.  You

09:34:42 23    filed your contracts.  So there would have been an

09:34:42 24    attachment to that that showed the contract that would

09:34:42 25    have all of those details.

09:34:42    1         Q.   Does it refer to an attachment here in this

09:34:42    2    paragraph when it's talking about the acquisition?

09:34:42    3         A.   It doesn't need to, sir.  The attachment would

09:34:42    4    be on the document.  All 10-Ks, I'm pretty familiar with

09:34:42    5    10-Ks and 10-Qs.  They all get filed with the SEC.  10-Q

09:34:42    6    is a quarterly report.  A 10-K is an annual report.  And

09:34:42    7    if you have entered into any material contracts

09:34:42    8    throughout the period, you have to file them as an

09:34:42    9    attachment, and they are at the bottom of it.  So you

09:34:42    10   provide a summary in the document and then you must

09:34:42    11   attach the contract.

09:34:42    12        MR. KANG:  Can we put this document down and

09:34:42    13   show Cigna Exhibit 30.  And, Your Honor, there's no

09:34:42    14   objection to this document.  I would offer it.

09:34:42    15        THE COURT:  Cigna Exhibit 30, is that right, no

09:34:42    16   objection?

09:34:42    17        MR. CHRIST:  That's correct, Your Honor.

09:34:42    18        THE COURT:  All right.  It may be published to

09:34:42    19   the jury.

09:34:42    20   BY MR. KANG:

09:34:42    21        Q.   Mr. Lagan, this is a Medical Billing Choices

09:34:42    22   billing policy and procedure guide, correct?

09:34:42    23        A.   Yes.

09:34:42    24        Q.   Again, this is --

09:34:42    25        MR. KANG:  If you go back to the next page,

09:34:42  1    Mr. Salazar.

09:34:42  2    BY MR. KANG:

09:34:42  3        Q.   See at the bottom right there, it says "Revised

09:34:42  4    6-24-2014," correct?

09:34:42  5        A.   Yes.

09:34:42  6        Q.   So the date of this document is June 24 of 2014,

09:34:42  7    yes?

09:34:42  8        A.   Yes.

09:34:42  9        Q.   And this is MBC's billing policy and procedure

09:34:42 10    guide, correct?

09:34:42 11        A.   Yes.

09:34:42 12        Q.   And by this point in time, MBC was owned by

09:34:42 13    Medytox, correct?

09:34:42 14        A.   Yes.

09:34:42 15        Q.   So this billing policy would also apply to

09:34:42 16    Medytox, correct?

09:34:42 17            MR. CHRIST:  Objection.  Leading.

09:34:42 18            THE COURT:  I will allow.  I've allowed

09:34:42 19    questions in that form by your side.  So you can answer

09:34:42 20    no as well as yes, or I don't know.

09:34:42 21        A.   No.  Only to the billing company.

09:34:42 22    BY MR. KANG:

09:34:42 23        Q.   Only applies to the billing company?

09:34:42 24        A.   Yeah, the billing company -- no other entity

09:34:42 25    would have been generating the bills, the claims.

09:34:42  1       Q.   MBC did all the billings for the clinical labs

09:34:42  2   that Medytox owned, correct?

09:34:42  3       A.   Yes.

09:34:42  4       Q.   So this billing policy then would apply to the

09:34:42  5   bills with respect to the clinical laboratories that

09:34:42  6   Medytox owned, correct?

09:34:42  7       A.   Applies to MBC.  It applies to the billing

09:34:42  8   company.  If a policy was written for a subsidiary, it

09:34:42  9   applied to that subsidiary.

09:34:42  10      Q.   Would this apply to billings that were submitted

09:34:42  11  on behalf of the three labs at issue?

09:34:42  12      A.   By MBC, yes.

09:34:42  13           MR. KANG:  Could we go to page 642096, please.

09:34:42  14  BY MR. KANG:

09:34:42  15      Q.   And you see this page of the billing policies is

09:34:42  16  entitled "Bad debt and collections," correct?

09:34:42  17      A.   Yes.

09:34:42  18      Q.   And there are some definitions, including one

09:34:42  19  that's "internal collections," correct?

09:34:42  20      A.   Yes.

09:34:42  21      Q.   And that states, "At least two formal letters

09:34:42  22  are sent and two phone calls are made to the responsible

09:34:42  23  party when an account remains past due.  If those actions

09:34:42  24  do not produce a response, further action will be taken

09:34:42  25  according to conditions set forth by the client."

09:34:42  1         Did I read that correctly?

09:34:42  2    A.   Yes.

09:34:42  3    Q.   This section applies to MBC's policy for

09:34:42  4  collecting patient bills, right?

09:34:42  5    A.   Yes.

09:34:42  6    Q.   So is this what MBC considered to be reasonable

09:34:42  7  efforts to collect amounts owed by patients?

09:34:42  8    A.   I believe so, but we also had a third-party

09:34:42  9  company hired.

09:34:42  10        MR. KANG:  Your Honor, move to strike.

09:34:42  11        THE COURT:  Yes.  You just have to answer the

09:34:42  12  question, if you can.  If you can't, say you can't

09:34:42  13  answer.

09:34:42  14        THE WITNESS:  Yes.

09:34:42  15        THE COURT:  This is what MBC considered to be

09:34:42  16  reasonable efforts to collect amounts owed by patients?

09:34:42  17        THE WITNESS:  Yes.

09:34:42  18  BY MR. KANG:

09:34:42  19    Q.   So if MBC did not send two formal letters to

09:34:42  20  collect a patient's bill, then that wouldn't meet its own

09:34:42  21  policy, correct?

09:34:42  22    A.   I'm trying to be respectful for the part of --

09:34:42  23  the requirement for a yes or no answer.  If MBC was

09:34:42  24  paying a third-party company that was responsible for

09:34:42  25  doing that, then MBC would not do it, the third-party

09:34:42   1    billing company that was specialist in collecting patient

09:34:42   2    -- if they did it, it was still -- the policy still

09:34:42   3    remains, the policy still applies.

09:34:42   4        Q.   If MBC didn't place two phone calls to collect a

09:34:42   5    patient's bill, then that wouldn't meet its own policy,

09:34:42   6    correct?

09:34:42   7        A.   Compare that to that policy, yes.

09:34:42   8        Q.   And under "external collections" --

09:34:42   9            MR. KANG:  Mr. Salazar.

09:34:42  10    BY MR. KANG:

09:34:42  11        Q.   -- it states, "After all resources have been

09:34:42  12    exhausted, remaining account balances may be turned over

09:34:42  13    to an outside collection agency at the client's

09:34:42  14    discretion."  Did I read that correctly?

09:34:42  15        A.   Yes.

09:34:42  16        Q.   So is this also what MBC considered to be

09:34:42  17    reasonable effort to collect amounts owed by patients?

09:34:42  18        A.   That was per their policy, yes.

09:34:42  19        Q.   So if MBC did not turn over to an outside

09:34:42  20    collection agency outstanding patient balances, then that

09:34:42  21    would not meet its own policy, correct?

09:34:42  22        A.   As written there, yes.

09:34:42  23            MR. KANG:  You can put that down.  Can we go to

09:34:42  24    642094.

09:34:42  25    BY MR. KANG:

09:34:42  1      Q.   This is another page from the MBC billing

09:34:42  2   policy, Mr. Lagan.

09:34:42  3           MR. KANG:  Can we zoom in on the bottom part,

09:34:42  4   "Self-pay patients."

09:34:42  5   BY MR. KANG:

09:34:42  6      Q.   Do you have an understanding as to what a

09:34:42  7   self-pay patient is?

09:34:42  8      A.   A patient that was not covered by insurance and

09:34:42  9   had to pay for their own services.

09:34:42  10     Q.   Someone who pays out of pocket?

09:34:42  11     A.   Pays for their own services.

09:34:42  12     Q.   Okay.  And would you agree with me that on the

09:34:42  13  second paragraph of that section, it reads, "If insurance

09:34:42  14  information or a response has not been received by MBC

09:34:42  15  within 45 days, a statement of account will be sent to

09:34:42  16  the patient in an amount of no less than 100 percent of

09:34:42  17  the Medicare fee schedule."  Did I read that correctly?

09:34:42  18     A.   Yes.

09:34:42  19     Q.   Do you know what that means?

09:34:42  20     A.   Not specifically.  I could take a fairly good

09:34:42  21  educated --

09:34:42  22           THE COURT:  Do not guess, sir.  No, that's not

09:34:42  23  allowed.  Thank you.

09:34:42  24  BY MR. KANG:

09:34:42  25     Q.   Does that mean that if a patient does not have

640

09:34:42  1    insurance, like what you said, but pays for the lab

09:34:42  2    services with his or her own money, then the price that

09:34:42  3    MBC would charge for that service is 100 percent of

09:34:42  4    Medicare?

09:34:42  5        A.    That's my interpretation, yes.

09:34:42  6        Q.    Then it goes on to say that, "The patient will

09:34:42  7    be offered a discount rate of 50 percent of the Medicare

09:34:42  8    fee schedule if the patient makes financial arrangements

09:34:42  9    or pays within 30 days."  Did I read that correctly?

09:34:42  10       A.    Yes.

09:34:42  11       Q.    That means that is a patient pays within 30

09:34:42  12   days, then the price that MBC would charge for that

09:34:42  13   service is 50 percent of the Medicare price, correct?

09:34:42  14       A.    Yes.

09:34:42  15       Q.    But if a patient has insurance, such as through

09:34:42  16   Cigna, then would you agree with me that the price that

09:34:42  17   was billed would be a price far higher than 100 percent

09:34:42  18   of Medicare?

09:34:42  19       A.    Yes.

09:34:42  20       Q.    Have you ever heard of the concept of a dual

09:34:42  21   pricing scheme, Mr. Lagan?

09:34:42  22       A.    No.

09:34:42  23       Q.    Not aware of that at all?

09:34:42  24       A.    No.

09:34:42  25            MR. KANG:  Your Honor, if I may have one minute.

641

09:34:42  1              THE COURT:  Yes.

09:34:42  2              MR. KANG:  One last check, Your Honor.  I'm

09:34:42  3    sorry.

09:34:42  4              THE COURT:  That's all right.

09:34:42  5              MR. KANG:  I have nothing further, Your Honor.

09:34:42  6    Thank you.

09:34:42  7              THE COURT:  Attorney Christ, do you have

09:34:42  8    cross-examination?

09:34:42  9              MR. CHRIST:  Yes, I do, Your Honor, briefly.

09:34:42  10             THE COURT:  Well, whatever it is, you may begin.

09:34:42  11             MR. CHRIST:  Could you put back on Cigna Exhibit

09:34:42  12   372, please, Mr. Smeig.

09:34:42  13                       CROSS-EXAMINATION

09:34:42  14   BY MR. CHRIST:

09:34:42  15      Q.   Okay.  Mr. Lagan, do you recall seeing this

09:34:42  16   document a few minutes ago by Attorney Kang?

09:34:42  17      A.   Yes.

09:34:42  18      Q.   Okay.  Do you know who created this document?

09:34:42  19      A.   No.

09:34:42  20      Q.   You don't know if the Labs created this

09:34:42  21   document?

09:34:42  22      A.   No, I don't.

09:34:42  23      Q.   There's a lot of discussion about a consent on

09:34:42  24   file.  Do you remember those questions, sir?

09:34:42  25      A.   Yes.

09:34:42  1      Q.   Am I correct that the Labs billed insurance

09:34:42  2   companies regularly for the services they perform?

09:34:42  3      A.   Yes.

09:34:42  4      Q.   Did they have insurance companies outside of

09:34:42  5   Cigna paid regularly to the Labs for those services?

09:34:42  6      A.   Sir, even Cigna paid for those services.

09:34:42  7      Q.   So Cigna paid for some of these services, too?

09:34:42  8      A.   Before they stopped paying, yes.

09:34:42  9      Q.   Would any of these insurance companies have paid

09:34:42  10  had there been no consent on file?

09:34:42  11          MR. KANG:  Objection, Your Honor.  Lack of

09:34:42  12  foundation.

09:34:42  13          THE COURT:  Sustained.

09:34:42  14  BY MR. CHRIST:

09:34:42  15     Q.   Would you have had -- would the Labs had to have

09:34:42  16  had consent from the insured to bill the respective

09:34:42  17  insurance companies that we just discussed?

09:34:42  18     A.   Yes.

09:34:42  19          MR. CHRIST:  No further questions.  Thank you,

09:34:42  20  sir.

09:34:42  21          THE COURT:  All right.  You may step down, sir.

09:34:42  22          THE WITNESS:  Thank you.

09:34:42  23          THE COURT:  Thank you.  You are excused, I

09:34:42  24  believe.

09:34:42  25          Where are we?  Your next -- what -- who was your

09:34:42  1   next witness?

09:34:42  2           MR. CUNNINGHAM:  Dr. Nicoll, who is not in our

09:34:42  3   custody or control, Your Honor.

09:34:42  4           THE COURT:  Is Dr. Nicoll waiting to come in?

09:34:42  5           MS. COSTIN:  He's downstairs, Your Honor.  I

09:34:42  6   just sent someone to go get him, Your Honor.

09:34:42  7           THE COURT:  That's good.  We'll have five

09:34:42  8   minutes by the time he gets from -- upstairs.

09:34:42  9           (Pause.)

09:34:42  10          THE COURT:  Are you Dr. Nicoll, sir?

09:34:42  11          THE WITNESS:  Yes.

09:34:42  12          THE COURT:  You may come to the witness stand.

09:34:42  13  We'll get you sworn in.  That's about all we're going to

09:34:42  14  get done.  When you arrive at the witness stand area, if

09:34:42  15  you'd remain standing so the clerk may administer the

09:34:42  16  oath.

09:34:42  17          THE CLERK:  Please raise your right hand.

09:34:42  18              DR. DANIEL JULES NICOLL,

09:34:42  19  having been called as a witness, was first duly sworn and

09:34:42  20          testified on his oath as follows:

09:34:42  21          THE WITNESS:  Yes, I do.

09:34:42  22          THE CLERK:  Please be seated.  Please state your

09:34:42  23  name for the record, spelling your last name.

09:34:42  24          THE WITNESS:  Daniel Jules Nicoll.

09:34:42  25          THE COURT:  We have got two minutes left, sir,

09:34:42   1    so you go ahead.

09:34:42   2            MR. CUNNINGHAM:  May it please the Court?

09:34:42   3            THE COURT:  Whatever you can do.  Go ahead.

09:34:42   4                    DIRECT EXAMINATION

09:34:42   5    BY MR. CUNNINGHAM:

09:34:42   6        Q.   Good afternoon, Dr. Nicoll.  Good afternoon.

09:34:42   7        A.   Good afternoon.

09:34:42   8        Q.   We have never met, have we, sir?

09:34:42   9        A.   I don't believe so.

09:34:42  10        Q.   Your deposition was taken in this case, was it

09:34:42  11    not?

09:34:42  12        A.   Yes.

09:34:42  13        Q.   But I did not take your deposition, did I?

09:34:42  14        A.   I don't remember who took it.  It was by --

09:34:42  15    electronic.  It wasn't in person.

09:34:42  16        Q.   Sir, my name is Fred Cunningham.  I'm one of the

09:34:42  17    attorneys that represents the Labs in this case against

09:34:42  18    Cigna.  It's nice to meet you.

09:34:42  19            Sir, are you still practicing medicine?

09:34:42  20        A.   No.

09:34:42  21        Q.   When did you retire?

09:34:42  22        A.   2021.

09:34:42  23        Q.   When you were a practicing doctor before you

09:34:42  24    went to work with Cigna, what was your area of specialty?

09:34:42  25        A.   Internal medicine.

| | | |
|---|---|---|
| 09:34:42 | 1 | Q.   What does an internal medicine doctor do? |
| 09:34:42 | 2 | A.   Internal medicine physicians take care of the |
| 09:34:42 | 3 | medical illnesses of adults. |
| 09:34:42 | 4 | Q.   What type of medical illnesses? |
| 09:34:42 | 5 | A.   I'm sorry? |
| 09:34:42 | 6 | Q.   What types of medical illnesses? |
| 09:34:42 | 7 | A.   What type of -- high blood pressure, diabetes, |
| 09:34:42 | 8 | pneumonia, colds.  The full gamut of adult care. |
| 09:34:42 | 9 | Q.   I'm sorry, I didn't understand you. |
| 09:34:42 | 10 | A.   The full gamut of adult care. |
| 09:34:42 | 11 | Q.   And would -- would you have been like a primary |
| 09:34:42 | 12 | care physician? |
| 09:34:42 | 13 | A.   Yes, internal medicine is one of the primary |
| 09:34:42 | 14 | care specialties. |
| 09:34:42 | 15 | Q.   Thank you, sir. |
| 09:34:42 | 16 | Sir, what did you do to prepare for your trial |
| 09:34:42 | 17 | testimony today? |
| 09:34:42 | 18 | A.   I reviewed some case -- some records over the |
| 09:34:42 | 19 | weekend two weekends ago.  I met with the attorney |
| 09:34:42 | 20 | several times. |
| 09:34:42 | 21 | Q.   Which attorneys did you meet with? |
| 09:34:42 | 22 | A.   Emily Costin and her associates. |
| 09:34:42 | 23 | Q.   Which? |
| 09:34:42 | 24 | A.   Emily Costin and her associates. |
| 09:34:42 | 25 | Q.   Who is in the courtroom here? |

646

09:34:42  1      A.    Yes.

09:34:42  2      Q.    Thank you.

09:34:42  3            And can you tell us what documents reviewed in

09:34:42  4    preparation for your testimony?

09:34:42  5      A.    I reviewed --

09:34:42  6            THE COURT:  I'm sorry.  You're going to have to

09:34:42  7    hold that question.  If you remember that's where you

09:34:42  8    left off, make a mark, please.

09:34:42  9            It is now 3:45, ladies and gentlemen, so I am

09:34:42  10   going to excuse you.  We'll see you tomorrow.  Get plenty

09:34:42  11   of rest.  Do something that's fun and different than

09:34:42  12   you're doing in here for the day, take your mind off it,

09:34:42  13   and we'll see you in the morning at 9:30 sharp.  Thank

09:34:42  14   you very much, ladies and gentlemen.

09:34:42  15           Dr. Nicoll, you may leave, but you must come

09:34:42  16   back tomorrow morning, and I would appreciate it if you

09:34:42  17   were available to go on the stand at 9:25 to be sure that

09:34:42  18   you are here because we need you when we bring the jury

09:34:42  19   in.

09:34:42  20           THE WITNESS:  Understood.

09:34:42  21           THE COURT:  Thank you very much, Doctor.

09:34:42  22           (In the absence of the jury at 3:46 p.m.)

09:34:42  23           MR. KANG:  Your Honor, could you please remind

09:34:42  24   him that he is still on the stand.

09:34:42  25           THE COURT:  Oh, yes.  And I will tell you what

09:34:42  1    we have been telling every witness.  Once you are on the

09:34:42  2    stand, you are not allowed to talk to anybody about your

09:34:42  3    testimony or what it might be coming up, and that

09:34:42  4    includes counsel for Cigna, whom obviously you have met

09:34:42  5    with and talked to.  So I told them they are not allowed

09:34:42  6    to, just like the Labs' lawyers they can't talk to their

09:34:42  7    witnesses.

09:34:42  8            So I just want to be sure that you understand

09:34:42  9    that.  So if you ask questions, they are going to say

09:34:42  10   can't talk to you.  So you understand it's me doing it.

09:34:42  11   Thank you very much, Doctor.

09:34:42  12           THE COURT:  Everybody be seated.  I would

09:34:42  13   like -- Liana is with the jury.  Could I impose on

09:34:42  14   someone who isn't going to be -- oh, Liana, you're done?

09:34:42  15   Could you close the back door for us, please.  I don't

09:34:42  16   want the jury to be walking by as I go through what I'm

09:34:42  17   going to go through.

09:34:42  18           I can't give you the number right now.  It's

09:34:42  19   somewhere in the ballpark of six hours plus.  But I would

09:34:42  20   say both sides burned about the same amount of time.

09:34:42  21   It's not my problem, it's your -- both of yours problem.

09:34:42  22   But there is a clock.  You've been forewarned.  You have

09:34:42  23   been told how I'm keeping it.  And if you run out, that

09:34:42  24   will be the end, other than your closing argument.

09:34:42  25   Excuse me.

09:34:42  1            I will note for the first time I have charged

09:34:42  2   the -- I don't know how many minutes it was, maybe four.

09:34:42  3   I can't -- I've got it written down here, but minutes

09:34:42  4   that it took to get Dr. Nicoll.  I believe that Cigna did

09:34:42  5   not appreciate the room we provided them, which was next

09:34:42  6   door, and we did that because it's next door.  And that's

09:34:42  7   fine.  My staff is nice enough to say, well -- I guess --

09:34:42  8   actually, I guess Cigna had roamed and identified the one

09:34:42  9   upstairs, which is a bigger room, I admit, and we agreed

09:34:42  10  to let you have that room.  But we cannot -- if you are

09:34:42  11  going to have witnesses up there who are next up and you

09:34:42  12  know you are getting to the end of your exam -- I mean,

09:34:42  13  you didn't how long Attorney Christ would be, I admit it.

09:34:42  14  But I would think once you sat down, Attorney Kang,

09:34:42  15  somebody on your team should have brought Dr. Nicoll to

09:34:42  16  sit somewhere on the first floor.  Obviously, we'd have

09:34:42  17  to close the door if he's on the bench outside this room.

09:34:42  18  But anytime there's that kind of delay -- and I know

09:34:42  19  there can be a delay, but that was a long time.  I don't

09:34:42  20  know what you felt like, but it felt like it was a long

09:34:42  21  time to me and I think the jury.  So just so you're

09:34:42  22  advised of that.

09:34:42  23            But I believe, as I say, the numbers are -- I'm

09:34:42  24  sorry.  That's not correct.  Up today, there's quite a

09:34:42  25  disparity, but as of the total used by each side, I

09:34:42  1   believe you are getting awfully close, whereas after Day
09:34:42  2   2 it was quite a disparity.  But I will confirm that for
09:34:42  3   you either after the break or first thing in the morning.
09:34:42  4        Also I asked for, but have not received, a
09:34:42  5   translation of exhibit numbers from depositions to
09:34:42  6   exhibit numbers at trial so we can address what I assume
09:34:42  7   will be the admission of exhibits that were used in
09:34:42  8   reading the deposition.  So far, we have -- oh, gosh --
09:34:42  9   Nicholson's deposition.  There were several exhibits.  I
09:34:42  10  gave you all the list of those exhibits, and I have yet
09:34:42  11  to be told what are they as marked in this trial.  And I
09:34:42  12  assume that that section was read because the lawyer is
09:34:42  13  representing to me that they were admissible, nobody
09:34:42  14  objected.  But there had been objections, so I don't
09:34:42  15  understand why I haven't got this translation.  And I
09:34:42  16  don't see how -- why they were read before I would have
09:34:42  17  been aware of what the documents were and were they
09:34:42  18  admitted and ask the other side that.  So that's my first
09:34:42  19  thing.
09:34:42  20       We're about to sometime tomorrow, I hope, start
09:34:42  21  Nemechek's deposition, and there will be the same
09:34:42  22  problem.  I don't -- one of the four I got a translation
09:34:42  23  of depo exhibits to trial exhibits.  I don't believe it
09:34:42  24  was Nemechek, but if it is, then somebody just has to
09:34:42  25  tell me, yes, Judge, you already got that one, and I'll

09:34:42  1    go pull it out of wherever it is I hid it.  So I expect

09:34:42  2    to see counsel -- well, I said 4:00, let's make it five

09:34:42  3    past 4:00.

09:34:42  4         I think -- how many folks is each side bringing

09:34:42  5    to this first phase of the charge conference relating to

09:34:42  6    the general instructions?

09:34:42  7         MR. CUNNINGHAM:  Your Honor, the Labs will have

09:34:42  8    three counsel present.

09:34:42  9         THE COURT:  And how about Cigna, how many people

09:34:42 10    will be there for Cigna?

09:34:42 11         MR. KANG:  We'll do three.

09:34:42 12         THE COURT:  Three and three, we can fit that in

09:34:42 13    there.  So, I usually do charge in my conference room.

09:34:42 14    It's a bit of a mess because -- I won't tell you whose

09:34:42 15    cause it is, but I think they're both in this room, and

09:34:42 16    -- but it's usable.  I think we'll do it in there.  So

09:34:42 17    Terri and -- I don't, Liana, I will talk to you about

09:34:42 18    whether you need to be there or not.  Okay.

09:34:42 19         We'll stand in recess until 4:05.

09:34:42 20         (Whereupon, a recess was taken 3:50 p.m. to 4:06

09:34:42 21    p.m.)

09:34:42 22         THE COURT:  We're here.  I don't have a final

09:34:42 23    time total, but you are quite close.  Obviously today was

09:34:42 24    quite a bit from Cigna.  We'll get that to you in a quick

09:34:42 25    email from the clerk.

09:34:42  1      We also will be sending -- I assume everybody

09:34:42  2  here is here because you are working on the charge.  So I

09:34:42  3  didn't see any point in sending it out, but you will

09:34:42  4  getting what I call Part 2, which is the Lab-related

09:34:42  5  charge, their claim, shortly after you leave.  And I

09:34:42  6  think my law clerk will explain in the cover email, it

09:34:42  7  has not been carefully proofed.  And further, we just had

09:34:42  8  -- we -- and I should have had it because this is what I

09:34:42  9  usually do.  But I -- there's has just been so much going

09:34:42  10  on in this case.  It will be edited, but just

09:34:42  11  structurally.

09:34:42  12      You will see the one you're getting is the way

09:34:42  13  it is now.  Eventually, we are going to convert it so

09:34:42  14  we'll define in the beginning, which we sort of already,

09:34:42  15  but to say it clearly, there's three labs who have

09:34:42  16  claims, each of them, so you've got to find as to each

09:34:42  17  lab have they proved it.  I'll sort of do that at the

09:34:42  18  beginning and tell them -- and so I'm going to give you

09:34:42  19  the charge on what -- how you prove that claim, what each

09:34:42  20  -- this is each lab has to do.  So when you do it for the

09:34:42  21  first lab, you have to go back and start at the beginning

09:34:42  22  of the charge and do it for the second and then for the

09:34:42  23  third.

09:34:42  24      So unfortunately, in the current version, within

09:34:42  25  it, I keep telling that within each element, okay, if you

09:34:42  1    found for the Lab 1 on this claim, you know, then you

09:34:42  2    should turn to Lab 2 and see if they have proven it.  And

09:34:42  3    it's just too awkward and burdensome and repetitive.  So

09:34:42  4    that's not a substantive change.  You'll get to comment

09:34:42  5    on it when you see it, but just so you know if you are

09:34:42  6    reading it, like, Oh my God, why does she keep doing it

09:34:42  7    this way.  We are going to fix it.  That will go out I

09:34:42  8    would say within a half an hour from my law clerk when

09:34:42  9    he's done in here.

09:34:42  10          So we're here today in the Labs versus Cigna,

09:34:42  11   Cigna versus Labs, that we've just recessed from trial on

09:34:42  12   what I called, which won't be in the final charge, but

09:34:42  13   Part 1, which is from Charge 1 through Charge 19, and

09:34:42  14   then the last charge, which is currently numbered 61,

09:34:42  15   what it will be I don't know.  And those are, in my view,

09:34:42  16   sort of general instructions I give to every jury.

09:34:42  17          And I'm here to ask you to comment on them.  Do

09:34:42  18   you have any edits, suggestions, objections, et cetera?

09:34:42  19   So I think I will start by going through, I suppose, one

09:34:42  20   at a time with you folks.

09:34:42  21          Is there objection to Charge 1, "Introduction"?

09:34:42  22   By the Labs?

09:34:42  23          MR. CHRIST:  No, Your Honor.

09:34:42  24          THE COURT:  How about by Cigna?

09:34:42  25          MS. KINGSBERY:  No, Your Honor.

```
09:34:42   1            THE COURT:  How about 2, titled "Two cases"?
09:34:42   2    From the Labs?
09:34:42   3            MR. CHRIST:  No objection, Your Honor.
09:34:42   4            THE COURT:  Cigna?
09:34:42   5            MS. KINGSBERY:  No.
09:34:42   6            THE COURT:  Charge 3, "Instruction outline."
09:34:42   7    From the Labs?
09:34:42   8            MR. CHRIST:  No objection, Your Honor.
09:34:42   9            THE COURt:  Cigna?
09:34:42   10           MS. KINGSBERY:  No objection.
09:34:42   11           THE COURT:  Charge 4, "Role of jurors."
09:34:42   12           MR. CHRIST:  No objection, Your Honor.
09:34:42   13           THE COURT  Labs, no.  Cigna?
09:34:42   14           MS. KINGSBERY:  No, Your Honor.
09:34:42   15           THE COURT:  And 5, "Role of attorneys."
09:34:42   16           MR. CHRIST:  No objection, Your Honor.
09:34:42   17           MS. KINGSBERY:  No objection.
09:34:42   18           THE COURT:  Now I'm going to switch who goes
09:34:42   19    first.
09:34:42   20           Number 6, "Burden of proof."  From Cigna's point
09:34:42   21    of view, any objection?
09:34:42   22           MS. KINGSBERY:  No objection, Your Honor.
09:34:42   23           THE COURT:  From the Labs' point of view?
09:34:42   24           MR. CHRIST:  No objection.
09:34:42   25           THE COURT:  Number 7, "What is or is not
```

```
09:34:42   1    evidence."

09:34:42   2              MS. KINGSBERY:  No objection.

09:34:42   3              MR. CHRIST:  No objection, Your Honor.

09:34:42   4              THE COURT:  Number 8, "Notetaking."  From Cigna.

09:34:42   5              MS. KINGSBERY:  We do not have an objection.

09:34:42   6              MR. CHRIST:  No objection.

09:34:42   7              THE COURT:  Lab --

09:34:42   8              Number 9, "Stipulation."  Cigna?

09:34:42   9              MS. KINGSBERY:  No objection.

09:34:42   10             THE COURT:  Labs?

09:34:42   11             MR. CHRIST:  No objection.

09:34:42   12             THE COURT:  Ten, "Interrogatories."  Cigna?

09:34:42   13             MS. KINGSBERY:  No objection.

09:34:42   14             THE COURT:  Labs?

09:34:42   15             MR. CHRIST:  No, objection.

09:34:42   16             THE COURT:  I'm sorry, Terri.  I'm going 95

09:34:42   17   miles an hour.

09:34:42   18             THE COURT REPORTER:  I got it.

09:34:42   19             THE COURT:  All right.  Taking a breath.

09:34:42   20             Turning back to the Labs, Charge 11.

09:34:42   21             MR. CHRIST:  No objection, Your Honor.

09:34:42   22             THE COURT:  Cigna?

09:34:42   23             MS. KINGSBERY:  No objection.

09:34:42   24             THE COURT:  Charge 12, "Depositions."  Lab?

09:34:42   25             MR. CHRIST:  No objection, Your Honor.
```

| | | |
|---|---|---|
| 09:34:42 | 1 | THE COURT:  Cigna? |
| 09:34:42 | 2 | MS. KINGSBERY:  No objection. |
| 09:34:42 | 3 | THE COURT:  Thirteen, "Direct and circumstantial |
| 09:34:42 | 4 | evidence."  The Labs? |
| 09:34:42 | 5 | MR. CHRIST:  No objection, Your Honor. |
| 09:34:42 | 6 | THE COURT:  Cigna? |
| 09:34:42 | 7 | MS. KINGSBERY:  No objection. |
| 09:34:42 | 8 | THE COURT:  Charge 14, "Inferences."  Labs? |
| 09:34:42 | 9 | MR. CHRIST:  No objection, Your Honor. |
| 09:34:42 | 10 | THE COURT:  Cigna? |
| 09:34:42 | 11 | MS. KINGSBERY:  No objection. |
| 09:34:42 | 12 | THE COURT:  Fifteen, "Determining the |
| 09:34:42 | 13 | credibility of witnesses."  Labs? |
| 09:34:42 | 14 | MR. CHRIST:  No objection, Your Honor. |
| 09:34:42 | 15 | THE COURT:  Cigna? |
| 09:34:42 | 16 | MS. KINGSBERY:  No objection. |
| 09:34:42 | 17 | THE COURT:  Starting over now to have Cigna |
| 09:34:42 | 18 | start as to 16. |
| 09:34:42 | 19 | MS. KINGSBERY:  No objection. |
| 09:34:42 | 20 | THE COURT:  "Impeaching witnesses."  Labs? |
| 09:34:42 | 21 | MR. CHRIST:  And no objection, Your Honor. |
| 09:34:42 | 22 | THE COURT:  Seventeen, "Expert witnesses." |
| 09:34:42 | 23 | Cigna? |
| 09:34:42 | 24 | MS. KINGSBERY:  No objection. |
| 09:34:42 | 25 | THE COURT:  Labs? |

09:34:42  1            MR. CHRIST:  No objection.

09:34:42  2            THE COURT:  Eighteen, "Multiple parties and

09:34:42  3  multiple defendants."

09:34:42  4            MS. KINGSBERY:  No objection.

09:34:42  5            THE COURT:  Labs?

09:34:42  6            MR. CHRIST:  I'm sorry, Your Honor.  I'm reading

09:34:42  7  it one more time.

09:34:42  8            THE COURT:  That's all right.  Terri appreciates

09:34:42  9  it.

09:34:42  10            MR. CUNNINGHAM:  Your Honor, just one point of

09:34:42  11  clarification.  You said multiple parties and multiple

09:34:42  12  defendants.

09:34:42  13            THE COURT:  Well, that's no longer true.  Thank

09:34:42  14  you.  That's definitely -- that's exactly -- multiple

09:34:42  15  plaintiffs and defendant.  Did we edit the body, though?

09:34:42  16  That's a good question.

09:34:42  17            MR. CHRIST:  Looks like the body has been

09:34:42  18  edited.

09:34:42  19            THE COURT:  Yeah, we just missed the title.

09:34:42  20  That's not unusual, but we will check.  I'm going to

09:34:42  21  write here, Alex, you should check the text.

09:34:42  22            MR. CHRIST:  There is --

09:34:42  23            THE COURT:  Defendant --

09:34:42  24            MR. CHRIST:  -- on the last line of the first

09:34:42  25  paragraph, it's plural defendants.

09:34:42  1            THE COURT:  And above that be "the defendant."

09:34:42  2    Are we agreed, Cigna?  Yes?

09:34:42  3            MS. KINGSBERY:  Yes.

09:34:42  4            THE COURT:  So that is another -- if I check

09:34:42  5    something, Alex, on my copy, it means we have agreed, you

09:34:42  6    should do it.  Thank you very much.

09:34:42  7            Anything else on that one?

09:34:42  8            MR. CHRIST:  Nothing from the Labs' side, Your

09:34:42  9    Honor.

09:34:42  10           THE COURT:  Number 19, Cigna, "Consolidated

09:34:42  11   cases."

09:34:42  12           MS. KINGSBERY:  No objection.

09:34:42  13           THE COURT:  You're Attorney Kingsbery, right?

09:34:42  14           MS. KINGSBERY:  Yes, Your Honor.

09:34:42  15           THE COURT:  I'm sorry.  There's a cast of

09:34:42  16   characters here.  I didn't get the playbill.

09:34:42  17           From Labs' side?

09:34:42  18           MR. CUNNINGHAM:  Is that the pejorative

09:34:42  19   characters, Your Honor?

09:34:42  20           THE COURT:  Not at all.

09:34:42  21           19, objection?

09:34:42  22           MR. CHRIST:  No objection, Your Honor.

09:34:42  23           THE COURT:  20 -- now we are at 61.

09:34:42  24           Lab -- Cigna, is there any objection to what I

09:34:42  25   call the closing remarks, which is now Numbered 61, the

| | | |
|---|---|---|
| 09:34:42 | 1 | lat -- what will be the last charge in the jury charge? |
| 09:34:42 | 2 | MS. KINGSBERY:  No objection. |
| 09:34:42 | 3 | MR. CHRIST:  No objection, Your Honor. |
| 09:34:42 | 4 | THE COURT:  Unbelievable. |
| 09:34:42 | 5 | I have got a feeling tomorrow is going to be |
| 09:34:42 | 6 | different. |
| 09:34:42 | 7 | MR. RADSHAW:  Don't jinx it. |
| 09:34:42 | 8 | I don't need to jinx it.  I know it will be. |
| 09:34:42 | 9 | All right.  I'm having trouble remembering -- |
| 09:34:42 | 10 | it's about 25 pages, but it could have got cut down since |
| 09:34:42 | 11 | we took out the second defendant for Cigna. |
| 09:34:42 | 12 | Please understand what you are getting tonight |
| 09:34:42 | 13 | is a draft.  I have not even read it since I gave the |
| 09:34:42 | 14 | changes to be fixed, so -- but you should be prepared to |
| 09:34:42 | 15 | point out everything to me.  You might get an answer, |
| 09:34:42 | 16 | well, I know that, I'm going to fix it.  I'm not |
| 09:34:42 | 17 | impatient when I say that.  I'm just saying you don't |
| 09:34:42 | 18 | need to worry, but you should worry, you should tell me |
| 09:34:42 | 19 | so I make a note.  I suspect there will be substantive |
| 09:34:42 | 20 | objections, however, which is the purpose of a charge |
| 09:34:42 | 21 | conference to get them out.  I guess that's it. |
| 09:34:42 | 22 | Is there anything else? |
| 09:34:42 | 23 | MR. CUNNINGHAM:  I just want to bring one thing |
| 09:34:42 | 24 | to the Court's attention.  It has nothing to do with the |
| 09:34:42 | 25 | jury instructions. |

| | | |
|---|---|---|
| 09:34:42 | 1 | THE COURT:  Yeah. |
| 09:34:42 | 2 | MR. CUNNINGHAM:  On Friday afternoon, I'm not |
| 09:34:42 | 3 | putting on a witness that I'm aware of.  Certainly this |
| 09:34:42 | 4 | will change. |
| 09:34:42 | 5 | THE COURT:  This coming Friday? |
| 09:34:42 | 6 | MR. CUNNINGHAM:  My niece is getting married in |
| 09:34:42 | 7 | North Carolina on Saturday, so I would really like -- |
| 09:34:42 | 8 | THE COURT:  Congratulations. |
| 09:34:42 | 9 | MR. CUNNINGHAM:  -- to duck out a couple of |
| 09:34:42 | 10 | hours early. |
| 09:34:42 | 11 | THE COURT:  That's between you and your team. |
| 09:34:42 | 12 | MR. CUNNINGHAM:  I appreciate it.  I just wanted |
| 09:34:42 | 13 | to let the Court -- |
| 09:34:42 | 14 | THE COURT:  No, I mean, if you are the middle of |
| 09:34:42 | 15 | a witness and you tell me, My flight is leaving at 12:30 |
| 09:34:42 | 16 | from Bradley or New York, you're not going to get |
| 09:34:42 | 17 | sympathy. |
| 09:34:42 | 18 | MR. CUNNINGHAM:  No, I understand that. |
| 09:34:42 | 19 | THE COURT:  But if you're not going to be here, |
| 09:34:42 | 20 | you're not going to be.  I assume other counsel will be |
| 09:34:42 | 21 | prepared -- |
| 09:34:42 | 22 | MR. CUNNINGHAM:  I just want to let you know. |
| 09:34:42 | 23 | THE COURT:  I appreciate that.  I think that's a |
| 09:34:42 | 24 | really excellent reason not to be here on Friday. |
| 09:34:42 | 25 | Is there any objection, Attorney Kang? |

09:34:42  1          MR. KANG:  No, Your Honor.

09:34:42  2          THE COURT:  What did I say to you a minute ago

09:34:42  3  about that I wanted to raise?

09:34:42  4          THE LAW CLERK:  It was about the use of the

09:34:42  5  transcript.

09:34:42  6          THE COURT:  Oh, yes.  Closing argument, two

09:34:42  7  agenda items.  If you don't want to answer now because

09:34:42  8  you don't have your whole team here, that's fine.  But I

09:34:42  9  need to know what you folks think you should have for

09:34:42  10  time.  And in connection with that, we have to have

09:34:42  11  agreement on reserving and the order of the pieces of the

09:34:42  12  closing.  Okay.  I think I know what that is.  I don't

09:34:42  13  know the times and how you break them, but I'm probably

09:34:42  14  going to look for you to tell me that sometime tomorrow,

09:34:42  15  maybe at the lunch break, at least to convey it to me.  I

09:34:42  16  doubt I'm going to agree with you on the time, but at

09:34:42  17  least I'll absorb it and think about it and I'll be able

09:34:42  18  to discuss it with you at a later time.

09:34:42  19          MR. KANG: Your Honor is referring to the main

09:34:42  20  closing and then rebuttal closing and --

09:34:42  21          THE COURT:  Well, except you have a responsive.

09:34:42  22  You have opening closing, responsive closing and rebuttal

09:34:42  23  on each side.  Okay.  So that's what I mean.  Now, maybe

09:34:42  24  you want to agree there will be no, quote, rebuttal, and

09:34:42  25  that the defendant in the claim gets the last word.  I

| 09:34:42 | 1 | have a feeling that's not what you're going to agree to |
| 09:34:42 | 2 | because then Attorney Kang won't be the last voice heard. |
| 09:34:42 | 3 | But I don't know.  I've been surprised today.  So that's |
| 09:34:42 | 4 | one thing. |
| 09:34:42 | 5 | What did I just say about -- what did you say? |
| 09:34:42 | 6 | THE LAW CLERK: Transcripts. |
| 09:34:42 | 7 | THE COURT:  I am going to ask you, and my |
| 09:34:42 | 8 | crackerjack clerk is going to remind me to do this when |
| 09:34:42 | 9 | we do discuss closings, I have a rule about demonstrative |
| 09:34:42 | 10 | exhibits.  You are allowed to put up on the screen or I |
| 09:34:42 | 11 | suppose you could put it on a poster, you can physically |
| 09:34:42 | 12 | show the jury anything that is evidence in full. |
| 09:34:42 | 13 | Okay.  However, some lawyers -- and you have |
| 09:34:42 | 14 | spent a lot of money on this lovely woman because they |
| 09:34:42 | 15 | have daily they have transcript, and up pops one line and |
| 09:34:42 | 16 | one question from the transcript.  I have never allowed |
| 09:34:42 | 17 | that.  My reason is as follows.  I believe it unduly |
| 09:34:42 | 18 | emphasizes, very small piece of the evidence, indeed a |
| 09:34:42 | 19 | very small piece of the testimony, and it leads to |
| 09:34:42 | 20 | arguments.  I mean, generally, you didn't get to object |
| 09:34:42 | 21 | to opponent's closing argument because, you know, I'm |
| 09:34:42 | 22 | telling them don't listen to anything that isn't in |
| 09:34:42 | 23 | evidence.  And if a lawyer is stupid enough to say this |
| 09:34:42 | 24 | is in evidence, well, I'm sure that, yeah, the jury will |
| 09:34:42 | 25 | remember. |

09:34:42  1          Here, I think it could very well be an

09:34:42  2   objection.  It's kind of like when we designate

09:34:42  3   deposition transcripts, right, we've seen it, gee, that's

09:34:42  4   incomplete.  We have to read more of that transcript and

09:34:42  5   that page and that line, whose time does that come out

09:34:42  6   of.  And then when there's a designation and there's a

09:34:42  7   counter objection, well, wait a minute, that's not really

09:34:42  8   needed, it isn't needed to make it complete, it isn't

09:34:42  9   needed to whatever.  Okay.  So for both those reasons,

09:34:42  10  which are really quite different, but I think equally

09:34:42  11  significant or important, I just don't allow you to pop

09:34:42  12  up a very small segment of the transcript.  It's

09:34:42  13  available if the jury want read-back.  We'll do that

09:34:42  14  freely and we'll discuss, you know, what are they asking

09:34:42  15  for, but we'll read back.  So I wanted you to know that.

09:34:42  16          As to demonstratives, I will set a time, we can

09:34:42  17  talk about how much.  If you are going to go to use a

09:34:42  18  demonstrative, you know, that you have to disclose it to

09:34:42  19  the other side in enough time that they can review it,

09:34:42  20  figure out if they object, come and tell me they object

09:34:42  21  and for me to rule.  So let's say they object, but it is

09:34:42  22  fixable.  In other words, the person who made it could

09:34:42  23  fix it, and I would then let it come in.  It's happened

09:34:42  24  to me once as a lawyer.  Well, the objection came up as

09:34:42  25  I'm standing up and going to put this thing on a stand,

09:34:42  1    This is pre-electronics, obviously.  And the lawyer

09:34:42  2    objects and the judge, nah, can't do that, Hall.  I won't

09:34:42  3    tell you why I think he said I couldn't, but I thought it

09:34:42  4    was perfectly acceptable.  Of course, we worked really

09:34:42  5    hard not to do anything that could be objected to.  I

09:34:42  6    could have fixed it.  But couldn't fix it when he's

09:34:42  7    calling on me, start your closing argument.  That's -- I

09:34:42  8    think that's incredibly unfair.  It's sandbagging.  It's

09:34:42  9    not really what a trial is supposed to be about.  So

09:34:42  10   we'll discuss it.  Maybe you can discuss among yourselves

09:34:42  11   how much time should that disclosure be if you have

09:34:42  12   demonstratives.

09:34:42  13        I suspect you're going to try to get everything

09:34:42  14   in that you want in closing, including damages and

09:34:42  15   discovery categories, et cetera.  That's interesting,

09:34:42  16   because lately I've been getting a lot of objections from

09:34:42  17   somebody who tries to do that, that it's too

09:34:42  18   argumentative.  It's basically a summation of evidence,

09:34:42  19   which is what you do in a -- but if you folks can agree

09:34:42  20   on that.  You both obviously have an interest here in

09:34:42  21   proving your damages.

09:34:42  22        And obviously, Attorney Kang, you've got to

09:34:42  23   prove it in three pieces.  You've got three labs.  You

09:34:42  24   only have one defendant, but you have three labs making a

09:34:42  25   claim.  So you each have sort of damages you want to put

09:34:42  1    together.  I don't -- I don't mean to scare you to death

09:34:42  2    that I'm not going to let you put it in, but that could

09:34:42  3    become a demonstrative if I don't let it come in.  I

09:34:42  4    don't know because I haven't seen them.  I don't know

09:34:42  5    what exhibits you are using.  So just a heads-up.

09:34:42  6            And if -- I guess if you agree, you know,

09:34:42  7    obviously, it can come in.  If you agree it should be an

09:34:42  8    exhibit, then that's no demonstrative, we don't have a

09:34:42  9    problem.

09:34:42  10           Yes, sir.

09:34:42  11           MR. RADSHAW:  How do you feel about verdict

09:34:42  12   forms in terms of a demonstrative?

09:34:42  13           THE COURT:  Oh, in terms of the question you are

09:34:42  14   asking?

09:34:42  15           MR. RADSHAW:  Special interrogatories, your

09:34:42  16   verdict forms.

09:34:42  17           THE COURT:  Yeah, it's going to be a long -- and

09:34:42  18   it's really just the special interrogatories.  It's

09:34:42  19   really not a -- I'm going to call it a verdict form, but

09:34:42  20   it's not going to say do you find for the Labs Number 1

09:34:42  21   against Cigna on Count Two.  It's not going to say that.

09:34:42  22   It's going to have a whole bunch of questions that you

09:34:42  23   and I -- all of us would read and say, Oh, yeah, that's a

09:34:42  24   Cigna verdict, that's a Lab Number 1 verdict.

09:34:42  25           I don't think that bothers me.  But does anybody

09:34:42  1    -- do you object?  I assume you are asking because you

09:34:42  2    want to do that, or you might want to.

09:34:42  3          MR. RADSHAW:  I'm asking because I have done it

09:34:42  4    in the past.

09:34:42  5          THE COURT:  Yeah, yeah.  I think I've allowed

09:34:42  6    it.

09:34:42  7          MR. RADSHAW:  You have asked a couple of

09:34:42  8    questions that it didn't fall in any of the categories

09:34:42  9    that you are talking about.

09:34:42  10         THE COURT:  Yeah, no, you're right, I didn't

09:34:42  11   cover that because I haven't written the darn thing.

09:34:42  12         MR. CUNNINGHAM:  Are you talking about basically

09:34:42  13   having a blow up an enlargement --

09:34:42  14         THE COURT:  Well, or you might pop up one

09:34:42  15   question and say you have to answer this question, and I

09:34:42  16   suggest all the evidence shows and you don't believe the

09:34:42  17   liars on the other side, then you should answer that yes.

09:34:42  18   I mean, you can verbally make that argument, in my

09:34:42  19   opinion.  It's not evidence, so it's not like you are

09:34:42  20   overemphasizing any evidence.  It's just -- I think it's

09:34:42  21   all right.

09:34:42  22         Attorney Kang, you want to be the devil's

09:34:42  23   advocate here?

09:34:42  24         MR. KANG:  No, I can't think of -- I can think

09:34:42  25   of something, but I think it's reasonable.

09:34:42   1          THE COURT:  Okay.  Let me think about it, but

09:34:42   2   right for now I don't see any problem, Attorney Radshaw.

09:34:42   3   I appreciate you raising that because you're right, it's

09:34:42   4   kind of sui generis.  It's a court document, in effect.

09:34:42   5   But they're going to have it, and I don't know what would

09:34:42   6   be wrong in emphasizing one over the other at a

09:34:42   7   particular time because your argument is emphasizing an

09:34:42   8   issue to them one at a time.  I mean, I'm sure you will

09:34:42   9   do some sweeping grand conclusion in your closings.  But

09:34:42  10   as you slog through it, you are talking about this issue

09:34:42  11   and then you'll have to decide this.  I mean, I don't

09:34:42  12   know.

09:34:42  13          All right.  So I think for now it's okay, but

09:34:42  14   please, somebody raise it again, but I will think of it.

09:34:42  15   My gut is it's not a problem.

09:34:42  16          MR. CUNNINGHAM:  Your Honor, as I understand it,

09:34:42  17   and as I do the math, obviously, this will be your call,

09:34:42  18   but it seems to me that the evidence will all be in by

09:34:42  19   Tuesday.  I guess the question is --

09:34:42  20          THE COURT:  I don't think so, because remember

09:34:42  21   you didn't get a full day Friday.

09:34:42  22          MR. CUNNINGHAM:  Okay.  So you're okay if we

09:34:42  23   have to go into Wednesday?

09:34:42  24          THE COURT:  I think my clock is going to tell me

09:34:42  25   that it's okay.

| | | |
|---|---|---|
| 09:34:42 | 1 | MR. CUNNINGHAM:  That's what I -- |
| 09:34:42 | 2 | THE COURT:  But I expect -- oh, I should have |
| 09:34:42 | 3 | mentioned this to you.  I expect that by noonish -- you |
| 09:34:42 | 4 | started at 11 -- early in the 11th hour of Friday.  So I |
| 09:34:42 | 5 | mean, we lost a minute here or there, right, but we're |
| 09:34:42 | 6 | pretty much doing fine.  I would think by lunch break on |
| 09:34:42 | 7 | Wednesday we should have run out of this clock one way or |
| 09:34:42 | 8 | another, both sides, or you don't want the rest of your |
| 09:34:42 | 9 | time.  And so you should be prepared to do closing |
| 09:34:42 | 10 | argument on Wednesday.  I will charge on Thursday.  I |
| 09:34:42 | 11 | don't think there's any chance, but you will have the |
| 09:34:42 | 12 | final charge before you stand up to do a closing, as is |
| 09:34:42 | 13 | required by law.  So that means we have to put this |
| 09:34:42 | 14 | charge to bed by Tuesday night. |
| 09:34:42 | 15 | MR. CUNNINGHAM:  One last question along the |
| 09:34:42 | 16 | lines of what you must mentioned. |
| 09:34:42 | 17 | THE COURT:  Yes. |
| 09:34:42 | 18 | MR. CUNNINGHAM:  If we were to finish closings |
| 09:34:42 | 19 | by, let's say, 2:00 p.m. on Wednesday -- |
| 09:34:42 | 20 | THE COURT:  Would I charge? |
| 09:34:42 | 21 | MR. CUNNINGHAM:  Yes. |
| 09:34:42 | 22 | THE COURT:  The charge is really long.  I think |
| 09:34:42 | 23 | the current page number, which is going to change but I |
| 09:34:42 | 24 | don't think by much, unless you tell mel things I've |
| 09:34:42 | 25 | overlooked or I may make a change, we're looking at about |

09:34:42  1    an hour and a half to two.  So I could get the charge in.

09:34:42  2    And I have charged where the next thing I say is, Go

09:34:42  3    home, have a good night's sleep, don't think about this.

09:34:42  4    Your next step is to talk about it with the other jurors.

09:34:42  5    I will do that, but I'm going to have to be darn sure I'm

09:34:42  6    going to get it in.  But that's fine, too.

09:34:42  7            My goal is to give them as much time -- because

09:34:42  8    when you see the interrogatory form that I haven't seen,

09:34:42  9    I have a funny feeling there is going to be a lot, lot of

09:34:42  10   questions.

09:34:42  11           Speaking of which, that's another thing I

09:34:42  12   haven't gotten decided, the exhibit translator.  I did

09:34:42  13   get it from Attorney Kang a proposed verdict

09:34:42  14   form/interrogatory questions for the jury.  Did I get one

09:34:42  15   from you folks?  I asked by law clerk about that.

09:34:42  16           MR. CHRIST:  Yes, I thought it was filed

09:34:42  17   yesterday -- last night --

09:34:42  18           THE COURT:  Last night.

09:34:42  19           MR. CHRIST:  -- for the Labs.

09:34:42  20           THE COURT:  Alex, could you -- once you send out

09:34:42  21   the email with Part 2, would you put an eyeball on that?

09:34:42  22           Thank you very much, Counsel.

09:34:42  23           All right.  So I've still got a little bit more

09:34:42  24   work on what I'm calling Part 3.  Obviously, once we have

09:34:42  25   the third conference on Thursday, there will be parts

09:34:42  1  that are still unsettled.  But my job from that point on

09:34:42  2  is to read what you have told me to read, whatever cases

09:34:42  3  you have given me, some other case that did it this way.

09:34:42  4  Look at your proposed language and decide do I think

09:34:42  5  that's going to make it better or not, to do research

09:34:42  6  basically and thought.  And I will at that point deal

09:34:42  7  with the charge issues.  I am not going to have a

09:34:42  8  conference Friday night, for example, assuming my

09:34:42  9  projected time table is correct.  I'll have you come

09:34:42  10  early on Friday or stay a little bit later, and I'll tell

09:34:42  11  you, look, I have looked at this, and on Charge 57, I

09:34:42  12  don't agree with Labs, Cigna, whoever it is, I'm going to

09:34:42  13  keep it the way is or, you know, you made a good point, I

09:34:42  14  don't agree entirely, I'm editing it, this is what it is

09:34:42  15  going to say.  We might send you out a copy of the

09:34:42  16  sections that are at issue that I'm responding and

09:34:42  17  explaining, this is what I'm going to do on this charge.

09:34:42  18  And you'll have your eyes in front of it.  I maybe then

09:34:42  19  put it on the record.

09:34:42  20        But that's how we'll work our way through the

09:34:42  21  fill-in-the-blank issues remaining after the first charge

09:34:42  22  conference on each section into the final.  I would fully

09:34:42  23  expect -- I mean, I actually gave thought to have you

09:34:42  24  folks come in Saturday.  If I'm way off that we can do

09:34:42  25  Parts 2 and 3 Wednesday and Thursday, we may need to.

09:34:42  1    But right now -- maybe I'm overly optimistic on the first

09:34:42  2    part, it's -- tomorrow is going to be a longer session,

09:34:42  3    and we'll see where we are.

09:34:42  4        I mean, a lot of times I'll say, no, I don't

09:34:42  5    agree with you.  I've thought about this and looked at

09:34:42  6    your case and I don't agree.  Other times I'll say I'll

09:34:42  7    take it under advisement, but I'll know by the next day.

09:34:42  8    And then others, it might take me over the weekend.  And

09:34:42  9    I have got Alex looking more closely.

09:34:42  10       Yeah, two things, I guess, given we don't have a

09:34:42  11   lot of time.  If you have a case -- I mean, I am going to

09:34:42  12   tell you why I don't agree with you.  And I haven't seen

09:34:42  13   cases that would support, say, the position you have

09:34:42  14   seen.  If you've got them, be ready to give me at least a

09:34:42  15   citation.

09:34:42  16       Second, if you look at Charge 42 and your team

09:34:42  17   looks at each other and says, What is she thinking, she

09:34:42  18   must have not gotten any sleep last night as opposed to

09:34:42  19   three hours of sleep, this is so bad, I don't even know

09:34:42  20   what to say to her at the conference.  Okay.  Submit a

09:34:42  21   different request to charge.  I have to say, no offense,

09:34:42  22   but the request to charges weren't terribly helpful to

09:34:42  23   me, especially on what are the difficult charges.  I

09:34:42  24   probably shouldn't have said that.  I'm sorry.  I'm being

09:34:42  25   very critical, and that's because I'm tired.

09:34:42  1         But if you have a form of charge that addresses

09:34:42  2    your concerns in something you are going to say, Judge,

09:34:42  3    this is all wrong in this charge, then come prepared with

09:34:42  4    a request, printed up, typed up and give us each a paper

09:34:42  5    copy.  And if you want to docket it as an attachment to

09:34:42  6    filing of additional request to charge, you just copy it

09:34:42  7    and slap on the docket.  Because I mean, we'll be talking

09:34:42  8    about it and I'll put on the record did I accept yours or

09:34:42  9    didn't I, or whatever, but you're probably going to want

09:34:42  10   to make a record of what you requested to charge.  Both

09:34:42  11   sides want to be careful of that.

09:34:42  12        But right now, I haven't got a request to charge

09:34:42  13   that I say, okay, I'm wrong in what I did and they're

09:34:42  14   right.  I haven't got one of those yet.  Maybe you will

09:34:42  15   give me one, but anyway -- so that would be helpful.

09:34:42  16        Just sitting here.  We have a lot of lawyers I

09:34:42  17   have had on trial, much simpler trials, too, who just

09:34:42  18   sort of sit at a charge conference, oh, Judge, you should

09:34:42  19   rewrite that to be blah, blah, blah.  And I'm like, wait

09:34:42  20   a minute, I mean --

09:34:42  21        MR. CUNNINGHAM: Terri, did you get that?

09:34:42  22        THE COURT:  Dot, dot, dot, dot, dot.  So that's

09:34:42  23   always helpful if it's a substantial edit.  If you are

09:34:42  24   telling me, oh, gee, you've got an S on the Labs or

09:34:42  25   you've got two defendants, or things like that, I don't

09:34:42  1    need you -- as you saw, I sit here and I check it and I

09:34:42  2    say, yes, you are right, and off we go.  That's not going

09:34:42  3    to be the case tomorrow.  Tomorrow is going to be the

09:34:42  4    longest.

09:34:42  5         Cigna's -- other than the fact there's only one

09:34:42  6    Cigna left, I'm sure we haven't caught all of those

09:34:42  7    edits, and that hopefully you are going to get by

09:34:42  8    tomorrow for Thursday.  It's possible we'll get it to you

09:34:42  9    tomorrow earlier in the day than what we're doing with

09:34:42  10   the second version.  That's not as long and I don't see

09:34:42  11   that -- I'm sure there will be issues both of you have

09:34:42  12   that are substantial and significant to your case and

09:34:42  13   your view of the case, but I don't see it as having as

09:34:42  14   many as in the Labs' charge.  So tomorrow could be --

09:34:42  15   make sure your eat your Wheaties in the morning.

09:34:42  16   Tomorrow could be a long day.

09:34:42  17        Anything else?

09:34:42  18        MR. KANG:  Your Honor, one question about the

09:34:42  19   motions for directed verdict.

09:34:42  20        THE COURT:  Oh, yeah, remember we talked about

09:34:42  21   that.  It's going to be at the end of all of the

09:34:42  22   evidence.  So there's another thing I have got to build

09:34:42  23   into.  When your clock is out of time, both of you,

09:34:42  24   which, say, is midday, noon, I am going to send them to

09:34:42  25   lunch.  The last thing you lawyers want if I'm saying,

09:34:42  1   okay, you are doing your closings, is to be arguing to me

09:34:42  2   about directed verdict.

09:34:42  3        I would suggest -- I don't know who is going to

09:34:42  4   go to the directed verdict motion versus the closings,

09:34:42  5   whether you're going to split up the closings, which is

09:34:42  6   -- you know, if one does the Lab, one does the Cigna

09:34:42  7   claims, whatever, that's fine.  It would certainly be

09:34:42  8   nice I think for the closers to not be having to do the

09:34:42  9   directed verdict.

09:34:42  10       But I will tell you, I generally don't -- it's

09:34:42  11  not like a summary judgment argument.  I'm not looking

09:34:42  12  for an hour's argument on the directed verdict.  I

09:34:42  13  probably shouldn't say this, but in all likelihood I will

09:34:42  14  reserve on some or all of the grounds that both of you

09:34:42  15  are -- I can tell you now what you are going to argue.

09:34:42  16  Okay.  And I think there may be some that might be

09:34:42  17  grantable, but not with what we have got in the air in

09:34:42  18  this case.

09:34:42  19       And to get this to the jury, I don't feel --

09:34:42  20  maybe after a brief argument on directed verdicts by one

09:34:42  21  of your team, I will be bowled away I'll look at Alex and

09:34:42  22  I'll say, Are they wrong?  And he'll say, No, there's

09:34:42  23  evidence on this at all.  There's no evidence on that.  I

09:34:42  24  mean, I might have done it with the Cigna Life.  Okay.

09:34:42  25  There is no evidence in the case about Cigna Life.  You

09:34:42  1    keep talking Cigna, but that's the first name of the

09:34:42  2    other party that's still in.  There's nothing about --

09:34:42  3    no, I guess it's Cigna -- whatever.  It wasn't clear to

09:34:42  4    me what you were proving up.  And when you got to your

09:34:42  5    case, yeah -- so that one, I might have done, but I don't

09:34:42  6    see any obvious one right now.  And I haven't had the

09:34:42  7    time trying to get this done to sort of sit down and

09:34:42  8    think, go over with Alex, okay, these are the elements.

09:34:42  9    Now we've drafted the charge at least, what's missing

09:34:42  10   that the parties haven't covered?  And there may be

09:34:42  11   something.  But let me put it this way.  I have not

09:34:42  12   infrequently reserved on directed verdict motions and

09:34:42  13   taken them up in post-trial briefs.

09:34:42  14        There's one more thing, don't let me forget,

09:34:42  15   defenses, equitable.  You need to point out those issues

09:34:42  16   to preserve your position for the post-trial brief,

09:34:42  17   right.  So it's important you iterate a topic with enough

09:34:42  18   detail and clarity that I and somebody else looking at

09:34:42  19   this record can say, oh, yeah, that's preserved, that's

09:34:42  20   grounds for post-trial, you know, judgment

09:34:42  21   notwithstanding the verdict, for example.  But that's

09:34:42  22   probably all.  If I need more, I will ask maybe during

09:34:42  23   the argument, but, yeah.

09:34:42  24        Okay.  We have another elephant in this room,

09:34:42  25   and that is equitable defenses.  Clearly, Cigna's claim

09:34:42  1    is going to the jury as, quote, legal, somewhat quasi

09:34:42  2    legal, but we're all assuming that's going to happen.

09:34:42  3    You may make that a grounds of your directed verdict, go

09:34:42  4    right ahead.  And it's not to bad idea, but I don't know.

09:34:42  5    I don't think so.

09:34:42  6         However, we a historic equitable remedy here, I

09:34:42  7    think even the Second Circuit's reversal of me made that

09:34:42  8    clear, of laches.  Now, I said in the ruling on summary

09:34:42  9    judgment there's an issue of fact.  Okay.  I didn't say

09:34:42  10   it was for the jury.  I said there's an issue of fact.

09:34:42  11   Now, generally, when there's an issue for the Court,

09:34:42  12   which I believe the laches defense is for me, I would

09:34:42  13   expect all the evidence on that defense to go into the

09:34:42  14   trial before the jury, but especially the claims involved

09:34:42  15   is to the jury, and then I -- just maybe not the day the

09:34:42  16   jury comes back, but maybe we'll have post-trial briefs

09:34:42  17   on the issue, I would then rule based solely on argument

09:34:42  18   or briefing, and there's no more hearing or trial.

09:34:42  19        There's another one, in pari delicto.  In my

09:34:42  20   opinion, I think is historically equitable defense.

09:34:42  21        Alex, you have to nod your head when I look at

09:34:42  22   you.  That's why you're down there so they can't see you

09:34:42  23   telling me what's the answer.  Right.

09:34:42  24        Same thing, I think an equitable defense.  That

09:34:42  25   one probably is more obviously covered by the evidence in

09:34:42  1    the record, or you wouldn't be wanting to say, no, Judge,

09:34:42  2    because we need a hearing on that.  But I mean on

09:34:42  3    laches, there's two elements.  The second one is really

09:34:42  4    the Labs, or whatever.  It is your defense.  Right?  So I

09:34:42  5    mean, I don't know whether either side -- it affects both

09:34:42  6    sides, thinks that when this is all over and you've left

09:34:42  7    the building, and I can take a deep breath and turn to

09:34:42  8    the rest of my docket, I'm not getting a call, Judge,

09:34:42  9    when you are scheduling the trial on the equitable

09:34:42  10   defenses?  Okay.  I'm not saying that I don't think you

09:34:42  11   should have one, but if you -- you told me four days and

09:34:42  12   I gave you four days.  If you think that is a short

09:34:42  13   period of time, trust me, try one or two equitable

09:34:42  14   defenses, which is additive evidence to what I've already

09:34:42  15   spent eight days listening to would be very brief.  Okay.

09:34:42  16   So think about that.

09:34:42  17        Will you be asking me for a further supplemental

09:34:42  18   hearing to introduce evidence that would never be

09:34:42  19   anything you are going to mention to the jury, but -- I

09:34:42  20   mean you have had evidence in they went out of business.

09:34:42  21   I mean, is that prejudice?  Is that your proof of

09:34:42  22   prejudice?  If it is, then we don't need a hearing at

09:34:42  23   post-trial.

09:34:42  24        I can't think of on laches in pari delicto, but

09:34:42  25   it could be we do not here need one.  And trust me, that

09:34:42  1    would be magic to my ears, but I don't want to prejudice

09:34:42  2    anybody who thought, well, it's to the judge.  I am going

09:34:42  3    to have a chance at another hearing to put on more

09:34:42  4    evidence.  I don't want to prejudice anybody with that

09:34:42  5    expectation, so I need to have some sense of why we need

09:34:42  6    an additional hearing  because you don't want to waste

09:34:42  7    your time in front of the jury because they don't have to

09:34:42  8    hear this piece of my proof, how long will it take and

09:34:42  9    when will we be in a position to get it done.  Bear in

09:34:42  10   mind, I can't do post-trial briefing until I make a

09:34:42  11   ruling.  It's part of that -- I can't think about

09:34:42  12   entering judgment without ruling on defenses, right,

09:34:42  13   unless I say I am going to throw the defense out.  I

09:34:42  14   don't think I'm doing that.  Certainly not on laches.

09:34:42  15         Pari delicto, I -- somebody is going to have to

09:34:42  16   explain to me why they are both in the same wrong, but

09:34:42  17   that's -- I am sure somebody will.  Anyway, so I need to

09:34:42  18   no that because I don't expect to take a long time to get

09:34:42  19   these post-trial briefs joined in front of me.  We're

09:34:42  20   going to have the whole -- after you gets done, who files

09:34:42  21   the first, who files -- I guess you both file on your

09:34:42  22   claims and then there's opposition and there's reply.  So

09:34:42  23   we'll have separate briefs.  I am going to have six

09:34:42  24   briefs.  I may change the local rule default length on

09:34:42  25   that one.  Remind me of that, Alex.  But I do not want

09:34:42  1    this case taking forever.

09:34:42  2        Alex has a one-year clerkship.  We're going to

09:34:42  3    get it done.  And he's the early clerk, so if that gives

09:34:42  4    you any idea.

09:34:42  5        Anything else?

09:34:42  6        MR. CUNNINGHAM:  When is the clerkship over?

09:34:42  7        THE COURT:  June 1.

09:34:42  8        MR. CUNNINGHAM:  I think we'll be okay.

09:34:42  9        THE COURT:  You think so now.

09:34:42  10        MR. CUNNINGHAM:  I think.

09:34:42  11        THE COURT:  You are very, very close, but Alex

09:34:42  12    and I are eight to ten minutes off of each other, and I

09:34:42  13    would like to resolve that before I give you a number,

09:34:42  14    but there's no question you are very close in total

09:34:42  15    amount of time taken by both.  And it's clearly about two

09:34:42  16    days and two or three hours total.  So all right.

09:34:42  17        Thanks very much.  See you tomorrow.

        18        (Court adjourned, 4:41 p.m.)

        19

        20

        21

        22

        23

        24

        25

1

2

3    COURT REPORTER'S TRANSCRIPT CERTIFICATE

4    I hereby certify that the within and foregoing is a true

5    and correct transcript taken from the proceedings in the

6    above-entitled matter.

7

8    /s/  Terri Fidanza

9    Terri Fidanza, RPR

10   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2                               EXAMINATION

3    Witness Name                                                    Page

4    MATTHEW NORTON

5        DIRECT EXAMINATION BY MR. CUNNINGHAM............... 416

6        CROSS-EXAMINATION BY MR. KANG ...................... 471

7    SEAMUS LAGAN

8        DIRECT EXAMINATION BY MR. CHRIST................... 521

9        CROSS-EXAMINATION BY MR. KANG ...................... 537

10       CROSS-EXAMINATION BY MR. CHRIST.................... 641

11   DR. DANIEL NICOLL

12       DIRECT EXAMINATION BY MR. CUNNINGHAM............... 644

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25