```
 1                   UNITED STATES DISTRICT COURT

 2                     DISTRICT OF CONNECTICUT

 3   _____
     CONNECTICUT GENERAL )
 4   LIFE INSURANCE CO.  )
     AND CIGNA HEALTH    )
 5   AND LIFE INSURANCE  )
     CO.                 )
 6          Plaintiffs )   NO: 3:19cv1324(JCH)
                        )   NO: 3:19CV1326(JCH)
 7    vs.               )   October 23, 2024
                        )   9:17 a.m.
 8                      )
     BIOHEALTH MEDICAL  )
 9   LABORATORIES INC,  )
     PB LABORATORIES, LLC)
10   and EPIC REFERENCE )
     LABS, INC.         )
11          Defendants. )
     _____)   141 Church Street
12                           New Haven, Connecticut

13

14               DAY FOUR OF TRIAL

15                   (REVISED)

16   B E F O R E:

17               THE HONORABLE JANET C. HALL, U.S.D.J.

18   A P P E A R A N C E S:

19   For CIGNA:         Edward T. Kang
                        Emily Costin
20                      Alston & Bird LLP
                        950 F Street, NW,
21                      Washington, DC 2004-1404

22                      Michelle Nicole Jackson
                        Alston & Bird LLP
23                      1201 West Peachtree Street
                        Atlanta, GA 30309

24
                      -- continued --
25
```

```
 1                          Alexander Akerman
                            Alston & Bird LLP
 2                          350 South Grand Avenue
                            51st Floor
 3                          Los Angeles, CA 90071

 4                          Kelsey Kingsbery
                            Alston & Bird LLP
 5                          555 Fayetteville Street
                            Ste 600
 6                          Raleigh, NC 27601

 7
       For BioHealth Labs:  Scott M. Hare
 8                          Anthony Thomas Gestrich
                            Raines Feldman Littrell
 9                          11 Stanwix Street
                            Suite 1400
10                          Pittsburgh, PA 15222

11                          Fred Alan Cunningham
                            Matthew Thomas Christ
12                          Rafferty Domnick Cunningham & Yaffa
                            2401 PGA Boulevard
13                          Suite #140
                            Palm Beach Gardens, FL 33410
14
                            John J. Radshaw, III
15                          John J. Radshaw, III, Esquire
                            65 Trumbull Street, 2d Fl.
16                          New Haven, CT  06510

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Who uttered the famous expression

2     once more into the breach?  It's a military person I

3     think.  I always liked that.

4          Anyway.  Good morning.  Once more into the

5     breach.

6          We're here on day of -- what is it, on day of

7     evidence, we're here on day four.  And I believe I forgot

8     to have you all enter your appearances, but I believe all

9     the same people are here.  Yes, I finally picked up over

10    there.  Maybe one other Cigna.  But, anyways, could the

11    Labs state their appearances and confirm that you all

12    were here yesterday or who wasn't here.  It's okay if you

13    weren't.  I just need the record.

14         MR. CUNNINGHAM:  Your Honor, Fred Cunningham for

15    the Labs.  I was here yesterday.

16         Mr. Christ was here yesterday.

17         THE COURT REPORTER:  I can't hear you.

18         THE COURT:  Sorry.  I was rustling papers.

19         MR. CUNNINGHAM:  You can't hear me or you can't

20    hear the Court?

21         THE COURT:  Couldn't hear you.

22         MR. CUNNINGHAM:  Okay.  Sorry, Your Honor.

23    These microphones are somewhat Lilliputian.

24         THE COURT:  Yes, yes.  But you know what's

25    interesting.  You do not have to bend over.  I feel bad

1    for tall people.  You just have to have your voice go

2    over the little bubble.

3              MR. CUNNINGHAM:  Thank you.

4              Fred Cunningham for the Labs.  I was here

5    yesterday.

6              Mr. Christ was also here.  Matthew Christ was

7    here for the Labs yesterday.  He was at the charge

8    conference and he will be here later this morning.

9              MR. HARE:  Your Honor, good morning.

10             Scott Hare from Raines Feldman, along with

11   Anthony Gestrich from my firm.  We have both been in and

12   out of courtroom.  We have been each day at some point.

13             THE COURT:  That's fine.

14             And Attorney Radshaw.

15             MR. RADSHAW:  John Radshaw.  I was here

16   yesterday as well.  Thank you.

17             THE COURT:  Thank you.  And for the Labs.

18             MR. KANG:  For Cigna, Your Honor.

19             THE COURT:  For Cigna.  I'm sorry.

20             MR. KANG:  No problem.

21             For Cigna, Edward Kang from Alston & Bird.  With

22   me at counsel's table is Emily Costin, Alex Akerman,

23   Kelsey Kingsbery, and Michelle Jackson, also from our

24   firm.  And Michael Goldfarb from Cigna who is our

25   corporate representative.

1           THE COURT:  Good morning.

2           I was told you folks have nothing to take up

3      this morning; is that correct?

4           MR. KANG:  We do have a couple of items, Your

5      Honor, but we're happy to --

6           THE COURT:  No, no.  Did you tell anybody that?

7           MR. KANG:  No.  We were going to actually take

8      it up at the break.

9           THE COURT:  Tell me the subject matter of the

10     items.

11          MR. KANG:  The first subject matter -- and we

12     have discussed both of these items with the Labs counsel.

13          The first is with respect to a portion of Mr.

14     Nicholson's deposition designation that was played.

15     There was one portion from page 213 to 216.  And the

16     specific question, Your Honor -- this was a Labs

17     designation that was played.  The question was:  Do you

18     know whether any of the Labs were ever under

19     investigation by any government or regulatory agency?

20          THE COURT:  I remember.

21          MR. KANG:  And so we have conferred with Mr.

22     Hare about a potential solution to that, but I just

23     wanted to flag that.

24          THE COURT:  Okay.

25          MR. KANG:  The second issue, Your Honor, is with

1    respect to the scope of the testimony of the Labs'

2    experts, Ms. Thelian and Mr. Haney.  In particular, due

3    to the Court's very clear direction that fee forgiving is

4    not in the case with respect to the Labs case, there are

5    portions of their testimony that relates to fee forgiving

6    in the Labs case.  And so that's another issue that we

7    wanted to take up with the Court.  Again, we may not have

8    enough time to do that before 9:30, but I wanted to flag

9    it.

10                THE COURT:  Thank you.

11                How is the day going to proceed as to witness

12    testimony?

13                MR. CUNNINGHAM:  Your Honor, we're going to

14    resume the testimony of Dr. Nicoll.  Then I believe we're

15    going to have Ms. Sharon Hollis.  And then we're going to

16    have, time permitting, of course, two experts,

17    Ms. Thelian and Mr. Haney.  So the expectation is all

18    live testimony.

19                THE COURT:  All live today.  Okay.  All right.

20                That brings me to my question of exchange of

21    exhibit lists for witnesses.  We talked about it at the

22    charge conference and we didn't get one.  Now, maybe it

23    was past the time you disclosed it and you didn't think

24    to send me the last one.

25                Can I have an explanation why I didn't get that?

1    I would think both sides were supposed to have sent me.

2    Maybe it's only the person taking direct of a witness,

3    but we never got it.

4         MR. CUNNINGHAM:  Your Honor, I believe that we

5    sent that to opposing counsel two days ago.  I apologize

6    if it has not been sent to the Court.  We can certainly

7    rectify that as soon as possible.

8         THE COURT:  Does the person crossing, like in

9    the case Cigna, do you tell them the exhibits you might

10   use or you didn't agree to that?

11        MR. KANG:  We have been doing that.  Obviously,

12   if there's unanticipated documents which we haven't --

13        THE COURT:  I understand that.  I need I guess

14   both of you to give me the list that were for these

15   people today.  And then if you would get in the habit of

16   adding Alex as a copy on that email.  It seems like

17   you're doing it with each other which is the most

18   important, but I would still like to see it.

19        MR. CUNNINGHAM:  Your Honor, if I may.  We have

20   not had a chance to confer with Mr. Kang's team about who

21   they plan to put on tomorrow.  But we will do that and

22   certainly we expect to get the exhibits they plan to use.

23        THE COURT:  Okay.  You think you will finish

24   your direct case sometime today or tomorrow?

25        MR. CUNNINGHAM:  I think tomorrow is more

1    realistic, Your Honor, because we have some deposition

2    testimony to play.

3            THE COURT:  You didn't, obviously, get to the

4    two depositions you planned to yesterday, right?

5            MR. GESTRICH:  Your Honor, my apologies.  We're

6    going to play the two deposition videos next week because

7    they were both defense witnesses to Cigna's case.

8            THE COURT:  Oh, I'm sorry.  I lost track of

9    that.

10           MR. GESTRICH:  We originally intended to put

11   them on earlier.  We have shifted that.

12           THE COURT:  That's no problem.

13           The only last thing is that I've lost track of

14   something I've already mentioned to you.  I need to put,

15   you know, the evidence rulings that I gave you ahead of

16   time so you can put your transcript, your deposition

17   videos together to play them when you wanted to.

18   Especially with respect to the ones that had 403, unless

19   that was withdrawn.  Which I don't think they were.  I

20   need to put on the record my reasons.  I have no idea

21   when we're going to fit that in.  My guess is possibly

22   Friday after the evidence.  I've told you I can't do a

23   charge conference Friday.  But I could stay, you know, a

24   half an hour after we finish with the jury.  And I'm

25   hoping I can at least do -- well, I guess I'm hoping to

1    get through the ones that are for the Labs.  And I

2    guess -- I don't know when I will put those on the record

3    for -- could be after the close of evidence and when the

4    jury is deliberating.  Just make a matter of record why I

5    ruled the way I did.  Either way.  All right.  But I have

6    to add that to my agenda.

7         I believe that Alex sent out to you this morning

8    the time of where you are.  Is there anyone who takes

9    great exception to where we think you are?

10        MR. CUNNINGHAM:  No, Your Honor.  Not from the

11   Labs.

12        MR. KANG:  No, Your Honor.

13        THE COURT:  Alex, do you want to remind me, I

14   should put in the time here.

15        I guess I have a few minutes.  Maybe I will ask

16   you to talk to me, Attorney Kang, about the Nicholson

17   deposition.

18        MR. KANG:  Yes, Your Honor.

19        This is in -- we had filed, obviously, at Docket

20   Number 346, the Motion in Limine for Lack of Enforcement

21   Action.  And I think the resolution on that was that

22   neither side was going to be offering evidence about

23   that.  Either we were not going to be offering evidence

24   that there was a criminal regulatory investigation, and

25   the Labs would not offer any evidence about the lack

1    thereof.  And I think Your Honor was basically like that

2    motion is now moot.  So this portion --

3         THE COURT:  When I meant moot -- gosh, this is

4    not a good sign that I'm starting out this morning.

5    Actually, that was another agenda item.  Let me shift to

6    that other agenda item for me which might get us back to

7    Nicholson and this question that was read.

8         You did take Ligotti's deposition on Monday,

9    right?

10        MR. KANG:  Yes.

11        THE COURT:  Certain people were missing in

12   action here in the courtroom.

13        Is that in process?  And when is the projected

14   time the Court will receive a copy of the transcript?

15        MR. KANG:  So we, per the Court's direction or

16   order, we, within 24 hours, we produced our designations

17   and served it on the Labs last night at 7:00 p.m.

18        THE COURT:  So you have to do those tonight and

19   cross-designate, object.  I think I gave Cigna time.  I'm

20   not sure I said a full day.  I don't know what I said.

21   Somebody can remind me.  To object to their designations

22   I suppose.  And then you're going to get it to me.

23        Could I impose and kill yet some more trees and

24   ask for a hard copy of the deposition.  I'm not going to

25   read it online.  I guess you've got to give it to me

1    because you are highlighting it, right?

2            MR. KANG:  That's right, Your Honor.

3            THE COURT:  So I will get a hard copy.

4            So I might possibly receive that by -- well,

5    certainly by Friday.

6            Okay.  And when is it expected you would want to

7    put that evidence on?

8            MR. KANG:  We were looking for Monday.

9            THE COURT:  I could probably do it Saturday.

10   Unless we're having to do the charge conference.  The

11   question is I guess getting it back to you.  Typed up and

12   back to you folks.  We'll deal with that.  And it might

13   be Sunday, you know, but hopefully I won't put it into

14   Monday morning on you.

15           MR. KANG:  Your Honor, I think we can get it to

16   you sooner.  Because if the Labs get us their designated

17   counters this evening, I think we can get it to the Court

18   by tomorrow morning.

19           THE COURT:  The problem is we'll be in charge

20   conference after.  And I will be dealing with those

21   issues.  If I can get it to you by Friday I will, but I'm

22   not promising it.

23           MR. KANG:  And the fortunate thing is that the

24   whole transcript is less than 90 pages.

25           THE COURT:  Okay.  That pivots us back to

1    Nicholson which we have two minutes to do.

2           You are going to offer testimony about this guy

3    being convicted of fraud in connection with writing

4    prescriptions in the South Florida substance abuse

5    treatment market, right?

6           MR. KANG:  No.

7           THE COURT:  Oh, you're not.  Okay.

8           Well, what's your solution on Nicholson, if you

9    all thought that it shouldn't come in, anything about

10   that?

11          MR. KANG:  Two choices.  One is that Cigna be

12   entitled to rebut that assertion with its own evidence

13   about investigations by government or regulatory

14   agencies.

15          THE COURT:  Of the world of South Florida

16   substance abuse because there's one Q and A or a couple

17   about the fact that these folks weren't investigated?

18          MR. KANG:  Of the Labs.

19          THE COURT:  Of the Labs?

20          MR. KANG:  Yes.

21          THE COURT:  I didn't think there was evidence.

22   I didn't hear any when I had the arguments on the in

23   limines.  You have evidence that they were a target or

24   they were being investigated by anywhere from the

25   regulatory agency up to the U.S. Attorney?

1      MR. KANG:  Yes.  So that's one offer.  And the

2  other offer is for the Court to instruct the jury to

3  disregard or ignore this portion of Mr. Nicholson's

4  testimony.

5      THE COURT:  What is, in a nutshell, because --

6  go ahead, Liana, let's line them up.

7      What's the Labs' point of view?

8      MR. CUNNINGHAM:  Mr. Kang sent us an email

9  shortly ago this morning.  It's a small passage.  If it

10  warrants any cure, certainly nothing further than a

11  corrective instruction from the bench.

12      THE COURT:  Fine.  I think's that the way I

13  would go.  But I have to tell you, I don't know whether

14  everybody is better off just not mentioning it, you know.

15  I mean, I don't know.  I suppose somebody will remember

16  it and maybe bring it up in deliberations.  So I guess I

17  need to do it.

18      MR. KANG:  Yes, Your Honor.

19      THE COURT:  Is everybody here, Liana?

20      THE CLERK:  They are lined up.

21      THE COURT:  Okay.  So we're ready.

22      I will draw a line under that.  To be honest

23  with you, I would like to see the Ligotti testimony.

24      Get the witness, please.

25      Dr. Nicoll, you need to be up here, sir.  Thank

1    you very much.

2            THE COURT:  Good morning, Doctor.

3            THE WITNESS:  Good morning.

4            (In the presence of the jury at 9:32 a.m.)

5            THE COURT:  Good morning, ladies and gentlemen.

6    Welcome back.  Everybody be seated.

7            If you remember, Dr. Nicoll was on the witness

8    stand.  We're continuing with his direct exam.

9            Good morning, Doctor.  Let me remind you, as I

10    do every witness, that the oath you took yesterday binds

11    your testimony today.

12            THE WITNESS:  Understood.

13            THE COURT:  Thank you, sir.

14            Go ahead.

15            DR. DANIEL NICOLL.

16            returned to the stand to testify further upon

17    his oath as follows:

18            MR. CUNNINGHAM:  Thank you, Your Honor.

19            May it please the Court.

20            THE COURT:  Yes.

21    CONTINUED DIRECT EXAMINATION BY MR. CUNNINGHAM:

22        Q.   Good morning, Dr. Nicoll.

23        A.   Good morning.

24        Q.   I want to make sure that you can hear me well.

25    Can you hear me well?

1    A.    Today I could.  Yesterday it wasn't quite as

2  clear.

3    Q.    Okay.  I will try to keep my voice up.  Just

4  please let me know if you can't here me well.  Okay?

5    A.    Yes, sir.

6    Q.    All right.  Sir, you started with Cigna in 1999,

7  yes?

8    A.    Yes.

9    Q.    And I believe you started with the SIU in 2013?

10    A.    Say that again clearly.

11    Q.    Did you start with the SIU in 2013?

12    A.    Yes.

13    Q.    You were a medical director within the SIU at

14  Cigna, right?

15    A.    I was a medical director within the medical

16  branch.  I was staff, not line management.  I didn't

17  report directly to the SIU.  So I supported them, but I

18  wasn't part of them.

19    Q.    Sir, how many medical directors were there in

20  the SIU during the time you were there?

21    A.    I couldn't hear the last part of your sentence.

22    Q.    How many medical directors were there in the SIU

23  during the time that you worked in that department?

24    A.    There were no medical directors in the SIU.

25    Q.    All of the medical directors were separate from

1    the SIU?

2        A.    Yes.

3        Q.    But the SIU relied upon the medical directors to

4    review medical records and make determinations of medical

5    necessity, right?

6        A.    Yes.

7        Q.    Now, sir, you told us yesterday that you were an

8    internist in your private practice?

9        A.    Correct.

10       Q.    Is that the same thing as an internal medicine

11   specialist?

12       A.    Yes.

13       Q.    Sir, during your time as an internist, you would

14   not have treated patients for substance abuse, would you?

15       A.    I treated patients, as we just spoke about it,

16   with substance abuse, but not for substance abuse.

17       Q.    Okay.  And, sir, isn't it true that if you had a

18   patient that was a substance abuse patient, you would

19   have referred that person out to the appropriate

20   specialist?

21       A.    Yes.

22       Q.    So you weren't involved in the regular and

23   continuing treatment of people with substance abuse

24   problems during your private practice?

25       A.    I was involved in their treatment, but not the

1    primary person taking care of the substance abuse.  So if

2    they had medical problems, I was continuing to take care

3    of that portion of their care.

4        Q.   But the specific problem of substance abuse

5    would be treated by a specialist to whom you referred the

6    patient?

7        A.   Correct.

8        Q.   Now, sir, were all of your actions taken in this

9    case taken on behalf of Cigna?

10       A.   Yes.

11       Q.   And you were authorized to take all of those

12   actions on behalf of Cigna?

13       A.   Yes.

14       Q.   And you were authorized to make determinations

15   as to medical necessity, correct?

16       A.   Yes.

17       Q.   Sir, I want to talk to you about medical

18   necessity for a moment.  Sir, would you agree with me

19   that medical necessity involved several different

20   factors?

21       A.   Yes.

22       Q.   Sir, would you agree with me that medical

23   necessity includes whether treatment is appropriate and

24   necessary for the symptoms, diagnosis, or treatment of

25   the condition?

699

1      A.    Yes.

2      Q.    Would you agree with me that medical necessity

3    must be within the standards of good medical practice?

4      A.    Yes.

5      Q.    And would you agree with me that medical

6    necessity or for treatment to be medically necessary, it

7    is not primarily for the convenience of any insured

8    person, physician, or another provider?

9      A.    Yes.

10      Q.    Now, sir, you said yesterday -- I know you

11   weren't on the stand long -- but you said that in

12   preparation for your testimony you had reviewed records.

13      A.    I reviewed some records and some other

14   documents, yes.

15      Q.    Okay.  And you had several meetings with Cigna's

16   counsel, right?

17      A.    Correct.

18      Q.    Can you tell us what records you reviewed in

19   preparation for your trial testimony?

20      A.    There were 13 records.  I couldn't tell you

21   which ones they were.

22      Q.    There were 13 records you said?

23      A.    I looked at 13 records.

24      Q.    You don't know, as we sit here, what those

25   records were?

1    A.    I did not look at the names on the records.  In

2  fact, I routinely don't do that.  There was a

3  designation, a number, that Cigna had assigned to that

4  exhibit.  So I remember some of those numbers.  But I did

5  not -- I didn't identify the individual patients, no.

6    Q.    Sir, did you ask or did you tell Cigna which

7  documents you wanted to review, or did they provide to

8  you the records they wanted you to review?

9    A.    They sent me three boxes.  And with the limited

10  time, I could only look at some but not all.

11    Q.    Sir, it is your understanding that those records

12  were some or all of the same records that Stephanie Canto

13  sent to you?

14    A.    I can't say for sure.

15    Q.    Well, sir, do you believe that the records were

16  the records, the same records that Stephanie Canto sent

17  to you ten years ago to determine whether you thought

18  there was medical necessity for the Labs treatment?

19    A.    I have no personal knowledge.  I have no reason

20  to doubt it.  But I can't say that I saw this and I saw

21  that and, indeed, they were the same.

22    Q.    And there would have been no reason for Cigna to

23  send you records to review other than the records you

24  were supposed to review back in 2013, correct?

25          MS. COSTIN:  Objection, Your Honor.

1    Speculation.  Lack of foundation.

2          THE COURT:  I think it's a proper subject.  I

3    will ask you to rephrase it.

4    BY MR. CUNNINGHAM:

5      Q.   Sir, wouldn't you have expected that Cigna would

6    have sent you the very same records that were sent to you

7    by Stephanie Canto a decade ago?

8      A.   Say that -- repeat it, please.

9      Q.   Sure.  Wouldn't you have expected that Cigna

10   would have sent you the very same records that Stephanie

11   Canto sent you to review a decade ago?

12     A.   I have no reason to doubt that they did.

13     Q.   Sir, let me ask you.  First of all, did you

14   speak with Stephanie Canto in preparation for your trial

15   testimony?

16     A.   No.

17     Q.   Did you review any of the Cigna file, like Ms.

18   Canto's case notes, to refresh your memory as to what

19   occurred during this investigation?

20     A.   Yes.

21     Q.   Okay.  So did you refresh your recollection or

22   refresh your memory as to the events that occurred or did

23   not occur during that time?

24     A.   I'm not sure what events you are speaking of.

25     Q.   Well, sir, you had a very limited role in this

1    investigation, right?

2        A.    Yes.

3        Q.    Stephanie Canto sent you records and you were

4    supposed to review those records, right?

5        A.    Correct.

6        Q.    And, in fact, you sent an email back to Ms.

7    Canto, which we will be showing the jury shortly,

8    reporting on the findings of your review of the records,

9    right?

10       A.    Yes.

11       Q.    Okay.  So that's what I'm asking about.  Are

12   those the documents -- not the medical records -- are

13   those the documents from the case notes that you reviewed

14   in preparation for your trial testimony?

15       A.    I reviewed the case notes and some emails, yes.

16       Q.    Sir, did your review of those documents refresh

17   your memory as to the events that occurred a decade ago?

18       A.    When you say events, yes, that refresh my memory

19   that I did the review, it refreshed my memory that that's

20   what I reported, my results.

21       Q.    That's what I'm asking, sir.  I'm not trying to

22   trick you.

23       A.    Okay.

24       Q.    Sir, isn't it true that you, without reviewing

25   those records, would have no independent recollection of

703

1    your activity on this particular matter?

2        A.    Could you ask that again, please?

3        Q.    Sure.  Isn't it true that without reviewing

4    those records that you just discussed, you would have had

5    no independent memory of the activity you conducted on

6    this file a decade ago?

7        A.    Certainly not of the details.  Did I remember

8    working with a Stephanie Canto?  Yes.  Would I remember

9    the specific case?  No.  Would I remember the specifics

10   of it?  No.

11       Q.    Now, sir, were you aware that Ms. Canto

12   testified in this courtroom that she was not

13   investigating BioHealth Labs for any lack of medical

14   necessity for the treatment they rendered?

15       A.    Could you say that again, please, sir?

16       Q.    Sure.  Were you aware that Ms. Canto testified

17   in this courtroom that she was not reviewing BioHealth

18   Labs for lack of medical necessity for any of the

19   treatment they rendered and billed to Cigna?

20       A.    I'm not aware of any of her testimony.

21       Q.    So, sir, you are not aware that Ms. Canto

22   testified that she was not pursuing medical necessity in

23   conjunction with BioHealth Labs?

24       A.    I'm not aware of any of her testimony.

25       Q.    Sir, did you speak with any non-lawyer employees

1    of Cigna to prepare for your testimony?  For example,

2    Mr. Norton, who is the Director of the SIU.

3        A.    No.  The only people I spoke to were the

4    attorneys, and one attorney very, very briefly, who is an

5    employee of Cigna.

6        Q.    And who was that?  I don't want to know what you

7    talked about.  I just want to know who it was.

8        A.    Mr. Carroll.

9        Q.    Sir?

10       A.    Mr. Carroll.  The gentleman back there who is

11   the Cigna attorney.

12       Q.    How do you spell his last name?

13       A.    I think it's C A R R O L L.

14       Q.    Okay.  Thank you.

15              And he's sitting in the back of the courtroom?

16       A.    Indeed.

17       Q.    And you would have spoken to him in conjunction

18   with or in preparation for your testimony?

19       A.    Not directly.  He was there when we were

20   speaking yesterday.

21       Q.    Again, I don't want to know what you talked

22   about.  But you had a meeting that included Mr. Carroll

23   who is an attorney with Cigna?

24       A.    I believe he was there when we were discussing

25   it, yes.

1    Q.    Now, sir, would you agree with me that the care

2    and treatment of patients suffering from addiction is a

3    specialized area of medicine?

4    A.    Yes.

5    Q.    Sir, when was the last time you actually treated

6    a patient?

7    A.    Probably during the time I was at Staten Island

8    University Hospital, which would have been '98, '99.

9    Q.    I was going to say you said you started with

10   Cigna in 1999.  So presumably it would have been before

11   that time, right?

12   A.    Yes.

13   Q.    Okay.  So it's been about 25 years or so since

14   you've actually treated patients, right?

15   A.    Correct.

16   Q.    Now, sir, when you were a practicing doctor,

17   would you agree with me that you would keep detailed

18   notes of the care and treatment of your patients?

19   A.    Yes.

20   Q.    Would you keep what are referred to as S.O.A.P.

21   notes?

22   A.    That wasn't the format I used.

23   Q.    What format did you use?

24   A.    Well, very traditional format with history,

25   physical, laboratory tests, impression, and plan.

1      Q.    Okay.  And S.O.A.P. notes would be subjective,

2   objective, assessment, and plan, correct?

3      A.    Correct.

4      Q.    But you would do the history and physical and

5   the impression method; is that correct?

6      A.    Yes.

7      Q.    It's essentially the same information, isn't it?

8      A.    The same information organized somewhat

9   differently, but yes.

10      Q.    When you would treat a patient, every time that

11   patient would come in to see you, you would document what

12   you found and what the plan was for future treatment,

13   right?

14      A.    Yes.

15      Q.    You would agree with me that as a practicing

16   doctor it is very important for you to document the

17   treatment and care of a particular patient, right?

18      A.    Yes.

19      Q.    And that's something you learned in medical

20   school, right, that you needed to keep detailed notes of

21   your treatment of patients?

22      A.    Correct.

23      Q.    It's important for the protection of the

24   patients, right?

25      A.    It's important for proper medical care, without

1    question.

2        Q.    And it's also important for yourself in case

3    something happens to go wrong?

4        A.    What was the last part of the sentence?

5        Q.    It's also important for you, as the doctor, in

6    case something goes wrong in a particular case?

7        A.    Indirectly, yes, I guess so.

8        Q.    Because you can then show what it is that you

9    did or did not do, right?

10        A.    Fair enough, yes.

11        Q.    Now, sir, was there any policy in the SIU at

12    Cigna or at Cigna that you would keep notes when you were

13    asked to review medical records in conjunction with your

14    work with the SIU?

15        A.    Nothing formal.  At least during the earlier

16    period of time that I was working with the SIU.

17        Q.    Did you sometimes -- strike that.

18            Were you sometimes provided Excel spreadsheets

19    in conjunction with the medical records that you were

20    sent?

21        A.    At times, yes.

22        Q.    And what would you do with those spreadsheets?

23        A.    The spreadsheet would have individual patients

24    or individual dates of service or individual procedures,

25    and I would have to make a determination line by line.

1    Q.    Okay.  And that would be sent to Ms. Canto or

2    whoever the SIU person you were working with, correct?

3    A.    Whoever sent it to me, I would send it back to

4    them, yes.

5    Q.    Is it your understanding that the purpose of

6    filling out those spreadsheets and giving them back to

7    the SIU person was to document what it was that you had

8    reviewed and your findings?

9    A.    Yes.

10    Q.    Now, sir, would you agree with me that Ms. Canto

11    did not send you an Excel spreadsheet when she sent you

12    the records that she sent to you review in this case?

13    A.    I have no memory of receiving an Excel

14    spreadsheet from her in this case.

15    Q.    And you looked at your notes or the claim file

16    notes that documented the whole transaction where Ms.

17    Canto sent you the records, correct?

18    A.    Yes.

19    Q.    There's no reference in those notes to you

20    having been provided an Excel spreadsheet, is there?

21    A.    No.

22    Q.    And, sir, you did not prepare any notes related

23    to your review of the records you reviewed that were sent

24    to you by Ms. Canto, right?

25    A.    I don't remember ever having recorded any notes

709

1    other than what I sent.  If I had any notes, when I left

2    Cigna all my records would have been discarded.

3        Q.   Can we please go to Joint Exhibit 141.

4             THE COURT:  That may be published.

5             MR. CUNNINGHAM:  And please scroll down because

6    these go chronologically, Mr. Smeig.

7    BY MR. CUNNINGHAM:

8        Q.   Do you see that document in front of you, sir?

9        A.   Yes.

10            MR. CUNNINGHAM:  Your Honor, if I may.  I don't

11   want the jury to have to read all of this.  So may I

12   direct the witness to certain portions of this that we'll

13   highlight?

14            THE COURT:  Certainly, unless he needs to read

15   more.

16            MR. CUNNINGHAM:  If you need to read any of it,

17   sir, please let me know.

18   BY MR. CUNNINGHAM:

19       Q.   I presume that this entry or this series of

20   emails would have been something that you reviewed in

21   preparation for your trial testimony, right?

22            Do you want us to enlarge that, sir?

23       A.   No.  I see the area.  Do I remember -- and thank

24   you for blowing it up.  My eyes are better.

25            Yes, it seems -- do I explicitly remember this

1    paragraph?  No.  Does it fall into the kinds of things
2    that I reviewed?  Yes.
3        Q.    Sir, how long ago did you review the documents
4    that you reviewed in preparation for your trial
5    testimony?
6        A.    We had a meeting yesterday where I reviewed a
7    lot of documents.  And some previous meetings, ten days
8    ago, and then some review before the deposition some year
9    and a half ago.
10       Q.    Do you remember how many meetings you had
11   specifically to prepare you for your testimony at trial?
12       A.    Somewhere in the range of probably a half a
13   dozen.
14       Q.    Over how long a period of time?
15       A.    Again, there was some meetings before the
16   deposition, and then --
17       Q.    I don't want to know about the deposition
18   testimony.  I'm sorry if I didn't make that clear.  Just
19   trial testimony.
20       A.    I would say there was before -- I was on
21   vacation last week.  So there was a meeting or two before
22   that and a couple of meetings after.  Somewhere more than
23   three, less than six.
24       Q.    Thank you, sir.
25            Now, sir, let me ask you.  I'm going to read

1    some of this into the record to try it make this go more

2    quickly, if I may.

3          Now, this is an email from Stephanie Canto to

4    you on September 19, 2013, correct?

5    A.   Yes.

6    Q.   And it says subject SIU case and it refers to

7    CollectAway Labs, correct?

8    A.   Yes.

9    Q.   And, sir, isn't it true that CollectAway Labs

10   was doing business as for Palm Beach Labs or PB Labs?

11   A.   Can you say that again, sir?

12   Q.   Isn't it true that CollectAway Labs is the same

13   thing as PB Labs?

14   A.   I don't have any knowledge of that.

15   Q.   Does it say the following, sir:

16         Good afternoon Dan.  Last month during our

17   one-on-one, I had briefly discussed the lab that I had in

18   Florida regarding a non-participating lab billing

19   excessively for CPT code 80299.  I had requested records

20   from the lab and, after some back and forth with them, I

21   received records.  I had requested records for 20

22   patients and they have supplied what appears to be claim

23   copies and the members Lab results.  I was wondering if

24   you would be able to review some of the records to try

25   and determine if their records substantiate what they

1    billed to Cigna for the dates of service in question.

2             Did I read that accurately, sir?

3        A.    Yes.

4        Q.    Mr. Smeig, can we go up to the next one

5    chronologically?

6        A.    I'm sorry.  Did you say --

7        Q.    I'm going to have Mr. Smeig who is handling our

8    exhibits scroll so that we can go to the next one in the

9    chronological sequence.

10            Sir, is the next email in the series from you to

11   Stephanie Canto on the same date, September 19, 2013 at

12   2:07, which would have been six minutes after Ms. Canto's

13   email to you?

14       A.    Yes.

15       Q.    Okay.  And let me read this into the record and

16   just confirm that I read it accurately.

17            This is you speaking to Ms. Canto.

18            Very much want to see the lab reports.  Key will

19   be what 80299 actually represents.  In general, unlisted

20   procedures should go to clinical review to determine into

21   which of three categories the service fits:

22            A. Standard services.  Standard service that

23   could/should have been billed with an explicit CPT.

24            B.  Unlisted service that is either (1)

25   medically necessary and appropriate or (2) E/I/U.

713

1          For services billed using the 99 codes, a very

2    significant portion will be A or B2.  Dan.

3          Did I read that accurately, yes?

4      A.   Yes.

5      Q.   Sir, in paragraph B2 there, what does E/I/U

6    mean?

7      A.   Experimental, investigational, unproven.

8      Q.   All right.  Let's scroll up, please, to the next

9    email in the series.

10         It's the one September 19 at 2:18 p.m. at the

11   bottom of the page there.

12         So, sir, Ms. Canto replies to your email on 2:18

13   or at 2:18 p.m. on the same date, which is 11

14   minutes after you sent your email to her, correct?

15     A.   Yes.

16     Q.   Ms. Canto says to you, I thought that they might

17   be suspect.  Do you want all 20 patient files?  It's

18   paper and there's one really large box with the records.

19         Did I read that accurately, sir?

20     A.   Yes.

21     Q.   Is this your response to Ms. Canto where you

22   tell her, I like paper.  Send them to me in Melville, and

23   you give the address for Cigna in Melville, New York,

24   correct?

25     A.    Correct.

714

1        Q.   Let's go to the next one please Mr. Smeig.

2             Ms. Canto tells you a few moments later, Okay,

3    will get these out today for you.  Thank you.  Correct?

4        A.   Yes.

5        Q.   Let's go to the next one, please.

6             Does Ms. Canto tell you just a little bit later

7    on the same date September 19, 2013, Dan, just an FYI

8    that you will receive two UPS items from me.  One is a

9    large box for CollectAway.  Another is a letter also for

10   CollectAway.  The box was picked up 25 minutes ago.  I

11   just realized that two records didn't make their way back

12   into the box so I needed to mail them out separately.

13   Sorry for any confusion.

14            Did I read that accurately, sir.

15       A.   Yes.

16       Q.   Mr. Smeig, can we go to the next email in the

17   sequence, please.  So scroll up just a little bit more

18   please, Mr. Smeig.

19            Okay.  So the email that we just went over, sir,

20   all occurred on September 19 of 2013, correct?

21       A.   That's what the record states.

22       Q.   And Ms. Canto told you she was sending you a

23   really large box via UPS, right?

24       A.   Yes.

25       Q.   She said that contained 20 patient files, right?

715

1      A.   Yes.

2      Q.   Now, sir, so you reply to Ms. Canto the very

3  next day at 2:32 p.m., right?

4      A.   Yes.

5      Q.   Now, sir, the documents were delivered to

6  Cigna's office in Melville sometime before 2:32 p.m. on

7  September 20, correct?

8      A.   Apparently.

9      Q.   Typically if there wasn't a priority overnight

10  delivery, what time would UPS deliver overnight packages

11  to Cigna in Melville?

12      A.   I have no knowledge about the hour they deliver.

13      Q.   If I told you the UPS box was probably delivered

14  to Cigna around 11:00 a.m., would that seem consistent to

15  you?

16      A.   I have no idea whether it came, 8:00, 9:00,

17  11:00 or noon.

18      Q.   Okay.  Let's talk about this email that you sent

19  to her.  Would you agree with me that this email that you

20  sent to Ms. Canto at 2:32 p.m., the very next day, within

21  hours of receiving the documents via UPS was intended to

22  convey your findings after you reviewed the records?

23      A.   Yes.

24      Q.   Do you say, sir, Stephanie, Didn't need this

25  much volume and will soon return the compliment.

716

```
 1              Were those your words, sir.
 2       A.    Yup, yes.
 3       Q.    Were you trying to convey to her that you didn't
 4  need to review all of the medical records which she sent
 5  you?
 6       A.    What I was conveying there was that the records
 7  were -- if you read the rest of it -- sufficiently
 8  egregious that were so far beyond the pale --
 9       Q.    I apologize, that wasn't my question.  Please
10  just answer my question.  Mr. Kang will have a chance to
11  question you.  I asked you a yes or no question.
12       A.    Repeat the question.
13       Q.    Sure I will.  Isn't it true that what you
14  intended to convey to Ms. Canto you did need to review
15  all of the medical records that she sent you?
16       A.    No.
17       Q.    She wrote in her email that it was a really
18  large box of documents, right?
19       A.    Yes.
20       Q.    And you are not here to tell this jury that you
21  actually reviewed every piece of paper in that really
22  large box of documents, are you?
23       A.    I have no memory of that day whatsoever.
24       Q.    Sir, there would have been thousands of patient
25  records, thousands of piece of paper in that box,
```

1    wouldn't there?

2        A.    Conceivably.

3        Q.    You're replying to her at 2:30 in the afternoon

4    of the morning or midmorning in which you received those

5    documents, right?

6        A.    I'm responding to her mid-afternoon, yes.

7        Q.    Now, sir, let me go down to the paragraph that

8    starts with It is noteworthy.  Do you see that, sir?

9    It's being highlighted right now.

10        A.    Yes.

11        Q.    Mr. Smeig, can you highlight that paragraph,

12    please?

13            Now, I want to ask you to confirm I'm reading

14    your words accurately, sir.  It is noteworthy that of the

15    ten charts I examined NONE -- in all caps -- had a

16    positive quantitative test and ALL --all caps -- had

17    multiple substances tested.  This would imply either very

18    unreliable qualitative testing ( requiring negative

19    confirmation despite preliminary positive testing) or

20    more likely the use of quantitative testing without the

21    appropriate qualitative test.

22            Did I read that accurately, sir.

23        A.    Yes.

24        Q.    Sir, you wrote to Ms. Canto that of the ten

25    charts you had examined, none had a positive quantitative

1    test, right?

2        A.    That's what I wrote, yes.

3        Q.    You put that in all caps, right?

4        A.    Yes.

5        Q.    You put that in all caps because you meant to

6    emphasize that, right?

7        A.    Yes.

8        Q.    Let's go to Joint Exhibit 14, please.

9            Now, sir, do you know as you sit here today that

10   the records that you reviewed in 2013 -- well, strike

11   that.  Let's do it this way.  What I wanted to ask you

12   about is an email.

13           MR. CUNNINGHAM:  And, Your Honor, I will have to

14   maybe approach the witness and give a copy to the Court.

15           THE COURT:  Okay.  How about defense?  That's

16   great.

17           MS. COSTIN:  Your Honor, this is not on the

18   disclosed list.  The 24-hour rule.  This is the first

19   time I'm seeing it.

20           MR. CUNNINGHAM:  I'm pretty certain that was

21   disclosed, Your Honor.  I could be wrong.

22           THE COURT:  Could I look at it?

23           MR. CUNNINGHAM:  Sure.

24           MS. COSTIN:  No.  It was not.

25           THE COURT:  The list that I didn't get or wasn't

1    on the "may use"?

2         MS. COSTIN:  Wasn't on the 24-hour disclosure

3    list.

4         THE COURT:  Well, you can show -- what purpose

5    are you offering it for?

6         MR. CUNNINGHAM:  Because it is not stipulated

7    that those are the records.

8         THE COURT:  Could you confer with counsel and

9    agree if they will stipulate.

10         MR. CUNNINGHAM:  I asked yesterday.  I was told

11    they would not.

12         MS. COSTIN:  I object, lacks foundation.

13         MR. CUNNINGHAM:  This is an email from Mr. Kang.

14         THE COURT:  Yes, but this witnesses' name is not

15    on it.  You can show it to him and ask a question.  I'm

16    not sure where it is going to go, but the objection will

17    be made.

18         MR. CUNNINGHAM:  It will be brief.

19         THE COURT:  I'm sure it is.  Show it to him.  I

20    mean, you could show somebody a telephone book if we

21    still had them.

22         MR. CUNNINGHAM:  May I approach the witness,

23    Your Honor?

24         THE COURT:  Go ahead.

25    BY MR. CUNNINGHAM:

1    Q.    Dr. Nicoll, I'm handing you a document that's

2    marked Labs' Trial Exhibit 11294 and this is an email

3    from Cigna's counsel.

4         MS. COSTIN:  I am going to object to Mr.

5    Cunningham reading from the email before it's been

6    admitted.

7         THE COURT:  Yes.

8    BY MR. CUNNINGHAM:

9    Q.    Sir, can you read the document?

10        THE COURT:  To yourself, sir.

11        THE WITNESS:  This is the first I'm seeing it.

12        THE COURT:  Absolutely, we understand, sir.

13   A.    I have read the document.

14   BY MR. CUNNINGHAM:

15   Q.    Thank you, sir.  Sir, when your deposition was

16   taken in this case, you were not shown any of the patient

17   records that had been sent to you by Ms. Canto for your

18   review, were you?

19   A.    I'm thinking -- a year and a half ago I remember

20   being asked to review some material.  I remember saying

21   that my time was limited and I wasn't going to review a

22   great deal of material.  I looked at some material during

23   that period of time.  Don't specifically remember what I

24   looked at a year and a half ago in preparation.  I do

25   remember that I did not want to look at a large volume of

721

1  material because I didn't want to spend my time doing

2  that.

3      Q.   Sir, you were not questioned in your deposition

4  about any of the patient records that Ms. Canto sent to

5  you?

6      A.   I don't remember.  I would have to look at the

7  deposition.  I certainly don't remember anything

8  specific.

9      Q.   Sir, weren't you advised that the reason you

10  weren't being questioned about those documents is because

11  Cigna had not produced those documents to the Labs yet?

12          MS. COSTIN:  Objection, calls for speculation.

13          MR. CUNNINGHAM:  I asked for his knowledge.

14          THE COURT:  Sustained.

15  BY MR. CUNNINGHAM:

16      Q.   Sir, is it your understanding that you weren't

17  shown any of the patient records or questioned about them

18  during your deposition because those records had not been

19  provided by Cigna to the Labs?

20      A.   I have no information about that whatsoever.

21          THE COURT:  The document has to be marked for

22  ID.  Somehow we have to make a record.

23          MR. CUNNINGHAM:  Sure, Your Honor.  It is marked

24  for ID as Labs' Exhibit 11294.

25          May I continue?

1          THE COURT:  Yes, you may.

2          11294?  What was shown to the witness and also

3   copy provided to counsel and the Court will be marked as

4   11294 as ID only.

5          And Liana, you will make some -- the name of the

6   sender and date, something like that on the subject as

7   listing it on the exhibit list.

8          MR. CUNNINGHAM:  We'll clear it up on the break,

9   Your Honor.

10  BY MR. CUNNINGHAM:

11      Q.   Before we talk about these records, did I hear

12  you correctly that you had a meeting with Cigna's counsel

13  last night?

14      A.   No.  Yesterday.  Following my very brief

15  testimony at 3:45.  The only conversation we had was what

16  time to be here and transportation.

17      Q.   That's all that was discussed?

18      A.   That's it.

19      Q.   All right, sir, now Ms. Canto said that she had

20  sent you records on 20 patients, right?

21      A.   That is what the email says, yes.

22      Q.   But you said that you only reviewed ten sets of

23  patient records, right?

24      A.   Yes.

25      Q.   Did you get Ms. Canto's approval to not review

1   all of the records that had been provided to you?

2        A.   No.

3        Q.   Let's go to Joint 14, please.  And let's go to

4   page 7, please.

5             Now, sir, I will represent to you that is the

6   first of the 20 records that Ms. Canto sent to you.

7   Okay?

8        A.   If you say so.

9        Q.   And we have all other 19 patient records as

10  exhibits and we'll be going over some of those with you.

11  Can you scroll down please, Mr. Smeig.

12            This is Joint 14.  Okay, sir --

13            First of all, I'm sorry, Mr. Smeig, would you

14  pull back so we can see the whole document?

15            Do you recognize this document?

16       A.   I recognize similar documents.  This specific

17  document perhaps because I recognize, I think I recognize

18  the name of the doctor only because it was unique.  Very

19  rarely do you put your name on Dr. David Simon.  It would

20  be -- I would write Daniel Nicoll, MD rather than the

21  title.  Very strange that you do that.  That's why I

22  think I may have seen that before because that struck me.

23       Q.   Let's go ahead and zoom in, Mr. Smeig on the

24  second half of that page, the bottom half of that page.

25  So scroll up just a little bit more please.

1          And sir, let me just -- I will ask you very

2    briefly about paragraph number one there.  And I will

3    read this to make this go a little more quickly.  Does it

4    say, To enable me to assess the costs of testing my

5    patients with this toxicology custom panel and

6    confirmatory testing hereby directed, I have carefully

7    reviewed the tests that I have selected here to include

8    in the panel.  I understand and hereby acknowledge number

9    One, I only order tests that I believe to be medically

10   necessary for each individual patient to ensure patient

11   compliance with the therapy I have prescribed for that

12   patient and I will order this panel accordingly.  If not

13   all of the components of this custom profile are

14   medically necessary, I will order only those individual

15   tests or a less inclusive profile I believe to be

16   medically appropriate.

17          Did I read that accurately, sir?

18   A.   Yes.

19   Q.   Would you agree with me that in this form

20   specifically with this paragraph number one, the doctor

21   is attesting that any labs he or she is ordering are

22   deemed by that doctor to be medically necessary?

23   A.   Yes.

24   Q.   That is the statement of the doctor who was

25   actually treating this particular patient, right?

1    A.    I don't know.  When you say "actually treating,"

2    it implies taking a history or physical, being the

3    patient's doctor.  When you say "actually treating," I

4    don't know.

5    Q.    The doctor ordered labs for this particular

6    patient, right?

7    A.    Apparently.

8    Q.    That's why we have a lab request form in front

9    of us, right?

10    A.    Yes.

11    Q.    Sir, it would be the treating doctor who would

12    arrive at a diagnosis for treatment of this particular

13    patient, right?

14    MS. COSTIN:  Objection. Misstates the document.

15    There's no patient name.

16    BY MR. CUNNINGHAM:

17    Q.    Whoever the patient is, sir, whoever the patient

18    is, that this Lab report or this Lab request form is

19    being issued for, isn't it true that the treating doctor

20    would be the person that would be determining the

21    diagnosis for that particular patient?

22    A.    If he was indeed the treating doctor.

23    Q.    And the treating doctor would also be

24    responsible for determining which labs to order for the

25    appropriate care and treatment of that patient, right?

726

1      A.    If he were the treating doctor.

2      Q.    Sir, you believe -- strike that.  Paragraph

3    number one indicates that this treating doctor believed

4    that the treatment that was ordered and depicted on this

5    form was medically necessary, right?

6      A.    This doctor, yes, whether he's the treating

7    doctor or not, I haven't seen evidence of.

8      Q.    Now, sir, when you were actually treating

9    patients up until 1998 or 1999, did you believe you, as a

10   treating physician, would be the person who was in the

11   best position to determine what was medically necessary

12   for that patient?

13     A.    When I was a treating physician, as all treating

14   physicians hopefully believe that what they were ordering

15   is medically appropriate, yes.

16     Q.    That's standard in the industry, isn't it?

17     A.    I believe it is standard in the profession

18   rather than the industry.

19     Q.    Sure.  Thank you.  The treating doctor

20   determines medical necessity?

21     A.    If you are the treating doctor, you don't

22   determine medical necessity.  You order what you feel is

23   medically necessary under the provision of the contract

24   of insurance.  There are other issues, but the treating

25   physician does it because he or she thinks it's medically

1    necessary.   Whether it is medically necessary and

2    reimbursable depends upon the coverage contract.   You

3    tend to make a distinction between the right of a

4    physician, the patient, to agree to something versus the

5    obligation to pay for what the doctor and patient agreed

6    to.

7        Q.    Now, sir, we looked a moment ago at your report

8    to Ms. Canto after you reviewed whatever you reviewed.

9    Do you remember that?

10       A.    Yes.

11       Q.    You never told Ms. Canto in your email that

12   there were statements of medical necessity in the

13   documents reviewed, did you?

14       A.    I did not tell her there was statements of

15   medical necessity, no.

16       Q.    Let's go to page 8, please.   And can we please

17   enlarge that, Mr. Smeig.

18            Sir, would you agree with me that that's a

19   physician's order?

20       A.    It's, it's certainly --

21            THE COURT:   Could you show him the whole

22   document?

23            Let yourself look at the whole of it before you

24   answer.

25            MS. COSTIN:   Lacks foundation, Your Honor.

1    Hearsay on the signature.

2         THE COURT:  Are you asking me to give a limiting

3    instruction?  We already dealt with that.  Okay.

4         I'm not sure if I have given this to you yet,

5    but I think I might have.  This is what's called a

6    Recurring Provider Agreement and it is in evidence.  You

7    have seen one.  If not this one, one like it.  The

8    Recurring Provider Agreements contain a signature, as you

9    can see you saw on the last one.  The handwritten

10   signatures themselves are admitted only for the purpose

11   of evidencing the Labs received the Recurring Provider

12   Agreement with the handwritten signatures within the

13   ordinary course of their business and the Labs' practice

14   was, after review, to accept and act upon those written

15   signatures.  So you should look at this exhibit and

16   similar ones you will see this morning with that

17   instruction in mind.  Thank you.

18        Go ahead, counsel.

19   BY MR. CUNNINGHAM:

20   Q.  So the question was, sir, that's a physician's

21   order, isn't it?

22   A.  I would have a hard time saying it's a physician

23   order in that it is not specific to a given patient.

24   There's also, and it is a distinction, maybe without a

25   great difference, between a laboratory requisition and a

729

1    physician order.  But this is not relating to an

2    individual patient.  So it is certainly a requisition

3    form, but to say it constitutes a formal order is beyond.

4        Q.   Alright.  Sir, would you agree with me that this

5    physician ordered a custom lab panel for this particular

6    patient?

7        A.   Say that again, sir.

8        Q.   Would you agree with me that this treating

9    doctor ordered a custom lab panel for this particular

10   patient?

11       A.   Again you keep referring to treating doctor.  I

12   see no evidence that this is the treating doctor.  It

13   certainly is an extensive panel.

14       Q.   Scroll up, Mr. Smeig.  At the bottom of this

15   form, it says provider name, David Simon, right?

16       A.   Yes.

17       Q.   And you said a moment ago that he was referred

18   to earlier as Dr. David Simon, right?

19       A.   That was one on the previous form, yes.

20       Q.   And there's a space on here for a provider

21   signature and there's something written beside the x

22   beside provider signature, right?

23       A.   Yes.

24       Q.   Which is purported the signature of the provider

25   Dr. Simon, correct?

1    A.    It would seem so.

2    Q.    Scroll back up please for just a moment.

3          My question to you earlier was this is a custom

4    lab panel that's being ordered for this particular

5    patient, right?

6    A.     It is a form that can be customized, yes.

7    Q.    And that's what was done here, it was

8    customized, wasn't it?

9    A.    Yes.

10   Q.    It wasn't a preset panel?  That's what custom

11   means, doesn't it?

12   A.    We're getting into a semantic here.  Preset

13   panel because is this preset for all the patients or is

14   it for an individual patient?  Again I don't see an

15   individual patient's name on it, so it would seem to be

16   the doctor's customized preset panel for whatever

17   population of patients that wanted to apply this panel

18   to.

19   Q.    Sir, that's is complete speculation on your

20   part, isn't it?

21   A.     Given the fact there's no name of the patient, I

22   don't know what it is.

23   Q.    It says "custom" and there are specific

24   substances that this treating doctor wanted tested by

25   this lab, right?

```
 1      A.    It --
 2      Q.    Yes or no, sir?
 3      A.    I'm not going to go through challenge the word
 4   "treating doctor."  This -- Let me finish the sentence,
 5   if you don't mind.
 6           THE COURT:  Sir, sir, you have to answer the
 7   question he asked.
 8      A.    Give me the question again please.
 9           THE COURT:  It says "custom" and there are
10   specific substances that this treating physician.  I'm
11   sorry, I may have asked a prior one.  Can you repeat the
12   question you think you have pending.  I've lost track of
13   it.
14   BY MR. CUNNINGHAM:
15      Q.    It says "custom" and it reflects this treating
16   doctor wanted specific substances tested by this
17   particular lab, right?
18      A.    Yes.
19           MS. COSTIN:  Objection to the characterization
20   of treating doctor.
21           THE COURT:  Overruled.
22   BY MR. CUNNINGHAM:
23      Q.    Please go to Joint Exhibit 25.  Can you scroll
24   down please?
25           Sir, at the bottom of this document, does it say
```

732

1    Practitioner Authorization.  I authorize Medytox through

2    it's affiliated labs to perform drug testing on patients

3    from my practice as directed by the individual patient

4    test requisition form as well as the provided custom

5    profile on file.  I understand that it is the

6    practitioner's responsibility to determine the medical

7    necessity of each test requested through the individual

8    patient test requisition form and custom profile.

9         Did I read that accurately, sir.

10   A.   Yes.

11   Q.   Then it has a line for practitioner signature,

12   right?

13   A.   Correct.

14   Q.   Practitioner would be another name for treating

15   doctor?

16   A.   A practitioner isn't necessarily a physician.

17   Q.   And there is a signature besides where it says

18   practitioner signature, right?

19   A.   Yes.

20   Q.   Can you scroll back up on that please for just a

21   moment, Mr. Smeig.

22        It gives the practitioner's name as Peter

23   Ventre, V E N T R E, correct?

24   A.   Yes.

25   Q.   Let's go to PDF page 4. Can we scroll --

1            First of all, let me ask, does this appear to be

2    another laboratory test panel and point of care testing

3    selection sheet from PB Laboratories?

4        A.    Yes.

5        Q.    Can you scroll down please, Mr. Smeig?

6            Is this one signed by -- purported to be signed

7    by a provider named a Dr. Peter Ventre?

8        A.    Yes.

9        Q.    Please go to Joint Exhibit 30.  And specifically

10   page 7, PDF 7.  Can you please scroll down a little bit,

11   sir, Mr. Smeig?

12           Okay.  And sir, does this form have the same

13   practitioner authorization that we saw just a moment ago,

14   that same language?

15       A.    Without going through it word by word, it would

16   seem so.

17       Q.    Does it say I authorize Medytox through its

18   affiliate labs to perform drug testing on patients from

19   my practice as directed by this individual patient test

20   requisition form as well as the provided custom profile

21   on file.  I understand that it is the practitioner's

22   responsibility to determine the medical necessity of each

23   test requested through the individual patient test

24   requisition form and custom profile.

25           Is that what it says, sir?

734

1      A.    Yes.

2      Q.    And it has a line for provider signature, right?

3      A.    Yes.

4      Q.    And there's a signature there, right?

5      A.    Yes.

6      Q.    It says provider's name, Tay, T A Y, Gaines, G A

7  I N E S, MD.

8      A.    Yes.

9      Q.    Did you tell Ms. Canto that any of these

10  physicians orders were in the file?

11     A.    No.

12     Q.    Wouldn't that be important for Ms. Canto to

13  know?

14     A.    No.

15     Q.    That wouldn't be for important for the SIU to

16  know before they stopped paying the Labs for services

17  performed?

18     A.    I don't think we ever questioned whether there

19  was an order for the testing and the issue was not that

20  the testing was done without an order.  So, no, that was

21  not relevant.

22     Q.    Were you aware that all of these exhibits, all

23  of these medical forms that I showed you so far were

24  taken from the medical records of one particular patient?

25     A.    Could you repeat the question, please?

1    Q.    Sure.  Were you aware that all of the medical

2    forms that I have discussed with you so far were taken

3    from the medical records of one particular patient?

4    A.    I'm not aware of that at all, no.

5    Q.    Please go to PDF 24.

6          That's fine.  Right there, Mr. Smeig.  Thank

10:27:14    7    you.

10:27:14    8          Now, sir, you told Ms. Canto, and you put in all

10:27:19    9    caps, that none of the records you reviewed had a

10:27:24    10    positive quantitative test, right?

10:27:26    11    A.    That's what the email said, yes.

10:27:39    12    Q.    Let's go to number 35, please.  Is that 35?

10:27:51    13    Okay.  Then go to 46, please.  We're in Joint Exhibit 14.

10:28:07    14          MR. CUNNINGHAM:  May I have a moment, Your

10:28:09    15    Honor.

10:28:09    16          THE COURT:  Sure.

10:28:16    17          MR. CUNNINGHAM:  We have a little issue.  Can I

10:28:40    18    please approach?

10:28:41    19          THE COURT:  Sure.  Go right ahead.

10:28:53    20          MR. CUNNINGHAM:  Thank you, Your Honor.  I

10:28:55    21    apologize.

10:28:55    22          THE COURT:  No worries.

10:28:59    23    BY MR. CUNNINGHAM:

10:28:59    24    Q.    All right, sir.  Let's do that again, please.

10:29:02    25          You told Ms. Canto in all caps that none of the

736

| 10:29:08 | 1 | patient records you reviewed had a positive quantitative |
| 10:29:12 | 2 | finding, right? |
| 10:29:12 | 3 | A.   Correct. |
| 10:29:13 | 4 | Q.   Sir, I want you to look at this document which |
| 10:29:16 | 5 | is page 24 of Joint Exhibit 14.  And you see toward the |
| 10:29:23 | 6 | top of the page it says specimen outcome positive. |
| 10:29:30 | 7 | A.   That -- |
| 10:29:31 | 8 | THE COURT:  Just asking if you see it. |
| 10:29:33 | 9 | A.   I see it.  Yes, thank you. |
| 10:29:35 | 10 | Q.   Is that what it says, sir, specimen outcome |
| 10:29:38 | 11 | positive? |
| 10:29:38 | 12 | A.   Yes. |
| 10:29:41 | 13 | Q.   Did you answer?  I'm sorry. |
| 10:29:42 | 14 | A.   I said yes. |
| 10:29:43 | 15 | Q.   All right.  Thank you, sir. |
| 10:29:44 | 16 | Let's go to PDF 35, please.  And I will |
| 10:29:51 | 17 | represent to you, sir, that this is for another patient. |
| 10:29:55 | 18 | Do you see toward the top of this page in the |
| 10:29:59 | 19 | same place on this form from PB Labs it says specimen |
| 10:30:03 | 20 | outcome positive?  Yes or no? |
| 10:30:06 | 21 | A.   Yes, I see it. |
| 10:30:08 | 22 | Q.   Let's go to page 46, please.  This is another |
| 10:30:14 | 23 | lab form from PB Labs. |
| 10:30:16 | 24 | Do you see there, sir, for this report for yet |
| 10:30:19 | 25 | another patient that it says specimen outcome positive? |

737

| | | |
|---|---|---|
| 10:30:25 | 1 | A.    Yes, I see it. |
| 10:30:26 | 2 | Q.    Please go to page 57.  Sir, I represent to you |
| 10:30:35 | 3 | that this is a form for yet another patient.  And do you |
| 10:30:40 | 4 | see where it says specimen outcome positive? |
| 10:30:44 | 5 | A.    Yes, I see it. |
| 10:30:46 | 6 | Q.    Let's go to page 71, please.  And I will |
| 10:30:52 | 7 | represent to you, sir, that this is a PB Labs form, |
| 10:30:56 | 8 | laboratory order for yet another patient.  Do you see |
| 10:31:00 | 9 | where it says specimen outcome positive? |
| 10:31:05 | 10 | A.    Yes. |
| 10:31:05 | 11 | Q.    Let's go to page 88, please. |
| 10:31:09 | 12 | A.    Excuse me? |
| 10:31:11 | 13 | Q.    88, please.  Sir, I will represent to you that |
| 10:31:17 | 14 | this is a PB Labs Laboratory Order for yet another |
| 10:31:21 | 15 | patient.  Do you see where it says on this form specimen |
| 10:31:26 | 16 | outcome positive? |
| 10:31:27 | 17 | A.    Yes, I see it. |
| 10:31:28 | 18 | Q.    Let's go to page 99, please.  Sir, I'll |
| 10:31:34 | 19 | represent to you that this is a PB Labs Laboratory Order |
| 10:31:38 | 20 | for yet another patient.  Do you see where it says |
| 10:31:42 | 21 | specimen outcome positive? |
| 10:31:44 | 22 | A.    Yes. |
| 10:31:45 | 23 | Q.    Now, sir, you wrote none in whatever records you |
| 10:31:52 | 24 | reviewed.  You said none of the records you reviewed |
| 10:31:56 | 25 | showed a positive quantitative test, right? |

10:31:58    1        A.    That's what I said.

10:32:01    2        Q.    I have just shown you seven positive

10:32:06    3    quantitative findings, sir.

10:32:07    4        A.    No, you haven't.

10:32:13    5        Q.    You said --

10:32:14    6        A.    If I may finish?  No, you haven't.

10:32:14    7            THE COURT:  You answered the question.  Thank

10:32:15    8    you.

10:32:16    9    BY MR. CUNNINGHAM:

10:32:17    10        Q.    Sir, you would agree, would you not, that seven

10:32:21    11    positive tests would be an indicator of medical

10:32:24    12    necessity, would it not?

10:32:25    13        A.    Absolutely not.

10:32:26    14        Q.    Let's go to Joint 15, please.  And PDF page 73,

10:32:35    15    please.

10:32:40    16            Sir, I will represent to you that this is a lab

10:32:45    17    report from another patient.  Does it indicate at the top

10:32:50    18    specimen outcome positive?

10:32:53    19        A.    It says specimen outcome positive, yes.  But --

10:33:00    20            THE COURT:  No, you answered the question, sir.

10:33:01    21    You can't go on.

10:33:03    22            THE WITNESS:  I'm sorry, Your Honor.

10:33:06    23            THE COURT:  It's all right.

10:33:06    24    BY MR. CUNNINGHAM:

10:33:06    25        Q.    Please go to Joint Exhibit 16.  Page 19, please.

739

10:33:14  1            And, sir, I will represent to you that this is

10:33:18  2   another patient, a different patient.  Does this PB

10:33:23  3   Laboratory's Laboratory Order Information Form say

10:33:26  4   specimen outcome positive?

10:33:28  5        A.   It says that, yes.

10:33:30  6        Q.   And does this document also reflect a point of

10:33:37  7   care test results?

10:33:40  8        A.   Yes.

10:33:41  9        Q.   What does point of care mean in this context?

10:33:48  10       A.   The expression point of care means literally at

10:33:52  11  the site where you are actually treating and seeing the

10:33:56  12  patient.  In particular, this is talking about a

10:34:00  13  quantitative or screening or presumptive testing done

10:34:06  14  where the patient is physically present.

10:34:09  15       Q.   Okay.  We're going to try to talk about this in

10:34:12  16  English, sir, if we could.  And I'm not being critical.

10:34:15  17       A.   I'm sorry.  I missed what you just said.

10:34:18  18            THE COURT:  Just ask the question.

10:34:20  19  BY MR. CUNNINGHAM:

10:34:20  20       Q.   Sir, when you say point of care, you mean like a

10:34:24  21  urine sample?

10:34:25  22       A.   Say that again, sir.

10:34:26  23       Q.   When you say point of care, you mean like a

10:34:30  24  urine sample?

10:34:31  25       A.   Like a what?

10:34:31    1        Q.    Urine sample.

10:34:32    2        A.    I'm having trouble --

10:34:34    3              THE COURT:  Somebody peed into a cup.

10:34:37    4        A.    The point of care isn't, how can I say this.  A

10:34:44    5    point of care means literally in my office, you pee into

10:34:52    6    the cup.  I test it there as opposed to that same pee

10:34:55    7    that you have in the cup and I send it to an outside

10:34:59    8    laboratory.  Point of care refers to literally at the

10:35:03    9    point of care.  Obviously, you're testing a urine

10:35:09    10   specimen.  Someone had to produce the specimen.  Whether

10:35:11    11   it's the same specimen split or a second specimen you

10:35:13    12   can't tell.  But point of care refers to it being done

10:35:17    13   literally in your office, at the patient's bedside, where

10:35:21    14   the patient is being treated, at the point of care.

10:35:25    15       Q.    And that is opposed to a situation where you do

10:35:27    16   a blood draw or something like that, and it has to be

10:35:31    17   sent to a lab outside the doctor's office to determine

10:35:36    18   the test results?

10:35:37    19       A.    Regardless of whether it's urine, blood, or any

10:35:40    20   other specimen, point of care means at the point of care.

10:35:44    21   Not sent out.

10:35:45    22       Q.    Now, sir, thank you for that.

10:35:49    23             Would you agree with me in this lab result

10:35:53    24   summary there is a positive finding, more than one

10:35:57    25   positive finding, on the point of care testing?

| | | |
|---|---|---|
| 10:36:04 | 1 | A.   At the point of care testing, yes.  There are |
| 10:36:07 | 2 | two. |
| 10:36:08 | 3 | Q.   And what are they, Gabapentin and opiates? |
| 10:36:13 | 4 | MS. COSTIN:  Objection. |
| 10:36:14 | 5 | THE COURT:  What's the objection? |
| 10:36:18 | 6 | Wait just a second, Doctor.  The lawyer for |
| 10:36:21 | 7 | Cigna has made an objection.  I can't hear it. |
| 10:36:24 | 8 | MS. COSTIN:  Mr. Cunningham misread the |
| 10:36:28 | 9 | document.  That's my objection. |
| 10:36:30 | 10 | MR. CUNNINGHAM:  I didn't hear the objection |
| 10:36:30 | 11 | either.  I'm sorry. |
| 10:36:30 | 12 | THE COURT:  She said you misread something. |
| 10:36:33 | 13 | MR. CUNNINGHAM:  Oh, I'm sorry. |
| 10:36:34 | 14 | THE COURT:  Gabapentin and opiates were |
| 10:36:38 | 15 | positive. |
| 10:36:39 | 16 | MR. CUNNINGHAM:  That's what I asked you, sir. |
| 10:36:40 | 17 | THE COURT:  I think you did misread. |
| 10:36:46 | 18 | MR. CUNNINGHAM:  Oh, I'm sorry. |
| 10:36:46 | 19 | THE COURT:  Benzodiazepines maybe that are |
| 10:36:50 | 20 | highlighted. |
| 10:36:52 | 21 | A.   Again, at the point of care, there was a |
| 10:36:55 | 22 | positive test for benzodiazepine and opiates. |
| 10:37:00 | 23 | Q.   All right.  Thank you, sir. |
| 10:37:01 | 24 | The point is simply that the point of care |
| 10:37:03 | 25 | testing resulted in positive findings, yes? |

```
10:37:06   1        A.    Yes.

10:37:07   2        Q.    Let's go to Joint 17, please.  And I would

10:37:10   3   represent to you, sir, that this is for another patient.

10:37:14   4   Let's go to page 105, please.

10:37:22   5             And, sir, on this PB Labs Laboratory Order, does

10:37:27   6   it indicate specimen outcome positive?

10:37:32   7        A.    Yes.

10:37:33   8        Q.    And are there also on this lab form positive

10:37:39   9   point of care test results for this particular patient?

10:37:42  10        A.    Yes.

10:37:43  11        Q.    What are they?

10:37:45  12        A.    I'm sorry.  The point of care testing you said

10:37:49  13   positive?

10:37:50  14        Q.    Yes.

10:37:50  15        A.    I'm looking at point of care.  Unless I'm

10:37:53  16   missing something, it says all negative.

10:37:59  17        Q.    What about benzodiazepines?

10:38:02  18        A.    It says negative.

10:38:02  19        Q.    And the lab result summary?

10:38:02  20        A.    We're talking about the point of care.

10:38:06  21        Q.    Okay.  But in the lab result summary, it says

10:38:09  22   that benzodiazepines is positive, right?

10:38:12  23        A.    Yes.

10:38:13  24        Q.    Let's go to Joint 18, please.

10:38:16  25             And I represent to you, sir, that this is for
```

10:38:20  1    yet another patient.

10:38:22  2            THE COURT:  This is Joint Exhibit 18?

10:38:24  3            MR. CUNNINGHAM:  Yes, ma'am.

10:38:26  4            THE COURT:  Thank you.

10:38:26  5        Q.    Page 13.  Sir, on this PB Labs Laboratory Order

10:38:33  6    Form, does it indicate that a specimen outcome is

10:38:37  7    positive?

10:38:37  8        A.    Yes.

10:38:41  9        Q.    And are there any point of care tests that are

10:38:45  10   positive as well?

10:38:48  11       A.    I don't see any point of care testing at all.

10:38:51  12       Q.    There is a positive finding for marijuana

10:38:56  13   metabolites, but you are saying that's not point of care

10:38:59  14   testing, right?

10:38:59  15       A.    From the pattern that you established

10:39:02  16   previously, the point of care was in the little box that

10:39:05  17   looks empty, and the lab results was the quantitative

10:39:09  18   testing done by the laboratory.  And then, as I

10:39:11  19   understand it, a summary of the actual quantitative

10:39:16  20   testing which appears below this.

10:39:17  21            So when I look at that, they're talking about a

10:39:24  22   class, and behind this there are pages and pages and

10:39:27  23   pages.  For this patient, probably be two pages of actual

10:39:34  24   quantitative testing.

10:39:37  25            I think if you go to a page below that, you

10:39:39   1   would have that list of quantitative testing.  The box

10:39:44   2   where it says Lab results summary, it is indeed a

10:39:48   3   summary.  It's not the report of the quantitative

10:39:50   4   testing.

10:39:50   5       Q.   Sir, isn't it true that there is a difference

10:39:54   6   between point of care testing and a quantitative test or

10:39:59   7   the result of those?

10:40:02   8       A.   There's a difference between -- and when you say

10:40:08   9   quantitative testing, there's a difference between point

10:40:10   10  of care which is generally screening qualitative

10:40:15   11  presumptive, and the laboratory, which could run a

10:40:19   12  presumptive quantitative panel or could run a definitive

10:40:25   13  qualitative test.

10:40:26   14      Q.   So would it be fair to say that qualitative

10:40:30   15  testing usually refers to the point of care type testing

10:40:33   16  that you described?

10:40:34   17      A.   No, I've seen quantitative testing run by the

10:40:37   18  laboratory.

10:40:38   19      Q.   So laboratories can do either qualitative or

10:40:41   20  quantitative testing?

10:40:41   21      A.   Yes.

10:40:41   22      Q.   What is the difference between those in your

10:40:44   23  mind, sir?

10:40:46   24      A.   The qualitative testing, also called

10:40:50   25  presumptive, is a test that tries to determine if the

10:40:56  1    presence or absence of a given substance with some kind

10:41:01  2    of threshold.  The quantitative testing is an actual

10:41:06  3    measure of the quantity.  The amount of the quantity.

10:41:08  4    The amount actually in the specimen with a cut-off.  So,

10:41:13  5    for example, if you did a qualitative test for narcotics,

10:41:19  6    it would say yes/no.  If you did a quantitative test, it

10:41:23  7    would say so many milligrams per milliliter of cocaine,

10:41:30  8    heroin.  It gives you a specific number.  From that

10:41:33  9    specific number there's a threshold, because times it

10:41:37  10   could be very, very low.  If you go beyond the threshold,

10:41:40  11   then the interpretation, not the test itself, the

10:41:44  12   interpretation of the test is a positive.

10:41:47  13          So, for example, if you do a qualitative test

10:41:51  14   and it says there's cocaine there.  It says yes/no.  Then

10:41:56  15   you do the quantitative test and it says there's so many

10:42:00  16   milligrams per hundred milliliters of cocaine.  As long

10:42:04  17   as it's more than a hundredth of a milligram, that's

10:42:08  18   considered a positive test.  So the first would say

10:42:10  19   yes/no.  The second would say so many milligrams per

10:42:14  20   hundred milliliters or whatever measure they're using.

10:42:18  21       Q.   Thank you for that, sir.

10:42:19  22          Let's go to Joint 19, please.

10:42:22  23          I'd represent to you, sir, that this is for

10:42:25  24   another patient.  And let's go to page 15.

10:42:36  25          Now, sir, does this Lab Order Form from PB Labs

| | | |
|---|---|---|
| 10:42:41 | 1 | indicate that there's a positive quantitative test |
| 10:42:45 | 2 | result? |
| 10:42:45 | 3 | A.   It indicates the specimen outcome is positive. |
| 10:42:50 | 4 | It doesn't say whether it's a qualitative or the |
| 10:42:53 | 5 | quantitative. |
| 10:42:53 | 6 | Q.   Sir, does one also -- this one has the point of |
| 10:42:55 | 7 | care results that you were talking about a moment ago, |
| 10:42:59 | 8 | right? |
| 10:42:59 | 9 | A.   Yes. |
| 10:42:59 | 10 | Q.   And this form for this particular patient shows |
| 10:43:02 | 11 | that there are positive point of care results for |
| 10:43:07 | 12 | barbiturates, benzodiazepines, and tricyclic |
| 10:43:14 | 13 | antidepressants, right? |
| 10:43:15 | 14 | A.   Yes. |
| 10:43:15 | 15 | Q.   Let's go to Joint Exhibit 20, please. |
| 10:43:21 | 16 | Which I'll represent to you, sir, is for another |
| 10:43:24 | 17 | patient.  Let's go to page 19, please. |
| 10:43:29 | 18 | All right.  Sir, on this PB Labs Laboratory |
| 10:43:33 | 19 | Order Form, does the specimen outcome indicate that it's |
| 10:43:39 | 20 | positive? |
| 10:43:39 | 21 | A.   Yes. |
| 10:43:41 | 22 | Q.   Are there also positive point of care results |
| 10:43:44 | 23 | for this particular patient on this form? |
| 10:43:46 | 24 | A.   Yes. |
| 10:43:47 | 25 | Q.   Benzodiazepines and tricyclic antidepressants, |

10:43:53  1    correct?

10:43:53  2         A.    Yes.

10:43:54  3         Q.    Let's go to Joint 21, please.  Page 18.

10:44:01  4              Sir, on this PB Labs Laboratory Order

10:44:06  5    Information Form, does it indicate that specific outcome

10:44:11  6    is positive?

10:44:11  7         A.    Yes.

10:44:18  8         Q.    Let's go to Joint Exhibit 22.  Page 20, please.

10:44:31  9              Sir, I will represent to you that this is a PB

10:44:36  10   Labs Laboratory Order Information Form for another

10:44:38  11   patient.  Does it indicate on the form that the specimen

10:44:42  12   outcome is positive?

10:44:43  13        A.    Yes.

10:44:51  14        Q.    Let's go to Joint Exhibit 23, please.  Page 17.

10:45:02  15             I will represent to you, sir, this is a PB Labs

10:45:06  16   Laboratory Order Information Form for another patient.

10:45:10  17   Does it indicate that the specimen outcome is positive?

10:45:15  18        A.    That's what it indicates.

10:45:18  19        Q.    Are there positive point of care results for

10:45:22  20   benzodiazepines and opiates and tricyclic

10:45:27  21   antidepressants?

10:45:27  22        A.    Yes.

10:45:27  23        Q.    Let's go to Joint Exhibit 24, please.  Page 19,

10:45:33  24   please.

10:45:35  25             Sir, I will represent to you that this is a PB

748

10:45:39  1    Labs Laboratory Order Information Form for another

10:45:42  2    patient.  Does it indicate that the specimen outcome is

10:45:46  3    positive?

10:45:46  4         A.   Yes.

10:45:49  5         Q.   And is there also a positive point of care

10:45:53  6    result for marijuana?

10:45:55  7         A.   Yes.

10:45:59  8         Q.   Let's go to Joint Exhibit 26, please.  Page 15.

10:46:10  9              Sir, I will represent to you this is a PB Labs

10:46:15  10   Laboratory Order Information Form for another patient.

10:46:20  11   Does this form also indicate that the specimen outcome is

10:46:24  12   positive?

10:46:24  13        A.   Yes.

10:46:25  14        Q.   And does it also indicate that there's a point

10:46:28  15   of care lab result which is positive for benzodiazepines?

10:46:33  16        A.   Yes.

10:46:35  17        Q.   Let's go to Joint Exhibit 27.  Page 47, please.

10:46:44  18             Sir, I will represent to you this is a PB Labs

10:46:48  19   Laboratory Order Information Form for another patient.

10:46:51  20   Does it indicate that the specimen outcome is positive?

10:46:55  21        A.   Yes.

10:46:59  22        Q.   And does it also indicate that there's a

10:47:03  23   positive point of care result for marijuana?

10:47:06  24        A.   Yes.

10:47:09  25        Q.   Let's go to Joint Exhibit 28, please.  Page 17.

749

10:47:19  1          I will represent to you, sir, that it this is a

10:47:22  2   PB Labs Laboratory Order Form for another patient.  Does

10:47:28  3   the form indicate that the specimen outcome is positive?

10:47:32  4        A.   Yes.

10:47:33  5        Q.   And is there also or are there also positive

10:47:38  6   point of care results for Benzodiazepines and Oxycodone?

10:47:43  7        A.   Yes.

10:47:44  8        Q.   Let's go to Joint Exhibit 29, please.  Page 46.

10:47:54  9          And I will represent to you, sir, that this is a

10:47:59  10  PB Labs Laboratory Order Form for another patient.  Does

10:48:02  11  it indicate that the specimen outcome is positive?

10:48:08  12       A.   You know, one of the things that I just noticed

10:48:11  13  as you say laboratory order.  It says laboratory order as

10:48:15  14  opposed to laboratory results.  So I'm kind of confused.

10:48:21  15  We've seen more results than order.  But yes.

10:48:22  16       Q.   Whether it says order form or whatever, there

10:48:27  17  are lab results reported on this form, correct?

10:48:29  18       A.   There's summary results, yes.

10:48:30  19       Q.   And it says that the specimen outcome is

10:48:33  20  positive, right?

10:48:34  21       A.   Yes.

10:48:35  22       Q.   And there are or there is a positive point of

10:48:39  23  care result for marijuana, correct?

10:48:43  24       A.   Yes.

10:48:44  25       Q.   Let's go to Joint Exhibit 30, please.  Page 21.

750

| | | |
|---|---|---|
| 10:48:53 | 1 | Sir, this is a PB Labs Laboratory Order |
| 10:48:57 | 2 | Information Form for another patient.  Does it indicate |
| 10:49:02 | 3 | specimen outcome positive? |
| 10:49:03 | 4 | A.    Yes. |
| 10:49:05 | 5 | Q.    And in this particular case, all of the point of |
| 10:49:09 | 6 | care result testing is negative, correct? |
| 10:49:12 | 7 | A.    Yes. |
| 10:49:15 | 8 | Q.    Let's go to Joint Exhibit 31.  Page 19. |
| 10:49:22 | 9 | A.    If you go back to that one for a second. |
| 10:49:26 | 10 | Q.    There's no pending question, sir. |
| 10:49:29 | 11 | A.    Excuse me? |
| 10:49:31 | 12 | Q.    There's no pending question. |
| 10:49:33 | 13 | THE COURT:  The only reason you could say |
| 10:49:34 | 14 | anything at this point without a question is if you |
| 10:49:36 | 15 | realize you testified wrongly and you want to correct an |
| 10:49:41 | 16 | answer.  That's the only thing you could say. |
| 10:49:44 | 17 | THE WITNESS:  Understood. |
| 10:49:47 | 18 | THE COURT:  Go ahead, counsel. |
| 10:49:47 | 19 | BY MR. CUNNINGHAM: |
| 10:49:47 | 20 | Q.    Joint Exhibit 31.  Page 19. |
| 10:49:50 | 21 | Sir, this is another PB Labs Laboratory Order |
| 10:49:54 | 22 | Information Form for another patient.  And does it |
| 10:49:57 | 23 | indicate that the specimen outcome is positive? |
| 10:50:00 | 24 | A.    Yes. |
| 10:50:06 | 25 | Q.    Let's go to Joint Exhibit 32, please.  Page 25. |

10:50:17  1          Sir, this is another Palm Beach Laboratories

10:50:21  2   Laboratory Order Information Form for another patient.

10:50:24  3   Does it indicate that the specimen outcome is positive?

10:50:27  4        A.   Yes.

10:50:31  5        Q.   And is there a positive point of care result for

10:50:35  6   marijuana?

10:50:35  7        A.   Yes.

10:50:38  8        Q.   Let's go to Joint Exhibit 33, please.  Page 19.

10:50:44  9   I'm sorry.  Page 257.

10:50:52  10         And, sir, I will represent to you this is

10:50:55  11  another PB Labs Laboratory Order for another patient.

10:50:59  12  Does it say specimen outcome abnormal?

10:51:03  13       A.   Yes.

10:51:04  14       Q.   What does abnormal mean as opposed to positive,

10:51:12  15  if you know?

10:51:13  16       A.   Well, the only thing that strikes me on the

10:51:17  17  form, if you look at the Lab tests results, the validity

10:51:21  18  testing is listed as abnormal.  If the validity testing

10:51:26  19  is abnormal, that would mean that the result was

10:51:31  20  unreliable.  So it would seem a parallel that they are

10:51:34  21  calling it abnormal because the validity testing was

10:51:38  22  abnormal, thereby negating the results of the

10:51:41  23  quantitative testing.

10:51:42  24       Q.   So the Lab is reporting that the result, the

10:51:46  25  positive finding that was shown, might not be valid or

752

10:51:50  1   legitimate, right?

10:51:51  2        A.   Well, in this case, there's one positive test.

10:51:57  3   It indicates throughout all the results, be they positive

10:52:01  4   or negative, it means an invalid -- an invalid specimen.

10:52:07  5        Q.   Sir, believe it or not, we reduced the number of

10:52:13  6   these results that we just went over with you.  But, sir,

10:52:16  7   I would represent to you that that would be 27 different

10:52:23  8   positive findings that were depicted in these records

10:52:27  9   that Ms. Canto sent to you.

10:52:28  10            MS. COSTIN:  Objection to the question.  Lacks

10:52:33  11   foundation.  There's no evidence these are from the

10:52:36  12   records Ms. Canto sent to Dr. Nicoll.

10:52:42  13            THE COURT:  That's your objection?

10:52:44  14            MS. COSTIN:  There's no foundation to his

10:52:46  15   question that this comes from the records that were sent

10:52:48  16   to Dr. Nicoll.

10:52:50  17            THE COURT:  I need to see counsel at sidebar.

10:53:02  18            (Sidebar.)

10:53:02  19            THE COURT:  Is it Cigna's representation to this

10:53:05  20   Court that the plaintiffs have picked random lab test

10:53:11  21   orders and samples that are not in any way related to the

10:53:14  22   SIU Canto sending of records to this doctor?

10:53:21  23            MS. COSTIN:  This doctor doesn't remember what

10:53:22  24   he reviewed.

10:53:26  25            THE COURT:  He didn't tell us that.

10:53:29    1              MS. COSTIN:  He has told you that or he's told

10:53:29    2    the Court that.  And Ms. Canto did not testify and

10:53:31    3    there's no record of what she sent to Mr. Nicholson.

10:53:34    4              THE COURT:  Let me say it again because I

10:53:37    5    probably wasn't clear.

10:53:38    6              Is it Cigna's position that these are not the

10:53:42    7    patient records that were sent by Canto to this doctor?

10:53:48    8              MS. COSTIN:  We can't be sure.

10:53:49    9              THE COURT:  You can't be sure?

10:53:51   10              MS. COSTIN:  We can't be sure.

10:53:53   11              THE COURT:  How is it you can't be sure?

10:53:57   12              You want to recover 14 million dollars, plus

10:54:02   13    about another eight in interest, maybe 20 in interest, of

10:54:06   14    payments made based upon an investigation you did that

10:54:10   15    you say proves this wasn't appropriate billing and you

10:54:15   16    don't know what you investigated to form the basis of

10:54:21   17    rejecting the claims.

10:54:22   18              MS. COSTIN:  What we're saying is that we have

10:54:24   19    produced the documents that were collected during

10:54:27   20    discovery.  There's been no one who can validate exactly

10:54:31   21    what was reviewed.

10:54:32   22              THE COURT:  Let me ask this question.  Did the

10:54:34   23    Labs ask for records that were part of the investigation

10:54:37   24    or did they just say give me a random 20 set of records

10:54:42   25    for patients?

754

10:54:45  1          MS. COSTIN:  Yes.

10:54:46  2          THE COURT:  They asked, right?

10:54:46  3          MS. COSTIN:  Yes.

10:54:46  4          THE COURT:  And you produced records in response

10:54:50  5     to that request?

10:54:51  6          MS. COSTIN:  Correct.

10:54:52  7          THE COURT:  That means you represented these are

10:54:54  8     the records that were part of the investigation reviewed

10:55:00  9     by Canto.  Sent to this doctor.  Went up the flag pole

10:55:03 10     all the way to Mr. Norton.  I mean, he didn't look at

10:55:07 11     them I understand.  But were the foundation of your

10:55:09 12     conclusions.  That's what you represented when you

10:55:11 13     produced them.  When somebody says give me the records re

10:55:19 14     X.  You can't just produce records in response to that.

10:55:24 15     See attached documents, you know, page 1 through 4,000 in

10:55:28 16     answer to that request and then say I don't know if these

10:55:33 17     are the documents.  I don't understand how a party can do

10:55:37 18     that.

10:55:38 19          MS. COSTIN:  Our position is that they did not

10:55:40 20     validate with Ms. Canto and there's no testimony in this

10:55:44 21     trial as to what she said to Dr. Nicoll.

10:55:46 22          THE COURT:  Well, there's your interrogatory,

10:55:48 23     their document response.  It's signed by a lawyer who is

10:55:53 24     an officer of this court.  If you tell me that that was

10:55:57 25     not a representation that the patient records produced,

| | | |
|---|---|---|
| 10:56:01 | 1 | which I assume are the ones he's shown him.  I mean, |
| 10:56:03 | 2 | that's a different question.  But that these were |
| 10:56:06 | 3 | produced and now being used by Cigna in response to an |
| 10:56:10 | 4 | interrogatory signed by an attorney that said, yes, these |
| 10:56:14 | 5 | are the documents in the investigation. |
| 10:56:19 | 6 | MS. COSTIN:  He doesn't know.  I mean, yes, we |
| 10:56:23 | 7 | produced the documents.  We produced the SIU file.  I |
| 10:56:26 | 8 | understand everything that you are saying.  But he's |
| 10:56:27 | 9 | testified he doesn't know what he reviewed.  And without |
| 10:56:32 | 10 | Ms. Canto validating what she sent him -- |
| 10:56:34 | 11 | THE COURT:  Well, Cigna stipulate these were |
| 10:56:34 | 12 | produced in response to a request by the plaintiff for |
| 10:56:40 | 13 | the records reviewed by Canto and sent to the doctor? |
| 10:56:51 | 14 | MS. COSTIN:  I have to look at the specific |
| 10:56:53 | 15 | document request.  I don't recall. |
| 10:56:55 | 16 | MR. CUNNINGHAM: We're getting it right now, Your |
| 10:56:55 | 17 | Honor. |
| 10:56:57 | 18 | Your Honor, if I may be heard just very briefly? |
| 10:56:57 | 19 | THE COURT:  Of course, sir. |
| 10:56:57 | 20 | MR. CUNNINGHAM:  This is why I had to show that |
| 10:56:59 | 21 | email from Mr. Kang to Mr. Christ, because I asked Mr. |
| 10:57:04 | 22 | Kang yesterday will you stipulate these are the records. |
| 10:57:06 | 23 | THE COURT:  I understand, sir.  That's not going |
| 10:57:06 | 24 | to get him to answer the question.  That's going to tell |
| 10:57:10 | 25 | you that they produced documents late. |

756

| | | |
|---|---|---|
| 10:57:13 | 1 | MR. CUNNINGHAM:  Yes, that was another issue. |
| 10:57:13 | 2 | THE COURT:  Forget about that issue right now. |
| 10:57:17 | 3 | MR. CUNNINGHAM:  When we took his deposition we |
| 10:57:19 | 4 | didn't have these documents. |
| 10:57:21 | 5 | THE COURT:  Yes, I understand.  I already know |
| 10:57:23 | 6 | that.  So forget about that issue. |
| 10:57:25 | 7 | The problem is introducing that email, which I |
| 10:57:28 | 8 | may very well do, mark it as an exhibit full, doesn't -- |
| 10:57:35 | 9 | it gives you a foundation to ask the question, but I |
| 10:57:37 | 10 | don't know that you're going to get the answer out of |
| 10:57:39 | 11 | this guy. |
| 10:57:41 | 12 | MR. CUNNINGHAM:  I don't think I will, Your |
| 10:57:42 | 13 | Honor.  I just have to make my record.  These are |
| 10:57:43 | 14 | documents that they produced to us in response to a |
| 10:57:46 | 15 | request for the medical records in the investigative |
| 10:57:48 | 16 | file. |
| 10:57:48 | 17 | THE COURT:  I suggest you ask him if he knows |
| 10:57:51 | 18 | these are the documents he reviewed, some of them |
| 10:57:53 | 19 | obviously.  He didn't review 20.  He reviewed ten, |
| 10:57:57 | 20 | whatever.  He's going to say I don't know.  Then you're |
| 10:58:00 | 21 | going to say did you review these particular records in |
| 10:58:03 | 22 | preparation of your testimony today about this case and |
| 10:58:06 | 23 | the SIU investigation of course as part of this case. |
| 10:58:09 | 24 | He's probably going to say no.  I don't know that you can |
| 10:58:13 | 25 | go any farther. |

```
10:58:14   1            But this is a very troubling position by Cigna.
10:58:17   2   I understand your technical objection is correct.  I'm
10:58:20   3   going to let him ask it.  He's not going to get the
10:58:24   4   answer.  But you cannot -- I mean, unless we're wrong
10:58:26   5   that they produced these documents, you produced them in
10:58:29   6   response to a document request that asked for the ones --
10:58:33   7   I can't believe they wouldn't have asked that.
10:58:36   8            MR. CUNNINGHAM:  I'm sure we did.
10:58:38   9            THE COURT:  If they're wrong about that that's
10:58:38  10   fine.  But if they're not wrong about it, this is very
10:58:42  11   troubling to the Court.  But I don't think you're going
10:58:44  12   to solve it with this fellow.  You may solve it with an
10:58:47  13   instruction by me.
10:58:48  14            MR. CUNNINGHAM:  That's what I was hoping, Your
10:58:49  15   Honor.
10:58:50  16            THE COURT:  I don't know if you're going to get
10:58:52  17   it.
10:58:54  18            MR. CUNNINGHAM:  Your Honor, we should have that
10:59:04  19   for you momentarily.
10:59:06  20            THE COURT:  I don't think that it's going to
10:59:08  21   prevent you from continuing.
10:59:10  22            (Sidebar concluded.)
10:59:10  23   BY MR. CUNNINGHAM:
10:59:10  24   Q.   Now, sir, you don't know, as you sit here today,
10:59:13  25   whether the records we just went over.
```

10:59:15    1        A.   I'm having trouble with the last part.  Your

10:59:17    2   voice tailed off and I didn't hear the end of it.

10:59:19    3        Q.   Let me start over.

10:59:29    4             THE COURT:  Is the mic on?  It didn't sound like

10:59:29    5   it.

10:59:29    6             MR. CUNNINGHAM:  I'm too tall for your

10:59:31    7   microphone, Your Honor.

10:59:33    8        Q.   Okay.  Is that better?

10:59:35    9        A.   Much.  Thank you.

10:59:36   10        Q.   Any time you need to let me know that, please

10:59:39   11   do.  I want to make sure you hear my questions.

10:59:43   12        A.   Obviously.

10:59:43   13        Q.   Sir, as we sit here today, you don't know

10:59:46   14   whether the records we just went over for the last half

10:59:50   15   hour or so were part of the records that you reviewed

10:59:54   16   that were sent to you by Ms. Canto back in 2013, do you?

10:59:58   17        A.   I do not know, no.

11:00:01   18        Q.   Sir, were any of the records that we just went

11:00:02   19   over, in the last half hour or so, records that you would

11:00:06   20   have been given to review for your trial testimony?

11:00:15   21        A.   They all look very similar.  I couldn't say yes

11:00:20   22   and I couldn't say no.

11:00:22   23        Q.   Did you review Lab Order Request Information

11:00:25   24   Forms like the ones we just went over in preparation for

11:00:28   25   your testimony?

| | | |
|---|---|---|
| 11:00:29 | 1 | A.    Yes. |
| 11:00:30 | 2 | Q.    Do you think that Cigna would give you records |
| 11:00:33 | 3 | to review that had nothing to do with this case? |
| 11:00:37 | 4 | A.    Of course not. |
| 11:00:38 | 5 | Q.    So you would presume that Cigna gave you records |
| 11:00:43 | 6 | that were the ones or partially the ones that we just |
| 11:00:47 | 7 | went over, right? |
| 11:00:48 | 8 | A.    Yes. |
| 11:00:59 | 9 | Q.    Sir, isn't it true that the entire investigation |
| 11:01:02 | 10 | of the Labs occurred because you wrote that none of |
| 11:01:07 | 11 | records you reviewed had a positive finding? |
| 11:01:12 | 12 | A.    Could you give me the first part of that |
| 11:01:15 | 13 | statement again? |
| 11:01:15 | 14 | Q.    Sure.  Isn't it true that the entire |
| 11:01:19 | 15 | investigation of the Labs occurred because when you were |
| 11:01:23 | 16 | asked to review those records, you said that none of them |
| 11:01:28 | 17 | showed positive findings? |
| 11:01:30 | 18 | A.    Well, the investigation started before I even |
| 11:01:33 | 19 | saw the records. |
| 11:01:34 | 20 | Q.    And you knew that the SIU at Cigna was relying |
| 11:01:38 | 21 | upon you to review those records and determine whether |
| 11:01:42 | 22 | the treatment rendered by the Labs was medically |
| 11:01:49 | 23 | necessary, didn't you? |
| 11:01:50 | 24 | A.    They were going to rely on me for the medical |
| 11:01:53 | 25 | necessity determination, yes. |

11:01:53  1    Q.   You knew that the opinion you gave Cigna was

11:01:57  2  going to be important to determining the future outcome

11:02:00  3  of that investigation, didn't you?

11:02:01  4    A.   It would be an important part of the

11:02:04  5  determination, yes.

11:02:04  6    Q.   And you knew that if you told Cigna that the

11:02:09  7  records showed positive findings and, therefore, medical

11:02:13  8  necessity, Cigna would not have been able to deny payment

11:02:17  9  of those claims, could they?

11:02:19  10    A.   Positive findings would not document medical

11:02:25  11  necessity.  So the sentence doesn't make sense.

11:02:27  12    Q.   All right.  You would agree with me, sir, that

11:02:28  13  if you told Cigna that these tests that were part of the

11:02:32  14  records they sent to you showed positive quantitative

11:02:36  15  findings, that Cigna would have a hard time claiming that

11:02:40  16  that treatment was not medically necessary, didn't you?

11:02:44  17    A.   Again, the positivity and medical necessity are

11:02:48  18  two unrelated issues.  If it's positive, it doesn't mean

11:02:53  19  it was medically necessary.  And if was negative, it

11:02:57  20  doesn't mean it was not medically necessary.

11:02:58  21    Q.   Sir, was it your belief that the labs and the

11:03:02  22  doctors who were ordering the tests from the labs were

11:03:07  23  falsifying the need for medical treatment?

11:03:11  24    A.   The word falsifying is a hard word.  When a

11:03:17  25  doctor orders something because they want to order it and

| 11:03:19 | 1 | if it's not necessary, that doesn't imply fraud. So I |
|---|---|---|
| 11:03:23 | 2 | would not use the word falsifying and fraud. |
| 11:03:26 | 3 | Q. Sir, you would agree with me, I believe you did |
| 11:03:29 | 4 | agree earlier, that medical doctors who are treating the |
| 11:03:32 | 5 | patient are the ones who are in the best position to |
| 11:03:37 | 6 | determine medical necessity, right? |
| 11:03:38 | 7 | A. No. |
| 11:03:38 | 8 | Q. You've never actually treated a substance abuse |
| 11:03:42 | 9 | patient. You would refer those out to appropriate |
| 11:03:46 | 10 | specialists, wouldn't you? |
| 11:03:46 | 11 | A. Yes. |
| 09:55:38 | 12 | Q. Sir, you wrote in your email to Ms. Canto that |
| 09:55:38 | 13 | you would stop payment and consider recovery against the |
| 09:55:38 | 14 | Labs, right? |
| 09:55:38 | 15 | A. Yes. |
| 09:55:38 | 16 | Q. You were chastised by Cigna for that, weren't |
| 09:55:38 | 17 | you? |
| 09:55:38 | 18 | A. Yes. |
| 09:55:38 | 19 | Q. You were chastised because that wasn't even |
| 09:55:38 | 20 | within your field of expertise to tell them to stop |
| 09:55:38 | 21 | payment and pursue recovery from the Labs, was it? |
| 09:55:38 | 22 | A. Right. |
| 09:55:38 | 23 | Q. You were there just to give opinions about |
| 09:55:38 | 24 | medical necessity or lack of medical necessity, right? |
| 09:55:38 | 25 | A. Medical necessity and some other issues, but not |

09:55:38   1    financial, right.  They told me the financial was not

09:55:38   2    part of my responsibility.

09:55:38   3          Q.   They told you overstepped your bounds, right?

09:55:38   4          A.   Absolutely.

09:55:38   5          Q.   Those were the exact words, weren't they?

09:55:38   6          A.   I don't remember the exact words, but certainly

09:55:38   7    the message.

09:55:38   8          Q.   Were you penalized in any way for overstepping

09:55:38   9    your bounds with respect to the work you did in this

09:55:38  10    case?

09:55:38  11          A.   No.

09:55:38  12          Q.   Sir, were you aware that Cigna actually withdrew

09:55:38  13    the medical necessity flag after receiving your email to

09:55:38  14    Ms. Canto?

09:55:38  15          A.   I know there was some question about  -- and

09:55:38  16    this I was not directly involved in -- there's some

09:55:38  17    question about the rationale for denials and I knew that

09:55:38  18    become an issue for them.

09:55:38  19          Q.   Sir, you haven't learned and I don't want to

09:55:38  20    know of anything you learned from your attorneys.  Didn't

09:55:38  21    you know that Cigna had to withdraw the flag against

09:55:38  22    these Labs after you sent your email to Ms. Canto?

09:55:38  23          A.   No.  I did not know that.

09:55:38  24          Q.   Now, sir, you were aware that there were

09:55:38  25    numerous different doctors treating the 20 patients and

```
09:55:38   1   the records you were supposed to review, right?
09:55:38   2       A.   There were several doctors, yes.
09:55:38   3       Q.   And sir, you wrote that you could not tell if
09:55:38   4   the doctor is participating.  Do you remember those
09:55:38   5   words?
09:55:38   6       A.   Yes.
09:55:38   7       Q.   And then you said, the referring medical doctor
09:55:38   8   has issues.  Do you remember those words?
09:55:38   9       A.   Yes.
09:55:38  10       Q.   Doesn't the word "the" imply only one doctor?
09:55:38  11       A.   The word -- okay.  The word "the" refers to an
09:55:38  12   individual physician.  The intention was to look at each
09:55:38  13   individual physician if an individual physician was
09:55:38  14   participating or an individual physician was not as
09:55:38  15   opposed to a group.
09:55:38  16       Q.   Sir, you didn't say all of the medical doctors
09:55:38  17   had issues.  You said "the" doctor.
09:55:38  18       A.   Well, the ordering doctor.  Again you are
09:55:38  19   looking at each record as the ordering doctor.  It wasn't
09:55:38  20   ordered by a club.
09:55:38  21       Q.   Sir, you didn't look at all of the records that
09:55:38  22   Ms. Canto sent to you, did you?
09:55:38  23       A.   We already established there were 20.  I looked
09:55:38  24   at 10.
09:55:38  25       Q.   You looked at one, didn't you?
```

764

| | |
|---|---|
| 09:55:38 | 1 |
| 09:55:38 | 2 |
| 09:55:38 | 3 |
| 09:55:38 | 4 |
| 09:55:38 | 5 |
| 09:55:38 | 6 |
| 09:55:38 | 7 |
| 09:55:38 | 8 |
| 09:55:38 | 9 |
| 09:55:38 | 10 |
| 09:55:38 | 11 |
| 09:55:38 | 12 |
| 09:55:38 | 13 |
| 09:55:38 | 14 |
| 09:55:38 | 15 |
| 09:55:38 | 16 |
| 09:55:38 | 17 |
| 09:55:38 | 18 |
| 09:55:38 | 19 |
| 09:55:38 | 20 |
| 09:55:38 | 21 |
| 09:55:38 | 22 |
| 09:55:38 | 23 |
| 09:55:38 | 24 |
| 09:55:38 | 25 |

     A.    No.

     Q.    If you looked at ten, you wouldn't have said
"the treating doctor" would you?

     A.    Yes, I would have.  We discussed that already,
talking about an individual, each individual doctor
whether they were par or non par.

     Q.    Let me ask you about one last thing.  This is
Labs' Trial Exhibit 6943.

          THE COURT:  Is it in evidence, sir?

          MR. CUNNINGHAM:  I don't believe it is in
evidence yet, Your Honor.  It's a trial exhibit.  Liana's
confirming it is not in evidence.  6943, Your Honor.  May
I proceed?

          THE COURT:  Yes, you may.  It is for
identification only?

          MR. CUNNINGHAM:  Yes, Your Honor, for
identification.

BY MR. CUNNINGHAM:

     Q.    Sir, do you see a series of emails in front of
you?

     A.    Yes.

     Q.    Mr. Smeig, can we scroll down chronologically to
the beginning of this sequence.

          All right now, sir, does this appear to be an
email from Stephanie Canto to a Douglas Nemecek?

```
09:55:38   1        A.   Yes.

09:55:38   2        Q.   That's Dr. Nemecek, right?

09:55:38   3        A.   Yes.

09:55:38   4        Q.   And this is dated December 7, 2014, right?

09:55:38   5        A.   Yes.

09:55:38   6        Q.   Now, I'm going to read part of it to try to

09:55:38   7   speed this along.

09:55:38   8             THE COURT:  You can't read it into the record.

09:55:38   9   You can direct his attention.

09:55:38  10             MR. CUNNINGHAM:  I'm sorry.  Your Honor, I would

09:55:38  11   say like to go ahead and move this exhibit into evidence.

09:55:38  12             MS. COSTIN:  The objection is simply foundation.

09:55:38  13   Dr. Nicoll is not copied on this.

09:55:38  14             THE COURT:  By foundation, what do you mean?

09:55:38  15             MS. COSTIN:  No personal knowledge.  He's not

09:55:38  16   copied on the email so I think he has to establish

09:55:38  17   whether or not he has any knowledge about this document.

09:55:38  18             THE COURT:  It's your position you can only ask

09:55:38  19   a witness questions about documents that they are copied

09:55:38  20   on or wrote in a corporation?

09:55:38  21             MS. COSTIN:  Yes, hearsay.

09:55:38  22             THE COURT:  I'm sorry.

09:55:38  23             MS. COSTIN:  It's hearsay.

09:55:38  24             MR. CUNNINGHAM:  This is not hearsay under 801,

09:55:38  25   Your Honor.
```

09:55:38  1            THE COURT:  Yeah.

09:55:38  2            MR. CUNNINGHAM:  This is opposing party

09:55:38  3    statement.

09:55:38  4            THE COURT:  I hear you.

09:55:38  5            Do you have any basis to question that it is a

09:55:38  6    document produced by Cigna from their records?

09:55:38  7            MS. COSTIN:  No.

09:55:38  8            THE COURT:  I think there's a catch-all about

09:55:38  9    otherwise reliable -- I can't remember what the number

09:55:38  10   1,000 and something -- and I happen to think it's

09:55:38  11   certainly admissible under 801 what isn't hearsay, but

09:55:38  12   also even if it is, it comes under the catch-all so it is

09:55:38  13   admitted.

09:55:38  14           MR. CUNNINGHAM:  Your Honor, may we publish this

09:55:38  15   to the jury.

09:55:38  16           THE COURT:  You may.

09:55:38  17   BY MR. CUNNINGHAM:

09:55:38  18      Q.   All right.  Let me ask you about this, sir, so

09:55:38  19   is this an email there Stephanie Canto to Dr. Douglas

09:55:38  20   Nemecek?

09:55:38  21      A.   Yes.

09:55:38  22      Q.   Dr. Nemecek was another medical doctor who

09:55:38  23   worked in conjunction with the SIU at Cigna, right?

09:55:38  24      A.   I think his primary responsibilities was Cigna

09:55:38  25   behavioral health.  I think he's assisted the SIU from

09:55:38  1    time to time, yes.

09:55:38  2        Q.   He was an employee of Cigna?

09:55:38  3        A.   Absolutely.

09:55:38  4        Q.   So I will try to go through this quickly, sir.

09:55:38  5    Does it say, Good afternoon, Dr. Nemecek?

09:55:38  6        THE COURT:   Can we just have the jury -- I tried

09:55:38  7    that once and I gave up.  I think if the jury reads then

09:55:38  8    when you look up when you are done, we can go forward.  I

09:55:38  9    imagine that's faster.

09:55:38  10       MR. CUNNINGHAM:   May I proceed, Your Honor?

09:55:38  11       THE COURT:   Yes.

09:55:38  12   BY MR. CUNNINGHAM:

09:55:38  13       Q.   Did it appear here that Stephanie Canto sent the

09:55:38  14   same records that she sent to you at a later date,

09:55:38  15   December 17, 2014, to Dr. Nemecek?

09:55:38  16       A.   No.

09:55:38  17       Q.   You think these are different records?

09:55:38  18       A.   It says, I'm trying to it determine if rehab

09:55:38  19   services were billed appropriately.  I didn't look at any

09:55:38  20   rehab services.

09:55:38  21       Q.   Okay.

09:55:38  22       A.   To ascertain if chiro services were rendered.

09:55:38  23   I didn't look at, I didn't receive any records.  So these

09:55:38  24   were not sent to me.

09:55:38  25       Q.   That's based on your understanding of the term

09:55:38  1    rehab records?

09:55:38  2        A.    Yes.

09:55:38  3        Q.    Now, sir, doesn't it say, I have separated the

09:55:38  4    medical records into two folders, one for lab medical

09:55:38  5    records and other for rehab and chiro medical records?

09:55:38  6        A.    Yes.

09:55:38  7        Q.    So at least some of these documents could have

09:55:38  8    been the same document that she sent to you, right?

09:55:38  9        A.    Could have.

09:55:38  10       Q.    And it says, The review -- this review was with

09:55:38  11   respect to Angel's Recovery, Angel's Rehab Recovery

09:55:38  12   Center and Angel's Chiro and PB Labs, correct?

09:55:38  13       A.    That's what it says.

09:55:38  14       Q.    And does it say in the last sentence of that

09:55:38  15   paragraph, The lab medical records were primarily being

09:55:38  16   reviewed with respect to the urine drug screenings that

09:55:38  17   were being collected at the rehab facility.

09:55:38  18             Did I read that accurately.

09:55:38  19       A.    That's accurate, yes.

09:55:38  20       Q.    Sir, you would agree with me that at least some

09:55:38  21   of these records that were sent to Dr. Nemecek were the

09:55:38  22   same records that were sent to you, specifically the lab

09:55:38  23   reports from PB Labs?

09:55:38  24       A.    You just deleted the word "could," could have

09:55:38  25   been, not with certainly.  Could have been.

09:55:38    1          Q.    That's fine.

09:55:38    2                 Let's scroll to the next entry in this sequence,

09:55:38    3    please.

09:55:38    4                 MR. CUNNINGHAM:  Your Honor, I would ask that

09:55:38    5    the jury read this, too.

09:55:38    6                 THE COURT:  Please do so.

09:55:38    7                 MR. CUNNINGHAM:  May I proceed, Your Honor?

09:55:38    8                 THE COURT:  Actually no.  The clerk has

09:55:38    9    dutifully reminded me it's 11:15.  I'm pretty sure the

09:55:38   10    time I told the jury we would break.  We'll take a

09:55:38   11    15-minute break and be back a few minutes after 11:30.

09:55:38   12    Fresh air, stretch.

09:55:38   13                 Sir, you are excused.  You have to be back here

09:55:38   14    by 11:30.

09:55:38   15                 THE WITNESS:  Of course.

09:55:38   16                 MR. CUNNINGHAM:  Your Honor, could you remind

09:55:38   17    the witness he's sequestered.

09:55:38   18                 THE COURT:  Yes.  Sir, remember you can't talk

09:55:38   19    to counsel.

09:55:38   20                 THE WITNESS:  I know that.

09:55:38   21                 (Discussion Off the Record.)

09:55:38   22                 THE COURT:  Did anyone find that?

09:55:38   23                 MR. CUNNINGHAM:  Yes, we did, Your Honor.  I

09:55:38   24    wanted Mr. Christ to be able to share that with you.

09:55:38   25                 THE COURT:  Okay, what does it say?

09:55:38  1          MR. CHRIST:  Your Honor, the November 1, 2021,
09:55:38  2   discovery response that Cigna produced to plaintiff's
09:55:38  3   first interrogatory, the third interrogatory requested
09:55:38  4   --sorry, I lost my place here.  Okay.  I'm sorry -- The
09:55:38  5   second interrogatory requested, State whether you or
09:55:38  6   anyone acting on your behalf has conducted any
09:55:38  7   investigation into the events of subject matter of the
09:55:38  8   amended complaint.  If so, identify the persons and
09:55:38  9   employer of all persons who conducted any investigation.
09:55:38 10   Part B, the dates of the investigation and Part C, the
09:55:38 11   dates of any reports of any investigation and the
09:55:38 12   identity of the --
09:55:38 13          THE COURT:  Why don't you send it to my law
09:55:38 14   clerk?  You are a long way from getting to the answer I
09:55:38 15   need.  Okay.  Thank you we will stand in recess.
09:55:38 16          (Whereupon, a recess was taken from 11:18 a.m.
09:55:38 17   to 11:31 a.m.)
09:55:38 18          THE COURT:  We need Attorney Cunningham.
09:55:38 19          Attorney Cunningham, we're ready to begin.
09:55:38 20          Okay. Liana, please get them.
09:55:38 21          (In the presence of the jury at 11:31 a.m.)
09:55:38 22          THE COURT:  Everybody be seated.  My family, if
09:55:38 23   they were here would be in hysterics about the words I'm
09:55:38 24   about to utter.  I'm told there's some comments about the
09:55:38 25   temperature and I actually agree with you.  I thought I

| | | |
|---|---|---|
| 09:55:38 | 1 | had requested GSA an hour ago when the temperature hit 66 |
| 09:55:38 | 2 | to turn the heat up slightly.  Because it was the only |
| 09:55:38 | 3 | way, one to stop the blowers which is the main cause for |
| 09:55:38 | 4 | the chill.  The only way to do it is by raising the |
| 09:55:38 | 5 | temperature.  I don't think anybody saw GSA or |
| 09:55:38 | 6 | maintenance so we yet again requested them to do |
| 09:55:38 | 7 | something.  I don't have blankets to hand out.  I'm |
| 09:55:38 | 8 | sorry.  We are working on it.  Sorry about that, Ladies |
| 09:55:38 | 9 | and Gentlemen.  Keeps everybody alert though. |
| 09:55:38 | 10 | (Discussion Off the Record.) |
| 09:55:38 | 11 | BY MR. CUNNINGHAM: |
| 09:55:38 | 12 | Q.    May it please the Court? |
| 09:55:38 | 13 | THE COURT:  Yes. |
| 09:55:38 | 14 | Q.    We were looking at Labs' Trial Exhibit 6943. |
| 09:55:38 | 15 | What I would to do, Mr. Smeig, is go to the entry that is |
| 09:55:38 | 16 | dated January 21, 2015.  That's it.  Thank you. |
| 09:55:38 | 17 | MR. CUNNINGHAM:  And Your Honor, could I ask if |
| 09:55:38 | 18 | the jury could read that, please. |
| 09:55:38 | 19 | THE COURT:  Yes.  That's the one that was |
| 09:55:38 | 20 | admitted, correct? |
| 09:55:38 | 21 | MR. CUNNINGHAM:  Yes, ma'am. |
| 09:55:38 | 22 | THE COURT:  Go ahead. |
| 09:55:38 | 23 | I think you can go, sir. |
| 09:55:38 | 24 | MR. CUNNINGHAM:  Thank you, Your Honor. |
| 09:55:38 | 25 | BY MR. CUNNINGHAM: |

09:55:38  1      Q.   Sir, Dr. Nemecek wrote to Stephanie Canto on

09:55:38  2   January 21, 2015, and said, In looking at these records,

09:55:38  3   I would estimate that the review of all these records

09:55:38  4   would likely take me several weeks and likely two to four

09:55:38  5   months to review and that is for the rehab and lab

09:55:38  6   charges associated with the drug screens.

09:55:38  7          Did I read that accurately, sir.

09:55:38  8      A.   Yes.

09:55:38  9      Q.   So, Dr. Nemecek says it would take him two to

09:55:38  10  four months to review all the records sent to him by Ms.

09:55:38  11  Canto, correct?

09:55:38  12     A.   Yes.

09:55:38  13     Q.   Took you two to three hours maximum?

09:55:38  14     A.   I don't know.

09:55:38  15     Q.   Well, you received those records sometime on the

09:55:38  16  morning of September 20 and 2:32 p.m. you wrote to Ms.

09:55:38  17  Canto with the results of your review, right?

09:55:38  18     A.   That's correct.

09:55:38  19          MR. CUNNINGHAM:  That's all the questions I

09:55:38  20  have.  Thank you, Your Honor.

09:55:38  21          THE COURT:  Cross-examination.

09:55:38  22                    CROSS EXAMINATION

09:55:38  23          MS. COSTIN:  Good morning, Your Honor, may it

09:55:38  24  please the Court.

09:55:38  25  BY MS. COSTIN:

09:55:38  1        Q.    Good morning, Dr. Nicoll.

09:55:38  2        A.    Good morning.

09:55:38  3        Q.    Thank you for being here again today.  We very

09:55:38  4    much appreciate it.

09:55:38  5              Dr. Nicoll, you answered a lot of questions

09:55:38  6    today using the term "medical necessity."  I would like

09:55:38  7    to talk about that term.  When we use the term "medical

09:55:38  8    necessity," what does that term mean to you?

09:55:38  9        A.    There's a formal definition, but basically it

09:55:38  10   implies that which is necessary to treat a patient's

09:55:38  11   condition or symptoms consistent with current medical

09:55:38  12   practice in the least expensive and intrusive manner.

09:55:38  13       Q.    Would you agree with me that medical necessity

09:55:38  14   includes being used in the treatment of the patient?

09:55:38  15       A.    Absolutely.

09:55:38  16       Q.    Why is that important?

09:55:38  17       A.    Well, medical necessity, again it's for the

09:55:38  18   treatment of a patient's condition or a patient's

09:55:38  19   symptoms that requires a licensed practitioner

09:55:38  20   appropriately to order, prescribe whatever.  If you -- if

09:55:38  21   something, if something it requires a medical order.  You

09:55:38  22   can take aspirin from the pharmacy for a headache, no one

09:55:38  23   is going to say that taking a aspirin for a headache

09:55:38  24   wasn't medically necessary.  You can do that on your own.

09:55:38  25   But anything that requires a prescription order, has to

09:55:38  1    have a physician order it.  It has to be appropriate for

09:55:38  2    the conditions, the symptoms and has to be consistent

09:55:38  3    with current medical practice and has to be prescribed or

09:55:38  4    done in a way that's most effective and cost effective.

09:55:38  5    So you wouldn't but someone in the hospital for a

09:55:38  6    headache.  You might give them a different medication.

09:55:38  7    So, it has to be for the treatment, for the patient,

09:55:38  8    consistent with medical practice and in a reasonable

09:55:38  9    manner.

09:55:38  10        Q.   Right.  You mentioned that the definition of

09:55:38  11   medical necessity is in the Cigna plans?

09:55:38  12        A.   Yes.

09:55:38  13        Q.   Under the terms of Cigna plans, who decides what

09:55:38  14   is medically necessary?

09:55:38  15        A.   Under the Cigna plans, it is the medical

09:55:38  16   director from Cigna.

09:55:38  17        Q.   Why doesn't the treating physician get to decide

09:55:38  18   what's medically necessary?

09:55:38  19        A.   In the old days, a patient and a doctor would

09:55:38  20   get together.  The doctor would say you need to do it.

09:55:38  21   The patient would pay for it and that compact was made.

09:55:38  22        Once the payment is being made by a third party,

09:55:38  23   you have to have a higher standard.  Right now, the

09:55:38  24   medical director will decide whether it's a covered

09:55:38  25   service, whether it is reimbursable or not, whether we

09:55:38  1    have to pay for it or not.  Outside that, if the patient

09:55:38  2    or doctor want to do it, the patient and doctor can agree

09:55:38  3    and be paid, but if we determine it's not medically

09:55:38  4    necessary we're not going to pay for it.  So it's very

09:55:38  5    important to understand we don't interfere with medical

09:55:38  6    practice per se.  We interfere with what we're going to

09:55:38  7    pay for and what we're not going to pay for.  Again if it

09:55:38  8    is something the doctor, the patient want to do, as long

09:55:38  9    as it's legal, we'll not stand in the way.  We're not

09:55:38  10   going to pay for things that we think don't fall within

09:55:38  11   the bounds of the definition we had and the medical

09:55:38  12   director makes that determination.

09:55:38  13        Q.   Thank you, sir.

09:55:38  14             Mr. Salazar, can we go back to Joint 141,

09:55:38  15   please.

09:55:38  16             Dr. Nicoll, this email I think we went through

09:55:38  17   earlier this morning with Mr. Cunningham.  It's an email

09:55:38  18   exchange between you and Ms. Canto in September of '13.

09:55:38  19   Do you recall that?

09:55:38  20             I think we can scroll down, Mr. Salazar, to Dr.

09:55:38  21   Nicoll's response.

09:55:38  22             Do you recall this email?

09:55:38  23        A.   Yes.

09:55:38  24        Q.   And if I recall, Mr. Cunningham directed your

09:55:38  25   attention to the sentence, "It is noteworthy."  Can we go

09:55:38  1    up a couple of lines to the sentence "issue is really

09:55:38  2    quite straightforward.  There is serious abuse."  Do you

09:55:38  3    see that?

09:55:38  4         A.   Yes.

09:55:38  5         Q.   Did you write that, sir?

09:55:38  6         A.   Yes.

09:55:38  7         Q.   What did you mean by that?

09:55:38  8         A.   When you see pages and pages and pages of

09:55:38  9    hundred dollar a line testing, all negative without a

09:55:38  10   rationale for it, that's abuse.  And they can give you

09:55:38  11   examples, but what I was looking at was pages and pages

09:55:38  12   of negative, negative, negative.

09:55:38  13        The other thing is when you look at the results,

09:55:38  14   when you do the screening test, what bothers me most is

09:55:38  15   you have to have a conversation with the patient.  So if

09:55:38  16   you do the screening test and it shows marijuana and you

09:55:38  17   say to the patient, Do you take marijuana?  And the

09:55:38  18   answer is yes.  You don't do a qualitative test.

09:55:38  19        If you are prescribing a medication,

09:55:38  20   benzodiazepine, Librium, Valium, Xanax and the test comes

09:55:38  21   out on the screening test positive for benzodiazepines,

09:55:38  22   again you have the conversation with the patient.  Are

09:55:38  23   you taking it?  Yes.  It's positive.  So what's abuse?

09:55:38  24   And I think it really relates to part of the standing

09:55:38  25   order which said, confirm all positive, confirm all

09:55:38  1   negatives.  The purpose of the quantitative test is
09:55:38  2   really to resolve a conflict between the history of the
09:55:38  3   patient and what you prescribed and the preliminary
09:55:38  4   testing.  If the preliminary testing and the patient's
09:55:38  5   history match then the definitive testing is -- or
09:55:38  6   quantitative testing is redundant and unnecessary.  Might
09:55:38  7   you be surprised from time to time, yeah.  But
09:55:38  8   consistently if it's negative and the patient said they
09:55:38  9   are not doing it or it's positive and the patient said
09:55:38  10  they did it or if the patient is prescribed the
09:55:38  11  medication and it didn't show up on the screening test
09:55:38  12  and you are concerned -- that's what we call diversion.
09:55:38  13  I gave you oxycodone.  The urine test showed you are not
09:55:38  14  taking narcotics.  I'm treating you for pain.  You are
09:55:38  15  taking the oxycodone.  Yes.  It came back negative.
09:55:38  16  What's up.  You're diverting, selling it?  What is going
09:55:38  17  on here?  If there is a discrepancy between the history
09:55:38  18  you take from a patient and the qualitative test, for
09:55:38  19  better or worse, positive or negative, that needs to be
09:55:38  20  resolved by a quantitative test.  When I see pages and
09:55:38  21  pages and pages of lines and lines and lines, negative,
09:55:38  22  negative, negative, negative and an occasional hit and
09:55:38  23  sometimes an occasional hit where the presumptive test
09:55:38  24  was positive anyway, that's of no value.  That's abuse.
09:55:38  25  That's doing testing just for the sake of testing.

09:55:38    1        Q.    Why don't we go through a couple of examples,

09:55:38    2    Mr. Nicoll, and you can elaborate on that further.

09:55:38    3            Mr. Salazar, can we go to Joint 14.  Can we

09:55:38    4    scroll down.

09:55:38    5            And Dr. Nicoll, let me go back to that email

09:55:38    6    141.  We talked earlier that your email indicated that

09:55:38    7    you had reviewed ten charts.  Does that mean you only

09:55:38    8    reviewed ten test results?

09:55:38    9        A.    No.  It means ten patients.

09:55:38    10       Q.    Ten patients.  I know you don't seem to recall

09:55:38    11   as you sit here today what specific patients you

09:55:38    12   reviewed, correct?

09:55:38    13       A.    Yes.

09:55:38    14       Q.    Can we go back to 14.  Scroll down, Mr. Salazar,

09:55:38    15   to the next page.

09:55:38    16            Do you see this first page of this Joint 14, Dr.

09:55:38    17   Nicoll?

09:55:38    18       A.    Do I see?  What was the question?

09:55:38    19       Q.    The client registration form.  Do you see this?

09:55:38    20       A.    Yes.

09:55:38    21       Q.    Can we scroll down to the next page and the

09:55:38    22   following page.  Following page.  I went to get to the

09:55:38    23   page that has the actual order, confirm positives,

09:55:38    24   negatives.  No.  Scroll back.  There we go.

09:55:38    25            Apologies.

09:55:38   1          THE COURT:  What page is it please for the

09:55:38   2   record?

09:55:38   3          MS. COSTIN:  Page 7 of the PDF.  I apologize,

09:55:38   4   Your Honor.

09:55:38   5   BY MS. COSTIN:

09:55:38   6      Q.   Do you see this document this Recurring Provider

09:55:38   7   and Consent Form, Dr. Nicoll?

09:55:38   8      A.   Yes.

09:55:38   9      Q.   You see on the box under the word "confirms."

09:55:38  10   Do you see the check marks next to positives, alerts and

09:55:38  11   negatives?

09:55:38  12      A.   Yes.

09:55:38  13      Q.   Do you see that?

09:55:38  14      A.   Yes.

09:55:38  15      Q.   As medical director of Cigna, what do you

09:55:38  16   understand that to mean?

09:55:38  17      A.   That you should do a quantitative test

09:55:38  18   regardless of the result of the qualitative test.

09:55:38  19      Q.   That would mean confirming whether it's positive

09:55:38  20   or negative?

09:55:38  21      A.   If it was positive, even with respect to

09:55:38  22   positive, do it again.  If it was a negative and expected

09:55:38  23   negative, do it again.

09:55:38  24      Q.   When would it ever about medically necessary to

09:55:38  25   confirm all positives and all negatives?

09:55:38  1      A.    Medically, not at all.

09:55:38  2      Q.    Let's go now to page 24 of this PDF, Mr.

09:55:38  3   Salazar.

09:55:38  4         And I believe this was one of the patient files

09:55:38  5   that we went over with Mr. Cunningham earlier this

09:55:38  6   morning.  As you sit here today, Dr. Nicoll, if you were

09:55:38  7   going to go to look at one of these lab test results,

09:55:38  8   what would be the first thing you would look at?

09:55:38  9      A.    First thing I would look at is the prescribed

09:55:38  10   medications.

09:55:38  11      Q.    Why is that?

09:55:38  12      A.    Well, if you are doing drug testing and in this

09:55:38  13   particular case, you can imply since they are getting

09:55:38  14   morphine, morphine sulfate, oxycodone, oxycodone with

09:55:38  15   Tylenol, a lot of pain medication, this is a pain

09:55:38  16   management patient.  So what you would expect then is

09:55:38  17   that as opposed to a drug abuse patient, so with a pain

09:55:38  18   management patient, you are prescribing narcotics.  You

09:55:38  19   expect the screening test to be positive and should you

09:55:38  20   do the definitive test, there'd be no reason to do it,

09:55:38  21   you'd expect it to be positive because you are

09:55:38  22   prescribing it.  The only thing that would be disturbing

09:55:38  23   in this particular patient, if you are had a negative

09:55:38  24   test for opiates.  If you had a negative test for opiates

09:55:38  25   and you say, I'm giving them all of these drugs.  Where

09:55:38   1   are they going?  If they are not going into you are they

09:55:38   2   going onto the street?  So the purpose of the screening

09:55:38   3   test or presumptive test, the simple test is to make sure

09:55:38   4   in this particular circumstance that indeed you are

09:55:38   5   taking the medication that's prescribed and perhaps that

09:55:38   6   you are not taking any other drugs.  So that in the

09:55:38   7   screening test, it tests for cocaine, it tests for

09:55:38   8   marijuana so you are taking pain medication and we do the

09:55:38   9   screening testing to make sure you are not taking

09:55:38  10   cocaine, marijuana or something else.  It's a

09:55:38  11   double-check.  A check to make sure you are taking what I

09:55:38  12   gave you and not taking anything else.

09:55:38  13       Q.   Can we scroll out, Mr. Salazar, and look at the

09:55:38  14   point of care results side by side with the prescription

09:55:38  15   medications.

09:55:38  16            Dr. Nicoll, my question is what do the point of

09:55:38  17   care results show to you based on what this particular

09:55:38  18   patient was prescribed?

09:55:38  19       A.   Well, it shows the opiates and oxycodone which

09:55:38  20   were prescribed.  The only thing that's disturbing is

09:55:38  21   that the Xanax, benzodiazepines, didn't show up.  The

09:55:38  22   Xanax which is a benzodiazepine did not show up on the

09:55:38  23   screen.  And then again doctor/patient, Are you taking

09:55:38  24   the medicine I prescribed?  And he says, You know

09:55:38  25   something, I use that when I'm nervous.  I haven't been

| | |
|---|---|
| 09:55:38 | 1 |
| 09:55:38 | 2 |
| 09:55:38 | 3 |
| 09:55:38 | 4 |
| 09:55:38 | 5 |
| 09:55:38 | 6 |
| 09:55:38 | 7 |
| 09:55:38 | 8 |
| 09:55:38 | 9 |
| 09:55:38 | 10 |
| 09:55:38 | 11 |
| 09:55:38 | 12 |
| 09:55:38 | 13 |
| 09:55:38 | 14 |
| 09:55:38 | 15 |
| 09:55:38 | 16 |
| 09:55:38 | 17 |
| 09:55:38 | 18 |
| 09:55:38 | 19 |
| 09:55:38 | 20 |
| 09:55:38 | 21 |
| 09:55:38 | 22 |
| 09:55:38 | 23 |
| 09:55:38 | 24 |
| 09:55:38 | 25 |

nervous.  I haven't taken a Xanax.  Okay, we're going to stop prescribing it.  Again when you have a pain management patient, you are looking at not just are they not taking marijuana or cocaine, you'll look to make sure they are indeed taking what you are giving them.  In this particular circumstance, interestingly enough, one of the prescribed medications didn't show up.  And that is -- Again, I'm a doctor so I talk to patients.  That's a conflict -- I'm prescribing for you.  Didn't show up --that has to be resolved with a conversation with the patient.  If the patient says, "No, doctor.  I'm really taking it.  Honest.  I don't know what's with the test. I'm really taking it."  Then, okay, we'll play hard ball. We're going to test not for a thousand different substances, we'll test for Xanax, quantitative test.  And if it turns out positive, okay, the qualitative test was wrong. You're taking it.  Happy birthday.  Everything is okay.  But if the quantitative test, the double-check on the history, the prescriptions and the history and what the patient tells you.

Q.  Can we scroll out, Mr. Salazar, and go back to the full document.

So if you recall this morning, Mr. Cunningham directed your attention to the top of this page that says "specimen outcome positive."  Do you recall that?

09:55:38   1          A.    Yes.

09:55:38   2          Q.    Did he show you the second page with any of the

09:55:38   3    lab test results with the samples that he showed you

09:55:38   4    today?

09:55:38   5          A.    You mean the second page with the actual

09:55:38   6    quantitative --

09:55:38   7          Q.    Correct.

09:55:38   8                Can we go to the second page of the document,

09:55:38   9    Mr. Salazar?

09:55:38  10                Dr. Nicoll, could you please explain to the jury

09:55:38  11    what this tabulated result page means to you?

09:55:38  12          A.    Yeah.  I tried to say before that the results

09:55:38  13    that was a summary.  This is the actual laboratory test.

09:55:38  14    This is line by line, each of the drugs that they checked

09:55:38  15    for.  And line by line whether the amount -- whether the

09:55:38  16    drug was detected and what amount.  So it goes by class

09:55:38  17    of drugs.

09:55:38  18                Stop right there, the antidepressants which are

09:55:38  19    drugs for depression, it lists, I guess, about a dozen or

09:55:38  20    so.  None of which were present.  There was -- the

09:55:38  21    patient wasn't taking them and these tricyclics, these

09:55:38  22    antidepressants are not a drug of abuse.  People don't --

09:55:38  23    they don't take the tricyclic antidepressants on the

09:55:38  24    street.  That's not a street drug.  There's no reason to

09:55:38  25    have tested for it.  The barbiturates were tested

784

09:55:38  1    negative.  The patient wasn't taking them, didn't

09:55:38  2    prescribe them.  Very, very interesting.  The reason I'm

09:55:38  3    laughing is remember I said the patient was prescribed

09:55:38  4    benzodiazepines, remember I said the result of the

09:55:38  5    screening test did not show benzodiazepines.  Then you

09:55:38  6    have the conversation, Hey, guy, are you taking them or

09:55:38  7    not?  Honest, Doc, I'm taking them.  So then you do the

09:55:38  8    quantitative test.  And you say, you know something, you

09:55:38  9    are right.  The qualitative preliminary test was wrong.

09:55:38  10   You are taking it.  Everything is okay.  That makes

09:55:38  11   sense.

09:55:38  12          So if I was treating this patient I would do

09:55:38  13   opiates.  I don't care you are taking it.  I'd prescribed

09:55:38  14   it for you.  Came up positive.  But there was a

09:55:38  15   discrepancy between what I expected and what you told me

09:55:38  16   and the preliminary test.  And that was resolved

09:55:38  17   beautifully by this test.

09:55:38  18          Now, on the first page it says "positive."

09:55:38  19   Means did they detect anything.  If you detected

09:55:38  20   something that you expected to detect, that's not an

09:55:38  21   unusual positive.  To me that's a negative result.  You

09:55:38  22   got nothing.

09:55:38  23          If you go further down, lots and lots and lots

09:55:38  24   of pages of tests.  Go further.  Probably on the next

09:55:38  25   page, okay.  So here, aside from the lots and lots of

09:55:38  1    negative or other tests and classes of drugs, here you

09:55:38  2    have the specific drugs that were prescribed and when the

09:55:38  3    body gets a certain drug sometime it converts it to

09:55:38  4    another chemical.  These three drugs are the narcotics

09:55:38  5    that were prescribed and the way the body metabolizes and

09:55:38  6    changes, oxycodone becomes oxymorphone when it's

09:55:38  7    metabolized.   Interestingly, that's also important to

09:55:38  8    sometimes to do so you want to be sure the patient is

09:55:38  9    taking it and not just putting a pill -- a little pill

09:55:38  10   into the urine. So this confirms the patient -- I look at

09:55:38  11   this and say yes, the patient is taking the morphine that

09:55:38  12   was prescribed, the patient is taking the oxycodone that

09:55:38  13   was prescribed.  The patient is taking a metabolite of

09:55:38  14   the oxycodone so everything seems kosher.  Looking at

09:55:38  15   this, having done the test for them --  I wouldn't have

09:55:38  16   even done the test for narcotics unless I thought the

09:55:38  17   patient was trying to cheat.  There was an issue of one

09:55:38  18   drug that they said they were testing -- they said they

09:55:38  19   were taking and the testing was negative, so I confirmed

09:55:38  20   it.  If you want to do make really sure that the

09:55:38  21   narcotics that you were prescribing were taken, okay, you

09:55:38  22   can make sure with those tests.

09:55:38  23         When you look at the other pages and pages and

09:55:38  24   pages of different classes of drugs that are negative,

09:55:38  25   there was no reason to do it.

786

09:55:38  1          And again when you say confirm all negatives,
09:55:38  2   the purpose of the quantitative test to me, in medicine,
09:55:38  3   is to resolve a conflict between the history you take --
09:55:38  4   and that is why we were going before, the treating
09:55:38  5   physician to take a history, what is a history, what are
09:55:38  6   they taking, what is the result of the qualitative test
09:55:38  7   and then you decide on the quantitative testing.
09:55:38  8          THE COURT:  I think we need a little more focus
09:55:38  9   so we don't get eight-minute answers.
09:55:38  10          THE WITNESS:  I'm sorry.
09:55:38  11          MS. COSTIN:  I was trying to get there.
09:55:38  12          Mr. Salazar, can we go back to the first page of
09:55:38  13   these lab test results, please.
09:55:38  14          Dr. Nicoll, when Mr. Cunningham was asking you
09:55:38  15   questions and he directed you to the positive results.
09:55:38  16   He suggested that a positive results means it is
09:55:38  17   medically necessary.  Does a positive result mean it is
09:55:38  18   medically necessary?
09:55:38  19      A.   No.
09:55:38  20      Q.   Why not?
09:55:38  21      A.   Medical necessity is determined before you do
09:55:38  22   the test, not on the basis of a result.  So you do the
09:55:38  23   test because you have an immediate need to do it.  If it
09:55:38  24   was negative, it was still medically necessary,  If by
09:55:38  25   some quirk of fate, it was positive, by chance alone or

09:55:38  1    whatever, that didn't make it -- the decision of medical

09:55:38  2    necessity is based on the information you have before the

09:55:38  3    test was done, not after.

09:55:38  4            MS. COSTIN:  I have nothing further, Your Honor.

09:55:38  5            THE COURT:  That completes your testimony, sir.

09:55:38  6    You're excused, I believe.

09:55:38  7            THE WITNESS:  Thank you.

09:55:38  8            THE COURT:  And the Labs, your next witness.

09:55:38  9            MR. CHRIST:  Your Honor, the labs call Sharon

09:55:38  10   Hollis to the stand.

09:55:38  11           THE COURT:  Can I ask everybody to just be a

09:55:38  12   little careful about not rubbing the mic when you stand

09:55:38  13   up.  You're not the first, but I hope you're the last.

09:55:38  14           Sharon Hollis, is she here?

09:55:38  15           MR. CUNNINGHAM:  That was the witness, Your

09:55:38  16   Honor.

09:55:38  17           THE COURT:  Oh, I'm sorry.  I apologize,

09:55:38  18   counsel.

09:55:38  19           Ms. Hollis?  Ma'am, I'm up here.  If you could

09:55:38  20   come up to this area, please.  When you arrive, would you

09:55:38  21   remain standing a moment?

09:55:38  22           MR. CUNNINGHAM:  I was just telling her she may

09:55:38  23   want her sweater, Your Honor.

09:55:38  24           THE COURT:  I couldn't hear you, but it doesn't

09:55:38  25   matter.

| | | |
|---|---|---|
| 09:55:38 | 1 | SHARON HOLLIS, Having been called as a |
| 09:55:38 | 2 | witness, was first duly sworn and testified on her oath |
| 09:55:38 | 3 | as follows: |
| 09:55:38 | 4 | THE WITNESS:  I do. |
| 09:55:38 | 5 | THE CLERK:  Please be seated. |
| 09:55:38 | 6 | Please state your name for the record and spell |
| 09:55:38 | 7 | your last name. |
| 09:55:38 | 8 | THE WITNESS:  Sharon Hollis.  Last name |
| 09:55:38 | 9 | H-o-l-l-i-s. |
| 09:55:38 | 10 | THE COURT:  Good morning, ma'am. |
| 09:55:38 | 11 | You may proceed. |
| 09:55:38 | 12 | MR. CHRIST:  May it please the Court. |
| 09:55:38 | 13 | DIRECT EXAMINATION |
| 09:55:38 | 14 | BY MR. CHRIST: |
| 09:55:38 | 15 | Q.   Good morning or actually afternoon now, |
| 09:55:38 | 16 | Ms. Hollis.  How are you? |
| 09:55:38 | 17 | A.   Good, thank you. |
| 09:55:38 | 18 | Q.   Ms. Hollis, have you ever worked for a company |
| 09:55:38 | 19 | called Medytox Solutions? |
| 09:55:38 | 20 | A.   Yes. |
| 09:55:38 | 21 | Q.   And when was that? |
| 09:55:38 | 22 | A.   Started June, July, 2011. |
| 09:55:38 | 23 | Q.   What was your role in that position? |
| 09:55:38 | 24 | A.   VP of Operations. |
| 09:55:38 | 25 | Q.   I'm sorry.  I didn't hear that. |

09:55:38    1        A.    Sorry.  VP of Operations.

09:55:38    2        Q.    In that role, what were your primary

09:55:38    3    responsibilities?

09:55:38    4        A.    So, primary responsibilities were for the flows

09:55:38    5    and processes of the operations which included the

09:55:38    6    software.

09:55:38    7        Q.    Okay.  Flows and processes.  Can you explain a

09:55:38    8    little bit more what you mean by processes?

09:55:38    9        A.    Yeah.  It's just how to ensure seamless transfer

09:55:38   10    of information.  And through department to another

09:55:38   11    department of information and data, as well as onboarding

09:55:38   12    of new clients, et cetera.

09:55:38   13        Q.    Now, as part of that responsibility, did you

09:55:38   14    happen to develop a software program or product called

09:55:38   15    Advantage?

09:55:38   16        A.    I had already developed that software, yes.  And

09:55:38   17    then it continued to develop over time.

09:55:38   18        Q.    And why did you develop that software?

09:55:38   19        A.    Um, so in 2010, I had been asked by a marketing

09:55:38   20    group who had just come into contact with the toxicology

09:55:38   21    testing and they had agreements with approximately six

09:55:38   22    facilities to facilitate their testing with various labs.

09:55:38   23    At that time, they had not gotten any samples across the

09:55:38   24    door and they asked me to come in and consult and see how

09:55:38   25    we could help that process.

09:55:38    1          The best thing I could do at that point was

09:55:38    2    simply sit in with the physicians offices, which they

09:55:38    3    allowed me to sit and observe.  And it was just very

09:55:38    4    painfully obvious that they simply didn't have the time

09:55:38    5    to be able to keep up with the demand of the toxicology

09:55:38    6    testing.

09:55:38    7          So back then they were ultimately having to

09:55:38    8    write a paper requisition for every single patient that

09:55:38    9    was coming through their door.  This was mandated

09:55:38   10    testing, I believe, that came out in about 2009.  Where

09:55:38   11    they wanted pain management clinics to ensure that they

09:55:38   12    were testing their patients to ensure compliance with

09:55:38   13    their prescribed meds.  They would see approximately 20

09:55:38   14    to 30 patients a day.  On a paper requisition, you have

09:55:38   15    probably seen them, they have to add all the patient

09:55:38   16    information, the insurance information, a little bit of

09:55:38   17    history on there, and then, furthermore, the tests that

09:55:38   18    they want tested for.  So that was quite time-consuming

09:55:38   19    for these facilities that were already very much at the

09:55:38   20    max of their capacity for what they could do.

09:55:38   21          So I just created a software that

09:55:38   22    simplified that process.  It simply put that information

09:55:38   23    into a software and allowed them to automate that

09:55:38   24    information rather than have to handwrite on every single

09:55:38   25    paper requisition.  That further went to send the

09:55:38   1   information to the labs.  And it also allowed them to

09:55:38   2   keep track of their point of care testing so that their

09:55:38   3   billing at the end of the day wasn't taking three hours.

09:55:38   4       So we ultimately reduced the process for the

09:55:38   5   physician's office from two to three hours in the

09:55:38   6   morning, three hours in the afternoon for the billing,

09:55:38   7   down to a minute and a half in the morning and 30 seconds

09:55:38   8   in the afternoon.  Just simplified.

09:55:38   9       Q.   And I'm sorry.  I forgot if I asked you this.

09:55:38  10            What was the name of the software again?

09:55:38  11       A.   Advantage.

09:55:38  12       Q.   Would this software provide, and forgive the

09:55:38  13   pun, some sort of advantage to the labs who used it?

09:55:38  14       A.   It was an advantage for both.  Number one, it

09:55:38  15   allowed the physicians' offices to reduce the workload

09:55:38  16   that they already had, and allowed them to be compliant

09:55:38  17   with the testing that they needed to do.  And it ensured

09:55:38  18   and reduced errors.  As we know, automation of software

09:55:38  19   reduces those errors in data from a manual process into a

09:55:38  20   digital process basically.

09:55:38  21       Q.   Now, you mentioned earlier that part of your job

09:55:38  22   responsibilities as the Vice President of Operations at

09:55:38  23   Medytox would have been -- was processes, correct?

09:55:38  24       A.   Correct.

09:55:38  25       Q.   So would you be familiar with the process

09:55:38  1    Medytox would have employed to process lab test orders?

09:55:38  2        A.   Can you clarify?

09:55:38  3        Q.   Sure.  Would you have been familiar with the

09:55:38  4    process that the labs would have taken to, I guess, send

09:55:38  5    their orders to the -- I'm sorry -- that the physicians

09:55:38  6    would have taken to send the orders to the labs?

09:55:38  7        A.   Yes.  So just for clarity, when we talk about

09:55:38  8    process of the lab, I'm not a clinical person.  So I

09:55:38  9    can't speak for the processes within the lab for testing

09:55:38 10    on the equipment.

09:55:38 11            So I'm going to step back a little bit and talk

09:55:38 12    about the process that I was overseeing which would have

09:55:38 13    been the journey, if you like, of the patient or the

09:55:38 14    patient data from the physician's office through to the

09:55:38 15    labs, from the labs through to the billing company, and

09:55:38 16    then the billing company through to the insurance

09:55:38 17    carrier, back from the insurance carrier, and then a

09:55:38 18    response to the patient.

09:55:38 19            So just that flow.  If you imagine that flow.

09:55:38 20    We have all been there with our claims and our insurance

09:55:38 21    carriers.  We start at the doctors.  That information has

09:55:38 22    to get to the insurance carrier and go through various

09:55:38 23    different systems before it gets there and before you get

09:55:38 24    back a letter that says, hey, you owe this.

09:55:38 25        Q.   Okay.  Let's start from the beginning then.

793

09:55:38  1          I believe you said the first step was from the
09:55:38  2  physician's office to the labs, correct?
09:55:38  3      A.   From the physician's office to the lab, correct.
09:55:38  4      Q.   Could you walk us through that chain in the
09:55:38  5  process or that link in that chain?
09:55:38  6      A.   I'm sorry.  It's so cold in here.
09:55:38  7          THE COURT:  We're working on it.
09:55:38  8      A.   Sorry.  So we can start with -- yes, so just the
09:55:38  9  data point of view.
09:55:38 10      Q.   Just the data from your standpoint as VP of
09:55:38 11  operations.
09:55:38 12      A.   Okay.  So inside of Advantage, the physician's
09:55:38 13  office has already uploaded the information of their
09:55:38 14  patients and their facility.  Okay.  That includes their
09:55:38 15  MPI that qualifies them to be able to tell us that they
09:55:38 16  can order tests for this patient and that that patient is
09:55:38 17  their patient that they are taking care of.
09:55:38 18          They then decide who needs testing and what
09:55:38 19  testing they need.  That information gets put into the
09:55:38 20  Advantage system and they create an order.
09:55:38 21          They will then have the patient provide a sample
09:55:38 22  and the sample will get sent to the lab, either by Fed
09:55:38 23  Ex, UPS, or a courier to pick it up.  While that's en
09:55:38 24  route, the data has already transferred.  Once the sample
09:55:38 25  arrives at the lab, we then have a front end processing

794

09:55:38  1    team who take the sample.  It would typically have a bar

09:55:38  2    code on it.  They would check the bar code, check the

09:55:38  3    system that the order for that bar code is in the system,

09:55:38  4    that everything looked right.  And from there they would

09:55:38  5    simply say, okay, we received the sample.  And that data

09:55:38  6    from Advantage would then transfer from the Advantage

09:55:38  7    software to the lab's software.

09:55:38  8              MR. CHRIST:  Could we put up, Mr. Smeig, Cigna

09:55:38  9    Exhibit 16.  This is just for ID only at this point.

09:55:38  10             This is a Cigna exhibit.  There's no objection.

09:55:38  11   I would like to publish it or offer it.

09:55:38  12             THE COURT:  Is there objection to the publishing

09:55:38  13   to Cigna Exhibit 16?

09:55:38  14             MS. JACKSON:  No objection.

09:55:38  15             THE COURT:  Well, that's his no objection.  It's

09:55:38  16   Cigna's document.  It's up on the screen, ma'am.

09:55:38  17             MS. JACKSON:  No objection, Your Honor.

09:55:38  18             THE COURT:  Thank you.

09:55:38  19             It's a full exhibit.  May be published.

09:55:38  20   BY MR. CHRIST:

09:55:38  21      Q.   Ms. Hollis, do you see that on your screen?

09:55:38  22      A.   I do.

09:55:38  23      Q.   Mr. Smeig, can you just zoom in on the supplies

09:55:38  24   request portion at the bottom.  I won't have you read

09:55:38  25   that.  That's a lot.  The jury could look at it.

795

09:55:38  1          But, Ms. Hollis, do you see there that it says a

09:55:38  2   workstation setup and a request for a laptop?

09:55:38  3      A.   Yes.

09:55:38  4      Q.   Why would that have been on this document?

09:55:38  5      A.   It was typical process for most labs.  If a

09:55:38  6   facility is sending samples to a lab, you know, they're

09:55:38  7   not typically going to be ordering in office next to the

09:55:38  8   patient.  They're going to have a different workstation.

09:55:38  9   And we just facilitate that workstation.  It's still our

09:55:38  10  property.  It just allows them -- and a lot of the time

09:55:38  11  in physicians offices, they are not actually allowed to

09:55:38  12  have other things on their computers due to their

09:55:38  13  compliance.  This is in a browser, Advantage software.

09:55:38  14  So we created a separate station for them where the

09:55:38  15  samples and the labeling could be done outside of the

09:55:38  16  rush of clinic space.  So if they needed it, we provided

09:55:38  17  it.  And if they didn't, they had some other system down,

09:55:38  18  again it was accessed through the browser.  Just

09:55:38  19  depending on their facility.

09:55:38  20      Q.   Mr. Smeig, can you zoom out the whole document.

09:55:38  21          I jumped a little ahead of you.  But what is

09:55:38  22  this document?  What's the title there?

09:55:38  23      A.   That's a Client Registration Form.

09:55:38  24      Q.   What would this document have been used for?

09:55:38  25      A.   Can you enlarge that, please?

796

09:55:38  1       Q.   There you go.

09:55:38  2       A.   Okay.  So this is just a basic client setup.  So

09:55:38  3  what we want to do is we want to, first of all, confirm

09:55:38  4  if they have a clear number, an occupational license.  We

09:55:38  5  want to make sure that they are a doctor, that they have

09:55:38  6  an MPI number.  That they are registered individual that

09:55:38  7  can order tests.  Okay.  So part of that.  And then we

09:55:38  8  just trying to get to understand who our client is.  What

09:55:38  9  their insurance breakdown is.  What's the expected

09:55:38  10 volume.  Obviously, we have a capacity in the labs.  So

09:55:38  11 understanding expected volumes, which they know.  They

09:55:38  12 know how many patients they have coming in throughout the

09:55:38  13 week or the day.  Basic things.  How do they want these

09:55:38  14 samples picked up.  Are they local.  Do we have a courier

09:55:38  15 that can pick it up.  Do they need to send by FedEx.

09:55:38  16 Basic stuff.

09:55:38  17      Q.   Thank you.  You can put down, Mr. Smeig.  Thank

09:55:38  18 you.

09:55:38  19           Where we left off, I believe, was the sample has

09:55:38  20 now made it's way to the Lab, correct?

09:55:38  21      A.   Right.  Okay.  Yep, back to the process.

09:55:38  22      Q.   Back to the process.  What's the next link in

09:55:38  23 the chain that you've described?

09:55:38  24      A.   Okay.  Again, so when we talk about data.  If I

09:55:38  25 may just back up again.  We're talking about just simply

09:55:38  1    doing one on one match.  Each software system, as you can

09:55:38  2    imagine, has a different label.  They may say patient

09:55:38  3    name.  It may say first name, last name.  See, basic

09:55:38  4    things like this.

09:55:38  5            So what we're trying to do is ensure that the

09:55:38  6    date from each system can transfer from one piece of

09:55:38  7    software to another.  So we may have a one on one match.

09:55:38  8    In other words, we'll have first name in this software,

09:55:38  9    first name in that software.  Makes it super easy.

09:55:38  10   There's a nice match.  But if we have first name, last

09:55:38  11   name here and patient name here, then we got to be able

09:55:38  12   to make that many to one match in that case.  So we'll

09:55:38  13   have a one to one match, a one to many match or a many to

09:55:38  14   one match.

09:55:38  15           So that's the purpose of the transfers.  So now

09:55:38  16   the transfer from Advantage to the LIS, or that

09:55:38  17   information now gets passed into the -- I'm going to back

09:55:38  18   up.  An LIS --

09:55:38  19       Q.   I was going to ask you.  Can you tell us what an

09:55:38  20   LIS is?

09:55:38  21       A.   That's the Laboratory Information System.  So

09:55:38  22   each facility IS going to have a management system.  The

09:55:38  23   laboratory has one called the Laboratory Information

09:55:38  24   System or Management System.  And that ultimately brings

09:55:38  25   the information in, the data in for the patient, the

09:55:38  1    facilities and the insurance carriers.  It also has the

09:55:38  2    list of tests and the type of tests that the laboratory

09:55:38  3    will run.

09:55:38  4         Q.   Okay.

09:55:38  5         A.   So the tests have been ordered through

09:55:38  6    Advantage.  That information goes over to -- may I

09:55:38  7    shorten it to LIS?  Laboratory Information System is a

09:55:38  8    mouthful.

09:55:38  9         Q.   Sure.

09:55:38  10         A.   So that goes over to the LIS.  The LIS receives

09:55:38  11    the tests that need to be run for the patient, per the

09:55:38  12    provider's request.  And that then sets into motion the

09:55:38  13    equipment and want the equipment needs to run for that

09:55:38  14    sample.

09:55:38  15         Q.   Okay.  So now we're at the point where the

09:55:38  16    actual test is being run; is that correct?

09:55:38  17         A.   Correct.

09:55:38  18         Q.   What's the next step in this process?

09:55:38  19         A.   So the equipment runs, whether it's

09:55:38  20    quantitatives or qualitative.  That result goes back to

09:55:38  21    the LIS.  And the LIS simply provides the raw data of

09:55:38  22    that result, whether it's a yes or no from the

09:55:38  23    quantitative, or a value from the qualitative.  And that

09:55:38  24    comes back into the Advantage System, where the Advantage

09:55:38  25    System processes that information into a lab report.  And

799

09:55:38   1    that is then made available for the physician to see that

09:55:38   2    the report is now available for them to review.  And the

09:55:38   3    physicians can then go ahead and review their reports.

09:55:38   4          It will also then batch all the data for the

09:55:38   5    day.  All those tests that have been run for the day.

09:55:38   6    And that data then is moved via an HL7 transfer.

09:55:38   7    Q.    Forgive me.  What's an HL7 transfer?

09:55:38   8    A.    So an HL7 is ultimately a way to encrypt data.

09:55:38   9    And we're encrypting data for obvious reasons.  We need

09:55:38  10    to protect the patient information.  So that is an

09:55:38  11    encrypted file that is then sent to the software, to the

09:55:38  12    billing software this time.

09:55:38  13    Q.    Okay.  So I gather we're now approaching another

09:55:38  14    chain in this process or another link; is that correct?

09:55:38  15    A.    Correct.

09:55:38  16    Q.    Is that the billing portion of the link?

09:55:38  17    A.    That's the billing portion.

09:55:38  18    Q.    Walk us through us that part of the process, if

09:55:38  19    you will?

09:55:38  20    A.    Okay.  So here we go.  We understand how the

09:55:38  21    data transfers, whether it's one-to-one or one to many,

09:55:38  22    et cetera.  We know what information is passing through,

09:55:38  23    patient information, insurance information, and the

09:55:38  24    testing information.

09:55:38  25          The billing software is there purely to receive

09:55:38    1    what the test was or the service was provided, whether it

09:55:38    2    was by the physician's office or, in this case, the labs.

09:55:38    3    And then from that code, identify the CPT code, which is

09:55:38    4    the billing code that needs to attach to it.  So the

09:55:38    5    billing software has a data base of the CPT codes and the

09:55:38    6    clients or the facility's pricing for each one of those

09:55:38    7    CPT codes or tests.

09:55:38    8            So it simply sends the test that it was done.

09:55:38    9    That test attaches to the CPT code.  We have the patient

09:55:38   10    information, the provider information, the insurance

09:55:38   11    information, and the lab at which it was tested, along

09:55:38   12    with the test and the CPT codes.  And that creates a

09:55:38   13    claim.  And that claim is now sent on to the insurance

09:55:38   14    carriers.

09:55:38   15        Q.   How is that claim sent to the insurance carrier?

09:55:38   16        A.   One of two ways.  And this is sort of antiquated

09:55:38   17    in some respects.  Some insurance carriers still do not

09:55:38   18    receive, certainly back then, did not receive electronic

09:55:38   19    data transfers.  So for some of those claims, they would

09:55:38   20    have to be dropped to pay for that.  That's how we would

09:55:38   21    say it.  They would be dropped to pay in a paper claim

09:55:38   22    and that would be mailed out to the insurance carrier.

09:55:38   23        Q.   Now, if the insurance carrier received claims

09:55:38   24    electronically, how would the claims be processed then?

09:55:38   25        A.   So electronic claims would first leave the

09:55:38  1    billing software.  And, again, with an HL7 file.  I

09:55:38  2    believe it was an HL7 file.  Yeah.  That would then go

09:55:38  3    into your clearinghouse.  And the clearinghouse is

09:55:38  4    another software.  This one is a third party as well as

09:55:38  5    the billing software.  So these are third party systems.

09:55:38  6         Q.   So what is a clearinghouse?

09:55:38  7         A.   Okay.  So a clearinghouse, this is -- imagine

09:55:38  8    all the many insurance carriers that you have.  And

09:55:38  9    imagine it like the old telephone systems where you have

09:55:38  10   somebody put in the wires into the right place.  So

09:55:38  11   that's what the clearinghouse is doing.  It's basically

09:55:38  12   connecting the information to the correct insurance

09:55:38  13   carrier.

09:55:38  14        Each one of those insurance carriers have their

09:55:38  15   own software.  Their own software system.  Many times

09:55:38  16   proprietary systems.  Which means their data is going to

09:55:38  17   be written and titled in various different ways.  So the

09:55:38  18   clearinghouse takes the data that we give it in its

09:55:38  19   single form, and it transfers it to each of the insurance

09:55:38  20   carriers software in the way that they need to receive

09:55:38  21   it.

09:55:38  22        Q.   Okay.  Now, once it's at the clearinghouse,

09:55:38  23   what's the next step in the process?

09:55:38  24        A.   At that point we begin to receive communication

09:55:38  25   from the insurance carriers.  So the first thing that we

09:55:38    1    will be informed is did it or did it not get to the
09:55:38    2    insurance carrier.
09:55:38    3        Q.    And how would you know that?
09:55:38    4        A.    The clearinghouse would simply identify that it
09:55:38    5    had been received.  And it would also identify those that
09:55:38    6    were not received.
09:55:38    7        Q.    And if the claim was received, what would happen
09:55:38    8    next to that claim?
09:55:38    9        A.    So at that point, we are in a waiting game for a
09:55:38   10    response back from the insurance carrier.  So now the
09:55:38   11    insurance carrier takes over.  They begin their review.
09:55:38   12    We then await for communication back, again, whether that
09:55:38   13    was via paper or electronically, for approved, denied,
09:55:38   14    more information required.
09:55:38   15        Q.    So where claims are processed electronically,
09:55:38   16    what were the three -- strike that.
09:55:38   17            With claims that were processed electronically,
09:55:38   18    what type of communication would the labs receive back
09:55:38   19    from the insurance company?  What form of communication?
09:55:38   20        A.    Electronically was it?
09:55:38   21        Q.    Yes.
09:55:38   22        A.    Again, it's just raw data that we're receiving
09:55:38   23    back.  And as that data comes back, it will give that
09:55:38   24    approved, denied, or more information required.  So it's
09:55:38   25    called an explanation of benefits in that information

09:55:38  1    coming back if it is the approved or denied.  And in that
09:55:38  2    approved and denied, it will then give you the reasons
09:55:38  3    why the judgment has been made, if you like.  Right.
09:55:38  4    This is where this claim falls.  And they give codes and
09:55:38  5    those codes have the explanations to them.
09:55:38  6        Q.   So would you either receive a explanation of
09:55:38  7    benefit saying the claim is approved, is that one form?
09:55:38  8        A.   Yes.
09:55:38  9        Q.   And then would another form be that the claim
09:55:38  10   has been denied?
09:55:38  11       A.   Correct.
09:55:38  12       Q.   And if it was denied, would it say why?
09:55:38  13       A.   Correct.  So there would be times where we would
09:55:38  14   then be able to follow up with the denials.  It may say
09:55:38  15   it's not medically necessary, for instance.  That would
09:55:38  16   be a big one.  And then we would just simply, again,
09:55:38  17   provide the documentation that we have the ability to
09:55:38  18   provide as a lab to demonstrate the medical necessity.
09:55:38  19       Q.   Ms. Hollis, would there be instances where you
09:55:38  20   would not receive any information from an insurance
09:55:38  21   company, in this respect Cigna?
09:55:38  22       A.   I don't have the exact facts in front of me.
09:55:38  23   But, yeah.  I mean, sure.  There's plenty of times that
09:55:38  24   we just simply don't hear from them.
09:55:38  25       Q.   Going back from -- once you have received

804

09:55:38  1    information back from Cigna in the form of an explanation

09:55:38  2    of benefit, what is the next step in the process?

09:55:38  3        A.   Well, again, it really depends on what the

09:55:38  4    information was.  If we have an approval on an

09:55:38  5    explanation of benefits, you have the price that we said

09:55:38  6    we were charging.  And then, as an approval, you'll have

09:55:38  7    from the insurance carrier say, well, okay, we see this

09:55:38  8    price.  But this is going to be what we allow you our

09:55:38  9    insurance carrier for this type of testing.  So we have

09:55:38  10   the allowable amount.  And then, of course, they've got a

09:55:38  11   contract with the patients that say, you know, what

09:55:38  12   portion the patient is supposed to pay.  You've all seen

09:55:38  13   your explanation of benefits.  You may have a co-pay.

09:55:38  14   You may have a deductible.  So that then comes back with

09:55:38  15   patient responsibility for the co-pay or the deductible.

09:55:38  16   That becomes the patient's responsibility.  And then we

09:55:38  17   have -- and so that's ultimately what you have on an

09:55:38  18   approval.

09:55:38  19        The difference in the charged and the allowed, I

09:55:38  20   mean, out of that allowed, what portion of that is

09:55:38  21   patient responsibility.

09:55:38  22        Q.   And so the portion that you learn is the patient

09:55:38  23   responsibility, what would you do with that information?

09:55:38  24        A.   So patient responsibility -- I want to make sure

09:55:38  25   that we're not missing anything, because I know got

09:55:38    1    straight into patient responsibility.

09:55:38    2            Do we want to stay there or do we want to stay

09:55:38    3    with process?

09:55:38    4        Q.   Well, if you think there's a step that I've

09:55:38    5    missed along the process.

09:55:38    6        A.   Well, I'm just -- because we only talked about

09:55:38    7    approvals.

09:55:38    8        Q.   Let's put denials aside for right now.  So for

09:55:38    9    approvals, once you've learned what the patient

09:55:38    10   responsibility is, what is the next step there?

09:55:38    11       A.   So we have another system.  So we take that

09:55:38    12   information, patient responsibility, and we had another

09:55:38    13   third party that would create statements.  So, again, we

09:55:38    14   have to now transfer that information out to another

09:55:38    15   third party that creates statements.  Those statements

09:55:38    16   are then created by that data which the insurance

09:55:38    17   carriers have told us are the patient's responsibility

09:55:38    18   for their contract with their patients.  That then gets

09:55:38    19   dropped into a statement, along with the information from

09:55:38    20   the patient with their address, et cetera.  And then that

09:55:38    21   statement gets mailed out to a patient.

09:55:38    22       Q.   The same question but for denials.  Would that

09:55:38    23   process change at all?

09:55:38    24       A.   Yes.  So now we have a denial in.  And, again,

09:55:38    25   really depends, because there's a litany of different

09:55:38  1    reasons why they may deny the claim.  So we have a

09:55:38  2    department, the follow-up team.  And the follow-up team

09:55:38  3    are there to review all of the information that's come

09:55:38  4    back from the insurance carriers.  And they may follow up

09:55:38  5    with the insurance carriers if, say, we haven't heard

09:55:38  6    back from them at all, or they're going to follow up with

09:55:38  7    them if they requested more information.  Even without a

09:55:38  8    denial, hey, we need something else.  Can you provide

09:55:38  9    that.  Sure.  And it may just request we don't believe

09:55:38  10   this to be the case and we say, well, okay, this is why

09:55:38  11   we believe it is the case that we should get paid.  We

09:55:38  12   provided the test.  We were asked to run the test from

09:55:38  13   the physician's office.  We provided the test.  This is

09:55:38  14   demonstration that we did the work.  And now we are

09:55:38  15   requesting payment as per that work.

09:55:38  16        Q.   Now from when you described the process

09:55:38  17   originally, I think we have gone through all of the main

09:55:38  18   steps.  Is there any step I'm missing?  Patient to

09:55:38  19   patient at this point.  We're back to the patient.

09:55:38  20        A.   I mean, there's -- you know, you get into the

09:55:38  21   patient engagement with trying to attempt to make calls

09:55:38  22   to say patients and things like that.  But at the point

09:55:38  23   of data transfers, I believe we're there.

09:55:38  24             THE COURT:  Just a moment.  Counsel's on her

09:55:38  25   feet.  You may not hear her.

09:55:38  1            MS. JACKSON:  Your Honor, objection.  I believe

09:55:38  2   we're getting close to territory that we have agreed is

09:55:38  3   not at issue in the Labs case.

09:55:38  4            THE COURT:  Do you know what she's referring to?

09:55:38  5            MR. CHRIST:  Yes.  I wasn't attempting to wade

09:55:38  6   into that territory.  I'm not wading further.

09:55:38  7            THE COURT:  I'm sorry.  Now I know.

09:55:38  8            All right.  You are cautioned that you should

09:55:38  9   not wade.  Thank you.  It's not relevant.

09:55:38 10            MR. CHRIST:  Thank you.

09:55:38 11       Q.   Can we pull up Labs Exhibit 5003, please.

09:55:38 12            And, Ms. Hollis, do you see this document on

09:55:38 13   your screen?

09:55:38 14       A.   Yes.

09:55:38 15       Q.   Do you recognize this document?

09:55:38 16       A.   I do.

09:55:38 17            MR. CHRIST:  I would like to offer this

09:55:38 18   document, it's Labs 5003, into evidence.

09:55:38 19            THE COURT:  Any objection?

09:55:38 20            MS. JACKSON:  No objection, Your Honor.

09:55:38 21            THE COURT:  All right.  It will be marked as a

09:55:38 22   full exhibit and it may be published to the jury, Exhibit

09:55:38 23   5003.

09:55:38 24       Q.   Ms. Hollis -- actually, can we zoom in on the

09:55:38 25   right three paragraphs in the middle of the screen.

| | | |
|---|---|---|
| 09:55:38 | 1 | Okay.  Perfect. |
| 09:55:38 | 2 | Ms. Hollis, do you see that document or those |
| 09:55:38 | 3 | three paragraphs with the title Consent Assignment of |
| 09:55:38 | 4 | Benefits? |
| 09:55:38 | 5 | A.   I do. |
| 09:55:38 | 6 | Q.   Are you familiar with that language?  I don't |
| 09:55:38 | 7 | need you to read it. |
| 09:55:38 | 8 | A.   I mean, I'm familiar with it, yup. |
| 09:55:38 | 9 | Q.   What was the purpose of that? |
| 09:55:38 | 10 | A.   So when a patient comes into a facility, that |
| 09:55:38 | 11 | says that they are prepared to be tested and provide |
| 09:55:38 | 12 | their insurance information to be billed. |
| 09:55:38 | 13 | Q.   Would this insurance information or -- excuse |
| 09:55:38 | 14 | me. |
| 09:55:38 | 15 | Would this consent have been included in the |
| 09:55:38 | 16 | Advantage software? |
| 09:55:38 | 17 | A.   Yes. |
| 09:55:38 | 18 | Q.   So this information would have been kind of on |
| 09:55:38 | 19 | the freight train, if you will, that has been traveling |
| 09:55:38 | 20 | through the various stops we've discussed?       MS. |
| 09:55:38 | 21 | JACKSON:  Objection, leading. |
| 09:55:38 | 22 | THE WITNESS:  No. |
| 09:55:38 | 23 | THE COURT:  Wait just a moment.  When lawyer |
| 09:55:38 | 24 | objects -- |
| 09:55:38 | 25 | THE WITNESS:  Oh, I'm sorry. |

09:55:38    1            THE COURT:  That's all right.  No way for you to

09:55:38    2    know.  You can't answer until I rule.

09:55:38    3            Overruled.

09:55:38    4       Q.   You can answer now.

09:55:38    5       A.   So, no, this doesn't transfer all the way

09:55:38    6    through.  This is a static form that remains in the

09:55:38    7    Advantage System.  Some things, for instance, when the

09:55:38    8    information comes into the Advantage System, or a patient

09:55:38    9    is brought into a facility, they're basically taking a

09:55:38    10   copy of their driver's license, a copy of their insurance

09:55:38    11   card, and they have this filled out, as well as the

09:55:38    12   client registration.  Those forms all stay in the

09:55:38    13   Advantage System.  There's no need for them to travel

09:55:38    14   through this static things.  They are not raw data.  But

09:55:38    15   they are available should they need to be provided at the

09:55:38    16   billing process.

09:55:38    17      Q.   Could we also now pull up Lab's Exhibit 5004,

09:55:38    18   please.  I'm sorry.  Stay at 5003.  Could we zoom out for

09:55:38    19   a minute.  For the whole document, if possible.  Okay.

09:55:38    20           My apologies.  Let's go to Exhibit 5004, please.

09:55:38    21   Could you scroll down to the next page.

09:55:38    22           Again, I would like to offer this Exhibit 5004,

09:55:38    23   page 2, into evidence if there's no objections.

09:55:38    24           THE COURT:  Any objection?

09:55:38    25           MS. JACKSON:  My only objection is that we do

09:55:38  1   have a limiting instruction.  To the extent they want to
09:55:38  2   introduce handwritten portions, but they do appear to be
09:55:38  3   redacted.
09:55:38  4         THE COURT:  I think that's correct.  Do you
09:55:38  5   agree?
09:55:38  6         MR. CHRIST:  Yes.
09:55:38  7         THE COURT:  So this exhibit is admitted.  You
09:55:38  8   said at 2.  Is this what was marked on the list as 5004
09:55:38  9   or you only offering part?
09:55:38  10        MR. CHRIST:  No, I was referring to page 2 of
09:55:38  11  the exhibit.  I'm offering 5004.
09:55:38  12        THE COURT:  Lab 5004 is admitted as a full
09:55:38  13  exhibit.
09:55:38  14        It's the same limiting instruction I gave about
09:55:38  15  the doctors, you know, signatures.  The consent forms,
09:55:38  16  there's now been two admitted, there may be more, into
09:55:38  17  evidence.  The consent forms contain handwritten
09:55:38  18  signatures within the document.  The handwritten
09:55:38  19  signatures themselves are admitted only for the purposing
09:55:38  20  of evidencing the Labs received the consent forms with
09:55:38  21  the handwritten signatures within the ordinary course of
09:55:38  22  business.  And the Labs practice was, after review, to
09:55:38  23  accept and act upon those handwritten signatures.
09:55:38  24        So you should accept this testimony, as well as
09:55:38  25  for the prior exhibit, with that instruction limiting.

09:55:38  1              Thank you.  Go ahead.

09:55:38  2        Q.   Ms. Hollis, does this look like a similar

09:55:38  3   patient consent form that we just discussed in the other

09:55:38  4   exhibit?

09:55:38  5        A.   Yes.

09:55:38  6        Q.   At the top, does this reference the laboratory

09:55:38  7   is Epic Reference Labs?

09:55:38  8        A.   It does.

09:55:38  9              MR. CHRIST:  I would like to move to Exhibit

09:55:38 10   5005, please.

09:55:38 11              THE COURT:  Any objection to this?

09:55:38 12              MS. JACKSON:  Same objection, with the limiting

09:55:38 13   instruction that has been given.

09:55:38 14              THE COURT:  The same instruction I just gave you

09:55:38 15   about 30 seconds ago will apply to this.  Thank you.

09:55:38 16              MR. CHRIST:  May we publish it?

09:55:38 17              THE COURT:  Yes, you may.  I'm sorry.

09:55:38 18              MR. CHRIST:  Thank you.

09:55:38 19              THE COURT:  Exhibit 5005 is a full exhibit.

09:55:38 20   BY MR. CHRIST:

09:55:38 21        Q.   Again, Ms. Hollis, is this a similar patient

09:55:38 22   consent form to the two others we just reviewed?

09:55:38 23        A.   Yes.

09:55:38 24        Q.   At the top, does this identify a specific

09:55:38 25   laboratory?

812

09:55:38  1    A.   Yes.

09:55:38  2    Q.   What laboratory is that for?

09:55:38  3    A.   PB Labs.

09:55:38  4         MR. CHRIST:  And could we go back real quick to

09:55:38  5    what was previously introduced as the Labs 5003.

09:55:38  6    BY MR. CHRIST:

09:55:38  7    Q.    I forgot to ask you this question, but do you

09:55:38  8    see at the top a logo there?

09:55:38  9    A.   Yes.

09:55:38  10   Q.   And what was this patient consent form for?

09:55:38  11   A.   That is for BioHealth Medical Laboratory.

09:55:38  12   Q.   Going back to the process.

09:55:38  13        MR. CHRIST:  You can take that down Mr. Smeig.

09:55:38  14   Thank you.

09:55:38  15   BY MR. CHRIST:

09:55:38  16   Q.   Going back to the process that you described

09:55:38  17   from patient to labs to billing company to insurance

09:55:38  18   company, back to labs, back to patient, how would a lab

09:55:38  19   that received a test order from a physical know that you

09:55:38  20   could bill an insurance company such as Cigna?

09:55:38  21   A.   I'm sorry.  Ask the question again.

09:55:38  22   Q.   Sure.  How would a lab know if -- actually, let

09:55:38  23   me just move on to another question.

09:55:38  24        In the process that you explained that we have

09:55:38  25   walked through, would you be able to tell if the labs

09:55:38  1   relayed a bill to Cigna?

09:55:38  2        A.   Would I be able to tell?  What was the question?

09:55:38  3   I'm so sorry.

09:55:38  4        Q.   So based on the process you described, if Cigna

09:55:38  5   possesses information in their records of claims

09:55:38  6   submitted by labs, how would that information have left

09:55:38  7   the labs and ended up in Cigna's possession?

09:55:38  8        A.   How do the insurance carriers get a claim from

09:55:38  9   the lab?

09:55:38  10       Q.   Yes.

09:55:38  11       A.   Okay.  Well, I mean, it starts obviously with a

09:55:38  12  doctor's order, a request from the doctor to provide a

09:55:38  13  test for a patient's sample.  And the data just transfers

09:55:38  14  through all the processes we discussed, ends up at the

09:55:38  15  insurance carriers and then comes back to us.

09:55:38  16            MR. CHRIST:  Thank you.  No further questions.

09:55:38  17            THE COURT:  Cross-examination.

09:55:38  18                      CROSS-EXAMINATION

09:55:38  19  BY MS. JACKSON:

09:55:38  20       Q.   Good afternoon Ms. Hollis.  I believe you were

09:55:38  21  deposed in this case.  I was able to attend virtually,

09:55:38  22  but I don't believe we've met before.  So you were

09:55:38  23  actually one of the original cofounders of Medytox

09:55:38  24  Solutions; is that correct?

09:55:38  25       A.   Yes.

09:55:38  1      Q.   And you had the idea for the software known as

09:55:38  2   Advantage?

09:55:38  3      A.   Yes.

09:55:38  4      Q.   You developed it with a graphic designer and a

09:55:38  5   software developer?

09:55:38  6      A.   Yes.  Myself and David storyboarded it, correct.

09:55:38  7      Q.   So when you first started on with Medytox, you

09:55:38  8   were the VP of operations; is that correct?

09:55:38  9      A.   Yes.

09:55:38  10      Q.   And at some point around 2013, you were the CEO

09:55:38  11   PB Laboratories?

09:55:38  12      A.   I think it was a very short period.  I don't

09:55:38  13   know whether it was 2013 or 2012, I can't remember

09:55:38  14   exactly.  I know there was a very short period of time

09:55:38  15   that I took position of CEO, which was ultimately just to

09:55:38  16   get the facilities up and running, yes.

09:55:38  17      Q.   You mentioned this before at your deposition,

09:55:38  18   but your role was mainly to get PB Laboratories up and

09:55:38  19   running at that point?

09:55:38  20      A.   Correct.  I can't remember whether it was CEO of

09:55:38  21   a specific lab or the entity that ran the labs, so I --

09:55:38  22   somewhere around there, ultimately, yes.

09:55:38  23      Q.   And your role was to hire people for PB Labs?

09:55:38  24      A.   Yes.

09:55:38  25      Q.   Because when Medytox first acquired PB Labs,

09:55:38  1    there was only one individual working there?

09:55:38  2         A.   At the time, yes.

09:55:38  3         Q.   There was no equipment, no lab supervisor, no

09:55:38  4    med techs?

09:55:38  5         A.   No.  So she ultimately was the med tech and she

09:55:38  6    had a medical director over the lab, obviously.  You have

09:55:38  7    to have those sort of things in place.

09:55:38  8         Q.   Who are you referring to?

09:55:38  9         A.   Sorry.  The lady who owned the lab at the time.

09:55:38  10   I forget the name.

09:55:38  11        Q.   But there was one individual there.  You had to

09:55:38  12   build it from the ground up?

09:55:38  13        A.   Yes.

09:55:38  14        Q.   When you did that, did you have any prior

09:55:38  15   experience with building a toxicology lab from the ground

09:55:38  16   up?

09:55:38  17        A.   No.  Absolutely not, just like I didn't with the

09:55:38  18   software.

09:55:38  19        Q.   You didn't have any experience working in a

09:55:38  20   toxicology lab?

09:55:38  21        A.   No.

09:55:38  22        Q.   Did you have any experience with the equipment

09:55:38  23   that performs the drug testing?

09:55:38  24        A.   No, absolutely not.

09:55:38  25        Q.   Did you have any experience in health care

09:55:38  1    before you started with Medytox?

09:55:38  2         A.   No.

09:55:38  3         Q.   Did you have a degree in health care?

09:55:38  4         A.   No.

09:55:38  5         Q.   Did you have any experience working in medal

09:55:38  6    coding -- medical coding?

09:55:38  7         A.   Nope.

09:55:38  8         Q.   Any experience in medical billing?

09:55:38  9         A.   No.

09:55:38  10        Q.   You testified in deposition last year that you

09:55:38  11   still have no experience with medical billing?

09:55:38  12        A.   No.

09:55:38  13        Q.   Just making sure.  And besides what you

09:55:38  14   described in terms of our role with the software, do you

09:55:38  15   have any experience working with health insurance

09:55:38  16   companies?

09:55:38  17        A.   No.

09:55:38  18        Q.   And you have no medical training?

09:55:38  19        A.   Nope.

09:55:38  20        Q.   And no professional experience in toxicology?

09:55:38  21        A.   Correct.

09:55:38  22        Q.   No professional experience in addiction

09:55:38  23   treatment?

09:55:38  24        A.   No.

09:55:38  25        Q.   And before you started working for Medytox, your

09:55:38  1    primary experience was in retail sales, correct?

09:55:38  2        A.    No.

09:55:38  3        Q.    What was your prior experience?

09:55:38  4        A.    So I had run businesses from the age of 18 up.

09:55:38  5        Q.    You were operating some dance schools?

09:55:38  6        A.    Dance schools and events, and festivals and

09:55:38  7    real estate.  And then a short little gig in retail sales

09:55:38  8    and then on to sales director for training sales.

09:55:38  9        Q.    But you would agree with me that most of what

09:55:38 10    you just described was related to sales?

09:55:38 11        A.    There was a good majority that was due to sales,

09:55:38 12    yes.

09:55:38 13        Q.    So let's go back to your role as VP of

09:55:38 14    operations at Medytox.  So in that role, did you

09:55:38 15    personally have any roles and responsibilities with

09:55:38 16    respect to billing insurance?

09:55:38 17        A.    No.

09:55:38 18        Q.    And did you have any roles and responsibilities

09:55:38 19    with respect to billing patients?

09:55:38 20        A.    No.

09:55:38 21        Q.    Billing was not your department, right?

09:55:38 22        A.    No.  My department was simply making sure that

09:55:38 23    the data transferred and the processes were in place to

09:55:38 24    allow that to happen.

09:55:38 25        Q.    Okay.  Thank you.  And did you have anything to

09:55:38  1     do with negotiating contracts on behalf of the company?

09:55:38  2         A.    No.

09:55:38  3         Q.    Because that was -- Medical Billing Choices was

09:55:38  4     Medytox's fully-owned billing company?

09:55:38  5         A.    Ask the question again.

09:55:38  6         Q.    So Medical Billing Choices was the billing

09:55:38  7     company that Medytox owned at this time?

09:55:38  8         A.    So it got full ownership of Medical Billing

09:55:38  9     Choices in, I believe, 2015.

09:55:38  10        Q.    But it was the company that Medytox relied on

09:55:38  11    for billing --

09:55:38  12        A.    Correct.

09:55:38  13        Q.    -- throughout the time period?

09:55:38  14        A.    Yes.

09:55:38  15        Q.    And it was doing the billing for the

09:55:38  16    laboratories?

09:55:38  17        A.    Correct.

09:55:38  18        Q.    You are familiar with the laboratories at issue

09:55:38  19    in the case?

09:55:38  20        A.    I'm familiar with all of the entities, yes.

09:55:38  21        Q.    And you testified previously at your deposition

09:55:38  22    that you have no oversight of MBC operations?

09:55:38  23        A.    No.

09:55:38  24        Q.    And you would rely on Mike Nicholson as a person

09:55:38  25    with most knowledge about MBC?

09:55:38  1    A.    You can imagine I relied on a lot of experts for

09:55:38  2  a lot of these processes, yes.

09:55:38  3    Q.    So in your role as VP of operations, you also

09:55:38  4  did not have any roles and responsibilities with respect

09:55:38  5  to financial accounting?

09:55:38  6    A.    No.

09:55:38  7    Q.    You weren't the one signing off on the 10-Ks or

09:55:38  8  writing to auditors?

09:55:38  9    A.    Absolutely not.

09:55:38 10    Q.    That would be the CFO at the time or the CEO?

09:55:38 11    A.    CFO or the CEO, correct.

09:55:38 12    Q.    But they both -- I think they both had to sign

09:55:38 13  off on the 10-Ks?

09:55:38 14    A.    I would imagine, yes.

09:55:38 15    Q.    So the CFO at that time was Jace Simmons?

09:55:38 16    A.    Jace Simmons, yes, in the early years.

09:55:38 17    Q.    So you would rely on him as a person for

09:55:38 18  knowledge about financial accounting and reporting for

09:55:38 19  Medytox at that time?

09:55:38 20    A.    I didn't need to rely on Jace for anything.

09:55:38 21  Nothing that Jace was doing from an accounting point of

09:55:38 22  view had anything to do with the processes and the flows

09:55:38 23  of the rest of the operation, correct. So you would see

09:55:38 24  me as basically a facilitator, right.  We have these

09:55:38 25  wonderful experts in development, in clinical, in

09:55:38  1    sciences, in billing, in coding, and they ultimately --

09:55:38  2    their brains, their skill set, their training, their

09:55:38  3    degrees, their experiences, that's what comes together to

09:55:38  4    collaborate as to what needs to happen.  I simply -- I

09:55:38  5    see myself as an operational facilitator, right, and I

09:55:38  6    bring that together and we are able to collaborate and

09:55:38  7    from that create the best processes that they determined

09:55:38  8    that they need ultimately.  Does that make sense?

09:55:38  9        Q.   Yes.  Thank you for that.  So you left Medytox

09:55:38  10   in 2015?

09:55:38  11       A.   Yes.  I mean, we were still attached, but I was

09:55:38  12   working on my own project at that time.

09:55:38  13       Q.   So you took a sabbatical for about a year or two

09:55:38  14   and you were working with a software company called Pet

09:55:38  15   -- Pet Corp.

09:55:38  16       A.   I created an EVMR system.  Sorry.  Acronyms

09:55:38  17   again.  So it's like a hospital -- it's like a medical

09:55:38  18   practice system, an EMR, but for vets, EVMR, rather than

09:55:38  19   EMR.

09:55:38  20       Q.   So just final question.  You were not employed

09:55:38  21   by Medytox after 2015?

09:55:38  22       A.   I was still employed by Medytox.  I wasn't quite

09:55:38  23   working with them on day-to-day operations.

09:55:38  24            MS. JACKSON:  Thank you so much.

09:55:38  25            THE WITNESS:  Thank you.

```
09:55:38   1              THE COURT:  Ms. Hollis, you may be excused.
09:55:38   2    Thank you very much for your testimony.  Thank you.
09:55:38   3              THE WITNESS:  Thank you.
09:55:38   4              THE COURT:  Your next witness.
09:55:38   5              Are the Labs calling their next witness, please?
09:55:38   6              MR. HARE:  Thank you.  Scott Hare for the Labs.
09:55:38   7    If it please the Court, we call Jackie Thelian.
09:55:38   8              THE COURT:  Yes.  Ms. Thelian, if you could come
09:55:38   9    up here to the witness stand area where I'm pointing.
09:55:38  10    And if you'd remain standing a moment so the clerk may
09:55:38  11    administer an oath to you.
09:55:38  12              THE WITNESS:  Thank you.
09:55:38  13              THE CLERK:  Would you raise your right hand.
09:55:38  14                        JACQUELINE THELIAN,
09:55:38  15    having been called as a witness, was first duly sworn and
09:55:38  16              testified on her oath as follows:
09:55:38  17              THE WITNESS:  I do.
09:55:38  18              THE CLERK:  Please be seated.  Please state your
09:55:38  19    name for the record, spelling your last name.
09:55:38  20              THE WITNESS:  Jacqueline Thelian.
09:55:38  21              MR. HARE:  Thank you, Your Honor.
09:55:38  22                        DIRECT EXAMINATION
09:55:38  23    BY MR. HARE:
09:55:38  24       Q.   Ma'am, I'll refer to you, of course, during your
09:55:38  25    examination as Ms. Thelian.  I realize that out of force
```

09:55:38   1   of habit I referred to you as Jackie.  Do you go by

09:55:38   2   Jackie outside the courtroom?

09:55:38   3       A.   I do.

09:55:38   4       Q.   Before we turn to your testimony, were you hired

09:55:38   5   by my law firm to provide a review and opinions and

09:55:38   6   testimony in this case?

09:55:38   7       A.   I was.

09:55:38   8       Q.   Have you done that?

09:55:38   9       A.   Yes, I did.

09:55:38  10       Q.   Are you prepared today to give your testimony in

09:55:38  11   this lawsuit?

09:55:38  12       A.   I am.

09:55:38  13       Q.   Let's begin first with your own background and

09:55:38  14   qualifications.

09:55:38  15            MR. HARE:  Mr. Smeig, if I could ask you to put

09:55:38  16   up Labs Exhibit 6961.  Your Honor, I understand this is

09:55:38  17   offered without objection.

09:55:38  18            THE COURT:  Is that correct, Counsel for Cigna?

09:55:38  19            MS. COSTIN:  Yes, Your Honor.

09:55:38  20            THE COURT:  Thank you.  It may be published as a

09:55:38  21   full exhibit.  It's admitted.

09:55:38  22            MR. HARE:  Thank you, Your Honor.

09:55:38  23   BY MR. HARE:

09:55:38  24       Q.   Ms. Thelian, what is this document that we're

09:55:38  25   looking at?

09:55:38  1      A.   It's my CV.

09:55:38  2      Q.   Your CV.  Is that your professional biography?

09:55:38  3      A.   Yes, it is.

09:55:38  4      Q.   I am going to be asking you some questions about

09:55:38  5  your background.  As we go through your history, would

09:55:38  6  it be helpful from time to time for you to be able to

09:55:38  7  consult your CV?

09:55:38  8      A.   It's fine.  I can do it or not, with or without.

09:55:38  9      Q.   Okay.  Let's just start with this.  What is your

09:55:38  10 profession, ma'am?

09:55:38  11     A.   I'll a certified professional coder.

09:55:38  12     Q.   What does that profession entail?

09:55:38  13     A.   It's a health care consultant.  So I typically

09:55:38  14 do chart audits.  I do monitorship for physicians who

09:55:38  15 potentially might get called for OPMC, the Office of

09:55:38  16 Professional Medical Conduct.  I do audits on behalf of

09:55:38  17 physicians for the Office of Inspector General on federal

09:55:38  18 cases.  I also do audits OMIG, the Office of Medicaid

09:55:38  19 Inspector General.  We do a lot of work, my company does,

09:55:38  20 with compliance, helping providers to understand the

09:55:38  21 complex coding system.  And we do a lot of education for

09:55:38  22 providers, facilities, health care providers.

09:55:38  23     Q.   You reference "my company."  What's the name of

09:55:38  24 your company?

09:55:38  25     A.   I'm sorry.  Medco Consultants.

09:55:38  1        Q.    Are you an owner of Medco?

09:55:38  2        A.    I am.

09:55:38  3        Q.    Does that company have any particular

09:55:38  4    certifications?

09:55:38  5        A.    The company itself, I'm a minority woman owned

09:55:38  6    business.

09:55:38  7        Q.    What's your formal education and any particular

09:55:38  8    training that equipped you to become a certified

09:55:38  9    professional coder?

09:55:38  10        A.    Okay.  So to become a certified professional

09:55:38  11    coder you have to take an examination to become certified

09:55:38  12    in coding.  And if you would like to instruct other

09:55:38  13    students or people who want to become certified, I have

09:55:38  14    also a certification, it's called a CPCI, a certified

09:55:38  15    professional educator or instructor, so I can train those

09:55:38  16    who wish to become certified.  I also have a CPMA, which

09:55:38  17    is a Certified Professional Medical Auditor instructor

09:55:38  18    certification.  And I also have a CHCA, which is a

09:55:38  19    certified chart auditor and educator.

09:55:38  20        Q.    Are you a member of any professional

09:55:38  21    organizations?

09:55:38  22        A.    I am.  The American Academy of Professional

09:55:38  23    Coders.  I'm also a member and actually a board member of

09:55:38  24    the Certified Healthcare Chart Auditors as well.

09:55:38  25             MR. HARE:  Can we turn to page 3 of this

| | | |
|---|---|---|
| 09:55:38 | 1 | exhibit, please. |
| 09:55:38 | 2 | BY MR. HARE: |
| 09:55:38 | 3 | Q.   Ms. Thelian, have you published any professional |
| 09:55:38 | 4 | papers on articles? |
| 09:55:38 | 5 | A.   I have, yes, and also a book. |
| 09:55:38 | 6 | Q.   I'm sorry. |
| 09:55:38 | 7 | A.   Also a book. |
| 09:55:38 | 8 | Q.   Okay.  We're looking now at page 3 of your CV, |
| 09:55:38 | 9 | and I believe it rolls over to page 4.  Is this a list |
| 09:55:38 | 10 | of your publications? |
| 09:55:38 | 11 | A.   It is. |
| 09:55:38 | 12 | Q.   It looks like, if we go to the top, the earliest |
| 09:55:38 | 13 | I see is from 1990 -- forgive me, 1999? |
| 09:55:38 | 14 | A.   Correct. |
| 09:55:38 | 15 | Q.   And to is it fair to say that for some 25 years |
| 09:55:38 | 16 | you have published in your profession? |
| 09:55:38 | 17 | A.   Yes. |
| 09:55:38 | 18 | MR. HARE:  May we please now forward to page 5 |
| 09:55:38 | 19 | of Exhibit 6961. |
| 09:55:38 | 20 | BY MR. HARE: |
| 09:55:38 | 21 | Q.   Have you testified in court or other |
| 09:55:38 | 22 | administrative proceedings previously? |
| 09:55:38 | 23 | A.   Yes. |
| 09:55:38 | 24 | Q.   If we look at pages 5, 6, and I believe 7 of |
| 09:55:38 | 25 | your CV.  Is this a list of cases or other contested |

09:55:38  1    matters in which you have testified previously?

09:55:38  2        A.    Correct.

09:55:38  3        Q.    Now, do you do expert witness work as your sole

09:55:38  4    occupation?

09:55:38  5        A.    No.

09:55:38  6        Q.    What is it that occupies most of your day-to-day

09:55:38  7    professional life?

09:55:38  8        A.    Chart auditing and education.

09:55:38  9        Q.    Other than providing expert testimony and

09:55:38 10    analysis, just can you share some of the types of

09:55:38 11    engagements for which people would hire you to provide

09:55:38 12    your expertise?

09:55:38 13        A.    Monitorship.  So some providers who need to be

09:55:38 14    monitored to make sure that their documentation and

09:55:38 15    coding is up to date, and actually that the documentation

09:55:38 16    supports the services that they are billing for.

09:55:38 17    Similarly, there's integrity agreements where physicians

09:55:38 18    or companies may have gotten into trouble with federal

09:55:38 19    government for improper coding, billing for services that

09:55:38 20    either they did not do specific to the requirement of

09:55:38 21    that particular CPT code.  So they would be monitored for

09:55:38 22    either three or five years.

09:55:38 23        Q.    Is your work in reviewing coding and billing

09:55:38 24    specific to the medical profession?

09:55:38 25        A.    No.  I also can review dental and durable

09:55:38  1    medical equipment.

09:55:38  2         Q.   Okay.  Thank you.

09:55:38  3              MR. HARE:  Your Honor, my understanding is that

09:55:38  4    the Court has already accepted both sides --

09:55:38  5              THE COURT:  I don't -- there will be an

09:55:38  6    objection if it's deemed you are asking something outside

09:55:38  7    the scope.

09:55:38  8              MR. HARE:  Exactly.

09:55:38  9              THE COURT:  Under that, you can proceed, sir.  I

09:55:38  10   thoughts of that and forgot to mention it this morning to

09:55:38  11   both sides.

09:55:38  12             MR. HARE:  Thank you, Your Honor.

09:55:38  13   BY MR. HARE:

09:55:38  14        Q.   Before we turn to your specific analysis and

09:55:38  15   opinions in this case, I want to talk about a couple of

09:55:38  16   terms that maybe we have heard and try to get an

09:55:38  17   understanding.  We may hear reference to CPT codes or the

09:55:38  18   Current Procedural Terminology codes.  Could you explain

09:55:38  19   to the jury what CPT codes are?

09:55:38  20        A.   Sure.  CPT stands for Current Procedural

09:55:38  21   Terminology.  So every time you would go to a physician

09:55:38  22   and that physician might see you for an office visit or

09:55:38  23   maybe a hearing test or to order certain tests, there are

09:55:38  24   numbers that get attached to those office visits and the

09:55:38  25   tests.  And the way that the physicians and facilities

09:55:38  1   will bill the insurance company is not by giving a

09:55:38  2   lengthy description of what was done.  They would give a

09:55:38  3   code.  And that code is a called a CPT code.  They are

09:55:38  4   five-digit codes, and each of those codes could describe

09:55:38  5   a surgery, a laboratory test, an office visit.

09:55:38  6         A HCPCS code is a Healthcare Common Procedural

09:55:38  7   Code coding system.  And that is a different subset of

09:55:38  8   codes, and that represents either durable medical

09:55:38  9   equipment, things like wheelchairs, commodes, and also

09:55:38  10  drugs are included in the HCPCS code set as well.

09:55:38  11        Q.   And HCPCS, is that H-C-P-C-S?

09:55:38  12        A.   Correct.

09:55:38  13        Q.   And I say for the benefit of a court reporter.

09:55:38  14             I want to turn now to this case in particular.

09:55:38  15  Shortly, we'll go through your opinions in some detail,

09:55:38  16  but initially could you just explain to the jury what it

09:55:38  17  is you were hired to do in this case?

09:55:38  18        A.   I was hired to look through certain subset of

09:55:38  19  records to determine if the documentation in those

09:55:38  20  medical records supported the CPT codes that were billed

09:55:38  21  to the insurance company.

09:55:38  22        Q.   And can you elaborate on that and say

09:55:38  23  specifically what your objectives -- what the objectives

09:55:38  24  of the engagement were?

09:55:38  25        A.   Again, the objective was to determine if the --

09:55:38  1    in this particular case, if the laboratory reports were

09:55:38  2    reported to -- or billed out with the correct CPT codes.

09:55:38  3         Q.   Did you also examine to the extent claims had

09:55:38  4    been denied for payment by CIGNA --

09:55:38  5         A.   Yes.

09:55:38  6         Q.   -- the denial reasons and rationale?

09:55:38  7         A.   Yes.  I'm sorry.  That's what I mean when I say

09:55:38  8    to review it.  So if there were claim denials by the

09:55:38  9    insurance company, I would look to see if those claim

09:55:38 10    denials appeared to be valid according to the rules and

09:55:38 11    regs and instructions in the CPT and HCPCS manuals.

09:55:38 12         Q.   Were you given records and documents to review

09:55:38 13    for purposes of your analysis and opinion?

09:55:38 14         A.   Yes.  I was given a set of 20 medical records,

09:55:38 15    which included onboarding information when the laboratory

09:55:38 16    would onboard with a particular laboratory.  The orders,

09:55:38 17    which is also included in the onboarding.  The laboratory

09:55:38 18    summaries, laboratory tests and the CMS 1500 claim forms,

09:55:38 19    which is a form that an insurance company will process a

09:55:38 20    claim from.  So it is the provider -- if you recall when

09:55:38 21    I was talking about the CPT codes and the HCPCS codes,

09:55:38 22    those are the codes that get transposed or, you know,

09:55:38 23    listed on the CMS 1500 claim form, and that claim form

09:55:38 24    goes to the insurance company.  And that's how the

09:55:38 25    insurance company will process a claim based upon the

09:55:38  1    codes.

09:55:38  2        Q.   CMS 1500, is that a standard form that's used in

09:55:38  3    your profession?

09:55:38  4        A.   Yes, it is.

09:55:38  5        Q.   What is CMS?

09:55:38  6        A.   CMS is the Centers for Medicare and Medicaid

09:55:38  7    Services.

09:55:38  8        Q.   That's a federal government agency?

09:55:38  9        A.   Yes, it is.

09:55:38  10        MR. HARE:  May we see, please, Labs Exhibit

09:55:38  11   6960.  Again, Your Honor, I understand this is offered

09:55:38  12   without objection.

09:55:38  13        THE COURT:  Okay.  It may be published.  It is a

09:55:38  14   full exhibit.

09:55:38  15   BY MR. HARE:

09:55:38  16        Q.   Ms. Thelian, we're looking now at the first page

09:55:38  17   of a 16-page documents marked Appendix A, Documents

09:55:38  18   Considered.  Would you explain what this document sets

09:55:38  19   out?

09:55:38  20        A.   This is a listing of all the documents that I

09:55:38  21   reviewed to formulate my analysis or opinions.

09:55:38  22        Q.   If we look at the last dark header line that

09:55:38  23   says Bates Numbered Records.  Do you see that?

09:55:38  24        A.   I do.

09:55:38  25        Q.   Bates numbering, what does that refer to?

09:55:38  1    A.    That's a number that's at the bottom of a

09:55:38  2  particular page or a document.  Each document has a

09:55:38  3  specified number.  So when you are looking at multiple

09:55:38  4  documents, it's easier to identify a document by a Bates

09:55:38  5  number than perhaps a title.

09:55:38  6    Q.    Then I see on page 1, looks like there are 29

09:55:38  7  lines of documents and document ranges, all prefaced with

09:55:38  8  Cigna.  What do you understand that to be?

09:55:38  9    A.    That these were documents from Cigna.

09:55:38  10    Q.    Produced in discovery?

09:55:38  11    A.    Correct.

09:55:38  12        MR. HARE:  Could we please jump to the last

09:55:38  13  page.  So 16 of 16 in this exhibit.

09:55:38  14  BY MR. HARE:

09:55:38  15    Q.    And I see more lines, this time ending at the

09:55:38  16  bottom on line 670.  Do you see that, Ms. Thelian?

09:55:38  17    A.    I do.

09:55:38  18    Q.    At this time we see Bates numbering in a range

09:55:38  19  prefaced by Labs.  What are those documents?

09:55:38  20    A.    Those are documents from the laboratory.

09:55:38  21    Q.    Taking as an example any of these, we look at

09:55:38  22  the first line on this lasting page Labs Bates number

09:55:38  23  ending in 080 through 083.  Are many of these 670 lines

09:55:38  24  multiple page documents?

09:55:38  25    A.    Yes.

09:55:38  1       Q.   All told, do you have an order of magnitude

09:55:38  2  guess as to the number of documents you reviewed for

09:55:38  3  purposes of your analyses?

09:55:38  4       A.   I wouldn't want to speculate, but it had to be

09:55:38  5  literally over a thousand.

09:55:38  6       Q.   Thank you.  Did you review any other materials

09:55:38  7  in preparation for your assessment and report and

09:55:38  8  testimony, for example, any professional or standard

09:55:38  9  manuals or materials in your profession?

09:55:38  10       A.   Yes.

09:55:38  11       Q.   And what did some of those include?

09:55:38  12       A.   Well, it's not enough just to look at the CPT

09:55:38  13  code that's reported.  There are rule and regs and

09:55:38  14  instructions to report each of those codes.  That's why

09:55:38  15  auditing is important.  So there's something called an

09:55:38  16  MUE, or Medical Unbelievable Edit, where it will tell you

09:55:38  17  how many times that particular service can be reported to

09:55:38  18  the same patient on the same day.

09:55:38  19          Then thre's NCCI edits, National Correct Coding

09:55:38  20  Initiative, which will tell you which does are bundled or

09:55:38  21  unbundled, meaning that some of them you can bill.

09:55:38  22  Others you cannot bill together.  The CPT manual itself,

09:55:38  23  although it provides instruction in each subheading,

09:55:38  24  whether it's laboratory or radiology, it also references

09:55:38  25  -- underneath those particular CPT codes there's little

09:55:38  1    arrows, some are red, some are green, but they each give

09:55:38  2    you additional documentation to look at which gives you

09:55:38  3    instruction.  Some are from the CPT Assistant, which

09:55:38  4    gives you a greater detail or in-depth reporting

09:55:38  5    information.  Some of them are for --  the other color

09:55:38  6    arrows would be for radiology.

09:55:38  7          But for this particular case, what I did lock at

09:55:38  8    was the CPT Assistant, the NCCI Edits, the MUE.  There's

09:55:38  9    also local coverage determinations that comes from

09:55:38  10   Medicare, they're LCDs.  So Medicare is an important

09:55:38  11   document to look at because they are basically the gold

09:55:38  12   standard on documentation.  And then there's LCAs or

09:55:38  13   Local Coverage Articles, which are related to the LCDs.

09:55:38  14      Q.   Do the CPT codes or usage of the CPT codes ever

09:55:38  15   change over time?

09:55:38  16      A.   They do.  They change every year.  Not every

09:55:38  17   single code in the book, but different sections.  There's

09:55:38  18   a committee and -- it's called the RUC committee, and

09:55:38  19   they come in and they review the value for the codes and

09:55:38  20   then the American Medical Association will take a look at

09:55:38  21   the codes to see if they need to be updated.  Because as

09:55:38  22   technology comes, you know, faster and faster, the CPT

09:55:38  23   manual itself has a difficult time keeping up with all of

09:55:38  24   the new types of services.  So they are updated yearly.

09:55:38  25      Q.   And as these codes are revised over time, are

834

| | |
|---|---|
| 09:55:38 | 1 |

those revisions published so that folks in your

profession and the medical profession are aware of the

latest usage?

A.   Absolutely.   The codes come out in November, but

they're for use in January is when, you know, the new

coding will start.   So sometimes you have new codes,

sometimes you have deleted codes, which means that a code

that you were use for a long period of times you may no

longer be able to use.   And then there are codes that are

revised, which means the same thing, you know, because

the descriptor of the code changes, a code that you were

using all along you may not be able to use.   And a code

that you never used since the revision came about, you

might be able to use.

Q.   Ms. Thelian, I think the jury has already seen

we're talking about medical billing and records that go

back as long as a decade ago, 2013, 2014, 2015.   When you

reviewed the file -- the records in this case, were you

applying the 2024 version of the CPT codes or the

applicable codes from the specific dates at issue?

A.   We were using the codes that were relative to

the time period.   That's very important.   And, you know,

a lot of people make that mistake, they will pick up a

2024 book, and meanwhile that claim can be from 2012 or

2013.   So the first thing I tell my students is your

09:55:38 1    books are very valuable.  They are your tools, right,

09:55:38 2    much like a carpenter would have a toolbox.  You want to

09:55:38 3    save your tools because these audits do go back several

09:55:38 4    years.  So the older books are very important to save.

09:55:38 5         Q.   You explained why you would use the appropriate

09:55:38 6    year.  Let me just ask the question.  Did you, in fact,

09:55:38 7    apply the relevant year to each set of bills that you

09:55:38 8    reviewed?

09:55:38 9         A.   Yes.

09:55:38 10        Q.   Thank you.  Did you also -- one other thing.

09:55:38 11   Did you review any of the deposition testimony from the

09:55:38 12   witnesses taken in discovery in this case?

09:55:38 13        A.   Yes.

09:55:38 14        Q.   Okay.  I want to start looking at some of these

09:55:38 15   records in particular.  If I could ask --

09:55:38 16             THE COURT:  I think this would be a good place

09:55:38 17   to take -- oh, sorry.  We've got another 15 minutes.  I

09:55:38 18   keep wanting to break at 1:00.  My apologies.  I always

09:55:38 19   like to jump in at a good time to do it, but it's not the

09:55:38 20   time.  Go ahead, Counsel.  My apologies.

09:55:38 21             MR. HARE:  It would be if we were further along,

09:55:38 22   Your Honor, because there is a turning point.

09:55:38 23             THE COURT:  If we weren't freezing to death.  I

09:55:38 24   have written four times.  I think my assistant is

09:55:38 25   downstairs with a crowbar, but it's still 64.  I can only

836

09:55:38  1    apologize.  I may go down with the crowbar at break.  But

09:55:38  2    go ahead, Counsel.

09:55:38  3            MR. HARE:  Thank you, Your Honor.

09:55:38  4            If we could look at Joint Exhibit J14, which I

09:55:38  5    understand is already in.

09:55:38  6            THE COURT:  Yes, it is, I believe.  Joint

09:55:38  7    Exhibit 14 is published.

09:55:38  8    BY MR. HARE:

09:55:38  9        Q.   My first question, Ms. Thelian, is whether you

09:55:38  10   recognize the document we have put up as Exhibit Joint

09:55:38  11   14.  This is multiple pages, and we're only looking at

09:55:38  12   one of them.

09:55:38  13       A.   Yes, I recognize it.

09:55:38  14       Q.   What do you recognize Exhibit Joint 14 to be?

09:55:38  15       A.   This is one of the sets of records that I looked

09:55:38  16   at for the Labs.

09:55:38  17       Q.   Okay.  And you referenced earlier 20 sets of

09:55:38  18   records.  Do you recall saying that?

09:55:38  19       A.   Yes.

09:55:38  20       Q.   Is this one of those 20?

09:55:38  21       A.   Yes.

09:55:38  22       Q.   Now, the page we're looking at, which is

09:55:38  23   actually the second page of Exhibit J14, is a letter on

09:55:38  24   Cigna letter stock from Stephanie Canto in the Cigna

09:55:38  25   audit unit dated July 15, 2013.  Do you see that?

09:55:38  1      A.    I do.

09:55:38  2      Q.    What do you understand this transmittal letter

09:55:38  3  to be?

09:55:38  4      A.    This is a letter and it's to the Lab, and it's

09:55:38  5  basically asking for medical records or documentation.

09:55:38  6          MR. HARE:  Okay.  And if we could click down to

09:55:38  7  the third page of Exhibit J14.

09:55:38  8  BY MR. HARE:

09:55:38  9      Q.    Do you recognize this page?

09:55:38  10     A.    I do.

09:55:38  11     Q.    And we're not going to drill deep into the

09:55:38  12 detail on these pages right now, but at a top level, what

09:55:38  13 do you recognize this page or this document to be?

09:55:38  14     A.    This is from Medytox to NPB [sic] Laboratories.

09:55:38  15 This appears to me to be an onboarding order. --

09:55:38  16         MR. HARE:  Mr. Smeig, if you could click down at

09:55:38  17 page or two or three, and I just want to give Ms. Thelian

09:55:38  18 the opportunity to acquaint herself again with Exhibit

09:55:38  19 J14.

09:55:38  20 BY MR. HARE:

09:55:38  21     Q.    These appear to the contents of one of the 20

09:55:38  22 patient records?

09:55:38  23     A.    Correct.

09:55:38  24         MR. HARE:  Your Honor, I'm going to try to do

09:55:38  25 this quickly, but I want to establish that there are 20

09:55:38  1    sets of patient records, and I am going to ask that we

09:55:38  2    publish Joint Exhibit J15 through J33, all of which are

09:55:38  3    in evidence and represent the 20 sets of patient records

09:55:38  4    we have heard about.  I would like Ms. Thelian just to

09:55:38  5    confirm that these are the records she reviewed.

09:55:38  6         THE COURT:  That's fine.

09:55:38  7    BY MR. HARE:

09:55:38  8         Q.  So looking about J15.  Ms. Thelian, is this one

09:55:38  9    of the sets of patient records?

09:55:38  10        A.  Yes.

09:55:38  11        Q.  J15 is 39 pages long.  Do you want us to go

09:55:38  12   through any further detail?

09:55:38  13        A.  No.

09:55:38  14             MR. HARE:  May we see Joint 16?

09:55:38  15        A.  Correct.

09:55:38  16   BY MR. HARE:

09:55:38  17        Q.  And you recognize this document?

09:55:38  18        A.  Yes.

09:55:38  19        Q.  This is again 346 pages in length.  Do you need

09:55:38  20   today to see all of those pages?

09:55:38  21        A.  I do not.

09:55:38  22             MR. HARE:  May we see Joint 17.

09:55:38  23        A.  Yes.

09:55:38  24   BY MR. HARE:

09:55:38  25        Q.  Same question, same answer?

09:55:38  1        A.    Correct.

09:55:38  2        Q.    Okay.  That is 1,313 pages.  You reviewed those

09:55:38  3    in the course of your preparation for this case?

09:55:38  4        A.    I did.

09:55:38  5              MR. HARE:  May we see Exhibit Joint 18, please.

09:55:38  6        A.    I see it.  I'm sorry.

09:55:38  7    BY MR. HARE:

09:55:38  8        Q.    This is a slight 265 pages.  Is this something

09:55:38  9    that you reviewed in preparation for your testimony?

09:55:38  10       A.    Yes.

09:55:38  11             MR. HARE:  May we see J20.

09:55:38  12    BY MR. HARE:

09:55:38  13       Q.    Same question, Ms. Thelian.

09:55:38  14       A.    Yes.

09:55:38  15       Q.    You reviewed these documents in your

09:55:38  16    preparation?

09:55:38  17       A.    Yes.

09:55:38  18             MR. HARE:  May we see J21.  And Your Honor, I

09:55:38  19    apologize for the mechanical nature of this.

09:55:38  20             THE COURT:  Just keep going.  I think it is

09:55:38  21    clear what you are trying to do and I understand why you

09:55:38  22    are doing it.

09:55:38  23             MR. HARE:  Is J21 -- actually, let's go to the

09:55:38  24    second page of J21.  And we see that same July 15 letter.

09:55:38  25    If you can click a third page down.

```
09:55:38   1   BY MR. HARE:
09:55:38   2      Q.   Same kind of document that you reviewed,
09:55:38   3   Ms. Thelian?
09:55:38   4      A.   Yes.
09:55:38   5           MR. HARE:  Let's go back to the third page of
09:55:38   6   J21.
09:55:38   7   BY MR. HARE:
09:55:38   8      Q.   Here, we see what looks like a table and says
09:55:38   9   member last name, member first name at the top.  Do you
09:55:38  10   see that?
09:55:38  11      A.   Yes.
09:55:38  12      Q.   Then I see that the names are substantially
09:55:38  13   redacted but for initials.  Do you see that?
09:55:38  14      A.   I do.
09:55:38  15      Q.   And we're going to come back to patient
09:55:38  16   initials.  But in preparing your materials and your
09:55:38  17   report, did you use patient initials in lieu of full
09:55:38  18   names in order to protect patient privacy rights?
09:55:38  19      A.   On some of the summary charts I used initials.
09:55:38  20   In my original reports, I used the full names.
09:55:38  21      Q.   And we're not disclosing full Thames to the jury
09:55:38  22   in court.  Is that your understanding?
09:55:38  23      A.   Correct.
09:55:38  24           MR. HARE:  May we now see J22.
09:55:38  25   BY MR. HAR
```

```
09:55:38   1        Q.   Same question, is this another set of medical
09:55:38   2   records you reviewed?
09:55:38   3        A.   Yes.
09:55:38   4             MR. HARE:  J23, please.
09:55:38   5   BY MR. HARE:
09:55:38   6        Q.   Same question, something you reviewed?
09:55:38   7        A.   Yes.
09:55:38   8        Q.   J24?
09:55:38   9        A.   Yes.
09:55:38  10        Q.   J25?
09:55:38  11        A.   Yes.
09:55:38  12        Q.   J26?
09:55:38  13        A.   Yes.
09:55:38  14        Q.   J27?
09:55:38  15        A.   Yes.
09:55:38  16        Q.   J28?
09:55:38  17        A.   Yes.
09:55:38  18        Q.   J29?
09:55:38  19        A.   Yes.
09:55:38  20        Q.   J30?
09:55:38  21        A.   Yes.
09:55:38  22        Q.   J31?
09:55:38  23        A.   Yes.
09:55:38  24        Q.   J32?
09:55:38  25        A.   Yes.
```

09:55:38  1      Q.    And J33?

09:55:38  2      A.    Yes.

09:55:38  3      Q.    Now I have counted, but does this reflect the 20

09:55:38  4  sets of patient records that you reviewed?

09:55:38  5      A.    I don't know that there were 20 that you showed

09:55:38  6  me, but I did look at 20.

09:55:38  7      Q.    Were you in the courtroom for some of

09:55:38  8  Dr. Nicoll's testimony?

09:55:38  9      A.    I was.

09:55:38  10     Q.    Did you hear him say he reviewed ten patient

09:55:38  11  records -- ten sets of patient records?

09:55:38  12     A.    I did.

09:55:38  13     Q.    Did you review just ten or these or did you

09:55:38  14  review all 20?

09:55:38  15     A.    I reviewed all 20.

09:55:38  16     Q.    But when I say did you review them, can you

09:55:38  17  describe to us what you did, what you were looking for,

09:55:38  18  what your process was in going through these 20 sets of

09:55:38  19  patient records, numbering thousands of pages?

09:55:38  20     A.    I, too, like to look at things on paper.  It's

09:55:38  21  much easier, you know, marking up, highlighting, sorting.

09:55:38  22  I just find it to be a little bit more convenient.  So

09:55:38  23  the first thing I did was to print out all of these 20

09:55:38  24  records.  And yes, some of them were a thousand pages.

09:55:38  25  But I was able to at least put them in chronological

843

| | | |
|---|---|---|
| 09:55:38 | 1 | order.  Sometimes you like to look at the information |
| 09:55:38 | 2 | that way. |
| 09:55:38 | 3 | Then what I would do is I would first determine |
| 09:55:38 | 4 | the CPT codes that being billed and pull out the rules |
| 09:55:38 | 5 | and the regs and the NCI edit.  Obviously all of those |
| 09:55:38 | 6 | documents that would give me information about those |
| 09:55:38 | 7 | particular codes. |
| 09:55:38 | 8 | Then I would look at the medical records |
| 09:55:38 | 9 | themselves.  In this case, the laboratory reports, to see |
| 09:55:38 | 10 | if, A, you did have an order for the testing on file, |
| 09:55:38 | 11 | which was from the onboarding file, and then determine if |
| 09:55:38 | 12 | the documentation from the laboratory reports supported |
| 09:55:38 | 13 | each of those CPT codes or HCPCS codes that were billed |
| 09:55:38 | 14 | and the diagnosis codes as well into play. |
| 09:55:38 | 15 | Q.   The jury, of course, will have access to these |
| 09:55:38 | 16 | full exhibits to the extent they want to review.  Rather |
| 09:55:38 | 17 | than pulling them out and working our way through them in |
| 09:55:38 | 18 | open court, were you able to extract the information that |
| 09:55:38 | 19 | you were looking for from each of these sets of 20 |
| 09:55:38 | 20 | patient records and prepare a summary? |
| 09:55:38 | 21 | A.   Yes. |
| 09:55:38 | 22 | MR. HARE:  May we see Labs Exhibit 6966.  I |
| 09:55:38 | 23 | understand this is offered without objection. |
| 09:55:38 | 24 | THE COURT:  6966 Labs Exhibit.  There's no |
| 09:55:38 | 25 | objection, it will be published as a full exhibit. |

844

| | |
|---|---|
| 09:55:38 | 1 |
| 09:55:38 | 2 |
| 09:55:38 | 3 |
| 09:55:38 | 4 |

BY MR. HARE:

Q.   Is that on your screen, Ms. Thelian?

A.   It is.  Is there any way you can make that a little bit bigger?

Q.   If you are able to do a call out of the -- we'll say the top section.  Now we'll need to scroll left to right because this is a landscape print.  But let me just start at the top level, Ms. Thelian.  Do you recognize this document?

A.   I do.

Q.   Is this the summary that you prepared?

A.   It's one of the summaries, yes.

Q.   Does this summary accurately reflect the information that you found when you reviewed the underlying medical records of thousands of pages?

A.   Yes.

Q.   So I want to start right where we are on this screen.  And just reading left to right the header line for each of these columns.  Would you just -- some of them are self-explanatory, but just tell us what that particular column represents?

A.   Sure.  So the first one is the patient's name, which has been replaced with the patient initials for privacy purposes.

Q.   Forgive me to interrupt.  Are these the initials

09:55:38  1   that we saw on one of a top level sheets in the

09:55:38  2   underlying patient records that we just walked through?

09:55:38  3       A.   Yes.

09:55:38  4       Q.   Okay.

09:55:38  5       A.   After patient name is the specimen collection

09:55:38  6   date.  That's typically the date that the specimen was

09:55:38  7   collected.  And then POC stands for point of care,

09:55:38  8   positive test.  So that column would show what tests were

09:55:38  9   positive on the point of care for that particular date of

09:55:38  10  collection.

09:55:38  11      Q.   May I stop you there.  What is point of care

09:55:38  12  that POC reference that you've put in your heading?

09:55:38  13      A.   Point of care is any test that's done in the

09:55:38  14  physician's office.  In this case, usually for point of

09:55:38  15  care for the drug testing it's a urine cup, and urine

09:55:38  16  would go in the cup and then that cup -- the specimen is

09:55:38  17  tested for various types of drugs.

09:55:38  18      Q.   So point of care, that is the physician's

09:55:38  19  officer or the treatment facility as opposed to the

09:55:38  20  testing lab?

09:55:38  21      A.   Correct.

09:55:38  22      Q.   Okay.  Then we see POC positive and a hash,

09:55:38  23  number sign?

09:55:38  24      A.   Right.  So what I wanted to do was look at a

09:55:38  25  information to see which point of care tests were

09:55:38  1    positive and how many of the tests showed up as positive.

09:55:38  2         MR. HARE:  Okay.  Now can we just begin to sweep

09:55:38  3    over, Mr. Smeig, and look at the next column.

09:55:38  4         A.   Okay.  The next column is the results from the

09:55:38  5    laboratory.  So this would list the positive tests that

09:55:38  6    time laboratory found.  And the following column would be

09:55:38  7    the number of tests that the laboratory found positive.

09:55:38  8    And the last column, Medco, that's my company name.  So

09:55:38  9    that would be the findings that we had.  This would show

09:55:38 10    whether there were any differences or discrepancies

09:55:38 11    between the point of care and the laboratory test.

09:55:38 12         Alert usually would be if there were duplicate

09:55:38 13    tests in there, meaning that -- in some case in all of

09:55:38 14    those documents that I was reviewing, some of them were

09:55:38 15    thousands of pages, we had duplicates in there.  So that

09:55:38 16    would be the alert.

09:55:38 17         THE COURT:  I think we're going to take a break

09:55:38 18    now.

09:55:38 19         MR. HARE:  Thank you, Your Honor.

09:55:38 20         THE COURT:  I have the right time now, right,

09:55:38 21    Liana?  All right.  So it's our lunch break.  Please get

09:55:38 22    some fresh air.  I think it's warmer outside, but I'm not

09:55:38 23    sure.  And we will continue to attempt to get the

09:55:38 24    attention of the maintenance department.  Thank you.

09:55:38 25         MR. HARE:  This witness understands she's not to

```
09:55:38   1    speak to us during the break.
09:55:38   2           THE COURT:  Can you wait until the jury leaves.
09:55:38   3    Thank you.
09:55:38   4           (In the absence of the jury at 1:15 p.m.)
09:55:38   5           THE COURT:  Did you understand that, ma'am?
09:55:38   6           THE WITNESS:  I couldn't hear her.
09:55:38   7           MR. HARE:  Thank you, Your Honor.
09:55:38   8           THE COURT:  Could you close the door for me,
09:55:38   9    please.  Thank you very much.
09:55:38  10           Excuse me, Attorney Radshaw.  I don't know if
09:55:38  11    Liana needs to go to the jury.  Do you need to or not?
09:55:38  12           THE CLERK:  I can in a minute.
09:55:38  13           THE COURT:  That's fine.  You can tell me later
09:55:38  14    what that's about.
09:55:38  15            There are a couple of things I want to address.
09:55:38  16    The Nicholson thing, there were two issues this morning.
09:55:38  17    I can't remember what it is.  I've got to look at
09:55:38  18    something, I think, and so I will, particularly the
09:55:38  19    ruling that was referenced.  So I will come back to that.
09:55:38  20    I don't think there's terrible rush to do it right now.
09:55:38  21            There was some mention about a Thelian/Haney
09:55:38  22    issue.  I thought it was suggested it was about this
09:55:38  23    witness.  So I guess I felt I needed to address that.
09:55:38  24            MS. COSTIN:  Your Honor, Ms. Thelian's Opinion 3
09:55:38  25    in her report addresses whether or not the SIU denial for
```

848

09:55:38  1    fee forgiveness was proper or not.  We believe that

09:55:38  2    that's already been decided by Your Honor and

09:55:38  3    excluded from the case.

09:55:38  4         THE COURT:  Right.

09:55:38  5         MS. COSTIN:  So we think that any testimony

09:55:38  6    regarding her opinion about fee forgiving or the SIU

09:55:38  7    denial for fee forgiving should not be mentioned during

09:55:38  8    her testimony.

09:55:38  9         THE COURT:  Well, Attorney Hare, I'll ask you --

09:55:38  10        MR. HARE:  Your Honor, I don't intend to have

09:55:38  11   her testify at all with respect to the propriety of that

09:55:38  12   denial.  We do have all of the denied claims identified

09:55:38  13   in their respective buckets.  So there's a universe of

09:55:38  14   claims that were denied claims.  As it happens, they were

09:55:38  15   denied for fee forgiving.  I need to be able to identify

09:55:38  16   that these are denied claims that comprise part of what

09:55:38  17   we're seeking to recover in this case.

09:55:38  18        I understand that the Court has ruled that Cigna

09:55:38  19   cannot defend against those claims on grounds of fee

09:55:38  20   forgiving because of the shortcomings of the policy

09:55:38  21   language, but I need to be able to identify these are all

09:55:38  22   of the claims at issue.

09:55:38  23        THE COURT:  So it's some kind of chart or

09:55:38  24   something, and at the time it says denied for fee

09:55:38  25   forgiveness?

| 09:55:38 | 1 | MR. HARE:  It is.  And then really this comes |
| 09:55:38 | 2 | into play then.  It's Mr. Haney who quantifies the -- |
| 09:55:38 | 3 | THE COURT:  Yeah, I -- how do you propose we |
| 09:55:38 | 4 | deal with that from Cigna's point of view?  I mean, I |
| 09:55:38 | 5 | have already written down on the list of opinions, I |
| 09:55:38 | 6 | crossed it out and I say no fee forgiveness.  I'm well |
| 09:55:38 | 7 | aware that it's not part of your defense of the case, but |
| 09:55:38 | 8 | don't know what you want me to do with a chart that was |
| 09:55:38 | 9 | prepared for that ruling and identifies it as the reason. |
| 09:55:38 | 10 | MS. COSTIN:  We have no objection to the chart |
| 09:55:38 | 11 | or the quantification or identification of the claims. |
| 09:55:38 | 12 | It's just the testimony about whether the Labs |
| 09:55:38 | 13 | collecting, patients, the fee forgiveness, that entire |
| 09:55:38 | 14 | line of testimony is just irrelevant. |
| 09:55:38 | 15 | THE COURT:  That sounds perfect.  I appreciate |
| 09:55:38 | 16 | that.  And it looks Attorney Hare is happy. |
| 09:55:38 | 17 | MR. HARE:  I had no intent of going and wasting |
| 09:55:38 | 18 | the jury's time on that. |
| 09:55:38 | 19 | MS. COSTIN:  Mr. Hare, for Haney as well, |
| 09:55:38 | 20 | exclude the same? |
| 09:55:38 | 21 | MR. HARE:  So as I understand, Cigna continues |
| 09:55:38 | 22 | to intend in its clawback claim to seek a recovery on an |
| 09:55:38 | 23 | unjust enrichment claim on the rationale that the Labs |
| 09:55:38 | 24 | engaged in bad conduct, including fee forgiving. |
| 09:55:38 | 25 | THE COURT:  Correct. |

09:55:38  1          MR. HARE:  Mr. Haney opines with respect to the

09:55:38  2    quality and nature of the proof that supports this

09:55:38  3    rational of fee forgiving.  To the extent fee forgiving

09:55:38  4    remains an issue in Cigna's claim against us, we're

09:55:38  5    entitled to probe adequacy of their evidence and

09:55:38  6    analysis.

09:55:38  7          THE COURT:  I agree with that.  If you don't, I

09:55:38  8    guess you're going to tell me.  Obviously, this is one

09:55:38  9    of those cases where -- I don't know, I suppose -- I

09:55:38  10   thought we agreed we weren't going to call -- recall

09:55:38  11   people except I thought we made a footnote exception that

09:55:38  12   could be experts.  So it's really a defense to their

09:55:38  13   claim or defense of the theory.  So you -- could you

09:55:38  14   recall Haney?

09:55:38  15         MR. HARE:  Yes, Your Honor.  Now the only

09:55:38  16   relevance of that testimony is, as the Court observes,

09:55:38  17   will be in the defense of the Cigna claim.  We do have

09:55:38  18   Mr. Haney scheduled to come back.

09:55:38  19         THE COURT:  Okay.

09:55:38  20         MR. HARE:  We'll address it then.

09:55:38  21         THE COURT:  That solves it, right?

09:55:38  22         MS. KINGSBERY:  We would object because

09:55:38  23   Mr. Haney's opinion and his expert report is related only

09:55:38  24   to the denied claims.  So only the claims that are at

09:55:38  25   issue in the Labs' case.  Mr. Haney wasn't disclosed as a

851

09:55:38  1    witness in Cigna's case with respect to any paid claims
09:55:38  2    that are at issue in Cigna's unjust enrichment claim.
09:55:38  3             MR. HARE:  May I respond.
09:55:38  4             THE COURT:  You may.  I will have to look at the
09:55:38  5    reports.
09:55:38  6             MR. HARE:  For five years we have litigated this
09:55:38  7    case with Cigna telling us that we're not entitled to be
09:55:38  8    paid because of fee forgiving.  Mr. Haney addressed that
09:55:38  9    issue.
09:55:38  10            THE COURT:  I will have to look at the opinion.
09:55:38  11   I'm having, I think, a similar reaction that you are, but
09:55:38  12   I have got to look at the opinion.
09:55:38  13            I am continuing to examine Cigna's position on
09:55:38  14   the records are the 20 records.  And I believe I'm
09:55:38  15   missing a piece.  I was offered up a paper version of an
09:55:38  16   email from Attorney Kang, but I thought -- it appears it
09:55:38  17   must have been a letter producing documents in response
09:55:38  18   to a December 30 letter I think of Attorney Christ.  Oh,
09:55:38  19   apparently I have it.  I will look at that at the break.
09:55:38  20   I will also take a look at Mr. Haney's -- is this --
09:55:38  21   would I need to look at both reports or is it only
09:55:38  22   addressed in the -- or I let you file a new report, or
09:55:38  23   was -- that covered all the issues he's opining on or
09:55:38  24   only limited, and was it one of those limited issues he
09:55:38  25   was redoing?

| | | |
|---|---|---|
| 09:55:38 | 1 | MR. HARE:  For today's purposes, we won't seek |
| 09:55:38 | 2 | his testimony with respect to fee forgiving. |
| 09:55:38 | 3 | THE COURT:  Oh, okay.  So that's -- |
| 09:55:38 | 4 | MR. HARE:  That analysis remains relevant in our |
| 09:55:38 | 5 | defense. |
| 09:55:38 | 6 | THE COURT:  On my bottom line agenda for later, |
| 09:55:38 | 7 | I need to look at Haney's report about fee forgiveness |
| 09:55:38 | 8 | re: Cigna's position that he should not be allowed to |
| 09:55:38 | 9 | testify. |
| 09:55:38 | 10 | Anything else from the parties? |
| 09:55:38 | 11 | All right.  Luncheon recess. |
| 09:55:38 | 12 | (Whereupon, a luncheon recess was taken from |
| 09:55:38 | 13 | 1:22 p.m. to 2:01 p.m.) |
| 09:55:38 | 14 | THE COURT:  Please be seated.  Thank you very |
| 09:55:38 | 15 | much for being back.  I guess we'll bring the jury out. |
| 09:55:38 | 16 | (In the presence of the jury at 2:02 p.m.) |
| 09:55:38 | 17 | THE COURT:  Everyone be seated.  You will be |
| 09:55:38 | 18 | excited to hear, we're at 65 degrees.  I don't know if |
| 09:55:38 | 19 | we're still climbing, but I've got a feeling if we keep |
| 09:55:38 | 20 | it on climbing, I guarantee we're going to overshoot, but |
| 09:55:38 | 21 | I'm living in hope. |
| 09:55:38 | 22 | Whenever you're ready, Attorney Hare. |
| 09:55:38 | 23 | MR. HARE:  I will try to warm the room, Your |
| 09:55:38 | 24 | Honor. |
| 09:55:38 | 25 | BY MR. HARE: |

853

09:55:38  1        Q.   Ms. Thelian, you remain under oath, of course.

09:55:38  2   Did you and I speak at all during the break?

09:55:38  3        A.   I did not.

09:55:38  4             MR. HARE:  Can we get Exhibit 6966 back on the

09:55:38  5   screen.

09:55:38  6   BY MR. HARE:

09:55:38  7        Q.   Just to finish up the header row.  Looking at

09:55:38  8   the POC positive tests column and the lab results

09:55:38  9   positive test columns, the jury has heard the terms

09:55:38 10   "qualitative testing" and "definitive testing."  I want

09:55:38 11   to talk first about the point of care positive test.

09:55:38 12   What form of testing is reported in that column?

09:55:38 13             MS. COSTIN:  Objection, Your Honor.  This

09:55:38 14   witness does not have an expertise in medicine to be

09:55:38 15   opining on particular kinds of drug testing.

09:55:38 16             THE COURT:  I don't know that the question calls

09:55:38 17   for her to do that.  I think it just calls for her to

09:55:38 18   look at the header.  Oh, I see.  He went on to say

09:55:38 19   qualitative.

09:55:38 20             MR. HARE:  I can lay a foundation, Your Honor.

09:55:38 21             THE COURT:  Go ahead.

09:55:38 22   BY MR. HARE:

09:55:38 23        Q.   Ms. Thelian, in reviewing thousands of pages of

09:55:38 24   medical records, including test results, were you able to

09:55:38 25   ascertain what form of testing was used at point of care

854

09:55:38  1   and what form of testing was used at the labs?

09:55:38  2       A.   Yes.  That's also given in instructions in our

09:55:38  3   coding manuals as to what constitutes a particular type

09:55:38  4   of test.  Point of care test is a urine test that goes

09:55:38  5   into a cup, and that test then gets determined to the

09:55:38  6   various types of drugs that are positive in that cup.

09:55:38  7       Q.   Okay.  And then the same question with respect

09:55:38  8   to the lab results, what form of test is that?

09:55:38  9       A.   That goes to the laboratory and they use

09:55:38  10  equipment or machinery to do the tests, and those tests

09:55:38  11  are determined to be positive or negative and the amount

09:55:38  12  of drug that's in the particular test of definitive is,

09:55:38  13  basically, is what it's called in our coding language.

09:55:38  14      Q.   Okay.  I want to spend some time now going

09:55:38  15  through Exhibit 6966 and looking at the content.  Before

09:55:38  16  I do that, forgive me.  I don't recall if I asked you

09:55:38  17  earlier today, is the information contained in your

09:55:38  18  summary report marked as Lab Exhibit 6966 taken from the

09:55:38  19  underlying medical records that you reviewed?

09:55:38  20      A.   Yes.

09:55:38  21      Q.   Does this summary accurately reflect the

09:55:38  22  information that you saw in those thousands of pages of

09:55:38  23  medical records?

09:55:38  24      A.   Yes.

09:55:38  25      Q.   Let's just start at the beginning.  Let's look

09:55:38   1    at the top of page 1.  I see there are four entries for a

09:55:38   2    patient identified a MZ.  Do you see that?

09:55:38   3        A.   I do.

09:55:38   4        Q.   And if we look at the reported POC positive

09:55:38   5    tests for patient MZ, let's start with the collection

09:55:38   6    date April 4, 2013.  Do you see that line?

09:55:38   7        A.   I do.

09:55:38   8        Q.   And was there a substance detected through the

09:55:38   9    qualitative testing at the point of care?

09:55:38  10        A.   There was.

09:55:38  11        Q.   I will just try to expedite it.  Is that

09:55:38  12    benzodiazepines?

09:55:38  13        A.   Correct.

09:55:38  14        Q.   Now, did the lab results detect and measure the

09:55:38  15    presence of both benzodiazepines and opiates?

09:55:38  16        A.   Yes.

09:55:38  17        Q.   If we look at the same patient MZ for the date

09:55:38  18    of service 6-20-13.  Same question, the qualitative POC

09:55:38  19    test detected benzodiazepines; is that right?

09:55:38  20        A.   Yes.

09:55:38  21        Q.   Did the lab results detect and measure

09:55:38  22    benzodiazepine, opiates and fentanyl?

09:55:38  23             MS. COSTIN:  Your Honor, I am going to continue

09:55:38  24    my objection that she does not have expertise to be

09:55:38  25    interpreting lab test results, nor is this in her report.

856

09:55:38  1   She's not qualified as an expert in this area.

09:55:38  2         THE COURT:  I think she's already testified to

09:55:38  3   it, so it's overruled.

09:55:38  4         MR. HARE:  This exhibit is in evidence as well.

09:55:38  5         THE COURT:  Right.  Yeah, that's what I was

09:55:38  6   trying to see, if you were just asking her about what is

09:55:38  7   there.  You went a little bit farther.  But she already

09:55:38  8   testified to it.

09:55:38  9   BY MR. HARE:

09:55:38  10     Q.   Does your summary Exhibit 6966 show that there

09:55:38  11  were three classes detected and measured at the

09:55:38  12  laboratory?

09:55:38  13     A.   Correct.

09:55:38  14     Q.   If we look at the next patient, JL.  And we can

09:55:38  15  actually just stay with this same call out.  For JL on

09:55:38  16  collection dates in January of 2013, I see January 4, 7,

09:55:38  17  8, 9, 11.  Are these all, once again, dates on which the

09:55:38  18  laboratory test detected and measured substances that

09:55:38  19  were not detected at the POC on qualitative test?

09:55:38  20     A.   Correct.

09:55:38  21        MR. HARE:  If you would pull back out and look

09:55:38  22  at this remainder of this page.  And I hope it is visible

09:55:38  23  to everyone.  I recognize it's small print.

09:55:38  24  BY MR. HARE:

09:55:38  25     Q.   But JL continues through the bottom of page 1.

| | | |
|---|---|---|
| 09:55:38 | 1 | And we see various dates of collection with associated |
| 09:55:38 | 2 | negative results at point of care and negative results at |
| 09:55:38 | 3 | the lab.  Is that -- am I reading this correctly, |
| 09:55:38 | 4 | Ms. Thelian? |
| 09:55:38 | 5 | A.   Yes. |
| 09:55:38 | 6 | MR. HARE:  Now let's go to the next page. |
| 09:55:38 | 7 | BY MR. HARE: |
| 09:55:38 | 8 | Q.   And if we continue to look at this same patient, |
| 09:55:38 | 9 | Patient JL, May 2013 down into July and August.  Does |
| 09:55:38 | 10 | this document reflect that at the point of care Patient |
| 09:55:38 | 11 | JL tested negative in the qualitative testing? |
| 09:55:38 | 12 | A.   Yes. |
| 09:55:38 | 13 | Q.   Now let's look at the dates of July 30 and |
| 09:55:38 | 14 | October [sic] 1st.  Same patient.  Are we still on JL? |
| 09:55:38 | 15 | A.   It's hard to see.  I think it is all JL. |
| 09:55:38 | 16 | Q.   So July 30 and August 1, are these two dates on |
| 09:55:38 | 17 | which Patient JL measured negative at the point of care |
| 09:55:38 | 18 | and yet at the laboratory a substance was detected, in |
| 09:55:38 | 19 | this case, buprenorphine? |
| 09:55:38 | 20 | A.   Correct. |
| 09:55:38 | 21 | BY MR. HARE:  Let's go down to the bottom third |
| 09:55:38 | 22 | of this same page. |
| 09:55:38 | 23 | BY MR. HARE |
| 09:55:38 | 24 | Q.   We're still now looking at Patient JL.  Do we |
| 09:55:38 | 25 | have a number of days on which the point of care |

09:55:38  1    qualitative test returned negative, and yet Patient JL

09:55:38  2    was measured positive for gabapentin?

09:55:38  3         A.    Correct.

09:55:38  4         Q.    Does that appear on a number of days?

09:55:38  5         A.    I'm sorry, I didn't hear the question.

09:55:38  6         Q.    I'm sorry.  Does that appear to be the case on a

09:55:38  7    number of dates throughout August, September, October of

09:55:38  8    2013?

09:55:38  9         A.    If she can zoom out from this that I can see the

09:55:38  10   dates.

09:55:38  11        Q.    Maybe if we pull back a bit.  Really, we're

09:55:38  12   looking at the bottom.

09:55:38  13        A.    Yes, now I can see it.

09:55:38  14              MR. HARE:  Let's go to page 4 of Exhibit 6966.

09:55:38  15   BY MR. HARE:

09:55:38  16        Q.    Let's look at Patient MH, who appears at the

09:55:38  17   bottom half of that page.  Ms. Thelian, are there reports

09:55:38  18   -- sorry -- results reported for collection dates in

09:55:38  19   January, February of 2013 that were negative at the point

09:55:38  20   of care and positive for buprenorphine at the laboratory

09:55:38  21   definitive test?

09:55:38  22        A.    Yes.

09:55:38  23        Q.    I could continue the exercise, but would it be a

09:55:38  24   fair summary to say that we see similar patterns

09:55:38  25   throughout your document that you put together this

859

| 09:55:38 | 1 | summary marked 6966? |
| 09:55:38 | 2 | A.    Correct. |
| 09:55:38 | 3 | MR. HARE:  May we see Exhibit 6967, please. |
| 09:55:38 | 4 | Your Honor, I believe this likewise is offered |
| 09:55:38 | 5 | without objection. |
| 09:55:38 | 6 | THE COURT:  Looks that way.  It may be pushed. |
| 09:55:38 | 7 | MR. HARE:  Thank you, Your Honor. |
| 09:55:38 | 8 | BY MR. HARE: |
| 09:55:38 | 9 | Q.    Ms. Thelian, do you recognize the exhibit we |
| 09:55:38 | 10 | marked as Lab 6967? |
| 09:55:38 | 11 | A.    Yes. |
| 09:55:38 | 12 | Q.    What is this document? |
| 09:55:38 | 13 | A.    It's a summary of that spreadsheet. |
| 09:55:38 | 14 | Q.    This is a summary -- first of all, did you |
| 09:55:38 | 15 | prepare this? |
| 09:55:38 | 16 | A.    I did. |
| 09:55:38 | 17 | Q.    This is a summary that you pulled from the |
| 09:55:38 | 18 | spreadsheet that we just looked at, which was 6966? |
| 09:55:38 | 19 | A.    Correct. |
| 09:55:38 | 20 | Q.    Does this tally the count for each of the 20 |
| 09:55:38 | 21 | patients laid out in further detail in 6966? |
| 09:55:38 | 22 | A.    Yes. |
| 09:55:38 | 23 | Q.    And I may have just said this, forgive me.  Is |
| 09:55:38 | 24 | this all 20 patients whose records you reviewed? |
| 09:55:38 | 25 | A.    I reviewed 20 patients, but this only represent |

09:55:38  1    17 because three of them did not have point of care

09:55:38  2    testing, so there was nothing to compare.

09:55:38  3         Q.   I am going to challenge you on that.  Let's

09:55:38  4    start on the top of page 1.  And I hate counting out

09:55:38  5    loud.  Don't zoom in yet.  I will ask you to count

09:55:38  6    silently with me.

09:55:38  7              Do you see ten patients reflected on page 1?

09:55:38  8         A.   I'm mixing this up with a different summary

09:55:38  9    sheet.  It's difficult to see.

09:55:38  10        Q.   I understand.  You prepared a lot of paper in

09:55:38  11   addition to reviewing a lot of paper in this case?

09:55:38  12        A.   I did.

09:55:38  13        Q.   If we look at the second page of Exhibit 6967,

09:55:38  14   do we see again another ten patients?

09:55:38  15        A.   We do.

09:55:38  16        Q.   If you'll to it the top and call out the first

09:55:38  17   or second or first three, whatever is convenient.  I want

09:55:38  18   to see what specific information is reflected in the

09:55:38  19   summary boxes.  So we see the patient's name, and once

09:55:38  20   again referenced by initials for anonymity; is that

09:55:38  21   right?

09:55:38  22        A.   Correct.

09:55:38  23        Q.   Are those the same initials that we saw in the

09:55:38  24   prior exhibit that tie into the 20 sets of patient

09:55:38  25   records?

09:55:38  1        A.    Yes.

09:55:38  2        Q.    And the referring facility, is that what we see

09:55:38  3   at the next line?

09:55:38  4        A.    That is correct.

09:55:38  5        Q.    And then there are three lines that report

09:55:38  6   numbers.  The number of testing days, the number of

09:55:38  7   positive point of care tests, and the number of positive

09:55:38  8   lab tests; is that right?

09:55:38  9        A.    That is correct.

09:55:38  10       Q.    I will ask you, taking as much time as you need,

09:55:38  11   if you can go through and just tell me whether there was

09:55:38  12   at least one positive lab test for each of these 20

09:55:38  13   patients reflected in the medical records that you

09:55:38  14   reviewed?

09:55:38  15       A.    Could you repeat the question?

09:55:38  16       Q.    Sure.  Let me just back up and lay the

09:55:38  17   groundwork.

09:55:38  18             In each patient box of Exhibit 6967, the bottom

09:55:38  19   line the number of positive lab tests; is that right?

09:55:38  20       A.    That is correct.

09:55:38  21       Q.    That pulls out the information that was in the

09:55:38  22   laboratory test result column that we saw on the prior

09:55:38  23   exhibit?

09:55:38  24       A.    Correct.

09:55:38  25       Q.    If we look at the number of positive lab tests

09:55:38  1    for each of these 20 patients, is there at least one
09:55:38  2    positive for all 20?
09:55:38  3        A.   I believe so.  I'm just looking through right
09:55:38  4    now, but I believe so.
09:55:38  5        Q.   I will ask Mr. Smeig so scroll through so you
09:55:38  6    and the jury can have the benefit of looking at the
09:55:38  7    entire two-page document.
09:55:38  8             So was my statement accurate?
09:55:38  9        A.   It is.
09:55:38  10       Q.   The jury has already heard about Exhibit Joint
09:55:38  11   141, which is an email thread by and between Dr. Nicoll
09:55:38  12   and Stephanie Canto.  One of the statements that
09:55:38  13   Dr. Nicoll makes to Stephanie Canto in an email dated
09:55:38  14   September 20, 2013 is the following -- and I will just
09:55:38  15   read a sentence so probably don't even need to put it up.
09:55:38  16            Quote, It is noteworthy that of the ten charts I
09:55:38  17   examined, none, all caps, N-O-N-E, none had a positive
09:55:38  18   quantitative test and all, all caps A-L-L, had multiple
09:55:38  19   substances tested.
09:55:38  20            Now, first of all, did you review ten charts or
09:55:38  21   20?
09:55:38  22       A.   Twenty.
09:55:38  23       Q.   Did you observe that in all 20 charts there
09:55:38  24   were, in fact, positive quantitative tests?
09:55:38  25       A.   Yes.

863

09:55:38  1      Q.   Did you observe a single chart for which there

09:55:38  2   were none, N-O-N-E, no positive quantitative tests?

09:55:38  3      A.   I did not.

09:55:38  4      Q.   Is Dr. Nicoll accurate or inaccurate in his

09:55:38  5   email claim to Stephanie Canto?

09:55:38  6      A.   I would say inaccurate.

09:55:38  7      Q.   Ms. Thelian, did your review of the 20 patient

09:55:38  8   records help you to form opinions in this case?

09:55:38  9      A.   It did.

09:55:38 10      Q.   Did you base your opinions among other documents

09:55:38 11   on the 20 sets of medical records?

09:55:38 12      A.   I did.

09:55:38 13      Q.   You listed --

09:55:38 14           MR. HARE:  If we can go back to 6960, we have

09:55:38 15   seen already.

09:55:38 16   BY MR. HARE:

09:55:38 17      Q.   You listed these, as I recall -- look at my

09:55:38 18   notes, because I don't recall -- 670 lines of sets of

09:55:38 19   documents among the materials that you reviewed.  Did

09:55:38 20   your review of those materials help you to form your

09:55:38 21   opinions in this case?

09:55:38 22      A.   They did.

09:55:38 23      Q.   Again, did you base your opinions on having

09:55:38 24   reviewed those documents as well?

09:55:38 25      A.   I did.

09:55:38 1    Q.   I would like to turn now to your specific

09:55:38 2    opinions.

09:55:38 3         MR. HARE:  And, Your Honor, forgive me.  I

09:55:38 4    didn't ask ahead of time.  May Ms. Thelian have a copy of

09:55:38 5    her paper -- paper copy of her amended report with her at

09:55:38 6    the witness stand?

09:55:38 7         THE COURT:  The report that was the submitted as

09:55:38 8    disclosure?

09:55:38 9         MR. HARE:  Correct.

09:55:38 10        MS. COSTIN:  I have to objection to that.  I

09:55:38 11   might ask her questions as well.

09:55:38 12        THE COURT:  Yeah.  I don't know, do we need to

09:55:38 13   have the record reflect that she looks at it to refresh

09:55:38 14   her recollection?  Are you -- I don't know quite how

09:55:38 15   you're going to use it, but I guess I will worry about

09:55:38 16   that when I see how you use it.

09:55:38 17   BY MR. HARE:

09:55:38 18        Q.   Ms. Thelian, do you have your -- a paper copy of

09:55:38 19   your report with you?

09:55:38 20        A.   Not here, no.

09:55:38 21        MR. HARE:  Your Honor, may I approach and hand

09:55:38 22   over?

09:55:38 23        THE COURT:  Yes.  This is not in evidence, so

09:55:38 24   you shouldn't road from it.  Just a cautionary

09:55:38 25   instruction.  Likewise to counsel.

09:55:38  1           THE WITNESS:  Thank you.

09:55:38  2  BY MR. HARE:

09:55:38  3      Q.   And to underscore that, Ms. Thelian, I am not

09:55:38  4  going to ask you to read from your report, but I wanted

09:55:38  5  to make it available in case you need to review it to

09:55:38  6  refresh any of your recollection over the details of your

09:55:38  7  report and the opinions.  And just to set the stage a

09:55:38  8  little further so we know where we are.

09:55:38  9           You initially prepared at our request a report

09:55:38  10  which you later amended in this case; is that right?

09:55:38  11      A.   Correct.

09:55:38  12      Q.   Is it the amounted report that you have with

09:55:38  13  you?

09:55:38  14      A.   It is.

09:55:38  15      Q.   You give four enumerated opinions in that

09:55:38  16  report.  We're going to go through those.  Three of them

09:55:38  17  we'll go through in detail.  One we'll just touch on

09:55:38  18  briefly.  I'm going to ask you this again at the end, but

09:55:38  19  are the opinions that you've provided that you set forth

09:55:38  20  if your amended report, are these opinions that you hold

09:55:38  21  within a reasonable degree of professional certainty?

09:55:38  22      A.   It is.

09:55:38  23      Q.   All right.  I want to turn to your first

09:55:38  24  opinion, which you call in the reports your amended

09:55:38  25  opinions, Amended Opinions 1, 2, 3 and 4.  And I want to

09:55:38  1    talk about an Amended Opinion 1 to begin.  And if you

09:55:38  2    need to refer to your report, just say so and I will

09:55:38  3    invite you to do that.

09:55:38  4         Can you first tell us what your Amended Opinion

09:55:38  5    Number 1 concerns.

09:55:38  6         A.   I'm going to turn to the page here.  May I?

09:55:38  7         Q.   I'm sorry?

09:55:38  8         THE COURT:  Yes.  If you don't recall which was

09:55:38  9    1 and which was 4, yes, you can look at it, but then you

09:55:38 10    should testify once you remember what's assigned 1, for

09:55:38 11    example.

09:55:38 12         A.   So Opinion 1 was claim denial for unlisted code.

09:55:38 13         Q.   Claims reported under an unlisted code, is that

09:55:38 14    what you said?

09:55:38 15         A.   Correct.

09:55:38 16         Q.   This morning you talked about CPT codes and how

09:55:38 17    those are used.  You explained to the jury that those

09:55:38 18    codes sometime change over time and it's important to

09:55:38 19    keep up with the latest definitions.  What is an unlisted

09:55:38 20    code?

09:55:38 21         A.   First of all, CPT instructions tell us that you

09:55:38 22    should select the code that represents the service or the

09:55:38 23    procedure that was provided.  However, knowing that

09:55:38 24    things change throughout the course of the year and it

09:55:38 25    takes time to update the manual, CPT provides what's

09:55:38  1    called an unlisted code.  So CPT does state you cannot
09:55:38  2    merely represent a code because it is sort of similar.
09:55:38  3    They prefer that you would use an unlisted code to
09:55:38  4    recognize that service that doesn't have a specific code
09:55:38  5    for its procedure or service that was provided.
09:55:38  6         Q.   Forgive me.  I'm turning to your opinion myself
09:55:38  7    in my copy of your report.
09:55:38  8              What did you review in order to assess and reach
09:55:38  9    your conclusions that your report in Amended Opinion 1?
09:55:38  10        A.   Well, I had to look at the lab report.  Then I
09:55:38  11   needed to look at a CMS 1500 claim form to see which CPT
09:55:38  12   code was reported, which indeed was an unlisted code.  So
09:55:38  13   each category in the CPT manual has a specific unlisted
09:55:38  14   code.  There's one for laboratory, there's one for
09:55:38  15   radiology, so on and so forth.  So I wanted to make sure
09:55:38  16   that they were using the correct unlisted code.
09:55:38  17             So basically it was a comparison between three
09:55:38  18   things, between the CPT manual, the CMS 1500 claim form,
09:55:38  19   the form that's used to report the service provided with
09:55:38  20   that CPT code and the lab report.
09:55:38  21             MR. HARE:  May we see Labs Exhibit 6962.  I
09:55:38  22   understand this is offered without objection.  This is
09:55:38  23   Appendix C from the amended report.
09:55:38  24             THE COURT:  69 -- oh, 62.  It may be published.
09:55:38  25   BY MR. HARE:

09:55:38  1      Q.    You have been through this with me now a couple

09:55:38  2   of times.  Let's start at the top.  And if you could just

09:55:38  3   identify what Amended Appendix C relates to.

09:55:38  4      A.    This is denial reason code 1698.

09:55:38  5      Q.    We talked about CPT codes, HCPCS codes, the CMS

09:55:38  6   1500.  I don't know if we've come across this term

09:55:38  7   before.  What is a denial reason code?

09:55:38  8      A.    I'm sorry.  Denial reason code is a -- again

09:55:38  9   everything is codified because there's no space on

09:55:38 10   Explanations of Benefits or CMS 1500 claim forms to

09:55:38 11   always write out a full description.  So when you get

09:55:38 12   your Explanation of Benefits from an insurance company

09:55:38 13   that tells you, well, this is the service you had and

09:55:38 14   this is what the provider billed and this is what was

09:55:38 15   paid.  Sometime insurance companies will deny a

09:55:38 16   particular service or procedure, and they use that with a

09:55:38 17   denial reason code.  And then at the bottom of your

09:55:38 18   Explanation of Benefits it will give you a description of

09:55:38 19   what that denial reason code would be.

09:55:38 20      Q.    Not meaning to make this a pop quiz, but what is

09:55:38 21   denial reason code 1698, which is the subject of Appendix

09:55:38 22   C?

09:55:38 23      A.    For Cigna, denial reason code 1698 is unlisted

09:55:38 24   code.

09:55:38 25      Q.    Unlisted code.  Now let's look at the header

09:55:38  1    line on this chart.

09:55:38  2           MR. HARE:  And I'll, with the Curt's permission,

09:55:38  3    just lead to get through this as quickly as we can.

09:55:38  4           THE COURT:  Yes.

09:55:38  5    BY MR. HARE:

09:55:38  6       Q.    The column Lab, we see Epic Labs, BioHealth, and

09:55:38  7    then if we scroll through the 37 pages of this exhibit,

09:55:38  8    PB Labs.

09:55:38  9           MR. HARE:  Actually, if you go to the bottom of

09:55:38 10    the first page, we'll see PB as well.

09:55:38 11    BY MR. HARE:

09:55:38 12       Q.    So you have done this analysis on a lab-by-lab

09:55:38 13    basis for each of the three labs in the lawsuit; is that

09:55:38 14    right?

09:55:38 15       A.    That is correct.

09:55:38 16       Q.    And then the next column is -- is it INV?

09:55:38 17       A.    If you could just make that larger, please?  It

09:55:38 18    looks like that is the individual DCN, Document Claim

09:55:38 19    Number.

09:55:38 20       Q.    I guess I didn't ask you yet to give the jury a

09:55:38 21    picture of how claims are billed and what a claim

09:55:38 22    consists of and what claim lines are.  Could you just

09:55:38 23    describe what medical billing, and particularly

09:55:38 24    electronic medical billing looks like?

09:55:38 25       A.    Sure.  We spoke about the CMS 1500 claim form.

09:55:38  1    The top part of that form will have demographic

09:55:38  2    information, the patient's names, the date of birth,

09:55:38  3    their type of insurance, you know, that's being billed.

09:55:38  4    When you get down to the middle of that claim form,

09:55:38  5    there's multiple lines on it.  And that line will have

09:55:38  6    the date of service.  It will have the CPT code that's

09:55:38  7    being reported which identifies that service or procedure

09:55:38  8    that was being done.  It will have units, the number of

09:55:38  9    units or the number of times that particular procedure or

09:55:38  10   service was done.  It might have a modifier, which is a

09:55:38  11   two-digit and sometimes it could be alphanumeric to

09:55:38  12   modify that type of service.  And then it has the

09:55:38  13   diagnosis code.  And that's the reason why that service

09:55:38  14   is being performed.  It will have the amount that is

09:55:38  15   billed as well, what provider or facility is looking to

09:55:38  16   get reimbursed.

09:55:38  17         And there's different -- as I mentioned, that

09:55:38  18   box has different lines, right.  So when you get your

09:55:38  19   Explanation of Benefits back, they also will delineate

09:55:38  20   each line item that was billed on that particular claim

09:55:38  21   form.  So column Number 2 on this spreadsheet is the line

09:55:38  22   number of which we found that particular CPT because, in

09:55:38  23   essence, that claim form can have multiple CPT doing an

09:55:38  24   analysis to identify the particular line number so you

09:55:38  25   can reference it back.

09:55:38  1      Q.    Okay.  Are those identifying numbers unique to

09:55:38  2   each claim line?

09:55:38  3      A.    Yes.

09:55:38  4      Q.    And then there are service dates and claim paid

09:55:38  5   dates identified.  What are those?

09:55:38  6      A.    So the first service date is again when we go

09:55:38  7   back to our CMS 1500 claim form, there could be to and

09:55:38  8   from dates, right?  So if you are in the hospital, we

09:55:38  9   would have to and from dates.  If it is a particular

09:55:38  10  service, such as going to a doctor's office or a

09:55:38  11  laboratory test, it would be the service date.  You would

09:55:38  12  more than likely just have one service date, which is

09:55:38  13  what we have here is the first service date.  And then

09:55:38  14  the claim pay date is the date that the insurer paid that

09:55:38  15  claim.

09:55:38  16     Q.    The service code then, I see a number of entries

09:55:38  17  that appear to be a five-digit number, 80375, for

09:55:38  18  instance, on the first line.  What are those?

09:55:38  19     A.    The service code here is the CPT code that we

09:55:38  20  have been speaking of.

09:55:38  21     Q.    Are CPT code sets forth in that same format, a

09:55:38  22  five-digit number?

09:55:38  23     A.    Right.  CPT is a five-digit number.  And again

09:55:38  24  as a reminder, the CPT code is identifying a particular

09:55:38  25  service that was performed.

09:55:38  1      Q.    Okay.   Then I see a column, remark code.   And

09:55:38  2  it's our friend 1698 that we saw at the top.   What is the

09:55:38  3  remark code column?

09:55:38  4      A.    The remark code column is the denial reason.

09:55:38  5      Q.    We can scroll through the entirety of Exhibit

09:55:38  6  6962.   It's 37 pages long.   Are these all instances of

09:55:38  7  claims that Cigna denied under denial code or reason code

09:55:38  8  1698?

09:55:38  9      A.    They are.   And I had the opportunity to review

09:55:38  10  the claims data from Cigna.   That's where this

09:55:38  11  information was culled out from.

09:55:38  12      Q.    Can you talk about that a little bit more.

09:55:38  13  What's the process that you went through in reviewing the

09:55:38  14  records that were given to you and reaching your opinion

09:55:38  15  as to whether that was a sound basis, an appropriate

09:55:38  16  basis for Cigna to deny these claims filling these 37

09:55:38  17  pages of spreadsheet.

09:55:38  18      A.    Sure.   So out of the -- the audit spanned a

09:55:38  19  couple of years, right, so in order to get the billing

09:55:38  20  information, that I was not going to look on paper

09:55:38  21  because it was many years' worth of claim status.   So

09:55:38  22  Cigna provided us with Excel spreadsheets of how they

09:55:38  23  processed the claims.   This is where I was able to pull

09:55:38  24  the information from.   I could look at those Excel

09:55:38  25  spreadsheets and then carved out of that -- we sorted

09:55:38  1    them by denial reason.  Then we were able to identify

09:55:38  2    what those denial reasons were and go back to those 20

09:55:38  3    charts and review and look to see if, indeed, those were

09:55:38  4    appropriate denial reasons.

09:55:38  5        Q.   Is this spreadsheet marked a Lab Exhibit 6962 an

09:55:38  6    extract from the underlying medical records that you

09:55:38  7    reviewed?

09:55:38  8        A.   Yes.

09:55:38  9        Q.   Is the information in the exhibit an accurate

09:55:38  10   representation of what you found in those underlying

09:55:38  11   business records?

09:55:38  12       A.   It is.

09:55:38  13       Q.   Ms. Thelian, were you able to reach an opinion

09:55:38  14   as to whether there was a valid basis for Cigna to deny

09:55:38  15   the claims reflected in these 37 pages of this exhibit

09:55:38  16   for reason -- denial reason code 1698?

09:55:38  17       A.   I found that denial reason 1698 for these

09:55:38  18   particular services on this Excel spreadsheet were not

09:55:38  19   correct.

09:55:38  20       Q.   Why in your opinion was Cigna erroneous in

09:55:38  21   denying these claims for that code reason?

09:55:38  22       A.   Well, for example, if you look at some of the

09:55:38  23   first service codes that are on the spreadsheet, those

09:55:38  24   are valid codes.  They are not an unlisted code.  But if

09:55:38  25   you scroll down to line -- well, look at the first

09:55:38  1    BioHealth.  I guess that's the best way to say it.

09:55:38  2    80299.

09:55:38  3          MR. HARE:  Let us catch up on the exhibit.  If

09:55:38  4    you can blow up the first line or first few lines of

09:55:38  5    BioHealth.  I'll ask you to pick up one more column so we

09:55:38  6    can see the CPT code that was reported at that line.

09:55:38  7    There you go.

09:55:38  8        A.   Thank you.

09:55:38  9    BY MR. HARE:

09:55:38  10       Q.   You can proceed.

09:55:38  11       A.   Thank you.  So unlisted codes always end in the

09:55:38  12    Number 9.  So it's easy to pick up.  If there were other

09:55:38  13    codes that end in 9, but when you see a 99, that's

09:55:38  14    usually a good tipoff that that CPT is an unlisted code.

09:55:38  15    So if one were to reference a CPT manual during the time

09:55:38  16    period in question, that descriptor of 80299 would be

09:55:38  17    unlisted code.  So that unlisted code was a valid code to

09:55:38  18    be used at that particular point in time.

09:55:38  19          Additionally, as I mentioned on a CMS 1500 claim

09:55:38  20    form -- and it's in the report.  I don't know if you will

09:55:38  21    get to it, but we also do list the name of the drug that

09:55:38  22    was being tested to show that there was no particular CPT

09:55:38  23    code to specifically identify that drug, hence the use of

09:55:38  24    the 80299.

09:55:38  25       Q.   So let's talk about that for a second.  When

09:55:38  1    there's a specific CPT code associated with a specific

09:55:38  2    drug, are you saying that would be the CPT code to use

09:55:38  3    for billing or testing with respect to that drug?

09:55:38  4        A.   Correct.

09:55:38  5        Q.   If there is no CPT that specifically identifies

09:55:38  6    a given drug that is being screened, could you just

09:55:38  7    explain how that test would be reported or what CPT code

09:55:38  8    you would use for that test?

09:55:38  9        A.   You would use the unlisted code.  That's right

09:55:38  10   in the introduction section of the CPT manual where --

09:55:38  11   like any other manual that you pick up tells you how to

09:55:38  12   use, you know, the codes that are in there.  And that's

09:55:38  13   what we're instructed to do.  If there's no specific

09:55:38  14   code, use an unlisted code.  Unlisted codes are provided

09:55:38  15   throughout the manual.

09:55:38  16       Q.   Are the 37 pages of spreadsheet in Lab Exhibit

09:55:38  17   6962 the instances where you found a denial based on the

09:55:38  18   denial reason code 1698 that you, in your opinion,

09:55:38  19   concluded were improper denials?

09:55:38  20       A.   Correct.

09:55:38  21          MR. HARE:  Can we please turn to Exhibit 6963.

09:55:38  22   I understand that's offered without objection.

09:55:38  23          THE COURT:  Appears to be, so it may be

09:55:38  24   published.

09:55:38  25   BY MR. HARE:

09:55:38  1      Q.    We're turning now, Ms. Thelian, to your second

09:55:38  2  opinion.  And I will try to expedite this and -- let me

09:55:38  3  just ask you this.  Was your approach to reviewing the

09:55:38  4  records, assessing the claims denials, testing out the

09:55:38  5  rationale for those denials and reaching your conclusion,

09:55:38  6  consistent with respect to your various opinions?

09:55:38  7      A.    Yes, it was the same.

09:55:38  8      Q.    Okay.  So let's turn to Opinion Number 2.  And

09:55:38  9  this is with respect to denial reason code 1648.  As

09:55:38  10  before, let me just start by saying -- what was it that

09:55:38  11  you were looking for as you report in your Opinion Number

09:55:38  12  2?

09:55:38  13     A.    Well, similar to what I was looking for in the

09:55:38  14  others, only with 1648, the denial reason for this is

09:55:38  15  invalid service code.

09:55:38  16     Q.    What does that mean, invalid service code?  We

09:55:38  17  heard about unlisted.  What is an invalid service code

09:55:38  18  denial?

09:55:38  19     A.    Sure.  As we discussed, the CPT manual changes

09:55:38  20  every year, right, and there were always new codes coming

09:55:38  21  in.  And you always have to use the codes that are

09:55:38  22  appropriate for that particular year.  So what happens

09:55:38  23  is, in some cases, technology just doesn't keep up, so

09:55:38  24  the codes that are listed on spreadsheet 1648 were indeed

09:55:38  25  valid for that particular time frame during the audit

877

| | | |
|---|---|---|
| 09:55:38 | 1 | period. |
| 09:55:38 | 2 | Q.   Okay.  And as before in the prior exhibit, do we |
| 09:55:38 | 3 | see columns identifying the labs, the particular claim |
| 09:55:38 | 4 | line identifying number, the relevant dates and the CPT |
| 09:55:38 | 5 | codes in the service code column? |
| 09:55:38 | 6 | A.   Correct. |
| 09:55:38 | 7 | Q.   And do we see remark code 1648? |
| 09:55:38 | 8 | A.   We do. |
| 09:55:38 | 9 | Q.   Is that the invalid code that you just |
| 09:55:38 | 10 | described? |
| 09:55:38 | 11 | A.   That is the denial reason code, yes. |
| 09:55:38 | 12 | Q.   This exhibit, once again, will be available to |
| 09:55:38 | 13 | the jury.  It's 55 pages of spreadsheet.  Are these all |
| 09:55:38 | 14 | instances where you reviewed the underlying medical |
| 09:55:38 | 15 | record in order to determine whether, in your opinion, |
| 09:55:38 | 16 | Cigna properly denied the claim for the reason |
| 09:55:38 | 17 | encompassed by denial reason code 1648? |
| 09:55:38 | 18 | MS. COSTIN:  Objection.  Mr. Hare, your comment |
| 09:55:38 | 19 | that she reviewed the underlying medical record for each |
| 09:55:38 | 20 | claim, I don't think she's testified to that.  I think |
| 09:55:38 | 21 | she's testified to claims data only. |
| 09:55:38 | 22 | MR. HARE:  I've been saying that all day long. |
| 09:55:38 | 23 | MS. COSTIN:  You used the term "medical record." |
| 09:55:38 | 24 | THE COURT:  I thought she testified she looked |
| 09:55:38 | 25 | at lab -- |

| | |
|---|---|
| 09:55:38 | 1 |
| 09:55:38 | 2 |
| 09:55:38 | 3 |

09:55:38  1          MS. COSTIN:  Wasn't medical records.

09:55:38  2          MR. HARE:  I can go through it again.

09:55:38  3          THE COURT:  Well, begin it, because I'm not sure

09:55:38  4    that we need to.  But you go ahead and ask a few

09:55:38  5    questions.  Could I ask, as long as we're interrupted,

09:55:38  6    there was a reference by the witness to spreadsheet --

09:55:38  7    gees, I've lost it -- 1648.  That appear to be a

09:55:38  8    particular page.  Oh, remark code 1648.  That's their

09:55:38  9    denial code, right?

09:55:38  10          MR. HARE:  Correct.

09:55:38  11          THE COURT:  I thought she said -- go ahead.

09:55:38  12          MR. HARE:  Let me just clarify for the Court.

09:55:38  13          Would you go to the top of the first page of

09:55:38  14    6963, and blow that up for us.  This is Appendix --

09:55:38  15          THE COURT:  Oh, I see.

09:55:38  16    BY MR. HARE:

09:55:38  17    Q.   So that's denial reason code 1648.  Is that what

09:55:38  18    you were referencing, Ms. Thelian?

09:55:38  19    A.   Yes.  1648 is for invalid code.

09:55:38  20    Q.   And when we look at the remark code column in

09:55:38  21    this spreadsheet, is this a compilation of all of the

09:55:38  22    instances where you found a denial for that 1648 reason

09:55:38  23    code?

09:55:38  24    A.   Those were all the denial reasons I found on the

09:55:38  25    spreadsheets for 1648.

09:55:38    1              THE COURT:  And you said spreadsheet 1648, you

09:55:38    2    mean this document?

09:55:38    3              THE WITNESS:  This document.  I'm so sorry.

09:55:38    4              THE COURT:  This is the spreadsheet that relates

09:55:38    5    to 1648.

09:55:38    6              THE WITNESS:  That's my bad.  I'm so sorry.

09:55:38    7              THE COURT:  No, no, it's not your fault.  Thank

09:55:38    8    you, sir.  Sorry to interrupt.

09:55:38    9    BY MR. HARE:

09:55:38   10        Q.   I just have to ask this question once again.  Is

09:55:38   11    this exhibit a summary that you prepared extracted from

09:55:38   12    all of the underlying records that you reviewed?

09:55:38   13        A.   Records and spreadsheets.

09:55:38   14        Q.   Okay.  And are these lines on -- the 55 pages of

09:55:38   15    Exhibit 6963, are these the instances in which you found

09:55:38   16    that Cigna denied a claim for this reason 1648?

09:55:38   17        A.   Correct.

09:55:38   18        Q.   And that's a clumsy question.  What I meant to

09:55:38   19    ask was: Instances when Cigna denied a claim for that

09:55:38   20    reason with which you disagree?

09:55:38   21        A.   Correct.

09:55:38   22        Q.   Okay.  And can you explain why, in your opinion,

09:55:38   23    the denials by Cigna of these claims for that reason were

09:55:38   24    inappropriate?

09:55:38   25        A.   Because during the time period, the CPT codes

09:55:38  1    reported on this spreadsheet were indeed valid for that

09:55:38  2    time period as per CPT manual.

09:55:38  3        Q.   I may have asked this already, but in Appendix

09:55:38  4    D, do we see all of BioHealth Laboratories, PB

09:55:38  5    Laboratories and Epic Reference Lab claims being denied

09:55:38  6    for this reason?

09:55:38  7        A.   Correct.

09:55:38  8        Q.   I want to turn now to your Opinion Number 3, and

09:55:38  9    we're only going to touch on this to identify claims.

09:55:38  10   We're not going to talk about any of the underlying

09:55:38  11   rationale.

09:55:38  12            MR. HARE:  Will you please pull up Lab Exhibit

09:55:38  13   6964.

09:55:38  14   BY MR. HARE:

09:55:38  15       Q.   As my colleagues are sorting through the PDF

09:55:38  16   exhibits, your Opinion 3 concerns claims that were denied

09:55:38  17   for reason code 0322; is that right?

09:55:38  18       A.   Correct.

09:55:38  19       Q.   And I don't want any explanation as to your

09:55:38  20   analysis in coming to your conclusions in Opinion 3, but

09:55:38  21   what are the claims -- strike that.

09:55:38  22            What is the denial reason identified as 03222?

09:55:38  23       A.   Fee forgiveness.

09:55:38  24            MR. HARE:  So does exhibit -- that's now on the

09:55:38  25   screen, Your Honor, offering Labs Exhibit 6964, which I

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
| 09:55:38 | 1  | understand is offered without objection.               |
| 09:55:38 | 2  | BY MR. HARE:                                            |
| 09:55:38 | 3  | Q.   Is this, once again, a similar format of          |
| 09:55:38 | 4  | spreadsheet that we looked at in the previous two      |
| 09:55:38 | 5  | opinions?                                              |
| 09:55:38 | 6  | A.   Yes.                                              |
| 09:55:38 | 7  | Q.   Are these all of the claims where Cigna denied    |
| 09:55:38 | 8  | claims submitted by the last jobs on a basis of or for |
| 09:55:38 | 9  | the reason of fee forgiving?                           |
| 09:55:38 | 10 | A.   Yes.                                              |
| 09:55:38 | 11 | Q.   We can move past that.                            |
| 09:55:38 | 12 | THE COURT:  It's published.  There was no              |
| 09:55:38 | 13 | objection that I heard.  Thank you.                    |
| 09:55:38 | 14 | MR. HARE:  Just to clarify the record, Your            |
| 09:55:38 | 15 | Honor.  This is one of these large exhibits that is    |
| 09:55:38 | 16 | broken into two pieces.  So we have 6964-1, which      |
| 09:55:38 | 17 | encompassed a first 150 pages of that spreadsheet, and |
| 09:55:38 | 18 | 6964-2, which encompass pages 151 through the end.     |
| 09:55:38 | 19 | THE COURT:  Have you put up the -1?                    |
| 09:55:38 | 20 | MR. HARE:  I think -1 is what we're looking at.        |
| 09:55:38 | 21 | THE COURT:  There is a continuation of the             |
| 09:55:38 | 22 | exhibit that -- the numbers are different but it's in the |
| 09:55:38 | 23 | same format and relates to the same subject.           |
| 09:55:38 | 24 | MR. HARE:  Do you have that available to you?          |
| 09:55:38 | 25 | Let's look at the second file encompassing the whole of |

09:55:38  1    6964.

09:55:38  2    BY MR. HARE:

09:55:38  3        Q.   And now we see this is enumeration appearing in

09:55:38  4    the upper left-hand corner of the screen, 6964-2.1 being

09:55:38  5    page 1.

09:55:38  6            Ms. Thelian, can you confirm that the two

09:55:38  7    exhibits that we just partially exhibited are the

09:55:38  8    spreadsheets broken in two identifying all of the claims

09:55:38  9    that were denied for the stated reason of fee

09:55:38  10   forgiveness?

09:55:38  11       A.   Yes.

09:55:38  12           MR. HARE:  May we now please see Labs Exhibit

09:55:38  13   6965.  And I understand this is offered without

09:55:38  14   objection.

09:55:38  15   BY MR. HARE:

09:55:38  16       Q.   And Ms. Thelian, I want to turn to your Amended

09:55:38  17   Opinion Number 4.  And this concerns denial reason code

09:55:38  18   0369.  Would you explain what that denial reason code

09:55:38  19   represents?

09:55:38  20       A.   Yes.  0369 is related to services not performed.

09:55:38  21       Q.   And did you review the documents that were

09:55:38  22   provided to you in order to form an opinion as to whether

09:55:38  23   Cigna properly denied claims for that reason 0369?

09:55:38  24       A.   I did.

09:55:38  25       Q.   Is this spreadsheet your summary of all of the

09:55:38  1    instances in which you concluded that there was a claim

09:55:38  2    denial for that reason that was like improper?

09:55:38  3        A.   Yes.

09:55:38  4        Q.   Same question I asked you before.  Does this

09:55:38  5    Exhibit 6965 represent information that you collected

09:55:38  6    from the underlying records that you reviewed?

09:55:38  7        A.   And spreadsheets, yes.

09:55:38  8        Q.   And does this exhibit accurately represent the

09:55:38  9    information that you found notice underlying original

09:55:38 10    documents?

09:55:38 11        A.   Yes.

09:55:38 12        Q.   Tell me what you did in order to review those

09:55:38 13    underlying documents and reach an opinion with respect to

09:55:38 14    the validity of a denial for reasons 0369?

09:55:38 15        A.   Well, services not performed in coding language

09:55:38 16    relates to billing for something that was not done.  So

09:55:38 17    the first thing I would do is obviously look to see if

09:55:38 18    there is a laboratory report provided for that particular

09:55:38 19    date of service and if it had the correct code that was

09:55:38 20    being billed out.  And I did.  That's what's on these

09:55:38 21    spreadsheets here.

09:55:38 22        Q.   So just in a hypothetical, if a doctor bills for

09:55:38 23    taking an x-ray, that in fact was never performed that

09:55:38 24    day, would that be properly denied for this reason 0369,

09:55:38 25    services not performed?

09:55:38  1    A.    Correct.

09:55:38  2    Q.    Did you review the records that were provided to

09:55:38  3    you in order to confirm that for each of the claims set

09:55:38  4    forth in Exhibit 6965, there was, in fact, documentation

09:55:38  5    showing the test had been performed?

09:55:38  6    A.    I looked at the 20 records, the claims in the 20

09:55:38  7    records to formulate my analysis and then went back to

09:55:38  8    the billing data or the spreadsheets to identify the

09:55:38  9    claims that were denied for 0369.

09:55:38  10   Q.    Were you able to reach a conclusion as to

09:55:38  11   whether, in fact, services had been performed as

09:55:38  12   reflected in the records you saw?

09:55:38  13   A.    For those 20 records that I reviewed for the CMS

09:55:38  14   1500 claim forms as well as the laboratory reports, the

09:55:38  15   answer is yes.

09:55:38  16   Q.    Okay.  Did you reach an opinion as to whether it

09:55:38  17   was appropriate for Cigna to deny the claims in your

09:55:38  18   spreadsheet, Amended Appendix F, Labs' Exhibit 6965, for

09:55:38  19   that stated reason?

09:55:38  20   A.    In my opinion, it was not accurate.

09:55:38  21   Q.    This exhibit is 48 pages of claim lines.  Was

09:55:38  22   that your opinion as to each of the claims appearing on

09:55:38  23   those 48 pages of spreadsheet claims?

09:55:38  24   A.    Yes.

09:55:38  25   Q.    I may have asked this, but belt and suspenders.

09:55:38  1    Does the information in Labs Exhibit 6965 accurately

09:55:38  2    represent the information you found in the underlying

09:55:38  3    records?

09:55:38  4         A.   In the 20 records that I reviewed as well as the

09:55:38  5    Excel spreadsheets that I reviewed, yes.

09:55:38  6         Q.   Earlier today you talked a little bit about some

09:55:38  7    of the work that you do as professional and through your

09:55:38  8    company Medco.  The kind of claims review and assessment

09:55:38  9    that you have been describing today in connection with

09:55:38 10    this lawsuit, is that typical of the work that you would

09:55:38 11    do even outside of litigation?

09:55:38 12         A.   Oh, yes.

09:55:38 13         Q.   What would be the circumstances apart from

09:55:38 14    lawsuits and federal courthouses where you would perform

09:55:38 15    this same sort of review of the billing records and

09:55:38 16    denials or allowances of claims?

09:55:38 17         A.   Well, a large area would be compliance.  A lot

09:55:38 18    of the insurance carriers do these routine reviews, as

09:55:38 19    they should.  So most of the facilities, physician

09:55:38 20    offices are aware that coding and billing is an important

09:55:38 21    function of it and it's very important to get it right

09:55:38 22    because that does impact the amount of reimbursement they

09:55:38 23    get and they want to make sure that it's accurate.  So

09:55:38 24    from a compliance program, we do lot of work with -- am I

09:55:38 25    allowed to mention names or --

886

09:55:38  1      Q.    Is it a clients of yours?

09:55:38  2      A.    Yes.  It's not attorney/client confidentiality.

09:55:38  3   It's compliance.

09:55:38  4      Q.    Tell us the kind of entity as opposed to a

09:55:38  5   specific --

09:55:38  6      A.    Department of Health.    So particularly with

09:55:38  7   their labs and lab codes are changing, I mean,

09:55:38  8   frequently.  You can just imagine during COVID all the

09:55:38  9   changeover and how the codes were coming out quickly for

09:55:38 10   the different types of tests, right.  So a lot of the

09:55:38 11   providers and facilities and labs -- the larger labs were

09:55:38 12   concerned with getting it right you know, because this

09:55:38 13   was going into millions of dollars.  Everybody was being

09:55:38 14   tested.  So there was a lot of compliance work to be done

09:55:38 15   with that.  Molecular testing, RNA, DNA, PCR testing.

09:55:38 16   The lab is just exploding with technology and you want to

09:55:38 17   make sure that you get it right because a lot of these

09:55:38 18   services do have a high volume of reimbursement.  Nobody

09:55:38 19   wants to pay back money that they should not have

09:55:38 20   received.  So there is a lot of compliance and education

09:55:38 21   for that.  And it's not just labs.  It's, you know,

09:55:38 22   surgical procedures, everyday, your internal medicine

09:55:38 23   doctor, pediatricians, everybody is aware of it.

09:55:38 24      Q.    So going through this review exercise for

09:55:38 25   purposes of providing an opinion and testimony in this

09:55:38  1    case was not unlike something you would do in other

09:55:38  2    circumstances any given day of the week for other

09:55:38  3    purposes?

09:55:38  4        A.   Correct.  One thing that -- if I may point out.

09:55:38  5    We're not clinicians so we never speak about medical

09:55:38  6    necessity as it relates to what a doctor would order.  We

09:55:38  7    don't opine to that.  What we do opine on is was the

09:55:38  8    documentation there according to the CPT manual,

09:55:38  9    according to the NCI Edits, all the rules and regs, the

09:55:38  10   Local Coverage Determinations, was the information there

09:55:38  11   to support that service being billed.

09:55:38  12       Q.   Thank you for that explanation.  Later in this

09:55:38  13   trial, the jury will hear from another expert witness

09:55:38  14   called by a Labs, Christopher Haney.  Do you know

09:55:38  15   Mr. Haney?

09:55:38  16       A.   I do.

09:55:38  17       Q.   Did you work with him in correction with this

09:55:38  18   case?

09:55:38  19       A.   I did.

09:55:38  20       Q.   Were you able to provide your analysis and the

09:55:38  21   results of your analysis to Mr. Haney for him to use in

09:55:38  22   his further analysis?

09:55:38  23       A.   I did.

09:55:38  24            MR. HARE:  Your Honor, may I have one moment?

09:55:38  25            THE COURT:  Yes.

| | |
|---|---|
| 09:55:38 | 1 |
| 09:55:38 | 2 |
| 09:55:38 | 3 |
| 09:55:38 | 4 |
| 09:55:38 | 5 |
| 09:55:38 | 6 |
| 09:55:38 | 7 |
| 09:55:38 | 8 |

BY MR. HARE:

    Q.    There's one more term of art that I want to ask
you about.  What does it mean when a biller is flagged?
Do you know that term?

    A.    I'm sorry?  What was the question?

    Q.    When a service provider like the Labs is
flagged, what does that indicate?

    A.    It could indicate a number of different things.
Once a flag is flipped in an insurance carrier's
processing system, claims don't gets paid or claims can
be held, meaning that before the service will be
provided, the provider or the lab will -- or the facility
will send in a claim, but that claim will pend, meaning
that once it hits the billing system, a letter will be
generated saying, before we pay this claim, we want to
look at medical records, you need to send the medical
records in first.  So that actually puts an
administrative burden on the provider because now it
holds up the whole process.  So one, they have to wait to
get the letter.  Once they get the letter, then they have
to pull the records and they have to send the records in,
and then they go to manual review.  So typically when
claims are submitted to an insurance company, they all
get adjudicated through the system.  It's kind of
automatic.  You know, you send it in electronically,

```
09:55:38   1    seven to ten days you'll get paid.
09:55:38   2           Once a flag is put on, it can take literally
09:55:38   3    months before you even get a response from the insurance
09:55:38   4    company as to whether that claim will be paid or denied.
09:55:38   5    If the claim gets denied, then you have appeal rights.
09:55:38   6    So it can take even longer to get a particular claim
09:55:38   7    paid.  It's finally a hardship and an administrative
09:55:38   8    burden to that particular facility or provider.
09:55:38   9       Q.   You gave and explained three opinions today with
09:55:38  10    reference to the spreadsheets and you also identified
09:55:38  11    claims on the fourth spreadsheet, which is the fee
09:55:38  12    forgiving.  We'll keep fee forgiving to the side.  To
09:55:38  13    summarize, is it your opinion that for each of the other
09:55:38  14    three denials it was inappropriate for Cigna to deny
09:55:38  15    those claims for the reasons they gave?
09:55:38  16       A.   In my opinion, yes, it was inappropriate.
09:55:38  17       Q.   Do you hold those opinions within a reasonable
09:55:38  18    degree of professional certainty?
09:55:38  19       A.   I do.
09:55:38  20           MR. HARE:  Thank you, ma'am.
09:55:38  21           Your Honor, I pass the witness.
09:55:38  22                       CROSS-EXAMINATION
09:55:38  23    BY MS. COSTIN:
09:55:38  24       Q.   Good afternoon, Ms. Thelian.
09:55:38  25       A.   Good afternoon.
```

09:55:38  1    Q.   We haven't met before.  My name is Emily Costin

09:55:38  2    and I represent the Cigna defendants in this case.  You

09:55:38  3    are here today holding yourself out as an expert for the

09:55:38  4    Labs in this case?

09:55:38  5    A.   I'm sorry, I couldn't understand that.

09:55:38  6    Q.   You are here holding yourself out as an expert

09:55:38  7    for the Labs in this case, correct?

09:55:38  8    A.   I am.

09:55:38  9    Q.   Your area of expertise is in medical coding,

09:55:38  10   correct?

09:55:38  11   A.   Correct.

09:55:38  12   Q.   And I understand we had a reference with Mr.

09:55:38  13   Hare that you have a copy of your amended report with

09:55:38  14   you.  I might ask you questions about that.  Okay?

09:55:38  15   A.   Okay.

09:55:38  16   Q.   Let's talk about your background a little bit.

09:55:38  17   I just want to be clear.  You did not go to medical

09:55:38  18   school, correct?

09:55:38  19   A.   That's correct.

09:55:38  20   Q.   You are not a medical doctor?

09:55:38  21   A.   I am not a clinician.

09:55:38  22   Q.   You are not a nurse?

09:55:38  23   A.   I'm not a clinician.

09:55:38  24   Q.   I take it you have never had any clinical

09:55:38  25   training in addiction medicine; is that correct?

09:55:38  1     A.    That's correct.

09:55:38  2     Q.    No clinical training in psychiatry?

09:55:38  3     A.    That's correct.

09:55:38  4     Q.    No clinical training in psychology?

09:55:38  5     A.    I am not a clinician, and I think that would

09:55:38  6  cover most of what you are asking.

09:55:38  7     Q.    And you have no clinical background in

09:55:38  8  interpreting lab test results, correct?

09:55:38  9     A.    In none of the work that I provided here was it

09:55:38  10  based on an interpretation.

09:55:38  11     Q.    That's not my question, ma'am.  I'm asking if

09:55:38  12  you have any training in interpreting lab test results?

09:55:38  13     A.    I do not.

09:55:38  14     Q.    No master's degree in public health?

09:55:38  15     A.    No.

09:55:38  16     Q.    No postgraduate degrees?

09:55:38  17     A.    Nope.

09:55:38  18     Q.    And because you are not a medical doctor, I take

09:55:38  19  it you have never rendered any patient care?

09:55:38  20     A.    That's correct.

09:55:38  21     Q.    You have never treated patients for addiction?

09:55:38  22     A.    That's correct.

09:55:38  23     Q.    Never treated patients for substance use

09:55:38  24  disorder?

09:55:38  25     A.    That is correct.

09:55:38  1      Q.   I would like to talk about your work with your

09:55:38  2  company Medco -- that you own, correct?

09:55:38  3      A.   Correct.

09:55:38  4      Q.   Medco provides coding services for clients,

09:55:38  5  correct?

09:55:38  6      A.   Correct.

09:55:38  7      Q.   And some teaching experience?

09:55:38  8      A.   Correct.

09:55:38  9      Q.   But you do not provide billing services to

09:55:38  10  clients, correct?

09:55:38  11      A.   I do RCM, which is revenue cycle management,

09:55:38  12  which billing.

09:55:38  13      Q.   You do not provide any services for health

09:55:38  14  insurance payors like my client Cigna, correct?

09:55:38  15      A.   I might have.  I can't swear to answer that one

09:55:38  16  way or the other.

09:55:38  17      Q.   You don't have any experience working for any

09:55:38  18  health insurance payor?

09:55:38  19      A.   I never was employed by a health insurance

09:55:38  20  payor.

09:55:38  21      Q.   You never worked for a drug testing laboratory

09:55:38  22  like the Labs in this case, correct?

09:55:38  23      A.   My company worked with many labs.

09:55:38  24      Q.   You never directly worked for a lab testing

09:55:38  25  company?

09:55:38  1        A.    I was not employed by a laboratory company, no.

09:55:38  2        Q.    And you have never performed coding services for

09:55:38  3    a drug testing laboratory in-house, correct?

09:55:38  4        A.    Not in-house.

09:55:38  5        Q.    And you have no personal experience working for

09:55:38  6    a health insurance company adjudicating claims, correct?

09:55:38  7        A.    I have never worked for a health insurance

09:55:38  8    company.

09:55:38  9        Q.    You previously testified at your deposition that

09:55:38  10   you have served as an expert witness in various

09:55:38  11   administrative proceeding and other types of professional

09:55:38  12   conduct proceedings, correct?

09:55:38  13       A.    Correct.

09:55:38  14       Q.    And in all of those proceedings you have always

09:55:38  15   been retained on behalf of the provider, correct?

09:55:38  16       A.    Correct.

09:55:38  17       Q.    And you have never served as an expert on behalf

09:55:38  18   of a federal government?

09:55:38  19       A.    Correct.

09:55:38  20       Q.    And you have never served as an expert on behalf

09:55:38  21   of the health insurance payor, correct?

09:55:38  22       A.    Correct.

09:55:38  23       Q.    Prior to this case, none of your prior expert

09:55:38  24   testimony related to claims for reimbursement for drug

09:55:38  25   testing laboratories, correct?

09:55:38  1    A.    Not testimony, no.

09:55:38  2    Q.    And none of your prior expert testimony related

09:55:38  3    to SIU investigations by insurance companies, correct?

09:55:38  4    A.    No.

09:55:38  5    Q.    In fact, Ms. Thelian, prior to this case, you

09:55:38  6    have never testified in any case in federal court before,

09:55:38  7    correct?

09:55:38  8    A.    That's correct.

09:55:38  9    Q.    And prior to this case, you've never testified

09:55:38  10   in any case in any state court before, correct?

09:55:38  11   A.    Correct.

09:55:38  12   Q.    And Mr. Hare asked you a couple of questions

09:55:38  13   about your prior work experience with Mr. Haney, who I

09:55:38  14   think we are going to hear from soon, correct?  Do you

09:55:38  15   remember that?

09:55:38  16   A.    Yes.

09:55:38  17   Q.    You have worked with him about half a dozen

09:55:38  18   times before?

09:55:38  19   A.    Probably around there, yes.

09:55:38  20   Q.    In all of those cases when you worked

09:55:38  21   collaboratively with Mr. Haney, those were all on behalf

09:55:38  22   of the provider side, correct?

09:55:38  23   A.    Correct.

09:55:38  24   Q.    I am going to ask you a couple of questions

09:55:38  25   regarding your amended report.  So if you need to refer

09:55:38  1    to it, that's fine with me.

09:55:38  2          On page 2 of your amended report, you state that

09:55:38  3    -- you talk about the scope of your report, what you were

09:55:38  4    asked to do, and you state that the counsel asked you to

09:55:38  5    evaluate and opine on the coding, billing and supporting

09:55:38  6    documentation for the Labs' covered drug testing claims.

09:55:38  7    Do you recall that?

09:55:38  8        A.   I'm reading it, yes.

09:55:38  9        Q.   And to form these opinions you looked at

09:55:38  10   documents that were provided by the Labs' counsel; is

09:55:38  11   that correct?

09:55:38  12       A.   That's correct.

09:55:38  13       Q.   You had the ability to ask counsel to see

09:55:38  14   additional documents if you wanted to, correct?

09:55:38  15       A.   Correct.

09:55:38  16       Q.   You testified at your deposition that

09:55:38  17   out-of-network providers like the Labs only get paid in

09:55:38  18   accordance with the plan terms.  Do you recall that?

09:55:38  19       A.   I don't recall.

09:55:38  20       Q.   You don't know?

09:55:38  21       A.   I said I don't recall.

09:55:38  22       Q.   Well, would you agree with me that

09:55:38  23   out-of-network providers like the Labs only get paid in

09:55:38  24   accordance with the plan terms?

09:55:38  25       A.   I'm not sure what you mean when you say "plan

896

09:55:38  1    terms."

09:55:38  2        Q.   Talking about the plans in this case, so the

09:55:38  3    Cigna plans that actually were the insurance policies,

09:55:38  4    insurance -- employer sponsored plans, the Cigna plans.

09:55:38  5    Would you agree with me that out-of-network providers are

09:55:38  6    only going to get paid in accordance with whatever the

09:55:38  7    terms of those plans are?

09:55:38  8        A.   The patient's plan with the carrier, yes.

09:55:38  9        Q.   Thank you.  And you testified at your deposition

09:55:38  10   that the plan terms only reimburse for covered services.

09:55:38  11   Do you recall that?

09:55:38  12       A.   I don't recall.

09:55:38  13       Q.   Well, would you agree with me that the plan

09:55:38  14   terms are only going to reimbursed out-of-network

09:55:38  15   providers for covered services?

09:55:38  16       A.   I would agree with that, yes.

09:55:38  17       Q.   You did not look at any plan documents in

09:55:38  18   preparing your opinions to testify here today, correct?

09:55:38  19       A.   No.  For my testimony, no.

09:55:38  20       Q.   To form your opinions?

09:55:38  21       A.   To form my opinion, I did look at Cigna's

09:55:38  22   laboratory policies.

09:55:38  23       Q.   I'm sorry, that wasn't my question, ma'am.  Let

09:55:38  24   me backtrack.  You didn't look at any of Cigna's plans

09:55:38  25   with its members in order to form your opinions here

09:55:38  1    today?

09:55:38  2        A.    Correct.

09:55:38  3        Q.    And would you agree with me that under the

09:55:38  4    terms of Cigna's plans, covered services include only

09:55:38  5    those services that are medically necessary?

09:55:38  6        A.    I would agree.

09:55:38  7        Q.    And you also testified at your deposition, I

09:55:38  8    will remind you, that medically unnecessary services are

09:55:38  9    not covered services under the terms of Cigna's plans?

09:55:38  10       A.    I would agree.

09:55:38  11       Q.    And if it's not a covered service, then it's not

09:55:38  12   payable to an out-of-network provider, correct?

09:55:38  13       A.    I would agree.

09:55:38  14       Q.    And we discussed briefly at the beginning of

09:55:38  15   your testimony that you are not a medical doctor?

09:55:38  16       A.    Correct.

09:55:38  17       Q.    And you don't make any opinions based on a

09:55:38  18   medical necessity, correct?

09:55:38  19       A.    That is correct.

09:55:38  20       Q.    And as you are sitting here today, you are

09:55:38  21   offering no opinion regarding the medical necessity of

09:55:38  22   any of the claims that the Labs submitted to Cigna?

09:55:38  23       A.    That's correct.

09:55:38  24       Q.    Ms. Thelian, did you look at whether the

09:55:38  25   patients whose claims are at issue had met their

09:55:38  1    deductibles?

09:55:38  2          A.    No.

09:55:38  3          Q.    And isn't it true then that when you say that

09:55:38  4    you assumed for the sake of argument that the claims at

09:55:38  5    issue here today were covered services, correct?

09:55:38  6          A.    I'm sorry.  Could you say that again?

09:55:38  7          Q.    Going back to your report.  I think the language

09:55:38  8    in your report says that you're evaluating and opining on

09:55:38  9    the Labs' covered drug testing claims?

09:55:38  10         A.    Right.  I did say that, uh-huh.

09:55:38  11         Q.    But you performed no analysis as to whether or

09:55:38  12    not those claims were actually covered under the terms of

09:55:38  13    the plan, correct?

09:55:38  14         A.    No, that's not correct.

09:55:38  15         Q.    That's not correct.

09:55:38  16         A.    No.  I looked at Cigna's policies, along with

09:55:38  17    the other information that I was looking at with the

09:55:38  18    laboratory tests, the Excel spreadsheets that were

09:55:38  19    provided by Cigna.

09:55:38  20         Q.    I'm talking about whether or not they were

09:55:38  21    covered under the terms of the plans.  You performed no

09:55:38  22    analysis of whether or not those claims were covered

09:55:38  23    under the terms of Cigna's plans?

09:55:38  24         A.    Cigna's policies that are produced by Cigna do

09:55:38  25    list what they cover for particular tests.  That's why

899

| 09:55:38 | 1 | the policies are produced.  That was part and parcel of |

09:55:38    1    the policies are produced.  That was part and parcel of

09:55:38    2    my review.

09:55:38    3        Q.    The Cigna coverage policies?

09:55:38    4        A.    The Cigna's coverage policies, correct.

09:55:38    5        Q.    I'm talking about each of the individual plans

09:55:38    6    that Cigna has with its members, you did not look at any

09:55:38    7    of those plans, correct?

09:55:38    8        A.    I did not, no.

09:55:38    9        Q.    So you could not have formed an opinion about

09:55:38   10    whether or not any of the services for any of the claims

09:55:38   11    were covered under the terms of each of those individual

09:55:38   12    member's plans?

09:55:38   13        A.    The policies that I looked at include policies

09:55:38   14    for commercial plans.  So you know, if Cigna produces a

09:55:38   15    policy for a commercial plan, I am assuming that that's

09:55:38   16    what that means.

09:55:38   17        Q.    Let's talk about how you identified the claims

09:55:38   18    at issue for your opinion.  Mr. Hare walked through for

09:55:38   19    the jury that you identified four denial codes that were

09:55:38   20    the basis of your opinions, correct?

09:55:38   21        A.    Correct.

09:55:38   22        Q.    And you focused on those four denial codes by

09:55:38   23    sorting the claims data that you received, correct?

09:55:38   24        A.    Correct.

09:55:38   25        Q.    And you focused on those four denial codes

09:55:38  1    because they were the highest volume, correct?

09:55:38  2        A.    No.

09:55:38  3        Q.    That's what you testified to at your deposition.

09:55:38  4        A.    It wasn't just based upon the highest volume.

09:55:38  5        Q.    You testified at your deposition that the only

09:55:38  6    methodology that you used that went into selecting these

09:55:38  7    four codes was the volume of the denials.

09:55:38  8        A.    When I looked at the denial reasons -- oh, I

09:55:38  9    understand what you are saying now.  My apologies.  We

09:55:38  10   looked at the denial reason to determine which of the

09:55:38  11   denial reasons were the most frequently used, hence the

09:55:38  12   highest amount.  Is that what you are referring to?

09:55:38  13       Q.    That's what I'm referring to.  And your

09:55:38  14   threshold for including those four denial codes was the

09:55:38  15   highest dollar amount at issue, correct?

09:55:38  16       A.    I didn't make that determination.

09:55:38  17       Q.    That was counsel that made that determination?

09:55:38  18       A.    I don't know who made the determination, but,

09:55:38  19   you know, I just sorted through the spreadsheets.

09:55:38  20       Q.    And in forming your opinions about the claims

09:55:38  21   data, just to be clear, you did not review every single

09:55:38  22   claim line in the claim spreadsheet, correct?

09:55:38  23       A.    I did not look at every single laboratory test

09:55:38  24   on those spreadsheets.

09:55:38  25       Q.    You did not look at the claim form for every

| 09:55:38 | 1 | single claim? |
|---|---|---|

09:55:38  1    single claim?

09:55:38  2        A.   That's correct.

09:55:38  3        Q.   You didn't look at medical records for every

09:55:38  4    claim?

09:55:38  5        A.   Only the 20 patients.

09:55:38  6        Q.   You didn't look at Cigna's explanation of

09:55:38  7    payments for every claim?

09:55:38  8        A.   Only the 20 patients.

09:55:38  9        Q.   Just to be clear, you don't form an opinion at

09:55:38  10   all about any other denial codes other than the four that

09:55:38  11   you testified to this afternoon, correct?

09:55:38  12       A.   Correct.

09:55:38  13       Q.   Going back to your amended report, and

09:55:38  14   specifically the objective section on page 2 that leads

09:55:38  15   into the top of page 3.  You say that counsel asked you

09:55:38  16   to evaluate and opine on Cigna's decision to flag and

09:55:38  17   deny reimbursement for the Labs' covered drug testing

09:55:38  18   claims.  Do you see that?

09:55:38  19       A.   No.  Where are you reading from?  I'm sorry.

09:55:38  20       Q.   I believe that's at the bottom of page 2 onto

09:55:38  21   the top of page 3.  Maybe it's at the top of page 3.

09:55:38  22       A.   I see it now.  Page 3.

09:55:38  23       Q.   So you were asked to opine on Cigna's decision

09:55:38  24   to flag and deny reimbursement for the Lab's covered drug

09:55:38  25   testing services?

| | | |
|---|---|---|
| 09:55:38 | 1 | A.   I do see that. |
| 09:55:38 | 2 | Q.   I think just a couple minutes ago Mr. Hare was |
| 09:55:38 | 3 | asking you some questions about what it means to flag a |
| 09:55:38 | 4 | provider.  Do you recall that testimony? |
| 09:55:38 | 5 | A.   I do. |
| 09:55:38 | 6 | Q.   Just to be clear, you have never worked for |
| 09:55:38 | 7 | Cigna before, correct? |
| 09:55:38 | 8 | A.   Correct. |
| 09:55:38 | 9 | Q.   You've never worked for the Cigna Special |
| 09:55:38 | 10 | Investigations Unit before? |
| 09:55:38 | 11 | A.   I did not. |
| 09:55:38 | 12 | Q.   You've never worked for any SIU department for |
| 09:55:38 | 13 | any health insurance payor before? |
| 09:55:38 | 14 | A.   That is correct. |
| 09:55:38 | 15 | Q.   You've never worked for a health insurance |
| 09:55:38 | 16 | company before? |
| 09:55:38 | 17 | A.   Correct. |
| 09:55:38 | 18 | Q.   You are not a certified fraud examiner? |
| 09:55:38 | 19 | A.   I'm sorry? |
| 09:55:38 | 20 | Q.   You are not a certified fraud examiner? |
| 09:55:38 | 21 | A.   I am not. |
| 09:55:38 | 22 | Q.   You are not an accredited health fraud |
| 09:55:38 | 23 | investigator? |
| 09:55:38 | 24 | A.   I am not. |
| 09:55:38 | 25 | Q.   Did you review the deposition of Mike Goldfarb |

09:55:38   1    in forming your opinions?

09:55:38   2         A.   I don't believe so.

09:55:38   3         Q.   Just to be clear -- I know you testified that

09:55:38   4    you reviewed these 20 files with some medical lab test

09:55:38   5    results in them.  There were no other medical records

09:55:38   6    that you saw or reviewed in forming your opinions?

09:55:38   7         A.   That's correct.

09:55:38   8         Q.   Let's talk about your Opinion 1, which is the

09:55:38   9    denial for code 1698.  And just to refresh the jury's

09:55:38  10    mind, the denial for 1698 is for the denial of the

09:55:38  11    unlisted code of 80299.  Do you recall that --

09:55:38  12         A.   I do.

09:55:38  13         Q.   -- opinion?

09:55:38  14              And you would agree with me -- I think this is

09:55:38  15    on page 6 of your report -- that the actual denial code

09:55:38  16    of 1698 says the unlisted code is disallowed because a

09:55:38  17    description of the service is required but was not

09:55:38  18    received.  Do you see that?

09:55:38  19         A.   I do.

09:55:38  20         Q.   You agree with me that's what the actual denial

09:55:38  21    description states?

09:55:38  22         A.   Correct.

09:55:38  23         Q.   And if I understand your opinion, you were

09:55:38  24    contending that Cigna's SIU improperly denied claims

09:55:38  25    using the 1698 code?

09:55:38    1        A.    Correct.

09:55:38    2        Q.    Did you ever speak with anyone at Cigna about

09:55:38    3    the meaning of the 1698 denial code?

09:55:38    4        A.    I did not speak with anyone at Cigna about that.

09:55:38    5        Q.    Were you in the room for Ms. Canto's testimony

09:55:38    6    on Monday?

09:55:38    7        A.    No, I was not.

09:55:38    8        Q.    You are not aware that she testified that 1698

09:55:38    9    was not a denial code that was available to the SIU?

09:55:38    10       A.    No, I was not here.

09:55:38    11       Q.    That's not a code that's imposed by the SIU?

09:55:38    12    You have no knowledge?

09:55:38    13       A.    I was just looking at the denial codes.  No.

09:55:38    14       Q.    On page 8 of your report, Ms. Thelian, you

09:55:38    15    contend that this denial code was improper because the

09:55:38    16    Labs submitted, quote, available sufficient information

09:55:38    17    for the claim to be adjudicated?

09:55:38    18       A.    Correct.

09:55:38    19       Q.    So if I understand what you are saying, your

09:55:38    20    opinion is that 80299 was an acceptable code because the

09:55:38    21    Labs submitted available sufficient information to

09:55:38    22    justify the use of that code; is that correct?

09:55:38    23       A.    If I may?

09:55:38    24       Q.    Mm-hmm.

09:55:38    25       A.    Your description is the unlisted code is

09:55:38    1    disallowed because a description of the service is

09:55:38    2    required but not received.

09:55:38    3         Q.   Correct.

09:55:38    4         A.   A description was provided on all of the claim

09:55:38    5    forms.

09:55:38    6         Q.   We'll get to that.  I'm trying to understand

09:55:38    7    that your opinion, at least as how you articulated it in

09:55:38    8    your report, is that the Labs submitted, quote, available

09:55:38    9    sufficient information for Cigna to adjudicate the claim?

09:55:38    10        A.   Correct.

09:55:38    11        Q.   And to support your opinion, you look at some of

09:55:38    12   the CMS 1500 claim forms?

09:55:38    13        A.   Along with the lab reports, yes.

09:55:38    14        Q.   Do you know how the labs submitted -- strike

09:55:38    15   that.

09:55:38    16             The CMS 1500 patient claim forms you looked at,

09:55:38    17   those were all from 2013, correct?

09:55:38    18        A.   They were for the 20 patients that were in the

09:55:38    19   grouping of records I received.

09:55:38    20        Q.   All of the patient examples in your report are

09:55:38    21   from 2013?

09:55:38    22        A.   The examples, yes.

09:55:38    23        Q.   Do you know how the Labs submitted those CMS

09:55:38    24   1500 forms to Cigna back in 2013?

09:55:38    25        A.   I do not.

906

09:55:38  1      Q.   You don't know if they were submitted paper or

09:55:38  2  electronic or snail mail?

09:55:38  3      A.   I do not.

09:55:38  4      Q.   Do you know if they were read by an actual

09:55:38  5  person or by a machine?

09:55:38  6      A.   I do not.

09:55:38  7           MS. COSTIN:  Okay.  Mr. Salazar, could we put up

09:55:38  8  Joint Exhibit 14, please.

09:55:38  9           THE COURT:  For clarification.  You mean read a

09:55:38  10  person or machine, you mean at the Cigna end when

09:55:38  11  received?

09:55:38  12           MS. COSTIN:  Uh-huh.

09:55:38  13           And can we go to page 27 in this PDF.

09:55:38  14  BY MS. COSTIN:

09:55:38  15      Q.   Ms. Thelian, is this one of the CMS 1500 claim

09:55:38  16  forms or like one of the ones that you looked at?

09:55:38  17      A.   Yes.

09:55:38  18      Q.   Do you see how in this claim form, on the

09:55:38  19  left-hand side, it has 1, 2, 3, 4, 5, 6 and there's

09:55:38  20  several lines of things that are being submitted for

09:55:38  21  claims?

09:55:38  22      A.   I do.

09:55:38  23           MS. COSTIN:  If we could blow that up, Mr.

09:55:38  24  Salazar, that would be helpful.

09:55:38  25  BY MS. COSTIN:

09:55:38  1       Q.   On this one in particular, do you see where it

09:55:38  2    has the date of service?

09:55:38  3       A.   Yes.

09:55:38  4       Q.   Then it has procedures, services or supplies

09:55:38  5    under Column D?

09:55:38  6       A.   I do.

09:55:38  7       Q.   And you see how this form in particular -- it's

09:55:38  8    a little difficult to read because the typing is kind of

09:55:38  9    over the line, not quite in the box where it is supposed

09:55:38  10   to be?

09:55:38  11      A.   It's a little off, yes.

09:55:38  12      Q.   Do you agree with me it might be a little

09:55:38  13   difficult for a machine to read this?

09:55:38  14           MR. HARE:  Objection, Your Honor.  There's no

09:55:38  15   foundation as to her machine intelligence background.

09:55:38  16           THE COURT:  Sustained.

09:55:38  17   BY MS. COSTIN:

09:55:38  18      Q.   Setting that aside.  Can we look at the first

09:55:38  19   line?  Do you see where it says, 6:00 a.m. and below it,

09:55:38  20   it says 80299?

09:55:38  21      A.   I do.

09:55:38  22      Q.   Is it your understanding that the Labs were

09:55:38  23   using the code 80299 for that service described as simply

09:55:38  24   6:00 a.m.?

09:55:38  25      A.   No.

09:55:38  1       Q.    No?  Do you see anything else next to 6:00 a.m.

09:55:38  2       A.    I do not.

09:55:38  3       Q.    There's no other supporting information to

09:55:38  4  support that particular line other than just the name of

09:55:38  5  the drug and the 80299, correct?

09:55:38  6       A.    No, no, no, not next to the 6:00 a.m., no.

09:55:38  7       Q.    So what we have here for this line in particular

09:55:38  8  is just the name of a drug and the code 80299?

09:55:38  9       A.    Correct.

09:55:38  10      Q.    There weren't any further descriptions provided

09:55:38  11  by the Labs?

09:55:38  12      A.    Correct.

09:55:38  13      Q.    Just to go back.  The denial code is that for

09:55:38  14  1698, as you have articulated in your report, the

09:55:38  15  unlisted code is disallowed because a description of the

09:55:38  16  service is required, but was not received.  Correct?

09:55:38  17      A.    Correct.

09:55:38  18           MS. COSTIN:  You can take that down, Mr.

09:55:38  19  Salazar.

09:55:38  20  BY MS. COSTIN:

09:55:38  21      Q.    Did you investigate whether the Labs resubmitted

09:55:38  22  the claims attaching any additional supporting

09:55:38  23  information?

09:55:38  24      A.    I know that claims were submitted multiple

09:55:38  25  times.

09:55:38  1    Q.   The specific claims that were denied with 1698?

09:55:38  2    A.   Some of them, I believe, were.  They were in

09:55:38  3    that mix.

09:55:38  4    Q.   Are you aware of whether the Labs resubmitted an

09:55:38  5    appeal for every claim explaining that -- the

09:55:38  6    circumstances and giving a further description?

09:55:38  7    A.   For every claim, I'm not aware.

09:55:38  8    Q.   I would like to talk about your opinion on

09:55:38  9    denial for code 1648, which is invalid service code.  As

09:55:38  10   I understand your opinion that you offered on this denial

09:55:38  11   code when speaking with Attorney Hare this morning, is

09:55:38  12   that denial reason code 1648 was incorrect and not proper

09:55:38  13   because there were CPT codes that were valid at the time

09:55:38  14   and were valid at the dates of service that the claim was

09:55:38  15   submitted.  Is that a correct summary of your opinion?

09:55:38  16   A.   It is.

09:55:38  17   Q.   If I understand your methodology in forming this

09:55:38  18   opinion, you simply looked at the claim and the CPT code

09:55:38  19   that was billed and then looked in the CPT manual at the

09:55:38  20   time to make sure it was a valid CPT code at the time?

09:55:38  21   A.   Correct.

09:55:38  22   Q.   And these are all in Appendix D to your reports

09:55:38  23   that I believe is Labs 6963; is that right?

09:55:38  24   A.   Correct.

09:55:38  25   Q.   You are not providing any opinion whatsoever as

09:55:38  1   to whether those claims were medically necessary,

09:55:38  2   correct?

09:55:38  3       A.   That's correct.

09:55:38  4       Q.   As you review the CPT manual in forming your

09:55:38  5   opinions on this denial code, would you agree with me

09:55:38  6   that the CPT manual has different codes based on the

09:55:38  7   specifics on each different procedure?

09:55:38  8       A.   Each procedure has its own CPT code, yes.

09:55:38  9       Q.   And CPT manual has different codes based on what

09:55:38  10  technology is used?

09:55:38  11      A.   Correct.

09:55:38  12      Q.   And you would agree the CPT manual has different

09:55:38  13  codes based on what the test was used for medically?

09:55:38  14      A.   If you are saying -- I'm not understanding the

09:55:38  15  question.

09:55:38  16      Q.   You would agree the CPT manual has different

09:55:38  17  codes based on what drug class is being tested, correct?

09:55:38  18      A.   Which drug class is being tested, yes.

09:55:38  19      Q.   So you didn't make any clinical determinations

09:55:38  20  about the services that were performed by the Labs,

09:55:38  21  correct?

09:55:38  22      A.   Correct.

09:55:38  23      Q.   And you didn't actually analyze whether or not

09:55:38  24  any of the CPT codes were the right code to use for the

09:55:38  25  particular service that was rendered?

09:55:38  1        A.    Not from a medical perspective, but from a

09:55:38  2    documentation and coding perspective, yes.

09:55:38  3        Q.    You wouldn't be able to do that from a medical

09:55:38  4    perspective, correct?

09:55:38  5        A.    I cannot do it from a medical perspective, no.

09:55:38  6        Q.    You testified at your deposition, Ms. Thelian,

09:55:38  7    that you reviewed Cigna's April 15, 2015 drug testing

09:55:38  8    policy; is that correct?

09:55:38  9        A.    Yes.

09:55:38  10       Q.    Did you review any of other Cigna's drug testing

09:55:38  11   coverage policies?

09:55:38  12       A.    I can't recall.

09:55:38  13       Q.    You testified at your deposition that you

09:55:38  14   didn't.  Does that refresh your memory?

09:55:38  15       A.    If that's what it says.

09:55:38  16       Q.    Do you review any EOPs sent to the Labs?

09:55:38  17       A.    I can't recall. --

09:55:38  18            MS. COSTIN:  Can we pull up Joint Trial Exhibit

09:55:38  19   78, Mr. Salazar.  Can say we scroll to the last page.

09:55:38  20   BY MS. COSTIN:

09:55:38  21       Q.    So if I understand your opinion here,

09:55:38  22   Ms. Thelian, on denial code 1648, your opinion is that

09:55:38  23   because there was a proper CPT code, then denial code

09:55:38  24   1648 for invalid service code was improper.  Do I

09:55:38  25   understand that correctly?

| | | |
|---|---|---|
| 09:55:38 | 1 | A.    Yes. |
| 09:55:38 | 2 | Q.    And on this EOP, if you can read the last |
| 09:55:38 | 3 | paragraph, it says "Healthcare professional, your claim |
| 09:55:38 | 4 | was received with a missing or invalid service code based |
| 09:55:38 | 5 | on our reimbursement policy.  Please correct the |
| 09:55:38 | 6 | information and resubmit the claim."  Do you see that? |
| 09:55:38 | 7 | A.    I do. |
| 09:55:38 | 8 | Q.    Did you consider this when forming your |
| 09:55:38 | 9 | opinions? |
| 09:55:38 | 10 | A.    I believe that these were corrected based upon |
| 09:55:38 | 11 | that Cigna policy in my amended report. |
| 09:55:38 | 12 | Q.    You believe.  Do you know? |
| 09:55:38 | 13 | A.    I do not know. |
| 09:55:38 | 14 | Q.    You don't know whether the Labs resubmitted |
| 09:55:38 | 15 | every claim on your Appendix D with further information |
| 09:55:38 | 16 | to correct the claim? |
| 09:55:38 | 17 | A.    I do not know if every claim was resubmitted. |
| 09:55:38 | 18 | MR. HARE:  Your Honor, may we ask for a sidebar, |
| 09:55:38 | 19 | please? |
| 09:55:38 | 20 | THE COURT:  Yes. |
| 09:55:38 | 21 | (Sidebar commenced.) |
| 09:55:38 | 22 | THE COURT:  Do you expect to be done today or |
| 09:55:38 | 23 | are you going -- |
| 09:55:38 | 24 | MS. COSTIN:  I'm trying to. |
| 09:55:38 | 25 | MR. HARE:  I am loathed to do this, but this |

| 09:55:38 | 1 | again goes to a discovery issue with regard to -- |

09:55:38    1    again goes to a discovery issue with regard to --

09:55:38    2            THE COURT:  I'm not surprised.

09:55:38    3            MR. HARE:  -- what was produced and what wasn't

09:55:38    4    produced.

09:55:38    5            Can you articulate the concern, Mr. Gestrich?

09:55:38    6            MR. GESTRICH:  Yes, Your Honor.  We filed a

09:55:38    7    motion to compel EOPs, EOBs and claim forms.  And when we

09:55:38    8    did that, Cigna represented to the Court that the

09:55:38    9    exhibits that are now Joint Exhibits 43 to 46 contain all

09:55:38    10   the information that's within EOP and EOB.  And they're

09:55:38    11   cross-examining a witness on a document they did not

09:55:38    12   produce.

09:55:38    13           MS. COSTIN:  It's a joint exhibit in the case.

09:55:38    14           MR. GESTRICH:  The argument is, did you review

09:55:38    15   this document.  She reviewed everything in the joint

09:55:38    16   exhibits, yes, Your Honor.  I'm sorry.

09:55:38    17           THE COURT:  She did review the joint exhibits or

09:55:38    18   she reviewed what you gave her, as you say, was

09:55:38    19   represented to be everything that didn't include it?

09:55:38    20           MR. GESTRICH:  She reviewed the line level

09:55:38    21   spreadsheets from Cigna that Cigna says contained all the

09:55:38    22   information within the EOPs.  And that was --

09:55:38    23           THE COURT:  Is that wrong?

09:55:38    24           MS. COSTIN:  Your Honor, I'm simply asking her

09:55:38    25   based on the EOP, based on the denial code, if she just

914

| | |
|---|---|
| 09:55:38 | 1 |
| 09:55:38 | 2 |
| 09:55:38 | 3 |
| 09:55:38 | 4 |
| 09:55:38 | 5 |
| 09:55:38 | 6 |
| 09:55:38 | 7 |
| 09:55:38 | 8 |
| 09:55:38 | 9 |
| 09:55:38 | 10 |
| 09:55:38 | 11 |
| 09:55:38 | 12 |
| 09:55:38 | 13 |
| 09:55:38 | 14 |
| 09:55:38 | 15 |
| 09:55:38 | 16 |
| 09:55:38 | 17 |
| 09:55:38 | 18 |
| 09:55:38 | 19 |
| 09:55:38 | 20 |
| 09:55:38 | 21 |
| 09:55:38 | 22 |
| 09:55:38 | 23 |
| 09:55:38 | 24 |
| 09:55:38 | 25 |

understands what that means.  I'm not intending to suggest that --

THE COURT:  Yes, you are.

MS. COSTIN:  I'm just intending to ask her the question whether she knows.  I'm not really understanding -- I'm not understanding the objection.

THE COURT:  I'm not understanding your response.

MS. COSTIN:  I'm not --

THE COURT:  You asked her, and basically she said she amended her report.  Is that because she got to see it later or --

MR. HARE:  The amended report followed the original Daubert rulings.

THE COURT:  I know.  But to the extent that perhaps she should have reviewed this EOP and didn't and it's a gotcha question, that's what I took this all to be.  Did the amended report reflect that she's seen something and it's not including the claim?

MR. GESTRICH:  It was a different scope.  If I may.  We filed a motion to compel the EOP, EOBs, and claim forms.

THE COURT:  Yeah.

MR. GESTRICH:  The Court denied it on the representation of Cigna that we already had all that information.

| 09:55:38 | 1 | THE COURT:  Oh, yeah, I remember that one. |

09:55:38  1    THE COURT:  Oh, yeah, I remember that one.

09:55:38  2    MR. GESTRICH:  Yes, Your Honor.  And we did not

09:55:38  3  get those.  And now at trial we're hearing about did you

09:55:38  4  review these forms.

09:55:38  5    MS. COSTIN:  That's not what I asked.  I didn't

09:55:38  6  ask if she reviewed the forms.

09:55:38  7    MR. GESTRICH:  You asked whether she reviewed

09:55:38  8  the EOPs.

09:55:38  9    MS. COSTIN:  That's different from the forms.  I

09:55:38  10  just asked if she reviewed --

09:55:38  11    MR. GESTRICH:  You put the EOP on the screen.

09:55:38  12    MS. COSTIN:  I didn't ask her if she reviewed --

09:55:38  13  I just asked her based on this one.

09:55:38  14    THE COURT:  You asked the question, Attorney

09:55:38  15  Costin, Did you consider this, referencing the document

09:55:38  16  that was up -- that is still up on the screen, which it

09:55:38  17  should be brought down when we're not talking about it,

09:55:38  18  but put that aside.  And I don't know how they can

09:55:38  19  consider it if you didn't disclose it in discovery.

09:55:38  20    MS. COSTIN:  We did disclose it.  It's a joint

09:55:38  21  exhibit.  It's a produced document.

09:55:38  22    THE COURT:  It has a discovery -- a number that

09:55:38  23  shows --

09:55:38  24    MS. COSTIN:  Yes.  Yes.  This is a produced

09:55:38  25  document.  It's a joint exhibit.  This is not a gotcha.

916

| | | |
|---|---|---|
| 09:55:38 | 1 | MR. GESTRICH: What Cigna has represented is |
| 09:55:38 | 2 | these lines on the spreadsheet contain all the |
| 09:55:38 | 3 | information within the EOPs. So Ms. Thelian reviewed the |
| 09:55:38 | 4 | line level spreadsheets. |
| 09:55:38 | 5 | THE COURT: Are you going to pursue this any |
| 09:55:38 | 6 | further? |
| 09:55:38 | 7 | MS. COSTIN: No. I'm done. |
| 09:55:38 | 8 | THE COURT: We can talk about it later when the |
| 09:55:38 | 9 | jury is deliberating. We'll have all the time in the |
| 09:55:38 | 10 | world about discovery. |
| 09:55:38 | 11 | MR. HARE: Thank you, Your Honor. |
| 09:55:38 | 12 | (Sidebar ends.) |
| 09:55:38 | 13 | MS. COSTIN: We can pull it down. |
| 09:55:38 | 14 | BY MS. COSTIN: |
| 09:55:38 | 15 | Q. Ms. Thelian, I would like to turn to your |
| 09:55:38 | 16 | Opinion 4, denial for code 0369. And I believe you |
| 09:55:38 | 17 | classify it as services not performed. Are you aware |
| 09:55:38 | 18 | that the actual denial code is services not rendered as |
| 09:55:38 | 19 | billed? |
| 09:55:38 | 20 | A. I have it as services not performed was |
| 09:55:38 | 21 | incorrect and unsubstantiated. |
| 09:55:38 | 22 | Q. Correct. But the Cigna SIU, their internal |
| 09:55:38 | 23 | remark code for 0369 is not services not performed, it's |
| 09:55:38 | 24 | services not rendered as billed. Are you aware of that? |
| 09:55:38 | 25 | A. I am. |

09:55:38    1        Q.    Okay.  And are you aware that Cigna used this

09:55:38    2   code to deny certain claims in this case on the basis of

09:55:38    3   medical necessity?

09:55:38    4        A.    I just -- I was just made aware of that, yes.

09:55:38    5        Q.    You were just made aware of that?

09:55:38    6        A.    Yes.

09:55:38    7        Q.    You have no opinion on medical necessity in your

09:55:38    8   report?

09:55:38    9        A.    That is correct.

09:55:38   10        Q.    I would like to go back to your chart that

09:55:38   11   Mr. Hare asked some questions about.  It's Labs Trial

09:55:38   12   Exhibit 6966.

09:55:38   13            MS. COSTIN:  If we can bring that up on the

09:55:38   14   screen, Mr. Salazar.

09:55:38   15            THE COURT:  That may be published.

09:55:38   16   BY MS. COSTIN

09:55:38   17        Q.    And as I understand it, Ms. Thelian, this is

09:55:38   18   your summary based on your review of these 20 patient

09:55:38   19   files that we have been talking about, correct?

09:55:38   20        A.    Correct.

09:55:38   21        Q.    You looked at the files and you simply

09:55:38   22   transcribed positive, negative, how many times a person

09:55:38   23   was tested, correct?

09:55:38   24        A.    Correct.

09:55:38   25        Q.    I do not see a column on here for prescribed

09:55:38  1    medications.  Did you look at prescribed medications?

09:55:38  2        A.   I did not.

09:55:38  3        Q.   You did not include that on your chart, correct?

09:55:38  4        A.   I did not.

09:55:38  5        Q.   And you did not include on your chart the

09:55:38  6    specific drug classes that were tested, correct?

09:55:38  7        A.   Correct.

09:55:38  8        Q.   You didn't include the drug test classes that

09:55:38  9    were tested at the point of care?

09:55:38  10       A.   I was just looking at the positive and negative

09:55:38  11   results for this particular exercise.

09:55:38  12       Q.   And under the column Lab results positive tests,

09:55:38  13   you identified the specific drugs that you believed the

09:55:38  14   patient tested positive for, correct?

09:55:38  15       A.   I took it from the Lab reports.

09:55:38  16       Q.   Correct.  But what I don't see is a column where

09:55:38  17   you indicate all of the things the patient tested

09:55:38  18   negative for.  You didn't put that on your chart, right?

09:55:38  19       A.   This was just to review the discrepancies

09:55:38  20   between the two.

09:55:38  21            MS. COSTIN:  Okay.  May I have a minute, Your

09:55:38  22   Honor?

09:55:38  23            THE COURT:  Yes.

09:55:38  24            MS. COSTIN:  I have nothing further, Your Honor.

09:55:38  25            THE COURT:  You may step down, ma'am.  Thank you

| | | |
|---|---|---|
| 09:55:38 | 1 | very much. |
| 09:55:38 | 2 | THE WITNESS:  Thank you. |
| 09:55:38 | 3 | THE COURT:  Next witness. |
| 09:55:38 | 4 | MR. GESTRICH:  The Labs call Mr. Christopher |
| 09:55:38 | 5 | Haney. |
| 09:55:38 | 6 | THE CLERK:  Stand right over there, and please |
| 09:55:38 | 7 | raise your right hand. |
| 09:55:38 | 8 | CHRISTOPHER HANEY, |
| 09:55:38 | 9 | having been called as a witness, was first duly sworn and |
| 09:55:38 | 10 | testified on his oath as follows: |
| 09:55:38 | 11 | THE WITNESS:  I do. |
| 09:55:38 | 12 | THE CLERK:  Please be seated.  Please state your |
| 09:55:38 | 13 | name for the record, spelling your last name. |
| 09:55:38 | 14 | THE WITNESS:  My name is Christopher Haney. |
| 09:55:38 | 15 | Last name is H-A-N-E-Y. |
| 09:55:38 | 16 | THE COURT:  Good afternoon, sir. |
| 09:55:38 | 17 | You may proceed. |
| 09:55:38 | 18 | MR. GESTRICH:  Thank you, Your Honor. |
| 09:55:38 | 19 | DIRECT EXAMINATION |
| 09:55:38 | 20 | BY MR. GESTRICH: |
| 09:55:38 | 21 | Q.   Good afternoon, Mr. Haney. |
| 09:55:38 | 22 | A.   Good afternoon. |
| 09:55:38 | 23 | Q.   So today I just want to give a quick snapshot of |
| 09:55:38 | 24 | the topics that you are going to testify to likely |
| 09:55:38 | 25 | tomorrow morning.  In general, what topics are you going |

09:55:38  1    to opine on with respect to your engagement in this

09:55:38  2    matter?

09:55:38  3        A.   I have got two primary topics that I'm going to

09:55:38  4    focus on.  I'm a forensic accountant and I'm a

09:55:38  5    statistician.  When we talk about statistics, we're going

09:55:38  6    to be talking about samples in this case.  Samples of

09:55:38  7    patients, samples of claims looked at and used as the

09:55:38  8    basis for some conclusions.  I'm going to render opinions

09:55:38  9    about those samples.

09:55:38  10       The other area of my focus is as a forensic

09:55:38  11   accountant.  In focusing on that topic, I am going to

09:55:38  12   talk specifically about financial damages in this case.

09:55:38  13   When we look at the claims for which the Labs were harmed

09:55:38  14   or damaged, we're going to look at the financial damages

09:55:38  15   associated with that harm and I'm going to quantify

09:55:38  16   that.

09:55:38  17       Q.   Can you please describe your educational

09:55:38  18   background?

09:55:38  19       A.   Yes.  I've got an undergraduate degree in

09:55:38  20   mechanical engineering from the Virginia Military

09:55:38  21   Institute.  I also have an MBA from the University of

09:55:38  22   Virginia.  I've got a graduate certificate in applied

09:55:38  23   statistics from Penn State as well.

09:55:38  24       Q.   Prior work.  Can you tell us about prior

09:55:38  25   relevant work to this case that you feel that the Court

09:55:38  1    would like to know?

09:55:38  2        A.    Certainly.  I think there's several prior work

09:55:38  3    experiences that I had before this case.  I spent five

09:55:38  4    years with General Electric as an internal auditor,

09:55:38  5    focusing on internal investigations, as well as audits

09:55:38  6    across the company, across the globe, including

09:55:38  7    healthcare business.  So some of the things when I talk

09:55:38  8    about sampling will be related to statistics.  I have

09:55:38  9    been in that role.  I have worn the shoes of an auditor,

09:55:38  10   and I did that for many years.

09:55:38  11         In addition to my time at General Electric, I

09:55:38  12   was a forensic accountant at the FBI.  I worked in the

09:55:38  13   Chicago field office, specializing in white collar and

09:55:38  14   health care violations.  About 50 percent of my cases

09:55:38  15   there were health care related.  Again, that was focused

09:55:38  16   on forensic accounting, determining what we call losses,

09:55:38  17   which is the same thing as damages in the civil setting.

09:55:38  18   But determining losses in those kind of violations.   So

09:55:38  19   I think those are both very relevant professional

09:55:38  20   experiences that I have had.

09:55:38  21         In addition to those, I have been the chief

09:55:38  22   compliance officer for a toxicology laboratory.  We're

09:55:38  23   talking about labs in this case.  I have been a

09:55:38  24   compliance officer for the same kind of labs dealing with

09:55:38  25   many similar issues there.  I conducted audits of our lab

09:55:38  1    at the time.  So I will be able to bring that background

09:55:38  2    to bear when we talk about some of those specific

09:55:38  3    statistical and accounting issues.

09:55:38  4         Q.   Do you do any lab consulting work?

09:55:38  5         A.   I do.  Since I -- I described many of my

09:55:38  6    full-time professional roles, I'm now a consultant with

09:55:38  7    the Forensus Group, and we are engaged regularly to

09:55:38  8    provide consulting advice to a variety of clients, about

09:55:38  9    80 percent which are health care focused.  Many of which

09:55:38  10   are labs, largely given my experience in the lab

09:55:38  11   community.  But I have worked on a variety of lab cases

09:55:38  12   providing a variety of consulting services, both

09:55:38  13   statistical and forensic accounting related.

09:55:38  14        Q.   In your work at Forensus, do you address and

09:55:38  15   consult on -- provide expert opinion on insurance

09:55:38  16   investigations?

09:55:38  17        A.   Certainly.  It may help to explain what Forensus

09:55:38  18   does.  We are a consulting firm, but it's a consulting

09:55:38  19   firm focused on litigation consulting.  So we are

09:55:38  20   typically focused on folks who are either in lawsuits

09:55:38  21   like this or think that a lawsuit is likely.  So most of

09:55:38  22   our cases involve some sort of dispute.  Maybe it's a

09:55:38  23   litigation or an arbitration or appeal of some kind, but

09:55:38  24   they're a dispute.  And often when we're engaged, they're

09:55:38  25   reimbursement focused, very similar to this.  Again,

09:55:38   1    approximately 80 percent of that caseload is health care

09:55:38   2    specific.

09:55:38   3        Q.   Have you had any relevant military experience?

09:55:38   4        A.   I think so.  I recently retired from the Army

09:55:38   5    Reserve.  I was -- enlisted as a combat engineer, but

09:55:38   6    spent over 20 years as a medical service officer.  My

09:55:38   7    responsibilities there are medical administration,

09:55:38   8    medical operations.  And again, I spent over 20 years

09:55:38   9    performing those duties.

09:55:38  10        Q.   And we're almost wrapped up with this.

09:55:38  11             Do you have any certifications?

09:55:38  12        A.   I do.  I have got several certifications, all of

09:55:38  13    which I think are relevant.  First, I'm a CPA, a

09:55:38  14    Certified Public Accountant.  I'm also a Certified Fraud

09:55:38  15    Examiner, a CFE.  Finally, I'm certified in Healthcare

09:55:38  16    Compliance, CHC.  All three of those certifications have

09:55:38  17    relevant training and conferences and documentation

09:55:38  18    related specifically to the areas of forensic accounting,

09:55:38  19    damages and statistical analysis, all of which are my

09:55:38  20    areas of specialty.

09:55:38  21        Q.   And just one last question on this.  Your --

09:55:38  22    what appear to be a spectrum of skills, how do you make

09:55:38  23    all of this work together?

09:55:38  24        A.   It's certainly a unique background.  You know,

09:55:38  25    when most people think of what a CPA do, they think about

09:55:38  1    their taxes.  That's not the kind of CPA that I am.

09:55:38  2    That's not my flavor.  Fortunately, my career path has

09:55:38  3    led to a lot of the things I deal with.  You don't

09:55:38  4    encounter a lot of statistician/accountants.  It's just

09:55:38  5    not a common combination of skills.  But fortunately

09:55:38  6    through the combination of the FBI and some of my

09:55:38  7    professional experience, a lot of those skills and

09:55:38  8    industries overlapped each other to where my skill set

09:55:38  9    found its way out.  These are the kind of cases I worked

09:55:38  10   on, and I enjoy working on.  It's a very niche focus,

09:55:38  11   health care-related cases that involve both forensic

09:55:38  12   accounting and statistics.  But fortunately for me, it's

09:55:38  13   been a career that has developed into a common niche for

09:55:38  14   me.

09:55:38  15            THE COURT:  I think you made it, sir.  I'm

09:55:38  16   afraid we're going to have to interrupt your testimony.

09:55:38  17            THE WITNESS:  I understand, Your Honor.

09:55:38  18            THE COURT:  You need to be back here tomorrow at

09:55:38  19   least by 9:25.  I appreciate you coming to the courtroom

09:55:38  20   and be ready to go because we'll bring the jury out at

09:55:38  21   9:30.  Thank you.

09:55:38  22            THE WITNESS:  I understand.  Thank you, Your

09:55:38  23   Honor.

09:55:38  24            THE COURT:  Ladies and gentlemen, we'll recess

09:55:38  25   for the day.  I think it's a lovely day out there, so go

09:55:38  1    enjoy it.

09:55:38  2            (In the absence of the jury at 3:46 p.m.)

09:55:38  3            THE COURT:  Everybody be seated just briefly.

09:55:38  4    We are going to reconvene in the conference room.  Let's

09:55:38  5    give it 4:02 -- I'm sorry -- five minutes past 4:00.

09:55:38  6            Just a -- don't take it as a criticism, but I

09:55:38  7    think you asked Ms. Thelian a question about was she --

09:55:38  8    you know, and obviously her qualifications are at issue

09:55:38  9    and proper cross-examination, but you asked her about was

09:55:38  10   she a fraud accountant or another kind of accountant.  I

09:55:38  11   don't know that you're offering a counter fraud

09:55:38  12   accountant or, you know, why we needed that apropos of my

09:55:38  13   not wanting to have a lot of words fraud thrown around.

09:55:38  14   But it's -- I didn't stop you.  It's not a big thing, but

09:55:38  15   I guess I'm just asking the parties to bear that in mind.

09:55:38  16           Okay.  Thanks.  We'll see you shortly.  Can you

09:55:38  17   recess us, please.  Thank you.

09:55:38  18           (Whereupon, a recess was taken from 3:48 p.m. to

09:55:38  19   4:06 p.m.)

09:55:38  20           THE COURT:  I expect that both sides will have a

09:55:38  21   person representing them who are authorized to talk about

09:55:38  22   exhibits will be available early Friday morning.  I don't

09:55:38  23   know.  Liana says she opens up about 8:30.  Might be

09:55:38  24   quarter to 9.  Let's say quarter to 9.  And be ready to

09:55:38  25   go over what people think are in evidence so far.

09:55:38  1          She'll then make a list of where there's any

09:55:38  2   dispute between the two parties with her.  We have other

09:55:38  3   ways.  We'll double check Liana and she'll get back to

09:55:38  4   you.

09:55:38  5          We're here this afternoon in the second day of

09:55:38  6   charge conference.  I believe what we hope to accomplish

09:55:38  7   is to get through what I call part 2.  It's basically the

09:55:38  8   charge relating to the substance of the Labs case.

09:55:38  9   Everybody understood that I hope.  All right.

09:55:38  10          Could I have appearances.  I guess we need that.

09:55:38  11          MR. CHRIST:  Matthew Christ on behalf of the

09:55:38  12   Labs.

09:55:38  13          MR. GESTRICH:  Anthony Gestrich on behalf of the

09:55:38  14   Labs.

09:55:38  15          MR. HARE:  Scott Hare for the Labs.

09:55:38  16          MR. CUNNINGHAM:  Fred Cunningham for the Labs.

09:55:38  17          MS. COSTIN:  Emily Costin for Cigna.

09:55:38  18          MS. KINGSBERY:  Kelsey Kingsbery for Cigna.

09:55:38  19          MR. AKERMAN:  Alexander Akerman For Cigna.

09:55:38  20          THE COURT:  That's it.  And my law clerk is

09:55:38  21   present.

09:55:38  22          Well, I'll proceed the way we did yesterday.

09:55:38  23          Charge Number 20 I believe is where we left off.

09:55:38  24   Is there any objection to that from the Labs?

09:55:38  25          MR. CHRIST:  No objection, Your Honor.

| | | |
|---|---|---|
| 09:55:38 | 1 | THE COURT:  How about Cigna? |
| 09:55:38 | 2 | MS. KINGSBERY:  No objection, Your Honor. |
| 09:55:38 | 3 | THE COURT:  21, statement of the case.  Any |
| 09:55:38 | 4 | objection from the Labs? |
| 09:55:38 | 5 | MR. CHRIST:  No objection, Your Honor. |
| 09:55:38 | 6 | MS. KINGSBERY:  In the bottom of the first |
| 09:55:38 | 7 | paragraph where it says in Count Two.  The Labs assert a |
| 09:55:38 | 8 | cause of action that each of them are.  We would ask to |
| 09:55:38 | 9 | have intended beneficiaries of Cigna's insurance |
| 09:55:38 | 10 | contracts.  I'm sorry, intended. |
| 09:55:38 | 11 | THE COURT:  I know.  What was the Labs' reaction |
| 09:55:38 | 12 | to that? |
| 09:55:38 | 13 | MR. CHRIST:  I think beneficiaries is perhaps |
| 09:55:38 | 14 | cleaner and more understandable for the jury.  Or we |
| 09:55:38 | 15 | could say -- well, I would say we could just say third |
| 09:55:38 | 16 | party beneficiaries, but that's less -- |
| 09:55:38 | 17 | THE COURT:  I think intended, I'm not even sure |
| 09:55:38 | 18 | what that means.  I don't think we used it in the |
| 09:55:38 | 19 | substantive charge on the count.  I could be wrong.  But |
| 09:55:38 | 20 | I don't see it.  We talk about benefit, you know, another |
| 09:55:38 | 21 | party. |
| 09:55:38 | 22 | MS. KINGSBERY:  If I may? |
| 09:55:38 | 23 | THE COURT:  I don't think I'm going to do that. |
| 09:55:38 | 24 | I will look at all of your comments afterwards again. |
| 09:55:38 | 25 | But I don't see a need for that.  So as of now, it's not |

928

```
09:55:38  1    in.
09:55:38  2            Alex, do you see any little stickers in the
09:55:38  3    desk?  Thanks.
09:55:38  4            MS. KINGSBERY:  I had one more.
09:55:38  5            THE COURT:  Sorry.  That's fine.  You can have
09:55:38  6    as many.  I didn't realize.
09:55:38  7            MS. KINGSBERY:  We would also like to include
09:55:38  8    statute of limitations for our affirmative defenses.
09:55:38  9            THE COURT:  I thought we talked about this in
09:55:38  10   pretrial.  I thought I ruled that's not in the case.
09:55:38  11   It's an equitable claim.  I said I'd consider laches.  I
09:55:38  12   asked yesterday actually about your proving laches.  Is
09:55:38  13   it going to be during the trial or are you going to look
09:55:38  14   for more time.  I don't know why statute of limitations
09:55:38  15   is still in.
09:55:38  16           MS. KINGSBERY:  So from Cigna's perspective,
09:55:38  17   statute of limitations would be a defense to the Labs
09:55:38  18   legal claims.  And Your Honor has already ruled that the
09:55:38  19   statutory claims are subject to a five year statute of
09:55:38  20   limitations.
09:55:38  21           THE COURT:  I'm sorry.  I have it backwards I
09:55:38  22   guess.  Right.  I forgot the folder.
09:55:38  23           THE CLERK:  I have it.
09:55:38  24           THE COURT:  That may be why I didn't pick it up.
09:55:38  25           Did you request that?
```

09:55:38  1          MS. KINGSBERY:  It's in our pretrial memorandum.

09:55:38  2          THE COURT:  Yes, I know.  But did you request a

09:55:38  3   charge of or is it anywhere in the statement of the case

09:55:38  4   or anywhere I might have had a clue, you know, that you

09:55:38  5   wanted me to do it?

09:55:38  6          I don't think so.  What's the position of the

09:55:38  7   Labs, please?

09:55:38  8          MR. GESTRICH:  I believe Cigna requested it in

09:55:38  9   the pretrial, yes, Your Honor.

09:55:38  10         THE COURT:  In pretrial?

09:55:38  11         MR. GESTRICH:  Yes, Your Honor.  I believe it

09:55:38  12   was the special defenses that Cigna offered.

09:55:38  13         THE COURT:  They listed it when they first

09:55:38  14   listed 12.  Then they listed a different three of the

09:55:38  15   revised.  I'm exaggerating.  But something like that.

09:55:38  16         So what's your position?  Should I add some

09:55:38  17   language here about a special defense, an affirmative

09:55:38  18   defense?  The second paragraph.

09:55:38  19         MR. GESTRICH:  Yes, Your Honor.  I would say

09:55:38  20   like to caveat this that I believe almost all are within

09:55:38  21   the six year statute of limitations that would govern.

09:55:38  22         THE COURT:  Is it six or five?  She said five.

09:55:38  23         MR. GESTRICH:  She said five for the statutory

09:55:38  24   claim.  But the third party Beneficiary claim would be

09:55:38  25   subject to common law statute of limitations reclaimant

| | | |
|---|---|---|
| 09:55:38 | 1 | and Connecticut statute of limitations. |
| 09:55:38 | 2 | THE COURT:  So Count Two is six and Count Five |
| 09:55:38 | 3 | is -- of the two in Count Five are five. |
| 09:55:38 | 4 | MR. GESTRICH:  Yes, Your Honor. |
| 09:55:38 | 5 | THE COURT:  Do I have any language you propose? |
| 09:55:38 | 6 | MS. KINGSBERY:  We can draft language to send to |
| 09:55:38 | 7 | you. |
| 09:55:38 | 8 | THE COURT:  That would be good.  Obviously, this |
| 09:55:38 | 9 | is a short description.  So I guess you can say -- I |
| 09:55:38 | 10 | guess what we're going to say is we can do it.  They also |
| 09:55:38 | 11 | three -- no, I'm sorry.  It's two causes of action. |
| 09:55:38 | 12 | I guess I would add a sentence before I will |
| 09:55:38 | 13 | instruct you or something to the effect of finally, Cigna |
| 09:55:38 | 14 | asserts a special defense, affirmative defense of statute |
| 09:55:38 | 15 | of limitations.  I guess we'll explain that briefly. |
| 09:55:38 | 16 | Okay.  I will ask you to give it to me.  How's that?  If |
| 09:55:38 | 17 | you can submit that soon, I would appreciate it. |
| 09:55:38 | 18 | Charge 22.  Labs? |
| 09:55:38 | 19 | MR. CHRIST:  Your Honor, we would object to I |
| 09:55:38 | 20 | guess the burden instruction based on *Mario* just for the |
| 09:55:38 | 21 | record. |
| 09:55:38 | 22 | THE COURT:  I was going back through docket |
| 09:55:38 | 23 | entries to see how I ruled on something to do with Ms. |
| 09:55:38 | 24 | Thelian, I don't remember, but I happen to see that |
| 09:55:38 | 25 | motion was -- I referenced the stipulation between the |

09:55:38  1    parties.  I don't think the ruling, at least on the

09:55:38  2    docket, reflected that I purchased that stipulation or

09:55:38  3    entered it or anything.  And as I have already explained,

09:55:38  4    I have spent a lot of time on this.  I don't see how to

09:55:38  5    charge it like *Mario*.

09:55:38  6         So I understand your objection.  It is

09:55:38  7    preserved.  I just want to be clear.  I understand you

09:55:38  8    object to the way I have given it.  But if it's way I

09:55:38  9    have given it you would, as a subset of objections, say,

09:55:38  10   well, if you are going to do it this way, Judge, or

09:55:38  11   without waiving our *Mario* objection, you shouldn't say it

09:55:38  12   this way.  You should say it another way.  I would expect

09:55:38  13   you tell me that.  I think I should have a chance to do

09:55:38  14   it as close to right or right as I can, even if you

09:55:38  15   object in the overall approach.

09:55:38  16        Let me put it this way.  When or if you go up on

09:55:38  17   appeal on this issue, I wouldn't expect to see as an

09:55:38  18   alternative argument even if should have been charged by

09:55:38  19   *Mario*, she did this wrong.  I would think that I would

09:55:38  20   have an objection to that.

09:55:38  21        If you don't agree with me, you have to tell me.

09:55:38  22   Because I have to figure out how to get you to do it.

09:55:38  23        MR. GESTRICH:  One addition we would add to

09:55:38  24   this, and we're happy to provide the proposed instruction

09:55:38  25   on this, would be related to course of performance,

09:55:38   1    course of dealing and usage of trade.  That may assist
09:55:38   2    with the jury understanding what medical necessity means,
09:55:38   3    because it relates to how Cigna has adjudicated prior
09:55:38   4    claims and determining that those are covered and now has
09:55:38   5    shifted its position on the same policies.
09:55:38   6             THE COURT:  One, is that a description of your
09:55:38   7    burden of proof?  As I told you, I don't comment on the
09:55:38   8    evidence.  I don't go through and summarize what you've
09:55:38   9    offered and which would support, for example, proof of an
09:55:38  10    element.  And I won't do it for them.  If anybody thinks
09:55:38  11    I'm doing it for the opposing party you can object.
09:55:38  12             So I don't know why I would be saying that.  And
09:55:38  13    I'm not sure I understand it anyway.  I guess if you have
09:55:38  14    language you want to edit this burden of proof on, you
09:55:38  15    can.  But I think it would belong in the medical
09:55:38  16    necessity section.
09:55:38  17             MR. GESTRICH:  Yes, Your Honor.
09:55:38  18             THE COURT:  Cigna?
09:55:38  19             MS. KINGSBERY:  No objection.
09:55:38  20             THE COURT:  Charge 23.  The Labs?
09:55:38  21             MR. CHRIST:  No objections, Your Honor, for
09:55:38  22    Labs.
09:55:38  23             THE COURT:  Cigna?
09:55:38  24             MS. KINGSBERY:  We had one objection to the
09:55:38  25    fourth element.  The language in the statute, I believe,

09:55:38  1    is specifically authorized rather than consented to.

09:55:38  2            THE COURT:  Is it just specifically authorized?

09:55:38  3    Or is it both?

09:55:38  4            MS. KINGSBERY:  I thought it was just

09:55:38  5    specifically authorized, but I have it right here.

09:55:38  6            MS. COSTIN:  (Handing.)

09:55:38  7            MS. KINGSBERY:  Whenever in a health insurance

09:55:38  8    claim form and an insured specifically authorizes payment

09:55:38  9    of benefits directly to any recognized --

09:55:38  10           THE COURT:  I could have sworn I saw different

09:55:38  11   language.  Doesn't appear to on a quick review.

09:55:38  12           Labs reaction to that?

09:55:38  13           MR. CHRIST:  I also don't see the consent

09:55:38  14   language in 638.

09:55:38  15           THE COURT:  Yeah.  I'm probably going to make

09:55:38  16   that amendment, or edit.  If I don't, your objection is

09:55:38  17   noted.  But I'm going to want to look more carefully.

09:55:38  18   But I appreciate you coming with the statute.

09:55:38  19           So it would be specifically authorized, right?

09:55:38  20   If I definitively go that way.

09:55:38  21           24.  Labs objection?  Element one.

09:55:38  22           MR. CHRIST:  Just for preservation purposes, the

09:55:38  23   same objection regarding *Mario*.  But as it stands, as

09:55:38  24   written, without waiving that objection, unless my

09:55:38  25   colleagues disagree, I think it's fine.  No objection.

| | | |
|---|---|---|
| 09:55:38 | 1 | THE COURT:  And Cigna? |
| 09:55:38 | 2 | MS. KINGSBERY:  No objection, Your Honor. |
| 09:55:38 | 3 | THE COURT:  Element 2, Number 25.  For the Labs? |
| 09:55:38 | 4 | Then I will shift who gets to go first. |
| 09:55:38 | 5 | MR. CHRIST:  Again, it would be just for |
| 09:55:38 | 6 | preservation, the same objection regarding *Mario*, without |
| 09:55:38 | 7 | waiving said objection as drafted -- actually, |
| 09:55:38 | 8 | Mr. Gestrich may have -- this is the place where you |
| 09:55:38 | 9 | would want to discuss your trade usage. |
| 09:55:38 | 10 | THE COURT:  This is where to be medically |
| 09:55:38 | 11 | necessary as is defined. |
| 09:55:38 | 12 | Remember we talked at the beginning and I said |
| 09:55:38 | 13 | on burden of proof I think it didn't strike me that's |
| 09:55:38 | 14 | where it belonged and we thought it might belong here. |
| 09:55:38 | 15 | MR. CHRIST:  I do think this would be the |
| 09:55:38 | 16 | appropriate place for Mr. Gestrich's prior comment or |
| 09:55:38 | 17 | suggestion. |
| 09:55:38 | 18 | MR. GESTRICH:  I would merely suggest that in |
| 09:55:38 | 19 | interpreting this term, medical necessity, under the |
| 09:55:38 | 20 | policies, the jury be instructed that it can consider |
| 09:55:38 | 21 | general aspects.  Not the specifics.  I'm not requesting |
| 09:55:38 | 22 | anything specific to Cigna but, rather, these ideas of |
| 09:55:38 | 23 | course of performance, course of dealing, and usage of |
| 09:55:38 | 24 | trade. |
| 09:55:38 | 25 | THE COURT:  I don't anywhere in here tell them |

09:55:38  1    other things to consider, right?  Didn't you tell me you

09:55:38  2    put Cigna's language on medical necessity?

09:55:38  3              THE CLERK:  It's in there.

09:55:38  4              THE COURT:  Give me a minute so I'm listening to

09:55:38  5    you.

09:55:38  6              I'm sorry.  Again, the categories you want me to

09:55:38  7    put in there?

09:55:38  8              MR. GESTRICH:  Would be up to course of

09:55:38  9    performance, course of dealing, usage of trade.

09:55:38  10             THE COURT:  Course of performance.  Usage and

09:55:38  11   trade.

09:55:38  12             MR. GESTRICH:  Cigna has adjudicated claims

09:55:38  13   under these same policies and paid them.

09:55:38  14             THE COURT:  Of course they have.  Probably 40

09:55:38  15   billion claims under these same policies.  Well, no,

09:55:38  16   these are individuals.  So maybe not that many.

09:55:38  17             MR. GESTRICH:  The same policies and to the

09:55:38  18   Labs.  So it would go to the interaction between on the

09:55:38  19   same contracts and with the same parties.

09:55:38  20             THE COURT:  So course of dealing, I would say.

09:55:38  21   I'm just puzzled by your phrases I guess.

09:55:38  22             They paid claims and never complained.  So they

09:55:38  23   should be -- you think they're estopped to complain here?

09:55:38  24             MR. GESTRICH:  No.  But it goes to Cigna's

09:55:38  25   viewpoint of whether these type of services are medically

936

| | | |
|---|---|---|
| 09:55:38 | 1 | necessary under the policy rather than a changed position |
| 09:55:38 | 2 | later. |
| 09:55:38 | 3 | THE COURT:  I see. |
| 09:55:38 | 4 | All right.  Cigna's response? |
| 09:55:38 | 5 | MS. KINGSBERY:  We would object to that to the |
| 09:55:38 | 6 | extent the Labs are allowed to suggest evidence that |
| 09:55:38 | 7 | would support their position, we would say the jury could |
| 09:55:38 | 8 | also consider the testimony of an expert that reviewed |
| 09:55:38 | 9 | the medical records, the testimony of a doctor who |
| 09:55:38 | 10 | submitted the orders.  I don't think that it is proper at |
| 09:55:38 | 11 | this point to be suggesting which evidence other than |
| 09:55:38 | 12 | just explaining the -- |
| 09:55:38 | 13 | THE COURT:  I don't know that the examples that |
| 09:55:38 | 14 | you gave me are analogous.  I'm going to tell them to |
| 09:55:38 | 15 | consider all the testimony, all the witnesses, and all |
| 09:55:38 | 16 | exhibits. |
| 09:55:38 | 17 | MS. COSTIN:  Could we then add in the language? |
| 09:55:38 | 18 | There's additional language in this individual policy |
| 09:55:38 | 19 | that states that an order from a physician is not |
| 09:55:38 | 20 | sufficient to establish medical necessity. |
| 09:55:38 | 21 | THE COURT:  Do you have that or the section? |
| 09:55:38 | 22 | MS. COSTIN:  We don't have a copy of it here, |
| 09:55:38 | 23 | but it is on the introduction to the policy. |
| 09:55:38 | 24 | THE COURT:  This policy? |
| 09:55:38 | 25 | MS. COSTIN:  Yes.  We can send that to |

| | | |
|---|---|---|
| 09:55:38 | 1 | Mr. Emmons. |
| 09:55:38 | 2 | THE COURT:  It would be like page one that you |
| 09:55:38 | 3 | mean by introduction? |
| 09:55:38 | 4 | MS. COSTIN:  It says right up under about this |
| 09:55:38 | 5 | policy.  It says covered services are not medically |
| 09:55:38 | 6 | --something along the lines of an order from a physician |
| 09:55:38 | 7 | does not make it medically necessary. |
| 09:55:38 | 8 | MR. HARE:  That sounds like argument.  Not to |
| 09:55:38 | 9 | say improper.  That sounds like argument and not a jury |
| 09:55:38 | 10 | instruction. |
| 09:55:38 | 11 | MS. COSTIN:  I mean, it seems like it's the same |
| 09:55:38 | 12 | thing if you want to argue course of conduct which we |
| 09:55:38 | 13 | object to. |
| 09:55:38 | 14 | THE COURT:  That's in the policy.  You can put |
| 09:55:38 | 15 | the policy in evidence and you can then argue from the |
| 09:55:38 | 16 | policy.  I think I'm telling them somewhere this is all |
| 09:55:38 | 17 | governed by a policy, right?  But this language isn't in |
| 09:55:38 | 18 | there.  I wouldn't expect it to be.  I'm not sure.  I was |
| 09:55:38 | 19 | initially not receptive.  I'm not sure I am receptive, |
| 09:55:38 | 20 | but I will think about it. |
| 09:55:38 | 21 | MR. GESTRICH:  Your Honor, if I may just to wrap |
| 09:55:38 | 22 | up? |
| 09:55:38 | 23 | THE COURT:  Could you give me some language? |
| 09:55:38 | 24 | Let's see how you write it. |
| 09:55:38 | 25 | MR. GESTRICH:  Yes, Your Honor. |

09:55:38  1          THE COURT:  The sooner the better would be good.

09:55:38  2   Anything else?  The Labs made that objection.  Is there

09:55:38  3   any further objection to this Element 2?

09:55:38  4          MR. HARE:  We're on 25?

09:55:38  5          MS. COSTIN:  We would object to adding that

09:55:38  6   language.

09:55:38  7          THE COURT:  Oh, I know you do.  You made the

09:55:38  8   objection.  I don't know if I'm going to.  They made

09:55:38  9   their request.  They have their record.  I think their

09:55:38  10  request is subject to my seeing the language.  That means

09:55:38  11  we'll probably come back and discuss it again.  We'll

09:55:38  12  revisit it.  I would like to see it written up and where

09:55:38  13  you would insert it.

09:55:38  14         MS. COSTIN:  We have one more.

09:55:38  15         THE COURT:  I wasn't sure the Labs finished.

09:55:38  16  Have you finished with yours, sir?

09:55:38  17         On 25.  Go ahead, Cigna.

09:55:38  18         MS. KINGSBERY:  We had one additional bullet

09:55:38  19  point from the definition of medical necessity in the

09:55:38  20  plans.  I'm not sure it was left out intentionally, but

09:55:38  21  it's the second one underneath appropriate and necessary

09:55:38  22  for the symptoms.  There's a bullet point that we would

09:55:38  23  ask to be added that says provided for the diagnosis or

09:55:38  24  direct care and treatment of the medical condition.

09:55:38  25         THE COURT:  You don't think the first bullet you

09:55:38  1   have there, the second one is kind of belt and

09:55:38  2   suspenders?

09:55:38  3         MS. COSTIN:  I think it's important to the

09:55:38  4   notion that it needs to be provided for the direct care

09:55:38  5   and treatment of the medical condition for the patient.

09:55:38  6         THE COURT:  You said it's appropriate and

09:55:38  7   necessary for treatment.

09:55:38  8         What's the Labs position?

09:55:38  9         MR. HARE:  If they are putting substantially the

09:55:38  10  same language in on the second bullet point, making four

09:55:38  11  total, and they are in the conjunctive, it's unfairly

09:55:38  12  emphasizing a single piece that's already in there.

09:55:38  13        MR. CUNNINGHAM:  As the Court pointed out, I

09:55:38  14  think it would be superfluous because that bullet point

09:55:38  15  already speaks to treatment of the condition.

09:55:38  16        THE COURT:  I'm smiling.  Let the record reflect

09:55:38  17  that.  I don't always smile.  But we're now up to four

09:55:38  18  lawyers talking on this side and two or three on this

09:55:38  19  side.  You have been quiet.  So you get a star.  I don't

09:55:38  20  mean to shut anybody out, but I hope we can let Attorney

09:55:38  21  Christ or whoever is supposed to care the burden get that

09:55:38  22  experience.  How's that?

09:55:38  23        I don't know that I'm inclined to, because I

09:55:38  24  think it may over emphasize.  But I will take a look at

09:55:38  25  it again and see what I think.

09:55:38  1              Anything else from Cigna on number 25?

09:55:38  2              MS. KINGSBERY:  No.

09:55:38  3              THE COURT:  26.  Let's change sides.  We'll go

09:55:38  4     to Cigna.

09:55:38  5              MS. KINGSBERY:  No objection, Your Honor.

09:55:38  6              THE COURT:  How about the Labs?

09:55:38  7              MR. CHRIST:  No objection, Your Honor.

09:55:38  8              THE COURT:  Okay.  How about 27 for Cigna?

09:55:38  9              MS. KINGSBERY:  We have the same objection to

09:55:38  10    the consented to language in the first sentence.  It's

09:55:38  11    the same.

09:55:38  12             THE COURT:  Alex, did I dream that?  Where did I

09:55:38  13    see the word consented?  I saw that word somewhere.  I

09:55:38  14    saw the statute.  It's not there, right?  Okay.

09:55:38  15             All right.  Does Labs have a counter-argument

09:55:38  16    that my recollection is pretty darn good that somewhere

09:55:38  17    it says consent?  What's your language?  Specifically

09:55:38  18    authorized, right?

09:55:38  19             MR. CHRIST:  We would agree that the statute

09:55:38  20    does say specifically authorized.  However, I also have

09:55:38  21    some recollection of seeing somewhere consent and I don't

09:55:38  22    know if it's in a case or somewhere.

09:55:38  23             THE COURT:  I think this is the same as the one

09:55:38  24    you already objected to.  Subject to my looking back at

09:55:38  25    what I looked when I wrote it this way or told Alex to

09:55:38  1    write it this way, I will agree with you.  I thought I

09:55:38  2    saw consent.  There was an alternative phrasing.

09:55:38  3    Something and consent.  Like authorize and consent, or

09:55:38  4    consent.  And I feel consent is a closer word.  There's

09:55:38  5    no reason for me to speculate what my memory is or

09:55:38  6    whether it might be good or not.  I'll look through what

09:55:38  7    my pile of resource material is and see.  And if I don't

09:55:38  8    find it then I will edit it as you request.  If I do, I

09:55:38  9    will let you know.  Okay.

09:55:38  10          Anything from the Labs?  You gave me a response

09:55:38  11   but on 27, but I don't know if you have an objection.

09:55:38  12          MR. CHRIST:  No further objection.

09:55:38  13          THE COURT:  Number 28 for Cigna.

09:55:38  14          MS. KINGSBERY:  No objection, Your Honor.

09:55:38  15          THE COURT:  Labs?

09:55:38  16          MR. CHRIST:  No objection, Your Honor.

09:55:38  17          THE COURT:  Number 29.

09:55:38  18          MS. KINGSBERY:  No objection.

09:55:38  19          MR. CHRIST:  No objection.

09:55:38  20          THE COURT:  30 for Cigna?

09:55:38  21          MS. KINGSBERY:  No objection.

09:55:38  22          MR. CHRIST:  Your Honor, we would request that

09:55:38  23   intended in paragraph 2 be removed to be consistent with

09:55:38  24   the rest of the language used in the instruction.

09:55:38  25          THE COURT:  In paragraph 2, the word intended?

942

09:55:38  1        MR. CHRIST:  I'm sorry.  In second bullet point

09:55:38  2  under paragraph 3.

09:55:38  3        THE COURT:  I thought we were on charge 30.

09:55:38  4        MR. CHRIST:  I'm sorry.  I jumped ahead.

09:55:38  5        THE COURT:  If that's a test, I think I did

09:55:38  6  okay.  So go ahead.

09:55:38  7        MR. CHRIST:  No objection, Your Honor.

09:55:38  8        THE COURT:  Thank you.  So I should -- No

09:55:38  9  objections.

09:55:38  10        31.  I guess we'll go back to the Labs.

09:55:38  11        MR. CHRIST:  So this is the bullet point.  Under

09:55:38  12  the third paragraph it starts with to prevail.  Where it

09:55:38  13  says were intended beneficiaries, we request that the

09:55:38  14  word beneficiaries -- I'm sorry.  That's fine as is.

09:55:38  15        THE COURT:  Okay.  Anyone else?  No.  Okay.

09:55:38  16        MR. CHRIST:  No objection, Your Honor.

09:55:38  17        THE COURT:  How about Cigna?

09:55:38  18        MS. KINGSBERY:  We do, Your Honor.  This is an

09:55:38  19  objection that you heard before.  The second paragraph

09:55:38  20  where the Court's describing the element of intent, the

09:55:38  21  second sentence, however, the Labs may be entitled to

09:55:38  22  damages for breach of these contracts if they can prove

09:55:38  23  that Cigna and its insured intended that the Labs

09:55:38  24  directly and primarily benefit.

09:55:38  25        THE COURT:  You want to add directly and

09:55:38  1   primarily?

09:55:38  2        MS. KINGSBERY:  That's right, Your Honor.

09:55:38  3        THE COURT:  Why primarily?  Where does that come

09:55:38  4   from?

09:55:38  5        MS. KINGSBERY:  That's exactly what Florida law

09:55:38  6   says is required for a third party beneficiary claim  And

09:55:38  7   we did pull some cases.

09:55:38  8        THE COURT:  What section are you quoting?

09:55:38  9        MS. KINGSBERY:  Case law.

09:55:38 10        THE COURT:  What case are you citing.

09:55:38 11        MS. KINGSBERY:  This is case from the 11th

09:55:38 12   Circuit.  We also have that Florida -- well, let me start

09:55:38 13   with the Florida Supreme Court case, *Foundation Health*.

09:55:38 14        THE COURT:  Oh, that one.  Yeah.  We consciously

09:55:38 15   put it this way.  I guess I would ask you, knowing, I

09:55:38 16   think expecting you would object, that do you have cases

09:55:38 17   after *Foundation* that go with that language?

09:55:38 18        MS. KINGSBERY:  We do.  And, in fact, the *Wolf*

09:55:38 19   case.

09:55:38 20        THE COURT:  At what page?  Any explanation for

09:55:38 21   why the jury, standard jury doesn't ask that charge?

09:55:38 22        MS. KINGSBERY:  I don't, Your Honor.  We can

09:55:38 23   provide you with a long string cite of Florida cases that

09:55:38 24   use the direct and primary language.

09:55:38 25        THE COURT:  Why don't you do that.

944

09:55:38  1            MS. KINGSBERY:  We'll do that.

09:55:38  2            THE COURT:  I will ask if the Labs want to

09:55:38  3    comment.

09:55:38  4            MR. CHRIST:  I don't it's consistent with the

09:55:38  5    standard third party beneficiary instruction.

09:55:38  6            THE COURT:  Well, I mean, it's what *Foundation*

09:55:38  7    says.  I'm not sure if I were doing Connecticut, I'm not

09:55:38  8    sure that language is in there.  But that's not what I'm

09:55:38  9    doing.

09:55:38 10            Well, if you can find me any cases that would be

09:55:38 11    supportive of what I'm doing without those adjectives, I

09:55:38 12    would appreciate seeing them.  I will sticker it.  And

09:55:38 13    THAT'S on the table for further discussion.  I will let

09:55:38 14    you know one way or another and why.

09:55:38 15            Okay.  32.

09:55:38 16            MS. KINGSBERY:  I want to add on 31, it is in

09:55:38 17    two places.

09:55:38 18            THE COURT:  Thank you for noting that.  We

09:55:38 19    probably would have overlooked it.  Thanks very much.

09:55:38 20            MS. KINGSBERY:  On that subject, the consent

09:55:38 21    language you might want to do a control find.  I found at

09:55:38 22    least four places where the term consent was used.  If

09:55:38 23    you decide, there's several places it would need to be

09:55:38 24    changed.

09:55:38 25            THE COURT:  Consent.  Okay.

945

09:55:38  1            32 for the Labs.  Any objection?

09:55:38  2            MR. CHRIST:  We would place the same objection

09:55:38  3    for preservation purposes regarding *Mario*.  And then also

09:55:38  4    suggest the proposed language that my colleague,

09:55:38  5    Mr. Gestrich, suggested a few moments ago regarding the

09:55:38  6    course of usage, course of performance and trade usage to

09:55:38  7    replace the three bullet points or to supplement the

09:55:38  8    three bullet points on page 44.

09:55:38  9            THE COURT:  It would go in the bullet points?

09:55:38  10           MR. CHRIST:  I believe so.

09:55:38  11           THE COURT:  Okay.  Any other objections for the

09:55:38  12   Labs?

09:55:38  13           MR. CHRIST:  No, Your Honor.

09:55:38  14           THE COURT:  And I assume Cigna will tell me I

09:55:38  15   should add that fourth bullet point to be number 2, the

09:55:38  16   number 2 one.

09:55:38  17           Anything else from Cigna?

09:55:38  18           MS. COSTIN:  Nothing further.  But I would say

09:55:38  19   that adding that -- we object to adding the course of

09:55:38  20   conduct language, but certainly not in the bullets

09:55:38  21   because --

09:55:38  22           THE COURT:  It's not in the policy.

09:55:38  23           MS. COSTIN:  Exactly.

09:55:38  24           THE COURT:  Labs 33.  Second element.

09:55:38  25           MR. CHRIST:  No objection, Your Honor.

| | | |
|---|---|---|
| 09:55:38 | 1 | MR. HARE:  I'm sorry.  Which one are we on? |
| 09:55:38 | 2 | MR. CHRIST:  33. |
| 09:55:38 | 3 | THE COURT:  How about Cigna? |
| 09:55:38 | 4 | MS. KINGSBERY:  Yes, Your Honor.  This will be a |
| 09:55:38 | 5 | similar objection to the language we just included, the |
| 09:55:38 | 6 | language we just discussed. |
| 09:55:38 | 7 | THE COURT:  Similar to 32? |
| 09:55:38 | 8 | MS. KINGSBERY:  No, Your Honor.  It would be |
| 09:55:38 | 9 | similar to 31, directly and primarily. |
| 09:55:38 | 10 | THE COURT:  I assume that we would control |
| 09:55:38 | 11 | search if we did it for benefits or beneficiaries, |
| 09:55:38 | 12 | whatever to see it it's in front of that.  But if it |
| 09:55:38 | 13 | belongs in front of that.  Okay.  But you should still |
| 09:55:38 | 14 | mention it. |
| 09:55:38 | 15 | Primarily, I don't get that.  I mean, primary |
| 09:55:38 | 16 | means the first.  And the written contract is the first |
| 09:55:38 | 17 | beneficiary.  So I don't know how a third party could be |
| 09:55:38 | 18 | the primary beneficiary.  They're the beneficiary of the |
| 09:55:38 | 19 | consent, but not of the benefit of the contract, if you |
| 09:55:38 | 20 | know what I mean.  It's like saying an insurance company |
| 09:55:38 | 21 | -- it doesn't matter.  I don't have to explain it, |
| 09:55:38 | 22 | because it's not important.  Explaining my bewilderment |
| 09:55:38 | 23 | of that word particularly. |
| 09:55:38 | 24 | Anymore on 34? |
| 09:55:38 | 25 | MS. KINGSBURY:  Yes, Your Honor.  In the last |

09:55:38  1    sentence we would also request that the terms clearly and

09:55:38  2    manifest -- clear and manifest be added in front of

09:55:38  3    intended.  That's also from the case law.  That's

09:55:38  4    repeated throughout the Florida cases that describe the

09:55:38  5    standard for third party beneficiary.

09:55:38  6         THE COURT:  Where would it be inserted?

09:55:38  7         MS. KINGSBERY:  Preponderance of the evidence

09:55:38  8    that Cigna and its insured.

09:55:38  9         THE COURT:  So at the last paragraph?

09:55:38  10         MS. KINGSBERY:  It's the last sentence of the

09:55:38  11    first paragraph.

09:55:38  12         THE COURT:  Must prove by a preponderance that

09:55:38  13    Cigna's insureds intended the Labs as providers.

09:55:38  14         MS. KINGSBERY:  Right before that.  Clearly and

09:55:38  15    manifestly.

09:55:38  16         And I have one more.  In the second paragraph,

09:55:38  17    second sentence, you may also consider language in the

09:55:38  18    insurance policies that indicate how benefits may be paid

09:55:38  19    to doctors and other medical providers as well as any

09:55:38  20    patient consent forms in evidence.

09:55:38  21         We would object to the inclusion of that

09:55:38  22    language as well as any patient consent forms in

09:55:38  23    evidence.  The case law holds that the evidence of intent

09:55:38  24    needs to come from the policy and not from -- it needs to

09:55:38  25    be the clear and manifest intent from the policy.

09:55:38  1         THE COURT:  Is that *Foundation* or would you cite

09:55:38  2  me something else?

09:55:38  3         MS. KINGSBERY:  I believe it's in *Foundation*,

09:55:38  4  but we can also provide another case.  I believe it's

09:55:38  5  also in the *Wolf* case.

09:55:38  6         THE COURT:  I guess when you provide me cases, I

09:55:38  7  would appreciate you telling me what charge it relates

09:55:38  8  to.

09:55:38  9         MS. KINGSBERY:  Yes, Your Honor, we'll do that.

09:55:38  10        MR. GESTRICH:  Your Honor, just so it does not

09:55:38  11  come as a surprise from the Labs, I submit the cases

09:55:38  12  directed at this topic, the Labs argument is directed for

09:55:38  13  third party beneficiaries is directed at incorporation of

09:55:38  14  Florida statutes.  It would be difficult for us to argue

09:55:38  15  about the intent of parties on provisions that are read

09:55:38  16  into the contract by Florida law.  The parties do not --

09:55:38  17        THE COURT:  In other words -- well, I'm sorry.

09:55:38  18  You continue.  I do have a question.  You go ahead.

09:55:38  19        MR. GESTRICH:  Whether those provisions are

09:55:38  20  stated in the policy or not, those are in the policy by

09:55:38  21  operation of Florida law.  And so it does not the matter

09:55:38  22  if the parties said we're not going to follow the law.

09:55:38  23  The law still mandates that those provisions are read in.

09:55:38  24  If the policies are agnostic to the law, that's still

09:55:38  25  read in.  So intent in this circumstance is irrelevant

| | | |
|---|---|---|
| 09:55:38 | 1 | because it deals with the operation of law, not the |
| 09:55:38 | 2 | contracting parties conduct or thoughts on the matter. |
| 09:55:38 | 3 | THE COURT:  Do you want to respond to that, |
| 09:55:38 | 4 | Cigna? |
| 09:55:38 | 5 | MS. KINGSBERY:  Yes, Your Honor.  The *Wolf* case |
| 09:55:38 | 6 | addresses this point directly and holds that the |
| 09:55:38 | 7 | incorporation of the statute in and off itself is not |
| 09:55:38 | 8 | sufficient to satisfy this element, because under Florida |
| 09:55:38 | 9 | law you have to show the clear and manifest intent of the |
| 09:55:38 | 10 | parties. |
| 09:55:38 | 11 | THE COURT:  Well, isn't that because is it Judge |
| 09:55:38 | 12 | Rubenstein, if I'm remembering correctly, says that there |
| 09:55:38 | 13 | isn't -- this cause of action doesn't work under Florida |
| 09:55:38 | 14 | law.  That's the one I don't free with her on. |
| 09:55:38 | 15 | MS. KINGSBERY:  She addressed those points.  She |
| 09:55:38 | 16 | addressed whether the health care provider in that case |
| 09:55:38 | 17 | was able to establish the element of intent by citation |
| 09:55:38 | 18 | to the statutes that were incorporated. |
| 09:55:38 | 19 | THE COURT:  Right. |
| 09:55:38 | 20 | MS. KINGSBERY:  And found that that was |
| 09:55:38 | 21 | insufficient. |
| 09:55:38 | 22 | THE COURT:  But didn't she find that it's not |
| 09:55:38 | 23 | implied into a contract?  So why would she look to |
| 09:55:38 | 24 | whether it was sufficient? |
| 09:55:38 | 25 | MS. KINGSBERY:  So she first found that the |

| | | |
|---|---|---|
| 09:55:38 | 1 | health care provider could not proceed directly under the |
| 09:55:38 | 2 | statute because there's no private right of action.  Then |
| 09:55:38 | 3 | she looked to the third party beneficiary claim and found |
| 09:55:38 | 4 | that the health care provider could not establish -- |
| 09:55:38 | 5 | actually it was a motion to dismiss.  That the health |
| 09:55:38 | 6 | care provider hadn't pled, because the health care |
| 09:55:38 | 7 | provider relied solely on the incorporation of the |
| 09:55:38 | 8 | statute. |
| 09:55:38 | 9 | THE COURT:  I have to go back and take a look at |
| 09:55:38 | 10 | the case again. |
| 09:55:38 | 11 | Do you have cases on this or is this just your |
| 09:55:38 | 12 | argument on the third party beneficiary law? |
| 09:55:38 | 13 | MR. GESTRICH:  That would be our argument.  And |
| 09:55:38 | 14 | if we submit cases in support of that, we didn't want the |
| 09:55:38 | 15 | Court to be surprised why we're submitting those. |
| 09:55:38 | 16 | THE COURT:  All right.  Noted.  The Court will |
| 09:55:38 | 17 | take a look at it. |
| 09:55:38 | 18 | Charge 34.  Labs, any objection? |
| 09:55:38 | 19 | MR. CHRIST:  It would be the same objection |
| 09:55:38 | 20 | raised previous for preservation purposes, *Mario*. |
| 09:55:38 | 21 | THE COURT:  *Mario*. |
| 09:55:38 | 22 | MR. CHRIST:  Also request the suggested language |
| 09:55:38 | 23 | that Mr. Gestrich proposed earlier. |
| 09:55:38 | 24 | THE COURT:  As to which other number?  When I go |
| 09:55:38 | 25 | to look at these later tonight.  What other language? |

951

09:55:38  1          MR. CHRIST:  25 and 32.

09:55:38  2          THE COURT:  That's fine.  So I will know if I

09:55:38  3    resolve it on 25, I probably am not adding it or if I'm

09:55:38  4    adding it, whatever.

09:55:38  5          Okay.  Is that it?  More?

09:55:38  6          MR. CHRIST:  Yes, Your Honor, that's it's.

09:55:38  7          THE COURT:  Cigna.

09:55:38  8          MS. KINGSBERY:  We would have the same response.

09:55:38  9    Object to the language and propose adding that one bullet

09:55:38  10   point that we already discussed.

09:55:38  11         THE COURT:  Okay.  Number 35.

09:55:38  12         MR. CHRIST:  No objection, Your Honor, from the

09:55:38  13   Labs.

09:55:38  14         THE COURT:  Cigna.

09:55:38  15         MS. KINGSBERY:  No objection.

09:55:38  16         THE COURT:  I guess I will go back over to

09:55:38  17   Cigna's side.  Number 36.

09:55:38  18         MS. KINGSBERY:  So this would be the overview of

09:55:38  19   affirmative defenses.  So we would ask that it the

09:55:38  20   statute of limitations be added.

09:55:38  21         THE COURT:  Right.  That would be the same as

09:55:38  22   where I'm addressing it earlier in the statement of the

09:55:38  23   case.  Something like that.  I don't remember the number.

09:55:38  24         MS. KINGSBERY:  That's correct.

09:55:38  25         THE COURT:  The Labs.

09:55:38  1           MR. CHRIST:  No objection, Your Honor.

09:55:38  2           THE COURT:  So you didn't object to this statute

09:55:38  3  of limitations earlier?

09:55:38  4           MR. CHRIST:  No.  I think that is in their

09:55:38  5  pretrial.

09:55:38  6           THE COURT:  Oh, that's right.  The amended --

09:55:38  7           MR. CHRIST:  Yes, Your Honor.

09:55:38  8           THE COURT:  Number 37.  For Cigna?

09:55:38  9           MS. KINGSBERY:  No objection.

09:55:38 10           THE COURT:  And the Labs?

09:55:38 11           MR. CHRIST:  I'm sorry?

09:55:38 12           THE COURT:  37, sir.

09:55:38 13           MR. HARE:  51 to 52.

09:55:38 14           THE COURT:  I don't mean to rush you.  I don't

09:55:38 15  know that you were answering or speaking to co-counsel.

09:55:38 16           MR. CHRIST:  Speaking to co-counsel.  My

09:55:38 17  apologies.

09:55:38 18           MR. GESTRICH:  That would appear fine.

09:55:38 19           THE COURT:  No objection, is that what you mean?

09:55:38 20           MR. GESTRICH:  No objection.  That's what I

09:55:38 21  meant.

09:55:38 22           THE COURT:  Thank you.

09:55:38 23           So 38.  Cigna, if you could begin.

09:55:38 24           MS. KINGSBERY:  No objection.

09:55:38 25           THE COURT:  Labs?

| | | |
|---|---|---|
| 09:55:38 | 1 | MR. CHRIST: No objection, Your Honor. |
| 09:55:38 | 2 | THE COURT: Okay. 39 for Cigna. |
| 09:55:38 | 3 | MS. KINGSBERY: No objection. |
| 09:55:38 | 4 | MR. CHRIST: No objection. |
| 09:55:38 | 5 | MR. GESTRICH: 39? |
| 09:55:38 | 6 | THE COURT: Did I miss one? |
| 09:55:38 | 7 | MR. GESTRICH: Labs case against Cigna. Fee |
| 09:55:38 | 8 | forgiveness. |
| 09:55:38 | 9 | THE COURT: Fee forgiveness. |
| 09:55:38 | 10 | MR. GESTRICH: I'm so sorry. I saw the header |
| 09:55:38 | 11 | and I was scared. |
| 09:55:38 | 12 | THE COURT: That's fine. I think you're going |
| 09:55:38 | 13 | to like this one. |
| 09:55:38 | 14 | MR. GESTRICH: This is a wonderful one. |
| 09:55:38 | 15 | THE COURT: Okay. 40 for Cigna? |
| 09:55:38 | 16 | MS. KINGSBERY: No objections. |
| 09:55:38 | 17 | THE COURT: Labs? |
| 09:55:38 | 18 | MR. CHRIST: No objection, Your Honor. |
| 09:55:38 | 19 | THE COURT: Okay. 41. Any objection, Labs? |
| 09:55:38 | 20 | MR. CHRIST: My apologies. I skipped right over |
| 09:55:38 | 21 | it. |
| 09:55:38 | 22 | No objection, Your Honor. |
| 09:55:38 | 23 | THE COURT: Cigna? |
| 09:55:38 | 24 | MS. KINGSBERY: No objection. |
| 09:55:38 | 25 | THE COURT: All right. 42. |

954

| | | |
|---|---|---|
| 09:55:38 | 1 | MR. CHRIST:  Labs should say notation of a typo |
| 09:55:38 | 2 | in the title regarding plural, the Labs plural. |
| 09:55:38 | 3 | THE COURT:  It should be possessive. |
| 09:55:38 | 4 | MS. COSTIN:  We'll not object to that one. |
| 09:55:38 | 5 | THE COURT:  That's good. |
| 09:55:38 | 6 | MR. CHRIST:  Finally. |
| 09:55:38 | 7 | MR. CUNNINGHAM:  We've broken her. |
| 09:55:38 | 8 | THE COURT:  I don't think so. |
| 09:55:38 | 9 | MR. GESTRICH:  No, we have not. |
| 09:55:38 | 10 | MS. COSTIN:  Exhausted me. |
| 09:55:38 | 11 | THE COURT:  Any others? |
| 09:55:38 | 12 | MR. CHRIST:  I'm sorry, I'm getting this |
| 09:55:38 | 13 | confused with the next. |
| 09:55:38 | 14 | No objection, Your Honor. |
| 09:55:38 | 15 | THE COURT:  Okay.  And how about Cigna? |
| 09:55:38 | 16 | MS. KINGSBERY:  Yes.  I will just repeat the |
| 09:55:38 | 17 | same objection.  So number 4 in the first full paragraph, |
| 09:55:38 | 18 | we have the same issue that we already talked about with |
| 09:55:38 | 19 | the consent language.  Although here -- |
| 09:55:38 | 20 | THE COURT:  It says I added.  I'm sure I saw |
| 09:55:38 | 21 | both those words and not the ones that I see in  the |
| 09:55:38 | 22 | statute you gave me.  But I will look at that.  Do you |
| 09:55:38 | 23 | remember what number, the first one where that issue came |
| 09:55:38 | 24 | up?  Must have been in the summary of the case.  No? |
| 09:55:38 | 25 | I will just put repeat. |

09:55:38  1          MS. KINGSBERY:  23 is the first one.

09:55:38  2          And then with Count Two, we have our same

09:55:38  3  objection.  We would like to add for bullet point number

09:55:38  4  2.  It was the clear and manifest intent of the parties

09:55:38  5  that the Labs were the direct and primary intended

09:55:38  6  beneficiaries of the policies.

09:55:38  7          THE COURT:  Count Two.

09:55:38  8          Okay.  Anything else?

09:55:38  9          MS. KINGSBERY:  I guess the only other thing

09:55:38 10  would be since there's not a separate section on the

09:55:38 11  statute of limitations.

09:55:38 12          THE COURT:  We're done, as far as you have come

09:55:38 13  prepared to discuss I'll say.  I know you just got the

09:55:38 14  other part 3 late last night.

09:55:38 15          So what else would you like to add?

09:55:38 16          MS. KINGSBERY:  We would like to add some

09:55:38 17  proposed language that we can send to you on the statute

09:55:38 18  of limitations as our affirmative defense.

09:55:38 19          THE COURT:  That would be great.

09:55:38 20          MS. KINGSBERY:  We'll do that.

09:55:38 21          THE COURT:  Do I discuss each of them

09:55:38 22  individually?  I think I do.

09:55:38 23          MS. KINGSBERY:  You did.

09:55:38 24          THE COURT:  So it would be that section that you

09:55:38 25  are going to send to me.

956

09:55:38  1          MS. KINGSBERY:  That's right.

09:55:38  2          THE COURT:  Okay.  All right.  That's fine.  You

09:55:38  3   are probably not the folks I should be asking.  I'm sure

09:55:38  4   Attorney Kang wants to be the one to tell me, but -- or

09:55:38  5   is making the call, but I don't know that I have heard

09:55:38  6   back from the parties on what I will call the equitable

09:55:38  7   aspects of the case and whether the parties will or

09:55:38  8   should in introduce all the evidence that would permit

09:55:38  9   the Court to make a decision on, for example, laches.

09:55:38  10         When you said statute of limitations, it

09:55:38  11  triggered my memory.  Do you have a position?

09:55:38  12         MS. KINGSBERY:  I do not have a position.  I am

09:55:38  13  going to have to defer to Attorney Kang on that.

09:55:38  14         THE COURT:  How about the Labs, are you ready to

09:55:38  15  tell me?  Do you have -- you have -- do they have

09:55:38  16  equitable?  God.  Oh, you have a special defense to their

09:55:38  17  case of laches.  Really, you -- I'm sorry.  Boy, it's

09:55:38  18  been a long day.  That's their special defense.

09:55:38  19         THE CLERK:  Laches and pari delicto.

09:55:38  20         THE COURT:  And pari delicto.  Thank you.

09:55:38  21         So you each do have one that I'm not charging.

09:55:38  22  And I think we need to know -- yeah.

09:55:38  23         MS. KINGSBERY:  I apologize, Your Honor.  We

09:55:38  24  would not be requesting a separate trial on the pari

09:55:38  25  delicto defense.

957

09:55:38   1          THE COURT:  Does the Labs know on laches?

09:55:38   2          MR. GESTRICH:  On laches, perhaps the solution

09:55:38   3    would be to request special interrogatories on that as an

09:55:38   4    advisory to the Court.

09:55:38   5          THE COURT:  Well, I could do that, but I don't

09:55:38   6    think I have to.  And it's awkward.  I just had to write

09:55:38   7    a ruling where I said I know I asked them their advice,

09:55:38   8    but, you know, to be honest with you in that case, I

09:55:38   9    think I actually admitted the charge wasn't very good and

09:55:38   10   they hadn't really -- it hadn't been fleshed out, shall

09:55:38   11   we say?  So I'm not sure I -- I'll think about that, but

09:55:38   12   I'm not inclined to love it.  But that means you're going

09:55:38   13   to -- all your evidence is in -- is going to be in on the

09:55:38   14   defense.  If you want me to ask them to advise, they've

09:55:38   15   got to have a record.  Right?  I mean, you can't say, oh,

09:55:38   16   yeah, they didn't think it was too slow for them to act,

09:55:38   17   but let me tell you some more stories of why they should

09:55:38   18   have filed sooner.

09:55:38   19          If I recall, is it your defense to that?  I

09:55:38   20   mean, I don't know how you defend it, but I don't mean to

09:55:38   21   tell you this is how, but I vaguely remember that there

09:55:38   22   was something about, well, we were litigating and

09:55:38   23   negotiating in the Florida lawsuit so we didn't bring

09:55:38   24   this claim.

09:55:38   25          MS. KINGSBERY:  For the delay element that is --

09:55:38  1          THE COURT:  Which did the Florida case end?  I

09:55:38  2    mean, I don't know that.

09:55:38  3          MS. KINGSBERY:  2017.

09:55:38  4          MS. COSTIN:  2017.

09:55:38  5          MR. GESTRICH:  Your Honor, not to backtrack, but

09:55:38  6    I am.

09:55:38  7          THE COURT:  Yeah.

09:55:38  8          MR. GESTRICH:  Particularly in light of

09:55:38  9    developments that occurred throughout the trial, it might

09:55:38 10    make sense to have a separate hearing on laches on the

09:55:38 11    limited topic because there may be developments that the

09:55:38 12    jury may not appreciate but the Court would be aware of.

09:55:38 13          THE COURT:  Well, I'm not surprised you would

09:55:38 14    ask that.  I think I might need to be -- have some clue

09:55:38 15    of what those are and how long it would take to present

09:55:38 16    the evidence and to think about could it be done now.  I

09:55:38 17    mean, I don't know what -- I'm not saying I won't give

09:55:38 18    you more time, but I would still like to make an informed

09:55:38 19    judgment.  Okay?

09:55:38 20          MR. GESTRICH:  Yes, Your Honor.

09:55:38 21          THE COURT:  Let me just look.  I think we're all

09:55:38 22    right on that.  I guess -- I hate to make you do this,

09:55:38 23    but I think we need to make a record.  I know you

09:55:38 24    disagree with my ruling about how I don't see how I can

09:55:38 25    charge a *Mario* ruling in this trial, and I hope -- I hope

959

| | | |
|---|---|---|
| 09:55:38 | 1 | what I spoke was at least understandable, even though you |
| 09:55:38 | 2 | don't agree with it.  But I would think you should make a |
| 09:55:38 | 3 | proposed charge.  I guess -- I guess you have a charge in |
| 09:55:38 | 4 | here. |
| 09:55:38 | 5 | I guess let me say, is that what you want to |
| 09:55:38 | 6 | stand on?  Let me see where that charge is.  Labs jury |
| 09:55:38 | 7 | instructions.  This is -- |
| 09:55:38 | 8 | MR. GESTRICH:  When we submitted our charge, it |
| 09:55:38 | 9 | was before the parties agreed -- |
| 09:55:38 | 10 | THE COURT:  I know it was. |
| 09:55:38 | 11 | MR. GESTRICH:  -- to -- yes, Your Honor.  So |
| 09:55:38 | 12 | that would not be the charge we would request on Mario. |
| 09:55:38 | 13 | THE COURT:  Well, tell me why that's -- I'm |
| 09:55:38 | 14 | making you do work that I know you don't have any free |
| 09:55:38 | 15 | time, but that would be a waste of time.  Normally, I |
| 09:55:38 | 16 | would think I would have a charge that I say I don't |
| 09:55:38 | 17 | accept and, you know, or -- you know, this is why.  Or |
| 09:55:38 | 18 | maybe I'll look at it and say, geez, this isn't that far |
| 09:55:38 | 19 | off from what I'm trying to say and I'll amend it and you |
| 09:55:38 | 20 | will have it, you know.  And then they can object, |
| 09:55:38 | 21 | whatever, but I don't know. |
| 09:55:38 | 22 | I made a note about that the other night as we |
| 09:55:38 | 23 | were going through this.  It just seems to be that would |
| 09:55:38 | 24 | be appropriate. |
| 09:55:38 | 25 | MR. GESTRICH:  We would appreciate the |

960

| | |
|---|---|
| 09:55:38 | 1 |

```
09:55:38   1   opportunity to submit that to the Court.
09:55:38   2          THE COURT:  I actually wanted to put on the
09:55:38   3   record because I know -- you know, I had -- we'd earlier
09:55:38   4   had the discussion of Mario, and then I come out and say
09:55:38   5   I'm not inclined to do it, and then it took me a day or
09:55:38   6   so to gather my thoughts.  Of course, one party objects,
09:55:38   7   which is not a surprise.  I just would like the record to
09:55:38   8   reflect that this came from Cigna.  You know, the horse
09:55:38   9   had left the barn almost.  I mean, I don't think it's in
09:55:38  10   your requested charge, is it?  Did we miss that case as a
09:55:38  11   basis for a charge that puts it this way and -- or did
09:55:38  12   you request the charge that is consistent with Mario?
09:55:38  13   I --
09:55:38  14          MS. COSTIN:  I think originally we did.
09:55:38  15          THE COURT:  Okay.  All right.  I'm just I guess
09:55:38  16   -- yeah.  Okay.
09:55:38  17          MS. COSTIN:  But we understand Your Honor's
09:55:38  18   reasoning now.
09:55:38  19          THE COURT:  Yeah.  Okay.
09:55:38  20          Oh.  You are arguing the lack of medical
09:55:38  21   necessity is -- is one of the things that -- that you're
09:55:38  22   trying to tell the jury think of this when you look at
09:55:38  23   everything for unfairness.  I'm not saying it exactly
09:55:38  24   right, but that's like -- with the fee forgiveness and
09:55:38  25   bundling, that the -- their conduct in this case and
```

09:55:38  1    these claims is just all wrong and it's not fair that we

09:55:38  2    should have had to pay them.  Okay.

09:55:38  3         MS. COSTIN:  Okay.

09:55:38  4         THE COURT:  And so as to they weren't medically

09:55:38  5    necessary, I would think in your case the burden is on

09:55:38  6    you?

09:55:38  7         MS. KINGSBERY:  In our case?

09:55:38  8         THE COURT:  In your case.

09:55:38  9         MS. KINGSBERY:  That's right, we don't object.

09:55:38  10        THE COURT:  The burden of not medical necessity.

09:55:38  11   Okay.  All right.  Just making sure.

09:55:38  12        Nobody made any comment, so I should probably

09:55:38  13   not open this box.  I'll probably be very sorry.  But I

09:55:38  14   think it's in the Labs' case I charged special defenses

09:55:38  15   as to two causes of action, not as the time one, the

09:55:38  16   prompt pay one.  And so I guess I didn't hear objection

09:55:38  17   to that.  You should understand when I do one of these

09:55:38  18   conferences, I want to know what you don't like that's on

09:55:38  19   the paper, but anything I'm not including, I mean that's

09:55:38  20   kind of like your *Mario,* I suppose, but, you know -- so

09:55:38  21   if anybody -- if the Labs think they have got special

09:55:38  22   defenses to the fact that it's uncontestable, you should

09:55:38  23   let me know that because I don't think so, but I need to

09:55:38  24   hear counsel to make sure I'm right.

09:55:38  25        MS. KINGSBERY:  We do believe the statute of

| | | |
|---|---|---|
| 09:55:38 | 1 | limitations would apply to this count. |
| 09:55:38 | 2 | THE COURT: So that would be the charge and how |
| 09:55:38 | 3 | many special defenses there are, right? Where is that? |
| 09:55:38 | 4 | Here it is, Page 50. So Cigna, in effect, you object |
| 09:55:38 | 5 | because I didn't include Prompt Pay Act cause of action |
| 09:55:38 | 6 | as a -- affirmative defense is applicable in the Prompt |
| 09:55:38 | 7 | Pay Act. Is that a correct way to put it? |
| 09:55:38 | 8 | MS. KINGSBERY: I'm not sure I understand what |
| 09:55:38 | 9 | you said. |
| 09:55:38 | 10 | THE COURT: Well, on Number 36 -- |
| 09:55:38 | 11 | MS. KINGSBERY: Yes. |
| 09:55:38 | 12 | THE COURT: -- are you saying that it should |
| 09:55:38 | 13 | read Cigna raises two affirmative defenses in response to |
| 09:55:38 | 14 | each of the Labs' three counts. |
| 09:55:38 | 15 | MS. COSTIN: I think -- I think she's saying -- |
| 09:55:38 | 16 | THE COURT: I'm sorry. |
| 09:55:38 | 17 | MS. COSTIN: -- she's got three affirmative |
| 09:55:38 | 18 | defenses in response to the Lab's two counts. |
| 09:55:38 | 19 | THE COURT: In other words, I list your special |
| 09:55:38 | 20 | defenses. I saw two counts. I didn't say which ones. |
| 09:55:38 | 21 | That's probably an oversight, Alex, but I'll make -- just |
| 09:55:38 | 22 | make a note. You think -- let me put it this way. You |
| 09:55:38 | 23 | think that the special defense of unbundling and |
| 09:55:38 | 24 | mitigation of damages is applicable to the Prompt Pay Act |
| 09:55:38 | 25 | 120 days, quote, incontestable. |

963

| | | |
|---|---|---|
| 09:55:38 | 1 | MS. KINGSBERY:  No, Your Honor. |
| 09:55:38 | 2 | THE COURT:  That's what I was trying to ask. |
| 09:55:38 | 3 | Now, if you were answering something else, you have got |
| 09:55:38 | 4 | to explain it because I don't understand what you were |
| 09:55:38 | 5 | doing if that's what you -- you're trying to do something |
| 09:55:38 | 6 | else. |
| 09:55:38 | 7 | MS. KINGSBERY:  No.  It was only just that the |
| 09:55:38 | 8 | statute of limitations applied to the Prompt Pay Act. |
| 09:55:38 | 9 | THE COURT:  Yeah, that I have got to add, that's |
| 09:55:38 | 10 | true.  You don't tell to add that's true.  Let me just |
| 09:55:38 | 11 | make sure.  I have got to add that to all of them.  Okay. |
| 09:55:38 | 12 | I will have to separate that, but that's okay. |
| 09:55:38 | 13 | I had a question about third-party beneficiary |
| 09:55:38 | 14 | but I think we have already discussed it.  The others |
| 09:55:38 | 15 | relate to the next section that we're not going to get to |
| 09:55:38 | 16 | today. |
| 09:55:38 | 17 | All right. |
| 09:55:38 | 18 | MS. COSTIN:  Your Honor, can I just make sure |
| 09:55:38 | 19 | we're on the same page? |
| 09:55:38 | 20 | THE COURT:  Yes. |
| 09:55:38 | 21 | MS. COSTIN:  For this affirmative defenses one, |
| 09:55:38 | 22 | I think what we're all saying is to take out the word |
| 09:55:38 | 23 | "two"  before the Labs' two counts because the special |
| 09:55:38 | 24 | defenses only apply to the Prompt Pay Act.  Do I have |
| 09:55:38 | 25 | that right or am I -- |

964

09:55:38  1          MS. KINGSBERY:  No.

09:55:38  2          THE COURT:  Wait a minute.  No.  There are two

09:55:38  3    special defenses -- affirmative defenses that apply to

09:55:38  4    two of the counts.  There is a third affirmative defense

09:55:38  5    that would apply to all three.

09:55:38  6          MS. COSTIN:  Okay.

09:55:38  7          THE COURT:  All right.  So I have to correct

09:55:38  8    that introduction and then I have to add a charge on

09:55:38  9    statute of limitations --

09:55:38  10         MS. KINGSBERY:  That's right.

09:55:38  11         THE COURT:  -- as to all three, but it will be a

09:55:38  12   different statute, right?  Did we agree on the statute?

09:55:38  13   Is somebody giving me the language or am I doing it?

09:55:38  14         MS. KINGSBERY:  Cigna is going to send you the

09:55:38  15   proposed language.  I think that --

09:55:38  16         THE COURT:  Okay.

09:55:38  17         MR. GESTRICH:  We should -- I think we should --

09:55:38  18   yeah, I think we can agree.  If Cigna provides that to us

09:55:38  19   tonight --

09:55:38  20         THE COURT:  That's fine.  That'd be great.

09:55:38  21         MR. HARE:  Just to be clear.  You're asking

09:55:38  22   whether we agree as to the statutory period applicable?

09:55:38  23         THE COURT:  Yeah, I guess.  Yeah.  Definitely.

09:55:38  24         MR. HARE:  Is that what you understood the --

09:55:38  25         THE COURT:  And can -- just tell me what it is.

| | | |
|---|---|---|
| 09:55:38 | 1 | MR. GESTRICH:  Five years for the statutory and |
| 09:55:38 | 2 | six years for the contract, is that -- |
| 09:55:38 | 3 | MS. KINGSBERY:  That's right.  That's our |
| 09:55:38 | 4 | position. |
| 09:55:38 | 5 | THE COURT:  And that's Florida law.  I mean, I'm |
| 09:55:38 | 6 | not challenging you, I'm just saying you are answering |
| 09:55:38 | 7 | that is the statute for those two types of causes of |
| 09:55:38 | 8 | action under Florida law. |
| 09:55:38 | 9 | MR. GESTRICH:  No, Your Honor.  It's -- the |
| 09:55:38 | 10 | statutory is five years under Florida law. |
| 09:55:38 | 11 | THE COURT:  Yeah. |
| 09:55:38 | 12 | MR. GESTRICH:  The common law third-party |
| 09:55:38 | 13 | beneficiary is six years under Connecticut law. |
| 09:55:38 | 14 | THE COURT:  Connecticut.  Thank you. |
| 09:55:38 | 15 | Okay.  Anything else? |
| 09:55:38 | 16 | We're not charging in pari delicto, right? |
| 09:55:38 | 17 | Because it's inequitable -- it's equitable.  But if -- |
| 09:55:38 | 18 | anybody thinks I should charge in pari delicto? |
| 09:55:38 | 19 | MS. KINGSBERY:  No, Your Honor. |
| 09:55:38 | 20 | THE COURT:  Thanks.  Otherwise, I would have |
| 09:55:38 | 21 | asked you for cases.  And good luck. |
| 09:55:38 | 22 | Yeah, that's a good point.  Course of dealing, |
| 09:55:38 | 23 | that's -- remember when I had a kind of puss on my face |
| 09:55:38 | 24 | when you first said that, and I'm like, What is he |
| 09:55:38 | 25 | talking about? |

| | | |
|---|---|---|
| 09:55:38 | 1 | MR. GESTRICH:  Yes, Your Honor. |
| 09:55:38 | 2 | THE COURT:  I believe that's a term out of UCC, |
| 09:55:38 | 3 | which relates to the law relating to goods.  This is |
| 09:55:38 | 4 | clearly a service.  Are you saying UCC applies? |
| 09:55:38 | 5 | MR. GESTRICH:  We will run down that question |
| 09:55:38 | 6 | and have an answer for the Court tonight. |
| 09:55:38 | 7 | THE COURT:  I'm not rejecting your concept, |
| 09:55:38 | 8 | although I'm not accepting it.  I've got to think about |
| 09:55:38 | 9 | it.  But it's just the phrasing doesn't strike me right. |
| 09:55:38 | 10 | That's kind of what my crackerjack clerk has phrased. |
| 09:55:38 | 11 | Anything else? |
| 09:55:38 | 12 | MR. CUNNINGHAM:  Your Honor, if I may.  I was |
| 09:55:38 | 13 | appropriately shushed by the Court with respect to the |
| 09:55:38 | 14 | charge conference. |
| 09:55:38 | 15 | THE COURT:  No, that's all right. |
| 09:55:38 | 16 | MR. CUNNINGHAM:  But I do think we need some |
| 09:55:38 | 17 | clarity on the issue of the prominence of the medical |
| 09:55:38 | 18 | records. |
| 09:55:38 | 19 | THE COURT:  The providence of the medical |
| 09:55:38 | 20 | records.  First of all, can I just -- I didn't want to do |
| 09:55:38 | 21 | this in front of the jury, but the -- I think it's |
| 09:55:38 | 22 | Attorney Hare, you said there were 20 records that you |
| 09:55:38 | 23 | went through, and they're 15 through 33.  Unless there's |
| 09:55:38 | 24 | two sets of records in one of those exhibits, if I count |
| 09:55:38 | 25 | the number 15 to 33, it's 19. |

09:55:38  1          MR. HARE:  It's 14 through 33.

09:55:38  2          THE COURT:  Then you might have misspoke, but

09:55:38  3   that's okay.  I do remember 14 is also a patient record,

09:55:38  4   so that's fine.

09:55:38  5          MR. HARE:  The way they were delivered --

09:55:38  6          THE COURT:  That's fine, I got it.  So -- but

09:55:38  7   you may have misspoke.  And then I could be wrong, but it

09:55:38  8   doesn't matter.  I'm sure you will have it right when you

09:55:38  9   do your closing or whatever, if you didn't already have

09:55:38 10   it right.  I didn't mean to say you were wrong and I'm

09:55:38 11   right.

09:55:38 12          I don't know what you mean by "province."

09:55:38 13          MR. CUNNINGHAM:  Sure, Your Honor.  Just if I

09:55:38 14   may give you context.  I mean prominence -- that's what I

09:55:38 15   said, prominence.

09:55:38 16          THE COURT:  Did I say Providence, like the city?

09:55:38 17   Really?  Oh, my God.

09:55:38 18          MR. CUNNINGHAM:  I was talking about the origin.

09:55:38 19          THE COURT:  Yes, I know.

09:55:38 20          MR. CUNNINGHAM:  Okay.

09:55:38 21          THE COURT:  Are they valid, are they what they

09:55:38 22   purport to be, are they good?

09:55:38 23          MR. CUNNINGHAM:  Right, Your Honor.  This came

09:55:38 24   up as I was preparing for the examination of Ms. Canto,

09:55:38 25   obviously.  And what happened here, I think the Court is

09:55:38  1  aware of this -- during the discovery phase of this case,

09:55:38  2  those records were not given to us until after discovery

09:55:38  3  was closed.  In fact, when we took the deposition of

09:55:38  4  Dr. Nicoll --

09:55:38  5         THE COURT:  You've got to say it for the record,

09:55:38  6  those records.

09:55:38  7         MR. CUNNINGHAM:  Those 20 records, Your Honor.

09:55:38  8         THE COURT:  That -- and you understood them -- I

09:55:38  9  do -- yeah, well, I have a couple preliminary questions

09:55:38  10  before you launch.

09:55:38  11         MR. CUNNINGHAM:  Sure.

09:55:38  12         THE COURT:  I've received a letter, I think from

09:55:38  13  Attorney Gestrich, to somebody on the Cigna team, very

09:55:38  14  close to New Years Eve, saying, You know this depo is

09:55:38  15  coming up, have we got everything?  And you first showed

09:55:38  16  me an email, but then I got a copy of a letter preceding

09:55:38  17  the email, I believe in which Attorney Kingsbery says,

09:55:38  18  You know, we're producing Cigna 47,000 to 8,000 or

09:55:38  19  whatever.  I don't have the documents in front of me.  I

09:55:38  20  don't know that they say what they are.  But -- and then

09:55:38  21  Attorney Kang's email sort of says that.

09:55:38  22         What I'm wondering is, did Cigna do a

09:55:38  23  supplemental response in writing to either -- it if it

09:55:38  24  was an interrogatory or a request for production.  If it

09:55:38  25  was interrogatory, it should have been signed by their

09:55:38  1    client and them.  But if it's request for production,

09:55:38  2    they sign it, in effect, saying we have produced these

09:55:38  3    further records that are responsive to this discovery.

09:55:38  4           MR. CUNNINGHAM:  I don't have the answer to that

09:55:38  5    question, Your Honor.  I think that Mr. Gestrich or

09:55:38  6    Mr. Christ might.  I certainly --

09:55:38  7           THE COURT:  Well, let me know.  I don't mean to

09:55:38  8    send you a wild goose chase.  Maybe Cigna knows the

09:55:38  9    answer.

09:55:38  10          MR. GESTRICH:  I believe I know the answer.

09:55:38  11          THE COURT:  I've got a feeling you're going to

09:55:38  12    say no.

09:55:38  13          MR. GESTRICH:  No.

09:55:38  14          THE COURT:  Yeah.

09:55:38  15          MR. GESTRICH:  That's correct.

09:55:38  16          THE COURT:  So go ahead, let me hear what you

09:55:38  17    want me to think about.

09:55:38  18          MR. CUNNINGHAM:  Your Honor, I feel like I was

09:55:38  19    unfairly maligned today when --

09:55:38  20          THE COURT:  By me?

09:55:38  21          MR. CUNNINGHAM:  No, no, no.  By opposing

09:55:38  22    counsel with whom we get along well, Your Honor, in the

09:55:38  23    context of things.  But I showed that email to Mr. Kang

09:55:38  24    yesterday, his email to Mr. Christ.  I know I did.  We

09:55:38  25    were right at your counsel table.

09:55:38  1              THE COURT:  The January.

09:55:38  2              MR. CUNNINGHAM:  I think it was January 3 of

09:55:38  3      '23.

09:55:38  4              THE COURT:  No, the email?

09:55:38  5              MR. CUNNINGHAM:  January 8 of '23.

09:55:38  6              THE COURT:  Yeah.

09:55:38  7              MR. CUNNINGHAM:  Right, from Mr. Kang to

09:55:38  8      Mr. Christ and our whole team except -- yes, I was copied

09:55:38  9      on that.  And so, Your Honor, I said to Mr. Kang, can't

09:55:38  10     we stipulate that these 20 patient records are the

09:55:38  11     records that Ms. Canto sent to Dr. Nicoll.  And Mr. Kang

09:55:38  12     said no, we can't stipulate to that.  And I said to him,

09:55:38  13     I think you are going to regret that.

09:55:38  14              Now, I didn't --

09:55:38  15              THE COURT:  Can I just clarify.

09:55:38  16              MR. CUNNINGHAM:  Sure.

09:55:38  17              THE COURT:  You said, can we stipulate these 20

09:55:38  18     records -- you are referring to the 20 that are the

09:55:38  19     subject of Canto's testimony, at least Canto's testimony,

09:55:38  20     maybe Nicoll, but he didn't look at them all, but --

09:55:38  21     okay.

09:55:38  22              MR. CUNNINGHAM:  Yes, Your Honor.

09:55:38  23              THE COURT:  Yeah.

09:55:38  24              MR. CUNNINGHAM:  Because I had seen this email

09:55:38  25     from Mr. Kang, which says our client was able to locate

| | |
|---|---|
| 09:55:38 | 1 |
| 09:55:38 | 2 |
| 09:55:38 | 3 |
| 09:55:38 | 4 |
| 09:55:38 | 5 |
| 09:55:38 | 6 |
| 09:55:38 | 7 |
| 09:55:38 | 8 |
| 09:55:38 | 9 |
| 09:55:38 | 10 |
| 09:55:38 | 11 |

certain records from an offsite records facility that
appear to be some or all of the 20 patient files
referenced in Mr. Canto's deposition.  So I didn't
understand why we couldn't stipulate to this, but that's
when I said to Mr. Kang, you know, I hope we can
stipulate to this.  But now, did I specifically say to
him, well, we're going to use this tomorrow.  I don't
know if I said that.  Maybe I didn't.  But I think he was
certainly on notice that I was going to use this email
because I had to use it with Dr. Nicoll if they wouldn't
stipulate.

So the concern I have, Your Honor, is what else
could those records be?  I mean, they answered discovery
responses and request to specific discovery requests from
us.  And to us, it's clear that they were indicating that
these were, in fact, the records that we think they are.
So I don't know why there's still a great deal of mystery
about this and I don't want this to remain an open issue.

THE COURT:  I have a couple of questions.
First, what in particular do you think was said that you
felt maligned you?

MR. CUNNINGHAM:  Well, just the -- I think the
implication was that Cigna's counsel were completely
caught off guard --

THE COURT:  Oh, okay.

09:55:38   1          MR. CUNNINGHAM:  -- that I was going to use this
09:55:38   2    email.
09:55:38   3          THE COURT:  You said it was out of time on
09:55:38   4    discovery, but you were still doing Nicoll.  Was it out
09:55:38   5    of time for fact discovery?
09:55:38   6          MR. CUNNINGHAM:  Attorney Gestrich, you probably
09:55:38   7    have a better recollection.
09:55:38   8          MR. GESTRICH:  At that point, yes, Your Honor.
09:55:38   9          THE COURT:  Okay.
09:55:38  10          MR. GESTRICH:  We received this communication.
09:55:38  11    This was also sent on Monday to Cigna's counsel with a
09:55:38  12    response --
09:55:38  13          THE COURT:  Well --
09:55:38  14          MR. GESTRICH:  I sent this same email.
09:55:38  15          THE COURT:  The email from January was sent this
09:55:38  16    Monday.
09:55:38  17          MR. GESTRICH:  I sent --
09:55:38  18          THE COURT:  You need to be more clear or the
09:55:38  19    record will be a mess.
09:55:38  20          MR. GESTRICH:  I will clarify.  I responded to
09:55:38  21    Mr. Kang's January 8, 2023 email on Monday, and stated,
09:55:38  22    "Nine days after we received your below email, we
09:55:38  23    received the only patient records in a stand-alone
09:55:38  24    production, Volume 29.  See attached.  Can you please
09:55:38  25    confirm that we can stipulate on the record tomorrow that

09:55:38  1    Joint Exhibits 14 to 33 are the 20 records that were sent

09:55:38  2    to Dr. Nicoll for review?"

09:55:38  3            THE COURT:  There was something in there that

09:55:38  4    wasn't clear to me.  Just a moment.  In other words, this

09:55:38  5    Monday, you wrote to Attorney Kang and asked him if he

09:55:38  6    would stipulate that Volume 29, which was 20 medical

09:55:38  7    records which you received with Attorney Kingsbery

09:55:38  8    letter, that they would stipulate those are the 20

09:55:38  9    records that Canto pulled and formed a basis of her

09:55:38 10    investigation.

09:55:38 11            MR. GESTRICH:  Yes, Your Honor.  And to clarify

09:55:38 12    for the record, the "see attached" that's referenced in

09:55:38 13    the email I read to the Court is the January 17, 2023

09:55:38 14    letter that we received with that production of those 20

09:55:38 15    patient records.

09:55:38 16            THE COURT:  From Attorney Kingsbery.

09:55:38 17            MR. GESTRICH:  Yes, Your Honor.

09:55:38 18            THE COURT:  I believe in the -- in either the

09:55:38 19    letter -- no, in the letter, I think, Attorney Kingsbery,

09:55:38 20    you say this is the 26th production.  Is that a -- am I

09:55:38 21    recall that?

09:55:38 22            MS. KINGSBERY:  I wouldn't dispute that if

09:55:38 23    that's what it says.

09:55:38 24            THE COURT:  And can I ask Cigna, when you

09:55:38 25    supplemented your production, if you hadn't -- no, what I

974

09:55:38  1    haven't got is a basic fact.  I think you reference

09:55:38  2    somewhere that this was asked for in at least -- and you

09:55:38  3    named three interrogatories, 1, 2 and 4, or something

09:55:38  4    like that.  Again, maybe -- can you go get me, Alex, the

09:55:38  5    documents -- they are either on the table like ready to

09:55:38  6    come out tomorrow, you know, that I had clipped, that was

09:55:38  7    -- the docket ruling and the transcript.  I don't think I

09:55:38  8    want that.  But it's -- it's also this correspondence

09:55:38  9    that -- could you just grab those quick?  No, not up

09:55:38  10   there.  In the office.  I think I brought them off the

09:55:38  11   bench.  Thank you.

09:55:38  12          Tell me when -- where the request for

09:55:38  13   production, interrogatory, anywhere, you asked in formal

09:55:38  14   discovery for records that would have called for this.

09:55:38  15   In other words, you either asked for the record -- I

09:55:38  16   don't know if you knew Canto picked 20.  You know, no,

09:55:38  17   you didn't know that.  So you asked for the records in

09:55:38  18   the investigation, something like that?

09:55:38  19          MR. GESTRICH:  On November 1, 2021, in

09:55:38  20   Interrogatory Number 2 response --

09:55:38  21          THE COURT:  Yeah.

09:55:38  22          MR. GESTRICH:  -- we asked for --

09:55:38  23          THE COURT:  Response?

09:55:38  24          MR. GESTRICH:  This is their response --

09:55:38  25          THE COURT:  Oh, yeah.

| | | |
|---|---|---|
| 09:55:38 | 1 | MR. GESTRICH:  -- on November 1st. |
| 09:55:38 | 2 | THE COURT:  Well, what did you ask? |
| 09:55:38 | 3 | MR. GESTRICH:  The interrogatory was, "State |
| 09:55:38 | 4 | whether you, or anyone acting on your behalf, has |
| 09:55:38 | 5 | conducted" -- |
| 09:55:38 | 6 | THE COURT:  I don't need to know that.  Tell me |
| 09:55:38 | 7 | where you would have expected to get records, either her |
| 09:55:38 | 8 | case notes or these patient files. |
| 09:55:38 | 9 | MR. GESTRICH:  Their response to that was a |
| 09:55:38 | 10 | Federal Rule of Civil Procedure 33(d) response that |
| 09:55:38 | 11 | indicated that they would produce those documents. |
| 09:55:38 | 12 | THE COURT:  In other words, they are going to |
| 09:55:38 | 13 | sub -- they're going to come back with the documents and |
| 09:55:38 | 14 | that will satisfy the answer to this interrogatory? |
| 09:55:38 | 15 | MR. GESTRICH:  Yes, Your Honor. |
| 09:55:38 | 16 | THE COURT:  And that response was signed by |
| 09:55:38 | 17 | whom? |
| 09:55:38 | 18 | MR. GESTRICH:  That was -- Attorney Christ has |
| 09:55:38 | 19 | it. |
| 09:55:38 | 20 | THE COURT:  And that was in November of 2021.  I |
| 09:55:38 | 21 | interrupted you when you told me "State if there was an |
| 09:55:38 | 22 | investigation."  I don't know that that would have gotten |
| 09:55:38 | 23 | the documents. |
| 09:55:38 | 24 | MR. GESTRICH:  We stated in the interrogatory -- |
| 09:55:38 | 25 | directed Cigna to identify the persons that conducted the |

| | | |
|---|---|---|
| 09:55:38 | 1 | investigation, the date, the dates of any reports of the |
| 09:55:38 | 2 | investigations, and who is in possession of those |
| 09:55:38 | 3 | reports.  The Nicoll review of the records was in |
| 09:55:38 | 4 | connection with the 20 patient records. |
| 09:55:38 | 5 | THE COURT:  Right. |
| 09:55:38 | 6 | MR. GESTRICH:  In addition to that, there was |
| 09:55:38 | 7 | also a document request. |
| 09:55:38 | 8 | THE COURT:  Okay.  I am going to make it real |
| 09:55:38 | 9 | simple.  I am not going to be able to give a response to |
| 09:55:38 | 10 | you, sir.  I want to see a copy of whatever discovery |
| 09:55:38 | 11 | request, if there's one or if there's 40, that it's your |
| 09:55:38 | 12 | position that this request should have produced -- |
| 09:55:38 | 13 | obviously they thought they should have because they say, |
| 09:55:38 | 14 | look, we found them and we produced them. |
| 09:55:38 | 15 | MR. GESTRICH:  Yes, Your Honor. |
| 09:55:38 | 16 | THE COURT:  I want to know how that was phrased, |
| 09:55:38 | 17 | if it was ever supplemented and if it ever referred to |
| 09:55:38 | 18 | these documents other than in the letter from Attorney |
| 09:55:38 | 19 | Kingsbery.  Okay? |
| 09:55:38 | 20 | MR. CUNNINGHAM:  Yes, Your Honor. |
| 09:55:38 | 21 | THE COURT:  All right.  So -- |
| 09:55:38 | 22 | MR. HARE:  Your Honor -- |
| 09:55:38 | 23 | THE COURT:  Yeah. |
| 09:55:38 | 24 | MR. HARE:  -- just to be clear, we are not |
| 09:55:38 | 25 | principally complaining about the timing of the |

977

```
09:55:38   1    production --
09:55:38   2            THE COURT:  I know.
09:55:38   3            MR. HARE:  -- in January.
09:55:38   4            THE COURT:  But I might be interested in that,
09:55:38   5    too.
09:55:38   6            MR. HARE:  Right.
09:55:38   7            THE COURT:  Yeah.  Okay.  But you are saying
09:55:38   8    it's just not reasonable practice to not stipulate that
09:55:38   9    these are records you produced to us representing that
09:55:38  10    that's what they were.
09:55:38  11            MR. HARE:  Precisely.
09:55:38  12            THE COURT:  Yeah.  Counsel, you may want
09:55:38  13    Attorney Kang for cover here, but I would really like to
09:55:38  14    hear a response.
09:55:38  15            MS. COSTIN:  I first would like to respond to
09:55:38  16    the comment about Mr. Cunningham feeling maligned this
09:55:38  17    morning.  We have an agreed procedure that documents that
09:55:38  18    are going to be used for the witness will be disclosed 24
09:55:38  19    hours in advance.  That document was not on the list.
09:55:38  20    Perhaps he didn't know that I would be covering
09:55:38  21    Dr. Nicoll today, so I had no notice that you were going
09:55:38  22    to use that document.
09:55:38  23            MR. CUNNINGHAM:  And I apologize for that.  I
09:55:38  24    didn't --
09:55:38  25            MS. COSTIN:  So for whatever conversation you
```

| | | |
|---|---|---|
| 09:55:38 | 1 | may or may not have had with Attorney Kang, I, as the |
| 09:55:38 | 2 | covering attorney, had no knowledge. |
| 09:55:38 | 3 | THE COURT: I was going to ask you if you copied |
| 09:55:38 | 4 | that to other -- the whole team. I know it's a lot, but |
| 09:55:38 | 5 | you can cut and paste. |
| 09:55:38 | 6 | MR. CUNNINGHAM: I understand. I understand the |
| 09:55:38 | 7 | position. |
| 09:55:38 | 8 | THE COURT: That's fine. That isn't the main |
| 09:55:38 | 9 | issue. |
| 09:55:38 | 10 | MS. COSTIN: Without having all of my records in |
| 09:55:38 | 11 | front of me, my understanding is that we initially |
| 09:55:38 | 12 | produced the complete SIU file. Ms. Canto was deposed. |
| 09:55:38 | 13 | THE COURT: Yeah. |
| 09:55:38 | 14 | MS. COSTIN: And something about these 20 |
| 09:55:38 | 15 | records came up at her deposition. |
| 09:55:38 | 16 | THE COURT: Right. |
| 09:55:38 | 17 | MS. COSTIN: So we then went and did a |
| 09:55:38 | 18 | supplemental search. And that's what resulted in the |
| 09:55:38 | 19 | supplemental production. |
| 09:55:38 | 20 | THE COURT: Right. |
| 09:55:38 | 21 | MS. COSTIN: I don't think Attorney Hare is |
| 09:55:38 | 22 | debating that we supplemented our discovery and produced |
| 09:55:38 | 23 | these records. |
| 09:55:38 | 24 | THE COURT: No, but he's debating that you won't |
| 09:55:38 | 25 | acknowledge that what you supplemented were the 20 that |

979

| | | |
|---|---|---|
| 09:55:38 | 1 | she talked about. |
| 09:55:38 | 2 | MS. COSTIN:  I understand that.  I think that a |
| 09:55:38 | 3 | concern in particular today and yesterday is that the |
| 09:55:38 | 4 | foundation could have been laid by asking Ms. Canto these |
| 09:55:38 | 5 | questions, if these were the records.  There's nothing |
| 09:55:38 | 6 | in evidence that they are.  I certainly can't certify |
| 09:55:38 | 7 | what they are.  That would have to come from someone |
| 09:55:38 | 8 | that -- |
| 09:55:38 | 9 | THE COURT:  Do you want me to let him call |
| 09:55:38 | 10 | Attorney Kingsbery to the stand? |
| 09:55:38 | 11 | MS. COSTIN:  We will go back to our client this |
| 09:55:38 | 12 | evening and see if we can coordinate on a stipulation to |
| 09:55:38 | 13 | this effect. |
| 09:55:38 | 14 | THE COURT:  That would be very nice. |
| 09:55:38 | 15 | MR. CUNNINGHAM:  Just to provide a little more |
| 09:55:38 | 16 | historical context, Your Honor.  I remember from |
| 09:55:38 | 17 | Ms. Canto's testimony that her deposition was taken |
| 09:55:38 | 18 | almost exactly two years ago. |
| 09:55:38 | 19 | THE COURT:  Yeah. |
| 09:55:38 | 20 | MR. CUNNINGHAM:  October of 2022. |
| 09:55:38 | 21 | THE COURT:  Yeah. |
| 09:55:38 | 22 | MR. CUNNINGHAM:  Those documents were not |
| 09:55:38 | 23 | produced until after January 8. |
| 09:55:38 | 24 | THE COURT:  I know.  There's something about |
| 09:55:38 | 25 | recently located.  I was going to ask Attorney Kang how |

09:55:38    1    recently, when did your client tell you?  And to be

09:55:38    2    honest with you, given -- I mean, I know only 1 percent

09:55:38    3    of what Attorney Hawkins dealt with in this pretrial

09:55:38    4    discovery of you folks.  But I might someday want to know

09:55:38    5    what and how was it communicated to your client that this

09:55:38    6    is what they had to search for and you -- you made a

09:55:38    7    judgment that what they were going to search and where

09:55:38    8    they were going to search was adequate to make a response

09:55:38    9    that you could sign as a lawyer or as an interrogatory,

09:55:38   10    someone at the client could sign.  I mean, I still do not

09:55:38   11    -- I'm still -- I've got to tell you, I have not let

09:55:38   12    go -- and maybe you didn't know I had it in my teeth --

09:55:38   13    but that affidavit how the document was highly

09:55:38   14    confidential and couldn't be produced, the last thing

09:55:38   15    that I think that Attorney Hawkins dealt with.  I mean,

09:55:38   16    it sounds like Eva Borden -- is it Eva Borden who signed

09:55:38   17    that affidavit?  If it isn't, I'm sorry.  But I assume

09:55:38   18    it's someone high enough to have known that it was then

09:55:38   19    the subject of a press release.

09:55:38   20         I mean, the problem is, I get things in my head

09:55:38   21    and they bother me, and I have a habit of not letting

09:55:38   22    them go.  And I probably shouldn't have even said it, but

09:55:38   23    I guess that's where I am on this.  I'm not letting this

09:55:38   24    go until I find out, you know, why wasn't it produced

09:55:38   25    earlier, except you are telling me you don't really care

09:55:38  1    about that.  But it may affect what your remedy here is.

09:55:38  2    So that's why I was asking for a better picture of the

09:55:38  3    history of this issue.

09:55:38  4         All right.  Well, I will await your response,

09:55:38  5    and I guess -- I guess -- what time do you think we

09:55:38  6    should be in tomorrow?  Any -- you obviously don't know

09:55:38  7    if are there any issues because you have been sitting in

09:55:38  8    here, so unless you already knew that there were some

09:55:38  9    issues when you came in the room.

09:55:38  10        Do you folks have any reason for you folks to

09:55:38  11   come in before the 9:15, no issue?  I mean, for example,

09:55:38  12   we came in today.  And I wasn't going to go out a little

09:55:38  13   bit early and then I get told there's two issues.  And it

09:55:38  14   sounds like, oh, well, it's okay, Judge, we can take it

09:55:38  15   up at lunch or we can do this.  But I'm here, I'm asking.

09:55:38  16   I think I told you 9:15, but you were all here.  And I

09:55:38  17   think I asked Liana or Alex to go out and ask do you have

09:55:38  18   anything.  No, we didn't do that.  Well, we'll do it in

09:55:38  19   the future or maybe we'll just have you come at 9:00 just

09:55:38  20   to be sure.  But, yeah, anyway, it probably was my bad,

09:55:38  21   I wasn't clear.  But I need to get an answer from you

09:55:38  22   tomorrow, hopefully, on this.  So I would say --

09:55:38  23        MS. COSTIN:  We'll have an answer tonight.

09:55:38  24        THE COURT:  -- everybody come at 9 o'clock.  And

09:55:38  25   if the answer is it's taken care of, Judge, and Attorney

982

| 09:55:38 | 1 | Cunningham says it is, Judge, then that's fine.  But -- |
| 09:55:38 | 2 | and then if there's any other issues, to let me know. |
| 09:55:38 | 3 | But let's say 9:00 just to be sure and -- yeah. |
| 09:55:38 | 4 | MR. GESTRICH:  Your Honor. |
| 09:55:38 | 5 | THE COURT:  Yeah. |
| 09:55:38 | 6 | MR. GESTRICH:  One small very -- hopefully this |
| 09:55:38 | 7 | is a very easy issue.  The -- |
| 09:55:38 | 8 | THE COURT:  You guys all have -- all -- both |
| 09:55:38 | 9 | sides have this habit of teeing up.  I'm only to be |
| 09:55:38 | 10 | brief.  I'm going to be -- you know, promises promises. |
| 09:55:38 | 11 | Go ahead, Attorney Gestrich. |
| 09:55:38 | 12 | MR. GESTRICH:  The counter designations to Mr. |
| 09:55:38 | 13 | Ligotti's testimony are due within 24 hours. |
| 09:55:38 | 14 | THE COURT:  Yeah. |
| 09:55:38 | 15 | MR. GESTRICH:  The attorneys have been sitting |
| 09:55:38 | 16 | at the table and they are due in a few hours.  I would |
| 09:55:38 | 17 | just ask can we have this to the other side by the end of |
| 09:55:38 | 18 | the night -- we'll call it end of day, which I think we |
| 09:55:38 | 19 | referred to as midnight. |
| 09:55:38 | 20 | THE COURT:  11:59. |
| 09:55:38 | 21 | MS. COSTIN:  We're just obviously trying to get |
| 09:55:38 | 22 | them to the Court as quickly as possible. |
| 09:55:38 | 23 | THE COURT:  No, I want them now, but it sounded |
| 09:55:38 | 24 | like from Attorney Kang -- I mean, see, he shouldn't |
| 09:55:38 | 25 | promise, but it sounded like it was going to move the |

| | | |
|---|---|---|
| 09:55:38 | 1 | process. |
| 09:55:38 | 2 | MS. COSTIN:  Well, if you get them to us at |
| 09:55:38 | 3 | 9:00, we can flip them quickly.  But if you get them to |
| 09:55:38 | 4 | us at midnight, we'll send them as soon as early as we |
| 09:55:38 | 5 | can in the morning. |
| 09:55:38 | 6 | THE COURT:  Depending on how many they got and |
| 09:55:38 | 7 | how many objections you got.  I mean, you know, you don't |
| 09:55:38 | 8 | know because you haven't seen it. |
| 09:55:38 | 9 | MR. AKERMAN:  Your Honor, earlier we said we |
| 09:55:38 | 10 | will get you the transcript in the morning.  It might be |
| 09:55:38 | 11 | closer to mid-afternoon. |
| 09:55:38 | 12 | THE COURT:  Yeah, no -- well, you know, I will |
| 09:55:38 | 13 | be sitting somewhere, so it won't matter if it's the |
| 09:55:38 | 14 | morning. |
| 09:55:38 | 15 | I still do need to put on the record my -- |
| 09:55:38 | 16 | unless you all think, no, Judge, that's fine, your |
| 09:55:38 | 17 | rulings are the rulings and that won't be an issue for us |
| 09:55:38 | 18 | on appeal, the rulings on the depositions, certainly the |
| 09:55:38 | 19 | 403, where you didn't withdraw a 403, I've got to state, |
| 09:55:38 | 20 | you know, the balance of relevance versus prejudice.  I |
| 09:55:38 | 21 | always said they taught me that in baby judge school, I |
| 09:55:38 | 22 | think. |
| 09:55:38 | 23 | I'm thinking -- I told you I couldn't do a |
| 09:55:38 | 24 | charge on Friday, but I can probably stay half an hour, |
| 09:55:38 | 25 | an hour, after the trial.  So at 4:00, see if I can get |

| | | |
|---|---|---|
| 09:55:38 | 1 | through at least the ones that have been read up to |
| 09:55:38 | 2 | today.  It's only -- was it Nicholson, the fellow from |
| 09:55:38 | 3 | North Carolinas, and Borden's, maybe.  That's a short |
| 09:55:38 | 4 | one.  One of the others is long and has a lot of |
| 09:55:38 | 5 | objections.  So I might not get to all of them, but I |
| 09:55:38 | 6 | will try to knock off some of them on Friday. |
| 09:55:38 | 7 | MR. HARE:  Sharon Hollis appeared live today, so |
| 09:55:38 | 8 | that -- that's moot, that transcript. |
| 09:55:38 | 9 | THE COURT:  Yeah, yeah.  No, I did -- I ruled on |
| 09:55:38 | 10 | Nemecek, Ziemian, Nicholson and -- was Hollis the other |
| 09:55:38 | 11 | one?  No.  I read Hollis, but -- it was Hollis? |
| 09:55:38 | 12 | MS. COSTIN:  No.  Borden. |
| 09:55:38 | 13 | MR. CHRIST:  No.  Borden. |
| 09:55:38 | 14 | THE COURT:  Borden, yeah.  Yeah.  I read Hollis, |
| 09:55:38 | 15 | I remember.  Bad choice as the first one and then you |
| 09:55:38 | 16 | told me live. |
| 09:55:38 | 17 | What's her accent, Australia or British? |
| 09:55:38 | 18 | MR. CUNNINGHAM:  British. |
| 09:55:38 | 19 | THE COURT:  Sounds Australian. |
| 09:55:38 | 20 | MR. CUNNINGHAM:  We said the same thing, Your |
| 09:55:38 | 21 | Honor.  She clarified that it was British. |
| 09:55:38 | 22 | MR. COSTIN:  Just Ligotti. |
| 09:55:38 | 23 | THE COURT:  Just Ligotti's? |
| 09:55:38 | 24 | MR. HARE:  Additional. |
| 09:55:38 | 25 | THE COURT:  Oh, additional, yeah.  But I got |

09:55:38  1    four that I have got to rule on already, plus Ligotti's.

09:55:38  2    No?

09:55:38  3           MR. CHRIST:  I thought you ruled.

09:55:38  4           THE COURT:  I ruled, but I believe I'm obligated

09:55:38  5    to make a record of why I think -- for example, if I

09:55:38  6    sustained a 403 objection, my view of the prejudice

09:55:38  7    outweighs the relevance.  If I overrule the objection, my

09:55:38  8    view was the relevance is too heavy and while there's

09:55:38  9    prejudice is, you know, not so great, whatever. I mean, I

09:55:38  10   don't -- I'm not talking about writing a treatise, I

09:55:38  11   think I've got to do that.  I don't know, but I will plan

09:55:38  12   to do it unless somebody tells me, no, Judge, don't do

09:55:38  13   that.

09:55:38  14          Okay.  Anything else?  Alex, anything else?  No?

09:55:38  15          All right.  Well, thank you very much.  We'll be

09:55:38  16   here tomorrow.  We'll be here on Cigna's case against the

09:55:38  17   Labs, and hopefully get that out and then we'll get you a

09:55:38  18   final full charge if not tomorrow night -- yeah,

09:55:38  19   hopefully tomorrow night.  You'll have it by Friday,

09:55:38  20   because as I say, we won't be talking about it again.

09:55:38  21   And I will let you know tomorrow if I think we're safe to

09:55:38  22   wait until Monday to do a further conference on issues.

09:55:38  23   I don't know yet based -- based on what you told me, I'm

09:55:38  24   not sure we need to, but I don't know about tomorrow.  So

09:55:38  25   I'll -- remind me to let you know that.

986

| | | |
|---|---|---|
| 09:55:38 | 1 | (Court adjourned at 5:28 p.m.) |
| 09:55:38 | 2 | |
| 09:55:38 | 3 | |
| 09:55:38 | 4 | |
| 09:55:38 | 5 | |
| 09:55:38 | 6 | |
| 09:55:38 | 7 | COURT REPORTER'S TRANSCRIPT CERTIFICATE |
| 09:55:38 | 8 | I hereby certify that the within and foregoing is a true |
| 09:55:38 | 9 | and correct transcript taken from the proceedings in the |
| 09:55:38 | 10 | above-entitled matter. |
| 09:55:38 | 11 | |
| 09:55:38 | 12 | /s/  Terri Fidanza |
| 09:55:38 | 13 | Terri Fidanza, RPR |
| 09:55:38 | 14 | Official Court ReporterINDEX |
| 09:55:38 09:55:38 | 15 | |
| 09:55:38 09:55:38 | 16 | |
| 09:55:38 09:55:38 | 17 | EXAMINATION |
| 09:55:38 09:55:38 | 18 | Witness Name                                              Page |
| 09:55:38 09:55:38 | 19 | DR. DANIEL NICOLL |
| 09:55:38 09:55:38 | 20 | CONTINUED DIRECT EXAMINATION BY MR. CUNNINGHAM... 695 |
| 09:55:38 09:55:38 | 21 | CROSS-EXAMINATION BY MS. COSTIN..................... 772 |
| 09:55:38 09:55:38 | 22 | SHARON HOLLIS |
| 09:55:38 09:55:38 | 23 | DIRECT EXAMINATION BY MR. CHRIST.................... 788 |
| 09:55:38 09:55:38 | 24 | CROSS-EXAMINATION BY MS. JACKSON.................... 813 |
| 09:55:38 09:55:38 | 25 | JACQUELINE THELIAN |

09:55:38    1      DIRECT EXAMINATION BY MR. HARE ..................... 821
09:55:38
09:55:38    2      CROSS-EXAMINATION BY MS. COSTIN.................... 889
09:55:38
09:55:38    3   CHRISTOPHER HANEY
09:55:38
09:55:38    4      DIRECT EXAMINATION BY MR. GESTRICH ................ 919

09:55:38    5

09:55:38    6

            7

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25