<pre>
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF CONNECTICUT


 3  _____
    CONNECTICUT GENERAL )
 4  LIFE INSURANCE CO.  )
    AND CIGNA HEALTH    )
 5  AND LIFE INSURANCE  )
    CO.                 )
 6           Plaintiffs )   NO: 3:19cv1324(JCH)
                        )   NO: 3:19CV1326(JCH)
 7    vs.               )   October 24, 2024
                        )   9:00 a.m.
 8                      )
    BIOHEALTH MEDICAL   )
 9  LABORATORIES INC,   )
    PB LABORATORIES, LLC)
10  and EPIC REFERENCE  )
    LABS, INC.          )
11           Defendants.)
    _____)   141 Church Street
12                          New Haven, Connecticut

13

14          DAY FIVE OF TRIAL

15

16  B E F O R E:

17          THE HONORABLE JANET C. HALL, U.S.D.J.

18  A P P E A R A N C E S:

19  For CIGNA:          Edward T. Kang
                        Emily Costin
20                      Alston & Bird LLP
                        950 F Street, NW,
21                      Washington, DC 2004-1404

22                      Michelle Nicole Jackson
                        Alston & Bird LLP
23                      1201 West Peachtree Street
                        Atlanta, GA 30309
24

25                  -- continued --
</pre>

```
 1                         Alexander Akerman
                           Alston & Bird LLP
 2                         350 South Grand Avenue
                           51st Floor
 3                         Los Angeles, CA 90071

 4                         Kelsey Kingsbery
                           Alston & Bird LLP
 5                         555 Fayetteville Street
                           Ste 600
 6                         Raleigh, NC 27601

 7

 8    For BioHealth Labs:  Scott M. Hare
                           Anthony Thomas Gestrich
 9                         Raines Feldman Littrell
                           11 Stanwix Street
10                         Suite 1400
                           Pittsburgh, PA 15222
11
                           Fred Alan Cunningham
12                         Matthew Thomas Christ
                           Rafferty Domnick Cunningham & Yaffa
13                         2401 PGA Boulevard
                           Suite #140
14                         Palm Beach Gardens, FL 33410

15                         John J. Radshaw, III
                           John J. Radshaw, III, Esquire
16                         65 Trumbull Street, 2d Fl.
                           New Haven, CT  06510
17

18

19

20

21

22

23

24

25
```

| 08:46:04 | 1 | THE COURT: We're here again this morning in |
| 09:01:00 | 2 | the matter of Cigna Health and Life Insurance Company |
| 09:01:05 | 3 | versus BioHealth Lab, et al, 3:19CV1324, and Biohealth |
| 09:01:12 | 4 | Lab versus Cigna Health, et al, 3:19cv1326. |
| 09:01:18 | 5 | If I can have appearances, please. |
| 09:01:20 | 6 | MR. HARE: Good morning, Your Honor. Scott Hare |
| 09:01:22 | 7 | and Anthony Gestrich for the Labs. Our counterparts are |
| 09:01:26 | 8 | trailing behind. |
| 09:01:30 | 9 | THE COURT: That's fine. |
| 09:01:30 | 10 | MS. KINGSBERY: Good morning, Your Honor. |
| 09:01:31 | 11 | Kelsey Kingsbery for Cigna. I'm here with Ted Kang and |
| 09:01:36 | 12 | Michelle Jackson. |
| 09:01:37 | 13 | THE COURT: Good morning. |
| 09:01:38 | 14 | There were a number of things that I had to |
| 09:01:41 | 15 | address. We didn't hear about anything additional from |
| 09:01:45 | 16 | you folks. So I am going to get going. |
| 09:01:51 | 17 | I don't know if Alex has conveyed this, but we |
| 09:01:54 | 18 | have the Labs at 10 hours and 49 minutes, and Cigna at 7 |
| 09:01:59 | 19 | hours and 10 minutes. Does that sound right, ballpark to |
| 09:02:05 | 20 | you folks? If not, you can tell me you question it. |
| 09:02:12 | 21 | We'll go back and have an audit. |
| 09:02:15 | 22 | Speaking of an audit. Ms. Thelian, do you need |
| 09:02:20 | 23 | her back? Are you calling her back in reply? |
| 09:02:23 | 24 | MR. HARE: We intend to yes, Your Honor. |
| 09:02:30 | 25 | THE COURT: Do you need to take a trial |

| | | |
|---|---|---|
| 09:02:32 | 1 | deposition for that? |
| 09:02:33 | 2 | MR. HARE:  I'm so sorry.  I didn't hear you. |
| 09:02:33 | 3 | THE COURT:  I'm asking if she'll be available. |
| 09:02:38 | 4 | MR. HARE:  As far as I understand.  I don't know |
| 09:02:40 | 5 | if this is what the Court is alluding to. |
| 09:02:42 | 6 | THE COURT:  Yes, her fall. |
| 09:02:42 | 7 | MR. HARE:  I'm told she had a fall exiting the |
| 09:02:46 | 8 | courthouse yesterday.  As of this morning, we don't have |
| 09:02:49 | 9 | the latest news on her condition.  She's still in New |
| 09:02:53 | 10 | Haven as I understand. |
| 09:02:54 | 11 | THE COURT:  Is she?  Because they said they were |
| 09:02:57 | 12 | going to New York. |
| 09:02:59 | 13 | MR. HARE:  I think that was the original plan |
| 09:03:02 | 14 | before the fall. |
| 09:03:03 | 15 | THE COURT:  No, after the fall. |
| 09:03:06 | 16 | MR. HARE:  The Court may know more than I do. |
| 09:03:10 | 17 | THE COURT:  If you would just make me aware of |
| 09:03:12 | 18 | the status as soon as you can.  It may be that you need |
| 09:03:17 | 19 | to do a trial deposition.  I don't know if the Cigna team |
| 09:03:21 | 20 | is aware.  Ms. Theilan, as she exited the building, fell |
| 09:03:26 | 21 | on the last step.  She was unable to stand.  She had |
| 09:03:30 | 22 | injured both ankles.  That's what I was told probably |
| 09:03:35 | 23 | fifth hand from the court security officers. |
| 09:03:38 | 24 | I don't know if I already asked you this, but I |
| 09:03:41 | 25 | should have.  So I'm going to now.  I need to know what |

09:03:44  1    the parties propose for closing argument.  Yes, I have

09:03:48  2    asked this.  And the order.  In other words, and how much

09:03:51  3    time you are reserving on I guess I will call it

09:03:55  4    rebuttal, whatever you want to call it, with the two

09:04:00  5    cases.

09:04:00  6           So I would hope to have some idea on that

09:04:05  7    tomorrow morning when we convene again at 9 a.m. because

09:04:10  8    there's the beginning of the agenda.

09:04:18  9           The issue came up yesterday about several lines,

09:04:22  10   but one answer I think of Nicholson's deposition about

09:04:27  11   lack of enforcement action.  Someone briefly in

09:04:31  12   addressing it at some point said we granted the motion in

09:04:36  13   limine to prevent evidence on that.  And it appears I

09:04:42  14   misspoke on the record.  I said in one sentence it was

09:04:45  15   denied.  Then I did another ruling and then I said it was

09:04:51  16   granted.  But the Clerk correctly recorded it on the

09:04:54  17   docket as denied, which I felt flowed naturally from the

09:05:01  18   ruling about Ligotti.  So I don't understand why we have

09:05:05  19   to fix it or why it opens a door.  I don't know.

09:05:09  20           Attorney Kang, are you going to press that?

09:05:12  21   And if so, I would like to hear at least briefly about

09:05:14  22   it.

09:05:19  23           MR. KANG:  Yes, Your Honor.  We had filed Docket

09:05:23  24   346, that was the motion in limine to preclude the Labs

09:05:26  25   from arguing lack of enforcement action.  And I was

09:05:31  1   looking back on the transcript of that conference, I

09:05:33  2   think it was day two.  And I believe that when we got to

09:05:37  3   the point where there was discussion about general lack

09:05:42  4   of enforcement of regulatory investigations or agency

09:05:48  5   investigations, and was the topic of this one line of

09:05:52  6   Mr. Nicholson's testimony.

09:05:53  7       THE COURT:  Right.  He didn't say anything about

09:05:55  8   criminal investigations being a subject, I think I asked,

09:05:58  9   evidence you had, you know, that sort of thing.

09:05:58  10      MR. KANG:  Correct.

09:05:58  11      THE COURT:  This was just the regulatory.

09:06:01  12      MR. KANG:  I believe that's essentially the

09:06:05  13  subject that Mr. Nicholson said there was none.  My

09:06:10  14  takeaway certainly from my recollection, as well as

09:06:13  15  reading the transcript, was there was going to be no

09:06:15  16  evidence on that from either side.

09:06:19  17      THE COURT:  I remember that subject.  I remember

09:06:21  18  you got in a back and forth and it was great confusion

09:06:26  19  over what investigation and what the agency could do or

09:06:32  20  couldn't do.  I haven't gone back and read the whole

09:06:34  21  transcript.  I just read the part where I ruled.

09:06:35  22  Somebody said it was granted and I remembered I denied

09:06:38  23  it.  So I was concerned.

09:06:40  24      But that particular discussion, I have only the

09:06:44  25  vaguest of recollections, but I do recall it.  And seemed

09:06:48  1    to me that it was a hornet's nest over what kinds of

09:06:54  2    investigations and were any done ever.  I don't know.  I

09:06:56  3    guess I could read it again.

09:06:58  4        But my view is that was a long deposition.  It

09:07:01  5    was one snippet.  I don't see it as harmful.  To be

09:07:11  6    honest with you, when you first raised it, my reaction

09:07:15  7    was if I make a point of it with the jury, it's just

09:07:23  8    going to highlight it and they're going to really

09:07:26  9    remember it.

09:07:26  10        Now, you know, I always tell lawyers and juries

09:07:30  11   that somebody will remember everything.  But it just

09:07:32  12   makes it a bigger issue than I think it has to be.  I

09:07:37  13   don't know.

09:07:38  14        What would you want to prove?  I think you said

09:07:41  15   something about open the door.  So what instruction would

09:07:45  16   you want or what would you want to prove in response to

09:07:49  17   that one sentence?

09:07:51  18        MR. KANG:  Well, I think if we were to ask for a

09:07:55  19   curative instruction, it would be simply that you heard

09:08:00  20   from a video deposition of Mr. Nicholson that he said

09:08:04  21   that there was no enforcement or government action taken

09:08:09  22   against the Labs and you are to disregard that and that

09:08:12  23   is stricken.  That would be one option.

09:08:15  24        The other option is for us to rebut that and to

09:08:21  25   show that we believe that there certainly was outreach

09:08:26  1    from a government agency and, you know, potential

09:08:31  2    pursuit.

09:08:31  3             THE COURT:  What government agency?  What

09:08:35  4    outreach?  When?  On what subject?  Is there a letter

09:08:38  5    informing the Labs that there was an investigation?

09:08:42  6             MR. KANG:  There was a subpoena.

09:08:43  7             THE COURT:  A subpoena?

09:08:47  8             MR. KANG:  Yes.

09:08:47  9             THE COURT:  I suspect a lot of subpoenas went in

09:08:49  10   front of a grand jury in South Florida before Dr. Ligotti

09:08:57  11   became BOP number Ligotti.  I'm pretty sure that there

09:09:00  12   was a number of those people who were not only not

09:09:04  13   indicted, but were never viewed by the Government as

09:09:07  14   involved in any bad doing, but were viewed as people who

09:09:13  15   had knowledge of how things operated.  But weren't

09:09:16  16   culpable.  You probably ran investigations like that.  I

09:09:19  17   did.

09:09:20  18             So I don't know that because a company gets a

09:09:23  19   subpoena, unless it was accompanied by you're under

09:09:28  20   investigation, you did x, y, and z, and we're opening an

09:09:31  21   investigation, you know, comparable to a target letter.

09:09:36  22   I don't know what a subpoena means.  It means you have

09:09:38  23   knowledge.  At least the Government thinks you do.

09:09:48  24             The problem with the curative as you articulated

09:09:49  25   is that it suggests that it wasn't true.  I don't know

09:09:54   1   that you can prove it wasn't true from what you just

09:09:58   2   said.  It would be as prejudicial to the Labs for the

09:10:02   3   jury to draw that inference from that curative

09:10:06   4   instruction.

09:10:06   5          MR. KANG:  I think the problem is -- and this is

09:10:08   6   why I thought we had agreed that there would be no

09:10:11   7   evidence on this subject.  Now the impression for the

09:10:14   8   juror that remembers it is going to think to themselves

09:10:21   9   potentially that there was no issue.  That there was

09:10:23   10  never any scrutiny by any Government agency into the

09:10:27   11  Labs and that is a misimpression.

09:10:29   12         THE COURT:  I haven't heard you tell me the

09:10:32   13  evidence that proves that's a misimpression.  You've told

09:10:35   14  me there was a subpoena.  I mean, I could go ask U.S.

09:10:41   15  Attorney Avery how many investigations she did this month

09:10:45   16  in front of our grand juries in which people were

09:10:49   17  witnesses who were never going to get indicted, and not

09:10:52   18  even viewed as a close call.

09:10:54   19         So unless you have more than they were

09:10:59   20  subpoenaed, I don't know that that proves what you want

09:11:07   21  to counter it with or what you want to justify the

09:11:14   22  erasing of the testimony with.

09:11:15   23         I'm not disputing, sir, that we did have a

09:11:18   24  conversation and I remember it about the regulatory

09:11:21   25  agencies and there being a lot of -- there was back and

09:11:25   1    forth of disagreements.  And I think you are correct that

09:11:30   2    we probably ended with we aren't going to open that door

09:11:35   3    but, I mean, it's a deposition designation.  Did you

09:11:40   4    object to it and I overlooked it or made a mistake?

09:11:53   5          MR. KANG:  I don't know.

09:11:54   6          THE COURT:  I mean, obviously, I didn't remember

09:11:54   7    the conversation on day two of the eight days of

09:11:55   8    pretrial.  Otherwise, the answer didn't -- I don't know.

09:12:01   9    Maybe you also object to foundation.  Whatever.  I missed

09:12:07  10    it, I guess.  I don't know.

09:12:09  11          Could I hear from the Labs and then we'll move

09:12:13  12    on and I'm going to think I guess about it, but I would

09:12:17  13    like to hear the Labs side.

09:12:21  14          MR. HARE:  I think, your Honor, I'll echo the

09:12:21  15    Court's observations.  That was such a fleeting moment in

09:12:24  16    the testimony that it seems that any instruction would

09:12:26  17    just call further attention to it.

09:12:30  18          With respect to the propositioned second cure.

09:12:33  19    This is a cure worse than the disease because now we're

09:12:37  20    trading an innuendo, and the prejudice to the Labs with

09:12:43  21    respect to any mention of subpoenas or prosecution

09:12:51  22    investigations is obvious.

09:12:54  23          I think, though, that dispositive observation,

09:12:57  24    Your Honor, is that the parties jointly designated that

09:13:02  25    deposition.  Everyone had an opportunity to review,

998

| | | |
|---|---|---|
| 09:13:05 | 1 | object as appropriate.  That fleeting snippet got |
| 09:13:10 | 2 | through. |
| 09:13:10 | 3 | THE COURT:  Can somebody tell me the pages in |
| 09:13:12 | 4 | question so I can take a look at it in context.  I can |
| 09:13:17 | 5 | take a look at it designations and objections. |
| 09:13:21 | 6 | MR. KANG:  I believe it was page 200, lines 13 |
| 09:13:25 | 7 | through 16, if I am not mistaken, Your Honor. |
| 09:13:27 | 8 | THE COURT:  I will do that.  We have some other |
| 09:13:30 | 9 | things to cover.  I will come back to this either to rule |
| 09:13:32 | 10 | or to have more discussion. |
| 09:13:36 | 11 | MR. HARE:  Another reference point, Your Honor, |
| 09:13:39 | 12 | I think you will see those lines designated at document |
| 09:13:44 | 13 | number 417, page 4 of 10, which is the parties' line and |
| 09:13:50 | 14 | page designations from that deposition testimony. |
| 09:13:53 | 15 | THE COURT:  Thank you very much.  Make it |
| 09:13:55 | 16 | easier. |
| 09:13:57 | 17 | I'm just reminding you all, we did a charge |
| 09:14:02 | 18 | conference yesterday afternoon after the trial and there |
| 09:14:05 | 19 | were three things we were expecting, and maybe not this |
| 09:14:09 | 20 | morning, but it would have been nice.  We are expecting |
| 09:14:12 | 21 | it if you expect to get the final charge. |
| 09:14:15 | 22 | I believe Cigna was going to give us a string |
| 09:14:19 | 23 | cite on directly and primarily.  Yeah, that was the |
| 09:14:24 | 24 | phrase.  Right, Attorney Kingsbery? |
| 09:14:28 | 25 | Labs was going to give us something on their |

09:14:31  1   request for that language of usage of trade, something

09:14:33  2   like that.  And you were jointly going to strive to agree

09:14:39  3   on the statute of limitations.

09:14:40  4        My goal is to get you folks by Saturday a fairly

09:14:44  5   stable and fairly final charge identifying what I hope

09:14:48  6   will be less than five sections of parts that I'm still

09:14:52  7   thinking of working on.  I'm waiting to hear from you,

09:14:56  8   those kinds of things.  Those we can deal with Monday,

09:14:59  9   Tuesday before and after the trial.  It's manageable.  So

09:15:04  10  I will be getting, I'm hoping by Saturday, and I won't be

09:15:10  11  if I don't hear from you.  And it will only make the

09:15:13  12  number of open issues -- these are open issues.  I can

09:15:15  13  deal with them today and tomorrow or whenever I get your

09:15:19  14  suggestions.  So I appreciate it.

09:15:28  15       Also, do we have a resolution on the issue that

09:15:32  16  occupied us at sidebar and again at the conference.  I

09:15:35  17  think maybe, Attorney --

09:15:43  18       MR. KANG:  Is this about the patient records,

09:15:43  19  Your Honor?

09:15:43  20       THE COURT:  Attorney Kang.  Yes, the 20.

09:15:45  21       MR. KANG:  Yes, I can address that.

09:15:46  22       We have had a chance to do further review into

09:15:51  23  the documents, Your Honor.  And I think we -- and I let

09:15:53  24  Attorney Hare and counsel know about this last night.  We

09:15:56  25  are willing to stipulate.

| | | |
|---|---|---|
| 09:15:58 | 1 | THE COURT:  Great.  Is that going to be on the |
| 09:16:02 | 2 | record or just going to be a question?  I mean, how are |
| 09:16:07 | 3 | we going to make that record? |
| 09:16:10 | 4 | MR. HARE:  I think the jury should be notified |
| 09:16:12 | 5 | of that with an instruction because the challenge had |
| 09:16:18 | 6 | been raised.  But at a minimum, we need to have it in the |
| 09:16:22 | 7 | record that those are in fact -- |
| 09:16:22 | 8 | THE COURT:  There's no dispute that the 14 to 33 |
| 09:16:25 | 9 | are the 20 patient records that were in Canto's |
| 09:16:34 | 10 | possession as part of the investigation and forwarded on |
| 09:16:39 | 11 | to Dr. Nicoll.  That's a fair statement? |
| 09:16:41 | 12 | MR. KANG:  Yes.  That's fine. |
| 09:16:43 | 13 | THE COURT:  Is there objection to my just |
| 09:16:46 | 14 | telling them?  I mean, will it come up again, the 20 |
| 09:16:49 | 15 | records, or are you done in your case, Attorney Hare, do |
| 09:16:53 | 16 | you know? |
| 09:16:54 | 17 | MR. KANG:  It may, Your Honor.  So -- |
| 09:16:58 | 18 | THE COURT:  Well, I think I will wait a little |
| 09:17:01 | 19 | while and see if Exhibits 14 to 33 become a subject of a |
| 09:17:06 | 20 | question, and then I would do what I just said.  Because, |
| 09:17:10 | 21 | otherwise, they are not going to connect this, that what |
| 09:17:15 | 22 | I just said to yesterday and what was being asked, et |
| 09:17:19 | 23 | cetera. |
| 09:17:20 | 24 | MR. KANG:  What we can do, Your Honor, the |
| 09:17:22 | 25 | parties could craft some language. |

09:17:22  1         THE COURT:  That's fine.  If you do it that's

09:17:25  2    safer.  But I'm happy to do it.

09:17:27  3         MR. KANG:  Perhaps at the appropriate time Your

09:17:30  4    Honor might say, ladies and gentlemen, we read some

09:17:32  5    stipulations at the beginning of trial and he's another

09:17:36  6    one.

09:17:36  7         MR. HARE:  That would suffice for the Labs, Your

09:17:40  8    Honor.

09:17:41  9         THE COURT:  If it comes up before that, I think

09:17:43  10   I might just do it verbally.  Please don't be shy about

09:17:47  11   correcting me or if you want to make a stipulation, I

09:17:50  12   will just say it's going to be the subject of a

09:17:53  13   stipulation.  If you are not sure I will say it right, I

09:17:55  14   will say that after I say what I say and we can make the

09:18:00  15   stipulation control.  I don't care.  But I think it just

09:18:02  16   needs to be taken care of.

09:18:09  17         Apparently when someone, the clerk, came out

09:18:12  18   they over heard Attorney Kang mentioning to someone on

09:18:16  19   the Labs side something about four demonstratives.

09:18:21  20         MR. KANG:  Yes, Your Honor.  I was just sharing

09:18:21  21   it with Attorney Hare as well.  If Mr. Goldfarb takes the

09:18:27  22   stand today, and I'm not sure if he will.  It's possible

09:18:30  23   he may take the stand this afternoon.  There's four or

09:18:33  24   five demonstratives.  I was just about to send an email

09:18:37  25   to the Court as well as to opposing counsel on what they

| | | |
|---|---|---|
| 09:18:40 | 1 | are, fairly benign slides I will use with him. |
| 09:18:43 | 2 | THE COURT:  When were they disclosed to the |
| 09:18:47 | 3 | Labs? |
| 09:18:47 | 4 | MR. KANG:  They haven't been disclosed yet.  We |
| 09:18:50 | 5 | just came up with these last night. |
| 09:18:53 | 6 | THE COURT:  Isn't that somewhere in my -- |
| 09:18:53 | 7 | MR. KANG:  24 hour rule, yes, Your Honor. |
| 09:18:55 | 8 | THE COURT:  I guess when you disclose them you |
| 09:19:00 | 9 | can, I don't know, let the Clerk now and then I will know |
| 09:19:04 | 10 | when 24 hours expire.  Otherwise, if they object, they |
| 09:19:09 | 11 | haven't reviewed them, I will tell you to keep moving and |
| 09:19:13 | 12 | do something else. |
| 09:19:14 | 13 | MR. KANG:  Sure. |
| 09:19:14 | 14 | THE COURT:  Thank you. |
| 09:19:15 | 15 | I think I told you the story of where I got |
| 09:19:18 | 16 | blocked with a demonstrative towards the end of trial. |
| 09:19:21 | 17 | It's a painful subject probably 35 years later. |
| 09:19:30 | 18 | I have a few more minutes, yeah.  Dang it. |
| 09:19:59 | 19 | (Discussion Off the Record.) |
| 09:20:00 | 20 | THE COURT:  I had a question.  I know the issue |
| 09:20:04 | 21 | of fee forgiveness was one of his -- is that his or is |
| 09:20:10 | 22 | that Ms. Thelian?  That's Ms. Thelian, right? |
| 09:20:17 | 23 | MR. GESTRICH:  His opinions are related to fee |
| 09:20:19 | 24 | forgiveness, but he's not opining on fee forgiveness. |
| 09:20:23 | 25 | THE COURT:  Is there going to be a problem from |

| | | |
|---|---|---|
| 09:20:25 | 1 | Cigna on that? |
| 09:20:30 | 2 | MS. KINGSBERY:  My understanding from our |
| 09:20:32 | 3 | discussion yesterday was that Mr. Haney would not be |
| 09:20:35 | 4 | opining with respect to fee forgiving at least today in |
| 09:20:38 | 5 | the Labs' case-in-chief. |
| 09:20:39 | 6 | THE COURT:  He'll be called back? |
| 09:20:41 | 7 | MS. KINGSBERY:  But potentially there's an |
| 09:20:43 | 8 | outstanding question of whether he would during Cigna's |
| 09:20:47 | 9 | case. |
| 09:20:48 | 10 | MR. GESTRICH:  I'm sorry, Your Honor.  I did not |
| 09:20:48 | 11 | hear what you said. |
| 09:20:50 | 12 | THE COURT:  She responded to your comment that |
| 09:20:52 | 13 | he wouldn't give an opinion of fee forgiveness, but it |
| 09:20:55 | 14 | was involved in his opinion.  She said she had |
| 09:20:59 | 15 | understood, and that was true about Ms. Thelian, but she |
| 09:21:03 | 16 | understood it about Mr. Haney, that on the subject of fee |
| 09:21:07 | 17 | forgiveness, if the experts were opining on it, they |
| 09:21:12 | 18 | would come back later, a second time, and address it. |
| 09:21:15 | 19 | In order not to confuse the jury, we keep |
| 09:21:19 | 20 | telling them fee forgiveness isn't in your case.  I know |
| 09:21:22 | 21 | where everything is melded, but that I think was a bridge |
| 09:21:26 | 22 | too far to ask him to keep out of your case if all a |
| 09:21:28 | 23 | sudden you shift into it. |
| 09:21:32 | 24 | MR. GESTRICH:  Yes, Your Honor.  I can tell you |
| 09:21:35 | 25 | the questions that are related to that topic to be |

| | | |
|---|---|---|
| 09:21:39 | 1 | abundantly clear.  We're going to ask him to opine on the |
| 09:21:43 | 2 | statistical basis of Ms. Canto's -- |
| 09:21:59 | 3 | THE COURT:  Go ahead. |
| 09:21:59 | 4 | MR. GESTRICH: Your Honor, if I can pick up where |
| 09:22:30 | 5 | I left off yesterday.  I think what we agreed to is that |
| 09:22:34 | 6 | although Mr. Haney in his report assesses from the |
| 09:22:39 | 7 | standpoint of statistical validity and reliability, the |
| 09:22:43 | 8 | conditions that Cigna drew -- |
| 09:22:45 | 9 | THE COURT:  Which opinion?  Which of his |
| 09:22:47 | 10 | opinion?  All three or which one? |
| 09:22:51 | 11 | MR. HARE:  His first opinion. |
| 09:22:52 | 12 | THE COURT:  That's what I thought, but I just |
| 09:22:54 | 13 | like to be clear. |
| 09:22:55 | 14 | MR. HARE:  Obviously, at the time he wrote the |
| 09:22:56 | 15 | report that was relevant to both actions.  Now that fee |
| 09:23:01 | 16 | forgiving is out as a defense to our case, the |
| 09:23:06 | 17 | relevancy -- |
| 09:23:07 | 18 | THE COURT:  His part of the opinion that relates |
| 09:23:09 | 19 | to fee forgiveness is really responsive to Cigna's case? |
| 09:23:14 | 20 | MR. HARE:  Correct. |
| 09:23:15 | 21 | THE COURT:  So when are you offering that? |
| 09:23:19 | 22 | MR. HARE:  Well, the fee forgiving criticisms |
| 09:23:22 | 23 | would be when he returns. |
| 09:23:24 | 24 | THE COURT:  So he's returning.  There's no |
| 09:23:27 | 25 | problem then, right, Attorney Kingsbery? |

09:23:31   1          MS. KINGSBERY:  That was my understanding, that

09:23:33   2    fee forgiving would not be discussed today.

09:23:36   3          MR. HARE:  And he does opine with respect to the

09:23:39   4    statistical validity as to other flags as well that

09:23:43   5    remain part of our case.

09:23:44   6          THE COURT:  I would think he would be.

09:23:47   7          MR. HARE:  But we're not going to have him say

09:23:49   8    their fee forgiving flag was unfounded.

09:23:53   9          THE COURT:  That's going to be later.

09:23:56   10         Now, could you explain to me -- and I see is

09:23:59   11   that Mr. Haney sitting in the courtroom?  Yes.

09:24:04   12         Understand I know nothing about what your

09:24:06   13   specialty is, although I did write an opinion.  The date

09:24:09   14   is April 26, 2024.  No, I'm not asking you, sir.  You

09:24:14   15   actually should be out of the courtroom I think.  It's

09:24:16   16   not right.  I would think Cigna might be nervous about

09:24:21   17   that.  Rightly so.

09:24:22   18         This is the revised report that I'm holding if

09:24:24   19   it's got that date, right?

09:24:27   20         MR. GESTRICH:  Yes, Your Honor.

09:24:28   21         THE COURT:  I have to confess, I didn't reread

09:24:32   22   my entire ruling.  I looked at the conclusion so I could

09:24:35   23   maybe go and see whatever, what happened in the revised.

09:24:39   24   And I, of course, was trying to do it on the bench

09:24:43   25   yesterday during testimony.  So I'm not sure I

1006

09:24:45  1    understand.

09:24:45  2          So you are going to tell me.  I ruled as to his

09:24:49  3    report.  And I remember the objection vaguely from Cigna

09:24:53  4    about something with zeros in a column.  And I wrote

09:24:57  5    that -- I granted their motion to preclude as to the

09:25:02  6    first sentence of part A concerning estimated damages in

09:25:06  7    paragraph 75 and 77 of opinion 2.

09:25:09  8          Does this April 20 something report reflect

09:25:13  9    those revisions?  I assume it does.

09:25:17  10         MR. GESTRICH:  Yes, Your Honor.

09:25:21  11         THE COURT:  Tell me how he revised 75 and 77,

09:25:31  12   because we failed to pull out -- that was something I was

09:25:31  13   going to do last night and I forgot -- the original

09:25:32  14   report to contrast it with what the revision looks like.

09:25:36  15         MR. GESTRICH:  Yes, Your Honor.

09:25:36  16         If I may turn the Court's attention to paragraph

09:25:40  17   76.  In his previous opinion, he opined on the paid

09:25:48  18   amounts within that equation that you see in the middle

09:25:52  19   of paragraph 77.  It begins with paid amount.  Did I say

09:26:01  20   77?  I'm so sorry.  To keep the record clear, I'm looking

09:26:03  21   at 76 and I drew the Court's attention to the wrong

09:26:08  22   paragraph.

09:26:08  23         THE COURT:  That's fine.  I'm there.

09:26:11  24         MR. GESTRICH:  His previous opinion was directed

09:26:15  25   at this equation.

09:26:16    1          THE COURT:  The equation that yields this chart?
09:26:19    2   It's not an equation.
09:26:22    3          MR. GESTRICH:  So in the middle of paragraph 76,
09:26:28    4   there is a bracket with paid amount in it and then
09:26:33    5   follows with equals allowed amount.
09:26:35    6          THE COURT:  Paid amount equals.  I apologize.  I
09:26:38    7   see it.
09:26:41    8          MR. GESTRICH:  He previously opined on the paid
09:26:46    9   amount and reviewed the unpaid data from Cigna.
09:26:50   10          THE COURT:  Which is in 75, according to
09:26:54   11   Mr. Haney.
09:26:55   12          MR. GESTRICH:  I'm sorry?
09:26:57   13          THE COURT:  Is that in 75, the charged amount?
09:27:02   14   Well, whatever.  Go ahead.  Keep going.
09:27:05   15          MR. GESTRICH:  His data set previously relied on
09:27:08   16   the unpaid data.  In his updated opinion, he relied on
09:27:13   17   the paid clams from Cigna to create a payment ratio to
09:27:18   18   apply to the unpaid claims.  And so his previous data set
09:27:25   19   was directed at unpaid data.  This data set is directed
09:27:30   20   at paid data.
09:27:31   21          THE COURT:  I think I understand what you just
09:27:33   22   said.  Obviously, I will hear his testimony and the
09:27:37   23   cross.  Thank you very much.
09:27:42   24          The other thing was I said the correct -- I
09:27:44   25   granted it based on opinion A.  No, I'm sorry.  The first

09:27:55  1    sentence of part A.  I wasn't really able to follow the

09:27:58  2    table of.  Contents there's three A's.  So I don't know

09:28:02  3    what was amended.  Is it that opinion that 77 is in?  The

09:28:06  4    paragraph I mean.

09:28:18  5        MR. GESTRICH:  My apologies, Your Honor.  I'm

09:28:20  6    not following where you are looking.

09:28:22  7        THE COURT:  Alex, can you go back and read the

09:28:24  8    guts of my ruling so you would understand what that

09:28:27  9    references and the conclusion that I granted it so I can

09:28:31  10   look at that or understand where to look for the

09:28:34  11   reference to that.  Okay.  That's fine.  Thank you very

09:28:34  12   much.

09:28:34  13       Are they here?  Let's bring them out if they

09:28:39  14   are.

09:28:48  15       So you now owe me the three things from part 2

09:28:50  16   of the charge conference plus your closing argument

09:28:53  17   ideas.

09:28:54  18       I began working on jury verdict interrogatories.

09:28:57  19   We might get it to you Saturday.  I can't guarantee it.

09:29:04  20   But, hopefully, we'll get it out this weekend.

09:29:09  21       And there was objection on 1006, some Matt Ryan

09:29:17  22   exhibits.  That means there's summaries.  Where the

09:29:22  23   underlying documents disclosed to the defendants in

09:29:24  24   sufficient time for them to review them?  I can't tell

09:29:26  25   you what that is.  It could be 4,000 pages.  It could be

```
09:29:31   1    400,000.
09:29:32   2          When were they given the underlying data to see
09:29:35   3    if your table's right and have they said that it's not
09:29:37   4    right or is everything copasetic?
09:29:40   5          MS. KINGSBERY:  We've provided all of the data
09:29:43   6    to the Labs.
09:29:44   7          THE COURT:  When?  And have you heard from them?
09:29:46   8          MS. KINGSBERY:  The claims data would have been
09:29:49   9    produced years ago.
09:29:50  10          THE COURT:  No.  And that's every piece of
09:29:52  11    claims data is in your summary?
09:29:54  12          MS. KINGSBERY:  No, Your Honor.  Two pieces.
09:29:56  13    The claims data which was produced years ago in
09:29:59  14    discovery.  And then the other piece is Mr. Haney's own
09:30:05  15    appendices they would have provided.  Those are the two
09:30:09  16    pieces of data that went into Mr. Ryan's calculations.
09:30:12  17          THE COURT:  Okay.  But this says it's a document
09:30:14  18    that you are offering that's a summary.
09:30:16  19          MS. KINGSBERY:  We actually dispute that it's a
09:30:17  20    summary.  These are Mr. Ryan's own calculations.
09:30:23  21          THE COURT:  You won't be using it until we have
09:30:26  22    time to understand it.  Okay.
09:30:27  23          MS. KINGSBERY:  That's fine, Your Honor.  We'll
09:30:29  24    lay the foundation.
09:30:30  25          THE COURT:  Not in front of the jury you won't.
```

| | | |
|---|---|---|
| 09:30:37 | 1 | Has the document you intend to offer been shown |
| 09:30:41 | 2 | to the other side?  Is it disclosed on an exhibit list? |
| 09:30:45 | 3 | MS. KINGSBERY:  Yes, Your Honor, it's on our |
| 09:30:48 | 4 | exhibit list. |
| 09:30:51 | 5 | THE COURT:  All right.  Are we all here? |
| 09:30:55 | 6 | THE CLERK:  Yes. |
| 09:30:55 | 7 | THE COURT:  Bring them out.  We're late again. |
| 09:31:00 | 8 | And we can get Mr. Haney, please. |
| 09:31:31 | 9 | (In the presence of the jury at 9:31 a.m.) |
| 09:31:33 | 10 | THE COURT:  Good morning.  It's Thursday.  I |
| 09:31:35 | 11 | hope you all got a good rest. |
| 09:31:35 | 12 | And we're ready to begin with Mr. Haney, I |
| 09:31:39 | 13 | believe. |
| 09:31:39 | 14 | Sir, if you come back up here to the witness |
| 09:31:42 | 15 | stand.  This time you can sit right down.  I will remind |
| 09:31:46 | 16 | you, as I do of any witness that has the pleasure of |
| 09:31:49 | 17 | sleeping overnight in New Haven, that your oath that you |
| 09:31:53 | 18 | took yesterday binds your testimony today. |
| 09:31:56 | 19 | Thank you very much. |
| 09:31:56 | 20 | Any time you are that ready, Attorney Gestrich. |
| 09:32:05 | 21 | MR. GESTRICH:  Yes, Your Honor.  I would request |
| 09:32:06 | 22 | that I may be permitted to hand Mr. Haney a paper copy, a |
| 09:32:10 | 23 | clean paper copy of his expert report for reference. |
| 09:32:11 | 24 | THE COURT:  Sure.  Has it been marked for |
| 09:32:13 | 25 | identification?  I realized we didn't identify Ms. |

09:32:15   1    Thelian's that she had on the bench there, but we can do

09:32:19   2    that later.  You can hand it to him.

09:32:22   3         What he's doing is giving you a copy of your

09:32:30   4    report, sir.  But actually it's your testimony that

09:32:32   5    counts for the jury.  So it's only there in the event

09:32:35   6    he's talking about something in it and you want to be

09:32:38   7    sure you are recalling it.  I want to advise you that if

09:32:41   8    you do look at to refresh your recollection, you then

09:32:45   9    have to put it aside and testify from your on

09:32:48   10   recollection.  You can't just sit there and read it.

09:32:51   11        THE WITNESS:  I understand that.

09:32:52   12        THE COURT:  I mean out loud.  You can read it to

09:32:54   13   yourself.  Thank you.

09:32:55   14        Go ahead, Attorney Gestrich.

09:32:59   15             CHRISTOPHER HANEY

09:32:59   16         returned to the stand and testified further

09:32:59   17   upon his oath as follows:

09:32:59   18   CONTINUED DIRECT EXAMINATION BY MR. GESTRICH:

09:33:00   19     Q.   Yesterday we started talking about the general

09:33:03   20   topics of your testimony that we would offer today.  And

09:33:07   21   I believe whenever -- you understand that you would be

09:33:12   22   providing opinions relating to statistical sampling basis

09:33:16   23   for certain aspects of investigations and the damages for

09:33:22   24   the Labs' claims.

09:33:23   25        Is that a fair summary?

09:33:25   1      A.    Yes, that's correct.

09:33:32   2      Q.    What was your assignment in this case?

09:33:36   3      A.    In this case, I was asked to conduct two primary

09:33:39   4    tasks.  I was asked to look, first, at the investigation

09:33:46   5    conducted by Cigna in this case.  And that investigation

09:33:52   6    included numerous statistical samples when they looked at

09:33:57   7    specific labs to identify certain issues of their

09:33:59   8    investigation.  I was generally asked to look at those

09:34:02   9    investigations and evaluate them from a statistical

09:34:05  10    standpoint to determine if the conclusions that they

09:34:08  11    reached actually had a valid statistical basis to get to

09:34:12  12    the conclusions they got to.  That was the first task of

09:34:15  13    my assignment.

09:34:16  14          The second task was to evaluate financial

09:34:18  15    damages, if any, if claims were ultimately identified by

09:34:23  16    Ms. Thelian to be improperly denied.  In other words, if

09:34:26  17    they should have been paid, my assignment was to figure

09:34:30  18    out how much they should have been paid as it relates to

09:34:33  19    financial damages.

09:34:42  20      Q.    When you were preparing for your opinion

09:34:45  21    relating to the statistical sampling, what types of

09:34:47  22    documents did you rely upon?

09:34:52  23      A.    Well, I think there's probably two main types of

09:34:54  24    documents I deal with when I get a case like this.  The

09:34:58  25    first is really the same regardless of which case I'm

09:35:02  1   dealing with.  And that's based on my experience and my

09:35:05  2   education and training, there are a variety of manuals

09:35:08  3   out there that tell us how to do statistical sampling.

09:35:11  4   They guide us through it.

09:35:13  5        As you would imagine, statistical sampling is a

09:35:17  6   science.  There are a variety of textbooks that tell you

09:35:20  7   how to do that.  They're filled with theory and equations

09:35:22  8   and those kind of things.  I relied on textbooks.  I rely

09:35:27  9   on manuals that advise auditors how to perform sampling.

09:35:27  10  For example, the AICPA, it's an association for certified

09:35:32  11  public accountants, which I'm a member of, advises us and

09:35:37  12  provides a whole manual on how auditors should design and

09:35:41  13  develop sampling when they're doing their audits.  That's

09:35:45  14  another source that I rely on.

09:35:46  15       So I have a variety of publicly available

09:35:48  16  sources that I use.  That's what I use in every case.

09:35:51  17  That's not just specific to this.  But those are the

09:35:53  18  standards that I use to evaluate sampling.  So it's not

09:35:56  19  just Chris Haney's opinion.  It's those sources as well.

09:36:00  20        The second thing I look at is specific to this

09:36:03  21  case.  And the evaluation can vary from case to case.

09:36:08  22  But in this case, I looked at the documentation that

09:36:10  23  Cigna said supported their conclusion.  That was

09:36:12  24  ultimately my assignment, was to determine if their

09:36:16  25  conclusions were appropriate.  So I looked at their

09:36:20  1  documentation behind what those conclusions were.  That

09:36:22  2  included primarily, number one, we saw -- I think I call

09:36:28  3  them case notes or an investigative ledger from Cigna,

09:36:31  4  where they recorded everything they did in their

09:36:34  5  investigation.  I understood that they recorded

09:36:37  6  everything they did.  They told me step-by-step what all

09:36:40  7  the pieces of their investigation were.  So I could

09:36:43  8  evaluate those steps.  That was the primary source of

09:36:48  9  information that I used.  That's the record of what they

09:36:51  10  did.

09:36:51  11          I also evaluated deposition transcripts.  That's

09:36:54  12  the testimony from Ms. Canto as well as Ms. Anderson.  I

09:36:59  13  understood them to be -- Ms. Canto was the lead

09:37:02  14  investigator who performed the investigation.

09:37:04  15  Ms. Anderson was her supervisor.  They both provided

09:37:08  16  deposition testimony.  So I was able to read what they

09:37:12  17  testified to, explaining their notes and what they did.

09:37:15  18      Q.  Now, I'm going to ask you to help us understand

09:37:19  19  some of these concepts, but I understand you have a

09:37:22  20  background in teaching; is that correct?

09:37:25  21      A.  Yes, I do.

09:37:25  22      Q.  Can you just describe briefly that background?

09:37:29  23      A.  Sure.  I teach a variety of topics.  I teach

09:37:34  24  forensic accounting courses to graduate students at VCU,

09:37:39  25  Virginia Commonwealth University.  I'm also a lecturer at

09:37:42  1    the University of Virginia.  And I've been a lecturer in

09:37:46  2    the past at Virginia Tech.

09:37:48  3         These are courses focused on forensic accounting

09:37:52  4    generally, but specifically related to litigation

09:37:54  5    consulting.  The area where I focus my specialty.  I

09:37:58  6    advise them on conducting investigations, conducting

09:38:02  7    interviews, performing data analysis, and ultimately how

09:38:05  8    we prepare to do this, to prepare reports and analysis

09:38:09  9    that are ultimately used in court.  So that's one aspect

09:38:12  10   of my teaching background is forensic accounting to

09:38:17  11   students.

09:38:17  12        Another area where I teach is a trade

09:38:20  13   association.  I'm a member of a variety of trade

09:38:23  14   associations where I both write articles as well as speak

09:38:26  15   at conferences.  A common area there is related to

09:38:31  16   statistical sampling.  One of the trade groups we teach

09:38:34  17   to is the National Healthcare Antifraud Association,

09:38:37  18   which is largely made up of insurance companies and

09:38:37  19   government auditors.  And I teach them how to employ

09:38:45  20   statistical sampling when they are doing their audits.

09:38:47  21   How to do it right so that the answer is reliable.  So

09:38:50  22   that when they come to court their answers can be used as

09:38:53  23   evidence because they're valid.  They're reliable.

09:38:57  24   They're meaningful.

09:38:58  25        Q.   Can you briefly describe what is statistical

09:39:02  1   sampling?

09:39:03  2       A.   So when we use the word "sampling", and you will

09:39:08  3   hear me use that more than anything else, because it's

09:39:11  4   kind of easier to understand.   There's a variety of

09:39:16  5   definitions.   You might hear folks say terms like

09:39:17  6   statistically valid random sampling.   I will do my best

09:39:22  7   to keep it simple.   But, remember, this is a science

09:39:25  8   where people get degrees in this topic specifically, with

09:39:29  9   years of training, graduate, professional degrees.

09:39:32  10  There's a variety of textbooks behind what we talk about.

09:39:35  11  And there's a lot of technical detail behind it.   I'm

09:39:39  12  going to do my best not to get into any of that today

09:39:42  13  unless it's absolutely necessary for you to do your job.

09:39:45  14       When we talk about sampling today, we're going

09:39:48  15  to talk about the concepts first, and that is when you

09:39:50  16  are trying to understand something about a large

09:39:53  17  population.   In this case, we've got thousands of claims.

09:39:56  18  We want to know some information about those.   If you

09:39:59  19  look at every single claim individually, it takes a long

09:40:03  20  time.   It's difficult.   Just logistically, it takes a

09:40:07  21  long time to do that.

09:40:09  22       Ms. Thelian showed you lots of orders what it

09:40:11  23  takes to look at an individual claim.   Imagine doing that

09:40:15  24  thousands and thousands of times.   So rather than do

09:40:17  25  that, we look at a sample.   We look at a subset of that

| | | |
|---|---|---|
| 09:40:21 | 1 | population.  And we use that subset to learn something |
| 09:40:23 | 2 | about the population as a whole. |
| 09:40:25 | 3 | So that's what I'll talk about in this case.  An |
| 09:40:28 | 4 | example of that that a lot of people are most familiar |
| 09:40:30 | 5 | with is political polling.  We see that all the time in |
| 09:40:34 | 6 | the news lately.  That is an example of sampling. |
| 09:40:39 | 7 | Because what they're doing, they're trying to learn |
| 09:40:41 | 8 | information about a large population of voters.  But they |
| 09:40:44 | 9 | will not talk to every voter.  They talk to a sample of |
| 09:40:47 | 10 | them to try to figure out who they are going to vote for. |
| 09:40:50 | 11 | And through statistics, through statistical equations and |
| 09:40:52 | 12 | processes, they reach conclusions about those voters.  So |
| 09:40:57 | 13 | polling conceptually, political polling, is very similar |
| 09:40:58 | 14 | to what we're going to talk about in this case with |
| 09:41:00 | 15 | regard to looking at all of the thousands of Lab claims. |
| 09:41:03 | 16 | MR. GESTRICH: Can we pull up Exhibit 6987? |
| 09:41:03 | 17 | This is Labs Exhibit 6987.  I understand it does not have |
| 09:41:03 | 18 | an objection pending. |
| 09:41:03 | 19 | MS. KINGSBERY:  Your Honor, there's an objection |
| 09:41:03 | 20 | to this document based on discussion this morning. |
| 09:41:03 | 21 | There's aspects of it that weighs into the topic that |
| 09:41:03 | 22 | Mr. Haney, I understand, will not be testifying about |
| 09:41:03 | 23 | today. |
| 09:41:03 | 24 | THE COURT:  What's your objection?  There's none |
| 09:41:03 | 25 | registered in the chart.  It says no objection pending. |

09:41:03  1          MS. KINGSBERY:  Yes, Your Honor.  It relates to

09:41:03  2   recent ruling relating to what aspects of the case

09:41:03  3   Mr. Haney can testify about.

09:41:03  4          THE COURT:  But didn't we know about them when

09:41:03  5   the chart of exhibits was prepared?

09:41:03  6          MS. KINGSBERY:  We did not, Your Honor.

09:41:03  7          THE COURT:  No?  I didn't get the exhibit list

09:41:03  8   until after I made that ruling, I don't think.  That's

09:41:03  9   puzzling.  Could it be published at least to me?  Don't

09:41:03  10  publish to the jury.

09:41:03  11         THE CLERK:  Yes, there is an override.  There is

09:41:03  12  nothing on the screen.

09:41:03  13         THE COURT:  Somebody publish it.  It's your

09:41:03  14  exhibit.  It wasn't up a second ago.  Now it is up.

09:41:03  15         MR. GESTRICH:  It is 6987?

09:41:03  16         MS. KINGSBERY:  I'm sorry, Your Honor.  I

09:41:03  17  thought he said 6987.

09:41:03  18         THE COURT:  No.  6978 is what he's brought up.

09:41:03  19  I don't know if that's the right one.  You first said

09:41:03  20  6987.  Is that what you want?

09:41:03  21         MR. GESTRICH:  Yes, Your Honor.  That is what I

09:41:03  22  want.

09:41:03  23         THE COURT:  That showed no objections.  Are you

09:41:03  24  objecting to that?

09:41:03  25         MS. KINGSBERY:  Yes, Your Honor.

```
09:41:03   1          THE COURT:  Okay, what's wrong?
09:41:03   2          MS. KINGSBERY:  Not specifically what you are
09:41:03   3   looking at.  This document has several different
09:41:03   4   charts and tables embedded in it all combined and certain
09:41:03   5   of them, I can tell you specifically which ones, go into
09:41:03   6   great detail on a topic that Mr. Haney will not be
09:41:03   7   testifying about.
09:41:03   8          THE COURT:  Do you plan on using that if you
09:41:03   9   know what she's talking about?
09:41:03  10          MR. GESTRICH:  I believe she -- Attorney
09:41:03  11   Kingsbery may be referring to -- I'll give an example.
09:41:03  12   Page 8.  This is a timeline.
09:41:03  13          MS. KINGSBERY:  Table 2 actually is what I'm
09:41:03  14   referring to.
09:41:03  15          THE COURT:  Table 2 is what she is worried
09:41:03  16   about.  Can we see that?  Is it in their report?
09:41:03  17          MR. GESTRICH:  It is in the report, yes, Your
09:41:03  18   Honor.  Please show page 2.
09:41:03  19          THE COURT:  Is that what you are objecting to?
09:41:03  20          MS. KINGSBERY:  There's a few of them, Your
09:41:03  21   Honor.
09:41:03  22          MR. GESTRICH:  This I don't believe references
09:41:03  23   the topic.
09:41:03  24          THE COURT:  Doesn't reference the words.
09:41:03  25          MR GESTRICH:  I'm not going to ask him about --
```

1020

| | | |
|---|---|---|
| 09:41:03 | 1 | THE COURT:  You are asking him about the |
| 09:41:03 | 2 | statistical approach? |
| 09:41:03 | 3 | MR. GESTRICH:  Yes, merely the statistical |
| 09:41:03 | 4 | approach. |
| 09:41:03 | 5 | THE COURT:  And the phrase we have discussed |
| 09:41:03 | 6 | will not come out. |
| 09:41:03 | 7 | MR. GESTRICH:  It will not appear on that one. |
| 09:41:03 | 8 | MS. KINGSBERY:  It is on the very next one. |
| 09:41:03 | 9 | THE COURT:  We'll see each one before he |
| 09:41:03 | 10 | publishes it.  I don't know if he's going to use the next |
| 09:41:03 | 11 | one.  If you don't use it we'll have to figure out a way |
| 09:41:03 | 12 | to mark the ones that were published as full exhibits and |
| 09:41:03 | 13 | the ones you do not use and this exhibit are not. |
| 09:41:03 | 14 | MR. GESTRICH:  Yes, Your Honor. |
| 09:41:03 | 15 | THE COURT:  Let's start with what he wants |
| 09:41:03 | 16 | because it doesn't seem to have the issue you are |
| 09:41:03 | 17 | concerned about, Attorney Kingsbery.  Put up the page you |
| 09:41:03 | 18 | wanted to start with, I think that's not the one that's |
| 09:41:03 | 19 | up. |
| 09:41:03 | 20 | MR. GESTRICH:  No, it's not, Your Honor.  Thank |
| 09:41:03 | 21 | you. |
| 09:41:03 | 22 | Can you turn to page 9? |
| 09:41:03 | 23 | Your Honor, may this page be published to the |
| 09:41:03 | 24 | jury so they can see this? |
| 09:41:03 | 25 | THE COURT:  Yes, it may. |

BY MR. GESTRICH:

Q.   Mr. Haney, can you give a broad overview of what this document is?

A.   Sure.  This is a chart that simplifies the process of sampling.  If you remember just a minute ago we talked about the concept the sampling that most of us encounter, and conceptually most of us understand.  But the devil is in the details.  Doing it properly take a lot of effort.  Each one of these steps requires a great level of detail and attention to detail to make sure they're done properly.  The purpose of this chart is to give you a high level listing of the steps required to do sampling.  There's eight circles here.  Those are the eight steps in the process of sampling an extrapolation. I will not go through each individually.  You can see these eight steps are broken up into two groups.

First there is planning and designing which are the four on the left.  Then there's execution and interpretation on the right.  Planning is before we do any work.  Before we draw a sample, we have to think about what we're doing.  What we're trying to accomplish. What is the necessary methodology to actually accomplish that.  A lot of work goes into that before we actually draw a sample and go talk to, in the case of a poll, go talk to a potential voter or in this case, go look at a

09:41:03  1    particular claim.

09:41:03  2         The second set of four steps are related to the

09:41:03  3    execution.  How do we actually do it?  How do we draw

09:41:03  4    the sample?  How do we choose which voters we want to

09:41:03  5    talk to are and what claims we want to look at.  That's

09:41:03  6    the execution and the implementation actually

09:41:03  7    interpreting the results.

09:41:03  8         Let me give you some examples of some of the

09:41:03  9    detail involved in each of these steps.  You will see the

09:41:03  10   fourth circle is determining the sample size.  How big of

09:41:03  11   a sample do we want to look at?  Now conceptually that

09:41:03  12   makes sense.  When you think about a poll the number of

09:41:03  13   people we talk to is going to matter.  The same thing in

09:41:03  14   this case.  The number of lab results we look at will

09:41:03  15   matter.  We're talking about thousands of charts,

09:41:03  16   thousands of claims that we're trying to learn something

09:41:03  17   about.  We want to make sure and look at enough of them

09:41:03  18   to have a meaningful result.  There are lots of

09:41:03  19   equations, lots of considerations.  There are chapters of

09:41:03  20   textbooks written specifically on this topic.  So I've

09:41:03  21   summarized it here the chart so you can see the main

09:41:03  22   steps.  Just know there's a lot of details that, you

09:41:03  23   know, go into getting this step exactly right.

09:41:03  24        Same thing for the fifth circle selecting the

09:41:03  25   sample.  Say we choose a sample size of 500.  We want to

09:41:03  1    talk to 500 voters.  How do we chose them?  Do we walk

09:41:03  2    out of the courthouse door and talk to the first 500

09:41:03  3    people we meet?  That may not be an appropriate

09:41:03  4    representation of all of the voters in the state of

09:41:03  5    Connecticut.  So we have to think about how are we going

09:41:03  6    to do it.  Generally you'll hear me use the term "random"

09:41:03  7    as to how to best select your sample.  Again there's a

09:41:03  8    variety of a technical considerations on how to do this

09:41:03  9    properly.  Devil is in the details but for the purpose of

09:41:03  10   understanding the high level steps of a sampling, I think

09:41:03  11   this chart is a good representation.  These are the main

09:41:03  12   eight steps you want to perform to get it right.

09:41:03  13           MR. GESTRICH:  I would ask that the next slide

09:41:03  14   not be published so is that we can determine.

09:41:03  15           THE COURT:  Go ahead.

09:41:03  16           MR. GESTRICH:  Can you turn to page 8?

09:41:03  17           THE COURT:  I see --

09:41:03  18           MR. GESTRICH:  I'm sorry, page 8.

09:41:03  19           THE COURT:  So I would suspect that there's two

09:41:03  20   dates, one above the line one below that you would object

09:41:03  21   to.  Is that what your concern was before?

09:41:03  22           MS. KINGSBERY:  Yes, Your Honor.

09:41:03  23           THE COURT:  How are we going to deal with that,

09:41:03  24   Attorney Gestrich?

09:41:03  25           MR. GESTRICH:  I'm not asking him to opine on

| | | |
|---|---|---|
| 09:41:03 | 1 | the validity of the action on those two dates, but merely |
| 09:41:03 | 2 | to understand the context of the sampling in what |
| 09:41:03 | 3 | occurred after the sampling was completed. |
| 09:41:03 | 4 | THE COURT:  So you are offering it to serve as |
| 09:41:03 | 5 | evidence of -- I'm not saying it is accurate, but |
| 09:41:03 | 6 | evidence that you think is accurate of when Cigna did or |
| 09:41:03 | 7 | focused on something verses another topic. |
| 09:41:03 | 8 | MR. GESTRICH:  Yes.  This would be a summary of |
| 09:41:03 | 9 | the ledgers that Ms. Canto -- I believe one or both may |
| 09:41:03 | 10 | already be in evidence. |
| 09:41:03 | 11 | THE COURT:  I'm going to overrule the objection. |
| 09:41:03 | 12 | I think I will remind the jury, remember I used the |
| 09:41:03 | 13 | phrase "fee forgiveness?"  I've talked to you a couple of |
| 09:41:03 | 14 | times that it's not relevant in the Labs' case where they |
| 09:41:03 | 15 | are trying to recover money.  You will see that on this |
| 09:41:03 | 16 | exhibit but he's not going to talk about that.  He's |
| 09:41:03 | 17 | putting a flag on a date when he understood something was |
| 09:41:03 | 18 | done by Cigna.  Of course that is subject to |
| 09:41:03 | 19 | cross-examination. |
| 09:41:03 | 20 | I think that's what this is offered for.  Have I |
| 09:41:03 | 21 | stated that correctly?  Tell me.  If not I will have to |
| 09:41:03 | 22 | fix it. |
| 09:41:03 | 23 | MR. GESTRICH:  No.  You stated it better than I |
| 09:41:03 | 24 | could. |
| 09:41:03 | 25 | THE COURT:  Go ahead. |

09:41:03  1    BY MR. GESTRICH:

09:41:03  2        Q.    Mr. Haney, do you recognize this document?

09:41:03  3        A.    I do.  I created this chart.

09:41:03  4              THE COURT:  So we're sure, this is page 8 of

09:41:03  5    this Exhibit 6987.

09:41:03  6        BY MR. GESTRICH:

09:41:03  7        Q.    What is this document, just generally?

09:41:03  8        A.    This is a factual summary of a timeline of

09:41:03  9    certain events in Cigna's investigation as I understand

09:41:03  10   them.

09:41:03  11       Q.    And what documents -- what documents is this

09:41:03  12   document based on?

09:41:03  13       A.    So this is a summary of my findings after

09:41:03  14   reviewing Cigna's case notes their investigation ledger.

09:41:03  15   They walked through all the steps they performed for

09:41:03  16   years, in some cases a great level of detail.  This chart

09:41:03  17   is simply meant to summarize those notes as it relates to

09:41:03  18   the samples that were relevant for my analysis.  I also

09:41:03  19   looked at the deposition testimonies, as I mentioned

09:41:03  20   before, of Ms. Canto and Ms. Anderson to inform that, but

09:41:03  21   the primary basis was the Cigna notes, case notes, of

09:41:03  22   that investigation.

09:41:03  23       Q.    I am going to call out -- it's beneath the

09:41:03  24   second dot -- PBL sample of ten.  What's a sample of ten?

09:41:03  25       A.    So there were several samples that were analyzed

09:41:03  1    by Cigna in their investigative notes.  What that means

09:41:03  2    when I look at it is there were several types of a

09:41:03  3    investigative steps taken.  They wanted to answer several

09:41:03  4    questions.  They didn't just take one sample to answer

09:41:03  5    everything.  They took several samples.  In some cases

09:41:03  6    different samples from different labs.  So for the

09:41:03  7    purposes of my analysis I wanted to talk about each of

09:41:03  8    those individually.  You will see the way I've -- and

09:41:03  9    this is nomenclature.  I've called these samples names,

09:41:03  10   just so we can talk about them.  For example, the first

09:41:03  11   one that is highlighted is the sample of ten.  It is the

09:41:03  12   sample of ten medical records that I understand Dr.

09:41:03  13   Nicoll testified that he reviewed, Ms. Thelian testified

09:41:03  14   she reviewed, these are the ten charts related to that

09:41:03  15   sample that Cigna used part of their investigation, so I

09:41:03  16   call them the sample of ten.  You may see other samples,

09:41:03  17   the sample of eight or the sample of 17.  That just the

09:41:03  18   nomenclature that I've applied so we can talk about them

09:41:03  19   individually if we need to.

09:41:03  20        Q.   That would follow with the other samples on

09:41:03  21   there, PBL sample of eight refers to a sample of eight

09:41:03  22   patients; is that correct?

09:41:03  23        A.   Yes, that's correct.

09:41:03  24        Q.   PPL sample of 17 refers to a sample of 17?

09:41:03  25        A.   That's correct.

09:41:03  1     Q.   PBL sample of 15 refers to a sample of 15 -- I'm

09:41:03  2  sorry, BioHealth sample of 15 refers to a sample of 15

09:41:03  3  patients?

09:41:03  4     A.   That's correct.

09:41:03  5     Q.   Below that is BioHealth survey of 108.  What is

09:41:03  6  the difference between usage of sample and survey in that

09:41:03  7  area?  And if you need to refer to your report.

09:41:03  8     A.   I do for just a moment.  As I recall, when we

09:41:03  9  reviewed the case notes related to this specific line of

09:41:03 10  the investigation, Cigna looked at 108 different patients

09:41:03 11  as part of their investigation and there was some

09:41:03 12  question as to whether that 108 was actually a sample.

09:41:03 13  If the total population has 108 patients and they look at

09:41:03 14  all 108, we're not talking about sampling anymore.  They

09:41:03 15  looked at everything.  There was some confusion in those

09:41:03 16  case notes.  There's some -- I was unclear whether Cigna

09:41:03 17  actually performed a sample of 108 or whether the total

09:41:03 18  population was 108 so I made the distinction of

09:41:03 19  calling it a survey here instead of a sample.

09:41:03 20     Q.   The chart with this timeline also includes what

09:41:03 21  appears to be flags.  Is that accurate?

09:41:03 22     A.   Yes.

09:41:03 23     Q.   What's your understanding of a flag?

09:41:03 24     A.   My understanding of the term "flag" in this

09:41:03 25  context is flags were applied to certain of the Labs by

09:41:03  1    Cigna in response to their investigative findings.  If

09:41:03  2    they found certain conclusions that a flag was deemed to

09:41:03  3    be necessary, they could flag the claims for that lab

09:41:03  4    going forward.  In other words, that lab wouldn't be paid

09:41:03  5    or some other activity based that placed on a flag going

09:41:03  6    forward.

09:41:03  7         As I understand it, these flags are all the

09:41:03  8    result of the investigative findings from each of the

09:41:03  9    samples.

09:41:03  10        Q.  I call your attention to the top, it's September

09:41:03  11   2013.  It says, PBL flagged.  We'll ignore the rest.

09:41:03  12   December, 2014 it says,  PBL flagged.  I will ignore the

09:41:03  13   rest.  And May, 2015 BioHealth flagged.  We'll ignore the

09:41:03  14   rest.  Just generally what is your understanding of what

09:41:03  15   happened when those flags were placed on those labs?

09:41:03  16        A.  So my understanding of when those flags were

09:41:03  17   placed from that point forward until the flags were

09:41:03  18   removed or modified the Labs did not receive

09:41:03  19   reimbursement for whatever respective reason the flag was

09:41:03  20   applied for.

09:41:03  21        Q.  Before those flags are placed on your chart,

09:41:03  22   there is a line before each of those that calls out, for

09:41:03  23   example, for the September 2013 flag its preceded by the

09:41:03  24   PBL sample of ten, then the 2014 flag two samples, the

09:41:03  25   2015 flag two samples.  Why are they placed the way they

09:41:03  1    are placed?

09:41:03  2        A.   They are related to each other.  This is not my

09:41:03  3    opinion.  This is a summary of my factual reading of the

09:41:03  4    record.  Ms. Canto testified in her deposition that the

09:41:03  5    flags that were applied and described here, were the

09:41:03  6    results of the samples performed in Cigna's

09:41:03  7    investigation.  Practically speaking, they performed

09:41:03  8    their investigation, looked at a sample of claim, reached

09:41:03  9    some conclusions based on that sample and if necessary,

09:41:03  10   applied the flag.  These are the cases where a flag was

09:41:03  11   applied as a result of samples being reviewed.

09:41:03  12       Q.   Did you review each of the samples that are

09:41:03  13   listed on this chart?

09:41:03  14       A.   I did.  To the extent the data was provided, I

09:41:03  15   did.

09:41:03  16       Q.   Did you come to a conclusion, for example, the

09:41:03  17   PBL sample of ten.  This is just a yes or no.  Did you

09:41:03  18   come to a conclusion about that?

09:41:03  19       A.   I did.

09:41:03  20       Q.   Did you come to a conclusion about the others on

09:41:03  21   the timeline?

09:41:03  22       A.   I did.

09:41:03  23       Q.   Is your conclusion for those the same?

09:41:03  24       A.   Yes.

09:41:03  25       Q.   What was your conclusion as to each of those

```
09:41:03   1    samples?
09:41:03   2        A.   So of all of the samples that I looked at that
09:41:03   3    are described here, I found, I will give you my general
09:41:03   4    conclusion first then give you some detail behind it, but
09:41:03   5    generally those samples are meaningless for inferring
09:41:03   6    something about a larger population.  They were not
09:41:03   7    conducted with the scientific method.  They did not
09:41:03   8    follow the necessary processes to perform a sample
09:41:03   9    correctly.  And as a result, the conclusions that came
09:41:03  10    out of them aren't reliable.  They aren't valid.  They
09:41:03  11    can't be used to talk about the population as a whole.
09:41:03  12    Those were my general conclusions.
09:41:03  13         There were four main reasons, lots of minor
09:41:03  14    reasons, but four main reasons that I want to talk
09:41:03  15    through.  Number one, none of them had sufficient
09:41:03  16    documentation to even support what was done.  This goes
09:41:03  17    back to kind of what we all learn in third grade, you
09:41:03  18    have to show your work.  When you are doing math -- this
09:41:03  19    is science -- when you are doing math, and this is
09:41:03  20    statistical sampling you have to document.  You have to
09:41:03  21    explain how you did what you did so someone else can walk
09:41:03  22    behind you and follow in your footsteps and check your
09:41:03  23    work.  That wasn't done for all of these samples.  In my
09:41:03  24    experience samples are found to be invalid on that reason
09:41:03  25    alone.  They weren't documented sufficiently to
```

09:41:03  1    understand what they did.

09:41:03  2        Nonetheless, I still reviewed what they did to

09:41:03  3    the extent they were provided to me.  The next fatal flaw

09:41:03  4    that I found, the sample sizes for all of these samples

09:41:03  5    were undersize.  Look at some of these sample sizes ten,

09:41:03  6    eight.  Just on an intuitive level, those sample sizes

09:41:03  7    are incredibly small to be inferring things about

09:41:03  8    thousands of other claims.  There's also technical

09:41:03  9    reasons.  When we talk about sample size, we'll talk

09:41:03  10   about the minimum required.  At the minimum you have to

09:41:03  11   have at least 30 or 50 claims before you can apply some

09:41:03  12   of these equations and statistics.  A sample of eight is

09:41:03  13   fatally flawed.  It is too small to do something

09:41:03  14   meaningful with.  Another is how those samples were

09:41:03  15   selected.  They have to be selected randomly.  You can't

09:41:03  16   haphazardly select them.  You can't cherry pick them.

09:41:03  17   There was no description in Ms. Canto's testimony on how

09:41:03  18   these samples were selected.  She didn't apply any

09:41:03  19   methodology for any of them.  And it couldn't be

09:41:03  20   described -- they were not randomly selected.

09:41:03  21        And then the last thing is how the results

09:41:03  22   were actually reached.  How they were extrapolated is

09:41:03  23   this statistical thing.  There was no method.  Ms. Canto

09:41:03  24   couldn't describe any statistical equations that she used

09:41:03  25   on any methodology.  That is if you go back to our step

09:41:03  1    eight, eight steps required to do sampling, extrapolating

09:41:03  2    the results correctly is a big one.  There was no

09:41:03  3    evidence that was done properly, no evidence of the

09:41:03  4    appropriate statistical equations, no evidence that there

09:41:03  5    was any science brought to bear on any of these samples.

09:41:03  6    So my conclusions ultimately were just that all of these

09:41:03  7    samples were invalid for supporting conclusions that they

09:41:03  8    led to.

09:41:03  9        Q.   I would like to turn to -- and this is not a

09:41:03  10   published page.  I would like to turn to page 6 of this

09:41:03  11   exhibit.  Exhibit -- Labs' Exhibit 6987.

09:41:03  12            THE COURT:  I'll just tell the jury to ask me.

09:41:03  13   If he ever says it's not published or something like and

09:41:03  14   it comes up on your screen, before you read somebody look

09:41:03  15   at me and say, "Judge, there's a problem."  Thank you.

09:41:03  16            Thanks very much, sorry to interrupt, sir.  This

09:41:03  17   is 6 but it is for ID basically.

09:41:03  18            MR. GESTRICH:  We would like this to be

09:41:03  19   published.

09:41:03  20            THE COURT:  Is there objection?

09:41:03  21            MS. KINGSBERY:  Yes, Your Honor.  This goes to

09:41:03  22   the heart of the subject that Mr. Haney is not going to

09:41:03  23   be testifying about.

09:41:03  24            THE COURT:  I think when we were first arguing,

09:41:03  25   the representation was there would be no questions about

09:41:03  1    that subject.  He was going to talk about that it from a

09:41:03  2    statistical basis.  The subject isn't identified.  I

09:41:03  3    don't know what the harm is.

09:41:03  4         MS. KINGSBERY:  This is the subject.  The

09:41:03  5    content of this table goes to what exactly the subject is

09:41:03  6    that he's not supposed to be talking about.  This doesn't

09:41:03  7    discuss statistics at all.  It's really the facts of it.

09:41:03  8         MR. GESTRICH:  Your Honor, this would not be

09:41:03  9    called out except for representations that were just made

09:41:03  10   of what this relates to.  My questions on this table are

09:41:03  11   merely to give an understanding of what the statistical

09:41:03  12   basis is for this.  I did not make that representation

09:41:03  13   and Mr. Haney did not make that representation.  That was

09:41:03  14   just made --

09:41:03  15        THE COURT:  What representation?  What it is

09:41:03  16   about?

09:41:03  17        MR. GESTRICH:  Yes.

09:41:03  18        MS. KINGSBERY:  These are the facts that Ms.

09:41:03  19   Canto was precluded from testifying about during her

09:41:03  20   direct examination.

09:41:03  21        THE COURT:  Can't it serve as an example for

09:41:03  22   this expert or a basis for his opinion about what he just

09:41:03  23   gave?

09:41:03  24        MS. KINGSBERY:  It is not an example.  This is

09:41:03  25   it.  These are the facts that Ms. Canto was not allowed

| | | |
|---|---|---|
| 09:41:03 | 1 | to testify about. |
| 09:41:03 | 2 | MR. GESTRICH:  Again, Your Honor, this goes |
| 09:41:03 | 3 | to -- |
| 09:41:03 | 4 | THE COURT:  Keep going.  We'll come back to it |
| 09:41:03 | 5 | at break. |
| 09:41:03 | 6 | MR. GESTRICH:  Yes, Your Honor. |
| 09:41:03 | 7 | THE COURT:  Make a note to yourself that I have |
| 09:41:03 | 8 | it address it.  Sorry.  Page 8 -- page 6.  Break.  Okay. |
| 09:41:03 | 9 | MR. GESTRICH:  Your Honor, I'm just asking for |
| 09:41:03 | 10 | guidance.  May I ask questions about this? |
| 09:41:03 | 11 | THE COURT:  Yes, as long as you don't read from |
| 09:41:03 | 12 | the record but as to what it means to him, you can ask |
| 09:41:03 | 13 | from that. |
| 09:41:03 | 14 | MR. GESTRICH:  Yes, Your Honor. |
| 09:41:03 | 15 | THE COURT:  Absolutely.  And then maybe we will |
| 09:41:03 | 16 | see if it is admissible. |
| 09:41:03 | 17 | MR. GESTRICH:  Yes, Your Honor. |
| 09:41:03 | 18 | BY MR. GESTRICH: |
| 09:41:03 | 19 | Q.   Mr. Haney, what is this document? |
| 09:41:03 | 20 | A.   This is a summary of one of Cigna's samples. |
| 09:41:03 | 21 | We're looking at a summary of a sample of eight.  These |
| 09:41:03 | 22 | are eight patients, and this is a line item summary of |
| 09:41:03 | 23 | each of patients and what Cigna found about each of the |
| 09:41:03 | 24 | eight. |
| 09:41:03 | 25 | Q.   How many patients are listed on this chart? |

09:41:03  1       A.    There are eight.

09:41:03  2       Q.    And you concluded and stated in the timeline

09:41:03  3  that you concluded this was an invalid sample?

09:41:03  4       A.    Correct.

09:41:03  5       Q.    Is there anything about this that strikes you as

09:41:03  6  -- that stands out to you?

09:41:03  7       A.    There were several thing that jump out by

09:41:03  8  looking at the listing of the results.  The first thing

09:41:03  9  that jumps out to me is there are only eight patients on

09:41:03  10  it.  We talked about the importance of sample size

09:41:03  11  before.  When you see it in this chart it is a visual

09:41:03  12  listing of eight patients. We are talking about thousands

09:41:03  13  of claims that these eight patients were used as a basis

09:41:03  14  to flag the Labs for.  Statistically that is not a valid

09:41:03  15  approach.  Sample size matters.  You have to have a

09:41:03  16  sufficient sample size for those equations to be

09:41:03  17  applicable.  Those equations don't work for a sample size

09:41:03  18  of eight.  So just visually, if I don't read anything on

09:41:03  19  that chart, I know by looking about that sample is not

09:41:03  20  going to be adequate.  The sample size is simply too

09:41:03  21  small.  And when you see it listed out as only eight, you

09:41:03  22  know that.  The example of the election poll is helpful

09:41:03  23  here.  If we went outside and talked to eight people

09:41:03  24  about who they were going to vote for and extrapolated

09:41:03  25  their results they wouldn't be meaningful.  We wouldn't

1036

| | | |
|---|---|---|
| 09:41:03 | 1 | want to trust that.  A sample size of eight is just not |
| 09:41:03 | 2 | applicable. |
| 09:41:03 | 3 | Q.   Are there results for all eight? |
| 09:41:03 | 4 | A.   There are results listed on this table.  From a |
| 09:41:03 | 5 | statistical perspective what I think is important to |
| 09:41:03 | 6 | understand is many of the results reflected here are what |
| 09:41:03 | 7 | we call nonresponder.  In other words, when Cigna |
| 09:41:03 | 8 | investigated the individual claim, they didn't get an |
| 09:41:03 | 9 | answer to the question they were trying to ask.  It's |
| 09:41:03 | 10 | non-response.  In statistical terms we call that |
| 09:41:03 | 11 | nonresponse bias and that comes up commonly when we talk |
| 09:41:03 | 12 | about polls.  If we want to call 500 potential voters and |
| 09:41:03 | 13 | ask them who they are going to vote for but only ten of |
| 09:41:03 | 14 | them pick up the phone.  The rest of them don't.  We |
| 09:41:03 | 15 | don't reach them.  They don't call back.  We only got the |
| 09:41:03 | 16 | people that wanted to talk to us.  That's bias. |
| 09:41:03 | 17 | Typically when we talk about statistics, the folks that |
| 09:41:03 | 18 | want to call us back all may have a predisposed opinion. |
| 09:41:03 | 19 | They may have a strong opinion about who they were going |
| 09:41:03 | 20 | to go to vote for.  Response bias is something that can |
| 09:41:03 | 21 | manipulate and cause a sample to be invalid.  In this |
| 09:41:03 | 22 | case there's a variety of nonresponses in the result of |
| 09:41:03 | 23 | these claims.  Out of eight claims listed here, 2, 3, 4, |
| 09:41:03 | 24 | 5 of them indicate there's no response.  To me that |
| 09:41:03 | 25 | indicates response bias and when I looked at the analysis |

| | | |
|---|---|---|
| 09:41:03 | 1 | provided by Cigna there was nothing done to deal with |
| 09:41:03 | 2 | that.  Nothing done to address it.  Nothing done to cure |
| 09:41:03 | 3 | it, even if a sample size of eight was big enough which |
| 09:41:03 | 4 | it isn't, this nonresponse bias issue is significant. |
| 09:41:03 | 5 | Q.   This is related to the election example you gave |
| 09:41:03 | 6 | earlier; is that right.  Just conceptually? |
| 09:41:03 | 7 | A.   Correct.  When we think about nonresponse bias |
| 09:41:03 | 8 | it happens commonly in polls where people have to |
| 09:41:03 | 9 | respond.  You get to chose to respond to a survey or a |
| 09:41:03 | 10 | poll.  Imagine how many surveys you might get in your |
| 09:41:03 | 11 | junk mail inbox.  How many do you respond to?  Yelp |
| 09:41:03 | 12 | reviews are a similar concept in that people that put |
| 09:41:03 | 13 | Yelp reviews are people that want to.  That's why you see |
| 09:41:03 | 14 | a lot of one star and a lot of five star Yelp reviews. |
| 09:41:03 | 15 | They have strong opinions.  This is a similar concept. |
| 09:41:03 | 16 | MR. GESTRICH:  Your Honor, that concludes on |
| 09:41:03 | 17 | this document, this page.  My questions on this given the |
| 09:41:03 | 18 | dialogue is it acceptable for the jury to see this page? |
| 09:41:03 | 19 | MS. KINGSBERY:  We object.  There's no factual |
| 09:41:03 | 20 | foundation about this because no witness testified about |
| 09:41:03 | 21 | this because they were precluded from doing so. |
| 09:41:03 | 22 | MR. GESTRICH:  This is a summary of Ms. Canto's |
| 09:41:03 | 23 | ledger. |
| 09:41:03 | 24 | THE COURT:  You can move it after the break.  I |
| 09:41:03 | 25 | don't understand the objection.  I will have it explained |

1038

| | | |
|---|---|---|
| 09:41:03 | 1 | to me then.  I'm sorry. I can't rule right now. |
| 09:41:03 | 2 | MR. GESTRICH:  Thank you, Your Honor. |
| 09:41:03 | 3 | I understand we'll have the same objections.  I |
| 09:41:03 | 4 | would say ask page 2 to be shown to Mr. Haney and the |
| 09:41:03 | 5 | Court alone.  I understand we can deal with this on the |
| 09:41:03 | 6 | break as well. |
| 09:41:03 | 7 | THE COURT:  Yes.  Thank you very much. |
| 09:41:03 | 8 | BY MR. GESTRICH: |
| 09:41:03 | 9 | Q.   Mr. Haney, do you recognize this document? |
| 09:41:03 | 10 | A.   Yes.  I prepared the chart. |
| 09:41:03 | 11 | Q.   What is this? |
| 09:41:03 | 12 | A.   This is similar to the last summary that we |
| 09:41:03 | 13 | looked at.  It is a summary of a different sample.  This |
| 09:41:03 | 14 | is the sample of 15, the sample of 15 patients.  Again |
| 09:41:03 | 15 | this is an itemized listing of all of those patients as |
| 09:41:03 | 16 | well as what Cigna result of their investigative efforts |
| 09:41:03 | 17 | were. |
| 09:41:03 | 18 | Q.   Looking at this chart there are essential two |
| 09:41:03 | 19 | types of results; is that correct? |
| 09:41:03 | 20 | A.   That's correct, yes. |
| 09:41:03 | 21 | Q.   Either responses or nonresponses? |
| 09:41:03 | 22 | A.   Correct. |
| 09:41:03 | 23 | Q.   And do you know -- just like one or two words -- |
| 09:41:03 | 24 | do you know what these were responses to? |
| 09:41:03 | 25 | A.   I believe phone calls. |

1039

09:41:03  1    Q.    Yes.   Okay.   Out of those 15 results how many

09:41:03  2  have any type of a response?

09:41:03  3    A.    Very few of them.   Let me count here.   Eleven of

09:41:03  4  15 have no response at all.   Eleven of the 15 have no

09:41:03  5  response.

09:41:03  6    Q.    This was based on the -- Ms. Canto ledger; is

09:41:03  7  that correct?

09:41:03  8    A.    That's correct.

09:41:03  9    Q.    For BioHealth?

09:41:03  10    A.    That's correct.

09:41:03  11    Q.    And you included the information from Ms.

09:41:03  12  Canto's ledger on this document?

09:41:03  13    A.    I did.   As best as I could prepare it.   Just a

09:41:03  14  factual summary of that ledger to simplify, again, a very

09:41:03  15  large, very detailed spreadsheet.   This just summarizes

09:41:03  16  the sample of 15 so you can visually see it in one place.

09:41:03  17    Q.    This is the same for page 6 that we reviewed

09:41:03  18  just a moment ago.   This was Ms. Canto's ledger for

09:41:03  19  PBL's, the PBL investigation and it dealt with phone

09:41:03  20  calls -- responses to phone calls; is that correct?

09:41:03  21    A.    That's correct.

09:41:03  22         MR. GESTRICH:   We would like it offer page 4.

09:41:03  23         THE COURT:   Offer as are you going to limit the

09:41:03  24  publication?   Is this I.D. and only shown to me and the

09:41:03  25  lawyers?

09:41:03  1          MR. GESTRICH:  We would like the jury to see

09:41:03  2    this document, this page.  It does not relate to that

09:41:03  3    topic.

09:41:03  4          THE COURT:  Any objection?

09:41:03  5          MS. KINGSBERY:  No objection.

09:41:03  6          THE COURT:  Thank you.  Page 4 is going to be

09:41:03  7    marked as a full exhibit.

09:41:03  8    BY MR. GESTRICH:

09:41:03  9      Q.   Mr. Haney, what is this document?

09:41:03  10     A.   This is a summary of the claims that were denied

09:41:03  11   by Cigna from the time frame that you see at the top of

09:41:03  12   the chart.  There's September 27, 2013 until March 26,

09:41:03  13   2014.

09:41:03  14     Q.   And does this relate at all to any of the flags?

09:41:03  15     A.   It does.

09:41:03  16     Q.   Which flag?

09:41:03  17     A.   I would need to see the timeline again.  I don't

09:41:03  18   have them memorized.

09:41:03  19     Q.   We can show the timeline.  Can we pull page 8.

09:41:03  20   And this is already published to the jury.

09:41:03  21          THE COURT:  Exhibit 6987 for the record?

09:41:03  22          MR. GESTRICH:  Yes, Your Honor.

09:41:03  23     A.   So the timeline here shows that in September of

09:41:03  24   2013, PBL was flagged for 0369.  You will see that in the

09:41:03  25   top left that's highlighted now.  That was when that flag

1041

09:41:03   1    was added for PBL.  That is the beginning of the

09:41:03   2    timeframe for the previous chart, the pie chart that we

09:41:03   3    were just looking at.  So this is the flag that's being

09:41:03   4    shown.  The results of this flag are what are being shown

09:41:03   5    in that pie chart.

09:41:03   6    BY MR. GESTRICH:

09:41:03   7        Q.    If we can turn back to page 4 of 6987.

09:41:03   8              This is the pie chart that you just referred to,

09:41:03   9    as I understand, and this shows the denials by CPT code

09:41:03   10   or, I'm sorry, by denial code; is that correct?

09:41:03   11       A.    Correct.  So this shows after the sample of ten,

09:41:03   12   PBL was flagged.  And they were flagged for code 0369.

09:41:03   13             And for the period following that, from

09:41:03   14   September, beginning September 27 of 2013, when that flag

09:41:03   15   was applied, all the way until March of 2014, these were

09:41:03   16   the claims that were denied by Cigna for PBL.  As you can

09:41:03   17   see, the vast majority of them are related to, if you

09:41:03   18   look at the bottom of the chart, the darker shade there,

09:41:03   19   related to 0369.  That's why they were denied.  And

09:41:03   20   that's consistent with what we would expect to see after

09:41:03   21   a flag is applied.  Many of the claims that were denied

09:41:03   22   in the case, the vast majority, were denied for that

09:41:03   23   reason.

09:41:03   24             MR. GESTRICH:   I would like to offer Labs

09:41:03   25   Exhibit 6987, page 5, to be published to the jury.

09:41:03  1          THE COURT:  You have to show it to me and the
09:41:03  2   other side.  Just to us so we can see if there's an
09:41:03  3   objection.
09:41:03  4          MS. KINGSBERY:  No objection.
09:41:03  5          THE COURT:  Page 5 may be published then.  If
09:41:03  6   you would keep a record of that, trying to keep records,
09:41:03  7   Liana, of the pages we're showing.  You should too.  So
09:41:03  8   far I have 5, 6, 8, 9.
09:41:03  9          Go ahead.
09:41:03  10  BY MR. GESTRICH:
09:41:03  11     Q.   I need you to close up your report.  If you need
09:41:03  12  to refresh your recollection, you can.
09:41:03  13          Do you remember -- you see at the top that this
09:41:03  14  says Cigna's denial to PBL's claims and then has the
09:41:03  15  dates March 27, 2014 to December 11, 2014?
09:41:03  16     A.   I do.
09:41:03  17     Q.   But the prior chart went to March 26, 2014.  Do
09:41:03  18  you recall that?
09:41:03  19     A.   I do.
09:41:03  20     Q.   Why are these charts different?  Why did you
09:41:03  21  list these differently?
09:41:03  22     A.   So if we go back to the timeline again, in March
09:41:03  23  26, 2014, something happened.  The flag was changed by
09:41:03  24  Cigna at that time.  And I think that's represented in
09:41:03  25  the timeline.  It may not be.

09:41:03  1          My understanding of Cigna's case notes is that

09:41:03  2  date the flag was changed or modified somewhat.  And this

09:41:03  3  shows the denials after that flag was modified.  You can

09:41:03  4  see the pie chart looks different.  The proportion of

09:41:03  5  claims denied for 0369 are different.  But my

09:41:03  6  understanding is that the flag was, at least to some

09:41:03  7  degree, modified at that date.  And that's why we have

09:41:03  8  two different charts, just to show you the before and the

09:41:03  9  after.

09:41:03  10     Q.   You would agree with me that the majority of the

09:41:03  11  claims are shaded with the 0369 code?

09:41:03  12     A.   Certainly.  The majority are still being denied

09:41:03  13  for the same denial reason.

09:41:03  14     Q.   I'm going to shift topics into your review of

09:41:03  15  the data.

09:41:03  16          Do you recall reviewing Cigna's data?

09:41:03  17     A.   When you say Cigna's data.  Yes, I reviewed a

09:41:03  18  variety of data from Cigna.  Can you tell me specifically

09:41:03  19  what you are referring to?

09:41:03  20     Q.   Let me state it differently.  In formulating

09:41:03  21  your damages opinion, what documents from Cigna did you

09:41:03  22  review?

09:41:03  23     A.   One of the key pieces of information in

09:41:03  24  calculating damages in this case was a large structured

09:41:03  25  set of data that Cigna provided that provided line level

09:41:03  1   detail for every claim in this litigation.  I use the

09:41:03  2   term structured data set.  That's kind of a term of art

09:41:03  3   that we use.  You can think of it as a spreadsheet.  It's

09:41:03  4   just a really big spreadsheet with a lot of details in

09:41:03  5   it, it had a lot of columns, for every single claim.  And

09:41:03  6   it gave us all of the information that each of those

09:41:03  7   individual claims in a single place where we could look

09:41:03  8   at the thousands of claims in one snapshot.

09:41:03  9       Q.   Can we please show Joint Exhibit 43.  I believe

09:41:03  10  this is a full exhibit.

09:41:03  11          THE COURT:  It is to be published.

09:41:03  12  BY MR. GESTRICH:

09:41:03  13      Q.   Mr. Haney, do you recognize this document?

09:41:03  14      A.   I do.

09:41:03  15      Q.   Is this one of the structured data sets?  If we

09:41:03  16  can remove the call out, please.

09:41:03  17      A.   It appears to be.  You know, this is how it's

09:41:03  18  formatted.  I can't read anything on it here.  But this

09:41:03  19  is I think a good visualization of the kind of data we're

09:41:03  20  working with.  It's a very large spreadsheet with a lot

09:41:03  21  of line items.  You can see that each individual claim is

09:41:03  22  listed as a row here.  And this was the format that

09:41:03  23  appears to be consistent with what Cigna provided in its

09:41:03  24  data sets.

09:41:03  25      Q.   Are you familiar with these types of structured

1045

09:41:03  1    data sets?

09:41:03  2        A.    Certainly.  These are in most healthcare cases,

09:41:03  3    this is largely the foundation of data that we start

09:41:03  4    with.  This is how it's organized.  There's thousands of

09:41:03  5    claims in almost every case.  They all have a great

09:41:03  6    amount of detail.  And organizing them in something

09:41:03  7    similar to this is common across all the healthcare cases

09:41:03  8    I've worked.

09:41:03  9        Q.    Do you have -- and this is just a yes or no.

09:41:03  10    Are you familiar with some of the headers at the top of

09:41:03  11    the document?

09:41:03  12        A.    Yes.

09:41:03  13        Q.    Are there some that you would need guidance from

09:41:03  14    the party producing these types of documents?

09:41:03  15        A.    Yes.  And maybe it's helpful just to explain how

09:41:03  16    we typically approach a data set like this.  When someone

09:41:03  17    gives me a data set like this, and it's not just specific

09:41:03  18    to this case, but in general.  Someone gives me data like

09:41:03  19    this and I look at the blue column across the top.  I'm

09:41:03  20    looking at headers to make sure I understand what each

09:41:03  21    field of data means.  Because if I don't understand it, I

09:41:03  22    can't analyze it correctly.

09:41:03  23        Some of these are pretty intuitive.  Patient

09:41:03  24    name.  Okay.  I can figure that out.  I know what that

09:41:03  25    probably means.  Some of the others aren't.  They're not

09:41:03   1    intuitive.  And often we have to go back to the person

09:41:03   2    who provided or created the data set to understand what

09:41:03   3    do these field mean.  What does this acronym mean that

09:41:03   4    you are listing on the data table.  But ultimately, the

09:41:03   5    goal before I can analyze any set of data, I have to

09:41:03   6    understand what all of the fields represent.

09:41:03   7         Q.   So, in this case, did you receive an explanation

09:41:03   8    of the headers, or at least of some of the headers?

09:41:03   9         A.   We did.  We received what I refer to as a data

09:41:03  10    dictionary.  That's somewhat of a term of art in our

09:41:03  11    industry.  But it's basically a document that tells me

09:41:03  12    what every single field means.  In other words, they look

09:41:03  13    at this blue row and for every single field, they give me

09:41:03  14    a definition of what's included in that data set.  We

09:41:03  15    call that a data dictionary.  And that helps us make sure

09:41:03  16    we're not make assumptions, we're not misinterpreting

09:41:03  17    things.  We are given the exact definition of what every

09:41:03  18    field means by the other party.  In the case, we did

09:41:03  19    receive a data dictionary from Cigna.

09:41:03  20         Q.   I'm going to ask to show to the witness Labs

09:41:03  21    Exhibit 11279.  This is not an admitted exhibit.  I

09:41:03  22    understand there may be objections to it.

09:41:03  23              THE COURT:  11279?

09:41:03  24              MR. GESTRICH:  Yes, Your Honor.

09:41:03  25    BY MR. GESTRICH:

1047

09:41:03  1      Q.    Mr. Haney, do you recognize this document?

09:41:03  2      A.    Yes.

09:41:03  3      Q.    If we can scroll to the bottom of the document,

09:41:03  4  please.

09:41:03  5            Is this the document that you referred to as

09:41:03  6  what you understand to be a data dictionary?

09:41:03  7      A.    Yes.

09:41:03  8            THE COURT:  Is there objection?

09:41:03  9            MS. KINGSBERY:  There is an objection, Your

09:41:03 10  Honor.  This is hearsay from outside counsel.

09:41:03 11            THE COURT:  Is it offered for the truth or is it

09:41:03 12  offered as this is what he received and based his work

09:41:03 13  on?

09:41:03 14            MR. GESTRICH:  This is offered for what he

09:41:03 15  received and based his work on.

09:41:03 16            THE COURT:  State of mind.  I don't see a

09:41:03 17  problem with that.

09:41:03 18            MS. KINGSBERY:  This is not relevant to his

09:41:03 19  current opinion.  Your Honor's already ruled on his

09:41:03 20  reliance on this document in connection with your prior

09:41:03 21  ruling.

09:41:03 22            THE COURT:  I don't think I have seen this

09:41:03 23  document before.  I have?  When did I see it?

09:41:03 24            MS. KINGSBERY:  You have, Your Honor.  This was

09:41:03 25  in connection with the motion to exclude testimony that

09:41:03  1    you ruled on.

09:41:03  2         MR. GESTRICH:  Your Honor, if they would like to

09:41:03  3    discuss that ruling I think that's separate.  This is --

09:41:03  4    he relied on this to understand.  I think the code that

09:41:03  5    they are referring to is not at issue with his opinion.

09:41:03  6         THE COURT:  The problem is you know that I don't

09:41:03  7    allow redirect.  So I have to anticipate what you might

09:41:03  8    cross on.  And it seems to me counsel is correct to lay

09:41:03  9    the foundations for the steps this gentleman has

09:41:03 10    explained in his work.  So unless you tell me you are

09:41:03 11    never going to question what this is going to show is the

09:41:03 12    basis for what he did in this respect as to charts and

09:41:03 13    what they meant, then I'm letting it come in.  It's

09:41:03 14    highly relevant.

09:41:03 15         MR. GESTRICH:  And, Your Honor, I think --

09:41:03 16         THE COURT:  No, no, sir.  I'm talking to

09:41:03 17    counsel.

09:41:03 18         MR. GESTRICH:  Yes, Your Honor.

09:41:03 19         MS. KINGSBERY:  We do not intend to question the

09:41:03 20    witness about the meaning of the definitions in this

09:41:03 21    letter.

09:41:03 22         THE COURT:  Okay.  And so, sir, can I just ask

09:41:03 23    you.  This is in reference to what the titles are and

09:41:03 24    understanding what's the content of the chart.  Did you

09:41:03 25    rely on this document that's marked for identification in

| | | |
|---|---|---|
| 09:41:03 | 1 | going forward with your work as to what's in the chart? |
| 09:41:03 | 2 | THE WITNESS:  I did. |
| 09:41:03 | 3 | THE COURT:  What it meant, each of the charts? |
| 09:41:03 | 4 | THE WITNESS:  Yes, Your Honor. |
| 09:41:03 | 5 | THE COURT:  I don't think it has to be in |
| 09:41:03 | 6 | evidence.  We have a lot on the to-do list, but we can |
| 09:41:03 | 7 | get to it if you want to mark it as ID and later we'll |
| 09:41:03 | 8 | see if it comes in as evidence, and it could be that you |
| 09:41:03 | 9 | will be redirecting on it, I don't know, and offering it |
| 09:41:03 | 10 | then. |
| 09:41:03 | 11 | But at this point I don't see a need for it to |
| 09:41:03 | 12 | come in. |
| 09:41:03 | 13 | MR. GESTRICH:  Thank you, Your Honor. |
| 09:41:03 | 14 | THE COURT:  So, Liana, 11279 is still ID. |
| 09:41:03 | 15 | Thank you. |
| 09:41:03 | 16 | MR. GESTRICH:  Can we please bring back Exhibit |
| 09:41:03 | 17 | 6987.  And I'm looking at page 1.  I do not believe this |
| 09:41:03 | 18 | has been published to the jury.  The Labs would like to |
| 09:41:03 | 19 | offer this to the jury. |
| 09:41:03 | 20 | THE COURT:  This page is what number, number 1? |
| 09:41:03 | 21 | MR. GESTRICH:  Yes, Your Honor. |
| 09:41:03 | 22 | THE COURT:  No.  Is there objection? |
| 09:41:03 | 23 | MS. KINGSBERY:  No objection. |
| 09:41:03 | 24 | THE COURT:  Page 1 of 6987 is marked as a full |
| 09:41:03 | 25 | exhibit and may be published. |

1050

09:41:03  1    BY MR. GESTRICH:

09:41:03  2        Q.    Mr. Haney, do you recognize this?

09:41:03  3        A.    I do.  I created this chart.

09:41:03  4        Q.    What is it?

09:41:03  5        A.    This is a summary of this big structured data

09:41:03  6    set that Cigna provided us.  So if you recall, the last

09:41:03  7    thing we looked at had the blue border across the top.

09:41:03  8    We couldn't read any of the details.  There were

09:41:03  9    thousands of pages.  This is just a summary of that data

09:41:03  10   set in one snapshot so that you can see what's included.

09:41:03  11       Q.    In your summary on the number of unique claims

09:41:03  12   submitted, you have listed 36,290?

09:41:03  13       A.    Correct.

09:41:03  14       Q.    Does that indicate the spreadsheets that you

09:41:03  15   looked at, there's a sum of 36,290 claims that you were

09:41:03  16   reviewing within those spreadsheets?

09:41:03  17       A.    Correct.

09:41:03  18       Q.    And the charged amount is listed a little more

09:41:03  19   than 56 million; is that correct?

09:41:03  20       A.    That's correct.

09:41:03  21       Q.    And the net paid amount is listed as 16 million,

09:41:03  22   is that accurate?

09:41:03  23       A.    It is.  And this wasn't analysis.  I didn't

09:41:03  24   determine these numbers.  There was a column called

09:41:03  25   charge amount and there's a column called net pay.

1051

| | | |
|---|---|---|
| 09:41:03 | 1 | There's no analysis behind this.  This is just a summary |
| 09:41:03 | 2 | of the data included. |
| 09:41:03 | 3 | THE COURT:  For the record, for the jury.  This |
| 09:41:03 | 4 | is what you took it from was called Joint Exhibit 43. |
| 09:41:03 | 5 | MR. GESTRICH:  I was just going to get to that. |
| 09:41:03 | 6 | BY MR. GESTRICH: |
| 09:41:03 | 7 | Q.   And that was not just based on Joint Exhibit 43, |
| 09:41:03 | 8 | that one document that you saw; is that correct? |
| 09:41:03 | 9 | A.   Based on that as well as the data dictionary |
| 09:41:03 | 10 | that we used to understand what those fields meant. |
| 09:41:03 | 11 | Q.   Let me show you Joint Exhibit 44.  This is a |
| 09:41:03 | 12 | Joint Exhibit with no objection. |
| 09:41:03 | 13 | THE COURT:  Yes, publish. |
| 09:41:03 | 14 | Q.   Can you please call out the top middle section |
| 09:41:03 | 15 | where it says Cigna's.  All right. |
| 09:41:03 | 16 | Was this one of the structured data sets that |
| 09:41:03 | 17 | you looked at? |
| 09:41:03 | 18 | A.   It appears to be, yes. |
| 09:41:03 | 19 | Q.   And it's for Epic Reference Labs? |
| 09:41:03 | 20 | A.   Yes. |
| 09:41:03 | 21 | Q.   If we can go back to Joint Exhibit 43 in the |
| 09:41:03 | 22 | same call out. |
| 09:41:03 | 23 | This was the structured data set that you looked |
| 09:41:03 | 24 | at as well? |
| 09:41:03 | 25 | A.   Yes. |

09:41:03  1    Q.   This was also one for Epic Reference, is that

09:41:03  2  correct?

09:41:03  3    A.   Yes.

09:41:03  4    Q.   Do you recall whether there were two separate

09:41:03  5  structured data sets for Epic Reference?

09:41:03  6    A.   I don't recall kind of the specifics of how they

09:41:03  7  were organized when we received them.  When we received

09:41:03  8  this data, it wasn't in a simple excel spreadsheet form.

09:41:03  9  That's kind of how I've characterized it so it's easy to

09:41:03  10 talk about it that way.  But it did take some

09:41:03  11 construction for us to take multiple files from Cigna and

09:41:03  12 put them together as one.  I don't recall exactly how

09:41:03  13 many files for each Lab were provided to us, no.

09:41:03  14       MR. GESTRICH:  Can you please show Joint Exhibit

09:41:03  15 45.  This is a Joint Exhibit with no objections.

09:41:03  16       THE COURT:  Yes.

09:41:03  17       MR. GESTRICH:  With the same call out.

09:41:03  18 BY MR. GESTRICH:

09:41:03  19    Q.   Was this another structured data set you

09:41:03  20 considered?

09:41:03  21    A.   Yes, it appears to be.

09:41:03  22    Q.   This was for BioHealth; is that correct?

09:41:03  23    A.   Yes.

09:41:03  24    Q.   Can you please turn to Joint Exhibit 46.  With

09:41:03  25 the same call-out.

09:41:03   1            This is also, Your Honor, a Joint Exhibit with

09:41:03   2   no objections.  May it be published?

09:41:03   3            THE COURT:  Yes.

09:41:03   4   BY MR. GESTRICH:

09:41:03   5      Q.   This was also -- this was the last structured

09:41:03   6   data set that you considered; is that correct?

09:41:03   7      A.   Yes, it appears to be.

09:41:03   8      Q.   This is for PB Labs?

09:41:03   9      A.   Yes, that's correct.

09:41:03  10      Q.   When you formed your damages opinion, did you

09:41:03  11   review Ms. Thelian's expert opinions?

09:41:03  12      A.   I did.

09:41:03  13      Q.   Were you here in the court yesterday while she

09:41:03  14   testified?

09:41:03  15      A.   For a part of her testimony, yes.

09:41:03  16            MR. GESTRICH:  We would like to offer labs

09:41:03  17   Exhibit 6987, page 10.

09:41:03  18            THE COURT:  Is it up so I can see it just rule

09:41:03  19   on it or see if there's any objection?

09:41:03  20            MS. KINGSBERY:  No objection.

09:41:03  21            THE COURT:  At 10.  All right.

09:41:03  22            MR. GESTRICH:  Can you please call that out?

09:41:03  23            THE COURT:  Okay.  May be published.

09:41:03  24            MR. GESTRICH:  Thank you, Your Honor.

09:41:03  25   BY MR. GESTRICH:

1054

09:41:03  1    Q.   What is this?

09:41:03  2    A.   This is a summary of Ms. Thelian's opinions.

09:41:03  3    Q.   And I see on the left side there are labs and it

09:41:03  4    begins with three lines for BioHealth, then three lines

09:41:03  5    for PBL, then two lines for Epic Reference; is that

09:41:03  6    correct?

09:41:03  7    A.   Yes.

09:41:03  8    Q.   And the number of unique claims, what does that

09:41:03  9    refer to?

09:41:03  10   A.   That's how many claims Ms. Thelian identified

09:41:03  11   that should have been paid for that respective denial

09:41:03  12   reason.

09:41:03  13   Q.   And then the charged amount, is that -- what

09:41:03  14   does that refer to?

09:41:03  15   A.   That is an amount that was taken again from

09:41:03  16   Cigna's structured data set.  That's the amount that the

09:41:03  17   Labs charged to Cigna for those claims.

09:41:03  18   Q.   So that's the amount that the Labs charged to

09:41:03  19   Cigna.  Is that the amount that you are going to opine

09:41:03  20   should have been paid to the Labs?

09:41:03  21   A.   No.  Not in this case.

09:41:03  22   Q.   How would you go about calculating how much the

09:41:03  23   Labs -- how much Cigna should have paid to the Labs if

09:41:03  24   the claims were allowed?

09:41:03  25   A.   So the calculation that we used in this case was

09:41:03  1    to determine what the Labs ultimately should have paid.

09:41:03  2    That was the methodology for damages.  To actually

09:41:03  3    perform that calculation --

09:41:03  4        THE COURT:  I think you meant Cigna should have

09:41:03  5    paid.

09:41:03  6        A.   I apologize.  What Cigna should have paid.

09:41:03  7            That actual calculation, what we did to perform

09:41:03  8    that calculation was to look at how Cigna had paid claims

09:41:03  9    historically.  We know or generally when a claim, we look

09:41:03 10    at a charge amount, that charge amount is probably not

09:41:03 11    going to be what Cigna pays because there could be some

09:41:03 12    difference related to a deductible.  There could be

09:41:03 13    co-insurance.  There could be co-pays.  There's lots of

09:41:03 14    reasons why the total charge amount might not be the

09:41:03 15    amount that Cigna actually writes a check for.

09:41:03 16            We wanted to understand what that discount would

09:41:03 17    be.  And the best way to understand that was to look at

09:41:03 18    the historical claims of data that Cigna had provided us

09:41:03 19    in this case.  If you remember from the summary chart, we

09:41:03 20    had approximately 21,000 claims over the same time frame

09:41:03 21    for the same labs where we knew how much Cigna actually

09:41:03 22    paid for claims.  So we could see what they typically pay

09:41:03 23    for a charge amount of a given dollar figure, what

09:41:03 24    percentage discount that would be.  We call that the

09:41:03 25    payment ratio in my analysis.  And that ratio is how much

09:41:03  1   of the charge amount should Cigna actually pay.  And in

09:41:03  2   the vast majority of the cases, that was 70 percent is

09:41:03  3   calculation that we applied.

09:41:03  4        So the calculation itself is to simply to apply

09:41:03  5   that payment ratio, use 70 percent as an example, to this

09:41:03  6   charge amount.  And that leads to the amount that Cigna

09:41:03  7   should have paid, which is equivalent to damages in this

09:41:03  8   case.

09:41:03  9     I would like to show page 11 of Labs Exhibit 6987.

09:41:03 10          MS. KINGSBERY:  No objection.

09:41:03 11          THE COURT:  6987 at page 11 shall be published.

09:41:03 12          MR. GESTRICH:  I think you got ahead of me on

09:41:03 13   the summaries.

09:41:03 14   BY MR. GESTRICH:

09:41:03 15     Q.  Do you recognize this document?

09:41:03 16     A.   This is a summary of the paid population that I

09:41:03 17   just described.  Let me kind of walk you through how we

09:41:03 18   built up to this.

09:41:03 19        Remember, the big structured data set we got

09:41:03 20   from Cigna had 36 odd thousand claims in it.  Some of

09:41:03 21   them had been paid.  Some of them had been denied.  When

09:41:03 22   we break out the paid claims -- I call that the paid

09:41:03 23   population.  And that's what this chart summarizes.  This

09:41:03 24   is just the paid claims.  It's approximately 21,000 of

09:41:03 25   those claims.  And this is, again, just a factual summary

| | | |
|---|---|---|
| 09:41:03 | 1 | of the data provided in that data set from Cigna for paid |
| 09:41:03 | 2 | claims. |
| 09:41:03 | 3 | Q.    So on this middle line, number of unique claims |
| 09:41:03 | 4 | submitted, your analysis included the review or analysis |
| 09:41:03 | 5 | of 20,977 claims, correct? |
| 09:41:03 | 6 | A.    Correct. |
| 09:41:03 | 7 | Q.    That were paid? |
| 09:41:03 | 8 | A.    That's correct. |
| 09:41:03 | 9 | Q.    And the charged amount on those claims were |
| 09:41:03 | 10 | 27,383,000 and some change.  The net paid amount was |
| 09:41:03 | 11 | approximately 15.8 million according to your chart; is |
| 09:41:03 | 12 | that correct? |
| 09:41:03 | 13 | A.    Correct. |
| 09:41:03 | 14 | Q.    Where -- did you obtain that information from |
| 09:41:03 | 15 | the structured data sets? |
| 09:41:03 | 16 | A.    I did, yes. |
| 09:41:03 | 17 | Q.    And if we can pull Joint Exhibit 43 up and call |
| 09:41:03 | 18 | out the top middle section. |
| 09:41:03 | 19 | Mr. Haney, do you see in column V it says paid |
| 09:41:03 | 20 | AMT?  I'm sorry.  You are moving the chart.  Stay right |
| 09:41:03 | 21 | where you are.  Stop. |
| 09:41:03 | 22 | Paid amount.  Do you see that in column V? |
| 09:41:03 | 23 | A.    I do.  Column V, as in Victor, is the paid |
| 09:41:03 | 24 | amount. |
| 09:41:03 | 25 | Q.    What did you understand the paid amount to be? |

09:41:03  1    Let me rephrase that.

09:41:03  2        Did you conduct any review to determine how

09:41:03  3    Cigna calculated the paid amount?

09:41:03  4    A.    I did.   We conducted a variety of analysis about

09:41:03  5    what the paid amount was, among other fields here, but

09:41:03  6    there were several steps we took in understanding the

09:41:03  7    paid amount.   Number one, we looked at the data

09:41:03  8    dictionary.   What did Cigna define the paid amount to be.

09:41:03  9    That was the first step we took.   When we look at the

09:41:03 10    data dictionary, it says the paid amount the paid amount.

09:41:03 11    It wasn't particularly helpful, but that tells us that's

09:41:03 12    the amount they paid on a claim.   But we also did

09:41:03 13    analysis to understand how they arrived at that amount.

09:41:03 14    And what we did was evaluate for this claim not just the

09:41:03 15    paid amount, but all the other financial values that we

09:41:03 16    provided.   The co-pay.   The co-insurance.   And for each

09:41:03 17    individual claim, we backed into the paid amount.   And we

09:41:03 18    could see all of the inputs that Cigna had used, all of

09:41:03 19    the inputs that they had used to get to the paid amount,

09:41:03 20    and we verified for 99.9 percent of these paid claims,

09:41:03 21    the equation that they used to determine the pay out.

09:41:03 22    Q.    Can you scroll over with the call out to columns

09:41:03 23    AG through AK.

09:41:03 24        Do you see under the column labeled AG,

09:41:03 25    co-insurance amount?

09:41:03  1    A.    I do.

09:41:03  2    Q.    Was that factored in your review of the paid

09:41:03  3    amounts to the -- was that factored into how the paid

09:41:03  4    amount was calculated?

09:41:03  5    A.    It was.  We found that the it co-insurance

09:41:03  6    amount was one of the variables in the equation to reach

09:41:03  7    the paid amount.  Which makes sense.  Cigna would be

09:41:03  8    concerned with what the co-insurance payment should be,

09:41:03  9    because they don't want to pay for that, that something

09:41:03  10   someone else should pay.  So they used that in their

09:41:03  11   calculation to determine how much they would pay for an

09:41:03  12   individual claim.

09:41:03  13   Q.    I will ask a couple yes or no questions.  Is

09:41:03  14   that also true for the co-pay amount?

09:41:03  15   A.    Yes.

09:41:03  16   Q.    Is that also true for DED.AMT?  Do you

09:41:03  17   understand that to mean deductible amount?

09:41:03  18   A.    Yes.

09:41:03  19   Q.    Was deductible amount factored in?

09:41:03  20   A.    It was.

09:41:03  21   Q.    And you did this on 20,977 claims?

09:41:03  22   A.    Correct.

09:41:03  23   Q.    So on 20,977 times you factored in the

09:41:03  24   co-insurance amount?

09:41:03  25   A.    Yes.

09:41:03  1     Q.   Unpaid claims.  The co-pay amount?

09:41:03  2     A.   Yes.

09:41:03  3     Q.   And the deductible amount?

09:41:03  4     A.   That's correct.

09:41:03  5     Q.   So on a go forward basis, is it necessary to

09:41:03  6  have the deductible amount, co-pay amount, co-insurance

09:41:03  7  amount to estimate what would have been paid for claims

09:41:03  8  where Cigna did not make a payment?

09:41:03  9     A.   I don't think so.  We have included those in our

09:41:03  10  calculation.  And I think I understand your question to

09:41:03  11  be do they need to be included again.  No, we don't want

09:41:03  12  to double count them again.  I don't need to deduct the

09:41:03  13  deductible amount a second time.  It's already been

09:41:03  14  considered in the calculation of the paid amount.  And

09:41:03  15  it's been considered because we validated that equation

09:41:03  16  and that's how the paid amount was determined.  And that

09:41:03  17  reflects what is in the member benefit plan.  That's how

09:41:03  18  the paid amount should be calculated.  And that's the way

09:41:03  19  that we calculated it in determining damages.

09:41:03  20         MR. GESTRICH:  The next page I will turn to has

09:41:03  21  not been admitted yet.  It's Labs Trial Exhibit Number

09:41:03  22  6987, page 14.  Can you please show that on the screen.

09:41:03  23         The Labs move to admit this page of the exhibit.

09:41:03  24         THE COURT:  Any objection?

09:41:03  25         MS. KINGSBERY:  No objection.

09:41:03  1          THE COURT:  All right.  It will be published.

09:41:03  2   Labs' Exhibit 69 -- 6587 is up.

09:41:03  3   BY MR. GESTRICH:

09:41:03  4      Q.   Mr. Haney, on this table you have listed

09:41:03  5   years and payment ratios.  Can you explain just what are

09:41:03  6   those, what do they mean?

09:41:03  7      A.   If you recall just a minute ago I explained how

09:41:03  8   we calculated damages for the claims that should have

09:41:03  9   been paid by Cigna.  And to do that, we looked at the

09:41:03  10  charge amount and we applied a payment ratio.  How much

09:41:03  11  of that charge amount should actually be paid.

09:41:03  12          I generalized a little bit when I explained it

09:41:03  13  before because I was trying to give you the simple answer

09:41:03  14  first.  We use the payment ratio and we applied it.  But

09:41:03  15  there's quite a bit of detail in how we arrived at what

09:41:03  16  is the appropriate payment ratio.  We didn't just take a

09:41:03  17  single ratio.  We didn't just take a mean or an average.

09:41:03  18  We applied a variety of analysis to understand how the

09:41:03  19  payment ratio varied over time.  How did it vary between

09:41:03  20  labs.  Ultimately our goal was to understand what's the

09:41:03  21  most appropriate payment ratio to apply, because we want

09:41:03  22  to get that right.  If that payment ratio changes,

09:41:03  23  damages changes.  They're directly related.  So it's

09:41:03  24  important to get that figure right.

09:41:03  25          What we found is that that ratio varied over

09:41:03  1   time.  And we wanted to consider that.  So rather than

09:41:03  2   just applying a single blanket payment ratio, you can see

09:41:03  3   here it varied over time.  Certain years it was lower.

09:41:03  4   And we applied those to the respective years for claims

09:41:03  5   in this case.  This is just a summary of what we found to

09:41:03  6   be the appropriate payment ratios that we applied.

09:41:03  7           MR. GESTRICH:  The Labs offer Labs' Trial

09:41:03  8   Exhibit 6971.  If I recall correctly, this is without

09:41:03  9   objection.

09:41:03  10          THE COURT:  All right.  Yes.  Except are there

09:41:03  11  any remaining objections?

09:41:03  12          MS. KINGSBERY:  No, Your Honor.

09:41:03  13          THE COURT:  Thank you.

09:41:03  14          It will be published as a full exhibit, 6971.

09:41:03  15          So it should be published.  There's no

09:41:03  16  objection.  So go ahead.

09:41:03  17          MR. GESTRICH:  6971.

09:41:03  18          THE COURT:  Yes.  Sorry.  I was looking at the

09:41:03  19  wrong page where you still had one.

09:41:03  20          Can you please call out the top middle section.

09:41:03  21  That text at the top middle.

09:41:03  22  BY MR. GESTRICH:

09:41:03  23      Q.   Mr. Haney, what is this document?

09:41:03  24      A.   This is the Appendix C to my expert report.

09:41:03  25  This is a big spreadsheet, again, summarizing for each

1063

09:41:03  1    individual claim what I calculated damages to be for

09:41:03  2    those claims.

09:41:03  3         Q.   I want to scroll over the headers.  So if we can

09:41:03  4    call out starting from the left.  Just the small section.

09:41:03  5              Do you see that header error type?

09:41:03  6         A.   I do.

09:41:03  7         Q.   Did you create that header?

09:41:03  8         A.   I created this file.  I did not input these

09:41:03  9    fields.  The vast majority of the fields to the left in

09:41:03  10   this spreadsheet came straight from Ms. Thelian.  These

09:41:03  11   are the claims that she identified that should have been

09:41:03  12   paid.  And she found it relevant to identify the error

09:41:03  13   type which one she disagreed with along with some of

09:41:03  14   these other fields.

09:41:03  15        Q.   So Epic Labs 1648.  Do you recall what that just

09:41:03  16   generally reflects?

09:41:03  17        A.   So these are -- this is a claim from Epic Labs.

09:41:03  18   And I think, as best as I can recall the way Ms. Thelian

09:41:03  19   describes it, the 1648 is the denial reason for that

09:41:03  20   claim.  In other words, that's the reason why Cigna

09:41:03  21   denied that claim in the first place.

09:41:03  22        Q.   I would like to go to the right side of that

09:41:03  23   chart.

09:41:03  24             Do you see the column that says unpaid allowed

09:41:03  25   amount?

09:41:03    1        A.    I do.

09:41:03    2        Q.    And this is the amount that was not paid by

09:41:03    3    Cigna, correct?

09:41:03    4        A.    Yes.

09:41:03    5        Q.    And this is the amount that the Labs submitted

09:41:03    6    to Cigna and Cigna did not pay?

09:41:03    7        A.    Yes.

09:41:03    8        Q.    And then on the right side, there's outstanding

09:41:03    9    principal amount.  Do you see the numbers do not match

09:41:03   10    between unpaid allowed amount and outstanding principal

09:41:03   11    amount?

09:41:03   12        A.    Yes, that's correct.

09:41:03   13        Q.    Why don't they match?

09:41:03   14        A.    This is where we actually took the mathematical

09:41:03   15    step of what I described of applying the payment ratio in

09:41:03   16    this middle column between the highlighted fields.  So

09:41:03   17    the third column there is just a calculation.

09:41:03   18        Q.    So if somebody were to look down the columns and

09:41:03   19    all the data within this document, this 6971, they would

09:41:03   20    see the unpaid allowed amount is the number there, the

09:41:03   21    annual median payment ratio, if you multiply those two

09:41:03   22    together, that's where you get the outstanding principal

09:41:03   23    amount for every single line on this spreadsheet?

09:41:03   24        A.    Correct.

09:41:03   25        Q.    And this is how you calculated the damages?

09:41:03  1        A.    Correct.

09:41:03  2        Q.    The total damages, is that correct?

09:41:03  3        A.    Correct.  So it's on an itemized basis.  We

09:41:03  4    didn't provide just one big calculation at the end.  We

09:41:03  5    looked at damages for every single claim that Ms. Thelian

09:41:03  6    identified that should have been paid.

09:41:03  7        Q.    Have you ever heard of the term prejudgment

09:41:03  8    interest?

09:41:03  9        A.    I have.

09:41:03  10        Q.    In this case, were you asked to calculate a

09:41:03  11    theoretical prejudgment interest amount?

09:41:03  12        A.    I believe so.  I think the term I used in my

09:41:03  13    report was penalty interest.  I'm not quite sure of the

09:41:03  14    difference.  But I think prejudgment interest is what

09:41:03  15    you're describing is what I calculated in my report.

09:41:03  16        Q.    And you're not opining on the legal aspects of

09:41:03  17    prejudgment interest or penalty interest.  It's merely to

09:41:03  18    place a number before the Court.  Is that correct?

09:41:03  19        A.    Correct.  I'm not an attorney.  So I don't have

09:41:03  20    any opinions about that.  I just did the calculation of

09:41:03  21    the interest.

09:41:03  22        Q.    Thank you.  I just wanted to clarify that before

09:41:03  23    we begin.

09:41:03  24            MR. GESTRICH:  The Labs would offer Exhibit

09:41:03  25    6973.  And this is without objection.

09:41:03  1          THE COURT:  Oh, without objection.  Then it will

09:41:03  2  be admitted.  Thank you.

09:41:03  3  BY MR. GESTRICH:

09:41:03  4      Q.   Mr. Haney, generally, what is this document?

09:41:03  5      A.   This is an appendix to my reports.  This is

09:41:03  6  Appendix E, and it was our calculation related to what I

09:41:03  7  call penalty interest.

09:41:03  8      Q.   What interest did you use on the claims?

09:41:03  9      A.   We used an interest rate of 12 percent.  This is

09:41:03  10 based on Florida law.  The counsel in this case provided

09:41:03  11 us the relevant laws that they deemed appropriate to be

09:41:03  12 applied.  So that included a 12 percent interest rate,

09:41:03  13 which begins accruing 120 days after the claim is

09:41:03  14 submitted.

09:41:03  15     Q.   Can you walk us through -- in the middle,

09:41:03  16 there's -- of the chart there's outstanding principal

09:41:03  17 amount and then interest -- we'll say interest end date,

09:41:03  18 daily interest rate and interest amount.  What are those

09:41:03  19 fields?

09:41:03  20     A.   Those are simply the inputs into the interest

09:41:03  21 calculation itself.  We broke these down to a daily

09:41:03  22 interest rate so that you could see how much is actually

09:41:03  23 accruing each day.  You know, the thing to think about

09:41:03  24 with interest here is it just continues to accrue.  So

09:41:03  25 each day that goes by, the interest grows a bit more.

| | | |
|---|---|---|
| 09:41:03 | 1 | This is interest -- and maybe it's helpful if I explain |
| 09:41:03 | 2 | what this interest is for. |
| 09:41:03 | 3 | If a claim is submitted but not paid and it's |
| 09:41:03 | 4 | ultimately determined that it should be paid, in this |
| 09:41:03 | 5 | case some of these claims have been pending for years |
| 09:41:03 | 6 | without payment.  And this interest is to -- I'm not an |
| 09:41:03 | 7 | attorney.  I don't want to summarize the legal -- |
| 09:41:03 | 8 | THE COURT:  I'm not sure he should be -- |
| 09:41:03 | 9 | MR. GESTRICH:  I'm just trying to understand the |
| 09:41:03 | 10 | calculation. |
| 09:41:03 | 11 | THE COURT:  That's fine.  That was the |
| 09:41:03 | 12 | calculation. |
| 09:41:03 | 13 | A.  So this is calculated as it's presented in this |
| 09:41:03 | 14 | chart.  We show how the daily interest accrues.  It is |
| 09:41:03 | 15 | based on Florida state law, which is a 12 percent annual |
| 09:41:03 | 16 | interest rate beginning 120 days after the claim is |
| 09:41:03 | 17 | submitted. |
| 09:41:03 | 18 | BY MR. GESTRICH: |
| 09:41:03 | 19 | Q.  I just want to clarify.  We're not discussing |
| 09:41:03 | 20 | here -- I'm not asking you to discuss any laws or any -- |
| 09:41:03 | 21 | anything on that side.  Just amounts.  Just amounts. |
| 09:41:03 | 22 | We're just dealing with amounts.  So you base this on 12 |
| 09:41:03 | 23 | percent interest? |
| 09:41:03 | 24 | A.  Correct. |
| 09:41:03 | 25 | Q.  And that's it.  Thank you. |

09:41:03  1          The interest end date it ends on April 26, 2024?

09:41:03  2      A.    That's correct.  That was the date of this

09:41:03  3  report.

09:41:03  4      Q.    So this does not reflect any interest that would

09:41:03  5  be added to this if we were looking at this today?

09:41:03  6      A.    That's correct.

09:41:03  7      Q.    For all of the labs, do you recall the

09:41:03  8  approximate total of the full amount of interest on this

09:41:03  9  spreadsheet, the total?

09:41:03 10      A.    So for this entire exhibit, interest is accruing

09:41:03 11  at a rate of around $50,000 a month.

09:41:03 12      Q.    50,000 a month.  As of April 26, 2024, do you

09:41:03 13  remember the approximate amount?

09:41:03 14      A.    I would have to refer to my report.

09:41:03 15      Q.    That would not be in there.

09:41:03 16      A.    Can you ask your question one more time to make

09:41:03 17  sure I understand.

09:41:03 18      Q.    Do you recall the -- before you came today, did

09:41:03 19  you run a sum to see what the total amount was on this

09:41:03 20  spreadsheet?

09:41:03 21      A.    Yes.  I misunderstood.  Sorry.  So the interest

09:41:03 22  as of this report date is approximately $5.2 million.

09:41:03 23  And if you were to continue that calculation, it would

09:41:03 24  accrue at a rate of around -- of approximately $50,000.

09:41:03 25      Q.    So you said about 5.2 million, it's accruing at

09:41:03    1    about 50,000 a month.  I might have the math wrong, but I

09:41:03    2    believe that would be it's been about six months.  So

09:41:03    3    that would be an additional 300,000 on top of the 5.2,

09:41:03    4    for a total of 5.5 million.  Did I do that math

09:41:03    5    correctly?

09:41:03    6        A.    That's an approximation, but yes.

09:41:03    7        Q.    Thank you.

09:41:03    8              MR. GESTRICH:  The Labs would like to introduce

09:41:03    9    exhibit -- Labs Exhibit 6983.  I understand this has an

09:41:03   10    objection to it, and so we'd just like it to be shown to

09:41:03   11    the Court and to the witness.

09:41:03   12              THE COURT:  Yes, please.  Are you still

09:41:03   13    asserting an objection, Ms. Kingsbery?

09:41:03   14              MS. KINGSBERY:  No, Your Honor.

09:41:03   15              THE COURT:  So it may be published as a full

09:41:03   16    exhibit, Labs 6983.

09:41:03   17    BY MR. GESTRICH:

09:41:03   18        Q.    Mr. Haney, what is this?  What is this document?

09:41:03   19        A.    This is a summary of my damages calculation

09:41:03   20    broken down on various characteristics, including who the

09:41:03   21    accounts are and by the individual labs involved.

09:41:03   22        Q.    So this is a simplified version of your table at

09:41:03   23    exhibit -- Labs Exhibit 6971; is that correct?

09:41:03   24        A.    Yes, and easier to read.

09:41:03   25        Q.    And this simplifies it.  The first page, as I

09:41:03   1    understand, is the summary; is that correct?

09:41:03   2        A.   Yes, that's correct.

09:41:03   3             MR. GESTRICH:  And then can we please turn to

09:41:03   4    page 2.

09:41:03   5    BY MR. GESTRICH:

09:41:03   6        Q.   Do you see that in the top left side it says,

09:41:03   7    "Summary of claims with date of service in 2013"?

09:41:03   8        A.   Yes.

09:41:03   9        Q.   So this is your 2013 chart?

09:41:03  10        A.   That's correct.

09:41:03  11        Q.   This is a component of the first page, correct?

09:41:03  12        A.   It is.

09:41:03  13        Q.   And then page 3, please.

09:41:03  14             This would be the 2014 page?

09:41:03  15        A.   That's correct, yes.

09:41:03  16        Q.   Page 5, please.

09:41:03  17             This would be the 20 -- I'm sorry.  This is page

09:41:03  18    4.  This is correct.  This is the 2015 page; is that

09:41:03  19    correct?

09:41:03  20        A.   Yes.

09:41:03  21        Q.   And then lastly, with page 5, this is the 2016

09:41:03  22    version of that summary; is that right?

09:41:03  23        A.   That's correct.

09:41:03  24        Q.   Can we please go back to page 1.

09:41:03  25             Are there any labs that you see that have a

09:41:03  1    disproportionate number of claims that were denied with

09:41:03  2    respect to the other labs?

09:41:03  3        A.   Well, certainly when we look at the aggregate

09:41:03  4    numbers on this page, BioHealth jumps out at me.  The

09:41:03  5    vast majority of the claims and the damages are

09:41:03  6    associated with BioHealth.

09:41:03  7        Q.   And do you see which plan most of those claims

09:41:03  8    are associated with?

09:41:03  9        A.   I do.  They are all from a plan called Florida

09:41:03  10   Individual, approximately in the center of the table

09:41:03  11   there.

09:41:03  12       Q.   Again, these are the charge amounts listed in

09:41:03  13   the table; is that correct?

09:41:03  14       A.   Yes.

09:41:03  15       Q.   And then at the bottom you have "Total

09:41:03  16   multiplied by," and there are three amounts listed at the

09:41:03  17   bottom?

09:41:03  18            MS. KINGSBERY:  Objection, Your Honor.  This is

09:41:03  19   outside the scope of Mr. Haney's report.  He didn't

09:41:03  20   include any calculations in his report or analysis with

09:41:03  21   respect to the individual labs.

09:41:03  22            MR. GESTRICH:  This is a summary of his Exhibit

09:41:03  23   C -- and I'm sorry.  The number is 6971.  This is not

09:41:03  24   new opinion.  This is a summary of this.  I understood

09:41:03  25   when we talked about simplifying this --

09:41:03  1          THE COURT:  Could someone publish for the Court

09:41:03  2   only 6971 just to refresh my recollection.  Oh, no.  It's

09:41:03  3   in evidence, but it's just for us.  Just publish it to

09:41:03  4   the lawyers and me, please, 6971.  Just so I remember

09:41:03  5   what it is.  We've seen a few.  Hello.  Maybe you have to

09:41:03  6   tell them, Attorney Gestrich.

09:41:03  7          MR. GESTRICH:  6971.  Oh, I -- he's finding it.

09:41:03  8          THE COURT:  Fine.  Thank you.  There it is.  Can

09:41:03  9   you tell me how many pages are in that?  Is this one of

09:41:03  10  those data --

09:41:03  11         MR. GESTRICH:  If I recall correctly, I believe

09:41:03  12  this is upwards of a thousand pages.

09:41:03  13         THE COURT:  Yeah.  Okay.  Do you have a basis to

09:41:03  14  suggest that the representation he made is wrong, that

09:41:03  15  the data that supports 6983, which is offered.  Is

09:41:03  16  that -- that's what's offered.  Is not just a different

09:41:03  17  -- a presentation by Labs?

09:41:03  18         MS. KINGSBERY:  Our objection is that none of

09:41:03  19  this is in his report.

09:41:03  20         THE COURT:  Overruled.  You may publish it.

09:41:03  21         MR. GESTRICH:  Can we please return to 6983,

09:41:03  22  page 1.

09:41:03  23  BY MR. GESTRICH:

09:41:03  24    Q.    The bottom states, "Total multiplied by," and

09:41:03  25  then gives a series of numbers.  Just refreshing our

09:41:03  1    recollection, those numbers listed, those were the

09:41:03  2    payment ratios that you determined were appropriate for

09:41:03  3    each year; is that correct?

09:41:03  4         A.    The percentages are.  So where you see 70

09:41:03  5    percent, 75 percent, 53 percent, those are all the

09:41:03  6    payment ratios for each respective year.

09:41:03  7         Q.    So the total numbers for each of the Labs -- and

09:41:03  8    I just want to get -- clarify that.  The total numbers

09:41:03  9    for each Labs that you opined are damages for the Labs,

09:41:03 10    for BioHealth is $3,501,090; is that correct?

09:41:03 11         A.    Yes.

09:41:03 12         Q.    For Epic is $855,474; is that correct?

09:41:03 13         A.    Yes.

09:41:03 14         Q.    And for PBL is $729,366; is that correct?

09:41:03 15         A.    Yes, that's correct.

09:41:03 16         Q.    I just want to draw your attention to one last

09:41:03 17    issue.  On page 4 of this Exhibit 6983, do you see where

09:41:03 18    most of the charges are listed?

09:41:03 19         A.    Yes.  On this chart, BioHealth, again, it's

09:41:03 20    representing the vast majority of the claims, as well as

09:41:03 21    the charge amounts and the damages.

09:41:03 22         Q.    And do you recall just a moment ago we were

09:41:03 23    looking at -- if you need us to turn back, we can -- for

09:41:03 24    Epic Reference 855,474 in the bottom number?  We can call

09:41:03 25    out -- your total damages number for Epic Reference is

```
09:41:03   1   listed as 855,474.  Do you see that?
09:41:03   2       A.   Yes.
09:41:03   3       Q.   And then do you see back on page 4, it is just
09:41:03   4   less than $100,000 less, meaning most of the denials for
09:41:03   5   Epic Reference occurred in 2015; is that correct?
09:41:03   6            THE COURT:  Just for the record, the lawyer's
09:41:03   7   question was given while highlighting the column Epic
09:41:03   8   Scenario and the number at the bottom.
09:41:03   9            MR. GESTRICH:  Thank you, Your Honor.
09:41:03  10   BY MR. GESTRICH:
09:41:03  11       Q.   You have given a number of opinions today.  Do
09:41:03  12   you hold all of those opinions to a reasonable degree of
09:41:03  13   certainty?
09:41:03  14       A.   Yes.
09:41:03  15            MR. GESTRICH:  Thank you.  I pass the witness.
09:41:03  16            THE COURT:  All right.  Cross-examination,
09:41:03  17   please.
09:41:03  18            MS. KINGSBERY:  May it please the Court.
09:41:03  19                     CROSS-EXAMINATION
09:41:03  20   BY MS. KINGSBERY:
09:41:03  21       Q.   Good morning, Mr. Haney.
09:41:03  22       A.   Good morning.
09:41:03  23       Q.   My name is Kelsey Kingsbery.  We've met before,
09:41:03  24   at least virtually.  Do you recall?
09:41:03  25       A.   I do.
```

09:41:03  1      Q.    I took your deposition twice.  I understand you

09:41:03  2   have been retained by counsel for the Labs to provide

09:41:03  3   some opinions in the case, correct?

09:41:03  4      A.    Yes.

09:41:03  5      Q.    And you have submitted three reports in total;

09:41:03  6   is that right?

09:41:03  7      A.    I think that's right.  An original expert

09:41:03  8   report, an amended expert report and a rebuttal report

09:41:03  9   are the three that I recall.

09:41:03  10      Q.    Right.  And you submitted the expert -- the

09:41:03  11   first expert report in March 2023, correct?

09:41:03  12      A.    That sounds right.

09:41:03  13      Q.    And then an amended report in April 2024, right?

09:41:03  14      A.    Yes.

09:41:03  15      Q.    And you are being paid for your testimony here

09:41:03  16   today, correct?

09:41:03  17      A.    No, that's not correct.

09:41:03  18      Q.    You are not being compensated to offer your

09:41:03  19   expert opinions in this case?

09:41:03  20      A.    My payment is not contingent upon what I testify

09:41:03  21   to at all.  We're paid for my time and work on this case.

09:41:03  22   It's not contingent at all on the testimony or the

09:41:03  23   outcome of the case.

09:41:03  24      Q.    You are being compensated for your time to work

09:41:03  25   on this case, correct?

09:41:03  1      A.   Yes.

09:41:03  2      Q.   It's about $595 an hour; is that right?

09:41:03  3      A.   It's exactly $595 an hour.

09:41:03  4      Q.   And I understand from your testimony that you

09:41:03  5  have formed some opinions about sample sets that Cigna's

09:41:03  6  SIU used; is that right?

09:41:03  7      A.   Yes.

09:41:03  8      Q.   And one of those was a sample set of ten.

09:41:03  9  That's what you referred to it as, correct?

09:41:03  10     A.   Yes.

09:41:03  11     Q.   You understand that sample set of ten was ten

09:41:03  12  sets of medical records for patients?

09:41:03  13     A.   Yes.

09:41:03  14     Q.   Let me rephrase.  It was medical records for ten

09:41:03  15  patients, correct?

09:41:03  16     A.   Yes, that's my understanding.

09:41:03  17     Q.   And your opinion had to do with the design and

09:41:03  18  execution of the sample set of those medical records,

09:41:03  19  correct?

09:41:03  20     A.   Yes.

09:41:03  21     Q.   And you have an accounting degree, right?

09:41:03  22     A.   No, that's not correct.

09:41:03  23     Q.   You have a background in accounting?

09:41:03  24     A.   I'm a certified public accountant.  I have

09:41:03  25  completed graduate coursework in accounting.

09:41:03  1    Q.   And you also have some background in statistics

09:41:03  2  as well, I believe?

09:41:03  3    A.   I do have a graduate certificate in applied

09:41:03  4  statistics, and I've been performing statistical and

09:41:03  5  accounting work for over 20 years now.

09:41:03  6    Q.   You don't have a medical degree, correct?

09:41:03  7    A.   I do not.

09:41:03  8    Q.   You don't also have any clinical training in

09:41:03  9  medicine, right?

09:41:03  10    A.   No, that's not correct.

09:41:03  11    Q.   You have clinical training in medicine?

09:41:03  12    A.   I do.

09:41:03  13    Q.   What is that?

09:41:03  14    A.   I have spent 20 years in the Army Reserve as a

09:41:03  15  medical service officer at a time when we were in two

09:41:03  16  wars.  We have a variety of clinical medical training.

09:41:03  17  I'm happy to walk you through all the details of it.

09:41:03  18    Q.   Do you have any experience analyzing medical

09:41:03  19  records to determine medical necessity?

09:41:03  20    A.   No.

09:41:03  21    Q.   Do you have any experience analyzing claims data

09:41:03  22  to determine medical necessity?

09:41:03  23    A.   No.

09:41:03  24    Q.   And you yourself didn't review the medical

09:41:03  25  record that you believe Cigna's SIU reviewed in

09:41:03  1    connection with that sample set of ten, correct?

09:41:03  2        A.   I didn't review them from a clinical standpoint.

09:41:03  3    I may have seen them just to see what they compose, but I

09:41:03  4    didn't review them from a clinical standpoint.

09:41:03  5        Q.   So you wouldn't know how many individual drug

09:41:03  6    testing results Dr. Nicoll reviewed in connection with

09:41:03  7    his review, correct?

09:41:03  8        A.   I don't, no.

09:41:03  9        Q.   And you wouldn't know how many claims for

09:41:03  10   payment Dr. Nicoll reviewed either, right?

09:41:03  11       A.   Right, I don't know.  I would need to see the

09:41:03  12   details of what he described in the Cigna SIU case notes.

09:41:03  13   I recall some description, but I can't recall exactly if

09:41:03  14   it talked about what he reviewed, how many of those

09:41:03  15   things he reviewed.

09:41:03  16       Q.   You are not aware if he reviewed medical records

09:41:03  17   for hundreds of individual claims for payment for PB

09:41:03  18   Labs, right?

09:41:03  19       A.   I haven't seen any evidence of that.

09:41:03  20       Q.   And in forming your opinion, you also didn't

09:41:03  21   consider the second review of medical records that

09:41:03  22   Dr. Nicoll conducted in May of 2014?

09:41:03  23       A.   I haven't see any evidence of that.

09:41:03  24       Q.   And you didn't include that sample in any of the

09:41:03  25   analysis that I heard about this morning, correct?

09:41:03  1      A.   I haven't seen any evidence of it, so I
09:41:03  2  certainly didn't analyze.
09:41:03  3      Q.   So you don't know how many medical records he
09:41:03  4  reviewed in connection with that review then, correct?
09:41:03  5      A.   I don't know if he reviewed any.
09:41:03  6      Q.   So you don't have any opinion with respect to
09:41:03  7  the statistical reliability of that sample set, correct?
09:41:03  8      A.   I don't know that I can answer that.  I don't
09:41:03  9  know that it even exists.  I don't know if he did
09:41:03  10  anything, so I don't have any opinions about what he may
09:41:03  11  or may not have done.
09:41:03  12      THE COURT:  I don't understand your question.  I
09:41:03  13  don't know what the basis is.
09:41:03  14      MS. KINGSBERY:  The question was whether he had
09:41:03  15  an opinion with respect to the sample set that Dr. Nicoll
09:41:03  16  reviewed in May of 2014.
09:41:03  17      THE COURT:  Okay.  Sorry I interrupted you.
09:41:03  18  BY MS. KINGSBERY:
09:41:03  19      Q.   You are not qualified to assess whether a drug
09:41:03  20  testing service is medically necessary, correct?
09:41:03  21      A.   I don't think so, no.
09:41:03  22      Q.   And you don't have an opinion as to whether any
09:41:03  23  of the drug testing services that the Labs performed were
09:41:03  24  medically necessary for the treatment of the patient,
09:41:03  25  right?

09:41:03  1     A.    No.

09:41:03  2     Q.    You also discussed a sample set of eight related

09:41:03  3   to an investigation to PB Labs; is that right?

09:41:03  4     A.    Yes.

09:41:03  5     Q.    And you referred to some communications with

09:41:03  6   patients in connection with that investigation, right?

09:41:03  7     A.    I need to refresh myself with my report.  Is

09:41:03  8   that all right?

09:41:03  9     Q.    You may.

09:41:03  10    A.    And your question was specific to the sample of

09:41:03  11  eight; is that correct?

09:41:03  12    Q.    That's correct.

09:41:03  13    A.    I apologize.  Give me just a second.  I

09:41:03  14  apologize.  Could you ask your question one more time?

09:41:03  15    Q.    You testified regarding certain communications

09:41:03  16  with patients in connection with the investigation,

09:41:03  17  right, and sample set of eight?

09:41:03  18    A.    That's my understanding of the investigation

09:41:03  19  that was performed with regard to the sample of eight.

09:41:03  20  It was an investigation into certain -- into eight

09:41:03  21  patients or eight claims.  And there were communications

09:41:03  22  performed for each of those eight, many of which were not

09:41:03  23  responded to.

09:41:03  24    Q.    You understand that contacting patients was just

09:41:03  25  one aspect of the investigation?

09:41:03  1       A.   I don't know that I can answer that.  With

09:41:03  2  regard to the sample -- I apologize.  My analysis was

09:41:03  3  focused on the sample of eight.  I wasn't focused on

09:41:03  4  other aspects of the investigation to the extent that PB

09:41:03  5  Labs was flagged by Cigna, I understand from Ms. Canto's

09:41:03  6  testimony that the reason the lab was flagged was because

09:41:03  7  of the sample of eight.  I don't recall any other

09:41:03  8  evidence that she testified about as the basis for her

09:41:03  9  flagging the claims.  But to the extent I reviewed it, I

09:41:03  10  reviewed the sample of eight based on her contention that

09:41:03  11  that was the purpose for the flag.

09:41:03  12       Q.   So you didn't consider any other documents that

09:41:03  13  PB Labs would have provided to Cigna in connection with

09:41:03  14  the investigation?

09:41:03  15       A.   I haven't seen any evidence of that, to the

09:41:03  16  extent it exists.  I didn't consider because I haven't

09:41:03  17  seen it.

09:41:03  18       Q.   Then you also wouldn't have considered any

09:41:03  19  documents that Cigna requested from PB Labs that PB Labs

09:41:03  20  was unable to provide to Cigna?

09:41:03  21            MR. GESTRICH:  Your Honor, this is going well

09:41:03  22  beyond the scope of Mr. Haney's opinions.  He testified

09:41:03  23  as to sampling design and whether the sample design was

09:41:03  24  appropriate, not these other topics that are coming up.

09:41:03  25            THE COURT:  Do you claim it?

09:41:03  1          MS. KINGSBERY:  I do, Your Honor.  He's reached

09:41:03  2   a conclusion regarding the validity of the --

09:41:03  3          THE COURT:  Sample size.

09:41:03  4          MS. KINGSBERY:  Conclusion as to the propriety

09:41:03  5   of the flag.  He didn't consider any other aspect of the

09:41:03  6   investigation.

09:41:03  7          MR. GESTRICH:  He testified as to the samples.

09:41:03  8          THE COURT:  I think we'll take our break early.

09:41:03  9   This is about the sixth thing I'm going to discuss at the

09:41:03 10   break.  So I'm not sure.  This may be one of those times

09:41:03 11   when I'm going to not get you back on time.  I know it

09:41:03 12   will be 20 minutes.  And if it is going to be much

09:41:03 13   longer, Liana will give you a heads, but count on 20.

09:41:03 14   Thanks very much, ladies and gentlemen.

09:41:03 15          (In the absence of the jury at 11:11 a.m.)

09:41:03 16          THE COURT:  You can step down, sir.  You

09:41:03 17   probably should leave.  You should be back -- at least

09:41:03 18   check in at about 11:30, a little before the 20.  Thanks

09:41:03 19   very much.

09:41:03 20          I thought his opinion was that your statistical

09:41:03 21   bases for flagging and denying the claims was unreliable

09:41:03 22   or not proper, had no basis, whatever words he used.  He

09:41:03 23   didn't talk about, you know, services not rendered.  I

09:41:03 24   mean, I guess he didn't review evidence from the Labs

09:41:03 25   that they actually put a sample in a machine and ran and

09:41:03  1   got an output, right.  He talked about the statistical

09:41:03  2   basis.

09:41:03  3        MS. KINGSBERY:  Yeah.  So his opinion is that

09:41:03  4   the flag was flawed because it was based on the

09:41:03  5   statistical sample.  So we're entitled to cross-examine

09:41:03  6   him on the fact that he didn't consider all of other

09:41:03  7   bases for the flag.

09:41:03  8        THE COURT:  Give me a second.  I think I

09:41:03  9   actually wrote this one down.  What's your recollection

09:41:03 10   of his testimony, Attorney Gestrich?

09:41:03 11        MR. GESTRICH:  My recollection is he was

09:41:03 12   directing his testimony at the samples and whether the

09:41:03 13   samples were appropriate.  Any conclusions from those

09:41:03 14   sample he opined would be invalid because they were

09:41:03 15   improperly designed.  He is not testifying about these

09:41:03 16   other topics.  And in particular, we would not go into

09:41:03 17   those other topics because they are the other aspects of

09:41:03 18   the fee forgiveness.

09:41:03 19        THE COURT:  Terri, can you get me back up to the

09:41:03 20   section where the cross begins?  I just want to see how

09:41:03 21   you -- you asked him some question on his opinions, and I

09:41:03 22   want to see how you phrased it.  Can you show me where

09:41:03 23   you have cross starting?  I've got it.

09:41:03 24        Attorney Gestrich, just direct -- you didn't use

09:41:03 25   the word "opinion" when you asked him, though, his

09:41:03  1  opinion.  I'm just trying to find one place.

09:41:03  2          I don't think you are entitled to, but because

09:41:03  3  it's cross, it's an expert, I'm going to let you continue

09:41:03  4  to cross him a bit about other things that when -- you're

09:41:03  5  going to claim went into Cigna's decision to, for

09:41:03  6  example, flag for fee forgiveness or some other grounds,

09:41:03  7  services not provided.

09:41:03  8          I'm just troubled that your questions are framed

09:41:03  9  in a way that suggest he was opining that Cigna's -- he

09:41:03 10  was basically doing, you know, a medical necessity

09:41:03 11  assessment, which he clearly wasn't, and he said that.

09:41:03 12  I'm just wondering if I should allow the Labs to ask one

09:41:03 13  question on redirect as to what he was doing was

09:41:03 14  analyzing the statistical bases and concluding that the

09:41:03 15  conclusion to Cigna was flawed because it was based --

09:41:03 16  ones of its bases was flawed.  That's what his opinion

09:41:03 17  was.

09:41:03 18          And your questions, I know they are leading and

09:41:03 19  I know it's cross, but because I don't generally allow

09:41:03 20  redirect, they are in some ways very misleading the way

09:41:03 21  you frame them.  I'm not saying you're doing anything

09:41:03 22  wrong.  Don't get me wrong, Attorney Kingsbery.  I'm just

09:41:03 23  saying that I'm concerned.  You know, 403 says I'm

09:41:03 24  supposed to keep things out that confuse the jury.  And I

09:41:03 25  know that opponent's cross is meant to do that, but

09:41:03  1    there's a point at which it becomes really misleading.  I

09:41:03  2    don't know how to tell you to frame it, but I may turn to

09:41:03  3    Attorney Gestrich and say a few questions on redirect,

09:41:03  4    and which I'm letting him merely ask, in effect, the

09:41:03  5    jury, for him, the witness, to define the scope of his

09:41:03  6    engagement in this respect, are we talking about the

09:41:03  7    statistical, whether the statistical samples were valid,

09:41:03  8    and as they formed a basis, they formed either that -- a

09:41:03  9    basis for Cigna's decision not to pay.

09:41:03  10          Would that be a correct statement, Attorney

09:41:03  11   Gestrich, of the sum of what he testified in that regard?

09:41:03  12          MR. GESTRICH:  Yes, Your Honor.

09:41:03  13          THE COURT:  So I don't know that I am going to

09:41:03  14   turn to you because it depends really on how I hear the

09:41:03  15   rest of the cross, but I might.  And that's what you are

09:41:03  16   allowed to do and not much more.

09:41:03  17          There was an objection, I think, to -- jeepers.

09:41:03  18   It's going to be 6983, page 4.  There was a calculation,

09:41:03  19   Attorney Kingsbery, that you said hadn't been in his

09:41:03  20   report.  However, just so the record is clear -- and I

09:41:03  21   understand that's a good objection.  But I -- my

09:41:03  22   understanding is it was merely breaking out total sums

09:41:03  23   from things in the report that was exchanged a long time

09:41:03  24   ago into the three labs, a bucket for each lab.  Is that

09:41:03  25   a fair statement, sir?

09:41:03  1          MR. GESTRICH:  Yes, Your Honor.

09:41:03  2          THE COURT:  Can you tell me, Attorney Gestrich,

09:41:03  3  when was that produced to Cigna and identified as an

09:41:03  4  exhibit?  I've got a second question, and that is:  When

09:41:03  5  did you tell them it was likely to be used?

09:41:03  6          MR. GESTRICH:  Yes, Your Honor.  An earlier

09:41:03  7  version of this was given to Cigna in June, and that was

09:41:03  8  before the Court narrowed the Labs' claims.

09:41:03  9          THE COURT:  Yeah.  I -- his numbers in the

09:41:03 10  original report, I didn't go to check, but they are

09:41:03 11  higher than what he put in evidence today, right?

09:41:03 12          MR. GESTRICH:  Yes, Your Honor.

09:41:03 13          THE COURT:  And I did those rulings when?

09:41:03 14          MR. GESTRICH:  I believe you did those rulings

09:41:03 15  in September.  I would like to say it was somewhere

09:41:03 16  within about seven to ten days we had the updated numbers

09:41:03 17  to Cigna.

09:41:03 18          THE COURT:  Those were exchanged with Cigna?

09:41:03 19          MR. GESTRICH:  Yes, Your Honor.

09:41:03 20          THE COURT:  And that's what he testified to?

09:41:03 21          MR. GESTRICH:  Yes, Your Honor.

09:41:03 22          THE COURT:  And when did -- this particular

09:41:03 23  exhibit, you have it listed as likely to offer with

09:41:03 24  objection.  I understand that.  When did you tell them

09:41:03 25  you were likely to offer -- I guess I didn't ask you to

09:41:03  1    do that until fairly recently.

09:41:03  2         MR. GESTRICH:  Yes.  We listed it as likely to

09:41:03  3    offer as soon as that was recommended for the --

09:41:03  4         THE COURT:  All right.  I stand by my ruling.

09:41:03  5    Obviously, it has been shown, but I -- I don't see.  It

09:41:03  6    is not a surprise.  It was consistent with the rulings.

09:41:03  7    It was disclosed, the calculation, some time ago, months

09:41:03  8    ago.  Not that I like this to happen, but I don't see

09:41:03  9    that it was a basis to keep it from the jury to give them

09:41:03  10   current numbers.

09:41:03  11        I will have to look at the question.  I don't

09:41:03  12   know the prejudgment interest goes to the jury.  Maybe it

09:41:03  13   does in Florida.

09:41:03  14        MS. KINGSBERY:  Our understanding it doesn't.

09:41:03  15        THE COURT:  That's okay, because there's no

09:41:03  16   charge on it, so if it did, I've got to ask Alex where's

09:41:03  17   my charge.  But I guess what I will have to add is -- at

09:41:03  18   the end of your case, I will probably add a sentence --

09:41:03  19   if you'd make a note of this, Alex -- to the effect when

09:41:03  20   I do the damages section, I will just add a sentence

09:41:03  21   saying that you have heard testimony about the

09:41:03  22   prejudgment interest, but that was testimony for the

09:41:03  23   Court, that's not an issue for you to worry about,

09:41:03  24   something like that.  Is that going to be objected to?

09:41:03  25        MR. GESTRICH:  I just want to add a

```
09:41:03   1    clarification on that prong.
09:41:03   2            THE COURT:  Yeah.
09:41:03   3            MR. GESTRICH:  These are claims from all
09:41:03   4    different years.
09:41:03   5            THE COURT:  I know.
09:41:03   6            MR. GESTRICH:  And so if the jury comes back
09:41:03   7    with less than all claims, it will be very difficult
09:41:03   8    for --
09:41:03   9            THE COURT:  So you don't want me to ask each lab
09:41:03  10    -- three labs times four years?
09:41:03  11            MR. GESTRICH:  Three labs times four years.  But
09:41:03  12    there is -- in Florida, it's considered a substantive
09:41:03  13    part.
09:41:03  14            THE COURT:  It goes to the jury, you're telling
09:41:03  15    me?
09:41:03  16            MR. GESTRICH:   I do not -- that question
09:41:03  17    itself, I'm not --
09:41:03  18            THE COURT:  You can add that to your list of
09:41:03  19    things to do.
09:41:03  20            MR. GESTRICH:  Yes.
09:41:03  21            THE COURT:  It's not in Connecticut.  I don't
09:41:03  22    believe it is in New York.  I don't think it is in
09:41:03  23    Massachusetts.  Those are the only jurisdictions I can
09:41:03  24    speak to.  So you are going to have to show me that as a
09:41:03  25    matter of the substantive claim in Florida, not only is
```

09:41:03  1    it the loss, the amount not paid that should have been

09:41:03  2    paid in 2013, but it's the interest from then to the date

09:41:03  3    of judgment.  You are going to have to show me cases on

09:41:03  4    that or statute or something or a form verdict, I don't

09:41:03  5    know.

09:41:03  6           MR. GESTRICH:  Yes, there are cases on that,

09:41:03  7    and we will submit those.  Thank you.

09:41:03  8           THE COURT:  I will add that to their list.  We

09:41:03  9    are going to start keeping a running list of what we're

09:41:03  10   expecting from everybody.

09:41:03  11          What else?  There was something else.  Liana,

09:41:03  12   did you give them a list of the exhibits in as of this

09:41:03  13   morning?

09:41:03  14          THE CLERK:  No.

09:41:03  15          THE COURT:  So you are going to do that?

09:41:03  16          THE CLERK:  Yes.

09:41:03  17          THE COURT:  So you understand my procedure.

09:41:03  18   Apparently I think on the Cigna side, the paralegal on

09:41:03  19   your team has been asking her about what's in and isn't,

09:41:03  20   and that's not how I do it, because you are going to

09:41:03  21   drive her crazy.  Okay.  So what she's going to do is

09:41:03  22   she's going to give you a list before the end of lunch.

09:41:03  23   And you -- each of you, someone on your team is going to

09:41:03  24   be responsible for exhibits.  And that person -- it can

09:41:03  25   be eight people doing it, I don't care, but that somebody

09:41:03 1    is going to be able to tell Liana by tomorrow, we don't

09:41:03 2    think this one, this one, this one are in, but we do

09:41:03 3    think, you know, X, Y, Z is in.  And you are going to

09:41:03 4    give her those numbers.  She's going to check her notes.

09:41:03 5    You know, it's not just the computer.  And she's going to

09:41:03 6    ask me or she'll ask Terri or she'll ask Alex what do we

09:41:03 7    have.  Certainly, Terri's is the controlling.

09:41:03 8          But somehow, we will make a judgment and let you

09:41:03 9    know, so presumably you can still offer evidence to the

09:41:03 10   end, you can fix it or you can tell me, no, the other

09:41:03 11   side things it went in, Judge, you know, whatever.  Yeah,

09:41:03 12   I think that's what we do.  And we'll do it again --

09:41:03 13   we'll probably do it again next Monday afternoon, maybe

09:41:03 14   Tuesday mid-lunch, and then we'll do it -- when the book

09:41:03 15   of evidence is closed, we'll do it again because that's

09:41:03 16   what's going to go to the jury when she hits the button

09:41:03 17   after the charge.  And that has to be -- if it isn't

09:41:03 18   agreed upon, it has to be argued on the record as to who

09:41:03 19   is wrong.

09:41:03 20         What else?  Was there anything else for you?

09:41:03 21         THE CLERK:  No.

09:41:03 22         THE COURT:  The other thing is, Liana, you have

09:41:03 23   to put a note somewhere about 6987, and I think the Labs

09:41:03 24   have a responsibility to provide to her 6987-A.  Let's

09:41:03 25   make it simple which are the pages published and admitted

09:41:03  1   into evidence.  It means you've got to fix your exhibit

09:41:03  2   list because just so you know what happens, when she

09:41:03  3   closes the file that indicates in JERS what's categorized

09:41:03  4   as exhibits as opposed to ID, there then is -- no, JERS

09:41:03  5   doesn't do it.  We get it from the lawyers.  You're not

09:41:03  6   going to know the answer, but -- this is her first trial,

09:41:03  7   by the way, just so you understand I'm trying to protect

09:41:03  8   this poor woman.

09:41:03  9        I think I ask the parties to provide me

09:41:03  10  certainly, you know, either when you are closed, after

09:41:03  11  you have closed or when I'm doing the charge, a clean

09:41:03  12  list of what you think your exhibits are in evidence.

09:41:03  13  So, for example, your list would now say 6987-A and a

09:41:03  14  brief description.  And it wouldn't say 6987, because

09:41:03  15  that's not in evidence.  Same thing for Cigna.

09:41:03  16       Please be sure that the descriptions aren't

09:41:03  17  loaded.  I can't remember the example that happened a

09:41:03  18  couple of years ago, but it was Exhibit 26, document that

09:41:03  19  shows the defendant is guilty.  It wasn't a criminal

09:41:03  20  case, but, you know, it shows they owed me $40 million.

09:41:03  21  I mean, literally, it was not a nice way to describe the

09:41:03  22  document.

09:41:03  23       So it's just to give them a help to try to find

09:41:03  24  what they are looking for when they start arguing or

09:41:03  25  discussing, well, wasn't there a document, let's go find

09:41:03  1    that document to see what that was about.  It helps them

09:41:03  2    find it.  So that's created by you.  It will be marked as

09:41:03  3    an exhibit somehow and be physically given to the jury

09:41:03  4    because it is a paper copy.

09:41:03  5         Okay.  Let's see if there was anything else.

09:41:03  6    Okay.  I don't -- was there any other objection, Attorney

09:41:03  7    Kingsbery or Attorney Gestrich?  I know a couple of times

09:41:03  8    I said keep going, pass it or whatever.  Was there

09:41:03  9    something else that I need to address?

09:41:03  10        MS. KINGSBERY:  I think there was the attorney

09:41:03  11   letter was the other --

09:41:03  12        THE COURT:  Yeah.  Well, I didn't let it get

09:41:03  13   used.  I asked a question.  If you want to object to my

09:41:03  14   question, but I asked you -- I mean you could have

09:41:03  15   challenged.  You know, he made the chart, right?  Well,

09:41:03  16   why did you do this or you did this, didn't you, when you

09:41:03  17   don't know or whatever.  So not that I recommend that

09:41:03  18   cross, but I just can't have you do that if, in fact, he

09:41:03  19   was told certain things and that's the basis for his

09:41:03  20   testimony --

09:41:03  21        MS. KINGSBERY:  Understood.  And that was not

09:41:03  22   what we were --

09:41:03  23        THE COURT:  So assuming she doesn't go there,

09:41:03  24   Attorney Gestrich, do you have an objection to the way I

09:41:03  25   treated it?

09:41:03  1          MR. GESTRICH:  No, not at all.

09:41:03  2          THE COURT:  Liana, tell them we are going to be

09:41:03  3   another -- it will be at 20 of 11:00, we'll bring them

09:41:03  4   in.  Okay.  Just give them a head's up.  That's only --

09:41:03  5   that's about seven or eight off.

09:41:03  6          Unless there's anything else, we'll stand in

09:41:03  7   recess.  Thank you very much.

09:41:03  8          (Whereupon a recess was taken 11:29 a.m. to

09:41:03  9   11:39 a.m.)

09:41:03 10          THE COURT:  Who is taking Attorney Goldfarb as a

09:41:03 11   witness?  Is it you, Attorney Kingsbery?  I don't think

09:41:03 12   so, but I'm asking.

09:41:03 13          MS. KINGSBERY:  That's fine, Your Honor.

09:41:03 14   Attorney Kang will.

09:41:03 15          THE COURT:  And where is Attorney Kang?  Drawing

09:41:03 16   up more demonstrative exhibits?

09:41:03 17          MS. KINGSBERY:  He's upstairs, Your Honor.

09:41:03 18          THE COURT:  That's fine.  He won't be able to

09:41:03 19   use them.

09:41:03 20          Go tell Liana we can go.  That's right, you've

09:41:03 21   still got Mr. Haney on the stand.  So it's reasonable

09:41:03 22   that Attorney Kang isn't here.

09:41:03 23          MS. KINGSBERY:  Yes, Your Honor.

09:41:03 24          THE COURT:  But I can't address an issue that I

09:41:03 25   need to address with him on his witness.  So we'll do

09:41:03  1    that at lunch.  It's okay to go, yes.

09:41:03  2             (In the presence of the jury at 11:40 a.m.)

09:41:03  3             THE COURT:  Do you have any estimate on how much

09:41:03  4    longer, Attorney Kingsbery?

09:41:03  5             MS. KINGSBERY:  Ten minutes, 15 minutes.

09:41:03  6             THE COURT:  Oh, where's the witness?  We didn't

09:41:03  7    excuse him, did we?

09:41:03  8             Everybody be seated.  I think the witness got a

09:41:03  9    different message of when we get back.  But it turns out

09:41:03  10   we could come back now, so we're going to go.  Is he on

09:41:03  11   his way, Counsel?

09:41:03  12            MR. GESTRICH:  He is, Your Honor, right now.

09:41:03  13            THE COURT:  That's fine.  Thanks very much.  It

09:41:03  14   was a bit confusing with the messages.

09:41:03  15            Mr. Haney, if you would take the witness stand

09:41:03  16   again, and the cross-examination is continuing.

09:41:03  17   BY MS. KINGSBERY:

09:41:03  18       Q.   Mr. Haney, I want to close the loop on the

09:41:03  19   sample set of eight that we were discussing before the

09:41:03  20   break.

09:41:03  21            Is it true that your opinion regarding the SIU

09:41:03  22   flag in connection with the sample set of eight is based

09:41:03  23   solely on your opinion with respect to the statistical

09:41:03  24   validity of that sample set; is that correct?

09:41:03  25       A.   I don't understand your question.  Can you

09:41:03   1   rephrase that.

09:41:03   2       Q.   Your opinion regarding the validity of the flag,

09:41:03   3   that's based on your opinion with respect to the

09:41:03   4   statistical reliability of the sample set?

09:41:03   5       A.   One more time.

09:41:03   6       Q.   Let me rephrase.

09:41:03   7            THE COURT:   If you can't answer, you can say

09:41:03   8   that.   If you don't understand or she's making an

09:41:03   9   assumption or something.   Go ahead.

09:41:03  10            THE WITNESS:   Thank you.

09:41:03  11   BYMS. KINGSBERY:

09:41:03  12       Q.   Your opinion is not based on any other aspect of

09:41:03  13   SIU's investigation other than the sample set?

09:41:03  14       A.   My opinion is solely related to the statistical

09:41:03  15   analysis that I performed focusing on the samples.

09:41:03  16       Q.   And Mr. Haney, you also offered an opinion

09:41:03  17   regarding the Labs' estimated damages that were allegedly

09:41:03  18   caused by Cigna's denials of the Labs' claims, correct?

09:41:03  19       A.   Yes.

09:41:03  20       Q.   And you offered an opinion on estimated damages

09:41:03  21   back in 2023, correct?

09:41:03  22       A.   I did.

09:41:03  23       Q.   And your opinion was reflected in your first

09:41:03  24   report; is that right?

09:41:03  25       A.   My opinion at the time, yes.

09:41:03  1        Q.    Okay.  And in forming that opinion, you did not

09:41:03  2    rely on the terms of any of the benefit plans that were

09:41:03  3    applicable to those claims, correct?

09:41:03  4        A.    I don't think that's entirely correct.  The

09:41:03  5    terms, as part of the benefit plans, are reflected

09:41:03  6    largely in the data set that we looked at.  Many of the

09:41:03  7    terms, not all of them.  But for example, the co-pay

09:41:03  8    amount that is owed by a patient, that is reflected in

09:41:03  9    the data set that we looked at.  Some of those terms from

09:41:03  10   the patient plans are reflected in the data set.  To the

09:41:03  11   extent I did need data from the benefit plans, I found

09:41:03  12   that relevant data in the data set, and, therefore, I did

09:41:03  13   not find it necessary to actually review individual plan

09:41:03  14   documents.

09:41:03  15       Q.    And you didn't review any of the plan documents

09:41:03  16   that were applicable to the unpaid claims at issue in

09:41:03  17   your estimated damages opinion, correct?

09:41:03  18       A.    No.  I didn't need to for my analysis.

09:41:03  19       Q.    And then you submitted an amended report; is

09:41:03  20   that right?

09:41:03  21       A.    I did.

09:41:03  22       Q.    You made some changes to your opinion regarding

09:41:03  23   the amount that you believe Cigna should have paid,

09:41:03  24   right?

09:41:03  25       A.    Yes.

09:41:03  1    Q.   We received some appendices this month regarding

09:41:03  2   your opinion.  And as I understand it, is it your opinion

09:41:03  3   that Cigna's denials of the Labs' claims caused estimated

09:41:03  4   damages in the amount of approximately $5 million?

09:41:03  5    A.   For my second opinion, that's correct,

09:41:03  6   approximately, yes.

09:41:03  7    Q.   And that estimation is based a list of claims

09:41:03  8   that you prepared in Amended Appendix C; is that right?

09:41:03  9    A.   Yes.

09:41:03  10        MS. KINGSBERY:  Mr. Salazar, if you can please

09:41:03  11  put up Labs Exhibit 6971, which is already in evidence.

09:41:03  12  It can be shown to the jury.

09:41:03  13  BY MS. KINGSBERY:

09:41:03  14    Q.   This is the list of claims for payment that the

09:41:03  15  Labs contend that Cigna improperly denied, correct?

09:41:03  16    A.   I don't know.  I can't read it.  Is it possible

09:41:03  17  to zoom in?

09:41:03  18        MS. KINGSBERY:  If you can zoom in, Mr. Salazar,

09:41:03  19  so the witness can see.

09:41:03  20        THE WITNESS:  Can you zoom into the title at the

09:41:03  21  top of the page, the header.

09:41:03  22    A.   This is my Appendix C, which is the itemized

09:41:03  23  claims related to damages in this case.  So that's what

09:41:03  24  this is.  Could you ask your question one more time?

09:41:03  25  BY MS. KINGSBERY:

09:41:03   1        Q.    Yes.   This is the list of claims for payment --

09:41:03   2   this list of claims for payment includes the claims for

09:41:03   3   payment that the Labs contend Cigna improperly denied; is

09:41:03   4   that correct?

09:41:03   5        A.    Yes.

09:41:03   6        Q.    But you did not decide which claims for payment

09:41:03   7   to include on this appendix, correct?

09:41:03   8        A.    No.   That was like Ms. Thelian's analysis.

09:41:03   9        Q.    You don't have an opinion as to whether any one

09:41:03  10   of the claims on Appendix C was actually improperly

09:41:03  11   denied; is that right?

09:41:03  12        A.    That's correct.

09:41:03  13        Q.    You didn't know -- you don't have an opinion as

09:41:03  14   to whether any of these claims are actually covered under

09:41:03  15   the applicable benefit plan, correct?

09:41:03  16        A.    That's correct.

09:41:03  17        Q.    Now, you would agree with me that the three labs

09:41:03  18   in this case do not have an in-network agreement with

09:41:03  19   Cigna, right?

09:41:03  20        A.    That's my understanding.

09:41:03  21        Q.    And you would also agree with me that when a

09:41:03  22   provider does not have an in-network agreement, the

09:41:03  23   provider's reimbursement is determined by the patient's

09:41:03  24   benefit plan, correct?

09:41:03  25        A.    I'm not a reimbursement expert.   I don't have an

09:41:03  1    opinion on that or an understanding that I'm comfortable

09:41:03  2    testifying to.

09:41:03  3         Q.   You are not sure how a provider is reimbursed

09:41:03  4    when it doesn't have a network agreement with the plan?

09:41:03  5         A.   I think to the extent you have questions about

09:41:03  6    how reimbursement works in certain circumstances, I'm

09:41:03  7    just not a reimbursement expert.  When it comes to that

09:41:03  8    issue, I don't have any opinions on that.

09:41:03  9         Q.   So you don't know whether the reimbursement

09:41:03  10   would be based on the terms of the patient's benefit plan

09:41:03  11   in this situation?

09:41:03  12        A.   I wouldn't testify to that, no.

09:41:03  13        Q.   Well, would you agree with me that the allowed

09:41:03  14   amount is a factor in determining the amount of

09:41:03  15   reimbursement?

09:41:03  16        A.   Again, I don't have -- not being a reimbursement

09:41:03  17   expert, I can't tell you how reimbursement should work.

09:41:03  18        Q.   I believe in your amended report, you observed

09:41:03  19   that for the claims that Cigna paid, the allowed amount

09:41:03  20   varied materially; is that correct?

09:41:03  21        A.   Yes.

09:41:03  22        Q.   When you calculated your damages estimation for

09:41:03  23   your amended opinion, again, you didn't rely on the terms

09:41:03  24   of any of the benefit plans at issue, correct?

09:41:03  25        A.   I'm sorry.  I missed the last words of your

09:41:03  1    question.

09:41:03  2         Q.   You did not rely on the terms of any of the

09:41:03  3    benefit plans at issue?

09:41:03  4         A.   I think that some of the terms of those benefit

09:41:03  5    plans are included in the data -- they are represented in

09:41:03  6    the data.  I didn't review any benefit plans.

09:41:03  7         Q.   That's my question.  Did you review the terms of

09:41:03  8    any of the benefit plans at issue?

09:41:03  9         A.   I didn't review any.  I didn't need to for my

09:41:03 10    analysis.

09:41:03 11         Q.   And you didn't calculate the allowed amount for

09:41:03 12    any of the claims that are listed on Appendix C; is that

09:41:03 13    right?

09:41:03 14         A.   My understanding of the allowed amount is that

09:41:03 15    it represents the amount that Cigna should have paid for

09:41:03 16    a claim, which mirrors the damages that I calculated in

09:41:03 17    the case for each claim what was the amount that Cigna

09:41:03 18    should have paid for a particular claim.  I did not call

09:41:03 19    it the allowed amount, but I think the practical

09:41:03 20    implications are that the calculation is the same for the

09:41:03 21    allowed amount and the damages that I calculated.

09:41:03 22         Q.   You testified about a column in the data that

09:41:03 23    was labeled the allowed amount; is that right?

09:41:03 24         A.   Yes.

09:41:03 25         Q.   For the claims that were on Appendix C, you

| | | |
|---|---|---|
| 09:41:03 | 1 | didn't calculate the allowed amount for any of those |
| 09:41:03 | 2 | claims that Cigna denied? |
| 09:41:03 | 3 | A.   I didn't call it that.  So if you take a look at |
| 09:41:03 | 4 | my Appendix C, you will not see a column called the |
| 09:41:03 | 5 | allowed amount. |
| 09:41:03 | 6 | Q.   You didn't calculate the deductible amount |
| 09:41:03 | 7 | either? |
| 09:41:03 | 8 | A.   No.  And I wouldn't.  That's -- |
| 09:41:03 | 9 | Q.   Just a yes or no question.  Did you calculate |
| 09:41:03 | 10 | the deductible amount? |
| 09:41:03 | 11 | A.   No. |
| 09:41:03 | 12 | Q.   And you didn't calculate the coinsurance amount, |
| 09:41:03 | 13 | did you? |
| 09:41:03 | 14 | A.   For what? |
| 09:41:03 | 15 | Q.   For any of the claims on Appendix C. |
| 09:41:03 | 16 | A.   I didn't need to. |
| 09:41:03 | 17 | Q.   So is that no, you didn't calculate the |
| 09:41:03 | 18 | coinsurance amount? |
| 09:41:03 | 19 | A.   No, I did not need to. |
| 09:41:03 | 20 | Q.   Now, you said that you relied on Ms. Thelian to |
| 09:41:03 | 21 | identify the claims in Appendix C, correct? |
| 09:41:03 | 22 | A.   That's correct. |
| 09:41:03 | 23 | Q.   And you were in the courtroom for Ms. Thelian's |
| 09:41:03 | 24 | testimony in this trial; is that right? |
| 09:41:03 | 25 | A.   Part of it. |

09:41:03  1      Q.   Did you hear her testify that she has no opinion

09:41:03  2   on whether any of the claims she identified were actually

09:41:03  3   covered under the terms of the benefit plan?  Do you

09:41:03  4   recall that?

09:41:03  5      A.   I don't.

09:41:03  6      Q.   Did you hear her testify that she has no opinion

09:41:03  7   as to whether any of the claims on -- the claims that she

09:41:03  8   identified were for services that were medically

09:41:03  9   necessary?

09:41:03  10     A.   I don't.

09:41:03  11     Q.   Did you hear her testify that she reviewed

09:41:03  12   records from 20 patients in forming her opinion?  Did you

09:41:03  13   hear that part?

09:41:03  14     A.   I don't recall hearing that in her testimony.  I

09:41:03  15   know from discussions with her and from reading her

09:41:03  16   report that she reviewed 20 charts, among other things,

09:41:03  17   as part of her analysis, but I don't recall that in her

09:41:03  18   testimony specifically.

09:41:03  19     Q.   And it's true that she identified thousands of

09:41:03  20   individual claims for payment that she contends were

09:41:03  21   improperly denied, correct?

09:41:03  22     A.   You'd have to ask her those questions.  I don't

09:41:03  23   know.

09:41:03  24     Q.   Well, did you investigate whether Ms. Thelian

09:41:03  25   used a statistically valid sample of claims in forming

09:41:03  1    the list of claims that you put on your Appendix C?

09:41:03  2        A.   I do recall her saying she looked at every

09:41:03  3    single claim.  And that's different from the sample we're

09:41:03  4    talking about.  I remember our discussion, that if you

09:41:03  5    look at the whole population, that's not sampling.

09:41:03  6    That's looking at the entire population.  My

09:41:03  7    understanding is that's what she did, if I'm recalling

09:41:03  8    her testimony correctly.

09:41:03  9             THE COURT:  Excuse me for a moment.  Terri,

09:41:03 10    would you just read back to me the question that was an

09:41:03 11    answer to?  I can't read it.

09:41:03 12             (Requested portion of the record read.)

09:41:03 13             THE COURT:  That's fine.  I just didn't hear the

09:41:03 14    beginning.  Sorry.  Go ahead, Counsel.  Apologies for

09:41:03 15    interrupting.

09:41:03 16    BY MS. KINGSBERY:

09:41:03 17        Q.   So I didn't get an answer to my question.

09:41:03 18             Did you investigate whether the sample that she

09:41:03 19    reviewed the 20 patients were a statistically valid

09:41:03 20    sample?

09:41:03 21        A.   The sample -- I did not, because the sample of

09:41:03 22    patients she reviewed was not her sample selection.  My

09:41:03 23    understanding is she reviewed the same 20 claims as

09:41:03 24    Dr. Nicoll.  Not in an effort to perform statistical

09:41:03 25    sampling, but simply to evaluate what Dr. Nicoll looked

09:41:03  1    at.  That's a different exercise, and I wouldn't have

09:41:03  2    evaluated that to evaluate her conclusions.

09:41:03  3         Q.   But you understand she concluded that thousands

09:41:03  4    of other claims were improperly denied, correct?

09:41:03  5         A.   I don't know what her conclusions are.  You'd

09:41:03  6    have to ask her.

09:41:03  7         Q.   Well, you included thousands of claims on your

09:41:03  8    Appendix C, correct?

09:41:03  9         A.   Yes.

09:41:03  10        Q.   And those were all based on Ms. Thelian's

09:41:03  11   identification of those claims, correct?

09:41:03  12        A.   Correct.

09:41:03  13        Q.   And you did not perform any investigation into

09:41:03  14   whether the sample set that she reviewed was

09:41:03  15   statistically valid?

09:41:03  16        A.   Again, the sample she reviewed was not a sample

09:41:03  17   by itself.  She reviewed a variety of evidence.

09:41:03  18        Q.   Did you conduct an investigation into the -- is

09:41:03  19   the answer no?

09:41:03  20        A.   The answer is no.  I wasn't asked to.  I didn't

09:41:03  21   need to.  It's not what she did in the first place.

09:41:03  22        Q.   Did you investigate whether any of the claims

09:41:03  23   that you put on Appendix C, the Labs had obtained the

09:41:03  24   patient's consent to perform those services?

09:41:03  25        A.   No.

09:41:03  1      Q.   Did you investigate whether any of the claims

09:41:03  2  that you put on Appendix C, the Labs -- the patient had

09:41:03  3  authorized direct payment to the Labs from Cigna?

09:41:03  4      A.   No.  I conducted analysis about statistical

09:41:03  5  sampling and forensic accounting.  That's not relevant to

09:41:03  6  those questions.

09:41:03  7      Q.   Did you calculate estimated damages for the

09:41:03  8  claims on Appendix C assuming a five-year statute of

09:41:03  9  limitations?

09:41:03 10      A.   Can you ask your question one more time?

09:41:03 11      Q.   You didn't exclude from the claims on Appendix C

09:41:03 12  any claims that were submitted before March 27, 2004

09:41:03 13  (sic); is that correct?

09:41:03 14      A.   I'm sorry.  I would have to review the specifics

09:41:03 15  to know an exact date of what the cutoff was.  I don't

09:41:03 16  have that memorized.

09:41:03 17      Q.   Do you know whether you excluded claims that

09:41:03 18  were submitted before March 27, 2014?

09:41:03 19      A.   As I sit here without looking at my report or

09:41:03 20  reviewing the analysis, I don't recall the exact date.

09:41:03 21      Q.   And you didn't exclude any claims for payment

09:41:03 22  that were associated with a self-funded plan for

09:41:03 23  purposes of Appendix C?

09:41:03 24      A.   I did not.  I don't know that someone else did

09:41:03 25  not exclude them.  Again, Ms. Thelian is the one who

09:41:03  1    identified the claims in Appendix C.  So for questions

09:41:03  2    about which claims were in Appendix C or why, those would

09:41:03  3    be questions that she would need to answer.

09:41:03  4         Q.   So you don't know one way or another?

09:41:03  5         A.   That wasn't the analysis that I performed.

09:41:03  6         Q.   And were you asked to calculate damages arising

09:41:03  7    from a violation from Section 627638 of the Florida Code?

09:41:03  8         A.   I don't know what that is.

09:41:03  9         Q.   So, no, you were not?

09:41:03  10        A.   I don't know what that is.  I can't answer your

09:41:03  11   question if you don't tell me exactly what you are

09:41:03  12   talking about.  That code number doesn't mean anything to

09:41:03  13   me.

09:41:03  14        Q.   My question is just whether you performed a

09:41:03  15   calculation as to damages arising from a violation of

09:41:03  16   that code.

09:41:03  17        A.   I don't understand your question so I can't

09:41:03  18   answer it.

09:41:03  19        MS. KINGSBERY:  One second.  I don't have any

09:41:03  20   other questions.

09:41:03  21        THE COURT:  All right.  I think there was a

09:41:03  22   question asked that addressed what my concern was, so I

09:41:03  23   think we're complete with the witness.

09:41:03  24        MR. GESTRICH:  I'm sorry.  The tail end trailed

09:41:03  25   off, and I did not hear.

09:41:03  1           THE COURT:  I said I think that there was a

09:41:03  2   question asked that clarified the concern I had about the

09:41:03  3   line of questioning, so I don't believe -- I believe the

09:41:03  4   witness is done with this aspect of his testimony.

09:41:03  5           MR. GESTRICH:  Thank you, Your Honor.

09:41:03  6           THE COURT:  Mr. Haney, you may step down.  I am

09:41:03  7   not going to excuse you because I think you are being

09:41:03  8   called back.  If I'm wrong about that, my apologies.  But

09:41:03  9   you should speak to counsel.  They're the ones who know.

09:41:03  10  Thank you very much.

09:41:03  11          Your next witness.

09:41:03  12          MR. GESTRICH:  I believe the next witness is

09:41:03  13  by --

09:41:03  14          THE COURT:  You finished your portion of the

09:41:03  15  case at this point that you're -- that we have agreed is

09:41:03  16  how we're going to proceed and we're now going to turn to

09:41:03  17  Cigna; is that correct?

09:41:03  18          MR. GESTRICH:  Yes.

09:41:03  19          THE COURT:  Okay.  If you remember, I hope,

09:41:03  20  ladies and gentlemen, there's two cases here.  Remember I

09:41:03  21  said Labs' case against Cigna and then Cigna's against

09:41:03  22  Labs.  And while there will be evidence and maybe

09:41:03  23  witnesses offered by each side in response to the other

09:41:03  24  side's case, the principal part of the Labs' case is in.

09:41:03  25  At least that's what they are telling me, they think it

09:41:03  1    is.  And so we're going to turn now to allow Cigna the

09:41:03  2    opportunity to call witnesses that they believe are

09:41:03  3    primarily supportive of their case against the Labs.  Is

09:41:03  4    that a fair statement?

09:41:03  5           MS. KINGSBERY:  Your Honor, Matt Ryan is

09:41:03  6    actually a defense witness in the Labs' case.

09:41:03  7           THE COURT:  I'm sorry.  So I can now back up and

09:41:03  8    explain that again.  I misunderstood.

09:41:03  9           In any case one party has against another, the

09:41:03 10    party whose claim it is has to prove certain things to

09:41:03 11    win their claim, right?  I told you about burden of

09:41:03 12    proof, et cetera.  Well, that's -- and so we started with

09:41:03 13    the Labs' case and they put on their witnesses that they

09:41:03 14    were -- they're going to argue proves their claim.

09:41:03 15           Every defendant in a case, which at this point

09:41:03 16    is -- Cigna is the defendant to the Labs' claim, gets to

09:41:03 17    call witnesses to defend against the witnesses and

09:41:03 18    evidence you have heard.  That's what we're going to do

09:41:03 19    next.  My apologies.  So the bottom line is, Cigna is

09:41:03 20    going to call a witness.

09:41:03 21           So would you call your witness.

09:41:03 22           MS. KINGSBERY:  Yes, Your Honor.  Matt Ryan.

09:41:03 23           THE COURT:  Mr. Ryan, if you'd come up here to

09:41:03 24    the witness stand where I'm pointing.  And when you get

09:41:03 25    there, if you'd remain standing.  The clerk is going to

```
09:41:03   1    administrator an oath to you.  Thank you.
09:41:03   2                        MATTHEW RYAN,
09:41:03   3    having been called as a witness, was first duly sworn and
09:41:03   4           testified on his oath as follows:
09:41:03   5           THE WITNESS:  I do.
09:41:03   6           THE CLERK:  Please be seated.  State your name
09:41:03   7    for the record, spelling your last name.
09:41:03   8           THE WITNESS:  My name is Matthew Ryan.  Last
09:41:03   9    name is R-Y-A-N.
09:41:03  10                     DIRECT EXAMINATION
09:41:03  11    BY MS. KINGSBERY:
09:41:03  12        Q.   Hi, Mr. Ryan.  Were you retained by Cigna as an
09:41:03  13    expert to offer some opinions in this case?
09:41:03  14        A.   Yes.  I was retained to review and analyze the
09:41:03  15    methodology employed by Mr. Haney to calculate the
09:41:03  16    alleged damages due to the Labs.
09:41:03  17        Q.   Are you here today to testify about those
09:41:03  18    opinions?
09:41:03  19        A.   Yes, I am.
09:41:03  20        Q.   Before we get to them, I would like you to tell
09:41:03  21    the jury a little bit about your background, starting
09:41:03  22    with your education.
09:41:03  23        A.   I graduated from Wake Forest University with a
09:41:03  24    degree in finance.
09:41:03  25        Q.   Where is it that you work?
```

09:41:03  1        A.    I work for Ankura Consulting.  It's a global

09:41:03  2    litigation and management consulting firm.  The company

09:41:03  3    assists clients in a number of different industries

09:41:03  4    usually undergoing some risk-related event, like a

09:41:03  5    dispute, a litigation, investigation, Government inquiry,

09:41:03  6    something of that nature.

09:41:03  7        Q.    And what is your current role?

09:41:03  8        A.    I'm a senior managing director in our disputes

09:41:03  9    and economics practice, specifically on our health care

09:41:03  10   team where I specialize and lead a team of consultants

09:41:03  11   that assist health care -- exclusively health care

09:41:03  12   clients in a variety of matters involving typically

09:41:03  13   claims reimbursement, the pricing, payment, billing

09:41:03  14   submission of medical claims in a variety of contexts.

09:41:03  15       Q.    Do you have a particular specialization?

09:41:03  16       A.    Yes.  My -- the cases I'm involved in typically

09:41:03  17   involve the administration of managed care benefits.  And

09:41:03  18   the matters I'm involved in involve usually a dispute

09:41:03  19   between two parties over the billing submission, payment,

09:41:03  20   pricing, processing of individual medical claims.

09:41:03  21           In that capacity, I think we have heard a little

09:41:03  22   bit earlier today about the data -- the electronic data

09:41:03  23   that's generated in those types of disputes.  So my

09:41:03  24   specialty is, you know, analyzing health care -- specific

09:41:03  25   health care claims data in the context of understanding

09:41:03  1  and assessing the manner in which health care claims were

09:41:03  2  submitted, paid and processed.

09:41:03  3      Q.   How long have you worked at Ankura?

09:41:03  4      A.   I've worked at Ankura for approximately six

09:41:03  5  years.  Since Ankura acquired my prior organization,

09:41:03  6  Navigant Consulting, in approximately 2018.

09:41:03  7      Q.   Did you work for Navigant?

09:41:03  8      A.   I did.  I worked for Navigant since I graduated

09:41:03  9  Wake Forest through the time in which Ankura acquired

09:41:03  10  basically the entirety of the disputes-related business

09:41:03  11  in 2018, and I have worked at Ankura since then.

09:41:03  12      Q.   And what -- was your work at Navigant similar to

09:41:03  13  your work at Ankura?

09:41:03  14      A.   It was.  Like I said, the entire disputes

09:41:03  15  business was acquired.  So my role and work at Ankura --

09:41:03  16  or at Navigant was essentially the same as the work I do

09:41:03  17  now.  Navigant had a number of different businesses, but

09:41:03  18  I focused in similar disputes and sort of risk-related

09:41:03  19  engagements.

09:41:03  20      Q.   How long in total have you been doing this kind

09:41:03  21  of work?

09:41:03  22      A.   Just under 16 years across my time at both

09:41:03  23  Navigant and Ankura.  Again, for the vast majority, I

09:41:03  24  would say almost 15 of that 16 years, exclusively work on

09:41:03  25  health care claims, reimbursement-related engagements.

09:41:03  1      Q.   And what about health care reimbursement

09:41:03  2  disputes, is that something you work on?

09:41:03  3      A.   Yes.  Like I referenced earlier, many of these

09:41:03  4  engagements, there's a dispute between two parties over

09:41:03  5  how claims were billed, submitted, the rate that was paid

09:41:03  6  on the claims, how they were processed.  So the disputes

09:41:03  7  can take a variety of different forms.

09:41:03  8          The common one is between a provider that sort

09:41:03  9  of renders and bills for the service, and the payor that

09:41:03 10  processes and pays the claim.

09:41:03 11          Other disputes can arise between groups of

09:41:03 12  members about how their claims were covered and their

09:41:03 13  benefits were administered.  I referenced early

09:41:03 14  investigations from a Government entity that's inquiring

09:41:03 15  about how a set of claims were processed and paid.  The

09:41:03 16  disputes can take a number of different forms.

09:41:03 17      Q.   And when you are hired to provide services in

09:41:03 18  connection with these healthcare reimbursement disputes,

09:41:03 19  what kind of analysis do you typically provide?

09:41:03 20      A.   The analyses can vary significantly based on the

09:41:03 21  nature of the issues that are in dispute.  You know, I

09:41:03 22  can review the information and the data available to just

09:41:03 23  understand kind of the fact pattern of what happened over

09:41:03 24  time.  How the submission and billing of claims changed.

09:41:03 25  How claims were processed over a course of time in

09:41:03  1    different markets for different types of services.  Kind

09:41:03  2    of understanding the overview of a particular dispute.

09:41:03  3           In many instances, I'm asked to analyze how

09:41:03  4    claims were paid, but also assess and develop analyses

09:41:03  5    that quantify the financial impact if the claims were to

09:41:03  6    have been processed or paid a different way.  So there

09:41:03  7    might be a dispute over a contract.  If contract A was

09:41:03  8    applied instead of contract B, how would that impact the

09:41:03  9    payment that was ultimately made.  You know, if certain

09:41:03 10    claims that weren't paid were, what would the financial

09:41:03 11    impact be.  So many of the cases that I'm involved in

09:41:03 12    have that sort of financial impact or damages component

09:41:03 13    to them.

09:41:03 14        Q.   Approximately how many of these health care

09:41:03 15    disputes have you handled over the course of your career?

09:41:03 16        A.   Many.  I would say hundreds at this point.  I

09:41:03 17    have been working exclusively on these health care

09:41:03 18    claims, reimbursement-type disputes, for nearly my entire

09:41:03 19    career.

09:41:03 20        Q.   I think I heard you refer to electronic claims

09:41:03 21    data.  Can you explain what that term means?

09:41:03 22        A.   So claims data is a broad term, but it refers

09:41:03 23    to, you know, generally the electronic data that's

09:41:03 24    created during the submission and payment process of any

09:41:03 25    individual claim.  So it starts with the provider who

09:41:03  1    rendered the service, and there's data generated on the

09:41:03  2    submission side of that transaction.  That includes

09:41:03  3    information like who the patient that received the

09:41:03  4    service was, the date the service occurred, information

09:41:03  5    about the specific services that were rendered and

09:41:03  6    billed.  The charge that the provider submitted.

09:41:03  7            And then on the other side of the transaction,

09:41:03  8    on the payor who processed the claim, additional

09:41:03  9    information is generated about, you know, the coverage or

09:41:03 10    the plan that the member had.  The overall rate or

09:41:03 11    allowable amount that was deemed to be covered for that

09:41:03 12    particular service.  How the payment of the claim, if

09:41:03 13    any, was kind of allocated between the patient and the

09:41:03 14    plan.  Other information's generated on the payor's side

09:41:03 15    of the transaction.  But that information collectively is

09:41:03 16    commonly referred to as claims data and often serves as a

09:41:03 17    primary basis to understanding a reimbursement dispute

09:41:03 18    and any analysis that might be needed about the claims

09:41:03 19    that are at issue.

09:41:03 20        Q.   How many of your work engagements have involved

09:41:03 21    analyzing claims data?

09:41:03 22        A.   Nearly all of the engagements that I'm involved

09:41:03 23    in, in some way, shape, or form analyze that type of

09:41:03 24    information.  And often, regardless of the party I'm

09:41:03 25    working for, the data generated by both the provider and

09:41:03  1    the payor is part of that overall analysis of

09:41:03  2    understanding the claims that are subject to the

09:41:03  3    engagement.

09:41:03  4        Q.   When you're engaged to work on one of these

09:41:03  5    matters, what type of client is it that have engaged you

09:41:03  6    in the past?

09:41:03  7        A.   We talked about two types of health care

09:41:03  8    clients.  I'm often retained by the payors that have

09:41:03  9    received and processed the claims.  Again, to understand

09:41:03  10   information about how providers bill the claims to them

09:41:03  11   and how the payment rates or coverage was administered on

09:41:03  12   the claims.

09:41:03  13       I have also worked for providers in a similar

09:41:03  14   context of understanding, you know, how claims billed

09:41:03  15   were ultimately paid and the financial impact of that.

09:41:03  16       Q.   And so beyond the claims data that you have

09:41:03  17   already discussed, do you typically review any other data

09:41:03  18   or documents in connection with analyses?

09:41:03  19       A.   Yes.  Often there's information outside of that

09:41:03  20   core electronic data information that we just discussed

09:41:03  21   that's often necessary to understand the context of the

09:41:03  22   dispute.  How claims were paid and what alternative, you

09:41:03  23   know, rates might be available.

09:41:03  24       So that could include information like a

09:41:03  25   contract, again, if it's applicable, understanding the

09:41:03  1    rates that the parties may have agreed to.  The benefit

09:41:03  2    plans which outline the terms of the members coverage

09:41:03  3    often include relevant information to understanding, you

09:41:03  4    know, how and why claims were processed the way they

09:41:03  5    were.

09:41:03  6            Other information could be claim specific

09:41:03  7    documentation.  So information that's created and sent to

09:41:03  8    the provider or the patient describing how a claim was

09:41:03  9    processed.  It's a remittance form it's often referred

09:41:03  10   to.

09:41:03  11           Medical records could be relevant.  There's

09:41:03  12   often other information outside of the electronic data

09:41:03  13   alone that is critical to understanding how and why

09:41:03  14   certain claims were paid the way they were and

09:41:03  15   evaluating, you know, how they should have been paid in

09:41:03  16   certain context.

09:41:03  17       Q.   I think you mentioned benefit plans.  What do

09:41:03  18   you mean by benefit plans?

09:41:03  19       A.   A benefit plan typically refers to the terms of

09:41:03  20   the member's coverage.  It's a document or an agreement

09:41:03  21   between an individual member and their plan sponsor who

09:41:03  22   provides the coverage, the benefits.  And it outlines a

09:41:03  23   whole host of provisions that are incorporated into their

09:41:03  24   coverage.  So it includes information about the types of

09:41:03  25   service that are covered.

09:41:03  1          But relevant to my analysis here, and my

09:41:03  2   analysis in many matters, it also includes information

09:41:03  3   around the amount of coverage that the member, you know,

09:41:03  4   received or purchased in certain scenarios.  Often

09:41:03  5   referred to as kind of the allowable benefit or the

09:41:03  6   allowable amount for services that they receive.

09:41:03  7          Another key component of benefit plans is the

09:41:03  8   provision around the financial responsibility sharing

09:41:03  9   between the patients and the plans themselves.  And

09:41:03 10   that's a key component of benefit plans that are often

09:41:03 11   relevant for these types of disputes.

09:41:03 12      Q.   Approximately how many of these benefit plans

09:41:03 13   have you reviewed in connection with your work?

09:41:03 14      A.   It's common for me to review benefit plans in

09:41:03 15   connection with my engagements.  So, I mean, over the

09:41:03 16   course of my career, it would be definitely in the

09:41:03 17   hundreds, if not more, of benefit plans that I've

09:41:03 18   reviewed across a number of different plans and payors.

09:41:03 19      Q.   Have you served as an expert in litigation or

09:41:03 20   arbitration before?

09:41:03 21      A.   Yes, I have.

09:41:03 22      Q.   How many times?

09:41:03 23      A.   I have provided written report or declaration as

09:41:03 24   well as -- or and/or actual testimony in 15 matters.

09:41:03 25      Q.   What was the general subject matter of those

09:41:03  1    matters?

09:41:03  2        A.    Generally, in those engagements where I'm asked

09:41:03  3    to offer testimony, it involves claims reimbursement, the

09:41:03  4    manner in which claims are billed, priced and ultimately

09:41:03  5    paid.  And oftentimes my analysis involves that kind of

09:41:03  6    detailed data analytics of the underlying claims in

09:41:03  7    dispute to assess potential damages or a payment impact

09:41:03  8    resulting from disputed issues involved in the

09:41:03  9    engagement.

09:41:03  10       Q.    Have you ever been disqualified as an expert

09:41:03  11   before?

09:41:03  12       A.    No. I have not.

09:41:03  13       Q.    Have you ever been excluded from testifying?

09:41:03  14       A.    I have not.

09:41:03  15       Q.    Are you being paid to testify?

09:41:03  16       A.    Ankura is being paid for the time I have spent

09:41:03  17   on this matter.

09:41:03  18       Q.    Is that payment impacted -- does that payment

09:41:03  19   impact in any way the substance of your opinion?

09:41:03  20       A.    No, it doesn't.

09:41:03  21       Q.    Can you explain what you were retained to do in

09:41:03  22   this case?

09:41:03  23       A.    I was retained to review Mr. Haney's reports and

09:41:03  24   ultimate opinions as to the Labs' alleged damages on

09:41:03  25   claims that the Labs contend were improperly denied by

09:41:03  1   Cigna.

09:41:03  2      Q.   Did you form an opinion with respect to Mr.

09:41:03  3   Haney's approach to calculating the Labs' damages?

09:41:03  4      A.   I did.  Overall, kind of big picture, my opinion

09:41:03  5   was that Mr. Haney's methodology for assessing those

09:41:03  6   damages was flawed.

09:41:03  7           Mr. Haney outlined his definition of the Labs'

09:41:03  8   damages in this case as the amount Cigna should have paid

09:41:03  9   on each disputed claim had Cigna not denied the claim.

09:41:03  10  And, in general, the terms that outline what Cigna should

09:41:03  11  have paid on any given claim for an out-of-network

09:41:03  12  provider like the Labs, are detailed and described in

09:41:03  13  each member's plan benefit which outlines the coverage

09:41:03  14  that they receive when they receive care from an

09:41:03  15  out-of-network provider.

09:41:03  16          Based on my review of Mr. Haney's methodology,

09:41:03  17  he did not consider or account for those individual plan

09:41:03  18  benefits that vary and describe the amount Cigna would

09:41:03  19  have paid on each claim.  And, therefore, I did not find

09:41:03  20  his methodology to be a reliable assessment of what Cigna

09:41:03  21  would have paid on the specific claims that he reviewed

09:41:03  22  or included in his calculation.

09:41:03  23     Q.   And we're going to talk more about that opinion

09:41:03  24  in a minute.  First, before we get into it.  Can you

09:41:03  25  explain on a high level what are the documents and data

09:41:03  1    that you analyzed in reaching that opinion?

09:41:03  2        A.   I reviewed several categories of information in

09:41:03  3    connection with my work on this matter.  Certainly,

09:41:03  4    Mr. Haney's reports and the various appendices and

09:41:03  5    calculations that he created in connection with those

09:41:03  6    reports.

09:41:03  7        I reviewed Mr. Haney's deposition testimony.  I

09:41:03  8    also reviewed entirety of the data, the claims data, that

09:41:03  9    Cigna produced in this case for all of the labs submitted

09:41:03  10   claims to Cigna.

09:41:03  11       I also reviewed several plan -- a number of

09:41:03  12   Cigna plan benefit documents like I described earlier.

09:41:03  13   Other claims related information.  The pleadings in the

09:41:03  14   case.

09:41:03  15       I think that covers the main categories of

09:41:03  16   information that I reviewed.

09:41:03  17       Q.   Why did you review the Cigna plan documents?

09:41:03  18       A.   As I discussed briefly earlier, in terms of

09:41:03  19   answering the question of what Cigna would have paid on

09:41:03  20   these claims, these disputed denied claims, the plan

09:41:03  21   benefits really are the source of that question.  So in

09:41:03  22   order to confirm my understanding of how benefits for

09:41:03  23   out-of-network providers are structured and described

09:41:03  24   generally, I reviewed specific Cigna plans that are

09:41:03  25   related to the disputed claims in this case to understand

09:41:03  1    and assess the manner in which Cigna's benefits are

09:41:03  2    described.

09:41:03  3         Q.   I think you also mentioned Cigna's claims data.

09:41:03  4    How much of the claims data did you review and analyze?

09:41:03  5         A.   Yes.   Cigna produced electronic claims data for

09:41:03  6    all, as I understand it, all claims billed by the Labs

09:41:03  7    during this period.   And I reviewed the entirety of that

09:41:03  8    information.   That served as, based on my review of Mr.

09:41:03  9    Haney's analysis, it was really the core information that

09:41:03  10   he reviewed and relied on for his calculations.   So I

09:41:03  11   reviewed the entirety of that information.

09:41:03  12        Q.   How many hours did you spend in total in forming

09:41:03  13   your opinions?

09:41:03  14        A.   Over the course of my work on this case, I have

09:41:03  15   spent over 150 hours reviewing all of Mr. Haney's

09:41:03  16   materials over time, as well as the data and

09:41:03  17   documentation we have discussed.

09:41:03  18        Q.   Backing up a little bit from the data and

09:41:03  19   documentation.   Do you have an understanding of whether

09:41:03  20   the labs in this case had a network agreement with Cigna

09:41:03  21   regarding the terms of reimbursement?

09:41:03  22        A.   It's my understanding they did not.   They were

09:41:03  23   out-of-network providers with Cigna's plans.

09:41:03  24        Q.   So when a provider like the Labs is

09:41:03  25   out-of-network with Cigna, how is it that the provider's

09:41:03  1    reimbursement is determined?

09:41:03  2        A.    So an in-network provider that has agreed to a

09:41:03  3    contract, part of that contract are prenegotiated payment

09:41:03  4    terms.  So in the instance of a in-network provider, that

09:41:03  5    contract will be often the source of the rate that

09:41:03  6    applies to claims that are billed by that provider.  And

09:41:03  7    because of that, there's a lot of uniformity in the

09:41:03  8    manner in which claims for an in-network provider would

09:41:03  9    be paid.  The plans that access that network, access that

09:41:03  10   contract, and regardless of the plan, the claim's paid at

09:41:03  11   that predetermined in-network grade.

09:41:03  12        For an out-of-network provider, it's different.

09:41:03  13   There is no predetermined contract that outlines the

09:41:03  14   reimbursement rates.  And in that scenario, the member's

09:41:03  15   plan, each member's plan describes the portion of the

09:41:03  16   claim that their benefit will cover.  There's a number of

09:41:03  17   ways in which the plan describes that.  But that

09:41:03  18   out-of-network benefit can vary, depending on the terms

09:41:03  19   of any member's plan, and that can produce and does

09:41:03  20   produce, you know, different rates for out-of-network

09:41:03  21   claims based on those benefits.  So it's very different.

09:41:03  22        Q.    So you mentioned that it can vary.  How is it

09:41:03  23   that the out-of-network benefits can vary across the

09:41:03  24   different plan?

09:41:03  25        A.    There are a number of ways, but really two main

09:41:03  1    core elements of the out-of-network benefit that really

09:41:03  2    drive the ultimate price that any payor, and Cigna in

09:41:03  3    this instance, will pay.

09:41:03  4         The first is the allowed amount.  Which really

09:41:03  5    is the covered amount, the total covered rate that the

09:41:03  6    plan will allow for a particular service.  And that rate

09:41:03  7    is described in a number of different ways, depending on

09:41:03  8    the benefits of the plan.  So there can be different

09:41:03  9    methodologies that a plan may select that outlines what

09:41:03  10   they will cover on an out-of-network basis.  Could be a

09:41:03  11   particular fee schedule that's attached to the plan.

09:41:03  12   Could be a percentage, a predetermined percentage of

09:41:03  13   Medicare or, you know, some third party benchmark that's

09:41:03  14   referenced as, you know, the rate that that plan will

09:41:03  15   cover or allow for a given out-of-network claim.

09:41:03  16   Assuming there's coverage for the service.  So that can

09:41:03  17   vary based on the plan.

09:41:03  18        The second element is the division of the

09:41:03  19   payment of that allowable amount between the patient and

09:41:03  20   the plan.  It's often referred to as cost sharing.  And

09:41:03  21   it really just means if there's a covered amount, say

09:41:03  22   $100, how much of that $100 will be the patients

09:41:03  23   out-of-pocket contribution, and what portion will the

09:41:03  24   plan, Cigna, in this instance, actually pay.  And there

09:41:03  25   are a number of different components to it.  You know, a

09:41:03  1   common one I think was referred to earlier is deductible,

09:41:03  2   which is kind of a fixed threshold that the member has to

09:41:03  3   contribute each year before their coverage kicks in or

09:41:03  4   initiates.  And that, the number, or the amount of any

09:41:03  5   member's deductible can vary based on the terms of their

09:41:03  6   plan.  One member might have a $500 deductible, another

09:41:03  7   member's coverage might have $700 deductible.  It varies

09:41:03  8   by the terms of each members policy or plan.

09:41:03  9        Another component is referred to as

09:41:03  10  co-insurance.  Which is a kind of think of it as a

09:41:03  11  percentage sharing of the allowable amount.  So some

09:41:03  12  plans might require the patient to pay, say, 20 percent

09:41:03  13  of the rate.  Other plans might, you know, that

09:41:03  14  percentage might be 30.

09:41:03  15       So that can all impact the ultimate amount that

09:41:03  16  Cigna or the plan will be responsible for paying for any

09:41:03  17  given claim, those two components.  There are other

09:41:03  18  components to plans, but those are the two main

09:41:03  19  components.

09:41:03  20       Q.   Did you review any of those Cigna benefit plans

09:41:03  21  in connection with your work?

09:41:03  22       A.   I did.  I reviewed a number of the plans, the

09:41:03  23  Cigna plans related to the claims at issue in this case.

09:41:03  24  And I found that consistent with my work in general,

09:41:03  25  involved in these types of disputes and plan-related

09:41:03  1    engagements, the Cigna plans outline the same concepts

09:41:03  2    that I just described.  I know there's different

09:41:03  3    methodologies for the out-of-network allowable amounts

09:41:03  4    referencing different sources, depending on the plan, as

09:41:03  5    well as those cost sharing benefits varying, deductible

09:41:03  6    co-insurance across the plans.

09:41:03  7        Q.   I understand you prepared two reports in this

09:41:03  8    case, is that correct?

09:41:03  9        A.   Yes, I've prepared two reports in this matter.

09:41:03  10       Q.   When was it you prepared the first one?

09:41:03  11       A.   I believe my first report was prepared in May of

09:41:03  12   2023.

09:41:03  13       Q.   What were you asked to do in connection with

09:41:03  14   that first report?

09:41:03  15       A.   In my first report, I was reviewing and

09:41:03  16   assessing the methodology Mr. Haney included in his first

09:41:03  17   report which I initially received in March.  I think

09:41:03  18   March of 2023.

09:41:03  19       Q.   What was your understanding of Mr. Haney's

09:41:03  20   opinion that you were analyzing?

09:41:03  21       A.   So in Mr. Haney's first report, he included a

09:41:03  22   calculation of the Labs' alleged damages on claims that

09:41:03  23   Cigna allegedly improperly denied.  And in his first

09:41:03  24   report, he defined the damage as, again, the amount

09:41:03  25   Cigna, in his opinion, should have paid on each one of

1126

09:41:03  1    these claims were it to have been processed as a payable

09:41:03  2    service.

09:41:03  3          In his first report that amount -- the amount

09:41:03  4    that he opined reflected what Cigna should have paid was

09:41:03  5    100 percent on the labs' bill charge, submitted bill

09:41:03  6    charge, on each and every service that was included in

09:41:03  7    his calculation.  And that was his methodology for

09:41:03  8    calculating the Labs' damages at that time.

09:41:03  9       Q.   What was your opinion and reaction to that

09:41:03  10   methodology?

09:41:03  11      A.   My opinion was that that assumption that Cigna

09:41:03  12   would have paid, you know, 100 percent of the labs

09:41:03  13   submitted bill charge on each and every claim was flawed

09:41:03  14   for a number of reasons.  You know, first off, as we

09:41:03  15   described, each member's benefit outlines the portion of

09:41:03  16   the charge or the portion of the claim that the plan will

09:41:03  17   cover.  And as based on my review of the Cigna plans that

09:41:03  18   I had looked at that time, as well as just general

09:41:03  19   industry practices from work in this space, it's not

09:41:03  20   always 100 percent of the bill charge.

09:41:03  21         I also found that the data that was available to

09:41:03  22   both me and Mr. Haney that included, you know, claims

09:41:03  23   that Cigna had paid, further illustrated that 100 percent

09:41:03  24   of the labs charge, you know, was not -- was not always

09:41:03  25   paid on claims that were adjudicated as payable.

09:41:03  1          So I found that Mr. Haney's assumption that the

09:41:03  2    Labs -- or that Cigna would have paid 100 percent of the

09:41:03  3    Labs charge on all of these claims was inconsistent with,

09:41:03  4    again, general industry practices, Cigna's plan documents

09:41:03  5    as I reviewed them, and the data that was available in

09:41:03  6    the case.

09:41:03  7      Q.    And did you provide a report that reflected

09:41:03  8    those opinions?

09:41:03  9      A.    I did.  I outlined those opinions and the

09:41:03  10   analysis that I developed to support that in that first

09:41:03  11   report in May of 2023.

09:41:03  12     Q.    Why did you submit a second report?

09:41:03  13     A.    I submitted a second report in, I think, April

09:41:03  14   or May of 2024, this year, based on my receipt of a new

09:41:03  15   or amended report from Mr. Haney earlier this year that

09:41:03  16   included a modified and adjusted opinion as to the Labs

09:41:03  17   alleged damages in the case.

09:41:03  18     Q.    Do you have an understanding of why Mr. Haney

09:41:03  19   submitted a new second report?

09:41:03  20     A.    My general understanding is that there was

09:41:03  21   rulings from the Court as to certain assumptions that

09:41:03  22   Mr. Haney had relied on in his --

09:41:03  23          THE COURT:  I'm not sure this is appropriate.

09:41:03  24          MS. KINGSBERY:  We'll move on.

09:41:03  25          THE COURT:  Thank you.

09:41:03  1    BY MS. KINGSBERY:

09:41:03  2        Q.   Let's talk about your current opinion in this

09:41:03  3    case.  So you listened to Mr. Haney's testimony today,

09:41:03  4    correct?

09:41:03  5        A.   Yes, I did.

09:41:03  6        Q.   What did you understand Mr. Haney to be

09:41:03  7    testifying about?

09:41:03  8        A.    Mr. Haney was testifying, as I understood it,

09:41:03  9    about his amended methodology for assessing the Labs

09:41:03  10   damages on these allegedly improperly denied claims.

09:41:03  11       Q.   And what was it that Mr. Haney did to calculate

09:41:03  12   the amount that he said Cigna should have paid?

09:41:03  13       A.   So rather than assuming that 100 percent of the

09:41:03  14   Labs' bill charge would be paid on all of the disputed

09:41:03  15   denials, Mr. Haney's amended approach reviewed a separate

09:41:03  16   set of claims that the Labs had submitted and Cigna had

09:41:03  17   paid historically.  Those claims were related to hundreds

09:41:03  18   of different plans.  You know, 20 thousand different

09:41:03  19   claims.

09:41:03  20            And Mr. Haney calculated an aggregate ratio for

09:41:03  21   each year, for all of the claims in each year, that

09:41:03  22   outlined the percentage of the Labs' bill charge that

09:41:03  23   Cigna ultimately paid on those, on that separate set of

09:41:03  24   claims, across all of those plans.  And he applied those

09:41:03  25   ratios, those annual ratios, to the separate distinct set

09:41:03  1    of denied claims to estimate, in his opinion, what Cigna

09:41:03  2    would have paid on each individual disputed denial had

09:41:03  3    they been adjudicated as payable.

09:41:03  4        Q.    What is your assessment of the methodology that

09:41:03  5    Mr. Haney employed?

09:41:03  6        A.    My opinion is that it remains flawed and that

09:41:03  7    it's really not considering or accounting for the members

09:41:03  8    plan benefits that, as I described earlier, outline what

09:41:03  9    Cigna would have paid on each one of these disputed

09:41:03  10   denied claims.  You know, he's applying the exact same

09:41:03  11   ratio across all claims in any given year to determine

09:41:03  12   his estimate of what Cigna would have paid, regardless of

09:41:03  13   the plan that's associated with the disputed denial and

09:41:03  14   regardless of obviously the terms that that plan would

09:41:03  15   outline, drive the actual amount Cigna would have paid.

09:41:03  16        I didn't -- based on my review, Mr. Haney

09:41:03  17   didn't review the plan documents or terms in developing

09:41:03  18   his estimate.  And, therefore, you know, I did not find

09:41:03  19   it a reliable methodology to arrive at what Cigna would

09:41:03  20   have paid had these claims been payable.

09:41:03  21        Q.    Remind me, again, what are the terms of the

09:41:03  22   benefit plans that you are referring to?

09:41:03  23        A.    So the two main ones are the varying

09:41:03  24   methodologies that outline the allowable amount or the

09:41:03  25   covered benefit for these out-of-network claims that were

| | |
|---|---|
| 09:41:03 | 1 |
| 09:41:03 | 2 |
| 09:41:03 | 3 |
| 09:41:03 | 4 |
| 09:41:03 | 5 |

09:41:03  1  billed by the Labs.  And then the second being the

09:41:03  2  division of payment.  What portion of each claim Cigna

09:41:03  3  would pay relative to the contribution or the out of

09:41:03  4  pocket contribution of the members.

09:41:03  5  Q.   Did Mr. Haney calculate any of those amounts

09:41:03  6  with respect to the claims that he identified?

09:41:03  7  A.   No.  Based on my review of his amended

09:41:03  8  spreadsheets and calculations, again, he applied the same

09:41:03  9  estimated payment percentage to all claims.  There was no

09:41:03  10  individual or separate calculation of allowed amounts or

09:41:03  11  amounts the patient may have been responsible for on any

09:41:03  12  of these denied -- disputed denied claims.

09:41:03  13  Q.   Did you yourself calculate the amount that Cigna

09:41:03  14  would have paid on each one of those claims?

09:41:03  15  A.   No, I did not.  I was asked to review and assess

09:41:03  16  Mr. Haney's methodology of how he arrived at what he

09:41:03  17  opined was the amount Cigna would have paid on these

09:41:03  18  claims.  I did not develop an alternative independent

09:41:03  19  assessment of the damages for the Labs.

09:41:03  20  Q.   So how is it that you are able to assess the

09:41:03  21  reliability of his calculation?

09:41:03  22  A.   Again, the initial question or the kind of

09:41:03  23  opinion that Mr. Haney offers as to what the Labs damages

09:41:03  24  are on these claims is, in his words, the amount Cigna

09:41:03  25  should have paid on each claim.  And there are certain

09:41:03  1    critical factors that answer that question or drive, you

09:41:03  2    know, how you would arrive at that amount.  And those are

09:41:03  3    kind of the benefit terms that we have been discussing.

09:41:03  4          And due to the fact that his methodology didn't

09:41:03  5    account for or incorporate variation in amounts that

09:41:03  6    would be paid based on the unique plans that are

09:41:03  7    applicable to the denied claims, I did not find it a

09:41:03  8    reliable methodology to assess what Cigna would have paid

09:41:03  9    on these claims.

09:41:03  10         Q.   Did you analyze each of the claim lines that are

09:41:03  11   on Mr. Haney's updated Appendix C?

09:41:03  12         A.   I have.  I've reviewed Mr. Haney's recently

09:41:03  13   updated spreadsheets and appendices in detail.

09:41:03  14         Q.   Mr. Salazar, can you please put up Labs' Exhibit

09:41:03  15   6971 which is in evidence.  If you can zoom in just a

09:41:03  16   little bit so that Mr. Ryan can see.

09:41:03  17         Do you recognize this document, Mr. Ryan?

09:41:03  18         A.   Can you highlight the header?  I believe I do.

09:41:03  19         Q.   Can you scroll up to the header at the top of

09:41:03  20   the page, Mr. Salazar.

09:41:03  21         A.   Yes.  This appears to be Mr. Haney's amended

09:41:03  22   Appendix C which lists out his calculation for each one

09:41:03  23   of the claims that were identified as, you know,

09:41:03  24   allegedly improperly denied.

09:41:03  25         Q.   And is there a continuation of this list in a

09:41:03  1    separate document?

09:41:03  2        A.   Yes.  I understand it was a single spreadsheet,

09:41:03  3    but I understand there's two different documents that

09:41:03  4    were created.

09:41:03  5        Q.   Did you review the entirety of both?

09:41:03  6        A.   Yes.

09:41:03  7        Q.   Now putting aside your criticism of the

09:41:03  8    methodology that Mr. Haney employed, did you observe with

09:41:03  9    respect to the individual claim lines -- did you have any

09:41:03  10   observation with respect to the individual claim lines

09:41:03  11   that were included in Mr. Haney's amended appendix C?

09:41:03  12       A.   I did.  I ultimately arrived at three primary

09:41:03  13   observations.  The first is that I understand Cigna

09:41:03  14   contends that certain of the Lab's claims or causes of

09:41:03  15   action are subject to a five-year statute of limitations

09:41:03  16   period.  And I found that there were claims included in

09:41:03  17   Mr. Haney's updated appendix C that would fall outside of

09:41:03  18   that five-year limitations period.

09:41:03  19           The second category, again I understand, Cigna

09:41:03  20   contends that certain claims associated with certain

09:41:03  21   self-funded plans are not at issue for certain of the

09:41:03  22   Labs' causes of action.  And there were claims included

09:41:03  23   on Mr. Haney's appendix C for self-funded -- certain

09:41:03  24   self-funded plans.  I think that was the extent of my

09:41:03  25   observations.

09:41:03   1        Q.    And were you asked to perform any calculations

09:41:03   2   with respect to those two observations?

09:41:03   3        A.    I was.  I was asked to quantify the specific

09:41:03   4   entries of Mr. Haney's appendix C based on those two

09:41:03   5   categories and assess the impact to Mr. Haney's estimated

09:41:03   6   damages were those two categories of claims to be

09:41:03   7   excluded.

09:41:03   8        Q.    Did you create any work papers reflecting those

09:41:03   9   calculations?

09:41:03  10        A.    I did.

09:41:03  11        Q.    What data did you rely on to perform those

09:41:03  12   calculations?

09:41:03  13        A.    The data that's included in Mr. Haney's amended

09:41:03  14   appendices and the accompanying Cigna claims data.

09:41:03  15        Q.    Mr. Salazar, will you pull up Cigna Trial

09:41:03  16   Exhibit 2895 which is not in evidence.

09:41:03  17              Do you recognize this document, Mr. Ryan?

09:41:03  18        A.    Yes, I do.

09:41:03  19        Q.    What is it?

09:41:03  20        A.    This is a work paper that I created that

09:41:03  21   reflects the results of those two calculations we just

09:41:03  22   discussed.

09:41:03  23        Q.    Do the tables accurately reflect your

09:41:03  24   calculations that you performed using Mr. Haney's

09:41:03  25   appendices?

1134

09:41:03  1       A.   Yes, they do.

09:41:03  2           MS. KINGSBERY:  So we would like to move Exhibit

09:41:03  3   2895 into evidence.

09:41:03  4           THE COURT:  Any objection?

09:41:03  5           MR. HARE:  No objection, Your Honor.

09:41:03  6           THE COURT:  Full exhibit.  May be published.

09:41:03  7   BY MS. KINGSBERY:

09:41:03  8       Q.   Mr. Salazar, if you will scroll to page 3 of

09:41:03  9   this exhibit.

09:41:03  10          Could you explain, Mr. Ryan, the calculations

09:41:03  11  that you performed that are reflected on this page of the

09:41:03  12  exhibit?

09:41:03  13      A.   I can.  So essentially what I'm describing here

09:41:03  14  is the impact to Mr. Haney's amended alleged damages were

09:41:03  15  claims outside of that limitations period and self-funded

09:41:03  16  claims, were they to have been removed.  So I will walk

09:41:03  17  through slowly so we can track.  The top table

09:41:03  18  identifies, if we're looking at the top row on the far

09:41:03  19  right, the total estimated damages in Mr. Haney's amended

09:41:03  20  appendix C is 5,085,930.  As I mentioned earlier, I

09:41:03  21  identified certain claims included in that calculation

09:41:03  22  that would fall outside of a five-year limitations

09:41:03  23  period.  And specifically those would be claims that were

09:41:03  24  received on or before March 27, 2014.  If claims received

09:41:03  25  prior to that date were excluded from Mr. Haney's amended

09:41:03  1    calculation, Mr. Haney's estimated damages would reduce

09:41:03  2    to 4,774,521.  That's the far right number in the middle

09:41:03  3    row of the table.  In addition, if any remaining claims

09:41:03  4    associated with self-funded plan sponsors were further

09:41:03  5    excluded from Mr. Haney's calculation, that number would

09:41:03  6    further reduce to 4,707,194.

09:41:03  7        Q.    Thank you, Mr. Ryan.

09:41:03  8            MS. KINGSBERY:  I don't have any further

09:41:03  9    questions.

09:41:03 10            THE COURT:  Cross-examination.

09:41:03 11                    CROSS EXAMINATION

09:41:03 12    BY MR. HARE:

09:41:03 13        Q.    Mr. Ryan, you and I have met twice by video

09:41:03 14    conference for your depositions prior to today; is that

09:41:03 15    right?

09:41:03 16        A.    That's correct.

09:41:03 17        Q.    Our first time meeting in person?

09:41:03 18        A.    Correct.

09:41:03 19        Q.    I want to talk for a moment about your

09:41:03 20    background.  I think you explained on direct that you

09:41:03 21    have been engaged in a number of consultations including

09:41:03 22    litigation, and other claims dispute matters.  Did I hear

09:41:03 23    that correctly?

09:41:03 24        A.    That's generally correct, yeah.

09:41:03 25        Q.    In fact, you have either consulted for or on

09:41:03  1    behalf of Cigna in prior engagements; is that correct?

09:41:03  2        A.   Yes.  Ankura's worked for Cigna before and I

09:41:03  3    have worked on some of those matters.

09:41:03  4        Q.   How many times have you been engaged through

09:41:03  5    your employer, either Navigant or Ankura, or doing work

09:41:03  6    for or on behalf of Cigna?

09:41:03  7        A.   I couldn't give you a specific number over the

09:41:03  8    15-year career.  Several times.

09:41:03  9        Q.   Okay.  And have you in the course of any of

09:41:03  10   those engagements provided reports and/or testimony again

09:41:03  11   either for or on behalf of Cigna?

09:41:03  12       A.   There's one prior matter where I issued a

09:41:03  13   written, kind of a written declaration in connection with

09:41:03  14   an analysis I performed on a behalf of Cigna.

09:41:03  15       Q.   Let me shift now.  The lawyers representing

09:41:03  16   Cigna in this lawsuit are from a law firm called Alston &

09:41:03  17   Bird.  Among your prior engagements, you also have done

09:41:03  18   work for -- at the request of Alston & Birds; is that

09:41:03  19   right?

09:41:03  20       A.   Again Ankura has worked on engagements with

09:41:03  21   Alston & Bird.  I've worked on some of those engagements.

09:41:03  22       Q.   How many times have you been engaged or done

09:41:03  23   work on a project either for or at the request of Alston

09:41:03  24   & Bird lawyers?

09:41:03  25       A.   Several times.

09:41:03  1      Q.   Can you be any more specific than several?

09:41:03  2      A.   I would have to think back again.  In 15 years,

09:41:03  3   it's a long time.

09:41:03  4      Q.   Fair enough.  Some of the work you have done

09:41:03  5   over your 16 years or so, has been consulting for or on

09:41:03  6   behalf of medical providers; is that correct?

09:41:03  7      A.   I have worked on engagements in connection with

09:41:03  8   provider clients as well, yes.

09:41:03  9      Q.   So you have been, sort of say, in Mr. Haney's

09:41:03  10  shoes before by which I mean providing either analysis or

09:41:03  11  reports or testimony on behalf of providers as opposed to

09:41:03  12  insurers?

09:41:03  13     A.   I have worked on behalf of provider clients on

09:41:03  14  claims-related matters, correct.

09:41:03  15     Q.   Okay.  And in the course of the engagements that

09:41:03  16  you been involved in on behalf of providers, you have

09:41:03  17  sometimes performed calculations as to what you believe

09:41:03  18  an appropriate reimbursement amount would be?

09:41:03  19     A.   Sure.  I have worked on matters with providers

09:41:03  20  that involve the review of how claims were submitted and

09:41:03  21  ultimately processed.  Yes.  That's a topic of those

09:41:03  22  engagements.

09:41:03  23     Q.   So you have done on behalf of providers the same

09:41:03  24  type of work that Mr. Haney did on behalf of the Labs in

09:41:03  25  this case?

09:41:03  1      A.   With respect to the review of how claims were

09:41:03  2   billed, and paid, I have done that work on matters with

09:41:03  3   provider clients.

09:41:03  4      Q.   Okay.  I want to focus now in this case on the

09:41:03  5   specific scope of your engagement.  As I understand your

09:41:03  6   testimony and your report, you were engaged to review and

09:41:03  7   assess the methodology that Mr. Haney applied in reaching

09:41:03  8   his opinions with respect to damages; is that correct?

09:41:03  9      A.   Correct.  I was asked to review Mr. Haney's

09:41:03  10  multiple reports and assess the data, the assumptions,

09:41:03  11  the general methodology that he employed to arrive at

09:41:03  12  those opinions of the Labs' alleged damages, correct.

09:41:03  13     Q.   Were you in the courtroom either yesterday or

09:41:03  14  more significantly today for any of Mr. Haney's

09:41:03  15  testimony?

09:41:03  16     A.   I was here all day today and part of yesterday.

09:41:03  17     Q.   You heard him testify regarding the subject of

09:41:03  18  statistical analysis and validity testing?

09:41:03  19     A.   I heard some testimony to that regarding

09:41:03  20  samples.

09:41:03  21     Q.   And to be clear you were not engaged to opine

09:41:03  22  with respect to that aspects of Mr. Haney's report or

09:41:03  23  review; is that true?

09:41:03  24     A.   Correct.  My review or my -- the scope of my

09:41:03  25  assignment was in connection with Mr. Haney's calculation

09:41:03  1  of the Labs' damages or the Labs' alleged damages on

09:41:03  2  these matters.

09:41:03  3      Q.   You were not asked by Cigna to design or to

09:41:03  4  describe a competing protocol in order to assess or

09:41:03  5  calculate what an allowed payable amount would have been

09:41:03  6  with respect to the claims at issue?

09:41:03  7      A.   No.  I was asked to review the methodology that

09:41:03  8  Mr. Haney employed and determine in my opinion whether

09:41:03  9  that was a reliable approach to determine what Cigna

09:41:03  10 would have paid on these claims.

09:41:03  11     Q.   In fact, not only were you not asked to do that

09:41:03  12 you did not, in fact, design any competing protocol?

09:41:03  13     A.   I did not independently calculate an alternative

09:41:03  14 calculation of damages for the Labs.

09:41:03  15     Q.   Because you haven't done that work, you don't

09:41:03  16 have any conclusion as to what the outcome, what the

09:41:03  17 calculation would be of some competing protocol?

09:41:03  18     A.   I've not calculated an independent affirmative

09:41:03  19 calculation of damages for the Labs.

09:41:03  20     Q.   You can't say one way or the other whether some

09:41:03  21 competing or alternative protocol would result in a

09:41:03  22 number that's materially different than the number that

09:41:03  23 Mr. Haney landed on?

09:41:03  24     A.   Yeah.  I haven't, I haven't calculated an

09:41:03  25 independent or separate assessment of the Labs' alleged

09:41:03  1    damages reflecting what the plan terms would outline as

09:41:03  2    to what Cigna would have paid on these claims, and in my

09:41:03  3    opinion neither has Mr. Haney.

09:41:03  4        Q.   And in fact, because you haven't done that

09:41:03  5    analysis and haven't run those calculations, you can't

09:41:03  6    rule out that some alternate protocol might have resulted

09:41:03  7    in a number even higher than what Mr. Haney landed on?

09:41:03  8        A.   I have not calculated an alternate number.

09:41:03  9        Q.   And because you haven't, you can't rule out that

09:41:03  10   the alternate calculation could be some larger number.

09:41:03  11       A.   Right.  My opinion is that Mr. Haney's

09:41:03  12   methodology that he relies on to arrive at his opinion of

09:41:03  13   what Cigna would have paid, is not reliable due to the

09:41:03  14   factors we have discussed.

09:41:03  15            MR. HARE:  Your Honor, that's all I have.  Thank

09:41:03  16   you.

09:41:03  17            THE COURT:  Thank you very much, sir.  I think

09:41:03  18   you are excused for now.  You should ask your counsel as

09:41:03  19   to schedule.  Thank you very much.

09:41:03  20            The next witness.

09:41:03  21            MS. KINGSBERY:  The next witness will be the

09:41:03  22   video deposition of Steve Ziemian.

09:41:03  23            THE COURT:  Okay.  Can you give me a minute to

09:41:03  24   get my stuff on that.  This one will go to after lunch,

09:41:03  25   right or not?

09:41:03  1          MS. KINGSBERY:  Yes, Your Honor.

09:41:03  2          THE COURT:  Just giving the jury an idea.  This

09:41:03  3   is another one of this depositions.  If you remember I

09:41:03  4   explained to you when we listened to Mr. Nicholson, was

09:41:03  5   the first one, that this is testimony taken under oath

09:41:03  6   during discovery, and while they are not always used at

09:41:03  7   trial if a witness is not going to be present in the

09:41:03  8   courtroom, a party can use the deposition.  So it should

09:41:03  9   be considered by you, whatever you hear  -- remember the

09:41:03  10  type is to help you understand, you know, but it is what

09:41:03  11  you hear he said, that testimony is evidence just as if

09:41:03  12  he was on that witness stand.

09:41:03  13          I haven't read exactly what you asked me to read

09:41:03  14  but I think that's close.

09:41:03  15          I didn't realize counsel had all left.  You have

09:41:03  16  to tell me if you do that so I stop talking.  What I did

09:41:03  17  was advise them about the deposition and just reminded

09:41:03  18  tell me what I told them before as to Mr. Nicholson that

09:41:03  19  it is used as evidence.  Okay.  So.

09:41:03  20          MS. KINGSBERY:  Your Honor, we wanted to let you

09:41:03  21  know that we're switching over to Cigna's case.

09:41:03  22          THE COURT:  Because this fellow is rebuttal.

09:41:03  23  Remember I gave you that little speech about two trials,

09:41:03  24  each side is going to present their own evidence.  I said

09:41:03  25  it a little earlier.  Mr. Ryan was presented by Cigna to

09:41:03  1    answer or respond to the evidence of the Labs.  This is

09:41:03  2    the beginning of the Cigna's case.  So they are calling

09:41:03  3    this witness and they are going to suggest to you in

09:41:03  4    closing argument that some or all of what he says is

09:41:03  5    helpful to their case.  Okay?  Whatever you are ready.

09:41:03  6             (Playing the video from 12:49 p.m. to 1:15 p.m.)

09:41:03  7             THE COURT:  Ladies and Gentlemen, lunch time.

09:41:03  8    I'm hungry.  I don't know about you.  We'll be gone until

09:41:03  9    2:00.  Another beautiful day, a little bit chillier.

09:41:03  10   That's not a bad thing so I suggest you all get out a

09:41:03  11   little bit.  Thank you very much for your attention.  I

09:41:03  12   do need to see you in 45 minutes.

09:41:03  13            (In the absence of the jury at 1:15 p.m.)

09:41:03  14            THE COURT:  Two things?  I'm sure it's my fault

09:41:03  15   because I failed to make a list of things that the

09:41:03  16   lawyers haven't followed up with the Court.  I asked when

09:41:03  17   I ruled on these, many of my rulings are, I don't know,

09:41:03  18   overruled if document in evidence or sustained, document

09:41:03  19   in evidence or not in evidence, I don't know which way I

09:41:03  20   left it, but I asked for what I called translation.  All

09:41:03  21   I know is Exhibit 3 to the deposition of Nemecek is about

09:41:03  22   to be discussed.  I have no idea if it's in evidence,

09:41:03  23   it's not in evidence.  If you go ahead and play it,

09:41:03  24   that's the sales manual, but there's several others later

09:41:03  25   today on.  Am I supposed to be saying this shouldn't be

09:41:03  1    played because I sustained an objection or should be

09:41:03  2    because I overruled it because it's in evidence.  So, for

09:41:03  3    example, do you have 43:6 to 44:17 keyed up to be played,

09:41:03  4    Cigna?

09:41:03  5         MS. JACKSON:  We're not playing any portions

09:41:03  6    that were ruled upon as being sustained.  As --

09:41:03  7         THE COURT:  If I said, "overruled, if document

09:41:03  8    in evidence" and I don't know whether the document is in

09:41:03  9    evidence.

09:41:03  10         MS. JACKSON:  Yes, we removed that specific one,

09:41:03  11    that conditional one where it was based on a document

09:41:03  12    being in evidence, we removed that clip.

09:41:03  13         THE COURT:  Every time it appears.  Perhaps you

09:41:03  14    check that at lunch.  If it happens, I will not be happy.

09:41:03  15         Yes, counsel?

09:41:03  16         And I would appreciate getting the translators

09:41:03  17    for whatever is remaining if that's the situation.  There

09:41:03  18    are documents used that are identified by the deposition

09:41:03  19    number and I don't have something that tells me what is

09:41:03  20    that number and is it in evidence at the time you are

09:41:03  21    playing that exhibit.

09:41:03  22         Yes, Sir?

09:41:03  23         MR. GESTRICH:  Ahead of playing this video,

09:41:03  24    Cigna's counsel sent the designated portions in this

09:41:03  25    video.  We spot-checked it before the video played and I

| | | |
|---|---|---|
| 09:41:03 | 1 | understand all of those are removed.  We don't have an |
| 09:41:03 | 2 | objection to the portions being played. |
| 09:41:03 | 3 | MS. JACKSON:  Your Honor, we did submit a chart |
| 09:41:03 | 4 | with a translation for this deposition.  It's been a |
| 09:41:03 | 5 | couple of weeks now, we can resend it.  Or maybe a couple |
| 09:41:03 | 6 | of days.  I'm losing track of time. |
| 09:41:03 | 7 | THE COURT:  Maybe you will send that again. |
| 09:41:03 | 8 | MS. JACKSON:  I will resend it. |
| 09:41:03 | 9 | THE COURT:  I have a lot to talk to you folks |
| 09:41:03 | 10 | about.  There's a big cloud hanging over my head and I |
| 09:41:03 | 11 | haven't finished pursuing it in terms of my own |
| 09:41:03 | 12 | understanding, but -- So I probably shouldn't open the |
| 09:41:03 | 13 | box right now.  Sorry.  Can someone confirm is |
| 09:41:03 | 14 | self-funded is that another word for ERISA? |
| 09:41:03 | 15 | MS. KINGSBERY:  No, Your Honor. |
| 09:41:03 | 16 | THE COURT:  No, that could also be NonERISA but |
| 09:41:03 | 17 | the business funds it and administer it, right? |
| 09:41:03 | 18 | MS. KINGSBERY:  Yes.  It doesn't have to do -- |
| 09:41:03 | 19 | ERISA could be self-funded or not. |
| 09:41:03 | 20 | THE COURT:  Is a Mr. Goldfarb testifying today |
| 09:41:03 | 21 | for Cigna? |
| 09:41:03 | 22 | MR. KANG:  I believe so, Your Honor.  He'll be |
| 09:41:03 | 23 | the next witness after this is done. |
| 09:41:03 | 24 | THE COURT:  I received, or I guess my law clerk |
| 09:41:03 | 25 | did, at 9:22 today a series of what are I think |

09:41:03  1    considered demonstratives.  Cigna wants to use them with

09:41:03  2    the witness.  They won't be admitted into evidence.

09:41:03  3    That's my definition of a demonstrative.  I guess I don't

09:41:03  4    understand.  Maybe I didn't make myself clear.  But I did

09:41:03  5    tell the story about a demonstrative at a trial I had 35

09:41:03  6    years ago that I painfully recall.  That was a last

09:41:03  7    minute objection but the idea that we save a lot of time

09:41:03  8    and we can have our lunch if we disclose a demonstrative

09:41:03  9    not the morning of the testimony, in enough time

09:41:03  10   permitting the opposing party to respond and challenge it

09:41:03  11   and say this isn't a fair representation.  I'm going to

09:41:03  12   object.  And then to let the Court know.  And the Court

09:41:03  13   gets to rule other than at lunchtime before the witness

09:41:03  14   it going on the stand.  If I mischaracterized what I got

09:41:03  15   this morning at 9:44, I'd appreciate if -- Attorney Kang,

09:41:03  16   I understand you are going to take the witness.  What

09:41:03  17   have I got wrong?

09:41:03  18          MR. KANG:  You didn't get anything wrong.  I

09:41:03  19   anticipated Mr. Goldfarb is going to extend until

09:41:03  20   tomorrow.

09:41:03  21          THE COURT:  Are you going to seek to use these

09:41:03  22   demonstratives today?

09:41:03  23          MR. KANG:  No.

09:41:03  24          THE COURT:  I see.  I guess we'll take it up

09:41:03  25   before we proceed to do the charge conference on section

09:41:03  1   three.

09:41:03  2          Could I ask the Labs are there objection to some

09:41:03  3   or all of the demonstratives, if you've had a chance to

09:41:03  4   look at them?

09:41:03  5          MR. CUNNINGHAM:  There are objections, Your

09:41:03  6   Honor.

09:41:03  7          THE COURT:  To all or some?

09:41:03  8          MR. CUNNINGHAM:  One in particular.

09:41:03  9          THE COURT:  I think I guessed that one, Attorney

09:41:03  10  Cunningham.  Would that happen to be the fourth one in

09:41:03  11  the --

09:41:03  12         MR. CUNNINGHAM:  Yes, it would be the fourth

09:41:03  13  one, Your Honor, which is the damages.

09:41:03  14         THE COURT:  No.  The damages are patient cost

09:41:03  15  share.  The fifth one is examples of balance billing.

09:41:03  16         MR. CUNNINGHAM:  It's captioned "Cigna's

09:41:03  17  damages."  I haven't had a chance to look at all of them.

09:41:03  18         THE COURT:  I got it last.  I understand.  The

09:41:03  19  others you don't have an objection to?

09:41:03  20         MR. CUNNINGHAM:  I haven't had a chance to fully

09:41:03  21  digest them, Your Honor.

09:41:03  22         THE COURT:  I guess, maybe we'll take it up 8:00

09:41:03  23  tomorrow morning then.  In the future, if you wish to use

09:41:03  24  a demonstrative with a witness, this applies to both

09:41:03  25  sides, you will give it to the other side 48 hours in

09:41:03  1    advance.  That will give the other side 24 hours or less

09:41:03  2    if they don't need it -- Well, actually you can't have 24

09:41:03  3    hours.  I have to know if there is an objection before

09:41:03  4    the person is going on the stand.  And maybe by the

09:41:03  5    morning you are offering it and you will have told Alex,

09:41:03  6    we have an objection on a demonstrative and I will tell

09:41:03  7    you come in at 8:00.  So that means you have to have

09:41:03  8    given it to the other side in time for them to have

09:41:03  9    reviewed it, checked it and told you.  Say, I suppose,

09:41:03  10   let's say by 7:00 on the evening before that you have an

09:41:03  11   objection.  If you can't work it out, you need to tell

09:41:03  12   Alex, we need the Court's help.  Okay.  I will take it up

09:41:03  13   when we're ready to.  Maybe we'll have time this

09:41:03  14   afternoon after the charge.  I don't know.  If not, we'll

09:41:03  15   do first thing in the morning.

09:41:03  16           Alex, remind me to set a time to tell them to

09:41:03  17   come for that.

09:41:03  18           All right.  We'll stand in recess.

09:41:03  19           THE COURT:  There's also a typo.  I don't know

09:41:03  20   if you folks figured that out.  I just caught it checking

09:41:03  21   my rulings.  First of all, you had a typo.  The last

09:41:03  22   entry is 377:7.  I don't think that's right.  That's

09:41:03  23   okay, that's insignificant.

09:41:03  24           I think it's -- they are not marked -- it's page

09:41:03  25   16 of 20 of docket 433.  The designation was 131-6

1148

09:41:03  1    through 24.  I sustained as to 131-14 to 131.2 and

09:41:03  2    obviously that doesn't make any sense and I meant go to

09:41:03  3    24.  So hopefully you will check that, Cigna, if you

09:41:03  4    would please.  Sorry, I don't know your name.  And just

09:41:03  5    make sure you kind of figured out that I made a mistake.

09:41:03  6    Or maybe my assistant I can say it's her fault.  Okay.

09:41:03  7    Thanks very much.

09:41:03  8              (Whereupon, a luncheon recess was taken from

09:41:03  9    1:24 p.m. to 2:02 p.m.)

09:41:03  10             THE COURT:  Please be seated, everybody.

09:41:03  11             MR. CUNNINGHAM:  Labs are ready, Your Honor.

09:41:03  12             THE COURT:  Somebody here to push the button?

09:41:03  13   Don't tell me you filed the paralegal I referenced

09:41:03  14   earlier?

09:41:03  15             MS. BERGER:  It's me.

09:41:03  16             THE COURT:  It's you.  My apologies.  I had

09:41:03  17   misunderstood something someone said about someone, and I

09:41:03  18   am told that you have been wonderful, my staff loves you,

09:41:03  19   which should be the first course in any paralegal course.

09:41:03  20   I also hear nice things about the Labs' paralegal.  So my

09:41:03  21   apologies on the record to you.  And if Liana doesn't

09:41:03  22   want to hear from you, she'll tell you, not me.  Thanks

09:41:03  23   very much.

09:41:03  24             MS. BERGER:  Thank you, Your Honor.

09:41:03  25             MR. CUNNINGHAM:  Our respective paralegals have

| | | |
|---|---|---|
| 09:41:03 | 1 | become very good friends. |
| 09:41:03 | 2 | THE COURT:  I was going to say that.  That's why |
| 09:41:03 | 3 | I mentioned your paralegal, because I'm told when they |
| 09:41:03 | 4 | finally physically met each other, they hugged or |
| 09:41:03 | 5 | something because they hadn't seen each other. |
| 09:41:03 | 6 | MR. CUNNINGHAM:  They live about ten miles |
| 09:41:03 | 7 | apart. |
| 09:41:03 | 8 | THE COURT:  Let's get the jury in.  Again, my |
| 09:41:03 | 9 | apologies about that. |
| 09:41:03 | 10 | MR. KANG:  Your Honor, we wanted to the let the |
| 09:41:03 | 11 | Court know about one thing with respect to the video.  We |
| 09:41:03 | 12 | understand that there's no objection to the audio |
| 09:41:03 | 13 | playing.  However, the way this technology is set up |
| 09:41:03 | 14 | because it was done remotely, we have the exhibits |
| 09:41:03 | 15 | actually that would appear on the screen.  And some of |
| 09:41:03 | 16 | those exhibits, as I understand the physical exhibits |
| 09:41:03 | 17 | were identified by the Court as having some conditional |
| 09:41:03 | 18 | issues unless we laid a foundation for that document to |
| 09:41:03 | 19 | be admitted. |
| 09:41:03 | 20 | THE COURT:  Right. |
| 09:41:03 | 21 | MR. KANG:  And so what we've done is we've gone |
| 09:41:03 | 22 | ahead and we're just going to take down the video and |
| 09:41:03 | 23 | just have the audio play because we don't want those |
| 09:41:03 | 24 | exhibits displayed. |
| 09:41:03 | 25 | THE COURT:  There shouldn't be testimony about |

09:41:03  1    the exhibits.

09:41:03  2            MR. KANG:  My understanding is there is no

09:41:03  3    objection to the audio, the testimony.

09:41:03  4            THE COURT:  I'm looking, for example, 53-6 to

09:41:03  5    54-15, hearsay, et cetera.  I said overruled if document

09:41:03  6    admitted into evidence.  That means it's sustained.  So

09:41:03  7    that segment of the testimony is sustained.  I thought

09:41:03  8    you told me, the good paralegal that she is that I put on

09:41:03  9    the record, that she didn't include that.

09:41:03  10           MS. JACKSON:  That's correct, Your Honor.

09:41:03  11           THE COURT:  I guess I will have to keep an eye

09:41:03  12   on it.  I was hoping to do something else on the side, as

09:41:03  13   they say, but I will pay attention because -- and then

09:41:03  14   after that, I have got to be told -- well, somebody is

09:41:03  15   searching for these translations.  I have the one in

09:41:03  16   front of me.

09:41:03  17           MS. JACKSON:  The issue is that the designated

09:41:03  18   testimony is what was ruled upon.  You know, anything

09:41:03  19   that was objected to and sustained has been removed.  But

09:41:03  20   it does discuss exhibits that are not yet admitted into

09:41:03  21   evidence.  I believe the Labs did have some objections to

09:41:03  22   those exhibits, but not to that portion of the testimony.

09:41:03  23           THE COURT:  If you are trying to lay a

09:41:03  24   foundation for its admission, you can do that as long as

09:41:03  25   you don't read from it.  I mean, yeah, that would be

1151

09:41:03  1    okay.  Do I have any way to know which of the trial

09:41:03  2    exhibit numbers are, in fact, in evidence, or do I have

09:41:03  3    to get my sheet and correlate it?  Which we're now

09:41:03  4    burning jury time, which I'm not happy about.  Doesn't

09:41:03  5    appear like 46 is in.  43 and -4 are in.  46.  78 is in,

09:41:03  6    if that's here.  No.

09:41:03  7        So the only ones in are what are Trial Depo

09:41:03  8    Exhibit 2, 3 and 5, according to me and your chart.  So I

09:41:03  9    don't have written down what depo is being discussed, but

09:41:03  10   I will pay attention.  And I may tell you -- I hope

09:41:03  11   somebody is going to sit there with their finger on the

09:41:03  12   play and not play button, and you will be responsive to

09:41:03  13   my saying stop playing.

09:41:03  14       Let's get the jury.  We're late.  We've got

09:41:03  15   another question on this, but we can do it afterwards.

09:41:03  16       (In the presence of the jury at 2:06 p. m.)

09:41:03  17       THE COURT:  Everybody be seated.  Thank you very

09:41:03  18   much, ladies and gentlemen.  Sorry.  We had a little

09:41:03  19   technical issue, but we're back.

09:41:03  20       We were playing the deposition, if you remember,

09:41:03  21   of a gentleman by the name of Stephan or Stephan Ziemian,

09:41:03  22   and I interrupted.

09:41:03  23       You can commence again, if you would, please.

09:41:03  24       (Playing the video, 2:07 p.m.)

09:41:03  25       (Paused the video, 2:10 p.m.)

09:41:03  1          (Sidebar commenced.)

09:41:03  2          THE COURT:  I didn't realize that was going to

09:41:03  3  be the first question.  This is one you are not playing

09:41:03  4  video; is that correct?

09:41:03  5          MS. JACKSON:  Yes, that's correct.

09:41:03  6          THE COURT:  What page did you start on?

09:41:03  7          MS. JACKSON:  We're at page 40, line 20 -- 40,

09:41:03  8  line 23, where we left off.

09:41:03  9          (Sidebar ends.)

09:41:03  10          THE COURT:  Ladies and gentlemen, you were

09:41:03  11  watching a video and seeing the streaming, but you were

09:41:03  12  hearing it, which is the evidence.  The video helps you

09:41:03  13  judge credibility, which that's always helpful.  The

09:41:03  14  problem is these were depositions the witness is in one

09:41:03  15  state, another lawyer somewhere else and a lawyer is

09:41:03  16  somewhere else with the stenographer.

09:41:03  17          There's several times during this the lawyer is

09:41:03  18  asking about a document and that -- it would have come up

09:41:03  19  on the screen.  In other words, the lawyer in one state

09:41:03  20  puts it on the screen so the witness in the other sees it

09:41:03  21  on his connection.  So that's what would show.  Those

09:41:03  22  documents are not yet in evidence.  So sometimes the

09:41:03  23  testimony is allowed in order to get -- because the

09:41:03  24  lawyer is trying to get evidence that will support

09:41:03  25  getting the document into evidence, but it's not yet.

09:41:03  1    Therefore, you can't see the document if it's not in

09:41:03  2    evidence.

09:41:03  3         So at those times during this deposition, you

09:41:03  4    won't see Mr. Ziemian.  You wouldn't have seen, you'd

09:41:03  5    have seen the document.  And you can't see it, so you

09:41:03  6    just have to listen.

09:41:03  7         Sorry.  I made it more complicated than it

09:41:03  8    needed to be.  You folks are paying attention, so I hope

09:41:03  9    you got it.

09:41:03  10         Start again, ma'am.  Thank you very much.

09:41:03  11         (Playing video, 2:12 p.m.)

09:41:03  12         (Paused video, 2:32 p.m.)

09:41:03  13         (Sidebar commenced.)

09:41:03  14         THE COURT:  That is in evidence, right?  So it's

09:41:03  15    Exhibit 43.  Is the jury going to be told by someone

09:41:03  16    other than me, or am I wrong about this one?

09:41:03  17         MR. KANG:  Your Honor, I don't believe this

09:41:03  18    document is in evidence.

09:41:03  19         (Sidebar ends.)

09:41:03  20         (Off-the-record discussion.)

09:41:03  21         THE COURT:  You won't be disturbed by the entry

09:41:03  22    of a maintenance person to turn up the thermostat, will

09:41:03  23    you?

09:41:03  24         (Sidebar.)

09:41:03  25         THE COURT:  I'm sorry.  I wasn't listening to

09:41:03  1    what someone just said to me.  My apologies.

09:41:03  2         MR. KANG:  I don't believe this document is in

09:41:03  3    evidence.

09:41:03  4         THE COURT:  I apologize then.  I have -- I

09:41:03  5    thought it was being marked as 2, and I had 43 in

09:41:03  6    evidence.  So I guess we've got to go over those lists.

09:41:03  7    It's not Joint.  It's Cigna.  Wrong list.  I'll go to the

09:41:03  8    correct list and I won't do this again.  43.  Yes, you

09:41:03  9    are right.  It's not in evidence, so you're not going to

09:41:03  10   play it.

09:41:03  11        (Sidebar ends.)

09:41:03  12        THE COURT:  Thank you, Dave.  We were at 66,

09:41:03  13   took it to 67.  If you did the same amount, we'll be

09:41:03  14   happy.  Thanks very much.  I know it's that time of year.

09:41:03  15        I apologize.  Are we ready to go or have I

09:41:03  16   created more of a problem?

09:41:03  17        (Playing the video, 2:14 p.m.)

09:41:03  18        (Pause the video)

09:41:03  19        (Sidebar commenced.)

09:41:03  20        THE COURT:  What page in the transcript?

09:41:03  21        MR. KANG:  I believe this is in evidence.  I

09:41:03  22   believe we'll put the video back up.

09:41:03  23        THE COURT:  Okay.  What page are you on?

09:41:03  24        MR. KANG:  We are on 54-24.  Thank you.

09:41:03  25        (Sidebar ends.)

1155

```
09:41:03   1              (Playing the video, 2:25 p.m.)

09:41:03   2              (Pause the video)

09:41:03   3              (Sidebar commenced.)

09:41:03   4         MR. KANG:  The next one is ID only.  Can

09:41:03   5    anyone --

09:41:03   6         THE COURT:  I understand.  I'm waiting to hear

09:41:03   7    the testimony.

09:41:03   8              (Sidebar ends.)

09:41:03   9              (Playing the video, 2:26 p.m.)

09:41:03  10              (Pause the video.)

09:41:03  11         MR. GESTRICH:  I'm sorry, Your Honor.

09:41:03  12         THE COURT:  Stop it, please.

09:41:03  13         What page are you on?  74-13?

09:41:03  14         MR. GESTRICH:  Page 74.  They are showing an

09:41:03  15    exhibit to which the Labs have launched an objection, and

09:41:03  16    that objection has not been resolved.

09:41:03  17         THE COURT:  73, line 13.  I don't see it.  There

09:41:03  18    wasn't an objection to the deposition transcript at this

09:41:03  19    point.  I understand what you are saying, but 7 -- it's

09:41:03  20    not in evidence.

09:41:03  21         Are you playing it, Attorney Kang, because there

09:41:03  22    was no objection for me to review?

09:41:03  23         MR. KANG:  Correct, Your Honor, no objection

09:41:03  24    pending.

09:41:03  25         THE COURT:  73, page 19, is that what we're
```

09:41:03  1   referring to?

09:41:03  2        MR. KANG:  Yes, Your Honor.

09:41:03  3        MS. JACKSON:  Cigna Exhibit 48.

09:41:03  4        THE COURT:  I thought it was 47.  This is marked

09:41:03  5   for ID.  It doesn't tell me the number there.  73 is

09:41:03  6   Exhibit 7.  Exhibit 7 on your translator is 48.  That is

09:41:03  7   correct.

09:41:03  8        All right, sir.  Attorney Gestrich.

09:41:03  9        MR. GESTRICH:  My apologies.  I got the numbers

09:41:03 10   mixed on the screen.

09:41:03 11        THE COURT:  7 is not -- is 48, and that I don't

09:41:03 12   believe is in evidence.

09:41:03 13        MR. GESTRICH:  Yes, Your Honor.

09:41:03 14        THE COURT:  Is there no objection?  You had no

09:41:03 15   objection on the list.

09:41:03 16        MR. GESTRICH:  I'm sorry.  It's the exhibits

09:41:03 17   before and after.  My apologies, Your Honor.

09:41:03 18        THE COURT:  Go ahead and play what you were

09:41:03 19   playing.  Just pick up right where you were.  Thank you.

09:41:03 20        (Playing video, 2:51 p.m.)

09:41:03 21        (Paused video, 3:03 p.m.)

09:41:03 22        (Sidebar commenced.)

09:41:03 23        MR. GESTRICH:  I think he's reading from

09:41:03 24   documents not in evidence.

09:41:03 25        THE COURT:  I'm very confused.  He's reading

09:41:03  1   documents that are not in evidence, but then I don't see

09:41:03  2   an objection to them.  So are they coming into evidence

09:41:03  3   and he's reading them?  You have got a whole pile of

09:41:03  4   objections of the exhibit forms.  You realize this is now

09:41:03  5   in evidence.

09:41:03  6          MR. GESTRICH:  The letter is in evidence, we

09:41:03  7   understand that.  We understand what he read is in

09:41:03  8   evidence.  We objected to the documents themselves.

09:41:03  9          THE COURT:  We'll deal with that later.  I just

09:41:03  10  want to be sure I was on the right page.

09:41:03  11         MR. KANG:  I was actually thinking we could --

09:41:03  12  the Labs okay.  We're fine stopping this.  I think we're

09:41:03  13  kind of losing the jurors right now anyway.

09:41:03  14         THE COURT:  What are you going to do?

09:41:03  15         MR. KANG:  We have Michael Goldfarb, the next

09:41:03  16  witness.

09:41:03  17         THE COURT:  We're going to finish it.  I

09:41:03  18  understand the problem.

09:41:03  19         (Sidebar ends.)

09:41:03  20         THE COURT:  How about everybody join me.  I have

09:41:03  21  to stand up.  How about everybody else stand up.  I know

09:41:03  22  this is tough.  It's the afternoon and it's been a long

09:41:03  23  day.  So, you know, just a few twists.  A few bend.  Deep

09:41:03  24  breath.  The area in here is terrible.  We can open the

09:41:03  25  back doors, Liana.  It's not that bad.  It's 68.  This is

09:41:03  1    what happens when it's 68.  You all are doing fine.  I'm

09:41:03  2    not being critical.  For my purposes, it feels like late

09:41:03  3    in the afternoon.  Let me put it that way.  The air is

09:41:03  4    actually 68.  That's why I don't like it -- anyway,

09:41:03  5    that's my problem, I guess.

09:41:03  6             All right.  Can we continue to play.  And I

09:41:03  7    apologize for the interruption.  Let's keep going.  We're

09:41:03  8    getting there.

09:41:03  9             (Playing video, 3:06 p.m.)

09:41:03  10            (Paused video, 3:28 p.m.)

09:41:03  11            THE COURT:  Could you stop playing that for a

09:41:03  12   moment.  That's page 110, line 14.  At this second of the

09:41:03  13   deposition transcript and Mr. Ziemian.

09:41:03  14            MR. KANG:  Yes, Your Honor.

09:41:03  15            THE COURT:  Unless I lost a page.  I apologize.

09:41:03  16   Keep playing.  That's my bad.  Sorry.

09:41:03  17            (Playing video, 3:28 p.m.)

09:41:03  18            (Stopped playing video, 3:45 p.m.)

09:41:03  19            MR. KANG:  That's the end of the deposition.

09:41:03  20            THE COURT:  Thank you very much.  That completes

09:41:03  21   the reading of the testimony, which is evidence, of

09:41:03  22   Mr. Ziemian.  And what perfect timing, ladies and

09:41:03  23   gentlemen.  It is quarter to 4:00.  Go home, relax, get

09:41:03  24   some fresh air.  Get a good night's sleep.  We'll be here

09:41:03  25   tomorrow at 9:30.  Thank you very much, ladies and

| | |
|---|---|
| 09:41:03 | 1 |
| 09:41:03 | 2 |
| 09:41:03 | 3 |

gentlemen.

(In the absence of the jury at 3:45 p.m.)

THE COURT:  Everybody be seated.  I have a few preliminary matters before we take a brief recess so that we can continue working on the charge.  Boy, I have a lot of questions.  The first question.  How are we dividing that time?  Is there agreement or not agreement?

MR. KANG:  Your Honor, we haven't had a chance to talk with Labs' counsel, but certainly we will confer with them this evening.

THE COURT:  Alex, that goes on the to-do list for both sides.  Thank you.  Therefore, I can't give you an update on time until I get an answer to that.  I guess so far I have -- I think the Labs at about an hour and 17, and I have Cigna at about an hour and seven, give or take.  That's subject to confirmation by my clerk, but I need to know the division of the time.

MR. KANG:  I'm so sorry, Your Honor.  I thought you were talking about closing argument allocation.  You're referring to Mr. Ziemian's --

THE COURT:  Allocation of Mr. Ziemian's deposition.

MR. KANG:  We've come to agreement on that.

THE COURT:  That is how much on each side?

MR. KANG:  For Cigna, it is one hour and 38

1160

09:41:03  1  minutes.

09:41:03  2          THE COURT:  Yes, sir.

09:41:03  3          MR. KANG:  For the Labs, ten minutes.

09:41:03  4          THE COURT:  That's great.  We'll email you a

09:41:03  5  number for the total for today, but you should have a

09:41:03  6  ballpark.  That's the first thing.

09:41:03  7          Second thing.  Cigna used an Exhibit Number

09:41:03  8  2895.  And imagine my surprise, no objection that I

09:41:03  9  heard.  But when I went to the list, 2895 -- I think I

09:41:03  10  have the number right -- it wasn't on the list.  2895,

09:41:03  11  it's some recalculation of Ryan to Haney's Appendix C.  I

09:41:03  12  go from 2884 to 1059-A.

09:41:03  13          MS. KINGSBERY:  This was the exhibit that we

09:41:03  14  submitted via email.  It was the late submitted

09:41:03  15  supplement exhibit.

09:41:03  16          THE COURT:  There was no objection to it.

09:41:03  17          MS. KINGSBERY:  No, Your Honor.

09:41:03  18          THE COURT:  It has to get on the list, number

09:41:03  19  one.  Number two, could I suggest that if somebody has

09:41:03  20  the time, all these ones at the back, if they are going

09:41:03  21  to be offered and admitted, they should be in numerical

09:41:03  22  order.  The juror might have written down a number and

09:41:03  23  they're going to go try to find it and it's not in the

09:41:03  24  place it's supposed to be.  If you don't think you will

09:41:03  25  ever get them into evidence, I guess don't bother.  But

```
09:41:03   1    yeah, if they are going into evidence, your list you give

09:41:03   2    to Liana is going to have to be in order.  How about I

09:41:03   3    put it that way.

09:41:03   4         Liana tells me that JERS crashed several times,

09:41:03   5    which is going to be wonderful if that happens during

09:41:03   6    deliberations.  She's just -- she's finally been able to

09:41:03   7    get them.  She wants to know if you would prefer to just

09:41:03   8    get them emailed to you since we're about to go as

09:41:03   9    opposed to printed out.  She'll email them right away to

09:41:03   10   you.

09:41:03   11        MR. CUNNINGHAM:  I'm sorry, Your Honor.  What

09:41:03   12   was it that crashed?

09:41:03   13        THE COURT:  The JERS, the JERS evidence

09:41:03   14   something or other system.

09:41:03   15        MR. CUNNINGHAM:  I thought you said jurors.

09:41:03   16        THE COURT:  No, JERS.  I think it stands for

09:41:03   17   something to do with a juries and evidence and system.  I

09:41:03   18   don't know what the R is.  I have no idea.  But we call

09:41:03   19   it JERS.

09:41:03   20        MR. CUNNINGHAM:  Email is fine for the Labs,

09:41:03   21   Your Honor.

09:41:03   22        MS. KINGSBERY:  That's fine.

09:41:03   23        THE COURT:  Liana, you have to send both sides

09:41:03   24   to both sides, okay, because they get to look and comment

09:41:03   25   on the other side's.
```

09:41:03  1           I am concerned because when we skip pages, it

09:41:03  2    looked like the paralegal, I think for Cigna, was like

09:41:03  3    taking a few seconds to advance.  Did we play like a zip

09:41:03  4    drive or the data stick or something that is exactly on

09:41:03  5    that data exactly what the jury saw?  In other words,

09:41:03  6    what we just displayed in the courtroom should already

09:41:03  7    exist in some form so that I can plug it in right now and

09:41:03  8    play exactly what they just saw?  Because is that's going

09:41:03  9    to be exhibits.

09:41:03  10           MR. KANG:  Your Honor, my understanding is we

09:41:03  11   can re-create it.

09:41:03  12           THE COURT:  From now on, you've got to have it,

09:41:03  13   and that's what you are playing.  You're not playing the

09:41:03  14   whole transcript and then stopping, starting, stopping,

09:41:03  15   starting.  You need to create exactly what was shown on

09:41:03  16   this screen, just like Terri only creates what's said

09:41:03  17   from the witness stand.  That's what gets sent to the

09:41:03  18   Circuit.  Thank you.  I guess that means that the Labs

09:41:03  19   may have to look at it to be sure that there was no

09:41:03  20   innocent error made.

09:41:03  21           You're looking at me, Liana.  What am I saying

09:41:03  22   wrong?

09:41:03  23           THE CLERK:  This video deposition wasn't marked

09:41:03  24   as a court exhibit.

09:41:03  25           THE COURT:  It will have to be once I get what

09:41:03  1    was played.  And that -- but it doesn't go to the jury,

09:41:03  2    but it gets replayed if they ask for it.  That's that.

09:41:03  3         Now, there were a bunch of exhibits in this

09:41:03  4    deposition that were shown and a bunch that were not

09:41:03  5    shown but read into the record.  When I did the sidebar,

09:41:03  6    I think I got an answer that the Labs didn't object to it

09:41:03  7    being read, but you didn't want the exhibit coming in and

09:41:03  8    that's why it wasn't shown.  It was still objected to.

09:41:03  9    Is that correct?

09:41:03  10            MR. KANG:  Yes, Your Honor.

09:41:03  11            THE COURT:  However, there were some that were

09:41:03  12   shown that are not yet in evidence but which reflect no

09:41:03  13   objection.  Should we take those as in evidence now for

09:41:03  14   purposes of Cigna's records?  I believe it's got to be

09:41:03  15   64, 65 and 66, but I could be wrong.  I'm not the one who

09:41:03  16   should be keeping track of this.

09:41:03  17            MR. KANG:  We were keeping track, Your Honor.

09:41:03  18            THE COURT:  What do you think it is?

09:41:03  19            MR. KANG:  We also have Cigna 44, 46, 48, 62,

09:41:03  20   63, and I think you said you got 64, 65, and 66.

09:41:03  21            THE COURT:  Yeah, but I've got to ask them if

09:41:03  22   they agree.  So you've told me everything?

09:41:03  23            MR. KANG:  Yes, Your Honor.

09:41:03  24            THE COURT:  Is there objection by Labs to those?

09:41:03  25   Let's take the 44, 46, 48, ones.

09:41:03  1          MR. HARE:  No objection, Your Honor.

09:41:03  2          THE COURT:  46 is already in evidence.  44 is in

09:41:03  3  evidence.  So it's just 48 we're going to mark into

09:41:03  4  evidence, Liana.  Okay.  48.

09:41:03  5          And then how about -- what did I just say -- 62

09:41:03  6  through 66, any objection?  None of those were previously

09:41:03  7  in evidence.

09:41:03  8          MR. HARE:  No objection by the Labs.

09:41:03  9          THE COURT:  Cigna Exhibit 62, Cigna Exhibit 63,

09:41:03  10 Cigna Exhibit 64, Cigna Exhibit 65 and Cigna Exhibit 66

09:41:03  11 are admitted as full exhibits, absent objection.

09:41:03  12         May I ask if we are -- somebody is going to be

09:41:03  13 playing -- still intends to play Eva Borden's and

09:41:03  14 Mr. Nemechek's?

09:41:03  15         MR. GESTRICH:  Yes, Your Honor, next week.

09:41:03  16         THE COURT:  Okay.  That's fine.  I still -- I

09:41:03  17 need to have an outline of my rulings.  I am ready to do

09:41:03  18 that, but we don't have any time today, but maybe

09:41:03  19 tomorrow.

09:41:03  20         Tomorrow, I gather we will start with

09:41:03  21 Mr. Goldfarb, and there are demonstratives.  I would ask

09:41:03  22 Attorney Kang to advise the plaintiffs as to which, if

09:41:03  23 not all, of the demonstratives that were sent this

09:41:03  24 morning at 9:00 something are going to be used by him or

09:41:03  25 he wants to be able to use them.  And then counsel

09:41:03  1    discuss any objections.  And Attorney Kang, you will now

09:41:03  2    be on notice if you wish to modify or adapt or somehow

09:41:03  3    try to respond in a way that you think I will find

09:41:03  4    acceptable, whatever, or you both just want to argue your

09:41:03  5    positions, I will be here tomorrow morning at 8:30 for

09:41:03  6    that purpose.

09:41:03  7          Okay.  Give me a minute.  Let me just make sure

09:41:03  8    we did everything.  I think that's it.

09:41:03  9          So I will see counsel in the conference room for

09:41:03  10   part three of the charge at ten minutes past 4:00.

09:41:03  11         Thank you all very much.  See you -- those

09:41:03  12   others, we'll see you in the morning.

09:41:03  13         I haven't got to the point somebody mentions 14

09:41:03  14   to 33 or 25 files.  I have a note to remember when we do

09:41:03  15   that, I am going to make some kind of comment.

09:41:03  16         MR. HARE:  There was a very brief passing

09:41:03  17   reference at one point today that didn't seem worth

09:41:03  18   interrupting, but we are alert to that.  So when the time

09:41:03  19   comes --

09:41:03  20         THE COURT:  If you think you are at a point and

09:41:03  21   you want it, stand up, I mean, and just say, Judge, these

09:41:03  22   are the 20 patient files issue, and I will say what we

09:41:03  23   talked about.  Okay.

09:41:03  24         MR. HARE:  Thank you, Your Honor.

09:41:03  25         THE COURT:  Anybody doesn't like what I say, you

1166

09:41:03  1    will tell me that you don't and why, and I will fix it.

09:41:03  2                (Whereupon, a recess was taken from 3:55 p.m.

09:41:03  3    to 4:09 p.m.)

09:41:03  4         THE COURT:  We're here in Cigna continued charge

09:41:03  5    conference.  There's three counsel for each side here.  I

09:41:03  6    am not going to bother with who is here.  You'll get

09:41:03  7    names as people speak.  We're about to do part 3, and I

09:41:03  8    have a question on that.

09:41:03  9         But before we get to that, I just want to remind

09:41:03  10   everybody yet again, yesterday in part 2, the Labs were

09:41:03  11   going to give me proposed language, as well as support

09:41:03  12   for adding phrases like " usage of trade" and "course of

09:41:03  13   dealing" language to -- I don't remember the charge

09:41:03  14   number, but I'm sure you do.  Also, I believe that Cigna

09:41:03  15   was going to give me, I think it was a string cite of

09:41:03  16   cases post foundation supporting the addition of two

09:41:03  17   adjectives that it was their view I should have in the

09:41:03  18   charge.

09:41:03  19        Also, you were both going to confer and submit a

09:41:03  20   charge on the affirmative defense of statute of

09:41:03  21   limitations, which I mistakenly omitted, which I would

09:41:03  22   greatly appreciate.

09:41:03  23        And lastly, today, there was mention of that

09:41:03  24   prejudgment interest.  And it's not in the charge,

09:41:03  25   obviously.  And so I would expect both counsel to educate

09:41:03  1    me on that subject.  I am not familiar with Florida law.

09:41:03  2    So if that's where it is and it's a matter of -- an

09:41:03  3    element of the cause of -- of damages includes

09:41:03  4    prejudgment interest, then I need to know how that's

09:41:03  5    explained and used in Florida.  As I say, in Connecticut,

09:41:03  6    I can guarantee you that it does not go to the jury.

09:41:03  7    Indeed, often there will be an explanation they shouldn't

09:41:03  8    worry about the time.  And maybe in this case that would

09:41:03  9    be appropriate if I decide the other way because there's

09:41:03  10   been so much time and you had testimony on it, and they'd

09:41:03  11   wonder, well, what are they supposed to do and are they

09:41:03  12   supposed to include it.  If I conclude no, they should

09:41:03  13   not make that mistake.  If I conclude yes, it should be

09:41:03  14   charged, then we have to talk about the charge.  Okay.

09:41:03  15   That's great.

09:41:03  16        All right.  We have a question.  Is unbundling

09:41:03  17   an issue for part 3 or is it an issue for part 2 of the

09:41:03  18   charge?

09:41:03  19        THE CLERK:  Two.

09:41:03  20        THE COURT:  Two.  So we just blew right by that,

09:41:03  21   huh?  Okay.

09:41:03  22        THE CLERK:  Yes.

09:41:03  23        THE COURT:  So we have a question.  We, I think,

09:41:03  24   charged Count Two -- at least I thought we were doing

09:41:03  25   this, unbundling -- in part 2, excuse me.  Unbundling as

1168

| | | |
|---|---|---|
| 09:41:03 | 1 | if it were a coverage exclusion, i.e., it's a defense. |
| 09:41:03 | 2 | I'm not confident that is Cigna's theory, and so I need |
| 09:41:03 | 3 | to have you tell me so I can confirm I'm charging it |
| 09:41:03 | 4 | properly.  If not, how should I charge it? |
| 09:41:03 | 5 | MS. KINGSBERY:  We don't have our unbundling |
| 09:41:03 | 6 | expert with us today, but we will confer on that and -- |
| 09:41:03 | 7 | THE COURT:  Okay.  Put it on your list.  Alex, |
| 09:41:03 | 8 | it goes on their list. |
| 09:41:03 | 9 | MR. HARE:  Is that Item 37, Your Honor? |
| 09:41:03 | 10 | THE COURT:  That's a good question.  We should |
| 09:41:03 | 11 | know exactly.  That's probably where I charged it, but it |
| 09:41:03 | 12 | might not belong there.  I mean, depending on what they |
| 09:41:03 | 13 | tell me what their theory of this is.  38 is Title what? |
| 09:41:03 | 14 | MR. HARE:  Services not covered - unbundling. |
| 09:41:03 | 15 | THE COURT:  Well, I call it an affirmative |
| 09:41:03 | 16 | defense.  Yeah, it's under affirmative defenses.  So |
| 09:41:03 | 17 | that's an exclusion, right?  It's not -- what we |
| 09:41:03 | 18 | understood it to be, an exclusion of the coverage.  And |
| 09:41:03 | 19 | my understanding is exclusions are to be proved by the |
| 09:41:03 | 20 | carrier or the insurer.  And so I treated it as an |
| 09:41:03 | 21 | affirmative defense given this is their claim.  So |
| 09:41:03 | 22 | basically they are proving X million and you are going to |
| 09:41:03 | 23 | prove or argue we should take out a half a million of |
| 09:41:03 | 24 | that because they bundled, or something like that, or all |
| 09:41:03 | 25 | of it.  I don't know what your argument is going to be, |

09:41:03  1    but that's how we have charged it.  And so we need to be

09:41:03  2    certain -- that didn't come up yesterday.  Nobody

09:41:03  3    objected.  But I would just like to confirm I have done

09:41:03  4    it properly.

09:41:03  5            MR. HARE:  We don't yet know what all the

09:41:03  6    evidence might be on this.  As I always understood on

09:41:03  7    unbundling, and you heard Ms. Thielan talk about CPT

09:41:03  8    codes and the use.  There will often be a CT code that

09:41:03  9    will account for some -- let's say some panel of

09:41:03  10   services.

09:41:03  11           THE COURT:  Some what?

09:41:03  12           MR. HARE:  Let's say a panel or a group of

09:41:03  13   services.

09:41:03  14           THE COURT:  Yes, yes.

09:41:03  15           MR. HARE:  Each one of which might have its own

09:41:03  16   separate CPT code.

09:41:03  17           THE COURT:  Correct.

09:41:03  18           MR. HARE:  The unbundling abuse is when you bill

09:41:03  19   all of them separately.

09:41:03  20           THE COURT:  When you really did a panel but then

09:41:03  21   you went ahead and charged for each one?

09:41:03  22           MR. HARE:  Right.  So if it is a covered service

09:41:03  23   that is -- if it's a collection of services all of which

09:41:03  24   are covered but should be billed under the bundle CPT

09:41:03  25   code --

09:41:03  1            THE COURT;  The bundled code, correct.

09:41:03  2            MR. HARE:  -- there should still be a payment?

09:41:03  3            THE COURT:  You'd think so.  That's why I used

09:41:03  4  -- it's like my Venn diagram, it would I think be part.

09:41:03  5  Now, I think in their case, their view is you're bad

09:41:03  6  guys, they should get every penny.  But on your claim, it

09:41:03  7  would seem to me it's we -- they want to take out those

09:41:03  8  which they prove were improperly unbundled, not billed

09:41:03  9  properly in terms of bundling, unbundled, whatever, of

09:41:03 10  the basket you think you have proven.

09:41:03 11            MR. HARE:  Right.

09:41:03 12            THE COURT:  So let's see what they say.  Let me

09:41:03 13  make -- understand their case, and then I will hear from

09:41:03 14  you and we'll make sure the charge is done properly.

09:41:03 15  Okay.

09:41:03 16            The last thing is, I gather you haven't

09:41:03 17  conferred on the closing arguments time, but, obviously,

09:41:03 18  that's on your list, and we're going to get an answer

09:41:03 19  soon.  Because I am going to probably want to tell the

09:41:03 20  jury Friday when I discharge.

09:41:03 21            Alex, remember to give me a sticker.  Don't give

09:41:03 22  me Teams because that thing keeps freezing.  So put a

09:41:03 23  sticker at there at 3:45 that I remind them about not

09:41:03 24  talking, not researching, et cetera.  One of my clerks

09:41:03 25  found an interesting article on lying about whatever --

09:41:03  1  on a subject that I think a juror would be interested to
09:41:03  2  read, but, oh, please God, they're not reading it about
09:41:03  3  denial of claims and the use of AI and the setting of
09:41:03  4  amounts of money that folks might want to say.  I think
09:41:03  5  it's a company your Cigna bought.  But anyway, it was
09:41:03  6  interesting.  And I don't know if it is accurate, but
09:41:03  7  again, I've got to remind them don't go researching.

09:41:03  8          But I think it's been -- so far -- they have
09:41:03  9  been here a while.  I am going to probably say to them
09:41:03 10  that I'm dangerously going to predict when they'll get
09:41:03 11  the case.  And what I intend to tell them is that you
09:41:03 12  guys will do closing certainly Wednesday afternoon and it
09:41:03 13  will be done.  And when they come back, I don't think I
09:41:03 14  will get to the charge Wednesday, but I will do it first
09:41:03 15  thing Thursday morning.  So that means before lunchtime,
09:41:03 16  they will have the case, and it's in their hands.  And
09:41:03 17  how they are is up to them.  I mean, I usually give them
09:41:03 18  an estimate of that.  Usually, you know, if it's a
09:41:03 19  four-day case, I will tell them at the end of the third
09:41:03 20  day that I think tomorrow is the last day.  I can't
09:41:03 21  promise.  But I just think psychologically it's -- it's
09:41:03 22  been a bit of a slog.  I mean, I think these guys have
09:41:03 23  done great.  But it's -- you know, we've already had --
09:41:03 24  what did we have, five days of evidence about insurance?
09:41:03 25  I mean, no offense, guys, but, yeah.  So that's my plan.

09:41:03   1          So I guess I should have some sense of your

09:41:03   2   sense of the time for closing argument.  But by our clock

09:41:03   3   -- we have had some delays today with some of those

09:41:03   4   depos, et cetera.  I'm not sure I'm -- and some earlier

09:41:03   5   where I spent time -- I'm not sure that we're charging

09:41:03   6   that or not.  But my guess is that I'm pretty confident

09:41:03   7   we're going to be done by certainly lunchtime, if not

09:41:03   8   noontime on Wednesday, with the evidence where your clock

09:41:03   9   is going to run out.

09:41:03  10          By the way, just as a reminder, make sure

09:41:03  11   probably -- it's more probably over the weekend, that's

09:41:03  12   -- Liana is giving you the list.  I'm sure there's some

09:41:03  13   your paralegals are going to say whatever Liana -- this

09:41:03  14   got in, Liana, it was this -- whatever.  You are going to

09:41:03  15   help her, but she is going to transcript, and we'll

09:41:03  16   figure it out on Monday or Tuesday.

09:41:03  17          But anything that you haven't offered or you

09:41:03  18   don't even think is in, let alone Liana, I would think

09:41:03  19   somebody on your team should be looking through those

09:41:03  20   exhibits and seeing do you want to offer them.  Even

09:41:03  21   joint ones.  I believe I told you even the joint, I'm not

09:41:03  22   shoveling in thousands of exhibits.  So there is going to

09:41:03  23   be a rare exception you're going to stand up on Tuesday

09:41:03  24   and say, Judge, we're going to want to move these four

09:41:03  25   exhibits, they're not going to be used with a witness,

09:41:03  1    but they'll know what they are about because they are

09:41:03  2    about, and you're going to explain to me why I would know

09:41:03  3    what they were about if I were a juror.  Those I might

09:41:03  4    let in.  But others, if you think, you know, you have got

09:41:03  5    to get it in, but maybe a witness talked about it so you

09:41:03  6    can persuade me that it's okay to get it in now, even

09:41:03  7    though the witness isn't on the stands.  But I'm just

09:41:03  8    giving you a heads-up and a warning.

09:41:03  9         You know, when you rest on Wednesday, what's in

09:41:03 10    is in, and you are not going to say, oh, wait a minute,

09:41:03 11    Judge, I want to move the following 87 exhibits.  They

09:41:03 12    are not coming in.  You shouldn't assume they'll come in.

09:41:03 13    So make sure your record is complete.

09:41:03 14         I am prepared to put Nicholson's objections on

09:41:03 15    the record and I'm prepared to put this guy, Nemechek's,

09:41:03 16    on the record.  I have Borden and the other guy's, I'm

09:41:03 17    taking home, but I think Ligotti is probably a priority

09:41:03 18    so I'll do that first.  At some point, maybe tomorrow, I

09:41:03 19    will put the -- why I ruled the way I did on the two I

09:41:03 20    mentioned.  So we'll get those done.

09:41:03 21         I guess the others I can put them on the record

09:41:03 22    when they are deliberating.  It's not really the end of

09:41:03 23    the world unless I realize, oh, my gosh, I should have

09:41:03 24    let me read it, that's a big mistake and that's harm and

09:41:03 25    prejudice and I tell you to read it.  I hope that isn't

09:41:03   1    the case.  So far, I think I have a basis for my rulings,

09:41:03   2    so -- but I would like to get them done.  But I have got

09:41:03   3    the weekend.

09:41:03   4          Lastly, assuming we get through part 3 tonight,

09:41:03   5    I believe you have gotten part 2.  Of course, it doesn't

09:41:03   6    have the three things you are going to help me with that

09:41:03   7    we talked about.  But part 2 you revised, you told me.

09:41:03   8          THE CLERK:  Yeah, but they don't have it.

09:41:03   9          THE COURT:  Oh, they don't have it.  Well, you

09:41:03   10   are going to have it.  Because I haven't looked at it, is

09:41:03   11   that why?  Okay.  Well, sometime tonight you are going to

09:41:03   12   have it.  The same thing with this, by tomorrow night we

09:41:03   13   will at least send out the version as either agreed to or

09:41:03   14   as objected to, but I said this is what I'm doing.

09:41:03   15         Anything that's I will look at it or you're

09:41:03   16   going to give me something, I'll look at it, or let me

09:41:03   17   think about it, anything like that, that's going on a

09:41:03   18   list.  And that will probably go into the weekend for us

09:41:03   19   after I get the verdict form done and get that out to

09:41:03   20   you, hopefully Saturday.  That's going to take some

09:41:03   21   discussion.

09:41:03   22         So that means that like Monday, Tuesday,

09:41:03   23   hopefully there's going to be a handful, less than ten,

09:41:03   24   hopefully not much more than five, of charges or missing

09:41:03   25   charges or language in a charge that's still on the

| 09:41:03 | 1 | agenda. But you will have 98 percent of the charge over |

09:41:03  1    agenda.  But you will have 98 percent of the charge over

09:41:03  2    the weekend.  As to that 2 percent that's open, I will

09:41:03  3    try to -- maybe we'll come in Monday morning early and I

09:41:03  4    will knock off a few of them, or maybe we'll stay -- come

09:41:03  5    in Tuesday morning and I will knock off quite a few.  And

09:41:03  6    I presume by Tuesday night, one way or another, by email

09:41:03  7    or something on the record, you will have everything put

09:41:03  8    to bed.  It could be Wednesday morning.  I just don't

09:41:03  9    know how hard the issues are going to be that are left,

09:41:03  10   but, yeah.

09:41:03  11          Same thing about the verdict form, I should have

09:41:03  12   it to bed by the time you stand up.  I'm not sure that's

09:41:03  13   in the statute or the rule that you are entitled to have

09:41:03  14   that, but I would hope I would.  Sometimes lawyers put

09:41:03  15   that on the screen as a demonstrative.  Can I just

09:41:03  16   suggest it might terrify the jury?  And I'm not sure it's

09:41:03  17   a good idea.  I mean, you can talk about it, you can

09:41:03  18   explain hopefully how it's this roadmap and the judge is

09:41:03  19   going to explain what to do or whatever.  But it could be

09:41:03  20   really long.  I'm actually toying with can I cut things

09:41:03  21   down, compress them, not make it three separate, make it

09:41:03  22   one with three parts, you know, that kind of thing.  So

09:41:03  23   I'm toying with that.  So that's that.

09:41:03  24          And if we finish the evidence early, I'm happy

09:41:03  25   to do lunch early.  We will probably order lunch for them

| | | |
|---|---|---|
| 09:41:03 | 1 | so we can have it delivered by noon or whatever.  If you |
| 09:41:03 | 2 | want an hour to gather your thoughts and just breathe, |
| 09:41:03 | 3 | but I would expect that we'll get the charges done on |
| 09:41:03 | 4 | Wednesday.  So anyway -- |
| 09:41:03 | 5 | Okay.  I'm looking at 44, which is the |
| 09:41:03 | 6 | introduction charge to Cigna's case. |
| 09:41:03 | 7 | Do I have any objection to that? |
| 09:41:03 | 8 | MS. KINGSBERY:  No objection from Cigna. |
| 09:41:03 | 9 | MR. CHRIST:  No objection.  But just a note that |
| 09:41:03 | 10 | I think there's an errant will in the third line from the |
| 09:41:03 | 11 | bottom. |
| 09:41:03 | 12 | THE COURT:  Give you.  Oh, no.  That I have |
| 09:41:03 | 13 | given you.  Yeah, that's right.  That I have given you |
| 09:41:03 | 14 | previously.  That's more proper. |
| 09:41:03 | 15 | So that is -- purple is going to be a go change, |
| 09:41:03 | 16 | Alex. |
| 09:41:03 | 17 | 45, statement of Cigna's case. |
| 09:41:03 | 18 | Cigna, any objection? |
| 09:41:03 | 19 | MS. KINGSBERY:  No objection. |
| 09:41:03 | 20 | MR. CHRIST:  Your Honor, I think the figure |
| 09:41:03 | 21 | that's referenced -- |
| 09:41:03 | 22 | THE COURT:  Now that I look at it, I wondered |
| 09:41:03 | 23 | because the figures seem to be moving. |
| 09:41:03 | 24 | MR. CHRIST:  Yes. |
| 09:41:03 | 25 | THE COURT:  So I can just say the parties agree |

09:41:03  1  Cigna paid money to the Labs, or somebody can tell me you

09:41:03  2  agree on what -- if you agree.  And if you don't, I will

09:41:03  3  write it that Cigna asserts that it paid, or I will just

09:41:03  4  say that they paid monies.  Because it's really evidence,

09:41:03  5  I guess.  I probably wouldn't say it.

09:41:03  6        So what's your view on that on Cigna's side?

09:41:03  7  Parties agree the figure Cigna paid money to the Labs on

09:41:03  8  account of billings?

09:41:03  9        MS. KINGSBERY:  I think we can all agree that

09:41:03  10  it's 16 million plus.  I believe the Labs' expert says

09:41:03  11  it's 16.1.  And we are willing to stipulate to that

09:41:03  12  number.

09:41:03  13        THE COURT:  Is that all right?  I don't usually

09:41:03  14  comment on evidence.  I don't think you have seen much

09:41:03  15  evidence in the charge.  So if I were writing this over

09:41:03  16  again, I'd probably say the parties agree that Cigna paid

09:41:03  17  monies to the Lab on account of billings, without saying

09:41:03  18  a number.  This is going to be in the jury room.  It's

09:41:03  19  kind of like giving them one of your pieces of evidence

09:41:03  20  for damages.  So I think I am going to say that whether

09:41:03  21  you don't want me to or not.  Even if you agree that the

09:41:03  22  figure -- on the figure, it's contrary to my theory of

09:41:03  23  what I want a charge to be.

09:41:03  24        Okay.  I will keep parties agree because

09:41:03  25  otherwise, I would have to say Cigna argues that they

09:41:03   1    paid monies or something.  There's no dispute that there

09:41:03   2    was money paid.

09:41:03   3         All right.  Okay.  So with that change, it is

09:41:03   4    acceptable to both sides?  Or you can preserve on an

09:41:03   5    amount if you want.

09:41:03   6         Go ahead, sir.

09:41:03   7         MR. CHRIST:  That change is acceptable to the

09:41:03   8    Labs.

09:41:03   9         The Labs have another comment in the second

09:41:03   10   paragraph.

09:41:03   11        THE COURT:  Yes.

09:41:03   12        MR. CHRIST:  There's a reference to both

09:41:03   13   unbundling and double billing.  I don't think there's

09:41:03   14   been a reference to both of those terms.  The

09:41:03   15   instructions, it's just been unbundling.  Or at least in

09:41:03   16   my quick review earlier, I didn't see anything.

09:41:03   17        THE COURT:  I think that's probably right.  What

09:41:03   18   do you think, Attorney Kingsbery?

09:41:03   19        MS. KINGSBERY:  I think that's right.  We have

09:41:03   20   used the word double billing to refer to unbundling.

09:41:03   21        THE COURT:  Yeah.  Well, if you agree --

09:41:03   22   somebody has used unbundling already, and you will use

09:41:03   23   that word, let alone you might use a synonym, but you are

09:41:03   24   going to use unbundling.  They'll know that that's what

09:41:03   25   we're talking about.  So I think we take that out.

09:41:03    1              Anything else, Attorney Christ?

09:41:03    2              MR. CHRIST:  Nothing else, Your Honor.

09:41:03    3              THE COURT:  So with two minor edits, 45 is put

09:41:03    4     to bed.

09:41:03    5              46, burden of proof.

09:41:03    6              MS. KINGSBERY:  No objection from Cigna.

09:41:03    7              MR. CHRIST:  No objection from the Labs.

09:41:03    8              THE COURT:  Two checks, Alex, means no change,

09:41:03    9     it's okay.

09:41:03   10              47, single Cigna company.

09:41:03   11              MS. KINGSBERY:  No objection from Cigna.

09:41:03   12              MR. CHRIST:  No objection from the Labs.

09:41:03   13              THE COURT:  Okay.  48, unjust enrichment.

09:41:03   14              MS. KINGSBERY:  The second sentence that says

09:41:03   15     the idea behind this cause of action is that someone who

09:41:03   16     unfairly receives a benefit without payment, to us reads

09:41:03   17     confusing, given that the benefit here is a payment.

09:41:03   18              THE COURT:  You're right.

09:41:03   19              MS. KINGSBERY:  So that -- I think that is

09:41:03   20     confusing.  And it gets explained later, but we would --

09:41:03   21              THE COURT:  How about we say a benefit, in this

09:41:03   22     case a payment.

09:41:03   23              MS. KINGSBERY:  That's acceptable.

09:41:03   24              THE COURT:  Is that all right with the Labs?  I

09:41:03   25     mean, benefit, I hope they are going to know what that

| | |
|---|---|
| 09:41:03 | 1 |
| 09:41:03 | 2 |
| 09:41:03 | 3 |

09:41:03  1   means, but -- I mean, I should speak in English.  I could

09:41:03  2   say unfairly receives a payment, you know, but the

09:41:03  3   element is, I believe, benefit, is it?

09:41:03  4        MR. CHRIST:  It is under Florida standard jury

09:41:03  5   instruction for unjust enrichment.

09:41:03  6        THE COURT:  Actually it says payments, Number 2.

09:41:03  7   I know it's benefit, but I've changed it in the element.

09:41:03  8   Payments.  I can just say unfairly receives payments.  I

09:41:03  9   like benefit, to be honest.

09:41:03  10        MS. KINGSBERY:  We don't have any objection to

09:41:03  11   the word benefit.  It was just --

09:41:03  12        THE COURT:  It's going to read, I'm suggesting,

09:41:03  13   who unfairly receives a benefit, in this case a payment,

09:41:03  14   may be unjustly enriched at the expense of another.

09:41:03  15        Is that all right with Cigna?

09:41:03  16        MS. KINGSBERY:  That works with a Cigna.

09:41:03  17        THE COURT:  How about with the Labs?

09:41:03  18        MR. CHRIST:   I'm sorry, Judge.  My colleague

09:41:03  19   said -- I can't hear your -- if you would.  Do you have a

09:41:03  20   comment?

09:41:03  21        MR. GESTRICH:  The comment would be benefit from

09:41:03  22   Cigna.

09:41:03  23        THE COURT:  Okay.  That's fine.  I think that's

09:41:03  24   appropriate.  That's fine.  Anything else, Labs, on this

09:41:03  25   one?

1181

09:41:03  1        MR. CHRIST:  On the last sentence of the first

09:41:03  2   paragraph, it says, Cigna asserts the Labs owe them

09:41:03  3   reimbursement for all of the money that Cigna has paid to

09:41:03  4   the three labs.  I have a concern about all of the money,

09:41:03  5   because under the various bases that there -- the Court

09:41:03  6   will be charging later --

09:41:03  7        THE COURT:  That's what he opened on, so that's

09:41:03  8   what he's -- I guess I could just say reimbursement of

09:41:03  9   monies.

09:41:03 10        MR. CHRIST:  Yes, that would be --

09:41:03 11        THE COURT:  And keep it vague and let him argue

09:41:03 12   what he wants to.  I don't know, Attorney Kang, if you

09:41:03 13   are going to argue you want every penny back or are you

09:41:03 14   going to argue, you know, more detail, this much comes

09:41:03 15   back for unbundling, this much comes back for this.  Or

09:41:03 16   however you are going to argue it, I shouldn't be telling

09:41:03 17   them how you are going to argue it.  So owing

09:41:03 18   reimbursement of monies is, I think, more generic.  Is

09:41:03 19   that all right?

09:41:03 20        MR. KANG:  Yes.

09:41:03 21        THE COURT:  That's what I will do.  And you both

09:41:03 22   have no problem.

09:41:03 23        Any other changes?

09:41:03 24        MR. CHRIST:  No other changes, Your Honor.

09:41:03 25        THE COURT:  How about you?  Did I get all of --

| | | |
|---|---|---|
| 09:41:03 | 1 | any comments from you? |
| 09:41:03 | 2 | MS. KINGSBERY:  No objection. |
| 09:41:03 | 3 | THE COURT:  Thank you very much. |
| 09:41:03 | 4 | Number 49, unfairness. |
| 09:41:03 | 5 | MS. KINGSBERY:  There's several instances in |
| 09:41:03 | 6 | which the Court says this element is in dispute.  The |
| 09:41:03 | 7 | second sentence. |
| 09:41:03 | 8 | THE COURT:  Yes. |
| 09:41:03 | 9 | MS. KINGSBERY:  And there are instances where |
| 09:41:03 | 10 | the Labs had the burden and some elements were agreed and |
| 09:41:03 | 11 | others were in dispute, but this language isn't included. |
| 09:41:03 | 12 | THE COURT:  It's not consistent? |
| 09:41:03 | 13 | MS. KINGSBERY:  It's not inconsistent.  So we |
| 09:41:03 | 14 | would just ask that it's the same language, which I think |
| 09:41:03 | 15 | in the Labs' case the language is Cigna bears the burden |
| 09:41:03 | 16 | of proving the element.  I can direct you to where I'm |
| 09:41:03 | 17 | talking about. |
| 09:41:03 | 18 | THE COURT:  You mean -- that's what you mean |
| 09:41:03 | 19 | here about burden of proof is on you on this?  Or in the |
| 09:41:03 | 20 | Labs' charge I should tell me that Cigna bears the |
| 09:41:03 | 21 | burden?  I don't understand.  I would just take it out. |
| 09:41:03 | 22 | MS. KINGSBERY:  Yes, Your Honor. |
| 09:41:03 | 23 | THE COURT:  Is that all right?  Okay.  So Alex, |
| 09:41:03 | 24 | this is a universal.  You've got to search and take it |
| 09:41:03 | 25 | out of every one.  And I'm going to make -- I will now |

1183

| | | |
|---|---|---|
| 09:41:03 | 1 | instruct as a new paragraph.  Understand that you're |
| 09:41:03 | 2 | likely to get a version of the draft over the weekend |
| 09:41:03 | 3 | that's going to be in effect an editing version.  In |
| 09:41:03 | 4 | other words, it's the version you will have already |
| 09:41:03 | 5 | gotten maybe Friday night, maybe you won't have gotten |
| 09:41:03 | 6 | it, but there's going to be a lot of picky edits in |
| 09:41:03 | 7 | there.  I don't know if we'll catch the inconsistencies. |
| 09:41:03 | 8 | Hopefully you catch them.  But, you know, like I just |
| 09:41:03 | 9 | made that a paragraph.  I'll do that somewhere else.  I |
| 09:41:03 | 10 | put in commas a lot, not because they are grammatically |
| 09:41:03 | 11 | accurate, but it's because I'm reading and I've got to |
| 09:41:03 | 12 | remember I've got to pause here for it to make sense |
| 09:41:03 | 13 | verbally.  There will be typos.  It will be -- I don't |
| 09:41:03 | 14 | know.  Just there will be style I don't think.  And we |
| 09:41:03 | 15 | will red line those versions and we will warn you that |
| 09:41:03 | 16 | there is -- this is the version where we did a lot of |
| 09:41:03 | 17 | little edits.  But the only substantive changes are. and |
| 09:41:03 | 18 | we'll heads-up the substantive ones.  But you should |
| 09:41:03 | 19 | always have somebody on your team carefully look at it |
| 09:41:03 | 20 | because we might miss a substantive one and not call it |
| 09:41:03 | 21 | out, and you should look at it. |
| 09:41:03 | 22 |         All right.  50, Element 3, totally of the |
| 09:41:03 | 23 | circumstances.  I love that one. |
| 09:41:03 | 24 |         Any objection?  I am going to turn now to the |
| 09:41:03 | 25 | Labs. |

1184

```
09:41:03   1              MR. CHRIST:  No objection, Your Honor.

09:41:03   2              THE COURT:  How about Cigna?

09:41:03   3              MS. KINGSBERY:  No objection.

09:41:03   4              THE COURT:  How about 51?  Labs?

09:41:03   5              MR. CHRIST:  No objection, Your Honor.

09:41:03   6              THE COURT:  How about Cigna?

09:41:03   7              MS. KINGSBERY:  No objection.

09:41:03   8              THE COURT:  This is like a criminal charge

09:41:03   9     conference, Attorney Kang.  Civil lawyers, it's usually

09:41:03  10     hours, right?  In the criminal cases, you know, a guy is

09:41:03  11     looking at 20 year man. min., and it's like five minutes.

09:41:03  12     I probably shouldn't have said that, Terri.

09:41:03  13              Count 52, unfairness bases.

09:41:03  14              I'm on Cigna again, so let's hear from you

09:41:03  15     first.  I think this is a good one for you to go first

09:41:03  16     on.

09:41:03  17              MS. KINGSBERY:  Yeah.  So the second sentence,

09:41:03  18     Cigna argues that none of the tests -- I think that

09:41:03  19     should say "for" -- it says "or" which the Labs billed.

09:41:03  20              THE COURT:  Yeah, that's a typo.

09:41:03  21              MS. KINGSBERY:  Yes.  And then we would say add

09:41:03  22     Cigna, for which the Labs billed Cigna, were medically

09:41:03  23     necessary.

09:41:03  24              THE COURT:  Alex would have caught that.  The

09:41:03  25     Labs billed Cigna.  Do you mind?  Do you object to those?
```

| | | |
|---|---|---|
| 09:41:03 | 1 | MR. CHRIST:  We don't object to that. |
| 09:41:03 | 2 | THE COURT:  Anything else? |
| 09:41:03 | 3 | MS. KINGSBERY:  No other objections. |
| 09:41:03 | 4 | THE COURT:  Attorney Christ? |
| 09:41:03 | 5 | MR. CHRIST:  Yes.  We would request a change to |
| 09:41:03 | 6 | the last sentence in the first paragraph that starts with |
| 09:41:03 | 7 | Third. |
| 09:41:03 | 8 | THE COURT:  Yeah. |
| 09:41:03 | 9 | MR. CHRIST:  Cigna claims the Labs engaged in |
| 09:41:03 | 10 | fee forgiveness, which claims violated some of its |
| 09:41:03 | 11 | policies after January 1, 2015. |
| 09:41:03 | 12 | MR. GESTRICH:  Yes, because it's not all.  Some |
| 09:41:03 | 13 | of the -- |
| 09:41:03 | 14 | THE COURT:  Oh, some of Cigna's policies.  I |
| 09:41:03 | 15 | should have the word Cigna's. |
| 09:41:03 | 16 | MR. GESTRICH:  Some of Cigna's policies, because |
| 09:41:03 | 17 | it's not all the post 2015 policies. |
| 09:41:03 | 18 | THE COURT:  So I'm telling them that they are |
| 09:41:03 | 19 | going to claim as a circumstances to consider that you |
| 09:41:03 | 20 | guys engaged in -- now is it all Labs that you think |
| 09:41:03 | 21 | engaged in fee forgiveness after this date on some of the |
| 09:41:03 | 22 | policies or just -- |
| 09:41:03 | 23 | MS. KINGSBERY:  Two of the labs were flagged. |
| 09:41:03 | 24 | All right.  One of the labs was flagged, another lab was |
| 09:41:03 | 25 | flagged shortly after that. |

09:41:03  1        THE COURT:  We should be clearer, Alex, about

09:41:03  2   when we're saying Labs, because don't they have to make a

09:41:03  3   finding -- or are we not going to make them a finding on

09:41:03  4   these bases?  Just let them argue and see whether they

09:41:03  5   find the third element.

09:41:03  6        THE CLERK:  Do you want an answer?

09:41:03  7        THE COURT:  It's a hypothetical, but it's

09:41:03  8   thinking out loud.

09:41:03  9        Well, let's talk about that, Alex, afterwards.

09:41:03 10   I haven't got to that part of the verdict form.

09:41:03 11        MR. KANG:  If I may, Your Honor, on that one.

09:41:03 12        THE COURT:  Yes, sir.

09:41:03 13        MR. KANG:  I might propose just deleting the

09:41:03 14   clause which it claims violated its policies after

09:41:03 15   January 1.

09:41:03 16        THE COURT:  Oh.  Yeah.

09:41:03 17        MR. KANG:  And part of the reason is that the

09:41:03 18   way it's currently drafted contradicts a little bit with

09:41:03 19   actually paragraph 51 where the Court I think is correct

09:41:03 20   in saying that -- the last paragraph there, I instruct

09:41:03 21   you that the terms of these policies do not necessarily

09:41:03 22   define what is unfair in the Labs' dealings with Cigna.

09:41:03 23   You may consider the terms of this these policies,

09:41:03 24   however, among other circumstances in determining whether

09:41:03 25   the circumstances are such that they would be unfair.

09:41:03  1          THE COURT:  So what do you want me to do with

09:41:03  2    the last -- oh, you are telling me that's inconsistent

09:41:03  3    with the last section of 52?

09:41:03  4          MR. KANG:  Right.

09:41:03  5          THE COURT:  The problem is what I mean to say,

09:41:03  6    maybe I'm not clear, that you may consider the terms of

09:41:03  7    these policies -- obviously they shouldn't consider the

09:41:03  8    terms of policies that are not relevant to what the issue

09:41:03  9    they are considering, right?  So I could add the terms of

09:41:03  10   the policies at issue or something like that.  But then I

09:41:03  11   think, assuming you all agree, I would tell them what are

09:41:03  12   the policies at issue on this issue.

09:41:03  13         MR. KANG:  I'm just worried that the way that

09:41:03  14   that sentence in 52 is currently written suggests that

09:41:03  15   our only bases for fee forgiveness is claim that it

09:41:03  16   violated policies after January 1, whereas --

09:41:03  17         THE COURT:  No, I'm just telling them this is

09:41:03  18   one of your bases.  You've got three bases, and then I

09:41:03  19   tell them they can just -- they can look at anything,

09:41:03  20   really, the circumstances.  But you want me to instruct

09:41:03  21   them on you are claiming three particular bases that

09:41:03  22   would be circumstances they should consider.  But even if

09:41:03  23   they don't find any of the three, I think my charge tells

09:41:03  24   them they could still find the element.  I don't think

09:41:03  25   you are limited.

09:41:03  1          But when I'm telling them what the element is

09:41:03  2     and they are deciding is that involved here and they

09:41:03  3     should consider it, it is a circumstance.  I can't tell

09:41:03  4     them to consider it as a circumstance when it's not in

09:41:03  5     the universe of your claim or -- yeah, which you claim

09:41:03  6     violated some of Cigna's, you know, policies after that

09:41:03  7     date, and which Labs' policies, I mean which policies the

09:41:03  8     Labs were billing at the time.  Yeah, that's a problem.

09:41:03  9          Any thoughts?  I've stickered it to talk to Alex

09:41:03  10    about it, but I have to understand where you guys are on

09:41:03  11    this.  I mean, what do you want me to do?  How is that?

09:41:03  12    Maybe we can't decide it until we get through Element 3,

09:41:03  13    but I mean, I can only go charge-by-charge.  I can't talk

09:41:03  14    about five charges at once.

09:41:03  15          MR. GESTRICH:  On that issue, Your Honor, the

09:41:03  16    2015 -- 2015 and later policies have that fee forgiveness

09:41:03  17    language.

09:41:03  18          THE COURT:  Yeah.

09:41:03  19          MR. GESTRICH:  But only some of them.  And if I

09:41:03  20    understand correctly, it's my recollection I think PBL

09:41:03  21    was not paid anything in 2015 and later.  We'll have to

09:41:03  22    confirm that, but -- so it may just be limited to two out

09:41:03  23    of three of the labs because of the time period.

09:41:03  24          THE COURT:  But how is the jury going to know

09:41:03  25    that?  Is that going to be part of the proof?  Am I

09:41:03  1    supposed to be charging them somewhere that?

09:41:03  2            MS. KINGSBERY:  Not from our perspective.

09:41:03  3            THE COURT:  Well, I know you want me to charge

09:41:03  4    the kitchen sink, but that's not your evidence.  I mean,

09:41:03  5    I -- maybe -- I don't know, is it the Lab's burden to

09:41:03  6    point that out in rebuttal?

09:41:03  7            MS. KINGSBERY:  Well, it's our position that --

09:41:03  8            THE COURT:  I mean, it -- basically, you can

09:41:03  9    argue anything in the closing.  Okay.  But the jury is

09:41:03  10   going to be told you have to have evidence for your

09:41:03  11   verdict.  It there's not evidence to support -- what is

09:41:03  12   it -- this is not medically necessary, right, the first

09:41:03  13   one.  That can't be.  Oh, because they weren't paid is

09:41:03  14   why it is not in the policies.  I assume you are going to

09:41:03  15   have evidence that there were charges by which labs,

09:41:03  16   there were -- there was a medical necessity requirement

09:41:03  17   for coverage in all the policies for which there were

09:41:03  18   charges, that you then denied because you didn't see

09:41:03  19   evidence of medical necessity so you don't have to pay a

09:41:03  20   claim that isn't in the policy.  Therefore, it's in your

09:41:03  21   number, some expert is going to put in front of the jury

09:41:03  22   of this is what you could write a check for us back to

09:41:03  23   us.  I mean, you need that proof, I think.  I don't know,

09:41:03  24   maybe there's other things you need to prove, but I think

09:41:03  25   I should tell the jury that.  I don't know.  I don't know

1190

09:41:03   1   that it's not an opposing argument in closing argument to

09:41:03   2   tell any -- I mean, you -- the argument should be

09:41:03   3   pointing out there's no evidence of this.  There's no

09:41:03   4   evidence of that.  But I'm supposed to tell the jury what

09:41:03   5   they need to decide something.  Yeah, I think so.  All

09:41:03   6   right.  Well, we'll take another look at that.

09:41:03   7         This is the first one, fee forgiveness.  Is --

09:41:03   8   how did I get from -- not medically necessary.  That's

09:41:03   9   one.  Two is unbundling.  And three is fee forgiveness.

09:41:03   10  I gotcha.

09:41:03   11        I think I need an additional sentence or two

09:41:03   12  that lays out that chain of proof that has to be there

09:41:03   13  before you can say this basis is there as to which

09:41:03   14  claims, and, therefore, those are the ones -- if you use

09:41:03   15  that basis and you find that it's unfair or it's whatever

09:41:03   16  Element 3 is, you would tell them to pay it back to me.

09:41:03   17  I mean, I think that has to be in there.  It's the same

09:41:03   18  as saying you have to prove Elements 1, 2, 3, and 4.

09:41:03   19  It's just describing -- it's really maybe a damage thing,

09:41:03   20  but it should be covered in the last element, I think.

09:41:03   21  Yeah.  Well, we'll talk about it.  You'll see some

09:41:03   22  changed language.  It's not good when my clerk scowls at

09:41:03   23  me.  So obviously, I'm not being clear, but we'll talk

09:41:03   24  about it and we'll get some more language out.

09:41:03   25        And then that's wasn't the only place.  Did

09:41:03  1    somebody have something else later on?

09:41:03  2            MR. CHRIST:  No.

09:41:03  3            MS. KINGSBERY:  We did not.

09:41:03  4            THE COURT:  That's not really fixed.  So we need

09:41:03  5    to go back to that.

09:41:03  6            53.  Page 68, the medical necessity.  I am going

09:41:03  7    to be honest with you, I'm going to look at all of these

09:41:03  8    bases again to be sure I've adequately charged it.  I

09:41:03  9    don't hear anybody telling me to add stuff, but I have my

09:41:03  10   only responsibility to make sure I think the jury will

09:41:03  11   understand what they have to do to have a basis for their

09:41:03  12   finding.  I will try to do that and may add a sentence or

09:41:03  13   two here or there.  So you should keep an eye out for

09:41:03  14   that because nobody has asked for it, but I may add it.

09:41:03  15   So be sure to look at it.

09:41:03  16            53, I don't know, I think I'm on the Cigna side,

09:41:03  17   but I'm not sure.

09:41:03  18            MS. KINGSBERY:  We don't have any objection.

09:41:03  19            MR. CHRIST:  No objections, Your Honor.

09:41:03  20            THE COURT:  54, unbundling.

09:41:03  21            MR. GESTRICH:  Your Honor, it is not an

09:41:03  22   objection.  On 53, we would have supplemental language in

09:41:03  23   connection with the same issue in medical necessity in

09:41:03  24   the Labs' case that we're submitting to the Court in

09:41:03  25   considering the policies in the performance between the

09:41:03  1    parties.

09:41:03  2            THE COURT:  Which you haven't given me yet?

09:41:03  3            MR. GESTRICH:  No, Your Honor, just --

09:41:03  4            THE COURT:  That you are supplementing for part

09:41:03  5    2, your claim; is that right?  So you'd want that here?

09:41:03  6    When you submit that to me, you probably --

09:41:03  7            MR. HARE:  We'll reference both.

09:41:03  8            THE COURT:  You should reference.  I'm just

09:41:03  9    wondering if when you submit additional requests, you

09:41:03  10   need to make a record.  I don't think your -- were your

09:41:03  11   charges ever docketed?  I don't know.  We haven't talked

09:41:03  12   much about what you requested.  But when you make a

09:41:03  13   request like you're going to do to supplement it, we're

09:41:03  14   going to talk about it and I'm going to make a ruling.

09:41:03  15   And I don't include what you supplemented and you

09:41:03  16   preserve your objection, the Circuit has got to be able

09:41:03  17   to see what you asked me to look at and what I rejected

09:41:03  18   is whatever.  So think back.  Somebody looking at this

09:41:03  19   after the fact, what do they need?  So they need it so

09:41:03  20   you make it an exhibit, I think -- not an exhibit -- a

09:41:03  21   docketed item, supplemental request to charge or

09:41:03  22   something like that.

09:41:03  23           So far I don't think any of your original ones

09:41:03  24   are really the subject of a particular objection.  You

09:41:03  25   have objected to what's here but not to a supplement.

09:41:03  1   What could happen is I have got this page, you say,

09:41:03  2   Judge, Supplement 53, and we have a discussion, but I say

09:41:03  3   no.  They have to know what you asked me to supplement if

09:41:03  4   you've said I object and you go up on appeal on that

09:41:03  5   objection.  Okay.  I don't know that your original ones

09:41:03  6   are in that category.  But if you think they are, file

09:41:03  7   them.  Request -- original request to charge or something

09:41:03  8   like that.

09:41:03  9        MR. GESTRICH:  Would it make easy for you if we

09:41:03  10  filed them supplemental appendices to the joint trial

09:41:03  11  memorandum?

09:41:03  12       THE COURT:  No, no, no.  I can tell you the

09:41:03  13  Circuit won't find that easier.  Is that where your

09:41:03  14  original request to charge is already there?  Is that --

09:41:03  15  okay.  So they are in the docket, so that's fine.  But

09:41:03  16  from now on, no.  That's dated months ago and nobody --

09:41:03  17  whatever.  No.  The simple answer is no.  Attorney

09:41:03  18  Gestrich, I appreciate you're strive for simplicity, but

09:41:03  19  that will not achieve it.

09:41:03  20       All right.  So other than you're preserving --

09:41:03  21  you're going to supplement unless you -- if you don't

09:41:03  22  supplement, then you've got no position here.  But if you

09:41:03  23  supplement it, I will look at it and rule on it and edit

09:41:03  24  if I agree or don't, I won't.  Other than that, this one

09:41:03  25  is okay?

```
09:41:03   1            MS. KINGSBERY:  Yes, Your Honor.

09:41:03   2            THE COURT:  I thought you were trying to find

09:41:03   3   something that you pointed out to.

09:41:03   4            MR. CHRIST:  No.  I just --

09:41:03   5            THE COURT:  Okay.  54, unbundling.  That's part

09:41:03   6   of two pages.  Any objection by Cigna?

09:41:03   7            MS. KINGSBERY:  No objection.

09:41:03   8            THE COURT:  How about Labs?

09:41:03   9            MR. CHRIST:  No objection.  Just what we were

09:41:03  10   checking to make sure the date was correct, October 1,

09:41:03  11   2013 referenced in the third paragraph.

09:41:03  12            THE COURT:  Oh, I see that.  I couldn't find it.

09:41:03  13            MR. CHRIST:  I believe it is.  I just --

09:41:03  14            THE COURT:  All right with Cigna?

09:41:03  15            MS. KINGSBERY:  That's correct, Your Honor.

09:41:03  16            THE COURT:  Thank you.  I don't know where we

09:41:03  17   got it out of something that looked like you agreed.

09:41:03  18            55, fee forgiveness.

09:41:03  19            MS. KINGSBERY:  Is it our turn?

09:41:03  20            THE COURT:  Yeah, it is.

09:41:03  21            MS. KINGSBERY:  We do have an objection.  The

09:41:03  22   second sentence where it describes fee forgiving.  We

09:41:03  23   would ask that -- to the end of the sentence, we'd also

09:41:03  24   include and the balance of the Labs' charges after

09:41:03  25   insurance.  It is the balance bill.
```

09:41:03  1          THE COURT:  That's not included in any of those

09:41:03  2   amounts?

09:41:03  3          MS. KINGSBERY:  It is not, Your Honor.

09:41:03  4          THE COURT:  Balance of -- give me the language.

09:41:03  5          MS. KINGSBERY:  The balance of the Labs' charges

09:41:03  6   after insurance.

09:41:03  7          THE COURT:  That's like the 24,000 plus that was

09:41:03  8   my orthopedic surgeon billed when I was out on network

09:41:03  9   with Anthem Blue Cross.  Yeah.  Unfortunately, he's a

09:41:03  10  friend of my daughter's.  Balance of the Labs' -- say

09:41:03  11  again.

09:41:03  12         MS. KINGSBERY:  Charges after insurance.

09:41:03  13         THE COURT:  Well, after insurance and all these

09:41:03  14  other things.

09:41:03  15         MS. KINGSBERY:  Yes, that's correct.  It would

09:41:03  16  be the balance.

09:41:03  17         THE COURT:  I would say after other payments.  I

09:41:03  18  mean it -- well, it doesn't include the deductibles.

09:41:03  19         MS. KINGSBERY:  The balance bill would be

09:41:03  20  whatever is left over after insurance pays and the

09:41:03  21  patient makes a payment on either co-pay, deductible,

09:41:03  22  coincidence.

09:41:03  23         THE COURT:  So it should read after what?

09:41:03  24         MS. KINGSBERY:  We recommend it just say after

09:41:03  25  insurance.

09:41:03  1          THE COURT:  Yeah, but insurance doesn't include

09:41:03  2     co-pay.  I mean, if I paid $35 to my doctor when I go for

09:41:03  3     a visit, I'm paying that to the doctor, which in the case

09:41:03  4     they took a consent, you're right.  I know you don't

09:41:03  5     agree, but they are arguing they took a consent, so it

09:41:03  6     goes to them, no?

09:41:03  7          MS. KINGSBERY:  The patient?

09:41:03  8          THE COURT:  The patient me, as a co-pay.  In

09:41:03  9     other words, my insurance doesn't pay the first $35.  So

09:41:03  10    when I walk up to the window at my doctor's, I pay my

09:41:03  11    doctor.  That's the provider.  In this case, all they

09:41:03  12    consent is  that the payment from insurance will go to

09:41:03  13    you and you're supposed to then bill for -- including the

09:41:03  14    co-pay wouldn't have been paid in these instances, right?

09:41:03  15    Is that -- it's a little different situation.  Okay.  So

09:41:03  16    balance of the Labs' charges after insurance.

09:41:03  17          MS. KINGSBERY:  Insurance payment.

09:41:03  18          THE COURT:  What does the Labs thing?

09:41:03  19          MR. CHRIST:  We would instead suggest that the

09:41:03  20    sentence just ends after obligations period, instead of

09:41:03  21    providing any examples of co-pays, deductibles and

09:41:03  22    coinsurance and anything else.

09:41:03  23          THE COURT:  Okay.  That's all right.

09:41:03  24          What do you think, Attorney Kingsbery?

09:41:03  25          MS. KINGSBERY:  We would ask that the

09:41:03  1    explanation for what the cost sharing obligations are be

09:41:03  2    included.

09:41:03  3              THE COURT:  I am going to think about that one.

09:41:03  4    I think I know what I'm doing, but I am going to think

09:41:03  5    about it.  Thank you.  Anything else on 55?

09:41:03  6              MS. KINGSBERY:  No other objections.

09:41:03  7              THE COURT:  How about you, Attorney Christ?

09:41:03  8              MR. CHRIST:  No other objections.

09:41:03  9              THE COURT:  56, I think.  Any objections?  Who

09:41:03  10   am I -- I lost track.  Sorry.

09:41:03  11             MR. CHRIST:  We can take it.

09:41:03  12             THE COURT:  I think it is your turn.

09:41:03  13             MR. CHRIST:  No objections, Your Honor.

09:41:03  14             THE COURT:  How about -- no?

09:41:03  15             MS. KINGSBERY:  No objections.

09:41:03  16             THE COURT:  Okay.  The next is voluntary payment

09:41:03  17   affirmative defense.  I think we better check the format

09:41:03  18   of that caption.  That's one of the things you are going

09:41:03  19   to edit is consistency in the caption.

09:41:03  20             Any objections, Attorney Christ?

09:41:03  21             MR. CHRIST:  Yes, Your Honor.  The numeral

09:41:03  22   Number 2 under the second paragraph.  The comment -- the

09:41:03  23   statement says, was made with, quote, full knowledge of

09:41:03  24   the facts.  And I was reviewing case law on the voluntary

09:41:03  25   payment affirmative defense, and specifically *Sundance*

09:41:03  1    *Apartments, Inc. versus General Electric,* and I can

09:41:03  2    provide the Court with a copy.  It's 581 F.Supp.2d 1215,

09:41:03  3    the Southern District of Florida 2008 case.  It's saying

09:41:03  4    like full knowledge -- the terminology that's used, it's

09:41:03  5    just knowledge.

09:41:03  6          THE COURT:  What did they use?

09:41:03  7          MR. CHRIST:  Just knowledge.  I have seen full

09:41:03  8    knowledge used in other cases.

09:41:03  9          THE COURT:  Yeah, I've seen it.

09:41:03  10          MR. CHRIST:  But it seems to be rarer.  The more

09:41:03  11    common terminology is just knowledge.  I don't know how

09:41:03  12    much of a difference it makes.

09:41:03  13          THE COURT:  I don't know that it makes a

09:41:03  14    difference.  It does kind of overemphasize the element.

09:41:03  15    I appreciate your reaction to it.  On the other hand, I

09:41:03  16    might -- I mean, knowledge of the facts, I'm not sure it

09:41:03  17    would be clear to me, well, I know some things about it,

09:41:03  18    but I don't know everything.  It does say the, so that

09:41:03  19    should tell them it means all, but it's -- that's -- I

09:41:03  20    mean, if I were having a conversation I'd probably say

09:41:03  21    you have to know all the facts.  Right?  That's how I

09:41:03  22    would say it.  So full knowledge is another way to say

09:41:03  23    that.

09:41:03  24          What's your position on that?

09:41:03  25          MS. KINGSBERY:  We agree.  We would ask that

09:41:03  1    full knowledge be kept in.  Otherwise, it sounds like all

09:41:03  2    you need is to know something.

09:41:03  3           THE COURT:  We'll take a look at that case.  Do

09:41:03  4    you have anything else I should look that?  Or does Cigna

09:41:03  5    have -- or any note about what cases that would support

09:41:03  6    my charge?

09:41:03  7           MS. KINGSBERY:  We can submit some if Your Honor

09:41:03  8    would like.

09:41:03  9           MR. CHRIST:  Here's a copy of that case.

09:41:03  10          THE COURT:  Is this out of the standard charge?

09:41:03  11          THE CLERK:  Your Honor, I was unable to locate a

09:41:03  12    model jury instruction.

09:41:03  13          THE COURT:  So there is no model jury -- that's

09:41:03  14    fine.  I think you told me that.  I'm sorry, Alex.  I

09:41:03  15    should have remembered.

09:41:03  16           With knowledge of the facts.  They are quoting

09:41:03  17    Florida Supreme Court of 1933.  I thought only

09:41:03  18    Connecticut lawyers had to do that.  So I guess if

09:41:03  19    anybody has got any other cases that I should look at to

09:41:03  20    get a sense of this one -- that is a Supreme Court case.

09:41:03  21    It seems to be a quote.  So we are going to want to take

09:41:03  22    a look at that.  If Cigna wants to shoot me something

09:41:03  23    else that maybe is more recent or more persuasive maybe,

09:41:03  24    even though that is Supreme Court, and you want to add

09:41:03  25    anything, please do that as soon as possible.  But I will

09:41:03  1    put pink on that, which means it is still open.

09:41:03  2            Anything else from the Labs on that?

09:41:03  3            MR. CHRIST:  No, Your Honor.  Thank you.  I

09:41:03  4    spoke too soon.

09:41:03  5            MR. GESTRICH:  I'm sorry.  One more with the

09:41:03  6    Court's order on summary judgment, it quotes the Florida

09:41:03  7    Supreme Court on this issue and includes a statement that

09:41:03  8    there must be some compulsion or coercion attending its

09:41:03  9    assertion which controls the conduct of the party making

09:41:03  10   the payment.

09:41:03  11           THE COURT:  Yeah, but didn't I write that that's

09:41:03  12   really not in this case or not?  What page are you at?  I

09:41:03  13   will go back and look at it, but --

09:41:03  14           MR. GESTRICH:  Yes, Your Honor.  This is on page

09:41:03  15   46 of Document 271.

09:41:03  16           THE COURT:  Yeah, but I remember that language.

09:41:03  17   It was seem bizarre to me, to be honest with you, when I

09:41:03  18   read the cases.  It is really not at issue here, is it?

09:41:03  19   Coercion?  I mean, they are big boys, you are big boys.

09:41:03  20   I mean, nobody had a gun to their head to write the

09:41:03  21   check.

09:41:03  22           MR. GESTRICH:  I think that supports the

09:41:03  23   argument of the voluntary payment doctrine because they

09:41:03  24   were not under compulsion or coercion to make a payment,

09:41:03  25   and made it.

09:41:03  1          THE COURT:  Oh, you think it helps you because

09:41:03  2   they can't prove that?

09:41:03  3          MR. GESTRICH:  Yes, Your Honor.

09:41:03  4          THE COURT:  We're going to look at that.  Why

09:41:03  5   did I write that summary judgment ruling?  What was I

09:41:03  6   relying on?  And if anybody thinks I happen to -- you

09:41:03  7   know, maybe I reached the right conclusion in the summary

09:41:03  8   judgment or not, but I didn't need to say that.  If you

09:41:03  9   can give me a case on it.

09:41:03  10          MR. GESTRICH:  There's two -- there's a

09:41:03  11   difference between the quote and the statement of it.

09:41:03  12   And so I think there's just -- it's unclear.

09:41:03  13          THE COURT:  Could be that maybe I overwrote it

09:41:03  14   in my own words.  And when I look at it, I'll decide a

09:41:03  15   charge.  I'm not going to make the same mistake in the

09:41:03  16   charge.  But I have a vague recollection of the coercion,

09:41:03  17   but I don't really remember the cases or why I wrote it

09:41:03  18   that way.  So we have got to look at that.

09:41:03  19          Anything else on this one?

09:41:03  20          MS. KINGSBERY:  Nothing else from us.

09:41:03  21          THE COURT:  The next is 58, voluntary payment,

09:41:03  22   defense knowledge of the facts.  Now, I know the full

09:41:03  23   thing I will circle because we've got to be sure we catch

09:41:03  24   it if we change it.  Do you object to the second full?

09:41:03  25          MR. CHRIST:  Yes, Your Honor.  That was only

| | | |
|---|---|---|
| 09:41:03 | 1 | comment on this one. |
| 09:41:03 | 2 | THE COURT: How about you for Cigna, anything |
| 09:41:03 | 3 | else on this one? |
| 09:41:03 | 4 | MS. KINGSBERY: No objection. |
| 09:41:03 | 5 | THE COURT: So that's just to make sure it's |
| 09:41:03 | 6 | consistent flag. |
| 09:41:03 | 7 | Damages, 59. Objections? |
| 09:41:03 | 8 | MR. CHRIST: No objections, Your Honor. |
| 09:41:03 | 9 | MS. KINGSBERY: No objections. |
| 09:41:03 | 10 | THE COURT: I assume I will need to add here as |
| 09:41:03 | 11 | well as in the damages section of Part 2, the Labs |
| 09:41:03 | 12 | charge, something about pretrial interest. I am either |
| 09:41:03 | 13 | going to conclude should -- the jury decides it, in which |
| 09:41:03 | 14 | case we have got to explain it to them, and -- or if I |
| 09:41:03 | 15 | decided it's not for them, I need to tell me them that |
| 09:41:03 | 16 | you heard testimony on it but that just was for the Court |
| 09:41:03 | 17 | and you don't have to worry about that, the court will |
| 09:41:03 | 18 | take care of that. I often do that in employment cases |
| 09:41:03 | 19 | there are damages that they are not going to decide and I |
| 09:41:03 | 20 | will say something to the effect of don't worry about. |
| 09:41:03 | 21 | You've heard about it, but I will take care of it. So |
| 09:41:03 | 22 | we'll have to look at that language. We'll have to look |
| 09:41:03 | 23 | at what you are going to give us. Remember you are |
| 09:41:03 | 24 | giving us stuff on that. And then we'll look at that, |
| 09:41:03 | 25 | what you give us, and do our own research and we'll let |

09:41:03  1    you know what we're going to do.

09:41:03  2          The last is I think summary of Cigna's case,

09:41:03  3    Number 60.  Let's appropriately turn back to Cigna.

09:41:03  4          MS. KINGSBERY:  This section has the same

09:41:03  5    objection about the parties dispute the third element

09:41:03  6    that I raised before.  And that issue also --

09:41:03  7          THE COURT:  Which?  Tell me the issue.  Tell me

09:41:03  8    the charge it was in so I will know and look at my notes.

09:41:03  9          MS. KINGSBERY:  49.

09:41:03  10          THE COURT:  So what's the issue?  49.  What's

09:41:03  11    the issue?

09:41:03  12          MS. KINGSBERY:  That when there's a disputed

09:41:03  13    element and -- when it's Cigna's burden, it says this

09:41:03  14    element is in dispute.  When it's the Labs' burden, that

09:41:03  15    language has not been included.

09:41:03  16          MR. CHRIST:  I'm sorry?

09:41:03  17          THE COURT:  I'm sorry?  What's in dispute?  I'm

09:41:03  18    saying it to you but not saying where their's is?

09:41:03  19          MS. KINGSBERY:  For the unjust enrichment claim,

09:41:03  20    the first two elements are not in dispute.  You see

09:41:03  21    the --

09:41:03  22          THE COURT:  Yeah.

09:41:03  23          MS. KINGSBERY:  And then the third one --

09:41:03  24          THE COURT:  Can you show me a Lab one from

09:41:03  25    yesterday where I didn't do what you want me to so I can

09:41:03  1    know what we're looking for.

09:41:03  2          MS. KINGSBERY:  It's actually in this one, the

09:41:03  3    voluntary payment affirmative defense.  So the first one

09:41:03  4    is not in dispute, but the second element is but we don't

09:41:03  5    say here this element is -- Cigna disputes this element

09:41:03  6    or this element is in dispute.  It just says the Labs

09:41:03  7    must prove the second element.  That's the inconsistency.

09:41:03  8          MR. CUNNINGHAM:  Wait a minute.  I say that you

09:41:03  9    stipulate the first elements are proven, so I wouldn't be

09:41:03  10   in dispute and I wouldn't be telling them who's got the

09:41:03  11   burden.  Then I say -- well, I don't say anything.  Where

09:41:03  12   do I say the burden is on them?

09:41:03  13         MS. KINGSBERY:  No, I think that's my point, you

09:41:03  14   don't say anything.  That's all we're asking is that --

09:41:03  15         THE COURT:  Do you know what they are asking,

09:41:03  16   because I'm really confused.

09:41:03  17         THE CLERK:  Can we change that sentence to Cigna

09:41:03  18   must prove the third element?

09:41:03  19         MS. KINGSBERY:  Yes.

09:41:03  20         THE COURT:  Change what sentence?  Because I

09:41:03  21   don't even know where we are, Alex.

09:41:03  22         THE CLERK:  Paragraph under the three elements.

09:41:03  23   60.

09:41:03  24         THE COURT:  Where does it say Cigna must prove?

09:41:03  25         MS. KINGSBERY:  That's the recommendation.

09:41:03  1          THE COURT:  Okay.  What comes before the

09:41:03  2    insertion you're recommending?  What line in the

09:41:03  3    paragraph the parties stipulate or agree?

09:41:03  4          MS. KINGSBERY:  We would keep that sentence, the

09:41:03  5    parties stipulate or agree.  And then the second sentence

09:41:03  6    there, instead of saying however, the parties dispute,

09:41:03  7    that's where we would just say Cigna must prove the third

09:41:03  8    element.

09:41:03  9          THE COURT:  I see.  Okay.  I don't know how

09:41:03  10   we're going to search for that throughout the charge, but

09:41:03  11   when we read it through that careful read, Alex, we

09:41:03  12   should look for that.  Cigna must prove the third

09:41:03  13   element.  And I'm going to strike the parties dispute

09:41:03  14   whether.  And then it's going to say Cigna must prove the

09:41:03  15   third element, comma.  Is that what you're asking?

09:41:03  16          MS. KINGSBERY:  Yes.

09:41:03  17          THE COURT:  Is there objection to that?

09:41:03  18          MR. CHRIST:  No objection, Your Honor.

09:41:03  19          THE COURT:  Would you like me to make that

09:41:03  20   change elsewhere as they seem to want me to?

09:41:03  21          MR. CHRIST:  Just for consistency.

09:41:03  22          THE COURT:  So when I write -- yo know what I

09:41:03  23   mean when I say universal, right?  Okay.

09:41:03  24          Any other objections?

09:41:03  25          MS. KINGSBERY:  No other objection.

| | | |
|---|---|---|
| 09:41:03 | 1 | THE COURT:  Any objections? |
| 09:41:03 | 2 | MR. CHRIS:  Oh, yes, on 78, the next page. |
| 09:41:03 | 3 | There's again a reference to full knowledge.  It's just |
| 09:41:03 | 4 | that open issue. |
| 09:41:03 | 5 | THE COURT:  Yeah, the open issue, correct. |
| 09:41:03 | 6 | If anybody is just sitting around with nothing |
| 09:41:03 | 7 | to do, it would be helpful, I think, if somebody could |
| 09:41:03 | 8 | call out the page in which we'll find other examples.  I |
| 09:41:03 | 9 | think you have suggested I'm inconsistent.  So any other |
| 09:41:03 | 10 | pages I should address or look at and change in order to |
| 09:41:03 | 11 | be consistent.  Do you follow me? |
| 09:41:03 | 12 | MS. KINGSBERY:  Yes, I do. |
| 09:41:03 | 13 | THE COURT:  That would be helpful, but I |
| 09:41:03 | 14 | understand you all have a lot to do. |
| 09:41:03 | 15 | Yeah.  So, Alex, have we covered everything? |
| 09:41:03 | 16 | And I think I said 8:30 tomorrow.  I think you |
| 09:41:03 | 17 | folks still need to talk.  And I have got a bit to do |
| 09:41:03 | 18 | tonight, too. |
| 09:41:03 | 19 | MR. GESTRICH:  Your Honor, just one issue that's |
| 09:41:03 | 20 | pressing.  At the end of Mr. Haney's testimony, the Court |
| 09:41:03 | 21 | had mentioned that Mr. Haney was not excused.  We just |
| 09:41:03 | 22 | want a clarification.  He is -- we are permitted to talk |
| 09:41:03 | 23 | to him about the case and without violating the |
| 09:41:03 | 24 | sequestration order? |
| 09:41:03 | 25 | THE COURT:  You think you are going to call him |

09:41:03  1    back, right?

09:41:03  2             MR. GESTRICH:  On a different subject.

09:41:03  3             THE COURT:  On a different subject.

09:41:03  4             MR. GESTRICH:  Yes, Your Honor.

09:41:03  5             THE COURT:  Can't you each talk to your expert

09:41:03  6    when they finish the first subject before they do the

09:41:03  7    second?  It's like prepping a witness.

09:41:03  8             MS. KINGSBERY:  We agree, Your Honor.

09:41:03  9             MR. GESTRICH:  I just wanted to make sure that

09:41:03  10   we were okay to do that before we --

09:41:03  11            THE COURT:  Yeah, yeah.  I mean, you can talk

09:41:03  12   about what he's already testified to.  He's closed out as

09:41:03  13   evidence.  So if you want to tell him that he did a great

09:41:03  14   job or you might smile more, you know, I guess you can do

09:41:03  15   that, too.  Because you are actually going to prep him on

09:41:03  16   a subject he hasn't started to testify on, right?

09:41:03  17            MR. GESTRICH:  Yes, Your Honor.

09:41:03  18            THE COURT:  So that's not a problem.

09:41:03  19            MS. KINGSBERY:  Just to clarify.  So Mr. Haney

09:41:03  20   will not be testifying next week about the SIU

09:41:03  21   investigations and statistical sampling with respect to

09:41:03  22   fee forgiving, which is what he testified to today?

09:41:03  23            MR. GESTRICH:  He will be testifying to his

09:41:03  24   rebuttal report.  But in the event that something comes

09:41:03  25   up where he needs to go up on rebuttal for some

09:41:03  1    unforeseen reason that we don't know of right now, that's

09:41:03  2    possible.  Just like I think Cigna was going to call

09:41:03  3    rebuttal witnesses as well, and they would not be

09:41:03  4    sequestered at this time.  Is that a fair statement?

09:41:03  5            MS. KINGSBERY:  We don't have a rebuttal report

09:41:03  6    from him on anything else.

09:41:03  7            THE COURT:  On anything other than what?

09:41:03  8            MS. KINGSBERY:  We have a rebuttal report.  It

09:41:03  9    is a rebuttal to Dr. Clark.

09:41:03  10            MR. GESTRICH:  On rebuttal.

09:41:03  11            THE COURT:  But his rebuttal is to Dr. Clark's

09:41:03  12    testimony?

09:41:03  13            MR. GESTRICH:  His rebuttal report.

09:41:03  14            THE COURT:  That's what his rebuttal testimony

09:41:03  15    will be, no?

09:41:03  16            MR. GESTRICH:  That is his defense testimony.

09:41:03  17            THE COURT:  His testimony in support of your

09:41:03  18    defense to Cigna's claims?

09:41:03  19            MR. GESTRICH:  Yes, Your Honor.

09:41:03  20            THE COURT:  That's the scope of it, is in that

09:41:03  21    report?

09:41:03  22            MR. GESTRICH:  Yes, Your Honor.

09:41:03  23            THE COURT:  Give me a minute.  I've got a

09:41:03  24    thought but I've got to write this down.

09:41:03  25            So her question, which I probably didn't get

| 09:41:03 | 1 | right because I didn't write it down, was, he won't |
| 09:41:03 | 2 | testify about fee forgiveness?  Now, they have fee |
| 09:41:03 | 3 | forgiveness in their claim.  Do you expect him to testify |
| 09:41:03 | 4 | about fee forgiveness?  Because I think they have a |
| 09:41:03 | 5 | problem.  I'm not saying they are right.  I'm just trying |
| 09:41:03 | 6 | to focus on what the issue is so we can get to it. |
| 09:41:03 | 7 | MR. GESTRICH:  I don't imagine that he will |
| 09:41:03 | 8 | testify on fee forgiveness.  But there were aspects of |
| 09:41:03 | 9 | his fee forgiveness testimony that we did not explore |
| 09:41:03 | 10 | because it was excluded from the Labs' case. |
| 09:41:03 | 11 | THE COURT:  From your case.  I see.  So if it's |
| 09:41:03 | 12 | in his original report, it would be your view, if you |
| 09:41:03 | 13 | decide you want to, you could offer that testimony in |
| 09:41:03 | 14 | rebuttal to their testimony on that basis of fee |
| 09:41:03 | 15 | forgiveness then.  And who is supposed to be testifying |
| 09:41:03 | 16 | to that? |
| 09:41:03 | 17 | MS. KINGSBERY:  I think that's why I'm confused. |
| 09:41:03 | 18 | THE COURT:  I know.  But tell me who is going to |
| 09:41:03 | 19 | testify.  Is it Clark or somebody else? |
| 09:41:03 | 20 | MS. KINGSBERY:  Clark is only testifying to |
| 09:41:03 | 21 | medical necessity. |
| 09:41:03 | 22 | THE COURT:  So who is testifying about fee |
| 09:41:03 | 23 | forgiveness? |
| 09:41:03 | 24 | MS. KINGSBERY:  Our fact witnesses. |
| 09:41:03 | 25 | THE COURT:  Fact witnesses.  Okay.  So why do |

09:41:03    1    you think that's a confusion?

09:41:03    2        MS. KINGSBERY:  Because he testified about his

09:41:03    3    opinions relating to fee forgiving today.  I'm not sure

09:41:03    4    what other opinions he has other than the statistical

09:41:03    5    sample of the fee forgiving investigation was invalid.

09:41:03    6    That's his opinion on fee forgiving, so I'm not --

09:41:03    7        THE COURT:  Right, but he didn't say it was

09:41:03    8    about fee forgiving there's a deficiency in the sample

09:41:03    9    they're using to argue to you about fee forgiving.  So I

09:41:03   10    think -- if I'm remembering, it's Number 2, and we

09:41:03   11    discussed how, wait a minute, they don't have -- they are

09:41:03   12    not proving -- there's nothing about fee forgiveness for

09:41:03   13    them, but then he said, well, but wait a minute, there's

09:41:03   14    a problem with the statistical.  And he wants to testify

09:41:03   15    about what -- how they chose the sample that led to fee

09:41:03   16    forgiveness.  And I said, of course, that's what he's

09:41:03   17    testifying to.

09:41:03   18        But I think -- I'm not saying they will do it or

09:41:03   19    that they'll need to do it, but I think if you have

09:41:03   20    testimony from fact witnesses about fee forgiveness and

09:41:03   21    they are -- I assume it will be arising out of the

09:41:03   22    investigation.  I believe he should be able to, in

09:41:03   23    effect, connect what he testified about today about the

09:41:03   24    sample that is on that timeline under fee forgiveness.  I

09:41:03   25    think there were two or three fee forgiveness actions.

09:41:03  1   And I think he's allowed to testify about the fact -- if

09:41:03  2   it's responsive to the direct, your -- well, your -- not

09:41:03  3   direct, but your case-in-chief.

09:41:03  4        If those samples or the evidence that was taken

09:41:03  5   from him or anything about them is a basis for your

09:41:03  6   decision of -- or your evidence is fee forgiveness

09:41:03  7   occurred or whatever, I think he can testify in rebuttal

09:41:03  8   of our case that, well, wait a minute, you don't have a

09:41:03  9   basis to do that, or whatever he's saying.  I'm

09:41:03  10  paraphrasing the statistical deficiencies, I'll call it,

09:41:03  11  that he testified to.  Because that was his opinion.  It

09:41:03  12  was disclosed.  We just didn't do it because we didn't

09:41:03  13  focus that deficiency.  We identified a deficiency.  We

09:41:03  14  didn't focus or connect it to fee forgiveness.  I think

09:41:03  15  he's allowed to do that.

09:41:03  16       MR. HARE:  The Court's right, we deferred

09:41:03  17  deliberately for that reason.

09:41:03  18       THE COURT:  Yeah, but I mean it could be that it

09:41:03  19  doesn't develop, that this is going to be relevant.  But

09:41:03  20  I think you should be prepared that I'm likely to let him

09:41:03  21  do that.  I don't know how long it's going to take, but I

09:41:03  22  think for him to be able to say that you heard that the

09:41:03  23  basis for what they did in denying because of fee

09:41:03  24  forgiveness was their research or investigation into X

09:41:03  25  and part of X is -- involves what he looked at

09:41:03  1    statistically by way of sampling, he should be able to

09:41:03  2    rebut your claim.  I do believe that.  But that's all,

09:41:03  3    nothing else in that first report.

09:41:03  4        MR. GESTRICH:  We can talk to him without

09:41:03  5    violating the sequestration order; is that correct?

09:41:03  6        THE COURT:  To what I just described, I mean,

09:41:03  7    yeah.  Why wouldn't you?  The first part of that Number 2

09:41:03  8    opinion he has already testified to, and you are not

09:41:03  9    going to have him retestify other than refer to his

09:41:03  10   testimony about that, and then have him explain why the

09:41:03  11   jury should accept his opinions about its deficiencies

09:41:03  12   statistically with regard to their claim that there's fee

09:41:03  13   forgiveness cross X thousand claims.

09:41:03  14       MR. HARE:  Yes.  Just proceeding with an

09:41:03  15   abundance of caution.

09:41:03  16       THE COURT:  I understand.  That's fine.  I think

09:41:03  17   you can talk to him, I guess about anything would be my

09:41:03  18   view at this point.  It's either done or it hasn't

09:41:03  19   started.  Right?

09:41:03  20       MR. HARE:  Game One of the World Series after

09:41:03  21   tomorrow.

09:41:03  22       THE COURT:  Everybody generally agree with us

09:41:03  23   that we're due to end the evidence before lunch on

09:41:03  24   Wednesday?  Nobody is disputing my clocks.  He's actually

09:41:03  25   using a chess clock.  But we made -- I think I told you

09:41:03  1    one -- we might have made one other minor -- it's a minor

09:41:03  2    adjustment.  It's single digits of numbers, but where it

09:41:03  3    was somebody's witness, but I thought that the other side

09:41:03  4    took an inordinate amount of time or objection that

09:41:03  5    was -- really shouldn't be charged to the witness, and

09:41:03  6    the person doing the witness.  If you want to know

09:41:03  7    exactly what I did, which witness, you have to tell me

09:41:03  8    because I'm going to have to go back and go through my

09:41:03  9    notes, but it was not -- it's total probably less ten

09:41:03  10   minutes per side.  So I don't think it is going to make a

09:41:03  11   big difference.

09:41:03  12            Okay.  All right.  Good.  Ten after 5:00, that's

09:41:03  13   great.  We all have places to go and things to do.  We'll

09:41:03  14   see you tomorrow.

09:41:03  15            (Adjourned, 5:12 p.m.)

16

17

18   COURT REPORTER'S TRANSCRIPT CERTIFICATE

19   I hereby certify that the within and foregoing is a true

20   and correct transcript taken from the proceedings in the

21   above-entitled matter.

22

23   /s/  Terri Fidanza

24   Terri Fidanza, RPR

25   Official Court Reporter

1                          INDEX.

2

3                       EXAMINATION

   Witness Name                                          Page

4

   CHRISTOPHER HANEY

5

      CONTINUED DIRECT EXAMINATION BY MR. GESTRICH ..... 1011

6

      CROSS-EXAMINATION BY MS. KINGSBERY ................. 1074

7

   MATTHEW RYAN

8

      DIRECT EXAMINATION BY MS. KINGSBERY ............... 1107

9

      CROSS-EXAMINATION BY MR. HARE ...................... 1135

10

11 STEVE ZIEMIAN

12    VIDEO DEPOSITION PLAYED..........................1142

13

14

15

16

17

18

19

20

21

22

23

24

25