1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3    _____
     CONNECTICUT GENERAL )
4    LIFE INSURANCE CO.   )
     AND CIGNA HEALTH     )
5    AND LIFE INSURANCE   )
     CO.                  )
6         Plaintiffs )      NO: 3:19cv1324(JCH)
                      )      NO: 3:19CV1326(JCH)
7     vs.             )      October 25, 2024
                      )      8:35 a.m.
8                     )
     BIOHEALTH MEDICAL    )
9    LABORATORIES INC,    )
     PB LABORATORIES, LLC)
10   and EPIC REFERENCE   )
     LABS, INC.           )
11        Defendants. )
     _____)    141 Church Street
12                              New Haven, Connecticut

13

14            DAY SIX OF TRIAL

15

16   B E F O R E:

17            THE HONORABLE JANET C. HALL, U.S.D.J.

18   A P P E A R A N C E S:

19   For CIGNA:          Edward T. Kang
                         Alston & Bird LLP
20                       950 F Street, NW,
                         Washington, DC 2004-1404
21
                         Michelle Nicole Jackson
22                       Alston & Bird LLP
                         1201 West Peachtree Street
23                       Atlanta, GA 30309

24

25            -- continued --

```
 1                        Alexander Akerman
                          Alston & Bird LLP
 2                        350 South Grand Avenue
                          51st Floor
 3                        Los Angeles, CA 90071

 4                        Kelsey Kingsbery
                          Alston & Bird LLP
 5                        555 Fayetteville Street
                          Ste 600
 6                        Raleigh, NC 27601

 7

 8   For BioHealth Labs:  Scott M. Hare
                          Anthony Thomas Gestrich
 9                        Raines Feldman Littrell
                          11 Stanwix Street
10                        Suite 1400
                          Pittsburgh, PA 15222
11
                          Fred Alan Cunningham
12                        Matthew Thomas Christ
                          Rafferty Domnick Cunningham & Yaffa
13                        2401 PGA Boulevard
                          Suite #140
14                        Palm Beach Gardens, FL 33410

15                        John J. Radshaw, III
                          John J. Radshaw, III, Esquire
16                        65 Trumbull Street, 2d Fl.
                          New Haven, CT  06510
17

18

19

20

21

22

23

24

25
```

1    THE COURT:  As I walked out here, I thought to

2  myself we have to stop meeting like this.

3    We're here this morning in the case of Cigna

4  versus BioHealth, et al., Docket Number 13-CV -- no,

5  19-CV-1324, and Epic Reference Labs, Inc., et al., versus

6  Cigna, 19-CV-1326.

7    If I can have appearances, please.

8    MR. CUNNINGHAM:  Fred Cunningham for the Labs,

9  Your Honor.

10    THE COURT:  Yes.

11    MR. HARE:  Your Honor, good morning.  Scott Hare

12  and Anthony Gestrich from Raines Feldman, for the Labs.

13    THE COURT:  Yes.

14    MR. KANG:  Good morning, Your Honor.  Edward

15  Kang from Alston & Bird, on behalf of Cigna.  With me at

16  counsel's table is Alex Akerman, Kelsey Kingsbery and

17  Michelle Jackson.

18    THE COURT:  Yes, good morning, everyone.

19    We are here because there was a dispute about

20  the next witness, I believe it would be Goldfarb, and the

21  use of demonstratives that were disclosed yesterday

22  morning by Cigna to the Labs.  And the reason I got you

23  here this early is I thought that that would take some

24  time.  But I have been advised -- I think the clerk only

25  saw the email this morning, if it was last night, I could

```
 1   have changed the time, but that there may be an agreement

 2   on this.

 3         MR. KANG:  Yes, Your Honor.  We met and

 4   conferred about it yesterday afternoon, and we have

 5   addressed the Labs' concerned.  Revised demonstratives

 6   were sent to Mr. Emmons last night.

 7         THE COURT:  Okay.  I can't tell where they were

 8   revised, to be honest.  I spent about 27 seconds flipping

 9   through them, but is -- is Attorney Kang correct -- I

10   don't know who is taking this, Attorney Gestrich, Hare or

11   Cunningham?  You've got to stand up so I can know who to

12   call.

13         MR. GESTRICH:  Yes, Your Honor, the -- that is

14   correct.  I am just going to double-check one statement

15   that they made on there.  If there's a change, yes, that

16   is -- sorry.  I had to look down at the screen.  Yes,

17   they are correct.  Thank you.

18         THE COURT:  I should have marked these, but

19   these are what you gave me.  Yeah, that was last night.

20   So we're going to cross that off and throw it somewhere.

21   All right.  So that was disposed of.

22         In a way, it's a good thing you are here.  I

23   have a page of agenda items.  My first problem is we owe

24   you clock update.  And I can't do it because I have --

25   I'm -- I have that the deposition of Ziemian occupied two
```

1    hours, and yet I only have 148 accounted for in the split

2    reported to me by Cigna, which was agreed to by the Labs.

3    I believe the other 12 minutes were taken because of

4    stopping and asking about exhibits in evidence and all of

5    that.  You folks can try to agree, but my humble opinion

6    is that would be chargeable to Cigna.  And so I would

7    ascribe 148 to Cigna.

8              Is there objection to that?

9              MR. KANG:  No, Your Honor.

10             THE COURT:  Okay.  The problem is, doing that, I

11   still only end up with -- I end with up significantly

12   less than five hours and 15 minutes.  Now, I can account

13   for unfortunately long periods where we were arguing over

14   things outside the presence of the jury.  We left early

15   in the morning break and came back late in the --

16   reconvened.  But I have got a take a closer look at it

17   and compare it to his time chart.  So you will get that

18   sometime.  Hopefully by the end of day.

19             Has there been either discussion or -- within

20   each team or between the teams on closing arguments?

21             MR. KANG:  Yes, Your Honor.  Mr. Cunningham and

22   I have conferred about that.  I'd certainly allow Mr.

23   Cunningham to speak if he has a different understanding.

24   We believe that one closing argument for each side would

25   be appropriate.  We would propose the same order that was

1    in opening.  And we have talked about time, and we have

2    discussed one hour for each side.

3            THE COURT:  Is that correct?

4            MR. CUNNINGHAM:  That's correct, Your Honor.

5    And I hope to goodness I don't use all of that time, but

6    I would rather overestimate than underestimate because of

7    the problem I got into on opening.

8            THE COURT:  That's fine.

9            MR. CUNNINGHAM:  And, Your Honor, the decision

10   we have to make is whether we're going to split it up or

11   not in liability and damages.

12           THE COURT:  That's okay.

13           MR. CUNNINGHAM:  So we'll make that decision and

14   let the Court know.

15           THE COURT:  Yeah, normally I wouldn't allow a

16   split other than with direct and rebuttal, but it's okay

17   in this instance, I think.

18           MR. CUNNINGHAM:  We probably won't, Your Honor,

19   but we'd like to have time to discuss that.

20           THE COURT:  That's fine.  What I don't

21   understand is the first part of Attorney Kang's report.

22   One closing argument, same order as opening.  So you

23   intend for the closing argument to be the Labs to stand

24   up and make a one-hour closing that addresses both your

25   case and the defense to the Cigna case, and for Mr. Kang

1    or whoever on his team is going to stand up and do one

2    argument as to the Cigna case and the defense to the Lab

3    case, and that's it?

4         MR. CUNNINGHAM:  That's my understanding, Your

5    Honor.

6         THE COURT:  I just want to be clear.  Usually

7    I'm asking how much time are you saving, do you want a

8    warning, and all that.  But is that your understanding,

9    Attorney Kang?

10        MR. KANG:  Yes, it is.

11        MR. CUNNINGHAM:  If I may just add one thing.

12        THE COURT:  Yes.

13        MR. CUNNINGHAM:  Obviously, normally, I'm used

14   to being the plaintiff for only 35 years now.

15        THE COURT:  Right.  And then getting the last

16   word.

17        MR. CUNNINGHAM:  Normally I get rebuttal.  So I

18   would like rebuttal as the plaintiff, and I think maybe

19   that's something that Mr. Kang and I need to discuss.

20        THE COURT:  I would have thought you'd already

21   discussed it because that's the big elephant in this

22   room.  Because if you each get rebuttal, it means the

23   Labs are up first, Cigna is then up second, then there's

24   rebuttal by you, and then Cigna gets up, and then you

25   answer and he rebuts.  So that's six pieces a closing,

1   which I would be open to discussing.  But the thing is,

2   you can't -- you can't about last up to his closing if

3   he's not last up to your closing, which is metaphysically

4   impossible.

5           MR. CUNNINGHAM:  Yes, Your Honor.

6           THE COURT:  I think you folks need to regroup

7   and discuss it.  But with the one hour each, the Court is

8   quite happy with that.  Because that was where I was.  So

9   we're going to nail that to the wall, and then you can

10  talk about is it one, is it two, is it -- two one hours

11  whole pieces of the hour divided into either one, two,

12  three or four pieces each?

13          MR. CUNNINGHAM:  Your Honor, if I may say this

14  last thing and I definitely will talk to Mr. Kang during

15  the break or over the lunch so that we can get this to

16  you.

17          THE COURT:  Go ahead.  Yes.

18          MR. CUNNINGHAM:  Your Honor, because we have the

19  burden of proof --

20          THE COURT:  Right, on your case.

21          MR. CUNNINGHAM:  -- I believe that we should

22  have get rebuttal because we have the burden of proof.

23          THE COURT:  That's fine.  But then he has the

24  burden of proof on his case, and he should get rebuttal,

25  and his is second.

1    MR. CUNNINGHAM:  Right.  Your Honor, I'd like to

2    confer with my team.

3    THE COURT:  That's fine.  You should confer and

4    then you should talk among each other.

5    MR. CUNNINGHAM:  We will, Your Honor.

6    THE COURT:  Thank you very much.

7    Have we got some data storing device upon which

8    is the Ziemian deposition that someone is going to stand

9    up and represent to the Court, understanding that means

10    under pains and penalties of perjury, that data

11    collection is exactly what we all saw in the courtroom?

12    MS. JACKSON:  The video has been prepared.  We

13    want to be able to serve on the Labs and allow them to

14    review it before submission.

15    THE COURT:  Fine.  And then it will be submitted

16    to the clerk.  And I'm not sure what we're going to call

17    it.  Maybe a Court exhibit, but it will be ID.  Thank

18    you.  Don't forget that has to be done.

19    Well, that's going to take a while.

20    I guess I would comment there's a fair amount of

21    reading from exhibits that aren't in evidence.  I realize

22    that was in a lot of the depositions, but it's happening,

23    I think, a little bit here.  And there aren't a lot of

24    objections.  And my general view is to let the parties

25    try their own case, but I guess what -- I will categorize

1    that just as an observation by the Court.  How is that?

2         On the charge issues, as you know we're here

3    very late getting both Version 3 -- I didn't proof 3, did

4    I?  I did.  It was a late night getting out to you what

5    is a clean version of what we think is Version 2 and 3.

6    I believe my clerk told you there are a number of issues

7    that have not been addressed.

8         If you read it and you say, Judge, I want you to

9    put these words in, they're are not there.  And why?

10   Because I haven't gotten what I asked for from the --

11   excuse me.  You offered to get me.  I don't know when you

12   think I am going to get this charge put to bed, but it's

13   in your interest to know.  I assume over the weekend some

14   folks are going to be thinking about a closing, if not

15   preparing it.

16        So, you know, I don't have what was supposed to

17   be an agreed-upon statute of limitations, so that hasn't

18   really been done.  That's an insertion of an additional

19   claim and changing 2 to 3, et cetera.  That's got to be

20   checked.  We've got usage of trade.  That's on the Lab

21   side.  On the Cigna side, there's -- oh, that primary and

22   whatever language that modifies one of the terms that's

23   required in an element.  So again, I would appreciate it.

24   I am hoping not to work on Sunday, so don't expect to

25   dump everything on me on Sunday afternoon.  Okay.  You

1225

1    will get the charge as you stand up to make it to the

2    jury if you do that to me.  Okay.  There's too much else

3    to get done for me.

4           I don't know, this -- the interrogatories and

5    special verdict form is going to be challenging and I --

6    because I was doing the charge last night, I'm less than

7    halfway through it.  And you know, it is far from final.

8    It really needs to be revised about eight times, I would

9    say, so that's going to take a lot of my time probably on

10    Sunday.  And we'll get it to you as soon as we can.

11    Hopefully, we can discuss it Monday after court.

12           Yes, ma'am.

13           MS. KINGSBERY:  Your Honor, we did provide a

14    submission regarding the clear and manifest language.  I

15    just want to confirm the Court did receive it.

16           THE COURT:  When?

17           Why was that on your email at 8:30 or 9:00 at

18    night?  Excuse me for a minute.

19           (Discussion Off the Record.)

20           THE COURT:  That's probably a late night failure

21    to communicate.  Apparently it came in while I was still

22    in the building but after I had proofed the charge and

23    the email to you folks.  So my apologies.

24           How about the statute of limitations, Attorney

25    Kingsbery, since you're doing so well on getting

```
 1   something to me?

 2          MS. KINGSBERY:  We did draft proposed language

 3   and is sent to the Labs.  We have not heard back from

 4   them.

 5          THE COURT:  So as you can see, the ball is on

 6   this side of the net.  I'm looking -- are you still going

 7   to pursue this usage of trade, Attorney Gestrich, or

 8   should I just expect it's not coming in and I can cross

 9   it off?

10          MR. GESTRICH:  We're still working through the

11   jury charge and expect to have it today.  There will be

12   some of us in and out of the lounge working --

13          THE COURT:  How about the statute of

14   limitations?  When did you get that?  I know you -- I

15   realize this case is challenging for all of us, I think

16   I'd say.  It's a lot of work.  But it's not like you are

17   here alone.  So when can I expect to hear from you on the

18   statute of limitations?

19          MR. GESTRICH:  That will also be today, Your

20   Honor.

21          THE COURT:  Great.  Now, you are all aware that

22   court management electronic case filing system, which is

23   otherwise known to you as docketing on the dockets, is

24   going to be shut down at noon today.  This is the first

25   time since 2003 this system has been offline during court
```

1227

```
 1    hours, working hours.  And it's the first time it's been
 2    offline for both days of a weekend.  They must have seen
 3    my calendar and decided this was a good weekend.  So you
 4    cannot docket and we cannot receive or get something you
 5    have docketed from 5:00 today.
 6              Now, our folks usually say we won't be back
 7    until Saturday at 6:00 and it ends up they send an email
 8    we're back at 2:00 or something.  So you should have
 9    somebody checking on Sunday as to things you've been
10    wanting to file or wanting me to look at by the
11    docketing, you know, before whatever time we told you was
12    the turn-on time because they may come back early.
13    However, I understand that -- I don't know if Liana
14    brought it up or you did, how do you get stuff to me?
15    And I think the answer is, if it's something you want to
16    docket and you would send it to me after you docketed it,
17    you should just PDF it to me already signed.  In other
18    words, this is how you are going to docket it and you
19    will not change it.  If you have to change it, you would
20    file an amended docketing item rather than just change it
21    and I have one thing and have looked at the PDF and then
22    on the record is something else.  I'd hope you appreciate
23    how bad that would be.  Okay.  So I think you email to
24    Alex.
25              I don't know if you are going to file something
```

1228

1  with 5,000 pages over the weekend.  I would suggest -- if

2  you have to, I guess you have to, but our printer is not

3  the highest speed printer.  It is Kinko's printers.  So

4  whatever you send me, and I'm a paper person.  It will

5  have to be printed.  So whatever.  But obviously, we want

6  you to continue on the charge things and things like that

7  to get things to us on -- like a closing proposal.  If

8  you want to report that, I'm not so sure you have to

9  report over the weekend on.  But anything else that you

10  come up, witness issues for Monday, things like that.

11          I guess I had a fundamental question as I was

12  going over the draft.  And as I told you, I am going to

13  go over it again this weekend, hopefully Saturday, on a

14  deep edit read as well as deep, is the jury going to

15  understand this, do I have to add things or edit further

16  things to make it clearer to them.  So the next version

17  you get from me, I would advise you -- somebody on your

18  team to read it very carefully.  I suspect while I will

19  make further edits as we maybe discuss open issues on,

20  say, Monday or Tuesday, that will be the way it will go

21  to the jury, I would say, to 98 or 99 percent of the

22  charge.  So we will discuss it.  And if I agree that I

23  should change it, edit it, obviously I will, but that's

24  what you should carefully review.  It's like reviewing

25  the first version.

1    In thinking about that as I read through last

2  night, which was not a deep edit or cleanup, I would

3  really like to understand better Cigna's theory of

4  unbundling.  First of all, where does it come from?  Is

5  unbundling excluded in the policy language or otherwise

6  addressed in a policy?  If I read an entire IFP policy

7  for Cigna, would I see either the word "unbundling" or

8  the concept?

9    MS. JACKSON:  Your Honor, so our exert, Dr.

10  Kelly Clark, will testify that this is an industry

11  practice.

12    THE COURT:  Okay.

13    MS. JACKSON:  I think this also came out

14  somewhat with Ms. Thelian.

15    THE COURT:  I thought I heard somebody

16  reference, and I'm not sure it was testimony, but I have

17  heard reference vaguely that this was a policy -- a

18  billing policy.  But then I've heard testimony from

19  Mr. Nicholson bemoaning the fact that because they are

20  out of network they had no policies or agreements with

21  Cigna about how and then -- this is on the follow-up

22  billing.  But he suggest -- it caused me to think there's

23  nothing anywhere under the contract for unbundling.  So

24  is there a reference in the policy that refers to

25  policies, billing policies or other policies not as in

1230

1  contract of insurance policy, but a policy like take your

2  shoes off at the door kind of policy.  Is there anything

3  like that in the insurance policy itself?

4         MR. KANG:  So you may -- we have heard testimony

5  about drug coverage policies.  I think Ms. Thelian

6  testified about it as well.  Those drug coverage

7  policies, we have seen some reference to the G codes.

8  You have seen that reference a few times.

9         THE COURT:  I sort of file that in a different

10  drawer.

11         MR. KANG:  That's part of our theory about

12  unbundling of services.

13         THE COURT:  Explain that to me.  I don't

14  remember what was said about G codes.  It didn't -- I

15  didn't catch any great detail.

16         MR. KANG:  Sure.  There was a point in time in

17  pre2013 that laboratories could bill multiple different

18  drug testing --

19         THE COURT:  Individual.

20         MR. KANG:  Individual using the codes like

21  80101.

22         THE COURT:  You could bill -- one code would be

23  for cocaine, one would be for crack, one would be for

24  oxy, one would be Fentanyl.

25         MR. KANG:  You could bill many of those in one

1    day.

2            THE COURT:  So you could bill four bills in my

3    example?

4            MR. KANG:  Right.  And you could bill many of

5    those in one day.

6            THE COURT:  That was pre '13.

7            MR. KANG:  Pre August 2013.  And then on August

8    19, 2013, Cigna adopted a CMS's policy of getting rid of

9    those individual codes and you had to bundle them all

10    into a G code, a G0431.  And there's been some testimony

11    from Dr. Mendolia and Mr. Lagan where they indicated that

12    they had received that notification.  And so what -- what

13    should have happened after that is all of those

14    individual codes should have been billed bundled up into

15    that G code.

16            THE COURT:  801 should only ever be used if all

17    the doctor wanted to know is if I was on Fentanyl or

18    whatever the drug is.

19            MR. KANG:  Yes.  And they should have been using

20    that G0431 code.  You can't break --

21            THE COURT:  How does a company like a lab who is

22    out of network in this case, how did they know how to

23    bill?

24            MR. KANG:  It's on Cigna's website and there's

25    been evidence in this case that they were actually

1232

1    personally notified of that.

2           THE COURT:  Is that evidence that it's on the

3    website and telling you --

4           MR. KANG:  It was a letter.

5           THE COURT:  -- don't ever bill 80101 unless it's

6    for the one drug mentioned there?

7           MR. KANG:  Letter sent in May of 2013.

8           THE COURT:  I haven't heard your case.  I'm not

9    going to hear it until -- it's almost gong to be too late

10   for me to think about revising significantly the terms.

11          MR. KANG:  There's been testimony from

12   Dr. Mendolia about that.  So there was evidence that came

13   in.  This was the "bad news from Cigna email" that we've

14   talked about a couple times.

15          THE COURT:  Okay.  All right.  Oh, that's what

16   that was?

17          MR. KANG:  Yes.

18          THE COURT:  I remember the bad news.  I don't

19   remember -- and what was the daylight on that email?

20          MR. KANG:  May 2013.

21          THE COURT:  Is there anything you want to add on

22   this?  I'm just thinking how do I charge it because, you

23   know, medical necessity or other issues are in the

24   insurance policy, right, and/or a statute in this case

25   read into the insurance policy.  Yes, sir, go ahead.  I'm

1233

1    sorry.

2            MR. GESTRICH:  Yes, Your Honor.  The argument

3    that we just heard is a new argument.  Their

4    interrogatory response on this topic, that is located on

5    the docket at Document 352-5 -- 352-5, on page 10,

6    provides Cigna's sworn interrogatory response.  Nowhere

7    does Cigna reference the argument that Mr. Kang just

8    made.

9            THE COURT:  What do they say?

10           MR. GESTRICH:  Cigna states that the Labs

11   improperly unbundled the following codes in claims for

12   reimbursement to Cigna during the time period at issue.

13   They point to the unbundled codes.  Unbundled codes, and

14   there's a list of codes.  And there's no reference to

15   codes that should have been omitted and used a G code

16   instead.

17           THE COURT:  It shouldn't be omitted.  It could

18   be a doctor would only want to test for one thing.

19           MR. GESTRICH:  On the G codes, they explain the

20   proper code is only one code can be billed.  But I think

21   what we heard today is these other codes should not have

22   been used, but the G code should have been used.

23           THE COURT:  If there's more than one drug  being

24   tested for.

25           MR. GESTRICH:  And that's not on this

1   interrogatory response.

2        THE COURT:  I'll take a look at it.  Could you

3   make a note to pull that.

4        Do you want to talk to me?

5        (Discussion Off the Record.)

6        THE COURT:  I will take a look at that,

7   Counselor.

8        Attorney Kang, you answered the positive side of

9   my question of where is it, and it is basically in a

10  letter of notice, on your website.  But is there any

11  language in the policy upon which you rely for this

12  policy outside the contract of policy insurance that is

13  or supports unbundling or references the letters, website

14  billing policies that you spoke about?

15       MR. KANG:  There isn't anything in the plan

16  documents or policies that specifically say unbundling,

17  Your Honor.  I think unbundling is a part of billing for

18  medically unnecessary services.

19       THE COURT:  Well, but that's an answer.  That's

20  your view, I guess.

21       MR. KANG:  Yes.  I'm sorry.  Ms. Jackson has

22  something to add as well.

23       MS. JACKSON:  There may be a lot more clarity

24  about this after Dr. Clark testifies because --

25       THE COURT:  There might be, but I don't have the

1  benefit of her until I gather the last minute.

2          MS. JACKSON:  I will direct you to the section

3  of her report where she discusses unbundling.  I believe

4  that's been filed.

5          THE COURT:  Okay.  Oh, no, it has, but I didn't

6  have time to pull it out.  Could you add that to the list

7  on things we've got to pull out.

8          MS. JACKSON:  Beginning on about page 15, she

9  talks about how unbundling is part of just the industry

10  wide standard for billing practices.  So it comes from

11  those authorities in addition to the policies that

12  Mr. Kang --

13          THE COURT:  Okay.

14          MR. KANG:  I will also add one more thing is

15  that the plan documents that I just referenced also do

16  incorporate the drug coverage policies.  And so the

17  policy that I was talking about that was up on the

18  website with the G code, those are incorporated by

19  reference into the Cigna plan documents.

20          THE COURT:  Where is that in a typical document,

21  like, I don't know -- one of the -- I think you gave us

22  an IFP document as an example recently.

23          MR. KANG:  We'll find that.

24          THE COURT:  So I will need to look at that a

25  little bit deeper.

1    There's another issue in the charge.  You I

2    think argued in the charge conference that I shouldn't be

3    -- I think it arose in the context of the consent

4    elements that you wanted additional adjectives to,

5    Attorney Kingsbery.  In that's the direct pay cause of

6    action, I think at least one place, or it could be

7    third-party  beneficiary.  I'm sorry.  But it has to do

8    with showing  intent of the parties or something.  It's

9    the third-party beneficiary.  And I think you were

10    arguing that I shouldn't be reading in the direct pay

11    statute into the jury's consideration of was there

12    evidence required to show the consent under that or

13    authority under that theory, right?

14    MS. KINGSBERY:  That's correct.

15    THE COURT:  I think -- I don't have the

16    citation, perhaps Alex can get it for you at the break or

17    email it to you.  There is a provision of the Florida

18    statute law of insurance that I put my eyes on yesterday.

19    It's a really short one, so you might have overlooked it.

20    And it basically says sections of this law of insurance

21    -- I'm paraphrasing it -- will be read into contracts in

22    the state of Florida, notwithstanding anything to the

23    contrary.

24    So I'm having trouble with rejecting the idea

25    that I can consider the direct pay statute as evidencing

1    in the insurance contract the intent of the parties to

2    that insurance contract to benefit the direct payee.

3         Now I admit if they do something find direct

4    payee, you probably have to wonder, okay, then that means

5    they weren't relying on that in Count Two.  But I think

6    if they answer yes on the direct payee, I think I can

7    tell them they can consider the consent, whatever it was

8    called, authorization on the form that the patients sign

9    as evidence of this intent that's required or consent

10   in Count Two.

11        MS. KINGSBERY:  We don't dispute that the

12   statutory provisions under Florida law are incorporated

13   in the policy.

14        THE COURT:  Okay.

15        MS. KINGSBERY:  Our argument was that that is

16   insufficient to satisfy the element.

17        THE COURT:  I am not talking about directed

18   verdict, Attorney Kingsbery.  I'm just talking about can

19   be considered as evidence.

20        MS. KINGSBERY:  The case law that we provided

21   establishes that the language in the policy must be the

22   evidence of the parties.

23        THE COURT:  I agree.  But I should point out and

24   instruct the jury that under Florida law, that language

25   includes the statutes referenced in the section I just

1238

1  paraphrased.

2       MS. KINGSBERY:  Our argument is that that is

3  insufficient.  That's what the *Wolf* case said.

4       THE COURT:  You can argue that in closing.  I

5  thought you were telling me I should take a sentence out

6  which talked about you can look to the consent forms as

7  part of this evidence.

8       MS. KINGSBERY:  The consent forms would not be

9  part of the evidence.  The case law says the evidence

10 must come from the language in the contract.

11      THE COURT:  Then I will add a further sentence,

12 which isn't -- I don't that you're going to like it, but

13 you've heard about the consent forms in connection -- or

14 authorization in connection with Count One direct pay.

15 Those forms, if you -- you know, signed by the patient,

16 under Florida law, are part of the policy of insurance.

17 So in considering the policy insurance to evidence

18 whether there was clear intent, which I am going to add,

19 to treat these people as third-party beneficiary,

20 includes the language of the statute on direct pay.

21 That's what I'm saying.

22      MS. KINGSBERY:  Understood.

23      THE COURT:  Okay.  Last question on charge --

24 again it is a Cigna question -- on fee forgiveness, which

25 you are arguing in your case-in-chief, the concept of

1  unfair, essentially.  Okay.  Are you making that argument

2  because it violates the policy of insurance or

3  because it's -- how can I put it?  Again, it is one of

4  these industry policies or it just isn't fair to forgive.

5         MR. KANG:  It's the last one.  It's just unfair.

6  That's informed by, among other things, industry

7  knowledge.  It's informed by language in the Cigna plans.

8  But the overarching point is that fee forgiveness --

9  engaging in fee forgiving is unfair.

10        THE COURT:  Who is going to testify to industry

11 practice?

12        MR. KANG:  Mr. Goldfarb, I anticipate will --

13        THE COURT:  Who is going to testify language --

14 what is the language in the Cigna plan that informs that

15 argument?

16        MR. KANG:  It is the long language, post 2015

17 language that Your Honor has addressed previously.

18        THE COURT:  That would only apply to their

19 consideration of your recoupment post 2015 and the

20 policies that had it in the policies.

21        MR. KANG:  I think that that will demonstrate

22 that that is a manifestation of Cigna's understanding and

23 belief that fee forgiving is bad.  I don't think that

24 we're limited, however.  We're not making an argument

25 that we're prohibited from saying fee forgiving was bad

1240

1    pre 2015.  Fee forgiving has always been bad.

2          THE COURT:  That argument can't be made.  Yeah,

3    we got a problem with that, but perhaps we'll have time

4    to talk about it.

5          And tell me why is just unfair, as you said your

6    argument would be, to fee forgive as to Cigna?  I mean,

7    this cause of action you have is basically I'm a victim

8    here, right?  And it's -- the circumstances are it's

9    unfair for you to keep my money.  That's what Cigna is

10   saying to the jury.  So I can't believe that when they

11   say unfair they mean for the victim, the plaintiff, in an

12   unjust enrichment case.  They are not talking about

13   public or public policy or the good of a world or lower

14   costs generally, so I will pay less because they are

15   going to make their guy pay less.  I mean, how is it

16   unfair for Cigna that there's fee forgiveness?

17         MR. KANG:  So first of all, I think you are

18   going to hear from Mr. Goldfarb as I opened or for our

19   overpayment demand.  This is not Cigna's money.  This is

20   -- Cigna was acting as a third-party administrator of

21   plan money.

22         THE COURT:  Are all the policies in your $16

23   million claim a third-party administrator's?

24         MR. KANG:  Virtually all of them, yes, the vast

25   majority.  So this is --

```
 1              THE COURT:  Individual family plans --
 2              MR. KANG:  That's for the Labs' case.
 3              THE COURT:  And you're not -- that's because
 4    they didn't get paid.  Sorry.  It's early in the morning.
 5    Thank you.  I am going to have to ponder this some more.
 6              I am not ready to give you the Ligotti
 7    designations.  I have spent a fair amount of time on
 8    them, but I've not finalized them.  I would like to hear
 9    a slight bit of argument right now because I have some
10    questions.  And I believe they are primarily going to
11    focus on one objection.
12              MR. CUNNINGHAM:  Your Honor, I'm sorry to
13    interrupt.
14              THE COURT:  Yes, sir.
15              MR. CUNNINGHAM:  If I may, I just want to bring
16    this up because I do have an issue that I need to discuss
17    with respect to the scope of Mr. Goldfarb's testimony.
18    And I didn't want to stand up and object, so --
19              THE COURT:  Go ahead.  Just do it.
20              MR. CUNNINGHAM:  I appreciate that.
21              Your Honor, what we're concerned about is -- in
22    looking at the exhibits that Cigna has told us they plan
23    to use with Mr. Goldfarb, I'm very concerned about the
24    intended scope of his testimony.  We deposed him as
25    30(b)(6) witness.
```

1242

1     THE COURT:  Right.

2     MR. CUNNINGHAM:  And he was designated by Cigna.

3   And really, Your Honor, the scope of that was with

4   respect to policies and procedures.  I have it here, Your

5   Honor.  Would Your Honor like to see it?  If I may

6   approach.

7     THE COURT:  I should have a copy.  But I don't

8   understand why the 30(b)(6) will define the scope at a

9   trial.

10     MR. CUNNINGHAM:  Here's what I'm concerned

11   about.  When he was deposed, there were several broad

12   categories, and obviously a lot of subparts to that

13   deposition.  But number one was processing of claims for

14   benefits from out-of-network providers.  We wanted it to

15   know what Cigna's policies and procedures were, and he

16   was designated as their corporate rep for that purpose.

17     Number two was denial of claims for benefits for

18   out-of-network providers.

19     THE COURT:  Why am I -- why does it matter?  If

20   you asked him about where he went to college and recessed

21   the deposition, that doesn't mean he can't testify at

22   trial as along as they describe generally the scope of

23   his testimony in the listing of witnesses?

24     MR. CUNNINGHAM:  Here's what I'm concerned

25   about, Your Honor.  I think they are going to try to

1    basically turn him into an expert witness.

2          THE COURT:  I was getting that creepy feeling,

3    but I haven't heard the questions yet.  You go on.

4          MR. CUNNINGHAM:  I just want to bring this up --

5          THE COURT:  What are the disclosure of the

6    exhibits telling you about -- oh, by the way, I need the

7    -- you know, I have ended up without the witness -- you

8    know, when they narrowed the number to 37 and 25

9    witnesses, they redescribe the subjects, you know, they

10   cut and paste what they were going to -- I need that,

11   Alex, as to this gentleman.

12         MR. CUNNINGHAM:  I'm sorry, Your Honor.

13         THE COURT:  Go ahead.

14         MR. CUNNINGHAM:  The bottom line is I believe

15   what they are going to try to do is have Mr. Goldfarb be

16   their garbage man.  And I don't mean that it

17   pejoratively.

18         THE COURT:  Cleanup hitter.

19         MR. CUNNINGHAM:  Exactly.  The World Series is

20   starting tonight, I believe.  Your Honor, the problem is

21   that he is not listed as an expert.  He's not

22   designated --

23         THE COURT:  I understand that.

24         MR. CUNNINGHAM:  He's a fact witness.

25         THE COURT:  Based on his knowledge?

1     MR. CUNNINGHAM:  And his knowledge --

2          THE COURT:  He, I understand, joined Cigna in

3  2015.

4          MR. CUNNINGHAM:  But he didn't join the SIU

5  until basically the events that occurred here had

6  occurred.  So I think --

7          THE COURT:  Was the investigation ongoing?

8          MR. CUNNINGHAM:  I don't think it was at that

9  point, but we can certainly --

10          THE COURT:  We'll find that out, I'm sure, if it

11  was.  If it wasn't, we might not find it out.

12          MR. CUNNINGHAM:  I didn't just want to have to

13  jump up 25 times during this testimony.

14          THE COURT:  You might do that, but maybe my

15  rulings on the first five times you stand up might

16  eliminate your -- depending on what I do.  You might

17  decide I'm not going to get whacked again, or maybe

18  Attorney Kang will understand we're not going to

19  accomplish what we thought we would.

20          MR. CUNNINGHAM:  If I can make this last point,

21  Your Honor.  I know we're pressed for time.

22          THE COURT:  Go ahead.

23          MR. CUNNINGHAM:  What we're concerned about is

24  we didn't take him or we didn't intend to take him as

25  30(b)(6).

```
1            THE COURT:  Was he identified in the 26(a) or

2   any supplement thereto before discovery closed as a

3   person had knowledge or was likely to be a witness until

4   he was designated as the 30(b)(6)?  Is Mr. Goldfarb in

5   the room?

6            MR. KANG:  No, he's not.

7            THE COURT:  Thank you.

8            MR. CUNNINGHAM:  I think he was, Your Honor.

9   We're not really disputing that --

10           MR. KANG:  Yes, he was.

11           THE COURT:  When was he disclosed?

12           MR. KANG:  We're going to double-check that and

13  confirm, but I believe it was our initial disclosure.

14           THE COURT:  All right.

15           MR. CUNNINGHAM:  I think what they want to do is

16  have him come in and talk about the investigation that he

17  really had nothing to do with.  They are going to be

18  calling Ms. Anderson.

19           THE COURT:  But I think it's the one you all

20  favor in the objections in the deposition.  I think it's

21  602 now, which I couldn't have told you what it was when

22  I started the depositions.  Lack of foundation, has no

23  personal knowledge.  So we'll see.  We'll see what

24  Attorney -- I don't know what Attorney Kang is going to

25  do.  But I don't think his testimony is of use to us in
```

1246

1    this trial if he joined the SIU and this investigation

2    sometime in 2015 or later and he's talking about,

3    basically, based on a case notes and talking to other

4    people in his company with a lawyer present about what

5    did you do.

6         MR. CUNNINGHAM:  That's my exact point, Your

7    Honor.  We didn't need him as a corporate rep.

8         THE COURT:  I know that.  I am trying to explain

9    to you.  I hear your argument.  I have already thought of

10   it.  But Attorney Kang has got his witness.  He was

11   properly disclosed in discovery discover.  I'm sure when

12   you saw his name you said, oh, well, he joined the SIU

13   team late, that's why.  But by then it was -- the water

14   is under the bridge and dam or whatever -- over the dam,

15   and we're not going to waste a depo on this guy.  But

16   we'll see.

17        Attorney Kang, do you have anything maybe you

18   might want to say so I will have an idea?  I don't have

19   to listen to the long arguments.

20        MR. KANG:  No, I think --  I will just say a

21   couple of things.  I do think that 602, and we will be

22   able to establish foundation on his personal knowledge.

23   I will also add, obviously, that the Labs have put forth

24   proposed admissions that they plan on reading into the

25   record on Mr. Goldfarb's testimony.  And those portions

1247

1   are parts of his 30(b)(6) deposition, so I believe that

2   with respect to those topics, Mr. Goldfarb should be

3   permitted to testify as a 30(b)(6) to rebut what they

4   would offer to the jury and read in.

5          THE COURT:  I never had that happen in a trial.

6   Is a 30(b)(6) witness allowed in trial?  I don't -- I

7   wouldn't think they would be.  The rule allows a 30(b)(6)

8   in the context of how you notice a deposition to obtain

9   evidence in discovery generally.  I hate to be cynical,

10  but my experience with 30(b)(6) is even ones I defended,

11  were that they didn't know everything, but there wasn't

12  anybody else in the company who knew Topic 2 and 3, and

13  so the witness did the best he could to figure out

14  historically in the company what happened with 2 or 3,

15  and he testifies to it, but it's rank hearsay.

16          And as far as I know, the Rules of Evidence

17  apply not at a deposition but at trial.  I can't let

18  hearsay in under the guise he's a -- jeepers criminy.

19  Can you imagine what you could do as a defense lawyer if

20  that was the rule?  You'd never have to call anybody

21  whose side conducted the investigation.  And maybe the

22  other side thinks they have got some decent evidence on

23  why it was a lousy investigation.  You'd never get the

24  witness because the 30(b)(6) would say, well, I don't

25  know about that.

1248

1    MR. KANG:  I think that is why -- my

2    understanding of law is that the -- in this instance, we

3    would not be able to elicit on direct Mr. Goldfarb's

4    testimony as a 30(b)(6).  However, my understanding of

5    the case law is that if the other side then

6    cross-examines the witness in his capacity is and the

7    testimony as a 30(b)(6), then that can be rebutted, for

8    example, on redirect.

9        THE COURT:  No, I don't do redirect.  So you've

10   got to figure out another way to do it.

11       MR. KANG:  And that is why on -- my point is

12   because they will be reading in after Mr. Goldfarb comes

13   down from the stand four pages of portions of his

14   testimony on February 16 of 2023 where he testified as a

15   30(b)(6) witness for Cigna on these topics, I would

16   proffer that when I examine him on direct I should be

17   able to go into those areas, at a minimum, with him sort

18   of acting as a 30(b)(6) witness.

19       THE COURT:  And you just thought about the need

20   to have redirect as to this witness as you stood there at

21   9:19 today.  I doubt it, Attorney Kang.  You don't have

22   to answer.  You knew this, if not last week, a long time

23   ago when you saw their request for admissions.

24       MR. KANG:  We raised this at a previous

25   pretrial, Your Honor, when you were talking about

1  Mr. Goldfarb's request for admissions.

2        THE COURT:  I remember talking about the

3  admissions.  I remember talking about how the

4  interrogatories have numbers in them and the jury will

5  never understand.  But maybe, you know, an unrememerable

6  moment in the approximately 70 hours of after pretrial,

7  or 60, that we held.

8        MR. KANG:  Your Honor, it was day one of trial

9  on pages 6 through 12.  Day one of trial.

10        THE COURT:  Seems like a long time ago in a land

11  far away.  And what was said?  I can't connect a bridge.

12  I'm going to need it, Terri.  So we're going to have to

13  take some time.  I guess we're going to stop right now

14  and get me connected.  This is my clock right now, and

15  I've been here for 50 minutes.  Your clock starts at

16  9:30.  And if it's running because we're still discussing

17  this, it's your clock.

18        MR. KANG:  So this was the colloquy that we had

19  on page 9.

20        THE COURT:  Yep.

21        MR. KANG:  I said --

22        THE COURT:  No, no, I'm sorry.  I would like to

23  stop --

24        MR. KANG:  I'm sorry.

25        THE COURT:  -- and ask Terri to explain to me

1250

```
 1    why I can't connect to bridge.
 2              (Discussion off the record.)
 3              THE COURT:  When we stopped speaking, it was due
 4    to a computer problem the Court was trying to determine
 5    how to fix.  Unfortunately, and not unusually, it has not
 6    been fixed.  So we'll proceed without the computer for
 7    the Court's help.
 8              We broke, I believe, at a time when Attorney
 9    Kang handed me about five or six pages of transcript,
10    which I appreciate him having it handed up to me to read
11    for I believe it's day one you said of the pretrial.  And
12    it looks like -- was it early in the pretrial or a
13    segment you printed?
14              MR. KANG:  I think it was actually day one of
15    trial, Your Honor.
16              THE COURT:  Trial.  All right.  Day one of the
17    trial.  So it was early on in the trial without the
18    presence of the jury.  I don't know why we would have
19    been talking on day one about party admissions.  I would
20    have thought that was a pretrial.  Doesn't matter.
21              At some point in the last month, we had a
22    colloquy on the record and the excerpt I have is page 7
23    it starts.  And Attorney Hare is up saying that's
24    correct, it's a party admission.  And that deposition in
25    particular was a 30(b)(6) corporate designee.  Clearly
```

1   referring to Attorney Goldfarb's deposition as a designee

2   pursuant to a 30(b)(6) notice that's just been handed up

3   to me.

4        And then I go on, I remember, blah, blah, blah.

5   And at some point in this early part of the discussion,

6   where I'm trying to figure out -- I'm talking to the

7   lawyers offering them as admissions, I'm trying to

8   understand.  We don't intend to offer depositions.

9   That's Attorney Kang.  I don't understand the purpose of

10  that.  I'm sorry.

11       The Court:  I remember.  I've read them.  Them

12  being Labs' admissions to be put to the jury by 30(b)(6)

13  Goldfarb.

14       So I don't understand, Attorney Kang, you've

15  got -- it's like you've designated almost the whole

16  deposition.  I assume, again, I'm referring to Goldfarb.

17  I don't understand the purpose of that.  You can do all

18  of this with him live.

19       Now, that was probably not an accurate

20  statement.  And I think they could wait.  Well, I don't

21  understand what's going on.  So I'm not sure you should

22  take anything I said there when I end what I say with I

23  don't understand.  Okay.

24       So the rest of it, I'm trying to understand.

25  You say we don't intend to offer his deposition

1  designation.  He's going to testify live.  I answer, I'm

2  not sure you can.  I mean, not when it's your witness if

3  he qualifies, right?  I don't know even know what that

4  means.

5          Mr. Kang:  Sure.

6          The Court:  Okay.  I'm going to say Cigna's

7  designations are withdrawn as to Mr. Goldfarb.  Is that a

8  fair statement, Attorney Kang?  That's the deposition of

9  Goldfarb.

10         Mr. Kang:  That's fine, yes, Your Honor.

11         The Court:  I've already done rulings.  There

12 was one objection to one of your nine designations of

13 short portions of the deposition and I believe I've ruled

14 on that; is that correct?

15         Hare:  That's our understanding, Your Honor.

16         Kang:  Your Honor, if I may.  On the Goldfarb

17 deposition one more time.  Obviously, with respect to us,

18 no problem with withdrawing.  I'm still having a hard

19 time understanding the Labs' basis for it.  Mr. Goldfarb

20 will be testifying on the stand and they can

21 cross-examine him.

22         The Court:  Right.

23         Kang:  So I don't know if it's in terms of if

24 they plan on reading after Mr. Goldfarb gets off the

25 stand additional portions of his transcript to the jury.

1253

1    I would disagree with that.  Obviously, I think they

2    should examine Goldfarb if he's there, any portions of

3    his deposition they want to impeach him on.  They are

4    entitled to do that.  But I just don't know the basis for

5    them, after Goldfarb gets off the stand, reading in

6    additional portions to the jury.

7         The Court:  I guess I don't think it's offered

8    by way of impeachment.

9         I was correct about that, yeah.

10        They could have said take one of those

11   statements, Q and As, take the answer where he says, yes,

12   I shot my wife.  They could say isn't that true,

13   Mr. Goldfarb, you shot your wife?  He can say yes.  So

14   he's admitted it.  Or no.  And then you could impeach

15   him.  They are, I believe, entitled to a statement of a

16   party opponent, right?  Goldfarb is someone in some

17   standing in the company.  He's not low down.

18        Now, I don't know where I got that.  That's an

19   aside.

20        I'm reading.  He's not an office, you know, a

21   delivery man or something.  He was involved in the issues

22   here.

23        That might have been a bad assumption.

24        I don't know what.  You tell me.  What was his

25   role?  Maybe I'm assuming something I shouldn't assume.

1254

1    Obviously we're still exploring.

2    Mr. Kang:  At the time, he was a lawyer within

3    the company.

4    That's an interesting answer, Attorney Kang.  At

5    the time.  You know, I failed to pick up on your answers,

6    but it would be good if I had asked you what time.

7    He's now a Director with SIU.  He testified as

8    our 30(b)(6).  My understanding of the law, Your Honor,

9    is that if in this instance the Labs were to offer, as

10   they apparently plan to do, his testimony as speaking on

11   behalf of the company as a 30(b)(6).  We are entitled

12   then also to examine him as to be able to speak on the

13   company's behalf as a 30(b)(6) witness.

14   Now, this is an error.  But it's four pages from

15   the end.

16   The COURT:  You can do that.  I don't know that

17   you are prohibited from that.

18   Again, it's the first time this issue has ever

19   arisen before me as a judge and I'm just responding.

20   Continuing.  Do you think he is?  Now I'm

21   beginning to wonder.  And I turn, I believe, to the Labs.

22   I mean -- continuing -- he can examine him directly on

23   whatever he wants to examine him on.

24   Hare:  Agreed, Your Honor.  And the Federal

25   Rules speak directly to this.  32(a)(3) Using depositions

1255

1  in court proceedings at a hearing or trial all, or part

2  of a depo, may be used against a party on these

3  conditions.  (3) It says an adverse party may use for any

4  purpose the depo of a party of anyone when deposed... was

5  a designee under 30(b)(6).  So reading in as admissions

6  has a purpose, and it's a proper and contemplated purpose

7  of Rule 32.

8        I'm not doubting you, sir.  I just want to read

9  the words, put my eyes on it.  But continue with what

10 you're citing.

11       Hare:  There was some unspoken ellipses in what

12 I just read.

13       The Court:  That's fine.  Deposition of a party,

14 agent or designee.  And he could be both an agent and a

15 designee, but he was clearly a 30(b)(6) witness.  And the

16 party may use, adverse party may use.  I don't say you

17 may use, Attorney Kang.  The adverse party may use for

18 any purpose the deposition of a party or anyone who, when

19 deposed, was the party's officer, director, managing

20 agent, or designee under 30(b)(6).  I don't think you

21 can.  I don't think there's a basis to prevent them from

22 using what I think are a few lines of testimony from this

23 deposition.

24       Kang:  So I don't have a problem with that, Your

25 Honor.  But if they're going to be offering Mr. Goldfarb

1    in his portions as a 30(b)(6) representative, he's just

2    talking about his personal knowledge, not a corporate

3    representative.  My point is I should be entitled during

4    my examination of Goldfarb to ask him questions on him,

5    on behalf of him as a corporate representative.

6            Court:  I don't hear any objection from Attorney

7    Hare to that.

8            Hare:  Rule 32(a), as the Court just pointed

9    out, empowers an adverse party, not.  Then I interrupted

10   you.  Apologies.

11           Court:  He's not talking about using the

12   deposition.  He knows the nine things you designated.

13   Those are topics he's forewarned to better cover on

14   direct because you're going to cover them on cross.  You

15   will cover by reading them.  So he's saying I have a

16   right to question on those subjects.

17           Now I don't -- are you saying -- and this is

18   Exhibit A in the thought processes of a judicial officer.

19   I mean I am literally -- not making it up.  I'm reacting

20   and thinking as we're talking because, of course, the

21   issue had not been presented to me previously.

22           This is the last page and a half and this is

23   what I said.  "I don't know.  Are you saying you have a

24   right to ask him anything at all about your two clients

25   as a 30(b)(6) subject on any subject?  I don't think so.

1   He was designated for one or more subjects in the

2   deposition.  On those, maybe we can talk.  But not on

3   everything."

4           Kang:  That's right.

5           Court:  What's your view, Attorney Hare?

6           Hare:  By way of live testimony Q and A, I

7   agree.

8           The Court:  I agree.  You can object if you

9   think it's not relevant, you think it's inappropriate or

10  whatever.  But he wasn't what he's designated.  That's

11  inartful.  I don't have the deposition notice in front of

12  me so I don't know the designation areas, but you're

13  going to have to get on your feet.

14          Mr. Hare:  We had understood all along by virtue

15  of counter-designations, Cigna was seeking to offer great

16  swabs of that deposition testimony which would be

17  inappropriate.  Live to an answer, of course, is governed

18  by the rules of trial.

19          Court:  That's fine.  As I say, I think at least

20  in the subjects in these lines designated you're

21  forewarned.  Don't expect to tell me you're going to get

22  up on redirect and do a lengthy examination of this

23  gentleman based on anything in those topics.  If you want

24  him to talk about those things, maybe pull the teeth

25  before they get to put him on the record.  You've got him

1    on direct.  You can do that.  Okay.

2         Hare:  Thank you.

3         Court:  All right.  One more question.  I

4    apologize.  It is not clear, but I think I clearly

5    said -- and this is when I was -- my experience was I let

6    brief redirect.  I said you're not going to do it on

7    redirect.  And I also said, admittedly, one line in five

8    pages, subject to the Rules of Evidence.

9         The designation of a representative is in the

10   discovery portion of the Federal Rules.  The purpose of

11   discovery is to permit a party to determine who has

12   knowledge, where is the information they're seeking,

13   particularly in the case of very large corporate

14   entities.  I would bet a lot of money that if I searched

15   the record -- minute records and drafts of Rules of

16   Evidence, that that rule came in after there was much

17   dismay and complaining by people who were opposing

18   corporations, and they were being met with witnesses whom

19   the deposing party thought would know something saying,

20   well, I don't really know anything.  I don't remember

21   anything.  I can't help you.

22        So my understanding of a 30(b)(6) was it forced

23   the corporate party, defendant or plaintiff, to identify

24   the best person in their company, and often it can be

25   five or six witnesses, to testify on five or six topics.

1259

1    And that person, while he may not have personal

2    knowledge, can at least provide information on behalf of

3    the company, under oath, to the best of his knowledge,

4    and having reviewed what he could.  Mary Jane down on the

5    third floor was involved in this phase of the activity,

6    or there's something else that would tell you who or when

7    or what we did and why we did it.  It allows a party to

8    then proceed to pursue that discovery, and that pointed

9    discovery, in order to keep the cost of discovery

10   reasonable.

11         That's my view of Rule 30(b)(6).  In my opinion,

12   if I'm wrong, I'll have to just go back and scrape my

13   brain and start from the beginning in my view of a

14   30(b)(6) witness and the trial evidence rules.

15         30(b)(6) clearly speaks about the use of the

16   transcript, the deposition, at trial.  And it says an

17   adverse party may offer it.  Clearly understanding it's a

18   statement of a party opponent.  Because the corporate

19   party has represented, in responding to the depo notice,

20   this person will speak on our behalf.  That's why I

21   believe it's allowed and that's why it's specifically

22   mentioned in the deposition.

23         Now, 30(b)(6) reads towards the end.  The

24   persons designated must testify about information known

25   or reasonably available to the organization.

1    Clearly, that supports my view that that person

2  designated, while not necessarily being involved in the

3  events being deposed on, has undertaken to gather the

4  knowledge, in effect, of the corporate entity, and to

5  testify about what he's gathered and be cross-examined on

6  it.

7    I can't find -- where is the offer of the

8  deposition at trial language, the adverse party language,

9  that was quoted in what you told me, Attorney Hare?

10    MR. HARE:  Rule 32, Your Honor.

11    THE COURT:  Rule 32, that's where I started.

12  No, maybe not so far off.

13    32.  Deposition of a party agent -- party agent

14  or designee.  An adverse party may use, for any purpose,

15  the deposition of a party when deposed or anyone who,

16  when deposed, was the party's officer, director or

17  designee... under Rule 30(b)(6).  Okay.

18    I think everything I've said in indicating my

19  view of this is correct.  I apologize if my thinking and

20  questioning was meandering.  It's clear that when the

21  topic got raised, it was not something I expected to

22  discuss when discussing the offer of an admission.  And I

23  think if I read the prior pages probably there was

24  discussion about are you going to read them out loud or

25  what about these document numbers.  What sense will they

1    make.  I could be wrong.

2           But where you gave me, Attorney Kang, and no

3    criticism that that's what you gave me.  That was fine.

4    But I'm just saying then this issue comes up, this

5    testimony at trial.  And while I was not tremendously

6    clear, and I said you could ask, there's nothing I've

7    said this morning that said you couldn't, Attorney Kang.

8    But I clearly suggested that there's a 602 issue.  Excuse

9    me.  And that I would rule on any such objections.  In

10   doing so, in saying that, I don't think I was consistent

11   with what I said.  But I wasn't as clear I hope as I'm

12   being now for the basis for my reasoning.  Why?  I do not

13   believe that Mr. Goldfarb, who didn't join the company

14   until 2015, can come here and testify, without being

15   disclosed as an expert, which he wouldn't be qualified

16   on, I don't think, just because he's 30(b)(6).  But let's

17   say he wasn't disclosed as an expert.  To testify as to

18   his view of things based on information that would

19   otherwise not be admissible.  Such as, talking to Canto,

20   talking to Nicoll, talking to, I don't know, Evanko, or

21   anybody from there down to what level he's at.

22          So I guess, Attorney Kang, that's my ruling.  I

23   assume you are going to object to it.  And if you want to

24   take more of your time, you can tell me why you think I'm

25   wrong.

1    MR. KANG:  Your Honor, we do object.  First of

2  all, let me say that I do anticipate that the majority,

3  if not all, of his testimony will be based on personal

4  knowledge.

5    THE COURT:  Okay.  Then we won't have a problem.

6    MR. KANG:  Correct.  But I will say our

7  objection that to the extent that the Labs have

8  designated a broad swath of topics to read into -- to the

9  jury on five pages of, as they characterize, admissions,

10  of behalf of the company during his 30(b)(6), there is

11  case law that says that in those instances, the company,

12  in this case us, is allowed to then subsequently ask

13  Mr. Goldfarb, as a 30(b)(6) witness, as to those topics

14  that they have opened the door to.

15    THE COURT:  Okay.  There's a premise to that

16  statement of what you should be allowed to do which is

17  confusing to me.  It's not an unusual experience I have

18  in this case.

19    My understanding is what you want to cross him

20  on is things which are offered as, in effect, under 32

21  and under as, in effect, also statements of a party

22  opponent.  He was authorized by the company to make those

23  statements.  And under 32 they are, in effect, bound by

24  them.  So I don't think they have to use them in cross.

25  I mean, they could stand up on Monday and read them into

1   the record.  They're not really -- they don't want to

2   argue with him over did he say this or not and what he

3   really meant or what he's learned since or let me change

4   that answer.  You can't do that with an admission.  I

5   don't think that's what they're doing.  That would be --

6   I'm sorry, I shouldn't comment on counsel's strategy.

7   But God almighty, you're going to let this guy wrangle

8   with you over his Q and A that you are offering under 32

9   and that's, in effect, a party opponent's admission under

10  the exception on the hearsay rule.  That can stand on its

11  own two feet.  Mr. Goldfarb went to Mexico for a

12  three-week vacation during the trial, they could offer

13  it.

14         I don't see it as a cross-examination that's

15  opening the door.  I don't know.  I mean, I didn't think

16  we were going to do admissions, interrogatories, and

17  whatever in the middle of examination.  And you

18  specifically told me in this discussion that I understand

19  this morning, you are not trying to impeach this man.

20         So, Attorney Kang, I think we have a disconnect.

21  Everything I said was assuming these statements from the

22  deposition are being offered by a combination of 802 and

23  32 as a basis to read as evidence, standing on its own,

24  an answer to a question which is read to give context.

25  So I'm confused.

1264

1    What does the Labs intend to do with these

2    admissions?  Are you going to cross-examine him on them?

3    MR. HARE:  Not at all.  Nor are we constrained

4    to doing that.  We're entitled to read these in.

5    THE COURT:  That's what I just finished saying.

6    MR. HARE:  Exactly.

7    THE COURT:  Okay.  So this transcript will

8    probably look just as confused as the one I read in a

9    minute ago.  But bottom line, Attorney Kang, I don't

10   think you are going to get a door open.  So I don't think

11   you're going to get redirect.

12   And what I said, I guess on day one, was be

13   forewarned.  They are going to put those in at some point

14   in this trial.  It could be the last thing they read to

15   the jury in their rebuttal case.  But I assume if you

16   want this man to kind of, I think the phrase I used was

17   pull the teeth, you ought to do it in your direct.

18   MR. KANG:  And that's what I'm asking for, to be

19   able to do it on direct.

20   THE COURT:  Well, then that's subject, as I said

21   on day one, to the "Rules of Evidence."  And that's where

22   602 comes in.  And that's a problem.  He is not

23   testifying.  There's no rule anywhere, civil procedure or

24   evidence, that I know of that let's a corporate defendant

25   designate a 30(b)(6) witness, which we all know often

 1    testifies to hearsay, get on a witness stand in front of

 2    a jury and give that evidence as the basis for his

 3    knowledge of what Canto did.  I mean, obviously, I doubt

 4    that's what you'll ask him because she's testified.  But

 5    anybody else in those notes or anybody else did based on

 6    his reading a document.  That's hearsay.  We don't allow

 7    that.  There's no rule or provision that allows a

 8    corporate defendant to do that.  I mean, maybe

 9    corporations ought to get together and think about.

10    That's a wonderful tool for them to shovel in hearsay.

11    But last I checked, the Rules of Evidence apply to your

12    questions.  And I can hear their objection and I will

13    rule.

14           MR. KANG:  So, Your Honor, one more point on

15    this.  Again, I'm hoping this is going to be a moot

16    issue.  However, my point is I don't think that they can

17    use 30(b)(6) as both a sword and a shield.  They are

18    saying, well, Mr. Kang can't be allowed to ask any

19    questions of Mr. Goldfarb as a 30(b)(6) witness.  He

20    can't get into that.  But when he gets off the stand, and

21    Mr. Kang can't ask him anymore questions, we're allowed

22    to read in five pages of his testimony to the jury which

23    he testified to as a 30(b)(6) witness.

24           THE COURT:  Why not?  Why not?  Tell me a rule.

25    Tell me even a Second Circuit case that says no, Judge

1    Hall.  You're just not right, Judge Hall.  You have to go

2    back and study the Rules on Evidence and the Civil Rules

3    of Procedure.

4            Because when they designate somebody as a

5    30(b)(6) whose testimony is rank hearsay throughout the

6    entire deposition but, nonetheless, helpful in discovery

7    to accomplish Rule 1 of the Federal Rules, that that

8    automatically anoints that witness to come in and testify

9    at trial about everything he said at the deposition that

10   you want him to testify to.  I don't know of any such

11   case or any rule.

12           I'm hearing silence.

13           MR. KANG:  No, I believe there is authority.  I

14   want to double-check it.

15           THE COURT:  Well, you're about to ask questions.

16   So, you know, you got me as the judge.  I'm sorry.  I'm

17   sure you had a moment of memorial sadness because I'm

18   incompetent on evidence rules.  But on this one, if I'm

19   wrong, I'm really sure I'm wrong.  It just does not

20   strike me as fair.  I mean, you could designate, it

21   wouldn't work, an actor to come in here as your 30(b)(6)

22   and do a great performance on the stand about how, well,

23   Canto did 47 more test telephone calls.  Cross.  Well,

24   it's not in the record.  Oh, no, but I talked to her and

25   that's what she told me.  Assume she didn't come to

1    trial.

2          MR. KANG:  That's not what we intend to do, Your

3    Honor.

4          THE COURT:  I know you don't.  But it's a

5    ridiculous example, but it's analogous.  Maybe you don't

6    and this has been a waste of time, in which case I'll

7    take it off your clock, but it sure sounded like that's

8    what you were going to do when we started this, I don't

9    know, 40 minutes ago, 30 minutes ago.

10         But I think the best thing to do is I'll just

11   rule.  But I'm not going to stop and explain my rulings.

12   I'm ruling based on what I said.

13         If you'll give me one moment, gentlemen and

14   ladies.

15         I'm sorry if I raised my voice.  I shouldn't

16   stand when I talk.  It was more out of enthusiasm for my

17   analysis.  I'm not directing any displeasure with

18   anybody, please understand that.  When I get excited I

19   tend to speak louder.  I don't know why.  It is like my

20   husband talks to somebody in California, he screams three

21   times louder on the phone than in Connecticut.  He has to

22   have them hear him.  That's kind of analogous but again a

23   bad one.  I'm terrible with analogies.

24         Ready to bring the jury in?

25         The difficult with my speaking louder is

```
 1   probably going to be, they realize it's not a technical

 2   issue.

 3           MR. CUNNINGHAM:  Your Honor, did you want to do

 4   that stipulation about the 20 medical records first?

 5           THE COURT:  No. I thought we would find a time

 6   today that's pertinent and they would remember what it

 7   was.  That's all I'm saying.  If that doesn't happen, you

 8   will remind me because I will probably not remember.

 9           (In the presence of the jury at 10:06 a.m.)

10           THE COURT:  Good morning, Ladies and Gentlemen.

11   This was bad this morning.  And I have to apologize

12   because I can't make the computer system apologize to

13   you.  Everybody be seated.  They were just not working.

14   His computer crashed as I was printing something to come

15   at 8:30 so I wouldn't be late with you folks.  We were

16   here for an hour and at 8:20, I looked up and I go to

17   connect something and no.  We have had IT down.  We have

18   made use of the time.  I don't know if you heard my

19   voice.  I got a little enthusiastic out here.  But we

20   used the time but it was primarily due to that computer

21   issue.  Which you may see folks back here at the break

22   and at lunch time trying to finish it for us.  I just

23   pulled the plug and said, stop, we'll go without it.  I

24   might be a little slower on doing some things, ladies and

25   gentlemen, because I don't have access to certain things
```

1269

1   at I usually am looking at here but I will do my best.

2   Again my apologies.  In some ways I could say I can't

3   believe this is day six and we got through it without

4   being a more than a minute or two late ever.  You can

5   look at it that way, but it doesn't excuse it.  I

6   appreciate your patience.  Maybe sitting in there makes

7   you realize why I am such a fanatic about getting you out

8   on time.  It's really frustrating, isn't it?  You've been

9   sitting there doing nothing.

10          But I'm going to give you an update at the end

11  of the day as to where we are.  I think we're in a good

12  place time wise to be honest with you.  Not that I'm

13  upset that we lost this time.  We'll be in a good place.

14  You will see at the end of the day.  Okay, Ladies and

15  Gentlemen.

16          I think, Attorney Kang, your opportunity to call

17  another witness, I believe.

18          MR. KANG:  Yes, Your Honor.

19          Cigna calls Michael Goldfarb.

20          THE COURT:  Mr. Goldfarb, if you would come here

21  to the witness stand and when you arrive, I ask that you

22  remain standing.  The clerk will administer the oath.

23          M I C H A E L   G O L D F A R B

24  having been called as a witness, was first duly sworn and

25          testified on his oath as follows:

```
 1              THE WITNESS:  I do.

 2              THE CLERK:  Please be seated.  Please state your

 3    name for the record, spelling your last name.

 4              THE WITNESS:  Michael Goldfarb.  Last name

 5    G-O-L-D-F-A-R-B.

 6              MR. KANG:  May I proceed, Your Honor?

 7              THE COURT:  You may, sir.  Go right ahead.

 8                     DIRECT EXAMINATION

 9    BY MR. KANG:

10       Q.   Good morning, Mr. Goldfarb.

11       A.   Good morning.

12       Q.   Mr. Goldfarb, where do you currently work?

13       A.   I work for Cigna.

14       Q.   And before we get into that, can you tell the

15    jury a little bit about your educational background

16    starting from college?

17       A.   Sure.  I went to college in Massachusetts at

18    Brandeis University and graduated in 1999 with a degree

19    in economics.  After that, I had a little work experience

20    and then I went to business school in New York City at

21    NCU for one semester.  Then I decided to switch gears and

22    become a lawyer.  I went to law school in New York City

23    at St. Johns University School of Law.

24       Q.   After you graduated from or -- did you graduate

25    from St. John's?
```

1    A.    I did.

2    Q.    Did you practice law after that?

3    A.    Yes.    After that I worked in a law firm for

4    three years.  During that time, I was doing white collar

5    criminal investigation work, litigation and then

6    specifically insurance coverage litigation representing

7    insureds suing insurance companies.

8    Q.    Did you also have experience as a lawyer in

9    health care matters?

10    A.    Not at that time.  But later I did.  Following

11    that experience, I moved to Connecticut.  I was a law

12    clerk to one of the justices of the Connecticut Supreme

13    Court and after that, I went to a law firm in Connecticut

14    where I did litigation work as well as some health care

15    work.

16    Q.    How long were you at that law firm in

17    Connecticut?

18    A.    Almost five years.

19    Q.    And all told, how long did you practice law at

20    both law firms as well as your experience as a law clerk?

21    A.    Approximately nine years.

22    Q.    Are you admitted to practice law in any states?

23    A.    Yes, I'm admitted to practice in California,

24    New York and Connecticut.

25    Q.    And when did you eventually join Cigna?

1    A.    May 4th, 2015.

2    Q.    Other than your law degree, Mr. Goldfarb, do you

3 have any other professional certifications?

4    A.    I do.  I'm an accredited health care fraud

5 investigator.

6    Q.    What is that?  Can you tell the jury?

7    A.    That is a certification that comes from the

8 National Health Care Anti-Fraud Association which is a

9 public private partnership of federal and state law

10 enforcement and health care payers including health plans

11 and health insurance -- larger health insurance

12 organizations such as Cigna, Aetna, United, things of

13 that nature.

14    Q.    You said private public partnership?

15    A.    Yes.

16    Q.    Who are some of the public entities that are a

17 part of that?

18    A.    Department of Justice, FBI, HHSOIG that's the

19 Office of Inspector General, as well as all sort of state

20 law enforcement agencies as well.

21    Q.    When did you get that certification?

22    A.    That's a good question.  Maybe 2018.  In order

23 to get that certification, I had to have a number of

24 years experience.  I had to do many hours of education

25 and training.  And the training I received was in part

1  from law enforcement agencies learning skills to detect

2  fraud.  Learning all sorts of schemes that are used in

3  health care to get reimbursement from providers that are

4  not due, bribery schemes, dual pricing schemes, fee

5  forgiving schemes, misrepresentation schemes, things of

6  that nature.

7      Q.    Do you work with and communicate with law

8  enforcement, FBI, DOJ in that regard?

9      A.    I do.  And in the course of my job, I have

10  reason to work with them on a regular basis.

11          And just to finish my answer about that

12  accreditation, in addition to all of the hours of

13  training, there's a test that you have to take.  So I

14  took the test.  I passed the test.  And I have to do

15  continuing education hours to maintain that designation.

16  I do about 30 plus hours of continuing education of the

17  type that I was discussing a year.

18      Q.    A year?

19      A.    Yes.

20      Q.    What does that continuing education entail?

21      A.    There are webinars that, you know, I will have

22  access to during the course of the year as well as

23  training conferences that I go to where law enforcement

24  and other plans and payers will go and present on various

25  topics.

1274

1    Q.   So you began working with Cigna in 2015?

2    A.   I did.  I just want to mention I'm also a

3  frequent speaker and leader of training on these topics

4  at this point.

5    Q.   Thank you.  Where is your office?

6    A.   My office is in Bloomfield, Connecticut.

7    Q.   Has it been there throughout your time at Cigna,

8  maybe other than the pandemic?

9    A.   Yes.

10    Q.   So you have been working with a Cigna close to a

11  decade now?

12    A.   Yes.

13    Q.   When you joined the company, can you describe to

14  the ladies and gentlemen what your first role was at

15  Cigna?

16    A.   Yes, I was hired as an attorney, as counsel in

17  the legal department and I was assigned to a special

18  investigation unit based on my previous work experience.

19  They thought I would be a good fit for that and so that's

20  the group that I supported.

21    Q.   When you say assigned to the Special

22  Investigation Unit tell the jury what that means?

23    A.   That means that I did report to, up to the

24  general counsel of Cigna.  I was in the legal department,

25  but all the lawyers have different business units that we

1  support.  So someone might support claim operation,

2  another person supports appeals operation.  I was

3  supporting the Special Investigation Unit.

4      Q.   Do you know someone named Bill Welch?

5      A.   I do.

6      Q.   Tell the ladies and gentlemen of the jury who is

7  Bill Welch is.

8      A.   Bill Welch was my supervisor.  He's an attorney

9  and he was the person who hired me at Cigna.

10     Q.   Was he also a lawyer at Cigna assigned to the

11 SIU?

12     A.   Yes.

13     Q.   As to his hierarchy, was he the general counsel

14 of Cigna?  Where was his position at the company?

15     A.   He was  -- above him was a gentleman who was the

16 head of litigation.  And above him is the general

17 counsel.  Actually above him was the deputy general

18 counsel and then the general counsel.

19     Q.   Mr. Welch and you were a few rungs below the top

20 general counsel at Cigna?

21     A.   Yes.

22     Q.   How long did you hold that role in the legal

23 department?

24     A.   I held that role through the end of 2016.

25     Q.   So about a year and a half?

1276

1    A.    Yes.

2    Q.    And we'll get back to this a little later but in

3    your capacity in the legal department, did you have

4    personal involvement in an investigation related to the

5    Labs in this case?

6    A.    Yes.  Almost immediately when I was hired, I was

7    asked to help out on the matters concerning the Labs in

8    this case.

9    Q.    So when you were in the legal department during

10   those first 18 months or so, can you describe to the

11   ladies and gentlemen what type of support you provided to

12   the SIU?

13   A.    I would be available to the investigators to

14   consult on their various investigations.  They might ask

15   me about whether they have sufficient evidence, things of

16   that nature.  I would give them tips about, hey, why

17   don't you try to gather evidence of this nature.  If a

18   lawyer was hired on the other side who was making it

19   difficult to get the information that they needed, I

20   would communicate with that lawyer and you know, try to

21   provide legal citation and reasons why they should

22   cooperate with us in our investigation.  I also oversaw

23   litigation.

24   Q.    And with respect to the Labs in this case, did

25   you have any interaction with a lawyer from the Labs?

1277

1   A.   Yes.

2   Q.   Who was that?

3   A.   His name was Dean Viskovich.  His title was

4   Lawyer and Compliance Person at the Labs.

5   Q.   So he was -- your understanding was that Mr.

6   Viskovich was someone that was employed by the Labs?

7   A.   Yes.

8   Q.   So you describe at the end of 2016, you moved to

9   a different role at Cigna?

10   A.   Yes.

11   Q.   Can you describe what your next role was?

12   A.   My next role was essentially my current role.

13   In January 1, 2017, I moved over to work directly in the

14   business unit of SIU and I had the title senior manager.

15   A lot of my role was similar, providing advice about

16   investigations.  But I was no longer providing legal

17   advice.  And I also took over roles of compliance for the

18   SIU.  I also had involvement in a lot of other business

19   initiatives where they wanted advice of SIU and I also

20   developed a reputation of somebody who had a good amount

21   of knowledge and good ideas and so I would be consulted

22   by various departments about initiatives that they were

23   doing.

24   Q.   Since you moved into that role -- so now you are

25   no longer in this legal department at Cigna.  Now you

1    were within the SIU directly?

2    A.    Yes.

3    Q.    So when you moved into that role, have you

4    continued to work and function as a lawyer for Cigna?

5    A.    No.

6    Q.    Did you become -- after you moved over, did you

7    personally work on SIU investigations?

8    A.    Yes.

9    Q.    What is your current title with the company?

10   A.    My title is I'm the director of the SIU.

11   Q.    What was your title when you first joined SIU at

12   the beginning of 2017?

13   A.    Senior manager.

14   Q.    Did you receive a promotion in that time period?

15   A.    I did.

16   Q.    During the nearly ten years that you have been

17   at Cigna, how many investigations for SIU would you say

18   you worked on or been involved with?

19   A.    Thousands.

20   Q.    Have you personally worked on investigations of

21   providers?

22   A.    Yes.

23   Q.    How many?

24   A.    Of providers?

25   Q.    Yes.

1    A.   Most of our investigations are of providers.  A

2  small number of our investigations concern insured

3  customers who are submitting false claims but that's a

4  very small portion.  Most of it is focused on providers.

5    Q.   Have you worked on investigations involving

6  labs?

7    A.   Yes.

8    Q.   Have you worked on investigations involving

9  substance use treatment centers?

10    A.   Yes.

11    Q.   How many?

12    A.    Hundreds.  And in connection with those

13  investigations, I have often performed on-site

14  investigations where I have gone to numerous substance

15  abuse treatment centers, many of which are in Florida,

16  but all over the country.  I have probably done that for

17  least 50.  And those are multiple day visits,

18  interviewing everyone who works at the treatment center

19  to get a very good understanding of the operation of the

20  place so we know what it is that they are not doing

21  correctly so we can work with them to get into

22  compliance.  Because our goal ultimately for most

23  providers is to resolve the issue.  We do an audit.  We

24  find issues of concern.  And then we do outreach and try

25  to work with the provider to correct what they are doing.

1280

1   If what they were doing caused Cigna to pay claims that

2   shouldn't have paid, we ask them to refund that money in

3   fairness.  We do want to work with them to do the right

4   thing and have a business relationship going forward if

5   we can.  We can't always do that.  Some people don't want

6   to change.  We also deal with a fair number of people who

7   are just criminals and they are not going to give money

8   back or make changes.

9        Q.   The on-site investigations or audits that you

10  described is that in furtherance of that effort by Cigna

11  to try to work with providers?

12       A.   Yes, it is.  I have also done on-sites of

13  toxicology labs.  I have also been on site not in

14  connection with an investigation but to educate myself.

15  I have spent a day at Labcorp and with their executives.

16  And I wanted to learn their entire process because

17  Labcorp is a good partner of ours.  I wanted a firm

18  understanding of how it is done correctly.  So when I go

19  into a laboratory that we're auditing where there's

20  findings that they were not doing it correctly, I have

21  something to compare it to.

22       Q.   Have some of these on-site audits that you've

23  personally conducted have been with providers in Florida?

24       A.   Yes.

25       Q.   How many would you say you have done?

1    A.    Probably at least 40.

2    Q.    And have you -- you talked about how you

3    interview some people in connection with those audits.

4    What are the types of people that you interview during

5    this process?

6    A.    I interview the medical director.  I interview

7    the clinical director.  I interview therapists.  I

8    interview behavioral health techs.  I interview owners of

9    treatment centers.  Those are the general people that I

10    interview.

11    Q.    Now Mr. Goldfarb, you have been sitting here at

12    trial as the company's corporate representative, correct?

13    A.    Actually I want to amend that answer.  I also

14    spend a lot of time interviewing the billing people for

15    laboratories and treatment centers to understand their

16    billing practices.

17    Q.    Thank you for that amendment.

18          You have been here during trial as Cigna's

19    designated representative?

20    A.    Yes.

21    Q.    And you have heard some names of various

22    treatment centers and other facilities during trial,

23    correct?

24    A.    Yes.

25    Q.    Do you recognize some of those facilities as

1282

1    ones that you have personal knowledge of?

2        A.    Yes.

3        Q.    And what are some of a names of those facility

4    that you have personal knowledge of based on your

5    experience?

6        A.    Angel's Recovery, Redemption.  If there was a

7    list -- I have seen a list of the referring providers to

8    this Lab and I'm very familiar with many of the names on

9    there in connection with other investigations that SIU

10   has done.  I have personally spoken to many of the people

11   who work at those treatment centers.  I have visited a

12   number of those treatment centers.  I'm familiar with the

13   medical directors who, many of whom were submitting

14   claims or signing off, I should say, on claims that were

15   being sent to the lab.

16           MR. CUNNINGHAM:  Your Honor, object to the

17   relevance of any of that.

18           THE COURT:  Yes.  I don't see it, sir.  You are

19   not offering him as expert.

20           MR. KANG:  Foundation, Your Honor.

21           THE COURT:  Foundation of what?  He's going to

22   testify to those conversations?  Generally?  Or about

23   these Labs?

24           MR. KANG:  About these Labs and about these

25   treatment centers, Your Honor.

```
1              THE COURT:  They have to be related to these
2    Labs.
3              MR. KANG:  Understood.  And we are going to
4    connect the dots.
5              MR. CUNNINGHAM:  Your Honor, these are also
6    discussions about visits he had after that the dates at
7    issue.
8              THE COURT:  I have to say, Attorney Kang.  I'm
9    sitting here thinking is this trying to qualify him as an
10   expert?
11             MR. KANG:  It's not.
12             THE COURT:  That's what it sounds like to me.
13             MR. KANG:  We'll move on.
14             THE COURT:  Let's get to something that's
15   relevant to this case.  Okay?  Thank you.
16   BY MR. KANG:
17      Q.  You are familiar with the three labs in this
18   case, correct?
19      A.  Yes, I am.
20      Q.  Have you heard this term -- are you familiar
21   with "in-network providers"?
22      A.  Yes.
23      Q.  And what is an in-network provider?
24      A.  Generally speaking, an in network provider is a
25   provider who has a direct contract with Cigna in which
```

1  they have agreed to see Cigna members and treat them and

2  have agreed to prenegotiated prices for their services

3  which are reasonable.

4      Q.   Before we go into that, Mr. Goldfarb, I want to

5  back up for a minute.  During your near decade at Cigna,

6  have you come to have an understanding as to the role

7  that commercial payers like Cigna plays in the health

8  care insurance?

9      A.   Yes.

10     Q.   How have you come to acquire that understanding?

11     A.   Well, because I have worked there almost ten

12  years and understanding the business of Cigna is integral

13  to my job.

14     Q.   Have you heard of the term "employer group

15  plans"?

16     A.   Yes.

17     Q.   Have you also heard the term "IFP plans"?

18     A.   Yes.

19     Q.   Can you tell the jury what an employer group

20  plan is?

21     A.   Yes.   To back up, you know, in this country

22  most people get their health care through their employer.

23  There's a variety of reasons for that.  But primarily --

24          MR. CUNNINGHAM:  Objection, Your Honor.  702.

25  He's not listed as an expert.

1    MR. KANG:  This is not expert testimony, Your

2  Honor.

3    THE COURT:  Why not?  He doesn't write the

4  policies.  He doesn't market the policies.  If he's

5  talking about he read policies, the policies speak for

6  themselves.  Otherwise it would be hearsay.  I understand

7  that we have -- everybody has some general -- I could

8  probably testify, not under oath, but I can explain a

9  group policy versus an individual.  But coupled with your

10  lead up to his experience, this is sounding like an

11  expert and I don't really know the basis.  I know he said

12  he worked there for nine years and he's done

13  investigations and I suppose there's policies involved in

14  the investigation so he's probably looked at them, but --

15    MR. KANG:  Should I lay more foundation, Your

16  Honor?

17    THE COURT:  I have to say -- I'm sorry.  I don't

18  know if we want more foundation.  We have had an awful

19  lot of background and we need to get on with the evidence

20  relevant to the case.  I will let him, very briefly, a

21  sentence or two -- because that sounded like a launch

22  into two pages in the transcript answer of, you know, the

23  different kinds of policies he has worked with in

24  experience that were in place in the time period at issue

25  in this case and that are at issue in the case.  How is

1   that?

2           MR. KANG:  Thank you, Your Honor.

3           THE COURT:  You know the answers to the time and

4   the policies at issue so you could frame your question to

5   ask him about those kinds of policies if he knows of

6   them.

7           MR. KANG:  Thank you.

8           THE COURT:  Then we can get his answer.  Sorry

9   that took awhile to figure that out.

10  BY MR. KANG:

11      Q.   Mr. Goldfarb, are you aware of the plans and

12  policies that are at issue in this case?

13      A.   Yes.

14      Q.   Are you aware that one of the types of plans at

15  issue in the case are called employer group plans?

16      A.   Yes.

17      Q.   Can you tell the jury what an employer group

18  plan is and whose money pays for claims of employer group

19  plans?

20      A.   Let me use an example of an employer group plan

21  in this case so we tie it to this case.  The Miami-Dade

22  School District is an employer group.  What that is is

23  the Miami-Dade School District has decided to offer

24  health benefits to its employees, basically teachers and

25  their families.  The money that is used to pay for claims

1    related to that plan, there's a health benefit fund

2    that's established and the money that goes in that comes

3    from teacher's paychecks as well as a contribution from

4    the Miami-Dade School District.  And when someone from

5    that plan goes to see a doctor, the money that's paid to

6    the doctor is not from Cigna.  It is from that health

7    benefit fund that's funded by teachers, their

8    families and the school district.

9        Q.   Is it your understanding that these employer

10   group plans comprise the majority of Cigna's claim for

11   damages against the Labs?

12       A.   It comprises the vast majority of Cigna's claims

13   for damages against the Labs.

14       Q.   So what is your understanding as to where that

15   money goes if Cigna recovers money?

16       A.   To the extent we recover money, all the money is

17   sent back to the group plans in portion as they were

18   affected by the circumstances in this case.

19       Q.   So for those group plans is it your

20   understanding that Cigna is an insurance company for

21   these plans?

22       A.   Cigna is not an insurance company.  Cigna is

23   predominantly a health benefits company.  We provide

24   services to these plans.  They come to Cigna for our

25   expertise and claims processing, handling appeals,

1    because we have a robust provider network with

2    prenegotiated, reasonable rates to see their members.

3    That is the service that Cigna supplies to group benefit

4    plans.

5        Q.   So what is SIU with respect to these employer

6    group plans?  What is SIU's role in -- with respect to

7    those plans?

8        A.   So the SIU exists because we are paying claims

9    with other people's money and so as a result of that,

10   there are laws which require companies like Cigna to have

11   an SIU.  To make sure we're safeguarding other people's

12   money and insuring that we're not paying for abusive,

13   wasteful, improper claims.

14       Q.   So that's employer group plans.  Have you also

15   heard that there are something called IFP plans that are

16   at issue in the case?

17       A.   Yes, I'm very familiar with IFP plans.

18       Q.   What is an IFP plan?

19       A.   As we have heard, it is an individual and family

20   plan.  This is a plan that's sold directly from Cigna to

21   an insured on the exchange.  People know it as an

22   Obamacare Plan.  That's what it is.

23       Q.   I want to go back to the employer group plans.

24   You mentioned the Miami County -- Dade County Public

25   Schools.  Is that a plan to your knowledge that is

1  actually at issue in this case?

2      A.   Yes.  And based on my review of claims data,

3  that plan has paid out the most money to the Labs of any

4  plan at issue in this case.

5      Q.   For employer group plans like the Miami-Dade

6  County Public Schools are the benefits that are provided

7  under those plans described somewhere in a document?

8      A.   Yes.  They are in what's called a plan document.

9      Q.   How about for IFP plans?  Is there a document

10  that describes what benefits are provided for individuals

11  who purchase an individual policy?

12      A.   Yes.  And we call that the IFP policy.

13      Q.   Are you familiar with these plan documents and

14  IFP policies?

15      A.   Yes, I am.

16      Q.   How are you familiar with them?

17      A.   In the course of my work, not only in the SIU

18  but as I described, I often work with matrix partners on

19  various business initiatives.  I've worked with people

20  who write IFP plans.  I also work with people on issues

21  writing group benefit plans, making recommendations about

22  language, also working with regulators who may have --

23  the plans are filed with the government.  So the

24  government sometimes says, "I'm concerned with" --

25          MR. CUNNINGHAM:  Objection, hearsay.  What the

1    Government says.

2         THE COURT:  Sustained.

3    BY MR. KANG:

4         Q.   We'll move on.  Have you heard of something

5    called a covered service?

6         A.   Yes.

7         Q.   What's a covered service?

8         A.   That's a defined term in either the plan or

9    policy.  Essentially it is a service that satisfies all

10   terms and conditions of coverage under the plan and no

11   exclusions under the plan are triggered of relevance to

12   this case --

13        THE COURT:  He didn't ask that question.

14        A.   Sorry.

15   BY MR. KANG:

16        Q.   Do you know, Mr. Goldfarb, plans have some

17   degree of flexibility in deciding what is a covered

18   service and what is not?

19        MR. CUNNINGHAM:  Objection, Your Honor.  Again,

20   this is 702.  He's testifying as an expert on insurance

21   plans.  He's not listed as an expert.

22        MR. KANG:  Your Honor, this is going into the

23   issues in the case regarding coverage.

24        THE COURT:  Could you read the question back to

25   me, Terri.

1    (Whereupon, the requested question was read back

2  by the Court Reporter.)

3    THE COURT:  Sustained.

4  BY MR. KANG:

5    Q.   Have you heard of medical necessity?

6    A.   Yes.

7    Q.   What is medical necessity?

8    A.   It is a defined term under the plans.  So, you

9  know, we can look at individual plans and it will tell

10  you exactly what medical necessity is.  Essentially --

11    THE COURT:  I think that need another question.

12  BY MR. KANG:

13    Q.   My question was going to be is medical necessity

14  a criteria in all plans?

15    A.   Yes, it is.

16    Q.   And for the plans and policies at issue in this

17  case, do you understand medical necessity to be a part of

18  those?

19    A.   Yes.

20    MR. CUNNINGHAM:  Objection, leading.

21    THE COURT:  Yes.  Sustained.  The answer will be

22  disregarded and stricken.

23  BY MR. KANG:

24    Q.   What, if anything, is your understanding as to

25  whether or not medical necessity is a criteria in the

1    plans?

2        A.    It is one of the terms and conditions that must

3    be satisfied in order for there to be coverage.

4            MR. CUNNINGHAM:  Objection, Your Honor.  Move to

5    strike.  This is all 702.

6            THE COURT:  I thought the question had -- maybe

7    it was the last one, but had had something about the

8    plans in this case.

9            MR. KANG:  That's correct, Your Honor.

10           THE COURT:  Well, I guess you should lay a

11   foundation that he's read the plans in this case.  But

12   even that, he's still testifying about documents not in

13   evidence.  But I'll let that because it's a predicate

14   question.

15           I'll allow it.

16   BY MR. KANG:

17       Q.    Mr. Goldfarb, is it your understanding that the

18   parties have entered into a stipulation regarding

19   representative samples of plans and policies in this

20   case?

21       A.    Yes.

22       Q.    Have you read all of those representative

23   samples?

24       A.    Yes.

25       Q.    And do those samples purport to be the same or

1   substantially similar in terms of the language as to all

2   of the plans and policies at issue in this litigation?

3       A.   Yes.

4       Q.   Based on your review, what, if anything, did you

5   see in those representative samples regarding medical

6   necessity as a criteria?

7       A.   It's a criteria in every plan.

8       Q.   Were you here earlier this week for the

9   testimony of Ms. Jacqueline Thelian?

10      A.   I was.

11      Q.   Do you recall Ms. Thelian testifying about

12  something called coverage or reimbursement policies?

13      A.   Yes.

14          THE COURT:  I'm sorry.  If he were an expert,

15  you could ask that.  I don't think you can ask another

16  witness about another witness's testimony.  I think this

17  gets into what we were talking about before the jury came

18  out.  I'm sorry I've jumped in but just, I mean, the

19  frame of the question creates the issue we discussed.

20          I think you should start again.  I clearly

21  interrupted you anyway.  So why don't you start again.

22  BY MR. KANG:

23      Q.   Are you familiar with something called coverage

24  policies?

25      A.   Yes.

1294

1    Q.   And in your function at SIU, do you review

2  coverage policies?

3    A.   Yes.

4    Q.   Why?

5    A.   One of the functions that we do is we conduct

6  audits to determine whether the services met the criteria

7  for coverage under the plan.

8    Q.   Are there coverage policies that are relevant in

9  this case as to these three specific labs?

10   A.   Yes.

11   Q.   Are you also familiar with something called

12 reimbursement policies?

13   A.   Yes.

14   Q.   And how are you familiar with reimbursement

15 policies?

16   A.   Same answer.  As part of our work in SIU, part

17 of the audit is to compare the billing and see if it

18 satisfies the requirements under the reimbursement

19 policy.

20   Q.   Are there reimbursement policies for Cigna that

21 are applicable in this case with respect to these three

22 Labs?

23   A.   Yes.

24   Q.   Are these coverage and reimbursement policies,

25 Mr. Goldfarb, different than the plan documents and IFP

1    policies you described earlier?

2        A.    Yes.

3        Q.    In what way?

4        A.    They're separate documents.  And so in order to

5    determine coverage, you have to meet all terms and

6    conditions of coverage under the plan.  And then you can

7    look to reimbursement policies and specific coverage

8    policies that make reference to specific services.  So

9    there's -- there are coverage in reimbursement policies

10   that relate to laboratory services.

11       Q.    So providers need to comply with those coverage

12   and reimbursement policies?

13            MR. CUNNINGHAM:  Objection, leading.

14            THE COURT:  It's not terribly leading, but I'm

15   going to sustain it on another ground.  I think if you

16   limit it to the policies he reviewed -- if you ask him

17   questions in connection with his knowledge of this

18   investigation, did they look at the coverage to see if

19   it's included, did they look at this.  But I don't know,

20   as we discussed when the jury wasn't here, whether you're

21   going to get there with that.  But that would be the way

22   you would ask a non-expert witness.

23            MR. KANG:  I'm sorry, Ms. Fidanza.  Could you

24   read back the question.

25            (Whereupon, the requested question was read

1    back by the Court Reporter.)

2    BY MR. KANG:

3        Q.   What, if anything, would the Labs in this case

4    have had to do in order to get their claims paid?

5            MR. CUNNINGHAM:  Objection, relevance.  It's

6    after.  He wasn't involved.  Calls for expert testimony.

7            THE COURT:  Read the question back, Terri.  I'm

8    sorry, I was writing a note about my computer concerns

9    here.

10           Go ahead, Terri.

11           (Whereupon, the requested question was read back

12   by the Court Reporter.)

13           MR. CUNNINGHAM:  Your Honor, it had nothing to

14   do with this investigation.  It was before his time.  And

15   702.  I apologize.

16           THE COURT:  I think you better come to sidebar.

17           (Sidebar.)

18           THE COURT:  Tell me again the question.

19           MR. KANG:  What did the Labs need to comply with

20   in order to get paid.

21           THE COURT:  That requires interpreting the

22   policy.  Having obtained information about what these

23   Labs were doing.  Now, he says he went and did all of

24   that.  I'm not saying he doesn't know the answers.  But

25   to me, it's a 701 or 2 witness.  He has an expertise.  I

1   would qualify him as an expert in insurance claims,

2   whatever area you would call him, fraud investigation.  I

3   mean, whatever.  If you had disclosed him and tendered

4   his opinion, I would have said, yeah, fine.  You better

5   get a rebuttal or whatever.  But I don't think you can

6   put him up here as a guy who wasn't there when the vast

7   majority, to use your word.  I'm dying for the answer to

8   the question what's the piece that isn't going to the

9   Miami Dade school teacher.

10          You know, he wasn't there.  He can't be a fact

11  witness.  I'm sorry, Attorney Kang, if I'm wrong on this

12  and I'm not doing you good.  But I just don't see it.

13          One of those questions I interrupted you on.

14  I'm sorry.  I really like to think I don't interrupt

15  lawyers.  You're advocates.  You do your jobs.  But you

16  started based on.  That's a classic expert question.  And

17  then ask him did you hear Ms. Thelian.  You are asking

18  him about another expert's testimony.  Just all of this

19  doesn't seem right to me.  The context is wrong.

20          Now, as to individual questions.  Will you be

21  able -- I mean, they were still billing, two of them, in

22  2015 when he got there.  I don't know whether he knew all

23  of this.

24          When did the last Lab bill these folks?  When

25  were they shut down or went out of business?

1    MR. KANG:  2018.

2    MR. CUNNINGHAM:  2017.

3    THE COURT:  He's saying 2018.  Probably by 2018.

4  I don't know if he was into this investigation.  He could

5  testify about that.  But, you know, yeah, but what he

6  knew based on what he did.  Prior to that, he has no

7  personal knowledge.  Now he maybe learned a lot.  It

8  makes it sounds like he knew with personal knowledge in

9  2016, '17, '18 about what happened 2012 to '15.  I don't

10  think he can testify to that.  If I'm not someplace at a

11  time, how do I have personal knowledge of that?

12    MR. KANG:  I think there's case law on his.

13  Rule 602.  And we're happy to provide that, Your Honor.

14    THE COURT:  You couldn't have it before the

15  witness got on the stand?  I mean, you had to have seen

16  this as an issue.  I'm sorry, maybe you didn't.

17    MR. KANG:  I didn't realize that these were

18  going to create these issues.  But there is Second

19  Circuit case law.

20    THE COURT:  Seriously?  You are calling a Cigna

21  representative.  He's not just a VP of Healthcare

22  Administration or Healthcare, whatever.  He is a lawyer

23  who served in General Counsel Office and now has a staff

24  or line position.  But he's still a lawyer.  Get up there

25  and go on for pages giving an answer to how this is done

1   and how that's done and what this policy requires and

2   what had to be happening.  What the Labs had to do to get

3   a claim in and what they couldn't claim and what they

4   could claim.  I mean, I don't know.  To the extent it's

5   based on the contracts, I guess somebody who there's a

6   claim at issue in the case could say our policies tell us

7   that claim isn't good.  But would you reject that claim?

8   I would.  But I don't know how he does it.  And I'm sorry

9   if I'm ignorant of this case law that you keep referring

10  to.  I don't know.

11          MR. KANG:  I think case law describes that 602

12  can be satisfied not just based on what you only know in

13  your head.

14          THE COURT:  Like you saw the accident.  Okay.

15          MR. KANG:  But it's also general observation.

16          THE COURT:  Sure.  That's 701.  I can talk about

17  things that might be something our expert would be called

18  to do as long as it's based on -- I'm sorry, ladies and

19  gentlemen.  It's one of those days -- 602.

20          Who decided the cases you're going to get for

21  me?

22          MR. KANG:  Cardamone.

23          THE COURT:  Okay.

24          701.  If he's not testifying as an expert.  I

25  have an opinion that's formed is limited to one that was

1300

 1    actually based on these perceptions.  Helpful to clear

 2    that he understand the witness's testimony.  For

 3    determining -- or determining a fact at issue.  And not

 4    based on scientific, technical, or other specialized

 5    knowledge.

 6         702 says -- I'm sorry.  Go ahead.

 7         MR. CUNNINGHAM:  I was going to say the analogy

 8    that I have seen in actual trials is might be question of

 9    how fast was the motorcycle going.

10         THE COURT:  I can get up there and say, boy, he

11    flew by me.  And I might estimate the speed, well, I

12    don't know, but here he went 50 feet in less than a

13    second.

14         MR. CUNNINGHAM:  I think that's permissible.

15    This is completely a horse of a different color.

16         THE COURT:  I have seen the video and based on

17    my expertise and the distance traveled and this type of

18    car and whatever, my expert opinion is he was going 75

19    miles an hour through the red light.

20         MR. CUNNINGHAM:  Right.  So in those situations,

21    I think lay witnesses can give opinion testimony, but

22    they are trying to turn this gentleman into an

23    undisclosed expert.

24         MR. KANG:  *Folio Impressions*, 937 F.2d 759,

25    second Circuit 1991.

1    There's a copyright case.  The issue there was

2    whether or not the witness who testified had sufficient

3    personal knowledge regarding the source of the background

4    and the pattern.  And there the Court said the witness

5    was able to satisfy 602 requirement because it was

6    established that she had significant responsibilities at

7    work and control at the place of employment, including

8    supervising the designers, overseeing their work.  So

9    even though she stated that she believed the document was

10   one in her studio's possession rather than she actually

11   knew, that was sufficient to satisfy 602.  So that was

12   one case.

13        THE COURT:  So this is the supervisor of a lab

14   who is testifying basically to the activities of that lab

15   during the development of a patent which patent is an

16   issue.  I guess it's copyright.

17        MR. KANG:  I don't know what industry --

18        THE COURT:  Obviously, this note, somebody

19   wanted to copyright it and who could do it.  Right?

20        MR. CUNNINGHAM:  Your Honor, that case goes to

21   602.  It doesn't address 702 at all.  Again, our

22   fundamental problem is he's trying to turn this gentleman

23   into an expert when he has no personal knowledge of the

24   claims that were denied in this case.

25        THE COURT:  That testimony was testimony by what

1    I'm going to call the supervisor.  Maybe I'm

2    mischaracterizing it.  But somebody who is overseeing the

3    lab or someplace where other people were doing work.

4    That she believed that would be within the nature of the

5    work they were doing or whatever.  Something like that if

6    I got it right.

7            MR. KANG:  That's right.  And there are a number

8    of other cases that we were able to find in other

9    context.

10            THE COURT:  But that would be -- in this case,

11    what you are doing, unless I'm misunderstanding, but so

12    far it fits this description.  You are asking him to

13    testify, you know, I don't know, whatever it is that was

14    the subject of the drawing, you know, about what -- it's

15    not did this happen.  In other words, if you showed them

16    a claim rejection form, he could say, if he supervised

17    claims, well, yeah, someone in my office did that.

18    That's one of our forms and that's one of our people and,

19    yes, that's one of our documents.  You wouldn't have to

20    bring in the woman who wrote the form.  It's not as good

21    as this testimony.

22            Let me go back to my notes.

23            Well, what was the last question again?

24            MR. KANG:  It was about the coverage policies.

25            THE COURT:  What was the very last question?

1    MR. KANG:  What would the labs have to comply

2  with I guess.

3    THE COURT:  How do they comply with the policy?

4    Excuse me for a minute.

5    I wanted to make sure I wasn't missing

6  something.

7    MR. KANG:  I'm very sorry, but there's another

8  case.  It's 2019, U.S. District Lexis 248241.  2019 case

9  in the Southern District of New York.

10    MR. CUNNINGHAM:  Can I get copies of these cases

11  they are showing to the Court.

12    THE COURT:  They're not showing them to me.

13  He's telling me.  But if you have a copy, otherwise hit

14  two on the printer.

15    I can't hear you.  She can't.

16    MS. JACKSON:  This case involved an employment

17  discrimination case and they brought in an employee who

18  had knowledge about the processes.  She was not there

19  during the time period --

20    THE COURT:  What processes?

21    MR. JACKSON:  How they train employees on, you

22  know, antidiscrimination policies.

23    THE COURT:  So what's the basis of her

24  knowledge?

25    MS. JACKSON:  Because she had knowledge about

 1    the operations of the company.

 2            THE COURT:  Even for the time she wasn't there?

 3            MS. JACKSON:  Even for the time she wasn't

 4    there.  She was there like 2012.  Time period at issue

 5    was around 2015.  But she was still permitted to testify.

 6            THE COURT:  About what time period?

 7            MS. JACKSON:  Just the general processes of that

 8    company.

 9            THE COURT:  And what was the case about, what

10    time period?  The facts in the complaint, what was the

11    date?

12            MS. JACKSON:  2014, 2015.

13            THE COURT:  So that was when she was there.

14            MS. JACKSON:   No, she was there earlier and she

15    had left the company.

16            MR. KANG:  She was there from 2010 to 2012.

17    Then she was testifying to events '12 to '16.

18            THE COURT:  I may have read this case.  Remind

19    me.

20            So what was her position in 2010 to 2012?

21            MR. KANG:  She was --

22            THE COURT:  Was she the cleaning woman or was

23    she head of HR?  I would like to know that.  Number 2, I

24    would like to know if the company established there had

25    been no changes in any pertinent rules or policies,

```
1    training procedures, et cetera, between 2012 and 2014.

2           I would qualify her if the answer to that

3    question is no.  And if the answer to the question is

4    even if she's -- she's someone who you expect would have

5    knowledge to testify about the procedures before 2012.

6    If they said they didn't change, then I would let her

7    testify about subsequent.  I wouldn't be offended by

8    that.  Not offended.  Excuse me.  Doesn't matter if I'm

9    offended.  There's no rule for that.  There's a basis for

10   her testimony.

11          MR. KANG:  I apologize, Your Honor.  I want to

12   make sure.

13          THE COURT:  We'll look at it.

14          MR. KANG:  I want to represent this accurately.

15          THE COURT:  I appreciate that, Attorney Kang.

16   You are very careful about cases cited to me.

17          MR. KANG:  I can't make accurate representations

18   on the --

19          THE COURT:  Well, if you can't, what do you

20   think I can do it with?  I just gave you an example of

21   where I would let him do it.  Okay.  But, you know, let's

22   say you call the head of claims at Cigna and he has

23   retired.  And the claims are started the day he retired

24   and went six months.  But the Cigna lawyer established

25   there's been no change in how they treat -- there's been
```

1306

```
 1   no announcements or changed codes or any of that stuff.
 2   The day after he left, you would treat a claim the same
 3   way when he was there.  And he's not the guy who denied
 4   the 40,000 claims that are at issue.  He's the guy who
 5   supervised the people or who wrote the program to decide
 6   we're going to deny that today because we want to have
 7   fewer claims or we want to have more.  We'll accept it.
 8   He can testify to that, because he has person knowledge
 9   of what's relevant to the case.
10            MR. KANG:  I would submit that, in fact, Mr.
11   Goldfarb is even better equipped to have personal
12   knowledge because he wasn't just a supervisor.  He
13   actually did these things.
14            THE COURT:  I understand.  But he didn't do this
15   investigation.  He's talking about these things that's
16   not pertinent to this case.  He didn't do those.
17   Ms. Canto did.  But he didn't do those at a time relevant
18   to 99 percent of this case.  If you want to go on
19   generalizations about vast majorities, I think I'm right
20   on that.  I don't think Epic's claims in this case are
21   very large, and if they continued two or three more years
22   that means it's not in the millions.  Maybe it's in the
23   low millions.  I don't know.  But that's what we's trying
24   to testify about things that occurred before he was
25   actually in the SIU unit.  But he said that some of his
```

1  early stuff was in that.  That's fine.  But not actually

2  doing whatever.  And you want him to talk about his

3  knowledge he gained from '16 or whenever it was he went

4  to SIU, '16 I guess.

5          MR. CUNNINGHAM:  January '17, I think.

6          THE COURT:  As to what happened or what applies,

7  or what would they look at or what would they have to do

8  in the time period.  I mean, unless you had prepped a

9  witness like this in this circumstance, they would not

10  know that their world, which is fee forgiveness, out.

11  Right?  And his experience at Cigna, okay, doesn't apply.

12  I've ruled in that case.  Yours it's in by a thread, but

13  it's in.  You know, it doesn't -- you don't have that

14  coverage exclusion issue in his actual work.  So if he

15  had investigated this, yeah.  Absolutely.  You know, you

16  have looked at their claims, right, at issue in the case.

17  Not all of them, but several.  And given the nature of

18  those claims as to, let's take an example this claim,

19  what did they need to do for this to be under the

20  coverage of the policy as you operated as an

21  investigator.  Doesn't mean that's that's the answer for

22  the jury.  That's the other thing that's wrong here.

23  It's like he's pronouncing, as a matter of law, coverage

24  on policies, exclusions.  I'm getting a little jealous.

25  He's taking over my job here.

1308

1    MR. KANG:  I think he's testifying to that

2  because that is what they apply at the SIU.

3    THE COURT:  Correct.  I don't disagree.  But he

4  didn't do that in this case.

5    MR. KANG:  Well, he actually did.

6    THE COURT:  When?

7    MR. KANG:  In 2015.  He testified that he worked

8  on this.  I can lay that foundation.

9    THE COURT:  Then your questions are going to

10  start with, in the time you were part or involved in the

11  investigation, as you have told us, explain literally

12  when did he start on this investigation and what was his

13  role.  I mean, he was not like a Canto.  He wasn't

14  supervising Ms. Canto at that time.  So you are going to

15  make that very clear.  Then you can ask a question that

16  is based on your experience.

17    MR. CUNNINGHAM:  Your Honor, because I now know

18  where he's going, the problem is what's going to come up

19  next.  I don't want to jump up again.  But what's going

20  to come up next is he just said he was dealing with

21  gentleman named Dean Viskovich at one of the labs.  He

22  was a lawyer at the time.  He was not an SIU investigator

23  at the time.

24    THE COURT:  Make a statement as a party

25  opponent?

1    MR. CUNNINGHAM:  No, I'm talking about Mr.

2  Goldfarb.

3    THE COURT:  Oh, he wasn't deal with the people

4  who put the bills in.

5    MR. CUNNINGHAM:  He was just a lawyer for Cigna

6  at the time.  He was not a fraud investigator at the

7  time.

8    THE COURT:  His testimony is going to be about

9  when he talks about he dealt with the labs.  What he said

10  so far.  He gave a name.  I didn't know he's a lawyer.

11    MR. KANG:  I anticipate he will say we came in

12  and had discussions with this Lab's lawyer.  And helped

13  manage and direct the investigation into some of these

14  labs.  As giving legal support and advising counsel to

15  Ms. Canto and others.

16    MR. CUNNINGHAM:  I don't think he was even in

17  the SIU at that time.  He said he started in the SIU

18  January 1 of 2017.

19    MR. KANG:  He was in the Legal Department

20  supporting SIU.

21    THE COURT:  I want to know what did he do.  How

22  many other company investigations was he supporting?

23  When you are in the Legal Department, your phone rings

24  and it's, hey, this is Mary over on X investigation.  We

25  hit a wall on this issue.  Can you tell us what we should

1    do.  What's the law on this.  Okay.  And then he hangs

2    that up and -- well, it wouldn't be a call anymore, it

3    would be an email.  The next one is is this is John over

4    in the XYZ investigation.  We don't know how to proceed.

5    This lawyer's yelling at us and we need you to come over

6    and be in the meeting with us.  Their lawyer I mean.

7    Okay.

8         So I don't know.  When he says he worked on the

9    SIU investigation, he clearly got to SIU.  He might spend

10   three minutes on it.  I don't even know when he got to

11   SIU.  I know he said he was on this investigation.  But I

12   have no idea about workloads at Cigna.  I mean, is this

13   all he did?  I don't think I heard that.

14        MR. CUNNINGHAM:  He started on May 4, 2015 with

15   Cigna.  He started out as a lawyer.  And he said January

16   1 of '17 he believed he went to the SIU.

17        THE COURT:  '17, yeah.

18        MR. KANG:  He was working --

19        MR. CUNNINGHAM:  Here it is right here, Your

20   Honor.

21        THE COURT:  He said he was working with -- he

22   was a counsel, a person in the counsel's office, whose

23   job included consulting or representing or working with

24   SIU.  I understand that part of General Counsel's Office.

25   But I don't know.  Did he get three emails from them in

1   two years or did he spend 90 percent of his time on the

2   SIU team and that's how they came to figure out, gee, we

3   should have this guy over with us.  He's good.  We like

4   him, blah, blah, blah.  He's not really a lawyer lawyer.

5   He understands the business.  That's how he gets his new

6   job.  That's great.

7           I don't know that yet.  I mean, I can't have you

8   have him talk about things from the time frame of 2015.

9   Which I'm probably going to instruct the jury.  The jury

10  should understand the claims at issue beginning in 2012

11  and stop for some Labs in 2015.  And one Lab continues to

12  at least 2017.  Okay.  I'm probably going to tell them

13  that once you establish what's the basis of his

14  knowledge.  I just cannot ignore reading you 701.  If a

15  witness is not qualified as an expert, the testimony in

16  the form of an opinion is limited to one that is (a)

17  rationally basis on the witness' perception.

18          So if his testimony is relevant to the case,

19  i.e., to the claims at issue, I don't believe you can ask

20  him about what the Labs needed to do on coverage issues,

21  and have him possibly have a personal basis prior to

22  2015.  Do you see what the basis is I need, Attorney

23  Kang?

24          MR. KANG:  I understand, Your Honor.

25          THE COURT:  I'm so sorry.

1312

1    MR. CUNNINGHAM:  Can we take 30 seconds here?

2    THE COURT:  Go ahead.

3    MR. CUNNINGHAM:  I just want to make sure the

4    record is clear on this, Your Honor.

5    This is at page 8 of his deposition.

6    I started here I believe on May 4, 2015.  I was

7    hired in the role of counsel in Cigna's Legal Department.

8    And within the Legal Department, specifically the

9    Litigation Section of Cigna's Legal Department.  I held

10   that role until through December 31 of 2016.  Starting on

11   January 1st of 2017, I had the role of Senior Manager in

12   the Special Investigation Unit.  I held that position

13   until January 1, 2019 and that's when I became a Fraud

14   Director of Cigna's SIU.

15   THE COURT:  I think I heard that in the direct,

16   but those dates, I mean.  Whatever.

17   I hope I'm clear.  You need to continue to

18   object and I will continue to rule.

19   (End of sidebar.)

20   THE COURT:  Thank you again for your patience.

21   BY MR. KANG:

22   Q.   Thank you, Your Honor.  Mr. Goldfarb, I want to

23   go back to when you started with the company, okay?

24   A.   Okay.

25   Q.   You said it was May of 2015?

```
 1        A.   Yes.
 2        Q.   Was the BioHealth investigation one of the
 3   matters you worked on?
 4        A.   Yes.
 5             THE COURT:  When did he work?
 6   BY MR. KANG:
 7        Q.   When did you work on the BioHealth
 8   investigation?
 9        A.   Almost immediately after I got there.  That was
10   a matter that I was asked to work on.
11        Q.   Mr. Welch asked you to work on that?
12        A.   Yes.
13        Q.   Was that a matter that you comprised -- how much
14   of your time did that matter comprise during your time?
15             MR. CUNNINGHAM:  What time?  Objection, vague.
16             THE COURT:  Well, you can rephrase that as how
17   much time because he's obviously struggling with that,
18   asking about that.  I think you need to put an end date
19   over what period, this period.  If you want to end with
20   his movement over to SIU that could be a good end date or
21   just take each year as an end date, I don't know.
22   BY MR. KANG:
23        Q.   You worked on the BioHealth investigation as one
24   of the first matters you worked on?
25        A.   Yes.
```

1    Q.   Did you also work on eventually the Epic

2    investigation?

3    A.   Yes.

4    Q.   And did you -- from what period of time to what

5    period of time do you recall working on the BioHealth

6    investigation?

7    A.   So, I just want to clarify.  I will call it the

8    BioHealth matter because essentially it's not over.

9         THE COURT:  That's not his question, sir.  You

10   have to answer his question.

11        He asked you to pick a time period you were in

12   the general counsel's office and tell him what percentage

13   of your work time did you devote to anything that had

14   BioHealth at the front of the file name?

15   A.   Probably from -- let me rephrase that.  From May

16   of 2015 through the filing of the initial lawsuit in

17   Florida, I spent maybe 15 percent of my time involved in

18   matters relating to BioHealth and Epic.

19   Q.   And when you referenced filing of the lawsuit

20   was that August of 2015?

21   A.   Yes.

22   Q.   In addition to the discussions that you had with

23   the Labs' lawyer Viskovich, did you also have

24   conversations with investigators at SIU about BioHealth

25   and Epic?

1    A.    Yes.

2    Q.    Did you provide support for those

3  investigations?

4    A.    Yes.

5    Q.    And you gave guidance to those investigators?

6    A.    Yes.

7         MR. CUNNINGHAM:  Objection, leading.

8         THE COURT:  I will allow it.  That one.

9  BY MR. KANG:

10    Q.    Which investigators do you recall giving support

11  and guidance to in those investigations?

12    A.    Stephanie Canto, Patrick Hurley, and senior

13  manager Deanna Anderson, as well as working with director

14  Tom Hixson.

15    Q.    I want to focus on -- and by the way, the Epic

16  you referenced that, that you wouldn't characterize it as

17  an investigation, but instead as a matter.  What do you

18  mean by that?

19    A.    There's the initial investigation of gathering

20  evidence, if you will, to try to determine what the

21  provider is doing.  And then a decision is made based on

22  the evidence you gather whether how to proceed.  For

23  instance, you could say it all looks good.  We can move

24  on to the next one.  Or there's an issue of concern that

25  rise to the level that we believe that we cannot trust

```
 1    your billing submissions.  Therefore, we place a flag.

 2    It is not over.

 3         Q.   Again I want to --

 4         A.   I didn't answer your question.

 5              THE COURT:  I'm glad you know that.  So you

 6    shouldn't have said anything you said if it --

 7              THE WITNESS:  No, I didn't finish answering his

 8    question.

 9              THE COURT:  Sorry, I thought you said you didn't

10    answer.

11              THE WITNESS:  He asked me the difference between

12    an investigation and a matter.  I was just describing an

13    investigation phase of it.  The matter is not over

14    because plenty of things happen after the flag is placed.

15    We are reaching out to the provider, we're trying to

16    engage them to give us more information.  We obtain more

17    information from other sources.  This can go on for years

18    and years and years.  There are very relevant

19    developments that, to this matter that happened in 2020.

20    And I have been very involved in all of the developments

21    basically from the time that I started at Cigna to today.

22              MR. CUNNINGHAM:  Objection, relevance.

23              THE COURT:  That's a long answer but go ahead.

24              MR. KANG:  Thank you, Your Honor.

25    BY MR. KANG:
```

1    Q.   Have you -- did you continue to work on the

2    BioHealth matter even after August of 2015 when the

3    lawsuit was filed?

4         MR. CUNNINGHAM:  Objection, cumulative.

5         THE COURT:  Cumulative?  We talked about it at

6    sidebar.  So far all I have gotten the time period for

7    the first three months he worked there.

8         MR. CUNNINGHAM:  He said he worked on through

9    2020.

10        THE COURT:  I know.  I'm trying to get a sense

11   of how much time because I need to know what he knows of

12   his own personal experience.

13        MR. CUNNINGHAM:  I understand, Your Honor.

14        THE COURT:  Thank you.

15        So, Attorney Kang, if you would frame the

16   question that way as to what after -- and I ask you to

17   pick an end date.  Otherwise I will be told about what

18   percentage he worked until today.  I certainly and I

19   don't think the jury cares, he spent yesterday on this

20   case, right?  We're talking about the time relevant to

21   this case.  Which as to one lab goes to '17 or '18, as to

22   the three of them commences I think in 2012 and goes to

23   maybe '15.  That's what I'm trying to find out or I'm

24   trying to help establish a basis for the questions you

25   want to ask.  Not help you, you know what I mean.  I'm

1    trying to stop the objection so you can get your answers

2    to questions that are appropriate based on rule 602, 701,

3    702 and 703.  Thank you.

4            MR. KANG:  I understand, Your Honor.

5    BY MR. KANG:

6        Q.   Mr. Goldfarb, with respect to BioHealth, you

7    said that you started working on BioHealth pretty much

8    when you started at the company in May of 2015?

9        A.   Yes.

10       Q.   Did you continue to work on the BioHealth

11   matter, not in preparation for your testimony today.  Did

12   you work on the BioHealth matter either as supporting SIU

13   from a legal perspective or working as an SIU

14   investigator after August of 2015?

15       A.   Yes.

16       Q.   When would you say that your work, putting aside

17   preparation for this litigation, when would you say that

18   your work on the BioHealth matter either supporting SIU

19   or as an investigator ended?

20       A.   The last development would have been around

21   2020.

22       Q.   And with respect to Epic, do you recall when it

23   was that, was that also a matter that you started working

24   on shortly after you started with the company?

25       A.   Yes.

1    Q.   And same question.  With respect to the Epic

2    matter, putting aside preparation for this litigation and

3    testimony, when would you say that your involvement in

4    the Epic matter as an SIU investigator or supporting SIU

5    ended?

6    A.   2020.

7    Q.   So I'm going to talk about the -- we'll focus on

8    your knowledge of, your personal knowledge during that

9    time period from May of 2015 to 2020.  Okay.  So --

10              THE COURT:  Hold on just a moment, sir.

11              Ladies and Gentlemen, this is our break time.  I

12   have a feeling I know where I'm going to spend it.  You

13   are excused.  Go get some fresh air for me if you would.

14   Do some stretches, bending, rotating, whatever. You are

15   excused until 11:30.

16               This is the definition of wishful thinking

17   11:30.  You are excused, sir and you should leave the

18   courtroom.  Come and check at 11:28 and Liana will give

19   you a signal as to no don't come in or come on down.

20   Thank you very much, sir.

21              MR. CUNNINGHAM:  Your Honor, I need a break.

22              THE COURT:  I guess everybody needs a break so

23   we'll be back at 25 past.  I don't know maybe you should

24   come back at 11:30 and I will keep ruling and keep

25   putting my reasons for the ruling.  I have to say this is

1    a rhetorical question, Attorney Kang, I'm not exactly

2    sure why I'm going to listen to what he did in 2020.  I

3    don't know.  Unless this is relevant to the proof of your

4    case or the defense against the Labs' case.  In the sense

5    of you know, like Canto or I conducted interviews with x

6    and y.  I reviewed these labs.  But what he did was he

7    hired experts.  He hired a law firm.  He sat in a meeting

8    with people who did these things told him they did these

9    things.  And then he gave him legal advice or told them

10   to go do something else.  I don't know.  Personal

11   knowledge, yeah, he sat in a meeting.  He can say that.

12   He could say what did you tell him to do next?  Hearsay

13   objection, state of mind, you know, maybe get some stuff

14   in that way.  But you know, what those people, I don't

15   know.  You have your hands full.  We'll stand in recess.

16           (Whereupon, a recess was taken from 11:18 a.m.

17   to 11:30 a.m.)

18           THE COURT:  The jury is still out.  I should

19   represent they were here this morning, the little time we

20   had.

21           I will put on the record I've had a very brief

22   time to look at the case that was cited, *Folio*

23   *Impressions*, that was authored by Judge Cardamone, who I

24   will just make the aside he was a lovely man and a very

25   good judge.  I had occasion to meet him.  He passed away,

1  of course, but I have met him.

2        His opinion, I believe, does not support what

3  the Cigna wants to do and, indeed, would very indirectly

4  support what I have been saying this morning that

5  describes the various rules that are at issue with this

6  man's testimony.

7        As I understand the facts, there was a question

8  of a violation of the copyright law.  And it had to do

9  with a pattern.  Terri, that's p-a-t-t-e-r-n, like a

10  dress.  And if some pattern was in the public domain,

11  then *Folio* wouldn't violate the copyright laws.  But if

12  it wasn't, if they used something that wasn't that

13  particular pattern, which was apparently in the public

14  domain, I could have that backwards, they would be

15  liable.  And the trial court's finding of I can't

16  remember which way, but relied heavily on testimony that

17  the creator of something copied the background of a

18  particular pattern from a public domain source.

19        The testimony was a lay witness, a woman who

20  apparently was a supervisor or had personal knowledge of

21  the studio in which this person worked who supposedly

22  created it.  And she testified she believed that that

23  pattern, that was the alleged thing that was copied, was

24  in her studio's possession.  Okay.  She didn't testify

25  that the designer, another person, used it in the design.

1322

1    But as the director of a lab or a studio, I think it very

2    reasonable she would say know what were the resources in

3    their studio.  That's what she testified to.

4          And then an expert was called, interestingly

5    enough missing in this case, to then base his testimony

6    based on that fact evidence and fact witness.

7          So I have read the case, Attorney Kang.  I

8    appreciate that you brought it to my attention.  My Clerk

9    suggests, on a quick look, there's not a lot of case law

10   out there.  And I think that usually tells me it means

11   this so clear and so decided.  What is out there is a lot

12   of cases about people claiming personal knowledge

13   shoveling in hearsay.  And I think it would be correct to

14   say that has been greatly frowned on in endless numbers

15   of cases.  But I haven't read them all.

16         That's the basis for my ruling and the basis for

17   why I have taken this view.

18         I'm sorry, I'm spending a lot of time putting my

19   reasons on the record.  I know this is a terribly

20   important issue in the case.  And it appears genuinely I

21   think Attorney Kang expected to be able to ask this

22   witness certain questions.

23         The other thing, Attorney Kang, is I don't like

24   to, as I say, interfere.  I would hope you would say I

25   haven't interfered much in the advocacy of each side.  In

1   terms of witnesses, I haven't asked a lot of questions of

2   witnesses.  But I need this witness to answer your

3   question.  I say that in this case -- generally we have a

4   problem with every witness.  As a lawyer, I would have

5   expected that he would appreciate that more than anybody

6   else.  But I need and that's why I'm not going to sustain

7   the leading because he's not doing one of these it's

8   true, isn't it, that, you know, or that's right, isn't

9   it.  He's putting something in his question.  The witness

10  is free to say yes or no, or to answer it one way or

11  another.  That wasn't part of my duties.  Was x part of

12  your duties?  No, that was not.  I don't think that's

13  leading.

14        But I think, given what we're trying to do here,

15  to see if you can lay a foundation for the later

16  questions you want to ask, Attorney Kang, you need to be

17  clear in your question because I'm going to strike his

18  answers.  Because there were a, couple.  I would have to

19  go back to find the specific ones, where it's like he

20  knew what he wanted to get in his testimony.  He's

21  checking a box.  Oh, I got that.  I explained that to the

22  jury.  That's not how it works.  You get to ask the

23  question.  I get to rule on an objection.

24        So, again, I am very reluctant to interrupt on

25  my own.  But I'm just very knowledgeable what's going to

1    happen here would happen, has happened, and might

2    continue.  Obviously, I would expect that counsel will

3    ask the questions in a way that are helpful to this

4    pursuit of evidence for the jury, and opposing counsel

5    will object or move to strike.  Object before the

6    question gets answered or move to strict promptly after.

7            MR. CUNNINGHAM:  Your Honor, I just want to add

8    one thing to that, if I may.  There were a couple of

9    times when the question didn't call for a hearsay

10   response.

11           THE COURT:  I know that.

12           MR. CUNNINGHAM:  Then he started answering and

13   started talking about hearsay.  So that was the first

14   time I could object.

15           THE COURT:  You stand up.  I will interrupt the

16   witness.  Now, I don't usually like anybody to stand in

17   the middle of an answer.  That's because the answer has

18   to come in.  But I think in this case, we're well past

19   understanding the issues and knowing.  And I may say to

20   you, I can't rule.  I can't tell him anything at this

21   time if you want me to strike that or object.  But if you

22   object to the question, you should get up, and he's

23   trying to answer over you, obviously, you have priority.

24           MR. CUNNINGHAM:  Thank you, Your Honor.

25           THE COURT:  All right.  Let's bring the witness

1   in.  Liana, will you go out and see if the witness the

2   witness is in the corridor.

3        MR. CUNNINGHAM:  Your Honor, I have not always

4   been standing because my right knee is giving me a lot of

5   problems.

6        THE COURT:  I appreciate you letting me know.

7   It is the custom in Connecticut courts for lawyers to

8   stand when they address the Court.  But if you have a

9   reason, it's fine with me.  I don't know what the jury

10  will think of it, to be honest with you.  That's not my

11  problem.  I have bad knees.  I still have them.  And I

12  understand.

13       Thank you for coming back.  You may be seated.

14       The jury will come out, Liana, please.

15       THE COURT:  I'm going to ask you outside the

16  presence of the jury, sir, so I don't have to do it in

17  front of them.

18       Would you please listen carefully to the

19  question and answer only that question.  Okay.  Thanks

20  very much. I think 100 percent of my witnesses have had

21  to have that instruction.  Thank you.

22       (In the presence of the jury at 11:39 a.m.)

23       THE COURT:  Everybody be seated.

24       When you can, we're ready to continue with Mr.

25  Goldfarb's testimony.  Whenever you're ready, Attorney

1326

1   Kang.

2   BY MR. KANG:

3       Q.   Mr. Goldfarb, I want to ask you about something

4   called fee forgiving.  Have you heard of fee forgiving?

5       A.   Yes.

6       Q.   Can you describe what fee forgiving means?

7       A.   Fee forgiving is when a provider fails to bill

8   or fails to collect a patient's deductible, co-insurance,

9   or any amounts that would otherwise be due.

10      Q.   Was the investigation that you supported and

11  worked on in BioHealth and Epic, were those fee forgiving

12  investigations?

13      A.   Yes.

14      Q.   And why is it that SIU investigates fee

15  forgiving?

16      A.   Because fee forgiving is a practice that causes

17  abusive and wasteful claims to be paid.  It drives up the

18  cost of health care for plans.

19          MR. CUNNINGHAM:  Objection, Your Honor, 702.

20          THE COURT:  Sustained.

21          MR. CUNNINGHAM:  Move to strike the answer.

22          THE COURT:  Answer is stricken.  Jury should

23  disregard it.

24  BY MR. KANG:

25      Q.   You said that fee forgiving involves the waiver

1    of what components again?

2        A.    Deductibles, co-insurance, and other amounts

3    that would be due under the plan, for instance, the

4    balance bill.

5        Q.    What is a deductible?

6        A.    Deductible is defined in the plan.  And it's the

7    amount that the insured must pay before any benefits are

8    payable under the plan.

9        Q.    What is co-insurance?

10       A.    Co-insurance is a percentage of the allowable

11   under the plan.  The allowable is essentially the price

12   which Cigna puts on the claim which is typically less

13   than the billed charge.

14       Q.    The IFP policies that are at issue in this case,

15   Mr. Goldfarb, that you have read, what's the co-insurance

16   percentage in those policies?

17            MR. CUNNINGHAM:  Objection, Your Honor.  The

18   policies speak for themselves.

19            THE COURT:  Do you claim it, sir?

20            MR. KANG:  Yes, I do.

21            THE COURT:  Is he speaking of one policy or is

22   he speaking of his knowledge based on his nine years at

23   the company knowledge of working with policies?

24            MR. KANG:  I believe he's testified that he's

25   reviewed the representative policies of the parties.

1    THE COURT:  But the question needs to be limited

2  to that, number one.  And I believe that the policies on

3  this point, in particular, changed close to when he came

4  to Cigna.  So I think you have to break this down.  I

5  have explained why so I'm not going to waste your time.

6    Go ahead.

7  BY MR. KANG:

8    Q.   Have you read the IFP policies with respect to

9  the Florida individual plans that the parties have agreed

10  to be representative in this case?

11    A.   Yes.

12    Q.   And based on your review of those policies, what

13  is the co-insurance requirement?

14    A.   It's 50 percent for out-of-network benefits.

15    Q.   So with respect to BioHealth and Epic, what, if

16  any, steps does SIU take with respect to investigating

17  whether providers have engaged in fee forgiving?

18    A.   There's a variety of steps.  They look at claims

19  data to see amounts billed.

20    Q.   Let's stop there.  Why does SIU look at claims

21  data for amounts billed?

22    A.   If the bill charged is significantly higher than

23  peers, there's a greater likelihood that the provider is

24  not collecting the full amount.  And so that is a factor

25  that we consider.

1    Q.    And when you say claims data, what is that?

2    A.    Claims data is information that can be pulled

3    from Cigna's electronic claim systems.  You can run a

4    query based on factors that you put in.  Relevant here, a

5    query would be done on claims paid to the Labs, to see

6    what claims they submitted and what was paid.

7        THE COURT:  I need to instruct the jury, if

8    you're going to pursue this line, that the jury considers

9    this solely, remember, we're on Cigna's claim, which is

10   unjust enrichment.  And I'm allowing them to use as

11   evidence what they call fee forgiveness for you to

12   consider.  However, it has no bearing, none, zero, you

13   should put -- if it's a bucket called fee forgiveness,

14   you put it out of the room in the jury deliberations when

15   you consider the Labs claims as to any claim based upon a

16   policy that was in existence prior to January 1, 2015.

17   Good.  I got that right.  Okay?

18        So that's why, Attorney Kang, I need you to be

19   specific about what his testimony relates to.  I realize

20   you can offer information about this policy.  I don't

21   think he said it's in the policy.  But, certainly, that

22   what it relates to is in the policy.  But, again, he

23   wasn't there investigating pre, you know, the 2014.  You

24   need to establish the fence around which his answers will

25   be received by the jury, and they need to keep it in mind

1    what I just said.

2         Go ahead, sir.

3         MR. KANG:  Thank you, Your Honor.

4    BY MR. KANG:

5    Q.   When I ask these questions,  Mr. Goldfarb, I

6    will try to limit it to that time period that you

7    described, May of 2015 to 2020.  Okay.

8         So you mentioned claims data is one of the

9    things that SIU would look into with respect to

10   investigations into fee forgiving?

11   A.   Yes.

12   Q.   And where -- is that claims data that Cigna

13   possesses?

14   A.   Yes.

15   Q.   And that can be you said queried.  What do you

16   mean by queried?

17   A.   You type into the computer the various fields of

18   information that you want, and then it creates a report

19   that contains those fields.

20   Q.   And may we put up Joint Exhibit 41, Mr. Salazar.

21        Do you see this document?  And may we publish,

22   Your Honor?

23        THE COURT:  Yes.  It's already in evidence.

24   BY MR. KANG:

25   Q.   Mr. Goldfarb, do you see this exhibit?

1    A.    Yes.

2    Q.    What is this exhibit?

3    A.    This exhibit is claims data from Cigna's claims

4 processing system with respect to claims that BioHealth

5 submitted to Cigna.

6    Q.    And when you said that there would be a query

7 run for claims data, is this the type of data that would

8 be -- that could be generated?

9    A.    Yes.

10    Q.    And there are a number of fields, columns, in

11 this spreadsheet, correct?

12    A.    Yes.

13    Q.    Are there actually a lot more columns that can

14 be generated from the claims data?

15    A.    Yes.

16    Q.    But is it your understanding we've limited it to

17 the issues relevant in this case?

18    A.    Yes.

19    Q.    How is this -- who compiles this information, to

20 your knowledge?

21    A.    This is information that's taken from claim

22 forms that are initially submitted to Cigna that contains

23 the patient and the provider and the diagnosis and the

24 codes billed.  That would all come from -- and the

25 charged amount -- that would all come from the provider.

1    MR. CUNNINGHAM:  Objection, Your Honor.  The

2  dates of service --

3    THE COURT:  Right.  What you have up is -- I

4  assume he'll go to the time period.

5    MR. CUNNINGHAM:  But there's been no predicate

6  laid.

7    THE COURT:  He's not testifying about these

8  entries.  Now that it's refreshed on the document, you

9  should take it down.  Because you're not asking him about

10  what's up on the screen.  We take things down when you

11  don't ask.

12    MR. KANG:  Then take it down.

13    THE COURT:  If you want to scroll to 2015 May or

14  whatever time period, you can do that, sir.  Please don't

15  misunderstand me.

16    MR. KANG:  My main focus was going to be on the

17  headers.  Maybe we can zoom in.

18    THE COURT:  Then highlight it, because it would

19  help.  I'm crawling into the screen trying to read it.

20  BY MR. KANG:

21    Q.  Do you see those columns and the descriptions in

22  those columns, Mr. Goldfarb?

23    A.  Yes.

24    Q.  Do each of these columns describe the

25  information that's in the claims data?

```
 1      A.    Yes.

 2      Q.    Sir, I will not go through all of these but

 3   maybe just a few.  Do you see that column N, charge

 4   amount?

 5      A.    Yes.

 6      Q.    What is that?

 7      A.    That is the billed charges that the -- here

 8   BioHealth had submitted to Cigna for the particular claim

 9   line.

10      Q.    Do you see column Q, claim received date?

11      A.    Yes.

12      Q.    What is that?

13      A.    That's the date that Cigna received the claim

14   from BioHealth.

15      Q.    How about column R, claim paid date?  What does

16   that mean?

17      A.    Claim paid date tells you the date that the

18   claim was last adjudicated.

19      Q.    What does adjudicated mean?

20      A.    Adjudicated means that an action was taken on

21   the claim.  And it would either be to pay the claim or to

22   deny the claim.

23      Q.    Okay.  So when you say paid, it's either paid or

24   denied?

25      A.    Yes.
```

1334

1    Q.    And how is that field populated?

2    A.    I don't understand the question.

3    Q.    Is it manually entered in or is it

4   automatically?

5    A.    It's automatically populated.

6    Q.    How about column T, situs TE Code.  What does

7   that mean?

8    A.    That's the state in which the employer group

9   plan is sitused.

10    Q.    Located?

11    A.    Yes.

12    Q.    Do you know of something called an explanation

13   of payments, sir?

14    A.    Yes.

15    Q.    Is that also known as an EOP?

16    A.    Yes.

17    Q.    What's an EOP?

18    A.    An EOP is a document that's generated

19   automatically when a claim is adjudicated, so paid or

20   denied, that is sent to the provider that provides

21   information about how every claim line was adjudicated.

22   Whether the claim line was paid, whether the claim line

23   was denied, and the reasons why.

24    Q.    Is there a column on this claims data that

25   reflects the date of the EOP?

1335

1    A.    Yes.

2    Q.    What column is that?

3    A.    Column R, claim paid date.

4    Q.    It doesn't say EOP on there, though, you would

5    agree?

6    A.    I agree.

7    Q.    How do you know that that is the date that the

8    EOP is generated?

9    A.    Because I have familiarity with Cigna's claim

10   systems.  And I know that when claims are adjudicated,

11   that an EOP automatically generates and is sent to the

12   provider on the date that the claim is adjudicated.

13         MR. CUNNINGHAM:  Objection, Your Honor.  This is

14   still vague.  There's been no attempt to tie this to a

15   specific date.  There's no date on this document.  These

16   claim dates all predate his involvement with Cigna by

17   three years.

18         THE COURT:  Is it correct that the jury should

19   consider this testimony based on his personal knowledge

20   about what he learned happened at the company in

21   connection with these topics?

22         MR. KANG:  Yes, Your Honor.

23         THE COURT:  May 2015 through I guess we're going

24   to 2020.  I don't know that I think that's a relevant

25   period.  But after May of 2015.

1336

1    MR. KANG:  If you want me to ask with every

2    question that, I'm happy to.

3    THE COURT:  It depends on how long this goes on.

4    For now, I think the jury will remember.  If you switch

5    to another time period or something that wouldn't be

6    clear about that, you should probably let us know.  But

7    for now, we'll let you skip that and everybody's going to

8    keep that in their brain.  You have a bucket called May

9    15th and forward, and this information and testimony goes

10   into that bucket.

11    The other thing I want to know, sir, is am I

12   correct that one of the Labs would not have been paid?

13   And I should put it correctly.

14    That you do not seek recovery from all three of

15   the labs because payments were not made as to one of

16   those labs after, I thought it was 2011.  '14, the

17   flag went on.  I know you are asking about BioHealth and

18   the labs.  I want to know if the jury should understand

19   not only time limit use, but also lab limit use in your

20   claim.  Because your claim is going to have to be

21   answered as to each lab.  Just like the Labs' claims.

22   You are going to answer, ladies and gentlemen, as to each

23   lab as to what did they prove or not.

24    So, I guess you have to tell me because,

25   otherwise, I have no basis to know whether this is, you

1  know, how to rule.

2      MR. KANG:  We're seeking recovery as to all of

3  the labs.

4      THE COURT:  And when did the first one of those

5  labs, when would be the last amount of money paid by you

6  folks in the bucket for that Lab's damages?  The first

7  one it stopped with.

8      MR. KANG:  Are you referring to PB Labs, Your

9  Honor?  I believe that was in 2014.

10      THE COURT:  That's what I thought.  So none of

11  his personal knowledge relates to anything to do with PB

12  Labs.

13      MR. KANG:  I believe Ms. Canto testified --

14      THE COURT:  I know.  I'm just trying to help the

15  jury understand what they are hearing and what that

16  evidence is and what is going to have to be considered by

17  them when they deliberate.  That's all, sir.

18      MR. KANG:  Well, maybe I can lay some

19  foundation.

20      THE COURT:  That would be helpful.  I think

21  because then they'll understand there's not only this May

22  15 and forward date, but there's also a Labs limitation

23  to consideration of the testimony at some point.

24      MR. KANG:  I appreciate that clarification.

25  BY MR. KANG:

1    Q.   Mr. Goldfarb, did you also have personal

2  involvement in the PB Labs matter?

3    A.   Yes.

4    Q.   What was the nature of your involvement in the

5  PB Labs matter?

6    A.   To provide advice to investigators regarding

7  developments in that matter, to review investigative

8  steps.  Our investigations are always generally backward

9  looking.  So the fact that I was hired on 2015 doesn't

10  mean I can't investigate claims that were submitted years

11  before.

12         THE COURT:  That's a good example of what I

13  spoke to you before the jury came out.  They will able to

14  tell you.  I have told every witness I think so far,

15  you've got to answer the question.

16         The question was what's the nature of your

17  involvement.  And now you're dropping into this general

18  statement about investigations and when you're hired and

19  you look back because that's when an investigation is.

20  He didn't ask that.  Thank you.

21         Strike that, ladies and gentlemen.

22         Go ahead, sir.

23         MR. KANG:  The entire testimony?  Can he answer

24  the first part, Your Honor?

25         THE COURT:  I think he already did.  What's the

1    nature of your involvement in the PB Labs matter?  To

2    provide advice to investigators regarding developments in

3    that matter, to review investigative steps.

4            If you want to ask more detail or what else did

5    you do, you can do that.

6            MR. KANG:  I just wanted to know --

7            THE COURT:  Go ahead and ask him.

8    BY MR. KANG:

9        Q.  Keeping the judge's instructions in mind, Mr.

10   Goldfarb, what was your involvement in the PB Labs

11   matter?

12       A.  Providing advice about investigative steps,

13   overseeing developments in the matter, which developments

14   might relate to and do relate to claims that came in from

15   basically the initiation of the Lab through the last paid

16   claim.

17       Q.  Was that involvement that you had in the PB Labs

18   matter with respect to your legal function as well as

19   your later SIU role?

20       A.  Both.

21       Q.  And if you -- did you begin -- when did you

22   begin working on the PB Labs matter?

23       A.  Shortly after I started at Cigna in May 2015.

24       Q.  And if you had to put, again, the end time

25   period as to when, putting aside preparation on this

1   litigation, what would be the end date in terms of your

2   involvement in the PB Labs matter?

3       A.   Sometime in 2020.

4       Q.   So you have personal knowledge as to the matters

5   for all three of these labs, Mr. Goldfarb?

6       A.   I do.

7       Q.   We were talking about fee forgiving, right?  And

8   one of the things that you had indicated could be done

9   with respect to a fee forgiving investigation was to

10  obtain claims data, correct?

11      A.   Yes.

12      Q.   Was a fee forgiving investigation, to your

13  knowledge, also initiated as to PB Labs?

14      A.   Yes.

15      Q.   So there was a fee forgiving investigation as to

16  all three of those Labs?

17      A.   Yes.

18      Q.   If we could put up -- and I want to go back to

19  the claim data again, Mr. Salazar.

20           We had just put up Joint Exhibit 41 which was

21  the claims data for BioHealth, correct?

22      A.   Yes.

23      Q.   If we can put up Joint Exhibit 42, Mr. Salazar.

24           Do you see this document, Mr. Goldfarb?

25      A.   I do.

1341

1    Q.   What is this document?

2    A.   This is claims data with respect to claims

3    submitted by Epic Reference Labs to Cigna.

4    Q.   So this is the type of claims data that would

5    have been obtained to conduct a fee forgiving

6    investigation into Epic?

7    A.   Yes.

8    Q.   And, again, if we can zoom in on the headers,

9    Mr. Salazar.

10         Do these appear to be the same type of headers

11   that we saw in the BioHealth claims data?

12   A.   Yes.

13   Q.   And we were talking about the column R, claim

14   paid date, and you were talking about an EOP?

15   A.   Yes.

16   Q.   That is the column which reflects the date that

17   an EOP is generated?

18   A.   Yes.

19   Q.   And to your knowledge, how are EOP's transmitted

20   to providers?

21   A.   In this case, all of the Labs were submitting

22   the claims electronically.  And, therefore, EOPs were

23   sent back electronically.

24   Q.   So, Mr. Salazar, can we just zoom in on that

25   column R so we can see a couple of those dates.  We won't

```
 1    go through all of these, but I want to see if we can zoom

 2    in a little bit more, sir.

 3           Do you see the claim paid date, the first one is

 4    November 23, 2016?

 5       A.   Yes.

 6       Q.   So is that the date then that an EOP, with

 7    respect to this particular claim in this row, would have

 8    been sent to the provider?

 9       A.   It is the last EOP that was sent to the

10    provider.  There could have been an earlier EOP also

11    sent.

12       Q.   Again, how is this generated?

13       A.   The claims data?

14       Q.   The EOPs.  I'm sorry.

15       A.   The EOP is automatically generated by the claims

16    system.  And based on how the claim was adjudicated and

17    that information is sent up, put on the EOP, and

18    electronically transmitted to the provider.

19       Q.   Can we put that one down.  Take a look at Joint

20    Exhibit 40.  I'm not going to spend a whole lot of time

21    here.

22           Do you recognize this document, Mr. Goldfarb?

23       A.   Yes.

24       Q.   Is this claims data with respect to PB Labs?

25       A.   Yes.
```

1    Q.   Is this the type of data that would have been

2   reviewed by SIU in connection with their fee forgiving

3   investigation into PB Labs?

4    A.   Yes.

5    Q.   So claims data you said is one step that SIU

6   takes in pursuing fee forgiving investigations.  What

7   else does SIU do?

8        MR. CUNNINGHAM:  Objection as to time frame,

9   Your Honor, vague.

10        THE COURT:  I think we need to, otherwise, we'll

11   get a lot of objections.

12   BY MR. KANG:

13    Q.   So the 2015 to 2020 time period.  Based on your

14   personal knowledge, Mr. Goldfarb, what, if anything else,

15   does SIU do to conduct fee forgiving investigations?

16    A.   They reach out to the provider and they ask the

17   provider for their billing policy, if they have one.  And

18   they ask the provider to provide billing and collection

19   ledgers.  They also may do outreach to patients, either

20   through letters, written correspondence, or phone calls,

21   to gather information from the patient's perspective

22   relevant to whether they have paid amounts to the

23   provider.

24    Q.   Okay.  Let's take those one by one.

25        So the first thing I heard you say was you reach

1344

1  out to providers.

2      A.   Yes.

3      Q.   And what is the purpose?  Why does SIU reach out

4  to the provider?

5      A.   The provider has some of the best evidence, if

6  you will, of whether they're collecting and billing for

7  patient cost share, because they should have records of

8  this.  And if they are collecting money, surely, they

9  have records of money they collected.  And it would just

10  be a very valuable source of information to consider.

11      Q.   In the 2015 to 2020 time period, were you aware

12  of providers that actually provided information to

13  support their billing and collection?

14      A.   Typically, in our investigations, providers

15  cooperate with our request and provide billing and

16  collection ledgers, as well as billing policies if they

17  have them.

18      Q.   In this instance, with respect to these three

19  labs, did the three labs provide their billing and

20  collection ledgers?

21      A.   No.

22      Q.   Could we put up, Mr. Salazar, Cigna Exhibit

23  2019.

24          Mr. Goldfarb, this document has been admitted in

25  evidence as Cigna Exhibit 2019.  Do you recognize this

1    document?

2         A.    I do.

3         Q.    What is your understanding of this document?

4         A.    This is a patient billing and collection ledger

5    that was produced in this litigation from the Labs.

6         Q.    Is this the type of billing and collection

7    ledger that you are familiar with in the 2015 to 2020

8    time period?

9         A.    Yes.

10        Q.    How many of these types of ledgers have you

11   reviewed?

12        A.    Hundreds.

13        Q.    And when you say this was produced in connection

14   with the litigation, during the 2015, 2020 time period,

15   did this information ever -- was this information ever

16   sent by the Labs to SIU?

17        A.    No.

18        Q.    Let me zoom in.  What are reviewing when you

19   review collection ledgers like this?  What are you

20   reviewing it for?

21        A.    Primarily to see whether they are collecting

22   money.  Whether there's amounts shown that the patient is

23   paying, as well as documentation of billing and efforts

24   to collect, such as sending out statements, calling

25   patients, sending patients to collections if they don't

1  pay.

2      Q.    Can you discern that information from billing

3  and collection ledgers like this?

4      A.    Yes.

5      Q.    Let's zoom in, if we can, Mr. Salazar, on column

6  M.

7          THE COURT:  We're looking at 2014.  February of

8  '15.  Is this just an example of a report that's in the

9  form it was created in the time period he's talking

10 about?

11         MR. KANG:  This was produced later, Your Honor,

12 after 2014.

13         THE COURT:  And it was produced after 2020.  If

14 he wants to testify that these are the kind of reports he

15 looked at in connection with these investigations of

16 these three labs from May of 2015 to whatever you're

17 using, 2020, I don't know why, but he can do that.  I

18 just don't understand what his answers are.

19 BY MR. KANG:

20     Q.    Can we go to column M as in Mary.  Thank you.

21         Do you see column M that states patient

22 (noninsurance payments)?

23     A.    Yes.

24     Q.    Is this the type of header or column that you

25 have come to see in billing and collection ledgers

1    between the time period of 2015 and 2020?

2         A.    Yes.

3         Q.    And what information is provided in those

4    columns?

5         A.    This shows the amounts that the Labs

6    collected from patients for all of these individual

7    claims that were submitted.

8         Q.    And have you had a chance to review this entire

9    document?

10         A.    Yes, I have.

11         Q.    Do you know how much, if you add up all of the

12    rows in column M, how much that comes out to?

13              MR. CUNNINGHAM:  Objection, Your Honor.  This is

14    hearsay.  Beyond the scope of his disclosed testimony.

15              THE COURT:  I normally would not sustain that

16    objection, Attorney Kang, because it's probably printed

17    at the bottom of the form and it's in evidence.  The

18    difficulty I'm having is, you know, when we draw a line

19    in old arithmetic and add up the numbers, what are we

20    adding?  I mean, I'm looking at 2014.  Is that PB?  I'm

21    going to see later ones that's not PB Labs.  This isn't

22    giving me information on them.  I don't know what the

23    answer is being used, offered to the jury for.  And,

24    thus, it makes it very hard for me to rule.  And there

25    are objections and I have to rule.  And I'm sorry because

1348

1    there's a lot of interruptions.  I apologize.  We don't

2    like that.  I'm sure counsel doesn't like to do it.

3         But it's just the difficulty with the basis of

4    his personal knowledge, as required under the rules for

5    him to testify, are limited to a time period that I don't

6    know how much of this report is covered by that.  Maybe a

7    lot.  Maybe there's just a page I happened to look at has

8    these earlier dates.  And I know you want him to testify

9    this is how they did it then, but he can't do that.  I'm

10   sorry, sir.

11        That's sustained.  I don't really know.  I think

12   there was an objection.  The total.  If you want to point

13   it to the jury's attention.  Again, I don't know,

14   sometime you will have to explain to them what the total

15   is comprised of.  But that's fine.  I understand you

16   aren't doing that maybe right now.  And that's fine.  The

17   jury has to understand they have to put the evidence

18   together, the pieces.  If you want to give a total

19   number, it's in evidence.  You can do that.

20        I'm sorry.  Go ahead.

21   BY MR. KANG:

22     Q.   If we were to add up all of those rows on column

23   M, what would you understand that to represent?

24     A.   That would represent the total amount of money

25   collected by all three Labs in this case from all

1   patients whose claims are listed on this spreadsheet.

2       Q.   I won't go through the hundreds of pages in

3   this, but do you see, at least on this page, anything

4   other than zero?

5       A.   No.

6       Q.   Mr. Salazar, could we see the column V.

7            Do you see that header, Mr. Goldfarb?

8       A.   Yes.

9       Q.   Have you seen headers like this in the time

10  period 2015 to 2020 when you've reviewed hundreds of

11  other billing and collection ledgers?

12      A.   Yes.

13      Q.   What do you understand this column to mean?

14      A.   This is the date, the first statement date.

15  That means it's the first date which they are

16  representing that they sent a bill to a patient for this

17  particular claim on each claim line.

18      Q.   Have you had a chance to review all of these,

19  the rows under this column?

20      A.   Yes.

21      Q.   Were all of the rows populated with a date in

22  the first statement date?

23      A.   No.

24      Q.   What does that signify to you?

25           MR. CUNNINGHAM:  Objection, 702.

1            THE COURT:  Does it relate?  I mean, I can't see

2    all the columns to see all dates, but I thought I saw a

3    2014 in there.  Again, that would be you can't offer

4    that.  You have got time problems here with his testimony

5    as to what is to be considered by the jury.  I hope it's

6    no surprise, I will put in the interrogatory for them,

7    they're going to tell us which Labs, if they decide

8    somebody owes money to you on your claim, you've proven

9    it, I'm going to ask them to tell me how much is there

10   claim as to 1, 2, 3.  That's why I'm fixated on the time

11   period of his knowledge, because he is 701 personal

12   knowledge witness.

13           So I don't think you can -- the objection is

14   sustained because I don't see the basis of the question

15   or the scope of the question, what the answer is offered

16   as to which defendants.

17   BY MR. KANG:

18       Q.   Do you see rows on here that relates to all

19   three of the Labs?

20       A.   Yes.  This is a document that is saying that the

21   Labs produced, that shows claims billed by all three Labs

22   in this case.

23       Q.   Is there anything in here in this --  in this

24   spreadsheet, Mr. Goldfarb, indicating a second statement

25   date?

1   A.   No.

2   Q.   Is there anything on here reflecting a date that

3   a first phone call was made?

4   A.   No.

5   Q.   A second phone call?

6   A.   No.

7   Q.   Is there anything on here reflecting a date of a

8   referral to an outside collection agency?

9   A.   No.

10   MR. KANG:  Should we put this exhibit down?

11   THE COURT:  Just a point of clarification.  You

12  said, yes, this is a document saying Labs shows claims

13  billed by all three Labs, something to that effect.  Sir,

14  you just gave that answer.

15   THE WITNESS:  Yes.

16   THE COURT:  This is a Cigna document, correct?

17   THE WITNESS:  No.  This was produced by the

18  Labs.

19   THE COURT:  All right.  And they did not produce

20  it by each individual Lab.

21   THE WITNESS:  No.

22   THE COURT:  Thank you.

23  BY MR. KANG:

24   Q.   Could we put up Cigna Exhibit 30, please.

25   Actually, before we do that.

1352

1    You had testified earlier, Mr. Goldfarb, that as

2  a part of fee forgiving investigations one of the things

3  that you ask for are billing policies and procedures?

4    A.    Yes.

5    Q.    Why do you do that?

6    A.    Billing policy and procedure is the policies

7  which the provider is saying that they follow.  So we

8  want to know what it is they are holding themselves to

9  as a written representation of this is our policy.

10    Q.    Have you reviewed billing policies in connection

11  with SIU investigations that you have personally worked

12  on?

13    A.    Yes.

14    Q.    Could we put up Cigna Exhibit 30 that's been

15  admitted in evidence.

16    Do you recognize this document, Mr. Goldfarb?

17    A.    I do.

18    Q.    What's the title of this document?

19    A.    MBC Medical Billing Choices, Inc. Billing Policy

20  and Procedure Guide.

21    Q.    Is this the type of document that you have

22  reviewed in connection with many other SIU

23  investigations?

24    A.    I have reviewed this document in connection with

25  these investigations.  And, yes, it is a type of document

1    that I have reviewed in many other investigations.

2        Q.    How did you come to review this document in

3    connection with your personal involvement with the

4    investigation into the Labs?

5        A.    When I arrived at Cigna, my supervisor, Bill

6    Welch, assigned these matters to me.  And in the course

7    of doing that, he forwarded me a lot of information that

8    had already been gathered in the course of the

9    investigation before I got there.  Among the things that

10   is had forwarded me was various correspondence between

11   himself and the Labs.  He forwarded me emails that he

12   received between himself, the Labs, their counsel.  And

13   this billing policy was among the documents that were

14   provided to me and was an attachment to one of the

15   emails.

16       Q.    Do you know why it was that the Labs produced

17   this document to Mr. Welch?

18       A.    Because it had been requested as part of the fee

19   forgiving investigation.

20       Q.    If we could turn, Mr. Salazar, to page 642096.

21             Is this page entitled Bad Debt and Collections?

22       A.    Yes.

23       Q.    Based on your personal involvement, what did you

24   come to understand this page to reflect?

25       A.    This page reflects MBC's policies with respect

1354

1  to collecting or making attempts to collect the

2  amounts from patients.

3          MR. CUNNINGHAM:  Objection, this is all hearsay.

4          THE COURT:  I thought he said it was in

5  evidence.  I thought he said the document is in evidence.

6          MR. CUNNINGHAM:  I'm sorry.  I apologize.

7          THE COURT:  I didn't check it.  I assume

8  Attorney Christ is checking those things but I usually

9  check.

10  BY MR. KANG:

11      Q.   Do you see under the definition section, Mr.

12  Goldfarb, something entitled "internal collections"?

13      A.   Yes.

14      Q.   Can you read that section to the jury?

15      A.   At least two formal letters are sent and two

16  phone calls are made to the responsible party when an

17  account remains past due.  If those actions do not

18  produce a response, further action will be taken

19  according to conditions set forth by the client.

20      Q.   What did you understand this to mean when you

21  reviewed it back in 2015?

22      A.   This was a representation from the Labs that

23  this was the policy that they were following.  That they

24  were sending two formal letters to patients and two phone

25  calls to patients in effort to collect patient's

1    deductible coinsurance and other amounts that were due.

2        Q.    Based on the billing and collection ledger that

3    we just saw earlier was there any column indicating they

4    were in fact sending out two formal letters and making

5    two phone calls?

6        A.    No.

7        Q.    Mr. Salazar, could we go to the next part of

8    internal collections.

9            Can you read that to the jury, please?

10       A.    After all resources have been exhausted,

11   remaining account balances may be turned over to an

12   outside collection agency at the client's discretion.

13       Q.    When you reviewed this in 2015, what did you

14   understand this to mean?

15       A.    Again this was a representation by the Labs

16   telling us during the course of the investigation that

17   they were going to be sending patients to an outside

18   collection agency under certain circumstances.

19       Q.    Based on the many investigations you have

20   conducted, is that what providers do to collect patient

21   cost share, refer to outside collection agencies?

22       A.    Yes.

23       Q.    Based on the billing and collection ledger that

24   we looked at, was there any indication at that time that

25   the Labs were, in fact, turning over to an outside

1   collection agency as set forth herein?

2       A.   No.

3       Q.   If we could zoom out, Mr. Salazar.

4            I want to reference actually down at the bottom.

5   You see there's a revised 6-24-2014 date?

6       A.   Yes.

7       Q.   Did you see this document personally after you

8   joined the SIU?

9       A.   Yes.

10      Q.   I'm sorry, Cigna.

11      A.   Yes.

12      Q.   And what, if anything, caught your eye with

13  respect to that revision date?

14      A.   A couple of things.  First, the date on which we

15  asked for the policy was before 6-24-2014.  And then the

16  word "revised" suggests there was a prior policy in

17  effect before 6-24-2014 which led us to request that

18  policy.

19      Q.   Please stop there.  You are saying that the

20  request that was made to the Labs was prior to this

21  revision date?

22      A.   Yes.

23           THE COURT:  Can I have clarification that the

24  policy, the prior policy, was sought when he was actually

25  part of the investigative team?

1    MR. KANG:  Correct.  But he believed -- I

2    believe his testimony was, Your Honor, he personally

3    reviewed this document in 2015.

4    THE COURT:  Then did he say, we should get the

5    prior one.  In other words was he involved in what his

6    testimony was about, what "we" did?

7    BY MR. KANG:

8    Q.  Were you involved in these efforts to get

9    billing policies from the Labs in 2015 when you joined?

10   A.  And subsequently, we have asked for the prior

11   policy.

12   Q.  And did you ever get a prior policy?

13   A.  We have never got a prior policy including in

14   connection with this litigation where they would have

15   been obligated to produce that.

16   THE COURT:  Thank you very much for that, sir.

17   But you were not called to give that testimony.  Nor can

18   you give it.

19   MR. CUNNINGHAM:  Move to strike, Your Honor.

20   THE COURT:  Nor was it responsive to the

21   question.  Let me tell you the question, Did you ever get

22   a prior policy?  Answer was, We never got a prior policy.

23   Period.  End of your answer.  Turn it back to your

24   lawyer.

25   Ladies and Gentlemen, we'll disregard the rest

1358

1    of that answer.  Thank you.

2    BY MR. KANG:

3        Q.    Do you know whether a prior policy, Mr.

4    Goldfarb, even existed?

5        A.    I do not.

6        Q.    When was the request made by SIU asking MBC and

7    the Labs to produce their revised -- their billing

8    policy?

9        A.    The first request for a billing policy?

10       Q.    Yes. If you can recall.

11       A.    That was several months before June of 2014.

12       Q.    So the request for a billing policy had been

13   made several months before this revision date?

14       A.    Yes.

15       Q.    Can we put this down and put up Joint Exhibit

16   132?

17             Mr. Goldfarb, do you understand that the

18   document is admitted in evidence in this case?

19       A.    I do.

20       Q.    Have you read this memo prior to your testimony

21   today?

22       A.    Yes.

23       Q.    The title of the memo "Account for and

24   Presentation of Bad Debts".

25       A.    Yes.

1359

1      Q.    And it's dated December 10, 2014?

2      A.    Yes.

3      Q.    Is this email and attached memo before or after

4   that revised MBC billing policy?

5      A.    This email says here was December 10th, so this

6   was some four months, three and a half months after the

7   revised policy.

8           THE COURT:  Is this actually 132A?

9           MR. KANG:  That may be correct, Your Honor.

10          THE COURT:  Thank you.  Just making sure that's

11  what is up.

12  BY MR. KANG:

13     Q.    So this document is six months after the

14  purported date of a MBC billing policy?

15     A.    Approximately, yes.

16     Q.    That MBC billing policy purported that the

17  policy was to send out two statements to patients?

18     A.    Yes.

19     Q.    Can I direct your attention, Mr. Salazar, can we

20  go to the last page of the document.  Could we zoom in,

21  Mr. Salazar, to the paragraph that begins "as the company

22  has yet."

23          Mr. Goldfarb, can you read that sentence to the

24  jury?

25     A.    As the company has yet to be able to bill

1360

1    patients for their portion of services rendered, the

2    total amount of such billings is included as a reduction

3    of revenue and any related bad debt provisions should

4    also about deducted from revenue.

5         Q.    You understand there's been testimony in this

6    case that this memo was provided to the Labs' auditor?

7         A.    Yes.

8         Q.    So they are telling the auditor in December 10,

9    2014, that they are not even able to bill patients?

10        A.    Correct.

11        Q.    Six months earlier what were they telling Cigna?

12        A.    They were representing to Cigna that they were

13   sending two statements followed by two phone calls and in

14   their discretion sending certain patients to collections.

15        Q.    Do you understand that Cigna relied on that

16   representation?

17        A.    Yes, it did.

18        Q.    In your opinion is that representation truthful?

19        A.    It is not.

20              THE COURT:  I'm sorry, sir.  You know you had

21   the word "opinion" in that question.  It's also a

22   conclusion.  And I don't think it's for him to state as a

23   fact as opposed to why did he take another step?  Because

24   I questioned the veracity of this.  That would be a

25   proper question.  But that question, I'm sorry, it's

1    going to be stricken.  I cannot see how -- I'm sorry --

2    I'll stop.  It is an opinion and a conclusory statement.

3    BY MR. KANG:

4        Q.   So we mentioned going back to fee forgiving

5    investigations, correct?

6        A.   Yes.

7        Q.   You talked about claims data?

8        A.   Yes.

9        Q.   You talked about provider outreach?

10       A.   Yes.

11       Q.   And that provider outreach would involve asking

12   for billing policies.

13       A.   Yes.

14       Q.   What else would you ask from providers?

15       A.   The billing and collection ledgers.

16       Q.   And what else could be done?

17       A.   We could also reach out to patients either

18   through written communication or phone call to ask about

19   their experience.

20       Q.   Do you know whether those steps were done in the

21   investigations into the Labs?

22       A.   I do.

23       Q.   Do you know what the results of those

24   investigations -- contact with the patients were?

25            MR. CUNNINGHAM:  Objection, vague as to time.

1    THE COURT:  Sustained, rephrase.

2    MR. CUNNINGHAM:  Also, Your Honor, can you ask

3  Mr. Kang to take down exhibits.

4    THE COURT:  Yes, please it is longer in

5  evidence.  Sorry, it is in evidence.  It's no longer

6  being questioned on so whoever is running exhibits if

7  Attorney Kang has moved on you need to take it down.

8    MR. KANG:  Thank you, Your Honor.

9  BY MR. KANG:

10    Q.  Let's talk about 2015 to 2020.  Do understand

11  that patient contact was with respect to fee forgiving

12  investigations into the Labs?

13    A.  Yes.

14    Q.  Specifically which Labs?

15    A.  BioHealth and Epic.

16    Q.  Do you understand there was a fee forgiving

17  investigation into PB Labs in 2014?

18    A.  Yes.

19    Q.  But that predates the window of time that we're

20  talking about here?

21    A.  Yes.

22    Q.  Do you understand there's also a fee forgiving

23  flag placed on PB Labs?

24    A.  Yes, I know that.

25    Q.  In order for there to be a flag placed on a

1363

1    provider what -- how does that happen?  How does SIU come

2    to that conclusion?

3        A.   Before placing a denial flag on a provider, the

4    investigator, their manager and others will look at the

5    totality of all the evidence they would have gathered to

6    date and if there's a reasonable belief that the claims

7    being submitted to Cigna are not covered for a certain

8    reason, then they will place that flag.  Because we have

9    an obligation to those plans like the Miami-Dade School

10   District to protect their money if we reasonably believe

11   that the claims being submitted are not covered, a denial

12   flag is placed.

13       Q.   Are you familiar with something called "remark

14   codes"?

15       A.   I am.

16       Q.   Is there a remark code that's associated with

17   denials for fee forgiving?

18       A.   Yes.

19       Q.   And are there also remark codes that are

20   associated with flags for what's called "services not

21   rendered as billed"?

22       A.   Yes.

23       Q.   Are those both SIU-related denial flags?

24       A.   Yes, they are.

25       Q.   Are there other denial -- remark codes or denial

1  codes that's used at Cigna that are not SIU denials?

2      A.   Yes.

3      Q.   Are you aware of a remark code, denial code

4  that's entitled 1698?

5      A.   I'm familiar with it.

6      Q.   Is that an SIU denial?

7      A.   It is not.

8      Q.   How about 1648?  Are you familiar with that?

9      A.   Yes, I am.

10     Q.   Is that an SIU denial?

11     A.   No.

12     Q.   Do the denial codes get transmitted to the

13 providers in some way?

14     A.   Yes.

15     Q.   How?

16     A.   They are included on --

17         MR. CUNNINGHAM:  Objection as to time frame,

18 vague.

19 BY MR. KANG:

20     Q.   2015 to 2020, Mr. Goldfarb.  Do remark codes

21 gets transmitted to providers in some way?

22     A.   Yes.

23     Q.   How?

24     A.   They are included on the explanation of payment.

25 That is automatically generated and sent to the provider

1    on the date that the claim is adjudicated.

2        Q.   I want to talk a little bit about going into

3    this denial flag.  What is a denial flag?

4        A.   A denial flag is instructions in the claim

5    system to not pay a particular service or an entire

6    claim.  And so it can be customized.  You can have an

7    investigation where only one type of service there's a

8    problem in which case you do a code-specific denial.  You

9    could also have an investigation where every claim is a

10   problem so then it would deny the entire claim.  We call

11   that an initial denial.

12       Q.   Again the SIU-related denials include fee

13   forgiving and services not rendered as billed?

14       A.   Yes.

15       Q.   Are there any others or are those the two main

16   ones?

17       A.   Those are the only ones in the relevant time

18   period.

19       Q.   In the relevant time period to your knowledge,

20   was -- did SIU have the capability of placing two flags

21   on claims?

22       A.   It did not.

23       Q.   So if, for example, with respect to PB Labs, if

24   SIU investigated PB Labs for medically unnecessary

25   services first and flagged them and later investigated

1    them for fee forgiving and corroborated fee forgiving,

2    was there the ability to place both flags on them?

3         A.    There was not.

4         Q.    Does the -- in that scenario, which flag would

5    be placed, fee forgiving or services not rendered as

6    billed?

7         A.    The one that was more inclusive.

8              MR. CUNNINGHAM:  Objection, Your Honor.  Is this

9    a hypothetical or tied to the case?

10             MR. KANG:  This ties with respect to PB Labs,

11   Your Honor.

12             THE COURT:  Let's have when he investigated this

13   or worked as a team investigating it.  In the time period

14   in question, did he look at flags placed, as to which lab

15   and when was it placed and does this system allow you to

16   place more than that flag?  I'm sorry, but the nature of

17   the proof and the limitations of his personal knowledge.

18             No offense, sir, but you were in a law firm when

19   a large part of this investigation occurred.

20             It's got to be -- the basis has to be laid,

21   Attorney Kang.

22             I apologize to the jury for all this

23   interruption.  I can tell by some of your expressions you

24   are getting tired of me talking about the time period.

25             In effect, you jumped to the last question of

1    what should be preceded by what he did in this case.

2    BY MR. KANG:

3        Q.    During the time period relevant for your

4    personal knowledge, Mr. Goldfarb, did the inability of

5    SIU to place two flags on a provider mean they were

6    abandoning their base for an earlier flag?

7        A.    No.

8        Q.    Why not?

9        A.    As you stated, during the relevant period, we

10   could only put one flag or the other.  So we had to

11   choose the more inclusive flag.  And what I mean by that

12   is if you had a services not rendered as billed flag and

13   it only applied to a certain claim, and later as was the

14   case here, evidence was developed that they were engaged

15   in fee forgiveness and that affects all claims, we had to

16   switch the flag from medical necessity or services not

17   rendered as billed to fee forgiveness because they have

18   an obligation to those group plans like the Miami-Dade

19   not to pay any of those claims because they all had the

20   problem of fee forgiveness.

21          If we left the other flag on, certain claims

22   would have paid even though we knew at that time that

23   they were engaged in fee forgiveness.  That's why the tag

24   was switched.

25       Q.    Have you heard the term "pended claims," Mr.

1   Goldfarb?

2       A.   Yes.

3       Q.   What's a pended claim?

4       A.   A pended claim, we have the ability in SIU to

5   put a provider in a medical records edit.  When the claim

6   comes in, it is pended.  It is put on hold.  A letter

7   goes out requesting records.  And pended means it's

8   literally waiting for the next step, waiting for the

9   records to come.

10      Q.   Were certain claims with respect to these three

11  labs pended?

12      A.   Yes.

13      Q.   What were they pended for?  Awaiting what?

14      A.   They were awaiting for the labs to provide

15  medical record documentation to support the claim.

16      Q.   And based on your involvement, were those

17  medical records provided by the Labs to substantiate

18  their services?

19      A.   They were not.

20      Q.   What is the difference between pending a claim

21  and denying a claim?

22      A.   Pending a claim, as we just said, is putting it

23  on hold, waiting for medical records.  If the medical

24  records come in, they would be clinically reviewed by a

25  medical director to determine whether the records support

1369

1    the services billed.  If they do, then the claim gets

2    paid.  If these don't, the claim gets denied.    If

3    medical records never come in, after ninety days, there's

4    an automatic denial.  The denial says, we requested

5    records.  You didn't produce them so the claim is denied.

6    And they have an opportunity to appeal that and provide

7    more records later if they wanted to do so.

8        Q.    If no records are provided during this pended

9    status after ninety days, is there automatically a

10   denial?

11       A.    Yes.

12       Q.    Is that done manually?

13       A.    No.

14       Q.    Automatically done?

15       A.    Yes, there are rules built into the claims

16   system that if records are not received within 90 days,

17   then we'll automatically deny.

18       Q.    Is that ninety-day period, is there some

19   significance to that?

20       A.    Yes.

21       Q.    Is that to comply with various Prompt Payment

22   Act laws?

23       A.    Yes, it is.

24       Q.    In this case, do you know whether there's a

25   Prompt Payment Act law that's applicable?

1    A.    Yes.

2    Q.    Is it Florida?

3    A.    Yes.

4    Q.    And do you know if the Florida Prompt Pay Act is

5    120 days?

6    A.    I know that it is, yes.

7    Q.    So the ninety-day period would resolve and

8    adjudicate claims within the 120 days?

9    A.    Yes, it would.

10    Q.    Mr. Goldfarb, we saw some claim level data.  Do

11    you remember that earlier?

12    A.    Yes.

13    Q.    Is there also something called "line level data"

14    that SIU would look at in, among other things, fee

15    forgiving investigations?

16        MR. CUNNINGHAM:  Objection, vague as to time

17    frame.

18        MR. KANG:  2015 to 2020, Your Honor.

19        THE COURT:  Okay, with that correction, allowed.

20    BY MR. KANG:

21    A.    Yes.

22    Q.    And would service line level data also be

23    reviewed for medical necessity issues?

24    A.    Yes.

25    Q.    What is the difference between service line data

1371

1    and claims data?

2        A.    Claims data, when you submit a claim on the

3    claim form you could have many different services.  So in

4    this case, we saw that they were submitting claims for

5    approximately 20 different drug tests on one date of

6    service, one claim form.  The claims data will only tell

7    you this is the date of the claim and this is the charged

8    amount.  It doesn't give you the detail of the specific

9    services they were billing for.

10            As opposed to line level data which breaks it

11   down and gives all the components of what they were

12   billing for.

13       Q.    So if, for example, a lab is billing 30

14   different substances tested in one date of service, how

15   would that appear on a claim level spreadsheet and on a

16   line level spreadsheet?

17       A.    On a claim level spreadsheet, you would just see

18   a claim number which is just an internal identifier of

19   Cigna of the number of the claim.  And then it would tell

20   you, for instance, this is the total bill charged for all

21   the services on that claim.  This is the total deductible

22   that's associated with the total co-insurance amount

23   outstanding.  It's a higher level of information.

24       Q.    And could we take a look, Mr. Salazar, at Joint

25   Exhibit 43 please?

```
 1                 THE COURT:  Is that in evidence?

 2                 MR. KANG:  I don't know if it is in evidence,

 3    Your Honor, but it is joint.

 4                 THE COURT:  Joint Exhibit 33 will be published.

 5                 MR. KANG:  43, Your Honor.

 6                 THE COURT:  43.

 7    BY MR. KANG:

 8        Q.   And if we can zoom in for the jury's

 9    convenience, Mr. Salazar.

10                 So, Mr. Goldfarb, do you recognize this

11    document?

12        A.   Yes.

13        Q.   Is this a line level data for Epic Reference

14    Labs?

15        A.   Yes.

16        Q.   Are you familiar with this document?

17        A.   I am.

18        Q.   How are you familiar with this document?

19        A.    We would have done a query in the claims system

20    during my employment that is asking for claims submitted

21    to Cigna by Epic Reference Labs, and this is pulling all

22    those claims and showing you the details about them.

23        Q.   As well as a section column that's called a

24    "remark code."  Do you see that?

25        A.   Yes.
```

1    Q.   What does that column reflect?

2         MR. CUNNINGHAM:  Excuse me, Your Honor, lack of

3    predicate.  Objection, lack of predicate. There's no time

4    frame here.  We have no idea --

5         THE COURT:  We're looking at 2014.  That's the

6    problem.

7    BY MR. KANG:

8    Q.   Maybe I should say, is this the type of -- well,

9    would you have requested in connection with your

10   involvement with Epic investigation between 2015 and

11   2020,  would you have requested this line level report?

12   A.   Yes.

13   Q.   Would you have reviewed that line level report?

14   A.   Yes.

15   Q.   So you see this column that's labeled "remark

16   code"?

17   A.   Yes.

18   Q.   What do you understand to be reflected in that

19   column header, that column header "remark code"?

20   A.   Remark code is a numerical code that's

21   associated with how a claim is processed.  Next to it, it

22   gives you the description and tell us what the remark

23   code means.

24   Q.   You said that there are certain remark codes

25   that are SIU specific?

1     A.    Yes.

2     Q.    Which ones are those?

3     A.    Services not rendered as billed.  The one

4  associated with charges which you are not obligated to

5  pay.  That is our fee forgiving exclusion.  Those are SIU

6  specific remark codes.

7     Q.    There are --

8          MR. KANG:  And, Your Honor, may I have a minute

9  with our technician?

10          THE COURT:  Sure.

11          MR. KANG:  This will be Exhibit 44.

12          THE COURT:  Joint?

13          MR. KANG:  Yes.

14          THE COURT:  Thank you.

15  BY MR. KANG:

16     Q.    Mr. Goldfarb, this is another line level report

17  associate with Epic.  Would you have reviewed this in the

18  relevant time period?

19     A.    Yes.

20     Q.    And if we could, Mr. Salazar, pull up as an

21  example 1698.

22          Do you see that remark code 1698 the unlisted

23  code is disallowed because a description of the services

24  required but not received?

25     A.    Yes.

1375

1    Q.   Would you have reviewed that code during the
2  2015 to 2020 time period?
3    A.   Yes.
4    Q.   As it appears on this spreadsheet that you saw
5  during the relevant time period?
6    A.   Yes.
7    Q.   What is your understanding as to what a 1698
8  code means?
9    A.   I'm familiar with this remark code.  And it
10  literally means what it says.  It's referring to an
11  unlisted code.  So if you scroll to the left, you will
12  see that the particular CPT code that they billed ends in
13  probably 99.  That's the unlisted code.  So they are
14  saying that that code you billed is disallowed you --
15  actually, let me rephrase that.  It is not necessarily a
16  99 code, but whatever code they billed is disallowed
17  because -- excuse me.  Yeah.  It was the 99 code.  It is
18  the unlisted code because a description of the service is
19  required but was not received.
20       It means we asked them, what are you doing?  And
21  they didn't provide the information.  Because an unlisted
22  code is a code for which, does not have a description.
23  So most codes in the code book, you know, it's a
24  five-digit number and refers to a specific service.
25    Q.   What if the provider gave a one-sentence

1    description of what drug was being tested?  Would that

2    satisfy 1698?

3         A.   It could.  So all they would have to do is tell

4    us what exactly you are doing.  In the case of a lab,

5    what lab service were you doing?  Then someone, it would

6    be reviewed to say, well, is there a CPT code for that

7    particular service?  If there was, they should be billing

8    that particular CPT code.  If they are not, than it would

9    be appropriate to bill the unlisted code.  But you get

10   this remark code when they don't provide that

11   information.

12        Q.   Take this down, Mr. Salazar.

13             When you joined Cigna in 2015, you said that SIU

14   was conducting and you joined, worked on the

15   investigation into the labs, correct?

16        A.   Yes.

17        Q.   And was the investigation into Epic, was that

18   ongoing?

19        A.   Yes.

20        Q.   What was the nature of that ongoing

21   investigation into Epic?

22        A.   The focus of that investigation was on fee

23   forgiving.

24        Q.   And you indicated that there was a lawsuit

25   initiated in August of 2015?

1    A.   Yes.

2    Q.   What, if any, impact did that have on Cigna's

3  decision as to whether to flag Epic for fee forgiving or

4  not?

5    A.   It had an impact.

6         MR. CUNNINGHAM:  Objection, calls for

7  speculation.

8         THE COURT:  Yeah, I don't know what the basis is

9  he has to know that.  If he made the decision obviously

10  he has knowledge, but otherwise I don't know.

11  BY MR. KANG:

12    Q.   Were you in the legal department at that time?

13    A.   I made the decision along with others.

14    Q.   You made the decision with respect to how to

15  treat Epic after the lawsuit had been filed?

16    A.   Yes.

17    Q.   Tell the jury what, if any, impact did the fact

18  that the lab sued Cigna have on the decision not to flag

19  Epic?

20         MR. CUNNINGHAM:  Your Honor, excuse me.  Is he

21  waiving privilege, voluntarily waiving privilege?

22         THE COURT:  Was he a lawyer or a SIU person at

23  this point?  Whatever.  You can establish that on cross.

24  If he was acting as a lawyer, I guess then you do what

25  you do.

```
 1              MR. KANG:  Your Honor, may I have a minute?
 2              THE COURT:  Sure.
 3    BY MR. KANG:
 4         Q.   Mr. Goldfarb, were there conversations that you
 5    had with SIU as a result of the litigation being filed?
 6         A.   Yes.
 7         Q.   And who was the supervisor who was overseeing
 8    the investigation into Epic?
 9         A.   Deanna Anderson.
10         Q.   As a result of those conversations that you had
11    with Ms. Anderson with respect to Epic, was a decision
12    made ultimately not to flag Epic?
13         A.   Yes.
14         Q.   But for the litigation being initiated, would
15    SIU have placed a flag on Epic?
16              MR. CUNNINGHAM:  Objection, calls for
17    speculation.
18              THE COURT:  Sustained.
19    BY MR. KANG:
20         Q.   Based on your involvement in the Epic
21    investigation, was there sufficient evidence to flag
22    Epic?
23         A.   Yes.
24         Q.   Why?
25         A.   Based on the information gathered, the totality
```

1  of the information that we had seen.  We had a reasonable

2  belief that they were engaged in fee forgiving.

3          THE COURT:  The question was, what would you

4  have done or not what you would have done, I'm sorry.  It

5  is asking about your decision to flag or not flag.  I

6  think.

7          But, the jury should understand, I presume, that

8  that's the basis for his answer is his understanding of

9  the sufficient evidence to support.

10         Go ahead.

11         MR. KANG:  Thank you, Your Honor.

12  BY MR. KANG:

13     Q.   Where was the litigation filed?

14     A.   Florida.

15     Q.   And that was filed in August of 2015?

16     A.   Yes.

17     Q.   What was the result of that lawsuit?

18     A.   The lawsuit was dismissed.

19         MR. CUNNINGHAM:  Objection, Your Honor.

20  Relevance.

21         MR. KANG:  Laches.

22         THE COURT:  I think you can ask it another way.

23         The jury should disregard the answer that was

24  quickly given as the lawyer was standing to object.

25         How about if it is relevant to laches and that

1  is your claim, when it ended is the basis of your

2  argument on that, so I think that's what you need to

3  know.  Not happened in it, was his deposition taken in

4  it, how long did it go, how far did it get.  Just when

5  was it ended.

6         MR. KANG:  Okay.

7  BY MR. KANG:

8     Q.  So the litigation was commenced in August of

9  2015?

10    A.  Yes.

11    Q.  In Florida?

12    A.  Yes.

13    Q.  And when did that litigation end?

14        If I were to tell you September 2017, does that

15  sounds about right?

16    A.  Yes.

17    Q.  During that time that the litigation was

18  pending, to your knowledge did Cigna have the opportunity

19  to pursue its claims against the Labs?

20    A.  To my knowledge, it did not.

21    Q.  And then the -- this litigation was commenced in

22  July of 2019, correct?

23    A.  Yes.

24    Q.  So how much time was there between the time that

25  the Florida litigation ended and this litigation

1    commenced?

2        A.    About a year and a half.

3        Q.    Mr. Goldfarb, do you have an understanding of

4    how much Cigna is seeking to recover in this lawsuit?

5        A.    Yes.

6        Q.    How much?

7        A.    It is approximately 16.1 million across the

8    three labs.

9        Q.    What does that represent?

10       A.    It represents the amounts that were paid to the

11   labs by Cigna and the group health plans at issue in the

12   case.

13       Q.    How did you determine that amount?

14       A.    I looked at a claim spreadsheet of all claims

15   paid to the Labs.

16            MR. CUNNINGHAM:  Objection, Your Honor.  This is

17   calling for expert testimony, 702.

18            THE COURT:  Yeah.  If you want to print a

19   record, a ledger, you want to print eight ledgers and

20   they add up to the number.  This would be something you

21   would expect of an expert.  Sustained.  I'm just going to

22   say sustained from now on and you know why I'm sustaining

23   it.

24   BY MR. KANG:

25       Q.    Can you tell the jury the methodology that you

1382

```
 1    went about to calculate the damages?
 2            MR. CUNNINGHAM:  Same objection, Your Honor.
 3            THE COURT:  Sustained.
 4    BY MR. KANG:
 5       Q.   What could a person look at to ascertain the
 6    total amount that was paid to the labs in this case?
 7            MR. CUNNINGHAM:  Objection, relevance.
 8            THE COURT:  It's vague.  I don't know what it
 9    means.  What person?  What universe of documents does he
10    have?
11    BY MR. KANG:
12       Q.   Could the amount paid by Cigna to the labs in
13    this case would that be indicated in the claims data?
14       A.   Yes.
15       Q.   Could you simply add up the total of amount paid
16    and come to that amount?
17       A.   Yes.
18       Q.   I want to go back to fee forgiving.  And you
19    testified about the various ways that SIU conducts fee
20    forgiving, correct?
21       A.   Yes.
22       Q.   Is there also language in Cigna's, in certain of
23    Cigna's plans that address fee forgiving?
24       A.   Yes.
25       Q.   And again based on your knowledge and relevant
```

1383

1    time period, did plans in that period contain language

2    that prohibited fee forgiving?

3        A.   Yes.

4            MR. CUNNINGHAM:  Objection, Your Honor.  I don't

5    know what he means by relevant time period.

6            THE COURT:  Sir, I think you should assume we'll

7    have objections to most of the questions, so I will ask

8    you please, do me a favor, and to pause at the end of his

9    question mark and not to immediately give the answer.

10   Because I keep telling the jury to strike and disregard.

11   But we're human beings.  And I don't know if you realize

12   this, but they have heard it so they will have to work

13   really hard to disregard.  I know jurors work really hard

14   and I trust them to do.  So far today we have had about

15   30 of those.  I think we could limit the number they have

16   to work hard at.  So if you give a pause and see counsel

17   at the other table is raising from their seat.

18           The objection is, I don't know what he means by

19   relevant period.  In this context in terms of his

20   immediately proceeding testimony, I agree.  Sustained.

21           MR. KANG:  I'm sorry.  Can I get a read back on

22   my question.

23           THE COURT:  To your knowledge and the relevant

24   time period.

25           Should we assume, sir, that that means the

1  middle of '15 to sometime in 2020?  Did plans in that

2  period contain language that prohibited fee forgiveness?

3          MR. KANG:  Yes, Your Honor.

4          THE COURT:  So go ahead, sir.  You may answer.

5  So your answer I think was yes and that stands.

6          You may consider it, Ladies and Gentlemen.

7          Go ahead.

8          MR. KANG:  I'm sorry, was that the answer to the

9  question?

10          THE COURT:  Yes.  Yes.

11  BY MR. KANG:

12     Q.   And why is it that there were fee forgiveness

13  provisions put into the plan?

14          MR. CUNNINGHAM:  Objection, calls for

15  speculation unless he has personal knowledge.

16          THE COURT:  I mean you have to have establish he

17  was part of a decision to modify the policies in question

18  in the case.

19  BY MR. KANG:

20     Q.   Mr. Salazar, can we put up -- can we pull up

21  Cigna 57 -- Joint 57.

22          THE COURT:  Joint 57 may be published by

23  agreement.

24          MR. KANG:  May I proceed, Your Honor?  Is it

25  published?

1385

```
1              THE COURT:  Yes, you may.  Absolutely.

2    BY MR. KANG:

3        Q.   Mr. Goldfarb, are you familiar with this

4    document?

5        A.   I am.

6        Q.   What is this document?

7        A.   This is a plan document for Ahold USA Inc. which

8    is a group employer plan.

9        Q.   Is this one of the plans, the employer group

10   plans that are at issue in the case?

11       A.   Yes.

12       Q.   And do you understand the parties have

13   stipulated and agreed that the language in this plan is

14   representative of the plan language at issue in this

15   case?

16       A.   That's my understanding.

17       Q.   And Mr. Salazar, if we could turn to the

18   exclusion section.  Put that down for a minute.

19            My apologies, Your Honor.

20   BY MR. KANG:

21       Q.   Could we put that exhibit back up, Mr. Salazar?

22   Can we go to page 30 of that exhibit.  And do you see

23   down there at the bottom left, Mr. Goldfarb, a section of

24   the document called "exclusions expenses not covered in

25   general limitations"?
```

```
 1        A.    Yes.

 2        Q.    Are you familiar with this portion of plan

 3   documents?

 4        A.    Yes.

 5        Q.    Have you reviewed the language in this exclusion

 6   section?

 7        A.    Yes.

 8        Q.    And do you see down there on the fifth bullet

 9   point starting with "charges which you are not

10   obligated"?

11        A.    Yes.

12        Q.    Can you read that?  And Mr. Salazar, if you

13   could highlight that.

14        A.    It needs to be read in conjunction with a piece

15   above.  It's like a continuation of a sentence.

16        Q.    When you say the piece above, what are you

17   referring to?

18        A.     Under "exclusions and expenses not covered".

19        Q.    If you can read that bolded part that you are

20   referring to.

21        A.    "Additional coverage limitations" --

22              THE COURT:  Sorry.  It is awfully long.  Can we

23   just count on the jurors to read it, and raise their

24   heads when you are done?

25              Just be sure you start with the bold at the top,
```

1387

1    the title, the bold, the heading.  Then go to the last

2    bullet on the left column beginning "changes which you

3    are not obligated."

4          MR. KANG:  Thank you, Your Honor.

5    BY MR. KANG:

6      Q.   Mr. Goldfarb, while the jury reads this, are you

7    familiar with this language?

8      A.   Yes.

9      Q.   Did you have any involvement in drafting this

10   language?

11     A.   This particular one, no.

12     Q.   Was the legal department involved in drafting

13   this language?

14     A.   Yes.

15     Q.   And what does this bullet point relate to?

16     A.   This relates to an exclusion --

17          MR. CHRIST:  Objection, 702.  He just said he

18   wasn't involved in the drafting the policy language.

19          THE COURT:  Sustained.

20   BY MR. KANG:

21     Q.   Are you familiar with this paragraph?

22     A.   Yes.

23     Q.   Do you refer to this paragraph in fee forgiving

24   investigations?

25     A.   Yes.

1388

1     Q.   Do you implement this paragraph in

2   conversations with providers in fee forgiving

3   investigations?

4     A.   Yes.

5     Q.   Is this a fee forgiving exclusion?

6     A.   Yes, and it's also dual pricing scheme

7   exclusion.

8     Q.   And when I want to read a few things, Mr.

9   Goldfarb.  It says, "charges which you are not obligated

10   to pay or for which you are not billed for, billed or for

11   which you had not have been billed except they are

12   covered by this plan."  Did I read that correctly?

13     A.   Yes.

14     Q.   What does that mean?

15     A.   It means several things.  An easy one is charges

16   that your are not billed for means the entire claim is

17   not covered.  If the provider does not bill you for their

18   services, then everything they submitted to Cigna is not

19   covered.

20          Another thing it means is charges that would not

21   have been billed except if they were covered under this

22   plan, this is what I'm referring to as a dual pricing

23   scheme.  So if the provider would charge you a lesser

24   amount if you didn't have insurance, but then decided

25   just because you have insurance, we're going to charge

1    you a lot more money, than those charges are not covered

2    by this plan.

3        Q.    Did you see there it says, "Cigna in its sole

4    discretion shall have the right to deny the payment of

5    benefits in connection with a covered service."  Do you

6    see that?

7        A.    Yes.

8        Q.    What do you understand that to mean?

9        A.    It means what it says, is that.

10            MR. CUNNINGHAM:  Objection, 702, Your Honor.

11            THE COURT:  I think it would be better if you

12    say, how did you apply this in your investigation?  In

13    other words, it is his understanding not as to how do you

14    interpret a contract.  I have already done that.  That's

15    what I do.  It is really, Okay, he's done an

16    investigation.  He's trying to see did they fee forgive.

17    Is that a reason we shouldn't pay.  It is how did he use

18    this exclusion as part of his investigation as to whether

19    there was coverage under the policy.  I'm sitting here

20    thinking that is what he's saying, but I guess we should

21    say that expressly.

22            MR. KANG:  Thank you, Your Honor. A much better

23    question.

24    BY MR. KANG:

25        Q.    How did you apply that language, Mr. Goldfarb,

1390

1    in your investigations?

2        A.    So, as it states, if Cigna determines that a

3    provider's waived, reduced or forgiven any portion of its

4    charges, that's referring to the investigation that we

5    do.  We're asking for records.  We're asking for the

6    billing policy, whether they've collected.  We are

7    talking to members and based on a totality of all that

8    information if Cigna determines that the provider has

9    waived a reduced or forgiven any portion of its charges

10   or any portion of co-payment, deductible or coinsurance,

11   then Cigna's SIU, Cigna in its sole discretion has the

12   right to deny payment for the services.  And that's why

13   you know, we're putting a denial flag.  So this is the

14   justification for the denial flag when those

15   circumstances have been found.

16       Q.    Thank you.  Then the next column over you see

17   where it starts "In the exercise of that discretion Cigna

18   shall have the right to require you to provide proof

19   sufficient to Cigna that you have made your required cost

20   share payments prior to the payment of any benefits by

21   Cigna."  Did I read that correctly?

22       A.    Yes.

23       Q.    How did you apply that in connection with SIU

24   investigations?

25       A.    Well, this is also the basis for requesting the

1    patient billing and collection ledgers from the provider

2    to the get that proof of -- that they were collecting

3    amounts.  But in addition to that, when you get the

4    denial based on this exclusion, you have the right to

5    appeal.  And on appeal if you provide proof that you have

6    made your required cost share payments then that would

7    get reviewed.  If in fact the payments were made, the

8    denial on that particular claim would be taken off.  And

9    assuming that the service was medical necessity and all

10   other terms and conditions of coverage are met, the claim

11   would be paid.

12       Q.   Again whose discretion according to this

13   language was it?

14            MR. CUNNINGHAM:  Objection, cumulative.  Asked

15   and answered.

16            THE COURT:  Sustained.

17   BY MR. KANG:

18       Q.   If we go back to -- I apologize, Your Honor.

19            If we go to page 22, Mr. Salazar.

20            THE COURT:  What exhibit are we on?

21            MR. KANG:  Joint Exhibit 57, Your Honor.

22            THE COURT:  Thank you.

23   BY MR. KANG:

24       Q.   Can we zoom in on the covered expenses

25   paragraph, sir.  If we can zoom in on just the top

1392

1    paragraph there.

2            You see a definition here in the plan titled

3    "Covered Expenses," Mr. Goldfarb?

4        A.    I see that.

5        Q.    Does it state among other things, Covered

6    expenses means the expense is incurred by or on behalf of

7    a person for the charges listed below if they are

8    incurred after he becomes insured for these benefits?

9        A.    Yes.

10       Q.    The next sentence reads, Expenses incurred for

11   such charges are considered covered expenses to the

12   extent that the services or supplies provided are

13   recommended by a physician and are medically necessary

14   for the care and treatment of an injury or sickness as

15   determined by Cigna.  Did I read that correctly?

16       A.    Yes.

17       Q.    How would you in conducting SIU investigations

18   apply or use that medically necessary language?

19       A.    When we're conducting an investigation that

20   involves the medical necessity of a service we request

21   records.  We have them clinically reviewed and

22   importantly it says "as determined by Cigna" so it is

23   going to be a Cigna medical director is going to review

24   the services to determine medical necessity.

25       Q.    And Mr. Salazar.

1    And that determination by Cigna, does that in

2  SIU investigations make it incumbent upon the provider to

3  provide sufficient records?

4    A.   Yes.

5    Q.   Does SIU believe that it is SIU's obligation to

6  find records to justify lack of medical necessity?

7    A.   No.

8    Q.   Mr. Salazar, can we go to page 52?  Can we zoom

9  in on medically necessary, medical necessity.

10    Do you see this portion, Mr. Goldfarb?

11    A.   Yes.

12    Q.   It states, "medically necessary covered

13  services and supplies are those determined by the medical

14  director to be"  Then it's got five bullet points?

15    A.   I see that.

16    Q.   Give a minute for the jury to read that.

17    THE COURT:  You want them to read the whole?

18    MR. KANG:  Yes, Your Honor.

19    THE COURT:  That's great.

20  BY MR. KANG:

21    Q.   In connection with SIU investigations what, if

22  any, impact would this language have on investigations?

23    A.   As I said, you know, in order for a service to

24  be covered, it must be medically necessary.  We have

25  certain investigations, for instance like PB Labs, where

1394

1    medical records are reviewed and if it is determined that

2    there is -- the totality of the review shows that the

3    provider is regularly submitting claims that do not meet

4    medical necessity and there is a pervasive pattern of

5    submitting such claims, then we'll place a "services not

6    rendered as billed" on the provider.

7        Q.    But when it says "medical director" here, whose

8    medical director is that?

9            THE COURT:  Go ahead and answer that.

10       A.    That would be a Cigna medical director.

11           THE COURT:  I'm sorry.  I didn't catch you

12   before your question.  It is past 1:15.  We'll see you

13   back here at 2 O'clock.  Thank you for your patience,

14   most especially I think with me today, this morning.

15   We'll go forward this afternoon and keep going.  Thank

16   you very much.  Get some fresh air and remember don't

17   discuss the case.

18           Sir, you can be excused, actually you should be

19   excused and you should wait in the front lobby or go to

20   their room if you want.  You need to be back in the

21   vicinity of the courtroom about 5 minutes to 2:00 to be

22   sure that you are able to be called in on time.  You

23   shouldn't talk to counsel during the break.

24           THE WITNESS:  I'm just going to grab the food in

25   that room.

1           THE COURT:  Go right ahead.  Thank you Liana.

2           (In the absence of the jury at 1:17 p.m.)

3           THE COURT:  I will ask a question.  I realize

4    it's attorney/client privilege.  It's rhetorical,

5    Attorney Kang.  Seriously, did you discuss with him that

6    he say as many times as he can like Miami-Dade school

7    system?  Your question never calls for an answer of who

8    the victim is in the case, but I have heard that, I don't

9    know how many times.  You have the ability to put in a

10   list of all the policies at issue and who the owners, or

11   funders or employees, whoever they are.

12          You can't talk to him, so you know, that's fine.

13   It is a rhetorical question, but I think if it was

14   discussed it is inappropriate.  Also I'm curious, if 9

15   years is almost 10, I don't know how from September of

16   '17 to August of '19, is approximately a year and a half

17   but I guess I need to do more math.  I'm still

18   struggling on yesterday's time.  We'll stand in recess.

19          (Whereupon, a luncheon recess was taken from

20   1:18 p.m. to 2:00 p.m.)

21          THE COURT:  Are we ready to bring this jury in?

22          We should get Mr. Goldfarb.

23          I have my objections or ruling.  Probably said a

24   bit too much.  Please understand my job is to try to keep

25   the trial moving.  I'm trying to assist.  If you don't

1396

1   feel that's what I'm doing, assisting, if I'm posing a

2   question that won't yield an objection, if it does, it's

3   going to get an overruled.  That he says, Why I have gone

4   on?  If he stands up, objection, I will say sustained or

5   overruled.

6          I think, Attorney Kang, you are very

7   intelligent, experienced lawyer.  You understand my view

8   and that continues to be my view.

9          (In the presence of the jury at 2:01 p.m.)

10          THE COURT:  Everybody be seated.  Good

11  afternoon, ladies and gentlemen.  We're ready to continue

12  with Mr. Goldfarb on his direct examination by Attorney

13  Kang.

14  BY MR. KANG:

15     Q.   Mr. Goldfarb, are you familiar based on your

16  experience at SIU with the phrase retrospective review?

17     A.   Yes.

18     Q.   What is a retrospective review?

19     A.   A retrospective review is an audit on claims

20  that were previously paid.

21     Q.   So it's for claims in the past?

22     A.   Yes.

23     Q.   And so when you're testifying here about your

24  investigation in these matters from 2015 through 2020,

25  would those investigations also involve claims that were

1397

1   paid prior to 2015?

2        A.   Yes.

3        Q.   Have you heard the term "pay and chase"?

4        A.   Yes.

5        Q.   What does that refer to?

6        A.   That refers to sometimes the insurance company

7   will pay a claim and later have to go back and have to

8   try to recoup the claim when they discover evidence that

9   it should not have been paid.

10        Q.   And do the -- are claims sometimes paid on the

11   front end because of compliance with Prompt Payment Act

12   laws?

13        A.   Yes.

14        Q.   As well as trusting the providers are submitting

15   accurate claims?

16        A.   Yes.

17        Q.   And so if you are involved in an investigation

18   into these three labs, from 2015 to 2020, would that

19   involvement -- that involve reviewing documents and

20   claims from prior to 2015?

21        A.   Yes.

22        Q.   What type of documents would you potentially

23   review prior to 2015?

24        A.   In this case, lab requisition forms, lab

25   results, documentation concerning billing policies,

1  because that's consistent with a retrospective review.

2  It's backwards looking.

3      Q.   Plan documents as well?

4      A.   Yes.

5      Q.   IFP policies?

6      A.   Yes.

7      Q.   Reimbursement policies?

8      A.   Yes.

9      Q.   Drug coverage policies?

10     A.   Yes.

11     Q.   Could those all be relevant to -- even though

12 they predate 2015, it could be related to your

13 investigation that you were involved in from 2015 to

14 2020?

15     A.   Yes.

16          MR. KANG:  So could I put up on the screen

17 Exhibit 220, Cigna Exhibit 220?

18          THE COURT:  That's a full exhibit, so please

19 publish it.

20 BY MR. KANG:

21     Q.   Mr. Goldfarb, have you reviewed this document?

22     A.   Yes.

23     Q.   And would have this been among the documents

24 that you would have reviewed based your involvement in

25 your investigation into these three labs that you did in

1399

1    2015 to 2020?

2        A.    Yes.

3        Q.    Who are these documents, sir?

4        A.    Well, this one is a document that is from PB

5    Laboratories, it's called a Recurring Provider

6    Acknowledgment and Consent.  So this is a facility

7    telling the lab what types of testing it wants done.

8            MR. KANG:  Could we go to page -- a couple of

9    pages later, Mr. Salazar.  Yes.  Thank you.

10   BY MR. KANG:

11       Q.    And is this materials -- how did -- how did SIU

12   obtain these materials?

13       A.    This was provided to SIU by the Labs.

14       Q.    And what treatment center does this document

15   relate to?

16       A.    Angel's Recovery.

17       Q.    Angel's Recovery, I believe you testified

18   earlier you have personal knowledge of that treatment

19   center?

20       A.    I do.

21       Q.    Have you visited Angel's Recovery?

22       A.    I have not.

23       Q.    Have you spoken with people affiliated with

24   Angel's Recovery?

25       A.    I have.

1400

1    Q.    And you see down there a practitioner name,

2  Kenneth Rivera-Kolb?

3    A.    Yes.

4    Q.    Does he also go by the acronym, KRK?

5    A.    Yes.

6         MR. KANG:  Can you scroll down, Mr. Salazar.

7  BY MR. KANG:

8    Q.    And do you see here there is a practitioner

9  authorization certification?

10    A.    Yes.

11    Q.    And there's a name next to the practitioner's

12  signature, correct?

13    A.    Yes.

14    Q.    And does that appear to be the signature of Tara

15  or Tova Jasperson?

16    A.    Yes.

17    Q.    Do you know Tova Jasperson?

18    A.    I do.

19    Q.    How do you know her?

20    A.    I know her in connection with an investigation

21  we did into Angel's Recovery.  She was one of the

22  co-owners of Angel's Recovery.  And in connection with

23  that investigation, I've had multiple conversations with

24  her.

25    Q.    She signs here that she is a practitioner,

1401

1    carry?

2        A.    Correct.

3        Q.    A medical practitioner?

4        A.    It says practitioner, and she's authorizing the

5    lab to do various drug testing, and so she's signing as

6    the practitioner.

7            MR. CUNNINGHAM:  Objection, Your Honor, as to

8    time frame.  This is three years before he started with

9    Cigna.

10            THE COURT:  He did say that he looked back when

11    he was investigating from '15 to '20.  I guess -- I don't

12    know that that's going to allow him to testify to every

13    document from before the time he got to Cigna.  But if he

14    answers under oath that that's something he looked at

15    while he continued that investigation in the time period

16    he was there, then I think that's okay.  But I guess

17    you're right, and I violated my rule in the very first

18    objection, but, you're right.  I do think, you know -- he

19    said he saw it, you know, he's talked to people, but I

20    don't know that this was all done in connection with --

21    this document was actually seen and investigated on by

22    him.  It was personal knowledge in a time period he

23    was -- worked there.  So I guess you need to probably

24    clarify that, and then we'll see if the objection still

25    stands.

1    MR. CUNNINGHAM:  Your Honor, just one more

2  thing, and I apologize.  The Court wanted us to remind

3  you about the stipulation once we started talking

4  about --

5    THE COURT:  Do you think this is a good time?

6    MR. CUNNINGHAM:  I think so.  This is talking

7  about the patient records.

8    THE COURT:  A little bit shifting.  Remember we

9  had testimony -- seems like a long time ago.  Oh, I think

10  at least Ms. Canto and certainly Ms. Thelian, I don't

11  know -- I don't know else but, certainly Ms. Canto, and

12  Dr. Nicoll.  There we go.  And they talked -- first,

13  Ms. Canto said she had 20 patient files.  Remember that?

14  We heard 20 several times.   Then we heard Dr. Nicoll and

15  that she sent those to Dr. Nicoll.  There was an email

16  about how she forgot two of them and here they are.

17  Right.  So there's 20. Then Dr. Nicoll testified about

18  some of them.

19    The parties have agreed that those -- that the

20  20 patient files that are marked in this trial as a joint

21  -- or whose exhibits are they, 14 to 33?

22    MR. KANG:  Joint.

23    THE COURT:  Joint exhibit.  That means both

24  parties agree that Exhibit 14 to 33.  That's 14 files,

25  they are patient files, those are the 20 that Ms. Canto

1    pulled out in her investigation.  She looked at those

2    files and sent them on Dr. Nicoll.  Those 20 are

3    Exhibit 14 to Exhibit 33.  It was a matter of some

4    questioning and objecting, et cetera.  So counsel have

5    discussed it and reached this stipulation, which is an

6    agreement, that you should view Exhibit 14 to 33 as the

7    20 patient files that were the subject of the SIU

8    investigation, among other things.

9            MR. CUNNINGHAM:  Thank you, Your Honor.

10           THE COURT:  Is that a fair statement, Attorney

11   Cunningham?

12           MR. CUNNINGHAM:  Yes.

13           THE COURT:  And you are all right, Attorney

14   Kang?

15           MR. KANG:  Yes, Your Honor.

16           THE COURT:  Great.  Thank you very much.

17   BY MR. KANG:

18       Q.   So Mr. Goldfarb, in connection with your work on

19   this matter from the 2015 to 2020 time period, did you

20   have occasion to review this document as well as the

21   other documents that the judge just instructed the jury

22   on?

23       A.   I don't know that I reviewed every single page

24   of every single document.  I reviewed lots of documents

25   of this nature, and this document appears familiar to me.

1            THE COURT:  Appears to what, sir?

2            THE WITNESS:  Appears familiar to me.

3            THE COURT:  Okay.  But I think the question was,

4  you also worked on this case in preparation for trial,

5  and so -- and he's asking you -- we decided we would stop

6  when the lawsuit was filed as far as your work.  So he

7  asked you, Was this a part of your work on the matter in

8  '15 to '20?  Did you have occasion to review this

9  document and use it in your investigation?  So I'm

10  afraid, take a moment, see what your memory is, but you

11  have to tell us.  And if the answer is you're not sure

12  you looked at it for it then, then you have to tell us

13  that.

14            THE WITNESS:  I can't say with certainty that I

15  saw this particular document.

16  BY MR. KANG:

17      Q.  You have spoken with Tova Jasperson, though?

18      A.  Yes.

19      Q.  Do you know -- do you have personal knowledge as

20  to whether Tova Jasperson is a doctor?

21      A.  She is not a doctor.

22      Q.  Do you know whether Tova Jasperson is a medical

23  professional?

24      A.  She is not.

25            THE COURT:  Could I say that was page -- it was

1    CMECF 4 of that exhibit, and the exhibit number was 220

2    of Cigna.  I didn't catch the Bates number.  It's

3    actually 1306.  Thank -- 3306.  Thank you very much for

4    enlarging it.

5            MR. KANG:  Mr. Salazar, can we go to the

6    previous page, Mr. Salazar.  3305, Mr. Salazar.

7    BY MR. KANG:

8    Q.   Mr. Goldfarb, in your experience during 2015 to

9    2020, are you aware of something called facility standing

10   orders?

11   A.   Yes.

12   Q.   What are facility standing orders?

13   A.   A facility standing order as it relates to lab

14   is an order for various different drug tests that is to

15   be used facility wide for all patients.

16   Q.   And what do you mean by facility wide for all

17   patients?

18   A.   Meaning that it is not individualized to the

19   particular patient.  Whoever shows up to this facility is

20   going to get this panel of drug tests.

21   Q.   Are you familiar -- have you seen facility

22   standing orders in connection with your investigations

23   you've worked on?

24   A.   Yes.

25   Q.   And does this document appear to be a facility

1406

1    standing order?

2        A.    Yes.

3        Q.    Why do you say that?

4        A.    Because there's nothing on here that

5    individualizes it to patient and it's attached to the

6    other document which was essentially the authorization by

7    the facility.

8        Q.    And do you see down there -- is there any field

9    indicating the name of a patient on this standing order?

10       A.    There's not.

11       Q.    Is there any field on here indicating the date

12   of this order?

13       A.    No.

14       Q.    And you also see on this particular facility

15   order there are check marks at the bottom that's to

16   confirm positive and confirm negative?

17       A.    Yes.

18       Q.    Based on investigations you've worked on, what

19   does that tell you?

20       A.    That's referring to if there was a qualitative

21   test, you know --

22           MR. CUNNINGHAM:  Objection, Your Honor, 702.

23           THE COURT:  I think he can testify to his

24   understanding as he reviewed these documents in

25   connection with his investigative work from '15 to '20.

1407

1   Go ahead, sir.  You can do it as long as the
2   attorney knows that's what he's testifying to.
3   A.   This is asking the lab to run definitive testing
4   on both -- or I should say they are going to run
5   definitive testing whether the qualitative -- the first
6   screen test came out positive or negative.  They are
7   asking for it -- both.
8   MR. KANG:  Thank you.  You can put this down.
9   BY MR. KANG:
10  Q.   Based on the investigations that you would have
11  conducted into these labs, would you have also reviewed
12  IFP policies?
13  A.   Yes.
14  Q.   Including those IFP policies that would have
15  been prior to 2015?
16  A.   Yes.
17  Q.   Why would you have been reviewing those IFP
18  policies?
19  A.   Because the question is the always the question
20  of coverage.  Is what they are doing covered under the
21  plan?  So I would say refer to the plan.
22  Q.   And what provisions, among others, would you
23  about focusing on?
24  A.   Medical necessity, as well as applicable
25  coverage policies for lab testing and reimbursement

1408

1    policies, things of that nature.

2            MR. KANG:  Mr. Salazar, could we put up Joint

3    Exhibit 51, please.  Could we see the next page, Mr.

4    Salazar.

5    BY MR. KANG

6        Q.   Do you see this document, Mr. Goldfarb?

7        A.   Ye.

8        Q.   Is this the type of IFP policy that you would

9    have reviewed?

10       A.   Yes.

11       Q.   And this is a policy that would have been

12   entered into between Cigna and an individual member?

13       A.   Yes.

14           MR. KANG:  Can we turn Mr. Salazar to Bates

15   Number 5808.  Could you zoom in, Mr. Salazar, on the

16   starting with a covered expenses and then going done to

17   covered services at the top there.

18   BY MR. KANG

19       Q.   Do you see that, Mr. Goldfarb?

20       A.   I do.

21       Q.   Is -- what are these -- is this the -- are these

22   the provisions that you would have reviewed in connection

23   with your SIU investigation?

24       A.   Yes.  These are provisions that I would review

25   and rely on in connection with the investigation.

1409

1    Q.   And why would you have been looking at these

2    provisions?

3    A.   Because one of the requirements of coverage is

4    that a service is medically necessary.

5         MR. KANG:  And could we then go Mr. Salazar to

6    5812.  And zoom into the definition of medically

7    necessary.

8    BY MR. KANG:

9    Q.   Mr. Goldfarb, would you have also been, in

10   connection with your SIU investigation, reviewing this

11   paragraph?

12   A.   Yes.

13   Q.   And why?

14   A.   Because this is the actual definition of

15   medically necessary contained in the policy.  So this is

16   the standard which must be satisfied in order for there

17   to be coverage for the Labs' test.

18   Q.   Why is that relevant to an SIU investigation?

19   A.   Because our investigations can involve cases

20   where a provider is regularly billing test that are not

21   will medically necessary to the point where we can't

22   trust their claim submissions and need to place a

23   "services not rendered as billed" flag on the provider.

24        MR. KANG:  Mr. Salazar, can we go back to page

25   5798 of the same document.  I'm sorry, sir, 5798.  Can

1    you zoom in, Mr. Salazar, on the paragraph that starts

2    with "The benefits of this policy are provided."

3    BY MR. KANG:

4        Q.   Mr. Goldfarb, do you see this section of the IFP

5    policy?

6        A.   Yes.

7        Q.   Is this a term or provision of the policy that

8    you would have reviewed and relied on here in your SIU

9    investigation?

10       A.   Yes.

11       Q.   Does this also clarify the definition of a

12   medically necessary in the IFP policies?

13       A.   Yes.

14       Q.   And could you read the second sentence of this

15   statement?

16       A.   The fact that a physician prescribes or orders a

17   service does not in itself mean that the service is

18   medically necessary or that the service is a covered

19   service.

20       Q.   When this language refers to a physician, who

21   does that refer to?

22       A.   The ordering physician.  The physician that

23   signed off on, in this case, lab orders.

24       Q.   Why would this have been -- this language have

25   been relevant to SIU investigations?

1    A.    Because it confirms that the medical necessity

2    determination is not made simply by the physician signing

3    an order.  We have a medical director who has to review

4    that, and there are important reasons for that.

5    Q.    Is this language that we reviewed in all of the

6    representative sample IFP policies that the parties have

7    agreed and stipulated to?

8    A.    Yes.

9    Q.    So to your knowledge, do -- the language

10   regarding medically necessary that we've reviewed up here

11   in all of the relevant IFP policies in connection with

12   this case?

13   A.    Yes.

14        MR. KANG:  You can take this down, Mr. Salazar.

15   BY MR. KANG:

16   Q.    Have you heard of the term "unbundling"?

17   A.    Yes.

18   Q.    Does SIU investigate allegations of unbundling?

19   A.    Yes.

20   Q.    What does SIU do to investigate unbundling?

21   A.    We --

22        MR. CUNNINGHAM:  Objection, Your Honor, time

23   frame.

24   BY MR. KANG:

25   Q.    2015 to 2020.

1412

1    A.    There's a number of steps that we can take that

2    include requesting claim data from our claims system to

3    see what's being billed, as well as requesting supporting

4    medical record documentation.

5    Q.    What is unbundling?

6    A.    Unbundling is when a provider bills for a lot of

7    components that are part of a great service or code.

8    Q.    And why does SIU investigate that?  Why is that

9    bad?

10   A.    Because unbundling is an attempt to get more

11   reimbursement when there is a more inclusive code that

12   they should have billed that would provide for lesser

13   reimbursement.

14   Q.    Were you involved in unbundling investigations

15   during the 2015 to 2020 time period?

16   A.    Yes.

17   Q.    As part of that -- the investigations in that

18   time frame, would you look to coverage policies or

19   reimbursement policies of Cigna that predate 2015?

20   A.    Yes.

21   Q.    Are you familiar with something called a G code?

22   A.    Yes.

23   Q.    What is a G code?

24   A.    A G code was a code that was introduced that is

25   basically a bundled code.  So the G code at issue, it

1413

1    says no matter how many classes of drugs you run a screen

2    on, you bill the G code and it includes everything.  You

3    have one payment whether you decide to do a few or you do

4    30.  And so it's called -- it's essentially a bundled

5    code.

6        Q.   So G code is a bundled code?

7        A.   Yes.

8        Q.   And is there something that you are familiar

9    with that's called a G0431?  Are you familiar with that?

10       A.   Yes.

11       Q.   And what is that a bundled code for?

12       A.   It is a bundled code for toxicology testing.

13       Q.   So after a certain period of time, were

14   laboratories required to bill under a G code?

15       A.   Yes.

16       Q.   Based on your investigation in 2015 to 2020, did

17   you come to learn that PB Labs was informed of this

18   change?

19       A.   Yes.

20            MR. KANG:  Could we put that up Joint Exhibit

21   159-A, sir.

22   BY MR. KANG

23       Q.   Do you see this document, Mr. Goldfarb?

24       A.   Yes.

25       Q.   Is this a document that you would have reviewed

1    during the course of your investigation into these

2    Labs from 2015 to 2020?

3        A.   Yes.

4        Q.   What is this letter?

5        A.   This is a letter from Cigna dated May 22, 2013

6    to PB Labs, informing them that, effective August 19,

7    2013, they can no longer bill under codes -- certain

8    codes beginning in 8, and instead they need to use the

9    bundled codes GO431 and GO434 if they wanted to be

10   reimbursed.

11       Q.   So after this effective date of August 19, 2013,

12   were the Labs allowed to bill unbundled services under

13   80100, 80101 and 80104?

14       A.   No.

15       Q.   They were supposed to use the bundled code of

16   GO431?

17       A.   Yes.

18       Q.   This is a form letter sent to the PB Labs?

19       A.   Yes.

20       Q.   Do you know whether a specific letter was also

21   sent to PB Labs?

22       A.   Yes.

23       Q.   How you know that?

24       A.   Again, when I was assigned this matter when I

25   arrived at Cigna, a lot of the correspondence was

1    forwarded to me so I could review it and get up to speed

2    on the investigation.

3        Q.   Was this policy of the of code edit change, was

4    this something that was placed on Cigna's website?

5        A.   Yes.

6        Q.   So the Labs were able to -- could have known

7    about this?

8        A.   Yes.

9            MR. KANG:  And Mr. Salazar, could we show Joint

10   Exhibit 11, please.

11   BY MR. KANG:

12       Q.   Do you recognize this document?

13       A.   I do.

14       Q.   Is this something you would have reviewed in

15   connection with your investigation from 2015 to 2020?

16       A.   Yes.

17           MR. KANG:  Your Honor, this is a Joint Exhibit

18   11.  I don't know if it has been previously admitted.

19           THE COURT:  I don't know, but it's in evidence

20   if it's absent objection, because it's joint and it's a

21   full exhibit.  I don't think it's been used before the

22   jury.  Go ahead.

23           MR. KANG:  Thank you, Your Honor.

24   BY MR. KANG:

25       Q.   Is this a letter from William Welch to a Mike

1  Gennett, dated April 9th of 2014?

2      A.   Yes.

3      Q.   And you are familiar with this?

4      A.   Yes.

5      Q.   Do you know who Michael Gennett is?

6      A.   Yes.

7      Q.   Was he a lawyer for the Labs?

8      A.   Yes.

9      Q.   So this is a communication from Cigna's in-house

10 counsel to a lawyer for the Labs?

11     A.   Yes.

12         MR. KANG:  If you could scroll down, Mr.

13 Salazar.

14 BY MR. KANG

15     Q.   If you could just read the first paragraph.

16 Maybe let the jury read it.

17         Mr. Goldfarb, is Mr. Welch reiterating here to

18 Mr. Gennett that codes under 80100, 80101 and 80104 would

19 no longer be reimbursable?

20         MR. CUNNINGHAM:  Objection.  Letter speaks for

21 itself.

22         THE COURT:  Sustained.

23 BY MR. KANG:

24     Q.   Did this letter reiterate the prior document we

25 had seen?

1    A.    Yes.

2    Q.    And does Mr. Welch -- there's a website down

3    there.  Do you see that?

4    A.    Yes.

5    Q.    What do you understand that to be?

6    A.    Well, there's a couple of websites on the

7    hardware.  Which one do you want me to focus on?

8         MR. KANG:  Mr. Salazar, if you could still keep

9    it on the prior paragraph.

10        THE COURT:  I think it's the one up here that's

11    worked.

12   BY MR. KANG

13   Q.    Can you read that last sentence of that first

14   paragraph, Mr. Goldfarb?

15   A.    Your client can obtain more details at code

16   editing guidelines ino the Cigna for Health Care

17   Professional's website at Cigna For HCP dot-com.

18   Q.    So this code editing change was made publicly

19   available?

20   A.    Yes.

21   Q.    Do you remember we saw a remark code 1648

22   earlier?

23   A.    Yes.

24        MR. KANG:  Your Honor, if I may have one minute.

25        THE COURT:  Yes.

1    MR. KANG:  I want to go back to one thing while

2  Mr. Salazar is finding is that.  Mr. Salazar, could we go

3  back to Cigna Exhibit 30, the MBC billing policy.

4  BY MR. KANG

5    Q.   Mr. Goldfarb, do you remember seeing this

6  document earlier in your testimony?

7    A.   Yes.

8    Q.   Is this also a document that you reviewed in

9  connection with your investigation into these three

10  labs from 2015 to 2020?

11    A.   Yes.

12    MR. KANG:  Mr. Salazar, could we go to Bates

13  Number 642094.

14  BY MR. KANG:

15    Q.   Again, MBC was -- what is your understanding as

16  to their affiliation or relationship with the Labs?

17    A.   MBC was a wholly-owned company by Medytox that

18  was purchased in August of 2011 for the purpose of doing

19  billing for the various labs owned by Medytox, including

20  the labs in this case.

21    MR. KANG:  Mr. Salazar, could you magnify the

22  section starting with "Self-pay patients," please.

23  BY MR. KANG:

24    Q.   Do you see that second paragraph, Mr. Goldfarb?

25    A.   Yes.

1    Q.   Can you read that to the jury.

2    A.   "If insurance information or response has not

3 been received by MBC within 45 days, a statement of

4 account will be sent to the patient in an amount no less

5 than 100 percent of the Medicare fee schedule.  The

6 patient will be offered a discount rate of 50 percent of

7 the Medicare fee schedule if the patient makes financial

8 arrangements or pays within 30 days."

9    Q.   Based on your investigation into these Labs

10 between 2015 and 2020, do you have an understanding as to

11 what Medicare fee schedule means?

12    A.   Yes.

13    Q.   What is it?

14    A.   It is a fee schedule that's published and

15 publicly available by the Government, CMS, that tells you

16 the rate which they will pay for pretty much all the CPT

17 codes for Medicare -- patients who have Medicare as their

18 insurance.

19    Q.   Based on your investigation in 2015 to 2020 time

20 period, do you have knowledge as to what the Medicare fee

21 schedule rates were for the services that were being

22 billed by the Labs?

23    A.   I do.

24    Q.   What's was the Medicare fee schedule?

25    A.   The Medicare fee schedule rate for the various 8

1420

1   codes billed by the Labs was in the range of 18 to $20

2   per code.

3        Q.   So if the Labs bill, for example, 20 drug tests

4   in a given day, how much of that add up to?

5        A.   Approximately $400.

6        Q.   Are you aware, based on your investigation

7   between 2015 and 2020, how much, in fact, the Labs were

8   charging Cigna for that same panel of tests?

9        A.   Three to $5,000.

10       Q.   Have you heard -- you referenced before a dual

11  pricing scheme.

12       A.   Yes.

13       Q.   Based on your investigation of these Labs, do

14  you understand them to have engaged in a dual pricing

15  scheme?

16       A.   I do.

17            MR. CUNNINGHAM:  Objection, Your Honor, 702.

18            THE COURT:  Yeah, it looks like it -- it's not

19  an ultimate issue, but it's close.  I'm sustaining it,

20  and the jury should disregard.

21  BY MR. KANG:

22       Q.   What is your understanding of a dual pricing

23  scheme?

24       A.   A dual pricing scheme is when someone charges

25  one price to one person or entity and a different price,

1    usually a higher price, to someone else when they believe

2    that the someone else has more money.

3        Q.   Does SIU investigate that?

4        A.   Yes.

5        Q.   Why?

6        A.   Because it's inherently unfair.  It's abusive.

7    It's wasteful.  It's deplorable, and it is specifically

8    excluded in our plans.

9        Q.   In the instance, according to this policy, if a

10   self-paid patient paid, it would be under the Medicare

11   fee schedule?

12       A.   Yes.

13            MR. KANG:  Put that down, Mr. Salazar.  Can we

14   put up Joint Exhibit 44, Your Honor.

15            THE COURT:  Joint Exhibit 44 may be published.

16   It is already in evidence.

17   BY MR. KANG:

18       Q.   Mr. Goldfarb, we saw this exhibit before lunch,

19   correct?

20       A.   Yes.

21       Q.   This is the -- would you agree it is the line

22   level reports for Epic Reference Labs?

23       A.   Yes.

24       Q.   You testified that you did review this between

25   2015 and 2020?

 1    A.   Yes.

 2    Q.   We were talking about the various remark codes,

 3 correct?

 4    A.   Yes.

 5 BY MR. KANG

 6    Q.   I want to direct your attention -- --

 7         MR. KANG:  If we can, Mr. Salazar, to one of the

 8 references, 1648.

 9 BY MR. KANG:

10    Q.   Can you read that, please.

11    A.   "Health Care Professional, your claim was

12 received with a missing or invalid service code based on

13 our reimbursement policy.  Please correct the information

14 and resubmit the claim along with a copy of this EOP to

15 the claim address on the back of the" -- and then it kind

16 of cuts off.

17    Q.   Does that get cut off because the description

18 goes on for another sentence or two?

19    A.   Yes.

20    Q.   Are you -- in connection with your

21 investigation, did you investigate what this remark code

22 means?

23    A.   Yes.

24    Q.   And we were looking at the reimbursement policy

25 with respect to GO431 earlier, correct?

1423

1    A.    Yes.

2    Q.    What was your understanding as to what this

3    remark code means?

4    A.    This is telling the provider that they were

5    using a code that was invalid based on our reimbursement

6    policy.  And so the reimbursement policy we told them

7    about said don't bill with these codes beginning in 8,

8    bill with the G code because we don't cover the codes

9    billing in 8.  And we're telling them in the remark code,

10   please resubmit with the correct coding.

11   Q.    Did you understand this remark code in this

12   instance to reference unbundling?

13   A.    Yes.

14   Q.    Ms. Thelian testified yesterday about 1648,

15   didn't she?

16   A.    She did.

17   Q.    Did she say 1648 was unbundling?

18   A.    No.

19   Q.    Did she ever work at SIU, to your knowledge?

20   A.    No.

21   Q.    These remark codes are -- are they SIU internal

22   remark codes?

23   A.    They are remark codes that I'm familiar with.

24   They are not from SIU because -- that is a reimbursement

25   policy that applies to anybody who submits claims to

1   Cigna.  They would have to follow that reimbursement

2   policy.  So it's aligned with the reimbursement policy we

3   saw earlier.

4        MR. KANG:  Your Honor, one minute.  If I may

5   take another one minute.

6   BY MR. KANG:

7        Q.   Mr. Goldfarb, in connection with your SIU

8   investigations, have you heard of something called an

9   assignment of benefits?

10       A.   Yes.

11       Q.   Is that something that you look at to ensure the

12  providers have in connection with your investigations?

13       A.   Yes.

14       Q.   What is an assignment of benefits?

15       A.   An assignment of benefits is something that the

16  patient would sign that essentially says I give you,

17  provider, the right to bill Cigna and seek benefits under

18  my plan and get paid directly from the plan for Cigna for

19  the services that you have rendered to me.

20       Q.   Why is that important for providers to have

21  assignment of benefits as it relates to SIU

22  investigations?

23       A.   Well, it's important as it relates to

24  out-of-network provider the.  Because out-of-network

25  providers don't have a contract with Cigna.  Therefore,

1  their only entitlement to bill Cigna is if they have an

2  assignment of benefits.  And so we look to see, as part

3  of our investigation, did they even have the right to be

4  sending us a bill in the first place to seek benefits

5  under the patient's plan.

6      Q.   These three labs in this case, are they all

7  out-of-network providers?

8      A.   Yes.

9      Q.   So in order to get paid, would they have had to

10 have an assignment of benefits?

11     A.   They did get paid because they represented that

12 they had an assignment of benefits.  Whether that payment

13 is proper, we would have to ask the question did they

14 indeed have an assignment of benefits.  And if they did

15 not, they should not have been paid.

16     Q.   Who would have given the Labs the assignment?

17     A.   It needs to be signed by the patient.

18          MR. KANG:  Can we go to Joint Exhibit 163,

19 Mr. Salazar.

20 BY MR. KANG:

21     Q.   Do you recognize this document, Mr. Goldfarb?

22     A.   Yes.

23     Q.   What is this document?

24     A.   This is a form that the patient fills out or is

25 supposed to fill out that contains their consent to have

1426

1    laboratory testing performed, as well as the assignment

2    of benefits language that I just mentioned.

3         Q.   I know this is purported to be dated 2013, but

4    is this document something you would have reviewed in

5    connection with your investigation from 2015 to 2020?

6         A.   It's the type of documents that we would review,

7    yes.

8              MR. KANG:   Can we zoom in on the

9    consent/insurance release paragraph.

10   BY MR. KANG:

11        Q.   Mr. Goldfarb, we've seen this document at other

12   points in this trial, correct?

13        A.   Yes.

14        Q.   So this is a patient consent form, isn't it?

15        A.   Yes.

16        Q.   Is it also an assignment of benefits form?

17        A.   Yes.

18        Q.   What language in here indicates that this is an

19   assignment of benefits form?

20        A.   "I further hereby authorize my insurance

21   benefits to be paid directly to PB Laboratories for the

22   services I receive."

23        Q.   And so in order for the Labs to have had the

24   rights to be paid, this form would have had to have been

25   signed?

1    A.    Yes.

2         MR. CUNNINGHAM:  Objection, calls for expert

3    testimony, 702.

4         THE COURT:  I'm going to sustain it, not on that

5    grounds, but other grounds.

6         MR. CUNNINGHAM:  Move to strike the response,

7    please, Your Honor.

8         THE COURT:  Yes.  The response should be

9    disregarded by the jury.  Stricken on the record.

10   BY MR. KANG:

11   Q.    The language that you just referred to,

12   Mr. Goldfarb, appears on this patient consent form,

13   correct?

14   A.    Yes.

15   Q.    We can show it, but do you recall a chart being

16   shown earlier during trial that had a bunch of nos under

17   the column patient consent on file?

18   A.    Yes, that was in connection with Mr. Lagan's

19   testimony.

20   Q.    Did you see any yeses under that patient consent

21   column?

22   A.    I did not.

23   Q.    What did that mean for you?

24        MR. CUNNINGHAM:  Objection.  Calls for the

25   expert conclusion, 702.

1428

```
 1              THE COURT:  I'm sorry.  Read the question back,
 2    Terri.  I can't read it.
 3                 (Requested portion read.)
 4              THE COURT:  You're going to have to ask it in a
 5    way --
 6              MR. KANG:  I will ask a different question, Your
 7    Honor.
 8              THE COURT:  -- I can understand that doesn't
 9    require an expert to tell us.
10              MR. KANG:  Sure.
11              THE COURT:  The objection is sustained.
12    BY MR. KANG:
13       Q.    What, if any, impact does the absence of a
14    assignment of benefits have on whether Cigna would
15    consider the Labs' claims payable?
16              MR. CUNNINGHAM:  Objection.  Calls for expert
17    testimony, 702.  He's asking for legal effect.
18              THE COURT:  When you say Cigna would consider, I
19    assume you really mean to say you, Mr. Goldfarb, in your
20    role in SIU on behalf of Cigna. --
21              MR. KANG:  Yes, Your Honor.
22              THE COURT:  I think if the question is limited
23    as I just did to what he would review that document as
24    meaning to him as an SIU investigator at the time
25    relevant to this investigation that they had of the three
```

1429

1    labs, I will permit the question to be answered.  It is

2    his understanding as an investigator.  That's a

3    permissible question, as he interpreted it while he was

4    in this investigation, so go ahead, sir.

5         You can answer, if you understood my long

6    qualification, Mr. Goldfarb.

7    A.    It is my understanding that if the Labs did not

8    have signed consent from a patient and signed assignment

9    of benefits, that there would not about coverage under

10   the plan because it requires that they have an assignment

11   of benefits in order to seek benefits under the plan as

12   an out-of-network provider.

13   BY MR. KANG:

14   Q.    Mr. Goldfarb, one other topic I want to cover is

15   appeals.

16        MR. KANG:  You can take this down, Mr. Salazar.

17   BY MR. KANG:

18   Q.    Does SIU have any involvement in the appeals

19   process?

20   A.    Some.

21   Q.    Tell the jury what, if any, involvement SIU has.

22   A.    So first, let's just frame this as an appeal to

23   the claim that was denied by -- for an SIU reason.  Okay.

24   We're going to limit it to that.

25        The provider -- once the claim is denied, the

1430

1    provider gets the explanation of payment and it includes

2    the remark code telling them exactly why it was denied.

3    So in this case, it was either services not rendered as

4    billed, which we all understand to mean medical

5    necessity, or fee forgiving, and that was the language we

6    saw earlier.  We tell them that's the reason.

7            They are then given the opportunity to appeal.

8    And the explanation of payment tells them that and tells

9    them how to take an appeal.  If they choose to take an

10   appeal, they are supposed to provide documentation,

11   records of appeal that supports why they think that the

12   denial is incorrect and requesting that the denial be

13   overturned.

14        Q.    Okay.  Go ahead.

15        A.    With respect to a medical necessity denial, the

16   expectation is they are to provide medical records in

17   support of the appeal to show that this particular denial

18   -- this particular denial of a claim of a laboratory test

19   was wrong because in the underlying medical records show

20   the medical necessity for the reason of that particular

21   test.  If they provide that on appeal, it would be sent

22   to a medical director to review and then a decision would

23   be paid as to whether Cigna agrees that that particular

24   test was medically necessary or not.

25            If Cigna agrees that it's medically necessary,

1   then the appeals organization will respond back and say

2   we agree that this particular claim is medically

3   necessary, and if all other terms and conditions are met,

4   they will pay the claim.  If they disagree or if the

5   provider fails to provide any records to support their

6   claim that it's medically necessary, then, on appeal, the

7   denial would be upheld and they will get an EOB and a

8   letter stating the denial is upheld because you failed to

9   provide information to support the reason why you are

10  seeking to overturn it.  That's medical necessity.

11         Fee forgiving, the other denial.  Again, they

12  will get the initial denial based on fee forgiving.  The

13  EOP issues.  It tells them your claim is being denied on

14  the basis of fee forgiving.  And so then as you saw in

15  the language of the fee forgiving denial, they are s

16  supposed to provide documentation to us that they

17  collected monies from the patient to prove that, in fact,

18  on this particular claim, they were not fee forgiving.

19  So they can take the appeal.  They should provide that

20  information.

21         If that information is provided, it will be sent

22  to it SIU investigator who is involved in the case

23  because they are the most knowledgeable person about the

24  case to review.  And then they can see okay, yes or no,

25  did they provide, did they actually show that there's

1   actually proof of payment.  If they show there is  proof

2   of payment, that will overcome the fee forgiving denial.

3   And then if all other terms and conditions are met of the

4   policy, including medical necessity, then the claim will

5   be paid.  If they fail to provide any documentation to

6   show that they collected any money, then the denial would

7   be upheld because they have not provided information to

8   overcome it denial.

9       Q.   Thank you.  Are there also -- in the appeals

10  process, is that all done by SIU?

11      A.   No.

12      Q.   What department at Cigna is involved in appeals?

13      A.   The National Appeals Organization.

14      Q.   And can appeals also be sent to an external

15  body?

16      A.   Yes.  Any appeal that concerns medical

17  necessity, if the provider disagrees with the Cigna

18  medical director, with their ultimate decision, they can

19  take an external appeal to an independent review

20  organization, and that is a body not Cigna.  And somebody

21  there, a medical director who is not affiliated with

22  Cigna, not affiliated with the labs, would review the

23  records to determine is this particular service medically

24  necessary.  If that reviewer who is outside of Cigna says

25  this is actually medically necessary, we are bound to

1    follow that and we will pay the claim if all other

2    terms and conditions are met.  If they are not, well,

3    then they are agreeing with the medical director anyway

4    and the claim will remain denied.

5        Q.   Have you heard of something call sober homes in

6    connection with your investigations?

7        A.   Yes.

8        Q.   What are sober homes?

9        A.   Sober homes are essentially just a house where

10   people have agreed to live and they all have agreed that

11   we're not going to use drugs and alcohol.

12       Q.   Have you investigated sober homes in connection

13   with your involvement in SIU?

14       A.   Yes.

15       Q.   And based on those investigations, are running

16   clinical laboratories referred from sober homes medically

17   necessary?

18       A.   They can't be.

19       Q.   Why?

20       A.   Because sober homes are not a medical facility.

21   They are --

22            MR. CUNNINGHAM:  Objection, Your Honor, 702.

23            THE WITNESS:  Your Honor, we're going to tie

24   this to the Labs.

25            THE COURT:  You've got to lay -- you can't get

1  the answer and then we'll see if you tied it, and I'll

2  tell the jury, you know that question at 2:52, forget it.

3  You need to lay a foundation with a fact witness for

4  their testimony, sir.  Sustained.  To the extent any

5  answer came in, it's disregarded and stricken.

6  BY MR. KANG:

7      Q.   Mr. Goldfarb, do you know whether any of the

8  facilities that were referring drug testing services to

9  these three labs were sober homes?

10     A.   I do know.

11     Q.   Do you know whether sober homes are licensed to

12  submit drug testing services to clinical laboratories?

13     A.   They are not.

14          MR. KANG:  One minute, Your Honor.

15          THE COURT:  Yes.

16  BY MR. KANG:

17     Q.   Having worked at SIU for nine, almost ten years,

18  can you tell us, is SIU considered a profit center at

19  Cigna?

20     A.   It isn't --

21          MR. CUNNINGHAM:  Objection, relevance.

22          THE COURT:  Yeah.  And who considers?  Where did

23  he get his knowledge?  This is his investigation.  Did he

24  investigate were they making enough money and how should

25  they deal with these claims?  I don't think you want to

1    go there, sir.  Sustained.  And the jury shall disregard

2    that answer.  Again, sir, would you give that gentleman a

3    few seconds to get out of his chair.

4    BY MR. KANG:

5        Q.   Mr. Goldfarb, in connection with the

6    investigation into these three Labs, are you aware of any

7    information that the -- that SIU was encouraged to deny

8    these Labs' claims?

9        A.   No.

10        Q.   Are you aware of any information that SIU was

11    encouraged to flag these three labs?

12        A.   No.

13            MR. KANG:  One minute, Your Honor.

14            THE COURT:  Sure.

15            MR. KANG:  No further questions.

16            THE COURT:  All right.  Cross-examination.

17            MR. CUNNINGHAM:  Thank you, Your Honor.

18            May it please the Court.

19                        CROSS-EXAMINATION

20    BY MR. CUNNINGHAM:

21        Q.   Good afternoon, Mr. Goldfarb.

22        A.   Good afternoon.

23        Q.   We have never formally met, have we?

24        A.   Well, I mean, we've met at various conferences

25    that we have had and in the hallway, but you did not take

1436

1    my deposition.

2        Q.    That's what I was going to ask you, sir.  Your

3    deposition was taken by my colleague, Mr. Hare, right?

4        A.    Correct.

5        Q.    Sir, my name is Fred Cunningham.  I'm one of the

6    attorneys that represents the Labs.  It's nice to

7    formally meet you.

8            Mr. Goldfarb, earlier in your testimony you told

9    Mr. Kang that you've been attending the whole trial as

10   Cigna's representative at the trial, right?

11       A.    Yes.

12       Q.    So you have seen the testimony of the Cigna

13   employees who have testified in our case, Stephanie

14   Canto, Mr. Norton and Dr. Nicoll, right?

15       A.    Yes.

16       Q.    And you have sat through all of that testimony,

17   have you not?

18       A.    I believe so, yeah.

19       Q.    Sir, I want to starts with the timing of your

20   work with Cigna.  My understanding is you started at

21   Cigna on May 4, 2015; is that correct?

22       A.    Yes.

23       Q.    You started there as a lawyer?

24       A.    Yes.

25       Q.    And in fact, you were a litigation lawyer at

1    Cigna for a period of time, right?

2        A.    Yes.

3        Q.    And then January 1 of 2017, you moved into the

4    SIU department, right?

5        A.    Yes.

6        Q.    And then after that you were promoted to your

7    concurrent position, I believe in 2019, right?

8        A.    Yes.

9        Q.    Sir, you would agree with me that you started at

10   Cigna after much of the events that occurred in these

11   investigations had already occurred, right?

12       A.    Yes.

13       Q.    You agree that your personal knowledge of a lot

14   of the activity and the investigation is very limited,

15   right?

16       A.    No.

17       Q.    You don't remember testifying to that at any

18   time, sir?

19       A.    I remember having a deposition.

20       Q.    Your deposition was about 200 pages, right?

21       A.    Ye.

22       Q.    You were asked a lot of questions and gave a lot

23   of answers, right?

24       A.    I did.

25       Q.    You don't remember testifying that your personal

1    involvement in these investigations was rather limited?

2        A.    With respect to what time frame?

3        Q.    We'll move on, sir.  The fact of the matter is,

4    you did not start at Cigna until several years after

5    these investigations had started with respect to these

6    Labs, right?

7        A.    That's too broad.  There's three labs.  The

8    investigations were not started several years before I

9    got there for all three labs, so you will have to be more

10   specific.

11           THE COURT:  That's a good point, but let me just

12   ask you -- he's cross-examining you, so he's looking for

13   a yes or no, or I can't answer.  That would have been a

14   good one for that one because -- if you have a different

15   answer for different labs.  So you need to reframe, sir.

16           MR. CUNNINGHAM:  Sure.  I will move on, Your

17   Honor.

18   BY MR. CUNNINGHAM:

19       Q.    Mr. Goldfarb, when you first started working at

20   Cigna, you were in the legal department working a

21   litigator, as we just established, right?

22       A.    My title was counsel, but yes.

23       Q.    Were you going to trial on cases?

24       A.    No.

25       Q.    What type of work were you doing?

1439

1   A.   The bulk of my job was to work with SIU

2   investigators supporting their investigations.

3   Q.   Okay.  Didn't you give advice to Patrick Hurley

4   and Deanna Anderson regarding the Epic Labs'

5   investigation?

6   A.   I did.

7   Q.   Now, sir, would you agree with me that Ms. Canto

8   flagged Palm Beach Labs on December 11 of 2014?

9   A.   I would need to see something to refresh my

10  recollection.

11  Q.   Does that sound about right?

12  A.   Honestly, as I sit here now, I would need to see

13  something to refresh my recollection.  I can't answer

14  that.

15  Q.   Sir, when you testified in this case when you

16  gave a deposition you said that you had spent

17  approximately 50 hours reviewing the file in minute

18  detail so that you could give your deposition testimony,

19  right?

20  Yes.

21  Q.   I presume that you would have reviewed relevant

22  portions of the file before you came in here today?

23  A.   Is that a question?

24  Q.   Yes.

25  A.   Yes, I have.

1440

1    Q.   But you don't remember when Ms. Canto flagged

2    Palm Beach labs?

3    A.   If you would like to put something in front of

4    me, I can confirm it, but I don't want to say under oath

5    any particular date.

6    Q.   Sir, I'm trying to speed this along.  We'll go

7    ahead and move on.

8         Sir, so Cigna never made another payment to PB

9    Labs after the flag was placed against PB Labs in

10   December of 2014, right?

11   A.   I can't say that with certitude.

12   Q.   Sir, would you agree with me that you seem to

13   have had a lot better memory on direct examination than

14   you do on cross-examination?

15   A.   No.

16   Q.   Let me take to you about a couple of things you

17   said on direct examination.  First of all, let's talk

18   about medical necessity.  That was certainly an important

19   topic on a direct examination, right?

20   A.   Yes.

21   Q.   You know that's an important context in the

22   context of this case, right?

23   A.   Yes.

24   Q.   Would you agree with me, sir, that treating

25   doctors determine medical necessity?

1    A.    No.

2    Q.    Would you agree that doctors initially are the

3    ones that determine medical necessity?

4    A.    No.

5    Q.    Who determines medical necessity?

6    A.    Says right so -- we all looked at it.  It was in

7    the plan document.  And it specifically says that the

8    Cigna medical director determines medical necessity.

9    That was a defined term in the Cigna plan.

10    Q.    So I don't mean to cut you off.

11    A.    Yeah.  And it specifically also says that the

12    treating physician is not -- just because the treating

13    physician orders something, that does not make it

14    medically necessary and covered under a Cigna plan.

15    Q.    But Cigna wrote these policies, right?

16    A.    Yes.

17    Q.    Cigna decides in these policies who defines or

18    who determines medical necessity, right?

19    A.    Yes.

20    Q.    So Cigna says I don't care if you are the

21    treating doctor, I don't care if you are the person who

22    is actually treating this person, our medical director,

23    who is an employee of Cigna, gets to be the final word on

24    medical necessity; isn't that true?

25    A.    There's a lot baked into that.  Can you break it

1442

1    down for me?

2        Q.   Sir, can you just answer the question?

3            MR. KANG:  Objection, Your Honor.  It's

4    compound.

5            THE COURT:  Sustained.

6    BY MR. CUNNINGHAM:

7        Q.   Let me break it down for you, sir.

8            The treating doctor is the person that is

9    actually treating the patient, observing the patient,

10   examining the patient and making recommendations as to

11   what treatment they think is medically necessary, right?

12           MR. KANG:  Objection.  Same objection, Your

13   Honor.

14           THE COURT:  He has to answer it, but all of the

15   things he reiterated are included in his question of does

16   he agree that the treating doctor is actually doing those

17   -- or is the treating doctor when he is doing those

18   things.

19       A.   With respect to this case, I have seen no

20   evidence that the treating doctor was doing any of those

21   things.

22   BY MR. CUNNINGHAM:

23       Q.   Sir, that wasn't my question.  I didn't ask you

24   specifically about this case.  I'm asking you generally.

25       A.   A hypothetical?

1    Q.    No, I'm not asking you a hypothetical.  You are

2  certainly not an expert, sir.  I'm just asking you as a

3  fact witness.  Isn't it true that the treating doctor is

4  the person who is actually seeing the patient, observing

5  the parent, examining the patient and then making

6  recommendations as to what treatment is medically

7  necessary?

8    A.    That's how it's supposed to work, yes.

9    Q.    Thank you.  And Cigna writes its own insurance

10  policies, right?

11    A.    Yes.

12    Q.    And Cigna says, we don't care what you say,

13  treating doctor, even though you are observing the

14  patient and examining the patient, we have --

15        MR. KANG:  Objection, Your Honor.

16        THE COURT:  You have to let him finish.

17  BY MR. CUNNINGHAM:

18    Q.    -- we have the last word.  Our medical director,

19  who is an employee of Cigna, is the final word on whether

20  treatment is medically necessary, true?

21        MR. KANG:  Objection.

22        THE COURT:  Basis?

23        MR. KANG:  Argumentative.

24        THE COURT:  I'll sustain it for that and another

25  reason.  Go ahead.

1444

1    BY MR. CUNNINGHAM:

2        Q.    Sir, Cigna's policy reserves unto its medical

3    director the last word as to whether treatment that

4    somebody is seeking to have Cigna pay for is medically

5    necessary, right?

6        A.    No.  As I explained, there's the opportunity for

7    an IRO, an independent person to --

8            THE COURT:  The answer is no, sir?

9        A.    The answer is no.

10    BY MR. CUNNINGHAM:

11        Q.    And the IRO is comprised on a Cigna employees,

12    isn't it?

13        A.    No, it is not.

14        Q.    Let's talk about the appeals process because I

15    know you talked about that on direct examination.  For

16    example, in the investigation of PB Labs, Stephanie Canto

17    placed the flag on PB Labs.  If PB Labs were to appeal

18    that, the appeal would go right back to Stephanie Canto,

19    wouldn't it?

20        A.    What flag are you talking about?

21        Q.    The one for services not rendered as billed.

22        A.    Okay.

23        Q.    Can you answer my question?

24        A.    Is it hypothetical if they had --

25        Q.    No, it's not a hypothetical.

1445

1    THE COURT:  You are answering about what you

2    would see on an appeal of a claim you looked at in your

3    investigation as to these Labs.

4    THE WITNESS:  Your Honor, they didn't take an

5    appeal.

6    THE COURT:  Okay.

7    A.    So I can't -- it is all hypothetical.

8    BY MR. CUNNINGHAM:

9    Q.    Sir, let me ask you this way.  If the Labs had

10   taken an appeal when that flag was placed for services

11   not rendered as billed, isn't it true that the person who

12   would have determined the appeal was Stephanie Canto?

13   A.    Not on the issue of medical necessity.

14   Q.    What about on the issue of a fee forgiveness?

15   A.    Hypothetically, if they had taken an appeal,

16   which they didn't do -- actually a few were appealed.

17   And as you know, the appeals do go to the SIU.  And if

18   there was documentation regarding fee forgiving, that

19   documentation would have been reviewed by the SIU

20   investigator, but there was no documentation attached to

21   any appeal.

22   Q.    Sir, my question was simply if there had been an

23   appeal of the placement of the flag for fee forgiveness

24   and Stephanie Canto had placed that flag, if there had

25   been an appeal, that appeal would have gone right back to

1    Stephanie Canto, true?

2            MR. CUNNINGHAM:  Objection to the hypothetical,

3    Your Honor.

4            THE COURT:  Well, he did say he remembered after

5    answering there hadn't been any appeals, there was.  And

6    so I think he needs -- it is not a hypothetical.

7            Do you want the question back, sir?

8        A.    Not just to Stephanie Canto.  As we know, Kathy

9    Giuliani also received appeals.

10   BY MR. CUNNINGHAM:

11       Q.    Kathy Giuliani just covered for Stephanie Canto

12   while she was on maternity leave, true?

13       A.    That's correct.

14       Q.    Sir, I'm not trying to argue with you.  I just

15   want to know if PB Labs had appealed the flag that

16   Ms. Canto placed for fee forgiveness, would that appeal

17   have gone back to Stephanie Canto?

18       A.    Either to Stephanie Canto or another person

19   covering Stephanie Canto.

20       Q.    So would not have gone to anybody who was not an

21   employee of Cigna, right?

22       A.    Correct.

23       Q.    Now, sir, these individual family plans were

24   really a consequence of Obamacare, were they not?

25       A.    Yes.

1447

1    Q.   You would agree with me that these individual

2  family plans provided very broad coverage, right?

3    A.   That's -- I can't answer that question.

4    Q.   Let me about more specific.  Sir, you would

5  agree with me that under the Cigna individual family

6  plans at issue here, lab services were considered a

7  covered item, were they not?

8        MR. KANG:  Your Honor, I was precluded from

9  asking questions on these general issues during my

10  direct.  I think Mr. Cunningham should be limited as

11  well.

12        MR. CUNNINGHAM:  I will lay the predicate, Your

13  Honor.

14        THE COURT:  You have to reframe that question.

15        MR. CUNNINGHAM:  I will.

16  BY MR. CUNNINGHAM:

17    Q.   Sir, you're familiar with the terms of the Cigna

18  individual family plans at issue in this case, right?

19    A.   Yes.

20    Q.   You reviewed those many times, haven't you?

21    A.   Yes.

22    Q.   You are familiar with the coverage language in

23  those individual family plans, aren't you?

24    A.   Yes.

25    Q.   You would agree me that lab testing is a covered

1    service under those individual family plans at issue

2    here, right?

3          MR. KANG:  Same objection, Your Honor.  Not an

4    expert, as Mr. Cunningham said.

5          MR. CUNNINGHAM:  I'm not asking for expert

6    testimony.

7          THE COURT:  Overruled.  Answer the question.

8      A.    The services are eligible for coverage if all

9    terms and conditions of the plan are met, no exclusions

10   are triggered, and as well as the coverage policies, they

11   are eligible for coverage.

12   BY MR. CUNNINGHAM:

13     Q.    So the presumption is that lab services are a

14   covered service or lab tests are a covered service unless

15   there's an exclusion or some condition that's not met?

16     A.    No.  The presumption is that there's --

17          THE COURT:  That's it.  That's the answer.  Ask

18   your next question, sir.  If you want him to explain, you

19   should ask him to explain.

20          MR. CUNNINGHAM:  Sure, and I will if I want him

21   to explain, Your Honor.

22   BY MR. CUNNINGHAM:

23     Q.    So sir, you would agree with me that under these

24   individual family plans that you reviewed -- I think you

25   said you reviewed hundreds of them.  Didn't you say that

1    on direct examination?

2    A.    In connection with this -- I don't think that's

3    what I testified to.

4    Q.    All right.  But the policies plainly state that

5    lab testing is a covered service subject to the other

6    terms and conditions and exclusions on the policy,

7    righting?

8        MR. KANG:  Objection, asked and answered.

9        THE COURT:  Right, but his answer came with a

10   qualification or explanation.  I think he's permitted to

11   start with the basis.  So you have to answer that

12   question, sir.  It's overruled.

13   A.    You have baked into your --

14       THE COURT:  Say you can't answer --

15   A.    I can't answer the way you phrased it.

16   BY MR. CUNNINGHAM:

17   Q.    Now, sir, you wrote a letter and also gave some

18   legal advice with respect to Epic Labs, right?

19   A.    I'm not sure what letter you are referring to,

20   but I did give legal advice with regard to Epic Labs.

21   Q.    You are aware that Epic was never flagged for

22   fee forgiveness in this case?

23   A.    Yes.

24   Q.    You agree -- are you aware that Epic had the

25   same billing company as both Palm Beach Labs and

1    BioHealth?

2         A.   I don't know that I knew that at the time.

3         Q.   You know that now.

4         A.   I know that now.

5         Q.   So even though Epic had the same billing company

6    as PB Labs and BioHealth, those labs were flagged for fee

7    forgiving, but Epic Labs never was?

8         A.   I am going to need you to repeat that.

9              MR. CUNNINGHAM:  Terri, could you please read

10   that back?

11             (Requested portion was read.)

12   BY MR. CUNNINGHAM:

13        Q.   True?  Yes or no.

14        A.   I can't answer the way that you phrased it.  It

15   will not reflect an accurate response.

16        Q.   You can't answer that question yes or no?

17        A.   I can't.

18        Q.   Let's break it down.  Epic Laboratories had the

19   same billing company as PB Labs and BioHealth, right?

20        A.   I know that now, yes.

21        Q.   Epic used the same testing procedures as PB

22   Labs and BioHealth, right?

23        A.   I don't know.

24        Q.   Sir, you talked at length on direct examination

25   about these examinations and investigations you did.  You

1    are not aware of that?

2        A.    There wasn't an investigation of medical

3    necessity into Epic Laboratories.

4        Q.    Sir, that's my point.  There was never a flag

5    placed on Epic Laboratories, right?

6        A.    For what?

7        Q.    For fee forgiveness.

8        A.    Correct.

9        Q.    Even though they used the same billing company

10   with the same procedures as Palm Beach Labs and

11   BioHealth?

12       A.    I don't know that to be the case.

13       Q.    You agree that there was never an allegation

14   made by Cigna that Epic performed tests that were not

15   medically necessary?

16       A.    That allegation has absolutely been made in this

17   case.

18       Q.    You believe that Epic placed a flag on -- excuse

19   me.

20             You believe that Cigna placed a flag on Epic?

21       A.    That wasn't your question.

22       Q.    Okay.  Did Cigna ever place a flag on Epic for

23   lack of medical necessity?

24       A.    No.

25       Q.    There was never a flag placed on Epic for fee

1    forgiveness, was there?

2        A.    No.

3        Q.    Now, sir, you testified at length on direct

4    examination about efforts made or not made by the Labs to

5    collect co-pays, deductible, et cetera, right?

6        A.    I testified on that subject.

7        Q.    Sir, you are aware that there were patients of

8    the Labs that were contacted by Ms. Canto who said that

9    they had received bills, true?

10       A.    At what time?

11       Q.    During Ms. Canto's investigation of PB Labs.

12            MR. KANG:  Objection, Your Honor, calls for

13   hearsay.

14            THE COURT:  You will have to reframe as to you

15   were aware in connection with this investigation, et

16   cetera, as Attorney Kang did in rephrasing some of his

17   questions.

18            MR. CUNNINGHAM:  I will, Your Honor.

19            THE COURT:  Sustained.

20   BY MR. CUNNINGHAM:

21       Q.    Sir, in conjunction with your investigation, you

22   would have had access to Ms. Canto's case notes and

23   ledger that documented her activity on this file, right?

24       A.    Yes.

25       Q.    That's something that you look at routinely,

1    right?

2         A.    No.

3         Q.    During investigations, you don't look at the

4    case notes or the activity performed or not performed by

5    the investigator?

6         A.    During this time frame, no, that was not part of

7    my job.

8         Q.    Did you happen to review that in preparation for

9    your trial testimony?

10        A.    Yes.

11        Q.    Okay.  So sir, you are aware that there are

12   references in Ms. Canto's ledger to calling patients of

13   the Labs who told her that they had, in fact, received

14   bills from the labs; isn't that true?

15             MR. KANG:  Objection, hearsay.

16             THE COURT:  Sustained, but I am going to

17   explain, as I did for Attorney Kang on many occasions how

18   to solve this problem.  I believe you want to know what

19   his understanding is in that regard.  And therefore, you

20   could ask him about this.  If it was in connection with

21   his job at Cigna from 2015 to 2020, to become aware of

22   that subject.  If he never became aware of it, well,

23   then, I guess he'll say no, he didn't.

24             MR. CUNNINGHAM:  Let me try to move on, Your

25   HOnor.  I'm trying to speed this along.  If I may.

1454

1    THE COURT:  Go ahead.  It's your examination,

2  sir.

3  BY MR. CUNNINGHAM:

4    Q.   Sir, isn't it true that you have previously

5  testified that some patients did report that they had

6  received a bail?

7    A.   I don't recall if --

8    Q.   Let me show that to you, sir.

9    MR. CUNNINGHAM:  Can we pull up his deposition.

10    THE COURT:  This is not published to the jury.

11    MR. CUNNINGHAM:  No.

12    THE COURT:  This is something called refreshing

13  a witness's recollection by showing him something so you

14  don't see what the something is.  You're going to hear

15  his answer.  It could be the Manhattan phonebook.

16    MR. CUNNINGHAM:  This is actually intended as

17  impeachment, Your Honor.

18    But let's go to page 151 of the deposition,

19  please.

20  BY MR. CUNNINGHAM:

21    Q.   This is your deposition taken on February 16,

22  2023.  We talked about the fact you were deposed, right?

23    A.   Yes.

24    Q.   Were you asked the following question and did

25  you give the following answer?  Question, starting at

1455

1  Line 11.

2          MR. KANG:  Your Honor, this is improper.  If

3  he's using it to refresh, he can have Mr. Goldfarb look

4  at this --

5          MR. CUNNINGHAM:  I'm not using it to refresh.

6          MR. KANG:  What are you using --

7          THE COURT:  He said he doesn't -- didn't he say

8  he can't recall or --

9          THE WITNESS:  I did say recall.

10         MR. CUNNINGHAM:  I can impeach him with --

11         THE COURT:  Well, if he recalled then, that

12  doesn't -- you can't offer it as testimony in the case,

13  which is what you are doing if you read it out loud.  If

14  you want him to first try to refresh, he can look at the

15  line and page.

16         MR. CUNNINGHAM:  That's fine.  Thank you, Your

17  Honor.

18         THE COURT:  Thank you.

19  BY MR. CUNNINGHAM:

20    Q.   Sir, do you see page 151, starting at line 11,

21  and going down through line 16, can you road that, sir,

22  and see if that refreshes your recollection as to the

23  testimony you gave in this case?

24    A.   It does, but I don't know what lab it's

25  referring to.  You said labs in your question to me, and

1456

1    this is referring to, it looks like, one lab.  So if you

2    phrase the question about a particular lab, I might be

3    able to give you an answer.  But generally all three, the

4    answer is different for all three.  So I need you to be

5    more specific.

6        Q.   This is your deposition testimony, isn't it,

7    taken under oath.

8        A.   It is.  And it says "labs," so we were obviously

9    having a conversation about a specific lab here.  If you

10    want to ask the question correctly about a specific

11    lab --

12            THE COURT:  Sir, you are not going to instruct

13    the lawyer.  Okay?

14            THE WITNESS:  Okay.

15            THE COURT:  You are going to stop.

16    BY MR. CUNNINGHAM:

17        Q.   Sir, does this refresh your recollection or not

18    as to the testimony you gave in this case under oath?

19            MR. KANG:  Your Honor, this is hearsay as well.

20    I'm going to object to that.

21            MR. CUNNINGHAM:  A deposition --

22            THE COURT:  Overruled on that basis.

23        A.   It does refresh --

24            THE COURT:  Sir, there is no question pending.

25    Do you understand you are answering the questions only?

1    THE WITNESS:  Yes.

2  BY MR. CUNNINGHAM:

3    Q.   Sir, does reading this passage, this five

4  lines from your deposition you gave under oath, refresh

5  your recollection as to your testimony that some patients

6  did report that they received a bill?

7    THE COURT:  Can you answer that question yes or

8  no?

9    A.   Some patients of a lab did receive a bill.

10    MR. KANG:  Your Honor -- Your Honor, this is

11  hearsay.

12    MR. CUNNINGHAM:  How is his testimony hearsay?

13    THE COURT:  He asked if it refreshes his

14  recollection.  Yes or no I told him is called for.  I do

15  not know in what universe that is hearsay testimony.  His

16  statement is yes or no about his state of mind.  It is

17  not hearsay.

18    MR. CUNNINGHAM:  It's also an admission, I

19  believe, but --

20    THE COURT:  Just if I could point out back at

21  19:00:01, I believe the question -- one of your

22  questions, sir, was, Now, sir, you testified at length --

23  excuse me.  I won't do that.  Go ahead and answer the

24  question, sir.

25    THE WITNESS:  I don't even know what the pending

```
 1   question is.
 2            THE COURT:  Does that refresh your recollection,
 3   those lines, and as to what?
 4       A.   Yes, this refreshes my recollection that some
 5   patients of a single lab --
 6            MR. KANG:  Your Honor, I'm sorry --
 7            THE COURT:  You should just -- you either have
 8   to say yes or no, sir.  I think that's why your lawyer is
 9   up.
10       A.   Yes.
11   BY MR. CUNNINGHAM:
12       Q.   Sir, you didn't mention at all on direct
13   examination that some patients --
14            MR. KANG:  Objection.  This calls for hearsay.
15   It's not about the deposition transcript.  It's about
16   what patients said.  That's hearsay.  It's not a question
17   of --
18            THE COURT:  He was asked -- he was asked, So you
19   were aware that there were patients of the Labs that were
20   contacted by Ms. Canto who said they had received bills,
21   correct?
22            Answer:  At what time?  Question mark.
23            I'm sorry.  You're right.  During Ms. Canto's
24   investigation of PB Labs.
25            Now, I don't know that the question is modified
```

1    to PB Labs or maybe you understood that.  I understood

2    the question to be labs and patients.  So maybe that was

3    unclear, and so maybe we have to make that clear and you

4    have to ask that question again, which is the first one I

5    read, patients at the labs.

6         MR. CUNNINGHAM:  Your Honor, this deposition was

7    taken by Mr. Hare.

8    BY MR. CUNNINGHAM:

9    Q.   What I would like to ask you, sir, is in Cigna

10   outreach to patients, whether by telephone or letter, did

11   any of the patients or patient representatives report to

12   Cigna that they, in fact -- that, in fact, they had been

13   billed by the Lab?

14        MR. KANG:  Objection, Your Honor.  That calls

15   for hearsay.

16        THE COURT:  I think it was asked in the

17   framework, in which you asked many questions that called

18   for hearsay, but he learned a bit and relied on it in

19   connection with his continuation of this investigation in

20   mid 2015 and on to 2020.  With that caveat and

21   understanding, ladies and gentlemen, as you do understand

22   everything said on direct, which was discussing the

23   general investigation, the question will be answered.

24        MR. CUNNINGHAM:  I'm sorry, Your Honor.  I've

25   kind of lost track of where we are in the --

1460

1    THE COURT:  You just asked the question and

2  there was an objection.

3    MR. CUNNINGHAM:  Right.  He did give an answer

4  to that question.

5    THE COURT:  The reporter -- this is one she

6  didn't get if he gave an answer at that -- right before

7  the objection was stated.

8    MR. CUNNINGHAM:  May I ask it again one more

9  time, Your Honor?

10    THE COURT:  Go right ahead, sir.

11  BY MR. CUNNINGHAM:

12    Q.   Sir, in Cigna's outreach to patients, whether by

13  telephone or letter, did any of those patients or patient

14  representatives report to Cigna that, in fact, they had

15  been billed by the lab?

16    MR. KANG:  Same objection, Your Honor.

17    THE COURT:  Understanding this is the same

18  caveat of his testimony on direct about the

19  investigation, why he did things, this is things he knew

20  of through his work in the investigation.  It doesn't

21  mean he personally did it, as I think lots of what was

22  testified to fall into that.  So with that caveat, the

23  question was:  In Cigna's outreach to patients, whether

24  by telephone or letter, did any of these patient or

25  patient representatives report to Cigna that, in fact,

1461

1   they had been billed by a lab?

2           THE WITNESS:  I think he said "the" lab.

3           THE COURT:  No, sir.  Not in that question.

4           THE WITNESS:  By a lab.

5   BY MR. CUNNINGHAM:

6       Q.   Yes, sir.

7       A.   Yes, by a lab.

8       Q.   Okay.  Now, sir, when -- you spent a long time

9   on direct examination and you had a long discussion with

10  Mr. Kang about fee forgiveness and what the labs did or

11  did not do to collect co-pays, deductibles, et cetera,

12  you never mentioned this, did you, that, in fact, the

13  investigation revealed that some patients did report that

14  they had received a bill?

15      A.   I answered his questions.  That wasn't --

16      Q.   You are not answering my question.

17      A.   No, I didn't, no.

18      Q.   Thank you.  And you know it is true because you

19  previously testified to it, that there were some

20  patients that did report that they had received a bill?

21      A.   I don't know whether it's true.

22      Q.   It's your testimony?

23      A.   I know that -- I know that there was --

24          THE COURT:  Sir, the answer -- the question

25  calls for yes or no or I cannot answer.  If you do not

1462

1    understand that instruction, you have to tell me.

2          THE WITNESS:  I don't know is the answer.

3    BY MR. CUNNINGHAM:

4      Q.   All right, sir.  You would agree with me that it

5    would be important if you knew as an investigator that

6    some patients had reported they had, in fact, received

7    bills from the Labs, it would be important for you to let

8    the jury know that, wouldn't it?

9      A.   Yes.

10     Q.   Thank you.  Now, sir, when you were talking

11   about flags, I want to make sure I understood your

12   testimony correctly.  So we know with the investigation

13   of PB Labs that the original flag Ms. Canto placed was

14   for services not rendered as billed, right?

15     A.   No.

16     Q.   What was it?

17     A.   It was a medical record request flag.  That was

18   the first thing she did.

19     Q.   What was the second one?

20     A.   The second one was services not rendered as

21   billed.

22     Q.   You said on direct examination that services not

23   rendered as billed was basically another way of saying

24   medical necessity, right?

25     A.   Yes.

1463

1    Q.    Now, sir, that flag was changed again -- that

2    flag was removed, the flag for services not rendered as

3    billed or medical necessity, after the Labs sent a lot of

4    documents, a lot of medical records that we've been

5    talking about to Ms. Canto, who then sent them to

6    Dr. Nicoll, right?

7          MR. KANG:  Objection, compound question.

8          THE COURT:  It's two events that are in the

9    question.  He's asking about something did or didn't

10   happen after two things occurred.  You may answer the

11   question, sir, yes or no.

12   A.    No.

13   BY MR. CUNNINGHAM:

14   Q.    That's not true?

15   A.    No.

16   Q.    The flag for services not rendered as billed or

17   medical necessity was not removed?

18   A.    It was placed after the records were sent to

19   Ms. Canto and reviewed by Nicoll.  That is when the flag

20   for -- for lack of medical necessity services not

21   rendered as billed was initially placed.

22   Q.    Then it was later removed, wasn't it?

23   A.    It was later replaced.

24   Q.    Sir, I --

25          THE COURT:  Answer the question, sir.

1464

1    THE WITNESS:  Yes.

2    BY MR. CUNNINGHAM:

3    Q.    Removed or replaced would have the same net

4    effect, wouldn't it, sir?

5    A.    Yes.

6    Q.    You told us that two labs could not be placed by

7    the SIU at the same time, right?

8    A.    Yes.

9    Q.    So the flag for medical necessity was removed

10   and the flag for fee forgiveness was placed, right?

11   A.    Yes.

12   Q.    Now, sir, you -- I believe you testified on

13   direct examination, please correct me if I'm wrong, I

14   believe you testified that the investigation of BioHealth

15   is still ongoing?

16   A.    In a sense, yes.

17   Q.    Sir, you are aware that BioHealth shut down

18   years ago when they weren't getting paid?

19   A.    Yes.

20   Q.    But the investigation is still going on?

21   A.    Yes.

22   Q.    Now, sir, is it your belief that Dr. Nicoll did

23   a specialized review of the medical records that were

24   sent to him by Ms. Canto?

25   MR. KANG:  Objection, Your Honor.  This is going

1465

1   far beyond the scope of direct.

2           THE COURT:  Overruled.

3   BY MR. CUNNINGHAM:

4       Q.   Can you answer the question, sir?

5           THE COURT:  You can answer the question, sir.

6   When I say overruled, it means you can answer the

7   question.

8       A.   Yes, he did a review.

9   BY MR. CUNNINGHAM:

10      Q.   And you are aware that -- well, you were in the

11  courtroom when Dr. Nicoll testified, right?

12      A.   Yes.

13      Q.   And Dr. Nicoll responded to Ms. Canto literally

14  within a matter of hours after receiving that large box

15  of medical regards to review, didn't he?

16          MR. KANG:  Objection.  Beyond personal

17  knowledge, Your Honor.

18          MR. CUNNINGHAM:  He was in the courtroom for the

19  testimony.

20          THE COURT:  He can't comment on that.  He has to

21  comment on whether he learned about something and then

22  you continued investigating.  I don't think you can ask

23  him to comment on another -- he's learned of it now.  I

24  mean, as to what was said, I'm not going to -- what was

25  said was said.  I don't think you can ask him to

1    incorporate the testimony into his testimony.  They have

2    already heard that.  They need to hear it from him.

3         MR. CUNNINGHAM:  Thank you, Your Honor.

4         THE COURT:  So rephrase, I guess.

5    BY MR. CUNNINGHAM:

6    Q.   Sure.  Sir, you are aware that Dr. Nicoll

7    responded to Stephanie Canto within a matter of hours of

8    receiving that large box of medical records via UPS,

9    right?

10        THE COURT:  Just asking if -- if you are aware

11   of that in connection with your investigation of these

12   Labs from 2015 to the beginning of this lawsuit, that's

13   what he's asking.  Were you aware of it at that time?

14   A.   Not at that time.

15   BY MR. CUNNINGHAM:

16   Q.   So when you looked at the file and you reviewed

17   the file in preparation for your trial testimony, you

18   didn't notice that Dr. Nicoll got the records on a

19   particular morning and then responded that he had

20   allegedly reviewed the records within a matter of hours?

21        MR. KANG:  Objection, Your Honor.  Going beyond

22   the scope of the time frame that we, I thought, agreed

23   upon, 2015 to 2020.

24        THE COURT:  He said during his investigation.  I

25   guess we've now learned it's still going on.  But I am --

1    when he uses the word "investigation," you should

2    understand he's referring to from the date you were

3    assigned in any way or received any work to work on this

4    investigation to the date of the lawsuit, first lawsuit

5    in Connecticut that's at trial today.

6            THE WITNESS:  Can you read back the question.

7            THE COURT:  Yes.  Terri.  When you reviewed the

8    file, 15:30:47.

9            THE COURT REPORTER:  I'm sorry.

10           THE COURT:  Yeah, that's sustained.  I

11   apologize.  I missed that portion.  It can't be in

12   preparation.  I mean, your question is asking about the

13   investigation.  That's not preparation for trial.  I cut

14   off the investigation.

15           MR. CUNNINGHAM:  That's fine, Your Honor.

16   BY MR. CUNNINGHAM

17      Q.   Sir, didn't you tell us just a little bit ago

18   that you had reviewed a number of documents to prepare

19   for your trial testimony?

20      A.   Yes.

21      Q.   Do you remember seeing the email from Stephanie

22   Canto sending the large box of medical records to

23   Dr. Nicoll by UPS?

24           MR. KANG:  Same objection, Your Honor.  Talking

25   about trial preparation.

1468

1     MR. CUNNINGHAM:  Let me rephrase.

2     THE COURT:  I guess I haven't heard the

3   question.  You've got to wait until he asks a question

4   that has some substance besides predicate.

5     MR. CUNNINGHAM:  Let me try it this way, Your

6   Honor.

7   BY MR. CUNNINGHAM:

8     Q.   Sir, during your investigation of PB Labs, do

9   you recall seeing the email from Stephanie Canto sending

10  a large box of 20 patient medical records to Dr. Nicoll

11  and then seeing Dr. Nicoll's response the very next day

12  indicating that he had reviewed the large box of medical

13  records?

14    A.   No.

15    Q.   Did you see those emails as you were preparing

16  for your trial testimony?

17    MR. KANG:  Objection, Your Honor.

18    THE COURT:  I will allow the question.  I will

19  allow that.  Just yes or no.

20    A.   Yes.

21  BY MR. CUNNINGHAM:

22    Q.   Sir, you are aware that that is essentially the

23  same documents that Dr. Nemecek later said he would need

24  three to four months to review, right?

25    A.   That's false.

1469

1    Q.   That's false.

2         THE COURT:  You are asking him about the other

3    fellow's testimony, which the jury hasn't even heard --

4    there's no objection, but I'm going to sustain --

5         MR. CUNNINGHAM:  But, Your Honor, the jury -- I

6    don't mean to argue with the Court.  The jury saw those

7    emails during the testimony.

8         THE COURT:  It was in an email.  I thought you

9    said testimony.

10        MR. CUNNINGHAM:  No.

11        THE COURT:  See those emails.  Okay.  You are

12   aware of essentially the same documents that he said --

13   well, your question didn't tell me it was an email, so --

14        MR. CUNNINGHAM:  I apologize, Your Honor, if I

15   didn't ask it --

16        THE COURT:  You just said you are aware of

17   essentially the same documents, et cetera, by Nemecek.

18   You didn't tell me if it was an e-mail, you didn't tell

19   him it was an email.

20        MR. CUNNINGHAM:  I'm sorry, Your Honor, you're

21   correct.  Dr. Nemecek has not testified yet.

22        THE COURT:  He hasn't testified. --

23   BY MR. CUNNINGHAM:

24   Q.   This came up in the testimony of Dr. Nicoll the

25   other day.  Dr. Nicoll was showed a series of emails

1    between Stephanie Canto and Dr. Nemecek where she sent

2    essentially the same 20 patient records to Dr. Nemecek,

3    and he said these would probably take me three to four

4    months to review.  Do you remember that?

5            MR. KANG:  Objection, Your Honor.

6            THE COURT:  Sustained.

7            MR. CUNNINGHAM:  Your Honor, there's one thing I

8    am going to have to take up at sidebar, but I will go

9    ahead and ask my last question before that.  It's just

10    something I need to for the record.

11            THE COURT:  Just ask the question, sir.

12    BY MR. CUNNINGHAM:

13    Q.   So, sir, did I hear your -- strike that.  Let me

14    ask you this.

15            You said that Cigna is seeking $16 million back

16    from the Labs, right?

17    A.   Yes.

18    Q.   Would that represent every penny that Cigna had

19    paid to the Labs during the time that the Labs were

20    submitting claims to Cigna?

21    A.   Yes.

22    Q.   Now, sir, I think you said -- you used the word

23    "deplorable."  I think you were talking about when people

24    have dual payment scheme, as you called it; is that

25    right?

1    A.    Yes.

2    Q.    Wouldn't it be deplorable for Cigna to try to

3    take back every single penny they paid to the Labs when

4    they Labs had demonstrated medical necessity for a lot of

5    the services that were rendered on behalf of the Cigna

6    subscribers?

7    A.    They didn't -- they haven't proven medical

8    necessity for a single claim, so it is not -- it is

9    completely proper for Cigna to recover that money.

10   Q.    You believe that Cigna should get the benefit of

11   every penny that it paid to these Labs that performed

12   these services?

13   A.    It is not Cigna's money.

14        THE COURT:    Answer the question.    It calls for a

15   yes or no.

16   A.    I can't answer the question the way it is

17   phrased.

18   Q.    Sir, you would agree with me that --

19        THE COURT:    Am I correct, sir, that the IFP

20   policies are Cigna's money?

21        THE WITNESS:    Yes, that portion is.

22        THE COURT:    Yes, that portion is.

23        Go ahead, sir.

24   BY MR. CUNNINGHAM:

25   Q.    Sir, it is true, is it not, that with regard to

1    the individual family plan policies, those are Cigna's --

2    or that is Cigna's money that you are trying to claw

3    back, as the law calls it, right?

4        A.    We are trying to recover that money, correct.

5        Q.    And sir, you would agree with me, would you not,

6    that the Labs themselves certainly don't determine

7    medical necessity, do they?

8        A.    No.

9        Q.    No, you would not agree -- maybe that was a bad

10   question.

11           Would you agree with me that the Labs do not

12   determine medical necessity?  I really thought we would

13   be able to agree on that one.

14       A.    Correct.

15       Q.    Thank you.  Sir, you would agree that the Labs

16   did, in fact, perform the Lab tests that are depicted on

17   the bills that they submitted to Cigna, right?

18       A.    I don't know if that's true.

19           MR. CUNNINGHAM:  Your Honor, we need to take

20   something up at sidebar.  I apologize.

21           THE COURT:  You are going to go to your next

22   question, sir.

23           MR. CUNNINGHAM:  I'm done, Your Honor, subject

24   to what we have to talk about next.  Depending on the

25   Court's ruling, I may or may not have some more

1473

1    questions.  This is something that just came up for the

2    first time on direct.

3         (Sidebar commenced.)

4         MR. CUNNINGHAM:  You're going to want

5    Mr. Gestrich to argue this because he pointed this out to

6    me.

7         MR. GESTRICH:  Your Honor, as I understand

8    Mr. Goldfarb testified about his investigation into the

9    Labs during the time period of 2015 and later.  We have

10   some privilege logs from Cigna that are replete with

11   withheld documents on the basis of privilege.  We do not

12   have any of these documents from Mr. Goldfarb during this

13   time.  I believe it's somewhere around 50 -- at least 40

14   up to about 50 documents, we don't how many more, do not

15   have his name on these documents.  We believe that we

16   should have the opportunity to review those documents on

17   the basis of waiver.  He's testifying as to his

18   investigation as of that time.  These documents would be

19   relevant, and we should have the opportunity to

20   cross-examine him about his investigation at that time.

21        THE COURT:  Is he the only attorney that's a

22   recipient and sender of the 30 pages you just referenced,

23   generally -- general knowledge of having reviewed it?

24        MR. GESTRICH:  On some of them, yes, on some of

25   them, no.

1  THE COURT:  As to the ones he's alone, does

2  that cover the time he stopped being a lawyer for Cigna

3  and became a staff person involved in SIU work, which I

4  think was January of 2016 or '17.

5  MR. CUNNINGHAM:  2017, Your Honor.

6  MR. GESTRICH:  I'm looking at some of them.  I'm

7  not certain as to that.

8  THE COURT:  You can't look to see the last one

9  in chronological --

10  MR. GESTRICH:  It's not chronological.

11  THE COURT:  They're not chronological.  I can't

12  address this question.  I don't think I can ask Attorney

13  Kang to address it.  Clearly, when Cigna slaps a lawyer

14  from the legal department on a document, they're going to

15  claim it's privileged.  I've seen that in the one

16  document I reviewed.  Whether it should or shouldn't

17  claim privilege is another question.  But if there's

18  nobody else on that document that's a lawyer, then if

19  that document does not say Attorney Smith in the legal

20  department told me the following, that is an abuse of

21  privilege assertion.

22  MR. CUNNINGHAM:  That's what we're concerned

23  about.

24  THE COURT:  Well, I'm concerned, too, because

25  we're three days away from this going to a jury.  But I

1   don't know because you haven't told me the answer, so I

2   cannot answer this.  I can't hear this argument.

3          MR. CUNNINGHAM:  I understand.  Let me just add

4   one point, Your Honor.  I'm sorry.  I think it was last

5   Friday when the Court said you wanted to see the

6   redactions.

7          THE COURT:  I did.  I didn't ask for that.

8          MR. CUNNINGHAM:  I didn't know if that had been

9   given to you.

10         THE COURT:  It did.  And I don't know what I am

11  going to do with it.  I don't believe it -- it's not

12  going to get used in this case just because I looked at

13  one example.

14         MR. GESTRICH:  Would it be possible for the

15  documents that are marked as redacted or withheld to be

16  submitted to the Court for --

17         THE COURT:  30 pages.  30 pages.  Seriously?

18  We're done here.

19         (Sidebar ended.)

20         THE COURT:  Ladies and gentlemen, we're close to

21  the witching hour so I am going to excuse you.  We aren't

22  going to be able to get any more testimony.

23         Sir, you can step down.  And if you'd leave the

24  courtroom, I'd appreciate it.  You are due back here at

25  9:25 on Monday morning.

1    Before you leave today, ladies and gentlemen, I

2    need to repeat some things because I told them to you a

3    while ago.  I've referred briefly to them from time to

4    time, but I am going to spend a few moments standing

5    between you and your weekend, and I apologize.  But

6    remember all of those instructions I gave you at the

7    beginning of this case.  I gave them to you twice,

8    actually.  I don't know if you noticed that.  Do not talk

9    to anyone about this case and do not let anyone talk to

10   you about it.  That includes -- "talk" defined in 2024

11   means via any electronic device, application, or

12   whatever, as well as verbal over a telephone, texting,

13   whatever.  Do not communicate or you express something

14   about this case to anyone.  That's the first thing I want

15   to remind you of.

16   And the second thing I want to remind you of is

17   do not attempt to research anything about this case.

18   That includes me, the lawyers, the witnesses, the company

19   involved -- the companies involved, excuse me, anything.

20   Even a general -- you are just interested generally in

21   healthcare coverage.  Okay.  No.  Nothing.  Okay.

22   I told you when we are done, you can make this

23   your life's goal to understand policies, exclusions,

24   everything else you've heard about so far, okay, but not

25   now.  Not now.

1    And I know I have told you this before and you

2    were very attentive, you've been very attentive

3    throughout this trial.  I cannot tell you -- thank you

4    enough for your service so far, but I just have to remind

5    you it is the weekend and we're getting deep into the

6    case.

7    I told you I would try to give you some idea --

8    this morning if I had told you when I thought you would

9    get the case, I would have said Thursday morning.  In

10   other words, it would be in your hands, you would have

11   heard closing argument and you would have heard my charge

12   on the law and you would begin to deliberate.  Yeah, in

13   the a.m., but very late in the a.m.  Okay.  Now I'm not

14   so confident after today.  I think, however, it will

15   still be that.  I'm going to tell you that's what it is

16   going to be.

17   Last I checked, I'm still in charge of the

18   trial.  So assuming that doesn't change, it's going to be

19   Thursday morning.  The evidence will end by midday

20   Thursday [sic].  Close approximate.  The lawyers will

21   probably close on Wednesday afternoon.  Then I charge you

22   on Thursday.  And as I told you --

23           THE COURT REPORTER:  You misspoke.

24           THE COURT:  What did I do?

25           THE COURT REPORTER:   The evidence is going to

1    end on Wednesday.

2         THE COURT:  End on Wednesday.  I'm sorry.

3    Wednesday midday, the lawyers have -- probably have lunch

4    -- we'll have lunch and the lawyers will then do closings

5    on Wednesday afternoon.

6         Thank you, Terri.

7         Then when you come back Thursday morning, I will

8    instruct you on the law.  You will take a copy of that

9    instruction, along with the verdict form, to the jury

10   room and in a few minutes after you get there, you'll

11   elect a foreperson and then Liana will come in, she'll

12   explain how you can look at the exhibits.  Remember I

13   told you, you can look at them.  Once she does that

14   preliminary instruction, she's going to leave and the

15   case is in your hands from then on.  I mean, if you want

16   to go later then 3:45, you can.  I'm not going to make

17   you -- trust me, I'm not going to make you do it.  And it

18   could be somebody has to be somewhere, you know, pick up

19   grandkids or children or whatever.  The schedule is more

20   your schedule.  Of course, I am not going to be happy if

21   you tell me you'd like to leave at 1:00.  I don't think

22   we'll do that.

23        But I'm just trying to make the point it's your

24   schedule at that point.  And how long it takes you to

25   deliver two verdicts is up to you.  So I can't tell you

1   -- I've given you an estimate when I thought you would be

2   done by, but I -- in terms of the dates of the trial.

3   But as of Thursday early lunch, it is in your hands I

4   believe.  That is my best estimate right now.  Generally

5   lawyers are -- judges are second only to lawyers in

6   estimating their time things take in a courtroom, but on

7   this one I'm pretty confident.

8            Okay.  Thank you very much.  Have a wonderful

9   weekend.  It still going to be good weather, shockingly,

10  in New England.  Enjoy it.  Get a lot of rest, and thank

11  you very much.

12           (In the absence of the jury at 3:47 p.m.)

13           THE COURT:  I don't know what you want me to do

14  with what you raised.  It's obviously very troubling, but

15  it's a little late in the game to be troubling.

16           MR. CUNNINGHAM:  Obviously, we found out that

17  out today.  There was a question that was asked.

18           THE COURT:  I can't hear you.

19           MR. CUNNINGHAM:  We just found out about this

20  today.  It wasn't --

21           THE COURT:  I know you did, but I did, too, sir.

22           MR. CUNNINGHAM:  I am sorry, but I have to make

23  my record, Your Honor.

24           THE COURT:  I know you do, sir.  And I

25  apologize.  You go right ahead.

1    MR. CUNNINGHAM:  No, it's okay.  It's been a
2    long week.
3        THE COURT:  It has been. --
4        MR. CUNNINGHAM:  Remember a question was asked
5    and I basically said, Are they intending to waive
6    privilege?
7        THE COURT:  I know.  I appreciated that, that
8    you did that, because you could have been quiet and
9    claimed he waived it.  I might have ruled he did.  I
10   don't know that I would, but I'm saying that was a risk
11   for him, and you raised it.  So go ahead.
12       MR. CUNNINGHAM:  So we couldn't bring this issue
13   to the Court's attention.  There would have been no
14   reason to until that happened today.  So I apologize, but
15   that's why we brought it up when we did.
16       THE COURT:  I know that's why you brought it up.
17   I'm not criticizing you.
18       MR. CUNNINGHAM:  Thank you, Your Honor.
19       THE COURT:  But I can't do anything about this
20   is when you brought it up.  We are two and a half days
21   short.  Again, I cannot give you the time.  Yesterday
22   does not make any sense to me.  Today I think you can
23   assume that the Labs are charged with, I don't know,
24   approximately -- we'll give you a final number, but
25   approximately 44 minutes, and the rest of the day -- it's

1   got to be more than that.  I don't know what Cigna's is.

2   I will have to give you the times.  Maybe yours is wrong,

3   too.  Today I can give you, and hopefully I will also

4   give you yesterday.  So you are going to know how much

5   time you have.

6          What I do know is you started on Friday minus, I

7   don't know, about an hour and ten minutes.  And so you

8   should finish on Wednesday about an hour and ten minutes

9   in.  That's eight days.  Obviously, I -- I have not been

10  counting sidebars and whatever up to today to any

11  particular party.  And so there have been some periods,

12  but my counts at least up to yesterday was there was not

13  a lot of time, less than an hour.  So it's clearly before

14  lunch on Wednesday you are going to be done.  And you are

15  going to be done.

16         You should make your record, sir.  I will come

17  in at 8:00 on Monday morning.  You can make any record

18  you want.  And Attorney Kang, you can make any response

19  you want.  This may be a very reason on appeal why you

20  get a retrial.  Okay.  And why someone is going to scrub

21  every one of those documents and decide if Attorney Kang

22  has unreasonably asserted and abused the discovery

23  process or not.

24         Okay.  I cannot imagine that I'm going to look

25  at 30 pages of privilege documents as well as the

1   unredacted document and decide is this privileged or not.

2   I would have to ask every paralegal in this district,

3   along with all the retired recall paralegals, and I don't

4   think we could all together do it over this weekend.

5   Okay.  It's just not going to happen.

6           You've made the issue.  If you tell Alex over

7   the weekend how much time do you need to put on the

8   record whatever you want to put on based on your review

9   of the 30 pages that Attorney Gestrich has mentioned that

10  he couldn't tell me, or any of them, when this gentleman

11  was not a lawyer.  It does not mean that even if there

12  are none and he was a lawyer and he's on the document,

13  okay, that's probably privileged, doesn't mean it is.

14  But it is not -- there's no prima facie showing.  But as

15  to any others, he can't say -- he can't play the role

16  Cigna had him play today and claim he's giving legal

17  advice, so -- I don't think.  I guess I could hear that

18  from Cigna in response to any argument you make on

19  Monday.

20          So you need to let -- let Alex know how much

21  time you need on Monday, and Cigna you should inform him

22  as well, Alex, how much time you would need if you wish

23  to raise this issue.  Okay?

24          MR. CUNNINGHAM:  Yes, Your Honor.  Thank you.

25          THE COURT:  Are you done with the witness given

1    what I have just said?  I mean, it's subject to what you

2    say on Monday to me.   But given what I think I'm going

3    to do, which is we aren't going to pursue that in the

4    context of this trial, other than to have you put your --

5    make your record  and for me to hear a response.

6         Now, I may respond in a direction I can't

7    anticipate right now, but I -- if I respond, fine, you've

8    made your record.

9         MR. CUNNINGHAM:  Your Honor, in good conscience,

10   I can't say that I'm finished without having any idea

11   what this is.

12        THE COURT:  I understand that.  I'm sorry.

13   That's fine, sir.  You can't say, and that's a perfectly

14   good answer.  I have no problem with that answer.  We'll

15   find out Monday at 9:30.

16        Okay.  I still have not received, despite

17   multiple requests, Borden's and Nemecek's exhibit depo

18   conversion translator to exhibit at trial.  Okay.  I have

19   not receive -- unless it got sent while -- okay.  We got

20   it.  Here we go again.  We have received it.  As of this

21   morning, I was told we had not received it.  So I now

22   have it and we'll -- probably while the jury is

23   deliberating I will put my rulings on these depositions

24   on the record.  I will turn to the Ligotti, and hopefully

25   debt that out tomorrow, and we will continue to work on

1484

1    the verdict form and attempt to get that to you over the

2    weekend, as well as doing a deep read on the charge.

3              There are a number of parts of the charge based

4    on the testimony here today that I am probably going to

5    edit.  So you do need to look very carefully at what I

6    take out or what I put in substantively, in addition to

7    my picky edits.

8              Is there anything further that this Court must

9    take up in this case at this time?

10             MR. GESTRICH:  Your Honor, the Labs raise the

11   issue of pages 2 and 6 of Exhibit Number -- I believe it

12   is 6983, that were discussed yesterday, but there was not

13   a ruling on those two pages.

14             THE COURT:  I'm so sorry, you are going to have

15   to refresh this judge's recollection --

16             MR. GESTRICH:  Yes, Your Honor.

17             THE COURT:  -- as to what Exhibit 6983 is and

18   what pages 2 and 6 are.

19             MR. GESTRICH:  Yes, Your Honor.

20             THE COURT:  Maybe somebody could it put up on

21   the screen.

22             MR. GESTRICH:  Mr. Smeig, could you put that on

23   the screen.

24             THE COURT:  6987 you are asking me about?

25             MR. GESTRICH:  Thank you very much.

1485

1    THE COURT:  6 and 2.  I have a vague
2    recollection.
3    MR. GESTRICH:  Yes, Your Honor.
4    THE COURT:  Let me just get the number again.
5    THE CLERK:  The exhibit number is 6987 for the
6    Labs and it's pages 6 and 2 that were ID only.
7    THE COURT:  ID only 6 and 2 of 6987.  Thank you
8    very much.  Oh, yes, I have a note here.  It's a full
9    exhibit as to some, and I listed pages 1, 5, 6, 8, 9 and
10   11.  Do you agree with that?  No, not 6.  Why do I have 6
11   on there?
12   THE CLERK:  Page 6 and 2, I  believe, is what
13   Attorney Gestrich is referring to.
14   THE COURT:  Yeah, I know.  Are those ID?
15   THE CLERK:  Only ID.
16   THE COURT:  Okay.
17   MR. GESTRICH:  Yes.
18   THE COURT:  What was the issue?  Because it says
19   -- go ahead.  What was -- it was objected to?
20   MR. GESTRICH:  It was objected to by Cigna as
21   being related to the fee forgiveness investigation and
22   the Labs offered this as an example of the statistical
23   sample analysis that Mr. Haney performed.  The Court had
24   not ruled on those two pages, and we are just asking for
25   clarification to finalize the exhibit as to whether we --

1486

1    THE COURT:  Was it shown to the jury?  You know,

2    we only showed some columns.

3    MR. GESTRICH:  The exhibit itself was not shown

4    to the jury because the Court deferred the ruling.

5    THE COURT:  What was your objection on this?

6    MS. KINGSBERY:  The objection was that it

7    related to the substantive results of the fee forgiving

8    investigation and not statistical sampling.  You can see

9    that this has to do with the actual responses and not the

10    statistical numbers.

11    THE COURT:  The witness was testifying about the

12    poor sampling techniques of Cigna, and I said this was

13    not going to be marked.  Why did I say it was ID only?

14    MR. GESTRICH:  There was a bit of discussion

15    about it.  As I understand Your Honor to mention the

16    parties could discuss it after the testimony so that we

17    would not waste the jury's time.

18    THE COURT:  That's fine.

19    MR. GESTRICH:  Yes, Your Honor.

20    THE COURT:  And we haven't discussed it, I

21    guess.   I don't have any recollection.

22    MR. GESTRICH:  Yes, that's correct, Your Honor.

23    THE COURT:  You object to pages 2 and 6 coming

24    in?

25    MS. KINGSBERY:  Just 2 and 6 of this particular

1487

1    exhibit, yes.

2            THE COURT:  It their case-in-chief or in their

3    opposition, which is -- which we're in the middle of to

4    your case?

5            MS. KINGSBERY:  We objected to it in our

6    case-in-chief.  There hasn't been any testimony about

7    this particular document in --

8            THE COURT:  Your case-in-chief.

9            MS. KINGSBERY:  That's right.

10           THE COURT:  Didn't the witness when he was on

11   the stand say anything about what this was?

12           MS. KINGSBERY:  Mr. Haney?

13           THE COURT:  Yeah.

14           MS. KINGSBERY:  He did, in the Labs' case he

15   did.

16           THE COURT:  Yeah.  But then you said no, no,

17   we're not happy and so we said we'll talk about it later?

18           MS. KINGSBERY:  That's my recollection.

19           THE COURT:  We know he was talking about it as

20   to sampling, right?  I mean, why doesn't it come in in

21   opposition to your case?  I mean, it supports the that

22   the question was asked.

23           MS. KINGSBERY:  He hasn't testified in our case

24   about this.

25           THE COURT:  You don't think he's given enough

1    predicate testimony to allow this portion of the document

2    of which the majority of cases are in evidence that this

3    document can now come in now that we're talking about

4    fee forgiveness?

5            MS. KINGSBERY:  If it's coming in in the Labs'

6    case, then --

7            THE COURT:  In your case.

8            MS. KINGSBERY:  Understand that fee forgiveness

9    is relevant to our case, yes.

10           THE COURT:  So answer my question.  The

11   question, if you don't have it, I just asked it, but

12   listen again.  Why doesn't this come in if they wish to

13   offer this in their case?

14           MS. KINGSBERY:  Our position is just that it

15   doesn't come in in their case, and there hasn't been a

16   witness in our case to testify about it.

17           THE COURT:  Why doesn't it come in in your case

18   as a defense to your claim that they did fee forgiveness,

19   the deplorable practice?

20           MS. KINGSBERY:  Just there hasn't been any

21   witnesses to talk about this exhibit in our case.

22           THE COURT:  We had Haney on the stand for I

23   don't know how long, and he identified this as a part of

24   his report.  Am I wrong?

25           MR. GESTRICH:  No, Your Honor.

1    THE COURT:  Thank you.  As part of his report

2    that he prepared in connection with his work.  You

3    examined him about anything that would have been a basis

4    to examine him about this.

5    MS. KINGSBERY:  Yes, Your Honor.

6    THE COURT:  And it's basically a summary of your

7    client's investigation.  I mean, is there -- you could

8    challenge it.  You would need him if it was offered and

9    you were saying, well, listen, I'm going to show you the

10   notes and Ms. Canto wrote number 6AG, there wasn't a

11   wrong number, they answered and said there was no bill,

12   whatever the answer should have been.  You are not

13   claiming that, right, as to any of the entries?

14   MS. KINGSBERY:  Are we challenging the accuracy

15   of the --

16   THE COURT:  Yeah, the accuracy.  That's a good

17   way to put it.

18   MS. KINGSBERY:  Yes, but he wasn't --

19   THE COURT:  No, no, ma'am.  I'm asking if any

20   entry on this table you have a basis in all your

21   documents and all your investigations to tell me, Judge,

22   I can represent to you and will prove to you, if you ask

23   me to, that some piece of evidence on that document is

24   false.

25   MS. KINGSBERY:  We think it's misleading because

1490

1    it's --

2            THE COURT:  Don't go with me on misleading.  Do

3    not go down that road, Counselor.

4            MS. KINGSBERY:  Yes, Your Honor.

5            THE COURT:  I asked you a question.  What is the

6    answer?

7            MS. KINGSBERY:  I don't know whether looking at

8    it right here whether there's something that -- I can say

9    that it is misleading because it's incomplete.  There

10   were full entries, and this is just a small summary of

11   each of the entries.

12           THE COURT:  Based that summary, is anything he

13   summarized based on the full record that apparently you

14   have looked at, has he mischaracterized it in a summary

15   fashion?

16           MS. KINGSBERY:  We believe so.

17           THE COURT:  So, for example, you are going to

18   tell me right now, Counselor -- you just represented

19   something to me.  One of those 15 entries, if I looked at

20   the underlying notes of Ms. Canto, all whatever pages it

21   took her to call one person that on some date in the date

22   range there, that what she did was either leave a

23   message, get a wrong number, disconnected, whatever,

24   whatever she reports, that your records show that is

25   false, or, similarly, result, that is an incorrect

1491

1    characterization?

2            MS. KINGSBERY:  No, Your Honor.

3            THE COURT:  That took a long time for that

4    answer, Counselor.  I hope the next question you get to

5    answer, you answer more succinctly and in less time.

6            MS. KINGSBERY:  Yes, Your Honor.

7            THE COURT:  I am going to think about it.  I

8    don't know whether -- I don't even know why you are

9    raising this.  If you want it in evidence or you want to

10    offer it in which case in evidence?

11            MR. GESTRICH:  Yes, Your Honor.  The -- yes, we

12    would like this to be in evidence.  We believe this could

13    come in either the Labs' or Cigna's case, but for the

14    Labs' case, Mr. Haney testified as to this document on

15    sampling protocols and whether sampling protocols were

16    appropriate here.  This document does not say fee

17    forgiveness, does not reference fee forgiveness.  There's

18    nothing about fee forgiveness on this document or in --

19            THE COURT:  You are saying basically, Judge, you

20    asked me to continue and not delay time on their argument

21    for why Mr. Haney -- couldn't come in on Mr. Haney's

22    testimony, and now you're asking me to rule on that.

23            MR. GESTRICH:  He explained this document, and

24    we're asking --

25            THE COURT:  Answer yes or no, please.

1492

```
 1          MR. GESTRICH:  Yes, Your Honor.

 2          THE COURT:  All right.  I am going to go back

 3   and look at that transcript.   Terri, if you could find

 4   that, please, when we had -- let's say ten pages before

 5   the document is offered and I put it off, both page 6 and

 6   2, Terri.  Thank you very much.

 7          Anything further?

 8          All right.  Court adjourns.

 9          (Adjourned, 4:05 p.m.)

10   COURT REPORTER'S TRANSCRIPT CERTIFICATE

11   I hereby certify that the within and foregoing is a true

12   and correct transcript taken from the proceedings in the

13   above-entitled matter.

14   /s/  Terri Fidanza

15   Terri Fidanza, RPR

16   Official Court Reporter

17

18                              INDEX

19                           EXAMINATION

20   Witness Name                                      Page

21   MICHAEL GOLDFARB

22      DIRECT EXAMINATION BY MR. KANG ..................... 1270

23      CROSS-EXAMINATION BY MR. CUNNINGHAM ................ 1435

24

25
```