1

2                          UNITED STATES DISTRICT COURT

3                          DISTRICT OF CONNECTICUT

4    _____
     CONNECTICUT GENERAL )
5    LIFE INSURANCE CO.  )
     AND CIGNA HEALTH     )
6    AND LIFE INSURANCE   )
     CO.                  )
7            Plaintiffs )    NO: 3:19cv1324(JCH)
                          )    NO: 3:19CV1326(JCH)
8                          )    October 28, 2024
      vs.                 )    8:40 a.m.
9                          )
     BIOHEALTH MEDICAL    )
10   LABORATORIES INC,    )
     PB LABORATORIES, LLC)
11   and EPIC REFERENCE   )
     LABS, INC.           )
12           Defendants. )
     _____)    141 Church Street
13                            New Haven, Connecticut

14

15              DAY SEVEN OF TRIAL

16

17   B E F O R E:

18              THE HONORABLE JANET C. HALL, U.S.D.J.

19   A P P E A R A N C E S:

20   For CIGNA:          Edward T. Kang
                         Alston & Bird LLP
21                       950 F Street, NW,
                         Washington, DC 2004-1404
22
                         Michelle Nicole Jackson
23                       Alston & Bird LLP
                         1201 West Peachtree Street
24                       Atlanta, GA 30309

25

1                    -- continued --

2                          Alexander Akerman
                          Alston & Bird LLP
3                          350 South Grand Avenue
                          51st Floor
4                          Los Angeles, CA 90071

5                          Kelsey Kingsbery
                          Alston & Bird LLP
6                          555 Fayetteville Street
                          Ste 600
7                          Raleigh, NC 27601

8

9   For BioHealth Labs:   Scott M. Hare
                          Anthony Thomas Gestrich
10                         Raines Feldman Littrell
                          11 Stanwix Street
11                         Suite 1400
                          Pittsburgh, PA 15222
12
                          Fred Alan Cunningham
13                         Matthew Thomas Christ
                          Rafferty Domnick Cunningham & Yaffa
14                         2401 PGA Boulevard
                          Suite #140
15                         Palm Beach Gardens, FL 33410

16                         John J. Radshaw, III
                          John J. Radshaw, III, Esquire
17                         65 Trumbull Street, 2d Fl.
                          New Haven, CT  06510

18

19

20

21

22

23

24

25

1           THE COURT:  Please be seated, everyone.  Good

2    morning to you.

3           We're here this morning in Labs versus Cigna,

4    and Cigna versus Labs, 19-CV-1324 and 19-CV-1326.  We're

5    here on day seven of trial.

6           The first thing I want to inform the Labs about

7    is we still do not have a list of your exhibits in a

8    format that work in our system.  That means when this

9    case goes to the jury there will be no Labs exhibits

10   sent.  My Deputy Clerk believes the request was made on

11   Wednesday, possibly Thursday.  This means that not only

12   is she not able to check, Cigna has been unable to check,

13   and I guess whatever.  Enough said.

14          After we've sent a clock to you folks, I believe

15   that by my count you folks should be roughly finished by,

16   say, 12:30, give or take a little, on Wednesday.

17   Whenever that is the case, I will send them off for lunch

18   for an hour.  I would expect brief directed verdicts.

19   And just you need to plant a flag, you have to tell me

20   the issues.  But I think you can assume I am not ruling

21   on them at this time.  That means that we will be back

22   could be anywhere from quarter to 2 to 2-ish, whatever

23   that is that hour ends, and then we'll do closing

24   arguments.

25          Have the parties discussed closing arguments any

1    further?

2         MR. KANG:  We have, Your Honor.  We did exchange

3    proposals.  Cigna stands by the original proposal, Your

4    Honor, for one hour on each side to be given and hour to

5    the Labs, followed by an hour for Cigna following the

6    order in opening statements.  The Labs counter-proposal

7    was for them to start with 45 minutes, 60 minutes for

8    Cigna, and then 15 minutes for the Labs.

9         THE COURT:  And what would the 15 minutes be?

10        MR. GESTRICH:  Yes, Your Honor.  The 15 minutes

11   would be to respond to Cigna's case, and the 45 would be

12   to present the Labs' case.

13        THE COURT:  Okay.  Which, of course, Cigna can

14   do at the end of your 60 minutes, respond to the Labs

15   case, right?  Your ability to do what would be known --

16   no, you would normally have a rebuttal.

17        MR. KANG:  I think Your Honor pointed out the

18   logistical complications given sort of the posture here

19   that both sides are plaintiffs.  You could sort of go ad

20   infinitum.

21        THE COURT:  I understand.  Well, not ad

22   infinitum, but when they finished that, if you had

23   reserved, you could get up to rebut their response to

24   your -- no, wait a minute.  Yeah, you would have that.

25   Whatever.

1    I will get back to you on that.  How's that?

2    Is there update -- anything on the Borden and

3  Ligotti depositions that you need to update me on?  I had

4  done, I thought, all of -- is it Ligotti?  And I thought

5  that was going out to you Saturday morning.  And then I

6  got here and there were gaps, and I'm not sure why.  So I

7  had to go through the whole deposition again.  That's

8  waiting my assistant to type up ASAP.  So, hopefully,

9  we'll get it to you at the break or at lunch.

10    I think there's the -- I guess I should first

11  ask if the parties have any issues.  Just to be sure that

12  I'm not going to get hit with -- if I get hit with at

13  9:25, oh, Judge, we have one more issue, it will not be

14  taken up.

15    MR. CUNNINGHAM:  Your Honor, Fred Cunningham on

16  behalf of the Labs.  We need to have a little discussion

17  about the expected testimony of Mr. Welch.

18    THE COURT:  I have that on my list.

19    MR. CUNNINGHAM:  Okay.  I just want to bring

20  that to the Court's attention.

21    THE COURT:  Yes.  And I also have on my list

22  6987.  Do you still need that?

23    MR. GESTRICH:  Yes, Your Honor.

24    THE COURT:  I have that on my list.

25    And for Cigna?

1    MR. KANG:  A couple of housekeeping matters,

2    Your Honor.  First, there were three exhibits that were

3    played during Mike Nicholson's designation.  Cigna

4    Exhibits 27, 40 and 41 that we would like to move in as

5    exhibits.  I believe that there are no objections from

6    the Labs on that issue.

7    THE COURT:  Any objection?

8    MR. CUNNINGHAM:  We're just pulling those up

9    really quickly.

10   THE COURT:  I understand.

11   I don't have them on the list.  Am I skipping a

12   page?  No.  I go from 2735 to 2833.

13   Attorney Kang, how do I mark an exhibit that is

14   not on my list?  Is it in JERS, Liana?

15   MR. KANG:  One minute, Your Honor.

16   THE COURT:  I mean, I'm not saying that it

17   isn't, but I don't know that it's agreed to.  I don't

18   have a column for objections.  Let's just start with

19   that.

20   All right.  We'll move on while some other

21   person at the table can address that.

22   All right.  Exhibit 6987.  What's Cigna problem

23   with those two pages, pages 6 and 2?

24   MS. KINGSBERY:  We don't have an objection to

25   that in Cigna's case.

1    THE COURT:  Fine.  That's good.  So those will

2    be received as full exhibits at this time, Liana, and

3    they should be so marked in JERS.

4         Is that all the pages, Attorney Gestrich?

5         MR. GESTRICH:  Yes, Your Honor.

6         THE COURT:  So that whole exhibit as originally

7    marked, Liana, should be admitted as a full exhibit.  And

8    all the separate pages should just be back to ID.  Just

9    work that out with the parties.  If all of the pages have

10   been admitted, it's ridiculous to mark separate exhibits

11   for each page.

12        MR. GESTRICH:  I'm sorry, Your Honor.  I might

13   have -- all of the pages that we needed to address are

14   admitted.  And we'll submit those as a sub -- we'll

15   delete the pages that were not admitted from --

16        THE COURT:  Well, I guess we just keep them as

17   single pages.  You need to submit 6 and 2 and have those

18   marked as full exhibits.

19        MR. GESTRICH:  Your Honor.

20        MR. KANG:  Your Honor, if I may clarify one

21   thing on the Nicholson exhibit?

22        THE COURT:  Yes.

23        MR. KANG:  Exhibits 27 and --

24        THE COURT:  Are joint or Cigna?

25        MR. KANG:  Cigna Exhibit.  27, and then separate

1    Exhibit 40, Exhibit 41.  Those are three exhibits.  I

2    apologize.  I might have misspoken.

3            THE COURT:  So is there objection now that you

4    know what to look at?

5            MR. GESTRICH:  No, Your Honor.

6            THE COURT:  So 27, 40, and 41 of Cigna's.

7    Terri, whenever I say a low number like that, I have to

8    know if it's Cigna or Joint because they have overlapped

9    the numbers contrary to the Pretrial Order.  Okay.  27,

10   40, and 41.  Did you understand what I just said, Liana?

11           THE CLERK:  Yes.

12           THE COURT:  All right.  I don't know.  I didn't

13   finish my message about the end of evidence.

14           Let's assume, for the sake of argument, we

15   finish 45 minutes after the morning break and that

16   happens to be 12:15 that day.  The break would be to

17   1:15.  Somebody on the team would be here to do the

18   directed verdicts.  Everybody would get a half hour

19   lunch, roughly.  The person doing the closing would have

20   an hour to close themselves.  However, what you should

21   understand is at 12:15 the mics are getting shut off.  So

22   if you have a vital piece of evidence which is your last

23   punch to give to the jury, you better be sure when you

24   offer it you have enough time to get it in.  Let's assume

25   there will be a few objections to slow you down.  Okay.

1    Attorney Cunningham, I was told you wish to put

2  something on the record about privilege.  Is that still

3  on the agenda for today?

4    MR. CUNNINGHAM:  Your Honor, I think

5  Mr. Gestrich is going to handle that.

6    THE COURT:  That's fine.  Whoever's going to do

7  it.

8    MR. GESTRICH:  Yes, Your Honor.  It's not

9  something that we would like to address during trial,

10  because we don't think we can address it during trial.

11    THE COURT:  That's fine.  That's fine.  I do

12  have an issue, however, if that's the case I am happy to

13  address it later.  And to be honest with you, I intend to

14  address it later.

15    Attorney Kang, I would request someone on your

16  staff provide my Law Clerk with a copy of the privilege

17  log or logs provided to the Labs during the discovery of

18  this case, any and all of them, supplementals, amended,

19  corrected.  Whatever they are, I want every one of them

20  and the date they were provided.

21    MR. KANG:  Yes, Your Honor.

22    THE COURT:  I am very concerned about the

23  appearance of attorney -- well, I'm going to call him

24  Mr. Walsh because he's not an attorney with an appearance

25  before me.  William Welch, excuse me.  Not Walsh.  I hope

1    I don't do that in front of the jury.

2         My understanding is he's something like head of

3    litigation or some title like that?

4         MR. KANG:  He was from 2012 to 2016 in the Legal

5    Department supporting SIU.

6         THE COURT:  Okay.  And what was he after 2016?

7         MR. KANG:  He was no longer with the company.

8         THE COURT:  I see.  All right.  So I know

9    there's a list of anticipated testimony as required in

10   the Pretrial Order.  I am just concerned.

11        You may recall, Attorney Kang, that I requested

12   that you give me one document that had been used, oh,

13   probably on Monday or Tuesday of last week, that had

14   redacted sections on it.  And I asked someone on your

15   team to give me the unredacted version.  And that just

16   happened to be a document in which privilege -- alleged

17   privilege assertion to redact material which involves

18   then Attorney Welch.  So I don't understand how he's

19   going to testify about I guess -- I don't know.  I guess

20   here on the list, SIU investigation into the Labs, if

21   everything he's written, and a lot of stuff that people

22   wrote to him, which I have to say -- I don't know, I have

23   to look more carefully.  But I would say there's at least

24   a few items, probably not significant, that were not

25   privileged that people wrote to him.

1    How are these people going to be able to
2  cross-examine him?  And don't tell me, oh, well, we'll
3  waive privilege as you sit down after direct examining
4  him.  That means they have a right to see I don't know
5  how many thousands of documents or portions of documents
6  from discovery.  Some of which I suspect would be quite
7  interesting them.
8    MR. KANG:  We anticipate, Your Honor, that
9  Mr. Welch's testimony will be very narrow in scope.
10    THE COURT:  Okay.
11    MR. KANG:  Only to one set of communications
12  that he had with Attorney Gennett was representing the
13  Labs.  That's going to be it.
14    THE COURT:  How long do you anticipate his
15  direct?
16    MR. KANG:  Ten minutes, if not less.
17    THE COURT:  I should have asked you that to
18  start with.  It's like those trial scheduling meetings I
19  have where I go on at length about what I require and
20  then one lawyer stands up and says, Judge, we're happy to
21  report we've settled case.  Maybe I should have asked
22  that.
23    That doesn't sound like we're going to have a
24  problem, if it's a conversation with opposing counsel.
25  I'm not sure that was explained in the scope of

1    testimony, but I don't know that it called for that

2    detail if he did it as part of the investigation.  But I

3    guess we'll see where that takes us.  All right.  Thank

4    you very much.

5            I believe I should put this on the record.  It

6    was reported that the Labs would not be continuing with

7    cross of Mr. Goldfarb.

8            MR. CUNNINGHAM:  That is correct, Your Honor.

9            THE COURT:  Thank you.  I just wanted it on the

10    record.

11            I guess I will tell the jury when we come back

12    that Mr. Goldfarb has been excused.  His testimony is

13    complete.  And that the Labs will be calling another

14    witness and I will turn to you.

15            Whom do you expect to get done today, sir?  I

16    thought I had a list of witnesses but, of course, I can't

17    find it.

18            MR. KANG:  Yes, Your Honor.

19            We will be calling Ms. Deanna Anderson who is an

20    SIU investigator first.  Mr. Welch, followed by Tom

21    Hixson who is also in SIU.  I anticipate Mr. Welch's

22    testimony, as I said, will be very short.  Mr. Hixson's

23    will be similarly very narrow in scope.  And then I

24    anticipate we should be get able to get to Dr. Kelly

25    Clark, our expert, today.

1    THE COURT:  All right.  I think I'm prepared.  I

2    have her deposition and I have my report.  I don't know

3    that I wrote -- make sure I have the right decision

4    ruling on her's.  Is it all in one ruling or was there a

5    motion about her?  Did you move to preclude Clark in part

6    or in whole?  Anybody remember on the Labs' team?

7    MS. COSTIN:  You only excluded one very narrow

8    sentence.  She will not be testifying to that.

9    THE COURT:  It was an omnibus conclusion, ruling

10    I did.  In other words, both sides experts were addressed

11    in the one ruling, right?

12    MS. COSTIN:  Correct.

13    THE COURT:  Thank you.  I have that.

14    Unless anybody's thought of a new issue, I will

15    raise two questions that come from revising the charge

16    and working on -- we're getting close to giving you a

17    verdict form.

18    You have another issue, sir?

19    MR. KANG:  I do.  Before we leave the subject of

20    Mr. Welch's testimony.  Again, I think my anticipated

21    direct is going to be very narrow.  I don't know the

22    scope of the Labs' cross-examination of him.  I do know

23    that during deposition they did cross-examine him about a

24    case that he worked on when he was at the Department of

25    Justice, the Ted Stevens case.

1    THE COURT:  The Alaska senator?

2    MR. KANG:  Yes, Your Honor.  I don't know if

3  they're going to go into that.  It is their prerogative

4  to do so.  But if they are intending to do that, I would

5  like to elicit that on direct just to front it.  Or if

6  they're not, then I don't need to waste time.

7    MR. CUNNINGHAM:  Your Honor, I don't plan to.

8  But I don't know what the direct is.

9    THE COURT:  I understand you don't know.  But

10  this might be one of my rebuttal, because I don't see a

11  point in bringing out something like that unless you have

12  to go there.  But that's fine.  I don't have any idea

13  what it is.  So I don't want to know.  And if I ever

14  learn, I probably would be inclined to allow you a brief

15  redirect on that subject.

16    MR. KANG:  Thank you, Your Honor.

17    THE COURT:  Anything else?  See, isn't it

18  amazing.  Everybody tells me all your issues and pop,

19  everybody pops up again.

20    Go ahead.

21    MR. GESTRICH:  We just learned of this.

22    THE COURT:  I don't need to know.  Go ahead.

23    MR. GESTRICH:  They sent to the Court the

24  anticipated order of witnesses.

25    THE COURT:  Yes.

1    MR. GESTRICH:  And then yesterday in their

2  disclosure of witnesses and exhibits for today, they did

3  not include Thomas Hixson on the list.  We did prepare

4  for -- I'm sorry.  Let me finish please.  We did not

5  prepare for Mr. Hixson cross because he was not listed on

6  the list.

7    Now, I understand their argument may be but we

8  gave the list of the anticipated order.  But in the

9  disclosure for today, he's not on the list.

10    MR. KANG:  May I respond?

11    THE COURT:  Yes, you may.

12    MR. KANG:  Mr. Hixson will be testifying today,

13  Your Honor, as indicated in my e-mail to Mr. Emmons on

14  Saturday.  We did not disclose any exhibits because we do

15  not intend to offer any exhibits through Mr. Hixson.

16    THE COURT:  Saturday.  Anticipated order of

17  witnesses.  Mr. Hixson is third.  That was at two o'clock

18  on Saturday.  Then we had -- what is it that you weren't

19  told about after Saturday?

20    MR. GESTRICH:  On Sunday there's the -- Cigna's

21  disclosures.  And the email reads: Below are Cigna's

22  disclosures.  We may also rely on exhibits disclosed by

23  the Labs for these witnesses.  And they list three

24  witnesses of the email.  Anderson, Welch --

25    THE COURT:  So he doesn't mean to use exhibits.

1    MR. GESTRICH:  It was not disclosed on Monday we

2    plan to have him.  They said anticipated on Saturday.

3    And then on Saturday with their witness disclosures and

4    exhibit disclosures he's not on the list.  There's not

5    Thomas Hixson.

6    THE COURT:  You're reading me the October 27

7    email at 10:01 a.m., is that correct?

8    MR. GESTRICH:  Yes, Your Honor.

9    THE COURT:  Below are Cigna's disclosures.  We

10   may also rely on exhibits disclosed by the Labs.  So they

11   list three people and give exhibits.

12   That's a withdrawal of a witness?

13   MR. GESTRICH:  They don't have him listed.

14   THE COURT:  But they're not using exhibits.  Why

15   would they list him?

16   MR. GESTRICH:  The parties agreed that by 10

17   a.m. the day before the testimony they would exchange

18   witnesses and exhibits.

19   THE COURT:  Right.  And they told you on

20   Saturday, 48 hours before, Hixson.

21   What am I missing here?  I mean, it would have

22   been nice if they said we are using no documents with

23   Hixson.  If they use a document with Hixson, I'm going to

24   interrupt his testimony and you have till tomorrow to

25   prepare.  Okay?

1509

1     MR. GESTRICH:  Thank you, Your Honor.

2     THE COURT:  But right now, if they don't use a

3  document, I don't know how you didn't know.  You could

4  have I suppose written back and said did you drop Hixson.

5  As I say, they could have told you no documents for

6  Hixson.  You could have written back are you dropping

7  Hixson.  I don't see the prejudice.

8     Anything else?

9     MR. CUNNINGHAM:  Your Honor, as I said, I do

10  have a couple of issues with regard to Mr. Welch's

11  anticipated testimony, but since we're just talking about

12  Mr. Hixson, I just have one issue that's been prompted by

13  the disclosure.

14     Your Honor, what I'm concerned about is,

15  obviously, they are not going to use any documents with

16  him.  What I'm concerned about is cumulative testimony.

17  I can imagine what --

18     THE COURT:  Then object.  There's a rule, right?

19  Just object.

20     MR. CUNNINGHAM:  Okay.

21     THE COURT:  I have up here sustained, overruled.

22  That's what I'm going to say.

23     MR. CUNNINGHAM:  I'm just trying to take care of

24  some of these things so we don't have to do it in front

25  of the jury.

1      THE COURT:  Well, maybe we will.  But if so, the

2  clock runs who I think is the person who caused the

3  problem.

4      MR. CUNNINGHAM:  Your Honor, may I turn to the

5  issues with Mr. Welch's testimony?  That's really just

6  two.

7      THE COURT:  Go right ahead.

8      MR. CUNNINGHAM:  All right.  Thank you.

9      Your Honor, I anticipate based on the exhibit

10  disclosure that Mr. Kang intends to have Mr. Welch

11  testify about two different letters that were sent -- one

12  was sent to the Michael Gennett who was at the Akerman

13  Law Firm in Miami who at the time was counsel for the

14  Labs.  That's a December 12, 2014 letter.  That's Cigna

15  Trial Exhibit 198.  Then there's a May 28, 2015 letter to

16  Dean Viskovich which I think has been referred to.  He

17  was the Legal Compliance Director for BioHealth.

18      So the December 12, that's Joint 160-A, Your

19  Honor.  So the December 12, 2014 letter concerns PB Labs.

20  The May 28, 2015 letter concerns BioHealth.  And, Your

21  Honor, they're essentially the same letters.  The text is

22  almost identical.  But here's the concern I have, Your

23  Honor.  Both of these letters concern Mr. Welch's --

24      THE COURT:  You said Joint 168?

25      MR. CUNNINGHAM:  160-A.  A as in apple.

1          THE COURT:  Okay.  Sorry.  You may continue.

2          MR. CUNNINGHAM:  What these concern, Your Honor,

3     is there are allegations of fee forgiveness in one letter

4     against PB Labs and one identical letter against

5     BioHealth.

6          THE COURT:  Whatever.

7          MR. CUNNINGHAM:  What he refers to here, what he

8     bases this on is policy language.

9          THE COURT:  Don't worry.  We're going to go to

10    that issue.  I have a huge issue.  It's really more on

11    unbundling, to be honest with you.  But we have already

12    somewhat touched that railing about the date when they

13    put it in the policy.  And that needs to be addressed or

14    the jury needs to understand when to consider the issue

15    based on my rulings.  It's then the question of, well,

16    what about during their claim, equitable claim for

17    unfairness, what period of time.  I was going to get to

18    that in the charge.  But you tell me what's wrong with

19    him asking the question of did you send these letters?

20         MR. CUNNINGHAM:  Well, I don't have a problem

21    with him asking if he sent the letters.

22         THE COURT:  Okay.  And then did he talk to

23    anybody about them.  That would be an admission.

24         MR. CUNNINGHAM:  Right.  But the problem is

25    because the Court has already ruled that fee forgiveness,

1  as defined in the policy, is not part of the defense of

2  Cigna's -- Labs's case against Cigna.  So what I'm

3  concerned about is if that was the entire basis for his

4  letters, it's not like he said, well, this is really

5  unfair, you know, we have a claim of unjust enrichment

6  against you.  What he's saying is this is based on policy

7  language.

8          THE COURT:  I hear your argument.  And makes me

9  even more convinced about the need to address certain

10  issues in the charge which I would normally not do.

11  Well, I wouldn't say that.  There's a need in the charge

12  to be clear about certain issues in this case to an

13  extent that I'm not sure I've seen with issues before.

14  It arises out of the two cases at once, the difference in

15  the nature of the causes of action, and certain time

16  periods that are significant.  And we will try to do that

17  in the charge.  But I don't see a reason to keep the

18  document out.

19          MR. CUNNINGHAM:  Okay.  I just wanted to bring

20  it to the Court's attention.

21          THE COURT:  You can cross him on it, too, if you

22  want.  I mean, you can do your case in this -- at this

23  time as well, right?  You have an opportunity -- no,

24  that's not what we have been doing.

25          You get to cross him about how, you know, the

1  period before this is not the judge -- I don't want you

2  to say I ruled or I'm going to charge.  But you know how

3  to ask the question.  I don't think it is an objection I

4  could sustain.  But I think you can cross him in a

5  defense to their unfairness on the concept that I've said

6  it's not in the policies.  You can argue how can that be

7  unfair, that sort of thing.

8          MR. CUNNINGHAM:  Thank you, Your Honor.

9          And then one last.  This is more of a procedural

10  issue, Your Honor.  When we went to take Mr. Welch's

11  depo, which was on February 10, 2023.  And, Mr. Smeig, I

12  may want you to pull this up for the Court.  He did not

13  review any materials in preparation for his deposition.

14  None.

15          THE COURT:  Well, you can ask him how many hours

16  he's spent preparing today for his testimony of ten

17  minutes.

18          MR. CUNNINGHAM:  I know, Your Honor, but here's

19  the other concern.

20          THE COURT:  I can't wait for them to hear Eva

21  Borden's deposition.  Go ahead.

22          MR. CUNNINGHAM:  So at page 35, line 8, he says:

23  I told Mr. Kang I have a little or no memory of PB Labs

24  and BioHealth.

25          THE COURT:  Boy, have you ever had such good

1    cross-examination.  Of course, he has a letter.  So he

2    doesn't have to remember that.

3         MR. CUNNINGHAM:  Well, he says at page 235 --

4         THE COURT:  Why are you telling me this?  This

5    is your cross-examination.  You can cross him on the

6    price of tea in China as far as I'm concerned.

7         MR. CUNNINGHAM:  But, Your Honor, just to make

8    the last point.  I understand the Court's ruling.

9         My last point, Your Honor, is we took his

10   deposition for the explicit purpose of finding out what

11   his trial testimony was going to be.  He said that

12   reviewing these documents would not refresh his

13   recollection.  So now he's going to come into the

14   courthouse today I believe and, all of a sudden, two

15   years later, his recollection is going to be miraculously

16   refreshed.  So I think it's improper practice, Your

17   Honor.  I think it's surprise.  But I'm happy to --

18        THE COURT:  File a grievance, sir.  I mean, I

19   can't tell a lawyer prepare your witness on his opposing

20   party's deposition.

21        MR. CUNNINGHAM:  Just making my record, Your

22   Honor.

23        THE COURT:  You make your magic in court over

24   that.

25        MR. CUNNINGHAM:  Thank you, Your Honor.

```
 1           THE COURT:  I'm assuming the Labs are going to
 2   provide Liana an Exhibit List that will work in our
 3   system.  Is there somebody that can tell me when that's
 4   going to happen?
 5           MR. GESTRICH:  I have the jump drives on the
 6   desk here.
 7           THE COURT:  Liana, do you want to take them.
 8   See if you can upload them while I'm talking.
 9           I will go to one topic.  I have a vague
10   recollection, Attorney Kang, it may have been in your
11   cross of Mr. Haney.  But I had the feeling that you were
12   laying a foundation for closing argument that the Labs
13   had not, you know, produced everything, had not done
14   something as to all claims, all patients, all this, all
15   that.  Now, I don't know that you used the word all.  And
16   I don't even know if you meant to ask this.  I just want
17   to know, do you think you're going down that road to
18   build a closing argument?  And it might not have even
19   been Mr. Haney.  I apologize.  All I know is I left the
20   bench and I had a very uncomfortable feeling.  It stayed
21   with me.  And I just thought I would raise it now rather
22   than during closing argument.
23           MS. KINGSBERY:  I did the cross of Mr. Haney,
24   but I'm not entirely sure which questions the Court is
25   referring to.
```

1    THE COURT:  You weren't trying to cross-examine

2  him on the fact that the Labs have not produced evidence

3  about all patients, all claims, et cetera?

4    MS. KINGSBERY:  I don't believe so, Your Honor.

5    THE COURT:  Okay.  And that won't be in your

6  closing argument, Attorney Kang?

7    MR. KANG:  You mean during the discovery

8  process?

9    THE COURT:  Yes, sir.

10    MR. KANG:  No.  That's not our argument.

11    THE COURT:  Okay.  All right.  I would be very

12  troubled by it.  I can just tell you, as long as we have

13  a minute, I have gone back and looked through quite a bit

14  of the filings that went to Attorney Hawkins, Special

15  Master Hawkins, during the long period of discovery.  I

16  won't bore you.  I could pull out quotes.  It is my

17  view -- so if you wish to press this argument, you need

18  to tell me and show me why.  But effectively I think you

19  are estopped from arguing to the jury they haven't

20  brought forth evidence on all their bills, that kind of

21  thing, because you vigorously resisted discovery.  When

22  they asked for all of something you said, come on,

23  Mr. Hawkins, we aren't going to try this case on 220,000

24  claims or I don't know how many patients or whatever the

25  other all requests were.  So that's just not

1    proportional.  It's not appropriate.  It's not relevant,

2    et cetera, et cetera.

3         And, unfortunately, Attorney Hawkins did not do

4    a formal ruling.  I'm thinking particularly about the

5    third motion to compel.  The one that led to your

6    production of the supposed highly confidential Cigna memo

7    in which Ms. Borden gave a statement, under oath, that it

8    was highly confidential.  That he only had to rule on

9    that because there was a series of exchanges

10   post-briefing with Mr. Hawkins in December and January in

11   which eventually you folks reached an agreement and you

12   filed a stipulation withdrawing the motion to compel per

13   the agreement, and I so ordered it.  So I never knew what

14   the resolution was.  The record doesn't reflect it.  But

15   I'm pretty sure at no time did Cigna produce all of

16   anything.

17        So that's the basis for my view.  And I don't

18   think an argument that somehow rests on that would be

19   appropriate by Cigna.

20        MR. KANG:  We don't intend to make that

21   argument.  But to be clear, Your Honor, we do intend to

22   argue, I expect, that the Labs didn't produce documents

23   to the SIU during the course of the SIU investigation.

24        THE COURT:  I think that's fair game.  That's in

25   the territory of -- well, what did they ask for, SIU,

1    particular claim numbers or every claim you've ever

2    filed, whatever?

3              MR. KANG:  Patient billing and patient

4    collection records.

5              THE COURT:  Well, that's already come out.

6              MR. KANG:  Correct.

7              THE COURT:  Well, that's as people might say, a

8    horse of a different color.

9              MR. KANG:  Medical records.

10              THE COURT:  But I don't know.  I think that's

11    within their ability.  I don't know who is taking the

12    lead today.  It keeps changing.

13              Who will answer my question of whether there

14    would be objection by the Labs to an argument based upon

15    during the investigation we did not receive all the

16    patient records we asked for, all the billing and

17    collection efforts we asked for, or nothing got produced

18    or some but not all got produced?

19              MR. CUNNINGHAM:  As Your Honor just said a

20    moment ago, I think that's fair game.  That's already I

21    think evidence in the record.

22              THE COURT:  That's fine.  I mean, it is not part

23    of the discovery process.  It was part of what Cigna did

24    and you did.

25              MR. KANG:  One last housekeeping.  I just wanted

1  to raise the issue of use of demonstratives during

2  closing.

3          THE COURT:  Yes.  I've already addressed it.

4  We're getting awful close.  We're close to 48 hours.

5  Didn't I set 48 hours?

6          MR. KANG:  You did, Your Honor.

7          We were hoping that we could have some relief

8  from that given that our case is still not entirely in

9  evidence yet.  We have, for example, Dr. Clark testifying

10 today.

11         THE COURT:  I have a feeling you have a pretty

12 good idea of your closing.  You've got a pretty good idea

13 of what evidence you are going to try to get in.  The

14 only problem would be is if it doesn't come in.  So I

15 have a pretty good idea that somebody at that table, if

16 not the other 18 people hidden in a room somewhere, are

17 already working on demonstratives.  I would suggest you

18 get them to the other side.  If you don't use them --

19 well, I would be careful not to try to bury people.  But

20 I would -- based on your expected testimony, I would get

21 any such demonstrative to them now if you want to use

22 them.

23         There's only so many hours in the day.  We

24 haven't put to bed the charge, let alone you haven't even

25 seen the verdict form.  So, you know, I have to review

 1  demonstratives and make rulings.  When am I going to do

 2  that, at 6:00 on Wednesday morning or 12:00 on Wednesday

 3  morning?  No.  You are closing on Wednesday afternoon.

 4  So when am I supposed to review them and then listen to

 5  argument?  When are you going to confer with them?  It

 6  doesn't work, Attorney Kang.

 7          MR. KANG:  Understood.

 8          THE COURT:  I will give you to lunch time, but

 9  that's it.

10          MR. CUNNINGHAM:  Until lunch time?

11          THE COURT:  Today.  It's two days.  It's 48

12  hours.  Same for the Labs.

13          MR. CUNNINGHAM:  I thought in a subsequent

14  conversation, the Court had said maybe 24 hours was

15  enough.

16          THE COURT:  If I said it, I apologize.  But I'm

17  pretty sure Attorney Kang was responding like I said 48.

18  I'm pretty sure I said 48.  I might have mused, well,

19  wait a minute, could we do 24.  How are you going to

20  respond to his 87 demonstrative exhibits?  And then

21  you're going to respond to him.  He's going to hopefully

22  modify a few in response.  Then you're going to look at

23  them again.  And then I'm going to look at them.  Then

24  I'm going to take the bench and hear your arguments and

25  then I'm going to rule?  I don't think so.

1    MR. CUNNINGHAM:  I understand, Your Honor.  But

2  I just want to make clear that we can use exhibits in

3  closing.

4    THE COURT:  Absolutely.  You can use any

5  document in evidence.

6    MR. CUNNINGHAM:  I just wanted to clarify that.

7    Your Honor, the last thing I need to bring up

8  which I hope will be very brief, is these letters that

9  Mr. Welch wrote that we just referred to a minute ago,

10  contain the word "fraud" numerous times.

11    THE COURT:  I can't redact it.

12    MR. CUNNINGHAM:  I know.  But I'm hoping that

13  the word "fraud" or "consumer fraud", which is referred

14  to, is not going to come out of Mr. Welch's mouth on

15  direct examination.

16    THE COURT:  I hope not.  I have a ruling on

17  that.  I will interrupt the questioner if it does.  And

18  if the witness tries to get the word in --

19    MR. CUNNINGHAM:  I was hoping that --

20    THE COURT:  I will interrupt the witness.  I

21  will excuse the jury and I will chastise the lawyer

22  involved and the witness.

23    MR. CUNNINGHAM:  Thank you, Your Honor.

24    THE COURT:  Anything else?  Is there another

25  word that the lawyers need to come out of their mouth

 1    before 12:28?

 2            MR. CHRIST:  Yes, Your Honor.

 3            THE COURT:  Unbelievable.

 4            MR. CHRIST:  We have a document that we

 5    exchanged with Cigna yesterday afternoon that we may use

 6    on cross with Ms. Anderson.  I don't know.  It may not be

 7    appropriate depending on the scope of direct.  I just

 8    wanted to bring it to the Court's attention because it

 9    was a Labs ID only exhibit.  And it's Exhibit Labs 5012.

10    It's just an excerpt of that exhibit which is an example

11    Explanation of Benefits by Cigna.

12            THE COURT:  I don't have an Exhibit 5012, let

13    alone an excerpt.  5012 is the exhibit.  It's not on your

14    list.

15            MR. CHRIST:  It is an ID only.

16            THE COURT:  It was on that thousands of list and

17    it's one of those 3,000 or 4,000 that were marked may

18    offer?

19            MR. CHRIST:  Yes.

20            THE COURT:  When did you tell Cigna you would be

21    using it?

22            MR. CHRIST:  Your Honor, we told Cigna that we

23    might use it yesterday afternoon just as we were

24    preparing for the examination.

25            THE COURT:  Attorney Kang.

1523

1    I'm sorry.  Tell me the document.  It's an

2    excerpt of what?

3    MR. CHRIST:  It's an Explanation of Benefit that

4    Cigna issued in relation to Epic Reference Lab.  So we've

5    redacted it for PHI, sent it to the other side.  It's

6    just one of those documents --

7    THE COURT:  Like an EO --

8    MR. CHRIST:  Like an EOP or EOB, yes, Your

9    Honor.

10   MR. KANG:  I don't have an issue with the EOB

11   document.  I'm not seeing the PHI issue.

12   MR. CHRIST:  It's been redacted.  I just wanted

13   to make sure you were okay with that.

14   THE COURT:  Because it wasn't on the list.  He's

15   making sure you weren't going to stand up and object and

16   I would have to deal with that.

17   It may be received.  But, you know, yet again,

18   you need to update your Exhibit List.  You need to

19   download the document.  And I hope there's someone on

20   your team who is responsible for that.  Because if it's

21   not done by a certain time, seriously, your exhibits are

22   not going to the jury.

23   MR. CHRIST:  Yes, Your Honor.  Thank you.

24   THE COURT:  Anything else?  Anybody need to go

25   to the bathroom.  Go right ahead, Attorney Cunningham.

1   I'm going to discuss unbundling.  But if it's you, only

2   you are talking on unbundling, I will wait.

3           Anyone need a break?  We're not taking any break

4   before 9:30.

5           Yes, Attorney Gestrich.

6           MR. GESTRICH:  Our expert, Dr. Boorstein, will

7   be here today.  He's a treating physician.  And he --

8   we would like to file a motion to ask for him to have

9   permission to bring devices into the courthouse.  We

10  conferred with the other side and the other side does not

11  object.

12          THE COURT:  You mean while he's waiting?

13          MR. GESTRICH:  Yes, Your Honor.

14          THE COURT:  Usually you do it by written motion

15  in this courthouse.

16          MR. GESTRICH:  We will.  I'm just alerting the

17  court that we will.

18          THE COURT:  Somebody has tell the people in the

19  front, the CSOs.  They're not going to take your word for

20  it that I said it's okay.

21          MR. GESTRICH:  We'll file the motion.  I just

22  wanted to alert the Court that we're going to do that

23  this morning.  Thank you.

24          THE COURT:  Anything else?  I don't know

25  Attorney Kang or anyone else on your team the issue of

1    unbundling that relate to the charge.  I didn't do much

2    of anything over the weekend on that.  Because we're

3    struggling.  My first question -- I'm going back to

4    basics.  This is like kindergarten 101.  Could you show

5    me language in Cigna's policy that prohibits unbundling?

6           MR. KANG:  The specific word "unbundling," no.

7           THE COURT:  Show me language that says that you

8    have to bill in accordance with codes published from time

9    to time with sufficient notice to your treater.

10          MR. KANG:  Your Honor, I believe it is a part of

11   the medical necessity component.  And that unbundled

12   codes are not medically necessary because if there's a

13   bundled code then the understanding is that that is a

14   medically necessary service.  So then if you unpack it

15   and unbundle it, then the component parts are not

16   medically necessary.

17          THE COURT:  So let me understand.  If I go to

18   Quest labs this week and my doctor has ordered three

19   tests.  They are blood tests.  They take one sample and

20   those three tests happen to be able to be bundled in

21   terms of running a test and therefore, as bundled-billed

22   they are medically necessary.  Your medical director

23   doesn't say, "Hall doesn't need that test, that's

24   ridiculous, right?"  These tests, my age, my medical

25   history, no question they are medically necessary

1    periodically.  But they come as a panel, I think is what

2    my doctor says to me, and so the lab is able to bill you

3    for one bill, one code, but the doctor gets a report on

4    three tests, measurements of something in my blood.

5    Okay.  You got that?

6            MR. KANG:  Yes, Your Honor.

7            THE COURT:  So you're telling me that it is

8    covered by the medical necessity exclusion in the

9    policies if by billing for it three separate times as

10   opposed to bundling for three tests which are medically

11   necessary.  In other words, there's nothing about the

12   test that's changed, just how the provider bills it.  You

13   are telling me that affects it's medical necessity.

14           MR. KANG:  Yes.  Because medical necessity has a

15   component about the least -- I'm forgetting the language

16   -- the least costly, right, not consideration of the less

17   costly alternatives.  So medical necessity has obviously

18   a clinical component but also a cost component as well.

19           THE COURT:  That's interesting because in

20   connection with my ruling on the fee forgiveness, I

21   became a little bit familiar with the law of insurance

22   and the fact that the insured should know what the policy

23   gives you, right?  And if it is ambiguous or just you

24   wouldn't have any idea then it is read against the

25   insurance company.  I'm just speaking generally.  How

1  would I ever know?  To me "least costly" means the doctor

2  should order a generic drug to prescribe.  They shouldn't

3  order the 19-year-old patent drug by name when somehow or

4  other some folks have a generic out, or the 21-year old

5  formerly patented drug by name, brand name.  Unless I

6  have allergic reaction to the generic or some other

7  reason, they know they should pick the generic.  It's

8  been shown to have the same medical benefit for treatment

9  for me, right?

10        MR. KANG:  Yes.

11        THE COURT:  How would they know -- how would a

12  doctor ordering tests or a lab doing tests know that by

13  billing it three times, it becomes medically unnecessary

14  because of the cost?  I'm going to struggle with that

15  one.  I have your answer.  The answer is -- let me make

16  it a little broader.  You have pointed me to the medical

17  necessity language in the policies.  I understand that.

18  What, if any, other basis can you point to in the policy

19  that would at any time relevant to this case put a biller

20  like the Labs on notice that they should not bill for

21  three tests, they should bill for one panel?

22        MR. KANG:  Your Honor, in advance of the charge

23  conference today, we are going to look -- I believe we

24  need to double-check this.  I want to put a placeholder

25  on this.  There may be language in the plans regarding

1    the requirement that codes be submitted in compliance

2    with, I believe, NCCI standards, National Center for

3    Coding Initiative.  I may be getting that acronym wrong.

4         THE COURT:  That's fine. The next question do

5    any of a family plans or any of the group plans or any of

6    the administered plans involved in the case incorporate

7    by reference omnibus reimbursement policies?  So that

8    would be an answer to that.  So I would like to see that.

9         MR. KANG:   Yes, Your Honor.

10        THE COURT:  Liana, see if they are there and get

11   them in line and let me know.

12        When is Ligotti going on?  Anybody have an idea?

13        MR. KANG:  I expect tomorrow most likely, Your

14   Honor.

15        THE COURT:  You are probably not going to get

16   the deposition rulings until lunch time.  But I will have

17   them to you before we come back in the afternoon.  As I

18   said, I thought they were done and I realized I skipped a

19   whole bunch.  I don't know why.  That's what has to be

20   done.

21        When is Borden getting read?

22        MR. GESTRICH:  Borden will likely be late

23   Tuesday or early Wednesday.

24        THE COURT:  Fine.  You will have that by the end

25   of today.  I'm told you have Ligotti already so that's

1    not a problem.

2        Liana, let's go.  I'm letting this happen and

3    the minutes go by.

4        (In the presence of the jury at 9:30 a.m.)

5        THE COURT:  Everybody be seated.  It is 9:30 on

6    the dot.  We will get this right before we're done,

7    Ladies and Gentlemen.  Welcome back.  I hope you all

8    enjoy that spectacular weather.  I have a feeling none of

9    us on this side of the jury bar did.  I hope you did, got

10   a lot of rest and we're ready to begin the home stretch

11   as I call it.  I'd given you an estimated schedule.  I

12   double-checked it this weekend.  I'm pretty confident

13   we'll be on schedule.

14       Let's proceed.  Are you ready with your next

15   witness?

16       I need to inform you that there was Mr. Goldfarb

17   on the stand at the end of the day if you recall.  There

18   was cross-examination, that witness is completed.  They

19   finished their cross.  I want to have the record show it.

20       Your next witness, Attorney Kang.

21       MR. KANG:  Thank you, Your Honor.  Cigna calls

22   Deanna Anderson.

23       THE COURT:  Ms. Anderson, great, you are ready

24   to go.  Come up to the witness stand and when you get

25   there please remain standing while the clerk administers

1530

1   on oath to you.

2                   D E A N N A   A N D E R S O N

3   Having been called as a witness, was first duly sworn and

4             testified on his/her oath as follows:

5             THE WITNESS:  I swear.

6             THE CLERK:  State your name for the record and

7   spell your last name.

8             THE WITNESS:  My name is Deanna Anderson,

9   D-E-A-N-N-A, A-N-D-E-R-S-O-N.

10            THE COURT:  Good morning, Ms. Anderson.

11            Whenever you are ready.

12                      DIRECT EXAMINATION

13  BY MR. KANG:

14       Q.   Good morning Ms. Anderson.

15       A.   Good morning.

16       Q.   Where do you currently work?

17       A.   I work at Cigna.

18       Q.   And how long have you worked at Cigna, ma'am?

19       A.   Just over 22 years.

20       Q.   Can you tell the jury a little bit about your

21  educational background starting from high school?

22       A.   Sure.  So for high school, I went to Lyman Hall

23  in Wallingford, Connecticut.  And then from there, I got

24  my bachelor's degree at Salve Regina in Newport, Rhode

25  Island.  And after that, I became an accredited health

1531

1    care fraud investigator.

2        Q.    Did you grow up in Connecticut?

3        A.    I did.

4        Q.    So what year did you join Cigna, ma'am?

5        A.    2002.

6        Q.    That's been about 22 years?

7        A.    Yes.

8        Q.    Can you tell the jury the various roles that you

9    have had at Cigna in your 22 years?

10       A.    Sure.  I started as a Fraud Investigator then I

11   was promoted to a Senior Investigator handling internal

12   ethics complaints and compliance training.  I then left

13   the Special Investigation Unit for a short time handling

14   enterprise-wide risk assessments and then

15   compliance-based assessments and training.  I came back

16   to the Special Investigations Unit as the intake manager

17   and then in September of 2013, I moved into my current

18   roll as a Senior Fraud Manager.

19       Q.    What is an Intake Manager at SIU, Ms. Anderson?

20       A.    The Intake Manager oversees the analysts that

21   are responsible for answering the calls to the special

22   investigations hotline, intaking emails from our email

23   box, setting up the initial leads and doing some initial

24   research prior to them being assigned to an investigator.

25       Q.    Are you familiar with the three labs in this

1    case PB Labs, BioHealth, and Epic?

2        A.    I am.

3        Q.    Were you involved in the SIU investigation into

4    each of these three labs?

5        A.    I was involved in supervising the investigations

6    at various stages.

7        Q.    Now Ms. Anderson, through the various roles that

8    you have had at Cigna in your 22 years included SIU, do

9    you have knowledge as to Cigna's adjudication of claims?

10       A.    I do.

11       Q.    Are you familiar with the term "auto

12   adjudication"?

13       A.    I am.

14       Q.    What is auto adjudication?

15       A.    Auto adjudication is when the claims are

16   automatically processed by the claims system without any

17   human intervention.

18       Q.    Why is it that Cigna uses auto adjudication of

19   claims?

20       A.    Due to the sheer volume of claims that Cigna

21   receives on a daily basis.

22       Q.    A manual review would not be possible?

23       A.    A manual review would not be possible of every

24   single claim.

25       Q.    Prior to the SIU investigations into these three

1    labs, were the claims submitted by the Labs auto

2    adjudicated?

3        A.    Yes, they were.

4        Q.    Ms. Anderson, do you know whether Cigna's claim

5    processing system is a trust basis system?

6        A.    It is.

7        Q.    What do you mean by that?

8        A.    What it means is that Cigna's claim system has

9    to trust the validity and the truthfulness of the

10   information on the claim form when processing that claim.

11       Q.    Why is that Cigna has to trust the truthfulness

12   of providers?

13       A.    Because due to the sheer volume of the claims,

14   we would not be able to review every single claim that

15   comes in.

16       Q.    And so can you remind me what's your current

17   role with Cigna?

18       A.    I'm a fraud senior manager.

19       Q.    How long have you had that position?

20       A.    Just over 11 years.

21       Q.    Was that the position that you held in the 2013

22   to 2017 time period?

23       A.    Starting in September of 2013, I have been in

24   this role.

25       Q.    Ms. Anderson, based on you time at SIU, what do

1    you understand the purpose of Cigna's SIU to be?

2        A.    The purpose of the SIU is to identify and

3    investigate allegations of fraud, waste, and abuse.

4        Q.    What's your understanding as to how SIU's work

5    impacts the assets of health plans Cigna administers?

6        A.    We're responsible for protecting or safeguarding

7    the plan assets.

8        Q.    I want to start with the investigation into PB

9    Labs, okay?

10       A.    Okay.

11       Q.    Was there an investigation that SIU initiated

12   into PB Labs?

13       A.    There was.

14       Q.    How did the investigation begin?

15       A.    The investigation began when we received a

16   referral from one of our clients that they were concerned

17   about some unusual and what they believed to be

18   repetitive and excessive billing for one customer.  And

19   they asked to us look into it further.

20       Q.    How are you personally familiar and aware of

21   that?

22       A.    At that point, I was the Intake Manager so I was

23   overseeing the analyst that input the initial allegation

24   into the case management system prior to it being

25   assigned to Stephanie Canto.

1    Q.    So you actually handled the intake of the
2    referral regarding PB Labs?
3    A.    Correct.
4    Q.    You mentioned there was a referral from a
5    client.  Which client was that?
6    A.    SAMBA.
7    Q.    What is SAMBA?
8    A.    SAMBA is one of our clients.  They are a federal
9    employee health benefit plan.  It stands for Special
10   Agents Mutual Benefits Association.
11   Q.    For SAMBA, the money that's used to pay claims
12   for SAMBA, whose money is that?
13   A.    It's the employer group money, so it's federal
14   money.
15   Q.    Is it Cigna's money that's used to pay those
16   claims?
17   A.    It is not Cigna's money.
18   Q.    What was the nature of the referral that came in
19   from SAMBA, ma'am?
20   A.    They were concerned for one customer.  What they
21   considered to be unusual and repetitive drug testing with
22   each service exceeding $1,000 a test.
23   Q.    Was the case assigned to an investigator?
24   A.    Yes.  The case was assigned to Stephanie Canto.
25   Q.    What was your involvement going forward?

1    A.   After September of 2013, I was Stephanie Canto's

2    manager so I was overseeing the investigation, answering

3    any questions that she had, assisting her with direction.

4    Q.   As a result of the SAMBA referral -- and by the

5    way, when approximately did that referral come in, ma'am?

6    A.   In April 2013.

7    Q.   After the referral came in, did there come a

8    time when SIU requested medical records from PB Labs?

9    A.   Stephanie did request medical records.

10   Q.   Why did SIU make that request?

11   A.   We requested medical records because of the

12   initial allegation that we received, in addition to

13   Stephanie performing data analysis and realizing that the

14   top paid code was an unlisted code, the 80299.  And we

15   would need medical records to understand what services

16   were being performed when that code was billed.

17   Q.   So this unlisted code is 80299, the CPT code?

18   A.   That's correct.

19   Q.   Explain why there was a concern that there was a

20   large volume of unlisted codes being billed?

21        MR. CHRIST:  Objection, Your Honor.  Cumulative

22   testimony to Ms. Canto's and Mr. Norton as well.

23        THE COURT:  I will allow it.  I will go back

24   take a look at my notes on Ms. Canto, but at this point

25   I'll allow it.

1  BY MR. KANG:

2     Q.   You may proceed.

3     A.   Can you repeat the question?

4     Q.   Why was there a concern about the significant

5  volume of unlisted code 80299 being billed?

6     A.   Okay.  So all services that are rendered by

7  providers have a specified CPT code.  So if a provider is

8  using an unlisted code, there's a concern that they could

9  be misrepresenting the services that are being billed by

10  providing a service, say, that might be experimental,

11  investigational or unproven.

12     Q.   What was the request that SIU had made for PB

13  Labs to produce?

14     A.   At that point, we had requested the medical

15  records.

16     Q.   Did PB Labs produce the medical records that the

17  SIU requested?

18     A.   They produced the lab results but not the

19  complete medical records.

20     Q.   And as a result, what, if anything, did SIU do

21  in response?

22     A.   At that point, we made the determination to flag

23  the provider for medical records solely for the 80299

24  code.

25     Q.   Is that known as a medical records edit?

1538

1     A.    It is.

2     Q.    Can you tell the jury what the purpose of a

3  medical records edit is?

4     A.    Medical records edit will request medical

5  records on every claim that the provider submits so we

6  can review the records prospectively meaning prior to the

7  claim being made.

8     Q.    So is that known as a prospective edit for

9  future claims being submitted?

10    A.    It is.

11    Q.    Does a medical records edit mean that Cigna

12 denies all future claims automatically submitted by PB

13 Labs?

14    A.    No.  It was only requesting medical records for

15 claims that had the 80299 on them.

16    Q.    So if PB Labs, in fact, provided sufficient

17 records to substantiate the medical necessity of those

18 services 80299, what would happen to those claims?

19    A.    Those claims would be paid.

20    Q.    For any other code other than an 80299, what

21 would happen if those were submitted?

22    A.    Those codes would be paid.

23    Q.    So was it limited just for medical records --

24 request for medical records with respect to 80299?

25    A.    That's correct.

1     Q.   Now you said that PB Labs provided some records

2   to the SIU?

3     A.   They did.

4     Q.   What kind of records were those?

5     A.   They did provide the lab results.

6          THE COURT:  I think we have heard this from

7   Ms. Canto what was that provided.  We saw the medical --

8   what was asked for.  We had testimony what they didn't

9   give, what they did give.  We had cross on.  Ms. Canto

10  was on the stand for quite a while as I refresh my

11  memory.  We're not doing a redo.  Please turn to

12  something that Ms. Canto did not testify to.

13         MR. KANG:  Yes, Your Honor. I will move on to

14  something, an aspect that I don't think she testified to.

15  BY MR. KANG:

16    Q.   Ma'am, the lab test results that were received,

17  were those for future claims or for past claims Cigna had

18  paid?

19    A.   Those were for past claims?

20    Q.   Were these for claims that had been paid as far

21  back as 2012?

22    A.   Yes, that is correct.

23    Q.   To your knowledge, did SIU have those lab test

24  results available when Cigna paid PB Labs in 2012?

25         MR. CHRIST:  Objection, Your Honor.  Again

1    cumulative to Ms. Canto's testimony on retrospective

2    review.

3            MR. KANG:  I don't believe Ms. Canto testified

4    specifically to the date.

5            THE COURT:  Move on to something else and I

6    will take it up at the break.  I have a vague

7    recollection but I cannot be certain.  Counsel's

8    representing she did.  If he's wrong, I will find out at

9    the break.  Go ahead.

10           MR. KANG:  Thank you, Your Honor.

11   BY MR.  KANG:

12       Q.   Can we put up Joint Exhibit 16A.

13           Ms. Anderson, the parties have stipulated and

14   agreed that this exhibit is one of the 20 records, lab

15   results, among the lab results that PB Labs sent to SIU,

16   okay?

17       A.   Yes.

18       Q.   Ms. Anderson, would these records have been

19   available to Cigna when the claims were originally

20   processed and paid?

21       A.   They would not have been.

22       Q.   Mr. Salazar, if we can move to document ending

23   in 4173, sir.

24           Ms. Anderson, do you recognize this document?

25       A.   I do.

1    Q.    What do you recognize this document to be?

2    A.    It appears to be a standing order for drug

3    testing.

4    Q.    And it is associated with which lab, ma'am?

5    A.    With PB Laboratories.

6    Q.    Would this standing order have been available to

7    SIU when the claims were originally processed and paid?

8    A.    It would not have been.

9    Q.    Do you see a patient name on this order?

10    A.    There is no patient name.

11    Q.    Do you see a line or field for patient name?

12    A.    There's no field for a patient name.

13    THE COURT:  I hope this is leading up to some

14    other question, Attorney Kang.  I have heard that

15    testimony about five times.

16    MR. KANG:  Yes, Your Honor.

17    BY MR. KANG:

18    Q.    Ms. Anderson, at some point --

19    You can put this down, Mr. Salazar.

20    The understanding is that the lab test results

21    were sent for clinical review; is that correct, Ms.

22    Anderson?

23    A.    That's correct.

24    Q.    Was there a decision subsequently made to

25    implement a denial flag on PB Labs?

1    A.    Yes.  We decided to flag the provider services

2  not rendered as billed.

3    Q.    What does services not rendered as billed mean

4  to you?

5    A.    Services not rendered as billed means the

6  services being provided to the customer are not what was

7  represented on the claim form.  So in this scenario,

8  there's an implied representation on the claim form that

9  the services are medically necessary.  As they were

10  deemed not medically necessary, the claims were denied,

11  services not rendered as billed.

12    Q.    At some point in time, did legal counsel from

13  Cigna get involved in the PB Labs investigation?

14    A.    They did towards the end of 2013.  But I believe

15  they had more involvement in 2014.

16    Q.    Who was the legal counsel of Cigna?

17    A.    Bill Welch.

18    Q.    At or around the time that Mr. Welch got

19  involved, do you know whether the Labs also brought a

20  lawyer on?

21    A.    Yes, they did.

22    Q.    After Mr. Welch became involved, ma'am, what if

23  any modifications were made to the denial flags on PB

24  Labs?

25    A.    Through discussions with Bill Welch and the

1543

1    Lab's counsel, the flag was changed to deny only the

2    quantitative or the confirmatory testing CPT codes.

3        Q.    After the denial flag was modified, what would

4    happen if the lab submitted claims for qualitative drug

5    screens?

6        A.    They would have been paid.

7        Q.    And after it was modified, what would happen if

8    the lab submitted claims for confirmatory, quantitative

9    tests?

10       A.    They would be denied as services not rendered as

11   billed.

12       Q.    Why was the denial flag modified?

13       A.    I wasn't privy to those conversations.  It was a

14   discussion between legal.

15       Q.    Did the denial flag modification mean in your

16   mind that the original flag to deny all services for lack

17   of medical necessity was wrong?

18       A.    No.  We had sufficient evidence to make that

19   decision at the time.  Dr. Nicoll's review was more than

20   just the 80299 code.  He had determined that all of the

21   services he reviewed were not medically necessary.

22   That's why that decision was made.

23       Q.    Did SIU send out an overpayment demand letter to

24   the Labs?

25       A.    They did.

1    Q.   Do you know the amount Cigna sought to recover

2    on that?

3    A.   The damages letter included a request for

4    approximately 2.4 million dollars.

5    Q.   What was that for?  Was it for the confirmatory

6    drug testing that was paid?

7    A.   Oh, I'm sorry.  Yes, we were requesting money

8    back for the lack of medical necessity on the

9    confirmatory drug testing.

10    Q.   To your knowledge, did PB Labs return that money

11    to Cigna?

12    A.   They did not.

13    Q.   I want to switch to the fee forgiving

14    investigation into PB Labs, Ms. Anderson.  Can you tell

15    the jury your understanding of what fee forgiving is?

16    A.   Fee forgiving is when a provider intentionally

17    waives the patient's portion of their cost share on a

18    claim.

19    Q.   Was there a fee forgiving investigation opened

20    up into PB Labs?

21    A.    There was.

22    Q.   Is fee forgiving something that the SIU

23    regularly investigates?

24    A.   Yes do.

25    Q.   Why?

1    A.    Fee forgiving is an issue for multiple reasons.

2  It conceals the total cost of the service to Cigna.  It

3  conceals from the customer's --

4          MR. CHRIST:  Objection, Your Honor.  I'm sorry,

5  again, this is cumulative testimony.

6          MR. KANG:  I don't believe Ms. Canto testified

7  to all of these reasons, Your Honor.

8          THE COURT:  I will allow this one.  But you had

9  the opportunity to examine Ms. Canto.  I know she was

10  called as their witness but you had the opportunity to

11  put on your case's evidence through her on the subjects

12  you wanted to and you did.  I'll allow it.  Go ahead.

13  BY MR. KANG:

14    Q.    Thank you.

15          Go ahead.

16    A.    It also causes an unfair inducement for the

17  customers to seek services from that provider and overall

18  causes a breeding ground for other schemes.

19    Q.    What do you mean by that?

20    A.    By the breeding ground so in this situation for

21  example, when you have such excessive medically

22  unnecessary testing, if the customers were being billed

23  hundreds of thousands of dollars a day, a couple of times

24  a week, for multiple weeks, possibly for month, I think

25  it is reasonable to believe that at some point one of

1546

1  those customers would have either stopped seeking those

2  services or they would have contacted Cigna to get a

3  better understanding of why the costs were so exorbitant.

4      Q.   Do you know how the fee forgiving investigation

5  into PB Labs got started?

6      A.   I do.

7      Q.   How?

8      A.   We received another complaint or concern from a

9  client in regards to extremely high spend for one

10  customer for substance abuse related services.

11     Q.   Which customer was that?

12     A.   Richard Sanborn.

13     Q.   Which client was it of Cigna?

14     A.   The client was American Nutrition.

15     Q.   What's American Nutrition?

16     A.   American Nutrition is an employer group.  They

17  offer a benefit plan that has health care benefits that

18  Cigna administers.

19     Q.   And did the referral from American Nutrition

20  regarding claims submitted with respect to Richard

21  Sanborn cause SIU concern about potential fee forgiving?

22     A.   It did.

23     Q.   Why?

24     A.   It caused concern about fee forgiving because

25  the services were so excessive and billed amounts were so

1   high that it would be leaving the patient with an

2   extremely large cost share.

3          MR. KANG:  I want to put up Cigna Exhibit 210,

4   Your Honor.

5          THE COURT:  Is that full exhibit please or if it

6   is for ID, please tell Liana that.

7          MR. KANG:  It is for ID only, now.

8          THE COURT:  So it needs to be stated on the

9   record as Exhibit 2010 for identification.  That then

10  tells Liana not it publish it.

11         MR. KANG:  210 for identification.

12         THE COURT:  Thank you.

13         MR. KANG:  If you could scroll down to the

14  second page.

15  BY MR. KANG:

16     Q.   Mrs. Anderson, do you recognize this document?

17     A.   I do.

18     Q.   Are you a recipient of this document, ma'am?

19     A.   I am.

20     Q.   Is it -- what was this email sent in respect to?

21     A.   This is the initial concerns outlined by

22  American Nutrition that was forwarded to Tom Hixson who

23  is my manager.

24     Q.   Is this the type of email that you receive on a

25  regular basis in performance of your duties at SIU,

1    ma'am?

2        A.    I would.    This email was forwarded to me because

3    my primary state of responsibility is Florida and

4    Stephanie was already reviewing PB Labs and that was one

5    of the labs that was mentioned in this referral.

6            MR. KANG:    Your Honor, I would offer Exhibit,

7    Cigna Exhibit 210 as a full.

8            MR. CHRIST:    No objection.

9            THE COURT:    Cigna 210 may be published to the

10   jury and marked as full.

11   BY MR. KANG:

12       Q.    Can you tell the jury, Ms. Anderson, what this

13   document is?

14       A.     This email is the referral from American

15   Nutrition.

16       Q.    And the date on here is April of 2014; is that

17   correct?

18       A.    That's correct.

19       Q.    Mr. Salazar, could we turn to Bates ending 0092,

20   please.

21           You see there at the top, Ms. Anderson, there's

22   a reference to customer in question is dependent RS.    Do

23   you see that?

24       A.    I do.

25       Q.    Do you understand that those redactions are due

1    to concerns about patient privacy?

2        A.    That's correct.

3        Q.    The RS that's referenced in there, is that

4    reference to Richard Sanborn?

5        A.    It is.

6        Q.    That we've referred to him as Richard Sanborn in

7    this case?

8        A.    Yes.

9        Q.    Do you see a list down there of a number of

10   names?

11       A.    Yes, I do.

12       Q.    What did you understand that list of facilities

13   to be?

14       A.    I'm sorry.

15       Q.    Did you understand those facilities listed below

16   as Mr. Sanborn's providers?

17       A.    Yes.

18       Q.    Do you recognize the names that are listed

19   there?

20       A.    I do recognize these that names.

21       Q.    Do you have firsthand knowledge of the other

22   providers on this list?

23       A.    I do.

24       Q.    How do you have firsthand knowledge?

25       A.    I was managing -- these are investigations that

1    we had in the SIU and I was managing at the time.

2        Q.    Based on your firsthand knowledge, Ms. Anderson,

3    what is Angel's Recovery that is on this list?

4        A.    Angel's Recovery is a substance abuse rehab that

5    offers outpatient care.

6        Q.    Do you see also there's a provider called AJ's

7    or AJS Transitional Living, ma'am?

8        A.    I do.

9        Q.    What is AJ's Transitional Living?

10       A.    AJ's Transitional Living is a sober home.

11       Q.    What is a sober home?

12       A.    Sober home is a residence where someone can

13   reside while they're undergoing treatment.

14       Q.    Have you conducted investigations during your

15   time at SIU into sober homes?

16       A.    I have.

17       Q.    Based on that what, if any, medical services are

18   provided at sober homes?

19       A.    There should be no medical services provided in

20   a sober home because they're not licensed in any manner.

21   In addition, there would be no licensed medical personnel

22   employed at a sober home.

23       Q.    Are you also aware, based on your

24   investigations, of a facility called Redemption?

25       A.    I have heard of --

1551

```
 1            MR. CHRIST:  Objection.  Cumulative to
 2   Mr. Norton's and Goldfarb.
 3            MR. KANG:  I don't believe we got this type of
 4   testimony.
 5            THE COURT:  Whether she's familiar wasn't
 6   cumulative.  But we'll see where it's going.
 7            MR. KANG:  Yes, Your Honor.
 8   BY MR. KANG:
 9      Q.   I'm sorry.  Can you repeat your answer?
10            Are you aware of a facility called Redemption?
11      A.   I am.
12      Q.   What type of facility is redemption?
13      A.   They are also a sober home.
14      Q.   What else do you know about Redemption,
15   particularly with respect to the Labs in this case?
16      A.   Redemption was a client of PB Lab that was owned
17   by Tova Jasperson who also owned Angel's Recovery.  And
18   Angel's Recovery was also a client of PB Lab.
19      Q.   If we could put this down.  And, Mr. Salazar, if
20   you can put up Cigna Exhibit 65.
21            THE COURT:  Is it a full exhibit, sir?
22            MR. KANG:  It is.  It has been admitted already.
23   BY MR. KANG:
24      Q.   Ms. Anderson, this is a document that's been
25   admitted in this case that purports to be list --
```

1    THE COURT:  Excuse me.  Can you take that down

2  for a second.  I don't have it on my list, but that would

3  be my mistake.  Would you confirm it's in.?

4    THE CLERK:  I have it.

5    THE COURT:  You have it.  Fine.

6    You may publish it.  Go ahead, sir.

7    MR. KANG:  Thank you, Your Honor.

8  BY MR. KANG:

9    Q.  Ms. Anderson, I'm showing you what's been

10  admitted in evidence as Cigna Exhibit 65.  Do you see

11  that, Ms. Anderson?

12    A.  I do.

13    Q.  So this is a document that lists the customers

14  of the Labs.  And do you recognize on this list the names

15  of any sober homes?

16    A.  I do.

17    Q.  How do you recognize them as sober homes?

18    A.  Through investigations within the SIU.

19    Q.  So you have personal knowledge as to the names

20  of some of these sober homes on the list?

21    A.  I do.

22    Q.  Can you identify for the jury which of these

23  entities are a sober homes?

24    A.  AJ's Transitional Living, Fresh Start.  Can we

25  scroll down?

1    Q.    Sure.  Mr. Salazar, can we highlight AJ's

2    Transitional Living.

3          What else, Ms. Anderson?

4    A.    Can we scroll down?

5          House of Principles and Clean Slate Living.

6    Q.    So AJ's Transitional Living, Fresh Start, House

7    of Principles, and Clean Slate Living?

8    A.    Correct.

9    Q.    Ms. Anderson, what, if any, knowledge would SIU

10   have that the Lab tests were being ordered by sober homes

11   when the claims were processed?

12   A.    We would not have known.

13   Q.    Why not?

14   A.    It would not have been listed on the claim form.

15   Q.    Can take this down.  Thank you, Mr. Salazar.

16         Going back to the fee forgiving investigation

17   into PB Labs.  Can you tell the jury what, if any, steps

18   were taken by SIU to investigate PB Labs for fee

19   forgiving?

20   A.    Yes.  We requested financial documents from the

21   provider, in addition to sending verification of service

22   letters to customers, and also interviewing customers as

23   well.

24   Q.    What type of information was requested of the

25   provider to produce?

1554

1    A.    So the financial documents would include some

2    type of billing ledger that indicated that the patient

3    made payments.  It could also include statements sent to

4    the customers in an attempt to collect their cost share.

5    There could also be proof of payment in the form of

6    canceled checks of credit card receipts, things of that

7    nature.

8    Q.    Did SIU ever receive materials from PB Labs

9    sufficient to show that they were collecting patient cost

10   share?

11   A.    No.  We did receive ledgers, but there was no

12   indication of patient payments on the ledgers.

13   Q.    So based on the information, the totality of the

14   information that was gathered, what, if any, conclusion

15   did SIU draw with respect to PB Labs and fee forgiving?

16   A.    We determined that PB Labs was not collecting

17   patient cost share.

18   Q.    And as a result, what was done?

19   A.    We changed the flag to deny all claims as fee

20   forgiving.

21   Q.    Do you know when that occurred?

22   A.    I do not recall.

23   Q.    Okay.  So towards the end of 2014?

24   A.    I'm sorry.  It was December of 2014.

25   Q.    During this period, Ms. Anderson, do you know

1    how many flags SIU could attach to a provider at one

2    time?

3        A.   One flag.

4        Q.   And why is that?

5             MR. CHRIST:  Objection.  Cumulative again.

6             THE COURT:  I've heard about one flag and

7    changing flags replaces the first flag.  I mean, I don't

8    know.  Unless it's a predicate to a question that's

9    new --

10            MR. KANG:  It actually --

11            THE COURT:  You're going to make that

12   representation to me?

13            MR. KANG:  No.  I will move on, Your Honor.

14            THE COURT:  Thank you.

15   BY MR. KANG:

16       Q.   Did the change in flag protocol from services

17   not rendered as billed to fee forgiving mean that SIU did

18   not believe that there was enough evidence to support its

19   earlier lack of medical necessity determination?

20       A.   It did not mean that.

21       Q.   What did it mean?

22       A.   It just meant that we would have one flag at a

23   time.  And because all Cigna plans have a cost share

24   component, the fee forgiving, the business practice of

25   fee forgiving actually affects all claims.  So at that

1    point, we made the decision to change the flag to fee

2    forgiving.

3        Q.    Are you aware whether PB Labs was informed about

4    SIU's conclusion?

5        A.    They were informed.

6        Q.    Okay.  And how?

7        A.    Bill Welch had sent a letter in December of

8    2014.

9        Q.    I will switch gears to BioHealth.

10            At some point, did SIU open an investigation

11   into BioHealth?

12       A.    We did.

13       Q.    Do you know when that investigation got started?

14       A.    That was April 2014 when we received the

15   referral from American Nutrition.

16       Q.    The same referral that led to the fee forgiving

17   investigation into PB Labs?

18       A.    That's correct.

19       Q.    Why was there a -- why did that referral cause

20   an investigation to be opened into BioHealth?

21       A.    Part of the referral that had come to us was

22   related to double billing.  At the time, the customer was

23   at Angel's Recovery, and Angel's Recovery was billing not

24   only for the level of care, but the professional fees for

25   the lab, while PB Labs was billing for drug testing at

1  the same time the customer was living in AJ's

2  Transitional Living.  So on the same date for the same

3  customer, the same services were being billed by AJ's

4  Transitional.  And then BioHealth was doing the

5  confirmatory testing for those services as well.

6      Q.   So the nature of the referral from American

7  Nutrition was to look into double billing?

8      A.   Was to look into double billing and fee

9  forgiving.

10     Q.   Was BioHealth eventually flagged for double

11 billing?

12     A.   They were not flagged for double billing.  It

13 turned out that the providers were not double billing,

14 but they were billing excessively.

15     Q.   Who was the investigator working on the

16 BioHealth investigation?

17     A.   Stephanie Canto.

18     Q.   At some point after there was no flag placed for

19 double billing, did Ms. Canto conduct an investigation

20 into other issues with respect to BioHealth?

21     A.   She did.

22     Q.   What was that?

23     A.   She investigated them for fee forgiving.

24     Q.   And why was a fee forgiving investigation into

25 BioHealth opened?

1    A.    So with the initial referral, there was concerns

2    because we have an out-of-network provider that was

3    excessively billing very high dollar charges which would

4    leave the patient with a very large out-of-pocket

5    expenses.

6    Q.    Was there outreach made by SIU to BioHealth

7    asking for records to support their collection of patient

8    cost share?

9    A.    We did request the financial documents.

10    MR. CHRIST:  Objection, cumulative.

11    THE COURT:  There's been some testimony about

12    that specifically, about the letter.  The letter was the

13    same form letter?

14    MR. KANG:  I don't believe that -- I believe

15    that there's going to be some different portions of

16    Ms. Anderson's on this, Your Honor.

17    THE COURT:  Well, ask her those questions.

18    MR. KANG:  I'm sorry.  As a predicate for my

19    questions, can Ms. Anderson answer the last question,

20    Your Honor?

21    THE COURT:  Yes.

22    BY MR. KANG:

23    Q.    Were there records requested of BioHealth?

24    A.    Yes.  We requested the financial documents.

25    Q.    And were those records, in fact, received?

1559

1    A.    They were not.

2    Q.    Was a fee forgiving flag implemented at some

3  point on BioHealth?

4    A.    It was.

5    Q.    When was that?

6    A.    I believe that was May of 2015.

7    Q.    Was there an overpayment demand ever made by SIU

8  to BioHealth?

9    A.    There was.

10    Q.    How much was that demand for?

11    A.    Approximately 5.4 million.

12    Q.    To your knowledge, did BioHealth ever return

13  that money?

14    A.    They did not.

15    Q.    When SIU investigated BioHealth, did it come to

16  learn of a connection that BioHealth had with PB Labs?

17    A.    At some point it became clear that PB Labs and

18  BioHealth were under the same umbrella corporation.

19    Q.    Which umbrella corporation was that?

20    A.    Medytox.

21    Q.    So why didn't SIU just go ahead and flag

22  BioHealth simply because of their connection with PB

23  Labs?

24    A.    We would never flag one provider solely because

25  they were related to another provider.  So in this

1    situation, both of these referrals came in at different

2    times from different places with different allegations.

3    So we would also review the allegation that came in.

4    Perform independent investigation.  And then draw

5    conclusions based on those -- based on the evidence that

6    we uncovered.

7        Q.    Thank you.  Was there an investigation that was

8    opened into Epic Reference Lab?

9        A.    There was.

10       Q.    And how are you familiar with that

11   investigation?

12       A.    I was the manager that oversaw that

13   investigation.

14       Q.    Can you tell the jury when that investigation

15   into Epic began?

16       A.    Around May of 2015.

17       Q.    And why did that investigation into Epic begin?

18       A.    We had an analyst in our Case Development Unit

19   that was reviewing verification of service letters for an

20   unrelated lab that were returned to sender by the United

21   States Postal Service.  And when he went into the claims

22   system to double-check the address, because it appeared

23   they all had the same address.  He also identified that

24   each of the customers had approximately 20 claims pended

25   from Epic.  That would be a red flag, that a provider

1    submitting a rather large number of claims all at one

2    time.

3            So from there, he went to review the exposure.

4    And at that point, around April of 2015, we had already

5    pay the provider over $1,000,000.  And he also identified

6    that they were targeting the IFP plans.

7        Q.    So as a result of that analysis, was there a fee

8    forgiving investigation opened up into Epic?

9        A.    There was.  Case Development opened the

10    investigation and initiated a fee forgiving

11    investigation.

12        Q.    What type of evidence was sought during that

13    investigation?

14        A.    So we also requested the financial documentation

15    in addition to sending verification of service letters to

16    the customers and performing interviews.

17        Q.    Let me show you what's been marked as a Joint

18    Exhibit 144, Ms. Anderson.

19            MR. KANG:  Your Honor, may I offer this exhibit?

20    It's a Joint Exhibit.

21            THE COURT:  Yes.  It may be published.

22            MR. KANG:  Thank you.

23            THE COURT:  144.

24    BY MR. KANG:

25        Q.    Ms. Anderson, I know there's a lot of small

1    print on there, but do you recognize this document?

2        A.    Yes, I do.

3        Q.    What is this document?

4        A.    These are case notes that were pulled from our

5    Case Management System.

6        Q.    What are case notes?

7        A.    Case notes memorialize the actions that an

8    investigator took throughout the course of an

9    investigation.

10       Q.    And what's the purpose of keeping case notes?

11       A.    To ensure the accuracy of the information.

12       Q.    Mr. Salazar, if we could jump ahead to page 25,

13   sir, of this PDF.  Zoom in on line 160.

14             Are each of these lines related to a particular

15   event and ordered chronologically?

16       A.    Yes.  So you will see the activity category and

17   the date, and then the action that was taken.

18       Q.    So for this particular entry, what's the date of

19   the activity that's memorialized here?

20       A.    May 4, 2015.

21       Q.    And, Mr. Salazar, could you highlight those

22   first two paragraphs under the note section.

23             So you see that first sentence says called phone

24   number listed on claims submitted by HCP.

25       A.    Yes.

1563

1    Q.   What was the HCP that's referenced in this

2  paragraph?

3    A.   That's the acronym for health care provider.

4    Q.   And in this context, which health care provider

5  was this?

6    A.   This is Epic.

7    Q.   And if you read the second paragraph starting

8  with Diana answered transfer.

9    A.   Yes.

10   Q.   It says, Diana answered transfer.  Investigator

11 informed her of the request for billing policy and

12 patient ledgers.  Diana inquired if this with a proposal.

13 Investigator advised it was a request for billing policy

14 and patient ledgers.

15      Did I read that correctly?

16   A.   You did.

17   Q.   In the context of this paragraph, was the

18 investigator a reference to an SIU investigator?

19   A.   Yes.

20   Q.   And what does this entry, in particular, those

21 last two sentences read, what does that entry reflect?

22   A.   Any time we're requesting information from a

23 provider, we have to call the provider first and have an

24 exact person that we're addressing the letter or the

25 facts to.  So in this case, Patrick Hurley was calling to

1564

1  obtain a name, which it looks like the name that he was

2  given was Evelyn Gil, and the fax number to send the

3  request for the billing policy and patient ledgers to.

4      Q.   Did Epic produce any patient ledgers that

5  reflected that they were collecting patient cost share?

6      A.   They produced ledgers, but none of them

7  reflected the collection of patient cost share.

8      Q.   What, if any, conclusion did SIU draw from that?

9      A.   SIU concluded that Epic was also waiving patient

10  cost share.

11      Q.   Engaging in fee forgiving?

12      A.   Yes, engaging in fee forgiving.

13      Q.   Ms. Anderson, did SIU ever flag Epic for fee

14  forgiving?

15      A.   We did not.

16      Q.   Did you believe there was sufficient evidence to

17  flag Epic for fee forgiving?

18      A.   Yes, there was sufficient evidence to flag for

19  fee forgiving.

20      Q.   Who made the decision not to flag Epic?

21      A.   That decision was made by Bill Welch who, again,

22  was our legal counsel at the time.

23      Q.   To your knowledge, what if any litigation had

24  begun at that point between the Labs and Cigna?

25      A.   The Labs had filed suit in Florida.

1    Q.   And so that had been initiated at the time that

2  the decision was made not to flag Epic for fee forgiving?

3    A.   That's correct.

4    Q.   Ms. Anderson, did SIU ever have concerns that

5  Epic was billing for medically unnecessary services?

6    A.   We did.  Due to the egregiousness of the

7  billing, we actually placed them into the IFP Lab Edit

8  around May of 2015 as well.

9    Q.   What is the IFP Lab Edit?

10    A.   The IFP Lab Edit was an edit that we were using

11  at the time, very sparingly using, for egregious

12  providers in the state of Florida -- I'm sorry --

13  egregious labs in the state of Florida that were

14  targeting the IFP plan and billing more than four

15  quantitative or confirmatory tests on one date of service

16  for one customer.

17    Q.   Was the IFP Lab Edit a denial flag?

18         MR. CHRIST:  Objection.  Cumulative to Mr.

19  Norton's testimony.

20         THE COURT:  To whose testimony?  I couldn't hear

21  you.

22         MR. CHRIST:  Norton.

23         THE COURT:  I thought you said Morton.

24         MR. KANG:  I don't believe it is cumulative.

25  And it's laying the predicate also to --

1    THE COURT:  I'll allow it.

2    MR. KANG:  Thank you.

3    BY MR. KANG:

4    Q.  Was the IFP Lab Edit a denial flag, Ms.

5    Anderson?

6    A.  It was not.  It would request medical records

7    for those claims.

8    Q.  So it's similar to the medical records edit that

9    was placed on PB Labs back in 2013?

10   A.  That's correct.

11   Q.  And so if Epic produced records sufficient to

12   show the medical necessity of the claims, what would

13   happen to those claims?

14   A.  The claims would have been paid.

15   Q.  So after being placed in the IFP edit, would all

16   of Epic's claims have been denied?

17   A.  I'm sorry.  Can you repeat that?

18   Q.  Let me withdraw that.  Let me ask it a different

19   way.

20   Were all labs placed into the IFP Lab edit?

21   A.  No.  Very few labs met the criteria to go into

22   this edit.  I believe it was around 22 labs all together.

23   Q.  Were PB Labs and BioHealth placed in the IFP Lab

24   edit?

25   A.  They were not.

1    Q.    Why not?

2    A.    I think the IFP edit came later.

3    Q.    They had already been flagged at that point?

4    A.    Yes.

5    Q.    Ma'am, going back to BioHealth for just one

6    minute.  They were flagged for fee forgiving, correct?

7    A.    That's correct.

8    Q.    Was the focus of the BioHealth investigation

9    ever on the lack of medical necessity of the services

10   billed?

11   A.    We were concerned about the medical necessity of

12   the services being billed.

13   Q.    Then why wasn't BioHealth investigated and

14   flagged for that?

15   A.    We never received records that would allow us to

16   make that determination.

17   Q.    If we could show Cigna Exhibit 2019.

18          THE COURT:  Is that a full exhibit?

19          MR. KANG:  Yes, Your Honor.

20          THE COURT:  May be published.

21   BY MR. KANG:

22   Q.    Ms. Anderson, do you recognize this document?

23          Mr. Salazar, if you can scroll down a little

24   bit.

25   A.    I do not.

1568

1    Q.   To your knowledge, was this document ever
2    produced by the Labs during the course of the SIU
3    investigation?
4    A.   No, it was not.
5         MR. CHRIST:  Objection, foundation.
6         THE COURT:  She just said she doesn't recognize
7    it.  Sustained.
8         But just for a moment, please.  What's the
9    number of this exhibit?
10        MR. KANG:  2019.
11        THE COURT:  2019.  That's a Cigna exhibit.
12   Thank you.
13        You have to be clear, because you have 219 and
14   we've had that problem already this morning.  So I'd
15   appreciate it if you were very clear.
16        MR. KANG:  Thank you, Your Honor.
17   BY MR. KANG:
18     Q.   Ms. Anderson, during the course of your
19   investigation --
20        THE COURT:  I think I sustained the question.
21   So we need a new question.  Don't go ahead with that one,
22   Ms. Anderson.  I'm sorry.
23     Q.   Ms. Anderson, during the course of your
24   investigation and your involvement with respect to the
25   three Labs, did you review some of the material that the

1  Labs provided?

2      A.   Yes.

3      Q.   Was this document among the materials that the

4  Labs produced that you reviewed?

5      A.   It was not.

6          MR. CHRIST:  Objection, again, foundation.  She

7  testified earlier she doesn't recognize this document.

8          THE COURT:  Right.

9          MR. KANG:  I think that's the point.

10          THE COURT:  The question was and the answer was,

11  yes, she reviewed some.  And it wasn't in the some pile.

12  That's what's been asked and answered.  For what it's

13  worth, I don't see an objection to that question.

14  BY MR. KANG:

15      Q.   Are you familiar with billing and patient

16  ledgers, Ms. Anderson?

17      A.   Yes.  I see them very often in our

18  investigations.

19      Q.   Have you personally reviewed billing and

20  financial ledgers provided by providers?

21      A.   I have.

22      Q.   Does this appear to be a billing and financial

23  ledger?

24      A.   It does appear to be some sort of ledger that

25  tracks the amount the insurance company paid and then the

1    patient payments.

2        Q.   Do you see column M over there on the right-hand

3    side?

4        A.   I do.

5        Q.   Is that titled Patient Noninsurance Payments?

6        A.   Yes, it is.

7        Q.   Are you familiar, based of the billing and

8    collection ledgers you have seen in other cases, what

9    that may be in reference to?

10           MR. CHRIST:  Objection, Your Honor.  Cumulative

11   to Mr. Goldfarb and Ms. Canto's testimony on this column

12   specifically.

13           MR. KANG:  Laying the predicate, Your Honor, for

14   a question that has not been asked.

15           THE COURT:  I'm sorry.  Your objection, again,

16   please, sir.

17           MR. CHRIST:  It's cumulative.  This question is

18   asking for cumulative testimony that has already been

19   asked of Mr. Norton and Ms. Canto specifically regarding

20   column M.

21           THE COURT:  I'll allow it.  It may be the next

22   question we'll have to pause on.  I will allow you to

23   answer the question, which is, are you familiar with

24   billing and collection ledgers that you have seen in

25   other cases as to what this column, meaning M, is in

1571

1    reference to.  Just a yes or no.

2        A.    I'm sorry?

3            THE COURT:  Just ask it again.  I might have

4    paraphrased it a bit.

5    BY MR. KANG:

6        Q.    Based on your familiarity with provider billing

7    and collection ledgers, do you have an understanding as

8    to what column M refers to?

9        A.    I do.

10       Q.    What do you understand that to be?

11           THE COURT:  Let's be clear.  She doesn't

12   remember this document.  So she's not testifying to what

13   that document means.  She's just talking about when she

14   sees that.  She's now being asked what it means.  Is

15   there any objection to that?  I'm not suggesting you

16   should have one.  I just don't want to get an answer that

17   has to be stricken.

18           MR. CHRIST:  No objection to that question.

19           THE COURT:  All right.  You may answer that

20   question, ma'am.

21       A.    It appears that that column would indicate any

22   patients -- I'm sorry -- any payments made by the

23   patients in relation to the claims and the dates of

24   service that are outlined in this document.

25       Q.    And, Mr. Salazar, if you can scroll out.

1    Ms. Anderson, do you see -- if you could scroll

2  down a little bit, Mr. Salazar, down here.

3    Do you see anything other than zeros in that

4  column?

5    MR. CHRIST:  Objection, cumulative.

6    THE COURT:  Sustained.  Document speaks for

7  itself, sir.  They are all cumulative.

8    MR. KANG:  Thank you.

9  BY MR. HARE:

10    Q.   Ms. Anderson, if this is a billing and

11  collection ledger associated with the Labs, would this

12  type of document have been important for you to have had

13  in the SIU investigation?

14    A.   It would have been very helpful.

15    Q.   Why?

16    A.   Because this indicates that no patients paid

17  their cost share.

18    MR. KANG:  No further questions, Your Honor.

19    THE COURT:  Cross-examination.

20    CROSS-EXAMINATION

21  BY MR. CHRIST.

22    Q.   Good morning, Ms. Anderson.  My name is Matthew

23  Christ.  I'm an attorney for the Labs.  I don't think

24  we've had the pleasure of meeting in person yet, but nice

25  to meet you.

1      A.    Good morning.

2      Q.    You would agree with me that Cigna's explanation

3  of payment or EOP informs the health care provider

4  whether a claim that that provider has submitted to Cigna

5  for payment is approved or denied, correct?

6      A.    Yes, that's correct.

7      Q.    And same thing for an Explanation of Benefit.

8  I've heard those terms used interchangeably, correct?

9      A.    That is not correct.

10      Q.    It's not correct.  Tell us the difference

11  between EOP and EOB, please.

12      A.    An EOB is an Explanation of Benefits that would

13  be sent to a customer.  And an EOP is an Explanation of

14  Payment that is sent to a provider.

15      Q.    As a Senior Fraud Investigator, is it fair to

16  say that you would be familiar with the insurance plans

17  that govern the claims that you're investigating?

18      A.    To a certain extent.

19      Q.    And, similarly, would you need to be familiar

20  with the insurance plans and the claims the investigators

21  that you supervise or manage are investigating?

22      A.    I think also to a certain extent depending on

23  the investigation.

24      Q.    Basically you have to know what the plan

25  generally permits and what it doesn't permit?

1    MR. KANG:  I'm going to object to this, Your

2    Honor.  We were precluded from going into the plans with

3    our other witnesses.

4         Also, beyond the scope.

5         THE COURT:  I think I will have to see counsel

6    at sidebar.  I'm not sure I understand.

7         (Sidebar.)

8         THE COURT:  I thought when a person in his shoes

9    got up, like when you got up, you could ask not just

10   cross of what she testified to, but also evidence in

11   support of their defense to your case.

12        MR. KANG:  I don't know if Ms. Anderson is

13   noticed as a --

14        THE COURT:  You noticed every one of his

15   witnesses that you shifted to your --

16        MR. KANG:  Yes, Your Honor.

17        THE COURT:  So how do you do anything that isn't

18   on cross?

19        MR. CHRIST:  I'm trying to lead up to with this

20   witness is who she heard that from.  I'm sorry.  Question

21   her about her determination of medical necessity.  So she

22   testified on direct about whether a claim was medically

23   necessary or not.

24        THE COURT:  Right.  She did do that, right,

25   Attorney Kang?

1    MR. KANG:  We didn't get into her information of

2  medical necessity.  No, we did not.  That's clinical

3  information.

4    THE COURT:  I know that.  But they were flagging

5  them or sending them to the medical director to determine

6  medical necessity.  She was looking at that.  She didn't

7  have records she said.  So what's the concern about

8  medical necessity?

9    MR. KANG:  I don't think Mr. Goldfarb was

10  precluded, as well as other SIU witnesses were precluded

11  from opining on the definition of medical necessity.

12    THE COURT:  No, I don't think we're going to

13  have them opine on it, other than to read an exhibit, I

14  suppose, that's in evidence.  You can do that.  But I

15  don't know where we's going.  So let's finish this, I

16  guess.  I do think I heard the medical necessity come out

17  of your mouth or her mouth this morning.

18    MR. CHRIST:  See, where I'm going with this is

19  I'm going to eventually show Ms. Anderson a copy of the

20  policy that says how you make a medical necessity

21  determination.

22    THE COURT:  Those bullet points?

23    MR. CHRIST:  Those bullet points.

24    THE COURT:  Fine.

25    MR. CHRIST:  Then show an EOP which says the

1    claim was denied for medical necessity.  And just say

2    does this provide the sufficient information that's

3    listed in the policy and that now you're raising it.

4    That's it.

5         MR. KANG:  I do agree.  I also think that that

6    is the type of testimony that we were I believe we were

7    precluded --

8         THE COURT:  When did I preclude you?  When did

9    you go to offer that and I precluded it?  I don't

10   remember precluding you other than with this witness.  I

11   don't think I've ever said you can't.  I haven't heard

12   this challenge.

13        MR. KANG:  I remember there were a lot of 702

14   objections.

15        THE COURT:  That's expert testimony.

16        MR. KANG:  And I think this leads into that.

17        THE COURT:  I see.  That could be argument.  A

18   document's in evidence.  Whether she defends whether that

19   notice is sufficient.  I think your point's a really good

20   one.  But I don't know that you can use this witness to

21   complain about what the company does on their EOBs and

22   EOPs.

23        MR. CHRIST:  The point I've been trying to make

24   with her is you have made a decision to deny claims as a

25   medical necessity.  Wouldn't you need to know x, y, z to

1    make that decision.  And part of x, y, z, as we're

2    arguing, is providing notice to the health care provider

3    the reasons why the claim has been denied as medically

4    unnecessary.

5            THE COURT:  I think you're getting into

6    argument.  Step back.

7            Excuse me, counsel.  Can I have you back for a

8    minute.  I have been refreshed in my recollection.  There

9    was testimony about the code went out on EOBs and Ps of

10   services.  What's the phrase?  Services not rendered as

11   billed.  And that being equivalent to their determination

12   of medical necessity.

13           Am I remembering that correctly?

14           MR. KANG:  That's correct.

15           THE COURT:  Then I think you have opened the

16   door, because they had told in some of their EOBs, right,

17   services not rendered.  How anyone would know -- I mean,

18   I guess he can put up the list of descriptions on medical

19   necessity and ask her if that code is in that list.  I

20   don't know you can take a long time on this, but he's

21   allowed to do it.

22           The objection is overruled.

23   BY MR. CHRIST:

24      Q.   Ms. Anderson, I believe you testified earlier

25   today that services not rendered as billed is equivalent

1578

1    to services that were not medically necessary, correct?

2        A.    No.

3        Q.    So services not rendered as billed is not the

4    same, in this are particular instance with PB Labs, as

5    services that Cigna determined were not medically

6    necessary?

7        A.    Services not rendered as billed is the denial

8    that we used because the claims were not medically

9    necessary.

10        Q.    Very good.  Thank you.

11            MR. CHRIST:  My Smeig, if you can pull up Joint

12    Exhibit 48, please.

13            THE COURT:  48?  Full exhibit?

14            MR. CHRIST:  Full Exhibit. Yes, Your Honor.

15            THE COURT:  It may be published.

16    BY MR. CHRIST:

17        Q.    This is the plan for Miami-Dade County Public

18    Schools.  That's a Cigna client that's been discussed in

19    this case.

20            Mr. Smeig, if you can go to page 52 of the

21    exhibit which is page 51 of this plan, a little

22    confusing.  And if you can scroll to the bottom.  Under

23    "claim determination procedures."  If you can highlight

24    "procedures regarding medical necessity determinations"?

25            Ms. Anderson, do you see in that section Cigna

1    plan states, "In general health services and benefits

2    must be medically necessary to be covered under the

3    plan," correct?

4        A.    That's what it says.

5        Q.    We agree on that point, right?

6        A.    I don't know if I can answer it the way you are

7    asking me.

8            THE COURT:  I agree.  Ask another question.

9            MR. CHRIST:  I will move on, Your Honor.

10           Mr. Smeig, if you can pull up Labs Exhibit

11   5012A.  And this is not published.

12           THE COURT:  So ID only.

13           MR. CHRIST:  Yes, ID.

14           THE COURT:  Then what you say after a number is

15   ID.

16           MR. CHRIST:  ID.  Thank you.

17    BY MR. CHRIST:

18       Q.    Ms. Anderson, have you seen this type of

19   document before?

20       A.    Yes.

21       Q.    And is this an explanation of benefits that we

22   were discussing earlier?

23       A.    It is.

24       Q.    This would go to the plan member or the patient?

25       A.    Correct.

1580

1    MR. CHRIST:  I would like to publish this

2    exhibit, Your Honor, admit this exhibit if there is no

3    objection.

4         THE COURT:  Any objection, sir?

5         MR. KANG:  No, Your Honor.

6         THE COURT:  5012A is now a full exhibit and may

7    be published.

8    BY MR. CHRIST:

9    Q.   Could, Mr. Smeig, if you can scroll to the

10   fourth page or maybe page 3 on here.  I'm sorry.  There

11   you go.

12        Under the notes here, does this state that

13   services were not rendered as billed?

14   A.   In part, yes.

15   Q.   And so is this informing the patient that the

16   reason the services is denied is because Cigna has

17   determined that the services were not rendered as billed?

18   A.   That's correct.

19   Q.   Mr. Smeig, if you can go back to exhibit, Joint

20   Exhibit 48, please, and go back to page 53 with the PDF.

21        So if the EOP we looked at now has denied a

22   claim, would you agree that's not a good outcome for the

23   patient.  The claim has been denied, correct?

24        MR. KANG:  Objection, Your Honor.  Relevance as

25   to not a good --

1581

1    THE COURT:  Sustained.

2    BY MR. CHRIST:

3    Q.   Would you agree that EOP that we just showed

4    denied the claim?

5    MR. KANG:  Objection, Your Honor, foundation.

6    MR. CHRIST:  She just testified.

7    THE COURT:  You want to go back to the exhibit?

8    MR. CHRIST:   Mr. Smeig, go back to exhibit

9    5012A, please, and page 3.

10    THE COURT:  Page 3 or 4 or 3?

11    BY MR. CHRIST:

12    Q.   Again looking at the notes here.  Does this

13    notice provide that the claim has now been denied?

14    A.   That's correct.

15    Q.   And perhaps we can do it this way.  Mr. Smeig,

16    can you keep this document on the right side of the

17    screen then pull up Joint Exhibit 48 on the left side of

18    the screen.  Thank you.  Joint Exhibit 48 please, sir.

19    Page 53.  Could you do a call out of the paragraph under

20    the heading "notice of adverse determination," please.

21    Ms. Anderson, I would like you to read this

22    Section.  You don't need to read it out loud.

23    THE COURT:  The jury is to read it while she's

24    reading it.

25    BY MR. CHRIST

1582

1    Q.   Ms. Anderson, is it fair to say that this

2  section provides -- places some requirements on Cigna

3  when providing a notice of adverse benefit determination?

4         MR. KANG:  Objection, Your Honor, vague.

5         THE COURT:  Rephrase it please.

6  BY MR. CHRIST:

7    Q.   Ms. Anderson, what does this section state?

8    A.   It is a Notice of Adverse Determination.

9    Q.   And does this section provide a list of

10  requirements that Cigna needs to provide to its member to

11  provide that notice of adverse determination?

12         MR. KANG:  Objection, Your Honor, lack of

13  foundation on personal knowledge, calls for a legal

14  conclusions and also expert testimony.

15         THE COURT:  How is it expert testimony?

16         MR. KANG:  Opining on the terms of the plan.  I

17  think this was the same objection that the Labs had with

18  respect to our witness.

19         MR. CHRIST:  May I, Your Honor.

20         THE COURT:  I think it is a leading question.  I

21  didn't hear opine.  Just asking does it -- this is an

22  insurance policy or contract, right?  Attorney Kang, am I

23  correct that is what this document is?

24         MR. KANG:  A plan document, benefits plan

25  document.

1    THE COURT:  Do you want to rephrase it, sir?

2  I'm not saying you have to.  I don't want to ponder over

3  in the if you are going to reframe.

4    MR. CHRIST:  No, I won't rephrase. I'm simply

5  asking if the document provides --

6    THE COURT:  I will allow it.

7  BY MR. CHRIST:

8    Q.  So Ms. Anderson, do you recall my question?

9    A.  I do.

10    THE COURT:  It should be answered yes or no.  If

11  you can't answer just say, I can't answer the way you

12  have asked.

13    A.  I don't think I can answer the way you have

14  asked.

15  BY MR. CHRIST:

16    Q.  Let's go through the document then.  Does this

17  document state that "The notice of an adverse benefit

18  determination needs to be provided in writing or

19  electronically."  That's the first sentence?

20    MR. KANG:  Objection, Your Honor.  Document

21  speaks for itself.

22    THE COURT:  I think he's pointing it to her so

23  he can ask a question.

24    I agree the document is the words you will have

25  to consider, not a short paraphrase of it.  Why don't you

1   direct her to a part of the document then ask your

2   question, sir?

3   BY MR. CHRIST:

4       Q.   Ms. Anderson, could you read the first part of

5   the first sentence until we get to?

6           THE COURT:  The highlighted section is the first

7   clause before the comma.  Would have that in mind when he

8   asks the question.

9   BY MR. CHRIST:

10      Q.   Your answer was yes, I believe?

11      A.   No, I was responding to her.

12           Yes, that is what this states.

13      Q.   Great.

14           And the next highlighted section, Mr. Smeig, if

15  you can take that down and highlight starting with the

16  word "and" and go to the colon.

17           And is this portion of the section we have blown

18  up here state, "The notice needs to provide the following

19  information"?

20           MR. KANG:  Objection, Your Honor, document

21  speaks for itself.

22           THE COURT:  It does.

23           MR. CHRIST:  I will rephrase.

24           THE COURT:  Sustained. I will not have you ask

25  if a document says what you are reading.  Sustained.

1  BY MR. CHRIST:

2      Q.  Ms. Anderson, what's the section that I have

3  highlighted here state?

4          MR. KANG:  Same objection, Your Honor.

5          THE COURT:  We have already read it.  I don't

6  know that it is relevant to this case that this witness

7  reads a section of it.

8          MR. CHRIST:  I will move on, Your Honor.

9          THE COURT:  Thank you.  I'm not saying you can't

10 ask a question based on the section.  We have all got it

11 in front of us so you should ask that question.

12 BY MR. CHRIST:

13     Q.  After reviewing this section, does this

14 paragraph require Cigna to provide in its notice of an

15 adverse benefit determination a specific reason why the

16 claim is being denied?

17         MR. KANG:  Objection, Your Honor.

18         THE COURT:  Sustained.

19 BY MR. CHRIST:

20     Q.  Doesn't this paragraph require Cigna to provide

21 a specific reason as to why they are denying a claim?

22         MR. KANG:  Objection, Your Honor.

23         THE COURT:  Just with a caveat the jury should

24 understand this is her understanding.  She's not telling

25 you how the law would interpret this contract or

1   necessarily how you will apply it in this case, with that

2   limitation, "What is your understanding?"  Ask the

3   question again with that limitation.

4   BY MR. CHRIST:

5       Q.   Ms. Anderson, based on your personal knowledge

6   as a service investigator in the SIU, does this plan

7   document that we reviewed require Cigna when making a

8   medical necessity determination of a claim to specify the

9   specific reason why the claim is being denied?

10          MR. KANG:  Objection for lack of foundation on

11  her personal knowledge as to this plan.

12          THE COURT:  Is this one of the representative

13  plans is it an IFP or some other kind?

14          MR. CHRIST:  It is one of plans representative.

15  It's the Joint Exhibit 48.

16          THE COURT:  Is it an IFP or another kind?

17          MR. CHRIST:  It is not an IFP plan.

18          THE COURT:  Then you have to ask to lay a

19  foundation.

20  BY MR. CHRIST:

21      Q.   Are you familiar with -- are you familiar with

22  employee benefit plans at Cigna?

23      A.   I'm at --

24          MR. KANG:  Objection, relevance.

25          THE COURT:  I think you need to narrow it to

1    with what's at issue in this case.

2    BY MR. CHRIST:

3        Q.   Moving to another topic.  If you can pull those

4    two documents down, Mr. Smeig, thank you.

5             You testified earlier that you said if medical

6    records were provided -- -- strike that.  You testified

7    earlier, Ms. Anderson, that if PB Labs had provided

8    medical records when requested, Cigna would have paid

9    those claims.  Did I hear you correctly?

10            MR. KANG:  Objection, Your Honor,

11   mischaracterizes the witness's testimony.

12            THE COURT:  Then she can tell him it does.  It's

13   cross-examination.  Overruled.

14   BY MR. CHRIST:

15       A.   That's not what I stated.

16       Q.   So had Cigna -- PB Labs provided medical records

17   after SIU sent out that request, Cigna would have still

18   denied those claims, correct?

19       A.   No.

20       Q.   If we can pull up Labs' Exhibit 6987, please.

21            THE COURT:  Is it a full exhibit or ID?

22            MR. CHRIST:  I think that's a full exhibit.

23   That's the exhibit we were talking about this morning,

24   Your Honor.

25            THE COURT:  Think and know is different.

1    Is it a full exhibit, Liana?

2    THE CLERK:  I was under the impression at that

3    time that specific pages were full.

4    THE COURT:  Good.  Isn't that good to know?

5    That would be ID when you call it up, sir.

6    MR. CHRIST:  Cigna, page 2 only.

7    THE COURT:  So that is now in evidence and that

8    page may be produced to the screen, Liana, but nothing

9    else.  Thank you.

10   BY MR. CHRIST:

11   Q.   Ms. Anderson, you were talking about the fee

12   forgiveness investigation into BioHealth.  Do you recall

13   that testimony?

14   A.   Yes.

15   Q.   And you were at the time, you would have had

16   access to Ms. Canto's case notes, case ledger, as a

17   manager?

18   A.   Depending on the time that you are referencing,

19   I might not have been Stephanie Canto's manager.

20   Q.   As a manager in the SIU, before approving any

21   decisions to flag or not flag a health care provider,

22   would you want to base your decision on the review of the

23   a case notes or ledger of your investigator?

24   A.   Yes.  My decision would be based on a evidence

25   obtained.

1589

```
 1      Q.   So Ms. Anderson, this is a summary of Ms.

 2   Canto's efforts to reach out to BioHealth patients to

 3   learn if they had received a bill or not.  Does this

 4   document list just 15 patients?

 5           MR. KANG:  Objection, Your Honor, lacks

 6   foundation on the witness's knowledge of this document.

 7           THE COURT:  She's looking at it, sir.  She can

 8   answer if it has 15.  Overruled.

 9   BY MR. CHRIST:

10      A.   It lists 15 patient's initials.

11      Q.   And does this document also list in a second

12   column various dates of outreach?

13      A.   It just says "date".

14      Q.   In the third column it also states "Cigna SIU

15   activity," correct?

16      A.   Yes.

17      Q.   Under that column there were two or three -- I'm

18   sorry -- there are two options there, either "left

19   message" or "disconnected" or a third, "wrong number" on

20   number 6; is that correct?

21      A.   Yes.

22      Q.   And then on the fourth column to the right there

23   is a result.  And is this list that -- of all of those

24   samples.  The first response is "no response", correct?

25      A.   That's what the document says.
```

1    Q.   Of the folks who actually responded 1, 2, 3 at

2    the bottom it actually says patients responded and

3    informed Ms. Canto or SIU that they actually received

4    either no bills or they did receive bills under number 8,

5    number 9, and number 14.

6         MR. KANG:  I'm sorry.  Is Mr. Christ just asking

7    if the document says that, Your Honor, or if in fact --

8         THE COURT:  I don't know if he's leading up to a

9    question.  But I will allow him as I did you a

10   preliminary question to lay a foundation.

11        But if you just have her read the document, next

12   time you do that and have another question, there will be

13   an objection and I will sustain it.

14        MR. CHRIST:  Thank you, Your Honor.

15   BY MR. CHRIST:

16   Q.   My question, ma'am, is as an investigator --

17   well, would you agree with me that of these responses

18   most of these are actually not indicative of fee

19   forgiving?

20        MR. KANG:  Objection, Your Honor.

21        THE COURT:  Overruled.

22   A.   I can't answer that the way you stated it.

23   Q.   There are three responses here where there is

24   actually a response received -- four, my apologies.  And

25   of those four, three of the four said they actually

1    received bills, correct?

2        A.   That's what this document says.  I'm not sure if

3    there's additional information.

4        Q.   Then the rest of a document shows there's no

5    response received at all.  My question is as an SIU

6    manager would this be sufficient information for you to

7    base a decision to flag a health care provider all their

8    claims for fee forgiveness?

9        A.   This specific document alone would not be

10   enough.

11       Q.   Are you aware that Epic -- I think you testified

12   earlier that Epic, PB Labs, and BioHealth were all under

13   the same umbrella company, correct?

14       A.   Yes.

15       Q.   Are you aware that PB Labs and BioHealth had the

16   same billing company as Epic?

17       A.   I do know that we figured that out at one point.

18       Q.   And the same business practices as Epic?

19       A.   I don't think I can answer that the way you are

20   asking.

21       Q.   Again these are all under the same umbrella,

22   company, correct?

23       A.   Correct.

24       Q.   I thought you said that Mr. Patrick Hurley was

25   the investigator into the Epic Reference Labs case,

1592

1      correct?

2          A.   That's correct.

3          Q.   And at the end of the day Epic was not flagged,

4      correct?

5          A.   That's correct.

6          Q.   And Stephanie Canto was the investigator who

7      flagged both PB Labs and BioHealth, right?

8          A.   That's correct.

9          Q.   Is Mr. Hurley still employed at Cigna today?

10         A.   He's not employed at Cigna.

11         Q.   Is Ms. Canto still employed at Cigna today?

12         A.   Yes, she is.

13             MR. CHRIST:  No further questions.  Thank you,

14     Your Honor.

15             THE COURT:  You may step down, ma'am.  Thank you

16     very much.

17             Call your next witness, Attorney Kang.

18             MR. KANG:  Your Honor, we call Bill, William

19     Welch to the stand.  Mr. Welch.

20             THE COURT:  Mr. Welch, would you please come up

21     here to the witness stand area.  When you arrive, I ask

22     that you remaining standing as the clerk is going to

23     administer an oath to you.  Thank you.

24                     W I L L I A M   W E L C H

25     Having been called as a witness, was first duly sworn and

1    testified on his/her oath as follows:

2            THE WITNESS:  I do.

3            THE CLERK:  Please be seated and state your name

4    for the record spelling your last name.

5            THE WITNESS:  My name is William Welch,

6    W-E-L-C-H.

7            THE COURT:  You may proceed.

8            MR. KANG:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10   BY MR. KANG:

11       Q.   Good Morning, Mr. Welch.

12       A.   Good morning.

13       Q.   Are you currently employed?

14       A.   I am not.

15       Q.   What was the last employment that you had,

16   Mr. Welch?

17       A.   I worked at Voya Financial.

18       Q.   When did you work at Voya?

19       A.   From August 2016 to March 2024.

20       Q.   What was the last title that you held at Voya?

21       A.   Deputy general counsel and chief compliance

22   offer.

23       Q.   Are you a lawyer?

24       A.   I am.

25       Q.   Can you tell the jury where and when you

1    graduated from law school?

2        A.    I graduated in 1989 and I graduated from the

3    Northwestern University School of Law in Chicago.

4        Q.    At some point in time, Mr. Welch, did you work

5    at Cigna?

6        A.    I did.

7        Q.    When?

8        A.    April of 2012 to June or July of 2016.

9        Q.    And what was your title at Cigna during that

10   time?

11       A.    Associate chief counsel.

12       Q.    And what were your responsibilities during that

13   time?

14       A.    My responsibilities were to set up and then run

15   an affirmative litigation program.  Then also to provide

16   support, advice, guidance to the Special Investigations

17   Unit.

18       Q.    Were you a legal advisor in some respect to the

19   SIU?

20       A.    Yeah, that's correct.

21       Q.    Are you familiar with some or all of Labs in

22   this case, sir?

23       A.    I am.

24       Q.    In 2014, did you have communications with a

25   lawyer from the Labs?

```
 1        A.    I did.

 2        Q.    And who was that?

 3        A.    Michael Gennett.

 4        Q.    At some point, did you ask Mr. Gennett for PB

 5   Labs' billing and collections policies?

 6        A.    I did.

 7        Q.    Did you also ask for a copy of their patient

 8   ledgers?

 9        A.    I did.

10        Q.    Showing you, if we can put up Mr. Salazar, Joint

11   Exhibit 36.  If we can go to page 2 of that document,

12   sir.  Mr. Welch, do you recognize --

13             MR. KANG:  Your Honor, this is a joint exhibit.

14   If I may move for the admission of this exhibit?

15             THE COURT:  Yes, you may.

16             MR. KANG:  Thank you.

17   BY MR. KANG:

18        Q.    Mr. Welch, do you recognize this document?

19        A.    I do.

20        Q.    What is it?

21        A.    It is a letter that I drafted and sent to

22   Mr. Gennett.

23        Q.    If you can scroll down, Mr. Salazar, and scroll

24   up a little bit, thank you.

25             Before the black box over there, sir, does that
```

1596

1    state, "In addition, please provide a copy of PB Labs'

2    patient ledgers showing billing and collection activities

3    for the following patients"?

4        A.    Correct.

5        Q.    And does it also state below the black box "we

6    also would like to get a copy of PB Labs' billing" --

7            MR. CUNNINGHAM:  Objection, your Honor.  The

8    letter speaks for itself.

9            THE COURT:  Yes, I thought we just had that

10   issue.  Sustained.  You need to read it and the jury

11   should also read it, then there will be a question.

12   BY MR. KANG:

13       Q.    Can you read it to yourself?

14       A.    Yes, I read it to myself.

15       Q.    Does this reflect your request to Mr. Gennett

16   for information regarding ledgers and collection

17   policies?

18       A.    It does, correct.

19            MR. KANG:  Can we put up Cigna Exhibit 30.

20            THE COURT:  Is it a full exhibit, sir?

21            MR. KANG:  Yes, Your Honor.

22            THE COURT:  All right, it is already in

23   evidence.  May be published.

24   BY MR. KANG:

25       Q.    Mr. Welch, do you recognize this document, sir?

1    A.    Yes, I do.

2    Q.    What is this?

3    A.    This is the billing policy and procedure guide

4  that I received in response to my request in the May 30th

5  letter.

6    Q.    I'm sorry.  Thank you for clarifying that.  What

7  was the date of the letter you sent to Mr. Gennett?

8    A.    May 30th.

9    Q.    If you can turn to the second page of this

10  document, Mr. Salazar.

11        Do you see at the bottom right corner?  There's

12  a "revised."  Do you see that?

13    A.    I do see that.

14    Q.    What did you understand the revised 6-24-2014 to

15  mean?

16    A.    I understood it to mean there had been a

17  previously policy in existence and the one I was

18  receiving was one that got revised on June 24, 2014.

19    Q.    Is it fair to say that this revision date was

20  about a month after your letter to Mr. Gennett?

21    A.    Correct.

22    Q.    Did you ever ask Mr. Gennett to provide a prior

23  version of this billing policy?

24    A.    I did.

25    Q.    Did you ever receive that?

1    A.    I did not.

2    Q.    Could we put up Cigna Exhibit 2019?  It's been

3  admitted, Your Honor.

4         THE COURT:  If you confirm that, Liana, it may

5  be published.

6         MR. CUNNINGHAM:  What was the number, Mr. Kang?

7         MR. KANG:  2019.

8         THE COURT:  Full exhibit, Liana.

9         MR. KANG:  Thank you, Your Honor.

10 BY MR. KANG:

11    Q.    If we can zoom in a little bit, Mr. Salazar,

12 maybe to the top headers.

13         Mr. Welch, do you recognize this document?

14    A.    I do not.

15    Q.    Did Mr. Gennett ever provide this document to

16 you in response to your request for patient ledgers?

17         MR. CUNNINGHAM:  Objection, foundation.  I

18 thought he did not recognize it.

19         MR. KANG:  I am asking him whether Mr. Gennett

20 ever provided this, if he knows.

21         THE COURT:  It's sustained.

22 BY MR. KANG:

23    Q.    Have you ever seen this document before, Mr.

24 Welch?

25         MR. CUNNINGHAM:  Objection, cumulative.

1599

1    THE COURT:  I'll overrule it.

2  BY MR. KANG:

3    A.   No, I haven't.

4    Q.   Did Mr. Gennett -- to your knowledge is this

5  anything among the materials that is Mr. Gennett provided

6  to you?

7    MR. CUNNINGHAM:  Objection, lack of foundation.

8    THE COURT:  I think you have to show him more

9  than a pull out of a document.  If you want to scroll

10  through or something else.

11  BY MR. KANG:

12    Q.   Mr. Salazar, can we scroll through this document

13  a little bit.

14    Did Mr. Gennett ever provide you a copy of this

15  document?

16    A.   He did not.

17    MR. KANG:  No further questions, Your Honor.

18    THE COURT:  Cross-examination.

19              CROSS EXAMINATION

20    MR. CUNNINGHAM:  Thank you, Your Honor.  May it

21  please the Court.

22    THE COURT:  Yes.

23  BY MR. CUNNINGHAM:

24    Q.   Mr. Welch, just to be clear the document that

25  Mr. Kang tried to show you, you have never seen that

1600

1    before?

2        A.    Correct.

3        Q.    You don't know whether that was provided to you

4    about Mr. Gennett, do you?

5        A.    I'm fairly certain he did not provide it to me.

6        Q.    But you said you have never seen it?

7        A.    Yes.

8        Q.    Somehow you know, even though you have never

9    seen it, that he didn't provide it to you.  Is that your

10   testimony, sir?

11       A.    No.  My testimony is I never got it from

12   Mr. Gennett because what I got from Mr. Gennett was a

13   very small sample of approximately 10, 12, patient

14   ledgers.  And in my best recollection, they were

15   handwritten.

16       Q.    Now, sir, we met when I took your deposition by

17   Zoom back in February of 2023; right?

18       A.    Correct.

19       Q.    Do you remember that?

20       A.    Yes.

21       Q.    Now, sir, isn't it true that when we took your

22   deposition, you had not reviewed a single record of any

23   type with regard to the investigation that you were

24   involved in with regard to these Labs; isn't that true?

25       A.    Prior to the deposition?

1    Q.   Yes, sir.

2    A.   Yes.  I had no access.

3    Q.   Did you ever ask Mr. Kang for any records so

4    that you can refresh your recollection?

5    A.   Refresh my memory to what?

6    Q.   Let me ask you this, sir, you left Cigna's

7    employment in April of 2016; right?

8    A.   Correct.

9    Q.   We took your deposition in February of 2023?

10   A.   Correct.

11   Q.   You told me that you had virtually no

12   independent memory of any of the investigation, what you

13   had done and what you had not done, right?

14   A.   I don't think that's correct.  I answered many

15   questions during the deposition.

16   Q.   Sir, didn't you tell me that you had advised Mr.

17   Kang before your deposition that you had virtually no

18   memory of the investigation you had been involved in.

19        MR. KANG:  Objection, Your Honor, hearsay.

20        MR. CUNNINGHAM:  I'm happy to show it to him,

21   Your Honor.

22        THE COURT:  You can.

23   BY MR. CUNNINGHAM:

24   Q.   Just so the record is clear, your deposition was

25   taken over seven years after you left Cigna, right?

1602

1    A.    Correct.

2    Q.    And Mr. Kang did not give you a single document

3    to review to refresh your recollection, refresh your

4    memory in advance of that deposition, right?

5         MR. KANG:  Objection, Your Honor, relevance.

6         THE COURT:  Overruled.

7    MR. CUNNINGHAM:

8    A.    To the best of my memory that is correct.

9    Q.    You didn't ask Mr. Kang to see any record that

10   is might refresh your memory of a investigation that you

11   were involved in?

12   A.    Correct, I did not.

13   Q.    Sir, isn't it true that you told Mr. Kang before

14   your deposition almost two years ago, that you have

15   little or no memory of Palm Beach Labs or BioHealth?

16   A.    I don't think that's correct.

17   Q.    Could we pull up that deposition please, Mr.

18   Smeig.

19        THE COURT:  Do I have a copy of that deposition?

20        MR. CUNNINGHAM:  We'll present it on the screen

21   to Your Honor.

22        THE COURT:  Just to me?

23        MR. CUNNINGHAM:  Yes.  It is loaded.  Not to the

24   Jury.

25        Let's go to page 35, please.

1    Your Honor, do you have that?

2    THE COURT:  I do.

3    MR. CUNNINGHAM:  May I proceed?

4    THE COURT:  Wait a minute, which particular

5  line?

6    MR. CUNNINGHAM:  I'm going to ask about the

7  question and answer starting at line 5 and ending at line

8  11 for impeachment purposes.

9    THE COURT:  Yes, you may.

10  BY MR. CUNNINGHAM:

11    Q.    Sir, do you remember being asked the following

12  question by me and giving the following answer starting

13  at line 5, "Question, did Mr. Kang ask you if you had any

14  independent recollection of your involvement in these

15  investigations and giving the following answer. 'He

16  didn't ask me that.  I volunteered that.  I told him I

17  have little or no memory of PB Labs, Biohealth.  I didn't

18  quite understand how I can serve a useful purpose.'"  Is

19  that your testimony, sir?

20    A.    It is.

21    Q.    Under oath?

22    A.    Correct.

23    Q.    You would expect that your memory would have

24  been better 2 years ago than today?

25    A.    No, I don't agree he with you.

1604

1    Q.   That's the question and answer that occurred in

2  your deposition when you were under oath, correct?

3    A.   Yes, but it referred to prior to the deposition.

4         THE COURT:  No, sir.  He called for yes or no.

5  You don't get to the explain.

6  BY MR. CUNNINGHAM:

7    Q.   Isn't it true that you also testified that

8  reviewing the case notes and ledgers would not even

9  refresh your memory of the events that had occurred in

10  the investigation?

11         MR. KANG:  Objection, Your Honor, beyond the

12  scope.

13         THE COURT:  What on direct?  What line of

14  questioning do you claim opened door to that line of

15  questioning?

16         MR. CUNNINGHAM:  Well, Your Honor, he's

17  testified to documents that were shown to him.  In his

18  deposition he said that showing him documents would not

19  refresh his recollection.

20         THE COURT:  What was his testimony about case

21  notes and ledgers on direct?

22         MR. CUNNINGHAM:  He was shown some documents

23  that he had he had never seen.  So I wanted to explore

24  that.  In other words, he's come up with new memories

25  today that he didn't have two years ago.  That's my

1  point.  If you want me to move on.

2          THE COURT:  That he had never seen, that point.

3          MR. CUNNINGHAM:  Right.  I think it's proper

4  impeachment, Your Honor.  It is very brief.

5          THE COURT:  I will hold you to that, sir.

6          MR. CUNNINGHAM:  It will be very brief, Your

7  Honor.

8          THE COURT:  You may answer the question.  Isn't

9  it true you also testified that reviewing case notes and

10  ledgers would not even refresh your recollection of

11  events that had occurred in the investigation?  That's

12  the question.  If he can answer yes or no.  If not, you

13  have to say you can't answer.

14  BY MR. CUNNINGHAM:

15      A.   I can't answer that.  I don't have a

16  recollection of that testimony.

17      Q.   Okay.  Can we go to page 35, line 22?

18          THE COURT:  For ID only?

19          MR. CUNNINGHAM:  Yes, Your Honor.

20  BY MR. CUNNINGHAM:

21      Q.   Going down through page 36, line 4.  Do you have

22  that in front of you, sir?

23      A.   I see.

24      Q.   Did I ask you the following question --

25          MR. KANG:  Your Honor, I object.  If he's

1  putting this in for ID only, Mr. Welch can review

2  silently to himself.

3          THE COURT:  Right.

4          MR. CUNNINGHAM:  May I proceed, Your Honor?

5          THE COURT:  Yes.

6  BY MR. CUNNINGHAM:

7      Q.   Were you asked the following question --

8          THE COURT:  He's not offering it only for --

9          MR. CUNNINGHAM:  I am impeaching him with prior

10  testimony, Your Honor.  That's the purpose.

11          THE COURT:  I don't see how it is inconsistent

12  to today, other than from argument not from the words he

13  said in his testimony.

14          MR. CUNNINGHAM:  If you look at lines 2 through

15  4 on page 36.  I think it is directly contradictory to

16  what he just said.  He just said he didn't say what --

17          THE COURT:  No, I will not allow you to read it

18  into evidence.

19          MR. CUNNINGHAM:  I will move on, Your Honor.

20  BY MR. CUNNINGHAM:

21      Q.   Mr. Welch, do you recall that you wrote one

22  letter to PB Labs, to Mr. Gennett, who was the attorney

23  for PB Labs, and then another letter to Mr. Viskovich who

24  was the Compliance Officer for BioHealth Laboratories?

25      A.   I recall that I wrote multiple letters to Mr.

1   Gennett.

2       Q.   Sir, did you review any documents for your trial

3   testimony or to prepare for your trial testimony?

4       A.   I did.

5       Q.   What documents did you review?

6       A.   I reviewed the correspondence between myself and

7   Mr. Gennett.  I reviewed the two overpayment letters that

8   were issued.  And I believe that's it.

9            THE COURT:  I may change my ruling that you're

10  allowed to introduce that.

11           MR. CUNNINGHAM:  Pardon me, Your Honor?

12           THE COURT:  The prior ruling where you had

13  testimony on the screen.  And I sustained the objection

14  that it couldn't be considered a prior inconsistent

15  statement.  The Court will allow you to introduce that

16  statement if you want to ask the question or two

17  predicate to offering it, you may.

18           MR. CUNNINGHAM:  Sure, I'll go back to it.

19           THE COURT:  I'm sorry.  Did you complete your

20  answer, that's what you looked at?

21           THE WITNESS:  Yes.

22           THE COURT:  Thank you very much.

23           Go ahead, sir.

24  BY MR. CUNNINGHAM:

25       Q.   Would you please look at your deposition

1608

1    testimony which should be on your screen.  Starting at

2    page 35, line 22, and going through page 36, line 4.  Let

3    me know when you've had a chance to review that, sir.

4            Are you finished, sir?

5    A.    I am finished.

6    Q.    Thank you.  Did you give -- did I ask you the

7    following question and did you give the following answer

8    in your deposition:

9            Q.    Do you believe that reviewing case

10   notes and ledgers would have refreshed your recollection

11   as to the activity you conducted in this case?

12           A.    Unlikely.

13           Q.    You don't think they would refresh your

14   recollection?

15           A.    No.

16           THE COURT:  What page of the deposition is that?

17           MR. CUNNINGHAM:  Page 35 and 36, Your Honor.

18           THE COURT:  Thank you.

19   BY MR. CUNNINGHAM:

20   Q.    Were those the question and answers from your

21   deposition taken under oath?

22   A.    That's correct.

23   Q.    Sir, just asking you about what you reviewed.

24   You have told us that you didn't review one piece of

25   paper before you gave your deposition in this case,

1609

1     right?

2         A.    Correct.

3         Q.    Sir, you knew, did you not, as somebody who has

4     been a lawyer since 1989, that I was taking your

5     deposition to try to find out with your testimony was

6     going to be at the trial of this case?

7            MR. KANG:  Objection, Your Honor, relevance.

8            THE COURT:  Overruled.

9         A.    I did not know that.

10   BY MR. CUNNINGHAM:

11         Q.    You weren't aware for the reason that I was

12   taking your deposition?

13        A.    I understood that you were taking my deposition

14   for purposes of the lawsuit.  But beyond that, meaning

15   what your purpose was, I didn't know one way or the

16   other.

17        Q.    Sir, you weren't aware that I was trying to find

18   out what your testimony under oath would be in the event

19   that this case went to trial?

20        A.    I didn't know your motive.  I had no idea one

21   way or the other.  I was happy to be deposed and I did.

22        Q.    So did you have any meetings with Mr. Kang or

23   anybody from his team in anticipation of your trial

24   testimony?

25        A.    Yes.

1610

1    Q.   How many meetings?

2    A.   Two.

3    Q.   And approximately what was the total time of

4    those meetings?  I don't want to know anything that was

5    said.  I just want to know how long those meetings took.

6    A.   Each one was about an hour.

7    Q.   So you met with Mr. Kang and Cigna's lawyers for

8    approximately two hours?

9    A.   Correct.

10   Q.   To discuss your trial testimony?

11   A.   Correct.

12   Q.   And you were shown documents during those

13   pretrial preparation sessions, right?

14   A.   Correct.

15   Q.   Sir, what I want to ask you about is the two

16   letters that you wrote.  And you remember that you had

17   written several letters but, in particular, a December

18   12, 2014 letter to Michael Gennett what was the Lab's

19   attorney, correct?

20   A.   Correct, he was the attorney.

21   Q.   I will tell you for the record, that's Cigna

22   Trial Exhibit 198.  And the second letter I want to talk

23   to you about is Joint Exhibit 160-A, as in apple.  And

24   that's a May 28, 2015 letter that was written to a Dean

25   Viskovich who was the Legal Compliance Director for

 1   BioHealth Laboratories, correct?

 2        A.   I don't have the documents in front of me.  So I

 3   can't really say one way or the other.

 4        Q.   We'll go ahead and put those up for you, sir, in

 5   order.

 6             MR. KANG:  Your Honor, I'm going to object for

 7   beyond the scope.

 8             THE COURT:  Yeah.  Those aren't the numbers of

 9   what we've looked at so far, right?

10             MR. KANG:  They are not.

11             MR. CUNNINGHAM:  I don't think he discussed

12   these in his direct testimony, Your Honor.

13             THE COURT:  He didn't.

14             MR. CUNNINGHAM:  Right.  It's the issue of fee

15   forgiveness which --

16             THE COURT:  You're putting on a defense?

17             MR. CUNNINGHAM:  Pardon me?

18             THE COURT:  You're putting on your defense?

19             MR. CUNNINGHAM:  I think we can characterize it

20   as that, Your Honor, because, yes, that would be what I'm

21   doing.

22             MR. KANG:  Again, Your Honor, they didn't notice

23   Mr. Welch as a witness in their case.

24             THE COURT:  You noticed every witness that you

25   crossed on, then move to direct in your case that he

1    listed, that he called?  I didn't recall that was the

2    understanding we had.

3            MR. KANG:  My understanding is yes, Your Honor,

4    we did.

5            THE COURT:  So how do you get to have him --

6    he's not really his witness.

7            MR. CUNNINGHAM:  He's not my witness.

8            THE COURT:  He's crossing him as an adverse

9    witness.

10           MR. CUNNINGHAM:  Right.  I'm cross-examining

11   Mr. Kang's witness that he put on in his case because of

12   the defense.

13           THE COURT:  We're going to excuse the jury two

14   minutes early, but we're going to be back two minutes

15   early, ladies and gentlemen.  Be careful.  Watch that

16   watch.  We'll be back at 11:28, even if we never leave

17   the courtroom.

18           Thank you very much, ladies and gentlemen.  Get

19   some of that nice fresh air.  Last few days you will be

20   able to go out without a winter coat.

21           You can step out of the room, sir.  I'm afraid

22   you can't stay.  Please be sure you're back here at about

23   11:25, because I have to be sure that we're ready to go.

24            Thank you very much.

25           (Discussion Off the Record.)

1    (In the absence of the jury at 11:14 a.m.)

2    MR. CUNNINGHAM:  May I take a one minute break?

3  I will be right back.

4    THE COURT:  Yes, go ahead.

5    I don't have the Lab's Witness List in front of

6  me from the last time it was addressed at pretrial

7  conferences.  I do have Cigna's which indicates CIC/D

8  case-in-chief/defense, right, which is the part you are

9  trying to ask him of --

10    MR. CUNNINGHAM:  Right.

11    THE COURT:  In the defense of Cigna's claims

12  right now.

13    MR. CUNNINGHAM:  Yes, Your Honor.

14    THE COURT:  Did you list this witness as a

15  witness that you would use in your defense on your

16  witness list like they did Matt Ryan?  He was called.  He

17  would be used -- him, Nicholson, Hollis, were all

18  indicated solely as defense.  I don't know.  Have you got

19  it up yet, Alex?  There's no D witnesses indicated, sir.

20    MR. CUNNINGHAM:  Your Honor, I will have

21  Mr. Gestrich come in, Your Honor, but --

22    THE COURT:  Well, we need to have him here.  I'm

23  here.  If he's going to speak for your client --

24    MR. CUNNINGHAM:  He didn't know that he was

25  going to, Your Honor.

1614

1     If I understand where the Court is headed with

2 this, I can proffer this outside the presence of the jury

3 later if the Court's going to say that we didn't list

4 him.

5     THE COURT:  I'm asking you why you are entitled

6 to, in effect, treat him on direct as your -- yes, on

7 direct, in effect, as a witness called in your defensive

8 case to Cigna's lawsuit.  Remember, we're trying two

9 lawsuits here.  I don't have a strong recollection of how

10 clearly I made this on the record of your need to.  But

11 clearly Cigna did that.  Now, maybe that's because they

12 understood they were going to pull this card at some

13 point in the trial.  I don't know.  But they did.

14     MR. CUNNINGHAM:  Excuse me one second, Your

15 Honor.

16     Okay.  Your Honor, I've confirmed that we did

17 not list Mr. Welch.

18     THE COURT:  Okay.  So how do you get to examine

19 him?  You can proffer it for the record later on, but how

20 do you get to do it?

21     MR. CUNNINGHAM:  It's cross-examination, Your

22 Honor, of the examination done by Mr. Kang.

23     THE COURT:  And what were the questions he asked

24 and answered on direct from Attorney Kang that this

25 question that we're about to go into or that was objected

1    to is within that scope?

2         MR. CUNNINGHAM:  In good conscience, Your Honor,

3    I --

4         THE COURT:  We'll have to go way back to find

5    it.

6         MR. CUNNINGHAM:  I cannot make an argument that

7    they delved deeply into fee forgiveness.  So I will drop

8    it, Your Honor.  Just proffer it outside the presence of

9    the jury.

10        THE COURT:  Tell me now.  It may affect my view.

11   I might agree with you.

12        MR. CUNNINGHAM:  This is the problem we have

13   because of this fee forgiveness issue, Your Honor.

14        THE COURT:  Right.  There's lots of objections.

15   You couldn't go into anything in your case.  But how are

16   you going to defend against it in his case?

17        MR. CUNNINGHAM:  Well, here's what I want to do,

18   Your Honor.  He sent these two letters to the two labs at

19   different times.  They're basically the identical letter.

20   And the only thing he talks about with respect to fee

21   forgiveness is under the plans, under the language of the

22   plans, you cannot engage in fee forgiveness.  So I just

23   want to establish that he never says anything in these

24   letters about unfairness.

25        THE COURT:  Please don't ask people about, both

1616

1    sides, what's the letter say.  You can ask, especially on

2    cross, what doesn't it say.  Both of you suffer from this

3    problem.  You want to read from the documents that are

4    already in evidence they've already read.

5          It's your argument that you want to make based

6    on his response is, I don't know, is there anything in

7    your letter about fee forgiveness that's not under the

8    policy?  I don't know.  I'm not going to tell you how to

9    do your case.  You pose a question and I will take the

10   objection.

11         MR. CUNNINGHAM:  Thank you, Your Honor.

12         I don't want the jury to read the entire length

13   of these letters.  I think they're both four page --

14         THE COURT:  I don't care whether you want them

15   to read them.  They are in evidence.  They may very well

16   read them.

17         MR. CUNNINGHAM:  I will be very brief, Your

18   Honor.

19         THE COURT:  But you had asked a question about

20   two letters that have not been shown to the jury at any

21   time in the course of his direct examination.  So

22   that isn't asking him what isn't in the letters he was

23   shown.  It wasn't asking him you never mentioned.  You're

24   introducing different letters and I have to assume it's

25   not within the scope.

1617

1     MR. CUNNINGHAM:  Well, that's what I was just

2  getting ready to do, Your Honor, is put those letters --

3  they are already in evidence.

4     THE COURT:  But that's not asking him is his

5  letters didn't contain fee forgiveness outside the

6  contract.

7     MR. CUNNINGHAM:  I want for him to look at the

8  letter.  I don't want the jury to read four pages.  I

9  just want him to look at the letter.  Say is there any

10  mention of --

11     THE COURT:  Which letter?

12     MR. CUNNINGHAM:  The two letters that I just

13  mentioned.  The one letter to PB Labs in 2014.

14     THE COURT:  But that wasn't testified to on

15  direct.

16     MR. CUNNINGHAM:  And then I'll have to proffer

17  it, Your Honor, if that's the Court's ruling.

18     THE COURT:  Could somebody put up one of those

19  letters.  I don't understand what question you're going

20  to ask.

21     MR. CUNNINGHAM:  Cigna Trial Exhibit 198 is up.

22  This is the December 12, 2014 letter.  Could you scroll

23  down, please.

24     THE COURT:  You're going to tell me that fee

25  forgiveness is about policy language.

1       MR. CUNNINGHAM:  Yes.

2       THE COURT:  Okay.  Put up the letters he was

3   shown, the two that were on his direct examination.

4   Attorney Kang, can you give me the numbers?

5       MR. KANG:  Yes, Your Honor.  Hold on.  Joint

6   Exhibit 36 was the letter, Your Honor.

7       THE COURT:  If you can put up 36 and then double

8   screen.  What's the other one?

9       MR. KANG:  I showed an MBC billing policy which

10  was Cigna Exhibit 30.

11      THE COURT:  Only one letter was shown?

12      MR. KANG:  One letter.

13      THE COURT:  36.  Open it up.  I just want to

14  read the text.  So if you can enlarge the text.  There

15  you go.

16      I don't understand why this relates --

17      MR. CUNNINGHAM:  This definitely relates to fee

18  forgiveness, Your Honor.  Their whole argument is we

19  asked for a copy of their billing practices because we

20  thought they were fee forgiving.  So they've opened the

21  door to this.  This is the whole issue of fee

22  forgiveness.

23      THE COURT:  If you use this document, you may

24  and questions about fee forgiveness, and what he recalls

25  he did or didn't do in connection with this letter or

1619

 1    anything related to this letter.  Other than that, you

 2    can't ask.

 3         MR. CUNNINGHAM:  Okay.  And I will just proffer

 4    it later, Your Honor, outside the presence of the jury.

 5         THE COURT:  Proffer what?  I just asked you to

 6    proffer.

 7         MR. CUNNINGHAM:  If the Court is satisfied.

 8    What I intended to do with those two letters is say these

 9    letters only mention that fee forgiveness violates the

10    Cigna plans.  Doesn't say anything about unfairness to

11    Cigna or anybody else.  That's all I wanted to do.

12         THE COURT:  I wouldn't use the documents.  You

13    can ask him a question about it, whether they ever talked

14    about anything else.  But you can use this document in

15    connection with that if you want to.  If you can.  But

16    otherwise, no.

17         MR. KANG:  Your Honor, just on this issue.  I

18    was very careful and narrow.

19         THE COURT:  I'm sure you were, sir.  But that

20    letter is in evidence.  You were questioning.  I mean,

21    he's asking for records.  Why was he asking for those

22    records?  Because somebody in the investigation unit said

23    we think there's a fee forgiveness problem I'm sure.  So

24    that's his state of mind.  He can tell us that.  Why did

25    you write this letter?  I mean, he didn't just get up one

1620

1    morning and say, oh, I think I'll write to Gennett and

2    ask him for his ledgers, right?  He had had a reason.

3    And then he can ask him why would they be concerned.  I

4    don't know.  I'm not going to write his

5    cross-examination.  But he's allowed to and some

6    questions.

7         MR. KANG:  It's not about the scope.  It's about

8    the privilege issue, Your Honor.  About his mental

9    impressions.  We were very careful not to get into that.

10         THE COURT:  What mental impressions?

11         MR. KANG:  If's he's going to ask why did you

12   write that letter, what were you having conversations

13   about with SIU.

14         THE COURT:  Well, he can ask it more leading.

15   What was the focus of the investigation at this time that

16   led you to for these documents?  Is he going to give me

17   privilege or is he going to tell me fee forgiveness?  Or

18   he can say wasn't fee forgiveness.  That you thought that

19   these records should be produced.  I mean, he could ask

20   that I suppose.  He's probably going to say I can't

21   remember.  But we already covered that.  And if he's got

22   privilege, he should assert it.  And then we'll deal with

23   that problem.

24         I think you can ask -- he can ask a leading

25   question that will avoid any attorney/client privilege,

1621

1  but still establish the reason he wrote this letter was

2  to obtain records in connection with an investigation of

3  fee forgiveness.

4          Would you agree that's why he wrote the letter?

5  I mean, the nature of the records, I could testify to

6  that.

7          MR. KANG:  Yes, Your Honor.  That's right.

8          THE COURT:  All right.  And you're going to go

9  from there, sir, and we'll deal with it.

10         Bring them in.

11         MR. CUNNINGHAM:  Thank you.  It will be very

12 brief.

13         THE COURT:  Stop telling me that, Attorney

14 Cunningham.  Okay.  Stop.

15         (In the presence of the jury at 11:30 a.m.)

16         THE COURT:  Please be seated, ladies and

17 gentlemen.  I hope you had a nice break.

18         You may be seated, Mr. Welch.  Thank you for

19 being prompt.

20          You may continue your cross-examination.  I

21 think it would be best with just a new question.

22         MR. CUNNINGHAM:  Thank you, Your Honor.  May it

23 please the Court.

24         THE COURT:  It may.

25 BY MR. CUNNINGHAM:

1       Q.   Mr. Smeig, will you put up that document that

2   Mr. Kang used during the direct-examination.

3            Could you enlarge that, please.

4            THE COURT:  There's a second page.  I would

5   suggest you show it to him to refresh his memory.  You

6   can scroll down, please.  Just has to have a sense of

7   what the document is.

8   BY MR. CUNNINGHAM:

9       Q.   Now, Mr. Welch, you remember you were shown this

10  document on direct examination by Mr. Kang?

11      A.   Correct.

12      Q.   And this is a letter written by you to Mr.

13  Gennett, the attorney for the Labs, right?

14      A.   Correct.

15      Q.   And what you wanted was a copy of PB Labs

16  patient ledgers showing billing and collection activity

17  for a number of patients, right?

18      A.   Correct.

19      Q.   And scroll down a little bit more.

20           And you also wanted a copy of PB Labs billing

21  and collection policies, right?

22      A.   Correct.

23      Q.   And, sir, the reason that you would have wanted

24  these items was because the Cigna SIU was investigating

25  whether PB Labs was engaged in fee forgiveness, right?

1    A.    I mean, that was one of the reasons, correct.

2    Q.    Let me ask you about just one more thing, sir,

3  which was something that Mr. Kang did not show you.

4         Let's go it page 9 of Cigna's Trial Exhibit 30.

5         THE COURT:  It is in evidence.

6  BY MR. CUNNINGHAM:

7    Q.    Sir, do you have that in front of you?

8    A.    I see it, yup.

9    Q.    Is this page titled Waivers, Discounts and

10 Financial Hardships?

11   A.    Correct.

12   Q.    Could I ask you to read that first paragraph to

13 yourself, sir.

14        Your Honor, may I ask the jury?

15        THE COURT:  Yes.

16        MR. CUNNINGHAM:  Thank you.

17 BY MR. CUNNINGHAM:

18   Q.    Let me know when you are finished with that,

19 please, sir.

20   A.    Okay.

21   Q.    Does this paragraph indicate that the general

22 policy of MBC Billing Services was to not offer

23 discounts, professional courtesies, or waive

24 co-payments or deductibles unless directed to do so by

25 their clients?

```
 1       A.    Correct.  That's what it says.

 2             MR. CUNNINGHAM:  That's all the questions I

 3   have.

 4             Thank you, sir.

 5             THE COURT:  Mr. Welch, you may step down.  Thank

 6   you.

 7             Your next witness, Attorney Kang.

 8             MR. AKERMAN:  Thomas Hixson for Cigna, Your

 9   Honor.

10             THE COURT:  Thank you, sir.  If you'd just

11   remain standing a moment so the Clerk can administer an

12   oath.

13             THOMAS HIXSON, having been called as a

14   witness, was first duly sworn and testified on his oath

15   as follows:

16             THE WITNESS:  Yes.

17             THE CLERK:  Please be seated.

18             Please state your name for the record and spell

19   your last name.

20             THE WITNESS:  Say my last name first?

21             THE COURT:  Either way, sir.  It doesn't matter.

22             THE WITNESS:  Thomas Hixson.

23             THE COURT:  Good morning, sir.  Go ahead

24   whenever you're ready.

25                     DIRECT EXAMINATION
```

1    BY MR. AKERMAN:

2        Q.    Mr. Hixson, are you currently employed?

3        A.    Yes.

4        Q.    Where are you employed?

5        A.    I work for Cigna.

6        Q.    What is your role for Cigna?

7        A.    I'm a Senior Director of the Special

8    Investigations Unit.

9        Q.    How long have you worked for Cigna?

10       A.    Since 1991.  33 years.

11       Q.    What was your role for Cigna in the year 2013?

12       A.    I was a Director of Special Investigations.

13       Q.    What did that role entail?

14       A.    I oversee the investigative teams focused in on

15   investigating inappropriate billing and waste and abuse.

16       Q.    Would that role have included working with

17   non-SIU Cigna employees when they were supporting the SIU

18   team?

19       A.    Yes.

20       Q.    Are you familiar with a Dr. Dan Nicoll?

21       A.    Yes.

22       Q.    Did you work with a Dr. Dan Nicoll at Cigna in

23   2013?

24       A.    Yes.

25       Q.    What did you work on with Dr. Nicoll?

1     A.    He provided clinical support to our

2  investigators.

3     Q.    Are you familiar with PB Labs?

4     A.    Yes.

5     Q.    Did Dr. Nicoll provide SIU support in 2013 in

6  relation to an investigation into PB Labs?

7     A.    Yes.

8     Q.    As to that work, did you ever admonish Dr.

9  Nicoll?

10     A.    No.  I wouldn't say I admonished him.

11     Q.    Did you ever provide Dr. Nicoll any feedback?

12     A.    Provided feedback, advice, and coaching in how

13  best to interact with our investigators.

14     Q.    Would there have been anybody other than you

15  related to Cigna that would have admonished Dr. Nicoll as

16  to his work with PB Labs in 2013?

17          MR. CUNNINGHAM:  Objection to relevance, Your

18  Honor.

19          THE COURT:  Yes.

20          MR. AKERMAN:  There was previous testimony, Your

21  Honor, on this topic when Dr. Nicoll was up, we

22  designated Mr. Hixson as both a defense and an

23  affirmative witness in our case.

24          THE COURT:  Give me just one moment.

25          I mean, what was your disclosure?  It better be

 1    awfully short, sir.  I really question relevance, but I

 2    will allow it.  Let's hear what his answer is.

 3            Would there have been anyone other than you that

 4    would have admonished Dr. Nicoll, anyone at Cigna, as to

 5    his work with PB Labs in 2013?

 6            THE WITNESS:  No.

 7            MR. AKERMAN:  No further questions, Your Honor.

 8            THE COURT:  Cross.

 9            MR. CUNNINGHAM:  No questions, Your Honor.

10            THE COURT:  All right, sir.  You're excused.

11            A long drive from Bloomfield for three minutes,

12    most of which I took up.

13            Next witness.

14            MS. COSTIN:  Your Honor, we call Dr. Kelly

15    Clark.

16            THE COURT:  Dr. Clark, if you would come up here

17    to the witness stand.  When you arrive, I'd ask if you

18    would remain standing so that the Clerk may administer an

19    oath.

20            MS. COSTIN:  If I may, Your Honor, approach the

21    witness and give her a copy of her expert report to have

22    for her reference.

23            THE COURT:  That's all that's in that folder?

24            MS. COSTIN:  Yes.  Her report and her rebuttal

25    report.

1628

1    THE COURT:  Okay.  I didn't think mine was quite

2    that big.  But if that's what you represent, that's fine.

3    DR. KELLY CLARK, having been called as a

4    witness, was first duly sworn and testified on her oath

5    as follows:

6    THE WITNESS:  I do.

7    THE CLERK:  Please be seated.

8    Please state your name for the record, spell

9    your last name.

10    THE WITNESS:  Kelly Clark, C L A R K.

11    THE COURT:  Give me just one moment, please.

12    MS. COSTIN:  It's her report and her rebuttal

13    report.

14    THE COURT:  Okay.  Go ahead.

15    DIRECT EXAMINATION

16    BY MS. COSTIN:

17    Q.    Good morning, Dr. Clark.

18    A.    Good morning.

19    Q.    Could you please tell the jury what your

20    profession is?

21    A.    I'm a physician.  I specialize in psychiatry and

22    addiction medicine.

23    Q.    Are you here today to provide opinions on behalf

24    of Cigna?

25    A.    Yes.

1629

1    Q.  We have heard Judge Hall reference two cases

2  over the past couple of weeks.  There's a case from the

3  Labs against Cigna, and a case Cigna against the Labs.

4  Which case are you here to talk about today?

5    A.  Both.

6    Q.  And you prepared a report in this case?

7    A.  Two reports.

8    Q.  Okay.  And what are those reports?

9    A.  The first is an expert report, and the second is

10 a rebuttal report to Ms. Thelian.

11   Q.  Those are the two reports that I have put in

12 front of you just to refresh, if needed, during the

13 course of this morning's discussion?

14   A.  Yes.

15   Q.  I would like to start with talking about your

16 background for the jury, if you would.  Could you please

17 describe where you went to college?

18   A.  I went to Coe College in Cedar Rapids, Iowa.  I

19 have a bachelor's in psychology.

20   Q.  Where did go to medical school, Dr. Clark?

21   A.  The University of Wisconsin in Madison.

22   Q.  When did you graduate from medical school?

23   A.  1989.

24   Q.  Did you do a residency?

25   A.  Yes.  I completed four years of psychiatric

1630

1    residency.

2        Q.   Dr. Clark, are you board certified in any

3    specialities?

4        A.   Yes.  Psychiatry and addiction medicine.

5        Q.   I'm going to break that apart.  If you wouldn't

6    mind, could you explain what the specialty of psychiatry

7    is?

8        A.   Psychiatry is the medical specialty of

9    diagnosing and treating individuals who have psychiatric

10   disorders, which are brain disorders and behavorial

11   disorders.

12       Q.   And what is the sub-specialty of addiction

13   medicine?

14       A.   Addiction medicine is similar.  It's for

15   multiple kinds of physicians, not just psychiatrists.

16   And it deals with the diagnosis and treatment of people

17   with the disease of addiction or substance misuse

18   disorders.

19       Q.   Are you admitted to practice medicine in any

20   states?

21       A.   Yes.

22       Q.   Which states?

23       A.   Kentucky, Indiana, Wisconsin, Massachusetts, New

24   York, Maryland, Virginia, Pennsylvania, Florida.  I think

25   that's it right now.

1    Q.    That's a pretty exhaustive list.

2         Do you have any post-graduate degrees other than

3    year medical degree?

4    A.    Yes.  I've got a Master's of Business

5    Administration with an additional Certification in Health

6    Sector Management from Duke University.

7    Q.    Dr. Clark, since your residency, have you

8    rendered any direct patient care?

9    A.    Yes.

10   Q.    Could you give the jury an overview of where you

11   have rendered that patient care?

12   A.    Well, I've rendered care in multiple states.

13   I've lived in multiple states.  I've rendered care in

14   acute hospital settings, in chronic hospital settings

15   like state mental hospitals, in outpatient clinics, in

16   outpatient just private practice, for University of

17   Massachusetts.  For just a variety of different settings.

18   Nursing homes, Methadone treatment programs, a range of

19   clinical settings.

20   Q.    And what has been the focus of your patient

21   care?

22   A.    Psychiatry and addiction medicine.

23   Q.    Do you currently render any patient care?

24   A.    Yes.

25   Q.    Where?

1    A.    At the Central State Hospital in Louisville,

2  Kentucky, where I live.

3    Q.    What do you do currently at the Central State

4  Hospital in Kentucky?

5    A.    Well, I'm what's called the officer of the day.

6  Every hospital has to have a doctor on site 24 hours a

7  day in order to handle any medical emergencies or, in

8  this case, psychiatric emergencies, emergencies related

9  to addiction.  So patients will come in.  I will do their

10  admission.  I will take their history or do the physical

11  examination.  I'll order their labs.  I'll order their

12  initial medications after determining, you know, a

13  diagnosis and an initial treatment plan.

14        I'm covering on weekends or holidays.  So people

15  who are in the hospital who have just come in recently, I

16  will see them and make sure that they are doing okay.

17  And then anything that's urgent or emergent that comes up

18  during the time that I'm there, the nurses will call me

19  to care for those patients.

20    Q.    Dr. Clark, over the course of your career since

21  graduating medical school in 1989, can you give me a

22  ballpark of how many patients you have treated for

23  substance abuse disorder?

24    A.    Thousands.

25    Q.    Other than practicing medicine and direct

1    patient care, have you had any other types of work

2    experience since graduating medical school?

3        A.   Yes.

4        Q.   Would you please describe that for the jury.

5        A.   Well, so I have done some education of students,

6    medical students, residents, physicians.  So I was on

7    faculty at University of Massachusetts in the Psychiatry

8    Department training psychiatry students and medical

9    students in dual diagnosis.  So that's psychiatry plus

10   patients who have got addictive disease needing inpatient

11   care.

12           I was on the faculty of Virginia Tech Carilion

13   Medical School.  I have done teaching for other kinds of

14   students and doctors.  So I just passed a little while, I

15   did a talk at the University of Georgia Medical School's

16   Department of Psychiatry, for the Howard University's

17   Addiction Medicine Fellows who are specializing in

18   Addiction Medicine.  Education for the Georgetown

19   University, Department of -- people who are getting

20   Masters in Addiction Policy.  So some education pieces as

21   well.

22       Q.   You mentioned your teaching experience.  Have

23   you ever served as a Medical Director of an organization?

24       A.   Yes.

25           I have been Medical Director of various kinds of

1634

1    organizations.  For a Methadone Clinic.  I've been

2    Medical Director for two health plans.  So CVS Caremark

3    and CDPHP which is a non-profit insurance plan in

4    New York.  I have been Chief Medical Officer for two

5    multi-state medical groups.  It's a variety of different

6    kinds of roles.

7        Q.   Could you explain a little bit more your work

8    for CVS Caremark as a Chief Medical Officer or Chief

9    Medical Director?

10       A.   I was just a Medical Director at CVS Caremark,

11   which is with CDPHP.  I was a Medical Director.  So we

12   would look at claims that came in, make medical necessity

13   determinations.  Looked also -- worked with SIU in both

14   of those roles.  Working on -- taking a look through the

15   data finding outliers.  And then following up on those

16   outliers to ensure that the members were receiving

17   appropriate treatment and being billed for that.

18       Q.   Over the course of your career, Dr. Clark, do

19   you have experience ordering drug testing services for

20   patients in addiction treatment?

21       A.   Yes.

22       Q.   Could you please describe that experience for

23   the jury.

24       A.   Just a part of my private practice, seeing

25   patients as an outpatient, seeing patients as an

1635

1    inpatient.  As part of working at Methadone treatment

2    programs.  As part of working at a hospital.  Currently

3    when patients come in, just ordering tests is a normal

4    part of clinical practice of psychiatry and addiction

5    medicine.

6        Q.    Do you have any experience billing health

7    insurance companies for the services that you have

8    provided?

9        A.    Yes.

10       Q.    Could you please describe that experience?

11       A.    Similarly.  So, again, in private practice,

12   I had a billing company.  So I would give the billing

13   company documentation at the end of a week saying what

14   goes on a bill.  I saw this patient at this place on this

15   date for this diagnosis and provided the service.  And

16   service isn't, you know, saw a patient 20 minutes.  It's

17   a CPT code or a Hicks Picks code.  This is the service

18   that I provided to that patient.  So I would give all

19   that information to my billing company who would just

20   send the bill to the insurance companies and so on.

21           But also just even working for a hospital.  I

22   need to fill out the form saying, okay, I did an

23   admission on this patient.  This is the admission code.

24   Not this one or this one.  This is the specific service

25   that I rendered on this day for this patient for this

1  diagnosis and et cetera.

2      Q.   Okay.  I would like to talk a little bit about

3  your professional affiliations separate from your work

4  experience.

5          Are you familiar with an organization called the

6  American Society of Addiction Medicine?

7      A.   Yes.

8      Q.   Can I call it ASAM?

9      A.   Yes.

10     Q.   What is ASAM, for the jury?

11     A.   ASAM is the professional organization of

12  physicians who specialize in addiction medicine.  Just

13  like psychiatrists have the American Psychiatric

14  Association.  Addiction medicine doctors have ASAM.  It's

15  the group that represents addiction physicians and allied

16  health professionals.

17     Q.   How many professionals are members of ASAM?

18     A.   Now there are over 7000 physicians, and then

19  some additional PhDs, pharmacists, et cetera.

20     Q.   Have you held any roles with ASAM?

21     A.   Yes.

22     Q.   What would those be?

23     A.   The physicians of ASAM elected me as President.

24  So I serve for two years as President Elect, two years as

25  President, two years as Immediate Past President.  And

1637

1    before my officer terms, I had chaired Legislative

2    Advocacy Committee, the Public Policy Council, Finance

3    Committee, and other roles.

4        Q.    When were you the President of ASAM?

5        A.    I would have to look through my CV.  I think it

6    was 2017 to 2019.

7        Q.    That sounds right.

8              Does ASAM give out any awards or honors?

9        A.    Yes.

10       Q.    Have you received any honors or awards from

11   ASAM?

12       A.    Yes.

13       Q.    What would that be?

14       A.    I actually received the highest award that ASAM

15   gives out.  It's for highly meritorious contributions to

16   addiction medicine and advancing the understanding of the

17   role of addiction in society.  It can be given out zero

18   to zero or one person typically per year.  And other

19   individuals who have gotten that award include Betty Ford

20   and Patrick Kennedy.

21       Q.    Other than your extensive experience with ASAM,

22   do you have any other professional affiliations in your

23   practice?

24       A.    Yes.

25       Q.    I'm a Distinguished Life Fellow of the American

1    Psychiatric Association and have held different roles

2    with that.  I'm a member of the American Medical

3    Association and I have been part of ASAM's delegation to

4    the AMA.  ASAM is the group that represents addiction

5    doctors within the AMA.  I'm a member of my county

6    medical society and a delegate from that county medical

7    society to our state medical society.

8         I'm a member of the International Society of

9    Addiction Medicine and have passed the International

10   Certification Examination for addiction physicians.  I

11   have a number of professional affiliations.

12   Q.   As part of your profession, do you do any

13   speaking?

14   A.   Yes.

15   Q.   Could you please just give the jury some

16   overview of your speaking experience in recent years?

17   A.   Sure.  So I have spoken in front of the

18   Presidential Opioid Commission, the National Institute of

19   Drug Abuse, the Food and Drug Administration, Substance

20   Abuse and Mental Health Services Administration.

21        THE COURT:  I'm sorry, ma'am.  I know you want

22   to get through it quick.  But this woman has been at that

23   machine other than three minutes since 8:40.  Even if

24   this was the first witness of the day, that's a little

25   fast.

1639

1    So I appreciate your intention, but you have to

2    remember my brain's got to process it.  Well, their brain

3    has to process it.  That's probably more important.  And

4    she does too.  Sorry about the interruption.

5    THE WITNESS:  Shall I start again?

6    THE COURT:  No.  As far as you got.  Where did

7    you end?  Could you please give the jury some overview.

8    You talked about the National Institute.

9    THE WITNESS:  Substance Abuse and Mental Health

10   Services Administration.  The Office of Controller

11   General.  Oh, gosh.  I said the Presidential Opioid

12   Commission.  Just a variety of kinds of -- last month I

13   spoke to the District Judges, all of the District Judges

14   in Kentucky where I live.  I have spoken to the National

15   Association of Attorneys General.  The National Governors

16   Association.  Just a wide range of I would say

17   noneducational, nonmedical educational speaking roles.

18   Q.    And the topics of your speaking have been what?

19   What General topics?

20   A.    Mental health, addiction.  Specifically things

21   around quality of care, standards of care, billing,

22   policy, payment policy.  Those kinds of things.

23   Q.    Dr. Clark, have you testified as an expert

24   before?

25   A.    Yes.

1    Q.    How many times have you been retained as an

2    expert?

3    A.    Well, the largest number of things I have done

4    has been over 300 times as a court-appointed independent

5    expert in guardianship trials in my county.  If a person

6    needs a guardian, they have to go to a jury trial and a

7    physician needs to see that person and evaluate them.  So

8    I have done that, as I said, over 300 times.  But in

9    terms of this kind of a lawsuit, over two dozen times.

10    Q.    And setting aside the guardianship cases and

11    we're just talking about sort of the lawsuit type cases

12    like the one we're here today.  How many times have you

13    testified at trial?

14    A.    I would have to see my CV but, I don't know,

15    ten.

16    Q.    And, in general, who have your clients been that

17    you've testified on behalf of?

18    A.    The largest number has been the Federal

19    Government.

20    Q.    And what branches of the Federal Government have

21    you been an expert for?

22    A.    The FBI, the DEA, the Regional AUSAs, and the

23    Civil Rights Division, Federal Civil Rights Division, and

24    the federal trial, DOJ's Trial's Office.

25    Q.    Without getting into any specifics about cases,

1    what types of cases have you handled for the Federal

2    Government?

3        A.    Typically criminal fraud or civil waste and

4    abuse issues.  Issues around appropriate medical care,

5    appropriate medical billing, appropriate ordering and

6    prescribing.

7        Q.    And what have been the topics of your expert

8    testimony?

9        A.    Medical necessity, appropriate medical care,

10   appropriate billing, urine drug testing, blood testing,

11   ordering and prescribing.

12       Q.    Have you ever been disqualified as an expert?

13       A.    No.

14       Q.    Have you ever been sued for malpractice, ma'am?

15       A.    No.

16       Q.    Dr. Clark, have you heard of an organization

17   called Clean Slate?

18       A.    Yes.

19       Q.    What is Clean Slate?

20       A.    Clean Slate is a company that provides treatment

21   for patients with opioid use disorder utilizing one of

22   two gold standard medications which is buprenorphine.

23       Q.    And how are you aware of Clean Slate?

24       A.    I served as the Chief Medical Officer for a few

25   years.

1642

1    Q.   And where is Clean Slate based, ma'am?

2    A.   They were based in Massachusetts.  Now they are

3    based in Tennessee.

4    Q.   Where did you perform your work for Clean State?

5    A.   Primarily at my home in Kentucky.

6    Q.   What did you do as a Chief Medical Officer for

7    Clean Slate?

8    A.   I was hired as Chief Medical Officer, but I was

9    hired by a physician who started the company and was CEO

10   who was overseeing -- over all of the clinicians.  And so

11   I came in and gave some clinical input, but I was

12   primarily tasked outwardly facing so doing policy work,

13   working with payers, getting insurance contracts, working

14   with the state around Medicaid contracts -- states around

15   Medicaid contracts and etc.,.

16   Q.   Did you have any oversight over patient care at

17   Clean Slate?

18   A.   No.  That went to the CEO physician and CEO who

19   replaced her.

20   Q.   Were you responsible for ordering any drug

21   testing for patients at Clean Slate?

22   A.   No.

23   Q.   Were you responsible for overseeing the

24   physicians who did?

25   A.   No.

1    Q.    Were you aware of whether Clean Slate was named

2  as a defendant in a lawsuit in 2017?

3    A.    Yes.

4    Q.    Could you explain your understanding of the

5  nature of the allegations in the complaint?

6    A.    To the best of my recollection, the complaint

7  was filed by doctor who worked there briefly as a whistle

8  blower complaint.  And there was allegations of a variety

9  of inappropriate things including inappropriate drug

10 testing as the company had a lab that did its drug

11 testing.

12   Q.    Do you have any understanding if there were

13 allegations about you in that complaint?

14   A.    No.  There were no allegations about me.

15   Q.    Did you eventually leave the company?

16   A.    Yes.

17   Q.    On what terms?

18   A.    I voluntarily resigned.

19   Q.    Since you left Clean Slate, how many times have

20 you served as an expert for the U.S. Government?

21   A.    Every single time they have hired me has been

22 since I resigned from Clean Slate.

23   Q.    That would be the areas of topic, of testimony

24 that you just discussed?

25   A.    Right.  18 times.

1644

1    Q.    On the topics of?

2    A.    On the topics of a medically appropriate care,

3    medical necessity, drug testing, ordering and billing,

4    blood work ordering and billing, appropriateness of

5    orders and prescribing.

6    Q.    I would like to turn to some topics that we have

7    talked about in this case and certainly as part of your

8    profession.  We have heard the term "medical necessity" a

9    lot during the past 2 weeks.  Could you please describe

10   to the jury in your experience what the term medical

11   necessity means to you?

12   A.    Sure.  So medical necessity is different than

13   something medically indicated.  Something might be

14   medically indicated if a person might potentially benefit

15   from this or they might want something that could

16   potentially benefit.  But medical necessity is a term

17   that covers what the health plan will pay for.  It's

18   what's needed.  It's defined in the health plan

19   documentation.  So a doctor can order something or you

20   can go get a test on your own, but for it to be billed to

21   the insurance company and to be paid, it needs to be

22   medically necessary.

23   Q.    In your experience who gets to decide what's

24   medically necessary?

25   A.    The health plan.  The issue is, is this service

1645

1    covered by the health plan.  Is it medically necessary as

2    covered by the language of the health plan and that's the

3    physician at the health plan.

4        Q.   I think this is the big elephant in the room

5    question, but why doesn't the treating physician get to

6    decide what's medically necessary for his or her patient?

7        A.   They get to decide what might be medically

8    indicated.  They get to order things but they don't get

9    to decide what gets paid for.  What gets paid for is

10   under medical necessity.

11       Q.   Could you give us an example, a real world

12   example, of something that might not be medically

13   necessary?

14       A.   Sure.  So say you went into the emergency room

15   and said, "I had an accident with my car.  I slammed my

16   thumb into the doorjamb of the car and my thumb is all

17   swollen and looks like it's broken."  They may do an

18   x-ray of your thumb.  Which is different than if you are

19   coming into an emergency room in an ambulance, confused

20   with clearly an open fracture of your leg and your arm is

21   going the wrong way.  What they are going to do then is

22   what we call a "man scan."  It is literally from the top

23   of your head through your feet.  You go through a scanner

24   because you have hurt your head, you've hurt your leg.

25   There are multiple things going on with you and we need

1    to know what that is.  It would be medical unnecessary to

2    do a man scan because you slammed your thumb into the

3    door of your car and it wouldn't be then medically

4    necessary to then say, "Oh, I found out you have

5    arthritis in your hip.  I needed to get a whole man scan

6    because look what I found."

7        Q.    Dr. Clark, you have talked about your experience

8    treating people for addiction.  Could you please explain

9    the different levels of care for someone suffering from

10   substance abuse disorder?

11       A.    Sure.  People with substance abuse use disorders

12   have a medical condition like other medical conditions.

13   There's a continuum of care.  There's inpatient care

14   where people sleep where they are getting treatment.

15   Think hospital or nursing home or in the case of a

16   serious car accident, rehab facilities.  People sleep

17   there while they are getting treatment.  Same thing with

18   substance abuse disorder.  People are sleeping where they

19   are getting treatment.  So that is an inpatient level of

20   care.  So sometime that is a hospital or rehab.  Then

21   there are different levels of outpatient care.  So you

22   might be, after your accident, you might be in a whole

23   physical therapy program where you need to go in for

24   physical therapy, speech therapy, occupational therapy

25   three time a week.  But you sleep at home.  Okay.  That's

1647

1  a different level of care that if you go in once a week

2  or once a month to see your physical rehab doctor.

3          THE COURT:  Can I interrupt you, doctor.  The

4  answer is fine, but the question was, can you explain

5  different levels of care for someone who suffers from

6  substance abuse disorder?

7          THE WITNESS:  Okay, Your Honor.

8          THE COURT:  Am I unfair to have interrupted her?

9          If you can testify, the question was you talked

10  about your experience treating people for addiction.

11  Could you please explain the different levels of care for

12  someone who suffers from substance abuse disorder?

13          THE WITNESS:  Okay.

14  BY MS. COSTIN:

15      A.   So at the outpatient level of a care, there's

16  partial hospital levels of care which is five days a

17  week, four hours a day.  There's intensive outpatient

18  level of care which is three hours a day, three days a

19  week.  And there is normal outpatient of care.  You see

20  people once a week, once a month.  There are these

21  continuums of care for treating substance abuse disorder.

22      Q.   Dr. Clark, what is a sober living home?

23      A.   A sober living home is a residence where people

24  live.  It is not a treatment center.  It's for people who

25  are trying to have an environment around them where

1648

1    people aren't using drug and alcohol.

2        Q.   Are there doctors on staff at a sober living

3    home?

4        A.   No, it is a residence.

5        Q.   What is the role of drug testing in treating

6    patients with substance abuse disorder?

7        A.   It has an important role.  It is objective

8    information that we can get about what a person may have

9    used recently.  And it is primarily used to help treat

10   the patient.  So we use it, "Look you're negative for

11   these things.  That's great.  Is there something else

12   you wanted to tell me or is there something working well

13   for you right now?"  Or, "Looks like you are struggling.

14   You were positive for that.  What happened?  What can you

15   do next time that's different, etc.?"  We use this to

16   help guide treatment.

17       Q.   Is there ever a reason to just test a patient to

18   see if they're lying?

19       A.   No.  We're not the Gestapo.

20       Q.   Have you heard the term "try to catch the

21   patient"?

22       A.   Yes.  It's used by people who don't understand

23   the purpose of this.  We don't check your blood sugar to

24   see if you had a donut for lunch.  That's not the purpose

25   of doing testings.

1    Q.    What factors should a physician consider when

2    ordering drug testing for patients in treatment?

3    A.    They should consider what is the drug of choice.

4    What's that person use?  How long might that drug stay in

5    the system?  What's the last time we tested for this?

6    What other drugs has the patient been using and what's

7    that associated with in, say, the community?  How much

8    does the testing cost?  How important is the information

9    that I'm getting?  How fast do I need the information?

10   How accurate does the information need to be?  They are

11   all questions around what information do I need in order

12   to treat the patient?

13   Q.    What be about cost?  Is that a factor?

14   A.    Yes.  Cost is absolutely a factor.

15   Q.    How so?

16   A.    One of the things for medical necessity in the

17   definitions, typically, is that the treatment not be more

18   expensive than a similar standard treatment that would be

19   less expensive and expect it to have the same results.

20   Q.    We have talked about some different types of

21   drug testing, so I would also like to ask your thoughts

22   on those.  Could you please describe the different types

23   of, I guess I'm going to call them, screening tests that

24   can be performed or ordered by a physician?

25   A.    Sure.  So screening tests are --to over simplify

1650

1    -- they use a technology that's similar to a home COVID

2    test or a home pregnancy test.  Where essentially you get

3    some fluid and there's a dipstick or if it's urine there

4    can be basically several kinds of dipsticks in there and

5    they change color.  If it changes color, it's positive.

6    If it doesn't change color, it's negative.  It is either

7    there or not there.  We can also do these kind of -- we

8    call them -- presumptive or screening tests or

9    preliminary or qualitative tests.  They give a yes/no

10   answer, there or not, color change or not.  You can do

11   that with your eye or put the specimen into a machine

12   that uses, basically, the same technology and says, yes,

13   it is there, no, it is not there.

14        Q.   You mentioned a COVID test, the yes or no.

15   Would that be a point of care test?  Or am I using that

16   it term incorrectly?

17        A.   If you are doing a test where the specimen is

18   collected than we generally call that a point of care

19   test.  So you have given your urine specimen or done a

20   nasal at your clinic.  They test it there.  That is a

21   point of care test.  If the test goes some place and gets

22   poured into a machine that does the same presumptive

23   stuff, that's still a presumptive test but it's not a

24   point of care.  The substance is moved, the specimen is

25   moved from where the specimen was given.

1   Q.   Under what circumstances would a physician need

2   both a point of care test and a screening test through a

3   machine?

4   A.   That would be relatively rare.  They are the

5   same kinds of screening tests.  The technologies are the

6   same.  They give a yes/no answer using amino acids.

7   Q.   After a screening test is performed what should

8   the physician do with the results?

9   A.   Analyze the results.  Is this the result I

10  expect?  Is it positive for what I expect it to be

11  positive for and negative for what I expect it to be

12  negative for?  And the physician may decide that there's

13  additional, more definitive testing that's necessary.

14  They always need to discuss it with the patients because

15  they need to use it for patient care in order for it to

16  be medically necessary.

17  Q.   So what would be the next step in the process?

18  I think you mentioned definitive testing?

19  A.   Definitive testing is a different kind of

20  testing.  It is a big expensive machine.  It can look for

21  probably thousands of kinds of substances.  And what it

22  does, as opposed to being a quick and cheap screening

23  test, it is slower.  These machines are not in the

24  typical doctor offices, so it takes a lot longer to get

25  the information.  The information is more expensive,

1652

1    takes longer to get.  It is more precise and, and so we

2    get that information if we really, really need the

3    information about a specific thing.

4        Q.   I think you mentioned a couple of minutes ago

5    expected results after the screening test.  Can you

6    explain when you would be getting results that are not

7    expected?

8        A.   Yes.  If you were being prescribed oxycodone and

9    your urine is negative for oxycodone, that's an

10   unexpected result.  If you are not prescribed an opiate

11   and it comes back positive for an opiate, that's an

12   unexpected result.  Something there that shouldn't be

13   there.  Something not there that should be there.  Those

14   are unexpected results.

15       Q.   Dr. Clark, is there a standard panel of tests

16   that is sort of standard in the industry to run for all

17   patients in substance abuse treatment?

18       A.   No.

19       Q.   Why not?

20       A.   Because patients are different.  One size

21   doesn't fit all for all patients.  Different practices

22   are different.  Different patients have a different

23   needs.

24       Q.   Why not just test for everything just to be

25   sure, just so you know?

1    A.    Well, in the first place it is not possible to

2    test for everything.  There are constantly new substances

3    that are being concocted in labs coming out into the

4    community.  It's not possible to test for them.  That's

5    just like getting a man scan on everybody who comes in

6    with a sore thumb.  It's an enormous waste of resources.

7    It would not be medically necessary to do this.

8    Q.    Dr. Clark, when you are ordering drug testing

9    for a patient in treatment, how often should you order

10   this kind of drug testing?

11   A.    It depends.  It depends on the patient and on

12   the information that the physician needs to treat that

13   patient at that time.  There are guidelines, but there

14   are no hard and fast rules.

15   Q.    Again, why not just test a patient multiple

16   times a week just to be sure?

17   A.    Well, again you can't test a patient for all the

18   drugs of abuse that are out there.  Just an enormous

19   waste of resource.  All that does is spend money that

20   doesn't mean to be spent, which just drives up premiums,

21   drives up taxes.  There is no reason to do this or

22   medical reason to do this.

23   Q.    Sorry, I didn't mean to interrupt you.  I

24   thought you just mentioned that there might be

25   guidelines or standards of frequency on drug testing.

1    Can you elaborate on what those might be?

2        A.    Yes, for methadone clinics, the clinics need to

3    run eight of these screening tests per year, per patient.

4    Eight screening tests per year.  During the time period

5    in question here, AMSA had put out a document mentioning,

6    I think, one test per month for patients in this

7    intensive outpatient level of care.  ASAM has also put

8    out guidance, recommendations.

9        Q.    Dr. Clark, are you familiar with the concept of,

10   I think we have been calling them, a standing order for

11   physicians that send out a urine for drug testing for

12   patients in substance abuse treatment?

13       A.    Yes.

14       Q.    And how are you familiar with the concept of a

15   standing order?

16       A.    I have seen this throughout my career and also

17   in my expert work.

18       Q.    And what do you understand that term to mean

19   "standing order"?

20       A.    Well, related to cases like this, this means a

21   list of orders, as you said drug testing, that is sort of

22   chosen for a facility or for a residence or for a

23   treatment program or some doctors' offices, a list of

24   things.  And rather than the doctor saying, "Okay well,

25   this patient, I want them to have this test on this date.

1    This is the information I need."  Everyone who is a

2    patient there gets the same testing done.  And that is

3    the use of standing order without an individual doctor

4    order with it.

5         Q.    Do you consider that to be a valid order?

6         A.    No.

7         Q.    Why not?

8         A.    Because a valid order is what the doctor

9    needs, or the nurse practitioner, at that time to teat

10   that patient.  The patient who -- these are typically, as

11   we are seeing here are very, very broad.  It's large

12   numbers of tests that would not be necessarily relevant

13   to a given patient in the general practice.

14        Q.    In your experience, is it appropriate for a

15   sober home to have a standing order for a panel of drug

16   tests to be performed for all patients at the sober home?

17        A.    No.

18        Q.    Why not?

19        A.    A sober home is not a treatment center.

20   Patients who come to a sober home can have --- well,

21   they're not patients, they are residents.  They are

22   people who live in the sober home can have a variety of

23   different issues.  Somebody may be there because they

24   have just alcohol use disorder or just having

25   problems with cannabis.  The same order for everybody who

1    comes in is nonsensical.

2        Q.    Same question in respect to a treatment center.

3    Is it ever appropriate to have a standing order for all

4    patients coming into a treatment center?

5        A.    So the doctor needs to say this patient needs

6    these tests.

7            MS. COSTIN:  Mr. Salazar, I would like to put up

8    Cigna's Trial Exhibit 2880.

9            Your Honor, this has already been admitted into

10   evidence.

11           THE COURT:  2280 Cigna's full Exhibit.

12           MS. COSTIN:  Cigna's Trial Exhibit 2880.

13   BY MS. COSTIN:

14       Q.    Dr. Clark, do you recognize this document?

15       A.    Yes.

16       Q.    And what is it?

17       A.    This is the U.S. Federal Register showing the

18   guidance from the Department of Health and Human

19   Services, OIG division.

20       Q.    I think we need to scroll down, Mr. Salazar, to

21   the bottom of the second column where it starts.  There

22   we go.  That's the part I'm talking about.

23           I'm sorry, you said the Office of Inspector

24   General at the Department of Health and Human Services?

25       A.    Yes.

1    Q.    What is that organization?

2    A.    That's basically the cops of HHS.

3    Q.    The cops of HHS.

4         MS. COSTIN:  Can we scroll to page 6 of 12, Mr.

5    Salazar, there's section there called "reliance on

6    standing orders."

7         And I think we'll just let the jury read this

8    for themselves.

9         Is that the Court's preference?

10        THE COURT:  Yes, it is.

11        MS. COSTIN:  Dr. Clark and the jury can read

12   this paragraph to themselves.

13   BY MS. COSTIN:

14   Q.    Dr. Clark, I would like to ask you a question

15   about the first sentence, "Although standing orders are

16   not prohibited in connection with an extended course of

17   treatment, too often they have led to abusive practices."

18   Do you see that?

19   A.    Yes.

20   Q.    What have you seen in your experience in the

21   industry?

22   A.    That is correct.

23   Q.    How so?

24   A.    Well, standing orders that have large numbers of

25   tests ordered no matter what the patient's problem might

1  be, lead to over testing, over billing.  The standing

2  orders that are not specifically ordered on a date or on

3  a specific patient are just there so anyone can come in,

4  and anyone who comes into a residence of a sober home

5  just gets this testing sent off.  That's not medically

6  appropriate.  That would be an abuse of billing

7  practices.

8      Q.   Goes on to say, "Standing orders in and of

9  themselves are not usually acceptable documentation the

10  tests are a reasonable and necessary.  Accordingly, the

11  insurer may reject standing orders as evidence that a

12  test is reasonable and necessary."  Do you see that?

13     A.   Yes.

14     Q.   Do you agree with that?

15     A.   Yes.

16     Q.   Why?

17     A.   The same reason.  A standing order that's just

18  there for anyone who walks in does not in any way imply

19  that that individual needed that test in order for that

20  clinician, that physician to treat them at that point in

21  time.

22     Q.   Dr. Clark, do laboratories make a determination

23  of medical necessity?

24     A.   No.

25     Q.   Then what can a laboratory do to make sure they

1659

1    are only supporting medical necessity testing?

2         A.    They can do what it says in this OIG guidance.

3    They can have their internal compliance department.  They

4    can refuse to accept standing orders, they can insure

5    they are getting specific orders for each patient.  What

6    it says in the guidance.

7         Q.    Can we scroll up to page 4 of this document, Mr.

8    Salazar and I look the at section under "medical

9    necessity."  It starts at the bottom of the page.  This

10   is correct.  Thank you.

11             And I think we can all read this, "Upon request

12   a laboratory" --

13             THE COURT:  We're all going to go read it,

14   right, so you aren't reading it.  Everybody read it.  Be

15   sure you have read it and the witness too.

16             MS. COSTIN:  For the record we're highlighting

17   the section that starts "Upon request".

18             THE COURT:  And the last word on the highlight

19   is "laboratories" which is a partial sentence.

20             MS. COSTIN:  Can you highlight the paragraph,

21   Mr. Salazar.

22   BY MS. COSTIN:

23        Q.    Dr. Clark, what is your understanding of the OIG

24   guidance regarding the obligations of laboratories to be

25   able to produce patient records upon request?

1660

1    A.    That if the payer is asking for documentation to

2    support the assertion that these claim are medically

3    necessary than the labs should be able to provide the

4    medical, underlying medical, records to support that

5    medical necessity assertion.

6    Q.    Thank you.

7         Mr. Salazar, I think we can take that down.

8         Dr. Clark, you were president of ASAM in 2017;

9    correct?

10    A.    Correct.

11    Q.    Did ASAM issue any recommendations for drug

12    testing for addiction treatment in 2017?

13    A.    Yes.

14    Q.    Were you involved in that recommendation?

15    A.    Yes.

16    Q.    And those are recommendations that are used in

17    the industry by physicians?

18    A.    Oh, yes.

19    Q.    What was the purpose of the recommendations that

20    came out in 2017 by ASAM?

21    A.    The purpose was to provide information and

22    recommendations for how clinicians should be utilizing

23    urine drug tests.  And also point out areas that would

24    not be appropriate uses of urine drug tests.

25    Q.    Can you explain what was going on in the

1    industry at the time that led ASAM to make these

2    recommendations in 2017?

3        A.    Yes.  So it became obvious in 2015 and 2016 that

4    there was an enormous explosion of inappropriate drug

5    testing billing occurring in the country.  That in

6    particular there were large panels of unnecessary tests

7    being ordered.  That tests were being ordered without

8    considering how long a drug stays in the body.  By which

9    I mean, a person using cannabis every day for a month and

10   they are positive for cannabis.  And on Monday they are

11   positive and they stop smoking it, they are going to be

12   positive on Friday and Monday and the next Friday.  It

13   stays in the body that long.  And then there was the use

14   of routinely confirming positive and negative tests from

15   screens.  So we saw this, this was a huge problem.  It

16   was a problem for patients.  It was a problem for our

17   field, our profession.  It was a problem for the public.

18   So we needed to call out, these are problems and this

19   instead is how we should be looking to do drug testing.

20       Q.    Dr. Clark, what was happening in the industry

21   that led to these recommendations?

22       A.    Well, there were two things that happened.  The

23   first was the parity law which said that for some

24   insurers they had to deal with a mental health addiction

25   issues the same way they do medical issues.  The second

1662

1    thing that happened was the Affordable Care Act or

2    Obamacare that allowed people to stay on their parents'

3    insurance until they turned 26 and also covered mental

4    health and substance abuse disorder things.  But what we

5    saw was that there was an enormous spike of people who

6    would be traveling, particularly to Florida going on

7    their parents insurance, going to detox and rehabs then

8    sober homes and back into detox and rehabs and sober home

9    and round and round and round, with bills for enormous

10   medically inappropriate treatment and enormous medically

11   unnecessary drug testings for thousands of dollars each.

12   And this led to, you know, patients suddenly getting

13   bills for enormous amounts of money.  Our profession

14   looked like we were over utilizing or involved in abusive

15   kind of billing and providing care.  That's why we built

16   those recommendations.

17        Q.   Have you ever heard the term "the Florida

18   shuffle"?

19        A.   Yes.

20             MR. HARE:  Objection, your Honor.  This is out

21   of scope of either of Dr. Clark's expert reports.

22             MS. COSTIN:  I will withdraw.

23             THE COURT:  Okay.

24   BY MS. COSTIN:

25        Q.   Dr. Clark, you, you -- I will move on.

1           Dr. Clark, I would like to talk then more about

2    what you were asked to do in this case specifically.  So

3    what were you asked to do for Cigna in this case?

4        A.   I was asked to look at the documents that were

5    provided to me and provide an opinion on these as

6    personally covered services.  So were these medically

7    necessary or properly billed and coded?

8        Q.   And are you being paid for being here today?

9        A.   I'm paid for my time.

10       Q.   Has that influenced your opinions in any way?

11       A.   No.

12       Q.   Let's talk about the materials that you reviewed

13   and the methodology that you did.  So what types of

14   documents did you review to form your opinions that you

15   are going to give here today?

16       A.    I reviewed the claims data which are enormous

17   spreadsheets that was provided by Cigna of the claims of

18   the three labs.  I reviewed the 20 charts that Ms.

19   Thelian and Dr. Nicoll reviewed.  In addition to -- those

20   are from PB Labs in 2014.  In addition, I reviewed

21   similar, similar patient files from the three labs for

22   multiple years.  I reviewed some business documents from

23   the Labs, internal emails from Cigna, claims, the

24   documents that the Labs used with their clients which

25   were any location that sent them lab specimens were their

1664

1    clients, a range of materials that were provided.

2    Q.    And based on your review of these materials did

3    you form opinions about the nature of the Labs' drug

4    testing services?

5    A.    Yes.

6    Q.    With a reasonable degree of certainty?

7    A.    Yes.

8    Q.    Did you review the Labs', I think they say at

9    the top, recurring provider agreements.  I think we have

10   referred to them as standing orders?

11   A.    Yes.

12   Q.    How many of those do you think that you

13   reviewed?

14   A.    Over 120.

15   Q.    Did you see a single standing order that had a

16   patient name on it?

17   A.    Not that I can recall.

18   Q.    Did you see a single physical order, in this

19   case, that had a patient name and a specific date?

20   A.     For a drug test, no.

21   Q.    Correct.  Did you in the course of reviewing all

22   of these materials regarding the Labs, did you form an

23   opinion about their business practices?

24   A.    Yes.

25   Q.    And what is that opinion?

1    A.    Well, the Labs' business practice was to find

2  clients which would be any individual organization that

3  would send them specimens, that was their client, and

4  then sell them their services with an order of what lab

5  tests were to be run on the specimens that came from that

6  client location.

7    Q.    Did you form an opinions on the types of clients

8  that the Labs solicited to provide services?

9    A.    Yes.

10    Q.    What is that opinion?

11    A.    There were primarily soliciting from addiction

12  treatments programs, also sober living residences, some

13  pain treatment providers, some primary care providers.

14    Q.    Did you form an opinion on the Labs' sales

15  practices?

16    A.    Yes.

17    Q.    What is that opinion?

18    A.    The labs had --

19        MR. HARE:  Objection, Your Honor, lack of

20  foundation.

21  BY MS. COSTIN:

22    Q.    Did you observe Mr. Lagan's testimony last week?

23    A.    Yes.

24    Q.    Did you review documents regarding the Labs'

25  sales practices?

1    A.    Yes.

2    Q.    What documents would those be?

3    A.    I reviewed internal emails.  I reviewed the

4  documents where they were billing patients after the Labs

5  were done.  Those kind of documents.

6    Q.    Based on Mr. Lagan's testimony and the documents

7  you review what opinions did you form about the Labs'

8  practices in gaining clients?

9         MR. HARE:  Same objection, Your Honor.

10  She didn't have Mr. Lagan's testimony when she issued

11  either of her two expert reports.

12         THE COURT:  I think it would be perhaps better

13  to ask her if she has an opinion on the subject, then ask

14  her what it's based on, because I think the opinion is

15  allowed.

16         MS. COSTIN:  I can move on.  That's fine.

17         THE COURT:  I have already reviewed her

18  opinions, correct?

19         MS. COSTIN:  You have.

20         Mr. Salazar, can we go to Joint Trial Exhibit

21  121.

22         And this has already been admitted, Your Honor.

23  BY MS. COSTIN:

24    Q.    Dr. Clark, is this one of the client's

25  registration type documents that you reviewed in forming

1    your opinion?

2              THE COURT:  It has not been admitted.

3              MS. COSTIN:  It has not?  I apologize.  There is

4    no objection.

5              THE COURT:  It hasn't been previously used.  I

6    want to give them the three seconds rule, remember?

7              MS. COSTIN:  I apologize.  I thought it had been

8    previously used.

9              MR. HARE:  Your Honor, thank you for that

10   opportunity.  No objection.

11             THE COURT:  It can be published.

12   By MS. COSTIN:

13      Q.   Let me reask my question then.  Apologies for

14   that.

15             Dr. Clark, is this one of the client

16   registration forms that you reviewed in forming your

17   opinions?

18      A.   Yes.

19      Q.   What is the agency name here?

20      A.   Fresh Starts Sober Living.

21      Q.   And I think I asked this question.  Do you have

22   an opinion on the tests that the Labs were running for

23   sober homes like Fresh Starts Sober Living?

24      A.   Yes, they were not providing treatment.  There's

25   no necessary for them to have medical testing done where

1668

1    they are not providing treatment.

2       Q.   Can we highlight, Mr. Salazar, over here on the

3    a right where it says "practice type sober home" and says

4    "daily patient volume."

5            Do you see that?

6       A.   Yes.

7       Q.   What do you understand that to mean, Dr. Clark?

8       A.    This is a sober home that monthly sends 120

9    specimens to Medytox PB Labs or anticipates doing so.

10      Q.   Can we scroll down to the second page, Mr.

11   Salazar.

12           And in the middle of the document can you see

13   the practitioner's name?

14      A.   Yes, Michael Ligotti.

15      Q.   Can say we scroll to the next page, actually the

16   following page that has the -- there we go.

17           Dr. Clark, could you please -- do you have an

18   opinion on this standing order?

19      A.   Yes.

20      Q.   What is your opinion?

21      A.    It shows the same patterns that ASAM identified

22   as inappropriate and abusive billing patterns.

23      Q.   Why is that?

24      A.    Because it has a very large list of arbitrary

25   drugs to be tested on everyone.  And at the top it says

1    "to provide quantitative testing" which is confirmatory

2    testing.  It says positives but positives and negatives

3    are what it has on the next page, I believe.  To do

4    testing on all of these 24 substances or 23 substances

5    looks like plus.

6         Q.   Can we go back up to the top where there's a

7    check mark next to "perform positives only" next to

8    "qualitative and quantitative."  Do you see that?

9         A.   Yes.

10        Q.   Do you have an opinion on that?

11        A.   It is not consistent with the next page where

12   they are going to do quantitative testing on all

13   specimens.  Having this kind of standing orders for

14   anyone that comes into this sober living residence is not

15   a medically appropriate approach.  They are not providing

16   treatment.  This is not individualized care.

17             MS. COSTIN:  I would like now to go to Cigna

18   Exhibit 752 which has not been admitted yet.  But I don't

19   think there's an objection.

20             THE COURT:  Any objection?

21             MR. HARE:  It is not yet appearing on my screen,

22   Your Honor.

23             THE COURT:  There it is.

24             MR. HARE:  No objection.

25             THE COURT:  All right.  752.  Cigna 752 is a

1    full exhibit.

2    BY MS. COSTIN:

3        Q.    Dr. Clark, is this one of the lab test results

4    that you reviewed in forming your opinion?

5        A.    Yes.

6        Q.    Can you read from the top the practice name,

7    Fresh Starts Sober Living?

8        A.    Fresh Starts Sober Living.

9        Q.    And the requesting physician is?

10       A.    Michael Ligotti.

11       Q.    And what is the date of birth that we can see

12   for that patient on this lab test results?

13       A.    You can see the year is 1987.

14       Q.    Can you identify and explain for the jury the

15   difference between the collected date, specimen received,

16   tested and completed as you understand them to mean?

17       A.    Yes.  In the tens of thousands of lab results

18   I've reviewed in my career, I typically see four lines

19   here.  The date that the specimen was actually collected

20   was obtained out of the body of the person.  The specimen

21   received, so that's when that specimen got to the lab.

22   Then the date tested is the date that the lab ran the

23   specimen through the machine.  Then usually it says

24   "reported."  Here it says "completed," is the day the

25   work is done which means that the result has been

1  provided to the prescriber, the place where the urine was

2  coming from.

3      Q.   And we'll go ahead and say this one was tested

4  on March 11th as you understand it; is that correct?

5      A.   Yes, it was collected on the 10th.

6           MS. COSTIN:  Can we go now to Cigna Trial

7  Exhibit 753.

8           The same issues, Your Honor, it has not been

9  admitted yet, but there's no objection.

10          THE COURT:  Any objection?

11          MR. HARE:  No objection, Your Honor.

12          THE COURT:  Okay.  May be published Cigna 753.

13  BY MS. COSTIN:

14      Q.   Take a look at this lab test result, Dr. Clark.

15  Is this one of the lab test results you looked at in

16  forming your opinion?

17      A.   Yes.

18      Q.   And what is the practice name?

19      A.   Fresh Starts Sober Living.

20      Q.   And who is the requesting physician?

21      A.   Michael Ligotti.

22      Q.   And what is the patient's date of birth as you

23  can read it?

24      A.   1987.

25      Q.   What is the collected date and tested date?

1    A.    It was collected on a 7-14.  It was tested on --

2    sorry, 3-14.  2014.  It was tested on 3-17-2014 and

3    completed 3-23.

4         MS. COSTIN:  And I'm going to do this one more

5    time, Your Honor, with Cigna Exhibit 755. Same issue.  It

6    has not been admitted yet, but there's no objection.

7         THE COURT:  Any objection?

8         MR. HARE:  No objection, Your Honor.

9         THE COURT:  Cigna Exhibit 755 is a full Exhibit

10   and may be published.

11   BY MS. COSTIN:

12   Q.    Dr. Clark, can you read this practice name for

13   us?

14   A.    Fresh Starts Sober Living.

15   Q.    And the patient's date of birth?

16   A.    1987.

17   Q.    And the requesting physician?

18   A.    Michael Ligotti.

19   Q.    And the collected date and tested date?

20   A.    Collected, 3-16.  Tested, 3-18.

21   Q.    I understand this patient's date of birth has

22   been redacted for the jury, but have you seen these last

23   three exhibits with the patient name and date of birth

24   unredacted?

25   A.    Yes, they are all the same patient.

1    Q.   They are all the same patient.

2         What is your opinion of the need to be testing

3    this patient for a sober living home on March 11th, March

4    14th and March 16th?

5    A.   This is not medically indicated.  This is --

6    three times in a week is a very high frequency.  The

7    sober home is not a medical provider.  Sometimes sober

8    homes or jobs or schools will want to do drug screens on

9    people.  They can buy a $25 drug screen cup and do that,

10   but to bill for it, that's not appropriate billing.

11   Q.   Can we go to Joint Exhibit 16, Mr. Salazar.  And

12   I believe this has been admitted.

13        THE COURT:  Agreed.  If it's admitted on your

14   list, it may be published.  Joint Exhibit 16 is a full

15   exhibit.

16   BY MS. COSTIN:

17   Q.   Dr. Clark, is this one of the standing orders

18   that you reviewed in forming your opinions?

19   A.   Yes.

20   Q.   And what is the agency name?

21   A.   It's part of a standing order.  It's Angel's

22   Recovery.

23        MS. COSTIN:  And can we scroll to page 3,

24   Mr. Salazar.

25   BY MS. COSTIN:

1    Q.   Do you see here, Dr. Clark, where it has an X

2  next to confirm positive and confirm negative?

3    A.   Yes.

4    Q.   Do you have an opinion on that?

5    A.   Yes.

6    Q.   What is your opinion on that?

7    A.   That this is exactly what the ASAM

8  recommendations were pointing our as unnecessary and

9  abusive lab testing practice.

10   Q.   Why is that?

11   A.   Because there's -- that kind of information,

12 positive and negative for everything on everyone, is not

13 going to be necessary for the treatment of the one

14 patient at that day.  If this one patient has simply

15 alcohol use disorder, here they are testing this person

16 for heroin, for K2 spice, for gabapentin.  These are not

17 appropriate or will not be necessary to treat a person

18 who has got alcohol use disorder.  This is excessive

19 testing.

20   Q.   I would like to switch gears and a talk a little

21 bit about -- we've heard reference to these 20 patient

22 files throughout this case.

23        Have you reviewed those 20 patient files that I

24 think are referenced as Joint Exhibits 14 through 33 in

25 this case?

1    A.    Yes.

2    Q.    And could you just describe, at a high level --

3    I don't think the jury has actually seen what they look

4    like.  They might have seen some snippets of them.  Could

5    you just describe for us what they look like in their

6    totality.

7    A.    So the files typically start with a few pages of

8    documents that describe who the salesperson is from the

9    lab, who the person is that's making the relationship

10   between the lab and the entity, so the client is.  The

11   client maybe a doctor's office.  It might be a sober

12   home.   It might be a treatment center.  So that's listed

13   on a page, and who is responsible for that.

14        Then there will be a page that would say what

15   kind of a place it is.  Often, little boxes to the check.

16   Or if it's pain or addiction treatment.  There will be a

17   page where there's a signature that says you can bill for

18   these kinds of things.  There's a page that will show

19   what we just showed, which is this whole list of things,

20   and the -- there will be check marks that would show what

21   this is -- this list is presumptively the order.  These

22   are the check marks for what the lab should do with the

23   specimen that comes from that location, that client.

24   Q.    Were you in the courtroom when Ms. Thelian

25   testified last Wednesday?

1    A.   Yes.

2    Q.   And do you recall that chart that she made that

3    had her notes on these 20 patient files?

4    A.   Yes.

5         MS. COSTIN:  Mr. Salazar, can we put that up?  I

6    think it is Labs' Trial Exhibit 6966.

7         THE COURT:  Is it in evidence?

8         MS. COSTIN:   Mr. Hare used it with Ms. Thelian

9    last Wednesday.

10        THE COURT:  It could be used for a lot of

11   things.  Do you have it in evidence?

12        THE CLERK:  Full.

13        THE COURT:  Thank you.  It may be published.

14   BY MS. COSTIN:

15   Q.   Dr. Clark, did you review this chart?

16   A.   Yes.

17   Q.   Do you have an opinion about this chart?

18   A.   Yes.

19   Q.   And what is your opinion?

20   A.   Well, it's irrelevant to the questions of

21   billing and coding, and it's misleading to a layperson on

22   the issues of medical necessity.

23   Q.   Why is it misleading on issues of medical

24   necessity?

25   A.   Because it somehow seems to imply that whether a

1    test is positive or negative is related to whether it's

2    medically necessary or not.  And the result is not

3    related to that.  It doesn't contain the kind of

4    information that a clinician would use in looking to

5    determine whether something would be medically necessary

6    or not.  It is missing who is the prescriber, what kind

7    of medicine the patient -- the person had been

8    prescribed, what the negatives were.  It is missing all

9    kinds of information that's necessary to interpret the

10   results of a drug test.  The results of a drug test are

11   not just "there's a positive here."

12       Q.   Is this the kind of chart that clinical

13   professional would ever put together?

14       A.   No.

15       Q.   Why not?

16       A.   Because it doesn't give clinical information

17   that's useful.

18       Q.   We've looked at -- a couple of minutes ago, we

19   looked at some lab test results.  Do you have an opinion

20   on whether you need clinical training to interpret lab

21   test results of that type?

22       A.   Yes.

23       Q.   What is that?

24       A.   Yes, you have to be a physician or a nurse

25   practitioner is needed to order these kinds of tests

1678

1     because we have to interpret -- we have to analyze the

2     results that come back.  And then we have to use that in

3     the treatment of the patient in order for it to be

4     medically necessary for their care.

5          Q.   If a test comes back positive, does that mean

6     that it's medically necessary?

7          A.   No.

8          Q.   When is the medical necessity recommendation or

9     determination made by the physician?

10         A.   Well, they don't make a determination of medical

11    necessity.  They should make a determination that

12    something is medically indicated, that they need this

13    information.  But they think they may need the

14    information before they ask for the information, not

15    after the information comes back.

16         Q.   I appreciate that.

17              I'd like to just walk through a couple of these

18    examples that are on Ms. Thelian's chart.  And let's

19    start with talking about Patient MZ, the first -- the

20    first four lines of this chart.

21              What can you tell -- why don't you tell the jury

22    what you observe just based on Ms. Thelian's chart about

23    this patient, MZ?

24         A.   Sure.  Just looking at this information on this

25    chart, I see that this person was tested about once a

1  month.  They're positive for opiates and oxycodone and

2  benzodiazepines, which are Valium, Xanax kinds of drugs

3  on a point of care test.  And then she has a column that

4  "Lab tests positive."  I'm not -- I can't tell from this

5  whether they -- this was a rescreening that they

6  typically did.  If they were screening test positives or

7  if these are the definitive tests that the Labs did.  But

8  they are positive for benzodiazepines, opioids, and

9  Fentanyl.  These are prescription medications.

10       And then she has a comment that says, "Point of

11  care did not pick up on this benzodiazapine," and the

12  "tricyclic not picked up on lab testing."  It's -- we

13  don't pick up on things like that.  This is not a

14  clinical way we think about using results.

15       MS. COSTIN:  Mr. Salazar, can we go to Joint 14

16  at page 24.

17       Joint 14 has already been admitted, Your Honor.

18       THE COURT:  Yes.  It may be published.

19  BY MS. COSTIN:

20    Q.  And if you could, Dr. Clark, if you could walk

21  us through these lab test results as they relate to

22  Patient MZ.

23    A.  So the practice name is Dr. David Simon and Mary

24  Scanlon.  So these are primary doctors.  They may treat

25  pain patients or addiction patients, but they are primary

1    care doctors.  Then I would go down to the area where I

2    see prescribed medications.  And the prescribed

3    medications include some benzodiazepines, and oxycodone

4    and morphine.  So some opioids.

5          And from there, I would look at the screening

6    test that was done.  She has point of care tests, which

7    was never billed by the practice, by the Labs.  And this

8    is positive for opiates and OxyContin, which is what I

9    expect this to be.  And then I ignore the piece on top of

10   this, which says "Lab results summary" because I'm not

11   analyzing a summary.  I want to go to the next two pages

12   and see what its results actually are.

13          So if we could go to the next page.

14          So this is one of the next two pages that shows

15   the test results.  And these are all the tests that were

16   run on this patient who was prescribed an opiate and a

17   benzodiazapine by a primary care doctor.  So what I see

18   is that it's -- I'll tell you what these are.  This is

19   heroin, amphetamines, a dozen kinds of antidepressants,

20   barbiturates, benzodiazepines.  And it's positive for

21   alprazolam.  The person was prescribed alprazolam, so I

22   expect to see that.  They test for buprenorphine, for

23   cocaine, for Ecstasy, for Fentanyl, for marijuana.

24          Next page, please.

25          Meperidine, methadone, methamphetamines, and

1681

1    then opioids -- opiates.  Positive for the things that

2    should be positive, given what it says they were

3    prescribed.  Oxycodone, it's breakdown.  Oxymorphone and

4    morphine.  And then they tested for PCP and propoxyphene.

5    So this chart that said positive for these things, yes,

6    the patient is positive for these things.  This is what

7    it says they were prescribed.

8        Q.   Did you form an opinion about the medical

9    necessity of this test for this patient, MZ?

10       A.   Yes.

11       Q.   And what is your opinion?

12       A.   The normal case here, the vast majority of these

13   tests could not possibly be considered medically

14   necessary because there are too many tests for things

15   there's no reason to think it is for information that the

16   doctor would need to know.

17       Q.   Are these the results that you would have

18   expected based on her prescription medication?

19       A.   These positives are what I would have expected

20   here that we're looking at on the screen.

21            MS. COSTIN:  Let's go back to Ms. Thelian's

22   chart, if we could, Mr. Salazar.  And let's go to --

23            THE COURT:  Exhibit number?

24            MS. COSTIN:  I'm sorry.  It's Exhibit Number --

25   the Labs' 6966.

1    THE COURT:  Yes.

2    MS. COSTIN:  And if we could scroll to the next

3  page.  I believe it's the patient that's listed as JA.

4  BY MS. COSTIN:

5    Q.  And just based on Ms. Thelian's chart,

6  Dr. Clark, could you please describe what you see here

7  for Patient JA?

8    A.  I see an enormous frequency of testing.  The

9  number of tests per period of time is extreme.  I think

10  there's 11 tests done in March here, if I'm counting this

11  correctly.  And these are point-of-care tests, and then

12  there are other tests that the Labs are doing.  And what

13  I'm seeing for positive -- the only things I see positive

14  in this patient are alcohol.  So this is a lot of testing

15  per week, per month, month after month after month after

16  month, which the only thing that she -- she says "picks

17  up alcohol."

18    Well, they didn't do a screen for alcohol.  You

19  don't need to do this kind of definitive testing to get

20  -- you can do a breathalyzer test for alcohol.  So this

21  is just, on the face of it, inappropriate frequency of

22  testing, too much testing over and over and over again.

23    And the other thing I would expect to see when

24  people are negative, negative -- when people are doing

25  well in treatment, then we expect for them to be tested

1    less often.  They are doing well.  They don't need so

2    much information about them, but this is continues.

3        Q.   Dr. Clark, what is your opinion about

4    Ms. Thelian's summary of 20 patient files that were part

5    of this SIU investigation?

6        A.   They are not -- they have nothing to do with the

7    appropriateness of billing and coding.  And clinically,

8    they are not helpful.  They just seem to be misleading to

9    laypeople who don't know how to interpret the results of

10   these tests.

11       Q.   After you reviewed these 20 files -- you might

12   have been in the courtroom when we discussed and email

13   from Dr. Nicoll to Stephanie Canto, that based on his

14   review, he believed that there was serious abuse going on

15   here.  Do you recall that?

16       A.   Yes.

17       Q.   Do you have an opinion, based on your review of

18   these 20 patient files clinically?

19       A.   Yes.

20       Q.   And what is that?

21       A.   I agree with Dr. Nicoll.  This is serious

22   billing abuse.

23       Q.   Other than your view of these 20 patient files,

24   did you see any other patient files of lab test results

25   in forming your opinions?

1   A.   Yes.

2   Q.   And what were those?

3   A.   Well, I didn't just look at this one file of the

4   20.  I took the files that were from PB Labs and from

5   BioHealth and from Epic for the years that were provided,

6   2012, '13, '14, '17.  They were different for different

7   labs.  But the Labs had provided information on -- I

8   think you call them patient packets that were sent to

9   patient to try to -- to bill the patients for the lab

10  tests.  And those would contain a list of what they were

11  billing for.  An order that allegedly justified was the

12  billing -- the tests, and then the results of those tests

13  for which the patient was seeing a bill.

14  Q.   These patient packets, just for clarity, these

15  were from all three labs?

16  A.   Yes.

17  Q.   And for what years did they cover?

18  A.   Multiple years per -- depending on the lab, but

19  between 2012 and 2017.

20  Q.   How many of those lab tests results for those

21  patients were you able to review when forming your

22  opinions?

23  A.   Over a hundred.

24  Q.   And what did you observe in those additional

25  hundred patient packets that you reviewed?

1685

1    A.    So I observed similar things with this extremely

2    high intensity or numbers of tests that are being tested

3    for.  There would be -- I saw a file where the standing

4    order was from -- from 2012.  The urine test was done in

5    2014.  And the bill to the patient was from 2015 for over

6    a thousand dollars.  So what I saw were these large

7    bills, often over a thousand dollars, up to $5,000, I

8    think, that patients were getting long after these long

9    lists of drug tests were done.

10   Q.    Dr. Clark, you said you reviewed Cigna's claims

11   data that's been part of this case, correct?

12   A.    Yes.

13   Q.    When we talk about the claims data, that's very

14   large Excel documents that I don't think the jury has

15   seen because they are very large and they have a lot of

16   personal health information.  But you've seen them,

17   correct?

18   A.    Yes.

19   Q.    And you saw them completely unredacted.  You had

20   the opportunity to see patient names in them, correct?

21   A.    Yes.

22   Q.    And for these claim spreadsheets, which labs did

23   they cover and over what period of times?

24   A.    They covered all three labs, PB Labs, BioHealth

25   Labs and Epic Labs, and they covered from 2012 to 2017 in

1    total among the labs.

2        Q.    And when you were reviewing this claims data to

3    form your opinions, how many lines of the claims data did

4    you review?

5        A.    From -- well, each of those spreadsheets that I

6    looked at combined were between 700 and 800,000.

7        Q.    Seven hundred and 800,000 lines on the Excel

8    document, correct?

9        A.    Correct.

10       Q.    Or across the documents?

11       A.    Yes.

12       Q.    And you reviewed every single one?

13       A.    Yes.  I took that information and I analyzed it.

14       Q.    Did you have any help performing this analysis?

15       A.    My computer.

16       Q.    Other than your computer?

17       A.    No.

18       Q.    So you personally put eyes on every single line

19   of this claims data?

20       A.    Yes.

21       Q.    About how many hours did you spend reviewing the

22   claims data in this case?

23       A.    This data, over 200.

24       Q.    Did you attempt -- when you were performing your

25   analysis, did you attempt to do any kind of statistical

1687

1    sampling of the data?

2        A.    No.  I looked at all the claims data.

3        Q.    So you looked at everything?  You didn't just

4    pull out certain things?

5        A.    Correct.

6        Q.    Can you please describe for the jury your

7    methodology in analyzing this claims data.

8        A.    Yes.  So these are -- the claims come in Excel

9    spreadsheets, and there often 80 columns across, 80

10   columns across, and then hundreds of thousands of rows

11   going down.  And so what I did with the information is I

12   sorted it.  So I sorted it by patient, patient's date of

13   service.  I sorted it by what services were being billed

14   for, the dates when they start doing this service or that

15   service.  I sorted it by amounts being billed for those

16   things, when did they change what they were billing for

17   this.  I sorted all of this information in multiple ways

18   and subsorting so that -- that's the way that you analyze

19   because there's just a huge amount of data cells.

20       Q.    You mentioned sorting it by patient that name.

21   Why did you do it that way?

22       A.    Well, to understand what the -- what each

23   individual -- I keep saying patients, but they are at a

24   sober home.  They are not necessarily a patient.  But

25   each individual plan member was -- the service that was

1    given to them, when it was given to them so that I can

2    look at medical necessity and appropriate billing

3    practices.

4        Q.   For that particular patient?

5        A.   That particular patient.

6        Q.   Have you performed this kind of analysis before?

7        A.   Yes.

8        Q.   In what capacity?

9        A.   I performed this as the medical director at

10   CDPHP for CVS Caremark and for my expert work for the

11   government and for provider.

12       Q.   And how does your approach to the claims data

13   differ from what Ms. Thelian did when she looked at the

14   claims data?

15       A.   Well, she looked at the -- when she was looking

16   at the data, she looked at the claims data by choosing --

17   by sorting for the internal codes that Cigna used to

18   discuss what they did with that claim when it came in.

19   So that's an internal code.  I didn't pay any attention

20   to the internal code of what Cigna did.  I took here are

21   the claims and I sorted them to look for medical

22   necessity and were they appropriately billed and coded.

23   So I looked at them in that way.

24            I looked at -- therefore, I looked all of those

25   claims, not just the ones that -- I think she said she

1689

1    used just a few codes to -- of how Cigna dealt with them

2    internally, and then just looked at those.  So I looked

3    at -- I did all of this in the claims, as well as in all

4    of those patient files.

5        Q.   From your review of the claims data, did you

6    form any opinion about the testing services that the Labs

7    were performing?

8        A.   Yes.

9        Q.   And what is that opinion?  Excuse me.

10       A.   They -- there are patterns clearly in here where

11   they are testing too many things, too many drugs per date

12   of service.  So that's too many intensity.  They're

13   testing too frequently, so too often.  And they are

14   testing for specific substances, which would not be

15   consistent with what a doctor needs information for to

16   treat the patient.  It wouldn't be medically necessary

17   for the treatment of the patient.

18       Q.   So let me unpack a couple of those things you

19   just said.  I think you with sort of a high intensity,

20   which as I understand is a lot of different drugs all at

21   once.  So what did you observe on average with the number

22   of drugs per patient that were being tested?

23       A.   Well, on average, there would be dozens -- I

24   mean not on average.  In the typical case, in most of

25   these claims, there would be dozens of tests being done

1690

1    per specimen on the patients.

2        Q.    And why is that concerning?

3        A.    Because not all patients are going to need that

4    kind of testing.  That's a lot of different drugs to be

5    tested for a range of different diagnoses and patients in

6    different settings.

7        Q.    I think you also mentioned that there were some

8    specific substances that you saw being tested that you

9    thought were inappropriate.  Could you elaborate on that?

10       A.    Yes.  The easiest thing to talk about are

11   antidepressants.  So antidepressants, they would often

12   bill for two -- two classes of checking antidepressants.

13   So they're old antidepressants, the tricyclics that we

14   don't use anymore.  Then there are new antidepressants,

15   like Prozac and Zoloft and Lexapro and et cetera.  These

16   are not drugs of abuse.  There's no street value for

17   Prozac.  These are not -- you know, these are not drugs

18   that -- I'm a psychiatrist.  We don't test urine for

19   Prozac.  We don't test blood for Prozac.  We don't --

20   this is not something that's medically necessary in the

21   practice of addiction medicine or psychiatry.

22            And they didn't just bill like all we did -- we

23   checked for one thing, Prozac.  They would bill one line,

24   but it was for six or more Prozac-like drugs and six or

25   more of the old tricyclic type antidepressants.  Then it

1691

1    came out to be like $450 just for those tests for 12

2    antidepressants per date of service on a patient.  That

3    kind of things -- those are not medically necessary

4    tests.

5        Q.    So we talked about high intensity and you talked

6    about specific substances.  I think you also mentioned

7    high frequency.  So what did you observe in terms of the

8    frequency of the testing in the totality of the claims

9    data?

10       A.    So in the average case here, there were

11   multiple tests per -- per week seen.  There were tests

12   where they were done literally three days in a row, weeks

13   after weeks after weeks.  Their -- patients were getting

14   tested every third day for a year.  This was the kind of

15   frequency that -- again, if you are positive for

16   marijuana on Monday and you've been using for a month,

17   you're not going to need to be tested that Wednesday and

18   Friday and then the next Monday, Wednesday and Friday and

19   the next Monday and Wednesday and Friday.

20       Q.    From your review of the claims data, did you

21   form an opinion about the Labs' billing?

22       A.    Yes.

23       Q.    What opinion is that?

24       A.    That there were multiple problems in the billing

25   and coding in ways that are not legitimate billing,

1692

1    appropriate billing practices.

2        Q.    Could you elaborate on what you observed.

3        A.    The easiest thing to explain is urinalysis.  So

4    I saw thousands of claims for urinalysis.  Urinalysis is

5    not during drug tests.  Urinalysis is what happens every

6    year when you go to the doctor and they take your blood

7    and then they did a urine sample.  And that urinalysis is

8    -- that checks for your kidneys.  It checks to see if you

9    are spilling sugar.  It checks for -- that your pH and

10   your creatinine, again, how are your kidneys running, all

11   kinds of different things go into that one code for

12   urinalysis.  The problem with the urinalysis billing over

13   and over again is I didn't see a single order for it and

14   I didn't see a single result for it.  There is no

15   evidence in the hundreds plus things I looked at that

16   those urinalyses were ever ordered or done.

17       Q.    Have you heard the term "unbundling" in the

18   industry?

19       A.    Yes.

20       Q.    Could you please explain to us what the term

21   "unbundling" means in the health care industry.

22       A.    Yes.  So as I just explained when you give that

23   urine specimen every year to your doctor and you get --

24   they show you the results, there's several lines of

25   things that come out in those results.  That is one code.

1    That is one service.  And each line that comes out that's

2    done doesn't get billed in and of itself.  It's part of

3    the bundle.

4         Okay.  Unbundling is, say, for example, billing

5    for a urinalysis plus a pH, which is part of that bundled

6    service, plus doing a creatinine, which is part of that

7    bundled service.  That's taking a code and billing the

8    bundle and then unbundling it.

9    Q.   Did you see any other -- did you see that with

10   the urinalysis in the billing?

11   A.   Yes.

12   Q.   Did you see any other examples of unbundling in

13   the Labs' claims -- in the claims data for the Labs?

14   A.   Yes.  But it is really difficult to explain.

15   Q.   Well, maybe we'll see some in the claims data

16   and we can talk about that.

17        Why is unbundling a problem?

18   A.   Because you are billing twice for the same

19   thing.

20   Q.   What is the result of that when you are billing

21   twice for the same thing?

22   A.   Well, the result of getting paid twice for the

23   same thing is just -- it's waste.  It's the definition of

24   medical waste.  And that just drives up the cost of

25   health care.  Drives up your premiums.  Drives up your

1   taxes.  It's not appropriate.

2       Q.   I would like to talk about the appendices that

3   you prepared for your report.

4           MS. COSTIN:  Your Honor, these -- this has not

5   been admitted yet, but I'd like to just show Dr. Clark

6   Cigna's 1063-A.

7           THE COURT:  It's for identification only?

8           MS. COSTIN:  For now.  I Believe there's an

9   objection.

10          THE COURT:  But you are not offering it now,

11  right?

12          MS. COSTIN:  Well, I'm going to have some

13  foundational questions, and then see if Mr. Hare will

14  waive your objection.

15          THE COURT:  Well, up there.  Ask the questions.

16  I'm just saying it's ID and --

17          MS. COSTIN:  For now it is, correct, Your Honor.

18  BY MS. COSTIN:

19      Q.   Dr. Clark, do you recognize this exhibit that's

20  been marked as Cigna Trial Exhibit 1063-A?

21      A.   Yes.

22      Q.   What is this document?

23      A.   This is information that I included as part of

24  an exhibit to my expert report.

25      Q.   And that's exhibit E to your expert report?

1695

1    A.    Yes.

2    Q.    And who created this appendix?

3    A.    I did.

4    Q.    How did you create this appendix?

5    A.    I did the sorting of the big spreadsheet of

6    claims information and I just copied and pasted

7    information about the specific patient and put it into a

8    new spreadsheet.

9    Q.    So the underlying data for this spreadsheet is

10   the claims data that you reviewed?

11   A.    Yes.  I didn't change any of the things you see

12   in the cells here, the information it that.

13   Q.    Fair to say it's an excerpt of the claims data?

14   A.    What you are looking at is an excerpt of the

15   claims data.

16   Q.    And why did you create this appendix in this

17   manner?

18   A.    Because these charts are huge, and it would be

19   extremely difficult to go back and forth and back and

20   forth and explain from the chair here is this patient,

21   here is what was billed for this day and then the next

22   day and et cetera.

23        MS. COSTIN:  Your Honor, I would like to move

24   this into evidence.

25        MR. HARE:  No objection, Your Honor.

1696

1    MS. COSTIN:  Fantastic.

2    THE COURT:  Full exhibit.

3    MS. COSTIN:  We are actually going to do this

4  with one more exhibit unless you -- do you have a problem

5  with 1064?

6    MR. HARE:  Well. I'd like to go through the

7  foundation.

8    MS. COSTIN:  We'lol go through the foundation

9  for 1064 as well, Your Honor.

10    THE COURT:  It's I.D. at this time?

11    MS. COSTIN:  I.D.  It's 1064-A.

12  BY MS. COSTIN:

13    Q.   Dr. Clark, I'm showing you a document that's

14  been marked Cigna Trial Exhibit 1064-A.

15    MS. COSTIN:  If we could call out the title of

16  this document.

17  BY MS. COSTIN:

18    Q.   Do you recognize this document, Dr. Clark?

19    A.   Yes.

20    Q.   And what is this document?

21    A.   This is a document that I provided as an

22  appendix to my expert report.

23    Q.   And how did you create this appendix?

24    A.   The same method I just said.  I just sorted by

25  patient and date and then I pulled all of the -- copied

1    all of the patient claims for this -- that spreadsheet,

2    which is that lab during that year and pasted it onto

3    another spreadsheet.  That's what this is.

4        Q.   And the source of this appendix is the claims

5    data?

6        A.   Yes.  This is just copy and pasted claim data.

7        Q.   Fair to say it's just an excerpt of the claims

8    data?

9        A.   Yes.

10            MS. COSTIN:  I would like to move for admission

11   of 1064-A.

12            MR. HARE:  No objection, Your Honor.

13            THE COURT:  1064-A is a full exhibit.

14   BY MS. COSTIN

15       Q.   Dr. Clark, I'd like to walk through a couple of

16   examples of what you observed of the patients based on

17   these appendices that you prepared for your report.

18            MS. COSTIN:  And I think we can starts with

19   1063-A, Mr. Salazar.

20   BY MS. COSTIN

21       Q.   We're going to go to Tab A.  These were

22   tabs from an Excel spreadsheet that you prepared,

23   correct?

24       A.   Yes.

25       Q.   Each tab is a different patient that you had

1  collected the information for?

2      A.  Yes.

3      Q.  So let's start off with the columns -- let's say

4  C through H.  And if you could, please, just explain for

5  the jury what this particular tab of your appendix

6  contains, at a high level.

7      A.  So this identifies that this patient's initials

8  are LM, the patient's age, gender, the state that this

9  member lives in, and this is to identify that individual.

10  It shows here that this is claims data from Epic Labs,

11  and this date of service that we're looking at here is

12  11-17-15. --

13      Q.  And if we could -- we're going to talk about the

14  services for November 17, 2015.  Can we sort of pull out,

15  Mr. Salazar, so Dr. Clark can explain how many lines of

16  service were billed just for November 17, just for this

17  one patient.

18      A.  Thirty-three different lines of specific codes

19  were billed.

20          MS. COSTIN:  And if we could go to Column J.

21  BY MS. COSTIN:

22      Q.  And if we could just scroll down to see the

23  particular services that were billed for this patient on

24  November 17 of 2015, so that Dr. Clark can explain what

25  specifically is being billed and what you observed?

1    A.    Sure.  So they are billing for Ecstasy, alcohol,

2    three or tour amphetamines, Ritalin, gabapentin, the

3    benzodiazepines, Lyrica, five or more opioids,

4    barbiturates, cannabinoids, heroin, PCP, another round of

5    opiates, buprenorphine, oxycodone, methadone, tapentadol,

6    cocaine, propoxyphene, tramadol.  I know there's more.

7    Q.    So just so that I understand and the jury

8    understands, that means each line each drug, that was

9    billed separately?

10   A.    Well, this line is not for each drug.  Some of

11   these are for drugs, but some of these are classes.  So

12   some of them can be up to 12, you know.  They can be a

13   certain number of drugs per class.

14   Q.    And you mentioned that there were 33 tests done

15   for this patient in one day.  What is your opinion on

16   that?

17   A.    I said 33 classes of -- of services that are

18   done.  That's very intense.  That's just a lot of tests

19   being done for one day.  And there's no information that

20   would show that this would be medically necessary.

21      MS. COSTIN:  Mr. Salazar, can we cal out rows 28

22   and 29, I believe.

23   BY MS. COSTIN:

24   Q.    You had talked a little bit earlier about seeing

25   testing for antidepressants.  Can you tell me what

1   this -- what those bold lines show?

2        A.   Yeah.   So there's one code line for the old

3   kinds of antidepressants, the tricyclic antidepressants,

4   and they billed for six or more of those tests being

5   done.  And then there's another line of code for the

6   newer class, the serotonergic class.  That's the Prozac,

7   Zoloft, Lexapro, Cymbalta kinds of antidepressants.  And

8   they billed for six or more of those.  So between -- they

9   did at least -- they are saying they did at least 12

10  different urine tests for antidepressants with the big

11  machine, the big expensive machine, and they billed this

12  for almost $450. --

13           MS. COSTIN:   And if we could go to Rows 30

14  through 32.

15  BY MS. COSTIN:

16       Q.   I believe there's a line for the urinalysis that

17  you were explaining a couple of minutes ago.   Could you

18  please explain what you see here relative to the

19  urinalysis and the lines above and below.

20       A.   Yes.  So this is, as it says, urinalysis.  This

21  is what you get done every year at your doctor's office.

22  Again, there was not a single order or a single result

23  for this I saw anywhere in the chart in these documents

24  provided.  But you will see under this urinalysis

25  discussion of what's included in it, you will see pH is

1  listed there, and you will see these are -- these are the

2  -- sort of the normal things that go in with this.  And

3  you'll see above and blow there is a bill for creatinine.

4  There's a bill for pH.  This is just sort of unbundling

5  kinds of stuff.

6          MS. COSTIN:  And if we could go to the bottom

7  just for this day to see what was billed to Cigna just

8  for this one day, November 17, for this patient.

9  BY MS. COSTIN:

10     Q.   How much was billed for this day?

11     A.   $4,375.82.

12     Q.   And how much paid by Cigna for this patient?

13     A.   2,274.07.

14          MS. COSTIN:  Thank you.  Your Honor, I'm about

15  to switch gears, but I'm mindful of the time right now.

16  Would you like me to continue?

17          THE COURT:  You have one more minute, ma'am.

18          MS. COSTIN:  If we could, Mr. Salazar, I'd like

19  to go to the next date of service for this patient.

20  BY MS. COSTIN:

21     Q.   And what is the date of service on this patient,

22  Dr. Clark?

23     A.   This is two days layer, 11-19-15.

24     Q.   What observations do you have about the billings

25  for this patient on November 19, 2015?

1    A.    They billed the same amount.  They billed the

2  same 33 codes.

3    Q.    The exact same 33?

4    A.    The exact same 33.

5    Q.    And do you recall how much was billed to Cigna

6  for this date of service for this patient two days later?

7    A.    I think we just said it was 4,200 something.

8    Q.    And what is your opinion then of the medical

9  necessity of these services just two days later after the

10  November 17 testing we just looked at?

11    A.    Again, there's too many tests.  These are tests

12  for things that would not be needed for medical

13  decision-making.  And this is too frequent a test.  This

14  is part of ASAM said before.  If you are positive -- if

15  you're -- you know, the results of one thing here you

16  don't need to test it this often.  So this would not be

17  considered medically necessary testing.

18    THE COURT:  All right.  I think now we'll take

19  our break.  Ladies and gentlemen, have a nice recess.

20  See you back at 2:15 -- I'm sorry, 2 o'clock.

21    You may step down, Doctor.  I'll need you back,

22  you know, four or five minutes before 2:00 in the hallway

23  to be sure that you're there to get called in at 2

24  o'clock.  Thank you very much.  Have a nice break.

25    (In the absence of the jury at 1:16 p.m.)

1            THE COURT:  Everybody may be seated.

2            Any issues?

3            Okay.  I will see you back at a few minutes

4       before 2:00.

5            I do have myself very few issues.  One,

6       obviously, Cigna needs to fix their exhibit list.  This

7       is going to be a real problem.  I guess Wednesday you

8       will have time because the clerk -- they don't need the

9       button pushed till Thursday.  So I will relax.  But those

10      documents you just used are As of full -- of full exhibit

11      that I'm sure is hundreds of pages.  So you have to

12      mark -- you're now going to have to mark the full

13      document A and the -- no, you marked it A, what you used.

14      So you have to mark -- that will be the full exhibit.

15      Liana, I don't know how you are keeping track of these

16      until you get a list that reflects what they are showing

17      to the person.  I don't know.  I could be wrong, but I

18      thought there were some you showed a portion of.  If I'm

19      mistaken, my apologies.

20           I had one question.  Nobody has raised an issue.

21      I just want to be sure this does not come up.

22           Dr. Krost, or however his name was pronounced,

23      was listed as a witness for the Labs and has been listed

24      for some time.  On the exchange of witnesses, I don't see

25      his name anymore, I see a Dr. Boorstein.  Is that because

1    Dr. Krost wasn't available and Boorstein is somebody you

2    have substituted and there's no objection or is there

3    some other explanation?

4           MR. HARE:  Dr. Boorstein, Your Honor, is a

5    disclosed exerts for the Labs.

6           THE COURT:  All right.  I don't think I had an

7    issue on him.  That's fine.

8           And then, Counsel, could I just request you not

9    be testifying.  I appreciate that.  That would be right.

10   Declarant.  Whatever.  You need to just ask a question,

11   not respond to -- I understand.  It is a habit I had, but

12   it's not appropriate.  Thank you.  I mean I had as a

13   lawyer, I should say.

14          Unless there's anything further, we're on

15   recess.

16          (Whereupon, a recess was taken from 1:18 p.m.

17          to 1:56 p.m.)

18          THE COURT:  Somebody here on both sides.

19          I asked a week or more ago for document

20   translations from depositions offered and exhibit

21   numbers.  I guess I finally got one, and I'm now trying

22   to finish Borden's, which is going to be played, I guess

23   not today, but I think you would like to see what I did.

24          There are -- I have the translations sheets, but

25   I am -- I need to know if the party who is offering this

1    testimony believes that the documents are in evidence on

2    that translation sheet.  In particular, Labs 6987.  No,

3    that's not right number.  I apologize.  Labs 11289, is

4    that in evidence?  It would be, by my count, Exhibit 3 to

5    the deposition.

6         Does the Labs have marked as evidence Exhibit

7    11239, which I understand to be deposition Exhibit 3 that

8    was first marked at page 22 of the deposition, and about

9    which there were questions, which if it's not in

10   evidence, I will sustain the objections.  If it's in

11   evidence, I will overrule them.

12        I need an answer to that question.  11289, does

13   Cigna have it in evidence?

14        It is time to bring the jury out.  I will mark

15   it as the objection is sustained because I have no proof

16   the document is in evidence.

17        If anyone receives this -- when it is

18   docketed -- if the document is in evidence, you should

19   submit a short pleading indicating that the document that

20   the question was about was in evidence.  And you are

21   going to tell me who it was marked with and when it was

22   admitted at the trial.  Okay.

23        MR. CHRIST:  We will do that.  Thank you, Your

24   Honor.

25        THE COURT:  Those were all sustained.

1        This troubles me that neither side can tell me

2   what their list shows is in evidence or isn't in

3   evidence.  That is very problematic.

4        You may be seated, Doctor.  I'm sorry.

5        (In the presence of the jury at 2:00 p.m.)

6        THE COURT:  Everybody be seated.  Welcome back,

7   ladies and gentlemen.  And we are continuing in the

8   direct examination of Dr. Clark.

9        You may proceed.

10  BY MS. COSTIN:

11     Q.   Good afternoon, Dr. Clark.

12          Just a few minutes before the lunch break, we

13  were talking about a patient example.  It was at your

14  report Cigna Exhibit 1063-A, Tab A.  Do you recall that?

15     A.   Yes.

16     Q.   The patient had the initials of LM.

17     A.   Yes.

18     Q.   I would like to go to another one of you

19  appendices.

20          MS. COSTIN:  This is 1064-A, Tab HF10,

21  Mr. Salazar.

22          THE COURT:  This is in evidence, right?

23          MS. COSTIN:  This is -- we just admitted it just

24  before the lunch break.

25  BY MS. COSTIN:

1    Q.    And do recognize this document, Dr. Clark?

2    A.    Yes.

3    Q.    This is a different appendix from the one we

4    were just looking at, correct?

5    A.    Right.

6    Q.    How did you prepare this document?

7    A.    Exactly the same way as the -- the earlier one.

8         MS. COSTIN:  And if we could, Mr. Salazar,

9    scroll in on the columns that identified as individual so

10   that Dr. Clark can identify who we're talking about here.

11   BY MS. COSTIN:

12   Q.    Can you please explain to the jury what this

13   particular tab of your appendix represents.

14   A.    Yes.  So this tab is all of the claims for Epic

15   Reference Lab for this year on this patient LM.  And you

16   can see the age, gender, et cetera, identifying

17   information.  And this is the first date of service on --

18   of the year that was billed.

19   Q.    And this is the same patient that we were just

20   looking at for the two dates of service in November,

21   correct?

22   A.    Correct.

23   Q.    So the first date of service here is January 5,

24   2015.

25        MS. COSTIN:  Can we scroll on the it bottom,

1    Mr. Salazar.

2    BY MS. COSTIN:

3        Q.    And identify the last date of service on your

4    spread.  Dr. Clark, what is the last date of service that

5    you identified for this patient in 2015?

6        A.    November 23rd.

7        Q.    And could you explain how many lines of service

8    were billed for this patient LM in the year of 2015 for

9    Epic Reference Labs?

10       A.    Yes.  If you go to the left, you will see the

11   number 7298, subtract the heading number, and there were

12   7,297 claim lines for the year.

13       Q.    Can you explain your methodology when you did

14   the totals to identify the total of the year.  How did

15   you do that?  What was your methodology?

16       A.    I utilized just the totality of the spread  -- I

17   pulled the information from the claims data.  I put it

18   onto the spreadsheet and I just summed everything that

19   came in the charged amount and the paid amount columns.

20       Q.    And how much did you identify was the charged

21   amount from Epic for this one patient for the year of

22   2015?

23       A.    Over half a million dollars.  $522,793.73.

24       Q.    And of the amount that was changed by Epic, what

25   was the amount that was actually paid by Cigna?

1    A.    Almost a quarter million.  $245,447.42.

2    Q.    And you said that this patient had services from

3    January 5th through November 23rd; is that correct?

4    A.    That's correct.

5    Q.    So how long is that?

6    A.    It is about ten and a half months.

7    Q.    And do you know offhand how many days of service

8    -- different days of service are represented for this one

9    patient, LM?

10    A.    About 106.

11    Q.    That's about ten per month?

12    A.    Yes.  About every third day.

13    Q.    So if Epic billed about 522,000 for the year,

14    what does that equate to for the average day of service?

15    A.    They billed about 4.9 thousand dollars.

16    Q.    What is your opinion based on this patient

17    example, LM?

18    A.    This is an extraordinary number of tests per day

19    of testing.  This is an extraordinary number of tests per

20    year.  This is -- in no way could be considered medically

21    necessary testing.

22        MS. COSTIN:  Mr. Salazar, can we go to Cigna

23    Exhibit 1063-A and Tab N.  And this was admitted just

24    before lunch, Your Honor.  We could scroll out and

25    identify the patient on this particular spreadsheet.

1  Thank you, Mr. Salazar.

2  BY MS. COSTIN:

3      Q.   Could you please explain, Dr. Clark, what is

4  represented on this Tab N of your Appendix E that's been

5  in evidence?

6      A.   This shows the claims that were billed for the

7  Cigna member CB in 2016 from Epic Reference Labs.

8      Q.   What is the first date of service for 2016?

9      A.   Again, January 5th, 2016.

10     Q.   Do you know what this means, account name?

11     A.   I'm sorry, what?

12     Q.   The account name, do you know what that means?

13     A.   Yes.  That's who purchased the insurance policy

14  for the Cigna member.

15         MS. COSTIN:  Now, let's take a look and we're

16  going to sort of blow up this January 5, 2016

17  specifically.  If we could just sort of expand that date

18  of service and go to Columns K and O, Mr. Salazar.

19  BY MS. COSTIN:

20     Q.   And if you could, could you explain for the

21  jury, Dr. Clark, what the Column K and O contain?

22     A.   Column K -- and you're just seeing portions of

23  it here -- contains the narrative of what each billing

24  code is described as.  So there's a billing code and

25  there's a number.  But here you'll see it's -- that

1   number is associated with this description of the codes.

2   That's what's Column K.

3            Column O here is the diagnosis of the patient.

4   It is the only diagnosis listed for this patient in these

5   claims.

6        Q.   So what is the diagnosis for Patient CB on this

7   appendix?

8        A.   Uncomplicated alcohol dependence.

9        Q.   And if you could identify the services that were

10  rendered and your opinion on the services that were

11  rendered from Patient CB?

12       A.   So there's three different drug screen bills.

13  There is an alcohol biomarker, amphetamines.  Again, six

14  or more Prozac kind of drugs.  Six or more old

15  antidepressants, barbiturates, benzodiazepines,

16  buprenorphine, cannabinoids, synthetic cannabinoids, four

17  to six of them, cocaine, Fentanyl, gabapentin, heroin,

18  methadone, Ecstasy, opioids one or more, opioids three or

19  four, oxycodones, synthetic stimulants, tapentadol,

20  tramadol.  Then urinalysis, creatinine, pH, PCP and

21  other.

22       Q.   What is your opinion on the services for Patient

23  CB based on the information from the claims data?

24       A.   There is no indication that these tests would

25  have been needed by the doctor to treat this patient's

1    uncomplicated alcohol dependence.

2        MS. COSTIN:  If we could, Mr. Salazar, go to the

3    bottom of the date of service for January 5th --

4    BY MS. COSTIN:

5        Q.   Oh, actually, do you happen to know how much was

6    billed for this patient just for one day of service for

7    January 5th?

8        A.   No, I actually don't recall that.

9        Q.   I'm not sure if we can show this on the screen.

10       MS. COSTIN:  We can scroll down to the bottom,

11   though, Mr. Salazar, and see how many dates of service

12   there were billed by Epic in 2016 for this patient.

13       A.   These are the lines of service.  The number of

14   dates of service were 49.  There were 49 dates that they

15   billed on.  They billed for 528 different lines of claims

16   going through 9/8 of the year.

17   BY MS. COSTIN:

18       Q.   What was the last service date for this patient,

19   CB?

20       A.   September 8th.

21       Q.   So that was January 5th through September 8th of

22   2017?

23       A.   Right, eight months.

24       MS. COSTIN:  Can we scroll on the bottom to see

25   the total amount that you summed for this patient for

1    2016.

2    BY MS. COSTIN:

3        Q.   Can you please explain what you did to arrive at

4    this amount?

5        A.   This is just the summary of the column of

6    charged amounts.

7        Q.   And what was the total amount billed by Epic to

8    Cigna during the year of 2016 for Patient CB?

9        A.   $86,304.77.

10       Q.   How much did Cigna pay?

11       A.   $39,301.69.

12           MS. COSTIN:  If we could, Mr. Salazar, go to --

13   it's the same Exhibit 1063-A.  We're going to go to Tab

14   C.  If we could do the same scrolling at Columns C

15   through H to identify the patient and the laboratory at

16   issue.  Thank you so much.

17   BY MS. COSTIN:

18       Q.   Could you please describe what's identified on

19   Tab C of this appendix, Dr. Clark.

20       A.   Yes.  These are all the claims for a patient

21   that -- whose initials are PC here.  And they are from

22   BioHealth, so a different Lab, and a different year.

23   This is 2014, beginning January 2, 2014.

24       Q.   And does this appendix that you prepared

25   represent all of the claims for this Patient CP for 2014?

1714

1      A.   From the BioHealth billings, yes.  I didn't

2  cross-reference them with other billings.

3      Q.   Understood.  And if we could then -- is January

4  2nd the first date of service for this patient in 2014?

5      A.   Yes.

6           MS. COSTIN:  Could we please scroll down to see

7  the last date of service for Patient CP in 2014 for

8  BioHealth.

9  BY MS. COSTIN:

10      Q.   Could you please explain the date to the jury.

11      A.   Yes.  So this is about three months one week

12  later.  This is April 11, 2014.

13      Q.   And how many lines of service were billed from

14  BioHealth to Cigna for that roughly three-and-a-half

15  month period?

16      A.   2,139 claim lines.

17      Q.   And how much was billed for this patient to

18  Cigna in 2014?

19      A.   $169,086.85 for that three months.

20      Q.   How much did Cigna actually pay?

21      A.   $26,689.67.

22      Q.   You said that was over 2,100 lines of claims,

23  correct?

24      A.   I believe so.

25      Q.   And that's over a three-and-a-half month period?

1    A.    Yes.

2    Q.    So is that about 700 lines of testing per month?

3    A.    Right.  Over $50,000 of billing per month.

4    Q.    What opinion did you form about this patient

5    from your review?

6    A.    This is unnecessary frequency.  This is

7    unnecessary intensity.  There are tests done that could

8    not about medically necessary.  This is an enormous

9    amount of billing from drug tests for a single patient

10   here.

11        MS. COSTIN:  Let's do another one.  Let's go to

12   1064-A, Mr. Salazar.  Tab HF-1.  We can could blow up the

13   Columns C through H as well.

14   BY MS. COSTIN:

15   Q.    And could you identify for the jury what this

16   tab of your appendix to your report identifies?

17   A.    Yes.  These are all the billings for the year

18   from Epic for the year 2015 for this member, RB.

19   Q.    And you prepared this in the same way that you

20   did for the other ones, correct?

21   A.    I did.

22   Q.    And what was the first date of service for this

23   member in 2015?

24   A.    January 5, 2015.

25        MS. COSTIN:  And can we scroll to the bottom to

1    see the last date of service for 2015.

2    BY MS. COSTIN:

3        Q.    Could you identify that for the jury.

4        A.    December 17, 2015.

5        Q.    And if we could -- how many lines of service

6    were billed to Cigna just in 2015 for this patient?

7        A.    10,213.

8        Q.    How much did you total is the amount that was

9    billed for the entire year of 2015 for this patient to

10   Cigna?

11       A.    Two-thirds of a million.  $668,762.04.

12       Q.    And how much did Cigna pay?

13       A.    $225,434.05.

14       Q.    And you said that these services were

15   performed from January 5th through December 17th; is that

16   correct?

17       A.    Yes.

18       Q.    And actually, we have -- if we can look at a

19   bottom here.  I think it is actually -- do you want to

20   take a look at the last row?

21       A.    Okay.

22       Q.    Do you know how many dates of service were

23   billed for this patient in 2015?

24       A.    Ninety-three.

25       Q.    And so that would be about what, how many days

1    per month?

2        A.   Well, this is what, 11-and-a-half months, so 93.

3    Eight --

4        Q.   Did you form an opinion about the billings for

5    Patient RB?

6        A.   Yes.

7        Q.   And what is that opinion?

8        A.   These are excessive billings.  This patient

9    continued to be -- this person continued to be tested at

10   a high frequency over the course of almost an entire

11   year.  Approximately twice a week for a year.  There's no

12   treatment program I know of where that would be

13   considered medically necessary to treat the patient.  And

14   that's just the frequency, not including the intensity of

15   all of the tests that were done that would not have been

16   needed to treat this patient.

17            MS. COSTIN:  Let's do one more, Mr. Salazar.

18   Let's do 1064-A, HF-9.  And can we identify the Column C

19   through H again to orient ourselves.

20   BY MS. COSTIN:

21       Q.   Dr. Clark, can you explain what this Appendix

22   HF-9 to your report includes?

23       A.   These are all claims for the year 2015 that were

24   billed by Epic for this patient, DF.

25       Q.   And the first date of service that you observed?

1718

1        A.    January 5, 2015.

2        Q.    The last date of service on this.

3              MS. COSTIN:  If we can scroll to the bottom,

4    Mr. Salazar.

5        A.    Was December 28.

6    BY MS. COSTIN:

7        Q.    And how many lines of service were billed to

8    Cigna in 2015 for this patient?

9        A.    7,436.

10       Q.    And so that's about over a 12-month period,

11   roughly, correct?

12       A.    Yes.

13       Q.    Do you think offhand how many different days of

14   service were rendered for this patient in 2015?

15       A.    103.

16       Q.    So that's about nine days of service per month?

17       A.    That's about every third day for the year.

18             MS. COSTIN:  Can we scroll to the bottom to see

19   how much the total is that you calculated for this member

20   for the year of 2015.

21   BY MS. COSTIN:

22       Q.    Could you please identify it for the jury.

23       A.    Medytox billed $539,326.30.

24       Q.    How much did Cigna pay?

25       A.    Over a quarter million.  $274,884.46.

1          MS. COSTIN:  I think we can pull that down,

2     Mr. Salazar.

3     BY MS. COSTIN:

4          Q.   Dr. Clark, we have just gone through a handful

5     of examples between just before lunch and now.  And these

6     examples were all highlighted in your report; is that

7     correct?

8          A.   Yes.

9          Q.   How many examples did you highlight in your

10    report based on your review of the total claims data?

11         A.   Oh, many more than this.

12         THE COURT:  Can I just ask for clarification.

13         THE WITNESS:  Sure.

14         THE COURT:  What do you mean by "highlighted"?

15    You mean included those pages for that patient?

16         MS. COSTIN:  Correct.  I could rephrase the

17    question.

18    BY MS. COSTIN:

19         Q.   Did you identify specific patients and discuss

20    them in your report?

21         A.   Yes.

22         Q.   Approximately how many did you discuss in your

23    report?

24         A.   Twenty.

25         Q.   And why did you pick out those 20 to discuss in

1    your report?

2        A.    Because I wanted to illustrate the analysis of

3    the claims data of all of the information and the

4    other -- trying to go through and explain it from an 80

5    columns times a hundred thousand rows would just be

6    impossible.

7        Q.    Did you include in your report every example

8    that you saw of a particular issue?

9        A.    No.

10       Q.    And why is that?

11       A.    Because it would be the entire spreadsheets.  I

12   just needed to illustrate some of the problems that I saw

13   so that the layperson could understand it without having

14   to undergo the analysis that I did.

15       Q.    Did you identify across all three labs how many

16   total patients are at issue in this case based on the

17   totality of the claims data?

18       A.    Yes.  I looked at the claims of every lab,

19   although I didn't cross-reference them.

20       Q.    How many -- if you could try to ballpark how

21   many unique patients we're talking about here with this

22   claims data?

23       A.    Definitely over a thousand.  I think probably

24   under 2,000.

25       Q.    If we were going to sit here today and go

1    through each patient and discuss each patient's claims

2    data, how long would that take?

3        A.   Each patient?

4        Q.   Yes.

5        A.   It would take months and months and months.

6        Q.   I would like to talk to you about one last

7    patient that we've heard throughout this litigation,

8    Richard Sanborn.  Did you review the records for Richard

9    Sanborn?

10       A.   Yes, I did.

11       Q.   And where did you review -- of the documents you

12   reviewed, where did that information come from?

13       A.   The information -- sorry.  I don't understand

14   the question.

15       Q.   Was he in the claims data, was he in the patient

16   files, do you recall?

17       A.   Oh, he was in both the patient files and the

18   claims data.

19       Q.   And what did you --

20            THE COURT:  Can you refer to him then from now

21   on as RS so Terri doesn't have to redact it everywhere?

22            MS. COSTIN:  Well, Richard Sanborn is a

23   pseudonym that we've been using.  It's not this

24   individual's name.

25            THE COURT:  Sorry.  I remember that now.  I

1    think that was Day 1, but I remember it now, but I didn't

2    remember.  Thank you very much.  That's not a real

3    person's name --

4              MS. COSTIN:  It's not a real person's name.

5              THE COURT:  -- who was treated -- whose sample

6    was tested at a lab.

7              MS. COSTIN:  Correct.  It's a pseudonym.

8              THE COURT:  Thank you.  Apologies for

9    interrupting.

10              MS. COSTIN:  No problem, Your Honor.

11    BY MS. COSTIN:

12    Q.    Dr. Clark, what did you learn when you looked at

13    the totality of the information about Richard Sanborn and

14    his billings with the Labs.

15    A.    Well, over a year-and-a-half period, he had --

16    there were claims from all three of the labs to Cigna for

17    this one Cigna member.  They -- each of the three labs

18    were billing for very high intensity, you know, meaning

19    multiple tests done per day of service, very high

20    frequency.  So being done very often.  All three of the

21    labs billed for urinalysis, which, again, I saw no orders

22    of and no results that these were ever done.  All three

23    billed at unbundling from the urinalysis.  I use that

24    example of, you know, you can't bill pH again while you

25    billed the urinalysis.  And between the three labs, there

1    was just repeated testing for enormous numbers of tests

2    for the period from January, I think, '13, until July of

3    '14.

4        Q.   And how much across all three labs was billed to

5    Cigna for Richard Sanborn for that year-and-a-half

6    period?

7        A.   Over three-quarters of a million dollars.  760

8    some thousand dollars.

9        Q.   And what is your opinion of what you learned

10   based on your review of the Richard Sanborn case?

11       A.   Well, this is just obscene billing.  This is

12   what people mean with they talk about liquid gold.

13            MS. COSTIN:  Thank you, Your Honor.  I have no

14   further questions.

15            THE COURT:  Cross-examination.

16            Could I have just one moment.  No, go ahead.

17   Sorry.  I don't need a moment.

18            MR. HARE:  Thank you, Your Honor.  If it please

19   the Court.

20            THE COURT:  Yes.

21                     CROSS-EXAMINATION

22   BY MR. HARE:

23       Q.   Dr. Clark, my name is Scott hare.  As you know,

24   I represent the Labs in this case.  You recall that I

25   took your deposition in this case?

1    A.    Yes.

2    Q.    I did that by video remotely over Zoom.  Do you

3    recall that?

4    A.    Yes.

5    Q.    I want to talk a little more about what brings

6    you here today.  You mentioned on direct that you are

7    being paid for your time in connection with this case.

8    A.    Yes.

9    Q.    You issued an initial report in this lawsuit

10   dated March 1, 2023; is that correct?

11   A.    I would have to look, yes.

12   Q.    That's a bit more than a year-and-a-half ago?

13   A.    Yes.

14   Q.    You indicated in your March 2023 report that

15   you're being compensated in this case at the rate of

16   $1,150 per hour of your time; is that correct?

17   A.    Yes.

18   Q.    In the year-and-a-half or more since you issued

19   your March 2023 report, has your rate gone up at all?

20   A.    No, not for this case.

21   Q.    So you are still charging your time at $1,150

22   per hour?

23   A.    Correct.

24   Q.    I deposed you, I referenced a moment ago, on

25   June 16, 2023.  Is that right?

1    A.    I don't recall the date.

2    Q.    Well, we can look at your transcript.  Do you

3    recall that it was roughly a year-and-a-half ago when I

4    took your deposition?

5    A.    I won't dispute you.

6    Q.    Okay.  And you told me during your position

7    that, as of that date almost a year-and-a-half ago, you

8    had billed Cigna $208,151 in fees for your expert work in

9    the case; is that right?

10    A.    I won't dispute that.

11    Q.    And you have continued to bill Cigna for your

12    time since I deposed you last summer, in 2023; is that

13    right?

14    A.    Yes.

15    Q.    You have been attending a number of the trial

16    days in this case?

17    A.    Yes.

18    Q.    How many days have you spent in the courtroom

19    observing the testimony and hearing the witnesses

20    testify?

21    A.    I don't remember.

22    Q.    Has it been more than one day?

23    A.    Yes.

24    Q.    And you're likewise charging that time at $1,150

25    per hour?

1    A.   Correct.

2    Q.   As we sit here today, what is the total that you

3 have billed Cigna for your work in connection with this

4 one lawsuit?

5    A.   I believe I have billed another 40 some hours,

6 something like that, a month or so ago.  So you would add

7 that to whatever it was at the time of my -- after my

8 deposition.

9    Q.   So at 1,150 an hour, another 40 hours would be

10 another $44,000, give or take?

11    A.   It's my estimate.

12    Q.   That's on top of the 208,000 that you had

13 charged as of last summer?

14    A.   Correct.

15    Q.   So roughly a quarter of a million dollars in

16 fees that you have charged Cigna in connection with this

17 one case?

18    A.   For an hourly rate, yes.

19    Q.   And you have done work for Cigna in other

20 lawsuits; is that right?

21    A.   One.

22    Q.   Okay.  You worked for Cigna in a case known as

23 TML Recovery versus Cigna; is that right?

24    A.   Yes.

25    Q.   And you were deposed in that case on October 5,

1   2023; is that right?

2       A.   I have no idea what the date was.

3       Q.   Let's set aside the date.

4            You will agree that you were deposed in the TML

5   lawsuit?

6       A.   Yes.

7       Q.   Much like you were deposed in this lawsuit?

8       A.   Yes.

9       Q.   Just like this case, you were charging Cigna for

10  your time in the TML litigation?

11      A.   Yes.

12      Q.   What was your total billing to Cigna in that

13  lawsuit?

14      A.   I have no idea.

15      Q.   That's a case that was scheduled to go to trial

16  in California earlier this month?

17      A.   Correct.

18      Q.   And you helped Cigna in its preparation for the

19  trial of that other lawsuit?

20      A.   Yes.  I was an expert for them in that trial --

21  in that case.

22      Q.   Putting aside testimony, have you done other

23  work for Cigna, whether or not the case found its way

24  into a courtroom or into a deposition room?

25      A.   No.

1      Q.    Okay.  If you take the two cases together that

2   you have done work for Cigna, do you have an estimate as

3   to what your total billing to Cigna has been for the work

4   that you've provided?

5      A.    No, I can't tell you.  I don't remember what --

6   how many hours I spent on that case.  I know I spent a

7   lot of hours on this case.

8      Q.    It's more that the $250,000, give or take, that

9   you charged in this case; you'll agree with that?

10              THE COURT:  What's more?

11              MR. HARE:  The total of the two cases.

12              THE COURT:  Oh, okay.

13      A.    The total of the two is greater than the total

14   of one, yes.

15   BY MR. HARE:

16      Q.    When did you first begin doing work for Cigna in

17   any capacity?

18      A.    Well, whenever I was approached for one of the

19   two cases.  I don't recall which case was first.

20      Q.    Was that sometime after 2017?

21      A.    Yes.

22      Q.    You identified a company on direct called Clean

23   Slate.  Do you recall that?

24      A.    Yes.

25      Q.    And you were the chief medical officer of Clean

1    Slate; is that right?

2        A.    That was my title, yes.

3        Q.    Clean Slate is actually a shorthand for a number

4    of associated companies; is that right?

5        A.    I'm not sure the business structure of the

6    company.

7        Q.    Do you recognize a company called Total Wellness

8    Centers, LLC?

9        A.    You know, I recall that there are physician

10   practices and then there's the company itself.  So maybe

11   that's one of those.

12       Q.    Do you recall a company called Clean Slate

13   Centers, Inc.?

14       A.    Yes.  I thought that -- I think that's the name

15   of the company.

16       Q.    Do you recall a company called Clean Slate

17   Centers, LLC, Limited Liability Company?

18       A.    No.

19       Q.    You only know an entity by the name Clean Slate?

20       A.    Yes.

21       Q.    All right.  That company operated a nationwide

22   chain of opioid treatment centers; is that right?

23       A.    No, that's actually not correct.

24       Q.    Tell me what line of business Clean Slate was

25   in.

1    A.    Office-based opioid treatment.  It's different

2  than an opoid treatment center.

3    Q.    I'm sorry, I didn't hear the first part of that.

4    A.    Office-based opioid treatment.  They're sort of

5  like doctor offices that are treating opioid use disorder

6  using buprenorphine, as I said earlier.  An opioid

7  treatment program is a methadone clinic.

8    Q.    And it had these centers nationwide, correct?

9    A.    I think they were in 12 states when I left the

10  company.  When I started, they were in one state.

11    Q.    Your role as chief medical officer at Clean

12  Slate required you to ensure appropriate medical and

13  clinical care for the company Clean Slate?

14    A.    Is that a question?

15    Q.    It is a question.

16    A.    No, that was not my role.

17    Q.    Do you recall providing testimony for the United

18  States of America in a lawsuit, a prosecution against

19  Arman Abovyan, which went on appeal to the 11th Circuit

20  Court of Appeals?

21    A.    I remember testifying in that case.

22    Q.    Do you recall giving testimony in that case

23  that, quote, the role of a medical director is to ensure

24  appropriate medical and clinical care?

25    A.    That would be really out of context, so I

1  wouldn't agree with that statement just as it stands

2  there in isolation.

3      Q.   You don't recall providing that testimony in the

4  prosecution brought by the United States?

5      A.   This slice here, no, I don't remember a slice of

6  a testimony.

7      Q.   This is one of the cases -- forgive me if I am

8  mispronouncing the defendant's name.  Arman Abovyan,

9  A-B-O-V-Y-A-N.  This is one on the cases in which the

10 government, the United States Government, brought you in

11 to testify as an expert on the Government's behalf; is

12 that correct?

13     A.   Yes.

14     Q.   Forgive me if I asked already.  What are the

15 years during which you were employed or affiliated with

16 Clean Slate?

17     A.   I might need my CV, but I think I started

18 part-time in 2014 and then more part-time in 2015 and

19 went full-time sometime thereafter, and I left in 2017.

20     Q.   So as of 2015, you were a full-time employee of

21 Clean Slate?

22     A.   At some point in there.  I don't know if it's as

23 of January 1, 2015.

24     Q.   Somewhere within that calendar year?

25     A.   I think so.

1    Q.   And you remained with Clean Slate until 2017?

2    A.   Correct.

3    Q.   You were chief medical officer of Clean Slate

4    during that period of full-time employment, beginning

5    sometime in 2015 until your departure in 2017?

6    A.   That was my title.

7    Q.   Now, while you were the chief medical officer of

8    Clean Slate, that company was sued by a whistleblower

9    acting on behalf of the United States of America, the

10   State of Indiana and the Commonwealth of Massachusetts,

11   correct?

12   A.   I believe so, yes.

13   Q.   And that's what's known as a False Claim Act or

14   a KtAM lawsuit that's brought by the whistleblower on

15   behalf of the government payor?

16   A.   I don't know that -- the legal jargon you are

17   using.

18   Q.   You do recall that the lawsuit that was filed

19   against Clean Slate named the United States of America,

20   it named the State of Indiana and it named the

21   Commonwealth of Massachusetts as the plaintiffs?

22   A.   And the whistleblower, I think, yes.

23   Q.   That's the ex rel. in the caption, the

24   whistleblower's name?

25   A.   I don't know what an ex rel. is.

1    Q.   Fair enough.  And that was a lawsuit brought by

2  or on behalf of these three Government bodies, the

3  federal government and two states, seeking to recover

4  payment from your company, Clean Slate, where you were

5  the chief medical officer?

6    A.   The company and its prior CEO, doctor that hired

7  me and oversaw the clinical work, yes.

8    Q.   The company was accused of overusing urine drug

9  testing regardless of medical necessity?

10    A.   I believe that's one was the allegations.

11    Q.   And the company was accused of self-referral,

12  meaning it would order drug tests and send those tests to

13  its own owned laboratory to process the tests, correct?

14    A.   I don't know if that's part of suit, but that's

15  correct.  That that was part of the company.

16    Q.   And the company ultimately paid about $6 million

17  to resolve that lawsuit and those claims; is that right?

18    A.   Not to the best of my knowledge.

19    Q.   Do you recall that the company made a payment to

20  settle the claims being brought against it?

21    A.   Yes, I remember reading a press release to that

22  effect for $3.5 million.

23    Q.   And don't recall whether there were some

24  components paid to other of the agencies involved?

25    A.   I actually don't have any knowledge of any other

1    payments to any other agencies.  That was the settlement

2    from the prior CEO and the company.

3         Q.   And it was around this time of that lawsuit --

4    when that lawsuit was pending that you left that company?

5         A.   I would have left while the lawsuit was pending,

6    yes, because I read later about the settlement.

7         Q.   Were you ever called to testify in the Clean

8    Slate lawsuit?

9         A.   Never.

10        Q.   Let's turn to your opinions in this case.  We

11   heard some testimony earlier today.  I want to be clear.

12   You were not asked by Cigna to render an opinion

13   regarding the validity of the denial codes that Cigna

14   used in denying the claims for payment being sought by

15   the Labs?

16        A.   The validity of the denial codes.  No.  There

17   are internal codes.  No.

18        Q.   And you recognize that there are a number of

19   claims at issue in the Labs case against Cigna that were

20   denied by Cigna at the time of submission?

21        A.   Yes.

22        Q.   And you understand that when Cigna denied

23   payment on those claims, it gave the Lab some stated

24   basis for the denial?  You have seen that in the record?

25        A.   Yes.

1    Q.    And you were not asked by Cigna to validate or

2    confirm or provide an opinion with respect to the

3    accuracy or validity of their denial rationale?

4    A.    No.  Those are those internal codes.  No.

5    Q.    And certainly, Cigna didn't ask you to review

6    each specific claim denial and opine as to the validity

7    of the grounds Cigna relied on at the time to deny each

8    of those claims?

9    A.    No.

10   Q.    You talked a little bit on direct about some of

11   the materials that you reviewed in order to perform your

12   assessment and render your opinions in this case; is that

13   right?

14   A.    Correct.

15   Q.    You did not review any Cigna policy documents in

16   preparing your expert report, did you?

17   A.    It depends on how you would define "policy."  So

18   I -- could you define that?

19   Q.    Well, you understand that there are policy

20   documents that Cigna publishes and will send to

21   subscribers or beneficiaries?

22   A.    There -- yes, that's still too broad for me to

23   respond to.

24   Q.    If I buy insurance from Cigna, Cigna will send

25   me some policy documents that I can go through and I can

1736

1     read to understand what kinds of coverage and coverage

2     benefits I'm being provided by Cigna in exchange for?

3         A.   For your specific contract, yes.

4         Q.   You did not review any such Cigna plans or

5     policies in this case?

6         A.   I don't think I saw the individual patient

7     policies.

8         Q.   Okay.

9              Do you recall giving some testimony regarding

10    Jacqueline Thelian?

11        A.   Yes.

12        Q.   And you were here for her testimony in court, I

13    understand?

14        A.   Correct.

15        Q.   Did you hear her providing some testimony about

16    her credentials and certifications?

17        A.   Yes.

18        Q.   You will agree that medical coding is a

19    recognized professional specialty?

20        A.   It is not a professional medical specialty.  It

21    is a -- it is a job description.  It is a job type.

22        Q.   Maybe I misspoke.  I didn't say it's a medical

23    profession.  I said medical coding is a recognized

24    professional specialty?

25        A.   Could you define "professional"?  Sorry.

1    Q.   Do you recall that I asked you that same

2  question in your deposition, and you were able to answer

3  it that day?

4    A.   No.

5         MR. HARE:  Okay.  May we have the deposition

6  transcript.

7         THE COURT:  Not to the jury?

8         MR. HARE:  Correct.  Can you go to page 43,

9  focusing beginning at line 20.

10         THE COURT:  Everyone is going to read that.  I'm

11  sorry, the witness is going to read it.  Hopefully not

12  the jury.

13  BY MR. HARE:

14    Q.   Again, you recall that I took your deposition in

15  the case, Dr. Clark?

16    A.   Yes.

17    Q.   On that day you swore and took an oath to tell

18  the truth, just like you did in court today?

19    A.   Yes.

20    Q.   And do you recall that I asked you, "Is medical

21  coding a recognized professional specialty?"  And you

22  answered, "There are certifications for coding, yes."

23    A.   Yes.

24    Q.   Did I read that correctly?

25    A.   That's correct.

1    Q.   And you were being truthful that day when you

2  gave me that answer to my question?

3    A.   Yes.

4    Q.   Okay.  There are recognized certifications from

5  the American Academy of Professional Coders?

6    A.   Yes.

7    Q.   From the American Health Information Management

8  Association?

9    A.   I don't know them all offhand, no.

10   Q.   You recognize the name of that professional

11  organization?

12   A.   Not as I sit here.

13        MR. HARE:  Would you please project only for the

14  witness and the Court page 44 of the deposition

15  transcript.

16  BY MR. HARE:

17   Q.   And Dr. Clark, I would like to call your

18  attention to -- on page 44, beginning at line 11,

19  question and answer.

20        "Question:  Okay.  Does the American Health

21  Information Management Association also issue a coding

22  certification?"  And you answered:  "They may."

23   A.   "They may."

24   Q.   Did I read that correctly?

25   A.   Yes.

1    Q.   Okay.  And you didn't express any uncertainty

2    about the existence of that organization?

3    A.   I didn't say they did.  I didn't say they

4    didn't.  I assumed "they may."

5    Q.   You recognized that organization name when I

6    asked you question that I just read?

7    A.   The -- year-and-a-half ago, yes.

8    Q.   There's a certification known as CCS, Certified

9    Coding Specialist.  Are you familiar with that?

10   A.   Not as I'm sitting here today.  I don't recall

11   the names of the certifying organizations.

12   Q.   Okay.  I would like to avoid pulling out the

13   deposition transcript each time, if possible.  Do you

14   have any reason to dispute that when I deposed you, you

15   acknowledged that you have heard of CCS, Certified Coding

16   Specialist?

17   A.   I won't dispute you.  I may have read

18   Ms. Thelian's CV before that deposition and had it in my

19   mind.  I don't have those in my mind now.

20   Q.   You, in any event, don't have any of these

21   certifications that we have just talked about?

22   A.   That's correct.

23   Q.   You don't have a CCS, Certified Coding

24   Specialist, certification?

25   A.   Correct.

1740

1    Q.   You don't have any certifications by the

2  American Health Information Management Association?

3    A.   Correct.

4    Q.   You are not certified by the American Academy of

5  Professional Coders?

6    A.   Correct.

7    Q.   In fact, you are not certified by any recognized

8  body in health care coding in any fashion?

9    A.   In health care coding, no.

10   Q.   Again, I want to understand the scope and the

11  limits of your opinion testimony.  You agree with me,

12  Dr. Clark, you are not here today testifying that, in

13  your opinion, there was not one test performed by the

14  Labs that was medically necessary?

15   A.   You are correct, that is not my testimony.

16   Q.   You will agree that drug testing, as a general

17  rule, is an essential component of treating patients with

18  a substance use disorders?

19   A.   Yes.

20   Q.   You will agree that drug testing is an essential

21  component of treating patients who have been prescribed

22  controlled substances?

23   A.   Yes.

24   Q.   That's necessary to confirm that the patients

25  are actually taking the medication that's been prescribed

1    to them?

2        A.    Yes.

3        Q.    That's something that in your profession you

4    refer to as a diversion control protocol?

5        A.    Correct.

6        Q.    In lay terms, that means you want to ensure that

7    if a patient is prescribed a substance, the patient is

8    actually taking it, not giving it away or selling it for

9    some other purpose?

10       A.    A controlled substance, correct.

11       Q.    You agree -- let me back up.

12             On direct, you made a comment that your -- as a

13   treating physician, you are not the gestapo.  Do you

14   recall that testimony?

15       A.    Yes.

16       Q.    Do you recall that you gave that in response to

17   a question by Ms. Costin about whether there's any

18   importance in checking whether a patient is being

19   truthful?

20       A.    Actually, I believe she said to see if they are

21   lying.

22       Q.    Okay.  To see if they are lying.  Is "lying"

23   another word for being untruthful?

24       A.    It's a bit different.

25       Q.    If Ms. Costin had asked you the question, do you

1    time sometimes investigate whether a patient is being

2    untruthful in the patient's self-report, would your

3    answer to Ms. Costin have been different?

4        A.    In this, no.

5        Q.    Because you are not the gestapo --

6        A.    That's correct.  That's not why we do the drug

7    testing to see if somebody is being truthful or

8    untruthful as a primary purpose.

9        Q.    Well, I didn't say primary purpose.  I said,

10   would you ever do that, and you said no, because you are

11   not the gestapo; is that right?  Did I understand you

12   correctly?

13       A.    That's what I said.

14       Q.    Now, you will agree that sometimes patient

15   self-report with respect to their drug use can be

16   inaccurate?

17       A.    Correct.

18       Q.    Self-report information can be inaccurate

19   because a patient's memory maybe fallible?

20       A.    Yes.

21       Q.    Self-reports might be inaccurate because

22   patients might be, in fact, deceptive?

23       A.    Yes, they may not be telling the truth, for a

24   number of reasons.

25       Q.    And deceptive, not telling the truth,

1743

1    untruthful, these are synonyms lying?

2         A.    If that -- okay.   That's fine.

3         Q.    And patients will sometimes lie to their

4    treating physician with respect to their use or misuse of

5    controlled substances?

6         A.    Yes, absolutely.

7         Q.    You agree it is important for treating

8    physicians who are seeing and treating patients for a

9    substance use disorder, it's important for those medical

10   professionals to have an objective measure of the

11   patient's use as opposed to simply relying on whatever

12   the patient self-reports?

13        A.    Correct.

14        Q.    You will agree that clinicians who are treating

15   patients with a substance use disorder will sometimes

16   order drug testing in the course of forming a diagnosis

17   of that patient?

18        A.    Yes.

19        Q.    Physicians treating patients for substance use

20   disorder will sometimes use testing to make

21   determinations regarding the patient's current health

22   station at a given moment?

23        A.    Yes.

24        Q.    You will recognize that patient's conditions

25   will sometimes change over time?

1    A.    Correct.

2    Q.    Physicians treating patients with substance use

3  disorders will sometime order drug testing to monitor the

4  effectiveness of a treatment plan?

5    A.    Correct.

6    Q.    Likewise, treating physicians will sometimes

7  order testing to monitor a patient's compliance with a

8  treatment plan?

9    A.    Correct.

10    Q.    And again, that could include compliance with

11  regard to avoiding the use of substances that the patient

12  should not be using; is that right?

13    A.    Yes.

14    Q.    And flipping it, compliance to ensure that the

15  patient is, in fact, taking the medication that has been

16  prescribed by that treating physician?

17    A.    Correct.

18    Q.    Likewise, you agree that the physician should

19  determine the frequency of testing that is needed for the

20  medical care of a patient?

21    A.    Yes.

22    Q.    You did not review any of the underlying medical

23  records in this case; is that right?

24    A.    I reviewed the documents that the Labs provided.

25    Q.    That's not my question.  Let's me ask it a

1    little more precisely.  You saw the results of laboratory

2    testing?

3         A.   Yes.

4         Q.   You saw the billing information that you

5    testified about earlier?

6         A.   Yes.

7         Q.   You didn't review any underlying medical records

8    from the respective patients' primary care or treating

9    physicians?

10        A.   To.  The Labs didn't provide any, that I'm aware

11   of.

12        Q.   And you didn't go out to get them?

13        A.   No.

14        Q.   You agree with me that in this case, the Labs

15   never saw any of these patients in the laboratory

16   facility?

17        A.   I don't know all of their facilities, but I

18   assume not.

19        Q.   Let's do better than assume.

20             MR. HARE:  May we have page 62 of the June 16,

21   2023 transcript of Dr. Clark's deposition.

22   BY MR. HARE:

23        Q.   Turning to page 62 of your deposition testimony,

24   beginning at line 8, question and answer.

25             "Question:  I understand.  And I'm asking you,

1   to your knowledge, did any of these labs ever see in

2   their facility any of the patients?"

3           And you answered, "Not that I'm aware of."

4       A.    Right.  I assume --

5       Q.    Did I read that correctly?

6       A.    I assume they did not.  Not that I'm aware of.

7       Q.    Well, you didn't say anything assuming.  You

8   said you have no knowledge.  This is a simple question.

9   You're not aware of any instance in which a single

10  patient was seen at the laboratory facility by any of the

11  three Labs I represent?

12      A.    Correct.

13      Q.    Okay.

14          THE COURT:  You are going to have a stop for a

15  moment.  I'm going to divide this time.

16          (Off-the-record discussion.)

17          THE COURT:  Go ahead, Counsel.  My apologies.

18          MR. HARE:  Thank you, Your Honor.

19  BY MR. HARE:

20      Q.    You are familiar with the phrase -- the term

21  "commercial labs"?

22      A.    Commercial lab is -- I would define it as a lab

23  that sells lab services to others.

24      Q.    Would you consider the three labs in this case

25  to be commercial labs?

1    A.    I think Medytox has commercial labs, billing

2    services, software service.  The labs themselves would be

3    commercial labs, yes.

4    Q.    Right.  I didn't ask you about Medytox and I

5    didn't ask you about billing.  I asked you whether you

6    agree that the three Labs in this lawsuit are commercial

7    labs?

8    A.    Yes.

9    Q.    And you agree that commercial labs do not

10   encounter patients in their Lab facility?

11   A.    No, I wouldn't agree with that.

12       MR. HARE:  May we have page 77 of Dr. Clark's

13   deposition.  Focusing beginning at line 6.

14   BY MR. HARE:

15   Q.    The following questions and answer.

16       "And do commercial labs meet with patients at

17   any point to take patient histories?

18        "Answer:  Not in this kind case of case, no."

19   A.    Correct.

20   Q.    Did I read that correctly?

21   A.    Yes.

22       THE COURT:  I am going to have to stop you

23   again.

24       (Off-the-record discussion.)

25       THE COURT:  My apologies, ladies and gentlemen.

1    Ever heard that computers and technology is going to save

2    us time?

3              (Pause.)

4              MR. HARE:  Ready to proceed, Your Honor?

5              THE COURT:  Yes, I am.

6              MR. HARE:  Thank you.

7    BY MR. HARE:

8        Q.   Let's just pick up and talk a little more about

9    what labs don't do.  Labs do not diagnose patients?

10       A.   They shouldn't.

11       Q.   Okay.  And these labs in particular, the three

12   labs I represent, they didn't diagnose any patients in

13   this case?

14       A.   Are you asking me the question?

15       Q.   I am asking you.

16       A.   I actually see information that would show me

17   that perhaps they were.

18             MR. HARE:  If we may have page 63 of Dr. Clark's

19   deposition.  Beginning at page -- forgive me -- line 20.

20             THE COURT:  Are you publishing this?

21             THE CLERK:  No.

22             MR. HARE:  It should not be.

23             THE CLERK:  No, it's not.

24             THE COURT:  Go ahead.

25   BY MR. HARE:

1    Q.    Beginning at line 20, question and answer.

2         "Question:  Okay.  Okay.  Do the labs -- do

3    these Labs perform any diagnosis of patients?

4         "Answer:  Diagnosis of patients, no."

5         Did I read that correctly?

6    A.    No.  You didn't complete my response, which is

7    the continuation of the line.  "Diagnosis of patients,

8    no.  They shouldn't."

9    Q.    Okay.  I will add those two lines then for

10   completeness, lines 20 through 24.

11        "Okay.  Do the labs -- do these Labs perform any

12   diagnosis of patients?

13        "Answer:  Diagnosis of patients, no.

14        "Question:  Do these Labs take any -- pardon me.

15        "Answer:  They shouldn't."

16        That's what you are referring to?

17   A.    That's correct.

18   Q.    Okay.

19   A.    They shouldn't be providing diagnoses.

20   Q.    We heard this in the course of the deposition

21   testimony on earlier question.  You will agree the Labs

22   do not take a patient history?

23   A.    I don't think these did, correct.

24   Q.    And you agree that these Labs do not perform any

25   physical examination of the patient whose samples are

1750

1     being tested?

2         A.   No, I don't see any evidence they would have

3     done that, no.

4         Q.   Right.  Dr. Clark, is it fair to say it's the

5     job of the physician or her staff to take a patient

6     history, examine a patient, diagnose a patient and

7     determine a course of care?

8         A.   No, it's not the responsibility of the staff to

9     do all of those things.

10        Q.   Well, let me ask it again more carefully.  You

11    agree it's the physician to take a patient history,

12    examine the patient, diagnose a patient and determine a

13    course of care?

14        A.   Yes.  Physician or nurse practitioner.  There

15    are clinicians that do this, yes.

16        Q.   And clinicians, those are folks who are staff in

17    the physician's --

18        A.   No.  Those -- those are professionals that are

19    capable of doing this.  They are physician -- advanced

20    practice clinicianers (phonetic) or other staff members

21    who can do that, but in general staff, no.

22        Q.   The licensed professionals and

23    paraprofessionals, though, yes?

24        A.   No.  Paraprofressionals are not capable of doing

25    this.

1    Q.   Let me clean up my question.  You agree that

2  it's the job of the physician to do those things we've

3  just talked about, taking a history, examining a

4  patient --

5    A.   Yes.

6    Q.   -- diagnosing a patient --

7    A.   Yes.

8    Q.   -- and determining a course of care?

9    A.   Yes.

10    Q.   You will agree it's incumbent on the physician

11  to determine or identify the tests that are appropriate

12  for the care of the patient?

13    A.   Yes.

14    Q.   And the physician will then issue orders for

15  tests or services or medication that, in the judgment of

16  that physician, are appropriate to the treatment plan for

17  that patient?

18    A.   Appropriate to the treatment, yes.

19    Q.   You agree that the physician should exercise

20  professional clinical judgment and order testing that is

21  useful and appropriate to the patient's circumstances?

22    A.   Yes.

23    Q.   Let's turn to the claims and claim denials in

24  this case.  You have already acknowledged that you were

25  not hired by Cigna to assess and validate their assertive

1752

1    reasons for denying claims, correct?

2        A.   Right.  Their internal codes, no, I didn't look

3    at those.

4        Q.   Now, you reviewed claims.  You saw claim that

5    Cigna denied when they were submitted by the Labs,

6    correct?

7        A.   Yes.

8        Q.   Most of the claims denials that you saw were for

9    reasons other than medically necessity, right?

10       A.   I have no idea.  I didn't look at the reasons

11   they were denied.  As I said earlier, I looked to see

12   were they medically necessary, were they appropriately

13   billed and coded.

14       Q.   You are not aware of a single instance in the

15   years 2012 through 2017 in which Cigna notified these

16   Labs that Cigna was denying a claim on grounds of medical

17   necessity?

18       A.   I don't think I saw any of those documents, no.

19       Q.   And I appreciate that, but that wasn't my

20   question.  You are not aware of a single instance in that

21   period 2012 through 2017 in which Cigna notified the Labs

22   that Cigna was denying a claim on the basis of a lack of

23   medical necessity?

24       A.   I think I answered you.  If I hadn't seen a

25   document, then I'm not aware of it, correct.

1    Q.    You are not aware of it from any source?

2    A.    Correct.  My source would be the documentation.

3    Q.    Okay.  You did observe that there were instances

4    where Cigna denied claims for lack of documentation?

5    A.    Again, I didn't --

6         THE COURT:  You have to make it a question.

7         MR. HARE:  Very good, Your Honor.  Thank you.

8    BY MR. HARE:

9    Q.    You are aware, Dr. Clark, that there were

10   instances when Cigna denied claims because of a lack of

11   documentation?

12   A.    Yes, I'm aware of that because I sat in the

13   court and heard some of this discussion.

14   Q.    Now, in those instances when Cigna denied claims

15   for a lack of documentation, you don't know whether Cigna

16   ever asked the Labs to provide supplemental

17   documentation?

18        MS. COSTIN:  Objection, Your Honor.  This is

19   outside the scope of her report.  She's offered no

20   opinion on Cigna's denial reasons.

21        THE COURT:  Which opinion would it be, sir?

22   Because then I can refresh my memory on whether it was

23   asked.

24        MR. HARE:  It's within the scope of her direct

25   testimony, Your Honor, and that's what I was trying to

1    respond to.

2          MS. COSTIN:  I think she testified she doesn't

3    offer any opinion on Cigna denial reasons.

4          MR. HARE:  That's not my question.  She

5    testified on direct --

6          THE COURT:  I think we should come to sidebar on

7    this.  This is on your clock, Counsel.

8          (Sidebar commences.)

9          THE COURT:  She testified what?  You have to

10   walk faster, Counsel, otherwise it will be your clock,

11   this sidebar.  Go ahead.

12         MR. HARE:  I believe she testified on direct,

13   Your Honor, that there were -- there was missing

14   information that is necessary in order to adjudicate the

15   claims.  I'm looking for my notes.

16         THE COURT:  I don't recall anything like that.

17   I do recall -- vaguely recall her being asked about --

18   maybe it is on your cross, but something about Cigna's

19   coding or -- it wasn't even about the coding.  But she

20   gave I think volunteer responses.  She didn't look at

21   that.  She didn't look at what was sent back to the Labs,

22   for example.

23         MR. HARE:  I'll withdraw the question.

24         (End of sidebar.)

25   BY MR. HARE:

1    Q.   Dr. Clark, I want to turn to the appendices

2   exhibits that we looked at earlier, your Exhibits 1063-A

3   and 1064-A, your spreadsheets.  Do you recall that?

4    A.   Yes.

5    Q.   And we don't need to put them up because I have

6   some general questions.  Those spreadsheets contain

7   information with respect to claims that Cigna paid,

8   correct?

9    A.   The claims that were -- that were put on their

10  system paid, not paid, all of the claims.

11   Q.   Well, you pointed out a number of instances in

12  which you summed a total billed amount.  Do you recall

13  that testimony?

14   A.   Yes.

15   Q.   And you summed a total paid amount.  Do you

16  recall that testimony?

17   A.   Yes.

18   Q.   And those were instances, quite naturally, where

19  Cigna actually made a payment to the Labs?

20   A.   But there would be payments, nonpayments,

21  partial billed payments, all of that was within the

22  chart.

23   Q.   Right.  I'm just trying to establish what I

24  thought was a simple point.  In those charts, when you

25  are itemizing those claim lines that you reviewed,

1  itemizing the charge amount, itemizing the paid amount,

2  those are claims that Cigna actually paid, correct?

3      A.   Paid claims would be within that chart, correct.

4      Q.   And that's the Cigna case against the Labs, as

5  you understand it; is that right?

6      A.   Yes.

7           MR. HARE:  Your Honor, may I have one moment?

8           THE COURT:  You may.

9           MR. HARE:  Thank you, Your Honor.  That's all I

10  have.

11          THE COURT:  You may step down, Doctor.  Thank

12  you very much.

13          Cigna's next witness, please.

14          MR. KANG:  Your Honor, we are going to play the

15  deposition designations of Michael Ligotti.

16          THE COURT:  Do you have those?

17          MR. KANG:  Yes, Your Honor, they're ready to go.

18          THE COURT:  You have those.

19          MR. KANG:  The Labs' counsel does not object.

20          THE COURT:  Does not object to what?  I ruled on

21  things.  You've --

22          MR. KANG:  We made the video for it, yes.

23          THE COURT:  All right.

24          MR. HARE:  That's right, Your Honor.  We've

25  performed a review of the designation of the --

1        THE COURT:  You're going to have to give me one

2   minute because I didn't know that's what you were

3   shifting to.

4        (Off-the-record discussion.)

5        THE COURT:  You can start playing.  I will be

6   all right from the beginning.

7        And again, some type of data storage unit will

8   be made of just exactly what's being shown and marked

9   later as a Court exhibit for ID.

10       MR. KANG:  Yes, Your Honor.

11       (3:09 p.m. playing video deposition of Michael

12   Ligotti.)

13       THE COURT:  Stop this, please.

14       (3:13 p.m., video stopped.)

15       THE COURT:  You are going to have to skip to

16   14-5.  I had -- it is a mistake.  I was actually checking

17   this and I didn't realize you would be moving to this

18   video.  I will explain why.  But 13 through 5 should not

19   be played, as well as 6 through 8.  My apologies to

20   Counsel.

21       Is it possible to skip or did you just have part

22   of the -- well, then take it off.  If you have to play

23   it.  Liana, take it off and stop it at line 14-8.  I'm

24   sorry.  When it gets to 14-11, you can stop and we'll

25   then continue to display.  Thank you.

1    MR. KANG:  So Your Honor, we can play until

2    14-11?

3    THE COURT:  No, sir, you cannot play from the

4    point he stopped at until 14-11.

5    MR. KANG:  Until 14-11.

6    THE COURT:  So he should pause so we then can

7    display that portion to the jury.  But right now, the

8    next section to 14-11 is not to be shown to the jury,

9    Liana.  You understood me, right?  Yeah.  Thank you.

10    Again, my apologies.  That's my error.

11    (3:14 p.m., playing video.)

12    THE COURT:  Just play.  Just keep playing what

13    you were going to play and then I'll tell you when to

14    stop.  Wherever you stopped, it was something.  Hit the

15    "play" button.  Don't worry about anything.  Just hit the

16    "play" button.

17    I'm sorry.  I take it back.  You may display

18    this to the jury with the jury's understanding these

19    lines of questioning about what he did at the Halfway

20    There facility, that he testified he was at earlier in

21    his career.  You may play the rest of it.  That's my

22    fault.  It was overruled, but it is not clear now that

23    we've taken a break what it relates to, so I instructed

24    the jury.

25    I'm sorry.  Could you stop for a moment.  Could

1  you stop for a moment, please, sir.

2          Sorry.  Continue.  I had lost track of where you

3  were.  Go ahead, sir.

4          (3:17 p.m., playing video.)

5          THE COURT:  3:42 p.m. could you stop that there.

6          (3:42 p.m., video stopped.)

7          THE COURT:  My apologies, Counsel.  This is on

8  my clock.  Somebody make a note of what time it is.

9          I think I am going to excuse the jury early.

10  It's three minutes early, the record should reflect.

11          Remember my instructions.  We'll have testimony

12  again tomorrow for the full day, and then on Wednesday I

13  think we're still on target for sometime midday to end

14  the testimony.  Thank you very much.  I hope you have a

15  nice relaxing weekend [sic].  Those of you who like

16  football -- I don't know, you might hate or like the

17  Giants, but whatever, go ahead and have a nice evening.

18  Thank you.

19          (In the absence of the jury at 3:43 p.m.)

20          THE COURT:  Everybody be seated.

21          A couple of questions before I tell you what I

22  see as a problem.  This fellow is the last witness of the

23  Labs.  You'll be resting?

24          MR. KANG:  For Cigna, Your Honor.

25          THE COURT:  Cigna.  Apologies.  Cigna.  Okay.

1    That's correct, sir?

2            MR. KANG:  Yes.

3            THE COURT:  Thank you.

4            And anybody have agreed on a time split?

5            MR. KANG:  Yes, Your Honor.  I believe the total

6    run time on this was 40 minutes, and it's 20 --

7    approximately 25 minutes to Cigna and 15 -- 25 minutes

8    and 34 seconds to Cigna, 14 minutes and 30 seconds for

9    the Labs.

10           THE COURT:  Wait a minute.  I have stopped.  I

11   don't know how we -- when I have a technical problem or

12   I'm concerned about something, that still relates to this

13   witness, so we'll have to work that out.

14           I -- to be honest with you, I wasn't even aware

15   this had gone out and was just about to double-check my

16   rulings.  But I guess it went out.  I think I told

17   someone to docket it.  I would ask you all if you have

18   the transcript in front of you, look at page 57, lines 3

19   through 17.  These Labs -- if you go back several

20   questions, it's clear it's the five treatment centers

21   he's been talking about that he had patients that he

22   ordered signed orders for.  And he's basically saying in

23   this answer he did it and he was asked, why did you do

24   it?  It was objected to as 602 and 801.

25           My opinion, it's offered for the truth of the

1   matter -- not for the truth of the matter asserted, but

2   for his state of mind.  Why do you do something?  So he's

3   not -- he's talking about with his of mind is right now

4   as to why he did this.  So 801 would be overruled.

5        602 was a basis objection, and there were some

6   times in this deposition where the question was framed to

7   ask all tests from the treating physician -- a treating

8   facility.  And you haven't established that he was the

9   only signer of orders from that facility, so I felt that

10  was an improper --  you haven't laid the foundation, and

11  unfortunately, it's a trial depo that you can't fix.

12       However, it is my view, and I guess I'll ask the

13  Labs to tell me why, that clearly he said he sent orders,

14  and to say why did you sign these standing orders, those

15  are the ones he's been talking about for about the last

16  20 pages, of the five facilities.  I don't think there's

17  any question in my mind that's what he -- what anyone

18  would understand the question to be.   I don't see why

19  that's a lack of basis.  I don't see why this doesn't

20  come in.  There's no -- you didn't do the expert

21  objection, nor do I see anything that would be called a

22  medical opinion.

23       In fact, it is the opposite of a medical opinion

24  or medical necessity or not medical necessity.  He's just

25  saying I think -- and again, I may reading this too

1    quickly.  Oh, I see.  I know.

2         Does this relate to your later objection about

3    he couldn't tell you who told him this?  It's a statement

4    of the Labs'.  He's saying that -- okay.  From when I saw

5    the patients in my office, we generated our office

6    visits, had a laboratory, did blood tests as well as drug

7    testing.  I was able to profit.  These referrals

8    otherwise, meaning I think the orders to your clients,

9    would not have place if I had not signed the standing

10   order and allowed those treatment centers to capitalize

11   on the orders and to benefit economically and

12   financially.  I don't understand how I could understand

13   those referrals to be anything other than standing

14   orders.  But if you want to tell me that my original

15   ruling is correct, I will feel a lot better tonight when

16   I reflects upon today.

17        MR. GESTRICH:  Yes, Your Honor, the question in

18   this section is:  How did Mr. Ligotti know this

19   information?  And he was --

20        THE COURT:  I don't understand like seven things

21   referenced in that statement.

22        MR. GESTRICH:  Yes, Your Honor.

23        THE COURT:  What information.   What section?

24   In this question and answer?  He said it is a standing

25   order.  It's not -- You are going to have to rephrase

1    your argument, sir, or I am going to disregard it.

2           MR. GESTRICH:  Yes, Your Honor.  And I want to

3    make sure I'm looking at the exact same section you're

4    looking at.

5           THE COURT:  Page 57, lines 3 through 17.  And I

6    have referenced back to a few prior pages where you'll

7    see a series of questions about these standing orders,

8    some of which I sustained.  I guess a lot of them I

9    sustained just prior to this.  But I thought I saw --

10           MR. GESTRICH:  I'm ready to respond.

11           THE COURT:  Go ahead, sir.

12           MR. GESTRICH:  Your Honor, the focus of that is

13    more geared at 57-11 through 17, not 5 through 11 -- 5 to

14    10.  He states on 11, "I was able to profit," and then

15    goes on say how he was able to profit off of what he was

16    doing.

17           THE COURT:  11 through 17 is about his personal

18    profit.  And that's the answer to the question of why did

19    he sign these standing orders.

20           MR. GESTRICH:  Yes, Your Honor.  And in later

21    testimony, he gives, at 84-5 --

22           THE COURT:  Yes.

23           MR. GESTRICH:  -- through 88-14, he's asked "How

24    do you know you were able to profit off of these?"

25           THE COURT:  What line was that, page?  What page

1764

1    and line?

2        MR. GESTRICH:  84-5 through 88-14.

3        THE COURT:  "How do you know you were able to

4    profit off the standing orders?"

5        MR. GESTRICH:  No.  It was he was -- he states

6    that he was -- he was given referrals for these.  So the

7    Labs asked -- we asked him --

8        THE COURT:  What did you understand the word

9    "referral" to mean?  Does that refer to a payment that he

10   gets as a doctor when I'm in my annual checkup and my

11   doctor orders a panel of tests that include, you know, I

12   don't know, sodium and stuff for my kidney and whatever

13   those -- ACPs and ACTs and all of those.  Obviously, the

14   lab bills my insurance company.  Does the get paid --

15   it's part of the fee she gets for doing a physical exam

16   every year, correct?  I mean, did your Labs make a

17   payment to Ligotti for the standing order he referred?

18       MR. GESTRICH:  No, Your Honor.

19       THE COURT:  So what do you mean by -- I assume

20   "referrals" refers to -- standing order?  I guess I'm

21   going to have to sleep on this.  I just stopped it early

22   because it struck me as a good place to insert this

23   question and answer as opposed to an ending question

24   where it is going to be out of order.  And here, this --

25   you stopped on some question.  I'm not saying it's in the

```
1   flow of your examination, but it wouldn't have looked --

2   it wouldn't look like, I don't know, a dog in the middle

3   of a herd of cows.  It wasn't a Sheepdog.  So I will take

4   a look at it and I will let you know tonight as to

5   whether I'm remaining with my sustained ruling or if I --

6   if it can be queued up to play that particular section,

7   or whatever part I tell you on that page, and then to

8   proceed -- continue with what -- where we stopped.

9              MR. GESTRICH:  Yes.  And Your Honor --

10             THE COURT:  Any question about what I just said

11  is going to happen tonight?

12             MR. GESTRICH:  No, Your Honor.

13             THE COURT:  Thank you.  Okay.  Yes, sir.

14             MR. GESTRICH:  As to the section -- and maybe

15  this will help the process.  5 through 10 --

16             THE COURT:  Yes.

17             MR. GESTRICH:  -- and then on 11, up to the

18  comma, we would --

19             THE COURT:  Up to the what?

20             MR. GESTRICH:  Up to the comma on --

21             THE COURT:  Which comma?

22             MR. GESTRICH:  On 11.

23             THE COURT:  Which comma?  There's two commas.  I

24  see three commas.

25             MR. GESTRICH:  On line 11.
```

1  THE COURT:  Line 11.

2  MR. GESTRICH:  Yes, Your Honor, there's a comma.

3  THE COURT:  What do you want me to do there?

4  Put that with line 5 through 11 to the comma.

5  MR. GESTRICH:  We will withdrew the objection up

6  to the comma.

7  THE COURT:  Brought as to that --

8  MR. GESTRICH:  Yes, Your Honor.

9  THE COURT:  So from 5 to part of 11, you've

10  withdrawn it.  But as to the bulk of 11 and I was unable

11  to the end of 11, you still have a 602 and an 801

12  objection.  Is that correct?

13  MR. GESTRICH:  Yes, Your Honor.  And may I give

14  two lines just to explain our reasoning?

15  THE COURT:  Briefly.

16  MR. GESTRICH:  This section deals with an

17  alleged kickback scheme.  And in that later section, he

18  cannot identify anybody associated with the Labs that

19  were a part of this kickback scheme.  And in fact,

20  alleges that he heard this through other people.

21  THE COURT:  Right.  And I kept out based upon

22  whoever did the sheet, his referrals to pages of 80

23  something to 80 something and I went and read those even

24  though it came later, and I concluded that it either was

25  hearsay or it wasn't, and ruled accordingly.

1            MR. GESTRICH:  Thank you.

2            THE COURT:  So you believe that from the part of

3    11 to the 17 is 801 and/or 602.

4            MR. GESTRICH:  It's 602 and it's confirmed by

5    his lack on personal knowledge because it is all hearsay

6    is the basis for that.

7            THE COURT:  I see.

8            MR. GESTRICH:  Yes, Your Honor.

9            THE COURT:  I see.  Do you want to add anything?

10            MR. AKERMAN:  Just very briefly, Your Honor.

11            THE COURT:  Yeah.

12            MR. AKERMAN:  That last part, I'll let you read

13    it, I think it goes to his understanding.  This is why I

14    did what I did.

15            THE COURT:  Well, that's what -- I have to look

16    at the -- the problem is it's very difficult, yeah.

17            MR. AKERMAN:  We'll let you sleep on it, Your

18    Honor.

19            THE COURT:  I am going to get in trouble if I

20    try to do it on the bench here.  I need to have more than

21    whatever I have had since 8:40.  I've had about 37

22    minutes of break.  I need a little more than that to

23    think this through because I thought I was right when I

24    first did it.  So we'll see if I'm still right.

25            All right.  Is there anything to be taken up?  I

1  intend to reconvene to go over the version of the charge

2  I gave last night.  Are you prepared to do that, or are

3  you going to tell me you got it too late?

4          MR. KANG:  Yes, we're prepared, Your Honor.

5          THE COURT:  Labs?

6          MR. GESTRICH:  Also, yes, Your Honor.

7          THE COURT:  So I am going to take a break until

8  20 past 4:00.  I will say for the benefit of court staff.

9  How's that?  That sounds better on the record.  You are

10  prepared to go forward with the witnesses you have

11  identified, Attorney Cunningham, or whoever is going to

12  address this issue about witnesses -- did you -- did you

13  give any witnesses today, for example, for tomorrow?

14          MR. CUNNINGHAM:  Yes, we have.

15          THE COURT:  I had an email over the weekend that

16  you sent to my law clerk.  And you listed six witnesses

17  those are whom you are beginning to call.

18          MR. CUNNINGHAM:  Well, Your Honor, as the Court

19  will recall, we have been talking about doing Mr. Evanko

20  from Cigna for over a week because tomorrow is the day

21  he's available.

22          THE COURT:  I see.

23          MR. CUNNINGHAM:  So we're going to him on in the

24  morning and then I'll let Mr. Gestrich talk about the

25  others.

1769

```
 1              THE COURT:  Okay.

 2              MR. GESTRICH:  Yes, Your Honor.

 3              THE COURT:  Here it the way you are going to

 4     call rather than other Evanko -- Evanko, whatever.  I'm

 5     sorry if I'm killing that.

 6              MR. GESTRICH:  We will be calling Dr. Boorstein,

 7     Ms. Thelian, and Mr. Haney, also playing the two

 8     deposition videos of Eva Borden.

 9              THE COURT:  Yes.

10              MR. GESTRICH:  And also the party admissions

11     video of Mr. Goldfarb.

12              THE COURT:  Thank you very much.  We'll stand in

13     recess.  I will see counsel it is conference room at

14     4:20.

15              (Off the record, 3:56 p.m.)

16              THE COURT:  I'm back on the record.  One

17     question.  Would you show them the exhibits to the

18     deposition of Eva Borden?  My clerk has none of them in

19     evidence.  If you believe as of I standing here today

20     saying that statement that is wrong, you need to let her

21     memo in the next five minutes.

22              (Whereupon, a recess was taken from 3:57 p.m. to

23     4:23 p.m.)

24              THE COURT:  We're reconvened in Labs versus

25     Cigna and Cigna versus Labs cases, 19-CV-1324 and 1326.
```

1    If counsel who are here could state their appearances for

2    the record.

3            MR. CHRIST:  Good afternoon, Your Honor.

4    Matthew Christ on behalf of the Labs.

5            MR. GESTRICH:  Anthony Gestrich on behalf of the

6    Labs.

7            MR. CUNNINGHAM:  Fred Cunningham, on behalf of

8    the Labs.

9            MR. KANG:  Edward Kang on behalf of Cigna.

10           MR. AKERMAN:  Alexander Akerman on behalf of

11   Cigna.

12           MS. JACKSON:  Michelle Jackson, on behalf of

13   Cigna.

14           MS. COSTIN:  Emily Costin on behalf of Cigna.

15           MS. KINGSBERY:  And Kelsey Kingsbery on behalf

16   of Cigna.

17           THE COURT:  Thank you.

18           We're here to go over a revised version of the

19   charge that was sent to the parties early evening, I

20   think, last night.  I don't want to misstate that.  And I

21   would like to go over really -- I guess I need to ask --

22   there were some editing, I'll call -- like my mother

23   edited my paper, that kind of editing, in the general

24   sections up to 20.

25           Are there any objections to what I've edited?

1          MR. CHRIST:  No objections from the Labs.

2          MS. KINGSBERY:  No objections from Cigna either.

3          THE COURT:  So nothing I did caused anybody to

4  be concerned.

5          So now we're up to 21, which is the Labs' case,

6  which goes until 46.  So we're going through 21 to 46.

7  Let me -- I'm sorry, it's more than 46, isn't it?  Yeah,

8  21 to 45.  Sorry.  45.

9          Let's talk first about 1 through 29, which takes

10  you through the end of Element 4 of the direct pay cause

11  of action.

12          Labs, that's your case, so any objections?

13          MR. CHRIST:  And I'm sorry.  Your Honor is

14  referring to Instruction --

15          THE COURT:  Section Number -- Instruction 21 to

16  Instructions 29.

17          MR. CHRIST:  I'm just flipping through -- there

18  was --

19          THE COURT:  It's all right.  I'm going to ask

20  the same question of Cigna, so you have this time to flip

21  through.

22          MR. CHRIST:  My colleague has a comment on

23  Instruction 23.

24          THE COURT:  23.

25          MR. GESTRICH:  Yes, Your Honor.

1           THE COURT:  If you have objection to any change

2   I made, but it reflects a ruling I made, you need to tell

3   me that, but go ahead.  23.

4           MR. GESTRICH:  Yes, Your Honor.  On --

5           THE COURT:  Yeah, I'm there.

6           MR. GESTRICH:  The second full paragraph that

7   begins "If you finds that Cigna."  The language appears

8   to direct the jury to find a verdict in Cigna's favor if

9   they agree with Cigna on any part of his affirmative

10  defense.

11          THE COURT:  Yeah.

12          MR. GESTRICH:  But some of its affirmative

13  defenses are limited to just mere portions of the claims.

14          THE COURT:  Well, the affirmative defenses in

15  this -- I see.  Because I did not apply -- I will call

16  them substantive, not temporal damage related affirmative

17  claims, but the substantive affirmative defenses I did

18  not apply to Count One the second part, prompt pay.  Is

19  that why that's wrong, or is there another reason it is

20  wrong?

21          MR. GESTRICH:  It's -- so if we're looking at,

22  for example, the statute of limitations defense.

23          THE COURT:  I haven't -- you are correct, but

24  that's not what I'm thinking of, so I need to make that

25  the clear.  I will correct that.  My intention here is to

1    tell them that as to the special defenses of -- and I

2    will make it clear -- affirmative defenses unbundling and

3    mitigation of damages and statute of limitations, I mean

4    here to say if you find that one of these affirmative

5    defenses unbundling has been proven, then you should

6    return a verdict for Cigna.  Would you still object to

7    that if I took out the damages affirmative defenses,

8    which are the other two I'm charging on here, mitigation

9    and statute of limitations?

10           MR. GESTRICH:  Each of the affirmative defenses

11   are carve-outs of the entire cause of action, so it is a

12   subset.

13           THE COURT:  That's correct.

14           MR. GESTRICH:  The way it's written --

15           THE COURT:  Then I think my solution would be to

16   cut out that paragraph and we'll just do it

17   defense-by-defense.

18           MR. GESTRICH:  Yes, Your Honor.

19           THE COURT:  Is there objection to that?

20           MS. KINGSBERY:  No objection.

21           THE COURT:  Anything else up to 29?

22           If it's easier, I will go each one individually.

23   I don't mind doing that.  I just thought you can scroll

24   through.  I'm not sure I made changes on some of even the

25   substantive ones, so that's what I was trying to avoid.

1    But you take your time.  I don't want you to skip telling

2    me something that you could have told me today.

3            MR. CHRIST:  No objections, Your Honor.

4            THE COURT:  No further objection.  Thank you.

5            MR. GESTRICH:  With the --

6            THE COURT:  21 to 29 with the exception of 23.

7            MR. GESTRICH:  And noting the 27 medical

8    necessity objection that has been previously raised.

9            THE COURT:  Actually, I think I added another

10   bullet.  Did I do that on medical necessity?

11           MR. CHRIST:  Yes, Your Honor.

12           THE COURT:  So you should definitely -- see,

13   that's an example I didn't edit it in your favor.  I

14   didn't think I was favoring you, but I had added Cigna

15   asked for another one of the bullets.  And I have

16   determined or decided that I would add that.  So in

17   addition to the three I think that I had originally

18   pulled out, I had rejected that fourth as I thought

19   duplicative.  However, if they are requesting it, it is

20   language in a policy, I inserted it.

21           So you preserve your objection, I presume, to

22   all four, my listing those four?

23           MR. GESTRICH:  Yes, Your Honor.  In addition, we

24   submitted a proposed supplemental charge within that

25   section dealing with the performance of the policies and

1    who determines medical necessity pursuant to the

2    policies.

3         THE COURT:  Yeah, but I -- the last one I looked

4    at, which was your original request to charge was --

5    maybe I looked at a later one and this is the one you

6    mean.  It is a *Mario* charge.

7         MR. GESTRICH:  It is.

8         THE COURT:  When did you submit this

9    supplemental?

10        MR. GESTRICH:  We submitted it, I believe,

11   Saturday morning.

12        THE COURT:  That's probably what I read.

13        MR. GESTRICH:  Yes, and we're noting that for

14   the record.

15        THE COURT:  Well, what did it say?

16        MR. GESTRICH:  It quoted language from the

17   policies where Cigna states its position on medical

18   necessity and states, in general, services must be

19   medically necessary, and then it provides an outline of

20   how medical necessity is determined.

21        THE COURT:  Did you bring a copy of this today?

22        MR. GESTRICH:  I did not bring a paper copy, no,

23   Your Honor.

24        THE COURT:  Would you go see if you can find it

25   because I should address it today?  If you want to write

1    me a note on a sticker, you can do so.  So we have a

2    placeholder to come back to.  What number is medical

3    necessity?

4         MR. GESTRICH:  27.

5         THE COURT:  We'll come back to 27.  Let's hear

6    from Cigna before we are able to go back to 27.  In

7    charges 1 through 29, sections, paragraphs -- sections, I

8    guess.  Any objections?

9         MS. KINGSBERY:  No objections.

10        THE COURT:  Then we may have to wait until he

11   comes back.  Let me see.  I can take the time to divide

12   this section.

13        The next section, if you would please make a

14   note somewhere or pencil somewhere other than your

15   computer where you can only look at one page at a time,

16   which is why I don't like computers, we're going to ask

17   you about Count One, which is Charge 30 through 32 and

18   after that I am going to ask you about 33 through 37.

19        All right.  So folks can be prepared and just

20   write a note on somewhere as to which one you will have

21   to scan to.  We'll save a little time that way.

22        (Discussion Off the Record.)

23        THE COURT:  I will have to look at this.  Have

24   you reviewed this one?

25        MS. KINGSBERY:  We have, Your Honor.

1           THE COURT:  What is your position on it?

2           MS. KINGSBERY:  We do not think that that would

3     be appropriate to be included.

4           THE COURT:  Why not?

5           MS. KINGSBERY:  Those instructions have to do

6     with what Cigna would be required to provide if the

7     claims were denied with medical necessity.  They don't

8     have anything to do with how to satisfy the Labs' burden

9     on medical necessity.  Some of the claims were not denied

10    as to medical necessity so those provisions wouldn't even

11    come into play.

12          THE COURT:  This is a section about medical

13    necessity presumably relevant to the cause of action in

14    part, so as to that part.

15          MS. KINGSBERY:  Doesn't apply to how you would

16    satisfy the burden of medical necessity.

17          THE COURT:  You will have more time to argue,

18    both of you, but I would like to look at it first.  Thank

19    you.

20          All right.  So I'm going back to the Labs, and

21    I'd like to hear from you on Charge 30 to 32, which is

22    the Prompt Pay Act of Count One.

23          MR. CHRIST:  No objections, Your Honor.

24          THE COURT:  Any objections?

25          MS. KINGSBERY:  No objections.

1           THE COURT:  Okay.  Moving right along.  I am

2   going to ask about Charge Sections 33 through 37, which

3   relate exclusively to the third-party beneficiary claim

4   in Count Two.  How about from -- I guess the Labs?  It's

5   your case.  So it's 33 to 37.

6           MR. GESTRICH:  On 33, we maintain the objection

7   to primarily and directly --

8           THE COURT:  Yes.

9           MR. GESTRICH:  -- for the reasons that we filed

10  on that.

11          THE COURT:  Correct.  I understand.  Primarily

12  because of what reason?

13          MR. GESTRICH:  The Labs filed a memo advocating

14  that the *Foundation Health*.  *Wolf* was incorrectly decided

15  on that topic and that *Foundation Health* supports the

16  opposite position.

17          THE COURT:  *Foundation Health* is where those

18  words come from.  Am I confused?  How can it support a

19  different position than the words it used?  I understand

20  that -- and I'm not relying on the *Wolf* case on this

21  point.  Okay.  I have a Florida Supreme Court decision

22  that in discussing this element uses that those

23  adjectives.  And that's -- and I believe the counsel for

24  Cigna provided me with what she first said in the first

25  conference a string cite of cases that came after.  And I

1    believe, and I could be mistaken, I can't find it in

2    here, but I believe when Cigna's counsel submitted that,

3    I recall there being a Supreme Court case in 2016.  I do

4    not remember the name, but that uses primarily clearly

5    manifestly primarily directly, I can't remember which or

6    both of those phrases.  Is it both, Counsel, that case

7    I'm trying to remember?

8             MS. KINGSBERY:  That's correct.

9             THE COURT:  Do you recall the name of the case?

10            MS. KINGSBERY:  2016.  I don't remember the

11   2016 --

12            THE COURT:  Where would I find that memo.

13            Alex, do I have any of their emails where they

14   submitted the sort of briefings or citations or arguments

15   about that in here?

16            THE CLERK:  I'm not sure.

17            THE COURT:  You don't remember if it was both

18   phrases or the one -- I don't know which one he's

19   objecting to right now.  Are you objecting to both

20   clearly and manifestly and primarily and directly?

21            MR. GESTRICH:  I think it is more directed at --

22   and perhaps this is mitigated by the Labs -- the

23   inclusion of the language of the statute, I think

24   probably addresses that issue.  Our concern was whether

25   primarily and directly would be outside of the statutes

1780

1    or whether the jury could read in from the statutes.

2         THE COURT:  Clearly, that's what the Supreme

3    Court did.

4         MR. GESTRICH:  Yes, Your Honor.

5         THE COURT:  But I am -- I decided -- I'm sure I

6    will get an objection on this, but I decided I was going

7    to read the statutory language, at least in pertinent

8    part, because -- and I will get an objection from Cigna.

9    Contrary to their position, there's another section of

10   the insurance law statute that says this is part of the

11   policy.  And I believe if it's part of the policy they

12   are going to have 20 sample policies, they are going to

13   go look for it, they're not going to find it.  So I felt

14   it was important to indicate that, as a matter of law, I

15   understood the statute to say any policy in Florida will

16   have this language.

17        Now, I will hear from Cigna as to whether that

18   section I have in mind doesn't apply to these two

19   statutes, but I understood it did and that's why I'm

20   including it.  So I will double-check that 2016 case from

21   the Supreme Court that, in effect, reaffirms, I will call

22   it, *Foundation's* use of the language that I'm putting in

23   here because I thought, well, it is not a real old case,

24   not like a Connecticut insurance case decided in 1930.

25   But, you know, it was 20 or so years ago.  I wanted to

1   make sure there weren't any subsequent cases at the

2   Supreme Court level that, you know, didn't really like

3   that extra fluff.  And it appeared to me that that case

4   that I'm having in mind and don't recall and don't have

5   in front of me, used same language.

6           MS. COSTIN:  I have the cite, if you'd like it.

7           THE COURT:  What's the cite?

8           MS. COSTIN:  The cite is Men*dez versus Hampton*

9   *Court Nursing Center,* 203 So.3d 146, and it is Florida

10  2016.

11          THE COURT:  Right.  And you cited it to me for

12  which of these adjectives.

13          MS. KINGSBERY:  Both of them.

14          THE COURT:  Both, that's what I recall.

15          MS. COSTIN:  It supports *Foundation Health*.

16          THE COURT:  I don't have the case in front of me

17  so I can't read to you from the case.  Did you give me a

18  pin cite.

19          MS. COSTIN:  148, Your Honor.

20          THE COURT:  I invite you to go check the case.

21  If you don't think that they properly summarized it, you

22  should let me know that in the morning and you should ask

23  for ten minutes of time.  I haven't told anybody a time

24  tomorrow, but that's one thing on your time agenda for

25  tomorrow morning.  If you find that, you should let Alex

 1   know within two hours of us leaving here tonight I need

 2   ten minutes on the *Mendez* case third-party beneficiary.

 3   That's all you have to tell them.

 4            MR. GESTRICH:  That you, Your Honor.

 5            THE COURT:  I'm pretty sure you are going to

 6   find it.  Anything else?  So you are preserving that

 7   objection?  I understand that.  I understand that.

 8   Anything else in 33 to 37 from the Labs.

 9            Okay.  Cigna, any objections?

10            MS. KINGSBERY:  Yes, Your Honor.  As we

11   previewed, we do have an objection to Section 35.

12            THE COURT:  What charge is?

13            MS. KINGSBERY:  This would be Element 2 of the

14   third-party beneficiary.

15            THE COURT:  Right.  What are your objections?

16            MS. KINGSBERY:  We would object to including --

17   in the second full paragraph, we would object to

18   including everything starting with the third sentence,

19   "You may also consider language in the insurance

20   policies that indicates how benefits may be paid,"

21   through the second page with the sentence ending "even if

22   these words do not appear in the contracts."  We think it

23   is sufficient to --

24            THE COURT:  You would end your objection at the

25   words "contain those provisions"?

1    MS. KINGSBERY:  Correct, Your Honor.  We think

2    it is sufficient to just say you can consider the terms

3    of the policies.  We would also --

4    THE COURT:  Why?  Because your view is that

5    these statutes are not part of your policies in the state

6    of Florida.

7    MS. KINGSBERY:  No, Your Honor.

8    THE COURT:  How are they going to know what's

9    the policy?  You marked 20 policies as examples.  How

10   will they know what other paragraphs should be in the

11   policy?

12   MS. KINGSBERY:  Well, I believe at the beginning

13   of the description of the Labs' case, the Court already

14   instructs these starts are incorporated into the policy.

15   THE COURT:  Where do they get the language of

16   the statutes?

17   MS. KINGSBERY:  They are cited in the jury

18   instructions.

19   THE COURT:  Right here where you objected,

20   that's my point, ma'am, is --

21   MS. KINGSBERY:  They are also in the other

22   section of the --

23   THE COURT:  Which section?

24   MS. KINGSBERY:  So for example, the Prompt Pay

25   Act statute.

1          THE COURT:  What page?

2          MS. KINGSBERY:  I'm sorry.   Section 30 would be

3    the Prompt Pay Act.  So we have the language of a statute

4    there.

5          THE COURT:  Well, I guess I could just

6    cross-reference that charge.  I often do that because

7    we're still in the Labs' case.  So after receiving --

8    okay.  Yeah, maybe it's belt and suspenders.  What is

9    your response to that?  Why can't I just say -- I

10   wouldn't cut the sentence "You may also consider language

11   in the insurance policies that's in evidence on the issue

12   of are they clearly intended."  See Section 30 quoted or

13   whatever.  See Section 30 for the language, something

14   like that.

15         MR. GESTRICH:  For purposes of clarity for the

16   jury, I think it may be most helpful for them to have the

17   actual words within the charge.

18         THE COURT:  I'm sure you would like me to repeat

19   14 times everywhere I say if they prove it, you should

20   find the Labs.  I don't know that that's necessary.  I

21   haven't made a final decision, but if I cut it from here

22   and add language about See Section 30 for language of

23   statute, it means that I agree it's redundant and not

24   necessary.  If I just reread it again and decide, well,

25   five sections is a long way, they don't remember what's

1785

1    in the statute even if I tell them to go look there

2    again, you know, I guess I won't cut it.  I've got to

3    tell you right now my inclination is to cut it.

4            MR. CHRIST:  One note is the language that is

5    currently there references in Sections 35 and 41 which

6    this is Section 35, so if the Court does keep this, that

7    needs to be changed.

8            THE COURT:  The numbers or --

9            MR. CHRIST:  It's referencing previously

10   instructed you on in Section 35, and this is Section 35.

11           THE COURT:  It is not the right section.  That's

12   why they are bold.  So every time we shift them, so --

13   yeah.  Jeepers.  Why don't I just -- isn't your objection

14   I should cut the words "they state" and then the quote?

15           MS. KINGSBERY:  Our objection is that everything

16   starting with the third sentence of that paragraph should

17   be cut.

18           THE COURT:  I told them to consider the policies

19   as a whole.  You don't want me to tell them they should

20   consider the paragraph that the statute says take these

21   languages and put them in that policy you are looking at.

22   So it's like if I took a scissors and cut out medical

23   necessity definition with the bullet points from your

24   policies, that would be okay.

25           MS. KINGSBERY:  If the Court is going to include

1  the language that the statutes are incorporated, we would

2  ask there be an instruction that the incorporation of

3  those statutes into the policies is not sufficient in and

4  of itself.

5      THE COURT:  I know that's your position.  I

6  ruled against you.  You need to preserve your objection.

7  I don't know if you already have.  I'm not sure you have,

8  but you've just done that.

9      MS. KINGSBERY:  Yes.

10      THE COURT:  Your position is that I do not have

11  to tell them what it is that's being read as part of the

12  policies that are in evidence and are incomplete without

13  that language that the legislature said is a part of

14  everybody's policy in Florida.  And I hear that objection

15  and I do not agree with it.  I can see that I have been

16  redundant and I will take a look at what I'm cutting and

17  where and you will see it in the next version.  All you

18  have to do at that point is know whoever is not happy,

19  maybe both of you won't be, you will note your objection.

20  But I don't believe I need more argument.

21      Where am I?  I'm with Cigna now.

22      MS. KINGSBERY:  We do for have any other

23  objections to those sections that we're at, 33 to 37.

24      THE COURT:  That includes any section I change

25  any language in that you have previously objected, you

1    have to tell me if you preserve that objection again.

2         MS. KINGSBERY:  We do not have any other

3    objection to that section.

4         THE COURT:  Now we're down to 38, right?  Let's

5    go down to -- oh, 45 may be too ambitious.

6         Let's go down to 45.  Labs?  I'm sorry.  Those

7    are pages.  It should be Section 38 to 45.

8         MR. CHRIST:  No objection to Section 38.

9         Looking at section 39 again.

10        No objection to 39.

11        No objection to 40.

12        No objection -- if you want to take a look at

13   the statute.

14        MR. GESTRICH:  Your Honor.

15        THE COURT:  Yes, sir.

16        MR. GESTRICH:  Although, we have the instruction

17   on the affirmative defense for in this -- I'm looking at

18   --

19        THE COURT:  Tell me what statute, let's start

20   with that.  Okay.  Number what?

21        MR. GESTRICH:  41.

22        THE COURT:  Your objection, sir?

23        MR. GESTRICH:  It is not an objection.  I'm

24   noting something.

25        THE COURT:  Okay.

1    MR. GESTRICH:  To prove the affirmative defense

2    as to third-party beneficiary cause of action.

3         THE COURT:  Yeah.

4         MR. GESTRICH:  There are no claims in the record

5    that would meet this criteria.

6         THE COURT:  Well, that will make the verdict

7    form easier.  Does Cigna point me to any evidence or --

8    and I think you're resting, but for the last four minutes

9    of this deposition, or five or ten, whatever it takes, is

10   mostly designated by them.  I can't imagine there's stuff

11   in there about claims before these dates.  My memory

12   could be poor.

13        MS. KINGSBERY:  I think we did identify some

14   claims that were submitted before.

15        THE COURT:  All right.  I would like to see -- I

16   would like you to send to me by 8:00 tonight where I can

17   find that either by -- an exhibit number obviously is the

18   easiest, but testimony if you want, that preceded the

19   dates that I have put in this charge, which I'm assuming

20   are the correct ones, but if they aren't, whatever dates

21   you think they are.  If you're going to tell me in a

22   minute -- okay.

23        MR. GESTRICH:  It's merely the third-party

24   beneficiary cause of action.

25        THE COURT:  At the charge at 41, I put a date of

1   March 27, 2014 and it covers all --

2           MR. GESTRICH:  That should be 2013.  It says it

3   twice, first '13, then '14.  The seconds one should say

4   '13.

5           THE COURT:  I have four 2014s on page 57 of

6   Charge 41.  Let's see if we can agree on that.  All three

7   of my dates -- we have one '13, and before and after we

8   have a total of three '14s.  Which do you think is the

9   correct date?

10          MR. GESTRICH:  In third-party beneficiary, it's

11  '13.

12          THE COURT:  I'm in Section 41 was the predicate

13  of my statement, sir.  Yes.

14          MR. GESTRICH:  Yes, Your Honor.  There are two

15  sections of dates.  In the second section of dates, it

16  should be '13, not the first section.

17          THE COURt:  This is -- so the third-party

18  beneficiary, the last date in this charge should be a 3.

19          MR. GESTRICH:  Yes, Your Honor.

20          THE COURT:  In the second to the last paragraph

21  in this section, it is correctly both 4.

22          MR. GESTRICH:  Yes.

23          THE COURT:  Got it.  Thank you very much.  Tell

24  me if you don't think those are the right dates.

25          MS. KINGSBERY:  Those are the correct dates.

```
 1              THE COURT:  As corrected.

 2              MS. KINGSBERY:  As corrected, that is correct.

 3              THE COURT:  Then if you would tell us by 8:00

 4    evidence that you think is in the record before those

 5    dates.

 6              MS. KINGSBERY:  Yes, Your Honor.  And now what

 7    I'm hearing is that the argument is only with respect to

 8    the third-party beneficiary cause of action, which --

 9              THE COURT:  The paragraph before is direct pay

10    is Prompt Pay.  This one on time, even though it's an

11    uncontestable payment is due, you can't get it outside

12    the statute, so it applies to all three.

13              MS. KINGSBERY:  You're right, Your Honor.  I

14    mean --

15              THE COURT:  You mean the '13 date only applies

16    to third-party.

17              MS. KINGSBERY:  That's correct, Your Honor.

18              THE COURT:  You want to amend what you said to

19    me now that you realized the typo was 4, which is our

20    bad, it's not yours.

21              MS. KINGSBERY:  Well, part of this is we drafted

22    this before the evidence come in from their damages

23    expert.  And I do believe that now that the evidence that

24    we have seen, there are claims before 2014 but not 2013.

25              THE COURT:  The third-party beneficiary, which
```

1    is -- all -- everything you've said is about third-party.

2            MS. KINGSBERY:  We can the last paragraph of

3    this.

4            THE COURT:  We should correct everywhere the

5    application of the affirmative defense to the Count Two

6    third-party beneficiary claim.

7            MS. KINGSBERY:  It does not apply to Count Two,

8    third-party beneficiary anymore.

9            THE COURT:  There's no need for the jury, if

10   they award damages, to tell me how much of this was prior

11   to the date that's now correctly in there because you

12   agree there are no claims prior to that date.  So I

13   assume there's no objection to my taking the last

14   paragraph out?

15           MR. GESTRICH:  No, Your Honor.

16           THE COURT:  How about the second to the last

17   paragraph, you believe there is evidence as to before

18   2014; is that correct?

19           MS. KINGSBERY:  Yes, Your Honor.

20           THE COURT:  The date that's in there.  So you're

21   -- and do you dispute that, Attorney Gestrich?

22           MR. GESTRICH:  I don't believe that evidence is

23   in record.

24           THE COURT:  You are going to provide me with

25   exhibits or testimony that's going to support the need to

1    charge the jury on something because there are claims

2    before that so they would have to pull those out.  And if

3    you could do that by 8:00 p.m. tonight and if you could

4    -- well, I'm going to tell you -- well, you're going to

5    either say we couldn't find it, Judge, so we withdraw --

6    we would suggest you cross out the whole charge and any

7    reference to statute of limitations.  That's one choice.

8         Second is Alex or Judge, however you want to put

9    it, here's some citations to evidence in the record prior

10    to the date still in Section 41 on the Count One causes

11    of action.  You will list them.  And you are then going

12    to say to Alex, we need X minutes in the morning to

13    address this.

14         MS. KINGSBERY:  Yes, Your Honor.

15         THE COURT:  Understanding we may or may not have

16    any objections, and I guess, Attorney Gestrich, if when

17    you see those at 8:00, by 9:00 you say -- and your team

18    agrees, they're right, there's evidence in here and it

19    should be -- it needs to be charged, it is a defense as a

20    as a matter of law that is an issue of fact for the jury

21    if damages are awarded.  If you don't agree that that

22    evidence is not really whatever, you're going to send an

23    email to Alex.  And if you think it's more than the ten

24    minutes Cigna says, you're going to say, Judge, I'm going

25    to need a lot more time and here is how much we need.

1  Okay?

2          MR. GESTRICH:  Yes, Your Honor.

3          THE COURT:  Otherwise, if you agree, you

4  objected and oops, I guess there was evidence.  We didn't

5  focus on it, but it's an exhibit and it's in evidence, it

6  is in totals, for example, Dr. Clark's totals of how

7  many, you know, whatever.  It has to be charged.  In

8  other words, I guess those were 15.  I don't know whether

9  those charts included periods prior to this date.  That's

10 what I'm not sure.  That's what you are going to look at.

11 You are going to see whether that's right and we're going

12 to figure out how much time we need to address it.  Okay?

13         MR. GESTRICH:  Yes, Your Honor.

14         THE COURT:  So that's 8:00 p.m. and 9:00 p. m.

15         Anything else from Cigna in Sections 38 through

16 45?

17         MS. KINGSBERY:  Yes, Your Honor, Section 39,

18 which is the unbundling section.

19         THE COURT:  You better settle in everybody.  We

20 have a lot on that one.  This morning Attorney Kang told

21 me he thinks there's language in -- about policy records

22 referenced in the policies.  My clerk has only had time

23 while trying to listen with the other ear to scan maybe

24 three or four of your sample policies, but he didn't find

25 it.  I would ask from you -- I guess you are on the hot

1794

1    spot -- a citation to a policy in evidence that has

2    something about -- that would be supportive of your

3    position that they violated the policies by unbundling.

4    Okay.

5            MS. KINGSBERY:  Okay.

6            THE COURT:  Let me tell you, he's a very law

7    clerk, but he happened to go back and look at exhibits to

8    summary judgment motions, and there was an Exhibit 58.  I

9    don't even know who offered it, but it's called "Cigna

10   Reimbursement Policy."  First of all, it says effective,

11   it says, First November, '14, and it lists things that

12   were covered.  I can't absorb by reading that whether

13   that included the stuff related to bundling.  And then

14   February 16 of 2015, I have a recollection I was told

15   this was -- they were put on notice in '14.  And it gets

16   curious at page 2394 of Exhibit 58 to somebody's -- it's

17   Docket Number 244-27.

18           I have the following in front of me.  It's

19   called "Laboratory tests.  When all test described is

20   included in laboratory panel, are performed on a single

21   patient, the laboratory panel code should be reported.

22   If reported separately, the individual laboratory codes

23   will be rebundled into an appropriate panel code for

24   reimbursement.  Individual laboratory codes that

25   constitute a panel are considered mutually exclusive to

1  the laboratory paneling code."

2        I was also taught to avoid the passive tense.

3  Who is going to bundle them?  You don't say.  You're not

4  saying the biller has to bundle them.  I mean, if I read

5  that, I mean, I've never billed a thing, but as the man

6  on the street, you know, it says laboratory code should

7  be reported.  And if it isn't, if they are separate, they

8  will be rebundled.  I don't know by whom.  Maybe Cigna

9  has got a computer, like they have computers and AI do

10  everything else that knows that this bundle code includes

11  all these those other codes.  So when you see two or more

12  of all these other codes as well as the bundle code,

13  Cigna is going to hit deny, the machine will hit denied

14  on all the unbundled and pay the bundle, unless there is

15  another reason, I mean of which you had many.  I know we

16  have heard a lot of testimony.  Medical necessity.  I

17  don't know what the others are.  Yeah, how does that put

18  them on notice that this is how they're supposed to bill?

19  When were they put on notice?

20        So that's still -- I still have an issue of how

21  is it that this billing practice is part of the policy?

22  And I understand the answer was, it is part of the

23  medical necessity language, but that's whether this panel

24  that was ordered and everything that was checked in that

25  panel was necessary.  The question of billing for both

 1    unbundled and bundled to me is they didn't -- I mean,

 2    they ran one test, right?  I mean, just this big machine

 3    that's so expensive, it does it once.  So I don't see why

 4    whoever was the -- what is it, objective of the passive

 5    verb tense, which I assume a machine could do it, didn't

 6    just say approved bundled and deny all the unbundled

 7    individual, unless there was another reason to deny, like

 8    why did you test for 47 substances when the guy is an

 9    alcohol patient?  For example, you would have denied

10    that.  Why?  Medical necessity.  Right.

11         But services not rendered, I don't know what

12    that means.  That's the code you used I think for

13    unbundling.  And I don't see that this tells me that, oh,

14    if I make that mistake, I guess Cigna get to say bump it

15    and I have got to do it again.  Sitting through all of

16    this testimony, do I think that's what Cigna would expect

17    and could have written?  It should have said instead of

18    passive, the Lab will resubmit bundled only and delete,

19    and that's required.  But what is this thing called?

20    Reimbursement policy.  Cigna Reimbursement Policy.  I

21    don't know when that section was effective.  And I don't

22    know -- I still don't know how this is part of the

23    policy, certainly as it would apply to a medical

24    necessity denial.

25         So to be honest with you, I don't really

 1    understand how I'm charging on unbundling, what the basis
 2    of it is.  I mean, yeah, I guess I will just say it flat
 3    out, right?  That's what I'm worried about right now.  So
 4    I wants to know, does Cigna incorporate in its own plans
 5    -- let's just take their own plans, IFPs, by reference,
 6    any omnibus reimbursement policies, any policies that
 7    would say effectively what I just read?  Is there any
 8    language in of the 20 policies in evidence that
 9    prohibits unbundling?  I don't care how it is written,
10    but you will make an objection that won't turn your face
11    purple that that's what covers unbundling, Judge, by
12    incorporating anything like that, any policies.
13            And then I guess my next question -- let's
14    assume I decide you have shown me it is really part of
15    the policy that -- that certainly a biller would
16    understand, or I mean it's really the patient has to
17    understand the policy.  But let's assume certainly
18    anybody would understand.  Does that language void
19    coverage or does it suggest what I just read here in this
20    document that, no, you'll get to bill for the bundle  get
21    to bill for the bundled but not the unbundled.  Right?
22    As I said, you might have six other reasons.  Don't get
23    me wrong.  But on this point, that -- this doesn't
24    support the position that everything gets rejected unless
25    you have -- on the bundled code you have another reason.

1    And I presume you would have to tell them that unless

2    your machine doesn't let you tell more than reason.  I

3    think that they do.  At least my coverage does.

4         And does this go to damages or liability?  I am

5    going to withdraw that one.

6         And when did it become a violation of Cigna's

7    policy?  I asked that because I'm a little nervous here.

8    This was not a question on summary judgment on either

9    case by either party.  But I know fee forgiveness was.

10   And I was told it's in all the policies.  Then later I

11   was told, no, it's not in all the policies, but I decided

12   the ones I looked at because I was -- I didn't see any

13   difference between the old and new until a certain date.

14   I believe January 1 of 2015.  And I am so charging.  Do I

15   need a similar date on unbundling as a defense, which

16   would be you can't deny these claims until that date?  So

17   that's a question.

18        If it is part of medical necessity, why do we

19   need a charge?  I have given you the additional bullet

20   you asked for, otherwise you had no objection.  Now, I

21   don't see the word unbundling in any of the other bullet

22   points.  If I've overlooked it, you're going to tell me

23   and I will do it.  Other than the four I gave, I don't

24   know, some of them are like surgery related, you know,

25   things that aren't at issue so I didn't do them all.  But

1  I think I have done all you think are related, and now I

2  agree I will do the one you asked to be sure, yeah.

3          Those are some of my questions.  I don't know if

4  you are ready to tell me answers to any of them.  I can

5  go through individually or as I spew them out did you

6  think, oh, we have got to think about this.

7          MS. KINGSBERY:  No, we thought about it.  Would

8  it be helpful to send you something in writing by 8:00

9  along with our statute of limitations?

10         THE COURT:  Yes, and you know what, I'm going to

11 ask you to docket it.  I'm a little concerned about some

12 of these support and things filed in support.  I think it

13 may be at the end you all have to collect them all and

14 then maybe we'll go through them as to what I relied on

15 in the charge, you know, in charging because otherwise,

16 the record is going to be incomplete.  But for this one,

17 let's docket it and you'll PDF it.  It should come up,

18 but I don't want him to have to be watching CM-ECF every

19 minute if you can email and say we have docketed the

20 attached, something like that.

21         MS. KINGSBERY:  We'll do that.

22         THE COURT:  What's the Labs' position on this,

23 what I have said?

24         MR. GESTRICH:  Your Honor, we would ask that

25 Cigna's unbundling argument be limited to its

1    interrogatory response with the specific CPT codes.  I

2    think that is the only the jury would have an

3    understanding.

4         THE COURT:  What does it say?  I don't have it

5    in front of me, sir, and I don't know if I've ever read

6    it.  Maybe I did in rereviewing the interrogatories that

7    you marked for evidence, but that was a while ago.  So

8    could you give a clue with it says.

9         MR. GESTRICH:  Yes, Your Honor.

10        THE COURT:  Thank you.  I'm sorry.  I'm getting

11   -- yeah, go ahead.

12        MR. GESTRICH:  The Labs served an interrogatory

13   on Cigna asking for their contentions as to why claims

14   were denied or should have been denied for alleged

15   unbundling and asked Cigna to state every fact to support

16   that.  It was denied or should have been denied for

17   unbundling.  Cigna responded with a table of codes that

18   shows the unbundled codes and what proper codes should

19   have been billed.  The argument --

20        THE COURT:  So in other words, what I just read

21   in this exhibit whatever, 58, to somebody's summary

22   judgment.  When all tests described is included in

23   laboratory panel are performed on a single patient,

24   laboratory panel codes should be reported.  If reported

25   separately, the individual laboratory codes will be

1801

1     rebundled into an appropriate panel code for

2     reimbursement.

3           MR. GESTRICH:  Yes, Your --

4           THE COURT:  Where will I find that interrogatory

5     -- is that one of your interrogatories you marked and

6     introduce into evidence?

7           MR. GESTRICH:  Yes, Your Honor.

8           THE COURT:  Where would I find it docketed?

9           MR. GESTRICH  At Document Number 352-5.  This is

10    page number 10, Trial Interrogatory 15.

11          THE COURT:  Okay.  We will look at that.  Your

12    position is what?  That the instruction on what is

13    unbundling as a defense by Cigna is that I should only

14    instruct on the content of that interrogatory answer?

15          MR. GESTRICH:  Yes.  They did not disclose the

16    plan or policy provision argument that we're hearing.

17          THE COURT:  Okay.  In other words, not disclose.

18    They didn't cite it in their answer as a basis for their

19    defense?

20          MR. GESTRICH:  Yes, Your Honor.  And there's a

21    second related point.  I guess there are two related

22    points.

23          THE COURT:  Yeah.  And what is the date of that

24    interrogatory answer?

25          MR. GESTRICH:  February 1, 2023.

1          THE COURT:  Seconds basis?

2          MR. GESTRICH:  The second related issue is in

3    the Court's summary judgment opinion, the Court excluded

4    unbundled claims, the unbundling argument as to PB Labs

5    on or after October 1, 2013.

6          THE COURT:  What's the first claim that's part

7    of your case with respect to PB Labs in a temporal sense?

8    Do you know if there were ones before that date.

9          MR. GESTRICH:  There are ones back to June 3,

10   2013.

11         THE COURT:  And those are ones probably that

12   were paid, 2013.  That were in their case or in your

13   case?

14         MR. GESTRICH:  That were in our case were not

15   paid.

16         THE COURT:  Not paid.  So they're -- so from

17   June 3, '13 to 10/1 of '13, PB Labs billed for tests that

18   -- I'm not sure why am I excluding it -- oh, I ruled in

19   the summary judgment.  What page?

20         MR. GESTRICH:  This was on page 50 of Document

21   271.

22         THE COURT:  Thank you very much.  Well, I

23   suggest Cigna look at that.

24         MR. KANG:  Your Honor, we have looked at it now.

25   We're okay with this.

1           THE COURT:  Okay with what?  I don't know what
2    "this" is.
3           MR. KANG:  With the trial -- the interrogatory.
4           THE COURT:  Is the basis of your unbundling?
5           MR. KANG:  Yes.
6           MR. GESTRICH:  The only issue that's slightly
7    related, we don't have dates to ascribe to those CPT
8    codes.
9           THE COURT:  You were going to talk to the Labs
10   and see if you can agree.  I mean, you have just thrown
11   out a several month period whether they can agree on once
12   they check the records of what's in evidence.  Right.
13   If you can do that tonight and report either -- I don't
14   care if that's late tonight or tomorrow morning before
15   trial.
16          MS. GESTRICH:  Yes, Your Honor.
17          THE COURT:  I have a few more questions, but I
18   want to look at this interrogatory.  I'm understanding
19   other than perhaps needing a date limitation on the
20   statute of limitations charge, then you -- you are happy
21   with what you have proposed and they accepted.
22          MR. GESTRICH:  Yes, Your Honor.
23          THE COURT:  Saying -- referring to the language
24   in the answer to the interrogatory as what?  As their
25   position of --

1     MR. GESTRICH:  That's the universe of their --

2  of the unbundling argument.

3     THE COURT:  Okay.

4     MR. GESTRICH:  But as to when those dates apply.

5     THE COURT:  I understand still an open issue.

6     MR. GESTRICH:  And that's not a statute of

7  limitations issue.

8     THE COURT:  Oh.

9     MR. GESTRICH:  Because the -- for example, the G

10  codes that are listed in that table --

11     THE COURT:  Yes.

12     MR. GESTRICH:  When you pull it up, you'll see

13  there are a number of G codes.  Those were not in force

14  at all times.

15     THE COURT:  Oh, come on.  Do you want to kill

16  me?  I mean, I don't have it in front of me so I guess

17  this answer -- when you look at documents they reference

18  is 400 pages long, I am going to read that to the jury?

19  Did you do anything about that problem identified before

20  we started trial that you wanted to offer interrogatories

21  or -- that reference document numbers that aren't by

22  exhibits?  And if they're not in evidence, I don't know

23  how the answers are going to get be of value to you.  If

24  they are in evidence, I assume you would substitute the

25  trial evidence exhibit and get them to agree and just

1    have that be the, quote, interrogatory that's

2    understandable by the jury.  Okay.  That's got to be

3    done.  Do you disagree, generally?

4             MR. GESTRICH:  No.

5             THE COURT:  Okay.  On this one, how long --

6    well, I guess we'll refer to the -- where am I going to

7    find G codes listed?  I mean, they referred to some

8    document.  Is that in evidence when G codes were in

9    effect?  Does it say it on the face of the document?  Is

10   it marked in evidence?

11            MR. GESTRICH:  The jury has heard  -- and maybe

12   this is -- Your Honor, let me withdrew on that.  That's a

13   better issue for argument to the jury, not for the

14   instruction charge.

15            THE COURT:  I am going to go look at this

16   instruction, so this issue hasn't been closed.

17            MR. GESTRICH:  Yes, Your Honor.

18            THE COURT:  Does it need a time limit in the

19   instruction as a statute of limitations instruction?

20            MR. GESTRICH:  It's not --

21            THE COURT:  In damages?

22            MR. GESTRICH:  It's not a limitation.  It's too

23   far in the weeds that I think it would not be a good use

24   of time to continue on that issue.

25            THE COURT:  Thank you.  So we're agreed that I

1   will somehow revise this so it reflects that answer to

2   interrogatories and the language in that as the basis for

3   the unbundling argument is limited to that; is that

4   correct?  Cigna?

5        MS. KINGSBERY:  Yes.

6        THE COURT:  Attorney Kang?

7        MR. KANG:  Yes, Your Honor.

8        THE COURT:  And that's what you wanted me to

9   say, something like that?  You will see the language.  If

10  you don't like the language, you will tell me.

11       MR. GESTRICH:  That's the gist of it, yes, Your

12  Honor.

13       THE COURT:  Great.  Cigna, any more on the

14  section we're in?

15       MS. KINGSBERY:  No, Your Honor.

16       THE COURT:  Let's see where we're going next.

17  Now I'm in Cigna's case.  So turning to Cigna.  I would

18  like you to look at Charge 46 through 49, so the

19  introductory sections.  Any objection?

20       MS. KINGSBERY:  No objection.

21       THE COURT:  How about the Labs?

22       MR. CHRIST:  No objection.

23       THE COURT:  Okay.  Cigna, anything from 50

24  through 53?  50 to 53?

25       MS. KINGSBERY:  No objection on those.

1807

1          THE COURT:  Any objections, any edits to which

2     you need to preserve your objections from the Labs?

3          MR. CHRIST:  No objection, Your Honor.

4          THE COURT:  No objections.  All right.  Now

5     we'll move to 59 through, I guess, 61 -- go to the end,

6     63.

7          MS. KINGSBERY:  We skipped some.

8          THE COURT:  What did I skip?  Oh.  55 through 58

9     we haven't done.  My apologies.  Sections 55 through 58.

10         MS. KINGSBERY:  Yes.  So on 56, this is

11    unbundling, so I think that --

12         THE COURT:  That's sort of an open issue.  I'm

13    going to flag that as part of the whole unbundling issue.

14    So we'll just skip over that right now.  Write it down.

15         Anything else this that range of 55 to 58 from

16    Cigna?

17         MS. KINGSBERY:  On 57, fee forgiveness, the

18    first paragraph that has the definition of fee

19    forgiveness, and I know the Court's revised the -- it's

20    the second sentence of the first paragraph.  "Fee

21    forgiveness is a practice of waiving or forgiving patient

22    cost share obligations."  I think we would recommend

23    cutting that phrase, which is the balance of the Labs'

24    charge after Cigna's payment, and instead just keep "such

25    as co-pays, deductibles, coinsurance, and the balance

1    bill."

2          THE COURT:  Keeping -- where is the language you

3    just said I should keep?  Where am I cutting -- starting

4    to cut?

5          MS. KINGSBERY:  We would cut "which is the

6    balance of the Lab's charge after Cigna's payment."

7          THE COURT:  You want me to cut the next sentence

8    in the next section and next sentence or just the rest

9    of that -- part of that sentence.

10          MS. KINGSBERY:  Just that phrase that I just

11    said.

12          THE COURT:  Thank you.  So in the third

13    sentence.  Anything else about this charge?

14          MS. KINGSBERY:  And then add in at the end of

15    that sentence "and the balance bill."

16          THE COURT:  What's the last word?

17          MS. KINGSBERY:  The balance bill.

18          THE COURT:  Bill.

19          First, tell me if you have any objection to this

20    section, Attorney Christ.

21          MR. CHRIST:  Not to the additions.  To the

22    section that was just discussed, we had a prior objection

23    to the description of the examples, co-pays, deductibles,

24    coinsurance or other payments.

25          THE COURT:  Yeah, that's in your cut section,

1809

1    Counsel, co-pays, deductibles, coinsurance or other

2    insurance payments?

3        MS. KINGSBERY:  Yes, we would like to keep that.

4        THE COURT:  I think I said the rest of the

5    sentence, but it is clear I'm not speaking straight

6    today.

7        Tell me the words you want me to cut from that

8    sentence, the third sentence in Charge 57 in the current

9    draft.

10        MS. KINGSBERY:  The second sentence of the first

11    paragraph.

12        THE COURT:  Fee forgiveness is the practice of

13    waiving or forgiving, and includes the words co-pay,

14    deductibles, coinsurance, all of that.  I thought you

15    told -- I don't understand.  You want me to cut the

16    entire sentence beginning with the words "Fee

17    forgiveness," and ending with the words "insurance

18    payments"?  Is that correct?

19        MS. KINGSBERY:  No, Your Honor.

20        THE COURT:  Tell me the words you want me to

21    cut.

22        MS. KINGSBERY:  The words we would like to cut

23    are "which is the balance of the Labs' charge after

24    Cigna's payment."  We would recommend cutting that.

25    Keeping "such as co-pays, deductibles, and coinsurance."

1    And then replacing "or other insurance payments" with the

2    phrase "and the balance bill."

3            THE COURT:  You want to replace -- "other

4    insurance payment" you want to replace with what?

5            MS. KINGSBERY:  "And the balance bill."

6            THE COURT:  The balance bill, B-I-L-L, correct?

7            MS. KINGSBERY:  Correct.

8            THE COURT:  This is all Cigna.

9            So now Labs, I want to know what you think.

10           MR. CHRIST:  We would prefer keeping the

11   sentence "Fee forgiveness is the practice of waiving or

12   forgiving patient cost sharing obligations," rather than

13   providing --

14           THE COURT:  And cut the rest off the sentence.

15           MR. CHRIST:  Yes, Your Honor.

16           THE COURT:  I will have to think about it.

17   You'll get -- the next version will reflect either one

18   side, the other or no sides, or could just be edited, my

19   edited version.  That's to do.  Right?

20           Any other objections in the range 55 to 58 from

21   the Labs?  I'm sorry.  From Cigna?

22           MS. KINGSBERY:  No, Your Honor.

23           THE COURT:  I keep doing that.

24           Labs, other than your comment on their edit in

25   that area, any other comments?

1       MR. GESTRICH:  On the -- I'm sorry.  Trying to

2   do the red line version.  Just one second.  The comment

3   is on the added language.

4       THE COURT:  I'm not looking at the red line, so

5   you are going to have to direct me to page, a paragraph

6   and a line.

7       MR. GESTRICH:  Yes, Your Honor, I'm trying to

8   pull it up.

9       THE COURT:  That's fine.

10      MR. GESTRICH:  Your Honor, the paragraph that

11  I'm looking at is the first full paragraph of page 76.

12      THE COURT:  Yes, sir, beginning my instruction

13  to you.

14      MR. GESTRICH:  Yes, Your Honor.

15      THE COURT:  What about it?

16      MR. GESTRICH:  The second to this last sentence

17  of that paragraph.

18      THE COURT:  Most, but not all?

19      MR. GESTRICH:  Yes.  We would ask that --

20      THE COURT:  That's a problem.

21      MR. GESTRICH:  -- the Court state "some of their

22  policies after that date exclude insurance coverage for

23  fee forgiveness."

24      THE COURT:  Okay.

25      MR. GESTRICH:  At this point, I don't know if

1    those policies have been identified for the jury.

2         THE COURT:  They haven't.  First, I'm asking

3    Cigna, is he correct that when I drafted "most but not

4    all," or even if I put in some of those, that it is a

5    correct statement that not every policy involved in the

6    case after January 1 of 2015 added the language I

7    characterized in this summary judgment as an example of

8    what would be clear to the ordinary policyholder?

9         MS. KINGSBERY:  I Believe that is correct, not

10   every single policy after that date.

11        THE COURT:  Why would I instruct the jury on

12   something that I don't believe there's evidence in the

13   record.  I don't -- I don't remember any evidence telling

14   me which exhibits -- which claims relate to exits post

15   January 1, 2015 that include this language.

16        MS. KINGSBERY:  Since this is Cigna's unjust

17   enrichment claim and not a contract claim, we aren't

18   going claim-by-claim, policy-by-policy to determine which

19   claims are governed by which policies.  This is -- we're

20   in Cigna's unjust enrichment.

21        THE COURT:  That's funny, because that

22   crackerjack clerk I mentioned just happened to leave me a

23   note about an issue I hadn't tied -- closed the circle on

24   the unbundling.  So your position -- and it is quite

25   similar to the question.  Your position is whether you

1   put the policyholder or the person who was authorized to

2   bill on that policyholder's behalf, even though you never

3   told them that there's nothing in the policy or

4   incorporated by residence in the policy at any time.

5   Let's take that hypothetical.  There was never anything

6   in the policy or referenced as incorporated in the policy

7   or whatever in a statute that could be incorporated in

8   the policy that fee forgiveness was -- there is no

9   specific language in the policy.  Your claim is a

10  policy-based language claim, I understand that.  But how

11  would they know it was unfair?  How will the jury know?

12  How is the jury going to determine it is unfair and how

13  would the Labs have known it was unfair?  Doesn't matter

14  if the knew if the jury thinks it was unfair based on all

15  the language relating to -- that you are going to give me

16  on unbundling and I've ruled out this issue for

17  significant portions, certainly PB's claims.  I don't

18  know, for the money you want back from them, or that was

19  a summary judgment ruling on the Labs, right?

20          So your view is even though if you -- at the

21  time when the ambiguous language was in a policy, you

22  didn't pay the Labs.  You have to pay them.  You can't

23  use a defense of fee forgiveness, but that you can

24  recoup everything they paid them because it's, quote,

25  unfair?

1          MS. KINGSBERY:  We think it's relevant to the

2    element of unfairness.

3          THE COURT:  Why is it unfair?

4          MS. KINGSBERY:  Well, the policies include how

5    much the patient owes and how much insurance --

6          THE COURT:  I said the policies prior to a

7    certain date.  I guess I said it couldn't be part of the

8    contract because it is ambiguous and I ruled as a matter

9    of law, but I don't know how it is unfair unless I charge

10   them on why it is not in the Labs' case maybe.  But then

11   I would have to tell them they can use that in

12   considering unfairness.  I'm struggling.  I mean, is it

13   unfair?  I'm just trying to think.  I'm terrible on

14   analyzing.  I just don't understand that.  I mean, if you

15   didn't like the letterhead they designed for PB Labs, you

16   could argue that was unfair to put it on this letterhead.

17   I mean, what's the universe of unfair that's appropriate

18   and that I should tell the jury is appropriate to

19   consider?

20         MS. KINGSBERY:  I think there's been testimony

21   on this, and some of it has been with respect to the dual

22   pricing scheme.  So you are charging one amount to Cigna.

23         THE COURT:  Yes, there's that.  And you claim

24   it hurts the public, it hurts the government, it hurts

25   the policyholders.  Yeah, go ahead, I do remember that.

1    MS. KINGSBERY:  The other part of it is the

2    patient is in the dark about the charges and the billing

3    and everything that's being done because they are not

4    receiving a bill.  And had they received a bill showing

5    all that's being done, the practices would have been

6    uncovered.  But if there's -- it never comes to light, it

7    leaves the patient in the dark, and that's unfair to both

8    Cigna and the patient.  This is part of what Ms. Anderson

9    was testifying about this morning.

10    THE COURT:  Do you want to respond to that?

11    Why isn't that testimony in the record that I just say

12    it's unfair and they are going to argue -- I hope they

13    are going to draw a line under this when they make the

14    argument, you are going to have to decide what's unfair.

15    You have heard testimony from Witnesses A, B, C, D,

16    whoever, who has told you about, you know, how that

17    increased costs and whatever they said.  I mean, is --

18    why would that about improper, number one?  And then what

19    more do I have to tell them other than unfair?

20    MR. GESTRICH:  We do not contest that.  It is

21    the -- most of the policies contain a fee forgiveness

22    provision in 2015 and later.

23    THE COURT:  I know.  But I'm talking about from

24    the beginning of time, 2012 when PB started billing and

25    there is no evidence of collecting bills or whatever they

1    are going to say about the records here.  Can they argue

2    that based on the testimony she just referenced, which I

3    recall more than one witness talking about -- maybe I'm

4    thinking about the opening statement, but I don't think

5    it was just Anderson.  I think I heard that before.  It

6    might not have been exactly the same whose harm, but I

7    heard the public, the government, plan, you know, the

8    companies that set up plans.  They don't ever mention

9    Cigna in their individual plans, but they are harmed too,

10   and they are entitled to claim it's unfair to them.

11        So one, is that an improper argument?  And two,

12   if that's the argument, I don't have to tell them

13   anything more than it's unfair, other than the bases they

14   are arguing it on.

15        Maybe -- why do I even tell them their bases?

16   That's a good question.

17        MR. GESTRICH:  I think telling the jury would be

18   -- telling the jury the basis of it is a little bit more

19   helpful to help the jurors understand these are not in

20   the policies, so this is an argument of general

21   unfairness.

22        THE COURt:  Okay.

23        MR. GESTRICH:  And some of the policies, this is

24   in there in the claw back claim, but not, of course, in

25   our claim against Cigna.

1    THE COURT:  Right.

2    MR. GESTRICH:  So for them to argue general

3  unfairness, that's a fair argument.  I don't think it

4  makes sense, but it is a fair argument.

5    THE COURT:  Fine.  But they have that general

6  testimony.

7    MR. GESTRICH:  Yeah.  That's not -- I don't see

8  that as problematic.

9    THE COURT:  And you think -- and apparently

10  Cigna does with edits, think that it is a good idea to

11  talk a little bit about each of their bases in addition

12  to reminding them this isn't the only, they have to look

13  at all the circumstances, which is what they element is.

14    MR. GESTRICH:  Breaking this down and take each

15  of the bases.

16    THE COURT:  Even if the jury says, oh, God, I

17  mean, you can't blame them for fee forgiveness or

18  unbundling back in whatever year whatever, they still

19  could conclude it was unfair for the reasons that the

20  witnesses have generally summarized was the harm people

21  suffered.

22    MR. GESTRICH:  If you are asking should the

23  instruction about narrowed to just general unfairness, I

24  think that makes more sense.

25    THE COURT:  Yeah.  Well, I thought I just asked

1   you that and you said no, it helps with bases.

2        MR. GESTRICH:  I understood the question to be

3   slightly different.  I thought you were talking about

4   breaking down each of the three arguments.

5        THE COURT:  I was.  Go ahead.

6        MR. GESTRICH:  Within the fee forgiveness

7   argument, I thought it was general unfairness for fee

8   forgiveness versus general unfairness plus pointing out

9   where it is in the policies.  If you are charging just on

10  unfairness generally without specifying their arguments,

11  then I think that's the most appropriate way to handle

12  unfairness as a general matter and let them make the

13  argument.

14       THE COURT:  Right.  So you would tell me to cut

15  this whole section  I mean, what's wrong with the

16  section?

17       MR. GESTRICH:  We didn't object to the --

18       THE COURT:  I know, but you just said should be

19  narrow, should be the beginning of that paragraph answer

20  you just give me.

21       MR. GESTRICH:  The only thing we asked to be

22  narrowed was the most -- most of the policies in 2015 and

23  later have this language, we just ask for it to be some

24  of the policies.  That's my only request was that "most"

25  be turned to "some."

1        THE COURT:  "Most" is where?  Where am I using

2   "most" and it should be -- that edit in that sentence.

3        MR. GESTRICH:  Yes, Your Honor.

4        THE COURT:  This is Charge 57 again?

5        MR. GESTRICH:  Yes, Your Honor.

6        THE COURT:  On page 76.  I see.  Gotcha.

7        MR. GESTRICH:  And then the void coverage.

8   Within that same sentence, it says "most."  We are were

9   requesting "most" be changed to "some."  And then it

10  states "void insurance coverage," where we were asking

11  for -- instead of "void" "exclude."

12       THE COURT:  You didn't tell me that.  Do you

13  object to that?  Void is a -- yeah, that's a bad word.

14  Do you object to that?

15       MS. KINGSBERY:  We do not object to that.

16       THE COURT:  The reason I think we stumbled on

17  this or I raised the question is that -- I think Attorney

18  Kang showed Mr. Goldfarb a post-2015 policy with the a

19  new language.  The language I had said would support a

20  contract claim of fee forgiveness or contract exclusion.

21  And I think that's why we put this in so there is a

22  post-2015 policy in evidence.  If they want to argue

23  unfair because of the policy as part of this, if you have

24  any claims that were paid, then I think -- and there's a

25  policy that says clearly -- or what I have said was clear

1    -- you can't do fee forgiveness, I think I maybe have to

2    add to this, not cut it.  Whatever.

3            Does Cigna not want me to do the three charges?

4            MS. KINGSBERY:  We do.  We think the way you

5    have it set up is the best way to do it.

6            THE COURT:  You are arguing for the reasons you

7    cited, that testimony about ten pages earlier, either

8    Anderson and maybe others, spoke about this general harm

9    to health care and coverage issues either by the person

10   who funds it or Cigna, if it's their plan, or the Miami

11   Dade Education Department or the public, et cetera, that

12   it's just bad for that reason.  And so that's why you

13   argue unfair?  That's what the closing argument is going

14   to be.

15           Is the closing argument also going to be and

16   besides which, after 2015 it is in these policies?

17           MS. KINGSBERY:  I don't know that we've drafted

18   the closing argument.

19           THE COURT:  Let me put it this way.  I don't

20   have evidence that would support that argument.  And

21   while I don't usually sustain an objection where a lawyer

22   says, that's not the evidence.  I mean, that's what the

23   argument is for.  Tell the jury what's the evidence. And

24   if we're not having rebuttal, this is the problem, you

25   don't get to stand up and say, he made this argument but

1    there's nothing in the record.  And given the fee

2    forgiveness, I keep telling them you've got to keep it

3    separate.  I'm not sure this morning that the -- I asked

4    you to start your case, but I guess I could charge -- I

5    could tell them tomorrow the evidence we've heard so far

6    since Attorney Kang started calling witnesses, is not

7    evidence in the case of the Labs versus Cigna.  Although,

8    you did designate it would be in defense, but I never

9    heard when were you shifting.  I believe we were doing

10   that earlier on.  How is the jury going to know?

11           I mean, you can't possibly argue that you can

12   use the policy language in any claim -- any policy after

13   2015 that has this language, you can use that as a basis

14   for finding unfair when I don't know and the jury could

15   never know what policies, what claims are under policies

16   that have the proper -- what I'll call -- what I thought

17   was the clear language?  Is that clear enough or am I

18   misspeaking?

19           MR. KANG:  No, I think --

20           THE COURT:  Thank you.

21           MR. KANG:  I understand.

22           THE COURT:  So you can't argue that because it's

23   not in the record.

24           MR. KANG:  The testimony from Goldfarb about the

25   2015 language is not -- that's not sufficient?

1        THE COURT:  You haven't identified which claims

2   that relates to, right?  I mean, I wrote "most, but not

3   all."  I think there was no objection to the edit by

4   Labs.  There was no objection by your team that "some"

5   was okay as an edit.  To me, I'm inferring, and I think

6   it's reasonable.  That means there are policies that are

7   at issue in the case that don't have the unambiguous

8   language.  And I don't have any recollection of evidence

9   that identifies what claims or what portion of these

10  claims, somebody sat down and did a summary chart that

11  has been reviewed by the other side that would tell the

12  jury, you know, as to those, whatever, that they can use

13  the policy language as a basis for unfairness as to these

14  claims.

15        MR. KANG:  I think we'll argue the general

16  unfairness, Your Honor.

17        THE COURT:  Fine.

18        MR. CUNNINGHAM:  I hate to do this, but I just

19  want to bring up one thing regarding closing argument. We

20  can talk about this more tomorrow, but it is on this

21  point.

22        I'm pretty you in opening statement Mr. Kang

23  concluded with this type of fee forgiving leads to

24  increase to insurance costs for all of us.  And I'm --

25        THE COURT:  That's a golden rule problem.

1           MR. CUNNINGHAM:  And I didn't want to object

2    during opening statement.

3           THE COURT:  Right.  Because I am going to tell

4    them, nothing in opening statement is evidence.

5           MR. CUNNINGHAM:  I think that would be extremely

6    improper closing by them.  I think it's --

7           THE COURT:  You cannot appeal.  I'm pretty sure

8    you know this, Attorney Kang.  You cannot argue in effect

9    that the jurors should view themselves as victims of this

10   conduct.

11          MR. KANG:  Of course.

12          THE COURT:  Now, the testimony I think talked

13   about -- or the question included the public as one of

14   the categories, the government, the public this, but I do

15   want to hear any argument that singles out everybody or

16   all of that.

17          MR. KANG:  Sure.

18          THE COURT:  I mean, you can talk about -- well,

19   yeah.  Okay.  Thank you.

20          MR. CUNNINGHAM:  Thank you.

21          THE COURT:  Are we done with -- I thought we

22   were farther than that.  What was the last group I asked

23   you folks to comment on?

24          MR. CHRIST:  I think we were going to 58, Your

25   Honor.

1          THE COURT:  Good thing I'm not a stenographer.

2     Oh, here it is.  Jeepers.  Yeah, 55 to 58.  Is there

3     anything further from Cigna?

4          MS. KINGSBERY:  No, Your Honor.

5          THE COURT:  No further.

6          How about the Labs?

7          MR. CHRIST:  Nothing further from the Labs.

8          THE COURT:  So there's some issues there I need

9     to look at, but other than that I'm not.

10          You all know what we spent time talking about.

11     That's what I need to get back to you on.

12          MR. KANG:  Your Honor, I'm so sorry.  On the fee

13     forgiveness issue again, again given that the closing is

14     going to be limited not to arguing about anything in the

15     plans.

16          THE COURT:  Correct.

17          MR. KANG:  I assume Mr. Cunningham or whoever is

18     doing argument for the Labs, is not going to stand up and

19     say well, if this was so unfair, wouldn't you have

20     expected this language to be in the plans or something to

21     that effect.

22          MR. CUNNINGHAM:  I need to make a note of that

23     one.  That's a good one.  I haven't completed formulating

24     my closing.  I would be happy to talk to Mr. Kang about

25     it.

1        THE COURT:  Do you think that argument would be

2    improper?

3        MR. CUNNINGHAM:  Your Honor, this fee

4    forgiveness argument has become I guess the bugaboo of

5    the trial.

6        THE COURT:  It really is.  Trust me.  The

7    bundling could be right up there.  These two are the

8    problem.

9        MR. CUNNINGHAM:  That's why I put that proffer

10   on a record with Mr. Welch this morning because as I

11   said, the basis for flagging for fee forgiveness was one

12   thing.  It was plan language.  And now I think what this

13   has done is this has become the exception.

14       THE COURT:  They flagged for fee forgiveness

15   back in that time chart.  Ms. Thelian didn't she have fee

16   forgiveness in '13 and '14?

17       MR. KANG:  Chris Haney.

18       MR. CUNNINGHAM:  My point was just because of

19   policy language.  So now because of this, they have been

20   able to go in through the back door where they couldn't

21   go in through the front door.  I have to figure out how I

22   will argue that in closing.

23       THE COURT:  What part of your testimony you

24   offered today were you offering in your defensive case?

25       MR. KANG:  For Ms. Anderson.

1           THE COURT:  From anybody.

2           MR. KANG:  Certainly as to fee forgiving that's

3    not.  That's only in our affirmative case.  I would say

4    the portions that she was testifying regarding the lack

5    of medical necessity on PB Labs and I believe --

6           THE COURT:  For all of your claims that are

7    covered by your cause of action?

8           MR. KANG:  That would be here testimony would be

9    in defense to, yes, to the Labs' claim.

10          THE COURT:  Anything else today?

11          MR. KANG:  I do believe she touched on some

12   testimony regarding medical necessity, lack of medical

13   necessity with respect to Epic at the tail end and so I

14   believe?

15          THE COURT:  You mean in the '17 time period.

16          MR. KANG:  2015.

17          THE COURT:  That's defensive or in your case?

18          MR. KANG:  I think that would be, that would be

19   both.

20          THE COURT:  Anything else today?  I'm not

21   limiting it to Ms. Anderson.

22          MR. KANG:  No.  Welch was fee forgiving.  That's

23   not the defense to their case.  And he testified to

24   damages.  That's our case so no, Welch is not for the

25   defense.  And Hixson was simply a sort of rebuttal to Dr.

1  Nicoll.

2         THE COURT:  That is in the defensive case.

3         MR. KANG:  Clark is both.

4         THE COURT:  On fee forgiveness, what parts of

5  her testimony on both.

6         MR. KANG:  She was all medical necessity.

7         THE COURT:  So that's not going to prevent a

8  problem for you.

9         MR. CUNNINGHAM:  I will try to formulate my

10  thoughts about closing tonight and I will be happy to

11  talk about it with Mr. Kang.  I think we can work

12  something out.

13         THE COURT:  If you cannot, you will bring it to

14  my attention.  I don't mean eight in the morning,

15  certainly by tomorrow afternoon.  After the jury leaves,

16  if you could do that, I'd appreciate it.

17         I'm inclined to start tomorrow by suggesting --

18  by not suggesting, by pointing out that I failed to do

19  something in yesterday's evidence and that is if you

20  remember we're trying two cases and this is where

21  Attorney Kang -- this is the part he gets to call but

22  they can be.  He could offer evidence in this part where

23  he's calling a witness both as to support his case Cigna

24  versus Lab but it also in defense of some part of the

25  Labs' case and that would be correct with respect to Ms.

1   Anderson's testimony on direct.  That was you did it,

2   right?

3       MR. KANG:  Yes, Your Honor.

4       THE COURT:  On so it is not fee forgiveness.

5   That's only affirmative.  Testimony offered through Ms.

6   Anderson about lack of medical necessity by PB Labs, was

7   offered in connection with Cigna's defense of the Labs'

8   claim as to the PB Labs claim and I wrote touched on.  I

9   don't know what that was in Anderson's testimony. You

10  gave a second reason.  All I wrote was touched on.  You

11  touched on --

12      MR. KANG:  For Epic.

13      THE COURT:  That's it.  There it is.  Touched on

14  medical necessity 2015 tail end defense and that would in

15  both cases you are saying.

16      MR. KANG:  Yes, Your Honor.

17      THE COURT:  Is there any objection if I were to

18  do that?  As to what they should consider the evidence

19  for?

20      MR. KANG:  No.

21      THE COURT:  Any objection from you?

22      MR. CUNNINGHAM:  None that I can think of right

23  now.  If I change your mind, I will be happy to let you

24  know.

25      MR. KANG:  On PB Labs I think that goes to both

1   our defense and        affirmative case.  I want to be

2   clear.

3        THE COURT:  I probably say something like all

4   the witnesses called yesterday concerned Cigna's

5   affirmative case.  However, some of the testimony of

6   Anderson was also offered in connection with defending

7   the Labs' case and those are I will iterate those two

8   things.  Is that okay?

9        MR. CUNNINGHAM:  I think that's accurate and I

10  think that's fine, Your Honor.

11       THE COURT:  Alex, I hope you can scribble that

12  down.  Terri, I will ask you to send me what I just said

13  so I can frame it.  Obviously if there's objection to how

14  I say it tomorrow, please do not hesitate to stop me when

15  I finish.  How is that?

16       So we're done with the side track to closing

17  argument and we had finished 55 to 58.  So our next

18  category is going to be 59 to 63.  Cigna?

19       MS. KINGSBERY:  No objection.

20       MR. CUNNINGHAM:  May I be excused?  I need to

21  get to a meeting.

22       THE COURT:  You certainly can as long as you

23  aren't going to come back and tell me Attorney Christ

24  should have added the following.

25       MR. CUNNINGHAM:  No, I won't.

1830

```
 1              THE COURT:  Any objection?

 2              MR. CHRIST:  No objections, Your Honor.

 3              THE COURT:  I will look to Alex on this.  We

 4    have major issues about unbundling still and I think I'm

 5    waiting for Cigna to provide me something.

 6              MS. KINGSBERY:  Yes, Your Honor.

 7              THE COURT:  The ball is on Cigna's court per

 8    what I said.  The second issue is I think we've

 9    identified fee forgiveness might be an issue unless we

10    solved that.  Did we solve that, Attorney Kang, when you

11    said you will only argue the people harmed by witnesses

12    testimony having identified categories of people?

13              MR. KANG:  I think we solved that, yes.

14              THE COURT:  Don't include the jury.

15              MR. KANG:  That's right.

16              THE COURT:  Right.  That's not an issue.  Any

17    other open -- what are the other open issues?  I had a

18    sticker Labs' burden of proof.  We agreed to cross one of

19    them out.  On this affirmative defenses that I put in

20    there.  Wasn't there a question of whether I was going to

21    cross out anything further?  That was for me to

22    deliberate on.  Sorry.  I think it's just me.

23              MS. KINGSBERY:  I think you asked for us to

24    submit evidence as to whether there's support for the

25    statute of limitations defense.
```

1   MR. GESTRICH:  We conferred by email.  We

2   realize what evidence they are going to rely on for that

3   and we agree there will be evidence in the record.

4   THE COURT:  So I shouldn't cut anymore than the

5   paragraph I cut on 23 which is the second full paragraph;

6   is that correct?

7   MR. GESTRICH:  Yes, Your Honor.

8   MS. KINGSBERY:  Yes, Your Honor.

9   THE COURT:  That's just a change.  That's not an

10  open issue.  Hurray.  I have the issue at 35.  But I

11  believe that was just I took it under advisement.  Do I

12  need to repeat the language verbatim from the statute so

13  that's just for me.  That's the court.  That's 22.

14  That's an edit.  That's just the court and the next

15  sticker I had was statute of limitations.  So that would

16  be -- that's on Cigna -- yeah.  We cut the last paragraph

17  of 41.  And we shouldn't cut anymore based on the answer

18  you gave me, Attorney Gestrich, correct?

19  MR. GESTRICH:  Yes, Your Honor.

20  THE COURT:  That's for me.  Those are just

21  edits.  That's water under the dam. Then we have got 75

22  and 76.  That's fee forgiveness.  I started to say the

23  second big elephant was fee forgiveness.  Then somebody

24  said that's not an issue anymore.  What did we just spend

25  half an hour on 57.  It's titled fee forgiveness in

1    Cigna's case.  I guess did we settle it other than what I

2    will call, not a stylistic, but the edit in paragraph 1

3    other than that have we settled as to the scope of

4    closing argument so there's no more issue on this?

5         MR. GESTRICH:  Was Cigna saying that they are

6    withdrawing the insurance policy issue from the charge as

7    well?

8         THE COURT:  No.  In defining unfairness under

9    all the circumstances, Element Three, and in including as

10   a basis of a circumstance that the jury can consider,

11   they are not withdrawing fee forgiveness totally.  They

12   are arguing, though, fee forgiveness based upon the

13   testimony she recounted about funds that pay these claims

14   or patients who have co-pays or whatever.  Whatever these

15   people said that supports an argument of the category of

16   people harmed, they are going to argue harm by fee

17   forgiveness.  They are going to argue that supports --

18   that we had fee forgiveness and that supports a finding

19   of unfairness.  Okay?

20        MR. GESTRICH:  Yes.

21        THE COURT:  Any problem with that?

22        MR. GESTRICH:  No.

23        THE COURT:  Other under the general testimony,

24   there will be no argument that any policies because they

25   clearly unambiguously enforceably precluded fee

1833

1  forgiveness, that also makes it unfair.

2         Am I right?  Attorney Kang is shaking his head.

3         MR. KANG:  Yes.

4         THE COURT:  This is the problem with the use of

5  the word policies.  I will say it one more time.  No

6  argument by Cigna in support of unfairness as a

7  conclusion that could be supported by an argument of

8  unfairness in finding unfairness as required in Cigna's

9  case will be based on policies, claims made by a Lab,

10 after January 1 of '15, on a policy -- an insurance

11 contract for coverage policy that has the words that I

12 cited as a way to be ambiguous in the ruling of excluding

13 all everything before that as to the ruling in summary

14 judgment on somebody's case that I'm now so confused I

15 can't tell you.

16        He will not make an argument that you can find

17 unfairness because we have that language in some policies

18 in this case after January of 2015.  He isn't going to

19 talk about policy language when he talks about

20 unfairness.  Attorney Kang is nodding his head.  If he's

21 not, he should be screaming at me.  Note the record he's

22 not screaming at me. He's not even speaking softly so

23 there will be no mention of policy languages or insurance

24 policies in this -- any other argument under what's

25 covered by a Charge 57 and is covered by the unfairness

1    argument in his burden of proof.

2         MR. GESTRICH:  I think you just clarified so the

3    language that's in 57 as to the insurance policies is

4    coming out; is that correct?

5         THE COURT:  Where is that language?

6         MR. GESTRICH:  Page 76 first full paragraph.  In

7    the second half of that paragraph.

8         THE COURT:  I see.

9         Would that be right to cut that?

10        MR. KANG:  That's fine.

11        MS. KINGSBERY:  We wouldn't object to that.

12        THE COURT:  Okay.  Agreed cut.

13        All right.  So any other objection you might

14   have overlooked and you said oh, my the God.  I didn't

15   tell her about this one.  But she's going to express

16   displeasure if I go back.  This is your chance.

17        Other than the numbers we have discussed, as far

18   as I'm concerned it is put to bed.  I mean this is 95

19   percent of the charge is put to bed.

20        MR. GESTRICH:  The only other thing are the

21   supplemental charges that we submitted that I understand

22   the Court will look at regarding relating to prejudgment

23   interest and --

24        THE COURT:  I haven't finished looking.  I did

25   gets that and I read it.  I haven't looked at all of the

1    cases you cite me.  But my sense was from what I have

2    looked at, this says you are entitled to it.  Certainly

3    if it was Connecticut, 100 percent and appears like

4    Florida has the same general rule.  I will paraphrase it

5    the way I know under Connecticut law.  Some certains are

6    due on the date they were billed or due and payable.  If

7    it takes 45 years to get to trial and get a verdict that

8    says yes, you should have been paid that in now 2012, you

9    should have been paid this or 2014, I will award you

10   prejudgment interest.

11          We'll probably argue about what rate applies.  I

12   will have to figure out if it's Florida or if it's 12,

13   whatever you want me to charge, but reserving that issue

14   of the rate.  I know of no reason under Florida law you

15   wouldn't be able to get that in a post -- it's why I

16   won't enter the verdict if it says you are entitled to

17   damages because I don't know how the heck I am going to

18   figure out what date it is from.  The verdict form right

19   now does not ask for every year.  But I have been known

20   on prejudgment interest to -- whatever.  I think I can

21   deal with it.  If you object, it will be appellate issue

22   487 for you.  Do you agree that's your position?

23          MS. KINGSBERY:  Yes, I thought the issue was

24   whether the issue should go to the jury or not.

25          THE COURT:  Correct.  And you agree it

1    shouldn't.  Are you preserving the right to argue that if

2    they found one claim shouldn't have been paid, it should

3    have been paid in 2014, that they get prejudgment

4    interest from 2014 to the date I enter judgment?

5            MS. KINGSBERY:  I'm sorry.  What was the

6    question?

7            THE COURT:  Is it your position -- because what

8    you just said doesn't answer my question.  I not only

9    just said to him it's not going to -- I don't think it

10   goes to the jury, and I will have to, you know, do a

11   final report to you that's my conclusion, but I'm

12   inclined to think that it should not go.  But my

13   conclusion is it shouldn't go because I'd read I don't

14   know how many cases he cited me that says they're

15   entitled to it under these circumstances.  I mean, they

16   rendered a bill to you on May 15 of 2014 and you didn't

17   pay it, let's say it would be 120 days after that.  You

18   didn't pay it by then.  Not that it's under the Prompt

19   Pay, but whatever it's under.  I don't know why they

20   wouldn't get paid interest.  Why do you get to keep that

21   interest?

22           MS. KINGSBERY:  We're not arguing that.

23           THE COURT:  So post verdict prejudgment, they

24   will ask me to award them X dollars, you will oppose and

25   I will decide and only after I decide that issue and what

1    I suspect will be a multitude of issues will I then enter

2    a verdict, at which point I'll get my post verdict

3    motions, and then I'll rule on those, at which point you

4    will take appeals.

5            Is that everybody's general understanding?

6            MS. KINGSBERY:  Yes, Your Honor.

7            MR. GESTRICH:  Yes, Your Honor.

8            THE COURT:  Thank you.

9            Remind me to talk to you about this.  You didn't

10   file a supplemental email to me or a list of cases, that

11   kind of stuff?

12           MS. KINGSBERY:  Regarding prejudgment interest?

13           THE COURT:  Yeah.

14           MS. KINGSBERY:  We sent you a briefing on

15   whether the issue should go to the jury or not.

16           THE COURT:  Yeah, on that.  I'm not sure I

17   particularly looked at cases you cited.  I thought they

18   were just from the Labs, but I will make sure I look.

19   But I mean, what you cited me supports what I just told

20   him I thought even his case is supported.

21           MS. KINGSBERY:  That's correct.

22           THE COURT:  Anything else?

23           MS. COSTIN:  Not on the jury charge, Your Honor.

24   Just what time would you like us here in the morning?

25           THE COURT:  Prejudgment.  The Labs raised that.

1838

1    And I said likely no, but we've got to tell you

2    definitively because I, to be honest, didn't finish with

3    all of a cases.

4            Time tomorrow.  Well, I don't know because I

5    don't know what agenda I have for tomorrow.  I probably

6    -- to the extent I can clear these issues that we have

7    outstanding, I would probably report to you on that or if

8    had more questions, I would ask them.  Whether we have

9    time to do that or not, I don't know.  I guess -- I think

10   I have identified two things that would include emails,

11   one from each side telling me how much time you need to

12   address this.  In other words, you were going to cite

13   evidence and I was going to look at it tonight and then

14   we were going to talk about it tomorrow.  So you need to

15   tell me how much time.  You need to tell me if you need

16   any time.

17           And you both need to tell me are there more

18   issues beyond what I told you I wanted to get tonight

19   that have to be addressed in the morning and how much

20   time.  And I would request that you confer before you

21   tell me that.  Understand I need to have a courtroom

22   deputy.  I can live without a courtroom deputy, but I

23   need this woman.  And she -- I don't know what time she's

24   going to bed in order to get here like this morning at

25   8:00.  She probably was in at 7:30 because she wants to

1    make sure her machine is working, she's connected, et

2    cetera.  She's probably going to be in bed if you tell us

3    after 9:15.  Let's assume that.

4         So you have to tell me how much time.  And if

5    you haven't been able to confer, just indicate we haven't

6    been able confer on this issue, Judge, because of your

7    wanting to know, and I will then probably confer with

8    Alex and we will get out an email to everybody saying we

9    need you to be here at, based on maybe what I would hope

10   to cover and based on what you told me.  How's that?  I

11   can't tell you now, is the short answer.

12        MS. KINGSBERY:  I think we have actually

13   resolved that one issue that you have --

14        THE COURT:  Which issue?

15        MS. KINGSBERY:  The statute of limitations.

16   That was the issue you asked us to let you know how much

17   time we needed and --

18        THE COURT:  Which part of the statute of

19   limitations, which case?

20        MS. KINGSBERY:  Cigna's statute of limitation

21   defense to the Labs' case, you had asked us to send you

22   evidence this evening --

23        THE COURT:  Right.

24        MS. KINGSBERY:  -- but we just resolved that

25   issue.

1    MR. GESTRICH:  Yes.

2    THE COURT:  What were you sending me evidence

3 on?

4    MS. KINGSBERY:  Whether there was evidence to

5 support the fact that the damages calculation includes

6 claims outside of the statute of limitations period.

7    THE COURT:  And we decided it did?

8    MR. GESTRICH:  We confirmed they will have

9 evidence and they do have evidence in the record.

10    THE COURT:  They have evidence that they have to

11 consider that.  So the charge -- I took one paragraph

12 out, but the other paragraph stayed.  That's that

13 paragraph, right?

14    MR. GESTRICH:  Yes, Your Honor.

15    THE COURT:  So no time tomorrow on that.  Was

16 there something you were telling us or -- and by a

17 certain time tonight and she was responding, was there an

18 issue you were going to give me something on?

19    MR. GESTRICH:  We discussed the *Mendez* case, and

20 after seeing how the rest of the charge played out, we do

21 not need time on that tomorrow.

22    THE COURT:  And what does that do to the issue?

23    MR. GESTRICH:  It was directed at primarily and

24 directly, the Court included the language from 627, 6131

25 and 638 either expressly or it made reference from the

1    earlier.

2         THE COURT:  Yes.

3         MR. GESTRICH:  I think that would address that

4    primarily and directly that the jury is considering those

5    components as well.

6         THE COURT:  So any notes I have in here about

7    you're telling me something about Mendez and they're

8    responding, that's a dead issue.

9         MR. GESTRICH:  We don't need to address that,

10   yes, Your Honor.

11        THE COURT:  Right now, do either side have

12   anything they know they want to address tomorrow morning?

13        No.  Okay.  I am going to say --

14        (Off-the-record discussion.)

15        THE COURT:  We have this huge unbundling issue.

16   I thought you were going to give me something on that --

17        MS. COSTIN:  You asked for it at 8:00 tonight.

18        THE COURT:  At 8:00 tonight.

19        MS. COSTIN:  You asked us to give you something

20   by 8:00 tonight.

21        THE COURT:  Right.  So let's try to talk about

22   that.  Let's say quarter to 9:00.  It depends on what you

23   give me, and I might not get through any of it.

24   Everybody should check -- it's too late.  You're going to

25   be awake, but you can have another cup of coffee.  So I

1  may make it 9:15.  But everyone should understand if I

2  say 9:15, that means neither of you have an issue nor

3  will you have an issue that you want to raise tomorrow,

4  okay?  Because in 15 minutes, the issues you guys or

5  ladies raise can't be dealt with so we're not going to

6  deal with.  9:15 is just so you're here, you're settled,

7  you've opened your computers, everybody is connected, the

8  witness is confirmed and ready to go.  I guess we're

9  reading Ligotti.  Maybe let's make it 9:00 because I'm

10  going to go --

11         MR. GESTRICH:  Would you like to address any of

12  the Borden issues tomorrow with the exhibits?  And I ask

13  that solely because I think the Labs would like an

14  opportunity to be at least heard on -- we're not offering

15  these exhibits to be admitted to the -- for the jury to

16  see, but rather to show the jury the level of

17  Ms. Borden's recollection when confronted with these

18  issues.

19         THE COURT:  That's one thing I have to tell you

20  you need to do.

21         MR. GESTRICH:  Yes, Your Honor.

22         THE COURT:  This exhibit list is not going to

23  delay the case going to the jury.  That means this has to

24  be put to bed by Wednesday afternoon, including exhibits

25  that are being offered by you and Cigna as we merrily go

1843

1     along for the next day and three hours or whatever it's

2     going to be, two hours.

3             I had a note and I forgot to tell you.  You have

4     to mark everything he put up that screen for I.D. and it

5     has to be added to your exhibit list.

6             MR. GESTRICH:  Yes, Your Honor.

7             THE COURT:  So let's start with that.  You said

8     Borden exhibits?

9             MR. GESTRICH:  The Eva Borden transcript

10    designations, there were exhibits.

11            THE COURT:  I was talking about today, I'm

12    sorry, with Welch, but you're talking about tomorrow?

13            MR. GESTRICH:  Yeah, possibly Wednesday.

14            THE COURT:  What did I say -- I don't understand

15    what the problem is.  I apologize.  I was completely

16    focused on a prior deposition that went in -- or a person

17    that a depo was used to the refresh recollection or

18    something.

19            MR. GESTRICH:  The --

20            THE COURT:  So what's the Borden issue?

21            MR. GESTRICH:  Eva Borden, the Court's overruled

22    a number of objections based on the -- overruled if the

23    document is admitted into evidence.  Most of the

24    documents we are not asking to be admitted into evidence.

25    It was merely to show Ms. Borden's level of recollection.

1844

1    The jury need not consider what the documents say, but

2    Ms. Borden, whenever she was shown these documents

3    relating, she cannot remember anything relating to this

4    investigation.  So we're not asking the jury to review

5    the documents.

6         THE COURT:  If you mark them in evidence, that's

7    what their obligation is.

8         MR. GESTRICH:  We are not asking to put those in

9    evidence.  We're just merely the opportunity to show the

10   deposition.  And we can black out the side of the screen

11   that shows the exhibits.

12        THE COURT:  That's what I would think because

13   they are not evidence.  I hope you have done that.  I

14   mean, I guess -- have I not given you my ruling on that

15   one?  I have to tell you, I have spent an inordinate

16   amount -- I've probably looked at Borden's four different

17   times the entire designation and objections because first

18   I didn't have the documents.  So I don't know if it's in

19   evidence, so it's not in evidence whatever I did on that

20   ruling because it wasn't in evidence.  I sustained if it

21   was.  Okay.  And then I finally got the translator I have

22   been asking for.  When did I get that one?  Yesterday, I

23   think.  Maybe I'm exaggerating.  Maybe it was it Friday.

24   But not -- maybe Friday.  And I went over it again.

25        Then I realized, wait a minute, they gave me an

1    exhibit number at trial, but I don't know if it's in

2    evidence.  So I've got to wait till Monday and find out

3    is it in evidence.  It took all -- Liana keeps telling me

4    none of them are in evidence.  I thoughts all of them but

5    the first, which said number not assigned.  I mean, now,

6    they are not in evidence, none of them are.  So whatever

7    -- I'm back to what I ruled when they are not in

8    evidence, I'm going to sustain the objection because you

9    read from it.  But if all it is is showing, yeah, the way

10   to deal with that is you've got to mark that for I.D.,

11   which I don't know, I guess four of the -- four or five

12   of the fix or six exhibits that are in the translator

13   have trial exhibit numbers, so I will tell her those are

14   all I.D.  But there's one that doesn't even have the

15   number, so you're going to have to mark that one for a

16   number.  I think it's Depo Exhibit 1, has no trial

17   number.  Have to mark that.

18            But during the showing, you are going to black

19   out any document that was put up on your split screen and

20   that's what you recorded was the split screen, just like

21   they did today.  Some of those are in evidence.  They

22   were allowed to show it.  Yours aren't.  You're not

23   allowed to show it, so black it out.  Otherwise, it's if

24   it's -- if you are reading into the record words from a

25   document not in evidence, I don't see how you can do that

1846

1    if the document -- I mean, I suppose if it was an

2    admission by a party opponent like a request for

3    admission, maybe.  But that would be in evidence.  This

4    was -- I don't know.

5         There were memos -- there were documents about

6    memos of meetings and she doesn't remember that meeting.

7    She doesn't remember a thing, for heaven's sakes.  But

8    you are asking about Bullet Point 5 in this Exhibit 5 to

9    the deposition that you marked 20 pages earlier, that I

10   had to go back and find out, okay, what's the bullet

11   point 5 to?  Is that in evidence?  Now that I know none

12   of them are, I didn't have to waste my time.

13        MR. GESTRICH:  One of them will be offered into

14   evidence tomorrow with Brian Evanko.  There were two

15   people on the memory.

16        THE COURT:  So I can't tell you what you can --

17   how to prepare that deposition.  I cannot tell you if I

18   don't know what that exhibit is.  What's the exhibit?  Do

19   they have an objection?  Is it a joint exhibit?  Is it

20   one they objected to?  Did you ask them are they going to

21   object if you offer it?  It's presumably on the list of

22   documents to be used with the witness tomorrow, right?

23   That's supposed to have been done by now.

24        How do you think I' going to rule on objections

25   reading from a document not in evidence?  It is hearsay,

1    right, among other things it could also be.  But as to

2    that, it is sustained.  It's not in evidence.  I spent I

3    don't know how much time today, and my clerk did the

4    same.  Not in evidence, Judge.  None of them.  You sure?

5    She went and checked again.  I'm sure, not in evidence.

6    Then I said, Ask the parties.  Do they claim that it's on

7    their list they marked?  Finally today just before I came

8    over, she tells me, no, they don't have them in evidence.

9         So right now Bernadette has left me.  She's long

10   gone home.  Something for me to proof to make sure she

11   properly wrote sustained, document not in evidence.  So

12   could you give me a clue which of the exhibits to the

13   deposition you think are going to be in evidence so maybe

14   I can look and see if it was more than an 801, 802

15   objection or whether it was another objection so I will

16   be specific in that?  So if you get it in, you will still

17   know if you are going to be able to ask the -- put in the

18   transcript because I maybe sustained another objection.

19        MR. GESTRICH:  Labs Exhibit 6940.

20        THE COURT:  Okay.  Do you know what it is at the

21   deposition?

22        MR. GESTRICH:  At the deposition --

23        THE COURT:  You don't have to tell me.  I mean,

24   it should be translated.

25        MR. GESTRICH:  It's on my screen.  I just have

1   to pull it up.

2         THE COURT:  By any chance, Attorney Kang, do you

3   know if you are going to object to that?  You told me you

4   don't --

5         MR. KANG:  Which one is this?  6940.

6         MS. KINGSBERY:  6940.

7         THE COURT:  What's it described as on the list

8   or what are the objections that you listed?

9         MR. GESTRICH:  Well, I can tell you it is

10   Deposition Exhibit 5 and it is the majority of the

11   deposition.

12         THE COURT:  Correct.  It's from when it's

13   introduced I think to the end on the designations.

14         MR. GESTRICH:  Near the end.

15         THE COURT:  And it's about a meeting, right?  An

16   email or minutes of a meeting and there's bullet points,

17   et cetera, no, or is it an email?

18         MR. GESTRICH:  It's a memo that was written from

19   Eva Borden directed to Brian Evanko, and Brian Evanko

20   will be on the stand tomorrow.

21         THE COURT:  I see.  And what are his objections,

22   do you know that?  Anybody know that?  Is it hearsay or

23   more?

24         MR. KANG:  Hearsay, 403.

25         MS. KINGSBERY:  403, 801.

1    THE COURT:  403 and what?

2    MR. KANG:  Hearsay.  403 and hearsay.

3    THE COURT:  403 and hearsay.  I will go back and

4 look at what Bern did.  I will proof that I have done the

5 correct rulings and then I will specifically look at the

6 ones I believe all the questions after 5 was marked

7 relate to 5; is that a fair statement?  You are going to

8 confirm that to me in an email by 7 o'clock.

9    MR. GESTRICH:  Yes, Your Honor.

10    THE COURT:  So I think it is marked somewhere in

11 the 20s, mid to late 20s.  It was marked in other words,

12 by the stenographer as Exhibit 5, and I believe -- it

13 appeared to me that everything after that -- but it could

14 be that there were some -- you went back to 3.  I'm not

15 sure.

16    MR. GESTRICH:  There is one additional exhibit,

17 but we'll mark that in the email.

18    THE COURT:  What do you mean one additional

19 exhibit?

20    MR. GESTRICH:  After 5.

21    THE COURT:  After.  So you'll tell me the

22 sections that you are questioning on something other than

23 5?  After 5 is marked, you will do that.  That would be

24 very, very helpful to me.  Thank you.

25    Anything else?  So what did I say, when are we

1    coming?

2              MS. COSTIN:  9:00.

3              THE COURT:  9:00.

4              MS. COSTIN:  9:00 unless we hear otherwise.

5              THE COURT:  If I -- depending on what I see from

6    Cigna on that 8:00 deadline and 9:00 to respond, you

7    should all check your boxes.

8              (Off-the-record discussion.)

9              THE COURT:  All right.  Well, then check your

10   box by 10:00 to see if the 9:00 start time I have given

11   you has been pushed back to something beginning with an

12   8.  Thank you very much.

13             (Adjourned, 6:22 p.m.)

14

15

16   COURT REPORTER'S TRANSCRIPT CERTIFICATE

17   I hereby certify that the within and foregoing is a true

18   and correct transcript taken from the proceedings in the

19   above-entitled matter.

20

21   /s/  Terri Fidanza

22   Terri Fidanza, RPR

23   Official Court Reporter

24            .

25

```
 1                              INDEX

 2                           EXAMINATION

 3    Witness Name                                       Page

 4    DEANNA ANDERSON

 5        Direct Examination by Mr. Kang ..................... 1530

 6        Cross-Examination by Mr. Christ.................... 1572

 7    WILLIAM WELCH

 8        Direct Examination by Mr. Kang .................... 1593

 9        Cross-Examination by Mr. Cunningham ............... 1599

10    MR. HIXSON

11        Direct Examination by Mr. Akerman ................. 1624

12    DR. KELLY CLARK

13        Direct Examination by Ms. Costin.................. 1628

14        Cross-Examination by Mr. Hare ..................... 1723

15    MICHAEL LIGOTTI

16         Video Deposition ..............................1757

17                    .

18

19

20

21

22

23

24

25
```