1          UNITED STATES DISTRICT COURT

2          DISTRICT OF CONNECTICUT

3    _____
     CONNECTICUT GENERAL )
4    LIFE INSURANCE CO.  )
     AND CIGNA HEALTH    )
5    AND LIFE INSURANCE  )
     CO.                 )
6         Plaintiffs )    NO: 3:19cv1324(JCH)
                      )    NO: 3:19CV1326(JCH)
7     vs.             )    October 29, 2024
                      )    8:19 a.m.
8                     )
     BIOHEALTH MEDICAL )
9    LABORATORIES INC, )
     PB LABORATORIES, LLC)
10   and EPIC REFERENCE )
     LABS, INC.         )
11        Defendants. )
     _____)    141 Church Street
12                            New Haven, Connecticut

13

14          DAY EIGHT OF TRIAL

15

16   B E F O R E:

17          THE HONORABLE JANET C. HALL, U.S.D.J.

18   A P P E A R A N C E S:

19   For CIGNA:        Edward T. Kang
                       Alston & Bird LLP
20                     950 F Street, NW,
                       Washington, DC 2004-1404
21
                       Michelle Nicole Jackson
22                     Alston & Bird LLP
                       1201 West Peachtree Street
23                     Atlanta, GA 30309

24          -- continued --

25                     Alexander Akerman
                       Alston & Bird LLP

```
 1                          350 South Grand Avenue
                            51st Floor
 2                          Los Angeles, CA 90071

 3                          Kelsey Kingsbery
                            Alston & Bird LLP
 4                          555 Fayetteville Street
                            Ste 600
 5                          Raleigh, NC 27601

 6

 7    For BioHealth Labs:   Scott M. Hare
                            Anthony Thomas Gestrich
 8                          Raines Feldman Littrell
                            11 Stanwix Street
 9                          Suite 1400
                            Pittsburgh, PA 15222
10
                            Fred Alan Cunningham
11                          Matthew Thomas Christ
                            Rafferty Domnick Cunningham & Yaffa
12                          2401 PGA Boulevard
                            Suite #140
13                          Palm Beach Gardens, FL 33410

14                          John J. Radshaw, III
                            John J. Radshaw, III, Esquire
15                          65 Trumbull Street, 2d Fl.
                            New Haven, CT  06510
16

17

18

19

20

21

22

23

24

25
```

1        THE COURT:  Be seated, everyone.

2        First of all, my apologies.  I'm pretty sure we

3   did not give you notice to be here at this time until

4   this morning, and that's on me.  I woke up in the middle

5   of the night and I thought, wait a minute, did we tell

6   them.  So my apologies.

7        We're here this morning in the Epic Labs, et al

8   versus Cigna, docket 19-CV-1326, and Connecticut General

9   Life, we're going to change that to Cigna versus

10  BioHealth, 19-CV-1324.

11       If I could have appearances please.

12       MR. HARE:  Good morning, Your Honor.

13       Scott Hare, Anthony Gestrich, and John Radshaw

14  for the Labs.

15       THE COURT:  Yes.  Good morning, sir.

16       MR. KANG:  Good morning, Your Honor.

17       Edward Kang, Alex Akerman, Kelsey Kingsbury, and

18  Michelle Jackson for Cigna.

19       THE COURT:  Good morning.  Thank you.

20       All right.  The reason I had to call you in is

21  there are a number of things I have to tell you as to my

22  thinking or what I'm doing that had to be done before the

23  jury gets in the room.

24       The first I think relates to the Ligotti issue

25  that I interrupted counsel on yesterday at the very

1   close.  I am going to amend my ruling on 57:3-17 of the

2   Michael Ligotti, October 21, 2024.  I'll call it document

3   designations and objections submitted by the parties and

4   upon which I indicated rulings and that was docketed.

5           If you can find the number of that docket for

6   me, Liana, I would appreciate it.

7           I believe we -- could someone tell me.  The

8   paralegal isn't here.  I believe we stopped at line 1 of

9   57.  Is that correct, sir?

10          MR. AKERMAN:  It is not.  I don't know the exact

11  line, but it was beyond that.

12          THE COURT:  Oh, beyond?

13          MR. AKERMAN:  Yes.  73-12, Your Honor.

14          THE COURT:  Okay.  73-12.  What did you just

15  say?

16          MR. AKERMAN:  73-12, Your Honor.

17          THE COURT:  Oh, I'm sorry.  You're right.  We

18  got past it, but I stopped it, one, because we were close

19  to the end and, two, because I thought it would be a good

20  place to pick up with this and then move right into that.

21  It would not sound discordant.

22          At 57, the objection had been to lines 3 through

23  lines 17, and I had sustained the entire objection.  Upon

24  closer reflection, my view is that there's a section to

25  referring patients and making money.  And later it is

1  clear, I think he's given three or four opportunities to

2  tell who said this and when or wherever, and Mr. Ligotti

3  really doesn't have a memory.  So it's a lack of personal

4  knowledge established anyways on the record.  It might be

5  his understanding, but we don't know the basis of his

6  understanding.  He certainly didn't say I was handing

7  over a bag of cash to somebody or vice versa.  Certainly

8  that involved the Labs.  These Labs, let me put it that

9  way.

10      My view is that lines 5 through the period in

11  line 7, I'll tell you logistically how we're going to

12  deal with this, and the section beginning at the very end

13  of line 12 to the end of line 17, is sustained under 801,

14  602.

15      The sentence reading when I saw those patients

16  and ending with for that testing in line 12, starting at

17  7 and line 12, may be read.  Obviously, there's a

18  logistical problem.  I see no prejudice to beginning the

19  testimony, having it keyed up this morning to hit play on

20  line 7.  The words "my office" doesn't convey any meaning

21  that's harmful from what I have cut out.  And the word

22  "and" at the end of 13 also doesn't convey any harm.

23      So as to that section, I am overruling the

24  objections because he's speaking about what he did.  His

25  personal knowledge of what he did.  Therefore, I don't

1    see a lack of foundation or hearsay.

2           As to the lines 5 and 6, and lines 13 through

3    17, I do see a 801, -2, and a 602 problem.

4           All right.  So I would ask if someone can

5    communicate to your paralegal to queue it up at line 3.

6    But he's going to have to go to line 7.  I realize he has

7    to ask the question.  So maybe it's logistically not

8    easy.  If he can start with "when I saw" and end at

9    "testing," that would be great.  But if not, those loose

10   vestiges in the front and the back, I have no problem

11   with. Then we would go to -- what did you think the page

12   was, sir, that we ended on?

13           MR. AKERMAN:  73-12.

14           THE COURT:  Does that sound right to the

15   plaintiffs?

16           MR. GESTRICH:  That sounds correct, yes, Your

17   Honor.

18           THE COURT:  Thank you very much.  So that's put

19   to bed.

20           The next issue, fee forgiveness.  I believe

21   during Mr. Goldfarb's testimony, and I have the

22   transcript here.  It starts about 1385.  He was shown a

23   Joint Exhibit 30 and testified about that policy.  No

24   effort was made to identify it as a policy dated sometime

25   from and after January 1, 2015.  So the jury basically

1858

```
1  heard this testimony about this policy that has fee

2  forgiveness language in it.  I think that's prejudicial

3  and it's going to challenge the jury to understand when I

4  tell them don't consider it.  Well, what is this policy?

5          So it is my intention, subject to hearing from

6  you, that in light of the position taken yesterday in the

7  charge conference, which I understand, I'm not going to

8  put it in a pretty way, but Cigna will not argue that

9  policies that have fee forgiveness language from and

10  after January 1 of 2015 are part of arguing fee

11  forgiveness in Cigna's case.  Right?  I will tell the

12  jury to disregard that testimony.  I'm just going to call

13  it Mr. Goldfarb, when he was discussing Joint Exhibit 30,

14  to disregard it.

15          I also may add language -- I clearly am going to

16  edit the charge in the Cigna's case on fee forgiveness to

17  reflect that either I have to take out anything that

18  suggests it's in the contracts because I understood

19  Attorney Kang will not argue that.  If I suggested that I

20  have to make sure that's not there.  I'm not sure exactly

21  how we edited or how we're going to edit it.  But that's

22  my intention.  But that you can see and comment on.

23          What I said just now, I need to advise you of

24  that, because I will the jury sometime either the

25  beginning or sometime at an appropriate break this
```

1    morning.

2         Attorney Kang.

3         MR. KANG:  Your Honor, I'm okay with that.  I

4    haven't had a chance, however, to connect with Attorney

5    Cunningham.  I certainly, as indicated during the

6    conference yesterday, I would prefer that Mr. Cunningham

7    not mention some type of this absence of fee forgiving

8    language because obviously that would not be accurate.

9    So if there can be agreement that neither side would

10   argue that in closing argument, that would be as

11   indicated in my charge conference.

12        THE COURT:  Did we talk about that last night?

13        MR. KANG:  Yes.

14        THE COURT:  I had the sense he wasn't.  I don't

15   remember precisely how that exchange went down.

16        Attorney Christ, you were there, and Attorney

17   Gestrich was there.  Attorney Cunningham was the one who

18   had to respond on the closing argument issue.  I remember

19   him sitting there in his chair, but I don't remember if

20   he said anything.

21        MR. GESTRICH:  I do not recall if he said

22   anything.  However, there is going to be glaring issue

23   with the jury seeing denials from Cigna on the Labs'

24   claims for fee forgiveness.  These are in our case

25   against Cigna.  So at least for those, we would ask for

1  the opportunity to say in these policies it did not have

2  that language.  And we don't need to address the paid

3  policies.

4      THE COURT:  In the claims in which it's said to

5  be fee forgiveness as the reason, you should understand

6  that those contracts of insurance don't have fee

7  forgiveness language.

8      MR. GESTRICH:  Yes, Your Honor.

9      THE COURT:  If you want to say it you can.  I'm

10  not sure Attorney Cunningham is going to do that.

11      Do you see a problem with that?  This is in

12  their case.

13      MR. KANG:  No, I don't.

14      THE COURT:  That opens up another question which

15  we don't have to deal with now, but I want to make sure

16  you understand it is kind of a tag along to what I just

17  said.  I'm told there's more than Joint Exhibit 30 among

18  the sample policies that are dated after January 1, 2015.

19  So, I don't believe anymore have been used.  I could be

20  mistaken about that.  But they're joint.  So I guess if

21  they have been used I've marked them into evidence.  And

22  that's I think a problem.  You can tell me at the charge

23  conference what I should do, if anything, about -- is it

24  30 that Goldfarb testified to?  Is it 30 that Goldfarb

25  testified to?  Was it joint?  It's a collection of

1    patient records.  That's one of the patient record files.

2    That doesn't make any sense.  I'd better find out what

3    exhibit it was.  Well, maybe I won't do this right away.

4    If somebody could identify the exhibits that are the

5    sample or representative policies.  They look like they

6    start -- there's some at 66.  Individual policy 2014.

7    Then there's five that are dated 2015.  Two are 2014 and

8    five are 2015.  This is all in the 50s of Joint Exhibits.

9    So if somebody can help me on that.

10            MR. KANG:  Your Honor, I believe I used Joint

11    Exhibit 57.

12            THE COURT:  It was 57?  All right.  It's hard to

13    tell.  It wasn't repeated in the segment that was copied

14    for me that I'm particularly -- so 57.  Can someone then

15    tell me are they all together, the policies?  Looks like

16    they might be.  51 -- no.  From 47 through 73.  Did you

17    mark that many policies?

18            MR. KANG:  That was part of the stipulation.  I

19    don't think I moved -- I certainly didn't use all of them

20    with Mr. Goldfarb.

21            THE COURT:  That's another question, what did

22    you use.  48 was used, but that's a 2013.  The Ahold one

23    was used, that's 57, with the witness Goldfarb.  I have

24    62 was used.  That's 2017.  63 is '14, 64 is '17, 65 is

25    '14, and 66 is '12.  So you have 64, 62, 57, and 56 are

1862

1    2015 sample policies that we'll have this language that

2    is not relevant to the jury's considerations.

3         I don't know what you want to do.  You can

4    either redact it, if you want to keep the policy in, or

5    we can just not introduce those policies.  Or you can

6    substitute that person's policy, that entity, Miami Dade.

7    You can put in their 2014 policy if you wanted to.  I

8    think we'll have to talk about this at another time.

9         MR. KANG:  Your Honor, our preference would be

10   to just redact the fee forgiving provisions.  You said

11   56, 57, 62, and 64.

12        THE COURT:  There's also 60.

13        MR. KANG:  Okay.

14        THE COURT:  Let me double-check that.  There's

15   also 54, Cigna's.  I assume they put in their own plan.

16   I believe -- no, you have got a lot down on 67.  Florida

17   individual '15, Florida individual '15, there's five

18   Florida individual 15's at Joint Exhibit 68 through 72.

19   So there's all those.  And then what did we say, 64, 62.

20        MR. KANG:  The Florida individual policies, Your

21   Honor, to be clear, does not have the post 2015 language.

22   So I don't think those need to be redacted.

23        THE COURT:  I'm sorry.  Say it again.

24        MR. KANG:  Those Florida individuals, they do

25   not have that language.  So I do not believe those need

1863

1   to be redacted.

2        THE COURT:  Do the Labs know or they're going to

3   have to check that it's not in there?

4        MR. GESTRICH:  That's correct.  We both stood

5   for the same reason.

6        THE COURT:  All right.  I didn't see you come

7   up.

8        So we'll strike 62 to 72.  So it would 40 -- I'm

9   sorry, it's not 40.  It's 48 -- no, I'm sorry.  That's in

10  evidence.  It is 54, 56, 57, 60, and that's it.  Okay.

11       Liana, would you leave me a note with those

12  numbers just so I have them correct.  I'm not going to

13  look at it now.

14       That then leaves a large issue for the Court.

15  Where shall I begin on this?

16       Is it correct, Attorney Kang, that with the

17  completion of this deposition you are resting?  You

18  haven't identified anymore witnesses.

19       MR. KANG:  That's correct.

20       THE COURT:  You can ask me to admit documents if

21  you wanted to at that point, but other than that.

22       MR. KANG:  Yes.

23       THE COURT:  I had my ruling in the summary

24  judgment brought to my attention last night about 10:30.

25  And I was reminded, which is really quite upsetting that

1    I had forgotten it, that I had made a ruling about

2    certain codes couldn't be part of claims filed by Labs.

3    I granted, I believe, summary judgment.  Do you remember

4    the page?  I'm probably getting this wrong.

5         Somewhere in here are codes.  Page 78.  It is

6    quite a ways back.  I didn't believe it could be that

7    late.  I'm sorry.

8         Cigna sought summary judgment on all

9    reimbursement codes billed by Labs -- this is on the Labs

10   case -- under certain CT codes barred by Cigna's, quote,

11   coverage policies.  Cigna asserts they were excluded from

12   coverage and whatever.  The Labs have responded that the

13   letter that was sent to them was inadequate to show they

14   were no longer reimbursable that I wrote was the

15   argument.  I'll confess, at that hour I didn't have time

16   to go back and reread the Labs brief as to what other

17   arguments you raised.

18        I say you disputed that there was a purported

19   change.  In other words, whether Cigna really did change

20   it.  I say the letter is clear.  So I granted in part,

21   and denied in part, as to those certain codes.  And I

22   denied in part about claims submitted after January 1,

23   2015, but I denied prior to them.  Okay.

24        I did look at Cigna's brief.  And, again, Cigna

25   uses the phrase twice, coverage policy.  And I have to

1    confess, it is my shortcoming, deficiency, that at this

2    stage of the case I was not focused on policy with a

3    capital P, like the exhibits we talked about, 57, or

4    whatever those numbers were.  And the question I don't

5    think was raised by the Labs of how is this an exclusion

6    of the policy.  In other words, the issue we have started

7    to talk about which I've indicated is the last elephant

8    in the room for me on the charge.  I've decided I think

9    every other issue except what relates to the bundling

10   issue in the Labs' case.  Clearly, Cigna is argue this in

11   the unfairness and we've indicated they are going to

12   argue it.  It just isn't right that you get to double

13   bill.  So that's not a problem.  It's in the Labs' case.

14           So, again, I will take blame for not having

15   focused on, although I'm not sure it was clear to me that

16   Cigna was speaking about what we have now identified as

17   billing practices, I will call it, just to distinguish

18   the word, that Cigna announces from time to time will or

19   will not be allowed to be billed, will or will not be

20   allowed to be paid if billed in a certain way.  That has

21   now become fairly clear to me and I think I have a

22   fundamental question to ask.  If it's not in the

23   policies -- and I just looked at a case this morning.  I

24   don't even remember the name.  It's Florida Supreme

25   Court.  But it applies the same law I applied to the fee

1    forgiveness pre 2015 to exclusion languages.  And I don't

2    know how I can read in billing practices to any exclusion

3    language.

4         Now, we're going to have time in the charge to

5    talk about this.  This is what we're going to spend the

6    charge conversation on this afternoon.  And I will at

7    that time talk about why I have such concerns, but I

8    think I will leave it at that.

9         Alex, can I see you for a minute.

10         (Discussion Off the Record.)

11         THE COURT:  The case I looked at was *Allstate*

12    *Insurance v. Orthopedic Specialists*.  It has no special

13    application to our issues other than the general law of

14    Florida on contract language and insurance policies.  So

15    Cigna submitted on October 28th proposed language.  I

16    didn't hear from the Labs.  I assume they will be

17    prepared to address this at the charge conference.  And

18    even Cigna has to say now on page 2 "implied in every

19    policy."  I don't know how you imply something into a

20    contract of insurance that's strictly construed.  So I

21    think we'll take that up after the jury leaves for the

22    day.  I thought it was important that I at least raise

23    it, so you have an opportunity maybe at lunch to prepare

24    that issue.

25         I believe that Alex -- I want to  --changing the

1    subject -- I want to confirm that Alex sent you an email

2    last night and he gave you the time used and how much

3    time is left until close of trial.  I believe that still

4    has an ending the two times together about midday on

5    Wednesday.  I said something yesterday about when the 42

6    hours runs, in effect when we're out on the time, the mic

7    will be shut off.  I'm not sure I will literally hold you

8    to that but it will be pretty close.  I want you to be

9    clear when the time runs out for your side and your mic

10   goes off, the other side has time his or her mic will

11   still run.  I don't know why I felt I needed to say it.

12   But I have a feeling I need to say more.

13          Then I discussed with you the fact at the charge

14   conference that I need to tell the jury that I forgot to

15   have Attorney Kang put on the record what the testimony

16   offered at the time of his case.  In other words, when

17   he was calling witnesses himself, not the Labs people

18   calling the witness to the stand.  Because, of course, he

19   cross-examined some of them and some of it was on his

20   case except for experts.

21          However, when Attorney Kang began the Cigna

22   versus Lab case he was calling the witnesses, and I

23   failed to have him tell me so you would know when he was

24   shifting his examination from his proof of the Cigna case

25   versus the Labs to the defense of the Labs versus Cigna

1    case.

2           So I just want to briefly, while the testimony

3    from yesterday is fresh in your mind, give you an

4    understanding.  I believe that Dr. Clark, this is what I

5    will say so I need you to tell me if I got it wrong.  Dr.

6    Clark, Mr. Welch were called only for Cigna's case.  No?

7    I see somebody shaking their head.

8           MS. COSTIN:  Dr. Clark is both.

9           THE COURT:  All right.  So I will start with

10   Mr. Welch was called only in Cigna's case against the

11   Labs; is that correct?

12          MR. KANG:  Yes.

13          THE COURT:  Okay.  Dr. Clark was called both in

14   support of Cigna's case and in defense of the Labs' case.

15   Is there a way I can divide her testimony or is like all

16   of she said, if you had to try this twice, you would call

17   her back and she would say the same thing.

18          MS. COSTIN:  I think 50/50 would be fine.

19          THE COURT:  Yeah, but I have to tell them what

20   50/50 --

21          MS. COSTIN:  We can calculate it.

22          THE COURT:  What topics?  When she was talking

23   about Thelian, clearly that was in defense.

24          MS. COSTIN:  Medical necessity goes to both.

25          THE COURT:  Right.  That was a major part of her

1    testimony.  Would you agree with me that that was a

2    significant part?  When she talked about Ms. Thelian

3    that's clearly in defense, right?

4         Well.  I will continue and somebody else can

5    come back and tell me the answer.  I thought the last one

6    was going to be hard.  Ms. Anderson, if you recall, you

7    heard her testify.  If you remember towards the end of

8    her testimony about 2015, she testified about that, in

9    other words that time period, she testified about the

10   lack of medical necessity and that evidence goes to both

11   cases, both in defense of the Labs' case for Cigna and in

12   support of Cigna's case.  It was offered by Cigna.

13        Another section was about lack of medical

14   necessity concerning PB Labs was offered in defense of

15   Cigna's defense to the Labs and in, also in connection

16   with the proof of their own claim.  In other words, the

17   Cigna case versus the Labs, so basically both cases.

18   Other than being told what part of Dr. Clark's, if any of

19   it, went just to the Labs' case, you have to tell me.  I

20   think Thelian is a defensive.

21        MS. COSTIN:  It was defensive.  It was also

22   anticipatory.  We thought Ms. Thelian would be coming

23   back to rebut Clark.

24        THE COURT:  That's still defensive.

25        MS. COSTIN:  Yes.

1           THE COURT:  In other words, you wouldn't have

2    had her testify about Thelian if I had let you try your

3    case separately.

4           MS. COSTIN:  Correct.

5           THE COURT:  On the medical necessity, for

6    example, that's both.  There's no question.  Roughly the

7    same --

8           MS. COSTIN:  I think the rebuttal portion to Ms.

9    Thelian's was that Ms. Thelian's report talked about the

10   20 patients and her analysis of that and her chart.  That

11   was rebuttal in part.

12          THE COURT:  Oh, the 20 patients.  Anything else?

13          MR. KANG:  Ligotti, Your Honor.  I think

14   Mr. Ligotti's testimony is both.

15          THE COURT:  Proof of what, sir?

16          MR. KANG:  Of medical necessity, so both cases.

17          THE COURT:  When do you think would be good for

18   me to say this to the jury?  First thing or after

19   Ligotti?

20          MR. KANG:  At the conclusion of Ligotti.

21          THE COURT:  Let me write that down, so, and

22   Liana --

23          Before you rest, so if I turn to you and ask you

24   anymore witnesses or are you resting or something like

25   that -- I didn't do it to you.  If I start to say, I'm

1  turning the case back to the Labs in defense of Cigna's

2  case, you need to pop up and say, "Judge, there was that

3  one other thing you mentioned that you wanted to discuss

4  with the jury."

5           MR. KANG:  Yes, Your Honor.

6           THE COURT:  You looked troubled, Attorney Hare.

7           MR. HARE:  To the contrary, Your Honor.  We have

8  all consciously avoided that word, "we rest."  I do

9  recall the Court informed the parties that we're going to

10 prioritize, among other things, witness convenience so we

11 can put evidence in out of order.

12          THE COURT:  So I will say something about that.

13          MR. HARE:  Thank you, Your Honor.

14          THE COURT:  It was my fault.  I did not ask

15 Attorney Kang to advise us all, the jury and me, of

16 parts of the testimony.  I may say to them, if you don't

17 mind, "Probably just as well, Ladies and Gentlemen.  You

18 will hear some of the testimony is for both, both their

19 defense and their offer for the case."  So I don't know

20 how you would have told me this is in my defense.  You

21 would have had trouble with that.  You can always

22 rationalize.

23          This is just a report on a charging issue so you

24 will understand.  I made the edits we discussed which

25 were very few.  However, there was a request for an

1    additional charge by the Labs. It's a five-page and it

2    proposes a prejudgment interest and medical necessity

3    determination additional charge to add to my already

4    discussion of that in the charge.  And at this point,

5    addressing pages 3 through 5 of that which is the medical

6    necessity one.

7        I would ask the Labs to please take what these

8    five pages, slap on a cover sheet with the caption, and

9    say the attached five pages were provided to the Court

10   and give the date if you remember and docket it today.

11       I am not going to give this charge.  I will

12   explain on page 3.  It refers to adding it to 26, 33 and

13   57.  It would actually be 54 and I can't remember -- the

14   other numbers are off by one or two in the draft, in the

15   version that will actually end up being given that I

16   couldn't tell you what it is.  It relates to medical

17   necessity.  I will not add it to the 54/55 one which is

18   in the Cigna charge because it is not a contract cause of

19   action.  They can argue anything.  They can argue that

20   the letterhead on your billing form they don't like, I

21   suppose if they want to.  I don't know how this would be

22   appropriate.  It could be inserted in the sections in 26

23   or 33 you referred to.  On the charge of medical

24   necessity under the contract, in my view, now I remember,

25   this is similar to something that Cigna spoke about

1    wanting in.  I can't remember, but it was yesterday's

2    discussion and I ended up saying, no.  That's really a

3    billing matter.  It is not the contract.  And as we're

4    learning as the days go by, there's a question of the

5    connection of the billing policies to the contract.  And

6    so I think if Cigna doesn't bill -- respond to the

7    billing in a way consistent with what's expressed here in

8    the requested charge, I don't think it can turn medical

9    necessity into something else.  In other words, that it

10   can make the bill covered because it didn't.  It is like

11   I don't think you can lose medical necessity because you

12   didn't bill right.  I don't think they can give you

13   medical necessity because you didn't bill right.  I'm not

14   sure that is clear, but that's what my ruling is.  I'm

15   not going to insert the language, Attorney Gestrich.

16           Just to confirm -- I will go over this at the

17   charge.  There's other edits, but I think pretty much

18   they were all agreed upon.  Maybe one in here that I

19   haven't told you about, but I will tell you.

20           Is there anything else, Alex?

21           (Discussion Off the Record.)

22           THE COURT:  I guess I should stop here given

23   yesterday's experience.  Are there any issues the lawyers

24   have?  I don't know if you would have told me you had

25   any.  Yesterday you didn't have any, and surprise, I

1874

1   think we had about six.  It was like ping pong, back and

2   forth.  Is there anything you are going to want to raise

3   before 9:25 that you want to raise now?

4        MR. KANG:  None from us, Your Honor.

5        MR. CHRIST:  Yes, Your Honor, just one

6   housekeeping matter I hope.  We received the Court's

7   rulings on Ms. Borden's objections last night.  I was

8   reminded, as I was looking through my emails this

9   morning, that Cigna has sent a request to us on Sunday to

10  withdraw some of their counter designations which were no

11  objections to.  So I'm just thinking of the best way to

12  just -- so if you are following along when we're playing

13  that video.

14       THE COURT:  Hold on just a moment.  I have that

15  out here.  Sorry, I think you noticed that I had

16  overlooked completely that if I sustain an objection to a

17  designation by the Labs then the cross designation

18  related to that comes out.  It appeared to me most of

19  those cross designations were identifiable because they

20  follow the designation.  So I took it upon myself to

21  figure out those would be excluded if the sustaining

22  still stands.  Why don't you just -- even if the document

23  comes in, then you would not include it.  Do you want to

24  put it on the record?  Is that what you want to do?

25       MR. CHRIST:  Your Honor, I want to make sure if

1  you are following along and then you'll say, "Wait a

2  minute, there's something" --

3          THE COURT:  Definitely, I will interrupt you.

4  So can you tell me what those are?  We can talk about

5  that exhibit also, then you would know how to prepare it,

6  the video that you are going to play.

7          MR. CHRIST:  It would be page 38, line 6 to 38

8  line 7.  Page 40, line 12 to page 40, line 15.

9          THE COURT:  Just a second.  I just got handed to

10  me what I docketed, so I can do on that.  Next one.

11          MR. CHRIST:  Then page 44, line 6 to page 44,

12  line 11.  And so those were the counter designations of

13  Cigna that follow that Exhibit 5, the objections that

14  were sustained.  Before that there were a few counter

15  designations they removed.  Page 7, line 13 to page 7

16  line 22; page 8, line 24 to page 9, line 10; page 9, line

17  16, to page 9, line 19; page 10, line 4, page 10, line

18  20; page 13, line 18, page 14, to line 20; finally page

19  25 line 8 to page 25, line 13.

20          THE COURT:  Okay.  Can counsel tell me when you

21  think you will play that?  I have her as -- she the last

22  -- she's the last witness prior to reading the Goldfarb

23  admissions; is that correct now?

24          MR. CHRIST:  Yes, Your Honor.

25          THE COURT:  Because you withdrew Thelian.  And

1   you told me yesterday Evanko one, Boorstein two, Thelian

2   three, Haney four, Borden five and six is the 30(b)(6)

3   admissions.

4          MR. CHRIST:  Yes, Your Honor.

5          THE COURT:  I found some more of the issues.

6   The only thing I would add to the requested charge about

7   medical necessity is to just make the point on the record

8   that I decided the burden of proof is on the Labs

9   initially and is on the Labs, strike initially.  This I

10  think also has the sense of it's really the burden on

11  Cigna to prove they responded to billing properly and

12  consistent with the policies.

13         In my view, this whole request goes to billing

14  which is not, at this point I'm not seeing it as part of

15  medical necessity.

16         Closing argument.  We really need to talk about

17  this.  You are not going to like what I will propose.  It

18  is neither sides.  Just to regroup, originally the

19  parties agreed 60 minutes each, no breaks.  Labs first.

20  Cigna last.  Yesterday the Labs changed their position

21  slightly saying they would like 45 for both their

22  arguments, I guess, or was it just on the Labs' case the

23  45?  Let's get that clear first.

24         MR. GESTRICH:  The Labs' case.

25         THE COURT:  And then Cigna would do -- Cigna

1  still wanted the whole 60 at once.  This is the Labs'

2  proposal, the Labs would reserve 15 to do their defense

3  to Cigna's case; correct?

4      MR. GESTRICH:  Yes.

5      THE COURT:  I'm troubled by that for a number of

6  reasons.  We're asking this jury to leave the room and

7  deliberate.  And it is very clear, I hope -- I will make

8  it very clear to them -- to remind them there are two

9  cases they are trying here.  And they should not consider

10  the evidence in one, necessarily, that's just for that

11  case in the other.  And they will be required when they

12  look at the verdict form to decide first, the Labs' case

13  and then Cigna's.  They can change the order but they are

14  going to do them separately.  They are not going to

15  answer the first question on the Cigna form and go over

16  and say, what are we going to decide on the Labs.  That's

17  not these cases.  In my opinion each having 60 minutes in

18  which you can ramble around about both cases and really

19  confuse the record in the two cases is not proper.  Now I

20  know the rule only allows me to control the mode of

21  questioning, whatever that is in chapter 6.  Doesn't talk

22  about the mode of closing argument, but I will assert my

23  authority.  If I don't have it, then I would be happy to

24  be educated on this point.  But I would find it very --

25  prejudice isn't the right word.  Well, it is prejudicial

1  to the jury process in this case.  It will not serve the

2  interest of justice.  It will not encourage the Labs --

3  sorry, the jury to stay within the lines of the two

4  cases.  I can explain that more.  I don't think I need

5  to.

6         So I have two proposals.  First, that the two

7  sides do what the Labs proposed.  15 on their case,

8  that's the last word they have on their case.  They don't

9  get a last word like they would if they were just trying

10 one trial.  Then Cigna gets up and they have -- you would

11 have to tell me how much time -- so many minutes to

12 answer the Labs' case -- argue the Labs case.  I don't

13 know the amount of minutes and therefore, I can't tell

14 the Labs that 15 is a reasonable amount to reserve.  But

15 when I know that, what Cigna's position will be on how

16 they want to split their time, then I will be able to

17 decide if the 45/15 split of the Labs is reasonable.  In

18 other words, I've never let somebody have an hour and

19 reserve 55 minutes.  I know it's a continuum.  That's

20 extreme.  Just so you understand where that concern

21 arises.  And why I can't confirm the 15 until I hear from

22 Attorney Kang.  One, as to this proposal.  And two, how

23 much time he thinks he'll spend answering the Lab's case.

24 Once he finishes on that time, he will or I will

25 specifically announce to the jury, we're now turning to

1    the closing argument of Attorney Kang in the Cigna versus

2    Labs case.  You will then commence in this first version

3    of my suggestion the Cigna versus Labs closing argument.

4    You would have to tell me how much time you would have --

5    in other words what have reserved in the Labs which is

6    therefore that which is remaining in the Cigna case.  And

7    the Labs then have their 15 minutes in defense of the

8    Cigna case only.

9         Now, I don't even like that.  Because if I were

10   Attorney Kang, I would say wait a minute, I get to rebut

11   that closing argument against my case by Attorney

12   Cunningham or whoever is doing it.  That's the benefit of

13   going second, his case being tried second.  I can't stop

14   that.  There's always someone who gets the last word.  To

15   be honest I would say actually prefer that we do three

16   parts:  Labs open, Cigna rebuts, Cigna argues against,

17   Labs have reserved some few minutes to respond to Cigna's

18   argument.  Everybody is done.  Labs sit down.  I tell the

19   jury you will now hear the closing argument in the case

20   of Cigna versus the three labs.  Attorney Kang, you do

21   your main argument on your case.  Labs' lawyer stands up,

22   "I will tell you, Ladies and Gentlemen, why you shouldn't

23   give them any money" or whatever.  And then whatever has

24   been left from Attorney Kang, he gets to say make a very

25   brief rebuttal.

1     That would be my second version of my view of

2  what needs to happen here.  So I need to hear from the

3  parties what's wrong overall with my approach and I

4  should to what the parties agreed, although at this point

5  they haven't agreed.  Assuming I'm going impose one of

6  these on the parties, which would you prefer?

7     I will start with Attorney Cunningham who

8  doesn't seem shy about getting up.  He must really not

9  like what I have proposed.

10     MR. CUNNINGHAM:  I thought you were coming to

11  me, Your Honor.

12     THE COURT:  Go ahead.

13     MR. CUNNINGHAM:  Your Honor, if I understand the

14  Court's proposal, so we have an hour to close in our case

15  against Cigna.  So we had said we would like 45 minutes

16  for the main closing then Mr. Kang give his closing --

17     THE COURT:  He would say give the entire bucket

18  and then you would get 15 just, just.

19     MR. CUNNINGHAM:  Which would be rebuttal in my

20  case.

21     THE COURT:  I didn't understand that.  I thought

22  it you said it would only be opposition to the Cigna

23  case.

24     Why do you get to be last?

25     MR. CUNNINGHAM:  Because I'm the plaintiff.

```
 1            THE COURT:  So is he.

 2            I think you all thought it was best to go first.

 3   This is the quote "prize."  This is the effect of my

 4   having to choose one of you to go first.  As the case has

 5   gone on, somebody may disagree with me in New York, but I

 6   think it was right to put the Labs first and so if you

 7   get to rebut the opponent's argument, I think Attorney

 8   Kang has to get to rebut.  Unless he tells me he doesn't

 9   want it and I haven't heard yet.  So you are telling me

10   that you were saying 45 for the Labs case and 15 to

11   respond to Attorney Kang in the Cigna case and rebut

12   Cigna's argument on your case.

13            MR. CUNNINGHAM:  Yes.  My overall concern is for

14   the jury who has been extraordinarily patient and

15   attentive.  I don't want to incur the wrath of the jury

16   on behalf of my client.  My overall thought is there's so

17   much overlap between our case against Cigna --

18            THE COURT:  Not when they go into the jury room.

19            MR. CUNNINGHAM:  I understand that.  I think we

20   can explain that in opening.  I'm concerned that

21   basically we're going to do twofold closing.

22            THE COURT:  What if I gave you another ten

23   minutes?

24            MR. CUNNINGHAM:  To do what?

25            THE COURT:  Total closing time that you would
```

1    divide into three pieces.

2         MR. CUNNINGHAM:  Your Honor, I think it is

3    certainly a discretionary call.  I would say not object

4    strenuously to that.  If I can't explain what I think --

5         THE COURT:  Alright, but --I cut your argument

6    off.  I'm sorry.

7         MR. CUNNINGHAM:  I'm mindful of the fact that

8    tomorrow or Thursday is actually Halloween as well.  And

9    so I want to get this case to the jury as quickly as we

10   can.  So I think we'll be fine with any proposal the

11   Court has.  I want to make sure we have enough time for

12   our main closing in our case and I don't need 45 minutes

13   to give my closing argument in the defense of Cigna's

14   case --

15        THE COURT:  I understand that.  I understand

16   that.  But I also -- What?

17        MR. CUNNINGHAM:  Can I say this last thing, Your

18   Honor?

19        THE COURT:  Certainly.

20        MR. CUNNINGHAM:  I think I have figured out the

21   way I would like this to go.  We do our main closing in

22   our case against Cigna.  Mr. Kang gets to get up and give

23   his full closing in defense of that case.  And then I get

24   some time for rebuttal, however we divide that up.  When

25   Mr. Kang does his closing on his case against us.  I'm

1    not going to take much time, Your Honor.  I might need 15

2    minutes for that closing.  Then I think maybe Mr. Kang

3    can rebuttal on that because that is the case in which he

4    is the plaintiff.

5            THE COURT:  Correct.  That was what I was

6    proposing on my second alternative on my view because we

7    had to do one or the other of that.

8            MR. CUNNINGHAM:  That makes sense, Your Honor.

9    I think that lets both sides get rebuttal, but I think it

10   also recognizes there is no way the second closing should

11   be as lengthy as the closing as plaintiff.

12           THE COURT:  No that's -- As I gave the example

13   somebody tries to reserve 55 minutes in a case with me, I

14   would say no, you can't reserve it.  I do think I have

15   the ability to control closings.  It has to be a

16   responsive.  You can't cross on damages.  In other words

17   if the plaintiff gets up and doesn't argue damages and

18   the defendant doesn't say a word about damages in his

19   responsive argument then the plaintiff doesn't get to

20   mention damages.  When you are saving 55 out of an hour

21   or ten out of 20.  I'm smelling a rat.

22           MR. CUNNINGHAM:  The bottom line is we would

23   like an hour for closing in your case against Cigna, and

24   I'm fine with 15 minutes for my closing in Cigna's case

25   against us.

1    THE COURT:  Tell me again the times?

2    MR. CUNNINGHAM:  An hour when we're closing on

3  our case against Cigna.  Which will be main closing then

4  probably 15 minutes of rebuttal.

5    THE COURT:  You are already past any time that's

6  been mentioned.

7    MR. CUNNINGHAM:  Pardon me?

8    THE COURT:  How are you dividing that hour?

9    MR. CUNNINGHAM:  I was going to say 45 minutes.

10    THE COURT:  Okay.  That's what I want to know.

11  How much in your opening argument of your case?

12    MR. CUNNINGHAM:  45 minutes which I don't think

13  I will use.

14    THE COURT:  Don't tell me that.  Just 45.

15  What's your rebuttal?

16    MR. CUNNINGHAM:  15 minutes, Your Honor.

17    THE COURT:  You do need the extra ten.  That's

18  your defense to Cigna's case if I give you ten, it will

19  be ten.

20    MR. CUNNINGHAM:  Ten or 15, Your Honor.

21    THE COURT:  Then you have to pare somewhere

22  else.  I'm not giving more.  The jury -- it's hard to

23  listen longer.  You all know that.

24    MR. CUNNINGHAM:  I would say then, Your Honor,

25  40 minutes for my main closing in my case.  15 for

 1    rebuttal.  Then ten minutes to close.

 2         THE COURT:  I'm not agreeing.  I just want to

 3    know.

 4         Can I turn to Attorney Kang.  What's your

 5    position?  I haven't heard a word from you generally as

 6    to my two proposals as to what it is going to be.  It is

 7    not going to be you do 60 minutes, Attorney Kang, when

 8    you wander both of the land of Labs' case and Cigna's

 9    case.  It's a good idea.  Took me a day to get my head

10    wrapped around that.

11         MR. KANG:  I'm fine with this proposal.

12         THE COURT:  Can you tell me what you think?  We

13    can adjust the times.  I want to have a general idea so I

14    can react and tell you that I have a problem.  You can't

15    reserve that much, whatever.  It will probably be you

16    can't reserve that much.

17         MR. KANG:  So on the Labs' case, on my rebuttal

18    to their initial opening, I would say 15 to 20 minutes,

19    Your Honor.  Give or take.  And then when it switches

20    over to our case.

21         THE COURT:  Your case-in-chief, your argument.

22         MR. KANG:  My initial open may be 35 to 40

23    minutes.

24         THE COURT:  Okay.  So you will reserve 20 to 25.

25         MR. KANG:  Do I have that much time left?

 1          THE COURT:  You have more.  You have 30 to 35 if

 2   I give an hour and ten which Attorney Cunningham is

 3   assuming I am giving.

 4          MR. KANG:  In that case I will do 45 on the

 5   initial open.  I will do ten minutes on -- ten to 15

 6   minutes on my rebuttal.

 7          THE COURT:  What's that put you over on?

 8          MR. KANG:  That puts me over on the other side

 9   about 15, 20 minutes.

10          THE COURT:  15 to 20.  I'm not locking those in

11   gold.  I want to have an idea.  I will come back with my

12   reaction to your idea.  You may say -- first, remind me

13   to ask you, have you changed your view how to split the

14   time?  I will have some sense of what I think is

15   appropriate.

16          Did we deal with your issue, Attorney Christ?  I

17   can't remember what it was that's why I'm worried.

18          MR. CUNNINGHAM:  He has lots of issues.

19          THE COURT:  I know he does.

20          MR. CHRIST:  I thought we did.  It was the

21   Borden designation.

22          It was brought to my attention Cigna made a

23   change to one of their counter designations at page 40.

24   It is now line 6, not line 8.

25          Page 40.  It was page 40, line 1.

1           THE COURT:  No.  Oh, 1 to 8.

2           MR. CHRIST:  And it's now 1 to 6.

3           THE COURT:  I might have actually caught that

4   and wondered about that.  Obviously that thought didn't

5   get itself on to this page.  Okay.  But then they want

6   that, unless exclude it because the exhibit's not

7   admitted.

8           MR. CHRIST:  Exactly.

9           THE COURT:  All right.  Now, I think there's a

10  couple other things I had in mind to do this morning.

11  But most of them relate to bundling and unbundling.  So

12  we'll save that for the charge conference.

13          So let's talk about this document.  My

14  understanding is, and I made my rulings.  Attorney Kang,

15  you indicated in your email to me that you withdrew your

16  403 objection about this memo.  I believe it was written

17  by Ms. Borden.  It is a three-page memo to Mr. Evanko and

18  another person I can't remember.  A lot of L's in the

19  name and that's all I remember.

20          You withdrew the 403 but, if you remember, you

21  also threw in 602 and 1002 to almost every objection.  I

22  assume those were withdrawn, because you then you made a

23  further statement that if I let the document in, if I

24  overrule a hearsay objection, it can come in.  So to me

25  that means you were saying indirectly the only objection

1    I have is hearsay.  So I acted accordingly.  I didn't

2    address the 602(a) and the 1002, and whatever else was

3    asserted when you did the 403.  I took that in your email

4    as 403, et cetera.

5           Was I right, Attorney Kang?

6           MR. KANG:  That is right.  We actually

7    previously withdrew those 602 and 1002.

8           THE COURT:  Was that communicated to me?  I

9    don't remember.

10          MR. KANG:  It was one at one of our many

11   pretrial conferences.

12          THE COURT:  That's not good.  That doesn't make

13   me feel good.

14          (Discussion Off the Record.)

15          THE COURT:  That document is that three-page

16   memo.  I apologize for that interruption which clearly

17   distracted me, because it's very distressing.

18          And, of course, Ms. Borden didn't remember, I

19   guess, writing it.  So I need to know -- the objection is

20   hearsay.  What would be the response to that objection in

21   terms of the admissibility of 6940 on the Labs' list, is

22   that correct?

23          MR. CUNNINGHAM:  Your Honor, this is not

24   hearsay.  This is a statement of an opposing party.  And

25   this goes to motive, intent, and plan, state of mind.

1  Parts of it have already been testified to I believe.

2         THE COURT:  I understand that.  Let's take them

3  one at a time.

4         If it's statement of a part opponent, it would

5  come in for the truth of the matter asserted.  My

6  understanding is that Mrs. Borden at the time, before she

7  moved on Enviro, whatever the thing that's in Chicago,

8  that Cigna required I guess.  Anyway, she's in that

9  company having to do with claims.  But before that she

10 was head of the Risk Group.  The Chief of the Risk Group

11 I believe is in there.

12        If I'm wrong about that, attorney Kang, you'll

13 correct me so I won't be thinking that.

14        MR. CUNNINGHAM:  I believe that's what

15 Mr. Norton testified to, Your Honor.

16        THE COURT:  Okay.  And as such, she's writing

17 to, what I understand, clearly to be her superiors, maybe

18 even one and two levels above her, to get to the top of

19 the company, the Cigna Health Company.  If I'm wrong

20 about that somebody is going to correct me.  Am I wrong?

21        MR. KANG:  Generally correct.  I think at the

22 time Mr. Evanko was the head of a particular business

23 segment, not of all of the Cigna Health.

24        THE COURT:  You're right.  It was since this

25 that he gets elevated to the head, CEO I'll call it.  I

1    see.

2         Above Mr. Evanko, was there anybody other then

3    the then CEO of the company who is the party to these

4    cases?

5         MR. KANG:  At this time in 2015?

6         THE COURT:  Yes.

7         MR. KANG:  I believe there were a couple of

8    layers between Mr. Evanko and the CEO of the company at

9    that time.

10        THE COURT:  Only in corporate America.

11        My comment shouldn't have been made, but it's

12   not just about Cigna.  It's just that there's lots of

13   layers.  All right.

14        And Evanko, in his position at the time, is whom

15   this woman reported to, right?

16        MR. KANG:  That's correct.

17        THE COURT:  Okay.  And it's a three-page memo,

18   as I view it, really giving an overall assessment of

19   what's been recovered so far about what has been referred

20   to as the South Florida substance abuse issue and the

21   unsustainable level of claims being made by various

22   entities including, in particular, labs and testing labs.

23   Have I fairly characterized that?

24        MR. KANG:  Yes, Your Honor.

25        THE COURT:  So why isn't it a statement of party

1    opponent?  I mean, she's clearly high enough in the

2    company.  This is something that's in the Risk

3    Department.  It's something she's authorized to speak on.

4    She's the one who gave an oath in support of a document

5    that really went to the same subject.  The company put

6    her forward to speak, in effect, to write the thing that

7    would speak for the company.  I'm referring to that memo

8    that was the subject to the third motion to compel.

9         So all of that tells me she's authorized to

10   speak on the subjects in the memo.  And that I believe is

11   what's required under the exception of party opponent in

12   801.  Made by the party in an individual -- it was a

13   representative capacity.  Is the party manifest that it

14   was adopted and believed to be true?  Well, to the extent

15   she had any memory, she certainly I think confirmed that

16   these topics in some extent confirmed these were being

17   discussed.  But we've had other evidence just referred to

18   by Cigna that would confirm that.  Made by a person whom

19   the party authorized to make the statement.  I've just

20   addressed that.  It was made by an agent on a matter

21   within the scope.  Agent or employee within the scope of

22   that relationship and while it existed.  That was

23   addressed.  Co-conspirator doesn't apply.

24        So I guess I would like to hear Attorney Kang

25   why it wouldn't qualify under that exception to hearsay.

1    MR. KANG:  We don't object to that if

2  Mr. Cunningham lays the foundation with the witness.  I

3  think that would be sufficient.

4    THE COURT:  You mean Mr. Evanko?

5    MR. KANG:  Yes, through the witness if he lays

6  the foundation.

7    MR. CUNNINGHAM:  I thought they said they

8  removed their foundation objection under 602.  I can do

9  it, Your Honor, but I thought it was unnecessary at this

10  point.

11    THE COURT:  I thought I just had a hearsay.  If

12  foundation means --

13    MR. KANG:  I meant foundation for the hearsay

14  exception, yes.

15    THE COURT:  I'm not convinced it isn't already

16  laid, but I guess it wouldn't hurt you on appeal,

17  Attorney Cunningham, if you tried to see if you could get

18  Mr. Evanko to cooperate and lay further foundation if his

19  memory is better.  But yeah.  Absent that, I'm not saying

20  it's not otherwise already admissible.

21    Also, to be honest with you, not all emails are

22  business records.  That's for sure.  But some are.  And

23  to me, this is the head of Risk who has been charged with

24  evaluating a very troubling situation, rightly so, for

25  the company.  Okay.  And this is her sort of report I'd

 1    call it or an interim report, whatever, but it is clearly

 2    a report to the people who supervise her and who, in

 3    turn, are going to have to report up eventually to a

 4    Board of Directors.  What are we doing in south Florida?

 5    What are we going to do about it?  Obviously, the company

 6    amended policies, changed billing, whatever.  You did all

 7    the things you did.  In my opinion, it's a business

 8    record because it's, I don't know, maybe there's 27 other

 9    reports that would summarize what this investigation was,

10    but this is the only one that I have seen that does that.

11    You know, pulls everything together.

12         So, to me, I think it could be made a business

13    record under 802.  Would you object to that?

14         MR. KANG:  No, Your Honor.  We don't disagree

15    with this.  Frankly, Your Honor, we were just sort on

16    maintaining the procedural position.  But we're happy to

17    withdraw it.

18         THE COURT:  All right.  So is the jury here,

19    Liana?

20         THE CLERK:  Yes.

21         THE COURT:  They're all here?

22         THE CLERK:  All here.

23         THE COURT:  God bless them.  This jury is

24    unbelievable.

25         MR. KANG:  May I have one minute, Your Honor?

1    THE COURT:  Yes, quickly.  It's got to be awful

2    quick, Attorney Kang.

3    (In the presence of the jury at 9:32 a.m.)

4    THE COURT:  Be seated, please.

5    Good morning, ladies and gentlemen.  My

6    apologies for being distracted there.

7    Welcome back.  We're getting close to the end.

8    Unfortunately, and you may not know this, but myself and

9    the lawyers have been busy working almost as much time as

10   you're in the courtroom after you're gone and before you

11   are here.  And that's why we were a minute or two late

12   this morning was wrapping up what we came in at 8:15 to

13   discuss.  And we will continue discussions after you

14   leave tonight.

15   Please understand that I'm trying my best to get

16   this done when we're going to get it done I told you, but

17   there's a lot that has to be addressed before they can do

18   closings and I can give you the charge.  Thank you for

19   your patience.

20   If you recall, yesterday I stopped and excused

21   you in the middle of Mr. Ligotti's deposition.  So we're

22   ready to continue the Ligotti deposition at this time.

23   If counsel is ready to play where I said.  Hold on just a

24   minute.  Let me get to that page.  Be sure that we're all

25   on the same page.  Yes, we are.

1    So if you could play those lines that we

2    discussed.

3    Go ahead.  Thank you very much.

4    (9:34 a.m. playing the video deposition of

5    Mr. Michael Ligotti.)

6    THE COURT:  That completes the reading of that.

7    Anymore witness you wish to call, Attorney Kang?

8    MR. KANG:  No, Your Honor.  I do want to remind

9    the Court, I believe you had something that you were

10    going to read.

11    THE COURT:  Yes.  I did have one question for

12    you about that, sir.

13    With respect to this deposition, I know you

14    pointed out that a portion of it was on both, on the

15    medical necessity.  What was the rest of it, would you

16    characterize it?

17    MR. KANG:  I believe the entire transcript is

18    both.

19    THE COURT:  All right.

20    Ladies and gentlemen, I know you remember when I

21    started I made a very big point that there's two cases

22    we're trying here.  You've going to have two verdict

23    forms to fill out.  And in the beginning I attempted to

24    be clear when the Labs were putting on their case that

25    Attorney Kang let us know when he was questioning a

1  witness, you know, when he stood up that would be in

2  defense on the Labs' case on behalf of Cigna.  But then

3  if he shifted to doing some evidence about his own claim,

4  he would mention that because I had asked him to.

5      The purpose, by the away, I think I told you,

6  calling a witness once and maybe sometimes do parts of

7  both cases was for the convenience of the witnesses.  I

8  mean, not to have to make them come back again.  Okay.

9  Here's your testimony in the Labs case.  Goodbye.  Go

10  back to wherever you live, and then come back again in 5,

11  6, 7 days and we'll put you on for Attorney Kang in his

12  case.

13      So we decided you would be able to separate the

14  evidence when you go deliberate that's been offered in

15  each case separately.  Unfortunately, yesterday I failed

16  to ask Attorney Kang to let us know on the witnesses he

17  called.  So, in effect, we heard four or five witnesses

18  and it wouldn't be clear.  It might be clear to you, but

19  it wouldn't necessarily be.  So I'm going to briefly tell

20  you how to consider those witnesses from yesterday when

21  Attorney Kang was questioning.

22      If you recall, Mr. Welch came.  And that one is

23  easy.  That's only in Cigna's case.  In other words, to

24  prove Cigna's claim that was the testimony.  It will be

25  offered and argued to be considered by you.

1       With respect to Ms. Anderson, if you remember

2  her, she was part of the SIU and she came and testified.

3  That was primarily offered in the Cigna's case against

4  the Labs.  However, there were two areas that Attorney

5  Kang wants the evidence to be considered in both cases.

6  In other words, if we made her come twice, she would have

7  had to repeat the same testimony in each case.  Those

8  areas generally are lack of medical necessity with

9  respect to PB Labs in the time period towards the end of

10 2015.

11      The other area that should be considered in both

12 cases, the other area was lack of medical necessity,

13 again, concerning PB Labs.  I guess that's generally that

14 whole topic, not just late 2015, was offered in both

15 cases.  Her testimony on medical necessity about PB Labs

16 was offered by Cigna both in their case where they are

17 claiming unjust enrichment, and in defense of the Labs

18 cases where they have three different causes of action

19 where they are claiming they should be paid from paid

20 invoices.

21      The next witness, you just heard the last few

22 minutes of him, that was Mr. Ligotti.  And Cigna has

23 offered that in both cases.  Mr. Ligotti's testimony

24 would be both in support of Cigna's claims and in defense

25 of the Labs' claims.

1           And the last is Mr. Hixson, that's another easy

2     one.  I started with an easy and ended with an easy.  He

3     was called only in defense of the Labs' claim, not in

4     support of Cigna's claim.  So Mr. Hixson's testimony

5     should be thought of only for that purpose.

6           Have I covered all of your witnesses and fairly,

7     if only roughly, described where it is to be used?

8           MR. KANG:  Yes, Your Honor.  Thank you very

9     much.

10          JUROR 9:  Dr. Clark?

11          THE COURT:  Oh, thank you.  So I didn't cover

12    them all.  Dr. Clark.

13          As I said, we were here a little bit late last

14    night.

15          Dr. Clark was offered in both on medical

16    necessity certainly, which was a significant portion of

17    her testimony.  That is in both cases.

18          Thank you very much for catching us on that.

19          Anything further?  Any exhibits to admit into

20    evidence or offer that haven't been admitted that you

21    think should be or any witnesses, Attorney Kang?

22          MR. KANG:  No, Your Honor.

23          THE COURT:  Thank you very much.

24          At this point we'll turn back to the Labs who

25    have an opportunity to offer witnesses in defense of the

1    claim against them by Cigna.  Again, that's the second

2    case that we just heard from the Attorney Kang his

3    witnesses were primarily to support his claim.  Now the

4    Labs get to briefly call a few witnesses in defense of

5    Cigna's claim.

6            MR. CUNNINGHAM:  Thank you, Your Honor.  May it

7    please the Court.  The Labs call Brian Evanko.

8            THE COURT:  Mr. Evanko, would you come up to the

9    witness stand.  And when you arrive, I'd ask if you'd

10   remain standing just a moment.  The Clerk here is going

11   to administer an oath to you.

12           Come right up here, sir.  Thank you.

13           BRIAN EVANKO, having been called as a witness,

14   was first duly sworn and testified on his oath as follows

15           THE WITNESS:  I do.

16           THE CLERK:  Please be seated.

17           Please state your name for the record and spell

18   your last name.

19           THE WITNESS:  Brian Evanko, E V A N K O.

20           THE COURT:  Whenever you are ready, sir.

21           Good morning, Mr. Evanko.

22           MR. CUNNINGHAM:  May it please the Court.

23                 DIRECT EXAMINATION

24   BY MR. CUNNINGHAM:

25       Q.   Good morning, Mr. Evanko.

1        A.    Good morning.

2        Q.    We have not met yet, have we, sir?

3        A.    No.

4        Q.    Sir, my name is Fred Cunningham.  I'm one of the

5   attorneys for the Labs.  Very nice to meet you, sir.

6        A.    Nice to meet you.

7        Q.    Sir, you did not give a deposition in the case,

8   did you?

9        A.    I have not given a deposition.

10       Q.    Sir, for whom do you work?

11       A.    I work for the Cigna Group.

12       Q.    How long have you worked for Cigna?

13       A.    Since 1998.

14       Q.    So about 26 years now?

15       A.    Yes, sir.

16       Q.    What is your current job title?

17       A.    I'm the Chief Financial Officer of the Cigna

18   Group, and I'm the President and CEO of Cigna Health

19   Care.

20       Q.    So are you the Chief Financial Officer for the

21   entire Cigna Corporation?

22       A.    Yes, I am.

23       Q.    And what are your duties as Chief Financial

24   Officer, briefly?

25       A.    Well, I'm responsible for all the financial

1    reporting requirements that the company has to comply

2    with SEC regulations.  I have to interact with the

3    investors since we're a publicly traded company.  We work

4    with our business teams to evaluate the growth

5    strategies, set budget goals for the departments, that

6    sort of thing.

7         Q.   I think you also said that another title you

8    have is related to the Cigna Health Care Group in

9    particular, right?

10        A.   That's correct.

11        Q.   What is that title?

12        A.   I'm the president and CEO of Cigna Health Care.

13        Q.   Okay.  And so does that mean you run the entire

14   Cigna Health Care Division?

15        A.   Yes, I do.  That's one of our two operating

16   divisions in the company.

17        Q.   Okay.  Sir, did you review any documents in

18   preparation for your trial testimony?

19        A.   Some documents were shared with me by our

20   counsel.

21        Q.   And we're going to go over I think four

22   documents during my examination of you.  Can you tell us

23   generally what documents you would have reviewed?

24        A.   I didn't have too much time to review documents.

25   I saw a few emails.  There was a couple of PowerPoint

1     type presentations from 2015, things along those lines.

2     But I didn't have much time to review these things.

3         Q.   And I presume that you met with Cigna's counsel

4     to prepare you for your trial testimony?

5         A.   Yes, sir.

6         Q.   I don't want to know anything you all talked

7     about, but how many meetings did you have?

8         A.   Let's see.  I believe three, over the course of

9     maybe three or four weeks.

10        Q.   If you total the amount of time that those three

11    meetings took, what would that be?

12        A.   Roughly three to four hours total.

13        Q.   Now, sir, did reviewing the documents you

14    reviewed refresh your memory as to the events that we're

15    here to talk about in this trial?

16        A.   To some degree.  I mean, it's almost ten years

17    ago.  But to some degree.

18        Q.   Let me try to start with an easy one, sir.  Can

19    we agree that the events that we are here to talk about

20    in this trial really occurred between 2013 and 2017?

21        A.   I believe so.  I'm not exactly familiar with all

22    the details of what the trial is about.  But I believe

23    that's the case based on the documents I saw.

24        Q.   Thank you, sir.

25             Now, sir, what was your job title back in 2013,

1    2014?

2        A.    At that time I was the President of our U.S.

3    Individual segment.

4        Q.    Okay.  What does that mean?

5        A.    So within our U.S. businesses, we have an

6    employer oriented health insurance business.  So

7    employers who buy health insurance for their employees.

8    And then we also have an individual business.  So this

9    would be for individuals who don't have access to a plan

10   through their employer or they don't qualify for Medicaid

11   or they don't qualify for Medicare so they have to buy

12   their own insurance.  And that was the business I was

13   responsible for.

14           It was a small business for our company.  It was

15   only about 3 percent of the total company's revenue.  But

16   it was for individuals who had to buy insurance directly.

17   So they could be unemployed.  They could be between jobs.

18   They could be self-employed.  They could work for a small

19   employer that doesn't offer health benefits, or they

20   could be early retirees.  Those are the types of

21   individuals that would buy insurance from my team.

22       Q.    Okay.  And as I understand it, please correct me

23   if I'm wrong, at that time Cigna sold two different type

24   of health insurance policies, one to the individuals that

25   you were just describing, and another class of policies

1   to employers who would provide health insurance for their

2   employees, correct?

3       A.   Those are two examples.  We had other offerings

4   as well.  But the two big ones were employers and

5   individuals, yes.

6       Q.   Sir, you had nothing to do at the time frame

7   we're talking about or in the time frame we're taking

8   about with the employer sponsored group health plans,

9   right?

10      A.   I was not responsible for overseeing them, but I

11  would interact with people that worked in the employer

12  sponsored health care division.

13      Q.   Do you remember who the CEO of that division was

14  at the time?

15      A.   I'm not a hundred percent sure.  My boss at the

16  time was Matt Manders and I believe he had accountability

17  for that.

18      Q.   Did you say just a moment ago that the

19  individual family policies were about 3 percent of

20  Cigna's total business at that time?

21      A.   Roughly.  It was approximately that.  It varied

22  based on the year.

23      MR. KANG:  Your Honor, objection.  If I could

24  get just a clarification as to what time period Mr.

25  Cunningham's referring to in his question.

1          MR. CUNNINGHAM:  I thought we had made it clear

2     it was 2013 to 2017.

3          A.   It varied based on the year.  So 2014 to '15

4     were the years I was referencing where it was about 3

5     percent.  It didn't change much over that time period,

6     though.  It was a small percentage of the total company.

7          Q.   Sir, just to make this easy, whenever I refer to

8     a time frame, I'm going to be referring to 2013 to 2017

9     unless I tell you differently.  Okay?

10         A.   Okay.

11         Q.   During that time frame, 2013 to 2017,

12    approximately what percentage of Cigna's business was the

13    employer sponsored group health plans?

14         A.   The vast majority of the company's business.  I

15    don't know the exact figure.  The vast majority.

16         Q.   You said a moment ago that there were the

17    individual plans and there were the employer plans, but

18    you said that Cigna also sold other products or other

19    types of plans at that time?

20         A.   Yes, sir.

21         Q.   What were the other types of policies that Cigna

22    sold?

23         A.   We had an International Health business.  So we

24    would sell to people outside the U.S.  My business was

25    specific within the U.S. markets.  We had international

1    business.  Then we had some group life and disability

2    projects that were unrelated to the core health care

3    business.

4        Q.   Okay.  So at that time, the employer sponsored

5    group health plans constituted the, I think you said,

6    vast majority of the plans that Cigna sold?

7            THE COURT:  Excuse me.  Apologies.  If you can

8    answer the question.  My bad.

9    BY MR. CUNNINGHAM:

10       Q.   I want to make the jury heard your answer, sir.

11       A.   The question was that comprised the vast

12   majority?

13       Q.   Yes, sir.

14       A.   Yes.  They were the vast majority of the number

15   of covered customers and of the revenue for the company

16   at the time.

17       Q.   Now, as I understand it, without getting into

18   the specific title, you were the CEO of that Individual

19   Plan Division from 2013 to 2017?

20       A.   I was the president of the U.S. Individual

21   business.  We had different titling at that time.  So

22   from July of 2013 until 2017 that was my role.

23       Q.   What I'm wondering, sir, is were you in charge

24   of that division, the Individual Plans, from 2013 to

25   2017?

1    A.    I was accountable for the results.  The

2  strategy, the ongoing customer and patient satisfaction

3  results, all those things were ultimately my

4  accountability.

5    Q.    Now, sir, when you say you were responsible for

6  the results, you're talking about the financial results

7  within that division, right?

8    A.    Financial results are one component.  But, very

9  importantly, the strategic direction of that business,

10  whether the patients are getting the care they need and

11  making sure there's good access to high quality health

12  care.  All those things were part of the accountability

13  that I had.

14    Q.    Would you agree with me that the strategic

15  vision also related to trying to keep that division

16  profitable?

17    A.    Over the long term, that was our goal.  We lost

18  money in that business in 2014, 2015, 2016, but we

19  continued to participate in different states because we

20  saw a long-term opportunity to make profits.

21  Additionally, we felt like there was a societal need for

22  this business segment to work for the U.S., because

23  there are a number of people that don't have access to an

24  employer plan or they don't qualify for Medicare or they

25  don't quality for Medicaid.  They need to buy their own

1  insurance.  So we felt we had an obligation to meet the

2  societal need for this market to work.  And so we wanted

3  to participate for those reasons as well.

4      Q.   Well, sir, not to quibble with you, but Cigna's

5  motivations were not entirely altruistic.  Those policies

6  were created as a result of Obamacare, right?

7      A.   The individual business.  The IFP business,

8  which is one of the parts of the Individual segment, was

9  a result of the Affordable Care Act or Obamacare as more

10  publicly known.

11      Q.   Right.  I saw ACA the other night and I couldn't

12  even remember what it was.  We're talking about Obamacare

13  here, right?

14      A.   The Individual and Family Plans business, or

15  IFP, was again popularly known as Obamacare at the time,

16  yes.

17      Q.   When Cigna was selling those policies, Cigna was

18  doing that to try to make a profit on those policies,

19  right?

20      A.   Over the long term.  I mean, we're a publicly

21  traded company so we have obligations to our

22  shareholders.  But that's only one of the considerations

23  in any businesses decision that we make.  It's not

24  limited to that.

25      Q.   Cigna was a Fortune 500 company at the time that

1    we're talking about here, 2013 to 2017, right?

2        A.    I believe so.

3        Q.    And Fortune 500 companies are interested in

4    their profits, aren't they?

5        A.    That's one of the considerations, but there are

6    many other things that matter to us or else -- for the

7    short term we could be focused on profits only.  But that

8    won't work for the long term.  The company won't survive.

9        Q.    Sir, isn't it true that profitability is one of

10   the main drivers of stock share price?

11       A.    That's one of the considerations that investors

12   look at.

13       Q.    And the lower your expenses, with all other

14   things being equal, typically the higher the profit,

15   right?

16       A.    All else equal, yes.

17       Q.    Sir, you would agree with me that it was your

18   goal to turn a profit within the division that you were

19   running, the Individual Plan Division?

20       A.    Over the long term, it was our goal.  We

21   expected to lose money in 2014, 2015, and 2016.  And we

22   did that.  We lost more money than we expected actually

23   in those years.

24       Q.    Well, sir, wasn't that because those Cigna

25   individual plans defaulted to reasonable and customary

1    charges if Medicare Plus was not paying the bills?

2         MR. KANG:  Your Honor, I'm going to object to

3    the leading questions on this.  It's direct exam.

4         THE COURT:  Well, I will allow what could be

5    called leading, because it's more than who, what, where,

6    when and why, because obviously it is a witness of the

7    opposing party.  But I certainly don't think you should

8    jump to the category of witness that allows you to do a

9    heavy cross on direct.  I don't want to use the word.

10    But I think you have to do a little bit more.

11         MR. CUNNINGHAM:  That's fine, Your Honor.

12    BY MR. CUNNINGHAM:

13       Q.  Sir, are you familiar with the term Core Action

14    Team at Cigna?

15       A.  I hadn't recalled what that name was until I saw

16    some of documents that we discussed earlier.  But I think

17    that was involved in the Individual and Family Plans

18    business in 2015, specifically.

19       Q.  Sir, the documents you reviewed refreshed your

20    memory as to what the Core Action Team was?

21       A.  They did.

22       Q.  Sir, in fact, weren't you the sponsor of the

23    Core Action Team?

24       A.  I don't know if I was a sponsor, but I was the

25    organizer essentially of the group.  Because I had,

1911

1    again, accountability for the overall performance of that

2    business at the time.  And we saw a big problem that

3    developed in 2015.

4        Q.   Sir, please do me a favor.  Please just try to

5    answer my questions.  And I think I asked you a yes or no

6    question.  So let me rephrase or let me repeat it.

7             Sir, what was the purpose of the Core Action

8    Team?

9        A.   I had organized the Core Action Team in 2015

10   after we saw explosive growth in substance abuse

11   utilization, specifically in South Florida, that was off

12   the charts compared to any mathematical norms or any

13   benchmarks that we had ever seen in all the years of

14   business that we had health care policies available.

15            And so we saw that and it appeared to be

16   wasteful spending.  Potentially fraud, waste, and abuse.

17   We didn't know for sure.  So I organized a group of

18   different people from around the company, doctors,

19   investigators, people that worked in medical economics,

20   people that were in our Behavorial Health Group, to try

21   to do more research and understand was the utilization

22   that we saw legitimate or not.  Because, again, the math

23   would suggest it was off the charts compared to any

24   historical norms.

25       Q.   Sir, isn't it true that your purpose in forming

1912

1  the Core Action Team was to try to contain or minimize or

2  lower the costs that you saw coming as a result of the

3  substance abuse treatment?

4          One of the considerations was cost, sure.  I

5  mean, that was a consideration.  But just as importantly

6  was making sure that there was patient safety here.

7  Because a lot of the examples that were brought to our

8  attention were about people being recruited in from other

9  locations to South Florida, people that were drug addicts

10 or recovering addicts.  And those types of things we have

11 accountability for ensuring patient satisfaction and

12 public safety.

13     Q.   Sir, would you agree with me that the Cigna

14 Individual Family Plans -- and you know those are

15 referred to as IFPs, right?

16     A.   Yes.

17     Q.   Those Individual Family Plans were intended to

18 provide broad coverage for a wide range of medical

19 conditions, weren't they?

20     A.   Yes.

21     Q.   You would agree with me, would you not, that lab

22 services were a covered item under those policies,

23 generally speaking?

24     A.   Lab services and many others were eligible to be

25 covered if they were deemed medically necessary, complied

1    with the clinical guidelines in our polices, et cetera.

2    So they were eligible to be covered.

3        Q.    Right.  So they're eligible to be covered unless

4    Cigna believed that there was some other reason in the

5    policy that they would not be covered.  Fair?

6        A.    Yes.

7        Q.    Thank you.

8              Sir, who was Eva Borden at that time in relation

9    to you?

10       A.    Eva Borden reported to me.  She was the head of

11    our risk management function in the individual segment.

12    Do you want me to give more detail?

13       Q.    Let them ask you a question specifically.  What

14    did it mean for her to be the risk manager in that

15    division?

16       A.    She had accountability for all type of risk for

17    the business, so strategic risk, operational risk,

18    compliance risk because these businesses are very highly

19    regulated, as well as financial risk.  So she had the

20    accountability for essentially putting together, what I

21    call oversight, over all those types of risk for the

22    business.

23       Q.    When was she responsible for looking at trends

24    and financial data to try to prevent catastrophes or

25    problems in the future in that individual plan division?

1    A.    She would rely on the finance people to do much

2    of that work.  But ultimately that was, I call that an

3    input into the process she used to assess risk for our

4    business.

5    Q.    Who was Glen Gerhard, G-E-R-H-A-R-D?

6    A.    Glen was one of a people that worked in what we

7    called our medical economics.  So you can think of this

8    as an individual who would study different types of

9    utilization patterns around the country and different

10   geographies.  He would look at specific hospitals and

11   locations in terms of the contracted rates we had agreed

12   with them.  He would look for abnormal health care

13   activities in different geographies.  That is what we

14   call the medical economics function.

15   Q.    Would it be fair to say that Ms. Borden and

16   Mr. Gerhard were both tasked with the responsibility for

17   looking at trends, looking at data and trying to forecast

18   what the future might look for -- what the future might

19   look like for that particular division?

20   A.    Glen's role was more than specific to my

21   business.  He had a responsibility for the whole

22   company's medical economics.  So he only spent a small

23   portion of his time on the individual business.

24   Q.    Sir, were Ms. Borden and Mr. Gerhard both

25   members of the Core Action Team?

1     A.    I believe so.  I don't remember all the members.

2     Q.    We'll show you a document in a moment.  Would

3  you have hand picked people that comprised the Core

4  Action Team?

5     A.    I talked to my team about who were the right

6  people to assemble.  I didn't do it all myself.  We

7  worked together on that.

8     Q.    Your people that you spoke with told you who

9  they thought should be on the Core Action Team?

10    A.    Yes.

11    Q.    Are you aware that both Eva Borden and Glen

12  Gerhard were on the Core Action Team?

13    A.    Again, I don't remember who was.  They probably

14  were.

15    Q.    Who was Lisa - I don't know how to pronounce the

16  last name -- it is L-O-U-G-H.

17    A.    Lisa Lough also reported to me.  She was

18  responsible for strategy and product development in the

19  individual business.

20    Q.    She was not an attorney, was she?

21    A.    I don't believe so.

22    Q.    Sir, I would like to go to Labs' Trial Exhibit

23  6597, Mr. Smeig.

24         THE COURT:  Is it in evidence?

25         MR. CUNNINGHAM:  It is not in evidence yet, Your

1    Honor.

2            THE COURT:  So ID, Liana.

3            MR. CUNNINGHAM:  6597.  That's 6957.

4            Your Honor, may I have a minute, please?

5            THE COURT:  Yes.

6    BY MR. CUNNINGHAM:

7        Q.    You said at the beginning of your examination

8    that you had reviewed some PowerPoint presentations?

9        A.    One of a exhibits I recall was a PowerPoint

10   presentation, yes.

11       Q.    Was that captioned "IFP substance abuse weekly

12   updates"?

13       A.    I believe that was the title.  I don't remember

14   the details of it.

15       Q.    And do you recall that that would have been

16   written by or put together by a person named Jessica

17   Deshaw, D-E-S-H-A-W?

18       A.    I don't remember.

19       Q.    I will come back to that in just a moment,

20   Okay?  Sir, what was total health network?

21       A.    Total health and network?

22       Q.    Excuse me, was it total health and network?

23       A.    I believe so.

24       Q.    What was that?

25       A.    That was part of the company that was

1    responsible for all the clinicians.  And we say network.

2    It's the contracting with all the health care providers

3    to construct networks that would be part of the health

4    insurance plans we offered.  So that group was

5    essentially a key partner to me in terms of our business

6    results.

7        Q.    What exactly was it that they were tasked with

8    doing?

9        A.    Well, the network part, what I was referencing a

10   minute ago, they would actually negotiate contracts with

11   hospitals, physician groups, surgical centers to agree on

12   contractual terms and pricing and that sort of thing.

13   And that would become the network when an individual goes

14   to utilize their health care in network would be a result

15   of all of that those contract negotiations.

16       Q.    That's fine, sir.  Did you finish your answer?

17       A.    There is a second component.  That's the total

18   health piece which is all of the clinical work.  So we

19   employ thousands of doctors and nurses that are doing

20   things like reviewing specific instances where someone

21   goes into the hospital to make sure that it is

22   appropriate care, to review all the clinical protocols

23   that we have in place for different circumstances.

24       Q.    When you refer -- when you refer to clinicians,

25   you are referring to doctors, right?

1    A.   And nurses and physician's assistants.  We have

2  a long list of people that we employ for clinical

3  backgrounds.

4    Q.   Did Mr. Gerhard work for TH&N?

5    A.   I believe he did at the time.

6    Q.   Okay, sir, at that time again 2013 to 2017, was

7  Mr. Matt Norton who has testified in this case running

8  the SIU division?

9    A.   I don't know which years that Matt had

10  accountability for the SIU.  But I believe he was either

11  very involved or the head of it during that time period.

12    Q.   I know we're going back more than ten years,

13  sir, so I appreciate it.

14         Mr. Smeig, do you have Labs' Trial Exhibit 6597,

15  please.

16         THE COURT:  This is ID.

17  BY MR. CUNNINGHAM:

18    Q.   Can we go to the next page of that please, Mr.

19  Smeig.

20         All right, sir, let me ask you is the caption at

21  the top of this page "Overall Weekly Status Report"?

22    A.   Yes.

23    Q.   And does it say "IFP Substance Abuse Program

24  Overview"?

25    A.   Yes, it does.

1     Q.   And does it say the executive sponsors are Brian

2  Evanko and Lisa Lough?

3     A.   Yes.

4     Q.   You also see that Eva Borden and Glen Gerhard

5  are listed here?

6     A.   Yes.

7     Q.   As recipients of this PowerPoint.  Also you see

8  the names Matt Norton and Tom Hixson?

9     A.   Yes.

10          MR. CUNNINGHAM:  Your Honor, we would like to go

11  ahead and admit this exhibit into evidence at this time.

12          THE COURT:  Is there an objection?

13          MR. KANG:  No, Your Honor.

14          THE COURT:  Labs' Exhibit 6597 is admitted as a

15  full exhibit and may be published to the jury.

16  BY MR. CUNNINGHAM:

17     Q.   Mr. Smeig, can we go to the portion that says

18  "program description or problem statement."  And just

19  highlight that.

20          And, Mr. Evanko, I would ask that you and the

21  jury take a look at what's been highlighted there, if you

22  would please.  Let me know when you are finished.

23     A.   Finished.

24     Q.   All right.  Sir, it is captioned a "Program

25  Description Or Problem Statement"; right?

1    A.    Yes.

2    Q.    And what it indicates is that the 2015 IFP

3    family plan substance abuse spend is 30 times greater

4    than 2014 OAP norms.  Is that what it says?

5    A.    Yes, it does.

6    Q.    What does the acronym OAP stand for?

7    A.    OAP was an acronym for one of our products

8    called Open Access Plus.  Which essentially was the

9    offering we had for all the employer sponsored business.

10   So we had over ten million customers in these OAP-style

11   products all around the country.  So it gave us a lot of

12   data to know what a normal level of utilization of

13   substance abuses is.  This business in 2015 was showing

14   some 30 times greater than that to the comment I made

15   early about off the charts utilization.

16   Q.    Did you say Open Access Plan?

17   A.    Open Access Plus.

18   Q.    Thank you.  Would the individual plans fall

19   within the Open Access Plus program as well?

20   A.    Not the way that this was referenced.  This was

21   referencing the Open Access Plus commercial employer

22   offerings I believe.

23   Q.    All right.  So it refers to the cause being

24   "abusive lab testing and lack of Medicare equivalents for

25   out of network outpatient rehab services"; correct?

1    A.    Yes.

2    Q.    What does that refer to when it refers to a

3  cause of this problem being a "lack of Medicare

4  equivalence for out of network outpatient rehab

5  services"?

6    A.    At the time, I recall that certain of these

7  services did not have a Medicare benchmark and therefore,

8  the out of network payments went to whatever the rehab

9  facility asked for in terms of the price.

10    Q.    So if there was no Medicare equivalent, for

11  example for lab testing, lab services, then the plan or

12  the cost would default to what the labs would say was

13  reasonable and customary, right?

14    A.    Not necessarily.  They would default to whatever

15  they asked for, their billed charges which are not always

16  reasonable and customary.

17    Q.    These plans would pay 100 percent of what the

18  labs asked for; right?

19    A.    In those situations, out of network, when there

20  was not an equivalent, that's what transpired.

21    Q.    Cigna wrote these plans; right?

22    A.    The IFP plans?

23    Q.    Yes.

24    A.    Yes.

25    Q.    So Cigna was the one that put in these policies

1    that if there was no Medicare involved, Cigna would pay

2    100 percent of what the labs requested; right?

3        A.    In the early days of the Affordable Care Act

4    there was a lot of issues because of Obamacare --

5        Q.    I asked you a yes or no question.

6            THE COURT:  Sir, I'm sorry, you have to answer

7    the question that was asked.

8            THE WITNESS:  Yes, Your Honor.

9    BY MR. CUNNINGHAM:

10       Q.    Sir, isn't it true that Cigna wrote these

11   policies that provided for 100 percent reimbursement for

12   lab services if there was no Medicare equivalent?

13       A.    That was the way we structured the contract.

14   What we had to do in those instances, we had to pay.

15       Q.    So the answer is yes?

16       A.    I don't remember exactly the way you worded it,

17   but we had to pay it 100 percent.

18       Q.    Cigna wrote the plans?

19       A.    We wrote the plans, yes.

20       Q.    Sir, this was described as a 150 to 250 million

21   dollar problem if it not dealt with swiftly, correct?

22       A.    That's what it reads, yes.

23       Q.    150 to 200 million dollars would be a big

24   financial problem within your individual plan division;

25   would it not?

1    A.    That's a lot of money for sure.

2    Q.    You would have been responsible for that if

3  there was a 150 or 200 million dollars in charges above

4  what you all were used to seeing, right?

5    A.    As the president of the division I was problem

6  for the financial outcome among over things, yes.

7    Q.    At the end of the day this would have been your

8  problem, right?

9        MR. KANG:  Objection, Your Honor, just again the

10  leading nature as discussed earlier.

11        THE COURT:  Yes.  I think it is not exactly that

12  question but he's answered the last question.

13  BY MR. CUNNINGHAM:

14    Q.    And sir, the recommendation was the problem be

15  dealt with swiftly, right?

16    A.    I think the recommendation that I asked the team

17  to go evaluate was the root cause and whether this was

18  appropriate utilization or not.  That was the primary

19  driver.

20    Q.    Sir, I asked you what I thought was a simple

21  question.  Was the recommendation that this be dealt with

22  swiftly?

23    A.    I mean certainly we wanted to act with speed in

24  this instance.

25        THE COURT:  Sir, I don't think you are answering

1   the question.  I understand what you want to do.  He's

2   asking if this report was the recommendation to those who

3   received it, I assume that you were one of them, that it

4   be dealt with swiftly.  That was the question.

5           THE WITNESS:  Okay.  I mean just the language is

6   "if not dealt with swiftly" which is different than a

7   recommendation to deal with it swiftly.  I'm sorry to be

8   argumentative.

9           THE COURT:  So you would say no.

10          THE WITNESS:  I would say no.

11  BY MR. CUNNINGHAM:

12      Q.   Sir, when you saw this problem that we have been

13  talking about, you believe that it needed to be dealt

14  with swiftly, didn't you?

15      A.   Sure.

16      Q.   All right.  Let's go to  -- if you scroll down a

17  little bit, Mr. Smeig, where it says "project level."  I

18  want to highlight that one row.  Thank you, sir.

19          And, Mr. Evanko, I would like you to read that

20  and I would ask if the jury can read along there and let

21  me know when you are done, please?

22      A.   Starting with "Over all"?

23      Q.   Just read it to yourself.  I want to orient you

24  to what I want to ask you about.

25      A.   Okay.

1    Q.   Sir, now when it says "project level" is this

2    describing activities that have already been undertaken

3    to try to resolve this problem?

4    A.   I believe what this was describing were a set of

5    different actions we were exploring to try to get toward

6    the root cause of what we viewed as wasteful spending.

7    Q.   Let's talk about this one particular section

8    called "program level drivers."  Does it indicate that

9    124 TINS were pended?

10   A.   Yes.

11   Q.   TINS refers to tax identification numbers,

12   right?

13   A.   Yes, it does.

14   Q.   Does that refer to individual businesses?

15   A.   Not necessarily.  The tax identification numbers

16   can mean different things, the way the provider structure

17   their operations.

18   Q.   Sir, if I refer to TINS, can we agree we're both

19   referring to the tax identification numbers?

20   A.   Yes.

21   Q.   This says "a total of 124 pended."  What does

22   that mean, sir?

23   A.   I believe what that means is we had identified

24   124 of these providers and their associated tax ID

25   numbers who we had, the SIU group, had flagged as a

1  potential problem for wasteful and unnecessary substance

2  abuse utilization.  And therefore, we pended claims

3  payment on those specific providers until we had

4  conclusion drawn as to whether it was a appropriate

5  utilization or not.

6      Q.   Meaning that once those TINS, those businesses,

7  those providers were pended, no further payments were

8  going to be made to those businesses for services they

9  had rendered unless and until that issue had been

10  resolved, right?

11     A.   That's correct.

12     Q.   And does it say that "claims are currently under

13  review to determine ability to deny"?

14     A.   Yes.

15     Q.   And deny would refer to the ability to deny

16  payment, right?

17     A.   Yes.

18     Q.   It doesn't say that claims are under review to

19  determine if we can pay them, does it?

20     A.   I'm sorry.  Can you ask that again?

21     Q.   It doesn't say these claims are currently under

22  review to determine the ability to pay them, does it?

23     A.   Correct.

24     Q.   Now, sir, the SIU at Cigna has the power to stop

25  paying a health care provider whenever it wants to,

1    right?

2        A.    No.  I don't think I can make that sweeping of a

3    statement.

4        Q.    Let me about more specific.  The SIU can do,

5    like it did in this case, and pend a claim and stop

6    payment immediately unless and until the problem that

7    Cigna perceives is resolved, right?

8            MR. KANG:  Objection, again leading.

9            THE COURT:  I will allow it.

10   BY MR. CUNNINGHAM:

11       Q.    Is that true, sir?

12       A.    I'm sorry.  I got lost there.  You are asking

13   can SIU stop payment?

14       Q.    Yes.

15       A.    So the SIU is an independent body that we have.

16   That reviews all of our --

17       Q.    Sir, it is a yes or no.

18       A.    Can you rephrase it?

19       Q.    Does the SIU at Cigna have the ability to

20   immediately stop payment by health care providers?

21       A.    They are able to pend claims.

22       Q.    And the effect of that you just told us a moment

23   ago is stop payment of the claim?

24       A.    For a period of time until the pend is resolved.

25       Q.    Could be forever, right?

1    A.    In certain instances, if we found it is an

2    ineligible claim, yes.

3    Q.    Mr. Norton, as director of the SIU, would not

4    need your permission or authority to deny payment to a

5    health care provider, would he?

6    A.    No.

7    Q.    You were ultimately his boss, right?

8    A.    No.  No, he worked in a different part of the

9    organization.

10    Q.    He reported to you, didn't he on some level?

11    A.    No.

12    Q.    You would be able to oversee everything he did

13    if he had an SIU investigation that related to an

14    individual plan that was within your purview, right?

15    A.    The SIU acted independently of my direction.  I

16    did not direct his work.

17    Q.    Mr. Smeig, please go down three rows where it

18    says "clinical policy."

19         And sir, I would say ask you and the jury to

20    review that please, that section.

21         Would you highlight that, Mr. Smeig, please?

22    A.    Okay.

23    Q.    Do you know what was meant by the term "clinical

24    policy"?

25    A.    I think broadly speaking we use that to describe

1  whether something is deemed medically necessary and

2  appropriate.

3      Q.  All right and does this section indicate that

4  Cigna was working with a company called Navigant,

5  N-A-V-I-G-A-N-T on alternative code mapping?

6      A.  It does say that, yes.

7      Q.  Who was Navigant, sir?

8      A.  They were a vendor that we had contracted with.

9  I was not very close to the vendor, the situation with

10 Navigant.

11     Q.  Do you know what it refers or what it means when

12 it refers to "alternative code mapping"?

13     A.  I believe this is in regards to when a specific

14 service is rendered, how it is coded for purpose of

15 claims payment.  I believe that's what's being referenced

16 here.

17     Q.  The concern was that if a particular service was

18 not Medicare eligible, Cigna would pay under these

19 individual plans 100 percent of whatever the provider

20 charged, right?

21     MR. KANG:  Your Honor, I will object to the

22 relevance on this.  This is related to a different code.

23     THE COURT:  Can you tell me what code?  And when

24 you say different, which code when you return it to the

25 8,000 --

1    MR. KANG:  H0015 which has nothing to do with

2  lab services in this case.

3    MR. CUNNINGHAM:  I will move on, Your Honor.

4    THE COURT:  Thank you.

5  BY MR. CUNNINGHAM:

6    Q.  Sir, where it says "Targeting and August release

7  from Medicare mapping" what does that mean?

8    A.  I believe this is related to the topic we

9  explored earlier when there was not a Medicare

10  equivalent.  This was essentially August would be the

11  release of our technology changes to adjust that mapping.

12    Q.  Because Cigna was trying to find a way to stop

13  having to pay 100 percent of what the provider billed if

14  there's no Medicare equivalent, right?

15    MR. KANG:  Again, Your Honor, this is not

16  relevant to the Labs' services which are at issue in this

17  case.

18    MR. CUNNINGHAM:  I don't think it needs to be,

19  Your Honor.  I'm asking an overall question.

20    THE COURT:  I will allow it.  Overrule the

21  objection.

22    That means you can answer it if you know the

23  answer.  If you want him to tell you the question again

24  --

25    THE WITNESS:  Yeah, I forgot the question.

1931

1    MR. CUNNINGHAM:  Terri, I'm going to have to ask

2    you to read the question.

3    THE COURT REPORTER:  Because Cigna was trying to

4    find a way to stop having to pay 100 percent of what the

5    provider billed if there's no Medicare equivalent, right?

6    BY MR. CUNNINGHAM:

7    A.   There were a series of things that were still

8    changing with the Affordable Care Act in this time

9    period.

10   Q.   This is a simple yes or no.

11   A.   We had a release here to change some of the

12   codes relative to the Medicare mapping, yes.

13   Q.   Cigna was trying to find away to change the

14   situation that it created, which was it had to pay

15   100 percent of services charged by the providers if

16   there's no medical equivalent for that service.  Yes or

17   no?

18   A.   The policy documents had to be approved by

19   regulators.  They had to clear that hurdle.

20   Q.   Cigna was trying to find a way to change the

21   situation it was in, which was having to pay for 100

22   percent of whatever health care provider billed when

23   there was no Medicare equivalent, yes or no?

24   A.   This is one specific issue, but, yes, for this

25   one specific issue.

1    Q.   Can we go to Labs 6490, please.  I'm sorry.  Now

2  I'm being dyslexic, 6940.

3         THE COURT:  6490?

4         MR. CUNNINGHAM:  6940.

5         THE COURT:  Labs' Exhibit for -- has it been

6  admitted or is there an objection, Attorney Kang?

7         MR. KANG:  No objection, Your Honor.

8         THE COURT:  So it is a full exhibit.

9  BY MR. CUNNINGHAM:

10   Q.   Could you go ahead and zoom in on the top part

11  of this for now, Mr. Smeig?

12         Sir, just to let you know what we're looking at,

13  is this document, 6940, a memo that is sent to you and

14  Lisa Lough?

15   A.   Yes.

16   Q.   From Eva Borden?

17   A.   Yes.

18   Q.   Is it captioned "Substance Abuse Actions August

19  6, 2015"?

20   A.   Yes.

21   Q.   And what I would like to do is to highlight and

22  have you and the jury read from where it says "Cigna's

23  cost" and down through those two bullet points.  And

24  please let me know when you are finished, sir.

25   A.   Finished.

1933

1    Q.    Now, sir, this memo is pretty much a summary of

2  what we have been talking about from that PowerPoint

3  presentation, right?  Outlines the problem that Cigna is

4  facing?

5    A.    I believe so.  I don't know what the rest of the

6  memo includes.

7    Q.    We'll go through some of it.  I'm not going to

8  go through the whole thing.  Let's do this.  Let's -- let

9  me ask you about one thing.  Bullet point 2 says "On a

10  full year basis this would amount to 150 to 200 million

11  in avoidable medical costs.  And what I want to ask you

12  about is in parentheses it says, "greater than 125 PMPM."

13  What does PMPM stand for?

14    A.    PMPM is per member per month.  That's a way we

15  measure the cost on a per person by population.

16    Q.    Thank you.  So let's focus on the action summary

17  for now.  If you can highlight that, Mr. Smeig.  Just

18  that one paragraph where it says "goal number one."

19         And I would ask you and the jury to read that,

20  sir, and please let me know when you are done.

21    A.    Okay.

22    Q.    Was this, in fact, one of the documents you

23  would have reviewed in preparation for your trial

24  testimony?

25    A.    I did see this one.

1934

1    Q.   I will not go through it in graphic detail.  I

2  want to ask you about a few particular things.  Does it

3  indicate that goal number one was to reduce the substance

4  abuse paid amount from greater than $1,000,000 a day to a

5  target of approximately $50,000 per claims-paid day?

6    A.   Yes.

7    Q.   Sir, and I assume you are good with numbers

8  because you are CFO, that would be a goal of a 95 percent

9  reduction in what was being paid, true?

10   A.   Yes.

11   Q.   Sir, would you agree with me that in order to do

12 that, in order to go from $1 million a day being spent,

13 to $50,000 a day, you would not be able to or Cigna would

14 not be able to review claims on an individual basis?

15   A.   I'm not sure I would agree with that.

16   Q.   Wouldn't there be a huge number of claims if you

17 were going to review each and every individual claim to

18 determine whether there was medical necessity or fee

19 forgiving?

20   A.   It would have been a lot of work, but it's

21 something we could do.

22   Q.   So you don't believe that -- strike that.

23        Sir, isn't one of the reasons that the edits

24 were done and the pends were done was because that was

25 the quickest way to stop paying a large number of claims?

1    A.    Not necessarily.  I think the research we had

2    done suggested that that was an appropriate action at the

3    time.

4    Q.    Now, sir, you would also agree with me, would

5    you not, that these policies, these individual plans,

6    also listed substance abuse as one of the medical

7    conditions that was covered?

8    A.    Yes.

9    Q.    Can we go to goal number 5.  And please

10   highlight that, Mr. Smeig.

11        I just want to ask you about this, sir.  I'll

12   ask you and the jury to read that, please.  And then I

13   will ask you a couple of questions about it.

14   A.    Okay.

15   Q.    All right, sir.  Goal number 5 was to reduce the

16   exposure in the year 2016 by adjusting Florida and Texas

17   plan designs to remove out of network benefits, right?

18   A.    That's what it says, yes.

19   Q.    And, sir, that wasn't something Cigna could do

20   without dealing with insurance regulators in particular

21   states, right?

22   A.    Correct.  The way this business worked, it was

23   an annual cycle.  So each year was a new policy year

24   essentially.

25   Q.    So there's not a way -- there was not a way for

1    Cigna to just say, you know what, starting tomorrow we're

2    going to remove out of network benefits from these plans,

3    right?

4        A.   That's correct.

5        Q.   That's something that would have to be approved

6    by the insurance regulators in whatever states they

7    wanted to do that in, right?

8        A.   Yes.

9        Q.   And in Florida, you would have had to deal with

10   the Office of Insurance Regulation, right?

11       A.   That's correct.

12       Q.   Okay.  Let me go to the next page, please, Mr.

13   Smeig.  I want to start -- I want to highlight where it

14   says this was driven.  And just highlight that section,

15   please.

16            Sir, I would ask you to read that and ask the

17   jury to read that.  And let me know when you are done,

18   sir.

19       A.   Okay.

20       Q.   All right, sir.  I just want to ask your

21   understanding of this.

22            So this is referring to the 154 TINs that had

23   been placed in a pend status, right?

24       A.   I'm not sure what the 154 actually is

25   referencing here.

1    Q.   Well, didn't we just talk about a few moments

2    ago that 154 different TINs were placed in an edit?

3    A.   I thought it was 124 on the other document.

4    Q.   It says facility and lab TINs, right?

5    A.   It does.

6    Q.   So let me ask you, sir.  Is this talking about

7    what had been done, what action had been taken with

8    respect to those 154 facilities and labs?

9    A.   It appears to characterize what we were doing

10   with each of those 154, yes.

11   Q.   So would 12 percent of the 154, the action taken

12   was to deny claims with evidence of fraud or abuse,

13   correct?

14   A.   Yes.

15   Q.   With respect to the 154 health care providers,

16   the action taken in 48 percent of the cases was to pend

17   the claims with suspected evidence of fraud or abuse,

18   right?

19   A.   Correct.

20   Q.   So on 48 percent of those claims for those 154

21   providers, the action taken was to immediately stop

22   payment and ask for documentation to be provided, right?

23   A.   Typically when we pend claims, yes, we ask for

24   more information to determine if it's appropriate to pay

25   or not.

1    Q.    And the payments are immediately stopped, right?

2    A.    They're stopped until that research is

3  completed.

4    Q.    And then for 20 percent of the 154 health care

5  providers, it said that they added labs to the manual

6  prepay edit requiring medical necessity review for any

7  test with greater than four drugs, right?

8    A.    That's what it says, yes.

9    Q.    And then with 1 percent of those 154 providers,

10  it said that Cigna was working with a single lab directly

11  contracted with Cigna?

12    A.    I'm not sure what that means exactly.

13    Q.    Do you think that means that those would have

14  been in network providers?

15    A.    Most likely, but I'm trying to interpret the

16  language here.  Most likely.

17    Q.    It says the labs that were directly contracted

18  with Cigna, right?

19    A.    That's what it says, yes.

20    Q.    And that's the whole point of in network versus

21  out of network, isn't it?  A provider that's in network

22  has a direct contract with Cigna.

23    A.    They have a contracted rate in their part of our

24  provider network, yes.

25    Q.    And an out-of-network provider does not have a

1   direct contract with Cigna, right?

2       A.   That's correct.

3       Q.   Okay.  And then it says 19 percent, no action is

4   being taken on remaining allow spend, right?

5       A.   Yes.

6       Q.   What does that mean?

7       A.   I believe that means we're continuing to pay

8   claims as we normally would in those instances.

9       Q.   Okay.  So at that time, with respect to the 154

10  different health care providers, 19 percent of those

11  providers were being paid for their services, but 81

12  percent were not being paid, if my math is correct,

13  right?

14      A.   Out of the 154 that were flagged.  Keep in mind

15  that are thousands of others that are being paid as

16  normal.

17      Q.   I understand.  I'm only asking you about the

18  154, sir.  19 percent were being paid.  81 percent were

19  not being paid?

20      A.   Out of the small number, yes.

21      Q.   All right.  I would like to move on to Labs

22  6579.

23           THE COURT:  Is it in evidence?

24           MR. CUNNINGHAM:  I don't believe it is yet, Your

25  Honor.

 1          THE COURT:  So it's ID at this time.  You want

 2     it brought up on the closed screen.

 3          MR. CUNNINGHAM:  Yes.

 4     BY MR. CUNNINGHAM:

 5          Q.   Mr. Smeig, can you go to an email that's on July

 6     8, 2015.  This is page 0003.  At the very bottom of that

 7     page.  That's it.  Thank you.

 8          All right.  Sir, does this appear to be an

 9     email that's written from Eva Borden to a number of

10     people, including you, on July 8, 2015 at 8:21 p.m.?

11          A.   Yes.

12          MR. CUNNINGHAM:  Your Honor, I would like to

13     move this into evidence at this time.

14          THE COURT:  Objection?

15          MR. KANG:  Your Honor, we have no objection to

16     this particular email, but not to the whole rest of the

17     chain.

18          THE COURT:  That's fine.  But you are only

19     offering one page, what we're seeing, is that right, what

20     you've shown us?

21          MR. CUNNINGHAM:  I am going to go a little

22     farther with another page, Your Honor.

23          THE COURT:  Well, if it's not every page, we'll

24     have to mark this 6579-A would be in evidence absent

25     objection.  And if you wish to offer another, we'll have

1    to call it 6579-B.

2            MR. CUNNINGHAM:  Thank you, Your Honor.

3            Your Honor, may we publish this page to the

4    jury?

5            THE COURT:  Yes.  It's a full exhibit absent

6    objection.

7    BY MR. CUNNINGHAM:

8        Q.   Okay.  So I would like to you scroll down

9    please, Mr. Smeig.

10           Before you do that, let me just ask you this one

11   thing.  Does it say from Eva Borden, I wanted to bring

12   something to your attention and get your feedback,

13   brainstorming, and support?

14       A.   Yes.

15       Q.   Let's go ahead and scroll down, please.

16           THE COURT:  Did Cigna understand he was going to

17   scroll?

18           MR. KANG:  This is okay, Your Honor.  This is

19   part of that email.

20           MR. CUNNINGHAM:  It's just a continuation of

21   that.  It goes on to a second page, Your Honor, same

22   email.

23           THE COURT:  Go ahead.

24   BY MR. CUNNINGHAM:

25       Q.   All right.  So I want to highlight where it says

1    impact.  Just that one part, Mr. Smeig.

2            And, Mr. Evanko, I'd ask you to read that.  And

3    I'd also ask the jury to read that.  Let me know when you

4    are finished.

5            Does it say Impact.  This issue is trending to

6    cost Cigna through IFP alone $170,000,000 annually. (This

7    does not represent employer losses due to our inability

8    to address.)

9        A.   Yes.

10       Q.   Now, sir, what I wanted to do is -- Mr. Smeig,

11   please go to the third bullet point under number 2 is

12   what I want to focus on.

13           I'm sorry.  The second bullet point.  There you

14   go.

15           Sir, I'd ask you to read that highlighted

16   portion, and also ask the jury to read that.

17           MR. KANG:  Your Honor, I'm going to object

18   again.  This is not related to lab services.  Clearly

19   it's outpatient centers which is not at issue in this

20   case.

21           THE COURT:  Well, you should read it.  But do

22   you claim it, sir?

23           MR. CUNNINGHAM:  I believe it's relevant, Your

24   Honor, because it clarifies what --

25           THE COURT:  I will allow it.

1    MR. CUNNINGHAM:  It's clarification, Your Honor.

2  And I'm going to move on.

3    THE COURT:  Because of the reference to the

4  Medicare equivalent.

5  BY MR. CUNNINGHAM:

6    Q.  All right.  Sir, does it say that Cigna is

7  paying these out of network outpatient centers

8  100 percent of billed charges because we do not have a

9  Medicare equivalent?

10    A.  That's what it says.

11    Q.  And you remember that's what we were talking

12  about earlier and I just wanted to make sure that's

13  clearly what's being talked about here.  Yes?

14    A.   It is, but it's specifically to the rehab

15  centers.  Not any toxicology labs.

16    Q.  I understand.  So next what I would like to do

17  and I think this will be for ID for this moment.

18    THE COURT:  Can you tell me how long that 6579-A

19  is?

20    MR. CUNNINGHAM:  Pardon me?

21    THE COURT:  Along that email list, how many

22  pages?

23    MR. CUNNINGHAM:  It's the bottom of one page and

24  then pretty much a full next page.  Two pages.

25    THE COURT:  I see.  So two pages we'll take when

1944

1  you mark it.  Go ahead.

2  BY MR. CUNNINGHAM:

3      Q.  Mr. Smeig, I would like to go to an email that's

4  at the bottom of page 0002.

5          THE COURT:  That will be ID.

6          MR. CUNNINGHAM:  Yes, Your Honor.

7  BY MR. CUNNINGHAM:

8      Q.  From Glen Gerhard to a number of people.  It's

9  the same exhibit, it's just 0002.  It's the one below

10  that, sir.  Scroll down a little bit more.  It's just a

11  header for now.

12          So, sir, let me ask you about this.  Does this

13  appear to be an email from Glen Gerhard on July 10, 2015

14  at 12:07 a.m. to the members of the Core Action Team?

15      A.  Yes, it looks that way.

16      Q.  And this is copied to you, is it not, sir?

17      A.  I am copied on here, yes.

18          MR. CUNNINGHAM:  Your Honor, we would like to

19  move this particular exhibit into evidence as well.

20          THE COURT:  Any objection to what will be marked

21  6579-B?

22          MR. KANG:  No objection, Your Honor.

23          THE COURT:  All right.  The email from July 7,

24  2015 at 12:07 a.m., is that correct, sir?  That's what

25  you're offering?

1945

```
 1          MR. CUNNINGHAM:  Yes, ma'am.  Yes, Your Honor.
 2   BY MR. CUNNINGHAM:
 3      Q.   Now, sir, 12:07 a.m. is 7 minutes after
 4   midnight, right?
 5      A.   Yes.
 6      Q.   So does it say in the subject area follow-ups
 7   from call substance abuse and other P&L impacts?
 8      A.   Yes, it does.
 9      Q.   What is your understanding of what the term P&L
10   means?
11      A.   That's just an acronym that we use for profit
12   and loss.  Just essentially the earnings of a company.
13      Q.   All right.  And, sir, does it appear that this
14   email is intended to be a summary of a phone call that
15   occurred sometime on Thursday, July 9, 2015?
16      A.   It looks that way, yes.
17      Q.   Do you have any independent memory of that call?
18      A.   I do not.
19      Q.   All right.  Mr. Smeig, I would like you to
20   highlight where it says Lab Drug Testing and then the
21   three numbered paragraphs under that.
22          And, Mr. Evanko, before I ask you and the jury
23   to read that, are there any attorneys that are copied on
24   this email?
25      A.   In the cc line?
```

1946

1    Q.   Yes, sir.

2    A.   I don't believe any of them are attorneys.

3    Q.   Please read those three paragraphs and let me

4    know when you're finished.

5    A.   Okay.

6    Q.   All right.  Sir, just above that, does it say

7    follow-up action from the call are as follows?  Do you

8    see that behind the highlight?

9    A.   Yes.

10   Q.   Thank you.  So is it your understanding that

11   this email was intended to summarize the phone call that

12   occurred with the Core Action Team on July 9, 2015?

13   A.   I'm not sure if this is the Core Action Team

14   but, broadly speaking, I agree with the premise here.

15   Q.   Everybody that's listed here is somebody that

16   was on the Core Action Team, right?

17   A.   Okay.

18   Q.   Well, I'm asking you.  Isn't that true?

19   A.   I don't remember who was in the Core Action

20   Team.  That's the only reason I'm splitting hairs with

21   you probably a little bit.

22   Q.   Okay.  I understand it was nine years ago, sir.

23   Sir, let me ask you this.  Let me talk about

24   this.  First of all, this is specifically regarding lab

25   drug testing, right?

1    A.    Yes.

2    Q.    And does it say that the action plan was prepay

3    editing.  That Lynn was to follow up with the prepay team

4    to understand concerns and cost estimates to expand the

5    edit to more TINs?

6    A.    Yes.

7    Q.    Paragraph number 2, Clinical Policy.  And does

8    this concern a plan to understand if Cigna could

9    accelerate the introduction of enhanced clinical policies

10   to support denials or editing of claims?

11   A.    That's what it says, yes.

12   Q.    What does that mean, sir?  To see if we can

13   accelerate the introduction of enhanced clinical policies

14   to support denials/editing of claims?

15   A.    I'm not sure what that means actually.

16   Q.    And then the third numbered paragraph related to

17   coding, pricing, and editing, right?

18   A.    Yes.

19   Q.    All right.  And one of the action items here was

20   to determine if Medicare pricing was being applied and,

21   if not, why.  Correct?

22   A.    Yes.

23   Q.    Let's scroll down just a little bit.

24        First, sir, right under that, under paragraph 3,

25   it says redacted privilege.  Do you see that?

1948

1    A.    I do.

2    Q.    Do you have any idea why that entry there is

3    redacted for privilege?

4    A.    I have no idea.

5    Q.    You said that there are no attorney recipients

6    on this email, right?

7    A.    Not the one that you showed me.

8    Q.    Let's go down and please highlight 1, 2, and 4

9    under Outpatient Behavorial Charges.

10        Sir, I would ask you to read 1, 2, 4, along with

11    the jury, and let me know you are finished, sir.

12        MR. KANG:  Your Honor, again, I'm going to

13    object on the prior basis that this case does not have

14    anything to do with outpatient behavorial charges.

15    Relevance.

16        MR. CUNNINGHAM:  Your Honor, I'll move on.  I

17    just want to ask him about one acronym, if I may.

18        THE COURT:  Go ahead.

19    BY MR. CUNNINGHAM:

20    Q.    Sir, it says Glen to outreach to Navigant to

21    identify if they have or could create an alternative U&C

22    table.  What does that refer to?

23        MR. KANG:  Same objection, Your Honor.

24        MR. CUNNINGHAM:  I just want to know what those

25    initials are.

1    THE COURT:  Overruled.  Do you know what a U&C

2    table means?

3    THE WITNESS:  Yes.  So U&C is an acronym.  It's

4    called usual and customary.  And so part of the challenge

5    in health care is if you don't have a contract with the

6    hospital or a physician group and it's an out of network

7    provider, what you pay them, there's not necessarily

8    always one price.  And so the usual and customary is a

9    way of coming up with what would be viewed as a

10   reasonable payment to an out of network provider.  I

11   think that's what this is referencing.

12   BY MR. CUNNINGHAM:

13      Q.   Now, Navigant was a consultant that Cigna had

14   retained to try to get their arms around this problem,

15   right?

16          MR. KANG:  Same objection, Your Honor.

17          MR. CUNNINGHAM:  I will rephrase, Your Honor.

18   BY MR. CUNNINGHAM:

19      Q.   Sir, Cigna had retained or consulted with

20   Navigant with respect to the bills that were being

21   submitted for lab testing by health care providers,

22   right?

23          MR. KANG:  Objection, Your Honor.  It also lacks

24   foundation.  This is, again, related to outpatient

25   behavorial charges which has nothing to do with this

1    case.

2          MR. CUNNINGHAM:  Your Honor, I'll move on.

3    We're going to get to it in just a moment.

4    BY MR. CUNNINGHAM:

5        Q.    But, sir, just so the records is clear, U&C

6    refers to usual and customary charges, right?

7        A.    Yes.

8        Q.    And, sir, number 3 is not included because it

9    says redacted-privilege, right?

10       A.    Apparently, yes.

11       Q.    Do you have any idea why that was redacted for a

12   claimed privilege?

13       A.    No.

14       Q.    Okay.  Then under paragraph 4, there is no

15   paragraph 5 because is that also says redacted-privilege

16   under paragraph 4.  Do you see that, sir?

17       A.    I do.

18       Q.    Do you have any idea why there was a claim of

19   privilege with respect to paragraph number 5?

20       A.    No idea.

21       Q.    All right.  Mr. Smeig, if you can scroll up to

22   page 2, please, with the email authored by Mr. Evanko.

23   That's it.  Please go ahead and highlight that whole

24   email.

25          Now, sir, this is an email that is authored by

1   you on Monday, July 13, 2015 at 10:48 a.m., correct?

2       A.   It appears that way, yes.

3       Q.   And does this, again, appear to be the people

4   that are on the Core Action Team?

5       A.   With the same caveat that I don't recall who was

6   on the Core Action Team.

7       Q.   And, sir, you were the author of this email,

8   right?

9       A.   Yes.

10          MR. CUNNINGHAM:  Your Honor, we would like to go

11  ahead and move this email into evidence.

12          THE COURT:  Is it just this what I'm seeing on

13  the screen?

14          MR. CUNNINGHAM:  Yes, ma'am, it's just that.

15          THE COURT:  Any objection, sir?

16          MR. KANG:  No, Your Honor.

17          THE COURT:  What page is it?  Is there a way to

18  identify it?  I guess by the date.  The number would be

19  -- is it still 6579-C?

20          MR. CUNNINGHAM:  Yes, Your Honor

21          THE COURT:  6579-C is a full exhibit.  That's

22  the date that was testified to that's on the email.

23          Go ahead.

24  BY MR. CUNNINGHAM:

25      Q.   Sir -- well, first of all, Mr. Smeig, could you

1    go ahead and highlight the body of this email.

2         Sir, please read that and I would ask the jury

3    to as well.

4         Before you do that, let me ask you.  Do you know

5    whether this was one of the documents that you would have

6    reviewed in preparation for your trial testimony?

7    A.   I think so.  I think I saw this one.

8    Q.   All right.  Please go ahead and read it and let

9    me know when you are done.

10   A.   Okay.

11   Q.   Sir, do you say in this email, this is the

12   single biggest issue that IFP is dealing with right now

13   impacting both current performance and future strategy?

14   A.   That's what I said, yes.

15   Q.   And you wanted to be included on any future

16   calls or meetings where this issue was addressed, right?

17   A.   That's what I asked for, yes.

18        MR. CUNNINGHAM:  One moment, Your Honor.  I

19   apologize.

20   BY MR. CUNNINGHAM:

21   Q.   Sir, what is EPIC, E P I C?  Not the Lab.  But

22   what was EPIC within your group at Cigna?

23   A.   EPIC within Cigna?

24   Q.   Yes.

25   A.   I actually don't recall what the acronym stands

1    for.  And this is not the EMR Epic, the vendor.  That's

2    not what you are asking about.  You're asking about

3    within?

4        Q.    I'm just asking if you know who EPIC was?

5            THE COURT:  Within Cigna.

6            MR. CUNNINGHAM:  YES?

7        A.    I don't recall what EPIC is.  I'm sorry.

8    BY MR. CUNNINGHAM:

9        Q.    Are you familiar with or do you recall that EPIC

10   was working on some long-term fixes to this problem that

11   Cigna had identified?

12       A.    I don't recall that.

13       Q.    Sir, would you agree with me that you were

14   interested in trying to find a way to stop the bleeding

15   as soon as possible that was being created by these

16   individual plans and the lab treatments?

17       A.    We were trying to ensure we could offer

18   affordable high quality health care.  And this issue was

19   impacting our ability to do that going forward.

20       Q.    And you wanted to fix it as quickly as possible,

21   didn't you?

22       A.    We needed to understand what was happening as

23   quickly as possible to determine if it was appropriate

24   utilization or inappropriate utilization.  So I had

25   urgency to determine the answer to that question.

1    Q.   Because you couldn't change the language of the

2  policy quickly?

3    A.   We could not change the language of the policy.

4  But we deem whether something was medically appropriate

5  or necessary or not through deeper research.

6    Q.   All right.  Can we please go to Labs Trial

7  Exhibit 6941.

8         THE COURT:  Is that for ID?

9         MR. CUNNINGHAM:  ID only at this time, Your

10  Honor.

11         THE COURT:  6941 is ID only, Liana.

12         MR. CUNNINGHAM:  May I proceed, Your Honor?

13         THE COURT:  You may.

14  BY MR. CUNNINGHAM:

15    Q.   Sir, does this appear to be something called a

16  Statement of Work for Substance Abuse Spend in South

17  Florida?

18    A.   It appears that way, yes.

19    Q.   And it mentions the word Navigant, N A V I G A N

20  T, right?

21    A.   Yes.

22    Q.   Who or what was Navigant?

23    A.   This, again, is a vendor that we were evaluating

24  an engagement with.

25    Q.   I'm sorry, I didn't hear you.

1      A.   It was a vendor that we were evaluating an

2   engagement with.  But I don't know the scope of services

3   associated with this.

4      Q.   We'll get to that in a moment, sir.

5           And does this say August 10 to

6   September 11, 2015?

7      A.   It does.

8           MR. CUNNINGHAM:  Your Honor, we would like to

9   move this exhibit into evidence at this time.

10          THE COURT:  Any objection?

11          MR. KANG:  Yes, Your Honor.  We would object on

12   a number of grounds.  First, it's not relevant given

13   that, again, as referenced in previous documents, this

14   relates to the outpatient rehab centers and not lab

15   services.  It's also hearsay.

16          THE COURT:  Why isn't this hearsay?

17          MR. KANG:  This is not a Cigna document.

18          THE COURT:  Thank you, I guess.

19          MR. CUNNINGHAM:  I think this goes to state of

20   mind, Your Honor.  This was a consultant.

21          THE COURT:  Then you have to tell me that's the

22   offer is state of mind.  You can't offer it as a full

23   exhibit for all purposes.

24          MR. CUNNINGHAM:  State of mind of a consultant

25   that Cigna was --

1    THE COURT:  Is your hearsay objection resolved

2  by that offer if I explain it to the jury?

3    MR. CUNNINGHAM:  Your Honor, we also believe

4  it's a business record.  I'm sorry.

5    MR. KANG:  I think we need to establish a

6  foundation that Mr. Evanko understood it that way if the

7  state of mind exception is to apply.

8    THE COURT:  All right.  It can't be a business

9  record if they didn't -- I guess you're claiming it's the

10  agents that made it?

11    MR. CUNNINGHAM:  Sure.

12    This is a document that was produced in

13  discovery, Your Honor.  This is from Cigna's file.

14    THE COURT:  Why isn't it is a business record as

15  made in a representative capacity?  They hired Navigant

16  to write a report.

17    MR. KANG:  This is a statement of work, Your

18  Honor.  I don't even know that there's foundation that

19  Navigant was ever hired for this.

20    THE COURT:  Well, the other problem I have is I

21  don't know whether Cigna thought it was a great report or

22  terrible.  I mean, we don't anything about the report.

23  So I don't see how I make it a business record on the

24  record you've established, Attorney Cunningham.

25    On state of mind, I guess you would have to

1  establish a few things for it to come in for state of

2  mind for purposes of testifying, sir.

3        MR. CUNNINGHAM:  Your Honor, I will try to lay

4  more of a foundation, if I may.

5        THE COURT:  Thank you.

6  BY MR. CUNNINGHAM:

7    Q.   Sir, can we just go to the next page, please.

8  Next page after that, please.  All right.  And scroll

9  down to where it says Summary Description.

10        MR. KANG:  Your Honor, I would object to

11  Mr. Cunningham reading in any portions of this.

12        THE COURT:  He's not reading.  If you think he

13  is, I want you on your feet.

14        MR. CUNNINGHAM:  I wasn't planning to, Your

15  Honor.

16        THE COURT:  Go ahead.

17        MR. CUNNINGHAM:  Please jut highlight that

18  summary description.

19        THE COURT:  Do not read it out loud or the

20  witness.

21  BY MR. CUNNINGHAM:

22    Q.   What I want to ask you, sir, is does this appear

23  to be a report that was generated by a company called

24  Navigant at Cigna's request?

25    A.   It appears that way.  The statement of work,

1958

1     that was in the contract.  So I'm not sure what

2     transpired post this.

3          Q.   Does it appear to be an analysis of substance

4     abuse spend in South Florida markets?

5          A.   Part A certainly references that.

6          Q.   Thank you.

7               MR. CUNNINGHAM:  Your Honor, I believe we've

8     laid the foundation for this.

9               THE COURT:  For what?  How does it come in?

10              MR. CUNNINGHAM: It comes into -- it also --

11              THE COURT:  You haven't laid a foundation for

12     state of mind.  I don't even know if he's read the whole

13     thing or remembers it.  As to business record, I'm a

14     little troubled by how we can lay a foundation that I

15     guess adopted on believed to be true.  There's another

16     one in here.  Authorized to make the statement.  Yeah,

17     I'm troubled you haven't laid that foundation.

18              On the state of mind, I'm not saying you can't.

19     But so far I don't have anything so it's still ID.

20              MR. CUNNINGHAM:  Okay.

21     BY MR. CUNNINGHAM:

22          Q.   Sir, do you know why Cigna would have reached

23     out to Navigant sometime in the summer of 2015?

24          A.   I don't recall specifically.  I mean, it was one

25     of the things on that prior chart you showed me of

1 actions we were exploring.

2    Q.    Wouldn't it be fair to say, sir, that the reason

3 that Cigna reached out to Navigant was to try to come up

4 with some alternative solutions to this 150 to

5 $200,000,000 problem that Cigna had identified?

6         MR. KANG:  Objection, Your Honor.

7         THE COURT:  He can answer if he can.  If he says

8 he doesn't remember or doesn't know or that isn't correct

9 or is it correct.  He can answer.

10    A.    We needed to understand what the drivers of this

11 unprecedented surge in utilization of substance abuse

12 benefits were in south Florida.  And that was the biggest

13 issue we had in the business at the time.  And we tried a

14 lot of different things to understand the root causes and

15 I think this is one of the paths we explored.

16 BY MR. CUNNINGHAM:

17    Q.    Sir, one on the biggest problems, one of the

18 biggest drivers was that Cigna's policy provided for

19 100 percent reimbursement to medical providers under

20 these plans when there was no Medicare equivalent.

21         MR. KANG:  Objection, Your Honor.  Relevance.

22 Again, Medicare issues related to something totally

23 separate from lab services.

24         THE COURT:  Overruled.

25         You can answer, sir, if you can.

1    One of the drivers was Cigna's policy providing

2  for 100 percent reimbursement to medical providers under

3  these plans in situations where there were no Medicare

4  equivalent.  Is that right?

5  BY MR. CUNNINGHAM:

6    A.    The primary issue here was --

7    Q.    Sir --

8    A.    -- the utilization of the benefits.

9    Q.    Sir, it's a yes or no question.

10   A.    The secondary issue was the payment.

11   THE COURT:  Sir, excuse me.  You have to ask me

12  to instruct the witness.  Okay.  The two of trying to

13  talk over each other doesn't create a record.  Thank you.

14   Sir, you have to answer the question.  And I

15  thought -- if you can't answer you can say I don't

16  understand, I can't answer, I don't remember, anything

17  like that.  But you can't go ahead and try to explain

18  some other answer you want the jury to hear.

19   THE WITNESS:  I'm sorry, Your Honor.  Can you

20  rephrase the question or repeat it?

21   THE COURT:  One of the biggest drivers was

22  Cigna's policy which provided for 100 percent

23  reimbursement to medical providers under these plans when

24  there was no Medicare equivalent.  Correct?

25   MR. CUNNINGHAM:  Yes, Your Honor.

1    A.    That was one of the factors that we were

2  exploring.

3  BY MR. CUNNINGHAM:

4    Q.    And, sir, isn't it true that if the Cigna

5  policies had defined or contained language that made it

6  clear that these out of network lab service charges would

7  not be paid at 100 percent in the absence of Medicare, we

8  wouldn't even be here right now, would we?

9         MR. KANG:  Objection, Your Honor, vague.

10         THE COURT:  Sustained.

11         MR. CUNNINGHAM:  I have no further questions,

12  Your Honor.

13         THE COURT:  All right, sir.

14         Cross-examination.

15              CROSS-EXAMINATION

16  BY MR. KANG:

17    Q.    Good morning, Mr. Evanko.

18    A.    Good morning.

19    Q.    I want to address a couple of things that

20  Mr. Cunningham was asking you on direct examination.

21  Okay.

22         He had asked you a question about the Core

23  Action Team and why it was assembled.  And I think his

24  question was that the Core Action Team was assembled

25  because you saw a big problem.  Do you remember that line

1  of questioning?

2      A.   Yes.

3      Q.   I believe he didn't let you complete your answer

4  as to what the big problem was.  Can you explain to the

5  jury from your perspective what the big problem was in

6  2015?

7      A.   Yes.  This was referencing one of the documents

8  we saw specifically in South Florida which is only one of

9  the many geographies in the individual business back

10  then.  And all the other geographies were fine.  But

11  specifically in South Florida we saw this tremendous

12  amount of utilization of substance abuse benefits.  And

13  as we started to research it it became clear that it was

14  not all legitimate.  And there were a number of examples

15  that came in where patients were brought in from other

16  parts of the country, fraudulently enrolled in health

17  insurance benefits, and then they were put in substance

18  abuse rehab facilities in South Florida for 30 days, and

19  they'd be getting drug tested over and over and over in

20  that time period.  And so that --

21          MR. CUNNINGHAM:  Objection, Your Honor.  I need

22  to approach really quickly.

23          THE COURT:  We will excuse the jury.  It's time

24  for our break.  And we'll see you back at 11:30, ladies

25  and gentlemen.  Thank you very much.

1    You, sir, are excused, Mr. Evanko.  You have to

2    leave the courtroom.

3         THE WITNESS:  I don't know where to go.

4         THE COURT:  What's that?

5         THE WITNESS:  I've never testified before.  I

6    don't know what I'm doing.

7         THE COURT:  That's okay.  You can go out that

8    back door.  Don't go that way.  And just go somewhere

9    other than standing by the door.  You have to leave.

10   We're going to talk.  So you shouldn't be where you can

11   hear us.  You need to be back a few minutes before 11:30

12   so that we're on time.

13        Go ahead, sir.

14        MR. CUNNINGHAM:  Your Honor, I think he just

15   talked about fraudulently.  I heard fraudulently.  And if

16   I heard correctly, and this is several times where

17   despite the fact --

18        THE COURT:  Hold on a minute.  Terri, would you

19   tell me.  I can't see it from what's up here.

20        MR. CUNNINGHAM:  Your Honor --

21        THE COURT:  No, sir.  That's fine.  I'm sorry I

22   didn't catch it.  I guess I should put a sticker up here

23   so that I can remember what I instructed Attorney Kang.

24   I appreciate it's not easy for a witness.  If it were, it

25   would be a different discussion we would be having right

1964

1  now.  I think I made it clear witnesses shouldn't be

2  using it.  Now, I don't want you telling them because you

3  are not supposed to talk to anybody.  I guess I should

4  have instructed him on that but I assumed he knows that

5  or any other lawyer on your staff knows it.

6         I guess when he comes back I'm going to say I

7  believe you have been told by counsel, but maybe you

8  don't remember, but I've made a ruling that the word

9  fraud cannot be used in questioning by the lawyers, and

10 that the witnesses were to be told to avoid the use of

11 that word.  So I believe you just used it and I would ask

12 that you be conscious of the instruction and use another

13 word or phrase to characterize the problem that I know is

14 easy from Cigna's point of view to call fraud, but not to

15 use that word.

16        MR. KANG:  If I may just respond to that, Your

17 Honor?

18        THE COURT:  Yes.

19        MR. KANG:  The Borden memo that has now been

20 offered by the Labs as evidence is now a full exhibit.

21        THE COURT:  Yes.  And it says fraud.  I know.

22        MR. KANG:  It talks about fraud.

23        THE COURT:  I know it does.  I don't think that

24 opens the door.  Everybody knows what the problem is in

25 south Florida.  If the jury doesn't know that we have a

1    big problem.  And how you characterize or Borden

2    characterized or he wants to characterize it as, quote,

3    fraud, I would just as soon not have that word repeated

4    over and over again.  It somebody is reading from that

5    document, yes.  If it is a part that says fraud, fine.

6    You get to say it.  I can't stop you.  It's in evidence.

7    But I don't think it opened the door.

8              MR. KANG:  May I ask him and point him to those

9    portions of the Borden memo that relate to clearly --

10             THE COURT:  Sure, you can.  I can't limit your

11   cross-examination.  There wasn't a request to redact it.

12   And I don't know that I would have allowed it.

13             Do you disagree, Attorney Cunningham?

14             MR. CUNNINGHAM:  No, Your Honor.  I just don't

15   want people throwing the word fraud around in the

16   courtroom.

17             THE COURT:  I agree.  I will tell him that

18   generally.  But if it's in the question or it's in the

19   document he's reading, he may use it in that context.

20             Where are we on the Labs responding to last

21   week's request by my Deputy Clerk to tell her whether she

22   agrees with the exhibits?  Did they do that yet and I

23   just didn't get the memo?  Quote, unquote, memo.

24             Liana, have the Labs given you a list that can

25   be uploaded and have they told you their position on

1   Cigna and the Joint List?

2          THE CLERK:  They had given me the thumb drive

3   yesterday and now they're in JERS.  But the list that I

4   had given last week to both sides, I didn't hear back on

5   that list.

6          THE COURT:  When you do think you're going to do

7   that?  Attorney Christ, I'm sorry, you are the

8   sacrificial lamb for your client, but it is unacceptable

9   when I direct a party to respond and you not only have

10  multiples days, you have a weekend.

11         MR. CHRIST:  Your Honor, we're emailing that

12  right now actually.  I have the file open.

13         THE COURT:  I shouldn't have to keep asking.

14         THE CLERK:   Your Honor, can I note it's now

15  going to be a new report?

16         THE COURT:  The new report from Cigna and the

17  Joint or is it only --

18         THE CLERK:  Now I have Joint, Cigna and the

19  Labs.

20         THE COURT:  All right.  Well, take what he's

21  given you.  She's going to generate a -- we need a new

22  report at the end of the day, because I have one I

23  thought wasn't even on the list.  We have got As, Bs and

24  Cs.  So the Labs need to send her again the new JERS

25  list.  Tomorrow morning first thing Liana is going to

1    come in and hit the print button for both sides.  Time to

2    check again.  We're going to resolve what the disputes

3    are.  All right.  I have to add that to the list.

4           We'll stand in recess, please.

5           (Whereupon, a recess was taken from 11:21 a.m.

6           to 11:32 a.m.)

7           THE COURT:  Are we are ready to continue?  Can

8    we bring the jury in?  Is that correct?  Thank you.

9    Let's do that, Liana.

10          I have to quickly tell you something, in your

11   last answer you used the word "fraud."  And I understand

12   that but because of a ruling I made lawyers were

13   instructed to not put that word in their questions.  I

14   thought the witnesses were going to be told try to avoid

15   the use of it.  I know that comes naturally to you.

16   That's your view of what happened here.  I think if you

17   could work hard not to.  Now there are going to be some

18   questions about that Eva Borden memo that's in evidence

19   and counsel points out a couple of paragraphs use the

20   words fraud.  That's how she thought it was, right?  So

21   he's allowed to ask you those questions.  I guess when

22   you are answering if you have to use the word fraud

23   because that's what she used and you're answering a

24   question about her memo you may use it.  Other than with

25   that document, I would ask you and direct you to try to

1   avoid the use of the word.  You can paraphrase into

2   another word.  Abuse you can use.  There's a lot of

3   things you could do.  Okay.

4            (In the presence of the jury at 11:34 a.m.)

5            THE COURT:  Attorney Kang, any issue with that?

6            MR. KANG:  No, Your Honor.

7            THE COURT:  Thank you.

8            Welcome back, Ladies and Gentlemen.  We'll

9   continue with the cross-examination of Mr. Evanko.

10  BY MR. KANG:

11     Q.   Thank you, Your Honor.

12          Mr. Salazar, could we put up Labs Trial Exhibit

13  6940 that was used by Mr. Cunningham on direct

14  examination?

15          Your Honor this is admitted as full.

16          THE COURT:  Yes.  6940.  That's correct.

17  BY MR. KANG:

18     Q.   Mr. Evanko, do you remember Mr. Cunningham

19  asking you some questions about this document during your

20  direct testimony?

21     A.   Yes.

22     Q.   This was a memo prepared or written by Eva

23  Borden to you and Ms. Lisa Lough?

24     A.   Yes.

25     Q.   Dated a August 6, 2015?

1      A.   Yes.

2      Q.   And I believe you characterized this, but

3  correct me if I'm wrong, this was a summary of

4  information that Ms. Borden had uncovered as a result of

5  the meetings of the Core Action Team?

6      A.   Again I'm not sure if the Core Action Team led

7  to this necessarily, but this was a summary of the

8  situation from my recollection in terms of what we knew

9  at the time.

10     Q.   I believe Mr. Cunningham asked some questions on

11 direct related to a couple of the goals down there at the

12 bottom of the page on action summary.  Do you remember

13 that?

14     A.   Yes.

15     Q.   He didn't ask you questions about a couple of

16 the paragraphs above that though, correct?

17     A.   Not that I recall.

18     Q.   Can we zoom in Mr. Salazar, on the "key drivers

19 section"?

20          Do you recall Mr. Cunningham asking you any

21 questions about this portion of Ms. Borden's memo?

22     A.   No.

23     Q.   Do you see here it talks about key drivers.  Did

24 I read that correctly?

25     A.   Yes.

1    Q.    Number one says "patient brokering," correct?

2    A.    Yes.

3    Q.    What is patient brokering?  What is your

4    understanding as to why that's the number one key driver?

5            MR. CUNNINGHAM:  Objection, Your Honor.

6            THE COURT:  Yes.

7            MR. CUNNINGHAM:  Irrelevant to this case.

8            THE COURT:  I don't know.  It is in this memo.

9    It is a part you directed our attention to, I thought.

10           MR. CUNNINGHAM:  No, I didn't, Your Honor.

11           THE COURT:  Not this section.

12           MR. CUNNINGHAM:  Because I don't think that's an

13   issue in the case.

14           THE COURT:  Why is it an issue in the case

15   Attorney Kang?  Briefly, very briefly.

16           MR. KANG:  This clearly relates to, as the Labs

17   have said, relates to substance abuse payments that were

18   made.

19           THE COURT:  I am going to overrule it.  You may

20   proceed.

21           You may answer the question, sir.  If you don't

22   recall it you can ask to have it put to you again.

23   BY MR. KANG:

24   Q.    Do you recall the question?

25   A.    I actually don't recall the words in question.

1    Q.   Do you know why patient brokering was considered

2    the number one key driver?  And what your understanding

3    of patient brokering is?

4    A.   It's one of the things that I was trying to

5    explain earlier this morning.  Back in 2014, and 2015,

6    which is the Affordable Care Act was effective starting

7    January 1, 2014, there were certainly technology

8    capabilities that weren't built at the time.  They were

9    still being built along the way.  So there's a reference

10   here to the FFM that's the federally facilitated market

11   place.  So what that means is some states use the federal

12   marketplace, other states built their own marketplace, so

13   like here in Connecticut if you buy individual insurance

14   you buy from the Connecticut exchange.  I think it is

15   called AccessCT.gov.  If you are in Florida or Texas or

16   in other states you might use the federal exchange, the

17   FFM.  If you go to healthcare.gov you will see on that

18   website if you are in Florida are in Texas or some other

19   places you can buy individual insurance directly from the

20   federal exchange.  At this time, this was back in 2015,

21   one of the problems with the federal exchange, FFM, was

22   it didn't do eligibility verification.  It wasn't able to

23   determine if you were a resident of the location that you

24   applied for.  So it was on kind of the honor system.  And

25   you had to provide documentation later on --

1    MR. CUNNINGHAM:  Objection to the relevance of

2  this, Your Honor.

3    THE COURT:  Yeah, I'm beginning to wonder.  I

4  thought this South Florida issue arose because people

5  were coming in and therefore out of network, maybe not

6  therefore, but out of network.

7    It is an awfully long answer, too.  No offense,

8  sir.  You were explaining nicely but other than it is one

9  of two key drivers identified in connection with this

10  problem, the other one being clearly relevant to the

11  case.  I'm not sure its relevance.  In other words, the

12  whole problem they were addressing wasn't just out of

13  network substance abuse lab tests or whatever it says in

14  there.  It was another problem, but that's not the

15  problem the case is about, is I think Attorney

16  Cunningham's concern.  So I wanted them to understand in

17  a nutshell what it was.

18  BY MR. KANG:

19    Q.    Sure.  Was the concern about patient brokering,

20  identified in number one, related to the concern

21  regarding out of network providers in the substance abuse

22  space?

23    A.    Yes.

24    Q.    How?

25    A.    So the brokers involved here were identifying

1   people in other places around the country.  And we have

2   examples of them being flown to Florida for 30 days to

3   stay in substance abuse rehab centers and being drug

4   tested over and over and over again.  And it was not

5   eligibility verification built in to verify they were a

6   Florida resident.  So all it took was 30 days to rack up

7   all of these medical bills.  They were targeting in some

8   cases drug addicts or people trying to rehabilitate.  We

9   have examples of homeless shelters being targeted so

10  there was a patient safety and public health issue here.

11      Q.   Was the IFP plan a particular target for that

12  patient brokering?

13      A.   It was.

14      Q.   Why?

15           MR. CUNNINGHAM:  Objection.  Rule 702, Your

16  Honor.  Not disclosed as an expert.

17           MR. KANG:  Your Honor, he was the president of

18  the --

19           THE COURT:  Targeted where?  I don't understand

20  your question.  I'll sustain the objection because it is

21  not clear what you are asking.

22  BY MR. KANG:

23      Q.   Was the IFP plan a particular target, to your

24  understanding based on your role as president on the U.S.

25  and individual segment, where out on this network -- I'm

1    sorry, were IFP plans a particular target of patient

2    brokering by out of network facilities?

3        A.    They were because of the eligibility

4    verification gap that existed in the federal marketplace.

5        Q.    Did that not exist with respect to employer

6    sponsored group plans?

7        A.    It did not because the purchasing was completely

8    different and the enrollment was completely different.

9        Q.    So number two key driver is entitled "out of

10   network outpatient rehab and drug testing", correct?

11       A.    Yes.

12       Q.    Drug testing relate to clinical laboratories?

13       A.    I believe so.

14       Q.    And it states that "Outpatient substance abuse

15   facilities, many located in South Florida, intentionally

16   remain out of network."  Did I read that correct?

17       A.    That's what this says, yes.

18       Q.    What's your understanding as to why many of

19   these facilities intentionally remain out of network?

20       A.    There's a variety --

21            MR. CUNNINGHAM:  Objection, lack of foundation.

22            THE COURT:  Yeah.  Yeah.  I think it is, sir.

23   Sustained.

24   BY MR. KANG:

25       Q.    As the president of U.S. individual segment,

1   would you have spoken with people to get an understanding

2   as to why outpatient substance abuse facilities

3   intentionally remained out of network?

4           MR. CUNNINGHAM:  Objection, hearsay.

5           THE COURT:  It would be.  I mean.  Yeah,

6   sustained.

7   BY MR. KANG:

8       Q.   Do you agree, Mr. Evanko, that Ms. Borden's memo

9   states that many out of -- outpatient substance abuse

10  facilities intentionally remain out of network?

11          MR. CUNNINGHAM:  Objection, document speaks for

12  itself.

13          THE COURT:  Sustained.

14  BY MR. KANG:

15      Q.   Do you see that it says down there that the

16  outpatient substance abuse facilities engage in a variety

17  of fraudulent and abusive practices including fee

18  forgiveness, physician kickbacks, and unnecessary drug

19  testing on customers?

20          MR. CUNNINGHAM:  Same objection, document speaks

21  for itself.

22          THE COURT:  I assume you have a follow-up

23  question.  We have been doing that, counsel.  Overruled.

24  BY MR. KANG:

25      Q.   Did I read that correctly, Mr. Evanko?

1    A.    Yes.

2    Q.    And you see that last part it says "unnecessary

3    drug testing on customers"?

4    A.    Yes.

5    Q.    Is that the performance of medically unnecessary

6    drug testing on customers?

7    A.    That's the implication of the way this is

8    written, yes.

9    Q.    I want to go back up, Mr. Salazar, if you could

10   just zoom in on the paragraph right above this.

11        Mr. Cunningham directed your attention to the

12   amount in that second bullet point the 150 million to 200

13   million dollars, right?

14   A.    Yes.

15   Q.    It is 150 million to 200 million in avoidable

16   medical costs.  That's what it says, right?

17   A.    Yes.

18   Q.    What's your understanding as to why this money

19   was an avoidable medical cost?

20   A.    We believed based on the research that was done

21   that the utilization here was not medically necessary.

22   As I said earlier, the patient brokering dynamic we

23   discussed, resulted in ineligible individuals utilizing

24   these benefits.

25   Q.    Was it the conclusion that the billing of 150

1  million to 200 million dollars was inappropriate?

2      A.    That was the conclusion we drew, yes.

3      Q.    Above that it says that "2015 year-to-date costs

4  for substance abuse are running 30 times greater than

5  comparable 2014 OAP."  In laymen's terms, can you explain

6  to the jury what that means?

7      A.    Sure.  So again the benchmark we used was the

8  2014 Open Access Plus product which are our employer

9  health benefits customer base.  We had ten million plus

10 customers all around the country, so we were able to

11 determine what would be a normal level of utilization of

12 substance abuse benefits at any given point in time.

13 What we saw in the IFP business in 2015 was substance

14 abuse was 30 times that normal amount that you would have

15 expected.  So it was almost mathematically impossible for

16 that to be legitimate care, for that to be legitimate

17 health care utilization.  Even in this business in IFP

18 in 2014, the substance abuse utilization was very similar

19 to what was in the employer book of business.  So it

20 spiked and ramped up significantly in 2015 as a result of

21 these actions.

22     Q.    And is that concern the reason that in the first

23 sentence of this memo it says "Cigna's costs attributable

24 to fraud and substance abuse claims have exploded during

25 2015 especially related to out of network utilization"?

1    A.    Yes.

2    Q.    Mr. Cunningham asked you and showed you a

3    document that there was problem that needed to be dealt

4    swiftly.  Do you remember that?

5    A.    Yes.

6    Q.    Is the description here and the 30 times greater

7    spend and 150 to 200 million dollars in avoidable medical

8    costs the reason that you believed this problem needed to

9    be dealt with swiftly?

10    A.    Both the financial impact but also the fact that

11    again there were real people being impacted by these

12    schemes.  And we had a decision to make as to whether we

13    can offer affordable health care in Florida.  We actually

14    decided to exit the Florida market in 2016 as a result of

15    all of these dynamics.  We had to make that decision in

16    the late part of the summer of 2015.  So we had urgency

17    to make the decision around participating.  We were not

18    able to offer care at an affordable price to all the

19    Floridians who needed it, who had nothing to do with

20    these issues we're discussing in this case.

21    Q.    Mr. Salazar, can we go to page 2 of this

22    document.  Can we zoom in on goal number one.

23    Mr. Evanko, do you remember Mr. Cunningham

24    asking you some questions about this portion of

25    Ms. Borden's memo?

 1    A.    Yes.

 2    Q.    And it states, "reduce the substance abuse paid

 3 amount from greater than a million dollars a day to a

 4 target of approximately $50,000 per claims-paid-day or

 5 $300,000 per week."  Did I read that correctly?

 6    A.    Yes.

 7    Q.    Have you heard of the concept of returning to

 8 baseline?

 9    A.    Yes.

10    Q.    And what does that mean?

11    A.    Objection, Your Honor.  This is beyond the scope

12 of my examination.

13         MR. KANG:  He asked about this paragraph, Your

14 Honor.

15         THE COURT:  I'm sorry, sir?

16         MR. KANG:  He asked about this and I'm going to

17 be asking a -- it's a predicate to a question about this

18 specific language.

19         THE COURT:  You did ask about this one, didn't

20 you, sir?

21         MR. CUNNINGHAM:  I did, Your Honor.

22         THE COURT:  Alright.  Overruled.

23 BY MR. KANG:

24    Q.    Mr. Evanko, have you heard the phrase returning

25 to baseline?

1980

1      A.    I have.

2      Q.    Was the $50,000 per claims-paid-day or $300,000

3   per week, was that in your or Ms. Borden's estimation a

4   return to baseline?

5      A.    That was approximately what we thought was a

6   normal level.  Earlier comments about what a broader

7   population would see for purposes of utilizing these

8   types of benefits.  And it was more consistent with what

9   the 2014 utilization levels were before this problem

10  exploded in 2015.

11     Q.    Was paying claims greater than a million dollars

12  a day a normal level?

13     A.    Not for substance abuse benefits.  It was an

14  extremely abnormal level.

15     Q.    We can put this down, Mr. Salazar.  Could we put

16  up Labs 6597, please.

17          THE COURT:  Isn't that the one -- sorry, I

18  forgot the numbers.

19  BY MR. KANG:

20     Q.    Do you remember Mr. Cunningham asking you some

21  questions during direct on this issue, Mr. Evanko?

22     A.    Yes, I do.

23     Q.    And Mr. Salazar, could you go to page 2.  If you

24  can zoom in on the paragraph that has the "program

25  description or problem statement" header.

1      Do you remember Mr. Cunningham directing your

2  attention to this portion of this PowerPoint?

3      A.   Yes.

4      Q.   And the first sentence reads, "In 2015 IFP

5  substance abuse spend is 30 times greater than 2014 OAP

6  norms due to abusive lab testing."  Did I read that

7  correctly?

8      A.   Yes.

9      Q.   What's your understanding as to what abusive lab

10  testing means?

11      A.   My understanding based on the team's work was

12  there was sometimes multiple times a day tests being

13  conducted on individuals, particularly those in the

14  substance abuse rehab centers that I referenced earlier.

15  Sometimes being tested for things that they were not even

16  believed to be under a influence of at some point.  The

17  frequency was just unnecessary.

18      Q.   Also, test results and lab tests being run for

19  orders that were never used by the physician?

20      A.   That's what I heard from our team, yes.

21      Q.   And then goes on to say, "lack of Medicare

22  equivalence for out of network OP rehab services."  Do

23  you remember Mr. Cunningham asking you some questions

24  about that?

25      A.   Yes.

1    Q.   Just to be clear, "out of network OP rehab

2  services" is that out of network outpatient rehab

3  services, sir?

4    A.   Yes, O-N stands for out of network.  O-P stands

5  for outpatient.

6    Q.   Does that have anything to do with lab testing

7  services?

8    A.   Not directly, no.

9    Q.   If you can put this down and zoom in, Mr.

10  Salazar, to the portion that says "clinical policy."

11        And there were a couple of questions related to

12  Navigant and very quickly, the issue there, starting with

13  "overall."  Do you see that sentence?

14    A.   Yes.

15    Q.   And the question regarding alternative code

16  mapping.  Do you see that?

17    A.   Yes.

18    Q.   That related, that issue related to a particular

19  code that's stated there H0015, correct?

20    A.   I'm not sure if those two things are related

21  actually.

22    Q.   But do you know what H0015 is, sir?

23    A.   I don't.

24    Q.   You would agree about me that this doesn't say

25  anything about G0431?

1    A.    Doesn't appear to.

2    Q.    Or G043 -- G434?

3    A.    No.

4    Q.    Or any code starting with 80101?

5    A.    No.

6    Q.    Mr. Salazar, could we highlight the line above

7    the SIU broker model?

8         Do you see here it says, Mr. Evanko, "Over all

9    five brokers flagged in total.  Three have been sent to

10   investigators.  Model for finding broker fraud has been

11   developed and is being used by SIU."  Did I read that

12   correctly?

13   A.    Yes.

14   Q.    Is that the type of conduct that's was also

15   described in Ms. Borden's document related to patient

16   brokering?

17   A.    Yes, it is.

18   Q.    Do you know whether the one of the parties in

19   this case, PB Labs, was ever flagged by SIU as a result

20   of the issues identified by Ms. Borden?

21   A.    I'm not familiar with the specific names of

22   specific labs.

23   Q.    Do you know whether BioHealth laboratories was

24   ever flagged by SIU as a result of these issues?

25   A.    I don't know.

1984

1    Q.    In fact, are you aware of any of the three labs

2    in this case?

3    A.    I don't know the specific names of the labs.

4    Q.    You testified on direct, Mr. Evanko.  Mr.

5    Cunningham asked you some questions about whether the IFP

6    plan was intended to cover lab services.  Do you remember

7    that?

8    A.    Yes.

9    Q.    And I believe your answer was that lab services

10   were eligible to be covered.  Do you recall that answer?

11   A.    Yes.

12   Q.    What do you mean by that?

13   A.    Well, within the scope of covered services in

14   our insurance policies, a number of things are subject to

15   being deemed a clinically necessary right before a

16   payment.  Because otherwise we wouldn't want to be paying

17   for things that are not deemed to be clinically

18   appropriate, in some cases unsafe or unnecessary,

19   unnecessary testing, unnecessary MRIs and X-rays.  So all

20   those things need to be deemed by our clinical experts to

21   be appropriate and necessary to keep costs affordable for

22   everyone.

23   Q.    So just because lab services were eligible to be

24   covered under a IFP plan, does that automatically mean

25   they were covered?

1    A.    No, it doesn't.

2    Q.    Would the services have had to have been deemed

3    medically necessary in order for them to be covered by

4    the IFP plans?

5    A.    Yes.

6    Q.    Mr. Evanko, Mr. Cunningham asked you some

7    questions regarding the SIU.  Do you remember that?

8    A.    Yes.

9    Q.    In your role as the president of the individual

10   segment back in 2013 to 2016 or '17, did Cigna's SIU

11   reports to you?

12   A.    No, it did not.

13   Q.    You said that the SIU was independent.  What did

14   you mean by that?

15   A.    The Special Investigations Unit or SIU operates

16   independent of all of our different business units.  They

17   have essentially a charter to look for fraud, waste and

18   abuse in the health care system.  As a result of that it

19   takes appropriate actions, working with authorities in

20   many instances if something is criminal in nature.  And

21   so they do that work to help protect the safety of our

22   patients and also to ensure we have affordable product

23   offerings.  But they work independently of our

24   businesses.  We work together, but they work

25   independently and make their own conclusions.

1    Q.    Did you in your capacity as president of a

2    individual segment, did you direct the work of SIU?

3    A.    I did not direct the work of SIU, but I was

4    involved and aware of what they were doing.

5    Q.    Did you supervise or manage investigations?

6    A.    No.

7    Q.    Did you know Stephanie Canto?

8    A.    I know her name, but I don't know her

9    personally.

10   Q.    Do you know Deanna Anderson?

11   A.    No.

12   Q.    Do you know Mike Goldfarb?

13   A.    No.

14   Q.    Dr. Dan Nicoll?

15   A.    No.

16   Q.    I know we have been talking a lot about the IFP

17   plan, sir.  Can you explain to the jury what the IFP plan

18   was during this time period?

19   A.    So again these are individual policies for

20   people who don't have health benefits through an employer

21   or they don't qualify for Medicare or Medicare or Tricare

22   or government programs.  So someone has to buy their own

23   policy, for themselves and for their family members,

24   spouse or children or other dependents.  So it is a

25   direct individual policy between us, the company, and the

1  individual.  And the market changed considerably in 2014

2  due to the Affordable Care Act and Obamacare, if you

3  will.  And 2014 and '15 were early years where a lot of

4  things still weren't, as I said earlier, totally built

5  with respect to the technology and the capabilities. A

6  lot of kinks had to be worked out of the system.  They

7  are now.  Everything works fine ten years later.  At the

8  time a lot of things didn't work right.

9      Q.   Who did you understand was going to be the

10  purchasers of the IFP policies?

11      A.   Individual people.  Individual customers and

12  their families.  If I understand your question.

13      Q.   That's fine.  So did you understand that Cigna

14  was intending to benefit individual and family members

15  with these IFP policies?

16      A.    Of course.  They were the primary

17  beneficiaries.

18      Q.   Do you believe that Cigna ever intended the IFP

19  plans to benefit out of network providers like the three

20  labs in this case?

21      A.   No.  I don't even understand the question.

22      Q.   Okay.  Why do you not believe that Cigna

23  intended to benefit out of network providers through the

24  IFP plans?

25          MR. CUNNINGHAM:  Objection, 702, your Honor,

1    foundation.

2            THE COURT:  That's what he said though.

3            MR. CUNNINGHAM:  It also calls for a legal

4    conclusion.

5            THE COURT:  I'm going to sustain it, unless I

6    missed something.  You can try to rephrase or do

7    something, but I sustain.

8            MR. KANG:  I withdraw.

9    BY MR. KANG:

10       Q.   Mr. Evanko, did there come a time when Cigna had

11   to exit the Florida IFP market?

12       A.   We did.  We exited in 2016.

13       Q.   Why did Cigna have to leave that market?

14       A.   The issue we have been discussing this morning.

15   The explosive growth in substance abuse utilization which

16   again was associated with a variety of wasteful spending

17   in our estimation.  It was unclear that we would be able

18   to offer cost effective, high quality healthcare to

19   Floridians in 2016 as a result of all of these issues.

20       Q.   What was a consequence in your view of Cigna

21   having to leave that market?

22           MR. CUNNINGHAM:  Objection.  This is cumulative,

23   Your Honor.  He just testified to this a few moments ago.

24           THE COURT:  He did.  I think we covered this.

25   You already spoke about a withdrawal and why, or he

1    mentioned why in his answer, I should say.  I don't think

2    you get to -- It's cumulative.  Sustained.

3    BY MR. KANG:

4        Q.   Mr. Evanko, as a result of exiting the market,

5    who do you believe suffered as a result?

6            MR. CUNNINGHAM:  Objection, relevance,

7    cumulative.  He already gave this answer.

8            THE COURT:  I will allow it.

9    BY MR. KANG:

10       Q.   You may answer.

11       A.   The individual customers.  We had tens of

12   thousands of customers in Florida, many of which had

13   nothing to do with out of network rehab centers or

14   substance abuse facilities or labs.  So those individuals

15   lost their coverage with us, had to find a new insurance

16   policy in 2016.  They may have had to changer their

17   doctors.  So those are the individuals that were

18   ultimately harmed by this.  And at the time, a lot of

19   other insurance companies were exiting this market as

20   well.  Right.  The big companies, United Healthcare,

21   Aetna, and the Blue Cross companies were exiting a lot of

22   the markets as well.

23           MR. CUNNINGHAM:  Objection, Your Honor.  The

24   relevance of other insurance companies has nothing to do

25   this case.

1990

1          THE COURT:  The jury should disregard that last

2    portion of his answer.

3          MR. KANG:  One minute, Your Honor.

4          THE COURT:  Yes, sir.

5          MR. KANG:  Just one more question, Your Honor.

6    BY MR. KANG:

7      Q.   Mr. Evanko, there was some questions about

8    Navigant, correct?

9      A.   Yes.

10     Q.   Just to be clear, did Navigant and any of those

11   issues relate to anything regarding the lab testing

12   services in your understanding?

13     A.   Not to my knowledge but I also wasn't completely

14   in the details of what we were doing with Navigant at

15   that time.

16     Q.   Does it appear that it related only to

17   outpatient facilities that have nothing to do with the

18   labs at issue in this case?

19     A.   Based on the document that was shown, yes.  But

20   again I don't know the complete scope of the Navigant

21   relationship.

22         MR. KANG:  No further questions, Your Honor.

23         THE COURT:  Sir, you are finished, excused.

24   Thank you very much.

25         Your next witness for Labs.

1       MR. HARE:  Thank you, Your Honor.  If it please

2   the Court, we call Robert Boorstein, Dr. Boorstein.

3       THE COURT:  Yes.  Someone can get Dr. Boorstein,

4   please.  Thank you.

5       Dr. Boorstein, can you come up to the witness

6   stand area where I'm pointing.  When you arrive if you

7   would remain standing.  The clerk is going to administer

8   an oath to you, sir.

9                        Robert Boorstein

10  Having been called as a witness, was first duly sworn and

11          testified on his/her oath as follows:

12      THE CLERK:  Please be seated.  State your name

13  for the record spelling your last name.

14      THE WITNESS:   Robert Boorstein,

15  B-O-O-R-S-T-E-I-N.

16      THE COURT:  Good morning -- Good afternoon, Sir.

17      MR. HARE:  Just barely, Your Honor.

18                      DIRECT EXAMINATION

19  BY MR. HARE:

20      Q.  Dr. Boorstein, I will ask you to be careful at

21  all times to speak directly into the microphone in front

22  of you.  As long as you are pointing in that direction we

23  should be able to hear you.  If I lose the trail I may

24  ask you to speak up, okay?

25      A.  Yes, sir.

1    Q.    Dr. Boorstein, before we turn to your testimony

2    today, were you hired by my law firm to provide a review

3    and opinions and testimony in this case?

4    A.    Yes, sir.

5    Q.    Have you done that, sir?

6    A.    Yes, sir.

7    Q.    Are you prepared today to give your opinion

8    testimony to the jury?

9    A.    Yes, sir.

10    Q.    Before we do that let's start with a bit of your

11    background and qualifications.  What is your profession,

12    sir?

13    A.    I'm a pathologist by training.

14    Q.    Okay.  I would like to go through your formal

15    education.  Where did you go to college?

16    A.    I went to Harvard college.

17    Q.    What did you major in at Harvard?

18    A.    I majored in chemistry.

19    Q.    Did you graduate from Harvard with a degree in

20    chemistry?

21    A.    Yes, I graduated with a degree, summa cum laude,

22    in chemistry.

23    Q.    Summa cum laude was your Latin honors in your

24    undergraduate program.  Is that right?

25    A.    Correct.

1  Q.   Did you obtain a master's degree at Harvard?

2  A.   An MD, PhD, Master's degree all concurrently at

3  Harvard, at Medical school at Harvard University.

4  Q.   Let's go through those.  What's the master's

5  degree concentration?

6  A.   Pharmacology.

7  Q.   And an MD, a medical degree?

8  A.   A medical degree.

9  Q.   And what was you PhD from Harvard University?

10  A.   Also in pharmacology.

11  Q.   And so you are now a physician.  When we say

12  doctor that would be MD or PhD.  You are a medical

13  doctor?

14  A.   I'm a medical doctor, yes.

15  Q.   Lets talk a little bit about your continuing

16  training after completing Harvard Medical School.  Did

17  you proceed to rotate through internships and residencies

18  in your field?

19  A.   I did internship and residency in pathology

20  after graduating from --

21  Q.   Where did you --

22  A.   I did my training at NYU Medical Center.  And

23  part of that training was in Bellevue Hospital Medical

24  Center.

25  Q.   NYU is that New York University?

1    A.    New York University.

2    Q.    Was that the NYU School of Medicine?

3    A.    Yes, they since renamed it.

4    Q.    Okay.  Upon completing your internship and then

5    residency, did you affiliate with NYU as a faculty

6    member?

7    A.    After finishing my residency and then one year

8    of fellowship, I remained at NYU as a faculty member.

9    Q.    What was your title if you had one?

10    A.    My initial title was assistant professor of

11    pathology.

12    Q.    With medical school at NYU?

13    A.    Yes at the medical school.

14    Q.    You mentioned a moment ago Bellevue Hospital.

15    Can you identify what Bellevue Hospital is and tell us

16    what your association or affiliation with that

17    institution was?

18    A.    Bellevue Hospital is a public hospital that's

19    affiliated with the NYU School of Medicine.  I did some

20    of my training there.  In 1996 I became director of

21    pathology at Bellevue Hospital.

22    Q.    And I haven't asked you this yet, what's a

23    director of pathology or more broadly a department of

24    pathology within a hospital?

25    A.    Within a hospital setting a department of

1  pathology does all the clinical diagnostic testing on

2  tissue, fluids for the hospital and it's affiliated

3  patients.  It would be a large number and variety of

4  tests.  And at Bellevue there would be a large number of

5  employees.  We had between 250 and 300 employees in the

6  department on the that site.

7      Q.   Are forgive me, did you say you were the overall

8  director?

9      A.   I was the director.  Yes, sir.

10      Q.   So you referenced testing.  Is this a laboratory

11  function?

12      A.   It is a clinical laboratory that does testing

13  under the rules of the federal government and New York

14  State.  And is highly regulated to perform that testing.

15      Q.   Okay.  Were you, I think you said that upon

16  joining the faculty at NYU you were an assistant

17  professor of pathology?

18      A.   Correct.

19      Q.   Were you ever promoted to a higher status?

20      A.   I was subsequently promoted to associate

21  professor and subsequently received a tenure at NYU.

22      Q.   Was that likewise with respect to the department

23  of pathology?

24      A.   All within the academic department of pathology

25  at the school of medicine.

1996

1     Q.   Beyond Bellevue Hospital, did you ever become

2  responsible for the pathology department at any other

3  hospital within New York City?

4     A.   So when I was working at Bellevue Hospital which

5  is run by the New York City Health and Hospitals

6  Corporation, beginning in 1996 for the next seven years,

7  I was involved in the consolidation of hospital

8  laboratories from eight other facilities, where I

9  developed responsibility for either bringing some of that

10  work from those other facilities to Bellevue or managing

11  the work from those hospitals on those sites.

12     Q.   Again was this specifically with respect to the

13  laboratory functions of the pathology group?

14     A.   Yes, all related to laboratory testing,

15  pathology clinical laboratory testing.  In addition to

16  the title at Bellevue I was also the director up at

17  Lincoln Hospital, what's now known as the downtown Bronx.

18  Then had a title to be overall network head for the nine

19  facilities.

20     Q.   We're going to talk in a moment about these labs

21  specifically and the testing procedures that give rise to

22  the lawsuit bringing us here.  I want to start with your

23  experience in the department of pathology with these

24  hospitals.  Did those laboratories perform a broad range

25  of testing functions?

1      A.    They did a wide variety of testing functions.

2      Q.    Would that testing include testing being

3   performed on patient samples including urine?

4      A.    Correct. Yes.

5      Q.    Blood samples?

6      A.    Yes.

7      Q.    Other tissue samples?

8      A.    Yes.

9      Q.    Now, specifically the sort of testing that we

10  will turn to in a moment, laboratory tests to measure the

11  presence of drugs, alcohol, and similar compounds, is

12  that something that would be performed in the

13  laboratories that you were associated with?

14     A.    There would be some of that testing in these

15  hospitals, yes.

16     Q.    Okay.  Let me bring us a little bit into the

17  modern era.  Are you familiar with a company called

18  Lenco, L-E-N-C-O, Diagnostic Laboratory?

19     A.    Yes, I worked at Lenco from 2013 to 2024.

20     Q.    What sort of company is a Lenco Diagnostic

21  Laboratory?

22     A.    Lenco is a full service clinical laboratory.  It

23  is privately owned.  That grew to be the largest

24  independent laboratory in New York.  And in the spring of

25  this year, they sold the laboratory asset to Quest

1998

1   Diagnostic Laboratory.

2       Q.   Were you responsible in your employment with

3   Lenco, and forgive me, you may have said, what was your

4   title at Lenco?

5       A.   So my title, the Lenco title was medical

6   director.  Just to clarify, the person -- there's a

7   person within a laboratory whose name is on the license.

8   The license title is laboratory director.  And so I was

9   the laboratory director in the view of CLIA or New York

10  State.  So the two titles are somewhat interchangeable,

11  but laboratory director has a statutory definition.

12      Q.   Okay.  I think you said a word about the size of

13  Lenco when it was still independent before being acquired

14  by Quest.  If you look at the biggest independent labs in

15  New York, where did Lenco rank in those days?

16      A.   It started as a modestly sized laboratory, but

17  by the time it sold it was the largest independent

18  laboratory.  A number of other independent laboratories

19  had been already been acquired by Labcorp and Quest

20  during that time.

21      Q.   We've heard a term, we'll come back to it in a

22  moment, commercial laboratory.  Is Lenco a commercial

23  laboratory?

24      A.   Yes, Lenco is a commercial laboratory.

25      Q.   Do you have any professional certifications,

1    board certificates?

2        A.    I'm Board Certified in Anatomic and Clinical

3    Pathology by the American Board of Pathology.  I also

4    have Certificates of Qualification in New York State for

5    about 15 different categories of testing that you are

6    required to have in order to test in New York State.

7        Q.    Are you licensed to practice medicine in any

8    jurisdiction?

9        A.    I'm licensed to practice medicine in New York,

10   New Jersey, Pennsylvania, and Florida.  Three of those

11   states, New Jersey, New York, and Florida, if you want to

12   be a Laboratory Director within those states, you also

13   need to have a Directors's license.

14       Q.    Okay.  Is a Director's license the corresponding

15   Government license as it relates to a Laboratory

16   Director?

17       A.    It looks exactly like a Medical license except

18   it says Laboratory Director instead of Medical license.

19       Q.    Do you hold the Director's license in any

20   jurisdiction?

21       A.    I hold the Director's license in those three

22   states.

23       Q.    Okay.  Please say them again.

24       A.    New York, New Jersey, and Florida.

25       Q.    Dr. Boorstein, before today, have you given

1  expert testimony in any other lawsuits?

2      A.   I've been deposed in approximately 15 other

3  lawsuits over the last 30 years.

4      Q.   Do you do expert witness testimony as your

5  full-time work?

6      A.   I would say it probably is about five percent of

7  my professional activity to be involved in litigation.

8      Q.   Okay.  Let's turn to this case, Dr. Boorstein.

9  What were you hired to do or what was the objective of

10  your review in this lawsuit?

11      A.   I was acquired to give a perspective from the

12  point of view of a laboratory, on what the obligations of

13  a laboratory are in terms of determining medical

14  necessity when a test is ordered.

15      Q.   Did you ultimately prepare and issue a formal

16  written report?

17      A.   Yes, I did.

18      Q.   In order to do that, Dr. Boorstein, were you

19  provided with any documents to review?

20      A.   I received a number of documents.  Can I refer

21  to the report?

22      Q.   Do you have a copy of your report with you?

23  Would it help you to refresh your memory to review that

24  report?

25      A.   I believe so.

1           THE COURT:  That's fine, Doctor.  You can do

2    that whenever you get a question and it would be good to

3    look at what exactly you said just to remember.  But

4    please bear in mind it is your live testimony that the

5    jury needs to hear.  So once you've refreshed your

6    recollection, be sure to put it aside and not read from

7    the report to the jury, because it's not in evidence.

8           Thank you very much, sir.

9           MR. HARE:  Thank you, Your Honor.

10           THE WITNESS:  Can I read from --

11           THE COURT:  You can read it to yourself.  You

12    cannot read it out loud, sir.  It is not in evidence and

13    you are not allowed to read something to the jury that's

14    not marked.  The idea is it's your live testimony.  You

15    can refresh as much as you want.

16      A.   I reviewed the complaint and the amended

17    complaint.  I reviewed the testimony of Dr. Clark.  And I

18    reviewed a number of other materials related to this case

19    provided by counsel.

20    BY MR. HARE:

21      Q.   Okay.  And have you actually been able to sit

22    here in the courtroom with us and hear some of the

23    testimony from prior witnesses?

24      A.   I have heard some of the testimony.

25      Q.   Were you here yesterday to listen to the

1    testimony given by Dr. Clark?

2       A.    I heard -- I did not make the first five or ten

3    minutes of that testimony, but I think I heard most of

4    the rest of it.

5             THE COURT:  Can I just invite the jury to have a

6    stretch.  We have been at this a long time.  I think we

7    all need that.  Thanks very much, ladies and gentlemen.

8    Sorry, I don't want to order you to stand up, but it's

9    just a good idea every once in a while.  Thanks very

10   much.

11            Anybody else wants to, you can join me.  Thanks.

12   I appreciate that.  Sorry to interrupt you, sir.

13            MR. HARE:  It was not an interpretation, Your

14   Honor.  I took up the invitation to stretch as well.

15            THE COURT:  Very good.

16   BY MR. HARE:

17      Q.    Dr. Boorstein, let's now turn to your specific

18   opinions in this case.  And in your written report you

19   offer three enumerated opinions:  Opinion 1, Opinion 2,

20   and Opinion 3; is that right?

21      A.    Correct.

22      Q.    Logically I will start with opinion 1 and then

23   we'll talk about the basis for your opinion.

24            Is it your opinion, Dr. Boorstein, that medical

25   providers, not commercial laboratories, determine whether

1    a laboratory test is medically necessary?

2        A.    The providers provide -- determine medical

3    necessity.  Not laboratories, commercial or otherwise.

4        Q.    Is it your opinion that commercial laboratories

5    are permitted to rely on those determinations from the

6    medical provider?

7        A.    Yes.

8        Q.    And let's break down because I would like you to

9    explain to the jury the basis for that opinion.  And

10   let's just start with this first piece of it.  The

11   medical -- forgive me.

12            Do laboratories determine medical necessity?

13       A.    No, they do not.

14       Q.    The laboratories, we're talking now about

15   commercial laboratories like the three labs in this case,

16   do they see and examine patients?

17       A.    No, they do not.

18       Q.    Do they take patient histories?

19       A.    No, they do not.

20       Q.    Do they perform any physical examination of

21   patients?

22       A.    No, they do not.

23       Q.    Do they diagnose patients?

24       A.    No, they do not.

25       Q.    Do laboratories make prognoses for patients?

1       A.    They do not directly make prognoses.  They get a

2   lab test and might give a prognosis, but they're not

3   doing a prognosis on the basis of history and physical.

4       Q.    Finally, do laboratories decide upon a course of

5   treatment or a course of care for patients?

6       A.    No.

7       Q.    Who is it who performs all of those functions we

8   talked about?

9       A.    The licensed provider that's authorized to order

10  the test.

11      Q.    In your opinion, are laboratories permitted to

12  rely on a medical provider's determination of medical

13  necessity?

14      A.    In my opinion, yes.  Laboratories rely on the

15  assertions of medical necessity from the licensed

16  providers ordering the test.

17      Q.    Let's talk now more specifically about doing

18  testing of patient urine samples.  Are laboratories

19  permitted to rely on a medical provider's determination

20  as to what testing should be performed of patient

21  samples?

22      A.    Yes.

23      Q.    In your opinion, are laboratories permitted to

24  rely upon a medical provider's determination as to the

25  frequency of testing?

1    A.    Yes.

2    Q.    And are laboratories entitled to rely on a

3  medical provider's determination as to the specific tests

4  being run on a given sample?

5    A.    They can only run the tests that are ordered by

6  the physician.

7         MR. HARE:  Mr. Smeig, could I ask you to bring

8  up Cigna Trial Exhibit 2880.

9         Your Honor, this already in evidence.

10 BY MR. HARE:

11   Q.    Dr. Boorstein, do you have this document

12 appearing on your screen at the witness stand?

13   A.    Yes, I do.

14   Q.    Do you recognize this publication from the

15 Federal Register?

16   A.    Yes, I do.

17   Q.    Do you remember being questioned about this

18 document in your deposition?

19   A.    Correct.

20   Q.    Okay.  I would like to turn, please, if you

21 could scroll down to the lower third of the first page of

22 Trial Exhibit 2880.

23         Just to orient ourselves, Dr. Boorstein, do you

24 see a section in this edition of the Federal Register

25 captioned Department of Health and Human Services, Office

1   of Inspector General?

2        A.   Yes, sir.

3        Q.   Do you recall Dr. Clark testifying yesterday

4   that the Office of Inspector General, the OIG, is, so to

5   say, the cops of HHS?

6        A.   I don't specifically recall that comment, but

7   it's not an unreasonable one.

8        Q.   Not unreasonable to describe OIG that way?

9        A.   Correct.

10       Q.   Mr. Smeig, may we please turn to page 4 of this

11   exhibit.  And I would like to start by focusing, once

12   again, if you can project the bottom third of page 4 of

13   this exhibit.

14            Dr. Boorstein, do you see a subsection

15   enumerated 2?  Section 2, Medical Necessity.

16       A.   Yes, sir.

17       Q.   I would like to go to the top of the section

18   column which is a long paragraph under this Medical

19   Necessity section.  And do you see near the end of that

20   paragraph the following statement in the Federal

21   Register:  We recognize that laboratories do not and

22   cannot treat patients or make medical necessity

23   determinations.

24       A.   Yes, sir.

25       Q.   Do you agree with that statement?

1    A.    That is my understanding of the law.

2    Q.    And is that statement consistent with the

3    opinions you have been giving us this afternoon?

4    A.    That is consistent with my opinions and my

5    practice and my observations of the standard in the

6    industry.

7    Q.    Thank you, Dr. Boorstein.  You can take that

8    down.

9         In this trial, Cigna has suggested that these

10   labs have an independent affirmative duty to review each

11   specific test order to determine medical necessity.  In

12   your opinion, Dr. Boorstein, is there any such duty on

13   the labs?

14   A.    No, sir.

15   Q.    In your experience, is it industry practice for

16   laboratories to do this independent review in order to

17   second guess instructions from a treating physician?

18   A.    It is not the practice.  And it would be

19   impossible to do.

20   Q.    Okay.  I want to turn now to an aspect of

21   medical necessity about which Dr. Clark testified.  Were

22   you here when she testified that medical necessity, that

23   determination, is up to the insurance company to make?

24   A.    Yes.

25   Q.    Okay.  Let's break that down a little bit.

1          In your experience, do determinations with

2    respect to medical necessity vary from one insurance

3    company to another?

4          A.    Absolutely.

5          Q.    Okay.  In your experience, do you sometimes

6    observe that the same test might be approved as medically

7    necessary by a given insurance company, and yet

8    disallowed for that reason by a different insurance

9    company?

10         A.    Yes, that is not uncommon.

11         Q.    Is there any one size fits all standardized

12   definition of medical necessity that would apply in all

13   cases?

14         A.    No, sir.

15         Q.    Does the definition or understanding of medical

16   necessity sometimes change over time?

17         A.    Medical necessity definitions frequently change

18   over time.

19         Q.    Why would that be?

20         A.    Because medical knowledge changes, medical

21   practice changes, and they're both for medical reasons

22   and financial reasons.  Insurers, both public and

23   private, will modify their definitions of medical

24   necessity as conditions change.

25         Q.    Recognizing that, recognizing that this is a

1    moving target over time, I want to focus now specifically

2    on the period from 2012 to 2017.  Those are the years

3    we're talking about in this case.  I want to focus

4    specifically on the testing being performed for a patient

5    population of patients being treated for substance use

6    disorder or for addiction.

7         Do you understand the context that I'm giving

8    you?

9    A.    Yes, sir.

10   Q.    Okay.  So focusing on this period, 2012 to 2017,

11   and focusing specifically on patients being seen for

12   substance use disorder.  Were the types of tests that

13   were performed by the Labs in this case appropriate and

14   necessary for the symptoms, the diagnosis, the treatment

15   of the condition experienced by patients seen for

16   substance use disorder?

17   A.    Yes, they were.

18   Q.    And, again, in that same context, 2012 to 2017,

19   patients being seen for substance use disorder.  Were the

20   tests being performed by the Labs within the standards of

21   good medical practice?

22   A.    Yes.

23   Q.    Let's turn to your opinion number 2 in your

24   written reports.  Same thing.  I will ask you to explain

25   the support or your reasoning for the opinion.

2010

1        But is it your opinion, Dr. Boorstein, that

2   medical providers will commonly provide commercial

3   laboratories with master order sheets for patients that

4   require laboratory testing?

5        A.   I'm sorry.  Can you repeat the question.

6        Q.   Certainly.  Is it your opinion that medical

7   providers commonly provide commercial laboratories with

8   master order sheets for patients requiring testing?

9        A.   Laboratories and providers mutually agree on

10  orders and order sheets, templates that are used, panels.

11  There are alternate terms that may be used.  There will

12  be a mutual agreement driven by the providers of what the

13  lab will provide.

14       Q.   And let me unpack that a little bit, because I

15  think you anticipated some additional questions that I

16  would ask.

17       This term master order sheet.  Do people in your

18  profession sometimes use the world template?  I think I

19  heard you say that.

20       A.   I think it overlaps with template, panels.  You

21  know, in our practice, we spent a lot of time working

22  with practitioners to define the panels that they could

23  order from our lab for their patients.

24       Q.   Let's follow up on that.  You said in your

25  practice.  Have you ever, in your profession, in your

1    career, been involved in setting up panels or designing

2    panels?

3         A.   Yes, sir.

4         Q.   Can you explain how you go about doing that for

5    a given practice area?

6         A.   Well, you actually can do that in a variety of

7    different areas, not just pain management, which is a

8    term that we would use.  You would do that, for example,

9    in women's health.  You would have a panel related to

10   what are the tests you would order for a woman coming in

11   for prenatal care.  A list of tests that you would do

12   that you would agree upon with the doctor.  And that may

13   vary from different doctors who have different

14   preferences about what would be part of that panel.

15         So we as a team, not me by myself, our

16   salespeople, our quality people, would work with

17   providers to give them the panels they are looking for

18   for the situations they want.

19         Q.   Now, in doing this, by developing a panel or

20   using a template or a panel, are labs forcing doctors to

21   order particular tests?

22         A.   Doctors order tests that they need and assert

23   that those tests are relevant.  Labs do not -- in my

24   experience, labs cannot force someone to order tests that

25   doctors do not want for their patients.

1    Q.   Now, let's step forward in this process.  You've

2    talked about how you would work with providers to develop

3    panels.  And then once you've done that, once a panel has

4    been developed, can you explain to the jury how those are

5    used in practice?

6    A.   So you might set up a panel.  We might have --

7    remember we had a general pain management panel, an

8    expanded panel.  We had a separate barbiturates panel for

9    technical reasons, not for clinical reasons. And doctors

10   ordering those tests would check that on their order form

11   and that's the result they would get.

12        Now, you always had the ability to customize.

13   So someone might add something to that panel if they

14   wanted.  If you had it available, they could add

15   something.  So it wasn't a one size fits all pattern, but

16   it was the basis for your relationship with the doctors.

17   Q.   So let's drill down a little bit.  Are panels

18   commonly used in the world of medical laboratory testing

19   generally?

20   A.   I didn't get the word before laboratory.

21   Q.   Are panels commonly used in medical testing?

22   A.   Yes.

23   Q.   Okay.  And specifically, are panels often used

24   for patients being seen for substance use disorder?

25   A.   They're used -- there's different panels for

1    every type of disorder.  But, yes, there's panels in

2    substance use disorder and panel management.

3        Q.   Is there something, per se, wrong or sinister

4    about using a panel?

5        A.   Not only is there nothing wrong, but it's

6    appropriate to standardize this testing, to simplify what

7    the lab has to do so that they reduce the number of

8    errors that they make and to standardize the practice

9    across doctors and within a doctor's practice.  So not

10   only is it not inappropriate, it's entirely appropriate.

11   And it makes sure that doctors don't miss things that

12   they want by having it embedded in the panel.

13       Q.   You talked a little bit about the interaction

14   between the laboratory side of the process and the

15   provider side of the process.  Are doctors the people who

16   will have the best and most current information relevant

17   to their local practice?

18       A.   Absolutely.

19       Q.   Would it be the medical providers who know what

20   the needs of their specific community are?

21       A.   That's basically when we set up the panels, we

22   went to the doctors and said what do you need to be on

23   the panels.  And they didn't always agree.  Our job was

24   to make it as consistent as possible to provide for as

25   many of the doctors as possible.

1      Q.    And if a panel is unduly narrow in the view of

2   the physician, the medical provider, is there any risk of

3   missing substances that the doctor might want to detect?

4      A.    From our perspective, if your test is too narrow

5   for a physician, they will go use a provider that gives

6   them a panel they want.  But, yes, they will do it

7   precisely because you may be missing something that they

8   view as important.  It's not that the laboratory views it

9   as important, it's the provider views it as important.

10      Q.    Finally, let me take you, once again, back to

11   the specific context of the tests that bring us here

12   today.  So we're talking about the period 2012 to 2017.

13   And we're talking about patients being seen for substance

14   use disorder.

15          In your opinion, Dr. Boorstein, were the types

16   of tests performed by the Labs within the standard of

17   practice of the profession at the time?

18      A.    Yes.

19      Q.    Finally, sir, I would like to turn to your

20   opinion number 3 in this case, which I will just

21   summarize relates to business practices.

22          Earlier today, I asked you whether Lenco is a

23   commercial laboratory.  You indicated that it is.

24      A.    Correct.

25      Q.    I don't know if we've ever heard in this trial.

1    So can you explain what a commercial laboratory is, what

2    that term means?

3        A.    So a commercial laboratory as opposed to a

4    university laboratory, hospital laboratory, is owned by

5    either individual or by offering a publicly traded stock.

6    The company's goals are to provide quality care to

7    patients and to make profits for the owners of the

8    company, or to increase the value of the company in case

9    it's going to be sold.  And it's no different than any

10   other type of business, including Cigna, in this free

11   market economy.  That's what, in a free market economy,

12   private companies are allowed to do.  They increase their

13   profits or increase the value of the company by providing

14   goods and services that people want to buy.

15       Q.   Cigna has been critical of the Labs for a

16   business practice that Cigna describes as either

17   upselling or cross-selling.  What do those terms mean to

18   you?

19       A.    Those terms have negative connotations that

20   there's something inappropriate for using your sales team

21   and your relationship with your customers to bring their

22   attention to new products that are of value to those

23   patients.  That's what, you know, at Lenco, that is part

24   of what I was brought in to do there, was to bring in new

25   projects, working with other partners, nationally

2016

1    recognized large corporations, to introduce new products

2    to the laboratory that we can bring to our patients and

3    say this is a good test for you for infectious disease.

4    This is a good test for you for liver disease.  And to

5    introduce new products and sell them with the idea that

6    it improves the quality of the service that doctors are

7    providing to patients.  And absolutely nothing -- in my

8    opinion, that's your job.  And it's not really unique to

9    commercial laboratories.  Hospital laboratories will also

10   cross-sell and upsell to their customers and bring on new

11   products.

12       Q.   Dr. Boorstein, you have offered a number of

13   opinions in your testimony today.  As to each of them, do

14   you hold these opinions within a reasonable degree of

15   professional certainty?

16       A.   Yes, sir.

17            MR. HARE:  Thank you, Your Honor.

18            I pass the witness.

19            THE COURT:  All right.  Cross-examination,

20   Attorney Kang.

21            MR. KANG:  Yes, Your Honor.

22               CROSS-EXAMINATION.

23       Q.   Good afternoon, Dr. Boorstein.

24            Sir, we have had a chance to meet before, right,

25   by Zoom?

2017

1        A.    I met with opposing counsel by Zoom previously,

2    yes.

3        Q.    I took your deposition back in June of 2023.  Do

4    you recall that?

5        A.    I recall the deposition, yes.

6        Q.    And the testimony that you provided back then

7    was truthful and accurate, correct?

8        A.    Yes, sir.

9        Q.    Did you have an opportunity to review that

10   transcript after the deposition to see if there were any

11   errors or inaccuracies?

12       A.    I have reviewed it.  I don't recall any

13   significant errors or inaccuracies.

14       Q.    And I believe you testified earlier that you are

15   getting paid for your testimony -- for your time here

16   today?

17       A.    Yes, sir.

18       Q.    As well as for your preparation for your

19   testimony here today?

20       A.    Yes, sir.

21       Q.    And your hourly rate is $1200 an hour, is that

22   correct?

23       A.    My hourly rate is $600 an hour.  For deposition

24   I bill 1200.  But the vast majority of the work is at

25   $600 an hour.

1      Q.   But for this work that you have been doing in

2  the case, it is 1200 an hour?

3      A.   Only for the time that I'm being deposed.

4      Q.   How about for your trial -- for preparation for

5  your trial testimony here today?

6      A.   Preparation is billed at $600.  Travel is billed

7  at $300.

8      Q.   Now, Dr. Boorstein, I understand that you are a

9  pathologist by training, correct?

10     A.   Yes, sir.

11     Q.   And what does a pathologist do?

12     A.   A pathologist is responsible for making

13  diagnoses based on examination of tissues or bodily

14  fluids.

15     Q.   You have not had clinical training as an

16  addictionologist?

17     A.   I have not had -- I have not trained and

18  certified as an addictionologist.  Addiction medicine is

19  part of medical training.  And part of licensure, in many

20  states, one is responsible for various aspects of

21  continuing education in addiction medicine.

22     Q.   Dr. Boorstein, you have been here at this trial

23  and you have heard in instructions that on

24  cross-examination the answer should be yes or no,

25  correct?

1    A.   Yes.

2    Q.   Okay.  I would appreciate it if a simple yes or

3  no answer, or if you can't answer, that would be

4  appropriate as well.  Okay?

5    A.   Yes.

6    Q.   Sir, you are not a psychiatrist, are you?

7    A.   No.

8    Q.   You are not clinically trained in psychiatry?

9    A.   I can't give a yes or no answer.

10    THE COURT:  You can say that, sir.  That's your

11  answer.  It's fine.

12  BY MR. KANG:

13    Q.   Are you a member of ASAM?

14    A.   No, sir.

15    Q.   That's the American Society of Addiction

16  Medicine, correct?

17    A.   You're testifying.

18    Q.   I'm asking you is that correct?

19    A.   It's not an organization I'm a member of.

20    Q.   Okay.  Is it an organization that you are aware

21  of?

22    A.   I'm aware of it, yes.

23    Q.   Now, I believe when I took your deposition back

24  in June of 2023, you said that as a pathologist you do

25  not generally treat or see patients, correct?

1      A.    I would have to look at the testimony if that's

2 exactly what I said.

3           MR. HARE:  Your Honor, as they pull up.  I will

4 object this is improper use.  He can ask the question as

5 opposed to saying, Isn't it true that in your deposition

6 I asked you this question?

7           THE COURT:  So he took his deposition and you

8 said, and the answer wasn't yes, so I think -- or he

9 wasn't sure.  So he's refreshing his recollection.  It is

10 overruled.  So you can show it to him on our screen.

11 It's not for the jury.

12           MR. KANG:  Thank you, Your Honor.

13           THE COURT:  If that's what you are wanting to

14 do.  I'm not saying you have to.  I'm just saying if you

15 want to.

16           MR. KANG:  We'll come back to that.  Thank you,

17 Your Honor.

18 BY MR. KANG:

19      Q.    I understand you have written a lot of scholarly

20 publications; is that correct, Dr. Boorstein?

21      A.    I have written -- again, you would have to

22 define "a lot."  I have written multiple numbers of

23 scholarly publications.

24      Q.    Would you agree with me that you haven't written

25 anything in the field of substance use disorder?

1      A.   Yes.

2      Q.   Would you agree that you haven't written any

3  scholarly publications in the field of drug testing?

4      A.   I'm not sure.

5      Q.   You are not sure.  Are you sure or unsure as to

6  whether you have written anything in the field of

7  addiction medicine?

8      A.   I have not written in addiction medicine.

9      Q.   You are sure about that?

10      A.   Correct.

11      Q.   Do you hold yourself out as an expert on

12  addiction medicine, sir?

13      A.   No, sir.

14      Q.   Or on substance use disorder?

15      A.   No, sir.

16      Q.   Or in the field of drug testing?

17      A.   Yes, sir.  I am an expert in drug testing.

18      Q.   You are an expert in drug testing.  What is the

19  basis of being an expert in drug testing?

20      A.   I'm trained and credentialed and licensed to

21  perform drug testing.  I have a certificate of

22  qualification in toxicology.

23      Q.   You would agree -- I believe you said you did

24  sit in on the deposition of Dr. Clark and you've read her

25  report as well, correct?

1    A.    Yes.

2    Q.    She is an expert on addiction medicine, isn't

3  she?  Correct?

4    A.    I have no opinion on her expertise in the field

5  I'm not an expert in.

6    Q.    You don't know whether or not she is an expert,

7  in your opinion, in the field of addiction medicine?

8    A.    I don't have expertise addiction medicine to

9  make that judgment.

10    Q.    And you also don't know whether -- or do you

11  know whether Dr. Clark is an expert in the field of

12  substance use disorder?

13    A.    I believe she represents her as such.

14    Q.    But you don't agree with her representation?

15    A.    I didn't say that.  She represents herself as an

16  expert.  I -- I do not know who the experts are in their

17  relative hierarchy of expertise.

18    Q.    My understanding, Dr. Boorstein, is that your

19  opinion is that medical providers determine whether a

20  laboratory test is medically necessary; is that correct?

21    A.    Yes.

22    Q.    And that commercial laboratories are permitted

23  to rely on those determination; is that correct?

24    A.    Yes.

25    Q.    I understand when I deposed you, your testimony

1    was that you were not asked to review medical records in

2    this case.  Is that still the case?

3        A.    Yes.

4        Q.    So you haven't reviewed a single medical record

5    in this case to determine whether the tests that were

6    ordered were clinically supported, correct?

7        A.    Not entirely.

8        Q.    Not entirely what?

9        A.    I believe in reading some of the transcripts and

10   in some of the documentations and rebuttals, there were

11   some aspects of medical records that were included in

12   those documents.

13       Q.    Did you review those from a clinical perspective

14   to determine whether or not the tests were medically

15   necessary or not?

16       A.    No.

17       Q.    And I believe you testified previously that you

18   were not asked by the Labs to opine on whether the actual

19   tests performed by the Labs were, in fact, medically

20   necessary from a clinical perspective, correct?

21       A.    I was not asked to review the medical necessity

22   of the tests on an individual or aggregate basis.

23       Q.    So you -- is it fair then, Dr. Boorstein, you

24   have no opinion on whether the tests performed actually

25   by the three labs in this case were medically necessary

2024

1    from a clinical perspective?

2        A.    I do have an opinion that they were ordered by

3    doctors who asserted were medically necessary, so I

4    believe it is likely that they were appropriate as the

5    licensed physicians ordering those tests have said they

6    were.

7        Q.    But you have not done a clinical review of any

8    of those records, correct?

9        A.    No, sir.

10       Q.    You are not rendering a clinical opinion as to

11   whether or not those tests were, in fact, medically

12   necessary, correct?

13       A.    I'm not making an independent determination of

14   whether they were medically necessary.

15       Q.    I believe you testified before that you didn't

16   review any of the drug testing results at issue in this

17   case either, correct?

18       A.    Correct.

19       Q.    And you also testified previously that you did

20   not review of any Cigna's plan documents related to this

21   case.  Is that still the case?

22       A.    Again, define "plan document."

23       Q.    The document that includes Cigna's definition of

24   "medical necessity."

25       A.    I have seen a document, I'm not entirely sure

2025

1    that it is entitled Cigna, that discusses some of those

2    aspects.

3        Q.   I believe your testimony previously was that you

4    had not reviewed any Cigna plan documents; is that

5    correct?

6        A.   I believe during my deposition I was asked to

7    look at a Cigna document, and I have seen that Cigna

8    document since.

9            MR. KANG:  Can we, Mr. Salazar, put up page 107,

10   lines 20 to 22 or Dr. Boorstein's deposition.

11           I will do this for ID only, Your Honor?

12           THE COURT:  So you are asking him to read it and

13   see if it refreshes his recollection what his answer was.

14   BY MR. KANG:

15       Q.   Dr. Boorstein, do you see that?

16       A.   Yes, sir.

17       Q.   Does that refresh your recollection as to

18   whether you testified -- whether you had reviewed any

19   Cigna plan documents related to this case?

20       A.   I believe at the time I made this deposition I

21   had not.  I didn't recall reviewing any such documents.

22       Q.   Have you since reviewed Cigna plan documents?

23       A.   I have seen a Cigna plan document.

24       Q.   Have you seen the definition of "medical

25   necessity" in the Cigna plan documents?

```
 1        A.    I don't specifically recall what that was.  If

 2    you show me the document, I can --

 3        Q.    Sitting here today, you can't remember one way

 4    or the other whether you saw the medical necessity --

 5        A.    I've only --

 6        Q.    -- provision?

 7              THE COURT:  I'm sorry.  You have to let him

 8    finish his question so this woman can take it down.

 9              So the question is, I think, sitting here today,

10    you can't remember one way or another as to whether you

11    looked at -- plan documents on medical necessity?  Was

12    that it?

13              MR. KANG:  Correct, Your Honor.

14              THE COURT:  Thank you.

15              Can you answer that question?

16    BY MR. KANG:

17        Q.    Can you answer that question, Dr. Boorstein?

18        A.    Can you repeat the question?

19        Q.    Sure.  Sitting here today, you don't know one

20    way or the other whether you actually reviewed the

21    medical necessity provision in the plan document?

22        A.    Yes.

23        Q.    You don't recall?  You don't know or you do

24    know?

25        A.    Repeat the question.
```

1    Q.   Sitting here today, do you know -- can you

2    recall whether you reviewed specifically the medical

3    necessity provision of any Cigna plan document?

4    A.   I don't recall.

5    Q.   And I believe you testified previously that a

6    service could be determined by a physician to be

7    medically necessary but it still may not be covered by

8    the terms of a member's health plan.  Do you recall that

9    testimony?

10   A.   I don't specifically recall that testimony, but

11   I don't disagree with it.

12   Q.   It makes sense, right?

13   A.   Correct.

14   Q.   And the reason that's the case is because the

15   plan might say that it is not medically necessary,

16   correct?

17   A.   I've lost the predicate there.

18   Q.   The reason that even if a physician says a

19   service is medically necessary, that still might not be

20   covered, the reason for that is because the plan -- or in

21   this instance, Cigna might determine that it is not

22   medically necessary?

23   A.   Correct.

24   Q.   At the end on the day, it is Cigna that makes

25   that determination, correct?

1        A.    Yes.

2        Q.    Dr. Boorstein, do you remember when I deposed

3    you, you testified about why it is important for services

4    to actually be used for the treatment of a patient in

5    order to be medically necessary?  Do you remember that?

6        A.    I don't recall.

7              MR. KANG:  Mr. Salazar, could we put up 172 for

8    ID only, pages -- line 17, to 173, line 3.

9    BY MR. KANG:

10       Q.    Does that refresh your recollection,

11   Dr. Boorstein?

12       A.    Yes.

13       Q.    Would you agree, sir, that in order for a

14   service to be considered medically necessary, it actually

15   needs to be used in a patient's treatment planning?

16       A.    Yes.

17       Q.    It actually needs to be used by the ordering

18   physician, right?

19       A.    Yes.

20       Q.    The physician actually needs to see and

21   interpret the results in order for the test to be

22   medically necessary, correct?

23       A.    Correct.

24       Q.    And if those tests are not used by the physician

25   at all, then you would agree that ordering the test isn't

1    necessary, right?

2        A.   Yes.

3        Q.   That would be wasteful, wouldn't it?

4        A.   Yes.

5        Q.   Dr. Boorstein, when I deposed you, you testified

6    about the definition of "unbundling."  Do you remember

7    that?

8        A.   No.

9             MR. KANG:  Could we go to 174 of his deposition,

10   Mr. Salazar.

11            MR. HARE:  Objection, Your Honor, outside the

12   scope of direct.

13            THE COURT:  Let me look at what the questions

14   are.  What are you going to ask him to look at?

15       A.   I see what I wrote.

16            THE COURT:  Hold on just a second, sir.  I have

17   to resolve something with the lawyers.

18            With opinion do you think came it came under, as

19   far as his testimony, Attorney Kang?

20            MR. KANG:  I will move on from that for now.

21   Let me take a look at my notes.  Maybe later.

22            THE COURT:  Sure.  Yeah.

23   BY MR. KANG:

24       Q.   Dr. Boorstein, you testified about something

25   called a master order sheet.  Do you recall that

1   testimony?

2       A.   No, I don't specifically recall that testimony.

3       Q.   You don't recall testifying just 20 minutes ago?

4       A.   I thought you said the deposition.

5       Q.   Oh, I'm sorry.  I meant during direct.

6       A.   Yes, you have asked me questions about master

7   order sheets.

8       Q.   Mr. Hare asked you about master order sheets,

9   correct?

10      A.   Yes.

11      Q.   And I asked you about master order sheets, too,

12  back if June of 2023, correct?

13      A.   I don't specifically recall.

14           MR. KANG:  Okay.  Can we show page 111,

15  Mr. Salazar.  111, 4 through 8.

16           THE COURT:  This is of his deposition, correct?

17           MR. KANG:  Yes, Your Honor, and just ID only.

18  BY MR. KANG:

19      Q.   Does that refresh your recollection as to

20  whether I asked you questions regarding master order

21  sheets?

22      A.   No, it doesn't.

23      Q.   It does not?

24      A.   No.

25      Q.   Do you recall -- did you review, in fact, any of

1   the master order sheets at issue in this case?

2       A.   I don't specifically recall looking at them as

3   master order sheets.  I looked at a number of documents.

4   It is not entirely clear how they were named and what

5   they were there for.

6       Q.   Do you know that master order sheets are

7   sometimes referred to as standing orders?

8       A.   That is something that people do.  It is not

9   entirely clear whether those terms -- those terms are not

10  synonymous.  And the use of standing orders and the use

11  of master order sheets are not entirely the same.

12      Q.   Do you recall testifying that you did not review

13  any of the standing orders in this case?

14      A.   I think I just said, no, I don't recall.

15      Q.   And showing you what has been marked, does not

16  refresh your recollection either?

17      A.   If you bring it back on the screen.

18      Q.   Sure.

19           THE COURT:  Page and line, please.

20           MR. KANG:  Page 111, lines 4 through 8, Your

21  Honor.

22           THE COURT:  Through 8, yes.  Thank you.

23      A.   You asked me a question and I said "not to my

24  recollection."

25  BY MR. KANG:

1    Q.    In the answer to the question of, "Did you

2    review some of those standing orders?"

3    A.    I still -- this is what I testified to.

4    Q.    Okay.  You testified -- when I asked you, "Did

5    you review some of those standing orders," your answer

6    was "not to my recollection," correct?

7    A.    Correct.

8    Q.    You also didn't review any of the claim forms

9    submitted by the Labs in this case, correct?

10    A.    Correct.

11    Q.    You also didn't review any of the claims data

12    that's relevant in this case, correct?

13    A.    Correct.

14    Q.    And Dr. Clark, she testified that she did review

15    the claims data, correct?

16    A.    Yes.

17    Q.    And, in fact, Dr. Clark, you will agree,

18    testified she reviewed all 700,000 lines of claims data

19    submitted the Labs in this case?  Do you recall that?

20    A.    I don't remember that number specifically, no.

21    Q.    But it is a lot more than you reviewed, right?

22    A.    I have testified I reviewed none.

23    Q.    Right.  So 700,000 lines would be more than the

24    number of lines that you reviewed, correct?

25    A.    Yes.

1      Q.   You testified that you were not providing an

2    opinion about the specific manner in which the three labs

3    in this case may have used standing orders.  Do you

4    remember that?

5      A.   No, I don't remember that.

6           MR. KANG:  Can we show 187, Mr. Salazar, 23 to

7    188, 3.  ID only, Your Honor.

8           THE COURT:  Is he looking at that to see if it

9    refreshes his recollection?

10          MR. KANG:  Yes, Your Honor.

11          THE COURT:  Does that refresh your recollection,

12   sir?

13

14          THE WITNESS:  Yes, it does.

15   BY MR. KANG:

16     Q.   So you did testify, did you not, that you were

17   not providing an opinion about the specific manner in

18   which the three labs in this case used standing orders,

19   correct?

20     A.   I -- Can you go back to that.

21          MR. KANG:  Would you put that back up,

22   Mr. Salazar.  187-23 to 188-3.

23     A.   This does not discuss standing orders.  It

24   discussed master order sheets.

25   BY MR. KANG:

1    Q.   Oh, okay.  So you are distinguishing standing

2    orders versus master order sheets?

3    A.   Yes, sir.

4    Q.   So let me rephrase.  Is it true that you are not

5    providing an opinion about the specific manner in which

6    the three labs in this case may have used master order

7    sheets in this case?

8    A.   Are you asking what I testified then or now?

9    Q.   I'm asking you now.

10   A.   I did not provide an opinion.

11   Q.   How about now, are you providing an opinion as

12   to the specific manner in which these three labs in this

13   case may have used master order sheets?

14   A.   No.

15   Q.   That's not something you were asked to do,

16   correct?

17   A.   No.

18   Q.   And you don't have a recollection of having

19   reviewed any of the Labs' master order sheets in this

20   case, correct?

21   A.   I don't specifically recall.

22   Q.   So you have no opinion as to whether or not

23   these three labs' use of master order sheets was

24   appropriate or inappropriate, correct?

25   A.   I have no reason to think it was inappropriate.

1          THE COURT:  He's just asking if you are giving

2    that opinion in this case as to whether it was

3    appropriate or inappropriate.  You haven't given an

4    opinion on that question?

5          A.    I'm not giving an opinion that it is

6    inappropriate, no.

7    BY MR. KANG:

8          Q.    I believe you testified on direct that -- to the

9    effect that medical providers often use master order

10    sheets because they are aware of the drugs that are

11    commonly used in the community.  Is that generally what

12    you testified to?

13         A.    Yes.

14         Q.    But wouldn't you agree with me, Dr. Boorstein,

15    that it would not be appropriate to use the same panel of

16    tests for different patients who might have different

17    conditions?

18         A.    No.

19         Q.    It would not be appropriate, correct?

20         A.    No -- wait, wait.  It would be appropriate to

21    use the same panels, yes.

22         Q.    Even if they had different conditions?

23         A.    It is entirely appropriate to develop broad

24    panels and use them for multiple conditions.

25         Q.    So it would be, in your opinion, a sound medical

1    medically appropriate practice to prescribe the same

2    panel of tests to someone who presents with alcohol

3    dependence and another patient who might have only a

4    heroin issue?

5         A.    It would be entirely appropriate for labs to set

6    up broad panels and use them for multiple purposes.  That

7    is well within the standard of practice in the industry.

8         Q.    Did you talk with any of the medical providers

9    who ordered the drug tests at issue in this case?

10        A.    I did not talk with providers.

11        Q.    You didn't talk with someone named Michael

12   Ligotti?

13        A.    I was not aware of the existence or Michael

14   Ligotti until yesterday.

15        Q.    You didn't talk with someone named Kenneth

16   Riveria-Kolb?

17        A.    I -- what's the name?

18        Q.    Kenneth Rivera-Kolb.

19        A.    The name is not familiar to me.

20        Q.    Never talked with him?

21        A.    I never talked with anyone related to this.

22        Q.    And I believe you testified during your

23   deposition that you also didn't talk about -- talk with

24   anyone from the treatment centers or sober homes that

25   ordered the drug tests at issue in this case, correct?

1    A.    Correct.

2    Q.    You didn't talk with anyone, for example, from

3  Angel's Recovery?

4          MR. HARE:  Objection.  Cumulative.

5    A.    I did not talk with anyone --

6          THE COURT:  I'll allow it.  Go ahead, sir.

7    A.    I did not talk with anyone other than counsel

8  about -- involved in this case.

9  BY MR. KANG:

10   Q.    I believe you testified on direct that it was

11  your belief that the Labs followed -- I may be getting

12  this wrong -- good standard of care; is that right?

13   A.    Yes, sir.

14   Q.    But again, that opinion is not formed by any

15  review of any of the actual underlying medical records in

16  this case, correct?

17   A.    Correct.

18   Q.    You also testified, Dr. Boorstein, that your

19  belief is that labs can relay on the assertions of

20  medical necessity of the underlying treating providers,

21  correct?

22   A.    Correct.

23   Q.    Is it your opinion that labs have no

24  responsibility whatsoever to ensure that medically

25  necessary tests are ordered?

2038

1      A.   No.

2      Q.   What responsibility do labs have that, in your

3  opinion, to ensure that medically necessary tests are

4  ordered?

5      A.   I think one can envision some circumstances

6  where if they feel tests are completely inappropriate

7  that they would not order that test.  I mean if you get a

8  PSA test on a woman, you would say that's inappropriate.

9           THE COURT:  Can you tell us what that is, just

10  so --

11          THE WITNESS:  Excuse me?

12          THE COURT:  What PSA --

13          THE WITNESS:  Prostate-specific antigen.

14          MR. KANG:  Mr. Salazar, can we put up Cigna

15  Exhibit 2880, page 45079.

16          THE COURT:  Is that in evidence?

17          MR. KANG:  Yes, Your Honor.

18  BY MR. KANG:

19      Q.   So Dr. Boorstein, you just testified that you do

20  agree that there is some responsibility that clinical

21  labs have to ensure that medically necessary tests are

22  ordered, correct?

23      A.   That's not exactly what I testified.

24      Q.   What did you testify?

25      A.   I said that one can envision cases where they

1  do.

2          MR. KANG:  And so if we can zoom in.

3  BY MR. KANG:

4      Q.   This was the HHS OIG guidance that I believe

5  there was some questions for you on direct, right?

6      A.   Uh-huh.

7          MR. KANG:  Can we zoom in, Mr. Salazar, on that

8  middle column, starting with "Laboratory should take all

9  reasonable steps."

10  BY MR. KANG:

11      Q.   Can you see that sentence, Dr. Boorstein?

12      A.   Yes, sir.

13      Q.   "Laboratory should take all reasonable steps to

14  ensure that it is not submitting claims for services that

15  are not covered reasonable and necessary."  Did I read

16  that correctly?

17      A.   Correct.

18      Q.   You agree with that statement, right?

19      A.   I agree with that statement.

20          MR. KANG:  Could we go to the next page, Mr.

21  Salazar?  And could we start at the bottom under "Test

22  utilization monitoring," Mr. Salazar.

23  BY MR. KANG:

24      Q.   Do you see down at the bottom there -- I know

25  it is hard to read, Dr. Boorstein, but on the left, "Test

1   utilization monitoring"?  Do you see that?  That OIG

2   believes that laboratories can and should take the steps

3   described in this compliance guide to help ensure

4   appropriate billing of lab tests."  Did I read that

5   correctly?

6       A.   Yes.

7       Q.   You would agree with that, right?

8       A.   Yes.

9            MR. KANG:  The next sentence, Mr. Salazar, if we

10  could zoom in on that.

11  BY MR. KANG:

12      Q.   States, "We also believe that there are steps

13  laboratories can take to determine whether physicians or

14  other individuals authorized to order tests are being

15  encouraged to order medically unnecessary tests."

16           Did I read that correctly?

17      A.   Yes.

18      Q.   And you would agree with that statement as well,

19  correct?

20      A.   Yes.

21      Q.   And the next sentence states, "More importantly,

22  if the laboratory discovers that it has in some way

23  contributed to the ordering of unnecessary tests, the OIG

24  believes the laboratory has a duty to modify its

25  practices as well as notify the physician or other

1   authorized individuals of its concerns and recommend

2   corrective action."

3         Did I read that correctly?

4     A.   Yes.

5     Q.   You would agree with that as well, correct?

6     A.   Yes.

7         MR. KANG:  One minute, Your Honor.

8         THE COURT:  Yes.

9         MR. KANG:  One more question, Your Honor.

10  BY MR. KANG:

11    Q.   Dr. Boorstein, were you asked to opine on

12  whether the actual tests performed by the Labs in this

13  case were medically necessary from a clinical

14  perspective?

15    A.   No, I was not.

16        MR. KANG:  Nothing further, Your Honor.

17        THE COURT:  You may step down, Doctor.  Thank

18  you.  You are excused.

19        How about we do this, we'll break now, but that

20  means you have to come back before 2:00.  So I would say

21  I would say expect to see you just a hair after 1:55.

22  Thank you very much, ladies and gentlemen.

23        (In the absence of the jury at 1:12 p.m.)

24        THE COURT:  Everybody be seated.

25        Any issues before our lunch break?

2042

 1          MR. HARE:  Your Honor, one question for the

 2   Court.  We were mindful of some comments the Court made

 3   this morning with respect to reviewing the motions for

 4   summary judgment as it relates to the billing policy

 5   documents.

 6          THE COURT:  Not reviewing it.  I just happened

 7   to read it.

 8          MR. HARE:  Right.  I understand.

 9          THE COURT:  Yeah.

10          MR. HARE:  And I don't want to -- we're

11   certainly not presuming what's in the Court's mind, but

12   we're trying to be alert to what may be in the Court's

13   mind.

14          THE COURT:  Sure.

15          MR. HARE:  We'll be putting on Mr. Haney next.

16   We anticipate in other respects concluding his testimony

17   today.  In the event the Court does at some point wish to

18   reexamine the topic that the Court addressed --

19          THE COURT:  Bundling.

20          MR. HARE:  Correct.

21          THE COURT:  I will tell you I have not decided.

22   I want to hear from counsel.  But I will tell you what is

23   a very vague thought or idea.  Okay.  I want to emphasize

24   that.  I would say not normally tell anybody this, but

25   obviously I don't want to make any party have to use more

1    time or bring a witness back who is charging a lot of

2    money, et cetera.

3        I toyed with the idea of taking unbundling out

4    completely.  I have decided I am not going to do that.

5    However, I am considering moving it from a, quote,

6    affirmative defense in the charge to a damages issue.  We

7    found very few cases, but we did find one that talked

8    about it in those terms.  And it's a pretty good opinion.

9    It means that the Labs still get to argue it.  It just

10   isn't listed as an affirmative defense.  And therefore, I

11   don't think -- I mean, again I haven't decided, but it

12   does substantively change the case in the sense that if

13   it is an affirmative defense, we had, of course, the big

14   question how much of the claim does it block.  Remember

15   that got raised for about two nanoseconds yesterday.

16       By making it a damage issue, not only if I think

17   that is the right way to go, it also addresses that

18   problem.  The jury can, as I'm having them on other

19   issues, in effect, subtract from the damages awarded to

20   the Labs the amount they think was improperly unbundled,

21   not bundled, however, you're going to argue that, Cigna.

22       Again, I just tell you that in response to your

23   concern about Mr. Haney and his testimony and the fact

24   you are all running out of time.  The sands of time are

25   ticking through the hourglass.  But I have not decided.

1    I am completely open to any other ideas you have about

2    how to deal with this issue.  But I think in the end I've

3    decided it is a billing issue, and to me that would be --

4    it would go to damages on whether you properly billed it

5    and are entitled to recover it or didn't.

6         Again, I'm saying thins out loud.  I can't

7    believe I'm saying, all capital letters in it transcript

8    should say this is not the court's decision.  These are

9    her thoughts on the issue, which is a challenging issue.

10   I think it is the last issue we really have to tackle

11   other than the verdict form.  And I need to discuss it.

12   We ran out on time last night.  And I don't know if we're

13   going to have enough time to discuss it tonight.  Yeah, I

14   haven't raised that problem with you, but I'm going to

15   save that for the end of the day.

16        So I am going to stand in recess.  I don't

17   really want anybody telling me, oh, that's a great idea,

18   Judge.  I say know you are probably tired, Judge, but

19   that's not a good idea, can I tell you -- we'll talk

20   about it later.  Thank you very much.

21        Last thing, Attorney Kang, is don't forget to

22   have someone on your team mark those depo sections you

23   showed as ID, you know, during the cross of Dr. Boorstein

24   so there's a record.

25             (Whereupon, a luncheon recess was taken from

2045

1    1:16 p.m. to 1:56 p.m.)

2            THE COURT:  Ready to bring the jury out.  We're

3    right on time.

4            MR. KANG:  Your Honor, one housekeeping matter.

5    For Dr. Boorstein's testimony, if there could be, at the

6    appropriate time, a limiting instruction that

7    Dr. Boorstein was only being used as a witness in the

8    Lab's defense.

9            THE COURT:  Of your case.

10           MR. KANG:  Correct.

11           THE COURT:  Is there any objection to my doing

12   that?

13           MR. GESTRICH:  Your Honor, he was a rebuttal

14   witness to the --

15           THE COURT:  To Dr. Clark, who you told me was in

16   both cases.  So it's kind of hard for me to say that it

17   is not both.

18           MR. KANG:  I think on a witness list he was

19   disclosed only as a defense witness, Your Honor.

20           MR. GESTRICH:  That aspect was for timing of

21   when he would testify.  He was testifying after

22   Dr. Clark.

23           THE COURT:  Communication in the case has been

24   less than stellar.  I can't tell the jury anything right

25   now because I don't have agreement and I don't know what

 1   the heck either side is saying.

 2         So let's bring the jury back, as we're supposed

 3   to.  I don't know when we're going to deal with this

 4   issue.  Just somebody has got to remind me to deal with

 5   it.  Did you tell me the D on your list meant timing as

 6   opposed to D on his list meant in defense of your case?

 7   Or maybe he didn't tell me D meant defense, but I think

 8   that's -- go ahead, come on in.  I guess that will be a

 9   rhetorical question.

10         (Jury enters, 1:58 p.m.)

11         THE COURT:  Everybody be seated.  Thank you.

12         Ready for the next witness, please.

13         MR. GESTRICH:  The Labs call Mr. Christopher

14   Haney.

15         THE COURT:  Yes.

16         Mr. Haney, welcome back.  As I tell any witness

17   who gets called back, the oath you took when you were

18   here previously in this trial applies to your testimony

19   today.  Thank you very much, sir.

20         Whenever you're ready, Attorney Gestrich.

21         MR. GESTRICH:  Yes, Your Honor.  May I give

22   Mr. Haney a clean copy of his rebuttal report?

23         THE COURT:  Yes, you may.  I will remind him

24   it's to be used to refresh your recollection, not to

25   testify from.  Thank you.

1      MR. GESTRICH:  Thank you, Your Honor.

2                 CHRISTOPHER HANEY,

3    returned to the stand to testify further on his oath as

4                     follows:

5                 DIRECT EXAMINATION

6    BY MR. GESTRICH:

7      Q.    Hello again, Mr. Haney.

8      A.    Afternoon.

9      Q.    The last time you were here you testified about

10   several matters.  Today you are here to testify about

11   something different, so I would ask you to explain just

12   very briefly what was your assignment in this matter?

13     A.    I was asked to respond to Dr. Clark's analysis

14   and testimony specifically as it relates to statistical

15   analysis and sampling.

16     Q.    Last week, you testified about the materials you

17   reviewed for your opinions; is that correct?

18     A.    Correct.

19     Q.    I don't want you to repeat any of the materials

20   you have already reviewed.  Let's look at new materials.

21   What did you review in addition to the previous materials

22   that were disclosed to form your opinions in response to

23   Dr. Clark's opinions?

24     A.    The primary documents I considered for this

25   testimony were Dr. Clark's report, which as I understood

1    was the basis of her testimony that she provided

2    yesterday.  All of the appendices to her report.  I also

3    reviewed Ms. Thelian's expert report, which was a

4    rebuttal to Dr. Clark's analysis.  And I reviewed all of

5    the appendices associated with that, too.

6        Q.   Were you in attendance yesterday when she

7    testified?

8        A.   I was.

9        Q.   Do you remember that last week you testified

10   about Joint Exhibits 43 to 46?

11       A.   I do.

12       Q.   Do you understand that's a subset of the same

13   data that Dr. Clark reviewed?

14       A.   Yes.  My understanding is the data that we

15   looked at regarding my testimony last week was a subset

16   of the full claims data that Cigna provided.  The full

17   claims set is what we referred to as the 700,000 lines.

18   That's the full Cigna data set.  What I testified to last

19   week was a subset of that.

20       Q.   And you were here yesterday.  She -- you heard

21   her testify that the there were 700,000 lines, consistent

22   with what you just said now; is that correct?

23       A.   I did, yes.

24       Q.   You heard her testify -- did you hear her

25   testify yesterday as to how many columns were in that

1  data?

2     A.   I did.  She said there were approximately 80

3  columns.  Those are the unique fields in that data,

4  things like patient name, date of birth, date of service,

5  what the codes were for.  Each of those was an individual

6  column in that data set.  I believe she testified there

7  were approximately 80.  There were actually 84, but

8  that's as best as I can recall what she testified to.

9     Q.   How many total data fields are in those

10 spreadsheets with the full Cigna data?

11    A.   So if we do the math, 700,000 times 84 columns

12 gives you about 60 million different data fields --

13 unique data fields in that data set, in that big

14 spreadsheet that she was referring to.

15    Q.   Let's just suppose somebody like Dr. Clark

16 reviewed those in 200 hours.  How many dates fields is

17 that per hour, per minute, per second?

18    A.   So if you break that down, 60 million data

19 fields is a 300,000 data fields an hour.  That's about

20 50,000 a minute.  A thousand a second is really what it

21 breaks down to in tangible terms of how many data fields.

22 If you spent every second of those 200 hours reviewing

23 data, the rate would be at about a thousand fields a

24 second.

25    Q.   I want to shift now to some terminology that

1    we're going to discuss in your testimony.  I want to make

2    sure we have an understanding of that terminology first.

3            First, have you heard the term "generalization"?

4    A.    Yes.

5    Q.    What does that mean?

6    A.    So when we use the term "generalization" in this

7    statistical space, we're really talking about reaching

8    conclusions about data that we haven't looked at.  And in

9    the world of sampling, that means we look at the sample,

10   we come up with some conclusions of the sample and then

11   we generalize across some other population.

12   Generalization is a statistical term, it's extrapolation,

13   but generalization is sometimes a little easier to

14   understand.

15           If we go back to the election examine that I

16   used last week, we're looking at a sample of voters,

17   we're going to pull how they intend to vote and then we

18   are going to generalize across the entire state or the

19   entire country about what we think everybody will vote,

20   That's what we mean when we say "generalization" in the

21   statistical world.

22   Q.    And how about the term "representative," what

23   does the term "representative" mean in the statistical

24   context?

25   A.    When we talk about representativeness, we're

1    really talking about does one thing reflect something

2    else properly.  When we select a sample, statistical

3    sampling is only really useful if our sample fairly

4    represents the total population.  And that's when we say

5    representativeness, a lot of times I like to tell

6    students  think about looking in a mirror, you want to

7    make sure your sample mirrors the population, at least

8    reasonably.  When we think about the polling example, if

9    we go out and we solicit advice from a sample of

10   potential voters, we want to make sure that those voters

11   represent the broader group.

12          Are we looking at a fair representation of men

13   and women or age groups or Republicans and Democrats?

14   You want to make sure that your sample is fairly

15   representative of the entire population.  So that's what

16   we talk about when we use that word.  Is it a good

17   snapshot of the total?

18       Q.   Then the term "cherry-picking," what does that

19   term mean?

20       A.   So "cherry-picking" is a term that we use when

21   it comes to sample selection.  If you remember last week

22   we talked about a proper way to select a sample is

23   randomly.  And what that does is that prevents any kind

24   of bias.  It prevents you from selecting claims that are

25   closest or easiest or to tell the story you want to tell.

1    When someone cherry-picks, they use a different

2    technique.  They select claims that they want for a

3    particular reason.

4         And what we find commonly is that's because they

5    are trying to tell a particular story, so they choose the

6    claims that tell the story they are trying to tell.  A

7    lot of times those are the outliers.  They are the

8    extreme examples that support their story, but they're

9    not a great representation of the total population.  So

10   when we hear "cherry-picking," it's generally a negative

11   connotation of someone who is trying to influence the

12   results by cherry-picking the items in the sample.

13   Q.   And then for each of those terms,

14   generalization, representative and cherry-picking, why

15   are those terms statistically relevant to Dr. Clark's

16   testimony?  Let's start -- we'll start one at a time.

17   Why is generalization statistically relevant to

18   Dr. Clark's testimony?

19   A.   It is relevant to what we heard Dr. Clark say

20   because she made lots of generalizations.  I will start

21   with one example.  She generalized about the Labs.  In

22   this case, we're talking about three labs, PB Labs,

23   BioHealth and Epic.  But we heard her refer to them as

24   Medytox, as a group.  She collectively treated them all

25   the same.  She painted them all with the same brush.

1  That's a generalization.  And she did that even though

2  many of the things she looked at only happened for one

3  lab.  That's painting that brush, generalizing across all

4  three labs, even though she saw particular

5  characteristics in only one, or maybe only two.  So those

6  are generalizations that we saw in her testimony.

7     Q.    Then.  The term "representative," why is that

8  statistically relevant to Dr. Clark's testimony?

9     A.    Again, we're going to talk about sampling and

10  some of the samples she referred to in her analysis,

11  whether those samples are representative or not was

12  largely part of my analysis to evaluate whether we could

13  actually say anything beyond those samples.  If they

14  weren't representative, we can't say anything beyond

15  those samples themselves.  And that was a particular

16  analysis that I performed in her work because that was

17  what she was testifying to.

18          In her report, she said many times that certain

19  things were representative.  She was assuming that they

20  were representative of something else.  She said she

21  assumed all the labs were representative of each other.

22  She said there was a sample on 12 patients that she

23  looked at, and she assumed that those 12 patients were

24  representative of the entire population.  That's why the

25  word "representative" is relative to my work because she

1    used it in many of her conclusions.

2    Q.   Then the last term "cherry-picking," why is that

3    term relevant to Dr. Clark's testimony?

4    A.   Again, because she specifically performed

5    cherry-picking in her analysis.  And we see it when we

6    look at what I will describe later as a sample of 12.

7    Those 12 patients that she -- she talked about some of

8    them in her testimony.  She presented all 12 in her

9    report.  They were cherry-picked.  They were specific

10   extreme examples.  In fact, when we look at her reports,

11   she called them the high-frequency examples because they

12   were outliers, they were extremes.  So they are

13   cherry-picked specifically for the purposes of her

14   analysis.

15   Q.   Mr. Haney, just a moment ago you spoke about

16   hearing the testimony that she referred to each of the

17   Labs as under one umbrella the Labs collectively in her

18   analysis.  Did I state that fairly?

19   A.   Generally, yes.

20   Q.   What are the fundamental differences between

21   these labs?

22   A.   So there were lots of differences when we talk

23   about -- again what I'm referring to, PB Labs, BioHealth

24   and Epic here.  There are a lots of differences that

25   indicate to me they should have been treated

1    differently.  Number one, they are different businesses.

2    They are fundamentally different business operations,

3    they are different labs that operated separately.  They

4    operated for different time frames.  When you look at the

5    years in question and when these labs were up and

6    running, those time frames are different.  they had

7    different physicians.  They treated different patients.

8            And one of the biggest differences that I saw is

9    the different patients that they are treating were

10   treated for different kinds of tests.  So for example,

11   Epic was a particular outlier.  Epic tested the vast

12   majority of the standard testing, and there's some

13   technical terms behind what that is, but certain kinds of

14   tests, the vast majority were performed at Epic.  That's

15   different from PB Labs, different from BioHealth.

16           So if you were to look at Epic, you wouldn't

17   want to generalize across the other three, and that's

18   exactly what Dr. Clark did.  The sample of 12 were all

19   from Epic.  But she took those conclusions and applied it

20   to PB Labs and to BioHealth as well.  So when we talk

21   about that cherry-picking, that where it was relevant in

22   her analysis.

23   Q.   Did you form an opinion about Dr. Clark's

24   treatment of the Labs collectively rather than

25   individually?

2056

1        A.    I did.

2        Q.    What is that opinion?

3        A.    My opinion was that she overgeneralized by

4   treating the Labs as one group, by painting them with the

5   same brush.  The analysis she provided in her report

6   didn't support the conclusion.  I think she did not

7   address the differences in those labs and she simply

8   generalized across all three labs improperly.

9        Q.    I want to set that aside and move to the more

10  fundamental question as to what Dr. Clark looked at.  And

11  so we just spoke about the generalization to all three

12  labs.  I want to move to what she looked at.

13            Did you -- I want to give just a general

14  overview.  Did you come to an opinion about the samples

15  that Dr. Clark looked at?

16       A.    I did.

17       Q.    You heard Dr. Clark say she didn't do sampling

18  yesterday; is that correct?

19       A.    I did.

20       Q.    So why are we talking about sampling?

21       A.    When I heard her testify yesterday, she said she

22  didn't do sampling.  But it doesn't really matter what

23  terminology she uses.  That's not the focus of my

24  analysis.  What I'm much more interested in is the

25  substance of what she did.  And what she did is the

1    textbook definition of statistical sampling.  She looked

2    at subsets of patients and she generalized about the

3    entire population based off of those subsets.  That is

4    sampling.  That follows -- if you recall last week we

5    looked at a chart that had eight circles in it.  Those

6    are the steps involved in sampling, and that is what I

7    evaluated.

8        I understand she testified that she didn't do

9    it.  But the substance of her report and the substance of

10   what she presented is textbook statistical sampling.

11   Q.  What about the 700,000 lines of data with 84

12   columns and 60 million data fields that she claims that

13   she reviewed in 200 hours.  Is that sampling?

14   A.   If she had reviewed that, no, that's not

15   sampling.  And we talked about this a bit last week.  If

16   you look at every single thing in the population, you are

17   not performing sampling, you're looking at everything.

18   However, although I heard her say that she did that

19   yesterday in her testimony.  When I looked at her report

20   and when I looked at everything that she put up on the

21   screen and everything she talked about, I did not see

22   evidence to support all of that analysis.

23       In fact, when I looked at all of the appendices

24   in her report, she only cited 55 patients in total.  When

25   someone only does that, that's tells -- that is the

1    documentation to support the analysis.  That's all I can

2    look at.  If that's all you give me, if all you show me

3    is 55, that's all I know to look at.

4         So as far as my analysis go, I look at what's in

5    front of me.  And in front of me in all of Dr. Clark's

6    exhibits and reports, there were only 55 patients.  And

7    we saw that on the screen.  There were only a few

8    examples put up and then generalizations about the total

9    population.  That is sampling, and it is improper.

10   Q.   Did you look at the sample that she reviewed?

11   And I think you just testified to that, but I want to be

12   certain.  Did you evaluate the sample that she reviewed?

13   A.   From a statistical perspective, certainly.  I do

14   want to clarify.  I think Dr. Clark looked at multiple

15   samples.  When I read her report, and I don't know if she

16   talked about each one of these individually in her

17   testimony, but when I looked at her report, she talked

18   about lots of individual samples that she had looked at.

19   And some of those samples are small.  Many of them only

20   had one patient.  I treat those as samples because she

21   generalized conclusions based on each of them.  So I did

22   look at several samples.

23        The primary one that she spent most the most

24   time describing both in her testimony and in her report

25   was what I call a sample of 12.  This was 12 patients.

2059

1    This is where there was an entire exhibit of her report

2    devoted to that.  It's the majority of what we looked at

3    on the screen yesterday, and that was a sample of 12

4    patients.  I believe she testified that she looked at

5    approximately 20.  It was actually 12.  But that is the

6    primary sample that she talked about the most.  I looked

7    at all of them, but that sample 12 is probably the one

8    that I focused the most attention on.

9        Q.   Did you draw any conclusions from your review of

10   the samples?

11       A.   I did.

12       Q.   What were your conclusions from the sample?

13       A.   Well, first of all, I concluded the same thing

14   that I concluded last week about the sample.  I had four

15   main conclusions.  I will just remind you of what those

16   were.

17          The documentation that Dr. Clark provided in her

18   report and what she provided in her testimony wasn't

19   sufficient to substantiate valid statistical sampling.

20   Back to third grade, you have got to show your work, and

21   the work didn't support the statistics that I would have

22   expected to see or that are required to be shown.

23          Second, the sample sizes were inadequate across

24   the board in all of the samples that I looked at.

25   Remember, sample size is needed to be at a minimum, a

1    bare minimum, 30 to 50 items.  Dr. Clark presented

2    samples of one, two patients, the sample of 12.  All of

3    the sample size, it's just fatally flawed.  You can't do

4    anything after that.

5         The third thing I found is how the samples were

6    selected.  They weren't selected randomly.  The

7    fundamental lynchpin of statistical sampling is they have

8    got to be selected randomly.  They weren't in this case,

9    and there is no evidence of how they were selected with

10   the exception of those that were cherry-picked

11   specifically that I will talk about.

12        And then the last thing I found is that there

13   were no extrapolation techniques used.  Statistically,

14   there's lots of equations, there's lots of science that

15   goes into extrapolating result or generalizing your

16   results.  You can't just look at the sample and say, oh,

17   well, everything applies like this.  It is not that

18   simple.  That's sometimes how we explain it, but there's

19   much more science behind it, and I didn't see any

20   evidence that any of that science was applied in this

21   case.

22        So those were the four things that are similar

23   from last week that I found.  I found all four of those

24   things were consistent across every single sample.

25        In addition, I found a fifth flaw, and that's

1    the cherry-picking that I described earlier.  The sample

2    of 12 was cherry-picked.  It was a sample -- when I look

3    at Dr. Clark's report, she referred as the high-frequency

4    examples.  Those are extreme examples, and I think she

5    referred to them in court when she said these -- when she

6    showed that many of those cases had multiple tests over

7    multiple months for an entire year in some cases.  So

8    they were high-frequency examples.  They weren't selected

9    randomly.  They were cherry-picked to tell a certain

10   sorry.  So that was a fifth flaw that I found in that

11   sample specifically.

12        Q.   On the cherry-picking point, would you be able

13   to find something different in the data other than these

14   high-frequency examples?

15        A.   Generally, I think the answer is almost always

16   yes.  When we talk about 700,000 lines of data, a good

17   statistician can spin many things in that data when

18   they're not doing objective analysis.  When they are

19   trying to tell a certain story, you can pick the claims

20   that tell the story you want and do that.

21             I will give you an example of an alternative set

22   of claims.  Now, this is not a sample.  This is not

23   something that's been -- that I would call valid

24   sampling, but I want to give you an example of an

25   alternative to cherry-picking.

1           Dr. Clark pointed to these 12 patients, the

2    sample of 12, and she pointed to the frequency.  She

3    said many of them had lots of tests over the course of

4    months, over the course of an entire year.  Some of them

5    being tested three times a week.  Those were 12 patients.

6    What I found when I looked at the data is more than half

7    of the patients in the entire population have less than

8    just three procedures over the entire five-year time

9    frame.

10           Now, I'm ont suggesting that those are

11   representative of the whole population, but that's an

12   example of if you go in and cherry-pick the data you

13   want, you can tell the story you want. And Dr. Clark did

14   that with 12 patients in that sample of 12.  The

15   alternative to that is 50 percent of the population

16   showed the opposite trend with regard to frequency only

17   having three procedures over five years.

18       Q.   And just to be clear.  You're not here to

19   testify about half the population in this?  This is an

20   example of what could alternately be argued; is that

21   correct?

22       A.   Certainly.

23       Q.   I want to focus for a moment on this.  What does

24   it mean that a sample is invalid?  And I think I heard

25   you say that word before, but I don't think I understand

1   it as well as you do.

2       A.   Right.  You have probably heard me use that word

3   several times.  When we talk about a sample being

4   invalid, that's a term of art that statisticians use.  It

5   means that that sample is not good for anything beyond

6   the sample itself.  You can't generalize with it.  Now,

7   you can look at the sample and you can evaluate those

8   things that you see in the sample itself, but you can't

9   take those conclusions and paint them across anything

10  else.

11          For example, if we're performing our

12  presidential poll and we go out and we learn something

13  about voters in a group.  We know that about those, let's

14  say, hundred voters that we talked to.  We know that

15  about them.  But if it's not a valid sample, we can't

16  make any other estimates.  We can't generalize.  We can't

17  say, oh, we think the entire state of Connecticut will

18  vote this way.  If the sample is invalid, the conclusions

19  are limited to the sample itself.

20      Q.   I want to wrap up with just a couple more.

21  Based on your review and based on what you have opined on

22  here, what is your opinion as to how Dr. Clark treated

23  samples?

24      A.   My opinion about Dr. Clark's sampling is that

25  all of her samples are invalid.  They weren't conducted

1    using valid statistical science for all of the reasons I

2    highlighted earlier, the four reasons -- for four reasons

3    that each sample is fatally flawed.  And the sample of 12

4    also has the issue of cherry-picking.  All of those

5    samples are invalid.  So any conclusions that come from

6    those samples can only be applied to those patients that

7    Dr. Clark looked like.

8        Q.   Mr. Haney, you presented multiple opinions in

9    this matter.  Do you hold those opinions within a

10   reasonable degree of certainty?

11       A.   I do.

12           MR. GESTRICH:  Pass the witness.

13           THE COURT:  Yes.

14           Attorney Kang -- excuse me.  Attorney Kingsbery.

15                     CROSS-EXAMINATION

16   BY MS. KINGSBERY:

17       Q.   Good to see you again, Mr. Haney.

18       A.   Good afternoon.

19       Q.   I understand you formed some opinions about

20   Dr. Clark's opinions in the case, correct?

21       A.   I did.

22       Q.   And those opinions relate to what you refer to

23   as statistical sampling; is that right?

24       A.   One of them does.

25       Q.   And I believe you testified that you heard her

1  say that she reviewed all of the claims data in the case,

2  correct?

3      A.   Yes.

4      Q.   And you also heard her say that she reviewed

5  between seven and eight hundred thousand lines of data;

6  is that right?

7      A.   Generally, yes.

8      Q.   And she didn't testify that she reviewed every

9  single column in the data, correct?

10     A.   I thought she did.

11     Q.   She referred to -- do you recall she referred to

12  the number of columns, correct?

13     A.   I recall her referring to the number of columns.

14  But my understanding of that was that that's what she

15  reviewed.  She was describing what she reviewed and she

16  indicated that there were 700,000 lines of data with -- I

17  think she said approximately 80 columns of data.  I

18  walked away with the conclusion that that is what she had

19  reviewed.

20     Q.   And you recall what she said was that she

21  personally put eyes on every single line of the data.  Do

22  you recall that testimony?

23     A.   I don't recall specifically, but I don't dispute

24  it.

25     Q.   Do you recall I asked you a few questions last

1    Thursday, I believe it was?  Do you recall that?

2         A.    I recall testifying last Thursday.

3         Q.    And I think I -- do you recall I asked you

4    whether you had investigated whether the sample set that

5    Ms. Thelian had relied upon was statistically valid?  Do

6    you remember me asking you that question?

7         A.    I do.

8         Q.    And I believe you said no, correct?

9         A.    I think my answer was more complete than that.

10   I didn't evaluate that work because Ms. Thelian didn't

11   perform statistical sampling.  She had reviewed -- as far

12   as I understand her testimony, I'm not trying to restate

13   it.  But my understanding of her work was she did review

14   every single claim that she had an opinion about.  And I

15   don't know that because when I look at the appendix of

16   her report, it listed every single claim that she had an

17   opinion about and what her opinion was. So there were

18   thousands of claims identified in her report.

19            When I looked at Dr. Clark's report, there were

20   only 55 patients presented.  And that's the difference of

21   Dr. Clark's report being a sample versus Ms. Thelian's of

22   not being a sample.

23        Q.    Do you remember when I asked you those

24   questions, I believe as part of your answer you said that

25   if you look at the whole population, that's not

1    sampling, that's looking at the entire population?  Do

2    you remember telling the jury that?

3        A.   I don't, but I think that's correct.  And I

4    think I said the same thing today.

5        Q.   In addition to the claims data, you understand

6    that Dr. Clark also looked at medical records, correct?

7        A.   Yes.

8        Q.   And you didn't look at any of those medical

9    records that Dr. Clark reviewed, correct?

10        A.   No.

11        Q.   So you don't know how many standing order forms

12    she reviewed, right?

13        A.   I know how many she -- I don't know the exact

14    number, but I know that anything she cited in her report

15    as something she reviewed, I certainly looked at and

16    considered.

17        Q.   You didn't analyze whether it was a

18    statistically valid sample of medical records that she

19    reviewed, correct?

20        A.   To the extent she identified any samples in her

21    analysis, whether they would have been medical records or

22    not, I did not see evidence that she performed any valid

23    samples.

24        Q.   My question was about the records that she

25    reviewed.  You didn't review any of those records,

 1    correct?

 2        A.   I'm sorry.  I'm kind of twisted up.  I think

 3    your questions have changed.  Can you maybe start over.

 4    Can you ask me your question.

 5        Q.   You didn't review any of the medical record that

 6    Dr. Clark reviewed?

 7        A.   No.

 8        Q.   And so you wouldn't know whether those records

 9    covered all three of the labs, correct?

10        A.   That's not correct.

11        Q.   So you would agree that she reviewed records for

12    Epic, correct?

13        A.   I would, yes.

14        Q.   She reviewed records for BioHealth, correct?

15        A.   She did.

16        Q.   And she reviewed records for PB Labs, correct?

17        A.   Yes.

18        Q.   You mentioned that she identified specific

19    patients, right?

20        A.   Correct.

21        Q.   And you refer to them as samples, correct?

22        A.   When she referred to groups of patients from

23    which she reached conclusions, yes, I refer to them as

24    samples.

25        Q.   You heard Dr. Clark testify that the examples

1    that she was providing to the jury were to illustrate

2    some of the problems that she identified.  Do you recall

3    her testifying to that?

4         A.   I don't specifically.  I think her report uses

5    that language, but I don't recall her testimony.

6         Q.   She never testified that those examples were the

7    only patients that she reviewed, correct?

8         A.   Those are the only patients she presented in her

9    report.

10        Q.   She never testified that those were the only

11   patients that she reviewed, correct?

12        A.   I can't answer that.

13        Q.   You would agree with me that she reviewed all of

14   the patients and all of the data in this case?

15             MR. GESTRICH:  Objection.  Speculative.

16             THE COURT:  Terri, can you read that back.

17             (Requested portion read.)

18             THE COURT:  Speculative?

19             MR. GESTRICH:  She's asking if he knows what she

20   reviewed.  He may know what she said she reviewed.

21             THE COURT:  Right.

22             MR. GESTRICH:  It is a lack of personal

23   knowledge.

24             THE COURT:  Correct.  I guess the -- you have to

25   lay a foundation, I guess, because I'm not sure that -- I

1    have an idea what his answer should be, but I'm not sure

2    he'll understand how to separate how he came to learn it.

3    BY MS. KINGSBERY:

4        Q.    You heard Dr. Clark --

5            THE COURT:    The question suggests you're asking

6    that he personally went back into Dr. Clark and learned

7    certain things as opposed to just either somebody told

8    him or he was sitting in here.  I don't know.  Whatever,

9    some other way.

10   BY MS. KINGSBERY:

11       Q.    You heard Dr. Clark testify that she reviewed

12   all of the claims data in the case, correct?

13       A.    I did.  I don't know that she did, but I know

14   that's what she said she did.

15       Q.    And she never testified that the patients she

16   identified for the jury were the only ones that she

17   reviewed, correct?

18       A.    I don't know.

19       Q.    You heard her testify that it would take her

20   months and months to go through each one of the patients'

21   data with a jury that she reviewed?  Do you recall that?

22       A.    Not specifically.

23       Q.    And you heard her testify that she didn't intend

24   to do any statistical sampling?

25       A.    I recall her saying that.  Again, my analysis

1    was focused on what she did, not what she said she did.

2    I looked at the substance of her work, and it is

3    statistical sampling.  That's something that happens in

4    our industry when folks who are not statisticians perform

5    analysis, they do things that they don't quite realize

6    are statistical sampling and have implications that are

7    important and they have to follow certain steps.  Just

8    because she doesn't quite understand the terminology

9    doesn't give you a pass to reach conclusions improperly.

10        Q.   Even though you testified that when you look at

11   the whole population, that's not sampling, according to

12   you, correct?

13        A.   If you do it properly.

14        Q.   Just to confirm.  You don't have any opinions

15   about the medical necessity of any of the drug testing

16   services in this case?

17        A.   I do not.

18             MS. KINGSBERY:  No further questions.

19             THE COURT:  You are excused now, I believe, from

20   the trial.  So safe travels.  Thank you.

21             Next witness for the Labs, please.

22             MR. CHRIST:  Your Honor, the Labs will play the

23   video deposition of Ms. Eva Borden.

24             THE COURT:  Yup.  Is that being operated by the

25   same person for you?  Thank you.  Again, this is a

1    deposition that was taken pre-trial, and the witness is

2    not able to be brought here, so it will be played by the

3    video section -- sections of her video deposition is what

4    I was trying to say, and sort of stopped in midstream.

5              Whenever you are ready, sir.

6              (Playing the video deposition of Eva Borden.)

7              MR. CHRIST:  Your Honor, that concludes the

8    video deposition.

9              THE COURT:  Thank you.  I will take that break

10   as an opportunity to stand up.  Your next witness, sir.

11             MR. HARE:  Your Honor, the last testimony we

12   have is to read in the deposition testimony of

13   Mr. Goldfarb.

14             THE COURT:  I'm sorry.  You mean the admissions

15   of 30(b)(6) witness?

16             MR. HARE:  Yes, Your Honor.

17             THE COURT:  All right, ladies and gentlemen.

18   Unless there's an objection I will briefly explain what's

19   going on here.  Also I would like ask -- I forgot to go

20   back last night and read these.  Do they reference

21   exhibits that are numbers from production opposed to

22   exhibit numbers?  Do they reference documents that are

23   identified by something other than exhibit numbers in

24   evidence?  I know that was an issue on some other things

25   but --

1          MR. HARE:  It was on other matters, Your Honor.

2          No exhibits referenced in these selections.

3          THE COURT:  Ladies and gentlemen, sorry, I'm

4    standing.  I'm stiff and I need fresh air.  I can't get

5    it in this room so that's a substitute for me to stand.

6          The next thing that will happen is that the Labs

7    are going to offer something -- This again comes from the

8    discovery phase.  Remember these depositions were from

9    the discovery phase, et cetera, so during discovery a

10   party is allowed under the rules to ask to have another

11   party identify a witness who would be what's called a

12   30(b)(6) witness.  That is someone who speaks on behalf

13   of the party.  In this case, Cigna.  It may have come out

14   during Mr. Goldfarb's testimony that he was the 30(b)(6)

15   witness.  I can't remember if it did, but he was the one

16   designated.  When that witness speaks in this deposition,

17   the effect is he's speaking for the corporation which

18   here is a party in this case -- these cases, excuse me.

19   So what the Labs are going to do is offer this.  Is this

20   in your defense?

21         MR. HARE:  This is in both the Labs' case and

22   the defense of the Cigna case.

23         THE COURT:  They are going to offer a certain

24   number.  I can't remember.

25         MR. HARE:  It is eight minutes approximately.

1          THE COURT:  Of sections of the 30(b)(6)

2    deposition which the Labs offer as evidence of an

3    admission by Cigna.  In other words when they read the

4    statement, I will give you a stupid example.

5          A 30(b)(6) witness says in a deposition when

6    asked what color was the moon last night.  They answer it

7    was purple.  Stupid example.  Nothing to do with the

8    case.  Then the person taking the deposition, that party,

9    is allowed to take that question and answer and read it

10   to you and you receive it as evidence.  In other words,

11   the answer is an admission and it is evidence in the case

12   just like every other piece of evidence.  You have to

13   weigh it and decide what to accept, not accept, how to

14   use it, but it is evidence.  I hope that's clear.

15   Anything further anybody would correct me on or add to?

16          MR. HARE:  Nothing from the Labs.

17          THE COURT:  You may proceed, Attorney Hare.

18          MR. HARE:  Thank you, Your Honor.  Before each

19   reading, I will identify the page and line numbers from

20   the transcript which is a transcript dated a February 16,

21   2023.

22          (Whereupon, Labs Exhibit 11296 was read into the

23   record.)

24             .

25          MR. HARE:  That concludes the reading, Your

1    Honor.

2         THE COURT:  Thank you very much.  Any further

3    evidence from the Labs?

4         MR. HARE:  That also concludes the Labs

5    presentation of testimony.  We are double-checking just

6    ensure we transmitted all the exhibits, but that's the

7    end of testimony for the jury.

8         THE COURT:  Cigna, are you finished too, right?

9         MR. KANG:  Yes, Your Honor.

10         THE COURT:  All right.  Thank you.  I will have

11    to take a brief recess to talk to counsel.  I will try to

12    do it at sidebar.  Hopefully it will only take a few

13    minutes.  But please be patient with me.  Stand up if you

14    need to stretch.

15              (Beginning of Sidebar)

16         THE COURT: A situation has developed.  I'm

17    unable to work late to try to finish the charge so we're

18    in a position that you could start closing tomorrow

19    morning which is what this means.  You all been quite

20    useful on your time.  You have another hour left.

21         Fortunately I have a situation that's a court

22    matter but I have to deal with it.  So the charge

23    conference will end at 5:15.  One option I considered is

24    coming back at 8:30 or nine and finishing it.  But I just

25    don't think that's smart.

1            So what I will tell the jury and I thought I
2    would be telling them tomorrow come on Thursday.  This
3    way we stick to our schedule but I think I will suggest
4    they come back.  I haven't decided whether I should say
5    12:30, 1 or 2.  I think I will say 12:30.  I will have a
6    few things to instruct them on the Goldfarb, 2015, how
7    many Boorstein time was on which side, things of that
8    sort.  Just little things but it will take -- you know
9    how it takes 15 minutes to do that, right.  If I'm giving
10   you the hour and ten and I'm going to each give you -- I
11   will give a break at some point in the back and forths so
12   that's two and a half hours.  If we start at 1:30, two
13   and a half takes us past our ending time, so I think I
14   need to tell them come at 12:30. I would hope by then
15   we'll have the charge conference, an hour and fifteen,
16   you will have heard what I'm thinking.  I have some
17   specific questions.  Then you can share with me your
18   reactions to my comments.  That allows me to give
19   instructions to my law clerk while I'm on the fly to what
20   I have to go to, but he can then -- I may come back to
21   court at nine and pick it up.  I'll have it.  Come in
22   early in the morning.  We can finalize it and give it to
23   you folks.  You can give me your comments and criticisms,
24   suggests edits, I suppose I should and then it would be
25   time to take a break for lunch, then get started at 12:30

2077

1    with the jury.  So you can't object that I can't be here

2    until 11:00 tonight to put this too bed.  Is there

3    anything you would suggest I could handle differently

4    than telling the jury effectively it's on me?

5         MR. HARE:  We're here at the Court's convenience

6    so whatever works best for Your Honor and is comfortable

7    for the jury, I'm in favor of.  What you just explained I

8    think was clear to me.  When would the court want to hear

9    argument on motions.

10        THE COURT:  I think I need you in the morning

11   9:30 I would say.  I will be able to get in early, then

12   we'll finalize it.  I don't know that we'll get you the

13   language tonight.  You will know what it is going to say.

14   When you came at nine, I send it to you in the morning or

15   it will be here when you come in.  Obviously comment on

16   the language.

17        I think at this point, you should preserve your

18   objection if you don't agree with my approach.  At that

19   point what you are doing is commenting on language.  Time

20   to take your remarks, to consider them, to edit which may

21   very well.  I might agree it is not said clearly or

22   whatever, give it back to you for you folks to comment

23   and put it to bed.  Also you haven't seen the verdict

24   form.  It is going to be given to you shortly.  Two

25   verdict forms.  I don't know.  We probably won't have

 1    time to comment so we'll have to do that in the morning.

 2    So I think you come -- I don't know.  I might say come at

 3    nine.  I'm not sure I will be ready.

 4            MS. COSTIN: You want us this afternoon?

 5            THE COURT:  Yes, for the charge conference, yes.

 6    Principally on unbundling.  We need to give them a

 7    redline this afternoon.  You remember we have very few

 8    issues.  Five pages are redlined.  Rest isn't changing.

 9    We'll give you redline.

10            MR. CUNNINGHAM:  One thing when are we going to

11    do closings?

12            THE COURT:  12:30.  Labs up 12:30, go for an

13    hour an hour ten with the break, give or take how you are

14    splitting, Ten minute break and come back.

15            (end of sidebar.)

16            THE COURT:  The good news is that the schedule I

17    gave you midday on Thursday, we'll be able to stick to

18    it.  I have to tell you there was a moment today when I

19    wasn't sure.  However, you may think, well, they are all

20    done with the evidence let's get going to closing at 9:30

21    tomorrow morning.  The problem is that due to a personal

22    matter.  It's a court-related matter that I have that's

23    court related my inability.  I'm unable to stay to 11:00

24    like I did last night to try to get all the issues

25    resolved having to do with what the charge should say.

1    The parties have an absolute right to comment on what I

2    think I should tell you and to make their record,

3    et cetera and we have got it pretty close.  It's not as

4    we call it in the trade put to bed.

5           In addition, the verdict forms have to be

6    reviewed and approved, subject to objection for you

7    before they do their closing arguments.  So the

8    parties have agreed, this is my best approach.  You folks

9    take the morning off and come in at 12:30.  There will be

10   a few housekeeping details that I have to address but I

11   would say within ten to 15 minutes, I will be saying to

12   the Labs please begin your closing argument so we'll get

13   them in tomorrow afternoon as I predicted and then I will

14   excuse, probably be about 3:45 or close to it.  You will

15   come back Thursday morning fresh.  You will have a charge

16   on your seat from me.  I will read it to you and as I

17   say, late morning you will be in your deliberations.

18          When you come in Liana will have menus left for

19   you.  You get to be the guest of the United States

20   Government for lunch when you deliberate.  So my view is

21   you are deliberating at noontime on Thursday.  So won't

22   be tomorrow but that's what happens on Thursday.  So I

23   will probably send you back and say you can begin

24   deliberations.  If you want to have your lunch first and

25   then begin.  As I told you, all of this is up to you come

1    Thursday midday.  So the good news is you have the

2    morning roughly off tomorrow.  The bad news is you have

3    the morning, from my point of view, you have the morning

4    roughly off because, of course, we could have moved this

5    case to its conclusion quicker if we started tomorrow

6    morning.  It is not physically possibly for me to do that

7    given this other court obligation that I have.  So I

8    thank you for your patience. We're holding to what I

9    predicted so I haven't disappointed you on that.  I'm

10   very confidential we'll hold on that.  We'll see tomorrow

11   be ready to come out a 12:30.  Liana will let you know

12   what's going on.  I don't see a reason we won't be ready

13   by then.

14          At this stage of any trial, any trial, one that

15   goes for two days or one that goes for 20 months, there's

16   also this sort of last minute issues that come up that

17   the court has to address.  But I'm pretty confident we'll

18   be out of the gate at 12:30 tomorrow afternoon.  So thank

19   you very much and enjoy your morning.  I think it's still

20   going to be a good day.  Maybe catch up on some of your

21   work and we'll see you at 12:30.

22          (In the absence of the jury at 3:40 p.m.)

23          (Discussion Off the Record.)

24          THE COURT:  We'll stand in recess for 15

25   minutes.  Going for 75 minutes on the charge.  Then I

1    will have to adjourn.

2              We'll stand in recess

3              (Whereupon, a recess from taken at 3:45 p.m.

4              to 4:05 p.m.)

5              THE COURT:  I am going to go over the redline

6    sections before we dive into the bundling issue.  If I

7    can put to bed the rest of it, I think I will feel a

8    little bit better.  I can tell you the pages.  There's

9    one at 32.  There's one at 33.

10             MS. COSTIN:  Page 32.

11             THE COURT:  Yes, I'm doing pages.  I'm sorry.

12             MS. COSTIN:  That's okay.

13             THE COURT:  In the redline, that's why I'm doing

14   it.  48, 49, 52, 57 and 76.  I'm not sure 76 is put to

15   bed, but we'll talk about it.

16             I said, Attorney Christ, I'm going to start with

17   the redlines, which I think I've either told you what I

18   was doing or that are disputed.  So the first one is page

19   32, Section 22 where I added merely in the second to the

20   last line -- this is in the redline version, so it's

21   Charge 22 on the first page, but whichever you want to

22   use.  I will give you the section and I'll give you the

23   page of the redline.

24             The last line I have added under two of their

25   causes of action to reflect the fact that the prompt

1    pay --

2           THE CLERK:  Your redline is not the same.  You

3    have seen a version --

4           THE COURT:  Then I'm going to talk about the

5    Section.  Section 22, Statement of the Labs' case.

6    Second to the last line, somewhere in that vicinity, you

7    will see that we added under two of their causes of

8    action to reflect that these don't apply to the Prompt

9    Pay Act.  Okay.  Uncontested.  Just housekeeping and

10   clarification.  Thank you.

11          No objection?

12          MR. CHRIST:  No objection.

13          MS. KINGSBERY:  I think that it doesn't apply to

14   the third-party beneficiary claim.

15          THE COURT:  Oh, I apologize.  I got confused.

16   It's the statute -- it's the other one doesn't apply.

17   Whatever.  Thank you very much.

18          The next is charge Section 23, Labs' case,

19   burden of proof.  We removed a paragraph.  So you have to

20   look at the redline to see what it is.  It was originally

21   the second paragraph.  The clean version would only have

22   two paragraphs.  What we removed read as follows.  If you

23   find Cigna has proven one or more of its affirmative

24   defenses as to one or more of the causes of action the

25   Lab has proven, then you would return a verdict for Cigna

1    on that cause of action for that Lab and have completed

2    your deliberations as to that Lab and that cause of

3    action.  We took that out because of the change in the

4    prior or not?

5         Somebody objected, the other side agreed.  Okay.

6    That's great.  So that's been removed.

7         Now I'm on Charge 35.  We added in the first

8    sentence of the first paragraph the definition of

9    "contracts of insurance" between Cigna and its insureds,

10   the words hereinafter referred to in this section as

11   quote, Capital P, Policies, end quote, or, quote,

12   Insurance Policies, end quote.  I think I did that

13   because I'm sick of struggling when people say "policy,"

14   Cigna has often referred to billing policies, which I

15   suppose is not unreasonable, but it certainly -- not

16   misleads me, but it causes me to go down the wrong path.

17   And when I'm trying to think of an insurance policy.

18   That's what my agent tells me, your policy covers that.

19   So I thought by doing this -- we'll have to -- you should

20   look carefully, and Alex will have to look carefully to

21   search for the word "policy" or "policies," make sure if

22   it's insurance contract, it is a capital P.

23        The next edit on this was in the second

24   paragraph where it begins, "It is not necessary for a lab

25   to have been named in," and then we've corrected for the

 1  change we just made.  Strike insurance policy, insert cap

 2  initial Insurance Policy.

 3          Continuing in the second sentence, there were

 4  some minor edits.  In deciding what Cigna and its

 5  insureds intended, you should consider the -- again

 6  substituting cap initial Insurance, cap initial Policies,

 7  and striking lower case insurance policies.

 8          Continuing to the next sentence.  You may also

 9  consider language in the cap initials Insurance Policies,

10  again correcting for the change.

11          And at the bottom of the page, the last line,

12  remember the language of, same change, Insurance

13  Policies.  We have also corrected the section citations

14  that should be reflected there.  Again, that's something

15  I would ask someone on your team who is not completely

16  sleep deprived who is going to proof this or whatever,

17  that if you see any -- something that's no longer true,

18  those sections or we've miscorrected cap I insurance,

19  et cetera, you will let me know in the morning.

20          Again, at the top of page -- of Charge 35,

21  again, the same Insurance Policies.  And then we have

22  deleted -- it is hard to tell.  Does that read the

23  statutes are a part of the Insurance Policies as a -- oh,

24  this is because I have already given the statutory

25  language fairly close to this charge, so I determined to

1    not repeat it so soon after, but to cross-reference them

2    at the bottom of the first page of 35 to the sections in

3    order to get the language to put in the contract.  So

4    those are the statutes that are part of the Insurance

5    Policies as a matter of law.  And you should read the

6    Insurance Policies in your -- in deliberations on this

7    Section -- in your deliberations on this section.

8              That's fine with me.  Is that all right with you

9    folks?

10             MR. CHRIST:  Yes, Your Honor.

11             MS. KINGSBERY:  I think we have already stated

12   our objection.

13             THE COURT:  You did, but you preserve it.  You

14   have to tell me because I edited.

15             MS. KINGSBERY:  I just want to make sure.

16             THE COURT:  I met part of your objection but not

17   all of it.

18             MS. KINGSBERY:  That's right.

19             THE COURT:  38.  Those are edits again in th

20   second paragraph, it's just the technical one, capitalize

21   Third, capitalize B on Beneficiary, describing the actual

22   cause of action.

23             In the next paragraph, third and final

24   affirmative defense, that was a substantive correction

25   that I had overlooked.  This is the direct pay and prompt

1    pay causes of answer, the statute of limitation applies

2    not to the third-party beneficiary causes of actions.  I

3    will tell them that I will be clear about that, you know,

4    when I get to them, in effect.

5             Any objection to that one?  That's 38.

6             MS. KINGSBERY:  No objection.

7             MR. CHRIST:  No objection.

8             THE COURT:  And then statute of limitations, we

9    deleted it from the third paragraph because it just

10   doesn't apply.

11            Agreed?  And you agreed I think on that,

12   correct?

13            MR. CHRIST:  Yes, Your Honor.

14            MS. KINGSBERY:  Correct.

15            THE COURT:  Last but not least, I don't remember

16   what charge this is.  It's page 76 of my redline.  Can

17   you tell me the number of the charge?

18            MR. CHRIST:  57.

19            THE COURT:  57.  Thank you very much.  It's the

20   second page, I believe.  And we have edited this in

21   response to comments from counsel.  I have to say I'm not

22   absolutely sure we're going to stick with this, but for

23   now I'll see what the reactions are.  If you could read

24   the paragraph.  It's been quite edited, so UI'm ont going

25   to try to point out the specific.  You have a redline and

1   you have the clean, so I suggest you read the clean and

2   you'll -- it's more important to know what it says now.

3          MR. CHRIST:  Just to clarify, Your Honor.  For

4   the record, are you referring to page 76, Charge 57?

5          THE COURT:  57, second page.  The paragraph, my

6   first instruction.

7          You all ready?

8          MS. KINGSBERY:  I don't have any objection to

9   this.

10          THE COURT:  How about you, sir?

11          MR. CHRIST:  No objection.

12          THE COURT:  I was going to add after -- the

13   third -- the sentence that begins -- it's hard to find on

14   the redline.  It's -- the paragraph ends with the words

15   "language in Cigna policy," and the words before that are

16   "fee forgiveness."  I was going to insert after "fee

17   forgiveness," -- fee forgiveness in any contract language

18   in a Cigna policy.  Is that all right?  Is that the way

19   it reads or have I got the wrong way it reads?

20          Let me get the original in front of me.  Yeah,

21   the terms of Cigna's policies do not necessarily --

22          I guess we changed it again.  I apologize.  Let

23   me back up.  So I think it says what I'd like -- it's

24   clear about what I was concerned about in the prior

25   draft, so I must have mentioned it to Alex and we had a

1   little improvement on it.   You didn't have to respond.

2           No objection from either side; is that correct?

3           MR. CHRIST:  To the change that you said?

4           THE COURT:  No.  To the change that you can look

5   at page 76 of 57.  Forget what I read.

6           MR. CHRIST:  In the redline version?

7           THE COURT:  I was looking at a prior redline,

8   which I wasn't happy with and I apparently conveyed that

9   and it got edited, which is what you have.  So this is

10  what I would like to know if you have any objection.

11          MR. CUNNINGHAM:  We're looking at the redlines

12  with red eyes.

13          THE COURT:  I know.  You and me both.

14          MR. CHRIST:  No objection to the version we were

15  looking at right now, page 76, Charge 57, the redline

16  version.

17          THE COURT:  Same with Cigna?

18          MS. KINGSBERY:  Same with Cigna.

19          THE COURT:  That leave us with unbundling,

20  correct?  That's I think the only issue -- well, you have

21  made objections, and maybe I should ask you tomorrow to

22  tell me what objections remain to the charge just to make

23  the record clearer, but I think to me the only big issue

24  is unbundling.  And not as it relates to Cigna's except

25  that it's Cigna's -- I wish Attorney Kang was here

1    because I was going to go over something about closing

2    argument.  I hope you are prepared to address it.

3            I think Attorney Kang suggested when I told him

4    I was going to instruct the jury about Mr. Goldfarb's

5    testimony about that policy that has the language which I

6    didn't realize how much time we spent on that contract

7    said, et cetera.  Anyway, I'm going to fix that in the

8    morning and tell the jury to disregard it, it's stricken,

9    and to disregard anything in Exhibit -- whatever the

10   number is -- 57, I think, that was referred to during the

11   testimony.

12           And then I think in closing argument, Attorney

13   Kang had suggested, well, Judge, you know, you are

14   telling me I can't raise it at -- okay, you can do that,

15   I don't have any objection, but, you know, I think that

16   if I can't talk about in my case or -- not my case, the

17   defense of the Labs' post 2015, that the Labs, you know,

18   shouldn't be able to say, hey, look, pre-2015 there's --

19   you know, there's nothing in here or the judge is telling

20   me there's nothing.  I actually do not see this as a

21   tit-for-tat or falls under the rule of equality.

22           I am telling the jury what I'm telling them

23   because it is what my ruling is.  It should not have been

24   testified to.  And it's confusing to the jury under my

25   rulings about fee forgiveness, and the discussions in

1    these conferences we have had where Attorney Kang has

2    indicated lastly, I think just yesterday, maybe the day

3    before -- it couldn't have been yesterday it was, you

4    know, that we -- we aren't arguing fee forgiveness under

5    any contract for his case.  So having that clarified

6    finally yesterday -- I don't know whether you want to

7    talk about the lack of the language in the pre-2015s or

8    not, but I don't believe that I am going to tell the Labs

9    they can't do it.  I think it will be clearer in the

10   charge, but whatever.  I am not going to tell them not

11   to.  That's a ruling I made as a matter of law.  I have

12   been telling them throughout the whole trial don't

13   consider it.

14        As to the post 2015 as a result of the position

15   taken yesterday, that's also now, in effect, the law of

16   the case, so -- but I don't think Attorney Kang wants to

17   say get up and say there's no contract policy post 2015.

18   I mean that's the equivalent.  He could argue that, but

19   that's not supportive of his position.  He'd never argue

20   that.  But I don't think he gets because he can't argue

21   it because the facts are different that -- or the law is

22   different, that he doesn't get -- he meaning the Labs

23   don't get to make their argument about a different time

24   period and different form of policy.  So that has to be

25   conveyed to Mr. Kang.

1          So let's go to unbundling.  And again, this is

2     going to be very difficult.  Attorney Kang is not out in

3     the courtroom, is he?  I assume he's back at the ranch

4     getting ready.  Yeah.  Well, I should have asked him to

5     say.  That's my mistake.  I made a lot of mistakes on

6     this bundling issue, so I'm just going to put it on the

7     record.

8          Have they ordered the transcript, Terri?  So

9     he'll be able to read it.  And I would request that you

10    at least put it in front of him tonight.  And I'm going

11    to ask him tomorrow did he have an opportunity to read

12    what I read.  And I hope you are going to be able to

13    answer my questions.  Otherwise, I'm going to tell the

14    jury we're not going to the jury on Thursday because

15    Cigna has created issues.  I mean, seriously, you do not

16    want that.

17         I have been trying to get basic answers about

18    how unbundling is in this case, really, how it is in the

19    contracts.  Now, I would say for about a week, I mean,

20    for example, there was an instance last week, I don't

21    know whether it was Thursday or when it was, and I was

22    told the charge expert isn't here so, you know, can we

23    discuss it tomorrow.  I mean, I just keep not getting an

24    answer.  And I'm not sure I still have an answer to many

25    of my questions.

1          Attorney Kang is very good at answering a

2    question, but when I go back and I think about it, it's

3    like I can't -- there's nothing when I put my hands

4    around it.  So we're just -- minutes away, hours, days, a

5    day -- less than a day away from closing argument.  And

6    I'm not going to go to take Cigna's words for this on

7    this issue.  I mean, I have been told things about this

8    issue by Cigna going back to the summary judgment motion

9    that haven't turned out to be accurate.  So bottom line

10   is I am not going to enforce a contract provision that

11   has never been put before me that's not in evidence and

12   that even Cigna has struggled to explain how it is in the

13   contract.

14          Last night I received your filing and I looked

15   at it, and I believe that one of the paragraphs literally

16   starts with the word "implied."  I will get to this in a

17   minute, but I don't think Florida law would permit me to

18   do that even if I was inclined to think you should be

19   able to imply this.  On the other hand, the Labs have

20   been pretty quiet on this issue.  You just sort of sit

21   there while I go with questions at Attorney Kang or

22   somebody else on his team.  And for example, and I can

23   understand you are all buried, you didn't get anything

24   filed last night in response to what they filed.  Not

25   surprising, but I'm just pointing out I don't really hear

1     a lot from you on this.  And I'm not really sure why not.

2          You disputed it in the summary judgment.  We

3     actually went back and looked at your brief, but you were

4     disputing it on something that didn't really put this

5     issue in front of me.  It had to do with the timing or

6     the dates, I think, if I'm remembering correctly.  And so

7     it wasn't so much, Judge, where does this come from?  How

8     does it become something that disqualifies, you know, the

9     claim, let alone disqualifies paying me?  How is that

10    part of the contractual obligation that I'm now standing,

11    in effect, in the shoes of a patient?

12         So I am going to direct a bunch of questions to

13    Cigna, and I would want to hear from the labs.

14         In your proposed charge you asked me to charge

15    the following on unbundling.  Quote, If you determine the

16    Labs' claims were properly denied due to an invalid

17    service code or improper use of an unlisted code, the

18    Labs cannot prevail on this claim.  Do you agree?

19         That's your proposed charge.  What, you don't

20    have it in front of you?

21         MR. CHRIST:  They're pulling it up.

22         MR. CUNNINGHAM:  Judge, what number is that?  I

23    apologize.

24         THE COURT:  I don't have it written down.  It's

25    Cigna's proposed charges, but they don't have numbers.

1    I'm sure it is called bundling or unbundling, but I don't

2    know the number.

3         Do you have it?  It's not very long.  Agreed?

4         MS. KINGSBERY:  Yes.

5         THE COURT:  The Labs' claims, in my opinion, are

6    contract claims.  Some are contracts because the statute

7    says you read in a statutory language.  Others are

8    contracts, just period.  I mean, even though they didn't

9    sign it, the law recognizes it can be a third-party

10   contract.  Okay.  So I'm going to ask Cigna one last time

11   to explain to the Court where in any of Cigna's Insurance

12   Policies -- that's capital I, capital P -- is that set

13   forth in a clear and unambiguous way, that being billing

14   policies if not followed will lead to exclusion of a

15   claim.

16        MS. KINGSBERY:  It doesn't say billing policies

17   will lead to --

18        THE COURT:  What does it say?  Tell me any

19   language you think says that.  You didn't tell me last

20   night any language.  You said "implied."  I know I have

21   been asking at least three times is there any language

22   that says these are incorporated by reference and the

23   party can go look for them on this website.  I mean,

24   that's common now, right?  I don't believe that's in

25   there.  We've checked -- not every policy you have, but a

1    certain number of sample ones.  We couldn't find anything

2    like that.

3            So you tell me what language would I look at

4    that would somehow be a basis for your argument that it

5    is part of the Insurance Policy, capital initial, that

6    the billing rules of Cigna policies, whatever you call

7    them, if not followed, will lead to an exclusion of a

8    claim.

9            MS. KINGSBERY:  The policies do for the

10   expressly incorporate -- at least the Florida individual

11   policies that we are discussing.

12           THE COURT:  That's fine.

13           MS. KINGSBERY:  We would refer to the coverage

14   provisions which say this is how much we're going to pay

15   for a service, and if you're billing for the same service

16   twice, Cigna is not going to provide coverage.

17           THE COURT:  How the insured would ever know that

18   that's what was intended.  I mean, you don't pay for --

19   it's covered to get a single drug test and it's covered

20   to get a panel tested.  Your problem -- and I don't say

21   it is an unreasonable position of Cigna.  Your problem is

22   it doesn't say our billing practices, in effect, if you

23   go read them, says you can't do that.  You can't get

24   twice for doing things once.  Everybody knows that.

25   We're going to tell you and we're going to

1    cross-reference it in the policy or we're going to state

2    it expressly. I don't know.  But short of that, it is not

3    in the contract.  Okay?

4         MR. CUNNINGHAM:  To me, this is analogous to the

5    old debate about fee forgiveness and the language in the

6    policy about being specific --

7         THE COURT:  It could be, but I'd like to keep

8    fee forgiveness dead.  But I agree with you, it has some

9    analogy.  I think it -- where I'm going to end up.  I

10   told you I'm thinking, unless I hear argument to the

11   contrary, that we're going to deal with this as a billing

12   issue, i.e. damages issue.  So I don't see that you are

13   getting harmed by failing to comply with Florida law and

14   plainly disclose.  But I think you can use it as a

15   defense to the amount of money they claim possibly.

16        MR. CUNNINGHAM:  There still has to be a basis

17   for it.

18        THE COURT:  That's a good question.  We'll talk

19   about that when we get to it.  Okay.

20        So you introduced a letter into evidence that

21   told the Labs to stop billing certain codes.  Okay.  You

22   also -- I think there's another letter that says, look,

23   see, our policies, you can't -- didn't you do a letter on

24   double billing, or am I confusing it with certain codes?

25        MS. KINGSBERY:  I'm aware of the August 2013

 1   letter.

 2            THE COURT:  And what is the topic, what kind of

 3   billing?

 4            MS. KINGSBERY:  You cannot bill these 80101

 5   codes.

 6            THE COURT:  The 80101 codes.  Okay.  Now, that

 7   letter refers to a, quote, code edit policy.  Is that in

 8   evidence, the code edit policy?

 9            MS. KINGSBERY:  Some versions of it, I believe.

10            THE COURT:  Really.  Can you tell me the exhibit

11   number?  Is the version referenced in that letter in

12   evidence?

13            MS. KINGSBERY:  That, I do not believe it is.

14            THE COURT:  You are going to have to check that

15   and you're going to email my law clerk early evening the

16   answer to the question.  So the number of the exhibit or

17   exhibits and the dates of them.  That -- which one is --

18   would be applicable -- if the person reading that letter

19   went and looked at the code edit policies that day, what

20   would they find in effect presumably on the website?

21   Did you produce code edit policy, the one at issue in

22   this letter in discovery?

23            MS. KINGSBERY:  We did not.

24            THE COURT:  Did you Labs receive it or know of

25   it?  Have they seen it?

1        MR. CHRIST:  No, Your Honor.  I'm thinking back

2    to the comments of my colleague Mr. Gestrich yesterday

3    that this was a discovery request, and we didn't receive

4    anything.

5        THE COURT:  Yet another one.

6        MR. CHRIST:  I thought that's what he said.

7        THE COURT:  So effectively, my question to you

8    and I guess Attorney Kang when he reads this is:  Are you

9    really asking me to give legal effect to and enforce a

10   policy that in discovery, according to the Labs, was

11   never seen again?  If you want to email me early evening

12   of some evidence that was produced, the one that's

13   referenced in the letter, that would be great.  Assuming

14   you don't have that evidence, then, in effect, the

15   plaintiffs never saw it, it's never been -- we're not

16   sure it is in evidence.  I guess that's the other gap

17   you've got to fill in.  And the jury -- you know, we may

18   or may not have it in evidence.  That's the gap you have

19   to fill in, but it's not clear it is.

20       I don't think it's -- I'm not sure it is

21   evidence.  Did you move it into evidence?  Even if it was

22   marked as an exhibit, that's what you have to tell me.

23   So my question is:  If you didn't do that, are you really

24   telling me to give legal effect and enforce a policy that

25   is a letter that relies on a document that's not in

1  evidence?

2        MS. KINGSBERY:  So our position would be that

3  the Labs received this letter and there is correspondence

4  after the fact that reflects the fact that the Labs

5  understood that they would be bound by this and that they

6  should not be billing these codes.

7        THE COURT:  Is that a fair statement, Attorney

8  Christ?

9        MR. CHRIST:  I am struggling to recall at the

10  moment the specific exhibit you are referencing that says

11  what the Labs say, yes, we understand we'll be bound by

12  this.

13        THE COURT:  That will be another part of your

14  email.  You're going to give me the exhibit of that

15  letter or that acknowledgement, whatever form it took.

16  Thank you.

17        Now in your filing last -- I'm turning a little

18  bit.  Anything further on -- okay.

19        In Cigna's filing last night, Cigna claimed that

20  the prohibition of -- I've already talked about this --

21  quote, implied in every policy.  So you told me that's

22  what you wrote.  And I think we have an answer that --

23  because we think it should be because we wrote to them,

24  well, we have policies that they should have known about.

25  But other than that, I see no basis under Florida law to

1    say it is in the contract.

2         Do you disagree with what I'm saying?

3         MS. KINGSBERY:  Other than our argument that

4    coverage is for a service.  And once it's paid for, it's

5    not covered.  That same service isn't covered again once

6    it is paid for.

7         THE COURT:  That would I think be a good

8    argument if they billed the bundling twice, but I don't

9    believe that's ever been an issue in the case.  What they

10   did is they billed bundling and then they unbundled and

11   billed a different one, which is, under your billing

12   system, recognized as a different service.  It had

13   different codes.  So I don't understand how that's a good

14   answer for you.

15        MS. KINGSBERY:  So if you billed a bundle code,

16   the service you are performing is in that code.  If you

17   separate it out and bill that service with a separate

18   code, it's --

19        THE COURT:  Right.  But you are arguing that

20   once you bill it, the service that's covered under the

21   policy has been paid, which is your obligation and they

22   can't bill again for that service.  What I'm pointing out

23   is that -- that would be true if they billed twice for

24   the bundle.  So code whatever bundle it is.  9782 is

25   bundled for certain drugs.  They bill 9782.  They get

1    paid.  The next day they bill it again.  That clearly

2    you're going to tell them, get out of here, we paid you.

3    You can't do that.

4         Now, I understand you want to argue that what

5    happened here is exactly the same, but I would suggest,

6    especially that your billing system contemplates a

7    different code for billing for the unbundled claims

8    versus the bundled, that is not analogous to that clear

9    you can only bill this service once.  The service is

10   different.  I understand practically it isn't different,

11   but we're talking about billing policies, we're talking

12   about insurance law where things have to be clear and

13   unambiguous.  I don't think it is a good argument.

14        And if Cigna previously told me that this

15   billing policies, including the bundling issue, was an

16   express term of the contract, then that would have been

17   wrong.

18        MS. KINGSBERY:  Unbundling is not an express

19   term of a Florida individual contract.

20        THE COURT:  Okay.  I don't -- I'm not sure that

21   I have all that packet I wrote up about the summary

22   judgment documents somehow got left on the bench, I

23   think.

24        In the summary judgment memo you wrote, you

25   said, quote, certain line charges for which the Labs seek

1    discovery -- I'm not sure why this was in the summary

2    judgment -- are indisputably not covered under Cigna's

3    reimbursement policy at the time and, therefore, properly

4    denied.  What was that based on, that statement?  Even if

5    you don't remember, what would you have based it on, if

6    you don't remember?

7            What did you base that statement to the Court in

8    the summary judgment brief?

9            MS. KINGSBERY:  Cigna's reimbursement policy.

10           THE COURT:  So policy with a small p.

11           MS. KINGSBERY:  Correct.

12           THE COURT:  Meaning billing policies, payment

13   policies, things of that sort that we've already talked

14   about in my view.  And I don't think you disagree --

15   well, maybe you disagree, but my view is not in the

16   contract.

17           MR. CHRIST:  Reimbursement policies may be not

18   the same thing as code edit policy, question mark. Is

19   that in evidence?

20           THE COURT:  The reimbursement policy, is that in

21   evidence?

22           MS. COSTIN:  I don't think so.

23           THE COURT:  That's a good question.  I guess

24   you're going to tell me that exhibit number if it is.

25   And did you produce that in discovery?  Maybe I will ask

1    the Lbs that.

2            Attorney Christ, do you remember getting

3    something called a reimbursement policy?

4            MR. CHRIST:  I do not, but I don't want to say

5    that that's something that we specifically requested.

6            THE COURT:  Could you check that and let my

7    clerk know.

8            Has anyone in this room seen that policy?

9            MS. KINGSBERY:  Yes.

10            THE COURT:  Where did you see it?

11            MS. KINGSBERY:  We did produce a reimbursement

12    policy.  I believe it is dated November 2014.

13            THE COURT:  Thank you.  And so when you wrote

14    certain line level charges for which the Labs seek

15    discovery -- again, I'm not sure -- you assured me it was

16    the summary judgment motion, but I think that was maybe a

17    cut and paste and you're talking about discovery.  I

18    don't know.  Are indisputably not covered under Cigna's

19    reimbursement policy at the time and, therefore, denied.

20            I'm assuming you wouldn't have said that if it

21    was not true.  The only way it's true -- can possibly be

22    true is if policies didn't mean Insurance Policies, with

23    capital I or P.

24            MS. KINGSBERY:  That's correct, a reimbursement

25    policy is what we're rely on.

1          THE COURT:  So am I correct -- is it fair to me

2     to say that you have argued for the first time in this

3     case, less than 48 hours before closing arguments, that

4     the unbundling prohibition is, quote, implied in an

5     insurance contract under Florida law, which expressly

6     does not favor implied.  You know, in other words, if

7     something is not clear to the reasonable person, it is

8     not coming in.  And you have been unable to tell me any

9     language in the actual Insurance Policies, with capital

10    initials, that there was any cross-reference, look at --

11    we're bringing in -- like I'm saying the statute says put

12    this language in the contract.  There's nothing in there

13    that you've told me that says notice, all our billing

14    practices are part of this contract.  They may change

15    from time to time.  See them at this website.  That

16    there's nothing like that in the policy?  Is that

17    correct?  Is that whole long statement correct?  And if

18    not, you pick it apart and tell me what I'm being unfair

19    about.

20          The important part of it is that you have only

21    just argued/conceded 48 before closing in this very

22    complicated case that the unbundled prohibition is,

23    quote, implied.

24          MS. KINGSBERY:  I think that's correct.  It is

25    not expressly in the contract.  It is publicly available

1    and was given notice to the providers of any changes, but

2    it's not expressly in the contract.

3          THE COURT:  The hours of Disney World is open is

4    publicly available, but I don't think it's in your

5    contract.  I'll just for the record note -- I can't

6    remember the name of the Florida case I looked at

7    recently, which, okay -- that talked about how -- is it

8    the Allstate -- yeah, in order for an exclusion or a

9    limitation in a policy to be enforceable, the insurer

10    must clearly and unambiguously draft a policy provision,

11    that means insurance policy, to achieve that result.

12    *Allstate versus Orthopedics*, 212 So.3d 973, 976, Florida

13    2017.

14          So how do I -- I can't charge this as an

15    exclusion under that law.  It's recent Florida Supreme

16    Court law.  Do you agree that I can't charge it as an

17    affirmative defense to the claim?  It is not an exclusion

18    coverage?

19          MS. COSTIN:  Correct.

20          THE COURT:  I will just point out just for the

21    record, just close this circle.  In the first pretrial

22    memo you described unbundling defense as a, quote, breach

23    of contract defense.  You later rephrased it as, quote,

24    services not covered.  So that's why we styled it based

25    on what -- those comments as an affirmative defense, but

```
1    I don't believe it should any longer be an affirmative
2    defense.
3            Do you object to my view?
4            MS. KINGSBERY:  I do not.
5            THE COURT:  Does the Labs object?
6            MR. CHRIST:  We do not, Your Honor.
7            THE COURT:  So last few questions before we get
8    to what do we do now.  You have claimed that the Labs
9    were put on notice with respect to unbundling by an
10   August 19, 2013 letter?  Have I got the right letter?  Do
11   you recall, is that the date?  Everybody agree?
12           Attorney Christ?
13           MR. CHRIST:  I recall, yes, that's the letter
14   from Mr. Welch?
15           MS. KINGSBERY:  I want to say it was in May, but
16   the effective date of the policy went into effect in
17   August.
18           MS. COSTIN:  This is in evidence.
19           THE COURT:  That's a good memory.  So that's the
20   August 19th it's effective.
21           So before that date, does that mean given the
22   absence of anything, it isn't even -- that they were fine
23   to bill it separately?
24           MS. COSTIN:  The 801 codes, correct.
25           THE COURT:  In their summary judgment
```

1    opposition, the Labs claim the policy did not go into

2    effect until 2015 if -- quote, if at all.

3         What's the Lab's position now on the correct

4    date?

5         MR. CHRIST:  Well, based on that -- based on

6    what's been said at the conference, I guess it would be

7    8-19-13.

8         THE COURT:  If you happen to find -- I want you

9    to check when you go back and you are going to let us

10   know very early evening if you disagree with that date.

11        So we have always assumed that -- we haven't

12   always assumed, but we have evolved to understanding and

13   agreeing that with respect to -- everything I have said

14   is on the Labs' case right now.  But we have been

15   assuming with respect to Cigna that you -- and we have

16   now gotten a firm agreement, it will be argued as it's

17   unfair in the concept that we all understand you can't

18   bill.  You haven't done two things, you can't bill for

19   two things.  You've got to bill for one.  Or you can't

20   bill for 20.  That's just not fair.  Right?  That's the

21   fairness circumstances, et cetera.

22        I'm sure I can hear Attorney Kang is writing

23   that right now.  He probably doesn't have to write it.

24   He knows what he's going to say.

25        Now my question is:  Can he say that about

1    claims prior to August 19, 2013?

2            MS. COSTIN:  No, not with respect to the 8 code,

3    no.

4            THE COURT:  So I probably have to add a charge.

5    And whatever the charge is I do on this, that it applies

6    only in the Cigna case from and after 8-19-13.  Agreed?

7    Agreed?

8            Everybody agrees.  They're all shaking their

9    heads.

10           Okay.  I have told you what Florida law

11   requires, the Allstate/Orthopedic case.  I will note you

12   cited me a case last night for Michigan, Eastern

13   District.  I thought it was a fine case.  I think it's

14   called Executive Ambulatory Surgical Center, something

15   like that.  It's a not too old case from the Eastern

16   District.  I reviewed it, laid eyes on it.  You cite it

17   for the proposition that unbundling can be implied in a

18   contract.  With all due respect, I don't think that's

19   what the case says.  I think the case says -- and it is a

20   summary judgment case, I should point out -- that, quote,

21   unbundling, end quote, should not be understood as a

22   coverage exclusion.  The Michigan District Court

23   considers and rejects the argument that unbundling makes

24   Plaintiff's claims completely non-compensable.

25           Let me read from that case.  Quote, unbundling

1    will reduce, not eliminate, the insurer's obligation to

2    pay.  A defendant may argue that an amount billed by a

3    provider is unreasonable because they, quote, unbundled,

4    end quote, their bill.  Because, quote unquote,

5    unbundling is not unlawful in the way the defendant

6    contends.  Unbundling does not foreclose a provider's

7    ability to recover reasonable costs for its services.

8    Quote, unbundling, end quote, is merely an argument that

9    it would be unreasonable to pay a provider twice for the

10   same procedure.  Classifying unbundling is an issue of

11   amount of payment, i.e., amount of defendants -- that's

12   me.  Back to the quote.  -- rather than entitlement to

13   payment is also logical, end of quote.

14          Actually, I -- we've ben moving to this

15   thinking, but this opinion was very helpful in having us

16   sort of talk our way through it.  So I'm in agreement

17   with that quote.  It's really what I've been saying for

18   the last 20 minutes.  But I will charge unbundling.  We

19   will draft something tonight.  We will get it to you

20   tonight as a defense -- like mitigation of damages.  I

21   don't know what we're going to call it, but like that.

22   In other words, after the liability is decided, if they

23   find for -- for the Labs, one or more of the Labs, yes,

24   we have a cause of action, so they turn to damages before

25   they -- and they decide damages.  That's how I have

2110

1    structured the verdict form.  They decide how much are

2    your total damages.  They are then asked to reduce, so

3    tell me what number to take out of that, for example, for

4    failing to mitigate.

5         MR. CUNNINGHAM:  There is no evidence of that in

6    the records.

7         MS. COSTIN:  There is.  There is.  I was about

8    to explain that.  So Ms. Thelian quantified damages

9    based on specific denial codes from Cigna.  And one of

10   those codes is 1648.  And Mr. Goldfarb testified last

11   Friday that 1648 is the code that was used for

12   unbundling.  It ties directly to this August 2013 policy.

13   That's the argument we're making.  That's what it's --

14        THE COURT:  I mean, you can say, I didn't hear

15   any evidence on that, but that's for you to say.  That's

16   your argument.  That's their argument.  The jury is going

17   to decide what's in evidence.  And if -- even if they

18   agree it's in evidence, whether they buy it.  Okay?

19        MR. CUNNINGHAM:  I mean, my biggest issue, Your

20   Honor, just for the record, is what is the basis for

21   this?  How are we supposed to know this?

22        THE COURT:  Well, when you move for a directed

23   verdict, okay, that's your solution, right?  And I take

24   that away and you're left with a big damages numbers.

25   This is why I'm asking for the big number before they

1    take away.  I mean, this directed verdict motion, don't

2    expect me to give yo 200 pages.  I'm giving you 40.  Good

3    luck.  I have a feeling there's a lot --

4              MS. COSTIN:  Forty total?

5              THE COURT:  I have a lot of issues.  No comment.

6         So it is only as a limit on the Labs' double or

7    multiple recovery for the same procedure.  And because

8    Cigna has not, despite repeated opportunity, shown the

9    Court any explicit exclusion in the policy that would

10   meet Florida law, the Court will not instruct that a

11   finding of unbundling makes services not completely

12   non-compensable.  However, as I say, in a normal contract

13   case, this would be a damage kind of mitigation issue.

14   It's not mitigation, but I guess it could be viewed kind

15   of.  I am not going to charge it that way, but you could

16   have avoided how much you are asking by, you know, using

17   their codes after they told you to use them.  So -- and I

18   think that completes my sermon on the mountain.

19        Could I have -- I guess I will starts wit Cigna

20   because -- well, first, let me hear from the Labs

21   generally about what I've said, not specifically what I'm

22   proposing, but is there anything you take exception to,

23   you think I've mischaracterized, that you haven't been

24   heard on that I should consider, et cetera, et cetera, et

25   cetera?  This is your moment.

1          I mean, you've got a -- I'm going to ask them

2    how do I charge it now or do you -- are you going to

3    object.  But even if you object, how should I charge

4    given what I've said?  Before I do that, though, I think

5    I should give you an opportunity to respond to everything

6    I've said, which was, you know, much more than just it's

7    only going to be damages.

8          MR. CHRIST:  I think this Court's reasoning

9    makes sense to us, that it is not a contractual

10   exclusion.  It's more appropriately defined as a

11   limitation on damages in our case.

12         THE COURT:  Okay.  So let me turn to Cigna since

13   it is your defense to damages now.  I'm going to ask you

14   how do you think -- you know, given the charge in front

15   of you is not going to be the right charge.  Other than

16   searching for "unbundling" to make sure we don't have the

17   stray remarks, what's the big change that Alex is going

18   to have to do while I'm off taking care of this other

19   court matter?

20         MS. COSTIN:  I think that the first paragraph

21   that explains what unbundling is --

22         THE COURT:  What page?  what charge are you on,

23   please?

24         MS. COSTIN:  I'm on Charge 39, as drafted, that

25   wouldn't be -- that Cigna asserts an affirmative defense.

1   I think we can strike that sentence, but we could strike

2   anything regarding it, excluded from coverage.  But we

3   could explain unbundling is what unbundling is.  I think

4   we can reference the Cigna policy and something about how

5   the jury can consider this when assessing calculation of

6   damages.  So perhaps it would be better placed in a

7   different section with damages.

8           THE COURT:  Right.  That was my next question.

9   Aren't we going to have to move it?  It will come after

10  damages.  And I think you have other defense to damages,

11  so it will go in there.  I'm going to have to change the

12  jury instruction form.  Yeah.

13          MS. COSTIN:  And I would suggest in our

14  proposed -- we had some proposed language in what we

15  submitted last night on the definition.

16          THE COURT:  I know, but I'm not sure that's --

17  you know, had you implied in the policy.

18          MS. COSTIN:  Take out implied in the policy.

19  Just the concept that -- not implied in every policy, but

20  something to the effect of unbundling seeks reimbursement

21  for more than one's first services that has been provided

22  one time consistent with the case that we cited, the

23  *Allstate* case.

24          THE COURT:  Oh, that sentence.  I see.

25          MS. COSTIN:  Something along the lines of

2114

1  unbundling is a concept of --

2      THE COURT:  So that would be part of your

3  concept section.  We'll take a look at that.  How about

4  from the Labs' point of view?  I guess, you know, you

5  don't have language -- you have what's there now.  So if

6  you want to tell me generally what -- in 39, you know,

7  what should I be working to fix in there, or whatever

8  else you would have.  You'd just, Judge, throw that out

9  the window and start from scratch, but this is what your

10 scratch should look like.

11      MR. CHRIST:  I think there's framework that can

12 be -- we could launch from here regarding -- trying to

13 find the paragraph here.  Just the problem is that

14 everything in here is -- it's either implied in the

15 contract or it's --

16      THE COURT:  Yeah, we've got to get all that out.

17      MS. COSTIN:  We're going to take that out.

18      MR. CHRIST:  I would just keep it, "Cigna must

19 prove by a preponderance of the evidence the Lab issued

20 bills for their service separately and they should have

21 been billed with a bundled code."

22      THE COURT:  Where is that you are reading from?

23 If you can tell me where.

24      MR. CHRIST:  That's in the third full paragraph

25 on the second page of Cigna's proposed language.

1         THE COURT:  The second page.  Oh.  This is --

2   which number are you on?

3         MR. CHRIST:  It's Charge 39, notice of proposed

4   language regarding jury charge.  Page 2, third full

5   paragraph.

6         THE COURT:  I don't have a third full paragraph

7   on page 2 of Charge C9.

8         MR. CHRIST:  The paragraph that says, "In order

9   to prove."  Maybe it's --

10        THE COURT:  That's the third paragraph at the

11  beginning on page 1 of the charge.

12        MR. CHRIST;  I'm sorry, Your Honor.  I'm looking

13  at the proposed instruction that Cigna submitted last

14  night, not the --

15        THE COURT:  I'm sorry.  Go ahead.  Yeah, all

16  right.  So on the second page.  Which full paragraph?

17        MR. CHRIST:  It starts with "Order to prove."

18        THE COURT:  I don't see that on the second page

19  of what they gave me last night.  I see.  I got it.

20        It is the third full paragraph in the proposed

21  charge that they gave last night.  Right?  So what would

22  you do with that paragraph?

23        MR. CHRIST:  I think simpler is better.

24        THE COURT:  Yeah.

25        MR. CHRIST:  So Cigna must prove by a

1    preponderance of the evidence that the Lab at issue

2    billed for the services separately when they should have

3    been billed with a bundle code.  That seems to be the

4    description I've heard throughout this case.

5            THE COURT:  So we're going to throw that whole

6    third paragraph out.  Let me make a note.  Did you get

7    what he proposed?  I didn't get it down.  Could you tell

8    me what you're proposing?

9            MR. CHRIST:  It's focusing on the second half of

10   the third paragraph, which says, "Cigna must prove by a

11   preponderance of the evidence the Lab at issue billed for

12   those services separately when they should have been

13   billed with a bundled code."

14           MS. COSTIN:  And then continue with the "If

15   Cigna proves by a preponderance of evidence."  Keep the

16   next paragraph.

17           THE COURT:  I'm completely confused.  Are you

18   following?

19           THE CLERK:  Yes.

20           THE COURT:  That's great.

21           Anything else on the charge besides rewriting

22   this section and cleaning up anyplace else that talks

23   about unbundling?  I probably am going to make it very

24   clear in the Cigna's case about unbundling, it arises is

25   an argument under the fairness concept and is not based

```
 1    in any way in the contracts.

 2              MS. COSTIN:  Understood.

 3              THE COURT:  Something like that.  Alex, would

 4    you look for a good place to put that, please.

 5              Then we have this jury charge problem.

 6              MS. KINGSBERY:  I have one other comment on the

 7    charge.

 8              THE COURT:  Yes.

 9              MS. KINGSBERY:  I overlooked one issue on

10    Section 57, fee forgiveness.  I wasn't appreciating that

11    we were talking about Cigna's here.

12              THE COURT:  Yeah.  It takes a long time to get

13    through there.  Wait until you see the verdict form.  57,

14    fee forgiveness.

15              MS. KINGSBERY:  So this -- the first paragraph

16    where the redlines are --

17              THE COURT:  Yeah, I don't have the redline.  So

18    I'm in the first paragraph.  Tell me the language.

19              MS. KINGSBERY:  The language is "The Court has

20    determined that none of Cigna's Insurance Policies before

21    January 1, 2015 include language" --

22              THE COURT:  I don't have the current version in

23    front of me.  I'm in the binder.  The Court has

24    determined those words are not in the first paragraph.

25    That's what you said, right, "The Court has determined"?
```

1          MS. KINGSBERY:  I'm sorry.  It's the next page.

2          THE COURT:  Oh, you're on the second page.

3          MS. KINGSBERY:  That's my fault.  The first

4    paragraph of the second page of 57.

5          THE COURT:  Where does it say "The Court"?  How

6    far down?  I don't see "The Court" in that one either.

7          MS. KINGSBERY:  It is part of the first

8    sentence, but it's --

9          THE COURT:  "I am instructing you based on the

10   law, as I have determined in this case is that to the

11   extent you wish to consider the language," blah, blah,

12   blah, "which may or may not decide to do.  The Court has

13   determined none of the policies before that date include

14   that language."  Is that the sentence?  Oh, I see.  The

15   Court has -- I'm sorry.  Got it.

16         MS. KINGSBERY:  That's right, yes.  And so since

17   we're in Cigna's case, so this would be true for the

18   Labs' case for all of the policies, but in Cigna's case,

19   there are ERISA policies still in Cigna's case --

20         THE COURT:  Yes.

21         MS. KINGSBERY:  -- and there has not been a

22   ruling with respect to those ERISA policies on fee

23   forgiving language.

24         THE COURT:  Right.

25         MS. KINGSBERY:  So this representation that the

1   Court has determined that none of Cigna's Insurance

2   Policies before January 1, 2015 include language

3   concerning fee forgiveness wouldn't be accurate.

4           THE COURT:  Why not?

5           MS. KINGSBERY:  Because Cigna --

6           THE COURT:  Magic.  All of a sudden the ERISA

7   cases, which really aren't preempted or anything are

8   going to get a preemption from Florida statutory law?  Go

9   ahead and tell me.

10          MS. KINGSBERY:  So at this point in the case,

11  the ERISA policies are all still in.

12          THE COURT:  I understand that.  I understand

13  that.  But why are the ERISA policies -- why is it true

14  that ERISA policies pre-January 1, '15, get to have fee

15  forgiveness read into them?

16          MS. KINGSBERY:  So the Court's ruling is that

17  the -- under Florida law --

18          THE COURT:  Yes.

19          MS. KINGSBERY:  -- that language does not

20  prohibit fee forgiveness.

21          THE COURT:  So your position is this is ERISA

22  law, which preempts the Florida law?  So we -- I mean,

23  you can't make that argument and have me -- let you keep

24  these claims in.

25          MS. KINGSBERY:  No.

1          THE COURT:  So what are you saying?

2          MS. KINGSBERY:  Our argument would be that these

3     policies are just not governed by Florida law at all.

4          THE COURT:  But that's the same thing.  If

5     they're not governed by Florida law, why is that?

6     Because of the law of preemption.  Congress had said

7     we're going to occupy this field.  If it's this kind of

8     policy, it's preempted.  Well, if it's preempted, then it

9     shouldn't be in your damages buckets.  I've sort of put

10    that issue off, and I think I warned you to enter the

11    judgment separately, in separate buckets you're going to

12    argue ERISA policies versus other because I am -- it's

13    not unlikely that I will remove the ERISA part of your

14    damages at the end of the case -- I mean in the directed

15    verdict context because I'm not persuaded it's not

16    preempted.

17         I know Attorney -- I can't remember which it

18    is -- is the ERISA expert, but I'm still struggling with

19    the idea these aren't preempted.  And remember the

20    argument.  We spent a little bit of time on it.  And I

21    just decided, look, I'll deal with it afterwards.  ERISA

22    is always a challenging issue.  I'm not going to do this

23    on the fly.  I mean, I did that with a lot of issues

24    given they came up at the very last minute.

25         But I really don't understand.  I mean, this --

1   the Labs probably should mark this for the argument on

2   that issue post trial, because to me you've just said

3   these cases are preempted.  We don't have to -- this is

4   something that governs the policy, which means -- that's

5   Florida law, it's contrary to the federal law, so it's

6   preempted under ERISA.  Well, if it's preempted, what is

7   it in this case?  How are they in this case?

8         MS. KINGSBERY:  I think two separate issues.

9   The policies are --

10         THE COURT:  You can say it's preempted on some

11   but not on other aspects of the policy.

12         MS. KINGSBERY:  No, I think the question on

13   preemption is whether the cause of action, the unjust

14   enrichment cause of action is preempted by ERISA.

15         THE COURT:  Right.  And that's -- we're talking

16   about damages under that cause of action.  You can't

17   separate the cause of actions and say, oh, damages is

18   this, it's after effect.  It's part of the cause of

19   action.

20         MS. KINGSBERY:  I understand.  And if the unjust

21   enrichment claim is preempted by ERISA, then all the

22   ERISA policies would be out.

23         THE COURT:  Right.

24         MS. KINGSBERY:  But at this point, there hasn't

25   been a ruling on that, and so there hasn't been a ruling

1    that for the ERISA policies fee forgiveness -- there is

2    no fee forgiveness language --

3            THE COURT:  Why does that come from?

4            MS. KINGSBERY:  The Court's ruling, I understand

5    was under Florida law.

6            THE COURT:  I understand it was, but where does

7    it say in ERISA law you -- somehow a nonexistent fee

8    forgiving provision gets read into the policy?

9            MS. KINGSBERY:  So there is the fee forgiving

10   language in those plans.  We cited several --

11           THE COURT:  Which plans? All of the ERISA claims

12   have fee forgiveness language.  What language?  The

13   language I said wasn't good enough?

14           MS. KINGSBERY:  That's correct.

15           THE COURT:  So you are telling me that ERISA --

16   the law applied to the policy here, even though it

17   doesn't affect the cause of action, will inform how to

18   interpret the contract even though the cause of action

19   arises under Florida law and, therefore, ERISA's law

20   tells me, Oh, don't be a stickler, Judge.  Don't require

21   that the policyholder has to know what the ground rules

22   are here.  Let the insurance company put in, you know,

23   what's right, Judge.  That will be fine.  I mean, really?

24   Is that what ERISA law says?

25           MS. KINGSBERY:  We cited several cases under

1    ERISA that said this --

2           THE COURT:  Where?

3           MS. KINGSBERY:  In our summary judgment brief

4    that said this exact language prohibits fee forgiving.

5    And I believe Your Honor's ruling was those are ERISA

6    cases under Florida law policies, I'm going to apply

7    Florida law, so I'm going to disregard the ERISA cases.

8           THE COURT:  I'm going to have to look at the

9    ruling on that.  I can vaguely remember, but I don't

10   remember what that language was, and I don't know that

11   I'm going to -- I mean, all I said in the ruling was,

12   well, you know, it is a different kettle of fish, I'm not

13   even going to think about it.  But I'm thinking about it

14   now because you are telling me not to do something that I

15   cannot understand why I wouldn't do it.

16          MS. KINGSBERY:  Yeah, so this is because that

17   was -- we were talking about the Labs' case and Florida

18   individual policies and Florida law.  This is Cigna's

19   case.  There's ERISA policies that would be governed by

20   ERISA.

21          THE COURT:  Can you tell me a case in addressing

22   ERISA policies that says, oh, you can imply anything that

23   -- you know, some sophisticated company would be able to

24   understand would be read in?

25          MS. KINGSBERY:  The cases address this language.

1    We can send you a couple that say it is prohibited.

2           THE COURT:  Any response from the Labs on that

3    issue that's just come out of the woodwork?

4           MR. CHRIST:  I don't know where to start.

5           THE COURT:  Exactly.  I feel the same way

6    because I can't start.  I'm at the end of the race and

7    here I go.  It's like we drop issues on me that it's

8    unbelievable.

9           MR. CHRIST:  I thought this issue was put to

10   bed.

11          THE COURT:  I mean, I've got to tell you, I

12   could name a hundred District Court judges I know would

13   tell you too late.

14          MS. COSTIN:  We raised the issue in the brief

15   that we submitted before -- just before trial.  And I

16   think --

17          THE COURT:  Which brief was that?

18          MS. COSTIN:  On --

19          THE COURT:  Oh, on ERISA?

20          MS. COSTIN:  -- the ERISA preemption issue.

21          THE COURT:  So I'll find it in that.

22          MS. COSTIN:  I believe so.

23          THE COURT:  It wasn't very clear the, which was

24   why I was not inclined to try to tackle it without

25   understanding.  So your argument wasn't very clear then

 1    or wasn't persuasive, but whatever.

 2         MS. COSTIN:  The argument that I just raised to

 3    Your Honor was briefed in opposition to the motion in

 4    limine on fee forgiving.  We raised this exact issue.

 5         THE COURT:  I'll look at that, too.  Thank you

 6    very much.

 7         Okay.  So you're going to have to pull that for

 8    me.

 9         I am going to have to call it quits here, so you

10    all have three minutes to tell me about the verdict

11    interrogatory form.

12         MS. COSTIN:  I've only had a chance to look at

13    the Cigna one, but I see a pretty major typo I just

14    wanted to raise.

15         THE COURT:  And what's that?

16         MS. COSTIN:  So this is on Cigna's case for

17    unjust enrichment.  It's Section 3, affirmative defense

18    of voluntary payment.

19         THE COURT:  Yeah.

20         MS. COSTIN:  For each one of these that says

21    "What amount of money awarded in Question 2A has

22    BioHealth Labs proven was paid to Cigna?  And I think

23    that should be paid "by" Cigna.

24         THE COURT:  Yeah, that's a biggie.

25         MS. COSTIN:  It's "to" in all three in A, B and

1    C, should be changed to "by."

2              THE COURT:  That's fine.  Thank you very much.

3    That's excellent.

4              MS. COSTIN:  I don't think the Labs are going to

5    object to that.

6              THE COURT:  That's an excellent catch.  Doesn't

7    matter if they do.

8              THE COURT:  That's the only thing you saw?  I am

9    going to have to ask you to please check our

10   cross-references, if you answer this, don'to answer, you

11   know, because --

12             MS. COSTIN:  We -- yes, and I haven't had a

13   chance.  We just got these before walking in.

14             THE COURT:  I understand.  Any -- but otherwise,

15   the way it's structured, the way I've laid out the order,

16   that kind of thing, nothing jumps out at you?  You're not

17   waiving any objection from --

18             MS. COSTIN:  Not yet.

19             THE COURT:  Not yet.  Good way to --

20             MR. CUNNINGHAM:  I literally have about one

21   minute.

22             THE COURT:  There you go.  You have one minute.

23             MS. COSTIN:  The Cigna one was a lot shorter so

24   I was able to --

25             THE COURT:  The Labs' is very long.  You can

1    tell me how to shorten -- middle of the night, I thought,

2    geez, we can statute of limitations damages out of there.

3    I put the date in the question.  Then I realized, no,

4    they've got to find that.

5          MR. CUNNINGHAM:  I have learned never to

6    underestimate the collective intelligence of a jury, but

7    I have to tell you --

8          THE COURT:  I know.  But what do you want me to

9    do?  You tell me what to do.

10          MR. CUNNINGHAM:  I need to have more time to

11    digest it and talk with our team and we can give you some

12    comments tonight.

13          THE COURT:  What time do you think we should

14    start?  We're not starting at 9:30 with these people, or

15    9:00.  I mean, seriously.  We have to put -- you're going

16    to have brand new bundling language.  You may or may not

17    get it tonight.  You may get it tomorrow morning at 8:00

18    or 8:30.  Then you're going to have to tell me about the

19    verdict form, I suppose.  I don't know.  Verdict -- I

20    mean, if there were two like the Cigna ones, we may have

21    great disagreements, but it wouldn't take long.  I would

22    hear the disagreement and I'd decide.  The problem is the

23    Lab one is so long.

24          MR. CUNNINGHAM:  Your Honor, would you like us

25    to try to give you at least our thoughts this evening?

1           THE COURT:  That would be great.

2           MR. CUNNINGHAM:  It will probably be late this

3  evening.

4           THE COURT:  That's fine.

5           MR. CUNNINGHAM:  We start meeting with our team

6  at 7:00.

7           THE COURT:  That's fine.

8           MR. CUNNINGHAM:  We will endeavor to give you

9  our thoughts on these.

10          THE COURT:  That's great.  Thank you very much.

11  Anything further?

12          MS. COSTIN:  I think just what -- hopefully we

13  can have a start time for tomorrow morning.

14          THE CLERK:  Yeah, 9:00.  I mean, I assume people

15  will want to break -- a good size break for closings.

16          THE COURT:  Yeah, for closings and for lunch and

17  just a -- you know, if there's any last minute issues

18  from what came out of the morning that might affect the

19  closing.  I mean, you know, the bundling issue, I mean,

20  you should go explain the effect and what -- you're here,

21  you do -- I don't know if you are doing that or not,

22  but -- you haven't told me if you are having other people

23  do it.  I think we should know that.

24          MR. CUNNINGHAM:  I'm doing the whole closing.

25          MS. COSTIN:  Mr. Kang is doing the whole

1    closing.

2         THE COURT:  That's what I thought.  So you know.

3    Attorney Kang has to be told and so that has to be

4    addressed.

5         Quarter to 9:00 I think is enough time.  I think

6    you'll end -- I'm hoping we'll end up with a sizeable

7    break.  But from experience in this case, I wouldn't put

8    money on it.  Thank you very much.

9         (Adjourned, 5:10 p.m.)

10

11

12   COURT REPORTER'S TRANSCRIPT CERTIFICATE

13   I hereby certify that the within and foregoing is a true

14   and correct transcript taken from the proceedings in the

15   above-entitled matter.

16

17   /s/  Terri Fidanza

18   Terri Fidanza, RPR

19   Official Court Reporter

20

21

22

23

24

25

2130

INDEX

EXAMINATION

Witness Name                                              Page

BRIAN EVANKO

   DIRECT EXAMINATION BY MR. CUNNINGHAM.............. 1899

   CROSS-EXAMINAITON BY MR. KANG ..................... 1961

ROBERT BOORSTEIN

   DIRECT EXAMINATION BY MR. HARE .................... 1991

   CROSS-EXAMINATION BY Mr. Kang ..................... 2016

Christopher Haney

   DIRECT EXAMINATION BY MR. GESTRICH ................ 2047

   CROSS-EXAMINATION BY MS. KINGSBERY ................ 2064

Eva Borden Video Deposition Played................. 2072