1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF CONNECTICUT

3    _____
     CONNECTICUT GENERAL )
4    LIFE INSURANCE CO.  )
     AND CIGNA HEALTH    )
5    AND LIFE INSURANCE  )
     CO.                 )
6            Plaintiffs )    NO: 3:19cv1324(JCH)
                         )    NO: 3:19CV1326(JCH)
7      vs.               )    October 30, 2024
                         )    8:44 a.m.
8                        )
     BIOHEALTH MEDICAL   )
9    LABORATORIES INC,   )
     PB LABORATORIES, LLC)
10   and EPIC REFERENCE  )
     LABS, INC.          )
11           Defendants. )
     _____ )    141 Church Street
12                            New Haven, Connecticut

13

14              DAY NINE OF TRIAL

15

16   B E F O R E:

17              THE HONORABLE JANET C. HALL, U.S.D.J.

18   A P P E A R A N C E S:

19   For CIGNA:          Edward T. Kang
                         Alston & Bird LLP
20                       950 F Street, NW,
                         Washington, DC 2004-1404
21
                         Michelle Nicole Jackson
22                       Alston & Bird LLP
                         1201 West Peachtree Street
23                       Atlanta, GA 30309

24              -- continued --

25

```
 1                        Alexander Akerman
                          Alston & Bird LLP
 2                        350 South Grand Avenue
                          51st Floor
 3                        Los Angeles, CA 90071

 4                        Kelsey Kingsbery
                          Alston & Bird LLP
 5                        555 Fayetteville Street
                          Ste 600
 6                        Raleigh, NC 27601

 7

 8   For BioHealth Labs:  Scott M. Hare
                          Anthony Thomas Gestrich
 9                        Raines Feldman Littrell
                          11 Stanwix Street
10                        Suite 1400
                          Pittsburgh, PA 15222
11
                          Fred Alan Cunningham
12                        Matthew Thomas Christ
                          Rafferty Domnick Cunningham & Yaffa
13                        2401 PGA Boulevard
                          Suite #140
14                        Palm Beach Gardens, FL 33410

15                        John J. Radshaw, III
                          John J. Radshaw, III, Esquire
16                        65 Trumbull Street, 2d Fl.
                          New Haven, CT  06510
17

18

19

20

21

22

23

24

25
```

1    THE COURT:  We're here again this morning in

2    the matter known as Cigna General Life, et al versus

3    BioHealth Laboratories, 3:19-CV-1324, and Epic Reference

4    Labs, Inc., et al versus Cigna Health and Life Insurance

5    Company, et al, 3:19-CV-1326.

6         May I have appearances, please.

7         MR. HARE:  Good morning, Your Honor.

8         Scott Hare, Matthew Christ, and Anthony Gestrich

9    for the Labs.

10        THE COURT:  Yes, good morning.

11        MS. KINGSBERY:  Good morning, Your Honor.

12        Kelsey Kingsbury for Cigna.

13        MS. COSTIN:  Emily Costin for Cigna.

14        THE COURT:  Good morning.

15        Well, I guess first things first, as they say.

16   I guess the Labs didn't like my Verdict Form.

17        MR. HARE:  I presume Your Honor makes reference

18   to the decision of the Labs to withdraw any independent

19   claim with respect to the statutory cause of action which

20   is now, I believe, numbered as Count One.

21        THE COURT:  I don't know that that's what I do.

22   That's an interesting question.  I think it might be

23   confusing to the jury.  It's been known as Count Two.

24   I've talked about it as Count Two.  They're going to

25   puzzle over, you know, I guess we have to talk about the

1    language I give them about Count One.  I think it's a

2    bridge too far to have a different Count One that I'm now

3    talking about.

4         MR. HARE:  Enumeration aside, Your Honor, and

5    understanding I think I'm addressing the issue the Court

6    has in mind.  The Court's correct.  We are hoping to

7    streamline and simplify the case and the issues for the

8    jury.  And that's what prompted this decision.

9         THE COURT:  I think given how limited time we

10   have before this is going to the jury, I'll just make

11   this question rhetorical.  And we couldn't have done that

12   sooner?  But I don't expect a response.  We'll have time

13   to talk about that later.

14        I did notice that you neatly slipped in the

15   issue that I think was raised by Attorney Kingsbury in

16   her response email to Attorney Gestrich's memo.  I don't

17   understand what you would like me to do.

18        I don't have Teams working, Terri, but we'll try

19   to do without it.

20        You did use some phrase of suggesting Count Two

21   incorporates the two counts of Count One.  Was that your

22   intention?  If so, why was your brief when I asked, I

23   don't know, the beginning of the pretrial conference, why

24   isn't the counts claims in Count One duplicative of the

25   claim in Count Two.

1          I don't have the brief in front of me, but my

2    recollection was, oh, no, Judge, it isn't.  And I don't

3    remember why it wasn't.  But even if it is, you can deal

4    with this with a duplicative damage thing.  So I did

5    that.

6          I think you all should appreciate that I have

7    been dealing with issues, some of the issues, by way of

8    advising how to present damages, to preserve issues for

9    post-trial motions that I could deal with some of these

10   issues or have the jury deal with a duplicative of

11   damages charge.  You noticed I added a duplicative damage

12   charge which Attorney Gestrich suggested.  You know,

13   whatever.  It doesn't matter.  Yin-yang.  It doesn't

14   matter.  We'll take care of it in a jury form and I did.

15         I don't understand if it's duplicative why you

16   needed both counts.  Why you didn't know that at the

17   beginning when I sort of flagged the issue.  But I'm not

18   saying you can't do it, but I don't have any request to

19   charge to change the charge.  I mean, is this just going

20   to be your argument?

21         I do quote the two statutes in the charge for

22   Count Two.  And I have done that now and we've focused on

23   that, including Cigna focused on it.  They didn't want me

24   to repeat the language and I decided, you know, that's a

25   good idea.  Well, of course, now we've put the language

1    back in because it's no longer in Count One.

2         But other than that, I don't think I ever heard

3    an objection to the reference to the statute.  But I'm

4    not sure I would have charged Count Two the way I am

5    right now if you hadn't had Count One to begin with.  But

6    I don't know what I would have done different.

7         I guess I'm asking you, without a request to

8    charge, it's very hard for me to respond to that comment

9    in your answer.

10        MR. HARE:  There are a couple of topics in the

11   Court's question.  Going back to the earlier briefing, I

12   likewise don't have our brief in front of us, Your Honor,

13   but I believe that what we articulated, among other

14   points, was that the damages are not entirely

15   duplicative.  Although they're overlapping, there are

16   distinctions as to the measure of damages in the two

17   claims.

18        Recognizing, however, that there is substantial

19   overlap and, again, trying to streamline issues for

20   ultimate presentation to the jury, it occurred to us that

21   there can be -- that there's value in trying to

22   streamline and simplify at the cost of, if any, minimal

23   impact on our separate damages that would only arise with

24   respect to the statutory claim.

25        We are also mindful that the Court has

1    entertained an argument that there is no private right of

2    action directly under the statutes.  I anticipate we may

3    hear that.  We might otherwise hear that argument in

4    motions today.  I recognize that that would be a

5    continuing issue in the case.  Once again, warranting in

6    favor of trying to streamline and take that issue out of

7    the case.

8            THE COURT:  Okay.  But that didn't answer my

9    question.  Is the charge, as Count Two was written with

10   minor adjustments, you know, some editing that has to be

11   done to take out causes, plural, in the introduction, for

12   example.  There's other edits throughout that, God knows,

13   that I caught them all last night at 11:00.

14           Is there -- I mean, your comment suggests, but

15   you offer me nothing, that I should rewrite Count Two

16   charge substantively because it includes these two causes

17   of action.  And I think that was Cigna's reaction.

18           I'm not saying you can't argue, you know, the

19   facts that those statutes are in the policy.  I'm not

20   saying that at all.  Indeed, I have charged that, I

21   believe.  We have discussed it at charge conferences.

22   And it is what it is.  So what I've done is I have

23   actually taken, cut and pasted the language of those two

24   statutes into the Charge Two charge, where I had acceded

25   to Cigna's argument to and just put a reference to see

1    sections blankety, blank, and blank, infra, where you

2    will see that language.  Well, now it says here is the

3    language.  But that's all I did to that charge.  I didn't

4    add anything further.

5           MR. HARE:  We do share and support the Court's

6    incorporation in Count Two.

7           THE COURT:  The language of the statute.

8           MR. HARE:  From the statute.

9           THE COURT:  Absolutely.  I didn't wait to ask

10   Cigna.  Maybe I'll listen if they have an objection, but

11   it has to be.  I can't refer to a section that isn't

12   there anymore, you know, about the language.

13          MR. HARE:  As an independent cause of action

14   only.

15          THE COURT:  I don't know what that means, sir.

16   I have one cause of action in Count Two.  That's one

17   cause of action.  I can't charge three causes of action.

18   I don't know.  You certainly didn't request me to charge

19   it.  Let me put it that way.

20          Let's start with fundamentals given I'm supposed

21   to be having this charge finalized by 12:30.  Okay.  I

22   have no request to charge from the Labs to alter Count

23   Two.  Nor have I ever had a request to charge to reflect

24   what you are now arguing.

25          Can we agree that that's a correct statement?  I

1    have not overlooked either a formal request to charge

2    docketed or 10:00 at night email from Attorney Gestrich

3    saying please add this language.  I have a couple of

4    those that I need to get docketed from Cigna.  But I

5    don't believe I ever got one like that from the Labs

6    relating to Count Two.  If I'm mistaken, you need to tell

7    me, sir.  We will go get it and I will look at it and

8    we'll discuss it.  And if I think it should be added I

9    will add it.  But I can't add something you haven't

10   requested charged.

11           MR. HARE:  I fear I may be at a disconnect, Your

12   Honor.

13           THE COURT:  Very well.  And if it's a disconnect

14   with me, you shouldn't assume it's your fault.  But I

15   don't understand what you want me to do.

16           Go ahead.  You try one more time.

17           MR. HARE:  I'm looking at the charge draft as of

18   yesterday at 4 p.m.

19           THE COURT:  I don't have my charge, if you can

20   believe it, here.  Go ahead, sir.

21           MR. HARE:  Count One is Statutory Cause of

22   Action Direct Payment.  That's the count I'm speaking to.

23           A separate independent cause of action under the

24   statute specifically.  Count Two, of course, is our third

25   party beneficiary count.  And we seek no further

1   alteration with respect to the charge or the elements

2   under Count Two which is a third party beneficiary cause

3   of action.

4           MR. GESTRICH:  Your Honor, only because I was

5   there whenever you and I had that exchange about that

6   section with that language.  The reference to the

7   statutes we believe should be in that Count Two.

8           THE COURT:  If you're listening, I have said

9   that twice.  I have done it already.

10          MR. GESTRICH:  We agree with you, Your Honor.

11  We agree with you.  We're not asking for the Court to

12  refer to Count One.  If that was conveyed or seemed to be

13  conveyed, we're not asking that.

14          THE COURT:  I didn't ask the question are you

15  asking the Court refer to Count One and Count Two.  Count

16  One won't exist when I'm giving this charge.  I asked if

17  you want me to alter the current charge of Count Two

18  other than in two respects.  To cut and pasta the

19  statutory language into the Count Two charge, and to make

20  necessary, I'll call it housekeeping edits, to reflect

21  that there's one cause of action.  There's one count.  I

22  don't know.  There's a lot of ways of picky edits that

23  you have to pick up and I'm sure I haven't caught them

24  all.  But those kind.  Anything beyond that?

25          MR. GESTRICH:  No.

1           THE COURT:  Can I hear from Cigna?  Does that

2    make you feel better, or do you want me now to ask them

3    what they're going to argue?

4           MS. KINGSBERY:  I'm still trying to get clarity

5    on my question is whether the Labs are proceeding on

6    their third party beneficiary claim based on a violation

7    of the statutes.  I think what I heard is no.  If there's

8    no changes to the jury instructions.  The statutes are

9    incorporated into the policies, but there is no

10   instruction on how the jury would find that Cigna

11   violated either one of the statutes.  We went through

12   great detail pages of how to establish a violation of

13   both of those statutes.  But I understand those will be

14   removed from the jury instructions such that Count Two

15   will be based on just a potential violation of coverage

16   provisions and not the statutes themselves.

17          THE COURT:  Right.  Prompt pay or direct pay

18   is -- I don't know so much about prompt pay.  More so

19   really -- I'm sorry.  I don't know so much about direct

20   pay because that's an element really of third party.

21   That the Labs are entitled to receive payment, I think.

22   Right?  It's really -- or my question really is -- and

23   they are not asking me to change the charge.  My question

24   is just are they going to argue to the jury, okay, Count

25   Two is just old-fashion breach of contract, right.

 1   There's just, you know, two different things.  One is

 2   we're here as the person who did the work, but we have a

 3   right to get there because the statute tells us we have a

 4   right to as the Judge tells you.  Okay?

 5           The second thing is, when you have a breach of

 6   contract, the jury has to figure out -- I'm not telling

 7   you the law.  I'm just making an argument.  What I'd say

 8   to the jury.  This wouldn't be my closing, but something

 9   like this.  You look to see if Cigna, whom we claim broke

10   their promises to us, who was really standing here as a

11   patient saying pay my bill, right.  So you need to look

12   at how did Cigna break their promise or promises.  And

13   I'm going to tell you how they broke it.  Now, they can

14   list eight breaches, they can list one in their argument.

15   I mean, it's stupid if they don't have evidence to

16   support the eight, but I don't think I can stop them from

17   arguing those.  But they have the charge.  The charge

18   doesn't say it's limited to one ground or anything.  I

19   don't think that's in the Count Two charge.  Their theory

20   is the breaches.  I don't know.  The theory is the

21   breaches they didn't get paid.  Well, I don't know.  I

22   don't know.  I'll see.  Maybe I'm way off base with what

23   I think they're saying they're going to do without saying

24   it.

25           MS. KINGSBERY:  No, I think that's right, Your

1    Honor.

2              THE COURT:  What's wrong with that?

3              MS. KINGSBERY:  If the violation is of the

4    Prompt Payment Act, there's no explanation in the jury

5    instructions as to what the elements of that statute is,

6    how many days.

7              THE COURT:  Therefore, I asked a series of

8    questions they're not asking me to charge.  So I guess,

9    Attorney Kang, you can pass on the word that he might

10   want to point that out.  But I don't know.

11             MS. KINGSBERY:  Understood.

12             THE COURT:  Once I gave her a chance to respond

13   about the charge, or the lack of adding to the charge, I

14   wanted to ask you, how is this closing argument

15   proceeding?  Am I wrong?  And if I'm not wrong, they have

16   no guidance on the Prompt Pay Act.  If you are going to

17   argue that.  If you're not going to argue it, it's fine.

18   And it could be said that it's in there, both sections,

19   because it helps or tends to support your third party

20   status.  Right?

21             MR. HARE:  The current draft at charge number

22   35, element two of the third party beneficiary claim, the

23   Court specifically incorporates and reminds the jury with

24   respect to the instructions that are otherwise currently

25   at 25 and 30 with respect to the statutory language that

```
 1   is read into the contract.

 2           THE COURT:  Correct.

 3           MR. HARE:  So contrary to Ms. Kingsbery's

 4   argument, we aren't bringing a breach of contract claim.

 5   What the contract says includes by law --

 6           THE COURT:  I understand that.  That's what I

 7   just said to her.

 8           MR. HARE:  I didn't want to waive because you

 9   talked about --

10           THE COURT:  No, you're not waiving.  Her

11   question really was my question, although I wasn't as

12   specific by that point until we got more specific.

13           Okay.  So you have this prompt pay language.  I

14   don't believe the statute -- give me a minute.  I'm on

15   the old charge by the way.  Hopefully, shortly, we're in

16   the midst of editing it.  I hope my assistant arrived and

17   we'll get it done.

18           Well, I don't know, it could be argued the

19   language of the Prompt Pay Act is pretty plain, you know.

20   You know, the elements are the Labs submitted a claim and

21   Cigna didn't pay it or deny it.  Right?  I'm not sure you

22   need much instruction on that.  So those words are in the

23   statute.  So they can argue as to their breach theories.

24   They didn't pay me.  If that's what they want to argue.

25   And I don't know.  We could have a special interrogatory
```

1    that asked, you know, after the first question or in the

2    first question we could put some sense of what was the

3    basis, if I'm ever told what their bases are.  So we

4    would have a better way to address this post-trial and

5    then on appeal.  We could do that.  But we have to do

6    this pretty quickly.  So my meandering, because I'm not

7    getting this resolved, it's not good.  I keep asking do

8    they want to change the request to charge.

9             Now I'm going to ask do you want to change the

10   Verdict Form?  I guess first I have to know -- and I'm

11   sorry, I guess we could go into an ex-parte status, but I

12   need to know what theories of breach you're going to go

13   argue to the jury.  When you go to the point of your

14   closing, ladies and gentlemen, these people did us wrong.

15   They broke their promises, right?  Let me tell you how.

16   And I will go over the evidence so you will understand

17   how clear it is they broke those promises.  Usually at

18   that point the lawyer says first, you know.  I don't

19   know.  One.  Then now they did this, if you can believe

20   it.  Let me show you that evidence.  I didn't prepare a

21   closing argument like Attorney Hare who is going to do

22   it.  Somewhere in the closing you have to tell the jury,

23   it seems to me, you have to persuade them that element,

24   they broke their promise.  I want to know how you are

25   going to argue they broke the promise.

1          MR. HARE:  We're going to argue that there are

2     contracts that provide payment for covered services.  The

3     claims were submitted that are covered services

4     warranting payment.  That by virtue of the statutory

5     requirements in Florida, we are third party beneficiaries

6     with respect to those contracts.  We have standing to

7     bring a claim and those are the claims we brought.  And

8     that it was a breach on the part of Cigna to withhold or

9     deny payment of those claims to us.  It's a contract

10    claim.

11         THE COURT:  You're never going to mention the

12    120 days?  I'm concerned, because there's a defense that

13    doesn't apply that, right?

14         The charge isn't the perfect mirror on the

15    Prompt Payment Act to either Count One, original Count

16    One, part one, or to Count Two.  Which is the affirmative

17    defense that doesn't go to that?  Failure to mitigate.

18    Because you don't have to mitigate.  If they didn't pay,

19    they didn't pay.  There's nothing to mitigate.  I haven't

20    charged mitigation as a defense to prompt pay.

21         You just want to in the purposes of simplicity

22    just forget about that issue?  I mean, I'm not charging

23    it.

24         (Discussion Off the Record.)

25         MR. HARE:  Your Honor, I might have been unclear

1   before.  I would like to make this specific point.

2          THE COURT:  That would be great.

3          MR. HARE:  The current draft, with respect to

4   the third party beneficiary claim, expressly incorporates

5   and references the prior instructions 25 and 30, which

6   are the statutory language instructions.  Yes, the Labs

7   seek those instructions.  Those instructions would be set

8   out at length in the instructions as to third party

9   beneficiary, because by foregoing Count One, the

10  independent statutory claim, the Court would not have

11  read those instructions in that section of the charge.

12         THE COURT:  You have now changed your position,

13  sir -- what time is it?  It's 9:07.  At 8:55, you told me

14  you sought no further alterations to the Count Two

15  charge.  I had at that point told you I was taking the

16  language from the charge on Prompt Pay statute and pasted

17  it in place of the back reference to the pages or to the

18  sections of the charge where that language -- where the

19  back references would be replaced with the actual

20  language.  Because there would be no section to go back

21  to that had the language.  I never, I don't believe, said

22  I was taking the whole Prompt Pay charge and dropping

23  into the Count Two charge.  That I asked you point blank.

24  If that's what you are now asking me, I just want to be

25  certain that's what you're asking me.  So when I look at

1    the old charge 25 -- we're not worried about direct

2    payment, am I correct?  Is the language of the statute of

3    direct payment enough to add to the charge, or do you

4    want the whole direct payment charge in there, all the

5    elements, all the charge?

6              MR. HARE:  The language of the statute.

7              THE COURT:  That's what I have in there now.

8              Now let's talk about prompt pay.  What do you

9    want as to prompt pay?  Remember I kept asking you what

10   are your requests to charge?

11             Now, to preserve your issues for appeal, a party

12   normally, I believe, is required to submit it in writing

13   to the Judge.  There's a real good reason for that.  I

14   have nothing in writing.  But I'm asking you, because I

15   don't understand what you want, what you want me to put

16   in the Count Two charge.  And I've asked now four times.

17             This is a problem I usually have with Cigna.  I

18   have had it throughout this entire case.  I have asked so

19   many questions.  I can't remember how many times I've

20   asked certain questions to Cigna.  I can't remember the

21   answer.  Because why?  I didn't get one.  I need your

22   answer, sir.

23             I want you to tell me in the version of

24   yesterday that had Count One in it, the last version,

25   what language are you saying I should put in Count Two?

1            MR. HARE:  Yes, Your Honor.  I will reference --

2            THE COURT:  I'm sorry, sir.  But it's a little

3    frustrating, but I will try to take a deep breathe.  I

4    want that question answered and I'm holding you to it.

5    So if you want to confer with Attorney Gestrich or

6    Attorney Cunningham, Attorney Christ, you do so.  But I

7    want an answer and you're bound by it.  Now, I know

8    technically at 12:29 you can stand up and say, Judge,

9    wait a minute, I really need this section of page section

10   25 or 30 from the old draft.  But you're not going to get

11   it at 12:26.

12           MR. HARE:  I will start with the current charge

13   30 which is Prompt Pay. That's where the Court --

14           THE COURT:  Yes, I'm looking at it.

15           MR. HARE:  We are asking the Court to include at

16   length in connection with the claim for third party

17   beneficiary breach, the language of the Prompt Pay

18   Statute which appears in the second paragraph of Count

19   30.  Sorry.  Instruction 30.

20           THE COURT:  The bullet that is part of the

21   second paragraph?

22           MR. HARE:  Yes.  And the preface, the statute

23   states because that contextualizes.

24           THE COURT:  Fine.  That's already in it, yet to

25   be typed.  I have decided to put it in.  I don't see any

1    basis to object.  I don't think there was an objection.

2          MR. HARE:  As to charge 25, I heard the Court

3    say a moment ago -- I don't know there's a remaining

4    issue there.  As to Charge 25, likewise, the Court

5    quotes, indent, within the second paragraph, it reads as

6    follows and then quotes from the statute.  Those are the

7    critical provisions to be read into the contract as a

8    matter of law that enable us to proceed.  That's what

9    we're asking the Court to include at length in its

10   instructions with respect to the third party beneficiary

11   claim.

12          THE COURT:  Anything else?

13          MR. HARE:  That's all, Your Honor.

14          THE COURT:  I have just one question to clarify.

15   Everything you said before I asked that little follow up

16   was perfectly clear to me until you got to the phrase "at

17   length."  I look at what I think you told me to cut and

18   paste and its not that long.  The two of them together

19   are less than a page.  So I want to be clear.  I will

20   tell you what I will cut and paste.  I am going to take

21   -- just a minute.  I will make this very clear.  What

22   page is the page where I agreed to see sections

23   previously like 25 and 30?

24          MR. HARE:  Yes, Your Honor.  That's current

25   Charge Number 35.  You reference the two prior charges.

1          THE COURT:  Bottom of 35, I say, "Those statutes

2    are a part of the insurance policies as a matter of law."

3    I will do a period after law.  I will then say, "The

4    direct payment provision reads as follows," colon, block

5    quote ending with the words "such services," end quote.

6    I will also then say, "The Prompt Pay Statute states,"

7    block quote, "after receiving written proof dot-dot-dot

8    to pay the claim period," end quote.

9          MR. HARE:  When I said "at length", I was not

10   saying these are lengthy.  I was saying as opposed to

11   incorporating by reference to prior instructions.

12         THE COURT:  That's what I wanted to clarify and

13   so now we know exactly the change that I did last night

14   at 10:00 when I said move this.

15         Is there any objection to that?

16         MS. KINGSBERY:  No, Your Honor.  We do not have

17   an objection to that.  I understand the statutes will be

18   quoted in full with respect to Element 2 of the third

19   party beneficiary claim.  The Labs will argue that

20   incorporation of that language is related to whether they

21   can satisfy the element of intent.

22         We are still unclear, though, whether the Labs

23   are going to argue that Cigna violated the Prompt Pay Act

24   or violated the Direct Payment Statute.

25         THE COURT:  As a basis for their breach, the

1    proof of what I call the breach in the --

2         MS. KINGSBERY:  The breach element of that cause

3    of action.  That's what we need clarity on.

4         THE COURT:  Could I have an answer to that

5    question so it is clear?

6         MR. HARE:  The breach is nonpayment.

7         THE COURT:  Correct.  Clearly, I'm not charging

8    them about the uncontestable aspects of the prompt pay,

9    but they will see that language in the statute.  So are

10   you going to argue about that?

11        MR. HARE:  We will not make that argument as an

12   independent basis, Your Honor.  The statutory language is

13   there.  There was no payment.  And we're here today.

14        THE COURT:  Okay.

15        MS. KINGSBERY:  I don't think that answered it.

16   He said --

17        THE COURT:  Do you feel my pain, Attorney

18   Kingsbery?

19        MS. KINGSBERY:  Excuse me?

20        THE COURT:  Now you feel my pain over the course

21   of -- when was the first pretrial to today?  You go

22   ahead. I'm sorry.

23        MS. KINGSBERY:  Yes, Your Honor.  I think I

24   heard the allegation is nonpayment, not untimely

25   response.  I'm just clarifying that their will be no

1    argument that Cigna violated the Prompt Pay Act or the

2    Direct Payment Statute.  Otherwise we need to prepare

3    that for closing.

4          MR. HARE:  She's out of the second pocket.

5    We're entitled to payment directly.  The statute gives us

6    that.  The policies are deemed to incorporate that.

7    We're here today seeking direct payment.

8          We will not make the argument, Your Honor, that

9    because 120 days ticked by, the guillotine falls and we

10   win.  We're going to win because we're entitled to

11   payment and we have never been paid, ten years later.

12         THE COURT:  And if the jury asks me a question,

13   which, of course, I will discuss with counsel before I

14   respond, should we address the issue or consider or some

15   other verb the issue of the statute when it says 120

16   days?  Or second question, when it says uncontestable.

17   How do we address that?  What do I tell them?

18         MR. HARE:  Disembodied from context, it seems to

19   me the Court would read the statute again to the jury.

20         THE COURT:  But it won't answer their question.

21   They already have the statute to read.  They are asking

22   "Judge, you told us to put this in the contract.  They

23   say they were harmed because they weren't paid.  Do we

24   look to see if it was more than 120 days and therefore,

25   you know, we apply this incontestable standard or do we

1   just look at all of these defenses and everything else

2   that Cigna is arguing to us and ignore the 120-day

3   incontestable factor?"

4           MR. HARE:  It's the latter, Your Honor, that

5   follows from --

6           THE COURT:  Okay.  As long -- I don't know the

7   question.  I never anticipate things correctly, but I'm

8   just thinking to myself if I were on this jury I would

9   have thq5 question.  But sounds like I'm going to be able

10  to answer something like, this cause of action is for

11  breach of a contract which the Labs have argued was

12  because Cigna did not pay their claims.   And they are

13  not arguing to you to in addition add on the fact that

14  they didn't do it in a certain time.  Something like

15  that. We can argue about the language, but I think that

16  would be -- they would leave this room and probably say

17  to themselves, Thank God.  We don't have to go through

18  when these claims were denied in the 700,000 line sheets.

19  We don't have to do that.  That's what they are going to

20  worry about.  I want to be sure that I think we're not

21  going to have a problem.  I can't do any better than that

22  for you, Cigna.   I think that's sufficient in my

23  opinion.  If I were on your side, I wouldn't argue it.

24  Now I guess Attorney Cunningham whose sitting here

25  looking a little tired gets up and says, "They didn't pay

1    in 120 days."  I don't know what I will do.  But he's not

2    going to do that he's been a real gentleman throughout

3    this trial.  Right, Mr. Cunningham?

4          MR. CUNNINGHAM:  And I have listened to

5    everything the Court said this morning.  I do not plan to

6    argue that.

7          THE COURT:  Alright.  And somebody on your team

8    needs to go somewhere in a closet and close the door and

9    read in out loud.  The cross-referencing seems like a

10   picky thing.  Cigna I think caught one.  I caught one

11   this morning.  Wasn't wrong, but it wasn't a good cross

12   reference.  But if I don't do those right then they will

13   struggle over.  "Wait a minute, what is she telling us to

14   do.  Why are we looking to see if we answered that

15   question?"  In other words it will lead to an overall

16   confusion as opposed to just that question.  Plus I don't

17   like them to come back and say, "Judge, you made a

18   mistake."  So really I think we need to take 15 minutes

19   to take a careful look.

20         If you don't mind, I would like to continue and

21   try to address some other issues that I have got.  All

22   right?

23         Can someone remind me where we are in closing

24   argument and now why I need to give you an hour and ten

25   minutes.  Please don't explode.  Seriously, it's a

1    different case, right?

2         So first tell me what the timing we agreed on or

3    maybe I didn't agree and I said I would get back to you.

4    Somebody tell me where we are.

5         MR. CUNNINGHAM:  Well, Your Honor, is there

6    anything you've seen during the trial that makes you

7    think that I would explode at something the Court said?

8    I won't do that.

9         Your Honor, obviously, I think the case has been

10   more streamlined.  The plan, as I understand it, was that

11   I do my main closing for 45 minutes.  Then Mr. Kang would

12   get to give his closing on the defense of our case

13   against Cigna.

14        THE COURT:  Do I know how long yet for Mr. Kang?

15   That's what -- I'm having trouble remembering it after

16   the 45.

17        MS. KINGSBERY:  I believe he said 15.

18        THE COURT:  15.  All right.

19        MR. CUNNINGHAM:  Wait.  15 minutes on defense?

20   His closing on defense on our claims?

21        THE COURT:  Yes.

22        MR. CUNNINGHAM:  Okay.  That's confusing, Your

23   Honor.

24        THE COURT:  No, that's all right.  He obviously

25   really wants his money back.

1          Go ahead.

2          MR. CUNNINGHAM:  And then 15 minutes for

3   rebuttal.

4          THE COURT:  So you're only giving him 10 for his

5   case.

6          MR. CUNNINGHAM:  I'm not giving him anything,

7   Your Honor.

8          THE COURT:  Well, let's finish that.  Cigna's

9   then -- and please write it down and tell me if he's

10  wrong.  But go ahead.  Then on Cigna's case.

11         MR. CUNNINGHAM:  On Cigna's case, my

12  understanding was that Mr. Kang reserved an hour.

13         THE COURT:  He can't reserve an hour.

14         MS. KINGSBERY:  No, I think it was 45 minutes.

15         THE COURT:  Yes, I thought it was 45.

16         MR. CUNNINGHAM:  Okay.  I'm sorry.

17         THE COURT:  And then the Labs, to rebut his

18  case, cigna's case.

19         MR. CUNNINGHAM:  I think we said 10 or 15

20  minutes, Your Honor.

21         THE COURT:  So you have 15, but -- no, I'm

22  sorry.  You have 10.  I'm sorry.  I only give you an

23  extra 10 minutes, right?

24         MR. CUNNINGHAM:  Now, Your Honor, let me ask you

25  this.  I know you've given us a block of time.  If I

1    finish my closing in our direct case against Cigna, I

2    don't think I'm going to take 45 minutes but you saw my

3    terrible forecast in my opening statement.

4         THE COURT:  I usually don't do that because it's

5    kind of not fair.

6         Let me make this rule clear.  You have to convey

7    this.  I think Attorney Kang would know it.  But if you

8    tell me 45, and I will give you a warning, if you want.

9    That's a long period.  So maybe three minutes before.

10   And you will just keep going and then you're going to sit

11   down.  If you keep going, okay, you have time in the pot.

12   Now I might say, Attorney Cunningham, you are at the time

13   you estimated.  Are you okay?  If you want to keep going

14   you can say, no, judge, thank you, and just keep talking.

15        MR. CUNNINGHAM:  That will be taking off my

16   rebuttal time I suppose.

17        THE COURT:  That's correct.  So if you don't

18   think you're going to be 45, my suggestion, and Attorney

19   Kang can do the same, you ask me for 40.  Okay.  If

20   you're a bad estimator, I mean, you might get two

21   interruptions from me.  They'll be nice and gentle.  But

22   if you tell me, no, I'm fine, Judge, that means I know

23   I'm eating into my rebuttal.  And you might end up taking

24   the 45, but then you only have 10 on rebuttal.  But if

25   you stop at 40, I will let you save the five.  Now I have

1    this big basket.  And they didn't know how big that

2    basket was.  How much I can hammer on the last word on my

3    case.  That's where I think it's unfair.

4              MR. CUNNINGHAM:  That's fine.

5              THE COURT:  So what you do you want to reserve?

6              MR. CUNNINGHAM:  I want to stay at 45, Your

7    Honor, just to be safe.

8              THE COURT:  Then you have the 15 and 10.

9              MR. CUNNINGHAM:  Yes, ma'am.  And I think 15

10   should be plenty for rebuttal.

11             THE COURT:  That's fine.  I do too.  I do too.

12             MR. CUNNINGHAM:  I don't anticipate a problem,

13   Your Honor.

14             THE COURT:  Okay.  It's really the rebuttal to

15   his case is going to be 10.

16             MR. CUNNINGHAM:  Yes, Your Honor.

17             THE COURT:  The defense of his case.  And your

18   last word to the jury is 10.  I thought that's what you

19   were worried about, but that's not my problem.

20             How about on Attorney Kang.  What's your

21   rebuttal of your case?

22             MS. KINGSBERY:  10, Your Honor.  So 45 and 10.

23             THE COURT:  So you're doing basically the same.

24             Next question.  Anybody want any warning?

25             MS. COSTIN:  You want a warning.  How much does

```
 1   he want, two minutes?
 2            MS. COSTIN:  Sure.
 3            THE COURT:  Okay.  On each, all three.  2, 2.
 4   And, again, the floor isn't going to open when the alarm
 5   goes off at 15 minutes.  But if I roll into 16 -- if it's
 6   16 and it doesn't sound like you're anywhere close, I'm
 7   going to say something.  You need to be done.  And that's
 8   not an invitation to take two, three more minute to wrap
 9   up.  Again, I think it's a fairness thing.
10            MR. CUNNINGHAM:  Your Honor, I would like a
11   three minute warning on each of my three different
12   arguments, please.
13            THE COURT:  Okay.  And I won't tell you that
14   it's three.  And I won't tell Attorney Kang it's 2.  I'm
15   just going to say you wanted to know.
16            MS. COSTIN:  Just do three for us as well.  It
17   will make it easier.
18            THE COURT:  That wouldn't be because I've been
19   challenged on the break times, would it?
20            All right. That was that issue.
21            We have a problem on the -- not a problem, but
22   the Boorstein.  I'm going to be telling the jury a whole
23   lot of things.  Not a whole lot.  It will take me five,
24   ten minutes.  One of things is, of course, like I did
25   yesterday, what the testimony was offered by Cigna for.
```

1    It's unfortunate I didn't do it right away.  Same thing

2    with Boorstein.  But I need to know.  There seems to be a

3    disagreement on Boorstein.

4          MR. GESTRICH:  Your Honor, we spoke about this

5    yesterday.

6          THE COURT:  Yeah, I know that.

7          MR. GESTRICH:  Yes, Your Honor.

8          At the time we listed him as a witness, there

9    were still a question as to whether *Mario* would apply or

10   not.  And, also, he was listed as -- he was a rebuttal to

11   Dr. Clark in the entirety of Dr. Clark's testimony.

12         Since that time, the Court has ruled on *Mario*.

13   And we did not present Dr. Boorstein in our

14   case-in-chief, because at that time Dr. Clark did not

15   testify.  He was being offered after she testified.  And

16   so it was as a matter of sequence, not as a matter of

17   which case is he testifying in.  He was disclosed in both

18   cases, as was Dr. Clark.

19         THE COURT:  If your view of the world, what do I

20   tell the jury Dr. Boorstein's testimony is offered in?

21   In support of the Labs case or in opposition to the Cigna

22   case?

23         MR. GESTRICH:  Both.

24         THE COURT:  Is there any way to separate by

25   topic of his testimony?

1          MR. GESTRICH:  No.  He discussed medical

2    necessity and it's applicable to both the paid claim and

3    unpaid.

4          THE COURT:  Could I hear from Cigna on this

5    issue.

6          MS. COSTIN:  Yes, Your Honor.

7          In the Labs' witness disclosure, which is docket

8    404, the Labs disclosed Ms. Thelian and Mr. Haney as

9    expert witnesses in both their case-in-chief and their

10   defense.  Dr. Boorstein was only disclosed as a defense

11   witness, despite the fact that they knew Dr. Clark would

12   be presented in both cases.

13         Our position is that Dr. Boorstein was only

14   presented by the Lab in the defense of Cigna's case.

15         THE COURT:  That would be a really good argument

16   I think if it weren't for the fact that you offered Dr.

17   Clark in defense to the Labs' case as well as in support

18   of your case.  And as Attorney Gestrich points out, they

19   wouldn't call an expert to rebut your expert until your

20   expert testified.  So I think his timing argument is

21   actually something I didn't think of yesterday.  He

22   didn't either.  But now we know it.  And I think it makes

23   sense.

24         Let's say -- I'm going to tell them both.  I'm

25   sorry.  That argument at this stage of the case, somehow

1  my brain is functioning in a way that that argument was

2  persuasive.

3          All right.  The 30(b)(6) admissions, have they

4  been prepared and marked as exhibits and added to your

5  list?

6          MR. HARE:  Yes, Your Honor.

7          Those were created as a separate stand alone PDF

8  appropriately redacted and provided in numbered format to

9  the Court.

10          THE COURT:  Okay.  So the documents are also in

11  the system as well as the list reflects it.

12          MR. HARE:  The transcript is in the system.  Is

13  that what the Court's referencing?

14          THE COURT:  No.  Why would you do that?  No, no.

15  That isn't what I meant.  I'm sorry.  Like when you were

16  going to do interrogatories, I think we talked about

17  making them into an exhibit.  In other words, what you

18  read from.

19          MR. HARE:  Your Honor, what I read from was the

20  30(b)(6) deposition --

21          THE COURT:  Oh, I thought you meant the

22  transcript when she took a transcript.  I apologize.

23          I see.  The admissions are in the form of his

24  answers to questions.

25          MR. HARE:  Read from the transcript from

1    February --

2            THE COURT:  That is correct.  Has that been

3    given to Cigna?  Have they seen it, that you've prepared

4    it correctly?  They need to see that and have an

5    opportunity to tell me, no, Judge.

6            MR. HARE:  Mr. Christ says it has been.  We'll

7    double-check that, Your Honor.

8            THE COURT:  Cigna needs to let me know if

9    there's any objection.  Thank you.

10           As far as the exhibits and this JERS system, I

11   think I told you this a while ago.  I would say by this

12   afternoon, because I'm going to need it first thing in

13   the morning.  And I need to give Liana time to look at it

14   and the other side to look at it.  So I think it has to

15   be say by 5:00.

16           You need to take your exhibit list and delete

17   any IDs, any document not in evidence.  You will then

18   have a list of exhibits that are in evidence.  You will

19   have a brief non-argumentative description of that

20   document.  And you will print it and provide Liana with

21   one copy to be marked as a Court Exhibit.  And I think we

22   want another copy to go to the jury.  This is now both

23   exhibits and the Court Exhibit List.  Both exhibit lists

24   and the Court Exhibit.

25           Liana, you are responsible, I would think, for

1    doing the Court Exhibit List.  Okay.  If you have

2    questions, tell me.

3         These are the only paper the jury will have in

4    the room unless they make further requests.  That needs

5    to be prepared in time to give the other side an

6    opportunity to make sure, yeah, this is the ones in

7    evidence that we've agreed with with Liana and the Court,

8    et cetera.  And they are accurately or fairly described.

9    There's not any edits that's been made to the description

10   to load it up.  And she needs to know that, I would think

11   by 8:30 tomorrow morning.  So email is fine.  Just be

12   sure you attach the list that you're saying you have no

13   objection to.

14        Liana, I guess you have to get your list and

15   send that to them by 5:00 today.  If you want, I can go

16   over it with you.

17        A lot of our Court Exhibit Lists are not in

18   evidence, I think.  But have they been reviewing the

19   Court Exhibit List, too, to be sure they agree on what's

20   evidence?

21        THE CLERK:  They have not.  And I believe that

22   there's some deposition videos we did not label as Court

23   Exhibits.

24        THE COURT:  Okay.  That's a housekeeping detail.

25   She said she doesn't think she's got every deposition

1      video labeled as a court exhibit which would be for ID.

2            Just so the record's clear, they were marked

3      Court Exhibits because I think -- that's not true.  I

4      take that back.  They should be the parties' exhibit

5      unless there's a deposition that you all can't agree who

6      was offering it.  But as I understood it, every one of

7      those charts that I did rulings on starts with a party's

8      designation, followed by objections, and followed by

9      counter-designation.  So to me that tells me it's the

10     person first designated who is calling the witness.  So

11     it really should be marked as ID on that party's list.

12     And then Liana should have the physical -- I don't know

13     what you're putting it on.  With are those things called?

14     A USB thumb drive.  Thumb drive is what I was looking

15     for.  Okay.  If there's any question, ask Liana.  And if

16     she doesn't understand it, I'll clarify it.

17           Now, I ordered that you have your list updated

18     to the end of yesterday in Liana's hands yesterday.  She

19     tells me -- I think she told me she got them.  They

20     should have been exchanged and everybody should have

21     looked at not only their own list.  Well, I take that

22     back.

23           Liana, did you have a chance to look at the

24     list?

25           THE CLERK:  I provided the list to the parties.

1          THE COURT:  Correct.  So they need to tell us

2     what ones they don't agree.  In other words, if you think

3     an exhibit should be in evidence, now is the time to tell

4     Liana.

5          Do you folks have a written -- could you

6     handwrite on a piece of paper the ones you don't agree

7     with her on?  And so, for example, during closing, if

8     it's not too disruptive to the jury or the lawyers, she

9     could be checking the list.  And I could give her my

10    list, if I have a checkmark, but I have not been exact in

11    always catching them.  I'm usually dealing with another

12    issue that's been brought up.  But at least she might

13    make some headway.  Then what she has to do is go to

14    Terri and search the record to see if that number was

15    admitted or used or whatever.

16         So that has to be done today, Liana.  So if they

17    can give you the list of the ones they think are missing

18    or mistakenly marked as evidence, then this morning you

19    could be doing it because you're not distracting me when

20    you work.  Is that possible?  Can somebody on one of the

21    teams make that?  It can be handwritten, you know, Labs

22    Exhibit 5010, 6082, 6175, whatever they are, so she can

23    start checking them.

24         MR. CHRIST:  Yes, Your Honor.  I'm actually

25    doing that right now.

1            THE COURT:  Thank you.  I am going to tell the

2    jury -- sorry, I've obviously overlooked something.

3            I need someone from the Labs to stand up and put

4    on the record the following:

5            We are dismissing or we move to dismiss, I

6    guess, Count One, including both causes of action on

7    behalf of, fill in the Lab's name, and say it three

8    times, I'd appreciate it.

9            MR. HARE:  Thank you, Your Honor.

10           Scott Hare.  I represent the Labs.

11           The Court did comment earlier that it would want

12    to see this in writing.  I had anticipated filing --

13           THE COURT:  I think the record will do it.  But

14    I will see what Cigna thinks.  Go ahead, sir.

15           MR. HARE:  A Rule 41 Stipulation of Dismissal

16    with respect only to what is currently the independent

17    count in the Labs' amended complaint for relief under the

18    statute.  In other words, our statutory claim.

19           We are dismissing the statutory claim as an

20    independent cause of action.  As the colloquy earlier I

21    hope made clear, the statute still forms a part by law of

22    the contract claim as third party beneficiary, but the

23    separate cause of action under the statutes directly we

24    are withdrawing.

25           THE COURT:  Okay.  Could you do what I asked you

1    to do?  What I would like you to say is whatever device

2    you are using, stipulation under Rule 41, Motion to

3    Dismiss, you know, is it with prejudice or without.  And

4    I would like to hear you say as to each of the three

5    plaintiffs are doing this.  I know we all use the phrase

6    the Labs, but if you were putting it in a motion I think

7    it would be more correct to say Epic Reference Labs,

8    Incorporated moves or stipulates, if that's what you

9    think they're going to say, they will stipulate to the

10   dismissal, withdrawal, with, without prejudice.  There's

11   little details here.

12          MR. HARE:  Fair enough, your Honor.  And I was

13   clumsy before.

14          Oh behalf of all three labs, BioHealth, PB

15   Laboratories, and Epic Reference Labs, the Labs each and

16   collectively move to dismiss with prejudice their

17   independent statutory.

18          THE COURT:  Which is Count One of the current

19   amended complaint, is that correct?

20          MR. HARE:  Yes, Your Honor.

21          THE COURT:  And that count includes two causes

22   of action under the statutes; is that correct?

23          MR. HARE:  Yes, Your Honor.

24          THE COURT:  I believe that was a motion.  So

25   because of the timing, you get to object.

1          Does Cigna object to the motion?

2          MS. KINGSBERY:  We do not.

3          THE COURT:  Absent objection, the Court grants

4  the motion of three Lab plaintiffs as to Count One,

5  Motion to Dismiss with prejudice.

6          MR. HARE:  Thank you, Your Honor.

7          THE COURT:  Now another thing I need to say to

8  the jury is about Mr. Goldfarb and this is roughly what

9  I'm going to say.

10          There's been a lot of testimony in the trial

11  about fee forgiveness.  I will instruct you about that in

12  my instructions, but I want to point to some testimony

13  from a witness, Mr. Goldfarb, who testified on Friday.

14  And his testimony, among other things, did concern fee

15  forgiveness.  During his testimony you were shown

16  language from a policy, insurance policy document on the

17  screen, and Mr. Goldfarb then testified about the

18  language that was up on the screen and how it had the

19  effect of excluding coverage when a provider engaged in

20  fee forgiveness.  First of all, the testimony is really

21  testimony about a legal conclusion, which I think I have

22  told you and I will tell you again that you should

23  disregard testimony about the law.  And I so instruct you

24  as to this portion of Mr. Goldfarb's testimony.

25          And the other thing I want to mention is that

1    his testimony was about fee forgiveness in contracts of

2    insurance at issue in the case.  And I instruct you that

3    the language of the policies -- fee forgiveness is not at

4    issue as it is found in the contracts of insurance.  It

5    will only be argued as a basis for Cigna's claim in

6    connection with proof of the element which I'll tell you

7    about in a minute which is that it was unfair for the

8    Labs, as Cigna argues, to engage in fee forgiveness.

9             Is there objection to that?

10            MS. KINGSBERY:  No objection.

11            THE COURT:  Any objection by the Labs?

12            MR. HARE:  No objection, Your Honor.

13            (Discussion Off the Record.)

14            THE COURT:  All right.  The next thing is -- I

15   didn't get a chance to look at this.  Let me take

16   something else.  Let me do demonstratives because that's

17   something that has to be addressed.

18            I did not get a chance to look at the

19   demonstratives which is apparently a lengthy PowerPoint

20   offered by -- disclosed by Cigna, apparently, that they

21   intend to use during closing.

22            I guess I need to ask is what was sent to my law

23   clerk I guess last night, or when did we get that,

24   wherever it was sent.  But I would like to know when.

25            THE CLERK:  3 a.m.

1          THE COURT:  Last night 3:00 a.m.

2          (Discussion Off the Record.)

3          THE COURT:  Apparently, we got it at 3 a.m. and

4     I'm happy to report I wasn't here.  However, I believe it

5     was represented that the Labs received it 48 before the

6     use.

7          Can you confirm that for me, please.

8          MR. CUNNINGHAM:  Your Honor, frankly, I had not

9     seen that whenever it was emailed.  I saw whatever time

10    it was.  I didn't see it at 3:00                 a.m. I can

11    tell you that much.

12         THE COURT:  Did anybody on the team focus on it?

13    Do you have any objection?

14         MR. CUNNINGHAM:  Well, Your Honor, I need to

15    look at it more closely.  But I would just say that

16    Mr. Kang and I joking yesterday about I said, well, I

17    guess neither one of us are using demonstratives in

18    closing because I remember the Court had said the other

19    day that we had 24 hours to do it and I think there was

20    like an 11 a.m. deadline and neither one of us did that.

21    Neither one of us submitted anything.  Now, I guess

22    they're saying they had submitted this earlier.

23         If I may, Your Honor, may I take a brief look?

24         THE COURT:  Sure.  I would ask if Cigna could

25    forward it.  I guess, Alex, could you forward that email

1    on to me so I will have it up and if there's any issue I

2    can address it.

3            MS. COSTIN:  Your Honor, I was just going to say

4    we provided it to the Labs with 48 hours notice to their

5    entire team.

6            THE COURT:  The entire team.  Okay.

7            MR. CUNNINGHAM:  Your Honor, if I may have a few

8    moments to look at it, I can probably give you an answer

9    in a moment.

10           THE COURT:  Yes, that's fine.  That's what I

11   said, you could.  I'm sorry if I wasn't clear.

12           MR. HARE:  Your Honor, may I just note the

13   following for the record?

14           THE COURT:  Sure.

15           MR. HARE: We had understood that the Court

16   instructed that any proposed demonstratives be exchanged

17   by, I think it was 11:00 a.m. on Monday.  In any event,

18   48 hours prior to closing.

19           We did get an email Monday afternoon from

20   Ms. Jackson at 2:07 p.m.  And I don't want to sound like

21   I'm standing on plus or minus 120 minutes.  Given the

22   late disclosure, given Mr. Cunningham's discussion with

23   Mr. Kang yesterday, we're seeing at 3:24 a.m. that Cigna

24   is still intending to use demonstratives.

25           If the Court's prepared to entertain that,

1    notwithstanding the marginally late disclosure, and I

2    won't argue that it was more than that, may we have until

3    later this morning?  Mr. Cunningham in his zeal has

4    suggested we'll look at quickly.  I feel like prudence

5    dictates that we spend a little more time than just a

6    minute or two while the Court is waiting to hear from us.

7            MR. CUNNINGHAM:  I'm sorry, Your Honor.  The

8    last point I wanted to make on this, Your Honor, is --

9    and I'm representing it to as an officer of the Court,

10   that I had this discussion, like I said, I was kind of

11   joking with Mr. Kang yesterday I think it was, I said,

12   well, I guess neither one of us are using demonstratives

13   in closing.  Had I known the Court was going to allow

14   late disclosure of demonstratives, you know, maybe we

15   could have done something as well.  I thought, based on

16   the fact that neither one of us disclosed demonstratives

17   by 11 a.m. on Monday, and the Court was very adamant

18   about that, I thought we were just going to use exhibits

19   that were in evidence in the case in closing.  So I have

20   not prepared any demonstratives because, frankly, I

21   thought they were late.

22           THE COURT:  Is this your objection or do you

23   want me to wait until I allow the time that was requested

24   and you make all your objections?

25           MR. CUNNINGHAM:  Your Honor, just looking

1    through what they have here, I do have an objection.

2    There's a lot here.

3            THE COURT:  Okay.  Then I suggest you confer or

4    look at it more carefully.  We'll try to take a break

5    soon.  I don't have much more on my list.  But knowing

6    you folks, there might be some more you have.  So we'll

7    need to discuss that.  And I think probably one of you

8    has to warn Attorney Kang, wherever he's hiding out, that

9    this issue has come up.  And either he might want to be

10   here for the argument or he should just be forewarned.

11   I'm not saying I'm not going to let him use them.  But I

12   think psychologically, mentally, he might want to be

13   prepared for that possibility.

14           MS. COSTIN:  I understand, Your Honor.

15           Our understanding on Monday morning's argument,

16   we raised this issue and we were instructed to exchange

17   demonstratives at lunchtime on Monday, which was still

18   two o'clock on Monday.  We exchanged them with their

19   team.

20           THE COURT:  Actually, it's 2:06.  So if you're

21   going to quibble --

22           MS. COSTIN:  We did not hear anything back until

23   now.

24           THE COURT:  I understand you didn't hear back.

25   I'm puzzled, though not surprised, unless Attorney

1    Cunningham actually said to Attorney Kang, you did not

2    prepare and forward to me demonstratives; is that

3    correct?  Even then I'm not sure.  I'm not saying you had

4    to say that, sir.  Please don't misunderstand me.  But

5    I'm not surprised that Attorney Kang did not say, in

6    response to his joking remark, well, wait a minute.  We

7    sent you some.  Didn't you see them?  But we'll see about

8    that.

9         There's an issue I raised yesterday about the

10   effective date of the billing change.  I can't even

11   remember which billing change.  But you each sent me

12   something last night.  And I am -- actually, this goes to

13   an issue I've raised, but I don't know that I ever got an

14   answer.  The difference between the code edit policy and

15   the claims reimbursement policy.

16        But Attorney Kang actually -- this is one of my

17   favorite documents.  I've been carrying it with me to

18   discuss at the charge for awhile and somehow I never seem

19   to get around to it.  But it's very clear about the 80,

20   you know, 1 codes.  And it says at the back it was

21   notified in November of '14.  But it says the

22   effective -- the formal effective date is February 16 of

23   2015.  That was document 244-27 at pages 4 and 5 from the

24   summary judgment.

25        You, in turn, gave me what is in evidence

1    correctly, Attorney Kingsbury, J159 which talks about a

2    code edit policy, effective date August 19, 2013.  Is

3    that the date we have in the charge, August of 2013?

4              THE CLERK:  Correct.

5              THE COURT:  So I think there was a question

6    about whether that is the correct date.  And Attorney

7    Gestrich has come forward with this document which I've

8    looked at it and thought about over the course of the

9    trial but never raised, which has a much later effective

10   date.  I mean, this one talks about deleting 80101, which

11   certainly makes sense.  You don't want anybody billing

12   under that, get it out of there.

13             I don't know what the difference is between a

14   reimbursement and the code edit policy.  I think the

15   documents that were given to me and that are in evidence,

16   including the email at the Labs, you know, they got a

17   message about it.  But I don't know in a contractual

18   effective, you know, read this, these policies into a

19   contract sense that's -- they on notice.  So if notice,

20   state of mind, anything like that was an element of the

21   case.  But as far as an effective date of a policy, I

22   guess, I'm asking Cigna why is your 2013 date correct and

23   not the January 2015 date?

24             MS. KINGSBERY:  I believe the January date is a

25   different update to the policy.

1          THE COURT:  Well, what it says at the back of

2    that page, I don't know if you pulled it up, but it

3    indicates the original notification of the omnibus

4    reimbursement policy.  It removed reimbursement policy

5    statements from the code edit policy and guidelines which

6    are now included in the omnibus reimbursement policy.

7    That was in November '14.  But then it very clearly says

8    effective February 2015.

9          Now, I don't know -- it's a notification.  It

10   tell's you that it removed reimbursement policy

11   statements from the code edit policy.  I don't know

12   whether a change, therefore, was made to this section on

13   page 4, Qualitative Drug Testing, in the 2015 effective

14   date one, or whether the language that is referenced in

15   this letter in 2013 and has this code edit policy

16   language where it says you can't bill this way, was that

17   edited again or was it, I guess, it was there originally.

18   I just don't know.  I mean there are conflicting dates.

19          Obviously Cigna decided to bring this code

20   editing policy into their omnibus -- what do they call it

21   -- reimbursement, I guess, policy, I think it is called.

22   Remember I had the question, what's the difference?  Now

23   I understand they had two different policies about what

24   would be paid and I suppose how to code it.  In the how

25   to code it, they would tell you what would be paid as

2179

1   well.  It is not until January of '15 then the how to

2   code it goes into what's reimbursable.  I could be dead

3   wrong.  Could be nice to have someone who could explain

4   this to me, unless maybe you can.  That's my

5   understanding.  If I'm wrong, I'm sorry.  But that's all

6   I can draw from the document so I'm not sure whether the

7   date we have is right or not.  Anybody want to help me on

8   this one?  Or are you going to just say, "Judge" -- when

9   you go to the circuit you will say, "Yeah Judge, the

10  transcript is silent.  Neither of us spoke which means

11  whatever the Judge did was fine."  That would be a good

12  one.

13          MR. GESTRICH:  For the record, I'm now standing.

14  Thank you, Your Honor.  Looking to the letter informing

15  -- purporting to inform the Labs of the change, you will

16  notice at the bottom it has a Labs' number on it, not a

17  Cigna number.  This was not produced to the Labs by Cigna

18  during discovery.  This is a Labs' document we had in our

19  possession.

20          THE COURT:  All of them are.

21          MR. GESTRICH:  Looking at that letter, the third

22  paragraph up from the bottom from the signature line, it

23  says "To view these changes."

24          THE COURT:  Yes.

25          MR. GESTRICH:  "To view these changes in our

1    updated code edit policy and guidelines, please login"

2    and then it gives a website and explains where to find

3    this.  This document was not produced to us.  This was

4    the issue.

5          THE COURT:  Which document?  The one you just

6    read from, Joint 159A?

7          MR. GESTRICH:  No, Your Honor.  The document

8    that's referenced in the updated code edit policy and

9    guidelines.  We have asked that Cigna show that this

10   actually took place.  We have received no evidence of

11   this.  And that was -- our argument is they've made this

12   argument from the letter but have not produced the actual

13   policy implementing these changes.

14         THE COURT:  I see.  So we do not know what the

15   code edit policy and guidelines said as of May 22, 2013

16   nor do we if you know it was on the website.

17         MR. GESTRICH:  Yes, Your Honor.  Certainly this

18   shows they intended it change something.  They wanted to.

19   It does not show they did.

20         THE COURT:  I think the other document you

21   produced, the one from the summary judgment which is not

22   in evidence, suggests that they didn't get around to

23   doing it until November of '14.  They announced it and it

24   was effective in January.  I'm sure there were timing

25   requirements.  I guess that kind of begins to explain the

1    difference -- could explain the difference in the dates.

2    I don't know, maybe Cigna is going to tell me they have

3    it.

4            MS. KINGSBERY:  No, we understand the argument.

5    We sent the letter explaining exactly what the change

6    was.  The Labs understood the change.  They knew they

7    weren't allowed to bill these codes.  They still billed

8    them and Cigna denied for the reasons stated in the

9    letter.  I believe we provided the email.

10           THE COURT:  You did.  I referenced it in my

11   comments.  Let's assume hypothetically nothing was posted

12   on the website as of May 22, 2013.  And even the April

13   letter, I think Mr. Welch testified about April 9, 2014

14   in which he talks about aligning with the CMS and various

15   codes.  It is the same subject matter.  He sends another

16   letter.  I wonder why they needed that.  I guess they

17   answered a question from the Labs suggesting it wasn't

18   clear.  But I have no knowledge, I guess -- I have no

19   knowledge.  I suppose -- as far as the record here, you

20   are relying on the letters.

21           MS. KINGSBERY:  Our position would be the letter

22   explains exactly what the update is.  Exactly what you

23   can and can't do and the Labs acknowledged it.

24           THE COURT:  What if you didn't update it?  I

25   presume there's some requirement of notice because the

1    one he gave me, the document he gave me is notified in

2    November and effective in January.  Why would you bother

3    to do that if you can just wake up one morning and

4    changing the billing?  The code editing or whatever you

5    call it at Cigna?  I don't know.  I'm speculating there's

6    a notice period.  I don't know otherwise why they waited

7    between notification and effective date.  How do I know

8    that they actually implemented the change that Cigna's

9    letter shows?  Or I suppose, maybe the Labs are going to

10   argue, you know, they did this because they were trying

11   to shut the spigot off, the 200 million dollar spigot,

12   right?  So they were trying to close every door they

13   could for these bills.  But, oops, they didn't quite get

14   around to implementing it in terms of policy.  And it's

15   been, I think, your position that the policies is what

16   controls these questions.  Remember, mainly because I

17   kept asking, is it in the insurance policy?  And finally

18   we have agreed, no, it is in these policies, Cigna

19   policies.  If it wasn't in the Cigna policies, I guess,

20   is it enough under an insurance contract to write a

21   letter and say, "We're not going to let you bill this

22   way"?  Maybe it is.  Maybe it is.  I'm not saying it

23   isn't.  But I'm having trouble connecting the dots.

24        MS. KINGSBERY:  The policy itself is not in

25   evidence.  It would be our position that we laid out

2183

1    exactly what the terms are if you would like to be

2    reimbursed.  Here's what you need to do.  Here's the

3    codes you can bill.  Here are the codes you can't bill.

4            THE COURT:  I hear that.

5            MS. KINGSBERY:  So that would be our position.

6            THE COURT:  Last question is this issue of

7    ERISA.  That came out to me from left field last night.

8    Do I have a request to charge on this subject?  I think,

9    and you tell me, and this can't be right, I had to have

10   misunderstand.  You are arguing to me yesterday that some

11   of your damages in your case for unjust enrichment, some

12   of them are in ERISA insurance policies.  And the law

13   under ERISA is not that strict.  Insurance contract

14   interpretation can't be ambiguous et cetera, read against

15   the insurance company of Florida and Connecticut and a

16   lot of other states.  If it's an ERISA policy, it gets

17   read differently.  I expressed surprise and dismay

18   because I believe there was a brief earlier.  There was a

19   brief and we had argument on, "No, Judge, this isn't

20   preempted.  It is not preempted under ERISA.  No. No. No.

21   This is a state cause of action and you don't need to get

22   into the ERISA issues.  So it is not preempted and look

23   at all of these nice cases."  I wonder where in all of

24   those nice cases where the judges said, no, it is not

25   preempted, they were being asked to take a piece of ERISA

 1    law and apply it to this case.  That's one question if

 2    you can hold it.  I get to ask multiples unlike the

 3    lawyers.

 4         The second question is -- and I'm pressing you

 5    like I pressed the Labs -- are you requesting me to

 6    charge anything here?  That's all really that I care

 7    about at this point.  As I said, hopefully you are

 8    presenting your damages in different buckets.  Not called

 9    ERISA is identifiable by you and confirmable by the Labs.

10    And I can deal with it on post-trial briefs if the issue

11    is -- I don't know what issue there would be on this.  So

12    answer my one question, sorry.

13         MS. KINGSBERY:  So I will answer the second one

14    first as I think that's easier.  We are not requesting

15    any charge with respect to ERISA.  That would be the

16    Labs' affirmative defense.  So Cigna is not requesting

17    any charge with a respect to ERISA.

18         THE COURT:  I'm not sure.  I don't understand

19    that.  I thought the point you were making is that my --

20    I did something.  I ruled on things relying upon the two

21    Florida Supreme Court cases.  They had to do with you

22    can't have ambiguous language.  Even if it is clear that

23    something doesn't say this is excluded or this is

24    required for coverage, you can't help read it into the

25    contract.  It is not there unless it is clear language,

2185

1    right?  I don't have the right words but something like

2    that.  Has to be clearly there, like medical necessity

3    everybody knows that medical necessity is in that policy.

4    You can't have coverage without it, right so that's

5    clear.  But I don't know, fee forgiveness, I said clearly

6    before '15 isn't there.  I also pretty much am saying it

7    isn't there after unless you change the language.  No, we

8    are even taking that.  I thought you were saying

9    yesterday, and maybe I misunderstood, Attorney Kingsbery,

10    that there was something we were discussing and I

11    shouldn't apply the Florida law of insurance contract

12    interpretation.  Did I misunderstand or misremember?

13         MS. KINGSBERY:  That's correct.  Florida law of

14    insurance would not apply to ERISA benefit plans.

15         THE COURT:  That's exactly right and that's

16    otherwise known as preemption.  And you told me this

17    isn't preempted because it is a state cause of action.

18         MS. KINGSBERY:  Two separate issues.  The

19    preemption issue is whether Cigna's unjust enrichment

20    cause of action is preempted under 514.  And that's been

21    briefed and that's pending.

22         THE COURT:  Still an open question.  I'm letting

23    you go to the jury with those damages but with the

24    caution you that you prove them separately.  But go

25    ahead.

1         MS. KINGSBERY:  With respect to the law that

2    applies to the interpretation of an ERISA plan, that

3    would be ERISA regardless of whether the unjust

4    enrichment claim is preempted under section 514.

5         THE COURT:  I guess that's going to remain for

6    after the verdict because, and again I do not profess to

7    know a lot about ERISA, but I don't think you have

8    partial ERISA.

9         MS. KINGSBERY:  With respect to the damages, we

10   did have a witness who was prepared to quantify the

11   damages associated with ERISA plans, but the line of

12   questioning was objected to and it was sustained.

13        THE COURT:  It makes me happy to think that you

14   think that I can remember that.  That's, I guess we'll

15   deal with it on post-trial issues if necessary.

16        All right, so I have got an answer you don't

17   want any changes in the charge.  My next question is, I

18   haven't had any request to change the Verdict Form.  Can

19   I infer from that there's no request on that regard on

20   this issue?  Which you now say is not really your problem

21   it is the Labs' problem.  I don't remember why it would

22   be the Labs' problem, but that's okay.

23        MS. KINGSBERY:  With respect to Cigna, we don't

24   other than the one you pointed out but that's been

25   corrected.  The one other change that we would request is

1    underneath Count One unjust enrichment, it says "have the

2    three elements."  I believe the jury charge says the

3    first two have already been satisfied.  So the question

4    for the jury is whether the third element has been

5    satisfied.

6            THE COURT:  That's right.  The question is how

7    do we word that?  Anybody have a charge number on your

8    cause of action?  Charge 50 in the old version.

9            (Discussion Off the Record.)

10           THE COURT:  "Has Cigna proven by the

11   preponderance of the evidence that the circumstances are

12   such."  Does the Labs object if I just change that to

13   "has Cigna proven by a preponderance of the evidence" and

14   then just quote the third element from the charge in old

15   section 50?  It reads, "The circumstances are such that

16   it would be unfair for that lab to retain those payments

17   they received from Cigna.  Question, with respect to the

18   following defendant."  That should say "defendants" even

19   though they are listed separately.

20           MR. GESTRICH:  Your Honor, my apologies.  I did

21   not catch this section you were looking at.

22           THE COURT:  The old section.  The version you

23   have is 50, Count One, unjust enrichment.  It was at page

24   67.  I will read it again because I'm adding a few more

25   words.

1              Anybody want me to reread it?

2          MR. GESTRICH:  We would merely ask you that

3    reread what you would like to be -- what the Court

4    proposes to be in there.

5          THE COURT:  Just give me a moment.

6          MR. GESTRICH:  Yes, Your Honor.

7          THE COURT:  "Has Cigna proven the third element

8    of its cause of action for unjust enrichment, by a

9    preponderance of the evidence, that the circumstances are

10   such that it would be unfair for that lab to retain those

11   payments it received from Cigna," -- probably should be

12   edited to just say something referencing the three labs

13   below.  I haven't quite got that right.  Give me another

14   minute.

15             This is how it reads or I would propose.  "Has

16   Cigna proven the third element of its cause of action for

17   unjust enrichment, by preponderance of the evidence, that

18   the circumstances are such that it would be unfair for a

19   lab to retain those payments it received from Cigna:

20   Biohealth, PB, and Epic."  We'll type it up and get you a

21   clean one, but that's roughly what is going to say.

22         MR. GESTRICH:  No objection to that section.

23         THE COURT:  Is that all right?

24         MS. KINGSBERY:  Yes, Your Honor.

25         THE COURT:  Jury charge is just about ready.

1    We'll give you a redline and a copy.  You have to discuss

2    or prepare a presentation or argument about

3    demonstratives.  And then this -- you will gets the final

4    Verdict Forms including this edit I just made.  Is there

5    anything else the parties wish to raise now?  And when I

6    say now I'm focusing on it's probably your last chance to

7    do it other than comments on the items I said that you

8    are about --

9              MR. HARE:  Only asking for the Court's

10   instruction as to when the Court would like to hear

11   motions?

12             THE COURT:  We have to do that.  I guess I don't

13   know, either 12 clock.  I mean Terri has to take a break.

14   Quarter to 12 or earlier if we're done with everything

15   else.  I don't know how much time you think you need to

16   go over the charge.  We'll have a redline.  It is very

17   specific sections.  It would probably be worth while for

18   somebody on your team skims the whole charge to be sure

19   we caught all the -- two counts of the Labs, those kinds

20   of things.  Obviously the big one is to incorporate those

21   paragraphs which I think I have done exactly what you all

22   said was okay.  I can't remember the other changes, but

23   to adjust for the fact that we have one Count for the

24   Labs. What else should we raise?  And what time should we

25   convene -- how much time do you need to answer your

1    question?

2          MR. HARE:  The Court previously instructed that

3    the parties would each have 30 minutes to present their

4    motions.

5          THE COURT:  Did I really?

6          MS. COSTIN:  I don't recall that.

7          THE COURT:  I don't recall that at all, sir.  I

8    told you I just need you to plant a flag.

9          MR. HARE:  That was in connection with projected

10   timing when it was anticipated that proof would go

11   through 12:30 today.  Obviously, we ended early and I

12   recall -- in any event, Your Honor --

13         THE COURT:  I guess I could give you half an

14   hour and come back at 2.  But Terri might fall out of her

15   chair and I might too.  But anyway we're not in it

16   situation.  How much time do you want?  Let's get the

17   question answered that I asked and then we can have more

18   discussion.

19         MR. HARE:  I don't need 30 minutes.  I think

20   about 20 covers what I'm hoping to present to the Court.

21         THE COURT:  What about Cigna?

22         MS. KINGSBERY:  That's more than enough, Your

23   Honor.

24         THE COURT:  We will be back here on directed

25   verdicts no later than ten past -- quarter past eleven.

1   With the idea that everybody -- we need a break before

2   you start.  11:15.

3          MR. HARE:  11:15, Your Honor.  Thank you.

4          THE COURT:  Before that we have to come back to

5   take objections, because when we come back to discuss the

6   charge in the Verdict Form, this is your last opportunity

7   to object.  Let's say, praise God, you came back and said

8   no more objections.  I might then ask you to tell me what

9   objections are you preserving, so we don't have to go

10  through that after.  And I don't have to say, "Oh my God,

11  I didn't know that you are objected to that."  So I will

12  ask you to tell me what are your preserved objections

13  that you've already made, that we talked about, but

14  sometimes I change.  I need you to tell me you still

15  don't like that charge I fixed it for you.  We'll do

16  that.  We'll take any new objections.  I will address the

17  new objections.  I will take a list of what you think you

18  preserved.  You are thereby preserving by repeating them.

19  That's your preservation of objection to the charge so we

20  don't do it after the charge.  Assuming I don't go off

21  script.  Assuming I don't do that, this is your chance to

22  object to the final charge because it isn't going to

23  change.  I do it just so not to keep them waiting for

24  Liana to get the process going.  If there are objections

25  obviously I will take them if I'm persuaded, we'll make

1    those small edits.  You will get a clean copy.  I'm not

2    giving you redline.  You will have to find the change.

3    And if we didn't make it right you will have tell me

4    before 11:15.  We have to do that.  I suggest we come

5    back at a quarter to eleven.  I hear any further

6    objections.  I hear a brief description of the ones you

7    have preserved.  And what I mean by preserve is, you are

8    telling me.  If you don't tell me when we come back, you

9    don't preserve them.  I know that's a little bit

10   different than I told you but I think -- there aren't

11   that many objections.  I think you should be able to do

12   that.  Then we may go directly into directed verdict

13   arguments or if we have a couple of minutes we can take a

14   break and deal with some logistics, some printing, how

15   many copies, then we'll do that.  Okay.

16           Yes, ma'am.

17           MS. KINGSBERY:  I have on exhibit just a couple

18   of housekeeping items.  I have the Ligotti deposition

19   videos.  I think I heard the Court say it should be

20   marked a Cigna exhibit for ID and --

21           THE COURT:  Yes.  If you were the one who called

22   him originally it should be a Cigna ID.  It won't be on

23   your list of exhibits, but you provide a copy to the

24   Court which he maintains.

25           MS. KINGSBERY:  Understood.  Then Cigna would

1    like to move for admission of its 10B interrogatories

2    into evidence.

3            THE COURT:  I don't know how you can do that

4    now.  I asked Attorney Kang, any exhibits he wants to

5    move.  I don't think you got the last word on their

6    claim.  I don't know how you get to do that.  There's a

7    reason that I ask these questions.  Obviously, counsel in

8    the case don't seem to think my questions are important

9    because they don't answer them and they ignore them.  I

10   asked Attorney Kang, on the record, do you have any

11   exhibits you want to offer right when he said, we're

12   done.  Okay.

13           MS. KINGSBERY:  Understood.  We don't need to

14   read them in we just wanted --

15           THE COURT:  I don't think I'm going to let you

16   do that.  I don't think it is proper.  I don't think it

17   is right.  They don't know for their closing that that's

18   what you are doing.  I don't have a charge in there

19   anymore on interrogatories, do I?

20           THE CLERK:  You do.

21           THE COURT:  I do?  Well fine.  I think we

22   probably should take it out because we don't have any.  I

23   don't think it is fair to them.  And I don't have to say

24   anything more.  That's my reason not an adequate reason

25   take it up.  Any other housekeeping?

1           MR. CHRIST:  Yes, Your Honor.  The Court

2   yesterday was speaking about redacting some of the fee

3   forgiveness language in the joint --

4           THE COURT:  I already talked about that.

5           MR. CHRIST:  We have done so.  We're sharing

6   those redactions now.  We'll share them about Ms. Barry.

7   I noticed those specific exhibits were never, I guess,

8   published to the jury.  They were joint.

9           THE COURT:  Then they don't come in.  Don't mark

10  the ones that are redacted.  You didn't ask me to move

11  them in.  They didn't ask me to move them in.  I asked if

12  you had any to move in.  Those were probably ones I would

13  allow because they were the subject of -- one of them was

14  the subject of testimony.  You have 57 in. Right?  That

15  was used.  I am pretty sure I said, just because it is

16  joint.  I'm very concerned a jury gets documents dumped

17  in their laps and they have no idea why.  To the extent

18  there's any prejudice that I'm saying you can't mark them

19  even though we have talked a lot about them, they weren't

20  used, you have the 57.  It's redacted I assume.  I don't

21  see any harm by not piling in another 14 copies of

22  policies, especially Miami-Dade Board of Education.

23  We'll stand in recess.

24          (Whereupon, a recess was taken from 10:25 a.m.

25          to 10:51 a.m.)

1          THE COURT:  Good morning, again.

2          I know you have just gotten it.  So have I.

3    We're in the process of finding many picky little edits

4    which I'm sure you might have picked some of them.  I'm

5    pretty sure I can wage a bet that you didn't get them

6    all, because we didn't get them all.

7          Let me start with any objections by the Labs to

8    the charge that was delivered at approximately 10:30 this

9    morning by my staff?  Any objections by the Labs to the

10   charge dated draft 10-30-24, 10:30 a.m.

11         MR. GESTRICH:  Yes, Your Honor.

12         The Labs would first like to preserve their

13   objection as to medical necessity.

14         THE COURT:  You don't have to give the detail.

15   As you've previously stated?

16         MR. GESTRICH:  Yes, Your Honor.

17         THE COURT:  Fine.

18         MR. GESTRICH:  The Labs would like to preserve

19   their objection as to unbundling.

20         THE COURT:  Well, that the language has changed.

21   So you're going to have to tell me what about it.

22         MR. GESTRICH:  With unbundling, the Labs

23   requested the the unbundling charge be limited to the

24   scope disclosed in trial interrogatory 15 by Cigna to

25   specific CPT codes.

2196

```
 1          THE COURT:  That could be a problem.  Did you

 2   respond to that?  I remember him raising that pretty

 3   recently.  That's why I have a pretty good memory of it.

 4   Did I ask you about that and did you give me a response?

 5          MS. KINGSBERY:  Our position would be that the

 6   proposed language that we provided in which was in here

 7   is what we would              propose be included, and

 8   have it not limited to the interrogatory responses.

 9          THE COURT:  I know that's your position.  But

10   why?

11          MS. KINGSBERY:  The evidence at trial is

12   consistent with what's in here.

13          THE COURT:  Could I ask you to direct me to

14   someplace on CM/ECF that I can find the interrogatory

15   that you want me to use as a basis for the charge, sir.

16          MR. GESTRICH:  Yes, Your Honor.  If you give me

17   one second.  I just need to find the -- 352 is the main

18   document number, but there's a subdocument number.

19          THE COURT:  Sir, somebody's going to have to get

20   it later.  But I would like to look at it.

21          Can you tell me any other objections you

22   preserve?  We are not going to tell the jury at 10:25 go

23   home.  Okay.  So we need to get a lot done I'm afraid.

24           What other objections do you preserve with my

25   request you give me the document ECF number at some, as
```

1    quickly as you can, but not as you're standing there

2    right now.

3            Give me your next objection you preserve.

4            MR. GESTRICH:  It is 352-6, trial interrogatory

5    15.

6            The next is on current charge 34 as to double

7    recovery in multiple defendants.  It does not appear that

8    it would be applicable with the withdrawal of Count One

9    from the charge.

10           THE COURT:  Oh, you're right.  But that's not a

11   preserve.  That's a new one.  And I think I want to take

12   care of it.  Let me just make sure you're correct.

13           Does Cigna object?

14           MS. KINGSBERY:  No, Your Honor.

15           THE COURT:  All right.  So the charge 34 is

16   completely eliminated at page 45 of most recent draft or

17   version; is that correct?  Correct?

18           Charge 44 is called double recovery multiple

19   defendants.  Is the entire charge removed?

20           MR. GESTRICH:  Yes, Your Honor.

21           THE COURT:  How about that, agree, Cigna, that

22   charge comes out; is that correct?

23           MS. KINGSBERY:  Yes.

24           THE COURT:  Okay.  Thank you.  That's not a

25   preserve.  Just tell me what you preserve.  Then I will

1    move to your objections to what's in the charge

2    currently.  That has only now have you had a basis to ask

3    me to change the charge.

4             MR. GESTRICH:  Yes, Your Honor.

5             THE COURT:  Have you found any errors in the

6    current charge other than the two areas you objected to

7    and preserved, and the one you told me that I accepted

8    and corrected?  Do you have any other places in the

9    charge you would say to me, Judge, you need to fix this?

10            MR. GESTRICH:  Your Honor, those are the only

11   ones that we've located so far.

12            THE COURT:  How about Cigna, have you got any

13   changes?  First, let's have your preservation of issues.

14            MS. KINGSBERY:  We have two objections that we

15   would like to preserve.  The first one is section 27 with

16   respect to the incorporation of the statutes.  The

17   objection was just the Court's decision not to include a

18   sentence --

19            THE COURT:  Yes, but you preserved that.  You

20   don't have to explain it.  I understand it.

21            MS. KINGSBERY:  And then the second objection we

22   want to preserve is section 48 on fee forgiveness.  On

23   page 63, the Court still has the language that says the

24   Court has determined that none of Cigna's

25   insurance                 policies before January 1, 2015

1    include language concerning fee forgiveness.

2            THE COURT:  That's something we've previously

3    discussed at some length.  You are preserving that

4    objection as you just stated.  Thank you.

5            Any edits to the current version?  I have some.

6            MS. KINGSBERY:  We don't have any edits right

7    now.

8            THE COURT:  I will tell you now, and the

9    following ones are changes to the section reference

10   pages.  You will find that in charge 20, Consolidated

11   Cases.  The second page of that charge should be a

12   correction which we are making now and you will get a

13   final copy.  There's a reference to section numbers.  So

14   that's going to get changed.  That's in the -- here it

15   is, it's the second page of that.  It's the second page

16   of that.  There's several references we need to check and

17   change any that are in error.

18           Likewise, the following page, Introduction to

19   the Labs Case, has section reference numbers which I

20   believe need to be changed.  They are being checked and

21   changed now.

22           Likewise, Multiple Plaintiffs, charge 24, at

23   page 34.  Section references need to be changed.

24           I skipped some.  I got those I think.  There's

25   some in the introduction on 21.  I'm not sure if I

1    mentioned those.

2              There's some in charge 34.  I did mention those.

3              And at charge 30, Damages, I failed to catch

4    last night.  Second paragraph, third line, toward the

5    right side.  It says:  If you find Cigna isn't liable to

6    one or more Labs on its cause of action.  Not at least

7    one of its causes.  There is only one now.

8              Let me see if there's anything else.

9              We're removing charge 34, which I think I fixed

10   in the interrogatories, but we didn't get back in the

11   instructions.

12             And page 37 has some cross-reference page

13   numbers.  Those are also being checked and changed.  You

14   will be able to see them before 12:30.  Here is another

15   one.  It's not going to be right.

16             Charge 40 has section page numbers.  Basically

17   somebody is going through and looking for any of those

18   bold section references and correcting them.  They are

19   also looking for the phrase causes plural or counts

20   plural, as relates to the Labs case.  So those you may

21   see edits.  I will give you a redline so you can quickly

22   check them, but I am not making, other that the deletion

23   of duplicative damages, the next version I do not believe

24   will have any substantive edits.  It will just be these

25   technical things to reflect the dropping of Count One.

1    If I do make any substantive edit, you will be warned to

2    look for it.  But you're welcome to look at all of it.  I

3    just don't think you will have the time to carefully

4    check it.  I shouldn't say that.  You should check it

5    all, but that's what I intend to do.

6         MS. COSTIN:  Your Honor, I have one more

7    proposed edit I believe.  I was just conferring with

8    Mr. Gestrich.

9         Number 12, Request for Admissions.  I don't

10   believe there's any request for admissions admitted in

11   the case, but striking that might adjust the numbers.

12   I'm just raising the issue.

13        THE COURT:  Every section number.

14        See, I always thought the admissions were in the

15   form of an answer to an admission.  Remember when you

16   stood up, I couldn't understand what you meant.  He meant

17   by disposition transcript.  So I had not understood that.

18        Number 12.  That means you're going to have to

19   go tell Bern about 12 and 34.  Take those out and then go

20   recheck the section numbers.  So that's coming out.

21        Anything else?

22        MR. GESTRICH:  Yes, Your Honor.  In charge 40,

23   page 51, we heard the Court's instruction that it will

24   look for causes of action in the labs.  There's a

25   reference to these causes of action.

```
 1              THE COURT:  What line?

 2              MR. GESTRICH:  My apologies.  The last paragraph

 3   on that page.  At the very bottom, second line down.

 4              THE COURT:  The cause of action, right?

 5              MR. GESTRICH:  Yes, Your Honor.

 6              THE COURT:  And the still plural affirmative

 7   defenses.

 8              MR. GESTRICH:  Yes, Your Honor.

 9              THE COURT:  Anything else?

10              Liana, would you please give these to Alex/Bern.

11   I think they have been communicated all of those changes,

12   but they should double-check.

13              The issue, there's still one more, but I don't

14   need it.  The request to charge as to interrogatory --

15   what did you say?  Which one?  15.  Sorry.

16              (Discussion Off the Record.)

17              THE COURT:  Is there any objection to the

18   Verdict Forms from the Labs as to the Verdict Form for

19   Labs case?  Any objection?  I believe you have a current

20   version.  This one is 8 a.m.  Did we make changes after

21   8?

22              Any objection to the Verdict Form for either

23   case?

24              MR. CHRIST:  Your Honor, we haven't seen it, at

25   least one on our desk.
```

1           THE COURT:  Liana would you ask Bern to give us

2   two copies.

3           (Discussion Off the Record.)

4           THE COURT:  Could I ask Cigna a question on this

5   objection about using the interrogatory 15 on the

6   unbundling charge.  If you recall, that was an objection

7   just stated.  That he wants to preserve an objection that

8   I should, in effect, charge -- the unbundling in the

9   charge should be changed to reflect your answer to

10  interrogatory 11.  You are looking at me like I'm talking

11  about in gibberish.

12          MS. KINGSBERY:  I understand.  I know what

13  you're talking about.

14          THE COURT:  I want to ask you is Cigna going to

15  make any argument that there's any other codes that are

16  not listed here, but that you are going to make an

17  argument based on that that are beyond those codes?

18          MS. KINGSBERY:  Nothing beyond what's already in

19  the instructions.

20          THE COURT:  Okay.  So I don't usually give this

21  level of detail.  Indeed, you have 60, 80 pages where I

22  don't give this level of detail on the evidence.  If they

23  are representing to me they are not seeking recovery or

24  to block something or no -- that's what made it unfair,

25  right.  That's why you shouldn't get, right.  So it comes

2204

1    into both cases.  They are not seeking to block your

2    recovery or to support their recovery of money based on

3    unbundling that went beyond the codes they answered here.

4    I'm not going to tell them the codes.  If you want to

5    argue it, go ahead and give them the list of the codes.

6    But their representation is they are not seeking to

7    recover anything beyond that.

8         Now, should I rely on it?  I don't know what

9    else I can do at this stage.  I just I think heard this

10   yesterday, but I could be wrong and they might have

11   raised it sooner.  But I never got a request to charge.

12   I still don't have a request to charge.

13        But it seems to me that what you are asking me

14   to put in based on the interrogatory is in the charge

15   except for the specific listing of codes.  And I don't

16   think that's helpful to the jury.  I don't think it is

17   appropriate in the charge.

18        Okay.  I'm just stating my position.  Yours is

19   preserved, sir.

20        Do we have the Verdict Form yet?  Okay.  That's

21   fine.  I have another thing to go to.

22        Okay, ladies and gentlemen, this is the fun

23   time.  What do I say to the jury?  I mean I'm not just

24   going to start reading a charge that says all right,

25   ladies and gentlemen, let me tell you about this case.

1    There's one count, called Count Two, with one cause of

2    action in the Labs case.  Seriously, I don't think that's

3    a good way to do it.  I'm not going on at length.  I'm

4    not commenting on motive or apologizing they had to

5    listen to some kind of evidence they didn't need to which

6    I'm not sure that's not the case.  But they could have

7    that thought I suppose.  I just want to say -- I mean,

8    I'm telling them I changed the charge.  You know, where I

9    tell them I don't think anything in this charge is

10   different from what I told you in the preliminary charge,

11   one of the general charges.  I had to edit it.  So I say

12   it is different.  But I don't believe that it's -- I

13   don't think -- I don't have the charge in front of me,

14   but I don't think I added a whole dissertation on it.

15        Count one is removed with its two causes of

16   action that you heard me tell you were x and y in the

17   pre-charge and I want you to just ignore them because

18   those have been removed from the case.  I don't know if

19   you want me to say it's been removed by agreement or

20   removed at the request of the Labs.  I don't know what

21   you want me to say.  I'm afraid if I open my mouth one of

22   is going to think that I prejudiced you.  So I invite you

23   to tell me what, if anything, you think I should say.

24        MR. CUNNINGHAM:  Your Honor, I would just ask

25   that the Court try to come up with something that's very

2206

1    neutral.

2              THE COURT:  But what would that be?

3              MR. CUNNINGHAM:  Well, that such

4    and              such is no longer an issue in the case.

5              THE COURT:  Okay.  And not to try to explain why

6    or how or it doesn't -- that's what I don't want to do.

7              MR. CUNNINGHAM:  I don't think they need to know

8    that, Your Honor.

9              THE COURT:  Okay.  Fine.  Anything else?

10             MR. CUNNINGHAM:  Specifically on what the

11   introductory part of the charge?

12             THE COURT:  I mean, it's not in there right now.

13   I thought I would just start before I started reading to

14   explain the Count One, two causes of action, are no

15   longer in the case.  And then do the charge where I just

16   briefly say that these are different as I explained at

17   the beginning.  So it's really not technically part of

18   the charge.

19             MR. CUNNINGHAM:  I think that's fine, Your

20   Honor.  I just don't think we need anything that could be

21   construed as pejorative as to why it's no longer in the

22   case.

23             THE COURT:  That's what I'm afraid of.  I can

24   think of words, but then you could sit there and thing

25   why did she say that.  So I just wanted to raise it.  So,

1    Cigna, is it all right with you if all I say at the

2    beginning of the charge, you know, outside the technical

3    charge, I just say I want to tell you before we start the

4    charge, you won't be hearing about Count One and the two

5    causes of action that are in Count One of the Labs' case

6    because they are no longer at issue in the trial.

7         MS. COSTIN:  That's fine, Your Honor.

8         THE COURT:  Now, the question is do I need to

9    add a sentence to the effect of you should still consider

10    all the evidence presented.  As I instruct you, you may

11    consider it as to the count -- the count remaining for

12    the the Labs and the counting remaining -- and the count

13    of Cigna.  Should I say that?  In other words, they might

14    think, well, wait a minute, we heard a lot of evidence.

15    I don't think you need it.

16         MS. COSTIN:  I had highlighted that as well,

17    Your Honor.  There have been times at trial that you have

18    given them a limiting instruction about certain witnesses

19    only applying to one case and not the other case.

20         THE COURT:  One case or the other, but not on

21    the part of the counts.

22         MS. COSTIN:  Correct.  Just being conscious of

23    that and not confusing the jury about those two issues.

24    That was all.

25         THE COURT:  Well, why don't I say all of the

1    evidence presented by the Labs and Cigna as to the Labs'

2    causes of action.  Because that doesn't effect the cross

3    party, across the case limitations.  That will be clear

4    in the instructions.

5              Is that all right with the Labs?

6              MR. CUNNINGHAM:  That's fine, Your Honor.

7              THE COURT:  Thank you.

8              Could I see you for a second, Alex.

9              (Discussion Off the Record.)

10             THE COURT:  There was a point, two or three days

11   ago, with Attorney Kang.  We were talking about the post

12   '15 policies might have been after Goldfarb's testimony.

13   I don't remember when, but it was fairly recently at one

14   of our conferences or before the jury came out.

15             The issue of, you know, is it in the post '15

16   policies or not.  That led to the redaction.  Led to

17   cutting out Goldfarb's testimony.  Because we understood,

18   and I think this is right, that Attorney Kang said he

19   would not argue unfairness in his claim based on contract

20   language.  Right?  So in my opinion that's a set issue.

21   So I do not have to get an answer to what sounded like

22   what Attorney Kang was saying was, well, Judge, if we

23   can't do that, then the Labs can't argue anything about

24   the pre 2015 policies.  And I don't know that I ever got

25   agreement from Attorney Kang, but my review is I'm not

1    going to go to hear anything about a policy and language

2    post 2015 in Attorney Kang's closing argument in Cigna's

3    case.  I can hear there's nothing in the policies to

4    prevent -- there's nothing in the policies about fee

5    forgiveness.  I'm not quite sure how you would say this,

6    Attorney Cunningham.  But I don't believe there's

7    anything that prevents him from making that argument.

8    Because I ruled as a matter of law that is the case or

9    based in part upon the last piece being agreed to by

10   Attorney Kang.

11        MS. KINGSBERY:  With respect to your first

12   point, you're correct.  Attorney Kang will not be arguing

13   policy language with respect to Cigna's unjust enrichment

14   claim.

15        With respect to the second point, we would

16   object to any argument regarding the fee forgiving

17   language in Cigna's policies with respect to Cigna's

18   claim on unjust enrichment.  And the reason goes back to

19   the objection that I just preserved regarding the fact

20   that there's been no ruling with respect to any of that

21   ERISA policies, the post 2015 language, plans that are

22   all at issue in Cigna's case.  So it would be inaccurate

23   to represent to the jury in Cigna's case that policies

24   don't prohibit fee forgiving.

25        THE COURT:  I thought that's what Attorney Kang

2210

```
 1    agreed.
 2          MS. KINGSBERY:  Attorney Kang has agreed he is
 3    not going to mention the policies.
 4          THE COURT:  He's not going to argue.
 5          MS. KINGSBERY:  He is not.
 6          THE COURT:  Attorney Cunningham, are you going
 7    to stand up and say you shouldn't really take that
 8    language in the post 2015 policies to rely on unfairness?
 9    I don't know.
10          MR. CUNNINGHAM:  What I plan to do, Your Honor,
11    as we said, this has been the most confusing issue in the
12    case.  But what I plan to say, because my understanding
13    is that fee forgiveness has been taken out of the case,
14    it's not a defense in the Labs case against Cigna.
15          THE COURT:  Well, do you have any claims post
16    January '15?  Isn't that how we solved this issue?
17          MR. GESTRICH:  Yes.
18          THE COURT:  Thank you, Attorney Gestrich.
19          When he says that fee forgiveness is in -- tell
20    me what you just said.  I'm sorry.
21          MR. CUNNINGHAM:  Your Honor, here's the context
22    that I plan to present.  So what I would say is after the
23    review of medical records by --
24          THE COURT:  You want it use it as a defense to
25    their case.  I'm sorry.  That doesn't solve my problem.
```

1        He can argue in his case -- I don't know why he

2   would, because I'm going to them six ways to Sunday, it

3   is not an issue in the Labs' case.  So I don't know that

4   you are going to mention it.

5        But you can.  As long it's clear that our claims

6   are all -- well, our claims are -- all the policies that

7   are at issue in our breach of contract action for not

8   paying under the policies have no language about fee

9   forgiveness.  That's a correct statement.  You can argue

10  that in your case.

11       Now, what are you going to argue in defense to

12  her case?

13       MR. CUNNINGHAM:  What I plan to argue is that --

14       THE COURT:  I'm sorry I'm asking you to tell me

15  argument.  Be very vague.

16       Oh, geez.  We're already out of your time.

17  Finish this up.

18       MR. CUNNINGHAM:  What I plan to argue, Your

19  Honor, I only have 10 minutes obviously.  So what I plan

20  to argue is that they are claiming unfairness because of

21  fee forgiving.  We have proven to you that fee

22  forgiveness did not occur here by the Labs.  We presented

23  the testimony of Mr. Welch.  We showed him the page.

24  And                  we also showed the ledger of Ms. Canto

25  where she made the phone calls and several of the

1    patients reported they had received a bill.

2            THE COURT:  So that's a lack of proof argument.

3            MR. CUNNINGHAM:  Pretty much.

4            THE COURT:  It's not mentioning a policy.

5            MR. CUNNINGHAM:  He's not going to mention a

6    policy.  So I don't think I need to mention a policy.

7            THE COURT:  So are we okay?

8            MS. KINGSBERY:  We're good.

9            THE COURT:  Fantastic.

10           Who is doing directed verdict?

11           I'm sorry.  Do you have the Verdict Forms?  Did

12    you give them to them?

13           MR. HARE:  May it please the Court.  I rise with

14    good news.  I think I'm more like 10 minutes than 20.

15           THE COURT:  Fantastic.

16           MR. HARE:  Each of three Labs, Your Honor, moves

17    for judgment as a matter of law pursuant to Rule 50(a)(1)

18    of the Federal Rules of Civil Procedure.  That rule

19    provides that if a party has been fully heard on an issue

20    during a jury trial, and the Court finds that a

21    reasonable jury would not have a legally sufficient

22    evidentiary basis to find for the party on that issue,

23    the Court may (a) resolve the issue against the party,

24    and (b) grant a motion for judgment as a matter of law

25    against the party.  We're asking for both, Your Honor.

1    Cigna has been fully heard with respect to its

2    claim for unjust enrichment.  Cigna has failed to

3    establish.  And no reasonable jury could find a legally

4    sufficient evidentiary basis to find for Cigna on this

5    claim.

6    Therefore, we move for judgment as a matter of

7    law.

8    There's are three parts to my argument, Your

9    Honor:

10    The first concerns standing and injury and fact

11    and causation; the second concerns damages and proof of

12    damages; and the third is laches.

13    The first topic, Your Honor, Cigna has failed to

14    establish standing, has failed to establish an injury in

15    fact, and has failed to establish causation.  I would

16    call to the Court's attention the Second Circuit decision

17    from 2008 in a case called *W.R. Huff v. Deloitte Touche*.

18    That's reported at 549 F.3d 100.

19    This is a case brought by an investment advisor

20    on behalf of its clients alleging not that the investment

21    advisor had been harmed, but that the clients had

22    suffered injury.  Quoting from the *W.R. Huff* decision of

23    the Second Circuit.  As a general rule, the "injury in

24    fact" requirement means that a plaintiff must have

25    personally suffered an injury.  The Second Circuit cites

1   to, among other cases, *Lujan*, the Supreme Court decision.

2   Additionally cites to say another Supreme Court decision

3   from 1972, *Moose Lodge No. 107 v. Irvis*.  That's reported

4   at 407 U.S. 163.  The pin cite is 166.  And the

5   parenthetical that the Second Circuit provides in

6   connection with that citation is as follows:  (Stating

7   that a party may invoke the Court's authority only in

8   order to, quote, seek redress for injury done to him, not

9   to seek redress for injuries done to others.)  The Court

10  goes on to say.  As we noted above, Huff has not alleged

11  in its complaint that it suffered any injury.  Rather,

12  the alleged injury was suffered by Huff's clients.  This

13  is all found at page 107 of 549 F.3d.

14        Your Honor, right out of the gate in this case,

15  Cigna admitted it has no injury in fact.  At least five

16  times during Mr. Kang's opening this point was conceded.

17  At page 65, lines 2 through 6, of the trial transcript.

18  Mr. Kang admitted, you will learn that the Labs made a

19  whole bunch of money.  Over $16,000,000.  But you know

20  who bore the cost?  You will hear it was the employers

21  who offered health plans to their employees and their

22  employees families.

23        Your Honor's smiling at me.

24        THE COURT:  No, no.  I'm not smiling.  That's my

25  poker face.  I couldn't play poker.  I'm just sitting

1    here.  That's all, sir.

2         Go ahead.

3         MR. HARE:  Thank you, Your Honor.

4         At page 75, lines 12 through 18, Mr. Kang

5    admitted.  Cigna asked them, referencing the Labs, to --

6         THE COURT:  Oh, you don't have to recount the

7    evidence.  I have a pretty good recollection of it.  And

8    as I said, I told you all, and nobody has objected, we're

9    obviously not deciding directed verdict motions.  I mean

10   I'm not capable as a court to do it.  I believe if you

11   tell me the scope of the argument, as you have already, I

12   don't need you to point me to why.  If this was a one day

13   trial and there's no evidence on something, I would have

14   thought of it and I would have decided.

15        MR. HARE:  Very good.  Without quoting, I will

16   just offer two more record citations.

17        THE COURT:  You can generalize it or whatever.

18   That's fine.

19        MR. HARE:  Ms. Canto in day one of trial, her

20   testimony appearing at page 210, lines 14 through 17,

21   makes the same point.

22        Mr. Goldfarb in his testimony and associated

23   colloquy, at page 1240, lines 20 through 25, the Court

24   has a colloquy with Mr. Kang.  This is when the Court

25   asked, are all of the policies in your $16 million claim

1    a third party administrators.  Mr. Kang admits virtually

2    all of them, yes, the vast majority.

3         Mr. Goldfarb echos that at page 1287, lines 9

4    through 13.

5         Your Honor, in a Second Circuit decision from

6    1979 called *Ss Silberblatt v. East Harlem Pilot Block*,

7    appearing at 608 F.2d page 28, pin cite page 37, the

8    Second Circuit focused on this issue and said, quote, to

9    sustain a claim of unjust enrichment, a plaintiff must

10   show that the defendant has at the plaintiff's expense

11   been enriched and unjustly so.

12        Cigna has not offered evidence of its own

13   damage.  It's offered evidence of what it alleges to

14   damages suffered by third parties who are not in this

15   courtroom and are not parties to this action.

16        My second argument, Your Honor, is related but

17   it concerns more specifically damages and the proof of

18   damages.  Cigna has given no expert testimony or other

19   competent testimony of damages to tie any particular

20   measure of damages into any particular alleged victim or

21   any particular alleged defendant lab.  And, again, this

22   concerns the, quote, vast majority of the alleged loss.

23   Because Cigna has not competent proof of damages, any

24   award would, by necessity, be speculative and, therefore,

25   unsupported.

1    My third prong of the argument, Your Honor, is

2    laches.  I'm bringing this up now to preserve the issue.

3    We understand that the Court will entertain that argument

4    separately.  But, again, for Rule 50 purposes, I'm

5    preserving it now.

6    As the Court knows, we have asserted many times

7    that Cigna waited too long to bring its claims to claw

8    back the payments that were made.  That is, by itself, a

9    bar to recovery on this claim.

10    That's a summary of my argument, Your Honor.

11    And, obviously, I'm happy to answer any questions the

12    Court might have.

13    THE COURT:  I don't think you planted a flag on

14    laches.  I don't think you have to.  Because I thought I

15    made it clear that would be an issue for the Court.

16    There's been no request to have interrogatories put to

17    the jury either advisory or otherwise.  So, in my

18    opinion, that's a subject from post-trial briefing and a

19    decision before a verdict is entered.  And I think we

20    briefly discussed do I need more evidence on it.

21    I understand you're planting the flag, but I

22    don't know that that's really a post -- a 50(a) motion.

23    But that's fine.

24    MR. HARE:  We had, Your Honor, I mentioned it

25    today, for belts and suspenders.

1            THE COURT:  Understood.

2            MR. HARE:  Thank you, Your Honor.

3            THE COURT:  All right.  Cigna's side, please.

4            MS. COSTIN:  Your Honor, may it please the

5    Court.  If it is all right, I will make one of our

6    motions and Ms. Kingsbery will make the other.

7            We're here today, Cigna moves pursuant to

8    Federal Rules of Civil Procedure 50(a)(1) as Mr. Hare

9    recited a few moments ago.  Cigna moves for judgment as a

10   matter of law on the Labs' third party beneficiary count

11   based on lack of proof of medical necessity of the

12   services provided.  As we have discussed at length in

13   this case, the Labs bear the burden to show, by a

14   preponderance of the evidence, that their services were

15   medically necessary.  Which means the Labs have the

16   burden that each test was appropriate and necessary for

17   the symptoms, diagnosis or treatment of the condition,

18   provided for the diagnosis or direct care and treatment

19   of the medical condition, within the good standards or

20   good medical practice, and not primarily for the

21   convenience of any insured person, physician or another

22   provider.

23           In the Labs' case-in-chief, the Labs failed to

24   offer any evidence that any of the services were

25   medically necessary.  No witness testified that they

1    reviewed any of the records in this case and formed an

2    opinion that the services were medically necessary.  The

3    Labs presented no fact witness with knowledge to testify

4    that any services at issue were medically necessary.

5    None of the Labs' expert had an opinion on medical

6    necessity.  In fact, all three of their experts

7    disclaimed offering an opinion on medical necessity.

8    There are standing orders that have been presented into

9    evidence in this case, but based on Your Honor's ruling

10   and limiting instructions, the Labs cannot rely on any

11   signatures as evidence that a doctor actually signed the

12   form certifying medical necessity.

13        The Labs have chosen not to offer any doctors

14   that signed the orders to testify at trial.  And the only

15   doctor to testify in this case that signed any of these

16   orders was unequivocal that the services he ordered were

17   not medically necessary.  On that basis, we would move

18   for judgment as a matter of law.

19        THE COURT:  Thank you.

20        MS. KINGSBERY:  May it please the Court, Cigna

21   also moves for judgment as a matter of law on the third

22   party beneficiary claim because the Labs have failed to

23   produce sufficient evidence that it was Cigna and the

24   insured's intent that the policy directly and primarily

25   benefit the Labs.  The Labs have not offered or

1    identified a single written policy provision that they

2    believe evidence such intent.   In a normal trial, we

3    would have made this motion when the Labs rested their

4    case-in-chief because the Labs did not even enter the

5    contract into evidence.   So the jury had no contract

6    provisions to even consider whether they evidence an

7    intent to directly and primarily benefit the Labs.   Cigna

8    served an interrogatory on the Labs asking them to

9    identify the complete factual basis for their position

10   that Cigna intend to benefit the Labs with their policies

11   and the Labs answered only that the Prompt Pay Act is

12   incorporated into the policies.   The fact that the Prompt

13   Pay Act is incorporated into the policies is not

14   sufficient as a matter of law to establish Cigna's clear

15   and manifest intent to directly and primarily benefit the

16   Labs.   If it was, the Florida Supreme Court in *Foundation*

17   *Health* would not have considered whether the healthcare

18   provider had identified other written provisions in the

19   policy evidencing the contracting party's intent.   And if

20   incorporation of the statute alone was sufficient, the

21   Supreme Court in *Foundation Health* would not have

22   remanded to the trial court to consider whether the

23   written policy provisions reflected such language.   We've

24   cited several Florida courts that have dismissed third

25   party beneficiary claims at the pleading stage for

2221

1    failure to identify written contract provisions outside

2    the Florida statutes for failure to establish the intent

3    element.  That's the *Wolf v. Cigna* case, *Columna Inc. v.*

4    *Aetna Health*, and *MSP Recovery v. Allstate*.   The Labs

5    have not identified any language in the policy to satisfy

6    their burden and the only person with knowledge to

7    testify about the issue was Brian Evanko who testified

8    that the policies were intended to primarily benefit the

9    individuals and their families that purchased the

10   policies, not out of network providers.

11            We also seek judgment as a matter of law on a

12   third party beneficiary claim to the extent that it is

13   based on an alleged violation of the Direct Pay Statute.

14   To establish a violation of the Direct Pay Statute, the

15   jury must find that each patient specifically authorized

16   direct payment to the Labs.  The Labs have not offered

17   any evidence that any patient specifically authorized

18   direct payment to the Labs.  There was no testimony from

19   anyone with personal knowledge regarding the collection

20   of patient authorizations.  And while there's a handful

21   of patient authorizations in evidence, pursuant to the

22   Court's limiting instruction, the jury cannot consider

23   any signed patient consent form as evidence that a

24   patient actually signed it authorizing direct payment.

25            For these reasons, we would seek judgment as a

1    matter of law.

2            THE COURT:  Thank you very much.

3            Anything further on the Rule 50 motions?

4    Everybody's planted their flags is what I'm saying is

5    sufficient.  I believe that's done as to the ones you  --

6    clearly as to the ones you mentioned.  The only thing you

7    haven't done is -- I stopped Attorney Hare -- summarized

8    your evidence, which would be normal but I think under

9    our circumstances nobody is complaining that they don't

10   have to do that.  I suspect you will find more evidence

11   to support your position by the time we do our briefs.

12   The only other issue I think that remains -- and thank

13   you for being brief and very clear.

14           I don't see my law clerk with a puzzled look on

15   his face.  I think he knows what the issues are.  Is that

16   a fair statement, Alex?

17           THE CLERK:  Yes.

18           THE COURT:  Now I think we have the

19   demonstrative issue.  Where are we on that?

20           MR. CUNNINGHAM:  Your Honor, I'm prepared if

21   you'd like to hear me.

22           THE COURT:  Go ahead, sir.

23           MR. CUNNINGHAM:  So, Your Honor, we looked at

24   those demonstratives and I will give you my version of

25   this, obviously.

1          THE COURT:  Let me get it up.  You go ahead.

2     I'm listening.

3          MR. CUNNINGHAM:  My recollection is, and I could

4     be mistaken but I think other members of team have the

5     same memory, when this issue of demonstratives for

6     closing first came up, I think the Court said, "Give 48

7     hours notice".

8          THE COURT:  I did.  I said it the last time I

9     raised it.  I said 48 hours.  Somebody asked me for 24

10    and I said that's not enough time to do what you need to

11    do which is to confer and see if you can agree.  If you

12    do, you redo it and then you have to look at it again.

13    Then I have to have time to rule on the objections.  I

14    know it is 48 and I have told you.

15          MR. CUNNINGHAM:  So then Monday morning, I

16    believe the Court brought to our attention that any

17    demonstratives that either party planned to use during

18    closing would have to be shown to the other side by

19    eleven a.m. Monday.  I believe Mr. Christ recalls that

20    the Court later said by Noon on Monday.  I will tell the

21    Court that once that ruling was issued, I thought the

22    matter was closed because I knew that neither side had

23    disclosed any demonstratives that they planned to use

24    during closing.  We were not going to be able to prepare

25    them while we were in Court that morning.  So I believed

1    that the issue was closed.

2          When the email came in Monday at 2:00 p.m.-ish

3    from Ms. Jackson and, in all honestly, I didn't look at

4    it because I thought the issue was closed.  So just from

5    a process and procedural standpoint, Your Honor --

6          THE COURT:  What time -- when do you think on

7    Monday I made those comments?  Pretrial?

8          MR. CUNNINGHAM:  It was in the morning, Your

9    Honor.  I don't remember if it was during a break.

10          THE COURT:  Could be a break.  Okay.  I am

11    wanting to get the timeline clear.  Go ahead, sir.

12          So you got an email at 2:06.  You didn't pay

13    attention to it.  One, you are in the courtroom and I

14    don't know if that's your job on your team, but whatever,

15    somebody didn't see it.

16          MR. CUNNINGHAM:  I'm being told you told the

17    parties by lunch time on Monday, we needed to show the

18    other side --

19          THE COURT:  So I referenced the disclosure time

20    was Monday at noon, not just the 48 hours before the

21    closings which I thought would start at noon on

22    Wednesday.

23          MR. CUNNINGHAM:  Frankly, Your Honor, because of

24    the Court's ruling on Monday, what the Court said, I

25    believed the issue was closed.  I believed that neither

1   side was going to be able to use demonstratives.  I

2   planned to do something brief, nothing elaborate.

3   Because I thought the Court made it clear if they were

4   not disclosed by lunchtime we weren't doing them.

5         So we got them 2:30-ish on Monday, I believe.

6   As I said, I didn't look at them.  Your Honor, the only

7   possible --  I will tell you I think one of their

8   PowerPoints they want to use at closing is 25 slides.  I

9   think the other one is 32 sides.  So they have 57 slides

10  if my math is a correct, Your Honor.  The only compromise

11  that I can offer, Your Honor, is there are, I think, four

12  or five slides, and the Court will recall Mr. Kang had

13  wanted to use some PowerPoint slides in his examination

14  of Mr. Goldfarb and the parties collaborated on those

15  because we had some objections.  Those objections were

16  worked out to everybody's satisfaction.  Mr. Kang did

17  not use them.  We have seen those.  I can't claim we

18  don't have any appropriate notice of those slides.

19        THE COURT:  I think I saw one of those.  It is

20  very small print.

21        MR. CUNNINGHAM:  I think there were five slides

22  total.  I believe those are the only demonstratives that

23  Cigna intends to use that were timely disclosed and we

24  would be willing to compromise and agree to allow

25  Mr. Kang to use those slides.

1          THE COURT:  Can I make the record clear before

2    you finish?  It is your position that, One, other than

3    those five, 47 of the proposed slides, were not disclosed

4    to the Labs by noon on Monday to be 48 hours before my

5    estimation of when closing would begin.  A deadline I had

6    set generically at the beginning of the trial - a while

7    ago.

8          MR. CUNNINGHAM:  That is correct, Your Honor.

9          THE COURT:  I did say lunchtime and 48 hours, my

10   law clerk says.  So they will argue "Judge, 2:06, we

11   missed it by six minutes.  Lunchtime is 2:00."  But I

12   thought I made it clear it was 48 hours before the

13   closing arguments.  If you took your four hours you each

14   had, we would be doing closings -- I don't know.  You

15   would finish your evidence, I think, with about two

16   hours.  So that would be 11:30 if we hadn't had all of

17   these issues, we would be going at 12.  That's what I

18   think I will hear.  "Judge, it was 6 minutes late in a

19   48-hour time period.  It was their fault they overlooked

20   it."

21          MR. CUNNINGHAM:  I don't believe that it was my

22   fault I overlooked anything.  I thought the Court's

23   ruling was extremely clear.  I remember in particular

24   there was one email that I wanted to use, remember that

25   there was a discussion that I showed it to Mr. Kang, but

1    I didn't know that Ms. Costin was handling that witness.

2    Because it was a little bit late, they raised an issue of

3    that.  I don't believe I got to do what I wanted to do

4    with that exhibit.  I'm just saying that what's fair for

5    the goose is fair for the gander.

6            THE COURT:  Do you know which of the numbers of

7    the five that you will agree to let them use because you

8    have seen them at least before, 5 minutes before they are

9    going to be used?

10           MR. CUNNINGHAM:  I'll give them to you in just a

11   moment.  Thank you, Your Honor.

12            THE COURT:  There are two parts so you need to

13   tell me which part and which page number.

14           MR. CUNNINGHAM:  Demonstrative 1, pages 2 --

15   these are all PowerPoint slides -- pages 2 through 7,

16   Your Honor.

17           THE COURT:  That's very helpful.  Thank you.

18           It is 6 that caught my eye.  That's the small

19   print one.  I remembered we had a discussion about it.

20   You are right.  That's the group that he thought about

21   with Goldfarb, but he didn't use them.  I don't know

22   about that.  You are saying it's okay.

23           Cigna, please.  Could I be heard.

24           MS. COSTIN:  Your Honor, you anticipated my

25   argument.  My recollection is that the argument on Monday

 1    was that Mr. Kang asked for us to have a 24-hour

 2    disclosure because Dr. Clark had not yet taken the stand.

 3    And Your Honor instructed us at lunchtime --

 4         THE COURT:  48 hours before closing.

 5         MS. COSTIN:  We heard lunchtime on Monday.  We

 6    disclosed them at 2:00 on Monday.  We disclosed them to

 7    the entire team.  I understand Mr. Cunningham might have

 8    been in Court.

 9         THE COURT:  Was there nobody on the team that

10    noticed that email?

11         MS. COSTIN:  Any member of the team could have

12    responded.  We understand they had 24 hours to object.

13    24 hours passed.  We heard nothing from any of them.  We

14    understood there's no objection to the demonstratives.

15    We sent them to the Court.

16         THE COURT:  You understand that under no

17    timekeeping that I disclosed to you would 48 hours equal

18    2:00 p.m.  You do understand that?  By Monday, you knew

19    how much time you had left.  I can go back and put it on

20    the record, if you'd like.  That would not make closing

21    argument 2 p.m.

22         MS. COSTIN:  As I recall without having the

23    transcript in front of me, the instruction was to

24    disclose by lunchtime on Monday.  That was my

25    recollection.

1          MR. CUNNINGHAM:  And Your Honor, all of these

2     are exhibits --

3          THE COURT:  But you are not answering my point.

4     There must be a school at Alston & Bird that teaches you

5     how to do this.  You give me a very eloquent answer, but

6     you didn't answer my question on this last point.

7          On Monday you knew how much time was left in the

8     trial.  I told you.  I never led you to believe that if

9     you finish on Monday with your evidence, we won't have

10    closing until Wednesday.  I said it had to be 48 hours

11    before closing argument and there was no way that was

12    going to be two O'clock on Wednesday.  So I don't know

13    how that argument helps you.

14         MS. COSTIN:  My recollection, Your Honor, was

15    that the original instruction was 48 hours.  When

16    Mr. Kang asked for additional time --

17         THE COURT:  I said no.  I can't believe I didn't

18    go back and say it would be 48.  I didn't do that?

19         MS. COSTIN:  My recollection was lunch on

20    Monday.  I can check the transcript.

21         THE COURT:  I'll give you to lunchtime.

22         Why is lunchtime six minutes after it ends?  Why

23    wouldn't lunchtime be 1:45?  When are they going to look

24    at it?  Lunchtime would be a good time.  I don't have

25    anything more on that.  I will come back.  I am going to

```
 1   take a recess and think about it.  I don't know what to
 2   do.  I cannot believe I have spent so much time in this
 3   case making clear what is my goal.
 4         You are dropping your arguments?  You just had a
 5   conversation with Attorney Kang or you just decide not to
 6   go with it.
 7         MR. CUNNINGHAM:  Your Honor, I don't want to
 8   mischaracterize or overstate.
 9         THE COURT:  I assume you are not
10   mischaracterizing.  He can come and tell me what he
11   thinks the conversation was.  But I would say like to
12   know what you think the conversation was.
13         MR. CUNNINGHAM:  I think it was yesterday
14   afternoon I said to Mr. Kang during the break, I guess
15   neither one of us are using demonstratives and we both
16   kind of chuckled.  So I'm not implying --
17         THE COURT:  I don't think Attorney Kang
18   chuckles.  Do you want to rethink that?
19         MR. CUNNINGHAM:  Maybe he tittered, Your Honor.
20   That's another euphemism for that.  Maybe.  I don't want
21   to read too much in that conversation.
22         THE COURT:  He did not respond, I sent you some.
23         MR. CUNNINGHAM:  No, he did not.
24         THE COURT:  This was yesterday.
25         MR. CUNNINGHAM:  Yes, Your Honor.  Yesterday
```

2231

1   afternoon.

2           THE COURT:  What were the circumstances, to

3   borrow Cigna's cause of action, under which the

4   conversation happened?  Were you walking in different

5   directions?

6           MR. CUNNINGHAM:  We were taking a break.

7           THE COURT:  You were facing him and uttered

8   those words.

9           MR. CUNNINGHAM:  Yes, Your Honor.

10          THE COURT:  He was paying attention as far as

11  you recall?

12          MR. CUNNINGHAM:  He responded or chuckled or

13  giggled.

14          THE COURT:  Well --

15          MR. CUNNINGHAM:  Whatever he did, Your Honor, it

16  indicated to me that he heard me.  And there was

17  certainly nothing that was said that, Hey, we sent you

18  those on Monday.

19          THE COURT:  I will take a brief recess.  I will

20  come back and advise you of my ruling on the matter.

21          You also should continue to review the charge.

22  You will get the new one shortly.  As I said, you will

23  get a redline, I think its mostly tweaks, plus removal of

24  the double damages.  Check all the redlines at least, if

25  not continue to check the charge.

1          (Whereupon, a recess was taken from 11:48 a.m.

2          to 12:15 p.m.)

3          THE COURT:  Please be seated, everyone.

4          I just delivered what I believe is the final

5     charge.  Unfortunately, the instruction that you also get

6     a redline, either that didn't happen or we just finished

7     printing those.  You will get a redline.  But you want to

8     look at the sections.  But the redline will tell you the

9     picky changes, the causes to cause, the three causes of

10    action to one cause of action.  Those kinds of

11    corrections.  Technical correction, section to section

12    number.  We believe we have caught them all.

13         The only substantive change in this version from

14    the one you've had for the last hour or two, is the

15    deletion of the duplicative of damages charge, and the

16    renumbering of the sections following.  So I don't

17    think -- you can just check that when you get it.  But I

18    don't think that's -- I mean, you know I'm doing it.

19    Okay.  I'm taking it out.  It is out.  So you are on

20    notice of the charge.

21         I would like to ask a favor of counsel.  I

22    always like to check like the charge, particularly

23    section references and the Verdict Form telling them to

24    answer this if you didn't answer that, that kind of

25    thing.  Would there be an objection to me, after your

2233

1    closing arguments, if I found an error, it says go back

2    and look at sections, you know, section 5 or, you know.

3    When I gave you the general instructions (1 through 20),

4    it turns out it's now 1 through 19.  If I made that 19 in

5    the version that is given to the jury, would there be any

6    objection?  You can make it later if you think that I'm

7    doing more than that.  But if that's all I did, would you

8    object to my fixing the technical or in the Verdict Form.

9    If you didn't answer -- I gather Cigna found another one

10   of those.  I think we've already fixed.  Whether you have

11   a copy, I have to get it to you.  We fixed that.  But if

12   we missed one of those, I fixed that in the Verdict Form.

13   That's all.

14          Any objection?

15          MR. CUNNINGHAM:  No objection from the Labs,

16   Your Honor.

17          THE COURT:  How about from Cigna?

18          MS. COSTIN:  No objection.  Your Honor, I did

19   catch something on the Verdict Form and I was told to put

20   it on the record.  If you'd like me to, I'd be happy to

21   do that now.

22          THE COURT:  Yes, put it on the record.

23          MS. COSTIN:  So this is under the Verdict Form

24   on the Labs case for third party beneficiary.  Page 4.

25   Under Section 4, Damages Reduction.  There are references

1    to skip question 3B, skip question 3C.  I believe that

2    should be 4.

3            THE COURT:  Yes.  I was told that on the way

4    out.  He's already made it.  He showed it to me.

5            You made the change that Cigna's counsel told

6    you, Alex, from changing 3B to 4B?

7            THE CLERK:  Correct.

8            THE COURT:  Okay.  That's been made.  Have we

9    given them a copy of the final verdict?  You will be

10   getting those.

11           Other than that change, the Verdict Forms are

12   the same as I think you saw 8:00 version this morning, am

13   I correct?  Is that what you marked that correction on?

14           MS. COSTIN:  Yes.  On the version from 8:00 this

15   morning.

16           THE COURT:  Did you have any other corrections

17   on the 8:00 version that you've already told me?

18           MS. COSTIN:  Nothing else.

19           THE COURT:  Did you have any corrections on the

20   Verdict Form?

21           MR. GESTRICH:  The one objection we would have

22   is to not listing the years out separately.  Because the

23   prejudgment interest issue, that will arise post-trial.

24           THE COURT:  No, I think we need to have that in

25   there.  Don't we?  We have to work on communication here.

1   What dates?  Let me ask you that.  Let's start with that.

2          MR. GESTRICH:  Separate damages numbers by year.

3   So that post-trial, whenever we come to prejudgment

4   interest if a verdict is rendered in the Labs favor, we

5   can calculate damages for the Court.  And the only

6   dispute I assume would be over rates, not due dates.

7          THE COURT:  Again, I suffer when counsel want me

8   to do something to a charge or do something to a Verdict

9   Form.  It would help if it's more than a technical issue

10  to give me the language.  I don't know where you want

11  this and what you want it to say, sir.  So let's be

12  specific.  Make your record.

13         MR. GESTRICH:  Yes, Your Honor.

14         On the Verdict Form, Section 2, there is for

15  each of A, B, and C a line for damages.

16         THE COURT:  Yes.  What are the damages?  Just

17  tell me.  That's the question.  Section 2 A, B, C.

18         MR. GESTRICH:  Yes, Your Honor.

19         THE COURT:  What do you want me to do there?

20         MR. GESTRICH:  We would ask that the damages be

21  split from just a number to for each year.

22         THE COURT:  What are the years, sir?

23         MR. GESTRICH:  2013, 2014, 2015, and 2016.

24         THE COURT:  And then when we go to the special

25  defenses, unbundling, how much do you take out because

1   they unbundled?  And how much do you take out because

2   they failed to mitigate?  Do you want me to put a

3   separate year line there as well?

4          MR. GESTRICH:  Yes, Your Honor.

5          THE COURT:  Oh.  And you proposed this to me

6   somewhere?

7          MR. GESTRICH:  When we discussed the prejudgment

8   interest instruction, it was during that discussion.

9          THE COURT:  I said that I would say address

10  pretrial interest post.  And if you wanted me to do

11  separate years, you should have asked me.

12         MR. GESTRICH:  At that point I believe the

13  discussion with the Court was that there could be a

14  separation by year.

15         THE COURT:  In the Verdict Form?

16         MR. GESTRICH:  In the Verdict Form.  That was my

17  understanding of the conversation.

18         THE COURT:  It might be on the record that way.

19  I don't remember it that way.

20         Is there an objection listing three years?

21         MR. GESTRICH:  Four years.

22         THE COURT:  Four years.  On each question about

23  damages or reduction?

24         MS. COSTIN:  No objection.

25         THE COURT:  All right.  You are not going to use

1    the Verdict Form during closing, right?  Because I can't

2    get that done in eight minutes.  We will do that and

3    we'll have a Verdict Form ready for you by 4:00 today.

4    And if there's any objection, counsel should let me know

5    within 30 minutes and I will have a conference on it.

6            Thank you.

7            MR. GESTRICH:  Thank you, Your Honor.

8            THE COURT:  Question on the slides.  I have one

9    more question and I see only one counsel.  Well, three

10   counsel.  And there's a fourth counsel.  There you go.

11   All counsel for the Labs are here.  I have a question.

12            Did anyone on the team, other than Attorney

13   Cunningham, I'm speaking of the four that are here, note

14   receipt of the email at 2:06 on Monday with the 52

15   slides?  How did you miss it?  I mean, I know there's a

16   flurry of emails.

17            Go ahead, sir.

18            MR. GESTRICH:  Yes, Your Honor.

19            I do believe that popped up on my computer as a

20   pop-up of an email was received.

21            THE COURT:  I know what it means.

22            MR. GESTRICH:  Yes, Your Honor.  And I don't

23   believe that at no time did I review those

24   demonstratives.

25            THE COURT:  At no time until the 3 a.m. email,

1    no one else on the team saw that email, is that correct?

2         Attorney Hare, you have to put more than a shake

3    your head.  Just a no or yes.

4         MR. HARE:  Your Honor, no, I did not look at

5    them.

6         THE COURT:  Attorney Christ.

7         MR. CHRIST:  No, I did not see it until this

8    morning.

9         THE COURT:  Attorney Radshaw.

10         MR. RADSHAW:  I did not, Your Honor.

11         THE COURT:  There's no one back at the ranch in

12    addition to you five, is that correct?  Or if there is,

13    did any of them tell you they saw it?

14         MR. CUNNINGHAM:  No, Your Honor, there's nobody

15    else back at the ranch.

16         THE COURT:  I don't agree with Cigna's view of

17    when this was due.  But I am going to disclose it on the

18    six minute being late or even an hour in six minutes

19    which is probably closer to when I had it in my mind when

20    I said lunch on Wednesday, which would not be a 1:15

21    lunch.

22         I'm not happy.  The reason I spent so much time

23    pretrial and during trial on the subject of

24    demonstratives is so I'm not wasting time when I should

25    be talking about what's wrong with the Verdict Form and

1    how to fix it.

2            I guess I now have Attorney Kang so I can ask

3    him.  Do you recall during a break on Tuesday Attorney

4    Cunningham, as he stood up, and I think you were both in

5    the same place, you would have both stood up and been

6    going to the men's room or somewhere, you would have been

7    looking at each other.  It's his recollection he said,

8    well, I guess neither of us are using demonstratives.  Do

9    you recall that comment?

10            MR. KANG:  Neither of us are using

11    demonstratives?

12            THE COURT:  Yes.

13            MR. KANG:  No, I don't remember that.  I

14    remember us talking about demonstratives.  I certainly

15    did not represent anything that we were not planning on

16    using them.

17            THE COURT:  On that day, what do you remember

18    talking about demonstratives?

19            MR. KANG:  I remember him saying that I guess

20    the Court -- my interpretation was that the Court hadn't

21    ruled on demonstratives.

22            THE COURT:  He said I guess the Court hasn't

23    ruled?  I mean, that doesn't make any sense.

24            MR. KANG:  I did not take away anything from

25    that conversation, Your Honor, that I was withdrawing any

1    demonstratives from our case.  That was certainly not --

2    I would have known that.

3         THE COURT:  Well, I'm not sure even if you

4    acknowledge the comment made, as reported by Attorney

5    Cunningham, which for the sake of what I'm going to say

6    I'm going to assume he made it, and that you didn't

7    disabuse him of his belief that there were none.  I don't

8    know that I would prevent you from using them on that.

9         The bottom line is I am extremely unhappy, and

10   principally at Cigna, about this.  On the other hand, I'm

11   sorry, I know their tactic is to bury you.  And they have

12   done a very good job of that, including burying me in

13   this case.  I wished I had said I would fine everybody

14   for all the exhibits you put on the list and didn't try

15   to get into evidence, because I would be a rich person,

16   or the Government's deficit would be less.  And I

17   understand there's flurries of emails and I can't even

18   keep up with them.  Okay.  But the fact of the matter is

19   that's the mode you have been communicating with.  You

20   are not alone, Attorney Cunningham.  You have other

21   people, any one of whom -- someone of whom should have

22   seen that email or been responsible to check emails and

23   bring it to your attention if you're the closer.

24        I don't believe that I can keep them from using

25   them.  I don't like it.  It's not the ruling I want to

 1    make, Attorney Cunningham.  But I don't see what I can do

 2    about it.  They were disclosed.  I didn't say I want to

 3    see you exchange them.

 4         I have to say, why did I get them at 3:00 in the

 5    morning?  Because you assume I didn't have any objection

 6    and you could have given them to me at 12:15 today in

 7    court.  I think I mentioned I like to look at them to see

 8    if they're prejudicial or problematic from my point of

 9    view, confusing the jury, misleading the jury, et cetera.

10    But 3:00 this morning would not have done it.

11         I'm sorry I'm going to interrupt what I'm

12    saying.  My assistant is handing both sides -- it's still

13    dated.  The date will be removed from the top page of

14    every charge.  But I am handing that both sides.  That

15    the final version and the redline that reflects the

16    changes we have discussed either specifically, and I have

17    ruled or we've had agreement, either a specific edit or

18    categoric, like causes to singular, plural to singular

19    count, plural to singular causes.  Section numbers

20    cross-referencing that are now out of date.  But you have

21    it in your hands.

22         The only thing that did not get done, at my

23    direction this morning, is my view is while the Verdict

24    Forms are in each case, this charge covers both cases.

25    And I believe the caption of both cases should be on the

1    first page.  And it is my view that the Epic case, while

2    numbered later, should be first, because that's the order

3    in which they're read.  But we can argue about the order.

4    I just want you to know the only difference between what

5    was just handed to you and which reflects changes that

6    were decided not just when I handed it to you, in other

7    words, you knew all the changes that are in there, is

8    exactly what I will give as the charge and governs your

9    closings except I intend to add the two captions, which

10   never gets read to the jury, but gets seen by them.  So I

11   need to disclose that.

12           Is there objection to adding the two captions?

13           MR. CUNNINGHAM:  No objection, Your Honor.

14           MS. COSTIN:  No objection, Your Honor.

15           THE COURT:  All right.  I don't know where I

16   left off on this.  I probably could tell you that you

17   couldn't use these, Attorney Kang, because when was I

18   supposed to have the chance to review them and decide if

19   there were too many, or let's assume they were somehow

20   misleading or in error.  I haven't even had a chance to

21   check the basis of these which I normally rely on

22   opposing counsel to say, Judge, this misleads the jury.

23           But the fact he doesn't have any comments, as

24   I've said, I can't charge that to you, Attorney Kang.

25   But the problem is I haven't had the chance.

1           Go ahead.

2           MR. CUNNINGHAM:  Just very briefly, Your Honor.

3           THE COURT:  It better be.  You are into your

4    closing argument time.  How's that?

5           MR. CUNNINGHAM:  That's fine, Your Honor.

6           Your Honor, as I said, there are 57 slides.

7    With everything that's been going on this morning, I will

8    tell you the slides are very detailed.

9           THE COURT:  I know they are.

10          MR. CUNNINGHAM:  And the major concern I have,

11   the overarching concern is these just reek of an

12   allegation of fraud.

13          THE COURT:  Is the word fraud in there?

14          MR. CUNNINGHAM:  I don't think so.  I don't

15   know.

16          THE COURT:  Well, you've got four people other

17   than who have had since 3 a.m. to read through them.

18          MR. CUNNINGHAM:  Your Honor, because this is all

19   about Mr. Bosom and his daughter, they never made the

20   connection on that.

21          THE COURT:  Well, that's what argument is.  They

22   are not going to the jury.

23          MR. CUNNINGHAM:  Making my record, Your Honor.

24          THE COURT:  But I guess I would say, Attorney

25   Kang, if you're not talking about a slide that's up, it

1    better be down.

2          MR. KANG:  Yes, Your Honor.

3          THE COURT:  I'm about to say something I

4    shouldn't say.  So I'm not going to say it.  But there

5    may come a day when I do say it.

6          Are we ready to begin?  Are Counsel ready?  Do

7    you want to turn the table a little bit more?

8          We have time.  This is going to be two hours and

9    a half.  That gets us to 3:30.  We don't have much time.

10   I will give you five minutes if you need to take a break.

11         MR. CUNNINGHAM:  Your Honor, I just want to make

12   sure I have the final version of the Verdict Form because

13   I want to use that in closing.

14         THE COURT:  The only change is the one you just

15   offered me five minutes ago.  You break out the damages

16   by year on both number 2 and number 3 and number 4.  So

17   there will be four lines after each A of question 2, 3,

18   and 4.

19         MR. CUNNINGHAM:  Your Honor, if I could take

20   five minutes, I'd appreciate it.

21         THE COURT:  Other than the addition on the year

22   lines that I cannot do in five mines, everybody should be

23   clear and there's no objection that is the Verdict Form.

24   This is the Verdict Form but for adding the four year

25   individual lines after every question in section 2,

1    section 3, and section 4.  Other than that, which we

2    talked about clearly, which was not objected to, that is

3    the Verdict Form.  So if you see anymore problems, before

4    opening would be a good time.  I realize you haven't had

5    it long and I realize that I didn't even get you the

6    first one.  I think when you saw the Labs, you would have

7    understood why it took us awhile to do.  Well, that and

8    the 87 conferences about the charge which preoccupied me.

9         MR. CUNNINGHAM:  I'm ready, Your Honor.

10         THE COURT:  I have a question for Attorney Kang.

11    Would I be correct in assuming you're spending 40 -- how

12    much time -- we agreed on the time.  You're using a total

13    of 60 minutes between rebutting them and your chief

14    arguments.  Did someone convey to you what we agreed

15    upon?

16         MR. KANG:  Yes.

17         THE COURT:  Thank you.

18         So I think that's an hour and ten minutes that

19    you have like that you are going to use to both rebut

20    their case, defend their case and assert your case.  And

21    the slides appear that 40 percent of them is on Bosom and

22    Jasperson.  Is that how much time you're spending in your

23    closing?

24         MR. KANG:  I don't anticipate I will use many of

25    those, Your Honor.

2246

1          THE COURT:  Oh, okay.  That's good to hear.

2    Because if I had time to review them ahead of time, I

3    might have thought they are excessive.

4          MR. KANG:  I don't think I'm going to use them,

5    to be honest.  I will use maybe some of the patient

6    examples, but I don't anticipate using the Bosom stuff.

7          THE COURT:  So there you go.

8          We planted a flag on the 50 yard line and we're

9    really only going for the 10.  So don't spend any time

10   worrying about the territory from the 10 to the 50 yard

11   line.

12         Everybody wanted a three minute warning.

13   Everybody's 45, 15, and 10; is that correct?

14         I have a short thing to tell the jury before

15   they come out but, otherwise, we're prepared, counsel to

16   begin closing; is that correct?

17         MR. CUNNINGHAM:  Yes, Your Honor.

18         THE COURT:  How about Cigna?  We're prepared

19   from Cigna's side?  I'm sorry.  I didn't hear a verbal

20   response.

21         MR. KANG:  Yes, Your Honor, we're ready.

22         THE COURT:  Thank you very much.  You can bring

23   the jury in.

24         (In the presence of the jury at 12:39 p.m.)

25         THE COURT:  Good morning, Ladies and Gentlemen.

1    Everybody be seated.

2            I think we're ready.  Two small things to tell

3    you, then we'll begin the closings.

4            First of all, remember I was trying to be good

5    about telling you if testimony was offered.  We were

6    trying to avoid calling twice if somebody is a rebuttal

7    expert or whatever.  I was trying to tell you the

8    testimony was offered in either defense in that other

9    side's claim or that side's claim against the first

10   person.  I did not do that for Dr. Boorstein but it will

11   be easy.  You can do his testimony was offered on both

12   defense.  Both in support of the Labs' claims and in

13   defense of Cigna's claims so you can use it in both

14   places.  One other thing I need to tell and that is you

15   will not be hearing in my instructions nor will I think

16   will you hear during closing argument anything about the

17   Labs' Count One.  If you remember Count One had two cases

18   of action.  I told you that at the beginning.  These

19   claims, these causes of actions, those two causes of

20   action in Count One are no longer in the case.  So but

21   just in case you have this thought, all the evidence the

22   Labs have offered is still relevant or they are going to

23   rely on and you should consider in considering what I

24   will continue to call Count Two so as not to confuse you

25   which is the cause of action for third party beneficiary.

1   All the evidence still comes in in that claim and all the

2   evidence Cigna offered in defense of that claim, of all

3   of the claims still comes in and should be considered by

4   you in defense of the third party beneficiary claim.

5          And of course, that's just to be sure you are

6   not sitting there puzzling for the next hour.  Wait, what

7   happened to Count One?  They're not arguing Count One.

8   It's just so you don't worry about that.  I'm going to

9   give you full instructions tomorrow, but I just thought I

10  should tell you something about that so you wouldn't

11  puzzle over it today.

12         Just so you know, the Court has permitted the

13  parties a total of an hour and ten minutes for both cases

14  in closing argument.  And they have chosen and the

15  Court's agreed that it will go as follows: 45 minutes for

16  the argument by the Labs in support of their claim.

17  Cigna will then give a 15-minute defense against that

18  claim.  In other words, we call it -- it's not really a

19  rebuttal, but it's their opportunity to talk to you about

20  why you should notice rule for the Labs on Count One.  So

21  I will call it a rebuttal.

22         The Labs have then saved ten minutes of their

23  time to answer that rebuttal, to say, look, you know,

24  they are trying to tell you this, and whatever.  You will

25  hear what it is.  So you know time wise 45, 15, 10.  That

2249

1    finishes the Labs' case because, you remember, you are

2    deciding that separately.  I will probably take a

3    ten-minute break at that point for everybody, for you,

4    for us, to allow them to get their papers on the stand,

5    that kind of thing.  Then you will come out.

6        Cigna gets 45 minute to argue to you about their

7    claim, their cause of action in their lawsuit.  The Labs

8    then have reserved 15 minutes in rebuttal to tell you why

9    -- what their defense is to that claim.  And then Cigna

10   has reserved ten minutes to respond to the Labs'

11   rebuttal.  So it's exactly the same breakdown of time.

12   So we'll do those three segments for the Labs' case, take

13   a very short break and them come back, do three segments

14   for the Cigna's case.  And at that point I will probably

15   send you home, but it will about close to our usual time.

16   It will be about 3:30.  Now it's going to be closer to

17   3:45.  So I will be right on spot.

18       So I invite Attorney Cunningham to approach the

19   lectern and begin your closing argument on behalf of the

20   Labs and the Labs case against Cigna.

21       MR. CUNNINGHAM:  Thank you, Your Honor.  May it

22   please the Court.

23       THE COURT:  Yes, it does.

24       MR. CUNNINGHAM:  Counsel.

25       Ladies and gentlemen of the jury, good

1    afternoon.  We're almost there.

2          The first thing I need to do on behalf of my

3    clients, and I'm sure Mr. Kang will do this as well, is

4    thank you all for your service.  We have watched you.  We

5    know that you have been paying attention, and we know

6    that at times this was not the world's most exciting

7    case, but we really appreciate the attention you have

8    paid and the hard work that you have done in this case.

9          You know, juries are the most powerful body in

10   our society.

11         THE COURT:  Can I stop you?  I hate to do this.

12   You've got to get closer -- you can bring the mic to that

13   sides if you want.  But I'm afraid -- I'm straining.  I

14   want to be sure they hear you, sir.  And I know that's

15   what you want.  I apologize.

16         MR. CUNNINGHAM:  Thank you.  And tell me if you

17   don't hear me, please.

18         THE COURT:  It's fine now.  And you can walk

19   back to that mic.  Just stay close to a mic.

20         MR. CUNNINGHAM:  I'm afraid of unplugging.

21         THE COURT:  You are fine.

22         MR. CUNNINGHAM:  Members of the jury, juries are

23   the most powerful body in our society.  In criminal cases

24   juries can even decide to put someone to death.  Think

25   about that amazing amount of power that juries have.

1    Fortunately in the case -- this is a civil case, and this

2    case is about money damages.  But I want to thank you

3    again.  We know how hard you've worked and how hard you

4    have paid attention in the case.

5           So why are we here?  At the end of this, at the

6    end of the day what we're going to do is we're going to

7    ask you to award damages to the three labs that were put

8    out of business by Cigna for services that they rendered

9    that we have proven to you were medical necessary.

10   Services that were rendered in most cases ten years ago

11   or more that we were never paid for.  So at the end of

12   this case, that's what we'll be doing is we'll be asking

13   you to award monetary damages or money to those Labs, to

14   our clients for the work that they performed.

15          Now, members of the jury if you think back to

16   opening statement, I think it was about ten day ago, what

17   I told you was this was a problem of Cigna's own creation

18   because Cigna decided that they would sell these

19   individual family policies in Florida.  Cigna decided on

20   the language that would go in those policies.  And what

21   they did that created the problem was if a health care

22   provider who was out of network did not have a particular

23   Medicare code for the services they performed under

24   Cigna's policy that they wrote, Cigna would reimburse

25   that health care provider at reasonable and customary

2252

1    charge which was interpreted to be 100 percent of the

2    charges billed.  That was Cigna's choice.  That's what

3    Cigna agreed to do.  Nobody forced Cigna to sell those

4    policies in Florida.  Nobody forced Cigna to put that

5    language in those policies.  Cigna is a Fortune 500

6    company.  It's a for-profit company.  And that's what

7    they decided to do.

8         Now you heard what happened here is around 2014

9    the alarm bells started going off at Cigna, and it was

10   clear to Eva Borden, who was a risk manager, to

11   Mr. Norton, whose testimony you heard, and you are heard

12   Ms. Borden's testimony, and to Mr. Evanko who you saw

13   yesterday.  It was clear to Cigna that they had a big,

14   big problem, a financial tsunami, a financial avalanche

15   that was being created by substance treatment in South

16   Florida.

17        Now, remember we have proven to you that lab

18   testing was a covered service under the Cigna policy.

19   Now, they have argued, or they have tried to prove to you

20   that, well, it was eligible.  You had to meet certain

21   requirements.  But the presumption was if you billed for

22   lab testing, that was a covered service.

23        So what happened here?  Cigna knew that it had

24   to solve this problem as quickly as possible.  You heard

25   the testimony of Mr. Evanko yesterday.  This was a big

2253

1    problem.  He was responsible for that individual family

2    plan division, and he admitted that, sure, I was

3    concerned about profits.  We were looking at 150 to 200

4    million dollars than we had been spending for this type

5    of treatment.

6          So what did they do?  Well, the problem was for

7    them that they could not change that policy quickly

8    yesterday.  You will remember that testimony from

9    yesterday.  They had to work through the Florida office

10   of insurance regulation.  They had work with Texas with

11   the insurance department in Texas.

12         Is that me, Your Honor?

13         THE COURT:  No.  Alex, could you close the back

14   doors.  Liana, could you close this door.  Thank you very

15   much.  I apologize for that interruption.

16         MR. CUNNINGHAM:  So they knew they couldn't fix

17   it quickly.  They weren't going to be able to change

18   those policies.  So they were going to keep incurring

19   those losses.  And you know, it was Ms. Borden and

20   Mr. Gerhard's job to figure out what's coming because we

21   need to be able to plan for this.  We need to turn a

22   profit in this division.

23         There was no other way for them to fix this

24   quickly than to do what they did.  They turned to the

25   SIU, the special investigation unit.  Because when they

1    did that, that allowed them to cut off payment

2    immediately.  You heard a lot of testimony in this case

3    about pends, P-E-N-D-S, about prepay edits, about

4    flagging TINs, tax information numbers.  That was the

5    only way that they could take care of this problem

6    quickly.  Now, they have had testimony in this case that,

7    well, sure, we would do that and we wouldn't pay, but if

8    they gave us what we needed and, of course, we could

9    later pay them.

10          Members of the jury, the evidence in this case

11   has been with our three labs, once those flags were

12   placed, they never paid us.  Never.  Despite whatever

13   information we gave them.  Let's talk about that.

14          So what happens here is Ms. Canto, who by the

15   way is a nice lady.  If anybody thinks I was too

16   aggressive with her, please don't take that out on my

17   clients.  You will have the ability -- well, there's a

18   jury instruction that talks to you about credibility of

19   witnesses.  I think we can say this about several of the

20   Cigna witnesses.  You can determine their ability to

21   remember things, you can determine how argumentative they

22   are.  You can determine how nice they were on direct

23   examination from Cigna's lawyers versus how they were on

24   cross-examination.  That is all something you can look at

25   in determining credibility of those witnesses.

1           What happened here?  So Ms. Canto is advised

2    that we have this major problem and we've got to do

3    something about this.  So what do they do?  Well, the

4    first thing they do is they place a flag, you heard a lot

5    of talk about flags, they place a flag on PB Labs.  What

6    happens with that is once you place that flag, they sent

7    the letter, the letter 56 requesting medical records.

8    Now, remember, our clients were labs.  And what the Labs

9    did is they got prescriptions from the treating doctors.

10   The treating doctors are the ones who are taking a

11   history from the patient, examining the patient,

12   determining a course of treatment for the patient and

13   assessing what is wrong with the patient.

14           We know these were all substance abuse patients.

15   And you have heard that this was rampant in south Florida

16   at the time.  This was part of the opioid crisis that

17   gripped major, major portions of this country.  So the

18   doctors sent in the prescription to our Labs, to my

19   clients.  And all we were doing was filling those

20   prescriptions.  They told us what they wanted and we did

21   it.

22           You heard Mr. Lagan talk about these machines.

23   We had these $350,000 machines that performed this

24   testing.  And there was a need for this for labs that

25   could respond quickly because the Labcorps and Quests of

1    the world weren't filling that need for a lot of

2    providers.  And that was especially important when

3    treating people who were suffering from the disease of

4    addiction.  You needed quick results.  You needed to know

5    what that person might have in their blood or in their

6    urine on a particular day.

7         So what happened here is our labs didn't have a

8    lot of medical records, the treating doctors would have

9    those medical records.  What we had typically is what you

10   saw in this case, which is lab request forms and

11   statements of medical necessity from the doctor, and this

12   is what I need, this is what I want you to test.  This is

13   what we had.

14        So we gave Cigna everything we had.  And you

15   heard the testimony in this case.  It was a large box of

16   documents, 20 patient records.  Now, there  was a lot of

17   talk about well, were these documents that I asked

18   Ms. Canto and Dr. Nicoll the actual records that they

19   reviewed.  And there was a lot of back and forth on that.

20   Cigna finally admitted, yes, those were the records.  We

21   got them from Cigna.  So those were the records, in case

22   there's any dispute about that or any disagreement about

23   that.

24        So those medical records get sent because they

25   placed a flag of medical necessity.  They called it

2257

1    services not rendered as billed, I believe, which they

2    admitted is essentially the same thing as medical

3    necessity.  So they did that.  We sent those.  Ms. Canto

4    sends those to Dr. Nicoll.  And you saw the testimony of

5    Dr. Nicoll.  He sends her a large box of documents, I

6    believe on September 19, by UPS to be sent to Cigna's

7    office in Melville, New York, which is where Dr. Nicoll

8    wanted them.  This is a large box of medical records.

9    That's how she described it.

10        Within a number of hours, roughly 2 p.m. the

11    next day.  Dr. Nicoll sends back an email to Ms. Canto

12    and says, hey, I received the box of records, I will

13    return the favor at some point.  Obviously, he wasn't

14    happy about receiving all of those medical records.  And

15    he said, I have reviewed ten of the patient records.

16    Now, members of the jury, again, this is an issue of

17    credibility.  Remember the email from Dr. Nemecek a few

18    months later when Stephanie Canto sends those records and

19    probably some other selective records for the same

20    patients, and Dr. Nemecek says, if you really want me to

21    review these, it is going to take three to four months.

22        It took Dr. Nicoll less than three hours to

23    allegedly review these records.  And what did he say?  He

24    said -- and you will remember this and you will this

25    exhibit in evidence.  None -- all caps.  None of these

1    records show positive quantitative findings.  And we went

2    through those with Dr. Nicoll, and I will talk to you

3    about a few of those right now.  And you have all of

4    these in evidence if you care to review any of these.  I

5    know we went through this with Ms. Canto and with

6    Dr. Nicoll.

7           But let me just show you Joint Exhibit 15.  Page

8    3, please.

9           So you will recall in these records that were

10   sent there was a signed form by the treating doctor, the

11   doctor who was actually treating the patient, stating

12   that every test -- attesting that every test was

13   medically necessary.

14          Mr. Smeig, can you kind of enlarge that, please.

15   Larger, please.  Scroll down a little bit more.

16          Okay.  So it says, To enable me to assess the

17   cost of testing -- my patient for this toxicology custom

18   panel and confirmatory testing hereby directed, I have

19   carefully reviewed the tests that I have selected to

20   include in the panel.  I understand and hereby

21   acknowledge, number one, I only order tests that I

22   believe to be medically necessary for each individual

23   patient to assure patient compliance with therapy I have

24   prescribed for the patient.  And I will order this panel

25   accordingly.  If not all of the components of this custom

1    profile are medically necessary, I will only order those

2    individual tests or a less-inclusive profile I believe to

3    be medically appropriate.

4         This form, or a form just like it, was in every

5    one of the 20 patient records that the Labs provided to

6    Cigna.  The doctor -- the treating doctor when sending

7    this request to the Labs is attesting that everything

8    that I have requested here is, to my knowledge, medically

9    necessary -- to my belief, medically necessary.  We

10   showed you 20 of those.  And in the interest of time, I

11   am not going to go through all of those again.  I'm sure

12   you will recall those.  You can look at those when you

13   are deliberating, if you care to.

14        Now, Dr. Nicoll admitted that he never told

15   Ms. Canto about the existence answer on the sworn doctor

16   statements attesting to medical necessity.  He just never

17   did that.  Dr. Nicoll decided on his own to only review

18   ten records.  Now, he says he reviewed ten records.  Each

19   one of these records may have contained hundreds, if not

20   thousand, of medical records.  He says he reviewed ten.

21   The point is he was asked to review 20.  And he never

22   told Ms. Canto that he was not going to review 20.  But

23   as he said, it is noteworthy of the ten charts I

24   reviewed, none had a positive quantitative test.

25        You all will recall that Dr. Nicoll didn't stop

1    there.  Dr. Nicoll went beyond that and said, I think you

2    should stop payment and seek recovery.  He admitted that

3    he went outside his lane.  He admitted that he

4    overstepped his bounds, and he admitted he was criticized

5    by his superiors at Cigna for doing that.  Now, why is

6    that important?  We believe what it shows is what he had

7    determined from the beginning.  He knew as soon as he got

8    those records -- first of all, he got that box, he was

9    not going to a review a gigantic box of medical records.

10   What was the easiest thing for him to do?  Just say I

11   looked at these and there's no medical necessity here.

12   Despite the fact that every one of those records, as you

13   have seen, contained a statement of medical necessity and

14   despite the fact that every one of those records showed a

15   positive quantitative finding.

16        Remember we talked about point of care testing,

17   which I was described as peeing in a cup.  So a lot of

18   those records showed positive point of care testing, and

19   then there were a lot of the other records that showed

20   positive testing that was actually sent out to the Lab

21   for various substances.  Every one of those records we

22   showed you had that.  But Dr. Nicoll said no, no medical

23   necessity.

24        Why would he do that?  Because that was the only

25   way to justify not paying the claims.  So you know what

1    happened after that.  What happened after that is they

2    get Mr. Welch involved.   And I thought we were going to

3    have a long cross-examination of Mr. Welch.  He was a

4    lawyer at Cigna.  He was there four years.  He was there

5    at the relevant times.  There were a lot of things that

6    he said that were not in the notes because Cigna claimed

7    that what he said was privileged.  But what Mr. Welch

8    did, and you saw this letter, Mr. Welch lifted the flag

9    for medical necessity.  We're not going to rely on that

10   anymore.

11        So was that the end of a story?  You remember

12   all these Cigna employees told you, well, if we flag

13   something and we get the information we are looking for,

14   then we'll pay those claims.  They just got the

15   information they were looking for.  They just got

16   statements of medical necessity for 20 patients signed by

17   the treating doctor and they had positive quantitative

18   tests on every one of those patient records you saw.

19        So why are we're here?  We're here because of

20   the plan.  The master plan.  We can't pay all of these

21   claims.  We think these are bad actors.  You saw that

22   when they did that prepay edit how many different labs

23   did they just paint with that broad brush?  We don't

24   think any of you are submitting any legitimate claims.

25   That wasn't just our three labs.  I think there were 24

1    different labs they just eradicated in one fell swoop.

2          Why?  Because then they wouldn't have to pay, at

3    least not then.  We're here and what we're hoping for is

4    that you will tell Cigna today is the day you pay,

5    because these tests were medically necessary, they are

6    covered services, we did what we were supposed to do and

7    you broke your promise to us because, members of the

8    jury, that's what this is at the end of the day.

9          This is breach of contract case.  The Cigna

10   policies at issue here, these individual family plans,

11   provided that lab testing was a covered service as long

12   as you medical necessity.

13         So what happened when they lifted that flag on

14   PB Labs for medical necessity?  They went and placed

15   another flag.  And we're not going to talk that much

16   about it now.  I'll talk more about it.  It's called fee

17   forgiveness.  I'm going to talk about it more when I'm

18   arguing in defense of the case Cigna brought against us

19   because, as you guys know, I talked about with

20   Mr. Goldfarb on examination, Cigna wants back every penny

21   it ever paid to these Labs.  They wants $16 million

22   back.  They want you to believe that not one single lab

23   test we performed was medically necessary or something

24   they should pay for.  That's what they want back.

25         What did Mr. Goldfarb say?  He said, well, we

2263

1    can only place one flag at a time.  This is a Fortune 500

2    company, whose software system only lets them place one

3    flag at a time.  That's what he said.  So what do we want

4    to do when we can only place one flag at a time?  We want

5    to place the most inclusive flag.  We want to try to stop

6    paying everybody if we can.  Medical necessity didn't do

7    it.  We couldn't prove lack of medical necessity, so we

8    have to go with fee forgiveness, even if there's no basis

9    for it.  We'll talk about that a lot more.

10          There was no policy language in Cigna's policies

11   at the time that prohibited fee forgiveness for medical

12   providers.  But that didn't matter because all they

13   wanted to do was they wanted to stop paying these claims

14   as quickly as possible.  Mr. Evanko had to make his

15   numbers.  Do you know how bad it would have looked to

16   take a 150 to 200 million dollar hit in the individual

17   family plan department at Cigna?  Well, maybe Cigna

18   should have thought about that when they decided to sell

19   these policies and when they wrote these policies the way

20   that they did.

21          What happened here, members of the jury, is

22   Cigna had a problem of their own creation.  And what did

23   they do?  They found a scapegoat.  The scapegoats were

24   the health care providers.  The health care providers

25   performed medically necessary services.

2264

1          And members of the jury, there's no dispute in

2     this case that our Labs did a ton of work and sent those

3     bills to Cigna.  Now they're going to say, well, they did

4     too much.  Well, even if we did too much, pay us for what

5     you should pay us for.  We would submit to you they

6     should pay us a lot more than zero.  And I will get to

7     that in just a moment.

8          You also heard Ms. Thelian -- Jackie Thelian was

9     her name.  She was here a couple of days ago.  She

10    confirmed that every one of these patient had a positive

11    test.  We also brought you the testimony of Dr. Mendolia.

12    I believe he was the witness in this case.  He said he's

13    been practicing medicine for 17 years.  He's retired now.

14    He talked about medically necessary.  I think he said he

15    worked in the emergency room, maybe in Brooklyn.  And he

16    said he saw substance abuse patients there.  And he

17    testified -- he told you that doctors -- treating doctors

18    are the ones that determine medical necessity, what is

19    necessary for that patient's care.

20         Then yesterday, you heard the testimony of

21    Dr. Boorstein, who I think has more degrees from Harvard

22    than any other living person.  When I heard his

23    background, I thought to myself I wonder if he's paid off

24    all the student loans yet.  He's an older gentleman, but

25    very, very incredibly well-educated man.

1    And you got to hear his testimony.  Board

2    certified, director of two distinguished hospital

3    pathology departments, lab director, medical director.

4    He testified that only a treating physician determines

5    what is medically necessary.  And doesn't that make

6    sense, ladies and gentlemen?

7    Medical necessity appropriately determined by

8    doctors who are actually seeing the patient, talking to

9    the patient, observing the patient, examining the

10   patient.  Isn't that who should determine medical

11   necessity, or should it be somebody who is sitting in

12   some remote office in Cigna's corporate headquarters

13   saying, oh, my God, we have 150 to 200 million dollar

14   problem?

15   Well, Mr. Evanko, whose fault is that?  Well,

16   you know, we sold the policies.  Nobody forced us to.  We

17   wrote this language.  Nobody forced us to.  But let's

18   find a way not to pay this.  Let's blame these Labs.

19   Let's shoot first and let's ask questions later.

20   And even when they ask the questions, they got

21   answers they didn't like.  So they still didn't pay.

22   That was the easiest and quickest way to try to shut down

23   these Labs.

24   Now, we were talking about Palm Beach Labs.

25   Let's talk about BioHealth for a minute.  I am going to

1    be very brief on this.

2            You might recall I asked Ms. Canto about this,

3    and I would submit she was rather combative about this,

4    but that's just my assessment.  You all get to determine

5    that.  You guys get to judge that.  The testimony was

6    crystal clear that she never, never investigated

7    BioHealth for performing tests that were not medically

8    necessary.  I think her quote was I never investigated

9    them for that, sir.

10           So one other thing.  Remember when Ms. Canto

11   placed the flag for fee forgiveness after giving up on

12   medical necessity with respect PB Labs.  You remember how

13   excited some of the people in the SIU were?  I think it

14   was Mr. Hixson said, wow, that's great action.  That's a

15   great response by Stephanie.  We have 750 of these pends.

16   That's a great idea, Stephanie.  You know why?  Because

17   then they wouldn't have to review medical records.

18   Because if you are going to place a flag for lack of

19   medical necessity, you have got to be able to review

20   those medical records.   Right?  So that's a great

21   response by Stephanie and Deana to deal with this

22   problem.  We had 750 pends.  Great job.  And that proves

23   to you that that's what they were trying to do, was just

24   try to deny these claims as efficiently as possible.

25           You heard the testimony of Mr. Norton, the

```
1   director of the SIU.  He also confirmed that BioHealth

2   was never accused of performing tests that were not

3   medically necessary.

4           So what does Cigna say in their policy --

5           Can we go to Joint Exhibit 48, please,

6   Mr. Smeig, pages 52, 53.  Do you have that, sir?

7           All right.  Here is what Cigna's policy says.

8           And I am going to need you to scroll down so I

9   can see here more of the next column, Mr. Smeig.  The

10  other way.  Sorry.

11          Here's what Cigna's policy says.  This is an

12  exhibit that's in evidence.  "In general, health services

13  and benefit must be medically necessary to be covered

14  under the plan.  The procedures for determining medically

15  necessary vary according to the type of service or

16  benefit requested and the type of health plan."

17          Please go farther down, Mr. Smeig.  Let's go

18  back up.  I'm sorry.  Go to the bottom of that left

19  column, please.

20          "Medical necessity determinations are made on

21  either A" --

22          MR. KANG:  Your Honor, I hate to interrupt, but

23  this is not a Florida policy.

24          MR. CUNNINGHAM:  It is an exhibit in the case,

25  Your Honor.  That's how it was represented to us.
```

1            THE COURT:  Can I see the title?  Can you get

2    rid of the blow-up?

3            What is it from?  Is it from an exhibit, sir?

4    Is it from an exhibit?

5            MR. CUNNINGHAM:  Yes, Your Honor.  Exhibit 52 --

6    I'm sorry, Exhibit 48.

7            THE COURT:  It's in evidence and it's dated

8    2015.  What is your objection, sir?

9            MR. KANG:  I apologize.  I thought it was a

10   different plan.  I apologize.

11           THE COURT:  You may continue.

12           MR. CUNNINGHAM:  Can I have my time back for

13   that?

14           THE COURT:  You can have your time back.

15           MR. CUNNINGHAM:  Let's go to page 53 of that,

16   Mr. Smeig.

17           So you saw this testimony briefly.  And what it

18   says in this policy at page 53 is -- it's captioned

19   "Notice of adverse determination."  What it says is, as

20   follows, "Every notice of an adverse benefit

21   determination will be provided in writing or

22   electronically and will include all of the following that

23   pertain to the determination.  Information sufficient to

24   identify the claim.  The specific reason or reasons for

25   the adverse determination.  Reference to the specific

1    plan provisions on which the determination is based.  A

2    description of any additional material or information

3    necessary to perfect the claim.  And an explanation of

4    why such material is -- information is necessary.

5         And let's stop there.  So this is what Cigna

6    promises in its policy it is going to give you if they

7    say we're not going to pay you.  Did you see one piece of

8    paper Cigna put in evidence in this case that does this?

9    Did you see any evidence that Cigna ever did this with

10   respect to the Labs?  I would submit to you that the

11   answer is no.  And there's a very simple explanation for

12   that.  Because they never gave it to us.  They never gave

13   us these notices of adverse determination their contract

14   with these providers says they would do.

15        But as to BioHealth, there was like never an

16   adverse determination.  And we believe -- we submit to

17   you that we have met our burden of proving medical

18   necessity on those claims.  They never even disputed

19   that.

20        Let's go to our last lab, which is Epic.  The

21   facts here are simple.  Cigna never alleged that Epic did

22   anything wrong.  Ever.  So why are we here with respect

23   to Epic?  Why didn't Cigna pay us?  We didn't do anything

24   wrong.  They don't even claim we did anything wrong, but

25   they didn't pay us.  Why?  Maybe Mr. Kang can explain

 1    that to you.

 2            Members of the jury, I would submit to you that

 3    we have proved to you by the greater weight of the

 4    evidence that we have carried our burden under these

 5    insurance policies.  This is a simple breach of contract.

 6    Cigna says to us, you prove that these services are

 7    medically necessary, we're going to pay you.  Well, guess

 8    what, we proved that they were medically necessary, and

 9    they haven't paid us.

10            Let me do this.  Let me go --

11            Your Honor, do you know how much time I have

12    left?

13            THE COURT:  Yes.  You have 22 minutes.  That's

14    to the warning.  I apologize.  And so you have -- I

15    apologize.  I should know this.  I just turned the page.

16            MR. CUNNINGHAM:  I think I'm fine.

17            THE COURT:  You have until 1:32, which in any

18    clock 15 minutes.

19            MR. CUNNINGHAM:  Okay.  Now, we are bringing

20    these claims under what's called a third-party

21    beneficiary theory.  In other words, even if you are not

22    an explicit party to the contract, there are factors that

23    we have to prove to be able to recover under those

24    contract.  So here's -- hang on one second.

25            Here we go.  Let me talk to you about this

1    first.  Let me give you a little bit of the jury

2    instructions here.   And Judge Hall is going to read to

3    you all the jury instructions.  It's called charging the

4    jury.  She's going to do that tomorrow morning, I

5    believe.  But we know some of the jury instructions that

6    are definitely going to given here.  So on the

7    third-party beneficiary claim of the Labs, the first

8    element that the Lab must prove to prevail on this cause

9    of action in Count Two is that Cigna was obligated to

10   make payments under the terms of its policies.  This

11   element requires a lab to prove by a preponderance, or

12   great weight, of the evidence, that the tests it

13   performed were medically necessary.

14        In order to be medically necessary, as that term

15   is defined in the Cigna plan, the services must be

16   appropriate and necessary for the symptoms, diagnosis or

17   treatment of the condition.  Lab testing was certainly

18   appropriate for symptoms diagnosed or the treatment of

19   substance abuse.

20        Provided for the diagnosis or direct care and

21   treatment of the medical condition.  Obviously, the lab

22   testing was done so that the doctors could arrive at a

23   diagnosis based on what substances were in or not in the

24   blood or urine.

25        Within the standards of good medical practice.

1    All of these lab tests that were prescribed by the

2    doctors were prescribed by doctors who were using

3    standards of good medical practice.

4         And not primarily for the convenience of any

5    insured person, physician or another provider.  These lab

6    tests were ordered -- were prescribed by the treating

7    doctors for the benefit of the patients.  They were

8    treating people in some cases whose lives were in danger

9    because of substance abuse.

10        So members of the jury, that's what you are

11   going to see as to what medical necessity is as

12   determined by Judge Hall.  That's what the law is on

13   medical necessity.  And we have proven that to you all

14   definitely by the greater weight of the evidence.

15        So let me go to the Verdict Form.  And there's

16   another jury instruction I want to talk to you about.

17   And this is what we have to prove to prove that we have a

18   claim or entitled to recover as a third-party beneficiary

19   under these insurance contracts.  The Labs must prove

20   each of the following elements by the greater weight of

21   the evidence that Cigna was obligated to make payments

22   under the terms of its policies.  We have proven that to

23   you.

24        The Labs, as a medical services providers, were

25   clearly and manifestly intended to directly benefit

1    primarily and directly from these policies.  I am going

2    to come back to that one.

3        That Cigna breached the obligation to make

4    payments under the terms of the policy.  In over ten

5    years, they haven't paid us yet.  So we have proven that

6    to you.

7        And that the Labs were damaged by Cigna's

8    nonpayment.  We have proven that to you.  All of these

9    Labs went out of business.  And we are going to talk to

10   you about specifically what our monetary damages are.

11       So let me talk to you about this one of the four

12   items that we just talked about.  The Labs were clearly

13   and manifestly intended to benefit primarily and

14   directly.  Florida statutes contain provisions that

15   expressly direct payments to and in favor of the

16   providers.  And Judge Hall will give you that instruction

17   as well.  You will see that in your packet of

18   instructions.  So Florida statutes say the law in Florida

19   is that providers -- excuse me -- that health insurers

20   have to direct payments to and in favor of the providers.

21       There's also a history of payments made by Cigna

22   to the Labs.  That was testified to in this case by

23   Mr. Haney.  There had been a course of dealing here where

24   Cigna had been paying for these services for a period of

25   time.  There were also admissions by Cigna's witnesses

1    that the claims would have paid directly to the Labs

2    unless a flag was placed on the Labs.  Testimony was if

3    we didn't place a flag, yes, we send payment directly to

4    the Labs.

5         There was also an admission by Mr. Evanko that

6    Cigna stopped issuing these policies in Florida to stop

7    paying providers like the Labs, and those are for the

8    reasons that we believe that these Labs were clearly and

9    manifestly intended to benefit directly from these

10   policies.

11        Let me talk to you about the Verdict Form

12   because this is actually what you are going to have to

13   work through in determining the damages of the Labs.  So

14   the first question is, "Have the four elements of the

15   third-party beneficiary cause of action been proven by a

16   preponderance of the evidence as to each Lab?"  And

17   that's what I just went over with you.  Okay.  We have to

18   prove those four elements.  We have proved all of them --

19   each of them overwhelmingly, even though we need to prove

20   them by greater weight of the evidence.

21        In terms of the damages for BioHealth, if you

22   answer Question 1 -- let me talk to you about this.  This

23   is going to be on -- It's Exhibit 6983.  You will see

24   this in evidence.  This was a report by Mr. Haney, who

25   you saw a couple of times.  He determined -- and he went

 1     through the whole methodology.  He's a CPA and he's also

 2     a statistician, I believe.  I think he has his MBA as

 3     well.

 4          So his testimony was -- he told you what his

 5     methodology was.  The damages for BioHealth, $3,501,090.

 6     And this was after applying all of the appropriate

 7     discounts.  He told you exactly how he did that.  The

 8     damages that he determined for Epic were $855,474. The

 9     damages he determined for PBL were $729,366.

10          So there is a defense or -- Cigna is going to

11     say that the Labs were guilty of something called

12     unbundling and, therefore, you should reduce the damages

13     because of that.  You did not see any specific example of

14     unbundling.  Hasn't been brought to you.  Instead, Cigna

15     wants you to speculate about where unbundling occurred

16     and what -- exactly what codes were unbundled.  Even

17     worse, Cigna will argue that if two codes were unbundled,

18     the Labs should not receive any payment for any service.

19          Cigna may argue that the Labs billed for

20     urinalysis.  But if you look at Dr. Nicoll's records or

21     if you look at those records that were sent to Dr.

22     Nicoll, you will find that the ordering physicians

23     requested urinalysis.  On the test results, you will see

24     the results of the urinalysis.

25          So the unbundling argument by Cigna just has not

1    been proven in this case, and they have never given any

2    proof of exactly how many dollars should not be paid

3    because of unbundling.  They haven't even proved that it

4    occurred.

5          Members of the jury, Mr. Kang is going to get up

6    in a few minutes and he'll be able to present the defense

7    of our case against Cigna, and then I will have a few

8    minutes left to rebut whatever Mr. Kang says.

9          Here's what I want to leave you with.  This

10   whole question of medical necessity.  Really what you are

11   deciding is:  Do treating doctors get to determine

12   medical necessity, or do people sitting in an office at

13   Cigna?

14         And you may remember there was kind of famous

15   line in the O.J. Simpson case where Johnny Cochran in

16   closing argument said, If it doesn't fit, you must

17   acquit.  What I would tell you in this case is if Cigna

18   doesn't want to pay, it doesn't matter what the treating

19   doctors say.

20         Members of the jury, we would ask that you find

21   in favor of the Labs in the amounts that I just

22   described.  We have proven to you that we suffered these

23   damages and that Cigna breached the contracts that it had

24   in this case.

25         Thank you so much for your time and attention.

1          THE COURT:  Thank you, Attorney Cunningham.

2          I will turn now to Attorney Kang, I believe will

3    do it for Cigna.

4          MR. KANG:  Yes, Your Honor.

5          THE COURT:  And I believe you reserved 15

6    minutes.

7          MR. KANG:  Thank you, Your Honor.  May it please

8    the Court.  Counsel.

9          Ladies and gentlemen of the jury, I want echo

10   Mr. Cunningham's appreciation for the time commitment

11   that each one of you have made during these past two

12   weeks.  I know the days have been long, and you have been

13   very patient.  But we appreciate the attention that you

14   have shown to us during this trial.

15         As I hope has been apparent during the course of

16   this case, this is an important one for Cigna.  After the

17   break, I am going to have an opportunity to address

18   Cigna's claim for damages based on unjust enrichment.

19   But for now, I'm going to explain why we believe the Labs

20   have not met their burden to prove the claim that they

21   have brought against Cigna.

22         And as Judge Hall told you this afternoon, the

23   Labs now have only one count remaining.  That's a breach

24   of contract claim, called third-party beneficiary.  And

25   Judge Hall is going to instruct you tomorrow that for

1    this claim the Labs have a burden of meeting every single

2    one of the elements.  If they fail to meet even a single

3    one of those elements by a preponderance of the evidence,

4    then you must find in Cigna's favor.  That's the law.

5            And the Court will tell you tomorrow, ladies and

6    gentlemen, that the Labs have the burden to prove that

7    when Cigna and individual insured entered into these IFP

8    policy contracts, Cigna and those individual patients

9    clearly and manifestly intended out-of-network providers,

10   like the Labs, to be the primary and direct beneficiaries

11   of that contract between Cigna and this individual

12   member.

13           The Labs also, Judge Hall will tell you, has the

14   burden of proving that each of the drug testing services

15   at issue were medically necessary.  Ladies and gentlemen

16   of the jury, I submit to you that the Labs will not and

17   have not been able to establish their burden on either of

18   these elements.

19           Let me start with the issue of whether the Labs

20   were intended by Cigna and these individual members to be

21   the primary and direct beneficiary of these IFP policies

22   because I submit to you if you find in favor of Cigna on

23   this element, your job on the Labs' one count is done.

24   And when you consider this element, I will invite you to

25   look at the language of the IFP policy.  It is admitted

1   at Joint Exhibit 51, ladies and gentlemen.

2          And I found it curious as I was listening to

3   Mr. Cunningham's closing argument that he didn't show you

4   that IFP policy.  The Labs are bringing a breach of

5   contract claim in this case, and he didn't even show you

6   the contract that's allegedly breached.  And the reason I

7   submit to you he did not show you that is because when

8   you take a careful look at Joint Exhibit 51, there's

9   nothing in there showing that out-of-network providers

10  like these Labs were intended by Cigna and individual

11  members to be the primary and direct beneficiaries of

12  those policies.

13         Instead, what you are going to see is reference

14  that the beneficiaries are the individuals.  The

15  individual's family members.  They are the intended

16  beneficiaries.

17         Mr. Salazar, could you put that up, please.

18         THE COURT:  Joint Exhibit 51, sir?

19         MR. KANG:  Yes, Your Honor.

20         THE COURT:  Thank you.

21         MR. KANG:  Ladies and gentlemen, this is page 6

22  of Joint Exhibit 51.  Please, I invite when you go back

23  to deliberate look at this document carefully.  And you

24  will see about this policy when we use the term "insured

25  person" in this policy, we mean you, the individual and

2280

1    any eligible family member who is covered under this

2    policy.  You and all family members covered under this

3    policy are listed on the policy specification page.  No

4    mention of out-of-network providers.

5         Let's look at page 23.  Here's another portion

6    of the contract.  You and -- you, your and yourself is

7    the policyholder who has applied for and been accepted

8    for coverage as an insured under the policy and is named

9    as the insured on the specification page.

10        Page 17, Mr. Salazar, if you could.

11        Family member means your spouse, children or

12   other persons eligible for coverage under this policy

13   because of their relationship with you.  Family members

14   who may be eligible for coverage under this policy are

15   described further in the section of the policy titled

16   "Who is eligible for coverage?"

17        Ladies and gentlemen, this language is clear on

18   who the intended beneficiaries of these policies are.

19   And if you had any lingering question or doubt on this

20   issue, you heard yesterday from Brian Evanko.  He was the

21   head of the Cigna business unit that oversaw this

22   product.  Remember what he said?  He testified that the

23   purpose of the IFP product was to help provide health

24   care coverage for individuals and family members who were

25   previously uninsured before the implementation of

1    Obamacare.  He testified that the primary beneficiaries

2    of these IFP contracts were the individuals who purchased

3    the policies and their families.  And that makes total

4    sense, doesn't it?  Right?

5         When a person signs up for an individual

6    contract for health care benefits, who do you think that

7    she's primarily and intending to benefit?  Herself, her

8    spouse, her children.  You really think that an

9    individual insured is entering into a contract to

10   primarily and directly benefit out-of-network providers

11   like these Labs?  No, of course not.  That makes

12   absolutely no sense, ladies and gentlemen.

13        So both your common sense and the evidence will

14   make clear that the Labs cannot meet their burden of

15   proving that they were the primary and direct

16   beneficiaries of these IFP policies.  The beneficiaries

17   were the people.  They were the individuals.  They were

18   their family members, not out-of-network providers like

19   the Labs.  So on that, if you find in our favor, your job

20   on this count is done.

21        But there's more.  Because the Labs also, as

22   Judge Hall will tell you, have the burden of proving --

23   they have the burden in their case of proving that their

24   services that they seek payment for were medically

25   necessary.  Okay.  And Judge Hall is going to instruct

1    you on what medical necessity means.  She's going to say

2    that there are four things that need to be met.  Service

3    needs to be appropriate and necessary for the symptoms,

4    diagnosis or treatment of the condition.

5         Two, needs to be provided for the diagnosis or

6    direct care and treatment of the medical condition.

7    Three, it has got to be within the standards of good

8    medical practice.  And four, not primarily for the

9    convenience of any insured person, physician or another

10   provider.  Not for catching paints, like Dr. Mendolia

11   said.

12        I submit to you, ladies and gentlemen, the Labs

13   cannot meet their burden of proving each of these four

14   elements of medical necessity.  And how do you know that?

15   Well, for starters, they didn't bring in a single doctor

16   who treated any of the patients at issue in this case to

17   testify that the drug testing services they ordered from

18   the Labs were medically necessary.  When you deliberate,

19   go ask yourself:  Why didn't they do that.  Could it be

20   that no doctor was willing to come up here, take the oath

21   to testify truthfully and look in your eyes and tell you

22   that these outrageously excessive battery of testing

23   services was, in fact, medically necessary?

24        The Labs also, ladies and gentlemen, didn't call

25   an expert in substance abuse treatment who had reviewed

1    the specific orders, the specific test results in this

2    case, and the specific claims at issue it tell you, yeah,

3    these services were medically necessary.  What experts

4    did they rely upon instead?  Professional coder, who

5    admitted that she's not a clinician.  A statistician and

6    a pathologist who hadn't reviewed a single medical record

7    or test result at issue in this case.  All of them

8    testified that they have no opinion regarding the medical

9    necessity of the specific services in this case.

10            So what do they try to rely on instead to try to

11   meet their burden of proving medical necessity?  Well,

12   first, they rely on these standing orders from the

13   doctors.  They say, well, doctor signed these orders and

14   we just ran them.  We just ran them.  Why is that enough?

15   Why is that not enough?  First of all, you might recall

16   that at the beginning of this trial, Judge Hall

17   instructed about that the handwritten signatures on the

18   standing orders cannot be used as evidence that a doctor

19   actually signed the order.

20            And I know it's been a long trial, ladies and

21   gentlemen.  There's been a lot of instructions and

22   legalese and sidebars and things like that, but this

23   limiting instruction is very important.  Because if, as

24   the Court instructed, the signed orders cannot be used as

25   evidence that a doctor actually signed form or claimed

1    that the tests were necessary, well, then you can't rely.

2    The standing orders cannot be themselves proof that the

3    tests were, in fact, medically necessary.

4           So for that reason alone, the Labs cannot meet

5    their burden of proving that each and every service was

6    medically necessary simply by pointing to a purportedly

7    signed doctor's order.

8           What else?  Well, the language of the IFP

9    policies, again the contract that Mr. Cunningham didn't

10   show you, themselves say that a doctor's order is not

11   enough for a service to be medically necessary.  Go back

12   and take a look closely at Joint Exhibit 51.  I will put

13   it up.

14          Page 6, Mr. Salazar.  If you can zoom in.

15          This is page 6, ladies and gentlemen, Joint 51.

16   If you could zoom in on that third paragraph starting

17   with "The benefits."  Read that second sentence, ladies

18   and gentlemen.  The fact that a physician prescribes or

19   orders a service does not in itself mean that the service

20   is medically necessary or that the service is a covered

21   service.  Right there, plain as day.  This is a contract.

22   They might not like it, but that's what the contract

23   says?

24          THE COURT:  This is your warning, sir, you asked

25   for.

1            MR. KANG:  What's that?

2            THE COURT:  Your three-minute warning you asked

3    for.

4            MR. KANG:  Oh, Your Honor, I'm sorry.  May I

5    keep going a little bit longer?

6            THE COURT:  I said it's your warning.  You have

7    three more minutes left.

8            MR. KANG:  May I go a little bit longer and use

9    my time --

10            THE COURT:  Oh, your other time, yes.  Yes, I

11    explained that yesterday.  That's not a problem.  I am

12    telling you where you are.

13            MR. KANG:  I will eat into my time this

14    afternoon -- or after this.

15            THE COURT:  Go ahead.

16            MR. KANG:  Third, ladies and gentlemen, you

17    heard that the Labs were not relying on individualized

18    orders tailored to individual patients.  You heard from

19    multiple --

20            THE COURT:  I'm sorry, sir, I've got to

21    interrupt you.  The time you have remaining is this -- I

22    see.  You're saying you've put it all -- you'll take it

23    from the other case.  I apologize.  Go ahead, sir.  Go

24    ahead.

25            MR. KANG:  Thank you, Your Honor.

1          Let me start over again.

2          Third, you heard that the Labs were not relying

3    on individualized orders that were tailored to individual

4    patients.  Right?  You heard from multiple witnesses,

5    including Seamus Langan, who said -- what did he tell

6    you?  These were facility orders, facility standing

7    orders that had no expiration date, no limit on the

8    amounts of time that can be used.  It didn't even have a

9    place on the form to add a patient's name.

10         When you go back and take a look at those

11   standing orders, take a look.  Do you see a single

12   patient name?  No.  Have you seen a single patient order

13   produced to you in this case?  No.  All you saw were

14   standing orders, one-size-fits-all orders that could be

15   used for all future individuals that walk into a

16   facility, whether they were a 60-year old female with

17   alcohol dependence or an 18-year old male with a heroin

18   addiction.  The same excessive battery of tests will be

19   run multiple times a week, no matter the patient, no

20   matter their condition.

21         And you heard, ladies and gentlemen, testimony

22   that this was exactly the Labs' business plan.  It was

23   the Labs that created this standing order.  It was the

24   Labs who incentivized their salespeople to get treatment

25   centers to run as many confirmatory tests as possible.

1          Mr. Salazar, could we put up Joint 14.

2          You saw some of these standing orders, ladies

3     and gentlemen.  You saw a bunch of them.  And you saw

4     checkmarks to confirm -- run confirmatory tests, whether

5     the initial POC or the qualitative drug screen was

6     positive or negative, run it.  Run it no matter what that

7     initial screen said.

8          And we know why they decided to do that.  Look

9     at Joint 37, please.  You saw this, the bad news from

10    Cigna email.  Right?  As far as back as May of 2013.

11    Seamus Langan said it means that the only real business

12    will be the confirmation business.  The only real money

13    is going to be in running these expensive confirmatory

14    tests over and over again without regard to any medical

15    necessity.

16         Your common sense tells you that the Labs' use

17    of these standing orders was ridiculous.  But if you had

18    any doubt, the U.S. Department of Health and Human

19    Services Office of Inspector General says that standing

20    orders like this are abusive as well.

21         We talked a lot about the OIG guidance during

22    this trial and again as I've said, I invite you to take a

23    look at it.  It's Cigna Exhibit 2880.  And here is what

24    it says.

25         If we can jump ahead, Mr. Salazar to 45081.

1          Although standing orders are not prohibited in

2     connection with an extended course of treatment, too

3     often they have led to abusive practice.  Standing orders

4     in and of themselves are not usually acceptable

5     documentation that tests are reasonable and necessary.

6     Accordingly, the insurer may reject standing orders as

7     evidence that a test is reasonable and necessary.

8          So that's another reason why the Labs cannot

9     meet their burden of proving medical necessity.

10          What else?

11          THE COURT:  Sorry to stop you, but how much time

12     do you plan to take that you -- from your other time in

13     the other case?

14          MR. KANG:  Your Honor, I will go -- how far am I

15     in?

16          THE COURT:  You are two minutes past your 15

17     minutes.

18          MR. KANG:  I will go another ten minutes, Your

19     Honor, if I may.

20          THE COURT:  I need counsel to come up quickly.

21     I'm sorry, Attorney Kang, for interrupting you, but I've

22     never had this.

23          (Sidebar commenced.)

24          THE COURT:  Do you object that he exceeded his

25     initial time?

1          MR. CUNNINGHAM:  I don't know why the Court set

2     limits if they are just going to be violated.

3          THE COURT:  I'm sorry, but I'm just thinking of

4     it.  I should have been aware of it, what, five minutes

5     ago.  But when you said you would take some time, I just

6     didn't think through.  My whole purpose of having you

7     tell me how much is so the other side knows, you know, A,

8     that he's going to -- I have to be sure to hit all the

9     bases or not get all.  If he's going to say five minutes,

10    I don't have much he's going to say.  Sorry.  I'm strict

11    this way in all cases.

12         MR. CUNNINGHAM:  Your Honor, if he were taking

13    time from his own rebuttal, that's a different story.

14    This is a completely different argument that he's

15    making --

16         THE COURT:  He's only got ten minutes there.

17    He's going to use all of his rebuttal, that's -- I'm not

18    going to do that to him.  But I don't know that -- I just

19    don't think it's fair, sir.  Your time you can use is in

20    the other case.  You shifted to that moment.

21         MR. KANG:  I understand.

22         THE COURT:  That case is -- if this were a

23    regular trial, you would be down right now.  Four, three

24    minutes maybe.  Sorry.

25         MR. KANG:  I will try to wrap it up, Your Honor.

1          THE COURT:  Thank you very much.

2          (Sidebar ended.)

3          My apologies for interrupting you, sir.

4          MR. KANG:  Ladies and gentlemen, when I come

5    back to you after break I will have more to say on

6    medical necessity.

7          But for now, let me address a couple of specific

8    points that Mr. Cunningham raised.  First of all, I want

9    to quickly address Mr. Cunningham, perhaps in recognition

10   that there is no evidence of medical necessity, there is

11   no evidence of the fact that the Labs are primary and

12   direct beneficiaries of contract, focused all of his

13   efforts on other things, things that don't matter.  The

14   SIU investigation.  The core action team.

15         Let me just quickly address those because the

16   Labs, because they have no evidence to prove their case,

17   resort to misdirection.  And I would say submit to you,

18   ladies and gentlemen, don't take the bait.  First they

19   try to poke hole in the SIU investigation.  I don't know

20   how long Mr. Cunningham spent talking about that.

21   Complete red herring.

22         The ladies and gentlemen on the SIU are good,

23   hard-working people.  But the Labs attack SIU, but they

24   themselves fail to explain why they didn't provide

25   information that the SIU had requested of them for years.

2291

1    Ladies and gentlemen, that is the basis of our

2    affirmative defense in the event that you find that they

3    have met their burden, which for all the reasons I've

4    said they have not, but even if you do, we submit to you

5    that their case, they failed to mitigate damages by

6    cooperating with the SIU investigation.

7          And regardless of whatever gaps there might have

8    been or things that SIU could have done more, the fact is

9    we now know that SIU is right.  Dr. Clark and Mr.

10   Ligotti, who I'm going to talk more about later, have

11   confirmed that the Labs' testing services were, in fact,

12   medically unnecessary.

13         I want to also briefly touch upon another

14   misdirection, which is about the core action team.  They

15   try to misdirect you and try to focus on the efforts to

16   address the big, big problem, as Mr. Cunningham has said.

17   Well, Brian Evanko told you what the big, big problem

18   was.  He told you why the so-called core action team was

19   formed.

20         And Ms. Borden's memo is clear, the big

21   problem --

22         Mr. Salazar, if we can put it up, Cigna Exhibit

23   6940.

24         The problem, ladies and gentlemen, was the

25   explosive increase in substance abuse cost from wasteful

1    and abusive practices.  You recall Mr. Evanko's testimony

2    about this yesterday.  He told you about the bad actors

3    known as patient brokers who lured vulnerable individuals

4    across state lines, enrolled them in individual policies

5    that they were never eligible for.  They preyed on young

6    people, on people struggling with addiction.  That's the

7    150 million to 200 million dollars in avoidable medical

8    cost that's being referred to.  And that, ladies and

9    gentlemen, was the reason that Cigna addressed this

10   issue.

11          This wasn't an effort by Cigna to try to

12   increase its bottom line by trying to squeeze legitimate

13   providers.  No.  This was Cigna trying to protect

14   patients and its plans from the worst of the worst --

15          THE COURT:  Wrapping up, sir?

16          MR. KANG:  -- as Matt Norton said.

17          THE COURT:  Are you wrapping up, sir?

18          MR. KANG:  Yes.  One last point.

19          THE COURT:  Thank you.

20          MR. KANG:  Mr. Cunningham touched briefly on the

21   fact that there was an issue regarding the Medicare

22   rates.  Ladies and gentlemen, that is just inaccurate and

23   another red herring.  Mr. Goldfarb testified last week

24   there were Medicare rates for lab services at issue.

25   They were 18 to 20 dollars per service.  The Labs had put

1    forth no evidence to rebut that.

2          To the extent they put in any documents with Mr.

3    Evanko, you heard Mr. Evanko tell you those Medicare rate

4    issues had nothing to do with lab services.  They had to

5    do with out-of-network outpatient rehab centers not at

6    issue in this case.  Don't let the Labs try to misdirect

7    you.

8          Thank you very much.  I'll be addressing you a

9    little bit later today with respect to our case.  I will

10   yield the time over.

11         THE COURT:  Thank you, Your Honor.

12         Attorney Cunningham.

13         MR. CUNNINGHAM:  Thank you, Your Honor.  May it

14   please the Court.

15         THE COURT:  You have reserved ten minutes, I

16   believe.

17         MR. CUNNINGHAM:  Thank you, Your Honor.

18         THE COURT:  Go ahead, sir.

19         MR. CUNNINGHAM:  Thank you.

20         Members of the jury, as I told you this is where

21   I get to rebut what Mr. Kang just said.  And for a moment

22   I thought that I was actually on trial because so many of

23   my actions were criticized.  But let me ask you to think

24   about one thing Mr. Kang just said a minute ago.

25         He actually said that we're misdirecting and the

1   SIU and the core action team don't matter.  Seriously?

2   That's why we're here.  That is exactly why we are here,

3   because of the SIU and the core action team.  Because

4   they didn't want to wait to see if they could change

5   their policies in Florida.  They just wanted to stop

6   these payments.  And they said, we'll stop these payments

7   temporarily until you give us what we need.  We gave them

8   what they needed.  They never paid us.  Ever.  That's

9   what we're going to ask you to do.

10          He also said we didn't provide -- the Labs

11  didn't provide information to Cigna.  Were we in the same

12  courtroom?  You heard about the 20 patient records.  That

13  was a large box that Dr. Nemecek said would take him two

14  to four months to review.  That sounds like a whole lot

15  of nothing if it is nothing.

16          One other thing is testimony of Seamus Langan,

17  the fellow from Northern Ireland who was in charge of the

18  Labs for a while.  Remember what he said?  None of the

19  other insurers in Florida were contesting medical

20  necessity for the Labs' services.  Blue Cross/Blue Shield

21  didn't question it.  Humana didn't question it.  It was

22  only Cigna.  It was the only insurance company that

23  questioned it.  And we know why.  Because they had to

24  stop the bleeding, as they put it.

25          You know, sometimes when there's bleeding you

```
1   can apply direct pressure to stop a wound.  You can also

2   tie a tourniquet around something, but you are probably

3   going to kill that limb.  That's exactly what Cigna did

4   here.  There was a vast overreaction because that was the

5   only way they could stop this.

6         They have not paid us.  Nobody has ever

7   apologized.  Nobody has ever said we were wrong.  They

8   haven't done anything.

9         I want to talk about Dr. Clark for just a moment

10  because Mr. Kang mentioned her.  Did you happen to hear

11  how much Dr. Clark has billed in the case for the work

12  she's done?  She's billing $1,150 an hour.  Let me repeat

13  that just in case that -- $1,150 an hour.  They won't pay

14  us.  They won't pay any of our labs for performing

15  services they admit we performed for over ten years, and

16  they'll pay their expert over $300,000 to come in here

17  and try to convince that these services were not

18  medically necessary.

19        Now, I believe Mr. Kang misspoke, but I am going

20  to try to clarify this anyway.

21        Mr. Smeig, can you put up Exhibit 6983, please.

22        I believe Mr. Kang said that the policy language

23  we were reading was not from --

24        What page was it, Mr. Christ?  It's Joint 48,

25  page 2.
```

2296

1          This is an exhibit in evidence and this is a

2    Miami Dade County Public School policy.  And I think you

3    heard Mr. Goldfarb talk many times about the teachers in

4    Miami Dade County.  This is a policy that is at issue

5    that is an exhibit in this case and it has exactly the

6    language that I read to you from the other policy.

7          Let me just mention this statute that we

8    mentioned.  Okay.  So Mr. Kang and Cigna say that these

9    insurance policies did not intend or directly benefit the

10   Labs who provided the services here.  Here's what Florida

11   statute says.  This will be in the jury charge that Judge

12   Hall gives you.  Whenever in any health insurance claim

13   form an insured specifically authorizes payment of

14   benefits directly to any recognized hospital, physician

15   or other person who provided the services in accordance

16   with the provisions of the policy, the insurer shall make

17   such payment -- shall make such payment to the designated

18   provider of such services.

19         That is Florida law.  And that is part of the

20   reason why these policies directly and primarily

21   benefited the Labs.

22         I want to leave you all with one thing, and I

23   don't know what you all thought about this.  I'm not sure

24   what I think about it.  Do you remember the email

25   exchange between Ms. Borden and Mr. Norton that

2297

 1    concludes with Mr. Norton saying, "We just make stuff

 2    up."  Remember that.  Isn't that what really happened

 3    here?  Cigna said it had to stop the bleeding.  This was

 4    the biggest problem facing Mr. Evanko's health care

 5    division at Cigna.  They couldn't stop paying these

 6    claims legitimately.  They couldn't stop paying them

 7    quickly unless they did exactly what they did.

 8            We, again, are going to ask you, members of the

 9    jury, to finally make Cigna pay for the work that we did

10    ten years later.  Thank you very much.

11            THE COURT:  Thank you, Attorney Cunningham.

12            That completes the closing arguments in the case

13    of the Labs versus Cigna.  We are going to take a

14    ten-minute break and we'll be back, and at that point it

15    will be Attorney Kang who begins the argument, followed

16    by a response or rebuttal by Attorney Cunningham, and

17    then a response by that briefly by Attorney Kang.

18            Thank you very much, ladies and gentlemen.

19    Don't talk about the case.

20            (In the absence of the jury at 1:57 p.m.)

21            THE COURT:  Anything that anybody wishes to put

22    on the record?

23            MR. CUNNINGHAM:  Nothing from the Labs, Your

24    Honor.

25            MR. KANG:  No, Your Honor.

1          THE COURT:  Okay.  I think Cigna needs to tell

2     me -- I counted that you went over seven minutes.  If you

3     think I'm wrong, you need to tell me.

4          MS. COSTIN:  That's our count as well.

5          THE COURT:  So I need to know from what portion

6     of your closing are you going to take it?  And I assume

7     you will be talking about your case, but I understand the

8     issues are very similar, so -- but I just make that

9     comment.  But do you want to take it from your 45 or take

10    it from your last ten?

11         MR. KANG:  I will take it, Your Honor, from my

12    45.

13         THE COURT:  So you will have 38 minutes, and I

14    will warn you at 35.

15         MR. KANG:  Thank you.

16         THE COURT:  You have 15, Attorney Cunningham,

17    and I will warn you at 12.  And Attorney Kang, you will

18    have ten, and I will warn you at nine.  Does that sound

19    okay with everybody?

20         MR. KANG:  Yes.

21         MR. CUNNINGHAM:  Yes, Your Honor.

22         THE COURT:  Thank you very much.  We'll stand in

23    recess.

24         (Whereupon, a recess was taken from 2:00 p.m. to

25    2:10 p.m.)

```
1              THE COURT:  I'm terribly sorry for interrupting

2    this.  I said to my assistant, I think that's the first

3    time I ever had a sidebar during closing, but I thought I

4    made clear my view of the fairness in terms of having to

5    disclose so that the other side can know how much time

6    you have.  They don't know your argument.  And I just --

7    when you first said can you go over, I was thinking you

8    had more -- you had another rebuttal, and you don't,

9    obviously, in this case, so that's why I felt the need to

10   stop because by then you'd gone I think -- oh, I don't

11   know, you'd gone the three-minute warning plus you'd gone

12   probably another four, and I was getting concerned about

13   if you thought my green light on take some more time

14   meant unlimited.  So my apologies, but I felt it was

15   necessary.

16              Okay.  We're ready to bring the jury out.

17              Are you ready to begin, sir?

18              MR. KANG:  Yes, Your Honor.

19              (In the presence of the jury at 2:12 p.m.)

20              THE COURT:  Please be seated, everyone.  Welcome

21   back, ladies and gentlemen.  As I said, we're ready to

22   begin the closing argument of Cigna in their case against

23   the Labs.

24              I invite Attorney Kang to begin whenever you are

25   ready.
```

1          MR. KANG:  Thank you, Your Honor.  Good

2     afternoon again, ladies and gentlemen.

3          So two weeks ago when I stood before you for

4     opening statements, I told you that it would be unfair

5     for the Labs to be rewarded for profiteering off of

6     patients who were suffering from drug addiction.  And

7     during the course of this trial, I submit to you that all

8     of the evidence has shown that's the case.

9          The Labs wrote facility standing orders that

10    created, as one witness said, the breeding ground for

11    treatment centers and sober homes to order wasteful,

12    abusive and medically unnecessary drug testing services.

13    They had Alan Boston on their payroll.  They paid him

14    over $200,000 at the same time that he was the co-owner

15    of Angel's Recovery, which was the number one referring

16    provider to BioHealth in February of 2014.

17         For many patients, the Labs billed hundreds of

18    thousands of dollars, in some instances over $700,000 for

19    urine drug tests that were not even used in the treatment

20    of any patient.  They ran these tests without even

21    getting patients' consent and then they concealed these

22    outrageous billings by not seeking to collect member's

23    cost share.

24         At the beginning of this trial, I told you that

25    Cigna trusted providers like the Labs to be truthful in

2301

1      their submission of claims.  You have now been presented

2      with a mountain of evidence during this trial

3      showing that the Labs broke that trust.  And they did it,

4      I submit to you, not to help any patients.  To the

5      contrary, they exploited the patients to line their

6      pockets.  Dr. Clark called it liquid gold.

7          Ladies and gentlemen, Cigna has one claim

8      against the Labs.  It's called unjust enrichment.  As

9      Judge Hall will instruct you tomorrow, the only question

10     that you have to answer is one:  Are the circumstances

11     such that it would be unfair for the Labs to retain the

12     payments that they received from Cigna?  If by a

13     preponderance of the evidence the answer to that one

14     question is yes, then you must find in Cigna's favor.

15         In evaluating what is fair or unfair, the Court

16     will instruct that you should consider the totality of

17     the circumstances.  What does that mean?  In light of all

18     of the evidence that's been presented in the case, if

19     your common sense tells you that it would be unfair for

20     the Labs to keep the money that Cigna paid $16.1 million,

21     then you must find in Cigna's favor.

22         So let's talk about why it would be unfair for

23     the Labs to keep the money that Cigna paid.  Let's talk

24     briefly about medical necessity.  I know I touched upon

25     Dr. Clark earlier.  Before I do that, I know during this

1    trial you have heard about different types of plans.  You

2    heard about IFP policies.  You heard about employer group

3    plans.  And while there are differences between these

4    plan types, there's one thing that all of them have in

5    common.  They all require services to be medically

6    necessary in order for them to be covered and payable.

7         I told you during opening statements that the

8    Labs repeatedly billed for services that were medically

9    unnecessary, that were wasteful and they got paid for

10   these services because Cigna trusted that the Labs were

11   being honest.  They were not.  How do you know that?

12   Well, again, I mentioned Dr. Clark, and I'll allude to

13   her briefly.

14        Dr. Kelly Clark told you so.  She is the former

15   president of ASAM, the American Society for Addition

16   Medicine, one of the nation's leading experts on

17   substance use disorder.  She regularly testifies as an

18   expert for the U.S. Department of Justice.  And she

19   testified that the standing orders used by the Labs were

20   neither valid nor appropriate.  She told you that

21   different patients have different needs, and, therefore,

22   individual orders need to be made.  But the standing

23   orders in this case were facility standing orders.

24   One-size-fits-all, regardless of age, size, addiction,

25   medical history, treatment plan.  Everyone gets tested

1    for everything.  And no limit on how long these orders

2    could be used.  Michael Ligotti, who you heard his video

3    deposition describe these standing orders as boilerplate.

4         What else did Dr. Clark do in her review?  She

5    reviewed the same 20 patient files that PB Labs had sent

6    to SIU back in 2013, along with at least 100 more patient

7    test results provided by the Labs in this case.  But then

8    she went even further.  She looked at all of the claims

9    data provided by Cigna in this case.  About 800,000 lines

10   of billings from the Labs to Cigna to analyze all of the

11   services billed by the Labs.

12        And I know Mr. Cunningham criticized Dr. Clark

13   for the amount of time she spent on her work.  It's

14   because of the massive billings and the massive number of

15   claims that the Labs sent to be billed over and over and

16   over again.  And Dr. Clark, to be thorough, wanted to

17   review each and every one of those.  She can't be

18   criticized for being thorough.

19        And what did she conclude?  She was outraged at

20   the level of unnecessary testing performed by the Labs.

21   First, she observed patients being treated for an

22   exorbitant number of drug classes at a time.  You saw

23   multiple examples.  I'm not going to rehash all of those,

24   but you heard her testify about one patient, CV,  whose

25   diagnosis was listed, you saw this, as alcohol

1    dependence, uncomplicated.  Yet, you saw he was tested

2    for all kinds of things, ecstasy, oxycodone, heroin,

3    cannabis, PCP, cocaine.  Each time, the Labs billed Cigna

4    more than $3,000 for date of service.  Dr. Clark said all

5    of this was completely unnecessary for a patient who

6    presented with alcohol dependency uncomplicated, they

7    could have just used a breathalyzer.

8         And of course, we heard Dr. Clark testify about

9    Richard Sanborn.  I told you about him in my opening

10   statements, and you heard her testify about this patient.

11   He was a patient at issue in the American Nutrition

12   referral.  His urine testing was performed by all three

13   Labs in this case over a year-and-a-half period.

14   December 2013, ladies and gentlemen, he was tested by PB

15   Labs nearly every day of the month for 24 total dates of

16   service.  In January 2014, March of 2014, and April of

17   2014, he was tested by each of them over and over and

18   over again. You know what the grand total bill was for

19   his services?  $760,000.

20        When you deliberate, go back and take a look at

21   the claims data and you will see what Dr. Clark saw as

22   well.

23        What did Dr. Clark have to say about all of this

24   spending?  She said it was the epitome of liquid gold.

25   And Dr. Clark explained that these patients weren't

1    outliers, they were common throughout the whole claims

2    data.  And again, I invite you to take a look at that

3    data as well.  Joint Exhibits 40, 41, and 42.

4         Now, you also heard from Michael Ligotti,

5    formerly Dr. Ligotti, who was one of the doctors who

6    actually signed an order to drug test from the Labs.  He

7    testified that he signed standing orders that were

8    prepared by PB Labs.  PB Labs drafted it.  And he told

9    you, as other witnesses have said, that these standing

10   orders were on behalf of the facilities, not on behalf of

11   individual patients.  Standing orders he said didn't even

12   name any patients.  They had no expiration date.  They

13   didn't limit the frequency of testing.  They weren't

14   individualized to the medical needs of any particular

15   patient.  How could they?  Because the orders were

16   already in place before a patient even walked into the

17   facility.  It makes no sense.  They were in, Dr. Michael

18   Ligotti's words, boilerplate orders.

19        And he told you that the tests he ordered was

20   never used in his treatment of patients.  In fact, he

21   testified that the tests were being ordered so frequently

22   that it wasn't even possible for him to use the tests for

23   any medical assessment or purpose.  In his words, these

24   results were, quote, not of any clinical use.

25   Mr. Ligotti testified, ladies and gentlemen, that he knew

1   that he authorized excessive urine drug testing through

2   standing orders, but he did it anyway.  Why?  Because, as

3   he said, he was able to profit off of this arrangement.

4        Now, I touched upon the OIG guidance briefly

5   when I spoke with you a few minutes ago, but I want to

6   mention it again because, again, this is a very important

7   document because the Labs argue that they have no duty to

8   determine whether the tests they run are medically

9   necessary or not.  Their premise is we can run wasteful

10  and excessive tests without taking any responsibility

11  because, according to the Labs, it's the doctors that

12  order the tests, not them.  But again, the OIG, the U.S.

13  Department of Health and Human Services, they disagree.

14  Because even if the Labs aren't treating patients, that

15  doesn't mean that they can focus solely on profits and

16  turn a blind eye towards wasteful services and wasteful

17  billing.  The OIG guidance instructs that Labs play a

18  role in the ecosystem to prevent waste and abuse.

19        Could we put, Mr. Salazar, Cigna Exhibit 2880,

20  which is the OIG guidance, ladies and gentlemen.  On

21  45079, again I invite you to read this document when you

22  deliberate.  It says, "Laboratory should take all

23  reasonable steps to ensure that it is not submitting

24  claims for services that are not covered reasonable and

25  necessary."

1          Next clip, Mr. Salazar.  This is on page 45080.

2          That OIG believes that laboratories can, and

3     should, take the steps described in this compliance

4     guidance to help ensure appropriate billing of lab tests.

5     We also believe that there are steps that laboratories

6     can take to determine whether physicians or other

7     individuals authorized to order tests are being

8     encouraged to order medically unnecessary tests.

9          And you remember yesterday, even the Labs' own

10    expert, Dr. Boorstein, remember when I was talking to him

11    and walked through some of these provisions, he agreed

12    with these requirements.  He agreed that these need to be

13    followed.  Yet, Mr. Langan, when I asked him about it, he

14    said he's never heard of the OIG guidance which, frankly,

15    is not surprising because it was Mr. Langan, I believe,

16    who helped come up with a concept of combining Casino

17    Players, Inc. and helping them get into the business of

18    clinical laboratory testing.

19         What else does the OIG guidance say?

20         Can we go to 45081, Mr. Salazar.

21         The use of standing orders is discouraged.  What

22    else?

23         45081, next clip, please.

24         Standing orders in and of themselves are not

25    usually acceptable documentation that tests are

1  reasonable and necessary.  Accordingly, the insurer may

2  reject standing orders as evidence that a test is

3  reasonable and necessary.

4          Next clip, please.

5          OIG guidance states that even when standing

6  orders are used, they should periodically monitor

7  standing orders.  Laboratories need to periodically

8  monitor standing orders.  You'll recall that Dr.

9  Mendolia, the first witness who testified in this trial,

10  said when I asked him questions, the Labs did none of

11  this type of monitoring and auditing of utilization.

12          What do the Labs do instead?  They simply buried

13  their head in the sand and ran tests on whatever order

14  came through the door, in total disregard of the

15  requirements of the OIG guidance.

16          And lastly, if we could, Mr. Salazar, go to

17  45081.

18          Standing orders should have a fixed term of

19  validity and must be renewed at their expiration.  That

20  wasn't the case here.  There was no fixed term of

21  validity.  There was no expiration date.  In fact, you

22  saw those standing orders yourself.  There's no date on

23  the standing orders whatsoever.  The Labs created and

24  provided the very standing orders that directly

25  facilitated the ordering and running of wasteful testing.

1    Created the breeding ground, as Ms. Anderson testified

2    to, of wasteful schemes.

3         This conduct was in complete disregard of the

4    OIG guidance, ladies and gentlemen, and the Labs cannot

5    credibly say that they were not aware of it.  This

6    guidance was dated 1998.  It was publicly available on

7    the Federal Register.  The Labs knew, or should have

8    known of this requirement.  For them to have made

9    millions upon millions of dollars in the clinical

10   laboratory industry, which remember Mr. Langan, he

11   admitted it's a highly regulated industry.  For them to

12   say we weren't even aware of this guidance, let alone

13   complying with them, that's the epitome of unfair.

14        What's another reason that it would be unfair

15   for the Labs to keep the money that it was paid by Cigna.

16   They targeted sober homes as clients.  As both Dr. Clark

17   and Mr. Ligotti testified, a sober home is not a

18   treatment center where patients receive medical care.

19        Ms. Anderson testified to this as well.  People

20   who stay in sober homes are not patients.  They are

21   residents for a temporary period of time.  There are no

22   doctors on staff at a sober home.  Simply put, sober

23   homes are not places to render medical care.  There is no

24   clinical need to be running tests and seeking urine

25   samples from sober homes.  And as a result, it is not

1    medically necessary to have a standing order for the

2    treatment of sober home residents.

3         And you heard about many sober homes at issue in

4    this case which were ordered and ultimately billed to

5    Cigna.  Fresh Start Sober Living, Choices Recovery,

6    Halfway There, AJ's Transitional Living, House of

7    Principles, Clean Slate Living were among the many sober

8    homes that you heard Mr. Ligotti and Ms. Anderson

9    identify during their testimony.

10        Folks, it would be unfair for the Labs to keep

11   money that they received for running medically

12   unnecessary services for sober home residents who are not

13   even in treatment while there.

14        What's another reason it would be unfair for the

15   Lab to keep the money?  Because they engaged in fee

16   forgiving, either not billing or not collecting a

17   patient's portion of the health care bill.  Fee

18   forgiving is an unfair practice because it drives up

19   health care premiums.  And as you've heard in this trial,

20   it's also unfair because fee forgiveness is the

21   camouflage that hides other unfair and improper schemes.

22   Fee forgiving, ladies and gentlemen, is inherently

23   unfair.

24        And as Ms. Anderson explained, fee forgiveness

25   concealed the services and charges from the patients.

1    Think of what happens if a person receives a massive

2    happens if a person received a massive and unexpected

3    health care bill.  That person would ask questions.  As

4    Ms. Anderson testified, if a provider actually billed the

5    customer for all of these excessive medically unnecessary

6    services, hundreds of thousands of dollars, a member

7    isn't going to keep seeking services from that provider.

8    They would seek services elsewhere.  They would complain,

9    just like American Nutrition complained to SIU.  That's

10   why, as I said in opening statement, by not seeking to

11   bill or collect a patient's cost share a provider's

12   excessive wasteful billing practice is more likely to fly

13   under the radar out of detection by either the patient or

14   by a payor like Cigna.  That is why fee forgiving is bad.

15   That is why fee forgiving is unfair.

16           What evidence did you receive in this case

17   showing that the Labs were engaged in fee forgiving?

18   Well, you heard from witnesses that Cigna's SIU

19   repeatedly asked the Labs to provide documentation

20   showing the amounts that the Labs were collecting from

21   patients.  Stephanie Canto, Bill Welch, Deanna Anderson,

22   they all testified to the SIU's efforts and they all

23   confirmed that the Labs never provided any patient

24   ledgers or financial information indicating that the Labs

25   were, in fact, collecting patient cost share.  These are

1    documents that any provider that is billing patients

2    legitimately should have at their fingertips.

3         And now we know, right, why the Labs didn't

4    provide anything.  Because in the course of this

5    litigation, the Labs were forced to turn over the

6    records.  And sure enough, these records confirm that the

7    Labs were not collecting the amounts due from patients.

8         Could we see, Mr. Salazar, Cigna Exhibit 2019.

9         Cigna Exhibit 2019, ladies and gentlemen.  You

10   saw this one quite a bit.  You saw the Labs' patient

11   ledger.  In 2014, on more than 31,000 claims, bunch of

12   zeros.  The Labs collected just $3,900 on 31,696 claim

13   lines.  And if that wasn't enough --

14        Mr. Salazar, could we put up Joint Exhibit 132.

15        You also saw the Labs' then CFO, Jace Simmons,

16   admit to their outside auditor in a memo that stated, in

17   fact, the Labs weren't even capable of sending bills to

18   patients as of December of 2014.  Remember that?  I asked

19   Mr. Langan.  I asked Mr. Mendolia about that as well.

20   According to Mr. Simmons' memo, this was all bad debt.

21        So the question is:  Why weren't the Labs

22   billing patients?  Well, you heard it from the Labs'

23   biller, Mike Nicholson.  If the Labs billed patients for

24   these astronomical rates that they were being to

25   insurance, they would have gone to another facility, just

1     like Ms. Anderson testified to.  And according to Mr.

2     Nicholson's email --

3             This is Cigna Exhibit 27.

4             January 2013, Mr. Nicholson, if we try to

5     balance bill their patients, they will not use us.  They

6     will not use us.  And, folks, this is particularly true

7     given that the Labs were not even obtaining consent from

8     the patients to test their urine in the first place.

9             You heard Dr. Mendolia tell you that consent was

10    important.  Seamus Langan testified that they were not

11    authorized to run the tests without a patient consent.

12    But what did you see in the documents produced in this

13    case?

14            Can we see Cigna Exhibit 372, please.

15            You saw the Labs' internal records, ladies and

16    gentlemen.  That's Cigna's Exhibit 372.  We saw this one

17    quite a bit.  For thousands upon thousands of claims that

18    the Labs were billing to Cigna, the Labs' own records

19    confirm on that consent on file column that they did not

20    have consent from the patients on file to perform the

21    drug testing services.

22            One last point before I leave fee forgiving.  Do

23    you remember that MBC billing policy, the one that's

24    dated a month after Bill Welch asked PB Labs for it?  It

25    is in evidence as Cigna Exhibit 30.

1          If you can put that up, Mr. Salazar.

2          Do you remember this document, ladies and

3    gentlemen?  If you look at page 2, you will see that it

4    has a revised date of June 24, 2014.  The Labs used the

5    words "revised date" to create the impression that a

6    previous billing policy existed.  It didn't.  Mr. Welch

7    asked PB Labs provide me a previous billing policy, and

8    they never did, nor did you ever see a document like that

9    in this case.

10         In sum, this billing policy wasn't a real

11   policy.  It was meant to conceal and deceive Cigna into

12   believing that they actually were following this policy,

13   billing and collecting patient cost share amounts.  We

14   now know that they were not.  And in fact, Mr. Simmons's

15   memo confirms that the Labs didn't even have the

16   capability of sending out bills until January of 2015,

17   which is six months after the date of this policy.  So

18   how could they be saying that we send out two patient

19   statements in June of 2014 when as of January 2015, Mr.

20   Simmons is saying we still can't send out a single

21   patient statement?

22         Could we also see the self-pay patient section,

23   Mr. Salazar?

24         You saw this portion of the MBC billing policy,

25   ladies and gentlemen.  And it says that if a patient

2315

1    doesn't have insurance, the Labs would charge, at most,

2    100 percent of the Medicare fee schedule.  As I said a

3    few minutes ago, there were Medicare prices for these lab

4    services. You heard Mr. Goldfarb tell you about that.

5    The rate for Medicare for these services was $18 to $20.

6    So Mr. Goldfarb told you that for a 20-panel test,

7    Medicare rate, that's about $400 for the whole panel.

8    But what did the patient, if they had insurance through

9    Cigna, what was the price that the Labs charged?  $3,000

10   to $5,000 for that same panel.  Ask yourself:  Is that

11   fair?  Is it fair for the Labs to charge almost ten times

12   the price that they would otherwise charge a patient just

13   because they had insurance?  Of course not.  That's dual

14   pricing, ladies and gentlemen.  That's another reason why

15   it would be unfair for the Labs to keep the money they

16   received.

17          What else?  Unbundling.  We heard a little bit

18   about this.  You heard Mr. Goldfarb tell you that

19   unbundling is when a provider bills for lots of component

20   parts that have been bundled together in one code.  Use

21   an example that illustrates it.  Think of a pizza.  Let's

22   say you order a whole pie that cost 20 bucks.  But in

23   addition, when you go pick up the pizza, in addition to

24   charging you for the whole pizza, the restaurant also

25   adds on a fee for the individual slices at five dollars a

1    slice.  That's what Dr. Clark explained with how the Labs

2    were billing pH and creatinine in addition to the bundled

3    urinalysis code.  The urinalysis code is the whole pie.

4    It's the $20 and only the $20 that you should have paid.

5    The pH and creatinine are the individual slices that the

6    Labs tacked onto the bill.  It would be unfair, ladies

7    and gentlemen, for a person to both pay for a whole pizza

8    pie as well as the individual slices.  You are still

9    getting just one pie.  In the same way, it's unfair for

10   the Labs to be billing for individual component services

11   in addition to a bundled code such as urinalysis.

12         And when you deliberate, think back on

13   Mr. Goldfarb's testimony when he told you about the

14   instances of unbundling.  He said that all of the claims

15   that were denied for the denial code 1648 are those where

16   claims were unbundled.  You will be able to find those in

17   the Cigna line level data, Joint Exhibits 43, 44, 45, 46,

18   and 47.

19         What's another reason that allowing the Labs to

20   keep the money would be unfair, ladies and gentlemen.

21   Alan Boston.  You heard a lot about Alan Boston during

22   this trial.  You heard that he was the co-owner of

23   Angel's Recovery, the facility that was the number one

24   customer of the Labs in February 2014.

25         Please put that up, sir.

1    You saw that just in the month of February of

2    2014 alone, Angel's Recovery referred 16,000 samples to

3    BioHealth and billed over $4 million.  Think about that.

4    16,000 samples in the month of February, means they were

5    referring about 575 samples a day.  That's outrageous.

6    And at the same time, Alan Boston was on the Lab's

7    payroll as a sales executive for the Labs.

8    You heard testimony from Steve Zimien that in

9    2014, Mr. Boston made over $200,000.  You also heard

10    testimony that Mr. Boston at the same time was the

11    co-owner of Angel's Recovery.  The other co-owner, his

12    daughter, Tova a/k/a Tara Jasperson, who you saw was

13    signing off on Angel's Recovery client registration forms

14    as a physician.  You know she was not.  Even Seamus

15    Langan admitted that.

16    And let's not forget, ladies and gentlemen, this

17    is the same Tova Jasperson who signed a confidentiality

18    agreement with Steve Zimien.  He was the head of sales of

19    the Labs, to safeguard private discussions back in

20    November of 2013.

21    What else was going on around that time?

22    Redemption, a sober home that Tova Jasperson had a

23    financial interest in, was being signed up as a client of

24    the Labs.  And at the same time, you heard Mr. Zimien's

25    video deposition testimony about a strange draft undated

1     Word document purportedly signed by a representative from

2     the State of Florida's laboratory licensure unit that

3     supposedly gave approval for Redemption to get a CLIA

4     certification.

5          Can we look at Exhibit 66, please.

6          Remember this document, ladies and gentlemen?

7     You heard throughout this trial that sober homes are

8     residences only.  They can't render medical services.

9     What was this?  Use your common sense, ladies and

10    gentlemen, when you deliberate.  This letter, undated, in

11    a weird draft format, was not a legitimate letter.  And

12    you heard from Steve Zimien's testimony that one of Alan

13    Boston's clients that he was getting paid for, getting

14    commissions on, was Redemption, the sober home that was

15    co-owned by his daughter.

16         When you go back and deliberate, folks, ask

17    yourself isn't there something suspicious going on with

18    this whole arrangement?  Don't you think that Alan Boston

19    being paid $200,000 by the Labs created an unfair

20    incentive for Angel's Recovery and Redemption to order as

21    many tests to be run by the Labs without any regard to

22    whether they were medically necessary or not?

23         Keep all of that in mind when you consider

24    whether that it would be fair for the Labs to keep the

25    money for tests that they ran and were paid by Cigna and

1    the employer groups that Cigna administered.

2            For all of these complaints that the Labs lodge

3    against Cigna about the core action team, the SIUi

4    investigation, the policies, there's no dispute that the

5    Labs' relationship with Cigna was lucrative.

6    Mr. Cunningham keeps talking about how Cigna needs to pay

7    the Labs, as if we didn't pay them.  They were paid a

8    lot.  Too much.  Unfairly.

9            In 2012 to 2017, over just those five years, the

10   Labs were paid a combined $16.1 million for urine testing

11   claims.  If you want to see how the $16.1 million in

12   payments look like, ladies and gentlemen, take a look at

13   Joint Exhibits 40 to 46, Cigna's claim data.  It's more

14   than 40,000 pages of entries which show you exactly how

15   much these three Labs were billing and how much Cigna was

16   paying.  This was money that Cigna paid first when it

17   trusted that the Labs were playing by the rules, when

18   they trusted that the Labs were honest brokers.  The Labs

19   pocketed that money.  They failed to provide records

20   showing that the tests were necessary when SIU asked, and

21   then still refused to give the money back when they were

22   caught.

23           As Ms. Anderson testified, Cigna asked PB Labs

24   pay back 2.4 million.  PB Labs refused.  Cigna asked

25   BioHealth, pay back 5.2 million.  BioHealth refused.

1    They didn't do it, and so now Cigna asks that you do it.

2    We ask that you order the Labs to pay back this money.

3    It would be unfair for the Labs to retain this money.

4    This money should be returned to the rightful owners.

5    Fairness dictates that it should.

6            Thank you, Your Honor.

7            THE COURT:  Thank you very much, Attorney Kang.

8            Attorney Cunningham, I believe that --

9            MR. CUNNINGHAM:  Please the Court.

10           THE COURT:  -- you have about 15 minutes, and I

11    will give you a brief warning.  Thank you, sir.

12           MR. CUNNINGHAM:  Members of the jury, this will

13    be the last opportunity I have to speak with you.  And

14    what I'm going to talk about now is the claim that Cigna

15    has brought against our Labs.

16           And Mr. Kang was just talking about unfairness

17    for about 30 minutes.  You know what's unfair?  What's

18    unfair is when you decide to sell insurance policies in

19    the state of Florida, when you decide what language you

20    want to put in those policies, when you decide the

21    reimbursement rates in those policies, when labs do

22    testing that is ordered by doctors, and you decide you

23    don't want to pay them for any of those tests that they

24    performed that were based on prescriptions from doctors.

25    That's what's unfair.

1          Remember I asked Mr. Goldfarb this on the stand

2     the other day?  I said, Your testimony is that you want

3     back every penny of that $16 million that was paid to the

4     Labs?  He said yes.  Think about this, members of the

5     jury.  Members of the jury, there may be some claims that

6     were inflated.  There may be one or two bad actors in our

7     doctors.  We had a number of doctors that were sending

8     prescriptions to our Labs.

9          Mr. Kang said there were 31,696 claims.  Is it

10    Cigna's position that every one of those claims was not

11    medically necessary?  Are you serious?  And if you are

12    going to say we want our money back, shouldn't you have

13    to prove which claims you say are unfair?  They have all

14    the claims data.  They couldn't get an expert -- they

15    paid an expert $300,000. They couldn't get an expert they

16    to say this is exactly how much we think we should get

17    back, this is what we think is unfair?  They never did

18    that.

19         And Mr. Kang concluded by talking about the

20    demand letters that were sent to BioHealth and PB Labs.

21    Those demand letters were sent after Cigna removed the

22    flags.  So why in the world would the Labs think that

23    they had to pay back that money when Cigna was

24    essentially admitting that it was wrong about the reason

25    that it wasn't paying?  Does that make any sense at all?

1    They think they can come into this courtroom and just

2    say, we paid you $16 million.  We want every penny of it

3    back.  Every one of these 31,000 claims was not medically

4    necessary.  Does that sound fair to you?  Because they

5    are the ones that's claimed that it's unfair that they

6    paid for these services.

7         What I want you all to think about is the

8    position of the Labs.  We're just getting orders from

9    doctors.  Doctors are telling us this is what we want.

10   There was an epidemic going on in south Florida.  There

11   were a lot of addicted people in south Florida.  And

12   we're supposed to go back behind every one of those?  Is

13   that what they want?  We're supposed to go back behind

14   every one of those prescriptions and call the doctor and

15   say, are you really sure this is medically necessary?

16   Come on.

17        Is anybody going to do that?  Is that

18   reasonable?  The question is:  Is it fair for Cigna to be

19   paid back 100 percent of the money it paid to these Labs.

20   There's nobody saying we didn't do the work.  Now they

21   are saying sometimes we did too much.  They were not

22   saying we didn't do the work.  Would it be fair for Cigna

23   to get money back from us when we admittedly did the

24   work?

25        I want to talk about Dr. Clark again because,

1    obviously, Cigna is relying very heavily upon her.

2    Remember that testimony she was, I believe, CEO of a

3    company called Clean Slate.  Remember they were sued.

4    Remember that they settled the case in which they were

5    sued.  Remember what they were sued for?  For seeking

6    reimbursement for services that were alleged medically

7    unnecessary.  Isn't that ironic?  And then she comes here

8    and tries to pass judgment on these Labs that admittedly

9    did the work that was the prescribed by the treating

10   doctors.

11          One other point on Ms. Clark.  You heard

12   Mr. Haney say, Well, if she really reviewed all those

13   records, she would have had to review 1,000 data fields

14   per second.  Members of the jury, Ms. Clark -- Dr. Clark

15   -- I think she's a psychologist, psychiatrist.  She

16   reviewed these patient records like Dr. Nicoll did, but

17   she charged $300,000 for it.

18          Mr. Kang talked about medical charges of

19   $760,000 for one patient.  These were people that were

20   struggling with the disease of addiction.  These were

21   people that were addicted to drugs and/or alcohol.  As

22   the Labs, how are we supposed to what the doctor is doing

23   in terms of treatment?  The treatment is, Well, let me

24   get this lab test from you guys, let me see what's in

25   this patient's blood or urine so I can figure out how to

1    treat this patient.  And now we're supposed to

2    second-guess the doctor and say, you know, maybe we

3    shouldn't take that?  Can you imagine what chaos that

4    would cause at the Labs if every time we got a

5    prescription from a treating doctor that we have to call

6    them and say, Are you sure, Doctor?  They've already

7    certified on these lab request forms that they've

8    attested that and they're not going to request anything

9    that's not medically necessary.

10        Let's talk about fee forgiveness.  Here's

11   something else that's unfair from our perspective.

12   Cigna's policies, you can look at them if you want, they

13   don't contain any prohibition against fee forgiveness.

14   It is not there.  So now we as the Labs are supposed to

15   know what's in Cigna's mind?  Cigna wrote the policies.

16   Again, they didn't put any prohibition against fee

17   forgiveness in there, but now we are being judged because

18   we allegedly fee forgave?  That doesn't seem fair, does

19   it?

20        Let's talk about the actual merits of that claim

21   for fee forgiveness.  Do you remember --

22        Mr. Smeig, is it 6987, please, Labs' exhibit.

23        Ms. Canto did an investigation.  Okay.  Once she

24   lifted the flag for medical necessity, once she conceded

25   she couldn't prove that.  She then placed a flag of fee

1    forgiveness because as Mr. Goldfarb said, that was the

2    most inclusive flag.  That was a way to stop paying

3    everything.  Shoot first, ask questions later.

4         This is in evidence, as I said, at 6987.  Here

5    is a summary of phone calls that Ms. Canto made when she

6    was investigating this issue of fee forgiveness.  And

7    let's look at Number 8, Patient MA.  Patient responded

8    and received bills.  That's not fee forgiveness.  Number

9    9, initials NA.  Family member responded and received

10   bills.  That's not fee forgiveness.  Number 14, Patient

11   MR, patient responded and received bills.  That's not fee

12   forgiveness.

13        Now, there's some other claims here where there

14   is no response.  But Mr. Kang seemed to want you to

15   believe and Cigna seemed to want you to believe that we

16   never tried to collect any patient co-pays or

17   deductibles.  We have proven to you that that is just not

18   true.  And there is no prohibition in the policy.

19   There's nothing in the policy that tells an insured or

20   the Labs that you can't fee forgive.  We didn't do it

21   anyway.

22        I want to talk to you about Mr. Welch.  The MBC

23   billing policy.

24        Cigna 30, please, Mr. Smeig.

25        Now, you remember that Mr. Welch came in and

1    testified the other day, very brief testimony.  He was

2    one of the main lawyers for Cigna for four years, and his

3    direct examination by Mr. Kang was very brief.  Basically

4    what he said was, I asked MBC for revised billing policy

5    and I never got a response.  I showed him the following,

6    which, by the way, Mr. Kang did not show him.

7            Can you please highlight this, Mr. Smeig,

8    general policy.

9            Here's what Cigna didn't show you when Mr. Welch

10   was on the stand.  MBC, Medical Billing Services, Inc.,

11   does not offer discounts, professional courtesies or

12   waive copayments or deductible unless directed to do so

13   by our clients, who we believe in good-faith will arrive

14   at such a decision in accordance with the applicable

15   laws.  Waivers and discounts are strongly discouraged

16   with our clients and are addressed on a case-by-case

17   basis.

18           Now, ask yourself why Mr. Kang and Cigna would

19   not show you that during the testimony of their witness

20   who was supposed to be their star witness on fee

21   forgiving?  Why wouldn't they show you that?  Because

22   they know if they showed you that their claim for fee

23   forgiveness goes completely by the wayside.

24           We were attempting to collect bills.  We were

25   attempting to collect payments from patients.  Remember

1    what Mr. Nicholson said?  He was the gentleman who ran

2    MBC.  He was shown by video.  And he said, you know,

3    these are transient people by nature.  A lot of these

4    people are homeless.  A lot of these people are living on

5    the streets.  They are drug addicts unfortunately.  They

6    are people that are addicted to alcohol.  It is not like

7    you can just call them on the phone and say, Hey, can we

8    send you a bill?  A lot of times you can't even find

9    these poor people that are suffering from the disease of

10   addiction.

11          So bottom line on that issue, members of the

12   jury, is there was no fee forgiveness going on here.

13   First of all, it wasn't prohibited by Cigna.  Secondly,

14   it wasn't happening.  We were trying to get these people

15   to pay co-pays.

16          Let's be frank about this.  What do you think is

17   the chance even when you are trying to collect

18   co-payments and deductibles, what do you think is the

19   chance you are going to get that from people that are

20   living on the street or people that are living in a sober

21   home?  We tried.

22          So members of the jury, Cigna wants to talk

23   about unfairness.  Cigna hasn't come in and said to you,

24   You know what, some of these bills for services you did

25   for the lab testing you did with your $350,000 machines,

1    some of those are legitimate.  Let's just fight about the

2    ones that we don't think are legitimate.  Cigna just

3    comes in and says we want back every penny we paid.

4            And Mr. Goldfarb when I asked him this -- I

5    think this was one of the very last things I asked him

6    last week.  Sir, are you saying that none of these

7    services performed by the Labs that comprise the

8    $16 million were medically necessary?  He said, Yes,

9    that's what I'm saying.

10           THE COURT:  You are at three minutes.

11           MR. CUNNINGHAM:  I'm almost finished, Your

12   Honor.

13           So members of the jury, the only unfairness here

14   is the way that Cigna has treated these Labs.  These Labs

15   admittedly did the work.  And what Cigna did here -- and

16   Mr. Goldfarb used the word "deplorable."  And I asked

17   him, wouldn't it be considered deplorable if somebody did

18   $16 million worth of work for you and you said we want

19   back every penny that we paid to you?  And I don't even

20   remember if he asked [sic] the question.

21           But members of the jury, they can't come in here

22   -- they shouldn't be allowed to come in here and say it's

23   unfair, we want back all $16 million.  And you shouldn't

24   do that unless you believe them that not one of those

25   bills that was sent to Cigna for payment for services

1    that were admittedly performed was not medically

2    necessary.  If you believe that any of them were

3    medically necessary -- and we have proven that they were

4    -- you should reject Cigna's claim.

5            Thank you very much.  I really appreciate it.

6            THE COURT:  Thank you.

7            Turning to Mr. Kang.  You have, I believe, ten

8    minutes for your final rebuttal in your case.

9            MR. KANG:  Thank you, Your Honor.

10           We're almost at the end now, ladies and

11   gentlemen.  Thank you again for your patience.

12           I want to touch very briefly and respond to a

13   few points that I heard Mr. Cunningham say.  Let me go

14   through them one at a time.

15           I heard Mr. Cunningham tell you that Cigna can't

16   identify which of the specific claims among the 31,000

17   were medically unnecessary.  It is just untrue, ladies

18   and gentlemen.  Dr. Clark took the stand.  She testified

19   about hundreds of them.  And do you remember what she

20   said?  She said she could go through all of them, but

21   you'd be sitting here and we'd all be sitting here for

22   months.  So it's simply not true that we can't identify

23   that these services were medically necessary.

24           And the interesting thing about Mr. Cunningham's

25   remarks was at no point did Mr. Cunningham point to any

1    evidence, any document, any witness, who said that their

2    services were medically necessary.  Because there isn't

3    that evidence, ladies and gentlemen.  There simply isn't.

4          Mr. Cunningham said nobody says we didn't do the

5    work.  You should get paid on it.  Well, if a doctor

6    takes an X-ray -- and I used this example in my opening

7    statement.  If a doctor takes -- you sprain your ankle

8    and you go in, and in addition to taking an x-ray of your

9    left ankle, does a whole body scan.  Does -- scans your

10   elbow, scans your shoulder, scans your knee, and then

11   runs it three or four times a week for months on end.

12   The doctor did the work.  Does that mean that the doctor

13   deserves to get paid on all of those medically

14   unnecessary X-rays?  Of course not.  That's exactly the

15   situation that we have here.  Just because you do the

16   work, even if they did, does not make it necessary if

17   those were wasteful and abusive, as is the case here.

18          I found it interesting Mr. Cunningham said how

19   is it that the Labs could have known that they weren't

20   supposed to fee forgive?  You know what, that statement

21   alone, ladies and gentlemen, shows that the Labs

22   shouldn't have even been in business.  Because fee

23   forgiving, as Ms. Anderson testified to, is well known.

24   It is inherently unfair.  Mr. Cunningham suggested if it

25   is not written down somewhere, how are you supposed to

1    know?

2          I give an example.  My children, they're

3    elementary school, how are they supposed to know where

4    the cafeteria is if it's not written in a manual or

5    written down somewhere?  Well, they follow where

6    everybody else is going for lunch.  And that's what they

7    should have done here.  Because people in this industry,

8    include Mike Nicholson, their biller, understood what fee

9    forgiving is.  Understood that the industry prohibited

10   that.  The Labs can't simply say that, Well, Cigna, you

11   didn't put it down in a policy expressly so we didn't

12   know.  That's just not how it works.

13          It's just like how they turned a blind eye to

14   the OIG guidance, ladies and gentlemen.  He says that

15   it's simply not true that we didn't collect any patient

16   cost share.  Actually, on this one I think Mr. Cunningham

17   and I can agree because the Labs did collect some money,

18   $3,900 out of 31,696 claims.  That was what was in

19   Exhibit 2019.  Out of millions upon millions upon

20   millions of billed charges over years upon years.  What

21   do they have to show for it?  $3,900.

22          It is really interesting that -- did you hear

23   any -- anything about Cigna Exhibit 2019, that patient

24   ledger, that shows that the Labs collected zero other

25   than a mere $3,900.  No.  Because they have no answer for

1    that document.  Their own document.

2         Mr. Cunningham says, Well, we tried to collect.

3    We tried to collect.  What evidence is there that they

4    tried to collect?  In fact, quite the contrary.

5    Mr. Simmons's memo shows they didn't try to collect and

6    couldn't try to even collect.  They didn't even have the

7    ability to send out patient statements until January of

8    2015.  Three years after they were billing Cigna for

9    claims.

10        And then what did Mr. Simmons say?  We just have

11   to write this off as bad debt because they didn't make

12   any collection efforts, ladies and gentlemen.  It's

13   simply not true that they tried to collect.  They were

14   waiving patient cost share.  And we already heard about

15   why that is bad.

16        Ladies and gentlemen, the Labs enriched

17   themselves by billing for millions of dollars of urine

18   testing that was not medically necessary.  Their business

19   model relied on facility standing orders that operated

20   like blank checks.  No expiration date, no limitation on

21   frequency.

22        How did Dr. Clark describe the Labs' practices?

23   An enormous waste of resources.  I think we can all agree

24   on that.  She said that's what people mean when people

25   talk about liquid gold.  The Labs used vulnerable

1    patients to line their own pockets.  They concealed what

2    they were doing.  They concealed that by not billing

3    patients for their portion of the cost share.  And they

4    didn't even get patient consent to run these services.

5    This is so unfair.

6          And we have been trying -- Cigna has been trying

7    for years to rectify it.  The Labs have refused.  And so

8    now, ladies and gentlemen, we come to you and we ask that

9    you remedy the situation.

10          Thank you.

11          THE COURT:  Thank you Attorney Kang.

12          The attorneys have finished their presentation

13   of their clients' case and defenses to the other.  So the

14   next step in this trial is I will instruct you on the

15   law.  There is not enough time in the day, so I will

16   expect you back at 9:30 tomorrow morning when I will

17   begin the charge.  I expect the charge will take over an

18   hour, but less than hour and a half.

19          And after that, you will -- we will send you to

20   the jury deliberation room and you can begin deliberating

21   as soon as Liana's explained the exhibits JERS system, we

22   call it, which won't take long.  So that's what your day

23   tomorrow is.

24          As I have said to you, from now on it's in your

25   hands and we'll pay attention to what timing you are

1    doing.  So not ours.  We won't decide it.  Thank you very

2    much.

3         I want to remind you one last time.  Well, it

4    won't be last.  Another time.  Do not talk to anyone or

5    let anyone talk to you or in any way you communicate or

6    anyone communicate to you about this case or anything to

7    do with it.  Do not attempt to research by any means

8    anything related to this case.  You can do all of that to

9    your heart's content after I say the words you are

10   discharged from your duties.

11        All right.  Thank you all very much for your

12   attention so far to this case, and we'll see you in the

13   morning.

14             (In the absence of the jury at 3:07 p.m.)

15        THE COURT:  Everybody be seated.  Anything

16   anybody wants to take up?

17        MR. GESTRICH:  I'm sorry.  Just for a clean

18   record.  Mr. Cunningham referenced 6987 during his

19   closing.  It was 698 -- 6987-2 is the exact exhibit.

20        THE COURT:  I don't have dashes and numbers in

21   exhibits.

22        MR. GESTRICH:  That was the separate exhibits

23   that were submitted.  6987 was ID only.  We broke that

24   exhibit out into pages.  And in the exhibit list the Labs

25   provided last night, it listed it as 6987-2.

1          THE COURT:  Haven't we been using A, B, Cs when

2     we made ID?  I'm not saying it's a problem.  I just --

3     it's going to be on your exhibit list as 6987-2?

4          MR. GESTRICH:  Yes, Your Honor.

5          THE COURT:  So noted.

6          Anything for Cigna, sir?

7          MR. KANG:  No, Your Honor.  Thank you.

8          THE COURT:  Thank you.

9          As I told you, I'm done with you for the day.

10    We'll see you tomorrow.  Unless there are issues, I would

11    expect everybody to be here at 9:15 so you can get

12    settled in.  No, I take that back.  I keep think we have

13    another day of evidence, another day of this.  I do not

14    bring the jury in in the morning.  What the procedure is,

15    is that Liana will -- I'm already past that.  I have the

16    charge.  So you will be here at 9:15.  If there's any

17    issues now you should tell me and you should come and

18    we'll tell you to come sooner.

19          It's my intention, and I warned you all, and you

20    didn't seem to object, I am going to reread the charge

21    very carefully.  And if there are any misnumbering of

22    cross-references, any failure to catch plural causes in

23    the Labs' case, for example, and make it cause or

24    otherwise adjust those kinds of things, counts to count,

25    that sort of thing.  We will send you out a redline

1    hopefully within the next hour or two.  Otherwise, we

2    will be sending you the -- I think you already received

3    the charge asx I intend to give but for anything I find

4    on the last read.  But I will send you a clean copy to be

5    absolutely certain you have that tonight and let you know

6    that's what I'm reading from.  There is no confusion.

7    I've given you multiple copies.

8          In the morning, I intend to obviously give each

9    -- there will be a copy on each seat for the jurors, and

10   I will provide two copies to each side.  I suppose if you

11   want more than that for your team, you'll print them out.

12   Likewise, I will include what is the clean final, no date

13   at the top, time, verdict forms.  We may have made a last

14   minute change of adding those lines, but was discussed

15   and not objected to, so there's just four lines on every

16   one of the damage things.  So you'll see that.  We'll

17   probably send that to you right away.

18         But if there's any issues, if you think it's not

19   what I told you or whatever, you want to make a record,

20   you want to object, you need to tell Alex I would think

21   by tonight at 8:00, copy to the other side, and you have

22   another issue, very briefly say what it is.  He will

23   respond to you, hopefully within an hour, by 9:00 the

24   judge will see you at, and give you an earlier time than

25   9:15.  If we don't hear anything about lawyers can't

1   resist the desire to say something or Judge, we need more

2   time, as I said, I expect everybody to be here at 9:15 so

3   you are settled and ready to go right at 9:30.

4           Any questions?  Thank you very much.  We'll see

5   you in the morning.

6           (Adjourned, 3:11 p.m.)

7

8

9   COURT REPORTER'S TRANSCRIPT CERTIFICATE

10  I hereby certify that the within and foregoing is a true

11  and correct transcript taken from the proceedings in the

12  above-entitled matter.

13

14  /s/  Terri Fidanza

15  Terri Fidanza, RPR

16  Official Court Reporter

17

18

19

20

21

22

23

24

25