```
1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3    _____
     CONNECTICUT GENERAL )
4    LIFE INSURANCE CO.   )
     and CIGNA HEALTH     )
5    AND LIFE INSURANCE   )
     CO.                  )
6             Plaintiffs )    NO: 3:19cv1324(JCH)
                          )    February 28, 2024
7     vs.                 )    10:06 a.m.
                          )
8    BIOHEALTH MEDICAL    )
     LABORATORIES INC,    )
9    PB LABORATORIES, LLC )
     and EPIC REFERENCE   )
10   LABS, INC.           )
              Defendants. )
11   _____)    141 Church Street
                               New Haven, Connecticut
12

13           ORAL ARGUMENT ON SUMMARY JUDGMENT

14

15   B E F O R E:

16            THE HONORABLE JANET C. HALL, U.S.D.J.

17

18   A P P E A R A N C E S:

19   For the Plaintiffs : Edward T. Kang
                           Emily S. Costin
20                         Alston & Bird LLP
                           950 F Street, NW,
21                         Washington, DC 2004-1404

22                         Kelsey Kingsbery
                           Alston & Bird LLP.
23                         555 Fayetteville Street.
                           Ste 600.
24                         Raleigh, NC 27601

25                         -- continued --
```

```
 1   For the Defendants : Scott M. Hare
                          Anthony Thomas Gestrich
 2                        Whiteford, Taylor & Preston LLP
                          11 Stanwix Street
 3                        Suite 1400
                          Pittsburgh, PA 15222
 4
                          Fred Alan Cunningham
 5                        Domnick Cunningham & Yaffa
                          2401 PGA Boulevard
 6                        Suite #140
                          Palm Beach Gardens, FL 33410
 7
                          John J. Radshaw, III
 8                        John J. Radshaw, III, Esquire
                          65 Trumbull Street, 2d Fl.
 9                        New Haven, CT 06510

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Please be seated everyone.  Good

2    morning to you all.  Give me a moment to get organized.

3          We're here this morning in a matter known as

4    Cigna versus BioHealth Labs, et al.  19CV1324.  If I can

5    have appearances please of counsel starting with Cigna.

6          MR. KANG:  Edward Kang from Alston & Bird

7    representing Cigna in this matter.  With me at counsel's

8    table is Kelsey Kingsbery, Michelle Jackson who actually

9    has a pro hoc vice motion and Emily Costin as well.

10          THE COURT:  And for BioHealth Labs.

11          MR. HARE:  Good morning, Your Honor.  If it

12    please the Court.  My name is Scott Hare.  I'm from the

13    Pittsburgh office of Whiteford Taylor & Preston.  I'm

14    joined today by my Whiteford colleague Anthony Gestrich

15    and we're joined also by co-counsel Fred Cunningham.

16    From here in New Haven, John Radshaw.

17          THE COURT:  Good morning to all of you.  I guess

18    I will just start by -- I'm sure counsel who have

19    appeared in front of me which is not many of you before,

20    I will tell you how I approach a matter like this.

21    There's obviously been a huge amount of material

22    submitted, and it's taken me much longer to get through

23    that and my law clerk to get through it than I hoped for,

24    but we have gotten through it.  I have read everything

25    you have submitted.  I've read much of it several times.

1          I come to the bench today with some thoughts

2     about how the issues will break, but I have not made

3     final decisions.  What I need today from you all and

4     please notice -- I hope I'm not too egotistical, but it

5     is about what I need.  I need to make a decision.  You

6     already made your arguments, right?  So what I need from

7     you is answers to questions.  You shouldn't read too much

8     into my questions.  I sometimes ask questions just to be

9     argumentative with you.

10         Generally, I'm asking you questions because I

11    either want to confirm something or I want to give you

12    the best chance to make an argument on something that I

13    have some serious questions about.  Okay.

14         So I will start with basic principles.  Answer

15    my question please.  I know you have come.  You've

16    probably spent many hours, maybe days preparing for the

17    argument.  You have things you are dying to tell me.  No

18    offense.  I suspect I have read about them and I don't

19    need to hear them again.  If you have something that you

20    cannot hold back.  You are going to literally drop dead

21    on the floor if you do not give this additional answer.

22    Please answer my question first and then you can add on a

23    little if you want.

24         If you don't answer my question, I will tell you

25    what happens.  The way my brain is I won't listen to your

1    answer because all I'm thinking of is, wait a minute,

2    where's my answer.  Where's my answer?  I have to

3    remember she or he didn't give me an answer.  That's all

4    I will think about.  I will not hear what you are saying

5    to me, literally will not hear it.

6         If at the end I have not extracted from you some

7    kernel or nugget or knowledge that is so essential that

8    you not leave New Haven without carrying it forward and

9    putting in front of me and hitting me over the head with

10   it, I will invite you to say it or to say whatever you

11   have to get off your mind or chest.  It does not mean you

12   have to say anything.  Trust me.  It just means there's

13   this point I have to make.  She doesn't really understand

14   this.  I have to really emphasize it, whatever, fine,

15   brief, but I will allow you so that's my beginning.

16        I will make a comment and then we'll put it out

17   of mind, I will put it out of my mind.  I will not think

18   about it, but I will note that each party filed a notice

19   of supplemental authority.  One arrived in my mailbox

20   this morning.  I know it was filed yesterday, but the way

21   it works here I don't check every docket of every case I

22   have every minute of the day.  So every morning I get a

23   summary report of what got filed yesterday.  Today I

24   learned of a Cigna supplement authority.  I will note

25   that the calendar in this case went out on February 6,

1     that's two, three weeks ago.  The rulings in question

2     were decided in January of this year.  Two days I

3     received notice of a supplement authority by the Labs and

4     again I will note the calendar went out two or three

5     weeks ago and that decision was last August.  So suffice

6     it to say I haven't read these.  I'm not sure I am going

7     to read them.  Strike that.  I will read them because I

8     read everything you submit, but next time you might think

9     about a judge trying to prepare for an argument of this

10    size, maybe the day before and two days before is

11    probably not a good time unless the decision just got

12    decided.  Enough.  It is off my chest.  You won't hear

13    about that again.

14          Where are we going to begin, Jensey?  I think

15    we'll begin with the Labs motion for summary judgment.  I

16    will begin with -- I'm going to call *BioHealth*, et al, I

17    call them the Labs.  That's how you are called.  If it is

18    wrong or you don't like it, tell me.  I had to come up

19    with a short hand.  I will start with questions for the

20    Lab so this is on your summary judgment motion as to

21    Cigna's claims.  Who wishes to be heard on that motion?

22          MR. HARE:  Your Honor, thank you.  Scott Hare

23    for the Labs.  I will address those topics.

24          THE COURT:  Let me start with your argument on

25    laches.  I don't know if you wish to come to the podium

1    and use that mic or you can stand at your table if you

2    have stuff or you want to confer.  Whatever is easiest

3    but the practice in this district is generally the lawyer

4    speaking to the Court is standing.

5            It appears to me, you correct me if I'm wrong,

6    that in the moving papers both sides assume that

7    Connecticut law applies to Cigna's state law claims.

8    Okay.  Unjust enrichment.  My reading of a fairly not so

9    recent but a 2019 decision out of the Supreme Court,

10    *Reclaimant Corp. versus Deutsch,* Connecticut applies the,

11    quote, most significant relationship test, end quote, to

12    unjust enrichment claims.

13            That is I'm supposed to apply the law from

14    whatever state has the most significant relationship to

15    the relevant occurrence.  Have I said anything yet that

16    you are standing there thinking God, this judge spent a

17    lot of time, but she doesn't understand it?

18            MR. HARE:  Nothing controversial yet, Your

19    Honor.

20            THE COURT:  So given this, doesn't the most

21    significant relationship test compel me to apply Florida

22    law, not Connecticut law?

23            MR. HARE:  Certainly that would be consistent

24    with Judge Underhill's decision in the Labs plaintiff

25    case in which he in the main denied the motion to dismiss

1 and indeed found that with respect to all of the common

2 law claims being asserted by the Labs, Florida law would

3 govern precisely for the reason that Florida bears the

4 most significant relationship to the underlying

5 transaction.  It would be fully consistent with that.

6 　　　　　THE COURT:  Okay.  All right.  Let me turn then

7 to -- well, I think I may skip this.  I will come back to

8 this one.

9 　　　　　Are you moving in summary judgment on Cigna's

10 declaratory judgment claim asserted in I think in Count

11 Three of their complaint?

12 　　　　　MR. HARE:  Yes, Your Honor.  We're moving for

13 summary judgment in its entirety as to Cigna's plaintiff

14 case.

15 　　　　　THE COURT:  I know.  I will get to this with

16 Cigna's counsel, but why do I even have to think about a

17 declaratory judgment claim?  Don't the causes of action

18 asserted by Cigna to the defenses they assert, the claims

19 you assert, the defenses you assert, by the time those

20 issues are all decided whether they be by summary

21 judgment or be by trial, who the heck needs a declaratory

22 judgment?

23 　　　　　MR. HARE:  Answering the two questions in

24 reverse order.  Yes and you don't.

25 　　　　　THE COURT:  Let me turn to unjust enrichment.

1    In particular, the medical necessity basis.  My

2    understanding is there's three bases asserted, but I will

3    address medical necessity.

4         You seem to argue in your motion and your brief

5    that as a matter of fact and law, the Labs are entitled

6    to rely on a doctor's determination of medical necessity

7    and you cite to a number of cases.  All those cases are

8    under the False Claims Act, a federal statute, which, you

9    know, bears some similarity to unjust enrichment but is

10   not unjust enrichment.  The elements are quite different,

11   right?  So how are those cases helpful to you or more

12   importantly, to me?

13        MR. HARE:  Certainly the Qui Tam, the Federal

14   False Claims Act statute has its own unique set of

15   elements.  Medical necessity is a doctrinal issue that is

16   spread throughout the business of medicine.

17        Importantly, in this case, Cigna acknowledges

18   and concedes that the burden with respect to medical

19   necessity is its own.  Cigna points out that medical

20   necessity is a policy exclusion.

21        THE COURT:  Correct.

22        MR. HARE:  Like with all policy exclusions, the

23   burden is on the insurance company to establish that

24   exclusion.

25        THE COURT:  Okay.  But haven't you just put the

1   nail on the head of my question.  You argue a doctor

2   wrote a script, told us to do this, we can rely on that.

3   Okay.  It is not a question of whether Dr. Smith or Dr.

4   Jones looks at me and says oh, Hall, you need this test,

5   you need that test.  The question here is does Cigna --

6   Yes, that's probably medically necessary unless the

7   doctors are quacks, right?  The question, though, in this

8   case isn't that.  The question is does Cigna cover the

9   cost of that test.

10          MR. HARE:  Your Honor, you have actually touched

11  upon what I would say is the keystone distinction between

12  a False Claims Act claim and the claim for reimbursement

13  here.  The False Claims Act requires a knowing

14  presentment.  It requires some scienter.

15          THE COURT:  Right.

16          MR. HARE:  In contrast, in this case, at the

17  onboarding stage with our referring physicians and

18  clinics, we insist among, other terms, that the referring

19  physician only prescribe and order tests that are

20  medically necessary.  Consistent with industry practice

21  as a lab who never encounters a patient, who has no skill

22  or capacity or sufficient information to assess medical

23  necessity, we have no ability to do anything other than

24  rely upon the expertise of the referring physician.

25          THE COURT:  Let's say I accept that argument.  I

1    will not argue with you about that statement.

2        MR. HARE:  Okay.

3        THE COURT:  It still has begged the question.

4    You can do the test.  Nobody is going to take your lab

5    license away because you are doing frivolous tests. You

6    have a doctor's script, right.  That's fine.  Between you

7    and the regulator in Florida and the world, you are fine.

8        But the question here is did Cigna promise the

9    person getting the test that they would pay for it.  And

10   they use medical necessity in their policy and I have a

11   footnote somewhere that I noted to myself a lot of

12   language from their policy about a lot of reasons and

13   things they think about in deciding is there coverage and

14   on the issue of is there medical necessity.

15       MR. HARE:  Understood.  It would be within the

16   purview of Cigna to deny a claim upon a showing of a lack

17   of medical necessity.  We find ourselves here at the

18   summary judgment stage and in the record, Cigna has not

19   met its burden to show the absence of medical necessity.

20       THE COURT:  We'll get to that.  I'm just picking

21   up on your brief which in my view kind of stops at well,

22   I can rely on the doctor.  I think, yeah, maybe you can.

23   But even if you can, that doesn't mean that when you

24   present a bill, you are going to get paid.  You may have

25   to present it to the guy who you took the blood out of

1    his arm and say you owe me because you don't have

2    insurance.

3         MR. HARE:  Fully agreed.  Without more that

4    would be the stopping point.

5         THE COURT:  That's fine.  Anything else on this

6    side at this time?  Okay.  Thanks very much.

7         I will call on Cigna at this point for my

8    questions on the Labs' motion for summary judgment.  In

9    other words, Cigna's opposition.

10        MR. KANG:  Good morning, Your Honor.

11        THE COURT:  I need to clarify something so this

12   should be I hope maybe it is not so short a question.

13   You assert a claim for unjust enrichment.  You want

14   recovery of monies you paid to the Labs on the theory of

15   unjust enrichment which as I understand the law

16   applicable, you can do it in one of two circumstances, a

17   person could.  One is where there is no contract but

18   circumstances suggest he was intended to be a beneficiary

19   or two, where there's a contract but it doesn't

20   particularly cover that thing about which you want unjust

21   enrichment back.  It is silent.

22        So in effect, you can't have a contract on a

23   term if you are trying to get unjust enrichment around

24   that term.  Agreed?

25        MR. KANG:  Yes.

1        THE COURT:  Okay.  My question to you what is

2   Cigna's position.  Is there no contracting between the

3   two parties or is there a contract, but it is silent on

4   the issue?

5        MR. KANG:  As to the two parties, Your Honor,

6   between Cigna and the Labs, there is no contract.  The

7   contract, to the extent it exists, is between Cigna and

8   the plan members.

9        THE COURT:  The insured?

10       MR. KANG:  Correct.

11       THE COURT:  That's fine.  Then why should I

12  apply a six-year statute of limitations from Connecticut

13  which is our very generous contract statute if we have no

14  contract?

15       MR. KANG:  Because Connecticut law cases both

16  before and *Reclaimant* say so.  And cases have looked at

17  this exact question as to whether or not the analogous

18  statute of limitations for unjust enrichment are what

19  that analogous statute of limitations is and they have

20  concluded both before and after the Supreme Court's

21  decision in *Reclaimant* that it is the most analogous

22  statute of limitations is breach of contract.

23       THE COURT:  I thought *Reclaimant* said, that is

24  the Supreme Court of Connecticut held that the unjust

25  enrichment claims are more accurately -- are considered,

1  quote, neither a species of tort nor contract.  Aren't

2  those words in there?

3       MR. KANG:  That is correct.  Let me make very

4  clear.  I want to be consistent with *Reclaimant*.

5       THE COURT:  And the *BioHealth* decision at the

6  Circuit.

7       MR. KANG:  Right.

8       THE COURT:  Not determinative.  I read the

9  circuit opinion carefully.

10       MR. KANG:  Unjust enrichment is an equitable

11  claim which the Second Circuit and *Reclaimant* held there

12  is no statute of limitations.  It becomes now when Your

13  Honor is considering the doctrine of laches, it is

14  obviously laches is an equitable determination at Your

15  Honor's discretion and one of the nondispositive

16  factors --

17       THE COURT:  Correct.  I agree.

18       MR. KANG:  -- that Your Honor can consider is --

19       THE COURT:  I should look at the statutory

20  limitations periods that might be analogous to the

21  equitable claim, right?

22       MR. KANG:  Correct.

23       THE COURT:  You want me to look at contract, but

24  I also have a tort statute in Connecticut and the Supreme

25  Court in *Reclaimant* suggests, well, it is neither of

1    them, but you could argue it is a tort.

2        Here you are talking about not false claims, but

3    claims that you think do not have a base, they are

4    baseless and therefore, that would sound more like a tort

5    than a contract, right?  So why aren't I looking at a

6    three-year statute, if I were gonna look at statutes

7    which I will look at per *BioHealth* for which I'm not

8    bound by.  I have to go beyond that, right?

9        MR. KANG:  Sure.

10        THE COURT:  We're in agreement.  Go ahead.

11        MR. KANG:  I would argue there, Your Honor, we

12    believe that sort of to the extent there is an analogous

13    statute of limitation to look at, it is the six year.

14    But I think even if you were to look at the three year as

15    sort of the guidepost, we're well within that time period

16    as well and I can explain that to you.

17        THE COURT:  You better because I thought we were

18    looking at about a four-year period.

19        MR. KANG:  Sure.  So just to be clear, right,

20    the delay that's at issue for purposes of laches is not

21    the delay as to when Cigna in this instance could have

22    brought a case.  It is about whether or not a delay was

23    excusable -- was inexcusable or unreasonable.  The

24    six-year time period.  I'm starting in April of 2013,

25    when the Cigna Internal Investigations Unit first got

1    wind.

2          THE COURT:  Opened their notebooks, yeah.

3          MR. KANG:  Correct.  To the time in August of

4    2019, when we filed this case, so we're talking about six

5    years and change.

6          THE COURT:  I wouldn't go that far back if I

7    were you, but I understand and appreciate your frankness

8    of laying out the most extreme time period.

9          MR. KANG:  Let's break up that six year and five

10   month time period into three buckets.  You can look at

11   April 2013 when Cigna first gets wind of it is

12   investigating the case.

13         THE COURT:  To when?  January 1, 2015?

14         MR. KANG:  No.  August 20, 2015 when the Labs

15   initiated the Florida litigation.

16         THE COURT:  Didn't you really know at least

17   about PB, whatever that initial stands for.  I go by PB.

18   That particular entity operating through the Labs

19   umbrella that you knew by I thought it was January of

20   2015.

21         MR. KANG:  We did.  However, during that time

22   period, during that first bucket, I will call that the

23   investigation and negotiations period because --

24         THE COURT:  Okay.  I got you.

25         MR. KANG:  So we're trying to -- Cigna's

1   30(b)(6) witness testified to this.

2          THE COURT:  I saw that.  I got that.  I know it.

3   I'm very familiar with that.

4          MR. KANG:  So we're trying to resolve it short

5   of litigation.

6          THE COURT:  That's bucket one.  What's the next

7   bucket?

8          MR. KANG:  The next bucket is August 2015 when

9   the Labs initiate, I will call it, the pendency of the

10  Florida litigation and until September, 2017 when the

11  Eleventh Circuit issues its decision.

12          THE COURT:  The Second Circuit wasn't too

13  impressed with the fact you didn't exert a counterclaim.

14  I was struck by that.  As a practitioner, I'm going back

15  a lot of years, I'm not sure that I remember what I

16  thought back then, but I don't know that I ever asserted

17  a counterclaim when I had a motion to dismiss pending.

18  You argued we're waiting for a ruling, right?

19          MR. KANG:  Correct.

20          THE COURT:  But they said you could have filed

21  an answer.

22          MR. KANG:  Correct.

23          THE COURT:  I should have gone back.  I went

24  back and read Rule 12 when I first read the opinion.  I

25  don't have it in front of me right now.  It is not

1    anything I ever saw in practice.  I guess it doesn't mean

2    they are not right that the rule permits you to do it.

3           MR. KANG:  It was one of the reasons, Your

4    Honor, we held --

5           THE COURT:  Yeah, I got it.

6           MR. KANG:  -- in abeyance because we believed

7    they were asserting counterclaims.

8           THE COURT:  Understood  Go ahead.

9           MR. KANG:  Regardless even though the Second

10   Circuit said that we could have brought our claim during

11   the pendency of the Florida litigation.  Again could have

12   brought is not the standard for laches.  Courts, and we

13   have cited this in our papers, have held that if a party

14   does not bring suit because there's other litigation

15   that's going on, other litigation pending, that's

16   excusable delay.

17          That gets us then to September 2017 to August

18   '19, 2019 which is about just under two years of delay.

19   We have a reasons as to why there's delay there.  I will

20   start off by saying even if that was inexcusable, we're

21   both well within the six year as well as three year

22   guidepost.

23          THE COURT:  There are cases out there that

24   say -- let me get this right.  It's kind of backwards.

25   Even if on an equitable claim, you are within the statute

1   of limitations that would be applicable because it is the

2   most analogous legal claim, you still can be barred under

3   laches, right?

4           MR. KANG:  That's true.

5           THE COURT:  If the person with the claim can

6   prove the two elements.

7           MR. KANG:  Fair point.  I will note and Your

8   Honor is obviously well aware of this, but the only two

9   cases that the Labs cite in which there was a finding of

10  laches was the *Zuckerman* case where there was a delay of

11  almost 65 years.  This was the Metropolitan Museum of Art

12  case and then there was the *Baghdaddy* case with a

13  Connecticut partnership dispute between the brothers.

14  That's a delay of 38 years.  Again not dispositive.  Yet

15  mere lapse of time is not, but those are the two cases

16  they cite.

17          THE COURT:  You got in your point you want to be

18  sure I focused on.  That's good.

19          Now I want to turn to equitable relief under

20  ERISA.  This is your claim Count Two.

21          MR. KANG:  Yes, Your Honor.

22          THE COURT:  This is you assert even though it's

23  equitable, so you can't get money damages, you are

24  looking to say I got a *res* out there, a body of asset

25  that I can attack because of the bad acts that you, Labs,

1    did.  Right?  Is that bottom line?

2         MR. KANG:  Yes, Your Honor.

3         THE COURT:  In your opposition to the summary

4    judgment motion, I think you say at 28 to 30, you are not

5    required to trace a particular funds.  Is that your

6    position?  In other words, you don't have to trace from

7    when you wrote your check, Cigna wrote a check, into the

8    hands of a lab into wherever it is now, you don't have to

9    draw a line for me or the jury?  To me I suppose.

10        MR. KANG:  That's what *Sereboff* said.  I know

11   *Montanile* said something different.  I think our position

12   and I want to refine.  I'm not going to backtrack on what

13   we said, but I will say this even if we are required to

14   trace, we have met that requirement in this case.

15        THE COURT:  We'll get to that in a minute.

16   Before we get there, are you arguing that you have an

17   equitable lien by agreement?

18        MR. KANG:  Yes.

19        THE COURT:  I want to clarify my thinking.

20        MR. KANG:  Yes.

21        THE COURT:  You base that on provisions in the

22   plan about how when an overpayment has been made by

23   Cigna, Cigna will have a right at any time to recover

24   that overpayment.  Is that basically what you are resting

25   it on?

1          MR. KANG:  Correct.  Correct.

2          THE COURT:  I will ask the Labs about that.  But

3    this is language in a contract you've told me the Labs

4    aren't a party to.

5          MR. KANG:  Right.

6          THE COURT:  So what agreement?  If you are doing

7    a lien by agreement, I have to have an agreement.  What

8    agreement is between Cigna and the Labs that creates this

9    lien?

10         MR. KANG:  Right.  *Sereboff* addressed this issue

11   and the Supreme Court said that an equitable lien by

12   agreement, they explain sort of what that term means.  It

13   is a lien that arises out of an agreement to convey

14   ownership of a specific property to one party as soon as

15   the counterparty gets title.

16         So we argue and courts have agreed that our

17   reimbursement provision for recovery of overpayment

18   satisfies and creates this lien.  Once the lien --

19         THE COURT:  But they are not a party to that.

20         MR. KANG:  It attaches to the *res*.  It attaches

21   to the property and the *Sereboff* court held.

22         THE COURT:  You are way ahead of me.  You just

23   told me you don't have a contract.  So you cited a minute

24   ago.  You don't have an agreement.  I mean *Sereboff* is a

25   lovely case.  Very interesting for me to read.  I don't

1   understand why it helps you.  Am I missing something?

2          MR. KANG:  It helps us because once an equitable

3   lien by agreement.  It is a little bit of a misnomer.

4          THE COURT:  That's what I'm trying to

5   understand.

6          MR. KANG:  Equitable lien by identification.  It

7   identifies the specific *res*.

8          THE COURT:  Now you are mixing I think, unless I

9   don't understand it, apples and oranges.

10          If I sell you my car, I don't need an agreement

11   to be able to retrieve it if for some reason I have a

12   lien by agreement.  If you still got my car in your

13   garage five days later and I find out your check bounced,

14   I could sue you and say I want my car back.  That's my

15   *res*.  I can trace it from when you drove it out of my

16   driveway to when you put it in your garage.  That is my

17   car.  I want it back.  That's a *res* equitable remedy,

18   okay, there's no question.  But you don't have that I

19   don't think here.  You have to use this equitable lien by

20   agreement and I still can't get past the fact you don't

21   have anything that gives you a leg to stand on that

22   there's an agreement.

23          Sorry.  I'm looking at her because I get a

24   little twisted on this about which issue I have to deal

25   with first so you go ahead and answer that.

1          MR. KANG:  Your example of the car is actually a

2    really good one is because S*ereboff*, my interpretation

3    and understanding of it is *Sereboff* said that when there

4    is a specific specifically identifiable sum of money

5    deposited into a specific fund.

6          THE COURT:  Right.  That's a restitutional.

7          MR. KANG:  It becomes the equivalent of your car

8    example.

9          THE COURT:  Understood.  But we don't have that,

10   correct?

11         MR. KANG:  We do.  We have the language in the

12   plans that say --

13         THE COURT:  Which they are not a party to.

14         MR. KANG:  They are not a party to.  Again it is

15   the agreement is the agreement that creates and

16   identifies the *res*.

17         THE COURT:  Let me go to a different part of

18   that statement that you just made a minute ago.  So in

19   2014 or '15, whenever it is.  Someone at Cigna pushed a

20   button and a computer transferred electronic funds on a

21   claim for Joe Jones' blood work which you now say we

22   shouldn't have paid that.  Eight reasons we shouldn't

23   have paid that.  We want it back.  Where is that money?

24   Identify it for me.  These people aren't even in business

25   anymore.

1          MR. KANG:  Right.  So during discovery, we've

2    produced claims data.

3          THE COURT:  That's what you paid.  That doesn't

4    trace the money.  Sorry.

5          MR. KANG:  So -- that's fair.

6          THE COURT:  I know I shouldn't be yelling.  I'm

7    excited because I think I actually understand this one.

8          MR. KANG:  I know the question I ultimately need

9    to get to.  So we are able to sort of backing up first.

10   We have satisfied the tracing requirement at least as of

11   the time when the overpayment -- when the payment was --

12   the title of the *res* was transferred.  We identified that

13   through the claims data that shows the check number,

14   shows the --

15         THE COURT:  That would be back in 2013, '15,

16   whatever.

17         MR. KANG:  Correct.  We also have evidence of

18   through documents that were produced by the Labs, account

19   numbers that are associated with the labs.  We also have

20   records, Your Honor, that show that funds were

21   transferred ultimately to the Medytox parent company and

22   both *Montanile* and post-*Montanile* cases have said that

23   even when the *res* that's specifically identified, gets

24   commingled with other funds, if there isn't complete

25   dissipation, then the lien is still in existence.  The

1    lien does not extinguish.

2          Our argument would be, at the end of the day I

3    think our position it is a factual issue.  Our argument

4    would be we could establish the continued existence of

5    the *res* and there's some post-*Montanile* cases that show

6    this.  If you look at the bank account, if you look at

7    the lowest intermediate balance of that account if it

8    never dipped below zero then that could be a way to show

9    that there's not can complete dissipation and therefore,

10   the *res* still exists.

11         THE COURT:  What are the best cases on this that

12   I should go back and read because obviously I have

13   forgotten about them?

14         MR. KANG:  I can get you a citation on it.  It

15   was actually a 2024 decision on *Verizon*.

16         THE COURT:  So I haven't seen it?

17         MR. KANG:  Yes.  That's correct.

18         THE COURT:  You want to share that with counsel?

19   I would like it today hopefully before you leave the

20   courtroom.

21         Your argument is you have evidence in the record

22   before me that in 2013, you paid one or more of the three

23   operating labs X million dollars for lab work you now

24   claim it shouldn't have been paid for because it wasn't

25   covered, all of the arguments put together, and that you

1    can trace that money in all three Labs' accounts, never

2    went below the total amount you paid them.  You can trace

3    it in that total amount out to Medytox, I'm saying that

4    wrong.

5           MR. KANG:   Medytox.

6           THE COURT:  From in approximately '15, '16,

7    somewhere later on.   Is Medytox still in business?

8    Remind me.

9           MR. KANG:  I believe they are a publicly-traded

10   entity.

11          THE COURT:  And you can trace up to today that

12   their bank accounts have never had less than that total

13   amount of all three transferred sometime in mid-2010s to

14   Medytox?

15          MR. KANG:  No.  I don't think we have that

16   evidence yet.  The reason why that's a factual dispute is

17   because our understanding is if we satisfy the tracing

18   requirement from the time that it was traced, from the

19   time that it was paid from Cigna to the Labs, in 2013 to

20   2015, we have satisfied the tracing requirement.

21          THE COURT:  Wow.  So if my car left your garage

22   and went to your mother-in-law's for dinner, then went to

23   your brother-in-law borrowed it for the week so it's in

24   his garage, and went somewhere after that, I only have to

25   trace it to your garage and it's now someone in the wind

1    but I can still restitute it back to me physically if I

2    win?

3         MR. KANG:  The Labs have to assert, Your Honor,

4    the argument that the funds were completely dissipated.

5    They have not asserted that.

6         THE COURT:  The burden of proof on tracing under

7    equitable remedy is on them?

8         MR. KANG:  The burden of assertion is on them.

9    They have not asserted either in their answer or any of

10   their affirmative defenses any argument about complete

11   dissipation.  At best, their affirmative defenses

12   maintain that there wasn't any --

13        THE COURT:  You folks have an interesting

14   concept.  I remember my mentor when I first arrived in

15   Hartford.  I practiced for a while.  I did a lot of civil

16   litigation with him, a very experienced trial lawyer.  I

17   can remember -- I can't remember whether I did it or an

18   opposing lawyer did it, but the first special defense was

19   failure to state a claim.  He started laughing and he

20   looked at me and said do you know that means that the

21   opposing party has to prove that we didn't prove our

22   claim?  You assert an affirmative defense, it assumes you

23   have the burden on what you assert.  It is not an

24   affirmative defense.  You don't have to say -- you are

25   denying the allegations which mean the plaintiff can't

1    prove, right?  You have 25 or the Labs have 25.  You guys

2    throw out special defenses like they are Christmas

3    ornaments.  I don't know that -- I will ask the Labs this

4    question, but they have to assert that it is been

5    dissipated even though you have the burden of tracing it?

6    Who says you only have to trace like one step or two then

7    on them to say, you can't trace any further.  That

8    doesn't sound like the law to me.

9           MR. KANG:  *Montanile*, in *Montanile* as well as

10   the post-*Montanile* cases that deal with complete

11   dissipation, Your Honor, in those cases all of the

12   parties that were opposing on the other side.

13          THE COURT:  Yup.  Yup.  I know *Montanile*.  It's

14   a good case.

15          MR. KANG:  They assert it.  They asserted

16   complete dissipation so that's just we don't have that

17   here.

18          THE COURT:  But you have no evidence that the

19   payments you tendered to the labs in the time period we

20   have been talking about that they are -- clearly they are

21   not in the possession of the labs, you agree that's not

22   the case.  But you can't prove that they still -- it

23   still exists. In other words, that they have -- I don't

24   think you have any evidence that the labs have expended

25   the payments on traceable items.  By expended, they could

1    have transferred as you mentioned.  Which you have

2    evidence to trace beyond that.  You don't have that

3    evidence.  You are telling me you don't have to because

4    the Labs haven't asserted something.

5        MR. KANG:  The short answer is yes, we don't

6    have that evidence now.  We believe that's an issue for

7    trial.

8        THE COURT:  Why isn't it an issue on summary

9    judgment for Count Two of your Count Two by the Labs?

10   You have no evidence.

11       MR. KANG:  Our position is they haven't asserted

12   a defense of complete dissipation.

13       THE COURT:  You will tell me what case says that

14   they have some burden in the middle of this tracing.

15   There's a point at which you can stop and sit back and

16   say gotcha, unless you remember to assert something.

17   What's that case going to be?  Verizon?

18       MR. KANG:  No.  We think that *Montanile* would

19   say in that instance the individual -- I forget his name.

20       THE COURT:  I think *Montanile* at 145, the

21   Supreme Court says the defendant expends the funds.  In

22   your case, you say they transferred it but that's

23   expending, they got rid of them. You can't find them in

24   the Labs possession, the plaintiff can only recover -- to

25   me that's your burden -- if the funds are traced to

1    traceable items.  To me *Montanile* is saying you have to

2    keep drawing that line.  You can't stop.

3        MR. KANG:  And ultimately let me turn to

4    *Montanile*, Your Honor, if I may so we're on the same page

5    here.  A couple of points I will note on this.  First of

6    all, *Montanile* the Supreme Court actually sends the case

7    back down.

8        THE COURT:  That's unusual in this day and age.

9    Go ahead.

10       MR. KANG:  The case it was sent back down for

11   further proceedings as to whether or not the assets had

12   been completely dissipated.  I think that would be the

13   purpose of trial in this case to determine whether or not

14   assets were dissipated or not.  I'm not saying that we

15   don't have any burden of establishing that at trial.  I

16   think *Montanile* can be read for the proposition this is a

17   trial issue as opposed to something that can be readily

18   determined at summary judgment.

19       THE COURT:  I will think about it.  Okay.  I

20   need to go on because we're still on the first motion and

21   I haven't finished with you.  I have a couple more

22   questions for you that are important to me.

23       On your unjust enrichment claim, the Labs have a

24   defense of voluntary payment.  If I decide under

25   Connecticut choice of law that Florida law applies to the

1    voluntary payment defense then payments are voluntary if

2    they were made if there's no coercion or compulsion

3    present when the payment is made.  Would you argue with

4    me that that's Florida law?

5            MR. KANG:  I believe the law is about full

6    knowledge of the relevant facts.

7            THE COURT:  That, too.  I pointed that out to my

8    law clerk when we got to this issue.  I agree absolutely.

9            So under this doctrine, do you concede that the

10   payments made after Cigna placed flags on the Labs that

11   those payments would have been made under circumstances

12   in which coercion or compulsion wasn't present and I will

13   give you for example, the PB Labs flag was December 11,

14   2014, the *BioHealth* this for fee forgiveness your

15   argument was May 22, 2015.  You didn't flag.  So let's

16   talk about PB Labs as of December 11, you flagged them on

17   issue of fee forgiveness.  Any payments made to them upon

18   which you would argue wait a minute, you're fee

19   forgiving, you can't do that.  It is not covered under

20   our policy because you forgave the fees.  Let's assume

21   you showed that.  If their defense is yeah, but then you

22   kept paying me.  We didn't have a gun to your head.  You

23   stopped paying on a lot of things.  You could have

24   stopped on this as of December 11, 2014 for PB Labs.  How

25   would you respond to that?

1          MR. KANG:  I would respond that my understanding

2    is that no payments or to the extent that any payments

3    were made a very small amount.

4          THE COURT:  That's fine.  Good answer.  That's

5    fine.

6          Also, I think in your opposition you note the

7    SIU, your team, made a determination about unbundling

8    practices I believe pretty early actually in September

9    2013, am I wrong about that?

10          MR. KANG:  No.  Cigna actually -- the SIU

11   investigation case notes show this.  Cigna was never

12   aware.  Never had full knowledge of unbundling.  There

13   was knowledge of an investigation into medical necessity,

14   into fee forgiving, but not unbundling.

15          THE COURT:  So on the unbundling, you guys just

16   decided sort of on a policy level, that your codes were

17   really leading into a problem i.e. millions of dollars of

18   claims every month, so you were going to halt those

19   codes, take them out which you did in 2015.  Is that how

20   you dealt with unbundling?

21          MR. KANG:  No.  Unbundling was not a part of the

22   SIU investigation.  Unbundling really came about in

23   connection with the litigation.

24          THE COURT:  All right.  That's fine.  I will go

25   back.  I'm not saying you are not right.  There's a lot

1    to hold in my head up here.

2          This is just a quick question.  I know I told

3    you my snarky attitude would leave the bench with the

4    comment on the late filing on supplemental, but you asked

5    me as to Count Three -- wait a minute.  Let me check.

6          This is the declaratory judgment.  I will not be

7    snarky but really seriously, what do you need a

8    declaratory judgment claim?  Why don't I get this out of

9    the case?  I can quote 500 Supreme Court cases about

10   declaratory judgments, but I will go to the Second

11   Circuit last year in *Admirable Insurance Inc. versus*

12   *Niagara Transformer* whether the declaratory judgment will

13   serve a useful purpose.  We got claims, we got cross

14   claims, we got counterclaims, we got special defenses to

15   wallpaper this courtroom.  What am I going to declare

16   that won't be decided either on summary judgment or if

17   goes to the jury, by a jury verdict or by any subsequent

18   ruling by the Court.  What do you need a declaratory

19   judgment for?

20         MR. KANG:  Certainly, Your Honor, if we prevail

21   in full on Counts One and Two, certainly I agree

22   that Count Three would be superfluous.

23         THE COURT:  Even if you don't prevail won't the

24   issues underlying your claims as well as the special

25   defenses that are pertinent to those claims have been, in

1    effect, decided so the declaratory judgment is not a very

2    effective remedy here which is another grounds that I'm

3    supposed to look at.  It doesn't do me any good to throw

4    it out.  They want me to throw it out.  When this case is

5    over and I drag myself out of this courtroom either today

6    or after a jury verdict or part of both and we enter

7    judgment and we have post-trial briefs and I rule and

8    it's on its way to New York, do you really think I will

9    be issuing a declaratory judgment ruling?  I don't think

10   so, but I guess I will save it for another day.  Okay.

11         One other thing.  Are you asserting one claim in

12   the declaratory judgment act count or is it all your

13   claims?  You want a declaratory judgment that basically

14   addresses all your claims.  You didn't have to pay these

15   people and they have to pay you back.  Is that what you

16   are asking me to declare?

17         MR. KANG:  Yes.  As well as I guess in Paragraph

18   156 that a declaration that the claims for reimbursement

19   are not covered and payable under --

20         THE COURT:  That's their claim, yeah.

21   Obviously, in *BioHealth* on appeal the circuit made the

22   point they agreed with you that the federal claims are

23   most analogous to unjust enrichment.  Do you remember

24   that?

25         MR. KANG:  Yes.

1    THE COURT:  Do you agree that the substantive

2  law that applies to unjust enrichment claim also applies

3  to any claim under declaratory judgment, Count Three?

4    MR. KANG:  Yes.

5    THE COURT:  You are going to get me that case,

6  and I will ask the Labs one question.

7    I would like you to react to this point he's

8  made with me about how you shouldn't get summary judgment

9  even though he can't actually trace the *res* past when it

10  went into Medytox or whoever from the Labs, that you

11  haven't asserted something and therefore, he doesn't have

12  to show that now.  He'll show it at trial.

13    MR. HARE:  I was tracing that argument, Your

14  Honor, I think where you came out is exactly --

15    THE COURT:  Don't assume where I came out.

16  Don't read anything into my questions.  Let's assume he

17  has a win on this point, what would you say to me?

18    MR. HARE:  What I mean to say is the final

19  question that you landed on I think captures it.  The

20  existence of a *res* is an element of the claim.  It's

21  Cigna's burden to identify the existence of a *res*.  We

22  are here on a motion for summary judgment.  They have not

23  presented any evidence in the record to show the

24  existence of the *res*, the whereabouts, the measure of the

25  availability of that *res* to respond to any sort of

1   equitable lien.

2          Having failed to meet the element, having failed

3   to provide any proof on an element of its claim, no

4   burden ever shifts to us even if we had assumed such a

5   burden.

6          THE COURT:  That's fine.  I forgot to ask

7   Attorney Kang a question.  And it has to do with choice

8   of laws.  This is on the Labs motion.  I don't have a

9   question, Jensey, but I'll make it up.

10          Do you agree I asked Attorney Hare some

11   questions about choice of laws.  Do you remember that?

12          MR. KANG:  I do, Your Honor.

13          THE COURT:  Let's assume in that instance I was

14   suggesting something in my questions, would you agree

15   with me that under a claim in Connecticut Supreme Court

16   applies the motion significant relationship and that, in

17   fact, here assuming that is the correct test and I'm

18   going to apply it is it that Florida is the most

19   significant relationship?  Would you contest that?  I

20   think you told me -- you didn't answer that so go ahead.

21          MR. KANG:  I don't dispute anything in

22   *Reclaimant*.  I do know that Judge Underhill as to the

23   Labs claims against us held that Connecticut law applies

24   to statute of limitations and Florida's substantive law

25   applies on the Labs' claims.

1          THE COURT:  Yes, On the statute.  Yeah, go

2    ahead.  Do you think he was right and he continues to be

3    right?  Let me ask you that question.

4          MR. KANG:  I think he was right.

5          THE COURT:  On those two points?

6          MR. KANG:  Yes.

7          THE COURT:  Does that cover that?  Yes.  That's

8    all I had.

9          Let me now turn to Cigna's motion for summary

10   judgment.  Whoever is arguing that, Attorney Kang.

11         MR. KANG:  Ms. Kingsbery is going to argue that.

12   I have the citation.  The case is *Verizon Sickness and*

13   *Accident Disability Benefit Plan versus Rogers*.  2024 US

14   Dist Lexis 15057, District of Rhode Island, January 29,

15   2024.

16         There's a couple of other post-*Montanile* cases

17   that I would direct the Court to on the issue of tracing

18   and dissipation that may be instructive.  *Zirbel versus*

19   *Ford Motor Company* 980 F.3d, 520, Sixth Circuit 2020.

20   And there's a Third Circuit decision *Renal Care versus*

21   *Wellspan Health* 709 Fed Appx 160 Third Circuit 2018.

22         There's also the underlying district court

23   opinion in the *Renal Care* case that I don't have the

24   citation with me right now.  That's also very helpful

25   context and background.  I would submit those cases for

1    the Court's consideration.

2              MR. CUNNINGHAM: Your Honor, may I be excused for

3    a moment?

4              THE COURT:  Yes, no worries.

5              Who is going to argue the Labs opposition to

6    Cigna's motion?  Is that you, Attorney Hare, too?

7              MR. HARE:  Thank you.  We have allocated

8    portions to both Mr. Cunningham in particular he'll

9    address the statutory front pay act issues.

10             THE COURT:  I do have questions.  I guess we

11   need to take a five-minute break.  He should be here.

12             MR. CUNNINGHAM: I can wait, Your Honor.

13             THE COURT:  I have Attorney Kingsbery please on

14   the questions I have for Cigna on your motion for summary

15   judgment.  I'm going to run out of time.  Let me go to

16   the ones that I thought were most important.

17             Is there a provision in the Cigna plans that are

18   generally at issue here that expressly state an

19   assignment is required for direct payment?

20             MS. KINGSBERY:  Yes, Your Honor.  There is an

21   assignment.

22             THE COURT:  Can you tell me an exhibit I can

23   look at that will tell me that?  56 something I'm sure.

24   Can you give me that cite?

25             MS. KINGSBERY:  Yes, Your Honor.  It is Exhibit

1   56 which is a group exhibit.

2          THE COURT:  Right.  Which letter?

3          MS. KINGSBERY:  Actually all of them.

4          THE COURT:  Can you give me a page cite on one

5   of them?

6          MS. KINGSBERY:  Yes, I can.

7          THE COURT:  Maybe one of your colleagues can

8   help you and you'll get that to me at the end.  All

9   right?

10          MS. KINGSBERY:  Yes, Your Honor.

11          THE COURT:  So it is a fact, though, that --

12   your argument is there's no assignments here, right?

13   Correct assignments as you define what an assignment has

14   to be, these folks didn't get those, right?

15          MS. KINGSBERY:  It is actually not Cigna's

16   argument that there's no assignment.  The Labs have

17   asserted in their complaint that they are not proceeding

18   under any claims for which the Labs have an assignment.

19          THE COURT:  Okay.  But my question is it would

20   be your position there are no assignments here as defined

21   by your policies; is that correct?

22          MS. KINGSBERY:  That's correct.

23          THE COURT:  So, however, Cigna paid the Labs

24   directly even though they had no assignments, right?

25   Okay.

1           Would you agree with me as I parse my way

2    through this and got a headache a couple of days ago when

3    I really dug into it, isn't there a difference between an

4    assignment and a consent to pay?

5           MS. KINGSBERY:  There is a difference between an

6    assignment and a consent to pay.

7           THE COURT:  That's what we have here, right?  In

8    other words, when I have a cause of action, you steal

9    money from me.  You steal $200 from me.  I don't want to

10   bother suing you.  But my law clerk she's a lawyer.  It

11   won't cost her anything for a lawyer.  So she says I will

12   take it from you, Hall, and so Hall assigns.  I hereby

13   transfer and convey any and all interest in my claim

14   against Attorney Kingsbery for $200 on this day,

15   notarized, blah, blah, blah, blah.  Okay?  She now has

16   it.  She can take you into court in her own name alleging

17   assignment.  She gets to sue you, right?

18          MS.  KINGSBERY:  That's right.

19          THE COURT:  In this case, we don't have that.

20   Basically Cigna, by practice, let alone the fact that the

21   insureds told the Labs, you know, you can go collect what

22   I'm owed from Cigna.  There's in a sense a consent to the

23   direct payment.  Would you agree?

24          MS. KINGSBERY:  So I would say that in every

25   claim submission that the Lab submitted to Cigna, they

1    would have indicated to Cigna that they either have an

2    assignment to receive payment or they don't.

3         So if Cigna received a claim form that indicated

4    they had had an assignment, Cigna probably would have

5    paid if the claim was covered.

6         In this case, though, the Labs have asserted

7    that they are not proceeding on any claims for which they

8    have an assignment.  So those claims wouldn't include any

9    claims presumably where they submitted a claim form to

10   Cigna and indicated that they had a valid assignment to

11   receive payment.

12        THE COURT:  Okay.  I love your arguing this.

13   All right?  You are doing great so far.  What was my

14   question?  It called for a yes or no answer.  You could

15   have said yes.  What you said, Judge, is accurate but,

16   okay, but you gave me the but first.  I don't know what

17   your answer is.

18        MS. KINGSBERY:  Yes.

19        THE COURT:  And I can't look it up because,

20   Terri, I'm getting a notice remove from cache transcripts

21   unfiled JCH 02-28.  When I click cancel, it keeps coming

22   back.  I actually clicked okay which meant a disconnect

23   or I'd lose it, but it still keeps come up so I can't go

24   back and tell you what my question was.

25        What was my question, Terri?

1          (Question read by the court reporter.)

2          THE COURT:  Would you agree?  Yes or no.  If you

3    can't answer it like a witness, you can say Judge, I

4    can't answer that yes or no, but I would be shocked if

5    you can't.

6          MS. KINGSBERY:  Let me make sure I understand

7    the question.  Did Cigna consent to the Labs --

8          THE COURT:  Was there, in effect, a consent to

9    direct payment to the Labs by the operation of how Cigna

10   did it, they paid it directly, they consented, the

11   insured consented by saying to the Labs you bill direct,

12   all of that, take all the circumstances that are not

13   disputed in this case for which a lot of disputes but not

14   that.  In effect, it's by consent.

15         MS. KINGSBERY:  Yes, Your Honor.  For the claims

16   that Cigna paid, there would be consent.

17         THE COURT:  Okay.  It is your position there's a

18   difference between an assignment and a consent?

19         (Pause.)

20         THE COURT:  Yes would be the answer.

21         MS. KINGSBERY:  Yes, Your Honor.

22         THE COURT:  Thank you.  I'm skipping that for

23   now because I'm running out of time.

24         I want to turn to the third-party beneficiary

25   claims and your argument about the pre2015 fee

1  forgiveness.  Am I on a page in the book here?

2          MS. KINGSBERY:  Yes, Your Honor.

3          THE COURT:  You cite to language in one of those

4  56 exhibits that you have no legal obligation to pay for

5  which no charge would be made if you did not have health

6  coverage, then you are not covered, right?

7          MS. KINGSBERY:  That's right.

8          THE COURT:  This is one of last arguments you

9  make on this Count Four that even if the Labs is

10  successful on summary judgment on the third-party

11  beneficiary claims, you are still entitled to summary

12  judgment on claims prior to 2015 because the undisputed

13  evidence is that the Labs were engaged in fee forgiving

14  and thus, this provision says no coverage.

15          The problem is from the papers, I can't discern

16  how that argument pertaining to fee forgiveness in

17  relationship to Count Four, third-party beneficiaries and

18  I don't believe you provide an explanation of why it is

19  relevant to Count Four.  Could you do that?  Is there an

20  argument offered in support of that affirmative defense

21  of fee forgiveness as to Count Four?

22          MS. KINGSBERY:  Yes, Your Honor.  Count Four is

23  a breach of written contract.  The Labs are asserting a

24  contract claim based on the policies.

25          THE COURT:  In other words, they don't owe an

1    obligation to the insured to pay for this procedure that

2    they have been billed for and in some cases, paid, right?

3           MS. KINGSBERY:  Right.

4           THE COURT:  And so the Labs -- I thought that

5    Count Four, though, was a third party -- Labs count was a

6    third-party beneficiary claim.  They are a third-party

7    beneficiary of that relationship and they are entitled to

8    be paid?

9           MS. KINGSBERY:  That's right.

10          THE COURT:  On your motion for summary judgment,

11   you want me to say that you violated the fee forgiveness

12   exclusion and therefore -- even if the Court says you are

13   entitled to be paid on third-party beneficiary theory

14   under that count of your complaint, you don't win?  Labs,

15   you don't win.  That's your argument, right?

16          MS. KINGSBERY:  In part.  Our argument is even

17   assuming the Court finds that the Labs have satisfied the

18   clear and manifest intent element and that there was a

19   breach of one of the statutory provisions that the Labs

20   are claiming there is a breach, as an affirmative defense

21   because the contracts under which the Labs are proceeding

22   have an exclusion for certain services where the Labs

23   have not obligated the patient to pay for their share, if

24   the labs can't demonstrate compliance with the contract

25   that they are proceeding under --

 1          THE COURT:  There's no coverage.  Isn't that
 2   what I just said so you would say I agree, Judge?
 3          MS. KINGSBERY:  I agree with you.
 4          THE COURT:  Thank you.  This argument you make
 5   in your summary judgment, is that in support of an
 6   affirmative defense or is it basically the Labs can't
 7   prove that we were obliged to cover this procedure under
 8   the terms of our contract with the insured?
 9          MS. KINGSBERY:  It is the latter.
10          THE COURT:  Okay.  Good.  That's what I was
11   confused about so now we have that clear so it's failure,
12   in effect, to prove your claim?
13          MS. KINGSBERY:  That's correct.
14          THE COURT:  Gotcha.  Very good.  Now continuing
15   on that claim.  Now the issue is does the policy clearly
16   prohibit what you claim the evidence indisputably shows
17   the labs were doing not billing.  Okay?  So you cite a
18   couple of ERISA cases I think in your brief at 71, your
19   opposition.  I'm sorry.  Their opposition was 71 pages
20   long?
21          MS. KINGSBERY:  Our motion?
22          THE COURT:  Yeah, your motion -- no, it wasn't.
23   That's not a correct cite.  I don't know where you said
24   it, but I understood that you cited to ERISA cases.  I
25   know I've read them.  But we're not under ERISA on this

1    claim, correct?  So under Florida law which you would

2    agree would apply to these claims?  This is a third party

3    beneficiary claim, right?  Do you agree the Florida law

4    applies?

5          MS. KINGSBERY:  I do agree Florida law applies.

6          THE COURT:  Florida law just like Connecticut

7    says that interpretation of an insurance policy is a

8    question of law for the Court?

9          MS. KINGSBERY:  That's right.

10          THE COURT:  Unlike ERISA where there's deference

11    to the administrator and he gets to do a whole lot of

12    stuff, he's in the wild west out there.  He's not reading

13    the words of a contract assuming you prefer one side gets

14    the benefit of the doubt or not that you do in insurance

15    contracts, right, so I don't understand.  You have to

16    tell me.  This is not a yes or no.  You get to give a

17    full answer.

18          How can the language that are in the plans be

19    reason -- that we are applicable to these folks, be

20    reasonably interpreted as barring fee forgiveness?

21          MS. KINGSBERY:  So I would agree with you that

22    Florida law applies but the reason why we have cited the

23    ERISA cases is because in each one of them the Court

24    looked at identical language and found that they language

25    does mean what Cigna argues it means which is that the

1   Labs are obligated --

2       THE COURT:  I'm past that.  I'm not applying

3   ERISA cases in the standard for administrators under

4   ERISA plans.  I'm applying Florida law that says I have

5   to read the contract provision.  I'm asking you how does

6   that contract provision -- I believe Florida provides

7   that I'm supposed to read any ambiguity in the favor of

8   the insured, right?  How does that provision put the man

9   on the street, the insured, on notice that if he goes

10  somewhere and they say don't worry about the co-pay, we

11  are going to pass that.  That all the sudden I have no

12  coverage.  Forgot about the co-pay.  I have no coverage.

13  How does that language, you tell me the words in this

14  provision, tell me that's going to be fee forgiveness and

15  boom, they have no coverage?

16      MS. KINGSBERY:  So the language in the policy is

17  that service for which the insured person has no legal

18  obligation to pay and so under the plain language, if the

19  insured's not being obligated by the provider to pay

20  their portion of the services, the services are excluded.

21      THE COURT:  Okay.  But maybe I'm outside the

22  record here, but I will spin an image that's in my mind.

23  These people who are actually undergoing treatment for

24  substance abuse presumably at some doctor or clinic, they

25  get sent by the doctor.  We need a lab test.  Go over to

1    the labs.  They show up at the labs, the labs say what's

2    your insurance.  I'm at Cigna.  They take the card.  They

3    write it down.  Take a test and they go home.

4         If I'm that person, how am I going to know that

5    I'm not getting billed?  Not billed later.  If I knew it

6    maybe I wouldn't have the test.  I've gone to doctors and

7    I have co-pays or other things and sometimes a lot of

8    them now make you do it ahead of time, give a credit card

9    online and sign it.  I see some doctors where I say don't

10   I have co-pay.  I actually say that to the front desk.

11   They say I don't know.  We'll check.  You'll get a bill.

12   These folks have to say that what do I owe you before I

13   go get the needle in my arm?  I would know and I'm not I

14   don't think the ordinary man on the street.  The ordinary

15   guy on the street is going to know that from this

16   language?  If it is so clear, why did Cigna was it in

17   2017 Lab Exhibit 71 begin to create policies that are

18   like five times as long as the fee forgiveness provision

19   in the policies generally at issue which expressly say if

20   Cigna determines -- so in other words, it is not you.

21   You better ask because Cigna later on is going to look at

22   this, that a provider is or has waived, reduced or

23   forgiven any provision of the charge or any portion of

24   co-payment, deductible or co-insurance.  You are required

25   to pay for the covered service without Cigna's express

1   consent.  You have done that.  Then Cigna in its sole

2   discretion shall have the right to deny payment.  The guy

3   on the street -- I understood it and the guy on the

4   street should understand it.  If he doesn't, then woe to

5   him.

6        And then you clarify even more.  I mean it is

7   almost a whole page whereas the one in 56J that I got

8   copied in here.  I have some dots in the middle, but it's

9   four lines the pertinent language.  Doesn't that

10  demonstrate what a clear fee forgiveness policy is in an

11  insurance policy even when read to the favor of the

12  insured which I have to do?  Doesn't 2017 kind of kill

13  you on this issue?

14       MS. KINGSBERY:  I would agree that the 2017

15  language provides additional detail and is clearer about

16  what it means.  That doesn't mean that the original

17  language that we have cited doesn't still mean that the

18  services are excluded if the provider doesn't --

19       THE COURT:  Tell me why is it reasonable.  Why

20  would it be reasonable if I'm going up to the counter at

21  Quest Diagnostic in Connecticut.  Attorney Radshaw would

22  know that.  That's where most people go it, right, or

23  Yale New Haven Hospital Outpatient.  I know that when I

24  go to that counter, I have to demand to pay my co-pay.

25  If they say I don't know what your co-pay is.  We'll let

1   you know later.  Because I haven't tendered what you

2   think is my co-pay or whatever else it is, later on you

3   have the right to say we are not going to cover that?

4   That's what you are telling me.  That an ordinary man on

5   the street would know that.

6           MS. KINGSBERY:  I would say that the policies

7   are very clear to the insured about the risks of seeing

8   an out-of-network provider versus an in-network provider.

9           THE COURT:  What provision other than the one

10  I'm citing to at 244-9 Exhibit 56J at page 46.  That's

11  what I have my mind on right now.  What other provisions

12  when read together with this one would say blinking red

13  light.  Stop.  Do not go to this lab.  Do not advance to

14  go unless you pay an amount of money you don't know what

15  it is.  How would I know that?

16          MS. KINGSBERY:  The provisions in the policy

17  explain the difference between what your costs are when

18  you see an out-of-network provider versus an in-network.

19          THE COURT:  I have been through this.  I have

20  been through this recently.  I have no idea how much it

21  is.  When I went to the surgeon in New York, I had no

22  idea how much the insurance company is going to pay him.

23  How much I have to pay him.  None of this was known to me

24  before I went and had the service.

25          MS. KINGSBERY:  I think that's an important

1    point because here the labs didn't communicate with the

2    patients at all to tell them how much they were going to

3    be charging for the services which they should have done.

4         THE COURT:  Maybe they didn't know until they

5    did the service.  How does the lab know?

6         MS. KINGSBERY:  Since they are their services

7    and their charges presumably they would know.

8         THE COURT:  So the insured should have paid the

9    full amount and subject to getting reimbursed by Cigna

10   for the $7.82 that a non-participating provider gets

11   covered for?

12        MS. KINGSBERY:  That's exactly right.  That's

13   why it's important if the labs are charging such high

14   rates that they are obligating the patient to pay their

15   portion.

16        THE COURT:  Okay.  You think what I'm citing

17   Exhibit 56J at Page 46.  In addition to any other

18   exclusion or limitation, there are no benefits provided

19   for services for which you have no legal obligation to

20   pay.  The insured knew when he went and had the blood

21   drawn, he had no legal obligation to pay.  Did the person

22   at the counter say you are not paying anything?  Do we

23   have any evidence of that?  How did he know he had no

24   obligation to pay?

25        MS. KINGSBERY:  The patient wouldn't known, but

1      the provider would.

2              THE COURT:  It's the patient's coverage we're

3      talking about.  I know you have to argue over then the

4      Labs have a consent to be paid to them, but it is really

5      the coverage to the insured.  How does the insured know

6      that at the time the service was provided?  When you call

7      up and an insurance company -- I don't have Cigna.  The

8      one have and you call up and you see, gee, I'm going to

9      have this procedure.  Could you tell me what's covered

10     and what isn't covered and they put you on hold for 47

11     minutes and come back and say something to you like this

12     would covered, that's covered, but we don't really know

13     until you have the procedure, the service, whatever.  I

14     don't know.  It is not in the record but I'm saying why

15     isn't that the situation for the insured?

16             MS. KINGSBERY:  I mean the insured wouldn't

17     know.  You are right.  The insured had no communications

18     with the Labs at all, so they wouldn't know whether the

19     Labs intended to bill them for their cost share

20     obligation or not.  But Cigna and the insured are bound

21     by the terms of the policy.

22             THE COURT:  That's true.

23             MS. KINGSBERY:  If the provider is not

24     obligating the patient to pay for their share of it, the

25     policy is clear that those services aren't covered.

1           THE COURT:  So under their third-party

2    beneficiary -- let me remember that.  What the elements

3    of that are.  Give me a moment.

4           Let me turn to another argument you make at the

5    very end of your motion, the last two pages.  You seek

6    summary judgment on all reimbursement claims billed by

7    the Labs under CPT codes that are barred by Cigna's

8    reimbursement policies. Do you remember that?

9           MS. KINGSBERY:  I do.

10          THE COURT:  I believe you argue that Cigna's

11   reimbursement policies bar the use of codes 80100, 8010

12   and 8104, correct?

13          MS. KINGSBERY:  That's correct.

14          THE COURT:  And the effective dates are I

15   think -- those are all effective as of August 19, 2013 so

16   any claims after that are barred and as to 8300 and 8304,

17   that's effective January 1, 2015, right?

18          MS. KINGSBERY:  That's correct.

19          THE COURT:  Is your argument regarding this CPT

20   codes being barred by the reimbursement policies, is that

21   offered in support of one of your affirmative defenses or

22   in opposition, in effect, you have no coverage under your

23   policy?

24          MS. KINGSBERY:  It would be similar to the fee

25   forgiving exclusion.  In that if all the other elements

1    of the breach of contract claim are met, these particular

2    codes are still not covered and so the Labs can't

3    demonstrate that they have complied with the terms of the

4    contract such that they would be entitled to relief.

5         THE COURT:  You view it as a special defense so

6    you are taking the burden of proof that these codes

7    doesn't cover anything after the relevant dates.  Is that

8    a fair statement?

9         MS. KINGSBERY:  Yes.

10        THE COURT:  Now, if after January 1, just

11   because that's the last date, I'm kind of trying to

12   generalize.  After January 1, 2015, Cigna reimbursed the

13   Labs for any of the billings using the codes by that date

14   had been barred and so let's take the particular one

15   barred as of then, the 8300-8304 spread so after January

16   1, Cigna goes ahead and pays the Lab on any 8300 claim.

17   Do you concede that the Labs are entitled to recovery for

18   all billings using that barred claim under the voluntary

19   payment theory?  No.  Under what theory would they be?

20        Let me ask the question.  Maybe your answer will

21   explain it.  Does Cigna concede the Labs are entitled to

22   recover for all billings using that alleged barred claim

23   going forward?

24        MS. KINGSBERY:  If Cigna inadvertently paid one

25   of those codes, no, we would not agree that's consent

1    that the Labs are entitled to reimbursement for all

2    claims.

3           THE COURT:  So it doesn't open the door if

4    somebody actually pushed the wrong button on one or two

5    claims?

6           MS. KINGSBERY:  That's right.

7           THE COURT:  If Cigna uses another basis for

8    denial.  In other words, you didn't say January 2 Labs

9    8300 is barred.  You didn't use whatever code would

10   communicate that.  You used a different code.  You used

11   the wrong color paper.  I don't know.  Policy number

12   doesn't apply or it is a typo.  Can the Labs recover

13   there even though it is for a now barred code?

14          MS. KINGSBERY:  The Labs cannot recover.

15          THE COURT:  Why not?

16          MS. KINGSBERY:  Cigna is not required to

17   identify every single reason by which a claim is not

18   covered when they deny.  So if they deny it for lack of

19   medical necessity, for example, but it also happened to

20   be one of these codes, they would not be precluded from

21   raising this.

22          THE COURT:  Where would I find support for that

23   absolute statement that you made?  It is a good one.  You

24   are not required to I.D. every basis for rejection.

25   Where do I find that?

1          MS. KINGSBERY:  I do have some cites for that.

2     So there's a *Juliano* case.

3          THE COURT:  Excuse me for a second.

4           (Discussion Off the Record.)

5          MS. KINGSBERY:  I have a few cites for you.

6     First is the *Juliano* case that I mentioned. 221 F.3d 279.

7     Then an Eleventh Circuit case, *Martinez-Claib* and the

8     cite for that one is 349 Federal Appendix 522.

9          THE COURT:  That's fine.  Is there anything in

10    the policies that provide this?

11         MS. KINGSBERY:  There's nothing in the policies

12    that says one way or another, yes, you can or, no, you

13    can't.

14         THE COURT:  All right.  This is a little picky

15    question.  This is the one where I'm getting back to be

16    in my snarky mode of late filings of supplemental.  I

17    believe in your response to the Labs additional material

18    facts response in their 56(a)(2) or (3) whatever it is

19    when they responded to your 56(a)(1) in this motion, you

20    and they did, did additional material issues of fact.

21    You objected to the Labs' statement in several instances

22    on the grounds that, quote, The Labs have not cited any

23    admissible evidence that supports this fact in

24    contravention of 56(a)(3), end quote.

25              I'm looking for example at your response to Labs

1    AMF Paragraphs 10, 13 and 15.  In particular, you

2    objected to the Lab use of Exhibit 62 filed by The Labs

3    that's a declaration under oath of Seamus Lagan which my

4    reaction was gee, that's usually admissible.  Located at

5    Document 254.  Then you tell me the exhibit was not

6    served and filed with the Local Rule 56(a)(2) statement

7    as required by the Local Rule 56(a).  You say that at

8    Page 10.  Then you note the deadline for electronic

9    filing was August 7 of 2023.  I set a date, right?  Okay.

10            Now, this may not be on your clock.  This may be

11   on Attorney Kang's or some other member of the team who

12   made a judgment to make this argument, but are you

13   kidding?  It's filed the next day.  I'm entitled to get

14   outrage when people are late or miss deadlines.  I think

15   really.  It is in front of me.  Do you think I picked the

16   motion up and decided it in 24 hours?  Clearly not.  I

17   didn't make my deadline of December which was my original

18   deadline because of the press of other matters.  It is a

19   rhetorical question.  Are you kidding?  Thanks.  Your

20   response is perfect.  Thank you very much.

21            If I can have counsel for The Labs up?  I have a

22   few questions for you on Cigna's motion for summary

23   judgment.  I thought that was Attorney Cunningham was

24   going to do it.  I'm jumping all over the place as you

25   know.

1          MR. HARE:  I will take all questions with

2    respect to the common law claims and Mr. Cunningham will

3    address the Florida statutory claim.

4          THE COURT:  Wait a second.  I will tell you what

5    I've got.  What category would you put their argument

6    about barred CPT codes?

7          MR. HARE:  That's in my hat, Your Honor.

8          THE COURT:  Give me a second.  Let me see what

9    else I have.  I want to start with statutory claims so

10   let's see Attorney Cunningham at the podium, if you don't

11   mind.

12         MR. CUNNINGHAM: Thank you, Your Honor.  May it

13   please the Court.

14         THE COURT:  Yes.  In your opposition, you

15   correctly argue I think that the Court must apply the

16   same timeliness rules that the Connecticut State Court

17   would apply and you further I think correctly argue under

18   Connecticut law, if the claim at issue is created by a

19   statute, then timeliness of that is considered a

20   substantive issue under the statute, correct?

21         MR. CUNNINGHAM: Yes, Your Honor.

22         THE COURT:  You don't, however, point out to me,

23   as I read *Reclaimant Corp.* decision and it does, it

24   reiterates the concept that under Connecticut choice of

25   laws which is the first page of this analysis,

1    Connecticut applies its law concerning limitations

2    periods to a claim substantively governed by another

3    state law only if the limitations is considered

4    procedural and not substantive.  Do you agree?

5         MR. CUNNINGHAM: Yes, Your Honor.  We believe

6    that the limitations as procedural and I believe that

7    Judge Underhill in the *Galea* case cited in our papers and

8    also Judge Squatrito ruled the same way in the *Johnson*

9    case cited in our papers.

10        THE COURT:  So would that mean that the Florida

11   statutory claims are governed by the applicable Florida

12   statute of limitations?

13        MR. CUNNINGHAM: Well, Your Honor.  I will try to

14   answer your question directly but I have to say that --

15        THE COURT:  I think you are trying to get me to

16   do Connecticut six year.  I think *Reclaimant* -- I just

17   said to you about *Reclaimant* suggests you are not right.

18        MR. CUNNINGHAM: Well, Your Honor, Cigna has

19   taken the position we don't even have any statutory

20   claims.  Cigna has taken the position --

21        THE COURT:  Forget them.  They are not up at the

22   podium.  They are not asking you questions.  I don't care

23   what they say.  I want to know your position.

24        MR. CUNNINGHAM: Our position is that the

25   Connecticut statute governing contractual claims, not

1    statutory, not statutory claims would apply and that's a

2    six-year statute.

3            THE COURT:  How do you get around *Reclaimant*?

4            MR. CUNNINGHAM: How do I get around what?

5            THE COURT:  *Reclaimant* where it says at pages

6    603 through 607 that when I start with the Connecticut

7    choice of laws which I think you agree I'm correct to

8    start there because where are we?  We're in Connecticut.

9    So Connecticut says that on a limitations period on a

10   claim substantively governed by another state law that I

11   apply their limitations period only if it is procedural

12   and not substantive.  And I think you just said to me the

13   Labs statute of limitations argument is procedural.

14           MR. CUNNINGHAM: That's what we believe, Your

15   Honor.  We believe the statute of limitations is

16   procedural.

17           (Discussion Off the Record.)

18           THE COURT:  Counselor, I have notes but it is

19   not consistent with what you are saying.  I don't want to

20   let it go by because when I get off the bench it will be

21   wait a minute.  I will figure out my notes.

22           MR. CUNNINGHAM: May I address something that

23   might or might not be helpful.  Your Honor, as I said,

24   Cigna has taken the position that we don't have any

25   statutory claims.  Cigna's argument is that all of our

1   claims are contractual in nature, so I don't even think

2   Cigna should be allowed to argue.

3          THE COURT:  It can.  You can always do it

4   assuming arguendo you judge find there are statutory

5   claims then they lose on another grounds.  Every lawyer

6   does that.  You do that.  I bet I can find a brief you

7   filed in the last two months that you did that.

8          MR. CUNNINGHAM: I don't think you will.  Maybe

9   in the last year, but not in the last two months.

10         THE COURT:  That's fine.  You just told me

11  unless I misheard you that the limitations should be

12  considered procedural under the Connecticut choice of

13  laws.

14         MR. CUNNINGHAM: That's what we believe, Your

15  Honor.

16         THE COURT:  Why did you write at your brief at

17  page 8, quote, in Connecticut, if, quote, the right is

18  newly created by statute, then the limitations period is

19  properly characterized as substantive because the period

20  of repose is so integral to a part of the cause of action

21  as to warrant saying that it qualifies the right.

22  *Reclaimant* at 986.  That's the opposite of what you just

23  told me.

24         MR. CUNNINGHAM: Your Honor, I apologize for

25  that.  What I would tell you is I'm relying pretty much

1    on the *Galea* case and the *Johnson* case.  Both cases

2    decided in this district.  As I said *Galea* by Judge

3    Underhill in 2021.

4              THE COURT:  I read them.  What's the second one?

5              MR. CUNNINGHAM: *Johnson case.*  Judge Squatrito.

6    I have no idea if I'm pronouncing that correctly.

7              THE COURT:  It is.  God rest his soul.

8              MR. CUNNINGHAM:  I didn't know that.  I'm sorry.

9    In any event, Your Honor, in both of those cases in

10   similar circumstances, both of those judges applied

11   Florida statute of limitations to -- excuse me.

12   Applied -- I know, Your Honor.  They applied Connecticut

13   statute of limitations to Florida claims.

14             There's no question that Florida substantive law

15   was held to apply to both of those claims, so we're

16   relying on that precedent in this district.

17             THE COURT:  Okay.  At least I understand so you

18   are telling me because it is procedural, I should apply

19   the Connecticut six-year statute of limitations?

20             MR. CUNNINGHAM: Yes, Your Honor.

21             THE COURT:  Which is a contract statute even

22   though the claim is based on a statutory provision in

23   Florida, a multiple statutory provision?

24             MR. CUNNINGHAM: That's our position, Your Honor.

25             THE COURT:  Does that strike you as a little

1   odd?

2         MR. CUNNINGHAM:  Well, Your Honor, this is an

3   odd case in the sense that we have statutory claims that

4   are essentially based upon contractual claims from when

5   you look at 67.6131, the Prompt Pay Act in Florida, what

6   it says at the very beginning, the first subsection of

7   that statute says that the provisions of this act have to

8   be incorporated into every --

9         THE COURT:  Right.  They argue which policies

10  but I know that language.  Let me ask you this, I think

11  you note in your brief that to your knowledge there are

12  no cases in which any court has applied 9511 to the 6131

13  or 6038 provisions of that Prompt Pay.

14        MR. CUNNINGHAM: As of the time our brief was

15  filed, I believe that was our position.

16        THE COURT:  Are you aware of any authority

17  applying any limitations period to claims 6131 or 6038?

18        MR. CUNNINGHAM: We are not, Your Honor.

19        THE COURT:  And will you just confirm for me

20  what I think you said in your brief that you are not

21  asserting any claims -- under 6131 you are not asserting

22  any claims?

23        MR. CUNNINGHAM: No, Your Honor.

24        THE COURT:  It's a different section.  What is

25  the number?

1          MR. CUNNINGHAM I will give that to you in just a

2     moment.

3          THE COURT:  64194.

4          MR. CUNNINGHAM: That's it, Your Honor.

5          THE COURT:  This is a little technical.  I have

6     to understand the record.  Were any of the Labs claims

7     submitted to Cigna that you were looking to Cigna to pay

8     claims to reimbursement that were submitted

9     nonelectronically?

10         MR. CUNNINGHAM: I don't know the answer to that

11    question.  Mr. Hare may know the answer to that question.

12    I simply don't.

13         THE COURT:  Okay.  I will follow up.  I will

14    skip that.  I will maybe come back.  I'm on those barred

15    CPT codes, right, comes back.

16         MR. CUNNINGHAM: That's for Mr. Hare, Your Honor.

17         THE COURT:  Thank you.  If you want to take your

18    break now, go right ahead.  I think from now on I'm on

19    those codes and just a picky, snarky question.

20         MR. HARE:  Anticipating some of your questions,

21    I'm bringing my laptop with me along with my notepad.

22         THE COURT:  How about answering that claim about

23    any claims for reimbursement were submitted

24    nonelectronically by the Labs.

25         MR. HARE:  Entirely submitted electronically.

1          THE COURT:  I assume that.  I want to confirm

2     it.  Could be a wrinkle in the case.  I'm on the barred

3     CPT codes.

4          Do the Labs agree that if Cigna's reimbursement

5     policies assert -- now, we can argue about when,

6     whatever, but at some point they actually say we will not

7     pay under this code.  Okay.  Assume that.  That the Labs

8     cannot recover payment for any claims for reimbursement

9     using those codes.

10          MR. HARE:  We don't concede that for the

11     litigation.  And I draw that distinction for an important

12     reason stemming from discovery.  Let me break that down

13     because I'll acknowledge the following: Outside of the

14     context of litigating a case, if a policy excludes

15     coverage for a particular procedure, that's not a covered

16     procedure.  It would not be reimbursable.  I have no

17     quarrel with that narrow proposition of coverage.

18          Obviously, as the Court has seen, we dispute

19     that the factual record says what Cigna now tells us it

20     does with respect to the vintage of the changes in its

21     reimbursement policy tethered to these particular CPT

22     codes.

23          THE COURT:  Let see if you agree.  As of June 1,

24     2015, Cigna had told the world, you included, that code I

25     hope I will remember the number, 8300 was not

1    reimbursable?

2         MR. HARE:  We acknowledge that as of January 1,

3    2015, I'm looking at my notes, CPT codes 80100, 80101,

4    and 80104, were no longer eligible for reimbursement.

5    Those all drug screen procedures.

6         THE COURT:  Okay.  So what is it about the

7    factual record that prevents you from agreeing with me

8    that if a reimbursement policy asserted clearly that

9    certain codes were barred that as to such a barred claim

10   as of the date of being barred, you can't recover

11   payment?

12        MR. HARE:  In the context of the litigation, the

13   difficulty is that from the outset, we asked Cigna to

14   identify all of the grounds on which any of the denied

15   claims were denied.  Precisely attempting to head off any

16   sort of Whac-A-Mole exercise where we would encounter

17   seriatim a change in rationale because we had seen that

18   during the course of a parties' dealings together.

19        This became a discovery issue that was addressed

20   through PJO Hawkins and was memorialized on the docket

21   and in the parties' correspondence and as of the

22   resolution in June of 2022, the parties agreed that Cigna

23   would identify all -- forgive me, identify every denial

24   reason that was for purported fee forgiveness, unbundling

25   and lack of medical necessity.  Any code not given Cigna

1     would stand on its rationale.

2           THE COURT:  Now we know because if you are

3     right, even if you are not right, I will not let them

4     come up in trial and stand up and say, there's this code,

5     we can deny for this reason.  You will stand up and say,

6     Judge, I haven't heard that code or that reason and I ask

7     and I know how much time was spent on discovery.  Trust

8     me.  I really am liking you guys today, but I have to

9     tell you there's been a long period of time where I kept

10    saying we should be sanctioning in this case.  Okay.  We

11    didn't I don't think.  I don't remember.  I don't think

12    we did, but Jim Hawkins deserves a medal of honor from

13    the president in this case.

14          MR. HARE:  On that all of the parties and their

15    counsel agree.  He's given selflessly of his time.

16          THE COURT:  Yeah, but you guys abused him in the

17    sense of these things shouldn't have been so contentious,

18    so disputed, but I didn't get into each one of them so I

19    don't know.  I just know by looking at it.  It was not

20    reasonable, but you all seem so nice today, so I maybe

21    will but that behind me those thoughts and trust me it's

22    a pox on both houses.  I'm not necessarily singling

23    anybody out.

24          Today you know every grounds for anything he's

25    claiming we don't owe you whether it's a special defense

1  or in his claims, right, of I want it back, right?

2      MR. HARE:  Correct.

3      THE COURT:  So why can't you answer my question?

4  My question is do you agree that if Cigna's reimbursement

5  policy says this code is not reimbursable as of this

6  date, you cannot recover?

7      MR. HARE:  I acknowledge that.  It is a coverage

8  issue if it is clearly excluded and the record shows

9  that.

10      THE COURT:  So these factual issues would be

11  like, okay, as of what date was it clear this was their

12  policy.  Is that one of them?

13      MR. HARE:  That's one of them.

14      THE COURT:  And whether the reasons they gave

15  don't fly either as a matter of law or fact, but they are

16  going to come up with another reason and you are worried

17  about that?

18      MR. HARE:  We have been.

19      THE COURT:  It is not going to happen.  I can

20  hear from Attorney Kang.  He could tell me why, Judge,

21  that's very inappropriate for you to say that.  I haven't

22  been heard.  This is why I can come in on the 14th day of

23  trial and tell me and start asking about another reason

24  that nobody has ever mentioned.  Assuming that I stick

25  with that point of view as a trial judge here, assuming

1    we get to trial, other than that, you agree with me.  If

2    the code is by policy announced by Cigna as of that date

3    from then forward, you can't bill for that code.

4         MR. HARE:  That's what I acknowledge is

5    uncontroversial.

6         THE COURT:  That's fine.  I think you argue or

7    you have asserted an argument that Cigna denied the

8    billings that used these codes the one I'm talking about

9    January 1, 2015 and the other dates, but they denied it

10   on a different ground, not the ground that the code is no

11   longer covered.

12        MR. HARE:  I'm with you.

13        THE COURT:  Right?

14        MR. HARE:  Right.

15        THE COURT:  So I think, for example, Cigna

16   denied some of your reimbursement claims not on the

17   grounds that's 8300 or whatever the numbers are, but

18   rather you didn't give the service you billed me for.

19   Maybe that's one of their arguments and you say they are

20   not entitled to summary judgment on that.  We still have

21   those claims.  They didn't use that grounds -- they

22   didn't use the code being barred grounds to reject it.

23        MR. HARE:  There's a difference between the

24   denial codes which are --

25        THE COURT:  Understood.  Do you take the

1   position that at least by the end of discovery, they have

2   to identify every claim you have asserted that they don't

3   think you should have been paid on or they don't want to

4   pay you now on.  However that comes up under your claim,

5   their claim, whatever, that they have to have told you

6   you aren't entitled to get this money or I'm entitled to

7   get back money that was paid on this claim for even if it

8   is one of those codes that's now out of date in 2015, so

9   they could have said that.  If they have another that I

10  find or the jury finds is a proper ground to have denied

11  it, let's say fee forgiving, just as a hypothetical, they

12  told you about fee forgiving and they say that's why they

13  said they weren't going to pay you, even if I throw fee

14  forgiving out, you are saying they can't refuse to pay

15  you or they can't get their money back if it is a code

16  that's now not billable because they didn't cite that

17  reason back in 2015, when they denied it.  They cited fee

18  forgiveness. I apologize.  I have gone all around the

19  mulberry bush, but I hope you understand it.

20          MR. HARE:  It is understandable because that's

21  been the experience with Cigna.

22          THE COURT:  I understand that.  Is it your

23  position they can't use the code being barred reason even

24  if they didn't cite it in February 2015? They cited

25  a different reason.

1           MR. HARE:  It's waived.  If they are asserting

2      this at the time of trial --

3           THE COURT:  No, they've told you before the

4      evidence is over.  They've told you wait a minute.  Woe,

5      we forgot to tell you that this code is barred so we'll

6      add that to our fee forgiveness reason.  It is not trial.

7      You know now that they think those things are barred.

8      They are all dated after January 1.  Of course, you know

9      that's their grounds.

10          MR. HARE:  If there's an exclusion that the

11     insurer seeks to assert, it is incumbent upon the insurer

12     to do so less that exclusion be waived.

13          THE COURT:  What do you say about a *Juliano* and

14     *Martinez* cited by Attorney Kang when he was up here and I

15     said why isn't it given up and he answered that Cigna is

16     not required to identify every basis.  They are by the

17     end of discovery.  I will give you that or by summary

18     judgment.  I will give you that.  I will listen to

19     Attorney Kang but I'm not excited that things coming out

20     of his back pocket during the middle of trial.

21          But if it has been disclosed by now that it will

22     qualify as a nonreimbursable claim.  It has a date of

23     February of 2015.  You know they are asserting the barred

24     codes.  You know that's outside the time period.  They

25     didn't cite it when they rejected it in March or April of

1   2015. They cited fee forgiveness, they cited bundling,

2   unbundling, whatever, why can't they rest on the barred

3   code?  You are not entitled to be paid for that.

4        MR. HARE:  I have no quarrel with that

5   proposition.  In the course of the parties' dealings, an

6   insurer finds a grounds for denial or imputative grounds

7   and asserts them, it need not exhaust the rest of the

8   available potential theoretical grounds for denial and

9   then the provider has the opportunity to respond, provide

10  additional documentation, maybe cure if it is a

11  documentation defect, maybe convince the insurer that the

12  asserted grounds was incorrect.  The insurer made them

13  pay the claim or may identify alternate grounds. That's a

14  different world from the world post-litigation where it

15  is a hide the bunny exercise.

16        THE COURT:  Have I got this right?  Are you

17  drawing a line between your claims to be paid where you

18  have not been paid which I think and throw it out.  You

19  tell me where I'm wrong.  He can assert post discovery,

20  anything he raised in discovery any grounds, summary

21  judgment grounds for why you can't be paid on a claim, he

22  can rely on those.  In other words, so if he denied it

23  for bundling, he can come in here today on summary

24  judgment and say those are codes that are barred.

25  However, when we go to the other side of the equation and

1    he wants money back.  He paid those claims in 2015.  They

2    made a mistake.  Somebody hit the wrong button.  He wants

3    unjust enrichment to pull back from you, you would argue

4    you can't do that.  You didn't tell me that's why you

5    denied.  You told me another reason which I have now won

6    on that reason so you should have paid me and it's

7    unfair, inequitable, unjust enrichment being, right?

8    It's inequitable to claw back money when you didn't tell

9    me then that I can't have these claims paid.  Is there a

10   difference there between your claim and his claim on what

11   we have been talking about, going around a bush on?

12           MR. HARE:  Sure.  Unless I'm lost because on his

13   claw back, they were paid.  They weren't denied.  They

14   were paid by definition.

15           THE COURT:  Right.  So he's got to prove unjust

16   enrichment which is an equitable theory, right?

17           MR. HARE:  If he wants to show up on a claw back

18   claim, assuming it's otherwise timely.  Giant hurdle

19   there and convince you, as the fact finder on the equity

20   claims, sitting in the absence of a jury, that the

21   payment was improper and inequitable for all of these

22   reasons that are now being articulated for the first

23   time, I will acknowledge that's a different investigation

24   than our attempt to get paid where there was a denial on

25   a given reason that we believe is unsubstantiated and now

1   we're hearing alternate grounds for denying that same

2   claim.

3           THE COURT:  Does that argument pertain to their

4   claw back equitable claim in their complaint or does it

5   also apply, is it your position, to your claim that you

6   should now be paid on a code that you have known since

7   January 1, 2015 isn't reimbursable?

8           MR. HARE:  I'm not sure the record shows that we

9   have known that.  I think the record shows at most that's

10  when Cigna adopted the exclusion.

11          THE COURT:  I don't know they have to show you

12  knew.  It is not covered I guess as of that date.  It was

13  well established.

14          MR. HARE:  Right.

15          THE COURT:  You make a distinction in your

16  briefs.  It took me a couple readings to get my head

17  wrapped around what the point was you were making on this

18  topic of, you know, these barred codes.  Cigna cites to

19  your expert, Ms. Thelian, if I'm saying it right, she

20  conceded that the policies barred these codes.  Then if

21  they did, they properly denied the claims using those

22  barred codes.  I think you responded that's little out of

23  context for the deposition and Ms. Thelian testified as

24  to denials under denial code 1648, not the ones at issue

25  about missing or invalid service code so at the most I

1    think you argued that -- I'm sorry.  At a minimum Cigna

2    doesn't get summary judgment as to your reimbursement

3    claims in your complaint under the codes at issue in this

4    section of their motion that were denied by Cigna on

5    other grounds, non-CPT code grounds.  Is that your

6    position?

7           MR. HARE:  I'm sorry, Your Honor.  I got lost

8    midway through that question.

9           THE COURT:  I'm going to the part of your

10   argument that yes, Ms. Thelian conceded something, but

11   there's a nuance to what she conceded and it had to do

12   with denial code 1648 which is a missing or invalid

13   service code, not for a barred service.  So I think you

14   argue in your brief that Cigna cannot get summary

15   judgment as to your reimbursement claims under the CPT

16   codes at issue in this part of Cigna's motion which is

17   these 30000 numbers that were denied by Cigna on other

18   grounds, nonCPT code grounds.  Have I got it right?  Hold

19   a minute.

20           (Discussion Off the Record.)

21           THE COURT:  Let me retract everything I said.  I

22   am correct about their relying on Thelian's alleged

23   concession.  There is some question when I went and

24   looked at it about whether it as broad a concession as

25   they argue.

1          Bottom line question is did Cigna reimburse you

2    guys for claims billed under the CPT codes at issue?

3    Meaning the 8100 and those codes after the relevant dates

4    August of 2013 or January of 2015?

5          MR. HARE:  So with the Court's permission, I

6    will defer that question to Mr. Gestrich.  He's prepared

7    to address issues concerning Ms. Thelian and Mr. Haney.

8          THE COURT:  Just address it please.  I don't

9    care who does it.  Although I will not the unfairness.

10   I'm up here by myself.  I don't have two colleagues on a

11   appellate panel to help me.  You guys have seven.  You

12   can say there, Attorney Gestrich.  Answer my question.

13   Did Cigna reimburse the Labs for claims billed under the

14   CPT codes at issue in Cigna's motion which are the 8100,

15   seq.  After the dates -- the relevant dates August of

16   2013, January of 2015.

17         MR. GESTRICH:  To the best of my recollection

18   and we can provide an official answer to the Court.  To

19   the best of my recollection after 2013, yes.  And I'm not

20   sure after 2015.

21         THE COURT:  Okay.  Let me ask, Attorney Kang.

22   Do you know the answer or I guess Attorney Kingsbery, do

23   you know the answer for sure or not or where I will find

24   the answer, anybody tell me.

25         MS. KINGSBERY:  That's consistent with our

1    recollection.  I don't know off the top of my head.

2            THE COURT:  Thank you very much.  That's all I

3    needed.  I have one more question for the Labs.  No, I

4    don't have to ask that.  All right.  Jensey, can I see

5    you for a second please?

6            (Discussion off the record.)

7            MR. HARE:  Shall I stand down, Your Honor?

8            THE COURT:  Yeah, I think you can.

9            I think we have literally and figuratively

10   exhausted the issues unless and I will invite the Labs

11   first, then I'll turn to Cigna.  If there's something

12   that you are dying to tell me before I leave the bench.

13           MR. HARE:  Thank you, Your Honor.  Only in that

14   I'm trying to be responsive to a question the Court had

15   and I will keep it very brief.  The Court had a colloquy

16   with Mr. Kang with respect to the ability or likelihood

17   that a practitioner would recognize the utility of filing

18   a counterclaim notwithstanding the dismissal.

19           THE COURT:  The Rule 12 issue.

20           MR. HARE:  I would simply observe that's

21   precisely what Cigna did in this case.  Cigna didn't file

22   a counterclaim.  Cigna filed its own separate cause of

23   action after the Labs filed in state court.  That's what

24   brings us here today on two consolidated actions.

25           THE COURT:  I understand.  Thank you.  How about

1   you, Attorney Kang?

2          MR. KANG:  Yes.  I will speak on behalf of the

3   Cigna side, Your Honor.   I wanted to follow up on one

4   point that Attorney Hare made when he came up here first

5   regarding the burden of establishing --

6          THE COURT:  That's good.  I should have asked.

7          MR. KANG:  I believe he said that the burden

8   would be on Cigna to establish an exclusion for medical

9   necessity.

10          THE COURT:  This is as relates to your claims to

11   recover money?

12          MR. KANG:  Correct.

13          THE COURT:  Okay, I gotcha.

14          MR. KANG:  So we claim lack of medical

15   necessity.  The question is who bears the burden of

16   proof.

17          THE COURT:  Good question.

18          MR. KANG:  There is a case in the Second Circuit

19   that decided this issue, Your Honor.  It is called *Mario*

20   *versus* --

21          THE COURT:  Nobody cited it?

22          MR. KANG:  I don't believe we did.  It is *Mario*

23   *versus PNC Food Market*, 313 F.3d 758, decided in June

24   of -- December of 2002 and the *Mario* case says that the

25   burden -- the ultimate burden of establishing medical

1  necessity or lack thereof depends on whether the medical

2  necessity provision in the plans are a condition of

3  coverage or an exclusion.  If it is a condition of

4  coverage --

5          THE COURT:  Who wrote the opinion?  Do you

6  remember?

7          MR. KANG:  Judge Sack I believe.  Judge

8  Calabresi.

9          THE COURT:  I would have guessed either of

10  those.  Don't tell the other judges.

11          MR. KANG:  And Judge Parker and McLaughlin.

12          THE COURT:  Sounds like a helpful opinion.  It

13  sounds rationale.  Condition is whether it is a function

14  of coverage or what's the other?

15          MR. KANG:  The burden on who has the depends on

16  whether medical necessity is a condition of coverage or

17  an exclusion.

18          In our plans, it is medical necessity, it is

19  clear that it is a condition of coverage.  It is not a

20  plan exclusion.

21          THE COURT:  I will look at that but go ahead.

22          MR. KANG:  Judge Calabresi held in those

23  instances where medical necessity is a condition of

24  coverage, ultimately the burden of establishing lack of

25  medical necessity is on the patient, the insured, or in

1    this case, the provider.

2         The plan administrator, however, still has an

3    obligation for determining, as he said, general medical

4    -- making a determination as to general lack of medical

5    necessity.  In other words, you can make a determination,

6    a plan administrator can determine lack of medical

7    necessity sort of in the usual case.

8         THE COURT:  That makes the arguments of the Labs

9    about how you haven't proven it and you cite to Dr. Clark

10   and Dr. Nicoll.

11        MR. KANG:  Dr. Nicoll and Dr. Clark.

12        THE COURT:  So this one you think, in your

13   reading --

14        MR. KANG:  Correct.

15        THE COURT:  Lets you skate home on this one.

16        MR. KANG:  So we believe that applying *Mario* the

17   opinions of Dr. Clark and Dr. Nicoll satisfy sort of in a

18   general case and the usual case --

19        THE COURT:  I got the argument.

20        MR. KANG:  If we demonstrate that, then it is

21   actually on the provider or the patient to come forward

22   with medical records or some other evidence to rebut.

23        THE COURT:  Okay.  Let me hear from Attorney

24   Hare.  I don't think this case was cited so it's kind of

25   unfair.  Are you familiar with it?

1          MR. HARE:  As of 30 seconds ago.

2          THE COURT:  Same with me.  Obviously I will read

3     it.  Let's leave it at this.  You don't get to respond.

4     I'm not sure why it wasn't cited.  Boy, when you were

5     citing Clark and Nicolls, I would have thought you would

6     have cited this case, Attorney Kang.  I will read it.

7     I'm sure you are going to read it.  If I have any

8     questions, we'll have a brief telephone call.  I don't

9     think we'll have a brief telephone call.  I have expended

10    about all at time I really want to expend on this case.

11    No offense, counsel.  It may be for a variety of reasons,

12    the fact I can't read the case, the fact doesn't seem

13    fair, whatever, you may get a notice we'll have a

14    telephone call in three hours or something, so somebody

15    better available on somebody's side to talk about that

16    case.  That's it.  Otherwise this case is on submission.

17         MS. COSTIN: May I be heard on one point

18    following up on Mr. Kang?

19         THE COURT:  On the what?  I can't hear you.  If

20    you are not in front of a mic.

21         MS. COSTIN: I just wanted to follow up on one

22    point that Mr. Kang just made and you were taking such

23    diligent notes about the definition of covered expenses

24    under the plan, Cigna's plans versus an exclusion.  We

25    submitted with our summary judgment motion several sample

1    plans.  These are Exhibits --

2          THE COURT:  56, right, I know.

3          MS. COSTIN: Exhibit 50, page 24, definition of

4    covered expenses, it is in that of every single plan.

5    Medical necessity is part of covered expenses.  It is not

6    part of the exclusions.

7          THE COURT:  You just said 56 and then you said

8    --

9          MS. COSTIN: No.  I said Exhibit 50.

10         THE COURT:  What's 50?

11         MS. COSTIN: Exhibit 50 to Cigna's summary

12   judgment motion.

13         THE COURT:  Yes.  What is it?  If I went to 50

14   and pulled it out, what is it?

15         MS. COSTIN:  It is the American Nutrition Open

16   Access Plus Medical Plan.  It is a sample plan.  I'm

17   directing the Court's attention to some of the sample

18   language in the plans.

19         THE COURT:  That's fine.  Thank you very much.

20   Anything else, counsel?

21         MR. KANG:  No, Your Honor.  Nothing from Cigna.

22         MR. HARE:  Your Honor, thank you for your time

23   today.  Thank you for hearing us.

24         THE COURT:  Thank you very much.  The matter is

25   under advisement.  Stand in the recess.

1          (Adjourned: 12:09 p.m.)

2

3

4

5     COURT REPORTER'S TRANSCRIPT CERTIFICATE

6     I hereby certify that the within and foregoing is a true

7     and correct transcript taken from the proceedings in the

8     above-entitled matter.

9

10    /s/  Terri Fidanza

11    Terri Fidanza, RPR

12    Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25