```
 1                  UNITED STATES DISTRICT COURT
 2                    DISTRICT OF CONNECTICUT
    _____
 3  EPIC REFERENCE LABS, INC.     |
    ET AL.,                       | No. 3:19-cv-01324-JCH
 4                   Plaintiffs,  |
    v.                            |
 5  CIGNA HEALTH AND LIFE         |
    INSURANCE COMPANY, ET AL.,    |
 6                   Defendants.  |
    _____|
 7  CIGNA HEALTH AND LIFE.        |
    INSURANCE COMPANY,            | No. 3:19-cv-01326-JCH
 8                   Plaintiff,   |
    v.                            |
 9  BIOHEALTH LABORATORIES, INC., | May 15, 2025
    ET AL.,                       | 2:00 p.m
10                   Defendants.  |
    _____|
11                                  New Haven, Connecticut

12                        ORAL ARGUMENT

13  B E F O R E:

14          THE HONORABLE JANET C. HALL, U.S.D.J.

15

16

17

18

19

20

21

22  Courtroom Deputy:               Court Reporter:
    Liana Barry                     Cassie Zayas, RPR
23

24

25                  Chambers:  203-773-2428
```

```
 1    A P P E A R A N C E S:
      Representing Cigna:
 2            EDWARD T. KANG
              EMILY SEYMOUR COSTIN
 3            Alston & Bird, LLP
              950 F Street, NW
 4            Washington, DC 2004-1404
              202-239-3728
 5            Email: edward.kang@alston.com
                     emily.costin@alston.com
 6
              KELSEY KINGSBERY
 7            Alston & Bird, LLP
              555 Fayetteville Street, Suite 600
 8            Raleigh, NC 27601
              919-862-2200
 9            Email: kelsey.kingsbery@alston.com

10            MICHELLE NICOLE JACKSON
              Alston & Bird, LLP
11            1201 West Peachtree Street
              Atlanta, GA 30309
12            404-881-7870
              Email: michelle.jackson@alston.com
13

14    Representing Epic, BioHealth and PB Labs:
              ANTHONY THOMAS GESTRICH
15            SCOTT M. HARE
              Raines Feldman Littrell, LLP
16            11 Stanwix Street, Suite 1100
              Pittsburgh, PA 15222
17            412-899-6460
              Email: agestrich@raineslaw.com
18                   share@raineslaw.com

19            ANTHONY ROSATO MINCHELLA
              Minchella & Associates, LLC
20            765 Straits Turnpike, Suite 2002
              Middlebury, CT 06762
21            203-758-1069
              Email: aminchella@minchellalaw.com
22

23

24

25
```

```
 1                    (Call to order, 2:00 p.m.)

 2              THE COURT:  Please be seated, everyone, and good

 3      afternoon to you.

 4              Welcome back.  We're here this afternoon for an

 5      oral argument on -- well, the particular pending motion I

 6      think we'll spend most of our time on is the motion for a

 7      judgment as a matter of law filed by the labs, I believe

 8      in the Cigna case.  I have some questions about a few

 9      other motions that we'll touch on at some point, but that,

10      I think is my principal focus.  The matter in which that

11      motion pends is known as Cigna Health and Life Insurance

12      Company versus Biohealth Labs, Inc. et al., 3:19-cv-1324.

13              Could I have appearances, please, starting with

14      the plaintiff.

15              MR. KANG:  I guess we're both plaintiffs,

16      Your Honor.

17              THE COURT:  Well, the plaintiff in the case I

18      just described.  There's only one, I think.

19              MR. KANG:  Your Honor, Edward Kang from

20      Alston & Bird on behalf of Cigna Health and Life Insurance

21      Company.  With me at counsel table is Kelsey Kingsbery,

22      Emily Costin, and Michelle Jackson.

23              THE COURT:  Could I inquire if the green light

24      is on at the base of your microphone.

25              MR. KANG:  Yes, Your Honor.
```

```
1              THE COURT:  Okay.  Could you pull that a little
2    bit closer?
3              MR. KANG:  Yes.
4              THE COURT:  Thank you very much.
5              MR. HARE:  Your Honor, good afternoon.
6              THE COURT:  Good afternoon.
7              MR. HARE:  My name is Scott Hare.  I'm here with
8    Anthony Gestrich from Raines Feldman Littrell on behalf of
9    the labs.  I will be principally arguing the labs' motion
10   as a matter of law at docket number 509.  Mr. Gestrich
11   will likely address any additional questions the Court may
12   have.
13             THE COURT:  All right.
14             MR. MINCHELLA:  Good afternoon, Your Honor.
15   Anthony Minchella, local counsel for the labs.
16             THE COURT:  Yes.  I know who you are, but the
17   record doesn't know you're here.  That's great.  Thank you
18   very much.
19             It is the labs' motion, so I'll start with you,
20   Attorney Hare.  Probably the first few are going to be
21   what I call housekeeping or preliminary questions.  You
22   filed a motion to vacate -- maybe this is an Attorney
23   Gestrich question, but you filed a motion to vacate the
24   judgment, arguing that the judgment, quote, "clouds the
25   timing for an appeal."  Can I just sort of terminate that
```

1  as moot or withdrawn?

2         I mean, on April 14th, the Second Circuit

3  granted the labs' motion to hold the appeal in abeyance

4  until I ruled on the outstanding motion concerning -- I

5  think it's captioned "to compel" and "for a new trial,"

6  that is pending currently or being addressed by Special

7  Master Hawkins.

8         And the federal rule, I think, makes it very

9  clear that until I do the last remaining motion, even

10  though you filed the appeal, it's not really effective.

11  But those are just my thoughts.

12         So why do I have this random motion hanging on

13  the docket?  Which I understand you're nervous -- did you

14  file a notice at the right time or soon enough, et

15  cetera -- but I think it's pretty clear to me you've done

16  what's had to happen, the circuit has done what they've

17  had to happen, and I still haven't decided that motion.

18         MR. GESTRICH:  Yes, Your Honor.  In the 1326

19  case, that could be terminated at moot.

20         THE COURT:  Great.  Thank you very much.  I --

21  just, for the record, one last time, you're probably sick

22  of me raising this.  Am I correct that you have abandoned

23  your defense of laches?

24         MR. GESTRICH:  Yes, Your Honor.

25         THE COURT:  Okay.  Thank you.  This is not so

1   much housekeeping, so we may be shifting chairs there.

2   But in Cigna's case against the labs, I would be

3   interested in your response to the question of whether the

4   jury needed to look at the language of the plans -- the

5   insurance plans or policies of insurance -- to determine

6   liability, what your answer to that would be.

7        MR. HARE:  With respect to the Cigna claims --

8        THE COURT:  Yes.

9        MR. HARE:  -- on the claim for unjust

10  enrichment, yes, they would.

11       THE COURT:  Well, wasn't our charge clear that

12  while they could look at the language, they were not bound

13  to look at it and that they could look at things other

14  than the policies?

15       MR. HARE:  The charge allowed the jury to look

16  beyond the policies, but directed the jury to the

17  policies.  For instance, with respect to medical

18  necessity, the Court at least twice in its charge

19  referenced the policies, saying in one instance, "Cigna

20  argues that none of the tests for which these labs billed

21  Cigna were medically necessary, and that under the terms

22  of their policies Cigna only pays claims for services that

23  are medically necessary."

24       THE COURT:  Are you quoting the closing argument

25  or my charge?  I missed what you said at the beginning.

1              MR. HARE:  This is taken from the charge, I

2      believe, Your Honor.

3              THE COURT:  All right.  I just wanted to be

4      sure.

5              MR. HARE:  There's a second instance of

6      reference to the policies with respect to medical

7      necessity.  There's a reference to the policies, in turn,

8      with respect to fee forgiveness.  Fee forgiveness is the

9      practice of waiving or forgiving patient cost-sharing

10     obligations, further explanation, or other insurance

11     payments.  Cigna claims that all three labs engage in fee

12     forgiveness by not collecting the cost-share obligations

13     of their patients.  That can only be understood and

14     assessed in the context of the policy documents

15     themselves.

16              The third of the three legs of the stool on

17     which Cigna predicates its claim for unjust enrichment, of

18     course, is the practice of unbundling.  Cigna itself at

19     docket number 456, these are Cigna's proposed jury

20     instructions.

21              THE COURT:  Oh, I know.  Don't worry, we'll get

22     to those later.  You don't have to tell me those.

23              Before we proceed, would you give me the

24     citation of the transcript you were reading from so the

25     record has it?

1          MR. HARE:  That comes from the trial transcript

2     on October 31st at 2398, line 18 --

3          THE COURT:  Okay.

4          MR. HARE:  -- through 2409, line 11.  Now, that

5     citation encompasses, of course, much --

6          THE COURT:  I've read it recently.  I have a

7     sense of what it's about.  But I'm not sure if it's within

8     the range of those pages or elsewhere, but I also told the

9     jury, didn't I, quote, "I instruct you that the terms of

10    these policies do not necessarily define what is unfair,

11    as that term was used in the third element."

12         MR. HARE:  Sure.  But at no point did the claim

13    strip itself in its entirety of the policies, and that's

14    the essence of the ERISA preemption argument.

15         THE COURT:  I understand.

16         MR. HARE:  Yes.

17         THE COURT:  Well, one of your arguments on this

18    issue is that because Cigna's claims are premised on the

19    existence of the ERISA plans, they're preempted.  But why

20    isn't this, I guess, what I'd call a garden variety fraud

21    claim or misrepresentation claim of the sort mentioned in

22    *Geller*?

23         Where, if I recall *Geller*, that's the one, Alex,

24    where the person wasn't entitled to be an insured as a

25    member of the plan, but became a member fraudulently and

1      filed claims for large amounts of money.  And that, I

2      think, was deemed a garden variety fraud.

3           I mean, I know that he didn't have his fraud

4      claim at the point going to trial as a cause of action,

5      but he clearly was arguing misrepresentations and those

6      sorts of things to meet the burden of proving unfair.  So

7      isn't it like *Geller* in that sense?

8           MR. HARE:  In the first instance, precisely

9      because Cigna did not proceed on a fraud claim.  Fraud can

10     be understood in an absolute and disembodied sense.  Cigna

11     has not brought and, in fact, explicitly was precluded

12     from bringing a fraud claim.

13          THE COURT:  Well, they're precluded because I

14     denied summary judgment.  It didn't mean there aren't

15     facts here that would amount to fraud.

16          MR. HARE:  Cigna proceeded on a state court

17     claim for unjust enrichment, predicated on these three

18     concepts.

19          THE COURT:  Right.

20          MR. HARE:  None of these concepts can be

21     understood in the absence of the policies themselves.

22          THE COURT:  Oh, let me take exception.  Let's

23     take unbundling, which I clearly, I think, instructed the

24     jury was not covered by the policies.  That took me a long

25     time to get there and a lot of kicking and screaming from

1    Cigna's counsel.  But at the end of the day, I think I

2    pronounced to the jury, It's not in the policy.  I think,

3    if I got that right.

4            Okay.  So here's something that's not in the

5    policy.  So while I may have said, consider the policies,

6    they're not going to find unbundling there, right?  It is

7    just the idea that I do one test, but I bill you for 16.

8    I don't see why a jury could not be reasonable in

9    concluding that's really unfair.

10           MR. HARE:  The very exercise that the Court had

11    to go through to reach that conclusion in order to

12    instruct the jury that the concept of unbundling, the term

13    where that framework is not to be found in these policies

14    itself required detailed reference to the policy.  That's

15    exactly the exercise that ERISA preemption guards against.

16           THE COURT:  What reference to the policy?

17           MR. HARE:  You had to go through the policies to

18    find that they were silent --

19           THE COURT:  That was only to find it wasn't

20    covered.  It didn't mean that they had to be construed or

21    applied.  I mean, the lady who joined a group to be

22    covered by insurance, I suspect there's a definition in

23    the policy of who's a member, but that didn't make it an

24    ERISA claim.

25           I mean, the fact that I have a policy and I had

1    to wrangle the lawyers to the ground to finally concede it

2    isn't in the policy doesn't mean that I'm engaged or it's

3    related to or connected with or whatever those other magic

4    words are in a preemption.  I don't see why that brings it

5    within the scope.

6            MR. HARE:  Because at the end of that long --

7    that dedicated analysis, the conclusion that Cigna seeks

8    to urge is that there is no coverage under these policies

9    because of unbundling.  Inevitably, we are back to a

10   discussion of the policies, whether it's silent or

11   otherwise, whether it's within or it's without, the claim

12   is that these claims -- the argument is that these claims

13   should never have been reimbursed because they are

14   inappropriate under the policy for this and two other

15   reasons.

16           THE COURT:  You don't think a jury, if faced

17   with the following -- I don't know, maybe some lawyer

18   would take it as a class action.  I go to the ice cream

19   store across the green and I order a cup of ice cream, and

20   it comes in a cup with the ice cream and a spoon and a

21   napkin, okay?

22           Now, I think everyone in the world expects that

23   the price posted for ice cream in the size I got is what

24   I'm going to pay, plus my token to Governor Lamont, for

25   getting what I just described, the ice cream in a cup with

1     a spoon and a napkin.  Now, if I get a bill from that guy

2     that says, Oh, no, Hall, here's the ice cream price you

3     saw on the wall, but besides that, I'm going to charge you

4     for the cup separate and I'm going to charge you for the

5     spoon and I'm going to charge you for the napkin.

6          You don't think a jury could find that to be --

7     let's say I paid it because what am I going to do?  Throw

8     the ice cream back at the guy?  But then I decided, that's

9     really not fair, and I go and get a lawyer to bring a

10    lawsuit for every thousands of people that went and bought

11    that ice cream and say, Jury, this is unfair.  You don't

12    think a jury would find that's -- I mean, the usual

13    practice is to bill one price to get the product.  And in

14    this case, to get this product, it has to be in a cup.  I

15    can't eat ice cream without a spoon and a cup, right?

16         So I don't understand why a jury could not

17    conclude that a practice of lab services -- which I assume

18    every juror has had some personal experience with getting

19    lab tests -- is billed one time in a bundle sense -- at

20    least if not 100 years ago, certainly in recent history --

21    and that to unbundle them without regard to what the

22    policy says, the policy says, Insured, I'm Cigna, I'm

23    going to pay -- it seems to be a decreasing amount every

24    time I get my insurance renewed, but -- 50 percent of your

25    lab tests when you go for your -- you know, when you go

1    for a physical or whatever.  That's what the policy is

2    about.  It's not about how can Cigna -- how should you

3    bill Cigna for a service.

4         MR. HARE:  We are not, in this case, in the

5    world of ice cream or other consumer transactions.

6         THE COURT:  Of course we're not.

7         MR. HARE:  We're in the world of ERISA and

8    ERISA-governed plans.

9         THE COURT:  I understand.

10        MR. HARE:  And that question, because of ERISA

11   preemption, would never get to the jury.  It certainly

12   does in the ice cream world where it's an ordinary

13   consumer transaction.

14        THE COURT:  That's begging my question, I think.

15   I don't know why I can't articulate it.  I'm terrible at

16   analogies.  I'm getting sick of apologizing for my poor

17   analogies.  But I just don't -- I mean, when this lady got

18   $100,000 in *Geller* of medical services which this plan

19   covered a large part of and she shouldn't have been a

20   member, I mean, yeah, how come she shouldn't be a member?

21   Policy.

22        But, you know, it didn't become an ERISA matter.

23   I think everybody cites it as, like, a black letter case,

24   is this going to tell you about straightforward fraud that

25   isn't preempted even though it involves health benefits

1     under a plan.

2              Excuse me for a minute.

3              (Discussion off the record.)

4              THE COURT:  All right.  I feel like I'm beating

5     a dead horse.  I'm sorry.  It's not dead, maybe, but I

6     feel like I'm beating it, anyways.

7              I don't remember your brief and I could have

8     forgotten it, you know, or misremembered it.  But I don't

9     believe you really addressed the idea that it's important

10    to Cigna that medical providers under the Cigna preemption

11    analysis are not core entities.  And it struck me as I

12    read the cases that that is a significant issue in an

13    analysis of the preemption issue.

14             Do you agree that your clients are not core

15    entities, as that phrase is used in the context of ERISA

16    plans and preemption analysis?

17             MR. HARE:  I do recall Cigna making a reference

18    to --

19             THE COURT:  I'm talking about you.  Cigna, I

20    know, made the argument.  I'm pretty sure.  I didn't make

21    it up.  Certainly, the cases I read cited by Cigna talk

22    about that in the context of the analysis and is often and

23    many times seems to be the beginning and the end of the

24    analysis by some of the courts on this issue.  Anyway.

25             To me -- it seemed to me that even though to me

1    it's not necessarily a sole determinative aspect of

2    analysis for preemption, it's certainly significant if

3    you're not a core entity.  In other words, when a plan or

4    an insurance company or the beneficiary or somebody goes

5    out and sues someone who's not a core entity -- like

6    beneficiaries, participants, administrators, employers,

7    trustees and other fiduciaries and the plan itself --

8    you're not one of those, then it's not core, really, to

9    the operation of what is the ERISA plan, which could

10    trigger the preemption.

11         MR. HARE:  I think the Court is correct -- I

12    think the Court is correct that there are cases that

13    describe providers like the labs as being outside that

14    core constituency.

15         THE COURT:  Right.

16         MR. HARE:  Candidly, Your Honor, I have not

17    focused on whether that distinction brings with it a

18    difference.  I mean, we're still dealing with the question

19    of whether coverage should be allowed under the policy,

20    and insureds are being affected either way.  But the Court

21    may be right.  I'm not sure we addressed that concept

22    head-on in our brief.

23         THE COURT:  All right.  Give me just a moment.

24         On the issue of standing, my question is, why

25    aren't the investigative resources expended by Cigna,

 1    clawback efforts and the time spent in that investigation,

 2    quote, "injuries in fact," as that phrase is pertinent to

 3    the issue of standing?

 4            MR. HARE:  They could be and in some cases are.

 5    That's not --

 6            THE COURT:  Why not here?

 7            MR. HARE:  Because that's not what Cigna sued

 8    on.

 9            THE COURT:  What do you mean they didn't sue on

10    it?  They didn't sue on what?

11            MR. HARE:  Cigna sued specifically to recover

12    payments made using third-party, absent-party funds.

13    Cigna paid lip service to its own process.  Cigna didn't

14    seek to recover one penny for its own costs, for its own

15    injury.  In fact, Cigna didn't even make its

16    individualized injury a feature of the case.

17            Cigna could, Your Honor, have obtained

18    assignments and stood here in the shoes of third parties.

19    It didn't.  At least it didn't put in evidence to that

20    effect.

21            Cigna could have pled a claim and shown evidence

22    of its own damages, which incidentally would not be an

23    unjust enrichment to the labs; it would be a different

24    measure of damages.  But Cigna didn't and Cigna certainly

25    didn't quantify those damages.

1          And having failed to do so and having decided

2     instead just to charge ahead, by its own admission, trying

3     to recover claims of absent parties, is what deprives it

4     of standing on the record in this case.

5          THE COURT:  I know we were both amused at trial

6     about the strategy of trying to paint the banner of the

7     entity seeking to make whole the poor teachers of

8     Miami-Dade.  I understand that.  I think you know my view

9     to that approach in this trial.

10         But I think I'm a little troubled about -- about

11    the language in *Spokeo*, for example, which is that you can

12    still have standing even if none of the damages at issue

13    are for your personal benefit.

14         I don't know of any case law that says that

15    standing requires every dollar of damages awarded to the

16    plaintiff has to be damage to the plaintiff.

17         MR. HARE:  I don't think we make that argument.

18    I recognize --

19         THE COURT:  But you just went on at some length

20    about they didn't seek any money for their own plans, this

21    is all somebody else's money.  I mean, I thought I heard

22    that, unless I wasn't listening carefully.

23         MR. HARE:  What I intended to argue is that

24    Cigna neither asserted a claim for, nor put in proof of,

25    damage to itself.  And, in addition, Cigna certainly never

1    quantified damages to itself.  By its admission --

2         THE COURT:  I thought they had some individual

3    policies that were their policies.  Those weren't included

4    in the damage proof?

5         MR. HARE:  What we heard from Mr. Kang at trial

6    is virtually all of the $16 million is the

7    administration --

8         THE COURT:  Well, "virtually all" isn't all.

9         MR. HARE:  Well, the Court, in fact, instructed

10   Cigna to break out its damages into what I think

11   colloquially we all came to call buckets.  Cigna didn't

12   take the Court up on that instruction or opportunity.

13        Had it done so, I can imagine a world where

14   Cigna might have quantified some alleged damages that it

15   claims to have suffered.  It chose not to go down that

16   path.  And, again, it's seeking a disgorgement from the

17   labs on a count of an unjust enrichment to them.

18        The labs in no way could conceivably be

19   enriched -- unjustly, justly, or otherwise -- by Cigna's

20   own administrative expenses, nor was that the argument.

21        THE COURT:  We're talking not about the elements

22   of the cause of action of unjust enrichment; we're talking

23   about standing.  And I don't -- I believe *Spokeo* reduced

24   to standing to the phrase "injury in fact."  It had to

25   put -- Cigna put its resources to work.  It had to pay the

1    payroll, for example, for Stephanie Canto.  It paid

2    Dr. Nicoll's payroll, all right?  How, it later accounted

3    for.  But it had expenses for its employment costs, for

4    example, of people who were part of this investigation.

5    Why isn't that an injury in fact by the conduct of your

6    client?

7            MR. HARE:  It may be, Your Honor.  It wasn't --

8    the case was not prosecuted on that basis.

9            THE COURT:  Well, there's a lot of issues about

10   how it was prosecuted, but I don't know that that

11   undercuts the ability to bring -- I mean, you could have

12   moved to dismiss for lack of standing in a 12(b)(6) motion

13   without its prosecution, and the question would be, do

14   they have standing or they don't have standing?

15           So I don't know how they decide to introduce

16   certain evidence and not other evidence, they decide to

17   emphasize certain arguments that they think are going to

18   make -- curry favor with the jury and not emphasize

19   others, I don't know that that affects their legal

20   standing to bring the claim.

21           MR. HARE:  It's interesting that the Court

22   references a Rule 12 motion.  Fully half the cases that

23   Cigna cites in what it describes as a near-universal

24   recognition of standing are, in fact, decisions on motion

25   to dismiss.

```
1              THE COURT:  Oh, don't even tell me how many

2    decisions have been cited to me in these briefs -- I don't

3    know that we have any that were done post-trial other than

4    what's the standard for a JMOL or what's -- but on the

5    merits of the issues like preemption and standing, I mean,

6    those are generally well taken care of.

7              But if I recall correctly, sir, I don't think

8    you made a motion for preemption in summary judgment.  Am

9    I wrong about that?

10             Have I got that right, Alex?  Yeah.

11             MR. HARE:  We don't want to disclaim whatever

12   the record shows.  I don't recall us raising that issue at

13   summary judgment.

14             THE COURT:  No, I don't think you did.  You

15   could have.  But, anyway.

16             You may find this an unfair characterization,

17   but my observation is that your brief in support of your

18   directed verdict motion does not at any length argue that

19   Cigna failed to prove its damages.  Have you abandoned

20   that argument or have I undervalued what you briefed?

21             It seems to me in your oral motion, I think at

22   trial, you argue that they didn't offer proof of damages

23   sufficient to tie any measure of damages to a particular

24   defendant lab.  That's at transcript 2216:16-25.  There

25   are other arguments I guess you could have made, and I
```

1    don't think you made them -- that a demand letter isn't

2    evidence of damages or whatever.

3            But your briefing currently seems to reference

4    the demand letter not on damages, but on the standing

5    issue.  So I guess I just wonder, where do I stand on the

6    damages as a basis for a judgment -- well, as a matter of

7    law?  That's another question.  Would damages get you

8    judgment or would it get you maybe a new trial on damages?

9            MR. HARE:  The Court is correct.  In our papers,

10   citing to the demand letter that Cigna sent to -- I

11   believe it was PB Labs, the $2.4 million --

12           THE COURT:  Right.

13           MR. HARE:  -- the argument that we made focused

14   on that exhibit, and then the inferences drawn from that,

15   is, as the Court says, that those are not Cigna's damages.

16   Those are the damages of the absent third parties.

17           The Court is correct that I believe in the oral

18   motion and argument, I probably argued at that point that

19   there's no evidence as to the other labs.  We didn't -- we

20   didn't develop that in the briefing because we recognize

21   that there is other evidence in the record, not of Cigna's

22   damages, but of damages approximating $16 million if

23   those --

24           THE COURT:  Right.  If they get past the

25   standing argument --

1          MR. HARE:  Correct.

2          THE COURT:  -- you no longer feel -- and I think

3    you're right -- that there's no evidence in the record.

4          MR. HARE:  Right.  A jury could look at that and

5    say, Well, we see line items, charges, and reimbursements

6    in an amount in excess of 2.4 million times 3.  So

7    that's -- so we did not waste the Court's time developing

8    that --

9          THE COURT:  I appreciate it.  That's why I'm

10   asking the question, is I want to understand the nature of

11   your argument on the damages.

12         All right.  I think that's all I have for now.

13         MR. HARE:  Thank you, Your Honor.

14         THE COURT:  Except I've misplaced something.

15         Oh, I have one other question.  I think I'll ask

16   it to you now.  It's really for both of you, but I'll ask

17   you now so I don't forget it.  I don't know if you'll

18   understand it when I ask it, so don't be hesitant to ask

19   me what am I really asking.

20         What is the role of the trial record in deciding

21   the ERISA issue?  You made a slight allusion to it.  In

22   other words, the way the case was tried -- normally, ERISA

23   preemption is decided, I'll let Judge Underhill on a

24   motion to dismiss or certainly a motion for summary

25   judgment.  Now, you have a record in the motion for

1    summary judgment, but, you know, you don't have the types

2    of arguments you have to a jury, et cetera.

3            So what, if any, role does the evidence of the

4    trial, in the trial, of the proceedings of the trial play

5    in deciding ERISA preemption?

6            For example, if I look at the abstract record, I

7    gave you an example of how I think it could be said -- and

8    I'll say something different to the opposing counsel, but

9    I'm talking to you -- that the unbundling issue could be

10   judged to be unfair by a jury, an ordinary and reasonable

11   jury, and that would satisfy the third element of unjust

12   enrichment.  And that's without regard.  That could have

13   been tried or done on summary judgment based solely on, I

14   don't know, practices in the industry, multiple -- billing

15   twice for the same -- whatever theory it could be that

16   makes people think it's unfair, that could be argued.

17   Never have to mention the policy, okay?  But that isn't

18   how the case got tried.  You and I know that.  I hope

19   Attorney Kang appreciates it.

20           We spent not just a trial, but pretrial

21   conferences, charge conferences.  I mean, I think it's the

22   last question I put to Cigna's counsel on the seventh jury

23   conference session the night before closing argument, I

24   finally got an answer to -- and I put it this way, as a

25   leading question to counsel -- there is no provision in

1    the policy for unbundling -- I think it was unbundling,

2    because I think I put fee forgiveness to bed, finally,

3    right, so it was unbundling.  And I finally, with a little

4    hesitation, got an answer, that's correct.  Okay?

5         So that's what we now all have in our heads --

6    at least I do, painfully -- of how this case proceeded.

7    There were hours and days spent wrangling about the policy

8    and what's in the policy.  Now, I'm sure Attorney Kang is

9    going to remind me, Judge, you didn't have one trial on

10   trial, you had two.  Your trial.  We talked about the

11   policy for that.  But we also spent a lot of time talking

12   policies and what's in it in connection with their case.

13   Okay?

14        So that's what I mean.  Like, what role does all

15   of that have in deciding ERISA preemption, which you want

16   me, I think, to say, Well, Judge, look, it's all about the

17   policy.  It's preempted.

18        On the other hand, I suspect I'll hear a

19   different answer from Attorney Kang which is supported

20   probably, maybe, in the record, you know.  But it's this

21   whole trial is certainly muddied with the policy under --

22   under the Cigna claim and case.

23        So -- but lots of times, I've heard the

24   expression "black letter law."  The issue of ERISA

25   preemption is an issue of law.  Pure issue of law.  You

1    know, you've got all those Supreme Court cases in

2    connection with, related to.  You go down those branches

3    of the decision tree.  That's all -- that's legal.

4          MR. HARE:  I would suggest, Your Honor, that we

5    should be informed by the investment of trial time in

6    deciding this question, we should look to the record

7    because the record shows us what case was actually tried,

8    what claims were actually prosecuted by Cigna.  At a

9    motion-to-dismiss stage, we don't yet know that.

10          THE COURT:  We know it only in what is in the

11    complaint.  And in this complaint, the word "fraud" was

12    frequently mentioned, which, of course, was not the basis

13    for the unjust enrichment claim.

14          MR. HARE:  Correct.

15          THE COURT:  At trial, certainly, I don't think.

16    But maybe I'll hear a different view of the trial from

17    Attorney Kang.

18          MR. HARE:  And even at the summary judgment

19    stage, all we know is what is set forth in a defined

20    record.  We now have the benefit of trial.  And having

21    gone through the trial, we know the claim that Cigna

22    prosecuted.  And it's a claim seeking reimbursement,

23    refunds on the basis of unjust enrichment under these

24    policies.  And the fact that we have to go through trial

25    to find out at the last moment what Cigna's actual claim

```
 1      is doesn't somehow leapfrog us over the preemption issue.
 2              THE COURT:  All right.  I think I've gotten
 3      through my questions.  If I have time at the end, I'll
 4      give each of you a minute to address something that might
 5      be burning on your mind that I didn't cover.  I'm not sure
 6      I'm going to have time, but we'll see how I do with
 7      Attorney Kang.
 8              MR. KANG:  Understood.
 9              MR. HARE:  Thank you, Judge Hall.
10              THE COURT:  I assume you're taking it, Attorney
11      Kang?
12              MR. GESTRICH:  No, Your Honor.  Actually, on
13      ERISA preemption, Ms. Costin is going to handle it.
14              THE COURT:  These are what I call housekeeping.
15      So whoever does housekeeping at your shop, my first
16      question is, why did you file a post-judgment motion for a
17      directed verdict?  You won.  You got a verdict.  Why would
18      I direct anything?  I got a jury verdict on the record --
19      they can see that -- and then I entered judgment.  Why do
20      I need to direct a verdict?
21              MS. KINGSBERY:  Yes, Your Honor.  As we stated
22      in the motion, it's our position that, had judgment been
23      entered and the case was over, we agree that motion is
24      moot and it doesn't need to be decided.
25              THE COURT:  Had what?  I couldn't hear you.
```

1           MS. KINGSBERY:  Had judgment been entered and

2     the case was over, there's no reason to resolve those

3     motions.

4           THE COURT:  But I did enter judgment in that

5     case.

6           MS. KINGSBERY:  But now we have a motion for in

7     camera proceedings that the Court has construed as a

8     motion for a new trial.

9           THE COURT:  What's it going to -- why do you

10    have a right to a directed verdict?  Assuming that it's

11    not final under the rules because there is a pending

12    motion and the circuit is going to say, even when you file

13    an appeal, Look, Hall has to decide this motion, we're not

14    going to have two tracks on appeal.  Right?  That's what

15    the thinking is.

16          So it's not final in that sense, but what good

17    is a directed verdict going to do for you?

18          MS. KINGSBERY:  It's because the issues in our

19    motion for judgment of a matter of law directly bear on

20    the in camera proceedings that are going on right now.

21          So, for example, I mean, Cigna has moved for a

22    directed verdict on two of the elements in the Labs case

23    that they had the burden of proving.  One was the intent

24    to benefit and the other was on medical necessity.

25          If Cigna is entitled to judgment as a matter of

1    law because the labs failed to put forth any evidence of

2    intent, then a motion for a new trial based on evidence

3    related to medical necessity is moot.  It's futile.

4           THE COURT:  Why isn't that just an argument in

5    your opposition to their motion for judgment as a matter

6    of law?

7           What am I missing, Alex?

8           (Conferring.)

9           THE COURT:  First point.  I -- if I now

10   understand what you're saying, you're trying to stop the

11   review by Attorney Hawkins of my consideration of the

12   motions.  Is that bottom line?

13          MS. KINGSBERY:  It's our view that a ruling on

14   this motion does have the potential to --

15          THE COURT:  I have two answers for that.  I

16   don't agree with that view, first of all.

17          And, second, it's pending in both cases.  So a

18   directed verdict in one case isn't going to end the

19   process that I have started.

20          MS. KINGSBERY:  That is correct.  It would

21   only --

22          THE COURT:  And I see no purpose in directing a

23   verdict in a case where I have a jury verdict.  I mean,

24   I've never heard it in my life.  It's -- yeah.  If I'm

25   wrong, I'm happy to have the circuit tell me so the next

1    time someone makes the motion, which might be in another

2    28 years -- I won't be here -- but somebody might then

3    know, oh, gee, no, you really have to be careful and

4    attend to that motion.

5        Okay.  In Cigna's case, are you harmed in any

6    way by the fact that I did not enter judgment yet?  I had

7    the sense that there was a bit of a dismay that I hadn't

8    reached a ruling yet, and therefore -- or I hadn't entered

9    judgment.  I think it was maybe in your response to my

10   order about a special master.

11       So it seems to me if I grant the labs' motion,

12   of course, we'll have a new trial.  But if I deny it, I'll

13   enter judgment for you, right, and it'll go up on appeal.

14   But if you -- if I enter judgment today, it wouldn't

15   matter because it's going to still have the pending motion

16   that's starting with Attorney Hawkins.  And so it wouldn't

17   go up on appeal now, whether you have a judgment or not.

18       So I'm a little puzzled by the -- maybe you

19   didn't mean to be unhappy with the fact I haven't entered

20   judgment in your case.  If that's the case, just tell me

21   that I just misread your pleading.

22       MR. KANG:  Whether it's characterized as being

23   unhappy or happy, it's not about that.  I will answer the

24   question in terms of the potential harm.  You're right,

25   Your Honor.  There is the potential for appeal.  In our

1    view, not having a judgment in our case awarding

2    $7 million-plus is delaying our ability to go and

3    potentially collect --

4              THE COURT:  Yeah.  I thought you were going to

5    say that.  And I think you're right in federal court,

6    obviously, absent a bond posted by the other side.

7              I guess that I raised the question -- I haven't

8    looked at it, so I'm not sure I know the answer -- but do

9    you believe that Cigna can collect its judgment before the

10   Court rules on the motion that is pending in both cases

11   that is -- and includes a motion for a new trial?

12             MR. KANG:  We have arguments on that point as

13   well, Your Honor.  Certainly, I recognize that Your Honor

14   has appointed Special Master Hawkins.  We did still oppose

15   the motion to compel that was filed by the labs.  I'm

16   happy to be heard on it now or later when Your Honor is

17   ready.  But we believe that there isn't a sufficient basis

18   in the record for the Court to order the in camera review.

19             And so, in our view --

20             THE COURT:  Yeah, but that's not -- I mean, you

21   haven't put that in front of me.  I haven't ruled.  I

22   mean, just because a party in a litigation believes their

23   position is sound or good doesn't really answer the

24   question of if I enter judgment, can the pendency of that

25   issue, which isn't yet decided, be -- still allow the

1   party who got the judgment to seek enforcement of it?

2   It's an undecided issue in the case, the outcome of which

3   could possibly lead to a new trial.

4          I don't know -- I don't know the circumstances.

5   I do know collections of judgments start upon the entry of

6   judgments.  But I don't know that it was intended that,

7   while there was still an issue that could lead to a new

8   trial, pending -- obviously, vigorously opposed by one

9   side and maybe supported by the other, but, nonetheless,

10  it's undecided that you would still be allowed to collect

11  that judgment, even though I could have technically

12  entered it?  I don't know.  Yeah.

13         MR. KANG:  I will be candid.  I haven't looked

14  in depth at that issue, Your Honor.

15         THE COURT:  I haven't, either.

16         MR. KANG:  Certainly, if it would help the Court

17  for further digging into that, we would be happy to do

18  that.

19         THE COURT:  That's all right.  We'll let you

20  know.  But -- yeah.  I've got to think about what I want

21  to do.

22         I would ask you in 30 seconds to tell me the

23  basis for the jury's verdict, in particular, what evidence

24  supports the finding that there was unjust or unfairness

25  in this case?  Whatever I charged on the third element,

1  what is the basis in the record for a reasonable jury to

2  find that?

3          MS. COSTIN:  Your Honor, I apologize for the

4  back-and-forth, but I intended to handle the ERISA

5  preemption arguments.

6          You're correct, Your Honor, and you started off

7  this afternoon with the jury instructions in particular.

8  The jury instructions told the jury to consider the

9  totality of the circumstances.

10          THE COURT:  I don't need to know what my charges

11  were.  I asked you a question.

12          What is the record, facts or evidence, that

13  support a jury's conclusion --

14          MS. COSTIN:  Of course, Your Honor.

15          THE COURT:  -- it is unfair, as that word is

16  defined in this element?

17          MS. COSTIN:  Dr. Clark testified at length about

18  the concept of medical necessity in the healthcare

19  industry.  Dr. Nicoll did as well.  Ms. Deanna Anderson

20  from Cigna's SIU testified at length about fee forgiveness

21  and the impact on the healthcare industry.  And Dr. Clark

22  also talked about and testified about unbundling and the

23  concepts of that in the healthcare industry.

24          All of that, coupled and supported by the

25  evidence that we put into the record about the labs'

1    business practices in general -- the use of standing

2    orders, the use of a sales department, the fact that we

3    had Dr. Ligotti testify that he did not order any

4    medically necessary tests -- the collective circumstances

5    of all of that is what would have supported the jury's

6    decision that the totality of the circumstances made it

7    unfair for the labs to retain these monies.

8              THE COURT:  All right.  Why isn't it fair to

9    characterize your case as an attempt to claw back benefits

10   paid out when there just was not coverage under the ERISA

11   plans at issue?  I mean, isn't that what you're really

12   doing?  You paid these people a lot of money.  I

13   understand that.  And when you, I guess, you know, got a

14   sense of what was going on in south Florida and looked

15   closely at it -- I mean, you just cited medical necessity.

16   That's a core provision of the plan.  You just cited fee

17   forgiveness.  Well, that's core, at least to how you pay

18   benefits.  So why isn't this just a clawback action based

19   on the fact there's no coverage under the plan?

20             MS. COSTIN:  Your Honor, my understanding is we

21   had an ERISA claim and, under Your Honor's motion for

22   summary judgment ruling, our ERISA claim was dismissed.

23   This was our alternative theory, was unjust enrichment.

24   The basis of that theory was the labs' conduct, including

25   its misrepresentations in its billing to Cigna and the

1     collective circumstances of the manner in which they were

2     performing services, over-performing services, performing

3     services without a doctor's order, all of that was the

4     collective circumstances that render this unfair for us to

5     be able to seek this restitution.

6             THE COURT:  I read a fair amount of the --

7     reread the charge and the closing arguments.  But you're

8     going to have to tell me -- I don't recall Attorney Kang's

9     voice talking about, you know, the misrepresentations --

10    the sorts of things you just mentioned.  Am I mistaken?  I

11    just was listening to other --

12            MS. COSTIN:  I don't know exactly what words he

13    used, but the circumstances and the evidence that was

14    presented is exactly what I just articulated, which is

15    what the labs were doing with standing orders, what they

16    were doing with overutilization of testing, Dr. Clark

17    testifying to all of that, Dr. Clark testifying to the

18    unbundling and how that resulted in duplicative and

19    double-billing to Cigna.

20            THE COURT:  So why did we spend so many hours,

21    so many days, talking about policies?

22            MS. COSTIN:  I believe that was largely in the

23    Labs case, Your Honor.

24            THE COURT:  You do?

25            MS. COSTIN:  I do.

1          THE COURT:  Okay.  I have to say I'm sure if I

2     wanted to spend a good part of the rest of my life, I

3     would be able to come up with multiple times where it was

4     raised clearly in the context of Cigna's case, but I don't

5     think I'm going to spend the rest of my life doing that.

6          MS. COSTIN:  If I could direct the Court's

7     attention to a particular case here that was cited in

8     Cigna's briefing, it's the *Advanced Chiropractic* case,

9     which is 54 F. Supp. 3d 260.  And in that case, the court

10    discussed the fact that the mere involvement of

11    definitions of terms in the plan is not sufficient to

12    warrant preemption.

13         So just because -- we're talking about medical

14    necessity, we're talking about unbundling, we're talking

15    about fee forgiveness and these concepts that were all

16    presented through witness testimony.  Yes, some of those

17    terms may exist in the policies, but that does not warrant

18    preemption here, particularly when the jury was instructed

19    that the plans are just one piece of evidence they might

20    possibly consider when looking at the totality of

21    circumstances.

22         THE COURT:  Is the following statement true or

23    not true from Cigna's point of view:  The labs

24    misrepresented that services were covered under the terms

25    of the policy, in your case?

1           MS. COSTIN:  Yes, I think that is true.

2           THE COURT:  Then doesn't liability turn on the

3   interpretation of the policies and what's covered?

4           MS. COSTIN:  It doesn't turn on the terms of the

5   policies.  The terms of the policies are simply

6   definitions in the policies that are the same thing as

7   the, you know, general industry knowledge of what

8   unbundling is.

9           THE COURT:  But I didn't get testimony about

10  general industry knowledge or practice; I got testimony

11  about, this language is in the policy.

12          MS. COSTIN:  Dr. Clark, Ms. Anderson,

13  Dr. Nicoll, Mr. Goldfarb.

14          THE COURT:  In your case against the labs, did

15  the jury need to look at group plans to determine

16  liability of the labs on your cause of action?

17          MS. COSTIN:  Did the -- let me make sure I

18  understood.  Did the jury need to look at the policies to

19  determine liability?  No.  This was an unfairness

20  allegation under the totality of circumstances.

21          THE COURT:  Okay.  If the jury didn't need to

22  look at the plans to determine liability, why did Cigna

23  spend so much time at trial talking about the contents of

24  those plans?

25          MS. COSTIN:  My understanding is that the

1    contents of the policies that were discussed were largely

2    in the Labs case.

3         THE COURT:  Well, let me give you an example

4    that would prove that representation to the Court to be

5    false.  I'll give you a moment to pay attention to me.

6         At one point during the trial, Cigna literally

7    put up the group plan language on the screen for the jury

8    to read and asked Mr. Goldfarb to interpret it.  After

9    reading the language Cigna put up, Mr. Goldfarb testified

10   to the existence of a fee-forgiving exclusion, okay?

11        This could only be about your case against the

12   labs, right?  Because I believe at this point, fee

13   forgiveness was irrelevant to -- I'm sorry -- this could

14   only be relevant to Cigna's case because at this point, I

15   had said it was not relevant to the Labs case, right?  So

16   how is that about the Labs case?

17        MS. COSTIN:  My understanding is that this was

18   clarified in the jury instructions to the jury that they

19   could consider the language as just one piece of the

20   totality of circumstances.  You are correct.

21        THE COURT:  In other words, I saved your bacon

22   because the requested charge, Cigna asked that I say the

23   following:  Services that are not medically necessary are

24   not covered under Cigna plans.

25        Why are we talking about Cigna plans?  It's not

1   the plans, you're telling me.

2          MS. COSTIN:  We're talking about the concepts

3   which are both in the plans --

4          THE COURT:  You didn't -- that's not what that

5   said.  That said, "services that are not medically

6   necessary are not covered under the plans."

7          Why would we care if they're covered if it's the

8   common practice or language or understood terms or things,

9   the way insurance is operated?  You wouldn't care what's

10  in the Cigna plans, right?

11         MS. COSTIN:  Your Honor, my -- I understand that

12  the language in the plans is one piece of this puzzle.

13  And, again, *Advanced Chiropractic* directly addressed this

14  exact issue of medical necessity language and said that

15  looking to the definition of "medical necessity" is not

16  sufficient enough to warrant preemption.

17         THE COURT:  It's not so much the phrase "medical

18  necessity"; it's the completion of the sentence which

19  continues, "are not covered under the Cigna plans."

20         My point is -- I'll try to be clear here,

21  obviously -- why does it matter if they're not covered

22  under the plans?  In fact, that was my charge.  It doesn't

23  matter about the policies.  What matters is if you find

24  it's unfair under the charges given by the Court.

25         So I obviously didn't give this charge because I

1    don't think it's the right charge for this cause of

2    action.  But this was Cigna's point of view of its case

3    within -- well, the requested charge probably came in

4    before trial, but you were still pressing it on the

5    seventh jury instruction day, I think.

6         But if that's not good enough, let's go to

7    Attorney Kang's closing argument where he told the jury

8    that Cigna's plans, quote, "require services to be

9    medically necessary."

10         Not just as -- you remember Dr. Clark.  You

11    remember that wonderful, really, really good witness --

12    you probably didn't pay her enough, she was so good.  This

13    was my judgment as the trial judge.  She was an

14    outstanding witness.  And I believe her to be testifying

15    truthfully and everything else.  She wasn't shading it for

16    your purpose.  But she just presented incredibly good

17    testimony.  I'm not sure I'm supposed to comment on that.

18         But he could have just said, you remember

19    Dr. Clark said medical necessity is like, you've got to

20    have that, not mention the word "policy."  Why would he

21    have to mention the policy?  As you've just told me, or

22    Attorney Kang did, no, we prove this through her testimony

23    about how this is part of the industry, this is always

24    required.  It's a medical coverage policy, right?  Why

25    wouldn't it have to be medically necessary without

1    reference to what the policy said?  You can have a policy

2    and not have the definition of "medical necessity," and

3    still be able to say it isn't covered because what would

4    be the point of the policy?  The point is to provide

5    health benefits.  If they're not medically necessary, they

6    wouldn't be paid for.

7            But that's not the approach you were taking in

8    your closing argument.  You said that Cigna's plans

9    require services to be medically necessary in order for

10   them to be covered and payable.  Isn't that a reference to

11   the plans?  Has that word "reference" been tweaked out

12   from trying to decipher the statute known as ERISA?

13           MS. COSTIN:  Well, I don't agree that that is

14   sufficient reference to the plans to warrant ERISA

15   preemption.  And I believe that is supported by several of

16   the cases that we have cited in our briefing, including

17   that --

18           THE COURT:  Is your microphone on?  You're not

19   coming over the loudspeaker.  I know that.

20           MS. COSTIN:  I apologize.

21           THE COURT:  It's all right.  Either get it

22   closer to you or make sure the green light is on.

23           MS. COSTIN:  The green light is on, Your Honor.

24           THE COURT:  All right.

25           MS. COSTIN:  But the fact that the plans have

1    certain language and definitions that were discussed at

2    trial and that were discussed in closing argument does not

3    necessarily warrant ERISA preemption here.

4         The fact is that the context of the -- the fact

5    that the plans exist and the fact that the -- that the

6    labs were submitting claims pursuant to those plans is not

7    sufficient to warrant preemption for this particular

8    claim.

9         And the case law that we have cited, the great

10    weight of authority that we have cited, has said that

11    these claims are not preempted and that a reference to a

12    definition in a plan is not sufficient in that regard.

13         THE COURT:  I'm going to make one more comment

14    on this topic before I give up on it, and it's a comment

15    that's probably of no value because no one who did not sit

16    through this trial, the eight days of pretrial, the seven

17    jury charge conferences, and then the trial and the

18    closings and the charge could ever appreciate why I am

19    battering on this term, maybe other than counsel for the

20    labs because they were there.  But I eventually held in

21    this case there was no fee forgiveness prohibition in

22    Cigna's pre-2015 policies.  But we -- it was a long and

23    bloody road for me to get there because every time that

24    you told me it was in this policy and we looked at it and

25    it wasn't, it was in another set of policies.

1       You folks fought like it was the battle of the

2   bulge, for heaven's sake, for me to find things in the

3   policies.  And I reincorporate my comment about the

4   seventh jury conference in which I finally, after only

5   reading a leading question written down in front of me and

6   sitting there until I got a direct answer did I finally

7   get an admission -- I think that's -- the unbundling

8   wasn't in the policies, okay?

9       So just in case anybody wonders why I'm pushing

10  you on this issue, the labs shouldn't be too happy because

11  the standard, I think, is, was there a basis?  And there

12  probably -- well, I don't know, I haven't made the

13  decision.

14      But that's not the -- I'm not addressing is

15  there a basis now.  I'm addressing things in your brief,

16  for example, where you say, "Cigna established liability

17  by presenting evidence of the labs' misconduct, not the

18  terms of the policy."

19      I find that, to someone not familiar with the

20  case, fraudulent.  To me, who is familiar with the case,

21  I'm breathless that a lawyer could make that statement to

22  this Court.  Seriously.  We spent so much time in your

23  case arguing about the policies, what's in the policies,

24  what's not in the policies.  I mean, you were there, I

25  think, for 99 percent of it.

1          I just -- I guess my question, having ranted,

2     is, do you want to reconsider that statement in your brief

3     and perhaps retract or modify it?

4          MS. COSTIN:  No, Your Honor.  The unjust

5     enrichment claim is a fairness claim.  It is whether or

6     not --

7          THE COURT:  That isn't my question to you.  My

8     question is, you represented in this statement in the

9     brief, and I think in how you tried the case, that you say

10    you established it by presenting evidence -- and maybe to

11    the extent that's a statement of fact in the sense that at

12    the end of the day, a circuit could look at the record and

13    conclude that there is evidence of misconduct which would

14    make it unfair, and ignore the days that we spent arguing

15    over the policies, therefore, not the terms of the

16    policies.

17         I guess that statement could be read that way,

18    to be relatively honest.  Is that the way it was intended

19    and I just misread it?

20         MS. COSTIN:  What page of our briefing,

21    Your Honor?

22         THE COURT:  Sure.  That's at page 14 of your

23    brief at 521.  I mean, it is a true statement -- it could

24    be.  If I rule for you and against the labs in this

25    motion, it will be because I find you established

1    liability by presenting evidence that a reasonable jury

2    could believe that there was misconduct in connection to

3    their practices, and that made it unfair for them to keep

4    this money that was paid to them.  I'm being very

5    simplistic.

6            MS. COSTIN:  Yes.

7            THE COURT:  Assuming I rule for you, that will

8    be a correct statement.  But what Cigna spent 90-plus

9    percent of the time at trial doing was trying to establish

10   evidence that these claims and bills and costs that were

11   paid were not covered by the policy.  That's my view of

12   this trial.  But I guess I'll leave it as a rhetorical

13   question.  Let me ask a related question, though.

14           You argue in the memo that on ERISA that the

15   claims turn on misrepresentations and misconduct.  Are

16   those misrepresentations here about whether the services

17   were covered or is it something -- well, I'll stop at

18   that.  Are the misrepresentations, misrepresentations

19   about what's covered?

20           MS. COSTIN:  The misrepresentations were about

21   medical necessity, which is, yes, that is a coverage

22   issue.  It is also just a general healthcare industry

23   concept.

24           THE COURT:  Can I ask you to do me a favor?

25   Take your finger and do that to your mic (indicating).

```
 1              MS. COSTIN:  (Tapping on mic.)
 2              THE COURT:  And then I'm going to ask you to
 3    pull the mic closer.  You don't have to bend over.  You
 4    can -- well, this is stuck like glue, but you can pick it
 5    up and talk into it like this.  I'll hear you.  Can you
 6    hear the difference?
 7              MS. COSTIN:  Can you hear me better now?
 8              THE COURT:  No.  Is it me?  I just don't hear
 9    it.  Maybe try the other mic.  Try the other mic.  I mean,
10    I can hear you, but it's hard to hear you.  So I'm -- it's
11    not good for that to be the case.
12              MS. COSTIN:  I think the question was -- oh,
13    that is better.
14              I think the question was what the
15    misrepresentations were.  And the misrepresentations were
16    about medical necessity; they were about whether or not
17    the services were being properly billed under the correct
18    coding and bundled or unbundled appropriately, and whether
19    or not they had properly collected patient cost share.
20    All of which are, yes, those are terms that are in the
21    plans, but they are also just general industry concepts
22    that all providers should comply with.
23              THE COURT:  Okay.  In your memo on ERISA
24    preemption, you argue that the, quote, "overwhelming
25    weight of authority supports a finding that Cigna's unjust
```

1    enrichment claim is not preempted."

2           You do recognize that there are several, not

3    more than several -- you could say many -- cases at the

4    same level, district court around the country, that come

5    to an opposite conclusion.  Do you agree?

6           MS. COSTIN:  I believe those are all

7    distinguishable and we've made those distinguishing

8    remarks in our briefs.

9           THE COURT:  Well, I suggest that I could get

10    plaintiff's -- counsel for the labs to stand up and

11    distinguish your, quote, "overwhelming weight."

12           MS. COSTIN:  The "overwhelming weight" is a

13    quote --

14           THE COURT:  How many cases do you have that

15    support your argument on this point?

16           MS. COSTIN:  We've cited at least 15 to 20 in

17    our brief, and the Blue Cross case specifically references

18    the overwhelming weight of authority and collects all of

19    cases in that regard.  And our distinction --

20           THE COURT:  You're quoting that?  When you said,

21    "overwhelming weight," it's a quote --

22           MS. COSTIN:  It's a quote, yes.

23           THE COURT:  I may not agree with that judge, but

24    it's not you.

25           MS. COSTIN:  The cases cited by the labs, Your

1    Honor -- and I believe we've distinguished a lot of those

2    cases -- involve different situations when the medical

3    provider has an assignment of benefits and --

4    THE COURT:  Well, I think a lot of your cases

5    you cite depend on different circumstances.  I mean,

6    really, does the case about the lady who shouldn't have

7    been a member of the plan gets $1,000 coverage, do you

8    think that's comparable to this case where you just told

9    me that you spent a lot of time in establishing a term in

10   the contract, "medical necessity," billing practices that

11   are applied to these policies, and the fee forgiveness,

12   co-sharing?

13   I mean, I -- I don't know.  I mean, I would say

14   it seems to me -- and this is why I asked originally them

15   the question about ERISA in considering the evidence,

16   because ERISA preemption is normally a legal question.

17   But here it seems to me, and you read all these cases you

18   gave me, I came away with the sensation of this isn't a

19   pure legal issue.  I mean, it turns on what the facts are

20   of the question presented, no?

21   MS. COSTIN:  Yes.

22   THE COURT:  Okay.  All right.  I found it

23   curious, although it's probably a moot question, but I

24   believe I went back and looked at Judge Underhill and the

25   briefs in that case on exemption.  You didn't -- you

```
 1   didn't argue or point out that the labs were not core

 2   entities in that brief.

 3           MS. COSTIN:  We did, Your Honor.  That's in our

 4   brief.

 5           THE COURT:  It is?

 6           MS. COSTIN:  Yes.  And the labs did not argue

 7   that they were one of the core entities.  That was one of

 8   the questions you asked Mr. Hare a few minutes ago.

 9           THE COURT:  I know what I asked.  What page does

10   it say that in your brief?

11           Are -- did you correct me?

12           MS. COSTIN:  Page --

13           THE COURT:  What I'm trying to say to you is you

14   argue about the fact they're not core entities to me, but

15   you didn't mention that when you argued it to Judge

16   Underhill the argument that their claims should be

17   preempted under ERISA.  Maybe -- am I not being clear?

18           MS. COSTIN:  He decided that issue.  I honestly

19   don't remember exactly what we argued on the motion to

20   dismiss, Your Honor.  That was a long time ago.

21           But Judge Underhill did rule that the labs were

22   not one of the core entities that was -- page 17 of his

23   motion-to-dismiss order.

24           THE COURT:  I was talking about your brief, but

25   maybe I overlooked it.
```

```
1              Did Cigna provide the jury with a basis to
2      separate Cigna's ERISA and non-ERISA damages?  I asked
3      that in a case that ruled against you.  I think I was
4      concerned about the circumstance and having to retry the
5      whole case.  I pointed out if you entered evidence
6      separately, even if you didn't flag to the jury what it
7      was -- you just say, here's one bucket, here's another,
8      but we all knew where they came from and we could easily
9      have a stip on that, that these were ERISA plan cases and
10     these weren't, we could just separate it out and maybe
11     avoid a retrial.
12              So my question is, did you provide the jury with
13     a basis to separate those two different -- Cigna, ERISA,
14     and non-ERISA damages or are there only ERISA damages in
15     your case?
16              MS. COSTIN:  There are not only ERISA damages.
17              THE COURT:  That's what I thought.
18              MS. COSTIN:  And no, Your Honor.  Actually, what
19     we recall is that Your Honor had requested that the
20     parties separate those damages, and we attempted to put
21     those in with Mr. Goldfarb and were precluded from doing
22     so.
23              It's also our position, though, that given this
24     is the labs' special defense of ERISA preemption, that
25     they bear the burden, continue to bear the burden of not
```

```
 1   only proving the affirmative defense, but proving which
 2   claims they relate to.  That's not Cigna's burden.
 3            THE COURT:  Well, it's going to be a burden if
 4   we've got to try the whole case over again.  But maybe
 5   it's a good thing to bill a client for all that money all
 6   over again.
 7            I was just curious.  A lot of the damages here
 8   had to be to, you know, where you're an administrator of a
 9   plan.  Is that a fair assumption on my part?  I mean, it's
10   not zero?  I mean, you talked a lot about recovering money
11   for other people's plans.  That's why I guess I assumed it
12   was a lot.
13            MS. KINGSBERY:  It is, Your Honor.
14            THE COURT:  Okay.
15            MS. KINGSBERY:  I don't have the exact number,
16   but ...
17            THE COURT:  I don't need to know.  It's a
18   premise of the question.
19            MS. KINGSBERY:  That's correct.
20            THE COURT:  So does Cigna give this money back
21   to the group plans?
22            MS. KINGSBERY:  Yes, Your Honor.
23            THE COURT:  Okay.  And what's it do, a pro rata
24   or by size of the percentage of the bills billed versus,
25   you know, how much they get for what you recovered?
```

1          MS. KINGSBERY:  I don't know exactly how Cigna

2     is going to do it.  I can't answer that question.

3          THE COURT:  Do they deduct the costs of their

4     investigation, those kinds of things?  I mean, I'm just

5     curious.

6          MS. KINGSBERY:  I do not believe so.

7          THE COURT:  All right.  And what if a plan

8     doesn't exist or isn't your plan anymore?  Maybe it got

9     dissolved, maybe it decided that the Aetna had better

10    rates -- who knows -- maybe they weren't happy about this

11    whole circumstance.  But whatever it is, you aren't

12    administering it anymore.

13         MS. KINGSBERY:  Yes, Your Honor.  I don't know

14    how Cigna resolves it on the back end and discharges its

15    administrative duties.

16         But it is my understanding that the money is

17    going back to the plans and that Cigna is going to do

18    everything it can to make sure that the money that is

19    allocated to the specific plans where the money was paid

20    is going to go back to the plans.

21         THE COURT:  Okay.  This is on damages.

22         How could a reasonable jury find that all three

23    of the labs owe the exact same amount of damages?  If I

24    recall, the stop-payment dates for the three labs was

25    different.  I also have the sense that the labs began

1    billing at different times.  So how is it possible --

2    "possible" is the right word -- that the damages would be

3    identical?

4                MS. KINGSBERY:  It was the province of the jury

5    to determine how much was it that the labs unfairly

6    retained.  The evidence that was put forth, it was Cigna's

7    position that all of it was unfairly retained.  And they

8    put forth evidence of how much each one of the labs was

9    paid, and it was more than the 2.4 million that was

10   allocated to at least two of the labs.

11               But the labs were instructed to consider all of

12   the evidence, including medical necessity, unbundling, fee

13   forgiving, and to assess for themselves how much it was

14   that it was unfair for the labs to retain.

15               And the amount that they decided was unfairly

16   retained was within the amounts that Cigna paid to each of

17   the labs.

18               THE COURT:  And it was the amount that was in

19   the demand letter, right?

20               MS. KINGSBERY:  To one of the labs.  To PB Labs,

21   that's correct.

22               THE COURT:  Yeah, one of the labs.  Can a demand

23   letter be evidence of damages?

24               MS. KINGSBERY:  The demand letter is evidence of

25   the amount that Cigna paid and was seeking to recoup, and

1    the jury instructions described that the damages are the

2    amount that Cigna paid and the labs unfairly retained.

3    So, yes.

4            THE COURT:  I don't remember if you objected to

5    it in that regard, offered for that purpose would be

6    hearsay.  But I don't know that we -- I didn't understand

7    it was being offered for that purpose.  You would have

8    been a smarter lawyer than I could have been if you

9    objected.

10           In your papers on the issue of standing, putting

11   aside the issue of whether Cigna has suffered an injury,

12   quote/unquote, could you just explain briefly your theory

13   of fiduciary standing, and does it depend on the ERISA

14   statute?

15           MS. KINGSBERY:  No, Your Honor.  The theory here

16   is that because Cigna stands in the position of a plan

17   administrator, it has a fiduciary duty to protect plan

18   assets.  And because it has that duty to protect those

19   plan assets, it has an interest, a legally protected

20   interest, in making sure that it is not paying invalid

21   claims.

22           That's the interest here, and that's what the

23   cases we've cited say is the interest here.  And it arises

24   from the fact that Cigna has this duty, it has this

25   obligation to its clients, to the plans.  And it is a

1    fiduciary.

2            THE COURT:  All right.  I have -- I think this

3    is the last question, although that question I said I was

4    going to ask both of you I seem to have misplaced.  Oh,

5    here it is.

6            Oh, I'll ask that.  What is the role of the

7    trial record, if any, in deciding the ERISA preemption

8    issue?

9            MS. KINGSBERY:  The standing issue or the ERISA

10   preemption?

11           THE COURT:  The ERISA preemption issue, is what

12   I just said.

13           MS. KINGSBERY:  Well, for ERISA preemption, you

14   would be looking at the trial record to see whether there

15   was evidence of unfairness.

16           THE COURT:  I'm sorry, say that answer again?

17           MS. KINGSBERY:  So the question is whether the

18   trial record has any bearing on the issue of ERISA

19   preemption?

20           THE COURT:  Yes.

21           MS. KINGSBERY:  Which I think was directed at

22   Ms. Costin and she answered it.  And I want to make sure

23   you're asking me the question about ERISA preemption again

24   and not about the issue of standing.

25           THE COURT:  Oh, I see, yeah.  No, I was asking

1    that question.  I apologize.  I didn't make a note of what

2    the answer was, so I guess I thought it hadn't been put.

3         I guess if you could -- either she or you could

4    summarize what your answer was that I have no memory of.

5         MS. COSTIN:  Yeah.  I believe my answer,

6    Your Honor, is the trial record as the totality of the

7    circumstances, the evidence of the behavior and the

8    conduct.

9         THE COURT:  But this is on the ERISA preemption

10   issue, which is normally a 12(b)(1) decision -- 12(b)(6),

11   excuse me.  You do it on the papers.  You don't have a

12   record.  I mean, you do it based on what you allege.  Your

13   allegations were there's fraud here and there's a lot of

14   those cases that you just were mentioned, the 15 or so,

15   that were about fraud, right, with a non-core entity.  But

16   we had a trial here.  And in the last 15 minutes, I've had

17   the description of what your case was supposed to be

18   about, which is, you know, various misrepresentations.

19        But it's not -- it isn't quite postured the way

20   the pleading was postured.  So it can't be a 12(b) type of

21   motion here.  I've already had the -- I have all this

22   record.

23        MS. COSTIN:  I understand, Your Honor.  The

24   reason the cases that are cited by both parties are

25   12(b)(6), is, you are correct, that is usually --

1          THE COURT:  Oh, I realize that.  What I'm asking

2     is, okay, we're in this land no one has ever tread before.

3     We don't have a map and I wondered what your view was.

4          MS. COSTIN:  And my view --

5          THE COURT:  Are you telling me, Judge, wipe your

6     brain clear of any memory of that trial?

7          MS. COSTIN:  No.  I think that there is the

8     legal context and the cases still support the notion of

9     whether or not -- when and where ERISA preemption applies.

10    But the case law supports the notion that an unjust

11    enrichment claim seeking recoupment for unfair practices

12    is not preempted by ERISA.  And I think the trial record

13    supports all of the evidence that I mentioned, the

14    totality of the circumstances of the unfair behavior.

15         THE COURT:  Okay.  On standing.  This is my last

16    question, but it's on standing.  Who has the burden on

17    that issue, and what is that burden?

18         MS. KINGSBERY:  Well, Cigna bears the burden to

19    establish subject matter jurisdiction.

20         THE COURT:  It's a jurisdictional question,

21    right?

22         MS. KINGSBERY:  The way I --

23         THE COURT:  If you have no standing, I have no

24    jurisdiction.  It's as simple as that, correct?  So that's

25    why it's your burden.

```
 1              MS. KINGSBERY:  That's the way I read the
 2    motion; they're attacking subject matter jurisdiction.
 3              THE COURT:  And what is the burden?  I mean, is
 4    it a preponderance of the evidence?
 5              MS. KINGSBERY:  I believe so, Your Honor.
 6              THE COURT:  All right.  If you'll give me just
 7    one moment, please.
 8              (Conferring.)
 9              THE COURT:  All right.  I think I've got what I
10    need.  Oh, there was a pending motion, 182, for leave to
11    file a reply to Cigna's response to order for response and
12    to show cause.  That's about the privilege issue.  And I
13    think that needs to be terminated either because I granted
14    it and forgot to terminate it or because I gave you leave,
15    you did file it.  You went ahead -- because, Attorney
16    Gestrich, you filed the memo.  And I've considered it, so
17    that motion will be granted.
18              Other than that, I think the docket is cleaned
19    up.  So what I have left is a motion for a new trial
20    and -- that's the wrong case.
21              Motion for judgment as a matter of law, motion
22    for new trial.  That's in the Cigna case.  And I'm going
23    to probably, well, terminate, but don't do it now.  I'll
24    probably do a short ruling on the motion for directed
25    verdict.  The motion for new trial in the Cigna case is
```

1    also still pending.  And a motion to vacate the judgment,

2    I spoke to you about that, right, Counsel?

3              MR. GESTRICH:  Yes, Your Honor.

4              THE COURT:  Yeah.  I don't think we need that

5    anymore.  So I can't remember if you agreed with me or

6    not.  If you don't, you have to tell me why it'd be wrong

7    for me to just terminate it as moot or something.

8              MR. GESTRICH:  Given the most recent ruling from

9    the Third Circuit, we agree -- or Second Circuit.  Wrong

10   circuit, Your Honor.

11             THE COURT:  Yeah.  Excuse me for just a minute.

12             (Conferring.)

13             THE COURT:  I just want to be clear on

14   something.  It's probably, you would think, clear in your

15   papers, but we want to hear you say it.

16             Your motion filed after the trial starts

17   about -- that involves the attorney/client privilege

18   assertion issues, I'll call it, is captioned, Motion to

19   Compel, which I think I'll probably terminate it as moot,

20   maybe, or whatever.  Maybe a lot of documents were turned

21   over.  I don't know.  In that sense, it could be a

22   compelling motion.

23             But the ultimate remedy you seek if that motion

24   is granted is a new trial in both cases?  I mean, I --

25   obviously, it depends on what I decide.  Has there been

1    abuse of the attorney/client privilege, how extensive was

2    it, is it de minimis, is it harmful?  Where was it

3    harmful?  Maybe it wasn't harmful in one case, but it was

4    in another.

5           Hypothetically, if I were to find that there

6    was, you know, gross overassertion of the privilege and it

7    tainted both trials because the story wasn't able to be

8    told -- I'm just coming up with words to describe this

9    possible conclusion.  But if it were that type of

10    conclusion, then your remedy you seek is a new trial; is

11    that correct?

12           MR. GESTRICH:  In the Labs 1326 case, yes, Your

13    Honor.  In the 1324 case, may I give a qualified answer?

14           THE COURT:  And which case is that?  The Cigna's

15    case?

16           MR. GESTRICH:  Yes, Your Honor.

17           THE COURT:  Okay.  Yes, you may.

18           MR. GESTRICH:  If the Court were to find ERISA

19    preemption over the claims and dismiss Cigna's claims

20    altogether, then we --

21           THE COURT:  That's a different motion.

22           MR. GESTRICH:  Yes, Your Honor.  In that case,

23    we would not look for a new trial.  But --

24           THE COURT:  Oh, yeah, I understand that.

25           MR. GESTRICH:  Yes.

1          THE COURT:  The claims would be dead.

2          MR. GESTRICH:  But otherwise, yes, Your Honor.

3          THE COURT:  Okay.  All right.  Unless anybody

4     wants to add something or comment on something that I

5     haven't given you an opportunity to say, I have a few

6     minutes.  Not a lot, but I do have a few minutes.

7          MR. KANG:  Yes, Your Honor.  If I may be heard

8     on the labs' motion to compel.  It's docket 510 in our

9     case against the labs.

10          THE COURT:  Yup.

11          MR. KANG:  And 139 in the labs case against us.

12          Your Honor has alluded to that motion as a

13     motion for a new trial during today's proceedings.  I know

14     there was a footnote in the order for Special Master

15     Hawkins that also referenced the motion to compel as a

16     motion for a new trial.

17          And I just want to say, you know, for the

18     record, it is our position, Your Honor, that the labs'

19     motion is not a Rule 59 motion for a new trial.  It is, as

20     they say, a motion to compel.

21          And in our view, the Rules of Civil Procedure

22     are clear on this.  Rule 59(e) requires a party to file a

23     Rule 59 motion within 28 days of judgment.  As Your Honor

24     knows, that's a deadline that cannot be extended for

25     cause, for good cause.  And in our view --

```
 1              THE COURT:  Your argument now is applying to
 2    both cases?
 3              MR. KANG:  Our argument is, yes, Your Honor.
 4    This is not --
 5              THE COURT:  No, I just wanted to clarify.  Go
 6    ahead.
 7              MR. KANG:  Well, actually, no.  This is --
 8    judgment has not been entered in Cigna's case against the
 9    labs.
10              THE COURT:  Right.
11              MR. KANG:  So this is as to the Rule 59 motion
12    that they filed in the labs' case against Cigna.
13              THE COURT:  Right.
14              MR. KANG:  In our view, Your Honor, their motion
15    and the request that -- the relief that they're requesting
16    in that motion is clear.  It's not a motion -- it's not a
17    request for a new trial.  In fact, their motion
18    specifically requests at page 1 that the Court compels
19    Cigna to produce to the Court or to Mr. Hawkins or other
20    special master to conduct an in camera review of the
21    documents.
22              They go on to say, on page 2, "If warranted by
23    that review, the labs will then seek relief under Federal
24    Rules of Civil Procedure, Rule 59, to obtain a full and
25    fair trial."
```

```
 1              And then here's another citation, Your Honor,

 2    that supports our view that this is not a motion for a new

 3    trial.

 4              I know that the Rule 59(e) motion --

 5              THE COURT:  Is this motion 510 on the docket?

 6              MR. KANG:  Yes, Your Honor.

 7              THE COURT:  Okay.  Why is -- why did the clerk

 8    call it -- and as my recollection, the phrase "new trial"

 9    is in the title of the motion -- a motion for new trial,

10    motion to compel?

11              MR. KANG:  I don't know, Your Honor.  This is

12    not a motion for new trial.

13              THE COURT:  You're saying the nature of the

14    pleading does not qualify as a proper motion for a new

15    trial?  Okay, I understand your argument.

16              MR. KANG:  Correct.  Correct.

17              THE COURT:  I -- we didn't plan to address this.

18    I had no idea that was your position.  This is the first

19    time, I think, I've heard it.  If I've overlooked

20    arguments in the past --

21              MR. KANG:  I think we put it in our opposition

22    brief.

23              THE COURT:  No.  So I think if you think it's --

24    you think it's relevant to the motion I heard today?

25              MR. KANG:  I think it is -- it is relevant
```

1  because we wanted to certainly state on the record this is

2  not a Rule 59 motion for new trial.  And because 28 days

3  has long since passed since the Court entered judgment in

4  the Labs case against Cigna, they are now barred.  They

5  are time-barred from bringing a Rule 59 motion for new

6  trial.  That is our position.

7          THE COURT:  What was the date I entered

8  judgment?

9          MR. KANG:  You entered judgment on

10 November 19th.

11         THE COURT:  November 19th?

12         MR. KANG:  Yes, Your Honor.

13         THE COURT:  Okay.  And ...

14         MR. KANG:  And I just want to say this one

15 additional thing, Your Honor.

16         The Rule 59(e) motion to vacate, which I know

17 Your Honor dismissed or resolved as moot today, paragraph

18 7 of that motion is very clear.  The labs state, "At this

19 time, the labs do not have the facts available to support

20 a Rule 59 motion for a new trial on the privilege issues."

21         So they have not filed, by their own admission,

22 a motion for a new trial.  This is a motion to compel.

23         THE COURT:  I think I understand you, but I'm

24 taking no action based on this oral presentation which is

25 not part of what the matter was set for hearing today on.

1    I have not read the papers even with an eye towards this

2    issue.  If you think that I need to do something because

3    of this view you have just raised with me, you need to do

4    something yourself, okay?

5              MR. KANG:  Yes, Your Honor.

6              THE COURT:  You should not view this as raised

7    with the Court.

8              MR. KANG:  We argued this in our opposition,

9    docket 515, as well as docket 175.

10             THE COURT:  Opposition to what?

11             MR. KANG:  Opposition to their motion to compel.

12             THE COURT:  Oh, to this motion you think is

13   mischaracterized.

14             MR. KANG:  Yes.

15             THE COURT:  All right.  Well, I haven't acted on

16   it.  I haven't considered it.  I'm not about to decide it.

17             MR. KANG:  Oh, and this motion was noticed for

18   today, Your Honor.

19             THE COURT:  Oh, I apologize.  That's my error.

20             (Conferring.)

21             THE COURT:  Well, I'll consider it in connection

22   with your opposition to the motion.  I don't know what

23   more you want me to do.

24             MR. KANG:  We would like --

25             THE COURT:  Mr. Hawkins, I guess, order your

1    documents returned and dismiss the motion as not a 59

2    motion because it wasn't filed in time and, therefore,

3    they can't get a new trial?  I can still consider

4    sanctions.  I can consider other remedies, I believe, that

5    they allude to in their motion, no?

6            MR. KANG:  It would have to be styled something

7    other than a Rule 59 motion.

8            But we also, Your Honor, separately believe that

9    if this is as they have represented, a motion to compel

10    discovery, post-judgment discovery, we do not believe that

11    there is an adequate basis to reopen discovery at this

12    late juncture, particularly on this issue on the privilege

13    clause that they had years to raise issues before

14    Your Honor.

15            THE COURT:  I've heard that argument before and

16    I don't buy it.  I think there are enough circumstances

17    here that cause me to have questions about your use of the

18    privilege assertion, and perhaps misuse, which can lead to

19    lots of different avenues available to this Court to

20    address.  One, of course, is a new trial.  But there are

21    others.  So I don't think that will tell me to stop this

22    process.

23            And at the end of the day, I may conclude, no,

24    you did a pretty good job of asserting privilege.  But

25    right now, I believe there's a basis for me to be -- to

1    have concerns about the assertion of privilege by your

2    company.

3              MR. KANG:  So -- and, Your Honor, I --

4              THE COURT:  Yeah.  You've got about 30 seconds,

5    sir.

6              MR. KANG:  Okay.  I just -- for the record, and,

7    again --

8              THE COURT:  I know you're making a record.  I

9    understand that.

10             We'll put it in all caps, Cassie, "making a

11   record," okay?

12             MR. KANG:  Thank you, Your Honor.  Respectfully,

13   the Court having concerns, while I recognize that the

14   cases in this circuit and in this district have held that

15   a motion and a request for an in camera review of

16   documents, the bar is extremely high.  Mere suspicion is

17   not enough.  An objection is not enough.

18             The labs -- not Your Honor, but the labs on

19   their motion have to come forward with a sufficient

20   factual basis.  And we've -- we've outlined, Your Honor --

21   I'll incorporate it by reference.  We specifically

22   addressed the two grounds that they said warrant an in

23   camera review.  Neither of those rise to the level that

24   this circuit, Judge Kravitz has held, even, that this is a

25   very high bar to get in camera review of documents when it

1 hadn't been raised for years.  We do not believe that that

2 standard has been met in this case.

3    THE COURT:  All right.  I understand your

4 position.  I think you're looking at documents that need

5 to put it in writing, which is great.  I have it.

6    All right?  Anything further?

7    MR. KANG:  Thank you, Your Honor.

8    MR. HARE:  I can answer the question of the

9 Court why the docket reflects "motion for new trial."

10 That wasn't a clerk's word choice; that was ours.

11    THE COURT:  I understand that.

12    MR. HARE:  When we docketed that motion, we

13 docketed that motion as a motion for new trial, and we did

14 that timely.

15    THE COURT:  He's saying -- no, because the

16 judgment went in on November 9th or 11th whatever the date

17 was.  When did you file a motion?  Oh, December 4th.  Why

18 isn't that timely?

19    MR. KANG:  The judgment entered November 19th,

20 and then their document was filed December 4th.

21    THE COURT:  And is that more than 28 days?

22    MR. KANG:  It's within 28 days.  But, again, it

23 was a motion to compel that they filed.

24    THE COURT:  No, no, no.  You made an argument

25 and you made -- maybe it's the end of the day and I'm

1    tired, but I'm pretty sure, Attorney Kang, this is a

2    perfect example of your arguments to this Court.  It's

3    like shifting sands or I don't know what.

4            You argued to me -- and I don't -- I'll bring

5    you back to court next week to sit here while she reads

6    the transcript back to you -- that you argued this can't

7    be a motion for new trial, I should strike that because it

8    wasn't filed timely.

9            MR. KANG:  No, that's not my argument.  My

10   argument is this is not a motion for a new trial.

11           THE COURT:  Why isn't it?

12           MR. KANG:  Because they, as I said, they

13   themselves --

14           THE COURT:  Why am I addressing this now when I

15   don't know the extent of any misuse of the privilege?

16           MR. KANG:  They have to file a motion -- this is

17   not a motion for new trial, as they --

18           THE COURT:  Your motion says, "new trial."  The

19   motion mentions new -- well, it says it'll have to file

20   another one once it gets the discovery.  But that doesn't

21   mean this isn't meant to be a motion for a new trial,

22   because you don't think it is?

23           MR. KANG:  They've said they don't have

24   enough -- they themselves say they do not have the facts

25   available to support a Rule 59 motion for new trial on the

1    privilege issues.

2              THE COURT:  That's right.  You keep briefing the

3    issue, sir, and eventually I'll write an opinion that you

4    can appeal to the circuit.

5              MR. KANG:  Thank you.

6              THE COURT:  If they tell me I shouldn't have

7    done this, Judge Kravitz is the smartest man and I should

8    have followed his ruling without knowing what the

9    circumstances were in his case, I'll be so informed in the

10   next case.

11             Right now, I have serious doubts about your

12   assertion of privilege.  This issue, I agree, they got the

13   documents.  Right.  When did you do the last dump of

14   privilege and a list of your privilege logs?  After

15   discovery closed, right?  Oh, yeah, but they still should

16   have raised the issue.  Well, they didn't, right?

17             But then we come to trial, and who do you put on

18   the witness stand?  Two lawyers whose names are peppered

19   throughout documents in this case, right?  And I'm pretty

20   sure the few I've looked at, most instances, they didn't

21   need to be on that document and they certainly weren't

22   giving legal opinions or receiving requests for legal

23   opinions.  So I don't think it is untimely, not under the

24   circumstances you created.

25             This Court is adjourned.

1          (Adjourned, 3:30 p.m.)

2

3

4                        CERTIFICATE

5

6      RE: *EPIC REFERENCE LABS, ET AL. v. CIGNA*, *ET AL.*

7      Case Nos. 3:19-cv-01326-JCH and 3:19-cv-01324-JCH

8

9          I, Cassie Zayas, RPR, Official Court Reporter

10   for the United States District Court, District of

11   Connecticut, do hereby certify that the foregoing 70 pages

12   are a true and accurate transcription of my stenographic

13   notes taken in the aforementioned matter to the best of my

14   skill and ability.

15

16                        _ /s/   CASSIE ZAYAS_____

17                        Official Court Reporter
                          United States District Court
18                        141 Church Street
                          New Haven, CT
19

20

21

22

23

24

25